# EXHIBIT 34 part 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN,** *et al.,* **individually, and on behalf of all others similarly situated,**

      **Plaintiffs,**

          **v.**

**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,**

      **Plaintiffs.**

**Case No. 1:11-CV-22408-MGC**

### PRIORITY CLAIMANTS' NOTICE OF FILING EXPERT DEPOSITION TRANSCRIPTS IN RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE, AND COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES

Priority Claimants, by and through undersigned counsel, hereby file the following expert depositions transcripts in support of their Response to Defendants' Motion and Memorandum for Summary Judgment (Dkt. No. 245) and Defendants' Statement of Material Facts Not In Dispute (Dkt. No. 250). The exhibits below will be cited in Priority Claimants' Reponses to docket numbers 245 and 250.

| Exhibit | Expert Deposition Transcript |
|---------|------------------------------|
| G1 | Deposition of Michael P. Elkin, Volume I & II |
| G2 | Deposition Transcript of Anthony M. Graziano, Volume I & II |

Dated: May 13, 2019.

          /s/ Patrick S. Montoya, Esq.
          Patrick Shanan Montoya
          Fla. Bar No. 0524441
          Email: Patrick@colson.com
          Colson Hicks Eidson
          255 Alhambra Circle, PH
          Coral Gables, FL 33134-2351
          Telephone: (305) 476-7400

Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by via CM/ECF on all parties authorized to receive service via CM/ECF, this 13th day of May 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT G1

Case 2:09-md-02047-EEF-MBN Document 22380-53 Filed 12/03/19 Page 6 of 221
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/15/2019 Page 2 of 388
CERTIFIED COPY

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
        ------------------------------:
 3    IN RE:  CHINESE-MANUFACTURED   : MDL NO. 2047
      DRYWALL PRODUCTS LIABILITY      :
 4    LITIGATION                      : SECTION:  L
                                      :
 5    THIS DOCUMENT APPLIES TO ALL   : JUDGE FALLON
      CASES                           :
 6                                    : MAG. JUDGE WILKINSON
                                      :
 7    ------------------------------:

 8
                              - - -
 9
                    Monday, March 11, 2019
10
                              - - -
11

12              ** CONFIDENTIAL **

13     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14                            - - -

15         Videotaped deposition of MICHAEL P. ELKIN,
       CPA, CFF, ABV, CFE, Volume 1, held at Colson
16     Hicks Eidson, 255 Alhambra Circle, Penthouse,
       Coral Gables, Florida, commencing at 10:05 a.m.,
17     on the above date, before Susan D. Wasilewski,
       Registered Professional Reporter, Certified
18     Realtime Reporter, Certified Realtime Captioner

19                            - - -

20            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
21                 deps@golkow.com

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 2

```
 1    APPEARANCES:

 2        BREIT DRESCHER IMPREVENTO
          BY:  JEFFREY BREIT, ESQUIRE
 3        600 22nd Street, Suite 402
          Virginia Beach, Virginia 23451
 4        Phone:  (757) 670-3888
          jeffrey@breitcantor.com
 5        Representing Plaintiffs

 6

 7        COLSON HICKS EIDSON
          BY:  NATALIE M. RICO, ESQUIRE
 8        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
 9        Phone:  (305) 476-7400
          natalie@colson.com
10        Representing Plaintiffs

11

12        MRACHEK FITZGERALD ROSE KONOPKA THOMAS & WEISS, P.A.
          BY:  GREGORY S. WEISS, ESQUIRE
13        505 South Flagler Drive, Suite 600
          West Palm Beach, Florida 33401
14        Phone:  (561) 655-2250
          gweiss@mrachek-law.com
15        Representing Plaintiffs

16

17        ABALLI MILNE KALIL
          BY:  CRAIG P. KALIL, ESQUIRE
18             MICHEL AYUB, ESQUIRE
          1 Southeast 3rd Avenue, Suite 2250
19        Miami, Florida 33131
          Phone:  (305) 373-6600
20        ckalil@aballi.com
          mayub@aballi.com
21        Representing Defendant Beijing New Building
          Materials PLC
22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 3

```
 1     APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  DIANA SZEGO FASSBENDER, ESQUIRE
 3        1152 15th Street, NW
          Washington, D.C. 20005-1706
 4        Phone:  (202) 339-8533
          dszego@orrick.com
 5        Representing Defendant Beijing New Building
          Materials PLC
 6

 7
          ALSTON & BIRD LLP
 8        BY:  SARAH O'DONOHUE, ESQUIRE
          1201 West Peachtree Street
 9        Atlanta, Georgia 30309-3424
          Phone:  (404) 881-7000
10        sarah.odonohue@alston.com
          Representing Defendant Taishan Gypsum Company
11

12
       ALSO PRESENT:
13

14        AURELIO ROMAN, Videographer

15        MARCIE D. BOUR, Yip Associates

16        ELAN STERNBERG, Kaufman Rossin

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 4

1                              - - -

2                         I N D E X

3                         Volume 1

4                   Monday, March 11, 2019

5                              - - -

6
    Testimony of:  MICHAEL P. ELKIN, CPA, CFF, ABV, CFE  Page
7
        DIRECT EXAMINATION BY MR. KALIL.................  7
8

9
                      E X H I B I T S
10
                   (Attached to transcript)
11
    MICHAEL ELKIN DEPOSITION EXHIBITS                   PAGE
12

    Exhibit 1    Notice of Videotaped Deposition of    10
13               Michael Elkin, CPA, CFF, ABV, CFE

14  Exhibit 2    Curriculum Vitae                       32
                 Michael P. Elkin, CPA/CFF/ABV, CFE
15
    Exhibit 3    Record of Expert Testimony for         40
16               Michael P. Elkin

17  Exhibit 4    Attachment A - Documents and Other     48
                 Information Considered - All
18               Claimants

19  Exhibit 5    General Binder                         13

20  Exhibit 6    Lost Equity Calculations for          30
                 Priority Claimants
21
    Exhibit 7    Binder - Elkin Expert Report -        62
22               Chinese Drywall Matter
                 February 19, 2019
23
    Exhibit 8    Exhibit 4 (Updated)                    65
24               Calculations of Damages for
                 Priority Claimants Steven & Cathy
25               Etter

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 5

1                      E X H I B I T S

2                 (Attached to transcript)

3    MICHAEL ELKIN DEPOSITION EXHIBITS              PAGE

4    Exhibit 9    Binder - CPK Email, Documents and   158
                  Other Information Considered -
5                 Updated(12), Report Exhibits -
                  Updated(12), Support Master
6                 Database - Updated(12)

7    Exhibit 10   Letter and September 18, 2012       175
                  Settlement Agreement and Release
8                 between Steven and Cathy Etter and
                  USAA
9
     Exhibit 11   November 26, 2004 Agreement between  180
10                Owner and Contractor

11   Exhibit 12   Special Warranty Deed               181

12   Exhibit 13   December 8, 2005 Mortgage - Etter   182

13   Exhibit 14   June 5, 2006 Modification and       184
                  Extension of Mortgage
14
     Exhibit 15   November 22, 2006 Mortgage          186
15                Modification and Consolidation
                  Agreement
16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1                    - - -

2        THE VIDEOGRAPHER:  Good morning.  We're now

3    on the video record.  My name is Aurelio Roman.

4    I'm the videographer for Golkow Litigation

5    Services.  Today's date is Monday, the 11th day

6    of March, 2019.  The time is 5 minutes after

7    10:00 a.m.

8        The video deposition is being held at Colson

9    Hicks & Eidson, 255 Alhambra Circle, Penthouse

10   Suite, Coral Gables, Florida 33134, in the matter

11   of Chinese Drywall, for the courts filed in the

12   US District Court, Eastern District of Louisiana.

13       The deponent is Michael Elkin.

14       Will all counsels please state your

15   appearance for the record.

16       MR. KALIL:  Craig Kalil on behalf of Beijing

17   New Building Materials, Public Limited Company.

18   With me is Michel Ayub from my office.  Also

19   present is Diana Fassbender of Orrick, Herrington

20   & Sutcliffe, and also present is Marcie Bour.

21       MR. BREIT:  Jeffrey Breit representing the

22   Plaintiffs in the Chinese drywall litigation,

23   together with a list of -- we'll let them -- oh,

24   am I the only one with a mic?

25       MR. WEISS:  There's mics all the way down.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1          MR. BREIT:  All right.

 2          MR. WEISS:  Yeah.

 3          MS. RICO:  Natalie Rico, also representing

 4     the Plaintiffs.

 5          MR. WEISS:  Greg Weiss on behalf of the

 6     Plaintiffs.

 7          MR. STERNBERG:  Elan Sternberg, assistant to

 8     Mike Elkin.

 9          MS. O'DONOHUE:  Sarah O'Donohue from Alston

10     & Bird on behalf of Taishan Gypsum Company.

11          THE VIDEOGRAPHER:  Madam Court Reporter,

12     swear in the witness.

13          THE COURT REPORTER:  Would you raise your

14     right hand?

15          Do you solemnly swear or affirm the

16     testimony you're about to give will be the truth,

17     the whole truth, and nothing but the truth?

18          THE WITNESS:  Yes, I do.

19          THE COURT REPORTER:  Thank you.

20          MICHAEL P. ELKIN, CPA, CFF, ABV, CFE, called as

21     a witness by Defendant Beijing New Building

22     Materials, having been duly sworn, testified as

23     follows:

24                    DIRECT EXAMINATION

25     BY MR. KALIL:
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 8

1    Q.   Will you state your full name, please?

2    A.   Michael Paul Elkin.

3    Q.   Mr. Elkin, you've been deposed before?

4    A.   Yes, I have.

5    Q.   On how many occasions?

6    A.   Roughly, 100.

7    Q.   So you are very familiar with the process?

8    A.   I believe so.

9    Q.   I'm going the ask you a number of questions

10   today.  If any of them are not clear, if you will

11   let me know, I will try to make them clear.

12   A.   Certainly.

13   Q.   And if you don't understand where I am going

14   with something, please tell me and I will try to

15   break it up into anything we need to.

16   A.   Thank you.  I appreciate that.

17   Q.   If you need a break at any time, will you

18   let me know?

19   A.   Of course.

20   Q.   Have you ever been deposed before in any

21   case that involves Chinese drywall or defective

22   drywall?

23   A.   No.

24   Q.   Have you ever testified in any case that

25   involves allegedly defective drywall or Chinese

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1   drywall?

 2       A.   No.

 3       Q.   Have you ever rendered any expert reports or

 4   opinions involving Chinese drywall or defective

 5   drywall?

 6       A.   No.

 7       Q.   What did you do to prepare for the

 8   deposition?

 9       A.   You mean specific to the deposition or

10   leading up from the beginning of the engagement?

11       Q.   Lets focus specific to the deposition?

12       A.   I reviewed my files.  I did a little bit of

13   extra jumping around into some documents so that my

14   memory would be a little fresher on some of the

15   issues and some of the plaintiffs.

16       Q.   Any particular plaintiffs?

17       A.   No.  I think I went through them all, at

18   least at some level.  Some of them are a little more

19   complicated than others, so I might have spent a

20   little bit more time on one or the other but I

21   believe I touched on all of them.

22       Q.   Did you speak with anybody other than the

23   plaintiff's attorneys in preparing for today?

24       A.   Again, with regard to preparing for the

25   deposition --
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1      Q.    -- yes.

2      A.    No, I did not.

3      Q.    I'm going to show you Exhibit 1 --

4      A.    Excuse me, other than other people in my

5    office.

6      Q.    That's a very good point.  Who in your

7    office have you talked to to prepare for today's

8    deposition?

9      A.    Probably Elan Sternberg.

10     Q.    Who is Elan Sternberg?

11     A.    Elan is a senior in my Forensic Advisory &

12   Valuation Services Group.

13     Q.    Anyone else?

14     A.    I don't believe so, specific to preparing

15   for this.

16     Q.    Okay.  All right.

17          (Elkin Exhibit 1 was marked for

18   identification.)

19   BY MR. KALIL:

20     Q.    I'm going to show you what we've marked as

21   Exhibit 1 to your deposition and it's a notice of

22   taking deposition.  I'll ask if you've seen that

23   before?

24     A.    Yes, I have.

25     Q.    Okay.  And did you review the request -- the

Page 11

1    requested documents in that notice on page 6?

2        A.    Yes, I did.

3        Q.    Okay.  And is there anything that you

4    brought with you today in response to that that has

5    not previously been produced?

6        A.    Yes.

7        Q.    What specifically have you brought today?

8        A.    For the most part, it's stuff that has been

9    produced but might not have had some of my notations

10   on it.  So I have a binder here that's got --

11   actually, I think this sticky one wasn't produced,

12   it's got a sticky, and it's got some of the

13   documents that were identified in my documents

14   considered, but I noted that they had some

15   highlighting and some tabs, which I considered for

16   this purpose to be sort of my notes, so I included

17   that.

18           I also brought with me the Exhibit .2, so

19   whatever Plaintiff .2, for each plaintiff that had a

20   lost equity segment, because I have a yellow sticky

21   within my notepad that had some notes on it, and it

22   also had a little bit of highlighting -- I mean

23   referencing on it, so I thought that you would want

24   that as well.

25       Q.    Okay.  I would like to take a look at those

Page 12

1    probably on a break rather than now, if we can.

2       A.    Okay.  Certainly.

3       Q.    If you can put those aside.   Anything else?

4             MR. KALIL:  Are those copies?

5             MS. RICO:  Uh-huh.

6             THE WITNESS:  And I'll keep one of these,

7       but these are copies of the other.

8    BY MR. KALIL:

9       Q.    I'm sorry.  These are?

10      A.    These are copies of the exhibits that I told

11   you that I also brought.

12            MR. BREIT:  We come prepared.

13            MR. KALIL:  You do.

14            MR. BREIT:  To save life and save time.

15            MR. KALIL:  Since we've got these in nice

16      little binders, why don't we mark them so we know

17      what they are and then we can go through them at

18      some point after I have had a chance to view them

19      on a break.

20            MR. BREIT:  Yeah, I figured we've got time

21      to do that but someone may want to look at it

22      while we're waiting.

23            MR. KALIL:  All right.

24   BY MR. KALIL:

25      Q.    Mr. Elkin, I'm going to mark what's labeled

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    the General Binder as Exhibit Number 5.

2        A.    I'm sorry, what number, 5?

3        Q.    5.

4              (Elkin Exhibit 5 was marked for

5    identification.)

6    BY MR. KALIL:

7        Q.    And can you tell me what's in that document,

8    just generally?

9        A.    It's a variety of information that I

10   received either from counsel or that I read online

11   or other sources to get with regards to a variety of

12   topics in there.  I think there is prejudgment

13   interest rates, and other information from online.

14   There is some information from the IRS.  I believe

15   that Judge Cooke's order is in there.  I believe

16   that some other relevant orders are in there as

17   well, or findings of fact.

18       Q.    Let me just take you through it generically

19   unless you have a list.

20       A.    Oh, wait.  I do have a copy -- I don't have

21   a copy.

22       Q.    Sure, under Tab Number 1, I see an order

23   from Judge Cooke, Docket Entry Number 112 of

24   November 16, 2018.

25       A.    That's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 14

 1      Q.   Tab Number 2 is an MDL Order Docket Entry

 2   2741 from April 21st, 2017?

 3      A.   That's correct.

 4      Q.   What is Tab Number 3?

 5      A.   Tab 3 is Findings of Fact and Conclusion of

 6   Law, the document that relates to the Germano

 7   matter.

 8      Q.   Okay.  Where did you get that?

 9      A.   I believe I downloaded that.

10      Q.   Okay.  When did you download that?

11      A.   Probably in the first or second week of

12   February, I would guess.

13      Q.   What is under Tab Number 4?

14      A.   Tab 4 was a table that was provided to me.

15   I had seen a table that looked a lot like this in

16   the discovery at some point and I asked about it and

17   it was sent to me.  I think it was given to me via

18   Dropbox by counsel.

19      Q.   Do you remember who?

20      A.   I believe it might have been -- I believe it

21   might have been Pete --

22      Q.   Pete Albanis?

23      A.   Thank you, of course, Pete Albanis, or his

24   office.

25      Q.   Okay.  All right.  Is that something you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 15

1    relied upon in forming your opinions?

2        A.   I don't know if I'd say I relied upon it.

3    It made it -- it just clarified some things and put

4    it in a tabular form.  I also had looked at the

5    Germano Findings of Fact and Conclusions of Law in

6    conjunction with this, and essentially with them it

7    gave me a better understanding of the types of

8    things that were included in various categories.

9        Q.   And what categories were you looking for

10   there?

11       A.   Well, I was trying to understand what was

12   considered to be remediation and perhaps the timing

13   of remediation versus personal property damage, and,

14   you know, I'm sure it educated me to other factors

15   in it, but I think that was the primary reason I was

16   looking at it.

17       Q.   Was that for purposes of segregating items

18   into categories of remediation or personal property

19   damage or otherwise?

20       A.   Probably primarily that and then also, just,

21   having a better understanding of all of this.

22       Q.   Did you set up any written protocols in your

23   office for segregating information into different

24   categories?

25       A.   I don't recall any written protocols.  I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 16

```
 1   recall having discussions with my staff to

 2   understand that.

 3         MR. BREIT:  Hold on one second.  Technical

 4   problem.

 5         MR. KALIL:  Am I speaking too softly?

 6         THE COURT REPORTER:  No-- a little bit.

 7   That will help.

 8         MR. BREIT:  It was all you.  I heard her

 9   going.

10         MR. KALIL:  It's always me.  Absolutely.

11         MR. BREIT:  Ready?

12         THE COURT REPORTER:  Yeah.

13   BY MR. KALIL:

14     Q.   Who in your -- while we're on the staff for

15   a second, who on your staff has assisted you in this

16   engagement?

17     A.   Primarily Elan Sternberg, who I mentioned

18   before, Michelle Reinhold, goes by Shelley, Austin

19   Paris, and then there may have been a variety of

20   other people that would have chipped in on a project

21   here or a project there.  I remember Rita Trabanco

22   handled one particular data entry project, Max

23   Halasz.

24     Q.   Can you spell that?

25     A.   H-a-l-a-s-z, and I'm sure if I went through
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 17

1    them, I'd find one or two other people, but I think

2    that's probably 90 percent or more of the work, and,

3    of course, myself.

4       Q.   Okay.  You told us a minute ago who -- well,

5    at least you started saying who these people are.

6    Can you tell me what each of these people was doing

7    involved with this engagement.  Let's start with

8    Elan Sternberg, if I'm saying the name right.

9       A.   Elan had a role pretty much in every aspect

10    of the matter from the standpoint of being with me

11    in most of the planning for it.  Elan was heavily

12    involved in the beginning and evaluating the

13    documentation that might be available to us as we

14    read through things.  He read early on some of the

15    depositions.  He was really leading the other group

16    that I discussed.  Sometimes they were directly with

17    me, often they were directly with him and often all

18    of them were together with me.

19          So he had roles in reviewing the information

20    organizing the information, directing the other

21    seniors or staff in their roles, and helping me to

22    bring all of it up to a final product.

23       Q.   And what is Elan's title?  I'm sorry if you

24    told me before, within the firm?

25       A.   I believe he's a senior, senior two

Case 2:09-md-02047-EEF-MBN Document 22380-53 Filed 12/02/19 Page 19 of
388
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 09/18/2013 Page 19 of
221

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    probably.

 2         Q.    How does that rank within the firm?  Can you

 3    give me the titles within your organization?

 4         A.    We have accounting clerks, we have

 5    administrative people, then we have accounting

 6    clerks, we have staff one, staff two, senior one,

 7    senior two, supervisor, manager, senior manager,

 8    associate principal, director, and principals, which

 9    are the equivalent of partners.

10         Q.    Okay.  And what -- your title is director?

11         A.    I'm a principal.

12         Q.    Principal.  Excuse me.  So Mr. Sternberg is

13    he the most senior person below you in this

14    engagement?

15         A.    In this particular engagement, yes.

16         Q.    Okay.  And then taking them in order from

17    senior to less senior, who is next?

18         A.    I believe Shelley, Michelle Reinhold is also

19    a senior; Austin Paris, I don't recall if he's a

20    staff two or a senior, maybe a staff two.

21              Rita Trabanco is a accounting clerk.

22              And Max Halasz is a senior.

23         Q.    And while we're on the staff, let's talk

24    billing rates for a second.  What are the billing

25    rates associated with these people, as best you
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   recall?  What is your billing rate on this

2   assignment?

3       A.   My billing rate is $575 per hour.  I don't

4   recall the billing rates of the other people, so I

5   would be guessing.

6       Q.   I don't want you to guess.  Are they all

7   within the rates set forth in your report, the range

8   that you've given us in your report?

9       A.   Yes.

10      Q.   Would they be proportional from most senior

11  to less senior, do the numbers follow?

12      A.   I believe so.

13      Q.   Good enough.  Now, what tasks did Michelle

14  Reinhold have in this engagement?

15      A.   Michelle had tasks, she would be

16  specifically assigned at one point to one or more of

17  the plaintiffs.  She and Austin and Elan each sort

18  of broke up the plaintiffs among that group so that

19  they would have similar roles in them.

20           I believe at the beginning, before I --

21  before I broke it up, Michelle and/or Austin were

22  gathering different types of information, so I think

23  right at the beginning Michelle was gathering more

24  of the -- I might have this backwards, but I think

25  she was gathering more of the information with

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 20

1    regard to the backup of damage claims, expenses,

2    receipts, and that type of stuff.

3         While I believe Austin was focused on

4    helping to gather information about the real estate,

5    the property itself.  Information was coming from a

6    number of different sources and Elan was involved

7    with both of those aspects.

8         And then once they were broken out into

9    different plaintiffs, they all -- each got involved

10   in both of those issues with regard to their

11   respective plaintiffs.  So it was lot of document

12   gathering at the beginning and organizing and then

13   in the analysis stage, it was broken up between, you

14   know, different plaintiffs.  I mean, I know that I

15   worked on every plaintiff, I know that Elan worked

16   on every plaintiff.  I don't think that Michelle or

17   Austin worked on every plaintiff.

18        Q.   When you say you worked on every plaintiff,

19   did you gather information on any of these

20   plaintiffs?

21        A.   I was involved in the gathering process.

22        Q.   And where was the information being gathered

23   from?

24        A.   We had a process where, initially, we had --

25   we were getting information as we requested it being

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 21

1    put on a Dropbox and we'd get a notice, there was

2    information for you on Dropbox and we would grab it

3    and pull it into our files.

4         At some point the information wasn't coming

5    in quite as fast as we needed it to and we were made

6    aware that there was a portal, BrownGreer I believe

7    is who administers that portal, and so we were given

8    access to that portal and when possible we pulled

9    information from there.

10        Some information was e-mailed to us from

11   time to time.  Probably more at the beginning than

12   towards the end, whether it was SPPFs, maybe some

13   interrogatories and those types of things at the

14   beginning, but the majority of the information we

15   got came from the Dropbox or from the portal itself

16   directly.

17   **Q.   And who was putting information in the**

18   **Dropbox, as you understand it?**

19        A.   I believe the attorneys and/or their

20   paralegals.

21   **Q.   Okay.  Were you tracking, in any way, the**

22   **sources of this information, in terms of who**

23   **provided it to you?**

24        A.   We were tracking it in terms of when we

25   received it.  We were tracking it in terms of how it

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 22

1    came in, whether through an e-mail or Dropbox.  I

2    don't believe we were tracking who had loaded it

3    into the Dropbox and I don't know that we would have

4    any way of knowing who had loaded it into portal.

5        Q.   And when you say you were tracking it in

6    terms of when you received it, where is that

7    reflected in any of your work papers or otherwise?

8        A.   It should be in the documents that you

9    received.  I don't recall if it included the

10   tracking document, but the main way that that was

11   tracked is there is a folder called raw discovery,

12   and inside that folder there are a bunch of other

13   folders so that every day that we downloaded

14   something, if it was from the portal on that day,

15   then it would say that day's portal and a date.

16        There was -- and I don't believe -- in fact,

17   I'm certain that I had not provided to you the raw

18   discovery.

19        Q.   I was just going to say I don't believe I've

20   seen it.

21        A.   Because you've seen all of those same

22   documents in the organized fashion that we gave them

23   to you through the HTML in the basket of documents.

24        Q.   Is that something that is electronic, the

25   raw discovery?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.   Yes.

2    Q.   I would like a copy, if you could provide

3  that to us.

4       Are there any other documents or database,

5  document sources or databases that have not been

6  provided to us?

7    A.   I don't believe so and it's possible that

8  you were provided the tracking that I was talking

9  about.

10    Q.   What type of a document would it be?

11    A.   Excel.

12    Q.   I don't believe I've seen it, Mr. Elkin, I

13  stand to be corrected but we can check on a break.

14  We were going through -- I'm sorry, we got a little

15  sideways.  We were going through Exhibit 5.  We

16  haven't quite finished.

17       We talked about most of the people who

18  assisted you.  Did we leave anything out in terms of

19  Rita -- I'm sorry, Trabanco?

20    A.   Uh-huh.

21    Q.   You said Rita Trabanco had one data entry

22  project, what was that data entry project?

23    A.   She had a data entry project which, I

24  believe, related to Claimant 17.

25    Q.   Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 24

1    A.   She, under my direction, keypunched or

2  entered the data from a number of documents from the

3  company that did their design and update work.  I'm

4  trying to remember the name of the company.  It's

5  not coming to me.

6    Q.   **This is Michael and Robyn --**

7    A.   That's correct.

8    Q.   **Michael and Robyn Rosen?**

9    A.   That's correct.  And she helped to put the

10  data in from those various documents that were

11  probably maybe about 100 or less pages, and then

12  each of those pages had multiple -- some of them had

13  one item and some of them had multiple items and I

14  had instructed her on the information that I wanted

15  her to take from those documents and put onto an

16  Excel schedule.  The primary focus was breaking them

17  down between capital improvements and personal

18  property.

19    Q.   **Okay.**

20    A.   I explained to her my criteria for doing

21  that.  She did a very good job of doing that.  I

22  went back and reviewed it and tweaked a couple of

23  things on it.  She also put in some numbers from the

24  proposals and the invoices that -- so that she could

25  calculate the tax, because the items were on the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 25

```
 1   list pre sales tax, but I wanted to include the

 2   sales tax into the numbers.

