# EXHIBIT 37

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., *et al.*,<br><br>    Defendants. | Case No. 1:11-CV-22408-MGC |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS NOT IN DISPUTE, AND
COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES**

I. **RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

In response to the numbered paragraphs offered by Defendants in support of their Motion for Summary Judgment on Non-Formula Damages, Plaintiffs respond as follows:[1]

1. Admitted in part. The facts contained in this paragraph are admitted except to the extent they suggest the five identified Priority Claimants *only* had boards with the identified markings in their home. Kevin and Stacey Rosen and Michael and Robyn Rosen also had boards in their homes that were "blank board." *See* M. Rosen Photo Excerpts, Ex. H; K. Rosen Photo Excerpts, Ex. I.[2]

2. Admitted in part. On April 8, 2019, the Special Master issued a Report & Recommendation Regarding Product ID Categories Attributable to the Taishan Defendants (ECF No. 233) ("Special Master PID R&R") in which she recommended that PID marking numbers 6, 7, and 8 not be attributable to Taishan. This paragraph is denied to the extent it suggests this recommendation represents a final determination. On April 29, 2019, Plaintiffs filed Objections to the Special Master PID R&R in which Plaintiffs seek, among other things, to overrule the Special Master's recommendation with respect to marking numbers 6, 7, and 8, as well as the Special Master's recommendation that "blank boards" not be attributable to Taishan. *See* ECF No. 253, incorporated herein by reference.

3. Admitted. Priority Claimants' claim for damages to the value of the affected properties beyond the costs to remediate are set forth more fully in Plaintiffs' Counterstatement of Facts, at ¶¶ 58-60, *infra*.

4. Admitted in part. Mr. Elkins performed the calculations described in this paragraph for 13 Priority claimants, not 12. *See* Elkin Report, Exhibit "E1" ("Elkin Report").

5. Admitted in part. It is admitted to the extent Defendants accurately characterize the process undertaken by Mr. Elkin and his testimony regarding same. It is denied to the extent it fails to paint the full picture of Mr. Elkin's testimony. For example,

---

[1] Plaintiffs' Response to Defendants' Statement of Material Facts Not in Dispute, and Counterstatement of Facts in Opposition to Defendants' Motion for Summary Judgment on Non-Formula Damages is referred to as the "Statement of Facts" and cited in Plaintiffs' Memorandum of Law in Opposition to Defendants Motion for Summary Judgment on Non-Formula Damages ("Pls.' Mem.") as "SOF ¶ __."

[2] Evidence submitted in support of this Statement of Facts is attached as exhibits to this filing and citations to those exhibits appear herein as "Ex. __." Some of these exhibits were filed with a separate "Notice of Filing," incorporated herein by reference, because of the volume of materials. These two Rosen photos were excerpts from larger documents produced to Defendants through the Brown Greer portal.

1

Defendants' refer to Mr. Elkin's work as a "cash flow analysis" but do not note that Mr. Elkin described his analysis as a "net investment capital" analysis. *See* Transcript of March 11, 2019 Dep. of Mr. Elkin ("Elkin Tr."), attached hereto as Exhibit G-1 at 134:18-135:11.

    6.    Admitted in part. It is admitted only to the extent it accurately quotes Mr. Elkin's deposition testimony regarding items he may or may not have "taken into account" in his analysis. Beyond that, this statement goes beyond a factual statement assuming, without support, that items referenced by Defendants are "factors . . . that may have also affected sales price"; and implying that the items listed by Defendants were relevant to Mr. Elkin's analysis. Mr. Elkin testified that "This was simply a financial calculation without those considerations." Ex. G-1 at 136:3-4.

    7.    Admitted in part. It is admitted only to the extent it accurately quotes Mr. Elkin's deposition testimony. Plaintiffs deny Defendants' characterizations that items should be, or could be, "factored in" to Mr. Elkin's analysis.

    8.    Admitted.

    9.    Admitted in part. It is admitted with the caveat that Mr. Graziano added: "This assumes disclosure of the detrimental condition, and provision of a certificate of completion from a recognized and qualified contractor." *See* Graziano Report, Ex. F, at 22.

    10.    Admitted in part. It is admitted that for current owners Mr. Graziano was instructed to use a current effective date of January 2019. For former owners, Mr. Graziano employed an effective date which coincided with the time that Plaintiffs' Plaintiffs' lost their homes due to foreclosure, short sales, etc.

