# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated, | |
| **Plaintiffs,** | |
| v. | |
| TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., *et al.*, | Case No. 1:11-CV-22408-MGC |
| **Defendants.** | |

### PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' FINAL CONTESTS AND REQUESTS FOR SETOFFS REGARDING THE CALCULATION OF REMEDIATION DAMAGES FOR THE FLORIDA *AMORIN* PLAINTIFFS

## TABLE OF CONTENTS

APPENDIX OF EXHIBITS .......................................................................................iii

I.      INTRODUCTION ...................................................................................1

II.     EFFORTS TO RESOLVE DEFENDANTS' CONTESTS ...........................8

III.    PLAINTIFFS' RESPONSE TO INDIVIDUAL
        OBJECTIONS ("A"-"Q") ........................................................................9

        A.   Objection "A" – Claimant Is Not an *Amorin* Named Plaintiff .................9

             1.   Taishan ..........................................................................10

             2.   BNBM .............................................................................12

        B.   Objection "B" – Assigned Claim to Another Entity or Person .................12

             1.   Charles DeMonaco (Claimant #308) .............................................12

             2.   Alfredo Pena (Claimant #1072) ....................................................12

             3.   Keith Santillo (Claimant #1310) ...................................................13

        C.   Objection "C" – Bought with Knowledge of Chinese Drywall .................13

             1.   Taishan .........................................................................13

                  a.   Patrick Kana (Claimant #662) .................................................14

                  b.   Phillip Coratti (Claimant #260) .................................................14

                  c.   William Kennedy (Claimant #678) ...........................................14

             2.   BNBM ..........................................................................15

                  a.   Clivens and Andrea Goldman (Claimant #477) ........................16

                  b.   Bryce and Stacey Kelly (Claimant #673) ................................16

                  c.   Danielle Lang (Claimant #707) ..............................................16

        D.   Objection "D" – Claimant Does Not Currently Own Affected
             Property.........................................................................................17

        E.   Objection "E" – Claimant Never Owned Affected Property ....................19

             1.   Condominium Associations ................................................................20

                  a.   Condominium Associations are Proper *Amorin* Class Members  20

                  b.   Condominium Associations Have Standing to Bring Claims
                       for Damages to Common Elements and to Units Within the
                       Condominium .......................................................................21

                  c.   Plaintiffs Are Not Seeking Duplicate Remediation Damages ....26

i

        2.   Robert Cardoza (Claimant #194 and Claimant #195) ..........................28

F.    Objection "F" – Claimant Failed to Submit an SPPF ...............................28

G.   Objection "G" – No Signature on Current SPPF Submission ..................30

H.   Objection "H" – Relevant Fields in SPPF Not Completed......................31

I.    Objection "I" – Incorrect Square Footage Reported ................................32

        1.   "Incorrect" or "Inaccurate" Proof of Square Footage ....................33

            a.   Luna Ocean Residences Condominium Association, Inc...........34

            b.   Blue Water Coach Homes Condominium Association ..............35

            c.   Magdalena Gardens Condominium Association ......................36

        2.   "Insufficient Proof" of Under Air Square Footage .......................37

            a.   Sheridan Beach Club Condominium Association

               Number Three, Inc..................................................................38

            b.   Sunrise Lakes Condominium Apt. Phase III, Inc.

               1, 2 and 5 ...............................................................................39

J.    Objection "J" – Chinese Drywall in Affected Property Not Manufactured

     by Taishan/BNBM ...................................................................................39

K.   Objection "K" – Insufficient Proof to Identify Manufacturer ...................40

L.   Objection "L" – Affected Property was Completely Remediated .............44

M.  Objection "M" – Affected Property was Partially Remediated ................46

N.   Objection "N" – Remediation Funded by Other Person or Entity ............47

O.   Objection "O" – Diminution of Value ....................................................50

P.    Objection "P" – Remediation Damages Formula ....................................51

Q.   Objection "Q" – Preservation of Evidence .............................................53

III.     REQUESTS FOR SETOFFS....................................................................54

        1.   Kenneth and Allison Grant.................................................................54

        2.   Eric and Karen Wilcox ......................................................................54

        3.   Steven and Cathy Etter .....................................................................54

IV.    CONCLUSION ......................................................................................55

**APPENDIX OF EXHIBITS**

**Exhibit No.** **Description**

A — Plaintiffs' Remediation Damages Spreadsheet

1 — Cost Index and Location Factor Conversion Calculated in 2018 for CDW Class Action as of November 1, 2018

2 — Addition and Errata to PSC's Supplemental Submission of an Updated Class Plaintiffs' Spreadsheet of Taishan Properties with RS Means Factors, Costs Per Square Foot, and Extended Costs, including Declaration of Ron Wright) [MDL Rec. Doc. 20887]

3 — Defendants' First Set of Interrogatories and Request for Production of Documents to All Claimants

4 — Plaintiffs' Spreadsheet Response to Ownership and Square Footage Discovery

5 — February 13, 2019 Email from Sandra Duggan to Defense Counsel Summarizing Call Discussing Contests and Setoffs

6 — Screenshots of HHK FileCloud Showing Cobblestone on the Lake, Units 443, 444 and 447 Files

7 — *Amorin* Class Members Named on *Wiltz* and *Haya*

8 — *Amorin* Claimants with Assignment of Rights for Remediation Claim Only

9 — April 5, 2019 Email from Gregory Weiss regarding DeMonaco Assignment

10 — Hovstone Properties Florida, LLC and Charles Stephen DeMonaco Settlement Agreement dated February 22, 2011 (BG Claimant ID 102249, Doc. ID 306703)

11 — April 4, 2019 Email from Holly Werkema regarding Pena Assignment

12 — April 3, 2019 Email from Gary Mason regarding Santillo Assignment

13 — Keith Santillo and Villa Lago Condominium Association at Renaissance Commons, Inc. Settlement Agreement dated October 30, 2010 (Doc. ID 204483)

14 — April 5, 2019 Email from Holly Werkema regarding Coratti's and Kana's Knowledge at Time of Purchase

15 — April 5, 2019 Email from Allison Grant regarding Kennedy's Knowledge at Time of Purchase

16 — December 27, 2010 and January 2, 2011 Emails regarding William Kennedy's Knowledge at Time of Purchase (BG Claimant ID 102781, Doc. ID 367961 & Doc. ID 367960)

17 — April 2, 2019 Email string between Harry Moren and Emma Schwab regarding Claimants Subject to Objection "C"

18 — April 4, 2019 Email from Holly Werkema regarding Lang SPPF

19 — Danielle Lang's First Amended Supplemental Plaintiff Profile Form (BG Claimant ID 111594, Doc. ID 367920)

iii

| 20 | Andrea and Clivens Goldman SPPF filed March 22, 2019 |
| 21 | April 5, 2019 Email from Manuel Comras Regarding Goldman's Knowledge Prior to Purchasing Property |
| 22 | April 5, 2019 Email from Bryce Kelly Regarding Knowledge Prior to Purchasing Property |
| 23 | Bruce Kelly's Plaintiff Profile Form (BG Claimant ID 101637, Doc. ID 135041) |
| 24 | Danielle Marie Lang's PPFs (BG Claimant ID 111594, Doc. ID 65268, Doc. ID 58819, Doc. ID 57342) |
| 25 | Acknowledgment of New Case and Appellate Court Docket of *Clivens Goldman and Andrew Goldman v. Deutsche Bank National Trust Compan* (4DCA#: 19-0399) |
| 26 | List of Florida *Amorin* Claimants that Remediated Property Prior to Selling |
| 27 | SPPF of Luna Ocean Residences Condominium Association, 704 N Ocean Boulevard, Unit 801 (Claimant #773) |
| 28 | SPPF of Luna Ocean Residences Condominium Association, 704 N Ocean Boulevard, Unit 901 (Claimant #774) |
| 29 | SPPF of Sheridan Beach Club Condominium Association Number Three, Inc., 529 E. Sheridan Street, Unit 406 (Claimant #1358) |
| 30 | Excerpts from Exhibit "A" to *Amorin* Complaint showing Condominium Associations Listed as Separate Claimants |
| 31 | Screenshots of BrownGreer Portal showing Condominium Associations' Claim Files |
| 32 | Amendment to Declaration of Condominium of Sheridan Beach Club Condominium Number Three to Add Phase III |
| 33 | Condominium Documents of Magdalena Gardens, a Residential Condominium |
| 34 | *In re Petition for Declaratory Statement, Winding Lake at Welleby Condominium Association*, DS 2006-7698, p. 8, citing Fla. Stat. § 718.111(11)(b), (c); Florida Department of Business Professional Regulation letter dated July 22, 2009 to Board of Directors of Laver's Resort and Racquet Club, a Condominium Association |
| 35 | SPPF of Luna Ocean Residences Condominium Association, Inc., Unit 603 (Claimant #767) |
| 36 | SPPF of John and Susan Flynn (Claimant #1724) |
| 37 | SPPF of Blue Water Coach Homes Condominium Association, Inc., 206 Shadroe Cove Circle, Unit 304 (Claimant #112) |
| 38 | SPPF of Bruce Casper, 206 Shadroe Cove Circle, Unit 304 (Claimant #1700) |
| 39 | SPPF of Sheridan Beach Club Condominium Number Three, Inc., 509 E. Sheridan Street, Unit 304 (Claimant #1347) |
| 40 | SPPF of Dina Hocker, 509 E. Sheridan Street, Unit 304 (Claimant #604) |

| | |
|---|---|
| 41 | Articles of Organization for Hurricane Holdings, LLC |
| 42 | Verification Page for Magdalena Gardens, Unit 723 (Claimant #822) |
| 43 | Magdalena Gardens, Unit 723 Invoices (BG Claimant ID 111470, Doc. ID 349845) |
| 44 | Magdalena Gardens, Unit 723 Proof of Payment (BG Claimant ID 111470, Doc. ID 349846) |
| 45 | Magdalena Gardens, Unit 723 Self Remediation Documents (BG Claimant ID 111470, Doc. ID 349935) |
| 46 | Magdalena Gardens, Unit 723 Remediation Contract and Photos (BG Claimant ID 111470, Doc. ID 350919; Doc. ID 351014; Doc. ID 351015; Doc. ID 351016) |
| 47 | Magdalena Gardens, Unit 723 PTO 1B Floorplan (BG Claimant ID 111470, Doc. ID 352489) |
| 48 | Magdalena Gardens, Unit 723 Post-Remediation Inspection Report (BG Claimant ID 111470, Doc. ID 360591 |
| 49 | Screenshot of BrownGreer Portal showing Doc. ID 360651 "Supplemental Plaintiff Profile Form" Uploaded April 2, 2018 |
| 50 | SPPF of Magdalena Gardens, Unit 723 (Claimant #822) |
| 51 | April 1, 2019 and March 26, 2019 Emails regarding square footage agreement for Attard, Bautista, Filardo & Ferroni |
| 52 | March 21, 2019 Email from Matt Lawson to Emma Schwab regarding square footage agreement for Krause |
| 53 | Taishan's Exhibit 29 with Column Added Identifying Difference Between Plaintiffs' Square Footage and Taishan's Square Footage |
| 54 | Luna Ocean Model A Floor Plan (BG Claimant ID 102723, Doc. ID 93357) |
| 55 | Luna Ocean Model B Floor Plan (BG Claimant ID 102723, Doc. ID 93358) |
| 56 | Luna Ocean Model C Floor Plan (BG Claimant ID 102723, Doc. ID 93360) |
| 57 | Luna Ocean Model D Floor Plan (BG Claimant ID 102723, Doc. ID 93362) |
| 58 | Luna Ocean Architect Floor Plans (BG Claimant ID 102723, Doc. 93368) |
| 59 | Luna Ocean Summary and Area Calculation by Howard Ehrsam, P.R., LEED, AP |
| 60 | Floor Plans for all Blue Water Coach Home Models (BG Claimant ID 111469, Doc. ID 367904) |
| 61 | Blue Water Affected Property Information Affidavit (BG Claimant ID 111469, Doc. ID 367903) |
| 62 | Blue Water Affected Property Information Affidavit on Azimut and SeaRay Models (BG Claimant ID 111469, Doc. ID 241933 and Doc. ID 244670) |
| 63 | Blue Water Affected Property Information Affidavit on Hatteras Model (BG Claimant ID 111469, Doc. ID 241935) |

| | |
|---|---|
| 64 | Blue Water Affected Property Information Affidavit on Bertram Model (BG Claimant ID 111469, Doc. ID 241944) |
| 65 | Blue Water Architectural Floor Plans (BG Claimant ID 111469, Doc. ID 367951) |
| 66 | Magdalena Gardens All Floor Plans (BG Claimant ID 111470, Doc. ID 136945) |
| 67 | Magdalena Gardens Charlotte County Property Appraiser Real Property Record (BG Claimant ID 111470, Doc. ID 122285) |
| 68 | Magdalena Gardens Charlotte County Property Appraiser Real Property Record (Doc. ID 123339 and Doc. ID 367972) |
| 69 | Magdalena Gardens Charlotte County Property Appraiser Real Property Record (BG Claimant ID 111470, Doc. ID 122840) |
| 70 | Magdalena Gardens Charlotte County Property Appraiser Real Property Record (BG Claimant ID 111470, Doc. ID 122396 and Doc. ID 124691) |
| 71 | Magdalena Gardens Charlotte County Property Appraiser Real Property Record (BG Claimant ID 111470, Doc. ID 123844) |
| 72 | List of Inaccuracies in Square Footage Objections Created by Allison Grant |
| 73 | Declaration of Condominium of Sheridan Beach Club Condominium Number Three (BG Claimant ID 111463, Doc. ID 367926) |
| 74 | Sheridan Beach Club Condominium Affected Property Information Affidavit (BG Claimant ID 111463, Doc. ID 267770) |
| 75 | Sheridan Beach Club Condominium Broward County Property Appraiser Records (BG Claimant ID 111463, Doc. ID 367835, Doc. ID 367837, Doc. ID 367838, Doc. ID 367839, Doc. ID 367840, Doc. ID 367842, Doc. ID 367845 and Doc. ID 367836) |
| 76 | H. Harris Investments Supplier of Chinese drywall Documentation |
| 77 | H. Harris Investments Inspection Report (BG Claimant ID 100142, Doc. ID 367873) |
| 78 | List of Claimants Subject to "L" Objection, but SPPF Indicates Property "Partially Remediated" |
| 79 | Gabriel Arugeta Remediation Documents (BG Claimant ID 105857, Doc. ID 362065) |
| 80 | SPPF of Gabriel Arugeta (BG Claimant ID 105857, Doc. ID 365491) |
| 81 | SPPF of Herschel Holt (BG Claimant ID 101891, Doc. ID 366102) |
| 82 | SPPF of Vashaun Williams (BG Claimant ID 105910, Doc. ID 361858) |
| 83 | Excerpt of 2018 34th Annual Edition of Open Shop Building Construction Costs with RSMeans Data |
| 84 | List of Claimants Subject to Objection "Q" that complied with PTO 1B |

85          Centerline Homes Settlement Agreement (BG Claimant ID 102785, Doc. ID 368038)

86          SPPF of Karen and Eric Wilcox (BG Claimant ID 101848, Doc. ID 351967)

87          SPPF of Bryce and Stacey Kelly (BG Claimant ID 101637, Doc. ID 368053)

88          L&W Supply Corporation Distributor Profile Form

89          Verified SPPF of Anthony & Candance Gody (BG Claimant ID 105456, Doc. ID 367872 and 367906)

90          Grant Settlement Release and Documents (Doc. ID Doc. 367686, 352389, 352388, 352384)

## I. **INTRODUCTION**

Judge Cooke's Trial Plan for Property Damage Claims is clear: "By **May 31, 2019**, the Special Master will use the Remediation Formula to issue a Report and Recommendation as to the total award for Property Damage Claims."[1]  Pursuant to that formula, "[t]he damages awarded will be calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 *as adjusted* by the RS Means location factor."  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, *24 (E.D. La. Apr. 21, 2017) ("Class Damages Order").[2]  Plaintiffs submit herewith, as Exhibit "A" to this Brief, "Plaintiffs' Remediation Damages Spreadsheet," which lists 1,802 Florida *Amorin* Claimants, identified by name and Claimant #.[3]  Plaintiffs have included in their Remediation Damages Chart the property address for each claimant, the verified square footage for each property, ownership status, the remediation damages information according to the R.S. Means data for 2017, *as adjusted* for each zip code,[4] setoffs asserted by Plaintiffs, and the letter objections ("A"-"Q") asserted by Defendants.  In cases where Plaintiffs agree that a particular claimant is not entitled to remediation damages, a red

---

[1] ECF No. 112 ("Trial Plan") at 8.

[2] "This figure is the [2015] national square foot unit price with certified industrial hygienist (CIH) costs included and was calculated by [Plaintiffs' expert] Mr. Inglis using R.S. Means to adjust the $86 per square foot cost [in *Germano* in 2010] to reflect <u>current-day building materials and labor</u>."  *Id.* at *24 n.10 (emphasis added).  When the Class Damages Hearing was conducted in 2015, the national R.S. Means figure was $105.91.  In 2017, when Judge Fallon's Class Damages Order was entered, the national R.S. Means figure had increased to $109.85.  As of 4th Quarter 2018, the national R.S. Means figure is $116.57.  Plaintiffs contend they are entitled to the current measure of remediation damages, and will make the 2019 adjustments when the updated R.S. Means data become available shortly.  *See* R.S. Means data (4th Quarter 2018) national square foot unit price calculated by the court-approved damages expert Ron Wright (attached hereto as Exhibit "1").

