# EXHIBIT 48

April 10, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

             ----------------------------:
 3   EDUARDO AND CARMEN AMORIN,       :
     et al., individually, and on :
 4   behalf of all others            :
     similarly situated,             :
 5                                    :
          Plaintiffs,                 :
 6                                    :
     v.                               : Case No. 1:11-CV-22408-MGC
 7                                    :
     TAISHAN GYPSUM CO., LTD.,        :
 8   f/k/a SHANDONG TAIHE DONGXIN :
     CO., LTD.; TAIAN TAISHAN         :
 9   PLASTERBOARD CO., LTD.,          :
     et al.,                          :
10                                    :
          Defendants.                 :
11                                    :
     ----------------------------:
12
                             - - -
13
                   Wednesday, April 10, 2019
14
                             - - -
15

16

17
                             - - -
18
             HEARING RE: CONTESTS & SETOFFS, Volume 1,
19       Pages 1 through 259, held before Special Master
         Tiffani G. Lee at Akerman LLP, 98 Southeast
20       Seventh Street, Suite 1100, Miami, Florida,
         commencing at 9:08 a.m., on the above date,
21       before Susan D. Wasilewski, Registered
         Professional Reporter, Certified Realtime
22       Reporter, Certified Realtime Captioner
23                           - - -
24              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
25                    deps@golkow.com
```

April 10, 2019

```
 1    APPEARANCES:
 2    SPECIAL MASTER:
 3        TIFFANI G. LEE, ESQUIRE
          HOLLAND & KNIGHT, LLP
 4
 5    COUNSEL FOR THE PLAINTIFF CLASS:
 6        COLSON HICKS EIDSON
          BY:   PATRICK S. MONTOYA, ESQUIRE
 7            patrick@colson.com
          255 Alhambra Circle, Penthouse
 8        Coral Gables, Florida 33134
          Phone:   (305) 476-7400
 9
10

          LEVIN SEDRAN & BERMAN
11        BY:   SANDRA L. DUGGAN, ESQUIRE
              sduggan@lfsblaw.com
12        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
13        Phone:   (215) 592-1500
14
15    ALLISON GRANT, P.A.
          BY:   ALLISON GRANT, ESQUIRE
16            agrant@allisongrantpa.com
          14 Southeast 4th Street
17        Boca Raton, Florida 33432
          Phone:   (561) 994-9646
18
19
          BARRIOS, KINGSDORF & CASTIEX, LLP
20        BY:   EMMA KINGSDORF SCHWAB, ESQUIRE
              eschwab@bkc-law.com
21        701 Poydras Street, Suite 3650
          New Orleans, Louisiana 70139-3650
22        Phone:   (504) 524-3300
23
24
25
```

April 10, 2019

```
 1    APPEARANCES:
 2    COUNSEL FOR TAISHAN GYPSUM COMPANY:
 3       ALSTON & BIRD LLP
         BY:  CHRISTY HULL EIKHOFF, ESQUIRE
 4            christy.eikhoff@alston.com
              MATTHEW D. LAWSON, ESQUIRE
 5            matt.lawson@alston.com
         1201 West Peachtree Street
 6       Atlanta, Georgia 30309-3424
         Phone:  (404) 881-7000
 7
 8
         ALSTON & BIRD LLP
 9       BY:  DAVID VENDERBUSH, ESQUIRE
              david.venderbush@alston.com
10       90 Park Avenue, 15th Floor
         New York, New York 10016-1387
11       Phone:  (212) 210.9400
12
13       AKERMAN LLP
         BY:  ENJOLIQUE D. AYTCH, ESQUIRE
14            enjolique.aytch@akerman.com
         350 East Las Olas Boulevard, Suite 1600
15       Fort Lauderdale, Florida 33301
         Phone:  (954) 463-2700
16
17
      COUNSEL FOR BEIJING NEW BUILDING MATERIALS:
18
19       ORRICK, HERRINGTON & SUTCLIFFE, LLP
         BY:  ANDREW K. DAVIDSON, ESQUIRE
20            adavidson@orrick.com
              HARRY J. MOREN, ESQUIRE
21            hmoren@orrick.com
              L. CHRISTOPHER VEJNOSKA, ESQUIRE
22            cverjnoska@orrick.com
         405 Howard Street
23       San Francisco, California 94105
         Phone:  (415) 773-5700
24
25
```

April 10, 2019

```
 1     APPEARANCES:

 2     COUNSEL FOR BEIJING NEW BUILDING MATERIALS:

 3        ABALLI MILNE KALIL

          BY:  JOSHUA D. POYER, ESQUIRE

 4             jpoyer@aballi.com

               CRAIG KALIL, ESQUIRE

 5             ckalil@aballi.com

          1 Southeast 3rd Avenue, Suite 2250

 6     Miami, Florida 33131

          Phone:  (305) 373-6600

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

April 10, 2019

```
 1                    I N D E X

 2                  Volume 1

 3            Wednesday, April 10, 2019

 4   PROCEEDINGS                              PAGE
```

```
 5   Introductory Remarks by Ms. Eikhoff..............    7

 6   Introductory Remarks by Mr. Vejnoska.............   20

 7   Introductory Remarks by Mr. Montoya..............   33

 8   Objection A Argument.............................   48

 9   Objection B Argument.............................   65

10   Objection C Argument.............................   66

11   Objection D Argument.............................   76

12   Objection E Argument.............................   90

13   Objection F Argument.............................  106

14   Objection G Argument.............................  112

15   Objection H Argument.............................  129

16   Objection I Argument.............................  146

17   Objection J Argument.............................  173

18   Objection K Argument.............................  174

19   Objections L and M Argument......................  187

20   Objection N Argument.............................  217

21   Objection O Argument.............................  229

22   Objection P Argument.............................  238

23   Objection Q Argument.............................  248
```

```
24                 E X H I B I T S

25                    (None)
```

April 10, 2019

```
 1                        - - -

 2            THE FOLLOWING proceedings were had and taken

 3      at 9:08 a.m.:

 4            SPECIAL MASTER LEE:  Okay.  So why don't we

 5      start with appearances, because we have some new

 6      faces -- welcome to the party -- starting with

 7      the Plaintiffs.

 8            MR. MONTOYA:  Your Honor, Patrick Montoya,

 9      Allison Grant, Sandy Duggan, and Emma Kingsdorf

10      Schwab for the Plaintiffs.

11            MR. KALIL:  Good morning, Your Honor.  Craig

12      Kalil and Joshua Poyer of Aballi Milne & Kalil on

13      behalf of Beijing New Building Materials, Public

14      Limited Company.

15            MR. MOREN:  Harry Moren, Andrew Davidson,

16      and Chris Vejnoska on behalf of BNBM.

17            MS. EIKHOFF:  And Christy Eikhoff, David

18      Venderbush, and Matt Lawson on behalf of Taishan.

19            MS. AYTCH:  Enjolique Aytch of Akerman, also

20      on behalf of Taishan.

21            SPECIAL MASTER LEE:  Okay.  We're here for

22      the hearing on the defendants' contests and

23      set-offs.  My understanding is the defendants are

24      going to present first, so I turn it over to you.

25            MS. EIKHOFF:  Thank you, Ms. Lee.
```

April 10, 2019

1           And good morning, everyone.

2           This litigation has had a long history, as

3      everyone knows, and so I wanted to get started by

4      orienting us as to where are we today and what

5      are we doing today.

6           We are at the damages adjudication stage to

7      determine individual damages for individual

8      plaintiffs, for each one of the 1800,

9      approximately, individual plaintiffs in this

10     case.

11          And it's important for us as Taishan to

12     recognize what that means when you are talking

13     about a defaulted defendant, because Taishan is

14     in default and Taishan knows that it is in

15     default in these cases.

16          But even where a defendant is in default,

17     they still have the due process right to defend

18     themselves against the imposition of damages.

19     Liability has been established, but damages is

20     separate.  And long ago the Supreme Court held

21     that a defaulted defendant still has a right to

22     come in and say, "These damages are wrong, these

23     damages cannot be fairly assessed against me.

24     Even if I'm liable, the damages have to be

25     correctly calculated."

April 10, 2019

1           The due process right encompasses two

2       fundamental twin colors, and one color is that

3       the plaintiffs still bear the burden of proof to

4       show damages, that does not change just because a

5       party is in default; and the defendants have a

6       right to be heard in their defense and to raise

7       their hand and say, "I have defenses against

8       these damages."

9           That's been recognized by the Supreme Court,

10      by the Eleventh Circuit, and indeed by the

11      plaintiffs in this case, and it's been recognized

12      by the judges in this case.

13          The defendants' right to contest the

14      imposition of damages was recognized by Judge

15      Fallon in the MDL, who, back in April 2017, in

16      the class damages context, said Taishan will be

17      permitted to review and contest the damages that

18      are being sought and to seek set-offs.

19          And then Judge Cooke's Trial Plan adopted

20      that and set up this process for us to submit in

21      writing all contests and requests for set-offs

22      and for you, as Special Master, to issue your own

23      report and recommendation as to those contests.

24          So we are here in an ordained step of the

25      damages adjudication process, our defenses and

1     our contests in remediation damages.

2         But, having read the plaintiffs' brief

3     yesterday, we see that they are asking you to

4     say, oh, don't listen to their defenses, don't

5     listen to their contests, they don't have a right

6     to impose them because, they say, Judge Cooke has

7     limited the defenses that they can assert.

8         And so in their brief -- this is a clip of

9     the brief that they filed on Monday.  The

10    plaintiffs say that the Court's trial plan limits

11    defendants to challenging only A, B, and C:

12    Product ID, ownership verification, and square

13    footage.

14        And then the plaintiffs say:  All other

15    arguments and defenses have been waived by virtue

16    of Judge Fallon's Class Damages Order and

17    defendants' defaults.

18        This is the plaintiff speaking, saying all

19    other damages and -- arguments and defenses have

20    been waived.  No Court in this case has ever said

21    that.  In fact, just the opposite.  We just saw

22    where they said all contests and set-offs can be

23    asserted.

24        So what the plaintiffs have here is, nope,

25    they are limited to A, B, and C, look at Judge

April 10, 2019

```
 1        Cooke's order.
 2              We looked at Judge Cooke's order, and there
 3        is a D, and from Judge Cooke's order, D is
 4        "Contests and Requests For Set-Offs."  And it
 5        sets up a separate track of this adjudication
 6        phase just for hearing our contests and for
 7        assessing the set-offs.
 8              So there is A, B, and C, product ID,
 9        ownership verification, and square footage; and
10        the last step is contests and set-offs.
11              And that makes sense that it's the last
12        step, because as defendants, we have the due
13        process right to assert our defenses against the
14        imposition of damages.
15              It all comes down to this:  Why we're here
16        today is the culmination of this long litigation
17        and the assessment of the individual damages that
18        each of the plaintiffs are entitled to under
19        their facts and under the law.
20              This is, for us, for all but 20 of these
21        1802 claims, this is our only opportunity to
22        assert our defenses against those damages before
23        you make your damages recommendation, and our
24        right to contest those damages is embodied in the
25        Court's orders, as you've seen, in Florida law,
```

April 10, 2019

1      and indeed, the US Constitution.

2            And we've been building to this moment for a

3      long time, actually.  Judge Fallon, after he

4      entered the class damages order in April of 2017,

5      then recognizing that the damages were going to

6      be adjudicated, Judge Fallon ordered that the

7      plaintiffs needed to complete Supplemental

8      Plaintiff Profile Forms, which are SPPFs.  That

9      was in January of 2018, so well over a year ago,

10     and they came in over the course of that year,

11     they have come in over time.

12            We worked with the plaintiffs on what was in

13     the SPPFs, what fields we were asking for, what

14     documents we were requesting, what information we

15     were requesting, and all of that information and

16     all of those documents were leading to this

17     moment, to the defenses and contests that we are

18     asserting here.

19            We reviewed every single document in every

20     single file for all of the claims that have been

21     brought against us, and, as you know, in February

22     we submitted our preliminary claim-specific

23     contests, and just this month we entered our

24     final contests that we're presenting today.  It

25     all comes down to this.

April 10, 2019

```
 1            These are the contests that we have itemized
 2       by category, and I'm sure, Ms. Lee, you are
 3       familiar now with the way that -- for each of the
 4       specific claims we asserted, the code, what
 5       objections and defenses that we're raising.
 6            And if you look at the topic headings here,
 7       you will see that even though the plaintiffs say,
 8       hey, they are limited to A, B and C, which we
 9       disagree with and think it is a clear misreading
10       of the Court's order, even so, when you look at
11       the topics, they are within the scope of
12       ownership, claimant property ownership, square
13       footage, remediation, and product ID, and they
14       are all within the scope of what was requested to
15       be discovered with the SPPFs that Judge Fallon
16       instituted after his last damages order,
17       establishing a formula.
18            So these are all areas that are expected,
19       they are fair game, they were previewed by the
20       Court and by the parties when we put together the
21       SPPFs that the judge then endorsed.
22            And so we're going to be going through these
23       today, A through Q, and telling you our positions
24       on what we think the law and the facts require.
25            So what are we not doing?  We are not
```

April 10, 2019

1   relitigating big legal rulings or small legal

2   rulings.  We are not relitigating decisions that

3   have been made by the judges in this Court.  In

4   reading the plaintiffs' brief yesterday, they

5   make that assertion, that we are trying to

6   decertify the class again, we're trying to attack

7   the formula again.  That's not what we're doing

8   here.

9        Now, let me be clear.  It is no secret that

10   we disagree with the Court's prior rulings on

11   class certification and on the formula.  We have

12   lodged our objections to that and the ultimate

13   legal determination on that is going to be for

14   other courts on other days.  We're not asking you

15   to revisit any of those.

16        In fact, what we are doing is we are seeking

17   to ensure that the Court's prior rulings on

18   remediation damages are lawfully applied.  And so

19   as you will hear us today as we go through our

20   defenses, we are the ones that are holding the

21   plaintiffs to the only formula that Judge Fallon

22   ever approved, we are the ones that are holding

23   the plaintiffs to using only verified under air

24   living square footage, which is the formula that

25   Judge Fallon established.  We're the ones that

April 10, 2019

1    are holding the plaintiffs to Judge Cooke's

2    ruling that remediation status matters and

3    changes the application eligibility of the

4    formula, and we are also holding the plaintiffs

5    to their burden of proof.

6         And this is a familiar theme, because we

7    talked about it a lot at the PID ruling -- I'm

8    sorry, the PID hearing, that the burden of proof

9    to establish damages is on the plaintiffs, and

10   they acknowledged that in their brief.  It cannot

11   be flipped, which was an argument they made at

12   the last hearing, nor can it be reduced, which is

13   the new argument that we saw in the brief that we

14   got on Monday.

15        And in that brief they argue that, yeah, we

16   know we have the burden of proof, but it's not

17   really the same as regular burdens of proof

18   because you are in default and so all inferences

19   should be made in our favor.

20        And for that interesting proposition, they

21   cite to two Second Circuit cases, and we were

22   curious about that proposition.  Of course, we

23   read the cases, and you will see if you read the

24   cases, Your Honor -- or Ms. Lee, that there is no

25   legal basis for drawing inferences in their favor

```
 1        in the damages adjudication context.

 2             So what those two cases were about was when

 3        you are trying to determine the scope of admitted

 4        liability by virtue of a default, then you look

 5        at the plaintiff -- sorry, you look at the

 6        complaint and the allegations in the complaint,

 7        and for determining the scope of admitted

 8        liability, you take the inferences in the

 9        complaint allegations in the plaintiffs' favor.

10             That's not at all what we're doing here

11        today.  The liability has been established.  We

12        have moved past the liability and now we're in

13        damages adjudication.  There is no law, not in

14        the Second Circuit, not anywhere, that says that

15        for -- to satisfy the plaintiffs' burden of proof

16        on damages against a defaulted defendant, that

17        all inferences should be made in their favor.

18        It's not the law.

19             And so their burden of proof is the same as

20        any old regular burden of proof:  It's

21        preponderance of the evidence, it's the greater

22        weight of the evidence, and that is what applies

23        when they seek to impose damages against the

24        defendants in this case.

25             We also wanted to say -- I said this is what
```

April 10, 2019

```
 1    we're not doing.  So first, we're not asking you
 2    to change any of the legal rulings in this case.
 3    We're also not asking you to dismiss any of the
 4    plaintiffs.
 5         What we are seeking as we go through these
 6    is that if there is a circumstance or a legal
 7    position or a factual position that we think may
 8    be disqualifying or may require individual
 9    adjudication of damages, then we use the term
10    "off-tracking," and off-tracking to us means they
11    don't get a spreadsheet formula application, they
12    require adjudication in the Court, along with all
13    of the other damages that they are seeking.
14         So this is an important point and it's easy
15    to forget.  It's not like, oh, well, now we're
16    going to have to set up some separate proceedings
17    for these people that wouldn't otherwise exist.
18    All of these plaintiffs have other damages, and
19    their other damages require individual
20    adjudication, and that's happening and that has
21    to happen anyway.
22         And so what we are saying when we talk about
23    off-tracking is just take their remediation
24    damages and just put it back in line with the
25    other damages that are otherwise needing to be
```

April 10, 2019

1    individually adjudicated.  It's simply shifting

2    the remediation damages back to that other

3    existing track.

4         Plaintiffs will get their day in court.

5    They will have it anyway, but the difference is

6    that remediation will be one of the elements of

7    the damages that will need to be considered in

8    that context rather than in this one.

9         Now, the plaintiffs are pushing for

10   expediency.  I predict that we're going to hear

11   that a lot today, that they've been waiting

12   10 years and, you know, Taishan has delayed

13   everything and this is more delay, delay, delay,

14   these people need to get their money.

15        But as you will see, as we've raised with

16   our contests, there are factual and legal issues

17   that cannot be resolved with a spreadsheet.  And

18   despite the plaintiffs' push for expediency, it

19   will not save any time to do this the wrong way.

20   As a matter of fact, that's going to make it

21   longer because if we rush these through and we

22   disregard factual obstacles and we disregard

23   legal obstacles and just slap a number down on a

24   spreadsheet without considering these defenses,

25   then it's going to -- those plaintiffs are not

April 10, 2019

1       going to get their money sooner, they are going

2       to get it later or much later, after there is an

3       appeal.

4            And so our request and what we are seeking

5       here is to let's do this the right way.  There

6       are some that we recognize are subject to getting

7       the formula that Judge Fallon approved and think

8       that you do that by a proper calculation.  We

9       recognize that.

10           We'll go through and we'll talk about the

11      ones that we think do not -- cannot be resolved

12      that way and that need to be off-tracked.

13           SPECIAL MASTER LEE:  Just a question.  So I

14      guess from reading your brief, it seemed like

15      there were a lot that you thought should be

16      off-tracked, and I guess my question is is that

17      determination for me to make or is that a

18      determination that Judge Cooke should be making?

19           MS. EIKHOFF:  Whether they should be

20      off-tracked?

21           SPECIAL MASTER LEE:  Uh-huh.  So it seems

22      like she sent this here thinking it was going to

23      be efficient, quick --

24           MS. EIKHOFF:  Right.

25           SPECIAL MASTER LEE:  -- not take a lot of

April 10, 2019

```
 1        time, and what you're proposing is something

 2        somewhat time-intensive for the individual

 3        issues, and I just wonder if she should be making

 4        the decision about off-tracking or not.

 5             MS. EIKHOFF:  If that's an issue that should

 6        be --

 7             SPECIAL MASTER LEE:  Not at all.  I'm just

 8        thinking out loud.

 9             MS. EIKHOFF:  And I am, too, in response,

10        that if that's an issue that you think should be

11        referred to Judge Cooke -- and some of that, it

12        may be appropriate.  Some of these are legal

13        questions that you may want the district court to

14        weigh in on.  And so we don't think it would be

15        inappropriate for you to say, hey, the defendants

16        are raising this issue and saying it's an

17        obstacle to me doing the spreadsheet, what should

18        I do with it?  I don't think there would be a

19        problem with that at all.

20             And so -- but what we are saying is we think

21        it would be inappropriate, when faced with the

22        legal barriers that we are presenting, to say,

23        yeah, I'm just going to apply the formula and put

24        them on a spreadsheet and recommend this to the

25        Court.  We think that there needs to be a pause
```

April 10, 2019

1       for proper legal and procedural considerations

2       there.

3           All right.  That's it for me.

4           MR. VEJNOSKA:  Morning, Ms. Lee, and

5       everyone.  I want to start and be very brief.  I

6       don't want to repeat what Ms. Eikhoff so aptly

7       said, but I want to talk about how BNBM fits into

8       this process and how BNBM sees this process.

9           And again, Ms. Lee, I'm Chris Vejnoska.

10      I'll just talk about some of these general ideas.

11      As we go through the specific

12      category-by-category contests, Mr. Davidson and

13      Mr. Moren will handle that.

14          So BNBM, in terms of being a direct player

15      in this litigation, you've probably already

16      figured this out but we are a small player in

17      terms of what allegations have been made by any

18      claimants that they have BNBM product in their

19      homes.

20          Now, the product identification phase of

21      this, as you know, has been continued due to some

22      difficulties we've had with our corporate witness

23      getting a visa, but the allegations are, as it

24      stands right now, that somewhere between 1700 and

25      1800 homes, BNBM product that the plaintiffs

April 10, 2019

```
1      claim we are responsible for, fewer than 100

2      claimants have that.

3           So the real reason that we're here, and the

4      reason that we're going to participate in every

5      aspect of this, is because of the allegation that

6      BNBM somehow is derivatively responsible for

7      Taishan product.

8           Now, there is no basis at this point in the

9      record for making any such conclusion.  The Court

10     itself, the MDL court in New Orleans, said so.

11     He said in his rulings from April of 2017, Judge

12     Fallon said that he'll get to questions of

13     corporate veil piercing if and when it becomes

14     necessary.

15          So when the plaintiffs say that Judge Cooke

16     has adopted all of Judge Fallon's rulings, Judge

17     Fallon has not made a ruling on liability.  No

18     Court has engaged in any of the substantive

19     requisite analysis to determine whether or not

20     BNBM is responsible for anything other than the

21     fewer than 100 homes in which it is alleged to

22     have product.

23          Now, I need to say this, Ms. Lee.  I think

24     it's actually important to your process, but I at

25     least need to say the following for the record:
```

April 10, 2019

1       That we have some fundamental objections to the

2       way that this process is going.

3           I wasn't going to get to this at this point,

4       but having listened to what Ms. Eikhoff said and

5       having looked quickly at the plaintiffs'

6       PowerPoint, BNBM has not been defaulted in Amorin

7       Florida.  There is no -- and you can look

8       anywhere in the record you want to.  The Amorin

9       Florida case stands on its own.  That's why we're

10      here.  It is a separate filing.  There is no

11      default entry in Amorin Florida against BNBM PLC,

12      and that is the defendant that we're talking

13      about here.  There is none.

14          Now, to be very clear, Judge Fallon, in

15      2017, made a ruling that says, well, because each

16      defendant has defaulted someplace, you're all

17      defaulted every place.  That's the essence as we

18      read it.  I'm not aware of any legal authority

19      for that kind of Whac-A-Mole approach, you can't

20      link it that way, but we have not defaulted here.

21          Now, I'm not asking Your Honor -- I mean,

22      Ms. Lee, I'm not asking you to necessarily do

23      this, but I am saying, for the record, somebody

24      is going to have to deal with this in this case,

25      whether it is you or Judge Cooke, because as a

April 10, 2019

1      result of that difference, we have a very

2      different position as to what we are entitled to

3      in terms of discovery and in terms of process.

4          But whether you agree with that or not, the

5      fact is that for Taishan and BNBM, we have been

6      granted adequate discovery on 20 claimants out of

7      1700 and some.  Those Priority Claimants have

8      been subject to some depositions and have

9      answered questions.

10         As for everybody else, all we have are

11     self-serving profile forms.  We don't have

12     interrogatory responses, we don't have document

13     responses.  We have maybe what they -- what they

14     elected that they thought was useful for them to

15     upload to the BrownGreer website.  We have no

16     depositions of any of those people.

17         So our position here is that we have not had

18     the opportunity to conduct the discovery that we

19     are entitled to under the Constitution and under

20     Florida state law, and that is especially

21     important because of the 20 Priority Claimants,

22     none of them alleged that they had BNBM product

23     in their home.  So we've not had the opportunity

24     to question any of the claimants who say they

25     have BNBM product in their home.

April 10, 2019

1          So why does this matter?  Well, it matters,

2     Ms. Lee, because each of these are individual

3     determinations, whether you go claimant by

4     claimant or category by category.  What the

5     situation is for each of these claimants, listed

6     on a spreadsheet or however else you want to list

7     them, they are individual determinations.

8          Now, I think Ms. Eikhoff adequately covered

9     this and she did it well.  I would only add, on

10    the question of whether the contests are actually

11    permitted or whether we are limited to only the

12    three fundamental categories that the plaintiffs

13    say we are, Judge Cooke herself recognized that

14    Florida damages law must be accounted for in your

15    proceedings.  She had a specific footnote that

16    referred to who may recover the actual cost of

17    remediation.

18          And even in Judge Fallon's order, if you go

19    through it and you look at it, he doesn't

20    necessarily say that the remediation formula

21    applies to everybody.  He said in 2017 that the

22    2015 damages hearing was about current owners.

23          And to put a finer point on this, there is

24    pending right now in New Orleans a motion by the

25    PSC asking the Court, "Will you please rule that

April 10, 2019

1     prior owners are entitled to the formula?"

2          So when the PSC, the plaintiffs, do that in

3     New Orleans, they are telling us sitting here

4     today they understand that it is not clear -- not

5     only not clear, it has not been done, that Judge

6     Fallon has ruled that the formula applies to

7     prior owners.

8          So by definition, we are going through a

9     contest process that determines whether or not

10    people are subject to the formula or not.

11         Next one please, Angela.

12         Now, plaintiffs accepted the burden of

13    proof.  I think it's Page 41 of their brief filed

14    on Monday.  Here is the Black Letter Law from

15    Florida Courts as to what that burden of proof

16    is.

17         Next one.

18         And that means they have the burden of proof

19    on all of these categories, because I want to be

20    really clear, especially because we're going

21    first here, pointing out defects in the prima

22    facie case that a plaintiff must make does not

23    shift the burden of proof.  Pointing out defects

24    in the prima facie case that the plaintiffs are

25    required to make is not an affirmative defense.

```
 1            For an affirmative defense, we have the

 2       burden of proof.  We at BNBM believe that,

 3       therefore, we probably have the burden of proof

 4       on showing that evidence has not been preserved,

 5       but as for everything else, they have the burden

 6       of proving this.

 7            Again, this is why this is individualized,

 8       and this is why, at this point, I would answer

 9       your question to Ms. Eikhoff by saying that, yes,

10       you should recommend to Judge Cooke, from our

11       perspective, these are the people who are subject

12       to the formula and everybody else requires an

13       individualized determination and so they are in a

14       second category, a second bucket.

15            And then you're going to have probably

16       within there subcategories:  Here is why for each

17       category or each person, however you choose to do

18       this.

19            But I do think that it's perfectly

20       appropriate for you to make that recommendation.

21       And, of course, if you want to refer something to

22       Her Honor to make the decision herself and just

23       to describe what the issue is, as Ms. Eikhoff

24       said, I think that's fine, too, but we think it's

25       perfectly appropriate for you to say -- in fact,
```

April 10, 2019

```
 1        we think that's what you're supposed to be doing

 2        here with these contests.

 3             As Ms. Eikhoff said, we're not asking you at

 4        this point to dismiss them.  I think we could,

 5        but we're not doing that.

 6             What we're saying is you should look at

 7        these and you should say, "You can't do A times B

 8        equals C for those people, you just can't."  Why

 9        not?  Because there are questions about their

10        ownership, the square footage, their entitlement,

11        and --

12             Go the next one.

13             -- the Florida law.

14             Now, the plaintiffs, as I said, what they

15        are trying to do is to fill in these gaps by

16        pointing to defaults and to say, "You're not

17        entitled to do anything except A, B, and C."

18             I've already explained to you why we don't

19        think that's at least the case for BNBM.  We have

20        not been defaulted.

21             But even under Rule 55, as Ms. Eikhoff

22        pointed out, damages still must be proven.  Also,

23        I'll tell you, standing must be proven still.

24        That's why you have the product ID part of it.

25        You've got to show that you actually have a
```

April 10, 2019

```
 1      reason to complain, you actually have the
 2      product.  Then you get to the damages part of it,
 3      and everything we're talking about today
 4      are whether there are damages, how much are the
 5      damages, whether you are entitled to damages.
 6           And these cases all explain that they have
 7      the burden of proving the damages to be awarded.
 8           Next.
 9           And Florida law controls that determination
10      and Florida law is very clear.  You look at the
11      damages and you take a step back and you say,
12      "You can make that argument, but does that
13      overcompensate the plaintiff?"
14           How do you determine that?  Actual costs,
15      what you actually paid.  You don't need a formula
16      when you know what was actually paid, and that's
17      what Florida law says, is that even if you apply
18      the formula --
19           Let's go to the next one.
20           -- all you are doing is making the plaintiff
21      whole.  You're not trying to give them a
22      windfall.
23           They've got to be equal to and precisely
24      commensurate with the injuries sustained, not
25      just what it could be, not even what it should
```

```
 1      be:  What it is, what it was.  You get the loss

 2      actually inflicted.

 3           Next one, Andrew.

 4           And to be really clear, because the PSC

 5      tries to do, you know, a little bit of

 6      exaggeration here to make us, I think, look

 7      almost cruel, we're not saying people don't get

 8      money under the right circumstances.  We're

 9      saying you get the work that was actually done,

10      and you have to prove that you're entitled to it,

11      including you have to own the property.  How do

12      you get remediation damages for something that

13      you can't remediate?

14           So Florida law makes this very clear, that

15      you can't do the cost of restoration where it

16      would exceed the value of the home.  Property

17      damage is compensable by the lesser of the costs

18      of repair or diminution in value.

19           So it's really, really important.  This is

20      why there are so many individualized questions

21      here.  The formula sounds wonderful, it sounds

22      easy.  The problem is that Florida law says

23      you've got to take another step and you've got to

24      say, okay, so I can look at that formula, but

25      what did -- what did the claimant -- even if I'm
```

April 10, 2019

1      going to now conclude that this person is

2      entitled to money, how much?  And there are

3      limits under Florida state law and we think that

4      that binds you.

5          Thank you.

6          SPECIAL MASTER LEE:  Did the defendants

7      conduct any discovery?  I thought the trial plan

8      contemplated some discovery on these issues.

9          MR. VEJNOSKA:  Of the 20 Priority Claimants.

10         SPECIAL MASTER LEE:  No, I think it --

11         MS. EIKHOFF:  There was some discovery on

12     some of the contests.

13         SPECIAL MASTER LEE:  Yeah.  What?  There

14     was?

15         MS. EIKHOFF:  There was.  There was a

16     discovery period for some of the contests, yes.

17         SPECIAL MASTER LEE:  But was there any

18     actual discovery related to any of this?

19         MS. EIKHOFF:  We worked on an individualized

20     basis of asking.  It was individualized exchanges

21     of requests for more information, requests for

22     explanation, that sort of thing.

23         MR. LAWSON:  Through the Supplemental

24     Plaintiff Profile Form process.

25         MR. VEJNOSKA:  Right, there was a profile

April 10, 2019

1     process.

2          MR. LAWSON:  The Supplemental Plaintiff

3     Profile Forms were amended and the documentation

4     that was requested in the Supplemental Plaintiff

5     Profile Forms was amended by plaintiffs

6     throughout the past few months as we've been

7     going through this process.  They've uploaded

8     significant volumes of materials where we have

9     noted deficiencies in their productions.

10         SPECIAL MASTER LEE:  Okay.  So what is

11    the -- yes?

12         MR. VEJNOSKA:  So there are categories that

13    they are supposed to answer, and the issue is

14    that we don't have the ability -- I mean, this is

15    like sending -- I mean, let's say that we want to

16    consider those to be like interrogatories.  Okay?

17    We all know in normal litigation, any litigation,

18    you have an interrogatory but the interrogatory

19    is answered by the plaintiff with its counsel and

20    without any ability to now cross-examine.  So we

21    have not had the chance to test that.

22         You may have materials that have been

23    uploaded, but we have not, for the non-Priority

24    Claimants, been able, for instance, to depose

25    anybody, and it's our position that we have the

April 10, 2019

1    right, certainly as to any claimant against us,

2    and also as to any claimant that the PSC wants to

3    say we're responsible for, to ask that claimant

4    questions, to find out what they really did.

5        Because when we talked to the claimants --

6    the Priority Claimants -- I think you're going to

7    hear about this as we go through the contest

8    process today -- you find out things that may be

9    very different than was on the profile form or

10   maybe you didn't know about until you asked

11   questions about it, or how things worked,

12   et cetera.

13       Somebody can say, for instance, "Well, this

14   is what it cost me to do this."  And then you ask

15   them questions and you find out, "Well, as long

16   as I was doing the remediation, I also decided I

17   would upgrade from, you know, Formica to marble

18   and I would do this and I would do that."  So you

19   have those kinds of issues.  That's just one

20   example of many.

21       SPECIAL MASTER LEE:  Okay.

22       MR. VEJNOSKA:  Thank you.

23       MR. MONTOYA:  Ms. Aytch, are you able to

24   toggle over to the presentation, or who's got the

25   control over that?

April 10, 2019

```
 1              (Discussion off the record.)
 2         MR. VENDERBUSH:  Maybe we can take a break
 3    after your opening and get everything to run on
 4    one computer so we can --
 5         MS. AYTCH:  Make it smoother.
 6         MR. MONTOYA:  I have never encountered a
 7    technological glitch in my career, so I'll go to
 8    the paper side.
 9         MS. EIKHOFF:  Welcome to the real world.
10         MR. MONTOYA:  That's right.
11         I took what I felt was a big risk last
12    November when I stood up in front of Judge Cooke
13    when the arguments were being set for whether or
14    not she would adopt all of Judge Fallon's
15    rulings, and the first thing out of my mouth in
16    response was, "Judge Cooke, have you ever seen
17    the movie 'Groundhog Day,' where Bill Murray
18    keeps waking up and the same thing keeps
19    happening to him over and over and over again?"
20         And I listened to the defendants'
21    presentation and we're back to the same things
22    over and over and over again.  You just heard
23    we're not going to relitigate past issues, and
24    what I'm hearing is the buzz words of
25    "individualized damages."  What does that really
```

1    mean?  They don't like the class certification.

2         Both of these defendants were at the class

3    certification damages hearing in this matter in

4    front of Judge Fallon.  Judge Fallon, in fact,

5    when they jumped back in the litigation, granted

6    them I believe a six-month extension of time to

7    prepare for the damages hearing.

8         They contested damages in this matter, they

9    cross-examined witnesses, and Ms. Eikhoff was

10   very candid with Your Honor and said, you know,

11   they didn't like the results.

12        Well, they don't like the results but we're

13   still here hearing the same arguments from them.

14   So really what this is, is an attempt to

15   relitigate these issues.

16        The second thing that I heard was "pause,"

17   the third thing was "delay," and then I heard

18   "off-track."  Those are all synonymous with "slow

19   this down, let's drag this out."

20        Why would they want to drag this out?  For

21   due process rights?  No.  The Court has already

22   determined -- Judge Fallon determined and Judge

23   Cooke determined -- that they've had their due

24   process, and they are getting due process by

25   virtue of these contests and this hearing before

April 10, 2019

1    Your Honor.

2         This is what's really happening:  There is a

3    large category of objections that are in front of

4    Your Honor about former owners and current

5    owners, and the issue is whether the former

6    owners get remediation damages.

7         We know the current owners do.  We know the

8    class definition actually says former owners and

9    current owners.  They don't want to pay former

10   owners.

11        Why are there former owners?  There are

12   former owners because when this happened back in

13   2009, '10, '11, '12, people had a choice:  They

14   had a choice to keep their Chinese drywall home;

15   or move their family out because of health

16   concerns or because they couldn't afford to fix

17   it and find another place.  Most families could

18   not afford two mortgages, could not afford to pay

19   two rents.

20        There is a litany of horror stories.  I

21   experienced them myself, and everybody sitting at

22   this table on the plaintiffs' side has, of

23   clients calling us and saying, "I've got this

24   problem with my bank.  They won't give me an

25   extension of time, they won't do a moratorium

1        because I want to fix my house, I can't."

2             And the bank's response was:  "We can't talk

3        to you until you're in default.  When you're in

4        default, we'll talk to you about maybe slowing

5        down your mortgage payments."

6             They didn't do that, so people lost their

7        homes, so people continue to lose their homes

8        each and every day.  That's what this is about.

9        So whenever you hear "former owner" or "current

10       owner," it's a litigation strategy to let people

11       lose their homes and say all you're entitled

12       to -- because you don't get remediation damages

13       if you're a former owner under their world view,

14       you get some damages but you don't get the

15       remediation formula.

16            That's not what Judge Fallon ordered.

17       Judge Fallon certified a class of former owners

18       and current owners and then apply the remediation

19       damages formula, which is Your Honor's charge

20       here today, to apply that formula.

21            They're asking you not to.  They are asking

22       you to make a decision, a discretionary decision

23       that is not contained in your charge.  They are

24       asking you to deviate from Judge Cooke's order.

25       That's not right.

1          You can read the order for yourself.  It's

2     ECF 112, Pages 6 to 7, as to what your charge is

3     here today.

4          They like to say that we are limiting them

5     to three objections.  We are, because that's what

6     the Court said.  They get to object or contest

7     product ID, ownership, and square footage.

8     That's it.

9          And what I was initially going to start with

10    today was the Jackson 5:  A-B-C, 1-2-3, it's as

11    easy as A-B-C, 1-2-3.  They've got three

12    objections.  They have three objections and what

13    did I get?  I got this, I get alphabet soup,

14    A through Q, 1 through 17.

15         It's not 1 through 17.  It's A-B-C.  That's

16    your charge.  That is your sole charge:

17    Ownership, product ID, and square footage.

18         Now, what I'm hearing is, "Well, kick it

19    back to Judge Cooke."  I have been in front of

20    Judge Cooke for many years, a lot of us in this

21    room have and know her well.  She's practical and

22    she's efficient.

23         The idea that you should kick it back to

24    Judge Cooke with further questions is outside of

25    your scope.  You would issue a report and

April 10, 2019

1    recommendation, and practically speaking -- and

2    it's not even the elephant in the room -- I don't

3    believe that Your Honor is sitting in this

4    position, having been appointed here, and is

5    honestly thinking that somebody is not going to

6    take you up, your report and recommendations, in

7    front of Judge Cooke.

8         Rulings against the defendants that you may

9    enter in this case they are going to take up

10   before Judge Cooke.  They'll have the opportunity

11   to argue that before Judge Cooke.  What they're

12   asking you to do is create more delay, kick it

13   back to Judge Cooke, and have to go back and

14   forth so we have this ping-pong effect.

15        No.  We're here today to be done, to get

16   these remediation damages determined, and that is

17   your charge, is to determine remediation damages.

18   They will continue to object when you award

19   remediation damages, but put that in front of

20   Judge Cooke, she can then make that

21   determination.  We believe that's outside of the

22   scope.  We also believe it's just yet another

23   delay tactic.

24        And from BNBM what I heard was -- I heard

25   from Taishan we're not going to relitigate this.

April 10, 2019

1        And then I heard from BNBM that the formula is

2        not right, that the remediation damages formula

3        is not right.

4              They stand up here and tell you the

5        remediation damages formula is not right after

6        Judge Fallon's order says the RSMeans formula is

7        appropriate?  Judge Cooke adopts all of

8        Judge Fallon's findings and orders, and then they

9        stand up and tell you, well, it's actual costs,

10       it's this, it's that, it's something.

11             It's what the Court says it is.  It's what

12       Judge Fallon said it was in 2015, reaffirmed in

13       2017, and Judge Cooke has now tasked Your Honor

14       with determining here today, and they are telling

15       you it's not right.

16             They keep relitigating the same issues over

17       and over again.  What you are hearing in this

18       hearing is individualized damages.  They want to

19       relitigate this class.

20             I understand they're preserving the record

21       for appeal, I get that, but it's a waste of time

22       in these proceedings.  They've said it, they've

23       briefed it.  Let's apply the remediation damages

24       formula.

25             Slide 1 -- or Slide 2 is your charge, is

April 10, 2019

1        your scope, is the remediation formula.  Now,

2        what is the remediation damages formula?  It's

3        the RSMeans formula that Judge Fallon approved,

4        that Judge Cooke has now endorsed and approved.

5             Essentially, what RSMeans is, it's a large

6        national construction database that conglomerates

7        I think 85,000, or some large number, of

8        different data points to come up with numbers on

9        construction.  And then what RSMeans has the

10       ability to do, and what Judge Fallon ruled,

11       was -- there is a national average for

12       construction, which at the time of Judge Fallon's

13       order in 2015 was $105.91, I believe, a $105 and

14       change, and in 2017 it went up slightly.

15            What RSMeans does or allows the Court to do,

16       and what Judge Fallon ordered, is there is a

17       regional discount or a regional application.  So

18       by ZIP code, you actually apply a multiplier to

19       it and it gives you the actual construction cost

20       in your district.

21            So what you will see in our spreadsheet,

22       which is Exhibit A, which we will suggest should

23       be the way you determine these claims and what I

24       will call, for lack of a better term, I think,

25       your Bible in these determinations that you

1       should be following, it's at Page 4 of the

2       presentation and Exhibit A to the brief.  And I

3       apologize for not having it on the screen.

4           What we did is we created the spreadsheet

5       with the claimant number, the claimant name, the

6       affected property address, city, state, ZIP code.

7       Then you will see another column for verified

8       under air square footage, which we believe the

9       square feet -- square footage to be.

10          And then will you see a column that says

11      2017 RSMeans National Square Footage Unit Price.

12      That's $109.85 for 2017.  That's the national

13      average for per square foot of construction.

14          So the remediation formula, if somebody were

15      going to have their home remediated, the national

16      average would be $107.95.  Put a pin in that.

17          The next column is the 2017 RSMeans location

18      factor.  When you go into the RSMeans database,

19      you can go in by ZIP code and it will tell you

20      for Claimant 193, for example, ZIP code 33993,

21      you multiply the $109.85 times 0.80, and you get

22      $87.88 per square foot.

23          So there is a regional modification.

24          You keep hearing about individualized

25      damages.  This is how -- this is as

April 10, 2019

1    individualized as you get with this data.  So

2    it's actually not $109.85 for Claimant 193, it's

3    $87.88 per square foot.

4         So we did that analysis for each and every

5    one of the claimants.  We took the regional

6    location factor and did the multiplication to

7    give Your Honor the accurate cost per square foot

8    to remediate these homes.

9         What we did in the next column is we did the

10   math.  We multiplied the adjusted remediation

11   cost per square footage times the square footage.

12        And then you will see to the right of that

13   the formula of damages, that's the total in this

14   column.

15        Defendant, objections, and then we go

16   through -- the objections are the alphabet soup

17   of objections that the defendants have asserted.

18        The set-offs:  What the set-offs are, are

19   any time that a claimant has got a payment in any

20   other settlement, for example, a Knauf

21   settlement, we reported that there and those are

22   the set-off numbers.

23        And then you have the total net in the last

24   column.

25        We suggest that, for efficiency's sake, Your

April 10, 2019

1         Honor could work off of this spreadsheet.

2               What we have also done in this spreadsheet,

3         you'll note there are some areas where there's

4         red lines, for example, on Line 196.  Those are

5         areas where we're not contesting.  Those areas

6         are not at issue at all.

7               There is another line that says "Complete

8         remediation entitled to actual cost of

9         remediation," Line 199.  So part of Your Honor's

10        -- Your Honor's charge is to determine the

11        remediation costs.  Where people have actually

12        remediated, they are entitled to their actual

13        costs.

14              On that point, I agree with defendants on

15        the Florida law.  They should -- they get their

16        actual costs because they actually remediated.

17        That's what they paid out-of-pocket.  The

18        argument they're making is people who have not

19        remediated and lost their homes due to

20        foreclosure or a sale in mitigation are not

21        entitled to remediation formula damages, but

22        that's not what the class definition that was

23        certified by Judge Fallon says.  It says current

24        and former owners.

25              So we would ask that Your Honor simply apply

1          the remediation formula to current owners and

2          former owners.  It's going to go up in front

3          of -- you do the math, you determine what's

4          right, it goes up before Judge Cooke.  They will

5          have the opportunity to make that argument before

6          her.  We believe it's outside of the scope of

7          what you were asked to do in this case.

8               So that is, again, Exhibit A to the brief.

9               So these are the challenges that we had

10         talked about that they are allowed to make.  This

11         is the ABC.  It's limited in scope.  It's

12         ECF 112, Pages 6 to 7.

13              And a little bit on the law:  You heard a

14         lot about the burden of proof, and I know Your

15         Honor is concerned about the burden of proof.  We

16         absolutely, as the plaintiff, have the burden of

17         proof.  There is no question about that.

18              But we did cite cases, and we urge Your

19         Honor to look at them, they are at Page 41 of our

20         briefing, and those cases, the Second Circuit

21         cases and others, say that all reasonable

22         inferences are drawn in the plaintiff's favor

23         while in default.  That's not saying you don't

24         have the burden of proof, but that you may draw

25         all reasonable inferences.  So that's what we're

1      talking about when we talk about burden of proof

2      in this case, that Your Honor is allowed to draw

3      those inferences.

4          Talking a little bit about what the Court

5      actually ruled in this case, as Your Honor knows,

6      Judge Cooke -- and this is from the order, Judge

7      Cooke's order:  The Court finds Judge Fallon's

8      decisions well reasoned and well supported by the

9      evidentiary record.  The Court adopts all of

10     Judge Fallon's factual findings and legal

11     conclusions and will not revisit any of his

12     rulings.

13         That's what they are asking you to do here

14     today.  Your charge is simply to calculate the

15     remediation damages and these individual contests

16     and set-offs.

17         Taishan, Tai'an Taishan Plasterboard Co.,

18     TTP, BNBM Group, CNBM Group, and CNBM have all

19     been held in default.  When Judge Cooke adopted

20     Judge Fallon's rulings, those were the defendants

21     that were held in default.  So you heard

22     something else here today.  Your Honor has the

23     full record in front of you.  You've got both

24     sets of briefings.  You're going to read those

25     briefings and you're going to weigh them and

1     decide which ones you believe, but there's -- the

2     orders are there.   It's in black and white.

3          I believe that defendants have either

4     misstated or overstated what class was certified

5     and what class was not certified.   You can

6     determine that for yourself.

7          Class certification was appropriate under

8     Rule 23.   That was found by Judge Fallon and

9     adopted by Judge Cooke.

10          Liability has been conclusively established

11     as to all defendants and the only remaining issue

12     is the amount of the order.   We're here about

13     damages.

14          Finally, as to the remediation formula, what

15     Judge Cooke also adopted, she found that the

16     remediation formula represents a reasonable and

17     reliable measure of the remediation damages that

18     the Court will apply to determine the appropriate

19     amount of property damage.

20          This slide alludes a little bit to what you

21     heard about taking things off-track.   This train

22     is moving, this train is moving quickly.   It's

23     moving at lightspeed, I will tell you from the

24     litigants' perspective.   Six or seven months

25     always seems like a long time, be in our world,

1    with 20 individual cases and the close to 1700 or

2    1800 claims, it is moving quickly.  I won't say

3    that it's not.  But this process was created to

4    increase those efficiencies.

5         Judge Fallon already looked at this, he had

6    a full hearing on it, and Judge Cooke has adopted

7    it.

8         So what they are asking you to do is to

9    remove a majority of the claims off-track, to put

10   them in another proceeding to delay this further.

11   And we suggest to you that's not what Judge Cooke

12   asked you to do.  She asked you to determine the

13   remediation damages formula.

14        They will have the chance to object to your

15   report and recommendation, but we suggest that

16   you follow Judge Cooke's order strictly and as

17   it's written.  And this is rife throughout their

18   brief.

19        I'll see if there is anything further I

20   wanted to add.  I thought I did.

21        As to BNBM, BNBM was deliberate --

22   deliberately defaulted themselves.  Judge Cooke

23   has ruled that BNBM is in default, adopting Judge

24   Fallon's orders.

25        You heard a lot of discussion about

1      discovery from BNBM.  I didn't get my -- and Your

2      Honor asked those questions.  I didn't get BNBM

3      saying, "We didn't get the opportunity to do full

4      discovery."  There was a two-month period where

5      discovery was allowed on these claims.  The

6      defendants served interrogatories on all of the

7      claimants.  That was supposed to be case-wide in

8      this matter.

9           They then agreed to the Supplemental

10     Plaintiff Profile Forms in lieu of those

11     interrogatories being answered.  They were

12     negotiated between plaintiffs and defendants

13     after individual discovery was served.

14          So there has been adequate opportunity to do

15     discovery in this matter.  We just want to

16     disabuse Your Honor of that notion.

17          I think we'll -- if you want to take a break

18     or raise any questions at all, then I'll move to

19     the individual questions.  Thank you.

20          SPECIAL MASTER LEE:  Do you want to take a

21     break?

22               (Discussion off the record.)

23          (Recess from 10:08?a.m. until 10:15?a.m.)

24          MR. VENDERBUSH:  Good morning, Ms. Lee.

25     David Venderbush from Alston & Bird.

April 10, 2019

1        So now we're going to dive into the

2    individual contests that apply to various

3    individual plaintiffs or others, as is the first

4    category.

5        As we do that, I just wanted to reset the

6    stage, because Mr. Montoya, I heard him sort of

7    suggesting don't look at these, don't worry about

8    it, not in your charge.

9        We believe it is in your charge and that

10   Judge Cooke didn't appoint you to stamp their

11   spreadsheet, because she could have done that.

12   She could have said, "Give me the spreadsheet on

13   the remediation formula and I'll approve it."

14       That's what they are asking you to do now.

15       And just so we're clear on the spreadsheet

16   that Mr. Montoya called the Bible, that is not

17   the Bible.  Neither side thinks that's the Bible.

18       What they -- what -- we think there is a

19   spreadsheet that needs to be created that uses

20   the $105.91 base figure that Judge Fallon

21   approved in 2015 -- or 2017.  We haven't seen

22   that yet.

23       They think it should be updated to 2019

24   figures, but they haven't produced that yet

25   either.  So what you have there, those figures,

1       those aren't the figures that either side thinks

2       could be the appropriate figures.

3            So -- and it says right at the top of here,

4       it says plaintiffs -- well, I can't read that

5       without glasses, but you can see what they say.

6            MR. MONTOYA:  "Update."

7            MR. VENDERBUSH:  They want to update.

8       That's the form that they created, but that is

9       not anyone's Bible at this point.

10           And so you shouldn't rubber-stamp that

11      because no Court -- Courts have talked about this

12      formula in general, but no Court has ever tried

13      to apply it to any individuals, no Court has

14      tried to do this kind of an activity.  And we

15      know that there are some problems in that

16      activity, how we can just use complete

17      remediation, which everyone agrees is in Judge

18      Cooke's order and that's consistent with Florida

19      law.

20           So something needs to happen here, and so

21      that's why we are going through this process.

22      And we think you can and should make these

23      decisions as a Special Master under Rule 53.  You

24      are not a rubber stamp, you make factual

25      findings.  And under Rule 53(f)(4), you make

1        legal conclusions and then the district court

2        judge can review those legal conclusions, but you

3        are fully empowered by Rule 53 to make legal

4        conclusions.

5             And it would be kind of odd -- I'll just

6        call it odd -- for you to know that there is a

7        big legal problem with someone getting this

8        formula and you don't do anything about it, you

9        don't -- you say, I'm going to ignore that legal

10       problem, I know Florida law requires something,

11       but off we go because Mr. Montoya needs this to

12       go fast for everybody.

13            You make your own decision, but that just

14       seems odd procedurally, and just odd with how law

15       works.

16            So I will just stop there because I want to

17       get to people who we think have a real legal

18       problem in process, and the order here, just so

19       we're clear, is not strategic.  The order here

20       kind of is an artifact of how we set up some of

21       our objections and how we were thinking, and

22       what's the problems with some of these claimants.

23            Like a year ago -- it was about a year ago

24       we knew we were going to have to bring some sort

25       of -- we've known since 2017 that we could have

1    contests.  So when we started to do the work,

2    because it's a lot of work to go through claim

3    files, try to figure out from what we have -- and

4    we don't have depositions, but we have some

5    documents.  So we spent a lot of time, and you

6    will hear more from Mr. Lawson, who has done a

7    lot of that work, how much work it is for over

8    1700 people.

9         When we started doing that, we just set up

10   some categories, and through how people are, they

11   kept the same categories in the same order and

12   then that just kept getting -- going.

13        So this is, obviously, not the most

14   important category that I'm starting with, but

15   it's just an artifact of history, but it shows an

16   important legal problem that we think you would

17   want to know about, and that is does this person

18   even have a claim in the lawsuit that is in front

19   of the Court?

20        And this seems kind of basic, but people

21   have lawsuits and they are named in lawsuits

22   under the Federal Rules of Civil Procedure, and

23   if you didn't put yourself on a complaint and you

24   didn't allege a specific claim for a specific

25   property in the lawsuit, then you're not in the

April 10, 2019

1        lawsuit.

2             And there is one lawsuit that is in front of

3        Judge Cooke, and derivatively in front of you,

4        and that is the Amorin Florida claim -- lawsuit.

5             So we're going to -- and so these people --

6        we're not saying that you should say they can't

7        ever sue anyone, they can't ever get damages.

8        We're just saying they can't get the Amorin --

9        they can't get this formula right now because

10       they are not in the lawsuit that is being

11       litigated right now.

12            And so you -- that needs to get pushed to

13       Judge Cooke to make this basic legal

14       determination of where should these people get a

15       remedy or where should they sue or what should

16       they do, because they're not in the only lawsuit

17       that's in front of Judge Cooke.

18            And there's two categories.  There is one

19       where the claimant is not a plaintiff in Amorin

20       at all, their name doesn't appear anywhere; and

21       then there is another one where the plaintiff is

22       named for certain claims but just not named for

23       the three subject properties that they've put on

24       this list sua sponte that were never in Amorin.

25            So real quickly, or hopefully quickly,

April 10, 2019

1        because this is important background on why do we

2        have the Florida Amorin complaint, there is the

3        unique history here, which is the plaintiffs

4        filed a series of what they call omnibus

5        complaints, and they've been very proud that they

6        made up this procedure.  It's a really weird

7        procedure.  It's novel.  Okay.  Judge Fallon has

8        used it for some time.

9             And there were some early ones:  Gross,

10       Wiltz, Germano, there is like eight or nine of

11       them, but at some point, I think -- and they can

12       tell you better -- but the plaintiffs decided

13       that they would try to supersede and consolidate

14       them all into Amorin, and they filed one in --

15       well, they filed three in 2011 that had 15

16       alleged class representatives, punitive class

17       representatives, and they filed them in the

18       Southern District of Florida, Eastern District of

19       Virginia, and the Eastern District of Louisiana,

20       and they were substantively identical.  There

21       were some words that were different, but they had

22       the same 15 class reps, they made the same causes

23       of action, for the most part.

24            And because they had some worries about

25       jurisdiction, they filed three identical

April 10, 2019

1    complaints, and those were all transferred to the

2    MDL in the Eastern District of Louisiana.

3        And then in 2012 they said, well, I know

4    we're going to move for a class, but let's just

5    get everyone named who are claimants that we know

6    of and we'll name them, and then we'll itemize

7    all of the properties that each one is suing for.

8    And so that was the practice, of a name of the

9    plaintiff and then listing all the properties

10   that they were suing for, and that was their way

11   of giving us notice of what was, under Rule 8,

12   what was the claim.  What did we have notice of?

13   The name and the property.

14       And so since then, that became the

15   definitive plaintiff list, was the Amorin

16   intervention complaint in 2012.  So you will hear

17   "the intervention complaint."  That's when it

18   created -- it started with 4,000 in 10 states.

19   It got culled down over time as people looked at

20   these more and more, and then after the rulings

21   that you've heard about, the damages FOFCOL and

22   the class cert, Judge Fallon remanded -- he began

23   the remand process, and he had these three Amorin

24   complaints for the Amorin group that he had

25   certified.

```
 1          And so then he took the Florida ones in
 2   Amorin Florida and sent them to Judge Cooke.
 3          And later, he took the Virginia complaint
 4   and he sent that to the Eastern District of
 5   Virginia, and he kept the Louisiana one.
 6          And then Florida and Louisiana stayed the
 7   other cases.
 8          And so who came to Florida are only the
 9   plaintiffs who are on the Florida intervention
10   complaint, and no one else is here as a
11   metaphysical and as a matter under the Rules of
12   Civil Procedure.  Okay?  So that's who gets to
13   litigate here.
14          I think you're going to hear two arguments
15   from them on this.  One is that the claimants
16   that we're talking about were on a list that
17   Judge Fallon tried to use in his first remand to
18   Florida, and that was a list the plaintiffs gave
19   him of the Florida -- that they thought should be
20   litigated in Florida, and he made a suggestion of
21   remand with that list.
22          And then we think the JPML, Judicial Panel
23   on Multidistrict Litigation, called him up and
24   said, "That's not going to work because we don't
25   remand lists.  We only remand the cases that we
```

April 10, 2019

1    transfer to."

2         And so Judge Fallon had to issue a new

3    remand suggestion, where he gave them the case

4    number for the Florida Amorin complaint that the

5    JPML had initially sent him.  And so that second

6    one -- so the first list didn't have any effect,

7    because that's not how the MDL process works.

8         So what he had to do was send it -- suggest

9    to the JPML that they transfer a case.  It was

10   the Florida Amorin complaint with the Florida

11   Amorin intervention plaintiffs on it, and that's

12   what landed in Judge Cooke's court and that is

13   what is before you now, and that's the only case

14   with the only plaintiffs that are in the Southern

15   District of Florida.

16        So we have two subcategories that we're

17   talking about here, and one is five claims that

18   are not on the Amorin plaintiffs list.  These are

19   the numbers here.

20        And the plaintiffs don't dispute that they

21   are not on the intervention complaint, and

22   they're going to say, well, they are here because

23   they are in the class.  And we're not

24   relitigating that a class was certified, but

25   we're saying that by splitting these people up,

April 10, 2019

 1      Judge Fallon has split up the class, and so we're

 2      not litigating the class here, because there's

 3      class members who are in Louisiana and there are

 4      class members who are in Virginia and there are

 5      class members from other states who are still in

 6      Louisiana and haven't been remanded yet.

 7           So nobody is litigating this class in one

 8      court.

 9           So if they want to bring in class members

10      who aren't on the Amorin complaint, they would

11      have to certify a subclass of Florida claimants

12      that these people would qualify for, but until

13      that happens, we're only -- we can only -- Judge

14      Cooke can only reach out to the people who are in

15      front of her.

16           And so those need to be -- they cannot be

17      part of this process and they need to be referred

18      to the District Court because they are not on the

19      Amorin complaint.

20           And the other one is more of a textual

21      matter that you can look at the intervention

22      itself:  Cobblestone on the Lake Master

23      Association.  They are named on the Amorin

24      complaint and they are named for certain claims

25      on the Amorin complaint, but there are three of

April 10, 2019

```
1        their properties that they've tried to put into

2        the spreadsheet.  Two do not -- these two units

3        do not appear anywhere in the Amorin complaint,

4        we don't have any notice of those two; and then

5        443 appears as the property or a claim of a

6        different plaintiff, Mr. Cocquerelle.

7             And so that's what we got notice of.

8             So we think we're going to hear from them,

9        and they said it in their brief, "Well, look, we

10       did Cobblestone on the Lake and we told you it

11       was Building 4, and so that's good enough.  That

12       means everything in Building 4, that means all

13       the units and all the walls and everything like

14       that."

15            But that was not the practice in this case

16       and it's not what they actually did.

17            So this is a cutout from the Amorin

18       intervention complaint, and you will see that

19       Building 4 was not intended to mean, "Oh, don't

20       worry, anything in Building 4, that's what we're

21       doing."

22            Because here they went down and said, "Hang

23       on.  So we have Building 4.  Maybe that's common

24       areas.  We can talk about that later."

25            But here we'll tell you what units that
```

```
 1        Cobblestone in Building 4 is seeking, and that's

 2        442 and 446.  So that does not mean that we meant

 3        443, 444, and the other ones, and so they are

 4        just simply not on the Amorin complaint.

 5             That's it.

 6             MR. DAVIDSON:  Good morning, Ms. Lee.  My

 7        name is Andrew Davidson on behalf of BNBM.  We

 8        join in Mr. Venderbush's eloquent explanation of

 9        Contest A.

10             We have one additional contest to assert in

11        Contest A.  We think it's a straightforward one,

12        and that's Claimant Number 198.  Here, this

13        claimant is not a class member in the Amorin

14        complaint, and the plaintiffs, in their brief,

15        agree it's not a class member.  So we think that

16        it can be removed from the formula process.

17             Thanks.

18             MS. DUGGAN:  Good morning, Ms. Lee.  I'm

19        Sandra Duggan.  It's good to see everyone here

20        again.

21             I want to put this in perspective.

22        Objection A was lodged against nine claimants

23        only, eight from Taishan and one from BNBM.

24             Working backwards, BNBM's objection, we've

25        agreed that that claimant is not a member of the
```

April 10, 2019

1        Amorin class.  There is no dispute there.

2              With regard to Taishan's disputes, there are

3        eight of them, and as Mr. Venderbush said, they

4        are in two different categories.  There are five

5        of the eight that they are claiming are not on

6        the Amorin complaint, and then there's three that

7        are on the Amorin complaint that they allege is

8        not specific enough.

9              By way of background, September 26, 2014,

10       Judge Fallon certified the Amorin class.  I think

11       it's important to understand that the Amorin

12       class encompasses more than the Amorin complaint.

13       It's a class of active litigants.  There are no

14       absent class members.

15             At the time the class was certified, the

16       defendants were in default, they were not before

17       the Court.  They had an opportunity to object to

18       the class certification but they chose not to be

19       in the proceedings.

20             Judge Fallon makes clear in his order -- and

21       Judge Cooke has adopted this order -- that the

22       Amorin class includes named plaintiffs from

23       Gross, from Wiltz, from Germano.  There are three

24       identical Amorin complaints.  One was filed in

25       Louisiana; one, Virginia; and one, Florida.  The

April 10, 2019

 1      reason they were filed was at the time the

 2      defendants were contesting jurisdiction in those

 3      locations, we wanted to protect all of the

 4      plaintiffs, and the concept was that everybody

 5      who was on an omni complaint previously would be

 6      part of the Amorin complaints.

 7           And so when Judge Fallon certified the

 8      Amorin class, he said that it's active litigants

 9      in Haya, Amorin, all of the prior omni complaints

10      against the Taishan defendants.

11           Now, what happened was five of those class

12      members, and they've been correctly identified as

13      Claimants Numbers 265, 312, 313, 378 -- and I

14      wish I could read my handwriting -- 1329, I

15      believe, they are -- there is no doubt they are

16      Amorin class members but they are not on a

17      specific Amorin complaint that was remanded to

18      Judge Cooke.

19           However, Judge Fallon, in his original

20      suggestion of remand, had them on the chart of

21      the cases he intended to remand.  And when the

22      parties jointly submitted to Judge Cooke a joint

23      case management plan, Exhibit B to that plan --

24      it's ECF 45 -- says the parties agree that there

25      are approximately 1700 claimants before this

April 10, 2019

1      Court, and these five Amorin class members are on

2      the list.

3          Now, when we met and conferred with the

4      defendants they said, well, that chart doesn't

5      really mean anything, they are not technically

6      before the Court.

7          But here is the issue that we're facing:

8      They are Amorin class members.  So if they are

9      not before the Court, what are we going to do

10     with them?  They have properties in Florida.

11     They should be adjudicated here.

12         So I suggested why don't we intervene those

13     five into this proceedings, would you agree to

14     that?  They said no.

15         So we're at a standstill there.  You know,

16     we dispute that they should -- we think they

17     should be adjudicated here, but if for whatever

18     reason they can't be, we will file a motion with

19     the Court to intervene in this proceeding.

20     Otherwise, they are hanging out there in another

21     jurisdiction when, in fact, the properties are

22     located in Florida.

23         Now, with regard to the three plaintiffs

24     that they also dispute, there is no question they

25     are on the complaint, but what they don't like is

```
 1        that it's not specific enough, and we address

 2        this in detail in our brief.  It's Cobblestone on

 3        the Lake.  The entry refers to Building 4.

 4             Building 4, we would argue, encompasses the

 5        units at issue, and it's not as if they didn't

 6        know what Building 4 meant, because all of the

 7        evidence on the PPF, on the SPPF, refers to these

 8        specific units.  They just don't like that it's

 9        not listed as those unit numbers.

10             And it's true, there are other unit numbers

11        in Building 4 that have their own entry on the

12        chart.  This one just says "Building 4."  There

13        is no dispute about that.  The question is does

14        the building encompass the units?  And if so, why

15        would you reject that claim?

16             We would argue that wouldn't be right.

17             SPECIAL MASTER LEE:  So why were some listed

18        by unit number and others more --

19             MS. DUGGAN:  I don't have a specific answer

20        on that.  Some were, and unfortunately in this

21        instance, three unit numbers, it just said

22        "Building 4" as opposed to listing them

23        specifically.

24             Mr. Venderbush said, well, it was the

25        practice.  It may have been the practice in other
```

April 10, 2019

1  cases to be more specific, but that's not a

2  reason to say they are not going to be

3  adjudicated here.  That would be a very harsh

4  consequence when, in fact, all of the evidence,

5  all of the files refer to those specific units.

6  We're not asking for the entire square footage of

7  the building to be adjudicated, because I believe

8  that one floor, for example, is a garage, you

9  know, they are not all impacted properties within

10  Building 4.

11    SPECIAL MASTER LEE:  Do you have a response?

12    MR. VENDERBUSH:  I think we don't have a

13  response.

14    On Category B, as you've heard hints of, the

15  parties have been talking a lot in the last month

16  since we filed the preliminary contests, and

17  through that work the plaintiffs have withdrawn

18  20 of the Bs.  We have withdrawn the remaining

19  three.  And for these reasons, if you assigned

20  your claim, then you're not the person who should

21  be before the Court.

22    I just want to point out that how that

23  happened was through us doing file review and,

24  actually, through a little bit of luck that we

25  have some homebuilder litigation as well and we

April 10, 2019

```
 1          saw that there were assignments that the

 2          homebuilders had, which is why they were suing us

 3          for these remediation claims.  And then we said,

 4          "Those look like familiar addresses."  And then

 5          so we went and saw they were Amorin claimants

 6          that were going to get pushed through the formula

 7          but they had assigned their claim.

 8               So we brought that to their attention and

 9          this was the result, and they brought some to our

10          attention.  But it just -- it was -- we were

11          lucky that we were able to catch them.  So that

12          was B.

13               Do you want to say anything about B?

14               MS. DUGGAN:  I just want to make one comment

15          about our spreadsheet.  When we agreed that there

16          was a valid assignment and, therefore, there

17          should be no remediation damages awarded, we put

18          the red line through the spreadsheet and we did

19          not calculate any number.

20               SPECIAL MASTER LEE:  Okay.

21               MR. VENDERBUSH:  So C should be very quick.

22          Again, these are people that we think should not

23          get remediation damages with the formula because

24          they have some serious fact questions about

25          whether they came to this problem and whether
```

1    they had any damages at all.

2         Florida law doesn't allow you to knowingly

3    buy a defective product, especially if you do so

4    at a steep discount because of the defect, and

5    then recover full damages.

6         And so there are some questions about this

7    and we -- because these are three people who

8    happened to check a box in the SPPF, "Did you

9    know about Chinese drywall when you purchased

10   your house?"  And so three out of 1700 said yes,

11   very candidly, but that's a big problem under

12   Florida law and sort of under damages

13   jurisprudence, do you have any damages?

14        And so before we rubber-stamp the formula

15   and send them out, they need to go somewhere else

16   to figure out what damages do you think you have.

17   We think they sort of made the point for us in

18   their brief of how factually complicated this is.

19   And so we said that Mr. Coratti had knowledge of

20   knowing about Chinese drywall when he bought the

21   house.

22        And they say:  While the presence of Chinese

23   drywall was disclosed to Mr. Coratti, he was

24   living in New York at the time and was unaware of

25   the magnitude from the off-gassing caused by

1       Chinese drywall and the expense of remedying the

2       Chinese drywall defect.  Had he been aware of the

3       full impact the Chinese drywall would have on the

4       property, he would not have purchased the

5       property.

6           Okay.  That's not a defense to what we're

7       saying here, right?  And he's a really good

8       example of he doesn't have any damages, because

9       the property was valued in 2007 at $725,000.  He

10      purchases it three years later, knowing it has

11      Chinese drywall, for a huge discount.

12          He came to this problem, and then he wants

13      you to stamp him some formula damages that would

14      give him $209,000, effectively making his house

15      for free that he bought, knowing -- as an

16      opportunity.  Did he want to remediate it and

17      then flip it and sell it for more?  I don't know

18      if we have all the facts of -- subsequent facts

19      for what happened, but that would be the

20      situation.  He doesn't have damages because he

21      came to this and made a real estate transaction

22      knowing it had Chinese drywall, so he cannot get

23      those damages.

24          And we think the other two, if you just read

25      their stories, they are telling a similar story.

April 10, 2019

1     That has to be individually adjudicated.

2          Do they have any damages?  I don't think so,

3     but I'm happy to have them come in and try to

4     prove other damages, a diminution of value, or

5     whatever it is that they think they did.  They're

6     on the Amorin complaint, they can have their day

7     in court.  They're not being punished, they're

8     just not getting the formula.

9          MR. DAVIDSON:  So for Contest C, our

10    perspective for BNBM, we asserted this contest

11    against three claims where the plaintiffs failed

12    to fill out any information on their SPPF.  They

13    didn't check the box, yes, they purchased with

14    knowledge; they didn't check the box, no, they

15    purchased without knowledge; they just didn't

16    check the box at all.

17         And we think that this contest in this

18    particular category shows some of the dangers in

19    applying the formula process without specific

20    individual adjudication.

21         As Mr. Venderbush said, a plaintiff cannot

22    claim damages if they purchased the product with

23    a defect knowingly.

24         Based on timely information that was

25    submitted for the first claimant, and that would

1      be the Goldmans, Claimant Number 477, and after

2      reviewing the PSC's final contest brief, BNBM

3      believes that we can withdraw our contest from

4      that particular claimant, but we must maintain

5      our contest for the other two:  The Kellys,

6      Number 673, and the Lang claimant, Number 707.

7           For the Kelly claimant, there was no

8      response in the initial SPPF as to whether or not

9      they purchased with knowledge.  There was some

10     information that was provided first to

11     plaintiffs' counsel, and then after BNBM

12     submitted its final contests brief on April 7th,

13     there was what appears to be an amended

14     Supplemental Plaintiff Profile Form submitted to

15     the BrownGreer portal, but none of that

16     information was timely submitted to us.  We

17     weren't able to analyze it or determine whether

18     or not they purchased with knowledge, so we

19     must maintain our objection for the Kellys.

20          As for the Langs, I think this actually

21     gives a good example of what we were up against

22     with discovery.  The Lang claimant apparently

23     submitted information to the BrownGreer plaintiff

24     portal and when we went to pull that information

25     down to us, the Plaintiff Profile Form was blank,

1      there was no information on that page.

2            Now, we can't go through, for 2,000

3      claimants, and say, okay, it's blank, was that a

4      BrownGreer failure?  Was that you didn't fill

5      anything out?  We just have to assume that you

6      didn't answer those questions.

7            The last argument for the Langs that the

8      plaintiffs put forward was, well, they purchased

9      this property in 2002 and there was no knowledge

10     of the defective Chinese drywall until news

11     stories hit in 2009, so you can't say they had

12     knowledge of Chinese drywall in 2002.

13            It's not whether or not they knew that the

14     defect was from Chinese drywall.  It's whether or

15     not they knew at the time of purchase whether

16     there something defective about the property.

17     Was there an odor?  Did the former owner report

18     having appliances fail or something of that

19     nature that's associated with the defective

20     drywall?  We just don't know that from the

21     information.  So the time period for when they

22     purchased it just isn't relevant.

23            Thank you.

24            MS. GRANT:  Good afternoon.  My name is

25     Allison Grant.  We now have five that are in

April 10, 2019

```
 1        dispute here, the specifics of which are

 2        addressed in our brief and I'm going to talk

 3        about BNBM's at the end.

 4             But our general response here is that

 5        knowing that a property has Chinese drywall prior

 6        to purchasing, it doesn't necessarily disqualify

 7        a claim.  What is knowledge?  Is it knowing

 8        that -- or is it the disclosure of Chinese

 9        drywall in sales documents?  Is it knowing that

10        the property is toxic?  Is it knowing what you

11        need to do in order to fix the property?

12             There's a lot of complications here, and to

13        say that simply because somebody had knowledge of

14        Chinese drywall, therefore, they are not entitled

15        to any damages, it's simply not the case.

16             Purchasing a property with Chinese drywall

17        is not the same as -- Taishan had cited a case

18        where a plaintiff continued to buy flushable

19        bathroom wipes after knowing that they were not

20        flushable.  I kept thinking about that.  You

21        know, how in the world is that anywhere near what

22        we've dealt with with these plaintiffs, who

23        purchased property and have no idea what's wrong

24        with their -- what's wrong with their homes.

25             This is a problem that took quite some time
```

1    to evolve.  So to say automatically, "You had

2    knowledge; therefore, you have no damage" is

3    simply not true.

4         But more importantly, knowledge is perhaps a

5    comparative fault type affirmative defense.  It's

6    not appropriate here.  Affirmative defenses have

7    been waived.  These defendants are in default and

8    they cannot raise the affirmative defense of

9    knowledge.

10        As to BNBM, there were three, and I believe

11   you said one that we're in agreement on.  I

12   cannot address Kelly, I don't have the facts of

13   that case, but I can talk about Lang, which

14   happens to be my client.  We don't know why it

15   was blank.  We submitted our paperwork, we did

16   the forms.  Apparently, there were a few

17   glitches, and we'll talk about that later on, so

18   I don't know why, when you clicked on the form,

19   it wasn't there.

20        Once we were notified that there was a

21   problem, I personally took care of it and

22   uploaded it.  I don't have the date before me,

23   but that was several weeks ago.

24        So to say we don't have the information is

25   simply not true.  It is in the portal and I know

April 10, 2019

1    the defendants have been notified of that fact.

2         In terms of -- this is a home that was built

3    in 2001.  So most of the drywall that we've been

4    discussing is 2006, and we do have some that we

5    have not addressed because that's in our BNBM

6    contest, the drywall was manufactured in '01.  So

7    this homeowner purchased drywall in 2002 and she

8    had no knowledge on her SPPF form of any

9    indication of Chinese drywall.  So to say that we

10   simply don't know what her situation was and,

11   therefore, you must put her off -- to the

12   off-track makes absolutely no sense.

13        SPECIAL MASTER LEE:  Question.

14        MS. GRANT:  Sure.

15        SPECIAL MASTER LEE:  When you talk about the

16   issue of knowledge being very complicated and,

17   you know, did it come from sales documents,

18   whatever, doesn't that sort of suggest that there

19   is a need for some discovery on some of these or

20   that there is some individualized analysis that

21   has to be done?

22        MS. GRANT:  Sure, in a case where you're not

23   in default, but in this case, they are in

24   default.  It's an affirmative defense, it's been

25   waived.

```
 1          SPECIAL MASTER LEE:  Okay.  Thank you.

 2          MR. DAVIDSON:  If I can just provide one --

 3    I tracked down the Lang claimant.  So we pulled

 4    up the BrownGreer profile form and it looks like

 5    the Supplemental Plaintiff Profile Form was

 6    updated on April 4th.

 7          SPECIAL MASTER LEE:  And what does it say?

 8          MR. DAVIDSON:  Sure.  So the original was

 9    March 19th, 2018, that's the blank one, and the

10    first amended supplemental was April 4th.

11          SPECIAL MASTER LEE:  And what does it say

12    about knowledge?

13          MR. DAVIDSON:  I think that's the one where

14    they -- on the day that our contests were being

15    filed, that's when they said, no, not aware.

16          SPECIAL MASTER LEE:  Okay.

17          MR. VENDERBUSH:  Can I just give a quick

18    response on C?  And that is what has not been

19    waived by default is their burden to prove actual

20    damages under Florida law.  And also, I'm just

21    being real clear that we're not asking Your Honor

22    to disqualify any claim.  She came up and said

23    that's not a reason to disqualify a claim.  It

24    may or may not be.  We think it is in a

25    particular -- in the particular case, we think,
```

April 10, 2019

```
1        with Mr. Coratti it is.

2             But for Your Honor -- for the Special

3        Master's purpose, that's not the question.  The

4        question is is it someone who can receive the

5        remediation formula.

6             SPECIAL MASTER LEE:  Okay.

7             MS. EIKHOFF:  Would you like to move on to

8        the next?

9             SPECIAL MASTER LEE:  Uh-huh.

10            MS. EIKHOFF:  Okay.  The next category is

11       one that you have heard about in the opening

12       remarks by the parties, and it's an important

13       one.  It is our objection and contest to the

14       imposition of the formula to plaintiffs who are

15       not current owners, and I want to make one thing

16       very clear, because I heard Mr. Montoya say in

17       his opening remarks that they don't want to pay

18       former owners.  Right?  How dare these defendants

19       come in here and after all of this time that's

20       passed and all of this litigation, how dare they

21       say they don't want to pay former owners.

22            We are absolutely not saying that.  We've

23       never said that.  Former owners should be paid

24       the damages that they are entitled to under

25       Florida law.  Period.  Full stop.  Okay?
```

April 10, 2019

1          So what's the remedy that we're seeking

2     here?  These claimants who are former owners

3     cannot get the formula.  Because they can't get

4     the formula, they need to be off-tracked to

5     determine what the appropriate measure of damages

6     would be.  It's a different measure of damages

7     from the formula.  It's damages, it's just not

8     what the formula would output as a mathematical

9     equation on a spreadsheet.

10          There are a couple of reasons for this.

11     Importantly, Florida law prohibits the

12     application of the formula to former owners.

13     Davey Compressor is the Florida Supreme Court

14     case that says the cost of restoration, like

15     remediation damages, cannot be adopted as the

16     measure of damages where restoration is

17     impossible, where remediation is impossible.

18          So if somebody has sold the home and they

19     live in another place and some new owner lives

20     there, giving the former owner money to remediate

21     that property is prohibited under Florida law

22     because it's impossible.  They can't use that

23     money to repair a home they no longer own.  It

24     doesn't make sense.

25          And we addressed this case, this is a

April 10, 2019

1      seminal Florida case on this point, and the

2      plaintiffs did not address this case at all in

3      their brief and response.

4           Instead, what they did -- and we heard it

5      again this morning -- is they said, "But Judge

6      Fallon has already ruled on this and Judge Fallon

7      included former owners in the class and,

8      therefore, they are trying to relitigate this all

9      over again.  It's very clear that the law of this

10     case is that the formula needs to apply to former

11     owners as well as current owners."

12          The formula damages has never been

13     authorized in this case to apply to former

14     owners, never.  Just the opposite.

15          Judge Fallon, in the order that created the

16     formula, it was the April 21st, 2017 FOFCL,

17     Findings of Fact and Conclusions of Law, he

18     expressly said this formula applies to current

19     owners only.

20          And if you were to read their brief, you

21     would probably be left with the impression, oh,

22     Judge Fallon has already ruled this definitely

23     applies to former owners, this is an issue that

24     is just res judicata now.  Right?

25          That's not true, because just a couple weeks

April 10, 2019

```
 1        ago the plaintiffs filed a brief to Judge Fallon

 2        in the MDL asking him to apply the formula to the

 3        claims of former owners, and our response to that

 4        brief is due later this week.  It's going to be

 5        argued in April.  This is not an established

 6        principle in this case, and it is wrong to

 7        believe that it is.  It has never been authorized

 8        in this case.

 9             So what would the damages be?  Right?  We're

10        saying they are entitled to something.  What

11        would it be?  It's not the formula.  It's going

12        to depend on facts and circumstances.

13             So let's say that the person who was the

14        plaintiff in this case, who is a plaintiff in

15        this case, they had Chinese drywall, assuming --

16        let's presume that it was made by Taishan, in

17        their property.  Then they sold the property.

18        They never remediated, they sold it, Chinese

19        drywall.

20             Their damages would be the diminution in

21        property value as a result of the Chinese

22        drywall.  What should it have been?  What was the

23        value it should have been?  What was it but for

24        the presence of Chinese drywall?

25             You just saw an example of that.
```

April 10, 2019

```
 1        Mr. Venderbush showed the guy who knew the house

 2        had just sold for $725,000.  He bought it for

 3        $175,000.  Diminution in property value, right?

 4        That would be the damages.

 5             So let's say that that first guy, the first

 6        owner of the property who bought it for 725 with

 7        Chinese drywall and then they sold it for 175,

 8        they could argue that that delta between what

 9        they bought it for and what they had to sell it

10        for would be their measure of damages.

11             And that's Florida law.  Florida law -- the

12        Airtech Service case says where the property is

13        not repaired before sale, the measure of damages

14        is not the cost of repair.  Right?  It's the

15        diminution of property value at the time of sale.

16             And that's going to require an

17        individualized, transaction-specific property

18        value assessment.  You don't have enough facts in

19        front of you now to determine what everyone's

20        diminution in property value is.  That's going to

21        take an individualized assessment of the

22        transaction, the property values, and what it was

23        and what it ended up being.

24             Now, it's a different scenario, though, if

25        the former owner remediated before the sale.  So
```

1      there is still a plaintiff in this case, they had

2      Chinese drywall, they had to remediate it, they

3      paid to have it remediated, and then life moved

4      on and, for whatever reason, they moved away from

5      the house, but they still claim that they were

6      harmed because they are out-of-pocket what they

7      had to pay to remediate their house.  That would

8      be the measure of damages.

9           Florida law requires that the measure of

10     damages for someone who has already remediated is

11     the reimbursement, so to speak, of what their

12     reasonable remediation costs were, and that

13     former owner would be entitled to that just like

14     a current owner would be entitled to that if they

15     never sold the property, whatever their

16     out-of-pocket reasonable costs were for the

17     remediation.

18          That's it.

19          MR. MOREN:  Good morning, Your Honor.  I

20     just have a few more points to add to what

21     Taishan said.

22          Consistent with what Christy just explained,

23     the diminution in value is appropriate for a

24     former owner who has not done any remediation

25     before the sale, because awarding them damages

April 10, 2019

```
 1        under the formula for remediation would be giving
 2        them a windfall for something that they cannot do
 3        and they have no intention to use this money for
 4        doing the cost of remediation.  They no longer
 5        own the property, they no longer have control.
 6             Similarly, to expand out a point that
 7        Christy made, in that situation where you had an
 8        owner who sold the property for $225,000 and then
 9        the second owner purchased it for $175,000,
10        you've got a potential problem with the double
11        dipping here.  If you're going to award damages
12        under the formula to the former owner, you have
13        the problem where the current owner also has a
14        claim for damages for the cost of restoration.
15        So, basically, you would be awarding the same
16        type of damages -- or you wouldn't be awarding
17        them because we don't know if the claim has been
18        made, but there is this potential that two
19        different plaintiffs can claim the same damages
20        to repair the property.
21             We also wanted to bring up one particular
22        plaintiff where there is a factual dispute over
23        whether or not this plaintiff is the current
24        owner.
25             So we have asserted that Plaintiff
```

April 10, 2019

```
 1        Number 477, the Goldmans, are not the current

 2        owners.  The records show that the property is

 3        owned by a bank.  The plaintiffs have argued that

 4        they have appealed the foreclosure and the bank's

 5        ownership.

 6             The fact remains that they acknowledge that

 7        these plaintiffs are not the current owner.  So

 8        if there is some dispute in the future about who

 9        is owning this property, that can't be resolved

10        right now, today, and making an award of damages

11        under the formula would be inappropriate for this

12        plaintiff.

13             MR. MONTOYA:  We're on Slide 16, I think.

14        Thank you.

15             Judge, this was the issue that I alluded to

16        earlier in the opening, versus the current and

17        former owners, and if you follow Judge Cooke's

18        order, and that she adopted all of Judge Fallon's

19        wherein the class definition says "current and

20        former owners," Judge Cooke's Trial Plan does not

21        distinguish between current and former owners for

22        the purpose of awarding remediation damages under

23        the formula.

24             That was the task that you were charged

25        with, which is to determine the remediation
```

April 10, 2019

1     damages.

2          Later down the line she may decide it's

3     something different.  I'm not going to sit here

4     and tell you that she may not, but your charge is

5     to determine those remediation damages under the

6     formula, the spreadsheet that is in front of you.

7          I've already said as a practical matter, I

8     think we all understand that both sides may end

9     up taking your report and recommendation up to

10    Judge Cooke.  She can then make that

11    recommendation.

12         In terms of the scope of your duty in this

13    case, that was not detailed in the task that was

14    assigned to you in terms of determining that.  I

15    think that would be outside of your scope,

16    frankly.

17         If we can go to the next slide.

18         Again, Judge Fallon said current and former

19    owners are in the Amorin class, and it's the

20    exact issue I alluded to earlier:  To reward the

21    defendants for their delay tactics in this

22    litigation, which is going in and out of the

23    jurisdiction, having been found in civil and

24    criminal contempt in this case, and having

25    delayed these proceedings for as long as they

1    have.

2         This comes from one of Judge Fallon's

3    orders, and it's detailed in this slide.

4    October 11, 2018, just last year, ECF 992 at 11

5    and 12, he said, "...given the glacial speed with

6    which this case has progressed, by the time the

7    case is resolved, there will be very few class

8    members left, if any.  Such a construction is

9    untenable and leads to an absurd result."

10        The longer this goes on, the longer you

11   don't award remediation damages, the longer this

12   takes, every day it affects these homeowners.

13        So we encourage you to stay within the

14   Court's order to you and the focus of this and to

15   order remediation damages.  If something is going

16   to be changed later, it's appropriately in the

17   hands of Judge Cooke at that time.

18        SPECIAL MASTER LEE:  Did the parties have

19   any argument before Judge Cooke about Florida law

20   as to who gets remediation damages and what other

21   type of damages you get if you are a former

22   owner?

23        MR. MONTOYA:  The arguments were whether or

24   not Judge Cooke was going to adopt Judge Fallon's

25   orders and reasoning or not, because she adopted

April 10, 2019

```
1    them in full.
2         MR. VENDERBUSH:  Because the argument was
3    whether she was bound by MDL law, by Eleventh
4    Circuit law, to follow what -- to adopt Judge --
5    or whether she -- and when she could revisit
6    those.
7         SPECIAL MASTER LEE:  I'm just trying to
8    understand if there was a point for her to
9    consider sort of the --
10        MR. VENDERBUSH:  We were talking about
11   Eleventh Circuit and MDL law.
12        SPECIAL MASTER LEE:  Okay.
13        MS. DUGGAN:  If I may, prior to entry of the
14   trial plan by Judge Cooke, there was significant
15   briefing.  The Court asked both parties to submit
16   their briefs.  The defendants submitted briefs to
17   reject the remediation damages formula.  BNBM
18   submitted a brief to enforce its rights, they
19   submitted a brief to enforce discovery.  And she,
20   in her trial plan, declared all of those ruled
21   upon when she adopted this order.  So our
22   position is it's already been addressed.  I
23   understand they want to raise it again, and the
24   parties are never going to come to an agreement
25   on this point.
```

April 10, 2019

```
 1              SPECIAL MASTER LEE:  All right.  When --
 2              MR. VENDERBUSH:  Our position is we haven't
 3        addressed it.
 4              SPECIAL MASTER LEE:  Okay.  So when you had
 5        that whole back-and-forth and all the briefing,
 6        was the point about this difference between
 7        current and former owners presented to the Court?
 8              MS. EIKHOFF:  Not to Judge Cooke, never, no.
 9              SPECIAL MASTER LEE:  Okay.
10              MR. MONTOYA:  Thank you.
11              MS. EIKHOFF:  If I may just quickly respond.
12              We showed you in our opening that we think
13        that the plaintiffs' view of the scope of your
14        duties as special master is being distorted in
15        their rendition.  And so you hear this refrain of
16        A-B-C, it's as easy as 1, 2, 3, A-B-C, that's all
17        you need to do, A-B-C, you need to just apply the
18        formula to the claims that we present to you.
19              All of that forgets the D.  There is a D in
20        Judge Cooke's order, and the D is contests and
21        set-offs, and that's part of your charge, too.
22        And all property damages were delegated to you as
23        the special master.  The individual adjudications
24        are on a separate track, and those are for other
25        damages.
```

April 10, 2019

1              And so, we know that Judge Cooke is

2       expecting you not just to apply the formula to

3       whatever spreadsheet the plaintiffs give you, but

4       to evaluate the legal and the factual contests

5       that are raised in Section D, and that's exactly

6       what we are doing today.

7              And one thing we know that Judge Cooke was

8       not asking you to do was to disregard Florida law

9       or to violate Florida law, and it's starting to

10      almost sound like they're saying why don't you

11      just go ahead and do that because -- just apply

12      the formula and if there is a problem with it,

13      let Judge Cooke deal with it.

14             We don't think that that's at all what Judge

15      Cooke expected you to do, to issue an unlawful

16      report and recommendation on property damages and

17      just expect that she can clean it up on the back

18      end.  That would not be doing a service.

19             Now, it is true, as Mr. Montoya showed you,

20      that Judge Fallon said that the class is composed

21      of former and current owners.  We do not dispute

22      that.  It does not follow that the formula

23      applies to everyone in the class, and the reason

24      that's crystal clear is that the class damages

25      formula that Judge Fallon issued explicitly said

April 10, 2019

```
 1        this formula only applies to current owners, and
 2        they know that because just a few weeks ago they
 3        filed in the MDL a motion saying, hey, could we
 4        also have this apply to the former owners?  And
 5        Judge Fallon hasn't made that decision yet.
 6             MR. VEJNOSKA:  If I could just add one last
 7        thing:  If and when Judge Fallon makes that
 8        ruling, he's not going to make it under Florida
 9        law.  He doesn't have the Florida claimants in
10        front of him.  He has the Louisiana claimants in
11        front of him.  And what he does will still need
12        to be done here and it's going to be under a
13        different law.
14             So that's -- and the other thing I'll say is
15        if you do it the way the plaintiffs want you to
16        do it, I can almost guarantee that this is going
17        to boomerang right back here.  If you send
18        something to the Judge and you say, well, you
19        know, there may be questions about this or that
20        or something else, the Judge is going to send it
21        back to you, I have to assume, and say, well,
22        decide those, make me a recommendation, I don't
23        want to have to go through 1700 claimants and
24        decide what the individual facts are for each
25        one.
```

April 10, 2019

```
 1            So to say that you just apply the formula

 2       and it includes former owners and that you should

 3       just make the decisions and we'll let Judge Cooke

 4       sort it all out seems completely contrary to what

 5       you've been doing for the last three or four

 6       months and what the Judge expects.

 7            MS. EIKHOFF:  We have one more property

 8       ownership based contest, and so I was going to

 9       suggest that maybe we get through that one and

10       then take a break.  Would that be okay?

11            SPECIAL MASTER LEE:  Sure.

12            MS. EIKHOFF:  All right.  The next one is E,

13       so this is under the umbrella of property

14       ownership.

15            We asserted this contest to the claimants

16       that never owned the property.  There are

17       plaintiffs on the Amorin intervention complaint

18       that you will not find on any property deeds for

19       the subject properties that they are asserting a

20       claim for, and our remedy for this, that we

21       suggest, is that these should be off-tracked

22       because, again, they have a different measure of

23       damages from the formula.

24            They are not entitled to class formula

25       damages because they are not class members.  So
```

April 10, 2019

1       the class definition says that the class is

2       comprised of owners of real properties, and the

3       plaintiffs that fall into this category are

4       essentially condo associations.  There are a lot

5       of condo association claims that have been

6       asserted, and I'm sure you will hear about it

7       from the plaintiffs as to why the condo

8       association is asserting it, but they're not part

9       of the class, and so Judge Fallon's class damages

10      formula for current owners, this can't apply to

11      them.  They are in a different category.  They

12      are a horse of a different color.

13           And we're not saying this only to just be,

14      like, oh, ticky-tacky, it says -- the class

15      definition says owners and they are not real

16      owners.

17           This is also common sense, because these

18      claims aren't like the others.  Right?  Like the

19      whole idea of a class, to the extent that there

20      is a class here that's been certified, is that,

21      okay, these claims are common, they are common

22      claims, they raise common issues.

23           But just look at these condo association

24      claims.  These condo association claims are

25      unique.  Their brief has more than 12 pages

April 10, 2019

1       dedicated to explaining to you why the condos are

2       -- the condo associations are bringing the claim

3       and not the unit owner who lives there.  And by

4       the way, the unit owner is also a plaintiff in

5       this case.  And so they've got the plaintiff over

6       here and then they've got the condo association

7       over here, and they've got all kinds of statutory

8       explanations and factual explanations as to why

9       they have structured it that way and it's just

10      the way they've done it for all these years and

11      it's worked and so we shouldn't ask any more

12      questions about it.

13          But we're here now to contest that these

14      claims don't belong in this process, and we're

15      not saying again that they don't ever have a

16      claim or that they have no standing to bring a

17      claim.  We're just saying their claims are

18      different and need to be treated differently in a

19      forum that is going to take into account all

20      these unusual relational facts that they are

21      presenting to you.

22          And so that is our position as to why these

23      should be off-tracked.

24          MR. MOREN:  So, Your Honor, we are bringing

25      this objection against plaintiffs who alleged

April 10, 2019

1       BNBM drywall not against a condo association but

2       against two claims where plaintiffs acknowledge

3       that the plaintiff bringing the claim was not

4       ever the owner of the property.  The owner

5       appears to have been an LLC, and this plaintiff

6       in Claims Number 194 and 195, this plaintiff is

7       bringing claims in his individual capacity for

8       this property that he did not own.

9           Now, he may have had some -- the plaintiffs

10      assert that he had been an agent of the LLC, but

11      the LLC is not currently active.  So whatever

12      needs to happen with this claim, it needs to be

13      properly adjudicated under Florida law on

14      corporate entities.

15           What is the significance that the LLC was

16      the owner of this property?  The LLC sold the

17      property.  This claimant is not bringing it on

18      behalf of the LLC.  So Florida law on this claim

19      needs to be resolved before claimants can recover

20      any damages for this property -- for these two

21      properties.

22           Thank you.

23           MR. MONTOYA:  Slide 18, please.

24           So my ears perk up as a class action lawyer

25      when I hear "individualized" and "unique."  And

April 10, 2019

1    what that means is we're going to defeat class

2    certification, we're going to take another shot

3    at it.  That's really what's happening here.

4         They are saying that these aren't class

5    members.  That's what's happening.  They are

6    saying they don't own the properties.  That's one

7    of the things they can object to.  They are

8    talking about off-track, but they're really

9    telling you don't do it because they assume they

10   don't own the properties.

11        These are all condo associations.  Condo

12   associations are not unique in Florida.  There's

13   over 30,000 condo associations in Florida.

14   Condominium associations are creatures of

15   statute:  718.111.  718.111(3) sets forth the

16   rights, duties, obligations of an association,

17   and one of those things that the associations can

18   do is bring lawsuits and maintain lawsuits and

19   settle lawsuits.  In fact, they have a fiduciary

20   duty to do so.

21        This is -- it's unique in the sense that

22   Florida has a lot of condominiums, that's true,

23   and Florida has developed its own body of law on

24   condominium associations.  We cited to Florida

25   Rules of Civil Procedure 1.221 as persuasive

April 10, 2019

```
1     authority, and 1.221 tells you that the

2     legislature here has made an easier path towards

3     class certification.

4          I understand it's not Rule 23, and I

5     understand it's not Rule 1.220 of the Florida

6     Rules of Civil Procedure that we're here about

7     today.

8          From a pleadings standpoint, all of these

9     condominium associations have been on these

10    complaints.  They are on notice.  The unit

11    numbers are there.  There are common elements in

12    terms of -- there's two different sets of

13    claimants:  There's individual units within a

14    condominium association where the association is

15    making claims on behalf of; and there's common

16    element areas.

17         What they are saying is because the

18    associations are not a titled owner to those

19    specific properties, then they don't fall within

20    the class definition, but we know by statute that

21    the association has a right to bring these

22    lawsuits.

23         I could not plead, as a practical matter, a

24    nominee complaint in trying to get these claims

25    in front of the Court 10 years ago, nine years
```

April 10, 2019

```
 1        ago, eight years ago, every single individual
 2        unit necessarily, but they have all that
 3        information.  They know which units are at issue.
 4             So Florida law tells you -- Florida Rules of
 5        Civil Procedure tell you -- if you look at what
 6        the Florida Rules of Civil Procedure do, you've
 7        got Rule 1.220, which is the basic class action
 8        rule, which tracks Rule 23.  Rule 1.221 doesn't
 9        do commonality, it doesn't do numerosity, it
10        doesn't do typicality.  It simply says:  Is there
11        a common interest?
12             And that's the same thing that 718.111(3)
13        tells you about the power of the associations to
14        maintain and settle lawsuits, is it's in the
15        matter of common interest to the association and
16        the unit owners.  Of course it is.
17             We're talking about drywall.  In these
18        condominiums, it's common to share walls, you
19        share drywall, you share toxic and defective
20        drywall.  It's a matter of common interest to get
21        that stuff out of there and remediate it.  In a
22        common element, in a hallway, all the individual
23        unit owners are going back and forth along that
24        hallway.
25             So simply put, it is a matter of common
```

April 10, 2019

1    interest, which triggers 718.111(3), which gives

2    the condominium associations standing to bring

3    those claims.

4         If you go to the next slide, please.  I've

5    got it.  Thank you.

6         718.111(3), the Florida legislature has

7    expressly given condominium associations the

8    authority to "institute, maintain, settle, or

9    appeal actions or hearings in its name on behalf

10   of all unit owners concerning --" there's that

11   term -- "matters of common interest to most --"

12   most, not all -- "to most or all unit owners --"

13   and you have the illustrative language of

14   "including, but not limited to," and it runs

15   through several different owners.

16        Again, "including, but not limited to,"

17   which keeps it open to bring lawsuits like this.

18        There are nine of these associations with

19   283 properties.  If there was anyone who had the

20   ability to contest the standing of the

21   association in this matter, it would be an

22   individual unit owner saying, hey, condo

23   association, you can't do this, this is my claim.

24        Well, what have we done?  The individual

25   unit owners' claims are also in this lawsuit.

April 10, 2019

1       They are on your spreadsheet at Exhibit A.  And

2       what we did in Exhibit A, when there is an

3       association claim and an individual unit owner's

4       claim that are the same claims, we've put zero

5       down for square feet for the individual unit

6       owners because we don't want to double dip.  The

7       claim for the remediation damages stands in the

8       same of the association, so we're not trying to

9       have two claims here, so we've limited it in that

10      fashion.

11           So, again, through 718.111(3) and as a

12      matter of common interest, the association has

13      the ability to bring these claims.

14           Thank you.

15           Counsel, anything to add.

16           MS. GRANT:  Yeah, if I could add one thing,

17      if I may.  There are 126 instances where the unit

18      owner also filed a claim, and actually, I think I

19      represent most of those.  So on our SPPFs we

20      specifically reference the condo association

21      standing, both from the condo's SPPF and the

22      individual's.  So there is no question as to

23      double-dipping, as Mr. Montoya stated.

24           I wanted to also mention the importance of

25      the condominium association bringing a claim is

April 10, 2019

```
1        there are more than 126 units.  There are people

2        who did not file claims for lots of reasons.

3        They were foreclosed, they were gone, sadly some

4        were diseased.  So a condo association still has

5        to pursue that claim.

6              Let's say we have 10 condo units in a row, 1

7        through 10, and Unit Number 5 is gone, absent,

8        deceased, whatever the case may be.  If the

9        condominium association is not the one to bring

10       that claim and the unit owner is gone, then what

11       would happen to that unit?  What would happen is

12       that the members of the association would

13       ultimately end up presumably paying for that.

14       That's an affected unit and that affects

15       everybody in the condo association.  It affects

16       them because they share walls, it affects them

17       because sometimes it has a horrific odor,

18       depending upon the layout of a condo, you open up

19       a door.  It affects values.  It affects

20       everything under the sun.

21             We know with condos in Florida, they can be

22       wonderful and they can also have a downside.

23       They are very strict.  So everything you do in a

24       condo, most condos, is governed by the

25       association.  You can't just fix your drywall.
```

April 10, 2019

```
1        It has to go through the association.  You can't

2    do anything so long as it affects anybody else.

3    And that's what we're talking about here with the

4    Chinese drywall.

5        So what's really important is not only the

6    126, which we've addressed, but those claims that

7    are not brought by any individuals and that the

8    association must pursue, and that's their right,

9    that's their standing.

10        I just wanted to mention one thing about

11    differentiating between -- we talked about common

12    elements and units.  Units also have common

13    elements.  Condominium documents address that:

14    What is the boundary of a unit?  We don't need to

15    get into that because they're generally the same.

16    They talk about perimeter walls and load-bearing

17    walls.

18        I don't want to get too complicated, but the

19    point is there are certain parts of a condominium

20    that actually are common elements, and that's

21    critical for -- well, it's important because,

22    one, we've got an association bringing a

23    representative claim, but they are also bringing

24    claims in their own right for common elements.

25        We have -- I represent an association, Luna
```

April 10, 2019

1     Ocean Residences.  It's a high-rise, 10 stories,

2     a beautiful building in Pompano Beach.  There is

3     10,000 square feet of hallways that have Chinese

4     drywall.

5          The defendants have not disputed the

6     calculations in term of square footage, but it,

7     too, also received this E objection:  Never owned

8     the affected property.

9          Well, of course, the association doesn't own

10    the hallway.  There is no -- you can't look up a

11    deed for the hallway.  I mean, that's crazy.  It

12    just doesn't make sense.

13         You have to step back and say what is the

14    intent here?  What did Judge Fallon intend when

15    we were dealing with class notice?

16         And yes, it does say "owners of real

17    property," and what that was designed to address

18    is we don't want tenants, you know, somebody who

19    is not an owner of a property filing a claim.

20         But he never intended -- and he certainly

21    could have said so if that was the intent -- to

22    exclude condos, and we know that's not what was

23    intended because throughout this case -- again,

24    it's been since 2009 we've listed these -- we've

25    had numerous settlements, and they're through

April 10, 2019

```
1       Knauf, through builders, installers, and

2       suppliers, and how those settlements were handled

3       and administrated is very important.  I think

4       it's the law of the case here.

5            We did exactly what we've discussed here.

6       The condominium associations who brought the

7       claims -- and occasionally -- well, not

8       occasionally.  A lot of times there were unit

9       owners with duplicate claims.  They stepped back.

10      We weren't going to double-dip, I want to be very

11      clear about that, and the moneys were -- it went

12      through the association to administer

13      accordingly.

14           In some instances, that meant reimbursing a

15      homeowner if they already paid.  In others it

16      meant paying for the remediation.  But the

17      important point was that the moneys went to the

18      association because they are the entity with

19      standing.

20           And we heard Counsel say, "We're not

21      disputing standing here, but we want to take all

22      of these condos, these 283 properties, off-track,

23      let's push them to the side and we can deal with

24      them in another proceeding."

25           There is no reason for that.  They are just
```

April 10, 2019

1        like any other unit owner that are entitled to

2        remediation damages.

3            MS. EIKHOFF:  Just a brief response to that

4        because, again, like the pages and pages and

5        pages we saw in the brief about the Florida

6        statutes and condo associations being special

7        under Florida law, the condo associations are

8        plaintiffs in this case, so they are not like the

9        contest A people we started off with when we

10       said, they're not on the list.  These guys are on

11       the list.  They're on the list, but they are not

12       members of the class.

13           The class literally says it's for owners of

14       real property, and it makes sense that they are

15       not part of the class because they are so

16       different from the other claims here.

17           And so you hear about, well, like, so we've

18       got a hallway that needs to be redone and so one

19       of our claims is for a hallway that needs to be

20       done.

21           That's not like the other claims in this

22       group.  That's not like what was being intended

23       when these were certified as a class.

24           And Ms. Grant talked about, well, it's the

25       law of the case that they should be included.

April 10, 2019

1          Well, you don't have law of the case based

2     on prior settlement agreements.  Okay?  So in a

3     private settlement agreement where there is a

4     class settlement that is set up, that class for

5     settlement can include whoever the parties want

6     it to include.  That does not adjudicate them to

7     be members of this class because they were part

8     of another class settlement.

9          And this is a big issue.  These are hundreds

10    of their claims that they have brought

11    representing these condo associations which raise

12    these unique and kind of weird issues, but there

13    is a lot of money at stake.  I mean, they've

14    got -- what is this, one claim?

15          MR. VENDERBUSH:  That's one claim, yeah.

16          MS. EIKHOFF:  There is a condo association

17    bringing one -- one of the claims is a $20,000 --

18          MR. VENDERBUSH:  It's a 10.

19          MS. EIKHOFF:  Oh, that's a 10?  That's a 1,

20    right?

21          MR. VENDERBUSH:  Right.

22          MS. EIKHOFF:  It's a 10,000 square foot area

23    for $948,000, and they are saying just run it

24    through, run it through the formula, run it

25    through, don't stop and think about it.

April 10, 2019

1           But they are not eligible for the class

2      formula.  They may be eligible for damages, but

3      not class formula damages because they are not

4      members of the class.

5           MS. DUGGAN:  With permission, I would like

6      to just make one statement, if I could, because

7      Ms. Eikhoff keeps focusing on the fact that she

8      claims they are not class members.

9           When Judge Fallon certified this class --

10     I'm going to repeat it again -- there are no

11     absent class members, there are only active

12     litigants.  The Court approved a class notice to

13     go out to all of the active litigants, and these

14     condo associations that are named on the

15     complaint received notice.  They are class

16     members.  That's a fiction they're now creating.

17     They are class members.

18          I understand they're arguing they shouldn't

19     be entitled to the formula damages.  That's a

20     separate argument.  They are class members.

21          MS. EIKHOFF:  Do you want to keep going or

22     do you want to take a brief break?

23          SPECIAL MASTER LEE:  A break is good.

24          MS. EIKHOFF:  Okay.

25               (Discussion off the record.)

April 10, 2019

1          MS. GRANT:  I just wanted to briefly say --

2     this is Cardozza.  I'm sorry, I don't have the

3     claim number in front of me.

4          The LLC is Hurricane Holdings, LLC, and it

5     is -- was -- the two members of it were husband

6     and wife, the Cardozzas.  And so we've alleged in

7     our brief -- we discussed it in our brief, I

8     don't need to go back through that, but the LLC

9     was dissolved, so the Cardozza -- Mr. Cardozza's

10    name appears on the complaint.  There's no

11    confusion about what property this is.

12         As an LLC with two members that are, I

13    guess, the equivalent of a single-member LLC when

14    you are dealing with a husband and wife, once the

15    LLC dissolves, you know, that individual owner

16    absolutely has the right to pursue the claim.

17         And, again, this is not a question of

18    notice, we didn't know.  They certainly knew,

19    they certainly knew.  That's all I wanted to add.

20         SPECIAL MASTER LEE:  Thank you.  Now we'll

21    take a break.

22         (Recess from 11:33?a.m. until 11:42?a.m.)

23         MR. LAWSON:  Matt Lawson for Taishan.  Good

24    morning, Ms. Lee.

25         So we've reached the Supplemental Plaintiff

April 10, 2019

1    Profile Form section of today's objections and

2    contests.  I wanted to give a little bit

3    background to explain why we've been talking

4    about these so much.

5        Ms. Eikhoff touched on it a little bit

6    earlier, but I think it's important to note how

7    central these forms are to this entire contest

8    process.  That will inform a lot of what we

9    discuss with these next few objections.

10       Going back to 2017, Judge Fallon's April

11   2017 order, he gave Taishan the right to contests

12   and set-offs in his class damages order, and

13   later on that year Judge Fallon said that we were

14   entitled to additional discovery on damages to be

15   able to make our contests and set-offs, because

16   discovery for damages had not been done before,

17   specifically discovery for remediation and the

18   status of remediation for affected properties had

19   never been done before in the MDL.

20       So the plaintiffs and the defendants got

21   together to be able to discuss a Supplemental

22   Plaintiff Profile Form, a form that all of the

23   claimants would fill out, verify, sign saying

24   that it was true and complete to their knowledge,

25   and submit it to us so we could get the discovery

April 10, 2019

1        in an efficient way to be able to answer our

2        questions about remediation damages and other

3        damages for these claims.

4             The parties met and conferred on that form,

5        they completed the form, they gave it to Judge

6        Fallon, and he blessed it in a pretrial order in

7        early 2018, and every claimant had a set deadline

8        to be able to submit that form.

9             Now, that first deadline was over a year

10       ago, back in March 2018.  There were extensions,

11       there were show cause periods, and then

12       eventually, the Florida claims were remanded to

13       the Southern District of Florida.

14            Once again, Judge Cooke gave these claimants

15       an opportunity to be able to submit Supplemental

16       Plaintiff Profile Forms.  In fact, she set a

17       deadline to be able to submit completed

18       Supplemental Plaintiff Profile Forms, a

19       January 14th, 2019 deadline.

20            Even before that deadline, if you look at

21       Item Number 1 in the plaintiffs' -- excuse me, in

22       the Court's trial plan for property damages, Item

23       Number 1 tells the plaintiffs that they need to

24       submit three lists:  The first list, to be able

25       to explain any claimants with completed

April 10, 2019

```
 1       Supplemental Plaintiff Profile Forms who do not
 2       have remediation damages; the second list, any
 3       claimants with completed Supplemental Plaintiff
 4       Profile Forms who do have remediation damages;
 5       and three, claimants without completed forms.
 6            Here under Objection F we have 15 claimants
 7       that are not in dispute they did not submit
 8       Supplemental Plaintiff Profile Forms before Judge
 9       Fallon's deadlines, before the deadlines imposed
10       by Judge Cooke, they still to this day have not
11       submitted those forms, and the plaintiffs have
12       marked those claims on their Exhibit A of their
13       brief with red lines re remediation damages.
14            They are pending dismissal before Judge
15       Cooke.  She has not issued that order yet, but at
16       this stage it is before her and on her desk.
17            There is one other claim that is in dispute.
18       We have subsequently filed a motion to dismiss
19       for that claim, a Magdalena Gardens claim, a
20       condo unit claim, and that motion to dismiss is
21       also before Judge Cooke.  We filed it yesterday.
22            This was a claim that we discovered through
23       this process did not have a Supplemental
24       Plaintiff Profile Form submitted before that
25       January 14, 2019 deadline that Judge Cooke set.
```

April 10, 2019

```
 1        The plaintiffs still listed it on their list of
 2    claimants with completed forms who had
 3    remediation damages, but that wasn't true.
 4        When we went through each individual file --
 5    and we went through all of them -- going through
 6    to be able to look at the forms, we realized this
 7    claim doesn't have one.  We flagged that in our
 8    preliminary objections to the plaintiffs, and
 9    then weeks later, that form finally was
10    submitted, but after this deadline.
11        So all of these are before Judge Cooke.
12    They are not something that we're asking you to
13    be able to take action on.  We already have a
14    remedy that is before Judge Cooke.  It will be
15    her decision on what to do with those claims,
16    whether to dismiss them as we've requested, or
17    otherwise.
18        MS. GRANT:  We are talking about one claim
19    out of 1700, 1800, that is in dispute here, and
20    it happens to be one of my places, one of my
21    clients.  Now, this one property, it's a condo,
22    the association is Magdalena Gardens, and there's
23    53 claims that we've presented.  For 52 of those
24    we filed SPPFs and uploaded our documents.  For
25    this one -- it's Unit 723, by the way -- I did it
```

April 10, 2019

1       myself.  I uploaded all the documents.

2           In March of 2018 I uploaded the remediation

3       contract, the photos, the invoices, proof of

4       payment, among a whole bunch of other things, and

5       I also uploaded the SPPF verification.

6           When you go on the portal, on the BrownGreer

7       portal, it shows you a description of the

8       document and then it will show you the date it

9       was uploaded.

10          I also uploaded an SPPF on April 2nd, 2018.

11      I can't tell you why, but it shows that it's

12      removed from the portal.  I wish I knew.  I don't

13      know what happened.  Presumably some technical

14      glitch.  No idea.

15          Had we known that this was an issue, I would

16      have taken care of it.  It was not in their

17      motion to dismiss.  It was in their objection --

18      in their contests, and I promptly took care of it

19      and submitted it.  So there is no issue.  It has

20      been submitted.

21          Is it timely?  Well, no.  It does not -- it

22      was not filed at the time -- it was the date we

23      just had before, January, it is after that, but

24      there is no question that they knew about this

25      claim, they know about Magdalena Gardens.  All of

April 10, 2019

```
1        the documents were in the portal.
2              I had an SPPF verification page.  Clearly,
3        there's a mistake.  They understand that.  This
4        is not an omission, it was nothing that was
5        deliberate, and for the life of me, I can't
6        understand why would you be changing that.  You
7        know, it just makes no sense here.
8              I think that's all I have on this one.
9              MR. LAWSON:  Your Honor, I don't think we
10       have anything further on that.  As I said, we
11       submitted a motion to dismiss for Judge Cooke, so
12       it's not actually a matter that's before you.
13             MS. GRANT:  I'm sorry.  It was last night,
14       by the way.
15             MR. LAWSON:  Yeah, I said that earlier.
16       Yes, we submitted it last night.
17             MS. GRANT:  Last night, late.
18             SPECIAL MASTER LEE:  I got it.  Yeah, I saw
19       it.
20             MS. GRANT:  Thank you.
21             SPECIAL MASTER LEE:  What's next?
22             MR. LAWSON:  So as I said for the previous
23       objection, F, we're now dealing with issues with
24       Supplemental Plaintiff Profile Forms, and in a
25       moment you're likely going to hear plaintiffs'
```

April 10, 2019

1      counsel stand up and say, "This is outside of the

2      scope of what you were supposed to do, this has

3      nothing to do with the trial plan or property

4      damages or the contests themselves."

5           And harkening back to Mr. Montoya's

6      reference to the Jackson 5, while they're playing

7      A-B-C, you can look at 1, 2, 3 of Judge Cooke's

8      property damage claims trial plan, just like I

9      was saying, it required them to provide lists of

10     plaintiffs with completed forms and plaintiffs

11     with lists -- or a list of plaintiffs who did not

12     have completed forms.

13          And again, having a completed form was the

14     ticket to be a part of this process.  If you

15     wanted to be considered for the remediation

16     damages formula or for remediation damages at

17     all, you needed to submit a completed form.  And

18     we know, from going back to when Judge Fallon

19     instituted this SPPF regime, every claimant was

20     required to not only fill out the entire form,

21     but also to be able to provide a signature.  Why?

22          Well, there's a lot of reasons for that, but

23     the first reason is because we needed to have a

24     verification that the information inside of the

25     SPPF was true and correct.

April 10, 2019

1        Now, here in Objection G we have a large

2   volume of claims where there was an amendment at

3   some stage in the process for that SPPF.  An

4   original SPPF was submitted, a verification was

5   given for that SPPF, but then somewhere in the

6   last year since these SPPFs have existed, an

7   amendment was submitted.

8        Now, with that amendment, there was

9   something missing, there wasn't a verified

10  signature on the SPPF.  So the client themselves

11  did not sign that amendment and say, "I agree

12  that this new amendment with different

13  information in it is true and correct under

14  penalty of perjury," the way that it was required

15  for all SPPF submissions to be complete.

16       Now, we agree that the language in Judge

17  Fallon's pretrial order was vague as to whether

18  amended SPPFs needed to include signatures, but

19  the plaintiffs have said that they are taking up

20  the task and have taken up the task to try to get

21  signatures for the amended SPPFs that they have

22  submitted over the last year.

23       Now, we got a count the other day from them

24  to say that they've gotten around 261 since our

25  preliminary objections to this back in February,

April 10, 2019

1      but there is 565 that we flagged here.  So we're

2      really talking about roughly half of them that

3      are still missing that verified signature.

4           Now, we have a proposed remedy that we've

5      discussed with the plaintiffs, and this is what

6      we are advocating for:  To be able to say that

7      unverified amendments are subject to be stricken

8      at the point that they have not received a

9      verified signature from the plaintiffs to this

10     point.

11          That means that we can go back, look at the

12     amendments that have been submitted without

13     verifications, and we will determine if those

14     verifications -- excuse me, if those amendments

15     contain new information that substantively

16     changed our view of those claims, that new

17     information would be stricken because that

18     amendment was never verified by the actual

19     claimant.  We don't know if that information is

20     true or not, so we would revert back to the

21     original SPPF submitted by these claimants to be

22     able to say what are our objections just knowing

23     what has been verified by this claimant.

24          To the extent that it changes them, we would

25     submit those to you.  I believe we talked about

April 10, 2019

1        it being within about a week to be able to go

2        through them and to be able to give you those

3        changes.

4             And we think that would be a fair way to be

5        able to resolve this issue where there is just

6        unverified information that has been amended and

7        added into this discovery process that leaves us

8        unclear and unable to determine whether the

9        client actually believes that it is true or if it

10       was submitted by their attorney without

11       verification from the client.

12            And we're not trying to be ticky-tacky with

13       this.  The reality with this is that there are

14       some troubling patterns in some of these SPPFs.

15       You can see that especially with changes to

16       "Remediation Status" that occurred after the

17       Court's remediation damages ruling.

18            Now, way back in November of last year,

19       Judge Cooke issued an order related -- with a

20       footnote, and this is the order that we've been

21       talking about, Property Damages Trial Order,

22       saying that completely remediated properties were

23       not entitled to the remediation damages formula

24       but instead entitled to actual costs.

25            Well, right after that order came out,

April 10, 2019

1       suddenly there was a volume of amended SPPFs that

2       had a single change.  They changed "Remediation

3       Status" from "complete," which would have

4       entitled them only to actual costs, to "partially

5       remediated," some within days, a few days of

6       Judge Cooke's order.  No verification was

7       immediately submitted along with those changes.

8               So we had an amended SPPF that, by all

9       indications, was not verified by the client,

10      changing a vital part of that SPPF only after

11      Judge Cooke notified all parties that remediation

12      status was going to affect whether they could get

13      the formula or not.

14              And that's why we were troubled by this, not

15      because the plaintiffs were endeavoring to be

16      able to add additional information.  We know that

17      for some of these they were simply adding

18      additional payments that the claimants received

19      in other settlements, updating that information

20      for us.  That's not what we're concerned about

21      here.

22              We're concerned about substantive changes

23      that were never verified by clients and that were

24      only submitted through amended SPPFs by their

25      attorneys.

April 10, 2019

```
 1              MS. EIKHOFF:  Is it not clicking?  I'll do
 2       it.  Is it frozen?
 3              MR. LAWSON:  So we talked a little bit about
 4       why this might matter, and it's not just
 5       speculative, because we have had the opportunity
 6       to be able to talk with some of these claimants,
 7       only a small volume, some in Florida, around 20,
 8       and then also around 40 in Louisiana that we've
 9       been able to have depositions of in the track in
10       the MDL.
11              We've heard a story from a number of them
12       who have had these amended SPPFs that raises the
13       red flags that we talked about earlier.
14              Here we gave an example of a Louisiana
15       Priority Claimant that had exactly the same fact
16       pattern, and we reference this in our brief, but
17       you can see in this transcript the confusion that
18       this claimant had about why their SPPF had been
19       amended to be able to say that it was partially
20       remediated when they knew, as the actual person
21       who owned the property, that it was completely
22       remediated.
23              And, unfortunately, that appears to be the
24       result of them not making that change and not
25       having that change being made with their consent,
```

April 10, 2019

1    but having it changed for them, potentially by

2    their attorney, and then submitted to us for

3    reasons that really can only be explained by

4    Judge Cooke's order and the tangible difference

5    that it can make in recovery if you are getting

6    actual costs versus the remediation damages

7    formula.

8         Now, as I said, our proposal is that we know

9    that the claims that still have unverified SPPF

10   amendments, we're going to review them to assess

11   the impact on the claim that striking that

12   unverified amendment would have, and that we will

13   provide you updated contests based on any

14   material changes in those unverified amendments,

15   if they exist.

16        And it is our position that you should only

17   consider verified SPPF information when

18   considering our revised contests in the claims

19   that are made by these claimants, because to the

20   extent that they are -- to give you an example,

21   when we're talking about remediation status a

22   little bit later, they are going to be saying,

23   well, these claimants self-reported partial

24   remediation, how could Taishan possibly say that

25   they are completely remediated?

April 10, 2019

1      And in some of those cases it's because the

2      only verified SPPF that has been provided says

3      that it was completely remediated, and they are

4      relying on self-reporting that is unverified and

5      that was submitted after Judge Cooke's order,

6      potentially for the purpose of being able to get

7      a different recovery than the one that they were

8      actually entitled to.

9          SPECIAL MASTER LEE:  So what amendments are

10     there other than this whole partially remediated

11     or completely remediated?  Give me some examples

12     of the types of things you saw.

13         MR. LAWSON:  Right.  So one of them is the

14     one that we're not concerned about, and this is

15     true of many of them, where they went back to the

16     field that asked for any prior payments that you

17     received for your Chinese drywall damages, and

18     some claimants added in additional payments to

19     that.  And we appreciate that, we appreciate the

20     work that the plaintiffs did to be able to update

21     that information, and we understand that they are

22     getting signatures for those as well.

23         But in addition to that, there is obviously

24     the Remediation Status changes, and within that

25     Remediation Status section, Section 5, not only

April 10, 2019

```
1      does it ask you whether there were -- what your

2      total remediation status was, complete or

3      partial, it also asks you to describe, if you

4      were partially remediated, what wasn't done.

5      Sometimes there were changes to that section.

6             Sometimes there were changes to the total

7      costs that the claimants said they incurred as a

8      result of the remediation, and we don't know if

9      that was an attorney changing those total costs

10     or if it's verified information from the actual

11     claimant.

12            Then you go into other sections and there

13     are changes to other damages that are not part of

14     this process, but things like diminution in

15     value, alternative living expenses, changes to

16     some of those fields, which will matter to later

17     processes to be able to be verified, but the core

18     of our issue was the Remediation Status and the

19     information about their knowledge of Chinese

20     drywall, information about any assignments that

21     they did or did not have, any information about

22     the sale of the property, when that occurred,

23     when they purchased the property.  That stuff

24     is -- if changed without verification, it impacts

25     our ability to be able to make our contests and
```

April 10, 2019

1     know what the truth is, because in a lot of cases

2     we wanted to be able to say we can take for face

3     value what these claimants have said on their

4     SPPF, and when they verified it under perjury to

5     be able to say this is true, that's real evidence

6     and that's something that we have to consider.

7     Unless there is something else in the file that

8     directly contradicts it, in a lot of cases we

9     would take them for their word.

10         But when their word is not backed by a

11    signature saying that it is true and correct,

12    it's different, and that's why we're asking for

13    this process to be able to play out just so we

14    can get this right and get the right information

15    verified, rather than relying on things that have

16    changed without verification through the last

17    year.

18         MS. EIKHOFF:  I would just add for this

19    proposed process, we do think that the clock has

20    stopped on them getting signatures.  We noted in

21    February, when we submitted our preliminary

22    contests, that there were 500 and something that

23    had amendments that hadn't been verified.  The

24    plaintiffs said, okay, we're going to try and get

25    signatures.  That was in -- there were comments

April 10, 2019

```
 1      to our preliminary objections:  "We're going to
 2      try and get signatures."
 3           As of yesterday they had gotten, I think,
 4      260 something more.  That leaves about 300 that's
 5      not been verified.  They've had weeks and months
 6      to do this.  So we do think at this point the
 7      remedy we would propose is the clock stops, if it
 8      hasn't been verified by now, then the decision is
 9      to see whether it was a material change, a change
10      that's material to this process, we'll undertake
11      that review, and then we will highlight to you
12      the ones that we think did have a material impact
13      on our objections and give you updated objections
14      and ask you to disregard that unverified
15      amendment.
16           MR. MOREN:  Chris, next slide, please.
17           Special Master Lee, I'd like to draw your
18      attention to the order on the screen by Judge
19      Fallon in the MDL.
20           It's not just that having signatures on
21      these SPPFs is handy or makes us feel more
22      comfortable about how we view the self-reported
23      information, Judge Fallon ordered that
24      plaintiffs' responses to the SPPF shall be
25      treated as answers to interrogatories under the
```

April 10, 2019

1      Federal Rules of Civil Procedure 33.

2          Interrogatories must be signed not by

3      counsel, not by anybody, they must be signed by

4      the person making the answer.  This is a

5      requirement of procedure here, and as you know,

6      Judge Cooke has adopted Judge Fallon's orders.

7          It's not just that we want to have the

8      signatures for all of the -- for all the reasons

9      that Mr. Lawson explained, it's that they are

10     required to provide them, and this is especially

11     relevant here because these SPPFs represent a

12     very limited amount of discovery that we've been

13     able to take with respect to the whole set of

14     1800 claimants.

15         Thank you.

16         MS. DUGGAN:  Special Master Lee, we were

17     surprised when we received this objection, and

18     the reason for that is that the parties engaged

19     in months of negotiations before PTO 11A was ever

20     entered within the MDL.

21         The reason we have the SPPF is because the

22     defendants served the plaintiffs with

23     individualized discovery for everyone in the

24     class, and rather than engage in that process, we

25     negotiated with the defendants the concept, which

April 10, 2019

```
 1          is often done in large litigations, to have -- we

 2          had a Plaintiff Profile Form in Chinese drywall,

 3          and now this was going to be a Supplemental

 4          Plaintiff Profile Form.

 5              We went back and forth and negotiated every

 6          single term of this form.  They did ask that the

 7          form be verified, which is what we've done.

 8          There is no single SPPF at issue here that was

 9          not signed when it was originally submitted.

10              Now, what PTO 11A provides is that if a

11          plaintiff -- and they agreed to this language --

12          must amend an SPPF, all subsequent versions must

13          be named accordingly:  First amended supplemental

14          profile form, second amended, et cetera, and that

15          will remain available and accessible to all

16          parties to a case through trial, appeal, if any,

17          or other resolution of litigation.

18              Had they wanted every single amendment to be

19          verified, they could have asked us, we could have

20          talked about it.  In fact, when the parties

21          engaged in this discovery in this process here

22          for remediation damages under Judge Cooke's trial

23          plan, she said you may serve appropriate

24          discovery on square footage and on ownership.

25          And they did, they served every single Florida
```

April 10, 2019

1      Amorin class member the same discovery.

2           And we negotiated with them.  We said, "Can

3      we respond via a spreadsheet and it does not have

4      to be verified?"  They said that would constitute

5      verification.  We did not obtain signatures from

6      every single plaintiff, and they agreed to that.

7           So when they asserted this contest, we were

8      surprised.  We're not -- we don't think it's

9      appropriate at this point to rewrite PCO 11A.

10          Now, the plaintiffs did do their initial

11     verifications and any time any document is

12     uploaded, let's say someone responsibly reports

13     an additional payment or, as we've noted, people

14     end up selling their homes -- I mean, life is

15     fluid here, it's not just stopped at a certain

16     point -- the parties responsibly give the

17     information to the defendants, but there was

18     never a requirement of a signature.

19          Now, I hate to say this, but I think

20     Ms. Eikhoff stated something misleading here,

21     because when I said I would go out and try to get

22     the signatures, I said I disagree with this

23     objection, but in an effort of good faith, we'll

24     try to get the signatures for you if that will

25     satisfy you.

April 10, 2019

1          Unfortunately, we only got about half,

2     that's true, but I don't think we were required

3     to.  We did it, but we were not required to.

4          Now, I understand what they want to do is

5     they want to go through the remaining unsigned,

6     unverified amendments and let us know if they are

7     considered passable by them, for example, it's

8     just an additional payment or do they really want

9     to contest it, and their new position is going to

10    be that should be disregarded by you, and we

11    would just ask for at least -- I'm not opposed to

12    that plan, I would just like at least another

13    week to respond once we get their revised

14    objections.

15         MR. LAWSON:  We don't have an objection to

16    them responding to our revised objections, but I

17    think what was still kind of the elephant in the

18    room that was not addressed by Ms. Duggan is the

19    fact that this isn't just a case of technical

20    violation of not providing a signature when there

21    is a minor change that doesn't -- where they are

22    just trying to give us a little more information.

23         As we pointed out in our initial discussion,

24    there are substantive changes that affect their

25    position on remediation status which directly

April 10, 2019

1    affects your ability to be able to apply the

2    formula or not apply the formula that are not

3    verified amongst this pool, and that's the real

4    concern here and why we've raised this issue and

5    why we will go through those amendments to be

6    able to make sure that none of that information

7    is being considered by you without verification,

8    especially in regard to remediation status.

9         SPECIAL MASTER LEE:  So if we go with that

10   proposal, when will you provide that list?

11        MR. VEJNOSKA:  While we're waiting, from

12   BNBM's perspective, they have had plenty of time

13   to sign.  Signatures are required.  The argument

14   that supplemental submissions do not need to be

15   verified is undercut by Judge Fallon's order.  He

16   refers to Federal Rule of Civil Procedure 26,

17   which says when you submit any information, the

18   party submitting it must sign it, and if there

19   are objections, the attorney must sign.

20        This isn't game playing.  I mean, this is

21   something that was enacted well over a year ago.

22   We wanted full discovery.  This is what we ended

23   up with, but having the individual claimants sign

24   their forms is not a bridge too far.  It was very

25   clear from the beginning, and I -- Mr. Lawson has

April 10, 2019

1    described this, and this is clearly where the

2    attorneys have made changes without even the

3    claimants knowing about them.  So we stand on

4    this objection.  That's Rule 33 that requires

5    that.

6        MS. EIKHOFF:  So it looks like we could get

7    our review done of the unverified SPPFs by a week

8    from today, on the 17th, and submit any updated

9    objections at that time based on that review, and

10   then the plaintiffs would like a week to review

11   and respond to that, which would be the 24th.

12       MR. LAWSON:  The third objection related to

13   SPPFs relates to Supplemental Plaintiff Profile

14   Forms that are incomplete.  Now, taking a step

15   back again to the 1, 2, 3 of Judge Cooke's trial

16   plan order, you can see over and over again the

17   emphasis on completed forms.

18       Why does that matter?  Because as I

19   described to you a little bit earlier, this was

20   our opportunity for damages discovery and these

21   were questions that we crafted and had approved

22   by the plaintiffs to be able to submit to their

23   clients that asked for information about specific

24   topics that we knew would impact the contests

25   that we are presenting to you today.

April 10, 2019

1    In over 500 cases that we have flagged,
2    plaintiffs have submitted Supplemental Plaintiff
3    Profile Forms, but they are relevant fields that
4    affect our ability to object that are blank.
5        Now, as someone who has spent well over -- I
6    don't even want to think about it because it
7    makes me sad -- a lot of hours looking at
8    Supplemental Plaintiff Profile Forms in the last
9    year, and I know Emma has been in the same
10   position, it is always a unique experience going
11   through one of these forms, because everybody
12   went through and answered them a little bit
13   differently.  But most of them, the majority at
14   least, answered all of the questions, but we have
15   this large section, over 500, who did not.
16       And we'll talk in a second about what kinds
17   of fields we're talking about and why it matters,
18   but our remedy for this is off-tracking, and
19   we've talked about off-tracking before.
20   Plaintiffs have called it delay, they've called
21   it unnecessary, but we have to take a step back
22   and think about what they're saying here.
23   They're saying ignore the fact that we didn't
24   complete the required discovery, that was
25   required of us over a year ago, we didn't fill

April 10, 2019

1    out the entire form, and we want you to still

2    give to these people the damages award based on a

3    formula that we're providing without them

4    fulfilling their discovery obligations.

5         So our proposed remedy is that there are

6    some fact issues that are unresolved, some

7    discovery that is unresolved from these forms.

8    Because they are incomplete, they should not have

9    been submitted by the plaintiffs on their list of

10   claimants with completed forms that got their

11   ticket to be a part of this process.  They should

12   have been on the other list.  They were not put

13   on that list.

14        It took us going through all of them -- for

15   us, over 1500 -- and finding all of these fields

16   missing to be able to flag this issue for them

17   and say, hey, these people shouldn't be part of

18   any kind of review with the special master

19   related to the damages formula or remediation

20   damages at all because they didn't follow the 1,

21   2, 3 of Judge Cooke's order.

22        Now, at this point discovery is closed, and

23   it would be unjust and unfair to be able to apply

24   the formula to claims that didn't fulfill their

25   discovery obligations.  They've had ample

April 10, 2019

1    opportunity to be able to resolve these SPPFs,

2    and to the extent that they have not, those

3    claims cannot move forward in any kind of formula

4    process on their Exhibit A for you to

5    rubber-stamp that amount of money for that claim

6    and send it to Judge Cooke.

7         And as we have underscored earlier, it isn't

8    like there weren't multiple opportunities to get

9    this right.  We're over a year since they were

10   originally due.  They had extensions all through

11   2018, and then even Judge Cooke gave them another

12   opportunity, imploring them to complete SPPFs, to

13   provide completed ones to be able to be a part of

14   this process today.

15        And here we are now, after the close of

16   objections and contests discovery, and to the

17   extent that there are missing fields for these

18   claims, it's just too little too late.  Those

19   would need to be able to be a part of the

20   individual adjudication process that will already

21   occur for those factual issues that are

22   unresolved by their damages discovery SPPFs to be

23   resolved in individual adjudication.

24        Now, after that, those issues may be

25   resolved and a proper amount of remediation

April 10, 2019

```
 1     damages can be determined.  I don't know what

 2     that proper amount will be because we were

 3     prejudiced in our ability to be able to make our

 4     objections because there were extremely important

 5     fields that were left empty.

 6          If you look here, we've given you just a

 7     sample of some of these issues.  A large volume

 8     of plaintiffs didn't even answer whether they

 9     were partially or completely remediated.

10          Now, you may say, well, what if they just

11     weren't at all?  Well, if they weren't at all,

12     people said no, they didn't just leave it blank,

13     and when we looked into the files, we found

14     evidence to suggest that they did remediate.

15          Now, what are we supposed to do with that?

16     Do we say that it was partially remediated, or do

17     we say it was completely remediated?  Well, we do

18     our best to be able to look at the file and make

19     that determination, but we're not that client's

20     attorney, we're not that claimant.  We have no

21     ability to be able to determine that when they

22     don't answer one of the core questions of our

23     contest discovery.

24          You see this, too:  When was CDW installed

25     in the property?  No answer for 241 that we were
```

April 10, 2019

1    able to find.

2         If they were aware that the property had

3    Chinese drywall when they acquired the property,

4    63 have no answers.

5         And you can kind of see, based on the

6    objections that we've been talking about today,

7    how not having an answer to that question would

8    lead us to guess.  So what were we supposed to

9    do?

10        Well, we could err on the side of just

11   putting the objection there, but in the end, we

12   were prejudiced in our ability to be able to make

13   full contests to these claims, and that's why it

14   matters.

15        It's not just to be technical and say, oh,

16   we gotcha, you didn't fill out every single

17   blank.  It's because it really mattered, we

18   flagged it in February, and we're still flagging

19   it today because we asked for this discovery over

20   a year ago and we're still waiting for it for

21   many of these fields.

22        MR. MOREN:  I'd like to add to what

23   Mr. Lawson said.

24        So BNBM, like Taishan, didn't raise this

25   objection if there was just any question that was

April 10, 2019

```
 1      left unanswered.  We looked at what are the

 2      relevant questions on the SPPF, what are the most

 3      important ones, so that we can make this

 4      objection in a way that is significant to this

 5      process.

 6          Now, Judge Cooke explained what needs to be

 7      done with forms that are not completed.  As

 8      Mr. Lawson said, they shouldn't even be in this

 9      process right now, according to her trial plan

10      order, ECF 112.

11          If they are not completed by January 14th,

12      according to Judge Cooke's order, they either

13      need to provide a compelling reason why they need

14      extended time, or the claims should be dismissed

15      with prejudice.  That's what Judge Cooke has

16      ordered.

17          That's not -- there isn't anything that you

18      need to do right now, Special Master Lee, with

19      these claims.  They need to go before Judge Cooke

20      to either be dismissed or plaintiffs have an

21      opportunity to seek an extension.  That's why you

22      don't need to consider these claims in this

23      formula process.

24          Thank you.

25          MS. SCHWAB:  Good morning -- good afternoon,
```

April 10, 2019

1    Special Master Lee, and everyone.  I'm Emma

2    Schwab on behalf of plaintiffs.  I just want to

3    briefly address this.

4        Thank you.

5        Okay.  So this is Category H.  We believe

6    that this is outside of Your Honor's scope.  We

7    have alluded to this throughout these categories,

8    that the defendants are able to challenge three

9    areas:  Product ID, square footage, and

10    ownership.

11        And they said, well, but yes, you know, we

12    were also able to raise the contests.  Well, the

13    contests are only related to product ID,

14    ownership, and square footage.  Her order is

15    clear as day and it's not vague at all.

16        This category, plaintiffs submit, is outside

17    of that scope.  Judge Cooke's order says in

18    order -- whenever she asked plaintiffs to submit

19    three lists, it said submit three lists:  One

20    list were complete forms where plaintiffs are

21    entitled to remediation damages; one where

22    plaintiffs have not completed forms; and then the

23    other one was completed forms that they're

24    entitled to -- I believe it was something else.

25        She did not say plaintiffs that have

April 10, 2019

1        incomplete forms, that was not what her order

2        said.  Her order said completed forms or those

3        forms that have not been submitted.

4             According to PTO 11A, a complete form is a

5        submitted form on the BrownGreer portal and a

6        verification, and plaintiffs submit that that was

7        done here.

8             I just want to point out Taishan's chart

9        that they put up on the screen that had the

10        breakdown of number of plaintiffs per area.

11            The first one is:  Has the property been

12        partially or completely remediated?

13            I would submit to you, Your Honor, that

14        defendants made their own determinations.  So

15        regardless of whether -- what was on the form,

16        whether it was blank or whether it was completed,

17        they made their own determination.

18            The second category is:  When was Chinese

19        drywall installed in the property, to the best of

20        your knowledge?

21            That is outside of the scope and it's not

22        relevant to ownership, square footage, or product

23        ID.

24            The third one:  If you have sold or

25        transferred ownership of the property, did you at

April 10, 2019

```
1          the time of the sale assign to anyone any right

2          of action for damages relating to the property?

3                This was provided in the verified discovery

4          that Ms. Duggan alluded to earlier.

5                The fourth one:  When you acquired the

6          property, were aware that it contained Chinese

7          drywall?

8                I would submit to you that that's not

9          relevant to ownership, product ID, or square

10         footage.

11               The next one:  If the property has been

12         partially remediated, identify the rooms of the

13         property that were remediated, the current

14         condition and status of the remediation, and the

15         amount of work remaining to be remediated.

16               Again, this is a category where defendants

17         made their own determination based on remediation

18         status, regardless of what was written in the

19         form.

20               The next one is:  Please identify who

21         performed the work to remediate the property.

22               Why or how this is relevant to product ID,

23         ownership, or square footage is beyond me, but I

24         will submit that it's outside of Your Honor's

25         scope.
```

April 10, 2019

```
 1            And finally:  Has the under air square
 2      footage of the property changed at any time since
 3      the installation of Chinese drywall?
 4            This was provided in the discovery responses
 5      that were submitted to defendants in January.
 6            MS. GRANT:  Can I add something from my
 7      personal experience?
 8            SPECIAL MASTER LEE:  Sure.
 9            MS. GRANT:  You know, I went through the
10      objection Hs, and Taishan did not tell us what
11      was missing, you know, it just said that it was
12      incomplete.
13            So you go back through, and this is a form
14      that's online and it's got the bubbles and you
15      check.  So sometimes, I mean, you really have to
16      look.  And after a while, like, wait a minute,
17      sometimes I couldn't tell.  It looked like
18      everything was there.
19            Now, there were cases where, certainly,
20      oops, I missed a box, but one example that I
21      found quite a few times, there is a section
22      called "Prior Payments," and it says:  Have you
23      received any payments from a settlement?  And
24      there is a yes-or-no checkbox, and underneath it
25      it says:  If yes, identify the source.
```

April 10, 2019

1       So I found probably half a dozen, maybe a

2   dozen of these where I didn't check yes or no.

3   Clearly my mistake, I didn't check it, but I then

4   disclosed the amount.

5       So you have to say, okay, she didn't check

6   yes or no but she's indicated the amount.

7   Obviously, the answer is yes.

8       That's not an excuse.  I've gone back and

9   I've fixed those things.

10      So when I see these numbers here, some of

11  that just doesn't make sense to me.  One of them

12  in particular dealt with what was the date --

13  when was the Chinese drywall installed.

14      Well, the clients, a lot of them, filled

15  these out and they would have question marks, and

16  that's actually one of the options.  It's a

17  pull-down menu, so when you insert the date, it

18  has, you know, zero through whatever the number

19  is, 12, for the month, but it also has question

20  marks.  So sometimes they put question marks, or

21  we did because we had no idea.

22      Some of those got flagged as well.

23  Sometimes they did, sometimes they didn't.

24      So it's not necessarily that the fields were

25  ignored.  There are legitimate reasons at times,

April 10, 2019

1    and sometimes, obviously, we needed to supplement

2    for that.

3         So I just wanted to point out that it's not

4    as simple as saying x number of people have

5    failed to submit those.

6         MR. LAWSON:  I'd like to address what

7    Ms. Grant just said, because I think that it's a

8    misunderstanding, and, unfortunately, it's a

9    little bit of a situation where a little more

10   communication would have helped.

11        Now, I've never had a discussion with

12   Ms. Grant about any of her claims and I, as far

13   as I know, did not have Emma Schwab telling me

14   about the specific ones that she's talking about,

15   but I do know that I sat down with Ms. Schwab to

16   be able to go over the fields that would have

17   triggered this Objection H and which ones would

18   not.

19        If someone -- in the example that you gave

20   about prior payments, if they explained what the

21   prior payment was but they didn't say yes or no,

22   we're not dumb and we're not looking for

23   technical violations.  That would not be the

24   case.  And if that were the reason why that

25   objection was triggered, which was not the way we

April 10, 2019

```
1     did this, we would gladly withdraw that, but that
2     was not the case for many of them that were
3     brought to our attention.  We were told, "These
4     don't have anything on them."  And then I would
5     look and I would be able to assess where the
6     missing field was.
7          Now, we originally addressed these back in
8     February, I think it was February 11th, and we
9     did not have a meaningful dialogue about, well,
10    what's missing for this one, what's missing for
11    that one.  We did for other objections, but we
12    did not have that dialogue coming from the
13    plaintiffs to be able to say, okay, can you tell
14    me which one is missing from this, from any of
15    them.
16         And I will fully represent that Ms. Schwab
17    did submit some and we did have dialogue about
18    some of them, but we're talking about 500 and
19    we're talking about meaningful fields, like the
20    ones that we just talked about, where there was
21    no answer.  To the extent that those are still
22    missing today, that is something that is too
23    little too late for these claimants to be able to
24    fulfill their discovery obligations.  They cannot
25    move forward in this process, they cannot be
```

April 10, 2019

1       entitled to the remediation damages formula, and

2       they should be off-tracked to be able to

3       determine those factual areas that were

4       unresolved by their discovery.

5            I also want to turn back to something that

6       Ms. Schwab had said, and then also the plaintiffs

7       have kind of made a theme today:  Well, it's just

8       A-B-C.  And I don't know why they keep saying

9       that, because if you look at Judge Cooke's order

10      on her Number 3, it said:  Defendants can dispute

11      the following aspects, and then it lists A, then

12      it asks for a report and recommendation; B, a

13      report and recommendation; C, report and

14      recommendation.  And it keeps stopping there.

15           And D is the contests and set-offs.  Never

16      does it say the contests and set-offs are only

17      for A, B, and C, and we are separately listing D.

18      It just doesn't do that.

19           So I don't think that we need to keep going

20      back to this common refrain of being outside of

21      the scope when that's just not what Judge Cooke's

22      order says.

23           Now, the other position that they just took

24      a moment ago was, well, the definition of a

25      completed form, it didn't say anything about we

April 10, 2019

1      had to fill out all the fields.

2            By that definition they are saying they

3      could have submitted blank forms and that would

4      have been sufficient to fulfill their

5      obligations.  They are essentially telling you,

6      when they are going through these, they could

7      have figured it out themselves, or, you know, it

8      doesn't really matter, like, yeah, we missed a

9      couple of them, but let's just move this process

10     along, let's just rubber-stamp these.

11           And that just can't be the way that an

12     adversarial process works, it can't be the way

13     that we do damages discovery, and it doesn't

14     fulfill their burden of proof for damages.

15           We did make our own determinations in some

16     cases, that is true, and we'll talk about

17     remediation status in that regard, but it was

18     only based on information they gave us.  So we

19     were limited in our ability to be able to make

20     those determinations based on what we were given,

21     and sometimes we weren't even given basic answers

22     to that status.

23           That's why we were prejudiced.  That's why

24     these claims need to be off-tracked.

25           MR. MOREN:  Ms. Lee, I would like to also

April 10, 2019

1 address something that Ms. Kingsdorf Schwab

2 mentioned.  I believe that she characterized

3 Judge Cooke's order as addressing only completed

4 forms versus forms that were -- had not been

5 submitted.

6   For the record, that's not what Judge

7 Cooke's order specified.  Judge Cooke's order has

8 three categories:  Completed forms that don't

9 claim remediation damages; completed forms that

10 do claim remediation damages; and forms that are

11 not completed.

12   I just wanted to clear it up for the record.

13 It's not forms that -- it's not unsubmitted

14 forms.  It's incompleted forms.

15   SPECIAL MASTER LEE:  Okay.  Anything else on

16 this category?

17   MS. EIKHOFF:  I am told that lunch has

18 arrived.  Do you want to -- it's 12:30 -- maybe

19 take a lunch break?

20   SPECIAL MASTER LEE:  Yes.

21   (Recess from 12:31?p.m. until 1:17?p.m.)

22   MS. EIKHOFF:  We're told the clicker should

23 be working again.

24   MR. LAWSON:  I think it does now.  Enjoliqu?

25 tested it as soon as everyone left the room.  It

April 10, 2019

1      was working fine.

2              MS. AYTCH:  Let me know if it doesn't.

3              MR. LAWSON:  The next contest we're going to

4      address is Objection I, which relates to

5      incorrect or unreliable proof of under air square

6      footage.

7              Now, even the plaintiffs have admitted today

8      that square footage is a core defense that we can

9      raise in these proceedings, and the reason for

10     that is because it is the primary input into the

11     remediation damages formula, which multiplies

12     verified under air living square footage against

13     the dollar-per-square-foot figures produced

14     through RSMeans that were discussed earlier.

15             So you can understand why it would be

16     critical that that number, that square footage

17     number, that under air square footage number, is

18     accurate, because if it's not, then the formula

19     output cannot be accurate.

20             Here we have flagged around 477 claims where

21     there is a significant issue with the under air

22     square footage that the plaintiffs are reporting

23     and claiming is verified.

24             We'll talk about that word "verified" in a

25     second.

April 10, 2019

```
 1          Here we're saying that they should be
 2     off-tracked because there is a fact question over
 3     the correct square footage measurement.  We
 4     understand why that would be an immediate stop
 5     sign for you to be able to say, well, I cannot
 6     proceed to apply the damages formula if I do not
 7     have an accurate square footage total for under
 8     air square footage that will allow me to be able
 9     to input it into the formula and get the output
10     for that damages calculation.
11          It matters because that's exactly what Judge
12     Fallon required in his order in April of 2017,
13     dictating how the formula would operate.  He said
14     that the plaintiffs needed to provide "verified
15     under air living square footage," and that's the
16     way that he put it.
17          Now, this encapsulates some of the different
18     ways that this type of square footage is referred
19     to.  "Under air square footage" is what it's
20     commonly called, and this means that an area is
21     air-conditioned, heated, it's part of the living
22     space that is part of the HVAC unit, that it is
23     able to be able to get cooler down here in
24     Florida, or in colder climates, it is heated.
25          It does not include areas like garages that
```

April 10, 2019

1      do not receive air conditioning that are

2      separate.  Now, those might receive total -- be a

3      total square footage or an adjusted square

4      footage amount, there are different terms, but

5      usually when you see something saying

6      "under air square footage," "AC square footage,"

7      "living area square footage," you're talking

8      about areas that are under air-conditioning or

9      heat.

10          Judge Fallon required them, back in 2017, as

11     the plaintiffs, to be able to provide verified

12     amounts for the square footage, and during the

13     summer of 2017 they undertake that project.  What

14     we received were verifications signed by the

15     claimants' attorneys saying this amount of under

16     air square footage is verified.  It would list

17     the total amount, it would have a signature from

18     that claimant's attorney saying "verified."

19          They would include with that some evidence

20     of under air square footage, and that was what

21     the plaintiffs provided in 2017.  Some of those

22     verifications are still the amounts that they are

23     relying on today.  Others have been modified or

24     they found different under air square footage

25     proof that they are now saying is the verified

April 10, 2019

1       under air square footage amount.

2           There has been give-and-take on this issue

3       over the last few months.  We've pointed out

4       areas where maybe the proof that they provided

5       did not show under air square footage, and they

6       may be able to point us to something different

7       that actually does and that changed the amount,

8       and we've withdrawn our objections in many of

9       those cases.  We withdrew dozens of these

10      objections from our preliminary objections to our

11      final objections that were submitted to you last

12      week.

13          That was a process that Emma and I were able

14      to go through with a lot of these claims to be

15      able to resolve these disputes.  So we were

16      trying to bring you the items, the Objection I's,

17      that were actually contested between the parties.

18          Those different types go into two different

19      categories, these Objection I's.  There is

20      inaccurate proof, and there is no proof.  It

21      sounds kind of similar, so let me explain what

22      we're talking about with each of these.

23          Inaccurate proof is a case where, when we

24      looked at the claimant's file, we discovered that

25      there were multiple under air square footage

April 10, 2019

1    totals in their claim files.  This is the

2    documentation submitted by the plaintiffs.  And

3    when we looked through all of the records, there

4    were multiple documents that showed different

5    under air square footage totals.

6         It's a little confusing but, you know, as

7    you will hear from plaintiffs and as we can

8    describe, there are a lot of different sources

9    for under air square footage.  Property

10   appraisers in counties across Florida will

11   provide, often, an under air square footage

12   amount.  Sometimes they provide a different kind

13   of total that includes nonair-conditioned areas

14   but often it will list a living area or an under

15   air square footage area, and that can be a

16   source.

17        Sometimes there are floor plans for

18   properties that will show the under air square

19   footage of the property on the floor plan.  You

20   can get a sketch or a floor plan created by a

21   professional who can go through and measure out

22   the square footage of your home and that can be

23   professionally done.

24        So there are a lot of different ways that

25   you can show under air square footage, and

April 10, 2019

1    plaintiffs have relied on many of those in many

2    cases, but what we found is a little bit unusual.

3         So when there were multiple under air square

4    footage amounts, in over 300 instances the

5    plaintiffs selected the higher under air square

6    footage amount of the multiple that were in the

7    claim file, regardless of the source of that

8    under air square footage.

9         So what I'm saying is that they didn't

10   always just rely on floor plans, they didn't have

11   a priority system that said a floor plan trumps a

12   property appraiser record and, therefore, if

13   there is both, we're going to go with what the

14   floor plan says.

15        We could see from the files that in every

16   instance they said which square footage total is

17   higher, that's the one we're verifying.

18        And that's troubling, right?  Because it's

19   not principled and it doesn't conform to any kind

20   of scientific measure or accurate measure of what

21   the square footage actually is.

22        So why does that matter?  They are going to

23   tell you, and it's true, in some cases it's three

24   square feet difference.  Okay.  That doesn't seem

25   like a big deal.  In some cases it's a 300 square

April 10, 2019

1      feet difference, and what you see in the

2      aggregate across these claims -- and here you can

3      see one that's almost 300 square feet difference.

4           In the aggregate across these claims, we are

5      talking about a difference in square footage

6      between the total that we provided on our exhibit

7      for these 300 claims that we found in their files

8      and their totals, the difference is 37,000 square

9      feet, an average difference between the total we

10     found and the total they are verifying of 117

11     square feet.

12          Now, to give you an idea, 117 square feet

13     means around an $11,000 to $12,000 amount under

14     the formula, and in every instance they picked

15     the higher amount.  So that means on average

16     every claimant under their totals that they are

17     providing is going to get around $12,000 more

18     because they just rounded up to the higher amount

19     that was found in the file.

20          Now, across these 300 plus properties,

21     that's a $4 million difference, a $4 million

22     rounding error that they have made by always

23     choosing the higher amount regardless of the

24     source of that under air square footage, and

25     that's just an immediate reason to pause and say,

April 10, 2019

1     "I can't just bless the amounts that they put in

2     their Exhibit A," because it wasn't principled,

3     because we actually have to have somebody

4     determine what is the right amount of square

5     footage for these properties.

6         Just taking their word for it or looking at

7     the verification didn't tell us that story.  We

8     wish it would have.  That's what Judge Fallon

9     told them to do in 2017, but the reality was

10    something different for over 300 claims, and it

11    makes a big difference.

12        So looking at this example -- and in their

13    brief they pointed to a number of condo

14    association units where they said, well, hey, we

15    have floor plans for these condo units, we looked

16    at the condo units and the floor plan says this

17    is the square footage, you all looked at the

18    property appraiser record and it's different,

19    but, you know, just ignore the property appraiser

20    record, go with the floor plan.

21        But here the plaintiffs have gone with the

22    property appraiser record, which shows an under

23    air square footage of 4,074 for this property,

24    but inside the claimant file there is a floor

25    plan for the property that they provided

April 10, 2019

1       previously.  And this is just one example.  Maybe

2       there is a story behind this, but they submitted

3       this as proof of under air square footage

4       previously, I think it was back in 2013.  This

5       was their proof then.  Maybe they have a

6       different story now, but we saw this over and

7       over again, where it was always the higher amount

8       that they went with, with no explanation of why

9       that amount was somehow superior, when in other

10      instances the property appraiser record was

11      disregarded and the floor plan was what they went

12      with.  We just don't know.

13          We don't know which ones are what.  We're

14      not saying to go with our number, that's not what

15      the purpose of us pointing this out is.  It's to

16      say that there isn't verified proof, there isn't

17      accurate proof, and if there isn't accurate

18      proof, they haven't met their burden and they

19      certainly cannot get a formula application for an

20      amount that is in dispute and needs to be

21      resolved in a way that is accurate and

22      verifiable.

23          So we talked a little bit about the first

24      category.  There is also a second category with

25      just no proof of square footage.  This is a

April 10, 2019

```
1      smaller number of claims, and the issue here is

2      kind of what I was bringing to your attention

3      before, that in some cases the amount that they

4      have provided in their verified proof is not

5      explicitly listed as under air square footage.

6      In fact, in some cases they have relied on

7      property appraiser records that say adjusted

8      square footage.

9          When we look at what the glossary definition

10     is, for example, in Broward County, the glossary

11     definition of adjusted building square footage

12     says:  The adjusted building square footage is

13     calculated from air-conditioned and

14     nonair-conditioned space.

15         On its face, that's not under air square

16     footage, and yet there were examples where that

17     was what was relied upon for Broward County

18     properties.

19         Now, they have pointed to, in their briefs,

20     some examples of, "Oh, there is a floor plan, it

21     doesn't list under air square footage, but the

22     club president or the condo association president

23     submitted an affidavit that says that the amount

24     is this."

25         We can't just say close enough or just take
```

April 10, 2019

1    our word for it.  You have to have real proof to

2    be able to meet your burden on damages and also

3    to be able to give an accurate measure of those

4    damages in any kind of formula, and something

5    like this just wouldn't cut it.

6         So to highlight this, you can see how an

7    adjusted square footage amount, including storage

8    spaces, would grossly inflate the amount of

9    square footage that a property has.

10        Here, the under air square footage of this

11   floor plan is listed as 3,844 square feet, but

12   you can see that there is a garage that is 626

13   square feet, and that by itself would add

14   thousands of dollars onto this property.  It

15   would make it a grossly inflated amount under the

16   remediation damages formula, and that's why we

17   needed this kind of adversarial process, to be

18   able to call out these issues and why we need to

19   be able to resolve them rather than just pushing

20   forward because it's close enough, it's good

21   enough because it is under air square footage or

22   it's close enough to under air square footage.

23        Close enough is not good enough in this

24   case, especially when we are talking about square

25   footage totals that would be going into their

April 10, 2019

1        formula.

2             MR. MOREN:  So I just have a few comments,

3        Special Master, I need to add to what Mr. Lawson

4        said.  I emphasize that here plaintiffs have the

5        burden of proving what their damages are and they

6        have the burden of proving what the square

7        footage should be used for the sole

8        plaintiff-specific input into the formula damages

9        calculation.

10            Now, we only raised this objection that's

11       similar to Taishan, we found conflicting evidence

12       that presented other square -- under air square

13       footage amounts to the alleged amount that

14       plaintiffs claimed.  Sometimes we found this

15       conflicting evidence in the plaintiffs' files on

16       the BrownGreer portal, other times we found it in

17       the public county records.

18            In our spreadsheet that we submitted with

19       the final contest, we documented what specific

20       conflicting forms of evidence we found that show

21       a different under air square footage number from

22       the number that plaintiffs alleged.

23            In the last couple months we've been able to

24       work with plaintiffs to resolve some of the

25       square footage claims, but we haven't been able

April 10, 2019

1      to resolve all of these, and so these 26 are the

2      ones that are remaining.

3          Because there is a dispute about these

4      claims, we submit that this, as Taishan argued,

5      that this needs individualized adjudication as to

6      what square footage should be used for these

7      claims before any application of the formula is

8      done to these 26 claimants.  Thank you.

9          Oh, just one more thing.  Excuse me.  I

10     forgot my second slide.

11         MR. VEJNOSKA:  You stand up once.

12         MR. MOREN:  So we just wanted to show you

13     this one example, where the Olschewiskis -- I am

14     not sure if I am pronouncing that right -- but

15     they claimed over 4,000 square feet, and we found

16     a floor plan, which is one of the sources that

17     plaintiffs rely on, in their file we found a

18     floor plan which clearly indicates a living

19     air-conditioned space of 3,700, 3,800.  So this

20     is over 400, almost 500 square feet that's less

21     than what the plaintiffs are claiming.

22         We don't know, similar to what Mr. Lawson

23     said, we don't know what the right answer is, we

24     just know that there is conflicting information

25     and that needs to be resolved first.

April 10, 2019

1          MR. MONTOYA:  Page 24 of the plaintiffs'

2     presentation.

3          Judge, I would direct you to Page 33 of our

4     brief, just if you want to kind of read along

5     with me, but I just wanted you to note, as you're

6     looking at this category, and really what it is

7     is a brief history lesson.  The profile forms in

8     this matter were filled out in 2010, and that's

9     when Taishan was initially sued but sat on the

10     sidelines, didn't do anything, took a while to

11     come to the litigation and went back out.  So the

12     initial profile forms have been out there since

13     2010.

14          In 2016, when they came back in the

15     litigation, the profile forms were available

16     again on a file cloud for them to look at.

17          In 2016, after Judge Fallon's class

18     certification damages order, the class plaintiffs

19     undertook a project to determine what the square

20     footages were, and in 2017 adopted -- I'm sorry

21     -- obtained that information and provided it to

22     the defense.

23          We're now in 2018, where the SPPFs have now

24     been provided.  So there has been eight years to

25     track these square footage numbers.

April 10, 2019

```
 1            And then after Judge Cooke entered her trial

 2     plan, there was approximately a two-month period

 3     where they could have conducted discovery on the

 4     square footage.  So there has been ample

 5     opportunity, ample due process in order for them

 6     to be able to contest this issue.

 7            So when I'm hearing their presentation, I

 8     think there is an intellectual disconnect here

 9     for me.  This is the point in the jury trial

10     where I look at the jury and say you get to

11     determine damages, you get to determine the facts

12     in this matter, you have a great job, a great

13     task, a great obligation, you're the fact finder.

14            Have we ever -- any of us ever been in a

15     trial where there wasn't different evidence?  No,

16     there is competing evidence.  That's what you're

17     charged to do.  You get to call balls and

18     strikes, you are the finder of fact here.

19            So we have met our burden of proof.  Here is

20     what we've turned in as an example.  And many

21     people, what they did with their SPPFs, they

22     filled out the initial Plaintiff Profile Form in

23     2010, they obtained addition information, for

24     example, from their developer, where they got a

25     developer to build their floor plan and submitted
```

April 10, 2019

1       that.   Later on, if they are on the tax rolls,

2       they submitted the property tax roll information.

3           They have also submitted independent

4       appraisals, county property appraiser records,

5       verifiable different sources.

6           Does it surprise anyone that the numbers are

7       slightly off from a developer/builder to the

8       property tax office?  No.  That's what happens in

9       south Florida.  We've seen it, we know that the

10      developers may put up a number and the property

11      appraiser's number may be different, but the

12      truth is neither of these folks have an ax to

13      grind in this litigation.  The numbers are what

14      they are, the numbers are there, you get to make

15      the decision.

16          The information is there.  We don't believe

17      that there has been any plaintiff that has not

18      submitted a square footage number.  We know the

19      house exists, you just have to determine what the

20      number is.

21          Now, I'm not telling you to pick plaintiffs'

22      number, not telling you to pick defendants'

23      number, not telling you to split the difference.

24      You need to do what you can determine is right,

25      but you get to make that decision, you get to

April 10, 2019

 1     draw the reasonable inferences in favor of the

 2     plaintiff under the default cases.

 3          But we have submitted square footage in each

 4     instance and I would submit to you that, again,

 5     most of these records, if not all of them, were

 6     contemporaneous at the time that the house was

 7     built.  This isn't -- these aren't numbers that

 8     were created for litigation purposes.  These are

 9     the numbers that were there from the builder or

10     the developer or the County in the property tax

11     records.

12          Where you see ANSI sketches, where that came

13     out was some of these claims had -- were part of

14     the Knauf settlement, and Knauf came in and did

15     their reports and did the square footage numbers,

16     so that's why you will see some sketches that are

17     later on in the litigation, because they actually

18     came in and measured them.

19          The other thing I would point out to you is

20     we've talked about current owners and former

21     owners.  A former owner only has available what

22     they had available when they lost the house, so

23     if they lost their house to foreclosure, if they

24     had a measurement from the property tax office or

25     maybe from the developer, they submitted it, but

April 10, 2019

```
1        it's kind of hard to get access to somebody's

2        home when they don't live there anymore.

3            So there are some practical realities to

4        this issue, but I don't think it is a leap and a

5        stretch to ask Your Honor to make a factual

6        finding when there is numbers in front of you.

7        They may be competing numbers, you may see under

8        air square footage, you may not, but the numbers

9        are there.  We've met our burden of proof, we

10       simply ask that you make the determination.

11           MR. LAWSON:  Can you bring this up for a

12       second?

13           So Mr. Montoya finished there with something

14       I thought was a little startling.  He said:  You

15       may see under air square footage, you may not,

16       but he wants you to move forward anyway.

17           We know that's not true.  They were ordered

18       by Judge Fallon in 2017 to provide verified under

19       air square footage.  The input in the formula is

20       under air square footage.  To tell you that it

21       doesn't matter whether you see under air square

22       footage or not in the property completely

23       disregards a court order that they were ordered

24       to follow in 2017, and here we are almost two

25       years later, since they were supposed to provide
```

April 10, 2019

1    that, and we're still finding gross

2    discrepancies.

3         He kept referring to our competing number.

4    That's not what we said.  We said that there are

5    multiple numbers in their own files and every

6    single time they picked the higher number.

7         And you just heard Mr. Montoya stand up here

8    and I was struck by the fact that there was no

9    response to that.  He showed you this list saying

10   all the different sources that they relied upon.

11   We don't disagree.  They did.  But wherever one

12   of these was higher, for 300 cases that's the one

13   they went with.  There is no explanation.  It's a

14   $4 million difference they boosted all of these

15   with no explanation, not because any one of these

16   sources were any better than the other, just

17   because the number was higher.  Even if number

18   wasn't under air square footage, it doesn't

19   matter.

20        And that's what you have in front of you on

21   that Exhibit A that they provided you.  They just

22   admitted it doesn't matter if it's under air or

23   not, doesn't matter if there is a discrepancy.

24   He told you you could figure it out.  How?

25        You have two different documents that both

April 10, 2019

```
 1      say they are under air square footage.  They are

 2      one of these sources.  You have no way of knowing

 3      that.  We don't either.  We didn't purport to in

 4      our filing.  That's because this needs to be

 5      figured out through individual adjudication.

 6      There is no way to move forward with the formula

 7      for these properties and they haven't given any

 8      answers to be able to explain these issues that

 9      we flagged in our objections.

10           MR. MOREN:  I would like to briefly add to

11      what Mr. Lawson just said.  It's true the

12      plaintiffs haven't given you any tools for

13      determining what the under air square footage is.

14      They have put all these files in front of you and

15      multiple sources and said the burden is on you,

16      the fact finder, to understand this.  The reason

17      that we say this requires individual adjudication

18      is because where there is this conflicting

19      information, then for certain other claims it may

20      very well require experts to come in who have the

21      appraisal background to understand what is

22      correct or not, to look at the property or not,

23      depending on what evidence is there for any

24      particular property.

25           As it is right now, we don't have a way to
```

April 10, 2019

```
1        move forward to find what these facts are.
2            MS. DUGGAN:  May I make one statement, would
3        that be all right?
4            SPECIAL MASTER LEE:  Sure.
5            MS. DUGGAN:  Okay.  I just want to say this.
6        The defendants participated in the class damages
7        hearing and in Judge Fallon's class damages order
8        he says at page 43:  Even the defendants'
9        suggestion, a house-by-house inspection by a
10       contractor is not likely to lead to a more
11       precise estimate given the acknowledged variation
12       of at least 17% in that method of estimation
13       recognized by the estimation textbook
14       authorities.  Considering this, persuing the
15       alternative is not only unreasonable
16       and inefficient, it is also unjust in light of
17       the continued suffering of the plaintiffs.
18            If the plaintiffs have provided, which in
19       every case they have verified under air square
20       footage, and they are relying on a piece of valid
21       evidence, the fact that there are other pieces of
22       evidence that have a different number, they are
23       certainly entitled to pick the higher number.  Of
24       course that's the one they are going to pick.  It
25       doesn't mean it's wrong.
```

April 10, 2019

```
1              If the appraiser came up with a different
2       number than the county appraiser or the tax
3       assessor or the builder, as long as it's a valid
4       piece of verified under air square footage, there
5       is not going to be just one in this world, there
6       might be multiple, and that's why they picked the
7       number that they did.  It doesn't knock them out
8       of the process to suggest at this point that we
9       have to have an expert come in and assess it.
10      That takes us completely off track of where we're
11      supposed to be at this stage in the litigation.
12              MR. MOREN:  So because you bring that up,
13      these particular square foot verifications have
14      been verified by attorneys.  They haven't been
15      verified by anybody with expertise in verifying
16      under air square footage numbers.  I think you --
17      I'm fairly certain that I think you've admitted
18      that they were all verified by attorneys.  I
19      mean, that's not a standard that will help the
20      Special Master determine the facts in this case.
21              MR. MONTOYA:  But each plaintiff -- each
22      file is going to have different indicia or
23      different proof as to square footage, so they are
24      not necessarily verified by a lawyer.  Most of
25      the time they are a third party, such as the
```

April 10, 2019

1    developer or the appraiser, et cetera, and one

2    thing I do know about Florida law is the

3    plaintiff is always able to testify what their

4    own damages are.  So whether there is a

5    verification from a plaintiff or it comes from

6    another source, it's certainly a verified source

7    along the way.  You just make the decision,

8    whatever number that may be, if there are

9    competing numbers in the file.

10          SPECIAL MASTER LEE:  Go ahead.

11          MR. LAWSON:  I just wanted to address that

12   final point.  They are saying where there is

13   competing numbers evidence, that somehow they are

14   going to win on that point and that

15   misunderstands the burden of proof.  It's the

16   greater amount of the evidence that they have

17   when it's equal.  They can't just say that an

18   equal amount on each side somehow tips in their

19   favor.  That's not the way that it works.  They

20   provided conflicting evidence and that's the

21   evidence that's before you.

22          SPECIAL MASTER LEE:  In the Knauf

23   settlement, what was the basis for the under air

24   square footage, like what was used as the basis?

25          MR. MONTOYA:  My recollection was the

April 10, 2019

1    inspectors were going on behalf of Moss, who was

2    going to remediate a home -- this is the way they

3    remediated homes -- they were going to remediate

4    a home and they will go punch holes in the wall

5    and do the product ID inspection and do a

6    measurement as well, and kick out a report, so

7    then Knauf could then look back and say, okay,

8    this is the square footage, Moss, you are going

9    to get X amount of dollars to do this remediation

10   and everybody had that affirmation.  That was

11   with a participating and willing defendant.

12          What you're faced with, Your Honor, are --

13   it's not like there aren't any numbers for square

14   footage.  You simply have to make the decision.

15          MR. VEJNOSKA:  I'm sorry, just one thing.

16   Ms. Duggan, with respect to her standard that it

17   doesn't mean it's wrong, that can't be the

18   standard.  The plaintiffs have the burden of

19   proving that it's right.  So if there are four

20   numbers there, they've got to prove which one is

21   right.  They can't just say, well, we gave you

22   four numbers and we picked one, we could pick any

23   one and they could all be right.

24          Only one is right.

25          MS. GRANT:  And I apologize.  Do you mind if

April 10, 2019

```
 1        I make one comment?  I think I can offer some
 2        insight in this.
 3             You have to look at when the evidence -- and
 4        Mr. Montoya alluded to this or said it -- when it
 5        was uploaded.  So when we had a client in 2010
 6        and I uploaded a floor plan, as the case
 7        developed and as we got more information, we
 8        continued to upload that.  The square footage
 9        that you should be looking at is what we
10        submitted in connection with -- we all did these
11        declaration of correctness of square footage,
12        which was signed by attorneys, and attached to
13        that was the document that we were relying on,
14        whether it be a floor plan or appraiser or an ad,
15        but whatever the case may be.
16             So to now say, well, there is four competing
17        documents, if you go back to 2010, perhaps there
18        are on some, but we weren't submitting it at that
19        time for purposes of proving square footage
20        today.  We were uploading every document that we
21        had, and obviously, as time goes on and our
22        knowledge became more and more and we had
23        information, we submitted that.
24             Our contention as to what the square footage
25        is is not only set forth in the plaintiffs'
```

April 10, 2019

1    spreadsheets that we've provided, but it's in

2    declarations of correctness that are signed and

3    verified by the attorneys with the document

4    attached.  There is no doubt that there is

5    occasional -- not occasionally, there is a lot of

6    variations, but there can be reasons.

7         It's not necessarily for us to explain why

8    there is a two-foot square foot difference, and

9    you will see in the defendants' spreadsheet, I

10   forgot what the number is, but there is something

11   like 75 that have a difference of five or 10

12   square feet or less, minimal, but it's not for us

13   to explain that.  There was nowhere to do that

14   here.

15        We submitted what we had.  We indicate in

16   our SPPFs that there had been no changes in the

17   square footage.  That's the issue.  It's not to

18   go hunt and peck and "ah, I found a document from

19   2010 where it showed a square footage of less."

20        Again, that may have been submitted for

21   another reason or at that time that's what we had

22   and now we have better information.

23        SPECIAL MASTER LEE:  I think I have

24   responses to that.

25        MR. LAWSON:  Oh, the response --

April 10, 2019

1              SPECIAL MASTER LEE:  Why wouldn't I just use

2        the declaration amounts?

3              MR. LAWSON:  Yeah.  So the declaration

4        amounts are not always the amounts that are

5        currently before the court.  The declarations

6        were submitted in 2017.  Some of those have

7        changed since then.  So if you were to look at

8        those, those will always be the current number.

9              And in Ms. Grant's point, in many cases they

10       did rely on the old submitted number because it

11       was higher, instead of a more current number from

12       a property appraiser record that was more recent

13       was not the number that they picked.

14             Again -- and they haven't explained.  I

15       guess the explanation is it just gets them more

16       money and they can do that if they want to, but

17       they always picked the higher number, regardless

18       of what year it came from, what source it came

19       from.  It was just about the number that would

20       get them a larger recovery and that was it.

21             MS. SCHWAB:  Ms. Lee, can I say one more

22       thing just to answer your question, the question

23       that you asked earlier about the Knauf

24       settlement?

25             If a plaintiff submitted, let's say, two

April 10, 2019

1     documents, both verified under air square

2     footage, BrownGreer, who was the claims

3     administrator for Knauf, they would, every single

4     time, 100 percent of the time, accept the higher

5     number, even if -- even if two documents were

6     submitted, so long as both were verified under

7     air square footage proof.

8          SPECIAL MASTER LEE:  Does anyone else want

9     to speak on this?

10          MR. VEJNOSKA:  Could we start over and do

11     the whole thing?

12          SPECIAL MASTER LEE:  Okay.

13          MS. EIKHOFF:  All right.  We're changing the

14     subject then from under air square footage to

15     product identification.

16          Our Contest J has essentially been resolved

17     now by this court.  Ms. Lee, you may recall from

18     our PID hearing I talked about that we were there

19     for the macro determination, but then there is

20     also a micro determination.

21          Our Contest J is the macro, and then K is

22     the micro.  And so your report and recommendation

23     from Monday resolved J, and this is the list of

24     the product ID categories that now must be --

25     claims with those categories must be excluded

April 10, 2019

1     from this process and from your report and

2     recommendation applying the formula.

3          So that brings us to K, when there is --

4     there are just a few of these that are issues

5     that present an insufficiency of product ID proof

6     on a claim-specific level.  That's the micro.

7          And we think that because there is this

8     proof insufficiency, you can't decide if it's

9     Taishan PID or not Taishan PID, you just can't

10    tell for these claims, and because of that, they

11    need to -- that fact issue with PID needs to be

12    resolved through some off-track method.  They

13    can't just get the rubber stamp on the formula as

14    the plaintiffs have presented it to you.

15         And the plaintiffs, they have categorized

16    all of their PID, and that's on the spreadsheet

17    that you've been given, but in some of these

18    cases, most -- I mean, the vast majority of these

19    cases, we agreed with their categorization of it,

20    but for some of these cases we don't agree, and

21    that needs to be resolved.

22         The Contest K objection applies to two

23    categories:  There's no PID proof at all, or

24    insufficient PID proof.

25         In the no PID proof category, those were

April 10, 2019

1      basically institutional investors in condo

2      associations, and that's where you would have an

3      institutional owner who has lots and lots and

4      lots of properties submitted, but they have not

5      submitted PID proof for the specific properties.

6      In one case, which we're actually going to

7      withdraw, and I'll discuss it in a minute, they

8      had one photo for all of the properties, and so

9      we don't know what was in those other properties.

10         Now, in that case, and that's the H. Harris

11     Investments one, after reviewing their brief and

12     reviewing their exhibits to the brief, we are

13     going to withdraw our objection because they did

14     show that there was other supply chain proof in

15     the file that could -- that could connect it to

16     Taishan product, so we are withdrawing for

17     H. Harris.

18         In the other one, though, the Sunrise Lakes,

19     there are -- I think there are 97 Sunrise Lakes

20     properties at issue here, but there was only

21     claim-specific product ID submitted for a

22     fraction of them, and the rest, there is just no

23     product ID at all.  There is just none for all of

24     these, for dozens and dozens of Sunrise Lakes

25     properties.

April 10, 2019

1     Now, the plaintiffs didn't deny that there

2     is no claim-specific proof there, and for the

3     first time on Monday, when we got their response

4     brief, we see that they are pointing to BNBM as

5     the manufacturer for the ones where they have no

6     proof.  So they say, "Well, we've got some

7     Supplier Profile Form that references BNBM."

8         That's news to us.  It was news to BNBM.  We

9     had never seen that before, but, in any event,

10    from where I stand as Taishan's lawyer, there is

11    still no proof that would attach that to Taishan

12    at all.  They have not given you sufficient

13    claims-specific product identification proof to

14    meet their burden of proof that Taishan was the

15    manufacturer for those units.

16        Now, the other category -- and there is just

17    a few of these, so this is not much to deal with.

18    It may be helpful for you to look at it but I

19    know it's hard to see up here, but this is an

20    example of where they're seeing something

21    different than we're seeing in terms of what

22    categories these go on.

23        So this is -- these four photographs are all

24    of the photographs that they provided for product

25    markings for the Twin Crest Associates claim,

April 10, 2019

1    which is Number 1568, and you can see it's

2    numbers, just like a bunch of dots, numbers that

3    are made out of kind of big pixilated dots, and

4    then there is this hard to really tell

5    photograph.  I don't know if this is like a piece

6    of metal, it looks like maybe metal, and there is

7    this strip of kind of a blue line of something.

8         And the way that they categorized this was

9    as Taian Taishan Plasterboard, PID Catalog

10   Number 1.

11        Well, Taian Taishan Plasterboard says Taian

12   Taishan Plasterboard on it.  The font is

13   completely different.  They -- this picture shows

14   that the writing on the boards are big numbers,

15   not Taian Taishan Plasterboard, and then there

16   are strips of yellow and blue tape, and we can

17   only guess that they are saying that maybe this

18   strip, that they think that that matches tape.

19        It's just not enough.  That's not the

20   greater -- the greater weight of the evidence is

21   not, oh, this establishes that this is Taishan

22   drywall, Taishan definitely manufactured this.

23        These numbers, by the way, aren't anywhere

24   in the product ID catalog.  We went through --

25   you know, there is the 43 different numbers, and

April 10, 2019

```
1       this isn't even in there.  This is -- someone

2       else made this, we don't know who made this, but

3       they have certainly not proved that it's Taishan.

4            Now, one thing that they said in their brief

5       that we actually agree with is they say, "Oh, you

6       guys are focusing too much on photographs and you

7       can prove product ID by all these other ways,"

8       and they give this list in their brief of you can

9       do it by interrogatories and deposition testimony

10      and receipts and packaging.

11           We completely agree.  We wish we had all

12      that stuff.  To Mr. Vejnoska's point from earlier

13      today, if we had really gotten to dig into each

14      one of these 1800 claims, then there could have

15      been a more robust PID proof developed, but

16      instead, what we have to base it on is tiny

17      pictures, and where they do show chain of

18      custody -- not chain of custody, sorry, supply

19      chain, then we've accepted it, just like we've

20      now done for H. Harris since that's been pointed

21      out to us, but the fact of the matter is they

22      were required in the SPPF to show all of their

23      PID proof, whatever you've got, you've got to

24      give it to us.

25           And in almost all of these cases, what we
```

April 10, 2019

```
1     have gotten is just a few pictures of markings,

2     and for a lot of these we're like, okay, that's

3     it, we see the marking, you know, the Special

4     Master will decide if that category is in or if

5     that category is out, but in the ones that we

6     have marked with Objection K, it's just simply

7     not enough to meet their burden of proof.

8          That's it.

9          MR. DAVIDSON:  As the Special Master knows

10    with regard to BNBM product identification, I

11    think we're still at the macro level so we can

12    discuss perhaps a more global contest.  The fact

13    that we haven't had a 30(b)(6) deposition of the

14    BNBM witness doesn't mean that we haven't made

15    any progress yet, and the plaintiffs understand

16    that we've produced a significant number of

17    documents related to product identification

18    markings, and we are still working with them to

19    figure out how we're going to move forward with

20    submitting a report on the product identification

21    and briefing given that our witness has

22    experienced some difficulties with obtaining a US

23    travel visa.

24         We may have an update for the Special Master

25    and for the plaintiffs, which we will speak to
```

April 10, 2019

```
 1        you guys after this meeting, but with regard to

 2        the product ID claims generally, just to preview,

 3        I think, where this is headed, BNBM is not going

 4        to be disputing markings that have a complete and

 5        full record of the BNBM name, the BNBM trademark,

 6        and other distinguishing matters.  And so that's

 7        why you can see here, even though we have

 8        somewhere in the neighborhood of 90 or so claims

 9        -- properties alleged against BNBM, we're only

10        objecting to about 49.

11             So within that 49 we are contesting that 39

12        properties that have the Category C, that's the

13        Chinese Manufacturing #2, the purple font, we

14        think it's going to be pretty clear from the

15        affirmative evidence that BNBM never applied

16        purple font and didn't use the markings that are

17        found on those boards.

18             We submitted a discovery request to the

19        plaintiffs several months back asking for all

20        their contentions, why they think that BNBM

21        produced the purple font board, and we think that

22        when those contentions are presented to the

23        Special Master, that you will find that they do

24        not meet the standards that you set forth in your

25        April 8th report.
```

April 10, 2019

1           Switching to the Sunrise Lakes surprise that

2    we saw in the PSC's April 8th brief for the very

3    first time, this was the first time that we

4    received any notification that the property in

5    the Sunrise Lakes development was alleging BNBM

6    drywall.

7           On December 31st of 2018, the parties

8    submitted a joint at attribution index that had,

9    with regard to the markings that were found in

10   Sunrise Lakes, that those marking categories were

11   all attributed to Taishan.  And then as recently

12   as the PSC's April 8th brief, in their Exhibit A,

13   if you go through all of the Sunrise Lakes

14   properties and you see the defendant that they

15   are alleging those properties against, it still

16   says Taishan for each and every single Sunrise

17   Lakes unit.

18          What the PSC does in its brief is say,

19   "Okay.  Now, instead of looking at the markings,

20   since we can't attribute those to BNBM, we're

21   looking at the Supplier Profile Forms that were

22   submitted many, many years ago."

23          One of the supplier profile forms says that

24   they submitted Chinese board to the Sunrise

25   Lakes, and we don't think that just saying

April 10, 2019

```
 1          "Chinese board" meets any sort of legal standard
 2      for attribution.
 3          The more detailed Supplier Profile Form is
 4      the L&W profile form.  That's Exhibit 88 to the
 5      PSC's brief.
 6          If you look at the L&W profile form, and I
 7      suggest you do, you will see a couple very
 8      important parts.  The first one is that L&W
 9      purchased drywall from a number of different
10      manufacturers, primarily Knauf, also BNBM, and
11      also another manufacturer called Bedrock.
12          What the profile form explicitly says on
13      page 3 is that L&W cannot trace from the
14      manufacturer to a property where that board came
15      from, and that to determine who the manufacturer
16      was you have to go to the property, look at the
17      back of the board and see the marking.
18          We think that none of this that is in the
19      PSC's April 8th brief meets any of the standards
20      that the Special Master put forth in your
21      April 8th report on product identification, and
22      we will have more once the parties submit our
23      joint briefing.
24          MR. MONTOYA:  On Page 26 -- there is the
25      problem.
```

April 10, 2019

```
1              Judge, I'll be brief.  It sounds like we are
2         largely in agreement here in the sense that --
3         and I think this is what I'm hearing, that -- I
4         think what defendants are saying is if there is
5         evidence in the file, in the BrownGreer portal,
6         or evidence that has been submitted that is other
7         than photographs, such as interrogatory answers,
8         stips, videos, recordings, delivery invoices,
9         inspections reports, et cetera, that those should
10        be considered by the court.  It's a totality of
11        the circumstances standard.  That's what we
12        briefed in our papers and that's what I'm hearing
13        and that we're in agreement on.
14              I think it's a pretty small number at this
15        point.  I think we counted 103 that were in
16        dispute.  If Harris is withdrawn, I think we're
17        down to 63, if my math is right, 103 minus 40.
18        So I'm not going to stand here and tell Your
19        Honor it's not hard work, because it's going
20        to take some digging and picking through the
21        file, but it is doable.
22              And that's the information that is there.  I
23        think we're all in agreement on that.  It's a
24        preponderance of the evidence standard, and as we
25        said multiple times here today, we think the
```

April 10, 2019

1      reasonable inferences are drawn in favor of the

2      plaintiffs in a default proceeding.

3              As to Sunrise Lakes that was mentioned

4      earlier, Sunrise Lakes are three different

5      condominium associations that were remediated.

6      In the BrownGreer portal there is an individual

7      remediation file for each one of those

8      properties, and in there you will find the

9      construction documents.  You will find that the

10     general contractor went and in each instance and

11     in each unit tested the drywall for sulfur

12     content.  The sulfur content was high indicating

13     it was Chinese drywall.

14             Some of the units do not have photographs.

15             I pointed out -- this is my client.  I

16     pointed out the Distributor Profile Form as to

17     L&W to give Your Honor a full appraisal of what

18     was supplied to those properties.  So L&W was the

19     supply company and in their Distributor Profile

20     Form in the MDL litigation they did say that they

21     had purchased from BNBM, and I didn't want to

22     leave that fact out.  I felt I had to do that for

23     my client.

24             Where you find more specific -- and I agree

25     with the representation that L&W says they cannot

April 10, 2019

1    track a specific supplier as to what went where,

2    but they shipped 4 x 12 x 1/2-inch drywall and

3    that's what their invoice says, and L&W can't

4    tell you it's BNBM, it's Knauf, it's this, it's

5    that.  That's not in dispute.

6        What is in dispute, I guess in point, is

7    G. Prulx, P-r-u-l-x, was the other supplier of

8    drywall for Sunrise Lakes, and what happened in

9    Sunrise Lakes was post-hurricane in 2006, the

10    roof went bad, they had leaks, they had to fix

11    the units.  The associations are -- they are 55

12    and over communities, it's mostly senior citizens

13    up in the Sunrise area, and the association

14    itself undertook to remediate the affected units

15    that had Chinese drywall.  They went in, tested

16    the units, that's why you will see testing in

17    each file, confirmed there was Chinese drywall,

18    and then the contractor ordered drywall from L&W

19    and G. Proulx.

20        G. Proulx's invoices indicate China board.

21    They don't say BNBM, they don't say Taishan, but

22    some of the indicia that we do have for Sunrise

23    Lakes indicates that Taishan was provided.

24        So it was a single construction project to

25    do these remediations.  We're asking you to look

April 10, 2019

 1      at the totality of the circumstances, including

 2      the Distributor Profile Forms and the other forms

 3      of evidence, other than the photographs, to make

 4      your determinations in the Sunrise Lakes case,

 5      and frankly, all the disputed cases, to consider

 6      the evidence that is before you and make a

 7      decision whether we've meet the burden of proof

 8      or not.

 9           Thank you.

10           MR. VEJNOSKA:  Ms. Lee, just one comment,

11      actually two.  I think that what Mr. Montoya just

12      said, and I appreciate his candor, speaks to just

13      a failure of proof as to this new Sunrise

14      allegation as against BNBM, but additionally, and

15      maybe coming first, it's too late.  It simply

16      can't be the case that 36 hours ago they could

17      serve a brief on us and include one sentence in

18      it and by that magically convert what has been

19      listed on the spreadsheet that they have been

20      telling us all morning is the Bible, from being a

21      Taishan allegation, which we don't think they can

22      support and they are now admitting they can't,

23      and convert it into BNBM.

24           So whether you call it waiver or estoppel or

25      anything else, I think the door has closed on

April 10, 2019

1    that and you don't even need to get to the

2    substantive defect in their proof.

3         Thank you.

4         MR. MONTOYA:  So I just want to make my

5    record clear in the sense as to Sunrise Lakes.

6         SPECIAL MASTER LEE:  Sure.

7         MR. MONTOYA:  I'm asking the Special Master

8    of the Court to look at the completeness of the

9    files and make a determination based on the

10   totality of the circumstances.

11        MR. VENDERBUSH:  So with plaintiffs'

12   consent, I'm going to talk about L and M together

13   because they are both about how much remediation

14   went on, and the big reason I'm going to do that

15   is because Florida law says that where some

16   remediation has gone on, the measure of the

17   damages is the actual cost that you've put into

18   it.  And that's the Barile Excavating case, which

19   is 462 So.2d 1129, and that's actually a partial

20   remediation case, and so the principle would go

21   upstream from whatever amount of remediation

22   you've done, the measure of that is the amount

23   you spent on it.

24        And as in Barile Excavating, you take that

25   amount, and if there was more to be done, that

April 10, 2019

1    would be the measure, you would estimate that,

2    but you would take the part that's done and

3    measure it by what you spent, and that's

4    consistent with the global Florida idea that we

5    talked about in the openings from MCI WorldCom,

6    of what's precisely commensurate with what

7    happened.

8         And so it's good to remember that the

9    remediation formula is a remediation estimate

10   formula, and the paradigm that Judge Fallon talks

11   about is people need to remediate their homes,

12   and they need the money to go out and do this

13   work, and we're told that there are many people

14   who need to do that, and we're accepting for

15   purposes of this process that where those people

16   -- for those people who need to remediate their

17   homes, and they are current owners who need the

18   money to go and remediate their homes, under the

19   court orders that we're operating under and that

20   we're not challenging here, the court has ordered

21   that should happen, but it needs to happen within

22   the confines of Florida law that Judge Fallon

23   didn't address in 2017, and that Judge Cooke

24   didn't fully consider when she had her order.

25        And Barile Excavating says what it says and

April 10, 2019

```
 1        the plaintiffs didn't address it, or say that it
 2        didn't say what we've said it is, and so that is
 3        the undisputed Florida law from the briefing
 4        between the parties and in this case.
 5             And so it actually doesn't matter whether it
 6        was completely remediated or partially remediated
 7        for purposes of how do you measure damages, and
 8        they cannot get a full remediation estimate
 9        formula and so they need to go to where they are
10        going to litigate their other damages and just
11        litigate what their actual damages are, which is
12        not going to be hard because they have the
13        amounts that they paid for whatever remediation
14        there is, and there is an estimate of what's
15        going to be left.  All right?
16             So just real quickly, to touch on the issues
17        that are in -- that are specific to each of these
18        from the briefing, there's not a dispute on this
19        other -- I'll call it a legal issue, which Judge
20        Cooke, on her own, without all this briefing on
21        Florida law that now you have gotten, recognized
22        from her knowledge of Florida law that if you've
23        remediated, you can only get actual costs.  So
24        she wrote that in her footnotes.  So that's -- so
25        we know that.
```

April 10, 2019

```
 1              So there seems to be a dispute on how many
 2      of those there are.  The plaintiffs say that
 3      there -- they admit that there are 298 who have
 4      checked the box "completely remediated" in
 5      whatever moment that they are accepting is the
 6      last moment, and so they accept that those
 7      aren't -- those can't be in the formula process
 8      and they -- but they want to limit us to those.
 9              So let me just defend our position here of
10      what we did.  We took whatever the very first
11      verified answer was, so if the first SPPF that
12      came in said "completely remediated," then we
13      counted that, because the circumstances under
14      which a lot of partial remediations' amendments
15      to change off of complete remediation were not
16      reliable to us, and so there's that.
17              And then we also did our own comprehensive
18      file review, and some of -- there were documents
19      in there that made it not not controversial, and
20      you are going to see from the plaintiffs, they
21      are going to talk to you about the Germano
22      standard for a complete remediation and it's
23      going to be Page 26 of their scope -- I'm sorry,
24      Page 28, and they say that you have to have all
25      of these things or else you're not completely
```

April 10, 2019

1      remediated, and the last one is a

2      post-remediation certification, and we found

3      post-remediation certifications in the document

4      files, and so that, to us, was a strong signal

5      that someone has gotten the complete remediation

6      because one of the environmental inspectors came

7      in and said you're good, there is no Chinese

8      drywall, and there is no aftereffects in here and

9      it's environmentally clean.

10         So those are the kind of documents that we

11     found that we looked at to say this is a complete

12     remediation.

13         But again, our position is that to be

14     offtracked from this process, we don't need to

15     litigate the wide spectrum of partial remediation

16     because Florida law doesn't recognize some sort

17     of binary moment of completeness.  You just

18     measure whatever you've done and then estimate

19     the rest.  And so you can't use an estimate to

20     cover over the part that you've done.  That was

21     exactly what Barile Excavating was about.

22         And so they want to limit us to self-report,

23     but we know that self-report is not reliable.

24         And so here -- there's a lot who changed.

25     This is the best one that we found, and you can

April 10, 2019

1    see the store story here.  They filed an original

2    SPPF in March of 2018, in that period when it was

3    ordered, and they said completely remediated.

4         Then Judge Cooke's order comes out on

5    November 16, 2018, three days later the amended

6    SPPF comes out and it's changed to partial

7    remediation, but they didn't answer the fields

8    for what work needed to be -- still needed to be

9    performed.  It was just a quick fix to change

10   from complete to partial.

11        We then took the plaintiffs' depositions,

12   this is one of the Priority Claimants, in

13   December of 2018, and they testified that Judge

14   Fallon's remediation protocol was followed.  And

15   so when we asked them why did you change to

16   partial remediation, they said, "Well, some tiles

17   weren't replaced," which isn't part of Judge

18   Fallon's protocol.

19        So on April 4th, which was the day we filed,

20   a couple days after, they changed back to

21   completely remediated, but they did -- they added

22   a footnote:  Attempting to reserve the right to

23   get the remediation formula if a fact finder

24   should later find that they were partially

25   remediated.

April 10, 2019

```
 1          So I don't know what they are trying to do,

 2     but that's why we don't think that the

 3     self-reporting can be the totality of what does

 4     it mean to be completely remediated.  And the

 5     bottom line is we don't think it matters because

 6     the measure of damages is what you did.

 7          And so we go to -- and so the point I've

 8     already made, which is that partially remediated

 9     need to be off-tracked as well because there is

10     these fact questions about the scope of

11     remediation, and the -- and it's not a binary

12     moment of you're completely remediated or you're

13     not completely remediated.

14          So they are going to -- I think they are

15     going to rely on Judge Cooke's wording of her

16     order where she said:  Completely remediated get

17     the formula and not completely remediated get to

18     go to the remediation formula.

19          And so I have two answers to that, which is

20     that is not Florida law, and so you would be

21     entering an order that is not Florida law; and

22     also, she did not have the benefit of any

23     briefing on that or any knowledge of what these

24     claims actually look like.

25          And so partially remediated spans the scope
```

April 10, 2019

1    of the people that they -- they gave us three

2    examples in their brief about partially

3    remediated:  People who only had their

4    air-conditioning fixed; people who only spent

5    $11,000; and if they had come to us with some of

6    those, we might have been able to resolve those.

7    We just -- that process didn't happen but it goes

8    all the way up to the Godys, who said, "Oh, there

9    were some tiles," or there are people who are

10   going to claim, "Oh, I didn't get some cabinets

11   fixed."

12        And so that doesn't meet Germano, and so

13   don't worry about everything that was already

14   spent, give me the full formula, which would be a

15   much more obvious violation of Florida law, like

16   you spent all of this to do almost everything

17   under Germano, but you still need to spend $2,000

18   for cabinets?  So don't measure it according to

19   Florida law for everything you've done, give us

20   the full formula?  And that's exactly what

21   happened in Barile Excavating and that's exactly

22   what the court of appeals said that's not how we

23   measure it here.

24        So no judge has ever ruled on that with full

25   knowledge, and so that's why we urge you not to

April 10, 2019

1     do it in that way, because it can only be error.

2          SPECIAL MASTER LEE:  Anything from the

3     plaintiffs?

4          MS. DUGGAN:  Special Master, the defendants

5     are urging you not to follow Judge Cooke's order.

6     Her order is very clear.  She said:  Plaintiffs

7     who have completely remediated their property are

8     entitled to recover the actual cost of

9     remediation.

10         Nobody disputes that.

11         She also says:  Conversely, plaintiffs who

12    have not completely remediated are entitled to

13    the remediation damages formula.

14         She did not say plaintiffs who have not

15    remediated.  She said who have not completely

16    remediated.

17         And this is not a situation where there is a

18    sliding scale.  I understand they want it to be a

19    sliding scale, which is a clear demarcation,

20    either you completely remediated or you didn't,

21    and they are saying that that's not fair, that's

22    against Florida law.

23         Judge Cooke was aware of Florida law.  I

24    think it's unfair to suggest here in this

25    proceeding that she didn't realize what she was

April 10, 2019

1    doing.  Her order is clear.

2           The concept of what is complete remediation

3    does not arise in a vacuum.  In February of 2010

4    there was a Germano trial before Judge Fallon in

5    the MDL.  It was against Taishan.  Taishan was

6    not there because they were in default and they

7    didn't show up, but Judge Fallon, through this

8    process, entered very detailed Findings of Fact

9    and Conclusions of Law as to what is the proper

10   scope of remediation.

11          I'm sorry.  I don't have the --

12          MS. EIKHOFF:  Yeah.  And it wasn't working

13   before.

14          MS. DUGGAN:  This list of items comes from

15   the court's order.  It requires that all drywall

16   be removed, not just the Chinese drywall, but all

17   the drywall, including all the domestic drywall,

18   all electrical systems, including the outlets,

19   the receptacles, the copper and silver pipes, the

20   plumbing, the HVAC system, the assembly, the

21   units, basically down to the studs is what's

22   required.

23          The electrical appliances have to be

24   replaced.  The carpet, the hardware, the vinyl

25   flooring.  There is where we get the tiles.  That

April 10, 2019

1    comes directly from the Germano Findings of Fact

2    and Conclusions of Law.  If tile is broken during

3    the remediation process, it is to be replaced.

4         Cabinets, countertops, crown moulding,

5    baseboards, bathroom fixtures and insulation.

6         Then once the remediation is complete, there

7    has be a cleanup to remove all the particulates,

8    there has to be a HEPA vacuum, a wet wipe, and

9    finally, a certification.  That's what is

10   required.

11        Now is not the time to argue that that is

12   not the proper scope.  That is the proper scope

13   and that's what we've been following in this

14   case.

15        Now, we all agree that if there was a

16   complete remediation, then, as we've indicated on

17   our chart, they are entitled to get their actual

18   costs back, but if it's a partial remediation,

19   they get the remediation damages formula.

20        And if maybe they just started the

21   remediation and didn't finish and they have a lot

22   more to go, they are entitled to it.

23        The defendants say, well, it's not fair if

24   they only miss one item.  I understand their

25   argument but, like I said, that's just not where

April 10, 2019

1      we're at.  That's not what the order provides.

2      The order does not provide you get a certain

3      measure up until a certain point.

4          I think Chinese drywall, you have to

5      understand, is a unique situation.  It's not like

6      the typical, you know, we're going to do this

7      much of the renovation and later on we'll take it

8      up, in five years, and we'll finish it.  So we

9      spent $1,000, it's a $5,000 job, and now we have

10     $4,000 more to complete.

11         If some of these families didn't have the

12     money and they took out some of the drywall but

13     they didn't replace all the wiring, they didn't

14     take the house down to the studs, years later

15     when they finally get their reward, they have to

16     start over.  It's not a question of now they are

17     having a windfall because they spent that money

18     and they are getting the full amount to repair.

19     They actually have to go back, take out any

20     drywall they replaced and start from scratch to

21     take out the wiring.  You can't just take out the

22     wiring without taking out the drywall.  This

23     isn't a windfall situation for them.

24         Sometimes people can only afford to replace

25     their appliances that kept breaking, so they are

April 10, 2019

1   going to have to start from scratch, and that's

2   what the order provides.  I don't think that we

3   can rewrite the order at this point.

4          SPECIAL MASTER LEE:  Does the plaintiffs --

5   do the plaintiffs agree that if there is a

6   post-remediation certification in the file that

7   it should be treated as completely remediated?

8          MS. DUGGAN:  Unfortunately, I don't think we

9   can conclude that.  I would have to argue that

10  every single item has to be complied with.

11  Sadly, in this situation, I understand -- I'm not

12  from Florida -- but there were instances where

13  certification was given but there was not a

14  complete remediation, so you can't just look to

15  that one item and say, "Well, it's complete."

16         Every single item on the checklist of the

17  Germano order has to be met before we would

18  consider it to be complete.

19         MS. GRANT:  And I can add about the

20  environmental certificates.  There is different

21  ones depending upon who issued it, but I just

22  pulled one up that I know did many of them in

23  these cases, and it does not say what counsel

24  represented.  It is not saying that the house is

25  A okay.  It is not saying that it has been

April 10, 2019

1    completely remediated.

2         For instance, the one I pulled up, all it

3    says is that the Chinese drywall has been

4    removed, and there is no dust or debris or

5    residue, and no detectable odor of Chinese

6    drywall at the completion of the remediation.

7         So as Ms. Duggan said, if a homeowner only

8    removed the Chinese drywall, and quite a few

9    people did this, they wanted to get the source

10   out, they wanted to make the house as safe as

11   they could for their kids, but they couldn't

12   afford to take the non-Chinese drywall out or the

13   domestic.  And I will explain about that in a

14   second.  Or they couldn't afford to take out the

15   wiring, but at least they got the offending board

16   out.

17        And you have someone come in and they do a

18   good cleanup job and they do a HEPA.  That

19   homeowner might receive an environmental

20   certificate, but that does not mean the house is

21   okay, it doesn't mean it's been completely

22   remediated, and it certainly doesn't put them

23   back in the position they should have been if

24   they never had the Chinese drywall.

25        And I want to explain why -- you started to

April 10, 2019

1    talk about it, and you did, about how you remove

2    the offending drywall, why that means that there

3    is additional work.  The wiring is obvious.

4    Right?  To access it, you've got to rip the

5    drywall out.

6        But let's take that and put that aside for a

7    moment.  There are some homeowners that only

8    removed the Chinese drywall but not the domestic

9    because it wasn't tainted, it wasn't off-gassing.

10   The problem with that is Chinese drywall, it

11   emits gases.  We don't need to get into the

12   technical aspects of it, but it stinks, and when

13   you take it down, it leaves drywall particulates,

14   that dust that gets all over the place.  That

15   dust gets into everything.  It gets into the

16   crevices behind the walls, it gets into

17   insulation, insulation behind Chinese drywall and

18   insulation behind domestic.  It gets into your

19   duct work.  It gets into every nook and cranny.

20       Many try, and they do a pretty good job, of

21   cleaning the surface areas and doing the HEPA

22   vacs to clean the air, but you can't get behind

23   the walls, especially domestic, you can't get

24   behind or, you know, underneath the ceilings

25   where there is insulation, in the attic where

April 10, 2019

1    that dust is, and what happens is that dust

2    continues to grow.  That dust can continue to

3    off-gas and have an odor.  That home needs to be

4    completely remediated.  In order to do that,

5    you've got to rip everything out again.

6         These homeowners that scraped together

7    whatever they could to try to do these partial

8    remediations should not be punished, should not

9    be penalized, I should say, for spending money.

10        What the defendants have suggested is, so if

11   a homeowner spent $20,000 and they didn't finish,

12   they didn't do the wiring, they didn't remove all

13   of the domestic board, they are saying that that

14   should be their cap, that's all that they should

15   receive.

16        That doesn't put them in the position they

17   should be.  It certainly doesn't make their home

18   completely remediated or comply with the Germano

19   decision.  And in looking at the case that they

20   cited, I'm quite baffled, because my reading of

21   it is completely different.  First of all, it

22   dealt with a mechanic's lien, that's the

23   excavating case, the Barile Excavating.  A

24   contractor walked off the job, this is for

25   driveways, and in a PC-affirmed, the court said

April 10, 2019

1       that the damages were your actual costs that the

2       plaintiffs had expended in that case to

3       remediate.

4            It didn't talk about partial remediation, it

5       was talking about, like I said, a contractor who

6       walked off the job and what those plaintiffs had

7       actually spent as opposed to an estimate.  That's

8       very different from what we have.

9            SPECIAL MASTER LEE:  Did you want to

10      respond?

11           MR. VENDERBUSH:  I guess, if we're going to

12      do the case.  The contractor walked off the job

13      and part of -- the owner of the property did part

14      of the work, and so the court measured the -- the

15      trial court measured the damages by an estimate

16      of all of the work, and then when it went up to

17      the court of appeals:  "The measure of damages

18      for an unfinished construction contract is the

19      reasonable cost of construction and completion in

20      accordance with the contract, if this is

21      possible."

22           So what was done, plus what it's going to

23      cost to complete.

24           "Here, it is obvious that the owner had

25      already completed a substantial portion of the

April 10, 2019

1    work which the contractor had failed to perform.

2    Since these actual cost figures were available,

3    we conclude that error occurred when the trial

4    court based its judgment on the estimated cost of

5    completion."

6         So using estimates rather than actual

7    expenditures is the error, and so that's the law.

8         And this is not a punishment.  We are

9    absolutely going to pay a judgment that gets them

10   every penny of what they prove they've spent and

11   that they need to spend to finish the job.  What

12   they can't get is this formula, which the

13   plaintiffs obviously like.  Right?  Because it's

14   going to be higher.  We've seen that in every

15   situation where we've looked at it.  And so

16   that's why they are clinging to this, and that's

17   why they feel they are being punished if they

18   don't get it.

19        And we are saying you don't get it if it

20   violates the law or if it doesn't fit the facts

21   of your case, or if you have some other legal

22   infirmity that makes it unlawful to do it.  Where

23   we will pay it, we will abide by it, where it

24   fits within what the court's order has said, but

25   it's sort of a reveal for why they don't want to

1       just prove their damages and stick with the

2       formula.

3               MS. GRANT:  May I have one more comment?

4               SPECIAL MASTER LEE:  Uh-huh.

5               MS. GRANT:  What you are talking about in

6       the excavating cases is a driveway.  Let's say

7       it's a 100 feet of driveway and the owner -- or

8       I'm sorry, the contractor did 50 square feet --

9       50 feet, and then the owner finished the rest of

10      the 50.  That's very different.  That wasn't a

11      partial remediation case.  They are just saying

12      the contractor did 50, you did 50, you are

13      entitled to the 50.

14              Very different here.  What they are

15      suggesting, again, is if somebody partially

16      remediated, I believe your words are it "doesn't

17      matter if it's a partial or complete."

18              Well, tell that to the homeowner who, like I

19      said, has scraped enough money together to just

20      do part of the job.  You know, many of these

21      homes are in communities, so we've got identical

22      houses side by side, and sadly -- fortunately for

23      some -- they had Knauf drywall, so they've been

24      remediated, and the Taishan person has not.

25              But even taking two homes side by side, same

```
 1      square footage, same layout, the one homeowner

 2      that spends $20,000 just doing a little bit to

 3      make it liveable, and the other homeowner that

 4      has done nothing, under the formula they recover

 5      full damages.  Say it's a 3,000 square foot home.

 6      Just doing rough math, $300,000 and change.

 7          But the homeowner that spent $20,000, what

 8      they are suggesting is that's all you get.

 9          Then I heard something a little bit

10      different:  "Well, no, you get what it would cost

11      to complete your job."

12          That would mean that we would be turning

13      each and every one of these -- I forget what the

14      number was, how many we've got in this

15      category -- into an individualized determination.

16      That's not what the court ordered.  We're not

17      going to -- we've not been ordered to do that.

18      It would be insane.  Judge Fallon has said it,

19      Judge Cooke has adopted his rulings.  That's not

20      the purpose of this proceeding, to have a trial

21      for each and every person, to figure out, "Okay.

22      You've spent your 20.  How much more does it cost

23      to fix?"

24          That would just throw this whole thing out

25      the door and we'd be starting all over again, and
```

April 10, 2019

1 that's not what the court intended and that's why

2 the order is written as such.

3  MR. VENDERBUSH:  She just said we're only

4 going to pay what someone has already spent.

5 That's exactly what we said we're not doing.  We

6 would measure the damages by what's been spent

7 and they would prove the estimate of what is

8 still to be done.  And if it's the whole thing,

9 then okay.  If you can prove that you need to rip

10 everything out, then okay, then that's what

11 you've proven.

12  But we don't have any proof of that.  We've

13 heard people say that's the case, but we don't

14 have any proof.  There has been no evidence of

15 people that need to do that.  And if you can

16 prove, when you are going to prove your other

17 damages anyway, that you can -- that you need to

18 absolutely rip away everything that you've spent

19 so far, then that's your actual estimate -- I

20 mean your actual damages commensurate with how

21 you've been harmed, and that is the standard.  So

22 we'll do whatever it is that needs to happen in

23 that house.

24  MR. VEJNOSKA:  Ms. Grant is right, this is

25 an individualized determination.  She is sitting

April 10, 2019

1    here giving you all sorts of examples, but what

2    about this, what about that.

3        Well, the examples you don't hear about is

4    what if somebody remediated in 2012, whether they

5    spent $20,000 or $100,000, whether they did the

6    first floor or the whole thing, and they've had

7    no problems since, they've had no complaint,

8    they've had no issue, there has been no smell,

9    there's been no problem.  According to their

10   theory, what you do is you give them -- I guess

11   you give them $100,000 and then they have to or

12   they get to rip everything out again and start

13   all over.

14       This concept where, with respect, she's

15   speaking like an expert of what can and can't be

16   remediated and what can't be removed, there are

17   substances much more dangerous than Chinese

18   drywall, dangerous to human health that are

19   removed, abated from homes all the time, and they

20   can be removed.  So to say it gets into the

21   cracks here or the insulation there, that depends

22   where it was.  It depends how much there is.

23       So what you have here is you have a

24   situation where there seems to be no dispute

25   about complete remediation, you only get what was

April 10, 2019

1       actually paid for.

2              The reason there is no dispute and the

3       reason Judge Cooke said that is that fits with

4       the MCI WorldCom case and Florida law.  Well, so

5       does the rest of this.  What you have actually

6       spent to fix your problem is what you get.  If

7       you are going to assert you still have a problem,

8       that's one thing.  If you are going to assert I

9       have no problem, but I've got this formula

10      lurking out there, a formula, by the way, that

11      was determined based on seven homes in Virginia

12      in a case that BNBM was not even a party to, and

13      that assumes the defect of the product.  And I

14      just have to say again, for the record, you can

15      look at their brief.  They've got a footnote in

16      there that lists the defaults, and Mr. Montoya

17      read it:  BNBM Group.

18             BNBM Group is not involved in this.  Judge

19      Fallon found no jurisdiction over BNBM Group.

20      BNBM PLC is involved in this case.  There is

21      no -- and they do not cite any default judgment

22      or even entry of default against BNBM PLC in

23      Amorin Florida.  And further, what that means is

24      we have a right to show, even if you find our

25      product is there, there is no problem with it,

April 10, 2019

1    and the CPSC has done tests on the BNBM product

2    and the product that was at issue at the time

3    that it was being sold in the United States was

4    found to have no problem.  They did test -- they

5    went to China.  They found one that they think

6    was only sold in China and they said we found

7    some sulfur here.

8         So yes, it's individualized, and it's

9    appropriately so, because that's what Florida law

10   requires.  Now, if somebody has not remediated at

11   all, they've done nothing with it, that's a

12   different category, and again, the BNBM and

13   Taishan positions are different on this given our

14   different default statuses, but that's not what

15   we're talking about here.  We are talking about

16   cases where there has been an actual remediation

17   and for all we know sitting here, the claimant's

18   position is:  Sure, I'll take the formula, I'll

19   take $300,000 or $400,000 for my square footage,

20   but I fixed this five years ago and I've got no

21   problem.

22        And I'm sure they can cite examples where

23   they think the opposite is true.  Fine.  That's

24   why it has to be individualized.  That's why it

25   can't just be shoved into a formula.

April 10, 2019

```
1           SPECIAL MASTER LEE:  Remind me.  What did

2    Judge Fallon say about these partially

3    remediated, if anything?  Because I guess when I

4    read the remediation formula and the pleading

5    that it's in, it seemed like he was trying to

6    avoid a lot of this individual determination.

7    "So this is the best I'm going to come up with,"

8    I think he said something about coming up with a

9    creative solution, whatever.

10        So he was trying to avoid a bunch of

11   individual determinations.

12        Judge Cooke adopted his findings, including

13   that the formula was reasonable, and sent it to

14   the Special Master for whatever.

15        So now you're saying but this is all

16   individual, so much of it is individual.  So how

17   do I accept that and also honor the spirit of why

18   we got here in the first place with this

19   remediation formula?

20        MS. EIKHOFF:  Well, remember that the

21   formula was created only for current owners.

22   Right?  And so that's -- and it has never been

23   applied before.  I think one of my colleagues

24   made that point before.  So this formula that was

25   created has been, up until it's come to you and
```

April 10, 2019

1      now it's sitting on your lap, has been a theory

2      that has never been applied.  And so what we're

3      seeing now is this clash of the idea that, hey,

4      we've got this really efficient formula, and that

5      in practice you are seeing that there is this big

6      clash.

7           And not just a clash, you know, because of

8      these big legal issues of, you know, should there

9      be a class or not, or was the formula a good

10     formula or not.  Like we said, those are -- we're

11     setting those aside.

12          We're seeing a direct clash between the

13     formula's application and Florida law, the law

14     that governs this case, and up until you, no one

15     has ever had to apply the formula while

16     conforming to Florida law at the same time.

17          Now, we are not saying that every single one

18     of these needs to be individually adjudicated.

19     There are some that are current owners who never

20     remediated, they've shown Taishan drywall, and if

21     their square footage is correct and if the right

22     formula is applied, we are not in a position now

23     to object to that.  We can appeal bigger issues

24     later but we understand.

25          But all of the contests that we're raising,

April 10, 2019

1        that Judge Fallon gave us the opportunity to do

2        and Judge Cooke has given us the opportunity to

3        do, is where those -- that clash of the

4        theoretical formula and the application of

5        Florida law and the facts of real life are coming

6        into a real friction, and you are in the

7        position, you have been delegated as a Special

8        Master, to figure that out.

9              And we don't pretend that these are all

10       going to be easy, because it is going to be hard

11       work, but we're not just saying, you know, this

12       is all -- every single one of these needs to be

13       individual, but as we've been showing and

14       explaining, a lot of these are.  Most of them

15       are.

16             MS. DUGGAN:  Judge Fallon did not specify in

17       his class damages order the difference between

18       complete and partial remediation.  Judge Cooke is

19       the first judge, jurist, who said that when it's

20       completely remediated, presumably, under Florida

21       law, they are entitled to their actual costs

22       back, but the concept of what's complete

23       remediation is set forth in the Germano Findings

24       of Fact and Conclusions of Law.  There is no

25       question about that.

April 10, 2019

```
1           And all of this friction is now being

2      created through this contest process.  The order

3      is clear.  It's not some theoretical formula that

4      has to be applied.  It's a clear formula, it's

5      very simple, and it's only being made complicated

6      by defendants who would like to take most of

7      these properties off-track and set them for some

8      future individualized adjudication process that's

9      not set forth in Judge Cooke's order.

10          MR. VEJNOSKA:  To be clear, to the extent

11     we're complicating it is because Judge Fallon did

12     not consider any state's laws in creating the

13     formula, that I'm aware of, but if he did, he

14     certainly did not consider Florida law.

15          What we're saying is he can create this

16     formula, but it still is subject to Florida law,

17     and Florida law is very clear about you remedy

18     the actual damage that was specifically inflicted

19     by the specific defendant, MCI.

20          And you've got the other cases that say:

21     And in any event, your award cannot exceed the

22     lesser of diminution in value or the actual costs

23     -- sorry, the value of the home, for instance.  I

24     think that's the Santa Rosa case.  They are cited

25     in our PowerPoint as well as in our briefs.
```

April 10, 2019

1        And so yes, maybe it makes it more

2    complicated, and maybe it will mean different

3    awards than you would get under the formula, but

4    that's what Florida law requires.  You can't wave

5    a wand and say this is the formula and you can

6    forget the law in a particular jurisdiction, just

7    flout it and just award the money.  That's not

8    the way it works.

9        MS. EIKHOFF:  And as I said at the

10    beginning, there already is a process in place.

11    There is a lane in this case for these plaintiffs

12    for individual adjudication of damages.  The

13    formula seems to have been created as a way to

14    let's speed this along, let's just do this faster

15    and get thousands done at once.  But the problem

16    with that is that expediency is not going to be

17    achieved if it's done in violation of law in the

18    first place, because if the goal is, hey, we need

19    to get these people money and what they are

20    rightfully owed under Florida law, then applying

21    a formula that violates Florida law is not going

22    to speed up getting money to them.  It's actually

23    going to slow it down big time, because it's

24    going to be appealed and overturned and

25    potentially remanded.

April 10, 2019

1          And so again, we are not trying to cheat

2     anyone out of money and damages that they have

3     actually suffered caused by Taishan product, and

4     we will pay them every penny that they spent

5     out-of-pocket and what is estimated that still

6     needs to be done, we'll do that if they have

7     remediated these properties.

8          But it's -- and so -- but it would be a

9     windfall, apparently, and it's what the

10     plaintiffs desperately want, to just ignore the

11     work that was actually done, ignore Florida law,

12     and rubber-stamp their formula calculation.

13          MS. DUGGAN:  This concept of windfall,

14     rubber-stamping, has already been argued to both

15     Judge Cooke and to Judge Fallon.  There was a

16     hearing, the defendants participated in the

17     hearing, expert witnesses were put up.  This did

18     not just arise in a vacuum.  And for them to say

19     now that it's contrary to Florida law, they've

20     already said that to Judge Cooke.  So I think we

21     need to acknowledge the court's order and proceed

22     from that.

23          MR. VENDERBUSH:  Even if we were to keep it

24     at complete remediation, if that was your

25     decision based on Judge Cooke's order, we still

April 10, 2019

```
1    have individual issues on the issue of complete

2    remediation.  They want to stick with what they

3    checked the box and never changed it in their

4    SPPFs, and we have found good evidence to suggest

5    that there was a complete remediation.

6         And so how do we resolve that?  Have they

7    proven complete remediation to the Germano

8    standard in each of these cases?  That proof has

9    not been submitted to you.

10        So it's still an issue, and it's actually

11   the greater -- much greater amount is in L than

12   in M.

13        In fact, I think this is a good time for a

14   break, actually.

15        SPECIAL MASTER LEE:  Yes.

16        (Recess from 2:50?p.m. until 3:13?p.m.)

17        MR. VENDERBUSH:  So category N is

18   remediation funded by another party, and this

19   seems, like, kind of basic to us, but we think

20   that this should be off-tracked because of the

21   strong indicia that in a remediation estimate

22   formula process, these people have no remediation

23   damages because someone else paid for the

24   remediation.

25        And so how did we find this?  Well, there is
```

April 10, 2019

1       self-reporting on the SPPF that someone else did

2       the remediation, we also did the file review that

3       we've been doing, and we also looked at sources

4       of set-off claims that the source suggests

5       strongly that they were in a program that someone

6       else paid for the remediation.

7              That's not the GBI settlement, which are

8       much smaller payments that were cash payments

9       made out of a smaller pool from suppliers.  So to

10      the extent they talk about GBI in their brief,

11      that was not something that we used as an

12      indicator that someone else paid for the

13      remediation.

14             So we think these need some review because

15      someone else probably paid for this.  And so how

16      do we know that?  Well, we have the general

17      principle that you shouldn't get a windfall.  If

18      someone else paid for your whole remediation, you

19      can't now get the 100 -- whatever the formula is

20      going to give you for money that you were never

21      out for.

22             But there is also specific Florida law in

23      the Deauville Hotel case, which is cited in our

24      brief under N, and I think if BNBM goes, they

25      have it in -- the full cite in their -- sorry, I

April 10, 2019

1    didn't write it down -- which says if you didn't

2    spend money for something, then you don't get

3    that as part of your damages.  It's kind of basic

4    but there is an actual case where a wedding

5    didn't -- anyway, you can read it if you want.

6    It's fascinating.

7         So the plaintiffs say that the set-offs

8    should -- what am I saying here?

9         So the plaintiffs say that, well, don't

10   worry about all that because we're going to have

11   set-offs.  Right?  But the set-offs are not

12   congruent, not necessarily congruent with the

13   amount that you got and have no damages.

14        So say you have no -- say you get the full

15   formula.  That doesn't necessarily mean that the

16   set-offs are going to zero you out for us.

17   Right?  Because our position is you don't have

18   any damages because someone else remediated for

19   you, but we can't, like, step back and say why

20   don't you get the formula and then we'll subtract

21   the set-offs?  We think you just don't get the

22   formula.

23        I took this from their PowerPoint that are

24   going to come up here and say, and the second

25   bullet says:  "Absent an assignment to a third

1    party, the fact that someone other than the named

2    claimant paid for the remediation does not

3    disqualify the claimant from an award of

4    remediation damages."

5         That is boggling to me.  So I look forward

6    to hearing their explanation of that bullet

7    because that seems exactly what it should do.  If

8    you had no remediation damages, then you are not

9    entitled to a remediation damage award.

10        MR. MOREN:  So this is the cite --

11        MR. VENDERBUSH:  Yes.

12        MR. MOREN:  -- referred to earlier.  This is

13   similar, Special Master Lee, to what we talked

14   about with Contest D, with the former owners,

15   where we have the problem of double-dipping here.

16   If someone else has spent the money on performing

17   the remediation, we may be responsible to

18   reimburse that entity that actually performed the

19   remediation, and if plaintiffs here are claiming

20   this money and the third party that performed the

21   remediation may request this money, we may be two

22   times exposed for the same work.

23        And that's why this just doesn't make sense

24   for them to try to get a recovery for any kind --

25   any money that they didn't expend.  That's the

April 10, 2019

1    reason behind this law.

2         I also looked through plaintiffs' brief to

3    understand why they think they might be entitled

4    to it anyway, and, you know, they suggest

5    theoretical scenarios, like there might be some

6    kind of subrogation agreement where they are

7    required to pursue these funds for the benefit of

8    the entity, but that may or may not be.  It's the

9    plaintiffs' burden here to show the damages, so

10   if there are these type of subrogation agreements

11   or anything else that they may be required to

12   pursue the money on behalf of the third party,

13   plaintiffs have the burden to show that

14   affirmatively.

15        That's all I have.  Thank you.

16        SPECIAL MASTER LEE:  Thank you.

17        MS. GRANT:  The defendants seek to exclude

18   or take off track 421 claimants because

19   remediation was funded by another person or

20   entity.  Most of these are actually cash payments

21   from a builder or a third party, and that's as

22   part of settlement and that's been disclosed and

23   that's part of the settlement.  There is no issue

24   there.  It's not a separate defense.  It

25   certainly shouldn't take somebody off track.

April 10, 2019

1         If the entity paid for remediation, like the

2    Knauf settlement, those have been disclosed as

3    well.  And I hear counsel saying, "Well, you have

4    no damages."  Well, you certainly do if you

5    haven't been completely remediated.

6         This is not double-dipping.  We're not --

7    I'm not aware of any situation, please pipe in if

8    we do, where we have competing claims where that

9    issue would arise.  Certainly we do not seek to

10   double-dip.  That's not what we're looking at

11   here.

12        They are saying just by virtue of the fact

13   that a builder or another entity, whoever they

14   may be, either paid cash or remediated your

15   property, oh, you're out, and that's simply not

16   the case.

17        The other category where we saw some

18   objections were for condominiums, and there is 37

19   of those, and as we talked about earlier, in the

20   condominium context, sometimes the individual

21   unit owners paid for partial remediations out of

22   their own pocket, and that's reflected in their

23   SPPFs and it's reflected in the association's

24   SPPF, but any funds will flow through to the

25   association.  They have standing and all parties

April 10, 2019

1    concerned agree that's the way it should be done,

2    that's necessary, and they will distribute

3    accordingly.

4         So the fact that a unit owner paid for

5    remediation, what they are arguing is, well, then

6    the association's claim, they got hit with this N

7    objection and they should be taken off track.

8         That makes absolutely no sense.  The statute

9    that we talked about provides for authority to

10   institute claims on behalf of unit owners.  Where

11   there is matters of common interest, it would be

12   illogical to say, "Well, great, you can bring a

13   claim but you can't collect a claim."  And that's

14   essentially where they are going here.

15        The last category, I think there is only a

16   few of these, and I can only speak as to my own

17   personal experience in trying to figure out why

18   some people got an Objection N, and oftentimes it

19   not noted, but it appears that the claimant

20   contracted with an entity to remediate their home

21   privately and perhaps they used a corporate

22   check, their business or their spouse paid for

23   it.  It is not a settlement, it's not a builder,

24   it's not a third party, it's the same person.

25        In fact, I have one where it's my client's

April 10, 2019

1     corporate check and he signs it.  Let's say his

2     name is John Doe.  Everything says John Doe.  The

3     check just happened to come from a corporate

4     entity.

5          That makes absolutely no different

6     whatsoever.  That person clearly has been

7     damaged.

8          I think that's all I have for this section.

9          MS. SCHWAB:  If I may, I --

10         MR. VEJNOSKA:  No.

11         MS. SCHWAB:  I just wanted to note that in

12    the Knauf settlement there were three different

13    tracts:  Option 1, 2 and 3.  Option 1 was your

14    typical you hire -- you used their contractor to

15    come and do the remediation.  Option 2 is where

16    you received the funds to pay your own

17    contractor.  Right?

18         MS. GRANT:  Actually, the contractor got

19    paid directly.

20         MS. SCHWAB:  I'm sorry.  The contractor got

21    paid directly.  I apologize.  And Option 3 is

22    cash, you get paid directly for your damages.

23         For Option 2 and Option 3, if it was a mixed

24    board home, meaning the home had Knauf and

25    Taishan, Knauf would only pay the percentage of

April 10, 2019

1       the amount of the remediation award --

2            MS. DUGGAN:  The percent of drywall

3       attributable to Knauf.

4            MS. SCHWAB:  -- equal to what is the

5       percentage of the home.

6            So in those scenarios, and there are dozens

7       of them, if a claimant's remediation damages were

8       let's say $100,000, but the home only had 50

9       percent Knauf, they would only receive $50,000.

10           And what we have discovered is through the

11      objection process, those claimants would receive

12      an Objection N because they are saying -- Taishan

13      is saying that the remediation was funded by

14      another person or entity, i.e. Knauf, but it was

15      only partially funded.

16           So our basis is that the set-offs would

17      account for any payments that have been received.

18           MR. MOREN:  But what you are saying here --

19      so in this situation where the property has been

20      completely remediated by Knauf, and say in your

21      hypothetical it costs $100,000 to do that, and

22      Knauf only paid $50,000, so you might claim

23      $50,000, but that's not the way you're doing it.

24      You are claiming the amount of damages under the

25      formula itself and then you are subtracting the

April 10, 2019

1       $50,000 that Knauf paid.  So if it is a normal --

2       if it's around a 2000-square footage house, the

3       formula damages are going to be about $200,000,

4       and you're subtracting out the $50,000 that Knauf

5       paid to get $150,000.  Whereas, the remediation

6       was done and it only costs $100,000.

7           That's what the objection is to in this

8       case, is that there is actual costs, that there

9       is no need to calculate -- to use the formula to

10      calculate damages here if they were remediated by

11      another party.

12          MS. DUGGAN:  I just want to clarify with

13      regard to the Knauf settlement.  Option 1 only

14      pertained to KPT Homes.  In other words, Moss,

15      through the Knauf settlement, completely

16      remediated the homes.  There was no cash payments

17      made other than for alternate living expenses and

18      move-in and move-out, et cetera, but that's not

19      the situation.

20          Option 2 and Option 3 were for mixed homes,

21      where they would pay the percentage attributable

22      to Knauf to the contractor or to the buyer if

23      they wanted to cash out at a cheaper amount, but

24      that's not a full remediation under the Knauf

25      settlement.

April 10, 2019

```
 1          MR. LAWSON:  Ms. Duggan is actually
 2    incorrect about Option 1 homes.  We have over 100
 3    Renaissance Condos homes that did not contain 100
 4    percent Knauf drywall and which were remediated
 5    by Knauf as part of the separate settlement even
 6    if the homes contained zero percent Knauf
 7    drywall.  I don't know how Knauf reached that
 8    agreement, but they did, and they are part of
 9    this list of claims, so -- and they are listed on
10    their spreadsheet as receiving Option 1.  They
11    were completely remediated by Knauf and they are
12    part of the active list that you have on your
13    spreadsheet.
14          MS. DUGGAN:  That is the one exception.  In
15    a pilot program very early on, you are correct,
16    there was an RCR settlement approved by the court
17    and Knauf has asserted a claim for reimbursement
18    for those payments.
19          MR. LAWSON:  Right.  And it's our
20    understanding from looking at those they don't
21    actually contain an assignment of the claims,
22    they contain a release and they have reserved
23    claims for non-KPT claims, non-Knauf claims,
24    against defendants like Taishan and BNBM.
25          Knauf has made a motion saying that those
```

April 10, 2019

1    claims were assigned to them.  I think they are

2    mistaken about the nature of Option 1 versus the

3    special settlement, because they looked at those

4    agreements, but they -- I would assume that

5    plaintiffs also take the position that they were

6    not assigned because they are pursuing them in

7    this process and in this litigation, and not

8    assuming that they've been assigned to Knauf.  I

9    don't think Knauf is standing in the shoes of

10   them today here in this process either.

11         MR. VENDERBUSH:  I think the bottom line

12   probably is that all of these Ns also involve

13   remediation, so they are going to fall within one

14   of our other objections as well, so we have a bit

15   of -- there is a cascade here.  Right?  There is

16   multiple and how they overlap.  And so,

17   obviously, there's a lot of complicated issues

18   here and we sort of revisited the condo

19   association problem.  Right?  And this is a third

20   way that condo associations stand alone.

21         And they have a sentence on page 49 in this

22   section:  "Thus the fact that remediation was

23   paid by a third party, i.e. unit owner, does not

24   defeat the condominium association's standing or

25   ability to collect damages."

April 10, 2019

```
 1              That was another one of those head
 2       scratchers for me.  How?  What?  How does that
 3       work?
 4              Something is going on with these condo
 5       associations that we don't get, and so we don't
 6       think we just sort of roll over that because it
 7       is sui generis.  They are not in the class
 8       because they are not property owners and they
 9       don't fit with what Judge Fallon had in mind for
10       this class, which was homeowners that need to
11       remediate, give them the formula and go.
12       Something else is happening here with -- so
13       that's just a reminder of that.
14              But for the purposes of N, we think they
15       will probably be captured by others.
16              SPECIAL MASTER LEE:  Did you guys address
17       this, too, on page 31?  I think you were saying
18       you had some questions about that on page 31.
19              MR. VENDERBUSH:  The next slide, I think.
20       They are not obligated to.
21              MS. GRANT:  No, we did.
22              SPECIAL MASTER LEE:  You did?  Okay.
23              MR. VENDERBUSH:  So then we have O, and so
24       I'll keep being the Florida law guy here.  We
25       have a basic principle in the Santa Rosa Golf
```

April 10, 2019

1    Association's case, which is, again, proper

2    measure of damages.  Florida law has a pretty

3    robust law on this, and you have to use

4    diminution in value as the proper measure of

5    damages when diminution is less than the cost of

6    repair.

7        And so what this is is the people that we

8    found from just their self-reporting of SPPFs, we

9    haven't been able to do a lot of discovery on

10   diminution in value because that's pretty

11   property specific and it's expert specific.

12   We've done it for some of the Priority Claimants,

13   where we could do that, and the plaintiffs -- and

14   we have experts on diminution in value and we're

15   going through the expert process now, where

16   people claim diminution in value and the

17   plaintiffs are going to be pushing for some

18   diminution in value in their other damages, but

19   where we could find it from the information that

20   we have, because people wrote down, "What's your

21   diminution in value?"  And where the diminution

22   in value written down, self-reported on the SPPF,

23   was less than the formula, then we think prima

24   facie that is what the proper measure of damages

25   is under Florida law.

April 10, 2019

1          And we actually have a concrete example of

2     it.  I can click through it.  David Deeg and

3     Deborah Hooker, in Claim 298, were deposed as

4     claimants.  They sold their property without

5     being remediated and they self-reported on their

6     SPPF that they had a diminution in value from

7     selling a property, which is one way that you can

8     measure diminution of value, of $194,700, and

9     they calculated that based on the difference in

10    their sale price and a later sale price that

11    happened after remediation.

12         So they sold it unremediated, somebody

13    bought it, remediated it and flipped it out, and

14    they claim that the difference between those two

15    prices is their diminution in value.

16         Fine.  That's their proof and we can take

17    that up when we have a fact finding about that.

18         But their formula calculation would be

19    $229,614 if they were -- if they are here.  And

20    so that -- that has to be the measure of damages,

21    not that.  And when she was questioned,

22    Ms. Hooker stated very strongly that she wasn't

23    seeking remediation, that she was seeking

24    diminution in value, and she said that's the fair

25    measure of damages.

April 10, 2019

```
1              So even lay people know that that is what
2        happens when you sell a property that's
3        unremediated, but there is all sorts of different
4        factual situations, but that's the Florida law
5        and we have done as well as we can.  So the ones
6        that we put Objection O for are the ones we know.
7        That's the best we can do within the process that
8        we've been given.
9              MS. EIKHOFF:  There is one more slide.
10             MR. VENDERBUSH:  Oh, I'm sorry.
11             So they say that there has to be some --
12       that we can't argue diminution in value until we
13       make some sort of showing, but again, they have
14       the burden and they have said what their
15       diminution in value is, and so that's why --
16       that's why we brought the ones to you that we
17       know about, that we have some evidence to fit in
18       the Florida law.
19             And then they say in their brief, at 50-51:
20       Where the plaintiff apparently admitted to a
21       lower diminution number, then at worse plaintiff
22       would simply be limited to the lesser of the two.
23             Yes, that is exactly what we're saying and
24       that's exactly what Florida law requires.
25             MR. MONTOYA:  It's Slide 32, please.  Judge,
```

April 10, 2019

1    we're back to your charge in this case, which is

2    calculating remediation damages.  You will not

3    find a diminution in value column at Tab A for

4    our chart.  We're not asking you to make that

5    determination.

6         I think what's going on here is a little bit

7    of litigation gotcha.  You've got people filling

8    out their profile forms, they are asked to put a

9    number in for diminution of value, or some people

10   did, some people didn't.  It is a separate track,

11   it is a different type of damage.  We have the

12   Priority Claimants.  They are -- that are set on

13   a different track:  Alternative living expenses,

14   diminution in value, et cetera.  That's not

15   before Your Honor.

16        But I do need to clarify one point on

17   Florida law.  The general law is that you get

18   cost of repair or diminution in value, but not

19   both and the lesser of the two.  I think that is

20   an accurate statement of Florida law.

21        But there is an exception, and the exception

22   is this, and this is what's bubbling up to the

23   surface in the Priority Claimants' trial.  So

24   when expert disclosures were due, we disclosed a

25   Florida real estate expert realtor and the

April 10, 2019

```
 1        realtor's opinion is that when you have to go and

 2        sell your Chinese drywall home, and under the

 3        Johnson vs. Davis case, that's a Supreme Court

 4        case that says you have to disclose the material

 5        defects, that's cited in our papers, you have to

 6        say it was remediated or it had Chinese drywall.

 7        That creates a permanent stigma.

 8            And that's the exception under Florida law

 9        where -- that we are seeking in the Priority

10        Claimants' trial.  We have designated experts.

11        They have designated experts.  The case law is

12        Bisque Associates of Florida vs. The Towers of

13        Quayside.  I will give Your Honor a copy, and a

14        copy to the parties as well.  It's not cited by

15        either party in these cases, but I need Your

16        Honor to understand that it is on a separate

17        track, I do not think it's for your

18        consideration, but I wanted you to be generally

19        aware of the law as well.

20            And I don't think it's -- that's my copy.

21            MS. EIKHOFF:  That's okay.

22            MR. MONTOYA:  These are my highlights to it,

23        but essentially what that case found was that

24        there was a flood at Quayside and there was

25        repairs made, and then the condominium made the
```

April 10, 2019

1     argument that if I have to disclose this flood

2     and it happened and it was repaired, it's going

3     to permanently impact the market value of it.

4          The trial court thought that it could decide

5     the issue of permanency, and what the Third DCA

6     found was it was actually a question of fact to

7     go to the jury as to whether it was permanent or

8     not, and the exclusion of the expert testimony in

9     that case, where the Florida realtor could come

10    in and say it created a permanent issue or

11    permanent stigma, that was for the jury to

12    decide.

13         So we will be pursuing that in the Priority

14    Claimants' side.  This isn't on your side.  Thank

15    you.

16         MR. MOREN:  I'd like to respond quickly to

17    what Mr. Montoya said.  He said the diminution of

18    value is not before you in this process.  What

19    we're objecting to here is that plaintiffs have

20    put before you -- put before all of us what they

21    think the number is for diminution in value.  And

22    as Mr. Montoya agreed, Florida law is clear that

23    a recovery is either diminution of value or

24    repair costs, but not both.  Any recovery for

25    repair costs is limited to what diminution value

April 10, 2019

1      can be, that's the cap.

2           So here, plaintiffs have told you that this

3      is what they think the diminution in value is.

4      That's a flag for you to consider when you are

5      assigning what are the remediation damages.  If

6      this plaintiff is before me and I'm calculating

7      their remediation damages, if I'm calculating the

8      formula, that number that they told you for

9      diminution of value is a flag that that's the

10     maximum you can award.  That's what this

11     objection is.

12          MR. VENDERBUSH:  So there is a little bit of

13     having it both ways, because this is supposed to

14     be the complete remediation, it's over, it's

15     done, and that's what repair costs -- you get to

16     do repair costs when it's repairable.  When you

17     can make -- you can fix the problem.

18          In this case they weren't sure whether they

19     had fixed the problem of the clogging pipes, but

20     this fixes the problem.  That's why they taut

21     Germano, because you've got to do it all, you've

22     got to do what Judge Fallon said.

23          And so if you fix the problem, then there's

24     no -- you don't do -- you do diminution in value

25     when you can't fix the problem.  Right?  You

April 10, 2019

1       cannot -- someone puts oil in your property, you

2       cannot fix -- you cannot get that oil out, so

3       we're going to pay you what your property has

4       lost.  Or if we can fix the problem, you get

5       repair costs.  Under Florida law, that's the

6       permanent versus temporary distinction.

7            And so we're not -- they have litigated this

8       case and they've moved forward that these are

9       temporary problems.  If this is a permanent

10      problem, and by the way, I mean, I'll testify --

11      I'm not testifying to this, but all the testimony

12      that we have, except from their expert, is that

13      doing a Chinese drywall remediation actually

14      improves your value because you have all new

15      material, number one, and you are guaranteed

16      buying a house that does not have Chinese drywall

17      in it in south Florida.

18           So there isn't any diminution, there is no

19      stigma going on here, but it also -- it's not

20      this case.  If they want -- if they think there

21      is some permanent damage, then that's a

22      diminution in value recovery under Florida law.

23           If they want to remediate and get

24      remediation costs because they can fix this

25      permanently, then that's a remediation estimate.

April 10, 2019

1          MR. MONTOYA:  Judge, essentially what they

2     are saying is it's almost an election of remedies

3     type issue, is what I'm hearing, but that's not

4     what the case says.  They are talking about the

5     real estate agent and it says in Headnote 6 and

6     7, speaking as the realtor, she would have

7     testified to her inability to sell the unit at

8     full market value because of potential buyers'

9     reluctance to pay full market price for a unit

10    whose plumbing has a repeated tendency of

11    clogging.

12         This doesn't say they fixed it.  That's the

13    issue.  The disclosure is made.  Does that

14    trigger the stigma or not?  That's a question for

15    the expert, that's a question for the jury,

16    that's simply not before you, but I wanted to get

17    the applicable law before you.

18         SPECIAL MASTER LEE:  Okay.

19         MR. VEJNOSKA:  Have you seen the light?

20         SPECIAL MASTER LEE:  I'm getting excited.

21         MS. EIKHOFF:  All right.  So I think

22    Mr. Vanderbush said several minutes ago, "I'm the

23    Florida law guy, I'm going to go."  So I'm not

24    going to talk to you about Florida law.  We're

25    actually shifting gears now from the series of

April 10, 2019

1    contests that were based on Florida law

2    specifically, and these last two contests are

3    based on what I will loosely call the law of this

4    case.

5         These last two objections, I will take them

6    one by one, but just to introduce P, this is

7    grounded in the judge's prior orders in this

8    case.  As I said at the very beginning of the

9    day, we're not trying to flip over all the tables

10   here and make you change everything.  In cases

11   like this, we're saying you need to comply with

12   the rulings that the courts in this case have

13   already entered.

14        And the P remedy, you will see, it apply --

15   it's the only -- not the P remedy.  The P contest

16   you will see applies to every single claim, and

17   the reason it applies to every single claim is

18   because, obviously, it's a global issue, and the

19   global issue is that for each one of these

20   claimants, the plaintiffs are asking you to apply

21   an inflated formula number, a formula number that

22   has been inflated over and above the formula

23   number that the court has entered in this case.

24        So what we're asking you to do, and I'll

25   explain this a little bit more as we go forward,

April 10, 2019

1      is where you determine that it's appropriate and

2      lawful to apply the formula, you need to apply

3      the base -- the formula that has the base figure

4      that is the only one that any court has approved

5      in this case, and that base figure is $105.91 per

6      square foot.

7          They have not -- the Bible spreadsheet that

8      they have given you does not have this number,

9      $105.91.  And as a matter of fact, they've

10      already said we're going to increase it again

11      because they are waiting for the 2019 numbers to

12      come back out so they can adjust it.

13          But here is why they can't do that on their

14      own.  They are not authorized as plaintiffs to

15      just keep increasing it year by year so that as

16      this litigation continues, it just keeps getting

17      higher and higher.

18          Here is a little bit of a procedural history

19      story.  We got into this case, we meaning the law

20      firm of Alston & Bird, got into this case when

21      Taishan reentered the litigation in February of

22      2015.  Within a few months we had this

23      evidentiary hearing on class damages and on the

24      plaintiffs' proposed formula that you have heard

25      so much about, and that led to the April 2017

1        FOFCOL that you have heard so much about.

2            So in the weeks and months leading up to

3        that June 9, 2015 evidentiary hearing, the

4        plaintiffs submitted the expert report of an

5        expert named George Inglis, and George Inglis had

6        put together this calculation and his original

7        report ended up looking nothing like the report

8        that was ultimately entered in the case and that

9        was relied upon by Judge Fallon, because we

10       deposed Mr. Inglis leading up to the evidentiary

11       hearing, as in the regular course of litigation

12       you would do, and in that deposition we exposed

13       multiple errors and problems with his report.

14            And so he submitted, leading up -- including

15       up to the night before the June 9 hearing,

16       multiple corrective declarations and

17       spreadsheets.  So he was replacing it, saying, "I

18       did the numbers again, I did the numbers again,

19       and I did the numbers again, and I have to take

20       this out and I have to adjust that."

21            And then he was put on the stand at the

22       evidentiary hearing and he had direct examination

23       and cross-examination, and that was an example of

24       the adversarial process at work.  An expert is

25       put forward, his opinions and bases are

1   challenged, and in that challenge it gets refined

2   to become what is ultimately approved by the

3   court.

4        So time passed between the evidentiary

5   hearing in June of 2015 and the court's eventual

6   FOFCOL in April of 2017, and it is not a secret

7   that one of the reasons so much time passed is

8   the parties were trying to mediate and that

9   didn't work out, and so Judge Fallon finally

10  issued his order in 2017.

11       But this is a really important point,

12  because Judge Fallon, when he issued his order of

13  $105.91 per square foot, Judge Fallon relied on

14  the expert report of George Inglis, which is the

15  only expert report that was in evidence and was

16  the only one that he had considered and had been

17  tested.

18       Now, plaintiffs emphasize in their briefing,

19  and I expect that they will when they stand up,

20  that Judge Fallon's order says that he approves

21  the formula as adjusted by the RSMeans location

22  factor, and they take that -- they interpret that

23  very broadly to mean "so we can adjust it however

24  we want, we can adjust it as we go forward, we

25  can adjust it by year, we can adjust it by ZIP

April 10, 2019

1    code, we can just sort of take this and run with

2    it."

3         But we know that that's not what Judge

4    Fallon approved for them to do, and the reason we

5    know it is that in between the evidentiary

6    hearing and the issuance of the FOFCOL, the

7    plaintiff submitted, filed with the court, a new

8    expert report of Ronald Wright.

9         Now, Ronald Wright is some sort of business

10   partner with George Inglis and he had been

11   unavailable for the June hearings, so they had

12   put up Inglis instead of Wright, but they said

13   that they worked together, so the plaintiffs say

14   these two guys are basically interchangeably, it

15   doesn't matter which one submits it.

16        What they did in December of 2016 is they

17   said, "We're going to have Mr. Wright adjust this

18   upward to bring it current, so from 105 to 107."

19   They submitted it to the court.

20        Judge Fallon had that for four months, and

21   yet when he issued his FOFCOL, he accepted

22   $105.19, the one that had been tested, the one

23   that had been entered into evidence.

24        So what you see the plaintiffs doing here is

25   since the 2015 ruling, they have had Mr. Wright

April 10, 2019

1      continue, whenever it's convenient for them,

2      whenever there is a point in the litigation that

3      they decide that they want this to be updated,

4      they have him just go ahead and rachet it up

5      again and increase it some more on the

6      year-to-year increase.  And I'm not saying he's

7      doing it arbitrarily.  It's based on the RSMeans

8      factor and, you know, sort of inflation or

9      whatever, but the fact of the matter is we've

10     never been able to test that because we've never

11     deposed Ronald Wright.  There has never been any

12     discovery on him.

13         And so they are just giving this to you as

14     if you can just accept it and they are telling

15     you that this is the court's number, but it's not

16     the court's number.  It's Mr. Wright's untested

17     number.

18         So to this day you don't have any -- you've

19     never been given a spreadsheet that has the

20     court's actual number, the only one that's been

21     approved in this case.  If you were to replace

22     their number with the court's approved number,

23     the $105 number, then Objection P would go away.

24     So right now it's applied to everyone.  If you

25     adjust it to apply the court-authorized formula,

April 10, 2019

1      that objection goes away, but that's the reason

2      that we have asserted that objection.

3           MR. DAVIDSON:  I believe Ms. Eikhoff

4      sufficiently covered Contest P, so we would pass.

5           MS. DUGGAN:  We acknowledge that in Judge

6      Fallon's class damages order the number of

7      $105.91 is the number that's stated, and that is

8      based on the RSMeans national square foot unit

9      price that was in effect in 2015, when the class

10     damages hearing occurred.

11          We would just suggest to you to read

12     Footnote 10 on Page 24 of the Westlaw cite of

13     that order.  Our interpretation is that what

14     Judge Fallon meant was the current figure,

15     because this was all based on increasing the

16     Germano finding back in 2010 of $86 a square foot

17     to bring it current.  That's how we got to the

18     $105.91 in the first place.

19          So our argument is that because the damages

20     are being calculated today, it should be the

21     current number.  We recognize that the order

22     itself says 105, but the footnote indicates it

23     should be brought to a current number.

24          Now, as far as Ron Wright and George Inglis

25     are concerned, they worked closely together for

April 10, 2019

```
 1        many years on this litigation calculating these

 2        numbers.  Unfortunately -- and George Inglis

 3        worked for Ron Wright, but right before the

 4        hearing, his wife was diagnosed with a terminal

 5        illness and he was unable to testify.  So we put

 6        up George Inglis for the hearing.  They deposed

 7        George Inglis.  And what Judge Fallon did was he

 8        approved the methodology that they put forward,

 9        so this is a methodology and it's based on

10        published figures.  It's not something we're

11        making up, it's not something we're trying to,

12        you know, present out of context.  It has a basis

13        and what happened was when the court finally

14        entered the order in 2017, asked the plaintiffs

15        to produce updated class spreadsheets, we did so,

16        but we put in the 2017 number because that's when

17        we were filing, and that's how on our spreadsheet

18        that you have in Exhibit A, we base it off

19        $109.85.

20            Our goal was to bring it current to 2019.

21        Unfortunately, something happened in the

22        publication at the beginning of this year and the

23        number wasn't available until yesterday.  So

24        yesterday we were told that it's $118.85, and I

25        understand the defense are going to object to
```

April 10, 2019

1      this, but we would like to ask for an opportunity

2      to present our updated spreadsheet, we'll do it

3      by Friday, within two days.  I understand the

4      objection is going to stand because, obviously,

5      if they object to the 2017 number, they are going

6      to object to the 2019 number.

7          There is only one other thing I wanted to

8      clarify, because a lot has been said about the

9      fact that the class damages here in the order

10     only pertains to current owners.  The reason for

11     that is that the hearing only pertained to

12     current owners.  When you read the Judge's

13     opinion, he says there will be other phases to

14     deal with former owners and other damages.  We

15     just never got there.  We had a two-year hiatus

16     or a one-and-a-half-year hiatus trying to settle

17     this case, and, you know, we are here today, but

18     that's the reason it only deals with current

19     owners.

20         We filed the former owner motion before

21     Judge Fallon because we understand the defendants

22     are objecting to the remediation damages that we

23     are applying to former owners.

24         Thank you.

25         MS. EIKHOFF:  So I would just add there that

April 10, 2019

1          if Judge Fallon intended to use the current

2      number and it was just -- his ruling meant fill

3      in the blank, whatever the current number is,

4      just fill in the blank, this is what I'm

5      approving, that theory would -- that theory does

6      not comport with the fact that the number he used

7      was not the current number.

8          They had submitted the number that was

9      current for 2017.  They said they filed it, and

10     we moved to strike because we thought it was

11     inappropriate, and so the point is that Judge

12     Fallon had the opportunity to use a more current

13     number that had been presented by Mr. Wright and

14     by the plaintiffs, and he didn't.  And so we take

15     that as a sign of his intention to say, "I'm

16     fixing this formula based on the evidence that

17     has been vetted and reviewed and accepted by this

18     court."

19          This is the last objection.

20          Again, we're looking at the law of the case,

21     the law that's been established by the MDL judge

22     in this case, and Objection Q is what we asserted

23     for a plaintiff's failure to preserve evidence in

24     compliance with the court's preservation order,

25     which is PTO-1, and I just want to be clear

1    upfront that we are not suggesting to you that

2    this is a standalone reason to off-track them or

3    to dismiss them, because by definition, all of

4    these have already been remediated.

5        And so we have already said that if they've

6    been remediated, they are not eligible for the

7    formula application and, therefore, they should

8    be off-tracked, so we're just raising this as an

9    issue that will need to be considered in that

10   adjudication where their remediation damages are

11   determined and their other damages are

12   determined.

13       But I just want to give you a little bit of

14   background on why PTO-1 exists and why we have to

15   flag it, because it is very important.  In June

16   2009, I think it's literally Document 1, Document

17   2 -- and now in the MDL there is like 22,000

18   documents on the docket.  This is Document Number

19   2 of the MDL, was PTO-1, general preservation

20   duty.  It wasn't very specific but it just said

21   everyone needs to preserve anything that could be

22   relevant to this case.

23       But then a few months later, once the

24   litigation got going, Judge Fallon issued an

25   order that particularly applied to people who

April 10, 2019

```
 1        were remediating their properties, because at

 2        that point some people were like, "Oh, I've got

 3        Chinese drywall, I need to get it out."  And so

 4        they said, "What do we do with this, with your

 5        general preservation order?"

 6             And Judge Fallon issued PTO-1(B) that has

 7        very detailed drywall sample preservation

 8        requirements for plaintiffs who have remediated

 9        their properties.  So that's why I'm saying this

10        only applies to people who have already

11        remediated.

12             And there was a lot of detailed

13        instructions, but some of the ones that we've

14        highlighted here are they had to preserve two

15        10X10 samples of every PID marking that was

16        removed if it was a different PID marking.  So

17        they got it all out of there, they had to save at

18        least two 10X10 samples that show the marking,

19        they have to take photos of every board that was

20        removed, they have to have a floor plan that

21        shows where the Chinese drywall boards were that

22        were removed, and all end tape on the property

23        needed to be preserved.  If there was even a

24        scrap of end tape, it had to be preserved.

25             And just think how much easier the PID macro
```

April 10, 2019

1    determination and micro determination would have

2    been if we would have had all of this.

3         But for more than 500 of the claimants, they

4    admitted on their SPPF, "yeah, we didn't do all

5    that, we didn't do it, we just didn't save it."

6         So we're left with, okay, well, I guess

7    we've got four pictures of partial drywall,

8    that's what we're going to have to base it on,

9    and we've done that because we've had to do it,

10   but that's why this is a problem.

11        And then, lest you think, well, gosh, that

12   was a long time ago, that was 2009 and now it's

13   2019, it's important to note that this has been

14   reiterated over the course of the MDL.  So in

15   2012 they revised other preservation requirements

16   but not these, these were not revised.

17        And then in 2015, when we got back in the

18   case, the plaintiffs asked Judge Fallon, "Hey,

19   you know, these are really onerous requirements

20   and could you lift it, we're done with Knauf now,

21   we're sort of moving on and years have passed, do

22   we still need to save all of this stuff and have

23   all of this stuff?"

24        And Judge Fallon rejected what they were

25   asking, which was, hey, lift it all together, and

April 10, 2019

```
1      said, "Okay, I'll lift it for Knauf property,

2      because those are being settled and that part of

3      the litigation is basically over, but you need to

4      do it for any other property, you need to save

5      this."

6            And they haven't, hundreds and hundreds

7      haven't done it.

8            In the SPPFs, we tracked the PTO-1(B)

9      requirements verbatim, so we said:  Did you do

10     this?  Did you preserve 10X10?  Did you save all

11     the end tape?  Did you take a picture?  Did you

12     provide a floor plan?

13           No, no, no, no, no.

14           And then, of course, our file review also

15     showed noncompliance.

16           Now, Judge Fallon, and this was his order,

17     says that the party responsible for failing to

18     preserve evidence may be subject to the claim or

19     defense of spoliation.

20           Now, we understand that under Florida law

21     and Eleventh Circuit law spoliation, there is a

22     rigorous set of standards, and so we're not

23     telling you to apply those standards to these

24     claims, because what we're saying is these should

25     be off-tracked anyway, and in the course of the
```

April 10, 2019

1    adjudication of their already remediated damages,

2    then it's going to be for that fact finder to

3    decide what the impact of their failure to comply

4    with PTO-1(B) should be.

5        MR. DAVIDSON:  So I would add one small

6    point to this to respond to an argument that the

7    plaintiffs brought up in their brief, and that's

8    the spoliation analysis here.  So it's not just

9    that we're doing product identification using a

10   small handful of photos of partial markings of a

11   few boards.  The product identification photos

12   that form the basis for most of the claims here

13   are from the initial inspections that were done

14   in 2010, 2011, 2012, when a home inspector comes

15   into the house, maybe drills one or two sample

16   holes in a couple parts of the house, sticks his

17   head inside, sticks a camera inside and takes a

18   small sampling of the boards in the house.

19        So we're faced right now with these

20   remediated properties, if they've removed the

21   evidence and the other boards that are now lost

22   and gone forever, with just a sampling of the

23   boards from the property.  So there could have

24   been boards from other Chinese drywall

25   manufactures in other parts of the house that

April 10, 2019

1        weren't sampled that we could turn to and say,

2        well, there were other causes of the defective

3        drywall in your property, but that evidence is

4        gone.  We can't cure it, we can't rely on other

5        photographs because those photographs weren't

6        taken, we can't get that evidence back.

7             The last two prongs in the analyses for

8        spoliation are whether or not there was intent

9        and whether there is potential for abuse.  We

10       don't think that either one of those is at play

11       but I think those are just further elements of

12       the individual adjudication that's necessary for

13       this particular defense.

14            MS. SCHWAB:  Very briefly, Your Honor,

15       because I think that we are all in agreement that

16       this is not necessarily something that's before

17       you, I heard.

18            Ms. Eikhoff stated earlier that by

19       definition all of these have been remediated, so

20       these are going to be taken care of elsewhere,

21       that they are going to be off-tracked.  I would

22       submit to you that plaintiffs agree for the --

23       for complete remediation properties.

24            Partial remediation, we think, obviously,

25       that those should not be removed and should not

April 10, 2019

1     be taken off track as they are still entitled to

2     the remediation damages formula.

3          By my calculation, 86 percent of the

4     plaintiffs that have remediated have received

5     this objection.  And we have presented 84,

6     Exhibit 84 to plaintiffs' brief, that identifies

7     all the claims that we disagree with this

8     objection because we believe that these claimants

9     did comply with PTO-1(B).  That is neither here

10    nor there and that is not before Your Honor,

11    because this is not -- this is not a sufficiency

12    argument.  That is taken care of in Objection K.

13    This is solely that preservation objection that's

14    not before Your Honor.

15          SPECIAL MASTER LEE:  Any response?

16          MS. EIKHOFF:  No response to that.  I was

17    just wondering if we could maybe -- since we are

18    done with our objection presentation, maybe have

19    a brief conference to see what the next steps

20    should be.

21          SPECIAL MASTER LEE:  Okay.  Let me tell you

22    what I was thinking about for next steps, which

23    may change how you caucus.  Since we had this

24    scheduled for two days, if agreeable to everyone,

25    and everyone hasn't already changed your flights,

April 10, 2019

1       I would prefer that we come back tomorrow and I

2       want to, like, think through what questions do I

3       have both conceptually and then on to specific

4       categories, and give you a chance to respond to

5       those tomorrow before we wrap up, as opposed to

6       just wrapping up and flying off, if you are all

7       willing to do that.  I think it won't take all

8       day, obviously, but I think that would be

9       productive.

10           MS. EIKHOFF:  Yeah, that sounds good to us.

11           MS. DUGGAN:  Of course.  And we would meet

12      at your office then tomorrow?  That's what was

13      scheduled.

14           SPECIAL MASTER LEE:  No.  We would be here.

15           MS. DUGGAN:  Oh, right here?

16           SPECIAL MASTER LEE:  We are scheduled --

17      aren't we schedule here?

18           MS. DUGGAN:  No, we're scheduled at your

19      office.

20           SPECIAL MASTER LEE:  Oh, then we'll go

21      wherever we're scheduled.  I don't know where

22      we're scheduled.  I'll meet here and you go

23      there.

24           MS. EIKHOFF:  In that case, I mean, it's

25      been a long day and you've sat through a lot.  I

April 10, 2019

 1      don't think that you need a summation from us, I

 2      think you've got the main points, so we're not

 3      going to do that and we'll be happy to show up

 4      tomorrow to answer your questions.

 5              MS. DUGGAN:  What time would work for you?

 6              SPECIAL MASTER LEE:  10:00.

 7              MS. DUGGAN:  10:00?  Okay.

 8              SPECIAL MASTER LEE:  I don't think it's

 9      going to take a long time.  I just feel like I

10      need to process some of what you said and think

11      about how it impacts other things.

12              MS. EIKHOFF:  Absolutely.  Thank you.

13              MS. DUGGAN:  Thank you.  We appreciate it.

14              MR. VEJNOSKA:  Could I just ask for planning

15      purposes, some of us have longer flights than

16      others, how long do you think we should allot for

17      it?

18              SPECIAL MASTER LEE:  Not more than three

19      hours.  We can start at 9:00 if you want, if that

20      gives you more comfort.  I just thought maybe --

21              MR. VEJNOSKA:  Yes.

22              SPECIAL MASTER LEE:  You want to start at

23      9:00?

24              MR. VENDERBUSH:  Only the San Francisco

25      people.

April 10, 2019

```
1              SPECIAL MASTER LEE:  We'll start at 9:00.

2       So we'll just start at 9:00 and plan to be done

3       by noon.  How about that?

4              MR. VENDERBUSH:  Thank you very much.

5              MS. EIKHOFF:  That sounds great.

6              MS. DUGGAN:  Thank you very much.

7              SPECIAL MASTER LEE:  Thank you.

8              (Whereupon, the hearing was recessed at

9       4:07 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

April 10, 2019

```
 1               C E R T I F I C A T E

 2

 3

 4          I, SUSAN D. WASILEWSKI, Registered

 5   Professional Reporter, Certified Realtime Reporter,

 6   Certified Realtime Captioner and Florida Professional

 7   Reporter, do hereby certify that I was authorized to

 8   and did report the foregoing proceedings, and that

 9   the transcript is a true and correct record of my

10   stenographic notes.

11          Dated this 14th of April, 2019, at Lakeland,

12   Florida.

13

14

15   _____

16   SUSAN D. WASILEWSKI, RPR, CRR, CRC, CMRS, FPR

17

18

19

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

April 11, 2019

```
 1               IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

    ----------------------------:
 3  EDUARDO AND CARMEN AMORIN,    :
    et al., individually, and on  :
 4  behalf of all others          :
    similarly situated,           :
 5                                 :
        Plaintiffs,                :
 6                                 :
    v.                            : Case No. 1:11-CV-22408-MGC
 7                                 :
    TAISHAN GYPSUM CO., LTD.,      :
 8  f/k/a SHANDONG TAIHE DONGXIN   :
    CO., LTD.; TAIAN TAISHAN       :
 9  PLASTERBOARD CO., LTD.,        :
    et al.,                       :
10                                 :
        Defendants.                :
11                                 :
    ----------------------------:
12

                     - - -
13
                  Thursday, April 11, 2019
14
                     - - -
15
16
17
                     - - -
18
            HEARING RE: CONTESTS & SETOFFS, Volume 2,
19      Pages 260 through 331, held before Special Master
        Tiffani G. Lee at Holland & Knight, 701 Brickell
20      Avenue, Suite 3300, Miami, Florida, commencing at
        9:05 a.m., on the above date, before Susan D.
21      Wasilewski, Registered Professional Reporter,
        Certified Realtime Reporter, Certified Realtime
22      Captioner
23                   - - -
24            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25               deps@golkow.com
```

April 11, 2019

```
 1    APPEARANCES:
 2    SPECIAL MASTER:
 3        TIFFANI G. LEE, ESQUIRE
          HOLLAND & KNIGHT, LLP
 4
 5    COUNSEL FOR THE PLAINTIFF CLASS:
 6        COLSON HICKS EIDSON
          BY:   PATRICK S. MONTOYA, ESQUIRE
 7            patrick@colson.com
          255 Alhambra Circle, Penthouse
 8        Coral Gables, Florida 33134
          Phone:   (305) 476-7400
 9
10
          LEVIN SEDRAN & BERMAN
11        BY:   SANDRA L. DUGGAN, ESQUIRE
              sduggan@lfsblaw.com
12        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106
13        Phone:   (215) 592-1500
14
15        ALLISON GRANT, P.A.
          BY:   ALLISON GRANT, ESQUIRE
16            agrant@allisongrantpa.com
          14 Southeast 4th Street
17        Boca Raton, Florida 33432
          Phone:   (561) 994-9646
18
19
          BARRIOS, KINGSDORF & CASTIEX, LLP
20        BY:   EMMA KINGSDORF SCHWAB, ESQUIRE
              eschwab@bkc-law.com
21        701 Poydras Street, Suite 3650
          New Orleans, Louisiana 70139-3650
22        Phone:   (504) 524-3300
23
24
25
```

April 11, 2019

```
 1    APPEARANCES:
 2    COUNSEL FOR TAISHAN GYPSUM COMPANY:
 3       ALSTON & BIRD LLP
         BY:  CHRISTY HULL EIKHOFF, ESQUIRE
 4            christy.eikhoff@alston.com
              MATTHEW D. LAWSON, ESQUIRE
 5            matt.lawson@alston.com
         1201 West Peachtree Street
 6       Atlanta, Georgia 30309-3424
         Phone:  (404) 881-7000
 7

 8

         ALSTON & BIRD LLP
 9       BY:  DAVID VENDERBUSH, ESQUIRE
              david.venderbush@alston.com
10       90 Park Avenue, 15th Floor
         New York, New York 10016-1387
11       Phone:  (212) 210.9400
12
13       AKERMAN LLP
         BY:  ENJOLIQUE D. AYTCH, ESQUIRE
14            enjolique.aytch@akerman.com
         350 East Las Olas Boulevard, Suite 1600
15       Fort Lauderdale, Florida 33301
         Phone:  (954) 463-2700
16

17

      COUNSEL FOR BEIJING NEW BUILDING MATERIALS:
18
19       ORRICK, HERRINGTON & SUTCLIFFE, LLP
         BY:  ANDREW K. DAVIDSON, ESQUIRE
20            adavidson@orrick.com
              HARRY J. MOREN, ESQUIRE
21            hmoren@orrick.com
              L. CHRISTOPHER VEJNOSKA, ESQUIRE
22            cverjnoska@orrick.com
         405 Howard Street
23       San Francisco, California 94105
         Phone:  (415) 773-5700
24
25
```

April 11, 2019

```
 1     APPEARANCES:

 2     COUNSEL FOR BEIJING NEW BUILDING MATERIALS:

 3        ABALLI MILNE KALIL

          BY:   JOSHUA D. POYER, ESQUIRE

 4            jpoyer@aballi.com

              CRAIG KALIL, ESQUIRE

 5            ckalil@aballi.com

       1 Southeast 3rd Avenue, Suite 2250

 6     Miami, Florida 33131

       Phone:  (305) 373-6600

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

April 11, 2019

```
 1                    - - -
 2            THE FOLLOWING proceedings were had and taken
 3    at 9:05 a.m.:
 4            SPECIAL MASTER LEE:  Okay.  Do we have
 5    everybody?
 6            All right.  They will bring some coffee at
 7    some point, and hopefully we'll still be here.
 8            And I just want to kind of have a more
 9    focused conversation today.  Yesterday's hearing,
10    there were several points in the hearing where I
11    was, in my head, thinking, "but I thought I read
12    X," or "but I thought this."  And at a certain
13    point, I felt like I needed to reset and look at
14    some of the things again so that I could have a
15    more focused conversation with you about some of
16    the important points that came up yesterday.
17            So I went back and read Judge Fallon's order
18    on class cert and his order after the damages
19    hearing, and then the orders that Judge Cooke
20    entered with the trial plan and things like that.
21    I went back and read my notes from yesterday with
22    those in mind and it led me to some additional
23    questions that I have for you.
24            So overall, big picture, I guess one of the
25    things that I don't feel comfortable with is the
```

April 11, 2019

```
 1        idea that Judge Cooke would have sent these
 2        claims for efficient resolution through a Special
 3        Master process and for me to send 1500 plus of
 4        them back to her and say, no, these should be
 5        off-tracked and individually determined.  I don't
 6        think that's what she intended, because the trial
 7        plan, frankly, is consistent with my view that
 8        she was looking for something very orderly, very
 9        efficient, pretty close to formulaic.
10             So that is still troubling me from a big
11        picture perspective.
12             I should also say I'm not announcing a
13        ruling.  I'm just telling you the things that are
14        kind of on my mind because I want you to have a
15        chance to tell me how I should think about those
16        things before you leave and get on your plane.
17             So that's one big picture question that I
18        have.
19             Then, having said that, the idea that
20        Florida law is not relevant and applicable, as
21        I'm sort of thinking about this, also doesn't
22        feel right to me.  So, meaning, if there are
23        legally sound bases to object to a claim, a
24        category of claims, et cetera, I think that's
25        fair game.
```

April 11, 2019

```
 1            I don't think Judge Cooke -- I think Judge
 2       Cooke was mindful of Florida law, and I don't
 3       think the adoption of a formula means that
 4       Florida law gets ignored.  So that's the second
 5       big picture thing that I'm thinking about.
 6            And then with respect to the timing of
 7       things and whether this can be efficiently
 8       resolved, you know, we started with a trial plan
 9       that was, at least when I looked at it, pretty
10       aggressive for the property damage claims, but it
11       did contemplate discovery on the three areas.  It
12       did contemplate some flexibility around the dates
13       and what we do when.
14            And, you know, you-all got together and you
15       made this joint submission where you sort of
16       amended the schedule, and I assumed that that
17       meant all of the discovery stuff was happening
18       without my involvement, and I was very happy.
19            So yesterday, when it kind of became clear
20       that there was a lot of other discovery stuff
21       that people felt should happen, part of my
22       question was, well, so why didn't you, A, first
23       do it; B, if the time allowed to do it was
24       insufficient, request additional time to do it.
25       And I'm still not completely clear on what
```

April 11, 2019

```
 1        additional discovery you really need to resolve

 2        the claims and, you know, how are you going to

 3        get them and all that kind of stuff.

 4             So those sort of things have been on my

 5        mind.  And I want everybody to kind of, you know,

 6        tell me your take on all of those things, and

 7        then I have some very specific questions on

 8        certain categories based upon my review of

 9        those -- what do you call them, FOFCOLs, and the

10        order of trial plan.

11             So if you guys want to start with those big

12        picture issues, and then we'll go to the more

13        specific questions.

14             MS. DUGGAN:  Well, in response to your first

15        question, it was our understanding that the trial

16        plan did govern these proceedings.

17             And we've already been through years of

18        proceedings before Judge Fallon in the MDL, and

19        then we had a briefing before Judge Cooke before

20        she entered her order.  I mean, a whole host of

21        motions were filed.

22             So it's our position that, at this point, we

23        are addressing dealing with the formula that was

24        approved as reasonable by Judge Fallon and by

25        Judge Cooke, presumably did consider Florida law.
```

April 11, 2019

1          We're in a situation where we have a

2    certified class, and it's not an individualized

3    process.  We're beyond that.  That occurred back

4    in 2014.  And there are going to be instances

5    where things are estimated.  That's the whole

6    basis for where we're at at this point in terms

7    of getting to a resolution of 1700 plaintiffs'

8    claims.  It's not going to be an exact measure in

9    every instance; for square footage, for example.

10         But the plaintiffs have verified their

11   evidence to the extent that they can.  There are

12   declarations of verification of square footage,

13   for example.

14         And we realized yesterday, by the way, that

15   while most of them are uploaded to the portal,

16   there is a link that we provided to defendants of

17   these declarations that we wanted to provide to

18   the Special Master because some of them may not

19   be on the portal, but they have been in this

20   process.

21         So the time for revisiting the concept of

22   the remediation damages formula is over.  We're

23   at the point where now we have to make those

24   calculations.

25         I understand they have objections that they

April 11, 2019

1   were permitted to assert.  It was my

2   understanding that the two-month period that was

3   provided for by Judge Cooke was for them to ask

4   questions of a particular plaintiff, with regard

5   to square footage, for example.  We thought

6   that's what they would engage in.  We thought

7   that's what this process was about.

8        So they were given the opportunity, they

9   engaged with us to a large extent in terms of

10  back-and-forth with the evidence that was there,

11  but they didn't schedule any individualized

12  discovery or serve any individualized discovery

13  on us in this two-month period.  They could have,

14  but they didn't.

15       So it was our understanding that that was

16  the time period to resolve these, and now we're

17  at a point where we are asking for a ruling.

18       SPECIAL MASTER LEE:  What about the whole

19  Florida law issue?

20       MS. DUGGAN:  Well, we feel that Judge Cooke

21  considered Florida law in her ruling.  In other

22  words, she ruled that if you were completely

23  remediated, you don't get the formula damages.

24  That's in accordance with Florida law.

25       They argued to her that it's the -- the

April 11, 2019

```
1    formula is unlawful.  She heard the arguments,

2    there was extensive briefing, and she ruled the

3    way she did.  So this isn't a reconsideration of

4    her ruling.  That wouldn't be proper here.  She

5    considered Florida law.

6         SPECIAL MASTER LEE:  But if there is a

7    category of contests that is contrary to Florida

8    law, are you saying that that can't be considered

9    at this point?

10        MS. DUGGAN:  I guess out of context, I'm not

11   sure exactly what you're referring to.  But the

12   whole concept of "the formula is unlawful," I

13   think at this point, that's not to be revisited

14   in this venue.

15        SPECIAL MASTER LEE:  Well, that's not what I

16   heard them say.  What I heard them say was there

17   are certain categories that, under Florida law

18   and how you determine property damages, won't --

19   or it's inconsistent.

20        MS. DUGGAN:  Well, they definitely argue

21   that a partial remediation is only entitled to

22   actual reimbursement, but that's not what the

23   Court's order says.  Judge Cooke certainly had

24   the opportunity to rule that way, but that would

25   take us into an individualized adjudication of
```

April 11, 2019

1     all these claims, how much remediation was done,

2     at what point.

3          And in the case of Chinese drywall, you

4     cannot just start where you left off.  You have

5     to start from scratch and renovate the entire

6     property, and that was taken into consideration.

7     That was taken into consideration by Judge Fallon

8     in Germano, in his class damages order, and when

9     Judge Cooke looked at it, she said it was

10    reasonable.  So she did take out the complete

11    remediations in accordance with Florida law, but

12    everything else is entitled to the remediation

13    damages formula.

14          SPECIAL MASTER LEE:  Okay.

15          MS. EIKHOFF:  I will speak to your -- your

16    first and second comments, and then Matt will

17    speak to the discovery issue.

18          Your observations on 1 and 2 are the fulcrum

19    here of a clash that is only manifesting in the

20    application of the formula.  So over here you

21    have a formula that is only ever been on paper

22    and has been blessed by the Court on paper, but

23    where the clash of Florida law is coming in is in

24    its first application, which is -- as I said

25    yesterday, has landed in your lap and we think

April 11, 2019

```
 1      that -- first of all, to Ms. Duggan's point that,

 2      well, they argued against the formula and so they

 3      can't argue against the formula again, we did

 4      argue against the formula in theory and just

 5      said, you know, it's just a bad system and we

 6      thought it was unlawful.  But that said, we lost.

 7           So we're not asking you to strike the

 8      formula and to not apply it in every instance.

 9      We're saying that it can't be applied where its

10      application would violate Florida law, and that

11      does create a real tension and a real friction

12      that you're feeling right now.

13           On the efficiency point, I am sympathetic to

14      that, because we heard you say yesterday and we

15      thought about it overnight, too, about, like,

16      yeah, this is -- it feels uncomfortable to send a

17      large volume of cases back to Judge Cooke.

18           On the one hand, as we said yesterday, those

19      cases still need to be adjudicated with Judge

20      Cooke anyway, so it's not actually increasing the

21      workload of the Court because it is simply

22      putting a category of damages back into trials

23      that would happen anyway.  But that said, we

24      could be creative in the individual adjudications

25      that we have suggested.
```

April 11, 2019

1    So, for example, as a special master, it is

2    within the Federal Rules of the purview of a

3    special master to do an individual adjudication.

4    So maybe one idea to explore would be they

5    don't all just get sent back, like "I've done

6    nothing on these," but maybe there could be a new

7    phase of your special mastership that would

8    involve resolving some of these claim-specific

9    damages issue in accordance with Florida law. So

10   that's -- that's something just to think about.

11   On partial remediation, I just want to

12   respond to something Ms. Duggan said about

13   saying, oh, it just -- it all has to be done

14   over, that's the rule, if any little thing hasn't

15   been done, if the tile wasn't switched or if the

16   cabinet doors weren't to their liking, the whole

17   thing needs to be redone.

18   There is no evidentiary basis for that.

19   That is -- that is something that we've heard the

20   attorneys say on the other side of the table.

21   They said it yesterday, and they said it again

22   today.

23   But I just want to make clear that no Court

24   has ever ruled that, and, in fact, no evidence

25   has ever been submitted for that proposition.

April 11, 2019

1          On discovery -- and I'm going to have Matt

2     talk about what was done in this period, because

3     a lot of work has been done.

4          But as you know, Ms. Lee, we had 20 Priority

5     Claimants on other damages, and those depositions

6     have been ongoing and have been extensive.  There

7     were, on our list, 1500 separate claims, and in

8     the amount of time that we had, it was not

9     possible to do full discovery on all of them or

10    even partial discovery on them.  Right?  Like if

11    you -- if we started doing -- we didn't even know

12    where to start with 1500 claims.  Where do you

13    start scheduling depositions, who do you pick,

14    how do you allocate your resources for that?

15         But that does not mean that we engaged in no

16    discovery at all or no efforts to gather more

17    information.

18         I'll turn to Mr. Lawson for that.

19         MR. LAWSON:  I think there might be some

20    confusion on this point that was created by our

21    call for individual adjudication and further

22    inquiry into these claims.  That is not a

23    statement that we believe we were unable to

24    determine what is wrong with these claims or

25    where the deficiencies and their proofs are.  Our

April 11, 2019

```
 1      argument is not that we just simply didn't have

 2      enough time for discovery so you cannot move

 3      forward with the formula.  That is not our

 4      position.

 5           We have received discovery from them.  We

 6      received it through the SPPF process, which began

 7      over a year ago.  We received it through the

 8      square footage requirement that they had to

 9      provide, verify under air square footage, which

10      has been ongoing for two years based on

11      Judge Fallon's order.  So those obligations were

12      already on them.  They were required to provide

13      that information that we requested in the SPPFs,

14      and we highlighted many cases where that was not

15      provided or was -- the information provided is

16      inaccurate and cannot be relied on to apply the

17      formula.

18           So when we're saying an individual

19      adjudication would need to have a fact finder

20      determine this, our statement is, we don't think

21      they've met their burden of proof across these

22      contests that we have, A through Q.  We think

23      what they have provided, despite our requests

24      under the SPPF, is not adequate and, therefore, a

25      finder of fact should make that determination,
```

April 11, 2019

1    that they have not met their burden of proof and

2    that they cannot have the formula applied to them

3    because of the deficiencies in their proofs that

4    they have provided across these categories.

5        Whether it be square footage, remediation,

6    ownership, these tenant issues that we were

7    talking about yesterday, that is where we're

8    saying individual adjudication is necessary

9    instead of you having to be able to say, from

10   your position, I am dismissing these claims or

11   I'm saying that they have not met that burden.

12       We understand that individual review of the

13   file is necessary to be able to make that kind of

14   factual determination that they have not met

15   their burden of proof, and that is where the

16   issue is.

17       Now, the amount of discovery that has

18   occurred and the back-and-forth between the

19   parties has allowed us to be able to make the

20   contests that we made and that we have presented

21   to you.  We had extensive back-and-forth with the

22   other side on square footage.

23       I think Ms. Duggan mentioned that earlier,

24   that we talked -- that we went through our

25   preliminary objections with them.  We withdrew

April 11, 2019

1     many of our preliminary objections on square

2     footage.  We objected on other categories that we

3     withdrew as well in our final objections because

4     of the process between the parties.  They have

5     submitted new information during the time between

6     our preliminary objections and our final

7     objections and -- because of our requests and

8     because of the objections that we made.

9          So that adversarial process worked and we

10    were able to get more information, but there are

11    still many areas that are unresolved and we

12    believe are a deficiency on their part at this

13    point because we made our request through the

14    SPPF process and also the request that was

15    required from them from Judge Fallon to provide,

16    verify under air square footage.

17         And where they haven't met that threshold,

18    where there is not a preponderance of evidence in

19    their favor to be able to prove those issues,

20    that's where our contests live in our spreadsheet

21    and why we believe those claims need to be

22    removed from immediate application of the formula

23    and taken into a process where someone makes that

24    determination to be able to say:  This was not

25    sufficient, and here is why.  Here is why this

April 11, 2019

1    claim cannot receive the formula, and here is why

2    the better application under Florida law is this

3    form of damages.

4         MR. VEJNOSKA:  Thank you.  I want to try to

5    be specific but only supplemental, not

6    repetitive.

7         On your first two questions, I think

8    yesterday you saw there is a very clear divide

9    between the two sides, and you heard it again

10   now.

11        What the plaintiffs' position is, is the

12   formula rules over everything, and if there is

13   anything at all that is considered, it was the

14   question of complete remediation, what happens in

15   complete remediation.  What they don't address

16   ever -- not yesterday, and not this morning --

17   are questions like diminution in value, value of

18   the home, actual costs.

19        Florida law is very clear that those are

20   absolute limitations on recovery of damages, and

21   we don't think that when Judge Cooke, or even

22   Judge Fallon to the extent he thought about it,

23   said, well, a formula will be useful and will be

24   efficient, it meant that it's also going to be

25   unlawful, we're going to do it regardless of what

April 11, 2019

```
1        Florida law applies for -- provides for.
2            The difficulty, I think, that you're feeling
3        now as the special master is, how do you get -- I
4        think you're right to be troubled that Florida
5        law does apply and that Judge Cooke did not mean
6        to just run roughshod over that.
7            The question is, well, what next?  What do
8        you do and how do you do your job?  I totally
9        understand not wanting to say, well, good news,
10       Your Honor, I ruled on 100 and here are, you
11       know, 1700 more, good luck with those.
12           A couple of suggestions:  One is that some
13       of the categories, when you make legal findings
14       on, will resolve a great number of claims.  Prior
15       owners, if you rule as we believe you should,
16       that will not say to those owners that you get
17       nothing.  It will just say, you have different
18       remedies than are remediation remedies and so on.
19       There may be another category or two.  And you're
20       going to be doing that, as I said, between now
21       and May 3rd, and so if you focus on a couple of
22       those, as I say, I think that you will.
23           I mean, one of the things here is not to be
24       overwhelmed, I think, by the idea that somehow
25       it's your job or the Court's job in the course of
```

April 11, 2019

1      just several months to dispose entirely of 1800

2      claims.  I think that you start with product

3      identification, you can do prior owners, maybe a

4      couple of others, you will have disposed of many,

5      many hundreds of claims, and that right there is

6      an accomplishment.

7          Now -- now we get to the question of, well,

8      what about everybody else?  How do you apply the

9      state law?  Well, I think, first of all, that's

10     another significant contribution that you can

11     make here, which is to state the ground rules, to

12     say, Okay, now, first of all, I can take this

13     number of people and I can see from looking at

14     the categories that there is no issue here,

15     really, they are complete remediation, I can

16     figure out the square footage, I know the

17     formula.

18          Maybe some of those you can rule on.

19          Others are not going to be part of the

20     remediation process.

21          So now you've dealt with the two ends of the

22     process, and so now you've got the middle that's

23     left, and in that middle -- you know, an issue

24     here is, well, what tools do you have?  And in

25     that middle, as I say, if you give the ground

1    rules:  Number 1, you get diminution in value or

2    actual repair costs, not just the formula;

3    Number 2, you don't get something that's worth

4    more than the value of your home.  That's

5    valuable.

6         Then you and the parties need to look at the

7    individual claimants and say, "But do I have that

8    information so that I can take the next step if

9    I'm going to do it in this process?"  And you

10   make an award based on how all of those interact.

11        This is where we get to the discovery

12   problem, and I want to be very clear again, and

13   it might be thought that I say this just for the

14   record, and it is for the record, but it's

15   actually, I think, something that you and Judge

16   Cooke need to decide.

17        We -- as I say, first of all, nobody has

18   ever ruled on the question of whether or not BNBM

19   is responsible for anything other than the fewer

20   than 100 categories, and see, actually, I think

21   there would be fewer than 50 claimants who claim

22   those.  But we're in this mess for everything.

23        And I'm not saying that you can rule on that

24   now, I'm just saying you can't attribute, to the

25   extent you are thinking of doing anything like

April 11, 2019

 1    that, any Taishan liability to us at this basis

 2    based on this record.

 3         Judge Fallon himself said, I'll decide that

 4    if and when I need to, whether I need to pierce

 5    that corporate veil.  And there has been no

 6    evidence on it for liability purposes.

 7         But when you -- the other thing that I need

 8    to say is -- and there really is no response to

 9    this:  There is no default against BNBM in

10    Florida Amorin.  There simply isn't.  The BNBM

11    PLC.

12         They have a footnote in their brief when

13    they list the defaults and they list against

14    whom.  And you can look at that forever, and you

15    will not see a reference to BNBM PLC, which is

16    the party involved here, being defaulted in

17    Florida Amorin, which means we have full

18    litigation rights, we have full discovery rights.

19    And that was the basis of my comment yesterday.

20         And now, getting to what Mr. Lawson said, at

21    a minimum what you heard yesterday was what

22    happens when you get to depose somebody and you

23    get to say, it says here that you're only a

24    partial remediation, and somebody says, no, no, I

25    don't know where that came from, I was complete.

April 11, 2019

1          And so we don't have that -- we didn't have

2     that opportunity to ask anybody other than

3     those 20.

4          And to be very clear, my understanding is --

5     and someone can correct me if I'm wrong, because

6     I will tell you I was not at the depositions, but

7     that when the defendants tried to ask the

8     Priority Claimants questions about remediation,

9     we were told, you can't do that, that's for

10    the -- you know, the contests, you can do, and

11    then -- but they agreed to let it happen anyway.

12         But that was their position.  Okay?  Is that

13    that's not -- that's not part of this process,

14    we'll let it happen.

15         So when you hear that somehow we had all the

16    discovery that we needed or when you think, well,

17    why didn't we notice 1700 other depositions --

18    well, first of all, you know the answer.  I mean,

19    we're not going to get 1700 depositions in

20    60 days or 80 days, or whatever it was.

21         But also, their position is, on these

22    fundamental questions that go to the remediation

23    costs:  You're not supposed to be asking that

24    stuff.  We'll let you do it for these people just

25    because you're already here.

April 11, 2019

1        And then another thing.  At those

2    depositions, there is this thing about, well, we

3    uploaded everything to the BrownGreer website,

4    all these documents.  And yet, at deposition

5    after deposition, two or three days before the

6    deposition, we're at the deposition, suddenly

7    piles of receipts would appear and other

8    documents.

9        So that tells us what we don't have for

10   these other people.

11       So it is not a problem of your making that

12   we're not allowed to do this discovery.  You're

13   right, it was a very ambitious schedule, and we

14   think that even under Rule 55, Taishan and we are

15   entitled to more discovery -- that's our

16   position -- more than what we've been given.

17       But to the specific point of what do you do

18   and how you do it next, as they say, I think that

19   you deal with some of these categories, you make

20   these conclusions, and that's going to just

21   remove some people from the process.

22       You make other decisions, and it's going to

23   say, here is the additional information that I

24   need to know:  Is it in the file?  How am I

25   supposed to choose?  How do I pick whatever the

April 11, 2019

1    square footage is, how do I pick what the

2    diminution of value is, how do I pick the other

3    things that Florida law says I need to look at?

4        And if you don't have that information,

5    then, you know, I think that's a recommendation

6    to Judge Cooke.  Florida law says this has to be

7    done, it has to be compared.  You need this

8    information, you've got to get that information

9    from -- well, you need to have a process for

10   getting that information.

11        MS. DUGGAN:  Mr. Vejnoska is asking you to

12   set ground rules as if Judge Cooke had not

13   already ruled on all of the issues that are

14   before you.  She heard all of these arguments

15   before.

16        In fact, he continues to say that BNBM is

17   not in default.  I understand that's their

18   position.  They argued that before the Court in

19   the MDL, they moved to vacate the default

20   judgments.  That was denied.

21        They got the cases remanded before Judge

22   Cooke and they filed a motion to enforce their

23   rights.  I argued this motion before Judge Cooke.

24   They wanted a ruling that they were not in

25   default.  She denied their motion.

April 11, 2019

1          Every single plaintiff that is before this

2     Court has a default against BNBM.  They are the

3     same plaintiffs that are in Gross, in Wiltz, in

4     Amorin in Virginia.

5          He is correct, there is no specific default

6     in the Florida Amorin action.  But all the other

7     judges that have reviewed this issue have denied

8     their motion, so they are held in default here,

9     and that's where we are today.

10         In terms of setting ground rules and, you

11    know, saying that there is a windfall under

12    Florida law, they argued that before Judge Cooke.

13    They gave specific examples where, under the

14    formula, they would get more money than the house

15    is worth.  They've presented all of this material

16    to her, and she ruled against them.  So it's not

17    time before the Special Master to set ground

18    rules and rewrite the Court's order.

19         The Court didn't say "individualized

20    discovery of 1700."  She said, if necessary, on

21    product ID, on square footage, or ownership.  She

22    didn't contemplate that we would be taking

23    depositions like we are for the 20 Priority

24    Plaintiffs in every case.  That would take years

25    to accomplish, and that's not what she wants.

April 11, 2019

1      The formula has been ruled reasonable under

2  the circumstances.  We are in a class situation

3  where we're addressing class damages.  So that's

4  not the same as an A versus B case where you can

5  adjudicate every single piece of damage.  So

6  we've already taken that into consideration.

7      And the reason, in the Priority Plaintiffs,

8  we objected when they wanted to go through item

9  by items, we said, that's a separate process.

10  The court created two tracks:  Remediation

11  damages on one track, other damages is on a

12  different track.

13      So remediation damages are where we are in

14  this venue before Your Honor, and that's why we

15  made the objection.  But we didn't want to stop

16  the process.  So we let them discover every

17  mirror, every countertop, every tile.  And they

18  asked all those questions about it, and they have

19  all the evidence.

20      But our position is that remediation damages

21  are addressed here.

22      MR. MONTOYA:  Judge, I don't want you to

23  take the bait on the diminution of value

24  argument.  They spent two days deposing my

25  appraisal expert, who believes there is stigma

April 11, 2019

```
1       attached to it, along the lines of the argument
2       that I made yesterday about when there is a
3       disclosure, that affects the property value
4       adversely and you get repair costs plus
5       diminution of value.
6           What they are asking you to do, basically,
7       is deny the remediation cost because there is not
8       enough -- there is not enough information,
9       there's not enough square footage, et cetera.
10      And they are going to come back on diminution of
11      value and say it's zero because their expert says
12      that there is no stigma.  We took their first
13      deposition last week:  There is no stigma.
14          So it's a bait, is what I'm telling you.
15          MS. EIKHOFF:  I actually want to respond to
16      that because I think there's maybe a
17      misunderstanding of what we're saying when we're
18      saying diminution in value in this context and
19      the stigma that you're talking about.
20          So when we are talking about diminution in
21      value, we are looking at when you have had a --
22      when you have a former owner who has sold the
23      property and remediation damages are no longer
24      appropriate under Florida law.  That's our
25      position.  And so in that case, the diminution of
```

April 11, 2019

```
1     value, the difference between what they should
2     have gotten and what they did get would be the
3     measure of damages in that case.
4           Now, in some cases, people are looking for
5     diminution in value on top of remediation
6     damages, and in that case, where they are seeking
7     diminution in value and remediation damages in a
8     situation where they are currently in the house,
9     then if they have -- if they can establish that
10    there is some diminution in value, then Florida
11    law would hold them to the lesser of those two
12    numbers.
13          But if -- well, actually, can you -- am I
14    explaining that right?
15          MR. VENDERBUSH:  Well, we don't need to
16    explain that much.  We just need to draw apart
17    their claim.  Their claim -- we're using
18    diminution of value two different ways.
19          MS. EIKHOFF:  Right, exactly.
20          MR. VENDERBUSH:  And so just that we don't
21    get confused to say we're going to -- we're going
22    to zero you out on stigma to try to get that on
23    top of remediation damages, because Number 1, we
24    think factually there is no stigma, but Number 2,
25    that you don't get both as a legal matter.
```

April 11, 2019

```
 1            But that's very different from our saying

 2       former owners are entitled to diminution in value

 3       as the measure of their damages where they sold

 4       their house for less because it had Chinese

 5       drywall, as an alternative measure, recognized

 6       under Florida law, to repair costs, which aren't

 7       allowed.

 8            So just -- we need to know that we're using

 9       or people are using diminution of value in two

10       very different ways and by saying that we oppose

11       your stigma diminution in value does not mean

12       that we're trying to zero out all of the former

13       owner claimants because that is not what we're

14       doing.

15            MS. EIKHOFF:  That's what I was trying to

16       say.  That's what I meant.

17            MR. VENDERBUSH:  I got it.

18            MS. EIKHOFF:  Yeah, Mr. Venderbush said it

19       better.

20            I do want to also point out, because we keep

21       talking about 1800 claims and we had 1500 claims

22       and all these claims, what's going to happen to

23       all these claims, this process has already

24       resolved a lot of the claims, as -- and this is a

25       point that Mr. Vejnoska was making.
```

April 11, 2019

```
1           We had talked yesterday about coming back in

2      a week and giving you an updated objection sheet

3      based on our review of the unverified amendments

4      to the SPPFs.

5           And we were talking about it, and I think at

6      that point it probably makes absolute sense that

7      when we update that sheet, we should also

8      highlight for you the claims that have already

9      come out of the process in various ways.

10          Your report and recommendation on PID took

11     out a lot of the claims, and so we could

12     highlight that for you.  They have withdrawn

13     several of the claims.  We've withdrawn some of

14     our objections to the claims.  And so we were

15     thinking that it makes sense for us to present

16     that to you, to highlight it for you.

17          And I think that when you see that, you will

18     see that we're actually not talking about 1800

19     claims anymore.  It's significantly less because

20     of the way that this process has worked.

21          MR. VENDERBUSH:  And some of them drop out

22     for good because of the rulings that you've made,

23     and some of them just come out of -- we know they

24     will come out of the formula, so they are not

25     gone, but like for the 298, they're just --
```

April 11, 2019

```
1        they're agreed to be not in the formula process.
2    So --
3            MS. EIKHOFF:  298 is?  She probably doesn't
4    know what 298 is.
5            MR. LAWSON:  They are completely remediated.
6            MR. VENDERBUSH:  Sorry, yeah --
7            MR. LAWSON:  They already were --
8            SPECIAL MASTER LEE:  I know all of that.
9            MS. DUGGAN:  I didn't know what 298 was, so
10   thank you for that part.
11           MR. LAWSON:  Yeah, no.  The plaintiffs, on
12   the spreadsheet, marked 298 claims that were
13   completely remediated to be able to say they are
14   obviously not part of the formula process because
15   of Judge Cooke's footnote about complete
16   remediation.
17           MR. VENDERBUSH:  So we shouldn't use a word
18   like "disposed" or "gone" too broadly because it
19   could be misunderstood.  Some have been sort of
20   disposed by the R&R on product ID but --
21           SPECIAL MASTER LEE:  Except that it's not
22   final.
23           MR. VENDERBUSH:  Absolutely.
24           MR. LAWSON:  Correct.
25           MR. VENDERBUSH:  But at this stage, and then
```

April 11, 2019

1        some have been excluded from the formula process.

2        So just so that we understand and we -- and

3        nobody overreacts in one way or the other, we

4        should keep in our own minds the different status

5        of those, and we would mark it in a way that you

6        understand.

7            MS. EIKHOFF:  We would also -- we would not

8        take them off the spreadsheet but just highlight

9        for you that these already have -- your rulings

10       already have impacted some of these claims.

11           SPECIAL MASTER LEE:  Did you have something

12       you wanted to say?

13           MR. LAWSON:  I did, and I think --

14       Ms. Duggan was talking about how, you know, we're

15       trying to challenge the formula, and that is not

16       an accurate reflection of our position with these

17       contests.

18           Our contests are something that -- I think

19       the judges across this case and even the

20       plaintiffs agree, there is a threshold

21       requirement to be eligible for the formula.

22       There are certain threshold requirements, and we

23       talked about a lot of them:  They needed to

24       provide verified under air square footage to put

25       in the formula, we need to have that; you need to

1    actually have a clam and be a class member, our

2    position is, a class member to be able to receive

3    a class damages formula; you need to have

4    completed forms, which Judge Cooke said was a

5    requirement to be able to be a part of this

6    process and to be eligible for the formula; and

7    your remediation status matters to be eligible

8    for the formula as well.

9        So when we're looking at this, we're not

10   saying, the formula, it just has to be tossed

11   out.  It says, no.  We need to find the people

12   who have met the threshold requirements to be

13   eligible for that formula.

14       And they agreed that those exist.  They have

15   already removed some of them for those reasons.

16       And that was the whole purpose of our SPPF

17   discovery that we've gone through, the whole

18   purpose of our objections, to just say:  Who is

19   eligible?

20       And that's what we've done here, not to say

21   that the formula cannot exist, to continue to

22   fight the existence of the formula, but to just

23   actually find the people who are truly eligible

24   for it.

25       MS. DUGGAN:  We wholeheartedly agree that if

April 11, 2019

1    you are not an Amorin class member, you're not

2    entitled -- with property in Florida, you're not

3    entitled to damages here.  We agree with that.  I

4    think there is eight in dispute before you.

5         The one up for BNBM, we've already agreed,

6    is not a class member.

7         We would like to reiterate that, for every

8    single one of the plaintiffs, we provided

9    verified square footage.  There is not a single

10   one that has an absence of a verification for

11   square footage, a number that's on a document

12   that is considered valid.  They disagree with

13   that, they say there's other numbers.  But in our

14   view, there is a square footage -- documented

15   square footage in the file.  So we're not missing

16   that.

17        Now, we agree with them that you have to be,

18   obviously, a class member to be eligible.  We've

19   also agreed a certain number, apparently it's

20   298, that were completely remediated were only

21   going to get their actual costs back as opposed

22   to the formula.  Anybody who had an assignment

23   that we considered valid, and I think we've

24   reached an agreement on almost all of those, if

25   not all of them --

April 11, 2019

1           MS. EIKHOFF:  All of them.

2           MS. DUGGAN:  All of them?  They are already

3      marked with a red line on our sheet, they are not

4      going to get formula damages, so Mr. Lawson is

5      correct on that point.

6           Where we fundamentally disagree is on the

7      amount of whittling down that they want to do so

8      that, really, there is very few left that would

9      get formula damages.  I mean, that's -- they

10     don't say that, but that is the result, when you

11     add up all of their contests, of what would

12     happen.

13          MR. LAWSON:  Ultimately, their standards for

14     eligibility are more lax than we believe that

15     they should be and that is where we have made our

16     objections, whether it be that we think there are

17     more properties that are completely remediated or

18     that their standard for eligibility disregards

19     Florida law in some instances, and that's where

20     we have dispute.

21          SPECIAL MASTER LEE:  Ms. Schwab.

22          MS. SCHWAB:  Yes.  I just want to respond to

23     Mr. Lawson's statement earlier that the

24     plaintiffs did not meet their burden.  They

25     served discovery on plaintiffs in regards to

April 11, 2019

1    ownership and square footage.  We responded to

2    that via spreadsheet.  That took care of the

3    ownership and square footage requirements,

4    product ID, we've already provided that.  And

5    last is the remediation status, we've provided

6    that as well.  So we think that plaintiffs have

7    met their burden.

8         MR. LAWSON:  Obviously we've pointed out

9    places where we disagree with that.

10        SPECIAL MASTER LEE:  Okay.  Anything else on

11   the big picture issues before I have more

12   specific questions.

13        So for the plaintiffs, at this stage, should

14   I only be looking at completed forms and verified

15   information?

16        MS. DUGGAN:  We believe you should be

17   looking at verified information.  With regard to

18   completed forms, I think it would, unfortunately,

19   depend on what they allege is incomplete.  I

20   understand that when people didn't know an answer

21   to something and they had a question mark,

22   sometimes it didn't let you put in a question

23   mark, that wasn't a permissible electronic

24   transmission of the information.  So if it's not

25   relevant to the calculation of remediation

April 11, 2019

```
 1        damages, I would say you do not have to ignore

 2        that or disregard it, because it pertains to

 3        other damages.  In other words, the SPPF was not

 4        designed to just deal with remediation damages,

 5        it was designed to deal with all of the plaintiff

 6        damages.  So some of these issues, like, you

 7        know, "do you have a diminution in values" is on

 8        a separate track, you know, loss of personal

 9        property is on a separate track.  So I would say

10        if there is some sort of deficiency in that

11        regard that can be addressed with Judge Cooke

12        down the road.

13             MR. LAWSON:  And to clarify for Objection H,

14        where we made that objection, it was not -- it

15        was only to say that a relevant field to

16        remediation damages was missing.  We did not make

17        that objection in instances where relevant

18        information for other losses, other damages was

19        missing.  So that would not have been the case.

20             We only did it, and our mission was to only

21        include that objection where we felt that we were

22        somehow prejudiced in our ability to be able to

23        make objections for remediation damages because

24        of missing information on their required forms

25        and that therefore; they were incomplete for this
```

April 11, 2019

```
 1          process.
 2               MS. GRANT:  That wasn't necessarily my
 3          experience.  I did find somewhere remediation was
 4          filled out, actually, I will take the instance,
 5          if I can find the particular clients, I think I
 6          flagged it, where they hadn't remediated, so
 7          there was no question there -- and if you know
 8          what I am talking about, that's fine -- and I
 9          went through it and the only thing that was not
10          filled out was this other damage section where it
11          has alternative living expenses, loss of use and
12          enjoyment, diminished value and on some of them
13          they would put zero, and on one or two I found,
14          just in the last couple days, we didn't have
15          anything, there was no value and it did get
16          flagged.  So I don't necessarily agree that the
17          only deficiency you're talking about -- I had
18          several with the question of "Have you received
19          other payments?"  And clearly, I did not check
20          yes or no and but then I disclosed the payment.
21          And those got flagged.  So I think through the
22          process what we've talked about in the week or
23          so, that we're going to see those Objections H
24          and you let us know what's been remedied and I
25          will probably address some of those, but I don't
```

April 11, 2019

1    think that's correct that the only ones you

2    objected to in the final contest were those where

3    there was missing information on remediation.

4         MR. LAWSON:  I've heard that before from the

5    plaintiffs and then I looked at it and I pointed

6    out areas that were missing.  There are a lot of

7    fields on the form.  And I think we can resolve

8    those, we have resolved some of those and it is

9    something that requires two people talking about

10   it and going through the form.  That is the

11   reality of it.  We spent hundreds of hours going

12   through these with the mission of only selecting

13   Objection H where it affected our other contests,

14   and this was not just to say that the remediation

15   field, Section 5 of the SPPF, was not filled out.

16   There are other sections that impact -- there are

17   objections that we have on this sheet, as you can

18   see, knowledge of Chinese drywall, the dates of

19   purchase, things like that, so you have those

20   fields that are sometimes missing, information

21   missing, in those areas.  And if there are some

22   that we could resolve, we did that whenever it

23   was brought up to us and I would be happy to go

24   through individual examples, but the reality is

25   we're talking about hundreds of these, not just a

1       few instances where there is a small issue.

2              MR. VENDERBUSH:  We sort of shouldn't be

3       litigating at this level right now, they should

4       just have filled out the forms.

5              MS. GRANT:  Well, sometimes they don't have

6       the information.  So you talked about when the

7       drywall was installed.  Those clients have no

8       idea when it was installed.  We know typically

9       that it was in 2006 and we put that information

10      when we knew it.  Sometimes they use the question

11      marks because you could in some instances.  I did

12      have some of those flagged and sometimes the

13      client would leave it blank, and we left it blank

14      as well.  There is no way to asterisks it and

15      comment or explain.  It was just blank.  So I

16      understand from your perspective, okay, they've

17      not answered when the drywall was installed.

18             MR. VEJNOSKA:  It's not just that they

19      haven't answered.  Okay?  If the drywall was

20      installed in 1995, it has nothing to do with

21      Chinese drywall.  That was resolved in 2012.

22      This is a fundamental part of your burden of

23      proof.

24             MS. GRANT:  But then it's not Chinese

25      drywall.  We all know what we are talking about

April 11, 2019

1          here.

2                    MR. VEJNOSKA:  I know, but the fact is that

3          you're saying if we don't fill it out, we should

4          just assume it's Chinese drywall, and all I'm

5          saying is that, to Mr. Venderbush's point, it's

6          easy to say, well, somebody doesn't know

7          something or they didn't fill it out.  That's

8          still -- I mean, if that person were in a court

9          of law, the first thing they'd have to show is

10         that it's Taishan or BNBM product, and then the

11         second thing they have to do is show that it

12         actually was installed then.

13                   MS. DUGGAN:  Chris, isn't that answered,

14         though, by the product ID requirement?  In other

15         words, if you don't come forward with proof that

16         you have the product in the property, that would

17         resolve that issue.

18                   MR. MONTOYA:  Or the timing after that

19         matter would be the purchase documents.  Most, if

20         not all, people are going to have their purchase

21         contract, their deed to their new home, you are

22         going to know when it is, more or less.  But to

23         ask a homeowner when the drywall was installed in

24         a home they didn't build, people won't know.

25         There is just certain things they just won't

April 11, 2019

1    know.

2         MR. MOREN:  But the point is here to answer

3    the question one way or another, not to leave it

4    blank and then put the burden on us to make an

5    inference about what kind of answer they

6    intended.

7         MR. VEJNOSKA:  I think we all agree that it

8    has to be -- it has to be relevant.

9         MR. LAWSON:  Just going back to Ms. Grant's

10   point about, "oh, we might have left it blank,"

11   there was a notes field.  Where people left

12   things blank, where they couldn't answer

13   something, people explained in the notes field in

14   the SPPF.  There was an area to include a large

15   narrative to be able to explain fields that were

16   not filled in.  If they just didn't know about

17   something that could all be explained.

18        So it's not to say they were so limited or

19   her hands tied by the form.  Ultimately, again

20   we're talking about a very small subsection of a

21   very large group of forms where they were missing

22   very important fields.  It's not just a case of,

23   "Oh, we didn't know that single information

24   field."  This is a much larger problem than that.

25        SPECIAL MASTER LEE:  So at this point do I

April 11, 2019

 1       have access to all these forms?

 2              MS. EIKHOFF:  You do.

 3              SPECIAL MASTER LEE:  Okay.  Because after

 4       the BrownGreer link --

 5              MS. DUGGAN:  Yeah.  I'm hoping that the

 6       password that you were provided works, so you do

 7       have access not only to the forms themselves but

 8       all of the backup information that's in each

 9       claim file except for one thing that might be

10       missing, which I mentioned earlier, and I believe

11       Emma is going to provide you with a link to these

12       other documents the defendants have but not all

13       of them were uploaded.  I can't explain why that

14       is but I'm told that's the case so that you will

15       have everything.

16              SPECIAL MASTER LEE:  Okay.  I want to talk a

17       little bit more about the whole former owners,

18       current owners and I want to -- give me a fresh

19       summary of plaintiffs' argument on that, as to

20       why former owners get the benefit of the

21       remediation damages.

22              MS. DUGGAN:  It is an equitable argument.

23       If you filed suit and you own the property at the

24       time you filed suit, our position is you are

25       entitled to damages.  We had a default judgment

April 11, 2019

1    against these defendants.  They were defaulted.

2    There was a judgment against them, and solely

3    through the passage of time in this litigation

4    there have been more and more and more former

5    owners and that's well documented both in the

6    MDL, we argued that and Judge Fallon has

7    recognized through significant delays, through no

8    fault of the plaintiffs, in this case we're

9    talking a 10-year old lawsuit, a lot of them have

10   become former owners because they were foreclosed

11   upon, they had to declare bankruptcy, they lost

12   their homes, they couldn't pay for their

13   mortgages and at the same time find alternative

14   housing.  This is just a perfect example where

15   through the strategy of defaulting, coming in,

16   testing jurisdiction, going up on appeal, having

17   the jurisdiction over the defendant affirmed,

18   then when subject to a judgment debtor exam, they

19   leave the jurisdiction, they go back to China, we

20   have a contempt order, class is certified,

21   scheduled for class damages hearing, the

22   plaintiffs are finally ready to get their claims

23   resolved and the defendants come back in, and

24   that was back in 2015.

25        So it's just taken us an incredibly long

April 11, 2019

1    time to get to where we are, and unfortunately,

2    many of the plaintiffs who owed their properties

3    when this suit started no longer own their

4    properties.

5        MS. EIKHOFF:  If I might respond to that, I

6    wanted to make it clear that it sounds like they

7    are saying, well, it's just not fair for them not

8    to get the formula because unfortunately they've

9    had to sell their home and Ms. Lee -- I'm sorry,

10   Ms. Duggan just said this is an equitable

11   argument.  Just out of the gates, there is no

12   equitable argument that can trump the clear

13   Florida law on this.

14       But second of all, this is not -- we're not

15   setting up an inequitable situation, because as

16   we said yesterday, we are not saying that if

17   you're a former owner you get no damages or you

18   get some fraction of your damages.  We are saying

19   if you are a former owner and you have damages

20   that you can prove that you've been harmed, then

21   in this case we will be obligated to be

22   responsible for every penny of those damages.  We

23   will make that former owner whole for whatever

24   they have done already and for whatever work

25   still has to be done with a reasonable estimate.

April 11, 2019

```
 1              And so this isn't like, oh, gosh, they get
 2      left holding the bag and they don't get anything.
 3      What they are resisting on the plaintiffs' side
 4      here is that they don't get this formula, this
 5      easy formula that it seems as if they are
 6      acknowledging, would be much more.
 7              And so -- and it is true on the former
 8      owners when they have sold their home that if
 9      there is a delta between what they should have
10      gotten when they sold their home and what they
11      actually got, they -- that would be made up, and
12      talking about equitable, the law is equitable and
13      this is not just something that we learn in law
14      school, but this is something that even lay
15      people understand, and we showed you yesterday
16      the excerpt of one of the Priority Claimants who
17      said "well, no, I don't -- I don't need money to
18      remediate the property, I don't live there
19      anymore, I'm only asking you for the amount that
20      I should have gotten for my home less what I did
21      get for my home."
22              And she said that would be the fair measure
23      of damages.
24              And so I just want to respond to this sense
25      that we're being unfair and we're cheating people
```

April 11, 2019

1        and we're punishing people.  We heard that

2        yesterday.  We're not.  We're saying that people

3        should get what they deserve and what they are

4        entitled to under the law.

5            MR. MONTOYA:  Judge, if our claimants got

6        what they deserved, the default that was entered

7        and the litigation was served in the first two

8        years of the litigation, this case would have

9        been done and multitudes of them would have been

10       able to retain their homes with the compensation

11       that they received in order to fix their homes.

12       They couldn't do that.  This was a defendant that

13       had been found in civil and criminal contempt for

14       running in and out of the jurisdiction.  You

15       can't ignore that history and you can't ignore

16       what has happened to these folks over time.

17       These are people that would have fixed their

18       homes.  Think about it, you know under your

19       mortgage document, if you have a material defect

20       in your home, you are obligated to fix it.  You

21       have to fix it.  You get the money, you fix it

22       and you try to move on with your life.

23           They can't be made whole at this stage as a

24       result of what has happened to them because of

25       this deliberate conduct and delay and it's gone

April 11, 2019

1        on and on and on and that is the argument and

2        it's born out in the Florida Priority Claimants'

3        testimony.  We've got 20 depositions from these

4        Priority Claimants and their stories are

5        remarkable.  It's your home is your castle, it's

6        your biggest investment, you've got your family

7        in there, they are concerned about their health,

8        they have got to leave, they lose their house and

9        this is a defaulted defendant.  This isn't

10       somebody we're fighting about liability on.  They

11       owed money and they don't want to pay it.  Every

12       day that goes by, we keep losing class members,

13       we keep losing people, the tragedy -- the human

14       tragedy continues and it has to stop.  So it

15       is -- they can't be made whole from where they

16       were after they lost their home.  Those damages

17       don't make them whole.

18            MR. VEJNOSKA:  They want to be made more

19       than whole.

20            MS. EIKHOFF:  Yeah.

21            MR. VEJNOSKA:  The law can be an ass, right,

22       but the law is very clear that says you can't get

23       the cost of restoration when restoration is

24       impractical.  They want that and they want

25       everything else.  We understand the everything

April 11, 2019

1    else that they are asking for and we'll address

2    that, and it will be awarded or not awarded.

3    Their compensation when they are no longer a

4    homeowner is for -- they are bringing claims

5    saying I sold my house and I got $200,000 less

6    than I should have.  Give me that and I'll be

7    where I should have been and they want other

8    things on top of that, or they want various

9    things, but you can't do that, pursue those

10   claims and then on top of that say, "And also you

11   get X hundred thousand dollars" to go in and

12   remediate the home the way they want to remediate

13   the home, but not remediate the home.

14        MS. EIKHOFF:  Mr. Montoya is not the first

15   plaintiff's lawyer to make the argument that

16   whatever money this defendant has to pay will

17   never be enough.  That's what it sounds like

18   you're saying.  It will never be enough.  They

19   can't be made whole.  They have to pay as much as

20   they possibly can pay because of what they have

21   done to these people and because of their

22   behavior in the litigation.

23        But that's -- but Florida law has a cap on

24   that, right?  So it's not -- the adversarial

25   system is governed by Florida law and the

April 11, 2019

1    limitations of Florida law.  So when you have a

2    plaintiff's lawyer on one side saying, Judge,

3    fact finder, jury, this will never be enough, the

4    amount of money you should pay as much as you can

5    make them pay because my client can never be made

6    whole, but that is contained and restrained by

7    Florida law that says you get what you are

8    entitled to, you get the exact amount of your

9    quantifiable harm and not more.

10          MR. MONTOYA:  Judge, there is -- well, let

11   me be very clear, I always get nervous when I

12   hear the word cap, there is no cap, okay?  But

13   the cap that is in front of you is a remediation

14   formula.  We're not asking for the world, we're

15   asking for remediation formula damages.  It's

16   easy to calculate, it's in front of you.  It's

17   been court approved.  Make no mistake about it.

18   We're not asking for a windfall, we're not asking

19   you to move heaven and earth, we're asking you to

20   make these folks whole.  That's the position

21   we're in.

22          And, you know, I don't know that Your Honor

23   has had the chance to see the briefing that was

24   before Cooke on the defendants' litigation

25   contests, but there are -- we have formerly

April 11, 2019

```
1    attorney-client privileged documents between the
2    defendants -- these defendants and their former
3    counsel that this was a deliberate litigation
4    strategy because there was no treaty between the
5    US and China, they didn't think that they were
6    collectable defendants, and they deliberately
7    avoided this litigation and let themselves go
8    into default.  That's record evidence in front of
9    Judge Cooke, it's record evidence in front of
10   Judge Fallon, and it's in the briefing and the
11   arguments that were done in November.  This was a
12   conscious strategy.
13         This isn't a defendant saying, well, you
14   know, I'm entitled to my due process rights, I've
15   done XYZ.  No, this was an avoidance.  That's why
16   heavy sanctions were levied against them, and
17   that's why Judge Fallon held them in civil and
18   criminal contempt.
19         SPECIAL MASTER LEE:  Okay.  I think I'm
20   going to have to think about the equitable
21   argument more because I guess when I read the
22   damages findings of fact, in Paragraph 59 he
23   says:  "On June 9, 2015, the court considered
24   only remediation damages for current owners."
25         MS. DUGGAN:  And the reason for that was
```

April 11, 2019

1    that the hearing was limited to current owners,

2    and Judge Fallon says elsewhere -- I apologize, I

3    don't know the paragraph number -- that at a

4    later phase former owners and other damages were

5    going to be considered.

6        MS. EIKHOFF:  But we would say they will be

7    considered and different damages may be

8    implemented.  So just saying that they will be

9    considered doesn't mean that necessarily means

10   they will get a formula.  It will be considered

11   and we think that's appropriate because it's a

12   different measure of damages.

13       MS. DUGGAN:  And we do have pending briefing

14   before Judge Fallon in the MDL on this specific

15   issue.

16       SPECIAL MASTER LEE:  Okay.  The 105.91

17   number and whether it should or could be

18   adjusted, Ms. Eikhoff?

19       MS. EIKHOFF:  Yes.

20       SPECIAL MASTER LEE:  I was reading back on

21   Footnote 10 and then when the Judge was

22   describing how he got to that number, he says a

23   lot of things that suggest to me that an

24   adjustment in the current value was contemplated.

25   I just want you to -- thank you.

April 11, 2019

```
 1              So when he's describing how Mr. Inglis got
 2       to this number, I guess beginning on Paragraph
 3       35, he talks about, I guess, taking the $86
 4       number from Germano, and then in Paragraph 36
 5       he's talks about different factors that he
 6       considered and he says:  An established cost on a
 7       per square foot basis converted to present
 8       value."
 9              And then he goes on and it's talking more
10       about that and how the RSMeans factors into this,
11       and then when he gets to announcing the formula,
12       he again says in the footnote that this figure is
13       a national figure, blah blah blah, using RSMeans
14       to adjust the 86 foot -- per square footage cost
15       to reflect current day building materials and
16       labor.
17              So he seems to be suggesting that there is
18       an adjustment to get to current value that he was
19       looking at in 2015, so why wouldn't we be doing
20       the same now when we're applying the formula?
21              MS. EIKHOFF:  I understand your question and
22       I want to address it in a couple of different
23       ways.  One is that I acknowledge what you have
24       read, and that is true, it does -- the formula
25       was arrived at by bringing it to a then present
```

1      value.  It was brought to a then present value as

2      of the June 2015 evidentiary hearing.

3          As I pointed out yesterday, though,

4      before -- four months before Judge Fallon issued

5      his FOFCOL, they submitted an update with a new

6      expert, their current expert Mr. Wright.  And so

7      if Judge Fallon wanted to say I'm going to pick

8      the most recent number by their most recent

9      expert, then he could have and would have

10     incorporated that into his FOFCOL.  So our

11     reading of that is -- the sequencing of what they

12     did and what Judge Fallon did is that he could

13     only adopt and use an expert report and formula

14     that had been through the discovery process and

15     that had been through the evidentiary process.

16         Now, does that mean that for all time in

17     this case we're frozen at 2015 and that number

18     could never ever be changed?  Probably not, but

19     it would have to go through the same sort of

20     process.  So that's our position there.

21         And I just wanted to point out that there is

22     some inconsistency in the plaintiff's view on

23     updating the formula and their view on ownership

24     status, because here they are saying that when

25     damages are applied, they need to be brought

April 11, 2019

1    to -- the number needs to be brought to current

2    day to reflect the current realities.  Right?  So

3    they are saying within a week or two they are

4    going to give you the 2019 numbers because that

5    -- those are the appropriate damages to reflect

6    the current reality and the current cost of

7    remediation.

8         At the same time, when we are talking about

9    current and former owners and the realities of

10   that, they are saying ownership should only be

11   determined as of the time that this case was

12   filed.  So you -- we can't reconcile that because

13   if you're going to -- if you were going to truly

14   reflect the current realities of what the

15   appropriate damages should be, then you would, on

16   the one hand, look at what the current situation

17   of the plaintiff is, and at the same time you

18   could potentially do an adjustment to the

19   formula, but it would need to go through the

20   proper judicial channels.

21        MS. DUGGAN:  I think she -- Ms. Eikhoff is

22   referencing two different concepts, one is the

23   entitlement to damages and the other is what is

24   the measure of damages.  When we talk about

25   bringing it current we're talking about being

April 11, 2019

1        awarded damages in 2019, they should be entitled

2        to the current value of those damages.

3            Now, Judge Fallon approved the methodology

4        through his order and through that class damages

5        hearing, and what we're talking about here is a

6        published set of data that are what come together

7        to be the national average.  That's published.

8        We're not asking to, you know, go out and figure

9        that out ourselves.  I mean, it comes from a

10       published document, it's already been approved,

11       and all we're saying is let's bring it to the

12       current value.  It's not as if we have to vet the

13       methodology.  That's already been approved.

14           MS. EIKHOFF:  But we have to just make sure

15       he did it right, and that's what we don't have

16       any opportunity to do.  And by the way, this is a

17       different guy.  This is -- I know that they work

18       together and they are hand in hand and all that

19       but it is a different guy.  And when we deposed

20       the first expert, we found that there was -- he

21       had some math errors and calculation errors, and

22       so what they are asking you to accept is a

23       completely unvetted calculation by an expert that

24       has not been through any of the rigors that are

25       established by the federal rules.

April 11, 2019

1       MR. VENDERBUSH:  There is not even an expert

2    report.

3       MS. DUGGAN:  I think I said this yesterday,

4    Mr. Wright and Mr. Inglis work together, they are

5    partners.  The only reason Mr. Wright didn't show

6    up for the hearing is because his wife was dying.

7    I mean, I think that sort of doesn't make a

8    difference.  I mean, Mr. Inglis could produce the

9    same number that Mr. Wright is producing, if

10   that's the problem that the defendants are

11   having.

12      MS. EIKHOFF:  Whoever did it, we just need

13   to be able to check it.

14      SPECIAL MASTER LEE:  Okay.  All right.

15   Well, you guys have made it so clear.  That's all

16   the follow-up that I wanted to do.  If there are

17   final remarks, closing remarks, anything that you

18   wanted to say that you haven't had a chance to

19   say, feel free.

20      MS. EIKHOFF:  I just wanted to make a couple

21   of remarks that -- points that I had written down

22   that I wanted to make sure that if we left today

23   and you heard nothing else from us, that this is

24   what I wanted to share.

25      You're in a tough position because you are

April 11, 2019

1      the first one to get this and your situation of

2      trying to figure out how do I land this plane

3      because this formula has been coasting in the air

4      and now it's coming to ground.  And so you're

5      going to have to figure out how to land this

6      plane.  And I understand this is -- I don't even

7      understand what you must be feeling because this

8      is a daunting task.

9           But I think that it's daunting but it is not

10     unmanageable and it is certainly achievable.  And

11     just practically speaking, here is how we see

12     this being a workable process for you.

13          Your PID report and recommendation is a good

14     template for how we see you approaching this.

15     Your PID report and recommendation, you went

16     through each of the contested categories and you

17     made a decision that you are recommending to the

18     court, and you didn't do that thinking, oh, how

19     many claims is this going to affect and how is

20     this going to change the volume of claims?  You

21     just looked at the evidence and in that case

22     you're looking more at the facts but you looked

23     and said this is the decision that I have -- that

24     I think is appropriate.

25          We think you should do the same thing with

April 11, 2019

```
1        this objections list.  You go through category by

2        category and you call the balls and strikes, and

3        that is -- that's the contests report and setoffs

4        report and recommendation that is contemplated by

5        Section D of Judge Cooke's trial plan.

6             So you go through the contests and

7        objections and you make those determinations.

8             And then your final report is where all of

9        those pieces are going to come together and the

10       effect of your decision will be manifested in

11       that final report, and we will -- we will help

12       you in that process, as we said, by providing you

13       our updated objections list and to show you the

14       progress that's been made so far.  But that's the

15       way that we see this taking place in an orderly

16       way along the -- along the program that was

17       designed for you by Judge Cooke.

18            MR. MONTOYA:  I think along this --

19            MR. VEJNOSKA:  Patrick, before you --

20            MR. MONTOYA:  Sure, go ahead, please.

21            MR. VEJNOSKA:  I just have a couple comments

22       and I didn't want to surprise you by going after

23       you, if it's all right.

24            I echo what Ms. Eikhoff said, I want to echo

25       what I started with, which is our position is
```

April 11, 2019

1    that you're now considering what Florida law

2    requires and you're considering what the facts

3    are, and frankly, what I hear from the plaintiffs

4    is you're a human calculator, you just do A times

5    B equals C.

6         And while that may be what some would call

7    efficient, I don't think it's -- I certainly

8    don't think it's justice, but I also don't think

9    it's what was contemplated.

10        When we talk about the equities I want to be

11   really clear that no one is saying that somebody

12   who otherwise has a claim can satisfy product

13   identification, can get through the necessary

14   and, frankly, very basic hoops gets nothing.

15   We're just saying it may not be the measure of

16   damages that they want it to be, because that

17   measure of damages either may be legally

18   precluded or, frankly, may not be equitable.

19   It's not equitable to give -- because those

20   people who are saying -- I hear them say they're

21   not getting remediation formula.  They are not

22   giving up their other claims.  If you give them

23   remediation formula, the next thing you are going

24   to hear is now I get diminution in value, now I

25   get stigma, now I get whatever else it is, and

April 11, 2019

1          when you add all those things up, I understand

2          the plaintiffs' position, maybe nothing is ever

3          enough, but at some point under the law it is

4          enough.

5               On equity, I would also just emphasize, they

6          can say what they want about all the defendants.

7          We were not held in contempt.

8               The only other thing I do want to emphasize

9          is that again, echoing what Ms. Eikhoff said,

10         while I imagine you went home last night and

11         thought, "Well, now what do I do?  How do I climb

12         this mountain?  How do I actually make progress?

13         How do I show Judge Cooke that her faith in me

14         and her election of this process all made sense?"

15              And it already does.  You already made a lot

16         of progress on this, on product identification.

17         And you're going to make a ton of progress on

18         this with just a few fundamental rulings about

19         what Florida law entails, and, therefore, who is

20         entitled to what, and again, on the equities,

21         when you decide that somebody is -- has satisfied

22         their product identification requirement but is

23         not entitled to remediation, you're not telling

24         that person, "I'm sorry, you get nothing, I don't

25         care."  You're just saying, "You're in a

April 11, 2019

```
 1      different process, this formula process is not

 2      the way that it works."

 3          And so when you decide some of those very

 4      fundamental decisions, Ms. Eikhoff has an apt

 5      analogy, you call balls and strikes.  You let the

 6      chips fall where they may, you make the right

 7      decision, and then it's the parties' job after

 8      May 3rd, on or about May 3rd.  And frankly, if

 9      the Special Master needs more time, I mean, I

10      don't think you're going to be asking for an

11      enormous amount of time, but these are

12      consequential decisions, so if you need more

13      time, you get a little more time.

14          But on or about May 3rd you make those

15      decisions and then it's our job to apply them and

16      to show you, "Well, here's now what's left and

17      here it is."  And on some of those you may say,

18      "Okay.  So this person qualifies here, qualifies

19      here, qualifies here, and so this is what my

20      award is."

21          And others you may say, "They still qualify

22      but the parties have not given me the

23      information, I don't have the tool to make that

24      last decision."  And then it's our job to figure

25      out how we do that.
```

April 11, 2019

```
 1        But I don't think that the daunting nature

 2   of the task -- obviously, I know it is not going

 3   to preclude you from the job, but I just don't

 4   want you to feel like it means that it's not even

 5   worth the effort, because I think that the effort

 6   is going to produce something that is going to be

 7   a spreadsheet where, you know -- and we've all

 8   preserved our objections to the formula process,

 9   et cetera, you know, and so we're not waiving

10   things when we say it's going to produce --

11   you're going to make some awards, or at least say

12   these people are eligible for the formula.

13   Period.  Full stop.

14        You may not actually even be able to do

15   that, because to their point of, well, it's not

16   enough just to say, "Well, we gave you a figure."

17   We have to give you the right figure for square

18   footage or whatever, but you will either decide

19   that you can do that or that you need a little

20   more progress made there.

21        But in the end, what it's going to do is

22   it's going to produce something with some awards

23   on one hand, some people out of the process on

24   the other, and some people in the process who may

25   get awards but not an exact formula award, and
```

April 11, 2019

```
 1        then some last category of people that you're

 2        going to say, "I think they are in the process

 3        and I think they are entitled to an award but I

 4        need to know X or Y before I can make my final

 5        recommendation on that."

 6             I think that's where this process just

 7        naturally takes you if you decide that you're not

 8        just a human calculator, and I just don't think

 9        you are.  Thank you.

10             MR. MONTOYA:  Judge, you will understand if

11        I'm a skeptic following the first cases back,

12        which was back in, I think, February of '09, if

13        I'm not mistaken, and we're 10 years down the

14        road and I think what you keep hearing is well,

15        just whack them on the remediation formula and

16        we'll pay them something on the other side.  I

17        heard twice yesterday that they were going to pay

18        damages.  We're 10 years out and nobody has seen

19        a dime.  The task in front of you is a

20        remediation damages formula.  Judge Cooke's order

21        is clear, we've given you a spreadsheet in Tab A

22        that has every claimant listed with square

23        footage, with their objections listed, your

24        rulings are on those three ABC categories that we

25        looked at.  Your charge is clear.  Your task is
```

April 11, 2019

1    clear.  I think Judge Cooke's order is clear.

2    The other arguments that you're hearing about

3    other stuff down the line is not in front of you

4    here.  We're just asking you to concentrate on

5    those areas that are before you and make the

6    right determination.  Yeah, you do call them

7    balls and strikes.  You have a very wavy job in

8    our mind.  I'm looking at you as a juror, as the

9    finder of fact, and we ask you to take all the

10   reasonable inferences in favor of the plaintiffs

11   given the default and rule on these cases on a

12   preponderance of the evidence standard, which is

13   a 51-to-49 standard, more likely than not, did we

14   produce enough evidence to get past the threshold

15   that is there for our plaintiffs to receive the

16   remediation formula.

17        MS. EIKHOFF:  I do just want to respond to

18   something and I'm going to limit it to a rebuttal

19   of something that you just said, that we're 10

20   years down the road and nobody has seen a dime.

21   I don't know if the court has -- if the Special

22   Master has been following the court's docket, but

23   we have reached an agreement, a settlement

24   agreement with attorneys for 500 of the Florida

25   claimants.  Their attorneys agreed to it, have

April 11, 2019

1    recommended it to their 500 clients and the

2    majority so far have accepted the settlement

3    agreement.

4        Mr. Montoya filed an objection to that

5    settlement and made arguments both in Louisiana

6    and in Florida that it's not enough under the

7    idea that it's never enough, they can never be

8    made whole.

9        And so that is hung up currently in the

10   courts and there is some pending motions about

11   that, but it rebuts the notion that we're sitting

12   over here, we're never going to pay a dime, we're

13   just trying to drag this out, we don't want to

14   offer anyone any money to address their harm.  We

15   have and we are and we are -- we would be able to

16   have done it by now in very high amounts of money

17   if they had not stood in the way of it.

18       And so I just wanted to respond that this

19   notion where we're being painted as just, you

20   know, these recalcitrant, contemptuous bad guys

21   that aren't going to pay anyone any money.

22       MS. DUGGAN:  With all due respect to

23   Ms. Eikhoff, I have to correct the record on some

24   points that she just made that are simply not

25   true.  We did not file an objection to the

1    settlement.  We filed a motion before Judge Cooke

2    to protect the Amorin class members that are

3    before her.  The defendants entered into a

4    settlement with some of the plaintiffs without

5    seeking any court approval.  Judge Cooke's sua

6    sponte before any briefing on our motion, stayed

7    the settlement.  She told the defendants and the

8    settling attorneys to file the settlement

9    agreement under seal, she was going to review the

10   settlement and she was going to schedule a

11   hearing, we did not object that it wasn't

12   sufficient, we don't have enough information to

13   know whether it was sufficient or not, and what

14   we were interested in is the communications that

15   were made to class members that are entitled to

16   protection from the court.  The court is the

17   overseer of the class member.

18        So it's not true that we objected to the

19   quantum of the settlement.  We don't know enough

20   information and as class counsel we had a duty,

21   fiduciary duty, the court has a fiduciary duty,

22   to protect the class members.

23        MS. EIKHOFF:  The filings will speak for

24   themselves.

25        SPECIAL MASTER LEE:  Okay.  Anything else

April 11, 2019

1       anybody else wants to say?

2               MS. DUGGAN:  Good luck.

3               MR. MONTOYA:  Godspeed.

4               MR. VEJNOSKA:  Thank you very much for your

5       time.

6               MS. EIKHOFF:  Thank you very much.

7               SPECIAL MASTER LEE:  So you know, I'm going

8       to be independently sort of looking at these

9       issues.  If anybody desires to do supplemental

10      briefing, I'm not asking for it, but do it by

11      April 22nd, or I will consider that you don't

12      want to do it.  And I think, you know, whatever

13      the agreements were as to when you are going to

14      provide them your lists and when you're going to

15      respond and all that stuff, you know from

16      yesterday, so we don't need to recap that.

17              An we'll see where this journey takes us.

18              MS. DUGGAN:  Just one more matter.  There is

19      still the open issue of the BNBM product

20      deposition.  We haven't had a chance to confer

21      yet but we will report to you by the end of this

22      week.  I think that we can do that by tomorrow in

23      terms of when think we can accomplish that and

24      get the briefing to you and our goal is to do it

25      as soon as possible.

April 11, 2019

```
 1              MR. MONTOYA:  I may have one more question

 2        or comment but let me confer with my cocounsel.

 3              SPECIAL MASTER LEE:  Okay.

 4              MR. MONTOYA:  Nothing further.

 5              SPECIAL MASTER LEE:  Nothing further?  Okay.

 6        Thanks, everyone.

 7              MS. EIKHOFF:  Thank you.

 8              (Whereupon, the hearing concluded at

 9        10:27 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

April 11, 2019

```
 1              C E R T I F I C A T E

 2

 3

 4         I, SUSAN D. WASILEWSKI, Registered

 5    Professional Reporter, Certified Realtime Reporter,

 6    Certified Realtime Captioner, Certified Manager of

 7    Reporting Services, and Florida Professional

 8    Reporter, do hereby certify that I was authorized to

 9    and did report the foregoing proceedings, and that

10    the transcript is a true and correct record of my

11    stenographic notes.

12         Dated this 16th of April, 2019, at Lakeland,

13    Florida.

14

15

16    _____

17    SUSAN D. WASILEWSKI, RPR, CRR, CRC, CMRS, FPR

18

19

20

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```