# EXHIBIT 49

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

EDUARDO AND CARMEN AMORIN
  et al.,

        **Plaintiffs,**

**v.**

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO.,
LTD. et al.,

        **Defendants.**

Civil Action No. 2:11-cv-377-MSD-RJK

---

## PLAINTIFFS' MOTION TO ADOPT PLAN FOR
## RESOLUTION OF VIRGINIA *AMORIN* CASES

Pursuant to E.D. Va. Local Rule 7 and the Court's Order entered December 27, 2018 (Rec. Doc. 66), the Plaintiffs hereby move the Court to adopt their Plan for Resolution for the reasons more fully set forth in the accompanying Memorandum in Support.

Dated: January 18, 2019

Respectfully submitted,

EDUARDO and CARMEN AMORIN, et al.,
              Plaintiffs

       /s/
_____
Jeffrey A. Breit (VSB No. 18876)
Breit Drescher Imprevento, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone: 757.670.3888
Facsimile: 757.670.3939
jeffrey@breit.law

Richard J. Serpe (VSB No. 33340)
Law Offices of Richard J. Serpe, P.C.
Crown Center
580 East Main Street, Suite 310
Norfolk, VA 23510
Telephone: 757.233.0009
Facsimile: 757.233.0455
Email: rserpe@serpefirm.com

Arnold Levin (*pro hac vice*)
Frederick S. Longer (*pro hac vice*)
Sandra L. Duggan (*pro hac vice*)
Keith Verrier (*pro hac vice*)
Nicole F. Serianni (*pro hac vice*)
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: 215.592.1500
Facsimile: 215.592.4663
Email: alevin@lfsblaw.com
Email: flonger@lfsblaw.com
Email: sduggan@lfsblaw.com
Email: kverrier@lfsblaw.com
Email: nserianni@lfsblaw.com
*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 18th day of January 2019, I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/
_____
Jeffrey A. Breit, Esquire
VSB No. 18876
Breit Drescher Imprevento, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia  23451
(757) 670-3888 Office
(757) 670-3939 Facsimile
jeffrey@breit.law
*Counsel for Plaintiffs Eduardo and Carmen Amorin, et al.*

2

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

|  |  |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated, | |
| **Plaintiffs,** | **Case No. 2:11-cv-377-MSD-RJK** |
| v. | |
| TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., *et al.*, | |
| **Defendants.** | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' PROPOSED PLAN FOR RESOLUTION OF VIRGINIA *AMORIN* CASES[1]

---

[1] Plaintiffs' Plan for Resolution with Attachment "A" hereto is filed pursuant to the Scheduling Order of December 27, 2018. During the December 18, 2018 initial conference, the parties addressed with the Court their separate visions for the fair and rapid resolution of the entirety of the litigation in Virginia. Plaintiffs' proposal takes into account the long delays experienced thus far in adjudicating Plaintiffs' claims and the need to proceed in accordance with governing legal principles. Given the voluminous record in this case, a Joint Appendix of documents referenced in Plaintiffs' Plan is filed herewith, and two hard copies of the Appendix will be delivered to the Court. Any additional documents referenced in Defendants' Responsive Brief or the Plaintiffs' Reply Brief will be added to the Joint Appendix ("Jt. App'x") as a supplement.

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 4

    A.  Defendants' Exports of Defective Chinese Drywall to the United States. ................ 4

    B.  Defendants' Well-Crafted Plan to Avoid Paying Any Chinese Drywall Judgments Has Significantly Delayed These Proceedings. ......................................................... 6

    C.  It is Undisputed that Chinese Drywall Creates a Corrosive and Toxic Environment that Requires Complete Remediation. .................................................................. 13

    D.  The Method for Calculating Plaintiffs' Remediation Damages Has Been Established. ............................................................................................................. 15

    E.  In Virginia, Plaintiffs' Evidence of Remediation and Non-Remediation Damages Has Already Been Submitted and Vetted in Connection with Prior Settlements. ... 17

III.  ARGUMENT .................................................................................................... 21

    A.  Giving Deference and Preclusive Effect to the MDL Court's Orders Accords with the Core Principles of the MDL Statute. ................................................................ 21

        1.  "Law of the Case" Doctrine in the Fourth Circuit. ........................................... 27

        2.  There Are No Grounds to Revisit Judge Fallon's Prior Rulings. ..................... 27

    B.  The Remediation Damages Formula Approved by the MDL Court is a Proper and Efficient Means to Compensate *Amorin* Class Plaintiffs Harmed by Defendants' Defective Venture Supply Chinese Drywall. ......................................................... 29

    C.  Defendants' Willful Defaults Favor Plaintiffs' Plan of Resolution. ........................ 33

    D.  Defendants in Default Have No Jury Trial Rights. ................................................. 34

    E.  Plaintiffs' Plan for Resolution Should Be Adopted. ............................................... 35

    F.  Defendants' Deliberate Defaults Defeat Any Claim of Entitlement to Discovery. .. 38

IV.  CONCLUSION ................................................................................................. 40

## I.    <u>INTRODUCTION</u>

The Virginia *Amorin* Plaintiffs are members of a certified class of property owners who suffered significant damages caused by Taishan's defective "Venture Supply" Chinese Drywall.[2] Regrettably, these Plaintiffs have waited almost a decade for their day in court, even though their lawsuits were part of the Chinese Drywall MDL that was formed in 2009. Despite tireless efforts to resolve these claims, "this case involving the Chinese Entities has only made glacial progress."[3] From Day 1, Defendants orchestrated and carried out a plan to obstruct the fair and speedy resolution of these proceedings, causing interminable delay. In fact, Defendants' "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their … perpetual motions to re-litigate settled matters."[4] The record is replete with proof that Defendants have gone to great lengths to manipulate our judicial system with one goal in mind – the avoidance of having to pay any Chinese Drywall judgments.

Defendants' conduct here has had serious adverse consequences for the *Amorin* Plaintiffs. For most of these innocent victims, the Chinese Companies have left them without the fruits of the American dream. The delays of the litigation have taken away their golden years and ruined their personal lives. In Michelle Germano's case, she served as the lead Plaintiff from Virginia who initiated the *Germano* class action against Taishan in 2009, having been forced to move out of her

---

[2] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014) [Jt. App'x, Tab 8], at *16. Taishan manufactured a variety of brands of Chinese Drywall, but all of the Virginia *Amorin* Plaintiffs' claims arise from Taishan's "Venture Supply" brand. Taishan is a defaulted party in *Amorin*, and jurisdiction has been definitively established against this Defendant.

[3] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629 (E.D. La. Jan. 2, 2018) (Order & Reasons denying motion to vacate default judgments) [Jt. App'x, Tab 16], at *9.

[4] *See id.* at *8 (pointing to substantial evidence demonstrating that Defendants' "absence in this litigation was a calculated strategy").

toxic Chinese Drywall home and abandon all of her possessions. Later, she was sued by her Homeowners Association for failure to pay HOA dues, she lost her home, and was forced to declare bankruptcy. She now lives in a rental unit.[5]

Ms. Germano's story is not unique, unfortunately. The recent testimony of the Florida Priority Plaintiffs illustrates the devastation caused by the Chinese Drywall debacle and the toll this litigation has taken on these Plaintiffs:

> For 12 years now we've been dealing with Chinese drywall. We're in our 60s. That's a sixth of our life we have had to deal with Chinese drywall, and nothing's been done. We've been married 21 years. Over 50 percent of our married life we have been dealing with Chinese drywall. Of the 21 years, almost seven years, or a third of our life, we have been separated. We couldn't be together because I had to go somewhere and work to pay for Chinese drywall. And during this whole time, we had to sit there and watch what -- we moved stuff out of our house to try to live somewhere and watch all of your neighbors get -- not all of them, many of them, excuse me -- get their house taken care of by Knauf in 2010 and 2011. And we went eight and nine years with nothing being done for us. And it's a travesty. It's a travesty is what's happened.[6]

"This was our home. This was our sanctuary. This is where we wanted to retire and be together for the rest of your lives and enjoy life after working all of our life, and that was taken away from us."[7]

Through the passage of time – nine-plus years and counting – many Plaintiffs have lost their homes through foreclosure or short sale, unable to afford the high costs of remediation and

---

[5] *See* Declaration of Mary Michelle Germano dated 12/21/2016 [Jt. App'x, Tab 36].

[6] *See* Transcript of Deposition of William Foster dated 1/8/2019 ("Wm. Foster Dep.") [Jt. App'x, Tab 37], at 14:21-15:15; *see also* Transcript of Vicki Foster dated 1/8/2019 [Jt. App'x, Tab 38], at 11:23-12:16; Transcript of Deposition of Candace Gody dated 12/12/2018 ("Gody Dep.") [Jt. App'x, Tab 39], at 140:14-15 & 92:5-7 ("this toxic Chinese drywall situation" "has taken over so much. This is one-seventh of my life I have been dealing with this. I am 71 years old, and I had to deal with all this.").

[7] *See* Transcript of Deposition of Vicki Foster dated 12/7/2018 [Jt. App'x, Tab 40], at 39:1-5.

not having sufficient resources to pay their mortgages while also paying for alternative housing.[8] A number of Plaintiffs have been forced into bankruptcy.[9] Some Plaintiffs lived in sheds on their property, unable to tolerate their toxic homes but having nowhere else to go, and others are living with family members.[10]

It is time to bring these proceedings to a close. Plaintiffs' Plan for Resolution of the Virginia *Amorin* Cases is a fair and streamlined approach that takes into account the hard work already done in the MDL, the abundance of due process afforded to the defaulted Defendants throughout the proceedings, and the rights of Plaintiffs to have their claims finally adjudicated as expeditiously as possible. Plaintiffs' Plan adopts all of the MDL Court's prior rulings. Given that liability against Defendants is established and the method for calculating Plaintiffs' remediation damages was thoroughly adjudicated by Judge Fallon by means of a contested evidentiary hearing,

---

[8] *See*, *e.g.*, Transcript of Deposition of Jeovany Nunez dated 12/19/2018 [Jt. App'x, Tab 41], at 55:22-56:8 (responding to questions from Defendants as to why Plaintiffs did not remediate their home on their own to fix the Chinese Drywall problem, Mr. Nunez explained, "Cost-wise. I mean, you have to repair – you'd have to go down to the studs, remove all the drywall and replace the drywall. It just was so expensive. I mean, there's no way I could have afforded to have done it.").

[9] *See*, *e.g.*, Transcript of Deposition of Andrew Feldkamp dated 12/13/2018 [Jt. App'x, Tab 42], at 49:23-50:1 (because of Chinese Drywall, "I was forced into bankruptcy and, you know, foreclosed on the house that I wanted to live in.").

