# EXHIBIT "10"

# Letter of Objections

## to the

## MDL 2047: Chinese-Manufactured Drywall Products Liability Litigation

## Global Settlement Agreement

Submitted on November 26, 2019

by

## Russell F. Moody

### Member of Amorin Class

to

### Honorable Eldon E. Fallon and Chinese Drywall Counsel

806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 26, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail and Email:
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Via U.S. Priority Mail:
Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse, Coral Gables, FL 33134

The following Objections to the Chinese-Manufactured Drywall Products Liability Litigation, MDL 2047, Global Settlement Agreement, preliminary approval filed on 08/20/19 (Ref. 1), are respectfully submitted by the undersigned, Mr. Russell F. Moody. Mr. Moody and his wife, Beverly L. Moody are members of the Amorin Class. The address of the affected property is 806 NW 38th Place, Cape Coral, Florida, Zipcode 33993. Mr. Moody intends to appear at the Fairness Hearing without counsel[1] and requests that he be allowed to address the Court concerning each of the following Objections during the Hearing.

---

[1] Judge Fallon Ordered that Morgan & Morgan attorney, Mr. Pete Albanis' motion to withdraw as Counsel of Record for Russell and Beverly Moody is Granted, file date: 10/31/19.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

The following Objections apply to either the entire Amorin Class, a specific subset of the Amorin Class, all plaintiffs in the Brooke Complaints, or a subset of plaintiffs in the Brooke Complaints as indicated for each of the individual objections presented below.

All documents to be used or offered into evidence at the Fairness Hearing have been identified in the list of references or included as Exhibits in this Letter of Objection.

## Background

The information provided below is accurate to best of the undersigned's knowledge. Due to the protracted nature and complexity of this litigation, and the sparsity of information shared with the plaintiffs by the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels, plaintiffs have often been kept in the dark, having received most of their information from social media such as the Victims of Chinese Drywall closed Facebook group.[2] Therefore, the information provided below may not be fully accurate; however, it is, in the opinion of the undersigned, sufficiently accurate to support the basis for all Objections.

There have been and are a number of different entities representing the defective Chinese drywall plaintiffs including the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels. There have also been several courts involved. For the undersigned, as a Florida resident, the two relevant courts are U.S. District Court, Eastern District of Louisiana, Judge Fallon presiding, referred to below as the "Court", and the U.S. District Court, Southern District of Florida, Judge Cooke presiding, referred to below as the "Cooke Court.". That represents a lot of firepower, firepower that, for nearly a decade, plaintiffs believed was aimed at reaching a fair settlement for the toxic Chinese drywall victims, and ensuring that these victims' rights under the law and under the Constitution were protected. That belief has been badly shaken over the last year.

After the Knauf settlement, over 4,000 plaintiffs remained in the MDL 2047 litigation, a majority are members of the Amorin Class. The following narrative is provided from a viewpoint of the Amorin Class, of which the undersigned is a Class member. However, as will be indicated, some Objections apply across all MDL 2047 plaintiffs, with the exception of those plaintiffs included in the Knauf settlement. A commonality among the Amorin Class members is that each member's home contains defective toxic Chinese drywall and that, as a baseline, all have suffered that same loss damages, i.e. the cost of remediating their home. The actual dollar cost is determined by the size of their home measured in square footage under air, and the regional construction and relocation costs. Relocation costs refer to the expenses associated with moving, storage, and temporary housing during remediation, which typically takes three to four months. There are also additional losses that may apply broadly across the Class members or may apply for a small group of Class members. Another significant commonality is that the plaintiffs' drywall was manufactured by Taishan or its affiliates, at least that's what our Morgan & Morgan attorney has told all his non-Knauf Chinese drywall (CDW) clients from the beginning.

Courts and plaintiffs' attorneys have certain fiduciary responsibilities with respect to ensuring that the rights of plaintiffs are protected, including plaintiffs' rights to be kept fully

---

[2] Class Counsel and our former Morgan & Morgan attorney will likely dispute this, but supporting evidence provided in Exhibits 1 and 2 will substantiate my "sparsity of information" claim.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

informed of relevant facts that may be pertinent to the litigation and to be engaged in the decision process particularly with regards to any pretrial settlement negotiations and subsequent agreement.

In fact, failure to inform and seek input from plaintiffs in a pretrial settlement agreement, particularly when that settlement agreement does not fully compensate plaintiffs for their losses may constitute judicial and attorney malpractice.

These fiduciary responsibilities, at least in part, are implicitly and explicitly identified by Class Counsel in "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) addressed to the Cooke Court with a file date of March 8, 2019 (Ref. 2)

While each of the following Objections warrants serious consideration as it provides sufficient grounds to deny final approval of the Settlement Agreement as it is currently written, taken together, Objections A through J present an overwhelming case for denying final approval of the Global Settlement Agreement.

## MDL No. 2047 Objection A – "Parker Waichman" Settlement

This Objection applies to the entire Amorin Class.

The Global Settlement Agreement should not receive final approval until the Class Counsels' concerns regarding the Parker Waichman Settlement Agreement are addressed and adjudicated by an impartial third party.

The "Parker Waichman" Settlement Agreement, aka the "Joint Notice of Settlement Agreement" and the "Small Settlement", appears to Class Counsels to blatantly violate the legal and Constitutional rights of the 498 victims of defective Chinese drywall who were involuntarily and unknowingly included in this Settlement Agreement (Ref. 2). That being the case, it brings into question the Court's motivation for approving the Parker Waichman Settlement Agreement or at least moving it forward, as the case may be. As Class Counsels had predicted (Ref. 2), the Parker Waichman Settlement Agreement also greatly undermined the opportunity for a fair settlement for the remaining Amorin Class members.

Class Counsels Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class, Document 222135-1 (Ref. 2), lays out in detail how the Parker Waichman Settlement Agreement circumvents the MDL process and undermines the Amorin Class Action process. Exhibit 1, the undersigned's letter to Judge Fallon, dated November 13, 2019, provides a summary of the salient issues that Class Counsel has, or at least had with the Parker Waichman Settlement Agreement.

## MDL No. 2047 Objection B – Noncompliance with Fiduciary Responsibility

This Objection applies to the entire Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets as defined in the Allocation Neutral report (Ref. 3)

Neither the Court nor Class Counsel nor the undersigned's former Morgan & Moran attorney has met their fiduciary responsibility with regards to informing and engaging the plaintiffs in this litigation, including during the settlement negotiation process, and after the Court's preliminary approval of the Global Settlement Agreement when each plaintiff must decide to either

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

accept or opt out of the settlement. The Global Settlement Agreement should not be finalized unless and until all parties have met their fiduciary responsibilities.

Class Counsel clearly articulates these responsibilities in Reference 2. For example, Class Counsel states unequivocally that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan."

Exhibit 2 is the undersigned's October 21, 2019 letter to Judge Fallon including two attachments that together illustrate that Class Counsel and the undersigned's former Morgan & Morgan attorney have not provided information that they are legally obligated to provide.

Exhibit 3 is the transcript of the October 23, 2019 Status Conference. During the Status Conference the Court made the following statement. "I received a long letter from Mr. Moody [the undersigned], who had a number of questions, but he has met already five or six or seven times with his attorney, and his attorney has endeavored to answer those questions. Sometimes the answers are not satisfactory, but they are answers. If you don't like the answer, you have the opportunity to say, 'I'm not coming to the dinner, folks. I'm just letting you know, I'm out,' and go to your own place and seek to obtain your dinner." The problem with this Court statement is that the Court is either wittingly or unwittingly equating responses to answers. It doesn't matter whether a plaintiff has met with his or her attorney five, six, or seven times, or even a hundred times. What matters is whether or not the attorney provides complete and honest answers to the plaintiff's questions. The Class Counsel has not, and the undersigned's former attorney did not and elected instead to withdraw as the undersigned's attorney.

Judge Fallon's "drumstick" analogy is also extremely troubling. It misrepresents and greatly belittles the gross unfairness of the Global Settlement Agreement, equating the plaintiffs, particularly those in the 75% and 20% Buckets, as spoiled brats who stomp away from the dinner table because they didn't get the whole drumstick.

Why would Class Counsel and the undersigned's former attorney refuse to answer questions concerning information relevant to, and possibly pertinent to a plaintiff's decisions, and why would the Court not compel Class Counsel and plaintiffs' attorneys to answer these questions? There are two possible motives. Honest answers to these questions may encourage the plaintiff to opt out, and that's clearly not in the best interest of the Court, Class Counsel, or the plaintiffs' attorneys. Or, honest answers to these questions would expose attorney and/or judicial misconduct or even malpractice.

## MDL No. 2047 Objection C – Fraudulent Motion to the Cooke Court

This objection applies to the Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets. It also impacts all plaintiffs who are included in the Global Settlement Agreement.

The Global Settlement Agreement is built on a foundation of fraud and, therefore, should not receive final approval. The path to the Global Settlement Agreement passed through a key motion to the Cooke Court, signed by Patrick S. Montoya. This motion contains fraudulent

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

statements that ultimately resulted in discounted settlement offers for all plaintiffs and hugely discounted settlement offers for many.

Neither the undersigned nor any of the CDW victims who posted on the Victims of Chinese Drywall Facebook page were consulted or informed about this critically important Motion. It's not clear whether or not ANY plaintiffs were consulted or informed about this motion.

On August 31, 2018, the "Plaintiffs' Motion and Memorandum of law to Adopt Plan for Resolution of the Florida Amorin Plaintiffs' Claims for Remediation and Other Damages", Document 52 (Ref. 4), was filed with the Cooke Court. The Motion began by stating that "After more than nine years of pretrial proceedings in the MDL and a Class Damages Hearing for all Amorin Plaintiffs, it is time to resolve efficiently and fairly the 1,700 claims for damages to properties in Florida resulting from defective Chinese Drywall. These homeowners deserve to have their day in court as soon as possible." "…it is time to resolve efficiently and fairly" and "These homeowners [Florida Amorin Plaintiffs] deserve to have their day in court as soon as possible." – so far, so good.

The Motion goes on to say "Liability is already established by virtue of numerous defaults entered against Defendants for willfully refusing to appear in the litigation at the outset and orchestrating a plan to avoid the MDL Court's jurisdiction and delay these proceedings. The only issue remaining is the amount of Plaintiffs' damages." – also good news, if only it were true.

Further along the Motion states that "Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 as adjusted by the RS Means location factor." The adjustment for Florida claims ranges from $84.73 to $90.02 per square foot under air.

So, if any plaintiffs had seen this motion, and it's not clear that any plaintiffs' attorneys provided a copy to their CDW clients or even informed their clients about the motion, it would be reasonable for the plaintiffs to assume that Taishan liability has been established and they'd be receiving $105.91 as adjusted by the RS Means location factor with the adjustment for Florida claims ranging from $84.73 to $90.02 per square foot under air. The only thing remaining was to verify that the plaintiff's drywall was one of the twelve covered drywalls based on markings and labels, verify the square footage under air, and verify ownership. Had this been true, as it was portrayed in the Motion, then what followed, even though what followed was a lie, would have been more palatable.

The Motion goes on to say that "Plaintiffs seek to reduce judicial labor and propose that remediation damages – calculated according to a formula approved by Judge Fallon following an evidentiary hearing with expert testimony – should be finalized expeditiously as part of a claims process before a Special Master." This is clearly a bald-faced lie, and it's unreasonable to assume that Judge Cooke didn't know it was a lie.

Had the Special Master's tasks simply been to recommend methods/criteria for verifying square footage, e.g. tax assessor records, proof that the plaintiff has one of the covered drywall types, aka Buckets, e.g. an inspection report by a certified home inspector, and home ownership, e.g. county courthouse, county recorder, city hall records, then the statement in the previous paragraph would have been a little white lie.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

It's understandable that plaintiffs' attorneys in a class action lawsuit have a great deal of latitude in making unilateral decisions without always consulting each individual plaintiff. However, it's well known that class action plaintiffs' attorneys occasionally abuse this power. When the plaintiffs' attorneys blatantly lie to the court about the intent and wishes of the plaintiffs, that crosses a line into misconduct, if not malpractice.

The Motion further states that "These verifications [of square footage, covered drywall and ownership] can be accomplished through a claims process and the use of a Special Master so as not to burden this Court's docket." If product ID were a simply a matter of providing evidence, e.g. inspection report, that one of the covered drywall types (Buckets) exists in the home, then "verifications" and "claims process" would have been appropriate. In the quoted statement above, the authors, either wittingly or unwittingly, obfuscated what they knew the real product ID issue to be[3]. Presenting product identification as an issue equivalent to square footage and ownership is disingenuous at best and brings the intentions of the Motion's Movers and the Cooke Court into question, a question that needs a satisfactory answer before final approval of the Global Settlement Agreement.

The Motion's Conclusion states, in part, that "Plaintiffs' counsel and the Plaintiffs' Steering Committee in the MDL have collaborated and cooperated to compile the detailed and substantial evidence supporting Plaintiffs' damages claims, to which Defendants have had full access for many months." There are two points here. First, is the reference to "Plaintiffs' counsel", clearly drawing a distinction between references to the intentions of the plaintiffs themselves and the plaintiffs' counsel. This underscores the lies in this Motion. Second, the plaintiffs' counsel claims to have detailed and substantial evidence supporting Plaintiffs' damages claims, evidence that Class Counsel now refuses to provide to plaintiffs in violation of Class Counsel's fiduciary responsibility.

## MDL No. 2047 Objection D – Inclusion of Inadmissible Evidence

This Objection applies to all plaintiffs included in the Global Settlement Agreement; however, it is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

Final approval of the Global Settlement Agreement should be denied due to the Allocation Neutral's consideration of inadmissible evidence in establishing the allocation of funds.

The Allocation Neutral was provided numerous documents pertaining to Product ID. Most of these documents are related to the Special Master appointed by the Cooke Court. Neither the Special Master's reports nor the plaintiffs' attorneys' objections to those reports have been adjudicated. Therefore, these documents should be ruled inadmissible in providing any basis of allocation by the Allocation Neutral.

In fact, the large number, and nature of the documents provided to the Allocation Neutral raises a red flag concerning the expansive role assumed by the Allocation Neutral and the likelihood that the Allocation Neutral is noncompliant with the Global Settlement Agreement.

---

[3] It turns out that, according to the Global Settlement Agreement, "product identification" is simply proof that drywall found in a plaintiff's home is one of the covered drywall types (Buckets).

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

MDL No. 2047 Objection E – Violations of the Global Settlement Agreement

This Objection applies to all plaintiffs included in the Global Settlement Agreement, but is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

The approval of the Global Settlement Agreement should be denied because the terms and conditions of the Agreement have been violated at least with respect to the Product ID basis for allocation of funds.

The Settlement Agreement states on page four that "**WHEREAS**, without conceding the correctness of any other Party's legal position, claims and/or defenses, the Parties wish to avoid the effort, expense and risk of continued litigation;"

So, neither Taishan's position that it may not have manufactured, or did not manufacture a particular covered drywall, nor the Plaintiffs' attorneys', including the PSC and Class Counsel, position that Taishan did, in fact, manufacture all covered drywall should be considered in the Allocation Model.

This matter becomes even more perplexing because on page 35 of the Settlement Agreement it states that "Taishan shall not be involved in the allocation or distribution of the Settlement Funds." So, per the Settlement Agreement, the Plaintiffs' attorneys are not conceding that Taishan may not have manufactured all covered drywall. And, Taishan is not involved in the allocation or distribution of funds. Therefore, it was strictly the Plaintiffs' attorneys' decision, and possibly the Court's as well, that Taishan's position on whether it did, may have, or didn't manufacture certain drywall Buckets would be a factor in the allocation of funds, despite the Plaintiffs' attorneys' position that all covered drywall was manufactured by Taishan. And so, the Plaintiffs' attorneys are, in fact, conceding that Taishan may not have manufactured covered drywall in Buckets D, I, and J, and Taishan didn't manufacture covered drywall in Buckets B, C, F, G, and L.

But it gets even worse. On page 21-22 of the Settlement Agreement it states that "The review, determination and approval of the Allocation Model by the Court shall be final and binding on the Parties and the Class. There shall be no right of appeal of the approval of the Allocation Model to any other court, including the U.S. Court of Appeals for the Fifth Circuit, such right of appeal having been knowingly and intentionally waived by each Settlement Class Member." So, if a plaintiff opts in but objects to this, quite possibly unlawful allocation model, and the Court dismisses that objection, it's not appealable. What the Plaintiff's attorneys and the Court have done is make the most objectional aspects of this settlement agreement unappealable. Why would they do that?

The only plausible explanation is that the Court and the Plaintiffs' attorneys know that they've agreed to a grossly unfair settlement. So, they've structured the settlement so that those who get the least net amount of funds are also those who are the least likely to opt out. Then they've further structured the settlement to put in place additional disincentives to opt out for those receiving the least. For example, as stated above, according to the Settlement Agreement including the Allocation Model, the plaintiffs' attorneys have conceded that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, a concession that violates the terms of the Settlement Agreement. And, if the Court approves this Settlement Agreement, it will have ruled that, in fact, Taishan did not manufacture drywall in Buckets B, C, F, G, and L, slamming the door shut on any real possibility that plaintiffs in Buckets B, C, F, G, and L who opt out could successfully sue

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

Taishan. Why would they do that? Because it's in the best interest of the Court, the Class Counsel, and the plaintiffs' attorneys to limit opt outs.

This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing miserably in that regard.

## MDL No. 2047 Objection F – Product Identification Means Proof of Covered Drywall

This Objection applies to all plaintiffs who are in the 75% Buckets D, I, and J, and the 20% Buckets B, C, F, G, and L.

In treating "Product Identification" as anything different than how it's defined in the Settlement Agreement, which the Allocation Neutral has done is a violation of the Settlement Agreement. Therefore, approval of the Settlement Agreement should be denied.

The Settlement Agreement states on page 13 that "Objective Allocation Criteria. 'Objective Allocation Criteria' shall mean the objective criteria that form the basis for the allocation of Settlement Funds among Eligible Class Members pursuant to the Allocation Model developed by the Allocation Neutral, subject to Court approval. The Objective Allocation Criteria shall include, but not be limited to: (i) Under Air Square Footage of the subject Affected Property (ii) **Product Identification** [emphasis added], (iii) Affected Property Ownership Status, (iv) Affected Property Remediation Status, (v) Set-Offs, (vi) Assignments of Class Members' rights to pursue Claims, and (vii) whether the claimant is an Amorin Plaintiff or a Brooke Plaintiff, or an absent Class Member. The Allocation Neutral may add additional Objective Allocation Criteria to the Allocation Model that will be submitted for Court Approval."

The Settlement Agreement states on page 14 that "Product Identification. 'Product Identification' shall mean the proof of Covered Chinese Drywall in the subject Affected Property, as defined in Section 1.12."

On page 11 of the Settlement Agreement "Covered Chinese Drywall. 'Covered Chinese Drywall' shall mean all drywall products alleged to be attributable to Taishan and/or the Additional Released Parties, including, but not limited to those products identified in the Taishan Product ID Catalog (See MDL Rec. Doc. 22152-3 and S.D. Fla. ECF No. 155-2) and as set forth in Exhibit 2: (A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K) Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. Covered Chinese Drywall excludes the following drywall products: Knauf, Knauf Tianjin, KPT, Bedrock, ProRoc, Panel Rey, IMG, USG, Shamrock Gold, Lafarge, Georgia Pacific, National Gypsum, and any drywall manufactured outside of the People's Republic of China."

So, for the Allocation Neutral to treat Product Identification as anything other than proof that the drywall is a covered drywall as defined by the Settlement Agreement is a violation of the Settlement Agreement.

Page **8** of 11

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## MDL No. 2047 Objection G - Compensation for All Remediation Damages

This Objection applies to all plaintiffs included in the Global Settlement Agreement.

The Global Settlement Agreement should be rational, reasonable, and consistent, including recognition of the fixed settlement amount agreed to by Taishan, i.e. $248M, and the prospect of compensating all plaintiffs for all property and remediation damages, which is zero.

Yet, on page 21, the Settlement Agreement states that "The Allocation Amount is intended to provide compensation for **all** [emphasis added] property and remediation damages as well as Other Losses." This brings the entire Settlement Agreement into question, and is therefore a basis for denying final approval of the Agreement.

## MDL No. 2047 Objection H – Insufficient Media Outreach

This Objection applies to all potential Absent Class Members.

There are serious doubts that the Settlement Agreement's terms and conditions for media outreach, as defined on pages 24 and 25 have been met. Therefore, the final approval of the Global Settlement Agreement should be denied, or at least delayed in proportion to the delays in meeting the Global Settlement Agreement's media outreach terms and conditions.

## MDL No. 2047 Objection I – Awards to Ineligible Plaintiffs

This Objection applies to all plaintiffs in the 100% Buckets A, E, H, and K.

If the Court approves the Global Settlement Agreement, including the Allocation Neutral Model as written, the Court will have ruled that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, and plaintiffs in these Buckets deserve no compensation. Since these plaintiffs are being awarded 20% of a yet-to-be-determined baseline amount, the final approval of the Global Settlement agreement should be denied.

The Allocation Neutral has decided to award 20% to plaintiffs with drywall in Buckets B, C, F, G, and L, essentially giving these plaintiffs a "participation trophy" award. There is no basis in law requiring or allowing plaintiffs to receive an award settlement on the basis of their participation in the litigation alone in a lawsuit. Given the fixed amount that Taishan has agreed to, i.e. $248M, giving out participation trophy awards to the 20% plaintiffs is unlawfully depriving the 100% plaintiffs of funds that should have been awarded to them. Participation trophy awards are appropriate in pre-teen soccer leagues, they are not appropriate in a court of law.

## MDL No. 2047 Objection J – Nefarious Intentions and Misinformation

This Objection applies to all plaintiffs in the Global Settlement Agreement.

Information provided to the undersigned by his former Morgan & Morgan attorney, Pete Albanis, and public statements made by attorney Arnold Levin, Lead Counsel for the Plaintiffs' Steering Committee and Class Counsel for the Global Settlement Agreement appear to be at odds with the Global Settlement Agreement. The Global Settlement Agreement should not receive final approval unless and until the incongruency between what plaintiffs' attorneys are saying and what's in the Global Settlement Agreement are satisfactorily resolved.

The undersigned's former Morgan & Morgan attorney, Pete Albanis, stated that it was Taishan that proposed a pretrial settlement during secret negotiations at the Cooke Court mandated mediation, that Taishan first proposed settling cases for those plaintiffs scheduled for trial in July

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

2019, and when the plaintiffs' attorneys agreed, Taishan proposed including all 1,734 Florida plaintiffs, and when the plaintiffs' attorneys agreed, Taishan proposed that the pretrial settlement resolve all cases nationwide.

In a New Orleans City Business article, published in March 2018 (Exhibit 4), attorney Arnold Levin is quoted as saying "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," and "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages," and "The Chinese will be all over America trying cases."

Later, in a CISION PR Newswire article, published in August 2019 (Exhibit 5), attorney Arnold Levin is quoted as saying he is, "**extremely pleased** [Emphasis added] with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

So, a lead counsel for the plaintiffs believes that a large jury-award (big verdict) is needed to provide a fair settlement, and he also believes that a big verdict is definitely collectable. Yet, if you believe Mr. Albanis, somehow the plaintiffs' attorneys had their arms twisted into accepting an extremely lowball offer from Taishan. But the Global Settlement Agreement contradicts this scenario.

The Global Settlement Agreement paints a different scenario. The Settlement Agreement on page 3 states "**WHEREAS**, Settlement Class Counsel has made a demand on Taishan to settle all Chinese Drywall claims of Class Members against Taishan and the Additional Released Parties;" So, according to the Settlement Agreement, the plaintiffs' attorneys were the party demanding a pretrial settlement, a settlement that falls $1 Billion short of a fair settlement for the plaintiffs.

## Conclusion

The plaintiffs in this drawn out litigation are not spoiled brats who want the whole drumstick, as Judge Fallon suggests. They are the victims. They were victimized by the Chinese who manufactured the toxic drywall. They were victimized by the construction industry that covered up the problem and continued to install toxic drywall. They were victimized by our elected government officials who promised over and over again to help but never did. They are the victims of our judicial system that failed to protect their rights. And finally, they are now being victimized by their own attorneys who are putting their self interest ahead of their clients. It's also worth pointing out that toxic Chinese drywall is a "gift" that keeps on giving. Rather than suffer foreclosure and/or bankruptcy, many victims have been living in their toxic homes for over a decade.

Respectfully Submitted to the Court.

Russell F. Moody

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

List of References

1. CLASS SETTLEMENT AGREEMENT WITH TAISHAN GYPSUM COMPANY LTD., F/K/A SHANDONG TAIHE DONGXIN CO. LTD. AND TAIAN TAISHAN PLASTERBOARD CO. LTD., Document 22305-2 Filed 08/20/19
2. Class Counsels Memorandum of Law In Support of Rule 23(d) Motion to Protect The Amorin Class, Case 2:09-md-02047-EEF-JCW Document 22135-1 Filed 03/08/19
3. CHINESE DRYWALL LITIGATION SETTLEMENT: ALLOCATION MODEL AND ALLOCATION NEUTRAL REPORT, Document 22304 Filed 08/19/19
4. PLAINTIFFS' MOTION AND MEMORANDUM OF LAW TO ADOPT PLAN FOR RESOLUTION OF FLORIDA AMORIN PLAINTIFFS' CLAIMS FOR REMEDIATION AND OTHER DAMAGES, Document 52 Entered on FLSD Docket 08/31/2018

List of Exhibits

1. Exhibit 1: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon, dated November 13, 2019
2. Exhibit 2: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019
3. Exhibit 3: TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS HEARD BEFORE THE HONORABLE ELDON E. FALLON UNITED STATES DISTRICT JUDGE, October 23, 2019
4. Exhibit 4: New Orleans City Business March 29, 2018 article: Judge: Return Chinese drywall lawsuits to original states"
5. Exhibit 5: CISION PR Newswire August 20, 2019 article: "Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits"

# Exhibit 1

Mr. Russell Moody letter to the Honorable Judge
Eldon E. Fallon, dated November 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 13, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail, and E-Mail
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

      This is a follow-up letter to my letter the Court dated October 21, 2019 (Ref. Document 22346) in which I asked the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision, and to extend the November 27, 2019 deadline due to Class Counsels' and my Morgan & Morgan attorney, Pete Albanis' unwillingness to provide the above referenced information, information that they have a fiduciary responsibility to provide (Doc. 22135-1, page 4).

      Class Counsel continues to ignore my requests for all relevant information that may be pertinent to our opt in/opt out decision. Morgan & Morgan and our attorney, Pete Albanis, recently cited irreconcilable differences in a, now Court approved, motion to withdraw as our counsel. The only "irreconcilable differences" we had with Morgan & Morgan is that we sought information from Morgan & Morgan that is clearly relevant and that may be pertinent to our opt in/opt out decision, and Morgan & Morgan chose to withdraw as our counsel rather than provide it.

      In "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) Class Counsel raised serious concerns and objections to the "Joint Notice of Settlement Agreement" (Doc. 22125), aka "Rogue Settlement", presented to the Court by Parker Waichman, Milstein, Jackson, Fairchild & Wade, Whitfield, Bryson & Mason, Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, and Taishan (Joint Notice Counsel). Class Counsel expressed concerns that the Rogue Settlement sought to settle at severely discounted rates without adequate communication with settling attorneys' clients (Doc. 22135-1, page 3). I would like to point out to the Court that Class Counsel is now seeking to settle for severely discounted rates, having reached a secret settlement agreement without any communication with the affected Class members.

      Class Counsel stated that Chinese drywall victims should receive compensation for their damages and that the Rogue Settlement may have a direct negative impact on the Amorin Class members who want full compensation for their damages (Doc. 22135-1, page 4). Class Counsel also asserts that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan." (Doc. 22135-1, page 4). Class Counsel has reached a settlement agreement for severely discounted compensation, and has not provided the undersigned with all relevant information that may be pertinent to our opt in/opt out decision. It is also not clear that Class Counsel has met its fiduciary responsibility with regards to providing any Class members with this information.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 11) Class Counsel states that "it is far from clear whether [the Rogue Settlement] was accomplished with a full and complete disclosure of facts and information to [the subset of Class members included in the Rogue Settlement]." What is clear is that Class Counsel itself negotiated a secret settlement agreement without any disclosure of facts and information to Class members.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1 pages 11-12) Class Counsel states that "To begin, the proposed settlement disregards this Court's formulaic method for calculating damages, by only allowing for the Florida Amorin cases a maximum, ironically referred to as a 'baseline,' of $60 per square foot for drywall with a limited sub-set of Taishan/Tiahe markings to current owners and former owners ... Other Class members would be subject to steep discounts up to 80%. However, Judge Cooke's Order of November 16, 2018, adopted all of this Court's well-reasoned findings, making any discount, especially the deep discounts agreed to by the Joint Notice Counsel, inappropriate." Ironically, Class Counsel later adopted discounts similar to, and possibly greater than the "inappropriate" Rogue Settlement discounts.

In Class Counsels' objection to the Rogue Settlement (Doc. 2135-1, page 13) they state that "The plain wording of the Rule authorizes a Class Notice relating to "any step in the action." The operative consideration in issuing Rule 23(d)(2) corrective and injunctive orders18 is the court's unique fiduciary role to protect the legal rights and interests of class members, and its institutional interest in controlling "the fair conduct of the action." Yet Class Counsel neglected its fiduciary responsibility to its Class members and, instead, misrepresented Class member interests and desires to the Court.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 15) Class Counsel raises concerns that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." Unfortunately, Class Counsel and, I believe many, if not most plaintiffs' attorneys are providing "one-sided" information to Class members to discourage them from opting out.

Class Counsels' nearly wholesale adoption of all the objectionable actions and inactions of the Joint Notice Counsels' Rogue Settlement is, I believe, clear evidence that Class Counsel is putting its self-interests, and possibly the interests of the Courts before the interests of the plaintiffs, i.e. toxic Chinese drywall victims. That Morgan & Morgan decided to withdraw from representing Beverly Moody and the undersigned, which the undersigned believes Morgan & Morgan did to avoid its fiduciary responsibility to provide all relevant information that may be

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

pertinent to our opt in/opt out decision I believe underscores the serious magnitude of the plaintiffs' attorneys' conflict of interest with their clients.

Class Counsel and the undersigned's attorney, before he and Morgan & Morgan withdraw from representing the undersigned, provided multiple responses to the undersigned's requests for relevant information that may be pertinent to our opt in/opt out decision. Unfortunately, those responses have, at best, been only partially responsive to those information requests.

In particular, the undersigned has repeatedly requested all relevant information pertaining to any and all evidence that Taishan manufactured ProWall, including information that was available to Morgan & Morgan and PSC in June 2010 when the undersigned retained Morgan & Morgan, as well as the additional evidence that was accumulated throughout this litigation.

The undersigned has also repeatedly requested relevant information related to collectability. In a March 29, 2018 article published in the New Orleans City Business, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee stated that "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict" and that "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, ... those companies' assets in this country can be attached if Taishan ignores court orders to pay damages." So, attorney Levin believed on March 29, 2018 that a fair jury trial award against Taishan was definitely collectable. Then, just five months later, attorney Levin totally undermined that strategy when his name appeared on a motion to the Cooke Court (Doc. 52) claiming that the "Plaintiffs seek to reduce judicial labor and propose that remediation damages ... should be finalized expeditiously as part of a claims process before a Special Master."[1] This apparent PSC change in strategy is clearly relevant to collectability and, therefore, relevant and pertinent to the opt in/opt out decision. Yet, the Class Counsel refuses to address this issue.

The undersigned believes that the actions of his former attorney and Class Counsel are intended to obstruct justice and to run out the clock as the November 27th deadline rapidly approaches.

In view of the foregoing, the undersigned respectfully submits the following requests to the Court.

- Allow plaintiffs to submit Objections directly to the Court and order Class Counsel to update the Chinese Drywall Settlement Information Website (https://www.chinesedrywallsettlement.com) and notify all plaintiffs of this change. Requiring plaintiffs to submit objections to Class Counsel is akin to requiring plaintiffs' attorneys to submit all motions to Taishan. The undersigned believes that requiring plaintiffs to submit objections to Class Counsel is prejudicial against the plaintiffs for reasons discussed above, and is underscored by attorney Duggan's email to the undersigned stating "At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances

---

[1] This statement appears to clearly be a lie. Although the undersigned understands that, in a class action, attorneys have wide latitude in representing the plaintiffs' interests, he doesn't believe that these attorneys have the authority to knowingly lie about the plaintiffs' intentions and desires.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court." So, according to Ms. Duggan, it's not even clear that the Court will receive objections except as an attachment to Class Counsels' "unified" response submitted to the Court.

- Compel Class Counsel to immediately provide all plaintiffs with all relevant information that may be pertinent to each plaintiff's opt in/opt out decision. While some required information will be common across all plaintiffs, some will not. As a minimum, different information is required depending on which of the 12 Buckets a plaintiff is in based on the markings and labels found on drywall in that plaintiff's home.

- Extend the November 27th deadline. The deadline for opting in or opting out, and filing an Objection is only two weeks away from the date of this letter, leaving insufficient time for plaintiffs to obtain and consider the information that they require and deserve in order to make an informed decision. Class Counsel is trying to run out the clock. I implore the Court to not be complicit in allowing Class Counsel to do that.

- Allow plaintiffs who have objections to defer their opt in/opt out decision until their objects have been presented to the Court and the Court has ruled on those objections. Requiring plaintiffs to opt in in order to object is basically saying you have to accept the deal to object to it. At the very least, this gives the appearance that allowing objections and holding a "Fairness" Hearing is all for show.

- Provide the undersigned, who is no longer represented by an attorney, with all documentation in the Courts' possession that is relevant and may be pertinent to the opt in/opt out decision, particularly information relevant to ProWall victims.

- Enter this letter into the Court Record.

As a final note, this litigation has been horribly complex and a terrible decade-long strain on the toxic Chinese drywall victims; however, one thing is perfectly clear. This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing to do that.

Respectfully,

*Russell F. Moody*

Russell Moody

# Exhibit 2

Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

October 21, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

My wife, Bev, and I are members of the Amorin Class. We have ProWall Chinese drywall putting us in one of the five "20%" Buckets. We need at least $65/SqFt to cover remediation costs. If we opt in, we'll likely get less than $10/SqFt.

I have sent emails addressed to, or copied to the Court via Mr. Dean Oser. I am writing this letter to you, in part, because Mr. Oser informed me that the most proper fashion to address the Court would be to write a letter to you. The problem with "snail mail" is that the lag time precludes timely resolution of critical matters prior to Court imposed deadlines.

While we intend to raise several serious objections should we opt in, including the unlawful denial of our Constitutional right to a jury trial, our immediate concern is our opt in/opt out decision. Class Counsel and our attorney are refusing to provide all relevant information that may be pertinent to our decision. Attachment 1 is my latest request for information. Attachment 2 is a string of email exchanges with Class Counsel in my unsuccessful attempts to get relevant information. I have also exchanged numerous emails, had phone calls, and face-to-face meetings with my attorney, Mr. Albanis, Morgan & Morgan, to no avail.

Also, I've gotten conflicting answers, but no specific information on the role Product ID played in the secret settlement negotiations, information that is clearly relevant to our opt in/opt out decision.

I believe that the problem I'm facing, and I see other plaintiffs facing, is due, at least in part, to the conflict of interest of Class Counsel and plaintiffs' attorneys who, I believe, have clearly put seeing this Settlement approved before the best interests of their clients.

I ask the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision.

I also ask the Court to extend the November 27, 2019 deadline due to the delays that plaintiffs have encountered in getting relevant information from Class Counsel and their attorneys that may be pertinent to their opt in/opt out decision.

Respectfully,

Russell F. Moody

Russell Moody

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 15, 2019 6:59 PM |
| **To:** | 'Sandra L. Duggan'; 'Arnold Levin'; 'SHerman@hhklawfirm.com'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'Dean_Oser@laed.uscourts.gov' |
| **Cc:** | 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier' |
| **Subject:** | MDL #2047: Relevant information bearing on opt in - opt out decision |
| | |
| **Importance:** | High |

Dear Class Counsel and Judge Fallon Court,

I am reaching out to Class Counsel in accordance with Judge Fallon's recent Order regarding communications with the Court during the Class Notice period: Document 22340, filed on October 9, 2019.

I am also reaching out to the Court with regards to the abovementioned Order.

I believe that it is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan. I know that Class Counsel agrees with me on this [MDL 2047, Document 22135-1].

I also believe that, thus far, neither the Court nor the Class Counsel have been fully responsive to the abovementioned responsibility.

I am speaking here on behalf of my wife, Bev, and myself, as well as all other MDL 2047 "Large Settlement" plaintiffs, particularly those falling in the 75% and 20% Buckets. However, my comments below specifically address those plaintiffs with toxic Chinese drywall where the drywall inspection report found ProWall markings/labels, typically on a very few drywall boards. Without visual evidence collected during the initial drywall installation or visual evidence collected during remediation, it's impossible to know whether or not toxic Chinese drywall with non ProWall markings/labels also exists in the home. A friend's inspection report also found ProWall, putting him in the 20% Bucket. Fortunately for him, when his home was very recently remediated, toxic Chinese drywall in the 75% Bucket was also found, just in time to meet the October 3, 2019 deadline for updating the spreadsheet.

We retained Morgan & Morgan in June 2010. For nearly a decade my wife, Bev, and I were told that our toxic Chinese drywall was manufactured by Taishan. "You are receiving this email because you have Chinese Drywall manufactured by Taishan in your home" a November 28, 2011 email from Morgan & Morgan states. Clearly, Morgan & Morgan, and by extension the PSC, must have had solid evidence at that time that Taishan manufactured ProWall, solid enough to withstand a challenge in a jury trial. It's also clear that we would not have been included in the Amorin Class Action had there not been equally, if not stronger solid evidence at that time that Taishan manufactured ProWall. Just one source of evidence, according to my attorney, involves the gypsum mine used by Taishan, although he provided insufficient details to affect our opt in – opt out decision.

We need to obtain from the Court and/or the Class Counsel all relevant information that may be pertinent to Taishan's alleged manufacture of ProWall in order to make an informed decision on opting in or opting out, i.e. information in the Court's and/or Class Counsel's possession between June 2010 and today that is relevant to what the ProWall plaintiffs' attorneys knew, when they knew, and how they knew (evidence) that Taishan manufactured ProWall.

Another critical factor in making an informed decision on opting in or opting out is collectability. In a March 25, 2018 news article, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict is needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA can be used as leverage to force Taishan to pay that fair award – definitely collectable the PSC said. Then, only four months later (August 30, 2018), attorney Levin's name is included on a motion filed with the Judge Cooke Court that asked the Cooke Court to forgo a trial in favor of a Special Master. Clearly something significant happened with regards to collectability between March and August 2018. What changed?

The above requested information, and any other relevant information in the possession of the Court and/or the Class Counsel that may be pertinent to the opt in/opt out decision, is needed by us, and all other ProWall plaintiffs, in order to make an informed opt in – opt out decision.

Thank you for your attention to this critical matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 08, 2019 4:45 PM |
| **To:** | 'Sandra L. Duggan' |
| **Cc:** | 'SHerman@hhklawfirm.com'; 'Arnold Levin'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier'; 'Dean_Oser@laed.uscourts.gov' |
| **Subject:** | RE: CDW Settlement Issues and Concerns |

Ms. Duggan,

I never doubted that you understood that my wife, Bev, and I, and most plaintiffs, particularly the "75% and 20% Bucket" plaintiffs, are deeply disappointed, not just in the anticipated outcome, but more so that we were apparently betrayed by our own attorneys and the Courts.

Although we feel that we have every right to be disappointed and very angry, my emails to you were not about disappointment and anger, even though that disappointment and anger may have shown through, and for that I apologize. My emails were about getting essential feedback and support from the attorneys supposedly representing us in this litigation. I'm not looking for rationalizations on why we should accept what is admittedly a horrible settlement offer. I'm looking for the facts that allow us to make an informed opt in /opt out decision, and to possibly allay concerns we have about how this litigation unfolded and ended up crashing and burning for many, if not most, plaintiffs.

What I don't understand is why the Class Counsel and my attorney are withholding information from the plaintiffs that is critical to our opt in / opt out decision. While I and other plaintiffs are questioning certain actions taken by the PSC, Class Counsel, and our attorneys, as well as the Courts, actions that many plaintiffs believe constitute misconduct, malfeasance, and possibly malpractice, our immediate and biggest concern is whether we should opt in or opt out. It's clear that you are withholding critical information from us. Why would you do that? I think in order to coerce as many as possible into opting in to a grossly unfair settlement offer.

I assume that you're pleading the 5th on the questions and concerns I raised. If not, I would still like you to address those questions and concerns. If you're not the right person to address those questions and concerns, please direct me to the right person.

Thank you for your consideration of this serious matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 2:53 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;

10/20/2019                                   RE CDW Settlement Issues and Concerns.htm

Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody: I understand that you are disappointed.  We wish you the best of luck in whatever course of action you decide to take.


Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Tuesday, October 8, 2019 2:17 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for your lengthy response. Honestly, to me, it appears to be a great legal rationalization for your actions, some of which raise serious concerns, particularly with regards to certain toxic Chinese drywall clients. I will, however, review your comments in detail and give serious consideration to your assertions.

Are you disputing the factual evidence of your about face?

Unfortunately, your responses don't fully address the specifics, or in some cases don't jibe with the facts related to our main concern: understanding/obtaining the evidence that Taishan manufactured ProWall. I'm hopeful that Mr. Albanis will provide us that evidence during our meeting this Thursday. However, The PSC and all the individual plaintiffs' attorneys must have had solid evidence that Taishan manufactured ProWall or they would not have included their ProWall clients, or their other "20% Bucket" clients, in the Amorin Class Action in the first place. Perhaps you can provide some insight into that. One explanation that appears to be supported by at least two plaintiffs' attorneys' comments is that Judge Fallon decided to only include Taishan as a Chinese drywall manufacturer defendant. Is that true? If so, what was Judge Fallon's rationale for that decision? If not, who decided to focus only on Taishan, and why?

It's recently come to light for many plaintiffs that there are multiple objectionable aspects concerning this litigation and the grossly unfair settlement agreement, all of which need to be addressed, including the plaintiffs' attorneys' fraudulent motion requesting a Special Master in lieu of a jury trial. However, our immediate concern is obtaining all evidence that Taishan manufactured ProWall, evidence that was available a decade ago, and the additional evidence acquired since then. If the only evidence that Taishan manufactured ProWall is what's contained in the Special Master's Product ID report, that I assume was provided to the Special Master by Mr. Albanis as the PSC's lead attorney on ProWall, that is a monumentally huge problem.

I just want honest answers to what I believe are legitimate and critical questions, the answers to which will bear heavily on our opt in /opt out decision.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



From: Sandra L. Duggan <sduggan@lfsblaw.com>
Sent: Tuesday, October 08, 2019 1:04 PM
To: russmoody@comcast.net
Cc: SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;
Dean_Oser@laed.uscourts.gov
Subject: RE: CDW Settlement Issues and Concerns

Dear Mr. Moody:

For over ten years we have fought hard on behalf of all Plaintiffs to prosecute the claims against Taishan and its parent companies.  As you know, Defendants challenged jurisdiction, service of process, liability, and damages. We adopted a coordinated, comprehensive approach in our litigation strategy among all jurisdictions where Chinese Drywall cases were pending, which continued following the remand of *Amorin* cases to Florida and Virginia, and, therefore, we dispute your characterization of any "about face."  The likelihood of getting a jury verdict is generally reflected in the Allocation Model:  If you fall into a Product ID Bucket for which the independent Court-appointed Special Master ruled there is insufficient evidence linking that drywall to Taishan, you have a much less likely chance of being able to present your case to the jury.  Similarly, if you were a *Brooke* Plaintiff (and we know you are an *Amorin* class member), you generally would have a greater chance that your case will be dismissed on statute of limitations grounds.  As to the ability to enforce a judgment, we have no way of predicting what Taishan may or may not do.  All we know is that (i) we don't have the same types of enforcement mechanisms that would be available to us vis-à-vis a U.S. Corporation, (ii) Taishan, in the past, left the litigation after jurisdiction was established, and (iii) there is an appeal pending before the U.S. Fifth Circuit that may result in the dismissal of Taishan's parent companies, CNBM, BNBM Group, and BNBM, which would greatly limit (if not completely eliminate) the available potential

assets in the U.S. that could be seized. We understand that you are disappointed with the Special Master's ruling on Product ID. We presented all relevant Product ID evidence to the Special Master, and argued in favor of attributing all Product ID categories to Defendants. But, unfortunately, with respect to several of the Product ID Buckets, which had lesser proofs of Product ID attribution to Taishan and/or BNBM, the Special Master saw it differently. Yes, there is a right to appeal, which we were in the process of pursuing. But there is a good chance that the Court will see things the same way as the Special Master. Nevertheless, you are free to opt out of the Settlement, take up the appeal, and hope that you can secure a jury trial on damages.

With regard to the Settlement, should you decide to remain in the class, please understand that the Allocation Neutral appointed by the Court considered all relevant evidence and Court rulings regarding Plaintiffs' claims for remediation damages and other losses in arriving at the Allocation Model that will be used to determine Allocation Payments. Under the law, the Court will "compare the settlement terms 'with the likely rewards the class would have received following a successful trial of the case.'" *Reed v. General Motors, Corp*, 703 F.2d 170, 172 (5th Cir. 1983). In other words, the Court will "compare the terms of the compromise with the likely rewards of litigation." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y.2007) (quotation omitted). The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys*, 851 F.Supp.2d at 1065. Rather, the Court will determine "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors not by attempting the impossible task of deciding whether the parties have reached exactly the remedy they would have asked the Court to enter absent the settlement, but instead by whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of plaintiffs' success on the merits." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 933 (E.D. La. 2012) (quoting and citing *Reed*; *Heartland Payment*, 851 F.Supp.2d at 1065; *Maher v. Zapata Corp*, 714 F.2d 436, 460 (5th Cir.1983)) (internal quotations omitted), *aff'd, In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014).

Regards,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender. If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

10/20/2019                                              RE CDW Settlement Issues and Concerns.htm

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 11:15 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;
Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my October 7th email. I do appreciate your attention to this serious matter.

The question I asked in that email relates directly to what I, and others, believe are the two most critical factors for us in deciding whether to opt in or opt out: the likelihood of winning a fair verdict in a jury trial and the likelihood of forcing Taishan to pay that fair award. The plaintiffs' attorneys' apparent complete about face on these two critical factors between March 25, 2018 and August 31, 2018 warrants an explanation to the plaintiffs, particularly those plaintiffs for which this proposed settlement is clearly not in their best interest. One possible explanation is pressure from the Courts to end this litigation quickly, which is actually mentioned in at least one motion to the Cooke Court. Is this the reason for the about face in litigation strategy? Is the answer contained in the court documents you referenced? It's a fair and essential question to ask, and deserves an honest answer for those considering whether they should opt in or opt out.

Again, the questions my wife, Bev, and I have must be answered well before the November 27th deadline to opt in or opt out, as they are critical to that decision. I believe it's clear that the PSC, Class Counsel, and other plaintiffs' attorneys collectively have answers to all these questions. To refuse to share those answers in an effort to force/intimidate clients into accepting an unfair settlement is clearly not acting in the clients' best interests. In fact, it demonstrates that these attorneys are no longer representing their clients' best interests.

I do appreciate your honesty in admitting that the proposed Settlement is not in our best interest, i.e. not in the best interest of plaintiffs with ProWall drywall or the other covered drywall that falls into the "participation trophy" award category of only 20% of what's likely not a fair settlement to begin with.

Thank you again for your attention to this serious issue.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, October 07, 2019 4:58 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;
Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Dear Mr. Moody – there is a process in place for you, as a class member, to voice any objections you have to the settlement, or to opt out if you would like to pursue litigation and reject the Settlement (*see* my attached previous email to you dated October 2, 2019).  The deadline for objecting or opting out is November 27, 2019.  Class Counsel will respond to any and all objections in writing on or before December 6, 2019, in advance of the Fairness Hearing.

The questions you have posed seem to relate to the litigation and our litigation strategy, not the fairness, reasonableness, or adequacy of the Settlement. Developments in the litigation have been reported in monthly Status Reports (*see, e.g.,* Rec. Docs. 22272, 22290, 22309, 22323), and the reasons why Class Counsel believe that the proposed Settlement is in the best interests of the overwhelming majority of class members is also a matter of public record (*see* Rec. Doc. 22305), and takes into consideration the delay, expense, and risks of litigation, including the challenges of maintaining jurisdiction over and enforcing any eventual judgments against the Taishan-related entities and/or their assets over in China.  You should have sufficient information about the unfolding of the litigation to date, the settlement, your estimated gross recovery under the settlement should it be finally approved, and the risks of continued litigation in order to make your decision. Plus, your counsel Pete Albanis is available to advise you, and I understand you and your wife have a meeting scheduled with him this week.

Thanks.

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 12:29 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

I clearly can't rely on getting answers to certain critical questions through the "Objection" process because I need answers to these questions in order to make an informed decision on whether to opt in or opt out. I pose one of those critical questions below. I did submit this question through the Settlement Website on October 1, 2019 and have not yet received a response. Here's the specific question I asked.

"What changed between March 25, 2018 when attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict was needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA could be used as leverage to force Taishan to pay that big award, and August 30 2018 when attorney Levin put his name on a motion to the Cooke Court undermining that judicial process, stating that the Plaintiffs seek to reduce judicial labor and propose that remediation damages should be finalized expeditiously as part of a claims process before a Special Master? Also, how did the PSC determine that the Plaintiffs, or at least the majority of Plaintiffs, wanted to forgo a jury trial in the interest of reducing judicial labor? I ask this question because it is central to our decision on opting in or opting out of the proposed settlement. Thank you for your attention, R. Moody"

I do have other questions that are critical to our decision on opting in or opting out. My wife, Bev, and I have a meeting with Mr. Albanis this Thursday where we hope to get answers to those questions. I'll follow up with you after that with any lingering questions that remain.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 02, 2019 4:08 PM
**To:** 'Sandra L. Duggan' <sduggan@lfsblaw.com>
**Cc:** 'SHerman@hhklawfirm.com' <SHerman@hhklawfirm.com>; 'Arnold Levin' <ALevin@lfsblaw.com>;
'rserpe@serpefirm.com' <rserpe@serpefirm.com>; 'patrick@colson.com' <patrick@colson.com>;
'bevmoody@comcast.net' <bevmoody@comcast.net>; 'palbanis@forthepeople.com' <palbanis@forthepeople.com>;
'Keith Verrier' <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you again for replying to my email.

I'm sorry, but I'm very confused. I've asked a few important questions and I've gotten replies (thank you) that, in some cases, answer those questions, and in other cases don't fully address those questions or raise additional questions. In some cases, you've essentially referred me to the Fallon Court, and I am following up accordingly.

It makes no sense to me to submit formal objections to you  or, more appropriately, to the Court, until we fully understand the details of this litigation that are essential in our understanding what and how decisions were made, and

on what basis and what evidence they were made. That's particularly necessary when there appear to be clear missteps and contradictions, and the "negotiated" settlement is so grossly unfair.

My wife, Bev, and I started our nearly decade-long trail of tears being told that we have Taishan toxic Chinese drywall. Then, as the litigation is about to cross the finish line headed for what the plaintiffs hoped would be a fair jury trial award – an award that the PSC said we'd be able to collect – that jury trial is short circuited by the plaintiffs' own attorneys and Taishan gets to call the shoots on what's fair, no questions asked. Now we are expected to be "extremely pleased" according to the PSC that we're about to be offered 14 cents on the dollar. I'm just trying to understand, and I'm following the settlement instructions for that purpose.

What we see, and what many other plaintiffs see, are our own attorneys, who are charged with representing our best interests, now intimidating their clients into accepting a terribly unfair settlement in order to unburden the courts and to end this litigation, unwilling to continue the long journey to a fair settlement for their clients. We can't turn a bind eye to what we see, and it would be disingenuous not to share that vision with the PSC and our attorneys – to give the PSC and our attorneys an opportunity to set the record straight. Please do that for us.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Wednesday, October 02, 2019 3:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody – we have made numerous attempts to respond to your many inquiries about the settlement. If you are not satisfied, you have a right to opt-out of the settlement and pursue your case in Court OR you may object to the settlement, as set forth in the class notice you received. At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court.  The deadline for objecting is November 27, 2019. If you choose to object, be sure to follow the procedures set forth in the class notice, and mail your objection to Class Counsel at the following addresses:

Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC

580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave., New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Sincerely,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of
LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure.
The information is intended only for the use of the individual or entity named above. If you think you
have received this message in error, please email the sender.  If you are not the intended recipient,
please delete the message and understand that dissemination, distribution or copying is strictly
prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 2, 2019 1:43 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my email. Unfortunately, you did not respond to my questions and concerns, none of which
involve the specifics of our claim, but rather affect all plaintiffs who are part of this grossly unfair settlement.

I have directed many questions that I believe are relevant to our specific claim to our attorney, Mr. Albanis, and I'm
looking forward to getting the answers. My wife, Bev, and I hope to meet with Mr. Albanis either later this week or next
week.

Even though I believe that the Courts and the Plaintiffs' attorneys have poisoned the well with regards to further pursuing
Taishan, we still need to better understand the details of this litigation in order to be able to make an informed decision

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

on whether to opt in or opt out, and to better understand the basis for submitting objections.

Thanks again for your reply.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, September 02, 2019 2:24 PM
**To:** russmoody@comcast.net; palbanis@forthepeople.com
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net
**Subject:** Re: CDW Settlement Issues and Concerns

Dear Mr. Moody - thank you for writing to us. I've copied your attorney Pete Albanis on this email. Because you are represented by counsel, you will need to speak with Mr. Albanis regarding the specifics of your claim.  If you are listed on the Master Spreadsheet, you will receive the class notice and a letter from the Claims Administrator Brown Greer in about 2 weeks.

Regards,

Sandra L. Duggan
Of-Counsel
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 Office
(215) 870-8258 Cell
(215) 592-4663 Fax


On Sep 2, 2019, at 1:54 PM, "russmoody@comcast.net" <russmoody@comcast.net> wrote:

Dear Messrs. Levin, Herman, Serpe, and Montoya, and Ms. Duggan,

As one of the 3,654 class members who are included in the settlement from the Amorin and Brooke complaints, I have many questions needing answers before I can choose a course of action concerning my options with regards to this yet-to-be-provided settlement offer. Our attorney, Pete Albanis, has responded to some of these questions, many times with answers that generate more questions. Hopefully, our attorney will be forthcoming with all the answers we'll need, well before the deadline we're facing to make a final decision. In the meantime, two questions posed on a closed Facebook group of toxic Chinese drywall victims that deserve immediate answers are the following.

"1) Will this be enough money to properly remediate these Toxic Chinese Drywall homes so that these properties don't continue to hit the market and harm other American Families?"

and

"2) Will this be enough money to make the families who have lived with this Toxic Chinese Drywall for 11 years whole and make up for all that they have had to endure during this time to include loss of use and enjoyment?"

If the answer is "No" to either of these questions for any of the plaintiffs, I respectfully ask that the Plaintiffs' Steering Committee and the plaintiffs' attorneys to stop publicly expressing pleasure, stop referring to the settlement as fair, and stop thanking Taishan and its attorneys. The takeaway from these public statements for those who are not toxic Chinese drywall victims, or who are not otherwise familiar with this litigation, is that all the victims will finally get the settlement amount they need to compensate them for their losses, particularly for the cost of remediating their homes. That's probably the intent, but it is, for all intents and purposes, a lie, a lie that infuriates the victims. Why do that? I think I know the answer, and it's definitely not ethical, probably worse, but please remember that toxic Chinese drywall victims have been "wounded" by the Chinese, the construction industry and their insurance companies, elected officials, the courts, and now our own attorneys. Please don't add insult to injury by rubbing salt in these wounds.

I also respectfully ask that the PSC remove its gag order on the plaintiffs' attorneys, which it has apparently imposed to ensure that the fake news story of a fair settlement is not undermined.

Thank you for your consideration of these vitally Important issues.

Respectfully,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

# Exhibit 3

**TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS HEARD BEFORE THE HONORABLE ELDON E. FALLON UNITED STATES DISTRICT JUDGE, October 23, 2019**

1

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4    ......................................................

 5    IN RE:  CHINESE-MANUFACTURED
      DRYWALL PRODUCTS
 6    LIABILITY LITIGATION

 7
                               CIVIL DOCKET NO. 09-MD-2047 "L"
 8                             NEW ORLEANS, LOUISIANA
                               WEDNESDAY, OCTOBER 23, 2019, 9:00 A.M.
 9

10

11    THIS DOCUMENT RELATES TO
      ALL CASES
12    ......................................................

13

14       TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                UNITED STATES DISTRICT JUDGE

16

17    APPEARANCES:

18

19    FOR THE PLAINTIFFS'
      LIAISON COUNSEL:         HERMAN HERMAN KATZ
20                             BY:  LEONARD A. DAVIS, ESQUIRE
                                    STEPHEN HERMAN, ESQUIRE
21                             820 O'KEEFE AVENUE
                               NEW ORLEANS, LA  70113

22

23                             LEVIN, FISHBEIN, SEDRAN & BERMAN
24                             BY:  SANDRA L. DUGGAN, ESQUIRE
                               510 WALNUT STREET, SUITE 500
25                             PHILADELPHIA, PA 19106


                  OFFICIAL TRANSCRIPT
```

2

```
 1   APPEARANCES CONTINUED:

 2

 3                    GAINSBURGH BENJAMIN DAVID
 4                    MEUNIER AND WARSHAUER
                      BY: GERALD E. MEUNIER, ESQUIRE
 5                    2800 ENERGY CENTRE
                      1100 POYDRAS STREET, SUITE 2800
 6                    NEW ORLEANS, LA 70163

 7
                      COLSON HICKS EIDSON
 8                    BY: PATRICK S. MONTOYA, ESQUIRE
                      225 ALHAMBRA CIRCLE, PENTHOUSE
 9                    CORAL GABLES, FL  33134

10

11                    LAMBERT & NELSON
                      BY: CAYLE PETERSON, ESQUIRE
12                    701 MAGAZINE STREET
                      NEW ORLEANS, LA  70130
13

14
     FOR THE STATE/FEDERAL
15   COORDINATION COMMITTEE:   LAW OFFICES OF RICHARD J. SERPE
                      BY: RICHARD SERPE, ESQUIRE
16                    580 EAST MAIN STREET, SUITE 310
                      NORFOLK, VA 23510
17

18
     FOR TAISHAN GYPSUM CO.,
19   LTD, AND TAI'AN TAISHAN
     PLASTERBOARD CO., LTD.:   ALSTON & BIRD
20                    BY: CHRISTINA H. EIKHOFF, ESQUIRE
                      ONE ATLANTIC CENTER
21                    1201 WEST PEACHTREE STREET
                      ATLANTA, GA 30309
22

23

24

25
                   OFFICIAL TRANSCRIPT
```

3

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE KNAUF
 4   LIAISON COUNSEL:        BAKER DONELSON BEARMAN
                             CALDWELL & BERKOWITZ
 5                           BY: KERRY J. MILLER, ESQUIRE
                             201 ST. CHARLES AVENUE, SUITE 3600
                             NEW ORLEANS, LA  70170
 6

 7
 8   FOR THE TAISHAN, BNMB
     ENTITIES AND CNBM ENTITIES
     LIAISON COUNSEL:        PHELPS DUNBAR
 9                           BY: HARRY ROSENBERG, ESQUIRE
                             365 CANAL STREET, SUITE 2000
10                           NEW ORLEANS, LA  70130

11

12   FOR TAISHAN GYPSUM CO.,
     LTD, AND TAI'AN TAISHAN
13   PLASTERBOARD CO., LTD.:   ALSTON & BIRD
                             BY: CHRISTINA H. EIKHOFF, ESQUIRE
14                             BERNARD TAYLOR, SR., ESQUIRE
                             ONE ATLANTIC CENTER
15                           1201 WEST PEACHTREE STREET
                             ATLANTA, GA 30309

16

17
                             ALSTON & BIRD
18                           DAVID VENDERBUSH, ESQUIRE
                             90 PARK AVENUE, 15TH FLOOR
19                           NEW YORK, NY  10016

20

21

22

23

24

25
                  OFFICIAL TRANSCRIPT
```

4

```
 1   APPEARANCES CONTINUED:

 2

 3   CHINA NATIONAL BUILDING
     MATERIALS GROUP CORPORATION
 4   AND CHINA NATIONAL BUILDING
     MATERIALS COMPANY LIMITED
 5   (COLLECTIVELY, "CNBM"):  GORDON, ARATA, MCCOLLAM,
                              DUPLANTIS & EAGAN
 6                            BY: EWELL E. EAGAN, JR., ESQUIRE
                              DONNA P. CURRAULT, ESQUIRE
 7                            ALEX B. ROTHENBERG, ESQUIRE
                              201 ST. CHARLES AVENUE, 40TH FLOOR
 8                            NEW ORLEANS, LA  70170

 9

10   ALSO PRESENT:           JACOB WOODY, BROWNGREER
                             SARAH OLSON, PLAINTIFF
11

12

13   OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                               CERTIFIED REALTIME REPORTER
14                             CERTIFIED MERIT REPORTER
                               500 POYDRAS STREET, ROOM B406
15                             NEW ORLEANS, LA  70130
                               (504) 589-7779
16                             Cathy_Pepper@laed.uscourts.gov

17

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
18   PRODUCED BY COMPUTER.
19
20
21
22
23
24
25
                  OFFICIAL TRANSCRIPT
```

## Page 5

I N D E X

PAGE

1  
2  
3  
4  
5  FAIRNESS HEARING ON DECEMBER 11TH, 2019............. 10  
6  INITIAL PAYMENT UNDER THE SETTLEMENT HAS BEEN FULLY  
7  MADE BY TAISHAN.................................... 11  
8  LONG FORM NOTICE WAS MAILED TO EVERY SINGLE KNOWN  
9  CLASS MEMBER....................................... 11  
10 ESTIMATE LETTERS WERE SENT BY BROWNGREER TO EVERY  
11 PLAINTIFF ON THE MASTER SPREADSHEET................ 11  
12 CLASS COUNSEL HAS SET UP A SETTLEMENT WEBSITE,  
13 CHINESEDRYWALLSETTLEMENT.COM, AND A CALL CENTER...... 11  
14 UPDATED MASTER SPREADSHEET BY THE END OF THE MONTH...13  
15 NEXT CONFERENCE IS NOVEMBER 22ND, 2019 ............. 16  

OFFICIAL TRANSCRIPT

## Page 6

1     P-R-O-C-E-E-D-I-N-G-S  
2     WEDNESDAY, OCTOBER 23, 2019  
3     M O R N I N G   S E S S I O N  
4     (COURT CALLED TO ORDER)  
5  
6  
7     THE DEPUTY CLERK:  All rise.  
8     THE COURT:  Be seated, please.  Good morning, ladies  
9  and gentlemen.  
10    VOICES:  Good morning, Judge.  
11    THE COURT:  Let's call the case.  
12    THE DEPUTY CLERK:  MDL 2047, In re:  Chinese  
13 Manufactured Drywall Products Liability Litigation.  
14    THE COURT:  Would counsel make their appearance for the  
15 record, please.  
16    MR. ROSENBERG:  Good morning, Judge Fallon.  
17 Harry Rosenberg, liaison counsel for Taishan, BNBM, and CNBM.  
18    MR. DAVIS:  Good morning, Your Honor.  Leonard Davis on  
19 behalf of the Plaintiffs' Steering Committee.  
20    THE COURT:  We're here today for our monthly status  
21 conference.  The case initially started with numbers of  
22 plaintiffs against numbers of defendants.  The unusual factor  
23 in this particular case is that I had about 20,000 individual  
24 claimants, which is not necessarily unusual or unwieldy, but in  
25 this particular case I had a thousand defendants, which is  

OFFICIAL TRANSCRIPT

## Page 7

1  unusual for this type of litigation.  
2     In any event, the two types of defendants that  
3  were involved in the case were manufacturers, and they were  
4  grouped into the Chinese manufacturers and the German  
5  manufacturers.  The case proceeded against the German  
6  manufacturers, Knauf, first, and it was resolved, settled, so  
7  they are no longer in the case, with the potential exceptions  
8  of one or two individual cases.  
9     The case then proceeded with vigor against the  
10 Chinese defendants, Taishan and others, and the case proceeded.  
11 There were trials and so forth, both state and federal, and the  
12 parties reached an agreement not too long ago.  It's a  
13 class-action settlement agreement, and that's where we are at  
14 this particular point.  
15    I had received a number of letters from  
16 individuals -- individual people, not lawyers -- questioning  
17 various aspects of it, and perhaps I should at least address  
18 what the concept is as best, at least, I can.  
19    Let me say a word about class actions.  Maybe the  
20 complexity of society, nationwide sales, opportunities of goods  
21 and material, instantaneous communication, and perhaps even  
22 lawyer advertising, this has brought about a situation where  
23 the traditional case, the traditional common-law case of one  
24 plaintiff, one defendant has morphed into numbers of plaintiffs  
25 and sometimes numbers of defendants.  Therefore, some vehicle  

OFFICIAL TRANSCRIPT

## Page 8

1  had to be established legislatively and enforced judicially to  
2  deal with this situation where you had multiple plaintiffs,  
3  20,000 individual plaintiffs, with a thousand lawyers, or  
4  thereabouts, filing suit.  
5     The traditional method of one plaintiff, one  
6  defendant -- one lawyer for the plaintiff, one lawyer for the  
7  defendant -- wasn't a vehicle that was able to be handled;  
8  therefore, legislatively a method of dealing with that type of  
9  litigation was created, and it was called a class action.  
10    It was adopted in the Federal Rules of Civil  
11 Procedure 23 to create a class action which created a method of  
12 dealing with litigation that involved multiple parties on at  
13 least one side of the case.  In order to qualify as a class  
14 action, you had to have some commonality.  It just wasn't the  
15 fact that you had a case, you had to have some commonality, and  
16 those commonalities had to preponderate in order for you to  
17 have an opportunity to join together as a class.  
18    The class action has some advantages to it, at  
19 least from the plaintiffs' standpoint, from the litigants'  
20 standpoint.  They can join together, and they can pool their  
21 costs so that it's not one person paying all of the costs.  The  
22 group, in a sense, pays the costs and attorney's fees, pays the  
23 attorney's fees, and they don't do it up front.  They are able  
24 to pool their resources, so to speak.  They have a common  
25 representation.  They are able to collect information more  

OFFICIAL TRANSCRIPT

9

09:07:15 1 easily and house that information more easily, so those are
09:07:22 2 advantages.
09:07:23 3 But there are some disadvantages, and the
09:07:29 4 disadvantages are sort of like a family situation where you
09:07:34 5 have 12 kids, and the turkey comes on the table, and 12 want a
09:07:43 6 drumstick. There are only two. There are two drumsticks, and
09:07:47 7 so if everybody wants a drumstick, they compromise on they get
09:07:53 8 a piece of it. They don't get the whole drumstick. There are
09:07:57 9 not 12 drumsticks on a turkey. That's a disadvantage.
09:08:03 10 Sometimes the disadvantages outweigh the
09:08:07 11 advantages. What to do in that situation. Well, the
09:08:12 12 legislation allows for that. They allow for you to leave the
09:08:16 13 table. You go on your own and get your own turkey, and that's
09:08:27 14 what the opt-out means in this type of litigation.
09:08:34 15 So there are advantages and there are
09:08:36 16 disadvantages, and the litigants are notified of this. They
09:08:41 17 are notified of the dinner, and they can come to the table or
09:08:46 18 they don't have to come to the table. If they don't want to
09:08:49 19 come to the table, though, they have to tell people. They have
09:08:53 20 to say, "I'm not going to be there," so that they don't set a
09:08:57 21 table for you. So you have to say, "I want out. I'm opting
09:09:03 22 out of this litigation," and you have that opportunity.
09:09:08 23 So the notice goes out and everybody is notified
09:09:14 24 of it. They have the opportunity to ask questions of their
09:09:21 25 attorney. Whatever question they have, they have an

*OFFICIAL TRANSCRIPT*

10

09:09:24 1 opportunity to do so.
09:09:26 2 I received a long letter from Mr. Moody, who had
09:09:33 3 a number of questions, but he has met already five or six or
09:09:37 4 seven times with his attorney, and his attorney has endeavored
09:09:41 5 to answer those questions.
09:09:43 6 Sometimes the answers are not satisfactory, but
09:09:48 7 they are answers. If you don't like the answer, you have the
09:09:51 8 opportunity to say, "I'm not coming to the dinner, folks. I'm
09:09:55 9 just letting you know, I'm out," and go to your own place and
09:10:05 10 seek to obtain your dinner.
09:10:06 11 So that's what we're doing, and the notice has
09:10:11 12 gone out, and we are having a last fairness hearing on
09:10:19 13 December 11th, is it, December 11th. Everybody has been
09:10:24 14 notified, and it's very costly to notify everybody, but the
09:10:29 15 class counsel has a duty, and they've extended a lot of
09:10:38 16 resources and time to make sure that everybody was noticed.
09:10:41 17 It seems to me that it's a fair notice. It's an
09:10:48 18 adequate notice. They are doing everything they can. They
09:10:50 19 have call operators to explain what the facts are, what the
09:10:58 20 opportunities are, what the disadvantages are, answer any
09:11:00 21 questions, and so people have an opportunity to do that, and
09:11:06 22 we'll have that hearing.
09:11:08 23 Today I have a status conference just to find out
09:11:13 24 what's happening and what response it's having, so I'll hear
09:11:17 25 from the parties at this time.

*OFFICIAL TRANSCRIPT*

11

09:11:20 1 MS. DUGGAN: Good morning, Your Honor. Sandra Duggan
09:11:23 2 on behalf of the plaintiffs. Your Honor, I would like to
09:11:26 3 report that the initial payment under the settlement has been
09:11:29 4 fully made by Taishan. Those monies are now safely held in the
09:11:34 5 court registry. The notice has gone out, long form notice was
09:11:38 6 mailed to every single known class member and estimate letters
09:11:42 7 were sent by BrownGreer to every plaintiff on the master
09:11:45 8 spreadsheet.
09:11:47 9 Under the settlement and the Court's approval
09:11:50 10 notice, class members had until October 3rd to dispute the
09:11:54 11 information on the master spreadsheet. BrownGreer has received
09:11:57 12 all of the disputes and will be publishing a revised master
09:12:00 13 spreadsheet by the end of this month, and that will go on the
09:12:04 14 docket so everybody can see it.
09:12:06 15 Class counsel has set up a settlement website,
09:12:10 16 ChineseDrywallSettlement.com. We also have a call center that
09:12:14 17 has been functioning, and I believe it's been working very
09:12:18 18 well. On the website itself there has been over 99,000 views,
09:12:23 19 and 72,000 of those have been from new users from all 50 states
09:12:28 20 plus the District of Columbia.
09:12:30 21 As regarding the call center, we've had over 200
09:12:35 22 callers. Class counsel have been returning the phone calls.
09:12:37 23 We have been responding to emails, and we have inquiries from
09:12:40 24 class members from 21 different states.
09:12:42 25 So we feel that the notice is working, people are

*OFFICIAL TRANSCRIPT*

12

09:12:45 1 asking questions, and we are answering all of those questions
09:12:48 2 to the best of our abilities.
09:12:50 3 THE COURT: All right. Anything from defense counsel?
09:12:53 4 MS. EIKHOFF: No. Just to reiterate the report of
09:13:00 5 Ms. Duggan that we do believe that the notice is working and
09:13:03 6 agree that it has been fair and adequate.
09:13:05 7 THE COURT: Okay.
09:13:07 8 Jake, do you want to give me some feel for what's
09:13:09 9 happening?
09:13:10 10 MR. WOODY: Yes, Judge. We did receive the challenges
09:13:14 11 that Ms. Dugan referred to. We've received 109 of them that
09:13:18 12 break down into various categories.
09:13:20 13 THE COURT: What are the major categories of concern?
09:13:22 14 MR. WOODY: The biggest category of concern is the one
09:13:28 15 that affects the dollar values the most, which is people who
09:13:30 16 want to switch from -- they claim that they in Amorin, we have
09:13:34 17 them in Brook, or they are in neither, and they want to be in
09:13:36 18 one of them, but those do affect the claim values the most, but
09:13:40 19 they also are fairly black and white for us to deal with.
09:13:45 20 THE COURT: The square footage, is that an issue?
09:13:48 21 MR. WOODY: Square footage, we did receive some
09:13:50 22 challenges on that. Most of the challenges are for a
09:13:52 23 relatively small amount of square footage, so no matter how we
09:13:57 24 rule on that, it won't really affect the payouts too much.
09:14:00 25 I don't see anything in the challenges that will

*OFFICIAL TRANSCRIPT*

13

09:14:02 1 have a significant impact on the estimates that we've already
09:14:04 2 made because when you have this many people and this much
09:14:08 3 money, it takes quite a bit of shifting to really change the
09:14:11 4 dollar values too much, but we are reviewing them and will
09:14:14 5 issue decisions in an updated master spreadsheet by the end of
09:14:19 6 the month.
09:14:19 7     THE COURT:  Okay.
09:14:21 8     MR. WOODY:  Thank you, Your Honor.
09:14:21 9     THE COURT:  All right.  Anything further?
09:14:23 10     Richard?
09:14:24 11     MR. SERPE:  Good morning, Your Honor.  Richard Serpe
09:14:32 12 for the PFC and class counsel.
09:14:35 13     Late last night around 9:00 p.m. I received an
09:14:38 14 e-mail from one of the Virginia class members, Sarah Olson, and
09:14:41 15 she has requested to briefly address the Court this morning.
09:14:44 16     THE COURT:  Sure.  Ms. Olsen, you're in court?  Would
09:14:48 17 you come forward, please, ma'am.
09:14:50 18     Okay.  I appreciate you being here.  I hope the
09:15:02 19 weather is okay for you to here in New Orleans.
09:15:05 20     MS. OLSON:  Much better than Wisconsin.  Thank you.
09:15:10 21     THE COURT:  Great.  Fine.  Yes, ma'am.
09:15:14 22     MS. OLSON:  I wasn't truly expecting to do this today.
09:15:17 23 I apologize.  I'm on vacation.
09:15:17 24     THE COURT:  That's alright.
09:15:18 25     MS. OLSON:  So when I realized last night that I was in

14

09:15:21 1 the town where this was at, I felt obligated to at least come
09:15:25 2 and watch.
09:15:26 3     THE COURT:  Sure.
09:15:28 4     MS. OLSON:  So I apologize, I didn't prepare very well.
09:15:31 5     THE COURT:  That's okay.  I appreciate you being here.
09:15:36 6     MS. OLSON:  In 2010 my husband and I received a letter
09:15:39 7 from our builder telling us that we had Chinese drywall in our
09:15:44 8 house, and he was on deployment at the time.  We're both Navy
09:15:47 9 veterans.  We graduated from the Naval Academy.
09:15:52 10     I didn't quite appreciate what that meant until I
09:15:54 11 started looking in on it.  At the time we had a
09:15:58 12 two-and-a-half-year-old son who was clearly not developing
09:16:01 13 correctly.  So for us, this has been a very emotional journey.
09:16:06 14 Since then we've had a third child.  We moved out of that house
09:16:08 15 as soon as we could because we were all very ill.
09:16:12 16     We -- I very vividly remember the first time we
09:16:18 17 met with Richard Serpe.  My husband had just finished a tour at
09:16:22 18 the Pentagon in a Chinese think tank, and we were sitting at
09:16:25 19 our dining room table, and he looked over at me he says, "We
09:16:29 20 will never see a penny from this case," just from the culture
09:16:33 21 and what he had learned in that job.
09:16:36 22     So we have been trying hard, not always
09:16:41 23 succeeding very well, in moving on for the past 10 years or so,
09:16:45 24 and every once in a while there is something that comes up that
09:16:48 25 reminds us of the emotional part of this.  But the rational

15

09:16:54 1 part of this we've always tried to keep in the back of our mind
09:16:57 2 that if we ever got something, we would be appreciative that
09:17:02 3 there was something versus nothing.  I can't imagine being in
09:17:05 4 the class of getting very little.
09:17:07 5     We're very fortunate that the lawyers we had
09:17:10 6 worked to put us in the class where we are.  I can't imagine we
09:17:14 7 would ever look at this settlement and think we're whole.
09:17:19 8 There is no way you can take an autistic child and another one
09:17:23 9 with chronic anxiety and say this doesn't affect us every day
09:17:28 10 of our lives.  Financially, we lost almost everything we had
09:17:32 11 trying to compensate for this.
09:17:35 12     I wish I could stand here and say there has got
09:17:38 13 to be a better solution.  I don't have that -- you know, with
09:17:44 14 all these people.  I guess I just want to say that for all of
09:17:50 15 you in this business room, this may not be emotional to you,
09:17:57 16 and there may never be a way to prove what we've had to go
09:18:01 17 through, the emotional, the diagnoses of PTSD, the constant
09:18:07 18 triggers that will follow us through the rest of our life.
09:18:10 19 Every day I wake up and I have to say how am I going to get my
09:18:15 20 son a successful member of society?  You may not be able to
09:18:17 21 capture that when you're making these decisions.
09:18:20 22     Please remember that there are real people behind
09:18:22 23 this, and as much as we can all say something is better than
09:18:28 24 nothing, the amount of money and energy we've expended, you can
09:18:33 25 never compensate us enough.

16

09:18:36 1     I used to look at, you know, people in
09:18:40 2 New Orleans, right, who lived through tragedies such as
09:18:45 3 hurricanes, and we've had houses with trees fall on them in
09:18:47 4 Virginia when we were in the military, there was never really a
09:18:50 5 good solution to this problem.  There wasn't an insurance that
09:18:53 6 helped us.  You know, this is it.  This is all we're going to
09:18:57 7 get.
09:18:58 8     So, I guess what I would say is, yes, more would
09:19:03 9 help, but I appreciate the time and the energy that everybody
09:19:06 10 has put into this, and, frankly, we want to move on with our
09:19:12 11 lives as much as possible.
09:19:15 12     Thank you.
09:19:16 13     THE COURT:  Okay.  Well, thanks for being here.  I
09:19:16 14 appreciate it.  I appreciate your comments.
09:19:21 15     MS OLSON:  Thank you.
09:19:30 16     THE COURT:  Anything further from anyone?
09:19:33 17     Okay.  With that, we'll end the conference then
09:19:38 18 and I'll see you all, when is the next one, November 22nd.
09:19:45 19     Okay.  Anything further?  Thank you all very
09:19:48 20 much.  Court will stand in recess.
09:19:50 21     THE DEPUTY CLERK:  All rise.
22     (WHEREUPON, at 9:19 a.m., the proceedings were
23 concluded.)
24     *   *   *
25

17

1                 REPORTER'S CERTIFICATE

2

3        I, Cathy Pepper, Certified Realtime Reporter, Registered

4   Merit Reporter, Certified Court Reporter in and for the State

5   of Louisiana, Official Court Reporter for the United States

6   District Court, Eastern District of Louisiana, do hereby

7   certify that the foregoing is a true and correct transcript to

8   the best of my ability and understanding from the record of the

9   proceedings in the above-entitled and numbered matter.

10

11             *s/Cathy Pepper*

12             Cathy Pepper, CRR, RMR, CCR

               Certified Realtime Reporter

13             Registered Merit Reporter

               Official Court Reporter

14             United States District Court

               Cathy_Pepper@laed.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25

               *OFFICIAL TRANSCRIPT*

# Exhibit 4

New Orleans City Business March 29, 2018 article:
Judge: Return Chinese drywall lawsuits to original
states"



## Judge: Return Chinese drywall lawsuits to original states

👤 By: The Associated Press   🕐 March 29, 2018   💬 0

Nine years after a judge began supervising a multitude of federal lawsuits that claim homes were damaged by Chinese drywall, he says it's time to return thousands of them for trial in the courts where they were filed.

The panel that put Judge Eldon Fallon in charge in 2009 said the first 1,700 would return to Florida's federal courts if no objections are filed by Thursday. At least three objections were filed Thursday by attorneys for about 750 clients. The filings did not give reasons for the objections.

Those opposing the transfer must file briefs of their arguments by April 12, and responses are due May 3, according to the U.S. Judicial Panel on Multidistrict Litigation's electronic docket.

Fallon ruled in 2010 that Chinese-made drywall released sulfur fumes into homes, sickening occupants, corroding metals in wiring, plumbing, appliances and electronics, and stinking up the houses. In 2013, he approved settlements involving up to 10,000 homes and other buildings with drywall from German-owned Knauf Plasterboard Tianjin Co.

Remaining cases involve a second company, Taishan Gypsum Co. Ltd., which didn't show up in court until Fallon found it in contempt and forbade any of its subsidiaries or affiliates to do business in this country until it participated in court proceedings.

Fallon told the panel he wants to transfer all remaining Chinese drywall cases that were sent to him.

Such requests are unusual: supervising judges resolve the great majority of cases, mostly through settlements, according to a 2014 Louisiana Law Review article by Edward F. Sherman of Tulane University.

"The gold standard, I think, is to get everybody to a point where you can get global peace for everybody," said Louisiana State University law Professor Margaret Thomas.

But when that doesn't happen the cases go to trial, and those trials must be held in the states where the suits were filed.

About 5,000 cases remain from eight states: Florida, Virginia, Louisiana, Alabama, Mississippi, Georgia, North Carolina and California, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee in this case, said Thursday.

Fallon said in a March 12 order and request that he's dealt with all pretrial motions raising common questions, held "bellwether trials" to lead the way, and has approved a formula for calculating property damages.

He wrote that his court "has worked diligently for the past nine years," producing abundant evidence and judicial opinions to enable the original courts and the parties in the lawsuits to steer any unresolved cases "to a fair and just conclusion."

His order and request was accompanied by a 118-page list identifying 1,734 cases comprising one Florida class action. There could be more than 1,000 additional cases in a separate group that includes Florida defendants, Levin said.

Plaintiffs whose cases would be transferred back include Jason and Heather Ancer of Land O Lakes, Florida. Jason Ancer said an inspector who claimed to be a Chinese drywall expert told them their house was fine, but their air conditioner began failing within months after they moved in. Their drywall turned out to have been made by Taishan. Five months after moving in, Heather Ancer became pregnant.

The couple left the house, stopped making payments on it and eventually declared bankruptcy.

"We don't know what to think," said Jason Ancer. "All I know is it seems that definitely we will not have any kind of recourse."

In Facebook groups of people affected by Taishan's drywall, he said people are asking how are individual trials going to do any good if the combined cases can't go forward.

That isn't so, Levin said.

"We as plaintiffs support what Judge Fallon has done," he said. "It's nine years, and the Chinese have tried every tactic to see to it that the people we represent either die or otherwise have their properties disposed of … just trying to frustrate the process."

Levin said the steering committee's attorneys are ready to work with lawyers representing the remaining defendants.

"Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," he said.

Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages, Levin said.

Once the cases return to their originating courts, he said, "The Chinese will be all over America trying cases."

**To sign up for free CityBusiness Daily Updates, click here.**

**Tagged with:** CHINESE DRYWALL   LAWSUIT

11/25/2019                          Judge: Return Chinese drywall lawsuits to original states – New Orleans CityBusiness

Copyright © 2019 New Orleans Publishing Group | 3350 Ridgelake Drive, Suite 281, Metairie, LA 70002 |
Phone: (504)834-9292 E-mail: mail@nopg.com

# Exhibit 5

CISION PR Newswire August 20, 2019 article:
"Plaintiffs' Steering Committee: Settlement
Announced in Decade-Old Chinese Drywall
Litigation Lawsuits"

# Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits

NEWS PROVIDED BY
**Plaintiffs' Steering Committee →**
Aug 20, 2019, 10:21 ET

NEW ORLEANS, Aug. 20, 2019 /PRNewswire/ -- Lawyers for thousands of property owners who alleged that their homes and properties were damaged by defective Chinese drywall filed a motion today asking a federal judge in New Orleans to approve a nationwide settlement of their lawsuits.  The Chinese Drywall Litigation has been ongoing for more than ten years.  The proposed settlement calls for $248 million to be funded by Taishan Gypsum, Co., a Chinese manufacturer of construction products.

Lead counsel for Plaintiffs' Steering Committee, Arnold Levin said that he is, "extremely pleased with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

Today's filing asks the Louisiana court for preliminary approval of the settlement terms and proposes a 90-day plan to notify all property owners who may be eligible for part of the payment.

Lawyers for the property owners estimate that thousands of homes and condominium properties were built using the defective drywall between 2005 and 2008, primarily in Florida, Louisiana, Alabama, Mississippi, and Virginia. The defective drywall has been associated with unpleasant odors and fumes that corrode metals, including air conditioning units, fixtures and other appliances.

Beginning around 2009, multiple lawsuits were filed against manufacturers, suppliers, builders, installers and other defendants alleged to have some involvement in making or supplying the problematic drywall.  The cases were consolidated in a multidistrict litigation case before Judge Eldon Fallon in U.S. District Court for the Eastern District of Louisiana in New Orleans who presided over more than one hundred status conferences and ruled on dozens of motions, including many addressing complex international and immunity law.  Federal courts in Miami, Florida and Norfolk, Virginia have also handled part of the lawsuits in recent months.  An initial set of cases was set for trial before U.S. District Court Judge Marcia Cooke in July, but the outlines of a class settlement were negotiated at a court-ordered mediation in late May.

The proposed settlement filings ask for the court to provide preliminary approval of the agreement, then review the deal again for final approval after a notice period and fairness hearing to occur later this year.  The proposal states that detailed information will be sent to known eligible parties and will be made available to the public in the event the court preliminarily approves the settlement.  If approved, payments from the settlement would be made to known property owners who have participated in the federal court litigation, as well as to any other property owners who can show that they had Chinese Drywall allegedly made by Taishan Gypsum or other participating defendants.

**CONTACT:**

**General/Lead Counsel:**
Arnold Levin
Sandra Duggan
Philadelphia, PA
sduggan@lfsblaw.com
(215) 870-8258

**Florida:**
Patrick Montoya
patrick@colson.com
(305) 476-7400

**Louisiana:**

Steve Herman

sherman@hhklawfirm.com

(504) 232-5154

**Virginia:**

Jeffrey Breit

jeffrey@breitcantor.com

(757) 622-6000

SOURCE Plaintiffs' Steering Committee

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED



**UNITED STATES**
**POSTAL SERVICE** ® | Retail

**P**

US POSTAGE PAID
**$7.35**

Origin: 33990
11/26/19
1130810422-4

PRIORITY MAIL 2-DAY ®

0 Lb 11.60 Oz
**1006**

EXPECTED DELIVERY DAY:  11/30/19

C010

SHIP
TO:
820 OKEEFE AVE
NEW ORLEANS LA  70113-1125

USPS TRACKING® NUMBER



9505 5144 0327 9330 7078 44

**PRIOR**
**MAI**

- Date of delivery specif
- USPS TRACKING™ incl
  international destination
- Limited international ins
- Pick up available.*
- Order supplies online.*
- When used international
  declaration label may be

  * Domestic only



P S 00001000014

EP14F Oct 2018
OD: 12 1/2 x 9 1/2



USPS.COM/PICKUP

FROM: 
Russell F Moody
806 NW 38th Pl
Cape Coral, FL 33993

TO:

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113

This envelope is made from post-consumer waste. Please recycle - again.

# Letter of Objections

to the

## MDL 2047: Chinese-Manufactured Drywall Products Liability Litigation

## Global Settlement Agreement

Submitted on November 26, 2019

by

### Russell F. Moody

Member of Amorin Class

to

Honorable Eldon E. Fallon and Chinese Drywall Counsel

806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 26, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail and Email:
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Via U.S. Priority Mail:
Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse, Coral Gables, FL 33134

The following Objections to the Chinese-Manufactured Drywall Products Liability Litigation, MDL 2047, Global Settlement Agreement, preliminary approval filed on 08/20/19 (Ref. 1), are respectfully submitted by the undersigned, Mr. Russell F. Moody. Mr. Moody and his wife, Beverly L. Moody are members of the Amorin Class. The address of the affected property is 806 NW 38th Place, Cape Coral, Florida, Zipcode 33993. Mr. Moody intends to appear at the Fairness Hearing without counsel[1] and requests that he be allowed to address the Court concerning each of the following Objections during the Hearing.

---

[1] Judge Fallon Ordered that Morgan & Morgan attorney, Mr. Pete Albanis' motion to withdraw as Counsel of Record for Russell and Beverly Moody is Granted, file date: 10/31/19.

The following Objections apply to either the entire Amorin Class, a specific subset of the Amorin Class, all plaintiffs in the Brooke Complaints, or a subset of plaintiffs in the Brooke Complaints as indicated for each of the individual objections presented below.

All documents to be used or offered into evidence at the Fairness Hearing have been identified in the list of references or included as Exhibits in this Letter of Objection.

## Background

The information provided below is accurate to best of the undersigned's knowledge. Due to the protracted nature and complexity of this litigation, and the sparsity of information shared with the plaintiffs by the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels, plaintiffs have often been kept in the dark, having received most of their information from social media such as the Victims of Chinese Drywall closed Facebook group.[2] Therefore, the information provided below may not be fully accurate; however, it is, in the opinion of the undersigned, sufficiently accurate to support the basis for all Objections.

There have been and are a number of different entities representing the defective Chinese drywall plaintiffs including the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels. There have also been several courts involved. For the undersigned, as a Florida resident, the two relevant courts are U.S. District Court, Eastern District of Louisiana, Judge Fallon presiding, referred to below as the "Court", and the U.S. District Court, Southern District of Florida, Judge Cooke presiding, referred to below as the "Cooke Court.". That represents a lot of firepower, firepower that, for nearly a decade, plaintiffs believed was aimed at reaching a fair settlement for the toxic Chinese drywall victims, and ensuring that these victims' rights under the law and under the Constitution were protected. That belief has been badly shaken over the last year.

After the Knauf settlement, over 4,000 plaintiffs remained in the MDL 2047 litigation, a majority are members of the Amorin Class. The following narrative is provided from a viewpoint of the Amorin Class, of which the undersigned is a Class member. However, as will be indicated, some Objections apply across all MDL 2047 plaintiffs, with the exception of those plaintiffs included in the Knauf settlement. A commonality among the Amorin Class members is that each member's home contains defective toxic Chinese drywall and that, as a baseline, all have suffered that same loss damages, i.e. the cost of remediating their home. The actual dollar cost is determined by the size of their home measured in square footage under air, and the regional construction and relocation costs. Relocation costs refer to the expenses associated with moving, storage, and temporary housing during remediation, which typically takes three to four months. There are also additional losses that may apply broadly across the Class members or may apply for a small group of Class members. Another significant commonality is that the plaintiffs' drywall was manufactured by Taishan or its affiliates, at least that's what our Morgan & Morgan attorney has told all his non-Knauf Chinese drywall (CDW) clients from the beginning.

Courts and plaintiffs' attorneys have certain fiduciary responsibilities with respect to ensuring that the rights of plaintiffs are protected, including plaintiffs' rights to be kept fully

---

[2] Class Counsel and our former Morgan & Morgan attorney will likely dispute this, but supporting evidence provided in Exhibits 1 and 2 will substantiate my "sparsity of information" claim.

informed of relevant facts that may be pertinent to the litigation and to be engaged in the decision process particularly with regards to any pretrial settlement negotiations and subsequent agreement.

In fact, failure to inform and seek input from plaintiffs in a pretrial settlement agreement, particularly when that settlement agreement does not fully compensate plaintiffs for their losses may constitute judicial and attorney malpractice.

These fiduciary responsibilities, at least in part, are implicitly and explicitly identified by Class Counsel in "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) addressed to the Cooke Court with a file date of March 8, 2019 (Ref. 2)

While each of the following Objections warrants serious consideration as it provides sufficient grounds to deny final approval of the Settlement Agreement as it is currently written, taken together, Objections A through J present an overwhelming case for denying final approval of the Global Settlement Agreement.

## MDL No. 2047 Objection A – "Parker Waichman" Settlement

This Objection applies to the entire Amorin Class.

The Global Settlement Agreement should not receive final approval until the Class Counsels' concerns regarding the Parker Waichman Settlement Agreement are addressed and adjudicated by an impartial third party.

The "Parker Waichman" Settlement Agreement, aka the "Joint Notice of Settlement Agreement" and the "Small Settlement", appears to Class Counsels to blatantly violate the legal and Constitutional rights of the 498 victims of defective Chinese drywall who were involuntarily and unknowingly included in this Settlement Agreement (Ref. 2). That being the case, it brings into question the Court's motivation for approving the Parker Waichman Settlement Agreement or at least moving it forward, as the case may be. As Class Counsels had predicted (Ref. 2), the Parker Waichman Settlement Agreement also greatly undermined the opportunity for a fair settlement for the remaining Amorin Class members.

Class Counsels Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class, Document 222135-1 (Ref. 2), lays out in detail how the Parker Waichman Settlement Agreement circumvents the MDL process and undermines the Amorin Class Action process. Exhibit 1, the undersigned's letter to Judge Fallon, dated November 13, 2019, provides a summary of the salient issues that Class Counsel has, or at least had with the Parker Waichman Settlement Agreement.

## MDL No. 2047 Objection B – Noncompliance with Fiduciary Responsibility

This Objection applies to the entire Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets as defined in the Allocation Neutral report (Ref. 3)

Neither the Court nor Class Counsel nor the undersigned's former Morgan & Moran attorney has met their fiduciary responsibility with regards to informing and engaging the plaintiffs in this litigation, including during the settlement negotiation process, and after the Court's preliminary approval of the Global Settlement Agreement when each plaintiff must decide to either

accept or opt out of the settlement. The Global Settlement Agreement should not be finalized unless and until all parties have met their fiduciary responsibilities.

Class Counsel clearly articulates these responsibilities in Reference 2. For example, Class Counsel states unequivocally that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan."

Exhibit 2 is the undersigned's October 21, 2019 letter to Judge Fallon including two attachments that together illustrate that Class Counsel and the undersigned's former Morgan & Morgan attorney have not provided information that they are legally obligated to provide.

Exhibit 3 is the transcript of the October 23, 2019 Status Conference. During the Status Conference the Court made the following statement. "I received a long letter from Mr. Moody [the undersigned], who had a number of questions, but he has met already five or six or seven times with his attorney, and his attorney has endeavored to answer those questions. Sometimes the answers are not satisfactory, but they are answers. If you don't like the answer, you have the opportunity to say, 'I'm not coming to the dinner, folks. I'm just letting you know, I'm out,' and go to your own place and seek to obtain your dinner." The problem with this Court statement is that the Court is either wittingly or unwittingly equating responses to answers. It doesn't matter whether a plaintiff has met with his or her attorney five, six, or seven times, or even a hundred times. What matters is whether or not the attorney provides complete and honest answers to the plaintiff's questions. The Class Counsel has not, and the undersigned's former attorney did not and elected instead to withdraw as the undersigned's attorney.

Judge Fallon's "drumstick" analogy is also extremely troubling. It misrepresents and greatly belittles the gross unfairness of the Global Settlement Agreement, equating the plaintiffs, particularly those in the 75% and 20% Buckets, as spoiled brats who stomp away from the dinner table because they didn't get the whole drumstick.

Why would Class Counsel and the undersigned's former attorney refuse to answer questions concerning information relevant to, and possibly pertinent to a plaintiff's decisions, and why would the Court not compel Class Counsel and plaintiffs' attorneys to answer these questions? There are two possible motives. Honest answers to these questions may encourage the plaintiff to opt out, and that's clearly not in the best interest of the Court, Class Counsel, or the plaintiffs' attorneys. Or, honest answers to these questions would expose attorney and/or judicial misconduct or even malpractice.

## MDL No. 2047 Objection C – Fraudulent Motion to the Cooke Court

This objection applies to the Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets. It also impacts all plaintiffs who are included in the Global Settlement Agreement.

The Global Settlement Agreement is built on a foundation of fraud and, therefore, should not receive final approval. The path to the Global Settlement Agreement passed through a key motion to the Cooke Court, signed by Patrick S. Montoya. This motion contains fraudulent

statements that ultimately resulted in discounted settlement offers for all plaintiffs and hugely discounted settlement offers for many.

Neither the undersigned nor any of the CDW victims who posted on the Victims of Chinese Drywall Facebook page were consulted or informed about this critically important Motion. It's not clear whether or not ANY plaintiffs were consulted or informed about this motion.

On August 31, 2018, the "Plaintiffs' Motion and Memorandum of law to Adopt Plan for Resolution of the Florida Amorin Plaintiffs' Claims for Remediation and Other Damages", Document 52 (Ref. 4), was filed with the Cooke Court. The Motion began by stating that "After more than nine years of pretrial proceedings in the MDL and a Class Damages Hearing for all Amorin Plaintiffs, it is time to resolve efficiently and fairly the 1,700 claims for damages to properties in Florida resulting from defective Chinese Drywall. These homeowners deserve to have their day in court as soon as possible." "…it is time to resolve efficiently and fairly" and "These homeowners [Florida Amorin Plaintiffs] deserve to have their day in court as soon as possible." – so far, so good.

The Motion goes on to say "Liability is already established by virtue of numerous defaults entered against Defendants for willfully refusing to appear in the litigation at the outset and orchestrating a plan to avoid the MDL Court's jurisdiction and delay these proceedings. The only issue remaining is the amount of Plaintiffs' damages." – also good news, if only it were true.

Further along the Motion states that "Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 as adjusted by the RS Means location factor." The adjustment for Florida claims ranges from $84.73 to $90.02 per square foot under air.

So, if any plaintiffs had seen this motion, and it's not clear that any plaintiffs' attorneys provided a copy to their CDW clients or even informed their clients about the motion, it would be reasonable for the plaintiffs to assume that Taishan liability has been established and they'd be receiving $105.91 as adjusted by the RS Means location factor with the adjustment for Florida claims ranging from $84.73 to $90.02 per square foot under air. The only thing remaining was to verify that the plaintiff's drywall was one of the twelve covered drywalls based on markings and labels, verify the square footage under air, and verify ownership. Had this been true, as it was portrayed in the Motion, then what followed, even though what followed was a lie, would have been more palatable.

The Motion goes on to say that "Plaintiffs seek to reduce judicial labor and propose that remediation damages – calculated according to a formula approved by Judge Fallon following an evidentiary hearing with expert testimony – should be finalized expeditiously as part of a claims process before a Special Master." This is clearly a bald-faced lie, and it's unreasonable to assume that Judge Cooke didn't know it was a lie.

Had the Special Master's tasks simply been to recommend methods/criteria for verifying square footage, e.g. tax assessor records, proof that the plaintiff has one of the covered drywall types, aka Buckets, e.g. an inspection report by a certified home inspector, and home ownership, e.g. county courthouse, county recorder, city hall records, then the statement in the previous paragraph would have been a little white lie.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

It's understandable that plaintiffs' attorneys in a class action lawsuit have a great deal of latitude in making unilateral decisions without always consulting each individual plaintiff. However, it's well known that class action plaintiffs' attorneys occasionally abuse this power. When the plaintiffs' attorneys blatantly lie to the court about the intent and wishes of the plaintiffs, that crosses a line into misconduct, if not malpractice.

The Motion further states that "These verifications [of square footage, covered drywall and ownership] can be accomplished through a claims process and the use of a Special Master so as not to burden this Court's docket." If product ID were a simply a matter of providing evidence, e.g. inspection report, that one of the covered drywall types (Buckets) exists in the home, then "verifications" and "claims process" would have been appropriate. In the quoted statement above, the authors, either wittingly or unwittingly, obfuscated what they knew the real product ID issue to be[3]. Presenting product identification as an issue equivalent to square footage and ownership is disingenuous at best and brings the intentions of the Motion's Movers and the Cooke Court into question, a question that needs a satisfactory answer before final approval of the Global Settlement Agreement.

The Motion's Conclusion states, in part, that "Plaintiffs' counsel and the Plaintiffs' Steering Committee in the MDL have collaborated and cooperated to compile the detailed and substantial evidence supporting Plaintiffs' damages claims, to which Defendants have had full access for many months." There are two points here. First, is the reference to "Plaintiffs' counsel", clearly drawing a distinction between references to the intentions of the plaintiffs themselves and the plaintiffs' counsel. This underscores the lies in this Motion. Second, the plaintiffs' counsel claims to have detailed and substantial evidence supporting Plaintiffs' damages claims, evidence that Class Counsel now refuses to provide to plaintiffs in violation of Class Counsel's fiduciary responsibility.

## MDL No. 2047 Objection D – Inclusion of Inadmissible Evidence

This Objection applies to all plaintiffs included in the Global Settlement Agreement; however, it is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

Final approval of the Global Settlement Agreement should be denied due to the Allocation Neutral's consideration of inadmissible evidence in establishing the allocation of funds.

The Allocation Neutral was provided numerous documents pertaining to Product ID. Most of these documents are related to the Special Master appointed by the Cooke Court. Neither the Special Master's reports nor the plaintiffs' attorneys' objections to those reports have been adjudicated. Therefore, these documents should be ruled inadmissible in providing any basis of allocation by the Allocation Neutral.

In fact, the large number, and nature of the documents provided to the Allocation Neutral raises a red flag concerning the expansive role assumed by the Allocation Neutral and the likelihood that the Allocation Neutral is noncompliant with the Global Settlement Agreement.

---

[3] It turns out that, according to the Global Settlement Agreement, "product identification" is simply proof that drywall found in a plaintiff's home is one of the covered drywall types (Buckets).

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## MDL No. 2047 Objection E – Violations of the Global Settlement Agreement

This Objection applies to all plaintiffs included in the Global Settlement Agreement, but is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

The approval of the Global Settlement Agreement should be denied because the terms and conditions of the Agreement have been violated at least with respect to the Product ID basis for allocation of funds.

The Settlement Agreement states on page four that "**WHEREAS**, without conceding the correctness of any other Party's legal position, claims and/or defenses, the Parties wish to avoid the effort, expense and risk of continued litigation;"

So, neither Taishan's position that it may not have manufactured, or did not manufacture a particular covered drywall, nor the Plaintiffs' attorneys', including the PSC and Class Counsel, position that Taishan did, in fact, manufacture all covered drywall should be considered in the Allocation Model.

This matter becomes even more perplexing because on page 35 of the Settlement Agreement it states that "Taishan shall not be involved in the allocation or distribution of the Settlement Funds." So, per the Settlement Agreement, the Plaintiffs' attorneys are not conceding that Taishan may not have manufactured all covered drywall. And, Taishan is not involved in the allocation or distribution of funds. Therefore, it was strictly the Plaintiffs' attorneys' decision, and possibly the Court's as well, that Taishan's position on whether it did, may have, or didn't manufacture certain drywall Buckets would be a factor in the allocation of funds, despite the Plaintiffs' attorneys' position that all covered drywall was manufactured by Taishan. And so, the Plaintiffs' attorneys are, in fact, conceding that Taishan may not have manufactured covered drywall in Buckets D, I, and J, and Taishan didn't manufacture covered drywall in Buckets B, C, F, G, and L.

But it gets even worse. On page 21-22 of the Settlement Agreement it states that "The review, determination and approval of the Allocation Model by the Court shall be final and binding on the Parties and the Class. There shall be no right of appeal of the approval of the Allocation Model to any other court, including the U.S. Court of Appeals for the Fifth Circuit, such right of appeal having been knowingly and intentionally waived by each Settlement Class Member." So, if a plaintiff opts in but objects to this, quite possibly unlawful allocation model, and the Court dismisses that objection, it's not appealable. What the Plaintiff's attorneys and the Court have done is make the most objectional aspects of this settlement agreement unappealable. Why would they do that?

The only plausible explanation is that the Court and the Plaintiffs' attorneys know that they've agreed to a grossly unfair settlement. So, they've structured the settlement so that those who get the least net amount of funds are also those who are the least likely to opt out. Then they've further structured the settlement to put in place additional disincentives to opt out for those receiving the least. For example, as stated above, according to the Settlement Agreement including the Allocation Model, the plaintiffs' attorneys have conceded that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, a concession that violates the terms of the Settlement Agreement. And, if the Court approves this Settlement Agreement, it will have ruled that, in fact, Taishan did not manufacture drywall in Buckets B, C, F, G, and L, slamming the door shut on any real possibility that plaintiffs in Buckets B, C, F, G, and L who opt out could successfully sue

Taishan. Why would they do that? Because it's in the best interest of the Court, the Class Counsel, and the plaintiffs' attorneys to limit opt outs.

This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing miserably in that regard.

## MDL No. 2047 Objection F – Product Identification Means Proof of Covered Drywall

This Objection applies to all plaintiffs who are in the 75% Buckets D, I, and J, and the 20% Buckets B, C, F, G, and L.

In treating "Product Identification" as anything different than how it's defined in the Settlement Agreement, which the Allocation Neutral has done is a violation of the Settlement Agreement. Therefore, approval of the Settlement Agreement should be denied.

The Settlement Agreement states on page 13 that "Objective Allocation Criteria. 'Objective Allocation Criteria' shall mean the objective criteria that form the basis for the allocation of Settlement Funds among Eligible Class Members pursuant to the Allocation Model developed by the Allocation Neutral, subject to Court approval. The Objective Allocation Criteria shall include, but not be limited to: (i) Under Air Square Footage of the subject Affected Property (ii) **Product Identification** [emphasis added], (iii) Affected Property Ownership Status, (iv) Affected Property Remediation Status, (v) Set-Offs, (vi) Assignments of Class Members' rights to pursue Claims, and (vii) whether the claimant is an Amorin Plaintiff or a Brooke Plaintiff, or an absent Class Member. The Allocation Neutral may add additional Objective Allocation Criteria to the Allocation Model that will be submitted for Court Approval."

The Settlement Agreement states on page 14 that "Product Identification. 'Product Identification' shall mean the proof of Covered Chinese Drywall in the subject Affected Property, as defined in Section 1.12."

On page 11 of the Settlement Agreement "Covered Chinese Drywall. 'Covered Chinese Drywall' shall mean all drywall products alleged to be attributable to Taishan and/or the Additional Released Parties, including, but not limited to those products identified in the Taishan Product ID Catalog (See MDL Rec. Doc. 22152-3 and S.D. Fla. ECF No. 155-2) and as set forth in Exhibit 2: (A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K) Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. Covered Chinese Drywall excludes the following drywall products: Knauf, Knauf Tianjin, KPT, Bedrock, ProRoc, Panel Rey, IMG, USG, Shamrock Gold, Lafarge, Georgia Pacific, National Gypsum, and any drywall manufactured outside of the People's Republic of China."

So, for the Allocation Neutral to treat Product Identification as anything other than proof that the drywall is a covered drywall as defined by the Settlement Agreement is a violation of the Settlement Agreement.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## MDL No. 2047 Objection G - Compensation for All Remediation Damages

This Objection applies to all plaintiffs included in the Global Settlement Agreement.

The Global Settlement Agreement should be rational, reasonable, and consistent, including recognition of the fixed settlement amount agreed to by Taishan, i.e. $248M, and the prospect of compensating all plaintiffs for all property and remediation damages, which is zero.

Yet, on page 21, the Settlement Agreement states that "The Allocation Amount is intended to provide compensation for **all** [emphasis added] property and remediation damages as well as Other Losses." This brings the entire Settlement Agreement into question, and is therefore a basis for denying final approval of the Agreement.

## MDL No. 2047 Objection H – Insufficient Media Outreach

This Objection applies to all potential Absent Class Members.

There are serious doubts that the Settlement Agreement's terms and conditions for media outreach, as defined on pages 24 and 25 have been met. Therefore, the final approval of the Global Settlement Agreement should be denied, or at least delayed in proportion to the delays in meeting the Global Settlement Agreement's media outreach terms and conditions.

## MDL No. 2047 Objection I – Awards to Ineligible Plaintiffs

This Objection applies to all plaintiffs in the 100% Buckets A, E, H, and K.

If the Court approves the Global Settlement Agreement, including the Allocation Neutral Model as written, the Court will have ruled that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, and plaintiffs in these Buckets deserve no compensation. Since these plaintiffs are being awarded 20% of a yet-to-be-determined baseline amount, the final approval of the Global Settlement agreement should be denied.

The Allocation Neutral has decided to award 20% to plaintiffs with drywall in Buckets B, C, F, G, and L, essentially giving these plaintiffs a "participation trophy" award. There is no basis in law requiring or allowing plaintiffs to receive an award settlement on the basis of their participation in the litigation alone in a lawsuit. Given the fixed amount that Taishan has agreed to, i.e. $248M, giving out participation trophy awards to the 20% plaintiffs is unlawfully depriving the 100% plaintiffs of funds that should have been awarded to them. Participation trophy awards are appropriate in pre-teen soccer leagues, they are not appropriate in a court of law.

## MDL No. 2047 Objection J – Nefarious Intentions and Misinformation

This Objection applies to all plaintiffs in the Global Settlement Agreement.

Information provided to the undersigned by his former Morgan & Morgan attorney, Pete Albanis, and public statements made by attorney Arnold Levin, Lead Counsel for the Plaintiffs' Steering Committee and Class Counsel for the Global Settlement Agreement appear to be at odds with the Global Settlement Agreement. The Global Settlement Agreement should not receive final approval unless and until the incongruency between what plaintiffs' attorneys are saying and what's in the Global Settlement Agreement are satisfactorily resolved.

The undersigned's former Morgan & Morgan attorney, Pete Albanis, stated that it was Taishan that proposed a pretrial settlement during secret negotiations at the Cooke Court mandated mediation, that Taishan first proposed settling cases for those plaintiffs scheduled for trial in July

2019, and when the plaintiffs' attorneys agreed, Taishan proposed including all 1,734 Florida plaintiffs, and when the plaintiffs' attorneys agreed, Taishan proposed that the pretrial settlement resolve all cases nationwide.

In a New Orleans City Business article, published in March 2018 (Exhibit 4), attorney Arnold Levin is quoted as saying "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," and "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages," and "The Chinese will be all over America trying cases."

Later, in a CISION PR Newswire article, published in August 2019 (Exhibit 5), attorney Arnold Levin is quoted as saying he is, "**extremely pleased** [Emphasis added] with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

So, a lead counsel for the plaintiffs believes that a large jury-award (big verdict) is needed to provide a fair settlement, and he also believes that a big verdict is definitely collectable. Yet, if you believe Mr. Albanis, somehow the plaintiffs' attorneys had their arms twisted into accepting an extremely lowball offer from Taishan. But the Global Settlement Agreement contradicts this scenario.

The Global Settlement Agreement paints a different scenario. The Settlement Agreement on page 3 states "**WHEREAS**, Settlement Class Counsel has made a demand on Taishan to settle all Chinese Drywall claims of Class Members against Taishan and the Additional Released Parties;" So, according to the Settlement Agreement, the plaintiffs' attorneys were the party demanding a pretrial settlement, a settlement that falls $1 Billion short of a fair settlement for the plaintiffs.

## Conclusion

The plaintiffs in this drawn out litigation are not spoiled brats who want the whole drumstick, as Judge Fallon suggests. They are the victims. They were victimized by the Chinese who manufactured the toxic drywall. They were victimized by the construction industry that covered up the problem and continued to install toxic drywall. They were victimized by our elected government officials who promised over and over again to help but never did. They are the victims of our judicial system that failed to protect their rights. And finally, they are now being victimized by their own attorneys who are putting their self interest ahead of their clients. It's also worth pointing out that toxic Chinese drywall is a "gift" that keeps on giving. Rather than suffer foreclosure and/or bankruptcy, many victims have been living in their toxic homes for over a decade.

Respectfully Submitted to the Court.

Russell F. Moody

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## List of References

1. CLASS SETTLEMENT AGREEMENT WITH TAISHAN GYPSUM COMPANY LTD., F/K/A SHANDONG TAIHE DONGXIN CO. LTD. AND TAIAN TAISHAN PLASTERBOARD CO. LTD., Document 22305-2 Filed 08/20/19
2. Class Counsels Memorandum of Law In Support of Rule 23(d) Motion to Protect The Amorin Class, Case 2:09-md-02047-EEF-JCW Document 22135-1 Filed 03/08/19
3. CHINESE DRYWALL LITIGATION SETTLEMENT: ALLOCATION MODEL AND ALLOCATION NEUTRAL REPORT, Document 22304 Filed 08/19/19
4. PLAINTIFFS' MOTION AND MEMORANDUM OF LAW TO ADOPT PLAN FOR RESOLUTION OF FLORIDA AMORIN PLAINTIFFS' CLAIMS FOR REMEDIATION AND OTHER DAMAGES, Document 52 Entered on FLSD Docket 08/31/2018

## List of Exhibits

1. Exhibit 1: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon, dated November 13, 2019
2. Exhibit 2: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019
3. Exhibit 3: TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS HEARD BEFORE THE HONORABLE ELDON E. FALLON UNITED STATES DISTRICT JUDGE, October 23, 2019
4. Exhibit 4: New Orleans City Business March 29, 2018 article: Judge: Return Chinese drywall lawsuits to original states"
5. Exhibit 5: CISION PR Newswire August 20, 2019 article: "Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits"

# Exhibit 1

Mr. Russell Moody letter to the Honorable Judge
Eldon E. Fallon, dated November 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 13, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail, and E-Mail
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA 70130

Your Honor,

This is a follow-up letter to my letter the Court dated October 21, 2019 (Ref. Document 22346) in which I asked the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision, and to extend the November 27, 2019 deadline due to Class Counsels' and my Morgan & Morgan attorney, Pete Albanis' unwillingness to provide the above referenced information, information that they have a fiduciary responsibility to provide (Doc. 22135-1, page 4).

Class Counsel continues to ignore my requests for all relevant information that may be pertinent to our opt in/opt out decision. Morgan & Morgan and our attorney, Pete Albanis, recently cited irreconcilable differences in a, now Court approved, motion to withdraw as our counsel. The only "irreconcilable differences" we had with Morgan & Morgan is that we sought information from Morgan & Morgan that is clearly relevant and that may be pertinent to our opt in/opt out decision, and Morgan & Morgan chose to withdraw as our counsel rather than provide it.

In "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) Class Counsel raised serious concerns and objections to the "Joint Notice of Settlement Agreement" (Doc. 22125), aka "Rogue Settlement", presented to the Court by Parker Waichman, Milstein, Jackson, Fairchild & Wade, Whitfield, Bryson & Mason, Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, and Taishan (Joint Notice Counsel). Class Counsel expressed concerns that the Rogue Settlement sought to settle at severely discounted rates without adequate communication with settling attorneys' clients (Doc. 22135-1, page 3). I would like to point out to the Court that Class Counsel is now seeking to settle for severely discounted rates, having reached a secret settlement agreement without any communication with the affected Class members.

Class Counsel stated that Chinese drywall victims should receive compensation for their damages and that the Rogue Settlement may have a direct negative impact on the Amorin Class members who want full compensation for their damages (Doc. 22135-1, page 4). Class Counsel also asserts that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan." (Doc. 22135-1, page 4). Class Counsel has reached a settlement agreement for severely discounted compensation, and has not provided the undersigned with all relevant information that may be pertinent to our opt in/opt out decision. It is also not clear that Class Counsel has met its fiduciary responsibility with regards to providing any Class members with this information.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 11) Class Counsel states that "it is far from clear whether [the Rogue Settlement] was accomplished with a full and complete disclosure of facts and information to [the subset of Class members included in the Rogue Settlement]." What is clear is that Class Counsel itself negotiated a secret settlement agreement without any disclosure of facts and information to Class members.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1 pages 11-12) Class Counsel states that "To begin, the proposed settlement disregards this Court's formulaic method for calculating damages, by only allowing for the Florida Amorin cases a maximum, ironically referred to as a 'baseline,' of $60 per square foot for drywall with a limited sub-set of Taishan/Tiahe markings to current owners and former owners ... Other Class members would be subject to steep discounts up to 80%. However, Judge Cooke's Order of November 16, 2018, adopted all of this Court's well-reasoned findings, making any discount, especially the deep discounts agreed to by the Joint Notice Counsel, inappropriate." Ironically, Class Counsel later adopted discounts similar to, and possibly greater than the "inappropriate" Rogue Settlement discounts.

In Class Counsels' objection to the Rogue Settlement (Doc. 2135-1, page 13) they state that "The plain wording of the Rule authorizes a Class Notice relating to "any step in the action." The operative consideration in issuing Rule 23(d)(2) corrective and injunctive orders18 is the court's unique fiduciary role to protect the legal rights and interests of class members, and its institutional interest in controlling "the fair conduct of the action." Yet Class Counsel neglected its fiduciary responsibility to its Class members and, instead, misrepresented Class member interests and desires to the Court.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 15) Class Counsel raises concerns that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." Unfortunately, Class Counsel and, I believe many, if not most plaintiffs' attorneys are providing "one-sided" information to Class members to discourage them from opting out.

Class Counsels' nearly wholesale adoption of all the objectionable actions and inactions of the Joint Notice Counsels' Rogue Settlement is, I believe, clear evidence that Class Counsel is putting its self-interests, and possibly the interests of the Courts before the interests of the plaintiffs, i.e. toxic Chinese drywall victims. That Morgan & Morgan decided to withdraw from representing Beverly Moody and the undersigned, which the undersigned believes Morgan & Morgan did to avoid its fiduciary responsibility to provide all relevant information that may be

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

pertinent to our opt in/opt out decision I believe underscores the serious magnitude of the plaintiffs' attorneys' conflict of interest with their clients.

Class Counsel and the undersigned's attorney, before he and Morgan & Morgan withdraw from representing the undersigned, provided multiple responses to the undersigned's requests for relevant information that may be pertinent to our opt in/opt out decision. Unfortunately, those responses have, at best, been only partially responsive to those information requests.

In particular, the undersigned has repeatedly requested all relevant information pertaining to any and all evidence that Taishan manufactured ProWall, including information that was available to Morgan & Morgan and PSC in June 2010 when the undersigned retained Morgan & Morgan, as well as the additional evidence that was accumulated throughout this litigation.

The undersigned has also repeatedly requested relevant information related to collectability. In a March 29, 2018 article published in the New Orleans City Business, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee stated that "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict" and that "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, … those companies' assets in this country can be attached if Taishan ignores court orders to pay damages." So, attorney Levin believed on March 29, 2018 that a fair jury trial award against Taishan was definitely collectable. Then, just five months later, attorney Levin totally undermined that strategy when his name appeared on a motion to the Cooke Court (Doc. 52) claiming that the "Plaintiffs seek to reduce judicial labor and propose that remediation damages … should be finalized expeditiously as part of a claims process before a Special Master."[1] This apparent PSC change in strategy is clearly relevant to collectability and, therefore, relevant and pertinent to the opt in/opt out decision. Yet, the Class Counsel refuses to address this issue.

The undersigned believes that the actions of his former attorney and Class Counsel are intended to obstruct justice and to run out the clock as the November 27th deadline rapidly approaches.

In view of the foregoing, the undersigned respectfully submits the following requests to the Court.

- Allow plaintiffs to submit Objections directly to the Court and order Class Counsel to update the Chinese Drywall Settlement Information Website (https://www.chinesedrywallsettlement.com) and notify all plaintiffs of this change. Requiring plaintiffs to submit objections to Class Counsel is akin to requiring plaintiffs' attorneys to submit all motions to Taishan. The undersigned believes that requiring plaintiffs to submit objections to Class Counsel is prejudicial against the plaintiffs for reasons discussed above, and is underscored by attorney Duggan's email to the undersigned stating "At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances

---

[1] This statement appears to clearly be a lie. Although the undersigned understands that, in a class action, attorneys have wide latitude in representing the plaintiffs' interests, he doesn't believe that these attorneys have the authority to knowingly lie about the plaintiffs' intentions and desires.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court." So, according to Ms. Duggan, it's not even clear that the Court will receive objections except as an attachment to Class Counsels' "unified" response submitted to the Court.

- Compel Class Counsel to immediately provide all plaintiffs with all relevant information that may be pertinent to each plaintiff's opt in/opt out decision. While some required information will be common across all plaintiffs, some will not. As a minimum, different information is required depending on which of the 12 Buckets a plaintiff is in based on the markings and labels found on drywall in that plaintiff's home.

- Extend the November 27th deadline. The deadline for opting in or opting out, and filing an Objection is only two weeks away from the date of this letter, leaving insufficient time for plaintiffs to obtain and consider the information that they require and deserve in order to make an informed decision. Class Counsel is trying to run out the clock. I implore the Court to not be complicit in allowing Class Counsel to do that.

- Allow plaintiffs who have objections to defer their opt in/opt out decision until their objects have been presented to the Court and the Court has ruled on those objections. Requiring plaintiffs to opt in in order to object is basically saying you have to accept the deal to object to it. At the very least, this gives the appearance that allowing objections and holding a "Fairness" Hearing is all for show.

- Provide the undersigned, who is no longer represented by an attorney, with all documentation in the Courts' possession that is relevant and may be pertinent to the opt in/opt out decision, particularly information relevant to ProWall victims.

- Enter this letter into the Court Record.

As a final note, this litigation has been horribly complex and a terrible decade-long strain on the toxic Chinese drywall victims; however, one thing is perfectly clear. This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing to do that.

Respectfully,

Russell F. Moody

Russell Moody

# Exhibit 2

Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

October 21, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

My wife, Bev, and I are members of the Amorin Class. We have ProWall Chinese drywall putting us in one of the five "20%" Buckets. We need at least $65/SqFt to cover remediation costs. If we opt in, we'll likely get less than $10/SqFt.

I have sent emails addressed to, or copied to the Court via Mr. Dean Oser. I am writing this letter to you, in part, because Mr. Oser informed me that the most proper fashion to address the Court would be to write a letter to you. The problem with "snail mail" is that the lag time precludes timely resolution of critical matters prior to Court imposed deadlines.

While we intend to raise several serious objections should we opt in, including the unlawful denial of our Constitutional right to a jury trial, our immediate concern is our opt in/opt out decision. Class Counsel and our attorney are refusing to provide all relevant information that may be pertinent to our decision. Attachment 1 is my latest request for information. Attachment 2 is a string of email exchanges with Class Counsel in my unsuccessful attempts to get relevant information. I have also exchanged numerous emails, had phone calls, and face-to-face meetings with my attorney, Mr. Albanis, Morgan & Morgan, to no avail.

Also, I've gotten conflicting answers, but no specific information on the role Product ID played in the secret settlement negotiations, information that is clearly relevant to our opt in/opt out decision.

I believe that the problem I'm facing, and I see other plaintiffs facing, is due, at least in part, to the conflict of interest of Class Counsel and plaintiffs' attorneys who, I believe, have clearly put seeing this Settlement approved before the best interests of their clients.

I ask the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision.

I also ask the Court to extend the November 27, 2019 deadline due to the delays that plaintiffs have encountered in getting relevant information from Class Counsel and their attorneys that may be pertinent to their opt in/opt out decision.

Respectfully,

Russell F. Moody

Russell Moody

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 15, 2019 6:59 PM |
| **To:** | 'Sandra L. Duggan'; 'Arnold Levin'; 'SHerman@hhklawfirm.com'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'Dean_Oser@laed.uscourts.gov' |
| **Cc:** | 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier' |
| **Subject:** | MDL #2047: Relevant information bearing on opt in - opt out decision |
| | |
| **Importance:** | High |

Dear Class Counsel and Judge Fallon Court,

I am reaching out to Class Counsel in accordance with Judge Fallon's recent Order regarding communications with the Court during the Class Notice period: Document 22340, filed on October 9, 2019.

I am also reaching out to the Court with regards to the abovementioned Order.

I believe that it is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan. I know that Class Counsel agrees with me on this [MDL 2047, Document 22135-1].

I also believe that, thus far, neither the Court nor the Class Counsel have been fully responsive to the abovementioned responsibility.

I am speaking here on behalf of my wife, Bev, and myself, as well as all other MDL 2047 "Large Settlement" plaintiffs, particularly those falling in the 75% and 20% Buckets. However, my comments below specifically address those plaintiffs with toxic Chinese drywall where the drywall inspection report found ProWall markings/labels, typically on a very few drywall boards. Without visual evidence collected during the initial drywall installation or visual evidence collected during remediation, it's impossible to know whether or not toxic Chinese drywall with non ProWall markings/labels also exists in the home. A friend's inspection report also found ProWall, putting him in the 20% Bucket. Fortunately for him, when his home was very recently remediated, toxic Chinese drywall in the 75% Bucket was also found, just in time to meet the October 3, 2019 deadline for updating the spreadsheet.

We retained Morgan & Morgan in June 2010. For nearly a decade my wife, Bev, and I were told that our toxic Chinese drywall was manufactured by Taishan. "You are receiving this email because you have Chinese Drywall manufactured by Taishan in your home" a November 28, 2011 email from Morgan & Morgan states. Clearly, Morgan & Morgan, and by extension the PSC, must have had solid evidence at that time that Taishan manufactured ProWall, solid enough to withstand a challenge in a jury trial. It's also clear that we would not have been included in the Amorin Class Action had there not been equally, if not stronger solid evidence at that time that Taishan manufactured ProWall. Just one source of evidence, according to our attorney, involves the gypsum mine used by Taishan, although he provided insufficient details to affect our opt in – opt out decision.

We need to obtain from the Court and/or the Class Counsel all relevant information that may be pertinent to Taishan's alleged manufacture of ProWall in order to make an informed decision on opting in or opting out, i.e. information in the Court's and/or Class Counsel's possession between June 2010 and today that is relevant to what the ProWall plaintiffs' attorneys knew, when they knew, and how they knew (evidence) that Taishan manufactured ProWall.

Another critical factor in making an informed decision on opting in or opting out is collectability. In a March 25, 2018 news article, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict is needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA can be used as leverage to force Taishan to pay that fair award – definitely collectable the PSC said. Then, only four months later (August 30, 2018), attorney Levin's name is included on a motion filed with the Judge Cooke Court that asked the Cooke Court to forgo a trial in favor of a Special Master. Clearly something significant happened with regards to collectability between March and August 2018. What changed?

The above requested information, and any other relevant information in the possession of the Court and/or the Class Counsel that may be pertinent to the opt in/opt out decision, is needed by us, and all other ProWall plaintiffs, in order to make an informed opt in – opt out decision.

Thank you for your attention to this critical matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

10/20/2019                              RE CDW Settlement Issues and Concerns.htm

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 08, 2019 4:45 PM |
| **To:** | 'Sandra L. Duggan' |
| **Cc:** | 'SHerman@hhklawfirm.com'; 'Arnold Levin'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier'; 'Dean_Oser@laed.uscourts.gov' |
| **Subject:** | RE: CDW Settlement Issues and Concerns |

Ms. Duggan,

I never doubted that you understood that my wife, Bev, and I, and most plaintiffs, particularly the "75% and 20% Bucket" plaintiffs, are deeply disappointed, not just in the anticipated outcome, but more so that we were apparently betrayed by our own attorneys and the Courts.

Although we feel that we have every right to be disappointed and very angry, my emails to you were not about disappointment and anger, even though that disappointment and anger may have shown through, and for that I apologize. My emails were about getting essential feedback and support from the attorneys supposedly representing us in this litigation. I'm not looking for rationalizations on why we should accept what is admittedly a horrible settlement offer. I'm looking for the facts that allow us to make an informed opt in /opt out decision, and to possibly allay concerns we have about how this litigation unfolded and ended up crashing and burning for many, if not most, plaintiffs.

What I don't understand is why the Class Counsel and my attorney are withholding information from the plaintiffs that is critical to our opt in / opt out decision. While I and other plaintiffs are questioning certain actions taken by the PSC, Class Counsel, and our attorneys, as well as the Courts, actions that many plaintiffs believe constitute misconduct, malfeasance, and possibly malpractice, our immediate and biggest concern is whether we should opt in or opt out. It's clear that you are withholding critical information from us. Why would you do that? I think in order to coerce as many as possible into opting in to a grossly unfair settlement offer.

I assume that you're pleading the 5th on the questions and concerns I raised. If not, I would still like you to address those questions and concerns. If you're not the right person to address those questions and concerns, please direct me to the right person.

Thank you for your consideration of this serious matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 2:53 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;

Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody: I understand that you are disappointed.  We wish you the best of luck in whatever course of action you decide to take.


Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Tuesday, October 8, 2019 2:17 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for your lengthy response. Honestly, to me, it appears to be a great legal rationalization for your actions, some of which raise serious concerns, particularly with regards to certain toxic Chinese drywall clients. I will, however, review your comments in detail and give serious consideration to your assertions.

Are you disputing the factual evidence of your about face?

Unfortunately, your responses don't fully address the specifics, or in some cases don't jibe with the facts related to our main concern: understanding/obtaining the evidence that Taishan manufactured ProWall. I'm hopeful that Mr. Albanis will provide us that evidence during our meeting this Thursday. However, The PSC and all the individual plaintiffs' attorneys must have had solid evidence that Taishan manufactured ProWall or they would not have included their ProWall clients, or their other "20% Bucket" clients, in the Amorin Class Action in the first place. Perhaps you can provide some insight into that. One explanation that appears to be supported by at least two plaintiffs' attorneys' comments is that Judge Fallon decided to only include Taishan as a Chinese drywall manufacturer defendant. Is that true? If so, what was Judge Fallon's rationale for that decision? If not, who decided to focus only on Taishan, and why?

It's recently come to light for many plaintiffs that there are multiple objectionable aspects concerning this litigation and the grossly unfair settlement agreement, all of which need to be addressed, including the plaintiffs' attorneys' fraudulent motion requesting a Special Master in lieu of a jury trial. However, our immediate concern is obtaining all evidence that Taishan manufactured ProWall, evidence that was available a decade ago, and the additional evidence acquired since then. If the only evidence that Taishan manufactured ProWall is what's contained in the Special Master's Product ID report, that I assume was provided to the Special Master by Mr. Albanis as the PSC's lead attorney on ProWall, that is a monumentally huge problem.

I just want honest answers to what I believe are legitimate and critical questions, the answers to which will bear heavily on our opt in /opt out decision.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 1:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns


Dear Mr. Moody:

For over ten years we have fought hard on behalf of all Plaintiffs to prosecute the claims against Taishan and its parent companies. As you know, Defendants challenged jurisdiction, service of process, liability, and damages. We adopted a coordinated, comprehensive approach in our litigation strategy among all jurisdictions where Chinese Drywall cases were pending, which continued following the remand of *Amorin* cases to Florida and Virginia, and, therefore, we dispute your characterization of any "about face." The likelihood of getting a jury verdict is generally reflected in the Allocation Model: If you fall into a Product ID Bucket for which the independent Court-appointed Special Master ruled there is insufficient evidence linking that drywall to Taishan, you have a much less likely chance of being able to present your case to the jury. Similarly, if you were a *Brooke* Plaintiff (and we know you are an *Amorin* class member), you generally would have a greater chance that your case will be dismissed on statute of limitations grounds. As to the ability to enforce a judgment, we have no way of predicting what Taishan may or may not do. All we know is that (i) we don't have the same types of enforcement mechanisms that would be available to us vis-à-vis a U.S. Corporation, (ii) Taishan, in the past, left the litigation after jurisdiction was established, and (iii) there is an appeal pending before the U.S. Fifth Circuit that may result in the dismissal of Taishan's parent companies, CNBM, BNBM Group, and BNBM, which would greatly limit (if not completely eliminate) the available potential

assets in the U.S. that could be seized.  We understand that you are disappointed with the Special Master's ruling on Product ID.  We presented all relevant Product ID evidence to the Special Master, and argued in favor of attributing all Product ID categories to Defendants.  But, unfortunately, with respect to several of the Product ID Buckets, which had lesser proofs of Product ID attribution to Taishan and/or BNBM, the Special Master saw it differently.  Yes, there is a right to appeal, which we were in the process of pursuing.  But there is a good chance that the Court will see things the same way as the Special Master.  Nevertheless, you are free to opt out of the Settlement, take up the appeal, and hope that you can secure a jury trial on damages.

With regard to the Settlement, should you decide to remain in the class, please understand that the Allocation Neutral appointed by the Court considered all relevant evidence and Court rulings regarding Plaintiffs' claims for remediation damages and other losses in arriving at the Allocation Model that will be used to determine Allocation Payments.  Under the law, the Court will "compare the settlement terms 'with the likely rewards the class would have received following a successful trial of the case.'" *Reed v. General Motors, Corp*, 703 F.2d 170, 172 (5th Cir. 1983).  In other words, the Court will "compare the terms of the compromise with the likely rewards of litigation." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y.2007) (quotation omitted). The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys*, 851 F.Supp.2d at 1065. Rather, the Court will determine "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors not by attempting the impossible task of deciding whether the parties have reached exactly the remedy they would have asked the Court to enter absent the settlement, but instead by whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of plaintiffs' success on the merits." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 933 (E.D. La. 2012) (quoting and citing *Reed*; *Heartland Payment*, 851 F.Supp.2d at 1065; *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir.1983)) (internal quotations omitted), *aff'd*, *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014).

Regards,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

10/20/2019                                              RE CDW Settlement Issues and Concerns.htm

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 11:15 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;
Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my October 7th email. I do appreciate your attention to this serious matter.

The question I asked in that email relates directly to what I, and others, believe are the two most critical factors for us in deciding whether to opt in or opt out: the likelihood of winning a fair verdict in a jury trial and the likelihood of forcing Taishan to pay that fair award. The plaintiffs' attorneys' apparent complete about face on these two critical factors between March 25, 2018 and August 31, 2018 warrants an explanation to the plaintiffs, particularly those plaintiffs for which this proposed settlement is clearly not in their best interest. One possible explanation is pressure from the Courts to end this litigation quickly, which is actually mentioned in at least one motion to the Cooke Court. Is this the reason for the about face in litigation strategy? Is the answer contained in the court documents you referenced? It's a fair and essential question to ask, and deserves an honest answer for those considering whether they should opt in or opt out.

Again, the questions my wife, Bev, and I have must be answered well before the November 27th deadline to opt in or opt out, as they are critical to that decision. I believe it's clear that the PSC, Class Counsel, and other plaintiffs' attorneys collectively have answers to all these questions. To refuse to share those answers in an effort to force/intimidate clients into accepting an unfair settlement is clearly not acting in the clients' best interests. In fact, it demonstrates that these attorneys are no longer representing their clients' best interests.

I do appreciate your honesty in admitting that the proposed Settlement is not in our best interest, i.e. not in the best interest of plaintiffs with ProWall drywall or the other covered drywall that falls into the "participation trophy" award category of only 20% of what's likely not a fair settlement to begin with.

Thank you again for your attention to this serious issue.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, October 07, 2019 4:58 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;
Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Dear Mr. Moody – there is a process in place for you, as a class member, to voice any objections you have to the settlement, or to opt out if you would like to pursue litigation and reject the Settlement (*see* my attached previous email to you dated October 2, 2019).  The deadline for objecting or opting out is November 27, 2019.  Class Counsel will respond to any and all objections in writing on or before December 6, 2019, in advance of the Fairness Hearing.

The questions you have posed seem to relate to the litigation and our litigation strategy, not the fairness, reasonableness, or adequacy of the Settlement. Developments in the litigation have been reported in monthly Status Reports (*see, e.g.*, Rec. Docs. 22272, 22290, 22309, 22323), and the reasons why Class Counsel believe that the proposed Settlement is in the best interests of the overwhelming majority of class members is also a matter of public record (*see* Rec. Doc. 22305), and takes into consideration the delay, expense, and risks of litigation, including the challenges of maintaining jurisdiction over and enforcing any eventual judgments against the Taishan-related entities and/or their assets over in China.  You should have sufficient information about the unfolding of the litigation to date, the settlement, your estimated gross recovery under the settlement should it be finally approved, and the risks of continued litigation in order to make your decision. Plus, your counsel Pete Albanis is available to advise you, and I understand you and your wife have a meeting scheduled with him this week.

Thanks.

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 12:29 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

I clearly can't rely on getting answers to certain critical questions through the "Objection" process because I need answers to these questions in order to make an informed decision on whether to opt in or opt out. I pose one of those critical questions below. I did submit this question through the Settlement Website on October 1, 2019 and have not yet received a response. Here's the specific question I asked.

"What changed between March 25, 2018 when attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict was needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA could be used as leverage to force Taishan to pay that big award, and August 30 2018 when attorney Levin put his name on a motion to the Cooke Court undermining that judicial process, stating that the Plaintiffs seek to reduce judicial labor and propose that remediation damages should be finalized expeditiously as part of a claims process before a Special Master? Also, how did the PSC determine that the Plaintiffs, or at least the majority of Plaintiffs, wanted to forgo a jury trial in the interest of reducing judicial labor? I ask this question because it is central to our decision on opting in or opting out of the proposed settlement. Thank you for your attention, R. Moody"

I do have other questions that are critical to our decision on opting in or opting out. My wife, Bev, and I have a meeting with Mr. Albanis this Thursday where we hope to get answers to those questions. I'll follow up with you after that with any lingering questions that remain.

Thank you for your attention to this serious matter.

Regards,


Russell Moody

806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 02, 2019 4:08 PM
**To:** 'Sandra L. Duggan' <sduggan@lfsblaw.com>
**Cc:** 'SHerman@hhklawfirm.com' <SHerman@hhklawfirm.com>; 'Arnold Levin' <ALevin@lfsblaw.com>; 'rserpe@serpefirm.com' <rserpe@serpefirm.com>; 'patrick@colson.com' <patrick@colson.com>; 'bevmoody@comcast.net' <bevmoody@comcast.net>; 'palbanis@forthepeople.com' <palbanis@forthepeople.com>; 'Keith Verrier' <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you again for replying to my email.

I'm sorry, but I'm very confused. I've asked a few important questions and I've gotten replies (thank you) that, in some cases, answer those questions, and in other cases don't fully address those questions or raise additional questions. In some cases, you've essentially referred me to the Fallon Court, and I am following up accordingly.

It makes no sense to me to submit formal objections to you  or, more appropriately, to the Court, until we fully understand the details of this litigation that are essential in our understanding what and how decisions were made, and

on what basis and what evidence they were made. That's particularly necessary when there appear to be clear missteps and contradictions, and the "negotiated" settlement is so grossly unfair.

My wife, Bev, and I started our nearly decade-long trail of tears being told that we have Taishan toxic Chinese drywall. Then, as the litigation is about to cross the finish line headed for what the plaintiffs hoped would be a fair jury trial award – an award that the PSC said we'd be able to collect – that jury trial is short circuited by the plaintiffs' own attorneys and Taishan gets to call the shoots on what's fair, no questions asked. Now we are expected to be "extremely pleased" according to the PSC that we're about to be offered 14 cents on the dollar. I'm just trying to understand, and I'm following the settlement instructions for that purpose.

What we see, and what many other plaintiffs see, are our own attorneys, who are charged with representing our best interests, now intimidating their clients into accepting a terribly unfair settlement in order to unburden the courts and to end this litigation, unwilling to continue the long journey to a fair settlement for their clients. We can't turn a bind eye to what we see, and it would be disingenuous not to share that vision with the PSC and our attorneys – to give the PSC and our attorneys an opportunity to set the record straight. Please do that for us.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Wednesday, October 02, 2019 3:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody – we have made numerous attempts to respond to your many inquiries about the settlement. If you are not satisfied, you have a right to opt-out of the settlement and pursue your case in Court <u>OR</u> you may object to the settlement, as set forth in the class notice you received. At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court.  The deadline for objecting is <u>November 27, 2019</u>. If you choose to object, be sure to follow the procedures set forth in the class notice, and mail your objection to Class Counsel at the following addresses:

Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave., New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Sincerely,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of
LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure.
The information is intended only for the use of the individual or entity named above. If you think you
have received this message in error, please email the sender.  If you are not the intended recipient,
please delete the message and understand that dissemination, distribution or copying is strictly
prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 2, 2019 1:43 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my email. Unfortunately, you did not respond to my questions and concerns, none of which
involve the specifics of our claim, but rather affect all plaintiffs who are part of this grossly unfair settlement.

I have directed many questions that I believe are relevant to our specific claim to our attorney, Mr. Albanis, and I'm
looking forward to getting the answers. My wife, Bev, and I hope to meet with Mr. Albanis either later this week or next
week.

Even though I believe that the Courts and the Plaintiffs' attorneys have poisoned the well with regards to further pursuing
Taishan, we still need to better understand the details of this litigation in order to be able to make an informed decision

on whether to opt in or opt out, and to better understand the basis for submitting objections.

Thanks again for your reply.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, September 02, 2019 2:24 PM
**To:** russmoody@comcast.net; palbanis@forthepeople.com
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net
**Subject:** Re: CDW Settlement Issues and Concerns

Dear Mr. Moody - thank you for writing to us. I've copied your attorney Pete Albanis on this email. Because you are represented by counsel, you will need to speak with Mr. Albanis regarding the specifics of your claim.  If you are listed on the Master Spreadsheet, you will receive the class notice and a letter from the Claims Administrator Brown Greer in about 2 weeks.

Regards,

Sandra L. Duggan
Of-Counsel
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 Office
(215) 870-8258 Cell
(215) 592-4663 Fax

On Sep 2, 2019, at 1:54 PM, "russmoody@comcast.net" <russmoody@comcast.net> wrote:

Dear Messrs. Levin, Herman, Serpe, and Montoya, and Ms. Duggan,

As one of the 3,654 class members who are included in the settlement from the Amorin and Brooke complaints, I have many questions needing answers before I can choose a course of action concerning my options with regards to this yet-to-be-provided settlement offer. Our attorney, Pete Albanis, has responded to some of these questions, many times with answers that generate more questions. Hopefully, our attorney will be forthcoming with all the answers we'll need, well before the deadline we're facing to make a final decision. In the meantime, two questions posed on a closed Facebook group of toxic Chinese drywall victims that deserve immediate answers are the following:

"1) Will this be enough money to properly remediate these Toxic Chinese Drywall homes so that these properties don't continue to hit the market and harm other American Families?"

and

"2) Will this be enough money to make the families who have lived with this Toxic Chinese Drywall for 11 years whole and make up for all that they have had to endure during this time to include loss of use and enjoyment?"

If the answer is "No" to either of these questions for any of the plaintiffs, I respectfully ask that the Plaintiffs' Steering Committee and the plaintiffs' attorneys to stop publicly expressing pleasure, stop referring to the settlement as fair, and stop thanking Taishan and its attorneys. The takeaway from these public statements for those who are not toxic Chinese drywall victims, or who are not otherwise familiar with this litigation, is that all the victims will finally get the settlement amount they need to compensate them for their losses, particularly for the cost of remediating their homes. That's probably the intent, but it is, for all intents and purposes, a lie, a lie that infuriates the victims. Why do that? I think I know the answer, and it's definitely not ethical, probably worse, but please remember that toxic Chinese drywall victims have been "wounded" by the Chinese, the construction industry and their insurance companies, elected officials, the courts, and now our own attorneys. Please don't add insult to injury by rubbing salt in these wounds.

I also respectfully ask that the PSC remove its gag order on the plaintiffs' attorneys, which it has apparently imposed to ensure that the fake news story of a fair settlement is not undermined.

Thank you for your consideration of these vitally Important issues.

Respectfully,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

# Exhibit 3

TRANSCRIPT OF MONTHLY STATUS
CONFERENCE PROCEEDINGS HEARD
BEFORE THE HONORABLE ELDON E.
FALLON UNITED STATES DISTRICT JUDGE,
October 23, 2019

1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   ........................................................

 5   IN RE:  CHINESE-MANUFACTURED
     DRYWALL PRODUCTS
 6   LIABILITY LITIGATION

 7
                          CIVIL DOCKET NO. 09-MD-2047 "L"
 8                        NEW ORLEANS, LOUISIANA
                          WEDNESDAY, OCTOBER 23, 2019, 9:00 A.M.
 9

10
     THIS DOCUMENT RELATES TO
11   ALL CASES

12   ........................................................

13

14      TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON
15               UNITED STATES DISTRICT JUDGE

16

17   APPEARANCES:

18

19   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:        HERMAN HERMAN KATZ
20                           BY:  LEONARD A. DAVIS, ESQUIRE
                                  STEPHEN HERMAN, ESQUIRE
21                           820 O'KEEFE AVENUE
                             NEW ORLEANS, LA  70113
22

23                           LEVIN, FISHBEIN, SEDRAN & BERMAN
                             BY:  SANDRA L. DUGGAN, ESQUIRE
24                           510 WALNUT STREET, SUITE 500
                             PHILADELPHIA, PA 19106
25

                    OFFICIAL TRANSCRIPT
```

2

```
 1   APPEARANCES CONTINUED:

 2

 3                    GAINSBURGH BENJAMIN DAVID
                      MEUNIER AND WARSHAUER
 4                    BY:  GERALD E. MEUNIER, ESQUIRE
                      2800 ENERGY CENTRE
 5                    1100 POYDRAS STREET, SUITE 2800
                      NEW ORLEANS, LA 70163
 6

 7                    COLSON HICKS EIDSON
 8                    BY:  PATRICK S. MONTOYA, ESQUIRE
                      225 ALHAMBRA CIRCLE, PENTHOUSE
 9                    CORAL GABLES, FL  33134

10

11                    LAMBERT & NELSON
                      BY:  CAYLE PETERSON, ESQUIRE
12                    701 MAGAZINE STREET
                      NEW ORLEANS, LA 70130
13

14   FOR THE STATE/FEDERAL
15   COORDINATION COMMITTEE:   LAW OFFICES OF RICHARD J. SERPE
                      BY:  RICHARD SERPE, ESQUIRE
16                    580 EAST MAIN STREET, SUITE 310
                      NORFOLK, VA 23510
17

18
     FOR TAISHAN GYPSUM CO.,
19   LTD, AND TAI'AN TAISHAN
     PLASTERBOARD CO., LTD.:   ALSTON & BIRD
20                    BY:  CHRISTINA H. EIKHOFF, ESQUIRE
                      ONE ATLANTIC CENTER
21                    1201 WEST PEACHTREE STREET
                      ATLANTA, GA 30309
22

23

24

25

                    OFFICIAL TRANSCRIPT
```

3

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE KNAUF
     LIAISON COUNSEL:      BAKER DONELSON BEARMAN
 4                         CALDWELL & BERKOWITZ
                           BY:  KERRY J. MILLER, ESQUIRE
 5                         201 ST. CHARLES AVENUE, SUITE 3600
                           NEW ORLEANS, LA  70170
 6

 7
     FOR THE TAISHAN, BNMB
 8   ENTITIES AND CNBM ENTITIES
     LIAISON COUNSEL:      PHELPS DUNBAR
 9                         BY:  HARRY ROSENBERG, ESQUIRE
                           365 CANAL STREET, SUITE 2000
10                         NEW ORLEANS, LA 70130

11

12   FOR TAISHAN GYPSUM CO.,
     LTD, AND TAI'AN TAISHAN
13   PLASTERBOARD CO., LTD.:   ALSTON & BIRD
                           BY:  CHRISTINA H. EIKHOFF, ESQUIRE
14                              BERNARD TAYLOR, SR., ESQUIRE
                           ONE ATLANTIC CENTER
15                         1201 WEST PEACHTREE STREET
                           ATLANTA, GA 30309
16

17

18                         ALSTON & BIRD
                           DAVID VENDERBUSH, ESQUIRE
19                         90 PARK AVENUE, 15TH FLOOR
                           NEW YORK, NY  10016
20

21

22

23

24

25

                    OFFICIAL TRANSCRIPT
```

4

```
 1   APPEARANCES CONTINUED:

 2

 3   CHINA NATIONAL BUILDING
     MATERIALS GROUP CORPORATION
 4   AND CHINA NATIONAL BUILDING
     MATERIALS COMPANY LIMITED
 5   (COLLECTIVELY, "CNBM"):  GORDON, ARATA, McCOLLAM,
                                  DUPLANTIS & EAGAN
 6                         BY:  EWELL E. EAGAN, JR., ESQUIRE
                                DONNA P. CURRAULT, ESQUIRE
 7                              ALEX B. ROTHENBERG, ESQUIRE
                           201 ST. CHARLES AVENUE, 40TH FLOOR
 8                         NEW ORLEANS, LA  70170

 9

10   ALSO PRESENT:          JACOB WOODY, BROWNGREER
                            SARAH OLSON, PLAINTIFF
11

12

13   OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                           CERTIFIED REALTIME REPORTER
14                         CERTIFIED MERIT REPORTER
                           500 POYDRAS STREET, ROOM B406
15                         NEW ORLEANS, LA  70130
                           (504) 589-7779
16                         Cathy_Pepper@laed.uscourts.gov

17

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
18   PRODUCED BY COMPUTER.
19
20
21
22
23
24
25

                    OFFICIAL TRANSCRIPT
```

5

INDEX

PAGE

FAIRNESS HEARING ON DECEMBER 11TH, 2019.............. 10

INITIAL PAYMENT UNDER THE SETTLEMENT HAS BEEN FULLY

MADE BY TAISHAN...................................... 11

LONG FORM NOTICE WAS MAILED TO EVERY SINGLE KNOWN

CLASS MEMBER.......................................... 11

ESTIMATE LETTERS WERE SENT BY BROWNGREER TO EVERY

PLAINTIFF ON THE MASTER SPREADSHEET................. 11

CLASS COUNSEL HAS SET UP A SETTLEMENT WEBSITE,

CHINESEDRYWALLSETTLEMENT.COM, AND A CALL CENTER...... 11

UPDATED MASTER SPREADSHEET BY THE END OF THE MONTH...13

NEXT CONFERENCE IS NOVEMBER 22ND, 2019 .............. 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*OFFICIAL TRANSCRIPT*

---

6

1        P·R·O·C·E·E·D·I·N·G·S

2        WEDNESDAY, OCTOBER 23, 2019

3        M O R N I N G   S E S S I O N

4        (COURT CALLED TO ORDER)

5

6

7        THE DEPUTY CLERK:  All rise.

8        THE COURT:  Be seated, please.  Good morning, ladies

9 and gentlemen.

10       VOICES:  Good morning, Judge.

11       THE COURT:  Let's call the case.

12       THE DEPUTY CLERK:  MDL 2047, In re:  Chinese

13 Manufactured Drywall Products Liability Litigation.

14       THE COURT:  Would counsel make their appearance for the

15 record, please.

16       MR. ROSENBERG:  Good morning, Judge Fallon.

17 Harry Rosenberg, liaison counsel for Taishan, BNBM, and CNBM.

18       MR. DAVIS:  Good morning, Your Honor.  Leonard Davis on

19 behalf of the Plaintiffs' Steering Committee.

20       THE COURT:  We're here today for our monthly status

21 conference.  The case initially started with numbers of

22 plaintiffs against numbers of defendants.  The unusual factor

23 in this particular case is that I had about 20,000 individual

24 claimants, which is not necessarily unusual or unwieldy, but in

25 this particular case I had a thousand defendants, which is

*OFFICIAL TRANSCRIPT*

---

7

1 unusual for this type of litigation.

2        In any event, the two types of defendants that

3 were involved in the case were manufacturers, and they were

4 grouped into the Chinese manufacturers and the German

5 manufacturers.  The case proceeded against the German

6 manufacturers, Knauf, first, and it was resolved, settled, so

7 they are no longer in the case, with the potential exceptions

8 of one or two individual cases.

9        The case then proceeded with vigor against the

10 Chinese defendants, Taishan and others, and the case proceeded.

11 There were trials and so forth, both state and federal, and the

12 parties reached an agreement not too long ago.  It's a

13 class-action settlement agreement, and that's where we are at

14 this particular point.

15       I had received a number of letters from

16 individuals -- individual people, not lawyers -- questioning

17 various aspects of it, and perhaps I should at least address

18 what the concept is as best, at least, I can.

19       Let me say a word about class actions.  Maybe the

20 complexity of society, nationwide sales, opportunities of goods

21 and material, instantaneous communication, and perhaps even

22 lawyer advertising, this has brought about a situation where

23 the traditional case, the traditional common-law case of one

24 plaintiff, one defendant has morphed into numbers of plaintiffs

25 and sometimes numbers of defendants.  Therefore, some vehicle

*OFFICIAL TRANSCRIPT*

---

8

1 had to be established legislatively and enforced judicially to

2 deal with this situation where you had multiple plaintiffs,

3 20,000 individual plaintiffs, with a thousand lawyers, or

4 thereabouts, filing suit.

5        The traditional method of one plaintiff, one

6 defendant -- one lawyer for the plaintiff, one lawyer for the

7 defendant -- wasn't a vehicle that was able to be handled;

8 therefore, legislatively a method of dealing with that type of

9 litigation was created, and it was called a *class action*.

10       It was adopted in the Federal Rules of Civil

11 Procedure 23 to create a class action which created a method of

12 dealing with litigation that involved multiple parties on at

13 least one side of the case.  In order to qualify as a class

14 action, you had to have some commonality.  It just wasn't the

15 fact that you had a case, you had to have some commonality, and

16 those commonalities had to preponderate in order for you to

17 have an opportunity to join together as a class.

18       The class action has some advantages to it, at

19 least from the plaintiffs' standpoint, from the litigants'

20 standpoint.  They can join together, and they can pool their

21 costs so that it's not one person paying all of the costs.  The

22 group, in a sense, pays the costs and attorney's fees, pays the

23 attorney's fees, and they don't do it up front.  They are able

24 to pool their resources, so to speak.  They have a common

25 representation.  They are able to collect information more

*OFFICIAL TRANSCRIPT*

9

09:07:15 1   easily and house that information more easily, so those are
09:07:22 2   advantages.
09:07:23 3           But there are some disadvantages, and the
09:07:29 4   disadvantages are sort of like a family situation where you
09:07:34 5   have 12 kids, and the turkey comes on the table, and 12 want a
09:07:43 6   drumstick. There are only two. There are two drumsticks, and
09:07:47 7   so if everybody wants a drumstick, they compromise on they get
09:07:53 8   a piece of it. They don't get the whole drumstick. There are
09:07:57 9   not 12 drumsticks on a turkey. That's a disadvantage.
09:08:03 10          Sometimes the disadvantages outweigh the
09:08:07 11  advantages. What to do in that situation. Well, the
09:08:12 12  legislation allows for that. They allow for you to leave the
09:08:16 13  table. You go on your own and get your own turkey, and that's
09:08:27 14  what the opt-out means in this type of litigation.
09:08:34 15          So there are advantages and there are
09:08:36 16  disadvantages, and the litigants are notified of this. They
09:08:41 17  are notified of the dinner, and they can come to the table or
09:08:46 18  they don't have to come to the table. If they don't want to
09:08:49 19  come to the table, though, they have to tell people. They have
09:08:53 20  to say, "I'm not going to be there," so that they don't set a
09:08:57 21  table for you. So you have to say, "I want out. I'm opting
09:09:03 22  out of this litigation," and you have that opportunity.
09:09:06 23          So the notice goes out and everybody is notified
09:09:14 24  of it. They have the opportunity to ask questions of their
09:09:21 25  attorney. Whatever question they have, they have an

*OFFICIAL TRANSCRIPT*

10

09:09:24 1   opportunity to do so.
09:09:26 2           I received a long letter from Mr. Moody, who had
09:09:33 3   a number of questions, but he has met already five or six or
09:09:37 4   seven times with his attorney, and his attorney has endeavored
09:09:41 5   to answer those questions.
09:09:43 6           Sometimes the answers are not satisfactory, but
09:09:48 7   they are answers. If you don't like the answer, you have the
09:09:51 8   opportunity to say, "I'm not coming to the dinner, folks. I'm
09:09:55 9   just letting you know, I'm out," and go to your own place and
09:10:05 10  seek to obtain your dinner.
09:10:06 11          So that's what we're doing, and the notice has
09:10:11 12  gone out, and we are having a last fairness hearing on
09:10:19 13  December 11th, is it, December 11th. Everybody has been
09:10:24 14  notified, and it's very costly to notify everybody, but the
09:10:29 15  class counsel has a duty, and they've extended a lot of
09:10:38 16  resources and time to make sure that everybody was noticed.
09:10:41 17          It seems to me that it's a fair notice. It's an
09:10:46 18  adequate notice. They are doing everything they can. They
09:10:50 19  have call operators to explain what the facts are, what the
09:10:56 20  opportunities are, what the disadvantages are, answer any
09:11:00 21  questions, and so people have an opportunity to do that, and
09:11:06 22  we'll have that hearing.
09:11:08 23          Today I have a status conference just to find out
09:11:13 24  what's happening and what response it's having, so I'll hear
09:11:17 25  from the parties at this time.

*OFFICIAL TRANSCRIPT*

11

09:11:20 1        MS. DUGGAN: Good morning, Your Honor. Sandra Duggan
09:11:23 2   on behalf of the plaintiffs. Your Honor, I would like to
09:11:26 3   report that the initial payment under the settlement has been
09:11:29 4   fully made by Taishan. Those monies are now safely held in the
09:11:34 5   court registry. The notice has gone out, long form notice was
09:11:38 6   mailed to every single known class member and estimate letters
09:11:42 7   were sent by BrownGreer to every plaintiff on the master
09:11:45 8   spreadsheet.
09:11:47 9        Under the settlement and the Court's approval
09:11:50 10  notice, class members had until October 3rd to dispute the
09:11:54 11  information on the master spreadsheet. BrownGreer has received
09:11:57 12  all of the disputes and will be publishing a revised master
09:12:00 13  spreadsheet by the end of this month, and that will go on the
09:12:04 14  docket so everybody can see it.
09:12:06 15        Class counsel has set up a settlement website,
09:12:10 16  ChineseDrywallSettlement.com. We also have a call center that
09:12:14 17  has been functioning, and I believe it's been working very
09:12:18 18  well. On the website itself there has been over 99,000 views,
09:12:23 19  and 72,000 of those have been from new users from all 50 states
09:12:28 20  plus the District of Columbia.
09:12:30 21        As regarding the call center, we've had over 200
09:12:35 22  callers. Class counsel have been returning the phone calls.
09:12:37 23  We have been responding to emails, and we have inquiries from
09:12:40 24  class members from 21 different states.
09:12:42 25        So we feel that the notice is working, people are

*OFFICIAL TRANSCRIPT*

12

09:12:45 1   asking questions, and we are answering all of those questions
09:12:48 2   to the best of our abilities:
09:12:50 3        THE COURT: All right. Anything from defense counsel?
09:12:53 4        MS. EIKHOFF: No. Just to reiterate the report of
09:13:00 5   Ms. Duggan that we do believe that the notice is working and
09:13:03 6   agree that it has been fair and adequate.
09:13:05 7        THE COURT: Okay.
09:13:07 8        Jake, do you want to give me some feel for what's
09:13:09 9   happening?
09:13:10 10       MR. WOODY: Yes, Judge. We did receive the challenges
09:13:14 11  that Ms. Dugan referred to. We've received 109 of them that
09:13:18 12  break down into various categories.
09:13:20 13       THE COURT: What are the major categories of concern?
09:13:22 14       MR. WOODY: The biggest category of concern is the one
09:13:26 15  that affects the dollar values the most, which is people who
09:13:30 16  want to switch from -- they claim that they in Amorin, we have
09:13:34 17  them in Brook, or they are in neither, and they want to be in
09:13:36 18  one of them, but those do affect the claim values the most, but
09:13:40 19  they also are fairly black and white for us to deal with.
09:13:45 20       THE COURT: The square footage, is that an issue?
09:13:48 21       MR. WOODY: Square footage, we did receive some
09:13:50 22  challenges on that. Most of the challenges are for a
09:13:52 23  relatively small amount of square footage, so no matter how we
09:13:57 24  rule on it, it won't really affect the payouts too much.
09:14:00 25       I don't see anything in the challenges that will

*OFFICIAL TRANSCRIPT*

13

09:14:02 1  have a significant impact on the estimates that we've already
09:14:04 2  made because when you have this many people and this much
09:14:08 3  money, it takes quite a bit of shifting to really change the
09:14:11 4  dollar values too much, but we are reviewing them and will
09:14:14 5  issue decisions in an updated master spreadsheet by the end of
09:14:19 6  the month.
09:14:19 7            THE COURT:  Okay.
09:14:21 8            MR. WOODY:  Thank you, Your Honor.
09:14:21 9            THE COURT:  All right.  Anything further?
09:14:23 10           Richard?
09:14:24 11           MR. SERPE:  Good morning, Your Honor.  Richard Serpe
09:14:32 12 for the PFC and class counsel.
09:14:35 13           Late last night around 9:00 p.m. I received an
09:14:38 14 e-mail from one of the Virginia class members, Sarah Olson, and
09:14:41 15 she has requested to briefly address the Court this morning.
09:14:44 16           THE COURT:  Sure.  Ms. Olsen, you're in court?  Would
09:14:48 17 you come forward, please, ma'am.
09:14:59 18           Okay.  I appreciate you being here.  I hope the
09:15:02 19 weather is okay for you to here in New Orleans.
09:15:05 20           MS. OLSON:  Much better than Wisconsin.  Thank you.
09:15:10 21           THE COURT:  Great.  Fine.  Yes, ma'am.
09:15:14 22           MS. OLSON:  I wasn't truly expecting to do this today.
09:15:17 23 I apologize.  I'm on vacation.
09:15:17 24           THE COURT:  That's alright.
09:15:18 25           MS. OLSON:  So when I realized last night that I was in

*OFFICIAL TRANSCRIPT*

14

09:15:21 1  the town where this was at, I felt obligated to at least come
09:15:26 2  and watch.
09:15:26 3            THE COURT:  Sure.
09:15:28 4            MS. OLSON:  So I apologize, I didn't prepare very well.
09:15:31 5            THE COURT:  That's okay.  I appreciate you being here.
09:15:36 6            MS. OLSON:  In 2010 my husband and I received a letter
09:15:39 7  from our builder telling us that we had Chinese drywall in our
09:15:44 8  house, and he was on deployment at the time.  We're both Navy
09:15:47 9  veterans.  We graduated from the Naval Academy.
09:15:52 10           I didn't quite appreciate what that meant until I
09:15:54 11 started looking in on it.  At the time we had a
09:15:58 12 two-and-a-half-year-old son who was clearly not developing
09:16:01 13 correctly.  So for us, this has been a very emotional journey.
09:16:06 14 Since then we've had a third child.  We moved out of that house
09:16:09 15 as soon as we could because we were all very ill.
09:16:12 16           We -- I vividly remember the first time we
09:16:16 17 met with Richard Serpe.  My husband had just finished a tour at
09:16:22 18 the Pentagon in a Chinese think tank, and we were sitting at
09:16:25 19 our dining room table, and he looked over at me he says, "We
09:16:29 20 will never see a penny from this case," just from the culture
09:16:33 21 and what he had learned in that job.
09:16:36 22           So we have been trying hard, not always
09:16:41 23 succeeding very well, in moving on for the past 10 years or so,
09:16:45 24 and every once in a while there is something that comes up that
09:16:48 25 reminds us of the emotional part of this.  But the rational

*OFFICIAL TRANSCRIPT*

15

09:16:54 1  part of this we've always tried to keep in the back of our mind
09:16:57 2  that if we ever got something, we would be appreciative that
09:17:02 3  there was something versus nothing.  I can't imagine being in
09:17:05 4  the class of getting very little.
09:17:07 5            We're very fortunate that the lawyers we had
09:17:10 6  worked to put us in the class where we are.  I can't imagine we
09:17:14 7  would ever look at this settlement and think we're whole.
09:17:19 8  There is no way you can take an autistic child and another one
09:17:23 9  with chronic anxiety and say this doesn't affect us every day
09:17:28 10 of our lives.  Financially, we lost almost everything we had
09:17:32 11 trying to compensate for this.
09:17:36 12           I wish I could stand here and say there has got
09:17:38 13 to be a better solution.  I don't have that -- you know, with
09:17:44 14 all these people.  I guess I just want to say that for all of
09:17:50 15 you in this business room, this may not be emotional to you,
09:17:57 16 and there may never be a way to prove what we've had to go
09:18:01 17 through, the emotional, the diagnoses of PTSD, the constant
09:18:07 18 triggers that will follow us through the rest of our life.
09:18:10 19 Every day I wake up and I have to say how am I going to get my
09:18:15 20 son a successful member of society?  You may not be able to
09:18:17 21 capture that when you're making these decisions.
09:18:20 22           Please remember that there are real people behind
09:18:22 23 this, and as much as we can all say something is better than
09:18:28 24 nothing, the amount of money and energy we've expended, you can
09:18:33 25 never compensate us enough.

*OFFICIAL TRANSCRIPT*

16

09:18:36 1            I used to look at, you know, people in
09:18:40 2  New Orleans, right, who lived through tragedies such as
09:18:45 3  hurricanes, and we've had houses with trees fall on them in
09:18:47 4  Virginia when we were in the military, there was never really a
09:18:50 5  good solution to this problem.  There wasn't an insurance that
09:18:53 6  helped us.  You know, this is it.  This is all we're going to
09:18:57 7  get.
09:18:58 8            So, I guess what I would say is, yes, more would
09:19:03 9  help, but I appreciate the time and the energy that everybody
09:19:08 10 has put into this, and, frankly, we want to move on with our
09:19:12 11 lives as much as possible.
09:19:15 12           Thank you.
09:19:16 13           THE COURT:  Okay.  Well, thanks for being here.  I
09:19:18 14 appreciate it.  I appreciate your comments.
09:19:21 15           MS OLSON:  Thank you.
09:19:30 16           THE COURT:  Anything further from anyone?
09:19:33 17           Okay.  With that, we'll end the conference then
09:19:36 18 and I'll see you all, when is the next one, November 22nd.
09:19:45 19           Okay.  Anything further?  Thank you all very
09:19:48 20 much.  Court will stand in recess.
09:19:50 21           THE DEPUTY CLERK:  All rise.
22           (WHEREUPON, at 9:19 a.m., the proceedings were
23 concluded.)
24                          * * *
25

*OFFICIAL TRANSCRIPT*

17

1                    REPORTER'S CERTIFICATE

2

3        I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                    s/Cathy Pepper

12                    Cathy Pepper, CRR, RMR, CCR

                      Certified Realtime Reporter

13                    Registered Merit Reporter

                      Official Court Reporter

14                    United States District Court

                      Cathy_Pepper@laed.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25

                      *OFFICIAL TRANSCRIPT*

# Exhibit 4

New Orleans City Business March 29, 2018 article:
Judge: Return Chinese drywall lawsuits to original
states"



## Judge: Return Chinese drywall lawsuits to original states

👤 By: The Associated Press   🕒 March 29, 2018   💬 0

Nine years after a judge began supervising a multitude of federal lawsuits that claim homes were damaged by Chinese drywall, he says it's time to return thousands of them for trial in the courts where they were filed.

The panel that put Judge Eldon Fallon in charge in 2009 said the first 1,700 would return to Florida's federal courts if no objections are filed by Thursday. At least three objections were filed Thursday by attorneys for about 750 clients. The filings did not give reasons for the objections.

Those opposing the transfer must file briefs of their arguments by April 12, and responses are due May 3, according to the U.S. Judicial Panel on Multidistrict Litigation's electronic docket.

Fallon ruled in 2010 that Chinese-made drywall released sulfur fumes into homes, sickening occupants, corroding metals in wiring, plumbing, appliances and electronics, and stinking up the houses. In 2013, he approved settlements involving up to 10,000 homes and other buildings with drywall from German-owned Knauf Plasterboard Tianjin Co.

Remaining cases involve a second company, Taishan Gypsum Co. Ltd., which didn't show up in court until Fallon found it in contempt and forbade any of its subsidiaries or affiliates to do business in this country until it participated in court proceedings.

Fallon told the panel he wants to transfer all remaining Chinese drywall cases that were sent to him.

Such requests are unusual: supervising judges resolve the great majority of cases, mostly through settlements, according to a 2014 Louisiana Law Review article by Edward F. Sherman of Tulane University.

"The gold standard, I think, is to get everybody to a point where you can get global peace for everybody," said Louisiana State University law Professor Margaret Thomas.

But when that doesn't happen the cases go to trial, and those trials must be held in the states where the suits were filed.

About 5,000 cases remain from eight states: Florida, Virginia, Louisiana, Alabama, Mississippi, Georgia, North Carolina and California, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee in this case, said Thursday.

Fallon said in a March 12 order and request that he's dealt with all pretrial motions raising common questions, held "bellwether trials" to lead the way, and has approved a formula for calculating property damages.

He wrote that his court "has worked diligently for the past nine years," producing abundant evidence and judicial opinions to enable the original courts and the parties in the lawsuits to steer any unresolved cases "to a fair and just conclusion."

His order and request was accompanied by a 118-page list identifying 1,734 cases comprising one Florida class action. There could be more than 1,000 additional cases in a separate group that includes Florida defendants, Levin said.

Plaintiffs whose cases would be transferred back include Jason and Heather Ancer of Land O Lakes, Florida. Jason Ancer said an inspector who claimed to be a Chinese drywall expert told them their house was fine, but their air conditioner began failing within months after they moved in. Their drywall turned out to have been made by Taishan. Five months after moving in, Heather Ancer became pregnant.

The couple left the house, stopped making payments on it and eventually declared bankruptcy.

"We don't know what to think," said Jason Ancer. "All I know is it seems that definitely we will not have any kind of recourse."

In Facebook groups of people affected by Taishan's drywall, he said people are asking how are individual trials going to do any good if the combined cases can't go forward.

That isn't so, Levin said.

"We as plaintiffs support what Judge Fallon has done," he said. "It's nine years, and the Chinese have tried every tactic to see to it that the people we represent either die or otherwise have their properties disposed of … just trying to frustrate the process."

Levin said the steering committee's attorneys are ready to work with lawyers representing the remaining defendants.

"Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," he said.

Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages, Levin said.

Once the cases return to their originating courts, he said, "The Chinese will be all over America trying cases."

**To sign up for free CityBusiness Daily Updates, click here.**

Tagged with:   CHINESE DRYWALL   LAWSUIT

11/25/2019                    Judge: Return Chinese drywall lawsuits to original states – New Orleans CityBusiness

Copyright © 2019 New Orleans Publishing Group | 3350 Ridgelake Drive, Suite 281, Metairie, LA 70002 |
Phone: (504)834-9292 E-mail: mail@nopg.com

# Exhibit 5

CISION PR Newswire August 20, 2019 article:
"Plaintiffs' Steering Committee: Settlement
Announced in Decade-Old Chinese Drywall
Litigation Lawsuits"

# Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits

NEWS PROVIDED BY
**Plaintiffs' Steering Committee →**
Aug 20, 2019, 10:21 ET

NEW ORLEANS, Aug. 20, 2019 /PRNewswire/ -- Lawyers for thousands of property owners who alleged that their homes and properties were damaged by defective Chinese drywall filed a motion today asking a federal judge in New Orleans to approve a nationwide settlement of their lawsuits.  The Chinese Drywall Litigation has been ongoing for more than ten years.  The proposed settlement calls for $248 million to be funded by Taishan Gypsum, Co., a Chinese manufacturer of construction products.

Lead counsel for Plaintiffs' Steering Committee, Arnold Levin said that he is, "extremely pleased with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

Today's filing asks the Louisiana court for preliminary approval of the settlement terms and proposes a 90-day plan to notify all property owners who may be eligible for part of the payment.

Lawyers for the property owners estimate that thousands of homes and condominium properties were built using the defective drywall between 2005 and 2008, primarily in Florida, Louisiana, Alabama, Mississippi, and Virginia. The defective drywall has been associated with unpleasant odors and fumes that corrode metals, including air conditioning units, fixtures and other appliances.

Beginning around 2009, multiple lawsuits were filed against manufacturers, suppliers, builders, installers and other defendants alleged to have some involvement in making or supplying the problematic drywall.  The cases were consolidated in a multidistrict litigation case before Judge Eldon Fallon in U.S. District Court for the Eastern District of Louisiana in New Orleans who presided over more than one hundred status conferences and ruled on dozens of motions, including many addressing complex international and immunity law.  Federal courts in Miami, Florida and Norfolk, Virginia have also handled part of the lawsuits in recent months.  An initial set of cases was set for trial before U.S. District Court Judge Marcia Cooke in July, but the outlines of a class settlement were negotiated at a court-ordered mediation in late May.

The proposed settlement filings ask for the court to provide preliminary approval of the agreement, then review the deal again for final approval after a notice period and fairness hearing to occur later this year.  The proposal states that detailed information will be sent to known eligible parties and will be made available to the public in the event the court preliminarily approves the settlement.  If approved, payments from the settlement would be made to known property owners who have participated in the federal court litigation, as well as to any other property owners who can show that they had Chinese Drywall allegedly made by Taishan Gypsum or other participating defendants.

**CONTACT:**

**General/Lead Counsel:**

Arnold Levin

Sandra Duggan

Philadelphia, PA

sduggan@lfsblaw.com

(215) 870-8258

**Florida:**

Patrick Montoya

patrick@colson.com

(305) 476-7400

**Louisiana:**

Steve Herman

sherman@hhklawfirm.com

(504) 232-5154

**Virginia:**

Jeffrey Breit

jeffrey@breitcantor.com

(757) 622-6000

SOURCE Plaintiffs' Steering Committee

UNITED STATES POSTAL SERVICE

PRIORITY MAIL



US POSTAGE PAID
$7.35

Origin: 33990
11/26/19
1130810422-4

Retail

PRIORITY MAIL 3-DAY®

EXPECTED DELIVERY DAY: 12/02/19

0 Lb 11.80 Oz

1006

C047

SHIP
TO:
510 WALNUT ST
STE 500
PHILADELPHIA PA 19106-3625

USPS TRACKING® NUMBER

9505 5144 0327 9330 7078 51

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

P0000100014



USPS.COM/PICKUP

× For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.

FROM:

Russell F Moody
806 NW 38th Pl
Cape Coral, FL 33993

TO:

Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018; All rights reserved.

# Letter of Objections

to the

## MDL 2047: Chinese-Manufactured Drywall Products Liability Litigation

## Global Settlement Agreement

Submitted on November 26, 2019

by

### Russell F. Moody

Member of Amorin Class

to

Honorable Eldon E. Fallon and Chinese Drywall Counsel

806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

November 26, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail and Email:
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Via U.S. Priority Mail:
Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse, Coral Gables, FL 33134


     The following Objections to the Chinese-Manufactured Drywall Products Liability
Litigation, MDL 2047, Global Settlement Agreement, preliminary approval filed on 08/20/19 (Ref.
1), are respectfully submitted by the undersigned, Mr. Russell F. Moody. Mr. Moody and his wife,
Beverly L. Moody are members of the Amorin Class. The address of the affected property is 806
NW 38th Place, Cape Coral, Florida, Zipcode 33993. Mr. Moody intends to appear at the Fairness
Hearing without counsel[1] and requests that he be allowed to address the Court concerning each of
the following Objections during the Hearing.

---

[1] Judge Fallon Ordered that Morgan & Morgan attorney, Mr. Pete Albanis' motion to withdraw as Counsel of Record
for Russell and Beverly Moody is Granted, file date: 10/31/19.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

The following Objections apply to either the entire Amorin Class, a specific subset of the Amorin Class, all plaintiffs in the Brooke Complaints, or a subset of plaintiffs in the Brooke Complaints as indicated for each of the individual objections presented below.

All documents to be used or offered into evidence at the Fairness Hearing have been identified in the list of references or included as Exhibits in this Letter of Objection.

## Background

The information provided below is accurate to best of the undersigned's knowledge. Due to the protracted nature and complexity of this litigation, and the sparsity of information shared with the plaintiffs by the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels, plaintiffs have often been kept in the dark, having received most of their information from social media such as the Victims of Chinese Drywall closed Facebook group.[2] Therefore, the information provided below may not be fully accurate; however, it is, in the opinion of the undersigned, sufficiently accurate to support the basis for all Objections.

There have been and are a number of different entities representing the defective Chinese drywall plaintiffs including the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels. There have also been several courts involved. For the undersigned, as a Florida resident, the two relevant courts are U.S. District Court, Eastern District of Louisiana, Judge Fallon presiding, referred to below as the "Court", and the U.S. District Court, Southern District of Florida, Judge Cooke presiding, referred to below as the "Cooke Court.". That represents a lot of firepower, firepower that, for nearly a decade, plaintiffs believed was aimed at reaching a fair settlement for the toxic Chinese drywall victims, and ensuring that these victims' rights under the law and under the Constitution were protected. That belief has been badly shaken over the last year.

After the Knauf settlement, over 4,000 plaintiffs remained in the MDL 2047 litigation, a majority are members of the Amorin Class. The following narrative is provided from a viewpoint of the Amorin Class, of which the undersigned is a Class member. However, as will be indicated, some Objections apply across all MDL 2047 plaintiffs, with the exception of those plaintiffs included in the Knauf settlement. A commonality among the Amorin Class members is that each member's home contains defective toxic Chinese drywall and that, as a baseline, all have suffered that same loss damages, i.e. the cost of remediating their home. The actual dollar cost is determined by the size of their home measured in square footage under air, and the regional construction and relocation costs. Relocation costs refer to the expenses associated with moving, storage, and temporary housing during remediation, which typically takes three to four months. There are also additional losses that may apply broadly across the Class members or may apply for a small group of Class members. Another significant commonality is that the plaintiffs' drywall was manufactured by Taishan or its affiliates, at least that's what our Morgan & Morgan attorney has told all his non-Knauf Chinese drywall (CDW) clients from the beginning.

Courts and plaintiffs' attorneys have certain fiduciary responsibilities with respect to ensuring that the rights of plaintiffs are protected, including plaintiffs' rights to be kept fully

---

[2] Class Counsel and our former Morgan & Morgan attorney will likely dispute this, but supporting evidence provided in Exhibits 1 and 2 will substantiate my "sparsity of information" claim.

informed of relevant facts that may be pertinent to the litigation and to be engaged in the decision process particularly with regards to any pretrial settlement negotiations and subsequent agreement.

In fact, failure to inform and seek input from plaintiffs in a pretrial settlement agreement, particularly when that settlement agreement does not fully compensate plaintiffs for their losses may constitute judicial and attorney malpractice.

These fiduciary responsibilities, at least in part, are implicitly and explicitly identified by Class Counsel in "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) addressed to the Cooke Court with a file date of March 8, 2019 (Ref. 2)

While each of the following Objections warrants serious consideration as it provides sufficient grounds to deny final approval of the Settlement Agreement as it is currently written, taken together, Objections A through J present an overwhelming case for denying final approval of the Global Settlement Agreement.

## MDL No. 2047 Objection A – "Parker Waichman" Settlement

This Objection applies to the entire Amorin Class.

The Global Settlement Agreement should not receive final approval until the Class Counsels' concerns regarding the Parker Waichman Settlement Agreement are addressed and adjudicated by an impartial third party.

The "Parker Waichman" Settlement Agreement, aka the "Joint Notice of Settlement Agreement" and the "Small Settlement", appears to Class Counsels to blatantly violate the legal and Constitutional rights of the 498 victims of defective Chinese drywall who were involuntarily and unknowingly included in this Settlement Agreement (Ref. 2). That being the case, it brings into question the Court's motivation for approving the Parker Waichman Settlement Agreement or at least moving it forward, as the case may be. As Class Counsels had predicted (Ref. 2), the Parker Waichman Settlement Agreement also greatly undermined the opportunity for a fair settlement for the remaining Amorin Class members.

Class Counsels Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class, Document 222135-1 (Ref. 2), lays out in detail how the Parker Waichman Settlement Agreement circumvents the MDL process and undermines the Amorin Class Action process. Exhibit 1, the undersigned's letter to Judge Fallon, dated November 13, 2019, provides a summary of the salient issues that Class Counsel has, or at least had with the Parker Waichman Settlement Agreement.

## MDL No. 2047 Objection B – Noncompliance with Fiduciary Responsibility

This Objection applies to the entire Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets as defined in the Allocation Neutral report (Ref. 3)

Neither the Court nor Class Counsel nor the undersigned's former Morgan & Moran attorney has met their fiduciary responsibility with regards to informing and engaging the plaintiffs in this litigation, including during the settlement negotiation process, and after the Court's preliminary approval of the Global Settlement Agreement when each plaintiff must decide to either

accept or opt out of the settlement. The Global Settlement Agreement should not be finalized unless and until all parties have met their fiduciary responsibilities.

Class Counsel clearly articulates these responsibilities in Reference 2. For example, Class Counsel states unequivocally that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan."

Exhibit 2 is the undersigned's October 21, 2019 letter to Judge Fallon including two attachments that together illustrate that Class Counsel and the undersigned's former Morgan & Morgan attorney have not provided information that they are legally obligated to provide.

Exhibit 3 is the transcript of the October 23, 2019 Status Conference. During the Status Conference the Court made the following statement. "I received a long letter from Mr. Moody [the undersigned], who had a number of questions, but he has met already five or six or seven times with his attorney, and his attorney has endeavored to answer those questions. Sometimes the answers are not satisfactory, but they are answers. If you don't like the answer, you have the opportunity to say, 'I'm not coming to the dinner, folks. I'm just letting you know, I'm out,' and go to your own place and seek to obtain your dinner." The problem with this Court statement is that the Court is either wittingly or unwittingly equating responses to answers. It doesn't matter whether a plaintiff has met with his or her attorney five, six, or seven times, or even a hundred times. What matters is whether or not the attorney provides complete and honest answers to the plaintiff's questions. The Class Counsel has not, and the undersigned's former attorney did not and elected instead to withdraw as the undersigned's attorney.

Judge Fallon's "drumstick" analogy is also extremely troubling. It misrepresents and greatly belittles the gross unfairness of the Global Settlement Agreement, equating the plaintiffs, particularly those in the 75% and 20% Buckets, as spoiled brats who stomp away from the dinner table because they didn't get the whole drumstick.

Why would Class Counsel and the undersigned's former attorney refuse to answer questions concerning information relevant to, and possibly pertinent to a plaintiff's decisions, and why would the Court not compel Class Counsel and plaintiffs' attorneys to answer these questions? There are two possible motives. Honest answers to these questions may encourage the plaintiff to opt out, and that's clearly not in the best interest of the Court, Class Counsel, or the plaintiffs' attorneys. Or, honest answers to these questions would expose attorney and/or judicial misconduct or even malpractice.

## MDL No. 2047 Objection C – Fraudulent Motion to the Cooke Court

This objection applies to the Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets. It also impacts all plaintiffs who are included in the Global Settlement Agreement.

The Global Settlement Agreement is built on a foundation of fraud and, therefore, should not receive final approval. The path to the Global Settlement Agreement passed through a key motion to the Cooke Court, signed by Patrick S. Montoya. This motion contains fraudulent

statements that ultimately resulted in discounted settlement offers for all plaintiffs and hugely discounted settlement offers for many.

Neither the undersigned nor any of the CDW victims who posted on the Victims of Chinese Drywall Facebook page were consulted or informed about this critically important Motion. It's not clear whether or not ANY plaintiffs were consulted or informed about this motion.

On August 31, 2018, the "Plaintiffs' Motion and Memorandum of law to Adopt Plan for Resolution of the Florida Amorin Plaintiffs' Claims for Remediation and Other Damages", Document 52 (Ref. 4), was filed with the Cooke Court. The Motion began by stating that "After more than nine years of pretrial proceedings in the MDL and a Class Damages Hearing for all Amorin Plaintiffs, it is time to resolve efficiently and fairly the 1,700 claims for damages to properties in Florida resulting from defective Chinese Drywall. These homeowners deserve to have their day in court as soon as possible." "…it is time to resolve efficiently and fairly" and "These homeowners [Florida Amorin Plaintiffs] deserve to have their day in court as soon as possible." – so far, so good.

The Motion goes on to say "Liability is already established by virtue of numerous defaults entered against Defendants for willfully refusing to appear in the litigation at the outset and orchestrating a plan to avoid the MDL Court's jurisdiction and delay these proceedings. The only issue remaining is the amount of Plaintiffs' damages." – also good news, if only it were true.

Further along the Motion states that "Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 as adjusted by the RS Means location factor." The adjustment for Florida claims ranges from $84.73 to $90.02 per square foot under air.

So, if any plaintiffs had seen this motion, and it's not clear that any plaintiffs' attorneys provided a copy to their CDW clients or even informed their clients about the motion, it would be reasonable for the plaintiffs to assume that Taishan liability has been established and they'd be receiving $105.91 as adjusted by the RS Means location factor with the adjustment for Florida claims ranging from $84.73 to $90.02 per square foot under air. The only thing remaining was to verify that the plaintiff's drywall was one of the twelve covered drywalls based on markings and labels, verify the square footage under air, and verify ownership. Had this been true, as it was portrayed in the Motion, then what followed, even though what followed was a lie, would have been more palatable.

The Motion goes on to say that "Plaintiffs seek to reduce judicial labor and propose that remediation damages – calculated according to a formula approved by Judge Fallon following an evidentiary hearing with expert testimony – should be finalized expeditiously as part of a claims process before a Special Master." This is clearly a bald-faced lie, and it's unreasonable to assume that Judge Cooke didn't know it was a lie.

Had the Special Master's tasks simply been to recommend methods/criteria for verifying square footage, e.g. tax assessor records, proof that the plaintiff has one of the covered drywall types, aka Buckets, e.g. an inspection report by a certified home inspector, and home ownership, e.g. county courthouse, county recorder, city hall records, then the statement in the previous paragraph would have been a little white lie.

It's understandable that plaintiffs' attorneys in a class action lawsuit have a great deal of latitude in making unilateral decisions without always consulting each individual plaintiff. However, it's well known that class action plaintiffs' attorneys occasionally abuse this power. When the plaintiffs' attorneys blatantly lie to the court about the intent and wishes of the plaintiffs, that crosses a line into misconduct, if not malpractice.

The Motion further states that "These verifications [of square footage, covered drywall and ownership] can be accomplished through a claims process and the use of a Special Master so as not to burden this Court's docket." If product ID were a simply a matter of providing evidence, e.g. inspection report, that one of the covered drywall types (Buckets) exists in the home, then "verifications" and "claims process" would have been appropriate. In the quoted statement above, the authors, either wittingly or unwittingly, obfuscated what they knew the real product ID issue to be[3]. Presenting product identification as an issue equivalent to square footage and ownership is disingenuous at best and brings the intentions of the Motion's Movers and the Cooke Court into question, a question that needs a satisfactory answer before final approval of the Global Settlement Agreement.

The Motion's Conclusion states, in part, that "Plaintiffs' counsel and the Plaintiffs' Steering Committee in the MDL have collaborated and cooperated to compile the detailed and substantial evidence supporting Plaintiffs' damages claims, to which Defendants have had full access for many months." There are two points here. First, is the reference to "Plaintiffs' counsel", clearly drawing a distinction between references to the intentions of the plaintiffs themselves and the plaintiffs' counsel. This underscores the lies in this Motion. Second, the plaintiffs' counsel claims to have detailed and substantial evidence supporting Plaintiffs' damages claims, evidence that Class Counsel now refuses to provide to plaintiffs in violation of Class Counsel's fiduciary responsibility.

## MDL No. 2047 Objection D – Inclusion of Inadmissible Evidence

This Objection applies to all plaintiffs included in the Global Settlement Agreement; however, it is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

Final approval of the Global Settlement Agreement should be denied due to the Allocation Neutral's consideration of inadmissible evidence in establishing the allocation of funds.

The Allocation Neutral was provided numerous documents pertaining to Product ID. Most of these documents are related to the Special Master appointed by the Cooke Court. Neither the Special Master's reports nor the plaintiffs' attorneys' objections to those reports have been adjudicated. Therefore, these documents should be ruled inadmissible in providing any basis of allocation by the Allocation Neutral.

In fact, the large number, and nature of the documents provided to the Allocation Neutral raises a red flag concerning the expansive role assumed by the Allocation Neutral and the likelihood that the Allocation Neutral is noncompliant with the Global Settlement Agreement.

---

[3] It turns out that, according to the Global Settlement Agreement, "product identification" is simply proof that drywall found in a plaintiff's home is one of the covered drywall types (Buckets).

## MDL No. 2047 Objection E – Violations of the Global Settlement Agreement

This Objection applies to all plaintiffs included in the Global Settlement Agreement, but is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

The approval of the Global Settlement Agreement should be denied because the terms and conditions of the Agreement have been violated at least with respect to the Product ID basis for allocation of funds.

The Settlement Agreement states on page four that "**WHEREAS**, without conceding the correctness of any other Party's legal position, claims and/or defenses, the Parties wish to avoid the effort, expense and risk of continued litigation;"

So, neither Taishan's position that it may not have manufactured, or did not manufacture a particular covered drywall, nor the Plaintiffs' attorneys', including the PSC and Class Counsel, position that Taishan did, in fact, manufacture all covered drywall should be considered in the Allocation Model.

This matter becomes even more perplexing because on page 35 of the Settlement Agreement it states that "Taishan shall not be involved in the allocation or distribution of the Settlement Funds." So, per the Settlement Agreement, the Plaintiffs' attorneys are not conceding that Taishan may not have manufactured all covered drywall. And, Taishan is not involved in the allocation or distribution of funds. Therefore, it was strictly the Plaintiffs' attorneys' decision, and possibly the Court's as well, that Taishan's position on whether it did, may have, or didn't manufacture certain drywall Buckets would be a factor in the allocation of funds, despite the Plaintiffs' attorneys' position that all covered drywall was manufactured by Taishan. And so, the Plaintiffs' attorneys are, in fact, conceding that Taishan may not have manufactured covered drywall in Buckets D, I, and J, and Taishan didn't manufacture covered drywall in Buckets B, C, F, G, and L.

But it gets even worse. On page 21-22 of the Settlement Agreement it states that "The review, determination and approval of the Allocation Model by the Court shall be final and binding on the Parties and the Class. There shall be no right of appeal of the approval of the Allocation Model to any other court, including the U.S. Court of Appeals for the Fifth Circuit, such right of appeal having been knowingly and intentionally waived by each Settlement Class Member." So, if a plaintiff opts in but objects to this, quite possibly unlawful allocation model, and the Court dismisses that objection, it's not appealable. What the Plaintiff's attorneys and the Court have done is make the most objectional aspects of this settlement agreement unappealable. Why would they do that?

The only plausible explanation is that the Court and the Plaintiffs' attorneys know that they've agreed to a grossly unfair settlement. So, they've structured the settlement so that those who get the least net amount of funds are also those who are the least likely to opt out. Then they've further structured the settlement to put in place additional disincentives to opt out for those receiving the least. For example, as stated above, according to the Settlement Agreement including the Allocation Model, the plaintiffs' attorneys have conceded that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, a concession that violates the terms of the Settlement Agreement. And, if the Court approves this Settlement Agreement, it will have ruled that, in fact, Taishan did not manufacture drywall in Buckets B, C, F, G, and L, slamming the door shut on any real possibility that plaintiffs in Buckets B, C, F, G, and L who opt out could successfully sue

Taishan.  Why would they do that? Because it's in the best interest of the Court, the Class Counsel, and the plaintiffs' attorneys to limit opt outs.

This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing miserably in that regard.

## MDL No. 2047 Objection F – Product Identification Means Proof of Covered Drywall

This Objection applies to all plaintiffs who are in the 75% Buckets D, I, and J, and the 20% Buckets B, C, F, G, and L.

In treating "Product Identification" as anything different than how it's defined in the Settlement Agreement, which the Allocation Neutral has done is a violation of the Settlement Agreement. Therefore, approval of the Settlement Agreement should be denied.

The Settlement Agreement states on page 13 that "Objective Allocation Criteria. 'Objective Allocation Criteria' shall mean the objective criteria that form the basis for the allocation of Settlement Funds among Eligible Class Members pursuant to the Allocation Model developed by the Allocation Neutral, subject to Court approval. The Objective Allocation Criteria shall include, but not be limited to: (i) Under Air Square Footage of the subject Affected Property (ii) **Product Identification** [emphasis added], (iii) Affected Property Ownership Status, (iv) Affected Property Remediation Status, (v) Set-Offs, (vi) Assignments of Class Members' rights to pursue Claims, and (vii) whether the claimant is an Amorin Plaintiff or a Brooke Plaintiff, or an absent Class Member. The Allocation Neutral may add additional Objective Allocation Criteria to the Allocation Model that will be submitted for Court Approval."

The Settlement Agreement states on page 14 that "Product Identification. 'Product Identification' shall mean the proof of Covered Chinese Drywall in the subject Affected Property, as defined in Section 1.12."

On page 11 of the Settlement Agreement "Covered Chinese Drywall. 'Covered Chinese Drywall' shall mean all drywall products alleged to be attributable to Taishan and/or the Additional Released Parties, including, but not limited to those products identified in the Taishan Product ID Catalog (See MDL Rec. Doc. 22152-3 and S.D. Fla. ECF No. 155-2) and as set forth in Exhibit 2: (A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K) Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. Covered Chinese Drywall excludes the following drywall products: Knauf, Knauf Tianjin, KPT, Bedrock, ProRoc, Panel Rey, IMG, USG, Shamrock Gold, Lafarge, Georgia Pacific, National Gypsum, and any drywall manufactured outside of the People's Republic of China."

So, for the Allocation Neutral to treat Product Identification as anything other than proof that the drywall is a covered drywall as defined by the Settlement Agreement is a violation of the Settlement Agreement.

## MDL No. 2047 Objection G - Compensation for All Remediation Damages

This Objection applies to all plaintiffs included in the Global Settlement Agreement.

The Global Settlement Agreement should be rational, reasonable, and consistent, including recognition of the fixed settlement amount agreed to by Taishan, i.e. $248M, and the prospect of compensating all plaintiffs for all property and remediation damages, which is zero.

Yet, on page 21, the Settlement Agreement states that "The Allocation Amount is intended to provide compensation for **all** [emphasis added] property and remediation damages as well as Other Losses." This brings the entire Settlement Agreement into question, and is therefore a basis for denying final approval of the Agreement.

## MDL No. 2047 Objection H – Insufficient Media Outreach

This Objection applies to all potential Absent Class Members.

There are serious doubts that the Settlement Agreement's terms and conditions for media outreach, as defined on pages 24 and 25 have been met. Therefore, the final approval of the Global Settlement Agreement should be denied, or at least delayed in proportion to the delays in meeting the Global Settlement Agreement's media outreach terms and conditions.

## MDL No. 2047 Objection I – Awards to Ineligible Plaintiffs

This Objection applies to all plaintiffs in the 100% Buckets A, E, H, and K.

If the Court approves the Global Settlement Agreement, including the Allocation Neutral Model as written, the Court will have ruled that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, and plaintiffs in these Buckets deserve no compensation. Since these plaintiffs are being awarded 20% of a yet-to-be-determined baseline amount, the final approval of the Global Settlement agreement should be denied.

The Allocation Neutral has decided to award 20% to plaintiffs with drywall in Buckets B, C, F, G, and L, essentially giving these plaintiffs a "participation trophy" award. There is no basis in law requiring or allowing plaintiffs to receive an award settlement on the basis of their participation in the litigation alone in a lawsuit. Given the fixed amount that Taishan has agreed to, i.e. $248M, giving out participation trophy awards to the 20% plaintiffs is unlawfully depriving the 100% plaintiffs of funds that should have been awarded to them. Participation trophy awards are appropriate in pre-teen soccer leagues, they are not appropriate in a court of law.

## MDL No. 2047 Objection J – Nefarious Intentions and Misinformation

This Objection applies to all plaintiffs in the Global Settlement Agreement.

Information provided to the undersigned by his former Morgan & Morgan attorney, Pete Albanis, and public statements made by attorney Arnold Levin, Lead Counsel for the Plaintiffs' Steering Committee and Class Counsel for the Global Settlement Agreement appear to be at odds with the Global Settlement Agreement. The Global Settlement Agreement should not receive final approval unless and until the incongruency between what plaintiffs' attorneys are saying and what's in the Global Settlement Agreement are satisfactorily resolved.

The undersigned's former Morgan & Morgan attorney, Pete Albanis, stated that it was Taishan that proposed a pretrial settlement during secret negotiations at the Cooke Court mandated mediation, that Taishan first proposed settling cases for those plaintiffs scheduled for trial in July

2019, and when the plaintiffs' attorneys agreed, Taishan proposed including all 1,734 Florida plaintiffs, and when the plaintiffs' attorneys agreed, Taishan proposed that the pretrial settlement resolve all cases nationwide.

In a New Orleans City Business article, published in March 2018 (Exhibit 4), attorney Arnold Levin is quoted as saying "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," and "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages," and "The Chinese will be all over America trying cases."

Later, in a CISION PR Newswire article, published in August 2019 (Exhibit 5), attorney Arnold Levin is quoted as saying he is, "**extremely pleased** [Emphasis added] with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

So, a lead counsel for the plaintiffs believes that a large jury-award (big verdict) is needed to provide a fair settlement, and he also believes that a big verdict is definitely collectable. Yet, if you believe Mr. Albanis, somehow the plaintiffs' attorneys had their arms twisted into accepting an extremely lowball offer from Taishan. But the Global Settlement Agreement contradicts this scenario.

The Global Settlement Agreement paints a different scenario. The Settlement Agreement on page 3 states "**WHEREAS**, Settlement Class Counsel has made a demand on Taishan to settle all Chinese Drywall claims of Class Members against Taishan and the Additional Released Parties;" So, according to the Settlement Agreement, the plaintiffs' attorneys were the party demanding a pretrial settlement, a settlement that falls $1 Billion short of a fair settlement for the plaintiffs.

## Conclusion

The plaintiffs in this drawn out litigation are not spoiled brats who want the whole drumstick, as Judge Fallon suggests. They are the victims. They were victimized by the Chinese who manufactured the toxic drywall. They were victimized by the construction industry that covered up the problem and continued to install toxic drywall. They were victimized by our elected government officials who promised over and over again to help but never did. They are the victims of our judicial system that failed to protect their rights. And finally, they are now being victimized by their own attorneys who are putting their self interest ahead of their clients. It's also worth pointing out that toxic Chinese drywall is a "gift" that keeps on giving. Rather than suffer foreclosure and/or bankruptcy, many victims have been living in their toxic homes for over a decade.


Respectfully Submitted to the Court.

Russell F. Moody

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## List of References

1. CLASS SETTLEMENT AGREEMENT WITH TAISHAN GYPSUM COMPANY LTD., F/K/A SHANDONG TAIHE DONGXIN CO. LTD. AND TAIAN TAISHAN PLASTERBOARD CO. LTD., Document 22305-2 Filed 08/20/19
2. Class Counsels Memorandum of Law In Support of Rule 23(d) Motion to Protect The Amorin Class, Case 2:09-md-02047-EEF-JCW Document 22135-1 Filed 03/08/19
3. CHINESE DRYWALL LITIGATION SETTLEMENT: ALLOCATION MODEL AND ALLOCATION NEUTRAL REPORT, Document 22304 Filed 08/19/19
4. PLAINTIFFS' MOTION AND MEMORANDUM OF LAW TO ADOPT PLAN FOR RESOLUTION OF FLORIDA AMORIN PLAINTIFFS' CLAIMS FOR REMEDIATION AND OTHER DAMAGES, Document 52 Entered on FLSD Docket 08/31/2018

## List of Exhibits

1. Exhibit 1: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon, dated November 13, 2019
2. Exhibit 2: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019
3. Exhibit 3: TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS HEARD BEFORE THE HONORABLE ELDON E. FALLON UNITED STATES DISTRICT JUDGE, October 23, 2019
4. Exhibit 4: New Orleans City Business March 29, 2018 article: Judge: Return Chinese drywall lawsuits to original states"
5. Exhibit 5: CISION PR Newswire August 20, 2019 article: "Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits"

# Exhibit 1

Mr. Russell Moody letter to the Honorable Judge
Eldon E. Fallon, dated November 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 13, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
 (239) 284-2068
 russmoody@comcast.net

Via Certified U.S. Mail, and E-Mail
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

     This is a follow-up letter to my letter the Court dated October 21, 2019 (Ref. Document 22346) in which I asked the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision, and to extend the November 27, 2019 deadline due to Class Counsels' and my Morgan & Morgan attorney, Pete Albanis' unwillingness to provide the above referenced information, information that they have a fiduciary responsibility to provide (Doc. 22135-1, page 4).

     Class Counsel continues to ignore my requests for all relevant information that may be pertinent to our opt in/opt out decision. Morgan & Morgan and our attorney, Pete Albanis, recently cited irreconcilable differences in a, now Court approved, motion to withdraw as our counsel. The only "irreconcilable differences" we had with Morgan & Morgan is that we sought information from Morgan & Morgan that is clearly relevant and that may be pertinent to our opt in/opt out decision, and Morgan & Morgan chose to withdraw as our counsel rather than provide it.

     In "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) Class Counsel raised serious concerns and objections to the "Joint Notice of Settlement Agreement" (Doc. 22125), aka "Rogue Settlement", presented to the Court by Parker Waichman, Milstein, Jackson, Fairchild & Wade, Whitfield, Bryson & Mason, Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, and Taishan (Joint Notice Counsel). Class Counsel expressed concerns that the Rogue Settlement sought to settle at severely discounted rates without adequate communication with settling attorneys' clients (Doc. 22135-1, page 3). I would like to point out to the Court that Class Counsel is now seeking to settle for severely discounted rates, having reached a secret settlement agreement without any communication with the affected Class members.

     Class Counsel stated that Chinese drywall victims should receive compensation for their damages and that the Rogue Settlement may have a direct negative impact on the Amorin Class members who want full compensation for their damages (Doc. 22135-1, page 4). Class Counsel also asserts that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan." (Doc. 22135-1, page 4). Class Counsel has reached a settlement agreement for severely discounted compensation, and has not provided the undersigned with all relevant information that may be pertinent to our opt in/opt out decision. It is also not clear that Class Counsel has met its fiduciary responsibility with regards to providing any Class members with this information.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 11) Class Counsel states that "it is far from clear whether [the Rogue Settlement] was accomplished with a full and complete disclosure of facts and information to [the subset of Class members included in the Rogue Settlement]." What is clear is that Class Counsel itself negotiated a secret settlement agreement without any disclosure of facts and information to Class members.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1 pages 11-12) Class Counsel states that "To begin, the proposed settlement disregards this Court's formulaic method for calculating damages, by only allowing for the Florida Amorin cases a maximum, ironically referred to as a 'baseline,' of $60 per square foot for drywall with a limited sub-set of Taishan/Tiahe markings to current owners and former owners … Other Class members would be subject to steep discounts up to 80%. However, Judge Cooke's Order of November 16, 2018, adopted all of this Court's well-reasoned findings, making any discount, especially the deep discounts agreed to by the Joint Notice Counsel, inappropriate." Ironically, Class Counsel later adopted discounts similar to, and possibly greater than the "inappropriate" Rogue Settlement discounts.

In Class Counsels' objection to the Rogue Settlement (Doc. 2135-1, page 13) they state that "The plain wording of the Rule authorizes a Class Notice relating to "any step in the action." The operative consideration in issuing Rule 23(d)(2) corrective and injunctive orders18 is the court's unique fiduciary role to protect the legal rights and interests of class members, and its institutional interest in controlling "the fair conduct of the action." Yet Class Counsel neglected its fiduciary responsibility to its Class members and, instead, misrepresented Class member interests and desires to the Court.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 15) Class Counsel raises concerns that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." Unfortunately, Class Counsel and, I believe many, if not most plaintiffs' attorneys are providing "one-sided" information to Class members to discourage them from opting out.

Class Counsels' nearly wholesale adoption of all the objectionable actions and inactions of the Joint Notice Counsels' Rogue Settlement is, I believe, clear evidence that Class Counsel is putting its self-interests, and possibly the interests of the Courts before the interests of the plaintiffs, i.e. toxic Chinese drywall victims. That Morgan & Morgan decided to withdraw from representing Beverly Moody and the undersigned, which the undersigned believes Morgan & Morgan did to avoid its fiduciary responsibility to provide all relevant information that may be

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

pertinent to our opt in/opt out decision I believe underscores the serious magnitude of the plaintiffs' attorneys' conflict of interest with their clients.

Class Counsel and the undersigned's attorney, before he and Morgan & Morgan withdraw from representing the undersigned, provided multiple responses to the undersigned's requests for relevant information that may be pertinent to our opt in/opt out decision. Unfortunately, those responses have, at best, been only partially responsive to those information requests.

In particular, the undersigned has repeatedly requested all relevant information pertaining to any and all evidence that Taishan manufactured ProWall, including information that was available to Morgan & Morgan and PSC in June 2010 when the undersigned retained Morgan & Morgan, as well as the additional evidence that was accumulated throughout this litigation.

The undersigned has also repeatedly requested relevant information related to collectability. In a March 29, 2018 article published in the New Orleans City Business, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee stated that "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict" and that "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, … those companies' assets in this country can be attached if Taishan ignores court orders to pay damages." So, attorney Levin believed on March 29, 2018 that a fair jury trial award against Taishan was definitely collectable. Then, just five months later, attorney Levin totally undermined that strategy when his name appeared on a motion to the Cooke Court (Doc. 52) claiming that the "Plaintiffs seek to reduce judicial labor and propose that remediation damages … should be finalized expeditiously as part of a claims process before a Special Master."[1] This apparent PSC change in strategy is clearly relevant to collectability and, therefore, relevant and pertinent to the opt in/opt out decision. Yet, the Class Counsel refuses to address this issue.

The undersigned believes that the actions of his former attorney and Class Counsel are intended to obstruct justice and to run out the clock as the November 27th deadline rapidly approaches.

In view of the foregoing, the undersigned respectfully submits the following requests to the Court.

- Allow plaintiffs to submit Objections directly to the Court and order Class Counsel to update the Chinese Drywall Settlement Information Website (https://www.chinesedrywallsettlement.com) and notify all plaintiffs of this change. Requiring plaintiffs to submit objections to Class Counsel is akin to requiring plaintiffs' attorneys to submit all motions to Taishan. The undersigned believes that requiring plaintiffs to submit objections to Class Counsel is prejudicial against the plaintiffs for reasons discussed above, and is underscored by attorney Duggan's email to the undersigned stating "At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances

---

[1] This statement appears to clearly be a lie. Although the undersigned understands that, in a class action, attorneys have wide latitude in representing the plaintiffs' interests, he doesn't believe that these attorneys have the authority to knowingly lie about the plaintiffs' intentions and desires.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court." So, according to Ms. Duggan, it's not even clear that the Court will receive objections except as an attachment to Class Counsels' "unified" response submitted to the Court.

- Compel Class Counsel to immediately provide all plaintiffs with all relevant information that may be pertinent to each plaintiff's opt in/opt out decision. While some required information will be common across all plaintiffs, some will not. As a minimum, different information is required depending on which of the 12 Buckets a plaintiff is in based on the markings and labels found on drywall in that plaintiff's home.
- Extend the November 27th deadline. The deadline for opting in or opting out, and filing an Objection is only two weeks away from the date of this letter, leaving insufficient time for plaintiffs to obtain and consider the information that they require and deserve in order to make an informed decision. Class Counsel is trying to run out the clock. I implore the Court to not be complicit in allowing Class Counsel to do that.
- Allow plaintiffs who have objections to defer their opt in/opt out decision until their objects have been presented to the Court and the Court has ruled on those objections. Requiring plaintiffs to opt in in order to object is basically saying you have to accept the deal to object to it. At the very least, this gives the appearance that allowing objections and holding a "Fairness" Hearing is all for show.
- Provide the undersigned, who is no longer represented by an attorney, with all documentation in the Courts' possession that is relevant and may be pertinent to the opt in/opt out decision, particularly information relevant to ProWall victims.
- Enter this letter into the Court Record.

As a final note, this litigation has been horribly complex and a terrible decade-long strain on the toxic Chinese drywall victims; however, one thing is perfectly clear. This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing to do that.

Respectfully,

Russell Moody

# Exhibit 2

Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

October 21, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

My wife, Bev, and I are members of the Amorin Class. We have ProWall Chinese drywall putting us in one of the five "20%" Buckets. We need at least $65/SqFt to cover remediation costs. If we opt in, we'll likely get less than $10/SqFt.

I have sent emails addressed to, or copied to the Court via Mr. Dean Oser. I am writing this letter to you, in part, because Mr. Oser informed me that the most proper fashion to address the Court would be to write a letter to you. The problem with "snail mail" is that the lag time precludes timely resolution of critical matters prior to Court imposed deadlines.

While we intend to raise several serious objections should we opt in, including the unlawful denial of our Constitutional right to a jury trial, our immediate concern is our opt in/opt out decision. Class Counsel and our attorney are refusing to provide all relevant information that may be pertinent to our decision. Attachment 1 is my latest request for information. Attachment 2 is a string of email exchanges with Class Counsel in my unsuccessful attempts to get relevant information. I have also exchanged numerous emails, had phone calls, and face-to-face meetings with my attorney, Mr. Albanis, Morgan & Morgan, to no avail.

Also, I've gotten conflicting answers, but no specific information on the role Product ID played in the secret settlement negotiations, information that is clearly relevant to our opt in/opt out decision.

I believe that the problem I'm facing, and I see other plaintiffs facing, is due, at least in part, to the conflict of interest of Class Counsel and plaintiffs' attorneys who, I believe, have clearly put seeing this Settlement approved before the best interests of their clients.

I ask the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision.

I also ask the Court to extend the November 27, 2019 deadline due to the delays that plaintiffs have encountered in getting relevant information from Class Counsel and their attorneys that may be pertinent to their opt in/opt out decision.

Respectfully,

Russell F. Moody
Russell Moody

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 15, 2019 6:59 PM |
| **To:** | 'Sandra L. Duggan'; 'Arnold Levin'; 'SHerman@hhklawfirm.com'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'Dean_Oser@laed.uscourts.gov' |
| **Cc:** | 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier' |
| **Subject:** | MDL #2047: Relevant information bearing on opt in - opt out decision |

**Importance:**        High

Dear Class Counsel and Judge Fallon Court,

I am reaching out to Class Counsel in accordance with Judge Fallon's recent Order regarding communications with the Court during the Class Notice period: Document 22340, filed on October 9, 2019.

I am also reaching out to the Court with regards to the abovementioned Order.

I believe that it is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan. I know that Class Counsel agrees with me on this [MDL 2047, Document 22135-1].

I also believe that, thus far, neither the Court nor the Class Counsel have been fully responsive to the abovementioned responsibility.

I am speaking here on behalf of my wife, Bev, and myself, as well as all other MDL 2047 "Large Settlement" plaintiffs, particularly those falling in the 75% and 20% Buckets. However, my comments below specifically address those plaintiffs with toxic Chinese drywall where the drywall inspection report found ProWall markings/labels, typically on a very few drywall boards. Without visual evidence collected during the initial drywall installation or visual evidence collected during remediation, it's impossible to know whether or not toxic Chinese drywall with non ProWall markings/labels also exists in the home. A friend's inspection report also found ProWall, putting him in the 20% Bucket. Fortunately for him, when his home was very recently remediated, toxic Chinese drywall in the 75% Bucket was also found, just in time to meet the October 3, 2019 deadline for updating the spreadsheet.

We retained Morgan & Morgan in June 2010. For nearly a decade my wife, Bev, and I were told that our toxic Chinese drywall was manufactured by Taishan. "You are receiving this email because you have Chinese Drywall manufactured by Taishan in your home" a November 28, 2011 email from Morgan & Morgan states. Clearly, Morgan & Morgan, and by extension the PSC, must have had solid evidence at that time that Taishan manufactured ProWall, solid enough to withstand a challenge in a jury trial. It's also clear that we would not have been included in the Amorin Class Action had there not been equally, if not stronger solid evidence at that time that Taishan manufactured ProWall. Just one source of evidence, according to our attorney, involves the gypsum mine used by Taishan, although he provided insufficient details to affect our opt in – opt out decision.

We need to obtain from the Court and/or the Class Counsel all relevant information that may be pertinent to Taishan's alleged manufacture of ProWall in order to make an informed decision on opting in or opting out, i.e. information in the Court's and/or Class Counsel's possession between June 2010 and today that is relevant to what the ProWall plaintiffs' attorneys knew, when they knew, and how they knew (evidence) that Taishan manufactured ProWall.

Another critical factor in making an informed decision on opting in or opting out is collectability. In a March 25, 2018 news article, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict is needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA can be used as leverage to force Taishan to pay that fair award – definitely collectable the PSC said. Then, only four months later (August 30, 2018), attorney Levin's name is included on a motion filed with the Judge Cooke Court that asked the Cooke Court to forgo a trial in favor of a Special Master. Clearly something significant happened with regards to collectability between March and August 2018. What changed?

The above requested information, and any other relevant information in the possession of the Court and/or the Class Counsel that may be pertinent to the opt in/opt out decision, is needed by us, and all other ProWall plaintiffs, in order to make an informed opt in – opt out decision.

Thank you for your attention to this critical matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

10/20/2019                         RE CDW Settlement Issues and Concerns.htm

**From:**            russmoody@comcast.net
**Sent:**            Tuesday, October 08, 2019 4:45 PM
**To:**              'Sandra L. Duggan'
**Cc:**              'SHerman@hhklawfirm.com'; 'Arnold Levin'; 'rserpe@serpefirm.com'; 'patrick@colson.com';
                     'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier';
                     'Dean_Oser@laed.uscourts.gov'
**Subject:**         RE: CDW Settlement Issues and Concerns

Ms. Duggan,

I never doubted that you understood that my wife, Bev, and I, and most plaintiffs, particularly the "75% and 20% Bucket" plaintiffs, are deeply disappointed, not just in the anticipated outcome, but more so that we were apparently betrayed by our own attorneys and the Courts.

Although we feel that we have every right to be disappointed and very angry, my emails to you were not about disappointment and anger, even though that disappointment and anger may have shown through, and for that I apologize. My emails were about getting essential feedback and support from the attorneys supposedly representing us in this litigation. I'm not looking for rationalizations on why we should accept what is admittedly a horrible settlement offer. I'm looking for the facts that allow us to make an informed opt in /opt out decision, and to possibly allay concerns we have about how this litigation unfolded and ended up crashing and burning for many, if not most, plaintiffs.

What I don't understand is why the Class Counsel and my attorney are withholding information from the plaintiffs that is critical to our opt in / opt out decision. While I and other plaintiffs are questioning certain actions taken by the PSC, Class Counsel, and our attorneys, as well as the Courts, actions that many plaintiffs believe constitute misconduct, malfeasance, and possibly malpractice, our immediate and biggest concern is whether we should opt in or opt out. It's clear that you are withholding critical information from us. Why would you do that? I think in order to coerce as many as possible into opting in to a grossly unfair settlement offer.

I assume that you're pleading the 5th on the questions and concerns I raised. If not, I would still like you to address those questions and concerns. If you're not the right person to address those questions and concerns, please direct me to the right person.

Thank you for your consideration of this serious matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 2:53 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;

10/20/2019                                          RE CDW Settlement Issues and Concerns.htm

<u>Dean_Oser@laed.uscourts.gov</u>
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody: I understand that you are disappointed.  We wish you the best of luck in whatever course of action you decide to take.


Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
<u>www.lfsblaw.com</u>

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.


**From:** <u>russmoody@comcast.net</u> <<u>russmoody@comcast.net</u>>
**Sent:** Tuesday, October 8, 2019 2:17 PM
**To:** Sandra L. Duggan <<u>sduggan@lfsblaw.com</u>>
**Cc:** <u>SHerman@hhklawfirm.com</u>; Arnold Levin <<u>ALevin@lfsblaw.com</u>>; <u>rserpe@serpefirm.com</u>; <u>patrick@colson.com</u>; <u>bevmoody@comcast.net</u>; <u>palbanis@forthepeople.com</u>; Keith Verrier <<u>KVerrier@lfsblaw.com</u>>; <u>Dean_Oser@laed.uscourts.gov</u>
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for your lengthy response. Honestly, to me, it appears to be a great legal rationalization for your actions, some of which raise serious concerns, particularly with regards to certain toxic Chinese drywall clients. I will, however, review your comments in detail and give serious consideration to your assertions.

Are you disputing the factual evidence of your about face?

Unfortunately, your responses don't fully address the specifics, or in some cases don't jibe with the facts related to our main concern: understanding/obtaining the evidence that Taishan manufactured ProWall. I'm hopeful that Mr. Albanis will provide us that evidence during our meeting this Thursday. However, The PSC and all the individual plaintiffs' attorneys must have had solid evidence that Taishan manufactured ProWall or they would not have included their ProWall clients, or their other "20% Bucket" clients, in the Amorin Class Action in the first place. Perhaps you can provide some insight into that. One explanation that appears to be supported by at least two plaintiffs' attorneys' comments is that Judge Fallon decided to only include Taishan as a Chinese drywall manufacturer defendant. Is that true? If so, what was Judge Fallon's rationale for that decision? If not, who decided to focus only on Taishan, and why?

It's recently come to light for many plaintiffs that there are multiple objectionable aspects concerning this litigation and the grossly unfair settlement agreement, all of which need to be addressed, including the plaintiffs' attorneys' fraudulent motion requesting a Special Master in lieu of a jury trial. However, our immediate concern is obtaining all evidence that Taishan manufactured ProWall, evidence that was available a decade ago, and the additional evidence acquired since then. If the only evidence that Taishan manufactured ProWall is what's contained in the Special Master's Product ID report, that I assume was provided to the Special Master by Mr. Albanis as the PSC's lead attorney on ProWall, that is a monumentally huge problem.

I just want honest answers to what I believe are legitimate and critical questions, the answers to which will bear heavily on our opt in /opt out decision.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 1:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Dear Mr. Moody:

For over ten years we have fought hard on behalf of all Plaintiffs to prosecute the claims against Taishan and its parent companies.  As you know, Defendants challenged jurisdiction, service of process, liability, and damages. We adopted a coordinated, comprehensive approach in our litigation strategy among all jurisdictions where Chinese Drywall cases were pending, which continued following the remand of *Amorin* cases to Florida and Virginia, and, therefore, we dispute your characterization of any "about face."  The likelihood of getting a jury verdict is generally reflected in the Allocation Model:  If you fall into a Product ID Bucket for which the independent Court-appointed Special Master ruled there is insufficient evidence linking that drywall to Taishan, you have a much less likely chance of being able to present your case to the jury.  Similarly, if you were a *Brooke* Plaintiff (and we know you are an *Amorin* class member), you generally would have a greater chance that your case will be dismissed on statute of limitations grounds.  As to the ability to enforce a judgment, we have no way of predicting what Taishan may or may not do.  All we know is that (i) we don't have the same types of enforcement mechanisms that would be available to us vis-à-vis a U.S. Corporation, (ii) Taishan, in the past, left the litigation after jurisdiction was established, and (iii) there is an appeal pending before the U.S. Fifth Circuit that may result in the dismissal of Taishan's parent companies, CNBM, BNBM Group, and BNBM, which would greatly limit (if not completely eliminate) the available potential

assets in the U.S. that could be seized.  We understand that you are disappointed with the Special Master's ruling on Product ID.  We presented all relevant Product ID evidence to the Special Master, and argued in favor of attributing all Product ID categories to Defendants.  But, unfortunately, with respect to several of the Product ID Buckets, which had lesser proofs of Product ID attribution to Taishan and/or BNBM, the Special Master saw it differently.  Yes, there is a right to appeal, which we were in the process of pursuing.  But there is a good chance that the Court will see things the same way as the Special Master.  Nevertheless, you are free to opt out of the Settlement, take up the appeal, and hope that you can secure a jury trial on damages.

With regard to the Settlement, should you decide to remain in the class, please understand that the Allocation Neutral appointed by the Court considered all relevant evidence and Court rulings regarding Plaintiffs' claims for remediation damages and other losses in arriving at the Allocation Model that will be used to determine Allocation Payments.  Under the law, the Court will "compare the settlement terms 'with the likely rewards the class would have received following a successful trial of the case.'" *Reed v. General Motors, Corp*, 703 F.2d 170, 172 (5th Cir. 1983). In other words, the Court will "compare the terms of the compromise with the likely rewards of litigation." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y.2007) (quotation omitted). The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys*, 851 F.Supp.2d at 1065. Rather, the Court will determine "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors not by attempting the impossible task of deciding whether the parties have reached exactly the remedy they would have asked the Court to enter absent the settlement, but instead by whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of plaintiffs' success on the merits." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 933 (E.D. La. 2012) (quoting and citing *Reed*; *Heartland Payment*, 851 F.Supp.2d at 1065; *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir.1983)) (internal quotations omitted), *aff'd, In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014).

Regards,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

10/20/2019                                                    RE CDW Settlement Issues and Concerns.htm

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 11:15 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my October 7th email. I do appreciate your attention to this serious matter.

The question I asked in that email relates directly to what I, and others, believe are the two most critical factors for us in deciding whether to opt in or opt out: the likelihood of winning a fair verdict in a jury trial and the likelihood of forcing Taishan to pay that fair award. The plaintiffs' attorneys' apparent complete about face on these two critical factors between March 25, 2018 and August 31, 2018 warrants an explanation to the plaintiffs, particularly those plaintiffs for which this proposed settlement is clearly not in their best interest. One possible explanation is pressure from the Courts to end this litigation quickly, which is actually mentioned in at least one motion to the Cooke Court. Is this the reason for the about face in litigation strategy? Is the answer contained in the court documents you referenced? It's a fair and essential question to ask, and deserves an honest answer for those considering whether they should opt in or opt out.

Again, the questions my wife, Bev, and I have must be answered well before the November 27th deadline to opt in or opt out, as they are critical to that decision. I believe it's clear that the PSC, Class Counsel, and other plaintiffs' attorneys collectively have answers to all these questions. To refuse to share those answers in an effort to force/intimidate clients into accepting an unfair settlement is clearly not acting in the clients' best interests. In fact, it demonstrates that these attorneys are no longer representing their clients' best interests.

I do appreciate your honesty in admitting that the proposed Settlement is not in our best interest, i.e. not in the best interest of plaintiffs with ProWall drywall or the other covered drywall that falls into the "participation trophy" award category of only 20% of what's likely not a fair settlement to begin with.

Thank you again for your attention to this serious issue.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, October 07, 2019 4:58 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

Dear Mr. Moody – there is a process in place for you, as a class member, to voice any objections you have to the settlement, or to opt out if you would like to pursue litigation and reject the Settlement (*see* my attached previous email to you dated October 2, 2019).  The deadline for objecting or opting out is November 27, 2019.  Class Counsel will respond to any and all objections in writing on or before December 6, 2019, in advance of the Fairness Hearing.

The questions you have posed seem to relate to the litigation and our litigation strategy, not the fairness, reasonableness, or adequacy of the Settlement. Developments in the litigation have been reported in monthly Status Reports (*see, e.g.*, Rec. Docs. 22272, 22290, 22309, 22323), and the reasons why Class Counsel believe that the proposed Settlement is in the best interests of the overwhelming majority of class members is also a matter of public record (*see* Rec. Doc. 22305), and takes into consideration the delay, expense, and risks of litigation, including the challenges of maintaining jurisdiction over and enforcing any eventual judgments against the Taishan-related entities and/or their assets over in China.  You should have sufficient information about the unfolding of the litigation to date, the settlement, your estimated gross recovery under the settlement should it be finally approved, and the risks of continued litigation in order to make your decision. Plus, your counsel Pete Albanis is available to advise you, and I understand you and your wife have a meeting scheduled with him this week.

Thanks.

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 12:29 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

10/20/2019                                          RE CDW Settlement Issues and Concerns.htm

I clearly can't rely on getting answers to certain critical questions through the "Objection" process because I need answers to these questions in order to make an informed decision on whether to opt in or opt out. I pose one of those critical questions below. I did submit this question through the Settlement Website on October 1, 2019 and have not yet received a response. Here's the specific question I asked.

"What changed between March 25, 2018 when attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict was needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA could be used as leverage to force Taishan to pay that big award, and August 30 2018 when attorney Levin put his name on a motion to the Cooke Court undermining that judicial process, stating that the Plaintiffs seek to reduce judicial labor and propose that remediation damages should be finalized expeditiously as part of a claims process before a Special Master? Also, how did the PSC determine that the Plaintiffs, or at least the majority of Plaintiffs, wanted to forgo a jury trial in the interest of reducing judicial labor? I ask this question because it is central to our decision on opting in or opting out of the proposed settlement. Thank you for your attention, R. Moody"

I do have other questions that are critical to our decision on opting in or opting out. My wife, Bev, and I have a meeting with Mr. Albanis this Thursday where we hope to get answers to those questions. I'll follow up with you after that with any lingering questions that remain.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




From: russmoody@comcast.net <russmoody@comcast.net>
Sent: Wednesday, October 02, 2019 4:08 PM
To: 'Sandra L. Duggan' <sduggan@lfsblaw.com>
Cc: 'SHerman@hhklawfirm.com' <SHerman@hhklawfirm.com>; 'Arnold Levin' <ALevin@lfsblaw.com>;
'rserpe@serpefirm.com' <rserpe@serpefirm.com>; 'patrick@colson.com' <patrick@colson.com>;
'bevmoody@comcast.net' <bevmoody@comcast.net>; 'palbanis@forthepeople.com' <palbanis@forthepeople.com>;
'Keith Verrier' <KVerrier@lfsblaw.com>
Subject: RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you again for replying to my email.

I'm sorry, but I'm very confused. I've asked a few important questions and I've gotten replies (thank you) that, in some cases, answer those questions, and in other cases don't fully address those questions or raise additional questions. In some cases, you've essentially referred me to the Fallon Court, and I am following up accordingly.

It makes no sense to me to submit formal objections to you  or, more appropriately, to the Court, until we fully understand the details of this litigation that are essential in our understanding what and how decisions were made, and

on what basis and what evidence they were made. That's particularly necessary when there appear to be clear missteps and contradictions, and the "negotiated" settlement is so grossly unfair.

My wife, Bev, and I started our nearly decade-long trail of tears being told that we have Taishan toxic Chinese drywall. Then, as the litigation is about to cross the finish line headed for what the plaintiffs hoped would be a fair jury trial award – an award that the PSC said we'd be able to collect – that jury trial is short circuited by the plaintiffs' own attorneys and Taishan gets to call the shoots on what's fair, no questions asked. Now we are expected to be "extremely pleased" according to the PSC that we're about to be offered 14 cents on the dollar. I'm just trying to understand, and I'm following the settlement instructions for that purpose.

What we see, and what many other plaintiffs see, are our own attorneys, who are charged with representing our best interests, now intimidating their clients into accepting a terribly unfair settlement in order to unburden the courts and to end this litigation, unwilling to continue the long journey to a fair settlement for their clients. We can't turn a bind eye to what we see, and it would be disingenuous not to share that vision with the PSC and our attorneys – to give the PSC and our attorneys an opportunity to set the record straight. Please do that for us.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Wednesday, October 02, 2019 3:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody – we have made numerous attempts to respond to your many inquiries about the settlement. If you are not satisfied, you have a right to opt-out of the settlement and pursue your case in Court OR you may object to the settlement, as set forth in the class notice you received. At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court. The deadline for objecting is November 27, 2019. If you choose to object, be sure to follow the procedures set forth in the class notice, and mail your objection to Class Counsel at the following addresses:

Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC

RE CDW Settlement Issues and Concerns.htm

580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave., New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Sincerely,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of
LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure.
The information is intended only for the use of the individual or entity named above. If you think you
have received this message in error, please email the sender.  If you are not the intended recipient,
please delete the message and understand that dissemination, distribution or copying is strictly
prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 2, 2019 1:43 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my email. Unfortunately, you did not respond to my questions and concerns, none of which
involve the specifics of our claim, but rather affect all plaintiffs who are part of this grossly unfair settlement.

I have directed many questions that I believe are relevant to our specific claim to our attorney, Mr. Albanis, and I'm
looking forward to getting the answers. My wife, Bev, and I hope to meet with Mr. Albanis either later this week or next
week.

Even though I believe that the Courts and the Plaintiffs' attorneys have poisoned the well with regards to further pursuing
Taishan, we still need to better understand the details of this litigation in order to be able to make an informed decision

on whether to opt in or opt out, and to better understand the basis for submitting objections.

Thanks again for your reply.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, September 02, 2019 2:24 PM
**To:** russmoody@comcast.net; palbanis@forthepeople.com
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net
**Subject:** Re: CDW Settlement Issues and Concerns

Dear Mr. Moody - thank you for writing to us. I've copied your attorney Pete Albanis on this email. Because you are
represented by counsel, you will need to speak with Mr. Albanis regarding the specifics of your claim.  If you are listed on
the Master Spreadsheet, you will receive the class notice and a letter from the Claims Administrator Brown Greer in about
2 weeks.

Regards,

Sandra L. Duggan
Of-Counsel
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 Office
(215) 870-8258 Cell
(215) 592-4663 Fax

On Sep 2, 2019, at 1:54 PM, "russmoody@comcast.net" <russmoody@comcast.net> wrote:

> Dear Messrs. Levin, Herman, Serpe, and Montoya, and Ms. Duggan,
>
> As one of the 3,654 class members who are included in the settlement from the Amorin and Brooke
> complaints, I have many questions needing answers before I can choose a course of action concerning my
> options with regards to this yet-to-be-provided settlement offer. Our attorney, Pete Albanis, has responded
> to some of these questions, many times with answers that generate more questions. Hopefully, our attorney
> will be forthcoming with all the answers we'll need, well before the deadline we're facing to make a final
> decision. In the meantime, two questions posed on a closed Facebook group of toxic Chinese drywall victims
> that deserve immediate answers are the following.
>
> "1) Will this be enough money to properly remediate these Toxic Chinese Drywall homes so that these
> properties don't continue to hit the market and harm other American Families?"
>
> and

"2) Will this be enough money to make the families who have lived with this Toxic Chinese Drywall for 11 years whole and make up for all that they have had to endure during this time to include loss of use and enjoyment?"

If the answer is "No" to either of these questions for any of the plaintiffs, I respectfully ask that the Plaintiffs' Steering Committee and the plaintiffs' attorneys to stop publicly expressing pleasure, stop referring to the settlement as fair, and stop thanking Taishan and its attorneys. The takeaway from these public statements for those who are not toxic Chinese drywall victims, or who are not otherwise familiar with this litigation, is that all the victims will finally get the settlement amount they need to compensate them for their losses, particularly for the cost of remediating their homes. That's probably the intent, but it is, for all intents and purposes, a lie, a lie that infuriates the victims. Why do that? I think I know the answer, and it's definitely not ethical, probably worse, but please remember that toxic Chinese drywall victims have been "wounded" by the Chinese, the construction industry and their insurance companies, elected officials, the courts, and now our own attorneys. Please don't add insult to injury by rubbing salt in these wounds.

I also respectfully ask that the PSC remove its gag order on the plaintiffs' attorneys, which it has apparently imposed to ensure that the fake news story of a fair settlement is not undermined.

Thank you for your consideration of these vitally Important issues.

Respectfully,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

# Exhibit 3

TRANSCRIPT OF MONTHLY STATUS
CONFERENCE PROCEEDINGS HEARD
BEFORE THE HONORABLE ELDON E.
FALLON UNITED STATES DISTRICT JUDGE,
October 23, 2019

1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    ********************************************

 5    IN RE:  CHINESE-MANUFACTURED
      DRYWALL PRODUCTS
 6    LIABILITY LITIGATION

 7                         CIVIL DOCKET NO. 09-MD-2047 "L"
 8                         NEW ORLEANS, LOUISIANA
                           WEDNESDAY, OCTOBER 23, 2019, 9:00 A.M.
 9

10    THIS DOCUMENT RELATES TO
11    ALL CASES

12    ********************************************

13        TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
14          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
15

16

17

18    APPEARANCES:

19    FOR THE PLAINTIFFS'
      LIAISON COUNSEL:        HERMAN HERMAN KATZ
20                            BY:  LEONARD A. DAVIS, ESQUIRE
                                   STEPHEN HERMAN, ESQUIRE
21                            820 O'KEEFE AVENUE
                              NEW ORLEANS, LA  70113
22

23                            LEVIN, FISHBEIN, SEDRAN & BERMAN
24                            BY:  SANDRA L. DUGGAN, ESQUIRE
                              510 WALNUT STREET, SUITE 500
25                            PHILADELPHIA, PA 19106


              OFFICIAL TRANSCRIPT
```

2

```
 1    APPEARANCES CONTINUED:

 2

 3                            GAINSBURGH BENJAMIN DAVID
 4                            MEUNIER AND WARSHAUER
                              BY:  GERALD E. MEUNIER, ESQUIRE
 5                            2800 ENERGY CENTRE
                              1100 POYDRAS STREET, SUITE 2800
 6                            NEW ORLEANS, LA  70163

 7                            COLSON HICKS EIDSON
 8                            BY:  PATRICK S. MONTOYA, ESQUIRE
                              225 ALHAMBRA CIRCLE, PENTHOUSE
 9                            CORAL GABLES, FL  33134

10

11                            LAMBERT & NELSON
                              BY:  CAYLE PETERSON, ESQUIRE
12                            701 MAGAZINE STREET
                              NEW ORLEANS, LA  70130
13

14    FOR THE STATE/FEDERAL
15    COORDINATION COMMITTEE:   LAW OFFICES OF RICHARD J. SERPE
                                BY:  RICHARD SERPE, ESQUIRE
16                              580 EAST MAIN STREET, SUITE 310
                                NORFOLK, VA 23510
17

18    FOR TAISHAN GYPSUM CO.,
19    LTD, AND TAI'AN TAISHAN
      PLASTERBOARD CO., LTD.:   ALSTON & BIRD
20                              BY:  CHRISTINA H. EIKHOFF, ESQUIRE
                                ONE ATLANTIC CENTER
21                              1201 WEST PEACHTREE STREET
                                ATLANTA, GA 30309
22

23

24

25


              OFFICIAL TRANSCRIPT
```

3

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE KNAUF
 4    LIAISON COUNSEL:      BAKER DONELSON BEARMAN
                            CALDWELL & BERKOWITZ
 5                          BY:  KERRY J. MILLER, ESQUIRE
                            201 ST. CHARLES AVENUE, SUITE 3600
 6                          NEW ORLEANS, LA  70170

 7    FOR THE TAISHAN, BNMB
 8    ENTITIES AND CNBM ENTITIES
      LIAISON COUNSEL:       PHELPS DUNBAR
 9                           BY:  HARRY ROSENBERG, ESQUIRE
                             365 CANAL STREET, SUITE 2000
10                           NEW ORLEANS, LA  70130

11

12    FOR TAISHAN GYPSUM CO.,
13    LTD, AND TAI'AN TAISHAN
      PLASTERBOARD CO., LTD.:   ALSTON & BIRD
14                              BY:  CHRISTINA H. EIKHOFF, ESQUIRE
                                BERNARD TAYLOR, SR., ESQUIRE
15                              ONE ATLANTIC CENTER
                                1201 WEST PEACHTREE STREET
16                              ATLANTA, GA 30309

17

18                              ALSTON & BIRD
                                DAVID VENDERBUSH, ESQUIRE
19                              90 PARK AVENUE, 15TH FLOOR
                                NEW YORK, NY  10016
20

21

22

23

24

25


              OFFICIAL TRANSCRIPT
```

4

```
 1    APPEARANCES CONTINUED:

 2

 3    CHINA NATIONAL BUILDING
      MATERIALS GROUP CORPORATION
 4    AND CHINA NATIONAL BUILDING
      MATERIALS COMPANY LIMITED
 5    (COLLECTIVELY, "CNBM"):   GORDON, ARATA, MCCOLLAM,
                                DUPLANTIS & EAGAN
 6                              BY:  EWELL E. EAGAN, JR., ESQUIRE
                                DONNA P. CURRAULT, ESQUIRE
 7                                ALEX B. ROTHENBERG, ESQUIRE
                                201 ST. CHARLES AVENUE, 40TH FLOOR
 8                              NEW ORLEANS, LA  70170

 9

10    ALSO PRESENT:            JACOB WOODY, BROWNGREER
                               SARAH OLSON, PLAINTIFF
11

12

13    OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
14                              CERTIFIED MERIT REPORTER
                                500 POYDRAS STREET, ROOM B406
15                              NEW ORLEANS, LA  70130
                                (504) 589-7779
16                              Cathy_Pepper@laed.uscourts.gov

17

18    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.
19

20

21

22

23

24

25


              OFFICIAL TRANSCRIPT
```

5

I N D E X

PAGE

FAIRNESS HEARING ON DECEMBER 11TH, 2019.............. 10

INITIAL PAYMENT UNDER THE SETTLEMENT HAS BEEN FULLY

MADE BY TAISHAN....................................... 11

LONG FORM NOTICE WAS MAILED TO EVERY SINGLE KNOWN

CLASS MEMBER.......................................... 11

ESTIMATE LETTERS WERE SENT BY BROWNGREER TO EVERY

PLAINTIFF ON THE MASTER SPREADSHEET................... 11

CLASS COUNSEL HAS SET UP A SETTLEMENT WEBSITE,

CHINESEDRYWALLSETTLEMENT.COM, AND A CALL CENTER...... 11

UPDATED MASTER SPREADSHEET BY THE END OF THE MONTH...13

NEXT CONFERENCE IS NOVEMBER 22ND, 2019 .............. 16

OFFICIAL TRANSCRIPT

---

6

P-R-O-C-E-E-D-I-N-G-S

WEDNESDAY, OCTOBER 23, 2019

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

08:48:19

09:01:16

09:01:19   THE DEPUTY CLERK:  All rise.

09:01:25   THE COURT:  Be seated, please.  Good morning, ladies

09:01:34 and gentlemen.

09:01:34   VOICES:  Good morning, Judge.

09:01:35   THE COURT:  Let's call the case.

09:01:35   THE DEPUTY CLERK:  MDL 2047, In re:  Chinese

09:01:42 Manufactured Drywall Products Liability Litigation.

09:01:42   THE COURT:  Would counsel make their appearance for the

09:01:44 record, please.

09:01:45   MR. ROSENBERG:  Good morning, Judge Fallon.

09:01:49 Harry Rosenberg, liaison counsel for Taishan, BNBM, and CNBM.

09:01:58   MR. DAVIS:  Good morning, Your Honor.  Leonard Davis on

09:02:01 behalf of the Plaintiffs' Steering Committee.

09:02:02   THE COURT:  We're here today for our monthly status

09:02:06 conference.  The case initially started with numbers of

09:02:14 plaintiffs against numbers of defendants.  The unusual factor

09:02:20 in this particular case is that I had about 20,000 individual

09:02:24 claimants, which is not necessarily unusual or unwieldy, but in

09:02:29 this particular case I had a thousand defendants, which is

OFFICIAL TRANSCRIPT

---

7

09:02:31   unusual for this type of litigation.

09:02:34          In any event, the two types of defendants that

09:02:40   were involved in the case were manufacturers, and they were

09:02:49   grouped into the Chinese manufacturers and the German

09:02:54   manufacturers.  The case proceeded against the German

09:02:57   manufacturers, Knauf, first, and it was resolved, settled, so

09:03:05   they are no longer in the case, with the potential exceptions

09:03:10   of one or two individual cases.

09:03:13          The case then proceeded with vigor against the

09:03:18   Chinese defendants, Taishan and others, and the case proceeded.

09:03:26   There were trials and so forth, both state and federal, and the

09:03:33   parties reached an agreement not too long ago.  It's a

09:03:40   class-action settlement agreement, and that's where we are at

09:03:48   this particular point.

09:03:46          I had received a number of letters from

09:03:52   individuals -- individual people, not lawyers -- questioning

09:04:03   various aspects of it, and perhaps I should at least address

09:04:08   what the concept is as best, at least, I can.

09:04:14          Let me say a word about class actions.  Maybe the

09:04:23   complexity of society, nationwide sales, opportunities of goods

09:04:31   and material, instantaneous communication, and perhaps even

09:04:37   lawyer advertising, this has brought about a situation where

09:04:42   the traditional case, the traditional common-law case of one

09:04:47   plaintiff, one defendant has morphed into numbers of plaintiffs

09:04:56   and sometimes numbers of defendants.  Therefore, some vehicle

OFFICIAL TRANSCRIPT

---

8

09:05:00   had to be established legislatively and enforced judicially to

09:05:07   deal with this situation where you had multiple plaintiffs,

09:05:12   20,000 individual plaintiffs, with a thousand lawyers, or

09:05:17   thereabouts, filing suit.

09:05:20          The traditional method of one plaintiff, one

09:05:26   defendant -- one lawyer for the plaintiff, one lawyer for the

09:05:30   defendant -- wasn't a vehicle that was able to be handled;

09:05:34   therefore, legislatively a method of dealing with that type of

09:05:40   litigation was created, and it was called a class action.

09:05:44          It was adopted in the Federal Rules of Civil

09:05:49   Procedure 23 to create a class action which created a method of

09:05:55   dealing with litigation that involved multiple parties on at

09:06:01   least one side of the case.  In order to qualify as a class

09:06:07   action, you had to have some commonality.  It just wasn't the

09:06:11   fact that you had a case, you had to have some commonality, and

09:06:15   those commonalities had to preponderate in order for you to

09:06:22   have an opportunity to join together as a class.

09:06:30          The class action has some advantages to it, at

09:06:36   least from the plaintiffs' standpoint, from the litigants'

09:06:40   standpoint.  They can join together, and they can pool their

09:06:44   costs so that it's not one person paying all of the costs.  The

09:06:52   group, in a sense, pays the costs and attorney's fees, pays the

09:06:58   attorney's fees, and they don't do it up front.  They are able

09:07:00   to pool their resources, so to speak.  They have a common

09:07:07   representation.  They are able to collect information more

OFFICIAL TRANSCRIPT

9

```
09:07:15   1    easily and house that information more easily, so those are
09:07:22   2    advantages.
09:07:23   3              But there are some disadvantages, and the
09:07:29   4    disadvantages are sort of like a family situation where you
09:07:34   5    have 12 kids, and the turkey comes on the table, and 12 want a
09:07:43   6    drumstick. There are only two. There are two drumsticks, and
09:07:47   7    so if everybody wants a drumstick, they compromise on then get
09:07:53   8    a piece of it. They don't get the whole drumstick. There are
09:07:57   9    not 12 drumsticks on a turkey. That's a disadvantage.
09:08:03  10              Sometimes the disadvantages outweigh the
09:08:07  11    advantages. What to do in that situation. Well, the
09:08:12  12    legislation allows for that. They allow for you to leave the
09:08:16  13    table. You go on your own and get your own turkey, and that's
09:08:27  14    what the opt-out means in this type of litigation.
09:08:34  15              So there are advantages and there are
09:08:36  16    disadvantages, and the litigants are notified of this. They
09:08:41  17    are notified of the dinner, and they can come to the table or
09:08:46  18    they don't have to come to the table. If they don't want to
09:08:49  19    come to the table, though, they have to tell people. They have
09:08:53  20    to say, "I'm not going to be there," so that they don't set a
09:08:57  21    table for you. So you have to say, "I want out. I'm opting
09:09:03  22    out of this litigation," and you have that opportunity.
09:09:06  23              So the notice goes out and everybody is notified
09:09:14  24    of it. They have the opportunity to ask questions of their
09:09:21  25    attorney. Whatever question they have, they have an
```

*OFFICIAL TRANSCRIPT*

10

```
09:09:24   1    opportunity to do so.
09:09:26   2              I received a long letter from Mr. Moody, who had
09:09:33   3    a number of questions, but he has met already five or six or
09:09:37   4    seven times with his attorney, and his attorney has endeavored
09:09:41   5    to answer those questions.
09:09:45   6              Sometimes the answers are not satisfactory, but
09:09:48   7    they are answers. If you don't like the answer, you have the
09:09:51   8    opportunity to say, "I'm not coming to the dinner, folks. I'm
09:09:55   9    just letting you know, I'm out," and go to your own place and
09:10:05  10    seek to obtain your dinner.
09:10:06  11              So that's what we're doing, and the notice has
09:10:11  12    gone out, and we are having a last fairness hearing on
09:10:19  13    December 11th, is it, December 11th. Everybody has been
09:10:24  14    notified, and it's very costly to notify everybody, but the
09:10:29  15    class counsel has a duty, and they've extended a lot of
09:10:38  16    resources and time to make sure that everybody was noticed.
09:10:41  17              It seems to me that it's a fair notice. It's an
09:10:46  18    adequate notice. They are doing everything they can. They
09:10:50  19    have call operators to explain what the facts are, what the
09:10:56  20    opportunities are, what the disadvantages are, answer any
09:11:00  21    questions, and so people have an opportunity to do that, and
09:11:06  22    we'll have that hearing.
09:11:08  23              Today I have a status conference just to find out
09:11:13  24    what's happening and what response it's having, so I'll hear
09:11:17  25    from the parties at this time.
```

*OFFICIAL TRANSCRIPT*

11

```
09:11:20   1              MS. DUGGAN: Good morning, Your Honor. Sandra Duggan
09:11:23   2    on behalf of the plaintiffs. Your Honor, I would like to
09:11:26   3    report that the initial payment under the settlement has been
09:11:29   4    fully made by Taishan. Those monies are now safely held in the
09:11:34   5    court registry. The notice has gone out, long form notice was
09:11:38   6    mailed to every single known class member and estimate letters
09:11:42   7    were sent by BrownGreer to every plaintiff on the master
09:11:45   8    spreadsheet.
09:11:47   9              Under the settlement and the Court's approval
09:11:50  10    notice, class members had until October 3rd to dispute the
09:11:54  11    information on the master spreadsheet. BrownGreer has received
09:11:57  12    all of the disputes and will be publishing a revised master
09:12:00  13    spreadsheet by the end of this month, and that will go on the
09:12:04  14    docket so everybody can see it.
09:12:06  15              Class counsel has set up a settlement website,
09:12:10  16    ChineseDrywallSettlement.com. We also have a call center that
09:12:14  17    has been functioning, and I believe it's been working very
09:12:18  18    well. On the website itself there has been over 99,000 views,
09:12:23  19    and 72,000 of those have been from new users from all 50 states
09:12:28  20    plus the District of Columbia.
09:12:30  21              As regarding the call center, we've had over 200
09:12:35  22    callers. Class counsel have been returning the phone calls.
09:12:37  23    We have been responding to emails, and we have inquiries from
09:12:40  24    class members from 21 different states.
09:12:42  25              So we feel that the notice is working, people are
```

*OFFICIAL TRANSCRIPT*

12

```
09:12:45   1    asking questions, and we are answering all of those questions
09:12:48   2    to the best of our abilities:
09:12:50   3              THE COURT: All right. Anything from defense counsel?
09:12:53   4              MS. EIKHOFF: No. Just to reiterate the report of
09:13:00   5    Ms. Duggan that we do believe that the notice is working and
09:13:03   6    agree that it has been fair and adequate.
09:13:05   7              THE COURT: Okay.
09:13:07   8              Jake, do you want to give me some feel for what's
09:13:09   9    happening?
09:13:10  10              MR. WOODY: Yes, Judge. We did receive the challenges
09:13:14  11    that Ms. Dugan referred to. We've received 109 of them that
09:13:18  12    break down into various categories.
09:13:20  13              THE COURT: What are the major categories of concern?
09:13:22  14              MR. WOODY: The biggest category of concern is the one
09:13:26  15    that affects the dollar values the most, which is people who
09:13:30  16    want to switch from -- they claim that they in Amorin, we have
09:13:34  17    them in Brook, or they are in neither, and they want to be in
09:13:36  18    one of them, but those do affect the claim values the most, but
09:13:40  19    they also are fairly black and white for us to deal with.
09:13:45  20              THE COURT: The square footage, is that an issue?
09:13:48  21              MR. WOODY: Square footage, we did receive some
09:13:50  22    challenges on that. Most of the challenges are for a
09:13:52  23    relatively small amount of square footage, so no matter how we
09:13:57  24    rule on that, it won't really affect the payouts too much.
09:14:00  25              I don't see anything in the challenges that will
```

*OFFICIAL TRANSCRIPT*

13

09:14:02 1  have a significant impact on the estimates that we've already
09:14:04 2  made because when you have this many people and this much
09:14:08 3  money, it takes quite a bit of shifting to really change the
09:14:11 4  dollar values too much, but we are reviewing them and will
09:14:14 5  issue decisions in an updated master spreadsheet by the end of
09:14:19 6  the month.
09:14:19 7        THE COURT:  Okay.
09:14:21 8        MR. WOODY:  Thank you, Your Honor.
09:14:21 9        THE COURT:  All right.  Anything further?
09:14:23 10       Richard?
09:14:24 11       MR. SERPE:  Good morning, Your Honor.  Richard Serpe
09:14:32 12  for the PFC and class counsel.
09:14:35 13       Late last night around 9:00 p.m. I received an
09:14:38 14  e-mail from one of the Virginia class members, Sarah Olson, and
09:14:41 15  she has requested to briefly address the Court this morning.
09:14:44 16       THE COURT:  Sure.  Ms. Olsen, you're in court?  Would
09:14:48 17  you come forward, please, ma'am.
09:14:59 18       Okay.  I appreciate you being here.  I hope the
09:15:02 19  weather is okay for you to here in New Orleans.
09:15:05 20       MS. OLSON:  Much better than Wisconsin.  Thank you.
09:15:10 21       THE COURT:  Great.  Fine.  Yes, ma'am.
09:15:14 22       MS. OLSON:  I wasn't truly expecting to do this today.
09:15:17 23  I apologize.  I'm on vacation.
09:15:17 24       THE COURT:  That's alright.
09:15:16 25       MS. OLSON:  So when I realized last night that I was in

*OFFICIAL TRANSCRIPT*

14

09:15:21 1  the town where this was at, I felt obligated to at least come
09:15:26 2  and watch.
09:15:28 3        THE COURT:  Sure.
09:15:28 4        MS. OLSON:  So I apologize, I didn't prepare very well.
09:15:31 5        THE COURT:  That's okay.  I appreciate you being here.
09:15:36 6        MS. OLSON:  In 2010 my husband and I received a letter
09:15:39 7  from our builder telling us that we had Chinese drywall in our
09:15:44 8  house, and he was on deployment at the time.  We're both Navy
09:15:47 9  veterans.  We graduated from the Naval Academy.
09:15:52 10       I didn't quite appreciate what that meant until I
09:15:54 11  started looking in on it.  At the time we had a
09:15:58 12  two-and-a-half-year-old son who was clearly not developing
09:16:01 13  correctly.  So for us, this has been a very emotional journey.
09:16:06 14  Since then we've had a third child.  We moved out of that house
09:16:09 15  as soon as we could because we were all very ill.
09:16:12 16       We -- I very vividly remember the first time we
09:16:16 17  met with Richard Serpe.  My husband had just finished a tour at
09:16:22 18  the Pentagon in a Chinese think tank, and we were sitting at
09:16:25 19  our dining room table, and he looked over at me he says, "We
09:16:29 20  will never see a penny from this case," just from the culture
09:16:33 21  and what he had learned in that job.
09:16:36 22       So we have been trying hard, not always
09:16:41 23  succeeding very well, in moving on for the past 10 years or so,
09:16:45 24  and every once in a while there is something that comes up that
09:16:48 25  reminds us of the emotional part of this.  But the rational

*OFFICIAL TRANSCRIPT*

15

09:16:54 1  part of this we've always tried to keep in the back of our mind
09:16:57 2  that if we ever got something, we would be appreciative that
09:17:02 3  there was something versus nothing.  I can't imagine being in
09:17:05 4  the class of getting very little.
09:17:07 5        We're very fortunate that the lawyers we had
09:17:10 6  worked to put us in the class where we are.  I can't imagine we
09:17:14 7  would ever look at this settlement and think we're whole.
09:17:19 8  There is no way you can take an autistic child and another one
09:17:23 9  with chronic anxiety and say this doesn't affect us every day
09:17:28 10  of our lives.  Financially, we lost almost everything we had
09:17:32 11  trying to compensate for this.
09:17:36 12       I wish I could stand here and say there has got
09:17:38 13  to be a better solution.  I don't have that -- you know, with
09:17:44 14  all these people.  I guess I just want to say that for all of
09:17:50 15  you in this business room, this may not be emotional to you,
09:17:57 16  and there may never be a way to prove what we've had to go
09:18:01 17  through, the emotional, the diagnoses of PTSD, the constant
09:18:07 18  triggers that will follow us through the rest of our life.
09:18:10 19  Every day I wake up and I have to say how am I going to get my
09:18:15 20  son a successful member of society?  You may not be able to
09:18:17 21  capture that when you're making these decisions.
09:18:20 22       Please remember that there are real people behind
09:18:22 23  this, and as much as we can all say something is better than
09:18:28 24  nothing, the amount of money and energy we've expended, you can
09:18:33 25  never compensate us enough.

*OFFICIAL TRANSCRIPT*

16

09:18:36 1        I used to look at, you know, people in
09:18:40 2  New Orleans, right, who lived through tragedies such as
09:18:45 3  hurricanes, and we've had houses with trees fall on them in
09:18:47 4  Virginia when we were in the military, there was never really a
09:18:50 5  good solution to this problem.  There wasn't an insurance that
09:18:53 6  helped us.  You know, this is it.  This is all we're going to
09:18:57 7  get.
09:18:58 8        So, I guess what I would say is, yes, more would
09:19:03 9  help, but I appreciate the time and the energy that everybody
09:19:08 10  has put into this, and, frankly, we want to move on with our
09:19:12 11  lives as much as possible.
09:19:15 12       Thank you.
09:19:16 13       THE COURT:  Okay.  Well, thanks for being here.  I
09:19:18 14  appreciate it.  I appreciate your comments.
09:19:21 15       MS OLSON:  Thank you.
09:19:30 16       THE COURT:  Anything further from anyone?
09:19:33 17       Okay.  With that, we'll end the conference then
09:19:36 18  and I'll see you all, when is the next one, November 22nd.
09:19:45 19       Okay.  Anything further?  Thank you all very
09:19:48 20  much.  Court will stand in recess.
09:19:50 21       THE DEPUTY CLERK:  All rise.
         22       (WHEREUPON, at 9:19 a.m., the proceedings were
         23  concluded.)
         24            *  *  *
         25

*OFFICIAL TRANSCRIPT*

17

```
 1                    REPORTER'S CERTIFICATE
 2
 3          I, Cathy Pepper, Certified Realtime Reporter, Registered
 4   Merit Reporter, Certified Court Reporter in and for the State
 5   of Louisiana, Official Court Reporter for the United States
 6   District Court, Eastern District of Louisiana, do hereby
 7   certify that the foregoing is a true and correct transcript to
 8   the best of my ability and understanding from the record of the
 9   proceedings in the above-entitled and numbered matter.
10
11                    s/Cathy Pepper
12                    Cathy Pepper, CRR, RMR, CCR
                      Certified Realtime Reporter
13                    Registered Merit Reporter
                      Official Court Reporter
14                    United States District Court
                      Cathy_Pepper@laed.uscourts.gov
15
16
17
18
19
20
21
22
23
24
25
                    OFFICIAL TRANSCRIPT
```

# Exhibit 4

New Orleans City Business March 29, 2018 article:
Judge: Return Chinese drywall lawsuits to original
states"



# Judge: Return Chinese drywall lawsuits to original states

👤 By: The Associated Press   🕓 March 29, 2018   💬 0

Nine years after a judge began supervising a multitude of federal lawsuits that claim homes were damaged by Chinese drywall, he says it's time to return thousands of them for trial in the courts where they were filed.

The panel that put Judge Eldon Fallon in charge in 2009 said the first 1,700 would return to Florida's federal courts if no objections are filed by Thursday. At least three objections were filed Thursday by attorneys for about 750 clients. The filings did not give reasons for the objections.

Those opposing the transfer must file briefs of their arguments by April 12, and responses are due May 3, according to the U.S. Judicial Panel on Multidistrict Litigation's electronic docket.

Fallon ruled in 2010 that Chinese-made drywall released sulfur fumes into homes, sickening occupants, corroding metals in wiring, plumbing, appliances and electronics, and stinking up the houses. In 2013, he approved settlements involving up to 10,000 homes and other buildings with drywall from German-owned Knauf Plasterboard Tianjin Co.

Remaining cases involve a second company, Taishan Gypsum Co. Ltd., which didn't show up in court until Fallon found it in contempt and forbade any of its subsidiaries or affiliates to do business in this country until it participated in court proceedings.

Fallon told the panel he wants to transfer all remaining Chinese drywall cases that were sent to him.

Such requests are unusual: supervising judges resolve the great majority of cases, mostly through settlements, according to a 2014 Louisiana Law Review article by Edward F. Sherman of Tulane University.

"The gold standard, I think, is to get everybody to a point where you can get global peace for everybody," said Louisiana State University law Professor Margaret Thomas.

But when that doesn't happen the cases go to trial, and those trials must be held in the states where the suits were filed.

About 5,000 cases remain from eight states: Florida, Virginia, Louisiana, Alabama, Mississippi, Georgia, North Carolina and California, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee in this case, said Thursday.

Fallon said in a March 12 order and request that he's dealt with all pretrial motions raising common questions, held "bellwether trials" to lead the way, and has approved a formula for calculating property damages.

He wrote that his court "has worked diligently for the past nine years," producing abundant evidence and judicial opinions to enable the original courts and the parties in the lawsuits to steer any unresolved cases "to a fair and just conclusion."

His order and request was accompanied by a 118-page list identifying 1,734 cases comprising one Florida class action. There could be more than 1,000 additional cases in a separate group that includes Florida defendants, Levin said.

Plaintiffs whose cases would be transferred back include Jason and Heather Ancer of Land O Lakes, Florida. Jason Ancer said an inspector who claimed to be a Chinese drywall expert told them their house was fine, but their air conditioner began failing within months after they moved in. Their drywall turned out to have been made by Taishan. Five months after moving in, Heather Ancer became pregnant.

The couple left the house, stopped making payments on it and eventually declared bankruptcy.

"We don't know what to think," said Jason Ancer. "All I know is it seems that definitely we will not have any kind of recourse."

In Facebook groups of people affected by Taishan's drywall, he said people are asking how are individual trials going to do any good if the combined cases can't go forward.

That isn't so, Levin said.

"We as plaintiffs support what Judge Fallon has done," he said. "It's nine years, and the Chinese have tried every tactic to see to it that the people we represent either die or otherwise have their properties disposed of … just trying to frustrate the process."

Levin said the steering committee's attorneys are ready to work with lawyers representing the remaining defendants.

"Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," he said.

Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages, Levin said.

Once the cases return to their originating courts, he said, "The Chinese will be all over America trying cases."

**To sign up for free CityBusiness Daily Updates, click here.**

Tagged with:   CHINESE DRYWALL   LAWSUIT

11/25/2019                          Judge: Return Chinese drywall lawsuits to original states – New Orleans CityBusiness

Copyright © 2019 New Orleans Publishing Group | 3350 Ridgelake Drive, Suite 281, Metairie, LA 70002 |
Phone: (504)834-9292 E-mail: mail@nopg.com

# Exhibit 5

CISION PR Newswire August 20, 2019 article:
"Plaintiffs' Steering Committee: Settlement
Announced in Decade-Old Chinese Drywall
Litigation Lawsuits"

# Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits

NEWS PROVIDED BY
**Plaintiffs' Steering Committee →**
Aug 20, 2019, 10:21 ET

NEW ORLEANS, Aug. 20, 2019 /PRNewswire/ -- Lawyers for thousands of property owners who alleged that their homes and properties were damaged by defective Chinese drywall filed a motion today asking a federal judge in New Orleans to approve a nationwide settlement of their lawsuits.  The Chinese Drywall Litigation has been ongoing for more than ten years.  The proposed settlement calls for $248 million to be funded by Taishan Gypsum, Co., a Chinese manufacturer of construction products.

Lead counsel for Plaintiffs' Steering Committee, Arnold Levin said that he is, "extremely pleased with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

Today's filing asks the Louisiana court for preliminary approval of the settlement terms and proposes a 90-day plan to notify all property owners who may be eligible for part of the payment.

Lawyers for the property owners estimate that thousands of homes and condominium properties were built using the defective drywall between 2005 and 2008, primarily in Florida, Louisiana, Alabama, Mississippi, and Virginia. The defective drywall has been associated with unpleasant odors and fumes that corrode metals, including air conditioning units, fixtures and other appliances.

Beginning around 2009, multiple lawsuits were filed against manufacturers, suppliers, builders, installers and other defendants alleged to have some involvement in making or supplying the problematic drywall.  The cases were consolidated in a multidistrict litigation case before Judge Eldon Fallon in U.S. District Court for the Eastern District of Louisiana in New Orleans who presided over more than one hundred status conferences and ruled on dozens of motions, including many addressing complex international and immunity law.  Federal courts in Miami, Florida and Norfolk, Virginia have also handled part of the lawsuits in recent months.  An initial set of cases was set for trial before U.S. District Court Judge Marcia Cooke in July, but the outlines of a class settlement were negotiated at a court-ordered mediation in late May.

The proposed settlement filings ask for the court to provide preliminary approval of the agreement, then review the deal again for final approval after a notice period and fairness hearing to occur later this year.  The proposal states that detailed information will be sent to known eligible parties and will be made available to the public in the event the court preliminarily approves the settlement.  If approved, payments from the settlement would be made to known property owners who have participated in the federal court litigation, as well as to any other property owners who can show that they had Chinese Drywall allegedly made by Taishan Gypsum or other participating defendants.

**CONTACT:**

**General/Lead Counsel:**

Arnold Levin

Sandra Duggan

Philadelphia, PA

sduggan@lfsblaw.com

(215) 870-8258

**Florida:**

Patrick Montoya

patrick@colson.com

(305) 476-7400

**Louisiana:**

Steve Herman

sherman@hhklawfirm.com

(504) 232-5154


**Virginia:**

Jeffrey Breit

jeffrey@breitcantor.com

(757) 622-6000


SOURCE Plaintiffs' Steering Committee



**UNITED STATES POSTAL SERVICE.**

Retail

**P**

US POSTAGE PAID

**$7.35**

Origin: 33990
11/26/19
1130810422-4

PRIORITY MAIL 2-DAY ®

0 Lb 12.30 Oz

1006

EXPECTED DELIVERY DAY: 11/30/19

C037

SHIP
TO:
255 ALHAMBRA CIR
MIAMI FL 33134-7411

USPS TRACKING®NUMBER

9505 5144 0327 9330 7078 75

This envelope is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018; All rights reserved.

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

P S 00001000014



FROM:

Russell F Moody
806 NW 38th Pl
Cape Coral, FL  33993

RECEIVED

TO:

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse, Coral Gables, FL 33134

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

✻ Domestic only.   ✻ For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.

# Letter of Objections

to the

## MDL 2047: Chinese-Manufactured Drywall Products Liability Litigation

## Global Settlement Agreement

Submitted on November 26, 2019

by

## Russell F. Moody

### Member of Amorin Class

to

### Honorable Eldon E. Fallon and Chinese Drywall Counsel

806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 26, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail and Email:
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Via U.S. Priority Mail:
Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse, Coral Gables, FL 33134

The following Objections to the Chinese-Manufactured Drywall Products Liability Litigation, MDL 2047, Global Settlement Agreement, preliminary approval filed on 08/20/19 (Ref. 1), are respectfully submitted by the undersigned, Mr. Russell F. Moody. Mr. Moody and his wife, Beverly L. Moody are members of the Amorin Class. The address of the affected property is 806 NW 38th Place, Cape Coral, Florida, Zipcode 33993. Mr. Moody intends to appear at the Fairness Hearing without counsel[1] and requests that he be allowed to address the Court concerning each of the following Objections during the Hearing.

---

[1] Judge Fallon Ordered that Morgan & Morgan attorney, Mr. Pete Albanis' motion to withdraw as Counsel of Record for Russell and Beverly Moody is Granted, file date: 10/31/19.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

The following Objections apply to either the entire Amorin Class, a specific subset of the Amorin Class, all plaintiffs in the Brooke Complaints, or a subset of plaintiffs in the Brooke Complaints as indicated for each of the individual objections presented below.

All documents to be used or offered into evidence at the Fairness Hearing have been identified in the list of references or included as Exhibits in this Letter of Objection.

## Background

The information provided below is accurate to best of the undersigned's knowledge. Due to the protracted nature and complexity of this litigation, and the sparsity of information shared with the plaintiffs by the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels, plaintiffs have often been kept in the dark, having received most of their information from social media such as the Victims of Chinese Drywall closed Facebook group.[2] Therefore, the information provided below may not be fully accurate; however, it is, in the opinion of the undersigned, sufficiently accurate to support the basis for all Objections.

There have been and are a number of different entities representing the defective Chinese drywall plaintiffs including the Plaintiffs' Steering Committee, Class Counsel, Lead Counsels, and individual plaintiffs' Counsels. There have also been several courts involved. For the undersigned, as a Florida resident, the two relevant courts are U.S. District Court, Eastern District of Louisiana, Judge Fallon presiding, referred to below as the "Court", and the U.S. District Court, Southern District of Florida, Judge Cooke presiding, referred to below as the "Cooke Court.". That represents a lot of firepower, firepower that, for nearly a decade, plaintiffs believed was aimed at reaching a fair settlement for the toxic Chinese drywall victims, and ensuring that these victims' rights under the law and under the Constitution were protected. That belief has been badly shaken over the last year.

After the Knauf settlement, over 4,000 plaintiffs remained in the MDL 2047 litigation, a majority are members of the Amorin Class. The following narrative is provided from a viewpoint of the Amorin Class, of which the undersigned is a Class member. However, as will be indicated, some Objections apply across all MDL 2047 plaintiffs, with the exception of those plaintiffs included in the Knauf settlement. A commonality among the Amorin Class members is that each member's home contains defective toxic Chinese drywall and that, as a baseline, all have suffered that same loss damages, i.e. the cost of remediating their home. The actual dollar cost is determined by the size of their home measured in square footage under air, and the regional construction and relocation costs. Relocation costs refer to the expenses associated with moving, storage, and temporary housing during remediation, which typically takes three to four months. There are also additional losses that may apply broadly across the Class members or may apply for a small group of Class members. Another significant commonality is that the plaintiffs' drywall was manufactured by Taishan or its affiliates, at least that's what our Morgan & Morgan attorney has told all his non-Knauf Chinese drywall (CDW) clients from the beginning.

Courts and plaintiffs' attorneys have certain fiduciary responsibilities with respect to ensuring that the rights of plaintiffs are protected, including plaintiffs' rights to be kept fully

---

[2] Class Counsel and our former Morgan & Morgan attorney will likely dispute this, but supporting evidence provided in Exhibits 1 and 2 will substantiate my "sparsity of information" claim.

informed of relevant facts that may be pertinent to the litigation and to be engaged in the decision process particularly with regards to any pretrial settlement negotiations and subsequent agreement.

In fact, failure to inform and seek input from plaintiffs in a pretrial settlement agreement, particularly when that settlement agreement does not fully compensate plaintiffs for their losses may constitute judicial and attorney malpractice.

These fiduciary responsibilities, at least in part, are implicitly and explicitly identified by Class Counsel in "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) addressed to the Cooke Court with a file date of March 8, 2019 (Ref. 2)

While each of the following Objections warrants serious consideration as it provides sufficient grounds to deny final approval of the Settlement Agreement as it is currently written, taken together, Objections A through J present an overwhelming case for denying final approval of the Global Settlement Agreement.

## MDL No. 2047 Objection A – "Parker Waichman" Settlement

This Objection applies to the entire Amorin Class.

The Global Settlement Agreement should not receive final approval until the Class Counsels' concerns regarding the Parker Waichman Settlement Agreement are addressed and adjudicated by an impartial third party.

The "Parker Waichman" Settlement Agreement, aka the "Joint Notice of Settlement Agreement" and the "Small Settlement", appears to Class Counsels to blatantly violate the legal and Constitutional rights of the 498 victims of defective Chinese drywall who were involuntarily and unknowingly included in this Settlement Agreement (Ref. 2). That being the case, it brings into question the Court's motivation for approving the Parker Waichman Settlement Agreement or at least moving it forward, as the case may be. As Class Counsels had predicted (Ref. 2), the Parker Waichman Settlement Agreement also greatly undermined the opportunity for a fair settlement for the remaining Amorin Class members.

Class Counsels Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class, Document 222135-1 (Ref. 2), lays out in detail how the Parker Waichman Settlement Agreement circumvents the MDL process and undermines the Amorin Class Action process. Exhibit 1, the undersigned's letter to Judge Fallon, dated November 13, 2019, provides a summary of the salient issues that Class Counsel has, or at least had with the Parker Waichman Settlement Agreement.

## MDL No. 2047 Objection B – Noncompliance with Fiduciary Responsibility

This Objection applies to the entire Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets as defined in the Allocation Neutral report (Ref. 3)

Neither the Court nor Class Counsel nor the undersigned's former Morgan & Moran attorney has met their fiduciary responsibility with regards to informing and engaging the plaintiffs in this litigation, including during the settlement negotiation process, and after the Court's preliminary approval of the Global Settlement Agreement when each plaintiff must decide to either

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

accept or opt out of the settlement. The Global Settlement Agreement should not be finalized unless and until all parties have met their fiduciary responsibilities.

Class Counsel clearly articulates these responsibilities in Reference 2. For example, Class Counsel states unequivocally that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan."

Exhibit 2 is the undersigned's October 21, 2019 letter to Judge Fallon including two attachments that together illustrate that Class Counsel and the undersigned's former Morgan & Morgan attorney have not provided information that they are legally obligated to provide.

Exhibit 3 is the transcript of the October 23, 2019 Status Conference. During the Status Conference the Court made the following statement. "I received a long letter from Mr. Moody [the undersigned], who had a number of questions, but he has met already five or six or seven times with his attorney, and his attorney has endeavored to answer those questions. Sometimes the answers are not satisfactory, but they are answers. If you don't like the answer, you have the opportunity to say, 'I'm not coming to the dinner, folks. I'm just letting you know, I'm out,' and go to your own place and seek to obtain your dinner." The problem with this Court statement is that the Court is either wittingly or unwittingly equating responses to answers. It doesn't matter whether a plaintiff has met with his or her attorney five, six, or seven times, or even a hundred times. What matters is whether or not the attorney provides complete and honest answers to the plaintiff's questions. The Class Counsel has not, and the undersigned's former attorney did not and elected instead to withdraw as the undersigned's attorney.

Judge Fallon's "drumstick" analogy is also extremely troubling. It misrepresents and greatly belittles the gross unfairness of the Global Settlement Agreement, equating the plaintiffs, particularly those in the 75% and 20% Buckets, as spoiled brats who stomp away from the dinner table because they didn't get the whole drumstick.

Why would Class Counsel and the undersigned's former attorney refuse to answer questions concerning information relevant to, and possibly pertinent to a plaintiff's decisions, and why would the Court not compel Class Counsel and plaintiffs' attorneys to answer these questions? There are two possible motives. Honest answers to these questions may encourage the plaintiff to opt out, and that's clearly not in the best interest of the Court, Class Counsel, or the plaintiffs' attorneys. Or, honest answers to these questions would expose attorney and/or judicial misconduct or even malpractice.

## MDL No. 2047 Objection C – Fraudulent Motion to the Cooke Court

This objection applies to the Amorin Class, but is particularly pertinent to those plaintiffs in the 75% and 20% Buckets. It also impacts all plaintiffs who are included in the Global Settlement Agreement.

The Global Settlement Agreement is built on a foundation of fraud and, therefore, should not receive final approval. The path to the Global Settlement Agreement passed through a key motion to the Cooke Court, signed by Patrick S. Montoya. This motion contains fraudulent

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

statements that ultimately resulted in discounted settlement offers for all plaintiffs and hugely discounted settlement offers for many.

Neither the undersigned nor any of the CDW victims who posted on the Victims of Chinese Drywall Facebook page were consulted or informed about this critically important Motion. It's not clear whether or not ANY plaintiffs were consulted or informed about this motion.

On August 31, 2018, the "Plaintiffs' Motion and Memorandum of law to Adopt Plan for Resolution of the Florida Amorin Plaintiffs' Claims for Remediation and Other Damages", Document 52 (Ref. 4), was filed with the Cooke Court. The Motion began by stating that "After more than nine years of pretrial proceedings in the MDL and a Class Damages Hearing for all Amorin Plaintiffs, it is time to resolve efficiently and fairly the 1,700 claims for damages to properties in Florida resulting from defective Chinese Drywall. These homeowners deserve to have their day in court as soon as possible." "…it is time to resolve efficiently and fairly" and "These homeowners [Florida Amorin Plaintiffs] deserve to have their day in court as soon as possible." – so far, so good.

The Motion goes on to say "Liability is already established by virtue of numerous defaults entered against Defendants for willfully refusing to appear in the litigation at the outset and orchestrating a plan to avoid the MDL Court's jurisdiction and delay these proceedings. The only issue remaining is the amount of Plaintiffs' damages." – also good news, if only it were true.

Further along the Motion states that "Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 as adjusted by the RS Means location factor." The adjustment for Florida claims ranges from $84.73 to $90.02 per square foot under air.

So, if any plaintiffs had seen this motion, and it's not clear that any plaintiffs' attorneys provided a copy to their CDW clients or even informed their clients about the motion, it would be reasonable for the plaintiffs to assume that Taishan liability has been established and they'd be receiving $105.91 as adjusted by the RS Means location factor with the adjustment for Florida claims ranging from $84.73 to $90.02 per square foot under air. The only thing remaining was to verify that the plaintiff's drywall was one of the twelve covered drywalls based on markings and labels, verify the square footage under air, and verify ownership. Had this been true, as it was portrayed in the Motion, then what followed, even though what followed was a lie, would have been more palatable.

The Motion goes on to say that "Plaintiffs seek to reduce judicial labor and propose that remediation damages – calculated according to a formula approved by Judge Fallon following an evidentiary hearing with expert testimony – should be finalized expeditiously as part of a claims process before a Special Master." This is clearly a bald-faced lie, and it's unreasonable to assume that Judge Cooke didn't know it was a lie.

Had the Special Master's tasks simply been to recommend methods/criteria for verifying square footage, e.g. tax assessor records, proof that the plaintiff has one of the covered drywall types, aka Buckets, e.g. an inspection report by a certified home inspector, and home ownership, e.g. county courthouse, county recorder, city hall records, then the statement in the previous paragraph would have been a little white lie.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

It's understandable that plaintiffs' attorneys in a class action lawsuit have a great deal of latitude in making unilateral decisions without always consulting each individual plaintiff. However, it's well known that class action plaintiffs' attorneys occasionally abuse this power. When the plaintiffs' attorneys blatantly lie to the court about the intent and wishes of the plaintiffs, that crosses a line into misconduct, if not malpractice.

The Motion further states that "These verifications [of square footage, covered drywall and ownership] can be accomplished through a claims process and the use of a Special Master so as not to burden this Court's docket." If product ID were a simply a matter of providing evidence, e.g. inspection report, that one of the covered drywall types (Buckets) exists in the home, then "verifications" and "claims process" would have been appropriate. In the quoted statement above, the authors, either wittingly or unwittingly, obfuscated what they knew the real product ID issue to be[3]. Presenting product identification as an issue equivalent to square footage and ownership is disingenuous at best and brings the intentions of the Motion's Movers and the Cooke Court into question, a question that needs a satisfactory answer before final approval of the Global Settlement Agreement.

The Motion's Conclusion states, in part, that "Plaintiffs' counsel and the Plaintiffs' Steering Committee in the MDL have collaborated and cooperated to compile the detailed and substantial evidence supporting Plaintiffs' damages claims, to which Defendants have had full access for many months." There are two points here. First, is the reference to "Plaintiffs' counsel", clearly drawing a distinction between references to the intentions of the plaintiffs themselves and the plaintiffs' counsel. This underscores the lies in this Motion. Second, the plaintiffs' counsel claims to have detailed and substantial evidence supporting Plaintiffs' damages claims, evidence that Class Counsel now refuses to provide to plaintiffs in violation of Class Counsel's fiduciary responsibility.

## MDL No. 2047 Objection D – Inclusion of Inadmissible Evidence

This Objection applies to all plaintiffs included in the Global Settlement Agreement; however, it is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

Final approval of the Global Settlement Agreement should be denied due to the Allocation Neutral's consideration of inadmissible evidence in establishing the allocation of funds.

The Allocation Neutral was provided numerous documents pertaining to Product ID. Most of these documents are related to the Special Master appointed by the Cooke Court. Neither the Special Master's reports nor the plaintiffs' attorneys' objections to those reports have been adjudicated. Therefore, these documents should be ruled inadmissible in providing any basis of allocation by the Allocation Neutral.

In fact, the large number, and nature of the documents provided to the Allocation Neutral raises a red flag concerning the expansive role assumed by the Allocation Neutral and the likelihood that the Allocation Neutral is noncompliant with the Global Settlement Agreement.

---

[3] It turns out that, according to the Global Settlement Agreement, "product identification" is simply proof that drywall found in a plaintiff's home is one of the covered drywall types (Buckets).

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## MDL No. 2047 Objection E – Violations of the Global Settlement Agreement

This Objection applies to all plaintiffs included in the Global Settlement Agreement, but is particularly pertinent to those plaintiffs who fall into the 75% and 20% Buckets.

The approval of the Global Settlement Agreement should be denied because the terms and conditions of the Agreement have been violated at least with respect to the Product ID basis for allocation of funds.

The Settlement Agreement states on page four that "**WHEREAS**, without conceding the correctness of any other Party's legal position, claims and/or defenses, the Parties wish to avoid the effort, expense and risk of continued litigation;"

So, neither Taishan's position that it may not have manufactured, or did not manufacture a particular covered drywall, nor the Plaintiffs' attorneys', including the PSC and Class Counsel, position that Taishan did, in fact, manufacture all covered drywall should be considered in the Allocation Model.

This matter becomes even more perplexing because on page 35 of the Settlement Agreement it states that "Taishan shall not be involved in the allocation or distribution of the Settlement Funds." So, per the Settlement Agreement, the Plaintiffs' attorneys are not conceding that Taishan may not have manufactured all covered drywall. And, Taishan is not involved in the allocation or distribution of funds. Therefore, it was strictly the Plaintiffs' attorneys' decision, and possibly the Court's as well, that Taishan's position on whether it did, may have, or didn't manufacture certain drywall Buckets would be a factor in the allocation of funds, despite the Plaintiffs' attorneys' position that all covered drywall was manufactured by Taishan. And so, the Plaintiffs' attorneys are, in fact, conceding that Taishan may not have manufactured covered drywall in Buckets D, I, and J, and Taishan didn't manufacture covered drywall in Buckets B, C, F, G, and L.

But it gets even worse. On page 21-22 of the Settlement Agreement it states that "The review, determination and approval of the Allocation Model by the Court shall be final and binding on the Parties and the Class. There shall be no right of appeal of the approval of the Allocation Model to any other court, including the U.S. Court of Appeals for the Fifth Circuit, such right of appeal having been knowingly and intentionally waived by each Settlement Class Member." So, if a plaintiff opts in but objects to this, quite possibly unlawful allocation model, and the Court dismisses that objection, it's not appealable. What the Plaintiff's attorneys and the Court have done is make the most objectional aspects of this settlement agreement unappealable. Why would they do that?

The only plausible explanation is that the Court and the Plaintiffs' attorneys know that they've agreed to a grossly unfair settlement. So, they've structured the settlement so that those who get the least net amount of funds are also those who are the least likely to opt out. Then they've further structured the settlement to put in place additional disincentives to opt out for those receiving the least. For example, as stated above, according to the Settlement Agreement including the Allocation Model, the plaintiffs' attorneys have conceded that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, a concession that violates the terms of the Settlement Agreement. And, if the Court approves this Settlement Agreement, it will have ruled that, in fact, Taishan did not manufacture drywall in Buckets B, C, F, G, and L, slamming the door shut on any real possibility that plaintiffs in Buckets B, C, F, G, and L who opt out could successfully sue

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

Taishan. Why would they do that? Because it's in the best interest of the Court, the Class Counsel, and the plaintiffs' attorneys to limit opt outs.

This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing miserably in that regard.

## MDL No. 2047 Objection F – Product Identification Means Proof of Covered Drywall

This Objection applies to all plaintiffs who are in the 75% Buckets D, I, and J, and the 20% Buckets B, C, F, G, and L.

In treating "Product Identification" as anything different than how it's defined in the Settlement Agreement, which the Allocation Neutral has done is a violation of the Settlement Agreement. Therefore, approval of the Settlement Agreement should be denied.

The Settlement Agreement states on page 13 that "Objective Allocation Criteria. 'Objective Allocation Criteria' shall mean the objective criteria that form the basis for the allocation of Settlement Funds among Eligible Class Members pursuant to the Allocation Model developed by the Allocation Neutral, subject to Court approval. The Objective Allocation Criteria shall include, but not be limited to: (i) Under Air Square Footage of the subject Affected Property (ii) **Product Identification** [emphasis added], (iii) Affected Property Ownership Status, (iv) Affected Property Remediation Status, (v) Set-Offs, (vi) Assignments of Class Members' rights to pursue Claims, and (vii) whether the claimant is an Amorin Plaintiff or a Brooke Plaintiff, or an absent Class Member. The Allocation Neutral may add additional Objective Allocation Criteria to the Allocation Model that will be submitted for Court Approval."

The Settlement Agreement states on page 14 that "Product Identification. 'Product Identification' shall mean the proof of Covered Chinese Drywall in the subject Affected Property, as defined in Section 1.12."

On page 11 of the Settlement Agreement "Covered Chinese Drywall. 'Covered Chinese Drywall' shall mean all drywall products alleged to be attributable to Taishan and/or the Additional Released Parties, including, but not limited to those products identified in the Taishan Product ID Catalog (See MDL Rec. Doc. 22152-3 and S.D. Fla. ECF No. 155-2) and as set forth in Exhibit 2: (A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K) Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. Covered Chinese Drywall excludes the following drywall products: Knauf, Knauf Tianjin, KPT, Bedrock, ProRoc, Panel Rey, IMG, USG, Shamrock Gold, Lafarge, Georgia Pacific, National Gypsum, and any drywall manufactured outside of the People's Republic of China."

So, for the Allocation Neutral to treat Product Identification as anything other than proof that the drywall is a covered drywall as defined by the Settlement Agreement is a violation of the Settlement Agreement.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## MDL No. 2047 Objection G - Compensation for All Remediation Damages

This Objection applies to all plaintiffs included in the Global Settlement Agreement.

The Global Settlement Agreement should be rational, reasonable, and consistent, including recognition of the fixed settlement amount agreed to by Taishan, i.e. $248M, and the prospect of compensating all plaintiffs for all property and remediation damages, which is zero.

Yet, on page 21, the Settlement Agreement states that "The Allocation Amount is intended to provide compensation for **all** [emphasis added] property and remediation damages as well as Other Losses." This brings the entire Settlement Agreement into question, and is therefore a basis for denying final approval of the Agreement.

## MDL No. 2047 Objection H – Insufficient Media Outreach

This Objection applies to all potential Absent Class Members.

There are serious doubts that the Settlement Agreement's terms and conditions for media outreach, as defined on pages 24 and 25 have been met. Therefore, the final approval of the Global Settlement Agreement should be denied, or at least delayed in proportion to the delays in meeting the Global Settlement Agreement's media outreach terms and conditions.

## MDL No. 2047 Objection I – Awards to Ineligible Plaintiffs

This Objection applies to all plaintiffs in the 100% Buckets A, E, H, and K.

If the Court approves the Global Settlement Agreement, including the Allocation Neutral Model as written, the Court will have ruled that Taishan did not manufacture drywall in Buckets B, C, F, G, and L, and plaintiffs in these Buckets deserve no compensation. Since these plaintiffs are being awarded 20% of a yet-to-be-determined baseline amount, the final approval of the Global Settlement agreement should be denied.

The Allocation Neutral has decided to award 20% to plaintiffs with drywall in Buckets B, C, F, G, and L, essentially giving these plaintiffs a "participation trophy" award. There is no basis in law requiring or allowing plaintiffs to receive an award settlement on the basis of their participation in the litigation alone in a lawsuit. Given the fixed amount that Taishan has agreed to, i.e. $248M, giving out participation trophy awards to the 20% plaintiffs is unlawfully depriving the 100% plaintiffs of funds that should have been awarded to them. Participation trophy awards are appropriate in pre-teen soccer leagues, they are not appropriate in a court of law.

## MDL No. 2047 Objection J – Nefarious Intentions and Misinformation

This Objection applies to all plaintiffs in the Global Settlement Agreement.

Information provided to the undersigned by his former Morgan & Morgan attorney, Pete Albanis, and public statements made by attorney Arnold Levin, Lead Counsel for the Plaintiffs' Steering Committee and Class Counsel for the Global Settlement Agreement appear to be at odds with the Global Settlement Agreement. The Global Settlement Agreement should not receive final approval unless and until the incongruency between what plaintiffs' attorneys are saying and what's in the Global Settlement Agreement are satisfactorily resolved.

The undersigned's former Morgan & Morgan attorney, Pete Albanis, stated that it was Taishan that proposed a pretrial settlement during secret negotiations at the Cooke Court mandated mediation, that Taishan first proposed settling cases for those plaintiffs scheduled for trial in July

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

2019, and when the plaintiffs' attorneys agreed, Taishan proposed including all 1,734 Florida plaintiffs, and when the plaintiffs' attorneys agreed, Taishan proposed that the pretrial settlement resolve all cases nationwide.

In a New Orleans City Business article, published in March 2018 (Exhibit 4), attorney Arnold Levin is quoted as saying "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," and "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages," and "The Chinese will be all over America trying cases."

Later, in a CISION PR Newswire article, published in August 2019 (Exhibit 5), attorney Arnold Levin is quoted as saying he is, "**extremely pleased** [Emphasis added] with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

So, a lead counsel for the plaintiffs believes that a large jury-award (big verdict) is needed to provide a fair settlement, and he also believes that a big verdict is definitely collectable. Yet, if you believe Mr. Albanis, somehow the plaintiffs' attorneys had their arms twisted into accepting an extremely lowball offer from Taishan. But the Global Settlement Agreement contradicts this scenario.

The Global Settlement Agreement paints a different scenario. The Settlement Agreement on page 3 states "**WHEREAS**, Settlement Class Counsel has made a demand on Taishan to settle all Chinese Drywall claims of Class Members against Taishan and the Additional Released Parties;" So, according to the Settlement Agreement, the plaintiffs' attorneys were the party demanding a pretrial settlement, a settlement that falls $1 Billion short of a fair settlement for the plaintiffs.

## Conclusion

The plaintiffs in this drawn out litigation are not spoiled brats who want the whole drumstick, as Judge Fallon suggests. They are the victims. They were victimized by the Chinese who manufactured the toxic drywall. They were victimized by the construction industry that covered up the problem and continued to install toxic drywall. They were victimized by our elected government officials who promised over and over again to help but never did. They are the victims of our judicial system that failed to protect their rights. And finally, they are now being victimized by their own attorneys who are putting their self interest ahead of their clients. It's also worth pointing out that toxic Chinese drywall is a "gift" that keeps on giving. Rather than suffer foreclosure and/or bankruptcy, many victims have been living in their toxic homes for over a decade.

Respectfully Submitted to the Court.

Russell F. Moody

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

## List of References

1. CLASS SETTLEMENT AGREEMENT WITH TAISHAN GYPSUM COMPANY LTD., F/K/A SHANDONG TAIHE DONGXIN CO. LTD. AND TAIAN TAISHAN PLASTERBOARD CO. LTD., Document 22305-2 Filed 08/20/19
2. Class Counsels Memorandum of Law In Support of Rule 23(d) Motion to Protect The Amorin Class, Case 2:09-md-02047-EEF-JCW Document 22135-1 Filed 03/08/19
3. CHINESE DRYWALL LITIGATION SETTLEMENT: ALLOCATION MODEL AND ALLOCATION NEUTRAL REPORT, Document 22304 Filed 08/19/19
4. PLAINTIFFS' MOTION AND MEMORANDUM OF LAW TO ADOPT PLAN FOR RESOLUTION OF FLORIDA AMORIN PLAINTIFFS' CLAIMS FOR REMEDIATION AND OTHER DAMAGES, Document 52 Entered on FLSD Docket 08/31/2018

## List of Exhibits

1. Exhibit 1: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon, dated November 13, 2019
2. Exhibit 2: Mr. Russell Moody letter to the Honorable Judge Eldon E. Fallon with two attachments, dated October 13, 2019
3. Exhibit 3: TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS HEARD BEFORE THE HONORABLE ELDON E. FALLON UNITED STATES DISTRICT JUDGE, October 23, 2019
4. Exhibit 4: New Orleans City Business March 29, 2018 article: Judge: Return Chinese drywall lawsuits to original states"
5. Exhibit 5: CISION PR Newswire August 20, 2019 article: "Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits"

# Exhibit 1

Mr. Russell Moody letter to the Honorable Judge
Eldon E. Fallon, dated November 13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

November 13, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Via Certified U.S. Mail, and E-Mail
Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA 70130

Your Honor,

      This is a follow-up letter to my letter the Court dated October 21, 2019 (Ref. Document 22346) in which I asked the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision, and to extend the November 27, 2019 deadline due to Class Counsels' and my Morgan & Morgan attorney, Pete Albanis' unwillingness to provide the above referenced information, information that they have a fiduciary responsibility to provide (Doc. 22135-1, page 4).

      Class Counsel continues to ignore my requests for all relevant information that may be pertinent to our opt in/opt out decision. Morgan & Morgan and our attorney, Pete Albanis, recently cited irreconcilable differences in a, now Court approved, motion to withdraw as our counsel. The only "irreconcilable differences" we had with Morgan & Morgan is that we sought information from Morgan & Morgan that is clearly relevant and that may be pertinent to our opt in/opt out decision, and Morgan & Morgan chose to withdraw as our counsel rather than provide it.

      In "Class Counsel's Memorandum of Law in Support of Rule 23(d) Motion to Protect the Amorin Class" (Doc. 22135-1) Class Counsel raised serious concerns and objections to the "Joint Notice of Settlement Agreement" (Doc. 22125), aka "Rogue Settlement", presented to the Court by Parker Waichman, Milstein, Jackson, Fairchild & Wade, Whitfield, Bryson & Mason, Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, and Taishan (Joint Notice Counsel). Class Counsel expressed concerns that the Rogue Settlement sought to settle at severely discounted rates without adequate communication with settling attorneys' clients (Doc. 22135-1, page 3). I would like to point out to the Court that Class Counsel is now seeking to settle for severely discounted rates, having reached a secret settlement agreement without any communication with the affected Class members.

      Class Counsel stated that Chinese drywall victims should receive compensation for their damages and that the Rogue Settlement may have a direct negative impact on the Amorin Class members who want full compensation for their damages (Doc. 22135-1, page 4). Class Counsel also asserts that "It is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan." (Doc. 22135-1, page 4). Class Counsel has reached a settlement agreement for severely discounted compensation, and has not provided the undersigned with all relevant information that may be pertinent to our opt in/opt out decision. It is also not clear that Class Counsel has met its fiduciary responsibility with regards to providing any Class members with this information.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 11) Class Counsel states that "it is far from clear whether [the Rogue Settlement] was accomplished with a full and complete disclosure of facts and information to [the subset of Class members included in the Rogue Settlement]." What is clear is that Class Counsel itself negotiated a secret settlement agreement without any disclosure of facts and information to Class members.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1 pages 11-12) Class Counsel states that "To begin, the proposed settlement disregards this Court's formulaic method for calculating damages, by only allowing for the Florida Amorin cases a maximum, ironically referred to as a 'baseline,' of $60 per square foot for drywall with a limited sub-set of Taishan/Tiahe markings to current owners and former owners ... Other Class members would be subject to steep discounts up to 80%. However, Judge Cooke's Order of November 16, 2018, adopted all of this Court's well-reasoned findings, making any discount, especially the deep discounts agreed to by the Joint Notice Counsel, inappropriate." Ironically, Class Counsel later adopted discounts similar to, and possibly greater than the "inappropriate" Rogue Settlement discounts.

In Class Counsels' objection to the Rogue Settlement (Doc. 2135-1, page 13) they state that "The plain wording of the Rule authorizes a Class Notice relating to "any step in the action." The operative consideration in issuing Rule 23(d)(2) corrective and injunctive orders18 is the court's unique fiduciary role to protect the legal rights and interests of class members, and its institutional interest in controlling "the fair conduct of the action." Yet Class Counsel neglected its fiduciary responsibility to its Class members and, instead, misrepresented Class member interests and desires to the Court.

In Class Counsels' objection to the Rogue Settlement (Doc. 22135-1, page 15) Class Counsel raises concerns that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." Unfortunately, Class Counsel and, I believe many, if not most plaintiffs' attorneys are providing "one-sided" information to Class members to discourage them from opting out.

Class Counsels' nearly wholesale adoption of all the objectionable actions and inactions of the Joint Notice Counsels' Rogue Settlement is, I believe, clear evidence that Class Counsel is putting its self-interests, and possibly the interests of the Courts before the interests of the plaintiffs, i.e. toxic Chinese drywall victims. That Morgan & Morgan decided to withdraw from representing Beverly Moody and the undersigned, which the undersigned believes Morgan & Morgan did to avoid its fiduciary responsibility to provide all relevant information that may be

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

pertinent to our opt in/opt out decision I believe underscores the serious magnitude of the plaintiffs' attorneys' conflict of interest with their clients.

Class Counsel and the undersigned's attorney, before he and Morgan & Morgan withdraw from representing the undersigned, provided multiple responses to the undersigned's requests for relevant information that may be pertinent to our opt in/opt out decision. Unfortunately, those responses have, at best, been only partially responsive to those information requests.

In particular, the undersigned has repeatedly requested all relevant information pertaining to any and all evidence that Taishan manufactured ProWall, including information that was available to Morgan & Morgan and PSC in June 2010 when the undersigned retained Morgan & Morgan, as well as the additional evidence that was accumulated throughout this litigation.

The undersigned has also repeatedly requested relevant information related to collectability. In a March 29, 2018 article published in the New Orleans City Business, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee stated that "Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict" and that "Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, ... those companies' assets in this country can be attached if Taishan ignores court orders to pay damages." So, attorney Levin believed on March 29, 2018 that a fair jury trial award against Taishan was definitely collectable. Then, just five months later, attorney Levin totally undermined that strategy when his name appeared on a motion to the Cooke Court (Doc. 52) claiming that the "Plaintiffs seek to reduce judicial labor and propose that remediation damages ... should be finalized expeditiously as part of a claims process before a Special Master."[1] This apparent PSC change in strategy is clearly relevant to collectability and, therefore, relevant and pertinent to the opt in/opt out decision. Yet, the Class Counsel refuses to address this issue.

The undersigned believes that the actions of his former attorney and Class Counsel are intended to obstruct justice and to run out the clock as the November 27th deadline rapidly approaches.

In view of the foregoing, the undersigned respectfully submits the following requests to the Court.

- Allow plaintiffs to submit Objections directly to the Court and order Class Counsel to update the Chinese Drywall Settlement Information Website (https://www.chinesedrywallsettlement.com) and notify all plaintiffs of this change. Requiring plaintiffs to submit objections to Class Counsel is akin to requiring plaintiffs' attorneys to submit all motions to Taishan. The undersigned believes that requiring plaintiffs to submit objections to Class Counsel is prejudicial against the plaintiffs for reasons discussed above, and is underscored by attorney Duggan's email to the undersigned stating "At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances

---

[1] This statement appears to clearly be a lie. Although the undersigned understands that, in a class action, attorneys have wide latitude in representing the plaintiffs' interests, he doesn't believe that these attorneys have the authority to knowingly lie about the plaintiffs' intentions and desires.

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court." So, according to Ms. Duggan, it's not even clear that the Court will receive objections except as an attachment to Class Counsels' "unified" response submitted to the Court.

- Compel Class Counsel to immediately provide all plaintiffs with all relevant information that may be pertinent to each plaintiff's opt in/opt out decision. While some required information will be common across all plaintiffs, some will not. As a minimum, different information is required depending on which of the 12 Buckets a plaintiff is in based on the markings and labels found on drywall in that plaintiff's home.

- Extend the November 27th deadline. The deadline for opting in or opting out, and filing an Objection is only two weeks away from the date of this letter, leaving insufficient time for plaintiffs to obtain and consider the information that they require and deserve in order to make an informed decision. Class Counsel is trying to run out the clock. I implore the Court to not be complicit in allowing Class Counsel to do that.

- Allow plaintiffs who have objections to defer their opt in/opt out decision until their objects have been presented to the Court and the Court has ruled on those objections. Requiring plaintiffs to opt in in order to object is basically saying you have to accept the deal to object to it. At the very least, this gives the appearance that allowing objections and holding a "Fairness" Hearing is all for show.

- Provide the undersigned, who is no longer represented by an attorney, with all documentation in the Courts' possession that is relevant and may be pertinent to the opt in/opt out decision, particularly information relevant to ProWall victims.

- Enter this letter into the Court Record.

As a final note, this litigation has been horribly complex and a terrible decade-long strain on the toxic Chinese drywall victims; however, one thing is perfectly clear. This preliminarily-approved settlement is clearly in the best interests of Taishan, the Courts, the Class Counsel and the plaintiffs' attorneys, and it is clearly NOT in the best interests of the Prowall victims and the other victims caught in the "20%" Buckets. The undersigned believes that it is imperative for the Courts, Class Counsel, and the plaintiffs' attorneys to avoid even the appearance of actions that may be viewed as prejudicial to the 20% plaintiffs. And, so far, the aforementioned stakeholders are failing to do that.

Respectfully,

Russell F. Moody

Russell Moody

# Exhibit 2

Mr. Russell Moody letter to the Honorable Judge
Eldon E. Fallon with two attachments, dated October
13, 2019

MDL 2047 Chinese-Manufactured Drywall Products Liability Litigation

October 21, 2019

Russell Moody
806 NW 38th Place
Cape Coral, FL 33993
(239) 284-2068
russmoody@comcast.net

Honorable Eldon E. Fallon
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA  70130

Your Honor,

My wife, Bev, and I are members of the Amorin Class. We have ProWall Chinese drywall putting us in one of the five "20%" Buckets. We need at least $65/SqFt to cover remediation costs. If we opt in, we'll likely get less than $10/SqFt.

I have sent emails addressed to, or copied to the Court via Mr. Dean Oser. I am writing this letter to you, in part, because Mr. Oser informed me that the most proper fashion to address the Court would be to write a letter to you. The problem with "snail mail" is that the lag time precludes timely resolution of critical matters prior to Court imposed deadlines.

While we intend to raise several serious objections should we opt in, including the unlawful denial of our Constitutional right to a jury trial, our immediate concern is our opt in/opt out decision. Class Counsel and our attorney are refusing to provide all relevant information that may be pertinent to our decision. Attachment 1 is my latest request for information. Attachment 2 is a string of email exchanges with Class Counsel in my unsuccessful attempts to get relevant information. I have also exchanged numerous emails, had phone calls, and face-to-face meetings with my attorney, Mr. Albanis, Morgan & Morgan, to no avail.

Also, I've gotten conflicting answers, but no specific information on the role Product ID played in the secret settlement negotiations, information that is clearly relevant to our opt in/opt out decision.

I believe that the problem I'm facing, and I see other plaintiffs facing, is due, at least in part, to the conflict of interest of Class Counsel and plaintiffs' attorneys who, I believe, have clearly put seeing this Settlement approved before the best interests of their clients.

I ask the Court to compel Class Counsel and all plaintiffs' attorneys to provide all relevant information that may be pertinent to our opt in/opt out decision.

I also ask the Court to extend the November 27, 2019 deadline due to the delays that plaintiffs have encountered in getting relevant information from Class Counsel and their attorneys that may be pertinent to their opt in/opt out decision.

Respectfully,

Russell F. Moody
Russell Moody

| | |
|---|---|
| **From:** | russmoody@comcast.net |
| **Sent:** | Tuesday, October 15, 2019 6:59 PM |
| **To:** | 'Sandra L. Duggan'; 'Arnold Levin'; 'SHerman@hhklawfirm.com'; 'rserpe@serpefirm.com'; 'patrick@colson.com'; 'Dean_Oser@laed.uscourts.gov' |
| **Cc:** | 'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier' |
| **Subject:** | MDL #2047: Relevant information bearing on opt in - opt out decision |

**Importance:**           High

Dear Class Counsel and Judge Fallon Court,

I am reaching out to Class Counsel in accordance with Judge Fallon's recent Order regarding communications with the Court during the Class Notice period: Document 22340, filed on October 9, 2019.

I am also reaching out to the Court with regards to the abovementioned Order.

I believe that it is the Court's and Class Counsel's responsibility as fiduciaries to ensure that Class members are protected, and that prior to any settlement they are made aware of all relevant information that may be pertinent to their decision of whether or not to accept a settlement offer by Taishan. I know that Class Counsel agrees with me on this [MDL 2047, Document 22135-1].

I also believe that, thus far, neither the Court nor the Class Counsel have been fully responsive to the abovementioned responsibility.

I am speaking here on behalf of my wife, Bev, and myself, as well as all other MDL 2047 "Large Settlement" plaintiffs, particularly those falling in the 75% and 20% Buckets. However, my comments below specifically address those plaintiffs with toxic Chinese drywall where the drywall inspection report found ProWall markings/labels, typically on a very few drywall boards. Without visual evidence collected during the initial drywall installation or visual evidence collected during remediation, it's impossible to know whether or not toxic Chinese drywall with non ProWall markings/labels also exists in the home. A friend's inspection report also found ProWall, putting him in the 20% Bucket. Fortunately for him, when his home was very recently remediated, toxic Chinese drywall in the 75% Bucket was also found, just in time to meet the October 3, 2019 deadline for updating the spreadsheet.

We retained Morgan & Morgan in June 2010. For nearly a decade my wife, Bev, and I were told that our toxic Chinese drywall was manufactured by Taishan. "You are receiving this email because you have Chinese Drywall manufactured by Taishan in your home" a November 28, 2011 email from Morgan & Morgan states. Clearly, Morgan & Morgan, and by extension the PSC, must have had solid evidence at that time that Taishan manufactured ProWall, solid enough to withstand a challenge in a jury trial. It's also clear that we would not have been included in the Amorin Class Action had there not been equally, if not stronger solid evidence at that time that Taishan manufactured ProWall. Just one source of evidence, according to our attorney, involves the gypsum mine used by Taishan, although he provided insufficient details to affect our opt in – opt out decision.

We need to obtain from the Court and/or the Class Counsel all relevant information that may be pertinent to Taishan's alleged manufacture of ProWall in order to make an informed decision on opting in or opting out, i.e. information in the Court's and/or Class Counsel's possession between June 2010 and today that is relevant to what the ProWall plaintiffs' attorneys knew, when they knew, and how they knew (evidence) that Taishan manufactured ProWall.

Another critical factor in making an informed decision on opting in or opting out is collectability. In a March 25, 2018 news article, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict is needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA can be used as leverage to force Taishan to pay that fair award – definitely collectable the PSC said. Then, only four months later (August 30, 2018), attorney Levin's name is included on a motion filed with the Judge Cooke Court that asked the Cooke Court to forgo a trial in favor of a Special Master. Clearly something significant happened with regards to collectability between March and August 2018. What changed?

The above requested information, and any other relevant information in the possession of the Court and/or the Class Counsel that may be pertinent to the opt in/opt out decision, is needed by us, and all other ProWall plaintiffs, in order to make an informed opt in – opt out decision.

Thank you for your attention to this critical matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

10/20/2019                                      RE CDW Settlement Issues and Concerns.htm

**From:**            russmoody@comcast.net
**Sent:**            Tuesday, October 08, 2019 4:45 PM
**To:**              'Sandra L. Duggan'
**Cc:**              'SHerman@hhklawfirm.com'; 'Arnold Levin'; 'rserpe@serpefirm.com'; 'patrick@colson.com';
                     'bevmoody@comcast.net'; 'palbanis@forthepeople.com'; 'Keith Verrier';
                     'Dean_Oser@laed.uscourts.gov'
**Subject:**         RE: CDW Settlement Issues and Concerns

Ms. Duggan,

I never doubted that you understood that my wife, Bev, and I, and most plaintiffs, particularly the "75% and 20% Bucket" plaintiffs, are deeply disappointed, not just in the anticipated outcome, but more so that we were apparently betrayed by our own attorneys and the Courts.

Although we feel that we have every right to be disappointed and very angry, my emails to you were not about disappointment and anger, even though that disappointment and anger may have shown through, and for that I apologize. My emails were about getting essential feedback and support from the attorneys supposedly representing us in this litigation. I'm not looking for rationalizations on why we should accept what is admittedly a horrible settlement offer. I'm looking for the facts that allow us to make an informed opt in /opt out decision, and to possibly allay concerns we have about how this litigation unfolded and ended up crashing and burning for many, if not most, plaintiffs.

What I don't understand is why the Class Counsel and my attorney are withholding information from the plaintiffs that is critical to our opt in / opt out decision. While I and other plaintiffs are questioning certain actions taken by the PSC, Class Counsel, and our attorneys, as well as the Courts, actions that many plaintiffs believe constitute misconduct, malfeasance, and possibly malpractice, our immediate and biggest concern is whether we should opt in or opt out. It's clear that you are withholding critical information from us. Why would you do that? I think in order to coerce as many as possible into opting in to a grossly unfair settlement offer.

I assume that you're pleading the 5th on the questions and concerns I raised. If not, I would still like you to address those questions and concerns. If you're not the right person to address those questions and concerns, please direct me to the right person.

Thank you for your consideration of this serious matter.

Regards,

Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Tuesday, October 08, 2019 2:53 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>;

Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody: I understand that you are disappointed.  We wish you the best of luck in whatever course of action you decide to take.


Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Tuesday, October 8, 2019 2:17 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for your lengthy response. Honestly, to me, it appears to be a great legal rationalization for your actions, some of which raise serious concerns, particularly with regards to certain toxic Chinese drywall clients. I will, however, review your comments in detail and give serious consideration to your assertions.

Are you disputing the factual evidence of your about face?

Unfortunately, your responses don't fully address the specifics, or in some cases don't jibe with the facts related to our main concern: understanding/obtaining the evidence that Taishan manufactured ProWall. I'm hopeful that Mr. Albanis will provide us that evidence during our meeting this Thursday. However, The PSC and all the individual plaintiffs' attorneys must have had solid evidence that Taishan manufactured ProWall or they would not have included their ProWall clients, or their other "20% Bucket" clients, in the Amorin Class Action in the first place. Perhaps you can provide some insight into that. One explanation that appears to be supported by at least two plaintiffs' attorneys' comments is that Judge Fallon decided to only include Taishan as a Chinese drywall manufacturer defendant. Is that true? If so, what was Judge Fallon's rationale for that decision? If not, who decided to focus only on Taishan, and why?

It's recently come to light for many plaintiffs that there are multiple objectionable aspects concerning this litigation and the grossly unfair settlement agreement, all of which need to be addressed, including the plaintiffs' attorneys' fraudulent motion requesting a Special Master in lieu of a jury trial. However, our immediate concern is obtaining all evidence that Taishan manufactured ProWall, evidence that was available a decade ago, and the additional evidence acquired since then. If the only evidence that Taishan manufactured ProWall is what's contained in the Special Master's Product ID report, that I assume was provided to the Special Master by Mr. Albanis as the PSC's lead attorney on ProWall, that is a monumentally huge problem.

I just want honest answers to what I believe are legitimate and critical questions, the answers to which will bear heavily on our opt in /opt out decision.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



From: Sandra L. Duggan <sduggan@lfsblaw.com>
Sent: Tuesday, October 08, 2019 1:04 PM
To: russmoody@comcast.net
Cc: SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
Subject: RE: CDW Settlement Issues and Concerns

Dear Mr. Moody:

For over ten years we have fought hard on behalf of all Plaintiffs to prosecute the claims against Taishan and its parent companies.  As you know, Defendants challenged jurisdiction, service of process, liability, and damages. We adopted a coordinated, comprehensive approach in our litigation strategy among all jurisdictions where Chinese Drywall cases were pending, which continued following the remand of *Amorin* cases to Florida and Virginia, and, therefore, we dispute your characterization of any "about face."  The likelihood of getting a jury verdict is generally reflected in the Allocation Model:  If you fall into a Product ID Bucket for which the independent Court-appointed Special Master ruled there is insufficient evidence linking that drywall to Taishan, you have a much less likely chance of being able to present your case to the jury.  Similarly, if you were a *Brooke* Plaintiff (and we know you are an *Amorin* class member), you generally would have a greater chance that your case will be dismissed on statute of limitations grounds.  As to the ability to enforce a judgment, we have no way of predicting what Taishan may or may not do.  All we know is that (i) we don't have the same types of enforcement mechanisms that would be available to us vis-à-vis a U.S. Corporation, (ii) Taishan, in the past, left the litigation after jurisdiction was established, and (iii) there is an appeal pending before the U.S. Fifth Circuit that may result in the dismissal of Taishan's parent companies, CNBM, BNBM Group, and BNBM, which would greatly limit (if not completely eliminate) the available potential

assets in the U.S. that could be seized.  We understand that you are disappointed with the Special Master's ruling on Product ID.  We presented all relevant Product ID evidence to the Special Master, and argued in favor of attributing all Product ID categories to Defendants.  But, unfortunately, with respect to several of the Product ID Buckets, which had lesser proofs of Product ID attribution to Taishan and/or BNBM, the Special Master saw it differently.  Yes, there is a right to appeal, which we were in the process of pursuing.  But there is a good chance that the Court will see things the same way as the Special Master.  Nevertheless, you are free to opt out of the Settlement, take up the appeal, and hope that you can secure a jury trial on damages.

With regard to the Settlement, should you decide to remain in the class, please understand that the Allocation Neutral appointed by the Court considered all relevant evidence and Court rulings regarding Plaintiffs' claims for remediation damages and other losses in arriving at the Allocation Model that will be used to determine Allocation Payments.  Under the law, the Court will "compare the settlement terms 'with the likely rewards the class would have received following a successful trial of the case.'" *Reed v. General Motors, Corp*, 703 F.2d 170, 172 (5th Cir. 1983). In other words, the Court will "compare the terms of the compromise with the likely rewards of litigation." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y.2007) (quotation omitted). The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys*, 851 F.Supp.2d at 1065. Rather, the Court will determine "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors not by attempting the impossible task of deciding whether the parties have reached exactly the remedy they would have asked the Court to enter absent the settlement, but instead by whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of plaintiffs' success on the merits." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010* 910 F. Supp. 2d 891, 933 (E.D. La. 2012) (quoting and citing *Reed; Heartland Payment*, 851 F.Supp.2d at 1065; *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir.1983)) (internal quotations omitted), *aff'd, In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014).

Regards,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 11:15 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my October 7th email. I do appreciate your attention to this serious matter.

The question I asked in that email relates directly to what I, and others, believe are the two most critical factors for us in deciding whether to opt in or opt out: the likelihood of winning a fair verdict in a jury trial and the likelihood of forcing Taishan to pay that fair award. The plaintiffs' attorneys' apparent complete about face on these two critical factors between March 25, 2018 and August 31, 2018 warrants an explanation to the plaintiffs, particularly those plaintiffs for which this proposed settlement is clearly not in their best interest. One possible explanation is pressure from the Courts to end this litigation quickly, which is actually mentioned in at least one motion to the Cooke Court. Is this the reason for the about face in litigation strategy? Is the answer contained in the court documents you referenced? It's a fair and essential question to ask, and deserves an honest answer for those considering whether they should opt in or opt out.

Again, the questions my wife, Bev, and I have must be answered well before the November 27th deadline to opt in or opt out, as they are critical to that decision. I believe it's clear that the PSC, Class Counsel, and other plaintiffs' attorneys collectively have answers to all these questions. To refuse to share those answers in an effort to force/intimidate clients into accepting an unfair settlement is clearly not acting in the clients' best interests. In fact, it demonstrates that these attorneys are no longer representing their clients' best interests.

I do appreciate your honesty in admitting that the proposed Settlement is not in our best interest, i.e. not in the best interest of plaintiffs with ProWall drywall or the other covered drywall that falls into the "participation trophy" award category of only 20% of what's likely not a fair settlement to begin with.

Thank you again for your attention to this serious issue.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, October 07, 2019 4:58 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

Dear Mr. Moody – there is a process in place for you, as a class member, to voice any objections you have to the settlement, or to opt out if you would like to pursue litigation and reject the Settlement (*see* my attached previous email to you dated October 2, 2019).  The deadline for objecting or opting out is November 27, 2019.  Class Counsel will respond to any and all objections in writing on or before December 6, 2019, in advance of the Fairness Hearing.

The questions you have posed seem to relate to the litigation and our litigation strategy, not the fairness, reasonableness, or adequacy of the Settlement. Developments in the litigation have been reported in monthly Status Reports (*see, e.g.*, Rec. Docs. 22272, 22290, 22309, 22323), and the reasons why Class Counsel believe that the proposed Settlement is in the best interests of the overwhelming majority of class members is also a matter of public record (*see* Rec. Doc. 22305), and takes into consideration the delay, expense, and risks of litigation, including the challenges of maintaining jurisdiction over and enforcing any eventual judgments against the Taishan-related entities and/or their assets over in China.  You should have sufficient information about the unfolding of the litigation to date, the settlement, your estimated gross recovery under the settlement should it be finally approved, and the risks of continued litigation in order to make your decision. Plus, your counsel Pete Albanis is available to advise you, and I understand you and your wife have a meeting scheduled with him this week.

Thanks.

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Monday, October 7, 2019 12:29 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>; Dean_Oser@laed.uscourts.gov
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

10/20/2019                                    RE CDW Settlement Issues and Concerns.htm

I clearly can't rely on getting answers to certain critical questions through the "Objection" process because I need answers to these questions in order to make an informed decision on whether to opt in or opt out. I pose one of those critical questions below. I did submit this question through the Settlement Website on October 1, 2019 and have not yet received a response. Here's the specific question I asked.

"What changed between March 25, 2018 when attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee, stated (paraphrasing) that a big verdict was needed to force Taishan into a fair settlement and that Taishan's assets and interests in the USA could be used as leverage to force Taishan to pay that big award, and August 30 2018 when attorney Levin put his name on a motion to the Cooke Court undermining that judicial process, stating that the Plaintiffs seek to reduce judicial labor and propose that remediation damages should be finalized expeditiously as part of a claims process before a Special Master? Also, how did the PSC determine that the Plaintiffs, or at least the majority of Plaintiffs, wanted to forgo a jury trial in the interest of reducing judicial labor? I ask this question because it is central to our decision on opting in or opting out of the proposed settlement. Thank you for your attention, R. Moody"

I do have other questions that are critical to our decision on opting in or opting out. My wife, Bev, and I have a meeting with Mr. Albanis this Thursday where we hope to get answers to those questions. I'll follow up with you after that with any lingering questions that remain.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)




From: russmoody@comcast.net <russmoody@comcast.net>
Sent: Wednesday, October 02, 2019 4:08 PM
To: 'Sandra L. Duggan' <sduggan@lfsblaw.com>
Cc: 'SHerman@hhklawfirm.com' <SHerman@hhklawfirm.com>; 'Arnold Levin' <ALevin@lfsblaw.com>;
'rserpe@serpefirm.com' <rserpe@serpefirm.com>; 'patrick@colson.com' <patrick@colson.com>;
'bevmoody@comcast.net' <bevmoody@comcast.net>; 'palbanis@forthepeople.com' <palbanis@forthepeople.com>;
'Keith Verrier' <KVerrier@lfsblaw.com>
Subject: RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you again for replying to my email.

I'm sorry, but I'm very confused. I've asked a few important questions and I've gotten replies (thank you) that, in some cases, answer those questions, and in other cases don't fully address those questions or raise additional questions. In some cases, you've essentially referred me to the Fallon Court, and I am following up accordingly.

It makes no sense to me to submit formal objections to you  or, more appropriately, to the Court, until we fully understand the details of this litigation that are essential in our understanding what and how decisions were made, and

on what basis and what evidence they were made. That's particularly necessary when there appear to be clear missteps and contradictions, and the "negotiated" settlement is so grossly unfair.

My wife, Bev, and I started our nearly decade-long trail of tears being told that we have Taishan toxic Chinese drywall. Then, as the litigation is about to cross the finish line headed for what the plaintiffs hoped would be a fair jury trial award – an award that the PSC said we'd be able to collect – that jury trial is short circuited by the plaintiffs' own attorneys and Taishan gets to call the shoots on what's fair, no questions asked. Now we are expected to be "extremely pleased" according to the PSC that we're about to be offered 14 cents on the dollar. I'm just trying to understand, and I'm following the settlement instructions for that purpose.

What we see, and what many other plaintiffs see, are our own attorneys, who are charged with representing our best interests, now intimidating their clients into accepting a terribly unfair settlement in order to unburden the courts and to end this litigation, unwilling to continue the long journey to a fair settlement for their clients. We can't turn a blind eye to what we see, and it would be disingenuous not to share that vision with the PSC and our attorneys – to give the PSC and our attorneys an opportunity to set the record straight. Please do that for us.

Thank you for your attention to this serious matter.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)



**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Wednesday, October 02, 2019 3:04 PM
**To:** russmoody@comcast.net
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net; palbanis@forthepeople.com; Keith Verrier <KVerrier@lfsblaw.com>
**Subject:** RE: CDW Settlement Issues and Concerns

Mr. Moody – we have made numerous attempts to respond to your many inquiries about the settlement. If you are not satisfied, you have a right to opt-out of the settlement and pursue your case in Court OR you may object to the settlement, as set forth in the class notice you received. At this point, if you want to remain in the settlement, it would best for you to submit all of your grievances about the settlement to us in writing as a formal objection, and we will file a unified response to your complaints with the MDL Court. The deadline for objecting is November 27, 2019. If you choose to object, be sure to follow the procedures set forth in the class notice, and mail your objection to Class Counsel at the following addresses:

Arnold Levin and Sandra L. Duggan
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Richard J. Serpe
Law Offices of Richard J. Serpe, PC

10/20/2019                                     RE CDW Settlement Issues and Concerns.htm

580 East Main St., Suite 310
Norfolk, VA 23510

Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Ave., New Orleans, LA 70113

Patrick S. Montoya
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

Sincerely,

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of
LEVIN SEDRAN BERMAN LLP and may be privileged, confidential and/or protected from disclosure.
The information is intended only for the use of the individual or entity named above. If you think you
have received this message in error, please email the sender.  If you are not the intended recipient,
please delete the message and understand that dissemination, distribution or copying is strictly
prohibited.


**From:** russmoody@comcast.net <russmoody@comcast.net>
**Sent:** Wednesday, October 2, 2019 1:43 PM
**To:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com;
bevmoody@comcast.net; palbanis@forthepeople.com
**Subject:** RE: CDW Settlement Issues and Concerns

Ms. Duggan,

Thank you for replying to my email. Unfortunately, you did not respond to my questions and concerns, none of which
involve the specifics of our claim, but rather affect all plaintiffs who are part of this grossly unfair settlement.

I have directed many questions that I believe are relevant to our specific claim to our attorney, Mr. Albanis, and I'm
looking forward to getting the answers. My wife, Bev, and I hope to meet with Mr. Albanis either later this week or next
week.

Even though I believe that the Courts and the Plaintiffs' attorneys have poisoned the well with regards to further pursuing
Taishan, we still need to better understand the details of this litigation in order to be able to make an informed decision

on whether to opt in or opt out, and to better understand the basis for submitting objections.

Thanks again for your reply.

Regards,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)


**From:** Sandra L. Duggan <sduggan@lfsblaw.com>
**Sent:** Monday, September 02, 2019 2:24 PM
**To:** russmoody@comcast.net; palbanis@forthepeople.com
**Cc:** SHerman@hhklawfirm.com; Arnold Levin <ALevin@lfsblaw.com>; rserpe@serpefirm.com; patrick@colson.com; bevmoody@comcast.net
**Subject:** Re: CDW Settlement Issues and Concerns

Dear Mr. Moody - thank you for writing to us. I've copied your attorney Pete Albanis on this email. Because you are represented by counsel, you will need to speak with Mr. Albanis regarding the specifics of your claim.  If you are listed on the Master Spreadsheet, you will receive the class notice and a letter from the Claims Administrator Brown Greer in about 2 weeks.

Regards,

Sandra L. Duggan
Of-Counsel
Levin Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 Office
(215) 870-8258 Cell
(215) 592-4663 Fax


On Sep 2, 2019, at 1:54 PM, "russmoody@comcast.net" <russmoody@comcast.net> wrote:

> Dear Messrs. Levin, Herman, Serpe, and Montoya, and Ms. Duggan,
>
> As one of the 3,654 class members who are included in the settlement from the Amorin and Brooke complaints, I have many questions needing answers before I can choose a course of action concerning my options with regards to this yet-to-be-provided settlement offer. Our attorney, Pete Albanis, has responded to some of these questions, many times with answers that generate more questions. Hopefully, our attorney will be forthcoming with all the answers we'll need, well before the deadline we're facing to make a final decision. In the meantime, two questions posed on a closed Facebook group of toxic Chinese drywall victims that deserve immediate answers are the following.
>
> "1) Will this be enough money to properly remediate these Toxic Chinese Drywall homes so that these properties don't continue to hit the market and harm other American Families?"
>
> and

"2) Will this be enough money to make the families who have lived with this Toxic Chinese Drywall for 11 years whole and make up for all that they have had to endure during this time to include loss of use and enjoyment?"

If the answer is "No" to either of these questions for any of the plaintiffs, I respectfully ask that the Plaintiffs' Steering Committee and the plaintiffs' attorneys to stop publicly expressing pleasure, stop referring to the settlement as fair, and stop thanking Taishan and its attorneys. The takeaway from these public statements for those who are not toxic Chinese drywall victims, or who are not otherwise familiar with this litigation, is that all the victims will finally get the settlement amount they need to compensate them for their losses, particularly for the cost of remediating their homes. That's probably the intent, but it is, for all intents and purposes, a lie, a lie that infuriates the victims. Why do that? I think I know the answer, and it's definitely not ethical, probably worse, but please remember that toxic Chinese drywall victims have been "wounded" by the Chinese, the construction industry and their insurance companies, elected officials, the courts, and now our own attorneys. Please don't add insult to injury by rubbing salt in these wounds.

I also respectfully ask that the PSC remove its gag order on the plaintiffs' attorneys, which it has apparently imposed to ensure that the fake news story of a fair settlement is not undermined.

Thank you for your consideration of these vitally Important issues.

Respectfully,


Russell Moody
806 NW 38th Place
Cape Coral, Florida
russmoody@comcast.net
239-284-2068 (mobile)
239-283-3959 (home)

# Exhibit 3

TRANSCRIPT OF MONTHLY STATUS
CONFERENCE PROCEEDINGS HEARD
BEFORE THE HONORABLE ELDON E.
FALLON UNITED STATES DISTRICT JUDGE,
October 23, 2019

1

```
                    UNITED STATES DISTRICT COURT

 1                  EASTERN DISTRICT OF LOUISIANA

 2

 3

 4     *************************************************************

 5     IN RE:  CHINESE-MANUFACTURED
       DRYWALL PRODUCTS
 6     LIABILITY LITIGATION

 7
                           CIVIL DOCKET NO. 09-MD-2047 "L"
 8                         NEW ORLEANS, LOUISIANA
                           WEDNESDAY, OCTOBER 23, 2019, 9:00 A.M.
 9

10
       THIS DOCUMENT RELATES TO
11     ALL CASES

12     *************************************************************

13

14           TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                   UNITED STATES DISTRICT JUDGE

16

17     APPEARANCES:

18

19     FOR THE PLAINTIFFS'
       LIAISON COUNSEL:        HERMAN HERMAN KATZ
20                             BY:  LEONARD A. DAVIS, ESQUIRE
                                    STEPHEN HERMAN, ESQUIRE
21                             820 O'KEEFE AVENUE
                               NEW ORLEANS, LA  70113
22

23                             LEVIN, FISHBEIN, SEDRAN & BERMAN
24                             BY:  SANDRA L. DUGGAN, ESQUIRE
                               510 WALNUT STREET, SUITE 500
25                             PHILADELPHIA, PA 19106


                     OFFICIAL TRANSCRIPT
```

---

3

```
 1     APPEARANCES CONTINUED:

 2

 3     FOR THE KNAUF
 4     LIAISON COUNSEL:       BAKER DONELSON BEARMAN
                              CALDWELL & BERKOWITZ
 5                            BY:  KERRY J. MILLER, ESQUIRE
                              201 ST. CHARLES AVENUE, SUITE 3600
 6                            NEW ORLEANS, LA  70170

 7
 8     FOR THE TAISHAN, BNMB
       ENTITIES AND CNBM ENTITIES
 9     LIAISON COUNSEL:       PHELPS DUNBAR
                              BY:  HARRY ROSENBERG, ESQUIRE
10                            365 CANAL STREET, SUITE 2000
                              NEW ORLEANS, LA  70130

11

12     FOR TAISHAN GYPSUM CO.,
       LTD, AND TAI'AN TAISHAN
13     PLASTERBOARD CO., LTD.:  ALSTON & BIRD
                                BY:  CHRISTINA H. EIKHOFF, ESQUIRE
14                                   BERNARD TAYLOR, SR., ESQUIRE
                                ONE ATLANTIC CENTER
15                              1201 WEST PEACHTREE STREET
                                ATLANTA, GA 30309

16

17

18                              ALSTON & BIRD
                                DAVID VENDERBUSH, ESQUIRE
19                              90 PARK AVENUE, 15TH FLOOR
                                NEW YORK, NY  10016

20

21

22

23

24

25

                                OFFICIAL TRANSCRIPT
```

---

2

```
 1     APPEARANCES CONTINUED:

 2

 3                   GAINSBURGH BENJAMIN DAVID
                     MEUNIER AND WARSHAUER
 4                   BY:  GERALD E. MEUNIER, ESQUIRE
                     2800 ENERGY CENTRE
 5                   1100 POYDRAS STREET, SUITE 2800
                     NEW ORLEANS, LA  70163

 6

 7                   COLSON HICKS EIDSON
 8                   BY:  PATRICK S. MONTOYA, ESQUIRE
                     225 ALHAMBRA CIRCLE, PENTHOUSE
 9                   CORAL GABLES, FL  33134

10

11                   LAMBERT & NELSON
                     BY:  CAYLE PETERSON, ESQUIRE
12                   701 MAGAZINE STREET
                     NEW ORLEANS, LA  70130

13

14     FOR THE STATE/FEDERAL
15     COORDINATION COMMITTEE:  LAW OFFICES OF RICHARD J. SERPE
                                BY:  RICHARD SERPE, ESQUIRE
16                              580 EAST MAIN STREET, SUITE 310
                                NORFOLK, VA 23510

17

18     FOR TAISHAN GYPSUM CO.,
19     LTD, AND TAI'AN TAISHAN
       PLASTERBOARD CO., LTD.:   ALSTON & BIRD
20                               BY:  CHRISTINA H. EIKHOFF, ESQUIRE
                                 ONE ATLANTIC CENTER
21                               1201 WEST PEACHTREE STREET
                                 ATLANTA, GA 30309

22

23

24

25

                     OFFICIAL TRANSCRIPT
```

---

4

```
 1     APPEARANCES CONTINUED:

 2

 3     CHINA NATIONAL BUILDING
       MATERIALS GROUP CORPORATION
 4     AND CHINA NATIONAL BUILDING
       MATERIALS COMPANY LIMITED
 5     (COLLECTIVELY, "CNBM"):   GORDON, ARATA, MCCOLLAM,
                                 DUPLANTIS & EAGAN
 6                               BY:  EWELL E. EAGAN, JR., ESQUIRE
                                 DONNA P. CURRAULT, ESQUIRE
 7                               ALEX B. ROTHENBERG, ESQUIRE
                                 201 ST. CHARLES AVENUE, 40TH FLOOR
 8                               NEW ORLEANS, LA  70170

 9

10     ALSO PRESENT:            JACOB WOODY, BROWNGREER
                                SARAH OLSON, PLAINTIFF

11

12

13     OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
14                               CERTIFIED REALTIME REPORTER
                                 CERTIFIED MERIT REPORTER
15                               500 POYDRAS STREET, ROOM B406
                                 NEW ORLEANS, LA  70130
16                               (504) 589-7779
                                 Cathy_Pepper@laed.uscourts.gov

17

18     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
       PRODUCED BY COMPUTER.
19
20
21
22
23
24
25

                                OFFICIAL TRANSCRIPT
```

## Page 5

5

I N D E X

PAGE

5  FAIRNESS HEARING ON DECEMBER 11TH, 2019..............   10
6  INITIAL PAYMENT UNDER THE SETTLEMENT HAS BEEN FULLY
7  MADE BY TAISHAN.....................................   11
8  LONG FORM NOTICE WAS MAILED TO EVERY SINGLE KNOWN
9  CLASS MEMBER........................................   11
10 ESTIMATE LETTERS WERE SENT BY BROWNGREER TO EVERY
11 PLAINTIFF ON THE MASTER SPREADSHEET.................   11
12 CLASS COUNSEL HAS SET UP A SETTLEMENT WEBSITE,
13 CHINESEDRYWALLSETTLEMENT.COM, AND A CALL CENTER......   11
14 UPDATED MASTER SPREADSHEET BY THE END OF THE MONTH...13
15 NEXT CONFERENCE IS NOVEMBER 22ND, 2019 ..............   16

OFFICIAL TRANSCRIPT

## Page 6

6

1          P-R-O-C-E-E-D-I-N-G-S
08:48:19   2          WEDNESDAY, OCTOBER 23, 2019
08:48:19   3          M O R N I N G   S E S S I O N
08:48:19   4          (COURT CALLED TO ORDER)
08:48:19   5
09:01:18   6
09:01:19   7          THE DEPUTY CLERK:  All rise.
09:01:25   8          THE COURT:  Be seated, please.  Good morning, ladies
09:01:34   9  and gentlemen.
09:01:34  10          VOICES:  Good morning, Judge.
09:01:35  11          THE COURT:  Let's call the case.
09:01:35  12          THE DEPUTY CLERK:  MDL 2047, In re:  Chinese
09:01:42  13  Manufactured Drywall Products Liability Litigation.
09:01:42  14          THE COURT:  Would counsel make their appearance for the
09:01:44  15  record, please.
09:01:45  16          MR. ROSENBERG:  Good morning, Judge Fallon.
09:01:49  17  Harry Rosenberg, liaison counsel for Taishan, BNBM, and CNBM.
09:01:58  18          MR. DAVIS:  Good morning, Your Honor.  Leonard Davis on
09:02:01  19  behalf of the Plaintiffs' Steering Committee.
09:02:02  20          THE COURT:  We're here today for our monthly status
09:02:06  21  conference.  The case initially started with numbers of
09:02:14  22  plaintiffs against numbers of defendants.  The unusual factor
09:02:20  23  in this particular case is that I had about 20,000 individual
09:02:24  24  claimants, which is not necessarily unusual or unwieldy, but in
09:02:29  25  this particular case I had a thousand defendants, which is

OFFICIAL TRANSCRIPT

## Page 7

7

09:02:31   1  unusual for this type of litigation.
09:02:34   2          In any event, the two types of defendants that
09:02:40   3  were involved in the case were manufacturers, and they were
09:02:49   4  grouped into the Chinese manufacturers and the German
09:02:54   5  manufacturers.  The case proceeded against the German
09:02:57   6  manufacturers, Knauf, first, and it was resolved, settled, so
09:03:05   7  they are no longer in the case, with the potential exceptions
09:03:10   8  of one or two individual cases.
09:03:13   9          The case then proceeded with vigor against the
09:03:18  10  Chinese defendants, Taishan and others, and the case proceeded.
09:03:26  11  There were trials and so forth, both state and federal, and the
09:03:33  12  parties reached an agreement not too long ago.  It's a
09:03:40  13  class-action settlement agreement, and that's where we are at
09:03:48  14  this particular point.
09:03:49  15          I had received a number of letters from
09:03:52  16  individuals -- individual people, not lawyers -- questioning
09:04:03  17  various aspects of it, and perhaps I should at least address
09:04:14  18  what the concept is as best, at least, I can.
09:04:19  19          Let me say a word about class actions.  Maybe the
09:04:23  20  complexity of society, nationwide sales, opportunities of goods
09:04:31  21  and material, instantaneous communication, and perhaps even
09:04:37  22  lawyer advertising, this has brought about a situation where
09:04:42  23  the traditional case, the traditional common-law case of one
09:04:47  24  plaintiff, one defendant has morphed into numbers of plaintiffs
09:04:56  25  and sometimes numbers of defendants.  Therefore, some vehicle

OFFICIAL TRANSCRIPT

## Page 8

8

09:06:00   1  had to be established legislatively and enforced judicially to
09:05:07   2  deal with this situation where you had multiple plaintiffs,
09:05:12   3  20,000 individual plaintiffs, with a thousand lawyers, or
09:05:17   4  thereabouts, filing suit.
09:05:20   5          The traditional method of one plaintiff, one
09:05:26   6  defendant -- one lawyer for the plaintiff, one lawyer for the
09:05:30   7  defendant -- wasn't a vehicle that was able to be handled;
09:05:34   8  therefore, legislatively a method of dealing with that type of
09:05:40   9  litigation was created, and it was called a class action.
09:05:44  10          It was adopted in the Federal Rules of Civil
09:05:49  11  Procedure 23 to create a class action which created a method of
09:05:55  12  dealing with litigation that involved multiple parties on at
09:06:01  13  least one side of the case.  In order to qualify as a class
09:06:07  14  action, you had to have some commonality.  It just wasn't the
09:06:11  15  fact that you had a case, you had to have some commonality, and
09:06:15  16  those commonalities had to preponderate in order for you to
09:06:22  17  have an opportunity to join together as a class.
09:06:30  18          The class action has some advantages to it, at
09:06:36  19  least from the plaintiffs' standpoint, from the litigants'
09:08:40  20  standpoint.  They can join together, and they can pool their
09:06:44  21  costs so that it's not one person paying all of the costs.  The
09:06:50  22  group, in a sense, pays the costs and attorney's fees, pays the
09:06:55  23  attorney's fees, and they don't do it up front.  They are able
09:07:00  24  to pool their resources, so to speak.  They have a common
09:07:07  25  representation.  They are able to collect information more

OFFICIAL TRANSCRIPT

9

09:07:15 1    easily and house that information more easily, so those are
09:07:22 2    advantages.
09:07:23 3            But there are some disadvantages, and the
09:07:29 4    disadvantages are sort of like a family situation where you
09:07:34 5    have 12 kids, and the turkey comes on the table, and 12 want a
09:07:43 6    drumstick.  There are only two.  There are two drumsticks, and
09:07:47 7    so if everybody wants a drumstick, they compromise on they get
09:07:53 8    a piece of it.  They don't get the whole drumstick.  There are
09:07:57 9    not 12 drumsticks on a turkey.  That's a disadvantage.
09:08:03 10           Sometimes the disadvantages outweigh the
09:08:07 11   advantages.  What to do in that situation.  Well, the
09:08:12 12   legislation allows for that.  They allow for you to leave the
09:08:16 13   table.  You go on your own and get your own turkey, and that's
09:08:27 14   what the opt-out means in this type of litigation.
09:08:34 15           So there are advantages and there are
09:08:36 16   disadvantages, and the litigants are notified of this.  They
09:08:41 17   are notified of the dinner, and they can come to the table or
09:08:48 18   they don't have to come to the table.  If they don't want to
09:08:49 19   come to the table, though, they have to tell people.  They have
09:08:53 20   to say, "I'm not going to be there," so that they don't set a
09:08:57 21   table for you.  So you have to say, "I want out.  I'm opting
09:09:03 22   out of this litigation," and you have that opportunity.
09:09:06 23           So the notice goes out and everybody is notified
09:09:14 24   of it.  They have the opportunity to ask questions of their
09:09:21 25   attorney.  Whatever question they have, they have an

**OFFICIAL TRANSCRIPT**

10

09:09:24 1    opportunity to do so.
09:09:26 2            I received a long letter from Mr. Moody, who had
09:09:33 3    a number of questions, but he has met already five or six or
09:09:37 4    seven times with his attorney, and his attorney has endeavored
09:09:41 5    to answer those questions.
09:09:43 6            Sometimes the answers are not satisfactory, but
09:09:48 7    they are answers.  If you don't like the answer, you have the
09:09:51 8    opportunity to say, "I'm not coming to the dinner, folks.  I'm
09:09:55 9    just letting you know, I'm out," and go to your own place and
09:10:05 10   seek to obtain your dinner.
09:10:06 11           So that's what we're doing, and the notice has
09:10:11 12   gone out, and we are having a last fairness hearing on
09:10:19 13   December 11th, is it, December 11th.  Everybody has been
09:10:24 14   notified, and it's very costly to notify everybody, but the
09:10:29 15   class counsel has a duty, and they've extended a lot of
09:10:38 16   resources and time to make sure that everybody was noticed.
09:10:41 17           It seems to me that it's a fair notice.  It's an
09:10:46 18   adequate notice.  They are doing everything they can.  They
09:10:50 19   have call operators to explain what the facts are, what the
09:10:58 20   opportunities are, what the disadvantages are, answer any
09:11:00 21   questions, and so people have an opportunity to do that, and
09:11:06 22   we'll have that hearing.
09:11:08 23           Today I have a status conference just to find out
09:11:13 24   what's happening and what response it's having, so I'll hear
09:11:17 25   from the parties at this time.

**OFFICIAL TRANSCRIPT**

11

09:11:20 1            MS. DUGGAN:  Good morning, Your Honor.  Sandra Duggan
09:11:23 2    on behalf of the plaintiffs.  Your Honor, I would like to
09:11:26 3    report that the initial payment under the settlement has been
09:11:29 4    fully made by Taishan.  Those monies are now safely held in the
09:11:34 5    court registry.  The notice has gone out, long form notice was
09:11:38 6    mailed to every single known class member and estimate letters
09:11:42 7    were sent by BrownGreer to every plaintiff on the master
09:11:45 8    spreadsheet.
09:11:47 9            Under the settlement and the Court's approval
09:11:50 10   notice, class members had until October 3rd to dispute the
09:11:54 11   information on the master spreadsheet.  BrownGreer has received
09:11:57 12   all of the disputes and will be publishing a revised master
09:12:00 13   spreadsheet by the end of this month, and that will go on the
09:12:04 14   docket so everybody can see it.
09:12:06 15           Class counsel has set up a settlement website,
09:12:10 16   ChineseDrywallSettlement.com.  We also have a call center that
09:12:14 17   has been functioning, and I believe it's been working very
09:12:18 18   well.  On the website itself there has been over 99,000 views,
09:12:23 19   and 72,000 of those have been from new users from all 50 states
09:12:28 20   plus the District of Columbia.
09:12:30 21           As regarding the call center, we've had over 200
09:12:35 22   callers.  Class counsel have been returning the phone calls.
09:12:37 23   We have been responding to emails, and we have inquiries from
09:12:40 24   class members from 21 different states.
09:12:42 25           So we feel that the notice is working, people are

**OFFICIAL TRANSCRIPT**

12

09:12:45 1    asking questions, and we are answering all of those questions
09:12:48 2    to the best of our abilities.
09:12:50 3            THE COURT:  All right.  Anything from defense counsel?
09:12:53 4            MS. EIKHOFF:  No.  Just to reiterate the report of
09:13:00 5    Ms. Duggan that we do believe that the notice is working and
09:13:03 6    agree that it has been fair and adequate.
09:13:05 7            THE COURT:  Okay.
09:13:07 8            Jake, do you want to give me some feel for what's
09:13:09 9    happening?
09:13:10 10           MR. WOODY:  Yes, Judge.  We did receive the challenges
09:13:14 11   that Ms. Dugan referred to.  We've received 109 of them that
09:13:18 12   break down into various categories.
09:13:20 13           THE COURT:  What are the major categories of concern?
09:13:22 14           MR. WOODY:  The biggest category of concern is the one
09:13:26 15   that affects the dollar values the most, which is people who
09:13:30 16   want to switch from -- they claim that they in Amorin, we have
09:13:34 17   them in Brook, or they are in neither, and they want to be in
09:13:38 18   one of them, but those do affect the claim values the most, but
09:13:40 19   they also are fairly black and white for us to deal with.
09:13:45 20           THE COURT:  The square footage, is that an issue?
09:13:48 21           MR. WOODY:  Square footage, we did receive some
09:13:50 22   challenges on that.  Most of the challenges are for a
09:13:52 23   relatively small amount of square footage, so no matter how we
09:13:57 24   rule on that, it won't really affect the payouts too much.
09:14:00 25           I don't see anything in the challenges that will

**OFFICIAL TRANSCRIPT**

13

```
09:14:02   1   have a significant impact on the estimates that we've already
09:14:04   2   made because when you have this many people and this much
09:14:08   3   money, it takes quite a bit of shifting to really change the
09:14:11   4   dollar values too much, but we are reviewing them and will
09:14:14   5   issue decisions in an updated master spreadsheet by the end of
09:14:19   6   the month.
09:14:19   7           THE COURT:  Okay.
09:14:21   8           MR. WOODY:  Thank you, Your Honor.
09:14:21   9           THE COURT:  All right.  Anything further?
09:14:23  10           Richard?
09:14:24  11           MR. SERPE:  Good morning, Your Honor.  Richard Serpe
09:14:32  12   for the PFC and class counsel.
09:14:35  13           Late last night around 9:00 p.m. I received an
09:14:38  14   e-mail from one of the Virginia class members, Sarah Olson, and
09:14:41  15   she has requested to briefly address the Court this morning.
09:14:44  16           THE COURT:  Sure.  Ms. Olsen, you're in court?  Would
09:14:48  17   you come forward, please, ma'am.
09:14:58  18           Okay.  I appreciate you being here.  I hope the
09:15:02  19   weather is okay for you to here in New Orleans.
09:15:05  20           MS. OLSON:  Much better than Wisconsin.  Thank you.
09:15:10  21           THE COURT:  Great.  Fine.  Yes, ma'am.
09:15:14  22           MS. OLSON:  I wasn't truly expecting to do this today.
09:15:17  23   I apologize.  I'm on vacation.
09:15:17  24           THE COURT:  That's alright.
09:15:18  25           MS. OLSON:  So when I realized last night that I was in
```

*OFFICIAL TRANSCRIPT*

14

```
09:15:21   1   the town where this was at, I felt obligated to at least come
09:15:26   2   and watch.
09:15:26   3           THE COURT:  Sure.
09:15:28   4           MS. OLSON:  So I apologize, I didn't prepare very well.
09:15:31   5           THE COURT:  That's okay.  I appreciate you being here.
09:15:36   6           MS. OLSON:  In 2010 my husband and I received a letter
09:15:38   7   from our builder telling us that we had Chinese drywall in our
09:15:44   8   house, and he was on deployment at the time.  We're both Navy
09:15:47   9   veterans.  We graduated from the Naval Academy.
09:15:52  10           I didn't quite appreciate what that meant until I
09:15:54  11   started looking in on it.  At the time we had a
09:15:58  12   two-and-a-half-year-old son who was clearly not developing
09:16:01  13   correctly.  So for us, this has been a very emotional journey.
09:16:06  14   Since then we've had a third child.  We moved out of that house
09:16:09  15   as soon as we could because we were all very ill.
09:16:12  16           We -- I very vividly remember the first time we
09:16:16  17   met with Richard Serpe.  My husband had just finished a tour at
09:16:22  18   the Pentagon in a Chinese think tank, and we were sitting at
09:16:25  19   our dining room table, and he looked over at me he says, "We
09:16:29  20   will never see a penny from this case," just from the culture
09:16:33  21   and what he had learned in that job.
09:16:36  22           So we have been trying hard, not always
09:16:41  23   succeeding very well, in moving on for the past 10 years or so,
09:16:45  24   and every once in a while there is something that comes up that
09:16:48  25   reminds us of the emotional part of this.  But the rational
```

*OFFICIAL TRANSCRIPT*

15

```
09:16:54   1   part of this we've always tried to keep in the back of our mind
09:16:57   2   that if we ever got something, we would be appreciative that
09:17:02   3   there was something versus nothing.  I can't imagine being in
09:17:05   4   the class of getting very little.
09:17:07   5           We're very fortunate that the lawyers we had
09:17:10   6   worked to put us in the class where we are.  I can't imagine we
09:17:14   7   would ever look at this settlement and think we're whole.
09:17:19   8   There is no way you can take an autistic child and another one
09:17:23   9   with chronic anxiety and say this doesn't affect us every day
09:17:28  10   of our lives.  Financially, we lost almost everything we had
09:17:32  11   trying to compensate for this.
09:17:36  12           I wish I could stand here and say there has got
09:17:38  13   to be a better solution.  I don't have that -- you know, with
09:17:44  14   all these people.  I guess I just want to say that for all of
09:17:50  15   you in this business room, this may not be emotional to you,
09:17:57  16   and there may never be a way to prove what we've had to go
09:18:01  17   through, the emotional, the diagnoses of PTSD, the constant
09:18:07  18   triggers that will follow us through the rest of our life.
09:18:10  19   Every day I wake up and I have to say how am I going to get my
09:18:15  20   son a successful member of society?  You may not be able to
09:18:17  21   capture that when you're making these decisions.
09:18:20  22           Please remember that there are real people behind
09:18:22  23   this, and as much as we can all say something is better than
09:18:28  24   nothing, the amount of money and energy we've expended, you can
09:18:33  25   never compensate us enough.
```

*OFFICIAL TRANSCRIPT*

16

```
09:18:38   1           I used to look at, you know, people in
09:18:40   2   New Orleans, right, who lived through tragedies such as
09:18:45   3   hurricanes, and we've had houses with trees fall on them in
09:18:47   4   Virginia when we were in the military, there was never really a
09:18:50   5   good solution to this problem.  There wasn't an insurance that
09:18:53   6   helped us.  You know, this is it.  This is all we're going to
09:18:57   7   get.
09:18:58   8           So, I guess what I would say is, yes, more would
09:19:03   9   help, but I appreciate the time and the energy that everybody
09:19:08  10   has put into this, and, frankly, we want to move on with our
09:19:12  11   lives as much as possible.
09:19:15  12           Thank you.
09:19:16  13           THE COURT:  Okay.  Well, thanks for being here.  I
09:19:18  14   appreciate it.  I appreciate your comments.
09:19:21  15           MS OLSON:  Thank you.
09:19:30  16           THE COURT:  Anything further from anyone?
09:19:33  17           Okay.  With that, we'll end the conference then
09:19:36  18   and I'll see you all, when is the next one, November 22nd.
09:19:45  19           Okay.  Anything further?  Thank you all very
09:19:48  20   much.  Court will stand in recess.
09:19:50  21           THE DEPUTY CLERK:  All rise.
          22           (WHEREUPON, at 9:19 a.m., the proceedings were
          23   concluded.)
          24                          *  *  *
          25
```

*OFFICIAL TRANSCRIPT*

17

1       REPORTER'S CERTIFICATE
2
3           I, Cathy Pepper, Certified Realtime Reporter, Registered
4    Merit Reporter, Certified Court Reporter in and for the State
5    of Louisiana, Official Court Reporter for the United States
6    District Court, Eastern District of Louisiana, do hereby
7    certify that the foregoing is a true and correct transcript to
8    the best of my ability and understanding from the record of the
9    proceedings in the above-entitled and numbered matter.
10
11              _s/Cathy Pepper_____
12              Cathy Pepper, CRR, RMR, CCR
                Certified Realtime Reporter
13              Registered Merit Reporter
                Official Court Reporter
14              United States District Court
                Cathy_Pepper@laed.uscourts.gov
15
16
17
18
19
20
21
22
23
24
25

        _OFFICIAL TRANSCRIPT_

# Exhibit 4

New Orleans City Business March 29, 2018 article:
Judge: Return Chinese drywall lawsuits to original
states"

# New Orleans
# CITYBUSINESS

## Judge: Return Chinese drywall lawsuits to original states

By: The Associated Press   March 29, 2018   0

Nine years after a judge began supervising a multitude of federal lawsuits that claim homes were damaged by Chinese drywall, he says it's time to return thousands of them for trial in the courts where they were filed.

The panel that put Judge Eldon Fallon in charge in 2009 said the first 1,700 would return to Florida's federal courts if no objections are filed by Thursday. At least three objections were filed Thursday by attorneys for about 750 clients. The filings did not give reasons for the objections.

Those opposing the transfer must file briefs of their arguments by April 12, and responses are due May 3, according to the U.S. Judicial Panel on Multidistrict Litigation's electronic docket.

Fallon ruled in 2010 that Chinese-made drywall released sulfur fumes into homes, sickening occupants, corroding metals in wiring, plumbing, appliances and electronics, and stinking up the houses. In 2013, he approved settlements involving up to 10,000 homes and other buildings with drywall from German-owned Knauf Plasterboard Tianjin Co.

Remaining cases involve a second company, Taishan Gypsum Co. Ltd., which didn't show up in court until Fallon found it in contempt and forbade any of its subsidiaries or affiliates to do business in this country until it participated in court proceedings.

Fallon told the panel he wants to transfer all remaining Chinese drywall cases that were sent to him.

Such requests are unusual: supervising judges resolve the great majority of cases, mostly through settlements, according to a 2014 Louisiana Law Review article by Edward F. Sherman of Tulane University.

"The gold standard, I think, is to get everybody to a point where you can get global peace for everybody," said Louisiana State University law Professor Margaret Thomas.

But when that doesn't happen the cases go to trial, and those trials must be held in the states where the suits were filed.

About 5,000 cases remain from eight states: Florida, Virginia, Louisiana, Alabama, Mississippi, Georgia, North Carolina and California, attorney Arnold Levin, spokesman for the Plaintiffs Steering Committee in this case, said Thursday.

Fallon said in a March 12 order and request that he's dealt with all pretrial motions raising common questions, held "bellwether trials" to lead the way, and has approved a formula for calculating property damages.

He wrote that his court "has worked diligently for the past nine years," producing abundant evidence and judicial opinions to enable the original courts and the parties in the lawsuits to steer any unresolved cases "to a fair and just conclusion."

His order and request was accompanied by a 118-page list identifying 1,734 cases comprising one Florida class action. There could be more than 1,000 additional cases in a separate group that includes Florida defendants, Levin said.

Plaintiffs whose cases would be transferred back include Jason and Heather Ancer of Land O Lakes, Florida. Jason Ancer said an inspector who claimed to be a Chinese drywall expert told them their house was fine, but their air conditioner began failing within months after they moved in. Their drywall turned out to have been made by Taishan. Five months after moving in, Heather Ancer became pregnant.

The couple left the house, stopped making payments on it and eventually declared bankruptcy.

"We don't know what to think," said Jason Ancer. "All I know is it seems that definitely we will not have any kind of recourse."

In Facebook groups of people affected by Taishan's drywall, he said people are asking how are individual trials going to do any good if the combined cases can't go forward.

That isn't so, Levin said.

"We as plaintiffs support what Judge Fallon has done," he said. "It's nine years, and the Chinese have tried every tactic to see to it that the people we represent either die or otherwise have their properties disposed of … just trying to frustrate the process."

Levin said the steering committee's attorneys are ready to work with lawyers representing the remaining defendants.

"Ultimately, the only thing that leads a recalcitrant defendant to settle is a big verdict," he said.

Taishan and its subsidiaries and affiliates do a lot of business in the United States. One of them sells solar panels to Walmart and another buying timber in Oregon, he said. Levin said those companies' assets in this country can be attached if Taishan ignores court orders to pay damages, Levin said.

Once the cases return to their originating courts, he said, "The Chinese will be all over America trying cases."

To sign up for free CityBusiness Daily Updates, click here.

**Tagged with:**   CHINESE DRYWALL    LAWSUIT

11/25/2019                          Judge: Return Chinese drywall lawsuits to original states – New Orleans CityBusiness

Copyright © 2019 New Orleans Publishing Group | 3350 Ridgelake Drive, Suite 281, Metairie, LA 70002 |
Phone: (504)834-9292 E-mail: mail@nopg.com

# Exhibit 5

CISION PR Newswire August 20, 2019 article:
"Plaintiffs' Steering Committee: Settlement
Announced in Decade-Old Chinese Drywall
Litigation Lawsuits"

# Plaintiffs' Steering Committee: Settlement Announced in Decade-Old Chinese Drywall Litigation Lawsuits

NEWS PROVIDED BY
**Plaintiffs' Steering Committee →**
Aug 20, 2019, 10:21 ET

NEW ORLEANS, Aug. 20, 2019 /PRNewswire/ -- Lawyers for thousands of property owners who alleged that their homes and properties were damaged by defective Chinese drywall filed a motion today asking a federal judge in New Orleans to approve a nationwide settlement of their lawsuits.  The Chinese Drywall Litigation has been ongoing for more than ten years.  The proposed settlement calls for $248 million to be funded by Taishan Gypsum, Co., a Chinese manufacturer of construction products.

Lead counsel for Plaintiffs' Steering Committee, Arnold Levin said that he is, "extremely pleased with the proposed settlement.  If the court approves it, thousands of homeowners affected by Taishan drywall will finally get much needed payments from Taishan."

Today's filing asks the Louisiana court for preliminary approval of the settlement terms and proposes a 90-day plan to notify all property owners who may be eligible for part of the payment.

Lawyers for the property owners estimate that thousands of homes and condominium properties were built using the defective drywall between 2005 and 2008, primarily in Florida, Louisiana, Alabama, Mississippi, and Virginia. The defective drywall has been associated with unpleasant odors and fumes that corrode metals, including air conditioning units, fixtures and other appliances.

Beginning around 2009, multiple lawsuits were filed against manufacturers, suppliers, builders, installers and other defendants alleged to have some involvement in making or supplying the problematic drywall.  The cases were consolidated in a multidistrict litigation case before Judge Eldon Fallon in U.S. District Court for the Eastern District of Louisiana in New Orleans who presided over more than one hundred status conferences and ruled on dozens of motions, including many addressing complex international and immunity law.  Federal courts in Miami, Florida and Norfolk, Virginia have also handled part of the lawsuits in recent months.  An initial set of cases was set for trial before U.S. District Court Judge Marcia Cooke in July, but the outlines of a class settlement were negotiated at a court-ordered mediation in late May.

The proposed settlement filings ask for the court to provide preliminary approval of the agreement, then review the deal again for final approval after a notice period and fairness hearing to occur later this year.  The proposal states that detailed information will be sent to known eligible parties and will be made available to the public in the event the court preliminarily approves the settlement.  If approved, payments from the settlement would be made to known property owners who have participated in the federal court litigation, as well as to any other property owners who can show that they had Chinese Drywall allegedly made by Taishan Gypsum or other participating defendants.

**CONTACT:**

**General/Lead Counsel:**
Arnold Levin
Sandra Duggan
Philadelphia, PA
sduggan@lfsblaw.com
(215) 870-8258

**Florida:**
Patrick Montoya
patrick@colson.com
(305) 476-7400

**Louisiana:**

Steve Herman

sherman@hhklawfirm.com

(504) 232-5154


**Virginia:**

Jeffrey Breit

jeffrey@breitcantor.com

(757) 622-6000


SOURCE Plaintiffs' Steering Committee



This envelope is made from post-consumer waste. Please recycle – again.

**Retail**

UNITED STATES
POSTAL SERVICE

**P**

US POSTAGE PAID
Origin: 33990
11/28/19
1130810422-4

$7.35

PRIORITY MAIL 2-DAY ®

0 Lb 11.60 Oz
1006

EXPECTED DELIVERY DAY:  11/30/19      C018

SHIP
TO:  580 E MAIN ST
STE 310
NORFOLK VA 23510-2323

USPS TRACKING® NUMBER

9505 5144 0327 9330 7078 37

EP14F Oct 2018
QD: 12 1/2 x 9 1/2

USPS.COM/PICKUP

P S00001000014

* Date of deli
* USPS TRACK
international
* Limited interna
* Pick up availab
* Order supplies
* When used inter
declaration label

* Domestic only

FROM:   Russell F Moody
806 NW 38th Pl
Cape Coral, FL  33993

TO:

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 East Main St., Suite 310
Norfolk, VA 23510

* Domestic only.    * For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.