 3          So I instructed her on how to do that and

 4   then I thoroughly reviewed that information.

 5      Q.   Were these instructions in writing?

 6      A.   No.

 7      Q.   Were they electronic?

 8      A.   No.

 9      Q.   Just verbal?

10      A.   She came into my office, I brought it onto a

11   screen and I showed her exactly what I wanted, I

12   believe Elan was with me at the time and instructed

13   her and if she had any questions, told her to go to

14   Elan or to me.

15      Q.   And Max, I'm going to get --

16      A.   Halasz.

17      Q.   Halasz, what did Max do?

18      A.   I don't recall specifically.  He may have

19   done some work on one of the plaintiffs or he may

20   have just been asked to review some things.  He

21   wasn't a primary player on the team but he had some

22   availability and we had some work that we needed

23   somebody to help us with it.

24      Q.   Okay.  When were you first consulted on this

25   matter?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 26

```
 1      A.   By consulted, you mean the first time I
 2   heard about it.
 3      Q.   First you heard about it?
 4      A.   It would have been sometime in the middle or
 5   end of December 2018.
 6      Q.   And how did you hear about it?
 7      A.   I believe I received a phone call.
 8      Q.   And who was that from?
 9      A.   I believe it was from Natalie Rico.
10   Actually, I'm not sure if it was Natalie or Patrick
11   Montoya.  It was somebody from the Colson Hicks
12   office and I don't recall who it was, the initial
13   call, might have even been a phone message or an
14   e-mail.
15      Q.   Did you make any notes from that call?
16      A.   I made notes from the first call in which I
17   actually had a conversation with Natalie and that's
18   why I was thinking of that one.  I don't remember if
19   prior to that I had a call or not.  If I did, I
20   don't have notes from it.
21      Q.   Did you learn anything in that call that
22   helped you in coming up with your report?
23      A.   I don't think so. I mean, I think I would
24   have learned a couple of dates that things were
25   happening and I would have been given names so that
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    I could run a conflict check and, I think, we

2    probably wouldn't have talked about much because I

3    hadn't run a conflict check.

4    **Q.   Let me shift back for a second, Mr. Elkin,**

5    **just to Exhibit 5.  I apologize for going back and**

6    **forth.**

7    A.   Sure.

8    **Q.   What is under Tab Number 6?**

9    A.   Tab Number 6 is a schedule that was provided

10   to me, I believe in Excel via Dropbox.  It was

11   identification by counsel of which claimants they

12   were alleging had partial or no remediation, versus

13   those claimants that they were claiming had complete

14   remediation.

15   **Q.   And were you asked to make any determination**

16   **as to whether anyone had had -- had actually had**

17   **partial or full remediation?**

18   A.   No, I was not.

19   **Q.   And you didn't do anything in that effect in**

20   **the course of your engagement?**

21   A.   That's correct.

22   **Q.   Did it matter for purposes of your**

23   **engagement, whether somebody had had partial**

24   **remediation, full remediation or no remediation?**

25   A.   I don't think so.  I mean I calculated the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 28

1   amounts based on the documentation and things that I

2   had, so I don't recall it having a role.

3       Q.    Okay.  What is under Tab 7 of Exhibit 5?

4       A.    Tab 7 is a download from the Florida --

5   MyFloridaCFO.com, which is the State's website and

6   the information that they provide with regard to

7   judgment interest and prejudgment interest.  It's

8   got two different sections in it.  It's got the most

9   current rates in the first section and it's got the

10  historical judgment interest rates in the second

11  section.  They are from slightly different parts of

12  the website.

13      Q.    Is that the source for the interest rates

14  applied in your calculation of prejudgment interest?

15      A.    Yes.

16      Q.    What is Tab Number 8, please, Mr. Elkin?

17      A.    Tab Number 8 is a variety of information

18  relating to casualty loss deductions and the

19  recovery and taxes on the amounts received after, if

20  somebody does take a casualty loss deduction.  It's

21  from a variety of IRS revenue procedures, rulings,

22  bulletins, publications, and I also, I don't know

23  why, but I stuck a tax form in there for the

24  casualty loss.

25      Q.    Do you have an understanding, sitting here

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 29

1   today, as to whether there were tax relief provided

2   to the Priority Claimants in connection with

3   defective drywall or Chinese drywall?

4      A.   I understand that some of the claimants may

5   have received -- taken a deduction for casualty loss

6   and, therefore, gotten a deduction which would have

7   given them a reduction of tax in the year in which

8   they had remediation expenses, also understanding,

9   of course, that anything that they received to

10  recover on that will then be taxable too.

11     Q.   But you didn't work up any spreadsheets in

12  your analysis that describes these Priority

13  Claimants?

14     A.   No.

15     Q.   Why not?

16     A.   I don't believe it's relevant.

17     Q.   You didn't calculate anywhere in your

18  reports which of the Priority Claimants received tax

19  relief?

20     A.   No, I did not.

21     Q.   Did you calculate in your report which of

22  the Priority Claimants might have paid any money as

23  a result of receiving payments?

24     A.   No, I did not.

25     Q.   Okay.  What is under Tab Number 9?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 30

1    A.   I think this is -- at the beginning, when we

2    got access to the docket -- excuse me, the portal.

3    Q.   **This is the BrownGreer?**

4    A.   Yeah, the BrownGreer.  I think Elan might

5    have printed this up to show it to me, or maybe I

6    printed it up at the time, I don't recall, but this

7    is just an example.  I guess this is for claimant

8    Foster, and it's just an example.  I don't know, did

9    the word example come out on your copy?

10   Q.   **It does appear to be written in yellow on**

11   **the front page.**

12   A.   It does, right?  Okay.  Yeah.

13   Q.   **Did you consider this page in any way in**

14   **preparing your report?**

15   A.   Not this page itself.

16   Q.   **Information of this nature?**

17   A.   Information of this nature from this portal.

18   I'm frankly not sure exactly why I have this in here

19   but I do.

20   Q.   **Okay.  All right.**

21        **Mr. Elkin, just so we can get these**

22   **documents identified, I'm going to mark as**

23   **Exhibit 6, one of the additional documents you**

24   **provided to me.**

25        (Elkin Exhibit 6 was marked for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    identification.)

2    BY MR. KALIL:

3        Q.    I'm not going to go through that in detail

4    now, I'm going to look at it on a break and ask you

5    a question, but if you could just tell me generally

6    what that is.

7        A.    This is a printout of each of the exhibits

8    for claimants that have a total lost equity

9    calculation.   In my binder that I brought with me

10   today, in the course of my review I was making notes

11   on a yellow sticky, and I was also making in some

12   cases either notations or references to the

13   documents to make them easier to find for me, and

14   recognizing that I was in -- putting notes on some

15   things that were in this binder, that was really

16   just primarily my report, I printed them up.   I

17   scanned them and printed them up so that you would

18   have copies of these notes rather than having to dig

19   through my binder for them.

20       Q.    You used the term total lost equity

21   calculation.   What do you mean by total lost equity?

22       A.    It's lost equity and it's just from a couple

23   of different components, so the word total is

24   getting on it, but lost equity, itself, is a term I

25   described in my report.   Would you mind if I go to

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    my report to see --

 2        Q.   I don't mind if you go to your report but I

 3    just want to know if that was specific to -- was

 4    there any difference between the lost equity

 5    calculations you did for any of the claimants and

 6    the ones that are here, or is this every claimant

 7    where you did a lost equity calculation?

 8        A.   I apologize, I don't --

 9        Q.   I was trying to understand if you were

10    referring to the word "total lost equity" as

11    something different.   Your title of this, on Exhibit

12    1, on the first page says:  1.2 lost equity Janet

13    Avery.

14             I didn't know if the word "total" meant

15    something segregated some of these from others.

16    That was all I was trying to get at.

17        A.   It does not mean anything separate.

18        Q.   That's all I was trying to --

19             Let me see if there is anything else.

20        A.   Here is your exhibit back.

21        Q.   Thank you.  We'll go back to where I wanted

22    to start.

23             (Elkin Exhibit 2 was marked for

24    identification.)

25    BY MR. KALIL:
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Mr. Elkin, I'm going to give you a copy of

2  what's been marked as Exhibit 2 and ask if you

3  recognize that.

4    A.   I do.

5    Q.   What is that, sir?

6    A.   This is my curriculum vitae.

7    Q.   Is that current as of today?

8    A.   It is.  I know that in the last couple of

9  days they've -- the marketing department is trying

10  to change the format of it.  They don't like the way

11  it looks but I believe all the same information is

12  there.

13    Q.   All right.  Is anything new that's not on

14  here?

15    A.   No.

16    Q.   All right.  You're a certified public

17  accountant, correct?

18    A.   That's correct.

19    Q.   Okay.  Are you expressing any opinions in

20  this case as a certified public accountant?

21        MR. BREIT:  Before you answer that question,

22    all of his opinions, obviously, relate to his

23    background and CV as a certified public

24    accountant.  I'm not sure I understand what

25    you're asking when you say are you giving

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 34

```
1      certified public accountant opinions.  They all

2      include his background and knowledge in order to

3      make those opinions and I'm not sure that it's

4      possible to delineate which ones are and which

5      ones aren't.

6           MR. KALIL:  I note your objection.

7   BY MR. KALIL:

8      Q.    Did you understand my question?

9      A.    I'm not certain.  Maybe you could read it

10  back.

11     Q.    Let me see if I can ask it differently.

12           Did you do any work in connection with your

13  engagement, that required you to apply your specific

14  skills as a certified public accountant and governed

15  by the standards appropriate for certified public

16  accountants?

17     A.    Yes.

18     Q.    What specifically did you do that required

19  that set of skills?

20     A.    Well, more importantly, you had multiple

21  things in that question and you talked to me about

22  standards and when I perform my work as a CPA, I

23  will always apply the, and be, within the standards.

24           With regard to whether or not I used my

25  skills or my training or my certification, there are
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 35

1  a number of issues, for instance, the tax issues,

2  that call on perhaps some specific training, but

3  moreover, the skills that I've developed over some

4  30 years, it's difficult to distinguish whether

5  those are skills that fall under the CPA bracket,

6  the CFF bracket, the AVB bracket, the CFE bracket or

7  anything that doesn't have a certification but are

8  part of the basket of skills that I bring to the

9  table.

10      I do believe that as a CPA and my experience

11  as a CPA, having performed public accounting

12  services over the course of my career, that there

13  are certain -- certainly skill sets and levels of

14  knowledge that I accumulated that were helpful here.

15  Q.   Okay.  Did you set forth any written

16  guidelines for your staff in terms of what they were

17  to do or based on your skills as a CPA, did you say

18  we must follow this standard?

19  A.   Nothing written.

20  Q.   Okay.  You mentioned the tax issues in your

21  response.  Am I correct that you said you did not do

22  any analysis of the tax impacts on the Priority

23  Claimants here?

24  A.   I didn't do any specific analysis or

25  calculations.  I was cognizant of the issue and I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 36

```
 1    determined that it was not relevant to my

 2    calculations.

 3        Q.    So you didn't use that skill set here?

 4        A.    Well, I used the skill set of understanding

 5    the tax law and the requirements and the impact on

 6    individual taxpayers, but I didn't use that skill

 7    set to make tax calculations.

 8        Q.    Fair enough.  Okay.  Financial forensics,

 9    what do you understand that to be in context of what

10    you've done here today?

11        A.    Most of it.  Financial forensics is a rather

12    broad category.  Technically, I suppose it means

13    anything that we do in our arena that relates to

14    matters that involve litigation or the court system.

15    It has, over the years, also taken on a broader -- a

16    broader spectrum so that a lot of the work that we

17    do that we call forensic accounting sometimes has

18    nothing to do with the court system, or at least not

19    yet.  It involves investigative accounting, fraud

20    tracing, and even some cases -- different types of

21    fraud prevention, which do not necessarily include

22    the court systems.

23        Q.    Did you do any fraud analysis here?  Are you

24    looking for any fraudulent materials?

25        A.    That wasn't the scope of what I was looking
```

Case 2:09-md-02047-EEF-MBN Document 22380-53 Filed 12/02/19 Page 42 of 221

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 37

1    for.

2        Q.    So that's beyond the scope of what you did?

3    You didn't do any fraud analysis here?

4        A.    No.

5        Q.    I take it you are not -- it's not listed

6    here.  You are not a real estate appraiser?

7        A.    No, I'm not.

8        Q.    You wouldn't hold yourself out as giving any

9    opinions on values of real estate?

10       A.    I would not.

11       Q.    You're not a personal property appraiser?

12       A.    I am not.

13       Q.    You wouldn't hold yourself out as giving

14   opinions on personal property?

15       A.    I would not.

16       Q.    What portion of your work, the last two or

17   three years, has been associated with litigation-

18   related assignments?

19       A.    It's really hard to determine.  More than

20   half of my time has nothing to do with any of that.

21   I run a department of 40 forensic accountants and

22   staff, and also I'm a liaison with the firm

23   management with regard to that, including a business

24   valuation department that very little of their

25   specific work is litigation-related.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 38

1            Then some of the, what I call, client fixing

2    work, which is actually working with cases or

3    individuals, some of it involves other than

4    litigation, so if I were to ballpark it, I would say

5    something less than 50 percent.

6        Q.   **Less than?  I'm sorry?**

7        A.   Less than 50 percent and I would be

8    comfortable saying probably more than 25 percent,

9    and then depending on the day, the week, the month,

10   and the year, some weeks that's all I do and some

11   weeks I don't do any of it.

12       Q.   **If we left out management issues, running**

13   **the firm and simply into work that you are doing**

14   **either client work or litigation work, how would you**

15   **break out the distinction?**

16       A.   More than half my time is on those other

17   things, so a little less than double, the 25 to 50.

18   It certainly wouldn't be 100 percent, so probably

19   the 50 wasn't a good estimate either.

20       Q.   **Would you agree that a greater proportion of**

21   **your nonmanagement time is spent on matters relating**

22   **to litigation than otherwise?**

23       A.   Yes.

24       Q.   **Has that been consistent for the last**

25   **several years?**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1      A.    Yes, if you include in there receiverships,

2    because I have had very demanding, time demanding,

3    receiverships where it may have taken 100 percent of

4    my time for half a year, but I think, typically,

5    receivership is related to some type of litigation

6    and it was in these circumstances I'm thinking of.

7      **Q.    What type of receiverships have you been**

8    **involved with?**

9      A.    The most recent was a receivership where I

10    took over the management and operations and sale and

11    winding down of maybe 30 to 40 -- 25 to 35 shopping

12    centers across the -- mostly the southeast, but

13    across the United States as far out as Arizona.

14      **Q.    Okay.**

15      A.    Other roles have been more as assistant to

16    receivers, but the most current one would have been

17    that.  I've been a special magistrate, which isn't

18    quite being a receiver, in a matter that involved a

19    dispute between partners in a construction

20    contracting business.  So receiver in a very small

21    check cashing/money order/cafe business, very

22    briefly for a bar.  I actually don't remember if I

23    was the named receiver or working for counsel.

24          A lot of different types of small

25    businesses, nothing major lately.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 40

1     Q.   Did the receivership of the shopping centers

2  in any way involve any aspects of defective drywall

3  or Chinese drywall?

4     A.   No, at least not that I'm aware of.

5     Q.   Okay.  The construction business, did

6  anything come up in that matter that involved

7  defective drywall or Chinese drywall?

8     A.   No.

9     Q.   In any receivership issues have you had any

10  dealings with defective drywall or Chinese drywall?

11     A.   Not that I'm aware of.

12     Q.   You're not a general contractor?

13     A.   No, I'm not.

14     Q.   Okay.  You wouldn't hold yourself out as an

15  expert on construction, I take it?

16     A.   On the technical sides of construction, no,

17  definitely not.

18     Q.   All right.  You've also provided us a copy

19  of your expert testimony.  Let me give you that.

20        (Elkin Exhibit 3 was marked for

21  identification.)

22  BY MR. KALIL:

23     Q.   Mr. Elkin, this is Exhibit 3.  I'll ask you

24  if you recognize Exhibit 3?

25     A.   I do.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 41

1    Q.   Is that an accurate list of your expert

2    testimony between February 2014 and February 2019,

3    as listed on top?

4    A.   I believe it is.  It's certainly intended to

5    be.

6    Q.   Okay.  Let me start with the first question.

7    Do any of these matters involve any allegations of

8    defective drywall or Chinese drywall?

9    A.   No.

10    Q.   Okay.  Do any of these involve valuations or

11    issues involving lost personal property?

12    A.   Possibly.

13    Q.   Let's go through them.  The first one --

14    A.   I can take you to the possibly and zero in

15    on the one that made me say possibly.

16    Q.   Why don't we do that?

17    A.   That may be more efficient.

18    Q.   Which one is that?

19    A.   This is the very last entry.

20    Q.   The Epic Hotels matter?

21    A.   Yes, I simply don't remember if any of the

22    damages in there involved personal property, I

23    believe they may have.

24    Q.   What was the essence of that case, Epic

25    Hotels versus DP Properties?  So is lost profits and

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 42

1    other damages due to business interruption, what was

2    going on?

3        A.    That was in connection with a impact to the

4    hotel in connection with Legionnaires' disease and

5    there were a variety of types of damages that were

6    categorized and calculated and I don't remember

7    certainly, but I'm pretty sure there would have been

8    some elements of personal property in that claim.

9        Q.    Did you do a calculation of personal

10   property, to your understanding?

11       A.    I don't recall.

12       Q.    Do you have your deposition from that case?

13       A.    Probably not.

14       Q.    Okay.  Would you check and if you do, would

15   you provide a copy to us?

16       A.    I will have to consult with counsel on that

17   case because if I remember correctly, this matter

18   settled and as often happens when a matter settles

19   or even when it doesn't settle, there is various

20   confidential elements of it, so I don't know that I

21   would be at liberty to do that.

22       Q.    I'm sorry, I didn't mean to speak over you.

23       A.    So if I am to do that, I will check with

24   counsel and then we'll go from there.

25       Q.    Did you prepare a report in that case?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 43

1    A.    Probably.

2    Q.    And same request, if you would provide a

3  copy to us if you can, okay?

4    A.    Okay.

5        MR. BREIT:  With the same proviso that

6    whether counsel thinks it's confidential to

7    whether or not he has it in the first place.

8  BY MR. Kalil:

9    Q.    I assume you keep your reports in the

10  computer system?

11   A.    Not always.  In fact, very often when there

12  has been a confidentiality order they also request

13  us to get rid of documents or those requests comes

14  at the end so it is possible that we do not.

15   Q.    You will check and let us know either way?

16   A.    I will check with counsel and follow their

17  directions.

18   Q.    You're confident, Mr. Elkin, that none of

19  the other matters listed on this sheet of testimony

20  have anything to do with claims for drywall or

21  damage to property as a result of allegedly

22  defective drywall?

23   A.    Yes.

24   Q.    Okay.  Just to touch on a few, the very

25  first one, Florida Beach Investments, what was the

Page 44

1  nature of the claims for damages in that case?

2      A.   There were investors -- well, an investor

3  and some junior lenders that were making claims to

4  be repaid or paid amounts that they believed were

5  owed to them.

6      Q.   So it was a pure economic claim for

7  investments?

8      A.   Pure economic claim for investments?  There

9  was nothing pure about it, so no.  It was a

10 complicated claim for a variety of things that

11 included not just the amounts but the activities of

12 the company and the accountings of the company.

13     Q.   And did you prepare a report in that case?

14     A.   Yes.

15     Q.   Okay.  Do you still have that report?

16     A.   Probably.

17     Q.   I'd like to ask you for a copy of that, too,

18 just to see if it has anything, maybe, bearing on

19 this?

20     A.   Once again, I will need to check with

21 counsel to see if I will be able to do that.

22     Q.   Understood.

23          MR. BREIT:  As well as reviewed by us with

24     regard to relevance and the appropriateness in

25     this case.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 45

1        MR. KALIL: Understood. Understood.

2  BY MR. KALIL:

3    Q.   Okay.  The Williams Island case, what was

4  the nature of the dispute there, as you recall?

5    A.   This particular element involved the

6  developers of Prive, which is a two-tower

7  development in the Aventura area and the developers

8  and their related parties were making claims against

9  Williams Island Property Owners Association, where

10  they believed that the actions of Williams Island

11  Property Owners Association caused them damages in

12  the development and sale of their property.

13    Q.   Was this an access issue, access to the

14  properties?

15    A.   There were issues of access in this case.  I

16  don't think that the specific claims relating to

17  Williams Island Property Owners Association, were

18  primarily centered around access.

19    Q.   Okay.  Did any of these claims or any of

20  these -- excuse me, matters involve damage to

21  personal property and valuations of that property?

22    A.   Only the Epic Hotel matter that we

23  discussed.

24    Q.   Okay.  Mr. Elkin, you were first engaged in

25  this matter on what date?

Page 46

```
 1       A.   I don't recall the exact date.  It would
 2  have been at the beginning of sometime in January.
 3       Q.   Okay.
 4       A.   Or sometime at the beginning of January.
 5       Q.   Early January?
 6       A.   Yes.
 7       Q.   Okay.
 8       A.   First or second week.
 9       Q.   And were you given a time frame in which
10  your work had to be performed?
11       A.   We had discussed a time frame.  I don't
12  recall what it was but yes.
13       Q.   Did you understand that there were deadlines
14  being met under Judge Cooke's order?
15       A.   Yes.
16       Q.   And what process did you undertake,
17  initially, in terms of getting information?  I think
18  you told me a little bit about it but what was
19  brought to you and what did you actually go looking
20  for?
21       A.   Well, initially very little was brought to
22  us.  We became aware through conversation that there
23  were three or four relevant documents that had been
24  filed related to each plaintiff, and so the first
25  step was us trying to gather for each claimant their
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 47

```
 1    answers to interrogatories, their answers to second

 2    interrogatories, and any amended answers there might

 3    be, and their -- I remember the initials but the

 4    property profile -- I don't remember the first P,

 5    but the SPPF.