    11.    Admitted in part. It is admitted but the full context of the exchange was: "Q. Now, your stigma damages analyses for the 20 Priority Claimants, those are predictions of potential future damages, correct? Those are predictions of my professional effort as to what they would have suffered as of the date of value within that -- within their respective reports. So it's not a prediction necessarily of the future; it's a prediction of the value diminution as if the property had been remediated as of those effective dates." *See* Transcript of March 18, 2019 Dep. of Mr. Graziano ("Graziano Tr."), attached hereto as Exhibit G-2 at 28:11-21.

    12.    Admitted in part. Admitted only so far that Mr. Graziano was provided by counsel the effective dates to use in his study. *See also* Response to Paragraph 10, *supra*.

13. Admitted in part, denied in part. It is admitted that the Priority Claimants also retained Ryan Greenblatt as a proffered expert real estate broker to opine on stigma purportedly caused by Chinese Drywall. According to Greenblatt, "Chinese drywall has a stigma, whether remediated or unremediated, and drastically lowers the value of a home." (Greenblatt Rep.) at 6. And due to Florida disclosure laws, Greenblatt believes this stigma to be permanent. *See, generally*, Brinkerhoff Tr., Ex. J, at 61:4-11 (realtor testified that "[t]here is a stigma regarding [Chinese drywall].").

14. Denied.

15. Denied as stated. As testified to by Mr. Deeg and Mrs. Hooker, the purchaser of their home was the son of the original builder who was able to purchase homes with Chinese-manufactured drywall in this community, and resell them in bulk as an economy of scale unavailable to a normal consumer/rational individual economic actor. *See* Deeg Tr., Ex. A-3, at 14:16-18, 20:20-21, 54:5-16, 56:14-58:1; Hooker Tr., Ex. A-4, at 38:13-39:2, 41:12-21; 50:5-11; 50:19-51:18.

16. Admitted in part, denied in part. It is admitted that the O'Briens originally claimed $295,000 for diminution in value. All of the remaining allegations in this paragraph are denied. Both Mr. and Ms. O'Brien are software engineers; they are not attorneys or property assessors. *See* L. O'Brien Tr., Ex. A-28, at 11:6-14; K. O'Brien Tr., Ex. A-27, at 35:22-24. Ms. O'Brien's testimony was she would rely on "expert testimony" to estimate the diminution in value. *See* L. O'Brien Tr., Ex. A-28, at 88:10-13; *see also* O'Brien Int. Resp., Ex. B-16, at Int. No. 1 (diminution in value determined by jury). In addition, the O'Brien's testified that the tax assessor lowered the value of their home because of Chinese drwll. *See* K. O'Brien Tr., Ex. A-27, at 24:5-12, 26:4-7; L. O'Brien Tr., Ex. A-28, at 74:24-75:6.

17. Admitted in part. It is generally admitted that this accurately represents statements made by Mr. Wites but by way of further explanation, Mr. Wites is not a real estate appraisal expert. Plaintiffs have proffered the expert testimony of Mr. Graziano as to the amount of any diminution in value/stigma. As a homeowner, Mr. Wites may testify as to his beliefs and opinions about the value of his home but appropriately relies upon an expert to opine as to the amount of that diminution/stigma.

18. Admitted in part. It is admitted that Priority Claimants are seeking punitive damages. It is also admitted that Priority Claimants are seeking damages for, among other

3

things, alternate living expenses ("ALE"), loss of use and enjoyment ("LOUE"), and lost rent. It is denied to the extent Defendants suggest those damages are not compensatory.

19. Admitted in part, denied in part. It is denied that there are items of ALE for which Priority Claimants have not met their burden, and that there are some items for which no evidentiary support is provided. It is admitted in all other respects.

20. Denied. Ms. Avery is claiming $11,322 as ALE for the period March 2010 through the short sale in July 2011. This represents the total paid to Ms. Avery's landlord for the period after she was forced to move out of her Chinese Drywall house. *See* Avery Int. Resp., Ex. B-1, at Int. No. 1; *see also* March 8, 2010 Residential Lease, Ex. D-1, at 9-16. Ms. Avery stopped making her mortgage payments in May 2010. Ms. Avery paid both her mortgage payments and rent payments in March, April, and May 2010. *See* Ex. 12A (filed under seal) to Defendants' Statement of Material Facts; *see also* J. Avery Tr., Ex. A-1, at 52:13-17.