[3] For the sake of consistency, the Parties agreed to use the same Claimant # for each claimant in their respective Briefs and charts.

[4] Plaintiffs' Updated Spreadsheets produced pursuant to the governing 2017 Class Damages Order included remediation damages calculations using the 2017 national square foot unit price published in R.S. Means (*see* Addition and Errata to PSC's Supplemental Submission of an Updated Class Plaintiffs' Spreadsheet of Taishan Properties with RS Means Factors, Costs Per Square Foot, and Extended Costs, including Declaration of Ron Wright [MDL Rec. Doc. 20887] (attached hereto as Exhibit "2").  Plaintiffs contend they are entitled to remediation damages based on current R.S. Means data, as set forth below in their response to Objection "P."  Plaintiffs will provide updated calculations of same, upon request by the Special Master or the Court.

strikethrough (deletion) line has been applied to that claimant's remediation damages total on the spreadsheet.

In calculating remediation damages for the *Amorin* Plaintiffs, the Court's Trial Plan specified that: "Defendants may challenge only the following aspects of the damages calculation:"

        a.  Product ID;

        b.  Ownership Verification; and

        c.  Square Footage.[5]

All other arguments and defenses have been waived by virtue of Judge Fallon's Class Damages Order (adopted by Judge Cooke) and Defendants' defaults in this litigation.[6]

In its Trial Plan, the Court allowed Defendants to conduct *limited* discovery regarding:

        (1) "whether the Claimant owns or owned the affected property and whether an assignment of Claimant assigned their claim for remediation damages" and

        (2) "whether the under air square footage of the property in question is accurate."[7]

On February 1, 2019, Plaintiffs served their responses to Defendants' ownership and square footage discovery requests by way of a spreadsheet (as agreed-to by the Parties) setting forth verified "under air" square footage information and current ownership/assignment

---

[5] ECF No. 112 at 6-7 (emphasis added).

[6] While the Plaintiffs have the burden to prove damages in a default proceeding, all reasonable inferences from the evidence are drawn in the Plaintiffs' favor. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

[7] *Id.* at 7.  On January 17, 2019, Defendants served interrogatories and requests for production of documents on all Florida *Amorin* Plaintiffs seeking verification as to (1) "whether the under-air square footage identified in the PSC's Master Spreadsheet (filed with the Court as docket entry 54) is the same as the under-air square footage of [each] property at the time the Chinese Drywall was installed"; (2) "whether the current owner(s) of [each] property is the same as the owner(s) listed in [the] most recently filed verified supplemental plaintiff profile form"; and (3) "whether there has been any change in the assignment of rights as reflected in the PSC's Master Spreadsheet (filed with the Court as docket entry 54)." *See* Defendants' First Set of Interrogatories and Request for Production of Documents to All Claimants (collectively attached hereto as Exhibit "3").

status for the 1,802 Florida *Amorin* claimants before the Court.[8]   This spreadsheet was intended to provide Defendants with the information they would need to make any ownership or square footage challenges permitted by the Court.   Defendants also had available to them each claimant's "claim file" electronically accessible through the BrownGreer Portal.[9]   The claim files include each Plaintiff's evidence of entitlement to damages against Defendants, such as:  a Plaintiff Profile Form ("PPF"), a Supplemental Plaintiff Profile Form ("SPPF"), indicia of Chinese drywall in the home, proof of ownership of the property, proof of purchase and sale documents, evidence of damages, receipts and invoices for repairs and replacements, square footage information, remediation expenses, other remediation-related documents, and prior settlement payments.

Despite the Court's unambiguous instructions in its Trial Plan and the limits on the challenges that Defendants may assert (and despite that Defendants are estopped from offering any other defenses), on April 2, 2019, Defendants submitted 17 different categories of objections ("A"–"Q") to Class Plaintiffs' claims for remediation damages[10] in an effort to avoid owing what they contend "is a staggering amount of money" – "approximately $300 million."[11]  Incredibly, after 10 years of litigation, these Defendants, who deliberately allowed default judgments to be entered against them, are seeking to bar 96% of the Plaintiffs from receiving damages under the Remediation Formula. When the dust settles, and all the

---

[8] *See* Plaintiffs' Spreadsheet Response to Ownership and Square Footage Discovery (attached hereto as Exhibit "4") (yellow highlights denote changes from what was previously produced or provided to Defendants).

[9] The BrownGreer Portal has been active since 2013.  All claimants are assigned a "Claimant ID" number on the Portal, referred to herein as "BG Claimant ID [____]."  Every document uploaded to the Portal is assigned a Document ID number, referred to herein as "Doc. ID [_____]."  For purposes of these proceedings, the Special Master has been given access to the Plaintiffs' evidence located on the BrownGreer Portal.

[10] BNBM asserts additional objections to this process based on defenses of "personal jurisdiction, liability, causation, defect, imputation, transferability of entities of default against other parties or from other actions, and damages," which must be overruled.  Judge Fallon and Judge Cooke, through adoption of the MDL Court's decisions, have denied BNBM's motions to dismiss for lack of jurisdiction, motions to vacate defaults, motions to decertify the *Amorin* Class, and a Motion to Enforce Trial Rights (ECF No. 66). Any further consideration of these points is outside the scope of the Special Master's role in this proceeding.

[11] Taishan Br. at 3.

objections are analyzed, these Chinese manufacturers are asking the Special Master to calculate remediation damages for only 73 claimants.[12]

Meanwhile, more than 1,700 Plaintiffs owning properties in Florida have waited almost a decade to have their claims adjudicated.  The best they can hope for under Defendants' scenario is that their "claims should be removed from the remediation-formula calculation spreadsheet and reserved for individual adjudication in a later phase with those plaintiffs' 'other damages.'"[13]  Problematically, there is no scheduled "later phase" for "other damages" (except for the 20 Priority Plaintiffs).  The Florida *Amorin* Class members are entitled to an award of remediation damages now, not at some later, unspecified date.  They have already waited a decade to have their claims adjudicated.  The Special Master and the Court should not tolerate any further delays by these Defendants.

Venturing far outside the scope of contests contemplated by the Court and beyond what is permitted for parties in default, Defendants have raised a panoply of arguments opposing the use of the Remediation Formula, certification of the *Amorin* Class, and the limitations placed by the Court on remediation damages discovery.  All of these arguments were rejected by the Court in its Order of November 16, 2018.[14]  Nevertheless, Defendants continue to assert that the Remediation Formula is "an unlawful method for determining individualized tort damages,"[15] that the formula is "complex and *ad hoc*,"[16] that "Florida law bars using estimated repair costs to measure damages in most situations presented here,"[17] and that somehow Judge Cooke did not properly consider Florida law[18] when she adopted Judge Fallon's ruling that "[t]he remediation formula represents a reasonable and reliable measure of the remediation damages which the Court will apply to determine the appropriate amount of property damages" in this case.[19]

---

[12] Claimants with only an "I" and "P" Objection, or those with just a "P" Objection.

[13] Taishan Br. at 4.

[14] ECF No. 112 at 4.

[15] Taishan Br. at 3; *see also id.* at 10-11.

[16] *Id.* at 8.

[17] *Id.* at 10-11.

[18] *Id.* (Judge Cooke "did not explicitly address Florida law in her trial plan order.").

[19] ECF No. 112 at 3.

Defendants ignore the fact that all of these arguments were previously made by them at the Class Damages Hearing in 2015, and rejected by the MDL Court in 2017.  Then, in 2018, "[a]fter considering the arguments raised in the motions and at the hearing, the record, and *the relevant legal authorities*, the Court **ADOPT[ED] all** of Judge Fallon's factual findings and legal conclusions and will not revisit any of his rulings absent a compelling showing of an intervening change in law or fact."[20]   Notwithstanding Defendants' suggestion to the contrary, the Special Master should *not* revisit any rulings of Judge Fallon or Judge Cooke with regard to remediation damages.  There has been no showing, much less a compelling one, of any *change* in law or fact in this case.

In an attempt to avoid a large remediation damages calculation, Defendants further argue that the "large cohort [of *Amorin* Class members] contains a wide variety of individual circumstances," and that "[t]hose differing circumstances are directly relevant to whether plaintiffs can legally recover damages using a class repair-estimate formula."[21]   In essence, Defendants seek an umpteenth bite at the apple to decertify the already approved Class.  This claim directly contradicts the Court's prior rulings and, in particular, the conclusion in Judge Fallon's class certification decision that "determining class-wide property damages for the class will affect all class members in a similar manner. The factual determination of class-wide property damages is common to the class members, and resolution of this common question will generate common answers apt to drive the resolution of the litigation." *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520, at *11 (E.D. La. Sept. 26, 2014) ("Class Certification Order").  Unlike other legal actions, "there is no dispute as to liability or causation in the present case.  The Defendants are liable and the Chinese drywall caused the damage to the properties and it has to be removed."  *Chinese Drywall*, 2017 WL 1421627 at *22 (emphasis added).[22]

As Judge Fallon concluded, and Judge Cooke affirmed, the application of the Remediation Formula is simple and straightforward, "based on objective standards and

---

[20] *Id.*

[21] Taishan Br. at 6.

[22] *See also* ECF No. 112 at 3.

verifiable data for each property."[23]   Moreover, "[g]iven the unique circumstances surrounding Chinese drywall and the absence of efficient and appropriate alternatives, a formulaic method used to calculate remediation damages is fair and reasonable."[24]   Indeed,

> the class remediation damages here do not present significant individualized issues, in contrast to physical ailments and loss of business profits. Rather, the only variance is in the amount required to pay for each remediation, which can be determined using a formulaic methodology. Unlike asbestos and mass accident cases, the damage issues presented in Chinese Drywall litigation are so distinct from questions of liability and causation (questions which have already been answered in favor of the Plaintiffs), it is proper and just to award aggregate damages. [Plaintiffs' expert] Mr. Inglis' formula, which calculates remediation damages based on square footage for each of the Taishan properties with verified under air square footage, is superior to the thousands of individual proceedings which would result if Defendants' proposal for property by property inspection and estimation were accepted.  Defendants' alternative amounts to cruel and unusual treatment of innocent homeowners. To now require individuals who have been displaced for more than six years [at the time of the Class Damages Hearing in 2015] to pursue individual claims and incur individual costs in a case where liability and fault have been established is not only an imposition on the courts, but also and more importantly, a serious injustice to those who have been harmed by the Defendants' actions.
>
> Each class member suffered the same kind of damage, and the only individualized determination required—the amount it will cost to remediate the properties—can be calculated using a formula to estimate the amount of each class member's damages. It is therefore unnecessary and unjust to hold individual mini-trials to determine remediation damages in this case. The damages calculation need not be exact. *See*, *e.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (ruling that damages estimates are appropriate even where "they cannot be measured ... with exactness and precision ...").[25]

---

[23] *Chinese Drywall*, 2017 WL 1421627 at *22.

[24] *Id.* at *14.

[25] *Id.* at *24 (emphasis added).

Judge Cooke specifically adopted Judge Fallon's Class Damages Order holding that "[t]he alternative to estimating property damages on a class-wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages."[26] Yet, Defendants' Briefs are replete with pleas for the Special Master to remove the vast majority of the Plaintiffs' claims from the formula process so that they may be resolved through "individual discovery and adjudication,"[27] in violation of the Court's Trial Plan, in violation of the Class Certification Order, in violation of the Class Damages Order, and in contravention of the fact that Defendants are estopped from offering any challenges to remediation damages awards beyond product identification, ownership and square footage. Under Defendants' proposal for "individualized claim adjudication,"[28] the parties and the Court will likely spend the next ten years or more resolving 1,700 claims for remediation damages resulting from Defendants' defective Chinese drywall.[29]  This last-ditch effort to turn on its head the Court's well-reasoned process and approved methodology for awarding *Amorin* Class members the remediation damages to which they are entitled, should be rejected.  Defendants had numerous opportunities in the past to contest class certification and class damages, and the time has finally come (after ten long years) for awards to be made. Defendants' objections should be overruled.

---

[26] ECF No. 112 at 3 (emphasis added), citing *Chinese Drywall*, 2017 WL 1421627, *25.

[27] Taishan Br. at 4, 5, 11, 18, 21, 24, 31, 34, 35, 37; BNBM Br. at 6, 8, 9.

[28] *Id.*

[29] The simple truth is that had Defendants answered the Plaintiffs' complaints when they were filed in 2009, 2010, and 2011 and served under the Hague, we would not be in this position.  Had Defendants shown up and participated in the litigation, instead of deliberately allowing defaults to be entered against them, these Defendants could have engaged in the discovery they seek now.  They could have analyzed the Plaintiffs' original PPFs when they were completed, they could have examined Plaintiffs' evidence on the BrownGreer Portal when it was uploaded, they could have sought additional discovery, they could have challenged the composition of the *Amorin* Class, and they could have made the objections they assert now at any time prior to the remand of these cases.  But instead, Defendants engaged in a strategy to sit on the sidelines of these proceedings while the Plaintiffs and the other Defendants in the case proceeded to litigate the claims at issue. Through no fault of these Plaintiffs, Defendants delayed the resolution of the claims before the Court.  In fact, Defendants' "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters."  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, *9 (E.D. La. Jan. 2, 2018).  At this point, it is far too late for Defendants to suggest alternatives to class-wide resolution of Plaintiffs' remediation claims.

## II.   <u>EFFORTS TO RESOLVE DEFENDANTS' CONTESTS</u>

Defendants issued their preliminary contests and requests for setoffs on February 11, 2019. The following day, the Parties held a call to address certain issues.[30] After that meeting, Defendants were to provide Plaintiffs with supporting documents for some of the objection categories and their work product for square footage so that an effort could be made to resolve as many contests as possible. Plaintiffs worked with individual counsel to address as many of the preliminary objections as possible and exchanged dozens of emails with defense counsel seeking clarification regarding certain objections. The Parties met following the MDL status conference on February 21, 2019, to further discuss certain objections. Thereafter, Taishan provided a revised spreadsheet on February 22, 2019, which identified for each claimant with a square footage objection whether Taishan disagreed with Plaintiffs' verified under-air square footage or whether Taishan alleged no proof of under air square footage. For the former category of objection, Plaintiffs requested that Defendants provide their square footage numbers, which Taishan did not provide until March 25, 2019, and BNBM did not provide until March 27, 2019. Plaintiffs identified numerous errors in Defendants' coding, which resulted in the withdrawal of certain objections.

The clear intent of Judge Cooke's two-fold contest process was for Defendants to conduct necessary discovery to resolve the only three items that could be challenged: Product ID,[31] ownership, and square footage. However, between February 11, 2019 (the date Defendants issued their preliminary contests) and April 1, 2019 (the date of their final contests), Defendants did not engage in any meaningful individual discovery, but rather used that period to find additional claims to contest. The below chart identifies the minimal progress made to resolve Defendants' contests. In several instances, no progress was made and in four cases, Defendants increased the number of claimants subject to the objection:

---

[30] February 13, 2019 Email from S. Duggan to Defense Counsel Summarizing Call Discussing Contests and Setoffs (attached hereto as Exhibit "5").

[31] Product ID discovery proceeded on a separate track, with the Special Master to issue a Report and Recommendation on Taishan's Chinese drywall products by April 8, 2019. Discovery regarding BNBM's Chinese drywall products has been delayed several times due to the fact BNBM's 30(b)(6) has been unable to obtain a visa to travel from China for his deposition.

| Objection | Preliminary Contests | Final Contests |
|---|---|---|
| A – not an *Amorin* named Plaintiff | 49 | 9 |
| B – assignment bars remediation damages | 36 | 23 |
| C – purchased with knowledge | 9 | 6 |
| D – not a current owner | 784 | 792 |
| E – never owned the property | 293 | 285 |
| F – failed to submit an SPPF | 20 | 17 |
| G – failed to sign current SPPF submission | 587 | 587 |
| H – failed to fill out SPPF completely | 608 | 547 |
| I – incorrect square footage | 744 | 503 |
| J – drywall not manufactured by Defendants | 880 | 786 |
| K – insufficient proof of Product ID | 142 | 103 |
| L – property was completely remediated | 631 | 639 |
| M – property was partially remediated | 158 | 156 |
| N – remediation funded by third party | 425 | 421 |
| O – diminution of value less than formula damages | 50 | 230 |
| P – Remediation Formula calculation not proper | 1,676 | 1,676 |
| Q – failed to comply with PTO 1 | 677 | 706 |

This Brief embodies the Plaintiffs' position on global issues related to Defendants' contests and requests for setoffs. For some claimants, individual counsel assert independent positions or responses, which are included herewith and/or attached hereto as an Exhibit.

## III.   PLAINTIFFS' RESPONSE TO INDIVIDUAL OBJECTIONS ("A"-"Q")

### A. Objection "A" – Claimant Is Not an *Amorin* Named Plaintiff

Defendants contend that 9 claimants (8 for Taishan[32] and 1 for BNBM) are subject to Objection "A" on the grounds they are "not an *Amorin* named plaintiff," and, therefore, not entitled to any damages. According to Defendants, these claimants were not named on the *Amorin* complaint, however, even if that were true, that does not necessarily mean the claimants are not members of the *Amorin* Class. The certified *Amorin* class is broader than the Plaintiffs named on the Florida *Amorin* complaint. In fact, the *Amorin* Class is comprised of "active litigants (either in the original action or in complaints in intervention) who are participants in":

---

[32] During discussions with Plaintiffs, BNBM confirmed that it joins Taishan's objections relative to this objection.