[10] *See*, *e.g.*, Transcript of Deposition of Dailyn Martinez dated 12/14/2018 [Jt. App'x, Tab 43], at 112:18-113:4 ("Q. How did you decide that you wanted – that you needed to live in the RV instead of living in your home? A. Because it's too much headache, too much respiratory problems. My son started getting worse all the time. And we decide to do something to try to -- at least a nighttime -- we can breathe better, you know. ***So that's why we decide to buy the RV and put it in the back to try to live in the RV***, sleep in the RV, and come back home, take a shower, cook, and go back to the RV.") (emphasis added); Gody Dep., at 76:20-77:3 ("... we went and stayed with family in New York. And because they wouldn't accept any type of compensation for us, we just paid for all the groceries while we were there."); Wm. Foster Dep., at 20:12-14 (in describing the various alternative living arrangements he endured away from his wife because he had to work out of state to pay for Chinese Drywall, Mr. Foster testified that he stayed with his elderly mom for a period of time).

the *only* remaining question is the quantum of remediation and other damages owed to 175 *Amorin*

class members with properties in Virginia, whose cases have been remanded to this Court.[11]

## II.     FACTUAL BACKGROUND

### A.     Defendants' Exports of Defective Chinese Drywall to the United States.

At the end of the summer of 2005, hurricanes Katrina and Rita made landfall on the Gulf

Coast of the United States, killing more than 1,800 people and demolishing thousands of homes,

commercial buildings and other property. In the aftermath of these deadly disasters that caused

massive destruction and in conjunction with a housing boom, there was a critical shortage of

---

[11] "*Amorin*" refers to three identical *Amorin* complaints filed in Virginia, Florida, and Louisiana in 2011, as protective actions on behalf of all Plaintiffs in the MDL with claims against Taishan. At that time, Taishan was contesting the jurisdiction of our courts to adjudicate Plaintiffs' claims against the Company in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D. La.) (under Virginia law); *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 09-4115 (E.D. La.) (under Florida law); and *Gross v. Knauf Gips KG, et al.*, 09-6690 (E.D. La.) and *Wiltz v. Beijing New Building Materials Public Ltd. Co., et al.*, Case No. 10-361 (E.D. La.) (under Louisiana law). There existed a colorable question regarding the application of the "stream-of-commerce" and "stream-of-commerce-plus" jurisdictional tests reflected in the plurality opinions in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) and *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987), as well as Justice Brennan's concurring opinion in *Asahi*. In order to protect Plaintiffs' claims in the event Taishan was successful in any of its jurisdictional motions to dismiss, each *Amorin* complaint included all of the Plaintiffs owning properties in Virginia, Florida, and Louisiana (and other states), who had claims against Taishan and its parent companies BNBM and CNBM arising out of their defective drywall.

There are 175 *Amorin* class members with properties in Virginia. The Virginia cases on the Louisiana *Amorin* complaint have been stayed by Judge Fallon in the MDL (*see* Order & Reasons dated 11/19/2018 [Jt. App'x, Tab 20]), and a similar motion to stay is pending before Judge Cooke in Florida. The Plaintiffs' Plan for Resolution contemplates filing a motion to stay the non-Virginia *Amorin* actions appearing on the Virginia *Amorin* complaint while those cases proceed in other jurisdictions.

drywall in this country. This created an opportunity for Chinese companies to sell their plasterboard products to American customers.[12]

Beginning in the fall of 2005 and continuing through 2008, Taishan took advantage of the increased demand for drywall in the U.S. by targeting customers along the East Coast in Virginia, New York, and North Carolina, along the Gulf Coast in Florida, Louisiana, Mississippi, Alabama, Georgia, and Texas, and in California.[13] Taishan customized its boards for the U.S. market – manufacturing its drywall according to U.S. dimensions (in inches as opposed to centimeters), altering its DUN logo to have red, white, and blue colors like the American flag, adding barcodes and designs to sealing tape and end tapes based on individual customer requests, and stamping its boards with specific names like "Venture Supply" for customers in Virginia, for example.[14]

Ultimately, Taishan shipped more than 86 million square feet of its Chinese Drywall to customers in those jurisdictions for installation in new construction and the refurbishing of homes.[15] In Virginia, Taishan manufactured and sold more than 150,000 sheets (totaling 7.3 million square feet) of its "Venture Supply" Chinese Drywall.[16] This defective drywall was installed in the Virginia *Amorin* Plaintiffs' homes.

---

[12] *See*, *generally*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829, 859, 898 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014) [Jt. App'x, Tab 1].

[13] *See* Chart of Taishan Sales to the United States ("Chart of Taishan Sales") (MDL Rec. Doc. 14843-3) [Jt. App'x, Tab 30]; *see also* Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007 (TG-0129675-76) ("Statement on the Data and Statistics of Exports") (MDL Rec. Doc. 21641-203) [Jt. App'x, Tab 32]; Statistics of U.S. Gypsum Boards by Self-Managed Export during 2005-2007 (TG-0129677) ("Statistics of U.S. Gypsum Boards Exports") (MDL Rec. Doc. 21641-204) [Jt. App'x, Tab 33].

[14] *See Chinese Drywall*, 894 F. Supp. 2d at 853, 876.

[15] *See* Chart of Taishan Sales; Statement on the Data and Statistics of Exports; Statistics of U.S. Gypsum Boards Exports.

[16] *See* Chart of Taishan Sales; *Chinese Drywall*, 894 F. Supp. 2d at 853.

Once installed, residents noticed unpleasant odors and corrosion to anything made of metal. Their appliances, televisions, computers, and heating and air conditioning systems failed, their fixtures and jewelry tarnished, and the house smelled like rotten eggs. In most instances, these victims of Chinese Drywall were forced to abandon their possessions and vacate the premises. Beginning in 2009, thousands of Plaintiffs across the country (and hundreds from Virginia) began to file claims in federal and state courts for damages against the manufactures of Chinese Drywall (principally the Chinese Taishan companies and German Knauf companies), as well as other responsible parties, including importers, distributers, suppliers, builders, and installers, and their insurers.

On May 1, 2009, Michelle Germano from Norfolk, Virginia and several other Plaintiffs in the Eastern District of Virginia filed a class action complaint against Taishan and the distributers and suppliers of Taishan's Venture Supply Chinese Drywall.[17] On June 15, 2009, the Judicial Panel for Multidistrict Litigation transferred *Germano* and other all federal actions alleging damages from Chinese Drywall to the Eastern District of Louisiana for coordinated discovery and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, assigning the case MDL docket number 2047.[18]

**B.    Defendants' Well-Crafted Plan to Avoid Paying Any Chinese Drywall Judgments Has Significantly Delayed These Proceedings.**

Within days of being served under the Hague, even before the MDL was formed, Taishan and its parent companies BNBM and CNBM[19] determined that willful default was the best strategy

---

[17] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655, 659 (E.D. La. 2010) (*Germano* Findings of Fact and Conclusions of Law) [Jt. App'x, Tab 3].

[18] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

[19] The MDL Court has held that that under Virginia law, Taishan is the agent of its parent BNBM and, therefore, Taishan's contacts in Virginia can be imputed to BNBM. *In re Chinese-*

for handling the Chinese Drywall litigation. Indeed, on May 11, 2009, Taishan reported to its leaders (Chief Song and Chief Cao), that "[a]fter analysis, Taishan Gypsum believes that this lawsuit is relatively complicated, and it plans not to respond" because: (1) responding to the lawsuit would incur a large amount of attorney's fees and traveling fees; (2) there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgments; (3) Taishan Gypsum does not have assets within the continental U.S.; and (4) even if the lawsuit is lost, the U.S. courts cannot execute on any judgment against Taishan's assets in China.[20] Defendants were confident that "the possibility of the US judgments being enforced in China is very low."[21]

As part of their judgment-avoidance game plan, after consulting with several American law firms, including Orrick,[22] Defendants attempted to reject service of process,[23] and even after

---

*Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595, *46 (E.D. La. Apr. 21, 2017) ("CNBM-BNBM Jurisdictional Order") (1292(b) appeal pending) [Jt. App'x, Tab 14]. BNBM has appealed the MDL Court's jurisdictional ruling pursuant to 28 U.S.C. § 1292(b), but in any event, BNBM owns 100% of Taishan. *See* CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM dated 10/13/2015 (MDL Rec. Doc. 21641-49) [Jt. App'x, Tab 29]. The MDL Court dismissed CNBM from this action. CNBM-BNBM Jurisdictional Order, 2017 WL 1476595 at *46.

[20] *See* Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited dated 5/11/2009 ("Informational Report on U.S. Class Actions") (MDL Rec. Doc. 21641-4) [Jt. App'x, Tab 25]. BNBM similarly decided that rather than respond to the Chinese Drywall lawsuits, "[t]he Company and Taishan Gypsum will continue to keep an eye on the progress of the incident." BNBM Announcement dated 5/28/2010 (MDL Rec. Doc. 21641-258) [Jt. App'x, Tab 26].

[21] *See* CNBM Announcement on Recent Developments in the Gypsum Board Litigation in the US dated 2/15/2015 (MDL Rec. Doc. 21641-196) [Jt. App'x, Tab 27], at p. 2.

[22] *See* The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States ("Course of Events Memo"), at p. 1 (MDL Rec. Doc. 21641-192) [Jt. App'x, Tab 28].

[23] *See* The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings ("Course of Events Memo – Brief Version") (MDL Rec. Doc. 21641-245) [Jt. App'x, Tab 31], at p. 4 (confirming Defendants' plan to "continuing to reject the service of legal process" in this case); *Chinese Drywall*, 2018 WL 279629, at *7 (pointing out that "these entities have refused to accept service at various points in this history of this

service was perfected, they ignored the complaints and deliberately allowed numerous defaults to be entered against them.[24] Defendants were aware that "Judge Fallon already issued a warning to Taishan Gypsum. If Taishan Gypsum did not respond to the litigation before September 24, 2009, the judge [would] hold a hearing on September 24, 2009, and issue a default judgment against Taishan Gypsum."[25] Defendants nevertheless failed to appear or respond, choosing instead to sit on the sidelines back in China while the litigation proceeded.