 6        Q.    Supplemental plaintiff profile form?

 7        A.    Plaintiff was the word I was looking so

 8    there was a plaintiff profile form and then there

 9    was a supplemental plaintiff profile form, and I

10    believe we got many of them at the beginning and

11    then continued to seek out -- seek those out, and

12    then reviewed them to understand the nature of the

13    claims and to start asking for information that

14    might be available that had been produced in the

15    case or was available.  Ultimately, we learned that

16    a lot of it was available on the portal, but the

17    counsels for respective claimants were operative in

18    putting things into a Dropbox, some of which may

19    have come from the portal or may have originated

20    from the portal.  They may have been subsequently

21    marked as an exhibit to a deposition or an affidavit

22    or produced as a Bates-stamped document, and we

23    found a lot of them that were -- or some of them

24    that were probably all three of the above, and then

25    in addition to that, we sought out the deposition
```

CONFIDENTIAL – MICHAEL P. ELKIN, CPA

Page 48

1   transcripts and deposition exhibits from the

2   depositions of each of the claimants.

3           It remained a rather fluid process of

4   getting documents as we could and recognizing when

5   we needed, there were certain documents, we sought

6   counsel's assistance whenever possible, if they were

7   aware of particular documents that were related to a

8   particular issue and they were cooperative in

9   helping us to identify that.

10          (Elkin Exhibit 4 was marked for

11   identification.)

12   BY MR. KALIL:

13     Q.   I'm going to show you what we've marked as

14   Exhibit 4 to your deposition and ask if you

15   recognize that document?

16          MR. BREIT:  What number is this?

17          MR. KALIL:  Exhibit 4.

18          THE WITNESS:  I do.

19   BY MR. KALIL:

20     Q.   And what is that, sir?

21     A.   This is Attachment A to my report.  It's a

22   listing of the documents and other information

23   considered for all of the different claimants.

24     Q.   Okay.  And it's in sections, starting with

25   Section A titled Pleadings and Other Legal

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Documents; is that correct?

2        A.    That's the first section, that's correct.

3        Q.    Are those all documents you would have

4    either received from counsel or from the portal?

5        A.    And when you say from counsel that is could

6    be either through an e-mail from counsel or them

7    making it available in the Dropbox?

8        Q.    Yes.

9        A.    I don't recall if the very first item, which

10   is Judge Cooke's order, if I received that from

11   counsel or if possibly we pulled that down from the

12   docket.

13       Q.    Okay.

14       A.    Which we sometimes do; so I'm just not

15   certain, but I think everything else on that list

16   would have come from counsel.

17       Q.    And did you personally review each of those

18   documents thoroughly in Section A?

19       A.    By the time this was over, I would say I've

20   reviewed at least parts of every document on that

21   list.  If something was an amendment to something, I

22   might not have read the original one.  I might have

23   only read the amendment, but for the most part, I

24   think that I looked at all of these.

25       Q.    Did you make notes on all of these?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 50

1    A.    No.

2    Q.    Did you make notes on any of them?

3    A.    No.

4    Q.    Okay.

5    A.    Not that I recall.  It's possible that I

6    might have put a check on something as I was going

7    through, maybe done -- put a little yellow sticky to

8    ask somebody a question.  I do a lot of yellow

9    stickies, but no real material notes that I can

10   think of.

11   Q.    Okay.  I neglected to ask you so let me go

12   back for a second.  Has anyone -- have you consulted

13   with anyone in your firm that who has had any prior

14   experience with defective drywall or Chinese drywall

15   that assisted you in preparing your report?

16   A.    What do you mean by experience with it?

17   Q.    Did you consult with anyone in your firm who

18   has previously dealt with issues involving Chinese

19   drywall or defective drywall that aided you in

20   preparing your report?

21   A.    I think I talked with somebody in my tax

22   department specific to treatment that they had

23   because they had a client that had made a -- had a

24   casualty loss deduction at some point in the past.

25   Q.    Okay.  And who would that have been, do you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    remember?

2       A.    It would have been one of three people.

3    Actually, the first one I talked to directed me to

4    either Evan Morgan or most likely -- no, it was not

5    Evan, it would have been -- I believe his name was

6    Eric Christianson.

7       Q.    Okay.  Anybody else in the firm that you

8    talked to, that gave you any information that you

9    used in formulating your opinions in your report?

10      A.    No.

11            MR. BREIT:  Before you -- you've already

12      answered it but for purposes of the question, the

13      question that preceded this question, I object to

14      the form.  The question that preceded it had to

15      deal with consulting.  This new question is a

16      different question in a different subject and I

17      want to make sure that you intended that and the

18      witness understood that.  Consulting and talking

19      and conducing for purposes of this formulation

20      are all different and I wanted to make sure that

21      the form of that was understood by you

22      particularly, and Counsel when that was his

23      intent.

24    BY MR. KALIL:

25      Q.    Well, let me ask it in a slightly different

Page 52

1   way.  Has anyone in your firm provided you any

2   information that was used in formulating your

3   opinions here, other than the people you've

4   talked -- you've described the system and the

5   project?

6       A.   Yes, and I just realized I left out a

7   significant player when I was listing people before.

8       Q.   Who was that?

9       A.   Cara Sharp.

10      Q.   Who is Cara Sharp?

11      A.   Cara Sharp is one of my partners in our

12  forensic group, our FABS group.

13      Q.   What did Cara -- what information did Cara

14  provide you that assisted you?

15      A.   Cara assisted me with the lost equity

16  calculations.

17      Q.   Okay.  To your knowledge had Cara had any

18  prior experience dealing with Chinese drywall or

19  defective drywall?

20      A.   I don't think so.  In fact, I know she did

21  not.

22      Q.   Has your firm represented any of the

23  priority plaintiffs in this case?

24      A.   Not that I'm aware of.

25      Q.   Have you had any clients, other than the one

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 53

1   you mentioned the person in the tax department was

2   dealing with, that had any interaction with Chinese

3   drywall?

4       A.   I don't know.

5       Q.   You're not aware of any others?

6       A.   Just that one.

7       Q.   The second set of documents in Exhibit 4 is

8   depositions and corresponding exhibits.  Where did

9   you get these from, sir?

10      A.   These would have come from counsel either

11  through e-mail or Dropbox.

12      Q.   And have you personally reviewed each and

13  every one of those?

14      A.   I'm sorry, have I personally reviewed each

15  of --

16      Q.   Each and every one of those depositions and

17  exhibits?

18      A.   Those being the transcripts and exhibits?

19      Q.   Yes.

20      A.   I have personally viewed parts of, if not

21  all of, the deposition transcripts.  I've reviewed

22  notes from review of them, and I have reviewed many

23  of the exhibits but, certain of the exhibits that I

24  didn't think were relevant, I just did not, so, for

25  instance, on the first page of that it says, floor

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    plan.  Maybe I clicked it and opened it, but not --

2    probably not intentionally.  So there are certain of

3    these that I would not have looked at because I

4    didn't believe they were relevant.

5        Q.    You said you reviewed parts of the

6    deposition transcripts.  Who prepared the excerpts

7    from the deposition transcripts for you?

8        A.    The excerpts were prepared by Elan

9    Sternberg.  There may have been one or two that

10   actually were prepared by me.  I don't recall.

11       Q.    Okay.  Would there be any way to tell?

12       A.    Actually, I can tell you I didn't because

13   then I would remember printing them, so those would

14   have been all Elan, I think.

15       Q.    Did you rely on Elan's selection in -- just

16   in helping you to decide what to review in the

17   deposition transcripts?

18       A.    We had a lot of discussion.  I didn't rely

19   entirely on it, but one of the good things that --

20   what he did help me with was to identify where in a

21   deposition a topic might be so if I was interested

22   in that topic I could read it more myself.  I mean,

23   I did open each of the depositions for one reason or

24   another.  I didn't rely solely on the deposition

25   summaries.

Page 55

1    Q.   Okay.  You stated, for instance, the floor

2    plan was not something you looked at?

3    A.   I don't think so.

4    Q.   For purposes of your report, you therefore

5    didn't consider it relevant to the layout of the

6    houses at issue?

7    A.   No.

8    Q.   I note that some of these have got Bates

9    stamps and some of them don't.  Is there any reason

10   for that that you're aware of?

11   A.   Some of the --

12   Q.   Some of the documents on this list,

13   Exhibit B, Bates stamps.  Did you make any effort to

14   understand why some were so numbered and some

15   weren't?

16   A.   The reason I have that is because some of

17   the documents did have Bates stamps and others did

18   not.

19   Q.   Okay.

20   A.   My understanding is documents, for instance,

21   that we pulled off of the portal, many of them did

22   not have Bates stamps.  They had a document ID

23   number and, therefore, it doesn't have a Bates

24   stamp.

25   Q.   Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 56

1      A.   Some of these also are transcripts and

2   things that typically would not have.  Some of them

3   are pleadings or filings.  In some cases they did

4   have -- they might have been marked as an exhibit

5   and maybe one or two of them actually had Bates

6   stamps for some reason, so when we found a document

7   and it had that, we tried as much as we could to

8   also include the Bates number.

9      Q.   Section C, of this Exhibit 4, lists

10  supporting documentation.  Is that a complete list

11  of all other documentation you've looked at in

12  preparing your report?

13     A.   When coupled with Section D and the items

14  before it, yes.

15     Q.   I'm sorry.  I may have skipped Section D?

16     A.   You didn't skip it.  It just didn't come

17  yet.

18     Q.   What is Section D then?

19     A.   Section D is our research and other sources

20  that were not provided directly to me, but that I

21  received either through online search or from public

22  records.

23     Q.   So am I correct in understanding that

24  Section D is materials that your firm went out and

25  gathered independently?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.    That's correct, or in a couple cases maybe

2    conversations we had.

3    Q.    Okay.

4    A.    But things that were not included in Section

5    C.

6    Q.    Did you list all conversations you had with

7    any of the priority plaintiffs on Section D?

8    A.    Yes.

9    Q.    I only see two.  I see Vickie and William

10   Foster and Kevin Rosen.  Is that consistent with

11   your understanding?

12   A.    Yes.

13   Q.    Were you on both of those conversations?

14   A.    Yes.

15   Q.    Okay.  Do you have any notes from those?

16   A.    No.

17   Q.    Okay.  Do you recall when you spoke to

18   Vickie and William Foster?

19   A.    Sometime within the week before the issuance

20   of my report, I believe.

21   Q.    Do you recall the reason that you spoke with

22   Vickie and William Foster?

23   A.    Trying to -- there were some documents that

24   were hard to read.  I was trying to get a better

25   understanding if there were better copies of them

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 58

1    somewhere, whether it was in the Doc IDs and what

2    have you, and I was trying to get an understanding

3    of one of the components of damage claims that they

4    had.

5        Q.    Which component?

6        A.    It was a component that related to

7    Mr. Foster needing to continue to work because he

8    was not comfortable without having cash flow while

9    there was questions with regard to his house and the

10   issues he was having with his house, and so he had a

11   variety of expenses that were associated with him

12   having to return to work.

13       Q.    Did you do any analysis or request any

14   information about his savings?

15       A.    No.

16       Q.    Do you have any documents that would

17   establish what assets Mr. Foster had at that time?

18       A.    No.

19       Q.    Was there any other topic that was discussed

20   in that call that you can remember?

21       A.    Not that comes to mind.

22       Q.    Okay.  You have a telephone conference --

23   conversation with counsel and Kevin Rosen.  Do you

24   recall the substance of that conversation?

25       A.    Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   Q.   Were there any notes made from that?

2   A.   No.

3   Q.   How long was the conversation?

4   A.   Five minutes, maybe.

5   Q.   And when was that?

6   A.   Would have been sometime in that few days or

7   week before the issuance of our report.

8   Q.   What was the substance of that conversation?

9   A.   I was trying to get an understanding of some

10  of his construction, his capital improvements and

11  getting -- understanding where the documentation of

12  that was within the -- within the documents.

13  Q.   What specific items were you trying to

14  understand?

15  A.   Well, he had a significant amount of

16  spending in constructing, and there is a very

17  detailed list of it in my report and I was trying to

18  find out where that detail was, and making sure that

19  I had properly addressed it.

20  Q.   How much time has been spent since your

21  engagement, your firm's engagement, in early January

22  through today, in connection with this engagement in

23  your report?

24  A.   Are you talking, like, total hours?

25  Q.   Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 60

1    A.   Hundreds.

2    Q.   **Do you have an accurate number or --**

3    A.   I probably have 150 hours myself.

4    Q.   **Okay.**

5    A.   And I suspect Elan has at least that, so

6    that's 300.  Probably more than 500.  I mean, I

7    can't guarantee that amount but I've got to believe

8    it was at least that.

9    Q.   **All right.**

10        **Are there things that you were looking for**

11   **that you have not been able to obtain in connection**

12   **with this engagement?**

13   A.   Yes.

14   Q.   **What have you not been able to obtain?**

15   A.   Well, to the extent that there were property

16   transactions, there were some instances where I

17   would have liked to have had the HUD from -- some of

18   them date back quite some period of time.  When I

19   didn't have the HUD, I used other information that

20   was available to reconstruct the most relevant

21   issues, but I would have liked to have had the HUD.

22        And, you know, as any forensic accountant

23   would like, although it's typically not expected, I

24   would have loved to have had every little receipt

25   and every little, you know, payment for every

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1   transaction that's on here, but -- so that's

 2   something I would have liked but I did find there to

 3   be sufficient information to provide reliability for

 4   the vast majority of the information I've included

 5   and when I didn't find something, I believe I made

 6   it clear through my documentation.

 7        Q.   So you've tracked in your -- is it the

 8   master Excel spreadsheet?

 9        A.   I don't remember what we call it.  It's

10   the -- I mean, that's what it essentially is.  There

11   is one Excel spreadsheet that has, I think, what we

12   call it the support --

13        Q.   Is it the support and master database?

14        A.   Thank you.

15        Q.   Is that the one that tracks when you did and

16   did not have supporting materials?

17        A.   It tracks what we looked at.  It didn't

18   track everything that we looked at.  Sometimes we

19   would look at -- a lot of these things are

20   documented in a lot of different ways in a lot of

21   different places, so it would have been tracking

22   sometimes more than one and sometimes, you know, the

23   last place it was seen or the first place it was

24   seen, so it doesn't document every level of

25   tracking.  Some of them do.
```

Page 62

```
 1      Q.    Was the intent to document everything in the
 2   support master database?
 3      A.    Not to document everything.  To document,
 4   you know, to give me a good way to get back to
 5   information that I could reach in order to see what
 6   we had that supported it.  It wasn't intended to
 7   identify every piece of paper that did or did not
 8   identify it.
 9      Q.    Okay.  Mr. Elkin, do you have a copy of your
10   report handy?
11      A.    I do.
12            MR. KALIL:  Could you give me a copy?
13            MR. BREIT:  He has one.
14            MR. KALIL:  We'll mark one.
15            THE WITNESS:  Would you like me to review it
16      for completion?
17            MR. KALIL:  Yes, please.  Let me hand you
18      what I'm going to mark as Exhibit 7.
19            (Elkin Exhibit 7 was marked for
20   identification.)
21            MR. BREIT:  Did we already mark 4?
22            MR. KALIL:  Did we mark 4?
23            MR. BREIT:  Yes.
24            MR. KALIL:  Yes, we did.
25            MR. BREIT:  This was 4.
```

Page 63

```
1           THE WITNESS:  Thank you.

2    BY MR. KALIL:

3      Q.   4 was the Attachment A.

4      A.   Thank you.

5      Q.   Let me show you Exhibit 7 and ask you if you

6    recognize that, and when you have it in front of

7    you, I will give you one caveat?

8           MR. BREIT:  Take your time.  Make sure it's

9       complete and accurate.

10          THE WITNESS:  Do you need me to go through

11      each of the 1 through 20 to make sure every

12      schedule is there?

13   BY MR. KALIL

14     Q.   We'll work through them in the course of

15   what we're doing, but generally do you understand --

16   let's start with the first part of that, the section

17   that's titled Expert Report of Michael Elkin, dated

18   February 19, 2019 and it's nine pages.

19     A.   That's correct.

20     Q.   Is that your expert report or some portion

21   of it?

22     A.   Yes.

23     Q.   What would you call that piece, sir?

24     A.   The body of the report without the exhibits

25   and attachments.
```

Page 64

1  Q.  And behind it there should be the

2  attachments, including the schedules we've talked

3  about, the attachments A, B and C that we've already

4  marked separately.

5  A.  That's correct.

6  Q.  And then the exhibits for each of the 20

7  Priority Claimants; is that correct?

8  A.  That is correct.  Those were the exhibits

9  that were submitted in connection with the February

10  19th report.

11  Q.  Okay.  And I believe in that binder, this is

12  the caveat, you will see an update for Exhibit 12?

13  A.  Yes, I see that.

14  Q.  And that was provided by you on February 26,

15  2019?  That's what it's dated.

16  A.  I don't recall -- yes.

17  Q.  And there is also an update for Exhibit 17

18  dated March 8th, 2019?

19  A.  That's correct.

20  Q.  Okay.  As of yesterday, were those all the

21  updates to your report?

22  A.  No.  As of yesterday I had -- there was

23  another update which I gave you at the beginning of

24  the deposition today that I had finished on

25  Saturday.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 65

```
1       Q.    That would be Exhibit 4 updated?

2       A.    That's correct.

3       Q.    Which actually is dated March 9th.  So

4    you're correct.

5             If we add that -- let me make that Exhibit

6    Number 8 since it was not in the binder.

7             (Elkin Exhibit 8 was marked for

8    identification.)

9    BY MR. KALIL:

10      Q.    Mr. Elkin, I'm going to --

11            MR. KALIL:  The Exhibit 4, did we -- can we

12      go off for one second?  I am just a little

13      confused.

14            Did we mark this already, Counsel?  This is

15      Exhibit 4 for Steven and Cathy Etter.  I don't

16      think so.

17            MS. RICO:  I don't believe we did, no.

18      A.    No, we did not.

19            MR. KALIL:  You gave me this copy that I've

20      got.  I'm going to check with the other copies,

21      make sure we get those marked.  There it is.

22            Let's go back on.

23    BY MR. KALIL:

24      Q.    I'm going to show you what I've marked

25    Exhibit 9 -- so Exhibit 8, and ask you what that is.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 66

```
 1      A.   This is an update to Exhibit 4 from my

 2   initial report for Steven and Cathy Etter.

 3      Q.   So if we add Exhibit 7 and Exhibit 8

 4   together, do we have your complete report?

 5      A.   Yes.

 6      Q.   Okay.

 7           MR. KALIL:  Do you need a break?

 8           THE COURT REPORTER:  No.

 9           MR. KALIL:  Okay.

10   BY MR. KALIL:

11      Q.   All right.  Mr. Elkin, in your report, the

12   first section titled Background, you state:  "Is not

13   intended to represent any expert opinion."

14           So you're not offering any opinion on the

15   status of the litigation or how that came into

16   being, are you?

17      A.   No, I'm not.

18      Q.   Okay.

19           MR. BREIT:  Do you want him to?  We could

20      add it on there.

21           MR. KALIL:  You know, if --

22           MR. BREIT:  I'd like someone to explain it

23      to me.

24           MR. KALIL:  Well, I could ask the question,

25      I probably should ask the question.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   BY MR. KALIL:

2       Q.   Mr. Elkin, do you have an understanding

3   sitting here today of what the pleading -- the

4   operative pleading is in the Florida litigation that

5   we're traveling under and what comprises that

6   pleading?

7       A.   I'm not certain.

8       Q.   I think we might get agreement around the

9   table.

10          You've got some references to some orders.

11  In Paragraph 2 you talk about Judge Cooke's -- you

12  talk about the case in front of Judge Cooke but

13  you're not expressing any statement on what the

14  status of that case is, are you?

15      A.   No, I'm not.

16      Q.   This is just background?

17      A.   That's correct.

18      Q.   Similarly, Paragraph 3 is just background

19  regarding the proceedings in front of the multi

20  district judge, you're not expressing any opinions

21  on the status of that case?

22      A.   I am not.

23      Q.   The references to the trial plan in

24  Paragraph 4 is talking about a timeline and the

25  methodology.  Are you expressing any opinions with

Page 68

```
 1    regard to either of those?

 2        A.   No.

 3        Q.   The -- Paragraph 5 just talks about a

 4   timeline for the 20 Priority Claimants and certain

 5   types of damages.  Now, you are going to be

 6   expressing opinions as to some damages in this case?

 7        A.   That's correct.

 8        Q.   Are you limiting your opinions to the 20

 9   Priority Claimants?

10             MR. BREIT:  When are we talking about?  As

11        of now?

12             MR. KALIL:  As of today.

13        A.   As of today, that's correct.

14        Q.   Have you been asked to do anything more than

15   look at the 20 Priority Claimants as of today?

16        A.   No.

17        Q.   Do you have any expectation, sitting here

18   today, that you will be asked to do analyses for

19   more than the 20 Priority Claimants?

20        A.   I haven't been asked at this time.

21             THE WITNESS:  When you have a good time, if

22        we could just take a quick break, I want to get a

23        little bit of water.

24             MR. KALIL:  This is as good a time as any.

25             THE VIDEOGRAPHER:  The time is 11:23.  We
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 69

```
 1      are going off the record.  Please stand by.

 2          (Recess from 11:23 a.m. until 11:31 a.m.)

 3          THE VIDEOGRAPHER:  The time is 11:31 and

 4      we're back on the video record.

 5  BY MR. KALIL:

 6      Q.   Mr. Elkin, in your scope of assignment --

 7  but let's first go through what you are not

 8  rendering your opinions on, if I may.  I think you

 9  address it in Paragraph 7.  You say you're not

10  rendering any opinions regarding any legal theories

11  or conclusions; correct?

12      A.   That's correct.

13      Q.   You're not rendering any opinions regarding

14  liability or issues of liability; is that correct?

15      A.   That's correct.

16      Q.   Are you also not making any effort to

17  allocate any damages as between the various

18  defendants in the litigation?

19      A.   I am not.

20      Q.   If you were asked to do that, do you think

21  you could do that?

22          MR. BREIT:  Before you answer that question,

23      are you talking about delineation of the damages

24      in each item, whether it was caused by a

25      particular defendant, or whether part of it was
```

Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 08/15/2013 Page 71 of 388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 70

```
 1      damaged and the other part was damaged by someone

 2      else?

 3              MR. KALIL:  First talking about --

 4              MR. BREIT:  Asking for clarification.

 5      BY MR. KALIL:

 6      Q.  First part is, could you allocate damages as

 7  to who caused the damages if asked to do so?

 8      A.  Probably not.

 9      Q.  Have you been asked to determine if any of

10  the damages in your report have previously been

11  compensated from any sources?

12      A.  No.

13      Q.  And you've not made any such allocations?

14      A.  That's correct.

15      Q.  Were you specifically instructed not to look

16  at that?

17      A.  It was a conversation we had.  I would say I

18  wasn't specifically instructed not to, unless me

19  asking "Will I be?" and me being told no is an

20  instruction.

21      Q.  So you asked if you should look at other

22  sources?

23      A.  I just asked what my role was expected to be

24  with regard to them, and they said that those would

25  be separate issues for the court, were not for me.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.    You are aware that many of the Priority

2  Claimants have received compensation from other

3  sources?

4    A.    I don't know if it would be termed

5  compensation or how to characterize it.  I know that

6  many of these Priority Claimants have received money

7  from something.

8    Q.    You've got a schedule, actually a work

9  paper, that lists payments made to the Priority

10  Claimants?

11    A.    Yes.

12    Q.    And do you have that available or do you --

13    A.    The -- I don't have it in the body of the

14  report.  It would be in the work papers that I

15  provided to you.

16    Q.    Okay.  Well, let me -- well, if we go

17  through the work papers, we'll do that in a minute,

18  you do have an actual listing of all of the payments

19  that you're aware of that were received by the

20  Priority Claimants?

21    A.    I believe that's correct.

22    Q.    And from what sources were those payments

23  received?

24    A.    I'd have to look at them to recall.  I

25  believe some of them were some types of settlements

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 72

1    and others may have been other things.  I might look

2    at them and not know specifically what they were.

3       Q.   But you didn't do any analysis of whether

4    those were related to the same damages, or did you?

5       A.   I did not.

6       Q.   Did you have any discussions with any of the

7    counsel as to whether the damages you were

8    calculating had been compensated in whole or in part

9    from any sources?

10      A.   No.

11      Q.   You state that you're not looking at -- or

12   not rendering opinions on any remediation for any of

13   the damages, this is in Paragraph 7 of your scope of

14   assignment.

15      A.   That's correct.

16      Q.   Why are you not looking at that issue?

17      A.   I wasn't asked to or ultimately was not

18   asked to.

19      Q.   You were also not rendering any opinions on

20   any personal injury claims?

21      A.   That's correct.

22      Q.   Not rendering any opinions of any loss of

23   use or enjoyment; is that correct?

24      A.   That is correct.

25      Q.   And you're not rendering any opinions on

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1   diminished value/stigma; is that correct?

 2      A.   That is correct.

 3      Q.   Now, let me just be clear.  Diminished value

 4   and stigma, what do you understand that to be in

 5   that context?

 6      A.   I have a limited understanding about it,

 7   just that it has to do with the impact that these

 8   circumstances has had or may continue to have on

 9   these properties.

10      Q.   You're also not going to be rendering any

11   opinions on any punitive damages?

12      A.   That's correct.

13      Q.   Now, let me direct you for a second to

14   Exhibit 1 for Janet Avery in your report, and

15   there's a document titled Data and Damage Summary.

16   Do you see that?  It's the first page under

17   Exhibit -- first page behind the title page for

18   Janet Avery.

19      A.   Yes.

20      Q.   Who prepared that document, sir?

21      A.   That was prepared in a combined effort by me

22   and by Elan Sternberg.

23      Q.   Okay.  And who determined what items to put

24   on that page?

25      A.   At the end of the day, I did, but it was in
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    conjunction with discussions with Elan, but I did.

2        Q.   Did you have any discussions with counsel in

3    determining what to be put on that page?

4        A.   No.

5        Q.   Did you provide any drafts of this format to

6    counsel?

7        A.   Counsel would have received a draft that

8    included this format.

9        Q.   Were there any drafts that were different in

10   terms of the types of information they were showing?

11       A.   No.

12       Q.   I note that there is a comment -- there is a

13   line on the very bottom that says punitive damages

14   and then the letters TBD?

15       A.   Yes.

16       Q.   TBD means to be determined?

17       A.   Yes.

18       Q.   By whom, sir?

19       A.   Not me.

20       Q.   Why did you include a line for that if

21   you're not doing that as part of your report?

22       A.   For clarity.

23       Q.   Clarity for what?

24       A.   Clarity to see that these are not items --

25   when I did this, I hadn't written the report yet or

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 75

1 I was in conjunction with it.  So I had a list that

2 I had identified in the order and other places as to

3 what various claims were.  So I just listed

4 everything there, and I thought it would be good to

5 make very clear what I do have an opinion on and

6 what I do not.

7    Q.   Did you ever consider taking those lines out

8 entirely if they're not part of your report?

9    A.   I don't think so.  It wasn't, you know, a

10 significant determination one way or another.

11    Q.   Do you have any expectation that at any

12 point in time you will be asked to add in a number

13 for punitive damage as part of your work in this

14 engagement?

15    A.   I don't know.

16    Q.   Have you been asked to be ready to do that?

17    A.   No.

18    Q.   In any of your spreadsheets or work papers

19 have you included any place where you can bring in a

20 punitive damage figure to these documents, these

21 summaries?

22    A.   No, no.

23    Q.   Does this document, the data and damage

24 summary, import data from other places in your work

25 papers?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.   Yes.

2    Q.   Where is this created?  Is it a spreadsheet?

3    A.   It's in the Excel that I provided to you.

4    Q.   Okay.  And there is no place that would feed

5    into the punitive damage amount in your work papers?

6    A.   No, there's not.

7    Q.   What about a loss of use and enjoyment, is

8    there anything in your work papers where you're

9    tracking any numbers of that nature?

10   A.   No.

11   Q.   Have you been asked to track that?

12   A.   No.

13   Q.   Do you expect at any point that someone else

14   will provide you any information about loss of use

15   and enjoyment and that you will be asked to testify

16   to that?

17   A.   No.

18   Q.   Diminution in value, you've listed it here

19   as another item that says "TBD."  Do you have any

20   place in your work papers where there is any

21   tracking of diminution of value?

22   A.   No.

23   Q.   Do you have any expectation that you will be

24   bringing any numbers into your damage summaries at

25   any point for diminution in value?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      A.   If I'm asked to.

 2      Q.   Has anybody asked you to do that yet?

 3      A.   They talked that at some point that I might

 4  be asked to add that on.

 5      Q.   Who talked about that?

 6      A.   I believe that was Natalie Rico.

 7      Q.   And when was that?

 8      A.   Before the issuance of the report, probably

 9  -- probably after I sent them a draft or somewhere

10  in that time period.

11      Q.   When did you prepare your first draft of the

12  report?

13      A.   When did I prepare -- I mean, I started

14  preparing the report almost as soon as we got the

15  engagement.  I mean, this was a very short period.

16  So when you say when did I start preparing the

17  draft, I mean, everything was just leading up to a

18  final portion.  The only thing that I would actually

19  consider a draft is when I actually send something

20  to somebody and it's marked up as draft.

21      Q.   How many drafts have you shared with counsel

22  of your report?

23      A.   One or two.

24      Q.   Okay.  When did you share the first draft?

25      A.   Roughly a week before it was due, I believe.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    I'd have to take a look and --

2        Q.   So your report --

3        A.   -- try to figure that out.

4        Q.   So your report is dated February 19th, so

5    somewhere in early February?

6        A.   Yes.

7        Q.   Okay.  And when did you share the second

8    draft?

9        A.   I'm trying to remember if I did do a second

10   draft.  I don't recall, but if I did, it would have

11   been sometime in that time period shortly before.

12       Q.   Okay.  And did you get any substantive

13   comments back on your first draft?

14       A.   Nothing particularly substantive.  I did get

15   one comment that I noticed just now, actually, that

16   I didn't correct, which is, I had West Palm Beach

17   division listed on all of my exhibits, but I also

18   have it on the cover page.  I took it off all the

19   exhibits, but left it on the cover page.  So, oops.

20   But, no, I don't recall anything -- anything

21   substantive.

22       Q.   Given that you had inquired of one of your

23   partners about the tax consequences of Chinese

24   drywall -- and let me be more specific.

25            I believe you said you inquired of one of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 79

1  your partners about whether there were tax

2  deductions that could be taken or casualty losses

3  that could be taken; is that correct?