21. Admitted.

22. Admitted in part, denied in part. It is admitted that Ms. Chatmon is seeking $23,940 in ALE for payments to her daughters from April 2010 through November 2018, that Ms. Chatmon owns her childhood home in Georgia and that she splits time between the two residences. The remainder of this paragraph is denied. Ms. Chatmon considered selling her home in Georgia but changed her mind when the situation with Chinese drywall arose. *See* Chatmon Tr., Ex. A-2, at 69:8-15. Ms. Chatmon was having health problems and when she discovered it was from the Chinese drywall, she moved out of her home and began to rent space from her daughters (first with one and then with the other) where she kept her belongings even when she travelled back to Georgia. *See id.* at 71:18-73:3, 94:2-5.

23. Admitted in part. It is admitted that (1) Vicki Foster lived in another residence (condo) that was owned by the Fosters from October 2009 to July 2011, and (2) the Fosters seek damages related to this timeframe. It is admitted that the Fosters were required to pay the expenses associated with ownership of the condo regardless of Chinese drywall but the record is clear that the condo was rented until Ms. Foster was forced out of her Chinese Drywall home and therefore, those expenses were offset by rental income. *See* V. Foster Tr., Ex. A-10, at 100:16-22, 103:21-23, 104:2-5.

24. Admitted.

4

25. Admitted. By way of explanation, Ms. Foster received a quote from a moving and storage company for $10,041.36 to store her personal property during the remediation but the Fosters never retained that company and that quote is not part of the damages they seek in this lawsuit. *See* V. Foster Tr., Ex. A-10, at 117:13-118:4.

26. Admitted in part, denied in part. The first three sentences of this paragraph are admitted. It is denied as to the remaining allegations. The Fosters would not have had to pay the expenses associated with the Kentucky home had Mr. Foster not been forced back to work because of the Chinese Drywall problem but instead would have either rented the home or sold it. *See* W. Foster Tr., Ex. A-9, at 7:3-20, 24:12-14.

27. Denied. The Fosters are not claiming reimbursement for mileage expenses.

28. Admitted in part, denied in part. It is admitted that Mr. Foster is claiming damages in the form of reimbursement of expenses for the period of 2013-2017. It is denied as to all other allegations in this paragraph. Mr. Foster contends that he had to return to work during this time frame to replace the money from their savings that had been spent due to the Chinese Drywall problem, i.e. caused by the Chinese drywall. *See* W. Foster Tr., Ex. A-9, at 11:21-24; V. Foster Tr., Ex. A-10 at 132:20-133:5.

29. Denied. Mr. Foster testified that prior to 2008, he had never had a cell phone but that when he went back to work and was away from his wife, he had to get one to stay in touch, and when he stopped working, he got rid of it. W. Foster Tr., Ex. A-9, at 27:10-28:1.

30. Admitted in part, denied in part. It is admitted that Ms. Nguyen lived with her mother and her mother helped her buy a new home. It is denied to the extent it suggests Ms. Nguyen did not rent from her mother. Ms. Nguyen testified that she paid her mother $900 per month in rent from May 2010 to June 2011. *See* T. Nguyen Tr., Ex. A-24, at 32:12-16. In 2011, Ms. Nguyen borrowed approximately $90,000 from her mother to purchase another home so that she could move out of her Chinese Drywall house. *See id.* at 35:9-36:11; *see also* Nguyen Docs., Ex. D-9 (including HUD Statement).

31. Admitted in part, denied in part. It is admitted that the $90,000 she borrowed from her mother forms a portion of her ALE claim. It is denied in all other respects. The entire $90,000 Ms. Nguyen received from her mother was a loan that she is required to pay back in full, she has made payments, and she still owes over $70,000 on the loan. *See* T. Nguyen Tr., Ex. A-24, at 38:1-5, 41:9-13, 43:2-9, 114:6-11.

5

32. Denied. Ms. Nguyen testified she paid her mother $900 per month from May 2010 to June 2011 for rent. *See* T. Nguyen Tr., Ex. A-24, at 32:12-16.

33. Denied as stated. It is admitted that in addition to their personal testimony and documentary exhibits, Priority Claimants have presented the report of Michael Elkin to support their individual claims for personal property damages. It is further admitted that Mr. Elkin received, reviewed, assembled and compiled an enormous volume of material from the plaintiffs to calculate their personal property damage totals. *See* Elkin Report, Ex. E1, at ¶ 13; *see also* Elkin Tr., Ex. G-1, at 61:7-62:8, 159:13-160:25 & Ex. 9.

34. Admitted in part; denied in part. For purposes of clarity, Plaintiffs admit that Mr. Elkin testified fully as follows: "My analysis was not to determine the eligibility of particular expenses, but rather to quantify the items that were being claimed and to do everything I could to find the backup." *See* Ex. G-1 at 126:2 to 126:5.