> *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E.D. La.); *Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09–6690 (E.D. La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Civ. Action No. 10–361 (E.D. La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–080 (E.D. La); *Haya, et al. v. Taishan Gypsum Co. Ltd., et al.,* Civ. Action No. 11–1077 (E.D. La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.,* Civ. Action. 12–0498 (E.D. La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1672 (E.D. La.)[33]; *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1395 (E.D. La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1673 (E.D. La.).

*Chinese Drywall*, 2014 WL 4809520, at *16.   Thus, as long as a claimant is named on one of these complaints, he or she is an *Amorin* Class member.

### 1. <u>Taishan</u>

The 8 claimants subject to Taishan's Objection "A" can be divided into two categories: (1) the entire building on a property in Florida is named on an *Amorin* intervention complaint, but some of the individual units within that building are not specifically identified; and (2) the claimant is a member of the *Amorin* Class, but is not named on the Florida *Amorin* complaint (or any complaint in intervention).

With respect to the first category of claims subject to Taishan's Objection "A," there are 3 claims brought by the same claimant, Cobblestone, which have the same physical address, 4351 Bellaria Way, and are in the same building within that property, Building 4.

Three of the individual unit numbers at issue within Building 4 (*i.e.*, #443, #444 and #447),[34] were not specifically identified on the Florida *Amorin* intervention complaint, but the claimant name and claimant address were identified accordingly:

---

[33] *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Case No. 11-1672 (E.D. La.) is the Florida *Amorin* action remanded to the Southern District of Florida, Case No. 1:11-CV-22408-MGC.

[34] These units are identified on Plaintiffs' Remediation Damages Spreadsheet as Claimant #236, Claimant #238, and Claimant #239.

| AMORIN, ET AL. V. TAISHAN GYPSUM CO., LTD., F/K/A SHANGDONG TAIHE DONGXIN CO., LTD., ET AL., CASE NO. 2:11-CV-1672 | | | | |
|---|---|---|---|---|
| EXHIBIT "A" – PLAINTIFFS NAMED IN PLAINTIFFS' OMNIBUS CLASS ACTION COMPLAINT (XV) | | | | |
| PLAINTIFF | ADDRESS OF SUBJECT PROPERTY | CITIZENSHIP OF PLAINTIFF | FIRM | PRIOR OMNI |
| Cobblestone on the Lake Master Association, Inc. | 4351 Bellaria Way (building 4) Ft. Myers, FL 33916 | FL | Allison Grant, P.A. Baron & Budd, P.C. Alters Boldt Brown Rash & Culmo | XIII |

The identification of the entire building (Building 4) on the complaint necessarily encompasses the affected units within the building and, therefore, it is clearly indicated that the claimant for this property includes multiple units therein.[35]

The fact remains: Cobblestone is making a claim for 4351 Bellaria Way, Building 4, and the individual units contested by Taishan undoubtedly are part of that claim. Defendants have been aware that Plaintiffs were making a claim for these properties since at least January 2016,[36] when Defendants downloaded indicia and other supporting evidence for these units stored on the HHK FileCloud. This objection should be overruled.

The second category of claims subject to Taishan's Objection "A" involves 5 claimants who were named in at least one of the complaints included in Judge Fallon's Findings of Fact and Conclusions of Law certifying the *Amorin* Class on September 26, 2014.[37] Specifically, these 5 claimants were included in *Wiltz* or *Haya*[38] and, therefore, they are *Amorin* Class members with properties in Florida,[39] and are entitled to a calculation of their remediation damages as part of this process.[40] It is undisputed that Judge Fallon intended for all Florida claimants included in the *Amorin* Class to be remanded to the Southern District of Florida. In fact, these claims in particular were included in the list of Florida claims that Judge Fallon

---

[35] Taishan relies on the fact that 2 additional units in Building 4, specifically #442 and #446, are separately identified on the *Amorin* complaint as claimants, however, this only underscores the fact that Taishan is aware that multiple units within Building 4 have claims against the company for its defective Chinese drywall.

[36] *See* screenshots of HHK FileCloud showing individual files were created and documents were uploaded for Units 443, 444 and 447 in November 2015, and counsel for Taishan downloaded said documents on January 26, 2016 (attached hereto as Exhibit "6").

[37] *See* List of claims at issue (attached hereto as Exhibit "7").

[38] *Id.*

[39] *Chinese Drywall*, 2014 WL 4809520, at *16.

[40] Contrary to Taishan's argument, Melvin Covetta (Claimant #265) is the only claimant also included on the *Brooke* complaint, so any suggestion that these 5 claimants can litigate their claims in other proceedings is without merit.

suggested be remanded, as well as the list of Florida claims Defendants agreed were before the Court.[41]   Therefore, they are properly before the Special Master for an award of remediation damages.

### 2.  BNBM

BNBM identified 1 claimant, Anthony Carmen/Joseph Pirczhalski (Claimant #198), as a non-member of the *Amorin* class.  Plaintiffs agree that this claimant is not a member of the Class.

### B.  Objection "B" – Assigned Claim to Another Entity or Person

Defendants assert that 23 claims are subject to Objection "B" on the grounds that an assignment of rights was given for the remediation damages claim.  Plaintiffs agree that an assignment exists for 20 of the *Amorin* claimants at issue.[42]   However, these 20 claimants maintain they are entitled to bring claims for other losses (an issue that is not before the Special Master), since the assignment only applies to remediation damages.

For the remaining 3 claimants subject to Objection "B,"[43] Plaintiffs dispute that an assignment exists for the following reasons.

### 1.  Charles DeMonaco (Claimant #308)

Mr. DeMonaco made no assignment of his claim.[44]  While Mr. DeMonaco settled with his builder, the settlement agreement "did not contain any assignment of their claim."[45] The objection as to this claim should be overruled.

### 2.  Alfredo Pena (Claimant #1072)

Mr. Pena lost his home in foreclosure, and because the current owner of Mr. Pena's property received a settlement payment from the Global/Banner/InEx class settlements in

---

[41] *See* The Parties' Joint Case Management Plan, at ¶ 3 ("The parties agree that the *Amorin* complaint remanded to this Court includes more than 4,000 named plaintiffs.  Approximately 1,700 *Amorin* plaintiffs are actively pursuing claims for properties in the State of Florida, which are listed on Attachment 'B' hereto ('Florida claims')") (footnote omitted) [ECF No. 45].

[42] *See* List Claimants and Claimant ## (attached hereto as Exhibit "8").

[43] Charles DeMonaco (Claimant #308); Alfredo Pena (Claimant #1072); Keith Santillo (Claimant #1310).

[44] April 5, 2019 email from Gregory Weiss regarding DeMonaco assignment (attached hereto as Exhibit "9").

[45] A copy of the settlement agreement at issue is located on the BrownGreer Portal at BG Claimant ID 102249, Doc. ID 306703 (attached hereto as Exhibit "10").

this case ("GBI payment"), Taishan argues (without any support) that an assignment of Mr. Pena's remediation damages claim must exist. Mr. Pena's individual counsel does not agree and contends: "The fact that another party received settlement funds from a separate settlement that the defendant is not a party to for this property does not establish an assignment of claims."[46]  In any event, there is no evidence of an assignment of Mr. Pena's claim, and Taishan should not benefit from the fact that other responsible Defendants settled the Chinese drywall claims against them and made a payment to the current owner of Mr. Pena's property.

### 3.  Keith Santillo (Claimant #1310)

Mr. Santillo has "assigned certain claims to Knauf and reserved others (the 'Reserved Claims').  By definition, the Reserved Claims include claims against non-settling parties. As Taishan was (and is) a non-settling party, Mr. Santillo has not assigned any of his claims against Taishan to Knauf or any other third party."[47] It should be noted that Mr. Santillo's claim is one of the Renaissance Commons properties. Out of the 107 Renaissance Commons properties on the *Amorin* complaint, Mr. Santillo's claim is the only one subject to Objection "B."

### C.  Objection "C" – Bought with Knowledge of Chinese Drywall

#### 1.  Taishan

Taishan asserts that 3 claimants are not entitled to remediation damages because they allegedly purchased their properties with knowledge of the existence of Chinese drywall. However, knowledge of the existence of Chinese drywall in a home does not necessarily disqualify a claim. These objections should be overruled.

---

[46] April 4, 2019 email from Holly Werkema regarding Pena assignment (attached hereto as Exhibit "11").

[47] April 3, 2019 email from Gary Mason regarding Santillo assignment (attached hereto as Exhibit "12").  *See also* Remediation Agreement (Doc. ID 204483) (attached hereto as Exhibit "13").

### a. Patrick Kana (Claimant #662)

At the time of purchase, Mr. Kana was unaware of the full extent of the remediation necessary to remedy the Chinese drywall defect.[48] The question regarding knowledge of Chinese drywall at the time of purchase was inadvertently answered incorrectly in the initial SPPF. This has since been corrected.

### b. Phillip Coratti (Claimant #260)

Contrary to Defendants' statement, there is no evidence that Mr. Coratti was an open-eyed purchaser. To the contrary, while the presence of the Chinese drywall in the affected property was disclosed to Mr. Coratti at the time of purchase, he was living in New York at that time, and was unaware of the magnitude of the off-gassing caused by Chinese drywall and the expense of remedying the Chinese drywall defect.[49] Had he been aware of the full impact the Chinese drywall would have on the property, he would not have purchased the property.

### c. William Kennedy (Claimant #678)

Mr. Kennedy purchased the subject property on May 4, 2011.[50] Prior to said purchase, there was conflicting evidence regarding whether the home contained Chinese drywall.[51] For example, on December 27, 2010, the seller's realtor represented to Mr. Kennedy's realtor: "[t]he results [of the Chinese drywall testing] have come back and they are contradicting the first set of results…" Later, on January 2, 2011, the seller's realtor advised: "[n]o offer is gonna push this along any faster. Unless your buyers are going to put a cash offer in for market value with no Chinese drywall. There needs to be a new test to be done to further see about the home having the drywall!!"[52] As shown by this evidence, the issue of whether the claimant purchased a property with disqualifying knowledge of Chinese drywall is far from clear.

---

[48] April 5, 2019 email from Holly Werkema regarding Coratti's and Kana's knowledge at time of purchase (attached hereto as Exhibit "14").

[49] *Id.*

[50] April 5, 2019 email from Allison Grant regarding Kennedy's knowledge at time of purchase (attached hereto as Exhibit "15").

[51] *See* December 27, 2010 and January 2, 2011 emails with seller's realtor and buyer's realtor at BG Claimant ID 102781, Doc. ID 367961 & Doc. ID 367960 (collectively attached hereto as Exhibit "16").

[52] *Id.*

Because of the above conflicting evidence, individual counsel disagrees that Mr. Kennedy's knowledge disqualifies this claim. This objection should be overruled.

### 2.  **BNBM**

In its final contests, BNBM asserts that 3 claimants[53] are subject to Objection "C," but the reason for the objection is not supported by the facts.  Apparently, BNBM takes the position that Plaintiffs purchased their property "with knowledge of Chinese drywall" based solely on the fact that this question on the Claimants' SPPF was left blank,[54] not because there is any evidence of Plaintiffs' awareness of defective drywall in their homes at the time of purchase.

BNBM's preliminary contests asserted this objection against the same 3 claimants. In an effort to resolve these contests, Emma Schwab on behalf of the Plaintiffs' Steering Committee reached out to individual counsel for the claimants at issue or the claimants themselves, if *pro se*, all of which contested BNBM's assertion that these claimants purchased with knowledge.  Then, Ms. Schwab contacted Harry Moren, counsel for BNBM, on March 28, 2019, to request an explanation as to why BNBM was taking the position that certain claimants should be subject to a Category "C" Objection. After a follow-up email was sent on April 2, 2019, because no response was received, Ms. Schwab was informed that BNBM would be "withdrawing some but not others."[55] It was not until BNBM's final contests and setoffs were submitted that Plaintiffs learned of the basis for this Objection for the 3 claimants that remain.[56]  Had Plaintiffs been informed of BNBM's position earlier, they would have been able to cure the objection before the final contests were submitted.[57] In any event, the objection should be overruled for the following reasons:

---

[53] Clivens and Andrea Goldman (Claimant #477); Bryce and Stacey Kelly (Claimant #673); Danielle Lang (Claimant #707).

[54] According to BNBM's Brief, these claimants received a Category "C" Objection because they failed to answer the question: "When you acquired the Property, were you aware that it contained Chinese drywall?" on their SPPF. *See* BNBM Br. at 2.

[55] April 2, 2019 email string between Harry Moren and Emma Schwab regarding claimants subject to Objection "C" (attached hereto as Exhibit "17").

[56] *See* BNBM Br. at 2.

[57] In at least one case, the failure to respond to the question was caused by a technical glitch in uploading the SPPF and supporting evidence to the BrownGreer Portal and the information did not transfer correctly.  As soon as counsel was notified of this problem, it was cured immediately. *See*

### a.  Clivens and Andrea Goldman (Claimant #477)

The Goldmans purchased the subject property in December 2006, as identified in their SPPF.[58] It would have been impossible for the Goldmans to have had knowledge of the Chinese drywall when it was installed prior to their purchase. Their individual counsel confirmed the same with their clients.[59] In any event, the Goldmans' lack of response on their SPPF as to whether they were aware of the Chinese drywall at the time of purchase is irrelevant, since they answered the next question that they became aware of the Chinese drywall in the affected property in 2010.[60] Nevertheless, the Goldmans have amended their SPPF and answered "no" to this question.[61]

### b.  Bryce and Stacey Kelly (Claimant #673)

The Kellys moved into the affected property in June 2002 after construction was completed. There is no question the Kellys, or any homeowner in the United States for that matter, were unaware of the Chinese drywall at this early time. Nonetheless, Mr. Kelly confirmed the same and represented that they were not aware of Chinese drywall in their property until February 2010.[62] This information was previously provided in the original PPF that these claimants completed on August 16, 2010,[63] which Defendants have access to. The Kellys also amended their SPPF to answer the question at issue.[64]

### c.  Danielle Lang (Claimant #707)

Ms. Lang submitted her SPPF to the BrownGreer Portal on March 19, 2018. However, when the form was submitted, the information entered into the form was not

---

April 4, 2019 email from Holly Werkema regarding Lang SPPF (attached hereto as Exhibit "18"); *see also* BG Claimant ID 111594, Doc. ID 367920 (attached hereto as Exhibit "19").

[58] Andrea and Clivens Goldman SPPF filed March 22, 2019, p. 2 (attached hereto as Exhibit "20").

[59] April 5, 2019 email from Manuel Comras regarding Goldman's knowledge prior to purchasing property (attached hereto as Exhibit "21").

[60] *See* Exhibit "20" at 2.

[61] *See* Goldman Amended SPPF, BG Claimant ID 101424, Doc. ID 367949.

[62] April 5, 2019 email from Bryce Kelly confirming claimant was not aware of Chinese drywall at time of purchase (attached hereto as Exhibit "22").

[63] *See* BG Claimant ID 101637, Doc. ID 135041 (attached hereto as Exhibit "23"). Although the Kellys are *pro se* claimants, their claim file on the BrownGreer Portal is voluminous.

[64] *See* BG Claimant ID 101637, Doc. ID 368053 (attached hereto as Exhibit "87").

transferred, so the uploaded form was essentially blank.[65]  Had Plaintiffs been informed of this issue prior to the final contests, it would not be an issue before the Special Master. Nevertheless, BNBM would have the Special Master believe that Defendants were provided no information on this property, which "prevents BNBM from defending itself."[66]  This is a far cry from the truth.  Defendants were provided with ownership information for this claim by BrownGreer in June 2017, including a copy of the warranty deed which indicates Ms. Lang purchased the subject property on August 29, 2002. To suggest that Ms. Lang was somehow aware of the presence of Chinese drywall back in 2002, many years before this problem was ever discovered, is without merit.[67]  The objection should be overruled.

## D. Objection "D" – Claimant Does Not Currently Own Affected Property

Taishan and BNBM have identified 792 claimants who are "former" owners of properties with Chinese drywall.  Plaintiffs agree, with the exception of 1 claimant,[68] that these Plaintiffs no longer own the affected property for which they are making claims, but reject Defendants' argument that these former owners are disqualified from recovering damages under the Remediation Formula.  First, the *Amorin* Class definition is clear that it "includes all current and former owners of properties in the United States containing drywall manufactured by [the Taishan] Defendants…."[69]  Defendants previously attempted to exclude

---

[65] *See* fn. 57, *supra* (Exhibit "18" hereto).  This technical issue is not limited to Ms. Lang's SPPF. Counsel have experienced this issue with dozens of other SPPFs.

[66] *See* BNBM Br. at 2.