On February 19 & 22, 2010, the MDL Court oversaw a bellwether trial in *Germano* for seven families who intervened to pursue their claims for damages from Taishan's Venture Supply drywall.[26] This trial resulted in a $2.6 million default judgment against the Company.[27] Faced with having to pay this judgment, on the last day for an appeal, Taishan entered a limited appearance solely to challenge jurisdiction and attempt to vacate the defaults in *Germano* and *Mitchell*.[28] At that time, Taishan admitted "it was served with the Complaint in *Germano*, but claim[ed] it did not respond because it did not understand the significance of it and it was ignorant of the U.S. legal system."[29] Taishan also claimed that "once it learned of and understood the Default Judgment against it, it expeditiously took measures to appear and participate in the litigation."[30] These claims of ignorance and innocence were not true, however, as Plaintiffs learned many years later through

---

litigation," but they "received notice of this action and had sufficient time to present their defense—but they did not.").

[24] *See Chinese Drywall*, 2014 WL 4809520, at *2 (itemizing defaults entered against Defendants).

[25] *See* Course of Events Memo, at p. 6.

[26] *See Germano* Findings of Fact and Conclusions of Law, 706 F. Supp. 2d at 657.

[27] *See Chinese Drywall*, 894 F. Supp. 2d at 832.

[28] *See id.*

[29] *Id.* at 863.

[30] *Id.*

hard-fought efforts to uncover documentary proof that Defendants consulted with American attorneys at the beginning of this litigation, willfully defaulted, and knowingly took a calculated risk that any judgments obtained here would be unenforceable in China where all of their assets are located.

In fact, Plaintiffs spent the next four years, from 2010-2014, engaged in arduous jurisdictional discovery that involved Judge Fallon traveling to Hong Kong "to observe the comments, intonation, and body language" of Taishan's witnesses,[31] extensive briefing and oral argument, and four separate appeals to the Fifth Circuit in order to successfully establish that the manufacturers of the drywall in Plaintiffs' homes – TG and TTP – are alter egos subject to the Courts' jurisdiction under Virginia, Florida, and Louisiana law.[32] Meanwhile, the *Germano* Intervenors (along with all Taishan Plaintiffs) had still not been paid. The MDL Court scheduled a Judgment Debtor Examination, but rather than pay the *Germano* judgment, the BNBM and CNBM Entities devised a plan for Taishan to fire its counsel of record (Hogan Lovells) and refuse to appear in open court. With no respect for valid judicial orders, Taishan abruptly fled the jurisdiction and went back to China. The Company refused to participate any further. As Judge Fallon pointed out: "They lost the appeal, and then they decided that they were going to walk away from the court because they didn't get their way. They're going to take their ball and go home, so to speak."[33] Defendants' blatant disregard for the decorum and rules of the Court resulted in a civil

---

[31] *Id*. at 833-34.

[32] *See id*. at 860-61, 872-74, 889, 895, 903; *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014) (affirming Judge Fallon's jurisdictional rulings in *Germano* under Virginia law and Fourth Circuit law) [Jt. App'x, Tab 1]; *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014) (affirming Judge Fallon's jurisdictional and alter ego rulings in *Mitchell*, *Gross*, and *Wiltz* under Florida law and Louisiana law and Eleventh Circuit law and Fifth Circuit law, respectively) [Jt. App'x, Tab 2].

[33] *See* Transcript of MDL Proceedings dated 1/22/2015 [Jt. App'x, Tab 22], at 20:14-17.

and criminal contempt order against Taishan and an injunction enjoining Taishan and its affiliates and subsidiaries from "conducting any business in the United States until or unless Taishan participate[d] in this judicial process."[34]

These sanctions were not the only sanctions imposed on Taishan in this litigation, as it turned out. On January 8, 2016, the MDL Court found that Taishan committed numerous discovery abuses, including "protracted withholding of relevant evidence."[35] Further, Taishan "conceded its failure to relay [to the Plaintiffs] [a key witness] Mr. Peng's whereabouts and produce documents from his computer in a timely manner," which caused an additional eight-month delay and forced the Plaintiffs to seek Court intervention.[36]

During Defendants' deliberate absence from the litigation, on September 26, 2014, the MDL Court certified the *Amorin* class consisting of:

> All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.[37]

---

[34] *See* Contempt Order and Injunction imposing penalties on Taishan and awarding attorneys' fees to Plaintiffs (MDL Rec. Doc. 17869) [Jt. App'x, Tab 6]. Not surprisingly, in violation of the Contempt Order, Taishan's affiliates – numerous CNBM and BNBM entities – continued to do business in the U.S. during the period of time that Taishan was in contempt of court.

[35] *See* Sanctions Order dated 1/8/2016 (MDL Rec. Doc. 19959) [Jt. App'x, Tab 12], at 14.

[36] *See id*. at 17.

[37] *See Chinese Drywall*, 2014 WL 4809520, at *16.

In addition, the Court approved notice (and supplemental notice) to the class,[38] and scheduled an evidentiary hearing to assess class-wide remediation damages.[39] On the day that the hearing was about to occur, "BNBM entered an appearance for the first time in this litigation and asked for a continuance to prepare for a class damages hearing."[40] At the same time, Taishan came back from China and returned to the proceedings.[41] The MDL Court granted Defendants a continuance and provided them four months to prepare their defense to Plaintiffs' method for calculating class damages.[42]

Shamefully, despite Defendants' entries of appearance in the litigation in 2015 and their active participation in the class damages hearing, these Chinese companies have tried to relitigate just about every ruling made in the MDL during the many years they sat on the sidelines and refused to participate in the normal course.[43] Defendants even sought unsuccessfully to vacate the default judgments against them, which they knowingly allowed to be entered.[44] "Meanwhile,

---

[38] *See id*.; *Amorin* Class Notice (MDL Rec. Doc. 18028-1) [Jt. App'x, Tab 34]; Order approving Supplemental *Amorin* Class Notice (MDL Rec. Doc. 18217) [Jt. App'x, Tab 7]; Supplemental Class Notice (MDL Rec. Doc. 18086-18) [Jt. App'x, Tab 35].

[39] *See* Order setting class damages hearing for February 12, 2015 (MDL Rec. Doc. 18217) [Jt. App'x, Tab 7].

[40] *See* Class Damages Order, 2017 WL 1421627, at *5.

[41] *See id.*

[42] *See id*. Not surprisingly, "[i]t was only after the Court certified the *Amorin* class and scheduled a hearing on class remediation damages that [BNBM and BNBM's parent, CNBM] decided to appear in the MDL in 2015—almost six years after suits were filed against them—to challenge Plaintiffs' evidence of damages, class certification, and the Court's jurisdiction over them." *Id.*

[43] *See Chinese Drywall*, 2018 WL 279629, at *9 ("In this case, the Court is disheartened that delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters.").

[44] *Chinese Drywall*, 894 F. Supp. 2d at 864 ("no basis to vacate the Default Judgment against TG in *Germano*") & 891 ("no basis to vacate the Preliminary Default" in *Mitchell*); *Chinese Drywall*, 742 F.3d at 595 ("the district court did not abuse its discretion by refusing to vacate the Default Judgment"); *Chinese Drywall*, 753 F.3d at 545 ("TG did not show good cause to vacate the preliminary entry of default in *Mitchell*."); *Chinese Drywall*, 2018 WL 279629, at *10 ("Movants

plaintiffs here—thousands of them—are still without remedy after installing defective Chinese drywalls and suffering from them."[45]

Recently, Defendants took the absurd position that former owners of properties with Taishan Chinese Drywall do not belong in the *Amorin* class despite the fact that the *Amorin* class definition includes "[a]ll owners" and both the Class Notice and Supplemental Class Notice made clear that the *Amorin* Class "includes all current *and* former owners."[46] The MDL Court promptly set the record straight on this point:

> Under Defendants' definition, the composition of the class would be ever-changing, and given the glacial speed with which this case has progressed, by the time the case is resolved, there will be very few class members left, if any. Such a construction is untenable and leads to an absurd result.[47]

Indeed, there are many claimants who no longer own their properties, through no fault of their own. Many simply could not continue living in toxic homes or afford to pay for alternative living expenses. These claimants should not and cannot be penalized as a result of Defendants' efforts to game the system and cause interminable delays.

---

had actual notice of this litigation from the outset, but voluntarily decided not to make an appearance until after the default judgments were entered," leading the MDL Court to find that "the entries of defaults were reasonable and within the Court's discretion.").

[45] *See Chinese Drywall*, 2018 WL 279629, at *10.

[46] *See* Class Notice, at fn. 2 (emphasis added) & Supplemental Class Notice, at fn. 2 (emphasis added).

[47] *See* Order and Reasons dated 10/11/2018 (MDL Rec. Doc. 21846) [Jt. App'x, Tab 18], at 11-12. The MDL Court acknowledged that "Defendants had the opportunity to participate in sculpting the class definition in 2014," but they "declined" this opportunity. "Moreover, Defendants were put on notice that the definition included both present and former homeowners in 2014 when the Court issued its legal notice and amended legal notice to the class," but "Defendants failed to object." *Id.*

###### C. It is Undisputed that Chinese Drywall Creates a Corrosive and Toxic Environment that Requires Complete Remediation.

There is no dispute that Chinese Drywall is defective. Through the release of reduced sulfur gases, Chinese Drywall creates a corrosive and dangerous environment that ruins electrical appliances, computers, electrical wiring,[48] HVAC units, plumbing, fixtures, circuit breakers, light switches, thermostats, duct work, mirrors, silverware, and jewelry.[49] In addition, Chinese Drywall produces foul odors and rotten smells that make it difficult, if not impossible, to live in the home.[50] After *Germano* was transferred to the MDL, seven Plaintiff families in *Germano* (the "*Germano* Seven") were permitted to intervene, along with Defendant intervenors Knauf Plasterboard Tianjin Co. Ltd. ("Knauf") and The Mitchell Company.[51] The MDL Court scheduled a bellwether trial of the *Germano* Seven's claims against Taishan to commence on February 19, 2010. "Vigorous discovery was conducted by the Intervenors. Depositions were taken and expert reports were exchanged. A *Daubert* hearing was held on January 29, 2010."[52]

The "overwhelming evidence" adduced at the *Germano* evidentiary hearing showed that the effects of defective drywall are devastating. Even in homes in which Chinese Drywall is only partly installed, the only possible remediation is to remove *all* of the drywall.[53] Further, the Court held that removal of all the drywall at one time is practical, economical and prudent, as is the

---

[48] "Corrosion on active residential wiring is a violation of the national safety code as well as the safety and building codes of the various states," including Virginia. *Germano* Findings of Fact and Conclusions of Law, 706 F. Supp. 2d at 676.

[49] *Id*. at 663-72.

[50] *Id.*

[51] The Mitchell Company brought a class action against Taishan on behalf of builders and secured a default against Taishan in that case. *See Chinese Drywall*, 894 F. Supp. 2d at 832.