4      A.   I was aware that there were.  I had asked

5  the partner that heads up that department if he had

6  or anybody in his group sort of could -- had

7  specialized in that or had done a lot of those.  And

8  he was aware of one of our managers -- I think he's

9  a manager, or a director -- in the group that had a

10  client that had that, so he just directed me to him.

11      Q.   So you were aware of that as a -- as an

12  issue that comes up in this context?

13      A.   Well, I read some of the questions in the

14  depositions, and I knew it was a question that was

15  being asked.  And so it's very often, when we're

16  doing damage calculations of any kind, that we talk

17  about taxes and whether they have an impact and

18  whether they should be done -- the damages should be

19  done pre or post-tax.

20          And so I was exploring the taxability not

21  only of -- as a deduction, but also the taxability

22  of money that would be received as compensation.  So

23  that was discussions that I wanted to have.

24      Q.   Why did you not put anything in your damage

25  summary that refers to whether you were or were not

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 80

1    considering the tax impact of the losses or

2    payments?

3        A.    I just don't think it's relevant, period.

4        Q.    Well, you're -- it's not something you're

5    calculating?  It's not something you were asked to

6    calculate?

7        A.    It's not a question of being asked to

8    calculate or not asked to calculate.  It's my

9    opinion that it's not needed to be calculated

10   because it wouldn't be an appropriate component in

11   order to offset the damage.

12       Q.    Let me ask you this, Mr. Elkin.  If somebody

13   receives a deduction on their tax return, does that

14   give them an increase in cash?

15       A.    Potentially.

16       Q.    Would that not be relevant if a deduct -- a

17   deduction is directly related to a Chinese drywall

18   or defective drywall event?

19       A.    It could be potentially relevant, except

20   that any recovery of those amounts would also be

21   taxable to the extent -- at a minimum, to the extent

22   to which it would offset any benefit they had

23   received.

24            And typically, when we do damage

25   calculations and there's uncertainty with regard to

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 81

1    the taxes that will be paid ultimately, we don't do

2    it.  We don't make tax calculations, and we don't

3    calculate tax benefits.

4        Q.   Were any of the Priority Claimants able to

5    obtain a tax deduction on their federal income tax

6    returns in relation to the Chinese drywall?

7        A.   I believe so.

8        Q.   Who?

9        A.   I don't recall as we sit here.

10       Q.   Okay.  This was an historical deduction?

11   When you say you believe so, somebody did this

12   historically?

13       A.   This happened in the past.

14       Q.   So it's not -- it's not an uncertain event?

15       A.   Well, that part might not be, but then the

16   recovery and the tax that they would have to pay on

17   it or may have already paid on some of the recovery

18   would be.

19       Q.   Now, if somebody had obtained -- if one of

20   the Priority Claimants had taken a tax deduction on

21   their federal income tax returns as a result of the

22   Chinese drywall -- defective drywall loss, and that

23   was a past year in their tax returns, you could

24   calculate the impact, couldn't you?

25       A.   Most likely.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 82

1    Q.   Did you make any effort to -- you didn't

2    make any effort to do that here?

3    A.   No.

4    Q.   To the extent somebody has an historical tax

5    deduction for defective drywall, and they pay less

6    income tax, doesn't that impact their cash flow such

7    that it should be taken into account in your

8    prejudgment interest calculations at a minimum?

9    A.   I think that would depend on a lot of

10   different circumstances.

11   **Q.   What would it depend on?**

12   A.   Well, it depends on what the --

13        MR. BREIT:  Before you answer this question,

14   let me just state an objection for purposes of

15   this deposition and what this expert has been

16   asked to do and not do.

17        You're now trying to inquire of this witness

18   in an area that he has not been asked to look

19   into, has not been asked to testify to, has not

20   given any information on any report to.  And

21   you're just throwing out questions to an

22   accountant because you want to know.

23        MR. KALIL:  Counsel, first of all, I object

24   to the speaking objection.  Typically, we say

25   simply "object to form" in this district, and

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   that's all we need.  If I need more, I can ask

2   you.

3       But I'm asking a question to understand his

4   methodology and his procedures.

5       MR. BREIT:  Well, with regard to his

6   methodology and procedures, this was not a part

7   of his expert report and/or testimony.

8       And so now I will state again on the

9   objection, whether you think it's speaking or

10  not, this is not part of his expertise that was

11  asked for in this case.

12      Now you're asking an expert to give you an

13  opinion broadly on tax information, which is not

14  a part of what he's supposed to do or asked to

15  do.  And I object to you trying to get him to

16  help you out on tax consequences of tax

17  returns --

18      MR. KALIL:  Counsel --

19      MR. BREIT:  -- which is not a part of this

20  subject area.

21      MR. KALIL:  Counsel, same thing.  "Objection

22  to form" is sufficient.  Speaking objections are

23  not allowed in the Southern District of Florida,

24  and I'd ask you not to make them.

25      MR. BREIT:  Well, then I'm going to ask you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 84

 1    not to go outside the expertise of this witness

 2    and keep on asking him.

 3         MR. KALIL:  It's --

 4         MR. BREIT:  Otherwise, he may just say "It's

 5    not part of my expertise.  I'm not going to

 6    answer."

 7         MR. KALIL:  Well, I think there's documents

 8    that this witness has already provided where he

 9    looked at the specific issue.  He's already given

10    me papers in his binder, and it is this binder

11    marked as Exhibit 5 where he has specifically

12    retrieved documents dealing with tax impacts of

13    Chinese drywall.  So he has looked at it.

14         MR. BREIT:  And what he said -- and so it's

15    clear on the record for purposes of your

16    questioning, he said, "I brought down from the

17    IRS documents with regard to this, but I am not

18    offering or stating or researched or reviewed

19    anything with regard to any of the Priority

20    Claimants for purpose of their testimony."

21         So you're way beyond this expert's testimony

22    for purposes of this case.

23         MR. KALIL:  I disagree with you, Counsel,

24    but I'm asking if this could be something that is

25    relevant to how he formulated his opinions.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    BY MR. KALIL:

2        Q.   So let me go back to my question.

3    Mr. Elkin, you did a schedule of prejudgment

4    interest based on expenditures of some of the

5    priority -- of all of the Priority Claimants who

6    spent money, did you not?

7        A.   Yes.

8        Q.   Okay.  And what did you consider in the

9    prejudgment interest calculations, just outflows?

10       A.   I just considered alternate living expenses

11   and personal property damage and remediation

12   expenses.

13       Q.   Okay.  So these are all expenses, outflows

14   of cash by those Priority Claimants, correct?

15       A.   That's correct.

16       Q.   Did you consider any inflows of cash?

17       A.   No.

18       Q.   You didn't factor in, in that part of your

19   report or anywhere else, any receipts by the

20   Priority Claimants of any funds from any sources,

21   did you?

22       A.   No.

23       Q.   Would you agree with me that if you are

24   calculating prejudgment interest on outflows, that

25   if you have an inflow, you should offset it?

Page 86

1        MR. BREIT:  Again, I'm going to object to

2    the form of the question.

3    A.   Not necessarily.

4    Q.   Would you agree with me that if a Priority

5    Claimant spends money and is -- then receives an

6    equivalent or greater amount, you would not be

7    calculating prejudgment interest on the expenditure?

8    A.   I don't think that can be determined at this

9    point.

10   Q.   Did you make -- you made no effort to

11   determine that?

12   A.   I didn't think it would be appropriate.

13   Q.   But you made no effort to determine that; is

14   that correct?

15   A.   I didn't include it.

16   Q.   Did you make any effort to determine it?

17   A.   Well, to the extent that I didn't include

18   it, that's the effort that I made.

19   Q.   You didn't include it in your processes at

20   all?

21   A.   I was aware of it, and it was -- the receipt

22   of those funds was included in a schedule in my work

23   papers.  But whether or not those amounts should or

24   shouldn't go to offset the amounts that were

25   included in my prejudgment calculation is not a

Page 87

1   determination to be made by me.

2       Q.   **Did you present any summary of those**

3   **receipts in your report proper?**

4       A.   In the report?  No.  Very clearly in the

5   tabs and the detail of the Excel schedule that was

6   provided to you, yes.

7       Q.   **The Excel schedule was provided to us, but**

8   **is not part of your report; is that correct?**

9       A.   It's not part of the -- it's not part of the

10  report.  Several of the tabs -- it forms several of

11  the tabs and calculations in the report.

12      Q.   **You agree with me that no part of your**

13  **report references the schedules that show the**

14  **receipts of funds by the Priority Claimants; is that**

15  **correct?**

16      A.   I don't recall, so I would have to go

17  through and look, but probably not.

18      Q.   **If you're at all uncertain, please take a**

19  **look.**

20      A.   I did not make reference to the specific

21  schedules, but I did have a paragraph that discussed

22  that I was not asked by counsel to address potential

23  reductions in damages in connection with potential

24  setoffs, settlement payments received by claimants,

25  or other collateral sources.  I understand that the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 88

1    applicability of these items is matter for the

2    court.

3       Q.    Okay.  Where is that you're referring to

4    specifically?

5       A.    Paragraph 29 on Page 9 of 9.

6       Q.    There is no reference in there that would

7    advice a recipient of your report to the fact that

8    you had calculated a schedule of these receipts, is

9    there?

10      A.    Probably not.  No.  Other than it being

11   clearly delineated in the Excel schedule that I

12   provided to you, I don't -- I don't think it's

13   referenced in my report, so --

14      Q.    You make a reference in Paragraph 25 of your

15   report to prejudgment interest.  I'd direct you to

16   that, and let me read it to you.

17            It says:  "I was asked by counsel to

18   calculate prejudgment interest amounts as an aid for

19   the court or trier of fact should it be determined

20   that prejudgment interest is awardable for any or

21   all components of damage."

22            You go on to say:  "I'm not providing an

23   opinion regarding whether such interest is a legal

24   remedy in this matter.  I understand such a

25   conclusion is a matter for the court."

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 89

1          So you've given the recipient of your report

2     notice that you've done a calculation of prejudgment

3     interest; is that correct?

4     A.    That's correct.

5     Q.    You have not given a similar advice to the

6     recipients of your report that you have information

7     regarding payments that you are not factoring into

8     that; is that correct?

9     A.    That is correct.  I don't believe that it's

10    relevant to make that -- such a disclosure, but I

11    would agree with you that it's not here.

12    Q.    Let me direct you to Paragraph 27 of your

13    report -- actually, Paragraph 26, excuse me.

14          "I have evaluated the nature and timing of

15    the various damage components, and I have calculated

16    potential prejudgment interest for each Priority

17    Claimant as reflected in the corresponding

18    Exhibits 1 through 20.  I calculated prejudgment

19    interest using the Florida statutory interest rates,

20    following the simple interest method, not

21    compounded, to calculate statutory interest for each

22    element of damage on a claim-by-claim basis.

23          So again, you're describing that you have

24    calculated prejudgment interest, but you have not

25    given any disclosure that there are other items that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 90

1    have been received by the Priority Claimants that

2    are not factored into that; is that correct?

3        A.    That is correct.

4        Q.    Paragraph 27, another paragraph dealing with

5    prejudgment interest:  "The period of prejudgment

6    interest has been calculated to begin at a date

7    corresponding with the date costs or damages were

8    incurred and to end on July 22, 2019, the

9    anticipated date of trial."

10          What do you mean by the date corresponding

11    with the date costs or damages were incurred?

12        A.    Based on the records that I reviewed, some

13    items were very clear, when something was paid for,

14    where the cost was incurred.

15          Other items required some level of

16    assumptions with regard to when it would have --

17    most likely have been paid.  Some items, the damage

18    may have taken place as of an assumed date even

19    though it might be something that had been paid for

20    in the past.

21        Q.    Okay.  So let's separate those out, then.

22    You've talked about costs and damages.  Are they two

23    separate components?

24        A.    I don't think so.  I mean, something can

25    cost something, but it might not be a damage in the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 91

1   case, so I think it's a combined --

2     Q.   When you try to calculate -- or when you've

3   calculated a date that a cost was incurred, what did

4   you use?

5     A.   I used the best available information.  So

6   by example, if somebody had a lease to rent a

7   piece -- to rent an alternative living facility, but

8   they were not available to provide data going back

9   to a certain period of time as to when they actually

10   wrote the check, I looked at the lease, and so I

11   assumed that it had been paid based on the terms of

12   the lease.  So that would be an example of where I

13   don't have the actual payments.

14        In some cases, I had the actual payments, so

15   I would have used those dates.

16     Q.   So the dates were the dates of expenditures?

17     A.   Yes.

18     Q.   Whether proven or assumed?

19     A.   Correct.

20     Q.   Did you determine -- did you make any --

21   excuse me.  You didn't make any effort to determine

22   the source of funds used to pay those costs, did

23   you?

24     A.   No.

25     Q.   How did you calculate the dates of damages

Page 92

1    incurred?  What did you use as your benchmark?

2        A.   Again, I think it's the -- it's the same

3    explanation.

4        Q.   Well, what is a damage as opposed to a cost?

5    You've used the two different words.

6        A.   Well, a cost can be something that costs

7    something, but not a damage.  So perhaps I could

8    have worded that a little bit such that it was just

9    costs/damages.  But I wasn't really using those as

10   separate -- as separate and distinct items requiring

11   definition.

12       Q.   You didn't include any costs in your report

13   that you are not also claiming as damages, or did

14   you?

15       A.   I may have excluded some, but they wouldn't

16   be on here.  There might be one or two that have

17   a -- have a zero next to them, but for the most

18   part, I observed things that cost money, but that

19   weren't included as damages.

20       Q.   Let me talk to you about dates of damage.

21   To the extent somebody has personal property that

22   you've included as a damage, what did you use as the

23   date of damage?

24       A.   That was a difficult component.  And again,

25   I've used them, to be clear, for purposes of these

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 93

1   calculations, with what I hope was a clear caveat

2   that ultimately those dates might be determined

3   based on the law, or what have you, to be different

4   dates.

5        Sometimes I would have used -- if it was a

6   cost that was incurred to replace something, I

7   believe I would have used the cost on the date that

8   they actually expended it, although there could be

9   argument that it was damaged earlier than that.

10       In some cases where I didn't have something

11  that was replaced, I used my judgment on a line item

12  basis to determine at what point that damage may

13  have taken place.

14       There were some things where I couldn't make

15  a determination as to when they were put in place,

16  so I used alternative dates, and I would have to go

17  line item by line item.

18       There was not a bright line, here's how

19  you're going to do it for each one, because the

20  facts and circumstances for each case were

21  different.

22       But when I had evidence of an actual date or

23  what I believed would be the date, particularly in

24  the alternate living expenses, I used a date then.

25       What I ultimately did was I used a -- I

Page 94

1   used -- I'm going to just call it a buffer period,

2   but I added an additional 30 days to the

3   calculation -- or I subtracted -- there is less days

4   of interest because I used a later date to try to

5   account for what might be differences as to whether

6   something hit a credit card expense or then got paid

7   a month later, or what have you, although there's

8   argument in other cases that I've been in where, if

9   it hit your credit card, that was the date of the

10  expense.

11        But I was trying to be as conservative as

12  possible, recognizing there is a variety of

13  different circumstances for these different dates.

14        **Q.   Mr. Elkin, would it be conservative to**

15  **include reimbursements in calculating prejudgment**

16  **interest?**

17        A.   I believe I was pretty clear that I haven't

18  considered what you're calling reimbursements and

19  I'm just calling other collateral sources or other

20  funds or other setoffs.  I don't believe it would

21  have been appropriate to do that because I haven't

22  made any conclusion whatsoever as to whether those

23  should apply, shouldn't apply, or are even relevant.

24        Some of those -- what you're calling

25  reimbursements may have been reimbursements for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1  things that aren't built into the damage

2  calculations.

3         So since I was not addressing that, and I am

4  not addressing that, I don't believe it would have

5  been proper to offset these things because I don't

6  render an opinion as to the relevance of these

7  setoffs or other amounts received.

8     Q.   Would you agree with me that if the court

9  determined that the items you've tracked as

10  reimbursements or payments, but that you haven't

11  worked into your report, were relevant, that they

12  would impact your damage calculations, and they

13  would reduce them?

14     A.   They could.

15     Q.   And would you agree with me that if the

16  court determined they were relevant, they would also

17  impact your prejudgment interest?

18     A.   They could.

19     Q.   Assuming the timing was such that they came

20  before an expenditure, they would reduce prejudgment

21  interest; is that correct?

22     A.   Or even if they came after an expenditure,

23  it might reduce the period interest.

24     Q.   Okay.  What about claimants -- Priority

25  Claimants who testified they were reimbursed for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 96

1    alternative living expenses, why didn't you include

2    that?

3         A.    I haven't been asked to determine the

4    relevance and the appropriateness of offsetting any

5    of the amounts that they received.

6         Q.    So notwithstanding the fact that some of the

7    Priority Claimants said they were reimbursed for the

8    expenses that you were tracking as a damage

9    component, you didn't back out those reimbursements?

10        A.    That's correct.

11        Q.    Let me go back for a minute to the personal

12   property expenses, items that were calculated as

13   being damaged.  Did you use the dates of acquisition

14   for those items, original acquisition, or the dates

15   of replacement as your basis?

16        A.    It depended on the type of item and the

17   timing.

18        Q.    Okay.  Is that reflected in your report or

19   your work papers anywhere?

20        A.    As to -- the date that I used is reflected.

21   As to whether or not it relates to the date that it

22   was originally purchased or the date it was replaced

23   would have to be determined on a line-by-line

24   item --

25        Q.    Is there a --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 97

1    A.    -- a line-by-line basis.

2    Q.    Is there somewhere in your work papers where

3    that is readily shown?  We can readily sort your

4    work papers or Excel spreadsheet by that

5    differentiation?

6    A.    I don't think so.

7    Q.    When you were dealing with personal property

8    and putting it into your spreadsheets, did you

9    obtain evidence and inventories of what was in each

10   property before the Chinese drywall or defective

11   drywall came into the property?

12   A.    No.

13   Q.    Okay.  Did you obtain full documentation of

14   what was in the --

15   A.    I'm sorry.  Could you read back the last

16   question?

17   Q.    Sure.  Let me do it -- let me do it a little

18   differently.  I think I'll make it clearer.

19   A.    I think the question that you asked is not

20   the question that I answered.

21   Q.    I think that's correct.

22   A.    Because there's something about that

23   question that doesn't work.

24   Q.    And I see the problem.  Let me see if I can

25   fix it.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 98

```
 1        When you were calculating personal property
 2   damages and putting that into your work papers and
 3   spreadsheets, did you obtain evidence and
 4   inventories of what was in each property prior to
 5   the time it was damaged?
 6      A.   That's still not really making sense to me,
 7   because my understanding is the dry -- the -- I
 8   don't know what would be considered the date of
 9   damage.
10        But if the date of damage is when the
11   drywall went in, then these people, or at least the
12   majority of them, would not have moved into the
13   house yet.  So it doesn't make sense that the
14   furniture would have been in there before the
15   drywall is installed.  If it's determined that it's
16   some other date that does correlate, but I did not
17   do that.
18      Q.   I take your point.  Let me make it a better
19   question.
20        Were you able to verify, through an
21   inventory or otherwise, that each item of personal
22   property that is claimed as a damage was, in fact,
23   in the Priority Claimant's house or other dwelling?
24      A.   No.
25      Q.   Okay.  Did you get an inventory by Priority
```

1  Claimant of the personal property that was damaged,

2  the date it was purchased, and the original cost?

3  A.  Some claimants had better information than

4  others.  Some of them had a lot of that information.

5  Some of them had very little.  And so to answer that

6  question, I would have to go on a -- pretty much a

7  case-by-case basis.

8  In one particular case, I received what I

9  believed to be a very detailed itemization that was

10  made actually by a third party.  In other cases,

11  there was more information -- I mean, we're talking

12  about information that would not typically be kept

13  by an individual.  So I really didn't expect to get

14  a lot of the information you're talking about.

15  Individuals don't always keep the receipts

16  and the proof of payment for things that they bought

17  many years ago, anticipating that they would need it

18  for any reason.  So some of them had better

19  information than others.  And I used a variety of

20  the information that they gave me.

21  Q.  Did you ask in all instances for either

22  proof or estimates of original costs?

23  A.  I asked about all of those things, and was

24  explained to me that everything that was either in

25  the items that had been provided to me that were

Page 100

1    Bates stamped or that were already on the portal

2    included everything that their clients had been

3    able -- and I say that -- I'm generalizing.

4         There might have been -- we're talking about

5    20 different plaintiffs, but overriding that

6    everything that was there was what they had with

7    regard to what they spent, what they had, if they

8    replaced it, what it cost them to replace, and if

9    they hadn't replaced it yet, what they used to

10   determine the case.  In some cases, that was an

11   estimate.

12       **Q.   And that was information provided by**

13   **counsel?**

14       A.   It was information provided through counsel.

15   I believe most, if not all, of it was information

16   they got from their clients.

17       **Q.   Did you speak to each of the clients to ask**

18   **for estimates?**

19       A.   I did not.

20       **Q.   Did you speak to each of the clients to ask**

21   **what additional information they might have that**

22   **could help you improve the accuracy of your report?**

23       A.   Not directly.

24       **Q.   Did you, through anybody in your firm, speak**

25   **to each of the clients to ask for that information?**

Page 101

```
 1      A.    No.  By not directly, I meant nobody in my

 2  firm directly spoke to the clients.  We would have

 3  spoken to counsel, made clear to counsel what we

 4  were looking for, and they would have inquired of

 5  their clients.

 6      Q.    With the two exceptions we talked about

 7  earlier?

 8      A.    With those two exceptions, and those were

 9  just relevant to specific line items, not the

10  entirety.

11      Q.    But you had access to the clients if you

12  wished to speak with them?

13      A.    I had asked, for those particular clients,

14  for the specific things I was looking for from these

15  clients, not for everything that they had provided.

16      Q.    Isn't it a fact you were provided with a

17  contact list for all of the clients, and that's in

18  your work papers?

19      A.    I do have that contacts list.  That wasn't

20  why I was provided the contact list.  I believe I

21  was provided that list either in the -- in the scope

22  of running a conflict check, identifying whose

23  lawyers are whose, or knowing which depositions were

24  taken.  But it was not for purposes of me expecting

25  to contact those people.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 102

1    Q.    Did anybody tell you not to contact the

2    clients?

3    A.    No.

4    Q.    So it was your decision?

5    A.    That's correct.

6    Q.    Sitting here today, can you say with any

7    certainty whether any of those clients might have

8    had greater information if you had reached out to

9    them?

10    A.    It's possible they could.

11    Q.    Okay.  You made no efforts to do that?

12        MR. BREIT:  Asked and answered.

13    A.    I believe I did make the effort.  I -- but I

14    can't tell you for sure what they might -- might or

15    might not have in some place.

16    Q.    To be clear, other than communications

17    through counsel, what other efforts, if any, did you

18    make to speak with the Priority Claimants and ask

19    for additional information?

20    A.    I felt comfortable that my inquiries of

21    counsel were sufficient.

22    Q.    Mr. Elkin, in regard to the values that you

23    put in your report for personal property that you

24    are claiming are damages, did you make any effort to

25    adjust them for the passage of time?  And by that, I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    don't mean prejudgment interest.  I mean from the

2    date an item was purchased until the date it was

3    determined to be damaged.

4        A.    No.

5        Q.    Did you make any effort to adjust to fair

6    market value for any of the personal property

7    items on the date -- fair market value on the date

8    of damage?

9        A.    No.

10       Q.    Did you make any effort to compare the

11   personal property items that are listed in your

12   damage schedules for each of the Priority Claimants

13   to see that a lost item and a replacement item were

14   of like kind and quality?

15       A.    No.

16       Q.    Did you make any effort to determine, for

17   any of the Priority Claimants, if any of the

18   personal property items that are listed in your

19   damage schedule were betterment or improvements over

20   the items that had been lost?

21       A.    Not specifically.

22       Q.    How about not specifically, what --

23       A.    I may have seen one or -- one or two places

24   where the replacement was of similar nature, but I

25   wasn't specifically looking at them for that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 104

1   purpose.

2       Q.  So you didn't make any judgment as to

3   whether a replacement item that might have been

4   better than the original should be included or not

5   included?

6       A.  That's correct.

7       Q.  Okay.  Did you see any instances that there

8   were replacement items that were of greater quality

9   than the original items?

10      A.  Not that I recall.

11      Q.  When you were given receipts for the

12  personal property items, were you able to verify,

13  for each of the receipts, specifically what quality

14  or type of item it was purchasing?

15      A.  No.

16      Q.  Did you put any procedures in place to

17  disallow any claimed personal property items if you

18  could not verify what was being purchased?

19      A.  No.  I mean, the procedure would have been

20  to identify whatever we believed was, in fact,

21  purchased, and when we could not, to make sure that

22  the description just accurately reflected that we

23  were unable to, either it was ineligible or it would

24  say miscellaneous.  But when we could identify what

25  it was, the description was included.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 105

1    Q.   Did you use the word "ineligible."  Did you

2    mean ineligible or illegible?

3    A.   I totally meant illegible.

4    Q.   That's what I thought.

5    A.   Thank you for helping with that.

6    Q.   That's fine.  You did not make any --

7    establish any procedures for determining

8    ineligibility of any of the items -- let me finish

9    the question.

10        Am I correct that you did not establish any

11   forensic procedures for determining ineligibility of

12   any personal property items claimed as damages by

13   the Priority Claimants?

14   A.   That's correct.

15   Q.   Did you -- and you also did not establish

16   any forensic procedures for determining if any of

17   the replacement personal property items were of

18   greater value than the ones that were damaged?

19   A.   That's correct.

20   Q.   Let me shift you back to your report for a

21   second.  The -- Paragraph 6, you state that:

22   Kaufman Rossin & Company was retained in January of

23   2019 by Colson Hicks Eidson to provide expert

24   witness and consulting services regarding Priority

25   Claimants' damages...

Page 106

1            And then you go on to say:  "Specifically,

2    Counsel requested that KR determine out-of-pocket

3    expenses for those who fully or partially

4    remediated..."

5            What did you understand the out-of-pocket

6    expenses to be here?

7       A.   It wasn't intended to be a technical term,

8    but it was intended to be a delineation as to these

9    are expenses that were for moneys spent, not

10   something that would -- was -- corresponded to any

11   formulas or damages that had been proposed through

12   any other prescribed formulas.

13      Q.   Let me see if I understand that.  Are you

14   saying that you were taking expenditures and putting

15   them into an Excel spreadsheet so they could be

16   added together, but you weren't doing any formulaic

17   analysis of those?  Is that what you're saying.

18      A.   No.

19      Q.   I misunderstood you.

20      A.   What I'm saying is I was aware, and am

21   aware, that there is a remediation formula with

22   regard to claimants that have not fully

23   remediated --

24      Q.   Okay.

25      A.   -- or completely remediated.  And I was

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    trying to make it clear that that's not what this

2    is.  This is related to expenditures.

3        Q.    Now, when you got information about

4    out-of-pocket expenditures, how did you put them

5    into the Excel spreadsheet?  Was there any vetting

6    that was done, or did everything that was brought to

7    your attention get put into the spreadsheets?

8        A.    Everything would have been put into the

9    spreadsheets that we could identify, and then if

10   there were things that we couldn't find backup for

11   or we didn't find relevant support for or we didn't

12   find -- or we found contradictions of, would have

13   either been removed or in some cases, or in some

14   cases, just a zero would have been put next to them.

15   But in most cases, I think they would have been

16   removed.

17          If we found an extraneous receipt somewhere

18   or we found something listed somewhere -- if it was

19   listed by the claimant, we would have included it

20   there and identified it as claimant.

21          Are you talking about specifically for

22   remediation or for everything in general?

23       Q.    Well, I'm talking about -- you've used the

24   term "out-of-pocket expenses," and I'm not sure how

25   broadly you were using that term in Paragraph 6.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 108

1    A.    I was primarily using those in conjunction

2    with the fully or partially remediated.

3    **Q.    Okay.**

4    A.    Although I suppose it would be relevant to

5    the other ones, as well.

6    **Q.    So if we go through your worksheets and your**

7    **spreadsheets, will there be entries showing which of**

8    **those expenses were excluded from your calculations?**

9    A.    There might be a handful.  Very few things

10   were actually excluded.  Well, actually, there

11   were -- there were large classes of things that

12   weren't entered in the first place.

13   **Q.    Okay.**

14   A.    So those wouldn't -- I don't know if those

15   ever even would have made it to the spreadsheet, or

16   if they did put them on the spreadsheet originally,

17   I think I would have just said, no, those don't

18   belong in here.

19         I don't remember if they stayed on the

20   schedule, because the schedule has the ability to --

21   I think there's a column in there where you can --

22   you can filter by damage, not damage, and a couple

23   of other categories.  It's likely I had them exclude

24   them in total just so we wouldn't spend a lot of

25   time on them.

Page 109

1    Q.    What type of categories would you excluded

2    in total?

3    A.    So, for example, if they had -- one

4    component that sticks out in my mind is they were

5    claiming as alternate damage -- alternate living

6    expenses amounts that they were paying for the

7    property owner association at the affected property,

8    and I did not include those as a damage for the

9    alternate living expenses.

10    Q.    That would have been an original living

11    expense, correct?

12    A.    If you want to call it that.  I just -- it's

13    expenses in connection with the affected property.

14    Q.    Any others that come to mind?

15    A.    Nothing that's jumping out at me at the

16    moment.  I mean, I'm sure there were other things.

17    It might have been things like real estate taxes or

18    other things like that that were also paid at the

19    affected property that might be relevant to one

20    area, but not to the areas that I dealt with.

21    Q.    Okay.  Now, with regard to the information

22    that you put into your spreadsheets, you would take

23    an expenditure which you saw some evidence of and

24    include it and then just add them all up by

25    claimant?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 110

```
 1     A.   No.  Then we would look for backup for them.