35. Admitted in part, denied in part. It is admitted that Mr. Elkin was never asked to determine or render an opinion as to whether any of the items of personal property were in fact damaged by defective drywall. Such a task was not within the scope of Elkin's engagement, and Elkin did not engage in any forensic analysis to try to determine whether the cause of the Priority Claimants' losses related to defective drywall. All other arguments and assertions in Paragraph 35 not specifically admitted are denied. Specifically, Defendants' statements regarding Mrs. Foster are misguided as the impact of Chinese drywall on personal property is well-established. *See, e.g., Germano* Findings of Facts, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655, 681-693, 705 (E.D. La. 2010).

36. Admitted.

37. Admitted.

38. Admitted in part, denied in part. It is admitted that Mr. Elkin did not consider whether replacement items were similar in kind and quality to the damaged item. All other arguments and assertions in Paragraph 38 not specifically admitted are denied. Defendants' statement that the golf cart "likely was an upgrade" in unsupported. Notwithstanding that, the Fosters are no longer seeking damages of $8,650 for the damaged golf cart.

39. Admitted in part, denied in part. It is admitted that there are some personal property claims without documentation of value. The remaining statements and characterizations in this paragraph are denied: (a) Denied. The Fosters are not missing

documentation for blinds that they replaced at a cost of $5,084. As Defendants acknowledged, the Fosters did produce an invoice from Budget Blinds prior to Ms. Foster's deposition. Plaintiffs are providing a clearer copy here showing the cost of $5,084 for the blinds. *See* Invoice, Ex. D-6, at 1; (b) Admitted; (c) Denied. Ms. O'Brien testified that they are seeking $3,492.16 for a replacement mattress they purchases when they moved out of the Chinese drywall house and an order form for the mattress was part of Exhibit 6 to her deposition. *See* L. O'Brien Tr., Ex. A-28, at 62:6-63:1; and (d) It is admitted that Mr. Rosen did not provide a receipt or other documentary evidence for his purchase of the two Samsung televisions. However, Mr. Rosen testified clearly to purchasing these two televisions for $3,500.00 and to their being damaged as a result of the defective CDW in the home. *See* Rosen Tr., Ex. A-29, at 32:17-33:11; 63:14-24.

40. Admitted in part, denied in part. Plaintiffs' expert, Mr. Graziano, prepared a report discussing one component of loss of use damages. In addition, LOUE damages include elements to be determined by a jury – amounts to account for, among other things: "personal discomfort or inconvenience which the plaintiff has suffered, or of any injury to health or other personal injury sustained by the plaintiff, or by members of his family so far as they affect his own enjoyment of the premises."

41. Admitted in part, denied in part. It is admitted that Mr. Graziano performed calculations to estimate each Priority Claimants' relevant rental value and moving costs as a proxy for the temporary loss of use during remediation in the manner described in this paragraph. Denied to the extent that Defendants' assert this is a complete estimate of Plaintiffs' LOUE damages for the reasons articulated in response to Paragraph 40, *supra*.

42. Admitted in part, denied in part. It is admitted that Mr. Graziano is not measuring all ALE incurred by the Priority Claimants. It is denied to the extent that Defendants assert Graziano's estimates are being offered "as a means of applying a dollar value to the Priority Claimant's loss of use and enjoyment of the Property." Defendants are adding the words "and enjoyment" and it is denied that Graziano's estimates are a complete estimate of Plaintiffs' LOUE damages, *see* Paragraph 40, *supra*.

43. Denied as stated. In addition to the rental value estimates in the Graziano reports, Priority Claimants are seeking the full LOUE damages available under the law which includes, among other things, "personal discomfort or inconvenience . . ., any injury to health

7

or other personal injury ... so far as they affect his own enjoyment of the premises." *See* Response to Paragraph 40, *supra*.

44. Admitted in part, denied in part. This paragraph contains characterizations and conclusions to which no response is necessary. Notwithstanding that, it is admitted that Ms. Avery seeks LOUE damages. The remainder of the allegations in this paragraph, including the suggestion that her LOUE damages are limited to $200,000, are denied. Ms. Avery testified that, because of Chinese drywall, she couldn't enjoy the home and there were specific activities she could not do, including: "having my friends over, having a meal, having an evening out at my home, enjoying each other's company." *See* J. Avery Tr., Ex. A-1, at 45:14-21; *see also* Avery Int. Resp., Ex. B-1, at No. 1.