[67] Ms. Lang also completed an initial PPF in January 2010, which attaches a copy of the inspection report and identifies the date she discovered the presence of Chinese drywall as October 10, 2009. Defendants have had access to the HHK FileCloud that housed all of the PPFs, including Ms. Lang's, since January 2016. Moreover, Defendants have had access to Ms. Lang's documents on the BrownGreer Portal since the date she uploaded her SPPF, March 19, 2018. The original PPF, as well as other documents counsel has uploaded for this claimant, can be found on the Portal at BG Claimant ID 111594, Doc. ID 65268, Doc. ID 58819, Doc. ID 57342 (collectively attached hereto as Exhibit "24").

[68] Clivens and Andrea Goldman (Claimant #477) on BNBM's chart is an error since the Goldmans are current owners.  While foreclosure proceedings have been instituted against these claimants, an appeal was filed February 13, 2019, and thus individual counsel submits the Goldmans have not lost ownership of their property.  *See* fn. 59, *supra* (Exhibit "21" hereto); Acknowledgment of New Case and Appellate Court Docket (collectively attached hereto as Exhibit "25").

[69] *Chinese Drywall*, 2014 WL 4809520, at *16; *see also Amorin* Class Notice [MDL Rec. Doc. 18028-1, at fn. 2]; MDL Order & Reasons dated 10/11/2018 clarifying that the *Amorin* Class includes current and former owners [ECF No. 99-2].

former owners from the *Amorin* class (after it was certified), but that notion was rejected by Judge Fallon.[70]   The MDL Court articulated the absurdity of Defendants' position with respect to former owners: "given the glacial speed with which this case has progressed, by the time the case is resolved, there will be very few class members left, if any. Such a construction is untenable and leads to an absurd result."[71]  The same reasoning is true with regard to the calculation of remediation damages for these Class members, which is further justification to reject Objection "D."

Moreover, the Court's Trial Plan does not distinguish between former and current owners.[72]  And clearly, there should be no distinction where a Plaintiff remediated an affected property prior to sale.[73]  Plaintiffs understand from discussions with Defendants that their position is that ownership status should be determined at the time damages are awarded, not at the time Plaintiffs filed suit.  In other words, the classification of "current" vs. "former" owners is potentially ever-changing until judgment is secured.  If Defendants are successful in their attempt to obtain "individualized claim adjudication," which will significantly delay the resolution of this litigation, there may be few, if any, current owners left.

Sadly, far too many of the *Amorin* Plaintiffs are former owners now, through no fault of their own, but because of Defendants' ongoing litigation-delay strategy that was developed before the MDL was formed in 2009.  The majority of Plaintiffs who lost their homes during this litigation as a result of foreclosure or sale in mitigation did not want to expose themselves and their families to Defendants' toxic drywall, but they could not afford to pay their mortgage at the same time they had to pay rent for alternate non-Chinese drywall housing. From the outset, Defendants were determined not to pay any Chinese drywall judgments.

---

[70] *See* MDL Order & Reasons dated 10/11/2018 [ECF No. 99-2].

[71] *Id.* at 11-12.

[72] *See*, *generally*, ECF No. 112.  Moreover, some Plaintiffs and purchasers of the affected properties (which were sold at reduced values) entered into a written agreement wherein upon transfer of ownership, Plaintiffs expressly reserved the exclusive right to bring all claims against Defendants notwithstanding the sale of the affected property.

[73] It is Plaintiffs' understanding that Defendants agree those "former owners" are entitled to reimbursement of their remediation damages, but are not entitled to formulaic damages.  Plaintiffs disagree. *See* list of claimants that remediated property prior to selling, which is based on individual counsel's representations or evidence in the claim file on BrownGreer (attached hereto as Exhibit "26").

Plaintiffs contend that these former owners are entitled to formulaic damages against the defaulted Defendants. But even assuming *arguendo* that Defendants are correct, they offer no justification for why the determination of ownership status should be made as of the date of judgment (*i.e.*, today) as opposed to when suit was filed (ten years ago), or when the default judgments were entered against them beginning in 2009.[74]  The inequities of Defendants' position are palpable.  An *Amorin* class member who was a current owner when the MDL was established in 2009 (and was entitled to remediation damages when suit was filed), but then lost her home through foreclosure or short sale during the litigation (because she could not afford to pay her mortgage while also paying rent for alternate housing, or because she could not refinance her mortgage due to the defective drywall in the home and was forced to enter foreclosure), as the case dragged on for years while Defendants did everything they could do to avoid the jurisdiction of the courts, should not be deprived of remediation damages *solely* on the grounds that she is considered by Defendants to be a *former* owner in 2019 when the approved formula is finally used to calculate remediation damages.

Even if a change in ownership status could somehow deprive Plaintiffs of their rights, the question still remains whether a Plaintiff with a valid *default judgment against Defendants*, who subsequently loses her property, no longer retains her right to collect the judgment. Plaintiffs reject this proposition.  This objection should be overruled.

### E.  Objection "E" – Claimant Never Owned Affected Property

Defendants have identified 285 claimants who they contend never owned the affected property and are therefore disqualified from receiving remediation damages.  Virtually all of these claims have been brought by condominium associations and/or condominium developers, and 2 of these claims have been brought by Robert Cardoza.

---

[74] *See* MDL Rec. Doc. 277 (holding Taishan in default in *Mitchell*); MDL Rec. Doc. 3013 (*Germano* default judgment against Taishan totaling $2,609,129.99); MDL Rec. Doc. 7302 (holding BNBM, BNBM Group, CNBM, and CNBM Group in default in *Gross*); MDL Rec. Doc. 7735 (holding BNBM in default in *Wiltz*); MDL Rec. Doc. 7736 (holding BNBM in default in *Gross*); MDL Rec. Doc. 15687 (holding BNBM in default in *Wiltz*; holding BNBM, BNBM Group, CNBM Group, and CNBM in default in *Gross*); MDL Rec. Doc. 17814 (holding Taishan, TTP, and CNBM in default in *Amorin* (Louisiana); holding Taishan and TTP in default in *Amorin* (Florida)); MDL Rec. Doc. 17815 (holding Taishan, TTP, BNBM, CNBM, and CNBM Group in default in *Amorin* (Virginia)).

### 1. **Condominium Associations**

Taishan contends that 283 condominium association claimants should be excluded from the process for awarding remediation damages because these claimants never "owned" the affected property and, therefore, do not meet the class definition of "owner." Taishan further argues that no condominium association has standing to bring claims – for itself or on behalf of the condominium unit owners.[75] And finally, Taishan argues that these claims are excludable under Objection "L" because the properties at issue were completely remediated by the condominium association. The last point can be addressed summarily as the record evidence indisputably demonstrates that a significant number of the contested condominium units <u>have not been remediated</u> and the remainder were only partially remediated.[76]

### a. **Condominium Associations Are Proper *Amorin* Class Members**

As discussed in Section D *supra*, Taishan's attempt to exclude claimants named on the *Amorin* complaint, who are proper *Amorin* Class members, is not new. Taishan previously urged the exclusion of Plaintiffs named in the *Amorin* Complaint who no longer own their property. Judge Fallon disagreed, finding that the plain reading of the class definition included both current and former homeowners and that Taishan's "construction is untenable and leads to an absurd result."[77] The MDL Court went on to state: "Defendants effectively seek to significantly narrow the scope of the *Amorin* class. Defendants had the opportunity to participate in sculpting the class definition in 2014, an opportunity they declined. Moreover, Defendants were put on notice that the definition included both present and former

---

[75] The defaults in this case establish Defendants' liability and estop them from offering any defense that would defeat the right of recovery. Defendants' objections should be limited to the quantum of damages only.

[76] *See, e.g.*, Luna Ocean Residences Condominium Association, Inc. ("Luna Ocean"), 704 N Ocean Boulevard, Unit 801 (Claimant #773), Doc. ID 346867, Section V (18 sheets of drywall were removed and replaced at a cost of $2,500 – clearly, a partial remediation) (attached hereto as Exhibit "27"); Luna Ocean, 704 N Ocean Boulevard, Unit 901 (Claimant #774), Doc. ID 347869, Section V (not remediated) (attached hereto as Exhibit "28"); Sheridan Beach Club Condominium Association Number Three, Inc. ("Sheridan Beach Club"), 529 E. Sheridan Street, Unit 406 (Claimant #1358), Doc. ID 360317, Section V (not remediated) (attached hereto as Exhibit "29").

[77] *See* MDL Order & Reasons dated 10/11/2018 [ECF No. 99-2] at 11.

homeowners in 2014 when the Court issued its legal notice and amended legal notice to the Class, to which Defendants failed to object.[78]

More than eight years after numerous condominium associations filed claims in this litigation, Defendants are attempting to exclude them from this process.[79]  First and foremost, Defendants are in default and thus have waived the right to raise the affirmative defense of lack of standing.  For this reason alone, Objection "E" should be overruled.  For the sake of argument, however, this objection is also without merit.

### b. Condominium Associations Have Standing to Bring Claims for Damages to Common Elements and to Units Within the Condominium

The Florida legislature has expressly given condominium associations the authority to "institute, maintain, settle, or appeal actions or hearing in its name on behalf of all unit owners concerning matters of common interest to most or all unit owners, including, but not limited to, the common elements; the roof and structural components of a building or other improvements; mechanical, electrical, and plumbing elements serving an improvement or a building . . ."  Fla. Stat. § 718.111(3).

Florida Rule of Civil Procedure 1.221,[80] and its companion statute, Florida Statute § 718.111, permit condominium and homeowner associations to bring class actions "as a

---

[78] *Id.*

[79] Their legitimate status as claimants in this litigation is evidenced by the fact that these condominiums received partial payments for their damages resulting from Chinese drywall, under various settlements with Knauf, builders, suppliers, and installers, which were approved by the MDL Court.

[80] "A homeowners' or condominium association, after control of such association is obtained by homeowners or unit owners other than the developer, may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all association members, including, but not limited to: (1) the common property, area, or elements; (2) the roof or structural components of a building, or other improvements (in the case of homeowners' associations, being specifically limited to those improvements for which the association is responsible); (3) mechanical, electrical, or plumbing elements serving a property or an improvement or building (in the case of homeowners' associations, being specifically limited to those elements for which the association is responsible); (4) representations of the developer pertaining to any existing or proposed commonly used facility; (5) protests of ad valorem taxes on commonly used facilities; and, in the case of homeowners' associations, (6) defense of actions in eminent domain or prosecution of inverse condemnation actions. If an association has the authority to maintain a class action under this rule, the association may be joined in an action as representative of that class with reference to litigation and disputes involving the matters for which the association could bring a class action under this rule. Nothing herein limits any statutory or common law right of any individual homeowner or unit owner, or class

matter of law" if a claim relates to a matter of "common interest to most or all unit owners." *The Florida Bar, In Re: Rule 1.220(b), Florida Rules of Civil Procedure,* 353 So. 2d 95, 97 (Fla. 1977). Rule 1.221 dispenses with certain requirements and permits a condominium association to bring certain class actions on behalf of its members without showing numerosity, commonality, typicality, and adequacy. As the Florida Supreme Court explained, "the elements traditionally required to establish the efficacy of a class are inherent in a condominium association relationship, making pleading and proof of such elements unnecessary and burdensome." *Id.* Although Fla. R. Civ. P. 1.221 does not apply to federal litigation, clearly there is no prohibition against a person or entity, whether it be an executor of an estate, a guardian *ad litem*, or a condominium association, from acting in a representative capacity under Rule 23 of the Federal Rules of Civil Procedure.

In a traditional complaint, a condominium association would have the opportunity to plead sufficient facts to show adequate class representation under Rule 23. However, an Omnibus Complaint does not lend itself to individual allegations and indeed, it is not necessary. Notwithstanding, Exhibit A to the *Amorin* Complaint makes clear that the condominium associations in this case are pursuing claims in their own name[81] for damages to untitled common elements, and on behalf of unit owners for damages to units,[82] which was caused by Defendants' defective Chinese drywall. As to the former, Sheridan Beach Club (Claimant #1352), for example, filed a claim for defective Chinese drywall installed in the pool bathroom (a common area) and Luna Ocean (Claimant #759) filed a claim for 10,000 square feet of affected common area hallways/corridors.[83]

---

of such owners, to bring any action that may otherwise be available. An action under this rule shall not be subject to the requirements of rule 1.220." Fla. R. Civ. P. 1.221.

[81] Notably, several of the condominium associations, including Blue Water Coach Homes Condominium Association, Inc. ("Blue Water"), Cobblestone on the Lake Condominium Association ("Cobblestone"), Magdalena Gardens Condominium Association, Inc. ("Magdalena Gardens") and Peace Harbor Condominium Association, Inc. ("Peace Harbor"), are listed as separate claimants on Exhibit "A" to the *Amorin* Complaint (collectively attached hereto as Exhibit "30").

[82] As discussed below, oftentimes a unit contains areas that are outside of the boundary of the unit and are, therefore, considered common elements.

[83] Separate property identification numbers were issued by BrownGreer for the above properties, and a description of the affected properties is contained in Exhibit A to the *Amorin* Complaint (collectively attached hereto as Exhibit "31").

Defendants objected to both of the above claims on the grounds that the respective condominium associations do not "own" the affected property. Of course, there is no deed to the hallways or the pool bathroom, but they are part of the condominium and the Chinese drywall caused damage to these areas. They are common elements of the condominium – they are not individually titled. Common elements are owned by the individual unit owners, who make up the condominium association, and are held by the condominium association in trust for its members, who must pay assessments for the costs of maintaining these common elements. *See Graves v. Ciega Verde Condo. Ass'n, Inc.*, 703 So. 2d 109, 111 (Fla. 2nd DCA 1997) (holding that condominium owners "have a common interest regarding the maintenance of the common elements"). Pursuant to the express language of Fla. Stat. § 718.111(3), the condominium associations herein are clearly authorized to bring these claims. Defendants' attempt to limit the definition of the Class to exclude property damaged by their defective drywall, which by its very nature is untitled but part of a larger structure that contains residences impacted by Chinese drywall, would surely produce an absurd, inequitable result.

In addition to pursuing claims for common areas, 9 condominium associations, *e.g.*, Sheridan Beach Club and Luna Ocean, also filed claims for affected units within the condominium. These units contain common elements of the condominium including, but not limited to, defective drywall, for which the condominium association is authorized to file suit as set forth above. Whether the association is *responsible* for repairing the damaged area is not relevant to these proceedings.[84] So too, a detailed discussion of the boundaries of a unit are not relevant here.[85] The boundaries of a condominium unit are very important for

---

[84] Rule 1.221, which applies to both condominium associations and homeowners' associations, expressly states that homeowners' associations may only file a suit related to the "structural components of a building, or other improvements" if the components or improvements at issue are ones "for which the association is responsible." Fla. R. Civ. P. 1.221. In contrast, there is no such limitation for suits by condominium associations. *Id.* Accordingly, Rule 1.221 permits a condominium association to bring class actions related to improvements for which their association is *not* responsible.

[85] For the sake of discussion, however, the boundary of a condominium unit (which is set forth in each condominium's Declaration of Condominium) typically includes drywall, in whole or part. In Florida, an individual's ownership interest in a condominium is often described as the "paint in." More particularly, the individual owner owns the space created by the interior, unfinished surfaces of the perimeter walls, floors and ceilings. This includes the paint on the walls and ceilings and any finishes placed on the floor, as well as the block of "airspace" located within those boundaries and any improvements located within, such as cabinetry and appliances. For example, the Declaration of Condominium for Sheridan Beach Club provides, "[e]ach unit shall include the interior finished walls

23

purposes of determining the scope of an individual owner's maintenance and repair responsibilities vs. those of the condominium association, but again, that issue is not before the Court or the Special Master.  For this reason, it is not necessary to examine condominium documents for each association in this case in order to determine damages.[86]

The law is clear:  each of the condominium association claimants herein have standing to recover all damages caused by the Chinese drywall, wherever located.[87]  Furthermore, given the unique nature of condominiums, it does not make sense to dissect damages based on the boundary of a unit, particularly due to the overlap and consequential damages that necessarily occur during the demolition and remediation process.  Without addressing the wiring and plumbing (both of which may be common elements), even if the only affected drywall in a unit was located on interior walls within the boundary of a unit, a condominium association is still authorized to file suit given the common interest to most or all unit owners in the building.  Fla. Stat. § 718.111(3).

---

and partitions which are contained in said Unit, and the inner decorated and/or finished surfaces of the perimeter walls, floors, ceilings, including plaster, paint, wallpaper (if any), etc. contained in said Unit, and all windows and exterior and interior doors and screens contained in said unit.  Each Unit does not include the following items which are hereby made part of the common elements: Unfinished surfaces of the perimeter walls, floor, and ceilings surrounding each Unit; Supporting columns, pipes, wire, conduits or public utility lines running through said Unit which are utilized for or serve more than one (1) Unit."  *See* Amended Condo. Decl. for Sheridan Beach Club (attached hereto as Exhibit "32").  Common elements, on the other hand, are defined as "the portions of the condominium property not included in the [definition of] units."  Fla. Stat. § 718.103(8).

[86] Notwithstanding, where available, Declarations of Condominiums have been uploaded to the BrownGreer Portal.  In the Declaration of Condominium of Magdalena Gardens, for example, the condominium association is specifically included as an owner of Association Property, which is defined as "that property, real and personal, which is owned or leased by, or is dedicated by a recorded plat to, the Association for the use and benefit of its Members."  *See* Decl. of Condo. for Magdalena Gardens at Sec. II(4) (attached hereto as Exhibit "33"). Also, under Sec. XV.B, the association has responsibility for maintenance and repair of common elements and limited common elements which are not the Owner's responsibility.