[52] *Germano* Findings of Fact and Conclusions of Law, 706 F. Supp. 2d at 660. The night before the evidentiary hearing, Knauf and Mitchell voluntarily withdrew from the proceeding. *Id.*

[53] *Id*. at 671.

replacement of all of the wiring in the home.[54] Even water-carrying copper pipes need to be replaced, since the "corrosive gases responsible for destroying copper in wiring have also damaged the plumbing and mechanical copper components."[55] The HVAC system and electrical devices and appliances, composed of so many materials susceptible to corrosion, likewise need to be replaced.[56] And, the damage involved in replacing all of these items also requires the replacement of wood trim and flooring, cabinets and countertops, fixtures, and all insulation.[57] The proper scope of remediation further requires a thorough cleaning with a HEPA vacuum and a power washer after removal of all toxic materials to remove fine drywall dust and other particles and to eliminate the offensive odor of the Chinese Drywall.[58]

In short, the Court found in *Germano* that every home afflicted with Chinese Drywall requires a top-to-bottom remediation – taking the walls down to the studs and replacing just about everything. The MDL Court found in 2010 that the average cost per square foot to remediate the homes was $86, and calculated the cost of repair of each of the seven intervenors' homes based on that figure.[59] The Court went on to find that the homes of the *Germano* Seven were "representative of a cross-section of contaminated homes" and that "the chemical and physical properties of Chinese-manufactured drywall ... do not differ significantly from region to region or state to

---

[54] *Id.* at 677 (finding "it both economical and practical to remove all the wiring while the drywall is gone, rather than removing only some of the wiring at this time and then risk later have to tear down the drywall again in the case that additional wiring exposed to the sulfur gases is harmed or fails. Additionally, the low-voltage wiring supporting life and safety devices such as fire alarms and smoke detectors should be removed and replaced because of the low cost of replacement when compared with the high risk of injury or death if these devices are not functioning properly.").

[55] *Id.* at 678.

[56] *Id.* at 678-81.

[57] *Id.* at 681-85.

[58] *Id.* at 685.

[59] *Id.* at 686-90.

state."[60] In other words, anyone whose home had Chinese Drywall installed could expect the same kind of damages and would require the same level of remediation.

### D. The Method for Calculating Plaintiffs' Remediation Damages Has Been Established.

On June 9, 2015, the MDL Court held an evidentiary hearing to assess the measure of remediation damages for the *Amorin* class. Defendants actively participated in the hearing – both Taishan and BNBM submitted briefing, presented argument, challenged Plaintiffs' experts and put forth their own expert witness in opposition to Plaintiffs' proposed remediation damages formula.[61] After the hearing, all parties submitted proposed Findings of Fact and Conclusions of Law. Thereafter, the MDL Court entered a Class Damages Order adopting a formula for calculating remediation damages (the "Remediation Damages Formula") based on universally accepted RS Means data, analogous to that used by national builders.[62] Judge Fallon concluded that:

- Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 *as adjusted* by the RS Means location factor."[63] In so ruling, the MDL Court recognized

---

[60] *Id*. at 690.

[61] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627 (E.D. La. Apr. 21, 2017) ("Class Damages Order") [Jt. App'x, Tab 15], at *5, *12-14 (discussing Defendants' participation in the evidentiary hearing).

[62] *See* Class Damages Order, 2017 WL 1421627, at *14.

[63] *See id*., at *24. This formula for calculating remediation damages on behalf of the *Amorin* Class was developed by Plaintiffs' experts George J. Inglis, P.E. and Ronald E. Wright, P.E. of Berman & Wright Architecture, Engineering & Planning, LLC. Mr. Wright and Mr. Inglis worked closely together throughout these proceedings to perform their calculations of remediation damages, but only Mr. Inglis testified at the evidentiary Class Damages hearing after Mr. Wright's wife became ill. Mr. Wright has since provided updated calculations of Plaintiffs' remediation damages as of 2017, and is prepared to testify, if necessary, regarding his formulaic determination of remediation damages.

that "[t]he alternative to estimating property damages on a class-wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages."[64]

- "Ultimately, all such claims will be based on verifications, not only of the under air living space square footage of the contaminated property, but also the presence of Taishan Drywall in those properties."[65]

- Defendants will have an opportunity to assert contests to square footage, product ID, and ownership, and seek set-offs.[66]

- Further, "[t]he Taishan Property Owners will still have an opportunity at later phases to seek damages for alternative living expenses and loss of use and enjoyment of their properties."[67]

In accordance with the Class Damages Order, beginning in June 2017, Plaintiffs submitted the totality of their evidence supporting their claims for remediation and other property damages to Defendants *via* the BrownGreer Chinese Drywall portal,[68] a Sharefile to which Defendants (and the MDL Court) have full access to Plaintiff Profile Forms, and Supplemental Plaintiff Profile Forms. This verified evidence is summarized on a master excel spreadsheet that contains detailed, updated (and in some cases amended) information regarding: (i) "under air" square footage

---

[64] *See id.*, at *25.

[65] *See id.*, at *24.

[66] *See id.*

[67] *See id.*, at *25.

[68] BrownGreer served as the Settlement Administrator for the Knauf class settlements (*i.e.*, settlements with the German Knauf manufacturer of KPT Chinese Drywall) in the MDL. BrownGreer also maintains in its database the profile forms and supplemental profile forms of the *Amorin* Plaintiffs.

(reflecting any changes due to remodeling in the home); (ii) ownership as of June 9, 2015 (including transfer of ownership and assignments of claims); (iii) RS Means calculations for remediation damages using 2017 data, adjusted for local factors; (iv) product ID; (v) prior payments received from one or more of the MDL class settlements; (vi) bankruptcies, foreclosures, and/or short sales; (vii) prior remediations; and (viii) other damages, such as alternative living expenses, loss of use and enjoyment, lost rent, and diminution of value.

Therefore, the calculation of remediation damages for 175 *Amorin* Plaintiffs with properties in Virginia can be accomplished through a Special Master to reduce judicial labor, as is being done for 1,700 *Amorin* Plaintiffs with properties in Florida.[69]

### E. In Virginia, Plaintiffs' Evidence of Remediation and Non-Remediation Damages Has Already Been Submitted and Vetted in Connection with Prior Settlements.

In connection with prior class settlements with builders and installers of Taishan's Venture Supply Chinese Drywall, and their insurers, the Virginia *Amorin* Plaintiffs previously provided proof of damages in support of alternative living expenses, costs associated with foreclosures and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to refinance, loss of income, and damage to personal property, in addition to proof of Venture Supply drywall in their homes, square footage, and ownership information. This evidence in support of Plaintiffs' claims for settlement awards was vetted by the Special Master in the MDL in 2013-2014, and approved by the MDL Court after an opportunity for objection.[70] Defendants could have objected to Plaintiffs' evidence, but chose not to.

\*   \*   \*

---

[69] *See Amorin v. Taishan Gypsum Co. Ltd.*, Case No. 11-22408-CIV-MGC, Order (S.D. Fla. Nov. 16, 2018) (ECF No. 112) ("Florida *Amorin* Trial Plan") [Jt. App'x, Tab 21].

[70] *See* Order Approving Virginia Settlements (MDL Rec. Doc. 16934) [Jt. App'x, Tab 5].

Given the extraordinary level of oversight of these proceedings by Judge Fallon for more than nine years in the MDL, the abundance of due process provided to Defendants, and the rights of Plaintiffs to achieve justice for the harms they have endured, this Court should adopt the prior rulings of the MDL Court adjudicating Defendants' liability, the proper measure of Plaintiffs' remediation damages, and the proofs of Plaintiffs' other damages, in order to proceed promptly to a final judgment. By giving preclusive effect to all of Judge Fallon's orders (as Judge Cooke has done in the Southern District of Florida),[71] Plaintiffs' claims can be finally resolved in this Court in a fair and speedy manner.

Otherwise, if Defendants have their way, there will be no Plaintiffs left to make claims against these Companies for their defective Chinese Drywall. Defendants' dilatory tactics and refusal to fairly adjudicate Plaintiffs' claims in a timely manner has had a serious adverse impact on their lives *in addition to* the damage caused by Defendants' Chinese Drywall. As aptly crystallized by the MDL Court during oral argument regarding a trial plan for the Louisiana *Amorin* cases:

> [T]he problem that I am faced with is that we've been doing this for nine years now. Every step of the way the defendant has resisted looking at the case. I mean, we've had jurisdictional issues and a bunch of other things. It just is apparent -- it appears to me, or at least it's a strong argument, that the whole approach is just delay. Delay because people die, delay because they lose their homes, delay because they're frustrated and giving up. And it's a method, and I am not talking about counsel, but it's just -- I don't know how much more I can give you to look at from the standpoint of bellwethers. I mean, we've discovered this case now for nine years. Even going to China to take depositions. And I think everybody knows the facts of this case pretty well, and it just seems to me that we're just – we're finding ourselves in, you know, a Dickens kind of Bleak House where we just keep discovering and keep moving the case at glacial speed, and pretty soon the glacier melts and you

---

[71] *See* Florida *Amorin* Trial Plan ("adopt[ing] **all** of Judge Fallon's findings of facts and legal conclusions") (emphasis in original).

<u>don't have anything</u>. And that concerns me. I am trying to figure a
way of just bringing this to a head and getting rid of the case.[72]

To implement the Louisiana trial plan, Judge Fallon has ordered that "[w]ith respect to

property remediation, the PSC shall provide Defendants with an accounting identifying: the

claimant owner, the square footage of drywall in the home, and proof of product I.D. Except for

good cause shown, discovery shall be limited to these areas with respect to these claims."[73] The

Court also ordered the parties to select 40 cases (20 per side) to proceed to discovery on Plaintiffs'

non-remediation damages, with fact discovery in those cases to conclude by April 2019. The Court

commented further that:

> We'll start the trials, and hopefully by next year we will at least have
> most of the trials finished because we're going to try them in flights.
> I think they're trying to do that in Florida and I think also in Virginia,
> so we'll be trying 10 or 15 together. There may be some problem
> with the punitive damages in some of those states. We don't
> necessarily have that issue in this matter, but that's been done
> before.[74]

In Florida, Judge Cooke has referred to a Special Master the calculation of Plaintiffs'

remediation damages using "the Remediation Formula [approved by Judge Fallon] to issue a

Report and Recommendation as to the total award for Property Damage Claims" for 1,700 Florida

*Amorin* Plaintiffs.[75] For Plaintiffs' other damages (*i.e.*, claims for alternate living expenses, loss of

use and enjoyment, lost rent, bankruptcy, foreclosure, and short sale), Judge Cooke has ordered

discovery for 20 Plaintiff Priority Claims, with trials to begin July 22, 2019.[76]

---

[72] *See* Transcript of MDL Proceedings dated 8/15/2018 [Jt. App'x, Tab 23] at 24:2-20 (emphasis added).