 2     Q.   Okay.

 3     A.   In some cases, adjust them if we thought the

 4  number was wrong.

 5     Q.   Okay.

 6     A.   Some of these documents go back a very long

 7  time, and I don't know how many times they have been

 8  copied over and over.  Some of them were very

 9  difficult to read, so we would blow them up on a

10  screen.  In a couple of cases, we asked for better

11  copies.  You know, maybe someone was aware of an

12  earlier production, either on the -- on the portal

13  that hadn't been copied then for an exhibit, because

14  the exhibits had a tendency to be a little harder to

15  read than some of the more original documents down

16  the road.  But we would verify that.  We would look

17  for the timing of those to make sure we had the

18  dates proper.

19          In some cases, there were things that I

20  would move from one category to another when I

21  observed the nature of the expenditure.  There were

22  some things that were being put in remediation, for

23  instance, an air-conditioner repair that was done

24  back in 2011 when they hadn't even started

25  remediation process.  And so that really is damage
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 111

1  to the air-conditioning system before it was being

2  replaced or anything like that. So that's really a

3  personal property damage, not a remediation effort.

4        So I went, I'd say, almost line item by line

5  item at one point or another, as did Elan, just

6  making sure that we felt we had things in the proper

7  categories. In some cases, to the totality of this,

8  it might not have mattered which category it was in,

9  but we did try.

10        And there's a lot of really small

11  expenditures, too, in here. You know, sometimes

12  there is a $12 item or $60 item. So I can't say I

13  necessarily focused on every single item, but

14  probably most of them.

15  **Q.   When -- in part of your answer, you said you**

16  **adjusted some of the items. And when you say**

17  **"adjusted," did you mean to make sure they matched**

18  **the receipts or the information provided?**

19  A.   There were some cases where it just looked

20  like either somebody had made a transposition error

21  on the information that we had been provided or -- I

22  remember one where we had a line item in there, but

23  when I looked at the receipt, I noticed that it

24  looked like it was -- it was Bed, Bath & Beyond.

25  And I don't know if you've ever been to Bed, Bath &

Page 112

1    Beyond, but they take anything back on an exchange.

2           And it was clear that something had actually

3    been returned and replaced, so I eliminated that

4    from the expenditure, because it looked like maybe

5    they took back whatever that damaged property was.

6           So I can't say I looked at every one of them

7    in that level of detail, but we did look at them

8    with as much detail as we could.  So that would have

9    been an adjustment.

10          And there might have been things where one

11   or two places we saw that maybe they had -- I mean,

12   remember, the people that did this, the homeowners,

13   the claimants, are not forensic accountants or

14   accountants, and they are dealing with older stuff.

15          So sometimes -- I would remember noticing

16   one or two where the number might have been actually

17   the change that was given on the receipt, as opposed

18   to the amount.  They were pretty close, but -- so

19   that's the type of adjustments that we tried to

20   make.

21      Q.    So you were -- you were making sure the data

22   you were putting into your spreadsheet matched the

23   invoices or receipts that you had been given?

24      A.    To the extent we could, yes.

25      Q.    Okay.  Did you do any calculations to say

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   not all of these should be included or some portion

2   of them should be included only?

3       A.   I think there were items from time to time

4   that we identified and didn't include --

5       Q.   Okay.  So --

6       A.   -- or --

7       Q.   I'm sorry.  I didn't mean to cut you off.

8       A.   And didn't include.  I don't remember at the

9   time, whether we -- we didn't have a process to

10  identify things and then say exclude.  So most of

11  those times, I think we just took them off the

12  schedule.

13      Q.   Was there any written process for your staff

14  to use in determining what should be included and

15  what should not be included?

16      A.   My staff was told to include everything that

17  they could, so that I would have an opportunity to

18  make that judgment and not leave that judgment to

19  them.

20      Q.   Did you review every single item on this for

21  that purpose?

22      A.   Pretty close.  Well, with what purpose?  To

23  determine whether it should be included or not?

24      Q.   Yes.

25      A.   Not every single line item, but the nature

Page 114

1   of the expenditures and the timing of the

2   expenditures and many of the larger expenditures,

3   but not all of them.

4       Q.    You mentioned returns.  That's an

5   interesting topic.  Did you set up any procedures to

6   see if any of the items being claimed had, in fact,

7   been returned?

8       A.    The staff was aware of it.  I mean, when you

9   say set up procedures, we're -- you know, we sat

10  together almost every day.  I reviewed the work that

11  had been in process, talked to them, sent them off

12  to do more work.  I did not -- we didn't have

13  written procedures as to -- as to what to do.

14      Q.    Am I correct that you did not make efforts

15  to verify that if you had a receipt, that the

16  claimant had not returned it on a separate document

17  that hadn't been provided to you?

18      A.    No, I did not.

19      Q.    Am I -- am I correct you didn't ask for

20  evidence of credit card statements to verify

21  receipts, if you had a receipt?

22      A.    In some cases, we had credit card

23  statements, and we did verify with credit card

24  statements if they were available.

25      Q.    If you didn't have them, did you ask for

Page 115

1  them?

2  A.  If we didn't have them, it was part of the

3  conversation where we were told we have what they

4  have.

5  Q.  Conversation with counsel?

6  A.  Counsel, yes.

7  Q.  But you never made any efforts to reach out

8  to the Priority Claimants directly to say, "Do you

9  have credit card statements," if you didn't have

10  them in the original set?

11  A.  That's correct.

12  Q.  Okay.  Once the information got into your

13  spreadsheets for -- let's just use out-of-pocket

14  expenses -- what did you do with it?  Did you just

15  tally it by claimant and add it up?  In other words,

16  did you -- did you perform any calculations on the

17  data after it was input?

18  A.  I mean, I did a lot of different types of

19  filtering in order to see the timing of things and

20  see them sequentially and to see -- in some cases, I

21  filtered by -- by vendor.

22      We did some extensive work just to try to

23  eliminate any duplicates, which we did also find.

24  So we would sort by dollar amount, and if we found a

25  number of -- we found a number of different times

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 116

```
 1   where there might have been two documents, maybe an

 2   invoice and a receipt, that related to the same

 3   thing.  So if there was a duplicate, we removed it.

 4        So we did a lot of hands-on analytics, not

 5   just general analytics, but really digging into,

 6   whether it was by vendor or whether it was by date,

 7   in each case on a claimant-by-claimant basis.

 8        Q.   So you were deduplicating the records?

 9        A.   Yes.

10        Q.   Okay.  And --

11        A.   And not only just deduplicating, but if we

12   found that -- if I remember correctly, in one or two

13   cases, there were payments that were made as a

14   deposit on something, and then later the full

15   payment was made, but the full payment didn't

16   include it.  But they might have put the amount that

17   was on the invoice.  So that's another form of

18   deduplicating or making sure that only the total

19   amount being paid was included.

20        Q.   Did you have any procedures to exclude items

21   based on date ranges?

22        A.   We looked at date ranges.  Again, it wasn't

23   a procedure.  It was a hands-on, take a look, does

24   it make sense.

25        We excluded alternative -- alternate living
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    expenses.  And again, I don't remember if they're in

2    the -- still in the database or if they were moved

3    to not damage.  But in some cases, in a lot of

4    cases, for folk that did not move back into the

5    house and might have still been living in the

6    alternate living -- alternative living facility, we

7    cut off the -- all those expenditures as of the date

8    of the foreclosure or the short sale or the sale in

9    mitigation.

10       Q.   I think you used the term "moved to not

11   damages."  Is that the other spreadsheet you were

12   talking about earlier, or is there somewhere else

13   that you moved it?

14       A.   On the same spreadsheet, if you sort --

15   there is -- there's -- one of the category -- one of

16   the columns that I believe says "category" or

17   something of the like.  And I believe one of the

18   categories is settlement, one of the categories is

19   damage, one of the categories is not damage, and I

20   don't remember if there was another category in

21   there.  But some of them may have been moved to not

22   damage or they may have been taken out completely.

23       Q.   Okay.  So --

24       A.   And just eliminated from the schedule.

25       Q.   This is under the categories that you use in

Page 118

1    your Support Master Database.  I'm pulling it up

2    here, and I don't know if you have it available,

3    Mr. Elkin.

4         A.    It would take me a little bit to log on, if

5    you want me to do that, but if you want me to --

6         Q.    But you've got, as I see it, three

7    categories, damage, not damage, and settlement.

8         A.    Okay.

9         Q.    What did you deem to be settlement?

10        A.    Just -- that was the generic term for any

11   moneys that we saw that were collected.  I don't --

12   I wasn't intending to characterize it.  I think one

13   of them had used that, because it says settlement on

14   some of the checks.  And so we just said anything

15   that's incoming money that's going to go on this

16   worksheet, just call it settlement so we can sort it

17   that way.

18        Q.    And what did you use as criteria for

19   something to be determined not damage?

20        A.    If they had picked up some detail from

21   somewhere and put it into the spreadsheet and either

22   it was clear on the surface that it wasn't damage or

23   if it was ultimately determined -- for instance, if

24   it was a property owner association payment made in

25   conjunction with the affected property, when we made

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 119

1    the determination, and I communicated to them that

2    those would not be included in alternate damage --

3    alternate living expenses, there may have been some

4    cases where they had already keyed in the data for

5    that particular claimant.  I don't recall if, in all

6    cases, they just simply removed it from the schedule

7    or if they called it not damage.

8          In some cases, where they hadn't already put

9    it in, they would not have keyed it into the

10   information, because that's how it would have been

11   identified to us.  That might include, you know,

12   lawn maintenance or any of the things that were

13   taking place on the facility that they were no

14   longer able to live in, the affected property.

15         MR. KALIL:  All right.  Can we take two

16      minutes, if that's okay with everybody?

17         MR. BREIT:  Yeah.

18         THE VIDEOGRAPHER:  The time is 12:31.  We're

19      going off the video record.  Please stand by.

20       (Recess from 12:31 p.m. until 12:35 p.m.)

21         THE VIDEOGRAPHER:  Stand by, please.  The

22      time is 12:35.  We're going off the video --

23      going on the video record.

24   BY MR. KALIL:

25      Q.   Mr. Elkin, in terms of the numbers that you

Page 120

1    put into your spreadsheets, once they were input and

2    once you've checked them off to make sure that the

3    numbers matched the appropriate receipts, what

4    calculations, if any, did you do on those numbers?

5        A.    Totaled them up.

6        Q.    Okay.

7        A.    Carried them to the prejudgment interest

8    spreadsheet in order to make those calculations,

9    carried them forward to summary schedules, which

10   isn't the calculations, just a function.  I don't

11   know if there's any other calculations.

12          There were some calculations that were made

13   before they got onto the spreadsheet, so that items

14   that were being delineated separate of their sales

15   tax would have the sales tax included into them, and

16   then brought on.  So that's -- and that's on a --

17   was done separately, so those were on -- they

18   ultimately end up here, but those were on separate

19   calculations.

20       Q.    Let me pause you, if I may.

21       A.    Yes.

22       Q.    Have those been provided?

23       A.    It's all in here.  I mean, it just rolled up

24   into it.  I think -- I think at one point, we were

25   putting the number in with a formula, just, you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    know, put the number in that's showing up here.  I

 2    think it's -- six-and-a-half percent was the sales

 3    tax at that time.  And so -- and then we would have

 4    replaced the item.

 5         And then when I went back and reviewed it, I

 6    just was reviewing with a little spreadsheet so I

 7    can check the number, and it would fall off.  But I

 8    don't believe it was a separate schedule.  I think

 9    it was an Excel schedule that was in this data and

10    then pulled into the summary data.

11       Q.   Okay.  Did you or any of your staff visit

12    any of the properties at issue?

13       A.   No.

14       Q.   Is it fair to say that the report we have,

15    with the three updated exhibits, represents your

16    full opinion in this case as of today?

17       A.   Yes.

18       Q.   Okay.  Are you expecting to give any

19    additional opinions between now and trial?

20       A.   I haven't been asked to.

21       Q.   Okay.  Is there any other -- have you --

22    have you noticed any other errors in your report

23    besides Exhibit 12 that you've updated, Exhibit 17

24    that you've updated, and Exhibit 4?

25       A.   No.
```

Page 122

1    Q.    Okay.  What brought to your attention the

2    need to update Exhibit 12?

3    A.    Exhibit 12, I believe, is the Martinez

4    family, and we had been aware that there was a

5    higher -- that they believed that there had been a

6    higher number than the number we were using.

7         And I believe in looking at our report and

8    looking at the documents we considered, they

9    recognized that we did not have a package that was

10   on the portal that included receipts that we had not

11   gotten, and so they asked us to look at that

12   particular document on the portal.

13        We went to the portal and got that document

14   and, in fact, recognized that there were -- I mean,

15   the biggest item that I recall was a reverse osmosis

16   equipment, and I believe there is a -- maybe an

17   air-conditioning repair, but there were -- and some

18   other smaller items, and so we added that to the

19   report.

20   Q.    Let me ask you, then, if you would look at

21   Exhibit 12 updated, which should be in your binder.

22   A.    Uh-huh.

23   Q.    And I see that on Page -- it's

24   Exhibit 12.1 updated.

25   A.    Yes.

1    Q.   It's three pages.  And you've been kind

2  enough to highlight the changes.  The first one is

3  the Bed, Bath & Beyond receipt.  Is that the one you

4  said you found there was a return on the same

5  receipt?

6    A.   I think it is.

7    Q.   Okay.  So you took that off?

8    A.   Yes.

9    Q.   The third page has a number of items, and I

10 was going to ask you about these.  What do you

11 understand the music equipment on here to be?

12   A.   I don't remember specifically.

13   Q.   Okay.

14   A.   I think that's a general characterization of

15 what was on the invoice.

16   Q.   What about the second entry, Pozo 100 foot

17 water well, what do you understand that to be?

18   A.   The plaintiff would have to describe that

19 specifically.  I believe it was either part of the

20 well or -- I'd have to go back to that specific

21 receipt to see what it is.  I don't recall as we're

22 sitting here right now.

23   Q.   Is that something you can access?  Because

24 this is -- this is one of the ones you've updated

25 since the time of your report, I want to find out.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 124

1    It should be fresh in your mind.

2       A.    I wouldn't say it should be fresh in my mind

3    when there's 20 different plaintiffs, but I could

4    possibly refer to that document.

5       Q.    Would you be kind enough to -- I mean, can

6    you tell me, sitting here today, what a water

7    well --

8       A.    Well, I do remember that they were on well

9    water there.

10      Q.    Okay.

11      A.    And I do remember I saw some expenditure for

12   replacement of the pump.  I don't think that's the

13   replacement of the pump, or it might be, but since

14   it's talking about depth, I'm wondering if that had

15   to do with some of the piping or anything that was

16   in connection with that.

17         So -- but to actually know specifically, I'd

18   have to get in and look at the actual -- it's -- I

19   mean, it's from PDF Page 48 of Document 329779.  But

20   I don't think that you -- and you were provided that

21   document.  Actually, you weren't provided that

22   document, I don't think.

23      Q.    Okay.

24      A.    I think you were just told the number

25   because it's -- it was on the portal.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 125

1    Q.   Okay.  Do you have that in your work papers?

2    A.   I can find it.  I think it may have reverted

3    back to --

4    Q.   I'm looking through what I've been provided,

5    Mr. Elkin, and I do not see that in the list of

6    documents that I have.

7    A.   It's not.

8    Q.   So am I correct, then, that there are

9    documents that you have relied on in doing this

10   update to the Martinez schedule that were not

11   provided to us yet?

12   A.   That one document.

13   Q.   Okay.

14   A.   And we've made reference to it.  It's

15   available to you on the portal, but -- I brought up

16   on the screen.  I think I said Page 48, but it's

17   actually PDF Page 49, which is properly reflected

18   there, and it's -- it says "well" on the top.

19   Q.   Okay.

20   A.   And I think pozo -- there were many

21   circumstances here where I had to rely on Google

22   Translate to get a general understanding.  Most of

23   the words, I had to -- I don't recall what that is.

24   Q.   Did you make any determination, when you

25   were updating Exhibit 12, that that was an

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 126

1   appropriate expense to include here?

2     A.   My analysis was not to determine the

3   eligibility of particular expenses, but rather to

4   quantify the items that were being claimed and to do

5   everything I could to find the backup. As to

6   whether or not the replacement or the repair that

7   relates to that well receipt, I did not.

8     Q.   And is that -- would that be true for all of

9   the items that are in your report, you were not --

10     A.   Yes.

11     Q.   I'm sorry. Let me just finish the question.

12     Would you agree with me that you were not

13   making a determination as to whether -- whether any

14   of these items were appropriately included in the

15   report; you were simply including them for purposes

16   of the numbers and tallying them up?

17     A.   For the numbers and to do a diligent job to

18   make sure that we applied relatively simple, but

19   forensic procedures to be able to correlate the

20   expenses with the claimed backup.

21     Q.   And those forensic procedures extended to

22   matching invoices with numbers in your spreadsheets,

23   but they did not include any determination of

24   whether those invoices were, in fact, related to the

25   claims in the case; is that fair?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 127

1    A.    To the extent that if something obvious

2    jumped out, we might have had some discussion

3    with -- about it.  There are things that I excluded

4    based on my observation and subsequent discussions.

5         In fact, particular to this -- this -- the

6    Martinez claim, I had excluded a relatively large

7    item, but that was not -- it wasn't my intended

8    scope to be able to go through every receipt and

9    determine its eligibility.

10   Q.    And recognizing that you've already said

11   you're not an expert on Chinese drywall or defective

12   drywall, is it your general understanding that wells

13   are usually found outside of the homes?

14   A.    The well itself?  Again, I'm not an expert

15   in wells, but I've had three or four of them, and

16   all of mine were outside of the house.  The motor

17   was inside of the house, and much of the piping was

18   inside the house -- inside the garage.

19   Q.    Inside the garage.  Do you have any

20   understanding of where the well referenced here for

21   Mr. Martinez was located?

22   A.    I do not.

23   Q.    There's another entry also on that same

24   page, Home Depot miscellaneous.  Are you able to

25   find that for us?

Page 128

1    A.    Yes.

2       Q.    And what is -- what is it that's being

3    identified, or why is it listed as miscellaneous?

4       A.    It's being listed as miscellaneous because

5    it contains a number of different things, and I am

6    not certain what all of them are.  You can see the

7    descriptions there, drain pan.  The most expensive

8    thing on there is a -- was a 4500-watt 50-gallon,

9    but I'm not sure what it actually is.

10          I think I started to look at the -- I don't

11   recall what I did to look at this, but it was

12   described as miscellaneous because I couldn't

13   specifically identify what it is.  And I expect that

14   the claimant would be able to do that.

15      Q.    So you're not offering any opinion as to

16   whether this is an appropriate item or any of the

17   items are an appropriate item to be claimed by the

18   Priority Claimants; is that correct?  That's not

19   part of your --

20      A.    That's correct.  That's correct.

21      Q.    Okay.  While we're doing the updates, can I

22   ask you to turn to Exhibit 17, the second correction

23   to your report that you provided us?  Do you have

24   that in front of you?

25      A.    I do.

Page 129

1    Q.   Okay.  Can you tell me what is different

2  between the original Exhibit 17 and the updated

3  Exhibit 17?

4    A.   Yes.  The Exhibit 17.2, in the original

5  calculation, incorrectly treated the second mortgage

6  reflecting that that second mortgage had been taken

7  out in conjunction with the acquisition.  And upon a

8  deeper dive and review, it was determined that that

9  actually was taken out later.

10       And you've heard the expression pulling

11  equity out of your home, and so this was an equity

12  loan, as I understand it.  And the beginning

13  balance, for purposes of my calculation, should have

14  been zero, not 298,115.  And that one change flows

15  through to reduce the lost equity by that same

16  amount, 298,115.

17    Q.   Okay.  Were there any other changes on

18  Exhibit 17?

19    A.   I think it looks like I corrected -- in the

20  footnote, it's -- in the original, it said 98,114.

21  It was missing the 2, so I put that 2 in there.

22    Q.   Okay.

23    A.   And now, actually, as I'm looking at it

24  right now, it says "as if this time," and I should

25  have corrected that to say "as of this time," but I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 130

1    didn't.

2         I don't see anything else that changed.  It

3    looks like the documents that are referenced are the

4    same.

5    Q.    So I take it in the original Exhibit 17, you

6    had assumed or presumed that all of the mortgages

7    were used to acquire or improve the house?

8    A.    I wouldn't say I assumed it.  I was just

9    wrong about it.  I think I -- I had read it

10   somewhere.  I thought I had read it somewhere.  I

11   think I must have confused two claimants.

12        And when I was going through a

13   reconciliation process at a more detailed level,

14   sort of taking this in a different direction, it

15   wasn't matching, and it wasn't matching by 298,115.

16   I went -- if I remember correctly, I went back to

17   the deposition, the Rosen deposition, I think I had

18   read pretty early.  And it became clear to me, and

19   so I had made a mistake.

20   Q.    When was the reconciliation process?  When

21   did you engage in that?

22   A.    Well, when I reviewed this before submitting

23   it, I was really looking at the calculations as they

24   are in the backup.

25        In preparation for the deposition, I did

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 131

1    it -- I'll just say going at it at a different

2    direction.  And so that took place last week and

3    then even through this weekend.

4           This particular item, I probably identified

5    on maybe Wednesday.  I don't remember the exact

6    time, but sometime last week.

7       **Q.   When you say in a different direction, what**

8    **do you mean by that?**

9       A.   Well, in order to determine the equity, the

10   money that they had in the deal, there's a lot of

11   different ways you can calculate it.  So we did it

12   one particular way, looking at the balances and

13   looking at the transactions one by one.

14          And then I did what I'll call a more

15   simplified method, and that's -- in the exhibits

16   that we marked at the beginning, that little yellow

17   sticky that's in the bottom left hand, was doing it

18   in a different direction.

19          So in other words, I was first measuring

20   what did they put into it -- not that binder.