45. Admitted in part, denied in part. It is admitted that Ms. Chatmon seeks LOUE damages and the statements in this paragraph attributable to Ms. Chatmon are generally correct. It is denied that her LOUE damages are limited to $375,000. Ms. Chatmon testified she has not been able to enjoy her home and that, among other things, she has been forced to live "from place to place with my kids." *See* Chatmon Tr., Ex. A-2, at 81:4-10, 105:11-12; *see also* Tesimonial, Exhibit 15A to Defs.' SOF.

46. Admitted in part, denied in part. It is admitted that Mr. and Mrs. Griffin did not live in the Chinese drywall property. It is denied they are limiting their LOUE damages to $100,000. The affected home was purchased as a retirement home, the Griffins took great care in picking specific items in the house with the expectation they would host their family and grandchildren, it was always the Griffins' intention to move into the home when they retired, and but for Defendants' defective drywall, they would have retired there. *See* Diane Griffin Tr., Ex. A-13, at 7:14-22; David Griffin Tr., Ex. A-12, at 112:16-113:17.

47. Admitted in part, denied in part. It is admitted that Ms. Marin was a college student during the time period in question and lived sometimes at the house and sometimes away at school. The remainder of the statements in this paragraph are denied including the assertion that Ms. Marin's claim for LOUE damages is limited to $100,000. Ms. Marin testified that the presence of Chinese drywall did impact her use and enjoyment of the property because "you don't really invite people to a home that's toxic" and that was true even though she wasn't "living there the whole time." *See* C. Marin Tr., Ex. A-18, at 33:16-20, 56:17-57:10. In addition, the presence of drywall prevented you from having "peace of

8

mind" and it prevented her from having her nephew over. *Id.* at 57:10, 86:5-87:8. Damages for LOUE are for the jury to decide. *See* ¶¶ 43-46, *supra*.

48. Admitted in part, denied in part. It is admitted that the Mirandas testified that you were unsure of how to calculate a specific number for LOUE damages. It is denied that they are seeking only $250,000 in those damages. The Mirandas provided testimony regarding how the Chinese drywall negatively impacted their ability to use and enjoy their property and a jury will make the determination as to the amount of those damages. *See* J. Miranda Tr., Ex. A-22, at 26:18- 28:6, 45:14-46:3; *see also* ¶¶ 43-47, *supra*.

49. Admitted in part. The statements herein are generally admitted but, by way of further answer, the exact amount of LOUE damage is for determination by the trier of fact. *See, e.g.*, ¶¶ 43-48, *supra*. Furthermore, the Rosens experienced the anxiety of having lived, and had their children live in a hazardous environment that made leaving the home and urgency, made living in the home difficult, and left them with concerns regarding the impact of their long-term health. *See* M. Rosen Tr., Ex. A-31, at 126:23-127:17; 133:9-136:5.

50. Admitted. *See also* ¶¶ 43-49, *supra*.

51. Admitted in part, denied in part. It is admitted that Priority Claimants are not pursuing claims for personal injury. It is denied that Plaintiffs are not seeking damages for mental or emotional distress in that they are components of claims for LOUE damages.

52. Denied as stated. This assertion is ambiguous and contains legal conclusions to which no response is required. It is admitted that, to the best of Plaintiffs' knowledge, the Florida legislature has not specifically adopted and ratified the International Building Code nor the ASTMC C 396/C 1369-069.

53. Denied as stated. This assertion is ambiguous and contains legal conclusions to which no response is required. To the extent Defendants are asserting that there are no written contracts between Defendants and any Priority Claimant for the purchases and/or sale of drywall, it is admitted: (a) Plaintiffs admit that none of the Priority Claimants purchased drywall directly from Taishan or BNBM; (b) Admitted to the extent Defendants assert that BNBM did not sell drywall directly to the Priority Claimants but instead sold to entities up the distribution chain; and (c) Admitted.

54. Denied as stated. This assertion is ambiguous and contains legal conclusions to which no response is required. It is admitted that the Priority Claimants did not

9

communicate directly with Defendants prior to the filing of the Complaint. It is specifically denied that Plaintiffs had any obligation to engage in such communication because Defendants are manufacturers of drywall.

55. Denied as stated. The drywall was used in the construction of the homes of Priority Claimants.

56. Denied. As set forth in the *Germano* Findings of Facts, *Chinese Drywall*, 706 F.Supp.2d at 663-66, Defendants' drywall contains contaminants that causes the release of pollutants, namely reduced sulfur gases. The release of these gases causes numerous problems including, but not limited to: they are irritating to the human body; they cause offending odors in homes, making the homes hard, if not impossible, to live in; they are corrosive to metals, particularly copper and silver; and the corrosion on metals causes premature failure of electrical and mechanical devices, and poses a fire risk.