[87] Similarly, irrespective of where the drywall is located and whether or not it is within the boundary of a unit, pursuant to Fla. Stat. § 718.111(11)(f), a condominium association is responsible for insuring all drywall, whether it is perimeter drywall or interior drywall, because the association is responsible for insuring "the condominium property inside the units as initially installed… regardless of any provision to the contrary in the governing documents."  *In re Petition for Declaratory Statement, Winding Lake at Welleby Condominium Association*, DS 2006-7698, p. 8, citing Fla. Stat. § 718.111(11)(b), (c); Florida Department of Business Professional Regulation letter dated July 22, 2009 to Board of Directors of Laver's Resort and Racquet Club, a Condominium Association, Case No. 2008066996 (collectively attached hereto as Exhibit "34").

Florida courts have consistently held that a condominium association may sue on behalf of all unit owners concerning matters of common interest, including, but not limited to, the common elements of the building. *Charley Toppino & Sons, Inc. v. Seawatch at Marathon Condominium Association, Inc.*, 658 So. 2d 922 (Fla. 1995). In *Charley Toppino*, the Court held that the condominium association had standing to recover all damages caused by the removal and replacement of a defective fire sprinkler system. Because the sprinkler system ran throughout the building, including inside the units, its maintenance, repair and replacement impacted both common and non-common elements and affected the interest of all or most of the unit owners.

Here too, the presence of Chinese drywall affects the interests of all or most members of a condominium association. The presence of defective Chinese drywall in a condominium unit is not only destructive and harmful to owners and occupants of that unit, but it can devalue the entire community, including units that do not have Chinese drywall. Corrosive gasses and foul odors from an affected unit can also permeate adjoining units and hallways, affecting the quality of life for all members of the condominium association. For this reason, standing is not only practical from a litigation standpoint, but here, a condominium association's participation may be essential where some owners with affected units never filed claims and no longer own the property. Furthermore, to deny the association standing would be illogical and highly prejudicial to all members of the condominium association, who would ultimately bear the cost of remediation. Judge Fallon certainly did not intend such a result – as is evidenced by the treatment of condominium associations in the class settlements approved by the Court earlier in the litigation.[88]

The cases cited by Defendants actually support Plaintiffs' position. When § 718.111 was amended in 1974, the condominium association was specifically permitted to sue on behalf of all unit owners concerning "matters of common interest to most or all unit owners, including, but not limited to, the common elements…" *Juno by the Sea Condo. Apartments, Inc.*, 418 So. 2d 1190, 1191 (Fla. 4th DCA 1982), could not be any clearer. Taishan's citation to *Century Village, Inc. v. Wellington, E, F, K, L, H, J, M, and G*, 361 So.2d 128 (1978) has no bearing on this case. The court there was concerned with whether the condominium

---

[88] MDL Rec. Doc. 16407-3.

association could sue on behalf of its unit owners for a violation of the deposit provisions of the statute. Finding the statute only allowed unit owners and not an association to the return of any excessive rents, it found the terms "association" and "unit owners" were "not interchangeable in this statutory context." *See* 361 So. 2d at 133 (underscored language omitted from Taishan's Brief). The legislature would need to extend this power to an association, and the court held "they did not and we cannot." *Id*. at 134. And, Taishan's final cite to *Cenvill Inv'rs, Inc. v. Condo. Owners Org. of Century Vill. E., Inc.*, 556 So. 2d 1197, 1199–200 (Fla. 4th DCA1990) is meaningless. This case simply held that the entity there was not a condominium association and therefore could not act as one.

### c. Plaintiffs Are Not Seeking Duplicate Remediation Damages

Certain condominium unit owners are on Plaintiffs' Remediation Damages Spreadsheet, but their remediation damages are calculated as $0. For most of these unit owners, this was done in coordination with the respective association to enable the unit owner to seek damages for non-remediation claims such as alternate living expenses, loss of use and enjoyment, and loss of personal property. Again, unlike a traditional complaint, an Omnibus Complaint does not afford the opportunity to make individual allegations and designate the type of damages sought. Notwithstanding, to make it clear that only the condominium associations herein are seeking remediation damages, each of these 126 claimants reported "zero" square footage for their properties and noted that the square footage was captured under the condominium association's claim, so that there was no "double-dipping" for remediation damages.[89] This was also made clear in the SPPFs. No claimant seeks to "double-dip."

More particularly, the SPPFs completed by condominium associations, including Blue Water, Luna Ocean, Magdalena Gardens, Peace Harbor and Sheridan Beach Club each reference the association's standing to bring claims for remediation damage.[90] Where

---

[89] Defendants continue to omit these 126 claimants from their spreadsheet. Plaintiffs have included them on the Plaintiffs' Remediation Damages Spreadsheet, but no remediation damages are calculated for them.

[90] For example, the SPPF filed by Luna Ocean for the property located at 704 Ocean Boulevard, Unit 603, Pompano Beach, Florida (Claimant #767) states: "Claimant is a condominium association, which is the entity with standing to bring claims pertaining to the remediation of all affected units." *See* BG Claimant ID 102723, Doc. ID 347039, Section II (attached hereto as Exhibit "35").

individual unit owners also filed claims for those same units,[91] the SPPFs specifically refer back to the condominium association's SPPF for information pertaining to remediation since the association is the entity with standing even where the unit owner has expended funds.[92]

From the outset of this litigation in 2009, condominium associations asserted claims for remediation damages. All concerned agree that it is in the best interest of its members that the condominium association brings these claims. Indeed, it is the law of the case and in accordance with Florida law. There has never been a challenge by any party (including any unit owners) until Defendants objected here, having defaulted and waived the right to raise the affirmative defense of standing.

In each of these prior settlements, the condominium associations received settlement funds for remediation damages to affected units. Their standing was welcomed and facilitated the settlement process and remediation of hundreds of affected condominium units. Unlike the remediation of a private home, the remediation of a condominium unit may require relocating other nearby residents, utilizing buck hoists for high rises, disabling elevators and other matters which must be coordinated through the condominium association. Additionally, there are strict rules regarding the material alteration (*i.e.,* remediation) of a unit. An individual unit owner may not unilaterally remediate his/her unit. Association

---

[91] Many unit owners have incurred remediation costs. And two condominium associations, namely, Magdalena Gardens and Peace Harbor, took out loans to pay for repairs and partially remediated units. This information has been disclosed to Taishan, but significantly, it is not Taishan's issue and it certainly does not provide grounds for objecting to these claims. Although beyond the scope of this proceeding, as a fiduciary, condominium associations have a duty to use recovered funds for the remediation of units. In some instances, the association and unit owner have entered into agreements regarding reimbursement.

[92] For example, the SPPF filed by John Flynn, 704 Ocean Boulevard, Unit 603, Pompano Beach, Florida (Claimant #1724) states: "Luna Ocean … (the 'Association'), which is the entity with standing to bring claims pertaining to the remediation of all affected units, including the Subject Property. The damages set forth herein under Section V are duplicative of those contained in the Association's SPPF for BG Claimant ID 18237. Supporting documentation has been uploaded under Property ID 18237." *See* BG Claimant ID 102750, Doc. ID 348072, Section VIII (attached hereto as Exhibit "36"). *See also* Blue Water, 206 Shadroe Cove Circle, Unit 304 (Claimant #112), BG Claimant ID 111469, Doc. ID 366179, Section VIII (attached hereto as Exhibit "37"); Bruce Casper, 206 Shadroe Cove Circle, Unit 304 (Claimant #1700), BG Claimant ID 111933, Doc. ID 366183, Section VIII (attached hereto as Exhibit "38"); Sheridan Beach Club Condominium Number Three, Inc., 509 E. Sheridan Street, Unit 304 (Claimant #1347), BG Claimant ID 111463, Doc. ID 360319, Section VIII (attached hereto as Exhibit "39"); Dina Hocker, 509 E. Sheridan Street, Unit 304 (Claim #604), BG Claimant ID 111763, Doc. 366199 (attached hereto as Exhibit "40").

approval is required.  This is important to protect the health and safety of others, but is also critical when remediating common elements.  Fla. Stat. § 718.113.  Nevertheless, Defendants ask this Court to produce a vastly different result <u>in the same litigation</u> for those condominium associations that were constructed with Taishan's drywall versus those constructed with other brands of drywall (*i.e.*, Knauf).  Such a result is highly prejudicial and contrary to the well-established law.

In sum, Plaintiffs contend that all 283 claimants subject to Objection "E" are Class members entitled to formulaic damages.

### 2.  Robert Cardoza (Claimant #194 and Claimant #195)

There are 2 claims subject to this Objection that are brought by the same claimant, Robert Cardoza, for properties at 1615 and 1617 91st Court (Claimant #194 and Claimant #195, respectively).  BNBM objects to these individual claims because the properties were owned by Hurricane Holdings, LLC, and not Mr. Cardoza.  BNBM concedes that Mr. Cardoza is the managing member and agent of Hurricane Holdings, but insists that because the property was not owned by Mr. Cardoza in his personal capacity,[93] he is disqualified from receiving remediation damages. When the subject property was sold in 2010, Robert Cardoza and wife Lori Cardoza were the signatories for Hurricane Holdings, LLC., which was administratively dissolved on September 28, 2012.  The *Amorin* complaint was filed in the Eastern District of Louisiana on October 8, 2012, and at that point, the Hurricane Holdings, LLC was no longer in existence.  Mr. Cardoza, the named plaintiff, was the real party in interest, who suffered the loss, and the proper party to bring these claims.  For these reasons, the objection to Mr. Cardozo's claims should be overruled.

### F.  Objection "F" – Claimant Failed to Submit an SPPF

Taishan filed a motion to dismiss for failure to submit SPPFs,[94] with respect to 15 out of the 16 claims subject to Objection "F."  That motion is pending before the Court.  In its opposition to the motion to dismiss, Plaintiffs did not take a position as to the dismissal of claims where no SPPF was completed.[95] Those claims for which no objection to dismissal

---

[93] *See* Articles of Organization for Hurricane Holdings, LLC (attached hereto as Exhibit "41"), which can also be found on Portal at BG Claimant ID 111870, Doc. ID 367726.

[94] ECF No. 171.

[95] *See* ECF No. 175.

was filed should be excluded from the process for calculation of remediation damages. Accordingly, Plaintiffs agree with Defendants that the Special Master should exclude the claims for all claimants with a Category "F" objection (and have so indicated on Plaintiffs' Remediation Damages Spreadsheet by a strikethrough mark on these claims), with the exception of 1 claim – Magdalena Gardens, 240 W. End Ave., Unit 723 (Claimant #822). This claimant is not subject to the motion to dismiss and is entitled to remediation damages.[96]

With respect to the unit at issue, individual counsel for Magdalena Gardens uploaded the SPPF verification page,[97] invoices from the contractor,[98] proof of payment,[99] and self-remediation documents[100] on March 12, 2018. The remediation contract and photographs were later uploaded on March 16, 2018.[101] A floorplan was uploaded on March 21, 2018,[102] and a post-remediation inspection report was uploaded on April 1, 2018.[103] Further, an SPPF was uploaded for this unit on April 2, 2018,[104] but then removed for some unknown reason. Individual counsel was not informed there was any deficiency with this property until Taishan's Preliminary Objections and Requests for Setoffs were issued last month, at which time individual counsel quickly remedied the issue and resubmitted the SPPF for this property.[105] Plaintiffs had hoped Taishan would be understanding of the technical problems involved with this claim, in light of the well-documented claim file, but unfortunately, Taishan has maintained its objection to this claim.

---

[96] In addition to the claim at issue, Magdalena Gardens has brought 53 additional *Amorin* claims for other units. Individual counsel timely filed a verified SPPF for all other units, in addition to voluminous supporting documentation.

[97] *See* BG Claimant ID 111470, Doc. ID 349844 (attached hereto as Exhibit "42").

[98] BG Claimant ID 111470, Doc. ID 349845 (attached hereto as Exhibit "43").

[99] BG Claimant ID 111470, Doc. ID 349846 (attached hereto as Exhibit "44").

[100] BG Claimant ID 111470, Doc. ID 349935 (attached hereto as Exhibit "45").

[101] BG Claimant ID 111470, Doc. ID 350919; Doc. ID 351014; Doc. ID 351015; Doc. ID 351016 (collectively attached hereto as Exhibit "46").

[102] BG Claimant ID 111470, Doc. ID 352489 (attached hereto as Exhibit "47").

[103] BG Claimant ID 111470, Doc. ID 360591 (attached hereto as Exhibit "48").

[104] BG Claimant ID 111470, Doc. ID 360651 (attached hereto as Exhibit "49").   While this document is no longer accessible, it is worth noting that it was assigned a Document ID # by BrownGreer, which confirms that something was uploaded for this claimant on this date.

[105] BG Claimant ID 111470, Doc. ID 36770 (attached hereto as Exhibit "50").

The following facts are undisputed: the SPPF for this unit was uploaded to the Portal but then inexplicably removed, the said claim was not subject to Defendants' motion to dismiss for failure to submit an SPPF, all supporting documents including the verification page for this property were timely uploaded, and an SPPF for this property is now uploaded since Plaintiffs were informed of the deficiency. There is no question that this was an honest mistake (perhaps of BrownGreer).  Indeed, Taishan does not even address this claim in its Brief, much less identify any prejudice the delay in submitting the SPPF caused. The glaring absence of a discussion has only one explanation: there was no harm caused by the delay, as all supporting documentation was timely submitted. For the above reasons, Plaintiffs submit Magdalena Gardens (Claimant #822) should not be excluded from the Remediation Formula determination.

## G. Objection "G" – No Signature on Current SPPF Submission

Defendants have asserted this objection for 587 claimants. The objection lacks genuine merit, as it does not relate to Product ID, ownership, or square footage and is outside the scope of the Court's Order.  Further, there is no requirement in the Court's orders for claimants who have filed amended SPPFs to upload a new verification to the BrownGreer Portal.  PTO 11A provides only that:[106]

> If a Plaintiff must amend a SPPF, all subsequent versions must be named accordingly ("First Amended Supplemental Profile Form," "Second Amended Supplemental Profile Form," etc.), and all iterations of a Party's Profile Form will remain available and accessible to all Parties to a case through trial, appeal (if any), or other resolution of the litigation.[107]

The provisions of PTO 11A were negotiated by the Parties in the MDL and approved by Judge Fallon. If Defendants wanted additional verifications to be submitted with every amendment to the SPPFs, they could have proposed such language.  They did not.  In approving the Parties' agreed-to order, the MDL Court did not require verifications for

---

[106] The deadlines in PTO 11A were amended by PTO 11B [MDL Rec. Doc. 21181]. All other provisions of PTO 11A remain in effect.

[107] MDL Rec. Doc. 21162, at 4, ¶ 4(e).

subsequent amendments to SPPFs.  Irrespective of Defendants' objection, many Plaintiffs, nearly 100, have already uploaded new verifications for their SPPFs and continue to do so.[108]

Dismissal of claims on the grounds that an amended SPPF has been uploaded to the Portal without a verification page would constitute an egregious and unwarranted sanction in this case.  All of the Plaintiffs subject to this objection uploaded a timely verification for their initial SPPF, pursuant to PTO 11A.  Defendants suggest that all 587 amendments were substantive changes similar to the example Taishan cites in its Brief for a <u>Louisiana</u> *Amorin* Plaintiff who is not before the Special Master.[109]  That is simply not the case.  Counsel for many Plaintiffs responsibly amended SPPFs after the GBI Other Loss holdback payments were issued in July 2018, to account for same in the Prior Payments section of the SPPF. Accordingly, the 587 claimants subject to this objection should not be excluded from the remediation damages formula process.  The objection should be overruled.

## H. <u>Objection "H" – Relevant Fields in SPPF Not Completed</u>

Defendants seek to disqualify 547 claimants from receiving remediation damages on the grounds they did not complete certain fields in their SPPF.  Defendants request that the Special Master remove these claims from the formula process so that they may be moved over to an unspecified "individual adjudication" process, with no date certain for their resolution. Once again, this objection is outside the scope of the Court's order on permissible challenges. Moreover, Defendants' contention that an incomplete SPPF prevents them from defending the claim is completely undermined by Defendants' self-serving determination as to the remediation status of claims, based on documents in claimants' claim files on the BrownGreer Portal, regardless of the information provided in the SPPF.  Defendants cannot claim on the one hand the SPPF is imperative and on the other disregard the SPPF responses when it is convenient for them to do so.

Notwithstanding the lack of merit to this objection, based upon BNBM's identification of the specific alleged deficiencies in the SPPFs at issue, the majority of the claimants subject

---

[108] Defendants have apparently ignored Plaintiffs' efforts to obtain these new signatures as the number of claims subject to this objection has remained unchanged since Defendants issued their preliminary contests.

[109] Taishan Br. at 21.

to this objection by BNBM have now fully completed their SPPFs, curing any potential objection. The others will be amended, if necessary, soon.

In contrast, Taishan did not provide specific SPPF deficiencies but merely alleged the information "solicited in the SPPF" is only possessed by Plaintiffs.  This is not true.  Plaintiffs have uploaded voluminous records for each claim, which Defendants can readily access.  In light of the fact that PTO 11A does not provide for a deficiency process, Plaintiffs requested that Taishan identify the Plaintiffs, by category, which they allege did not properly complete the SPPF, but Taishan declined to do so.