[73] *See* Order & Reasons dated 10/12/2018 (MDL Rec. Doc. 21847) [Jt. App'x, Tab 19], at 10.

[74] Transcript of MDL Proceedings dated 12/20/2018 [Jt. App'x, Tab 24], at 6-7.

[75] *See* Florida *Amorin* Trial Plan, at 6-8.

[76] *See* Florida *Amorin* Trial Plan, at 9-11.

In Virginia, only one product is at issue: Taishan's Venture Supply Chinese Drywall. The MDL Court has already ruled that Taishan manufactured the Venture Supply boards and is responsible for the damages caused by it, and that ruling was upheld by the Fifth Circuit Court of Appeals five years ago.[77] Plaintiffs have already provided to Defendants (and filed in the MDL Court) evidence of the "under air" square footage in their homes, product ID, and proof of ownership. Accordingly, there is no reason to delay the calculation of the Virginia *Amorin* Plaintiffs' remediation damages based on the evidence of record.

Similarly, each of the Virginia *Amorin* Plaintiffs previously completed claim forms documenting their non-remediation damages in connection with Virginia settlements with builders, suppliers, and installers of Venture Supply Chinese Drywall. Plaintiffs' proofs of damages were vetted by the Special Master in the MDL and approved by Judge Fallon after an opportunity for objection.[78] Again, Defendants could have participated in that process but chose not to. Therefore, the calculation of Plaintiffs' non-remediation damages could also be made by a Special Master, or in the alternative presented at a hearing or hearings before the Court or Magistrate Judge pursuant to Fed. R. Civ. P. 55(b)(2).

---

[77] *See Chinese Drywall*, 894 F. Supp. 2d at 853, *aff'd*, 742 F.3d 576.

[78] *See* Order dated 10/23/2015 [Jt. App'x, Tab 11].

III.      **ARGUMENT**

    A.    **Giving Deference and Preclusive Effect to the MDL Court's Orders
Accords with the Core Principles of the MDL Statute.**

The "multidistrict litigation statute, 28 U.S.C. § 1407, was enacted as a means of conserving judicial resources in situations where multiple cases involving common questions of fact were filed in different districts." *In re Food Lion, Inc., Fair Labor Standards Act Effective Scheduling Litig.*, 73 F.3d 528, 531-32 (4th Cir. 1996). As such, the MDL process endeavors to avoid duplicative rulings. *See In re Tremont Grp. Holdings, Inc., Sec. Litig.*, 626 F. Supp. 2d 1338, 1340 (J.P.M.L. 2009). The Fourth Circuit has recognized that this feat is best accomplished by having the transferor court give deference on remand to the MDL transferee court's rulings:

> One of the charter Panel members wrote the following with regard to whether transferor judges should modify orders of transferee judges:
>
> [I]t would be improper to permit a transferor judge to overturn orders of a transferee judge even though error in the latter might result in reversal of the final judgment of the transferor court. If transferor judges were permitted to upset rulings of transferee judges, the result would be an undermining of the purposes and usefulness of transfer under Section 1407 for coordinated or consolidated pretrial proceedings because those proceedings would then lack the finality (at the trial court level) requisite to the convenience of witnesses and parties and the efficient conduct of actions.

*Food Lion*, 73 F.3d at 531, quoting Stanley A. Weigle, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (1978).

Although the *Food Lion* ruling has rarely been cited in the Fourth Circuit on this particular subject, in the one known instance on point, Judge Jones, sitting in the Abingdon Division of the Western District of Virginia, refused to reconsider a dispositive ruling by the transferee court upon remand based upon the holding of *Food Lion* and the law of the case doctrine. *See United States ex rel. Staley v. Columbia/HCA Healthcare Corp.*, 587 F. Supp. 2d 757, 760 (W.D. Va. 2008).

Based on the reasoning of *Food Lion,* the *Staley* court determined that refusing to modify the transferee court's ruling provides the needed "[r]estraint [that] ensures uniform and efficient pretrial proceedings, a result clearly intended by the multidistrict litigation system." *Id.* Regarding the law of the case doctrine, Judge Jones also held: "Like the multidistrict litigation system, the law of the case doctrine supports 'finality and efficiency [in] the judicial process.' It 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Id.* at 761, quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988), and *Arizona v. California,* 460 U.S. 605, 618 (1983). The court thus denied reconsideration of the MDL court's ruling.

More recently, in the *Lipitor* litigation, the Fourth Circuit reiterated the district court's prerogative to issue an MDL-wide dispositive ruling. *See In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prod. Liab. Litig.*, 892 F.3d 624, 648 (4th Cir. 2018). Citing *Food Lion* with approval, the Court of Appeals praised the district court for avoiding "recommending to the Panel that the many cases in this MDL be resolved individually in their transferor courts by judges largely unfamiliar with the litigation and its complexities" and electing instead "to resolve Pfizer's summary judgment motion, resulting ultimately in dismissal of the plaintiffs' claims." *Id.* The Fourth Circuit appeared to reason that rulings that have broad implications for all cases in an MDL should be addressed by one court and administered uniformly.

Outside the Fourth Circuit, there is widespread agreement that MDL orders on remand should have some binding effect. *See In re Ford Motor Co.*, 591 F.3d 406, 410 (5th Cir. 2009), *cert. denied*, 561 U.S. 1006 (2010) ("authorities are unanimous that some deference must be given to the transferee court's decisions."); *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 n.5 (7th Cir. 1996) ("[i]t would vitiate much of the purpose of consolidating litigation if, after remand, parties

could simply re-visit the transferee court's pre-trial rulings, and force the common defendant to deal piecemeal with once-collective matters.").

In addition, commentators have noted that most courts have adopted the "law of the case" doctrine, and the courts adopting that approach "have generally rejected challenges to the MDL court's decision." William B. Rubenstein, 6 NEWBERG ON CLASS ACTIONS, *Preclusive Effect of Orders in Multidistrict Litigations (MDLs)*, § 18:47 (5th ed. Jun. 2018 update). The Fifth Circuit has called this the "better view" and held that "transferor courts should use the law of the case doctrine to determine whether to revisit a transferee court's decision." *Ford Motor Co.*, 591 F.3d at 411; *see also McKay v. Novartis Pharmaceutical Corp.*, 751 F.3d 694, 703 (5th Cir. 2014).

Under this approach, "transferor courts should rarely reverse, because any widespread overturning of transferee court decisions would frustrate the principle [sic] aims of the MDL process and lessen the system's effectiveness." *Id.* At the same time, the law of the case approach allows the transferor court to consider changes in the law or serious errors. *Id.* Justice Ginsburg, then sitting on the District of Columbia Circuit, also endorsed the law of the case approach. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

There are significant reasons to accord near-preclusive effect to determinations in the transferee court. The MANUAL FOR COMPLEX LITIGATION explains that:

> Although the transferor judge has the power to vacate or modify rulings made by the transferee judge, subject to comity and "law of the case" considerations, doing so in the absence of a significant change of circumstances would frustrate the purposes of centralized pretrial proceedings.

*See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.133 (2017); *see also* Edward Sherman, *When Remand is Appropriate in Multidistrict Litigation*, 75 LA. L. REV. 655, 465 (2014) ("If

transferor judges were permitted to upset the rulings of transferee judges, the result would be an undermining of the purpose and usefulness of transfer under section 1407 for coordinated or consolidated pretrial proceedings because those proceedings would then lack the finality (at the trial court level) requisite to the convenience of witnesses and parties and to the efficient conduct of actions.").

In other words, as many courts and commentators have determined, the entire purpose of consolidating actions in a transferee court are for the efficient, orderly, and consistent determination of claims with similar factual and evidentiary issues. As the former Chief Counsel for the J.P.M.L. and Executive Editor for the MANUAL FOR COMPLEX LITIGATION explained:

> The purpose of 28 U.S.C. § 1407 is to streamline the entire pretrial process by eliminating duplication in discovery, reducing litigation costs, and saving time and effort on the part of the parties, the witnesses and the judiciary. *See In re Plumbing Fixture Cases*, 298 F. Supp. 484, 499 (J.P.M.L. 1968). The clear remedial aim of the statute is "to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *Id.* at 491-92.

Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 213 (1976). The possibility of multiple conflicting rulings of various transferor courts would undermine the entire purpose of the MDL statute.

For that reason, many courts have held that generally "[o]rders issued by a federal transferee court remain binding if the case is sent back to the transferor court...." *In re Zyprexa Prod. Liab. Litig.*, 467 F. Supp. 2d 256, 273 (E.D.N.Y. 2006); *see also In re EDNY Cathode Ray Tube Antitrust Cases*, 2017 WL 4351503, *1 (E.D.N.Y. Sept. 29, 2017); *Parkinson v. Novartis Pharm. Corp.*, 5 F. Supp. 3d 1265, 1271-72 (D. Ore. 2014); *Rutz v. Novartis Pharm. Corp.*, 2012 WL 12842794, at *5 (S.D. Ill. Dec. 7, 2012) (refusing to revisit *Daubert* rulings that were litigated and decided in the MDL court); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 428-29

(E.D.N.Y. 2011). "Indeed, exceptions of the law of the case principle should be especially rare in these circumstances, because refusal to follow the previous ruling would result in the sort of piecemeal decision making that MDL centralization is intended to avoid." *Law of the Case Doctrine and the Effect of Transfer and Remand on Choice of Law*, 15 FED. PRAC. & PROC. JURIS. § 3867 (4th ed.). *See also Hill v. Ford Motor Co*., 975 F. Supp. 2d 1351, 1358 (N.D. Ga. 2013) (cautioning that "when a party challenges an MDL judge's ruling on remand, a transferor court 'should rarely reverse, because any widespread overturning of transferee court decisions would frustrate the principle [sic] aims of the MDL process and lessen the system's effectiveness.'"), citing *Ford Motor*, 591 F.3d at 411.

In this litigation, when confronted with the identical situation presented here, upon remand of 1,700 Chinese Drywall cases to the Southern District of Florida, Judge Cooke agreed that her discretion was best employed by giving complete preclusive effect to Judge Fallon's rulings.