21   It's --

22      **Q.   Thank you.**

23      A.   It's there.  And -- and so if you went to

24   17 -- it should be in that binder.  It probably says

25   17U.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 132

```
 1     Q.   Okay.

 2     A.   It just says 17.

 3     Q.   Okay.

 4     A.   So in this -- you know, it's a lot of the

 5   same numbers because they are coming from the same

 6   place, but I made a simple calculation of, here's

 7   the money that they put into it via paying for it,

 8   the 1,825,000.  Here, I just broke it out between

 9   the million six --

10     Q.   Bear with me one second.  I'm trying to

11   follow you.

12     A.   Sorry.  I'm down on the yellow sticky on the

13   bottom left.  Are we talking about --

14     Q.   Are we on 17?

15     A.   17.2 updated.

16     Q.   I'm looking for a 1,825,000.

17     A.   You won't see it.

18     Q.   Oh.

19     A.   That's my point.  It's a 1,600,000 plus

20   225,000.

21     Q.   Got it.

22     A.   So the testimony would have been that

23   they 1,825,000.  It was a combination of the

24   1,600,000 purchase price and then there were some

25   work orders in place at that time, and then capital
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 133

1   improvements that were made subsequent to the home,

2   to bring up a total of 1,975,000 that he had

3   actually physically put in money for.

4        I took out the balances of the loans that

5   were due at the time of the sale and mitigation, and

6   then I adjusted that for the closing costs and

7   related credits to come to a net of 1,192,583, which

8   is basically the money he had in the deal, you know,

9   not including the money that he had spent to carry

10  the property, the interest expense, the real estate

11  taxes, the hazard insurance, all those things.

12       This is just the money that he had so that

13  at the end -- sometimes someone says, How much

14  equity do you have in your house?  Well, the equity

15  I have is -- is, you know, what -- what I put into

16  it or what it's worth less the mortgages that I

17  have.

18  Q.   So I'm just going to ask you a question:

19  Isn't the general definition of equity in regards to

20  real estate the difference between the market value

21  and the outstanding incumbrances or loans?

22  A.   It can be, and -- and as you'll see in my

23  report, I defined what I'm calling equity in this

24  particular case.  And -- and it's including

25  settlement costs and other -- other capital -- other

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 134

```
 1    outlays, either during the acquisition or held back

 2    from them at the sale.

 3         And one of those reasons is they weren't

 4    given an opportunity to get that money out of this

 5    because of either sale through foreclosure or sale

 6    on a short sale or the fact that they sold it

 7    prematurely.

 8    Q.   You're not expressing an opinion on whether

 9    they were not able to sell it otherwise, are you?

10    A.   No, I'm not.

11    Q.   You're taking that as that's what they

12    stated to you?

13    A.   Well, in part, I think it's -- I don't want

14    to call it obvious, but I think it's a fair

15    assumption on my part just for purposes of being

16    able to make a calculation, not to render an

17    opinion.

18    Q.   The assumption being that the Priority

19    Claimants' reduction in their cash flows -- this is

20    really a cash flow analysis, isn't it?

21    A.   More or less, yeah.  In fact, I think

22    what -- the best way to describe it --

23    Q.   In Paragraph 22 of your report?

24    A.   Yeah.  That it's really like almost net

25    investment capital.  It's the amount that they've
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 135

1  paid for the affected property.  So it's what was

2  paid directly by claimant through deposits, funds at

3  closing, payments of principal on mortgages, or

4  capital improvements, less the funds that they may

5  have received when they either sold it through --

6  whether -- when it was foreclosed, although I don't

7  think anybody got money back when it was foreclosed,

8  through a short sale or through -- or through sale

9  in mitigation.  And to the extent that they had to

10  come out-of-pocket for anything at one of those

11  events, that was included as well.

12      Q.  Am I correct in doing your analysis of lost

13  equity, you did not make any effort to take into

14  account general market forces in the real estate --

15  in the real estate world?

16      A.  That's absolutely correct.

17      Q.  Did you not attempt to take into account

18  whether any of the Priority Claimants has bought at

19  a high point in the real estate market and sold at a

20  low point?

21      A.  That's correct.

22      Q.  And you did not take -- attempt to take into

23  account any other issues that might have affected

24  the values of the property to determine whether the

25  equity was reduced for reasons wholly unrelated to

1    the presence of defective drywall or Chinese

2    drywall?

3        A.    That's correct.  This was simply a financial

4    calculation without those considerations.

5        Q.    Okay.  Am I correct that you did not take

6    into account in your calculation of lost equity, as

7    you've defined it, whether or not any of the

8    claimants, Priority Claimants, received a reduction

9    in property taxes as a result of the presence of

10   defective drywall or Chinese drywall?

11       A.    That's correct.

12       Q.    Okay.  Am I correct that you didn't take

13   into account in your calculation of lost equity, as

14   you've defined it, whether or not any of the

15   Priority Claimants overdeveloped their properties

16   for the neigh- -- neighborhood?

17       A.    I did not.

18       Q.    Am I correct that you did not take into

19   account for your determination of lost equity for

20   any of the Priority Claimants whether they made

21   improvements that were not the type of improvements

22   that are dollar-for-dollar increase in the value of

23   a home?

24       A.    I think that's sort of the same question as

25   the one before, but that's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.    Okay.  Am I correct that you didn't take

2  into account in your report whether or not any of

3  the Priority Claimants had the financial capacity to

4  maintain their homes rather than lose them through

5  foreclosures or short sales?

6    A.    That's correct.

7    Q.    Am I correct that you did not investigate

8  the circumstances of any of the short sales and what

9  negotiations were had with the lenders in regard to

10  the Priority Claimants who had short sales?

11    A.    That's correct.  Those things -- all those

12  things that you just said were not within my scope.

13    Q.    Am I correct that you did not investigate

14  any of the foreclosure processes in connection with

15  any of the Priority Claimants who were facing a

16  foreclosure?

17    A.    I mean, investigate the process, that's

18  correct.  I reviewed the documentation to see the

19  financial impact.

20    Q.    Am I correct that you did not attempt to

21  evaluate in any manner whether a piece of real

22  estate sold at a foreclosure sale has a lower sale

23  price than the same property sold privately?

24    A.    That's correct.

25    Q.    Am I correct that you did not attempt to

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 138

1  evaluate in any manner in your report whether a

2  property sold by a short sale has a lower selling

3  price than a property sold outside of that process?

4      A.   That's correct.

5          MR. KALIL:  Good point for lunch?  It's

6      1:00 o'clock.

7          MR. BREIT:  It's up to you.  It's good with

8      me.

9          THE VIDEOGRAPHER:  The time is 1:00 o'clock.

10     We're going off the video record.  Stand by.

11         (Recess from 1:00?p.m. until 1:53?p.m.)

12         THE VIDEOGRAPHER:  The time is 1:53, and

13     we're back on the video record.

14  BY MR. KALIL:

15     Q.   Good afternoon, Mr. Elkin.  Just a couple of

16  cleanup things.

17         We mentioned -- or we talked about earlier

18  some items that you were retrieving from the portal.

19         Did you have full -- do you have full access

20  to the -- the portal that gives you full access to

21  all the documents on it?

22     A.   I don't know if my access is restricted or

23  not.

24     Q.   Okay.

25     A.   I know that I can get the things I see.  I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 139

1    don't know if there are more things on it or not.

2        Q.    Have you ever inquired as to whether your

3    access is full or limited?

4        A.    No.

5        Q.    Has anybody guided you in what items to look

6    at or suggested to you you should look at certain

7    items in the portal?

8        A.    Yes.  When we were seeking backup in

9    different information, we specifically got guidance

10   from probably each counsel as to things that they

11   knew were there that we relied on -- or that -- that

12   related to the different expenses.

13       Q.    Did they give you any proactive suggestions

14   on things you should look at as well?

15       A.    Yeah.  Yeah, they linked them to, you know,

16   particular items, or they would give us a list of

17   things and say, these came from -- these items or

18   this item.

19       Q.    Okay.

20       A.    That was -- that was the whole purpose.  We

21   really didn't go to the portal for the purpose of

22   looking through the portal for everything.  We went

23   to the portal to get better copies of something, and

24   really, once we got it, just to -- to know that

25   there was some information there, but we were still

Page 140

1    relying on representations of what documents were

2    available.

3        Q.   And -- and representations from counsel as

4    to what documents might be helpful in your analysis?

5        A.   Yes.

6        Q.   Is everything you've relied upon with the

7    exception of one document we talked about earlier,

8    on the Dropbox?  Did you -- everything you

9    generated.  Excuse me.

10            There was one document --

11       A.   On the Dropbox?

12       Q.   I'm sorry.  That's been --

13       A.   Oh, the drop -- the second drop, yes.

14       Q.   Second Dropbox.

15       A.   The Dropbox that was provided for you?

16       Q.   Exactly.

17       A.   Yes.  It's possible that you got the Dropbox

18   that was connected to the HTML?

19       Q.   I have the HTML link.

20       A.   Yeah, okay.  Then you have the basket that

21   was -- the one file of documents that has everything

22   in it, so yes.

23       Q.   Okay.  Would I find in there the list of

24   documents that counsel suggested you review on the

25   portal?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1      A.   What you'll find in every section is a Word

2   or PDF document that -- they called it "damage

3   summaries," and it's not that at all.  But it links

4   different expenses and different things, and it

5   links them to either things on the portal or it

6   links it to wherever they were aware that those

7   documents were.  And you'll find that in every

8   section.

9      Q.   Well, I -- when I look --

10      A.   It's a Word document.

11      Q.   I am looking at what I have a link to right

12   now, and I've got -- let me see if I can find it

13   here.  Bear with me one second.

14          I see under "Supporting Documents,"

15   Section C, something EXT923 Martinez Out-of-Pocket

16   Damages Summary Provided by Counsel.

17          So I think that may be one of the documents

18   you relied on.

19      A.   I think -- well, I know I included it.

20          Are you looking at the -- what are you

21   looking at?

22      Q.   I am looking at -- whatever this is.

23      A.   Okay.  So that's the -- the --

24      Q.   The HTML link?

25      A.   The HTML -- yeah, sorry.  Let me log onto

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 142

1    this real quick.

2        Q.    I want to make sure we have the same

3    materials.

4        A.    Absolutely.

5              So which one were you looking at?

6        Q.    Well, I saw the one that says -- if you go

7    up or -- excuse me, if you -- if I go to "Supporting

8    Documentation" --

9        A.    Yeah, which --

10       Q.    EXT9774, Florida Claimants Remediation, that

11   appears, at least what I'm seeing --

12       A.    Well, that's something different.

13       Q.    Okay.  That looks like I'm in the wrong one.

14   Let me go back.

15       A.    If you pick a particular claimant --

16       Q.    Yeah.

17       A.    -- I can show you what I'm talking about in

18   any claimant you'd like to ask about.

19       Q.    Why don't we just take the first one, Avery?

20       A.    Okay.  All right.  For some reason --

21       Q.    Your link is not working?

22       A.    Yeah.  So let me go to the same thing, if

23   you don't mind, but I'm going to go to the live

24   version of it --

25       Q.    Okay.

Page 143

```
 1    A.   -- which is the same basic thing, except
 2  it's using the software that it was designed for,
 3  and you will see it looks just like yours.
 4    Q.   Uh-huh.
 5    A.   And so at the bottom of Avery, you will see
 6  "Janet Avery Out-of-Pocket Damage Summary."
 7    Q.   Okay.  We'll go to that.
 8    A.   And you can see there that this was counsel
 9  sending me some things and basically telling me what
10  doc ID this lease was at.
11    Q.   All right.  And is -- is that the listing
12  which you were referring to of what counsel directed
13  you to on the portal, or was there anything else?
14    A.   It's possible, like on a phone conversation,
15  they could have also said something, but I don't
16  think so.  I think for the most part -- if they did
17  that, maybe we were on the phone and we were on the
18  portal while we talked to them, but I don't recall
19  that ever happening.  So I think -- I think it was
20  always this.
21         And then for Martinez, I don't remember, I
22  think they actually e-mailed me the actual document,
23  the one that we just looked at before.
24    Q.   Yeah.
25    A.   I think they e-mailed it to me, and I
```

Page 144

1    probably double-checked it, because I typically do

2    that on the docket but --

3        Q.    Is this -- is this a single time event per

4    priority plaintiff, or were these updated over time?

5        A.    I don't think they were updated.  I think

6    basically it was -- we were asking them where did

7    some of this stuff come from.  They were trying to

8    get stuff onto the portal as fast as they could, and

9    it really wasn't happening fast enough for us.  So

10   they said they could put this together for us.

11        I don't know if they already had this or

12   they put it together, but, no, it wasn't the

13   continual update thing.

14        Q.    All right.  Just a definitional thing.

15   There is a phrase, "sale in mitigation," that's in

16   your report.  Is that a phrase you came up with or

17   somebody else generated that?

18        A.    I think it evolved out of a conversation.

19   It's not a technical term I came out of.  I think it

20   was just, in their mind, a more descriptive -- more

21   descriptive of what -- what took place.

22        Q.    Not your choice of words?

23        A.    I don't know how it evolved, whether I said

24   "sale in mitigation" and they said, oh, let's use

25   that, or if they said, we want to call this "sale in

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 145

1    mitigation," but it's not a term that I've used

2    outside of this case.

3        And I think I define it somewhere in my

4    report to be clear as to what I mean by that.

5    **Q.   Can you tell me where that's found in your**

6    **report?**

7    A.   Sure.  It's on Page 7 of 9, and it does say:

8    "Counsel refers to homes that were sold outside

9    of foreclosure or short sale as sales in mitigations

10   as claimants contend that such sales were made at

11   amounts below what they should have sold for but for

12   the Chinese drywall circumstance."

13       So that does make it sound a little bit more

14   to me like that was a terminology that they had been

15   using.

16   **Q.   So does that refresh your recollection that**

17   **was counsel's terminology, not yours?**

18   A.   I don't actually remember it that way, but

19   if I wrote that, which I did -- I wrote the

20   footnote -- then probably so.

21   **Q.   And when you say that -- in here that**

22   **claimants contend such sales were made at amounts**

23   **below what they should have sold for but for this,**

24   **that's based upon representations from counsel, the**

25   **claimants' statements, and/or things you read in**

1    their depositions?

2        A.    Things I read in their depositions, things

3    that they put into their interrogatories or in their

4    SPPF or -- or anything like that.

5        Q.    But you didn't do any analysis of whether

6    that was an accurate statement or inaccurate?

7        A.    That's absolutely correct.

8        Q.    In your report, you say that you were asked

9    to determine out-of-pocket expenses.  And we've

10   touched on this, but I just want to make sure I

11   understand the use of that word "determine."

12            Was there anything else that you were trying

13   to do in terms of measuring the amounts put in

14   besides tying it into receipts or other evidences of

15   expenditures?

16       A.    Well, we were trying to determine the

17   accuracy of them.  So for instance, one of the

18   remediation expenses, the documentation was there,

19   everything was there, but it was missing a

20   50,000-dollar expenditure that was made to a

21   subcontractor as opposed to directly to the

22   contractor.

23            So there was an amount of, you know, going

24   through the documents, you know, as an accountant, a

25   forensic accountant, you know, tying things out and

1   making sure that things were included or not, as we

2   said before, duplicated or not duplicated.  But as

3   far as making determinations outside of the

4   financial and accounting accuracy, no.

5       Q.   And -- and again, you didn't verify each

6   expense independently as to whether it was

7   reasonable or in any other measure, just it had been

8   incurred?

9       A.   For the most part, that's correct.

10      Q.   Well, where would there be exceptions on

11  that?

12      A.   There -- there was -- I mean, the one thing

13  I can think of related to a motorcycle.

14      Q.   Okay.

15      A.   And I don't know that I made any

16  determination, but there was conversation as to

17  whether or not to include that motorcycle in the

18  personal damages -- personal property damages.  And

19  we talked about a number of different things, and

20  I'm pretty sure that that's not included.

21      Q.   When you say it's "not included," meaning

22  you didn't put it into your damage report?

23      A.   That's correct.

24      Q.   And why did you determine not to put the

25  motorcycle in?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 148

```
 1      A.   There were a combination of things and I --
 2    it was older, but then also I had read somewhere
 3    that they had sold it, but they couldn't tell me how
 4    much they sold it for.  And I just -- I don't
 5    remember what it was at that point, but the
 6    combination of all those things, we just felt that
 7    -- now, I was trying to be conservative for the most
 8    part with measurements, but in that particular case,
 9    I said -- you know, I don't remember my exact words,
10    but I said I'd prefer not to include it.
11      Q.   It was a Kawasaki motorcycle, if I recall
12    correctly.
13      A.   That's good, yes.  On a yellow receipt.
14      Q.   Did it have anything to do with the fact
15    that it might have been parked outside as opposed to
16    inside?
17      A.   No.
18      Q.   Any others that come to mind?
19      A.   Other than things that we've already spoken
20    about, I don't think so.
21      Q.   Did you ask --
22      A.   Actually, I take that back.  I'm sure there
23    are some other ones that aren't coming to my mind,
24    but the majority of them are the ones we've spoken
25    about.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 149

1     Q.   Is there any way that we can find those from

2   your -- your work papers to see which ones you

3   exercised that additional level of inquiry?

4     A.   I think it would just be things that might

5   be listed somewhere that aren't on my listing, so I

6   don't think so.

7     Q.   Okay.  But I'm correct in saying there was

8   no comparison on items in your damage reports and

9   market values or things of that ilk?

10          That's not part of what you were doing?

11    A.   That's correct.

12    Q.   And I think I used the term "market values."

13          You didn't -- just to be clear, you didn't

14   make any effort to compare the prices in your report

15   for any personal property items with any other

16   measure of value except what the receipts were

17   showing?

18    A.   With one exception where, actually, I was

19   provided with an inventory that included a column

20   that had -- I believe they referred to it as

21   "replacement cost."

22    Q.   And which one was that?

23    A.   I believe that is for Claimant 3.

24    Q.   Let's see.  Is that David Deeg and Deborah

25   Hooker?

Page 150

1    A.    Yes.

2        Q.    Okay.  And where can we find in your

3    reports, if it's there -- it wasn't in your work

4    papers -- that other inventory?

5        A.    Well, if you look at Exhibit 3.1 --

6        Q.    Right.

7        A.    -- you will see that there is a -- five

8    pages of detail.  And when you look at "Supporting

9    Document" for that detail, it says "Duraclean

10   Inspection Report."  And it provides the -- the

11   Bates number from which each line item came and it

12   identifies that it was Exhibit 8 to a deposition,

13   and it identifies the PDF page that it came from.

14       Q.    Okay.  So that --

15       A.    The document itself is, of course, not with

16   my report, but it's specifically referenced.

17       Q.    And in that instance, you're not expressing

18   any opinion on whether those values are correct,

19   that's somebody else's work directly?

20       A.    That's correct.

21       Q.    Is that the only instance where you have

22   something of that nature?

23       A.    That's the only thing I can recall right

24   now.

25       Q.    All right.  While we're on that, why don't

Page 151

1    we just work through the column just to understand

2    what these are, if you don't mind.  We're on 3.1.

3            The first column -- these are all

4    extractions from your Excel spreadsheets?

5        A.    These are -- that's fair enough.  This is an

6    extraction from the support database.

7        Q.    Okay.

8        A.    And it -- less information was brought over

9    to here so that it could give you the relevant

10   columns for this.  There may be one or two instances

11   where I might have made an update on the exhibit and

12   didn't make it on the original support database, but

13   they'd be very few.

14       Q.    All right.  So the first column is just

15   "Type."  Is that just the category into which you've

16   allocated that expense?

17       A.    That's correct.  If you recall on the --

18   when we were looking earlier at the Support Master

19   Database or Master Support Database, there was a

20   column before that that had Damage, Not Damage,

21   Settlement.  And so that wasn't necessary to make

22   this schedule so big since everything that's on here

23   is damage, so I didn't include that column.

24       Q.    Okay.  Now, if I look at the Support Master

25   Database -- let's see if I can find this.  Are you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 152

1    saying that the -- the type is just a selection from

2    the options in there?

3        A.   Yes.

4        Q.   Okay.  And in there, I'm seeing a number of

5    different types of categories, if you will.  I don't

6    know if you can pull that up.

7        A.   What I'm going to do is pull up the one that

8    was sent to you that was the most recent updated

9    one, that was sent when we sent you the corrections

10   to 12.

11       Q.   "Support Master Database Updated (12)"?

12       A.   And it's got a little parenthesis in it that

13   says 12?

14       Q.   That's the one I'm looking at.

15       A.   Perfect.  Yeah.  Make sure we're on the

16   same --

17       Q.   And I see under the "Type," there is a

18   number of possible selections, if you look at the

19   dropdown.

20       A.   That's right.

21       Q.   Okay.  Let's run through those for a second.

22            What were "Additional Damages"?

23       A.   Additional damages were the things that fell

24   into a category consistent with Judge Cooke's order.

25   I would have to go into the specifics of that, but

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 153

1    those are things that were not some of the things

2    that she specifically made reference to.  So it was

3    not alternate living expenses, it was not personal

4    property damage, it was not remediation.

5              You see in some cases, I -- I would have put

6    a -- I would have put a description of it, so one of

7    them says "Additional Damages, Lost rent."

8         Q.   Right.

9         A.   The particular one that's only called

10   "Additional Damages" actually just relates to a

11   small group of expenses, and those were attorneys'

12   fees and that was primarily for Claimant Miranda and

13   that related to costs in connection with their

14   foreclosure and possibly bankruptcy.  I don't

15   remember if they -- which they had.  I'd have to

16   look at that.  And then 96 dollars' worth of FedEx

17   expenses in connection with, I guess, this -- this

18   matter.

19        Q.   Are those included in your damages for

20   Miranda or excluded?

21        A.   Included.

22        Q.   Okay.  And why would you put the foreclosure

23   costs in your damages?

24        A.   One of the specific things in Judge Cooke's

25   order said "costs in connection with foreclosure,"

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 154

1    so they have been itemized there.

2        Q.   Now, it says on there, if I'm looking at it,

3    "Supporting Document Engagement Agreement"?

4        A.   That's correct.

5        Q.   Okay.  And then "proof of payment, no"?

6        A.   That's correct.

7        Q.   What does that mean?  You couldn't --

8        A.   I didn't have copies of the actual checks of

9    the payments, but I had copies of the agreement that

10   called for the payments.

11       Q.   And it called for payments at different

12   times?

13       A.   Yes.

14       Q.   Okay.  All right.  Did you make any attempt

15   to verify if those payments were actually made?

16       A.   Other than knowing that I didn't have the

17   checks and they weren't available to me.  We -- we

18   would ask, Do you have the checks?  And they would

19   say no.

20       Q.   So you would have asked the plaintiff's

21   counsel?

22       A.   That's correct.

23       Q.   But you didn't go to the lawyer -- the law

24   firm that was referring to, the third --

25       A.   No.  No.

1    Q.   Is it fair to say that in your work, you

2    have not reached out to third parties to verify data

3    that was not available through counsel?

4    A.   Other than going onto research property

5    information, that's correct.

6    Q.   Public records?

7    A.   Public records, that's correct.

8    Q.   Question:  When you were preparing your

9    report, actually before you issued your report, did

10   you provide the report and the schedules to each of

11   the plaintiffs to have them review it before you

12   finalized your report?

13   A.   I provided it to each of their counsel.

14   Q.   Each of their counsel.

15        And did you get any comments back before you

16   issued your report from the plaintiffs?

17   A.   Yes.

18   Q.   Okay.  Which ones?

19   A.   One was Kevin and Stacy Rosen with regard to

20   not having included all of the capital improvements.

21   Q.   That's the one we talked about earlier?

22   A.   That's correct.

23   Q.   Anyone else?

24   A.   I think I may have fielded a question or two

25   with regard to -- I remember there was one question

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 156

1    in connection with the duration of somebody's

2    remediation period.  It was more of a question, and

3    I don't remember if anything changed as a result of

4    that.

5        Q.    Okay.

6        A.    Take West Palm Beach off of the header.

7              I don't remember anything else coming up.

8        Q.    Okay.

9        A.    I think, you know, there were a couple -- a

10   couple of questions and then -- I apologize.  Then

11   subsequent to actually issuing the report, I heard

12   back with regard to the one that we talked about for

13   Martinez about there being some additional -- I

14   guess they went to look into why their number was

15   lower, and aside from the motorcycle, they realized

16   that these other things that had been on one of the

17   things that they had submitted for -- for

18   reimbursement for hadn't been picked up, and that's

19   that reverse osmosis, and I think some

20   air-conditioning repair.

21       Q.    Okay.  And that's -- that's how you got

22   those additional receipts?

23       A.    That's correct.

24       Q.    But no further discussions with them at that

25   point?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      A.    Not with the parties.  I -- I don't think

 2   I -- I never talked to the Martinez claimant but

 3   conversations with Mr. Albanis specific to that.

 4      Q.    Do you recall anything more about those

 5   receipts than what we talked about earlier?

 6      A.    No.  It was in a package that had a lot of

 7   the same receipts.  We had to actually go through

 8   there to make sure that we weren't duplicating any

 9   of them, and these was toward the back of that

10   package.  So I don't know if it got cut off from a

11   package or what happened, but it was -- it was clear

12   that -- clear that they had intended those to be

13   included as part of their personal property damage.

14      Q.    Okay.  Let me take you back, since we were

15   there, to the Support Master Database updated -- and

16   in fact, to be fair to you, I think we have that as

17   an exhibit.

18            I'm going to turn to my colleague who is

19   better at managing these things than I am and ask if

20   we have that as an exhibit.

21            MR. KALIL:  While he's doing that, let me

22        digress for one moment and just tell everybody I

23        realized on the break that I had marked as

24        Exhibit 8, the Steve and Cathy Etter report, I

25        had marked a copy that I had actually written on.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 158

```
 1        With your permission, I will substitute a clean

 2     copy.

 3            MR. BREIT:  With permission.

 4   BY MR. KALIL:

 5      Q.    And I'll just ask Mr. Elkin to verify that,

 6   just to make it clear.

 7      A.    That looks to be a complete copy.

 8      Q.    All right.

 9            (Elkin Exhibit 9 was marked for

10   identification.)

11   BY MR. KALIL:

12      Q.    Mr. Elkin, let me hand you, just so we can

13   do it for the record, what we've had put together as

14   Exhibit Number 9, and I believe that is everything

15   that was sent to us when you updated Exhibit 12,

16   including the Excel spreadsheets we've been talking

17   about, but if you'd take a minute and just verify

18   that for me.  My apologies, but --

19      A.    I'll try.

20      Q.    Start --

21            MR. BREIT:  Take your time.

22   BY MR. KALIL:

23      Q.    Take your time.

24      A.    Yeah.

25            MR. BREIT:  I'll be back tomorrow.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1          Have you looked at it?  That's what I want

2     to know.

3          MR. KALIL:  Have I looked at it?  Yes.

4          Do you want to go off the -- for a second?

5     Let's not burn the tape.

6          THE VIDEOGRAPHER:  The time is 2:16.  We're

7     going off the video record.  Stand by.

8          (Recess from 2:16?p.m. until 2:22?p.m.)

9          THE VIDEOGRAPHER:  The time is 2:22.  We're

10    back on the video record.