57. Denied as stated. Plaintiffs are without sufficient knowledge or information to admit or deny the statements in this paragraph as to Defendants' property holdings.

## II.   COUNTERSTATEMENT OF FACTS

58. Plaintiffs' expert, Mr. Michael Elkin, extracted data from numerous sources of evidence including Priority Claimants' depositions, interrogatory responses, SPPFs and the voluminous receipts, invoices, contracts and other documents produced by Priority Claimants to Defendants. *See* Elkins Report, Ex. E1. In utilizing this data, Mr. Elkin created a summary for each Plaintiff reflecting their damages for a number of categories of damages including: (1) remediation expenses; (2) ALE; (3) personal property damage expenses; (4) lost rental income from affected properties; (5) legal fees and costs in connection with foreclosures, short-sales or bankruptcy; (6) lost equity; and (7) additional damages. *See* Elkins Report, Ex. E1, at Exs. 1-20.

59. Plaintiffs' expert Graziano estimated diminution in value/stigma for all of the Priority Claimants. *See* Graziano Report, Ex. F1; Priority Claimant Summaries, Ex. F2-21.

60. In addition, Plaintiffs have each provided additional evidence supporting their claim for damages with this SOF: **(1) <u>Avery</u>**: (Avery Int. Resp., Ex. B-1, at Int. No. 1 (listing damages); Avery Tr., Ex. A-1, 44:2–45:21 (LOUE), 89:12-90:15 (ALE); Avery SPPF, Ex. C-1, at Section VII (listing damages); Avery Docs, Ex. D-1, at 1-16); **(2) <u>Chatmon</u>**: (Chatmon Int. Resp., Ex. B-2, at Int. No. 1 and 2; Chatmon Tr., Ex. A-2, at 74:5–77:5 (ALE), 81:4-10,

10

105:11-12, 108:13-16 (LOUE); Chatmon SPPF, Ex. C-2, at Section VII (listing damages); Chatmon Docs, Ex. D-2, at 1-41); **(3) Deeg/Hooker**: (Deeg/Hooker Int. Resp., Ex. B-3, at Int. No. 1 (listing damages); Deeg Tr., Ex. A-3, at 14:16-18, 20:20-21, 54:5-16, 56:14-58:1 (Diminution in Value/Loss of Equity); Hooker Tr., Ex. A-4, at 38:13-39:2, 41:12-21; 50:5-11; 50:19-51:18 (Diminution in Value/Loss of Equity); Deeg/Hooker SPPF, Ex. C-3, at Section VII (listing damages); Deeg/Hooker Docs, Ex. D-3, at 1-43); **(4) Etter**: (Etter Int. Resp., Ex. B-4, at Int. No. 1 (listing damages); S. Etter Tr., Ex. A-6, at 111:3-21, 162:7-14, 163:1-16, 164:9-19 (LOUE), 141:18-143:17, 144:12-146:24, 165:4-20, 166:18-167:2, 181:18-183:1, 184:2-185:12 (ALE), 20:15-26:15, 30:10-17, 60:16-62:15, 94:1-95:15, 169:14-170:23, 171:17-176:13 (Diminution in Value/Loss of Equity); Etter SPPF, Ex. C-4, at Section VII (listing damages); Etter Docs, Ex. D-4, at 1-76); **(5) Feldkamp**: (Feldkamp Int. Resp., Ex. B-5, at Int. No. 1 (listing damages); A. Feldkamp Tr., Ex. A-7, at 53:16-54:16 (LOUE), 86:3-24 (ALE), 72:22-73:16 (Personal Property Damages); Feldkamp SPPF, Ex. C-5, at Section VII (listing damages); Feldkamp Docs, Ex. D-5, at 1-21); **(6) Foster**: (Foster Int. Resp., Ex. B-6, at Int. No. 1 (listing damages); W. Foster Tr., Ex. A-9, at 14:1-16:11 (LOUE), 7:3-13:2, 19:16-23:8 (additional damages); V. Foster Tr. I (12/19), Ex.A-10, at 7:3-13:2, 19:16-23:8 (additional damages), 98:11-99:13, 100:3-133:11 (ALE), 138:16-144:14, 145:13-147:3 (LOUE); V. Foster Tr. II (1/8/2019), Ex. A-10, at 5:23-48:19 (personal property damage); Foster SPPF, Ex. C-6, at Section VII (listing damages); Foster Docs, Ex. D-6, at 1-13); **(7) Gody**: (Gody Int. Resp., Ex. B-7, at Int. No. 1 (listing damages); Gody Tr., Ex. A-11, at 42:18-48:16, 91:13-92:22 (personal property), 70:18-72:7, 91:13-92:22, 140:8-141:3 (LOUE and damaged property); 57:12-16, 64:18-20, 73:3-88:5, 90:1-18, 118:21-121:11, 122:2-123:16, 125:15-24, 127:3-128:24, 132:7-10 (ALE); Gody SPPF, Ex. C-7, at Section VII (listing damages); **(8) Griffin**: (Griffin Int. Resp., Ex. B-8, at Int. Nos. 1 and 5(b) (listing damages); David Griffin Tr., Ex. A-12, at 58:16-59:5, 112:16-113:17 (LOUE), 110:6-14, 120:5-13 (Diminution in Value), 106:2-107:13 (Lost Rental Income); Griffin SPPF, Ex. C-8, at Section VII (listing damages); Griffin Docs, Ex. D-7, at 1-221); **(9) Hernandez**: (Hernandez Int. Resp., Ex. B-9, at Int. No. 1 (listing damages); J. Hernandez Tr., Ex. A-15, at 10:18-11:5 (LOUE); B. Hernandez Tr., Ex. A-14, at 98:1-99:21, 124:12-125:10 (LOUE); Hernandez SPPF, Ex. C-9, at Section VII (listing damages); **(10) Lalwani**: (Lalwani Int. Resp., Ex. B-10, at Int. No. 1 (listing damages); D. Lalwani Tr., Ex. A-16, at 24:1-27:6 (LOUE), 29:13-31:16 (Diminution