This objection should be overruled.

## I.   Objection "I" – Incorrect Square Footage Reported

Defendants allege incorrect or inaccurate square footage for 503 claimants.  They assert a different square footage number for 342 of these claims,[110] and contend the remaining 161 claims have not provided sufficient proof of under-air square footage.  BNBM identified the source of its square footage numbers for some of the 26 claims it disputes; however, Taishan provided no basis for its square footage numbers, stating just that the numbers are based on another document uploaded to the claim file.[111]  The efforts to resolve these contests have been unsuccessful unfortunately, and Defendants seem determined to dispute even the smallest of differences in square footage assertions.  Plaintiffs' verified evidence of square footage is in the record. And based on that evidence, Plaintiffs are entitled to an award of Remediation Formula damages.  Nevertheless, Plaintiffs response to Taishan's objections as follows:

---

[110] BNBM disputes 26 claims and Taishan disputes 316 claims on square footage grounds.

[111] Disappointingly, Taishan maintained its Incorrect Square Footage Objection for four claims: Attard (Claimant #45), Bautista (Claimant #78), Filardo (Claimant #398), and Feroni (Claimant #400), even though Plaintiffs represented to Taishan's counsel it agreed with Taishan's square footage number. The difference in square footage for each property was 14 square feet. *See* April 1, 2019 and March 26, 2019 emails regarding agreement for Attard, Bautista, Filardo & Ferroni (attached hereto as Exhibit "51").

### 1.  "Incorrect" or "Inaccurate" Proof of Square Footage

Taishan has objected to the verified square footage numbers in 316 properties[112] because its file review revealed "competing square-footage figures."[113]  Taishan states that it does not know which of the under-air square footage numbers in the claim file "is accurate or if either is accurate" and for this reason, the "under-air square footage . . . must be resolved through individual discovery and adjudication."  Taishan Br. at 24.

This suggestion runs afoul of the governing Class Damages Order and the Court's Trial Plan.  Defendants have already been provided several opportunities to conduct square footage discovery. All Plaintiffs completed an initial PPF setting forth the square footage for each property when their cases were included on an Omnibus complaint. Defendants could have reviewed the PPFs and indicia when they were submitted as early as 2010, had they not deliberately sat on the sidelines and allowed defaults to be entered.  But regardless, Defendants have had access to these documents, among others, since 2016 *via* the HHK FileCloud. Moreover, BrownGreer undertook an extensive ownership project in 2017, pursuant to Judge Fallon's Class Damages Order, whereby BrownGreer investigated the ownership status of all *Amorin* claimants.  All of this information was provided to Defendants in the summer of 2017.  Further, Plaintiffs submitted verified proof of square footage for all properties in June 2017. In addition, Plaintiffs completed SPPFs in 2018. And, finally, on February 1, 2019, Plaintiffs served their responses to Defendants' ownership and square footage discovery requests by way of a spreadsheet setting forth verified "under air" square footage information.[114]  Defendants were given approximately two months under the Trial Plan to conduct square footage discovery.  The fact that Defendants have presented no valid

---

[112] Although Exhibit 29 to Taishan's Brief includes 318 properties, Taishan did not assert Objection "I" with respect to Donald Krause (Claimant #696) or RCR Holdings II, LLC (Claimant #1187) in its final contests.  Objection "I" was raised in the preliminary contests for both of these claimants; however, Taishan withdrew the objection for Mr. Krause on March 21, 2019. *See* email and attachment (attached hereto as "52").  Although Taishan's square footage for RCR Holdings II, LLC (Claimant #1187) is different than Plaintiffs, no Objection "I" has been asserted for this claim.  Thus, these claims should not have been included on Taishan's Exhibit 29.

[113] According to Taishan, there are 71 properties with less than a 10-foot square footage difference, of which 23 have a purported discrepancy of less than 5 square feet. *See* Exhibit "53" (Defendants' Exhibit 29 with added column showing the disputed square footage difference).

[114] *See* Plaintiffs' Spreadsheet Response to Ownership and Square Footage Discovery (Exhibit "4" hereto).

reason to dispute the verified square footage on Plaintiffs' chart is grounds to deny the objection.[115]

Types of proof of square footage vary depending on the circumstances, however, the reliable sources generally include, but are not limited to: developer/builder floor plans, independent appraisals, county appraiser measurements, American National Standards Institute (ANSI) floorplans, architectural drawings, and as-built plans.  Taishan's objections are based on its contention that its own "reliable evidence of an under-air square footage [is] different from the amount claimed on the [Plaintiffs'] spreadsheet."  Taishan Br. at 24.  However, Taishan would not reveal the source of this "reliable evidence," which obviously limited Plaintiffs' ability to address those few cases where there may have been a true and correctable discrepancy.  In any event, Taishan's lack of support for the objection warrants the Special Master denying the objection altogether.

Not surprisingly, Defendants have also objected to square footage whenever there is a variation (regardless of how minor it is) between the Plaintiffs' submission and the county property appraiser.[116]  This is common in condominiums, because, for example, the thickness of walls may or may not be included in the square footage calculations of the county appraiser.  Some utilize ANSI, measuring from the centerline of the walls between the units, but others use a "paint-to-paint" approach which yields a marginally lower square footage.  The fact that there are minor variations in appraiser reports does not mean Plaintiffs' submissions are inaccurate or that any claim "must be taken off-track" for remediation damages calculations.  Some specific examples of the unreasonable position taken by Defendants include the following.

### a. <u>Luna Ocean</u>

Luna Ocean is a ten-story oceanfront mid-rise condominium within interior access.  Chinese drywall was installed in the hallways/corridors and vestibules and in 18 of the 28

---

[115] Plaintiffs concede Taishan's suggested square footage number for one claimant, Porfirio Gallegos (Claimant #438) is correct, and have revised that square footage amount on Plaintiffs' Remediation Damages Spreadsheet (the correct square footage is 3,844 instead of 5,975).

[116] Out of the 342 claims for which Defendants allege a different square footage number, Plaintiffs rely on an appraisal with floorplan, American National Standards Institute (ANSI) floorplan drawing, or builder's floor plan in at least 139 of the claims. Defendants are presumably relying on assessors' records (which are often lower) to support their position.

units in the building.  There are 4 models of apartments.  Each includes a balcony, which was expressly excluded from the under-air square footage indicated on the floor plan:

> Model A (units ending in 01): 2,750 sq. ft.[117]
>
> Model B (units ending in 02): 2,686 sq. ft.[118]
>
> Model C (units ending in 03): 2,413 sq. ft.[119]
>
> Model D (units ending in 04): 2,858 sq. ft.[120]

The above under air square footage is identical to the measurements depicted in the Building Plans prepared by the hired architect.[121] As noted in the building plans, none of the balconies were included in computing square footage under air. Yet, Taishan objected to the square footage for each of the above units notwithstanding Plaintiffs' verification of square footage as depicted on the architect's plans, the developer's floor plans, the calculations submitted by Mr. Ehrsam, and as set forth in counsel's Declaration of Correctness of Square Footage.  The preponderance of the evidence clearly supports the verified square footage reported by Plaintiffs as correct, and Plaintiffs' figures should be used to apply the Remediation Formula.

### b.  Blue Water

Blue Water is a two-story condominium consisting of 15 buildings, each with 4 units. There are 4 models.  Each floor plan includes the square footage for the patio/entry and garage, but these are expressly excluded from the under-air living area.

> Azimut: 1,646 sq. ft. under air.
>
> Bertram: 2393 sq. ft. under air.
>
> Hatteras: 2,381 sq. ft. under air.
>
> SeaRay: 1,646 sq. ft. under air.[122]

---

[117] *See* BG Claimant ID 102723, Doc. ID 93357 (attached hereto as Exhibit "54").

[118] *See* BG Claimant ID 102723, Doc. ID 93358 (attached hereto as Exhibit "55").

[119] *See* BG Claimant ID 102723, Doc. ID 93360 (attached hereto as Exhibit "56").

[120] *See* BG Claimant ID 102723, Doc. ID 93362 (attached hereto as Exhibit "57").

[121] *See* BG Claimant ID 102723, Doc. 93368 (attached hereto as Exhibit "58").  Additionally, Howard Ehrsam, P.R., LEED, AP of Chinese Drywall Screening, inspected these units and computed area calculations and found the identical square footage as the architect.  *See* BG Claimant ID 102723, Doc. ID 171865 (attached hereto as Exhibit "59").

[122] Floor plans can be found on the Portal at BG Claimant ID 111469, Doc. ID 367904 (attached hereto as Exhibit "60").

Pursuant to an Affected Property Information Affidavit[123] signed by the President of the Association, which attached the above floor plans as well as the Developer's Declaration regarding Square Footage:

- All units ending in 01 and 02 contain 1646 sq. ft. under air (Azimut Model or SeaRay Model).[124]

- All units ending in 03 and 04 in Buildings 1, 2, 3, 4, 5, 9, 10, 11, 12, 13 and 14 contain 2,381 sq. ft. under air (Hatteras Model).[125]

- All units ending in 03 and 04 in Buildings 6, 7 and 8 contain 2,393 sq. ft. under air (Bertram Model).[126]

Architectural Plans also contain the identical square footage.[127] Yet, Taishan objected to the square footage of every unit in Blue Water notwithstanding Plaintiffs' verification of square footage as depicted on the architect's plans, the developer's floor plans, and as set forth in counsel's Declaration of Correctness of Square Footage. Again, the preponderance of the evidence clearly supports the conclusion that the verified square footage reported by Plaintiffs is correct and should be used to apply the Remediation Formula.

### c. Magdalena Gardens

Magdalena Gardens is a two-story condominium consisting of 15 buildings, each with 6 units. There are 4 models. Each floor plan includes the square footage for the entry, lanai and garage, but these are expressly excluded from the under-air living area.

Unit A (all units ending in 11 or 13): 1300 sq. ft

Unit B (all units ending in 12): 1282 sq. ft.

Unit C (all units ending in 21 or 23): 1592 sq. ft.

Unit D (all units ending in 22): 1553 sq. ft.[128]

---

[123] BG Claimant ID 111469, Doc. ID 367903 (attached hereto as Exhibit "61").

[124] *See* BG Claimant ID 111469, Doc. ID 241933 and Doc. ID 244670 (collectively attached hereto as Exhibit "62").

[125] *See* BG Claimant ID 111469, Doc. ID 241935 (attached hereto as Exhibit "63").

[126] *See* BG Claimant ID 111469, Doc. ID 241944 (attached hereto as Exhibit "64").

[127] BG Claimant ID 111469, Doc. ID 367951 (attached hereto as Exhibit "65").

[128] BG Claimant ID 111470, Doc. ID 136945 (attached hereto as Exhibit "66").

The Declaration of Condominium also sets forth the identical square footage.[129]   In addition, the Charlotte County Property Appraiser reported the identical square footage for Units A,[130] Units B,[131] Units C,[132] and Units D.[133]   Inexplicably, Defendants objected to every B, C, and D model.   The preponderance of the evidence clearly supports the conclusion that the verified square footage reported by Plaintiffs is correct and should be used to apply the Remediation Formula.   These condominium claims demonstrate the flaws in Defendants' square footage objections.[134]   There are additional flaws with respect to individual homes.[135] These objections should be overruled.

## 2.   "Insufficient Proof" of Under Air Square Footage

Taishan objects to 161 claims it alleges have not provided sufficient proof of under-air square footage. There are 2 condominium associations within this category that account for the majority of the claims:   Sheridan Beach Club (22 claims) and Sunrise Lakes Condominium Apt. Phase III, Inc. 1, 2 and 5 ("Sunrise Lakes") (97 claims), which are addressed individually.

---

[129] *See* fn. 85, *supra* (Exhibit "33" hereto) at p. 42.

[130] BG Claimant ID 111470, Doc. ID 122285 (attached hereto as Exhibit "67").   In one instance, the Charlotte County Property Appraiser originally reported a unit as having 1,300 sq. ft., but for reasons which are unclear, the square footage is now reported as 1,305 even though the unit has not changed. *See* Doc. ID 123339 and Doc. ID 367972 (collectively attached hereto as Exhibit "68").

[131] BG Claimant ID 111470, Doc. ID 122840 (attached hereto as Exhibit "69").

[132] BG Claimant ID 111470, Doc. ID 122396 and Doc. ID 124691 (collectively attached hereto as Exhibit "70").

[133] BG Claimant ID 111470, Doc. ID 123844 (attached hereto as Exhibit "71").

[134] Separate and apart from the foregoing, Taishan states that Plaintiffs' spreadsheet contains 126 Plaintiffs for which, the Parties agree, the formula will not apply.   This is not entirely accurate.   As discussed in response to Objection "E" above, the Plaintiffs assigned these claimants a zero (0) square footage number because the respective condominium association is the entity with standing to pursue the claim for remediation damages.   In the unlikely event that the Special Master or the Court finds that the condominium associations do not have standing, these unit owners will reassert their claim for remediation damages for these properties.

[135] *See* example of responses to specific inaccuracies (attached hereto as Exhibit "72"). This list is illustrative and is not exclusive.

a. **Sheridan Beach Club**

Sheridan Beach Club is a condominium with three buildings.  There are 7 different models (A through G), sketches of which are attached to the Declaration of Condominium.[136] There is no floor plan containing the square footage per model, although the Developer noted in the Declaration of Condominium that he planned to offer units that will be "approximately 1,151 air conditioned square feet to approximately 1,615 air conditioned square feet."[137]

The President of the Sheridan Beach Club prepared an Affected Property Information Affidavit[138] representing the under air square footage for each building as follows:

509 E. Sheridan Street

- 24 units with 1150 sq. ft. under air
- 2 units with 1250 sq. ft. under air
- 3 units with 1,575 sq. ft. under air

519 E. Sheridan Street

- 20 units with 1150 sq. ft. under air
- 2 units with 1250 sq. ft. under air
- 3 units with 1575 sq. ft. under air

529 E. Sheridan Street

- 23 units with 1150 sq. ft under air
- 2 units with 1250 sq. ft under air
- 3 units with 1575 sq. ft. under air

Defendants agree that 519 E. Sheridan, Unit 107 (Claimant #368) has 1,150 under air sq. ft. and 529 E. Sheridan, Unit 408 (Claimant #1369) has 1,250 under air sq. ft., but they curiously object to the other 20 claims (some of which contain proof identical to these two uncontested claims) on the ground that there is "[n]o Proof of Under-Air Sq. Ft."  However, Plaintiffs have uploaded adequate documentation of square footage for all properties.[139]

---

[136] BG Claimant ID 111463, Doc. ID 367926 (attached hereto as Exhibit "73").

[137] *Id.*, p. 8.

[138] BG Claimant ID 111463, Doc. ID 267770 (attached hereto as Exhibit "74").

[139] *See* BG Claimant ID 111463, Doc. ID 132636, Doc. ID 276368, Doc. ID 265615, Doc. ID 265614, and Doc. ID 265611 (collectively attached hereto as Exhibit "74").

For the vast majority of units, the above square footage is consistent with the Broward County Property Appraiser's reported adjusted (*i.e.*, under air) square footage.[140] Defendants' Objections for these condos is misplaced. The preponderance of the evidence clearly supports the conclusion that the verified square footage reported by Plaintiffs is correct and should be used to apply the formula.

### b. Sunrise Lakes

Plaintiffs submitted the property records for 97 units from Broward County's Appraiser's Office, which Defendants rejected because it includes "*non air-conditioned* space."[141] While Plaintiffs concede the Broward County Appraiser's Office includes non-air-conditioned space in its "adjusted building square footage" reports, that fact is not applicable to these condominiums as there are no garages, and the porches and balconies are common areas that are not part of any individual unit.   In other words, Broward County's adjusted square footage numbers on its property tax rolls are correct as they pertain to the individual units because Broward County may only tax a unit owner for property the unit owner owns, not common areas. Broward County's adjusted square footage for the individual units is correct and is reliable as it comes from an entity that does not have a conflict of interest or bias with regard to the issues in this case. Moreover, Defendants' arguments are moot as the Sunrise Lakes condominium association took on and did complete the remediations for the units claimed and the association is seeking its actual costs, as opposed to Remediation Formula damages.

### J. Objection "J" – Chinese Drywall in Affected Property Not Manufactured by Taishan/BNBM

Defendants have asserted Objection "J" against 786 claimants,[142] alleging lack of Product ID attributable to Defendants. Defendants urge the Special Master to exclude these

---

[140] Examples can be found at BG Claimant ID 111463, Doc. ID 367835, Doc. ID 367837, Doc. ID 367838, Doc. ID 367839, Doc. ID 367840, Doc. ID 367842, Doc. ID 367845 and Doc. ID 367836 (collectively attached hereto as Exhibit "75").

[141] Taishan Br. at 25 (emphasis in original).

[142] Many claimants have uploaded indicia of markings Taishan has admitted, yet Taishan asserted a "J" Objection for these claimants. For example, Jesus and Amy Adaniel (Claimant #12), Blue Water, 221 Shadroe Cove, Units 1303 and 1304 (Claimant #103 and Claimant #104) and 174 Shadroe Cove, Unit 1004 (Claimant #107), and Conway Centre, 1657 Port St. Lucie (Claimant #257) all have indicia of Taishan Product ID Catalog Photo #2 [ECF No. 155-2], which is an admitted Taishan marking.