> The Court **ADOPTS <u>all</u>** of Judge Fallon's factual findings and legal conclusions and will not revisit any of his rulings absent a compelling showing of an intervening change in law or fact. This includes, but is not limited to, the following:
>
> o Taishan, TTP, BNBM Group, CNBM Group, and CNBM have been held in default. *See* Findings of Fact and Conclusions of Law with Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) at ¶¶ 13-15, Rec. Doc. 18028.
>
> o Under Florida law, Defendants constitute a single business enterprise for purposes of piercing the corporate veil and holding each of the defendants—including BNBM—liable for the conduct of their affiliated entities. *Id*. at ¶¶ 50-51.
>
> o Class certification was appropriate under Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3). *Id*. at ¶ 79.
>
> o Liability has been conclusively established as to all defendants and the only remaining issue is the amount of the

award. Findings of Fact and Conclusions of Law Related to
the June 9, 2015 Damages Hearing at ¶20, Rec. Doc. 20741.

○ The remediation formula represents a reasonable and
reliable measure of the remediation damages which the
Court will apply to determine the appropriate amount of
property damages. *Id.* at ¶ 92.[79]

In surveying the law, Judge Cooke noted that the law in the Fourth Circuit "employs a bright line

rule preventing transferor courts from overruling transferee courts."[80] Because Judge Cooke sits

in the Eleventh Circuit, where no controlling authority has yet been provided by the Circuit Court,

Judge Cooke's analysis also took into account alternative approaches, including "substantial

deference" and the "law-of-the-case rule." Weighing all these matters, the Florida Court concluded

that it did not have to adopt any approach because no intervening events of significance occurred.

Judge Cooke held:

> [T]he Court need not adopt a level of deference to dispose of
> Defendants' motions. All three approaches agree that absent an
> intervening change in law or fact, a transferor court should not
> overrule a transferee court's rulings. Here, Defendants have not
> shown "a significant change of circumstances." Manual for
> Complex Litigation, Fourth, § 20.133. Rather, Defendants
> seemingly seek to revisit the MDL's decisions because they disagree
> with Judge Fallon's conclusions. They cannot, for to do so would
> "frustrate the purposes of centralized pretrial proceedings." *In re
> Ford Motor Co.*, 591 F.3d at 411. The Court will not allow the
> parties to pervert the MDL process. Instead, by giving preclusive
> effect to Judge Fallon's finding of fact and conclusions of law, the
> Court effectuates the purpose of a multidistrict litigation: to ensure
> the "just and efficient conduct" of this action. 28 U.S.C. § 1407(a).[81]

---

[79] *See* Florida *Amorin* Trial Plan, at 3.

[80] *Id.* at 2, citing *Food Lion*, *supra*.

[81] *Id.* at 2-3.

It follows from this reasoning that this Court has ample authority to apply either *Food Lion*'s bright-line preclusive effect ruling or the law of the case doctrine as established by the MDL judge. *Id*.; *see also Staley*, 587 F. Supp. 2d at 760.

## 1.    "Law of the Case" Doctrine in the Fourth Circuit.

Under the guidance provided by *Staley*, the law of the case doctrine strongly supports granting preclusive effect to Judge Fallon's orders on liability and the use of the remediation formula to award damages to *Amorin* class members in this case. Under law of the case doctrine, this Court is required "to uphold earlier decisions in the same case unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Staley*, 587 F. Supp. 2d at 761-62, quoting *Sejman v. Warner-Lambert Co*., 845 F.2d 66, 69 (4th Cir. 1988).

## 2.    There Are No Grounds to Revisit Judge Fallon's Prior Rulings.

The fact that Defendants may disagree with Judge Fallon's rulings is not tantamount to a showing that the rulings are erroneous, let alone clearly erroneous.[82] In the final analysis, Defendants cannot present any justification for revisiting those issues now, especially in light of their recalcitrant conduct throughout these proceedings. From the outset, Defendants planned to ignore the complaints properly served on them and there is no question they were aware of the consequences of defaulting. They were monitoring the lawsuits from the beginning and were represented by American lawyers throughout these proceedings, even during their absence from

---

[82] In other courts, the Defendants have challenged the damages formula approved by Judge Fallon, starting with alleged flaws in the *Germano* judgment in 2010. *See Chinese Drywall*, 2017 WL 1421627, at *12. While Defendants dispute the results of the class damages hearing, they cannot show clear error or manifest injustice.

the jurisdiction. Since entering the litigation late in the game, Defendants have taken advantage of every opportunity to revisit the MDL Court's rulings, over and over. They sought on multiple occasions to vacate the defaults against them, they moved to decertify the *Amorin* class, and they requested an immediate appeal of the Class Damages Order as well as the MDL order denying their decertification motion.[83]

Thus far, Defendants have been unsuccessful in their efforts "to go back to square one,"[84] however, through their never-ending motion practice Defendants successfully protracted these *Chinese Drywall* proceedings and delayed relief to Plaintiffs in violation of Plaintiffs' due process rights and the paramount mandate of Rule 1 of the Federal Rules of Civil Procedure.[85] There is no justification to revisit and reconsider on remand Defendants' defaults, class certification, or the remediation damages formula. In accordance with the purpose of the MDL statute – to conserve judicial resources, in accordance with Judge Cooke's Trial Plan Order adopting all of Judge Fallon's rulings, and in accordance with the well-reasoned decisions of *Food Lion*, *Staley*, and others that support granting deference to the transferee court's orders, this Court should give entirely preclusive effect to Judge Fallon's rulings on liability and the remediation damages formula applicable to the Virginia *Amorin* class members. Otherwise, almost ten years of

---

[83] *See Chinese Drywall*, 2018 WL 279629, at *1-2 (describing BNBM's multiple attempts to vacate defaults); *see also* Defendants' Motion to Decertify (MDL Rec. Docs. 20627, 20631, 20632); MDL Order & Reasons dated 4/21/2017 re Motion to Decertify (MDL Rec. Doc. 20740) ("Decertification Opinion"); MDL Order & Reasons dated 8/22/2017 (MDL Rec. Doc. 20910) (denying motions to certify Class Damages Order and Decertification Opinion for immediate appeal under Section 1292(b)) ("1292(b) Opinion").

[84] *See Chinese Drywall*, 2018 WL 279629 at *10 (denying motion to vacate defaults); *see also* Decertification Opinion; 1292(b) Opinion.

[85] *See* Advisory Committee Notes on 2015 Amendments to the Federal Rules of Civil Procedure ("parties share the responsibility to employ the rules [of procedure]" "to secure the just, speedy, and inexpensive determination of every action.").

proceedings will have been for naught, and the parties and this Court will likely enter a second decade of litigation.

> **B.    The Remediation Damages Formula Approved by the MDL Court is a Proper and Efficient Means to Compensate *Amorin* Class Plaintiffs Harmed by Defendants' Defective Venture Supply Chinese Drywall.**

Application of the remediation damages formula approved by the MDL Court will be the most effective and efficient way to resolve Plaintiffs' remediation damages claims. On multiple occasions, Defendants have sought to have the MDL court reject the class-wide application of the Remediation Damages Formula, without success. The MDL Court has ruled repeatedly that the Remediation Damages Formula is both reliable and its use in this case is compliant with the requirements of Rule 23.

On June 5, 2015, the MDL Court's *Daubert* Order upheld Plaintiff Expert George Inglis's use of the remediation damages formula ("Mr. Inglis's proposed expert opinion is highly relevant on the issue of class damages... Mr. Inglis is qualified to give an expert opinion within the scope of his experience as a building engineer... Mr. Inglis may testify based on facts or data that are reasonably relied upon by experts in his field...").[86]

Then, on August 3, 3015, the MDL Court denied Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet, which was based on the Remediation Damages Formula and admitted at June 9, 2015 Class Damages Hearing.[87]

On April 21, 2017, the MDL Court entered its Class Damages Order. Based on a review of all the scientific and economic damages evidence, the MDL Court found the following:

---

[86] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2015 WL 3603624, at *3 (E.D. La. June 5, 2015).

[87] *See* Order & Reasons regarding Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet dated 8/3/2015 (MDL Rec. Doc. 19355) [Jt. App'x, Tab 10].

a.  Chinese Drywall is defective.[88]

b.  The remediation protocol is evidence-based and has been confirmed by its application in the actual remediation of several thousand homes.[89]

c.  The scope of the remediation protocol is necessary for all Chinese Drywall contaminated homes, and has been used by national builders including Beazer Homes and Lennar Homes, and for 2,200 homes in the Knauf settlement program.[90]

d.  Mr. Inglis and Mr. Wright (Plaintiffs' Remediation Damages Experts) have evaluated Chinese Drywall damages in several states to establish the scope and costs of remediation.[91]

e.  The scope of remediation work ("strip to the studs") is evidence-based and field tested, and confirmed by scientific investigations, practical construction experience, and building codes.[92]

f.  The remediation formula utilizes construction bid pricing, RS Means Unit Pricing, Square Footage pricing, and RS Means local building and labor costs adjustment factors – all of which constitute recognized damage evaluation methods in the industry.[93]

---

[88] Class Damages Order, 2017 WL 1421627, at *6.

[89] *Id.*, at *6, *11.

[90] *Id.*, at *7-8.

[91] *Id.*, at *11.

[92] *Id.*, at *11-12.

[93] *See id.*

    g.  The remediation damages model is limited to the interior of homes and does not present the variability of cost factors present in new home construction.[94]

    h.  The relevant case law supports the appropriateness and reliability of the Inglis remediation damages methodology.[95]

Also on April 21, 2017, the Court denied Defendants' Motion to Decertify the Class, finding that the Plaintiffs properly established a formulaic method to determine class-wide remediation property damages, and that remediation damages constituted the predominant issue in the case.[96]

Finally, on August 20, 2018, in the MDL Court's Suggestion of Remand Order, the Court reiterated that it had established and "approved a class-wide evidence – based formula and methodology to calculate property [remediation] damages involving defective drywall," and "strongly encouraged" transferor courts to utilize it "to determine the appropriate award in each individual case."[97]

As of 2019, the facts have not changed, the law has not changed, and none of the MDL Court's rulings on the damages formula have been reversed. Thus, based on the MDL Court's specific rulings it is clear that remediation damages for each damaged property can be reliably determined utilizing the strongly recommended evidence-based formula. *Id.* That formula requires only objective pieces of information for each damaged property: primarily the number of square feet, proof of ownership, and product identification (in this case Venture Supply drywall); and

---

[94] *See id.*, at *12-13.

[95] *See id.*, at *24-25.

[96] *See* Decertification Order at 7, 14, 20 ("The only variation is the extent of damages suffered based on the square footage of the involved property").

[97] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 3972041 (E.D. La. Aug. 20, 2018) (Suggestion of Remand) [Jt. App'x, Tab 17], at *5.

because this information has already been established by the MDL Special Master, whose findings were accepted by the MDL Court,[98] Plaintiffs submit these findings should be adopted by this Court. As the MDL Court determined, remediation damages are the predominant issue in this case; and thus, its resolution is most likely to lead to resolution of the entire litigation.