11          (Discussion off the record.)

12    BY MR. KALIL:

13    Q.    Mr. Elkin, you have in front of you what's

14    been marked as Exhibit 9, and I will ask you if you

15    recognize that as the updates you provided to

16    Exhibit 12, to the Documents and Other Information

17    Considered Updated, the Report Exhibits Updated, the

18    Support Master Database Updated?

19    A.    I believe that's correct.

20    Q.    Okay.

21    A.    The Support Master Database Updated (12) is

22    a little bit difficult because it's multi pages.

23    What I did verify is that the first and last group

24    of them are the same, and then I know specifically

25    that there were Martinez items that were changed,

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 160

1   and so I did find them on the spreadsheet, but I

2   couldn't possibly go through line item by line item,

3   but it seems correct.

4           The only other thing is at the back of this

5   binder, there is a blue sheet and then another copy

6   of a Support Master Database, and I don't know if

7   that is the original one or what it's intended to

8   be.

9       Q.   That's a fair question, and I suppose the

10   only way we can find out the answer is if we look

11   for the change.

12       A.   Yeah, and I don't see the changes on it.

13   That's why I suspect that it's not what was -- what

14   accompanied it.

15       Q.   Okay.

16       A.   So --

17       Q.   We may well have put that into the -- so we

18   can --

19       A.   It makes perfect sense.  I just didn't want

20   to say that was everything because I don't think I

21   sent you that one with it as well.

22       Q.   Oh, well.

23       A.   Let's look again.

24           This was -- yeah, I only sent you the

25   updated.

Page 161

1    Q.   Now, whether we work from the paper or work

2    from the electronic, I was going to ask you if you

3    would go back to the support master database so we

4    can run through some of the categories --

5    A.   Okay.

6    Q.   -- that you have in there and see what they

7    relate to.

8    A.   Okay.

9    Q.   Okay.  If we look under the Types, I

10   think we -- excuse me, I said "categories," I meant

11   "Type."  I just wonder if you can tell us what, for

12   instance, "betterment" is.  It's one of the types

13   you have selected there.

14        I believe it's under D for --

15   A.   Yeah, I'm just -- I'm -- I'm going to --

16   Q.   -- select all --

17   A.   Yeah, I don't want anything else filtered

18   through this.

19        Okay.  I'm sorry.  Your question was?

20   Q.   What did you intend the word "betterment" to

21   be in that part of your report?

22   A.   "Betterment" was intended to identify things

23   that might have been considered to be beyond the

24   scope of remediation --

25   Q.   Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 162

1    A.    -- and, therefore, potentially not part of

2    remediation expense.

3    Q.    Did you also intend to include any

4    improvements beyond what had existed before?  And by

5    that, I mean if one of the Priority Claimants had

6    had an item that they said was damaged and they had

7    replaced it with a better item, were you factoring

8    that in in any way?

9    A.    No.

10   Q.    If we look at what comes up in "Betterment,"

11   it's only one of the priority plaintiffs?

12   A.    I believe that's correct.  I believe it's

13   Chapman, but we'll see.  Yes.

14   Q.    Okay.  And why did you include these under

15   "Betterment"?

16   A.    At one point I was reviewing Chapman's

17   deposition as well as the proposal that she had for

18   the remediation.  I think it was back in December of

19   2018.  And specifically in connection with questions

20   that she was asked, she identified a group of

21   expenditures as improvements.

22   Q.    Okay.

23   A.    I think she had made a -- I don't think they

24   had been done yet.  I don't even know if they have

25   been done yet today.  But she had identified, I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 163

 1    think, that she had put a deposit down on them or

 2    was about to put a deposit down on them, but they

 3    had been specifically identified by her as beyond

 4    the scope of remediation.

 5        Q.    So you were relying on her statement this

 6    was beyond, you weren't making an independent

 7    determination on that?

 8        A.    That's correct.

 9        Q.    If we look down to "Capital Improvements,"

10    what does that refer to?

11        A.    So Capital Improvements would have been for

12    a couple of claimants that had specifically

13    identified work that they had done in addition to

14    purchasing the house to make capital improvements

15    or -- or improvements to the home that were not

16    personal property damage, things that were attached

17    to the home or part of the construction.

18        Q.    Okay.  And these -- these would be the

19    Rosens, both group of Rosen claimants?

20        A.    As it turns out.  Let's see if there is

21    anybody else in that category.

22              That's correct, it's just those two.

23        Q.    If I direct you to Line 2244, for example.

24        A.    Yes.

25        Q.    Wallpaper in the powder room, is that

Page 164

```
 1   something that they determined to be a capital
 2   improvement or you determined it to be a capital
 3   improvement?
 4        A.   I determined it to be a capital improvement.
 5        Q.   And why would you consider that capital
 6   improvement?
 7        A.   Because it's not something that can be taken
 8   out of the home.  The delineation that I made,
 9   because these came from -- from specific things that
10   they got from their design group, was if it was
11   something that you could pick up and take out of the
12   house, it was personal property, and if it wasn't,
13   then -- sort of also thought of that along the lines
14   of if I was selling the house to somebody, the
15   things that they would reasonably expect would stay
16   there or the things that you would expect you would
17   be able to take away, or if you weren't going to
18   take them away, they typically would go on a
19   separate schedule identifying those things in the
20   purchase of a residence.
21             So, for instance, televisions.  If I were --
22   typically that's considered personal property, but
23   if you are selling your home and they are getting
24   the televisions, sometimes you list those out on a
25   personal property rider or addendum.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1  Q.  Okay.  Was there a listing that you gave to

2  your staff to help allocate these?

3  A.  I spoke to you earlier.  That's the work

4  that I had Rita Trabanco do.

5  Q.  Okay.

6  A.  So I gave her very specific instructions

7  with basically the description that I just gave you

8  and I think I changed three things on the entire

9  list that she did, but I went item by item.

10  Q.  So we found her work product?

11  A.  The result of her work product, that's

12  correct.

13  Q.  Is there anything else that she was doing

14  other than this one?

15  A.  She did other things in the case.  She

16  helped us -- I don't know if you've noticed, but on

17  all the things that are -- they are document ID'd,

18  at least at the point that I had her do it.  So if

19  there is a document ID in the title, because there

20  is no Bate number on it or anything else, I had her

21  put a footer in the bottom right of all those

22  documents so that if somebody printed that up, you

23  could see document ID and so it wouldn't just be

24  some loose paper and you would know that it was a

25  document ID that would have come from the portal.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 166

1    Q.   So it was effectively making sure the

2  documents could be tracked?

3    A.   Yes.

4    Q.   All right.

5    A.   And she may have done some other schedules

6  for us here and there.  She's, you know, incredibly

7  fast with entering data into these things.  So I

8  don't know, Elan may have asked her to do one or two

9  projects along the way, but all of it got reviewed

10  at multiple levels.

11    Q.   Okay.  Now, the Rosen -- Michael Rosen,

12  Capital Improvements, were they based on a proposal

13  or were they based on actual expenses?

14         Can you tell?

15    A.   They were based on proposals that the

16  testimony was that these proposals were pulled

17  because that's the work they actually had done at

18  those costs.

19    Q.   And did you go beyond the proposals to

20  verify that in any way?

21    A.   I was unable to do that.  No.

22    Q.   Okay.  Let me ask you to turn to Type -- and

23  let me see if I can get the right one here, excuse

24  me -- "Settlement Check From Contractor."

25         I think we see just one.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 167

```
 1     A.   Yes.

 2     Q.   This is for Etter?

 3     A.   Yes.

 4     Q.   Okay.  And what did you understand that to

 5   be?

 6     A.   I understood it to be a check from J. Helm

 7   Construction.

 8     Q.   Was that the -- was that the company that

 9   built her home?

10     A.   I don't know.

11     Q.   Did you make any inquiries?

12     A.   No.

13     Q.   Did anybody suggest that that is something

14   you should follow up?

15     A.   No.

16     Q.   Can I ask you to look at -- do you have any

17   doubt that that is the contractor who built the home

18   for Ms. -- for the Etters?

19     A.   I don't know one way or the other.

20     Q.   Okay.  If we go to the "Type Settlement

21   Program Check," can you select that, please?

22     A.   Okay.

23     Q.   Okay.  And what do you understand these to

24   be?

25     A.   These were checks that I understood came
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 168

1   through the vendors that are listed here.  It says

2   "Vendor" here, but that would have been probably the

3   payer; and the description there would have been a

4   description of the source.  This information would

5   have come from either the SPPF or the interrogatory

6   specifically related to this or copies of the checks

7   themselves.

8            Beyond that, I don't -- other than what it

9   says on them, I don't have a deep understanding of

10  what they were for.

11     Q.   Do you understand from the plaintiffs that

12  these were actually funds they received?

13     A.   Yes.

14     Q.   And these relate to a number of the

15  different plaintiffs?

16     A.   That's correct.

17     Q.   Okay.  And have you not included any of

18  these payments in any of your work for any of the

19  priority plaintiffs; is that correct?

20     A.   I have included these payments in a schedule

21  in my work papers.  I have not -- they are -- they

22  are part of what I make reference to in a paragraph

23  we reviewed earlier where I have not incorporated

24  them in any way into the calculations that I've

25  made.

Page 169

```
1      Q.   Okay.  So these -- none of these payments
2   find their way into the calculations you've made in
3   your -- in your report?
4      A.   That's correct.
5      Q.   What is the total number of those payments
6   that you're showing on this sort?
7      A.   47.
8      Q.   And what is the total value?
9      A.   $628,221.
10     Q.   Okay.  And for it looks like all but five,
11  you actually have proofs of payment?
12     A.   It looks that way, although my notes tell me
13  it's possible that it -- that I have proof of
14  payment for two of those five.
15     Q.   Okay.  Now, help me --
16     A.   Now, it's probably not actually.
17     Q.   When you say the "notes," what notes would
18  you be looking for?
19     A.   I'm looking in the column that says
20  "Supporting Doc."
21     Q.   Okay.
22     A.   And since two of those said "check," I
23  thought perhaps we had a copy of the check, but I'm
24  looking at it.  It does appear to only go to the
25  SPPF.  I'm guessing in the SPPF, maybe it made
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 170

1  reference to a check number or something.  So that

2  told me that it was a check but that I didn't

3  actually see the check, so I probably kept "no" in

4  there.  I would have to go back to the specific

5  document to be sure.

6      Q.  And if you wanted to do that, how would you

7  do that?

8      A.  I would go to the SPPF for this claimant,

9  which is Wites --

10     Q.  Okay.

11     A.  -- and I would take a look at what it said

12  there.

13     Q.  All right.  And it -- and the total amount

14  that you have identified as not having proof of

15  payment is what dollar amount?

16     A.  $72,784.

17     Q.  And for the balance, you do have proofs of

18  payment?

19     A.  Pardon?

20     Q.  For the balance of the settlement of -- I

21  think it's for the settlement -- let me get the

22  terminology.

23     A.  "Settlement program check"?

24     Q.  Yeah, settlement program check, you do have

25  proofs of payment?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 171

```
1     A.   It does appear so.

2     Q.   Okay.  Now, if you -- if you include in your

3   selection "Settlement Program Check" and "Settlement

4   Check From Contractor," what number do you get up to

5   there?

6     A.   $680,437, 43 different line items.

7     Q.   Let me ask you to include whether or not you

8   have proof of payment.

9     A.   Do you want to know the whether or the not?

10    Q.   Well, let's include all of them.

11    A.   The "yes" or the "no"?

12    Q.   Let's include both.  Let's do all under

13  "Proof of Payment."

14    A.   Oh, actually, I realize -- I'm sorry.

15    Q.   That's okay.

16    A.   I still had that filter on --

17    Q.   That's what I thought.

18    A.   -- if that's what you meant.

19         $753,221.

20    Q.   And now, that -- you're looking currently at

21  the support database updated.  Would that

22  information be the same in the support database

23  original?  Would you also show $753,000 in either

24  settlement program checks or settlement checks from

25  contractors?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 172

```
1      A.   I -- I would think so because that was not

2  anything that changed based on the changes to

3  Exhibit 12 updated.

4      Q.   Okay.  Now, do you have a different type

5  that would include insurance payments or some other

6  denomination under "Type"?

7      A.   I don't see one, no.

8      Q.   Do you recall any of the priority plaintiffs

9  receiving a payment from an insurance company?

10     A.   Yes.

11     Q.   Do you know --

12     A.   I think so.

13     Q.   Do you know who that was?

14     A.   I don't.  I recall that the insurance

15  company was USAA I think.

16     Q.   That's consistent with my recollection.

17     A.   But I don't remember who it was.

18     Q.   Is there --

19     A.   Let me look and see if it -- if it's in

20  here.  It might not be in here.  I don't know if we

21  have the payment.  I remember reading that in a

22  deposition.  I don't actually remember -- I'm

23  guessing it's not in there.  Let's open up the whole

24  database and see if USAA is in there in case we

25  called it something else.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 173

1    Anything else sorted over here?  No.  So

2    that should be -- well, something sorted.  Yeah.

3    Damage.  Okay.

4    No, now that thing is sorted.  And we'll put

5    in periods just in case.

6    I don't believe it's in the database.

7    Q.  Okay.  Is there another place that you could

8    identify -- I think it might be Etter.  Is there any

9    way you can tell if Etter received that payment?  If

10   not, I can take a look.

11   A.  Well, if it's not in this database --

12   Q.  Right.

13   A.  -- then I hadn't identified it directly.

14   Q.  Okay.

15   A.  It's possible there was somewhere else and

16   not entered here because we were -- that was not the

17   primary focus of what we were doing.  But I think

18   other than seeing it in the deposition, that might

19   be the only place.

20   And that does make sense that it was Etter

21   because I was looking at Etter's deposition just

22   recently because of the revision that we did.

23   Q.  So it's --

24   A.  But I'm not aware of any documents

25   specifically related to it.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   All right.  The reason I asked the question

2  is you had some that didn't have a proof of payment,

3  and I didn't know if there was distinction made

4  between those and the USAA?

5    A.   I don't think so.

6    Q.   Okay.  Do you recall the order of magnitude

7  of the USAA payment?

8    A.   I don't.

9    Q.   We'll find them and then come back to it.

10      All right.  Mr. Elkin, you had given us an

11  update this morning, Exhibit 4 updated for Steven

12  and Cathy Etter which we've marked as Exhibit 8.

13  Can I give that to you, please?

14    A.   Sure.

15    Q.   All right.  Mr. Elkin, let's take a look at

16  the update which you did.  This is Exhibit 8 for

17  Steven and Cathy Etter.  And while you've got --

18  actually, you've got a deposition exhibit.  Why

19  don't -- why don't we do that first, if you want?

20    A.   I was just looking, because you were making

21  reference to the USAA, and I noted on here that

22  there is an -- Exhibit 9 is a letter regarding a

23  settlement agreement between the Etters and USAA,

24  and you had asked me if I had any documents so --

25    Q.   Yes.

Page 175

```
 1     A.    -- I was looking to see what that document
 2  is.
 3     Q.    Let me mark a copy of that as Exhibit 10 to
 4  your deposition and hand that to you.
 5           (Elkin Exhibit 10 was marked for
 6  identification.)
 7  BY MR. KALIL:
 8     Q.    And ask you if that's what you're referring
 9  to?
10     A.    Okay.  Yes.
11     Q.    And do you see on Page 4 a reference to a
12  payment and settlement funds?
13     A.    Yes.
14     Q.    And what is the amount that's referenced
15  there?
16     A.    It's $368,203.69.
17     Q.    Okay.  And this was a document you had
18  available to you when you were preparing your
19  report?
20     A.    Yes.
21     Q.    Is there any reason -- well, but you didn't
22  put that number into your spreadsheet or your work
23  papers?
24     A.    That's correct.
25     Q.    Okay.  If you added that in to the prior
```

Page 176

1 number that you had calculated from all of the

2 settlement payments and settlement program checks

3 that had not been factored into your damage

4 calculations, what would the total amount left out

5 be?

6     A.    Can you ask your question again, please?

7     Q.    Sure.  If you include the $368,203.69

8 described as a payment to -- payable to Steven and

9 Cathy Etter in Exhibit 10 to your deposition or

10 Exhibit 9 to the Etters' deposition, and you add

11 that to the total of the settlement program checks,

12 settlement checks from the contractors that you had

13 previously described as not being included in your

14 damage calculations, what is the total that you have

15 not included in your damage calculations of these

16 numbers?

17     A.    $1,121,425 is the total of those checks or

18 those amounts.

19     Q.    And just to be clear, those are not anywhere

20 in your damage calculations in your expert report?

21     A.    Those are the items that are referred to in

22 the paragraph that we reviewed earlier, and they are

23 not part of the calculations in the exhibits.

24     Q.    Let me ask it a little bit differently.  Is

25 it fair to say that the $1,121,422 is how it rounds

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    up on mine is not included in the damage

 2    calculations in your expert report?

 3        A.    That weren't included there?

 4        Q.    Let me do it differently.

 5        A.    All right.

 6        Q.    I -- I said it -- if my questions are

 7    difficult, I'll make them better.

 8              You would agree with me, Mr. Elkin, that the

 9    sum we've just determined, $1,121,422 in payments

10    from the various sources we've discussed are not

11    deducted in any way from the damage calculations in

12    your expert report?

13        A.    That's correct.

14        Q.    Please take me through what you did with

15    respect to the Etters' calculation of lost equity in

16    the update you gave us this morning, and that's

17    Exhibit 8 to your deposition today.

18        A.    So referring to Exhibit 4.2 Updated that is

19    inside of attachment -- excuse me, Exhibit 8 of the

20    deposition.

21        Q.    So I can follow along with you, I'm going to

22    get 4.2 Original and 4.2 Updated so I can do them

23    both.  Okay.  All right.  I have 4.2 Updated in

24    front of me.

25        A.    I apologize.  Did you say to walk you
```

Page 178

1    through the calculation?

2       Q.   Well, let's first start with:  How did this

3    come to your attention that this number was -- that

4    the number reflected in Exhibit 4.2 of your original

5    report was incorrect?

6       A.   I had initially -- it came to my attention

7    because I was doing a more detailed, different

8    direction I think I described earlier of the

9    amounts, and I was -- I was not coming up with the

10   same answer.

11          And when I was referring back to I believe

12   Mr. Etter's deposition, at that point I recognized

13   that we had treated the land as a separate

14   transaction, as though the land had been bought

15   separately, and then that the mortgage that was

16   taken out was strictly to cover the construction,

17   and that didn't seem right.

18          So I went back to look at the detail, along

19   with the deposition, along with my new

20   reconciliation methodology and realized that was in

21   fact wrong, and that the mortgage was taken out at

22   the time of the -- I think the land was recorded at

23   one point, but it was all very close to the same

24   point in time.

25          So it was clear that the mortgage included

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 179

1    the land; and, therefore, it was wrong to assume or

2    to build in a calculation that had the land in it,

3    600,000, and the construction at the million one,

4    whatever the amount of the loan was at that point.

5         So I went back and took the documentation --

6    we didn't have the HUD unfortunately from the

7    beginning, the settlement statement.  So I went back

8    and took the construction contract and identified

9    that the construction contract was for $1,465,716,

10   and I recognized that the estimate, according to the

11   Etters' answers to interrogatories, was that the

12   cost of the project was $1,524,843.

13        I was unable to determine why there was a

14   difference between the million 465 and the million

15   524, but it made sense that that amount would

16   include closing costs or other such costs.  So I

17   accepted that as an estimate for the settlement

18   costs.

19        I then took out the loan balance for the

20   actual loan of $1,253,000 reflecting that the amount

21   due from the claimant at close would have

22   approximated $271,843.  Then I took the mortgage at

23   the beginning of a million 253 and I understood that

24   the Etters had paid off their mortgage, and so I

25   gave them credit for paying down the entire

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1   1,253,000.

 2           And then to determine the cash paid to

 3   claim -- and then backed out from that the cash that

 4   they received upon the close of the sale in

 5   mediation -- in mitigation of 1,458,559, giving them

 6   a total lost equity as we've described as $66,284.

 7           (Elkin Exhibit 11 was marked for

 8   identification.)

 9   BY MR. KALIL:

10     Q.   Okay.  Let me show you what I've marked as

11   Exhibit 11 to your deposition, Mr. Elkin, and ask

12   you if you recognize that document.  It was

13   previously marked as Exhibit 2 to Mr. Etter's

14   deposition.

15     A.   Yes.

16     Q.   Is that the -- the contractor's agreement

17   that you were talking about?

18     A.   Yes, that's the very first line item that we

19   discussed.

20     Q.   Okay.  That is dated November 26, 2004?

21     A.   That's correct.

22     Q.   Okay.  And that's something that you had at

23   the time you did your first report, Exhibit 4.2?

24     A.   I did.

25     Q.   Okay.  And on the last page of that
```

Page 181

1  document, there is an amendment to contract.  Do you

2  see that?

3     A.   Yes.

4     Q.   And it talks about the purchase price of the

5  lot as $600,000?

6     A.   Yes.

7     Q.   Okay.  And if we go back to the page before

8  that, it also shows a $600,000 purchase price,

9  discounted lot price?

10    A.   That's correct.

11    Q.   And the total of 1,465,000 is the estimate?

12    A.   That's correct.

13    Q.   So you had that information.  Now, I note in

14  the original 4.2, for purchase price you had a

15  reference to Martin County property search.  Is that

16  something where you or someone on your staff had to

17  go out to search the public records of Martin County

18  to find out the acquisition price for the Etters'

19  property?

20    A.   Yes.

21         (Elkin Exhibit 12 was marked for

22  identification.)

23  BY MR. KALIL:

24    Q.   Okay.  Let me show you Exhibit 12, if I may,

25  to your deposition and ask if you recognize that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 182

```
1    document?

2        A.   Yes.

3        Q.   Is that the deed for the acquisition of the

4    Etters' property?

5        A.   Yes, it is.

6        Q.   Okay.  And did you determine from the doc

7    stamps on the deed that the purchase price was

8    $600,000?

9        A.   Yes.  I divided the 4,200,000 by seven cents

10   per thousand to determine that the $600,000 was the

11   purchase price.

12       Q.   And the date of the deed is what?

13       A.   December 8, 2004.

14            (Elkin Exhibit 13 was marked for

15   identification.)

16   BY MR. KALIL:

17       Q.   Okay.  Let me show you what I'm going to

18   mark as Exhibit 13 to your deposition.  I'm sorry to

19   slide it this way.

20            Do you recognize that document as something

21   you've seen before?

22       A.   Yes.

23       Q.   And is that the mortgage that's referenced

24   on your original Exhibit 4.2?

25       A.   Yes.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      Q.   And that is a construction mortgage?

 2      A.   I believe so.

 3      Q.   And that's for $1,172,000?

 4      A.   That's correct.

 5      Q.   Did you ever get a draw schedule for the

 6   construction of the Etters' property?

 7      A.   I did not.

 8      Q.   Okay.  Did you ever ask for one?

 9      A.   No.

10      Q.   When you or your staff were looking for the

11   documents -- sorry.

12           That document, the mortgage we've just

13   marked as Exhibit 13, is also referenced as a source

14   document in your original Exhibit 4.2 as a KR

15   document public records?

16      A.   Yes.

17      Q.   Does that mean it was retrieved by somebody

18   in your staff?