11

in Value); Lalwani SPPF, Ex. C-10, at Section VII (listing damages); **(11) Marin**: (Marin Int. Resp., Ex. B-11, at Int. No. 1 (listing damages); C. Marin Tr., Ex. A-18, at 33:16-20, 56:17-57:10, 86:5-87:8 (LOUE), 43:18-44:2 (Diminution in Value); Marin SPPF, Ex. C-11, at Section VII (listing damages); **(12) Martinez**: (Martinez Int. Resp., Ex. B-12, at Int. No. 1 (listing damages); Martinez Tr., Ex.A-20, at 62:16-64:7, 112:1-116:15, 122:8-125:10 (LOUE), 120:5-121:7 (ALE), 52:17-53:6 (Personal Property Damages); Martinez SPPF, Ex. C-12, at Section VII (listing damages); **(13) Miranda**: (Miranda Int. Resp., Ex. B-13, at Int. No. 1 (listing damages); J. Miranda Tr., Ex. A-22, at 26:18-28:6, 45:14-46:3 (LOUE); Miranda SPPF, Ex. C-13, at Section VII (listing damages); Miranda Docs, Ex. D-8, at 1-8); **(14) Nguyen/Tuyen**: (Nguyen Int. Resp., Ex. B-14, at Int. No. 1 (listing damages); Nguyen Tr., Ex. A-24, at 109:1-8 (LOUE), 32:12-16, 35:9-36:11, 38:1-5, 41:9-13 (ALE); Nguyen SPPF, Ex. C-14, at Section VII (listing damages); Nguyen Docs, Ex. D-9, at 1-9); **(15) Nunez**: (Nunez Int. Resp., Ex. B-15, at Int. No. 1 (listing damages); J. Nunez Tr., Ex. A-25, at 66:7-71:8 (LOUE), 15:8-16:21, 17:18-23:5, 102:6-103:19 (Diminution in Value), 64:19-65:2 (Damage to Credit); M. Nunez Tr., Ex. A-26, at 14:16-17:22, 23:15-24:16 (LOUE), 16:23-17:18, 20:1-12 (Damage to Credit); Nunez SPPF, Ex. C-15, at Section VII (listing damages); **(16) O'Brien**: (O'Brien Int. Resp., Ex. B-16, at Int. No. 1 (listing damages); K. O'Brien Tr., Ex. A-27, at 21:7-22:9 (lost equity), 23:15-24:8, 26:23-28:13 (diminution in value), 26:23-28:13, 32:3-6, 33:16-34:23 (remediation damages), 33:16-34:23 (LOUE); L. O'Brien Tr., Ex. A-28, at 16:19-23, 82:14-88:5 (lost equity), 66:22-66:11 (ALE), 88:7-95:19 (diminution in value), 104:19-105:7, 109:18-111:9 (remediation), 63:18-65:21 (LOUE), 61:12-63:15 (personal property); O'Brien SPPF, Ex. C-16, at Section VII (listing damages); O'Brien Docs, Ex. D-10, at 1-47); **(17) Rosen (Michael and Robyn)**: (M. Rosen Int. Resp., Ex. B-18, at Int. No. 1, 2, and 5(b); M. Rosen Tr., Ex. A-31, at 38:20-22, 153:14-154:3 (LOUE), 114:7-115:20 (personal property), 133:9-136:5, 137:16-140:11 (ALE), 152:11-153:10 (diminution in value); R. Rosen Tr., Ex. A-32, at 16:13-18:9 (LOUE), 24:13-26:12 (ALE), 9:15-16:12, 19:25--21:8 (personal property); M. Rosen SPPF, Ex. C-18, at Section VII (listing damages); M. Rosen Docs, Ex. D-12, at 1-188); **(18) Rosen (Kevin and Stacey)**: (K. Rosen Int. Resp., Ex. B-17, at Int. No. 1, 2, and 5(b); K. Rosen Tr., Ex. A-29, at 40:6-44:6 (LOUE and personal property), 50:16-51:3 (ALE), 51:7-11, 77:1-82:17 (diminution in value); K. Rosen SPPF, Ex. C-17, at Section VII (listing damages); K. Rosen Docs, Ex. D-11, at 1-811); **(19) Walls**: (Walls Int.