786 claimants from the formula process at this time.  Plaintiffs respectfully disagree.  There is no reason to delay the calculation of Plaintiffs' remediation damages.

The Parties have separately briefed the Product ID attribution issues concerning Taishan's Chinese Drywall products and presented their respective positions to the Special Master on March 10, 2019.  The Special Master is scheduled to issue her Report and Recommendation for Taishan Product ID categories on April 8, 2019.  The results of that Report and Recommendation will determine which Plaintiffs, if any, are subject to this Objection.

Unfortunately, discovery regarding BNBM's Chinese drywall products has been delayed several times due to the fact BNBM's 30(b)(6) has been unable to obtain a visa to travel from China for his deposition.  The Parties are in the process of negotiating an alternative solution, including the possibility of proceeding without this deposition so as not to delay resolution of the claims against BNBM any further.

### K. Objection "K" – Insufficient Proof to Identify Manufacturer

Taishan has asserted Objection "K" against 103 claimants on the grounds that the claimants allegedly do not have photographic proof of Defendants' product markings or have photo(s) that are not clear, and therefore they are barred from recovery of remediation damages.  Defendants' objection lacks merit because there is no case law in Florida that limits the method for establishing Product ID to photographs and markings only – this is an arbitrary requirement invented by the Defendants.  In fact, the court in *Sweeney v. Kimberly–Clark Corporation*, Civil Action No. 14-cv-3201, 2016 WL 727173, at *6 (M.D. Fla. Feb. 22, 2016), *order clarified*, No. 14-CV-3201-T-17EAJ, 2016 WL 7138530 (M.D. Fla. Mar. 3, 2016), suggests that "receipts or packagin from the wipes [Plaintiffs] believe caused the November 2011 clog," "photographs," the actual "wipes at issue," as well as the Plaintiffs' "testimony" about using the Defendants' wipes and later seeing the plumber remove wipes from the plumbing system gave "rise to a reasonable inference that both Defendants' wipes were a cause of the clog."  *Sweeney*, 2016 WL 727173, at *7.  This supports a "totality of the circumstances" approach in relation to the review of Plaintiffs' evidence and certainly does not require any Plaintiffs to produce any particular photograph or marking to meet their Product ID burden.

Evidence of Product ID can be direct or circumstantial and can be comprised of testimony, interrogatory answers, stipulations, documents, videotapes, photographs, recordings, and other physical evidence, such as delivery invoices, inspection reports, and affidavits. Where the property is part of a condominium building and/or larger group of units and the drywall was provided by a single supplier, indicia for one unit is reasonably sufficient for another.

In this case, liability against Defendants is established *via* default, and the Court has ruled that Plaintiffs are entitled to remediation damages according to the formula adopted by Judge Fallon in the MDL, provided they have proof of Chinese drywall manufactured by Taishan or BNBM. The purpose of this proceeding is simply to show that the harm-causing products at issue in this litigation (*i.e.*, defective drywall) were manufactured by Defendants. *See*, *generally*, *Sweeney*, 2016 WL 727173, at *6 (M.D. Fla. Feb. 22, 2016), citing *Pulte Home Corp. v. Ply Gem Indus., Inc.*, 804 F. Supp. 1471, 1484-85 (M.D. Fla. 1992). This determination is governed by the preponderance-of-the-evidence standard, *see id.*, which means that <u>upon consideration of all the evidence, it is more likely than not that a given marking is attributable to Defendants</u>. *See United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012); *see also Huck v. Louisville Ladder, Inc.*, No. 807-CV-199-T-24MSS, 2008 WL 222682, at *2 (M.D. Fla. Jan. 25, 2008) (stating that "Plaintiffs must be able to show, by a preponderance of the evidence … that [the defect] existed at the time the … manufacturer parted possession with the product."); *Pulte Home Corp. v. Ply Gem Indus., Inc.*, 804 F. Supp. 1471, 1486 (M.D. Fla. 1992) (same); *Elias v. Evenflo Co.*, No. 04-CV-36OC10-GRJ, 2005 WL 1668427, at *4 (M.D. Fla. July 8, 2005) (finding that plaintiffs had the burden of proving "by a preponderance of the evidence, that the blue substance was a substantial factor in bringing about Aiden's injuries."); *Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1191 (11th Cir. 1995) ("[...] plaintiffs must show that it is more likely than not that the defendant's acts was a substantial factor in bringing about the injury.").

While Plaintiffs have the burden to prove damages in a default proceeding, all reasonable inferences from the evidence must be drawn in the Plaintiff's favor. *See Finkel*, 577 F.3d at 84; *Au Bon Pain*, 653 F.2d at 65. If the greater weight of the evidence favors the

41

Plaintiff, then the factfinder is obligated to find in Plaintiffs' favor.[143]  "Greater weight of the evidence" is defined to mean "the more persuasive and convincing force and effect of the entire evidence in the case."[144]  Obviously, what the "entire evidence" is depends on the facts of any particular case.

Taishan raises specific examples in its Brief with relation to this objection. The first relates to 40 properties of H. Harris Investments[145] (Claimant #515 - Claimant #554).  Taishan argues all 40 properties should be excluded from this process on the grounds that evidence of Product ID was submitted after March 5, 2019.[146] This argument is entirely misplaced. The Product ID discovery deadline in the Court's Trial Plan is solely related to discovery of the Chinese drywall Product ID categories manufactured by Defendants,[147] as evidenced by the March 1, 2019 simultaneous briefing referenced in subsection 3(a)(v) of the Trial Plan.  This deadline did not apply to Plaintiffs' proofs of Defendants' products in their homes.[148] Moreover the Special Master's deadline to issue her Report and Recommendation in subsection 3(a)(vi) relates only to a determination "as to whether the Product ID categories should be attributed to Defendants despite their denial,"[149] not whether Plaintiffs have provided sufficient proof of those products in their properties.  If that were the case, a claimant that remediates after March 5, 2019, would be excluded from producing any evidence of Product ID, while at the same time Taishan would argue they are excluded from remediation damages for not complying with the MDL Court's Pre-Trial Order 1. This would be an absurd result.

---

[143] *See*, *generally*, Fla. Standard Jury Instrs. in Civil Cases § 401.3.

[144] *Id.*

[145] This claimant is the owner of a development of 52 townhomes located in Pace, FL. Only 40 properties contain Chinese drywall as the other 12 properties were constructed during a later phase.

[146] Taishan Br. at 26. It is no surprise why Taishan fails to provide authority for this statement.

[147] ECF No. 112 at 6, ¶ 3a, later amended by ECF No. 174 to extend the deadline to March 5, 2019 for Product ID discovery related to the Chinese drywall products manufactured by Defendants.

[148] Taishan Br. at 26; ECF No. 112 at 6, ¶ 3(a)(v).

[149] ECF No. 112 at 6, ¶ 3(a)(vi).

H. Harris Investments received its drywall from one supplier, Pate Stevedore Company.[150]  The developer, Harry Harris had leftover drywall after completion of the homes, which he is storing in a local warehouse.  All drywall in the warehouse has the same markings (MADE IN CHINA MEET OR EXCEEDS ASTM C1396 04 STANDARD). The only manufacturer at issue is Taishan.  An inspector conducted strontium testing at the subject units and confirmed the presence of Chinese drywall, and because there was only one manufacturer at issue, did not perform extensive inspections as the properties are currently rented.  Getting access to the properties and cutting large pieces of sheetrock out of the walls is not only incredibly destructive, but also costly. Nevertheless, when Plaintiffs received Taishan's preliminary objections, they diligently attempted to schedule inspections of these properties and were finally able to obtain reports before Defendants issued their final contests.

The other example Taishan raises in its Brief relates to Sunrise Lakes, which Taishan calls "another institutional plaintiff."  Taishan's characterizations aside, Sunrise Lakes is an age-limited community for the elderly that experienced significant roof damage from a hurricane and had the further misfortune of having the hurricane repairs done with Chinese drywall. Upon discovering the Chinese drywall and due to its vulnerable population, the Associations at Sunrise Lakes took it upon themselves to remediate the problem. Sunrise Lakes drywall suppliers were G. Proulx and L&W Supply for its hurricane reconstruction. Unfortunately for the Associations, L&W bought drywall from BNBM.[151] L&W did not specify what type of drywall was sent to Sunrise Lakes for the hurricane restoration project. G. Proulx expressly noted it supplied "CHINA BOARD" to Sunrise Lakes.[152]  When the Associations remediated the properties, it chemically tested each and every piece of drywall. Those test results for Sunrise Lakes are contained in the BrownGreer claim files and clearly match indicia for Chinese drywall.  For all claims with this objection, Plaintiffs can show by the greater weight of the evidence that Taishan or BNBM manufactured the drywall at issue. These claims should not be excluded from the process for awarding remediation damages –

---

[150] *See* attached Exhibit "76." *See also* BG Claimant ID 100142, Doc. ID 367873 (attached hereto as Exhibit "77").

[151] *See* L&W Distributor Profile Form (attached hereto as Exhibit "88").

[152] *See id.*

either by the Remediation Formula (for unremediated or partially remediated properties) or by reimbursement of out-of-pocket expenses (for completely remediated properties).

## L. Objection "L" – Affected Property was Completely Remediated

In their final contests, Defendants have asserted 639 claimants are not entitled to Remediation Formula damages because their properties were completely remediated. This category of objection is comprised of claimants Defendants believe completely remediated their property based on Defendants' interpretation of documents in the claim file, regardless of the answers provided in the SPPF. According to Judge Cooke's Trial Plan, claimants who completely remediated their properties "may only recover the actual cost of remediation."[153] Plaintiffs object to Defendants' determination as to which claimants completely remediated their properties vs. which claimants partially remediated their properties.

For starters, BNBM identified 13 claims (for 12 claimants) it alleges have completely remediated their properties. Plaintiffs agree with the Objection for 4 of these claimants.[154] For the 8 remaining claimants, Plaintiffs contend BNBM's categorization is incorrect. In fact, 1 claim that BNBM alleges was completely remediated actually did no remediation at all.[155] With respect to the other 7 claims, these claimants indicated on their SPPFs that the properties were partially remediated because the work done to fix the Chinese drywall problem in their homes fell short of Judge Fallon's governing remediation protocol set forth in the *Germano* Findings of Fact and Conclusions of Law,[156] to which Judge Cooke gave "preclusive effect."[157]

---

[153] ECF No. 112 at 6, ¶ 1.

[154] *E.g.*, Thomas and Sheri Coombs (Claimant #259), Gerard Guida (Claimant #512), John and Donna McKenzie (Claimant #914), and Jorge Perez (Claimant #1081 - both properties). The SPPFs submitted for these claims confirm that the properties were completely remediated. Accordingly, these claimants are entitled to recover their out-of-pocket costs.

[155] Susan and Thomas Cahill (Claimant #177).

[156] *In re Chinese Manufactured Drywall Products Liab. Litig.*, 706 F. Supp. 2d 655, 671 (E.D. La. 2010). According to the *Germano* ruling, complete remediation requires removing and replacing: all drywall, all electrical systems, all copper pipes and plumbing, HVAC assembly and units, damaged electrical devices and appliances (basically "anything that has a button"), any appliance with copper or silver components, carpet, hardwood, vinyl flooring, cabinets, countertops, trim work, crown molding and baseboards, bathroom fixtures, and insulation. Complete remediation also requires post-drywall removal cleanup with a HEPA vacuum and a post-remediation certification verifying that the remediation was correctly performed and the home is safe to be reoccupied.

[157] ECF No. 112 at 3.

Likewise, Taishan identified 627 claimants it contends completely remediated their properties. Plaintiffs respectfully disagree with the categorization of at least 329 claims subject to this objection,[158] as the SPPFs for these claimants indicates that the properties were partially remediated because the work performed fell short of the *Germano* protocol.

For example, Taishan asserted an "L" Objection for Gabriel Argueta alleging he completely remediated his home. According to the uploaded remediation documentation, Mr. Argueta's remediation expenses total $11,066.48.[159] Mr. Argueta's "remediation" consisted of only removing the Chinese drywall and some tiles.[160] No wiring or plumbing was replaced. It cannot be seriously argued that Mr. Argueta's remediation was anything but partial and incomplete. Likewise, Taishan has asserted an "L" Objection for Herschel and Karen Holt. The Holts' SPPF clearly states the ceiling drywall was not replaced and "[e]lectrical wiring throughout the house replaced. Insulation throughout the house was not replaced."[161] Again, this is notably short of the *Germano* standard. The most egregious Defendants' example may be Vashaun and Erika Williams. The Williams' SPPF states the only "remediation" work done to their home is AC repairs to their HVAC system.[162] No other remediation has been completed. In fact, the Chinese drywall remains in the home today. The basis of Taishan's objection for the Williams is unknown, but whatever it may be, it is in error.

Taishan's self-serving determination as to the scope of the Plaintiffs' remediation is unfounded, contrary to documents in the claim file, contrary to the law of the case, and contrary to Judge Cooke's Trial Plan.

---

[158] *See* List of disputed properties (attached hereto as Exhibit "78").

[159] BG Claimant ID 105857, Doc. ID 362065 (attached hereto as Exhibit "79").

[160] BG Claimant ID 105857, Doc. ID 365491 (attached hereto as Exhibit "80").

[161] BG Claimant ID 101891, Doc. ID 366102 (attached hereto as Exhibit "81").

[162] BG Claimant ID 105910, Doc. ID 361858 (attached hereto as Exhibit "82").

**M. Objection "M" – Affected Property was Partially Remediated**

There are 156 claimants subject to a Category "M" Objection from Defendants.[163] Plaintiffs agree that all 156 claimants are categorized correctly as partial remediations, but disagree with Defendants' argument that the measure of damages for those who partially remediated their properties (presumably because they could not afford to completely and adequately fix the Chinese drywall problem they faced) is reimbursement of actual costs rather than formula damages. Taishan seems to suggest that, if permissible under Florida law, these claimants would also be entitled to damages "to compensate [ ] for any remaining remediation work."[164] However, in the next paragraph, the Brief cites *Barile Excavating* to suggest that estimated cost of completion damages are prohibited.[165] The logical conclusion to Taishan's argument is that Plaintiffs who partially remediated would only be entitled to reimbursement of actual out-of-pocket costs because an estimate of the cost to complete the remediation is not allowed. Taishan's position is entirely unreasonable and does not comport with the Court's Trial Plan or the Class Damages Order.

Judge Fallon's *Germano* protocol provides explicit detail as to what complete remediation entails. At a minimum all drywall, all wiring, and all insulation must be replaced.[166] If a claimant's remediation included the removal of only the Chinese drywall, but domestic drywall was left in the home, and the ends of the wiring were merely clipped as opposed to being removed, this would be considered a partial remediation because it falls woefully short of the proper *Germano* protocol. To complete the remediation under these circumstances, a claimant cannot simply continue where the repairs left off. Instead, all drywall in the home, even the drywall that was previously replaced, must be removed and

---

[163] Taishan's Brief provides a lengthy discussion addressing two claims subject to its Partial Remediation Objection: William and Vicki Foster (Claimant #415) and Anthony and Candace Gody (Claimant #474). However, Taishan has coded both claims with Objection "L," not Objection "M." Plaintiffs agree that Mr. & Mrs. Gody completely remediated. Accordingly, counsel for Mr. & Mrs. Gody submitted a verified amended SPPF on April 2, 2019 (BG Claimant ID 105456, Doc. ID 367872 and Doc. ID 367906) (collectively attached hereto as Exhibit "89"). As for the Fosters, Plaintiffs are further evaluating the completeness of their remediation but contend that the remediation is partial at this time.

[164] Taishan Br. at 31.

[165] *Id. See also* BNBM Br. at 8 ("For the work already done, [ ] these Plaintiffs might recover, at most, those actual costs").

[166] MDL Rec. Doc. 2380, at 29-39, 40-46.

replaced again as the Chinese drywall particulate sticks to other drywall and insulation and remains in wall cavities (where drywall was not removed) and the duct work throughout the property.  In order to complete the remediation these Plaintiffs must start the process over at the beginning in order for the home to be rid of the toxic Chinese drywall and the damage it caused.  To suggest that these Plaintiffs be punished because they used what limited resources they had to make their property a little more tolerable is unreasonable.

According to the clear language in Judge Cooke's Trial Plan: "Plaintiffs who have not completely remediated may recover the amount provided by the Remediation Formula."[167] The term "not completely remediated" includes those properties that were partially remediated, *i.e.*, those that did not receive the proper scope of remediation in accordance with the *Germano* protocol, as well as those were not remediated at all. Plaintiffs reject Taishan's suggestion that "the Court seemed to be under the misimpression that properties were either fully remediated or not remediated at all".[168] If Judge Cooke's intent was what Defendants are suggesting, the Court would have simply removed "completely" from that sentence in its order.

These claimants are entitled to a home free from all effects of Chinese drywall and that includes replacing everything affected by the Chinese drywall as precisely described in the *Germano* protocol, for it is only then that Plaintiffs will be made whole. Claimants who did not fully comply with the *Germano* protocol are indeed entitled to Remediation Formula damages by order of both the MDL Court and the Transferor Court here.  Plaintiffs submit these claims are properly before the Special Master for a determination of formula damages.