Other courts recognize that damages estimates based on expertise in building engineering are admissible and reliable. *See*, *e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011), *aff'd*, 729 F.3d 108 (2d Cir. 2013), *cert. denied*, 572 U.S. 1087 (2014); *Rai v. Santa Clara Valley Transp. Auth.,* 2015 WL 860761, at *15 (N.D. Cal. Feb. 24, 2015); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 735-36 (N.D. Ohio 2014) (rejecting defendant's arguments that the methodology of plaintiff's engineering expert was unreliable because it was not representative, particularly where the engineer had "called on his own experience in washer design for Whirlpool to support his conclusion that the design of the Duet machines led to a propensity to develop mold"); *see also Cason-Merenda v. VHS of Mich., Inc*., 296 F.R.D. 528, 544 (E.D. Mich. 2013) (approving class certification based on damages expert's formula without requiring statistical sampling); *S. States Coop., Inc. v. Melick Aquafeeds, Inc.,* 701 F. Supp. 2d 1348, 1361 (M.D. Ga. 2010), *aff'd sub nom. S. States Co-op., Inc., v. Melick Aquafeeds, Inc*., 476 Fed. App'x 185 (11th Cir. 2012) (fishery expert can use "simple arithmetic and algebra" to support his opinion); *accord In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 691-693 (N.D. Ga. 1991) ("The fact that the methodologies contain some form of averaging does not automatically render them methods of

---

[98] *See* MDL Order dated 10/23/2015 (granting Class Counsel's Motion for Authority to Disburse Funds from the Four Virginia-based Settlements for Other Loss) (MDL Rec. Doc. 19639) [Jt. App'x, Tab 11].

fluid recovery. On the contrary, Dr. Beyer's economic analysis evidences common impact and permits, with reasonable certainty, formulaic calculation of damages.").[99]

The MDL Court's reasoning "toes the line" established by this precedent. Since the only issue remaining in these remanded default cases is to determine the damages owed to Plaintiffs, the remediation formula is an appropriate method of computing the amount of these damages. Any suggestion that the formula should be rejected is unfounded and without merit.

### C.       Defendants' Willful Defaults Favor Plaintiffs' Plan of Resolution.

Defendants in this case are in default, and, therefore, liability has been established. The Federal Rules of Civil Procedure are "designed for the just, speedy and inexpensive disposition of cases on their merits…." *Sun Bank of Ocala v. Pelican Homestead & Saving Ass'n.*, 874 F.2d 274, 276 (5th Cir. 1989). A defendant that fails to respond to an action effectively derails this process and invites a process of accelerated litigation. A defendant that has been placed in default under Rule 55(a) at the time of a Rule 55(b)(2) damages trial, has confessed liability pursuant to the well-pled allegations of the complaint which that defendant failed to answer. The jurisprudence of the United States Supreme Court, dating from the 19th century, likewise mandates that a defendant which fails to set aside the entry of a default is thereafter barred from contesting any and all facts established by that default. *Ohio Cent. R.R. Co. v. Cent. Trust Co. of New York*, 133 U.S. 83 (1890).

---

[99] Defendants previously relied on *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. App'x 350 (5th Cir. 2005), to refute this principle, but it does not. There, the Court of Appeals recognized long-standing jurisprudence in the Fifth Circuit to the effect that, provided damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances," *id.* at 354, quoting *In re Monumental Life Ins. Co.,* 365 F.3d 408, 416 (5th Cir. 2004), such objective methodologies may be employed to prove class damages. It was only because the plaintiffs in that case "provide[d] no evidentiary support for [their] claim," that there was no abuse in discretion in the district court's denial of class certification. *Id.* This ruling hardly supports the proposition that a property-damage class like that before this Court is improper.

As default judgments have been entered against Defendants in this case, all well-pled allegations of Plaintiffs' complaints regarding liability are deemed admitted, leaving only the issue of compensation for Plaintiffs' property damage. *See Ryan v. Homecomings Fin-Network*, 253 F.3d 778, 780-81 (4th Cir. 2001). In addition, while a plaintiff has the burden to prove damages in a default proceeding, all reasonable inferences from the evidence are drawn in the plaintiff's favor. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981).

### D.      Defendants in Default Have No Jury Trial Rights.

In this case, both Taishan and BNBM deliberately defaulted in the *Amorin* action when it was pending in the MDL and, therefore, neither Defendant has any trial rights. BNBM is liable to the *Amorin* class just as Taishan is liable. Consistent with this reasoning, to assess class remediation damages, the MDL Court appropriately held a non-jury hearing pursuant to Fed. R. Civ. P. 55(b)(2)(B). Both Taishan and BNBM fully participated in that damages hearing before the Court alone, without a jury present. For that reason, Defendants are not entitled jury trial rights, having already forfeited such rights in the MDL.

"[T]he overwhelming weight of authority instructs that the Seventh Amendment does not guarantee a jury trial after default." *Armeni v. Transunion LLC, Inc.*, No. 15-0066, 2016 WL 7046839 at *2 (W.D. Va. Dec. 2, 2016). To be clear, "[u]nder federal law there is no right to a jury trial after default absent a federal statute that specifically preserves the right to a jury trial after default." *Estate of Faull v. McAfee*, No. 6:13-cv-1746, 2015 WL 6125309, at *4 (M.D. Fla. Oct. 16, 2015).[100] This proposition has not only been applied in district courts in the Fourth Circuit but

---

[100] In fact, this well-settled law dates back to the origins of our judicial system. *See Brown v. Van Braam*, 3 (Dallas) U.S. 344, 355 (1797) (concluding that "the English authorities countenance the Rhode Island law and practice" with regard to the roles of judge and jury in determining damages,

has been well-accepted in federal courts nationwide. *See*, *e.g.*, *Graham v. Malone Freight Lines, Inc.*, 314 F.3d 7, 16 (1st Cir. 1999) ("Neither the Seventh Amendment nor the Federal Rules of Civil Procedure require a jury trial to assess damages after entry of default in these circumstances."); *Matter of Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) (holding that neither plaintiff nor defendant has a constitutional right to a jury trial following default); *Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003) (finding that a party bears no constitutional right to a jury trial following the entry of default); *Mwani v. Bin Ladin*, 244 F.R.D. 20, 23 (D.D.C. 2007) (finding no constitutional or statutory right to a jury trial following default but leaving open the question whether, as a discretionary matter, a jury trial would be the most appropriate method for assessing damages); Wright and Miller, 10A FED. PRAC. & PROC. CIV. § 2688 (4th ed.) (upon default, "neither side has a right to a jury trial on damages.").

Because the Defendants' right to a jury trial has been forfeited as a consequence of their deliberate defaults, there is good reason to accelerate the implementation of Plaintiffs' trial plan. This Court has the authority under Rule 55(b) to determine Plaintiffs' remediation damages based on matters already of record in the MDL and to determine their other loss damages either directly or by using a Special Master or Magistrate Judge. To expedite the speedy conclusion of this litigation, Plaintiffs encourage the Court to adopt Plaintiffs' plan for resolution.

**E.**     **Plaintiffs' Plan for Resolution Should Be Adopted.**

Plaintiffs' proposed Plan and Schedule for Resolution of the Virginia *Amorin* cases, as set forth in Exhibit A hereto, will fairly and efficiently complete the process of adjudicating legitimate Chinese Drywall claims that have been pending for more than nine years. The use of existing

---

including that "[w]here judgment is by default, the court may give the damages, without putting the party to the trouble of a writ of enquiry [to a jury]").

findings by the MDL Special Master who already verified the square footage, product ID, and ownership proofs previously submitted in this litigation promotes judicial economy and utilizes the discovery generated in this case while it was pending in the MDL.

Plaintiffs' Plan follows the parameters already established in the MDL for resolution of remediation damages claims on behalf of all *Amorin* Class Members. Defendants already had an opportunity to contest these damages at the Class Damages Hearing, and their motions for reconsideration and immediate interlocutory appeal were denied. Plaintiffs' evidence of damages resulting from Venture Supply Chinese Drywall was evaluated by the MDL Court-appointed Special Master in 2013-2014, in connection with the Virginia settlement administration process with non-manufacturing Defendants (builders, installers, distributers, insurers) in the Venture Supply Chinese Drywall supply chain. Venture Supply, based in Norfolk, Virginia, purchased drywall from Taishan, which was manufactured to meet Venture Supply's requirements, *e.g.*, United States size specifications, labeling, etc.[101] This defective "Venture Supply" Taishan drywall was sold to class members throughout Virginia and elsewhere. It is now the law of the case that Taishan manufactured all Venture Supply Chinese Drywall.

On July 9, 2013, the MDL Court issued an Order and Judgment certifying four settlement classes and granting final approval to these settlements, including the Venture Supply class.[102] Thereafter, the Court and the Court-appointed Special Master administered the allocation process of these settlements, during which class members provided details of their property square footage,

---

[101] *See In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d at 589 ("TG manufactured its drywall to Venture's requested dimensions on a made-to-order basis. . . . TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code.").

[102] *See* Order Approving Virginia Settlements [Jt. App'x, Tab 5].

etc. to the Special Master to allow him to calculate their allocative share.[103]  Aggrieved parties were entitled to challenge any finding by the Special Master through an appeal to the District Court.  The culmination of the allocation process occurred when class members sought final approval of the distribution of Settlement Funds. On October 23, 2015, the District Court issued its Order approving the Special Master's distribution of the Settlement Funds, which necessarily considered the status of each class member (whether current or former owner) and the square footage of each property.[104] These findings by the Special Master, as endorsed by the MDL Court, should be conclusive in these proceedings.

In the event Defendants contend they are entitled to challenge class members' ownership status or the number of square feet in any property, they are mistaken.  By the time the MDL Court issued its Order approving the Special Master's distribution of the Settlement Funds, the Defendants were on notice of the proceedings and had an opportunity to be heard.  Months earlier, on February 12, 2015, BNBM entered its appearance for the first time in the MDL and Taishan returned to the jurisdiction to seek a continuance and participate in evidentiary class damages hearing.[105] As such, the Defendants had the opportunity to object to the Special Master's findings but chose to shirk their responsibilities. They should not now be rewarded for their intransigence and be allowed additional discovery or other proceedings intended to further delay the resolution of Plaintiffs' claims. Instead, this Court should proceed promptly with motions practice intended to summarily determine the Defendants' liability.

---

[103] *See* Minute Entry dated 3/26/2015 (MDL Rec. Doc. 18559) [Jt. App'x, Tab 9], at 25-28.