19      A.   Yes.

20      Q.   Okay.  Did they find anything else at the

21   time from the public records with regard to the

22   Etters' property?

23      A.   I don't believe they found anything else

24   that would have -- that they thought would be

25   useful.
```

1      Q.   Did they find anything else that they

2   brought to your attention that you determined was

3   not useful?

4      A.   No.

5           (Elkin Exhibit 14 was marked for

6   identification.)

7   BY MR. KALIL:

8      Q.   I'm going to show you what's marked as

9   Exhibit 14 -- what I'm marking as Exhibit 14, if I

10  may, and ask if you recognize that document.  And

11  it's titled "Modification and Extension of

12  Mortgage."

13     A.   I have not seen this document.

14     Q.   Okay.  That appears to be from the public

15  records of Martin County, Florida.  Is that where

16  your staff retrieved the original mortgage?

17     A.   I believe so.

18     Q.   Does this appear or does it state on its

19  face that is a modification of the original

20  mortgage, and can you tell that by the book and page

21  number referenced?

22     A.   It does appear so.

23     Q.   They just missed that?

24     A.   I don't know if they missed it or they just

25  didn't feel it was relevant when they were looking.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 185

1    Q.   Okay.  Did you have any discussions with

2  anyone about what was relevant or not relevant in

3  giving the lost equity timely for the Etters at the

4  time you prepared Exhibit 4.2?

5    A.   The discussion was that we would try to

6  determine the history of the purchases, sales, and

7  financing.

8    Q.   And Exhibit 4.2 was attributing a $1,172,000

9  mortgage in addition to a $600,000 purchase price as

10  the equity, as you described it, that was put in by

11  the Etters when you did that first calculation?

12    A.   Yes, and that was incorrect.

13    Q.   Okay.  And would it have been important to

14  know if the mortgage had been modified in any way?

15    A.   It, along with -- even without having this,

16  had I seen the documentation and put two and two

17  together in a better form, I would not have needed

18  this to make that correction.

19    Q.   Okay.

20    A.   I had the information originally, and that

21  was a mistake.

22    Q.   And the information you're talking about is

23  the deposition testimony of the Etters; is that

24  correct?

25    A.   Well, it's the deposition testimony and the

Page 186

1    other records we just looked at, the purchase

2    contract that does make it clear that the $600,000

3    was embedded in that, the mortgage that took place

4    at the same time.

5        Q.    All right.

6        A.    So I would not have needed this Exhibit 14

7    to -- I should have identified that correction at

8    the time I was reviewing it initially.

9        Q.    All right.  So what you -- you've done,

10   though, is you've then gone further and -- excuse

11   me, let me show you another document, and I

12   apologize for skipping around here.

13           (Elkin Exhibit 15 was marked for

14   identification.)

15   BY MR. KALIL:

16       Q.    I'm going to show you what's been marked as

17   Exhibit 15 to your deposition and ask you if you've

18   seen that document before?

19       A.    I've not seen this specific document.

20       Q.    Does that appear to be a mortgage

21   modification and consolidation agreements of

22   November 22nd, 2006?

23       A.    Yes.

24       Q.    Does it appear to relate to the Etters'

25   loan?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.    Yes.   In fact it's the balance that was used

2    in my updated calculation of 1,253,000 which I

3    didn't take from this document, but I took instead

4    from the information from the actual loan

5    statements.

6        Q.   When you say the "loan statements," what

7    specifically were you referring to?  It says in your

8    updated 4.2 loan statement as Etter Deposition

9    Exhibit 3.

10   A.    I've brought up on the screen Exhibit 3,

11   which was referred to in my schedule.   This is a

12   loan statement as it says up in the top right corner

13   for Seacoast National Bank dated November 19th,

14   2010, stating that the current balance is 1,253,000,

15   which is the same number on the document that you

16   just gave me from the public records.

17       Q.   Right.   Now, that loan statement is

18   December 1st, 2010.   What date did the Etters sell

19   their property, according to your updated

20   Exhibit 4.2?

21   A.    I believe it was 2016.

22       Q.   So some four-and-a-half years later?

23   A.    Give or take.

24       Q.   Okay.   Did you -- did you obtain any further

25   documentation about the loan balance on the date of

Page 188

1    sale?

2        A.   My understanding is the loan had been paid

3    off by the date of sale.

4        Q.   What was that based on?

5        A.   The fact that the HUD did not show any

6    mortgage being paid off at that date and Mr. Etter's

7    testimony that had he paid off the loan when he sold

8    his business.

9        Q.   If I'm not mistaken, you are attributing the

10   full mortgage balance as a -- an investment by the

11   Etters; is that correct?  Let -- let me -- let me do

12   that differently.

13            In your calculations of lost equity on

14   Exhibit 4.2 Updated, what are you treating as the

15   equity?

16       A.   The amount that would be calculated as due

17   from the claimant at close, the amount of the

18   mortgage that they paid off, less cash paid to

19   claimants on the sale of the home.

20       Q.   Okay.  Now, if I take you back to

21   Exhibit 4.2, before you updated it, there's an

22   item -- an entry "Mortgage Beginning Balance."

23            Do you see that?

24       A.   In the -- in the original?

25       Q.   Yes, in the original.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.    Yes.

2    Q.    And that's $1,172,000?

3    A.    That's correct.

4    Q.    And then on the "Mortgage Beginning Balance"

5  on Exhibit 4.2 Updated, it's moved to $1,253,000?

6    A.    That's correct.

7    Q.    How did you verify what was done with the

8  additional amounts borrowed, if at all?

9    A.    I did not.

10   Q.    Okay.  Fair enough.  Would you agree with me

11  that if the additional borrowings were not put into

12  the house, your amended calculation of lost equity

13  would not be accurate for what it is intended to

14  show?

15   A.    That depends on if it was closing costs or

16  other things that were intended to modify the

17  mortgage.  If it was cash that had been purely taken

18  out, then I would agree with that.

19   Q.    And you didn't make any effort to determine

20  what those amounts were used for?

21   A.    That's correct.

22   Q.    Okay.  Did you find any other -- well, let

23  me say it differently.

24        In your calculations of lost equity for any

25  of the other Priority Claimants, have you found any

Page 190

1   errors?

2       A.   We talked earlier about Rosen.

3       Q.   Yes.

4       A.   No, I haven't.

5       Q.   Okay.  Have you found all of the source

6   documents that you wish to look at for each of the

7   Priority Claimants to do the calculations you are

8   doing on lost --

9       A.   On many of them I would prefer to have the

10  HUDs, so I don't have the HUDs for everything.

11      Q.   Fair to say that you don't have supporting

12  documents to show the precise details on some of

13  those?

14      A.   That's correct.

15      Q.   Is there a possibility that any of the

16  Priority Claimants might have -- other than we've

17  talked about so far, might have taken out equity

18  from their homes by way of borrowings and used it

19  for purposes other than improvements to their house?

20      A.   I don't believe, based on my review of

21  these, that such circumstances exist; and I believe

22  I would have identified -- one in particular I did

23  identify and I don't recall any others -- where the

24  circumstances or the sequence of borrowing would

25  have lent to that opportunity.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Fair enough.  And just to be clear,

2  Mr. Etter -- Mr. Elkin, my apology.

3         To be clear, Mr. Elkin, in your calculations

4  for lost equity for Steven and Cathy Etter, you do

5  not include in the calculations the USAA payment in

6  any fashion?

7    A.   That's correct.

8         MR. KALIL:  Can we take a two-minute break?

9         THE VIDEOGRAPHER:  The time is 5 minutes

10   after 3:00, and we're off the video record.

11        Stand by.

12        (Recess from 3:05 p.m. until 3:12?p.m.)

13        THE VIDEOGRAPHER:  The time is 12 after

14   3:00, and we're back on the video record.

15 BY MR. KALIL:

16   Q.   Mr. Elkin, you mentioned before we went off

17 that you had one other circumstance where you

18 identified a Priority Claimant may have taken money

19 out.  Do you -- I think that's what you said.  Do

20 you recall who that might be?

21   A.   I believe it was Kevin and Stacy Rosen.

22   Q.   Okay.  Okay.  Let me take you back to one

23 last point on the Etters, and I'm going to direct

24 you to Exhibit 6 which you provided me this morning,

25 which is the yellow stickies.  Do you have that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 192

1    handy?

2        A.    Yes.

3        Q.    Okay.  You've got -- first of all, you've

4    said $59,127 is an estimate for closing costs.  But,

5    again, just to be clear, there -- there is no

6    documentation that supported that?

7        A.    Yeah.  I don't know if it was closing costs

8    or potentially overruns for the construction or

9    potentially an error in Mr. Etter's calculation.

10       Q.    Okay.  And do you know if the original loan

11   for the Etters was $1,172,000, the original

12   mortgage, but they show a purchase price of

13   $1,465,716 on your updated schedule, do you know

14   where the balance came from?

15       A.    My understanding is it came from the

16   claimants.

17       Q.    And do you know how they paid that?

18       A.    I do not.

19       Q.    Okay.  You don't have any supporting

20   documents to establish that they did in fact pay

21   that?

22       A.    Other than testimony, I don't believe so.

23       Q.    And what would the difference be on that

24   between those two numbers, if you just did the math?

25       A.    Well, it -- if it's on the million 172?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 193

```
 1      Q.    Yes.  The million 172 being the original
 2  loan amount --
 3            MR. BREIT:  Do you need a calculator?
 4            THE WITNESS:  Yeah, I've got one.
 5  BY MR. KALIL:
 6      Q.    -- and 1,465,416 being the amount that they
 7  had put on their -- I believe their claimants'
 8  profile form -- or their answers to interrogatories,
 9  excuse me.  What is the amount that you do not have
10  support for beyond that?
11      A.    And I apologize again.  Your question?
12      Q.    Sure.  If I understand it correctly, in your
13  updated schedule for Steven and Cathy Etter, you've
14  calculated a purchase price for the land and
15  construction of $1,465,716 based upon the
16  construction contract and the deposition testimony;
17  is that correct?
18      A.    Yes.
19      Q.    And the original mortgage that was taken
20  out -- and we can get the date of it -- which was in
21  December of 2004 was for $1,172,000.
22            What is the amount that had to be provided
23  from some other source?
24      A.    $293,716.
25      Q.    And am I correct that you have never seen
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 194

1    any proof that that additional 293,716 was in fact

2    paid?

3        A.    That's correct.

4        Q.    Do you know if the Etters received any

5    deduction on their income taxes relating to Chinese

6    drywall?

7        A.    I don't recall.

8        Q.    Okay.

9        A.    I imagine they did.

10       Q.    Okay.

11       A.    I think that might be from testimony.

12       Q.    I could direct you to Page 80 of I believe

13   it is Steven Etter's deposition of January 11, 2019

14   where the topic came up.  I'm going to ask you if

15   you have seen that before?

16       A.    Yes.

17       Q.    Okay.  So there is a reference to that.  Did

18   you --

19       A.    As I indicated, I thought I had seen it in

20   the deposition --

21       Q.    Yeah.

22       A.    -- and that's what I saw.

23       Q.    But you don't have any information as to

24   what amount they might have received on their taxes?

25       A.    That's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 195

1 Q. Did you make any efforts to find that out?

2 A. No.

3 Q. Can I direct -- well, let me first ask you:

4 Do you recall if the Etters received any reduction

5 in their property taxes for their home as a result

6 of Chinese drywall?

7 A. I don't know.

8 Q. Can I direct you to Page 33 of Mr. Etter's

9 deposition, and particularly Lines 5 through 9?  Did

10 you read that before?

11 A. Yes.

12 Q. Okay.  Mr. Etter appears to be saying that

13 there was a program in Martin County to give you a

14 lower tax value; is that correct?

15 A. Yes.

16 Q. Okay.  Did you make any efforts to verify if

17 that had in fact occurred?

18 A. No.

19 Q. And on Page 34, Lines 2 through 4, Mr. Etter

20 confirms that reduced his tax payments; is that

21 correct?

22 A. That's what it says.

23 Q. Okay.  Do you have any reason to doubt that?

24 A. No.

25 Q. Mr. Elkin, can I direct to you Exhibit 4.1

Page 196

1    with regard to the Etters?

2        A.    Yes.

3        Q.    And what -- again, that is a calculation of

4    damages that you have done for the Etters?

5        A.    That's correct.

6        Q.    Okay.  Do you see -- let me find it here.

7              Do you see any charges for Florida Power &

8    Light for the Etters under "Alternate Living

9    Expenses"?

10       A.    Yes.

11       Q.    And what's the earliest date that you see a

12   charge for that?

13       A.    December of 2012.

14       Q.    Okay.  And what is the latest date you see

15   for that?

16       A.    September of 2013.

17       Q.    Okay.  Now, when were that -- when did they

18   return to the property?

19       A.    August of 2013.

20       Q.    Okay.  You didn't exclude the September

21   statement?

22       A.    Well, it's September 6th.

23       Q.    Okay.

24       A.    So it would include power through the month

25   of August.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    Q.   Okay.

 2    A.   And to the extent that they were making

 3  payments at an alternate -- at an alternate

 4  location, it seemed to be appropriate to include

 5  that.

 6    Q.   All right.  When you included for

 7  calculations of alternate living expenses, did you

 8  attempt to make any adjustments for reduced expenses

 9  at the primary residence?

10    A.   No.

11    Q.   In any instance?

12    A.   No.

13    Q.   Okay.  Is it correct that you did not

14  attempt to adjust for duplicative alternative living

15  expenses in your analysis?

16         MR. BREIT:  Could you define what you mean

17    by "duplicative expenses," please?

18         MR. KALIL:  Certainly.  Certainly.

19  BY MR. KALIL:

20    Q.   Am I correct that if you were including a

21  utility expense in an alternate living location, you

22  did not adjust for any reduction in the living

23  expense in the primary location?

24    A.   That's correct.  My calculation is the

25  expenses they incurred in an alternate living
```

Page 198

1    facility.

2        Q.   Okay.  And -- and you don't do any offset

3    for reductions elsewhere?

4        A.   I did not.

5        Q.   Okay.  Were you -- were you asked not to do

6    that, or was that your choice?

7        A.   My choice.

8        Q.   Hold on one second.  I think we may be done.

9             Mr. Elkin, did you read all of Mr. Steven

10   Etter's deposition of January 11, 2019?

11       A.   I don't recall if I read the whole thing or

12   if I read through parts.

13       Q.   Okay.

14       A.   I feel like I read the whole thing, but I'm

15   not sure.

16       Q.   Do you recall Mr. Etter stating that they

17   stopped paying for utility services at their primary

18   home while it was being remediated?

19       A.   I don't recall one way or another, but it

20   wouldn't surprise me.

21       Q.   Let me direct you, if I may, to Page 145 of

22   Mr. Etter's deposition, and Page [sic] 18, if I may,

23   or you can start before that if you wish.

24       A.   I see that.

25       Q.   Do you agree with me that Mr. Etter saying

Page 199

1   he ceased paying for utilities at his primary

2   residence when he moved to the alternate residence?

3       A.   Yes.

4       Q.   And why would you consider the expenses at

5   the alternate residence an additional cost?

6       A.   They were expenses that they had for their

7   alternate living facility.  As to whether or not

8   other expenses changed, I think that that has more

9   to do with the loss of enjoyment or other elements

10  of damage than as a direct offset against these

11  components.

12      Q.   So if somebody moves out of one residence

13  and ceases having any expenses associated with it

14  and moves into another residence and has the same

15  expenses they would have had in the primary, you

16  could count those expenses as alternate living

17  expense just because they are in a different

18  location?

19      A.   Well, I'm identifying the costs at the

20  alternate facility.  There are a lot of other

21  factors that go into play as to expenditures that

22  did or didn't continue in a house they were no

23  longer able to live in, and so I considered those to

24  be factors that should be considered separately.

25      Q.   And where are those considered in your

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 200

1    report for the Etters?

2        A.    I'm not addressing loss of use and

3    enjoyment.

4        Q.    **So am I correct in saying that your**

5    **definition of "alternate living expenses" does not**

6    **require an increase in expenses, just a different**

7    **location?**

8        A.    It's the expenses that they incurred at an

9    alternate living residence.

10       Q.    **Are we saying the same thing or something**

11   **different?**

12       A.    Pardon?

13       Q.    **Are we saying the same thing or something**

14   **different?  And did -- is --**

15       A.    If you want to read back.

16       Q.    **Sure.**

17       A.    I heard it as a little bit different.

18       Q.    **And let me -- let me see if I can do that.**

19             **For purposes of your expert reports, have**

20   **you defined "alternative living expenses" in your**

21   **report anywhere?  I believe it's in Paragraph 17.**

22       A.    Paragraph 17, Page 5 of 9 in my report and

23   Paragraph 18, but I don't believe I specifically

24   defined it.

25       Q.    **Okay.  So --**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.    I believe the expenditure is defined -- or

2    there are very different circumstances between

3    different claimants as to what they did for purposes

4    of living outside of the house that they couldn't

5    live in anymore, and so each one was considered

6    differently.  If somebody had a reduction in their

7    FPL bill because they moved into a smaller house or

8    a small condo or whatever it was, versus whatever

9    they were paying or stopped paying in the other

10   home, I considered those be two separate issues for

11   purposes of my calculation of alternate living

12   expenses.

13   Q.   Okay.  And when you say you consider those

14   to be two separate issues, one of which you are

15   going to tally up and one of which you are not going

16   to tally up; is that correct?

17   A.    That is correct.

18   Q.   So is it fair to say that in no instances

19   where you calculated alternative living expenses for

20   any of the Priority Claimants did you attempt to

21   limit those to additional expenses, these were just

22   any expenses?

23   A.    That's correct.

24   Q.   Does it say that anywhere in your report?

25   A.    No, I don't think it specifically says it,

Page 202

1    but I think that it's what I did.  It's what I

2    believe my evidence and my -- my schedules reflect.

3    And to the extent sometimes things need a little

4    additional clarification, that's why we're here

5    today.

6        Q.    Well, I'm just trying to see where in the

7    schedules attached to your report we can determine

8    that there is -- is or may be a reduction in

9    expenses at the primary residence.  Is that

10   reflected anywhere in the schedules?

11       A.    The -- it's reflected by the fact there are

12   no reductions on the schedule.  That would be the

13   first -- the first thing.  And it's reflected in the

14   fact that all the things that are on there are the

15   full amount that they paid.

16           So that's simply looking at the schedule, as

17   you have already deduced.  The amounts that they did

18   pay are on there, and there is no deduction for

19   anything else.

20       Q.    Is there anything in the schedules attached

21   to your report to show the court or any finder of

22   fact that might see your report that there were or

23   were not continued expenses in other locations?

24       A.    No.

25       Q.    And I take it that leaving aside your

Page 203

```
 1    report, there is no work sheet or schedule from

 2    which we could make that analysis in any of your

 3    work papers?

 4        A.    That's correct.

 5             MR. KALIL:  Can we take a longer than

 6        two-minute break for a different reason?

 7             THE VIDEOGRAPHER:  The time is 3:31.  We're

 8        going off the video record.  Stand by.

 9             (Recess from 3:31?p.m. until 3:47?p.m.)

10             THE VIDEOGRAPHER:  The time `is 3:47.  We're

11        back on the video record.

12    BY MR. KALIL:

13        Q.    Mr. Elkin, just to follow up on one of the

14    questions I asked you before, is it correct that you

15    didn't make any efforts for any of the Priority

16    Claimants to gather information that would allow you

17    to do a comparison of their expenses in their

18    primary residence before they moved out and after?

19        A.    That's right.

20        Q.    Okay.

21        A.    And I'm aware of them, but I didn't do any

22    analysis.

23        Q.    All right.  I think we're done with Foster.

24             One topic we didn't go to and correct

25    earlier was you have in your report the damage
```

Page 204

```
 1    summaries, and I don't see a place for diminution in
 2    value and stigma.  I see a place for diminution in
 3    value.
 4            Do I understand correctly that you are
 5    expecting to receive additional numbers or
 6    information from other experts that will be put in
 7    that report or you're not planning on putting
 8    anything in?
 9       A.   I -- it was mentioned to me at one point
10    that maybe I would.  If I did, it would just be a
11    question of sticking something on and adding it.  I
12    wouldn't be doing anything above that.
13            When you say you don't see it, are you
14    saying because this line item just says "Diminution
15    of Value" on Exhibit 4?
16       Q.   Yes.
17       A.   Yeah.  I didn't -- when I -- when I put that
18    in there, I didn't have in mind the word "stigma."
19       Q.   Okay.
20       A.   And I just never made the change.
21       Q.   All right.  And -- and -- but I'm also
22    referencing this Page 7 of your report,
23    Paragraph 23, the narrative on "Diminution in Value
24    and Stigma."  I just want to be sure I'm
25    understanding you correctly.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 205

1          You're not going to be doing any analysis or

2    providing any opinions on that irrespective of what

3    you might learn from other experts; is that correct?

4        A.   That's right.

5        Q.   Okay.  What is the reason for including

6    counsel as represented to me that the amounts will

7    be provided to me by that expert at a later date,

8    what are you expected to do with those?

9        A.   I think if they wanted to have a summary up

10   there that had the numbers together, that I might

11   have just put it on my schedule and I just wanted to

12   make sure I gave a warning, "Hey, this number might

13   be" -- it says "TBD" right now, to be determined.

14   That didn't mean to be determined by me, and so

15   maybe they were going to ask me to put it on the

16   schedule.

17       Q.   But you wouldn't be expressing any opinions,

18   regardless?

19       A.   No.

20       Q.   Has there been any expansion of the scope of

21   your engagement since you signed your expert report

22   on February 19th, 2019?

23       A.   No, I don't think -- when I signed the

24   engagement, I don't know that we knew the full scope

25   of what it would be.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Okay.

2    A.   But there was nothing beyond what I

3   anticipated it would be like.

4    **Q.   Have you talked to any of the experts that**

5   **might be generating reports on diminution in value**

6   **or stigma since you were engaged in this case?**

7    A.   I had conversation with Mr. Graziano --

8    Q.   Okay.

9    A.   -- very much toward the beginning of the

10   engagement and have not spoken with him since, that

11   I can think of.

12   **Q.   Do you recall what those conversations**

13   **centered on?**

14   A.   I don't know how specific they were to any

15   particular issue, but I know that I spoke to him.  I

16   don't think that I spoke to him about methodologies

17   or anything like that.

18         I'm trying to think if -- I don't know that

19   there was anything very specific.  That was -- it

20   was sort of trying to gain an understanding with --

21   with others as to the scope of who was doing what,

22   so it was probably more about just in general who

23   was doing what.

24   **Q.   Did you call him, or did he call you?**

25   A.   It wasn't a phone call.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1        Q.    Did you meet with him in person?

2        A.    I was at a meeting that he was in attendance

3   at.

4        Q.    Who else was there?

5        A.    A lot of people.

6        Q.    The best as you recall?

7        A.    Elan, Natalie, Patrick Montoya, Greg Weiss,

8   Holly Werkema, Allison -- I don't remember her last

9   name --

10       Q.    Okay.

11       A.    -- but she's co-counsel with Holly on some

12  cases.  And some other people that I don't remember

13  their names, but I believe essentially the other --

14  there was a -- hopefully they won't read this

15  transcript and realize I didn't remember their

16  name -- Dugan or -- or --

17       Q.    Okay.

18            MR. BREIT:  We know who she is.

19       A.    And then there were some people that were,

20  like, down to the right, and I don't remember who

21  they were.

22            But they were -- there was a Pete was

23  there --

24  BY MR. KALIL:

25       Q.    Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 208

```
1      A.    -- if I didn't say him.

2            So there was -- there was everybody from all

3      four of these, and those are the ones I'm most

4      familiar with; and then, for instance, I don't

5      believe you were there --

6            MR. BREIT:  (Shaking head.)

7      A.    -- and Mr. Graziano.

8      BY MR. KALIL:

9      Q.    Do you recall when that meeting took place?

10     A.    I think it was like the first week of

11     February, maybe the end of January.  It was -- it

12     was very much toward the beginning of digging in.

13     We had -- we had dug in some but --

14     Q.    Did you make any notes from that meeting?

15     A.    I didn't.  At one point I drew a picture

16     with the names on it.  I should have kept that.  But

17     I looked at it and realized I had done a bad job.

18     At some -- like in a room like this, I will do that

19     so that I can remember.  So clearly I should have

20     kept it, but I think I got rid of it that day.

21     Q.    Anything else?

22     A.    But as far as notes themselves, no.

23     Q.    Did you gather any information at that

24     meeting that has made its way into your report?

25     A.    Not details.  I mean, I -- I talked a bit
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 209

1    about trying to understand what the -- how I was

2    going to be able to communicate with people and ask

3    questions and -- and get -- get information and

4    tried to understand what my scope would be with

5    regard to, you know, understanding there were other

6    experts and there is things that are not within my

7    scope.  So a lot of it was also making sure they

8    understood, you know, what was within my expertise

9    and what was not.

10        Q.   Have you had any subsequent meetings or

11   discussions with any of the other experts retained

12   by the plaintiffs?

13        A.   No.

14        Q.   All right.

15             MR. KALIL:  With your consent and counsel's

16        consent, this is probably a good place to break

17        for the day and pick it up at 9:00 o'clock

18        tomorrow, if that works.

19             MR. BREIT:  It's okay with me.

20             MR. KALIL:  Didn't think you'd complain.

21             MR. BREIT:  You're making me go to the gym,

22        which I didn't want to do.

23                  (Discussion off the record.)

24             MR. KALIL:  If -- if I may, one thing

25        that -- just to give you a heads-up for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    tomorrow -- if you don't mind going back on for

 2    one second.

 3         One of the things I want to do tomorrow, and

 4    I want to give you advance warning so we can do

 5    it quicker, I'd asked you earlier about how you

 6    had determined prices for items that had been

 7    damaged, personal property items, and you said it

 8    would be a case-by-case basis.  I want to give

 9    you the heads-up that I'd like to go through that

10    in some detail tomorrow so you can think about

11    that.  Maybe we can do it a little quicker rather

12    than just springing it on you.

13         MR. BREIT:  Can you give me an example, give

14    him an example --

15         MR. KALIL:  Sure.

16         MR. BREIT:  -- just to -- just so it will

17    help speed us up.

18         MR. KALIL:  I could pick any one of the 20

19    Priority Claimants and I'll select some of the

20    items in there and say, "Was this a cost when

21    they bought it originally?  Was this a

22    replacement cost?  Was this some other valuation

23    method, and how do you determine it?"

24         MR. BREIT:  Right.  So how do you have the

25    number to get you to that number that's on your
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    sheet?

2       MR. KALIL:  Exactly.  And -- and to get

3    variations on the theme and see what -- what the

4    variations are and how you determine them.  So I

5    can give you that ahead of time rather than

6    springing it on you.

7       THE WITNESS:  Okay.  I don't know that I

8    will be able to do anything in advance other than

9    go through detail, but I will think of -- I'll

10    give it some thought.

11       MR. KALIL:  If -- if -- I appreciate that.

12    I just didn't want it to come out of the blue.

13       THE WITNESS:  I appreciate it.

14     (Discussion off the record.)

15       THE VIDEOGRAPHER:  The time is 3:55.

16    (The deposition was recessed at 3:55 p.m.)

17     (Whereupon, the deposition recessed at

18   3:55 p.m.)

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1                C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of MICHAEL

 6   ELKIN was duly taken on Monday, March 11, 2019, at

 7   10:05 a.m. before me.

 8          The said MICHAEL P. ELKIN, CPA was duly sworn

 9   by me according to law to tell the truth, the whole truth

10   and nothing but the truth and thereupon did testify

11   as set forth in the above transcript of testimony.

12   The testimony was taken down stenographically by me.

13   I do further certify that the above deposition is

14   full, complete, and a true record of all the

15   testimony given by the said witness, and that a

16   review of the transcript was requested.

17

18   _____

19   Susan D. Wasilewski, RPR, CRR, CCP

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 213

1                    INSTRUCTIONS TO WITNESS

2

3

4              Please read your deposition over carefully

5    and make any necessary corrections.  You should

6    state the reason in the appropriate space on the

7    errata sheet for any corrections that are made.

8

9              After doing so, please sign the errata sheet

10   and date it.  It will be attached to your

11   deposition.

12

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
                                                        Page 214
1                          - - - - - -

2                        E R R A T A

3                          - - - - - -

4     PAGE   LINE   CHANGE

5     ____   ____   _____

6        REASON: _____

7     ____   ____   _____

8        REASON: _____

9     ____   ____   _____

10       REASON: _____

11    ____   ____   _____

12       REASON: _____

13    ____   ____   _____

14       REASON: _____

15    ____   ____   _____

16       REASON: _____

17    ____   ____   _____

18       REASON: _____

19    ____   ____   _____

20       REASON: _____

21    ____   ____   _____

22       REASON: _____

23    ____   ____   _____

24       REASON: _____

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 215

1                 ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4  acknowledge that I have read the foregoing pages, 1

5  through 214, and that the same is a correct

6  transcription of the answers given by me to the

7  questions therein propounded, except for the

8  corrections or changes in form or substance, if any,

9  noted in the attached Errata Sheet.

10

11

12  _____     _____

13  MICHAEL P. ELKIN, CPA, CFF, ABV, CFE      DATE

14

15

16

17

18  Subscribed and sworn to before me this

19  _____ day of _____, 20____.

20  My Commission expires: _____

21

22  _____

23  Notary Public

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 216

1                    LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

25