12

Resp., Ex. B-19, at Int. No. 1 (listing damages); L. Walls Tr., Ex. A-33, at 16:1-9, 121:3-125:3 (LOUE), 125:22-144:10, 174:5-17 (ALE), 78:14-79:20, 106:8-120:14 (Personal Property Damages); R. Walls Tr., Ex. A-34, at 10:18-11:1, 19:12-19 (LOUE), 14:20-15:5 (ALE), 6:18-8:10 (Personal Property Damages); Walls SPPF, Ex. C-19, at Section VII (listing damages); Walls Docs, Ex. D-13, at 1-24); **(20) Wites:** (Wites Int. Resp., Ex. B-20, at Int. Nos. 1, 2, 5 (listing damages); M. Wites Tr., Ex. A-36, at 140:2-144:10, 157:16-161:23; 23:9-30:1, 163:17-167:12 (LOUE), 94:23-97:3, 132:16-135:6 (ALE), 83:11-84:1 (Diminution in Value), 23:9-16 (Personal Property Damages); Wites SPPF, Ex. C-20, at Section VII (listing damages); Wites Docs, Ex. D-14, at 1-2).

61. Taishan's manufacturing process had little consistency and controls. *See* CHE Gang Tr., Ex. K, at 184:4-12; 185:6-10; 208:7-12. In addition, Taishan would simply defer to customers. This was noted by a Knauf employee regarding BNBM pricing: "[t]he board does not comply with the ASTM nor do they have any certification. From the Shandong plant they are currently using Phosphor gypsum. ln the past we know they have received 'top up' loads from TaiHe group which are quite ordinary in quality and use Asbestos in same plants instead of glass fibre." *See* Norris email (11/17/2005), Ex. L; *see also* Guardian Building Products (4/30/2008), Ex. M. In addition, Defendants were on notice of defects in their drywall. In another instance, to combat Taishan's claim that the issues arose during shipping, an analysis was done of Taishan's boards with those shipped by Pingyi Baier Building Materials Co., Ltd. ("Baier") and testing showed no issues with the Baier boards and significant issues with the Taishan boards. *See* K. Johnson email (8/22/2006), Ex. N; *see also* J. Gunn email (5/11/2006), Ex. O; Taishan Synopsis (GBP001263), Ex. P. Baier's boards were also found not to be defective when tested by the CSPC. *See* CPSC Release 10-243 (May 10, 2010), Ex. Q, at 1-2.

Dated: May 13, 2019

Respectfully Submitted,

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351

13

Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

14

**CERTIFICATE OF SERVICE**

      I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 13th day of May, 2019.

                                          /s/ Patrick S. Montoya, Esq.
                                          Patrick Shanan Montoya
                                          Fla. Bar No. 0524441
                                          Email: Patrick@colson.com
                                          Colson Hicks Eidson
                                          255 Alhambra Circle, PH
                                          Coral Gables, FL  33134-2351
                                          Telephone:  (305) 476-7400
                                          Facsimile:  (305) 476-7444
                                          *Interim Lead Counsel for Plaintiffs*