### N. Objection "N" – Remediation Funded by Other Person or Entity

There are 421 claimants with a Category "N" Objection. Defendants seek to deny a claimant's recovery based on the idea that the claimant's remediation was funded by another person or entity.  However, absent an assignment to a third party, the fact that someone other than the named claimant paid for the remediation does not disqualify the claimant from an award of remediation damages.

---

[167] ECF No. 112 at 6, n.1.

[168] Taishan Br. at 31.

In many cases, the Plaintiffs may have entered into a subrogation or reimbursement agreement and/or Plaintiff may have an obligation to pursue the claim. In other instances, the remediation that was performed and paid for by a third party was only a partial remediation,[169] in which case additional repairs are needed and the Plaintiff is entitled to be compensated for the remediation under the formula.[170] The majority of the claimants in this category are presumably given this objection because they received some funds from the Knauf/GBI settlement.[171] However, Plaintiffs are not attempting to receive recovery again for these amounts, which is the purpose of the proposed setoffs. Defendants have provided no support for their objection to these 421 claimants, and instead categorically argue they should be excluded from the remediation damages process.

Further, Taishan argues that "[e]ven if a claimant whose property was remediated by another did pay some remediation costs, that claimant should be entitled to damages only for their actual incurred costs."[172] In the case of a condominium, the fact that the unit owner paid for the remediation (which is the case in at least 37 claims)[173] is irrelevant given the association's standing to bring claims, which is not disputed by the association or the unit

---

[169] In the case of Claimant #497, BG Claimant ID 102785, Doc. ID 368038 (Exhibit "85" hereto), the Claimant entered into a settlement with the builder. The builder paid for the partial remediation of the affected property. There was no assignment to the builder. In fact, their settlement agreement provided that nothing in the settlement would "bar or prevent Claimants from seeking relief against the manufacturer (*i.e.*, Taishan). *See* Doc. ID 367686, p. 2. Furthermore, the builder neglected to remove all of the Chinese drywall, which the Claimant paid to later remove. *See* Doc. ID 352389, Doc. ID 352388, Doc. ID 352384 (collectively attached hereto as Exhibit "90").

[170] In such case, in the absence of an assignment, the fact that the builder expended funds on behalf of the Plaintiff is irrelevant and does not require a setoff.

[171] *See* list of claimants subject to Objection "N" that counsel has advised claimant fully funded remediation or remediation was only partially funded with prior payments

[172] Taishan Br. at 34.

[173] Taishan has asserted this same objection for Luna Ocean, Magdalena Gardens and Sheridan Beach Club. In each of the following instances, both the condominium association and unit owner state in their SPPF that the association has standing to bring claims for remediation damages even where the unit owner expended the funds. *See* Claimant #s 99, 103, 109, 110, 112, 114, 118, 119, 122, 760, 761, 762, 766, 767, 768, 770, 771, 772, 773, 775, 776, 777, 812, 813, 836, 837, 1346, 1347, 1348, 1351, 1359, 1360, 1362, 1363, 1367, 1368 and 1370.

owner.[174]   Payment will be made to the association, not the individual.  Taishan's objection to claims brought by condominium associations where the remediation was funded by someone other than the association, ignores the law of the case and misinterprets Florida condominium law.

The clear import, express and implied, of Fla. Stat. § 718.111 is that an association may not only sue third parties, but when successful, the association necessarily has the authority to collect the proceeds.   Furthermore, condominium associations have a fiduciary duty to act in the best interest of their members, which includes remitting proceeds to the unit owner accordingly.   Clearly, these associations and unit owners have worked together in presenting these claims.  The unit owners' documentation and evidence of payment have been uploaded under the above condominium associations' BG Claimant ID number and all concerned have agreed that the association is the entity with standing to pursue remediation damages.  Accordingly, this is not a situation where parties are seeking double recovery. Thus, the fact that remediation was paid by a third party (*i.e.*, unit owner) does not defeat the condominium association's standing or ability to collect damages.  A contrary result would produce an unjust result and one that is contrary to the legislative scheme of empowering condominium associations to institute lawsuits on behalf of its members.

Separate and apart from the foregoing, Taishan has asserted a Category "N" Objection where there is no third party.  In some instances, perhaps Taishan's confusion arose because the claimant paid for the remediation from a corporate check, although a review of the underlying documentation and invoices would have made clear that the claimant was the payor.  In other instances, it is unclear why Taishan has objected.  *See* Claimant #s 285, 372, 1177, 1241, 1285, 1311, 1323, 1328, 1401 and 1409.  In each of these instances, the claimants paid for their remediations, and the objection asserted against these claims is without merit.

---

[174] Taishan also states that these unit owners have no remediation injury because their properties were remediated by Knauf.  This is incorrect, with the exception of one condominium, namely, Renaissance Commons.  Further, Peace Harbor paid for the partial remediation of 6 units and Magdalena Gardens paid for the partial remediation of numerous units, although some unit owners also incurred costs. This distinction is beyond the scope of this proceeding as remediation damages will be paid to the respective condominium associations, which will then disburse said funds to unit owners accordingly.

**O. Objection "O" – Diminution of Value**

Defendants argue that 50 claimants, whose self-reported diminution of value in their SPPF is less than the calculated award of remediation damages under the formula, should be denied remediation damages.  They contend that Plaintiffs may not get both diminution in value and remediation damages.  This objection should be overruled.  Whether Plaintiffs are entitled to remediation damages in addition to an award for diminution of value is a judicial determination that will be made at a later date if Plaintiffs decide to pursue these claims.  But, in any event, the Special Master should not be deterred from calculating remediation damages for these Plaintiffs.  Judge Cooke tasked the Special Master with issuing a Report and Recommendation concerning Product ID, ownership, and square footage, and ultimately by using the Remediation Formula "to issue a Report and Recommendation as to the total award for Property Damage Claims."[175]  Diminution of value and other losses are not before the Special Master.

Moreover, Defendants are wrong on the facts of this case and in the application of this principle.  Plaintiffs' recovery of diminution in value for their home is permitted in Florida when the damages are permanent, due to the required disclosure of a material defect in their homes under the Florida Supreme Court landmark case of *Johnson v. Davis*, 480 So. 2d 625, 629 (Fla. 1985) (holding that a seller of residential property must disclose those facts materially affecting the value of the property, which are not readily observable and not known to a buyer).

Nevertheless, Plaintiffs' self-reported diminution of value figure, as required by the SPPF, cannot be used against them in advance of a determination regarding their damages pursuant to the remediation damages formula.  It is not the Plaintiffs' burden of proof to affirmatively establish both diminution of value and remediation damages. If Defendants have evidence of diminution of value, then they should come foreword with it.  Defendants cannot argue they believe it's possible that diminution of value is less than remediation damages, and therefore the Plaintiffs cannot recover remediation damages, unless and until they establish what the diminution in value figure would be.  In the specific example Defendants offer on this point, where the Plaintiff apparently admitted to a lower diminution

---

[175] ECF No. 112 at 6-8.

number, then, at worst, Plaintiff would simply be limited to the lesser of the two. This Plaintiff's claim should not get kicked out of this process into some other proceeding where Taishan will ask for an opportunity to litigate (or re-litigate) the diminution of value number also.

**P. Objection "P" – Remediation Damages Formula**

Plaintiffs have included in their Remediation Damages Spreadsheet (submitted here as Exhibit "A") the remediation damages information according to the R.S. Means data for 2017, *as adjusted* for each zip code, as this is the information that was produced in the MDL pursuant to the Class Damages Order entered in 2017.[176] Defendants object to Plaintiffs' remediation damages calculations across the board. They contend that Plaintiffs are limited to the 2015 R.S. Means national square foot unit price (*i.e.*, $105.91), since the Class Damages Hearing occurred in 2015 and the Class Damages Order refers to that figure. However, in emphatically reaffirming Plaintiffs' class-wide remediation damages formula in 2017, Judge Fallon noted that the remediation damages estimates determined by the formula were adjusted to current dollars, as adjusted for location. Specifically, Judge Fallon noted that the damages determined by the application of the formula were adjusted in time from the $86 per square foot used in the 2010 *Germano* trial, to the $105.91 per square foot figure used in the Plaintiffs' formula on the date of the June 9, 2015 Class Damages Hearing. The MDL Court stated in the 2017 opinion: "This figure [$105.91] is the national square foot unit price with certified industrial hygienist (CIH) costs included and was calculated by Mr. Inglis using R.S. Means to adjust the $86 per square foot cost [from 2010 to 2015] to reflect the current-day materials and labor."[177]

Accordingly, Plaintiffs contend they are entitled to current remediation damages. To reflect the "current-day materials and labor costs," for the remanded Plaintiffs before this Court in 2019, it is necessary to adjust the national square foot unit price in the same way Judge Fallon did in 2015. To do so, the same standard reference for updating to current costs, the R.S. Means materials and labor updated database, is used. Plaintiffs' remediation damages expert Ron Wright has updated the national square foot unit price to $116.57 per

---

[176] *See* fn. 4, *supra.*

[177] Class Damages Order, 2017 WL 1421627, at *24 n.10 (emphasis and bracketed material added).

square foot,[178] based on the most recently available updated national R.S. Means data (4th Quarter 2018), and will make the 2019 adjustments when the updated R.S. Means data becomes available very shortly.  Updating to current prices is a standard R.S. Means method for calculating materials and labor costs,[179] and similarly it is recognized in the law on determining damages.  At the time of the Class Damages Hearing, the R.S. Means national price per square foot was $105.91. Judge Fallon's ruling was not issued until April 2017,[180] at which time the national square foot unit price had increased to $109.85.  The MDL Court's Class Damages Order adopted Plaintiffs' expert's "damages *methodology* to quantify the aggregate damages."[181]  Moreover, the national square foot unit price was calculated by adjusting "the $86 per square foot cost to reflect *current-day building materials and labor*."[182] Plaintiffs have waited long enough for an award and by no fault of their own, it has been an additional two years since Judge Fallon's Class Damages Order.  Plaintiffs are entitled to current-day building materials and labor and, thus, the 4th Quarter 2018 R.S. Means national price per square foot (or the 2019 national price per square foot when available), as adjusted for local factors, is the proper figure for calculating formulaic damages.[183]

---

[178] *See* fn. 2, *supra* (Exhibit "1" hereto).  The calculation of the national square foot unit price using the most recently available R.S. Means data (4th Quarter 2018) was performed by the court-approved damages expert Ron Wright.

[179] The R.S. Means method for adjusting a national average cost with a time adjustment to current prices and local city or zip code adjustment is demonstrated in the R.S. Means Manual (excerpt attached hereto as Exhibit "83").

[180] Class Damages Order, 2017 WL 1421627.

[181] *Id*. at *24 (emphasis in original).

[182] *Id*. at *24, n.10 (emphasis added).

[183] *Cf. MB Reo-FL Church-2, LLC v. Tampa for Christ Church, Inc.*, No. 8:16-CV-276-T-33MAP, 2017 WL 3251645, at *7 (M.D. Fla. July 31, 2017), *appeal dismissed*, No. 17-13972-A, 2017 WL 5997419 (11th Cir. Oct. 26, 2017), *reconsideration denied sub nom. MB Reo-FL Church-2,LLC v. Tampa for Christ Church, Inc.*, No. 8:16-CV-276-T-33AEP, 2017 WL 4959432 (M.D. Fla. Nov. 1, 2017).  In *MB Reo*, the plaintiff (MB Reo) filed his motion for summary judgment on September 16, 2016, seeking to quiet title, recover damages for slander of title, and for declaratory judgment relating to an attempted real estate sales transaction that soured between MB Reo (seller) and defendant Tampa for Christ Church, LLC (potential buyer).  Defendant then filed a number of interlocutory appeals and repeated requests for extensions of time, which delayed its deadline to oppose the summary judgment motion to May 29, 2017.  After blowing that deadline as well, the court granted default judgment in favor of the plaintiff. Notably, the court ruled that the judgment amount requested by the plaintiff consisted of "carrying costs related to the property," which were only covered up until September of 2016 (the date of filing the summary judgment motion), whereas it was now July of 2017. Accordingly, the court ordered the

**Q. Objection "Q" – Preservation of Evidence**

There are 677 claimants with a Category "Q" Objection.[184]   Defendants seek to disqualify these claimants from the remediation-damages formula for an alleged failure to comply with Pretrial Order No. 1. As a practical matter, PTO 1B only applies to those claimants that have remediated. According to Defendants' Objection Key, 788 claimants either partially or completely remediated and 677 claimants did not comply with PTO 1B.

The crux of a spoliation sanction, which Defendants appear to be seeking by their objection, is that a party is subject to sanction if found to have *willfully* destroyed evidence that is *relevant* (or *crucial*) to the other party's claim or defense. "[A] party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence **resulted in prejudice**."[185] Accordingly, in the Eleventh Circuit, courts consider five factors in determining whether spoliation sanctions are warranted: (1) whether the [responding party] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the [spoliating party] acted in good or bad faith; and (5) the potential for abuse [by the spoliating party] as a result.[186] Here, Defendants will not be prejudiced by the alleged destruction of evidence.  All claimants have proof of Product ID to support their claims, such that tangible drywall samples are of no practical importance.

Moreover, Defendants are in default. Liability is established. In light of Judge Fallon's finding that if a home has even one board of defective Chinese Drywall Plaintiffs are entitled to damages because all of the drywall in the home needs to be removed, Product ID evidence consisting of photos, inspection reports, delivery receipts, and/or other indicia is sufficient.

Judge Cooke ordered the Special Master to issue a Report and Recommendation on Product ID, ownership and square footage.  Although preservation indirectly relates to

---

plaintiff to file a supplement "wherein MB Reo calculates its current damages and costs." *Id.*, 2017 WL 3251645, at *7 (emphasis added).

[184] *See* list of claimants subject to Objection "Q" that complied with PTO 1B or other relevant Court Orders, which is based on individual counsel's representations or evidence in the claim file on BrownGreer (attach hereto as Exhibit "84").

[185] *Eli Lilly and Co. v. Air Exp. Intern. USA, Inc.,* 615 F.3d 1305, 1318 (11th Cir. 2010), citing *Flury,* 427 F.3d at 943 (emphasis added).

[186] *Flury,* 427 F.3d at 945.

Product ID, it goes beyond the scope of the Special Master's role.  This objection should be overruled.

## III.   REQUESTS FOR SETOFFS

Plaintiffs agree to all identified setoff amounts asserted by Defendants in their final contests,[187] except for 3 claims:

### 1.   Kenneth and Allison Grant

Taishan has asserted $19,366.45 as a setoff for Kenneth and Allison Grant (Claimant #497).  In 2009, the Grants received $7,115.00 as part of a settlement with Centerline Homes, wherein Centerline agreed to perform certain repairs and make certain cash payments to Grant for "property damage [personal property], loss of use, diminution in value, and any other economic claims."[188]  Additional payments were due, but were not made as a dispute arose regarding Centerline's repairs.  The above payment is clearly not related to remediation damages and thus should not be counted as a setoff. The accurate setoff for the Grants is $12,251.45.

### 2.   Eric and Karen Wilcox

Taishan has asserted $36,756.19 as a setoff for Eric and Karen Wilcox (Claimant #1642). While Plaintiffs concede that amount is the total for what said claimants received from the Beazer settlement, $19,200.00 was reimbursement for living expenses during the remediation and $7,556.19 for moving costs.[189] These payments are clearly not related to remediation damages and thus should not counted as a setoff. The accurate setoff for the Wilcoxes is $10,000.00. In any event, due to the assignment, the remediation damages will be zero.

### 3.   Steven and Cathy Etter

Taishan has asserted $392,852.55 as a setoff for Steven and Cathy Etter (Claimant #381).  However, $368,203.69 of this amount are funds received from their homeowners insurance carrier, in settlement of their general claim against their homeowners insurance policy.  The settlement did not designate the use of the funds, and further, the breadth of the

---

[187] This agreement does not encompass the unspecified setoff amounts with an asterisk on Taishan's Florida Contests and Setoffs Chart.

[188] *See* BG Claimant ID 102785, Doc. ID 368038 at p. 3, para 5 (attached hereto as Exhibit "85").

[189] *See* SPPF at p. 6, at BG Claimant ID 101848, Doc. ID 351967 (attached hereto as Exhibit "86").

homeowners' policy (*i.e.*, covering claims for personal property, consequential damages, etc.) precludes applying a setoff for remediation at this time.  Therefore, the accurate setoff for the Etters is $24,648.86, which represents the GBI payment (and holdback amount) the Etters received.

## IV.    **CONCLUSION**

For the reasons set forth above, Defendants' objections should be overruled and Plaintiffs should be awarded remediation damages according to Plaintiffs' Remediation Damages Spreadsheet (Exhibit "A").


Dated: April 8, 2019                                    Respectfully Submitted,


                                                       /s/ Patrick S. Montoya, Esq.
                                                       Patrick Shanan Montoya
                                                       Fla. Bar No. 0524441
                                                       Email: Patrick@colson.com
                                                       Colson Hicks Eidson
                                                       255 Alhambra Circle, PH
                                                       Coral Gables, FL  33134-2351
                                                       Telephone:  (305) 476-7400
                                                       Facsimile:  (305) 476-7444
                                                       *Interim Lead Counsel for Plaintiffs*