[104] *See* MDL Order dated 10/23/2015) ((granting Class Counsel's Motion for Authority to Disburse Funds from the Four Virginia-based Settlements for Other Loss) (MDL Rec. Doc. 19639) [Jt. App'x, Tab 11]; *see also* Minute Entry dated 2/17/2016 (MDL Rec. Doc. 20092) [Jt. App'x, Tab 13], at 17-18.

[105] Class Damages Order, 2017 WL 1421627, at *5.

## F.  Defendants' Deliberate Defaults Defeat Any Claim of Entitlement to Discovery.

Defendants should not be permitted to have this case proceed as it would have, had they answered the original complaints over nine years ago and litigated the matter on a normal track. Instead, Defendants engaged in numerous dilatory delay tactics that caused the litigation to proceed at a glacial pace.[106]

This Court, and all district courts, always have the discretion to limit irrelevant and harassing discovery. *See*, *e.g.*, *Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986) (court has wide discretion in setting the limits of discovery). Here, liability has already been established by default, so no discovery is needed about product defect. As for remediation damages, proofs of square footage, product ID, and ownership were already provided to Defendants. There is no discovery needed on this specific and narrow issue, especially given that only Taishan's Venture Supply drywall is at issue.[107]

Moreover, Rule 55(b) does not provide for discovery ahead of a default judgment hearing. As one court observed, "[u]nder Rule 55(b), the *only* right a party against whom default has been entered and who has subsequently made an appearance in the case is the right to seven days' notice of any evidentiary hearing set to determine the amount of damages. At the most, it is within the court's discretion to allow discovery on the issue of damages." *Arch Wood Prot., Inc. v. Flamedxx, LLC*, No. 1:10-cv-282, 2012 U.S. Dist. LEXIS 198648, at *4 (E.D. Tenn. Feb. 3, 2012) (emphasis in original). This Court has observed that whether such post-default discovery will be permitted is

---

[106] *See Chinese Drywall*, 2018 WL 279629, at *10 ("Nearing its ninth year, this case involving the Chinese Entities has only made glacial progress. This MDL was consolidated in 2009. [The CNBM/BNBM Defendants] did not make an appearance until 2015. And now, in 2018, [Defendants] are asking this Court to go back to square one.").

[107] *See* Class Damages Order, 2017 WL 1421627, at *24-25.

within the broad discretion of the trial court. *Alstom Power, Inc. v. Graham*, No. 3:15cv174, 2016 WL 354754, at *2 (E.D. Va. Jan. 27, 2016), citing *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 568 n.16 (4th Cir. 1995) ("The scope and conduct of discovery are within the sound discretion of the district court."). **Moreover, Rule 26(b)(2)(C)** requires the Court to limit discovery where "the discovery sought is unreasonably cumulative or duplicative…," **"**the party seeking discovery has had ample opportunity to obtain the information by discovery in the action," or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i-iii).

In *Graham*, the Richmond Division of this Court permitted a plaintiff to conduct limited post-default discovery on the issue of damages. Of course, where a defendant's default has deprived the plaintiff of the ability to conduct discovery on damages, the exercise of the court's discretion in allowing such discovery makes sense. It is true that some courts have exercised their discretion to permit defaulting defendants to conduct limited discovery regarding damages. *See Clague v. Bednarski*, 105 F.R.D. 552, 552 (E.D.N.Y. 1985). In *Zero Down Supply Chain Sols., Inc. v. Global Transp. Sols., Inc.*, No. 2:07cv400, 2012 WL 4925368, at *1-2 (D. Utah Oct. 16, 2012), the court allowed defaulting defendants to conduct discovery limited to the amount of damages and refused to allow discovery on the issues of causation, mitigation, or right to off-set. *Id.* at *2-3. But a court may also exercise its discretion by refusing to allow a defendant to conduct *any* discovery ahead of a default judgment hearing. For example, in *Flamedexx*, *supra*, the Court refused to permit a defaulting defendant to engage in discovery, reasoning that, "if defendant is truly deserving of the entry of default by repeatedly and intentionally ducking service, as is alleged by the plaintiff, the undersigned will not reward the defendant by allowing it to engage in

protracted litigation on the issue of damages…" *Id.* at *4-5. The defendant, according to the court was "entitled to seven days' notice and no more." *Id.* at *5.

Here, the MDL court has determined that Taishan (1) was willfully in default; (2) lied to the court; (3) manipulated evidence in an effort to hide documents from discovery; and (4) was in contempt for refusing to comply with the Court's valid orders. Allowing Taishan to engage in *any* discovery ahead of the entry of default judgment would reward it for years of delay and willful disobedience. The Court should, therefore, exercise its discretion and refuse to allow Taishan to engage in any discovery. To the extent any discovery is permitted, it should be carefully narrowed by the Court.

In the event the Court allows discovery with regard to damages for non-remediation losses, only limited discovery should be permitted, which may be overseen by the Magistrate Judge or Special Master.

## IV.   **CONCLUSION**

An MDL court, like any federal court, deserves significant deference. After all, a party to a prior action is generally precluded from relitigating "an issue litigated in a prior proceeding if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982). Given the Defendants' dilatory and obstreperous conduct in this litigation, the substantial due process Defendants have been afforded, the prior adjudication of these issues in the MDL, the lack of any reason to revisit class certification, Defendants' defaults, or the validity of the Remediation Damages Formula, this Court should grant entirely preclusive effect to the MDL Court's rulings on these issues. Further, the

Court should refuse any additional discovery and proceed with Plaintiffs' proposed Plan for Resolution.

Dated: January 18, 2019                Respectfully Submitted,

EDUARDO and CARMEN AMORIN, *et al.*, Plaintiffs

_____/s/_____

Jeffrey A. Breit (VSB No. 18876)
Breit Drescher Imprevento, P.C.
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone: 757.670.3888
Facsimile: 757.670.3939
jeffrey@breit.law

Richard J. Serpe (VSB No. 33340)
Law Offices of Richard J. Serpe, P.C.
580 East Main Street, Suite 310
Norfolk, VA 23510
Telephone: 757.233.0009
Facsimile: 757.233.0455
Email: rserpe@serpefirm.com

Arnold Levin (*pro hac vice*)
Frederick S. Longer (*pro hac vice*)
Sandra L. Duggan (*pro hac vice*)
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: 215.592.1500
Facsimile: 215.592.4663
Email: alevin@lfsblaw.com
Email: flonger@lfsblaw.com
Email: sduggan@lfsblaw.com
*Co-Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 18th day of January 2019 I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will then send a notification of such filing (NEF) to counsel of record.

_____/s/_____

Jeffrey A. Breit, Esquire (VSB No. 18876)
Breit Drescher Imprevento, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia  23451
(757) 670-3888 Office
(757) 670-3939 Facsimile
jeffrey@breit.law
*Counsel for Plaintiffs Eduardo & Carmen Amorin et al.*

### ATTACHMENT "A"

### PLAINTIFFS' PROPOSED PLAN AND SCHEDULE FOR RESOLUTION OF THE *AMORIN* CASES IN THE EASTERN DISTRICT OF VIRGINIA

- <u>January 18, 2019</u> – Plaintiffs to file Plan for Resolution of Virginia *Amorin* cases

- <u>February 8, 2019</u> – Defendants to file response to Plaintiffs' Plan for Resolution of Virginia *Amorin* cases

- <u>February 19, 2019</u> – Plaintiffs to file reply in support of Plan for Resolution of Virginia *Amorin* cases

- <u>March 1, 2019</u> – Plaintiffs to file Motion to Voluntarily Dismiss certain inactive Virginia *Amorin* claims and non-Taishan Defendants

- <u>March 1, 2019</u> – Parties to file motions to stay or dismiss non-Virginia *Amorin* cases proceeding in other jurisdictions

- <u>March, 2019</u> (date to be determined by the Court) – Hearing on the Plan for Resolution of the Virginia *Amorin* cases

- <u>April 1, 2019</u> – Referral to Special Master the calculation of Plaintiffs' remediation damages according to the Remediation Damages Formula adopted by Judge Fallon in the MDL <u>and</u> the calculation of Plaintiffs' other damages, including costs for alternative living expenses, costs associated with foreclosures and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to refinance, loss of income, and damage to personal property

**Plaintiffs respectfully submit that there are no issues in the Virginia *Amorin* class that warrant individual hearings on Rule 55 damages**.

- o However, assuming, arguendo, that hearings are required in some or all of Plaintiffs' cases, Plaintiffs respectfully request that these hearings commence in May of 2019, with ten Plaintiffs grouped into a "Flight" for Rule 55 hearings as follows:

- <u>May 7, 2019</u> – Rule 55 Hearing for Flight 1 of Virginia *Amorin* cases (cases are grouped by date filed first, then alphabetically for cases filed the same date)

- <u>May 14, 2019</u> – Rule 55 Hearing for Flight 2 of Virginia *Amorin* cases

- <u>May 21, 2019 through August 27, 2019</u> – Rule 55 hearings for Flights 3 through 17.

**Taishan has already been provided with all the documentation supporting claims for remediation and other damages for all 175 Virginia *Amorin* Plaintiffs.**

o  All 175 Virginia *Amorin* Plaintiffs have Venture Supply Chinese Drywall – which was judicially determined to have been manufactured by Taishan

o  Evidence of square footage, ownership proof, product ID, and other losses has already been provided to Defendants and reviewed by the Court-appointed Special Master in the MDL in 2013-2014, in connection with the class settlement administration process with non-manufacturing Defendants (builders, installers, distributers, insurers) in the Venture Supply Chinese Drywall supply chain

o  This evidence was published by Judge Fallon in the MDL with an opportunity for all litigants to contest

o  Judge Fallon considered objections to the findings of the Special Master and approved class-wide damage awards from the settlements with non-manufacturing Defendants for Venture Supply Plaintiffs who are Virginia *Amorin* class members

o  Accordingly, no additional discovery or depositions are warranted with regard to square footage, ownership, or product ID or Plaintiffs' other damages

o  Judge Fallon approved a class damages formula for remediation damages of *Amorin* class members, following a contested evidentiary hearing on June 15, 2015 – at which both Taishan and BNBM participated, cross-examined Plaintiffs' expert, put on their own experts in opposition to class damages, and submitted proposed Findings of Fact and Conclusions of Law

o  Defendants sought immediate appeal of the class damages ruling, and their motion was denied

o  Defendants sought to vacate the default judgments against them, and their motions were denied

o  Should the Court conclude that Taishan is entitled to receive additional discovery or entitled to more process under Rule 55 on a Plaintiff-by-Plaintiff basis, Plaintiffs respectfully suggest that the Eastern District of Virginia scheduling order process can accommodate the exchange of these materials in advance of the Proposed Rule 55 hearing schedule