**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:11-CV-22408-MGC**

EDUARDO AND CARMEN AMORIN, *et al.*,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., *et al.*,

      Defendants.

_____/

**DEFENDANT TAISHAN'S**
**RESPONSE TO PLAINTIFFS' OBJECTIONS TO**
**AND APPEAL FROM THE SPECIAL MASTER'S REPORT**
**AND RECOMMENDATION REGARDING PRODUCT ID**
**CATEGORIES ATTRIBUTABLE TO TAISHAN GYPSUM CO., LTD.**

After months of Product ID discovery, hundreds of pages of briefing and exhibits, a day-long evidentiary hearing, and weeks of deliberation, Special Master Tiffani Lee issued a Report & Recommendation ("PID R&R"), which found that some Product ID categories are attributable to Taishan and some categories are not. That PID R&R was legally correct and well-reasoned. Because the Special Master did not find in Plaintiffs' favor on every category, Plaintiffs now argue to the Court that she got everything wrong except for where she attributed certain denied markings to Taishan. Plaintiffs' objections are thus purely results-oriented—asserting error where Special Master Lee was unpersuaded by Plaintiffs' evidence, but welcoming her conclusions when they align with Plaintiffs' goals.

The Court should adopt the PID R&R and reject all of Plaintiffs' arguments, which fall into three broad buckets. First, the Court should reject Plaintiffs' new arguments and theories that they never presented in the long course of Product ID adjudication, and which are now both waived and also legally and factually unsupported. Second, the Court should reject Plaintiffs' attempt to reassert faulty arguments that Special Master Lee fully

**EXHIBIT 7 (part 1 of 3) to Memorandum of Law in Support of Class Settlement**

considered and rightfully rejected. Finally, the Court should reject Plaintiffs' attempt (taking up half of their brief) to relitigate to this Court the detailed, evidence-specific findings that Special Master Lee made on a category-by-category basis.

I.    **The Special Master Properly Applied Florida's Burden of Proof**

The Special Master rightly held that Plaintiffs bore the burden of proving that Taishan manufactured the drywall at issue. *See* PID R&R at 4. That is Florida law. *See Devore v. Howmedica Osteonics Corp.*, 658 F. Supp. 2d 1372, 1378 (M.D. Fla. 2009) (applying Florida law that "the user must establish the manufacturer's relationship to the product in question"); *Vecta Contract, Inc. v. Lynch*, 444 So. 2d 1093, 1095 (Fla. Dist. Ct. App. 1984) (reversing verdict for plaintiff who "did not offer sufficient evidence that defendant manufactured the defective chair").

Plaintiffs have admitted repeatedly that Florida law requires them to prove by the "greater weight of the evidence" that certain categories of Product ID were manufactured by Taishan. *See* ECF No. 253-1 at 22-23 (citing Florida law); Pls.' Objections to PID R&R at 5-6 (citing Florida law). Yet, they have also tried repeatedly to *eliminate or alleviate* their Florida law burden with a variety of novel and incorrect arguments. The Special Master rightly rejected Plaintiffs' attempt to shift the burden, and the Court should too.

In their written submission to Special Master Lee, Plaintiffs tried to leverage "the Court's inherent powers" to create a "rebuttable presumption" or "adverse inference" that all drywall was made by Taishan, wanting Taishan to have to disprove it. *See* ECF No. 253-1 at 24. Plaintiffs suggested this burden-shift as an "equitable remedy" because of Taishan's historical litigation conduct. *Id.* at 25. At the evidentiary hearing, Plaintiffs made no bones about what they wanted Special Master Lee to do:

> But for us to be forced, for the plaintiffs to be forced into the situation where we're getting stuff on the eve of depositions ten years later, that's where *I ask you as the finder of fact, as the trier of fact, to shift the burden.*

(ECF No. 253-5 at 50 (emphasis added); *see also id.* at 55 ("So we're asking you to shift the burden of proof.")).

The Special Master fully considered and rejected Plaintiffs' unlawful suggestion. Special Master Lee addressed Plaintiffs' arguments for burden-shifting, and correctly found

that "Plaintiffs have not established a sufficient predicate for the Special Master to impose or recommend a sanction pursuant to the authority granted under Federal Rule of Civil Procedure 53(c)(2)." (PID R&R at 4). Plaintiffs presented no valid law to support burden-shifting as a general "equitable remedy" for litigation conduct or because the proof issues are difficult.[1] And they failed to address the Eleventh Circuit law that prohibits that regime. *See Blackston v. Shook & Fletcher Installation Co.*, 764 F.2d 1480, 1483 (11th Cir. 1985) (rejecting presumption shifting burden of proof to defendants on Product ID in product defect case). Special Master Lee correctly applied Florida law requiring that "Plaintiff bears the burden to prove by the greater weight of the evidence that the product was manufactured by the Taishan Defendants." (PID R&R at 4).

Their equitable argument having failed, Plaintiffs now shift to a new theory to alleviate their evidentiary burden, pointing to Taishan's default status to argue that Taishan's liability should be "presumed, with Defendants carrying the burden of persuasion." (Pls.' Objections at 5). That proposition fails in several respects. First, Plaintiffs did not present this very different argument to the Special Master and thus waived it. *Cf., Starks v. United States*, No. 09-22352-CIV, 2010 U.S. Dist. LEXIS 110806, at *7-9 (S.D. Fla. Oct. 17, 2010) (holding that "[a]rguments that are not raised before a magistrate judge cannot be raised for the first time as an objection to a report and recommendation" and thus "must be deemed waived"); *see also Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009) ("We conclude that the district court has broad discretion in reviewing a magistrate judge's report and recommendation, and, therefore, the district court did not abuse its discretion in declining to consider Williams's timeliness argument that was not presented to the magistrate judge.").

Second, the law is clear that while default can affect a plaintiff's burden to prove *liability*, it has no effect on the separate burden to prove *damages*. *See Damian v. Oakmont Fin., Inc.*, 2016 U.S. Dist. LEXIS 191727, at *9 (S.D. Fla. May 20, 2016) ("The party seeking

---

[1] Nor have Plaintiffs even attempted to undertake to meet the onerous standard to show spoliation that can result in an adverse inference in this District. *In re Bos. Boat III, L.L.C.*, 310 F.R.D. 510, 513 (S.D. Fla. 2015) (describing the elements and standards to merit an adverse inference for spoliation under Eleventh Circuit law). As the Special Master observed, MDL Judge Fallon previously addressed Plaintiffs' complaints with an evidentiary hearing, and "did not find spoliation or the basis to impose adverse inferences." (PID R&R at 4).

default judgment must prove its damages."); *Christiansen v. McRay*, 380 F. App'x 862, 863-64 (11th Cir. 2010) (affirming denial of monetary damages in default judgment because plaintiff failed to meet burden of proving damages); *see generally Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003) (holding in default proceeding that "Federal law . . . requires a judicial determination of damages absent a factual basis in the record"). That is consistent with what the MDL judge, this Court, and the Plaintiffs themselves have recognized throughout the litigation: each Plaintiff must prove Product ID to be entitled to damages from Taishan. That was the entire point of the multi-month Product ID adjudication process that this Court ordered the Special Master to oversee.

Third, Plaintiffs' only legal citations, two Second Circuit cases, do not remotely support their argument. (Pls.' Objections at 5 (citing *Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981))). Those two extrajurisdictional cases do not involve the determination of damages for a defaulted defendant, but instead address the threshold scenario of whether a complaint has sufficiently pled a cause of action. Indeed, the *Au Bon Pain* court expressly *rejected* that plaintiffs were entitled to any favorable inferences on the damages question. 653 F.2d at 65 ("First, at the inquest, the court should have accepted as true all of the factual allegations of the complaint, *except those relating to damages*." (emphasis added)).

The Court should also reject Plaintiffs' attacks on the Special Master's citation of evidence and her credibility. Plaintiffs unfairly accuse Special Master Lee of having relied only on "direct photographic evidence and markings" for her decisions. (Pls.' Objections at 5-6). But the PID R&R shows citations to multiple forms of evidence, including, deposition testimony, *see, e.g.*, PID R&R at 7 (citing January 22, 2019 Deposition of Taishan Gypsum); shipping records and invoices, *see, e.g.*, PID R&R at 7 (citing TG-PID-000079 Run & Fly Invoice); produced documents, *see, e.g.*, PID R&R at 6 (citing TG-PID-000042 and 046); public records, *see, e.g.*, PID R&R at 5 (citing Consumer Product Safety Commission Press Release); emails, *see, e.g.*, PID R&R at 7 (citing email chain between Manchester In Home and Run & Fly); and manufacturer profile forms, *see, e.g.*, PID R&R at 6 (citing Taishan Defendants' Manufacturer Profile Forms).

And Plaintiffs' criticism that "the Special Master essentially accepted without question" Taishan's PID explanations and was "[p]erhaps . . . swayed" by Taishan's oral

advocacy has no place in fair argument. (Pls.' Objections at 6-7). That unfounded speculation not only is an insult to the Special Master's considered conclusions, but it also provides no legal basis for this Court to reject them. *See Wind v. Barnhart,* 133 F. App'x 684, 691 (11th Cir. 2005) ("Choosing between conflicting evidence is a task particularly suited to the fact finder.") (quoting *Landry v. Heckler,* 782 F.2d 1551, 1554 (11th Cir. 1986)).

The Court should adopt the Special Master's application of Florida law placing the burden on Plaintiffs to prove Product ID by a preponderance of the evidence and adopt the Special Master's determinations that Plaintiffs failed to meet that burden for several Product ID categories.

II.    **The Special Master Did Not Make "Errors In [Her] Analysis That Flow Through the Entire Report & Recommendation" As Plaintiffs Argue**

The Court should reject Plaintiffs' attempt to take a second bite at the apple by simply repackaging the same arguments that did not persuade the Special Master. Because the Special Master did not adopt the arguments Plaintiffs reiterate in their Section III, Plaintiffs allege that Special Master Lee made "ERRORS IN [HER] ANALYSIS THAT FLOW THROUGH THE ENTIRE REPORT & RECOMMENDATION." *See* Pls.' Objections at 7 (Section III header). Not so. Special Master Lee was tasked with weighing the evidence and considering the parties' arguments, and was justified in drawing the conclusions she laid out in the PID R&R.

First, Plaintiffs argue to this Court that there is a "complete lack of evidence that there are other manufacturers of ***defective*** Chinese drywall." *Id.* at 9. But Taishan showed the Special Master that U.S. government agencies investigating problems with Chinese Drywall identified many more manufacturers besides Taishan, BNBM and Knauf that exported to the U.S. from 2005 to 2008. *See* Defendant Taishan's Product Identification Contentions and Defenses ("PID Position Paper") (Ex. A) at 7-8. In fact, the CPSC referenced "well over one hundred manufacturers, importers, drywall distributors and builders." (Tab 14 at 3).[2] As Taishan pointed out, Plaintiffs *themselves* sued multiple other Chinese drywall manufacturers, alleging the *same defects* as alleged against Taishan. Those other Chinese drywall *defendants* named by *Plaintiffs* as manufacturers of defective drywall include:

---

[2] The exhibits to Taishan's PID Position Paper are referred to herein by their respective Appendix "Tab" numbers. An Index to the Appendix and Tabs 1-25 are attached hereto as Exhibit B. Tabs 26-68 are attached hereto as Exhibit C.

- Pingyi Baier Building Material Co., Ltd. ("Baier")
- Pingyi Zhongxing Paper-Faced PlasterBoard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd. ("Chenxiang" a/k/a "C&K")
- Crescent City Gypsum;
- Prowall Drywall;
- International Materials Trading a/k/a IMT Gypsum;
- Panel Rey a/ka/ Panel de Yeso Panel
- Shamrock Gold
- Pro-Roc
- Gridmarx a/k/a GridMarx and Grid Marx
- LaFarge
- Toughrock
- Gypsum Board
- USB
- Pabco

(Tab 7 at 3-4; Tab 8 at ¶¶ 531-543).  Taishan pointed this out in its March 1, 2019 PID Position Paper and at the March 8, 2019 evidentiary hearing.  Plaintiffs did not convince the Special Master that, contrary to their own prior judicial admissions, Taishan is the only manufacturer of defective Chinese drywall in the U.S. besides Knauf, BNBM and C&K.  This Court has applied the well-established rule that plaintiffs are bound by the allegations in their complaints:

> Plaintiffs further argue that Defendant cannot simply rely on Plaintiffs' admissions of fact contained in their Complaint. These arguments are unavailing. "[A] party is bound by the admissions in his pleadings." *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177-78 (11th Cir. 2009) ("[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.").

*Downer v. Royal Caribbean Cruises, Ltd.*, No. 11-21948-Civ-COOKE/TUR, 2012 U.S. Dist. LEXIS 75233, at *3 n.1 (S.D. Fla. May 31, 2012) (Cooke, J.).  In objecting to the Special Master's findings, Plaintiffs are bound to their prior admissions that many other Chinese manufacturers exported defective drywall to the United States.  They cannot now assert that no other manufacturer in China could have possibly made defective Chinese drywall other than Taishan and Knauf.

Moreover, the logic of Plaintiffs' argument leads to the absurd (and apparently intended) conclusion that any piece of reactive Chinese drywall in the U.S., regardless of the

marking, was manufactured by Taishan, unless that marking says Knauf on it. Plaintiffs want this result even though some of the drywall at issue bears the actual company names of *other Chinese drywall manufacturing defendants* named by Plaintiffs in this litigation.

Plaintiffs next claim that Special Master Lee gave "no weight" to alleged "inconsistencies and inaccuracies" in Taishan's manufacturing process and record-keeping. (Pls.' Objections at 9). What follows in Plaintiffs' Section II.B. is a laundry list of pieces of evidence that Plaintiffs accuse the Special Master of "ignor[ing]." *Id.* But Plaintiffs do not explain how that evidence commands a different result than that reached by the Special Master. Plaintiffs simply itemize nine (9) points, then give the Court nothing to do with them. Plaintiffs had the opportunity to—and did—present that evidence to the Special Master, who considered it, but still found Plaintiffs to fall short of their evidentiary burden for some PID categories. Plaintiffs do not begin to guide the Court on why those points should cause the Court to reject the Special Master's findings.

Plaintiffs also fault the Special Master's observation that "[w]hen deposed, the corporate representative for [Taishan] *suggested* that a chemical analysis of the boards could be done to determine their formulations and whether they came from the same batch or formulation as other boards that [Taishan] admit[s] they manufactured." (PID R&R at 10 n.6 (emphasis added)). As the Special Master accurately observed, Taishan's corporate witness did make this suggestion[3]—and made it on January 22, 2019—nearly seven weeks before the PID evidentiary hearing on March 11, 2019. In fact, the statement about possibly doing a comparative chemical component analysis was made on the first day of a two-day deposition in which two separate Plaintiffs' counsel cross-examined the witness. Plaintiffs did not ask a single question about the statement, nor did they propound any follow-up discovery in the multiple remaining weeks of PID discovery.

---

[3] The relevant testimony, in its entirety is:

> Of course, there are other ways to make the [PID] determination. . . .

> Number two, from the chemical analysis channel, we can compare whether the component of chemical from this board is the same as the chemical component which is covered from the residual boards in Taishan's warehouse.

(Taishan Dep., Jan. 22, 2019 (Tab #32) at 70-71).

At the hearing, Plaintiffs' counsel argued vigorously that any suggestion of using a comparative analysis to assist with Product ID determination was not feasible. *See* ECF No. 253-5 at 233-34. Nevertheless, the Special Master determined that Plaintiffs could have explored this option. (PID R&R at 10 n.6). Despite having had days to depose Taishan's witness in January and weeks of discovery following Taishan's day-one testimony, Plaintiffs made no effort to explore Taishan's suggestion until *after* PID discovery and the evidentiary hearing had closed. *See* Pls.' Objections at 10 (admitting that Plaintiffs did not ask Taishan for more information about possible chemical component analysis until after the evidentiary hearing). Nor did Plaintiffs take the opportunity, offered by the Special Master, to submit post-hearing supplemental briefs on any PID issue. *See* ECF No. 253-5 at 277-78.

Plaintiffs' current unsupported arguments that chemical component testing is "bogus" should have no bearing on this Court's adoption of Special Master Lee's PID R&R. Plaintiffs have the burden to prove that Taishan manufactured the drywall for which they seek to hold Taishan liable. As Plaintiffs admit, that evidence can take many forms and can be circumstantial. In the same portion of the deposition that Taishan's corporate representative suggested the possibility of comparative chemical component analysis, he also suggested examining supply chain documentation to trace drywall to Taishan as a manufacturer—an evidentiary method that Plaintiffs have used in some instances. *See* Tab 32 at 70-71.

But for all blank boards with unmarked edge tape, Plaintiffs have done nothing more than point to Taishan's record of producing some blank boards. Special Master Lee rightly ruled that that, even so, "without additional information, the Special Master is unable to determine what portion or which claimants' homes" have blank drywall that Taishan manufactured. (PID R&R at 10). That is the right consequence of Plaintiffs failing to meet their burden, regardless of all of the real or hypothetical other ways that Plaintiffs might have tried to prove their case.

III. **The Court Should Reject Plaintiffs' Attempts to Relitigate Every PID Category Determined by the Special Master**

Plaintiffs assert that virtually every PID decision that the Special Master made was wrong. In the last ten (10) pages of their Objections Brief, Plaintiffs present to this Court a condensed version of what they argued to the Special Master in 56 pages of PID briefing, 71

exhibits, and several hours of an evidentiary hearing.  Rather than take this Court down the path of a needless "do over," Taishan stands by the evidence and arguments it already made to the Special Master for each of the categories, and will incorporate those specific records by reference for each PID category.  Taishan will also note flaws and inconsistencies in the Plaintiffs' Objections Brief where warranted.

Inexplicably, in their Objections Brief, Plaintiffs do not follow the alphabetical order of the PID categories or the corresponding sequence of the PID R&R, but instead present their category-specific objections in no particular order at all.  In responding to Plaintiffs' objections below, Taishan will follow the Special Master's ordering and track the sequence in which they are presented in the PID R&R.

### A.  Category "B" – C&K Drywall

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 25-28 and at the March 11 evidentiary hearing at pages 118-127 of the transcript.  (Ex. A at 25-28; ECF No. 253-5 at 118-127).  The Special Master found that Plaintiffs did not meet their burden of proof to establish by the greater weight of the evidence that Taishan made drywall in this category.

The evidence is overwhelming that C&K drywall was manufactured by a different defendant—Chenxiang, a/k/a C&K.  In their objections to the Special Master's unequivocal findings on this point, Plaintiffs wander so far from the evidence as to render their new C&K attribution theory unrecognizable compared to what they argued to the Special Master.

Plaintiffs grossly misstate the record when they claim that "Taishan regularly fulfilled orders for American-sized drywall during times of increased demand for smaller gypsum board factories."  (Pls.' Objections at 20).  They offer no citation for this erroneous proposition.  The Special Master heard that same unsupported argument from the Plaintiffs and was not moved.  *See* ECF No. 253-1 at 32.  Plaintiffs' statement is not true and not supported by the testimony.  Taishan's corporate representative explained that Beijing Building Material Import & Export Co.,[4] a drywall sourcing agent, sought to obtain American-sized drywall from China in the relevant time period and first went to smaller manufacturing companies for their needs because the smaller companies' relatively cheap prices.  But then

---

[4] Despite the similarity of names, this company is unrelated to Defendant BNBM.

when those smaller companies could not fulfill the customers' demands, *the buying agent* turned to Taishan to fulfill their orders. (Tab 32 at 68). This passage in no way supports Plaintiffs' contorted notion that Taishan—a large, more expensive manufacturer—regularly produced boards for smaller, cheaper companies.[5]

This Court should reject Plaintiffs' attempt to unveil a completely new theory of attribution—never presented to the Special Master in any form—involving unsupported allegations of C&K's bankruptcy and newly alleged corporate relationships between C&K, CNBM and BNBM. First, if Plaintiffs believed this theory somehow proves that Taishan made drywall branded with C&K's name, Plaintiffs should have made the argument to the Special Master, and they did not. *Cf. Starks*, 2010 U.S. Dist. LEXIS 110806, at *7-9 (holding that arguments first made in an objection to a report and recommendation "must be deemed waived"). Second, Plaintiffs offer zero evidence to support their bald factual assertions. *See* Pls.' Objections at 20 n.70 (referencing only *id.* at 3 n.9, which provides no record citations for Plaintiffs' description of a supposed 2004 acquisition of C&K by CNBM and subsequent alleged corporate events and transactions). Third, the convoluted theory in and of itself fails to support the notion of Taishan printing a competitor's name on its boards, a flaw that Plaintiffs tacitly acknowledge by throwing it in as the last sentence of their C&K argument without any further explanation.

B.  Category "F" – IMT Gypsum

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 28-32 and at the March 11 evidentiary hearing at pages 137-143 of the transcript. (Ex. A at 28-32; ECF No. 253-5 at 137-143). The Special Master found that Plaintiffs did not meet their burden of proof to establish by the greater weight of the evidence that Taishan made drywall in this category.

Plaintiffs' own argument shows that the Special Master drew the correct conclusion that Plaintiffs did not "establish by a greater weight of the evidence" that Taishan manufactured drywall marked "IMTGypsum.com." Plaintiffs claim that their evidence "would certainly make it more probable than not, *absent evidence to the contrary . . . .*" (Pls.'

---

[5] *See* Tab 32 at 138 (explaining that it would be "impossible" for Taishan to make C&K boards because C&K is a competitor with lower quality products).

Objections at 17 (emphasis added)). But, as the Special Master found, the record *did* contain contrary evidence. Taishan's corporate representative testified that Taishan did not mark boards with the "IMTGypsum.com" spray marking and did not use asterisks instead of multiplication signs. (PID R&R at 6). Plaintiffs cannot make that record evidence disappear by calling it "self-serving." Plaintiffs did not present any evidence that Taishan made boards with the "IMTGypsum.com" spray marking that was at issue, and their theory of attribution depends on making speculative, illogical leaps and adverse credibility determinations. The Special Master made the correct determination and the Court should adopt it.

### C. Category "G" – ProWall

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 32-35 and at the March 11 evidentiary hearing at pages 153-161 of the transcript. (Ex. A at 32-35; ECF No. 253-5 at 153-161). The Special Master found that Plaintiffs did not meet their burden of proof to establish by the greater weight of the evidence that Taishan made drywall in this category.

The crux of Plaintiffs' objection is a direct attack on Special Master Lee's weighing of the evidence and decision not to rule in Plaintiffs' favor. Plaintiffs stridently state that "it cannot seriously be questioned" that Plaintiffs have established that Taishan made drywall with ProWall markings, and they fault Special Master Lee's consideration of Taishan's truthful testimony about that product, which they characterize as "self-serving" because, in their view, Taishan has a pervasive "credibility problem." (Pls.' Objections at 17-18). Plaintiffs' jaundiced view of Taishan is exactly why an unbiased sophisticated fact-finder was needed to objectively weigh the evidence and determine if Plaintiffs had met their burden to prove Taishan Product ID. Plaintiffs' frustration that the Special Master did not rule in their favor on every assertion does not mean that the Special Master erred.

### D. Category "I" – Made in China Meet[s] or Exceed[s]

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 35-40 and at the March 11 evidentiary hearing at pages 180-194 of the transcript. (Ex. A at 35-40; ECF No. 253-5 at 180-194). The Special Master found that Plaintiffs did not meet their burden of proof to establish by the greater weight of the evidence

that certain drywall markings within in this category were made by Taishan, despite Taishan's denial of those markings.[6]

Plaintiffs' Objections Brief misstates and confuses the evidence with respect to Taishan's Manufacturing Profile Form ("MPF"). Plaintiffs erroneously state that

> Taishan incorrectly filled out the MPF, denying responsibility for boards marked "Meet or Exceeds" because it had no records of manufacturing boards with that marking, but then after the residual boards" that said "Meet or Exceeds" were found in late-2018, it had to accept responsibility for those despite prior denials, SM R&R at 9.

(Pls.' Objections at 11-12). This passage is nonsensical because the MPF does not *deny* making anything. *See* Tab 27; Tab 28. Instead, the MPF is a verified court submission from October 2010 providing an extensive chart of products that Taishan manufactured, including date, exporter, importer, quantity, price, product markings, edge sealing tape markings, and notes for 243 orders of drywall with U.S. dimensions from March 13, 2006 to July 3, 2007. (Tab 28; Tab 29). The MPF does not therefore deny certain markings; it effectively makes an affirmative statement of "here's what we made."

It is true that the "MEET OR EXCEED" language reported on the MPF was uniform and did not use precise capitalization or English verb tenses—a fact that Taishan never shied away from in its testimony, PID Position Paper, or at the evidentiary hearing. *See* Tab 32 at 72, 107, 112-113; Tab 36 at 5; Ex. A at 11-12; ECF No. 253-5 at 188-89. Plaintiffs themselves admitted to the Special Master that "It's not a stretch that a Chinese manufacturer operating in a foreign language would make a grammatical error." (ECF No. 253-1 at 46 n.208). Both Taishan and the Special Master determined that the best evidence of Taishan's markings was Taishan's actual exemplars, which formed the basis for Taishan's admissions and denials in the Special Master's PID determination process. That decision was sound, and should be upheld.

### E. Category "J" – Various Drywall Dimensions, Including 4feetx12feetx1/2inch.

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 41-45 and at the March 11 evidentiary hearing at pages 201-205 of the

---

[6] Taishan did not deny that it made the following subcategories: 13, 17 and 20. Thus, those subcategories were not at issue for the Special Master's determination.

transcript. (Ex. A at 41-45; ECF No. 253-5 at 201-205). The Special Master found that Plaintiffs *did* meet their burden of proof to establish by the greater weight of the evidence that Taishan made drywall in the following denied subcategories: 5 and 9.[7] But Plaintiffs *did not* meet their burden of proof to establish that Taishan made drywall in the following denied subcategories: 6, 7, 8, 10, and 11.[8]

In the tedium of argument about fonts, asterisks, capital lettering, and dot matrix printing, the Plaintiffs' objections regarding the "Drywall Dimensions" category fault the Special Master for not taking illogical leaps suggested by Plaintiffs. For example, Plaintiffs argue that because Taishan admitted to making drywall boards with what appears to be a capital letter "Y" in Drywall,[9] it should therefore also be responsible for all boards with a capital letter "W" in Drywall. *See* Pls.' Objections at 16 ("Given that Taishan manufactured defective high-sulfur 'DrYwall' with a capital 'Y,' [it is] *more likely than not* that it also manufactured defective 'DrYwall' with a capital 'W' . . . ."). In arriving at this conclusion, Plaintiffs again rely on their own faulty and self-contradictory assumption that no other Chinese manufacturer could have made defective, generically marked drywall other than Taishan. *See id.*

## F. Category "L" – White Edge Tape, Boards with No Markings or Boards with No Markings Other Than Numbers

Taishan provided ample evidence and argument on this category in its PID Position Paper at pages 45-50 and at the March 11 evidentiary hearing at pages 223-233 of the transcript. (Ex. A at 45-50; ECF No. 253-5 at 223-233). The Special Master found that Plaintiffs did not meet their burden of proof to establish by the greater weight of the evidence that Taishan made drywall in this category.

Lacking any evidence to meet their burden of proof, Plaintiffs again seek to cloak themselves in a fabricated presumption that "Plaintiffs are entitled to the reasonable inference that this non-Knauf high-sulfur off-gassing defective drywall was made by

---

[7] Despite the adverse rulings in this category, Taishan has not objected to the PID R&R.

[8] Taishan did not deny that it made subcategory 2. Thus, that subcategory was not at issue for the Special Master's determination.

[9] Technically, it's not a capital "Y" but rather a lowercase "y" that has been raised up to fit in the same printing range as all the other letters.

Taishan." (Pls.' Objections at 19). They present no legal basis to relieve their Florida-law burden. It is not justified by the Tariff Act of 1930, 19 U.S.C.S. § 1304(a), an argument the Special Master heard and rightly rejected. This Court should do the same because Plaintiffs cannot connect their quasi "negligence *per se*" argument to the burden of proving damages. Even if they could, the argument would still fail because that commerce regulation requires only a marking of the *country of origin*—not any identification of the *manufacturer*. And, as this process has borne out, the words "Made In China" do *not* sufficiently establish who manufactured a product. Therefore, Plaintiffs' argument that Taishan "created the identification problem by failing to properly mark their boards" is a nonstarter. Special Master Lee accordingly (and rightfully) placed no weight on that misguided logic.

## CONCLUSION

For the foregoing reasons and based on the totality of the evidence, this Court should reject the Plaintiffs' objections to the Special Master's PID R&R and adopt the findings of the Special Master.

Dated: May 13, 2019                Respectfully submitted,

> */s/ Enjoliqué Aytch*
> Enjoliqué Aytch
> Fla. Bar No. 0104881
> Email: enjolique.aytch@akerman.com
> Akerman LLP
> Las Olas Centre II, Suite 1600
> 350 East Las Olas Boulevard
> Fort Lauderdale, FL 33301-2229
> Telephone: (954) 463-2700
> Facsimile: (954) 463-2224
>
> **ALSTON & BIRD LLP**
> 1201 West Peachtree Street
> Atlanta, Georgia 30309
> Phone: (404) 881-7000
> Fax: (404) 881-7777
>
> Bernard Taylor, Esq.
> Georgia Bar No. 669625

Michael P. Kenny, Esq.
Georgia Bar No. 415064
Christina Hull Eikhoff, Esq.
Georgia Bar No. 242539
David Venderbush, Esq.
New York Bar No. 2920817
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd.*
*and Tai'an Taishan Plasterboard Co., Ltd.*

## SERVICE LIST:

*Attorneys for CNBM and the BNBM Entities*

L. Christopher Vejnoska (CA Bar No. 96082)
Eric Matthew Hairston (CA Bar No. 229892)
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE
LLP
The Orrick Building
San Francisco, CA  94105
T: 415-773-5700
Email:  cvejnoska@orrick.com
       ehairston@orrick.com
       adavidson@orrick.com

James L. Stengel (NY Bar No. 1800556)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
51 West 52nd Street
New York, NY, 10019
T:  212-506-5000
Email:  jstengel@orrick.com

Craig P Kalil
Joshua Poyer
Aballi Milne Kalil P.A.
SunTrust International Center
1 SE 3rd Avenue
Suite 2250
Miami, FL 33131
305-373-6600
Fax: 305-373-7929
Email: ckalil@aballi.com

*Attorney for Zhejiang Provincial Second Light Industry Enterprises Group*

Hongwei Shang
The Law Office of Hongwei Shang, LLC
9130 S. Dadeland Boulevard
Suite 1620
Miami, FL 33156
786-581-9759
Fax: 786-581-9168
Email: hshanglaw@gmail.com

*Attorneys for Plaintiffs*

Arnold Levin
Levin Fishbein Sedran & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106
215-592-1500
Fax: 592-4663
Email: alevin@lfsblaw.com

Natalie Marie Rico
Colson Hicks Eidson
255 Alhambra Circle
Penthouse
Coral Gables, FL 33134
305-476-7400
Fax: 305-476-7444
Email: rico.natalie@gmail.com

Christopher A. Seeger
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100
Email: cseeger@seegerweiss.com

Dawn M. Barrios
Barrios Kingsdorf & Casteix
701 Poydras Street
One Shell Square Suite 3650
New Orleans, LA 70139-3650
504-524-3300
Email: barrios@bkc-law.com

Emma Kingsdorf Schwab
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
504-524-3300
Email: eschwab@bkc-law.com

Frederick S. Longer
Levin Fishbein Sedrin & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106-3697
215-592-1500
Fax: 592-4663
Email: flonger@lfsblaw.com

Jay Patrick Dinan
Parker Waichman LLP
27300 Riverview Center Blvd., Suite 103
Bonita Springs, FL 34134
239-390-8609
Fax: 239-390-0055
Email: jdinan@yourlawyer.com

Jeffrey A. Breit
Breit Drescher Imprevento PC
600 22nd Street, Suite 402
Virginia Beach, VA 23451
757-622-6000
Email: Jeffrey@breit.law

Pearl Anna Robertson
Irpino Avin Hawkins
Email: probertson@irpinolaw.com

Richard S. Lewis
Hausfeld, LLP
1700 K. Street, N.W.
Washington, DC 20006
202-408-4600
Email: rlewis@hausfeld.com

Richard J. Serpe
Law Offices of Richard J. Serpe, PC
580 E Main Street
Suite 310
Norfolk, VA 23510
757-233-0009
Email: rserpe@serpefirm.com

Sandra Duggan
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500
Email: sduggan@lfsblaw.com

Scott George
Seeger Weiss, LLP
1515 Market Street
Suite 1380
Philadelphia, PA
215-553-7980
Email: sgeorge@seegerweiss.com

Patrick Shanan Montoya
Colson Hicks Eidson
255 Alhambra Circle
Penthouse
Coral Gables, FL 33134-2351
305-476-7400
Fax: 476-7444
Email: patrick@colson.com

Jeffrey S. Grand
Seeger Weiss LLP
77 Water Street, 8th Floor
New York, NY 10005
(212) 584-0700
Email: jgrand@seegerweiss.com

Jimmy Faircloth
Faircloth, Melton, & Sobel
Gras Town Plaza
412 N. 4th Street, Suite 230
Baton Rouge, LA 70802
(225) 343-9535
Email: jfaircloth@fairclothlaw.com

Leonard A. Davis
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
504-581-4892
Email: ldavis@hhklawfirm.com

James V. Doyle
Doyle Law Firm, PC
201 Biscayne Blvd.
28th Floor
Miami, FL 33131
305-677-3388
Fax: 844-638-5812
Email: jim.doyle@doylefirm.com (Inactive)

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN, *et al.*,
individually, and on behalf of all others
similarly situated,

       Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., *et al.*,

       Defendants.

_____/

**DEFENDANT TAISHAN'S
PRODUCT IDENTIFICATION
<u>CONTENTIONS AND DEFENSES</u>**

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................... 1

II.  EACH PLAINTIFF'S BURDEN OF PROOF ...................................... 3

III. PID BACKGROUND ................................................................................ 4
     A.   Dispelling the Myth of Only Two Chinese-Drywall Manufacturers ............. 4
     B.   Plaintiffs' Admissions Re Other Manufacturers ............................................ 6
     C.   Scope of Drywall Imports from China 2005-2008 ........................................ 7

IV.  SOURCES OF PID INFORMATION ................................................... 8
     A.   Taishan Product ID Catalog ........................................................................... 9
     B.   Unreliable Sources ......................................................................................... 9
          1.   "Drywall Indicia Guide" Posted on MDL Website ca. Sept.
               2009 ...................................................................................................... 9
          2.   "Drywall Indicia Guide" from Knauf Settlement ............................... 10
          3.   Inspection Report Statements about Manufacturers ......................... 10
     C.   Reliable Evidence ......................................................................................... 11
          1.   Taishan's Manufacturing Profile Forms .......................................... 11
          2.   Taishan's Responses to Court's Drywall Website Photos ................. 12
          3.   Deposition Testimony ....................................................................... 13
          4.   Taishan Drywall Exemplars ............................................................. 13
     D.   Impermissible Inferences ............................................................................. 13
          1.   Pervasive Characterization of Taishan as a "Bad Actor" ................. 13
          2.   Allegations of Noncompliance with Document Preservation
               Order ................................................................................................ 14
               a.   Drywall Printing Machines ..................................................... 16
               b.   Manufacturing Instructions .................................................... 17
               c.   Domestic Production Process Manuals ................................... 18
               d.   Plaintiffs' Noncompliance With PTO1 .................................. 20

V.   PID CATEGORIES AT ISSUE ............................................................. 22
     A.   Reservation of Claim-Specific Determination ............................................. 22
     B.   Categories Not At Issue ................................................................................ 23
     C.   Contested Categories .................................................................................... 24
          1.   Category B: C&K ............................................................................. 25
               a.   Taishan's Record Denials ....................................................... 25
               b.   Other Record Evidence ........................................................... 25
               c.   Plaintiffs' Insufficient Theory of Attribution ........................ 27
          2.   Category F: IMT Gypsum ................................................................ 28
               a.   Taishan's Record Denials ....................................................... 28
               b.   Other Record Evidence ........................................................... 29
               c.   Plaintiffs' Insufficient Theory of Attribution ........................ 30
          3.   Category G: ProWall ....................................................................... 32

|   |   | a. | Taishan's Record Denials .................................................... 32 |
|   |   | b. | Other Record Evidence......................................................... 32 |
|   |   | c. | Plaintiffs' Insufficient Theory of Attribution ...................... 34 |
|   | 4. | Category I: Made in China Meet or Exceeds ................................... 35 |
|   |   | a. | Taishan's Record Positions .................................................. 37 |
|   |   | b. | Other Record Evidence......................................................... 38 |
|   |   | c. | Plaintiffs' Insufficient Theory of Attribution ...................... 40 |
|   | 5. | Category J: Drywall With Dimensions............................................. 41 |
|   |   | a. | Taishan's Record Positions .................................................. 43 |
|   |   | b. | Other Record Evidence......................................................... 44 |
|   |   | c. | Plaintiffs' Insufficient Theory of Attribution ...................... 45 |
|   | 6. | Category L: Boards with white edge tape and no other markings; boards with no markings or boards with no markings other than numbers; and any other product ID categories ............... 45 |
|   |   | a. | White Edge Tape With No Spray Markings ......................... 45 |
|   |   | b. | "Tapered edge" (Photos 3 and 4 )......................................... 49 |

Defendants Taishan Gypsum Co., Ltd., and Tai'an Taishan Plasterboard Co., Ltd. (collectively "Taishan") submit to the Special Master its Product Identification ("PID") Contentions and Defenses under the Court's November 16, 2018 Order. Appx. 1 at 6.[1]

## I. INTRODUCTION

The time has come for Plaintiffs to start proving their claims. After entry of default, Plaintiffs still bear the burden to prove that they incurred damages from Taishan's products. In the Court's process, the Special Master is the gatekeeper to assess whether each claimant has provided sufficient PID proof to meet their burden to prove by a preponderance of the evidence that Taishan manufactured the drywall in each respective property. That proof has a macro and a micro component. First, the Special Master must determine "whether the Product ID categories should be attributed to Defendants" (the macro component), then she must resolve "all Contests" by Defendants, which will include that a particular claimant's PID proof is insufficient to establish that their claim falls into a PID category attributable to Taishan (the micro component). Appx. 1 at 6-8. This brief and the upcoming PID hearing on March 11-12, 2019, address the first prong of that process.[2]

The Special Master should make categorical PID determinations in an accurate factual context—giving no weight to mythologies about Chinese drywall imports that have developed over the long course of this litigation. Those mythologies encompass two related fictions: (1) that only two Chinese drywall manufacturers—Taishan and Knauf—exported products to the U.S. in the 2005-2008 timeframe; and (2) that any Chinese drywall not attributable to Knauf must necessarily be Taishan's. Those two myths are proven false by public records, the evidence developed to date, and Plaintiffs' own admissions. As Plaintiffs' counsel have known since they filed their first complaint in 2009, many drywall manufacturers in China were active in the relevant timeframe, and their history of sending products to the U.S. is well documented. So, not surprisingly, more than 44 unique varieties of PID drywall markings

---

[1] The date of submission was modified by agreement of the parties in their January 17, 2019 Joint Submission and endorsed by the Special Master.

[2] Individual contests will be addressed in subsequent submissions, including during the April 10-12, 2019 hearing.

have been at issue in this litigation. It cannot be presumed that Taishan made all of them simply because they are not marked "Knauf."

Over a decade of litigation, several documents and testimony have created a reliable record to guide the Special Master's categorical PID determination. That evidence includes judicial admissions, party testimony, third-party testimony, and public records. Taishan cites that evidence in its defense, rebutting unreliable resources, presumptions and other evidentiary gap-fillers on which Plaintiffs will likely rely.

The evidence shows that Taishan has admitted its responsibility for certain PID, but has rightfully denied other categories and sub-categories. Reliable records show that those categories were made by other Chinese companies, some that Plaintiffs named as defendants (but then abandoned in a Taishan-only strategy), and some that Plaintiffs never called into the U.S. litigation. The Special Master will see that Plaintiffs' approach of seeking to hold Taishan responsible for *all* non-Knauf Chinese drywall in the case is untenable, and unjust. A fair weighing of the evidence demands a finding that certain PID categories are not Taishan's products, and that claims with those markings are disqualified from recovery against Taishan.

The below list summarizes Taishan's positions on PID categories:

**Categories Taishan does not deny**:
- Category H: Taian Taishan or Taihe Tape (photos # 1, 14, 15, and 16 in the Taishan Product ID Catalog)
- Category K: Venture Supply (photos # 38, 39, 40, 41 in the Taishan Product ID Catalog)

**Categories Taishan partially contests**:
- Category I: Made in China Meet or Exceeds
  - Taishan does not deny: # 13, 17, and 20
  - Taishan denies: # 18, 19, 21
- Category J: Various Drywall dimensions:
  - Taishan does not deny:  # 2
  - Taishan denies:  # 5, 6, 7, 8, 9, 10, 11

**Categories Taishan denies**:
- Category B: C&K (# 34, 35, 36)
- Category F: IMT Gypsum (# 30, 31, 32, 33)
- Category G: ProWall (# 43, 44)
- Category L: Boards with white edge tape and no other markings; boards with no markings or boards with no markings other than numbers; and any other product ID categories
- Taishan denies:  # 3, 4, 12

## II.    EACH PLAINTIFF'S BURDEN OF PROOF

Each Plaintiff here, seeking to recover under Florida law, bears the burden of proof to establish that the drywall that caused any claimed damages was manufactured by Taishan. *See Devore v. Howmedica Osteonics Corp.*, 658 F. Supp. 2d 1372, 1378 (M.D. Fla. 2009) (applying Florida law that "the user must establish the manufacturer's relationship to the product in question"); *Vecta Contract, Inc. v. Lynch*, 444 So. 2d 1093, 1095 (Fla. Dist. Ct. App. 1984) (reversing verdict for plaintiff who "did not offer sufficient evidence that defendant manufactured the defective chair").

Taishan's defaulted status does not lessen each Plaintiff's evidentiary burden. *See Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003) (holding in default proceeding that "Federal law . . . requires a judicial determination of damages absent a factual basis in the record"); *see generally Christiansen v. McRay*, 380 F. App'x 862, 863-64 (11th Cir. 2010) (affirming denial of monetary damages in default judgment because plaintiff failed to meet burden of proving damages); *Damian v. Oakmont Fin., Inc.*, 2016 U.S. Dist. LEXIS 191727, at *9 (S.D. Fla. May 20, 2016) ("The party seeking default judgment must prove its damages.").

Thus, as an element of default damages, each Plaintiff must prove that any claimed damages flow from Taishan-manufactured drywall. *See Buchanan v. Bowman*, 820 F.2d 359, 362 (11th Cir. 1987) (assessing whether default damage "was proximately caused by the appellants'" conduct); *Ironworkers Local 397 Pension Fund & Ironworkers Local 397 Annuity Fund v. Window Worx, LLC*, 2018 U.S. Dist. LEXIS 214622, at *8 (M.D. Fla. May 25, 2018) ("[A] party may seek from the court a default judgment for the amount of the damages *caused* by the defaulting party." (emphasis added)).

Moreover, Rule 55(b)(2) permits a court to "conduct an evidentiary hearing 'to determine the amount of damages or to establish the truth of any averment by evidence.'" *Philpot*, 317 F.3d at 1266 (quoting FED. R. CIV. P. 55(b)(2)). Judge Fallon has ordered—and Judge Cooke has adopted—that each Plaintiff must provide proof of "the presence of Taishan Drywall" in each "contaminated property." Appx. 2 at 50. Thus, it can neither be assumed nor presumed that any Plaintiff had Taishan drywall in a particular property. Instead, for each claim, Plaintiffs must show by a preponderance of the evidence the specific presence of Taishan drywall.

Plaintiffs have for years pursued thousands of claims against Taishan, with a large variety of markings, asserting implausibly that Taishan made them all, regardless of the many variations (including a lack of any markings). In the decade since the litigation commenced, Plaintiffs have never been called upon to make an evidentiary showing of PID proof, and Taishan has not, until now, had an opportunity to defend itself to a fact-finder on PID. The evidence will show that, while Taishan does not deny that it made some of the markings and PID categories, Plaintiffs cannot sufficiently tie certain markings to Taishan, and Plaintiffs' attribution theories are factually and logically unsound.

## III.    PID BACKGROUND

### A.    Dispelling the Myth of Only Two Chinese-Drywall Manufacturers

One of the misconceptions that has been perpetuated in this litigation is the notion only two companies in China manufactured drywall that was sent to the United States in the 2005 to 2009 time period. That unfounded assumption has been perpetuated through rote repetition in the procedural background section of court papers.[3] The time has come to dispel that myth.

The disparate participation of defendants Knauf and Taishan in this litigation appears to have contributed to the problem. Defendant Knauf, based in Germany but with manufacturing operations in China, entered the case to defend on the merits in July 2009. Taishan later joined the case in June 2010, but embarked immediately on a threshold jurisdictional challenge that ultimately rose to the appellate level with Fifth Circuit rulings in 2014. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). While Taishan's litigation activities were all *jurisdictional*, the Plaintiffs' claims advanced against Knauf on the merits. After about two years of discovery and litigation in the U.S., including a bellwether trial (*Hernandez*), Knauf entered into a comprehensive and complex class-settlement agreement with homeowners that was finalized December 20, 2011 after more than a year in

---

[3] The MDL Court's Order and Reasons on Taishan's jurisdictional challenge dated September 4, 2012, states without citation that "The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities." *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 830 (E.D. La. 2012). A LexisAdvance legal database search reveals that that exact sentence has been repeated by the Court in at least 27 different orders, including as recently as February 4, 2019. Appx. 3 at 2.

the making. The property owners in that settlement were represented by the same lead counsel and Plaintiffs' Steering Committee ("PSC") that continue to prosecute claims against Taishan in this and related cases.

The determination of eligibility for compensation under the Knauf Settlement required a sorting of claimants between Knauf and not-Knauf. The highly structured and complex agreement provided for varying degrees of actual remediation of properties by a third party contractor and/or cash payments to homeowners. The extent of Knauf drywall in the claimants' property determined the extent of eligibility and compensation. Thus, starting with the Knauf "pilot program" in 2010, the driving purpose of PID efforts in the MDL was to determine if drywall was Knauf or not-Knauf.

Somehow in that process, "not-Knauf" became synonymous with Taishan. *Cf. In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d at 830 ("The litigation has focused upon these two entities and their downstream associates, and has proceeded on separate tracks"). Knauf certainly had no incentive to investigate the origins of drywall that it disclaimed, and the Plaintiffs had a strong incentive to equate all non-Knauf drywall with Taishan—the absent, defaulted co-Defendant. Consistent with that approach, after Taishan withdrew from the litigation in July 2014, the PSC put together a Motion for Class Damages seeking to hold Taishan responsible for *all of the other claimants in the lawsuit*—regardless of PID. *See* Appx. 4. The grand total of the Plaintiffs' proposed damages award for 3,852 claimants was $1,263,330,881.19. Appx. 4. When Taishan reentered the litigation in February 2015 to challenge the damages, Defendants exposed multiple flaws in Plaintiffs' claimant list, including several facial errors and multiple duplicate entries. Appx. 5 at 3-5. After a June 2015 hearing on Plaintiffs class-damages formula, Plaintiffs admitted to the Court in September 2015 that "product identification of a number of listed properties may be inadequate" and stated that it was in the process of "evaluat[ing] for purposes of dismissal all clients where product identification may be lacking." Appx. 6. Unfortunately, Plaintiffs' pattern of overinclusion persists to this day. With Taishan and BNBM the only remaining defendants, Plaintiffs seek to hold Taishan and BNBM responsible for as many of the not-Knauf claims as possible, regardless of how implausible the attribution to either entity.

## B. Plaintiffs' Admissions Re Other Manufacturers

But Plaintiffs know about Chinese drywall manufacturers other than Knauf and Taishan. Their early complaints show it. In the *Gross* class complaint filed on October 7, 2009, Plaintiffs named several Chinese drywall manufacturers beyond Knauf, Taishan and BNBM. Appx. 7 at 3-4. That complaint identified Pingyi Baier Building Material Co., Ltd. ("Baier") and Pingyi Zhongxing Paper-Faced PlasterBoard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd. ("Chenxiang" a/k/a "C&K"). *Id.* at 3. That early complaint also named twenty John Doe manufacturing entities. When Plaintiffs filed the *Wiltz* class complaint on February 10, 2010, they targeted four Chinese manufacturers: Taishan Gypsum and TTP, BNBM and Chenxiang, but also added a list of "unascertainable manufacturer defendants":

- Crescent City Gypsum;
- Prowall Drywall;
- International Materials Trading a/k/a IMT Gypsum;
- Panel Rey a/ka/ Panel de Yeso Panel
- Shamrock Gold
- Pro-Roc
- Gridmarx a/k/a GridMarx and Grid Marx
- LaFarge
- Toughrock
- Gypsum Board
- USB
- Pabco

Appx. 8 at ¶¶ 531-543.[4] The *Gross* and *Wiltz* complaints were precursors to the *Amorin* complaint now pending in the Southern District of Florida, and plaintiffs from those complaints are specifically incorporated in the *Amorin* class definition. Appx. 10 at ¶ 79.

So Plaintiffs knew that other Chinese drywall manufacturers were out there, and even named them in this lawsuit. But the PSC ultimately abandoned claims against those other manufacturers, perhaps because of the difficulty of service of process to Chinese entities through the Hague Convention. The PSC has on many occasions in this case—even in recent

---

[4] Plaintiffs' counsel recently described their efforts to identify manufacturers in China and name them as defendants in this case: "We went to the Internet and picked out Chinese plasterboard companies and filed complaints to toll statutes of [limitations] under market share and other indeterminate defendant theories." Appx. 9 at 56:4-6.

weeks—described how onerous it is to perfect service against companies in China. In a February 13, 2019 hearing, Plaintiffs' counsel described the process of serving Chinese companies as follows:

> [P]laintiffs . . . have to go through the Hague Convention, spend six figures for each complaint to get it translated and service, in about nine months to a year, and then the Chinese, they just, frankly, reject it. I have been through the service issue. It goes and it sits in their Embassy, or wherever it sits, for months and months and months, and eventually they reject it, and then we are years down the road.

Appx. 11 at 19:2-11.

For whatever reason, after serving Knauf and Taishan, the PSC did not follow through on service to other Chinese manufacturers that the PSC, at least for a while, believed were responsible for their clients' damages. But the PSC's abandonment of other Chinese drywall manufacturers as defendants does not make them cease to exist as potential suppliers to the U.S. market. Plaintiffs' expedient fallback was to change course and try to hold Taishan liable for virtually all claims that were "not-Knauf." For many claims, as described below, that assumption cannot satisfy Plaintiffs' burden of proof.

## C. Scope of Drywall Imports from China 2005-2008

U.S. government findings also establish that more than two companies manufactured Chinese drywall that came to the United States in the relevant time period. One of the first organizations to attempt to estimate the total amount of Chinese drywall imported to the United States was the Consumer Product Safety Commission ("CPSC"). In 2009 and 2010, the CPSC presented monthly status reports to Congress regarding its investigation into the Chinese drywall problem. The CPSC provided Congress with early estimates of the Chinese drywall imported to the United States during the relevant time period. That number presented to Congress was 6,997,456 sheets (approximately 335 million square feet) – a number which the CPSC claimed to have verified through its "partnerships with CBP and ICE" as well as through "investigations of importers and distributors." Appx. 12 at 2.[5]

---

[5] The 335 million square foot figure is based on the standard dimensions of U.S. drywall: 4 feet by 12 feet, or 48 square feet. Multiplying the 6,997,456 sheets by 48, produces total square footage of 335,877,888 square feet.

In July 2012, Housing and Urban Development (HUD) presented to Congress a report titled "Study of the Possible Effect of Problem Drywall Presence on Foreclosures." The report findings include a calculation of the amount of Chinese drywall that entered the United States during the relevant time period. The HUD report concludes that a miniscule amount of Chinese drywall was imported to the United States in most years, with 2006 being the exception. In 2006, Chinese drywall imports were 22 percent of the total drywall imported to the U.S. and 1.7 percent of all ½ inch drywall used in the country that year. HUD reported that approximately 299 million square feet of Chinese drywall was imported to the United States from 2004 to 2007, but 94.5 percent of that was imported in 2006.[6] Appx. 13 at 5, 28, 30.[7]

Those government agencies' reports debunk the oft-repeated MDL myth that there were only two primary manufacturers of Chinese drywall that came to the U.S.—on the contrary, the CPSC referenced "well over one hundred manufacturers, importers, drywall distributors and builders." Appx. 14 at 3. The CPSC's testing results reported on drywall manufactured not only by Knauf, Taishan, and BNBM, but also by Chenxiang, Baier, and other named and unnamed manufacturers. Appx. 15 at 1-2.

## IV.    SOURCES OF PID INFORMATION

The Special Master has several sources of information to fulfill the Court's directive to determine what categories of PID are attributable to Taishan. This section starts with a background explanation of the compilation submitted by the parties as the Taishan Product ID Catalog. It then identifies inherently *unreliable* sources that should be disregarded altogether, and then itemizes several other sources that constitute *reliable* evidence as judicial admissions or sworn testimony. Finally, Taishan rebuts the Plaintiffs' attempt to fill their evidentiary gaps with reliance on adverse inferences from unfounded document-preservation allegations.

---

[6] Table 1 to the July 17, 2012 HUD Report shows that of the Chinese drywall imported to the U.S. between 2004 to 2007, 94.5 percent was imported in 2006. *Id.* at 30.

[7] The HUD numbers regarding total volume are likely more reliable than the CPSC numbers given that the HUD report came after the initial CPSC report, and involved cooperation with the CPSC. *Id.* at 3-4, 6, 27.

### A.    Taishan Product ID Catalog

For the purposes of the Special Master's duty to make categorical determinations about PID attributions, the parties agreed to submit a compilation of exemplar photographs called the Taishan Product ID Catalog (sometimes casually referred to by counsel as the "PID Bible"). *See* Appx. 16. That Catalog was created by the PSC during the course of a lengthy mediation with Taishan in 2016. The Catalog purports to include every unique set of Chinese drywall markings among all of the PSC's clients in the MDL. The pictures are often pulled from third party inspection reports, which helps explain the lack of uniformity of formatting in the document. The black page numbers were added by the PSC later, and show 44 different types of markings.

### B.    Unreliable Sources

A few document categories have emerged that are decidedly unreliable, and which the Special Master should ignore.

#### 1.    "Drywall Indicia Guide" Posted on MDL Website ca. Sept. 2009

On August 21, 2009, almost a year *before* Taishan entered an appearance in the MDL, Judge Fallon ordered "all parties provide either the Plaintiffs' Liaison Counsel or the Defendants' Liaison Counsel with a photographic catalog of markings, brands, endtapes and other identifying markers that they have found in the affected homes to date." Appx. 17. A couple of weeks later, the PSC's lead counsel Russ Herman and Knauf's counsel Kerry Miller (appointed by the Court as Defendants' Liaison Counsel), jointly submitted "Chinese Drywall Markings: Photographic Examples" to the Court, which was later posted on the Court's MDL website at www.laed.uscourts.gov/case-information/mdl-mass-class-action/drywall/markings. Appx. 18; 19. Despite Taishan's absence, and without any submissions in the record to establish the origin of certain markings, that "Chinese Drywall Markings: Photographic Examples" purported to attribute certain markings to Taishan, including generic markings such as "Drywall 4feetx12feetby1/2inch." *See* Appx. 20 at 43. Whoever compiled the Chinese Drywall Markings: Photographic Examples added headings intended to clearly attribute certain PID characteristics to the absent Taishan.

While the Court later instructed defendants in the case, including Taishan, to provide written admissions or denials as to those attributions (discussed more in Section C below), the MDL Court never adjudicated the attributions in that document and never adjudicated

PID at all. Yet a false aura of authority hovers over the Drywall Indicia Guide because it remains posted on the MDL Court's website.

### 2. "Drywall Indicia Guide" from Knauf Settlement

The "Drywall Indicia Guide," which the PSC and Knauf's counsel created for the Court's website, evolved into a similar document that became an exhibit to the Knauf Settlement filed on December 20, 2011. Appx. 21. The purpose of that version of the Guide was to determine eligibility for benefits under the Knauf Settlement (described above). Accurate identification of not-Knauf products was not a goal. Whoever from Knauf and the PSC created the Drywall Indicia Guide assigned to Taishan a host of markings, including every variation of the generic markings "Made in China, Meets or Exceeds ASTM C1396 04 Standard" and "Drywall 4feetx12feetx1/2inch." *See id.* at 6-8. Remarkably, Plaintiffs have gotten even more aggressive in their attribution of boards to Taishan than they were in December 2011 when they helped create the Drywall Indicia Guide. They now attribute to Taishan or BNBM three markings that were identified in the Guide as "*Unknown* Chinese Manufacturer[s]" numbers 1, 2 and 3. *See id.* at 19-21.

While the Drywall Indicia Guide may have been a useful tool for administration of the Knauf Settlement, it is not admissible evidence, nor is it remotely reliable to determine PID. It should be ignored.

### 3. Inspection Report Statements about Manufacturers

The inaccurate and misleading Drywall Indicia Guide posted on the Court's website then misled third-party inspectors tasked with identifying drywall in claimants' homes. *See, e.g.,* Appx. 22; 23. Those inspectors had no other reference for attributing certain markings to certain manufacturers. Therefore, the errors in the Drywall Indicia Guide were compounded by third-party inspectors drawing erroneous conclusions from it.

Even where a third-party inspection report does not explicitly reference the Drywall Indicia Guide, the conclusions of those reports as to PID are inadmissible hearsay. The basis of an inspector's conclusion that a certain marking is attributable to Taishan (or any other manufacturer) cannot be tested without sworn testimony and the opportunity to cross examine that inspector. Many of those inspection companies do not exist anymore – they filled a need for construction expertise at a time when the economic recession was deep and a behemoth Chinese drywall litigation industry was starting its engines. Defendants have not

waived authenticity and hearsay objections to third-party inspection reports. No third-party inspection report without the author as a testifying witness is admissible in this case, and the Special Master should not consider any contents therein for the truth of the matte asserted.

### C. Reliable Evidence

#### 1. Taishan's Manufacturing Profile Forms

In the very early stages of the MDL, Judge Fallon ordered all manufacturing defendants to complete a Manufacturing Profile Form ("MPF"). *See* Appx. 24; 25. The MPF required each defendant to report to the Court an itemization of the drywall goods that it exported to the United States. The MPF called for, among other things, the "Identi[ty of] any markings on the drywall product (e.g. lot number, batch number, serial number, color markings, UPC codes, etc.)" and "a detailed list of all names, brand names, titles, and designations by which this drywall is known." Appx. 26.

After entering an appearance in June 2010, Taishan submitted verified MPFs for Tai'an Taishan Plasterboard Co. Ltd ("TTP") and for Taishan Gypsum in October 2010. Taishan's MPFs were verified by Song Qinghai, a duly authorized representative of the companies. Taishan Gypsum accurately completed its MPF by listing drywall that it manufactured "on a made-to-order OEM basis on two isolated occasions for a U.S. purchaser, Venture Supply, Inc."[8] Appx. 27. TTP had manufactured many more boards that went to the U.S. so TTP's MPF provided an extensive chart of products that it manufactured, providing date, exporter, importer, quantity, price, product markings, edge sealing tape markings, and notes for 243 orders of drywall with U.S. dimensions from March 13, 2006 to July 3, 2007. Appx. 28; 29. Taishan's MPF's are thus authenticated, sworn judicial admissions regarding the volume and characteristics of drywall Taishan manufactured.

The information contained in the MPFs was compiled by Wenlong Peng, who was the manager of Taishan's foreign sales department during the time period covering Taishan's manufacture and sale of drywall with U.S. dimensions. Appx. 30 at 55:12-17. The information was presented in the MPF format by Hogan Lovells, Taishan's original counsel in the MDL, and verified by an authorized company representative. Mr. Peng was deposed

---

[8] As discussed further in section V below, Taishan has not denied that it manufactured drywall with Venture Supply markings.

three times in this litigation, once in 2011 and then in 2012 and 2015. Mr. Peng helped compile the information contained in the MPFs with the assistance of counsel. Appx. 31 at 529:4-20. Mr. Peng consulted Taishan's sales handler regarding different sales information; reviewed invoices, contracts, and other related documents; and then "compiled the [MPF] according to the format provided by counsel." *Id.* at 530:2-12. He also assisted in the preparation of the exhibit attached to the MPFs, listing the exports of Chinese drywall into the U.S. Appx. 30 at 342:13-343:19.

English is not Mr. Peng's primary language[9], and it is possible that precise details about the English language markings were quite literally "lost in translation" in the multi-step process of creating the MPFs. For example, the MPF refers uniformly to several instances of using the marking code "MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD." *See* Appx. 29 at 1-2. In fact, actual exemplars of Taishan's board use the words "MEET OR EXCEEDS" (adding an "S" to the end of EXCEED). In Taishan's recent 30(b)(6) deposition for purposes of this PID determination process, Taishan's corporate representative testified about those variations. He described the MPF as "correct," although "[s]ome information may not be most precise." Appx. 32 at 72:3-8. He also testified that the MPF "is correct, but it's possible that it's not very precise. It did not pay attention to small details, such as the changes between plural and singular forms." *Id.* at 107:13-18 (as corrected by Appx. 36 at 5). Again, he testified that the MPF "is correct but not necessarily precise because it did not distinguish capital letter with lowercase letter." Appx. 32 at 112:22-113:1.

Despite the imprecision respecting certain English language markings, the MPF remains a reliable source of information about Taishan's manufacture and sale of drywall for the U.S. market.

### 2. Taishan's Responses to Court's Drywall Website Photos

As noted in Section B above, the so-called "Drywall Indicia Guide" on the MDL Court's website remains an inaccurate and misleading document created by counsel for other parties with no concern for Taishan's position. Nevertheless, in March 2011, Taishan, through counsel, submitted its positions on each of the itemized entries on the website. *See*

---

[9] No employee of Taishan speaks fluent English. All depositions in the case were given through an interpreter.

Appx. 33 Those positions were authorized statements of the company to the Court, and constitute judicial admissions. Although the webpage itself has no reliable basis, Taishan's written court submissions responding to the contents of the website should be credited.

In the category-specific discussions in Section V below, those positions are referenced as "Website Responses."

### 3. Deposition Testimony

Throughout the multi-year course of the litigation, many Taishan employees have given deposition testimony, most recently in January 2019 on the specific topic of PID pursuant to the Joint Submission. Appx. 32. The Special Master obviously can and should consider that sworn testimony.

### 4. Taishan Drywall Exemplars

Taishan did not, in the regular course of business, save samples of every drywall order that it manufactured. *Id.* at 270:15-22. Nor was it required to—Taishan ceased manufacture of U.S.-sized drywall boards in July 2007; the U.S. lawsuits did not commence until early 2009. However, in the course of preparation for Taishan's 30(b)(6) deposition on PID issues, Taishan located in its warehouse several lots of excess U.S.-sized drywall boards that were never shipped and kept on site. *Id.* at 31:12-18; Appx. 36 at 4. Those exemplars provide good guidance on what markings Taishan made, and did not make. They are referenced below in the category-specific discussions.

### D. Impermissible Inferences

### 1. Pervasive Characterization of Taishan as a "Bad Actor"

A recurring theme of the Plaintiffs' prosecution of this action has been to demonize Taishan simply because it is a Chinese company. The rhetoric has at times swung dangerously close to xenophobic prejudice, seeking to gain advantage by painting all Chinese as hostile to American values and judicial system. For example, Plaintiffs' MDL counsel tried to bolster his argument on document privilege by irrelevantly remarking that "in the past China has brought into the United States defective toys that are lead based, defective built, defective pet supplies, defective drywall and, recently, defective flooring." Appx. 34 at 4:25-5:3. Later that year, during a hearing on jurisdictional issues (now pending at the Fifth Circuit), Plaintiffs' counsel implied that all Chinese are liars and offered the comment that "Just[ice] Brandeis once remarked that sunlight is the best disinfectant. And what we're faced with here is

disinfecting a Chinese corporate enterprise that permeates our culture in which they use our Courts, but deny our Courts the opportunity to judge their torts, their commercial activity." Appx. 35 at 46:22-47:1; 57:4-8.[10] Judge Fallon admonished Plaintiffs' counsel for that approach. *Id.* at 84:1-6.

In the administration of justice, neither Taishan's nationality nor its litigation conduct should influence the fair determination of PID attribution. The Special Master should resist any implicit or explicit calls to substitute evidentiary burdens with unfounded presumptions.

## 2. Allegations of Noncompliance with Document Preservation Order

Taishan suspects that Plaintiffs may ask the Special Master to fill evidentiary gaps with adverse inferences based on allegations that Taishan somehow violated its duty to preserve documents and evidence.[11] Plaintiffs cannot establish that Taishan failed to follow PTO1 (Judge Fallon's preservation order) to which Taishan testified it "strictly complied." Appx. 32 at 273:22-274:2. Any argument seeking to impose the extraordinary sanction of an adverse inference would fail because: (1) Taishan had no obligation to avoid routine destruction of materials before it had knowledge of any duty to preserve; (2) once established, Taishan's obligation was to preserve only materials related to its manufacture and sales of drywall boards for the American market—not every document in the company's possession; and (3) Plaintiffs could not establish the requisite bad faith for an adverse inference.

First, "[t]he Eleventh Circuit has made clear that a duty to preserve evidence only 'arises once litigation is pending or reasonably foreseeable.'" *Calhoune v. Ford Motor Co.*, 2019 U.S. Dist. LEXIS 13070, at *6 (S.D. Fla. Jan. 28, 2019) (quoting *Jetport, Inc. v. Landmark Aviation Miami, LLC*, 2017 U.S. Dist. LEXIS 222009, 2017 WL 7732869, at *3 (S.D. Fla. Jul. 24, 2017)); *see also Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in *pending or reasonably foreseeable litigation.*" (emphasis added) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999))).

---

[10] Although Taishan did withdraw from the litigation in July 2014 following jurisdictional rulings, Taishan did return seven months later through new counsel, paid its penalties, and has continuously and fully defended itself in the case for more than four years.

[11] If Plaintiffs do argue spoliation and seek sanctions, Taishan reserves its due process right to file an opposition addressing that specific request.

Lawsuits in the U.S. over Chinese drywall were first filed in early 2009, and Judge Fallon's preservation order was entered on June 16, 2009. Taishan did not participate in the case until June 2010. Therefore, by the time Judge Fallon's order had been entered, more than two years had passed since Taishan's last manufacture of drywall for the American market. Under governing law, materials that were lost in the interim cannot give rise to spoliation sanctions.

"[A] party is not guilty of spoliation when it destroys documents as part of its regular business practices and is unaware of their potential relevance to litigation." *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1326 (S.D. Fla. 2010) (quoting *Matya v. Dexter Corp.*, 2006 U.S. Dist. LEXIS 18358, 2006 WL 931870, at *11 (W.D.N.Y. Apr. 3, 2006)). Thus, "even when litigation is reasonably foreseeable, '[a] corporation under a duty to preserve is not required to keep every shred of paper, every e-mail or electronic document, and every backup tape. . . . In essence, the duty to preserve evidence extends to those employees likely to have relevant information—the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary.'" *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730, 740-41 (N.D. Ala. 2017) (quoting *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 517-518 (S.D.W.Va. 2014)). "While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 127 (S.D. Fla. 1987) (quoting *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1442, 1455 (C.D. Cal. 1984)).

Second, Taishan had no duty to preserve materials that have no bearing on the issues in the lawsuit—such as Taishan's manufacture of goods for Chinese domestic use. "[A] party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice." *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010). These Plaintiffs could not meet the Eleventh Circuit spoliation test to show, among other things, that they were "prejudiced as a result of the destruction of evidence" or that the evidence had any "practical importance." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (affirming denial of adverse inference).

Third, Plaintiffs also could not show the requisite bad faith. "[A]n adverse inference instruction is only proper 'when the absence of the evidence is predicated on bad faith.'" *Id.* at 1308 (quoting *S.E.C. v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012)). The only evidence here is that Taishan's conduct was in good faith.

Moreover, even if Plaintiffs could somehow meet the high standard for an adverse inference—which is doubtful—any such request should be denied because of Plaintiffs' unclean hands on preservation obligations. Hundreds of claimants have admitted under oath that they did not comply with the Court's evidence preservation orders, even when those orders gave explicit instruction on exactly what and how to preserve. Unlike the Taishan material that Plaintiffs likely will rely on, Plaintiffs' failures are directly relevant to the current issue of proving PID.

### a. Drywall Printing Machines

Based on Plaintiffs' counsel's deposition questioning, Taishan expects Plaintiffs to assert that Taishan should have preserved manufacturing equipment past its useful life and before Taishan had any duty to preserve materials. The evidence shows that, even if that equipment had been saved, it would hold no useful information given its operational limitations.

First, Plaintiffs have not established that Taishan destroyed those machines *after* Judge Fallon issued PTO1 in June 2009—at least two years after Taishan's *last* shipment of U.S.-sized drywall. *See Calhoune*, 2019 U.S. Dist. LEXIS 13070, at *6-7 (holding that no duty to preserve exists before the party has notice of pending or impending litigation). Taishan did acknowledge that it does not have in its possession the "three to six" machines that in 2006-2007 printed spray markings on American-sized drywall (and other) boards. Appx. 32 at 188:14-22. But Taishan also testified that those machines "did not have a long lifespan" and were often recalled by ink suppliers for maintenance problems. *Id.* at 190:25-191:6.

Second, the evidence shows that Taishan's spray marking machines were not sophisticated and had no long-term memory ability to store marking data from more than one prior print job:

> [T]he people in the production and purchasing department explained to me that the spray marking machine is only a machine with a spraying head. When the information you input later replaced the information prior, the prior information is gone.

16

Assume that I could find the spray marking machine, there wouldn't be any prior information in it. We could even not be able to open the machine itself.

*Id.* at 207:5-17. Thus, contrary to the evidence, Plaintiffs' wrongly speculate that those dated pieces of Chinese manufacturing machinery could somehow, if existent, reveal historic records of hundreds of production runs of U.S.-sized drywall boards (and, necessarily, any Chinese or other language markings for other boards). Plaintiffs also wrongly speculate, without evidence, that Taishan replaced those machines after it received Judge Fallon's PTO 1 preservation order years later.

On the present record, the Special Master should reject any requested spoliation sanction against Taishan.

### b.    Manufacturing Instructions

Taishan also suspects that Plaintiffs may seek to remedy their evidentiary deficiencies by seeking an adverse inference regarding manufacturing instruction slips sometimes provided to the factory in connection with the production of U.S.-sized drywall. In preparation for its voluntary PID 30(b)(6) deposition, Taishan produced to Plaintiffs form documents called "sales plan notifications" that were "written by the salespeople in the sales department [as] a requirement for the production plan." *Id.* at 275:17-20. Copies (or originals) of the forms were maintained in the sales department, and specifically retained in a cabinet for preservation in accordance with the Court's preservation order. *Id.* at 278:12-81:2; Appx. 36 at 6. However, in the ordinary course of business, the Sales Plan Notification instructions that were given to the *production department* to guide the manufacture of the drywall were discarded immediately after use. Taishan testified how that worked:

Let me explain to you the operation process, because at the time I happened to be a salesperson working on it. . . . [B]ecause Chinese are not very sensitive to English . . . when the worker who would initially input the spray marking would not be able to understand it completely, in that circumstance, the person who issued the plan notification would print out a more formal spray marking requirement attached to it.

The information of spray marking that is attached is for the use of the spray marking worker who input the information. When this person completed inputting this information, this piece of paper will be thrown away. This is our common operation practice.

Appx. 32 at 284:14-285:12. Taishan further explained:

> After our attached spray marking was handed over to the spray marking worker
> to be input, . . . when the input of the spray marking was completed, this piece
> of paper would be trash and be thrown away. This sales plan notification would
> also be thrown away after this batch of production has finished its delivery.

*Id.* at 288:14-21. Thus, the Sales Notification Plan documents maintained by the sales department never had the additional detailed print instructions, which were for the benefit of non-English speaking factory workers, and the non-English speaking factory workers never held on to those detailed print instructions once those markings were input into the spray marking machine for the production run. When Taishan received its document preservation instruction from the Court in 2010, *id.* at 156:3-157:5, it could not have resurrected those trashed instruction slips from years before. By then, they had been long-discarded in the ordinary course, which was well within Taishan's rights to do. *See Calhoune*, 2019 U.S. Dist. LEXIS 13070, at *6-7 (holding that no duty to preserve exists before the party has notice of pending or impending litigation).

There is no document preservation failure on Taishan's part under those circumstances. Indeed, the production of those Sales Notification Plan documents from a preservation cabinet in the sales department reflects Taishan's commitment to maintaining documents related to its manufacture of U.S.-sized Chinese drywall even more than a decade after the documents were created.

### c. Domestic Production Process Manuals

Less than one week before Taishan's PID deposition was scheduled, Plaintiffs' counsel requested copies of two documents referenced in a much earlier document production—a production made by Hogan Lovells during jurisdictional discovery on January 18, 2011. Over the holiday weekend leading up to the PID deposition, Taishan located and produced current versions of the referenced documents, which bear the following titles: (1) Quality Management Regulation (Appx. 37 at TG-PID-000081), and (2) Product Identification Use Management Regulation (Appx. 37 at TG-PID-000143); *see* Appx. 32 at 289:14-290:14 (identifying the two documents as "Quality Management Policy" and "the management policy for product marking usage"). At the company deposition, Plaintiffs' counsel asked Taishan no questions about those documents other than to have Taishan's corporate representative read language highlighted by Plaintiffs' counsel on the title page of each document. *See* Appx. 32 at 291:3-292:18. That exercise in directed reading appears to seek to

highlight the multiple revisions of each document over the last decade-plus, although Taishan does not currently have copies of those prior revisions.

Had Plaintiffs' counsel done more than merely ask the witness to read highlighted portions, they would have learned more about the operational policy manuals. Taishan has never viewed those manuals as falling under the Court's preservation order because those manuals govern only Taishan's production of drywall for sale and use within China. Appx. 36 at ¶7-8. The manuals themselves differentiate the procedures for foreign-bound products, directing that the technical requirements (including trade dress, packaging, shipping mark, packing requirement, and date and location of delivery) for foreign-bound drywall are governed by the contract for that drywall. *See* Appx. 37 at Article 7.1 of Chapter 3; Appx. 38 at TG-PID-000183. Thus, the manuals do not govern foreign sales and production, including production of U.S.-sized drywall. Appx. 36 at ¶7.

That is consistent with Taishan's testimony that there are written standards and requirements for marking drywall for domestic use, but not for drywall bound outside of China—those foreign-bound drywall markings had customized markings as directed by the buyer:

> As for the exported gypsum board or the gypsum board that we did not use domestically, not only American size, usually we operate according to the customer's request. We did not have a standard method to stipulate that.
>
> For our domestic products, which are the products that carry Taishan's brand, . . . [w]e have a requirement in regarding to their markings universally; that's there is a written record. [*sic*]
>
> * * *
>
> Q: Focusing only on the American-sized, or nondomestic, drywall, there was no standard method for printing given to the machine operators; is that correct?
>
> * * *
>
> A: . . . There was no written instruction on the operation. Usually we did what the customers requested.

Appx. 32 at 213:10-214:24. Therefore, the operational regulations spelled out in Taishan's former and current "Product Identification Use Management Regulation" manual are inapplicable to the production of drywall *for export*, which are governed by contract specifications, not those rules. *See* Appx. 37 at Article 7.1 of Chapter 3; Appx. 38 at TG-PID-

000183; Appx. 36 at ¶7. They do not fall within the scope of PTO1's preservation mandate, and Taishan was entitled to overwrite the revisions in the regular course of business. *See Managed Care Sols., Inc.*, 736 F. Supp. 2d at 1326 (holding that "a party is not guilty of spoliation when it destroys documents as part of its regular business practices and is unaware of their potential relevance to litigation").

Moreover, common sense dictates that the former versions of those manuals, even if available, would not shed any light on the specific PID category questions before the Special Master. The evidence establishes that U.S.-sized drywall markings were customized according to customer directives. Appx. 32 at 213-14. The MPFs show that boards were marked in different ways for different customers. A procedure manual focused on domestic production policies would not also include order-specific, customized information not reflected on the MPF's or other documents produced in this case. The Special Master should avoid any effort by Plaintiffs to use the absence of historical manual revisions to overcome Plaintiffs' evidentiary shortcomings to prove their requisite PID.

### d.      Plaintiffs' Noncompliance With PTO1

Finally, Plaintiffs cannot seek to exploit any inadvertent noncompliance with PTO1 by Taishan while at the same time ignoring their own pervasive and *admitted* violations of the same order and subsequent preservation orders. When the MDL was formed in June 2009, Judge Fallon issued a general evidence preservation order ("PTO 1") requiring all parties to preserve all evidence potentially relevant to claims in the MDL or face "dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences." Appx. 39 at 8. In October 2009, Judge Fallon issued PTO 1(B), which gave specific requirements for the preservation of physical evidence from "properties that may be repaired by the parties during the course of this litigation." Those requirements included, but were not limited to, preservation of physical samples of "every different drywall brand or marking removed from an affected property," at least one sample of each type of drywall endtape found in the affected property, photographs of every Chinese drywall board removed from the property, a diagram of where those boards were removed from the property, and "affected" HVAC coil, electrical component and plumbing samples. Appx. 40 at 2-6. Again, Judge Fallon warned Plaintiffs that a "party responsible for failing to preserve evidence may be subject to the claim or defense of spoliation." *Id.* at 7.

In January 2012, Judge Fallon issued PTO 1(I) which revised PTO 1(B) and eased its preservation requirements. Under PTO 1(I), preserving claimants were required to preserve only photographs of their "affected" HVAC coils, plumbing components, and electrical components – rather than preserving samples – but the requirement to preserve photographs and physical samples of drywall remained (as did the threat of spoliation sanctions for failure to preserve). Appx. 41 at 2-7. In March 2015, after Taishan re-entered the MDL litigation, Judge Fallon again modified his evidence preservation requirements in PTO 1(J), removing the preservation burden on any claimants who did not have active claims in the MDL (i.e., claimants who had settled with Knauf and other defendants through the MDL Settlement Program). Appx. 42 at 1-2. Claimants with active claims against Taishan, BNBM, and CNBM were required to continue to preserve all evidence outlined in PTO 1(I) related to those claims (i.e., all non-Knauf drywall and end tape samples and photographs). *Id.* at 3-4. To date, Judge Fallon's Pre-Trial Orders on physical evidence remain in place and required all claimants with remediated properties to maintain all evidence listed in those orders or face sanctions.

Notwithstanding the specific directives and warnings from the MDL Court, 624 claimants admitted under oath that they did not meet their preservation obligations. That is 79% percent of the 789 claimants who acknowledged remediating their properties. Moreover, Taishan has raised preservation objections with an additional 53 claimants who did not admit to their own failure to retain evidence, but for whom Taishan has evidentiary reason to believe violated PTO 1.

The Court will ultimately need to determine the appropriate sanctions for a claimant's failure to preserve the evidence that can establish the PID and extent of Chinese drywall in the property at issue. But, at a minimum, the Plaintiffs' own admitted noncompliance should estop them from gaining a substantive advantage in the lawsuit by shortcutting their evidentiary burden with any accusations of Taishan's noncompliance. If the Special Master has concerns about PTO 1 noncompliance by either side, that issue should be separately addressed by the Court in a full and fair way, taking into account the actions of both Plaintiffs and Defendants.

## V.    PID CATEGORIES AT ISSUE

### A.    Reservation of Claim-Specific Determination

In the Joint Submission Appendix 1 stating the parties' positions on the PID categories at issue in this case, Taishan's non-denial entries included the following important proviso:

> Subject to *sufficient claimant-specific proof of Product ID*, including but not limited to location and dimensions of markings, font type and color, and other physical and visual characteristics of drywall boards, do not deny that products with these type of markings were manufactured by Taishan.

Appx. 43 (emphasis added). The reason for that protective language is that Taishan has *not* conceded that the Plaintiffs' assignment of PID categories to each claim is accurate based on the PID proof in the claimants' file. While the parties agree on the PID categorization for a large number of the claims, there are many claims for which Taishan disputes the PSC's conclusion as to what the claimants' PID proof shows.

For example, claimant David Pruna's only proof of alleged Taishan indicia is a single photograph of a sliver of unmarked, white-and-blue end tape, shown here:



No record evidence shows that Mr. Pruna retained that sample, and he no longer owns the property at issue. The above picture is insufficient to sustain a finding that Taishan manufactured the drywall in Mr. Pruna's property.

In its preliminary Contests and Setoffs filed on February 11, 2019, Taishan itemized on a claim-specific basis each of the claims for which it contends that "Chinese Drywall in affected property was not manufactured by Taishan" (Objection J) and/or "Insufficient proof to identify manufacturer of Chinese Drywall" (Objection K). Appx. 44; 45. Plaintiffs' and defense counsel are in discussions to resolve claim-specific proof-sufficiency disputes where possible, and to identify those claims for which the Special Master (or Court) must make a claim-specific PID determination in addition to the categorical determinations addressed in this brief. Those claims will be presented to the Court in Taishan's final Contests and Setoffs to be filed April 2, 2019, and related subsequent proceedings.

The upshot is that the Special Master's determination of categorical PID attribution does not end the PID inquiry for many of those claims. Where the PSC's categorization of a claim and Taishan's categorization of a claim are at odds, a claim-specific proof review and adjudication will be required before any remediation damages award can be recommended to the Court.

**B. Categories Not At Issue**

Subject to that important reservation on claim-specific proof, Taishan does not dispute on a categorical basis that it manufactured drywall with markings shown in the following complete categories: (H) Taian Taishan or Taihe Tape (photos #1, 14, 15 and 16 in the Taishan Product ID Catalog) and (K) Venture Supply (photos 38, 39, 40 and 41 in the Taishan Product ID Catalog).

Additionally, Taishan does not dispute certain subcategories, but denies other subcategories. Some broad categories include multiple variations of PID markings under the same umbrella. Categories I and J are often referred to in this case as the "generics" because the words on the drywall boards are generic phrases, not brand names. PID markings in Category I reflect some variation of the following words (verb tense, capitalization and punctuation varies): MADE IN CHINA MEET OR EXCEEDS ASTM C1396 04 STANDARD. Markings of those type do not, on their face, positively identify a specific drywall manufacturer. Similarly, PID markings in Category J reflect some variation of the

following words (again, capitalization and punctuation varies): DRYWALL 4 feet x 12 feet x 1/2 inch. The generic categories each have multiple variations that are discernable from one another. As discussed more fully in sections 4 and 5 below, Taishan has reason to believe that it may have manufactured certain of the variants within the generic categories, but denies that it made *all* of them, as the PSC asserts. The specific generic photo marking numbers from the Taishan Product ID Catalog that Taishan denies and does not deny are identified and discussed in sections 4 and 5 below.

Plaintiffs allege that Categories A (BNBM/Dragon board) and C (Chinese Manufacturer #2 (purple stamp) were manufactured by BNBM and not Taishan; therefore Taishan need not address them in this brief. Defendant BNBM will address those categories in its forthcoming PID position paper.

That leaves the following contested categories:[12]

- Category B: C&K

- Category F: IMT Gypsum

- Category G: ProWall

- Category I: Made in China Meet or Exceeds (partially contested)

- Category J: Various Drywall dimensions, including 4feetx12feetx1/2 inch and 4feet*12feet*1/2inch (partially contested)

- Category L: Boards with white edge tape and no other markings; boards with no markings or boards with no markings other than numbers; and any other product ID categories

Taishan addresses each of those categories below.

### C.    Contested Categories

The Plaintiffs have not satisfied their burden to prove by a preponderance of the evidence that the following PID categories were manufactured by Taishan. Therefore, remediation damages cannot be imposed on Taishan for claims in those PID categories.

---

[12] The parties agree that there are no Florida claims with markings in categories D (Crescent City Gypsum) and E (DUN) before this Court, so the Special Master need not make a determination on those categories.

### 1.    Category B: C&K

Taishan's attribution of C&K marked drywall to Taishan is confounding given that C&K was a known competitor of Taishan's—and one that Plaintiffs *named as a defendant in this lawsuit*. Plaintiffs have no proof that Taishan manufactured C&K boards; indeed, all reliable proof establishes firmly that C&K were manufactured by another known company in China. Therefore, the Special Master should deny remediation damages to claimants with C&K markings.

#### a.    Taishan's Record Denials

Nowhere on Taishan's MPFs does "C&K" appear, as a board marking or otherwise. *See* Appx. 27; 28; 29. Moreover, Taishan denied manufacturing boards with the C&K marking in its March 2011 Court submission responding to the Drywall Indicia Guide post on the Court's MDL website. *See* Appx. 33. Consistent with those records, Taishan denied Category B in its Joint Submission. *See* Appx. 43.

In a January 13, 2012 jurisdiction deposition, Peng Wenlong, former manager of Taishan's foreign sales department, testified that C&K was a competitor not affiliated with Taishan. Appx. 31 at 525:16-23. In its recent PID 30(b)(6) deposition, Taishan's corporate representative testified:

> I have not found any record showing that Taishan had manufactured any edge tape or sprayed marking bearing the letters "C&K."
>
> And according to my knowledge, C&K is also a gypsum board manufacturer; its Chinese name is Chenxiang. And from the information I learned from customers, at that time, Chenxiang had also manufactured a lot of the products with white edge tape and without sprayed letters.

Appx. 32 at 133:10-23. When asked directly whether Taishan ever manufactured products for Chenxiang, Taishan responded:

> No. We're competitors. It's impossible for us to manufacture gypsum board for them. The quality of our products far exceeds that of theirs.

*Id.* at 138:14-21.

#### b.    Other Record Evidence

The proof that C&K was a brand of an independent manufacturer is overwhelming, and starts with the Plaintiffs' own admissions. The Plaintiffs' *Wiltz* complaint (filed Oct. 7, 2009) and *Gross* complaint (filed February 20, 2010) named as a defendant Pingyi Zhongxing

Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd. Appx. 7; 8. For ease of reference, that defendant will be referred to herein as "Chenxiang." Those actions were a precursor to the current *Amorin* action, and Judge Fallon's class certification order specifically incorporates by reference plaintiffs named in the *Wiltz* and *Gross* complaints. Appx. 10 at ¶ 79. The *Wiltz* and *Gross* complaints allege that Chenxiang "manufactured . . . gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more" and "manufactured and sold" to suppliers in the United States. Appx. 7 at ¶ 36; Appx. 8 at ¶ 530.

Throughout this litigation and elsewhere, Chenxiang is identified as the maker of the C&K brand. Plaintiffs took testimony in 30(b)(6) depositions of a U.S. drywall supplier called Wood Nation in 2011 and 2012. In that deposition, Plaintiffs presented Wood Nation's corporate representative, Richard Hannam, with a drywall test report and letter from Chenxiang that had been produced by Wood Nation. Appx. 46 at 100:22-101:12. The relevant testimony, upon being shown that Chenxiang letter:

A: This was for C&K drywall.

Q: So the manufacturer listed on this test report, is that the manufacturer of C&K drywall?

A: Yes.

*Id.* at 101:7-12. Notably, Wood Nation also procured drywall from Taishan, which the corporate representative assumed was the focus of his deposition. After lengthy questioning by Plaintiffs' counsel about Wood Nation's business with Chenxiang, counsel and witness had the following exchange:

A: Excuse me. What does this have to do with what we're doing here?

Q: These cases are part of a multidistrict litigation.

A: I see.

Q: And C&K is one of the defendants . . . .

*Id.* at 67:19-24. Plaintiffs' Counsel Patrick Montoya even sheds light on what "C&K" may stand for: China & Korea. *Id.* at 62:25-63:2.

It was not only Plaintiffs and witnesses in this case that recognized Chenxiang as the separate manufacturer of C&K drywall. The U.S. government did as well. In a May 25, 2010

Press Release entitled "CPSC Identifies Manufacturers of Problem Drywall Made in China," the Consumer Product Safety Commission identified Chenxiang as the manufacturer of "C&K Gypsum Board." *See* https://www.cpsc.gov/Newsroom/News-Releases/2010/CPSC-Identifies-Manufacturers-of-Problem-Drywall-Made-in-China/.

### c. Plaintiffs' Insufficient Theory of Attribution

Plaintiffs' attribution theory for C&K drywall hangs on the thinnest of reeds. Although the simultaneous briefing schedule before the Special Master does not allow for Taishan to respond to Plaintiffs' specific arguments, Taishan anticipates that Plaintiffs will seek to link Taishan to C&K because the two companies had a common customer—Richard Hannam of Wood Nation. More specifically, Taishan expects that Plaintiffs will argue that Taishan manufactured C&K boards because C&K board markings include the phone number 813-994-6499 (Wood Nation's phone number), and Taishan manufactured boards for Wood Nation and also included Wood Nation's phone number, at Wood Nation's express request. Appx. 46 at 70:17-21; Appx. 48; *see also* Appx. 32 at 78:3-6 ("Q: The [MPF] product markings contain the phone number 813-994-6499, correct? A: Correct. That's what it says under Product Markings [for Wood Nation imports].").

Wood Nation's testimony establishes that Wood Nation also sold C&K drywall from Chenxiang—a wholly different company. *See* Appx. 46 at 64:17-20; 100:22-101:12. Although Mr. Hannam describes a shipment of C&K drywall that he purchased from a port in the U.S. and not through direct negotiations with Chenxiang, Mr. Hannam's role in procurement of drywall from multiple Chinese manufacturers over several years leads to the reasonable inference that Mr. Hannam purchased directly from C&K at some point and also gave Chenxiang his "standard specifications" that included his phone number. Appx. 46 at 70:17-21; Appx. 47 at 8:10-14:10. The far less reasonable inference—indeed one that runs contrary to all evidence in this case—is that *Taishan* manufactured drywall with the brand name of its lesser competitor *and* the phone number of one of Taishan's established customers, and no record of that transaction exists, and both Wood Nation and Taishan deny the existence of the transaction in multiple depositions over multiple years.

The Plaintiffs' theory that Taishan manufactured C&K drywall requires the Special Master to:

- Ignore the Plaintiffs' own complaints in this case;

- Reject the CPSC's identification of Chinese drywall manufacturers;

- Disregard Taishan's repeated and consistent denials over a near-decade of litigation; and

- Disregard the testimony of the supplier who actually ordered drywall from Taishan and gave Taishan specific marking instructions.

Such a conclusion would so far against the clear weight of the evidence as to be unsupportable.

### 2.  Category F: IMT Gypsum

Plaintiffs also fail to show by a preponderance of the evidence that Taishan manufactured boards with the spray marking "IMTGYPSUM.COM." IMT Gypsum is also a company that Plaintiffs named as a defendant in one of the predecessor complaints in this lawsuit, and Plaintiffs' attribution theory relies on inferences unsupported by the record.

### a.  Taishan's Record Denials

Taishan denied manufacturing boards with the IMT Gypsum marking in its March 2011 Court submission responding to the Drywall Indicia Guide post on the Court's MDL website. *See* Appx. 33. Taishan's MPFs do not show any drywall orders with the words "IMTGYPSUM.COM" sprayed on the side of the board, as shown in the Taishan Product Markings Catalog at photos 30, 31, 32 and 33. TTP's MPF does identify several orders of drywall that have "Edge Sealing Tape Markings" described as "Blue and white edge sealing tape: IMTGYPSUM." *See* Appx. 29 at lines 59-61, 67-112, 118-119, 121 and 125-126. But those orders did *not* include any spray markings with IMTGYPSUM.COM---instead, the spray markings on those orders was "DRYWALL 4feetX12feetX1/2inch." *Id.* None of the photo exemplars in Category F have markings that match Taishan's order records.

Consistent with those records, Taishan denied Category B in its Joint Submission. *See* Appx. 43. In the recent PID deposition, Taishan's corporate representative testified:

> There is no evidence to support that Taishan has manufactured the gypsum board reflected in the picture with the marking "IMT" on it reflected from Taishan's manufacturer's profile.

> The Taishan manufactured board with "IMT" marking on it, the marking is on the blue-and-white edge tape. The spray marking only reflects the drywall 4 feet by 12 feet by half inch. It did not spray the wording of "IMT" on the back of the board; therefore Taishan deny the products bearing these markings were produced by Taishan.

Appx. 32 at 60:3-15.

### b.    Other Record Evidence

The *Wiltz* complaint names as a defendant "International Materials Trading a.k.a. IMT Gypsum." Appx. 8 at ¶ 534. Specifically, IMT Gypsum is alleged to be an "Unascertainable Manufacturer Defendant"—*i.e.*, one of several "manufacturers of the defective Chinese manufactured drywall at issue in this litigation" that have "fraudulently concealed their identities and/or their involvement in the manufacture, distribution, supply, sale, importing, exporting, and/or brokering of the defective drywall at issue in this litigation." *Id.* ¶ 531. As to IMT specifically, Plaintiffs alleged:

> Defendant, International Materials Trading a.k.a. IMT Gypsum; International Materials Trading, Ltd.; IMT; International Materials Trading IMT Chinese Plasterboard; and International Materials Trading (IMT) Gypsum (hereafter "IMT") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulting in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

*Id.* ¶ 534.

Taishan's customer for all drywall orders bearing blue and white edge tape with the word "IMTGYPSUM" (but with a generic "DRYWALL" spray marking) was an exporter company called Beijing Building Materials Import & Export Co., Ltd.[13] *See* Appx. 29 at lines 59-61, 67-112, 118-119, 121 and 125-126. Therefore, Taishan never dealt with any entity bearing the IMT Gypsum name. Taishan's corporate representative testified about the Beijing exporter's efforts to purchase drywall from multiple companies, not just Taishan:

> According to the description of many customers, at the time in the very beginning, they [Beijing Building Materials Import & Export Company] started to make American-sized gypsum board in many small factories such as Pingyi or Zaozhuang, because the small factories had comparatively low price.
>
> Later, because the quantity of products manufactured by the small factories could not meet the demand of the customers, therefore it approached Taishan to process part of their boards

Appx. 32 at 67:22-68:15.

---

[13] Despite the similarity of names, this company is not related in any way to Defendant BNBM.

Government records confirm that International Materials Trading procured drywall from manufacturers other than Taishan in the relevant time period. Specifically, U.S. shipping data shows that International Materials Trading imported its largest volumes from *Chenxiang/C&K* in June 2006, and also ordered from Baier. In fact IMT's volume purchased from Taishan (through Beijing Building Materials Import & Export Co., Ltd.) in June 2006 was only a small fraction of the drywall that it imported from Chenxiang/C&K and Baier. The table below reflects that International Materials Trading brought in *ten times the volume* of drywall from C&K than from Taishan:

| PRODUCT DESCRIPTION | CONSIGNEE | SHIPPER | ARRIVAL DATE | GROSS WEIGHT (LB) | GROSS WEIGHT (KG) | FOREIGN PORT | US PORT |
|---|---|---|---|---|---|---|---|
| BOARD GYPSUM BOARD GYPSUM BOARD | INTERNATIONAL MATERIALS TRADING | PINGYI BAIER BUILDING MATERIALS | 06/27/2006 | 576000 | 262000 | TSINGTAO | PT. EVERGLADES |
| BOARD GYPSUM PLASTER BOARD GYPSUM | INTERNATIONAL MATERIALS TRADING | BEIJING BUILDING MATERIALS IMPORT | 06/27/2006 | 576400 | 262000 | TSINGTAO | PT. EVERGLADES |
| TH IS SHIPMENT CONTAINS NO WOOD | INTERNATIONAL MATERIALS TRADING,LTD | SHANDONG CHENXIANG G.B.M.CO.LTD. | 06/27/2006 | 5199275 | 2363307 | TSINGTAO | PT. EVERGLADES |
| GYPSUM BOARD | INTERNATIONAL MATERIALS TRADING | SHANDONG CHENXIANG GYPSUM CONSTURCT | 06/16/2006 | 31196 | 14180 | QINGDAO | PT. EVERGLADES |
| BOARDS GYPSUM BOARDS GYPSUM BOARDS | INTERNATIONAL MATERIALS TRADING | PINGYI BAIER BUILDING MATERIAL | 06/06/2006 | 583000 | 265000 | NINGPO | PT. EVERGLADES |

*See* Appx. 49; 50.

### c. Plaintiffs' Insufficient Theory of Attribution

Plaintiffs ground their attribution theory for boards with an IMTGYPSUM.COM spray marking on Taishan's self-reported manufacture of boards with *edge tape* bearing the IMT Gypsum name. But those are two very different PID patterns. Taishan's custom boards for an export company who requested IMT Gypsum on edge tape does not, in itself, prove that Taishan manufactured every drywall board that exists with some variation of the word IMT Gypsum anywhere on its surface. That is especially true considering Taishan's sworn testimony that the export company was known to have made similar purchases from several other manufacturers in China, Appx. 32 at 67:22-68:15, and shipping records showing that C&K manufactured *ten times* the volume of boards for IMT than did Taishan. The similarity in appearance of IMTGYPSUM.COM markings to C&K markings further underscores the high probability that C&K manufactured the IMTGYPSUM.COM boards exemplified in photos 30 through 33. (see comparison below)

Taishan Product ID Catalog #34:



Taishan Product ID Catalog #30:



For that reason, the Plaintiffs' identification of one board showing IMT edge tape *and* an IMTGYPSUM.COM spray marking is not dispositive of the issue. *First*, that picture could easily show a board ordered by IMT from another Chinese drywall manufacturer—namely, C&K or Baier. *Second,* that the IMT edge tape is blue and white does not establish that Taishan made it. A customer ordering from other manufacturers could easily make the same colors request for multiple orders for uniformity. *Third,* Taishan does not have an exemplar of the exact blue and white edge tape that it created for the IMT Gypsum orders, nor is it required to have retained one. *See* Appx. 32 at 223:7-224:3 (describing that the print molding tools for edge tapes have an "effective life usage span" of approximately six months, therefore "these records were no longer in existence in 2008 and 2009" per the regular course of business); *see also Calhoune*, 2019 U.S. Dist. LEXIS 13070, at *6-7 (holding that no duty to preserve exists before the party has notice of pending or impending litigation). Therefore, it cannot be said that Taishan necessarily manufactured the tape in the photo, especially because the spray markings are irreconcilable with Taishan's records.

In light of the established record that the volume of IMT's orders C&K dwarf the volume of what it got from Taishan, and the evidence contradicting that Taishan made any boards with IMTGYPSUM.COM as a spray marking, the Plaintiffs fail to meet their burden

to show by a preponderance of the evidence that Taishan manufactured the boards in Category F (photos 30, 31, 32 and 33).

### 3. Category G: ProWall

Plaintiffs also fail to show by a preponderance of the evidence that Taishan manufactured boards with the spray marking "MADE in CHINA MEETS ASTM C36/C1396 STANDARD" with blue, yellow, and white end tape labeled "ProWall." Plaintiffs' theory of attribution relies on inferences unsupported by the record. On the contrary, the record supports attribution of ProWall drywall to Kang Yi Jia—an independent and competing Chinese drywall manufacturer based in Taihe. Therefore, the Special Master should deny remediation damages to claims relying on ProWall markings.

#### a. Taishan's Record Denials

Taishan denied manufacturing boards with the ProWall marking in its March 2011 Court submission responding to the Drywall Indicia Guide post on the Court's MDL website. *See* Appx. 33. Taishan's MPFs do not show any drywall orders with the word "ProWall" on edge sealing tape or references to blue, yellow and white edge sealing tape shown in the Taishan Product Markings Catalog at photos 43 and 44. None of the photo exemplars in Category G have markings that match Taishan's order records.

Consistent with those records, Taishan denied Category G in its Joint Submission. *See* Appx. 43. In the recent PID deposition, Taishan's corporate representative testified:

> During the time to prepare for my deposition on behalf of the corporation, Taishan, as its representative, I have reviewed a lot of materials as well as compared a lot of information. I did not find any information of Taishan having produced products for ProWall.

Appx. 32 at 140:16-23.

#### b. Other Record Evidence

The *Wiltz* complaint, filed on October 10, 2010, names as defendants "ProWall Drywall, Inc. a.k.a. Prowall; Pro Wall and Pro-Wall." Appx. 8 at ¶ 533. ProWall is alleged to be an "Unascertainable Manufacturer Defendant"—*i.e.*, one of several "manufacturers of the defective Chinese manufactured drywall at issue in this litigation" that have "fraudulently concealed their identities and/or their involvement in the manufacture, distribution, supply, sale, importing, exporting, and/or brokering of the defective drywall at issue in this litigation." *Id.* ¶ 531.

Additionally, the *Gross* complaint, as amended on October 19, 2009, names as defendants "Jinan Run & Fly New Materials Co., Ltd." and alleges that company to be "involved in the manufacturing and/or sale of gypsum drywall." Appx. 51 at ¶ 28. Specifically, the allegations against this entity state:

> Upon information and belief, Defendant Jinan Run & Fly New Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Jinan Run & Fly New Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Jinan Run & Fly New Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

*Id.* at ¶ 28.

The Amended *Gross* complaint also names as defendants "Tai'an Kangyijia Building Materials Co., Ltd." and alleges that company to be "involved in the manufacturing and/or sale of gypsum drywall." *Id.* at ¶ 36. Specifically, the allegations against this entity state:

> Upon information and belief, Defendant Tai'an Kangyijia Building Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Tai'an Kangyijia Building Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Tai'an Kangyijia Building Materials Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Tai'an Kangyijia Building Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Tai'an Kangyijia Building Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

*Id.* at ¶ 36.

Plaintiffs mistakenly attribute ProWall drywall to Taishan because of a single sale of drywall made by Taishan to another Chinese company in May 2006. An invoice produced by Taishan shows that Taishan sold 9,936 drywall sheets to a Chinese company called Run & Fly (Jinan) New Materials Company, Limited ("Run & Fly") on May 8, 2006. *See* Appx. 32 at 146:6-11; Appx. 52. That invoice shows that the 9,936 sheets were ordered in what Taishan would later learn were U.S. dimensions, and were delivered on wooden pallets. Appx. 32 at 147:5-150:6. However, the Chinese company ordering the drywall issued a common invoice for Chinese domestic use, not for export. *Id.* 148:17-149:8. There were no spray markings on those boards; they were blank with plain white edge tape. *Id.* at 149:9-16. That was the only business Taishan ever did with Run & Fly, which subsequently bought from a competing drywall manufacturer in Taihe who sold American-sized drywall to Run & Fly at lower prices than Taishan's. *Id.* at 150:7-151:21; Appx. 36 at 6. The competing drywall manufacturer that Run & Fly turned to is named Tai'an Kangyijia Building Materials Co., Ltd. ("Kang Yi Jia"). *Id.* Third party produced documents reflecting that transaction are included in the Appendix at 53 (March 10, 2006 Email Chain), 54 (April 7, 2006 Invoice from Manchester In Home to Stock Building Supply), 55 (May-June 2006 Run & Fly Production and Shipping Schedule), and 56 (Stock Building Supply Distributor Profile Form). Those documents appear to show that, unbeknownst to Taishan, Run & Fly sold that "trial order" of approximately 10,000 sheets to Manchester In Home for Stock Building Supply. Appx. 53.

Plaintiffs have also pointed to a document of unknown origin[14] purporting to be a May 27, 2006 production schedule from Run & Fly that describes production of 55,440 boards with "ProWall tapes" on "steel pallets." Appx. 55. That production schedule cannot be for the single Taishan order: the date, volume, board marking, and pallet specifications are all different.

## c. Plaintiffs' Insufficient Theory of Attribution

Plaintiffs base their attribution theory for boards with ProWall markings on a convoluted interpretation of a series of emails and invoices that together tell a different story

---

[14] There is no Bates number on this document, and Plaintiffs have never identified its source. As such, it is unauthenticated hearsay, and does not constitute admissible evidence. Taishan nevertheless addresses the substance of the document because it is central to Plaintiffs' theory of attribution.

than the one that Plaintiffs advance. Because Run & Fly, Manchester Home and Stock Building Supply all procured drywall from China around the same time, Plaintiffs conflate the order of the 9,936 blank boards with white edge tape sold by Taishan to Run & Fly with Run & Fly's subsequent production of 55,440 boards with "ProWall tapes" later that month. Plaintiffs seek to link Taishan to the second, bigger production (with specified ProWall markings) by the production schedule's reference to the "Taihe Factory," which Plaintiffs presume can only mean Taishan. Appx. 55. But that speculative theory cannot be reconciled with the evidence. The reliable record shows that Taishan never manufactured any drywall with "ProWall" markings, and its only order for Run & Fly was a small order of blank boards with white edge tape. Taishan testified that Run & Fly abandoned Taishan as its manufacturer after that initial trial order in favor of its cheaper, Taihe-based competitor Kang Yi Jia. *See* Appx. 32 at 150:7-151:21; Appx. 36 at 6. Thus the only reasonable inference is that *Kang Yi Jia* is the manufacturer with the "Taihe factory" that produced 55,440 boards with "ProWall tapes" in late May 2006—after Taishan's single order of blank boards was complete. Accordingly, the drywall in Category G (photos 43 and 44) was most likely made by King Yi Jia, and not Taishan. Therefore, the Special Master should exclude those claims from recovery from Taishan.

### 4.    Category I: Made in China Meet or Exceeds

The "Made in China" category is the first of the two "generic" markings categories, which are somewhat different from the categories described above that Taishan denies outright. For the generic categories, Taishan denies strongly that it manufactured every variation of markings in that broad category. Instead, Taishan denies responsibility for several of the photo examples in Category I, but does not deny that it manufactured drywall with certain markings. Specifically, Taishan does not deny that it made the different markings below (photos 13, 17, 20):

Taishan Product ID Catalog #13:

Taishan Product ID Catalog #17:



Taishan Product ID Catalog #20:



But Taishan denies that it made the following markings (photos 18, 19, 21):

Taishan Product ID Catalog #18:



Taishan Product ID Catalog #19:



Taishan Product ID Catalog #21:



### a.   Taishan's Record Positions

Taishan's MPF for TTP reflects multiple orders using the product marking: "MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD." Appx. 29 at lines 6-10, 12-14, 64-66, 113-117, 120, 123-124, 127-130, 132-176, 179-182, 185-197 and 202-213. Consistent with that record, in its March 2011 Court submission responding to the Drywall Indicia Guide post on the Court's MDL website, Taishan gave the following response to photos with the "Made in China Meet(s) or Exceed(s)" spray marking:

> TTP records indicate that it sold drywall to U.S. dimensions with the following markings:
>
> "MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD"
>
> However, there is insufficient evidence to conclude that the drywall depicted in this image was sold by TTP because, among other reasons, other manufacturers may have produced drywall with these markings.

*See* Appx. 33. That statement truthfully reflects Taishan's position: it may have made *some* boards with those words on them, but it does not follow that it made *all* boards with those words on them.

That PID determination process is the first proceeding in which Taishan has had an opportunity to defend against the PSC's assertion that Taishan should be liable for all boards with any variation of this generic phrase. In the course of preparing for PID discovery, Taishan located in its warehouse leftover inventory of U.S.-sized drywall boards that it manufactured in the 2006-2007 timeframe. *See* Appx. 32 at 102:16-21, 103:14-104:1, 105:7-

106:20. Two of the types of board markings found on those residual boards bore the words: "MADE IN CHINA MEET OR EXCEEDS ASTM C1396 STANDARD." See below:

TIG-PID-000005 (Appx. 66)



TIG-PID-000020 (Appx. 66)



With the benefit of those exemplars, Taishan was able to distinguish between the multiple variations presented in Category I, and accept litigation responsibility for the boards with spray markings matching its examples (photos 13, 17 and 20), and to distinguish its boards from the other inconsistent examples (photos 18, 19 and 21).

### b. Other Record Evidence

As explained in Section II above, Taishan and Knauf were not the only two manufacturers of drywall in China whose goods came to the United States in the relevant time period. In fact, HUD import data and records from this case show that Taishan's market share was somewhere around ***30 percent***. That figure is derived from HUD's finding of an overall volume of approximately 299 million square feet of Chinese drywall imported to the United States from 2004 to 2007, compared with Taishan's MPF total reported volume of approximately 90 million square feet.[15] Appx. 13; 27; 29. Using the other active defendants' MPFs to derive their market shares, that leaves a remainder of almost 22 percent of the

---

[15] On their MPFs, Taishan and TTP report shipments of 153,912 sheets and 1,720,610 sheets, respectively. *See* Appx. 27; 29. Multiplying these amounts by 48 (the square footage of a standard U.S.-sized drywall board), produces total square footage for Taishan and TTP of 7,387,776 and 82,589,280, respectively. The total square footage for both entities combined is 89,977,056.

Chinese drywall imported into the U.S. that had to be manufactured by a company other than Taishan, BNBM, or Knauf.[16]

The Taishan Product Markings Catalog—which was compiled by *Plaintiffs*—shows the disparity among markings that use some variation of the same generic phrase. But they are not the same: Some have an "S" after "MEET" and/or "EXCEED." Some use a comma or a period after "MADE IN CHINA." The spray marking letter styles differ from each other.

Deposition testimony of drywall purchasers establishes that customers buying from Chinese manufacturers demanded standardized board markings stating that the products met or exceeded ASTM C1396, the North American building standard. For example, in January 2006, a company called North Pacific was looking to source drywall from China because "[i]t was less expensive" to buy than U.S. made drywall. Appx. 60 at 42:22-43:3. North Pacific's email request to a trading company called Devon International specifically requested that whatever drywall could be obtained from China would need a "stamp that will be on each sheet for (equal to or exceeds ASTM) or your equivalent." *Id.* at 83:15-86:13 and Appx. 61. The purchase order later executed between the buyer and the trading company specified that the drywall "Must have stamp that this product meets or exceeds North American ASTM Standards."[17] Appx. 60 at 131:28-134:3; Appx. 62. Devon's representative testified that he believed that that marking was a requirement of U.S. Customs. Appx. 60 at 134:10-23. In another email from North Pacific in May 2006, the buyer requested that the boards actually be stamped with the words, "MEETS OR EXCEEDS ASTM STANDARDS," and refused

---

[16] Knauf Plasterboard (Tianjin) Co., Ltd. And Knauf Plasterboard (Wuhu) Co., Ltd. Report shipments of 5,286,015 and 1,219,697 square meters, respectively. *See* Appx. 57. Multiplying these amounts by 10.7639 (1 square meter = 10.7639 square feet), yields total square feet for KPT and Knauf Wuhu of 56,898,136.9 and 13,128,696.5, respectively. The total square footage for the combined Knauf entities is 70,026,833 square feet. Appx. 57. BNBM reports shipments of 6,758,187 square meters. Multiplying this amount by 10.7639 produces a total square footage of 72,649,152. Appx. 58; 59.

[17] After touring many drywall manufacturing companies in China, Devon ultimately purchased from Taishan, and the markings on the boards in that shipment match the markings of photo example 17, which Taishan has not denied. Devon's produced photo of the drywall ordered from Taishan looks identical to one type of the excess-inventory boards recently located by Taishan. *Compare* Appx. 60 at 134:4-135:8; Appx. 65, *with* TG-PID-000005. Appx. 66.

to accept a separate certificate showing that compliance. Referencing prior orders, the buyer stated:

> The ones we have seen has "meets astm requirements" printed on the paper edges. Please have someone check with the chinese on ours. Not a problem one way or the other but will help us in selling it. thanks.

*Id.* at 164:19-169:21; Appx. 63. The same buyer provided Devon with photo examples of the drywall stamp by email (although the photo attachments were not retained or produced by Devon). Appx. 60 at 170:6-171:2; Appx. at 64. Thus, North Pacific is an example of a U.S. buyer who had already obtained drywall from China with the generic "Meets or Exceeds ASTM" language *before* purchasing any drywall boards with the same generic markings from Taishan (through intermediaries).

### c. Plaintiffs' Insufficient Theory of Attribution

Following their playbook since they decided to train their litigation sights on Taishan, the Plaintiffs seek to hold Taishan liable for ***all drywall in the case*** with generic markings. But that overreaching tactic does not withstand the tests of logic and reason. Customers (like North Specific) were asking multiple Chinese manufacturing companies to use the same standard language for regulatory and/or marketing purposes. And with more than one-fifth of the Chinese drywall market in the U.S. made up of companies that are no longer defendants (and others who never were), it is not reasonable to conclude that Taishan was the only maker of drywall with those generic words—especially where the Plaintiffs' own exemplars show at least six variations of print style, language and punctuation.

Taishan has recognized throughout the course of this litigation that it manufactured some of the drywall with generic markings. Its discovery of exact specimens of two of the "Made in China" markings that it manufactured provides precision to the question of which should be attributable to Taishan, and excludes those that should not.

Plaintiffs bear the burden of proof on PID. It is not Taishan's burden to disprove a presumption that it made every variation of boards for which Plaintiffs seek to recover. Plaintiffs have failed to meet their burden to impose liability on Taishan for claims with PID markings matching photos 18, 19 and 21 of the Taishan Drywall Markings Catalog. Therefore, the Special Master should exclude those claims in Category I in those product marking sub-categories from any remediation damages award recommendation.

5. **Category J: Drywall With Dimensions**

Like Category I, Category J comprises generic markings. In this category, the generic words are some variation of DRYWALL 4 FEET X 12 FEET X 1/2 INCH. The variations within that category are even more wide and pronounced than the variations in the "Made in China" category. Plaintiffs have identified at least eight different marking types that differ in print style, capitalization and symbols. Taishan does not deny that it made boards with the following marking (photo 2):

Taishan Product ID Catalog #2:



But Taishan denies that it made all of the remaining variations of Drywall with dimensions (photos 5, 6, 7, 8, 9, 10, 11):

Taishan Product ID Catalog #5:

Taishan Product ID Catalog #6:



Taishan Product ID Catalog #7:



Taishan Product ID Catalog #8:



Taishan Product ID Catalog #9:



Taishan Product ID Catalog #10:



Taishan Product ID Catalog #11:



### a.    Taishan's Record Positions

Taishan's MPF for TTP reflects multiple orders using the product marking: "DRYWALL 4feetX12feetX1/2inch." Appx. 29 at lines 15, 22-23, 29-61, 67-112, 118-119, 121, 125-126. Consistent with that record, in its March 2011 Court submission responding to the Drywall Indicia Guide post on the Court's MDL website, Taishan gave the following response to photos with the "DRYWALL" spray marking:

> TTP's records indicate that it sold drywall to to [*sic*] U.S. dimensions with the following markings:
>
> "DRYWALL 4feetX12feetX1/2inch"
>
> However, there is insufficient evidence to conclude that the drywall depicted in this image was sold by TTP because, among other reasons, other manufacturers may have produced drywall with these markings.

*See* Appx. 33. That statement truthfully reflects Taishan's position: it may have made *some* boards with those words on them, but it does not follow that it made *all* boards with those words on them.

Unlike with the "Made in China" category, Taishan does not have any remaining exemplars showing the "Drywall" marking. Therefore, Taishan's litigation position to accept responsibility for the markings in photo 2 relied on its similarities in font and print style to the "Made in China" exemplars it found. *See* Appx. 32 at 114:11-23. Even so, Taishan's position is conciliatory—while Taishan could "neither confirm nor deny that it is a product of Taishan because of the significant lack of information on it," Taishan nevertheless, for purposes of this litigation, "do[es] not deny the possibility that 2 is a product of Taishan, as a possibility." *Id.* at 115:17-20, 116:18-20.

### b. Other Record Evidence

The significant presence of other Chinese drywall manufacturers that exported drywall to the U.S. in the relevant time period is just as important in the analysis of that generic category as it is in the "Made in China" category. Twenty-two percent of all Chinese drywall was manufactured by a party that is neither Taishan, nor BNBM, nor Knauf. Taishan's share of that market was around 30 percent. *See* Section 4(b) *supra*.

The Plaintiff-compiled Taishan Product Markings Catalog shows significant disparity among markings that use some variation of that same generic phrase. Just a comparison of the "Y" in "Drywall" amongst the photos shows that it would be unreasonable to conclude that they came off the same manufacturing line. In Taishan's admitted category 2, the "Y" stands above the other letters and is angular and diagonal. But in 5, 6, and 11, the Y is short with no straight lines. The Y in 7 is capitalized and angular, with a straight vertical base. The Y in 8 is highly pixelated, as is the Y in 10, which appears to have a straight base with a curvy top. Note that the Y in photo 9 is very similar to the Y in photo 2, which Taishan does not deny, but the photo category includes additional numerical markings that are *not* consistent with Taishan's records, so the photo category is denied. Appx. 32 at 118:9-14; Appx. 36 at 6.

The variations don't stop there. Photos 7 and 10 are in all caps. Photo 11 capitalizes the D and the W. Most use an "x" for the multiplication sign, but photo 8 uses a "*." The levels of pixilation vary significantly, from virtually solid thick black printing (photo 5) to single-line stippling (photo 10) to multi-line stippling (photo 8). Taishan explained those differences in its PID deposition. *See* Appx. 32 at 112-132; Appx. 36 at 6.

### c. Plaintiffs' Insufficient Theory of Attribution

Despite those differences, Plaintiffs once again seek to hold Taishan liable for **all drywall in the case** with generic markings. But the conclusion that the same manufacturer—Taishan—made every single one of the variants of generic drywall in Category J is even more unreasonable than that conclusion in Category I. It would be a speculative assumption that would not withstand scrutiny.

Plaintiffs bear the burden of proof on PID. Plaintiffs simply do not have sufficient evidence to prove that it is more likely than not that Taishan manufactured all drywall in the United States that was marked with the word "Drywall" and the dimensions of the board. Plaintiffs have failed to meet their burden to impose liability on Taishan for claims with PID markings matching photos 5 through 11 of the Taishan Drywall Markings Catalog. Therefore, the Special Master should exclude those claims in Category J in those product marking sub-categories from any remediation damages award recommendation.

### 6. Category L: Boards with white edge tape and no other markings; boards with no markings or boards with no markings other than numbers; and any other product ID categories

The final category could qualify as an "Other" or "Miscellaneous" category. But it is not insignificant. There are almost a hundred claims in this category seeking remediation damages from Taishan. But Taishan should not have to pay any damages for any of the claims in this category because their PID proof is not only insufficient—it is virtually nonexistent. This section will address the sub-categories within Category L.

### a. White Edge Tape With No Spray Markings

Plaintiffs have included in this action claims where the only indicia of PID is a mere blank drywall board with unmarked tape remnants. The photo exemplar of this category, photo number 12 in the Taishan Product ID Catalog, is virtually self-defeating. This is the so-called unique indicia of Taishan's product:

Taishan Product ID Catalog #12:



Plaintiffs' assertion that any blank board with blank tape on it was made by Taishan is based on Taishan's MPF, which includes some entries for boards without spray markings and with "white edge sealing tape (without words printed thereupon)." *See, e.g.,* Appx. 29 at lines 62-63. But Plaintiffs' reliance on photos of blank portions of board and fragments of white (or whitish) tape of some kind falls dramatically short of the proof that would show by a preponderance of the evidence that Taishan in fact manufactured the drywall in the property. That is especially true given the obvious uncertainty on the Plaintiffs' side about what "white edge sealing tape" even is in the drywall context. As Taishan's corporate PID representative explained, "white edge sealing tape" is not to be confused with other white connection tape or paper on other edges of drywall boards. The testimony is elucidating:

Q: . . . Would you agree with me that photograph 27 [of the Taishan Product ID Catalog (*see* Appx. 16)] has white edge tape in it?

A: I do not see that.

Q: Do you know what the white stripes are in photograph 27?

A: It should be a tape of edge connection . . . Which means that during the production of the board, in between two boards, they will need to be connected by the edge connection tape. The purpose of it is to prevent cracks created between the two boards.

Q: Sir, is it your position that in . . . photograph 27, in the lower left-hand corner, that this is not white edge tape?

> A: According to my experience of working in this industry for years, the edge tape is supposed to be positioned on its short side. The spray marking is parallel with the long side of the board.
>
> So when you look at the spray marking parallel to the long side of the board, for sure it is not, an edge tape. The only possibility is that it[']s an edge connection tape. This is determined according to my years of experience working in this industry.

Appx. 32 at 37:11-38:18. Taishan also distinguished between "white edge sealing tape" and the paper that is wrapped around the gypsum board, which counsel also suggested was white edge tape:

> The edge – the white tape is not edge tape. It is a face paper of the gypsum board. There are two papers in the gypsum board during production. One is on tope; one is at the bottom.
>
> The side that have spray marking, we call it the back. In order to distinguish the front side with the back side, each paper has a different color.
>
> When you look at the white strip of paper parallel with the spray marking, it is a face paper, not an edge tape, just like the picture that I showed you just now. It clearly reflected this issue.

*Id.* at 40:20-41:8.

There is no telling how many of the scores of "white edge tape" claims presented by Plaintiffs are in fact showing pieces of connection tape or face paper, but it is clear that Plaintiffs' characterization of what the drywall photos show cannot be trusted.

Even if, by chance, a claimant's PID proof *did* show a clear photo of actual white edge tape, that proof would still be grossly insufficient because Taishan's deposition testimony (and common sense) reflects that unmarked boards with white tape were not a product unique to Taishan:

> According to the information we learned from customers, at the time while producing the gypsum board with American sizes, a lot of . . . manufacturers used the white edge tape just like this kind without words on it, even to the point that there were no spray marking on the back of the board.
>
> * * *
>
> Therefore, by only looking at something that is white, without wording and is edge tape and it has no spray marking on it, you cannot really decide it is a product produced by Taishan. We need more comprehensive information in order to confirm the product.

*Id.* at 49:6-13, 51:3-9. The 2009 testimony of a third party trading company, La Suprema Enterprise, Inc., bears that out. *See* Appx. 67. Testifying about drywall purchases made in China in or around November 2005, La Suprema described purchases from three main sources: Knauf (about 50 percent); Beijing Building Materials (referenced on Taishan's MPF as an exporter; about 30 percent) and Baier (about 20 percent). *See id.* at 106:16-107:3. The following exchange is instructive:

Q: . . . What distinguishing marks does the Pingyi Baier drywall have on it?

A: None.

Q: Does it say "Pingyi Baier" on it?

A: No.

Q: Does it say "Chinese Drywall"?

A: No.

Q: It has no markings on it at all?

A: Not that I recall.

Q: How about the Beijing product, Beijing Materials?

A: What about it?

Q: What distinguishing marks does it have?

A: None.

Q: It doesn't say BNB, BMB or Beijing Materials?

A: It doesn't say – it doesn't say anything.

*Id.* at 107:6-108:3. So, not surprisingly, Taishan was not the only Chinese drywall manufacturer making blank drywall with U.S. dimensions in 2006 and 2007. As Taishan testified, in order to prove that blank drywall was Taishan's product, the Plaintiffs would need to provide "more comprehensive information" – such as a chemical analysis of a sample or supply chain documentation showing how that the drywall in that property can be traced to Taishan. *See* Appx. 32 at 51:3-9, 70:15-71:18. Plaintiffs offer none such distinguishing support to meet their evidentiary burden, offering a mere scintilla of evidence that is far too tenuous to tip the scales to a preponderance.

Therefore, the Special Master should exclude the claims in Category L that are based on blank drywall boards with some kind of white tape or paper (photo number 12).

### b.   "Tapered edge" (Photos 3 and 4 )

Plaintiffs also advance for damages from Taishan four claims based on the following markings:

Taishan Product ID Catalog #3:



Taishan Product ID Catalog #4:



Taishan's MPFs do not describe any boards with "Tapered edge" markings; in fact, the words "Tapered edge" appear nowhere on the MPFs at all. *See* Appx. 29. Plaintiffs' theory that boards marked "Tapered edge" must have been manufactured by Taishan appears to be born of an October 12, 2005 email exchange between a Taishan representative and a potential

buyer asking for small size samples of drywall boards with a tapered edge. Appx. 32 at 90:13-25; Appx. 68. But Taishan's testimony explains that tapered edges are the common edge type for drywall universally:

> Therefore, ordinarily, most of the gypsum boards have tapered edges. Square edges are rarely used. It is only used in the small numbers of the board. This is a universal use for gypsum boards in the world.

Appx. 32 at 93:3-7. Therefore, there is nothing extraordinary or unique about a potential buyer requesting a sample of Taishan's drywall with a tapered edge. That does not mean that all drywall bearing the mark "Tapered edge" must have been manufactured by Taishan. On the contrary, such an assumption goes against the clear weight of the evidence, which is that Taishan has no records (and Plaintiffs have produced none) linking Taishan to boards with that marking.

Thus, the Special Master should exclude the claims in Category L that match photo numbers 3 and 4.

Dated: March 1, 2019

Respectfully submitted,

*/s/ Enjoliqué Aytch*
Enjoliqué Aytch
Fla. Bar No. 0104881
Email: enjolique.aytch@akerman.com
Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

Bernard Taylor, Esq.
Georgia Bar No. 669625
Michael P. Kenny, Esq.

Georgia Bar No. 415064
Christina Hull Eikhoff, Esq.
Georgia Bar No. 242539
David Venderbush, Esq.
New York Bar No. 2920817
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and
Tai'an Taishan Plasterboard Co., Ltd.*

## SERVICE LIST

Arnold Levin, Esq.
Sandra Duggan, Esq.
Frederick S. Longer, Esq.
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500
*Attorneys for Plaintiffs*

Jay P. Dinan
Email: jdinan@yourlawyer.com
Parker Waichman LLP
27300 Riverview Center Boulevard, Suite 103
Bonita Springs, Florida 34134
Office: 239.390.1000
Fax: 239.390.0055
*Counsel for Parker Waichman LLP Plaintiffs*

Dawn Barrios, Esq.
Emma Kingsdorf Schwab, Esq.
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, Louisiana 70139,
504-524-3300
*Attorneys for Plaintiffs*

Jimmy Faircloth, Esq.
Faircloth, Melton, & Sobel
Gras Town Plaza,
412 N. 4th Street, Suite 230
Baton Rouge, LA 70802,
(225) 343-9535
*Attorney for Plaintiffs*

Leonard A. Davis, Esq.
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue,
New Orleans, Louisiana 70113,
PH: (504) 581-4892
*Attorneys for Plaintiffs*

Scott A. George, Esq.
Jeffrey S. Grand, Esq.
Christopher Seeger, Esq.
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102,
(215) 564-2300
*Attorney for Plaintiffs*

Pearl Anna Robertson, Esq.

Jeffrey A. Breit, Esq.

IRPINO, AVIN, HAWKINS, LLP
2216 Magazine Street
New Orleans, LA 70130
504-525-1500
*Attorneys for Plaintiffs*

BREIT DRESCHER IMPREVENTO,
P.C.
600 22nd Street, Suite 402
Virginia Beach, VA 23451
757-622-6000
*Attorneys for Plaintiffs*

James V. Doyle, Esq.
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500 Fax: 844-638-5812
Jim.Doyle@DoyleFirm.com
*Attorneys for Plaintiffs*

Richard S. Lewis, Esq.
Hausfeld LLP,
1700 K Street, NW., Ste. 650
Washington, DC 20006
(202) 540-7200
*Attorneys for Plaintiffs*

Richard J. Serpe, Esq.
LAW OFFICES OF RICHARD J.
SERPE, PC.
580 E. MAIN STREET, SUITE 310
Norfolk, Virginia 23510
757-233-0009
*Attorneys for Plaintiffs*

Patrick Shanan Montoya
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

David Venderbush, Esq.
Michael P. Kenney, Esq.
Kristine McAlister Brown, Esq.
Christina Hull Eikhoff, Esq.
Bernard Taylor, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: 404-881-7000 Fax: 404-881-7777
*Counsel for Defendant Taishan Gypsum Co.
Ltd, & Tai'an Taishan Plasterboard Co.*

Eric Matthew Hairston, Esq.
L. Christopher Vejnoska, Esq.
James L. Stengel, Esq.
Andrew K. Davidson, Esq.
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
*Counsel for BNBM PLC*

# Exhibit B

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/06/19 Page 76 of 668
Case 1:12-cv-02406-MGC Document 277 Entered on FLSD Docket 05/13/2015 Page 2 of
759

**Index of Appendix to**
**Defendant Taishan's Product Identification Contentions and Defenses**

| Tab | Description |
|-----|-------------|
| 1 | Order, dated November 16, 2018 (Rec. Doc. 112) |
| 2 | Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages Hearing, dated April 21, 2017 (MDL Rec. Doc. 20741) |
| 3 | Order and Reasons Allocating Common Benefit Fees in the Knauf Aspect of This Litigation, dated February 4, 2019 (MDL Rec. Doc. 22089) |
| 4 | Plaintiffs' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice, dated October 29, 2014 (MDL Rec. Doc. 18086) |
| 5 | Taishan's Memorandum of Law in Support of Emergency Motion to Compel Production of Information Relevant to Plaintiffs' Motion for Assessment of Class Damages, dated April 6, 2015 (MDL Rec. Doc. 18598-1) |
| 6 | Letter from Plaintiffs to Judge Fallon, dated September 8, 2015 (MDL Rec. Doc. 19490-2) |
| 7 | Class Action Complaint (*Gross* Complaint), dated October 7, 2009 (E.D. La. Case No. 09-6690, Rec. Doc. 1) |
| 8 | Plaintiffs' Omnibus Class Action Complaint (II) (*Wiltz* Complaint), dated February 10, 2010 (E.D. La. Case No. 10-361, Rec. Doc. 1) |
| 9 | Transcript excerpts from E.D. Va. Status Hearing, December 18, 2018 (E.D. Va. Case No. 11-377) |
| 10 | Findings of Fact and Conclusions of Law with Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3), dated September 26, 2014 (MDL Rec. Doc. 18028) |
| 11 | Transcript excerpts from Motion Hearing, February 13, 2019 |
| 12 | Consumer Product Safety Commission (CPSC) Investigation of Imported Drywall Status Update, September 2009 |
| 13 | Department of Housing and Urban Development Report to Congress, July 17, 2012 |
| 14 | CPSC Investigation of Imported Drywall Status Update, October 2009 |
| 15 | CPSC Press Release #10-243: CPSC Identifies Manufacturers of Problem Drywall Made in China, dated May 25, 2010 |
| 16 | Taishan Product ID Catalog, filed December 31, 2018 (Rec. Doc. 155-2) |
| 17 | Pre-trial Order No. 10, dated August 21, 2009 (MDL Rec. Doc. 171) |

| 18 | Joint Motion for Entry of Photographic Catalog of Drywall Markings, dated September 3, 2009 (MDL Rec. Doc. 201) |
|----|----|
| 19 | Order, dated September 4, 2009 (MDL Rec. Doc. 211) |
| 20 | Chinese Drywall Markings: Photographic Examples |
| 21 | Drywall Indicia Guide, dated December 20, 2011 (MDL Rec. Doc. 12061-10) |
| 22 | Evidence Sample Preservation Report by Intuitive Environmental Solutions, LLC for Mr. and Mrs. Anthony Gody, dated July 8, 2011 |
| 23 | Chinese Drywall Screening Report for Dailyn Martinez, dated March 21, 2012 |
| 24 | Pre-trial Order No. 11, dated August 17, 2009 (MDL Rec. Doc. 168-1) |
| 25 | Pre-trial Order No. 1F, dated March 9, 2010 (MDL Rec. Doc. 1692) |
| 26 | Defendant Manufacturers' Profile Form ("MPF"), dated August 17, 2009 (MDL Rec. Doc. 168-2) |
| 27 | MPF for Taishan Gypsum Co. Ltd., dated October 13, 2010 |
| 28 | MPF for Tai'an Taishan Plasterboard Co., Ltd., dated October 14, 2010 |
| 29 | Exhibit A to MPF for Tai'an Taishan Plasterboard Co. Ltd. |
| 30 | Excerpts from Deposition of Wenlong Peng, April 7, 2011 |
| 31 | Excerpts from Deposition of Wenlong Peng, January 13, 2012 |
| 32 | Excerpts from Taishan 30(b)(6) Deposition Regarding Product Identification, Gang Che, January 22-23, 2019 |
| 33 | Letter from Hogan Lovells Regarding Photographic Examples of Chinese Drywall Markings (with attachments), dated March 22, 2011 (MDL Rec. Doc. 8310) |
| 34 | Transcript excerpts from Motion Hearing, April 17, 2015 |
| 35 | Transcript excerpts from Motion Hearing, December 8, 2015 |
| 36 | Declaration of Gang Che and Errata for Taishan 30(b)(6) Deposition Regarding Product Identification, dated February 28, 2019 |
| 37 | TG-PID-000081 and TG-PID-000143, Exhibit 49 to Taishan 30(b)(6) Deposition Regarding Product Identification |
| 38 | TG-PID-000167, Machine Translation of TG-PID-000081 |
| 39 | Pre-Trial Order No. 1, dated June 16, 2006 (MDL Rec. Doc. 2) |
| 40 | Pre-Trial Order No. 1(B), dated October 9, 2009 (MDL Rec. Doc. 337) |
| 41 | Pre-Trial Order No. 1(I), dated January 24, 2012 (MDL Rec. Doc. 12257) |
| 42 | Pre-Trial Order No. 1(J), dated March 20, 2015 (MDL Rec. Doc. 18528) |

| 43 | Appendix 1 to the Parties' Joint Submission to Special Master Regarding Product Identification Discovery and Adjudication, dated December 31, 2018 (Rec. Doc. 155-1) |
| 44 | Taishan - Preliminary Florida Contests and Setoffs - Objection Key, submitted February 11, 2019 |
| 45 | Taishan - Preliminary Florida Contests and Setoffs, submitted February 11, 2019 |
| 46 | Excerpts from Wood Nation 30(b)(6) Deposition, Richard L. Hannam, February 13, 2012 |
| 47 | Excerpts from Wood Nation 30(b)(6) Deposition, Richard L. Hannam, February 14, 2011 |
| 48 | Exhibit 9 to Wood Nation 30(b)(6) Deposition, Richard L. Hannam, February 14, 2011 |
| 49 | Declaration of Nickie Bonenfant, ImportGenius, dated February 27, 2019 |
| 50 | Exhibit A to Declaration of Nickie Bonenfant |
| 51 | Amended Class Action Complaint (Amended *Gross* Complaint), dated October 19, 2009 (MDL Rec. Doc. 366) |
| 52 | Exhibit 50 to Taishan 30(b)(6) Deposition Regarding Product Identification |
| 53 | Email Chain Between Manchester In Home and Run & Fly, dated March 10, 2006 |
| 54 | Invoice from Manchester In Home to Stock Building Supply, dated April 7, 2006 |
| 55 | Run & Fly Production and Shipping Schedule, May-June 2006 |
| 56 | Distributor Profile Form for Stock Building Supply of Florida, dated February 13, 2012 |
| 57 | MPFs for Knauf Entities, dated September 2009 |
| 58 | MPFs for BNBMPLC and BNBM Group, dated April 8, 2015 (MDL Rec. Doc. 18628-2) |
| 59 | BNBMPLC-E-0000819-820, BNBM Sales Records |
| 60 | Excerpts from Deposition of Robert Scharf, March 24, 2011 |
| 61 | Exhibit 4 to Robert Scharf Deposition |
| 62 | Exhibit 28 to Robert Scharf Deposition |
| 63 | Exhibit 31 to Robert Scharf Deposition |
| 64 | Exhibit 34 to Robert Scharf Deposition |
| 65 | Exhibit 29 to Robert Scharf Deposition |
| 66 | TG-PID-000005, TG-PID-000020, Drywall Samples |
| 67 | Excerpts from La Suprema Enterprise, Inc. 30(b)(6) Deposition, Salomon Abadi, October 19, 2009 |
| 68 | Exhibit 35 to Taishan 30(b)(6) Deposition Regarding Product Identification |

# Tab #1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-22408-Civ-COOKE

EDUARDO AND CARMEN AMORIN, *et al.*,
individually and on behalf of all others similarly
situated

       Plaintiffs,

vs.

TAISHAN GYPSUM CO., LTD., f/k/a
SHANDONG TIASHE DONGXIN CO. LTD.,
*et al.*,

       Defendants.

_____/

### ORDER

    Since the United States Judicial Panel on Multidistrict Litigation's remand to this
Court, ECF No. 13, the parties to this action have filed a series of motions which, at
bottom, seek to determine how much deference the Court would give to the decisions of
Judge Fallon, who presided over the MDL in the United States District Court for the
Eastern District of Louisiana. *See, e.g.*, Plaintiffs' Motion and Memorandum of Law to
Adopt Plan for Resolution of Florida *Amorin* Plaintiffs' Claims for Remediation and Other
Damages, ECF No. 52 ("Plaintiffs' Trial Plan Motion"); Defendants' Motion to Reject
Application of Remediation Damages Formula, ECF No. 61 (the "Remediation Damages
Formula Motion"); Defendants' Motion and Memorandum to Enforce Discovery Rights,
ECF No. 66 (the "Discovery Rights Motion").

    In their papers, Plaintiffs argue that "the judicial labor here has been completed"
because liability has been established. Plaintiffs' Trial Plan Motion at 7. Because they
believe the only remaining issue is the amount of damages, Plaintiffs implore the Court to
limit discovery to: 1) verification of square footage, 2) proof of Defendants' product in the
property, and 3) proof of ownership. *Id.* at 5.

    Defendants disagree. Their motions seek to reopen discovery into liability and
causation, reject application of the remediation damages formula, and challenge Judge

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/06/19 Page 81 of 668
Case 1:11-cv-22408-WCC Document 227 Entered on FLSD Docket 01/25/2016 Page 7 of 11
759

Fallon's determination that liability has been established as to all defendants—including BNBM. *See* Remediation Damages Formula Motion at 20; Discovery Rights Motions at 6; Beijing New Building Materials PLC's Motion to Enforce Trial Rights and Memorandum in Support at 1, ECF No. 67. To bridge the chasm between the parties' contentions, the Court ordered supplemental briefing and held a hearing on which level of deference the Court should afford Judge Fallon's rulings. *See* Endorsed Order Setting Hearing, ECF No. 91. After considering the arguments raised in the motions and at the hearing, the record, and the relevant legal authorities, the Court **ADOPTS all** of Judge Fallon's findings of facts and legal conclusions.

A survey of the legal landscape reveals three approaches to the preclusive effect of MDL orders. Under the first approach, courts employ a bright line rule preventing transferor courts from overruling transferee courts. *See, e.g.*, *In re Food Lion, Inc. Fair Labor Standards Act Effective Scheduling Litig.*, 73 F.3d 528, 531 (4th Cir.1996); *see also Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 n.5 (7th Cir.1996) (noting "it would vitiate most of the purposes of consolidating litigation if, after remand, parties could simply re-visit the transferee court's pre-trial rulings"). Alternatively, some courts reject the bright line rule in favor of a "substantial deference" approach. *See, e.g.*, *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009) (listing different levels of deference to reviewing decision of a transferee court); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 460 F.3d 1217, 1228 (9th Cir. 2006). Others still follow the law-of-the-case rule where "a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently." *United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997).

The Eleventh Circuit has not explicitly endorsed any of these approaches. However, the Court need not adopt a level of deference to dispose of Defendants' motions. All three approaches agree that absent an intervening change in law or fact, a transferor court should not overrule a transferee court's rulings. Here, Defendants have not shown "a significant change of circumstances." Manual for Complex Litigation, Fourth, § 20.133. Rather, Defendants seemingly seek to revisit the MDL's decisions because they disagree with Judge Fallon's conclusions. They cannot, for to do so would "frustrate the purposes of centralized pretrial proceedings." *In re Ford Motor Co.*, 591 F.3d at 411. The Court will not allow the

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/06/19 Page 82 of 668
Case 1:11-cv-22408-MGC Document 227-12 Entered on FLSD Docket 11/25/2019 Page 83 of 101
759

parties to pervert the MDL process. Instead, by giving preclusive effect to Judge Fallon's finding of fact and conclusions of law, the Court effectuates the purpose of a multidistrict litigation: to ensure the "just and efficient conduct" of this action. 28 U.S.C. § 1407(a).

Accordingly, the Court hereby **ORDERS and ADJUDGES** as follows:

- The Court finds Judge Fallon's decisions well-reasoned and well-supported by the evidentiary record. The Court **ADOPTS** **all** of Judge Fallon's factual findings and legal conclusions and will not revisit any of his rulings absent a compelling showing of an intervening change in law or fact. This includes, but is not limited to, the following:

  o Taishan, TTP, BNBM Group, CNBM Group, and CNBM have been held in default. *See* Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) at ¶¶ 13-15, Rec. Doc. 18028.

  o Under Florida law, Defendants constitute a single business enterprise for purposes of piercing the corporate veil and holding each of the defendants—including BNBM—liable for the conduct of their affiliated entities. *Id.* at ¶¶ 50-51.

  o Class certification was appropriate under Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3). *Id.* at ¶ 79.

  o Liability has been conclusively established as to all defendants and the only remaining issue is the amount of the award. Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages Hearing at ¶ 20, Rec. Doc. 20741.

  o The remediation formula represents a reasonable and reliable measure of the remediation damages which the Court will apply to determine the appropriate amount of property damages. *Id.* at ¶ 92.

- The Court **ADOPTS** the Trial Plan included as Exhibit A to this Order.

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/06/19 Page 83 of 668
Case 1:11-cv-22408-MGC Document 227 Entered on FLSD Docket 11/16/2018 Page 4 of 11
759

- To the extent that they are inconsistent with this Order and Trial Plan, the Court **DENIES** *as moot*:

  - Plaintiffs' Motion and Memorandum of Law to Adopt Plan for Resolution of Florida *Amorin* Plaintiffs' Claims for Remediation and Other Damages (ECF No. 52);

  - Defendants' Motion to Adopt Defendants' Trial Plan (ECF No. 53);

  - Defendants' Motion to Reject Application of Remediation Damages Formula (ECF No. 61);

  - Beijing New Building Materials PLC's Motion to Enforce Trial Rights and Memorandum in Support (ECF No. 66); and

  - Defendants' Motion and Memorandum to Enforce Discovery Rights (ECF No. 67);

**DONE and ORDERED** in Chambers, at Miami, Florida, this 16th day of November 2018.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Counsel of Record*
*Tiffani G. Lee, Special Master*

4

# Attachment A

## TRIAL PLAN FOR PROPERTY DAMAGE CLAIMS

1.  By **December 14, 2018**, Plaintiff will provide list of property damage claimants split into three categories: 1) claimants with completed forms who have not remediated damages; 2) claimants with completed forms who have remediated damages; 3) claimants without completed forms.[1]

2.  For the Claimants without completed forms,

    a.  By **January 14, 2019**, Plaintiffs must amend and complete forms or provide a compelling reason why their time to complete the forms should be extended.

    b.  If they fail to do so, these claimants will be **DISMISSED** *with prejudice*.

3.  For the Claimants with completed forms, Defendants may challenge only the following aspects of the damages calculation:

    a.  Product ID[2]

        i.   By **December 31, 2018**, Defendants will admit or deny in writing whether they manufactured the Product ID categories.

        ii.  By **January 14, 2019**, Plaintiffs will respond to Defendants denials in writing.

        iii. If the Special Master determines there's a genuine dispute, Parties may engage in limited discovery.

        iv.  By **February 15, 2019**, all Product ID Discovery must be completed.

        v.   By **March 1, 2019**, Parties will submit simultaneous briefs on their Product ID contentions.

        vi.  By **April 1, 2019**, the Special Master will issue a Report and Recommendation as to whether the Product ID categories should be attributed to Defendants despite their denial.

---

[1] The Court notes that plaintiffs who have completely remediated may only recover the actual cost of remediation. Conversely, Plaintiffs who have not completely remediated may recover the amount provided by the remediation formula.

[2] The Product ID categories are: 1) BNBM/Dragon board; 2) C & K; 3) Chinese Manufacturer #2 (purple stamp); 4) Crescent City Gypsum; 5) DUN; 6) IMT Gypsum; 7) ProWall; 8) Taian Taishan or Taihe Tape; 9) Made in China Meet or Exceeds; 10) various Drywall dimensions, including 4feetx12feetx1/2 inch and 4feet*12feet*1/2inch; 11) Venture Supply; 11) White Edge Tape, boards with no markings or boards with no markings other than numbers; 12) others.

b. Ownership Verification

    i. By **January 18, 2019**, Defendants will serve on Plaintiffs the discovery they seek regarding whether the Claimant owns or owned the affected property and whether an assignment of Claimant assigned their claim for remediation damages ("Ownership Verification discovery").

    ii. By **February 1, 2019**, Plaintiffs will respond to Defendants Ownership Verification discovery requests.

    iii. If the Parties disagree as to the necessity of any Ownership Verification discovery, the Special Master will resolve those disputes.

    iv. By **March 15, 2019**, all Ownership Verification Discovery must be completed.

    v. By **April 15, 2019**, the Special Master will issue a Report and Recommendation as to Ownership Verification.

c. Square Footage

    i. By **February 1, 2019**, Defendants will serve on Plaintiffs the discovery they seek regarding whether the under air square footage of the property in question is accurate ("Square Footage discovery").

    ii. By **February 15, 2019**, Plaintiffs will respond to Defendants Square Footage discovery requests.

    iii. If the Parties disagree as to the necessity of any Square Footage discovery, the Special Master will resolve those disputes.

    iv. By **April 1, 2019**, all Square Footage Discovery must be completed.

    v. By **May 1, 2019**, the Special Master will issue a Report and Recommendation as to Square Footage.

d. Contests and Requests for Set-offs

    i. By **February 11, 2019**, Defendants will submit in writing all contests and requests for set-offs.

    ii. By **February 25, 2019**, Plaintiffs will respond to Defendants contests and requests for set-offs.

    iii. By **April 1, 2019**, all Contests and Requests for Set-Offs Discovery must be completed.

    iv.  By __May 3, 2019__, the Special Master will issue a Report and Recommendation as to contests and requests for Set-offs.

4.  By __May 31, 2019__, the Special Master use the Remediation Formula to issue a Report and Recommendation as to the total award for Property Damage Claims.

## TRIAL PLAN FOR OTHER DAMAGES[3] AND PERSONAL INJURY CLAIMS

**November 7, 2018**:   Plaintiffs will select the first 20 Florida claims to be tried (the "Priority Claimants").

**December 14, 2018**: Parties shall furnish opposing counsel with a written list containing the names and addresses of all fact witnesses intended to be called at the Priority Claimant trial and only those witnesses listed shall be permitted to testify unless good cause is shown and there is no prejudice to opposing party.  The parties are under a continuing obligation to supplement discovery responses within <u>ten days</u> of receipt or other notice of new or revised information.

**January 14, 2019**:   All <u>fact</u> discovery must be completed for the Priority Claimants.

**February 15, 2019**:  All Priority Claimant-specific dispositive <u>*and*</u> other pretrial motions not explicitly excluded by S.D. Fla. L.R. 7.1.A.1 and accompanying memoranda of law, must be filed.

**February 15, 2019**:  Plaintiff must furnish expert witness list to the Defendant, along with the summaries/reports required by Fed. R. Civ. P. 26(a)(2), and only those expert witnesses shall be permitted to testify at the Priority Claimant Trial. Within the fourteen-day period thereafter, Plaintiff shall make its experts available for deposition by the Defendant.

**March 1, 2019**:     Defendant must furnish expert witness list to the Plaintiff along with the summaries/reports required by Fed. R. Civ. P. 26(a)(2), and only those expert witnesses shall be permitted to testify at the Priority Claimant Trial. Within the fourteen-day period thereafter, Defendant shall make its experts available for deposition by the Plaintiff.

**April 1, 2019**:     All <u>expert</u> discovery must be completed for the Priority Claimants.

**April 15, 2019**:     All *Daubert* and *Markman* motions and accompanying memoranda of law must be filed.

**May 31, 2019**:     For the Priority Claimant trial:

(a) A Joint Pretrial Stipulation must be filed.  The stipulation shall conform to Local Rule 16.1(c) and include a joint, neutral summary of the claims and defenses in the case, <u>not to exceed one short paragraph per litigant claim</u>, to be read as an introduction for *voir dire* examination. The pretrial stipulation shall also include Plaintiff's non-binding breakdown of damages with corresponding amounts and other relief sought. The parties shall meet at least one month prior to the deadline for filing the pretrial

---

[3] Other Damages includes, but is not limited to, claims for alternate living expenses, loss of use and enjoyment, lost rent, bankruptcy, foreclosure, and short sale.

Case 1:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 89 of 668
Case 1:11-cv-22408-MGC Document 202 Entered on FLSD Docket 07/23/2013 Page 15 of 101
759

stipulation to confer on preparation of that stipulation. The Court will not accept unilateral pretrial stipulations, and will strike *sua sponte* any such submissions. A copy of the joint pretrial stipulation shall be delivered to chambers in Microsoft Word format at the time of filing via email to cooke@flsd.uscourts.gov;

       (b) A Joint Summary of the Parties' Motion(s) *in Limine* must be **separately filed**. The joint summary shall contain a cover page providing the style of the case and an index of the motion(s) *in limine*. For each evidentiary issue, the joint summary must include: a one page argument identifying the evidence sought to be excluded or included at trial and citing legal authority supporting exclusion or inclusion; and a one page response to the argument citing legal authority in support of admission or exclusion of the disputed evidence. The parties shall work together to prepare the joint summary, and are encouraged to resolve evidentiary issues through stipulation. Motions *in limine* will not be accepted in any other form.

       **July 12, 2019**:    (a) Final proposed jury instructions and verdict form must filed.[4] The parties shall submit a SINGLE, JOINT set of proposed jury instructions and verdict form, though the parties need not agree on the proposed language of each or any instruction or question on the verdict form. Where the parties do agree on a proposed instruction or question, that instruction or question shall be set forth in Times New Roman 14 point typeface. Instructions and questions proposed only by the plaintiff(s) to which the defendant(s) object shall be italicized. Instructions and questions proposed only the defendant(s) to which the plaintiff(s) object shall be bold-faced. Each jury instruction shall be typed on a separate sheet and must be supported by citations of authority. Each disputed jury instruction shall also state the basis for the objection(s) at the bottom of the sheet, before the citations of authority. In preparing their requested jury instructions, the parties shall utilize as a guide the Pattern Jury Instructions for Civil Cases approved by the United States Eleventh Circuit, including the Directions to Counsel contained therein. A copy of the proposed jury instructions and verdict form shall be delivered to chambers in Microsoft Word format at the time of filing via email to cooke@flsd.uscourts.gov;

       (b) A trial witness list indicating each witness who will testify at trial, a one-sentence synopsis of the testimony, and in consultation with opposing counsel, indicate the amount of time needed for direct and cross examination;

       (c) A list of witnesses with some identifying information (address or place of employment) to provide to jury; and

       (d) Proposed *Voir Dire* questions specific to the case (general *voir dire* questions should not be included).

       (e) Any proposed deposition designations, cross-designations, and objections therein. Parties must submit their designations in one table, with columns

---

4 If this action is to be set for a bench trial the Parties are directed to submit proposed findings of fact and conclusions of law in lieu of proposed jury instructions.

Case 1:09-md-02047-EEF-MBN Document 23392-10 Filed 12/06/18 Page 90 of 668
Case 1:16-cv-22408-MGC Document 202-2 Entered on FLSD Docket 01/16/2019 Page 10 of
759

listing the witnesses' names, the deposition dates, the proposed designations by page and line, and any objections using the codes listed in Local Rule 16.1(e)(9).

**July 17, 2019**:        Calendar Call shall be held at 3:00 p.m. before the Undersigned United States District Judge at the Federal Courthouse, Courtroom 11-2, 400 North Miami Avenue, Miami, Florida.

**July 22, 2019**:        Trial is set for the Court's two-week trial period.

# Tab #2

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 92 of 668
Case 2:09-md-02047-EEF-JCW Document 20741 Filed 03/29/18 Page 9 of 18 of
759

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED | MDL NO. 2047 |
| DRYWALL PRODUCTS LIABILITY | SECTION: L |
| LITIGATION | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: ALL CASES | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW
## RELATED TO THE JUNE 9, 2015 DAMAGES HEARING

### I.      PROCEDURAL HISTORY

The following procedural history has been recited in several of the Court's previous opinions, but in order to place the current issues in context it is restated here. From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 93 of 668
Case 1:11-cv-22408-MGC Document 27-4 Entered on FLSD Docket 09/18/2012 Page 2 of 19 of
759

homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall.  Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation.  Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities.  The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below:

### A. Knauf Entities

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States.  The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.  The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009.  *See* (R. Doc. 18).  On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service.  *See* (R. Doc. 401).  On March 15-19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall.  *See* (R. Doc. 2713).  For purposes of the trial, KPT stipulated that its Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor."  *Id*.  The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law ("*Hernandez* FOFCOL"), *see id.*, and entered a Judgment in the amount of

2

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 94 of 668
Case 2:09-md-02047-EEF-JCW Document 20741 Filed 03/24/17 Page 19 of 20 of
759

$164,049.64, including remediation damages in the amount of $136,940.46, which represented a

cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc.

3012).

Thereafter, on October 14, 2010, the Knauf Entities entered into a pilot remediation

program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely

based upon the remediation protocol formulated by the Court in *Hernandez*. The Knauf pilot

remediation program is ongoing and has, at present, remediated over 2,200 homes containing

KPT Chinese drywall using the same protocol. At the Court's urging, the parties began working

together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class

Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-

related, Chinese drywall claims. *See* (R. Doc. 12061-5). In addition to the Knauf Settlement

Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered

into class settlement agreements, the effect of which settles almost all of the Knauf Entities'

chain-of-commerce litigation. These additional class action settlement agreements involve the

following defendants and in most cases, their insurers: Interior Exterior Building Supply, LP

("Interior Exterior"); the Banner Entities; L&W Supply Corp. and USG Corp.; and a group of

numerous homebuilders, installers, suppliers. *See* (R. Docs. 10033-3, 12258-3, 13375-2, 14404-

2). The Court first granted preliminary approval to all of the foregoing settlement agreements,

and after the fairness hearing, certified and granted approval for the class settlements. Although

the Court occasionally must deal with common benefit fees, settlement administration and

enforcement issues, the Knauf portion of this litigation is largely resolved.

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 95 of 668
Case 1:16-cv-24408-MGC Document 27-10 Entered 20 FLSD Docket 12/19/18 Page 5 of 21 of
759

### B.    Chinese Defendants

In contrast to the straightforwardness with which the MDL litigation proceeded against the Knauf Defendants, the litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities").  Other Chinese-based Defendants include the CNBM Defendants ("CNBM"), comprised of the China National Building Materials Group Corporation, China National Building Materials Company Limited, China National Building Materials & Equipment Import & Export Corporation, and CNBM Forest Products (Canada) Ltd; and the BNBM Defendants ("BNMB"), comprised of Beijing New Building Materials Public Limited Company, and Beijing New Building Material (Group) Co. Ltd. As discussed below, the course of the litigation involving the Taishan Entities and other Chinese-based defendants has not followed the same trajectory or enjoyed the same measure of resolution as that involving the Knauf Entities.

As an alleged manufacturer of Chinese drywall which has been installed in plaintiffs' properties, Taishan is a named defendant in numerous cases in both the MDL litigation and litigation filed in state courts.  The Court's initial inquiry regarding Taishan involved four cases in the MDL in which Taishan was served, entered an appearance, and in two of these cases, subjected to default judgment proceedings.  These four cases are: *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; *Gross v. Knauf Gips KG*, Case No. 09-6690; and *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361.  The Court will briefly discuss each of these cases as they pertain to Taishan before detailing the overall course of the MDL litigation involving the claims against Taishan.

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 96 of 668
Case 2:09-cv-08024-EEF-MBN Document 20741 Filed 04/20/18 Page 9 of Page 22 of
759

*Germano* has served as the main vehicle for the MDL litigation involving Taishan, particularly TG. *Germano* was filed originally in the U.S. District Court for the Eastern District of Virginia as a putative class action against TG by the owners of homes located in Virginia which allegedly contain TG-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2) (Case No. 09-6678). On August 3, 2009, TG was validly served. *See* (R. Doc. 1-7) (Case No. 09-6687). Thereafter, on October 13, 2009, *Germano* was transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009. (R. Doc. 1) (Case No. 09-6678). Subsequent to transfer, Plaintiffs filed a Second Amended Complaint ("SAC"), which was granted, expanding the class to a nationwide class. *See* (R. Doc. 470) (Case No. 09-md-2047). The Court then permitted the intervention of 14 individual plaintiffs (the "Intervening-Plaintiffs"). (R. Doc. 641).

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida who used drywall manufactured by TG for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall and/or other property damaged by the drywall, and/or incurred liability for property damages. *See* (R. Doc. 1-1) (Case No. 09-4115). On May 8, 2009, service was executed on TG. *See* (R. Doc. 52) (Case No. 09-md-2047). Shortly thereafter, *Mitchell* was transferred to the Eastern District of Louisiana and consolidated with the MDL litigation. *See* (R. Doc. 1) (Case No. 09-4115).

*Gross* and *Wiltz* were both filed in the Eastern District of Louisiana and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall. *See* (R. Doc. 1) (Case No. 09-6690); (R. Docs. 1, 1-1)

Case 2:09-md-02047-EEF-MBN Document 23302-10 Filed 12/26/19 Page 97 of 668
Case 1:18-cv-24049-WBDZ4-ECF Rnw 2740 wmber 07 al FDE 01049/19/1Bage 9 of 23 of
759

(Case No. 10-361). Taishan was served or entered an appearance in both cases. *See* (R. Docs. 2140, 2141, 2553); (R. Docs. 7408, 7409). *Gross* involves claims against "indeterminate defendants" who have allegedly concealed their identity and are allegedly responsible for the Chinese drywall in plaintiff class members' properties. *See* (R. Doc. 1) (Case No. 09-6690). *Wiltz*, on the other hand, is a more typical class action filed on behalf of property owners against Taishan as a result of the damage caused by the presence of Taishan's drywall in their properties. *See* (R. Docs. 1, 1-1) (Case No. 10-361).

The first issues in the MDL litigation involving Taishan arose when TG failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that TG had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1-7) (Case No. 09-6687). After affording TG more than a reasonable amount of time to answer or enter an appearance, the Court entered a preliminary default against TG in both cases (R. Docs. 277, 487) and moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Intervening-Plaintiffs' claimed damages. *See* (R. Doc. 502, 1223, 1258, 2380). At this hearing, the Intervening-Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380, hereinafter "*Germano* FOFCOL"). The *Germano* FOFCOL noted that the average cost per square foot to repair the *Germano* properties was $86 and that the average cost was based on "the average of independent quotes from two local reputable Virginia contractors." *Id*. at 57. Further, the *Germano* FOFCOL found that the "homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes." *Id*. at 62. On May 11, 2010, the Court issued a Final Default Judgment against TG in *Germano*, in favor of the Intervening-Plaintiffs, in

Case 2:09-md-02047-EEF-MBN   Document 22302-10   Filed 12/06/19   Page 98 of 668
Case 1:8a:2v:209-md-02047-EEF-MBN   Document 20241-1   Filed 03/26/18   Page 98 of 24 of
759

the amount of $2,609,129.99.  (R. Doc. 3031).  On the last day to timely do so, June 10, 2010,

TG filed a Notice of Appeal of the Default Judgment in *Germano*.  (R. Doc. 3670).  On this same

day, TG also entered its appearance in *Germano* and *Mitchell*.  *See* (R. Doc. 3668).

 After TG entered its appearance in the MDL, it quickly sought to have the Final Default

Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal

jurisdiction, as well as on procedural grounds.  *See* (R. Docs. 5436, 5583).  However, because of

the pending appeal, this Court was without jurisdiction to address any motions filed by TG.  *See*

(R. Doc. 5504).  Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its

appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the

preliminary default and default judgments.  *See* (R. Doc. 5649).  In response, this Court issued an

order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions.  *See*

(R. Doc. 6101).  In the fall of 2010, the Court directed the parties to commence the personal

jurisdiction discovery necessary to resolve TG's motions to vacate.  Sometime after the initial

discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to

other cases in which Taishan been served, including *Gross* and *Wiltz*.

 Formal personal jurisdiction discovery of Taishan began in October 2010, *see, e.g.*, (R.

Docs. 5839, 5840), and continued over the year-and-a-half leading up to the filing of Taishan's

motions.  Discovery has included the production of both written and electronic documents, as

well as depositions of Taishan's corporate representatives, with each type of discovery

proceeding in a parallel fashion.  This discovery has often been contentious, requiring close

supervision by the Court.  The Court has presided over regularly-scheduled status conferences to

keep the parties on track, and conducted hearings and issued rulings to resolve numerous

discovery-related disputes.  *See, e.g.*, (R. Docs. 7136, 7511).

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 12/06/19 Page 99 of 668
Case 1:11-cv-22408-MGC Document 207-4 Filed 04/20/18 Page 9 of Page 25 of
759

In April 2012, TG and TTP re-filed various motions: a motion to dismiss for lack of

personal jurisdiction, a motion to vacate the entry of default and to dismiss the action in *Mitchell*,

a motion to dismiss the complaint in *Gross*, and a motion to dismiss the complaint in *Wiltz*.

Responses in opposition were filed by the PSC, Interior Exterior, the Banner Entities, and

Certain Florida Homebuilders, (R. Docs. 14202, 14204, 14209, 14216, 14356, 14372, 14390,

14392, 14391-4), with other parties joining in these motions, including the State of Louisiana

(collectively the "Respondents"). Prior to the hearing, evidentiary objections were raised by

Taishan, which the Respondents addressed. On June 29, 2012, over three years since the creation

of MDL 2047, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the

Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with

Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion

involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page order regarding Taishan's motions in

*Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to vacate, denied

the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re:*

*Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La.

2012). The Court also ruled that TTP was operating as the alter ego of TG. The Court certified an

interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of

2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this

Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured*

*Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-*

*Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for

writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

This Court set a judgment debtor examination for July 17, 2014 and ordered Taishan to appear. Instead of appearing, however, Taishan fired its Hogan Lovells attorneys and indicated that it was again "withdrawing" from the litigation. The Court held Taishan in contempt of court. (R. Doc. 17869). Pursuant to this contempt order, Taishan was ordered to pay $15,000 in attorneys' fees to Plaintiffs' counsel and $40,000 as a penalty for contempt. The contempt order also enjoined Taishan and its affiliates and subsidiaries from conducting business in the United States until or unless it participated in the judicial process. In addition, the contempt order provided that if Taishan or its affiliates or alter egos did business in violation of the contempt order, they would forfeit 25% of the earnings. The Court did not immediately permit Taishan's terminated attorneys to withdraw from the litigation, in order to ensure that Taishan was on notice of the progress of the proceedings, Taishan's contempt and "withdrawal" notwithstanding.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to [Taishan] drywall. *See* (R. Doc. 18028 at 34-35, hereinafter "Class Certification FOFCOL"). The Court so ruled following a motion from the PSC. (R. Doc. 18086). The motion was unopposed by any party.

The Court set a class damages hearing for February 12, 2015. At that hearing, BNBM entered an appearance for the first time in this litigation and asked for a continuance to prepare for a class damages hearing. (R. Doc. 18331). The Court granted the request for a continuance.

Taishan subsequently entered an appearance with its new counsel, Alston & Bird, LLP. (R. Doc. 18352). CNBM also entered an appearance for the first time in this litigation. On March 17, 2015, the Court ordered Taishan to purge itself of contempt and again continued the damages hearing to April 28, 2015. (R. Doc. 18831). Thereafter, the Court granted yet another request for a continuance and set the class damages hearing for June 9, 2015.

The hearing on damages proceeded on June 9, 2015. The PSC presented two witnesses. First, the PSC called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer serves as Settlement Administrator for the Knauf Settlement and Claims Administrator for the Global, Banner, and InEx Settlements (collectively referred to as the "GBI settlements"). The PSC then called George J. Inglis, a Professional Engineer and Senior Project Consultant with Berman & Wright Architecture, Engineering and Planning, as its designated expert to testify about remediation damage estimates. Defendants called David Pogorolich as their first damages rebuttal expert. Pogorolich is a Director at Navigant Consulting and a licensed Certified General Contractor in the State of Florida. Defendants called Dr. M. Laurentis Marais as their second expert. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc. The Court earlier held that Dr. Marais was an expert in statistical science and sampling but was not qualified to testify about building damage or remediation estimation methodology.

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the hearing, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/26/19 Page 103 of 668
Case 2:14-cv-02004-EEF-MBN Document 48-4 Filed 04/26/17 Page 12 of 28
759

finding of fact, the Court adopts it as such. Notwithstanding the foregoing, the Court would like to make clear at the outset that the instant Findings of Fact and Conclusions of Laws relate to the property damages caused by Chinese Drywall. The June 9, 2015, Hearing was held for the sole purpose of hearing testimony regarding the property damages aspect of this MDL litigation. Accordingly, the findings and conclusions herein do not address issues of alter ego, jurisdiction or contempt.

## II.     BACKGROUND – GYPSUM & DRYWALL

Drywall is a widely used construction material that is also known as gypsum board, wallboard, plasterboard, and sheetrock. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). A drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Id.* Gypsum is a hydrated calcium sulfate, composed of two molecules of water ($H_2O$) and one of calcium sulfate ($CaSO4$). *Id.* The gypsum used to make drywall can be created both naturally and synthetically. *Id.* Naturally occurring gypsum is a deposit largely the result of the evaporation of water in ancient inland seas which contains large amounts of dissolved gypsum. P2.0051-001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.*; P2.0240.0014 (ASTM International report). To make drywall from gypsum, first gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of

11

Case 2:09-md-02047-EEF-MBN Document 22383-10 Filed 12/06/19 Page 103 of 668
Case 2:09-cv-06044-EEF-MBN Document 887-41 Filed 04/26/15 Page 12 of 29
759

its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 6); P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 9-10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P2.0240-0026 (ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall. P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimensions, February 1992 at 6). Since the 1950's, drywall has become a primary source material for

buildings in the United States. As mentioned above, due to a shortage of U.S.-manufactured drywall, Chinese-manufactured drywall was brought into the United States.

## III.    GENERAL FINDINGS ON CHINESE DRYWALL

### A.    Chinese Drywall is Defective

**1.** As established by the U.S. Consumer Product Safety Commission ("CPSC"), the Florida Dept. of Health, other scientific entities, and this Court in the *Germano* FOFCOL, the defective nature of this Chinese drywall is undisputed.

**2.** The Chinese drywall in question has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. It releases three main gases: (i) hydrogen sulfide ($H_2S$), (ii) carbonyl sulfide (COS), and (iii) carbon disulfide ($CS_2$). *Germano* FOFCOL at 12. The Plaintiffs' experts detected sulfur gas emissions by conducting laboratory tests on samples of this Chinese drywall. The CPSC, Florida Dept. of Health and other investigatory agencies and firms also reported that Chinese drywall emits sulfur gases. *Id.* at 12-13.

**3.** The sulfur gases released by Chinese drywall are irritating to the human body during exposure. Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things. *Id.* at 13.

**4.** The sulfur gases released by this Chinese drywall cause offending odors in homes, making them hard if not impossible to live in, and are corrosive to metals, particularly copper and silver, which are uniquely vulnerable to corrosion from sulfur gases. *Id.* The sulfur gases emitted from Chinese drywall create an environment classified among the most severe industrial corrosive environments in the Battelle Classification scheme and the standards established by the International Standards Association. *Id.* at 19-20.

13

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/26/19 Page 105 of 668
Case 2:14-cv-02094-EEF-MBN Document 44 Filed 04/30/15 Page 14 of 81
759

5.    Forensic examination by scientific and technical experts, including testing of building

materials in the damaged homes of the *Germano* Plaintiffs, further confirmed the wide-spread

impact of the corrosive environment, which included corrosion of copper wiring, copper pipes

and silver-based components in electronics, including HVAC circuitry and brazing on pipes,

causing premature failure of electrical and mechanical devices.  *Id.* at 14, 23.

### B.    Property Damage Arising From Chinese Drywall Requires Total Remediation

6.    The Court adopts and incorporates herein the *Germano* FOFCOL, which accurately

explains the scope of remediation required for class plaintiffs' properties.  *Germano* FOFCOL at

29-31; *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La.

2010).

7.    After considered analysis of the impracticality and risks of the selective remediation

approach, the Court found in *Germano* and re-affirms herein that remediating a Chinese drywall

property requires complete remediation and cleaning; thus, the Court again rejects any

remediation approach that favors selective remediation such as the one originally proposed by

the Knauf experts in *Germano*. *Id.* The remediation protocol fashioned in *Germano* is evidence

based and has been confirmed via its application in the actual remediation of several thousand

homes.

8.    The scientific and practical constructability evidence presented before this Court, which

relies on long-term observation, sampling and testing of properties with Chinese drywall,

scientific investigation of Chinese drywall and the science of corrosion, practical construction

experience (particularly the experience of the national builders), and electric and building codes,

demonstrates that proper remediation of the danger posed by Chinese drywall must include the

removal of *all* drywall, all electrical wiring, the entire HVAC system, and many other items such

as appliances, carpet, cabinetry, trim work and flooring. *Germano* FOFCOL at 27-55;
*Hernandez* FOFCOL at 20-34; Transcript at pp. 106:8-110:3.

9.   This scope of remediation is necessary even in homes with "mixed" drywall, where
Chinese and non-reactive drywall may be found, because the sulfur gases disburse and circulate
creating a generally corrosive environment and, moreover, there is no reliable or practicable
method for selective identification and removal of Chinese drywall in mixed homes. *Germano*
FOFCOL at 27-40.  Large Florida homebuilders with extensive experience in Chinese drywall
remediation have determined that removal of all drywall in affected homes is efficient and cost-
effective, and that attempted selective identification and removal of CDW is neither efficient nor
cost-effective. *Id.* at 31.

10.  It is both economical and practical to remove all the wiring while the drywall is removed,
rather than removing only some of the wiring at the time of remediation and then risk later
having to tear down the drywall again in the event that additional wiring exposed to the sulfur
gases is harmed or fails.  Additionally, the low-voltage wiring supporting life and safety devices
such as fire alarms and smoke detectors should be removed and replaced because of the low cost
of replacement when compared with the high risk of injury or death if these devices are not
functioning properly. *Id.* at 39.

11.  Copper pipes and HVAC units must be replaced.  It is more cost-effective and less time
consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall
properties as opposed to attempting to "clean" the corrosion off copper components and HVAC
ductwork. *Id.* at 39-46.

12.  The evidence shows that carpeting must be replaced because attempting to remove and
store the carpet during the remediation is not cost-effective.  Similarly, hardwood or vinyl

flooring must be replaced because dust generated during the remediation process will intrude into the cracks and crevices of the flooring. However, tile flooring may be properly protected during the remediation process, and if this can be done, the Court finds that it does not need to be removed and replaced. *Id.* at 49-50.

**13.** Similarly, it is more cost-effective to replace cabinets, countertops, trim, crown molding, baseboards, bathroom fixtures, and insulation than attempt exacting removal, storage and subsequent re-installation. *Id.* at 51-53.

**14.** In order to eliminate the tremendous amount of dust produced from removal of the drywall, and to eliminate the offensive odor of the Chinese drywall, properties need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be used to remove the fine drywall dust and other particles. Additionally, properties should be wet-wiped or power washed to eradicate any remaining particles. *Id.* at 53.

**15.** Following the deconstructing phase of the remediation process, the properties will need to be inspected by an independent and qualified engineering company. This is important for insurance, resale potential, and peace of mind for the present occupants. The independent and qualified engineering company should provide a letter or report indicating that the remediation has been correctly performed. *Id.* at 53-54.

**16.** The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders Beazer Homes and Lennar Homes. National builders Beazer and Lennar have also independently assessed the need for complete remediation through scientific evidence, practical cost considerations, and hands-on experience with the problem. Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, the evidence does not support the

16

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 108 of 668
Case 2:14-cv-02094-EEF-MBN Document 44-11 Filed 04/20/15 Page 19 of 84
759

feasibility of such an option. The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the property owner. *Id.* at 54.

17. Thus, in sum, the appropriate scope of remediation includes: removal and disposal of all damaged and affected building components in the properties, replacement of all drywall, replacement of entire HVAC assembly, replacement of entire electrical system (including receptacles and switches), replacement of all copper and silver plumbing and electrical switches, replacement of all items that are likely to be damaged during demolition (i.e., cabinets, trim and baseboards), replacement of items that are ultimately more efficient to replace than restore, such as carpet and flooring, a complete cleaning of the premises, and confirmation from an independent and qualified engineering company to confirm the quality and completeness of the cleanup and provide the necessary assurances for insurance, resale potential and peace of mind for the affected property owners. As mentioned, the scope of remediation is supported by the testimony of the experts and confirmed by the remediation of over 2,200 homes carried out in the Knauf Settlement Program.

## IV.    LIABILITY FOR EXPOSURE IN CLASS PLAINTIFFS' PROPERTY

18. The *Germano* FOFCOL resolved a multitude of factual and legal issues including the scope of remediation and the right to recover remediation damages. The Class Certification FOFCOL essentially adopted the *Germano* ruling regarding liability and causation. The Court adopts and incorporates herein the *Germano* and Class Certification Tools and emphasizes its prior holding that Taishan and its affiliates are liable to the Class Plaintiffs.

17

Case 2:09-md-02047-EEF-MBN Document 22293-10 Filed 12/26/19 Page 109 of 668
Case 2:14-cv-02094-EEF-MBN Document 227-4 Filed 04/26/15 Page 18 of 85
759

**19.** The Court already has found the Taishan Defendants in default. The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). Additionally, the Taishan affiliates have also been held in default with respect to the proceedings in *Wiltz*, *Gross*, and *Amorin*. On February 1, 2011, BNBM, BNBM Group, CNBM, and CNBM Group were held in default in the *Gross* proceedings. (R. Doc. 7302). These same entities were again held in default in *Gross* on August 7, 2012 (*i.e.*, as to the omnibus interventions complaint that was filed in *Gross*). (R. Doc. 15687). On February 24, 2011, BNBM was held in default in the *Wiltz* proceedings. (R. Doc. 7735). On July 1, 2014, Taishan, TTP, and CNBM were held in default with respect to the *Amorin* case originally filed in this Court (Case No. 2:11-cv-1395) (R. Doc. 17814). Pursuant to this same Order, Taishan and TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11-cv-1672). *Id.* Also on July 1, 2014, Taishan, TTP, BNBM, CNBM, and CNBM Group were held in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11-cv-1673) (R. Doc. 17815). (R. Docs. 7735, 17814, 17815). Moreover, the Court already determined that the Defendants' liability was conceded by their default. Class Certification FOFCOL at 31.

**20.** Given that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default, there is no contributory negligence, and this Court already entered a liability judgment, the only issue currently pending before the Court is the amount of damages which should be awarded to the Plaintiffs in order to accomplish the necessary remediation.

## V.  EVIDENCE AT THE JUNE 9, 2015 DAMAGES HEARING

**21.** As discussed *supra*, in September of 2014, the Court conducted a certification and liability phase of this MDL, finding the Defendants liable and certifying a class of real property

owners asserting claims for remediated damages arising from or related to the Chinese drywall manufactured, sold, distributed, supplied, marketed, inspected, imported, or delivered by the Defendants and their affiliates. On June 9, 2015, this Court held an evidentiary hearing to deal with the second phase of the Chinese drywall litigation: damages. The purpose of the hearing was, simply, to determine how much the Defendants and their affiliates owe the class to remediate their homes due to the damages caused by toxic, corrosive Chinese drywall. The Plaintiffs called two witnesses—Jacob Woody and George Inglis—to present their formulaic class-wide damages approach. In response, the Defendants called two witnesses—David Pogorolich and Dr. M. Laurentis Marais—to demonstrate that the Plaintiffs' formulaic approach fails to provide a reasonable estimate of remediation costs.

**22.** First, Plaintiffs called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer has served, and continues to serve, as a settlement administrator for various settlements that have been entered into in these consolidated proceedings, including the Knauf remediation class settlement and the Global, Banner, and INEX ("GBI") Class Settlements. Tr. at 26:1-17. In connection with the settlements, BrownGreer has amassed a database containing square footage and other information regarding properties that have been the subject of claims in this litigation, including many of the properties that the PSC sought to include in the class. Tr. at 39:12-22.

**23.** BrownGreer utilizes a quality assurance protocol in the work it does as a claims administrator. 18:21-22. The QA protocol includes processes to review both the eligibility of claims as well as the allocation of payment to eligible clams. 19:1-9. In the course of its claims administration activity, BrownGreer allows audits by any party on request, and would have

allowed Taishan to request such an audit had it chosen to be, and remain, an active litigant in the MDL as claims were being submitted and verified. Tr. at 19:10-20.

24. Mr. Woody testified that, at all pertinent times, BrownGreer has endeavored to provide the best available claims information to all parties, has remained mindful of its Court-appointed position in this case, and has taken no interest in which party prevails in the class damages hearing. Tr. at 102:08-17.

25. In October 2014, at the request of the PSC, Mr. Woody oversaw a project to provide information regarding square footage of class properties as well as, to a lesser extent, to provide information regarding product identification. Tr. 39-41; 47-50.

26. BrownGreer used three sources of information to verify the square footage of class members' properties: (1) BrownGreer's prior GBI review process; (2) public sources such as tax appraisals, property ownership records and official government websites; and, if those two sources were unavailable, (3) square foot data from the Court-approved Plaintiff Profile Forms (PTO 11, R. Doc. 168-1). Tr. 44-47. The form specifies that it is to be completed under oath and signed under penalty of perjury, requires identification of the manufacturer of the Chinese drywall found on the property, and requests the amount of square footage for the property. It further allows for claimants to supplement information on an ongoing basis, permitting attachments such as photographs, inspection reports, etc. Tr. at 22:7-23:23. According to Mr. Woody, BrownGreer would not have relied solely on the square footage data from the Plaintiff Profile Forms in connection with the Knauf or GBI settlements. Tr. at 44:25-47:11; 71:24-72:9.

27. With regards to product identification, BrownGreer utilized both a Court-approved photograph catalog (PTO 10, R. Doc. 171) and a Court-approved "Drywall Indicia Guide" (PTO

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 112 of 668
Case 2:14-cv-02094-EEF-MBN Document 44-1 Filed 04/20/15 Page 21 of 88
759

27, R. Doc. 17060) in order to identify the types of drywall and the manufacturers of drywall associated with the properties on the class list.  Tr. at 23:23-25:4; 34:15-19; 47:12-49:19.

**28.** Relying on photographic evidence and inspection reports, Mr. Woody was able to verify that 1,285 properties on the original class list of approximately 3,700 class members had Taishan drywall.  As to the remaining 2,449 properties on the original class list, the only proof that Taishan or Chinese drywall was used in the claimants' properties was the claimants' statements on the Plaintiff Profile Forms.  Tr. 55:23-56:10; 100:14-101:1.  Mr. Woody did not undertake, and has not yet been asked to undertake, a review of attachments to the Plaintiff Profile Forms.  Tr. 49:24-51:16.  If and when BrownGreer determined that a property contained 100% Knauf drywall, not Taishan drywall, those properties were removed from the class list.  Tr. 76-79.

**29.** Mr. Woody acknowledged that information on Plaintiff Profile Forms was not always reliable and, absent verifiable supporting evidence, such as photographs or inspection reports, he did not regard a statement on a profile form as sufficient evidence of product identification.  Tr. 75.

**30.** In any allocation process to follow the Court's aggregation or assessment of class-wide remediation damages, Mr. Woody confirmed that BrownGreer would be able to use its existing systems and protocols to verify Plaintiff Profile Form statements identifying the presence and amount of Taishan drywall for a given property.  Tr. 51:23-52:3.  None of the changes to the list of properties for this first phase of damages proofs—the calculation of class-wide remediation damages—changed the class definition, but rather only refined it, by decreasing the number of properties, the list of properties that is the subject of remediation damages proof during this initial phase.  Tr. 64:11-65:2.

**31.** At Defendants' request following their re-appearance in the litigation, Mr. Woody provided Knauf remediation data which, initially, included both remediation and move-in/move-out payments. Tr. 29:19-30:4. Following a second request from Defendants, Mr. Woody modified the Knauf remediation payment data to include only remediation data and not move-in/move-out payments. The Knauf Settlement remediation payments recorded by BrownGreer and provided to Defendants exclude the following cost items:

> Any delay payments made due to problems with Knauf remediation;
>
> (1) Still-open remediation properties (a total of 655 as of the time the information was provided by BrownGreer);
>
> (2) Insurance premiums for subcontractor or drywall disposal activities;
>
> (3) Both pre- and post-remediation inspection (including Xactimite and bid proposals) costs;
>
> (4) Certified Industrial Hygienist/Environmental charges for inspection and testing (clearance) remediation of a property, which is required in every case if remediation by Knauf;
>
> (5) "Economies of scale" associated with the Knauf use of Moss as a single, general contractor for the remediation settlement; and
>
> (6) Remediation administration/oversight fees and costs for Moss' services as general contractor. Tr. at 59:4-61:23; 62:17-19.

Thus, the average cost of $65.16 per square foot for the Knauf remediation under this calculation method does not reflect remediation-related costs for general contractor oversight, certified industrial hygienist (CIH) charges, inspection costs, or insurance premiums. Tr. at 98:4-11.

**32.** Second, Plaintiffs called George J. Inglis. Mr. Inglis is a Professional Engineer and Senior Project Consultant with Berman and Wright Architecture, Engineering, and Planning ("Berman & Wright"). He has 40 years of experience in project and construction management, building diagnostics, building forensics and remediation of building defect damages. 103:25-104:6.

**33.** After joining Berman & Wright's predecessor (Buric) in 2010, Mr. Inglis performed forensic engineering services to identify construction deficiencies and compliance with building codes, design documents, and manufacturers' specifications. He determined cause and effect relationships that resulted in damage to residential, multifamily, industrial, and commercial buildings, including damages such as water intrusion, mold, structural repairs, roofing repairs and replacement, and costs to remediate homes constructed with reactive Chinese drywall. Additionally, he has identified possible sources of defects that lead to water intrusion and/or mold problems and has worked with buildings in post-Hurricane Katrina and post-Hurricane Wilma settings to determine specific causes of damages and related cost estimations. 103:25-106:16.

**34.** Mr. Inglis' professional engineering engagements also include multi-state building defect cases, including the assessment and remediation of damages caused by synthetic stucco on buildings across several states. 105:17-106:7.

**35.** Mr. Inglis and his firm have widespread general experience estimating cost of repair damages and utilizing RS Means, which is a generally accepted method of calculating building costs. Specifically, they have been assessing construction estimates for remediating Chinese drywall properties since 2009. 106:8-107:5. In fact, they were instrumental in determining the appropriate scope and costs of remediating the Chinese drywall properties in *Germano*. 107:17-110:3. They continued their work on a variety of Chinese drywall properties across several states into 2015, establishing the scope of remediation for these properties and estimating the costs of remediation. 112:6-19; 157:8-18.

**36.** Mr. Inglis determined the remediation damages for each of the properties with verified under air square footage based on the following factors:

23

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 115 of 668
Case 2:09-md-02047-EEF-MBN Document 22347-41 Filed 04/26/19 Page 24 of 31
759

  o  A uniform and well-defined scope of work necessary to eliminate the harm and
     remediate the damage that is caused by Chinese drywall to the interior of each
     property;
  o  An established cost on a per-square-foot basis converted to present value;
  o  A measure of the under air space to remediated;
  o  Consideration of local factors related to building labor and materials

**37.** As this Court earlier determined and Mr. Inglis confirms, there is a well-established and

defined scope of work necessary to fully remediate a Chinese drywall property. *Germano*

FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Tr. at 157:8-158:5; 159:21-160:1. This well-

established evidence-based and field-tested scope of work for remediating a Chinese drywall

property requires that the interior of the home be stripped to the studs (with all wiring, plumbing,

fixtures, cabinets, HVAC systems and insulation removed), cleaned by wet-wipe and HEPA

vacuum, and examined and tested by an independent entity before the property is brought back to

its originally intended condition. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34.

This scope of work was established based on long-term observation of properties with Chinese

drywall (including sampling and testing), scientific investigation of Chinese drywall and the

science of corrosion, practical construction experience (particularly the experience of national

builders, and electric and building codes). *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at

20-34; Tr. at 106:8-110:3. The scope of work is the same regardless of the type of building or

the location of the property. The only difference is the square footage of the contaminated area

of the building.

**38.** Mr. Inglis' determination regarding remediation damages for each property begins with a

benchmark figure of $86 per square foot to remediate a property. This $86 figure was developed

in 2010 using data from the *Germano* properties. In 2010 in the *Germano* litigation, Berman &

Wright established that the cost of remediating the seven *Germano* homes was $86 per square

foot. This figure was based on two competitive bids for the appropriate scope of work i.e., total

24

remediation, with a pricing cross-check developed through R.S. Means, which has been
recognized by this Court to be a standard textbook and reference tool for building construction
estimation.  *Germano* FOFCOL at 57-86; 110:14-23. 111:7-24.  Over the following years of
experience with many Chinese drywall properties in several states, Mr. Inglis and his firm
Berman & Wright have found that $86 per square foot is a reliable measure of the costs on a
square foot basis for a full scope remediation of Chinese drywall properties, when adjusted for
location and time. 111:23-112:3, 113:23-114:19, 116:21-117:3, 163:22-:24, 165:22-166:1,
166:16-117:17.

**39.** Using the widely-recognized R.S. Means, Mr. Inglis adjusted the $86 per square foot cost
to reflect the then-current-day building materials and labor costs.  119:8-11. Thereafter, he
generated a national square foot unit price by adjusting for the local building labor and material
costs for Norfolk, Virginia where all of the *Germano* properties were located.  *Id.*  In making
both of these adjustments, Mr. Inglis used data from R.S. Means to adjust for local material and
labor costs listed by zip code.  *Id.*

**40.** Initially, Mr. Inglis computed his estimations incorrectly because of a local cost factor
error in the online R.S. Means tool he used.  However, Mr. Inglis discovered this error and
corrected it prior to the hearing.  120:14-123:10.

**41.** Defendants raised concerns that Mr. Inglis did not consider whether each property was in
an urban, suburban or rural setting.  However, the Court is satisfied that the use of R.S. Means
data, a standard cost reference used by professionals in the field, keyed to the zip code of each
property sufficiently and reliably accounts for location factors in the individual and aggregate
damages estimate.  159:19-24, 170:20-171:2.

**42.** Finally, Mr. Inglis added 6% of the remediation costs to the national square foot unit price to pay for the pre- and post-remediation inspection, sampling, testing and certification of the homes. 110:21-23.

**43.** The final, national square foot unit price with CIH costs included is $105.91. However, this is reduced by the local building costs factors in nearly every state in which class properties exist. (R. Doc. 19197 at 37).

**44.** This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

**45.** Mr. Inglis' estimate applies to each of the Taishan properties, regardless of whether they have been remediated by the Taishan Property Owners in the past or are yet to be remediated. Each Taishan Property Owner is entitled to a sum that would pay for a proper, full remediation.

**46.** Following the testimony by the Plaintiffs' experts, Defendants called two experts. The Defendants' experts do not have building damage and cost of repair experience comparable to that of Mr. Inglis. First, Defendants called David Pogorolich as their first damages rebuttal expert at the hearing. Mr. Pogorilich is a Director in the Construction Practice at Navigant Consulting. He was qualified and accepted by the Court as an expert in the field of construction cost estimating and project management for construction sites.

**47.** However, Mr. Pogorolich's experience with Chinese drywall is limited to only five homes in Florida for which he assisted an insurance adjustor. He has no experience with establishing or implementing the remediation protocol for Chinese drywall homes, which were already being remediated when he was retained. 207:4-19; 210:11-213:24. While Mr.

26

Pogorolich agrees with the Plaintiffs that the drywall must come out of the home, he supports a remediation approach where each home is inspected and a project specific location estimate is developed for each home. 189:8-20. According to Mr. Pogorolich, "the only way to prepare a reasonable estimate for a particular house is to visit the house, look at the layout, look at the qualitative and quantitative issues, [and] look at the fit and finish." 189:14-18. However, this approach is impractical and ill-advised given the number of homes needing remediation and the more than six-year wait already endured by the homeowners. To deal with tragedy on a case-by-case or home-by-home basis where liability has already been established would result in decades of delay and would vary with the passing of time.

**48.** Additionally, the task of stripping a property to the studs and rebuilding does not present the same variability in costs as does an entirely new construction (*i.e.*, building a new house). 161:125-162:9. With Chinese drywall remediation, the bulk of the costs is in nearly uniform demolition of the drywall and replacement of standard building materials – differences in finish from home to home add little variability to the total damages estimate. *Id.*

**49.** Thus, the hypothetical problem posed by Mr. Pogorolich at the damages hearing when he compared two equally sized properties with very different lay-outs is not a problem; it is a routine aspect of damage estimation. Such variations, to the extent they exist in some outlier homes, present minimal cost variation in the final total remediation damages estimate. Defendants' Exhibit 34; 195:22-196:19. Most of the Taishan properties are typical single family homes—like the *Germano* homes—where variations in trim and standard appliances will ultimately make no significant difference in the cost of repair. 125:3-22. Furthermore, the potential risk of any minimal cost variation is greatly outweighed by the fact that the alternative—individually inspecting each home to determine a project specific estimate—is both

27

inefficient and unjust given the number of Plaintiffs who are still awaiting resolution of their claims where liability has already been established.

50. Second, Defendants called Dr. M. Laurentius Marais as their second damages rebuttal expert at the hearing. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc., specializing in applied mathematical and statistical analysis, including statistical extrapolations based on sampling and calculation of damages.

51. This Court held earlier that Dr. Marais is not qualified to address the Court regarding building damage or remediation estimation methodology, but may only offer, to the extent relevant, testimony about raw statistics. (R. Doc. 19092 at 4) ("There is no basis for him to provide expert testimony regarding methods or scope of remediation or accuracy of square footage cost data.").

52. Dr. Marais is an expert in statistical science and statistical sampling. 231:14-20. Dr. Marias testified that Mr. Inglis' damages methodology is an extrapolation in that it attempts to determine, based on information obtained from a sample of properties, conclusions about the large group of properties that comprise the class. 234:4-23. According to Dr. Marais, Mr. Inglis' methodology does not comport with well-established principles for obtaining statistically and scientifically valid extrapolations from samples, and, therefore, cannot be relied upon to estimate class-wide damages or damages for individual class members. 233:4-238:1.

53. The Plaintiffs' expert, Mr. Inglis, however, testified that he did not rely on statistical sampling in reaching his opinions. 156:14-25. While he did calculate averages in forming his opinion, his opinion was grounded in his extensive professional experience evaluating the cost of repair for Chinese drywall buildings and extensive historical scope of work and cost of repair

28

Case 2:09-md-02047-EEF-MBN Document 22089-10 Filed 12/06/19 Page 120 of 668
Case 2:09-md-02047-EEF-JCW Document 22347-1 Filed 04/26/05 Page 29 of 46
759

data. 116-116; 156-157. Like any engineer, he made use of basic statistics but his estimates relied on professional experience, not statistical science. 156:17-158:11.

**54.** The statistical opinion of Dr. Marais does not alter this Court's conclusion regarding the adequacy of Plaintiffs' formulaic damages calculation. In forming his opinion, Dr. Marais neither relied on (nor was he qualified as an expert to opine on) the Court's Finding of Facts and Conclusions of Law in *Germano* and *Hernandez* regarding the scope of work or costs or repair to remediate Chinese drywall homes. 278:17-25; 280:6-10. Dr. Marais offered no statistical sampling alternative utilizing historical data of remediation activities.

**55.** Given the unique circumstances surrounding Chinese drywall and the absence of efficient and appropriate alternatives, a formulaic method used to calculate remediation damages is fair and reasonable. Mr. Inglis' estimation of remediation costs—rather than a series of individual inspections and individual mini-trial estimates—spares the Taishan Property Owners from the costs and further delay of individual inspections, which may cost thousands of dollars per person, take several months or years to complete and, most likely, will not lead to a more precise estimate than the ones provided by Mr. Inglis.[1]

**56.** That said, there will have to be a claims process, similar to that utilized in the Knauf settlement, to ensure that properties contained Taishan-manufactured Chinese drywall and to verify the under-air square footage. BrownGreer will be tasked with establishing and implementing this process. Such a process will ensure that damages are accurately allocated to each individual class member.

---

[1] Estimations, even when they are competitive bids performed by a builder personally inspecting the property, are still merely estimations. As the American Association of Profession Estimators notes in a leading treatise, variations even among several competitive bids can reach up to 30% with an average of a 17% difference. "If general contractors, bidding with the same documents, can't get closer than a 15-20% spread, it is unrealistic to guarantee an estimate to be within a specific, small percentage." Defendants' Exhibit 7 at p. 77.

## VI.     CONCLUSIONS OF LAW

### A.     Nature of the Proceedings Under Rule 55

**57.** This Court has (1) already found the Taishan Defendants in default pursuant to Fed. R. Civ. P. 55(a) and (2) already determined in its *Class Certification* FOFCOL that the Defendants' liability has been conceded by their default. *See Class Certification* FOFCOL at 31. As a result of Defendants' default, the defectiveness and the corrosive effect of Chinese drywall were resolved in favor of Class Members. Even the Defendants' experts agree that the drywall is defective and needs to be removed. Thus, the only issue before the Court is the amount of damages which should be awarded to the Class for property remediation.

**58.** Since Defendants are in default and this Court already entered a liability judgment, Rule 55(b)(2) governs the procedure for determining the amount of damages. Pursuant to Rule 55(b)(2), the Court may conduct hearings to determine the amount of damages. Although the Rule does not mandate such a hearing, this Court determined that a damages hearing was appropriate under the circumstances to determine a damages calculation. *James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993).

**59.** The June 9, 2015, Damages Hearing was the first hearing of what will be multiple hearings that the Court will hold in order to assess the full amount of damages owed to class members. On June 9, 2015, the Court considered only remediation damages for current owners. Other damages, such as alternative living expenses, bodily injury, foreclosure, and/or lost rent, may be considered at other proceedings in this Court or other Courts where appropriate. The Court divided the hearings into phases because it is the most fair and efficient way to assess damages in this complex litigation. As discussed further below, remediation damages in this unique Chinese Drywall MDL can be calculated on an aggregated formulaic basis and, thus, it is in the best interest of all parties to consider remediation damages together in the first stage of the

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/26/19 Page 122 of 668
Case 2:09-md-02047-EEF-MBN Document 22380 Filed 04/26/19 Page 122 of 668
759

damages proceedings. This approach will also allow the prompt remediation of homes so they can be re-inhabited comfortably and safely.

**60.** It is well-established in this Circuit that this Court may divide hearings regarding damages into phases, particularly in complex cases where, as here, such a division would serve judicial efficiency by separating common issues from individual ones. *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir.) *cert. denied sub nom. BP Expl. & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754, 190 L. Ed. 2d 641 (2014) ("[P]redominance may be ensured in a mass accident case when a district court performs a sufficiently 'rigorous analysis' of the means by which common and individual issues will be divided and tried. In many circuits, this has been accomplished by means of multi-phase trials under Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination."); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir. 1992) *on reh'g*, 53 F.3d 663 (5th Cir. 1994) (affirming and "express[ing] [its] admiration" for the district court's trial plan, which included three damages phases and allowed the district court to adjudicate common class issues in the first phase and alter adjudicate individualized issues in later phases, despite due process challenge).

**61.** Further, this Court finds that the Class Notice and Supplemental Class Notice issued on September 26, 2014, and December 30, 2014, (*see* R. Doc. 18231-1 at 4) were sufficient under Rules 23(c)(2) and 23(d)(2) to inform class members about the nature of the litigation, the class claims, and their legal rights. *See* (R. Doc. 18998). Although Plaintiffs made certain changes to their damages model leading up to the June 9, 2015, hearing, these changes did not alter the sufficiency of the class notices. *Id.* at 4-5. The Class definition has remained the same and there

is no precedent to suggest that changes to a damages model require supplemental class notice.
*Id.* at 5.

**62.** While the default judgment conclusively establishes liability, it is not conclusive of the class damages for remediation costs which Plaintiffs seek. Liability and damages require separate and equally "rigorous analysis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). The June 9, 2015, damages hearing provided the opportunity for the Court to engage in such rigorous analysis and determine that, given the uniqueness of the instant action, the Plaintiffs have presented a reasonable and reliable method of calculating remediation damages on a class-wide basis and have accommodated individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

### B. Chinese Drywall – A Unique Class Action

**63**. Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 396 (7th Cir. 2014) (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("Under Rule 23, district courts are permitted to 'devise imaginative solutions to problems created by the presence in a class action litigation of individual damage issues.'"). In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence.

**64**. With regards to the Taishan drywall in this case, in contrast to these typical class actions, there is no issue of either liability or causation. The fact that each Taishan property owner suffered the same harm to their property and the same type of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong.

32

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/26/19 Page 124 of 668
Case 2:14-cv-02049-EEF-MBN Document 227-11 Filed 04/26/15 Page 33 of 80
759

Here, Taishan has been held liable for defective Chinese drywall, and any properties containing Chinese drywall are defective, requiring the removal of the Chinese drywall.  As mentioned above, even the Defendants agree that the drywall is defective and must be removed and the property remediated.  Thus, the only variation is the *extent* of the damages suffered based on the square footage of the involved property.  *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("'Even wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.'") (quoting *Bell Atlantic Corp. v. AT&T Corp*., 339 F.3d 294, 306 (5th Cir. 2003)).  This variation can be uniformly recognized by a square footage analysis established using a representative statistical sample.  Indeed, recently, the Supreme Court held that, under certain circumstances, statistical evidence may be used to make class-wide determinations depending on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action.  *Tyson Foods, Inc. v. Bouaphekeo*, 136 S. Ct. 1036, 1046 (2016) (citing *Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011). A comparison of this class action to other more typical types of class actions is useful to demonstrate why a formulaic statistical method for calculating damages is appropriate in this case, even though it may not be appropriate under other circumstances.

### 1.    Asbestos

**65**.  Asbestos class actions generally involve vast disparities among not only the degree of injury, but also the type of injury.  In contrast to asbestos, the level of exposure to Chinese drywall in this case is immaterial because the class is not asserting personal injury claims, but rather property damage claims.  No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it, which inevitably involves time and expense.  As a result, Chinese drywall damages cannot be easily analogized to asbestos

33

Case 2:09-md-02047-EEF-MBN Document 22383-10 Filed 12/06/19 Page 125 of 668
Case 2:09-md-02047-EEF-MBN Document 22347-41 Filed 11/26/19 Page 34 of 81
759

damages.

66. In asbestos cases, plaintiffs share the common fact that they have all been exposed to asbestos at some point; however, the resultant health effects often vary dramatically and warrant individual adjudication to determine damages. Asbestos exposure does not guarantee illness, and even if sickness does occur, the degree of injury among plaintiffs varies according to the diversity of class members' characteristics, including their preexisting physical conditions, their health habits, the type and duration of the exposure, the severity and nature of the resulting diseases, the type of treatments received, etc. The variations among plaintiffs' injuries resulting from asbestos also preclude calculation of damages by formula because some individuals become more seriously ill than others. Additionally, the stakes for the defendants are relatively high in asbestos cases, rendering individual adjudication more appropriate than class action.[2]

67. In *Amchem Products, Inc. v. Windsor*, the Supreme Court considered certification of a class for settlement that included some individuals who had been exposed to asbestos and had become ill, and others that had been exposed but had yet to manifest any injuries. 521 U.S. 591 (1997). The Court held that the class failed to satisfy Rule 23's predominance and adequacy-of-

---

[2] Plaintiffs seeking compensation for property damage do not stand to recover nearly as much as plaintiffs would in actions for wrongful death, and accordingly have less incentive to litigate individually. *See Bevrotte v. Caesars Entm't Corp.*, No. 11-543, 2011 WL 4634174 at *5 (E.D. La. Oct. 4, 2011). Defendant BNBM's reliance on *McLaughlin v. Am. Tobacco Co.* for the proposition that a court should not estimate gross damages for the class and then adjust the total amount later on when processing individual claims is misplaced: whereas the plaintiffs bringing civil fraud claims against tobacco companies in *McLaughlin* proposed "an aggregate determination [that was] likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants," in this case, Plaintiffs' class damages proposal does not appear to compensate potential claimants who had not actually been affected by the presence of Chinese drywall. 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). The Second Circuit in *McLaughlin* was concerned that claimants who had perhaps never relied upon the defendants' misrepresentations about cigarettes or whose reliance was not the proximate cause of each individual's loss might still be allowed to recover despite not having a viable fraud claim, a circumstance distinguishable from the instant case where no proof of individual reliance on any representation is required. *Id.* at 231. Moreover, the *McLaughlin* plaintiffs had proposed disposing of the residue through a cy pres distribution rather than returning any overpayment to the defendants, which further increased the risk of overpayment in the aggregate. *Id.* at 232. However, the Second Circuit even acknowledged that "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Id.* at 231.

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 126 of 668
Case 2:09-md-02047-EEF-MBN Document 22314-4 Filed 04/26/19 Page 35 of 82
759

representation requirements because the class members' shared experience of asbestos exposure was outweighed by the variety of questions that pertained to the various subclasses and individual members. For example, some of the plaintiffs had been exposed but had experienced no symptoms at all and, even among those experiencing health problems, the degree of health issues were diverse.[3]  *Id.* at 626–28.

68.  Defendants cite to other asbestos cases such as *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) and *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the claim that Fifth Circuit law does not permit the assessment of tort damages derived from extrapolation formulas using averaged results from prior cases.  However, both asbestos-related cases are distinguishable from the present case, which only involves property damage.

69.  In *In re Fibreboard Corp.*, the Fifth Circuit reluctantly vacated a trial plan in mass tort litigation involving the claims of 3,031 plaintiffs asserting asbestos-related injuries. 893 F.2d 706 (5th Cir. 1990).  The phase of the trial plan at issue called for a jury to ascertain damages for the entire class on the basis of a trial of the specific claims of eleven class representatives, together with evidence the parties presented about the claims of thirty illustrative plaintiffs, and the testimony of experts about damages to the entire class. The Fifth Circuit blocked the proposed plan because it failed to require each claimant to prove both causation and damages, as required by Texas law, and because it asked the jury to ascertain damages for a group of

---

[3] The Supreme Court was also concerned that the notice might be insufficient to justify the preclusion of almost every class member from pursuing future litigation:  "Even if they fully appreciate the significance of [the] notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether" to participate in the class settlement.  *Id*. at 628.  Here, the *Amchem* Court's concern about sufficiency of notice to potential asbestos claimants is less relevant because the damages arising from Chinese drywall are not dependent on slowly-developing symptoms of illness that perhaps may be undiscoverable during a long latency period.  Another factor distinguishing the Chinese drywall class from *Amchem* is that the class representatives in the matter currently before this Court possess the same interest and had suffered the same injuries as the other class members.

35

Case 2:09-md-02047-EEF-MBN Document 22383-10 Filed 12/06/19 Page 127 of 668
Case 2:14-cv-02094-EEF-MBN Document 82-4 Filed 04/26/15 Page 38 of 83
759

claimants who suffered widely divergent injuries on the basis of a statistical profile.  *Id.* at 710-711.

70.  In *Cimino*, which involved the same asbestos cases from *Fibreboard*, the same plaintiffs proposed a new plan that contemplated trying 160 sample cases and then awarding the remaining 2,128 plaintiffs "an amount of actual damages equal to the average of the awards made in the sample cases." 151 F.3d at 319.  The Court held that the damages plan "plainly contravenes *Fibreboard*'s holding" and "permit[ing] recoverable tort damages to be determined in a lump sum for the entire class" is simply contrary to *Fibreboard*.  *Id.* at 319.  As described *supra*, the focus in *Fibreboard* was not the number of sample cases; rather, it was the fact that "[i]n Texas, it is a fundamental principle of traditional products liability law that the plaintiffs must prove that the defendant supplied the product which caused the injury" and the fact that there were such great disparities among the class members.  893 F.2d at 710-711.

71.  Specifically, the so-called "class" of plaintiffs in *In re Fibreboard* and *Cimino* consists of persons with different occupations, different exposure periods, who were claiming different diseases.  *Id.* at 710.  Additionally, the plaintiffs' admissions of fact in those cases show the following additional disparities among class members: (a) the class includes persons who do not have legal claims against one defendant; (b) one or more members of the class may be barred from prosecuting claims against one defendant by virtue of their prior employment with that defendant; (c) the severity and type of physical and mental injuries varies among class members; (d) the nature and type of damages varies among class members; (e) not all of the plaintiffs were injured by the acts or omissions, conduct, or fault of all of the defendants; (f) the dates of exposure to asbestos-containing products varies among class members; (g) the types of products to which class members were exposed varies among class members; and (h) the dates that class

36

Case 2:09-md-02047-EEF-MBN Document 22293-10 Filed 12/26/19 Page 128 of 668
Case 2:09-md-02047-EEF-MBN Document 22347-1 Filed 04/26/2019 Page 37 of 84
759

members knew or should have known of their exposure to asbestos-containing products is not

identical among class members. *Id.*

   **72**.  The instant drywall action is highly distinguishable from *In re Fibreboard* because

the Plaintiffs' characteristics in MDL 2047 cannot be described as particularly diverse and there

is no issue relating to causation of injury.  All of the Plaintiffs in MDL 2047 have the same

complaint; they own properties requiring remediation as a result of defective drywall.  There is

no variation with regard to the severity and type of injury or the nature and type of the damages.

All Plaintiffs[4] are entitled to total remediation of their homes.  The duration of exposure or

quantity of drywall installed does not change the nature of damages, and the solution to their

problems (remediation) is identical in every instance.  Here, unlike most asbestos cases,

including *In re Fibreboard*, (and unlike other similar circumstances, such as exposure to second-

hand smoke), plaintiffs' property damages in the Chinese drywall class do not vary according to

duration or intensity of exposure or resulting health effects that would require individual

minitrials to ascertain the origins of the damages.[5]

---

[4] When this Court refers to the Plaintiffs, it is not referring to the Plaintiffs listed on the Class Spreadsheet presented at the June 9, 2015, hearing, which the Court is aware has been subsequently modified.  Rather, the Court is referring to those claimants who are able to adequately prove that the property they own contains Taishan/TTP drywall.

[5] Notably, both *Fibreboard* and *Cimino* rely on due process and Article III concerns relating to the fact that the assessment of tort damages is ultimately grounded in state tort law.  However, these concerns stemmed primarily and specifically from the fact that there was no trial determination regarding causation. *Cimino*, 151 F.3d at 319. Under Texas law, the Seventh Amendment gives the right to a jury trial to make a causation determination.  In *Cimino*, there was no such trial determination made, and no jury determined, that exposure to [Defendant's] products was a cause of the asbestos disease of any of the 160 sample plaintiffs.  Since there was no causation determination regarding the sample plaintiffs, there could be no causation determination extrapolated to the remaining 2,128 plaintiffs.  For these remaining cases, there was also no trial and no jury determination that any individual plaintiff suffered an asbestos-related disease.  Predictably, the lack of causation determination renders any damages determination "likewise fatally defective." *Id.* at 319-320.  With regard to the instant MDL, which related to drywall, not asbestos, there has been a conclusive determination regarding causation.  Chinese drywall causes offending odors in homes and is corrosive to metals, requiring total property remediation.  The Article III and due process concerns present in the aforementioned cases are not present in MDL 2047.  Accordingly, this Court rejects Defendants' suggestion that it is ignoring its *Erie* obligation under Article III to "remain faithful" to the applicable law of each state in these diversity cases by accepting Plaintiffs' proposed formulaic damages plan. *See Fibreboard*, 893 F.2d at 711.  Given that liability and the scope of remediation have been conclusively determined, awarding

37

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 129 of 668
Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 129 of 668
759

## 2. Mass Accidents

**73**. The Advisory Committee commentary discussing the predominance requirement in FRCP 23(b)(3) specifically mentions mass accident victims as the type of class that would typically not meet the requirement, because the individual interests of each injured plaintiff would be too disparate and therefore better managed in individual adjudications. *See* Fed. R. Civ. P. 23 advisory committee's note to the 1966 amendments. However, as the Supreme Court noted in *Amchem*, "the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number." 521 U.S. 591, 625 (1997); *accord. Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that "it is theoretically possible to satisfy the predominance and superiority requirements of Rule 23(b)(3) in a mass tort or mass accident class action, a proposition this court has already accepted.").

**74**. Unlike asbestos cases where the exposure occurs over long periods of time, mass tort cases frequently arise following a single incident. Despite resulting from a single occurrence, most mass tort class actions are complicated, even if liability is established, because the issue of causation is inextricably intertwined with damages and remains to be litigated. For example, in *Robertson v. Monsanto Co.*, the Fifth Circuit found that class certification was inappropriate when the defendant was liable for an ammonia gas release at its plant, but the plaintiffs had highly individualized determinations regarding both causation and damages for mental distress, physical injuries, property damage, economic injuries, medical expenses, etc. 287 Fed. Appx. 354, 361-62 (5th Cir. 2008). In particular, the *Monsanto* plaintiffs were seeking damages for emotional distress and other intangible injuries, which are impossible to calculate using a

---

solely remediation damages to claimants whose homes require remediation due to the presence of Taishan drywall does not present a conflict with the *Erie* doctrine.

formula because they "implicate[] the subjective differences of each plaintiff's circumstances [and] cannot be calculated by objective standards."⁶ *Id.* at 362 (quoting *Steering Comm.*, 461 F.3d at 602); *but see Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006) (finding presence of claims for personal injury and mental anguish damages did not undermine a finding of predominance when they did not form a significant portion of the plaintiffs' claims).

75. As with asbestos cases, damages resulting from mass accidents can be highly individualized because they involve such factors as "location, exposure, dose, susceptibility to illness, nature of symptoms, type and cost of medical treatment, and subsequent impact of illnesses on individuals." *Steering Comm.*, 461 F.3d at 602. The damages resulting from the oil spill at issue in *In re Deepwater Horizon*, for example, varied drastically depending on multiple "individual questions." 739 F.3d 790, 815 (5th Cir. 2014). In *Deepwater Horizon*, these questions presumably included disparities such as proximity to the oil spill, the type of claimant (whether a business or a property owner), and the amount of oil taken in, etc. *See also Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 553 (5th Cir. 2011) (remanding class certification to the district court for further consideration of whether the predominance requirement was met when plaintiffs exposed to petroleum coke dust from a nearby refinery "sought a variety of damages, including personal injury, fear, anguish, discomfort, inconvenience, pain and suffering, emotional distress, psychiatric and psychological damages, evacuation, economic damages, and property damages").

76. In contrast to mass tort plaintiffs complaining of personal injuries, the Chinese drywall plaintiffs' property damage claims vary only according to the cost of remediation based

---

⁶ Another important distinguishing factor was that the *Monsanto* class consisted entirely of named plaintiffs, eliminating some of the usual benefits of class actions such as identification and notification of potential unnamed class members as well as issuance of a single binding judgment in order to foreclose indefinite, repetitive litigation. 287 Fed. Appx. at 363.

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/19 Page 131 of 668
Case 2:09-md-02047-EEF-MBN Document 20007-4 Filed 12/10/15 Page 40 of 87
759

on the under-air square footage of the contaminated property and are therefore subject to formulaic calculation by objective standards.   In the instant case, the class experienced class-wide damages directly tied to liability: the need to replace the defective drywall.  This injury is common to every class member, with the only difference being how much drywall each class member had to replace and how much the contractor charged in order to perform the work.  This case is thus more analogous to *Turner v. Murphy Oil USA, Inc.*, in which a class action was brought against an oil company when plaintiffs suffered property damage as a result of an oil storage tank spill.  234 F.R.D. at 601.  This court found that the class negligence claims would not require extensive individualized proof that would preclude class treatment:

> Defendant has argued that Plaintiffs' claims for personal injury and mental anguish do not meet the predominance requirement because certain factual elements of their claims will require individualized inquiry—when the plaintiff first learned of the oil spill, what preventative measures were taken to avoid personal injury, and what pre-existing health and mental conditions existed for each plaintiff. While some individualized inquiry will be required, the Court does not believe that this inquiry will be extensive.

*Id*. at 607 n.6.  This court reasoned that "[t]he presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary." *Id*. at 607.  Similarly, in this case, individualized trials are not necessary to determine either liability or the existence or nature of damages.  The defective drywall was found in the walls of each property, and there is no real variation as to the type of claimant since all of the Claimants are property owners.  The only variation among Claimants is the cost of remediation as determined by the under-square footage of the contaminated property.  For those few property owners who feel that their properties are unique and not similar other class members may opt out and have their properties individually inspected and then evaluated by a jury.

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/26/19 Page 133 of 668
Case 2:09-md-02047-EEF-JCW Document 20892-41 Filed 04/26/17 Page 43 of 88
759

### 3. Antitrust

**77**.  Antitrust class actions are also distinct from the instant action alleging property damage.  Antitrust injuries are often speculative: but for the defendant's conduct, the market might have been more competitive, entry for new producers may have been easier, or prices hypothetically would have been lower.  *See Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294, 297 (5th Cir. 2003) (recognizing that because "the nature of an antitrust claim means that 'some plaintiffs can only hypothesize about what the state of their affairs would have been absent the wrong,'" antitrust plaintiffs are not held "to the same burden of proof of damages as demanded of plaintiffs in other civil cases") (internal citation omitted) (quoting *H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978)).  Antitrust injuries can be difficult to measure when they arise from multiple theories of liability or when the variegated nature of the plaintiffs affected makes an individualized damages determination more appropriate.  In the instant matter, these types of problems observed with calculating damages resulting from antitrust injuries are not present: the injury is not speculative, and but for the production and installation of defective drywall, the plaintiffs would not have been required to remediate their properties.

**78**.  For example, a divided Supreme Court in *Comcast Corp. v. Behrend* reversed a class certification in an action against a cable television company allegedly engaging in anticompetitive conduct because the plaintiffs could not demonstrate that "damages [were] capable of measurement on a classwide basis."  133 S. Ct. 1426, 1433 (2013).  The plaintiffs in *Comcast* included some who "*may* have been overcharged because of petitioners' alleged elimination of satellite competition," others who "*may* have paid elevated prices because of petitioners' increased bargaining power vis-à-vis content providers ," and others who "*may* have paid rates produced by the combined effects of multiple forms of alleged antitrust harm."  *Id*. at 1434 (emphasis added).  Unlike the supra-competitive prices imposed upon consumers in

41

*Comcast*, which were potentially attributable to multiple other causes besides the defendant's specific anticompetitive conduct at issue, the property damages in this matter related to defective drywall are susceptible of estimation without raising similar questions of liability.[7]  *Id.* at 1434.

**79**.  Even when causation is clear, antitrust violations can cause drastically different levels of injury depending on the specific circumstances of various class members, such that determining injuries such as lost profits or lost labor productivity can be significantly more fact-intensive than the straightforward and uniform property damages at issue in this case.  For example, in *Bell Atl. Corp. v. AT&T Corp.,* a class of businesses sued a telecommunications company under the Clayton Act, alleging that the defendant attempted to monopolize the "caller ID" market and, as a result, the service was unavailable to some users during the class period. 339 F.3d at 297.  The plaintiffs' proposed formula used a nationwide average for labor costs and a national average for the amount of time that class members would have saved per telephone call had the caller ID service been available on long-distance calls during the class period.  *Id.* at 304.  However, the Fifth Circuit affirmed the district court's denial of class certification on the grounds that the individualized nature of the damages precluded certification when "[t]he record indicate[d] that rather than merely examining lost time and average labor costs, any adequate estimation of actual damages suffered would require consideration of the variegated nature of the businesses included in both the proposed classes, together with the range of uses, depending on the size and technological sophistication of any given business, to which caller ID could be applied."  *Id.*  Moreover, the plaintiffs in *Bell Atlantic* failed to demonstrate that the absence of

---

[7] In *In re Deepwater Horizon*, the Fifth Circuit observed that *Comcast's* holding that "a district court errs by premising its Rule 23(b)(3) decision on a formula for classwide measurement of damages whenever the damages measured by that formula are incompatible with the class action's theory of liability" is "simply inapplicable" in cases that do not involve numerous common issues of liability.  739 F.3d at 815.  *Comcast* is distinguishable from this case because there is only one theory of liability: that the defendants manufactured and distributed defective drywall.

caller ID would have had any noticeable effect at all on some of the businesses in the proposed class.[8]  *Id.*  The circumstances in *Bell Atlantic* in which class members could have been compensated who had not even incurred *any* damages whatsoever are therefore distinguishable from the present case where the proposed class does not contain any individual who did not possess Chinese drywall.

### C.    Aggregate Damages are Superior to an Individualized Alternative

#### 1.    Plaintiffs Use an Appropriate Formula to Calculate Remediation Damages

80.  $86 per square foot, which is evidence based, is a reliable benchmark estimate for the costs of remediation.  The remediation costs take into account the uniform scope of the repair for each class member, the *limited* nature of repair (interiors only), and the use of well-established mid-points as the baseline for each damages estimate before considering individualized square footage and local building cost factors. Given these considerations, the degree of variability of square footage costs for remediation of these homes is typical of what is expected in the discipline of damages estimation, and is not significant when viewed in relation to the total costs of repair.  Even the Defendants' suggestion—house by house inspection by a contractor—is not likely to lead to a more precise estimate, given the acknowledged variation of at least 17% in that method of estimation recognized by the estimation textbook authorities.  Defendants Exhibit 7 at pg. 77.  Considering this, pursuing the alternative is not only unreasonable and inefficient, it is also unjust in light of the continued suffering of the Plaintiffs.

---

[8] For example, some of the businesses potentially for inclusion in the proposed classes utilized telephone systems that were incompatible with the defendant's caller ID service, such that it would have been impossible for those businesses to have ever used the service even if the defendant had not engaged in the alleged conduct.  *Id.* at 305-06.

43

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/26/19 Page 135 of 668
Case 2:14-cv-02094-EEF-MBN Document 44 Filed 04/26/15 Page 135 of 81
759

**81**.  Plaintiffs' expert relied on multi-disciplinary corrosion science (as discussed at length in the Court's earlier FOFCOLs in *Germano* and *Hernandez*, particularly when defining the scope of work for remediation), in conjunction with bid-pricing, unit pricing, square footage pricing, and localized construction cost factors, to establish the damages formula.  While his formula stemmed from average calculations of the *Germano* properties, it was grounded in the relevant science and historical cost data.  Mr. Inglis used well-established estimation methods in arriving at the base $86 per square foot measure, and then used RS Means to adjust this sum to current building material and labor costs and then to reflect the local building and material costs for each Taishan property.  RS Means provides reliable data for such a calculation.  *Germano* FOFCOL at p. 58 ("RS Means is a well-recognized and accepted publication which compiles national data on a national basis for cost to repair and replace building components.").

### 2.  Fifth Circuit Law Does Not Bar Plaintiffs' Damages Proposal

**82**.  The Fifth Circuit has explained that a formula-based calculation of class damages is appropriate in circumstances where individual trials are not required, particularly when the damages portion of the suit can be severed from the liability inquiry:

> Even wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate, and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.  Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate.

*Bell Atlantic*, 339 F.3d at 306 (internal citation omitted).  *See also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (aggregating class damages by a formulaic calculation is acceptable in circumstances where individualized damage calculations are not required); *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 354-55 (5th Cir. 2005) (recognizing that damages which are "capable by means of objective standards" are permissible

so long as there exists a "suitable formula for calculation of damages").  This standard is met by Mr. Inglis' damages methodology, which is a formulaic calculation of class wide damages based on objective standards and verifiable data for each property.

> Nonetheless, the Fifth Circuit has also held:

>> [B]efore a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected. Typically, such a finding must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole.

*In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1020 (5th Cir. 1997).  Defendants argue that the Court, bound by the holding in *Chevron,* must reject the Plaintiffs' request for an award of aggregate damages based on the Inglis method because his damages calculation stems from the $86 per square foot estimate from the seven *Germano* properties.  In the abstract, this is a compelling argument.  However, given the *sui generis* nature of this Chinese Drywall litigation, *Chevron,* like most of the cases cited by Defendants is distinguishable.

**83**.  In *Chevron,* plaintiffs asserted tort claims for industrial pollution of a residential subdivision, claiming that hazardous substances that were improperly stored by defendants' in defendants' waste pits migrated into the environment causing personal injury and property damage.  *Id.* at 1017.  The trial plan invalidated by the Fifth Circuit "provided for a unitary trial on the issues of 'general liability or causation' on behalf of the remaining plaintiffs, as well as the individual causation and damage issues of the selected plaintiffs, and ordered the selection of a bellwether group of thirty (30) claimants, fifteen (15) to be chosen by the plaintiffs and fifteen (15) to be chosen by Chevron."  *Id.* at 1017.  The goal of the trial in *Chevron* "was to determine

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 137 of 668
Case 2:14-cv-02094-EEF-MBN Document 44 Filed 04/26/15 Page 46 of 83
759

its liability, or lack thereof, in a single trial and to establish bellwether verdicts to which the
remaining claims could be matched for settlement purposes." *Id.*

   84. In rejecting the plan, the Fifth Circuit was particularly concerned that the district
court's trial plan was "devoid of safeguards designed to ensure that the claims against Chevron
of the non-represented plaintiffs as they relate to liability or causation are determined in a
proceeding that is reasonably calculated to reflect the results that would be obtained if those
claims were actually tried." *Id.* at 1020. Instead, the court found the procedure created potential
liability to 3,000 plaintiffs "by a procedure that is completely lacking in the minimal level of
reliability necessary for the imposition of such liability." *Id.* The court focused its concern on
the fact that a nonrepresentative bellwether sample group would be tasked with "answer[ing]
troubling causation or liability issues" for the entire universe of plaintiffs and "the lack of
fundamental fairness contained in a system that permits the extinguishment of claims or the
imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative
sample of plaintiffs." *Id.* at 1019, 1021.

   85. In the instant case, claims will not be extinguished nor will liability be imposed on
the basis of Mr. Inglis' methodology. Mr. Inglis' calculations are not an answer to causation or
liability issues. Causation and liability have been conclusively established. Additionally, these
concerns regarding the potential unrepresentativeness of plaintiffs are understandably alarming
in a case like *Chevron* where there are so many variables. In *Chevron* (as in the asbestos-related
cases), liability, causation, and damages may vary significantly according to the diversity of the
class members' characteristics, including their preexisting physical conditions, their health
habits, the type and duration of the exposure to the hazardous substance, the severity and nature
of the resulting diseases, the type of treatments received, etc. In contrast to *Chevron*, duration of

exposure to Chinese drywall is immaterial. No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it. The use of data from the *Germano* homes does not present the same problems as the use of bellwethers in *Chevron* would have presented. The limited diversity among properties in the instant matter is not comparable to that of the personal injury and property damage claims in *Chevron*. Moreover, there is no dispute as to liability or causation in the present case. The Defendants are liable and the Chinese drywall caused the damage to the properties and it has to be removed.

### 3. Aggregate Damages are Favorable Given the Limited Variation Present in Chinese Drywall Litigation

**86**. District courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman*, 606 F.3d 391, 391 (7th Cir. 2014). Plaintiffs have devised a reasonable and reliable solution to calculate remediation damages on a class-wide basis and accommodate individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

**87**. Under the circumstances of this case and given the *sui generis* nature of Chinese Drywall, the Plaintiffs' proposal to calculate remediation damages is not "clearly inadequate," and a formulaic approach is superior to the thousands of individual proceedings that would result if Defendants' proposal for property by property inspection and estimation were accepted. The costly and wasteful individualized mini-trials that would result from Defendants' proposal would further burden the Taishan property owners and further delay the benefits they can hope to receive from this litigation. This Court has already ruled that damages may be calculated in a formulaic manner. *Class Certification* FOFCOL at 11-12 ("[T]he average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis.").

**88**. The Court does not deny that there is some variation, but concludes that the time,

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 139 of 668
Case 2:14-cv-02046-EEF-MBN Document 227-11 Filed 04/26/15 Page 48 of 85
759

expense, and inefficiency of inspecting every affected property would result in an inequitable

solution, given the delay these property owners have already experienced in obtaining relief. As

evidenced by Mr. Pogorolich's testimony, many properties will have varying remediation costs

based on factors such as ceiling height, number of partitions, and quality of interior finishes.

However, the variations among damages in this case are so relatively minor that the damages are

susceptible to being calculated by a formula.[9]

89. As discussed *supra*, the class remediation damages here do not present significant

individualized issues, in contrast to physical ailments and loss of business profits. Rather, the

only variance is in the amount required to pay for each remediation, which can be determined

using a formulaic methodology. Unlike asbestos and mass accident cases, the damage issues

presented in Chinese Drywall litigation are so distinct from questions of liability and causation

(questions which have already been answered in favor of the Plaintiffs), it is proper and just to

award aggregate damages. Mr. Inglis' formula, which calculates remediation damages based on

square footage for each of the Taishan properties with verified under air square footage, is

superior to the thousands of individual proceedings which would result if Defendants' proposal

for property by property inspection and estimation were accepted. Defendants' alternative

amounts to cruel and unusual treatment of innocent homeowners. To now require individuals

who have been displaced for more than six years to pursue individual claims and incur individual

---

[9] Defendants assert that Plaintiffs' formula for calculating damages is inadequate because it relies on
"averages." (Rec. Doc. 18879 at 12). In support of their argument, they cite *Corley v. Orangefield Indep. Sch.
Dist.*, in which the court reversed a class certification on the grounds that "the injur[ies] to the landowners varie[d]
in substantial ways, depending on the value, character and location of the property." 152 F. App'x 350, 355 (5th
Cir. 2005). However, *Corley* did not involve property damage, but rather involved unauthorized transmissions of
voice, data and video communications across private land by telecommunications companies. The reason that the
damages were so varied in *Corley* was because some parcels "might be situated in a geographic 'choke point' such
that a telecom company would be forced go many miles out of its way if that parcel proved unavailable." *Id.* at 354.
Defective drywall does not involve such drastic variations in damages.

Case 2:09-md-02047-EEF-MBN Document 22393-10 Filed 12/06/19 Page 140 of 668
Case 2:14-cv-02722-EEF-MBN Document 237-41 Filed 04/26/2015 Page 49 of Page 86 of
759

costs in a case where liability and fault have been established is not only an imposition on the courts, but also and more importantly, a serious injustice to those who have been harmed by the Defendants' actions.

90. Each class member suffered the same kind of damage, and the only individualized determination required—the amount it will cost to remediate the properties—can be calculated using a formula to estimate the amount of each class member's damages. It is therefore unnecessary and unjust to hold individual mini-trials to determine remediation damages in this case. The damages calculation need not be exact. *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (ruling that damages estimates are appropriate even where "they cannot be measured . . . with exactness and precision . . .").

91. The fact that each Taishan property owner suffered the same harm and the same nature of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong. *See supra* Section VI (B). The class remediation damages here do not present significant individualized issues, like physical ailments and loss of business profits. *Id.* Rather, the only variance is in the amount required to pay for each remediation, which can be readily determined using the formulaic methodology presented by Mr. Inglis in accordance with the following protocol.

## VII. CONCLUSION

92. Plaintiffs have offered a reasonable and reliable measure (superior to any alternative) of the remediation damages for the Taishan Properties with verified under air living square footage. The Court adopts Mr. Inglis' damages *methodology* to quantify the aggregate damages.

93. To implement this remediation process:

**IT IS ORDERED** that the Plaintiffs Steering Committee, under the supervision of BrownGreer, submit an updated Class Plaintiffs' Spreadsheet endeavoring to include only

Taishan properties with verified under air living square footage. Any costs associated with Brown Greer's assistance in revising the Class Plaintiffs' Spreadsheet are to be borne by the Defendants.

**IT IS FURTHER ORDERED** that the revised Class Plaintiffs' Spreadsheet, on which the Court will rely to determine the aggregate total of these remediation damages, be submitted to the Court within two months of this Order. Taishan will then be permitted to review and contest or seek set-offs.

The damages awarded will be calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91[10] *as adjusted* by the RS Means location factor. Ultimately, all such claims will be based on verifications, not only of the under air living space square footage of the contaminated property, but also the presence of Taishan Drywall in those properties.

The relevant case law supports the appropriateness and reliability of the Inglis remediation damages methodology presented at the June 9, 2015 hearing. Therefore, the Court finds the Inglis remediation damages methodology to be a reliable, fair and reasonable estimate of aggregate remediation damages. The final determination of these damages shall be made pursuant to the subsequent set-offs and claims proceedings.

This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

---

[10] This figure is the national square foot unit price with certified industrial hygienist (CIH) costs included and was calculated by Mr. Inglis using R.S. Means to adjust the $86 per square foot cost to reflect current-day building materials and labor.

The alternative to estimating property damages on a class-wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages.  The Taishan Property Owners will still have an opportunity at later phases to seek damages for alternative living expenses and loss of use and enjoyment of their properties.

New Orleans, Louisiana this 21st day of April, 2017.

UNITED STATES DISTRICT JUDGE

# Tab #3

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 144 of 668
Case 2:09-md-02047-EEF-MBN Document 22089-1 Filed 12/04/19 Page 19 of 90 of
759

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | MDL NO. 2047 |
| THIS DOCUMENT RELATES TO: ALL CASES | SECTION "L" (5) |

_____

## ORDER AND REASONS
## ALLOCATING COMMON BENEFIT FEES
## IN THE KNAUF ASPECT OF THIS LITIGATION
_____

## I.
## BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials in the United States, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to report various physical afflictions allegedly caused by the Chinese drywall.

These homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors,

and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a June 15, 2009 transfer order from the United States Judicial Panel on Multidistrict Litigation, all federal cases involving Chinese-manufactured drywall were consolidated for pretrial proceedings in MDL 2047 in the United States District Court for the Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf entities and (2) the Taishan entities. Because the Taishan entities contested jurisdiction at the outset and refused to accept service of process, it was necessary to conduct this litigation along two tracks. The first track involved the Knauf entities.

The Knauf entities ("Knauf") are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf entities are named defendants in numerous cases consolidated with the MDL litigation as well as litigation in state courts. The Knauf entities did not contest jurisdiction and first entered their appearance in the MDL litigation on July 2, 2009. *See* Rec. Doc. 18. On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service. *See* Rec. Doc. 401. After a period of intense discovery, the court set various bellwether trials. From March 15, to March 19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* Rec. Doc. 2713. For purposes of the trial, Knauf stipulated that KPT Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor." *Id*. The Court, based on the evidence presented, found the KPT Drywall was a defective product and issued a detailed Findings of Fact and Conclusions of Law in favor of Plaintiff Hernendez ("*Hernandez* FOF /COL"), *see id.*, and entered a Judgment in the amount of

2

$164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* Rec. Doc. 3012.

On October 14, 2010, Knauf agreed to participate in a pilot program to remediate a number of homes using the remediation protocol formulated by the Court in the *Hernandez* case. The Knauf pilot remediation program has remediated over 2,800 homes containing KPT Chinese drywall using essentially the same protocol. At the Court's urging, after a number of homes had been remediated, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

Thereafter, the PSC and Knauf entered into settlement discussions, and on December 20, 2011, some two years after the formation of this MDL. The PSC reached a global remediation settlement with Knauf, which is designed to resolve all Knauf-related Chinese drywall claims.

After a bellwether trial involving the downstream Knauf distributor, North River, numerous other settlement agreements were also reached with other downstream entities in the chain of commerce with the Knauf. These entities included various distributers, builders, and installers (and their insurers) of the Knauf-manufactured Chinese drywall.

On August 12, 2013, Plaintiffs' and Defendants' Liaison counsel entered into a second settlement agreement addressing claims filed after December 9, 2011 (the "New Claims Settlement Agreement"). R. Doc.16978-1. Under the New Claims Settlement Agreement, Claimants who gave notice prior to October 25, 2013 and qualified under the terms of the New Claims Agreement were eligible to seek benefits under the Knauf Class Settlement Agreement, subject to the requirements set forth in both agreements. R. Doc. 16978-1.

Under the terms of the settlements, the claimants with KPT Chinese drywall (drywall manufactured by Knauf's Chinese subsidiary) were offered several options. Under Option 1, the claimants were offered the opportunity to receive a complete, environmentally certified remediation of their properties. Under Option 2, the claimants were offered cash reimbursement in the event the home was already remediated. Finally, under Option 3, claimants were offered a cash payment instead of remediation as well as the opportunity to receive monetary benefits from the Knauf downstream chain of commerce entities to compensate them for other specifically designated losses.

As part of the Knauf remediation settlement, the defendants also agreed to pay reasonable costs, including the cost of administering the program, and an additional amount for attorneys' fees, which includes both the fees for contract counsel and those for common benefit counsel. The total available for attorneys' fees, costs, and unreimbursed assessments is $208,643,656.85, of which $105,359,193.97 is allotted for common benefit attorneys' fees; $3,842,822.29 has been allotted for common benefit attorneys' costs; and $2,187,000.00 has been allotted for common benefit attorneys' unreimbursed assessments, leaving $97,254,640.59 to disburse among contract counsel.[1] This payment, relieves every claimant of all contingency fee and cost reimbursement obligations to

---

[1] In its January 31, 2018 order, the Court noted that the funds available for attorneys' fees as of October 31, 2017 was $197,803,738.17 [$187,803,738.17 (total available for attorneys' fees) + $10,000,000.00 (Taishan Advance)]. R. Doc. 21168 at 21 n.5, 24. Since that time, as of October 31, 2018, the amount of funds available has increased to $202,806,084.56, as the funds have earned interest over time. In determining the amount of attorneys' fees available for common benefit counsel, the Court underwent the following arithmetic:

   $195,241,093.85 [total available for attorneys' fees] + $7,564,990.71 [remainder of the Taishan Advance] - $192,250.00 [Special Master fee unpaid] = $202,613,834.56.

This leaves common benefit counsel with $105,359,193.97 [$202,613,834.56 x .52] for common benefit fees, resulting $111,389,016.26 to allocate [$105,359,193.97 + $3,842,822.29 (costs) + $2,187,000.00 (unreimbursed assessments)].

   For contract counsel, the Court determined the amount available for attorneys' fees by taking 48% of the total amount available for fees, including the remaining amount available from the Taishan Advance, which leaves $97,254,640.59 available for contract counsel's attorneys' fees:

   $195,241,093.85 [total available for attorneys' fees] + $7,564,990.71 [remainder of the Taishan Advance] - $192,250.00 [Special Master fee unpaid] = $202,613,834.56; $202,613,834.56 x .48 = $97,254,640.58.

4

both retained contract counsel and common benefit counsel (with exception of the Virginia litigants), and thus represents an amount which otherwise would have been payable by the claimants out of their settlement recovery. The claimants have now all received their appropriate portion of the settlement funds. It is now time to focus on the attorneys' fees for this aspect of the litigation for the purpose of determining the appropriate allotment of these fees.

This process requires a two-step analysis. The first step required a determination of the proper split between the contract counsel and the common benefit counsel. The second step involves an analysis of the appropriate allotment of the fees to each counsel. In its January 31, 2018 order, the Court dealt with the first step of this analysis, determining that the appropriate split between contract counsel and common benefit counsel was 52% for common benefit counsel and 48% for contract counsel. R. Doc. 21168. At this point it is worth noting that many, if not all, of the common benefit applicants are also contract counsel in at least some of the cases and will receive significant compensation from those cases in addition to any amounts they may receive in common benefit fees. For this reason, it is disconcerting and disappointing to receive such vexatious, vitriolic, and acerbic briefs from some of the attorneys who seek common benefit fees. It is unfortunate that this has become the new norm in this type of litigation. If such unseemly conduct persists, it will likely spawn "corrective legislation" to attempt to bring back some civility and professionalism to this aspect of complex litigation.

In any event, having completed the first step in this analysis, it is now time to proceed to the second step and determine the appropriate allotment of these common benefit fees and costs to the attorneys who performed common benefit work that produced the favorable result in this case. First, to put this process in perspective, it is helpful to review the procedures adopted to document the common benefit work in this litigation.

From the very beginning of this MDL and long before the Settlement Agreements were even contemplated, the Court took steps to create a fair and open environment for all interested attorneys to perform work for the common benefit of the Knauf drywall litigants. To centralize leadership and control of litigation of this magnitude, fourteen individuals were appointed to the Plaintiffs' Steering Committee (the "PSC"). *See* Pretrial Order No. 8 (July 27, 2009), R. Doc. 144. But the Court, the litigants, and the justice system in general also have an interest in broadening the range of attorney participation in MDL cases, lest the work be confined to a specialized bar of MDL attorneys, which would result in exclusivity, unfairness, and discrimination and, in the long run, inure to the disadvantage of litigants and their attorneys. Therefore, the Court authorized and encouraged the PSC to create sub-committees comprised of interested Plaintiffs' attorneys not on the PSC and assign them tasks consistent with the PSC's duties. The Court encouraged all interested attorneys, including those in state court litigations, to coordinate with the PSC and to do work for the common benefit of all the Knauf litigants and become eligible for a common benefit fee. Over sixty firms or attorneys availed themselves of the opportunity to perform common benefit work and it is now time to allocate fees and costs to those attorneys whose common benefit work produced the result in the Knauf aspect of this MDL.

There has been much discussion regarding the process by which a Court should allocate common benefit attorneys' fees. The Fifth Circuit's holding in *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008), in which the court reviewed an allocation of attorneys' fees in a class action settlement, is instructive on this point. The takeaway from *High Sulfur* is that, in allocating a fund for attorneys' fees, the Court must conform to "traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight." *Id.* at 234. This process requires creating a sufficient record that includes

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/18 Page 150 of 668
Case 2:09-cv-04115-EEF-JCW Document 220-1 Filed 12/04/15 Page 17 of 76
759

making sufficient factual findings, accurately recording the time worked, analyzing the *Johnson* factors, providing all applicants an opportunity to be heard, and exercising independent judgment in allocating those fees rather than simply rubber-stamping a committee recommendation or "pulling it out of the air." This Court has been guided by these principles.

At an early period in this case, the Court established procedures for any attorney seeking a common benefit fee or the reimbursement of common benefit expenses to follow. A CPA was appointed to monitor and record the common benefit work and expenses. The Court ordered those doing common benefit work and incurring common benefit expenses to report monthly to the Court-appointed CPA (Phil Garrett) the hours worked, the nature of the work, and expenses incurred. Time and Expense Guidelines were established to govern all activities performed and expenses incurred by counsel in pursuit of common benefit work. Working with the CPA is a paralegal whose task is to monitor and verify that the attorneys' filings are consistent with these guidelines. If the time reported by counsel for a specific task was inconsistent with the guidelines, not appropriate for that task, or not for the common benefit, the CPA rejected the time and counsel was so advised. Throughout this litigation the Court met monthly with the CPA to review the reported material. These reports have now been summarized and show the total amount of time spent by those seeking common benefit fees and the type of work performed from the inception of this MDL until 2013, the date the Knauf Settlement was finalized. Common benefit costs were recorded from inception until 2014 because of costs incurred in distribution.

After this settlement was finalized, in an effort to get attorneys' input, the Court appointed a Fee Allocation Committee comprised of a representative number of attorneys, including both members and non-members of the PSC who were either active in the state litigation or who performed significant work in the MDL. After meeting with all interested attorneys, receiving fee

requests together with supporting material, the Fee Allocation Committee was charged with the task of making a recommendation on the appropriate allocation to all those seeking common benefit fees. This recommendation was then posted on the Court's website to afford all counsel an opportunity to see the recommendation and respond. A deadline was set for responses or objections. Seventeen objections were timely received.

The Court then appointed a Special Master to review the objections and meet with the objectors and establish a method or procedure for affording them due process to state and advocate their respective positions. The Special Master was authorized to allow reasonable discovery by the interested parties, request and receive briefs, and hear oral argument. Thereafter, the Special Master made a recommendation as to the appropriate allocation of fees to the objecting counsel, which the Court posted to the court's website inviting responses. *See generally* R. Doc. 21945. The Court received seventeen responses from interested parties.

This management process from the onset was transparent and has produced abundant information and data for the Court to make an informed decision as to the fee and cost allocations. At this point, the Court has before it: (1) the recommendations of the Attorneys' Fees Allocation Committee; (2) a minority report from a member or members of the Attorneys' Fees Allocation Committee; (3) the responses or objections to these recommendations; (4) the recommendations of the Special Master; (5) objections to the Special Master's recommendations; and (6) the CPA's summary of the total time spent, the type of work performed, and the costs expended by each attorney who followed the Court's directive and contemporaneously reported the common benefit work performed and cost incurred.

Taking all this information into consideration together with the data collected and impressions formed during ten years of regular monthly meetings, a plethora of discovery motions,

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/18 Page 153 of 668
Case 2:09-md-02047-EEF-JCW Document 22029 Filed 11/04/18 Page 9 of 78
759

and several bellwether trials, the Court now undertakes the thankless task of determining the fair and appropriate allocation of costs and fees to those who performed common benefit work that produced the result achieved in this case.

At the outset, it is important to note that not all work performed by counsel in this case was common benefit work, since some of it was specific to a personal contract case and not for the common benefit of all cases. Furthermore, not all common benefit work was valued the same way. For example, work logged for discovery, brief writing, oral presentation to the Court, trial, appeal, or settlement was generally assigned a greater weight or value than time spent "assessing the case" which generally includes monitoring e-mails and other common benefit administrative functions. This is especially appropriate when the person who spends time "assessing the case" is not on the PSC and is not charged with performing any common benefit administrative functions. Moreover, in this case it is the Court's view that the time spent on trial preparation and presentation as well as designing and negotiating the settlement, particularly the latter, was the most valuable in producing the result. As this Court has observed in other opinions, determining the type of common benefit work that primarily contributed to the favorable result and the value assigned for that work necessarily injects an unavoidable amount of subjectivity in the Court's fee evaluation. The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts, data, and experience and to invite and consider input from those affected. This Court has attempted to strike this balance through this tedious and long-drawn-out process. The total amount to be allocated including common benefit fees, held costs, and remaining assessments is $111,389,016.26.[2]

---

[2] As the Court explained in its January 31, 2018 Order & Reasons, R. Doc. 21168, the figure for attorneys' fees listed in that Order, $99,762,099.56, reflected the total amount available for attorneys' fees as of October 2017, *id.* at 24 & n.9. The amount of attorneys' fees disbursed pursuant to the instant Order, $105,359,193.97, reflects the amount currently available for distribution, as calculated by the Court-appointed CPA. The additional funds available

Case 2:09-md-02047-EEF-MBN Document 22292-40 Filed 12/06/19 Page 153 of 668
Case 2:14-cv-01004-EEF-MBN Document 22292-40 Filed 12/06/19 Page 15 of 79
759

The Court will now address each common benefit applicant in alphabetical order, setting out the amount of the allocation and the factual basis underlying the court's conclusion.

### 1)  **Allison Grant, P.A.**

This law firm is located in Boca Raton, Florida. This firm identified the existence of Chinese drywall in the fall of 2008 before there was public information about Chinese drywall and after working with home inspectors to identify problems in properties the firm represented. It began investigating and met with local government authorities in Florida to develop a protocol for inspections. It also dealt with tax assessors and financial institutions to address economic burdens suffered by the substantial number of claimants it represents. The firm worked with members of the PSC and contractors to implement the Pilot Program and to create efficiencies for participants. Specifically, the firm communicated with Benchmark Inspection and Moss Contractors to provide input in connection with unique Florida condominium law issues and specific homeowner claimant issues. It attended the home inspections of the *Banner* class representatives, Gary Carroll and Robert Block, and participated in their depositions.

The firm has logged 85 common benefit hours from inception through 2013, the year of the second Knauf settlement. The firm had no reported held costs and paid no assessments for the litigation. The Fee Allocation Committee recommends a common benefit fee of $28,000.00. The Minority of the Allocation Committee recommends $28,000.00, and the Special Master recommends $29,000.00. The Court finds that an appropriate allotment to this firm is $29,059.44.

---

are due to interest earned on the original amount. The $111,389,016.26 amount listed above includes held costs, unreimbursed assessments, and attorneys' fees.

Case 2:09-md-02047-EEF-MBN Document 22382-40 Filed 12/06/19 Page 154 of 668
Case 2:09-md-02047-EEF-MBN Document 22380-39 Filed 12/06/19 Page 12 of 80
759

**2) Alters Law Firm, P.A.** **(formerly known as Alters, Boldt, Brown, Rash, & Culmo)**

This law firm is located in Miami, Florida. This firm became involved in the Chinese Drywall Litigation early in the MDL. A substantial amount of its time involved participation with efforts involving elected officials and to address the circumstances suffered by Plaintiffs. The firm also had some efforts in pursuing the Banner entities. The firm reports that it made the following common benefit contributions: (1) discovery, principally concerning *Banner*; (2) government relations; (3) meeting with experts and developing a program to fingerprint drywall chemically for identification; (4) conducting home inspections, and drywall sampling; (5) preparing for expert depositions; and (6) reviewing documents and assisting in the preparation for bellwether trials.

On June 6, 2018, a Notice of Filing Order Suspending Jeremy W. Alters was filed in the United States District Court, Eastern District of Louisiana in the MDL. R. Doc. 21361. Attached to the Notice as Exhibit "A" was an Order dated May 21, 2018 from the Supreme Court of Florida making the suspensive of Jeremy W. Alters effective immediately and ordering certain actions to occur.

The firm has no held costs, logged 657.50 common benefit hours and paid $50,000.00 in assessments through 2013, of which $40,000.00 has been reimbursed, leaving an unreimbursed amount of $10,000.00. The Fee Allocation Committee recommends a common benefit fee of $150,000.00 plus a return of the remaining assessment for a total of $160,000; the Minority suggests $250,000.00, plus the return of the remaining assessment for a total of $260,000; and the Special Master recommends $175,000.00 plus the unused assessment for a total of $185,000. The

11

Case 2:09-md-02047-EEF-MBN Document 22382-40 Filed 12/06/19 Page 155 of 668
Case 2:09-md-02047-EEF-MBN Document 22289-40 Filed 12/06/19 Page 12 of 81 of
759

Court finds that a fair allotment to this firm is a common benefit fee of $177,577.00 plus a return of the remaining assessment for a total of $187,577.00

### 3)  **Anderson Kill, PC**

This law firm is located in New York City, New York. Anderson Kill (through its partner and managing shareholder, Robert Horkovich) represented the "WCI Chinese Drywall Trust" in an action ("*Pate*") to recover from certain commercial liability carriers that were denying coverage to builders, among others, for Chinese Drywall remediation. The firm contributed to the Plaintiffs' efforts to prosecute the Omni V complaint involving insurers by participating in insurance discovery matters, insurance motion practice, and arguing on two occasions, which proved to be of mixed success. The firm had a contingency fee contract to represent the WCI Trust and was paid over $340,000.00 by its client. Notably, the Fee Committee, as others seeking common benefit fees, have not been compensated over the extended length of this prolix litigation. The work this firm submitted for common benefit substantially included work that it was already committed to perform for the WCI Trust. Most of the work performed and submitted by this firm was handled by paralegals or policy analysts who are para-professionals and not attorneys, whose billings were deemed excessive and unreasonable. This firm's work was limited solely to a small portion of the insurance portion of the Global Settlement.

The firm reports spending a total of 4,180.83 hours on this litigation and claims it has $20,627.57 in held costs. The Fee Allocation Committee and the Minority of the committee suggest $90,000.00 in common benefit fees plus costs of $20,627.57. The Special Master recommends $300,000.00 in fees plus held costs. The Court notes that a large percentage of this firm's recorded hours were spent in "case assessment" (nearly 50%).    While this type of work is necessary and beneficial for the common benefit when it is done by those in leadership positions

who have to duty to make decisions on the appropriate course of the litigation, it is not as valuable to the common benefit when done by those outside of leadership. In this instance the hours spent in case assessment deserve less weight. Accordingly, the Court finds that a fair allotment to this firm is a $111,388.91 common benefit fee plus held costs for a total of $132,016.48.

### 4) **Andry Law Firm**

Andry Law Firm did not submit any common benefit hours or held costs to the Court-appointed CPA. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, leaving the amount of $2,000.00 outstanding.

The Fee Allocation Committee and the Special Master recommend $0.00 in common benefit fee and a return of the unreimbursed costs of $2,000.00. The Minority of the Allocation Committee recommends $20,000.00 in fee plus unreimbursed costs. The Court finds that an appropriate allocation to this firm is $2,000.00.

### 5) **Aronfeld Trial Lawyers, P.A.**

This law firm is located in Coral Gables, Florida. Aronfeld Trial Lawyers, through its owner Spencer Aronfeld, has applied for a common benefit fee based upon having brought certain cases into the MDL. Mr. Aronfeld held two town meetings in Florida to discuss CDW with residents and later had cause to visit a warehouse where drywall was stored in Virginia.

The firm reports it spent 112.95 common benefit hours and paid $10,000.00 in assessments of which $8,000.00 has been reimbursed. It reports it has $3,431.06 in held costs. The Fee Allocation Committee and the Special Master recommends $4,500.00 in common benefit fee plus held costs and unreimbursed assessments for a total sum of $9,931.06 The Minority of the Allocation Committee recommends $24,500.00, plus held costs and unreimbursed assessments for a total of $29,931.06. The Court notes that all but three of the hours submitted by

this firm as common benefit were for "assessing the case" and this firm was not on the PSC or had any administrative responsibilities.   The three remaining hours were spent on discovery. The Court finds that a fair allotment to this firm is $3,767.97 for common benefit work plus held costs and unreimbursed assessments for a total of $9,199.03.

### 6)  <u>Aylstock, Witkin, Kreis & Overholtz</u>

This law firm is located in Pensacola, Florida. Aylstock, Witkin, Kreis & Overholtz did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding. The Fee Allocation Committee and the Special Master recommend $0.00 in common benefit fee and a return of the unreimbursed assessment of $2,000.00. The Minority of the Fee Allocation Committee recommends $20,000.00 in common benefit fee plus return of the unreimbursed costs. The Court finds that an appropriate allotment to this firm is $2,000.00.

### 7)  <u>Barrios, Kingsdorf & Casteix</u>

This law firm is located in New Orleans, Louisiana. Dawn Barrios was appointed to the PSC and was also appointed Chair of the State/Federal Committee. She was named Co-Chair of the Written Discovery Committee, Co-Chair of the Witness Development Committee, and Co-Chair of the Research and Collection of Standards (Domestic and Foreign Publications and Journals/FOIA/Public Records Requests) Committee. Additionally, she was appointed as a Member of the Fee Committee. Ms. Barrios and her law partner, Bruce Kingsdorf, also served on numerous other PSC Committees, including the Discovery Deposition Committee, Case Tracking Committee, Administration & Depository Committee, the MDL Law Committee, and the

Louisiana Law Subcommittee, Bankruptcy and Financial Research Committee, Insurance Committee, Public Relations Committee, and Trial & Trial Package Committee.

As Chair of the State/Federal Committee, Ms. Barrios played an important role in communicating with attorneys in the MDL and in state courts around the country, particularly in Virginia and Florida, setting up databases for profile forms, disseminating mass email notices and reminders, and addressing questions from hundreds of individual Plaintiffs' counsel as well as defense counsel to foster coordination. She regularly presented to the Court at each monthly status conference on these matters.

In addition, Ms. Barrios participated in devising the damage model used in the *Germano* and *Hernandez* cases and assisted in drafting the proposed Findings of Fact and Conclusions of Law for the *Germano* and *Hernandez* trials. Further, Ms. Barrios helped prepare the detailed claim forms and numerous CAPS for the various interrelated class settlements, and she has liaised with the settlement administrators, individual counsel, and the Court-appointed *Pro Se* Curator for many months to ensure consistency in claims administration.

The firm has logged 7,964.30 hours in common benefit work and has $70,452.96 in held costs, which were approved by the Court-appointed CPA. The firm has paid $700,000.00 in assessments for the litigation, of which $132,857.14 is outstanding. The Fee Allocation Committee, the Minority of the Committee, and the Special Master recommend a common benefit fee of $2,750,000.00 plus held costs and unreimbursed assessments for a total of $2,953,310.10. The Court finds that an appropriate allotment to this firm is a common benefit fee of $2,902,596.96 plus held costs and the remainder of the assessments for a total of $3,105,907.06.

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/06/19 Page 159 of 668
Case 2:14-cv-02094-EEF-MBN Document 22380-40 Filed 12/06/19 Page 15 of 85
759

## 8) **Becnel Law Firm LLC**

This law firm is located in Reserve, Louisiana. The firm filed the first lawsuit in Louisiana involving Chinese Drywall and filed the Motion to Transfer and Consolidate the Chinese Drywall Litigation with the Judicial Panel for Multidistrict Litigation, which it argued at the transfer and consolidation hearing in Louisville, Kentucky. Daniel Becnel was appointed to the PSC. The majority of the firm's hours involved home inspections and activities in connection with the creation and administration of the Pilot Program. It worked initially with experts to help develop inspection protocols.

The firm also participated in town hall meetings, helped facilitate Consumer Product Safety Commission efforts, and participated in various meetings with government and elected officials to address the circumstances suffered by Plaintiffs. In December 2009, the firm helped create a public service announcement with New Orleans Saints' coach, Sean Payton, that was used to inform affected property owners and ultimately led to the filing of the Payton Omnibus Complaint. The firm also assisted in discovery and preparing its client Cheryl and David Gross for their deposition testimony in connection with the Interior Exterior bellwether trial. The firm also investigated potential claims involving personal injuries.

The firm logged 2,834.85 common benefit hours and reported having held costs of $27,243.80. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been reimbursed leaving an outstanding amount of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $700,000.00 plus held costs plus the outstanding amount of assessment for a total amount of $860,100.94. The Minority recommends a common benefit of $2,100,000.00 plus held costs and the outstanding assessment for a total of $2,260,100.94. The Special Master recommends a common benefit fee of $1,000,000.00 plus the

held costs and the outstanding assessments for a total of $1,160,100.94. The Court finds that an appropriate allotment to this firm is a common benefit fee of $1,077,196.67 plus held costs and the outstanding assessment for a total of $1,237,297.61.

### 9) Bencomo & Associates

This law firm is located in New Orleans, Louisiana. The Bencomo & Associates firm did not log any common benefit hours or record any held costs. The firm did contribute $10,000.00 in assessments, of which $8,000.00 was reimbursed, leaving $2,000.00 outstanding. The Fee Allocation Committee and the Special Master recommend payment of the outstanding assessment of $2,000.00, but no common benefit fee. The Minority recommends a common benefit fee of $20,000.00 plus a return of the outstanding amount of assessment for a total of $22,000.00. The Court finds that an appropriate allotment to this firm is $2,000.00.

### 10) Berrigan, Litchfield, Schonekas, Mann & Traina, LLC

This law firm is located in New Orleans, Louisiana. Members of this firm represent individual claimants. The firm seeks common benefit fees for having attended a seminar regarding subrogation and attempted to publish news articles.

This firm has recorded 17.25 hours of common benefit work but has reported no held costs. The firm has contributed $10,000.00 in assessments of which $8,000.00 has been returned leaving a total of $2,000.00. The Fee Allocation Committee and the Special Master recommend $900.00 in common benefit fee plus a return of $2,000.00 in assessment for a total of $2,900.00. The Minority recommends a common benefit fee of $20,000.00, plus a return of the assessment for a total of $22,000.00. The Court notes that the entire time logged was for time spent assessing the case. The Court finds that an appropriate allotment for this firm is a common benefit fee of $968.82 plus return of the remainder of the assessment for a total of $2,968.82.

17

### 11) Bruno & Bruno, LLP

This law firm is located in New Orleans, Louisiana. The firm represents a number of individual clients and it actively inspected a number of properties of these clients. Additionally, the firm reports that it participated in insurance discovery, document review identified facilities in Alabama and Florida containing Chinese drywall, interviewed and vetted class representatives, and drafted a complaint containing allegations against an insurer.

The firm has logged 458.60 common benefit hours and incurred held costs in the amount of $6,219.03. The firm contributed $10,000.00 in assessments of which $8,000.00 has been repaid, leaving a balance of $2,000.00. The Fee Allocation Committee recommends a common benefit fee of $18,000.00 plus payment of the held costs and the remainder of the assessment for a total of $26,219.03. The Minority recommends $38,000.00 common benefit fee plus the held costs and the assessment remainder for a total of $46,219.03. The Special Master recommends $75,000.00 plus payment of the held costs and the assessment for a total of $83,219.03. The Court finds that an appropriate allotment for this firm is a common benefit fee of $43,049.71 plus the held costs and the assessment remainder for a total of $51,268.74.

### 12) Burdman Law Group

The law firm is located in San Diego, California. The Burdman Law Group filed a class action lawsuit in the United States District Court for the Central District of California and provided a deposition of a corporate representative from an importer of Chinese Drywall from China to California, who was later deposed in the MDL.

The firm reports logging 50.50 common benefit hours and incurring $1,561.73 in held costs. The Fee Allocation Committee, The Minority of that committee, and the Special Master

recommend a common benefit fee of $15,000.00 plus the held costs for a total of $16,561.73. The Court finds that an appropriate allotment to this firm is $17,704.36.

### 13) Collins - Live Oak

Collins - Live Oak did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding. The Fee Allocation Committee and the Special Master recommend reimbursement of $2,000.00 but no common benefit fee. The Minority recommends a common benefit fee of $20,000.00 plus a return of the assessment remainder for a total of $22,000.00. The Court finds that an appropriate allotment to this firm is $2,000.00.

### 14) Colson Hicks Eidson PA

This law firm is located in Coral Gables, Florida. This firm filed one of the first complaints in the country, *Vickers v. Knauf Gips, KG, et al.*, No. 09-04117, in the United States District Court for the Southern District of Florida. The firm devoted extensive, time, resources, and personnel to the litigation. The late Ervin Gonzalez was appointed to the PSC and served as Plaintiffs' Liaison Counsel in Miami-Dade County and assisted in coordinating activities in Broward County. Members of the firm actively participated in the preparation and review of documents produced by various entities in the litigation. Several members of the firm, including Partner Patrick Montoya, who replaced Mr. Gonzalez on the PSC after he passed, were active in discovery, including the preparation and taking of numerous deponents, which included witnesses from the supply chain, from manufacturers through installers. The firm participated in over forty depositions, including depositions taken outside of the United States, in Germany, Great Britain, and Hong Kong. Additionally, the firm argued and drafted numerous motions both in state and

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/06/19 Page 163 of 668
Case 2:14-cv-02094-EEF-MBN Document 26-30 Filed 12/06/19 Page 20 of 89
759

federal court. Members of the firm tried the *Seifart v. Banner Supply* case, which was the first

bellwether jury trial in Florida, resulting in a Plaintiff verdict against Banner Supply Company,

and Colson worked up other state court matters for trial. Furthermore, members of the firm were

on the InEx trial team. Colson helped negotiate and was instrumental in the negotiation and

development of the Banner Settlement and has actively participated in the administration of the

Banner, Global and Knauf Settlements.

The firm logged 14,080.55 common benefit hours and has held costs of $387,668.26. The

firm has contributed $700,000.00 in assessments, of which $560,000.00 has been reimbursed,

leaving an outstanding amount of $132,857.14. The Fee Allocation Committee and the Special

Master recommend a common benefit fee of $3,900,000.00 plus reimbursement of the held costs

and the return of the assessment remainder for a total of $4,420,525.40. The Minority

recommends a common benefit fee of $5,300,000.00 plus held costs and a return of the

assessment remainder for a total of $5,820,525.40. The Court finds that an appropriate allotment

to this firm is a common benefit fee of $4,841,098.76 plus held costs and a return of the

assessment for a total of $5,361,624.16.

### 15) Cuneo Gilbert & LaDuca

This law firm is located in Washington, D.C. Cuneo Gilbert & LaDuca has 126.75

common benefit hours from inception through 2013, and $4,037.79 in held costs through 2014,

which were accepted by the Court-appointed CPA pursuant to PTO 9. The firm did not make a

presentation before the Fee Committee. The firm contributed $10,000.00 in assessments to the

litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is

outstanding.

The Fee Allocation Committee and the Special Master recommend reimbursement of $4,037.79 in held costs and $2,000.00 in outstanding assessments for a total of $6,037.79. The Minority recommends $20,000.00 in common benefit fee plus the held costs and outstanding assessments for a total of $26,037.79. The Court notes that seventy-five hours of logged time was spent on discovery. The remaining hours were logged for case assessment. Accordingly, the Court finds that an appropriate common benefit fee is $21,480.24 plus held costs and the remaining assessment for a total of $27,518.03.

### 16) <u>Davis & Duncan, LLC</u>

This law firm is located in Mandeville, Louisiana. Davis & Duncan, LLC has 2.90 common benefit hours from inception through 2013, and $0.00 in held costs through 2014, which were accepted by the Court-appointed CPA pursuant to PTO 9. The firm did not submit either an Initial Affidavit or a Second Affidavit and did not make a presentation before the Fee Committee. The firm did not make any contributions in assessments to the litigation. The Fee Allocation Committee, the Minority of that committee, and the Special Master recommend no payment to this firm. The Court notes that the total time summitted by this firm was for "case assessment," and this firm had no common benefit administrative responsibilities. Accordingly, the Court agrees that no allotment is due this firm.

### 17) <u>Gainsburgh, Benjamin, David, Meunier, Warshauer, LLC</u>

This law firm is located in New Orleans, Louisiana. Gerald Meunier, a partner appointed to the PSC, and his firm played a leading role in several aspects of this litigation and made important contributions to MDL 2047. Mr. Meunier was also appointed Chair of the Inspections Committee, Co-Chair of the Trial & Trial Package Committee, Co-Chair of the Medical Monitoring Committee, Co-Chair of the Overall and MDL Law Committee, and Co-Chair of the

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/06/19 Page 165 of 668
Case 2:14-cv-02504-EEF-MBN Document 22380-40 Filed 12/06/19 Page 22 of 81 of
759

Discovery Deposition Committee. Additionally, he was appointed as a Member of the Fee

Committee, as Subclass Counsel for the Louisiana Subclass in the InEx Settlement, and as

Subclass Counsel for the Commercial Owner Subclass in the Knauf Settlement. Mr. Meunier and

other members of his firm also served on numerous other PSC Committees, including the

Litigation Group and Seminar Planning Committee, New Defendants Committee, Research and

Collection of Standards (Domestic and Foreign Publications and Journals/FOIA/Public Records

Requests) Committee, Witness Development Committee, Written Discovery Committee, and

Louisiana Law Subcommittee.

At the inception of the MDL, the Gainsburgh firm committed several personnel to this

litigation, including several partners and an associate. These attorneys were involved in important

aspects of the case that substantially contributed to its overall resolution, including: strategic

planning, factual investigation, preparation of pleadings, lay and expert witness discovery, trial

preparation and presentations, and legal analysis. The firm actively participated in the preparation

of a limited portion of briefing before this Court and lent editorial input to briefing before the

District Court and the Fifth Circuit Court of Appeals. Mr. Meunier took an active and leading role

in the *Hernandez* bellwether trial, the *Clement* and *Campbell* cases that settled on the eve of trial,

and the *North River* trial and was responsible for direct and cross-examination of numerous key

witnesses in those trials. Mr. Meunier also assisted PSC member Richard Serpe with preparation

for state court trials in Virginia. Gainsburgh Partner, Michael Ecuyer, was a member of the

*Germano* trial team. Messrs. Meunier and Ecuyer were integral in developing trial theories,

engaging in extensive pretrial discovery, preparing experts, working up the cases, and developing

a comprehensive remediation protocol. One of Mr. Meunier's principal trial presentation

contributions was to solely handle all of the witnesses associated with Beazer Homes, whose

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/06/19 Page 166 of 668
Case 2:14-cv-02094-EEF-MBN Document 230-30 Filed 12/06/19 Page 23 of Page 82 of
759

testimony and videotaped work activity on Florida homes established that, apart from the purely scientific support for a "back-to-studs" remediation to make Plaintiff property owners whole, the actual experience of builders like Beazer was that a "back-to-studs" remediation also was the most practical and cost-efficient way to remove and replace defective Chinese Drywall. Knauf, though presenting scientific rebuttal on the scope of remediation, was unable to meaningfully rebut this "hands-on" evidence.

This firm logged 7,963.55 common benefit hours and incurred held costs of $108,510.76. This firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been reimbursed, leaving a balance of $132,857.14. The Fee Allocation Committee and the Minority of that committee recommend a common benefit fee of $8,600,000.00 plus the remainder of the assessment and the held costs for a total of $8,841,367.90. The Special Master recommends a common benefit fee of $8,500,000.00 plus outstanding assessment remainder and held costs for a total of $8,741,367.90. The Court notes that over 6,000 of this firm's common benefit hours were logged performing trial work, the type of work that is the most stressful and contributed significantly toward the result achieved in this case. The Court holds that an appropriate allotment for this firm is a common benefit fee of $9,191,557.05 plus held costs and the remainder of the assessment for a total of $9,432,924.95.

### 18) Gary, Naegele & Theado, LLC

This law firm is located in Lorain, Ohio. Through its partner, Robert Gary, it became aware of the problem of defective drywall in certain Florida homes in early 2009 and conducted meetings in Florida with homeowners as well as environmental experts and scientists. The firm spent the bulk of its time traveling throughout Florida meeting with an inspector and its clients to address issues with representatives of the Florida Department of Health. The firm also assisted

23

with legal research and state/federal coordination after the MDL was formed.

The firm has performed 476.20 hours doing common benefit work from inception through 2013 and has incurred $13,979.54 in held costs through 2014. The Fee Allocation Committee recommends a common benefit fee of $47,000.00 plus held costs and reimbursement of the remaining $2,000.00 in assessments for a total of $62,979.54. The Minority of the committee recommends a common benefit fee of $67,000.00, plus held costs and the remainder of the assessments for a total of $82,979.54. The Special Master recommends a common benefit fee of $100,000.00 plus a return of the remaining assessments and the held costs for a total of $115,979.54. The Court notes that only thirty-three of the hours logged were in pre-trial work and the balance of the hours were spent monitoring e-mails. The Court finds that an appropriate allotment for this firm is a common benefit fee of $65,605.37 plus held costs and the remaining assessment for a total of $81,584.91.

### 19) <u>Glago Law Firm LLC</u>

This law firm is located in New Orleans, Louisiana. Glago Law Firm LLC has 149.15 common benefit hours from the MDL's inception through 2013, and $0.00 in held costs through 2014. The firm did not submit either an Initial Affidavit or a Second Affidavit and did not make a presentation before the Fee Committee. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 but a return of the remainder of the assessments for a total of $2,000.00. The Minority recommends a common benefit fee of $20,000.00, plus a return of the remainder of the assessments for a total of $22,000.00. The Court notes that this firm did not submit the required

affidavits and did not seek a common benefit and did not object to the conclusions of the fee allocation committee. Accordingly, the Court concludes that the appropriate allotment to this firm is the return of the remaining assessment for a total of $2,000.00.

### 20) **Hausfeld LLP**

This law firm is located in Washington, D.C. Hausfeld, LLP's Partner, Richard Lewis, was designated "Of Counsel" to the PSC, and Mr. Lewis was involved in substantive common benefit work from the early stages of the litigation. He assisted in the preparation of expert witnesses and damage protocols, argued *Daubert* motions before the Court in connection with the *Germano* trial, and was active as a member of the *Germano* trial team in dealing with expert-witnesses. After these trials, he assisted in drafting complex Findings of Facts and Conclusions of Laws for these bellwether cases. He also participated in settlement negotiations for the Virginia state court settlements and contributed to class certification briefing in the MDL.

This firm has performed 5,106.50 hours in common benefit work and has incurred $66,504.16 in held costs. The firm has contributed $175,000.00 in assessments, of which $140,000.00 has been returned leaving a balance of $35,000.00. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $3,200,000.00 plus a return of the remainder of the assessments and the held costs for a total of $3,301,504.16. The Minority recommends a common benefit fee of $3,500,000.00 plus the return of the assessment balance and the held costs for a total of $3,651,504.16. The Court finds that an appropriate allotment to this firm is a common benefit fee of $3,550,591.33 plus held costs and a return of the remainder of the assessment for a total of $3,652,095.49.

**21) Hawkins Stracener & Gibson PLLC**

This law firm is located in Saint Louis, Mississippi. Hawkins Stracener & Gibson PLLC did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend no common benefit fee but a return of the remainder of the assessments for a total of $2,000.00. The Minority recommends a common benefit fee of $20,000.00 plus a return of the assessment for a total of $22,000.00. The Court finds that an appropriate allotment to this firm is $2,000.00.

**22) Herman, Herman & Katz, LLC**

The firm is located in New Orleans, Louisiana. HHK became involved very early on in the *Chinese Drywall* litigation, and on July 6, 2009, pursuant to Pre-Trial Order No. 3, Russ M. Herman was appointed as Plaintiffs' Liaison Counsel. Thereafter, on July 27, 2009, Russ Herman was appointed, pursuant to PTO 8, as an Ex-Officio Member of the PSC. R. Doc. 144. Mr. Herman has continued to serve throughout the pendency of this litigation, devoting significant resources, and continues to fulfill the Court-appointed duties as Plaintiffs' Liaison Counsel and Ex-Officio Member of the PSC. Senior Partner Leonard Davis has assisted in all aspects of the litigation and helped to perform Plaintiffs' Liaison Counsel's duties. In addition, partners, associates, paralegals, law clerks, assistants, accounting personnel, and other legal and technical experts have participated in this litigation on a full-time basis since its inception. Mr. Herman and Mr. Davis have worked hand-in-hand with Lead Counsel and the Law Office of Levin, Sedran & Berman, LLP ("LSB") virtually daily to oversee, direct, and coordinate the prosecution of claims

Case 2:09-md-02047-EEF-MBN Document 22292-40 Filed 12/06/19 Page 170 of 668
Case 2:14-cv-02094-EEF-MBN Document 22280-39 Filed 12/06/19 Page 170 of
759

on behalf of thousands of Chinese Drywall victims in this MDL and various state courts around the country.

HHK oversaw and orchestrated all activities of the PSC. The activities include, but are not limited to, serving as the recipient for all court orders, which included setting up and implementing File & Serve Xpress (formerly, Lexis-Nexis File & Serve), in accordance with Pre-Trial Order No. 6, and coordination with defense liaison counsel for the filing and exchange of pleadings and documents in accordance with a unique certificate of service for this litigation; maintaining an up to date service list and the tracking of counsel contact information pursuant to Pre-Trial Order Nos. 5 and 5(A); and coordinating and establishing a document depository and maintaining a complete file of all documents that were accessible to Plaintiffs' counsel.

HHK conducted and chaired over 60 face-to-face PSC meetings between August 5, 2009 and December 2013. Many of these meetings took place face-to-face in conferences at the law offices of HHK, where Plaintiffs' Lead and Liaison Counsel presided. At each conference, status updates were provided, committee activities were monitored, progress of the case was noted, and strategies were developed. Agendas for meetings and various PSC activities were prepared by HHK, after consultation with LSB.

HHK maintained files of all communications and court filings. Throughout the litigation, HHK received, almost daily, calls and correspondence from various counsel, as well as *Pro Se* claimants, and answered questions or directed interested parties to the Court's website so that counsel and litigants could interface with the Court, and coordinated with Defense and Plaintiffs' counsel to allow for smooth administration of the Court's docket.

The Court appointed a Plaintiffs' Steering Committee in Pre-Trial Order No. 8, which set forth various responsibilities for the PSC. The Court appointed Russ Herman and Arnold Levin,

as Lead Counsel of the PSC, to coordinate the responsibilities of the PSC, schedule PSC meetings, keep minutes or transcripts of these meetings, appear at periodic court noticed status conferences, perform other necessary administrative or logistic functions of the PSC, and carry out duties as the Court may order, all of which have been accomplished throughout this litigation.

HHK, together with LSB, was involved in the preparation and filing of all briefing and presented oral argument to the Court on all major motions. The various motions included, among others, motions pertaining to discovery, motions for default judgment, motions for class certification, insurance motions for declaratory judgment, motions to dismiss for lack of jurisdiction on grounds of economic loss doctrine, pollution exclusion and other homeowners policy exclusions, motions related to choice of law, service and venue, motions under the All Writs Act, a motion to establish a Plaintiffs' expense fund, and motions for approval of class settlements and objections thereto. HHK signed and filed all motions. Drafts were read in advance and revisions, as well as oppositions, were reviewed by HHK. HHK wrote briefs and argued appeals to the Court of Appeals.

Early on the litigation, HHK retained an investigator with extensive Chinese and German networks, to determine as rapidly as possible, the location of the mine from which defective drywall was manufactured. The investigator successfully tracked down and reported information about the Knauf Defendants, its executives, and banking contacts. This information was useful to assist in developing a discovery plan. The investigator also provided information regarding the whereabouts of various Chinese Defendants and employees.

HHK established and managed the PSC depository and was responsible for tracking and supervising all document productions from Defendants and third-parties, orchestrated and created relevant timelines, cast of characters, hot documents, and researched the financial relationships

among the manufactures and their upstream entities, as well as the chain of distribution of
Chinese Drywall that ultimately was installed in Plaintiffs' properties. HHK was intimately
involved in all document productions, review of documents produced by Defendants, translations
as well as deposition preparation.

HHK interviewed, vetted, and retained a Chinese attorney to assist with legal issues,
research and translation. This Chinese attorney has assisted HHK and the PSC with document
review and obtaining Chinese documents throughout the course of the litigation. The Chinese
attorney has also assisted the PSC with legal research involving Chinese law.

HHK also worked with the Discovery Committee to get dates of drywall shipments, the
ports of entry of Knauf drywall, and ultimately track the volume of imported by the Knauf
Defendants to the United States. HHK was responsible for the logistics and coordination with
defense counsel for all depositions in this litigation and virtually all notices issued by the PSC
were prepared and issued by HHK. HHK prepared templates for depositions, oversaw the
preparation of deposition summaries, and organized deposition exhibits. HHK oversaw the
development of various Profile Forms, which ultimately were incorporated into various Pre-Trial
Orders. HHK followed up with Plaintiffs' counsel and coordinated with defense liaison counsel
for the exchange of each side's completed Profile Forms. HHK actively participated as first or
second chair on all initial depositions taken in this matter, including the Knauf Defendants,
Porter-Blaine, Venture Supply, InEx, and North River. Every initial deposition related to Knauf's
liability was taken by members of HHK and/or LSB. Prior to each deposition, HHK, together
with LSB, analyzed discovery and documents to prepare. HHK also took a number of the
depositions in the *Hernandez* trial. Furthermore, HHK has actively participated in a number of the
depositions of the Taishan Defendants, Banner, various insurers and installers, class

29

representative Plaintiffs, objectors to class settlements, and experts. HHK prepared and filed numerous motions to compel and for sanctions for discovery abuse and oppositions to motions to quash, and HHK also handled oral argument on a number of discovery motions.

HHK was actively involved in the creation and implementation of the Pilot Program, which was negotiated by HHK and LSB to begin the initial steps for the formulation of an overall Settlement Program. This Pilot Program introduced the Ombudsman to act for claimants and/or their lawyers in a way in which a property owner could consult with a licensed contractor to work through constructions issues without the need for lawyer involvement. The remediation contractor, Moss Construction, was chosen as lead contractor as a result of negotiations and vetting by HHK. An in-depth search for a national general contractor with experience in residential and commercial reconstruction was undertaken by HHK and offices were set up in Florida and New Orleans for contact and communication. HHK negotiated throughout the Pilot Program and eventual Settlement Agreements with Moss Construction and its liaison, Philip Adams, and other executives who met regularly with HHK and the Ombudsman to implement and resolve all remediation issues under the programs.

HHK worked, created, and helped prepare the various Omnibus complaints, which brought claims against all parties in the Chinese Drywall supply chains on behalf of approximately 10,000 Plaintiffs. LSB consulted with HHK after reviewing United States Fifth Circuit Court of Appeal cases and opinions of the U.S. Supreme Court and the Omnibus Complaint concept was developed. Numerous Omnibus Complaints were created that enabled lawyers representing individual claimants to file suit without incurring extravagant service filing costs and interrupting statute of limitations/prescription. HHK saw that the Omnibus Complaints were translated, filed, and served on the foreign manufacturing Defendants pursuant to The Hague

Convention. Service of these Omnibus Complaints through The Hague Convention resulted in substantial time and expense but created a vehicle that enabled individual claimants to efficiently file suit.

HHK helped develop and implement the Threshold Inspection Program ("TIP") and created a catalogue that identified markings, brands, intakes and other identifying markers of Chinese Drywall in affected homes that was used in the creation of Pre-Trial Order No. 10. HHK also vetted numerous contractors and helped select an inspection company to carry out the TIP and ultimately the Knauf Settlement Program.

At the very early stage in the litigation, HHK partner, Stephen Herman, organized focus groups to set the stage for successful prosecution of Chinese Drywall cases. These focus groups and presentations were used in all bellwether trials in the MDL. Stephen Herman oversaw all trial work in the Herman Herman client case, *Hernandez*, which ultimately set parameters for remediation efforts. HHK oversaw a review of numerous cases reviewed by the PSC to determine Plaintiff bellwether selections. Though the *Hernandez* case was selected to be the first case tried, HHK did not participate in the committee vote which made that selection. Stephen Herman was selected as co-lead trial counsel and members of HHK participated and were present at the trial. HHK also formed trial teams and oversaw all trial work in the *Germano* and *North River* bellwether trials, and also actively participated in the preparation of the *Clement* and *Campbell* trials. Further, members of HHK actively participated in the *North River* trial. HHK selected and prepared appropriate Plaintiff representatives, conducted multiple inspections of their properties and completed an assessment of individual damages. HHK briefed specific legal issues for trial and participated in motion practice before the Court for many of the trial matters. In addition, HHK retained scientific, technical and damages experts, developed trial themes and illustrative

31

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 175 of 668
Case 2:09-md-02047-EEF-MBN Document 22089-1 Filed 11/18/19 Page 32 Page 4 of 201 of
759

trial exhibits, created a comprehensive remediation protocol, organized focus groups, prepared witnesses and experts, filed and responded to *Daubert* motions and *in limine* motions, and prepared opening and closing statements, lines of direct and cross-examination testimony, jury charges, verdict forms, and proposed Findings of Fact and Conclusions of Law. As a result of bellwether trials, the Court established a formula based upon a dollar per square foot remediation calculation that has been used extensively throughout this litigation.

HHK spearheaded and engaged in intense settlement negotiations. Initial negotiations began with Knauf and eventually took place with Banner, InEx, L&W, and more than 700 suppliers, installers, and insurers. During the course of negotiation, Knauf's original counsel held settlement discussions in Miami attended by HHK and LSB that did not prove fruitful; however, further discussions with new mediators proved to be beneficial. HHK actively participated in the selection and mediation process with the original mediator utilized for settlement discussions, as well as John Perry. During negotiations, HHK actively consulted with construction experts to develop a remediation protocol for Plaintiffs' properties and undertook discussions with additional experts to formulate a settlement agreement. HHK prepared or supervised the preparation, execution, and integration of the five original class settlement agreements in the MDL, as well as the four Virginia class settlement agreements, and worked with LSB to prepare the necessary and appropriate exhibits and pleadings to implement the settlements. Once the Settlement Agreements were approved, HHK created and implemented settlement claim forms and Court Approved Procedures to administer the programs. Further HHK coordinated with the Special Master, Claims Administrators, Court-appointed Ombudsman, and the Court-appointed Curator to carry out and implement settlements. Further, numerous *pro se* claimants consulted HHK to obtain assistance with the settlement process and HHK frequently communicated with

Case 2:09-cv-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 176 of 668
Case 2:09-md-02047-EEF-Rfd-w2-7Document 22040-1 Filed 08/18/19 Page 33 of 202 of
759

the Court appointed curator, Robert Johnston. Knauf provided monthly reports of the status of settlement payments and claims which were reviewed with Knauf's counsel to assist in successful completion of the Settlement Program.

The firm has logged 40,350 common benefit hours from inception through 2013 and has incurred held costs in the amount of $191,102.27 through 2014.The firm contributed $700,000.00 in assessments through 2013 of which $560,000.00 has been reimbursed, leaving an outstanding amount of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $26,524,849.78 plus payment of the held costs and a return of the remaining assessment for a total of $26,848,809.19. The Minority of the committee recommends a common benefit fee of $17,000,000.00 plus the remaining assessment and the held cost for a total of $17,323,959.41. The Special Master recommends a common benefit fee of $22,588,599.78 plus a return of the remaining assessment and payment of the held costs for a total of $22,912,559.19. The Court finds that this firm together with the Levin firm were the major contributors to the successful conclusion of this phase of the litigation. They were involved and directed the activities in the expert retention, preparation and discovery, trials and settlement, the major dispositive aspects of this litigation. The Court concludes that an appropriate allotment for this firm is $22,018,233.18 plus held costs and a return of the unused assessments for a total of $22,342,192.59.

### 23) Ingram & Associates

This law firm is located in New Orleans, Louisiana. Ingram & Associates did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding. The Fee Allocation Committee and the Special Master recommend no common benefit fee but a return of the remaining assessment for a

total of $2,000.00. The Minority recommends a common benefit fee of $20,000.00 plus a return

of the remaining assessment for a total of $22,000.00. The Court finds that an appropriate

allotment for this firm is $2,000.00.

### 24) Irpino Law Firm

This law firm is located in New Orleans, Louisiana. The firm became involved in the

*Chinese Drywall* Litigation early on in the MDL. The Irpino firm assisted in drafting pleadings,

participated extensively in discovery, including document review, drafting written discovery,

depositions, and privilege and confidentiality claims. The firm chaired the Document Depository

Committee and actively assisted in the ongoing oversight and activities of the depository.

Additionally, Anthony Irpino worked extensively with a number of experts in the litigation. The

firm also assisted in motion practice including issues involving personal jurisdiction. The firm

actively participated in the work-up and trial of the Interior Exterior bellwether trial and served on

the trial team. Further, the firm played an active role in challenging privilege log entries and was

active in the North River Trial, including trial preparation and the writing and preparation of

briefs. The Irpino firm was named as "Of-Counsel" to the PSC, and in May 2018Anthony Irpino

was named as a member of the PSC. Throughout the litigation, the Irpino Law Firm has been

consistently a "go to" and "relied upon" firm for many important PSC projects. The firm's

common benefit contributions have been utilized by the PSC and have advanced the litigation.

The firm has logged 7,687.10 hours in common benefit work from inception through 2013

and has incurred $10,903.75 in held costs through 2014. The firm has contributed $50,000.00 in

assessments of which $40,000.00 has been repaid, leaving $10,000.00 remaining. The Fee

Allocation Committee recommends a common benefit of $2,000,000.00 plus payment of held costs

and a return of the remaining assessment for a total of $2,020,903.75. The Minority

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 178 of 668
Case 2:09-md-02047-EEF-JCW Document 22089-1 Filed 03/08/19 Page 35 Page 204 of
759

recommends a common benefit fee of $2,100,000.00 plus a return of the remaining assessment
and payment of held costs for a total of $2,120,903.75. The Special Master recommends a
common benefit fee of 2,750,000.00 plus payment remaining assessment and held costs for a total
of $2,770,903.75. The Court finds that an appropriate allocation to this firm is $2,902,596.96 plus
held costs and a return of the unused assessments for a total of $2,923,500.71.

### 25) **Kanner & Whiteley, L.L.C.**

This law firm is located in New Orleans, Louisiana. The firm became involved in the
Chinese Drywall Litigation primarily in connection with insurance matters. The firm primarily
worked with PSC members to address insurance coverage claims and various insurance motions,
but its role in the MDL ceased in September 2010. In connection with insurance matters it
assisted in the preparation of written discovery issued to carriers as well as pleadings filed in
connection with insurance motions. It also defended against insurance motions occurring in state
court regarding pollution exclusion provisions, and other provisions of the policies.

This firm has logged 624.95 common benefit hours and incurred $4,169.13 in held costs.
The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been
repaid. The Fee Allocation Committee recommends a common benefit fee of $47,000.00 plus a
return of the remaining assessment and payment of held costs for a total of $53,169.13. The
Minority recommends a common benefit fee of $67,000.00 plus held costs and a return of the
remaining assessment for a total of $73,169.13. The Special Master recommends a common
benefit fee of $65,000.00 plus held costs and return of remaining assessment for a total of
$71,169.13. The Court notes that a little over one half of the recorded hours were spent in
monitoring e-mails, and nearly all of the remaining recorded hours were spent on pre-trial issues
and discovery. The Court concludes that an appropriate allocation to this firm is a common

benefit fee of $72,106.43 plus held costs and a return of the remaining assessment for a total of $78,275.56.

### 26) __Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman, & McKee, PA__

This law firm is located in Ft. Lauderdale, Florida. Its partner, Michael Ryan, was appointed by Judge Greene as Liaison Counsel for Plaintiffs in the *Chinese Drywall* litigation in Florida state court (Broward County). Mr. Ryan also is appointed by this Court to serve as a member of the Fee Committee. Prior to his service as a member of the Fee Committee, Mr. Ryan's principal common benefit contribution was made in the cases brought in the Broward County, Florida against Banner. He collaborated with Ervin Gonzalez on class action proceedings and with Victor Diaz and the Durkee firm in motion practice. He also undertook efforts to address and clarify certain claims for purposes of the settlement agreement ultimately negotiated by the PSC with Defendants. In connection with the litigation against Banner in Florida, Mr. Ryan's firm filed fourteen cases involving over 350 individual properties. He also was a member of the Trust Advisory Board of the WCI Chinese Drywall Trust, and in that regard, he participated in mediations and in review of pleadings filed in the WCI insurance coverage litigation.

This firm has logged 699.80 hours doing common benefit work from inception until 2013 and has incurred $34,237.84 in held costs. The firm did not make any contributions to the litigation fund. The Fee Allocation Committee and the Minority of that committee recommend a common benefit of $425,000.00 plus held costs for a total of $459,237.84. The Special Master recommends a common benefit fee of $350,000.00 plus payment of held costs for a total of $384,237.84. The Court notes that about one third of this firm's logged time was spent monitoring e-mails and some of the time logged was in pursuit of its own cases. The Court concludes that the appropriate allotment to this firm is $430,491.65, plus held costs for a total of $464,729.49.

36

### 27) **Landskroner - Grieco - Merriman LLC**

This law firm is located in Cleveland, Ohio. Landskroner Grieco Merriman LLC, through its managing member Jack Landskroner, was minimally involved in the early investigation of Chinese Drywall, specifically as CDW problems affected residents in the State of Florida. Mr. Landskroner traveled to Florida to meet with residents. His partner Paul Grieco also attended the MDL panel hearing in 2009, on behalf of Plaintiffs in a class action which the firm had filed in the State of Ohio.

This firm logged 57.25 hours doing common benefit work from inception to 2013 and has expended $2,950.25 in held costs. The firm contributed $10,000.00 in assessments to the litigation fund of which $8,000.00 has been repaid leaving a balance of $2,000.00. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $23,000.00 plus payment of held costs for a total of $27,950.25. The Minority of the Committee recommend a common benefit fee of $43,000.00 plus payment of the held costs for a total of $47,950.25. The Court finds that an appropriate allotment to this firm is a common benefit fee of $26,907.08 plus held costs and a return of the remaining assessment for a total of $31,857.33.

### 28) **Lemmon Law Firm, LLC**

This law firm is located in New Orleans, Louisiana. The firm became involved in the Chinese Drywall Litigation in the early stages when it filed individual client lawsuits. It represented Paul and Celeste Clement claimants in one of the early bellwether trials which was fully worked up and settled on the eve of trial. The *Clement* settlement assisted, as did other bellwether trials, in paving the way for the Knauf Pilot Program. This firm was active in the *Clement* pretrial preparation, including trial motion practice. The firm also assisted and participated in a mock trial. The firm actively participated in insurance and Defendant/Plaintiff

Profile Form assignments and worked with the Plaintiffs' depository and its staffing. It oversaw a large project which involved charting insurance coverages, exclusions and other relevant information that was ultimately integrated into an overall database that contained Plaintiff and Defendant data. The firm assisted the PSC with town hall meetings and reviewing documents during discovery in connection with personal jurisdiction motions. Andrew Lemmon became "Of Counsel" to the PSC and the firm's common benefit contributions were often utilized.

From inception of this MDL until 2013 this firm logged 4,695.25 hours doing common benefit work and incurred $12,103.96 in held costs. The firm contributed $150,000.00 in assessments to the litigation of which $120,000.00 has been paid leaving a balance of $30,000.00. The Fee Allocation Committee recommends a common benefit fee of $450,000.00 plus payment of the held costs and return of the remaining assessment for a total of $492,103.96. The minority recommends a common benefit fee of $750,000.00 plus held costs and the remaining assessment for a total of $792,103.96. The Special Master recommends a common benefit fee of $800,000.00 plus held costs and a return of remaining assessment for a total of $842,103.96. The large majority of this firm's logged time was spent on discovery and trial preparation. The Court finds an appropriate allotment to this firm is a common benefit fee of $774,025.86 plus held costs and a return of the remaining assessment for a total of $816,129.82.

### 29) Leopold Kuvin, P.A. & Mrachek, Fitzgerald

The Leopold Firm is located in Palm Beach Gardens, Florida and the Mrachek firm is located in West Palm Beach, Florida. The firms jointly became involved in Chinese Drywall early in the litigation. The majority of their time focused on individual client matters involving the Villa Lago at Renaissance Commons, a claimant within the MDL. The firms handled the Villa Lago claim and participated, with the assistance of the PSC, in the settlement negotiations and

finalization of settlement documents including approval and motions related to the administration of the Villa Lago settlement (including the appointment of a receiver).

This firm has logged 832.75 common benefit from inception through 2013 and incurred $32,789.34 in held costs. The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been repaid leaving a balance of $2,000.00. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $47,000.00 plus held costs and a return of the remaining assessment for a total of $81,789.34. The Minority recommends a common benefit fee of $67,000.00 plus held costs and remaining assessment for a total of $101,789.34. The Court finds an appropriate allotment to this firm is a common benefit fee of $53,811.46 plus held costs and the remaining balance of assessment for a total of $88,600.80.

### 30) Levin Papantonio Law

This law firm is located in Pensacola, Florida. Ben Gordon was appointed to the PSC and served as co-chair of the Science Committee and Expert Committee, Trial Committee and IT Committee. Levin Papantonio participated in the early stages of the MDL in the development of the initial inspection program of impacted properties and was a member of the *Germano* trial team. Mr. Gordon was a co-chair of the Science Committee and Expert Committee, who helped early on to secure and develop a number of expert witnesses and the firm assisted in the preparation of expert reports and working with experts who were considered for the *Germano* and *Hernandez* trials. The firm also assisted in administering and compiling Plaintiff Profile Forms.

This firm logged 4,136.90 common benefit hours from inception through 2013 and incurred held costs of $80,991.39. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $750,000.00

39

plus held costs and remaining assessment for a total of $963,848.53. The Minority recommends a common benefit fee of $2,150,000.00 plus held costs and the remaining assessment for a total of $2,263,848.53. The Court finds that an appropriate allotment to this firm is a common benefit fee of $1,301,484.06 plus held costs and the remaining assessment for a total of $1,515,332.59.

### 31) Levin Sedran & Berman, LLP

LSB is located in Philadelphia, Pennsylvania. The firm became involved in the *Chinese Drywall* litigation at its inception, with the March 2009 filing of the principal class action complaint against the major Defendants in *Vickers v. Knauf GIPS KG, et al.*, No. 09-20510-CIV (S.D. Fla.), and the perfection of foreign service therein pursuant to The Hague Convention. Thereafter, Senior Partner Arnold Levin presented the consolidation motion before the Judicial Panel on Multidistrict Litigation in Louisville, KY. After the JPML ordered *Vickers* and other cases transferred to this Court on June 15, 2009,[3] Mr. Levin was appointed, pursuant to Pre-Trial Order No. 8, as Lead Counsel of the Plaintiffs' Steering Committee ("PSC"). Since then, Mr. Levin has worked virtually full-time on this case for more than nine years. LSB has committed significant additional resources to the litigation, including the full-time contributions of Senior Partner Frederick Longer and Of Counsel Sandra Duggan, who have worked on all aspects of the litigation, including preparation of Omni Complaints, pleadings, discovery, major briefing, bellwether trials, settlement, and appeals. Significantly, as evidenced by Mr. Garrett's reports, other LSB partners, associates, paralegals, and technical support have also provided important contributions to this case.

Together with Plaintiffs' Liaison Counsel, Russ Herman, and his firm (HHK), LSB has taken responsibility for spearheading and overseeing the prosecution of all Chinese Drywall

---

[3] *In re Chinese-Manufactured Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

40

claims in the MDL, as well as coordinating with state law claimants to coordinate and pursue litigation against more than 1,650 Defendants, including the manufacturers, their parents and affiliates, exporters/importers, brokers, distributors, suppliers, retailers, builders, installers, and insurers.

LSB regularly interfaced with the Court, communicated with and assisted individual Plaintiffs' counsel and *Pro Se* litigants, and coordinated with defense liaison counsel, as necessary. LSB attended and participated in all of the Court's monthly status conferences and hearings, all major motions, jurisdictional hearings, and Settlement Fairness Hearings, and LSB continues to perform these services. LSB further helped coordinate and monitor state court litigation in both Florida and Virginia and appeared regularly (once a month during the active phase of the Knauf litigation) before State Court Judges, including Judge Farina and Judge Hall, to provide status reports of the MDL litigation and/or to argue dispositive motions, including issues such as the economic loss rule and pollution exclusion.

LSB assisted the Court in implementing numerous pretrial orders and minute entries and other orders covering a variety of topics such as administration procedures, scheduling deadlines, service requirements, preservation of evidence, the Court-approved Threshold Inspection Program (TIP), Profile Forms, identification of the numerous Chinese Drywall manufacturers, Privilege Logs, Confidentiality, Already Remediated Properties, and other issues regarding guidelines for common benefit timekeeping and cost reimbursement and claims administration.

LSB also assisted in developing a comprehensive, multi-pronged discovery strategy that involved: (a) creation of various profile forms for all parties to complete; (b) preparation and service of extensive written interrogatories, requests for admission, letters rogatory, FOIA requests, subpoenas, and/or requests for production of documents on all Defendants and

41

numerous third parties; (c) preparation of motions to compel and responses to motions for protective orders and motions to quash; (d) preparation of a deposition protocol and template for summarizing depositions; and (e) depositions of all important manufacturers, importers, suppliers, distributors, builders, and installers. LSB helped establish and maintain a document depository, and assigned teams to analyze over 1,000,000 pages of documents produced by Defendants and third parties, and also created timelines and casts of characters for use in the litigation. LSB participated as first or second chair in numerous depositions, including those of key employees of manufacturers, which were instrumental in leading the way to proving that the Court has jurisdiction over Taishan in Virginia and other forums in the U.S. It was LSB's ideation to have a demonstrative "showcase" trial in the MDL, using the *Germano* action as a vehicle to obtain a judgment applicable to Taishan, but in which the Knauf Defendants could participate and attempt to demonstrate what few defenses they had available against the overwhelming proofs of liability that were generated at the direction of Lead Counsel. Mr. Longer second-chaired the Venture Supply and Porter-Blaine deposition of Sam Porter, which created the roadmap for achieving the four Virginia Settlements. Mr. Levin and Mr. Longer took the key depositions of the Knauf Defendants in New York, Germany and Hong Kong (*i.e.*, Baldwin Knauf (Germany), Isabel Knauf (Germany), Hans Peter Ingenillem (Germany), Martin Halbach (Germany), Hans Ulrich Hummel (New York), and Mark Norris (Hong Kong)), which directly led to the creation of the KPT Pilot Program and ultimately to the Knauf Settlement and the L&W Settlement. LSB also participated in other key depositions, including those of North River's principal witness, Agnes Reiss, and others. In addition, LSB devoted substantial time to reviewing relevant documents, preparing for, conducting, and/or participating in key depositions of witnesses in Germany and Hong Kong, and others in the Chinese Drywall supply chain, third parties and insurance

companies. In particular, LSB Senior Associate Matthew Gaughan engaged in a number of

depositions (*i.e.*, Vicki Lingafelter, Victoria Lundquist, Dale Raymond Montgomery, David

Montgomery, Peggy Sargent and Steve Vassil) as part of the PSC's effort to prosecute direct

claims against insurance companies and to ward off pollution exclusion defenses. LSB's efforts to

pursue the insurers of the Defendants were instrumental in achieving the Global Settlement with

more than 700 Builders, Suppliers, Installers, and Insurers.

LSB oversaw and was instrumental in the preparation of all briefing in the MDL. LSB

prepared and oversaw the preparation of, and/or participated in every major common benefit

motion, memorandum of law, proposed order, and responsive brief. In addition to numerous

motions to compel, motions for sanctions, responses to motions to quash and motions for

protective orders, LSB filed hundreds of significant and dispositive motions and/or briefs, or

responses to same, in the MDL, on appeal to the Courts of Appeals for the Fourth Circuit

(*Travco*), Fifth Circuit (*Southern Homes and Cataphora*), and Ninth Circuit (*Cataphora*), and in

Virginia state court (*Travco*) and Florida state court (working with Ervin Gonzalez, whose efforts

were instrumental) on a wide variety of topics, including: default judgments; personal

jurisdiction; motions to disqualify counsel; economic loss doctrine; exclusions under homeowners

insurance policies; service of process; class settlement certification and approval, objections to

settlement and class notice; All Writs Act authority of the Court; dismissal of Defendants; and

establishment of a litigation fee and expense fund. LSB also handled the response briefing and

assisted in presenting oral argument to the Court on these motions.

LSB participated in forming trial teams and oversaw all trial strategy and trial work in this

litigation for the *Germano*, *Hernandez*, and *North River* bellwether trials, and LSB also oversaw

the intense preparation for the *Clement* and *Campbell* cases that settled on the eve of trial. These

common benefit efforts entailed the selection and preparation of appropriate Plaintiff representatives, multiple inspections of their properties and a complete assessment of individual damages, retention of scientific, technical and damages experts, development of trial themes and illustrative trial exhibits, creation of a comprehensive remediation protocol, organization of focus groups, preparation of witnesses and experts, filing and responding to *Daubert* motions and numerous *in limine* motions, and preparation of opening and closing statements, lines of direct and cross-examination testimony, jury charges, verdict forms, and proposed Findings of Fact and Conclusions of Law.

LSB worked tirelessly to bring the Knauf Defendants, Banner, InEx, L&W, and more than 700 suppliers, installers, and insurers to the table for settlement talks and negotiations, resulting in the KPT Pilot Program, InEx Settlement, Banner Settlement, Knauf Settlement, Global Settlement, and L&W Settlement, as well as the four Virginia class settlements. In addition, LSB oversaw the Major Homebuilders Settlement Agreement which laid the groundwork for the resolution of all Homebuilder's participation in the various settlements. Later, LSB negotiated and resolved various Homebuilder's entitlement to a refund of certain common benefit attorneys' fees set aside from the Banner and Global settlement through a Memorandum of Understanding (Rec.Doc. 20641). All of these settlements were centered and based on the principal Knauf Settlement, which created an <u>uncapped</u> Remediation Fund, to which certain funds from the other settlements were added. LSB prepared or supervised the preparation, execution, and integration of each of the nine detailed and complex class settlement agreements, which provided comprehensive benefits to all class members. LSB also handled the Fairness Hearings and implemented each of the class settlements. This required extensive efforts to confront and overcome objections from professional objectors, including Christopher A. Bandas.

On behalf of class members, LSB analyzed Mr. Bandas' trail of meritless objections designed to achieve a payoff for him to disappear. Rather than engaging in that conduct, LSB successfully deposed Mr. Bandas' clients and had his objections overruled by the Court. In so doing, LSB dispatched Mr. Longer and Mr. Gaughan on repeated occasions to Corpus Christi, Texas to depose and expose the specious objections of Mr. Bandas' clients, Saul Soto and Ernest Vitella, after motions practice resulted in an order from the Southern District of Texas denying Mr. Bandas' motion to quash subpoenas. Earlier, LSB's discovery effort exposed that another objector of Mr. Bandas was his personal secretary, whose identity, once discovered, ignominiously withdrew her objection, along with two other purported clients of Mr. Bandas. LSB also litigated objections lodged by Mr. Mark Milstein and Mr. David Durkee on behalf of their client, Mr. Wayne Kaplan, who was an attorney. Mr. Longer deposed Mr. Kaplan, whose objection to the Banner Settlement was withdrawn following his deposition. LSB coordinated with the Special Master, Claims Administrators, Court-appointed Ombudsman, and Court-appointed Curator for the fair and adequate claims administration processes. LSB was frequently engaged to develop and draft the several Claims Administrator Procedures (or "CAPs") that were necessary to ensure the fair administration of the interrelated settlements, *e.g.*, CAP No. 1; CAP No. 2; CAP No. 3; CAP No. 4; CAP No. 5; and CAP No. 6.

This firm logged 43,663.75 common benefit hours from inception through 2013 and incurred held costs of $1,083,786.21. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $26,524,849.78 plus held costs and remaining assessment for a total of $27,741,493.13, and the Special Master recommends a common benefit fee of $22,588,599.78 plus held costs and remaining assessment for a total of

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 163 of 668
Case 2:09-md-02047-EEF-JCW Document 22049-1 Filed 06/18/19 Page 46 of 215 of
759

$23,805,243.13. The Minority recommends a common benefit fee of $17,000,000.00 plus held

costs and the remaining assessment for a total of $18,216.643.35. The Court notes this firm along

with HHK made the most significant contributions to this litigation, which brought about the

result in this phase of the case. The firm played a leading role in expert location, preparation, and

trial. The firm made a major contribution in designing and negotiating a very complicated

settlement. The Court finds that an appropriate common benefit fee for this firm is

$22,018,233.18 plus held costs and the remaining assessment for a total of $23,234,876.53.

### 32) Lockridge Grindal Nauen P.L.L.P

This law firm is located in Minneapolis, Minnesota. The firm initially became involved in

the Chinese Drywall Litigation when it filed suit on behalf of Plaintiffs who alleged damages in

Louisiana, Ohio and Florida. A partner in the law firm served on the written Discovery

Committee, Experts Committee and Inspections Committee.  The firm participated on one of the

PSC committee telephone conference calls and assisted in preparing a timeline to identify third

parties for subpoenas.

This firm logged 142.50 common benefit hours from inception through 2013 and incurred

held costs of $1,425.20. The firm contributed $10,000.00 in assessments to the litigation of which

$8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee and

the Special Master recommend a common benefit fee of $23,000.00 plus held costs and remaining

assessment for a total of $26,425.20. The Minority recommends a common benefit fee of

$43,000.00 plus held costs and the remaining assessment for a total of $46.425.20. The Court

finds that an appropriate allocation to this firm is a common benefit fee of $27,337.27 plus held

costs and the remaining assessment for a total of $30,762.47.

### 33) **Luckey & Mullins, PLLC**

This law firm is located in Ocean Springs, Mississippi. The firm assisted PSC member Dan Bryson by reviewing shipping invoices and bills of lading early in the litigation, as well as documents to identify manufacturers, suppliers and installers and helped locate builders and homeowners with Chinese drywall. The firm also performed some research on insurance issues involving the pollution exclusion.

This firm logged 47.75 common benefit hours from inception through 2013 and incurred no held costs. The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $14,000.00 plus held costs and remaining assessment for a total of $16,000.00. The Minority recommends a common benefit fee of $34,000.00 plus held costs and the remaining assessment for a total of $36,000.00. The Court notes that all but ten hours of the common benefit time logged by this firm was spent monitoring e-mails. The reminder was either logged pursuant to discovery matters or evaluating settlement. The Court finds that the appropriate allotment to this firm is a common benefit fee of $16,142.63 plus a return of the remaining assessment for a total of $18,142.63.

### 34) **Martzell Bickford**

This law firm is located in New Orleans, Louisiana. The firm initially became involved in the Chinese Drywall Litigation when it retained experts to review and develop methods for identifying contaminated drywall. It worked with members of the PSC to provide assistance for the various meetings with government and elected officials and assisted in limited document discovery review.

This firm logged 155.75 common benefit hours from inception through 2013 and incurred held costs of $15,542.32. The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee recommends a common benefit fee of $23,000.00 plus held costs and remaining assessment for a total of $40,542.32. The Special Master recommends a common benefit fee of $30,000.00 plus held costs and remaining assessment for a total of $47,542.32. The Minority recommends a common benefit fee of $43,000.00 plus held costs and the remaining assessment for a total of $60,542.32. The Court notes that over one half of the common benefit hours logged by this firm (99.26 hours) was spent monitoring e-mails, and the remaining common benefit hours were on logged pursuant to discovery issues and pre-trial preparation. The Court finds the appropriate allotment to this firm is a common benefit fee of $37,668.83 plus held costs and the remainder of the assessment for a total of $55,211.15.

### 35) <u>Mason LLP</u>

This law firm is located in Washington, DC. The firm made contributions in connection with insurance-related matters as Gary Mason was co-chair of the Insurance Committee. However, Mr. Mason focused his efforts on his individual client, Villa Lago, and worked with the PSC in connection with settlement negotiations and finalization of settlement documents, including approval and motions related to the administration of the Villa Lago Settlement.

This firm logged 226.70 common benefit hours from inception through 2013 and incurred held costs of $9,625.50. This firm reports it made important common benefit contributions by making a presentation on the Economic Loss Rule; writing articles on the Economic Loss Rule; participating in litigating the lead Economic Loss Rule case in Maryland; and participating in organizational meetings. The firm contributed $50,000.00 in assessments to the litigation of

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 193 of 668
Case 2:09-md-02047-EEF-JCW Document 22089-1 Filed 08/09/19 Page 49 of 18 of
759

which $40,000.00 has been returned leaving a balance of $10,000.00. The Fee Allocation

Committee recommends a common benefit fee of $70,000.00 plus held costs and remaining

assessment for a total of $89,625.50. The Special Master recommends a common benefit fee of

$80,000.00 plus held costs and remaining assessment for a total of $99,625.50. The Minority

recommends a common benefit fee of $170,000.00 plus held costs and the remaining assessment

for a total of $189,625.50. The Court notes that over one half of the firm's logged common

benefit time (166 hours) were spent in monitoring e-mails and most of the remainder of its time

was spent in pre-trial preparation. The Court finds the appropriate allotment to this firm is a

common benefit fee of $91,480.29 plus held costs and the remaining assessment for a total of

$111,105.79.

### 36) <u>Morgan & Morgan</u>

This law firm is located in Orlando, Florida. This firm filed the first federal court class

action case involving Chinese drywall (*Allen v. Knauf*) in January 2009. Lawyers in the firm

participated in various aspects of the litigation and Scott Weinstein was appointed as a member of

the Plaintiffs' Steering Committee. Michael Goetz of the firm actively participated in discovery

and town hall meetings and Pete Albanis of the firm interviewed experts, participated in

inspections, discovery and helped with legal research. Members of the firm assisted with the

organization of Florida counsel for preparation of Omni complaints and profile forms and also

helped organize profile forms. Further, the firm participated in town hall meetings, contacted

government affiliates in Florida, and the Consumer Product Safety Commission. The firm also

assisted in various state court and MDL trials.

This firm logged 2,969.00 common benefit hours from inception through 2013 and

incurred held costs of $140,581.27. The firm contributed $700,000.00 in assessments to the

litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee

Allocation Committee recommends a common benefit fee of $1,000,000.00 plus held costs and

remaining assessment for a total of $1,273,438.41. The Special Master recommends a common

benefit fee of $1,250,000.00 plus held costs and remaining assessment for a total of

$1,523,438.41. The Minority recommends a common benefit fee of $2,400,000.00 plus held costs

and the remaining assessment for a total of $2,673,438.41. The Court finds that an appropriate

allotment for this firm is $1,947,221.54 for a common benefit fee plus held costs and the

remaining assessments for a total of $2,220,659.95.

### 37) Morris Bart, L.L.C

This law firm is located in New Orleans, Louisiana. The firm became involved in the

Chinese Drywall Litigation in 2009 when it filed individual client lawsuits. Thereafter, the

majority of the firm's hours involved clients' home inspections and common benefit activities in

connection with participating in the Pilot Program. Young attorneys in the firm assisted in

discovery and preparing its clients Cheryl and David Gross for their deposition testimony in

connection with the Interior Exterior bellwether trial. Additionally, the firm participated in

document review and helped create a public service announcement utilized to inform affected

property owners of Chinese Drywall issues.

This firm logged 1,734.66 common benefit hours from inception through 2013 and

incurred held costs of $7,439.42. The firm contributed $10,000.00 in assessments to the litigation

of which $8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation

Committee recommends a common benefit fee of $350,000.00 plus held costs and remaining

assessment for a total of $359,439.42. The Special Master recommends a common benefit fee of

$500,000.00 plus held costs and remaining assessment for a total of $509,439.42. The Minority

recommends a common benefit fee of $370,000.00 plus held costs and the remaining assessment for a total of $379,439.42. The Court notes that over 80% of the firm's common benefit time was spent in monitoring e-mails. Most of its remaining time was for work in discovery and pre-trial preparation. The Court concludes the appropriate allotment for this firm is $376,680.20 plus held costs and a return of the remaining assessment for a total of $386,119.62.

### 38) Nast Law LLC

This law firm is located in Philadelphia, Pennsylvania. Nast Law LLC has 222.60 common benefit hours from inception through 2013, and $2,928.93 in held costs through 2014. The firm did not submit either an Initial Affidavit or a Second Affidavit and did not make a presentation before the Fee Committee. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed, R. Doc. 16829, and $2,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $4,928.93. The Minority recommends a common benefit fee of $20,000.00 plus held costs and the remaining assessment for a total of $24,928.93. The Court finds that an appropriate allotment for this firm fee to this firm is $4,928.93.

### 39) Parker Waichman LLP

This law firm is located in Bonita Springs, Florida. The firm became involved in the *Chinese Drywall* litigation in 2009 when it filed the first federal class action complaint regarding Chinese Drywall entitled *Allen v. Plasterboard Tianjin Co., Ltd., et al*, No. 09-00054, Florida Middle District, Fort Myers Division. Jerrold Parker was appointed to the PSC. The firm represents a substantial number of individual clients. The firm was involved in the creation and

setup of a Plaintiffs' Depository, initially maintained and updated a PSC website that housed Profile Forms and other information regarding affected properties and assisted in inputting information from Plaintiff Profile Forms as well as homeowner's insurance information, into the website database. The firm also participated in town hall meetings and various meetings with government and elected officials to address the circumstances suffered by Plaintiffs and assisted in creating a public service announcement utilized to inform affected property owners of Chinese drywall issues. The firm also worked with the Becnel firm to investigate the nature and extent of potential bodily injury claims. Apart from the firm's initial contributions, it has not been active in the litigation and on June 28, 2018, Mr. Parker moved to withdraw his appointment as a member of the PSC, which the Court granted on June 29, 2018. R. Doc. 21440. The firm reports that it made the following common benefit contributions: researching legal issues particular to Florida; coordinating discovery with builders and drafting related motions to compel; receiving and analyzing remediation offers made by builders to homeowners; organizing and participating in town hall meetings for property owners; handling information concerning bodily injury claims; handling intake of homeowners; handling information concerning defendants insurance and evaluating cases for bellwether trials.

This firm logged 8,905.75 common benefit hours from inception through 2013 and incurred held costs of $146,300.95. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $650,000.00 plus held costs and remaining assessment for a total of $929,158.09. The Special Master recommends a common benefit fee of $2,900,000.00 plus held costs and remaining assessment for a total of $3,179,158.09. The Minority recommends a common benefit fee of 2,050,000.00 plus held costs

and the remaining assessment for a total of $2,329,158.09. The Court notes that nearly one half of the firm's common benefit time was spent on case assessment, and most of that time was logged by paralegals. The majority of its remaining common benefit time was spent on discovery and pre-trial preparation. The Court concludes the appropriate allotment for this firm is a common benefit fee of $2,037,038.98 plus held costs and the remaining assessment for a total of $2,316,197.07.

## 40) Paul A. Lea, Jr., APLC

This law firm is located in Covington, Louisiana. Paul A. Lea, Jr. did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm submitted an Initial Affidavit and indicated that it incurred $16,749.47 in expenses in connection with Chinese Drywall Litigation. Though the affidavit states that a detail of the expenses is contained in the Case Cost Management System maintained by Philip Garrett, the information does not appear in Mr. Garrett's reporting. The firm did not submit a Second Affidavit and did not make a presentation before the Fee Committee.

The Fee Allocation Committee, the Special Master, and the Minority recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $0.00. The Court finds that an appropriate allotment to this firm is $0.00.

## 41) Pender & Coward, PC

This law firm is located in Virginia Beach, Virginia. It filed the first Chinese Drywall case in Virginia Circuit Court in 2009 on behalf of its clients, Dr. Benjamin and Holly Proto. The firm also handled the defense of two (2) Chinese Drywall cases in Virginia. In connection with the *Proto* matter, the firm was paid attorney fees for handling the case and the firm presently seeks to recover common benefit fees, as well as held costs, in order to reimburse the client for some of

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 197 of 668
Case 2:14-cv-02004-MDL-2047-EEF-MBN Document 22007 Filed 08/18/18 Page 54 of 123 of
759

the prior paid attorney fees and costs. This payment was considered by the FC as others have received no compensation over the nine-year span of this protracted litigation. The firm worked with Virginia Class Counsel in connection with the *Proto* case to conduct discovery, work with experts and develop testing protocols and repair protocols to create repair cost estimates for remediation work used in the *Proto* case. The firm also assisted with briefing and defending dispositive motions in the *Proto* case.

This firm logged 702.15 common benefit hours from inception through 2013 and incurred held costs of $17,697.26. The firm did not make any contributions in assessments to the litigation. The Fee Allocation Committee, the Special Master, and the Minority recommend a common benefit fee of $23,000.00 plus held costs and remaining assessment for a total of $40,697.26. The Court finds that an appropriate allotment to this firm is a common benefit fee of $24,752.03 plus held cost for a total of $42,449.29.

### 42) Pendley Baudin & Coffin, LLP

This law firm is located in Plaquemine, Louisiana. This firm first became involved in July 2009 and primarily assisted in reviewing documents in connection with the L&W production, analyzing insurance documents and helped work up initial Knauf cases. The firm performed work on behalf of its individual clients, Hobbie/Renaissance/Villa Lago, together with several other law firms. One of the firm's clients was initially selected into the discovery pool for bellwether cases and the firm worked with the PSC to inspect and investigate the extent of Chinese drywall in the property. The firm assisted in reviewing documents for two of the initial Knauf corporate depositions as well as assisted in briefing regarding some insurance matters. The firm also was an active participant and counsel of record in the competing Lowe's drywall lawsuit filed in Georgia,

which required extensive involvement by the PSC to resolve overlapping claims occurring there, as well as in the MDL.

This firm logged 717.45 common benefit hours from inception through 2013 and incurred held costs of $9,877.46. The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee recommends a common benefit fee of $47,000.00 plus held costs and remaining assessment for a total of $58,877.46. The Special Master recommends a common benefit fee of $150,000.00 plus held costs and remaining assessment for a total of $161,877.46. The Minority recommends a common benefit fee of $67,000.00 plus held costs and the remaining assessment for a total of $78,877.46. The Court notes that over 75% of the time reported as common benefit was spent monitoring e-mails, and one half of that time was done by a paralegal. The majority of the remaining time recorded by the firm was for work done in discovery and pre-trial preparation. The Court finds the appropriate allotment for this firm is a common benefit fee of $53,811.46 plus held costs and the remaining balance of the assessment for a total of $65,688.92.

### 43) **Podhurst Orseck, P.A**

This law firm is located in Miami, Florida. Then-Partner Victor Diaz was appointed to the PSC pursuant to PTO 8 and remained on the PSC until January/February 2011, when he left the firm, and Robert Josefsberg was appointed to the PSC, who was later replaced by Peter Prieto. The law firm was actively involved in early 2009 and filed the *Harrell* case, which resulted in one of the first individual fee recoveries of a Chinese drywall matter. The firm also filed the Morris-Chin case which was the first Chinese drywall case that achieved service of process through the Hague Convention. Members of the firm participated actively in the discovery phase of the *Harrell* matter, which, together with the *Seifart* case in Florida, revealed important documents

55

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 199 of 668
Case 2:09-md-02047-EEF-JCW Document 22401 Filed 03/04/19 Page 56 of 125 of
759

leading to the Banner settlement. Further, members of the firm actively participating in preparing and taking a number of Knauf Defendant key employee depositions. Members of the firm also were involved in briefing both federal and state court matters involving issues pertaining to the Economic Loss Doctrine, the Hague Convention, and further assisted in working with experts and expert reports. The firm also gathered materials from the Consumer Product Safety Commission, Florida Health and made FOIA requests and worked on government relations and public relation matters. This firm had representation on the following committees: Science Committee, Government Relations Committee, Public Relations/Public Affairs Committee, Personal Injury Committee and Trial Committee.

This firm logged 5,483.25 common benefit hours from inception through 2013 and incurred held costs of $173,657.23. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $1,000,000.00 plus held costs and remaining assessment for a total of $1,306,514.37. The Special Master recommends a common benefit fee of $2,000,000.00 plus held costs and remaining assessment for a total of $2,306,514.37. The Minority recommends a common benefit fee of $2,400,000.00 plus held costs and the remaining assessment for a total of $2,706,514.37. The Court finds that an appropriate allotment to this firm is $2,162,467.36 in common benefit fee plus held costs and the remaining assessment for a total of $2,468,981.73.

### 44) Reeves & Mestayer, PLLC (f/k/a Lumpkin & Reeves PLLC)

This law firm is located in Biloxi, Mississippi. The firm became involved in the Chinese Drywall Litigation early on when it filed individual client lawsuits and Jim Reeves was appointed to the Plaintiffs' Steering Committee. Members of the firm served on the following committees:

Case 2:09-md-02047-EEF-MBN Document 22290-10 Filed 12/06/19 Page 200 of 668
Case 2:09-cv-06404-EEF-MBN Document 22390-1 Filed 08/09/19 Page 57 of 126 of
759

Witness Development Committee, Governmental Relations Committee, Inspections Committee, Insurance Committee, State and Federal Committee, Discovery Deposition Committee and Trial and Trial Package Committee. The firm was very active in cases from Alabama and Mississippi. It participated in discovery matters including document review, preparation of written discovery and depositions. Members of the firm traveled and participated in depositions outside of the United States involving Knauf management. The firm assisted in discovery and preparation of the Interior Exterior bellwether trial. It was an active participant in document selection and the vetting of experts for use at the InEx trial. It also provided legal research specific to Alabama and Louisiana law that was utilized by the PSC. The firm also assisted with town hall meetings.

This firm logged 9,364.71 common benefit hours from inception through 2013 and incurred held costs of $76,878.62. The firm contributed $650,000.00 in assessments to the litigation of which $520,000.00 has been returned leaving a balance of $122,857.14. The Fee Allocation Committee recommends a common benefit fee of $600,000.00 plus held costs and remaining assessment for a total of $799,735.76. The Special Master recommends a common benefit fee of $2,250,000.00 plus held costs and remaining assessment for a total of $2,449,735.76. The Minority recommends a common benefit fee of $2,000,000.00 plus held costs and the remaining assessment for a total of $2,199,735.76. The Court concludes the appropriate allotment to this firm is a common benefit fee of $2,152,458.27 plus held costs and a return of the remaining assessment for a total of $2,352,194.03.

### 45) <u>Reich & Binstock, LLP</u>

This law firm is located in Houston, Texas. Reich & Binstock, LLP did not have any common benefit hours from inception through 2013, or any held costs through 2014. The firm

contributed $50,000.00 in assessments to the litigation through 2013, of which $40,000.00 was reimbursed R. Doc. 16829, and $10,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $10,000.00. The Minority recommends a common benefit fee of $100,000.00 plus held costs and the remaining assessment for a total of $110,000.00. The Court finds that an appropriate allotment to this firm is $10,000.00.

## 46) **Rhine Law Firm, P.C.**

This law firm is located in Wilmington, North Carolina. The firm provided preliminary research on insurance coverage matters before turning exclusively towards handling its individual client, the Villa Lago claim.

This firm logged 417.75 common benefit hours from inception through 2013 and incurred held costs of $11,109.28. The firm contributed $10,000.00 in assessments to the litigation of which $8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee recommends a common benefit fee of $47,000.00 plus held costs and remaining assessment for a total of $60,109.28. The Special Master recommends a common benefit fee of $65,000.00 plus held costs and remaining assessment for a total of $78,109.28. The Minority recommends a common benefit fee of $67,000.00 plus held costs and the remaining assessment for a total of $80,109.28. The Court notes that 40% of the common benefit time logged by this firm was spent in monitoring e-mails. The majority of the remaining common benefit time recorded by this firm was spent on pre-trial matters and discovery. The Court concludes an appropriate allotment to this firm is a common benefit fee of $66,474.01 plus held costs and a return of the balance of the assessment for a total of $79,583.29.

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 203 of 668
Case 2:09-md-02047-EEF-JCW Document 22019-1 Filed 08/19/19 Page 99 of 128 of
759

**47) <u>Richard J. Serpe, P.C.</u>**

This law firm is located in Norfolk, Virginia, and was an early leader among Plaintiffs' counsel in developing the concepts and the evidence necessary to support both the liability and damage claims of Plaintiffs in the *Chinese Drywall* litigation. Mr. Serpe was appointed to the PSC. As counsel representing the intervening Plaintiffs in the first bellwether (*Germano*) trial, he was not only an active but a lead member of that trial team. Mr. Serpe was also primarily responsible for advancing the Chinese Drywall claims of Plaintiffs in the parallel Virginia state court litigation, a substantial responsibility which precluded his handling of other legal business for his firm. The Virginia state court litigation involved extensive discovery, multiple trial settings against non-manufacturer Defendants, and four separately-negotiated and judicially-approved class settlements. These settlements served to enhance the global settlement efforts in the MDL.

Mr. Serpe continues to assist in pursuing the non-settling Taishan Defendants, principally Taishan Gypsum Co., Ltd., Taian Taishan Plasterboard, their parents CNBM and BNBM, and related entities and to achieve a judgment for class-wide damages for Plaintiffs with Taishan-manufactured Chinese Drywall. To this end, he has successfully negotiated a settlement with Taishan to compensate the Porter-Blaine/Venture Supply class for claims they were assigned by the Porter-Blaine/Venture Supply Defendants in one of the Virginia class settlements. Mr. Serpe attended monthly Virginia status conferences, set scores of cases for trial against builders and installers not covered by the four Virginia class settlements, and obtained millions of additional dollars in settlements for the Venture victims. Further, Mr. Serpe spent hundreds of hours reviewing Taishan document productions focused on distribution networks and he took three major importer depositions before traveling to Hong Kong during the first round of depositions abroad.

This firm logged 13,413.08 common benefit hours from inception through 2013 and incurred held costs of $76,064.30. The firm contributed $375,000.00 in assessments to the litigation of which $300,000.00 has been returned leaving a balance of $75,000.00. The Fee Allocation Committee and the Minority recommend a common benefit fee of $3,650,000.00 plus held costs and remaining assessment for a total of $3,801,064.30. The Special Master recommends a common benefit fee of $3,500,000.00 plus held costs and the remaining assessment for a total of $3,651,064.30. The Court finds that an appropriate allotment to this firm is a common benefit fee of $4,252,075.33 plus held costs and the remaining assessment for a total of $4,403,139.63.

### 48) Law Offices of Robert M. Becnel

This law firm is located in LaPlace, Louisiana. The firm became involved in the Chinese Drywall Litigation early on in the MDL. With leadership approval, it assisted in inspecting homes and helped create some of the protocols for the inspection of homes. The firm also participated in efforts with elected officials to address the circumstances suffered by Plaintiffs.

This firm logged 819.00 common benefit hours from inception through 2013 and incurred held costs of $6,216.99. The firm contributed $75,000.00 in assessments to the litigation of which $60,000.00 has been returned leaving a balance of $15,000.00. The Fee Allocation Committee recommends a common benefit fee of $4,500.00 plus held costs and remaining assessment for a total of $25,716.99. The Special Master recommends a common benefit fee of $100,000.00 plus held costs and remaining assessment for a total of $121,216.99. The Minority recommends a common benefit fee of $154,500.00 plus held costs and the remaining assessment for a total of $175,716.99. The Court notes that 30% of the common benefit time logged by this firm was spent monitoring e-mails. The majority of the remaining time reported by this firm was spent on

discovery. The Court concludes that the appropriate allotment to this firm is a common benefit fee of $81,861.86 plus held costs and a return of the remaining assessment for a total of $103,078.85.

### 49) Roberts & Durkee, PA & Milstein Adelman, LLP

The Durkee firm is located in Coral Gables, Florida. The Milstein firm is located in Santa Monica, California. These firms worked closely together, and began activities involving Chinese drywall in late 2008 in the State of Florida. Durkee was Plaintiffs' Liaison Counsel in West Palm Beach and was on the Plaintiffs' Steering Committee in the Miami-Dade and Broward County litigation. Mr. Durkee participated in briefing Florida legal issues and was involved in the Banner mediations. The firm worked on political matters, which included meetings with a State Senator and addressing tax relief for victims. On November 29, 2012, an Agreement was reached with the Plaintiffs' Steering Committee in the MDL that allowed the Milstein and Durkee to submit their time and expenses for common benefit consideration.

This firm logged 3,722.50 common benefit hours from inception through 2013 and incurred held costs of $155,928.82. The firms did not make any contributions in assessments to the litigation. The Fee Allocation Committee, the Special Master, and the Minority recommend a common benefit fee of $450,000.00 plus held costs and remaining assessment for a total of $605,928.82. The Court finds that an appropriate allotment is a common benefit fee of $484,303.11 for a total of $640,231.93.

### 50) Seeger Weiss LLP

This law firm is located in New Jersey. Chris Seeger was appointed to the PSC. Seeger Weiss committed significant resources to the MDL to establish the science that would drive the claims and discovery in this litigation and to conduct key bellwether trials that would serve as a basis for establishing liability against the manufacturing Defendants and the scope of remediation

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 205 of 668
Case 2:09-cv-06690-EEF-MBN Document 22349-1 Filed 06/09/19 Page 62 of 131 of
759

damages for all Plaintiffs. The results achieved from the back-to-back *Germano* trial against

Taishan Gypsum Co. in February 2010 and the *Hernandez* trial against the Knauf Defendants in

March 2010, in which Seeger Weiss acted as lead trial counsel, helped lead to the settlement

ultimately reached with distributor, supplier, and installer Defendants and their insurers.

     Seeger Weiss, as one of the leaders of the MDL trial teams, provided significant expertise

and insight to counsel overseeing state court trials around the country, including the *Harrell* trial

against Banner in Florida. In addition, Seeger Weiss assisted in document review, preparation of

time lines, and development of profile forms, inspection protocols, electronic discovery protocols

involving matters such as search terms, etc. Seeger Weiss also prepared numerous pretrial

motions related to discovery, particularly motions to compel. Seeger Weiss took and defended

most of the expert depositions, prepared *Daubert* motions and other *in limine* motions, and

successfully argued several motions concerning the scope of discovery and the lack of validity of

Defendants' proffered scientific expert opinions. Further, Seeger Weiss prepared the Plaintiffs for

trial, identified witnesses, conducted focus groups, developed trial themes and theories of liability

and damages, created illustrative trial exhibits, and otherwise oversaw and participated in every

aspect of the *Germano*, *Hernandez*, and *North River* trials and the preparation for the *Clement* and

*Campbell* trials, which settled on the eve of trial. These responsibilities required substantial

attention from Seeger Weiss, including key members of the firm for intensive periods during the

litigation. Seeger Weiss's efforts resulted in verdicts for Plaintiffs that ultimately established the

Court's remediation protocol.

     Members of the Seeger Weiss firm were active in the preparation and taking depositions

of the Knauf Defendants in Germany, as well as Banner and InEx depositions. Mr. Seeger

participated in and took many of the depositions in both of the initial rounds of depositions that took place in Hong Kong.

This firm logged 14,380.35 common benefit hours from inception through 2013 and incurred held costs of $399,123.84. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned. Of the $140,000.00 remaining after partial reimbursement of assessments, the firm voluntarily donated $7,142.82 to the American Association for Justice, leaving a balance of $132,857.18. The Fee Allocation Committee and the Minority recommend a common benefit fee of $8,600,000.00 plus held costs and remaining assessment for a total of $9,131,981.02. The Special Master recommends a common benefit fee of $8,500,000.00 plus held costs and remaining assessment for a total of $9,031,981.02. The Court finds an appropriate allotment to this firm is a common benefit fee of $9,675,323.21 plus held costs and a return of the remaining assessment in the total amount of $10,207,304.23.

### 51) <u>Law Offices of Sidney Torres, III</u>

This law firm is located in Chalmette, Louisiana. Law Offices of Sidney Torres, III did not submit any common benefit hours or held costs to the Court-appointed CPA pursuant to PTO 9. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed R. Doc. 16829, and $2,000.00 is outstanding. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $2,000.00. The Minority recommends a common benefit fee of $20,000.00 plus held costs and the remaining assessment for a total of $22,000.00. The Court finds that an appropriate allotment to this firm is $2,000.00.

## 52) **Singleton Law Firm**

This law firm is located in Shreveport, Louisiana. The firm performed minimal common benefit work, much of which was simply review of emails and attending conferences. The firm seeks compensation for visiting a number of homes that contained Chinese drywall and had some generalized discussions with Mr. and Mrs. Hernandez.

This firm logged 339.00 common benefit hours from inception through 2013 and incurred held costs of $9,862.94. The firm contributed $50,000.00 in assessments to the litigation of which $40,000.00 has been returned leaving a balance of $10,000.00. The Fee Allocation Committee and the Special Master recommend a common benefit fee of $18,000.00 plus held costs and remaining assessment for a total of $37,862.94. The Minority recommends a common benefit fee of $118,000.00 plus held costs and the remaining assessment for a total of $137,862.94. The Court notes that 33% of the common benefit time logged by this firm was spent monitoring e-mails. There is a reference to 155 hours logged at trial, but there is no record of the firm's handling any trial, so the Court assumes the reference is for assistance in trial preparation. The Court concludes the appropriate allotment to this firm is a common benefit fee of $21,469.43 plus held costs and a return of the remaining assessment for a total of $41,332.37.

## 53) **Strom Law Firm, LLC**

This law firm is located in Columbia, South Carolina. Strom Law Firm, LLC has 69.25 common benefit hours from inception through 2013, and $3,356.21 in held costs through 2014. The firm did not submit either an Initial Affidavit or a Second Affidavit and did not make a presentation before the Fee Committee. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed R. Doc. 16829, and $2,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $5,356.21. The Minority recommends a common benefit fee of $20,000.00 plus held costs and the remaining assessment for a total of $25,356.21. The Court finds that the appropriate allotment to this firm is a total of $5,356.21.

### 54) **Taylor Martino, PC**

This law firm is located in Mobile, Alabama. Taylor Martino actively participated in the Prichard McCall settlement, in which Lead counsel contributed, and which served to initiate later settlements in the litigation.

This firm logged 471.00 common benefit hours from inception through 2013 and incurred held costs of $0.00. The firm did not make any contributions in assessments to the litigation. The Fee Allocation Committee, the Special Master, and the Minority recommend a common benefit fee of $175,000.00 plus held costs and remaining assessment for a total of $175,000.00. The Court finds that an appropriate allotment to the firm is $188,341.46.

### 55) **The Lambert Firm**

This law firm is located in New Orleans, Louisiana. The Lambert Firm (previously Lambert & Nelson), through its founder and owner Hugh Lambert, was actively involved in this MDL from its earliest stages. Mr. Lambert was appointed to the PSC. The firm participated in the development of inspection and preservation-of-evidence protocols and procedures. Mr. Lambert also assisted the PSC trial teams in the MDL bellwether trials, *i.e.*, *Germano*, *Hernandez* and *Campbell/Clement*. Mr. Lambert and his firm also rendered assistance to the PSC trial team in the trial against InEx and North River Insurance. As Chair of the Insurance Committee of the PSC, Mr. Lambert participated in the organization and analysis of global homeowner insurance

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 209 of 668
Case 2:14-cv-02004-EEF-MBN Document 27-1 Filed 08/09/19 Page 96 of 135 of
759

information and coverage issues. This firm reports that it made the following additional common

benefit contributions: serving Rule 30(b)(6) notices and subpoenas duces tecum; compelling

production of documents; organizing and analyzing produced documents; deposing witnesses;

advising the PSC concerning the briefing of legal issues; researching and briefing various motions

and developing inspections protocols

This firm logged 4,750.00 common benefit hours from inception through 2013 and

incurred held costs of $63,448.31. The firm contributed $700,000.00 in assessments to the

litigation of which $560,000.00 has been returned leaving a balance of $132,857.14. The Fee

Allocation Committee recommends a common benefit fee of $1,400,000.00 plus held costs and

remaining assessment for a total of $1,596,305.45. The Special Master recommends a common

benefit fee of $1,500,000.00 plus held costs and remaining assessment for a total of

$1,696,305.45. The Minority recommends a common benefit fee of $2,800,000.00 plus held costs

and the remaining assessment for a total of $2,996,305.45. The Court notes that, of the 4,750

common benefit hours this firm logged in this case, 3,274 (69%) were spent in case assessment.

However, since its lead counsel was on the PSC, it was necessary that he keep abreast of the

developments in the case to help guide the litigation. But, to be fair, it has to be conceded that this

time should not be valued at the same level as his time in pre-trial, discovery, trial, and settlement

negotiations. The Court concludes the appropriate common benefit for this firm is $2,793,078.43

plus held costs and a return of the remaining assessment for a total of $2,989,383.88.

### 56) <u>The Steckler Law Firm / Baron & Budd</u>

These law firms are located in Dallas, Texas. Bruce Steckler was appointed to the PSC at

the inception of this matter, and at that time was a shareholder at Baron & Budd, PC. In the

course of the litigation, Mr. Steckler left Baron & Budd and became a partner in Steckler LLP

a/k/a The Steckler Law Firm. However, a single, common benefit fee application is submitted by the two entities, with the understanding that one allocation of a share of the common benefit fee fund will be deemed as recognizing the combined common benefit contribution of both entities, and in particular, the continuing contributions of Mr. Steckler over the course of his association with both entities. At the PSC's request, Mr. Steckler took a lead role for Plaintiffs in the MDL on all bankruptcy issues. He also shared a lead role on insurance matters in the MDL, and coverage issues in particular (both for CGL and homeowner policies). Mr. Steckler actively worked in resolving demands on commercial carriers, including those carriers named in the *Pate* action being prosecuted by Robert Horkovich and Anderson Kill on behalf of WCI. Mr. Steckler also participated in settlement discussions with Knauf and certain homebuilders.

This firm logged 6,870.32 common benefit hours from inception through 2013 and incurred held costs of $180,679.34. The firm contributed $700,000.00 in assessments to the litigation of which $560,000.00 has been returned. Of the $140,000.00 remaining after partial reimbursement of assessments, the firm voluntarily donated $7,142.86 to the American Association for Justice, leaving a balance of $132,857.14. The Fee Allocation Committee recommends a common benefit fee of $1,800,000.00 plus held costs and remaining assessment for a total of $2,113,536.48. The Special Master recommends a common benefit fee of $2,500,000.00 plus held costs and remaining assessment for a total of $2,813,536.48. The Minority recommends a common benefit fee of $3,200,000.00 plus held costs and the remaining assessment for a total of $3,513,536.48. The Court notes that, of the 6870 common benefit hours logged by these firms, 3735 (54%) were spent in case assessment. However, since the main partner was a member of the PSC, it was necessary for him to keep abreast of the cases' developments, so he could assist in chartering the litigation's direction. But, as previously noted,

it must be conceded that this time is not entitled to the same value as his time in discovery, pre-

trial, and trial. The Court finds an appropriate allotment to these firms is a common benefit fee of

$2,902,596.96 plus held costs and the return of the remaining assessment for a total of

$3,216,133.44.

### 57) Thornhill Law Firm

This law firm is located in Slidell, Louisiana. Members of Thornhill Law Firm, APLC

assisted in discovery aspects related to its client, Kelly and Steven Teal, who were chosen by the

Knauf entities as potential bellwether Plaintiffs and later in the litigation selected by Interior

Exterior Building Supply and North River Insurance Company as potential bellwether Plaintiffs.

The activities performed by the firm in these matters included inspection of the Teal's property

and assisting with their deposition. Furthermore, the firm provided input with respect to insurance

matters.

This firm logged 115.75 common benefit hours from inception through 2013 and incurred

held costs of $1,607.49. The firm contributed $10,000.00 in assessments to the litigation of which

$8,000.00 has been returned leaving a balance of $2,000.00. The Fee Allocation Committee and

the Special Master recommend a common benefit fee of $18,000.00 plus held costs and remaining

assessment for a total of $21,607.49. The Minority recommends a common benefit fee of

$38,000.00 plus held costs and the remaining assessment for a total of $41,607.49. The Court

finds the appropriate allotment to this firm is a common benefit fee of $26,877.24 plus held costs

and a return of the remaining assessment for a total of $30,484.73.

### 58) Vaughn Bowden & Wooten, PA

This law firm is located in Gulfport, Mississippi. The firm assisted in addressing a

singular issue involved in the Rule 30(b)(6) deposition of InEx, which was limited to ASTM

standards, agreements between InEx and local drywall retailers and the manner in which retailers sold drywall to consumers, installers and contractors. In connection with this, the firm interviewed an individual chemist, who was one of the authors of the ASTM C36 and ASTM 1396 Standards for Gypsum Drywall, and the firm also reviewed purchase orders and delivery tickets from InEx.

This firm logged 100.50 common benefit hours from inception through 2013 and incurred held costs of $0.00. The firm did not make any contributions in assessments to the litigation. The Fee Allocation Committee, the Special Master, and the Minority recommend a common benefit fee of $4,500.00 plus held costs and remaining assessment for a total of $4,500.00. The Court finds that an appropriate allotment to this firm is $4,844.13.

### 59) **VM Diaz and Partners, LLC**

This law firm is located in Miami, Florida. Partner, Victor Diaz, previously was a partner in the Podhurst Orseck. PA law firm up until January/February 2011. Though Mr. Diaz was not on the PSC as of January/February 2011, he was reappointed to the PSC in March 2012 in Pre-Trial Order No. 8(B). Victor Diaz was active in the *Synalovski* and *Harrell* cases and worked with PSC leadership to resolve and administer the *Harrell* matter. Further, Mr. Diaz attended Knauf witness depositions in New York and Germany and took discovery in his capacity as counsel for individual clients.

This firm logged 2,070.00 common benefit hours from inception through 2013 and incurred held costs of $16,414.31. The firm did not make any contributions in assessments to the litigation. The Fee Allocation Committee and the Minority recommend a common benefit fee of $500,000.00 plus held costs and remaining assessment for a total of $516,414.31. The Special Master recommends a common benefit fee of $600,000.00 plus held costs and the remaining

69

assessment for a total of $616,414.31. The Court notes that, of the 2,070 common benefit hours logged by this firm, 1,564 (75%) were spent on case assessment. For a period, the lead counsel was a member of the PSC and needed to keep current on the developments in the case to allow him to properly assist in directing the course of the litigation, so the time spent in case assessment is justified. However, this time was limited and is not entitled to the same value as time this counsel spent on discovery, trial, and settlement. The Court concludes the appropriate allotment to this firm is a common benefit fee of $538,114.54 plus held costs and the remaining assessment for a total of $554,528.85.

### 60) Webb & Scarmozzino, P.A.

This law firm is located in Fort Myers, Florida. Webb & Scarmozzino, P.A. has 47.00 common benefit hours from inception through 2013, and $4,119.34 in held costs through 2014. The firm did not submit either an Initial Affidavit or a Second Affidavit and did not make a presentation before the Fee Committee. The firm contributed $10,000.00 in assessments to the litigation through 2013, of which $8,000.00 was reimbursed R. Doc. 16829, and $2,000.00 is outstanding.

The Fee Allocation Committee and the Special Master recommend a common benefit fee of $0.00 plus held costs and remaining assessment for a total of $6,119.34. The Minority recommends a common benefit fee of $20,000.00 plus held costs and the remaining assessment for a total of $26,119.34. The Court notes that the total common benefit time recorded by this firm was spent on case assessment and the firm was not on the PSC so there was, in fact, no common benefit rendered by this firm. The Court concludes that the appropriate allotment to this firm is $6,119.34.

70

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 31 of 66
Case 2:14-cv-02004-EEF-MBN Document 29-1 Filed 04/18/15 Page 31 of 40 of
759

### 61) Whitfield, Bryson & Mason (Lewis & Roberts PLLC)

This law firm is located in Raleigh, North Carolina. The firm became involved in the *Chinese Drywall* Litigation early in the MDL. Partner Dan Bryson was appointed to the PSC. The firm assisted in reviewing documents produced during the course of the MDL and helped prepare discovery. Mr. Bryson was appointed co-chair of the Science and Expert Committee and actively worked with experts that were utilized at trial in the *Germano* and *Hernandez* cases, as well as trials in Florida state court. WBM also assisted in taking many of the expert depositions and prepared responses to *Daubert* motions and motions *in limine*. The firm also helped draft Proposed Findings of Fact and Conclusions of Law and worked with the trial team for bellwether trials. The firm also helped review shipping invoices and bills of lading to identify manufacturers, suppliers and installers of Chinese Drywall. WBM has worked with a consortium of other firms to handle many individual clients. Apart from its initial intensive trial work of 2009–2010, and support of state trial work in Florida, WBM has not been particularly active in MDL common benefit work, and devoted itself to individual client projects, e.g. Villa Lago.

This firm logged 7,864.35 common benefit hours from inception through 2013 and incurred held costs of $149,666.16. The firm contributed $400,000.00 in assessments to the litigation through 2013, of which $320,000.00 was reimbursed, R. Doc. 16829, and $80,000.00 is outstanding.

The Fee Allocation Committee recommends a common benefit fee of $3,000,000.00 plus held costs and remaining assessment for a total of $3,229,666.16. The Special Master recommends a common benefit fee of $3,100,000.00 plus held costs and remaining assessment for a total of $3,329,666.16. The Minority recommends a common benefit fee of $3,800,000.00 plus held costs and remaining assessment for a total of $4,029,666.16. The Court finds the

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 215 of 668
Case 2:09-cv-06604-EEF-JCW Document 22049-1 Filed 08/09/19 Page 82 of 41 of
759

appropriate allotment to this firm is a common benefit fee of $3,766,804.67 plus held costs and

the remaining assessment for a total of $3,996,470.83.

Accordingly; for the foregoing reasons,

**IT IS ORDERED** that the common benefit fund shall be allocated to the following firms

in the following amounts, plus any interest accumulated over this amount:

| Law Firm Name | Total |
|---|---|
| Allison Grant, P.A. | $29,059.44 |
| Alters, Boldt, Brown, Rash & Culmo | $187,577.00 |
| Anderson Kill, PC | $132,016.48 |
| Andry Law Firm | $2,000.00 |
| Aronfeld Trial Lawyers, P.A. | $9,199.03 |
| Aylstock, Wilkin, Kreis & Overhotz | $2,000.00 |
| Barrios, Kingsdorf & Casteix | $3,105,907.06 |
| Becnel Law Firm LLC | $1,237,297.61 |
| Bencamo & Associates | $2,000.00 |
| Berrigan, Litchfield, et al. | $2,968.82 |
| Bruno & Bruno, LLP | $51,268.74 |
| Burdman Law Group | $17,704.36 |
| Collins - Live Oak | $2,000.00 |
| Colson Hicks Edison | $5,361,624.16 |
| Cuneo Gilbert & LaDuca | $27,518.03 |

| | |
|---|---|
| Davis & Duncan | 0.00 |
| Gainsburgh, Benjamin, et al | $9,432,924.95 |
| Gary, Naegele & Theado | $81,584.91 |
| Glago Law Firm | $2,000.00 |
| Hausfeld LLP | $3,652,095.49 |
| Hawkins Stracener & Gibson | $2,000.00 |
| HHK | $22,342,192.59 |
| Ingram & Associates | $2,000.00 |
| Irpino Law Firm | $2,923,500.71 |
| Kanner & Whiteley, L.L.C. | $78,275.56 |
| Krupnick, Campbell, etc | $464,729.49 |
| Landskroner, Grieco & Merriman, LLC | $31,857.33 |
| Lemmon Law Firm | $816,129.82 |
| Leopold Kuvin, P.A. & Mrachek, Fitzgerald | $88,600.80 |
| Levin Papantonio Law | $1,515,332.59 |
| Levin, Sedran & Berman | $23,234,876.53 |
| Lockridge, Grindal, Nauen | $30,762.47 |
| Luckey & Mullins, PLLC | $18,142.63 |
| Martzell Bickford | $55,211.15 |
| Mason LLP | $111,105.79 |

Case 2:09-cv-03047-EEF-MBN Document 22390-10 Filed 12/06/19 Page 217 of 668
Case 2:14-cv-02404-EEF-MBN Document 22049-1 Filed 08/09/19 Page 34 of 43
759

| | |
|---|---|
| Morgan & Morgan | $2,220,659.95 |
| Morris Bart, L.L.C | $386,119.62 |
| Nast Law Firm | $4,928.93 |
| Parker Waichman LLP | $2,316,197.07 |
| Paul A. Lea, Jr., APLC | $0.00 |
| Pender & Coward, PC | $42,449.29 |
| Pendley Baudin & Coffin | $65,688.92 |
| Podhurst Orseck, P.A | $2,468,981.73 |
| Reeves & Mestayer | $2,352,194.03 |
| Reich & Binstock, LLP | $10,000.00 |
| Rhine Law Firm, P.C. | $79,583.29 |
| Richard J. Serpe, P.C. | $4,403,139.63 |
| Robert M. Becnel | $103,078.85 |
| Roberts & Durkee PA/Milstein Adelman | $640,231.93 |
| Seeger Weiss LLP | $10,207,304.23 |
| Sidney Torres, III | $2,000.00 |
| Singleton Law Firm | $41,332.37 |
| Strom Law Firm | $5,356.21 |
| Taylor Martino, PC | $188,341.46 |
| The Lambert Firm | $2,989,383.88 |

| | |
|---|---|
| The Steckler Law Firm | $3,216,133.44 |
| Thornhill Law Firm | $30,484.73 |
| Vaughn, Bowden & Wooten, P.A. | $4,844.13 |
| VM Diaz and Partners | $554,528.85 |
| Webb & Scarmozzino, P.A. | $6,119.34 |
| Whitfield Bryson Mason | $3,996,470.83 |
| **Totals** | $111,389,016.26 |

New Orleans, Louisiana on this __4th__ day of February, 2019.

_____
Eldon E. Fallon
U.S. District Court Judge

# Appendix I – Time Totals by Firm

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Allison Grant, P.A. | Grant, Allison | Attorney | 26.75 | 7.75 | 9.75 | 0 | 0 | 40.75 | 85 |
| **Allison Grant, P.A.Total** | | | **26.75** | **7.75** | **9.75** | **0** | **0** | **40.75** | **85** |
| Alters, Boldt, Brown, Rash, & Culmo | Alters, Jeremy | Attorney | 165 | 124.25 | 30.25 | 11.5 | 0 | 0 | 331 |
| Alters, Boldt, Brown, Rash, & Culmo | Brown, Bob | Attorney | 56 | 86.75 | 48.75 | 4.25 | 0 | 0 | 195.75 |
| Alters, Boldt, Brown, Rash, & Culmo | Crenshaw, Andre | Attorney | 40 | 37 | 1.25 | 0 | 0 | 0 | 78.25 |
| Alters, Boldt, Brown, Rash, & Culmo | Gilbert, Bobby | Attorney | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Alters, Boldt, Brown, Rash, & Culmo | Rogow, Bruce | Attorney | 0 | 16 | 0 | 0 | 0 | 0 | 16 |
| Alters, Boldt, Brown, Rash, & Culmo | Feurtado-Pedron, Annette | Paralegal | 25.25 | 0 | 0 | 0 | 0 | 0 | 25.25 |
| Alters, Boldt, Brown, Rash, & Culmo | Moore, Matthew | Law Clerk | 0 | 9.25 | 0 | 0 | 0 | 0 | 9.25 |
| **Alters, Boldt, Brown, Rash, & CulmoTotal** | | | **288.25** | **273.25** | **80.25** | **15.75** | **0** | **0** | **657.5** |
| Anderson Kill, PC | CONNOLLY, KEVIN | Attorney | 0 | 0 | 0.25 | 0 | 0 | 0 | 0.25 |
| Anderson Kill, PC | DICANIO, CARRIE | Attorney | 8.5 | 0 | 0 | 0 | 0 | 0 | 8.5 |
| Anderson Kill, PC | HERTZOG, RENE | Attorney | 3 | 72.5 | 0 | 0 | 0 | 0 | 75.5 |
| Anderson Kill, PC | HORKOVICH, ROBERT | Attorney | 7.25 | 64.25 | 26.25 | 15.75 | 0 | 88.25 | 201.75 |
| Anderson Kill, PC | LADD, MARK | Attorney | 1.25 | 518.25 | 3 | 0 | 0 | 0 | 522.5 |
| Anderson Kill, PC | MASCIA, RAYMOND | Attorney | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| Anderson Kill, PC | PIAZZA, ANNA | Attorney | 95.75 | 732.75 | 220 | 14.25 | 0 | 57.75 | 1,120.50 |
| Anderson Kill, PC | GERSHMAN, HARRIS | Paralegal | 710.28 | 14.25 | 2.5 | 0 | 0 | 10.7 | 737.73 |
| Anderson Kill, PC | ILIE, CLAUDIA | Paralegal | 47.5 | 60.25 | 39.5 | 0 | 0 | 0 | 147.25 |
| Anderson Kill, PC | MOLINA, ANNA | Paralegal | 2.5 | 0 | 0 | 0 | 0 | 0 | 2.5 |
| Anderson Kill, PC | STANOMIR, MICHAELA | Paralegal | 3 | 0 | 54.75 | 0 | 0 | 0 | 57.75 |
| Anderson Kill, PC | TALABACU, VICTORIA | Paralegal | 64 | 35 | 60 | 0 | 0 | 0 | 159 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|------|----------|-------|-----------------|-----------|-----------|-------|--------|------------|-------------|
| Anderson Kill, PC | FELDGREBER, IZAK | Other | 404.25 | 8.75 | 0 | 0 | 0 | 0 | 413 |
| Anderson Kill, PC | FIELDS, GLENN | Other | 675.35 | 12.5 | 0 | 0 | 0 | 0 | 687.85 |
| Anderson Kill, PC | FLYNN, DONALD | Other | 0 | 0 | 5 | 0 | 0 | 0 | 5 |
| Anderson Kill, PC | LYEW, DARYL | Other | 0 | 0 | 13.75 | 0 | 0 | 0 | 13.75 |
| Anderson Kill, PC | NATSU, CORINA | Other | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Anderson Kill, PC | QUILES, ESTHER | Other | 5.25 | 0.25 | 0 | 0 | 0 | 0 | 5.5 |
| Anderson Kill, PC | SAMET, KATHLEEN | Other | 0 | 0 | 3.5 | 0 | 0 | 0 | 3.5 |
| **Anderson Kill, PCTotal** | | | **2,045.88** | **1,519.75** | **428.5** | **30** | **0** | **156.7** | **4,180.83** |
| Aronfeld Trial Lawyers, P.A. | Aronfeld, Spencer M. | Attorney | 54.48 | 0 | 1 | 0 | 0 | 0 | 55.48 |
| Aronfeld Trial Lawyers, P.A. | Kraus, E. Lennon | Attorney | 28.8 | 0 | 1 | 0 | 0 | 0 | 29.8 |
| Aronfeld Trial Lawyers, P.A. | Ramirez, Elizabeth | Paralegal | 7.9 | 0 | 0 | 0 | 0 | 0 | 7.9 |
| Aronfeld Trial Lawyers, P.A. | Lindsay, Mayra | Other | 18.77 | 0 | 1 | 0 | 0 | 0 | 19.77 |
| **Aronfeld Trial Lawyers, P.A.Total** | | | **109.95** | **0** | **3** | **0** | **0** | **0** | **112.95** |
| Barrios, Kingsdorf & Casteix | Barrios, Dawn | Attorney | 685.75 | 612 | 353 | 1,792.00 | 18.25 | 105.25 | 3,566.25 |
| Barrios, Kingsdorf & Casteix | Boling, Jeremiah | Attorney | 0 | 0 | 64 | 4 | 0 | 0 | 68 |
| Barrios, Kingsdorf & Casteix | Casteix, Barbara | Attorney | 0.75 | 0 | 0 | 0 | 0 | 0 | 0.75 |
| Barrios, Kingsdorf & Casteix | Kingsdorf, Bruce | Attorney | 42.25 | 115.25 | 117 | 441.5 | 17 | 1.5 | 734.5 |
| Barrios, Kingsdorf & Casteix | Wool, Zachary | Attorney | 64.25 | 154.75 | 96 | 557 | 0 | 54 | 926 |
| Barrios, Kingsdorf & Casteix | Bell, Phyllis | Paralegal | 0 | 0 | 0 | 3.25 | 0 | 0 | 3.25 |
| Barrios, Kingsdorf & Casteix | Butler, Maxwell | Paralegal | 24.25 | 0 | 0 | 0 | 0 | 0 | 24.25 |
| Barrios, Kingsdorf & Casteix | Casselberry, Jill | Paralegal | 304.8 | 11.5 | 32.25 | 38.25 | 0 | 13 | 399.8 |
| Barrios, Kingsdorf & Casteix | Folts, Dena | Paralegal | 353.75 | 95.5 | 184.75 | 568.25 | 0 | 31.75 | 1,234.00 |
| Barrios, Kingsdorf & Casteix | Kingsdorf, Emma | Paralegal | 188 | 11.25 | 35.5 | 16.5 | 0 | 1.25 | 252.5 |
| Barrios, Kingsdorf & Casteix | Lootens, Anne | Paralegal | 5 | 0 | 2 | 1 | 0 | 0 | 8 |
| Barrios, Kingsdorf & Casteix | Osburn, Marva | Paralegal | 0 | 0 | 1.75 | 14.5 | 0 | 0 | 16.25 |
| Barrios, Kingsdorf & Casteix | Para, Para | Paralegal | 0 | 0 | 4 | 0 | 0 | 0 | 4 |
| Barrios, Kingsdorf & Casteix | Robein, Lane | Paralegal | 167.75 | 49.75 | 140.5 | 282.25 | 0 | 0 | 640.25 |
| Barrios, Kingsdorf & Casteix | Wool, Spencer | Law Clerk | 86.5 | 0 | 0 | 0 | 0 | 0 | 86.5 |
| **Barrios, Kingsdorf & CasteixTotal** | | | **1,923.05** | **1,050.00** | **1,030.75** | **3,718.50** | **35.25** | **206.75** | **7,964.30** |
| Becnel Law Firm LLC | Becnel, Daniel | Attorney | 134.25 | 39.25 | 600.5 | 96.75 | 0 | 0 | 870.75 |
| Becnel Law Firm LLC | Becnel, Darryl | Attorney | 0 | 0 | 34.25 | 0 | 0 | 0 | 34.25 |
| Becnel Law Firm LLC | Becnel, Devon | Attorney | 322 | 46.25 | 295.25 | 0 | 0 | 0 | 663.5 |
| Becnel Law Firm LLC | Becnel, Toni | Attorney | 146 | 3.5 | 79.5 | 0 | 0 | 0 | 229 |
| Becnel Law Firm LLC | Christina, Salvadore | Attorney | 113.5 | 26.75 | 196.85 | 0 | 0 | 9.5 | 346.6 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Becnel Law Firm LLC | Crose, Jennifer | Attorney | 47.5 | 0 | 194.75 | 0 | 0 | 0 | 242.25 |
| Becnel Law Firm LLC | Moreland, Matthew | Attorney | 14.75 | 39.5 | 372.25 | 0 | 0 | 0 | 426.5 |
| Becnel Law Firm LLC | Percy, Will | Attorney | 0 | 0 | 22 | 0 | 0 | 0 | 22 |
| **Becnel Law Firm LLCTotal** | | | **778** | **155.25** | **1,795.35** | **96.75** | **0** | **9.5** | **2,834.85** |
| Berrigan, Litchfield, Schonekas, Mann & Traina, LLC | Chenevert, Matthew P. | Attorney | 9.25 | 0 | 0 | 0 | 0 | 0 | 9.25 |
| Berrigan, Litchfield, Schonekas, Mann & Traina, LLC | Daste, Carey B. | Attorney | 1.25 | 0 | 0 | 0 | 0 | 0 | 1.25 |
| Berrigan, Litchfield, Schonekas, Mann & Traina, LLC | Litchfield, E. John | Attorney | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Berrigan, Litchfield, Schonekas, Mann & Traina, LLC | Torregano, Kathy Lee | Attorney | 4.75 | 0 | 0 | 0 | 0 | 0 | 4.75 |
| **Berrigan, Litchfield, Schonekas, Mann & Traina, LLCTotal** | | | **17.25** | **0** | **0** | **0** | **0** | **0** | **17.25** |
| Bruno & Bruno, LLP | Bruno, Joseph | Attorney | 15.25 | 273 | 99.75 | 61.75 | 0 | 0 | 449.75 |
| Bruno & Bruno, LLP | Debarbieris, Melissa | Attorney | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| Bruno & Bruno, LLP | Hatcher, Chris M. | Attorney | 0.25 | 0.25 | 0.25 | 0 | 0 | 0 | 0.75 |
| Bruno & Bruno, LLP | Joanen, L. Scott | Attorney | 0 | 0 | 0.1 | 0 | 0 | 0 | 0.1 |
| **Bruno & Bruno, LLPTotal** | | | **23.5** | **273.25** | **100.1** | **61.75** | **0** | **0** | **458.6** |
| Burdman Law Group | O'Leary, Pieter | Attorney | 41 | 0 | 9.5 | 0 | 0 | 0 | 50.5 |
| **Burdman Law GroupTotal** | | | **41** | **0** | **9.5** | **0** | **0** | **0** | **50.5** |
| Colson - Hicks Edison PA | Drury, Chris | Attorney | 0 | 0 | 6.75 | 0 | 0 | 0 | 6.75 |
| Colson - Hicks Edison PA | Gonzalez, Ervin | Attorney | 4,135.95 | 751.75 | 1,178.50 | 121 | 145.75 | 0 | 6,332.95 |
| Colson - Hicks Edison PA | Keiser, Jeff | Attorney | 174 | 42.75 | 76.25 | 103.5 | 9.25 | 0 | 405.75 |
| Colson - Hicks Edison PA | Lefebvre, Maureen | Attorney | 77 | 42 | 0 | 0 | 0 | 0 | 119 |
| Colson - Hicks Edison PA | Montoya, Patrick | Attorney | 493.5 | 1,099.00 | 1,649.35 | 445 | 79.75 | 0 | 3,766.60 |
| Colson - Hicks Edison PA | Rico, Natalie | Attorney | 591.25 | 354.25 | 401.5 | 317.5 | 98 | 0 | 1,762.50 |
| Colson - Hicks Edison PA | Tuchman, Jaimie | Attorney | 78.25 | 25.75 | 1,051.00 | 0 | 0 | 0 | 1,155.00 |
| Colson - Hicks Edison PA | Ferrer, Belkis | Paralegal | 1.5 | 137.25 | 348.75 | 0 | 0 | 0 | 487.5 |
| Colson - Hicks Edison PA | Yunis, Bernardita | Paralegal | 44.5 | 0 | 0 | 0 | 0 | 0 | 44.5 |
| **Colson - Hicks Edison PATotal** | | | **5,595.95** | **2,452.75** | **4,712.10** | **987** | **332.75** | **0** | **14,080.55** |
| Cuneo Gilbert & LaDuca | Anderson, William | Attorney | 28.75 | 50.25 | 0 | 0 | 0 | 0 | 79 |
| Cuneo Gilbert & LaDuca | Cohen, Daniel | Attorney | 17 | 0 | 0 | 0 | 0 | 0 | 17 |
| Cuneo Gilbert & LaDuca | Gilbert, Pamela | Attorney | 4 | 0 | 0 | 0 | 0 | 0 | 4 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Cuneo Gilbert & LaDuca | LaDuca, Charles | Attorney | 0 | 25.25 | 0 | 0 | 0 | 0 | 25.25 |
| Cuneo Gilbert & LaDuca | Cheek, Laura | Paralegal | 1.5 | 0 | 0 | 0 | 0 | 0 | 1.5 |
| **Cuneo Gilbert & LaDucaTotal** | | | **51.25** | **75.5** | **0** | **0** | **0** | **0** | **126.75** |
| Davis & Duncan, LLC | Mark, Duncan | Attorney | 2.9 | 0 | 0 | 0 | 0 | 0 | 2.9 |
| **Davis & Duncan, LLCTotal** | | | **2.9** | **0** | **0** | **0** | **0** | **0** | **2.9** |
| Gainsburgh, Benjamin, et al | Ecuyer, Michael | Attorney | 140.5 | 7.75 | 19 | 1,118.75 | 67.5 | 43 | 1,396.50 |
| Gainsburgh, Benjamin, et al | Ervin-Knott, Nakisha | Attorney | 31.5 | 0 | 3.25 | 16.5 | 0 | 0 | 51.25 |
| Gainsburgh, Benjamin, et al | Gilbreath, Tara | Attorney | 0 | 0 | 3 | 3.25 | 0 | 0 | 6.25 |
| Gainsburgh, Benjamin, et al | Lambert, Palmer | Attorney | 0 | 0 | 0 | 3.4 | 0 | 0 | 3.4 |
| Gainsburgh, Benjamin, et al | Meaher, Helen | Attorney | 0.5 | 8.5 | 0 | 43.75 | 7 | 0 | 59.75 |
| Gainsburgh, Benjamin, et al | Meunier, Gerald | Attorney | 92.75 | 204 | 27 | 4,706.25 | 23.5 | 24.75 | 5,078.25 |
| Gainsburgh, Benjamin, et al | Warshauer, Irving | Attorney | 75.5 | 0 | 0 | 121.25 | 0 | 0 | 196.75 |
| Gainsburgh, Benjamin, et al | Martin, Denise | Paralegal | 0 | 0 | 0 | 113 | 0 | 0 | 113 |
| Gainsburgh, Benjamin, et al | McClure, Monica | Paralegal | 3.5 | 0 | 13.75 | 95 | 0 | 0 | 112.25 |
| Gainsburgh, Benjamin, et al | Plonsky, Kim | Paralegal | 159.8 | 0 | 33.25 | 521.85 | 0 | 64 | 778.9 |
| Gainsburgh, Benjamin, et al | Shumaker, Meghan | Paralegal | 137 | 0 | 21.25 | 0 | 0 | 0 | 158.25 |
| Gainsburgh, Benjamin, et al | Harrell, Katelyn | Law Clerk | 0 | 0 | 0 | 9 | 0 | 0 | 9 |
| **Gainsburgh, Benjamin, et alTotal** | | | **641.05** | **220.25** | **120.5** | **6,752.00** | **98** | **131.75** | **7,963.55** |
| Gary, Naegele & Theado, LLC | Jori Bloom, Naegele | Attorney | 6.25 | 32.25 | 0 | 0 | 0 | 0 | 38.5 |
| Gary, Naegele & Theado, LLC | Robert D., Gary | Attorney | 367.45 | 0.75 | 0 | 0 | 0 | 0 | 368.2 |
| Gary, Naegele & Theado, LLC | Comstock, Tracy | Paralegal | 69.5 | 0 | 0 | 0 | 0 | 0 | 69.5 |
| **Gary, Naegele & Theado, LLCTotal** | | | **443.2** | **33** | **0** | **0** | **0** | **0** | **476.2** |
| Glago Law Firm LLC | Glago, Mark P | Attorney | 124.15 | 20.5 | 0.75 | 0.75 | 0 | 0 | 146.15 |
| Glago Law Firm LLC | Gremillion, Wendy | Attorney | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| **Glago Law Firm LLCTotal** | | | **127.15** | **20.5** | **0.75** | **0.75** | **0** | **0** | **149.15** |
| Hausfeld LLP | Ghareeb, Faris | Attorney | 196.65 | 95.5 | 35.25 | 9.5 | 0 | 0 | 336.9 |
| Hausfeld LLP | Giddings, Nathaniel | Attorney | 7.5 | 0 | 0 | 0 | 0 | 0 | 7.5 |
| Hausfeld LLP | Kenney, Jeannine | Attorney | 0 | 0 | 0 | 5.5 | 0 | 0 | 5.5 |
| Hausfeld LLP | Landau, Brent | Attorney | 0 | 0 | 0.5 | 0 | 0 | 0 | 0.5 |
| Hausfeld LLP | Lewis, Richard | Attorney | 322 | 637.5 | 182 | 1,394.00 | 5 | 322 | 2,862.50 |
| Hausfeld LLP | Pizzirusso, James | Attorney | 34.5 | 71.6 | 2.5 | 17.5 | 4.5 | 0 | 130.6 |
| Hausfeld LLP | Ward, Kristen | Attorney | 222.75 | 284 | 0.5 | 128.5 | 4 | 273.85 | 913.6 |
| Hausfeld LLP | Lucas, Brian | Paralegal | 212 | 82.5 | 41 | 183.5 | 0 | 0 | 519 |

| Firm | Employee | Class | Case Assessment | Pre-Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Hausfeld LLP | Lucina, William | Paralegal | 0 | 22.5 | 0 | 0 | 0 | 0 | 22.5 |
| Hausfeld LLP | McDonald, Fiona | Paralegal | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Hausfeld LLP | Pegram, Chris | Paralegal | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| Hausfeld LLP | Robinson, Elliot | Paralegal | 0 | 0 | 0 | 7.5 | 0 | 6.5 | 14 |
| Hausfeld LLP | Sandberg, Amanda | Paralegal | 57 | 10.1 | 1 | 0 | 0 | 0 | 68.1 |
| Hausfeld LLP | Stubbs, Kristina | Paralegal | 8.5 | 5 | 0 | 0.25 | 0 | 0 | 13.75 |
| Hausfeld LLP | Armstrong, Robert | Law Clerk | 16.75 | 22.85 | 0 | 7.25 | 0 | 0 | 46.85 |
| Hausfeld LLP | Jenkins, Spencer | Law Clerk | 13 | 68.45 | 0 | 0 | 0 | 0 | 81.45 |
| Hausfeld LLP | Rovinsky, Jeremy | Law Clerk | 0 | 0 | 0 | 0 | 61.25 | 0 | 61.25 |
| Hausfeld LLP | Singerman, Joel | Law Clerk | 0 | 0 | 15.5 | 0 | 0 | 0 | 15.5 |
| **Hausfeld LLPTotal** | | | **1,097.65** | **1,300.00** | **278.25** | **1,753.50** | **74.75** | **602.35** | **5,106.50** |
| HHK | Ahlquist, Aaron | Attorney | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| HHK | Cain, Joseph | Attorney | 1 | 0 | 0 | 3 | 0 | 0 | 4 |
| HHK | Creevy, John | Attorney | 0 | 0 | 5.5 | 37.75 | 0 | 0 | 43.25 |
| HHK | Davis, Leonard | Attorney | 1,958.00 | 3,794.75 | 1,471.25 | 924.75 | 135.25 | 1,934.00 | 10,218.00 |
| HHK | Epstein, Jeremy | Attorney | 1,215.25 | 583.75 | 165 | 467.75 | 14.25 | 1,662.00 | 4,108.00 |
| HHK | Gisleson, Soren | Attorney | 9 | 35 | 0.5 | 5.75 | 0 | 0 | 50.25 |
| HHK | Herman, Russ | Attorney | 2,078.00 | 2,381.00 | 1,216.50 | 902.75 | 236.25 | 2,100.75 | 8,915.25 |
| HHK | Herman, Stephen | Attorney | 303.25 | 173.25 | 248.75 | 696.75 | 3.25 | 13.75 | 1,439.00 |
| HHK | Klick, James | Attorney | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| HHK | Knoll, Edmond | Attorney | 28.25 | 0 | 7.25 | 39.5 | 0 | 17.5 | 92.5 |
| HHK | Lane, Steven | Attorney | 2.25 | 3.25 | 0 | 0 | 0 | 0 | 5.5 |
| HHK | Robinson, Craig | Attorney | 2.75 | 0 | 0 | 0 | 0 | 0 | 2.75 |
| HHK | Blisard, Brandy | Paralegal | 2,213.75 | 2,009.50 | 1,316.25 | 107 | 2 | 435.25 | 6,083.75 |
| HHK | Bolden, Nina | Paralegal | 402 | 108 | 56.75 | 69.5 | 0 | 0 | 636.25 |
| HHK | Catalanotto, Amy | Paralegal | 539.5 | 70 | 95.75 | 72.5 | 0 | 0 | 777.75 |
| HHK | Dean, Crystal | Paralegal | 19.5 | 0 | 0 | 8 | 0 | 0 | 27.5 |
| HHK | Ferbos, Krystle | Paralegal | 11 | 0 | 0 | 7.5 | 0 | 0 | 18.5 |
| HHK | Ingram, Om | Paralegal | 68 | 3.75 | 6.5 | 1 | 0 | 0 | 79.25 |
| HHK | Laborde, Heather | Paralegal | 47.75 | 19.5 | 12.5 | 1 | 0 | 0 | 80.75 |
| HHK | Lanassa, Carroll | Paralegal | 56.25 | 9.5 | 0 | 7.5 | 0 | 0 | 73.25 |
| HHK | Lory, Vickie | Paralegal | 38.5 | 54.75 | 48.75 | 34 | 9 | 43.75 | 228.75 |
| HHK | Robein, Lane | Paralegal | 299.25 | 1,119.25 | 2,780.00 | 783 | 0 | 968 | 5,949.50 |
| HHK | Rodriguez, Fernando | Paralegal | 4 | 0 | 4.75 | 8.75 | 0 | 0 | 17.5 |
| HHK | Valenti, Regina | Paralegal | 55.75 | 6 | 24.75 | 86 | 0 | 82.75 | 255.25 |
| HHK | Barone, Kristin | Law Clerk | 1.5 | 1 | 3.5 | 0.5 | 0 | 3.5 | 10 |
| HHK | Bolton, Lindsey | Law Clerk | 13 | 3.25 | 1.5 | 0 | 4.75 | 0 | 22.5 |
| HHK | Connick, Brendan | Law Clerk | 0 | 4 | 2 | 0 | 0 | 0 | 6 |
| HHK | Fetzer, Campbell | Law Clerk | 4 | 8 | 0 | 0 | 4 | 0 | 16 |
| HHK | Komins, Benton | Law Clerk | 13 | 0 | 0 | 0 | 0 | 5.75 | 18.75 |

| Firm | Employee | Class | Case Assessment | Pre-Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|------|----------|-------|-----------------|-----------|-----------|-------|--------|------------|-------------|
| HHK | Mau, Donald | Law Clerk | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| HHK | Pierre, Sonya | Law Clerk | 30 | 0 | 0 | 0 | 0 | 0 | 30 |
| HHK | Simpson, Ben | Law Clerk | 11.75 | 0 | 6.5 | 4 | 0 | 0 | 22.25 |
| HHK | Weintraub, Adam | Law Clerk | 24.5 | 3.5 | 92.5 | 0.5 | 0 | 1.5 | 122.5 |
| HHK | Woods, III, Carl | Law Clerk | 9 | 1.5 | 1 | 0 | 0 | 0 | 11.5 |
| HHK | Comfort, Kelly | Other | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.5 |
| HHK | Curcio, Nicholas | Other | 0 | 0 | 0 | 0 | 0 | 7.5 | 7.5 |
| HHK | Dean, Victoria | Other | 103 | 8 | 0 | 0 | 0 | 0 | 111 |
| HHK | LeBlanc, Pamela | Other | 44.75 | 0 | 0 | 0 | 0 | 0 | 44.75 |
| HHK | Longoria, Sofia | Other | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.5 |
| HHK | Robinson, Kate | Other | 281 | 1.25 | 0 | 0 | 0 | 0 | 282.25 |
| HHK | Verges, Sarah | Other | 525.5 | 0 | 0 | 0 | 0 | 0 | 525.5 |
| **HHKTotal** | | | **10,422.00** | **10,406.75** | **7,567.75** | **4,268.75** | **408.75** | **7,276.00** | **40,350.00** |
| Irpino Law Firm | Irpino, Anthony | Attorney | 1,082.25 | 1,352.10 | 2,642.25 | 1,027.75 | 91 | 138 | 6,333.35 |
| Irpino Law Firm | Pichon, Jeremy | Attorney | 0 | 0 | 0 | 0 | 0 | 8 | 8 |
| Irpino Law Firm | Robertson, Pearl | Attorney | 0 | 5 | 13 | 0 | 658.75 | 0 | 676.75 |
| Irpino Law Firm | Zayas, Brandy | Paralegal | 0 | 0 | 5 | 40 | 0 | 0 | 45 |
| Irpino Law Firm | Irpino, Jonathon | Law Clerk | 0 | 0 | 0 | 254 | 0 | 0 | 254 |
| Irpino Law Firm | Reese, Justin | Law Clerk | 16.75 | 0 | 34.75 | 318.5 | 0 | 0 | 370 |
| **Irpino Law FirmTotal** | | | **1,099.00** | **1,357.10** | **2,695.00** | **1,640.25** | **749.75** | **146** | **7,687.10** |
| Kanner & Whiteley, L.L.C. | Fuselier, Melissa | Attorney | 41.25 | 46 | 0 | 0.25 | 0 | 0 | 87.25 |
| Kanner & Whiteley, L.L.C. | Kanner, Allan | Attorney | 182.5 | 74.25 | 11.25 | 0.75 | 0 | 0 | 268.75 |
| Kanner & Whiteley, L.L.C. | Petersen, Elizabeth | Attorney | 0.25 | 0 | 0 | 0 | 0 | 0 | 0.25 |
| Kanner & Whiteley, L.L.C. | St. Amant, Cynthia | Attorney | 106.7 | 141.5 | 1.75 | 4.25 | 0 | 0 | 254.2 |
| Kanner & Whiteley, L.L.C. | Fuselier, Melissa - paralegal duties | Paralegal | 0 | 0 | 2.5 | 0 | 0 | 0 | 2.5 |
| Kanner & Whiteley, L.L.C. | Miller, Elizabeth | Paralegal | 7.5 | 0 | 0 | 0 | 0 | 0 | 7.5 |
| Kanner & Whiteley, L.L.C. | Rhoden, Judith | Paralegal | 2.5 | 0 | 0.25 | 0 | 0 | 0 | 2.75 |
| Kanner & Whiteley, L.L.C. | St. Amant, Cynthia - paralegal duties | Paralegal | 0.5 | 0.5 | 0.75 | 0 | 0 | 0 | 1.75 |
| **Kanner & Whiteley, L.L.C.Total** | | | **341.2** | **262.25** | **16.5** | **5** | **0** | **0** | **624.95** |
| Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman, & McKee, PA | Ryan, Michael | Attorney | 191.25 | 159.3 | 99.5 | 36.75 | 3 | 210 | 699.8 |
| **Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman, & McKee, PATotal** | | | **191.25** | **159.3** | **99.5** | **36.75** | **3** | **210** | **699.8** |
| Landskroner - Grieco - Madden LLC | Grieco, Paul | Attorney | 3 | 9 | 0 | 0 | 0 | 0 | 12 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Landskroner - Grieco - Madden LLC | Landskroner, Jack | Attorney | 2.75 | 26.25 | 0 | 4.75 | 0 | 0 | 33.75 |
| Landskroner - Grieco - Madden LLC | Legando, Drew | Attorney | 0 | 0 | 0 | 10.75 | 0 | 0 | 10.75 |
| Landskroner - Grieco - Madden LLC | Mazzi, Alicia | Attorney | 0 | 0 | 0 | 0.75 | 0 | 0 | 0.75 |
| **Landskroner - Grieco - Madden LLCTotal** | | | **5.75** | **35.25** | **0** | **16.25** | **0** | **0** | **57.25** |
| Law Offices of Robert M. Becnel | Becnel, Robert | Attorney | 267.25 | 0 | 397.5 | 154.25 | 0 | 0 | 819 |
| Law Offices of Robert M. Becnel | Zink, Diane | Attorney | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Law Offices of Robert M. BecnelTotal** | | | **267.25** | **0** | **397.5** | **154.25** | **0** | **0** | **819** |
| Lemmon Law Firm, LLC | Lemmon, Andrew | Attorney | 91 | 283 | 607 | 457 | 0 | 98 | 1,536.00 |
| Lemmon Law Firm, LLC | Matheny, Megan | Attorney | 3 | 8.75 | 13.75 | 11 | 0 | 0.5 | 37 |
| Lemmon Law Firm, LLC | Netting, Irma L. | Attorney | 9 | 3.25 | 0 | 7 | 0 | 0 | 19.25 |
| Lemmon Law Firm, LLC | Torres, Eric | Attorney | 0.25 | 14.5 | 129.25 | 0 | 0 | 0 | 144 |
| Lemmon Law Firm, LLC | Crotwell, Christy | Paralegal | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| Lemmon Law Firm, LLC | Field, Kathleen | Paralegal | 0 | 0 | 1,182.25 | 19.5 | 0 | 0 | 1,201.75 |
| Lemmon Law Firm, LLC | Kuiper, Tiffany | Paralegal | 28 | 34.25 | 636 | 50.25 | 0 | 1.25 | 749.75 |
| Lemmon Law Firm, LLC | Planchet, Joni | Paralegal | 0 | 0 | 0 | 7.75 | 0 | 0 | 7.75 |
| Lemmon Law Firm, LLC | Robbins, Andrea | Paralegal | 0 | 0 | 465.25 | 0 | 0 | 0 | 465.25 |
| Lemmon Law Firm, LLC | Sauzer, Gregory | Law Clerk | 0 | 2.5 | 2 | 47 | 0 | 0 | 51.5 |
| Lemmon Law Firm, LLC | Caropino, Jennifer | Other | 2 | 0 | 0 | 2 | 0 | 0 | 4 |
| Lemmon Law Firm, LLC | Champagne, Tammy | Other | 10.5 | 0 | 173 | 0 | 0 | 0 | 183.5 |
| Lemmon Law Firm, LLC | Cheramie, Hillary | Other | 3 | 14.25 | 272.25 | 0 | 0 | 0 | 289.5 |
| **Lemmon Law Firm, LLCTotal** | | | **152.75** | **360.5** | **3,480.75** | **601.5** | **0** | **99.75** | **4,695.25** |
| Leopold Kuvin, P.A. | Langino, Adam | Attorney | 2.35 | 12.7 | 8 | 2 | 0 | 0 | 25.05 |
| Leopold Kuvin, P.A. | Leopold, Theodore | Attorney | 22 | 37 | 86.85 | 0.5 | 0 | 0 | 146.35 |
| Leopold Kuvin, P.A. | Martin, Diana | Attorney | 0 | 17.5 | 0 | 0 | 0 | 0 | 17.5 |
| Leopold Kuvin, P.A. | Weiss, Gregory | Attorney | 94.9 | 135 | 33.5 | 39.75 | 0 | 110.8 | 413.95 |
| Leopold Kuvin, P.A. | Fine, Tim | Paralegal | 2 | 0 | 15 | 0 | 0 | 0 | 17 |
| Leopold Kuvin, P.A. | Gelder, Julie | Paralegal | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Leopold Kuvin, P.A. | Hartnett, Meg | Paralegal | 1.5 | 0 | 0 | 0 | 0 | 0 | 1.5 |
| Leopold Kuvin, P.A. | Johnson, Debby | Paralegal | 8.65 | 0 | 6.4 | 0 | 0 | 0 | 15.05 |
| Leopold Kuvin, P.A. | Marks, Lori | Paralegal | 16.5 | 0.25 | 56.75 | 0 | 0 | 0 | 73.5 |
| Leopold Kuvin, P.A. | Whiddon, Tatum | Paralegal | 120.85 | 0 | 0 | 0 | 0 | 0 | 120.85 |
| **Leopold Kuvin, P.A.Total** | | | **268.75** | **204.45** | **206.5** | **42.25** | **0** | **110.8** | **832.75** |

| Firm | Employee | Class | Case Assessment | Pretrial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Levin Papantonio Law | Blanchard, Robert | Attorney | 21.75 | 0 | 0 | 0 | 0 | 0 | 21.75 |
| Levin Papantonio Law | Cash, William | Attorney | 259.5 | 33.25 | 1.25 | 200.5 | 0 | 0 | 494.5 |
| Levin Papantonio Law | Gordon, Ben | Attorney | 1,776.45 | 459.85 | 36.6 | 852.05 | 0 | 9.7 | 3,134.65 |
| Levin Papantonio Law | Morris, Larry | Attorney | 110.5 | 0 | 0 | 0 | 0 | 0 | 110.5 |
| Levin Papantonio Law | Morris, Lea | Attorney | 8.5 | 0 | 0 | 0 | 0 | 0 | 8.5 |
| Levin Papantonio Law | Paulos, Christopher | Attorney | 41.5 | 0 | 0 | 0 | 0 | 0 | 41.5 |
| Levin Papantonio Law | Charles, Charisse | Paralegal | -8.75 | 5.75 | 3 | 0 | 0 | 0 | 0 |
| Levin Papantonio Law | Lambert, Taxie | Paralegal | 31.5 | 0 | 0 | 0 | 0 | 0 | 31.5 |
| Levin Papantonio Law | Bell, Alice | Other | 14.5 | 0 | 0 | 0 | 0 | 0 | 14.5 |
| Levin Papantonio Law | Gardiner, Stacey | Other | 11 | 0 | 0 | 0 | 0 | 0 | 11 |
| Levin Papantonio Law | Johnson, Crystal | Other | 123 | 0 | 0 | 4.25 | 0 | 0 | 127.25 |
| Levin Papantonio Law | Johnson, Pamela | Other | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| Levin Papantonio Law | Killam, Luke | Other | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| Levin Papantonio Law | Lovings, Delecia | Other | 30 | 0 | 0 | 0 | 0 | 0 | 30 |
| Levin Papantonio Law | McKenney, Lakia | Other | 7.25 | 0 | 0 | 0 | 0 | 0 | 7.25 |
| Levin Papantonio Law | Murphy, Erin | Other | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| Levin Papantonio Law | Thompson, Chris | Other | 37 | 0 | 0 | 0 | 0 | 0 | 37 |
| **Levin Papantonio Law Total** | | | **2,530.70** | **498.85** | **40.85** | **1,056.80** | **0** | **9.7** | **4,136.90** |
| Levin, Sedran & Berman | Berman, Laurence | Attorney | 2.5 | 3.25 | 3 | 23 | 3 | 17 | 51.75 |
| Levin, Sedran & Berman | Duggan, Sandra | Attorney | 459.75 | 1,994.75 | 158.75 | 205.75 | 1,768.50 | 2,698.25 | 7,285.75 |
| Levin, Sedran & Berman | Fishbein, Michael | Attorney | 0 | 36.5 | 0 | 0 | 150.75 | 0 | 187.25 |
| Levin, Sedran & Berman | Fox, Brian | Attorney | 0 | 16.25 | 0 | 7.25 | 0 | 0 | 23.5 |
| Levin, Sedran & Berman | Gaughan, Matthew | Attorney | 78.25 | 4,188.00 | 690 | 89.25 | 448.25 | 490.75 | 5,984.50 |
| Levin, Sedran & Berman | Levin, Arnold | Attorney | 603.75 | 2,757.75 | 1,263.25 | 740.5 | 339.5 | 3,088.00 | 8,792.75 |
| Levin, Sedran & Berman | Levin, Daniel | Attorney | 0 | 450.75 | 21.75 | 4 | 0 | 0 | 476.5 |
| Levin, Sedran & Berman | Longer, Fred | Attorney | 1,026.25 | 2,777.50 | 1,017.50 | 711.25 | 467 | 2,557.75 | 8,557.25 |
| Levin, Sedran & Berman | Schaffer, Charles | Attorney | 0 | 10.5 | 81 | 444.25 | 0 | 0 | 535.75 |
| Levin, Sedran & Berman | D'Andrea, Patricia | Paralegal | 0 | 18.75 | 0 | 0 | 0 | 0 | 18.75 |
| Levin, Sedran & Berman | Hesson, Cheryl | Paralegal | 0 | 1,657.00 | 420 | 0 | 0 | 671.5 | 2,748.50 |
| Levin, Sedran & Berman | Hutson, Marion | Paralegal | 0 | 358.5 | 37.5 | 0 | 9 | 95 | 500 |
| Levin, Sedran & Berman | Klick, Laura | Paralegal | 0 | 11.25 | 120.75 | 0 | 0 | 0 | 132 |
| Levin, Sedran & Berman | Lascio, Jennifer | Paralegal | 0 | 182.25 | 71 | 0 | 0 | 0 | 253.25 |
| Levin, Sedran & Berman | Lord, Monica | Paralegal | 0 | 2,561.25 | 5 | 12 | 0 | 0 | 2,578.25 |
| Levin, Sedran & Berman | Murphy, Debbie | Paralegal | 3 | 1,935.00 | 16 | 12 | 0 | 0 | 1,966.00 |
| Levin, Sedran & Berman | Rapone, James | Paralegal | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| Levin, Sedran & Berman | Sentyz, Kylie | Paralegal | 0 | 124 | 257 | 0 | 0 | 0 | 381 |
| Levin, Sedran & Berman | Smith, Tom | Paralegal | 14 | 206 | 1,806.50 | 212 | 79 | 0 | 2,317.50 |
| Levin, Sedran & Berman | Sweeney, Anne Marie | Paralegal | 0 | 0 | 13 | 0 | 0 | 0 | 13 |

| Firm | Employee | Class | Case Assessment | Pre-Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Levin, Sedran & Berman | Toolanen, Sophie | Paralegal | 0 | 7.5 | 49.5 | 0 | 0 | 0 | 57 |
| Levin, Sedran & Berman | Worrell, Nicole | Paralegal | 0 | 2.5 | 16.5 | 0 | 0 | 0 | 19 |
| Levin, Sedran & Berman | Roda, Joseph | Law Clerk | 0 | 22 | 0 | 0 | 0 | 0 | 22 |
| Levin, Sedran & Berman | Shrack, Thomas | Other | 36 | 164.75 | 444.75 | 5.75 | 0 | 107.25 | 758.5 |
| **Levin, Sedran & BermanTotal** | | | **2,223.50** | **19,490.00** | **6,492.75** | **2,467.00** | **3,265.00** | **9,725.50** | **43,663.75** |
| Lockridge Grindal Nauen P.L.L.P | Davis, Craig | Attorney | 2.75 | 0 | 24.5 | 0 | 0 | 0 | 27.25 |
| Lockridge Grindal Nauen P.L.L.P | Flaherty, Yvonne | Attorney | 0.25 | 0 | 0 | 0 | 0 | 0 | 0.25 |
| Lockridge Grindal Nauen P.L.L.P | Hartel, Constance | Attorney | 0 | 0 | 49 | 0 | 0 | 0 | 49 |
| Lockridge Grindal Nauen P.L.L.P | Johnson, Matthew | Attorney | 0 | 0 | 41 | 0 | 0 | 0 | 41 |
| Lockridge Grindal Nauen P.L.L.P | Shelquist, Robert | Attorney | 18.75 | 1.75 | 1.5 | 0.25 | 0 | 0 | 22.25 |
| Lockridge Grindal Nauen P.L.L.P | LeRoy, Kelly | Paralegal | 1 | 1 | 0.25 | 0 | 0 | 0 | 2.25 |
| Lockridge Grindal Nauen P.L.L.P | Kelly, Kathleen | Other | 0 | 0 | 0.5 | 0 | 0 | 0 | 0.5 |
| **Lockridge Grindal Nauen P.L.L.PTotal** | | | **22.75** | **2.75** | **116.75** | **0.25** | **0** | **0** | **142.5** |
| Luckey & Mullins, PLLC | Arnedo-Zayed, Marina | Attorney | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Luckey & Mullins, PLLC | Mullins, Stephen | Attorney | 38.75 | 2 | 0 | 0 | 0 | 7 | 47.75 |
| Luckey & Mullins, PLLC | Craft, Rebecca | Paralegal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Luckey & Mullins, PLLC | Pendleton, Kelly | Paralegal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Luckey & Mullins, PLLCTotal** | | | **38.75** | **2** | **0** | **0** | **0** | **7** | **47.75** |
| Martzell Bickford | Bickford, Scott | Attorney | 10.75 | 0 | 1.75 | 0.25 | 0 | 0 | 12.75 |
| Martzell Bickford | Centola III, Larry | Attorney | 78.5 | 17.75 | 23 | 0.25 | 0 | 3 | 122.5 |
| Martzell Bickford | Donahue, Roshawn | Attorney | 2 | 0 | 0 | 3.75 | 0 | 0 | 5.75 |
| Martzell Bickford | Doody, Spencer | Attorney | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Martzell Bickford | Landry, Jason | Attorney | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Martzell Bickford | Nazareth, Neil | Attorney | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Martzell Bickford | Moore, Bud | Paralegal | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| Martzell Bickford | Rodriguez, Carlos | Paralegal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Martzell Bickford | Thomas, Adam | Paralegal | 0 | 2.5 | 0.75 | 3.5 | 0 | 0 | 6.75 |
| Martzell Bickford | Valaske, Carla | Paralegal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Martzell BickfordTotal** | | | **99.25** | **20.25** | **25.5** | **7.75** | **0** | **3** | **155.75** |
| Mason LLP | Bansal, Monica | Attorney | 0 | 8.25 | 0 | 0 | 0 | 0 | 8.25 |
| Mason LLP | Desai, Khushi | Attorney | 33 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mason LLP | Mason, Gary | Attorney | 123.75 | 13 | 19 | 3 | 0 | 10 | 168.75 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Mason LLP | Solen, Donna | Attorney | 0.25 | 0.75 | 0 | 0 | 0 | 0 | 1 |
| Mason LLP | DiCocco, Monica | Paralegal | 8 | 6.5 | 0 | 0 | 0 | 0 | 14.5 |
| Mason LLP | Santillo, Keith | Paralegal | 1.2 | 0 | 0 | 0 | 0 | 0 | 1.2 |
| **Mason LLPTotal** | | | **166.2** | **28.5** | **19** | **3** | **0** | **10** | **226.7** |
| Milstein Adelman, LLP | Durkee, David | Attorney | 192.75 | 371.75 | 56.75 | 0 | 0 | 0 | 621.25 |
| Milstein Adelman, LLP | Milstein, Mark | Attorney | 159.5 | 269.75 | 0 | 0 | 0 | 202.5 | 631.75 |
| Milstein Adelman, LLP | Stevens, Paul | Attorney | 105.5 | 4 | 19.25 | 0 | 0 | 132 | 260.75 |
| Milstein Adelman, LLP | Suarez, Carolina | Attorney | 115.75 | 262 | 4.25 | 0 | 0 | 0 | 382 |
| Milstein Adelman, LLP | Willett, Allison | Attorney | 296.25 | 915 | 59.5 | 0 | 0 | 556 | 1,826.75 |
| **Milstein Adelman, LLPTotal** | | | **869.75** | **1,822.50** | **139.75** | **0** | **0** | **890.5** | **3,722.50** |
| Morgan & Morgan | Albanis, Pete | Attorney | 307.25 | 126.75 | 295.25 | 0 | 0 | 61.5 | 790.75 |
| Morgan & Morgan | Givens, Tamra | Attorney | 0 | 20.5 | 27.75 | 0 | 0 | 0 | 48.25 |
| Morgan & Morgan | Goetz, Michael | Attorney | 221.25 | 170.75 | 2.5 | 0 | 0 | 2.25 | 396.75 |
| Morgan & Morgan | Meyer, J Andrew | Attorney | 0.5 | 96 | 0 | 0 | 0 | 0 | 96.5 |
| Morgan & Morgan | Mirabole, Angela | Attorney | 0 | 0 | 27.5 | 0 | 0 | 0 | 27.5 |
| Morgan & Morgan | Petosa, Frank | Attorney | 89.75 | 25.75 | 334.5 | 113.75 | 0 | 0 | 563.75 |
| Morgan & Morgan | Soffin, Rachel | Attorney | 0 | 50.5 | 86 | 0 | 0 | 0 | 136.5 |
| Morgan & Morgan | Weinstein, Scott Wm | Attorney | 578.75 | 171.75 | 82 | 0 | 0 | 19.25 | 851.75 |
| Morgan & Morgan | Jacobs, Jolene | Paralegal | 0 | 0 | 0.5 | 0 | 0 | 0 | 0.5 |
| Morgan & Morgan | Szilagyi-Rigsby, Elizabeth | Paralegal | 24 | 4.75 | 18 | 0 | 0 | 10 | 56.75 |
| **Morgan & MorganTotal** | | | **1,221.50** | **666.75** | **874** | **113.75** | **0** | **93** | **2,969.00** |
| Morris Bart, L.L.C | Alvarez, Mekel | Attorney | 4.5 | 2.5 | 0 | 57.41 | 0 | 0 | 64.41 |
| Morris Bart, L.L.C | Bart, Morris | Attorney | 90 | 22.5 | 0 | 0 | 0 | 0 | 112.5 |
| Morris Bart, L.L.C | Bowman, Reed | Attorney | 346.25 | 18.75 | 0 | 0 | 0 | 0 | 365 |
| Morris Bart, L.L.C | Keiser, Jeff | Attorney | 1,103.00 | 23.5 | 49.25 | 0 | 0 | 0 | 1,175.75 |
| Morris Bart, L.L.C | Beck, James | Other | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| Morris Bart, L.L.C | Erato, Rae | Other | 0 | 0 | 0 | 5 | 0 | 0 | 5 |
| **Morris Bart, L.L.CTotal** | | | **1,555.75** | **67.25** | **49.25** | **62.41** | **0** | **0** | **1,734.66** |
| Nast Law LLC | Burkholder, Michele | Attorney | 0 | 0.35 | 0 | 0 | 0 | 0 | 0.35 |
| Nast Law LLC | Burns, Erin | Attorney | 1.5 | 39.6 | 0.25 | 0 | 0 | 0.25 | 41.6 |
| Nast Law LLC | Gallucci, Daniel | Attorney | 0 | 6.75 | 0 | 0 | 0 | 0 | 6.75 |
| Nast Law LLC | Nast, Dianne | Attorney | 9.75 | 81.5 | 2.25 | 0 | 0 | 2.25 | 95.75 |
| Nast Law LLC | Roda, Joseph | Attorney | 0 | 1.25 | 0 | 0 | 0 | 0 | 1.25 |
| Nast Law LLC | Snyder, Jennifer | Attorney | 0 | 0.25 | 0 | 0 | 0 | 0 | 0.25 |
| Nast Law LLC | Berrier, Meredith | Paralegal | 0 | 25.4 | 0.75 | 0 | 0 | 0 | 26.15 |
| Nast Law LLC | Halsted, Amber | Paralegal | 0 | 13.5 | 0.75 | 0 | 0 | 0 | 14.25 |
| Nast Law LLC | McVey, Kristina | Paralegal | 0 | 6.25 | 0 | 0 | 0 | 0 | 6.25 |
| Nast Law LLC | Roberts, Cathryn | Paralegal | 6.75 | 15 | 0.5 | 0 | 0 | 5 | 27.25 |
| Nast Law LLC | Stephenson, Sheila | Paralegal | 0 | 2.75 | 0 | 0 | 0 | 0 | 2.75 |

| Firm | Employee | Class | Case Assessment | Pre-Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| **Nast Law LLCTotal** | | | **18** | **192.6** | **4.5** | **0** | **0** | **7.5** | **222.6** |
| Parker Waichman LLP | Breakstone, Jay | Attorney | 8.75 | 40 | 0 | 1.5 | 0 | 0 | 50.25 |
| Parker Waichman LLP | Cambs, Peter | Attorney | 0 | 0 | 173.75 | 67.25 | 0 | 0 | 241 |
| Parker Waichman LLP | Chaikin, Jordan | Attorney | 438.75 | 1,036.00 | 578 | 8 | 0 | 11.5 | 2,072.25 |
| Parker Waichman LLP | Charnas, Scott | Attorney | 0 | 64.25 | 8 | 0 | 0 | 0 | 72.25 |
| Parker Waichman LLP | Falkowitz, Gary | Attorney | 0 | 0 | 59.25 | 1.5 | 0 | 0 | 60.75 |
| Parker Waichman LLP | Goodwin, April | Attorney | 219.5 | 0 | 241.25 | 15.25 | 0 | 17.25 | 493.25 |
| Parker Waichman LLP | Krangle, David | Attorney | 48 | 0 | 0 | 0 | 0 | 0 | 48 |
| Parker Waichman LLP | Kravitz, Ronni | Attorney | 0 | 0 | 21 | 0 | 0 | 0 | 21 |
| Parker Waichman LLP | Lau, Yatfai | Attorney | 0 | 0 | 78 | 0 | 0 | 0 | 78 |
| Parker Waichman LLP | Muhlstock, Melanie | Attorney | 0 | 0 | 19 | 0 | 0 | 0 | 19 |
| Parker Waichman LLP | Parker, Jerrold | Attorney | 1,142.50 | 783.75 | 414.25 | 239.25 | 0 | 0 | 2,579.75 |
| Parker Waichman LLP | Cussen, Catherine | Paralegal | 161 | 0 | 0 | 0 | 0 | 0 | 161 |
| Parker Waichman LLP | George, Annmarie | Paralegal | 3.75 | 0 | 0 | 0 | 0 | 0 | 3.75 |
| Parker Waichman LLP | Goldman, Aliza | Paralegal | 128 | 0 | 0 | 0 | 0 | 0 | 128 |
| Parker Waichman LLP | Hayat, Shafi | Paralegal | 169 | 0 | 0 | 0 | 0 | 0 | 169 |
| Parker Waichman LLP | Hoehn, Rosemarie | Paralegal | 229 | 0 | 0 | 0 | 0 | 0 | 229 |
| Parker Waichman LLP | Marenghi, Joann | Paralegal | 0 | 0 | 48 | 0 | 0 | 0 | 48 |
| Parker Waichman LLP | Olayo, Jeanette | Paralegal | 172 | 0 | 0 | 0 | 0 | 0 | 172 |
| Parker Waichman LLP | Parker, Sean | Paralegal | 0 | 0 | 456.25 | 0 | 0 | 0 | 456.25 |
| Parker Waichman LLP | Schmitt, Lauren | Paralegal | 62.5 | 0 | 47 | 0 | 0 | 0 | 109.5 |
| Parker Waichman LLP | Schnall, Deborah | Paralegal | 160 | 0 | 0 | 0 | 0 | 0 | 160 |
| Parker Waichman LLP | Spiteri, Jennifer | Paralegal | 140 | 0 | 0 | 0 | 0 | 0 | 140 |
| Parker Waichman LLP | Trivino, Dana | Paralegal | 201 | 0 | 0 | 0 | 0 | 0 | 201 |
| Parker Waichman LLP | Tsiskakis, Loretta | Paralegal | 0 | 0 | 51 | 0 | 0 | 0 | 51 |
| Parker Waichman LLP | Whelan, Jeanetta | Paralegal | 10 | 0 | 0 | 0 | 0 | 0 | 10 |
| Parker Waichman LLP | Cronin, Roy | Other | 374.75 | 2.25 | 94.75 | 25.25 | 0 | 0 | 497 |
| Parker Waichman LLP | Goldstein, Jeff | Other | 406 | 0 | 5 | 0 | 0 | 0 | 411 |
| Parker Waichman LLP | Huynh, Linh | Other | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| Parker Waichman LLP | Laraia, Robert | Other | 92.5 | 0 | 0 | 0 | 0 | 0 | 92.5 |
| Parker Waichman LLP | Rao, Deepak | Other | 126.25 | 0 | 0 | 0 | 0 | 0 | 126.25 |
| **Parker Waichman LLPTotal** | | | **4,298.25** | **1,926.25** | **2,294.50** | **358** | **0** | **28.75** | **8,905.75** |
| Pender & Coward, PC | Fulkerson, Alysha | Attorney | 9.9 | 16.1 | 4.85 | 0 | 0 | 0 | 30.85 |
| Pender & Coward, PC | Green, Ross | Attorney | 0 | 6.2 | 0 | 0 | 0 | 0 | 6.2 |
| Pender & Coward, PC | Holcomb, Wayne | Attorney | 5.4 | 7.4 | 0 | 0 | 0 | 0 | 12.8 |
| Pender & Coward, PC | Hunn, Jeffery | Attorney | 14.8 | 84.5 | 0 | 2.5 | 0 | 1.7 | 103.5 |
| Pender & Coward, PC | Johnson, Alex | Attorney | 5.9 | 0 | 0 | 0 | 0 | 0 | 5.9 |
| Pender & Coward, PC | Kubovcik, Andrew | Attorney | 0.3 | 0 | 0 | 0 | 0 | 0 | 0.3 |

| Firm | Employee | Class | Case Assessment | Pre-Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Pender & Coward, PC | Lahren, Anne | Attorney | 1.5 | 4 | 0 | 0 | 0 | 0 | 5.5 |
| Pender & Coward, PC | Lang, James | Attorney | 3.4 | 9.2 | 0 | 0.7 | 0 | 0 | 13.3 |
| Pender & Coward, PC | Lascara, Wiiliam | Attorney | 113.6 | 193.8 | 62.4 | 15 | 0 | 9.6 | 394.4 |
| Pender & Coward, PC | Scheible, Daniel | Attorney | 0.3 | 0 | 0 | 0 | 0 | 0 | 0.3 |
| Pender & Coward, PC | Eisel, Teresa | Paralegal | 68.6 | 39.2 | 20.2 | 1.1 | 0 | 0 | 129.1 |
| **Pender & Coward, PCTotal** | | | **223.7** | **360.4** | **87.45** | **19.3** | **0** | **11.3** | **702.15** |
| Pendley Baudin & Coffin, LLP | Baudin, Pamela | Attorney | 1.75 | 0 | 0 | 0 | 0 | 0 | 1.75 |
| Pendley Baudin & Coffin, LLP | Baudin, Stanley | Attorney | 0.75 | 0 | 0 | 0 | 0 | 0 | 0.75 |
| Pendley Baudin & Coffin, LLP | Coffin, Christopher | Attorney | 90.75 | 48 | 37.25 | 21.5 | 0 | 0 | 197.5 |
| Pendley Baudin & Coffin, LLP | Edwards, Allen | Attorney | 1 | 0 | 39.5 | 0 | 0 | 0 | 40.5 |
| Pendley Baudin & Coffin, LLP | Pendley, Patrick | Attorney | 15.25 | 1.25 | 0 | 0.75 | 0 | 0 | 17.25 |
| Pendley Baudin & Coffin, LLP | Rockforte, Nicholas | Attorney | 87.75 | 13.75 | 10 | 27.5 | 0 | 4.5 | 143.5 |
| Pendley Baudin & Coffin, LLP | Dupont, Shayna | Paralegal | 5 | 0 | 4.5 | 0 | 0 | 0 | 9.5 |
| Pendley Baudin & Coffin, LLP | Edwards, Renee | Paralegal | 292.95 | 0 | 13.75 | 0 | 0 | 0 | 306.7 |
| **Pendley Baudin & Coffin, LLPTotal** | | | **495.2** | **63** | **105** | **49.75** | **0** | **4.5** | **717.45** |
| Podhurst Orseck, P.A | Diaz, Jr., Victor | Attorney | 972.5 | 140.5 | 2 | 0 | 0 | 0 | 1,115.00 |
| Podhurst Orseck, P.A | Eaton, Joel | Attorney | 11.5 | 9.25 | 0 | 0 | 0 | 0 | 20.75 |
| Podhurst Orseck, P.A | Ezell, Katherine | Attorney | 0.75 | 0 | 0 | 0 | 0 | 0 | 0.75 |
| Podhurst Orseck, P.A | Gravante, John | Attorney | 61.25 | 7.75 | 0 | 15.5 | 0 | 69.5 | 154 |
| Podhurst Orseck, P.A | Josefsberg, Robert | Attorney | 652.5 | 46.75 | 0 | 17 | 0 | 0 | 716.25 |
| Podhurst Orseck, P.A | Prieto, Peter | Attorney | 99 | 35 | 0 | 64.25 | 0 | 0 | 198.25 |
| Podhurst Orseck, P.A | Rosenthal, Stephen | Attorney | 14.25 | 4.5 | 0 | 0 | 0 | 0 | 18.75 |
| Podhurst Orseck, P.A | Rundlet, Alexander | Attorney | 156 | 142.5 | 0.5 | 0 | 0 | 0 | 299 |
| Podhurst Orseck, P.A | Weinshall, Matthew P. | Attorney | 14.75 | 0 | 0 | 0 | 0 | 0 | 14.75 |
| Podhurst Orseck, P.A | Enriquez, Ramon | Paralegal | 354.5 | 22.5 | 38.25 | 0 | 0 | 0 | 415.25 |
| Podhurst Orseck, P.A | Lawson, Michelle | Paralegal | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.5 |
| Podhurst Orseck, P.A | Popowski, Ailyn | Paralegal | 21.25 | 0 | 0 | 0 | 0 | 0 | 21.25 |
| Podhurst Orseck, P.A | Doddo, Jimmy | Law Clerk | 27.25 | 4.5 | 0 | 0 | 0 | 0 | 31.75 |
| Podhurst Orseck, P.A | Donner, Jeffrey | Law Clerk | 717.25 | 337 | 120.25 | 12 | 0 | 0 | 1,186.50 |
| Podhurst Orseck, P.A | Handelson, Erika | Law Clerk | 4.25 | 7.25 | 0 | 0 | 0 | 0 | 11.5 |
| Podhurst Orseck, P.A | Harrigan, Thamar | Law Clerk | 979.75 | 0 | 0 | 0 | 0 | 0 | 979.75 |
| Podhurst Orseck, P.A | Kerr, Mark | Law Clerk | 3 | 6.5 | 0 | 0 | 0 | 0 | 9.5 |
| Podhurst Orseck, P.A | Lorenzo, Jorge | Law Clerk | 3 | 0 | 0 | 1.25 | 0 | 0 | 4.25 |
| Podhurst Orseck, P.A | Thornton, Clayton | Law Clerk | 33 | 0 | 0 | 0 | 0 | 0 | 33 |
| Podhurst Orseck, P.A | Olmos, Felix | Other | 101 | 4 | 0 | 1 | 0 | 0 | 106 |
| Podhurst Orseck, P.A | Patton, Bert | Other | 19.75 | 0 | 0 | 0 | 0 | 0 | 19.75 |
| Podhurst Orseck, P.A | Valledor, Mary | Other | 126.75 | 0 | 0 | 0 | 0 | 0 | 126.75 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| **Podhurst Orseck, P.A Total** | | | **4,373.75** | **768** | **161** | **111** | **0** | **69.5** | **5,483.25** |
| Reeves & Mestayer, PLLC | Burkes, Jennifer | Attorney | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| Reeves & Mestayer, PLLC | Busby, Tom | Attorney | 1,818.80 | 698.22 | 1,435.25 | 294.5 | 8.25 | 19 | 4,274.02 |
| Reeves & Mestayer, PLLC | Lumpkin, Mark | Attorney | 265.9 | 147.89 | 145.49 | 140.64 | 4 | 6 | 709.92 |
| Reeves & Mestayer, PLLC | Reeves, Jim | Attorney | 2,064.80 | 653.47 | 1,267.25 | 319.25 | 7.25 | 13.75 | 4,325.77 |
| Reeves & Mestayer, PLLC | Parkinson, Paula | Paralegal | 13 | 0 | 0 | 33 | 0 | 0 | 46 |
| **Reeves & Mestayer, PLLC Total** | | | **4,171.50** | **1,499.58** | **2,847.99** | **787.39** | **19.5** | **38.75** | **9,364.71** |
| Rhine Law Firm, P.C. | Rhine, Joel | Attorney | 164 | 191 | 22.5 | 5.5 | 0 | 0 | 383 |
| Rhine Law Firm, P.C. | Wagner, Katherine | Attorney | 0 | 8.25 | 0 | 0 | 0 | 0 | 8.25 |
| Rhine Law Firm, P.C. | Kelley, Shannon | Paralegal | 4.75 | 0 | 21.25 | 0 | 0 | 0 | 26 |
| Rhine Law Firm, P.C. | Schomp, Cristi | Paralegal | 0.5 | 0 | 0 | 0 | 0 | 0 | 0.5 |
| **Rhine Law Firm, P.C. Total** | | | **169.25** | **199.25** | **43.75** | **5.5** | **0** | **0** | **417.75** |
| Richard J. Serpe, P.C. | Biagioni, Joseph | Attorney | 491.75 | 25 | 12 | 344.5 | 0 | 0 | 873.25 |
| Richard J. Serpe, P.C. | Breit, Jeffrey | Attorney | 233 | 94 | 28.25 | 92 | 11.5 | 39 | 497.75 |
| Richard J. Serpe, P.C. | Brown, Joan | Attorney | 0 | 21 | 0 | 0 | 0 | 0 | 21 |
| Richard J. Serpe, P.C. | Drescher, John | Attorney | 119 | 242 | 93.5 | 75.55 | 41.5 | 0.5 | 572.05 |
| Richard J. Serpe, P.C. | Gilbert, Oscar | Attorney | 0 | 7.5 | 6.5 | 42 | 0 | 0 | 56 |
| Richard J. Serpe, P.C. | Imprevento, Michael | Attorney | 157 | 473 | 24 | 252 | 83 | 31 | 1,020.00 |
| Richard J. Serpe, P.C. | Leeth, Billie | Attorney | 0 | 26 | 0 | 57 | 0 | 0 | 83 |
| Richard J. Serpe, P.C. | Serpe, Richard | Attorney | 527.73 | 296.5 | 128 | 1,315.05 | 0.5 | 30.25 | 2,298.03 |
| Richard J. Serpe, P.C. | Serpe- 2, Richard | Attorney | 210 | 431.75 | 402.5 | 535 | 46.25 | 501.25 | 2,126.75 |
| Richard J. Serpe, P.C. | Baker, Terry | Paralegal | 0 | 0 | 8 | 0 | 0 | 0 | 8 |
| Richard J. Serpe, P.C. | Biagioni - 2, Joseph | Paralegal | 7.25 | 9.25 | 0 | 0 | 0 | 0 | 16.5 |
| Richard J. Serpe, P.C. | Campbell, Bridget | Paralegal | 23 | 0 | 0 | 13.5 | 0 | 0 | 36.5 |
| Richard J. Serpe, P.C. | Cohen, Rebecca | Paralegal | 850.25 | 96.5 | 334.5 | 101 | 0 | 204.75 | 1,587.00 |
| Richard J. Serpe, P.C. | Derby, Erin | Paralegal | 9 | 1.5 | 0 | 6 | 0 | 0 | 16.5 |
| Richard J. Serpe, P.C. | MacPherson, Amy | Paralegal | 14.5 | 9.75 | 0 | 0 | 0 | 0 | 24.25 |
| Richard J. Serpe, P.C. | Oliver, Tracy | Paralegal | 796.75 | 1,112.25 | 996.5 | 625 | 67.75 | 552 | 4,150.25 |
| Richard J. Serpe, P.C. | Puckett, Debbie | Paralegal | 0.5 | 6.5 | 0.5 | 3.75 | 0 | 0 | 11.25 |
| Richard J. Serpe, P.C. | Todd, Dianne | Paralegal | 1 | 14 | 0 | 0 | 0 | 0 | 15 |
| **Richard J. Serpe, P.C. Total** | | | **3,440.73** | **2,866.50** | **2,034.25** | **3,462.35** | **250.5** | **1,358.75** | **13,413.08** |
| Seeger Weiss LLP | George, Scott Alan | Attorney | 430.95 | 378.65 | 1,029.60 | 769.25 | 48.25 | 12.75 | 2,669.45 |
| Seeger Weiss LLP | Grand, Jeffrey | Attorney | 385 | 220 | 796 | 2,831.00 | 0 | 17.5 | 4,249.50 |
| Seeger Weiss LLP | Kekatos, Diogenes | Attorney | 19.9 | 18 | 0 | 0 | 0 | 0 | 37.9 |
| Seeger Weiss LLP | O'Brien, James | Attorney | 57.7 | 0 | 0 | 2.5 | 0 | 0 | 60.2 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Seeger Weiss LLP | Schimmel, Miriam | Attorney | 0 | 0 | 10 | 0 | 0 | 0 | 10 |
| Seeger Weiss LLP | Seeger, Christopher | Attorney | 1,619.00 | 310.5 | 1,000.00 | 3,596.00 | 0 | 270.5 | 6,796.00 |
| Seeger Weiss LLP | Tsai, Joseph | Attorney | 36.5 | 4.5 | 56 | 103 | 0 | 0 | 200 |
| Seeger Weiss LLP | Weiss, Stephen | Attorney | 0.8 | 0 | 0.5 | 0 | 0 | 0.25 | 1.55 |
| Seeger Weiss LLP | Bush, Rodney | Paralegal | 0 | 0 | 25.5 | 0 | 0 | 0 | 25.5 |
| Seeger Weiss LLP | Griffith, Lauren | Paralegal | 1 | 0.5 | 34.5 | 12 | 0 | 0.5 | 48.5 |
| Seeger Weiss LLP | Karlitz, Amanda | Paralegal | 20.5 | 0 | 9.75 | 0 | 0 | 0 | 30.25 |
| Seeger Weiss LLP | Kibria, Somaiya | Paralegal | 40 | 0 | 121.25 | 64 | 0 | 0 | 225.25 |
| Seeger Weiss LLP | Torres, Andro | Paralegal | 1.75 | 0 | 0 | 0 | 0 | 0 | 1.75 |
| Seeger Weiss LLP | Wickline, Kristin | Paralegal | 8 | 2.75 | 1.75 | 0 | 0 | 0 | 12.5 |
| Seeger Weiss LLP | Lipner, David | Other | 0 | 0 | 12 | 0 | 0 | 0 | 12 |
| **Seeger Weiss LLPTotal** | | | **2,621.10** | **934.9** | **3,096.85** | **7,377.75** | **48.25** | **301.5** | **14,380.35** |
| Singleton Law Firm | Singleton, Willie | Attorney | 78.5 | 34.25 | 32.75 | 155.75 | 0 | 0 | 301.25 |
| Singleton Law Firm | Webster, Barbara | Law Clerk | 37 | 0 | 0.75 | 0 | 0 | 0 | 37.75 |
| **Singleton Law FirmTotal** | | | **115.5** | **34.25** | **33.5** | **155.75** | **0** | **0** | **339** |
| Strom Law Firm, LLC | John, Alphin | Attorney | 5.5 | 0 | 0 | 35.75 | 0 | 0 | 41.25 |
| Strom Law Firm, LLC | Madden, Robyn | Attorney | 0 | 0 | 0 | 0.75 | 0 | 0 | 0.75 |
| Strom Law Firm, LLC | Pacella, Mario | Attorney | 0 | 0 | 0 | 2.25 | 0 | 0 | 2.25 |
| Strom Law Firm, LLC | Strom, Pete | Attorney | 3.5 | 0 | 0 | 21.5 | 0 | 0 | 25 |
| **Strom Law Firm, LLCTotal** | | | **9** | **0** | **0** | **60.25** | **0** | **0** | **69.25** |
| Taylor Martino, PC | Braswell, Kasie | Attorney | 16.25 | 28 | 1.75 | 0 | 0 | 53 | 99 |
| Taylor Martino, PC | Rowan, Edward | Attorney | 20.75 | 3.75 | 12.25 | 0 | 0 | 4 | 40.75 |
| Taylor Martino, PC | Taylor, Richard | Attorney | 61.25 | 59 | 91 | 0 | 0 | 120 | 331.25 |
| **Taylor Martino, PCTotal** | | | **98.25** | **90.75** | **105** | **0** | **0** | **177** | **471** |
| The Lambert Firm | Lambert, Hugh | Attorney | 2,019.00 | 81.25 | 89.5 | 212.5 | 0.5 | 14 | 2,416.75 |
| The Lambert Firm | Mangat, Chathan | Attorney | 42.5 | 0 | 0 | 0 | 0 | 0 | 42.5 |
| The Lambert Firm | Nelson, Linda | Attorney | 84 | 3 | 0 | 0 | 0 | 0 | 87 |
| The Lambert Firm | Peterson, Cayce | Attorney | 831.75 | 129 | 85 | 255 | 15 | 16.25 | 1,332.00 |
| The Lambert Firm | Guidry, Amy | Paralegal | 205.5 | 4 | 169.5 | 36 | 0 | 0 | 415 |
| The Lambert Firm | Lumpkin, Allison | Paralegal | 31.5 | 0 | 0 | 0 | 0 | 0 | 31.5 |
| The Lambert Firm | Minden, Jennifer | Paralegal | 4.5 | 0 | 73.75 | 0 | 0 | 0 | 78.25 |
| The Lambert Firm | Pince, Adrianna | Paralegal | 0 | 0 | 176 | 0 | 0 | 0 | 176 |
| The Lambert Firm | French, Justin | Law Clerk | 0 | 0 | 98.25 | 0 | 0 | 0 | 98.25 |
| The Lambert Firm | Lambert, M. Palmer | Law Clerk | 10.5 | 0 | 0 | 0 | 0 | 0 | 10.5 |
| The Lambert Firm | Beckett, Gerry | Other | 44.75 | 1.5 | 12 | 0 | 4 | 0 | 62.25 |
| **The Lambert FirmTotal** | | | **3,274.00** | **218.75** | **704** | **503.5** | **19.5** | **30.25** | **4,750.00** |
| The Steckler Law Firm | Bautista, Sharon | Attorney | 21.5 | 33.75 | 7.5 | 0 | 0 | 0 | 62.75 |
| The Steckler Law Firm | Brown, Bob | Attorney | 196.5 | 24.5 | 19.75 | 124 | 2 | 57.75 | 424.5 |
| The Steckler Law Firm | Melancon, Renee | Attorney | 159.75 | 305.5 | 13.75 | 0 | 0 | 0 | 479 |
| The Steckler Law Firm | Reddell, Kelly | Attorney | 53.25 | 57.25 | 1.75 | 297.25 | 0 | 0 | 409.5 |
| The Steckler Law Firm | Saucer, Ann | Attorney | 8.25 | 68.45 | 0 | 0 | 0 | 0 | 76.7 |

| Firm | Employee | Class | Case Assessment | Pre Trial | Discovery | Trial | Appeal | Settlement | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| The Steckler Law Firm | Sbaiti, Mazin | Attorney | 0.5 | 184 | 65.25 | 0 | 0 | 0 | 249.75 |
| The Steckler Law Firm | Steckler, Bruce | Attorney | 3,165.05 | 480.25 | 206.25 | 65 | 0 | 330.82 | 4,247.37 |
| The Steckler Law Firm | Turcotte, Ray | Attorney | 83.25 | 42.25 | 155.5 | 5 | 0 | 0 | 286 |
| The Steckler Law Firm | Wilkins, Stephanie | Paralegal | 47 | 139.75 | 11.25 | 436.75 | 0 | 0 | 634.75 |
| **The Steckler Law FirmTotal** | | | **3,735.05** | **1,335.70** | **481** | **928** | **2** | **388.57** | **6,870.32** |
| Thornhill Law Firm | Elliot, Frank | Attorney | 2.75 | 0 | 72 | 0.5 | 0 | 0 | 75.25 |
| Thornhill Law Firm | Thornhill, Tom | Attorney | 24.25 | 0 | 0 | 8.75 | 0 | 5 | 38 |
| Thornhill Law Firm | Fugate, Christy | Paralegal | 2.25 | 0 | 0 | 0.25 | 0 | 0 | 2.5 |
| **Thornhill Law FirmTotal** | | | **29.25** | **0** | **72** | **9.5** | **0** | **5** | **115.75** |
| Vaughn Bowden & Wooten, PA | Wooten, Eric | Attorney | 45.25 | 0 | 55.25 | 0 | 0 | 0 | 100.5 |
| **Vaughn Bowden & Wooten, PATotal** | | | **45.25** | **0** | **55.25** | **0** | **0** | **0** | **100.5** |
| VM Diaz and Partners, LLC | Diaz, Victor | Attorney | 821.25 | 71.5 | 81.5 | 32.5 | 2.25 | 38.25 | 1,047.25 |
| VM Diaz and Partners, LLC | Lorenzo, Jorge | Attorney | 429 | 36.5 | 15.25 | 7.75 | 2.25 | 164.5 | 655.25 |
| VM Diaz and Partners, LLC | Popowski, Ailyn | Attorney | 313.75 | 0 | 0 | 0 | 0 | 34.25 | 348 |
| VM Diaz and Partners, LLC | Yarzabal, Iliana | Paralegal | 0 | 0 | 0 | 0 | 0 | 19.5 | 19.5 |
| **VM Diaz and Partners, LLCTotal** | | | **1,564.00** | **108** | **96.75** | **40.25** | **4.5** | **256.5** | **2,070.00** |
| Webb & Scarmozzino, P.A. | Scarmozzino, Jim | Attorney | 47 | 0 | 0 | 0 | 0 | 0 | 47 |
| **Webb & Scarmozzino, P.A.Total** | | | **47** | **0** | **0** | **0** | **0** | **0** | **47** |
| Whitfield Bryson and Mason, LLP | Bryson, Dan | Attorney | 1,898.25 | 458 | 616.5 | 2,448.10 | 0 | 94 | 5,514.85 |
| Whitfield Bryson and Mason, LLP | Harris, Scott | Attorney | 72 | 1.5 | 2.5 | 0 | 0 | 0 | 76 |
| Whitfield Bryson and Mason, LLP | Lee, Matthew | Attorney | 2.5 | 0 | 36 | 0 | 0 | 0 | 38.5 |
| Whitfield Bryson and Mason, LLP | Bakemeier, Kay | Paralegal | 814.3 | 7.5 | 31 | 231.5 | 0 | 0 | 1,084.30 |
| Whitfield Bryson and Mason, LLP | Mkamanga, Amanda | Paralegal | 884.2 | 0 | 0 | 136.5 | 0 | 0 | 1,020.70 |
| Whitfield Bryson and Mason, LLP | Sena, Deborah | Paralegal | 110 | 0 | 16 | 0 | 0 | 0 | 126 |
| Whitfield Bryson and Mason, LLP | Lendino, Tim | Law Clerk | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| **Whitfield Bryson and Mason, LLPTotal** | | | **3,785.25** | **467** | **702** | **2,816.10** | **0** | **94** | **7,864.35** |
| **Grand Total:** | | | **67,202.91** | **53,830.63** | **43,714.94** | **40,576.35** | **5,311.50** | **22,500.92** | **233,137.25** |

**Tab #4**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, **Case No. 09-6687 (E.D.La.);**

*Gross, et al. v. Knauf Gips, KG, et al.*, **Case No. 09-6690 (E.D.La.);**

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, **Case No 10-361 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1672 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1395 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1673 (E.D.La.))**

## PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES PURSUANT TO RULE 55(b)(2)(B) AND REQUEST FOR APPROVAL OF SUPPLEMENTAL NOTICE

On September 26, 2014, the Court granted the Plaintiffs' motion for class certification

1

Case 2:09-md-02047-EEF-MBN Document 22380-105 Filed 12/06/19 Page 236 of 668
Case 1:Case 2:09-md-02047-EEF-MBN Document 22380-105 LSHba8acR0041574page 22 Page 1d62 of
759

seeking to certify a class of existing class members[1] with claims against the Taishan

Defendants.[2]  *See* Rec.Doc. # 18028 ((hereafter "CLASS FOFCOL").  In its CLASS FOFCOL

the Court certified a class defined as follows:

> All owners of real properties in the United States, who are named
> Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or
> *Wiltz* (*i.e.*, not an absent class member), asserting claims for
> remediated damages arising from, or otherwise related to Chinese
> Drywall manufactured, sold, distributed, supplied, marketed,
> inspected, imported or delivered by the Taishan Defendants.

In accordance with the Court's CLASS FOFCOL, Plaintiffs issued notice to all class

members by first class mail on September 26, 2014.  *See* Notice of Filing Affidavit of Tim

Walters, Rec.Doc.No. 18035.  All class members wishing to opt out of the class are required to

mail opt out forms to Class Counsel by no later than October 27, 2014.  To date, Class Counsel

---

[1] The class is comprised of active litigants (either in the original action or in complaints in intervention) who are participants in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.) ("*Germano*"); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.) ("*Gross*"); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La) ("*Wiltz*"); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); and/or *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.) (collectively, "*Amorin*").  For administrative reasons the class definition is limited to the actions in *Amorin*, *Germano*, *Gross* and *Wiltz*.  All class members are named plaintiffs in the *Amorin* actions.

[2] The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd.; Beijing New Building Materials Limited Co.; Beijing New Building Materials Group Co., Ltd.; China National Building Materials Co., Ltd.; China National Building Materials Group Corporation; and Tai'an Taishan Plasterboard Co., Ltd..  The "Taishan Affiliates" are comprised of the following entities: Beijing New Building Materials Limited Co.; Beijing New Building Materials Group Co., Ltd.; China National Building Materials Co., Ltd.; China National Building Materials Group Corporation; and Tai'an Taishan Plasterboard Co., Ltd..

have received no requests for exclusion.

Based on the current status of the instant class proceedings, Plaintiffs' respectfully request that the Court award damages to the class. For the reasons set forth in the memorandum of law submitted in conjunction herewith, Plaintiffs request that the Court award $1,263,330,881.19 in damages to the class. In addition, Plaintiffs have prepared a supplemental notice that fully describes the damages model outlined in the memorandum of law. Plaintiffs request that the Court approve the supplemental notice and allow an additional forty day opt-out period to allow class members to consider the proposed damages model being pursued.

Dated: October 29, 2014               Respectfully submitted,

/s/ Leonard A. Davis
Russ M. Herman, Esquire (LA Bar No. 6819)
Leonard A. Davis, Esquire (LA Bar No. 14190)
Stephen J. Herman, Esquire (LA Bar No. 23129)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (on the brief)
Fred S. Longer (on the brief)
Sandra L. Duggan (on the brief)
Matthew C. Gaughan (on the brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
ALevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

3

## PROPOSED OF COUNSEL TO CLASS,
## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler
The Steckler Law Firm
12700 Park Central Drive, Ste 1900
Dallas, TX 75251
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 29-2931
hlambert@thelambertfirm.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

4

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 238 of 668
Case 1:Case 2:09md-md02047-EEF-JCW Document 27 Document 22386-1 Filed 08/02/13 Page 95 Page 165 of
759

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax:(239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax:(228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 29th day of October, 2014.

               /s/ Leonard A. Davis\
               Leonard A. Davis, Esquire\
               Herman, Herman & Katz, LLC\
               820 O'Keefe Avenue\
               New Orleans, LA 70113\
               Phone: (504) 581-4892\
               Fax: (504) 561-6024\
               Ldavis@hhklawfirm.com

               *Plaintiffs' Liaison Counsel*\
               *MDL 2047*

# Tab #5

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 09-6687 (E.D. La.);

*Gross v. Knauf Gips, KG*, Case No. 09-6690 (E.D. La.);

*Wiltz v. Beijing New Building Materials Public Limited Co.*, Case No. 10-361 (E.D. La.);

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1672 (E.D. La.);

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1395 (E.D. La.); and

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1673 (E.D. La.).

## TAISHAN'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO COMPEL PRODUCTION OF INFORMATION RELEVANT TO PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES

# INTRODUCTION

Plaintiffs have filed a motion arguing that, collectively, they are entitled to approximately $1.3 billion, yet they refuse to produce (or consent to the production of) the following documents that are directly relevant to the determination of class membership and assessment of damages:

(1) Plaintiff profile forms updated with information current in 2015;

(2) All information regarding each class member in the custody of both BrownGreer PLC and Garretson Resolution Group (collectively, the "Settlement Administrators"), including but not limited to the percentage of Taishan drywall contained in each class member's property and any compensation or remediation already received from other sources related to Chinese drywall; and

(3) All information in the custody of the Settlement Administrators regarding the actual cost of remediating properties as part of the various drywall settlements over the last five years.

Taishan and the Court cannot determine class membership and an accurate assessment of damages without the above-listed information that Plaintiffs refuse to provide, even though the data from the Settlement Administrators is readily available.[1]  In light of the April 28, 2015 hearing on Plaintiffs' Motion for Assessment of Class Damages and the April 20, 2015 briefing

---

[1] After a meet and confer between Taishan's counsel and the PSC on April 1, 2015, it appeared that an agreement had been reached to jointly request and authorize the Settlement Administrators for documents at least in category 2.  By April 3, unfortunately, those discussions had broken down, and the PSC withheld its consent for the Settlement Administrators to provide Taishan with *any* information or documents other than the original plaintiff profile forms, and – apparently from the Virginia Settlement only – a listing of class member's names, addresses and square footage.

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 245 of 668
Case 2:14-cv-02722-EEF-MBN Document 28-8 Filed 04/09/15 Page 3 of 71 of
759

deadline, the Court should grant Taishan's motion and order Plaintiffs to produce this relevant information.

## ARGUMENT

### A. Taishan Is Entitled to Updated Plaintiff Profile Forms

The Court has long recognized that profile forms are "vital" and "necessary" in this litigation. *See* December 10, 2009 Status Conference Transcript (Doc. 690), at p. 8. Pretrial Order No. 11 (Doc. 168-1) required Plaintiffs to submit profile forms to liaison counsel on or before September 2, 2009. As a result of a number of parties' failure to provide profile forms, the Court subsequently entered Pretrial Order No. 25 (Doc. 11151) requiring every party in this litigation to submit profile forms on or before November 15, 2011. Thus, the information in most plaintiff profile forms is more than 5 years old (and in no case less than 3 years old). That information is stale and in many cases likely no longer accurate.

To determine class membership and accurately assess damages in this case, Plaintiffs should produce complete and updated plaintiff profile forms for each class member. Although some class members may have previously submitted one or more profile forms in connection with claims and/or settlements related to the MDL, plaintiff profile forms previously submitted by class members are outdated, incomplete with respect to information necessary to determine class membership and damages in this action, and, with the passage of time, many are likely inaccurate. In fact, the PSC apparently does not even have square footage information for 34% of the class. *See* Plaintiff's Mem. of Law in Supp. of Mot. for Assessment of Class Damages

Case 3:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 246 of 668
Case 2:09-md-02047-EEF-MBN Document 18566-11 Filed 04/09/15 Page 34 Page 272 of
759

(Doc. 18086-1) at 6 n.7 (explaining that the "area of each house is unknown" for 1,317 of the 3,852 class properties).[2]

A preliminary analysis of class members and their respective properties[3] reveals a number of errors that are likely attributable to outdated, inaccurate or incomplete plaintiff profile forms.[4]  For example,

- Class members who have dismissed their claims or opted out of the class;[5]

- Class members who have filed notices of remediation, and therefore, have likely remediated their properties and incurred *actual* remediation costs;[6]

- Seven class members who were part of the *Germano* case and have already received judgments;[7]

- Class properties that *only* contained Knauf drywall as demonstrated by their eligibility for the Settlement Agreement For The Demonstration Remediation

---

[2] Recent statements to the press by the PSC confirm that there is a lack of sufficient information at this time to determine class membership and accurately assess class damages, "Herman said he doesn't know how many houses will be part of the next decision.  'At this juncture, some people have been foreclosed upon, some evicted, some have had short sales.  But it's going to be between 2,500 and 4,000 homes.  And the minimum amount would be in the range of $90 per square foot.'"  Janet McConnaughey, *Hearing About Chinese Drywall Damage Scheduled for April 28*, State (Columbia, S.C.), Mar. 30, 2015, http://www.thestate.com/news/business/national-business/article16941221.html#/tabPane=tabs-b0710947-1-1.

[3] *See* Plaintiffs' Mem. of Law in Supp. of Mot. for Assessment of Class Damages, Exhibit C (Docs. 18086-14, 15 and 16).

[4] These class members and properties are highlighted in the class list used by Plaintiffs and their expert Ronald E. Wright.  *See* **Exhibit A**.

[5] Five examples of class members who have filed motions to dismiss their claims because the "drywall in their home is not defective and/or was manufactured domestically," as well as documentation of two families who have opted out of the class, are attached in **Exhibit B**.

[6] Five examples of notices of remediation filed by class members are attached as **Exhibit C**.

[7] *See* rows A1, A1044, A1602, A1737, A1844, A1942 and A2068 of **Exhibit A**.

4

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 247 of 668
Case 2:14-cv-02722-EEF-MBN Document 23-3 Filed 04/09/15 Page 5 of 73 of
759

Of Homes With KPT Drywall, or by their previously submitted plaintiff profile forms which only allege the presence of Knauf drywall;[8]

- Multiple class members who assert claims for the same property;[9] and

- No fewer than fifty (50) class members who no longer own the property on which they assert a claim according to public records.[10]

Accordingly, Taishan requests that each class member submit the plaintiff profile form attached as **Exhibit F** (the "Taishan PPF"). The Taishan PPF seeks the same information as plaintiff profile forms previously approved by this Court. *See e.g.*, Docs. 168-2; 17170-1 and 17170-2. In light of settlements and remediations that have occurred since the Court first required plaintiffs to submit profile forms in September 2009, the Taishan PPF also seeks additional information directly relevant to the determination of class membership and assessment of damages in this action (*e.g.*, whether a class member has fully or partially remediated his property; whether a class member has received any settlement funds).

Because of the fast-approaching April 28, 2015 hearing on class damages, Taishan requests that the Court require Plaintiffs to submit a complete set of Taishan PPFs for each class member no later than April 15, 2015. Given the impending hearing date on a pending motion

---

[8] Class properties that were part of this Demonstration Remediation Of Homes With KPT Drywall are highlighted in **Exhibit D**. Two examples of previously submitted plaintiff profile forms which only allege the presence of Knauff drywall in two class properties are attached as **Exhibit G**. These two previously submitted plaintiff profile forms are the first such examples that Taishan identified after beginning its review after receiving the forms from BrownGreer on Saturday, April 4, 2015.

[9] Examples include rows A917 and A1746 (11106 Kiskadee Circle New Port Richey, FL 34654), rows A1441 and A1452 (2561 52nd Avenue NE Naples, FL 34120), rows A1792 and B645 (3142 SW Martin Street Port Saint Lucie, FL 34988), rows A1870 and B1105 (9596 Cobblestone Creek Drive Boynton Beach, FL 33472), and rows A2216 and B335 (17181 Morris Bridge Road Thonotossa, FL 33592) of Mr. Wright's list of class members. *See* **Exhibit A**.

[10] *See* **Exhibit E**.

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 248 of 668
Case 2:14-cv-02094-EEF-MBN Document 28-5 Filed 04/09/15 Page 26 Page 274 of
759

seeking $1.3 billion in damages on behalf of these identified individuals, Taishan's request is
reasonable. The Court previously required plaintiffs to file profile forms within twelve (12)
calendar days. *See* Pretrial Order No. 25 (Doc. 11151). To the extent that Plaintiffs are
concerned about expense or delay, Taishan is willing to work with the PSC to create an online
option for submitting information, which Taishan understands BrownGreer PLC has used in
another MDL.

Finally, Taishan requests that the Court hold that any class member who fails to submit a
Taishan PPF on or before April 15, 2015 is precluded from recovery in this action. The Court
has previously held that dismissal with prejudice is appropriate for a plaintiff's failure to timely
submit a profile form. *See* December 10, 2009 Status Conference Transcript (Doc. 690), at p. 9
("[I]f they resist and do not file the profile forms, I will assume that they are not interested in
proceeding with the litigation and dismiss their case with prejudice."); March 23, 2011 Status
Conference Transcript, at pp. 5-6 ("From plaintiffs' standpoint, if they don't do it and the meet
and confer is arranged and done and there's no question that a certain amount had not been filled
in, there's no reason for it, then I'm going to set a rule to show cause why those cases should not
be dismissed for failure to comply with the Court's orders.").

### B. Taishan Is Entitled to All Information Related to Class Members in the Custody of the Settlement Administrators

The PSC is required to utilize actual remediation cost data when available, and Taishan is
entitled to discovery of that information. Under the governing law of Louisiana and certain other
class states, "[d]amages may be predicated on estimation only when the loss has not been
repaired." *Volkswagen of America, Inc. v. Robertson*, 713 F.2d 1151, 1169 (quoting *Lambert v.
Allstate Ins. Co.*, 195 So. 2d 698, 700 (La. Ct. App. 1967)). For homes that have been

6

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 249 of 668
Case 2:09-cv-07628-EEF-MBN 2 Document 22380-11 Filed 12/06/19 Page 7 of 275 of
759

remediated, Plaintiffs "must produce the best evidence available"—"repair bills," not estimates. *Id*.

The Settlement Administrators are in a unique position of maintaining more information than anyone else, including the Court and the PSC, about the class members and their respective properties, claims filed by each class member, settlement funds received by each class member, and remediation costs of class properties that have already been fully or partially remediated. This information, as well as any other information that the Settlement Administrators have about the class members or the class properties, is directly relevant to and necessary for determination of class membership and an accurate assessment of damages.

In particular, because the PSC's pending motion for class damages is based on a purportedly formulaic cost per square foot ***estimate*** for remediation, it is critically important for the determination of damages to know whether the identifiable class members have in fact already had their homes remediated, and if so, the actual cost of such remediation and any other compensation already received by the claimant.

There is no dispute that a substantial number of properties contained mixed drywall. In fact, the Knauf Settlement distributed settlement funds based on the percentage of Knauf drywall contained in a property with mixed drywall. Therefore, in order to properly assess damages, information regarding the percentage of Taishan drywall in each class member's property is directly relevant to and necessary for a proper assessment of damages. This information is in the hands of the able Settlement Administrators in this MDL, and could be provided to Taishan and the PSC with the push of a button.

In light of the April 28, 2015 hearing on class damages, Taishan requests that the Court require Plaintiffs to allow the Class Administrators to produce all information in their custody related to any class member or class property no later than April 15, 2015.

### C. Taishan Is Entitled to All Information in the Custody of the Settlement Administrators Regarding the Actual Remediation Costs

In granting the PSC's motion for class certification, the Court expressly pointed to the vast amount of empirical remediation cost data maintained by the Settlement Administrators:

> The Court can likewise determine the cost of remediation, through the submission of affidavits, expert evidence and from data gathered by Moss & Associates (subject to appropriate cost adjustments), for remediation costs generally (*i.e.*, empirical evidence concerning the cost or remediation performed by Moss & Associates under the Knauf settlement program). For purposes of calculating class-wide damages, data concerning class members currently before the Court (*i.e.*, data from BrownGreer PLC concerning the square footage of class members' homes) can be used to estimate the size of the class so that damages can be calculated on an aggregate basis.

Doc. 18028 at pp. 32-33. Other Eastern District of Louisiana decisions have also recognized the importance of actual remediation cost data in evaluating property repair damages. *See Williams v. Allstate Insurance Co.*, No. 08-62, 2008 WL 5110604 at *3 (E.D. La. Nov. 26, 2008) (excluding expert testimony on repair costs that were not based on the actual repair data); *accord Tardo v. State Farm Fire & Cas. Co.*, No. 08-1165 (E.D. La. June 22, 2009 (Doc.63)); (Africk, J.) (same); *Lightell v. State Farm Fire & Cas. Co.*, No. 08-4393 (E.D. La. Dec. 31, 2009 (Doc. 66)) (Barbier, J.) (same). *See also Lacroix v. State Farm Fire & Cas. Co.*, Court No. 9-0609, 2010 WL 2265577, at *4 (E.D. La. June 2, 2010) (holding that remediation estimates are irrelevant as a matter of law under *Daubert* where actual repair cost data is available).

In this case, actual remediation cost data exists. It is true that for the *Germano* Plaintiff-Intervenors, the Court necessarily had to rely on estimates and predictions of the recommended remediation effort. But that was then; from the perspective of now, there is an entire body of

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 251 of 668
Case 2:14-cv-02094-EEF-MBN Document 28-31 Filed 04/09/15 Page 9 Page 9 of 77 of
759

actual remediation cost data from thousands of properties subject to the same claims of defective drywall as the current class. Such information, which is readily available through the Settlement Administrators, would be highly relevant to Taishan, its experts, and this Court to determine whether the PSC's proposed estimate should be revised to reflect the remediation reality over the course of several years.

Based on the foregoing, it is clear that Taishan is entitled to all information and back-up documentation related to remediation costs in the custody of the Settlement Administrators.

In light of the April 28, 2015 hearing on class damages, Taishan requests that the Court require Plaintiffs to allow the Class Administrators to produce all information regarding the actual cost of remediating properties as part of the various drywall settlements over the last five years no later than April 15, 2015.

## CONCLUSION

For the reasons set forth above, Taishan respectfully requests that the Court grant its Emergency Motion to Compel Production of Information Relevant to Plaintiffs' Motion for Assessment of Class Damages.

Respectfully submitted,

Dated: April 6, 2015

/s Michael P. Kenny
Bernard Taylor, Esq.
Georgia Bar No. 669625
Michael P. Kenny, Esq.
Georgia Bar No. 415064
Cari K. Dawson, Esq.
Georgia Bar No. 213490
ALSTON & BIRD LLP
1201 West Peachtree Street

9

Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
michael.kenny@alston.com
*Counsel for Taishan Gypsum Co., Ltd. and Tai'an
Taishan Plasterboard Co., Ltd.*

Alan Dean Weinberger
LA Bar No. 13331
HANGARTNER, RYDBERG & TERRELL, LLC
One Shell Square
701 Poydras St., Suite 310
New Orleans, Louisiana 70179
Phone: (504) 434-6815
Fax: (504) 522-5689
aweinberger@hanrylaw.com
*Local Counsel for Taishan Gypsum Co., Ltd. and
Tai'an Taishan Plasterboard Co., Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO COMPEL PRODUCTION OF INFORMATION RELEVANT TO PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES** has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 6th day of April, 2015.

/s Michael P. Kenny
Michael P. Kenny, Esq.
Georgia Bar No. 415064
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
michael.kenny@alston.com
*Counsel for Taishan*

# Tab #6

Case 2:09-md-02047-EEF-MBN Document 22382-40 Filed 12/06/19 Page 255 of 668
Case 2:09-cv-02040-EEF-JCW Document 29400-2 Filed 08/15/15 Page 1 of 1
759

# LEVIN, FISHBEIN, SEDRAN & BERMAN

*Counsellors at Law and Proctors in Admiralty*

ARNOLD LEVIN
MICHAEL D. FISHBEIN
HOWARD J. SEDRAN
LAURENCE S. BERMAN
FRED S. LONGER *
DANIEL C. LEVIN
CHARLES E. SCHAFFER
AUSTIN B. COHEN *
MICHAEL M. WEINKOWITZ * †
CHARLES C. SWEEDLER *
MATTHEW C. GAUGHAN * †
KEITH J. VERRIER *
BRIAN F. FOX

\* also admitted in New Jersey
† also admitted in New York

510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106-3697
www.lfsblaw.com

TELEPHONE (215) 592-1500
FACSIMILE (215) 592-4663

OF COUNSEL:
SANDRA L. DUGGAN

September 8, 2015

**VIA E-MAIL AND HAND DELIVERY**

The Honorable Eldon E. Fallon
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room C-456
New Orleans, LA 70130

Re: *Status of Damages Claims against Taishan*

Dear Judge Fallon:

This letter provides a status report on the Plaintiffs' damages claims against Taishan, and is being copied to defense counsel and all individual plaintiffs' counsel. The report covers: (1) an update of the PSC's work to prepare for claims processing by investigating the claims put forward on Plaintiff Trial Exhibit 79. (Ex. 79 admitted in the June 9, 2015 trial set forth the formulaic aggregate Certified Classwide remediation damages for those properties listed on Ex. 79), (2) the PSC has directed the individual counsel to dismiss certain claims and to evaluate for purposes of dismissal all clients where product identification may be lacking, (3) a description of the type of claims belonging to Certified Class members that were not covered by Ex. 79 and for which Plaintiffs will seek a subsequent phase to prove these damages, and (4) a new Omni Compliant (XX) filed September 4, 2015 which asserts claims against Taishan on behalf of Taishan property owners for properties not included in the Certified Class (individual counsel have come forward with evidence of Taishan Chinese Drywall contaminated properties since the Certification of the Class, September 26, 2014 (Rec. Doc. 18028)).

LEVIN, FISHBEIN, SEDRAN & BERMAN
Hon. Eldon E. Fallon
September 8, 2015
Page 2

1. UPDATE PLAINTIFFS TRIAL EX. 79 – At the June 9, 2015 hearing and in Plaintiffs Proposed FOFCOL (Rec. Doc. 19197), plaintiffs requested two rulings from the Court: (1) a finding that the formulaic method used to calculate remediation damages is fair and reasonable, and (2) that the aggregate formulaic remediation damages for properties on Ex. 79 proceed to claims processing for claims verification and set offs. (Plaintiffs specifically requested that at this time a final judgment as to the dollar amount for aggregate formulaic Class remediation damages not be issued, (Rec. Doc. 18753 at p 3, para IV(C), Rec. Doc. 19289 at p 3)). Since the June 9 hearing, the PSC has continued to verify aspects of the claims presented on Ex. 79, and is now prepared for claims processing since it has updated its analysis of Ex. 79. As a result of this investigation, the PSC has determined that product identification of a number of listed properties may be inadequate, and thus, the aggregate remediation damages claim in Ex. 79 may potentially be reduced in clams processing from $497,180,467 to approximately $349,374,356.

2. DISMISSALS - As part of its work to prepare for claims processing, the PSC has determined that there are Taishan claims in the process of being dismissed by counsel, and an additional significant number of Class member properties for which the PSC will request counsel to file a notice of dismissal should product identification be lacking. At present counsel have provided to the PSC authorization to dismiss approximately 50 properties. Some Class members have already filed Notices of Voluntary Dismissals. In addition, the PSC is working daily with counsel to assist with product identification. This additional process may cover approximately 900 Class member properties that are in the process of being reviewed for dismissal in the next 30 days.

3. CLASS MEMBER DAMGES CLAIMS FOR A SUBSEQUENT PROCEEDING - Certified Class members (both those identified on Ex. 79 and those not identified on Ex. 79) have damage claims in addition to the aggregate remediation claim set forth in Ex. 79, for which the PSC has reserved the right to present at a subsequent proceeding. (See Order and Reasons, Rec. Doc. 18998 at p 5, Rec. Doc. 19197 at ¶¶28,161,162.) These claims on behalf of current or former owners include: (a) ALE claims, (b) loss of use and enjoyment claims, (c) short sale/ foreclosure claims, (d) personal property claims, (e) lost rent/business claims, (f) remediation claims not included in Ex. 79 such as claims of former owners, and (g) other individualized damage claims not covered by categories (a) – (f) above.

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Hon. Eldon E. Fallon
September 8, 2015
Page 3

4. NEW TAISHAN OMNI COMPLAINT – Subsequent to the Certification of the Taishan Class (Rec. Doc. 18028), many counsel came forward with additional Taishan Chinese Drywall contaminated properties that may not have been included in the Certified Class and which were presented by clients to individual counsel. A new Omni Taishan complaint covering these properties (Omni XX) was filed on September 4, 2015. The complaint identifies approximately 800 damaged properties. Counsel has provided the product identification and square footage information on these properties to the PSC, and the PSC has attempted to place only claims with proper product identification on Omni XX.

Respectfully,

ARNOLD LEVIN

RUSS HERMAN

cc:     All Plaintiffs' Counsel
        Defense Counsel

# Tab #7

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2009 OCT -7  AM 3: 42

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| DAVID GROSS, CHERYL GROSS, AND LOUIS VELEZ, individually, and on behalf of all others similarly situated, | CASE NO.: |
| | **09-6690** |
| Plaintiffs, | COMPLAINT **SECT. L MAG. 2** |
| v. | |
| KNAUF GIPS KG, KNAUF PLASTERBOARD (TIANJIN) CO., LTD., KNAUF PLASTERBOARD (WUHU), CO., LTD., KNAUF PLASTERBOARD (DONGGUAN) CO., LTD., TAISHAN GYPSUM CO., LTD., f/k/a SHANDONG TAIHE DONGXIN CO., LTD., PINGYI BAIER BUILDING MATERIALS CO., LTD., USG CORPORATION, BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY, ("BNBM"), CHINA NATIONAL BUILDING MATERIALS CO. LTD., ("CNBM"), BEIJING NEW BUILDING MATERIALS (GROUP) CO., LTD., ("BNBM GROUP"), CHINA NATIONAL BUILDING MATERIAL GROUP CORPORATION ("CNBM GROUP'), PINGYI ZHONGXING PAPER-FACED PLASTERBOARD CO., LTD. f/k/a SHANDONG CHENXIANG BUILDING MATERIALS CO., LTD., (CHENXIANG); SINKIANG TIANSHAN BUILDING MATERIAL AND GYPSUM PRODUCT CO., LTD., TAISHAN GYPSUM CO., LTD. LUCHENG BRANCH, YUNAN TAISHAN GYPSUM AND BUILDING MATERIAL CO. LTD., TAI'AN JINDUN BUILDING MATERIAL CO., LTD., TAISHAN GYPSUM (XIANGTAN) CO. LTD., TAISHAN GYPSUM (PINGSHAN) CO., LTD., TAISHAN GYPSUM (HENGSHUI) CO., LTD., TAISHAN GYPSUM (HENAN) CO., LTD., HUBEI TAISHAN BUILDING MATERIAL CO., LTD., TAISHAN GYPSUM (TONGLING) CO., LTD., WEIFANG AOTAI GYPSUM CO., LTD., | **JURY TRIAL DEMAND** |

Fee 350
✓ Process _____
x Dktd _____
___ CtRmDep _____
___ Doc. No._____

1

Case 2:09-md-02047-EEF-MBN Document 22302-10 Filed 02/06/19 Page 260 of 668
Case 1:11-cv-00377-CG-EN Document 2-7 Filed 10/26/09 Page 13 of Page ID #86 of
759

**TAISHAN GYPSUM (PIZHOU) CO., LTD.,
FUXIN TAISHAN GYPSUM AND BUILDING
MATERIAL CO., LTD., TAISHAN GYPSUM
(WENZHOU) CO., LTD., TAISHAN GYPSUM
(CHONGQING) CO., LTD., TAISHAN
GYPSUM (JIANGYIN) CO., LTD.,
QINHUANGDAO TAISHAN BUILDING
MATERIAL CO., LTD., TAI'AN TAISHAN
GYPSUM BOARD CO., LTD., TAISHAN
GYPSUM (BAOTOU) CO., LTD., SHAANXI
TAISHAN GYPSUM CO., LTD, ROTHCHILT
INTERNATIONAL, LTD., L&W SUPPLY
CORPORATION d/b/a SEACOAST SUPPLY,
BANNER SUPPLY CO., LA SUPREMA
TRADING, INC., LA SUPREMA
ENTERPRISE, INC., BLACK BEAR GYPSUM
SUPPLY, INC., SMOKEY MOUNTAIN
MATERIALS, INC., EMERALD COAST
BUILDING MATERIALS,
INTERIOR/EXTERIOR BUILDING SUPPLY,
LP., INTERIOR/EXTERIOR ENTERPRISES,
LLC, RIGHTWAY DRYWALL, INC.,
INDEPENDENT BUILDERS SUPPLY
ASSOCIATION, INC., TOBIN TRADING
INC., VENTURE SUPPLY INC., KNAUF
INSULATION GMBH a/k/a KNAUF USA,
CNBM USA CORP., SUNRISE BUILDING
MATERIALS LTD., DEVON
INTERNATIONAL, TRIORIENT TRADING,
INC., GREAT WESTERN BUILDING
MATERIALS, ALL INTERIOR SUPPLY,
INC., KNAUF GYPSUM INDONESIA,
GUANGDONG KNAUF NEW BUILDING
PRODUCTS CO., LTD., KNAUF AMF GMBH
& CO. KG, KNAUF DO BRASIL LTD., TAIAN
TAISHAN PLASTERBOARD CO., LTD.,
SHANGHAI YU YUAN IMP & EXP CO., LTD.
and, JOHN DOE Defendants 1-20,**

       **Defendants.**

_____/

## CLASS ACTION COMPLAINT

2

Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals and entities that have owned, own, or acquired homes, residences, or other structures physically located in the United States containing defective drywall that was designed, manufactured, exported, imported, distributed, delivered, supplied, marketed, or sold by Defendants, Knauf Gips KG ("Knauf Gips"); Knauf Plasterboard (Tianjin) Co., Ltd. ("Knauf Tianjin"); Knauf Plasterboard (Wuhu) Co., Ltd.; Knauf Plasterboard (Dongguan) Co., Ltd.; Taishan Gypsum Co., Ltd. F/k/a as Shandong Taihe Dongxin Co., Ltd. ("Taishan"); Pingyi Baier Building Materials Co., Ltd.; USG Corporation ("USG"); Beijing New Building Materials Public Limited Co. ("BNBM"); China National Building Materials Co. Ltd.; Beijing New Building Materials (Group) Co. Ltd.; China National Building Material Group Corporation ("CNBM Group"); Pingyi Zhongxing Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd. ("Chenxiang"); Sinkiang Tianshan Building Material And Gypsum Product Co, Ltd., Taishan Gypsum Co., Ltd. Lucheng Branch, Yunan Taishan Gypsum And Building Material Co. Ltd., Tai'an Jindun Building Material Co., Ltd., Taishan Gypsum (Xiangtan) Co. Ltd., Taishan Gypsum (Pingshan) Co., Ltd., Taishan Gypsum (Hengshui) Co., Ltd., Taishan Gypsum (Henan) Co., Ltd., Hubei Taishan Building Material Co., Ltd., Taishan Gypsum (Tongling) Co., Ltd., Weifang Aotai Gypsum Co., Ltd., Taishan Gypsum (Pizhou) Co., Ltd., Fuxin Taishan Gypsum And Building Material Co., Ltd., Taishan Gypsum (Wenzhou) Co., Ltd., Taishan Gypsum (Chongqing) Co., Ltd., Taishan Gypsum (Jiangyin) Co., Ltd., Qinhuangdao Taishan Building Material Co., Ltd., Tai'an Taishan Gypsum Board Co., Ltd., Taishan Gypsum (Baotou) Co., Ltd., Shaanxi Taishan Gypsum Co., Ltd, Rothchilt International, Ltd. ("Rothchilt"); L&W Supply Corporation d/b/a Seacoast Supply ("Seacoast"); Banner Supply Co. ("Banner"); La Suprema Trading, Inc. ("La Suprema Trading"); La Suprema

Enterprise, Inc. ("La Suprema Enterprise"); Black Bear Gypsum Supply, Inc. ("Black Bear"); Smokey Mountain Materials, Inc.; Emerald Coast Building Materials; Interior/Exterior Building Supply, LP; Interior/Exterior Enterprises LLC; Rightway Drywall Inc.; Independent Builders Supply Association, Inc. ("IBSA"); Tobin Trading Inc. ("Tobin"); Venture Supply Inc. ("Venture"), Knauf Insulation GMBH a/k/a Knauf USA ("Knauf USA"), CNBM USA Corp., Sunrise Building Materials Ltd., Devon International, Triorient Trading, Inc., Great Western Building Materials, All Interior Supply, Inc., Knauf Gypsum Indonesia, Guangdong Knauf New Building Product Co., Ltd., Knauf Amf GmbH & Co. Kg, Knauf Do Brasil Ltd., Taian Taishan Plasterboard Co., Ltd., Shanghai Yu Yuan Imp & Exp Co., Ltd., and John Doe defendants 1-20.

The Defendants have marketed their products in a manner designed to conceal their identity making a class action appropriate since it would visit an injustice by permitting these wrongdoers, who among them have inflicted an injury upon the entirely innocent Plaintiffs, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused harm.

In support thereof, Plaintiffs state as follows:

## JURISDICTION, PARTIES, AND VENUE

1.      This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act.  *See* 28 U.S.C. § 1711, *et. seq.*  Plaintiffs and certain Defendants are citizens of different states and the amount in controversy of this Class action exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

2.      Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1)-(2) because Plaintiffs and a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to the claim occurred in this

District, or a substantial part of the property that is the subject of this action is situated in this district.

## PLAINTIFFS

3. Plaintiff Louis Velez owns a home located at 5427 Paris Avenue, New Orleans, LA 70122.

4. Approximately two years ago, Mr. Velez undertook to remodel his home using defective Chinese drywall. Mr. Velez has no way of identifying the manufacturer of the defective Chinese drywall in his home.

5. By way of explanation, an inspection of Mr. Velez's home revealed the drywall in his home has markings with unintelligible numbering. There are no corresponding markings identifying the manufacturer of the drywall.

6. Notwithstanding his inability to identify the manufacturer of the drywall in his home, there are several factors demonstrating there is Chinese manufactured drywall in Mr. Velez's home. For instance, Mr. Velez has experienced several instances of corrosion, bad odors, and a renter living in the home, Bruce Velez, has experienced headaches and other personal injuries that have been linked to the defective Chinese drywall at issue in this litigation.

7. The defective Chinese drywall that is installed in Mr. Velez's home was designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by certain unknown defendants.

8. The defective Chinese drywall in Mr. Velez's home has caused him to suffer property damages.

9.     Plaintiffs David Gross and Cheryl Gross (the "Gross Plaintiffs") (the Velez Plaintiffs and the Gross Plaintiffs shall be referred to herein collectively as "Plaintiffs"), together own a home located at 400 Hay Place, New Orleans, LA 70124.

10.     Following the ravishes of Hurricanes Katrina and Rita, the Gross Plaintiffs undertook to repair heavy damages that had been sustained to their home.  After the completion of the repairs in December 2006, Plaintiffs moved back into their home.

11.     The Gross Plaintiffs have since discovered that defective Chinese drywall was used during the repairs to their home.  The Gross Plaintiffs have no way of identifying the manufacturer of the defective Chinese drywall in their home.

12.     By way of explanation, an inspection of the Gross Plaintiffs' home revealed "made in China" markings on their drywall without any corresponding markings identifying the manufacturer.

13.     The defective Chinese drywall that is installed in the Gross Plaintiffs' home was designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by certain unknown defendants.

14.     The defective Chinese drywall in the Gross Plaintiffs' home has caused both property damage and personal injuries to the Gross Plaintiffs.

## DEFENDANTS

15.     Defendant Knauf Gips is a German corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  One of Knauf Gips' affiliates, Knauf Verwaltungsgsellschaft KG, owns a substantial stake in USG.  Knauf Gips is a leading manufacturer of building materials and systems.  Knauf Gips, together with its affiliates, including Knauf Tianjin, provides building

materials and systems to customers in over 50 countries, including the United States. Upon information and belief, at all materials times hereto, Knauf Gips supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, and its agents, apparent agents, and employees.

16. Among other things, in 1995, Knauf Gips introduced its advanced production techniques and technology into China. From 1997 through 2001, Knauf Gips invested in China and established three plasterboard plants which are located in Wuhu, Tianjin and Dongguan. The product quality of all Knauf Gips' plants in China, including Knauf Tianjin, are strictly controlled according to the requirements of Knauf Gips' headquarters in Germany. Moreover, Knauf Gips' sales and technical support teams support Knauf Gips' businesses throughout the world, including Knauf Tianjin in China. Knauf Tianjin and its employees are the actual and/or apparent agents of Knauf Gips.

17. Upon information and belief, Knauf Gips, together with its affiliates and/or actual or apparent agents, including Knauf Tianjin, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Knauf Gips and/or Knauf Tianjin has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Knauf Gips and/or Knauf Tianjin manufactured and sold, directly and indirectly, to certain suppliers in the United States.

18. Defendant Knauf Tianjin is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina,

7

and Virginia. Knauf Tianjin is involved in the manufacturing and sale of gypsum drywall. Knauf Tianjin is the actual agent and/or apparent agent of Knauf Gips. Upon information and belief, Knauf Tianjin, individually and/or together with and at the direction and control of its principal, Knauf Gips, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Knauf Tianjin and/or Knauf Gips has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Knauf Tianjin and/or Knauf Gips manufactured and sold, directly and indirectly, to certain suppliers in the United States.

19. Defendant Knauf Plasterboard (Wuhu) Co. Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Knauf Plasterboard (Wuhu) Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Knauf Plasterboard (Wuhu) Co., Ltd. manufactured, sold, distributed, marketed or placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Knauf Plasterboard Wuhu Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Knauf Plasterboard (Wuhu) Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

8

20.     Defendant Knauf Plasterboard (Dongguan) Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.   Knauf Plasterboard (Dongguan) Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall.   Upon information and belief, Knauf Plasterboard (Dongguan) Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Knauf Plasterboard (Dongguan) Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States.   Upon information and belief, Knauf Plasterboard (Dongguan) Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

21.     Defendant Knauf USA is an Indiana corporation with a principal place of business in Shelbyville, Indiana.  By information and belief, Knauf USA is a subsidiary of Knauf GIPS.

22.     By information and belief, Knauf USA acted as an agent for Knauf GIPS and other Knauf entities by promoting and marketing the drywall at issue in this litigation to American suppliers.  Accordingly, Knauf USA caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

23.     Upon information and belief, Defendant Pingyi Baier Building Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.   Pingyi Baier Building Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured, sold,

9

distributed, marketed and/or placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Pingyi Baier Building Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

24. Defendant Taishan is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Taishan is involved in the manufacturing and sale of gypsum drywall. Upon information and belief, Taishan manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Taishan has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Taishan manufactured and sold to certain suppliers in the United States.

25. Upon information and belief, defendant Taishan is owned and/or controlled by defendant Beijing New Building Materials Public Limited Co. ("BNBM"), which is a state-owned entity and respectively controlled by the Chinese government. BNBM is traded on the Shenzhen Stock Exchange.

10

26.     Defendant, BNBM caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

27.     Defendant China National Building Material Co., Ltd., is a partially owned subsidiary of BNBM Group.

28.     Defendant, China National Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

29.     Upon information and belief, defendant BNBM is owned and/or controlled by defendant Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"), which is a state owned entity and respectively controlled by the Chinese government.

30.     Defendant BNBM Group caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

31.     Upon information and belief, BNBM Group is owned and/or controlled by China National Building Materials Group Co. ("CNBM Group"), which is a state owned entity and respectively controlled by the Chinese government.  CNBM Group is traded on the Hong Kong stock exchange.

32.     Defendant CNBM Group caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

33.     Defendant CNBM USA Corp. is a California corporation with a principal place of business in California.  By information and belief, CNBM USA Corp. is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group.

34.     By information and belief, CNBM USA Corp. acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the drywall at issue in this litigation to American suppliers.  Accordingly, CNBM

11

USA Corp. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

35. To the extent Taishan, BNBM, China National Building Material Co., Ltd., BNBM Group and CNBM Group are deemed to be foreign sovereign entities, Plaintiffs bring their claims against these entities pursuant to 28 U.S.C. § 1605(a)(2), the commercial activity exception to the Foreign Sovereign Immunities Act, or alternatively under § 1605(a)(5), the tortious act exception. Plaintiffs allege that the claims against Taishan, BNBM, China National Building Material Co., Ltd., BNBM Group and CNBM Group are based upon commercial activities carried on in the United States. The claims also seeks monetary damages against a foreign state for damage to property occurring in the United States, caused by the tortious acts or omissions of that foreign state, or of any official or employee of that foreign state while acting within the scope of his office or employment.

36. Defendant Chenxiang is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Chenxiang is involved in the manufacturing and sale of gypsum drywall. Upon information and belief, Chenxiang manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Chenxiang has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Chenxiang manufactured and sold to certain suppliers in the United States.

37.     Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd, is a foreign corporation and is a manufacturer of plasterboard.  Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. is a subsidiary of Taishan.

38.     Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

39.     Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a foreign corporation that operates a manufacturing plant.  Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a subsidiary of Taishan.

40.     Defendant Taishan Gypsum Co. Ltd. Lucheng Branch caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

41.     Defendant Yunan Taishan Gypsum And Building Material Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products.  Defendant Yunan Taishan Gypsum And Building Material Co., Ltd. has a joint-stock agreement with Defendant BNBM.

42.     Defendant Yunan Taishan Gypsum And Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

43.     Defendant Tai'an Jindun Building Material Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products.  Defendant Tai'an Jindun Building Material Co., Ltd. has joint-stock agreement with Defendant BNBM.

44.     Defendant Tai'an Jindun Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

13

45.     Defendant Taishan Gypsum (Xiangtan) Co. Ltd., is a foreign corporation. Defendant Taishan Gypsum (Xiangtan) Co. Ltd. is a subsidiary of Taishan.

46.     Defendant Taishan Gypsum (Xiangtan) Co. Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

47.     Defendant Taishan Gypsum (Pingshan) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum products.  Defendant Taishan Gypsum (Pingshan) Co., Ltd. is a subsidiary of Taishan.

48.     Defendant Taishan Gypsum (Pingshan) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

49.     Defendant Taishan Gypsum (Hengshui) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum.  Defendant Taishan Gypsum (Hengshui) Co. Ltd., is a subsidiary of Taishan.

50.     Defendant Taishan Gypsum (Hengshui) Co,. Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

51.     Defendant Taishan Gypsum (Henan) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

52.     Defendant Taishan Gypsum (Henan) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

53.     Defendant Hubei Taishan Building Material Co., Ltd. is foreign corporation and is a manufacturer of gypsum.  Defendant Hubei Taishan Building Material Co., Ltd. is a subsidiary of Defendant BNBM.

54.     Defendant Hubei Taishan Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

14

55.     Defendant Taishan Gypsum (Tongling) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

56.     Defendant Taishan Gypsum (Tongling) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

57.     Defendant Weifang Aotai Gypsum Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products.  Defendant Weifang Aotai Gypsum Co., Ltd. is a subsidiary of Taishan.

58.     Defendant Weifang Aotai Gypsum Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

59.     Defendant Taishan Gypsum (Pizhou) Co., Ltd. is a foreign corporation and is a manufacturer of gypsum.  Defendant Taishan Gypsum (Pizhou) Co. is a subsidiary of Taishan.

60.     Defendant Taishan Gypsum (Pizhou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

61.     Defendant Fuxin Taishan Gypsum And Building Material Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

62.     Defendant Fuxin Taishan Gypsum And Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

63.     Defendant Taishan Gypsum (Wenzhou) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

64.     Defendant Taishan Gypsum (Wenzhou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

65.    Defendant Taishan Gypsum (Chongqing) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

66.    Defendant Taishan Gypsum (Chongqing) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

67.    Defendant Taishan Gypsum (Jiangyin) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum.  Defendant Taishan Gypsum (Jiangyin) Co., Ltd. is a subsidiary of Taishan.

68.    Defendant Taishan Gypsum (Jiangyin) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

69.    Defendant Qinhuangdao Taishan Building Material Co., Ltd., is a foreign corporation and is a manufacturer of gypsum.  Defendant Qinhuangdao Taishan Building Material Co., Ltd. is a subsidiary of Taishan.

70.    Defendant Qinhuangdao Taishan Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

71.    Defendant Tai'an Taishan Gypsum Board Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

72.    Defendant Tai'an Taishan Gypsum Board Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

73.    Defendant Taishan Gypsum (Baotou) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

74.    Defendant Taishan Gypsum (Baotou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

75. Defendant Shaanxi Taishan Gypsum Co., Ltd., is a foreign corporation and subsidiary of Taishan.

76. Defendant Shaanxi Taishan Gypsum Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

77. Defendant USG is a Delaware corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. USG, together with its various affiliates, including Seacoast, is the nation's largest distributor of drywall and related building products.

78. Defendant Seacoast is a Delaware corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Seacoast is a subsidiary of USG.

79. Defendant Banner is a Florida corporation, having its principal place of business in Miami-Dade County, Florida. Banner is a supplier of drywall and related building products. Banner supplied the drywall at issue in this litigation in Florida and/or other affected states.

80. Defendant La Suprema Trading is a Florida corporation, having its principal place of business in Miami-Dade County, Florida. La Suprema Trading is a supplier of drywall and related building products. La Suprema Trading supplied the drywall at issue in this litigation in Florida and/or other affected states.

81. Defendant La Suprema Enterprise is a Florida corporation, having its principal place of business in Miami-Dade County, Florida. La Suprema Enterprise is a supplier of drywall and related building products. La Suprema Enterprise supplied the drywall at issue in this litigation in Florida and/or other affected states.

82.     Defendant Black Bear is a Florida corporation, having its principal place of business in Largo, Florida.  Black Bear is a supplier of drywall and related building products.  Black Bear supplied the drywall at issue in this litigation in Florida and/or other affected states.

83.     Defendant Smokey Mountain Materials, Inc. is a foreign corporation, having its principal place of business in Knoxville, Tennessee.  Smokey Mountain Materials, Inc. is a supplier of drywall and related building products.  By information and belief, Smokey Mountain Materials, Inc. supplied the drywall at issue in this litigation in certain of the affected states.

84.     Defendant Emerald Coast Building Materials is a division of Smokey Mountain Materials, Inc.  Emerald Coast Building Materials is a supplier of drywall and related building products.  By information and belief, Emerald Coast Building Materials supplied the drywall at issue in this litigation in certain of the affected states.

85.     Defendant Interior/Exterior Building Supply, LP is a Louisiana Limited partnership with a principal place of business in New Orleans, Louisiana.  Interior/Exterior Building Supply, LP is a supplier of drywall and related building products.  Interior/Exterior Building Supply, LP supplied the drywall at issue in this litigation in Louisiana and/or other affected states.

86.     Defendant Interior/Exterior Enterprises LLC, is a Louisiana Limited liability company with its principal place of business in New Orleans, Louisiana.  Interior/Exteriors Enterprises LLC is a supplier of drywall and related building products.  Interior/Exteriors Enterprises LLC supplied the drywall at issue in this litigation in Louisiana and/or other affected states.

87.     Defendant Rightway Drywall, Inc., is a Georgia corporation with its principal place of business in Mason and/or Bonaire, Georgia.  Rightway Drywall, Inc. is a supplier of

18

drywall and related building products. By information and belief, Rightway Drywall, Inc., supplied the drywall at issue in this litigation in certain of the affected states.

88. Defendant IBSA is a member owned buying organization with its principal place of business in Smithfield, North Carolina, and is authorized to do and doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. IBSA is a supplier of drywall and related building products.

89. Defendant Rothchilt is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Rothchilt exports products, including gypsum drywall, to customers in the United States. Upon information and belief, Rothchilt sold, distributed, marketed and placed with the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Rothchilt has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and the drywall supplied by Rothchilt is installed in numerous structures in the United States.

90. Defendant Tobin is a Virginia corporation with its principal place of business located at 5008 Gatehouse Way, Virginia Beach, Virginia, 23455.

91. Defendant Tobin imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall at issue in this case. Tobin supplied the drywall at issue in this litigation in Virginia and/or other affected states.

92. Defendant Venture is a Virginia corporation with its principal place of business located at 1140 Azalea Garden Road, Norfolk, Virginia, 23502.

19

93. Venture imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall to builders that was supplied to and damaged Plaintiffs and Class Members. Venture also imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall directly to some Plaintiff and Class Members. Venture supplied the drywall at issue in this litigation in Virginia and/or other affected states.

94. Defendant Sunrise Building Materials Ltd., is a Canadian Corporation with its principle place of business located at Unit 7, 55 Nugget Ave., Scarborough, Toronto, ON, Canada, M15 3L1. Sunrise Building Materials Ltd. is a supplier of drywall and related building products. By information and belief, Sunrise Building Materials Ltd., supplied the drywall at issue in this litigation in certain of the affected states.

95. Defendant Devon International is a Pennsylvania Corporation with a principle place of business located in King of Prussia, Pennsylvania. Devon International is a supplier of drywall and related building products. By information and belief, Devon International supplied the drywall at issue in this litigation in certain of the affected states.

96. Defendant Triorient Trading, Inc., is a Connecticut Corporation with a principal place of business located in Stamford, Connecticut. Triorient Trading, Inc. is a supplier of drywall and related building products. By information and belief, Triorient Trading, Inc. supplied the drywall at issue in this litigation in certain of the affected states.

97. Defendant Great Western Building Materials is a Arizona Corporation with a principal place of business located in California. Great Western Building Materials is a supplier of drywall and related building products. By information and belief, Great Western Building Materials supplied the drywall at issue in this litigation in certain of the affected states.

98.     Defendant All Interior Supply, Inc., is a Florida Corporation with a principal place of business located in Hialeah, Florida. All Interior Supply, Inc. is a supplier of drywall and related building products. By information and belief, All Interior Supply, Inc. supplied the drywall at issue in this litigation in certain of the affected states.

99.     Defendant Knauf Gypsum Indonesia is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. By information and belief, Knauf Gypsum Indonesia is a subsidiary of Knauf GIPS.

100.     Defendant Knauf Gypsum Indonesia caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

101.     Defendant Guangdong Knauf New Building Product Co., Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. By information and belief, Guangdon Knauf New Building Product Co., Ltd. is a subsidiary of Knauf GIPS.

102.     Defendant Guangdong Knauf New Building Product Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

103.     Defendant Knauf Amf GmbH & Co. Kg is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. By information and belief, Knauf Amf GmbH & Co. Kg is a subsidiary of Knauf GIPS.

104.     Defendant Knauf Amf GmbH & Co. Kg caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

105.    Defendant Knauf Do Brasil Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. By information and belief, Knauf Do Brasil Ltd. is a subsidiary of Knauf GIPS.

106.    Defendant Knauf Do Brasil Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

107.    Defendant Taian Taishan Plasterboard Co., Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. By information and belief, Taian Taishan Plasterboard Co., Ltd. is a subsidiary of Knauf GIPS.

108.    Defendant Taian Taishan Plasterboard Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

109.    Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States.

110.    Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

111.    John Doe Defendants One (1) through Twenty (20) are corporations, partnerships, companies, or other entities involved in the marketing, design, development, manufacture, production, testing, inspecting, selling, advertising, promoting, distribution, importing, exporting, delivery, or supply of the defective drywall, whose identities are not presently known by Plaintiffs.

**FACTS GIVING RISE TO INDUSTRY WIDE ALTERNATIVE LIABILITY**

112.    At all times herein mentioned, the Defendants collectively controlled 100% of the relevant market for the sale, distribution, exporting, importing, supplying, and/or marketing of

the defective Chinese drywall at issue in this litigation. The Conduct of the Defendants occurred simultaneously at all relevant times.

113. The defective drywall at issue in this litigation presents a uniform risk of harm. That is, the drywall was defective since it emitted noxious gases that caused property damages and/or personal injuries to Plaintiffs and Class Members.

114. Plaintiffs, and Plaintiffs alone, have engaged in a genuine and diligent effort to identify the manufacturers and other parties connected to the distribution of the defective drywall in this litigation without success due to the inherent inability to identify the manufacturer of the product that caused them harm. This inability to identify the product manufacturer results from the Defendants' deliberate distribution of the defective Chinese drywall in a manner that makes it difficult and/or impossible for consumers to determine the source of the drywall.

115. For instance, Defendants concealed the origin of the defective Chinese drywall by distributing it without any packaging and/or markings that can be used to track the product to a specific manufacturer, supplier, distributor, etc. By way of example, certain manufacturers have deliberately engaged in subterfuge by marking their drywall as "made in China" without any corresponding markings identifying that defendant as the manufacturer of the drywall in question. The Plaintiffs Steering Committee ("PSC") has identified several such unidentifiable markings that have been made of record in accordance with PTO 10.

116. Since the drywall at issue in this litigation is a fungible product that is difficult to trace in the absence of such identifying characteristics, all Defendants are liable to Plaintiffs in ratio to their proportionate share of the relevant market.

117. Given the uncertainty as to which Defendant has caused the Plaintiffs' harm, the burden should be upon Defendants to prove that they did not cause the harm to Plaintiffs and Class Members consistent with Restatement (Second) of Torts Section 433(B).

## FACTS REGARDING PRODUCT DEFECT

118. Upon information and belief, Defendants' drywall contains gypsum.

119. In "defective drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants herein), the gypsum and other components of the product break down and release sulfides and other noxious gases that are then emitted (or "off-gassed") from the drywall. This action seeks damages from Defendants for their joint and several acts and/or omissions.

120. Sulfides and other noxious gases, such as those emitted from Defendants' drywall, cause corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

121. Exposure to sulfide and other noxious gases, such as those emitted from Defendants' drywall, causes personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

122. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from Defendants' defective drywall.

123. Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the defective drywall, which was unfit for its intended

purpose and unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to personal property in Plaintiffs' and Class Members' homes, residences or structures and/or caused personal injury resulting in eye irritation, a sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

124.  Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the defective drywall at issue in this litigation.

125.  Defendants recklessly, wantonly and/or negligently implement faulty, procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the defective drywall at issue in this litigation.

126.  As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.

127.  As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages.  These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.

128.  As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from

these products, Plaintiffs and the Class Members have been exposed to toxic gases, suffered personal injury, have been placed at an increased risk of disease, and have need for injunctive relief in the form of repair of their home, of their home contracts, emergency/corrective notice, environmental testing and monitoring, and/or medical monitoring.

129.    Defendants engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall at issue in this litigation. Defendants' parallel conduct suggests their common behavior was not the result of idiosyncratic decision making.

130.    By information and belief, certain of the foreign defendants have positioned themselves in a manner designed to avoid or evade liability for their role in causing the manufacture, exporting, importing, distribution, delivery, supply, marketing, and/or sale of the defective drywall at issue in this litigation by making it difficult for injured consumers (located in the United States) to accomplish service on them. Such foreign defendants are seemingly attempting to avoid responsibility for their tortious conduct.

### FACTS REGARDING INVESTORS WHO AIDED AND ABETTED DEFENDANTS

131.    J.P. Morgan Chase & Co. ("J.P. Morgan"), and certain other corporations and entities (collectively the "Investing Entities"), engaged in a deliberate and/or reckless course of conduct designed to aid and abet Defendants in the manufacture, exporting, importing, distribution, delivery, supply, marketing, and/or sale of the defective drywall at issue in this litigation.

26

132.    By information and belief, but for these investments by the Investing Entities, Defendants would not have been able to manufacture, export, import, distribute, deliver, supply, market, and/or sell of the defective drywall at issue in this litigation.

133.    The Investing Entities were aware or should have been aware that Defendants were manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling the defective drywall at issue in this litigation in a manner that would make it difficult for injured consumers (located in the United States) to accomplish service on the foreign defendants.

134.    Notwithstanding their apparent knowledge and/or negligent failure to discover the tortious scheme by the foreign defendants, the Investing Entities purposefully made investments with these foreign defendants in a manner that was designed to shield them from liability to American property owners.

135.    For instance, J.P. Morgan acquired a 12.3% interest in CNBM's tradeable shares with the understanding that this entity would profit from its exploitation of homeowners seeking to rebuild their lives after the devastation of hurricanes Rita and Katrina.    This type of investment was ideal to the Investing Entities since these investments could be very profitable while avoiding the risk of loss where the foreign defendants can avoid the service of process by American consumers and responsibility for their tortious conduct.

136.    Other entities that are known to own an interest in CNBM are Atlantis Investment Management Ltd., Schroder Investment Management Limited, Baillie Gifford & Co., Callander Alex, Menzies Robin, Plowden Charles, Telfer Andrew, Warden Alison, Whitley Sarah, and Government of Singapore Investment Corporation Pte Ltd.

137.    Entities that are known to own an interest in BNBM are China Construction Bank, Cha Genlou, Industrial and Commercial Bank of China, Aerospace Science & Technology

Finance Co., Ltd., China Social Insurance Fund Portfolia 108, Bank of China, Agricultural Bank of China, Zhongrong International Trust Co., Ltd.

138.    By investing in entities such as CNBM and BNBM, the Investing Entities put themselves in a position to profit from the exploitation of American Consumers who were injured by Defendants.

139.    Accordingly, the Investing Entities engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in investing in foreign entities responsible for the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall.

140.    Additional discovery will reveal the full role and responsibility of the Investing Entities for the damages incurred by Plaintiffs and Class Members and their potential as party defendants.

## FACTS REGARDING OTHER ENTIITIES THAT MAY HAVE AIDED AND ABETTED DEFENDANTS

141.    Plaintiffs' investigation has revealed several entities that are affiliated with certain foreign defendants.

142.    Tai'an Taihe Shengyuan Industry and Trade Co., Ltd., is a foreign corporation that has a joint-stock agreement with Defendant BNBM.

143.    BNBM Design & Research Institute Co., Ltd., is a foreign defendant that has a joint-stock agreement with Defendant BNBM.

144.    Shuoguang Tejing Technology Development Co., Ltd., is a foreign defendant that has a joint-stock agreement with Defendant BNBM.

28

145. Tancheng Xinxing New Decoration Material Co., Ltd., is a foreign corporation operating in the paper products industry. Defendant Tancheng Xinxing New Decoration Material Co., Ltd. has a joint-stock agreement with Defendant BNBM.

146. BNBM Technology Development Co., Ltd., is a foreign corporation that has a joint-stock agreement with Defendant BNBM.

147. Xuzhou Falashite Building Material Co., Ltd, is a foreign corporation and is a subsidiary of Defendant BNBM.

148. Tai'an Donglian Investment and Trade Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

149. BNBM Zhaoqing Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

150. BNBM Suzhou Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

151. Beijing New Material Incubator Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

152. BNBM Taicang Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

153. BNBM Chengdu Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

154. BNBM Hubei Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

155. Hubei Taishan Building Material Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

156.    BNBM Ningbo Co., Ltd., is a foreign corporation and is a  subsidiary of Defendant BNBM.

157.    BNBM Building Plastic Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

158.    BNBM Suzhou Mineral Fiber Ceiling Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

159.    BNBM Home Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

160.    BNBM Guang'an Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM.

161.    BNBM Beijing Chenlong Decoration Engineering Co., Ltd. (aka BNBM Chenlong Decoration Co. Ltd.), is a foreign corporation and is a subsidiary of Defendant BNBM.

162.    China National Building Material Investment Co., Ltd., is a foreign corporation that is owned and/or controlled by CNBM Group.

163.    BNBM Commercial Trading Co., Ltd., is a foreign corporation that is owned and/or controlled by CNBM Group.

164.    Beijing New Building Material (Group) Co., Ltd., Xiamen Sales Center is a foreign corporation that is owned and/or controlled by CNBM Group.

165.    Beijing New Building Material (Group) Co., Ltd., Zhengzhou Branch is a foreign corporation that is owned and/or controlled by CNBM Group.

166.    Baoding Zhugen New Material Company is a foreign corporation that is owned and/or controlled by CNBM Group.

167. Beijing CNBM International Corporation, is a foreign corporation that is owned and/or controlled by CNBM Group.

168. Beijing New Building Material (Group) Co., Ltd., Shijiazhuang Branch is a foreign corporation that is owned and/or controlled by CNBM Group.

169. China National Building Material And Equipment Import & Export Corporation (aka CNBM Equipment, China National Building Material Import and Export Company, China National Building Material Import and Export Company, CNBM Trading, CNBM International, CNBM International Corp., and China New Building Material[s] & Equipment[s] Import & Export Corp.).

170. By information and belief, China Building Materials Academy is a foreign corporation that is owned and/or controlled by CNBM Group.

171. By information and belief, CNBM International Engineering Co. Ltd. is a foreign corporation that is owned and/or controlled by CNBM Group.

172. Zhujiang Building Material Industrial Co., Ltd., is a foreign corporation that is owned and/or controlled by CNBM Group.

173. CNBM Hangzhou Design & Research Institute is a foreign corporation that is owned and/or controlled by CNBM Group.

174. BNBM Beijing Zhugen Sales Center (aka BNBM Zhugen Sales Center) is a foreign corporation that is owned and/or controlled by CNBM Group.

175. BNBM International Co., Ltd., is a foreign corporation that is owned and/or controlled by CNBM Group.

176. Beijing New Building Material (Group) Co., Ltd., Jinan Branch is a foreign corporation that is owned and/or controlled by CNBM Group.

31

177.     BNBM Tianjin Century Sales Corporation is a foreign corporation that is owned and/or controlled by CNBM Group.

178.     Neo-China Group Engineering Consultancy Corporation is a foreign corporation that is owned and/or controlled by CNBM Group.

179.     BNBM Plastic Pipe Co., Ltd., is a foreign corporation that is owned and/or controlled by CNBM Group.

180.     By information and belief, China Triumph International Engineering Co. Ltd. is a foreign corporation that is owned and/or controlled by CNBM Group.

181.     By information and belief, CTIEC Shenzhen Scieno-Tech Engineering Materials Co. Ltd. is a foreign corporation that is owned and/or controlled by CNBM Group.

182.     By information and belief, CNBM Technology Co. Ltd. is a foreign corporation that is owned and/or controlled by CNBM Group.

183.     By information and belief, Beijing New Building Material (Group) Co., Ltd. North China Branch is a foreign corporation that is owned and/or controlled by CNBM Group.

184.     By information and belief, Tian'an Jindun Building Material Co., Ltd. is a foreign corporation that is owned and/or controlled by CNBM Group.

185.     By information and belief, Taishan Paper Gypsum Co., Ltd. Tia'an is a foreign corporation that is owned and/or controlled by CNBM Group.

186.     By information and belief, Taishan Gypsum Co. Ltd. Jiangxi is a foreign corporation that is owned and/or controlled by CNBM Group.

187.     By information and belief, Shanghai Hengsheng New Building Material Development Company Limited is a foreign corporation that is owned and/or controlled by CNBM Group.

32

188.   By information and belief, Xian Wall Materials Research & Design Institute is a foreign corporation that is owned and/or controlled by CNBM Group.

189.   By information and belief, United Suntech Craft, Harvest Supreme International Ltd., and Rich Well (Far East) Ltd., and Beijing Building Materials Import and Export Co., Ltd., are other potential parties who may have aided and abetted the Defendants in this action.

190.   Additional discovery will reveal the full role and responsibility of the above entities for the damages incurred by Plaintiffs and Class Members and their potential as party defendants.

## CLASS ACTION ALLEGATIONS

191.   Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class comprised of:

> All owners and landlords of real properties located in the United States containing defective Chinese drywall manufactured, sold, distributed, and/or supplied by Defendants.

192.   The following Persons shall be excluded from the Class: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all Persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

193.   For purposes of this Complaint, as to each affected property owned by a class member, the law of the State where the property is located should apply to the claims of such class members.  To the extent the Court determines Plaintiffs are improper class representatives for class members who own property outside the State of Louisiana, stand-alone classes, with

class representatives to be identified at a later date, should be used to represent the interests of class members who own property outside of Louisiana.

194.    Upon information and belief, the Defendants' defective and unfit drywall was installed in at least hundreds of homes, residences, or other structures owned by Plaintiffs or Class Members.   Therefore, the Class is sufficiently numerous such that the joinder of all members of the Class in a single action is impracticable.

195.    There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Class.   Among these common questions of law and fact are the following:

a.      whether Defendants' drywall products that release sulfide and other noxious gases are defective and/or unfit for their intended purpose;

b.      whether Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall products;

c.      whether Plaintiffs and Class Members are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct;

d.      whether Plaintiffs and Class Members are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct; and

e.      whether Plaintiffs and Class Members are entitled to proceed against Defendants under a market share alternative theory of liability.

196. The legal claims of Plaintiffs are typical of the legal claims of other Class Members. Plaintiffs have the same legal interests and need for legal remedies as other Class Members.

197. The Plaintiffs and each member of the Class have defective and unfit drywall in their homes, residences, or other structures. Due to the drywall in Plaintiffs' and Class Members' homes, residences, or other structures, Plaintiffs and Class Members suffered damages and the need for injunctive and equitable relief, as set forth herein.

198. Plaintiffs are adequate representatives of the Class and, together with their legal counsel, will fairly and adequately protect the interests of the Class. Plaintiffs have no conflict with the Class and are committed to the vigorous prosecution of this action.

199. The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and litigation involving defective and harmful products. Counsel will fairly and adequately protect the interests of the class.

200. The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

201.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

202.    A class action is superior to other methods of dispute resolution in this case. The Class members have an interest in class adjudication rather than individual adjudication because of their overlapping rights. It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class members would protect their rights on their own without this class action case. Management of the class will be efficient and far superior to the management of individual lawsuits. Accordingly, Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

203.    The issues common to the class members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

204.    Defendants have by their conduct concealed their tortious conduct and their identities and as such the statute of limitations and prescription should not run on the claims of Plaintiffs and Class Members.

**COUNT I**
**NEGLIGENCE**
**(Against All Defendants)**

205.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

206.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering,

g) supplying, h) inspecting, i) marketing, and/or j) selling this drywall, including a duty to adequately warn of their failure to do the same.

207. Defendants knew or should have known that their wrongful acts and omissions would result in harm and damages in the manner set forth herein.

208. Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling this drywall.

209. Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

210. Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of Plaintiffs and Class Members with the drywall, upon leaning it had been sold in an unreasonably dangerous condition.

211. Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

212. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT II
## NEGLIGENCE PER SE
### (Against All Defendants)

213.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

214.     Defendants owed statutory duties to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, and/or j) selling this drywall.

215.     Defendants breached their statutory duties to the Plaintiffs and Class Members by failing to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, and/or j) selling this drywall.

216.     Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other State and local Building Codes, to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall.  For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTMC C 1396/C 1396M-069, and its predecessor(s).  Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

217.     Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

218.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT III
## BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES
### (All Defendants)

219.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

220.    Defendants and/or their agents were in privity with Plaintiffs and Class Members and/or Plaintiffs and Class Members were foreseeable third party beneficiaries of any warranty.

221.    At the times Defendants utilized, supplied, inspected, and/or sold this drywall for use in structures owned by Plaintiffs and Class Members, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in structures owned by Plaintiffs and Class Members for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

222.    Defendants placed their drywall products into the stream of commerce in a defective condition and these products were expected to, and did, reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

223.    The drywall was defective and not merchantable because it was unfit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in structures owned by Plaintiffs and Class Members for use as a building material, because it contained defects as set forth herein.

224.    The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in structures owned by Plaintiffs and Class Members as a building material) due to the defects set forth herein.

225.    Defendants had reasonable and adequate notice of the Plaintiffs' and the Class Members' claims for breach of warranty and failed to cure.

226.    As a direct and proximate cause of Defendants' breach of warranties, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

**COUNT IV**
**PRIVATE NUISANCE**
**(Against All Defendants)**

227.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

228.    The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into structures owned by Plaintiffs and Class Members which has unreasonably interfered, and continues to interfere, with the Plaintiffs' and Class Members' use and enjoyment of their properties and caused them harm and damage as discussed herein.

229.    Defendants' interference has impaired the rights of Plaintiffs' and Class Members' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

230.    Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

231.    The interference with Plaintiffs' and Class Members' use of their property caused by Defendants is substantial and is ongoing.

232.     Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs' and Class Members' damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

233.     As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

**COUNT V**
**NEGLIGENT DISCHARGE OF A CORROSIVE SUBSTANCE**
**(All Defendants)**

234.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

235.     Defendants had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

236.     Notwithstanding their actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, Defendants nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs and class members.

237.     By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendants breached their duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs and class members.

238.     Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the corrosive and dangerous propensities of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

239.    Plaintiffs and class members have suffered injuries by virtue of their exposure to the defective drywall at issue in this litigation.  Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

240.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.  The injuries sustained by Plaintiffs and Class Members are within the foreseeable zone of risk created by Defendants.

### COUNT VI
### UNJUST ENRICHMENT
### (All Defendants)

241.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

242.    Defendants received money as a result of Plaintiffs' and Class Members' purchases of Defendants' defective drywall, or purchases of structures containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

243.    Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs and the Class Members.

244.    Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

### COUNT VII
### VIOLATION OF CONSUMER PROTECTION ACTS
### (All Defendants)

245.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

246.    This is an action for relief under the various Consumer Protection Acts of the jurisdictions in which affected properties are present. *See* L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala. Code 1975 § 8-19-1, *et seq.* (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *et seq.* (North Carolina Consumer Protection Act); F.S. § 501.201, *et seq.* (Florida Deceptive and Unfair Trade Practices Act); Va. Code. Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection Act); Tex. Bus. Com. Code Ann. § 17.41, *et seq.* (Texas Deceptive Trade Practices-Consumer Protection Act); Miss. Code Ann. § 75-24-1, *et seq.* (Mississippi Consumer Protection Act).

247.    The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of defective drywall constitute violation of the aforementioned provisions of the Consumer Protection Acts of the Relevant States.

248.    Plaintiffs and Class Members have suffered actual damages as a result of Defendants' violation of these Consumer Protection Acts and are entitled to relief.

249.    As a direct and proximate cause of Defendants' violations of the Consumer Protection Acts of the Relevant States, Plaintiffs and Class Members have incurred harm and damages as described herein.

### COUNT VIII
### EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING
### (All Defendants)

250.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

251.    Plaintiffs and the Class Members are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

43

252.     Plaintiffs and the Class Members will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, rescind, and/or repair the structures owned by Plaintiffs and Class Members.

253.     Plaintiffs, on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1)  to buy back or rescind the contracts for Plaintiffs' and Class Members' homes or other structures, or  in the alternative, remedy, repair and/or replace the drywall in such structures upon proof by the defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the Class and the general public that there is no defect in, or danger associated with, the drywall; (3) institute, at their own cost, a public awareness campaign to alert the Class and general public of the defect and dangers associated with the drywall; and (4) create, fund, and support a medical monitoring program.

254.     Until Defendants' defective drywall has been removed, Defendants should provide continued environmental and air monitoring in the structures owned by Plaintiffs and Class Members.

255.      Plaintiffs and Class Members have been exposed to greater than normal background levels of sulfides and other hazardous chemicals as a result of exposures to Defendants' defective and unfit drywall and have suffered personal injuries as a result.

256.     The sulfides and other noxious gases which have been released from Defendants drywall and to which Plaintiffs and Class Members have been exposed are proven hazardous, dangerous, or toxic substances.

257.     Plaintiffs' and Class Members' exposures were caused by the Defendant's negligent or otherwise tortious conduct.

258.     Plaintiffs' and Class Members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

259.     The method and means for diagnosing the Plaintiffs' and Class Members' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the Plaintiffs and Class Members by preventing or minimizing health problems that they may encounter as a result of the defective and unfit drywall.

260.     As a proximate result of their exposure to sulfide and other noxious gases from Defendants' defective and unfit drywall, Plaintiffs and Class Members have developed a significantly increased risk of contracting a serious latent disease.

261.     Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

262.     The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

    a.   an order certifying the case as a class action;

b. an order appointing Plaintiffs as the Class Representatives of the Class;

c. an order appointing undersigned counsel and their firms as counsel for the Class;

d. compensatory and statutory damages;

e. punitive damages as allowed by law;

f. pre and post-judgment interest as allowed by law;

g. injunctive relief;

h. an award of attorneys' fees as allowed by law;

i. an award of taxable costs; and

j. any and all such further relief as this Court deems just and proper.

Respectfully submitted,

Dated: October 7, 2009        By: _____

Russ M. Herman, Esquire
Leonard A. Davis, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
*Plaintiffs' Liaison Counsel*
*MDL 2047*

**PLAINTIFFS' STEERING COMMITTEE**

Arnold Levin, Esquire
Daniel C. Levin, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 305 of 668
Case 1:11-cv-22408-MGC Document 277 Entered on FLSD Docket 05/08/2014 Page 281 of 759

Dawn M. Barrios
**Barrios, Kingsdorf & Casteix, LLP**
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
**Becnel Law Firm. LLC**
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Victor Manuel Diaz
**Podhurst Orseck, P.A.**
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
**Colson, Hicks, Eidson, Colson**
 **Matthews, Martinez, Gonzales,**
 **Kalbac & Kane**
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Jerrold Seith Parker
**Parker, Waichman, Alonso LLP**
27399 Riverview Center Blvd.
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
**Lumpkin & Reeves**
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
**Echsner & Proctor, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
**Lambert and Nelson**
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
**Baron & Budd, P.C.**
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
**Gainsburgh, Benjamin, David, Meunier**
 **& Warshauer, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Christopher Seeger
**Seeger Weiss, LLP**
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
**Morgan & Morgan**
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

## INDIVIDUAL PLAINTIFFS' COUNSEL

Russ M. Herman, Esquire
Leonard A. Davis, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Richard S. Lewis<br>HAUSFELD LLP<br>1700 K Street, N.WSuite 650<br>Washington, DC 20006<br>Phone: (202) 540-7200<br>Fax: (202) 540-7201<br>rlewis@hausfeldllp.com<br><br>Daniel K. Bryson<br>Lewis & Roberts<br>3700 Glenwood Avenue, Suite 410<br>Raleigh, NC 27612<br>Phone: (919) 981-0191<br>Fax: (919) 981-0431<br>dkb@lewis-roberts.com | Jeremy W. Alters<br>Alters, Boldt, Brown, Rash & Culmo, P.A.<br>4141 N.E. 2nd Avenue<br>Suite 201<br>Miami, FL 33137<br>Phone: (305) 571-8550<br>Fax: (305) 571-8559<br>jeremy@abbrclaw.com<br><br>Richard J. Serpe, Esquire<br>Law Offices of Richard J. Serpe<br>Crown Center, Ste. 310<br>580 East Main Street<br>Norfolk, VA 23510-2322<br>rserpe@serpefirm.com |

## SPECIAL COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Harry T. Lemmon, Esquire<br>Attorney at Law<br>650 Poydras Street, Suite 2335<br>New Orleans, LA 70130<br>Phone: (504) 581-5644<br>Fax: (504) 581-2156<br>htlemmon@bellsouth.net | Edward F. Sherman<br>Tulane Law School<br>6329 Freret Street<br>New Orleans, LA 70118-5670<br>Phone: (504) 865-5979<br>esherman@tulane.edu |

# Tab #8

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA,

2019 FEB 10 PM 3: 01

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

KENNETH AND BARBARA WILTZ,       CASE NO.:
individually, and on behalf of all others
similarly situated, [ADDITIONAL
PLAINTIFFS LISTED ON SCHEDULE OF
PLAINTIFFS, ATTACHED HERETO AS       **CLASS ACTION COMPLAINT**
EXHIBIT "A"],

      **Plaintiffs,**

      **JURY TRIAL DEMAND**

v.

BEIJING NEW BUILDING MATERIALS
PUBLIC LIMITED CO., [ADDITIONAL
DEFENDANTS LISTED ON SCHEDULE OF
DEFENDANTS, ATTACHED HERETO AS
EXHIBIT "B"],

      **Defendants.**

_____/

## PLAINTIFFS' OMNIBUS CLASS ACTION COMPLAINT (II)

Pursuant to Fed. R. Civ. P. 23, the class representatives in this action bring suit on behalf

of themselves and all other similarly situated owners and residents of real property containing

defective Chinese manufactured drywall that was designed, manufactured, imported, distributed,

delivered, supplied, marketed, inspected, installed, or sold by the Defendants. In order to

accomplish an effective class structure, each of the class representatives is pursuing a nationwide

class action against the manufacturer of the drywall located in plaintiffs' homes (Classes 1-15).

Subordinate to these national class actions, the identified class representatives are participating

in subclasses asserting claims against of their distributors, suppliers, importers, exporters, and

brokers (Subclasses 16 - 47); each of their builders and developers (Subclasses 48 - 213); and

1

___ Fee $360
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

each of their contractors and installers (Subclasses 214 - 254) for whom they have standing

(class and subclass members shall be collectively referred to herein as "Class Members"). Each

of the Defendants in this action are liable for damages incurred by Plaintiffs due to their role in

the design, manufacture, importing, distributing, delivery, supply, marketing, inspecting,

installing, or sale of the defective drywall at issue in this litigation.

## JURISDICTION, PARTIES, AND VENUE

1. Original jurisdiction of this Court exists by virtue of 28 U.S.C. §1332(d)(2) and the

Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. § 1711, *et. seq.* The Plaintiffs and certain

of the Defendants in these actions are citizens of different states and the amounts in controversy

in these actions exceed five million dollars ($5,000,000.00), exclusive of interest and costs.

2. For each subclass, the Court has original jurisdiction under CAFA and/or

supplemental jurisdiction under 28 U.S.C. § 1367.

3. Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1)-(2) and (c)

because Plaintiffs and a significant number of the absent class members reside in this jurisdiction

and a substantial amount of the events and occurrences giving rise to these claims occurred in

this District, or a substantial part of the property that is the subject of this action is situated in

this district. Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and

the June 15, 2009 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"). *See*

*In re: Chinese-Manufactured Drywall Products Liability Litigation*, 626 F.Supp.2d 1346

(J.P.M.L. Jun. 15, 2009).

## **PLAINTIFFS**

4. For purposes of clarity, the Plaintiffs are asserting claims on behalf of all owners and residents of the subject properties, including but not limited to, minors and other residents of the properties who do not appear herein as named plaintiffs.

5. Unless specifically stated to the contrary, all Plaintiffs are citizens of the state where they reside and all entities are citizens of the state where they are organized. For those entities, where the state of organization is not listed, it is asserted upon information and belief that the entity is incorporated and/or organized in the state of its principal place of business.

6. Plaintiffs, Kenneth and Barbara Wiltz are citizens of Louisiana and together own real property located at 5337 Cameron Blvd., New Orleans, Louisiana 70112. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

7. Plaintiff, St. Martin Lion's Club c/o Don Richardson owns real property located at 15900 La Moyne Blvd., Biloxi, Mississippi 39532. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

8. Plaintiffs, David Deeg and Deborah Hooker are citizens of Florida and together own real property located at 516 Southwest Akron Avenue, Stuart, Florida 34994. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

9. Plaintiffs, David Lefton and Michelle Garcia are citizens of Florida and together own real property located at 106 Southwest Milburn Circle, Port St. Lucie, Florida 34953. Plaintiffs

are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

10. Plaintiff, Gloria Arnold is a citizen of Louisiana and owns real property located at 4385 Genoa Road, New Orleans, Louisiana 70129. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

11. Plaintiffs, Marquesa and Shantez Bean are citizens of Louisiana and together own real property located at 10200 Flossmoor Drive, New Orleans, Louisiana 70127. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

12. Plaintiff, Jamie Lynn Evans is a citizen of Louisiana and owns real property located at 7505 Mercury Drive, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

13. Plaintiff, Hazel Mae Gundorf is a citizen of Louisiana and owns real property located at 4316 Toulouse Street, New Orleans, Louisiana 70119. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

14. Plaintiffs, Torrey and Vondria Lewis are citizens of Louisiana and together own real property located at 2812 Oak Drive, Violet, Louisiana 70092. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

15. Plaintiff, Donald J. Ludwig, Sr., is a citizen of Louisiana and owns real property located at 2521 Lawrence Drive, Meraux, Louisiana 70075. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

16. Plaintiffs, Shawn and Jill Moran are citizens of Louisiana and together own real property located at 735 Angela Avenue, Arabi, Louisiana 70032. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

17. Plaintiff, Kenneth M. Sigur is a citizen of Louisiana and owns real property located at 3608-3610 Pakenham Drive, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

18. Plaintiff, Thomas Vucinovich is a citizen of Louisiana and owns real property located at 4330 Genoa Road, New Orleans, Louisiana 70129. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

19. Plaintiff, Richard Ankiel is a citizen of Florida and owns real property located at 138 Ocean Bay Drive, Jensen Beach, Florida 34957. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

20. Plaintiffs, John and Laura Arguello are citizens of Florida and together own real property located at 12430 SW 50th Street, Unit 107, Miramar, Florida 33027. Plaintiffs are

participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

21. Plaintiffs, Dan and Frances Auker are citizens of Florida and together own real property located at 10820 Tiberio Drive, Fort Myers, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

22. Plaintiff, Keith Baker is a citizen of Florida and owns real property located at 12077 Honeysuckle Road, Fort Myers, Florida 33977. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

23. Plaintiff, Dirar Bdaiwi is a citizen of Florida and owns real property located at 12421 SW 50 CT Unit 335, Miramar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

24. Plaintiffs, Ed and Ashli Belfour are citizens of Florida and together own real property located at 7260 Wisteria Avenue, Parkland, Florida 33076. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

25. Plaintiff, Marlene Bennett is a citizen of Florida and owns real property located at 8770 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

6

26. Plaintiff, Blue Water Condominium Association owns real property located at 14360 So. Tamiami Trail, Unit B, Fort Myers, Florida 33912. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

27. Plaintiff, Blue Water of Cape Coral owns real property located at 221 Shadroe Cove Circle, Unit 1004, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

28. Plaintiffs, Sheryl and Jarrod Brookman are citizens of Florida and together own real property located at 9821 Cobblestone Creek, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

29. Plaintiff, Beni Brik is a citizen of Florida and owns real property located at 240 West End Drive, Unit 1311, Punta Gorda, Florida 33950 and 240 West End Drive, Unit 1312, Punta Gorda, Florida 33950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

30. Plaintiff, Edward Cardenas is a citizens of Florida and owns real property located at 5030 SW 126 Avenue, Miramar, Florida 33027. Plaintiff is participating as class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

31. Plaintiff, Robert Cardoza is a citizen of Florida and owns real property located at

1615 91st Court, Vero Beach, Florida 32966 and 1617 91st Court, Vero Beach, Florida 32966. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

32. Plaintiff, Edmondo Catalfamo is a citizen of Florida and owns real property located at 8791 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

33. Plaintiff, Alexander Cherba is a citizen of Florida and owns real property located at 9492 Cobblestone Creek Drive, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

34. Plaintiff, Lawrence Cohen is a citizen of Florida and owns real property located at 1690 Renaissance Commons, Apartment 1496, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

35. Plaintiff, Joyce Defrancesco is a citizen of Florida and owns real property located at 2218 SW Embers Terrace, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

36. Plaintiffs, Pedro and Margarita Delgado are citizens of Florida and together own real property located at 2023 SW 30th Terrace, Cape Coral, Florida 33914. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying

this complaint which are incorporated herein by reference.

37.  Plaintiffs, Jarred and Rochelle Fenalson are citizens of Florida and together own real property located at 10440 SW Stephanie Way, Unit 212, Port St. Lucie, Florida 34987.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

38.  Plaintiffs, Thomas Filardo and Thomas Filardo, Jr. are citizens of New York and together own real property located at 182 SE 2nd Street, Deerfield Beach, Florida 33441. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

39.  Plaintiff, Louise M. Forte is a citizen of Florida and owns real property located at 9477 Cobblestone Creek Drive, Boynton Beach, Florida 33472.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

40.  Plaintiffs, Roy and Mary Frankhouse are citizens of Florida and together own real property located at 9853 Whipporwill Trail, Jupiter, Florida 33478.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

41.  Plaintiffs, Michael Gallacher and Randall Baker are citizens of Florida and together own real property located at 8911 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

42.  Plaintiff, Armando Garcia is a citizen of Florida and owns real property located at

9

12421 SW 50 Court, Unit 305, Miramar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

43. Plaintiffs, Dominic and Lauren Gianetti are citizens of Florida and together own real property located at 8881 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

44. Plaintiff, Franklin Gil is a citizen of Florida and owns real property located at 5030 SW 126th Avenue, Unit 205, Miramar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

45. Plaintiff, Barbara Gonzalez is a citizen of Florida and owns real property located at 7512 Brideview Drive, Westley Chapel, Florida 33545. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

46. Plaintiff, Roy Harrysperad is a citizen of Florida and owns real property located at 8697 Cobblestone Point Circle, Boynton Beach, Florida 33462. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

47. Plaintiffs, Bernard and Barbara Heinemann are citizens of Florida and together own real property located at 5202 SW 28th Place, Cape Coral, Florida 33901. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

10

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 318 of 668
Case 2:11-cv-22408-MGC Document 1-9 Entered on FLSD Docket 06/30/2011 Page 244 of 759

accompanying this complaint which are incorporated herein by reference.

48. Plaintiffs, Sylvia and Louis Holloway are citizens of Florida and together own real property located at 174 Shadroe Cove Circle, Unit 1002, Cape Coral, Florida 33991. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

49. Plaintiff, Jan Jacko is a citizen of Florida and owns real property located at 519 SE 25 Lane, Cape Coral, Florida 33909. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

50. Plaintiff, Leonard Jackson is a citizen of Florida and owns real property located at 9593 Ginger Court, Parkland, Florida 33076. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

51. Plaintiffs, Steve and Kim Jamison are citizens of New Jersey and together own real property located at 10560 SW Stephanie Way, Unit 1-209; Port St. Lucie, Florida 34987. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

52. Plaintiffs, Katherine and Andrew Kessler are citizens of Florida and together own real property located at 3056 Juniper Lane, Davie, Florida 33330. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

53. Plaintiffs, Angelo and Anna LaGambina are citizens of Florida and together own real

property located at 1142 SW Kickaboo Road, Port St. Lucie, Florida 34953. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

54. Plaintiffs, Gul and Deborah Lalwani are citizens of New Jersey and together own real property located at 4590 Kodiak Drive, Vero Beach, Florida 32967. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

55. Plaintiff, Guy Lamour is a citizen of Florida and owns real property located at 8860 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

56. Plaintiffs, Robert and Colette Lynch are citizens of Florida and together own real property located at 5012 SE Mariner Garden Circle, Stuart, Florida 34997. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

57. Plaintiff, Magdalen Gardens Condo Association owns real property located at 240 West End Avenue, Units 412, 413, 812, 911, 912, 913, 923, 1011, 1013, 1311, 1313, 1312, 1321, 1323, 1511 and 1512, Punta Gorda, Florida 33950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

58. Plaintiffs, Mohammed A. and Kamrun N. Manzur are citizens of Florida and together own real property located at 8686 Cobblestone Point Circle, Boynton Beach, Florida 33472.

Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

59. Plaintiffs, Troy and Dina Marchese are citizens of Florida and together own real property located at 8830 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

60. Plaintiff, Cassandra Marin is a citizen of Florida and owns real property located at 3865 SW Wycoff Street, Port St. Lucie, Florida 34953. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

61. Plaintiff, Claire Marston is a citizen of Florida and owns real property located at 240 W. End Drive, Unit 1412, Punta Gorda, Florida 33950 and 241 W. End Drive, Unit 923, Punta Gorda, Florida 33950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

62. Plaintiff, Paul Marzulff is a citizen of Florida and owns real property located at 240 West End Drive #412, Punta Gorda, Florida 33950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

63. Plaintiff, Jose Miranda is a citizen of Florida and owns real property located at 8890 SW 229th Street, Miami, Florida 33190. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are

13

incorporated herein by reference.

64. Plaintiffs, Giraldo and Kelly Monge are citizens of Florida and together own real property located at 177 SE 2nd Court, Deerfield Beach, Florida 33411. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

65. Plaintiffs, Nick and Karen Morakis are citizens of Florida and together own real property located at 8859 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

66. Plaintiffs, Jose and Dawn Morales are citizens of Florida and together own real property located at 215 NW 29 Terrace, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

67. Plaintiffs, Thai and Lieu Nguyen are citizens of Florida and together own real property located at 26 NW 6th Street, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

68. Plaintiffs, Krzysztof Olschewiski and Chad Prandi are citizens of Florida and together own real property located at 8680 Cobblestone Pointe Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

69. Plaintiff, Steward Osicki is a citizen of Florida and owns real property located at 240

14

West End Drive, 413, Punta Gorda, Florida 33950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

70. Plaintiff, Judy Parra is a citizen of Florida and owns real property located at 12430 SW 50th Street, #109, Miramar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

71. Plaintiff, Adela Perez is a citizen of Florida and owns real property located at 12430 SW 50th Street, Unit 113, Miramar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

72. Plaintiffs, Francisco and Ewa Pigna are citizens of Florida and together own real property located at 8836 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

73. Plaintiffs, James and Janice Poggio are citizens of Florida and together own real property located at 13409 Ainsworth Lane, Port Charlotte, Florida 33029. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

74. Plaintiffs, Alexander and Susan Popov are citizens of Florida and together own real property located at 8842 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

accompanying this complaint which are incorporated herein by reference.

75. Plaintiffs, Davidson Raymond and Jean Robert are citizens of Florida and together own real property located at 8797 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

76. Plaintiffs, Ronald and Jacqueline Reckseit are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Units 1111 and 1225, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

77. Plaintiffs, Michael and Kathryn Reeves are citizens of Florida and together own real property located at 2226 Soho Bay Court, Tampa, Florida 33606. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

78. Plaintiff, Tod Rismiller is a citizen of Ohio and owns real property located at 3619 Oasis Boulevard, Cape Coral, Florida 33914. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

79. Plaintiff, Sandy Roy is a citizen of Florida and owns real property located at 10560 SE Stephanie Way, #203, Port St. Lucie, Florida 34986. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

16

80.  Plaintiff, Robert Santimauro is a citizen of Florida and owns real property located at 22220 Red Laurel Lane, Estero, Florida 33928.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

81.  Plaintiffs, Hector Santos and Fenta Nigest are citizens of Florida and together own real property located at 7516 Brideview Drive, Wesley Chapel, Florida 33545.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

82.  Plaintiffs, Fay and Benjamin Scott are citizens of Florida and together own real property located at 5256 NW South Lovett Circle, Port St. Lucie, Florida 34986.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

83.  Plaintiffs, Bruce and Susan Serbin are citizens of Florida and together own real property located at 7990 NW 126 Terrace, Parkland, Florida 33076.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

84.  Plaintiffs, Wayne and Mandy Siegel are citizens of Florida and together own real property located at 9355 Cobblestone Brooke Court, Boynton Beach, Florida 33472.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

85.  Plaintiffs, Scott and Wendy Smith are citizens of Florida and together own real property located at 3840 Sorrel Pine Drive, Wesley Chapel, Florida 33544.  Plaintiffs are

17

participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

86. Plaintiff, Shakira Smith-Jacob is a citizen of Florida and owns real property located at 12421 SW 50 Court #337, Mirarmar, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

87. Plaintiff, Santurnino Spiga is a citizen of Florida and owns real property located at 8617 Via Rapallo Drive #37-203, Estero, Florida 33928. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

88. Plaintiffs, David and Julia Sponsel are citizens of Florida and together own real property located at 3332 Grassglen Place, Wesley Chapel, Florida 33544. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

89. Plaintiff, Russ Spotts is a citizen of Florida and owns real property located at 194 Shadroe Cove Circle #602, Cape Coral, Florida 33993. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

90. Plaintiff, Stephanie Steiner is a citizen of Florida and owns real property located at 8665 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

91. Plaintiffs, Peter and Janet Teixeira are citizens of Florida and together own real property located at 8809 Cobblestone Point Circle, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

92. Plaintiff, Michael Valdes is a citizen of Florida and owns real property located at 8912 SW 229 Street, Miami, Florida 33190. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

93. Plaintiffs, Andrew and Cathy Walker are citizens of Florida and together own real property located at 7460 Bridgeview Drive; Wesley, Florida 33545. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

94. Plaintiff, Dorothy Lee is a citizen of Louisiana and owns real property located at 7514 Dwyer Road, New Orleans, Louisiana 70126. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

95. Plaintiffs, Mary Leftwich, Brian Leftwich, Owen Leftwich, Kerry Coleman and Erin LeBlanc are citizens of Louisiana and together own real property located at 6708 General Diaz Street, New Orleans, Louisiana 70124. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

96. Plaintiff, Christy Moritz is a citizen of Louisiana and owns real property located at

19

3704 Gallo Drive, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

97. Plaintiffs, Doug and Lisa Salzer are citizens of Louisiana and together own real property located at 614 Carmenere Drive, Kenner, Louisiana 70065. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

98. Plaintiffs, Cindy and Nathaniel Bierria are citizens of Louisiana and together own real property located at 7631 Brevard Avenue, New Orleans, Louisiana 70127. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

99. Plaintiff, Mark Elias is a citizen of Louisiana and owns real property located at 3028 Ivy Place, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

100. Plaintiffs, Mary and Lorne Hall are citizens of Louisiana and together own real property located at 5319 St. Anthony Avenue, Gentily, Louisiana 70122. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

101. Plaintiff, Tonya Hite is a citizen of Louisiana and owns real property located at 4404 Parise Avenue, New Orleans, Louisiana 70122. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

20

complaint which are incorporated herein by reference.

102.  Plaintiffs, Jan and Matthews Hughes are citizens of Louisiana and together own real property located at 3513 Van Cleve Drive, Meraux, Louisiana 70075.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

103.  Plaintiff, Jon Jackel is a citizen of Louisiana and owns real property located at 244 Springrose Drive, Belle Chasse, Louisiana 70037.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

104.  Plaintiffs, Barbara and Herbert Johnson are citizens of Louisiana and together own real property located at 2425 Independence Street, New Orleans, Louisiana 70117.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

105.  Plaintiff, Willie Taylor is a citizen of Louisiana and owns real property located at 1409 Deloney Street, New Orleans, Louisiana 70117.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

106.  Plaintiff, Eric Bienemy is a citizen of Louisiana and owns real property located at 2823 Daniel Drive, Violet, Louisiana 70092.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

107.  Plaintiff, Virgie Holloway is a citizen of Louisiana and owns real property located at

21

2522 Pauger Street, New Orleans, Louisiana 70116. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

108. Plaintiff, Patricia Gordon is a citizen of Louisiana and owns real property located at 7409 Cornwall Place, New Orleans, Louisiana 70126. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

109. Plaintiff, Beatrice LeBlanc is a citizen of Louisiana and owns real property located at 4510 Cerise Avenue, New Orleans, Louisiana 70127. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

110. Plaintiff, Leonard Louis is a citizen of Louisiana and owns real property located at 2366 Odin Street, New Orleans, Louisiana 70122. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

111. Plaintiff, Herman Thomas is a citizen of Louisiana and owns real property located at 2215 Joliet Street, New Orleans, Louisiana 70127. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

112. Plaintiff, Frances Nelson is a citizen of Louisiana and owns real property located at 4619 Nighthart Street, New Orleans, Louisiana 70127. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

complaint which are incorporated herein by reference.

113. Plaintiff, Daphne Jones is a citizen of Louisiana and owns real property located at 2531 Delery Street, New Orleans, Louisiana 70117. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

114. Plaintiff, Louise Joseph is a citizen of Louisiana and owns real property located at 1021 Leonidas Street, New Orleans, Louisiana 70118. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

115. Plaintiff, Gary Smith is a citizen of Louisiana and owns real property located at 4849-51 Lynhuber Drive, New Orleans, Louisiana 70126. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

116. Plaintiff, Tarika Smith is a citizen of Louisiana and owns real property located at 3005 Oak Drive, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

117. Plaintiff, Linda Zubrowski is a citizen of Louisiana and owns real property located at 109 Indian Mound Lane, Slidell, Louisiana 70461. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

118. Plaintiff, Delores Bailey is a citizen of Louisiana and owns real property located at

Case 2:09-md-02047-EEF-MBN Document 23292-10 Filed 12/06/19 Page 331 of 668
Case 2:09-md-02047-EEF-MBN Document 7-10 Filed 02/08/2019 Page 257 of 759

2213 Beachhead Lane, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

119. Plaintiff, Sandra Perez is a citizen of Louisiana and owns real property located at 1927 Abundance, New Orleans, Louisiana 70122. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

120. Plaintiffs, Horace and Donna Lindsay are citizens of Florida and together own real property located at 2804 St. Bart's Square, Vero Beach, Florida 32967. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

121. Plaintiffs, Keith and Shirley Morgan are citizens of Florida and together own real property located at 6545 Caicos Court, Vero Beach, Florida 32967. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

122. Plaintiffs, John and Sydna Peterson are citizens of Louisiana and together own real property located at 6334 Canal Blvd., New Orleans, Louisiana 70124. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

123. Plaintiff, Joseph Quartararo is a citizen of Louisiana and owns real property located at 5813 Ruth Street, Metairie, Louisiana 70003. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are

incorporated herein by reference.

124. Plaintiff, Cathy Parker Vapy is a citizen of Louisiana and owns real property located at 9700 Andover Drive, New Orleans, Louisiana 70127. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

125. Plaintiff, Catherine Simon is a citizen of Louisiana and owns real property located at 3817 Napoleon Avenue, New Orleans, Louisiana 70125. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

126. Plaintiff, Barbara R. Alvarez is a citizen of Florida and owns real property located at 4225 NE 16 Street, Homestead, Florida 33033. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

127. Plaintiff, Marc Barriento is a citizen of Florida and owns real property located at 4057 SW Cheribon Street, Port St. Lucie, Florida 34953. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

128. Plaintiffs, Peter and Karen Bell are citizens of New York and together own real property located at 5140 SE Mariner Gardens Circle, Unit I-65, Stuart, Florida 34997. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

129. Plaintiffs, Thomas and Sheri Coombs are citizens of Florida and together own real

property located at 3454 Lago de Talavera, Wellington, Florida 33467. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

130. Plaintiff, Luis D'Agostino is a citizen of Florida and owns real property located at 17555 Collins Avenue #308, Sunny Isles Beach, Florida 33160. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

131. Plaintiffs, William and Jennifer Delayo are citizens of Florida and together own real property located at 19848 Maddelena Circle, Fort Myers, Florida 33967. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

132. Plaintiffs, Randy Dwight and Mercedes Hutchinson are citizens of Florida and together own real property located at 12430 SW 50th Street #127, Miramar, Florida 33027. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

133. Plaintiffs, Peter and Robyn Ellington are citizens of Florida and together own real property located at 1213 NW 37 Place, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

134. Plaintiff, Charmaine Fong is a citizen of Florida and owns real property located at 9816 Cobblestone Lakes Court, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

complaint which are incorporated herein by reference.

135. Plaintiffs, Julianne and Joshua Frankze are citizens of Florida and together own real property located at 1201 NW 2 Street, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

136. Plaintiff, Arledys Gallardo is a citizen of Florida and owns real property located at 4179 NE 16 Street, Homestead, Florida 33033. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

137. Plaintiffs, Aleksandra and Roza Gelman are citizens of New Jersey and together own real property located at 2849 St. Barts Square, Vero Beach, Florida 33483. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

138. Plaintiffs, Yenny Hernandez and Jorge Perez are citizens of Florida and together own real property located at 3603 SW 20 Street, Lehigh Acres, Florida 33976. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

139. Plaintiff, Marjorie Johnson is a citizen of Florida and owns real property located at 704 SW 23rd Terrace, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

140. Plaintiff, Rick Kennard is a citizen of Florida and owns real property located at

27

11314 Bridge Pine Drive, River View, Florida 33569. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

141.   Plaintiffs, Marcela and Rafael Lugo are citizens of Florida and together own real property located at 1951 SW 22 Drive, Homestead, Florida 33035. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

142.   Plaintiffs, Lincoln and America Mendez are citizens of Florida and together own real property located at 4180 North Highway A1A, Unit 801B, Hutchinson Island, Florida 34949. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

143.   Plaintiffs, Daniel CC and Mary Jo Necastro are citizens of Illinois and together own real property located at 8617 Via Rapallo Drive, Estero, Florida 33928. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

144.   Plaintiff, Marie Octobre is a citizen of New York and owns real property located at 1609 SW 22 Lane, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

145.   Plaintiffs, William and Stacy Peekare citizens of Florida and together own real property located at 11 Baffin Avenue, Tampa, Florida 33609. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this

28

complaint which are incorporated herein by reference.

146.  Plaintiff, Jorge Perez, on behalf of JP Real Estate Development owns real property located at 10169 and 10165 SW 171 Street, Miami, Florida 33157.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

147.  Plaintiffs, Lee and Alyssa Quittner are citizens of Florida and together own real property located at 9830 Cobblestone Creek, Boynton Beach, Florida 33472.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

148.  Plaintiffs, Duane and Beth Ratliff are citizens of Florida and together own real property located at 4205 Amelia Plantation Court, Vero Beach, Florida 32967.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

149.  Plaintiffs, Jonathan S. and Diane Resnick are citizens of Florida and together own real property located at 17910 Monte Vista Drive, Boca Raton, Florida 33496.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

150.  Plaintiff, Kevin Rosen is a citizen of Florida and owns real property located at 17830 Monte Vista Drive, Boca Raton, FL 33496.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

151. Plaintiff, Mitchell Rubin is a citizen of Florida and owns real property located at

9800 Cobblestone Lakes Court, Boynton Beach, Florida 33472. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

152. Plaintiff, Dawn Saliba is a citizen of Florida and owns real property located at 6102 Raintree Trail, Fort Pierce, Florida 34950. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

153. Plaintiff, Talavera, LLC owns real property located at 3261 Lago de Talvara, Lot 1, 3301 Lago de Talavera, Lot 6, 3533 Lago de Talavera, Lot 35, 3240 Lago de Talavera, Lot 48, 3462 Lago de Talavera, Lot 67, 3558 Lago de Talavera, Lot 75 and 3574 Lago de Talavera, Lot 77, Wellington, Palm Beach County, Florida 33467. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

154. Plaintiffs, Anna Tataris and Roy De Jesus are citizens of Florida and together own real property located at 4842 Tuscan Loon Drive, Tampa, Florida 33619. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

155. Plaintiff, Keith Willett is a citizen of Florida and owns real property located at 4418 West Vasconia, Tampa, Florida 33629. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

156. Plaintiffs, Aaron and Wendy Wruble are citizens of Florida and together own real

30

Case 2:09-md-02047-EEF-MBN Document 23292-10 Filed 02/06/19 Page 338 of 668

property located at 1294 Exotic Avenue, North Port, Florida 34288. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

157. Plaintiffs, Gene and Que Raphael are citizens of Florida and together own real property located at 3018 Lake Butler Court, Cape Coral, Florida 33909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

158. Plaintiffs, Beresford and Theresa Bertram are citizens of Florida and together own real property located at 1707 SW 81 Way, North Lauderdale, Florida 33068. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

159. Plaintiffs, Gerald and Betty Brynn are citizens of Florida and together own real property located at 511 Rimini Vista Way, Sun City Center, Florida 33575. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

160. Plaintiffs, Sean and Katie Andrade are citizens of Florida and together own real property located at 1730 SW 81 Way, North Lauderdale, Florida 33068. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

161. Plaintiffs, Maikel and Karen Anise are citizens of Florida and together own real property located at 9661 Cobblestone Creek, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

31

accompanying this complaint which are incorporated herein by reference.

162. Plaintiffs, Miguel and Jacqueline Areces are citizens of Florida and together own real property located at 5300 Seagrape Drive, Ft. Pierce, Florida 34982. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

163. Plaintiffs, Richard Lizotte and Ronald Robichaux are citizens of Florida and together own real property located at 2124 Siefield Greens Way, Sun City Center, Florida 33573 and 2120 Siefield Greens Way, Sun City Center, Florida 33573. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

164. Plaintiff, Michael Peloquin is a citizen of Florida and owns real property located at 12747 Kentwood Avenue, Ft. Myers, Florida 33913. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

165. Plaintiffs, Mary and David Cheeran are citizens of Florida and together own real property located at 987 Fish Hook Cove, Bradenton, Florida 34212. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

166. Plaintiff, Javie Cuellar is a citizen of Florida and owns real property located at 12735 Kentwood Avenue, Ft. Myers, Florida 33913. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

32

167. Plaintiff, Barry Estadt is a citizen of Florida and owns real property located at 529 Rimini Vista Way, Sun City Center, Florida 33571. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

168. Plaintiff, Charles Kim is a citizen of Florida and owns real property located at 991 Fish Hook Cove, Bradenton, Florida 34212. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

169. Plaintiffs, Earl and Gwynn Gall are citizens of Florida and together own real property located at 2122 Siefield Greens Way, Sun City Center, Florida 33573. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

170. Plaintiffs, Sundaram and Jeeva Harikrishnan are citizens of Florida and together own real property located at 542 Rimini Vista Way, Sun City Center, Florida 33753. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

171. Plaintiffs, Patricia Lippold and Janet Hibbs are citizens of Florida and together own real property located at 2214 Siefield Greens Way, Sun City Center, Florida 33573. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

172. Plaintiff, Samuel Perone is a citizen of Florida and owns real property located at 7063 Lost Garden Terrace, Parkland, Florida 33076. Plaintiff is participating as a class

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

173.  Plaintiffs, Charles and Josephine Russo are citizens of Florida and together own real property located at 2246 Siefield Greens Way, Sun City Center, Florida 33573.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

174.  Plaintiffs, Patsy and Maureen Campola are citizens of Florida and together own real property located at 9607 Cinnamon Court, Parkland, Florida 33076.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

175.  Plaintiff, Chester Stewart is a citizen of Florida and owns real property located at 6848 Long Leaf Drive, Parland, Florida 33076.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference

176.  Plaintiffs, David Dion and Eunice Parks are citizens of Florida and together own real property located at 9781 Cobblestone Creek, Boynton Beach, Florida 33472.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

177.  Plaintiffs, Roger and Allison Elliott are citizens of Florida and together own real property located at 2003 SW Laredo Street, Stuart, Florida 34994.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

34

178. Plaintiffs, Leroy and Bernadette Floyd are citizens of Florida and together own real property located at 2602 Rhode Island Avenue, Ft. Pierce, Florida 34947. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

179. Plaintiff, Charles Gatto is a citizen of Florida and owns real property located at 273 Swan Lane, Jupiter, Florida 33458. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

180. Plaintiffs, William Bicelis Machado and Franyelina Lopez are citizens of Florida and together own real property located at 14721 SW 6 Street, Pembroke Pines, Florida 33027. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

181. Plaintiffs, Norberto and Belgica Pratts are citizens of Florida and together own real property located at 14701 SW 6 Street, Pembroke Pines, Florida 33027. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

182. Plaintiff, Doug Romain is a citizen of Florida and owns real property located at 10846 SW Meeting Street, Port St. Lucie, Florida 34987. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

183. Plaintiffs, David and Donna Valentine are citizens of Florida and together own real property located at 3467 Mestre Place, North Venice, Florida 34275. Plaintiffs are participating

35

as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

184. Plaintiff, Claudia Vasquez is a citizen of Florida and owns real property located at 702 SW 147 Avenue, Pembroke Pines, Florida 33027. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

185. Plaintiffs, Kenneth and Victoria Boersma are citizens of Florida and together own real property located at 9664 Cobblestone Creek Drive, Boynton Beach, Florida 33472. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

186. Plaintiffs, Peter and Annett Catalano are citizens of Florida and together own real property located at 1458 SW Goodman Avenue, Port St. Lucie, Florida 34952. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

187. Plaintiffs, John and Andrea Adams are citizens of Florida and together own real property located at 10642 SW Gingermill Drive, Port St. Lucie, Florida 34952. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

188. Plaintiff, Cindy Carrol is a citizen of Louisiana and owns real property located at 1220 Magnolia Alley, Mandeville, Louisiana 70471. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

36

189. Plaintiff, Dorothy Stanich is a citizen of Louisiana and owns real property located at 1912 Duels, New Orleans, Louisiana 70119. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

190. Plaintiffs, John and Beverly Utterback are citizens of Illinois and together own real property located at 1241 Kendari Terrace, Naples, Florida 34120. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

191. Plaintiff, Colleen Rondeno is a citizen of Louisiana and owns real property located at 3110 Law Street, New Orleans, Louisiana 70119. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

192. Plaintiffs, Gene Nudelman and Tatyana Levina are citizens of Florida and together own real property located at 7240 Wisteria Avenue, Parkland, Florida 33076. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

193. Plaintiffs, Marcelo and Cecilia Torres-Lutz are citizens of Florida and together own real property located at 334 Cipriani Way, Venice, Florida 34275. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

194. Plaintiff, Claudia Mendez is a citizen of Florida and owns real property located at 12960 Turtle Cove Trail, North Fort Myers, Florida 33903. Plaintiff is participating as a class

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

195. Plaintiffs, Cynthia and Jonathan Scott are citizens of Florida and together own real property located at 1984 Gloria Circle, Palm Bay, Florida 32905. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

196. Plaintiffs, Eric and Karen Wilcox are citizens of Florida and together own real property located at 14117 Stowbridge Avenue, Tampa, Florida 33626. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

197. Plaintiff, Ximena Almeida is a citizen of Louisiana and owns real property located at 3513 Golden Avenue, Chalmette, Alabama 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

198. Plaintiffs, Peter and Robin Bast are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1428, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

199. Plaintiffs, Frank and Carolyn Bragoli are citizens of New York and together own real property located at 1690 Renaissance Commons Blvd., Unit 1314, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

38

200. Plaintiff, Philip Brice is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1227, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

201. Plaintiffs, Roger Casalengo and Betty Ann Kramer are citizens of Florida and Virginia, respectively and together own real property located at 1690 Renaissance Commons Blvd., Unit 1324, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

202. Plaintiffs, Jay and Shari Cohen are citizens of New Jersey and together own real property located at 1690 Renaissance Commons Blvd., Unit 1405, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

203. Plaintiffs, Braxton and Kerrie Collins are citizens of Mississippi and together own real property located at 10720 Hwy 614, Moss Point, Mississippi 39562. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

204. Plaintiff, Patrick Conlin is a citizen of New York and owns real property located at 1690 Renaissance Commons Blvd., Unit 1218, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

205. Plaintiffs, Arish Peter and Alpa Dalal are citizens of New York and together own

39

real property located at 1690 Renaissance Commons Blvd., Unit 1401, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

206. Plaintiffs, Angelo and Deborah D'Ambrosio are citizens of New York and together own real property located at 1660 Renaissance Commons Blvd., Unit 2305, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

207. Plaintiff, Robert Dawson is a citizen of Virginia and owns real property located at 4326 Lydias Drive, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

208. Plaintiff, Marta DeNaea is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1224, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

209. Plaintiff, Martha Lisa DeNavea is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1429, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

210. Plaintiff, Jeremy Dickey is a citizen of Alabama and owns real property located at 60 Pinebark Court, Wetumpka, Alabama 36093. Plaintiff is participating as a class

40

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

211.  Plaintiff, Marlon Ditianquin is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1309, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

212.  Plaintiff, Vincent Ercolino is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1206, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

213.  Plaintiffs, Joseph and Tracy Fatta are citizens of Louisiana and together own real property located at 2622 College Street, Slidell, Louisiana 70458.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

214.  Plaintiff, Sean Flaherty is a citizen of New Jersey and owns real property located at 1690 Renaissance Commons Blvd., Unit 1402, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

215.  Plaintiff, Van Foster is a citizen of Alabama and owns real property located at 1610 13th Street N, Birmingham, Alabama 35204.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

41

216. Plaintiffs, Jacques and Rose Gani are citizens of New York and together own real property located at 1660 Renaissance Commons Blvd., Unit 2525, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

217. Plaintiff, Vernon Hampton is a citizen of Louisiana and owns real property located at 5641 St. Matthew Circle, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

218. Plaintiffs, Jason and Cassie Herrington are citizens of Mississippi and together own real property located at 26975 Old Americus Road, Lucedale, Mississippi 39452. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

219. Plaintiff, Wendy Lee Hobbie is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1411, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

220. Plaintiffs, Timothy and Karen Irvin are citizens of Virginia and together own real property located at 1690 Renaissance Commons Blvd., Unit 1216, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

221. Plaintiffs, Perry and Alice Jioia are citizens of New York and together own real property located at 1690 Renaissance Commons Blvd., Unit 1327, Boynton Beach, Florida

33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

222. Plaintiffs, Alan and Ilana Kellner are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1310, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

223. Plaintiffs, John and Susanna Kolich are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1519, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

224. Plaintiffs, Arthur and Martha Kovens are citizens of Maryland and together own real property located at 1660 Renaissance Commons Blvd., Unit 2527, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

225. Plaintiff, Leneva Jean Kropf is a citizen of Michigan and owns real property located at 1690 Renaissance Commons Blvd., Unit 1205, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

226. Plaintiffs, Mark and Diana Lemberg are citizens of New York and together own real property located at 1690 Renaissance Commons Blvd., Unit 1328, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

43

227.  Plaintiff, Michael Leone is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1202, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

228.  Plaintiffs, Barty Litwin and Mel Litwin (A/K/A Melvin Litwin) as Trustee of the Mel Litwin (A/K/A Melvin Litwin) Declaration Trust, u/a/d 02/28/06 are citizens of Florida and own real property located at 1690 Renaissance Commons Blvd., Unit 1409, Boynton Beach, Florida 33426.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

229.  Plaintiffs, George and Adrienne Luntz are citizens of Florida and together own real property located at 1660 Renaissance Commons Blvd., Unit 2516, Boynton Beach, Florida 33426.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

230.  Plaintiffs, Fernando and Bridget Madero are citizens of Florida and together own real property located at 17105 78th Road North, Loxahatchee, Florida 33470.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

231.  Plaintiff, Danielle Lee Maness is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1128, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

44

232. Plaintiff, Jason Scott McMurray is a citizen of Mississippi and owns real property located at 47 Monarch Blvd., Hattiesburg, Mississippi 39441. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

233. Plaintiffs, Carlos and Margarita Molina are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1308, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

234. Plaintiffs, Paul and Lois Murray are citizens of New York and together own real property located at 1660 Renaissance Commons Blvd., Unit 2415, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

235. Plaintiff, Melissa Norris is a citizen of Mississippi and owns real property located at 721 Hundred Acre Road, Neely, Mississippi 39461. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

236. Plaintiffs, Rhoda and Aly Okaily are citizens of Pennsylvania and together own real property located at 1690 Renaissance Commons Blvd., Unit 1412, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

237. Plaintiff, Joel Perecca is a citizen of New York and owns real property located at 1690 Renaissance Commons Blvd., Unit 1211, Boynton Beach, Florida 33426. Plaintiff is

participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

238. Plaintiffs, Nicholas and Adrienne Renzetti are citizens of New York and together own real property located at 1690 Renaissance Commons Blvd., Unit 1321, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

239. Plaintiff, Martin Riback, as Trustees of the Martin Riback Revocable Trust Agreement dated April 4, 1997 are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1212 and Unit 1410, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

240. Plaintiffs, Steven and Marsha Richman are citizens of Florida and together own real property located at 1690 Renaissance Commons Blvd., Unit 1422, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

241. Plaintiff, RMM Investments, LLC owns real property located at 1690 Renaissance Commons Blvd., Unit 1103, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

242. Plaintiff, Keith Santillo is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1323, Boynton Beach, Florida 33426. Plaintiff is

46

participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

243.  Plaintiffs, Stephen Schour and Susan Mitchell are citizens of Florida and Colorado, respectively and together own real property located at 1690 Renaissance Commons Blvd., Unit 1106, Boynton Beach, Florida 33426.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

244.  Plaintiff, Melvin Seymore is a citizen of Alabama and owns real property located at 920 County Road 946, Cullman, Alabama 35057.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

245.  Plaintiff, Norman Shiyou is a citizen of Mississippi and owns real property located at 6030 Wanda Circle, Kiln, Mississippi 39556.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

246.  Plaintiff, Sandra Siegel is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1427, Boynton Beach, Florida 33426.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

247.  Plaintiffs, Stacey Ann Tilmann and Kimberly Noah are citizens of Florida and together own real property located at 1660 Renaissance Commons Blvd., Unit 2502, Boynton Beach, Florida 33426.  Plaintiffs are participating as class representatives in the class and

47

subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

248. Plaintiff, Tuller Investments, LLC owns real property located at 1690 Renaissance Commons Blvd., Unit 1419, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

249. Plaintiff, Odilio Vargas is a citizen of California and owns real property located at 1690 Renaissance Commons Blvd., Unit 1424, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

250. Plaintiff, Frances Verderame is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1219, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

251. Plaintiffs, Greg and Sherry Wiggins are citizens of Alabama and together own real property located at 1047 Well Road, Brewton, Alabama 36426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

252. Plaintiff, John Wiley is a citizen of Pennsylvania and owns real property located at 1541 Gerona Terrace, North Point, Florida 34286. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

253. Plaintiffs, Yefim Zagalsky and Yelena Alekseyeva are citizens of New Jersey and together own real property located at 1690 Renaissance Commons Blvd., Unit 1418, Boynton Beach, Florida 33426. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

254. Plaintiff, Sheldon Zitner is a citizen of Florida and owns real property located at 1690 Renaissance Commons Blvd., Unit 1311, Boynton Beach, Florida 33426. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

255. Plaintiffs, Donald and Nadja Fisher are citizens of Louisiana and together own real property located at 3140 N. Roman Avenue, New Orleans, Louisiana 70117. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

256. Plaintiff, Audrey Mae Johnson is a citizen of Louisiana and owns real property located at 3444 Toledano Street, New Orleans, Louisiana 70125. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

257. Plaintiff, Kenneth Long is a citizen of Louisiana and owns real property located at 4700 San Marco Road, New Orleans, Louisiana 70129. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

258. Plaintiffs, Raymond and Mary Lubrano are citizens of Louisiana and together own

49

real property located at 3909 Jacob Drive, Chalmette, Louisiana 70043. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

259. Plaintiff, Jude Marullo is a citizen of Louisiana and owns real property located at 5870 Sylvia Drive, New Orleans, Louisiana 70124. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

260. Plaintiff, Dorothy Pennington is a citizen of Louisiana and owns real property located at 302 West Shannon Lane, Harahan, Louisiana 70123. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

261. Plaintiffs, Alphonso and Nora Walker are citizens of Louisiana and together own real property located at 11346 Catalina Avenue, Baton Rouge, Louisiana 70814. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

262. Plaintiffs, James and Joanne Haseltime are citizens of Florida and together own real property located at 12020 Creole Court, Parrish, Florida 34219. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

263. Plaintiffs, Travis C. and Kelly E. Johnson are citizens of Florida and together own real property located at 1924 SE 21 Court, Homestead, Florida 33035. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying

this complaint which are incorporated herein by reference.

264. Plaintiffs, Paul and Tellina are citizens of Florida and together own real property located at 10902 NW 83 Street Building 7, Unit 201, Doral, Florida 33178. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

265. Plaintiff, Damien Querol is a citizen of Florida and owns real property located at 3301 NE 183 Street, Unit 1207, Aventura, Florida 33160. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

266. Plaintiff, Debra Frazier is a citizen of Louisiana and owns real property located at 10231 Castlewood Drive, New Orleans, Louisiana 70127. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

267. Plaintiffs, Elbert and Gloria Bland are citizens of Louisiana and together own real property located at 2315 and 2317 Industry Street, New Orleans, Louisiana 70122. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

268. Plaintiffs, Larry and Rose Givins are citizens of Louisiana and together own real property located at 6007 Warfield Street, New Orleans, Louisiana 70126 and 6009 Warfield Street, New Orleans, Louisiana 70126. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

51

269. Plaintiff, Symone McQueen Webley is a citizen of Florida and owns real property located at 12715 Saulston Place, Hudson, Florida 34669. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

270. Plaintiffs, Don and Janice Marlinga are citizens of Michigan and together own real property located at 11697 Bald Eagle Way, Naples, Florida 34119. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

271. Plaintiff, Jon Scott McLain is a citizen of Louisiana and owns real property located at 82401 Heintz Jenkins Road, Bush, Louisiana 70431. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

272. Plaintiff, Almeida Properties, L.L.C. owns real property located at 3325 Golden Drive, Apt. A, B, C and D, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

273. Plaintiff, Tiffany Braden, as Representative of the Estate of Jane Bienemey, Deceased is a citizen of Louisiana and owns real property located at 2024 Guerra Drive, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

274. Plaintiff, Lucille Alveris is a citizen of Louisiana and owns real property located at

3220 Oaks Drive, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

275. Plaintiff, Stephnea Hadley is a citizen of Louisiana and owns real property located at 5524 Feliciana Drive, New Orleans, Louisiana 70126. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

276. Plaintiff, Lona McCallum is a citizen of Louisiana and owns real property located at 2309 Riverbend Drive, Violet, Louisiana 70092. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

277. Plaintiff, David Ghafari is a citizen of Massachusetts and owns real property located at 921 Acroft Avenue, Lehigh Acres, Florida 33971. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

278. Plaintiffs, James and Barbara Walsh are citizens of Florida and together own real property located at 14781 Quay Lane, Delray Beach, Florida 33446. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

279. Plaintiff, Gordon DeLeon is a citizen of California and owns real property located at 1209 East St. Avide, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

complaint which are incorporated herein by reference.

280. Plaintiff, Joseph Fluence is a citizen of California and owns real property located at 2716 Veronica Drive, Chalmette, Louisiana 70043. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

281. Plaintiff, Lacy Brown is a citizen of Louisiana and owns real property located at 2446 Presburg Street, New Orleans, Louisiana 70122. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

282. Plaintiff, Terry Mundy is a citizen of California and owns real property located at 2529 Paul Drive, Cypress Gardens, Louisiana 70075. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

283. Plaintiffs, Michael and Nancy Guerriero are citizens of Florida and together own real property located at 15336 Yellow Wood Drive, Alva, Florida 33920. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

284. Plaintiff, Elizabeth Young is a citizen of Florida and owns real property located at 2330 Summersweet Drive, Alva, Florida 33920. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

285. Plaintiffs, Antonio and Isabel Amaral are citizens of Massachusetts and together

54

Case 2:09-md-02047-EEF-MBN Document 23392-10 Filed 04/06/18 Page 362 of 668
Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 02/06/18 Page 288 of 759

own real property located at 5221 Athens Way, Venice, Florida 34293. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

286. Plaintiff, Arlana Barnes is a citizen of Florida and owns real property located at 4745 and 4747 28th Street South West, Lehigh Acres, Florida 33973. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

287. Plaintiffs, Eric and Anne Marie Bartschart are citizens of New Jersey and together own real property located at 7855 Hawthorne Terrace - Unit 1604, Naples, Florida 34113. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

288. Plaintiffs, Peter and Amanda Earley are citizens of Florida and together own real property located at 15828 Caloose Creek Circle, Fort Myers, Florida 33903. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

289. Plaintiff, Toni Mosley is a citizen of Florida and owns real property located at 6143 Laurelwood Drive, Fort Myers, Florida 33905. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

290. Plaintiffs, Scott Saltzman and Jordana Mondschein are citizens of Florida and together own real property located at 8485 Breezy Hill Drive, Boynton Beach, Florida 33473. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the

schedules accompanying this complaint which are incorporated herein by reference.

291. Plaintiff, Denise Scott is a citizen of Florida and owns real property located at 14051 Danpark Loop, Fort Myers, Florida 33912. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

292. Plaintiff, George Turckes is a citizen of Florida and owns real property located at 526 Wheaton Trent Place, Tampa, Florida 33619. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

293. Plaintiffs, Robert and Sandra Cruz are citizens of Florida and together own real property located at 12444 Southbridge Terrace, Hudson, Florida 34669. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

294. Plaintiff, William Murphy is a citizen of Florida and owns real property located at 4755 Tuscan Loon Drive, Tampa, Florida 33619. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

295. Plaintiffs, Brett and Wendy Avner are citizens of Florida and together own real property located at 18020 Via Bellamare Lane, Miramar Lakes, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

296. Plaintiff, Frank Cardenas, III is a citizen of California and owns real property

56

located at 4402 Ruth Avenue South, Lehigh Acres, Florida 33972. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

297. Plaintiffs, John Karcher and Deborah Coaker are citizens of Florida and together own real property located at 1730 Old Burnt Store Road North, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

298. Plaintiffs, Donald and Bobby Krause are citizens of Florida and together own real property located at 11685 Bald Eagle Way, Naples, Florida 34120. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

299. Plaintiff, Derek Marinell is a citizen of Florida and owns real property located at 1045 Gladys Street, Lehigh Acres, Florida 33974. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

300. Plaintiffs, John and Maria Mattesich, Rosemary Johnson and Barbara Morin are citizens of Florida and together own real property located at 4338 Jacaranda Parkway, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

301. Plaintiff, Orlando Pena is a citizen of Florida and owns real property located at 824 SW 17th Street, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in

the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

302. Plaintiffs, Erasmo and Kathleen Rappa are citizens of Florida and together own real property located at 2128 South West 5th Avenue, Cape Coral, Florida 33991. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

303. Plaintiff, Carlos Zavala is a citizen of Florida and owns real property located at 14119 Danpark Loop, Fort Myers, Florida 33912. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

304. Plaintiff, Francisco Cardenas is a citizen of Florida and owns real property located at 6928 Marble Fawn Place, Riverview, Florida 33578. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

305. Plaintiff, Dian Gittens is a citizen of Florida and owns real property located at 4130 Bismarck Palm Drive, Tampa, Florida 33610. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

306. Plaintiff, Fernando Guzman is a citizen of Florida and owns real property located at 10830 Kensington Park Avenue, Riverview, Florida 33578. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

307. Plaintiff, Danny Keeling is a citizen of Florida and owns real property located at 2550 Sea Wind Way, Clearwater, Florida 33763. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

308. Plaintiffs, Michael and Mary Ellen Mattia are citizens of Florida and together own real property located at 10834 Kensington Park Avenue, Riverview, Florida 33569. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

309. Plaintiffs, Richard and Rita Vayda are citizens of Florida and together own real property located at 366 Recker Highway, Auburndale, Florida 33823. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

310. Plaintiffs, Edgar Corea and Elsie Gilmore are citizens of Florida and together own real property located at 12600 South West 50th Court, #407, Miramar, Florida 33027. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

311. Plaintiffs, Patrick and Ann Hanlon are citizens of Florida and together own real property located at 3407 West Oakellar Avenue, Tampa, Florida 33611. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

312. Plaintiff, Shawn Henson is a citizen of Virginia and owns real property located at 1213 Avondale Lane, Newport News, Virginia 23602. Plaintiff is participating as a class

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

313. Plaintiffs, Ashley and Gloria McKnight are citizens of Florida and together own real property located at 505 North West 3rd Place, Dania Beach, Florida 33004. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

314. Plaintiffs, Ross and Jacyln Paskow are citizens of Florida and together own real property located at 12430 SW 50th Street - Unit 129, Miramar, Florida 33027. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

315. Plaintiff, Benito Quaranta is a citizen of Florida and owns real property located at 4541 Rolling Greene Drive, Wesley Chapel, Florida 33543. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

316. Plaintiffs, Chris and Kate Quinn are citizens of Florida and together own real property located at 4210 West Kensington Avenue, Tampa, Florida 33629. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

317. Plaintiffs, Brian Jones and Kimberly Davis are citizens of Florida and together own real property located at 2015 Sea Ray Shore Drive, Clearwater, Florida 33763. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

318. Plaintiff, Jorge Junco is a citizen of Florida and owns real property located at 536 Vincinda Crest Way, Tampa, Florida 33619. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

319. Plaintiffs, Christopher and Rosemary Knight are citizens of Florida and together own real property located at 21311 Morning Mist Way, Land O Lakes, Florida 34639. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

320. Plaintiffs, Perry and Cassandra Fontenot are citizens of Virginia and together own real property located at 1016 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

321. Plaintiffs, Philip and Clarine Allen are citizens of Virginia and together own real property located at 907 Eastfield Lane, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

322. Plaintiffs, Taddarreio and Mattea Atkins are citizens of Virginia and together own real property located at 955 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

323. Plaintiff, Eric Bailey is a citizen of Virginia and owns real property located at 958 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class

61

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 369 of 668

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

324. Plaintiffs, Jerry and Inez Baldwin are citizens of Virginia and together own real property located at 4020 Dunbarton Circle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

325. Plaintiffs, Demitrous Blount and Brian Riera are citizens of Virginia and together own real property located at 963 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

326. Plaintiffs, Craig and Angela Brown are citizens of Virginia and together own real property located at 1031 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

327. Plaintiff, Demetria Burgohy is a citizen of Virginia and owns real property located at 950 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

328. Plaintiffs, Byron and Maria Crist are citizens of Virginia and together own real property located at 2408 Caitlan Loch Lane, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

Case 1:11-cv-02405-MRB Document 22392-10 Filed 12/06/19 Page 370 of 668 of 759

329. Plaintiffs, Dan and Maureen Day are citizens of Virginia and together own real property located at 1804 Mayberry Drive, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

330. Plaintiffs, Lisa and Jason Dunaway are citizens of Virginia and together own real property located at 27206 Flaggy Run Road, Courtland, Virginia 23837. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

331. Plaintiff, Jeffrey Dunn is a citizen of Virginia and owns real property located at 8170 N. View Boulevard, Norfolk, Virginia 23518. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

332. Plaintiff, Rick Edmonds is a citizen of Virginia and owns real property located at 801 Holly Street, Richmond, Virginia 23220. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

333. Plaintiff, Amanda Fowle is a citizen of Virginia and owns real property located at 957 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

334. Plaintiff, Carol Freeman is a citizen of Virginia and owns real property located at 951 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

335. Plaintiffs, Barbara and Peter Galgano are citizens of Maryland and together own real property located at 8105 Kirkcaldy Court, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

336. Plaintiff, Tappan Gandy is a citizen of Virginia and owns real property located at 1215 Avondale Lane, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

337. Plaintiff, Michelle Germano is a citizen of Virginia and owns real property located at 8171 N. View Boulevard, Norfolk, Virginia 23518. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

338. Plaintiffs, Arvin and Clarissa Goboy are citizens of Virginia and together own real property located at 3972 Border Way, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

339. Plaintiffs, Roy and Juanita Gulledge are citizens of Virginia and together own real property located at 1772 Carriage Drive, Hampton, Virginia 23664. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

340. Plaintiff, John Harvilla is a citizen of Virginia and owns real property located at 967 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

341. Plaintiffs, Steve and Liz Heischober are citizens of Virginia and together own real property located at 214A 80th Street, Virginia Beach, Virginia 23451. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

342. Plaintiffs, Curtis and Lynn Hinkley and Stephanie Hinkley-Lopez are citizens of North Carolina and together own real property located at 156 Mulbery Lane, Hertford, North Carolina 27944. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

343. Plaintiffs, Dennis and Sharon Jackson are citizens of Virginia and together own real property located at 8151 N. View Blvd., Norfolk Virginia 23518. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

344. Plaintiff, Pryncess Johnson is a citizen of Virginia and owns real property located at 959 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

345. Plaintiffs, Richard and Delores Jones and Valerie Anderson are citizens of Virginia

65

and together own real property located at 1010 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

346. Plaintiffs, Joe and Cathy Leach are citizens of Virginia and together own real property located at 4043 Dunbarton Circle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

347. Plaintiffs, Jon and Suzanne Lenander are citizens of Virginia and together own real property located at 8108 Helmsdale Court, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

348. Plaintiff, Christopher Levy is a citizen of Virginia and owns real property located at 4644 Lake Drive, Virginia Beach, Virginia 23455. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

349. Plaintiffs, Turner and Juanita Mackall are citizens of Virginia and together own real property located at 1211 Avondale Lane, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

350. Plaintiffs, Elizabeth and Joseph Matulenas are citizens of Virginia and together own real property located at 163 South Gum Avenue, Virginia Beach, Virginia 23452. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

66

accompanying this complaint which are incorporated herein by reference.

351. Plaintiffs, Preston and Rachel McKellar are citizens of Virginia and together own real property located at 1008 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

352. Plaintiffs, Fred and Vanessa Michaux are citizens of Virginia and together own real property located at 901 Eastfield Lane, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

353. Plaintiffs, William and Deborah Morgan are citizens of Virginia and together own real property located at 8495 Ashington Way, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

354. Plaintiffs, Colleen and Tuan Nguyen are citizens of Virginia and together own real property located at 1100 Michaelwood Drive, Virginia Beach, Virginia 23452. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

355. Plaintiff, Gunman Oh is a citizen of Virginia and owns real property located at 961 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

356. Plaintiffs, Robert and Lisa Orlando are citizens of Virginia and together own real

67

property located at 4091 Dunbarton Circle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

357. Plaintiffs, Marlon and Latosha Parker are citizens of Virginia and together own real property located at 954 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

358. Plaintiffs, Jacqueline and Rodney Phillips are citizens of Virginia and together own real property located at 1025 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

359. Plaintiff, Robert Popovitch is a citizen of Virginia and owns real property located at 1217 Avondale Lane, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

360. Plaintiffs, Anton and Melissa Riedl are citizens of Virginia and together own real property located at 969 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

361. Plaintiffs, Karen and Vincent Sakony are citizens of Virginia and together own real property located at 4063 Dunbarton Circle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

accompanying this complaint which are incorporated herein by reference.

362.  Plaintiff, Mark Sakowski is a citizen of Virginia and owns real property located at 120 Chanticleer Court, Williamsburg, Virginia 23185.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

363.  Plaintiff, Karl Sherwood is a citizen of Virginia and owns real property located at 1029 Hollymeade Circle, Newport News, Virginia 23602.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

364.  Plaintiff, Catherin Simpson is a citizen of Virginia and owns real property located at 112 Chanticleer Court, Williamsburg, Virginia 23185.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

365.  Plaintiff, Juanita Smith is a citizen of Virginia and owns real property located at 956 Hollymeade Circle, Newport News, Virginia 23602.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

366.  Plaintiff, Ben Walker is a citizen of Virginia and owns real property located at 1012 Hollymeade Circle, Newport News, Virginia 23602.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

367.  Plaintiff, Lawrence Ward is a citizen of Virginia and owns real property located at

69

214-B 80th Street, Virginia Beach, Virginia 23451. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

368. Plaintiffs, Gregory and Flordeliza Woodson are citizens of Virginia and together own real property located at 3965 Border Way, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

369. Plaintiffs, Joe and Delma Anello are citizens of Virginia and together own real property located at 3957 Border Way, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

370. Plaintiff, Victoria Cain is a citizen of Virginia and owns real property located at 1020 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

371. Plaintiff, Vida Dillard is a citizen of Virginia and owns real property located at 1219 Avondale Lane, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

372. Plaintiff, Michael Hollingsworth is a citizen of Virginia and owns real property located at 905 Easfield Lane, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

70

complaint which are incorporated herein by reference.

373.  Plaintiffs, Frank and Yvonne Topf are citizens of Virginia and together own real property located at 2417 Caitlan Loch Lane, Virginia Beach, Virginia 23602.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

374.  Plaintiffs, Gerald and Michelle Barnes are citizens of Virginia and together own real property located at 5588 Brixton Road, Williamsburg, Virginia 23185.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

375.  Plaintiffs, Papansam, P. Ahalya and Rajiv Hrishikesh are citizens of Virginia and together own real property located at 5599 Brixton Road, Williamsburg, Virginia 23185.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

376.  Plaintiff, Zenaida Perez, is a citizen of Virginia and owns real property located at 956 Hollymeade Circle, Newport News, Virginia 23602.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

377.  Plaintiff, Edwin Cousins, III is a citizen of Virginia and owns real property located at 952 Hollymeade Street, Newport News, Virginia 23602.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

378.  Plaintiffs, Brenda and Charles Whittington are citizens of Virginia and together own

71

real property located at 2105 Governors Pointe Drive, Suffolk, Virginia 23436. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

379. Plaintiff, Roger Atwell is a citizen of Virginia and owns real property located at 5516 Brixton Road, Williamsburg, Virginia 23185. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

380. Plaintiff, Michael Levine is a citizen of Virginia and owns real property located at 5548 Brixton Road, Williamsburg, Virginia 23185. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

381. Plaintiffs, Matt and Candi Darst are citizens of Virginia and together own real property located at 1014 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

382. Plaintiff, Hoo Suk Lee is a citizen of Virginia and owns real property located at 1018 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

383. Plaintiff, Soon Kim is a citizen of Virginia and owns real property located at 1022 Hollymeade Circle, Newport News, Virginia 23602. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this

72

complaint which are incorporated herein by reference.

384. Plaintiff, Yeong Hee Hong is a citizen of Virginia and owns real property located at 5539 Bixton Road, Williamsburg, Virginia 23185. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

385. Plaintiff, David Starnes is a citizen of Virginia and owns real property located at 4095 Dunbarton Circle, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

386. Plaintiff, Asa Holden Knight is a citizen of Virginia and owns real property located at 4319 Eleanors Way, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

387. Plaintiffs, James and Kristin Griffin are citizens of Virginia and together own real property located at 311 Preservation Reach, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

388. Plaintiffs, Bryan and Kimberly Wood are citizens of Virginia and together own real property located at 603 Mansion Road, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

389. Plaintiffs, Joshua and Sharntay Harry are citizens of Virginia and together own real

73

property located at 903 Eastfield Lane, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

390. Plaintiffs, Nosel Tomas, Lance Coates, Virginia Masana, Flor Villania and Joan Nestib are citizens of Virginia and together own real property located at 3961 Vorder Way, Virginia Beach, Virginia 23456. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

391. Plaintiffs, Daniel and Lillian Nolan are citizens of Virginia and together own real property located at 216 Wildlife Trace, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

392. Plaintiffs, Andrew and Linda Smith are citizens of Virginia and together own real property located at 217 Wildlife Trace, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

393. Plaintiff, Jeffrey Estes is a citizen of Virginia and owns real property located at 308 Preservation Reach, Chesapeake, Virginia 23320. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

394. Plaintiff, Robert Barrett is a citizen of Virginia and owns real property located at 310 Preservation Reach, Chesapeake, Virginia 23320. Plaintiff is participating as a class

74

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

395. Plaintiffs, Gregory and Nancy Curtis are citizens of Virginia and together own real property located at 221 Wildlife Trace, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

396. Plaintiffs, Kenneth and Jeri Johnson and Johnson Family Living Trust are citizens of Virginia and together own real property located at 609 Mansion Road, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

397. Plaintiff, Brad Bonsoulin is a citizen of Virginia and owns real property located at 4124 Brittany Way, Williamsburg, Virginia 23185. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

398. Plaintiffs, Hugh and Tracy Vest are citizens of Virginia and together own real property located at 111 Eston's Run, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

399. Plaintiffs, Dwight and Psyche Page are citizens of Virginia and together own real property located at 102 Overlook Point, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

75

400. Plaintiffs, Keith and Elizabeth Berry are citizens of Virginia and together own real property located at 607 Mansion Road, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

401. Plaintiffs, Sara and Geoffrey Pagano are citizens of Virginia and together own real property located at 211 Wildlife Trace, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

402. Plaintiffs, James and Sheri Fields are citizens of Virginia and together own real property located at 1203 Avondale Lane, Newport News, Virginia 23602. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

403. Plaintiff, Jason Purse is a citizen of Virginia and owns real property located at 4309 Creekside Loop, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

404. Plaintiffs, Lupe and Joseph Charsagua are citizens of Virginia and together own real property located at 610 Mansion Road, Yorktown, Virginia 23693. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

405. Plaintiffs, John and Margaret Galanda are citizens of North Carolina and together own real property located at 186 Cedarwood Boulevard, Hertford, North Carolina 27944.

Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

406. Plaintiff, Jason McLaain is a citizen of Virginia and owns real property located at 3209 Rannock Moor, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

407. Plaintiffs, Christopher and Carrie Dolan are citizens of Virginia and together own real property located at 3302 Rannock Moor, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

408. Plaintiffs, Paul and Janet Jones are citizens of Virginia and together own real property located at 3303 Rannock Moor, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

409. Plaintiffs, Susan and Jeffrey Tierney are citizens of Virginia and together own real property located at 3301 Rannock Moor, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

410. Plaintiffs, Jason and Jessica Madzuma are citizens of Virginia and together own real property located at 5303 Center Street, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

411. Plaintiffs, Scott and Margaret Jarrett are citizens of Virginia and together own real property located at 3210 Rannock Moor, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

412. Plaintiffs, Anthony and Caroline Palamidessi are citizens of Virginia and together own real property located at 3309 Aaron Thistle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

413. Plaintiff, Frances Myott is a citizen of Virginia and owns real property located at 3208 Rannock Moor, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

414. Plaintiff, Mariana Lee is a citizen of Virginia and owns real property located at 4320 Lydia Drive, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

415. Plaintiff, Alexander Anderson is a citizen of Virginia and owns real property located at 309 Preservation Reach, Chesapeake, Virginia 23320. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

416. Plaintiff, Ronald Campana, Jr., is a citizen of Virginia and owns real property located at 4323 Eleanors Way, Williamsburg, Virginia 23188. Plaintiff is participating as a class

78

representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

417. Plaintiffs, Marcus and Debbie Stevenson are citizens of Arizona and together own real property located at 2506 Swilkens Bridge, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

418. Plaintiffs, Nathan and Elizabeth Kiewiet are citizens of Virginia and together own real property located at 3307 Arran Thistle, Williamsburg, Virginia 23188. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

419. Plaintiff, Bryon Hand is a citizen of Virginia and owns real property located at 3207 Arran Thistle, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

420. Plaintiffs, Calvin and Tammy Loper are citizens of Virginia and together own real property located at 321 Croft Crossing, Chesapeake, Virginia 23320. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

421. Plaintiff, Cassie Evans is a citizen of Virginia and owns real property located at 4321 Eleanors Way, Williamsburg, Virginia 23188. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

79

422.  Plaintiff, Jessica McLenaghan is a citizen of Virginia and owns real property located at 4317 Eleanors Way, Williamsburg, Virginia 23188.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

423.  Plaintiffs, Warren and Ann Marie Higgs are citizens of Virginia and together own real property located at 2906 Craig End, Williamsburg, Virginia 23188.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

424.  Plaintiffs, Gilbert and Gloria Villaverde are citizens of Florida and together own real property located at 1616 SW 52nd Street, Cape Coral, Florida 33914.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

425.  Plaintiffs, Marilou and Aladin Destacamento are citizens of Florida and together own real property located at 910 Alaska Avenue, Lehigh Acres, Florida 33971.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

426.  Plaintiffs, William and Virginia Meehan are citizens of Connecticut and together own real property located at 2624 NW Embers Terrace, Cape Coral, Florida 33993 and 332 NE 26th Terrace, Cape Coral, Florida 33909.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

427.  Plaintiffs, Matthew and Stephanie Distel are citizens of Florida and together own

80

real property located at 1145 NW 28th Avenue, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

428. Plaintiffs, David and Cassidy Williams are citizens of Florida and together own real property located at 334 NW 17th Terrace, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

429. Plaintiffs, Antonio and Deborah Randazzo are citizens of Florida and together own real property located at 2193 Willoughby Street, Port Charlotte, Florida 33980. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

430. Plaintiffs, Laura Paige and Roger David Hembree are citizens of Florida and together own real property located at 8558 Pegasus Drive, Lehigh Acres, Florida 33971. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

431. Plaintiffs, Joyce and James Morris are citizens of Florida and together own real property located at 12626 Astor Place, Fort Myers, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

432. Plaintiffs, Luis and Odette Santos are citizens of Florida and together own real property located at 3251 Lee Way Court, N. Fort Myers, Florida 33903. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

accompanying this complaint which are incorporated herein by reference.

433. Plaintiffs, Ralph and Catherine Sangiovanni are citizens of Florida and together own real property located at 2219 SE 27th Street, Cape Coral, Florida 33904. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

434. Plaintiff, Cristina Cruz is a citizen of Florida and owns real property located at 812 Adeline Avenue, Lehigh Acres, Florida 33971. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

435. Plaintiffs, Nelson and Losi Pinney are citizens of Florida and together own real property located at 138 SE 29th Street, Cape Coral, Florida 33904. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

436. Plaintiff, Pollux, LLC is a citizen of Florida and owns real property located at 721 Ashley Road, Lehigh Acres, Florida 33974, 1257 Brook Park Avenue, Lehigh Acres, Florida 33913, 1145 Pineda Street East, Lehigh Acres, Florida 33974, 1220 Ederle Street, Lehigh Acres, Florida 33974. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

437. Plaintiffs, Mark Alan and Sandra Foster are citizens of Florida and together own real property located at 2832 Sarletto Street, North Port, Florida 34288. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

82

438. Plaintiff, Ashley Ball is a citizen of Florida and owns real property located at 19420 La Serena Drive, Fort Myers, Florida 33967. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

439. Plaintiff, Paulett Antinarelli is a citizen of Florida and owns real property located at 914 SW 23rd Street, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

440. Plaintiff, Janet Avery is a citizen of Florida and owns real property located at 10671 Camerelle Circle, Fort Myers, Florida 33913. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

441. Plaintiffs, Garry and Lynn Baker are citizens of Ohio and together own real property located at 2817 NW 4th Terrace, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

442. Plaintiff, Casel Bowen is a citizen of Florida and owns real property located at 4834 Tuscan Loon Drive, Tampa, Florida 33619. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

443. Plaintiffs, Robert Bynoe and Jennifer Little-Bynoe are citizens of Florida and together own real property located at 190 Valdira Street, Punta Gorda, Florida 33983. Plaintiffs

are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

444. Plaintiff, Anne Cammarata is a citizen of Massachusetts and owns real property located at 6511 Clark Street, Hudson, Florida 34667. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

445. Plaintiff, David Carr is a citizen of Florida and owns real property located at 3602 Oakwood Drive, Wesley Chapel, Florida 33543. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

446. Plaintiffs, Ariel and Mitchell Chimelis are citizens of Florida and together own real property located at 561 SW Prater Avenue, Port St. Lucie, Florida 34953. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

447. Plaintiffs, Alfred and Lorraine Cirinelli are citizens of New Jersey and together own real property located at 304 SE 21st Terrace, Cape Coral, Florida 33990. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

448. Plaintiff, James Clark is a citizen of Florida and owns real property located at 6710 SW Miami Avenue, Arcadia, Florida 34266. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

84

449. Plaintiffs, Jimmy and Patricia Clark are citizens of Florida and together own real property located at 3432 SW 15th Terrace, Cape Coral, Florida 33914. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

450. Plaintiff, Jenine Colello is a citizen of Florida and owns real property located at 2201 NW Embers Terrace, Cape Coral, Florida 33993. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

451. Plaintiffs, Manfredo and Maria Cotraccia are citizens of New York and together own real property located at 11569 Hammocks Glade Drive, Riverview, Florida 33569. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

452. Plaintiff, Melvyn D. Covetta is a citizen of California and owns real property located at 1203 NW 24th Place, Cape Coral, Florida 33993. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

453. Plaintiff, Donnett Daley is a citizen of Florida and owns real property located at 2518 55th Street W., Lehigh Acres, Florida 33971. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

454. Plaintiff, John C. DeYoung is a citizen of Florida and owns real property located at 4147 Courtside Way, Tampa, Florida 33618. Plaintiff is participating as a class representative in

85

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 393 of 668

the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

455. Plaintiff, Demetrius Dixon is a citizen of Florida and owns real property located at 11421 Mountain Bay Drive, Riverview, Florida 33569. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

456. Plaintiffs, Timothy and Melissa Dorman are citizens of Florida and together own real property located at 10703 Rockledge View Drive, Riverview, Florida 33579. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

457. Plaintiff, Mary Doster is a citizen of Florida and owns real property located at 1900 Emily Blvd., Winter Haven, Florida 33884. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

458. Plaintiff, Richard Edwards is a citizen of Florida and owns real property located at 1629 SW 14th Place, Cape Coral, Florida 33991. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

459. Plaintiffs, Vincent and Doren Emandez are citizens of Florida and together own real property located at 11310 Bridge Pine Drive, Riverview, Florida 33569. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

86

460.  Plaintiffs, Carlos and Elizabeth Espada are citizens of Florida and together own real property located at 6338 Cherry Blossom Trail, Gibsonton, Florida 33534.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

461.  Plaintiffs, William and Vicki Foster are citizens of Florida and together own real property located at 10814 Fortina Drive, Fort Myers, Florida 33913.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

462.  Plaintiffs, Gary and Patricia Gallucci are citizens of Florida and together own real property located at 10862 Tiberio Drive, Fort Myers, Florida 33913.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

463.  Plaintiffs, Scott and Amy Garrity are citizens of Florida and together own real property located at 14820 Ninebark Court, Land O'Lakes, Florida 34638.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

464.  Plaintiffs, Anthony and Candace Gody are citizens of Florida and together own real property located at 18042 Tiberio Drive, Fort Myers, Florida 33913.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

465.  Plaintiffs, Mark and Serafina Grayson are citizens of Florida and together own real property located at 2921 Dayton Drive, Winter Haven, Florida 33884.  Plaintiffs are participating

Case 2:09-md-02047-EEF-MBN Document 23292-10 Filed 12/06/19 Page 395 of 759

as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

466. Plaintiff, Wesley Harrison is a citizen of Florida and owns real property located at 6661 Woodland Road, Macclenny, Florida 32063. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

467. Plaintiffs, Kyle and Mamie Himmelberger are citizens of Florida and together own real property located at 900 SW Embers Terrace, Cape Coral, Florida 33991. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

468. Plaintiffs, Edd and Mary Hipps are citizens of Florida and together own real property located at 4506 Highland Creek Drive, Plant City, Florida 33567. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

469. Plaintiffs, Robert and colleen Jablonski are citizens of Florida and together own real property located at 8000 Allamando Court, Lehigh Acres, Florida 33872. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

470. Plaintiffs, Jason and Jessica James are citizens of Florida and together own real property located at 3850 NW 32nd Place, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

88

471.  Plaintiffs, Henrik and Jennifer Johansson are citizens of Florida and together own real property located at 27070 Eden Rock Court, Bonita Springs, Florida 34135.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

472.  Plaintiff, Abraham Johnson is a citizen of Maryland and owns real property located at 11316 Bridge Pine Drive, Riverview, Florida 33569.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

473.  Plaintiff, Kaufman/Manley, a General Partnership owns real property located at 13966 Clubhouse Drive, Tampa, Florida 33618.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

474.  Plaintiffs, Houchang and Hazel Khatamian are citizens of Florida and together own real property located at 2710 SW 10th Avenue, Cape Coral, Florida 33914.  Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

475.  Plaintiff, Peter Kotajarvi is a citizen of Illinois and owns real property located at 4141 Courtside Way, Tampa, Florida 33618.  Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

476.  Plaintiffs, Dennis and Karen Lang are citizens of Florida and together own real property located at 1717 NE 4th Place, Cape Coral, Florida 33909.  Plaintiffs are participating as

class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

477. Plaintiffs, Giovanni and Christine Latona are citizens of Florida and together own real property located at 2056 NE 20th Terrace, Cape Coral, Florida 33909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

478. Plaintiffs, John and Jacine Lester and Larry Schiller are citizens of Florida and together own real property located at 921 NW 8th Place, Cape Coral, Florida 33993 and 1901 NE 4th Place, Cape Coral, Florida 33909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

479. Plaintiff, Eddie Licon is a citizen of Florida and owns real property located at 100715 Rockledge View Drive, Riverview, Florida 33579. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

480. Plaintiff, Mauricio Londono is a citizen of Florida and owns real property located at 4635 Rolling Green Drive, Wesley Chapel, Florida 33543. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

481. Plaintiffs, Wsvaldo and Martha Madrigal are citizens of Florida and together own real property located at 2716 16th Street West, Lehigh Acres, Florida 33871. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules

accompanying this complaint which are incorporated herein by reference.

482. Plaintiffs, Jesse and Morgan Matos are citizens of Florida and together own real property located at 1422 Cupid Avenue, Christmas, Florida 32709. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

483. Plaintiffs, Carmine and Emmanie Maurice are citizens of Florida and together own real property located at 4742 14th Street SW, Lehigh Acres, Florida 33873 and 4740 14th St. SW, Lehigh Acres, Florida 33873. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

484. Plaintiff, Erika Maysonet is a citizen of Florida and owns real property located at 4201 28th Street SW, Lehigh Acres, Florida 33876. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

485. Plaintiffs, Joseph and Christina McKinnon are citizens of Florida and together own real property located at 528 Wheaton Trent Place, Tampa, Florida 33619. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

486. Plaintiff, Rose McLaughlin is a citizen of Florida and owns real property located at 8870 Pinto Court, Naples, Florida 34113. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

487. Plaintiffs, Brian and Stephanie McLendon are citizens of Florida and together own real property located at 11317 Bridge Pine Drive, Riverview, Florida 33569. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

488. Plaintiffs, Michael and Stephanie McNeill are citizens of Florida and together own real property located at 13940 Clubhouse Drive, Tampa, Florida 33618. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

489. Plaintiff, Nelson Medina is a citizen of Florida and owns real property located at 18472 Sunflower Road, Fort Myers, Florida 33967. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

490. Plaintiffs, Stuart and Lee Meyers are citizens of Florida and together own real property located at 12491 Verandah Blvd., Fort Myers, Florida 33905. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

491. Plaintiff, Samuel Mirakian is a citizen of Ohio and owns real property located at 20316 Larino Loop, Estero, Florida 33928 and 20345 Larino Loop, Estero, Florida 33928. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

492. Plaintiffs, Imtiaz and Sabita Mohammed are citizens of Florida and together own real property located at 324 Laurel Avenue South, Lehigh Acres, Florida 33974. Plaintiffs are

92

participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

493. Plaintiffs, Tony and Veronica Morton and Mendel and Debbie Tipton are citizens of Kentucky and together own real property located at 703 SW 22nd Terrace, Cape Coral, Florida 33991. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

494. Plaintiffs, James and Kathleen Nichols are citizens of Florida and together own real property located at 1217 NE 7th Place, Cape Coral, Florida 33909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

495. Plaintiffs, Magno and Aracelli Nuqui are citizens of Florida and together own real property located at 10860 Tiberio Drive, Fort Myers, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

496. Plaintiff, Joan Patterson is a citizen of Florida and owns real property located at 1934 Rowland Drive, Odessa, Florida 33556. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

497. Plaintiffs, Anthony and Marcia Perga are citizens of Florida and together own real property located at 13932 Clubhouse Drive, Tampa, Florida 33618. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

93

498. Plaintiffs, Steven and Dorothy Raucci are citizens of Florida and together own real property located at 10856 Tiberio Drive, Fort Myers, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

499. Plaintiffs, Rigoberto and Maria Rivas, Luis Mitjans and Arturo Loynaz are citizens of Florida and together own real property located at 3506 Tropicana Parkway West, Cape Coral, Florida 33993. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

500. Plaintiffs, Damian and Sonia Rivera are citizens of Florida and together own real property located at 3518 20th Street, SW, Lehigh Acres, Florida 33876. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

501. Plaintiff, Ann Rosko is a citizen of Florida and owns real property located at 705 Bently Street East, Lehigh Acres, Florida 33874. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

502. Plaintiff, Russell Winsome is a citizen of Florida and owns real property located at 184 Wanatah Avenue, Lehigh Acres, Florida 33874. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

503. Plaintiffs, Samir and Julia Salman are citizens of Michigan and together own real

94

property located at 3620 SW 3rd Terrace, Cape Coral, Florida 33991. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

504. Plaintiffs, Enock and Marie Sanon are citizens of Florida and together own real property located at 4303 17th Street SW, Lehigh Acres, Florida 33976. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

505. Plaintiffs, Francisco and Maricellis Santana are citizens of Florida and together own real property located at 1311 Bridge Pine Drive, Riverview, Florida 33569. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

506. Plaintiffs, Manuel and Judith Santos are citizens of Florida and together own real property located at 3175 Tucker Avenue, St. Cloud, Florida 34772. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

507. Plaintiffs, Eric and Andrea Sonnie are citizens of Ohio and together own real property located at 10864 Tiberio Drive, Fort Myers, Florida 33913. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

508. Plaintiffs, Lee and Laura Stewart are citizens of Florida and together own real property located at 836 Hewitt Drive, Port Orange, Florida 32127. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this

95

complaint which are incorporated herein by reference.

509. Plaintiffs, Jams and Loretta Stowell are citizens of Florida and together own real property located at 16931 W. Jenny Lane, Loxahatchee, Florida 33470. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

510. Plaintiffs, Francisco Sulen and Diana King are citizens of Florida and together own real property located at 8502 Summer Avenue, Fort Myers, Florida 33908. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

511. Plaintiffs, Eddie and Michele Teague are citizens of Florida and together own real property located at 2807 21st Street West, Lehigh Acres, Florida 33871. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

512. Plaintiff, Stephen Valcq is a citizen of Florida and owns real property located at 11250 NE 220th Street, Fort McCoy, Florida 32134. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

513. Plaintiff, Gladys Valle is a citizen of Florida and owns real property located at 302 NE 14th Street, Cape Coral, Florida 33909. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

514. Plaintiff, Joan Watson Trust owns real property located at 10834 Tiberio Drive, Fort

Case 2:09-md-02047-EEF-MBN Document 23292-10 Filed 06/09 Page 404 of 668

Myers, Florida 33913. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

515. Plaintiff, Linda Weaver is a citizen of Florida and owns real property located at 95076 Lousheltony Road, Fernandina Beach, Florida 32024. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

516. Plaintiffs, John and Dena Wethington are citizens of Florida and together own real property located at 2691 Quincy Avenue SE, Palm Bay, Florida 32909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

517. Plaintiffs, Scott and Lucille Whitlock are citizens of Florida and together own real property located at 1124 NE 14th Street, Cape Coral, Florida 33909. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

518. Plaintiffs, Lee and Kimberly Yost are citizens of Florida and together own real property located at 13954 Clubhouse Drive, Tampa, Florida 33618. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

519. Plaintiff, Joseph Serio is a citizen of Louisiana and owns real property located at 5 Hunter Place, Metairie, Louisiana 70001. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are

incorporated herein by reference.

520. Plaintiff, Mindy Sitaras is a citizen of Florida and owns real property located at 15948 Fish Hawk Creek, Lithia, Florida 33547. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

521. Plaintiff, Mark Hamwee is a citizen of London and owns real property located at 2557 Deerfield Lake Court, Cape Coral, Florida 33909. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

522. Plaintiff, Marie Desire is a citizen of Florida and owns real property located at 4734 14th Street SW, Lehigh Acres, Florida 33973 and 4736 14th Street, SW, Lehigh Acres, Florida 33973. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

523. Plaintiffs, Siegfried and Nancy Pumberger are citizens of Mississippi and together own real property located at 474 Channel Mark Drive, Biloxi, Mississippi 39531. Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

524. Plaintiff, Tyrone C. Turner is a citizen of Louisiana and owns real property located at 17447 Rosemont Drive, Prairieville, Louisiana 70769. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this complaint which are incorporated herein by reference.

## **DEFENDANTS**

525.  Unless specifically stated to the contrary, all individual defendants are citizens of the state where they do business and all entities are citizens of the state where they are organized. For those entities, where the state of organization is not listed, it is asserted upon information and belief that the entity is incorporated and/or organized in the state of its principal place of business.

### **The Manufacturing Defendants**

526.  Defendant, Beijing New Building Materials Public Limited Co. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

527.  Defendant, Taishan Gypsum Co., Ltd. F/k/a Shandong Taihe Dongxin Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured,

99

sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

528. Defendant, Taian Taishan Plasterboard Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

529. Defendant, Taian Taishan Plasterboard Co., Ltd. is a wholly owned subsidiary of Defendant, Taishan Gypsum Co., Ltd. F/k/a Shandong Taihe Dongxin Co., Ltd. ( Taian Taishan Plasterboard Co., Ltd. and Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. are collectively referred to herein as "Taishan").

100

530. Defendant, Pingyi Zhongxing Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

### The Unascertainable Manufacturer Defendants

531. Upon information and belief, certain defendants are manufacturers of the defective Chinese manufactured drywall at issue in this litigation. Because these defendants have fraudulently concealed their identities and/or their involvement in the manufacture, distribution, supply, sale, importing, exporting, and/or brokering of the defective drywall at issue in this litigation they are considered "unascertainable manufacturer defendants." Certain of the defendants below (and the Plaintiffs asserting claims against them) may later need to be included in the proceedings in *Gross, et al. v. Knauf GIPS KG, et al.*, Case No. 09-6690 (E.D.La.), as parties to the Plaintiffs' Omnibus Class Action Complaint in Intervention (III).

532. Defendant, Crescent City Gypsum, Inc. is a manufacturer, importer, exporter,

101

distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

533. Defendant, Prowall Drywall, Inc. a.k.a. Prowall; Pro Wall and Pro-Wall (hereafter "Pro Wall") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

534. Defendant, International Materials Trading a.k.a. IMT Gypsum; International Materials Trading, Ltd.; IMT; International Materials Trading IMT Chinese Plasterboard; and International Materials Trading (IMT) Gypsum (hereafter "IMT") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

535. Defendant, Panel Rey a.k.a. Panel de Yeso Panel (hereafter "Panel Rey") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

536. Defendant, Shamrock Gold is a manufacturer, importer, exporter, distributor,

102

supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

537. Defendant, Pro-Roc a.k.a. ProRoc; Pro Roc and ProRock (hereafter "Pro Roc") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

538. Defendant, Gridmarx a.k.a. GridmarX; Grid Marx and GridMarX (hereafter "Gridmarx") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

539. Defendant, La Farge a.k.a. LaFarge and Lafarge (hereafter "La Farge") is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

540. Defendant, Toughrock is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of

103

incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

541. Defendant, Gypsum Board is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

542. Defendant, USB is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

543. Defendant, Pabco is a manufacturer, importer, exporter, distributor, supplier, and/or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Class and Subclass Members. Defendant's address and place of incorporation are unknown and have been fraudulently concealed by this Unascertainable Defendant and others.

**The Distributor/Supplier/Importer/Exporter/Broker Defendants**

544. Defendant USG Corporation is a Delaware corporation with a principal place of business in Chicago, Illinois. USG, together with its various affiliates, including its subsidiary, L&W Supply Corporation and Seacoast Supply Company, is the nation's largest distributor of drywall and related building products. USG, through its subsidiary L&W Supply Corporation,

104

Case 2:09-md-02047-EEF-MBN Document 22292-40 Filed 12/06/19 Page 412 of 668

sold, distributed, supplied, marketed, inspected, imported, exported, or delivered the drywall at issue in this litigation. USG is responsible for the actions of its subsidiary through control person and other management activities.

545. Defendant, L&W Supply Corporation d/b/a Seacoast Supply Company is an entity or individual with a principal place of business at 550 W. Adams Street, Dept. 174, Chicago, Illinois 60661. Defendant is organized under the laws of Delaware. L&W Supply Corporation is a subsidiary of USG. Defendant is a importer, exporter, distributor or supplier of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

546. Defendant, Ace Hardware Corporation is an entity or individual with a service address at c/o Lexis Documents Services, Inc., Registered Agent, 150 S. Perry Street, Montgomery, Alabama, 36104. Defendant is organized under the laws of Delaware. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

547. Defendant, Aces Towing Enterprises, L.L.C. is an entity or individual with a principal place of business at 205 St. Bernard Hwy., Chalmette, Louisiana 70043 . Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

548. Defendant, All Florida Drywall Supplies, Inc. is an entity or individual with a principal place of business at 8503 Sunstate St., Tampa, Florida 33634. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of

drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

549. Defendant, Allied Building Products Corp., f/k/a Dolphin Building Materials is an entity or individual with a principal place of business at 315 Avenue A, Fort Pierce, Florida 34950. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

550. Defendant, Allsteel & Pypsum Products, Inc. is an entity or individual with a principal place of business at 1250 NW 23rd Avenue, Fort Lauderdale, Florida 33311. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

551. Defendant, Banner Supply Company Fort Myers, LLC is an entity or individual with a principal place of business at 2910 Cargo Street, Fort Myers, Florida 33916. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

552. Defendant, Banner Supply company Pompano, LLC is an entity or individual with a principal place of business at 1660 SW 13th Court, Pompano Beach, Florida 33069. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

106

553. Defendant, Banner Supply Co. is an entity or individual with a principal place of business at 7195 NW 30th Street, Miami, Florida 33122. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

554. Defendant, Banner Supply International, LLC is an entity or individual with a principal place of business at 7195 NW 30th Street, Miami, Florida 33122. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

555. Defendant, BE Wholesale is an entity or individual with a principal place of business at 81 Golden Property Road, Bremen, Georgia 30110. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

556. Defendant, Black Bear Gypsum Supply, Inc. is an entity or individual with a principal place of business at 2050 Tall Pines Drive, Suite B, Largo, Florida 33771. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

557. Defendant, Black Bear Gypsum, LLC is an entity or individual with a principal place of business at 2050 Tall Pines Drive, Suite B, Largo, Florida 33771. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or

107

broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

558. Defendant, Cajun Construction & Design, Inc. is an entity or individual with a service address at Clint Nunez, 2310 Perdido Street, New Orleans, Louisiana 70119. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

559. Defendant, HLP/GAC International, Inc. is an entity or individual with a service address at George Thomas Anding, 1718 Trinity Valley Drive, Carrollton, TX 75006. Defendant is organized under the laws of Texas. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

560. Defendant, City Salvage, Inc. is an entity or individual with a service address at Larry W. Loftin, 804 Lambert Street, Laurel, MS 39440. Defendant is organized under the laws of Mississippi. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

561. Defendant, Dalessio Drywall & Painting Corporation is an entity or individual with a principal place of business at 39406 Rock Ford Avenue, Zephyrhills, Forida 33542. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

108

562. Defendant, Drive Enterprises, Inc. is an entity or individual with a principal place of business at 2101 Walkers Lane, Meraux, Louisiana 70075. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

563. Defendant, Gulf Sales & Import Company, Inc. is an entity or individual with a principal place of business at 1600 N. Upland Avenue, Metairie, Louisiana 70003. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

564. Defendant, Home Depot USA, Inc. is an entity or individual with a service address at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Defendant is organized under the laws of Delaware. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

565. Defendant, Interior/Exterior Building Supply, LP is an entity or individual with a principal place of business at 727 S. Cortez Street, New Orleans, Louisiana 70119. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

566. Defendant, Interior/Exterior Enterprises, LLC is an entity or individual with a principal place of business at 727 S. Cortez Street, New Orleans, Louisiana 70119. Defendant is

109

organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

567. Defendant, Millennium Builders, Inc. is an entity or individual with a service address at Justin Mire, 310 Pinehurst Street, Suite 3, Lafayette, Louisiana 70508. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

568. Defendant, Osprey-Gulf Shore Building Materials, Inc. is an entity or individual with a principal place of business at 4328 Domestic Avenue, Naples, Florida 34104. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

569. Defendant, Just-Rite Supply, Inc. is an entity or individual with a principal place of business at 3790 Park Central Boulevard, North Pompano Beach, Florida 33064. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

570. Defendant, RJL Drywall, Inc. is an entity or individual with a principal place of business at 8181 Bayshore Road, Fort Myers, Florida 33917. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and

110

damages to Subclass Members.

571. Defendant, Rosen Building Supplies, Inc. is an entity or individual with a principal place of business at 5310 NW 33 Avenue, Suite 100, Ft. Lauderdale, Florida 33309. Defendant is organized under the laws of Florida. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

572. Defendant, Stock Building Supply, LLC is an entity or individual with a principal place of business at 8020 Arco Corporate Drive, Raleigh, North Carolina 27617. Defendant is organized under the laws of North Carolina. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

573. Defendant, the Porter-Blaine Corporation is an entity or individual with a principal place of business at 1140 Azalea Garden Road, Norfolk, Virginia 23502. Defendant is organized under the laws of Virginia. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

574. Defendant, Venture Supply, Inc. is an entity or individual with a principal place of business at 1140 Azalea Garden Road, Norfolk, Virginia 23502. Defendant is organized under the laws of Virginia. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

575. Defendant, Tobin Trading, Inc. is an entity or individual with a principal place of

111

business at 5008 Gatehouse Way, Virginia Beach, Virginia 23455. Defendant is organized under the laws of Virginia. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

576. Defendant, Wholesale Direct Lumber, LLC is an entity or individual with a principal place of business at 2728 Conti Street, New Orleans, Louisiana 70119. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

**The Developer/Builder Defendants**

577. Defendant, A & D Homes, Inc. is an entity or individual with a principal place of business at 25 Homestead Road, Suite 5, Lehigh Acres, Florida 33936. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

578. Defendant, A.R.B.C. Corporation is an entity or individual with a principal place of business at 5645 Strand Boulevard, Naples, Florida 34110. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

579. Defendant, Ainslie Group, Inc. is an entity or individual with a principal place of business at 389 Edwin Drive, Virginia Beach, Virginia 23462. Defendant is organized under the

112

laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

580. Defendant, Albanese-Popkin The Oaks Development Group, L.P. is an entity or individual with a principal place of business at 1200 S. Rogers Circle, Suite #11, Boca Raton, Florida 33487. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

581. Defendant, Alvian Homes, Inc. is an entity or individual with a service address at Robert Rimany, Jr., 3812, SW 3rd Terrace, Cape Coral, Florida 33991. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

582. Defendant, American Eastern, Inc. is an entity or individual with a principal place of business at 632 Hampton Highway, Yorktown, Virginia 23693. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

583. Defendant, Wellington, LLC is an entity or individual with a principal place of business at 632 Hampton Highway, Yorktown, Virginia 23693. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to

Subclass members as described herein.

584. Defendant, American Gallery Development Group, LLC is an entity or individual with a principal place of business in Cape Coral, Florida during all periods relevant to the instant cause of action who no longer does business in Florida and pursuant to F.S. Chapter 48 has authorized service to be made upon the Secretary of State of the State of Florida, P.O. Box 6327, Tallahassee, Florida 32314. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

585. Defendant, American Homes is an entity or individual with a service address at 25167 North Toledo Blade Boulevard, #2, North Port, Florida 34289. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

586. Defendant, Antilles Vero Beach, LLC is an entity or individual with a principal place of business at 202 SE 5th Street, Delray Beach, Florida 33483. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

587. Defendant, Aranda Homes, Inc. is an entity or individual with a principal place of business at 1310 SW4th Terrace, Cape Coral, Florida 33991. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to

114

Subclass members as described herein.

588. Defendant, Arizen Homes, Inc. is an entity or individual with a principal place of business at 2700 W. Cypress Creek Road, Suite B-111, Ft. Lauderdale, Florida 33309. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

589. Defendant, Atlantic Homes Development Corporation is a service address at Kenneth L. Allen, 109 Nat Turner Boulevard, Newport News, Virginia 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

590. Defendant, Atlantic Homes, LLC is an entity or individual with a principal place of business at 2 Eaton Street, Suite 1100, Hampton, Virginia 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

591. Defendant, HHJV, LLC is an entity or individual with a principal place of business at 729 Thimble Shoals Boulevard, Suite 4A, Newport News, Virginia 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

592. Defendant, McCale Development Corporation, is an entity or individual with a

115

principal place of business at 729 Thimble Shoals Boulevard, Suite 4A, Newport News, Virginia 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

593. Defendant, AHJV, LLC, is an entity or individual with a principal place of business at 2 Eaton Street, Suite 1100, Hampton, Virginia 23669. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

594. Defendant, Kensington Woods, LLC, is an entity or individual with a principal place of business at Drawer 18, Parkview Station, Newport News, Virginia 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

595. Defendant, Atlantic Homes, LLC is an entity or individual with a principal place of business at 1877 Harbor Point Circle, Weston, Florida 33327. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

596. Defendant, Barony Homes, Inc. is an entity or individual with a principal place of business at 2508 Del Prado Boulevard South, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and,

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 424 of 668
Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 350 of 759

directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

597. Defendant, Bass Homes, Inc. is an entity or individual with a service address at William L. Bass, P.O. Box 344, Stapleton, Alabama 36578. Defendant is organized under the laws of Alabama. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

598. Defendant, Bay Colony - Gateway, Inc. is an entity or individual with a service address at Vivien Hastings, 24301 Walden Center Drive, Suite 300, Bonita Springs, Florida 34134 . Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

599. Defendant, Baywood Construction, Inc. is an entity or individual with a principal place of business at 3515 Del Prado Boulevard, #107, Cape Coral, Florida 33990. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

600. Defendant, BDG Waterstone, LLC is an entity or individual with a principal place of business at 12098 SW 133 Ct., Miami, Florida 33186. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

117

601. Defendant, Beazer Homes Corp. is an entity or individual with a principal place of business at 1000 Abernathy Road, Suite 1200, Atlanta, Georgia 30328. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

602. Defendant, Breakwater Homes Association is an entity or individual with a principal place of business at 2621 SW21st Street, Ft. Lauderdale, Florida 33316. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

603. Defendant, Brighton Home Builders, Inc. is an entity or individual with a principal place of business at 3082 SW Savona Boulevard, Port Saint Lucie, Florida 34953. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

604. Defendant, Bristol Corner, LLC is an entity or individual with a principal place of business at 5115 16th Avenue South, Tampa, Florida 33619. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

605. Defendant, Brothers Properties LA, LLC, is an entity or individual with a principal place of business at 3440 East St. Bernard Highway, Meraux, Louisiana 70075. Defendant is

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 426 of 668
Case 2:09-md-02047-EEF-MBN Document 4140-1 Filed 06/29/19 Page 1 of 1 Page 352 of 759

organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

606. Defendant, Calvin P. Williams is an entity or individual with a principal place of business at 1020 Red Barn Road, Breaux Bridge, Louisiana 70517. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

607. Defendant, CB Creek, Inc. is an entity or individual with a service address at Nelson Pinney, 405 SE 31st Street, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

608. Defendant, Central Harbor Homes Corporation, is an entity or individual with a principal place of business at 6540 Sweetgum Drive, New Port Richey, Florida 34655. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

609. Defendant, Centex Homes is an entity or individual with a principal place of business at 5801 Pelican Bay Boulevard, Suite 600, Naples, Florida 34113. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm

119

and damages to Subclass members as described herein.

610.    Defendant, Chase Construction, Inc. is an entity or individual with a principal place of business at 4237 SW 23rd Avenue, Cape Coral, Florida 33914. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

611.    Defendant, Core Construction Services Southeast, Inc. is an entity or individual with a principal place of business at 4227 Exchange Avenue, Naples, Florida 34104. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

612.    Defendant, Country Walk Sales, LLC is an entity or individual with a principal place of business at 12610 Race Track Rod, Tampa, Florida 33626. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

613.    Defendant, Crossroad Homes, Inc. is an entity or individual with a principal place of business at 5946 Northwest Batchelor Terrace, Port St. Lucie, Florida 34986. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

614.    Defendant, Curb Appeal Home Builders, Inc. is an entity or individual with a

120

principal place of business at 2425 Casey Court, Virginia Beach, Virginia 23454. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

615. Defendant, Custom Homes by Kaye, Inc. is an entity or individual with a principal place of business at 5979 Pine Ridge Road, Naples, Florida 34119. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

616. Defendant, D.R. Horton, Inc. is an entity or individual with a principal place of business at 301 Commerce Street, Suite 500, Fort Worth, Texas 76102. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

617. Defendant, Daniel Wayne Homes, Inc. is an entity or individual with a principal place of business at 12860 Banyan Creek Drive, Fort Myers, Florida 33908. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

618. Defendant, Deangelis Diamond Homes, Inc. is an entity or individual with a principal place of business at 6635 Willow Park Drive, Naples, Florida 34109. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and,

directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

619. Defendant, Delta Eden, Inc. is an entity or individual with a principal place of business at 2269 South University Drive, Suite 148, Ft. Lauderdale, Florida 33324. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

620. Defendant, Devonshire Properties, Inc. is an entity or individual with a principal place of business at 3412 Bay to Bay, Tampa, Florida 33629. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

621. Defendant, E.B. Developers, Inc. is an entity or individual with a principal place of business at 7200 W. Camino Real Road, Suite 302, Boca Raton, Florida 33433. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

622. Defendant, Eastmond Enterprises, Inc. is an entity or individual with a principal place of business at 314 Gunnery Road South, Lehigh Acres, Florida 33971. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

623. Defendant, Enchanted Homes, Inc. is an entity or individual with a principal place of business at 260 B Professional Place, North Ft. Myers, Florida 33903. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

624. Defendant, FFH, LLC is an entity or individual with a principal place of business at 7950 Belford Parkway, Suite 1600, Jacksonville, Florida 32207. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

625. Defendant, Franciscus Homes, Inc. is an entity or individual with a principal place of business at 616 Village Drive, Suite G, Virginia Beach, Virginia 23454. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

626. Defendant, Bush Construction Corp. is an entity or individual with a principal place of business at 4029 Ironbound Road, Suite 200, Williamsburg, Virginia 23185. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

627. Defendant, Plantation Group, LLC is an entity or individual with a principal place of business at 4029 Ironbound Road, Suite 200, Williamsburg, Virginia 23185. Defendant is

123

organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

628. Defendant, Greensprings Plantation, Inc. is an entity or individual with a principal place of business at 4029 Ironbound Road, Suite 200, Williamsburg, Virginia 23185. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

629. Defendant, Greensprings Condominiums, LLC is an entity or individual with a principal place of business at 4029 Ironbound Road, Suite 200, Williamsburg, Virginia 23185. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

630. Defendant, G.L. Homes of Boynton Beach Associates IX, Ltd. is an entity or individual with a principal place of business at 1600 Sawgrass Corp. Parkway, Suite 400, Sunrise, Florida 33323. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

631. Defendant, Grand Harbour Homes, Inc. is an entity or individual with a principal place of business at 4722 SW 29th Avenue, Cape Coral. Florida 33914. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and

124

damages to Subclass members as described herein.

632. Defendant, Groff Construction, Inc. is an entity or individual with a principal place of business at 6728 Willow Lake Circle, Fort Myers, Florida 33912. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

633. Defendant, Gryphon Corporation is an entity or individual with a principal place of business at 3635 Bougainvillea Road, Miami, Florida 33133. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

634. Defendant, Development Co. of Boca, Inc. d/b/a Boca Developers is an entity or individual with a principal place of business at 321 E. Hillsboro Boulevard, Deerfield Beach, Florida 33441. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

635. Defendant, Hansen Homes of South Florida, Inc. is an entity or individual with a principal place of business at 1436 SE 16th Place, Cape Coral, Florida 33990. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

636. Defendant, Harbor Walk Development, LLC is an entity or individual with a

125

principal place of business at 404 Oakmears Crescent, Suite 101, Virginia Beach, Virginia 23462. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

637. Defendant, Genesis Group, Inc. is an entity or individual with a service address at Paul Gerhardt, 4801 Courthouse Street, Suite 300, Virginia Beach, Virginia 23188. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

638. Defendant, Wermers Development, Inc. is an entity or individual with a principal place of business at 404 Oakmears Crescent, Suite 101, Virginia Beach, Virginia 23462. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

639. Defendant, Clark-Whitehill Enterprises, Inc. is an entity or individual with a principal place of business at 4224 Holland Road, Suite 102, Virginia Beach, Virginia 23452. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

640. Defendant, Traderscove Corporation d/b/a The Henin Group is an entity or individual with a principal place of business at 228 Annie Street, Orlando, Florida 32806. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members'

126

homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

641. Defendant, Premier International Realty d/b/a Henin Realty is an entity or individual with a service address at Paul Gerhardt, 4801 Courthouse Street, Suite 300, Virginia Beach, Virginia 23188. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

642. Defendant, International Property Investments of Central Florida, Inc. d/b/a Henin International Services is an entity or individual with a service address at Paul Gerhardt, 4801 Courthouse Street, Suite 300, Virginia Beach, Virginia 23188. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

643. Defendant, Jerome Henin is an entity or individual with a principal place of business at 228 Annie Street, Orlando, Florida 32806. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

644. Defendant, David Daniels is an entity or individual with a service address at 15 Landings Lane, Ormond Beach, Florida 32174. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members

127

as described herein.

645. Defendant, Holiday Builders Construction of Florida, Inc. is an entity or individual with a principal place of business at 1801 Penn Street, Suite 1A, Melbourne, Florida 32901. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

646. Defendant, Home DevCo., LLC is an entity or individual with a principal place of business at 5350 West Atlantic Avenue, Suite 101, Delray Beach, Florida 33484. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

647. Defendant, Inman Construction Services, Inc. is an entity or individual with a service address at Kenneth L. Inman, 618 Central Avenue, Jefferson, Louisiana 70121. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

648. Defendant, Ironwood Properties, Inc. is an entity or individual with a principal place of business at 202 SE 5th Avenue, Delray Beach, Florida 33483-5207. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

649. Defendant, J. Galloway Construction, Inc. is an entity or individual with a principal

128

place of business at 1146 Highway 20, Interlachen, Florida 32148. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

650. Defendant, Jim Morris & Sons, Inc. is an entity or individual with a principal place of business at 235 West Drive, Melbourne, Florida 32904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

651. Defendant, Jim Walter Homes, LLC is an entity or individual with a principal place of business at 4211 West Boy Scout Boulevard, Suite 1000, Tampa, Florida 33607. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

652. Defendant, Joseph Scott, is an entity or individual with a principal place of business at 4967 Brittany Court, New Orleans, Louisiana 70124. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

653. Defendant, K. Hovnanian First Homes, LLC d/b/a First Home Builders of Florida is an entity or individual with a service address at NRAI Services, Inc., 2731 Executive Park Drive, Suite 4, Weston, Florida 33331. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall

in these homes, which has resulted in harm and damages to Subclass members as described herein.

654. Defendant, FHBF Partners, LLP f/k/a First Home Builders of Florida is an entity or individual with a service address at Patrick Logue, 6076 Eagle Watch Court, N. Fort Myers, Florida 33917. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

655. Defendant, K&B Homes, Inc. is an entity or individual with a principal place of business at 1121 Lumsden Trace Circle, Valrico, Florida 33594. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

656. Defendant, Kaye Homes of South Florida, Inc. is an entity or individual with a service address at John C. Kaye, 3979 Pine Ridge Road, Naples, Florida 34119. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

657. Defendant, KB Home Florida, LLC is an entity or individual with a principal place of business at 10475 Fortune Parkway, #100, Jacksonville, Florida 32256. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

130

658. Defendant, KB Home Tampa, LLC is an entity or individual with a principal place of business at 3450 Buschwood Park Drive, Suite 250, Tampa, Florida 33618. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

659. Defendant, KB Home Orlando, LLC is an entity or individual with a principal place of business at 9102 South Park Center Loop, Suite 140, Orlando, Florida 32819. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

660. Defendant, Lavish Holding Corp. is an entity or individual with a principal place of business at 2070 N. Ocean Boulevard, #3, Boca Raton, Florida 33431. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

661. Defendant, Lee Harbor Homes, Inc. is an entity or individual with a principal place of business at 1708 Lincoln Avenue, Leigh Acres, Florida 33970. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

662. Defendant, Legend Custom Builders, Inc. is an entity or individual with a principal place of business at 1429 Colonial Boulevard, Suite 201, Fort Meyers, Florida 33907. Defendant

131

is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

663. Defendant, Lennar Corporation, is an entity or individual with a principal place of business at 700 NW 107th Avenue, Suite 400, Miami, Florida 33172. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

664. Defendant, Lennar Homes, LLC, is an entity or individual with a principal place of business at 700 NW 107th Avenue, Suite 400, Miami, Florida 33172. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

665. Defendant, Littles Construction of Central Florida, Inc. is an entity or individual with a principal place of business at 1316 Arrowhead Court, Auburndale, Florida 33823. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

666. Defendant, LTL Construction, Inc. is an entity or individual with a principal place of business at 2601 East 4th Avenue, Tampa, Florida 33629. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass

132

members as described herein.

667. Defendant, MacGlen Builders, Inc. is an entity or individual with a principal place of business at 5985 South River Circle, Macclenny, Florida 32063. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

668. Defendant, Majestic Homes of Port St. Lucie, Inc. is an entity or individual with a principal place of business at 4061 Royal Palm Beach Boulevard, Royal Palm Beach, Florida 33411. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

669. Defendant, Mandalay Homes, Inc. is an entity or individual with a principal place of business at 16759 S.R. 54, Lutz, Florida 33558. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

670. Defendant, Mariner Village Townhomes, Inc. is an entity or individual with a principal place of business at 7975 NW 154th Street, Suite 400, Miami Lakes, Florida 33016. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

671. Defendant, United Homes International, Inc. is an entity or individual with a

133

principal place of business at 7975 NW 154th Street, Suite 400, Miami Lakes, Florida 33016. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

672. Defendant, Maronda Homes, Inc. of Florida is an entity or individual with a principal place of business at 1383 St. Route 30, Clinton, Pennsylvania 15026. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

673. Defendant, McCar Homes, Inc. is an entity or individual with a principal place of business at 4125 Old Milton Parkway, Alpharetta, Georgia 30005. Defendant is organized under the laws of Georgia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

674. Defendant, Merit Homes, Inc. is an entity or individual with a principal place of business at 2436 Park Road, Lehigh Acres, Florida 33971. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

675. Defendant, Meritage Homes of Florida, Inc. is an entity or individual with a principal place of business at 17851 N. 85th Street, #300, Scottsdale, Arizona 85255. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and,

directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

676. Defendant, Midwest Construction & Development, LLC is an entity or individual with a principal place of business at 1016 Clemons Street, Suite 305, Jupiter, Florida 33477. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

677. Defendant, Milenium Homes & Development, Inc. is an entity or individual with a principal place of business at 110 W. Reynolds Street, #104, Plant City, Florida 33563. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

678. Defendant, Monopoly Builders, Inc. is an entity or individual with a principal place of business at 1924 SE 13th Street, Cape Coral, Florida 33990. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

679. Defendant, MW Johnson Construction of Florida, Inc. is an entity or individual with a principal place of business at 17645 Juniper Path, Suite 100, Lakeville, Minnesota 55044. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

680. Defendant, Northstar Holdings at B & A, LLC is an entity or individual with a principal place of business at 1732 S. Congress Avenue, Suite 335, Palm Springs, Florida 33461-2140. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

681. Defendant, Oscar Jiles d/b/a JJ Construction is an entity or individual with a principal place of business at 108 Jiles Lane, Braithwaite, Louisiana 70040. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

682. Defendant, Overlook, LLC is an entity or individual with a principal place of business at 9030 Stony Point Parkway, Suite 490, Richmond, Virginia 23235. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

683. Defendant, Parellel Design and Development, LLC is an entity or individual with a principal place of business at 2627 Landview Circle, Virginia Beach, Virginia 23454. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

684. Defendant, Overlook Point, LLC is an entity or individual with a principal place of business at 10 San Jose Drive, Suite 4C, Newport News, VA 23606. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or

through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

685.  Defendant, Oyster Bay Homes, Inc. is an entity or individual with a principal place of business at 4207 Lee Boulevard, Lehigh Acres, Florida 33971.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

686.  Defendant, Palm Isles Holdings, LLC is an entity or individual with a principal place of business at 888 Kingman Road, Miami, Florida 33035.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

687.  Defendant, South Kendall Construction Corporation, is an entity or individual with a principal place of business at 888 Kingsman Road, Homestead, Florida 33035.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

688.  Defendant, Par-Self, Inc. is an entity or individual with a principal place of business at 2525 SE 20th Place, Cape Coral, Florida 33904.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

137

689. Defendant, Peak Building Corporation, is an entity or individual with a principal place of business at 308 Sturgeon Lane, Virginia Beach, Virginia 23456. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

690. Defendant, Stone Development, LLC is an entity or individual with a principal place of business at 112 73rd Street, Virginia Beach, Virginia 23451. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

691. Defendant, Portofino Homes, Inc. is an entity or individual with a principal place of business at 611 SE 11th Street, Suite A, Cape Coral, Florida 33990. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

692. Defendant, Pride Homes of Lakes By the Bay - Parcel H, LLC is an entity or individual with a principal place of business at 12248 SW 127th Avenue, Miami, Florida 33186. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

693. Defendant, Pukka Development, Inc. is an entity or individual with a principal place of business at 252 Ocean Bay Drive, Jensen Beach, Florida 34957. Defendant is organized under

138

the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

694. Defendant, R.A. Grant Corporation is an entity or individual with a principal place of business at 860-A S.E. 46th Lane, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

695. Defendant, R. Fry Builders, Inc. is an entity or individual with a principal place of business at 1508 SE 12th Terrace, Cape Coral, Florida 33990. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

696. Defendant, RCR Holdings, II, LLC is an entity or individual with a principal place of business at 1500 Gateway Boulevard, Suite 200, Boynton Beach, Florida 33426. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

697. Defendant, Renar Development Company is an entity or individual with a principal place of business at 3731 NE Pineapple Avenue, Jensen Beach, Florida 34957. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm

139

Case 2:09-md-02047-EEF-MBN Document 23280-10 Filed 12/06/19 Page 447 of 668

and damages to Subclass members as described herein.

698. Defendant, Rivercrest, LLC/The St. Joe Company is an entity or individual with a principal place of business at 245 Riverside Avenue, Suite 500, Jacksonville, Florida 32202. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

699. Defendant, Rottlund Homes of Florida, Inc. is an entity or individual with a principal place of business at 2637 McCormick Drive, Clearwater, Florida 33759. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

700. Defendant, Rylex Homes, Inc. is an entity or individual with a principal place of business at 5214 Hammock Circle, Saint Cloud, Florida 34771. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

701. Defendant, S. Petersen Homes, Inc. is an entity or individual with a principal place of business at 1217 East Cape Coral Parkway, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

702. Defendant, Safeway Contractors, LLC is an entity or individual with a principal

140

place of business at 705 Florida Street, River Ridge, Louisiana 70123. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

703. Defendant, Santa Maria Builders, LLC is an entity or individual with a principal place of business at 2100 Trade Center Way, Suite D, Naples, Florida 34109. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

704. Defendant, Southern Bay Homes, Inc. is an entity or individual with a principal place of business at 9990 Coconut Road, Bonita Springs, Florida 34135. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

705. Defendant, Southern Community Homes, Inc. is an entity or individual with a principal place of business at 3624 Del Prado Boulevard South, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

706. Defendant, Southern Homes of Broward XI, Inc. is an entity or individual with a principal place of business at 12895 SW 132nd Street, Suite 200, Miami, Florida 33186. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members'

141

Case 2:09-md-02047-EEF-MBN Document 23292-10 Filed 12/06/19 Page 449 of 668

homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

707. Defendant, Southern Star Construction Company, Inc. is an entity or individual with a principal place of business at 950 West Causeway Approach, Mandeville, Louisiana 70471. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

708. Defendant, Laporte Family Properties is an entity or individual with a principal place of business at 950 West Causeway Approach, Mandeville, Louisiana 70471. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

709. Defendant, Leroy Laporte, Jr. is an entity or individual with a principal place of business at 950 West Causeway Approach, Mandeville, Louisiana 70471. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

710. Defendant, Standard Pacific of South Florida GP, Inc. is an entity or individual with a principal place of business at 9900 SW 107th Avenue, Miami, Florida 33176. Defendant is organized under the laws of Delaware. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

711. Defendant, Stuart South Group, L.C. is an entity or individual with a principal place

142

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 459 of 668
Case 1:19-cv-22408-WQH Document 27 Entered on FLSD Docket 08/12/2019 Page 376 of
759

of business at 918 Southeast Lincoln Avenue, Stuart, Florida 34994. Defendant is organized

under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or

through agents, installed defective drywall in these homes, which has resulted in harm and

damages to Subclass members as described herein.

712. Defendant, Suarez Housing Corporation is an entity or individual with a principal

place of business at 9950 Princess Palm Avenue, #212, Tampa, Florida 33619. Defendant is

organized under the laws of Florida. Defendant built certain Subclass Members' homes and,

directly or through agents, installed defective drywall in these homes, which has resulted in harm

and damages to Subclass members as described herein.

713. Defendant, Sunrise Homes is an entity or individual with a principal place of

business at 62250 West End Boulevard, Slidell, Louisiana 70461. Defendant is organized under

the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through

agents, installed defective drywall in these homes, which has resulted in harm and damages to

Subclass members as described herein.

714. Defendant, Sunrise Construction & Development, LLC is an entity or individual with

a principal place of business at 62250 West End Boulevard, Slidell, Louisiana 70461. Defendant

is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and,

directly or through agents, installed defective drywall in these homes, which has resulted in harm

and damages to Subclass members as described herein.

715. Defendant, Sunrise Construction, LLC is an entity or individual with a principal

place of business at 62250 West End Boulevard, Slidell, Louisiana 70461. Defendant is

organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and,

directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

716. Defendant, Suntree Homes, Inc. is an entity or individual with a service address at George H. Barin, 2113 Greenview Cove Drive, West Palm Beach, Florida 33414. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

717. Defendant, Tapia Brothers Construction, Inc. is an entity or individual with a principal place of business at 4289 Lac St. Pierre, #205, Harvey, Louisiana 70058. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

718. Defendant, Taylor Morrison of Florida, Inc. is an entity or individual with a principal place of business at 4905 West Laurel Street, Suite 100, Tampa, Florida 33607. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

719. Defendant, Three J's Remodeling, Incorporated is an entity or individual with a principal place of business at 134 Valencia Drive, Fort Walton Beach, Florida 32548. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

144

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 452 of 668

720. Defendant, Timberline Builders, Inc. is an entity or individual with a principal place of business at 3618 Del Prado Boulevard, Cape Coral, Florida 33904. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

721. Defendant, Toll Estero, Ltd. Partnership d/b/a Toll Brothers is an entity or individual with a service address at CT Corporation Systems, 1200 S. Pine Island Road, Plantation, Florida 33324. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

722. Defendant, Tony Helton Construction, LLC is an entity or individual with a service address at Tony Helton. Sr., 230 Black Fin Cove, Slidell, Louisiana 70458. Defendant is organized under the laws of Louisiana. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

723. Defendant, Touchstone at Rapallo, Inc. is an entity or individual with a principal place of business at 8551 Via Rapallo, Estero, Florida 33928. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

724. Defendant, Turn Key Home Builders, Inc. is an entity or individual with a principal place of business at 350 S. County Road, Suite 102-136, Palm Beach, Florida 33480. Defendant

145

is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

725. Defendant, United Homes, Inc. is an entity or individual with a principal place of business at 7975 NW 154th Street, Suite 400, Miami Lakes, Florida 33016. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

726. Defendant, Vasquez Construction Company, LLC is an entity or individual with a principal place of business at 806 Young Street, Ypsilanti, Mississippi 48198. Defendant is organized under the laws of Mississippi. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

727. Defendant, Venus Street, LLC is an entity or individual with a principal place of business at 19080 NE 29th Avenue, Aventura, Florida 33180. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

728. Defendant, Vernon Construction Corporation is an entity or individual with a service address at William G. Vernon, 3201 Bayou Sound, Longboat Key, Florida 34228. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm

146

and damages to Subclass members as described herein.

729.  Defendant, Vet Construction, Inc. is an entity or individual with a principal place of business at 709 North Armanda Road, Venice, Florida 34285.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

730.  Defendant, Vizcaya Custom Homes,. Inc. is an entity or individual with a principal place of business at 3311 Oakellar Avenue, Tampa, Florida 33611.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

731.  Defendant, Walker Homes, Inc. is an entity or individual with a service address at Kenneth Walker, 141 W. Baffin Drive, Venice, Florida 33595.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

732.  Defendant, WB Construction Company, Inc. is an entity or individual with a principal place of business at 18465 Tulip Road, Fort Meyers, Florida 33967.  Defendant is organized under the laws of Florida.  Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

733.  Defendant, Preserve Development, LLC is an entity or individual with a principal

place of business at 404 Oakmears Crescent, Suite 101, Virginia Beach, Virginia 23462. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

734. Defendant, Governor's Pointe, LLC is an entity or individual with a principal place of business at 4953 Exeter Drive, Suffolk, Virginia 23434. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

735. Defendant, Woodall, LLC is an entity or individual with a principal place of business at 7919 Ardmore Rod, Norfolk, Virginia 23518. Defendant is organized under the laws of Virginia. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

736. Defendant, Woodside Homes of Southeast Florida, LLC is an entity or individual with a principal place of business at 2540 Metro Centre Boulevard, Suite 3, West Palm Beach, Florida 33407. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

### The Contractor/Installer Defendants

737. Defendant, Acreage Drywall, Inc. is an entity or individual with a principal place of business at 136931 Deerby Drive West, Oxahatchee, Florida 33470. Defendant is organized

148

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 456 of 759

under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

738. Defendant, AI Brothers, Inc., is an entity or individual with a principal place of business at 2512 SW 22nd Place, Cape Coral, Florida 33914. Defendant is organized under the laws of Florida . Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

739. Defendant, American Building Materials, Inc. is an entity or individual with a principal place of business at 30427 Commerce Drive, San Antonio, Florida 33576. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

740. Defendant, BelTex Contracting, Inc. is an entity or individual with a principal place of business at 330 Eden Isles, Slidell, Louisiana 70458. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

741. Defendant, Beta Drywall, LLC is an entity or individual with a principal place of business at 6586 Hypoluxo Road #306, Lake Worth, Florida 33467. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and

149

damages to Subclass Members.

742. Defendant, Better Boxing is an entity or individual with a service address at 1600 N. Upland Avenue, Metairie, Louisiana 70033. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

743. Defendant, C.L. Paul Plastering, Inc. is an entity or individual with a principal place of business at 17490 East Street - Unit 3, North Fort Myers, Florida 33917. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

744. Defendant, Cemex, Inc. (formerly CSR Rinker) is an entity or individual with a principal place of business at 840 Gessner Ste., Ste. 1400, Houston, Texas 77024. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

745. Defendant, D&A Construction Services, Inc. is an entity or individual with a principal place of business at 3341 Southwest Islesworth Circle, Palm City, Florida 34990. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

746. Defendant, Delgado's Painting is an entity or individual with a principal place of business at 422 Terry Parkway, Gretna, Louisiana 70056. Defendant is organized under the laws

150

of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

747. Defendant, Drywall Experts, Inc. is an entity or individual with a principal place of business at 5695 52nd Drive South, Lake Worth, Florida 33463. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

748. Defendant, Five-Star Drywall, Inc. is an entity or individual with a principal place of business at 6901 North Drive, Ft. Myers, Florida 33905. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

749. Defendant, G. Drywalls Corporation is an entity or individual with a principal place of business at 12951 SW 124 Street, Miami, Florida 33186. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

750. Defendant, G&B Roofing & Construction, Inc. is an entity or individual with a service address at Barbaro Hernandez, 503 DuMonde Drive, Westwego, Louisiana 70094. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has

resulted in harm and damages to Subclass Members.

751. Defendant, Harrell's Drywall, Inc. is an entity or individual with a principal place of business at 1225-B 131 St. Avenue, Tampa, Florida 33612. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

752. Defendant, HC Seals Drywall Partners is an entity or individual with a principal place of business at 125 George Mitchell Road, Carriere, Mississippi 39426. Defendant is organized under the laws of Mississippi. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

753. Defendant, Hinkle Drywall, Inc. is an entity or individual with a principal place of business at 1460 Booth Drive, Valrico, Florida 33594. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

754. Defendant, J. Wade Payne, LLC is an entity or individual with a principal place of business at 900 South Bengal Road, Metairie, Louisiana 70003. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

755. Defendant, J.W. Hodges Drywall, Inc. is an entity or individual with a principal

152

place of business at 2771 Vista Parkway, Ste. F4, West Palm Beach, Florida 33411. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

756. Defendant, Jose Lopez is an entity or individual with a principal place of business at 1311 Mandeville Street, New Orleans, Louisiana 70126. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

757. Defendant, Joseph Jones is an entity or individual with a principal place of business at 1838 St. Roch Avenue, New Orleans, Louisiana 70122. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

758. Defendant, Kevin Burton is an entity or individual with a principal place of business at 11120 S. Idlewood Court, New Orleans, Louisiana 70128. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

759. Defendant, Lopez Drywall, Inc. is an entity or individual with a service address at David King, Esq., 1416 Kingsly Avenue, Orange Park, Florida 32073. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

760. Defendant, Banner Supply Company Ft. Myers, LLC is an entity or individual with a

principal place of business at 2910 Cargo Street. Fort Myers, Florida 33916. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

761. Defendant, O.C.D. of S. Florida, Inc. is an entity or individual with a principal place of business at 3431 SW 11 St. #11, Deerfield Beach, Florida 33442. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

762. Defendant, Mesa Construction Group, Inc. is an entity or individual with a principal place of business at 7300 SW 8 Ct., N. Lauderdale, Florida 33068. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

763. Defendant, P.D.C. Drywall Contractors, Inc. is an entity or individual with a principal place of business at 3489 SE Gran Parkway, Stuart, Florida 34997. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members

764. Defendant, Preferred Homes, Inc. is an entity or individual with a principal place of business at Highway 190 East, Slidell, LA 70458. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in

154

Case 2:09-md-02047-EEF-MBN Document 23203-10 Filed 12/06/19 Page 462 of 668
759

the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

765.  Defendant, Ray Turner Drywall, LLC is an entity or individual with a principal place of business at 10736 Jacamar Drive, New Port Richey, Florida 34654.  Defendant is organized under the laws of Florida.  Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

766.  Defendant, Raymond Building Supply Corp. is an entity or individual with a service address at Duane Swanson, 7751 Bayshore Road, N. Ft. Myers, Florida 33917.  Defendant is organized under the laws of Florida.  Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

767.  Defendant, Residential Drywall, Inc. is an entity or individual with a principal place of business at 9237 Lazy Lane, Tampa, Florida 33614.  Defendant is organized under the laws of Florida.  Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

768.  Defendant, RJL Drywall, Inc. is an entity or individual with a principal place of business at 8181 Bayshore Road, Fort Myers, Florida 33917.  Defendant is organized under the laws of Florida.  Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

155

769. Defendant, S3 Enterprises, Inc., d/b/a AL Brothers Metal Framing and Drywall is an entity or individual with a principal place of business at 8695 College Parkway, Suite 434, Fort Myers, Florida 33919. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

770. Defendant, Schear Corp. is an entity or individual with a principal place of business at 5490 Lee Street, Lehigh Acres, Florida 33971. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

771. Defendant, Shamick Drywall, Inc. is an entity or individual with a principal place of business at 518 Collins Street, Ormond Beach, Florida 32174. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

772. Defendant, South Florida Custom Trim, Inc. is an entity or individual with a principal place of business at 4860 Mahogany Ridge Drive, Naples, Florida 34119. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

773. Defendant, Speedy Drywall is an entity or individual with a service address at Cassie Zeledon, 600 Justice Court, Marrero, Louisiana 70072. Defendant is organized under the laws of

156

Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

774. Defendant, Stock Building Supply, LLC.is an entity or individual with a principal place of business at 8020 Arco Corporate Drive, Raleigh, North Carolina 27617. Defendant is organized under the laws of North Carolina. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

775. Defendant, The Porter Blaine Corporation is an entity or individual with a principal place of business at 1140 Azalea Garden Road, Norfolk, VA 23502. Defendant is organized under the laws of Virginia. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

776. Defendant, Upscale Properties, Inc. is an entity or individual with a principal place of business at 401 Hooper Drive, Kenner, Louisiana 70065. Defendant is organized under the laws of Louisiana. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

777. Defendant, Wolf & Bear Distributors is an entity or individual with a principal place of business at 2881 East Oakland Park Blvd., Ft. Lauderdale, Florida 33306. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm

157

Case 2:09-md-02047-EEF-MBN Document 23200-10 Filed 12/06/19 Page 465 of 668

and damages to Subclass Members.

## FACTS REGARDING PRODUCT DEFECT

778. Upon information and belief, Defendants' drywall contains gypsum.

779. In "defective drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants herein), the gypsum and other components of the product break down and release sulfides and other noxious gases that are then emitted (or "off-gassed") from the drywall.

780. Sulfides and other noxious gases, such as those emitted from Defendants' drywall, cause corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

781. Exposure to sulfide and other noxious gases, such as those emitted from Defendants' drywall, causes personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

782. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from Defendants' defective drywall.

783. Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall, which was unfit for its intended purpose and unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to personal property in Plaintiffs' and Class Members' homes, residences or

structures and/or caused personal injury resulting in eye irritation, a sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

784. Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall at issue in this litigation.

785. Defendants recklessly, wantonly and/or negligently implement faulty, procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the defective drywall at issue in this litigation.

786. As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.

787. As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages. These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.

788. As a direct and proximate result of Defendants' defective and unfit drywall and the

159

corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and the Class Members have been exposed to toxic gases, suffered personal injury, have been placed at an increased risk of disease, and have need for injunctive relief in the form of repair and remediation of their home, of their home contracts, emergency/corrective notice, environmental testing and monitoring, and/or medical monitoring.

### FACTS REGARDING INVESTORS WHO AIDED AND ABETTED DEFENDANTS

789. J.P. Morgan Chase & Co. ("J.P. Morgan"), and certain other corporations and entities (collectively the "Investing Entities"), engaged in a deliberate and/or reckless course of conduct designed to aid and abet Defendants in the manufacture, exporting, importing, distribution, delivery, supply, marketing, and/or sale of the defective drywall at issue in this litigation.

790. By information and belief, but for these investments by the Investing Entities, Defendants would not have been able to manufacture, export, import, distribute, deliver, supply, market, and/or sell of the defective drywall at issue in this litigation.

791. The Investing Entities were aware or should have been aware that Defendants were manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling the defective drywall at issue in this litigation in a manner that would make it difficult for injured consumers (located in the United States) to accomplish service on the foreign defendants.

792. Notwithstanding their apparent knowledge and/or negligent failure to discover the tortious scheme by the foreign defendants, the Investing Entities purposefully made investments with these foreign defendants in a manner that was designed to shield them from liability to American property owners.

793. For instance, J.P. Morgan acquired a 12.3% interest in China National Building Materials Co. Ltd.'s ("CNBM") tradeable shares with the understanding that this entity would profit from its exploitation of homeowners seeking to rebuild their lives after the devastation of hurricanes Rita and Katrina. Because CNBM holds a controlling stake in BNBM, this type of investment was ideal to the Investing Entities since these investments could be very profitable while avoiding the risk of loss where the foreign defendants can avoid the service of process by American consumers and responsibility for their tortious conduct.

794. Other entities that are known to own an interest in CNBM are Atlantis Investment Management Ltd., Schroder Investment Management Limited, Baillie Gifford & Co., Callander Alex, Menzies Robin, Plowden Charles, Telfer Andrew, Warden Alison, Whitley Sarah, and Government of Singapore Investment Corporation Pte Ltd.

795. Entities that are known to own an interest in BNBM are China Construction Bank, Cha Genlou, Industrial and Commercial Bank of China, Aerospace Science & Technology Finance Co., Ltd., China Social Insurance Fund Portfolia 108, Bank of China, Agricultural Bank of China, Zhongrong International Trust Co., Ltd.

796. By investing in entities such as CNBM and BNBM, the Investing Entities put themselves in a position to profit from the exploitation of American Consumers who were injured by Defendants.

797. Accordingly, the Investing Entities engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in investing in foreign entities responsible for the manufacture, exporting, importing, distribution,

161

delivery, supply, inspection, marketing, and/or sale of the defective drywall.

798. Additional discovery will reveal the full role and responsibility of the Investing Entities for the damages incurred by Plaintiffs and Class Members and their potential as party defendants.

## **CLASS ACTION ALLEGATIONS**

### **The Manufacturing Classes (Classes 1, 9 and 13)**

799. The representative Plaintiffs with claims against the manufacturing defendants set forth in the attached Schedule "1" (the alignment of Plaintiffs and Defendants is depicted in Schedule 1 for each class), assert classes pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the manufacturing defendants for whom they have standing. The designated Plaintiffs in Schedule 1 define their classes to be as follows:

> All owners and residents (past or present) of real property located in the United States containing defective Chinese drywall manufactured, sold, distributed, and/or supplied by each manufacturing defendant identified in Schedule 1.

800. The Manufacturing Defendant classes identified in Schedule 1 are comprised as follows:

Class #1: Beijing New Building Materials Public Limited Co.

Class #9: Pingyi Zhongxing Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.

Class #13: Taishan

162

### The Unascertainable Manufacturing Defendant Classes
### (Classes 2-8, 10-12 and 14-15)

801.  The representative Plaintiffs with claims against the unascertainable manufacturing

defendants set forth in the attached Schedule "1" (the alignment of Plaintiffs and Defendants is

depicted in Schedule 1 for each class), assert classes pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3)

and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those

similarly situated, against the unascertainable manufacturing defendants for whom they have

standing.  The designated Plaintiffs in Schedule 1 define their classes to be as follows:

> All owners and residents (past or present) of real property located in
> the United States containing defective Chinese drywall that was
> manufactured, sold, distributed, supplied, marketed, inspected,
> imported, exported, brokered, or delivered by each unascertainable
> manufacturing defendant identified in Schedule 1.

802.  The Unascertainable Manufacturing Defendant classes identified in Schedule 1 are

comprised as follows:

Class #2:      Crescent City Gypsum, Inc.

Class #3:      Gridmarx

Class #4:      Gypsum Board

Class #5:      IMT

Class #6:      La Farge

Class #7:      Pabco

Class #8:      Panel Rey

Class #10:     Pro Roc

Class #11:     Pro Wall

Class #12:     Shamrock Gold

Class #14:     Toughrock

Class #15:     USB

**The Distributor/Supplier/Importer/Exporter/Broker Subclasses (Subclasses 16-47)**

803.  The representative Plaintiffs with claims against their distributors/suppliers, set forth

in the attached Schedule "2" (the alignment of Plaintiffs and Defendants is depicted in Schedule 2

for each subclass), assert subclasses pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4)

of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated,

against the distributors/suppliers for whom they have standing.  The designated Plaintiffs in

Schedule 2 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in
> the United States containing defective Chinese drywall that was
> sold, distributed, supplied, marketed, inspected, imported, exported,
> brokered, or delivered by each defendant identified in Schedule 2.

804.  The Distributor/Supplier/Importer/Exporter/Broker subclasses identified in Schedule

2 are comprised as follows:

Subclass #16:  Ace Hardware Corporation

Subclass #17:  Aces Towing Enterprises, LLC

Subclass #18:  All Florida Drywall Supplies, Inc.

Subclass #19:  Allied Building Products Corp. f/k/a Dophin Building Materials

Subclass #20:  Allsteel & Pypsum Products, Inc.

Subclass #21:  Banner Supply Company Fort Myers, LLC

Subclass #22:  Banner Supply Co.

Subclass #23:  Banner Supply Company Pompano, LLC

Subclass #24:  Banner Supply International, LLC

Subclass #25:  BE Wholesale

Subclass #26:  Black Bear Gypsum Supply, Inc.

Subclass #27:  Black Bear Gypsum, LLC

Subclass #28:  Cajun Construction & Design, Inc.

Subclass #29:  City Salvage, Inc.

Subclass #30:  Dalessio Drywall & Painting Corporation

Subclass #31:  Drive Enterprises, Inc.

Subclass #32:  Gulf Sales & Import Company, Inc.

Subclass #33:  HLP/GAC International, Inc.

Subclass #34:  Home Depot U.S.A., Inc.

Subclass #35:  Interior/Exterior Building Supply, LP

Subclass #36:  Interior/Exterior Enterprises, LLC

Subclass #37:  Just-Rite Supply, Inc.

Subclass #38:  L&W Supply Corp. d/b/a Seacoast Supply Co.

Subclass #39:  Millennium Builders, Inc.

Subclass #40:  Osprey-Fulf Shore Building Materials, Inc.

Subclass #41:  RJL Drywall, Inc.

Subclass #42:  Rosen Building Supplies, Inc.

Subclass #43:  Stock Building Supply, LLC

Subclass #44:  The Porter-Blaine Corporation

165

Subclass #45: Tobin Trading, Inc.

Subclass #46: Venture Supply, Inc.

Subclass #47: Wholesale Direct Lumber, LLC

### The Builder/Developer Subclasses (Subclasses 48-213)

805.  The representative Plaintiffs with claims against their builders/developers, set forth

in the attached Schedule "3" (the alignment of Plaintiffs and Defendants is depicted in Schedule 3

for each subclass), assert subclasses pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4)

of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated,

against the builders/developers for whom they have standing.  The designated Plaintiffs in

Schedule 3 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in
> the United States containing defective Chinese drywall where each
> of the defendants identified in Schedule 3 was the builder or
> developer of the property.

806.  The builder/developer subclasses identified in Schedule 3 are comprised as follows:

Subclass #48:          A & D Homes, Inc.

Subclass #49:          A.R.B.C. Corporation

Subclass #50:          AHJV, LLC

Subclass #51:          Ainslie Group, Inc.

Subclass #52:          Albanese-Popkin the Oaks Development Group, L.P.

Subclass #53:          Alvian Homes, Inc.

Subclass #54:          American Eastern, Inc.

Subclass #55:          American Gallery Development Group, LLC

166

| | |
|---|---|
| Subclass #56: | American Homes |
| Subclass #57: | Antilles Vero Beach, LLC |
| Subclass #58: | Aranda Homes, Inc. |
| Subclass #59: | Arizen Homes, Inc. |
| Subclass #60: | Atlantic Homes Development Corporation |
| Subclass #61: | Atlantic Homes, LLC |
| Subclass #62: | Barony Homes, Inc. |
| Subclass #63: | Bass Homes, Inc. |
| Subclass #64: | Bay Colony-Gateway, Inc. |
| Subclass #65: | Baywood Construction, Inc. |
| Subclass #66: | BDG Waterstone, LLC |
| Subclass #67: | Beazer Homes Corp. |
| Subclass #68: | Breakwater Homes Association |
| Subclass #69: | Brightom Home Builders, Inc. |
| Subclass #70: | Bristol Corner, LLC |
| Subclass #71: | Brothers Properties LA, LLC |
| Subclass #72: | Bush Construction Corporation |
| Subclass #73: | Calvin P. Williams |
| Subclass #74: | CB Creek, Inc. |
| Subclass #75: | Central HaborHomes Corporation |
| Subclass #76: | Centex Homes |
| Subclass #77: | Chase Construction, Inc. |

| | |
|---|---|
| Subclass #78: | Clark-Whitehill Enterprises, Inc. |
| Subclass #79: | Core Construction Services Southeast, Inc. |
| Subclass #80: | Country Walk Sales, LLC |
| Subclass #81: | Crossroad Homes, Inc. |
| Subclass #82: | Curb Appeal Home Builders, Inc. |
| Subclass #83: | Custom Homes by Kaye, Inc. |
| Subclass #84: | D.R. Horton, Inc. |
| Subclass #85: | Daniel Wayne Homes, Inc. |
| Subclass #86: | David Daniels, individually |
| Subclass #87: | Deangelis Diamond Construction, Inc. |
| Subclass #88: | Deangelis Diamond Homes, Inc. |
| Subclass #89: | Delta- Eden, Inc. |
| Subclass #90: | Development Co. of Boca, Inc. d/b/a Boca Developers |
| Subclass #91: | Devonshire Properties, Inc. |
| Subclass #92: | E.B. Developers, Inc. |
| Subclass #93: | Eastmond Enterpreises, Inc. |
| Subclass #94: | Enchanted Homes, inc. |
| Subclass #95: | FFH, LLC |
| Subclass #96: | FHBF Partners, LLP, f/k/a First Home Builders of Florida |
| Subclass #97: | Franciscus Homes, Inc. |
| Subclass #98: | G.L. Homes of Boynton Beach Associates IX, Ltd. |
| Subclass #99: | Genesis Group, Inc. |

168

| | |
|---|---|
| Subclass #100: | Governor's Pointe, LLC |
| Subclass #101: | Grand Harbour Homes, Inc. |
| Subclass #102: | Greensprings Condominiums, LLC |
| Subclass #103: | Greensprings Plantation, Inc. |
| Subclass #104: | Groff Construction, Inc. |
| Subclass #105: | Gryphon Corporation (GC) |
| Subclass #106: | Hansen Homes |
| Subclass #107: | Hansen Homes of South Florida, Inc. |
| Subclass #108: | Harbor Walk Development, LLC |
| Subclass #109: | HHJV, LLC |
| Subclass #110: | Holiday Builders Construction of Florida, Inc. |
| Subclass #111: | Holiday Builders, Inc. |
| Subclass #112: | Home DevCo, LLC |
| Subclass #113: | Inman Construction Services |
| Subclass #114: | International Property Investments of Central Florida, Inc. d/b/a Henin International Services |
| Subclass #115: | Ironwood Properties, Inc. |
| Subclass #116: | J. Galloway Construction, Inc. |
| Subclass #117: | Jerome Henin, individually |
| Subclass #118: | Jim Morris & Sons, Inc. |
| Subclass #119: | Jim Walter Homes, LLC |
| Subclass #120: | Joseph Scott |

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 477 of 668
Case 2:09-cv-22408-WJZ Document 27 Document 440-11 Filed 12/16/09 Page 37 Page 403 of
759

| | |
|---|---|
| Subclass #121: | K. Hovnanian First Homes, LLC d/b/a First Home Builders of Florida |
| Subclass #122: | K&B Homes, Inc. |
| Subclass #123: | Kaye Homes of South Florida, Inc. |
| Subclass #124: | KB Home Florida, LLC |
| Subclass #125: | KB Home Orlando, LLC |
| Subclass #126: | KB Home Tampa, LLC |
| Subclass #127: | Kensington Woods, LLC |
| Subclass #128: | Laporte Family Properties |
| Subclass #129: | Lavish Holding Corp. |
| Subclass #130: | Lee Harbor Homes, Inc. |
| Subclass #131: | Legend Custom Builders, Inc. |
| Subclass #132: | Lennar Corporation |
| Subclass #133: | Lennar Homes, LLC |
| Subclass #134: | Leroy Laporte, Jr. |
| Subclass #135: | Littles Construction of Central Florida, Inc. |
| Subclass #136: | LTL Construction, Inc. |
| Subclass #137: | MacGlen Builders, Inc. |
| Subclass #138: | Majestic Homes of Port St. Lucie, Inc. |
| Subclass #139: | Mandalay Homes, Inc. |
| Subclass #140: | Mariner Village Townhomes, Inc. |
| Subclass #141: | Maronda Homes, Inc. of Florida |

| | | |
|---|---|---|
| Subclass #142: | McCale Development Corporation |
| Subclass #143: | McCar Homes, Inc. |
| Subclass #144: | Merit Homes, Inc. |
| Subclass #145: | Meritage Homes of Florida, Inc. |
| Subclass #146: | Midwest Construction & Development LLC |
| Subclass #147: | Millennium Homes & Development, Inc. |
| Subclass #148: | Monopoly Builders, Inc. |
| Subclass #149: | MW Johnson Construction of Florida, Inc. |
| Subclass #150: | Northstar Holdings at B & A LLC |
| Subclass #151: | Oscar Jiles d/b/a. JJ Construction |
| Subclass #152: | Overlook, LLC |
| Subclass #153: | Overlook Point, LLC |
| Subclass #154: | Oyster Bay Homes, Inc. |
| Subclass #155: | Palm Isles Holdings, LLC |
| Subclass #156: | Parellel Design and Development LLC |
| Subclass #157: | Parr-Self, Inc. |
| Subclass #158: | Peak Building Corporation |
| Subclass #159: | Plantation Group, LLC |
| Subclass #160: | Portofino Homes, Inc. |
| Subclass #161: | Premier International Realty d/b/a Henin Realty |
| Subclass #162: | Preserve Development, LLC |
| Subclass #163: | Pride Homes |

| Subclass #164: | Pukka Development, Inc. |
|---|---|
| Subclass #165: | R A Grant Corporation |
| Subclass #166: | R. Fry Builders, Inc. |
| Subclass #167: | RCR Holding II LLC |
| Subclass #168: | Renar Development Company |
| Subclass #169: | Rivercrest, LLC/The St. Joe Company |
| Subclass #170: | Riverstreet Homes, Inc. |
| Subclass #171: | Rottlund Homes of Florida, Inc. |
| Subclass #172: | Rylex Homes, Inc. |
| Subclass #173: | S. Petersen Homes, Inc. |
| Subclass #174: | Safeway Contractors, L.L.C. |
| Subclass #175: | Santa Maria Builders, LLC |
| Subclass #176: | South Kendall Construction Corp. |
| Subclass #177: | Southern Bay Homes, Inc. |
| Subclass #178: | Southern Community Homes, Inc. |
| Subclass #179: | Southern Homes of Broward XI, Inc. |
| Subclass #180: | Southern Star Construction Company, Inc. |
| Subclass #181: | Standard Pacific of South Florida GP, Inc. |
| Subclass #182: | Stone Development, LLC |
| Subclass #183: | Stuart South Group, L.C. |
| Subclass #184: | Suarez Housing Corporation |
| Subclass #185: | Sunrise Construction |

172

| Subclass #186: | Sunrise Construction and Development, LLC |
|---|---|
| Subclass #187: | Sunrise Homes |
| Subclass #188: | Suntree Homes, Inc. |
| Subclass #189: | Tapia Brothers Consructions, Inc. |
| Subclass #190: | Tapia Construction, Inc. |
| Subclass #191: | Taylor Morrison of Florida, Inc. |
| Subclass #192: | Three J's Remodeling, Incorporated |
| Subclass #193: | Timberline Builders, Inc. |
| Subclass #194: | Toll Estero Ltd. Partnership, d/b/a Toll Brothers |
| Subclass #195: | Tony Helton Construction, LLC |
| Subclass #196: | Touchstone At Rapallo, Inc. |
| Subclass #197: | Traderscove Corporation d/b/a the Henin Group |
| Subclass #198: | Turn Key Home Builders, Inc. |
| Subclass #199: | United Homes |
| Subclass #200: | United Homes International, Inc. |
| Subclass #201: | Vasquez Construction Company, LLC |
| Subclass #202: | Venus Street, LLC |
| Subclass #203: | Vernon Construction Corporation |
| Subclass #204: | Vet Construction, Inc. |
| Subclass #205: | Vizcaya Custom Homes, Inc. |
| Subclass #206: | Walker Homes, Inc. |
| Subclass #207: | WB Construction Company, Inc. |

| Subclass #208: | Wellington LLC |
|---|---|
| Subclass #209: | Wermers Development, Inc. |
| Subclass #210: | Woodall, LLC |
| Subclass #211: | Woodside Homes |
| Subclass #212: | Woodside Homes of Southeast Florida, LLC |
| Subclass #213: | Wyndwil, LLC |

### The Contractor/Installer Subclasses (Subclasses 214-254)

807.  The representative Plaintiffs with claims against their contractors/installers, set forth in the attached Schedule "4" (the alignment of Plaintiffs and Defendants is depicted in Schedule 4 for each subclass), assert subclasses pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the contractors/installers for whom they have standing.  The designated Plaintiffs in Schedule 4 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in the United States containing defective Chinese drywall where each of the defendants identified in Schedule 4 was the contractor or installer of the drywall for the property.

808. The contractor/installer subclasses identified in Schedule 4 are comprised as follows:

| Subclass #214: | Acreage Drywall, Inc. |
|---|---|
| Subclass #215: | AI Brothers Inc. |
| Subclass #216: | American Building Materials, Inc. |
| Subclass #217: | Banner Supply Company Fort Myers, Inc. |
| Subclass #218: | Bel-Tex Contracting, Inc. |

174

| | |
|---|---|
| Subclass #219: | Beta Drywall, LLC |
| Subclass #220: | Better Boxing |
| Subclass #221: | C.L. Paul Plastering, Inc. |
| Subclass #222: | Cemex, Inc. (formerly CSR Rinker) |
| Subclass #223: | D&A Construction Services, Inc. |
| Subclass #224: | Delgado's Painting |
| Subclass #225: | Drywall Experts, Inc. |
| Subclass #226: | Five-Star Drywall, Inc. |
| Subclass #227: | G. Drywalls Corporation |
| Subclass #228: | G&B Roofing and Construction, Inc. |
| Subclass #229: | Harrell's Drywall, Inc. |
| Subclass #230: | HC Seals Drywall Partners |
| Subclass #231: | Hinkle Drywall, Inc. |
| Subclass #232: | J. Wade Payne, LLC |
| Subclass #233: | J.W. Hodges Drywall, Inc. |
| Subclass #234: | Jose Lopez |
| Subclass #235: | Joseph Jones |
| Subclass #236: | Kevin Burton |
| Subclass #237: | Lopez Drywall, Inc. |
| Subclass #238: | Mesa Construction Group, Inc. |
| Subclass #239: | O.C.D. of S. Florida, Inc. |
| Subclass #240: | P.D.C. Drywall Contractors, Inc. |

| Subclass #241: | Preferred Homes, Inc. |
| Subclass #242: | Ray Turner Drywall, LLC |
| Subclass #243: | Raymond Building Supply Corp. |
| Subclass #244: | Residential Drywall, Inc. |
| Subclass #245: | RJL Drywall Inc. |
| Subclass #246: | 3 Enterprises, Inc. d/b/a Al Brothers Metal Framing and Drywall |
| Subclass #247: | Schear Corp. |
| Subclass #248: | Shamick Drywall, Inc. |
| Subclass #249: | South Florida Custom Trim, Inc. |
| Subclass #250: | Speedy Drywall |
| Subclass #251: | Stock Building Supply, LLC |
| Subclass #252: | The Porter-Blaine Corporation |
| Subclass #253: | Upscale Properties, Inc. |
| Subclass #254: | Wolf & Bear Distributors |

**General Class Allegations and Exclusions from the Class Definitions**

809. The following Persons shall be excluded from the Class and Subclasses: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all Persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

810. Upon information and belief, the defective and unfit drywall in Plaintiffs' homes or other structures was installed in at least hundreds of homes, residences, or other structures owned by Plaintiffs and Class Members. Therefore, the Classes and Subclasses are sufficiently numerous

176

such that the joinder of all members of the Classes and Subclasses in a single action is impracticable.

811. There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Classes and/or Subclasses. Among these common questions of law and fact are the following:

a. whether Defendants' drywall products that release sulfide and other noxious gases are defective and/or unfit for their intended purpose;

b. whether Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall products;

c. whether Plaintiffs are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct; and

d. whether Plaintiffs are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct.

812. The legal claims of named Plaintiffs are typical of the legal claims of other Class and Subclass Members. Additionally, for each of the subclasses that named Plaintiffs seek to participate in, the legal claims of the named Plaintiffs are typical of the legal claims of other Subclass Members. Named Plaintiffs have the same legal interests and need for legal remedies as other Class and/or Subclass Members.

813. Named Plaintiffs are adequate representatives of the Class and Subclasses in which they participate, together with their legal counsel, each will fairly and adequately protect the

177

interests of Class and Subclass Members. Named Plaintiffs have no known conflict with the Class or Subclasses and are committed to the vigorous prosecution of this action.

814. The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and complex litigation involving defective and harmful products. Counsel will fairly and adequately protect the interests of the Classes and/or Subclasses.

815. The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class and/or Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for the party opposing the Class and Subclass; or adjudications with respect to individual Class and Subclass members that, as a practical matter, would be dispositive of the interests of the other Class and Subclass members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

816. The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and/or Subclass, so that final injunctive relief is appropriate respecting the Class and/or Subclass as a whole.

817. A class action is superior in this case to other methods of dispute resolution. The Class and Subclass members have an interest in class adjudication rather than individual adjudication because of their overlapping rights. It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class and Subclass Members would protect their rights on their own without this

178

class action case. Management of the class will be efficient and far superior to the management of individual lawsuits. Accordingly, Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

818. The issues particularly common to the Class and Subclass members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

## COUNT I
## NEGLIGENCE
### (Against All Defendants)

819. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

820. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) installing, j) marketing, and/or k) selling this drywall, including a duty to adequately warn of their failure to do the same.

821. Defendants knew or should have known that their wrongful acts and omissions would result in harm and damages in the manner set forth herein.

822. Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling this drywall.

823. Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could

179

have on the property and bodies of Plaintiffs and Class Members.

824. Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of Plaintiffs and Class Members with the drywall, upon leaning it had been sold in an unreasonably dangerous condition.

825. Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

826. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT II
## NEGLIGENCE PER SE
### (Against All Defendants)

827. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

828. Defendants owed statutory duties to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

829. Defendants breached their statutory duties to the Plaintiffs and Class Members by failing to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

830. Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other State and local Building Codes, to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall. For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTMC C

1396/C 1396M-069, and its predecessor(s).

831. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

832. Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

833. As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT III
## STRICT LIABILITY
### (All Defendants)

834. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

835. At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

836. The drywall, including that installed in the homes of Class Members was placed by Defendants in the stream of commerce.

837. Defendants knew that the subject drywall would be used without inspection for defects by consumers.

838. Defendants intended that the drywall reach the ultimate consumers, such as Class Members, and it indeed reached Class Members when it was installed in their homes.

839. When installed in Class Members' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

181

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 489 of 668
759

840. At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

841. The subject drywall was not misused or altered by any third parties.

842. The Defendants' drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

843. The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing.

844. The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through off-gassing.

845. The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

846. The Defendants' defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to Class Members.

847. The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

848. Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Class Members, acting as reasonably prudent people discovery that

182

Case 2:09-md-02047-EEF-MBN Document 23390-10 Filed 12/06/19 Page 490 of 668

Defendants' drywall was defective, as set forth herein, or perceive its danger.

849. Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Class Members.

850. Defendants' defective drywall benefit to Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

851. The defects in the drywall, as well as Defendants' failure to adequately warn Class Members of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages and/or personal injuries to Class Members.

**COUNT IV**
**BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES**
**(All Defendants)**

852. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

853. Defendants and/or their agents were in privity with Plaintiffs and Class Members and/or Plaintiffs and Class Members were foreseeable third party beneficiaries of any warranty.

854. At the times Defendants utilized, supplied, inspected, and/or sold this drywall for use in structures owned by Plaintiffs and Class Members, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in structures owned by Plaintiffs and Class Members for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

855. Defendants placed their drywall products into the stream of commerce in a defective condition and these products were expected to, and did, reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

856. The drywall was defective and not merchantable because it was unfit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in structures

183

owned by Plaintiffs and Class Members for use as a building material, because it contained defects as set forth herein.

857. The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in structures owned by Plaintiffs and Class Members as a building material) due to the defects set forth herein.

858. Defendants had reasonable and adequate notice of the Plaintiffs' and the Class Members' claims for breach of warranty and failed to cure.

859. As a direct and proximate cause of Defendants' breach of warranties, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

**COUNT V**
**BREACH OF THE IMPLIED WARRANTY OF FITNESS AND MERCHANTABILITY**
**PURSUANT TO FLORIDA STATUTES SECTION 718.203**
**(On Behalf of Plaintiffs Who Own Condominiums in the State of Florida)**
**(Against Builders Only)**

860. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

861. Subclass Members who own condominiums in Florida, are owners of condominiums as that term is defined by Florida Statutes section 718.503.

862. Such Subclass Members, as owners, are entitled to the benefit of the statutory warranties of fitness and merchantability pursuant to Florida Statutes section 718.203.

863. Each of the builders who are subject to this claim are developers, as defined by Florida Statutes section 718.203(16), as they created condominiums or offered condominiums for sale in the ordinary course of business.

184

864.  Pursuant to Florida Statutes section 718.203(1)(a-e), each of the builders who are subject to this claim is deemed to have granted Subclass Members, who own condominiums in Florida, an implied warranty of fitness and merchantability for the purposes or uses as follows:

a.  As to each unit, a warranty for 3 years commencing with the completion of the building containing the unit.

b.  As to the personal property that is transferred with, or appurtenant to, each unit, a warranty which is for the same period as that provided by the manufacturer of the personal property, commencing with the date of closing of the purchase or the date of possession of the unit, whichever is earlier.

c.  As to all other improvements for the use of unit owners, a 3 year warranty commencing with the date of completion of the improvements.

d.  As to all other personal property for the use of unit owners, a warranty which shall be the same as that provided by the manufacturer of the personal property.

e.  As to the roof and structural components of a building or other improvements and as to mechanical, electrical, and plumbing elements serving improvements or a building, except mechanical elements serving only one unit, a warranty for a period beginning with the completion of construction of each building or improvement and continuing for 3 years thereafter or 1 year after owners other than the developer obtain control of the association, whichever occurs last, but in no event more than 5 years.

865.  At all times relevant hereto, routine maintenance was performed by Subclass Members and/or the builders who are subject to this claim or by an association controlled by such builders.

185

866.  At the times the builders who are subject to this claim installed, utilized, supplied, inspected, and/or sold drywall for use in the Subclass Members' homes, the builders knew, or it was reasonably foreseeable, that the drywall would be installed in the Subclass Members' homes for use as a building material, and warrantied the product be fit and merchantable for that use.

867.  Defendants' drywall product was placed into the stream of commerce by the builders who are subject to this claim in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

868.  The drywall was defective because it was not fit for the uses intended or reasonably foreseeable by the builders; to wit, the installation of the drywall in Subclass Members' homes for use as a building material, because it contained defects as set forth herein.

869.  The builders who are subject to this claim breached the implied warranty of merchantability and fitness because the drywall was not fit to be installed in Subclass Members' homes as a building material due to the defects set forth herein.

870.  The builders who are subject to this claim had reasonable and adequate notice of the Subclass Members' claims for breach of implied warranty of fitness and merchantability and failed to cure.

871.  As a direct and proximate cause of the builders' breach of the warranties under Florida Statutes section 718.203, Subclass Members have incurred harm and damages and/or personal injuries as described herein.

186

## COUNT VI
## BREACH OF THE IMPLIED WARRANTY OF HABITABILITY
### (Against Builders Only)

872. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

873. The Builder Defendants were in direct contractual privity with their Subclass Members.

874. The drywall that the Builder Defendants installed in the homes of Subclass Members was placed into the stream of commerce by the Builder Defendants in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said drywall product without substantial change in the condition in which it was sold.

875. Certain Subclass Members bought their homes containing defective drywall based upon the judgment of the Builder Defendants.

876. The Builder Defendants breached the implied warranty of habitability because the defective drywall causes Subclass Members homes not be meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality due to the defects set forth herein.

877. The Builder Defendants had reasonable and adequate notice of the claims of the Subclass Members for breach of implied warranty of habitability and failed to cure.

878. As a direct and proximate cause of the Builder Defendants' breach of the implied warranty of habitability, Plaintiffs and Subclass Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT VII
## BREACH OF CONTRACT
### (Against Builders Only)

879. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

187

880. As part of the agreements to purchase real properties from the Builder Defendants, for which Subclass Members paid valuable consideration, the Builder Defendants contracted with Subclass Members to construct homes that would be free of defects.

881. The Builder Defendants materially breached their contracts by providing Subclass Members with defective homes; to wit, the homes contained drywall that is inherently defective because it emits various sulfide and other noxious gases through off-gassing that causes harm and damage as described herein.

882. As a direct and proximate cause of the Builder Defendants' breach of contract, Plaintiffs and Subclass Members have incurred harm and damages as described herein.

**COUNT VIII**
**VIOLATION OF THE LOUISIANA NEW HOME WARRANTY ACT**
**(on Behalf of Plaintiffs Who Own Homes in the State of Louisiana)**
**(Against Louisiana Builders Only)**

883. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

884. The Louisiana New Home Warranty Act provides protection to owners of homes against builders in connection with the construction of the homes.

885. For each applicable subclass, every subclass plaintiff is an "owner," as that term is defined by LSA-R.S. 9:3143(3), who is asserting a claim under the New Home Warranty Act against their "builder," as that term is defined by LSA-R.S. 9:3143(1).

886. Implicit in every Builder Defendant's building contract is the requirement that the work to be completed be performed in a workmanlike manner that is free from defects in material and workmanship.

188

887. Each of the Builders who are subject to this claim violated their duty to use materials that are free from defects. The drywall used by these Builders is defective for the reasons set forth above.

888. Given the defect in the drywall, the Builders knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

889. As a direct and proximate cause of the Builders' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT IX
## REDHIBITION
### (By Louisiana Plaintiffs Against All Defendants)

890. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

891. The drywall manufactured, distributed and/or sold by Defendants was not reasonably fit for its ordinary and intended purpose.

892. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises, in accordance with La. Civ. Code art. 2524.

893. In addition, or in the alternative, the drywall manufactured, distributed and/or sold by Defendants contained redhibitory defects, in that, at the time of delivery, the propensity to emit or off-gas Sulfer compounds and/or other potentially harmful, irritating and/or corrosive substances renders the drywall so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known of the defect or defects.

894. In the alternative, the defects are redhibitory in that, while not rendering the drywall totally useless, diminish the drywall's use and/or value to such an extent that it must be presumed that

189

Case 2:09-md-02047-EEF-MBN Document 23302-10 Filed 12/06/19 Page 497 of 668

the buyer would have bought it, but for a lesser price.

895. The Manufacturing Defendants are conclusively presumed to know of the defects in the drywall manufactured by them.

896. In addition, it is believed and alleged that All Defendants knew of the defects in the drywall at the time the drywall was delivered and/or sold.

897. Defendants have had numerous opportunities to repair and/or replace the drywall and associated fixtures and/or building components and have failed to do so; in addition, and/or in the alternative, such requests have been, would have been and/or would be futile; Manufacturing Defendants and/or Distributor Defendants are, moreover, deemed to be placed on notice when notice is provided to Builder Defendants (and/or Distributor Defendants); and All Defendants, in addition, or alternatively, had actual knowledge of the problems in the drywall and the need for replacement, remediation and/or repair.

898. All Defendants are therefore liable to all Louisiana Plaintiffs for a return of the purchase price, (with interest from the time it was paid), reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the drywall and associated items, for damages, and for reasonable attorneys' fees, in accordance with La. Civ. Code art. 2545.

899. In the alternative, to the extent that any Distributor Defendant and/or Builder Defendant did not know of the defects in the drywall at the time of delivery and/or sale, those defendants are liable to Louisiana Plaintiffs to repair, remedy or correct the defect; and/or, if unable to do so, for a return of the purchase price, (with interest from the time it was paid), reimbursement of the reasonable expenses occasioned by the sale, and those expenses incurred for the preservation of the drywall and associated items, in accordance with La. Civ. Code art. 2531.

190

## COUNT X
## LOUISIANA PRODUCTS LIABILITY ACT
### (Manufacturing Defendants)
### (Pleaded in the Alternative Against Distributor Defendants)

900.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

901.  In addition to any and all damages, attorneys fees and other remedies made available to Louisiana Plaintiffs under the warranty of fitness and/or warranty against redhibitory defects, the Manufacturing Defendants are liable to Louisiana Plaintiffs under the Louisiana Products Liability Act, ("LPLA"), La. R.S. 9:2800.51, *et seq.*

902.  The LPLA is also pleaded in the alternative with respect to any Distributor Defendant who might be considered a "manufacturer" under La. R.S. 9:2800.53(1)(a) (labels or otherwise holds the drywall out as his own), 9:2800.53(1)(b) (exercises control over or influences a characteristic of the drywall causing damage), 9:2800.53(1)(c) (the manufacturer of a product which contains the drywall as a component part), and/or 9:2800.53(1)(d) (a seller of a product of an alien manufacturer where the seller is in the business of importing or distributing the drywall for resale and is the *alter ego* of the alien manufacturer).

903.  The Manufacturing Defendants, upon information and belief, expressly warranted that "the gypsumboards manufactured and sold ... are guaranteed to be free from defects in materials and workmanship."

904.  The Manufacturing Defendants expressly warranted that "the gypsumboards were manufactured in accordance to ASTM C36."

905.  The drywall at issue is, in all cases, unreasonably dangerous by virtue of the unreasonable off-gassing and/or emission of Sulfer compounds and/or other corrosives, toxins and/or

191

irritants, which do not in any way contribute to or enhance the utility of the drywall, yet pose a risk to the wiring, plumbing, appliances, personal property, overall economic value of the property and financial security of the owner, and/or the health of the residents of the property.

906. At all times pertinent and material hereto, there existed alternative feasible manufacturing processes and/or designs of drywall which perform all of the functions and utility of traditional drywall, without emitting unreasonable levels of Sulfer and/or other toxic and/or corrosive compounds.

907. At all times pertinent and material hereto, Manufacturing Defendants (and/or Distributer Defendants who may be considered "manufacturers" under the LPLA) knew that their drywall was unreasonably dangerous and/or defective as set forth herein.

908. In the alternative, Manufacturing Defendants (and/or Distributer Defendants who may be considered "manufacturers" under the LPLA) should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or defective characteristics and/or conditions, had they reasonably employed then-existing scientific and/or technical knowledge, reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

909. Defendants' drywall is unreasonably dangerous in composition or construction in that, at the time it left Defendant's control, it deviated in a material way from Defendant's own specifications or performance standards.

910. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in design, in that, at the time the drywall left Defendant's control, there existed an alternative design for the product that was capable of preventing Plaintiffs' damage, and the likelihood of causing the plaintiffs' damage and the gravity of that harm outweighed the burden (if any) on the Defendant in

192

adopting such alternative design and the adverse effect (if any) on the utility of the drywall.

911. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in that it fails to conform to an express warranty about the product which induced the use of the product and caused damage to Plaintiffs to the extent that the warranty was untrue.

912. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous due to an inadequate warning, in that, at the time the drywall left Defendant's control, the drywall possessed a characteristic that might cause damage and yet Defendant failed to use reasonable care to provide an adequate warning of such characteristics and/or dangers to users and/or handlers of the drywall.

913. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises.

## COUNT XI
### PRIVATE NUISANCE
### (All Defendants)

914. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

915. The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into structures owned by Plaintiffs and Class Members which has unreasonably interfered, and continues to interfere, with the Plaintiffs' and Class Members' use and enjoyment of their properties and caused them harm and damage as discussed herein.

916. Defendants' interference has impaired the rights of Plaintiffs' and Class Members' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

917. Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

193

918. The interference with Plaintiffs' and Class Members' use of their property caused by Defendants is substantial and is ongoing.

919. Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs' and Class Members' damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

920. As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT XII
## NEGLIGENT DISCHARGE OF A CORROSIVE SUBSTANCE
### (All Defendants)

921. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

922. Defendants had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

923. Notwithstanding their actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, Defendants nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs and class members.

924. By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendants breached their duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs and class members.

925. Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the corrosive and dangerous propensities of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse

194

effects that it could have on the property and bodies of Plaintiffs and Class Members.

926. Plaintiffs and class members have suffered injuries by virtue of their exposure to the defective drywall at issue in this litigation. Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

927. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein. The injuries sustained by Plaintiffs and Class Members are within the foreseeable zone of risk created by Defendants.

**COUNT XIII**
**UNJUST ENRICHMENT**
**(All Defendants)**

928. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

929. Defendants received money as a result of Plaintiffs' and Class Members' purchases of Defendants' defective drywall, or purchases of structures containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

930. Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs and the Class Members.

931. Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

**COUNT XIV**
**VIOLATION OF CONSUMER PROTECTION ACTS**
**(All Defendants)**

932. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

933. This is an action for relief under the various Consumer Protection Acts of the jurisdictions in which affected properties are present, including but not limited to, L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala. Code 1975 § 8-19-1, *et seq.* (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *et seq.* (North Carolina Consumer Protection Act); F.S. § 501.201, *et seq.* (Florida Deceptive and Unfair Trade Practices Act); Va. Code. Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection Act); Tex. Bus. Com. Code Ann. § 17.41, *et seq.* (Texas Deceptive Trade Practices-Consumer Protection Act); Miss. Code Ann. § 75-24-1, *et seq.* (Mississippi Consumer Protection Act).

934. The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of defective drywall constitute violation of the provisions of the Consumer Protection Acts of the Relevant States.

935. Plaintiffs and Class Members have suffered actual damages as a result of Defendants' violation of these Consumer Protection Acts and are entitled to relief.

936. As a direct and proximate cause of Defendants' violations of the Consumer Protection Acts of the Relevant States, Plaintiffs and Class Members have incurred harm and damages as described herein.

196

## COUNT XV
## EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING
### (All Defendants)

937. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

938. Plaintiffs and the Class Members are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

939. Plaintiffs and the Class Members will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, rescind, and/or repair the structures owned by Plaintiffs and Class Members.

940. Plaintiffs, on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) to buy back or rescind the contracts for Plaintiffs' and Class Members' homes or other structures, or in the alternative, remediate, repair and/or replace the drywall in such structures upon proof by the defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the Class and the general public that there is no defect in, or danger associated with, the drywall; (3) institute, at their own cost, a public awareness campaign to alert the Class and general public of the defect and dangers associated with the drywall; and (4) create, fund, and support a medical monitoring program.

941. Until Defendants' defective drywall has been removed and remediated, Defendants must provide continued environmental and air monitoring in the structures owned by Plaintiffs and Class Members.

197

942.   Plaintiffs and Class Members have been exposed to greater than normal background levels of sulfides and other hazardous chemicals as a result of exposures to Defendants' defective and unfit drywall and have suffered personal injuries as a result.

943.   The sulfides and other noxious gases which have been released from Defendants drywall and to which Plaintiffs and Class Members have been exposed are proven hazardous, dangerous, or toxic substances.

944.   Plaintiffs' and Class Members' exposures were caused by the Defendant's negligent or otherwise tortious conduct.

945.   Plaintiffs' and Class Members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

946.   The method and means for diagnosing the Plaintiffs' and Class Members' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the Plaintiffs and Class Members by preventing or minimizing health problems that they may encounter as a result of the defective and unfit drywall.

947.   As a proximate result of their exposure to sulfide and other noxious gases from Defendants' defective and unfit drywall, Plaintiffs and Class Members have developed a significantly increased risk of contracting a serious latent disease.

948.   Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

949.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

198

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class and Subclass Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

- a. an order certifying the case as a class action;
- b. an order certifying the Class and each of the Subclasses;
- c. an order appointing Plaintiffs as the Class Representatives of the Class;
- d. an order appointing undersigned counsel and their firms as counsel for the Class;
- e. compensatory and statutory damages;
- f. punitive damages as allowed by law;
- g. pre and post-judgment interest as allowed by law;
- h. injunctive relief;
- I. an award of attorneys' fees as allowed by law;
- j. an award of taxable costs; and
- k. any and all such further relief as this Court deems just and proper.

Respectfully submitted,

Dated: February 10, 2010      By:_____

Russ M. Herman
Leonard A. Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel MDL 2047*

**PLAINTIFFS' STEERING COMMITTEE**

Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

200

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
 Matthews, Martinez, Gonzales,
 Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

201

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seith Parker
Parker, Waichman, Alonso LLP
27399 Riverview Center Blvd.
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

**OF COUNSEL TO PLAINTIFFS' STEERING
COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W.
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Jeremy W. Alters
Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

**COUNSEL FOR INDIVIDUAL PLAINTIFFS**[1]

---

[1]Attached hereto as Exhibit "C" is the contact information for each plaintiff's counsel and
pro se plaintiff.

203

## Alters, Boldt, Brown, Rash & Culmo
*Counsel on Behalf of the Following Individual Plaintiffs*:

Cherba, Alexander
Garcia, Armando
Gil, Franklin
Marchese, Troy & Dina
Parra, Judy
Smith-Jacob, Shakira

## Alters, Boldt, Brown, Rash & Culmo and
## Shapiro, Blasi, Wasserman & Gora, P.A.
*Counsel on Behalf of the Following Individual Plaintiffs*:

Ankiel, Richard
Arguello, John & Laura
Auker, Dan & Frances
Baker. Keith
Bdaiwi, Dirar
Belfour, Ed & Ashli
Bennett, Marlene
Blue Water Condominium Assoc.
Blue Water of Cape Coral, Inc.
Bookman, Sheryl & Jarrod
Brik, Beni
Cardenas, Edward
Cardoza, Robert
Catalfamo, Edmondo
Cherba, Alexander
Cohen, Lawrence
Defrancesco, Joyce
Delgado, Pedro & Margarita
Fenalson, Jarred & Rochelle
Filardo, Thomas & Thomas Jr.
Forte, Louise M.
Frankhouser, Roy & Mary
Gallacher, Michael & Baker,
Randall
Gianetti, Dominic & Lauren
Gonzalez, Barbara
Harryspersad, Roy

Heinemann, Bernard & Barbara
Holloway, Sylvia & Louis
Jacko, Jan
Jackson, Leonard
Jamison, Steve & Kim
Kessler, Katherine & Andrew
LaGambina, Angelo & Anna
Lalwani, Gul & Deborah
Lamour, Guy
Lynch, Robert & Colette
Magdalena Gardens Condo
Association
Manzur, Mohammed & Kamrun
Marin, Cassandra
Marston, Claire
Marzulff, Paul
Miranda, Jose
Monge, Giraldo & Kelly
Morakis, Nick & Karen
Morales, Jose & Dawn
Nguyen, Thai & Lieu
Olschewski, Krzysztof & Prandi,
Chad
Osicki, Sieward
Perez, Adela
Pigna, Francisco & Ewa
Poggio, James & Janice

Popov, Alexander & Susan
Raymond, Davidson & Jean
Robert
Reckseit, Ronald & Jacqueline
Reeves, Michael & Kathryn
Rismiller, Todd
Roy, Sandy
Santimauro, Robert
Santos, Hector & Fenta, Nigest
Scott, Fay & Benjamin
Serbin, Bruce & Susan
Siegel, Wayne & Mandy
Sitaras, Mindy
Smith, Scott & Wendy
Spiga, Saturnino
Sponsel, David & Julia
Spotts, Russ
Steiner, Stephanie
Teixeira, Peter & Janet
Valdes, Michael
Walker, Andrew & Cathy

## Baron & Budd
*Counsel on Behalf of the Following Individual Plaintiffs*:

Rondeno, Colleen
Stanich, Dorothy
Utterback, John & Beverly

204

**Barrios, Kingsdorf & Casteix,** *Counsel on Behalf of the Following Individual Plaintiffs*:

Lee, Dorothy
Leftwich, Mary
Leftwich, Brian
Leftwich, Owen
Coleman, Kerry
LeBlanc, Erin
Moritz, Christy
Salzer, Doug & Lisa

**Becnel Law Firm**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Elias, Mark
Hite, Tonya
Jackel, Jon

**Bencomo & Associates,** *Counsel on Behalf of the Following Individual Plaintiffs*

Bienemy, Eric

**Berniard Law Firm, Gregory DiLeo and Kanner & Whiteley,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Wiltz, Kenneth & Barbara

**Gould Cooksey Fenne, P.A.,** *Counsel on Behalf of the Following Individual Plaintiffs*:

Lindsay, Horace & Donna
Morgan, Keith & Shirley

**Lewis & Roberts, PLLC,** *Counsel on Behalf of the Following Individual Plaintiffs*

| | | |
|---|---|---|
| Brice, Philip | DeNavea, Martha Lisa | Leone, Michael |
| Almeida, Ximena | Dickey, Jeremy | Luntz, George & Adrienne |
| Barry Litwin & Mel Litwin (A/K/A | Ditianquin, Marlon | Madero, Fernando & Bridget |
| Melvin Litwin) as Trustee of the | Ercolino, Vincent | Maness, Danielle Lee |
| Mel Litwin (A/K/A Melvin | Fatta, Joseph & Tracy | Martin Riback, as Trustee of the |
| Litwin) Declaration of Trust, | Flaherty, Sean | Martin Riback Revocable Trust |
| u/a/d 02/28/06 | Foster, Van | Agreement dated April 4, 1997 |
| Bast, Peter & Robin | Gani, Jacques & Rose | McMurray, Jason Scott |
| Bragoli, Frank & Carolyn | Hampton, Vernon | Molina, Carlos & Margarita |
| Casalengo, Roger & Betty Ann | Herrington, Jason & Cassie | Murray, Paul & Lois |
| Kramer | Hobbie, Wendy Lee | Norris, Melissa |
| Cohen, Jay & Shari | Irvin, Timothy & Karen | Okaily, Rhoda & Aly |
| Collins, Braxton & Kerrie | Jioia, Perry & Alice | Pereca, Joel |
| Conlin, Patrick | Kellner, Alan & Ilana | Renzetti, Nicholas & Adrienne |
| D'Ambrosio, Angelo & Deborah | Kolich, John & Susanna | Richman, Steven & Marsha |
| Dalal, Arish Peter & Alpa | Kovens, Arthur & Martha | RMM Investments, LLC |
| Dawson, Robert | Kropf, Leneva Jean | Santillo, Keith |
| DeNavea, Marta | Lemberg, Mark & Diana | Schour, Stephen & Susan Mitchell |

205

| | | |
|---|---|---|
| Seymore, Melvin | Tuller Investments, LLC | Zagalsky, Yefim & Yelena |
| Shiyou, Norman | Vargas, Odilio | Alekseyeva |
| Siegel, Sandra | Verderame, Frances | Zitner, Sheldon |
| Tilmann, Stacey Ann & Kimberly | Wiggins, Greg & Sherry | |
| Noah | Wiley, John | |

### deGravelles, Palmintier, Holthaus & Furge, LLC *Counsel on Behalf of the Following Individual Plaintiffs*:

Turner, Tyrone C.

### Diliberto & Kirin, *Counsel on Behalf of the Following Individual Plaintiffs*:

Serio, Joseph

### Herman, Herman, Katz & Colar, LLP, *Counsel on Behalf of the Following Individual Plaintiffs*:

Hughes, Mathew and Jan
Peterson, John and Sydna
Quartararo, Joseph
Simon, Catherine
Vapy, Cathy Parker

### Krupnick, Campbell, Malone, *Counsel on Behalf of the Following Individual Plaintiffs*:

| | | |
|---|---|---|
| Adams, John & Andrea | Elliott, Roger & Allison | Machado, William Bicelis & Lopez, |
| Andrade, Sean & Katie | Estadt, Barry | Franyelina |
| Anise, Maikel & Karen | Floyd, Leroy & Bernadette | Peloquin, Michael |
| Areces, Miguel & Jacqueline | Gall, Earl & Gwynn | Perone, Samuel |
| Bertram, Beresford & Theresa | Gatto, Charles | Pratts, Norberto & Belgica |
| Boersma, Kenneth & Victoria | Harikrishnan, Sundaram & Jeeva | Romain, Doug |
| Brynn, Gerald & Betty | Kim, Charles | Russo, Charles & Josephine |
| Campola, Patsy & Maureen | Lippold, Patricia, Hibbs, Janet | Stewart, Chester |
| Catalano, Pete & Annett | Lizotte, Ricahrd, Robichaux, | Valentine, David & Donna |
| Cheeran, Mary & David | Ronald | Vasquez, Claudia |
| Cuellar, Javier | | |
| Dion, David, Parks, Eunice | | |

### Lambert & Nelson, PLC, *Counsel on Behalf of the Following Individual Plaintiffs*:

Carol, Cindy

### Lovelace Law Firm, P.A., *Counsel on Behalf of the Following Individual Plaintiffs*:

Pumberger, Siegfried & Nancy

### Levin, Fishbein, Sedran & Berman
### Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales,
### Kalbac & Kane; and Hausfeld, LLP,
*Counsel on Behalf of the Following Individual Plaintiffs*:

Alvarez, Barbara R.
Barriento, Marc
Bell, Peter & Karen
Coombs, Thomas & Sheri
D'Agostino, Luis
Delayo, William & Jennifer
Dwight, Randy, Hutchinson, Mercedes
Ellington, Peter & Robyn
Fong, Charmaine
Frankze, Julianne & Joshua
Gallardo, Arledys

Gelman, Aleksandra & Roza
Hernandez, Yenny, Perez, Jorge
Johnson, Marjorie
Kennard, Rick
Lugo, Marcela & Rafael
Mendez, Lincoln & America
Necastro, Daniel CC & Mary Jo
Octobre, Marie
Peek, William & Stacy
Perez, Jorge, JP Real Estate Development
Quittner, Lee & Alyssa

Raphael, Gene & Que
Ratliff, Duane & Beth
Resnick, Jonathan S. & Diane
Rosen, Kevin
Rubin, Mitchell
Saliba, Dawn
Talavera, LLC
Tataris, Anna, DeJesus, Roy
Willett, Keith
Wruble, Aaron & Wendy

### Levin, Fishbein, Sedran & Berman
### Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales, Kalbac & Kane;
### Hausfeld, LLP and Law Offices of Richard J. Serpe,
*Counsel on Behalf of the Following Individual Plaintiffs*:

Allen, Philip & Clarine
Anderson, Alexander
Anello, Joe & Delma
Atkins, Taddarreio & Mattea
Atwell, Roger
Bailey, Eric
Baldwin, Jerry & Inez
Barnes, Gerald & Michelle
Barrett, Robert
Berry, Keith & Elizabeth
Blount, Demitrous, Rivera, Brian
Bonsoulin, Brad
Brown, Craig & Angela
Burgohy, Demetria
Cain, Victoria
Campana, Ronald, Jr.
Charsagua, Lupe & Joseph
Cousins, Edwin, III
Crist, Byron & Maria
Curtis, Gregory & Nancy
Darst, Matt & Candi
Day, Dan & Maureen
Dillard, Vida
Dolan, Christopher & Carrie
Dunaway, Lisa & Jason
Dunn, Jeffrey
Edmonds, Rick
Estes, Jeffrey
Evans, Cassie
Fields, Jamell & Sheri

Fontenot, Perry & Cassandra
Fowle, Amanda
Freeman, Carol
Galanda, John & Margaret
Galgano, Barbara & Peter
Gandy, Tappan
Germano, Michelle
Goboy, Arvin & Clarissa
Griffin, James & Kristin
Gulledge, Roy & Juanita
Hand, Bryon
Harry, Joshua & Sharntay
Havrilla, John
Heischober, Steve & Liz
Higgs, Warren & Ann Marie
Hinkley, Curtis & Lynn & Hinkley-Lopez, Stephanie
Hollingsworth, Michael
Hong, Yeong Hee
Hrishikesh, Papansam & P. Ahalya & Rajiv
Jackson, Dennis & Sharon
Jarrett, Scott & Margaret
Johnson, Kenneth & Jeri & Johnson Family Living Trust
Johnson, Pryncess
Jones, Paul & Janet
Jones, Richard & Delores & Anderson, Valerie
Kiewiet, Nathan & Elizabeth

Kim, Soon
Knight, Asa Holden
Leach, Joe & Cathy
Lee, Hoo Suk
Lee, Marianna
Lenander, Jon & Suzanne
Levine, Michael
Levy, Christopher
Loper, Calvin & Tammy
Mackall, Turner & Juanita
Madzuma, Jason & Jessica
Matulenas, Elizabeth & Joseph
McKellar, Preston & Rachel
McLaain, Jason
McLenaghan, Jessica
Michaux, Fred & Vannessa
Morgan, William & Deborah
Myott, Frances
Nguyen, Colleen & Tuan
Nolan, Daniel & Lillian
Oh, Guman
Orlando, Robert & Lisa
Pagano, Sara & Geoffrey
Page, Dwight & psyche
Palamidessi, Anthony & Caroline
Parker, Marlon & Latosha
Perez, Zenaida
Phillips, Jacqueline & Rodney
Popovitch, Robert
Purse, Jason

| Riedl, Anton & Melissa | Stevenson, Marcus & Debbie | | Walker, Ben |
|---|---|---|---|
| Sakony, Karen & Vincent | Tierney, Susan & Jeffrey | | Ward, Lawrence |
| Sakowski, Mark | Tornas, Noel & Coates, Lance | & | Whittington, Brenda & Charles |
| Sherwood, Karl | Masana, Virginia & Villania, | | Wood, Bryand Kimberly |
| Simpson, Catherine | Flor & Nestib, Joan | | Woodson, Gregory & Flordeliza |
| Smith, Andrew & Linda | Topf, Frank & Yvonne | | |
| Smith, Juanita | Vest, Hugh & Tracy | | |
| Starnes, David | | | |

## The Law Office of Joseph M. Bruno, APLC,
### *Counsel on Behalf of the Following Individual Plaintiffs*:

Bailey, Delores
Gordon, Patricia
Holloway, Virgie
Jones, Daphne
Joseph, Louise
LeBlanc, Beatrice
Louis, Leonard
Nelson, Frances

Perez, Sandra
Smith, Gary
Smith, Tarika
Thomas, Herman
Zubrowski, Linda

## Law Offices of Sidney D. Torres, III,
### *Counsel on Behalf of the Following Individual Plaintiffs*:

Arnold, Gloria
Bean, Marquesa & Shantez
Evans, Jamie Lynn
Gundorf, Hazel Mae
Lewis, Torrey & Vondria
Ludwig, Donald J., Sr.
Moran, Shawn & Jill
Sigur, Kenneth M.
Vucinovich, Thomas F.

## Leopold-Kuvin, P.A., *Counsel on Behalf of the Following Individual Plaintiffs*:

Deeg, David & Hooker, Deborah
Lefton, David & Garcia, Michelle

## Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.
### *Counsel on Behalf of the Following Individual Plaintiffs*:

Mendez, Claudia
Nudleman, Gene & Levina, Tatyana
Scott, Cynthia & Jonathan
Torres-Lutz, Marcelo & Cecilia
Wilcox, Eric & Karen

**Martzell & Bickford.** *Counsel on Behalf of the Following Individual Plaintiffs*:

Fisher, Donald & Nadja
Johnson, Audrey Mae
Long, Kenneth
Lubrano, Raymond & Mary
Marullo, Jude
Pennington, Dorothy
Walker, Alphonso & Nora

**Milstein, Adelman & Kreger and Roberts & Durkee,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Hamwee, Mark
Suarez, Humberto

**Morgan and Morgan**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Antinarelli, Paulett
Avery, Janet
Baker, Garry/Lynn
Bowen, Casel
Bynoe, Robert & Little-Bynoe,
Jennifer
Cammarata, Anne
Carr, David
Chimelis, Ariel/Michelle
Cirinelli, Alfred/Lorraine
Clark, James
Clark, Jimmy/Patricia
Colello, Jenine
Cotraccia, Manfredo/Maria
Covetta, Melvyn D.
Daley, Donnett
Desire, Marie
DeYoung, John C.
Dixon, Demetrius
Dorman, Timothy/Melissa
Doster, Mary
Edwards, Richard
Emandez, Vincent/Doren
Espada, Carlos/Elizabeth
Foster, William/Vicki
Gallucci, Gary/Patricia
Garrity, Scott/Amy
Gody, Anthony/Candace
Grayson, Mark/Serafina

Harrison, Wesley
Himmelberger, Kyle/Mamie
Hipps, Edd/Mary
Jablonski, Robert/Colleen
James, Jason/Jessica
Johansson, Henrik/Jennifer
Johnson, Abraham
Kaufman/Manley
Khatamian, Houchang/Hazel
Kotajarvi, Peter
Lang, Dennis/Karen
Latona, Giovanni/Christine
Lester, John/Jacine & Schiller,
Larry
Licon, Eddie
Londono, Mauricio
Madrigal, Wsvaldo/Martha
Matos, Jesse/Morgan
Maurice, Carmine/Emmanie
Maysonet, Erika
McKinnon, Joseph/Christina
McLaughlin, Rose
McLendon, Brian/Stephanie
McNeill, Michael/Stephanie
Medina, Nelson
Meyers, Stuart/Lee
Mirakian, Samuel
Mohammed, Imtiaz/Sabita
Morton, Tony/Veronica & Tipton,

Mendel/Debbie
Nichols, James/Kathleen
Nuqui, Magno/Aracelli
Patterson, Joan
Perga, Anthony/Marcia
Raucci, Steven/Dorothy
Rivas, Rigoberto/Maria, Mitjans,
Luis, Loynaz, Arturo
Rivera, Damian/Sonia
Rosko, Ann
Salman, Samir/Julia
Sanon, Enock/Marie
Santana, Francisco/Maricellis
Santos, Manuel/Judith
Sonnie, Eric/Andrea
Stewart, Lee/Laura
Stowell, Jams/Loretta
Sulen, Francisco, King, Diana
Teague, Eddie/Michele
Valcq, Stephen
Valle, Gladys
Watson, Joan - Trust
Weaver, Linda
Wethington, John/Dena
Whitlock, Scott/Lucille
Winsome, Russell
Yost, Lee/Kimberly

**Morris Bart**, *Counsel on Behalf of the Following Individual Plaintiffs*

Bierria, Cindy & Nathaniel
Hall, Mary & Lorne
Johnson, Barbara & Herbert
Taylor, Willie

209

**James, Hoyer, Newcomer & Smiljanich, P.A. and**
**Norton, Hammersley, Lopez & Skokos, P.A.,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Haseltime, James & Joanne

### Parker, Waichman, Alonso, LLP, *Counsel on Behalf of the Following Individual Plaintiffs*:

| | | |
|---|---|---|
| Amaral, Antonio & Isabel | Henson, Shawn | Murphy, William |
| Avner, Brett & Wendy | James & Barbara Walsh | Paskow, Ross & Jacyln |
| Barnes, Arlana | Jones, Brian, Davis, Kimberly | Pena, Orlando |
| Bartschat, Eric & Anne Marie | Junco, Jorge | Quaranta, Benito |
| Brown, Lacy | Karcher, John, Coaker, Deborah | Quinn, Chris & Kate |
| Cardenas, Francisco | Keeling, Danny | Rappa, Erasmo & Kathleen |
| Cardenas, Frank III | Knight, Christopher & Rosemary | Saltzman, Scott, Mondschein, |
| Corea, Edgar, Gilmore, Elsie | Krause, Donald & Bobby | Jordana |
| Cruz, Robert & Sandra | Marinell, Derek | Scott, Denise |
| De Leon, Gordon | Mattesich, John and Maria, | Turckes, George |
| Earley, Peter & Amanda | Johnson, Rosemary, Morin, | Vayda, Richard & Rita |
| Fluence, Joseph | Barbara | Young, Elizabeth |
| Gittens, Dian | Mattia, Michael & Mary Ellen | Zavala, Carlos |
| Guerriero, Michael & Nancy | McKnight, Ashley & Gloria | |
| Guzman, Fernando | Mosley, Toni | |
| Hanlon, Patrick & Ann | Mundy, Terry | |

### Podhurst Orseck, PA, *Counsel on Behalf of the Following Individual Plaintiffs*:

Anise, Maikel & Karen
Johnson, Travis C. & Kelly E.
Mitchell, Paul & Tellina
Querol, Damien

### Reich & Binstock, *Counsel on Behalf of the Following Individual Plaintiffs*:

Bland, Elbert & Gloria
Frazier, Debra
Givins, Larry & Rose

### Shapiro, Blasi, Wasserman & Gora, PA, *Counsel on Behalf of the Following Individual Plaintiffs*:

Marlinga, Don & Janice

### Taylor, Martino Zarzaur, *Counsel on Behalf of the Following Individual Plaintiffs*:

St. Martin Lions Club
   c/o Don Richardson

**The Thornhill Law Firm, APLC**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Almeida Properties, L.L.C.
McLain, Jon Scott

**Watts Hilliard, LLC**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Braden, Tiffany, as Representative of the
  Estate of Jane Bienemey, Deceased

**Webb & Scarmozzino**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Ball, Ashley
Cruz, Cristina
Destacamento, Marilou & Aladin
Distel, Matthew & Stephanie
Foster, Mark Alan & Sandra
Hembree, Laura Paige & Roger David
Meehan, William & Virginia
Morris, Joyce & James
Pinney, Nelson & Losi

Pollux, LLC
Randazzo, Antonio & Deborah
Sangiovanni, Ralph & Catherine
Santos, Luis & Odette
Villaverde, Gilbert & Gloria
Williams, David & Cassidy

**Willis & Buckley APC**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Alveris, Lucille
Hadley, Stephnea
McCallum, Lona

**Zimmerman Reed**, *Counsel on Behalf of the Following Individual Plaintiffs*:

Ghafari, David

**Pro Se Plaintiffs**

Webley, Symone Mcqueen

211

# Tab #9

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 520 of 668
Case 1:11-cv-22408-MGC Document 27 Entered on FLSD Docket 09/15/2015 Page 2 of 46 of
759

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                          NORFOLK DIVISION


 3

 4   EDUARDO AND CARMEN AMORIN, et al., )
                                        )
 5            Plaintiffs,               )
                                        )
 6   v.                                 )    Civil Action No.:
                                        )       2:11cv377
 7   TAISHAN GYPSUM CO., LTD, et al.,   )
                                        )
 8            Defendants.               )

 9

10                    TRANSCRIPT OF PROCEEDINGS

11                         (Status Hearing)

12

13                        Norfolk, Virginia
                          December 18, 2018

14

15

16   BEFORE:       THE HONORABLE MARK S. DAVIS
                   Chief United States District Judge
17                 and
                   THE HONORABLE ROBERT J. KRASK
18                 United States Magistrate Judge

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 521 of 668
Case 1:11-cv-22408-MGC Document 277-2 Entered on FLSD Docket 09/15/2015 Page 47 of 759

2

```
 1   Appearances:

 2         LAW OFFICES OF RICHARD J. SERPE, P.C.
                 By: RICHARD JAMES SERPE
 3         -- and --
           BRIET DRESCHER IMPREVENTO
 4                 By: JEFFREY ARNOLD BREIT
           -- and --
 5         LEVIN SEDRAN & BERMAN, LLP
                 By: ARNOLD LEVIN
 6                     SANDRA LUCILLE DUGGAN
                       Counsel for Plaintiffs
 7
           WILLCOX & SAVAGE
 8                 By: ERIC DAVID COOK
           -- and --
 9         ALSTON & BIRD LLP
                 By: BERNARD TAYLOR, SR
10                     CHRISTINA HULL EIKHOFF
                       Counsel for Defendants Tiashan Gypsum and
11                     Taian Tiashan Plasterboard

12         KALEO LEGAL
                 By: WILLIAM RUEGER POYNTER
13                     SHEPHERD D. WAINGER
           -- and --
14         ORRICK HERRINGTON & SUTCLIFFE, LLP
                 By: JAMES LAMONT STENGEL
15                     DIANA MARIE FASSBENDER
                       LAWRENCE CHRISTOPHER VEJNOSKA
16                     Counsel for Beijing New Building Materials
                       Public Limited Co.

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 522 of 668
Case 1:11-cv-22408-MGC Document 27-2 Entered on FLSD Docket 09/15/2015 Page 4 of 48
759

1              P R O C E E D I N G S

2

3           (Proceedings commenced at 2:03 p.m. as follows:)

4

5           COURTROOM DEPUTY CLERK:  In Case No. 2:11cv377,

6   Eduardo Amorin, et al. vs. Taishan Gypsum, Co. Limited, et al.

7           Counsel, are we ready to proceed?

8           MR. BREIT:  Plaintiffs are ready.

9           MR. COOK:  Taishan Gypsum is ready.

10          MR. POYNTER:  BNBM is ready, Your Honor.

11          THE COURT:  All right.  Well, good afternoon to all of

12  you.

13          I know that we are here to try to figure out the

14  current status of the case and which way we're going to move

15  forward with the cases, and so I'm looking forward to hearing

16  from all of you about that.

17          Madam Clerk?

18          (Court and courtroom deputy conferred.)

19          THE COURT:  So, Mr. Serpe and Mr. Breit, are you all

20  prepared to make some comments today about where you see the

21  case right now and where you see it going from the plaintiffs'

22  perspective, at least those plaintiffs that you represent?

23          MR. BREIT:  Your Honor, we are prepared to tell you

24  and the Court where we are today.  There have been some --

25          THE COURT:  All right.  Why don't you --

1    THE COURT:  And that's Beijing New Building Materials

2  Public Limited Company?

3    MS. DUGGAN:  Which we refer to as BNBM.  But I would

4  like to point out to the Court that CNBM Group, which was the

5  defendant in this litigation, has been dismissed by Judge Fallon

6  and FSIA grounds.

7    THE COURT:  Did I read their name or is it on my

8  docket?  CNBM?

9    MS. DUGGAN:  China National Building Materials Group

10  was a defendant in the Amorin case, and they were dismissed.

11    THE COURT:  Okay.  It's not listed on my current

12  docket.

13    MS. DUGGAN:  CNBM was also a defendant, but Judge

14  Fallon dismissed CNBM in Virginia.

15    MR SERPE:  With respect to the remaining unrepresented

16  defendants, we're going to prepare papers and have them removed

17  from the case so that we end up with the 175 plaintiffs, and

18  then the two or count them as three if you count TTP and Taishan

19  separately, represented defaulted defendants as the only

20  defendants in the case.

21    THE COURT:  All right.  Mr. Levin, did you need to --

22  do you want to say something?

23    MR. LEVIN:  I think they're going a fine job, Your

24  Honor.

25    THE COURT:  Okay.  There's a microphone back there.

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 524 of 668
Case 1:11-cv-22408-MGC Document 27-2 Entered on FLSD Docket 08/15/2015 Page 50 of 759

56

```
 1              MR. LEVIN:  You will see a lot of strange named
 2   Chinese companies that have no bearing on the case.  In the
 3   beginning of this case, we did not know who manufactured what.
 4   We went to the Internet and picked out Chinese plasterboard
 5   companies and filed complaints to toll statutes of lists under
 6   market share and other indeterminate defendant theories.  We'll
 7   clean up that docket for you, sir.
 8              THE COURT:  Okay.
 9              MR SERPE:  Thank, Your Honor.
10              THE COURT:  Thank you.
11         Mr. Cook, Mr. Poynter, anything else you all want to
12   tell me right now?
13              MR. COOK:  Nothing from Taishan, Your Honor.
14              MR. POYNTER:  Nothing from BNBM, Your Honor.
15              THE COURT:  Counsel, we're going take about a
16   five-minute, hopefully five-minute recess, then we'll come back.
17              (Recess taken from 3:28 p.m. to 3:38 p.m.)
18              THE COURT:  So Mr. Serpe?
19              MR. BREIT:  Your Honor?  Your Honor?
20              THE COURT:  Yes?  Oh, we're still waiting for people?
21   Let's wait a second.  Make sure we've got everybody here.
22              MR SERPE:  I think we have a quorum.
23         Your Honor, we were speaking during the recess, and
24   based on our experience with -- a couple different issues.  One
25   is what should the schedule be with deadlines, and then second
```

```
 1    is these motions, some of the substantive motions, for example

 2    jury trial versus not, and --

 3                (Counsel conferred.)

 4                MR SERPE:  Your Honor, we think that we can reach

 5    agreement given a few more minutes with respect to an

 6    appropriate schedule for submissions that would really work for

 7    all parties.  We're concerned that the lack of distinction

 8    between, you know, an outline of a scheduling order versus the

 9    substantive motions, that there might not have been enough time

10    available for parties to actually do the briefing that we

11    anticipated.  With the Court's indulgence, we'd like to speak

12    for another couple of minutes and see if we could propose a

13    schedule for that.

14                THE COURT:  Mr. Taylor?

15                MR. TAYLOR:  Your Honor, the bottom line is the

16    Christmas Eve comment got all of our attention.  So we want to

17    be sure that we address that.

18                MS. EICKHOFF:  That we're not filing on Christmas Eve.

19    We're working cooperatively to avoid that, Your Honor.

20                MR. LEVIN:  Your Honor, I'm probably -- Levin -- I'm

21    probably the only one not affected by Christmas Eve other than

22    Jeffrey here.  But I can tell you that I am not going to impact

23    on Christmas Eve, because on Christmas Eve I will be looking for

24    a Chinese restaurant that's open.

25                Your Honor, what we would like to do, really, we've
```

# Tab #10

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.);

*Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.);

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No 10-361 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## WITH RESPECT TO PLAINTIFFS' OMNIBUS MOTION FOR CLASS
## CERTIFICATION PURSUANT TO RULES 23(a)(1)-(4)  and 23(b)(3)

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 528 of 668
Case 2:09-md-02047-EEF-MBN Document 22380-1 Filed 06/28/19 Page 2 of 54 of
759

**FINDINGS OF FACT**

## I.  **Introduction**

1.  This matter involves the claims of thousands of class members who have suffered property damages arising from defective Chinese-manufactured drywall ("CDW" or "Chinese Drywall") manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants and used in plaintiffs' properties.

2.  The plaintiffs are active litigants (either in the original action or in complaints in intervention) named in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La.); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); and/or *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.).

3.  The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM");

Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd. (hereafter "TTP").

4.     The "Taishan Affiliates" are comprised of the following entities: BNBM, BNBM Group, CNBM, CNBM Group, and TTP.

5.     From 2005 through 2008, the housing boom and rebuilding efforts necessitated by Hurricanes Katrina and Rita led to a shortage of construction materials in the United States, including drywall.  As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the East Coast and Gulf South.  After the installation of the Chinese Drywall, property owners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829-30 (E.D.La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).

6.     On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred all federal civil actions alleging damages from Chinese Drywall to the United States District Court for the Eastern District of Louisiana for coordinated and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

### A.     The Representative Plaintiffs

7.     Eduardo and Carmen Amorin are participants in *Wiltz*, *Gross*, *Abel*, and each of the

*Amorin* complaints. They own a property located at 240 West End Drive #721, Punta Gorda, FL 33950. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

8. Albert and Betsy Butzer are participants in *Haya* and each of the *Amorin* complaints. They own a property at 9519 26th Bay Street, Norfolk, VA 23518. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

9. Jack and Anna McGinn are participants in *Wiltz* and each of the *Amorin* complaints. They own a property located at 4301 Blackthorne Court, Virginia Beach, VA 23455. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

10. Thomas and Virginia Spencer are participants in *Wiltz*, *Almeroth*, and each of the *Amorin* complaints. They own a property located at 2481 Lakewood Manor Drive, Athens, GA 30606. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

11. Elliot and Angelina Everard are participants in *Gross*, *Abel*, and each of the *Amorin* complaints. They own a property located at 3000 N. Palm Drive, Slidell, LA 70458. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

**B.** **Procedural History**

12. The *Germano* Plaintiffs (Michelle Germano, Dennis and Sharon Jackson, Jason and Lisa Dunaway), on behalf of themselves and all other similarly situated owners, initiated a class action against Defendant Taishan on May 1, 2009, by filing a complaint in the Eastern District of

4

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 531 of 668
Case 2:09-cv-06024-EEF-MBN Document 28089-1 Filed 06/23/19 Page 3 of 657 of
759

Virginia. Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. On August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Taishan. On October 13, 2009, Plaintiffs' case was then transferred to the Eastern District of Louisiana as part of MDL 2047. Subsequent to transfer, on October 30, 2009, Plaintiffs moved to amend the First Amended Compliant to assert a national class against Taishan. Plaintiffs' motion to amend was granted on November 18, 2009. *See* Rec.Doc.# 469.

### C. Default Judgments Have Been Entered Against All the Taishan Defendants

13. The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009 (Rec.Doc. #487);[1] furthermore, seven intervenor Plaintiff families in *Germano* (Robert and Lisa Orlando, William and Deborah Morgan, Joseph and Vannessa Michaux, Preston and Rachel McKellar, Steven and Elizabeth Heischober, Jerry and Inez Baldwin, and Joseph and Cathy Leach), who are Virginia homeowners with Taishan Chinese Drywall in their properties, obtained a default judgment against Taishan on May 11, 2010 (Rec.Doc. #3013).

14. The Taishan Affiliates have also been held in default with respect to the proceedings in *Wiltz*, *Gross*, and *Amorin*. On February 1, 2011, BNBM, BNBM Group, CNBM, and CNBM Group were held in default in the *Gross* proceedings. *See* Rec.Doc.# 7302. These same entities were again held in default in *Gross* on August 7, 2012 (*i.e.*, as to the omnibus intervention complaint that was filed in *Gross*). *See* Rec.Doc.# 15687. On February 24, 2011, BNBM was held in default in the *Wiltz* proceedings. *See* Rec.Doc.# 7735. On July 1, 2014, Taishan, TTP, and CNBM were held in default with respect to the *Amorin* case originally filed in this Court (Case No. 2:11-CV-1395). *See* Rec.Doc.# 17814. Pursuant to this same Order, Taishan and

---

[1] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014).

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 533 of 668
Case 1:Case 2:09-md-02047 Document 22380-10 LEED 06/23/19 Page 5 of Page 458 of
759

TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11-CV-1672). *Id.* Also on July 1, 2014, Taishan, TTP, BNBM, CNBM, and CNBM Group were held in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11-CV-1673). *See* Rec.Doc.# 17815. These default judgments are summarized in the chart below:

**CASES WHERE THE TAISHAN DEFENDANTS HAVE BEEN HELD IN DEFAULT**

|  | Taishan | TTP | BNBM | BNBM Group | CNBM Group | CNBM |
|---|---|---|---|---|---|---|
| *Germano* | X |  |  |  |  |  |
| *Wiltz* |  |  | X |  |  |  |
| *Gross* |  |  | X | X | X | X |
| *Amorin* (Virginia) | X | X |  | X | X | X |
| *Amorin* (Louisiana) | X | X |  |  |  | X |
| *Amorin* (Florida) | X | X |  |  |  |  |

15.     The Court held an evidentiary hearing in the *Germano* proceedings on February 19 and 22, 2010, and issued Findings of Fact and Conclusions of Law on April 8, 2010. *See Germano* Findings of Fact and Conclusions of Law, (hereinafter "FOFCOL"), Rec.Doc. #2380.[2] In the FOFCOL, the Court made judicial findings regarding the scope of remediation and property

---

[2] This Court's FOFCOL are supported by the record presented during the evidentiary hearing on confirmation of the default against Taishan, including the Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. Dated February 19, 2010, the trial transcripts, the testimony and reports of Plaintiffs' expert witnesses, as well as the exhibits admitted into evidence. A complete list of all witnesses providing testimony during these proceedings (whether by live testimony or deposition transcript) and all exhibits admitted into evidence is set forth in this Court's minute entries dated February 22, 2010 and February 26, 2010. *See* Rec.Doc.#s 1258 and 1497.

6

damages sustained by the intervenor *Germano* Plaintiffs as a result of defective Taishan Chinese Drywall. The Court entered a final default judgment with awards to the seven Plaintiff Intervenors on May 10, 2010. *See* Rec.Doc. #3013.

16. Following the *Germano* bellwether trial, counsel for Taishan entered a limited appearance, filed a notice of appeal, and contested the Court's exercise of personal jurisdiction of the Defendant. The parties agreed to stay the appeal for purposes of conducting jurisdictional discovery. At the conclusion of the jurisdictional discovery, the parties briefed the issue of whether or not this Court could exercise personal jurisdiction over Taishan.

17. On September 4, 2012, this Court issued its Order and Reasons denying (1) Taishan's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum, Co., Ltd.*, Case No. 09-6687 [Rec.Doc.# 13490]; (2) Taishan's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss this Action in *The Mitchell Co., Inc., v. Knauf Gips, KG*, Case No. 09-4115 [Rec.Doc.# 13566]; (3) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG*, Case No. 09-6690 [Rec.Doc.# 13590]; and (4) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361 [Rec.Doc.# 13591]. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012) (hereafter the "Jurisdictional Rulings").[3]

---

[3] This Court's Jurisdictional Rulings are supported by the evidentiary record created by the parties and at oral argument. The evidentiary record submitted by the parties includes:

- The exhibits to Taishan's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.#s 13490-2 to 13490-29;
- The exhibits to Taishan's renewed motion pursuant to rules 55(c) and 12(b)(2) to vacate the entry of default and dismiss this action, *see* Rec.Doc.#s 13566-2 to 13566-15;

7

On January 28, 2014, the Fifth Circuit affirmed this Court's jurisdictional ruling in the *Germano* action. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). More recently, the Fifth Circuit affirmed the Court's September 4, 2012 Order as it

- The exhibits to Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd.'s motion pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc.#s 13590-2 to 13590-31;
- The exhibits to Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd.'s motion pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc.#s 13591-2 to 13591-31;
- The exhibits appended to the PSC's Response in Opposition to Taishan Gypsum Co., Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.#s 14202-1 and 14202-2;
- Plaintiffs' Expert Declarations of Professor Liu Junhai, Bing Cheng and Professor James V. Feinerman in Support of the PSC's Response in Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in *Germano* and *Mitchell* and (2) Taishan's Motions to Dismiss the Complaints in *Gross* and *Wiltz*, *see* Rec.Doc.# 14203;
- The exhibits to the PSC's Response in Opposition to Taishan's Motions Pursuant to Rule 12(b)(2) to Dismiss Complaints, *see* Rec.Doc.#s 14204-1 to 14204-3;
- The PSC's Global Statement of Facts and exhibits thereto, *see* Rec.Doc.# 14215;
- The exhibits to Interior Exterior's Memorandum in Support of the PSC's Response in Opposition to Taishan's Motions Pursuant to Rule 12(B)(2) to Dismiss and to Provide Additional Support in Response Thereto, *see* Rec.Doc.#s 14356-1 and 14356-2;
- The exhibits to RESPONSE/MEMORANDUM in Opposition filed by Mitchell Company Inc. re MOTION to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.#s 14372-1 to 14372-10;
- The exhibits to Certain Florida Homebuilders' Amicus Curiae Response to Taishan Gypsum Co. Ltd.'s Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss this Action, *see* Rec.Doc.#s 14390-1 to 14390-26;
- The exhibits to the Memorandum of Taishan Gypsum Co. Ltd. in Reply to Plaintiffs' Opposition to the Renewed Motion to Vacation the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.#s 14572-1 to 14572-12;
- The exhibits to the Memorandum of Taishan Gypsum Co. Ltd. in Reply to Plaintiffs' Opposition to the Renewed Motion to Vacation the Default Judgment and Dismiss this Action, *see* Rec.Doc.#s 14573-1 to 14573-12;
- The exhibits to the Memorandum of Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. in Reply to Opposition to Their Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc.#s 14575-1 to 14575-11; and
- The exhibits to the Memorandum of Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. in Reply to Opposition to Their Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint. *See* Rec.Doc.#s 14574-1 to 14574-11.

8

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 535 of 668
Case 1:Case 2:09md0604d2 EEF-MBN Document 22292-10 Filed 06/28/19 Page 9 of Page 461 of
759

related to the *Gross*, *Wiltz* and *Mitchell* actions. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014). The Fifth Circuit's Orders affirming this Court's Jurisdictional Rulings are now final, as no petitions for a writ of certiorari to the United States Supreme Court were filed. Pursuant to these rulings, jurisdiction over Taishan and TTP has been conclusively established.

### D. Taishan's and TTP's Contacts with the United States

18. Taishan and its wholly-owned subsidiary TTP have a number of contacts with the United States. From 2005 to 2009, Taishan, TTP, and/or their affiliated companies manufactured and sold approximately 1,825,202 sheets of Chinese Drywall that were shipped to and used in the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 849-50. Taishan holds itself out as a Chinese manufacturer of new building materials, particularly drywall, that exports its products world-wide, including the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 850. During the relevant period, Taishan's marketing and informational brochure included an illustration of its world-wide marketing web, which depicted an arrow pointing from China to the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 850. Taishan's website, like its brochure, states that Taishan is one of the largest drywall manufacturers in the world and that it exports its product world-wide, including to the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 850. Taishan also advertises and sells its drywall on Alibaba.com, which allows customers to purchase its drywall worldwide, including in the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 850. The employees of Taishan and TTP use Americanized names, and speak English, and TTP's employees were employed by Taishan specifically to solicit business and service the United States market. *See Jurisdictional Rulings*,

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 536 of 668
Case 2:09-cv-06304-EEF-JCW Document 180-8 Filed 05/09/15 Page 53 of 62
759

894 F.Supp.2d at 850. Taishan and TTP manufactured drywall specifically for U.S. customers by: representing their drywall satisfied American Society for Testing and Materials ("ASTM") standards; measuring the drywall in U.S. measurements; placing on the drywall, labels written in English and information and colors as requested by U.S. customers; and employing packing and shipment of the drywall for the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 850-51.

19. Taishan and TTP shipped large quantities of drywall to the states of Virginia, Florida, and Louisiana. For instance, Taishan directed shipments of drywall to Venture Supply in Virginia totaling 159,000 sheets. *See Jurisdictional Rulings*, 894 F.Supp.2d at 853. From 2006 to 2007, Taishan and/or TTP sold almost 200,000 sheets of its drywall, through several transactions, to Florida customers or customers doing business in Florida. *See Jurisdictional Rulings*, 894 F.Supp.2d at 875. During 2006 and 2007, Taishan and/or TTP sold at least 45,756 sheets of drywall, through a number of transactions, which ended up in Louisiana. *See Jurisdictional Rulings*, 894 F.Supp.2d at 898.

20. In addition to drywall, Taishan also imported and/or sought to import metal studs, framing, tracking, toilets, and sinks to the United States. *See Jurisdictional Rulings*, 894 F.Supp.2d at 877. Taishan has also delivered shipments of drywall to California, New York, and North Carolina. *See* Exhibit "1" to Affidavit of Russ M. Herman in Support of the Plaintiffs' Steering Committee's Global Statement of Facts and Memorandum of Law in Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz, Rec.Doc.#14843-3.

## II.     Judicial Findings Regarding the Defective Nature of Chinese-Manufactured Drywall and the Need for and Scope of Remediation

21.     It has been established by the Consumer Product Safety Commission ("CPSC") and in these proceedings that Chinese Drywall releases reduced sulfur gases.  FOFCOL at 12.  The three main gases that are released from Chinese manufactured drywall are hydrogen sulfide (H2S), carbonyl sulfide (COS), and carbon disulfide (CS2).  FOFCOL at 12.  The CPSC and Plaintiffs' experts have detected reduced sulfur gas emissions by conducting laboratory tests on samples of Chinese drywall.  FOFCOL at 12.  These emissions are often associated with strong odors.  FOFCOL at 12.  The fact that Chinese Drywall emits sulfur gases has been reported by the CPSC, the Florida Department of Health, and other investigatory agencies and firms.  FOFCOL at 12-13.

22.     The sulfur gases released by Chinese Drywall causes offending odors in homes, making them hard if not impossible to live in, and are corrosive to metals, particularly copper and silver.  FOFCOL at 13.

23.     As a result of this Court having held the evidentiary hearing to determine the scope of remediation, cost of remediation and other property damages caused by Taishan Chinese Drywall to the seven Plaintiff – Intervenors, (February 19, 2010, February 22, 2010), the Court's April 8, 2010 FOFCOL resolved a multitude of factual and legal issues for the seven Plaintiff Intervenors' claims against Taishan (such as scope and cost of remediation and the right to recover remediation damages).  To properly remediate plaintiffs' homes, it is established that homeowners will be out of their homes for 4-6 months during remediation, and that families thus are entitled to alternate living expenses during the remediation process.  FOFCOL at 56-57.  Moreover, the average cost of repairing class members' homes is subject to calculation on a

11

formulaic, square footage basis. Indeed, this Court made similar findings in the later *Hernandez* trial. *See* April 27, 2010 Findings of Fact and Conclusions of Law, Rec.Doc.# 2713. The same approach to the determination of damages for repair and remediation is applicable to the class representatives and class members subject to appropriate cost adjustments.

### III.     Alter Ego and/or Piercing the Corporate Veil

24.     The State-owned Assets Supervision and Administration Commission of the State Counsel (hereafter "SASAC") of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. FOFCOL at 10.

25.     The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan and its affiliate companies. FOFCOL at 10. The degree of control SASAC (Government of China) exerts and influences over the Taishan Defendants is extensive. FOFCOL at 10. For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of state-owned enterprises (hereafter "SOEs"); appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council. FOFCOL at 10-11.

26.     Furthermore, SASAC oversees and controls 150 large central SOEs, including CNBM Group. FOFCOL at 11. SASAC owns 100% of the CNBM Group. FOFCOL at 11. CNBM Group, in turn, owns 56.4% of the CNBM and 75% of BNBM. CNBM owns 52.40% of BNBM.

12

Case 2:09-cv-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 538 of 668
Case 2:09-md-02047-EEF-JCW Document 18081-1 Filed 10/16/18 Page 93 of 465 of
759

FOFCOL at 11. On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin

(Taishan) by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. FOFCOL at

10.

27. This Court's Order of September 4, 2012 found that Taishan and TTP are one and the

same entity under an alter-ego and/or agency theory. *See Jurisdictional Rulings*, 894 F. Supp. 2d

at 869-72. For instance, in concluding that TTP's jurisdictional contacts with the state of Florida

could to be attributed to Taishan under an alter-ego or agency theory, this Court made several

important findings regarding the relationship between the companies, including, but not limited to,

the facts that: Taishan controlled 100% of TTP's shares; that several high-ranking Taishan

employees were appointed to the board of directors of TTP; that several former Taishan

employees became employees of TTP, were paid by Taishan during the time they worked for

TTP, and then returned to Taishan after TTP ceased production; that TTP was authorized to use

Taishan's brand, but did not pay for this authorization; that TTP sold Taishan brand drywall; and

that when dealing with customers Taishan and TTP regularly held themselves out as operating as

a single business enterprise. *See Jurisdictional Rulings*, 894 F. Supp. 2d at 869-72. After

applying Florida law to these facts this Court concluded that TTP's jurisdictional contacts should

be imputed to Taishan. *See Jurisdictional Rulings*, 894 F. Supp. 2d at 869-72. The Court

reached the same conclusion for purposes of applying TTP's jurisdictional contacts to Taishan

for purposes of asserting personal jurisdiction over these companies under Louisiana law. *See

Jurisdictional Rulings*, 894 F. Supp. 2d at 895.[4]

---

[4] With the exception of TTP none of the other Taishan Affiliates entered an appearance or
otherwise participated in these proceedings. While the discovery involving TTP established that
Plaintiffs properly pierced the corporate veil as to TTP, the Plaintiffs were unable to proceed

13

28.     CNBM, CNBM Group, BNBM, and BNBM Group are affiliates of Taishan.  *See* Request for Admissions at ¶¶ 7 and 8.[5]

29.     At all relevant times, BNBM and CNBM had and still have control over Taishan and all of its subsidiaries.  *See* Request for Admissions at ¶ 85 and ¶87.

30.     BNBM owned sufficient stock and/or equity ownership in Taishan to give it actual working control over Taishan.  *See* Request for Admissions at ¶ 19.   At all relevant times, BNBM was Taishan's dominant stockholder.  *See* Request for Admissions at ¶ 33.   At all relevant times, BNBM exerted sufficient control over Taishan as its dominant stockholder.  *See* Request for Admissions at ¶ 34.

31.     Taishan and TPP shared common officers, directors, board members, and/or chairmen with BNBM and BNBM Group.  *See* Request for Admissions at ¶ 20.   BNBM and BNBM Group had common employees with Taishan and TPP.  *See* Request for Admissions at ¶ 21.   BNBM and BNBM Group had common personnel and management with Taishan.  *See* Request for Admissions at ¶ 52.   The control of Taishan, BNBM and BNBM Group was unified into a single body of oversight and control.  *See* Request for Admissions at ¶ 23.   At all relevant times, the directors and officers of Taishan who were also the directors and officers of BNBM and BNBM Group acted in concert in the interest of BNBM and BNBM Group.  *See* Request for Admissions at ¶ 24.

---

with any discovery involving the other Taishan Affiliates in light of their default status.

[5]In addition to the above findings, the PSC served Taishan and TPP with a Request for Admissions on July 21, 2014.  *See* Exhibit "A" (hereinafter "Request for Admissions") to Notice of Filing (Admission of Fact by Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. to Request for Admissions Dated July 21, 2014), Rec.Doc.# 17993.  Since neither Taishan nor TPP timely responded to the PSC's Request for Admissions within 30 days after being served, the Request for Admissions are deemed admitted in accordance with Fed.R.Civ.P. 36(a)(3).

32.     Taishan and TPP shared common officers, directors, board members, and/or chairmen with CNBM and CNBM Group.  *See* Request for Admissions at ¶ 49.  CNBM and CNBM Group had common employees with Taishan and TPP.  *See* Request for Admissions at ¶ 50.  CNBM and CNBM Group had common personnel and management with Taishan.  *See* Request for Admissions at ¶ 51.  The administrative control of Taishan, CNBM and CNBM Group was unified into a single body of oversight and control.  *See* Request for Admissions at ¶ 54.  At all relevant times, the directors and officers of Taishan who were also the directors and officers of CNBM and CNBM Group acted in concert in the interest of CNBM and CNBM Group.  *See* Request for Admissions at ¶ 55.

33.     At all relevant times, Taishan was undercapitalized, inadequately capitalized, and thinly incorporated such that it was insufficiently funded, or had insufficient capital to support its operations.  *See* Request for Admissions at ¶ 26.

34.     At all relevant times, Taishan never complied with requisite corporate formalities including, but not limited to, issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions.  *See* Request for Admissions at ¶ 46.

35.     At all relevant times, BNBM, BNBM Group, CNBM, and CNBM Group directly and/or indirectly, financed all or substantially all of Taishan's operations.  *See* Request for Admissions at ¶¶ 27-28.  At all relevant times, BNBM, BNBM Group, CNBM, and CNBM Group paid all or substantially all of Taishan's expenses.  *See* Request for Admissions at ¶¶ 29-30.

36.     At all relevant times, the salaries and other expenses or losses of Taishan were paid by or paid directly with funds originating from BNBM, BNBM Group, CNBM, and/or CNBM Group

15

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/19 Page 543 of 668
Case 2:09-cv-04304-EEF-MBN Document 18081 Filed 08/25/19 Page 96 of 468 of
759

or any of their parents, subsidiaries, or sister entities. *See* Request for Admissions at ¶ 41 and ¶ 60.

37.     At all relevant times, the same person(s) directly controlled the finances of Taishan BNBM, BNBM Group, CNBM, and/or CNBM Group, including but not limited to: loan agreements between Taishan and BNBM, BNBM Group, CNBM, and/or CNBM Group (formal or informal, written or verbal); wire transfers of funds to Taishan from BNBM, BNBM Group, CNBM, and/or CNBM Group; wire transfers of funds to Taishan from BNBM, BNBM Group, CNBM, and/or CNBM Group; and a joint banking and/or checking account for Taishan, BNBM, BNBM Group, CNBM, and/or CNBM Group. *See* Request for Admissions at ¶ 25 and ¶ 56.

38.     At all relevant times, Taishan, BNBM, BNBM Group, CNBM, and/or CNBM Group had centralized accounting. *See* Request for Admissions at ¶ 43 and ¶ 62.

39.     At all relevant times, BNBM , BNBM Group, CNBM, and CNBM Group siphoned funds from Taishan. *See* Request for Admissions at ¶¶ 31-¶ 32.

40.     At all relevant times, there were multiple undocumented transfers of funds between Taishan and BNBM, BNBM Group, CNBM, and/or CNBM Group —both from Taishan to BNBM, BNBM Group, CNBM, and/or CNBM Group and from BNBM, BNBM Group, CNBM, and/or CNBM Group to Taishan. *See* Request for Admissions at ¶ 44 and ¶ 63.

41.     At all relevant times, BNBM, BNBM Group, CNBM, and/or CNBM Group had the authority to withdraw money from Taishan's operating account, and actually did so on several occasions without notice to or permission by Taishan. *See* Request for Admissions at ¶ 45 and ¶ 64.

42.     At all relevant times, Taishan, BNBM, BNBM Group, CNBM, and CNBM Group used

16

the same office spaces and shared resources including, but not limited to: facsimile machines; telephones; internet servers; email accounts; secretarial staff; and office supplies. *See* Request for Admissions at ¶¶ 39 and 59.

43.     At all relevant times, employees of Taishan rendered services on behalf of BNBM, BNBM Group, CNBM, and/or CNBM Group and vice versa—employees of BNBM, BNBM Group, CNBM, and/or CNBM Group rendered services on behalf of Taishan in fulfilling its contractual or business obligations. *See* Request for Admissions at ¶ 42 and ¶ 61.

44.     The allocation of profits and losses as between BNBM, BNBM Group, CNBM, and/or CNBM Group and Taishan is unclear and virtually non-existent. *See* Request for Admissions at ¶ 47and ¶ 66.

45.     BNBM and Taishan's development and production capacities were reported as one in CNBM's May 2010 Overseas Regulatory Announcement. *See* Request for Admissions at ¶ 101. BNBM and Taishan's development and production capacities were reported as one unified report in the 2009 BNBM Annual Report. *See* Request for Admissions at ¶ 102. BNBM and Taishan's development and production capacities were reported as one unified report in the Summary of BNBM 2008 Annual Report. *See* Request for Admissions at ¶ 103. At all relevant times, BNBM and Taishan's development and production capacities were reported as one unified report in the 2006 BNBM Annual Report. *See* Request for Admissions at ¶ 104.

46.     The Corporate Restructuring of CNBM and CNBM Group, wherein BNBM purchased Taishan stock, was not an arms-length transaction, was for inadequate consideration, and was for the purpose of defrauding Taishan's creditors. *See* Request for Admissions at ¶ 77, ¶ 79, and ¶ 80.

17

47.     At all relevant times, Taishan and/or TTP were express and/or implied mandataries (*i.e.* agents) of BNBM, BNBM Group, CNBM, and/or CNBM Group, in that BNBM, BNBM Group, CNBM, and/or CNBM Group had and still has the right to control the conduct and/or actions of Taishan and TTP, and Taishan and/or TTP have authority to bind BNBM, BNBM Group, CNBM, and/or CNBM Group.  *See* Request for Admissions at ¶¶ 82-83.

## CONCLUSIONS OF LAW

**I.     The Taishan Affiliates are Liable to the Class as Affiliates of Taishan or Under the Theory of Alter Ego/Piercing the Corporate Veil**

48.     "[T]he dictionary definition of the term affiliate in Black's Law Dictionary (7th ed.1999) is a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation …".  *Hopkins v. Howard*, 930 So. 2d 999, 1007 (La. App. 4 Cir. 2006), *writ denied*, 930 So. 2d 984 (La. 2006).  In *Southern Capital Enterprises, Inc. & F. David Tutt v. Conseco Services, L.L.C., et al.*,  476 F.Supp.2d 589 (M.D.La. 2007), the court equated the term affiliate to the single business enterprise theory of piercing the corporate veil.  *Id.* at 595.  Under the single business enterprise theory, a court "may disregard the concept of corporate separateness and extend liability to each of the affiliated corporations to prevent fraud or to achieve equity."  *Id.* (quoting *Brown v. Auto. Casualty Ins. Co.*, 644 So.2d 723, 727 (La.Ct.App.1995)).

49.     In *Green v. Champion Ins. Co.,* 577 So.2d 249 (La.Ct.App. 1st Cir.1991), *writ denied*, 580 So.2d 668 (La. 1991), the court set forth a non-exclusive eighteen-factor test to determine whether a group of affiliated entities constituted a single business enterprise. Those factors as set forth by the court are as follows:

   1.  Corporations with identity or substantial identity of ownership, that is, ownership of

18

sufficient stock to give actual working control;

2. Common directors or officers;

3. Unified administrative control of corporations whose business functions are similar or supplementary;

4. Directors and officers of one corporation act independently in the interest of that corporation;

5. Corporation financing another corporation;

6. Inadequate capitalization ("thin corporation");

7. Corporation causing the incorporation of another affiliated corporation;

8. Corporation paying the salaries and other expenses or losses of another corporation;

9. Receiving no business other than that given to it by its affiliated corporations;

10. Corporation using the property of another corporation as its own;

11. Noncompliance with corporate formalities;

12. Common employees;

13. Services rendered by the employees of one corporation on behalf of another corporation;

14. Common offices;

15. Centralized accounting;

16. Undocumented transfers of funds between corporations;

17. Unclear allocation of profits and losses between corporations; and

18. Excessive fragmentation of a single enterprise into separate corporations.

*Green*, 577 So.2d at 257–58. These factors do not constitute an exhaustive list. *Id.* at 258.

Moreover, no one factor is dispositive on the issue of whether a single business enterprise exists.

*Id.* Establishing these facts is common to every class member, thus making class certification

19

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/06/19 Page 546 of 668
Case 2:09-md-02047-EEF-JCW Document 18048 Filed 08/26/14 Page 20 of 72
759

appropriate.

50.     Based upon the Court's above findings of fact, the Court concludes that Taishan, TTP,
BNBM, BNBM Group, CNBM, and CNBM Group constitute a single business enterprise for
purposes of piercing the corporate veil and holding each of these entities liable for the conduct of
their affiliated entities. *See supra* at ¶¶ 21-47.  More specifically, the Court concludes that Class
Counsel has satisfied factors 1-8 and 10-18 of the *Green* eighteen-factor test.  In light of these
conclusions as well as this Court's prior conclusions involving the relationship between the
Taishan Affiliates, the Court concludes that the Taishan Affiliates may be held liable for the
conduct of their affiliated entities.

51.     Although the above analysis involves the application of Louisiana law, the Court
concludes that Taishan, TPP, BNBM, BNBM Group, CNBM, and CNBM Group may be held
liable for the conduct of their affiliated entities under the laws of Virginia, Florida, Mississippi,
and Alabama law.  Under Virginia law, a court may pierce the corporate veil to find that an
individual (or corporation) is the alter-ego of another corporation where it finds "(i) a unity of
interest and ownership between the two entities; and (ii) that one entity used the other "to evade
a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair
advantage." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir. 2002).  Thus,
for a court to disregard the corporate veil, the plaintiff must show that a subsidiary is organized
and operated as a mere instrumentality or conduit of the stockholders, and it must further appear
that recognition of the separate corporate entities would aid an unjust loss or injury. *Marsh
Broadcasting of Washington, D.C., Inc. v. George Mason Univ. Found.*, 21 Va. Cir. 89, 91
(Fairfax County Cir. Ct. 1990) (citing *Beale v. Kappa Alpha Order*, 192 Va. 382, 386, 64 S.E.2d

789 (1951)).  To "pierce the corporate veil" under Florida law, three factors must be proven: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant.  *See Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 4th DCA 2008).  Under Mississippi law, courts will disregard corporate identity if it is shown that one corporation is a "mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation."  Buchanan v. Ameristar Casino Vicksburg, Inc., 957 So.2d 969, 978 (Miss. 2007) (quoting Johnson & Higgins of Miss., Inc. v. Comm'r of Ins., 321 So.2d 281, 285 (Miss.1975)).  To pierce the corporate veil, under Alabama law, a plaintiff must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences. *See* Econ Marketing, Inc. v. Leisure American Resorts, Inc., 664 So.2d 869, 870 (Ala. 1994).  The corporate veil may be pierced where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation. *Id.*

## II.     Plaintiffs are Entitled to Class Certification

As a threshold matter, the Court's analysis of the instant motion for class certification is

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/18 Page 548 of 668
Case 2:09-cv-02040-EEF-JCW Document 18047-1 Filed 06/19/15 Page 24 of 74
759

greatly simplified by the status of the Taishan Defendants as default judgment defendants. Because of the default judgments, liability is conclusively established, and the Court need only determine whether it is appropriate to certify a class under Rule 23 to determine class-wide damages pursuant to Rule 55(b)(2)(B). For the reasons discussed in detail below, the Court concludes that class certification is appropriate.

### A. Standard of Review

52.   Courts that have addressed default judgments in the class certification context have ruled that the admissions of fact in the complaint are not sufficient for class certification. Following the "rigorous analysis" standard set forth in *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982), these courts have reasoned that the legal conclusions of Rule 23 are not waived or admitted by the default. *See*, *e.g.*, *Davis v. Hutchins*, 321 F.3d 641, 648-49 (7th Cir. 2003) (where the court vacated the district court's findings of class damages because class certification had not been determined). The court in *Davis*, held:

> There is the general principle that factual allegations in the complaint are deemed admitted by the defendant upon default; however, application of that general principle does not solve the class-certification issue. Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions.

*Davis*, 321 F.3d at 648-49. *See also Partington v. American Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 341 (4th Cir. 2006) (notwithstanding the entry of default judgment, courts must formally address whether class certification is appropriate under a rigorous Rule 23 analysis). Thus, the Court will engage in rigouours analysis of Rule 23's prepreqisites.

53.   The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001).

22

Class certification is soundly within the district court's discretion, and this decision is essentially a factual inquiry. *Vizena v. Union Pac. R.R. Co.,* 360 F.3d 496, 502-03 (5th Cir. 2004). In some cases it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (U.S. 2011). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (U.S. 2013). Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.*

## B.  Plaintiffs have Established the Requirements of Rule 23(a)

### 1.  Numerosity – Rule 23(a)(1)

54.     To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of proposed class members." *Pederson v. La. State Univ.,* 213 F.3d 858, 868 (5th Cir. 2000). "Although the number of members of any proposed class is not determinative of whether joinder is impracticable," the Fifth Circuit has generally set the threshold of 100 to 150 people as satisfying the numerosity requirement. *Mullen v. Treasure Chest Casino LLC,* 186 F.3d 620, 624 (5th Cir. 1999).

55.     Since the class is comprised of active litigants, Plaintiffs have proven that the class consists of approximately 4,150 members.[6]  Joinder of 4,150 class members is impracticable and

---

[6] *See Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La.); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La) (service of this complaint on the Taishan

23

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/19 Page 550 of 668
Case 2:09-md-02047-EEF-MBN Document 18021-1 Filed 10/25/19 Page 24 of 76 of
759

would lead to a squandering of judicial economy and resources of the parties. The presently available evidence of such a large class demonstrates that the proposed class clearly meets the numerosity requirement. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2012 WL 92498, *9 (E.D. La. Jan. 10, 2012) (finding numerosity requirement satisfied where, "[there were a] large number of potential claimants who may benefit from the Settlement Agreement.").

        **2.**      **Commonality – Rule 23(a)(2)**

56.    The threshold for establishing commonality is not high since "for purposes of Rule 23(a)(2) even a single common question will do." *Dukes*, 131 S.Ct. at 2556. As per *Dukes*, to satisfy Rule 23's commonality requirement, class claims "must depend upon a common contention...of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S.Ct. at 2551. The Supreme Court explained that the key consideration in assessing commonality is not whether the class raises common claims, but whether a class action can "generate common answers apt to drive the resolution of the litigation." *Id.* "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014).

57.    Here, determining class-wide property damages for the class will affect all class members

---

Defendants is ongoing); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.) (service of this complaint on the Taishan Defendants is ongoing); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.) (service of this complaint on the Taishan Defendants is ongoing); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.).

24

in a similar manner.  The factual determination of class-wide property damages is common to the class members, and resolution of this common question will generate common answers apt to drive the resolution of the litigation.  *See Chinese Drywall*, 2012 WL 92498 at \*10 ("because the Judicial Panel on Multidistrict Litigation ordered the subject cases to be consolidated in the MDL based upon commonality of facts, and the factual and legal issues arising from KPT Chinese drywall are common to all claimants."); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 605 (E.D. La. 2006) (finding commonality where a few common, central issues affected all or most of the class members).

> ### a.    Collateral Estoppel Effect of *Germano* Findings of Fact and Conclusions of Law and Res Judicata Effect of the Court's Jurisdictional Rulings

58.    Under the doctrine of collateral estoppel, the Court may also rely on the extensive findings already made by the Court in the *Germano* default judgment proceedings.  (Rec.Doc.# 2380).  The Supreme Court has approved the use of offensive, non-mutual collateral estoppel under certain circumstances.

> Generally stated,  The doctrine of collateral estoppel … bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits.

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979); *see also U.S. v. Davenport*, 484 F. 3d 321, 326 (5th Cir. 2007).  The *Parklane* court noted that certain circumstances might exist in a case to justify a court's refusal to apply collateral estoppels, including where: (a) a defendant has little incentive to defend vigorously, (b) the second action affords the defendant procedural opportunities not available in the first action that could cause a different result, and (c) "if the judgment relied upon as a basis for the estoppels is itself inconsistent with one or more previous judgments in favor of the defendant.  *Parklane,* 439 U.S. at 330-31; *In re Plunk*, 481 F. 3d 302,

308 (5th Cir. 2007).

59.    Under the *Parklane* standards, it is appropriate to give the Findings of Fact and Conclusions of Law a preclusive effect in this class proceeding.  The defendant has had a full opportunity to litigate, but chose not to respond to process.[7]  FOFCOL at 5.  It is also clear that the Court's findings on the scope and cost of remediation and property damages were "necessary to support a valid and final judgment on the merits."  *Parklane*, 439 U.S. at 330-31.  Furthermore, none of the *Parklane* factors which would justify a court's refusal to apply collateral estoppel is present on the *Germano* record.  Therefore under *Parklane* and *Plunk*, the Court holds that the Findings of Fact and Conclusions of Law (Rec.Doc. #2380) are entitled to be given preclusive effect in this class proceeding.

60.    With respect to the Court's Jurisdictional Rulings, Taishan vigorously opposed personal jurisdiction at both the district court level and at the Fifth Circuit Court of Appeals.  Taishan lost at both levels.  Therefore, the Court's Jurisdictional Rulings are entitled to res judicata effect.  "Res judicata means a thing decided; the doctrine states that a final judgment on the merits rendered by a court of competent jurisdiction is conclusive as to the parties and their privies; therefore, attempts to litigate the matter further are barred."  *German v. Corr. Corp. of Am.*, 2006 WL 2583732, * 1 (N.D. Miss. Sept. 6, 2006) (internal quotes omitted), *citing Cromwell v. County of Sac.*, 94 U.S. 351, 352 (1876); *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 535 (5th Cir. 1978).

---

[7] It is noteworthy that intervenor Knauf, prior to withdrawing from the *Germano* proceedings, vigorously contested Plaintiffs' evidence on the scope of remediation and cost of remediation through the process of filing expert reports, cross-examining Plaintiffs' experts at depositions, and filing *Daubert* challenges against Plaintiffs' remediation and damages experts (which were denied).  FOFCOL at 5-6.

26

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/18 Page 553 of 668
Case 2:09-md-02047-EEF-MBN Document 18028-1 Filed 10/16/14 Page 27 of 79
759

61.     In sum, the Findings of Fact and Conclusions of Law from the proceeding for the seven

Plaintiff Intervenors are entitled to be given a preclusive effect under the *Parklane* standards.

The Court's Jurisdictional Rulings are likewise entitled to preclusive effect.

### 3.    Typicality – Rule 23(a)(3)

62.     Rule 23(a)(3) requires that the claims of the class representatives be typical of the class's

claims or defenses.  "The typicality criterion focuses on whether there exists a relationship

between the plaintiff's claims and the claims alleged on behalf of the class."  NEWBERG ON

CLASS ACTIONS §3:13.  Again, the threshold for typicality is low:  class representatives must

show similarity between their legal and remedial theories and the theories of the rest of the class.

*Mullen,* 186 F.3d at 625.  Typicality does not require that the claims of the class are identical, but

rather that they share the same essential characteristics – a similar course of conduct, or the same

legal theory.  *See James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001) (*quoting* 5

James W. Moore, *et al*., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)).

63.     The property damage claims of the class representatives are typical of, if not identical in

nature to, those of the class members.  The determination of these damages depends on the same

factual predicate as to the manufacturer of the defective product, product identification, the

mechanism of damage occurring in class members' homes, the need for remediation, the scope

of remediation, the square footage costs of accomplishing the remediation, and alternative living

expenses during remediation.  *See Chinese Drywall*, 2012 WL 92498 at *10 ("typicality is

satisfied because each of the plaintiffs is seeking money from the Knauf defendants for the costs

of remediation . . . and the proposed Class and Subclass representatives have claims

against KPT which are typical of all plaintiffs.").  Thus, the typicality requirement is met.

27

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/19 Page 554 of 668
Case 2:09-md-02047-EEF-JCW Document 18023-1 Filed 10/08/14 Page 29 of 480 of
759

### 4. Adequacy of Representation – Rule 23(a)(4)

64.     Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members.  There can be differences between the class representatives and other class members so long as these differences do not "create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen,* 186 F.3d at 626.  A district court should evaluate whether the class representatives have a sufficient stake in the outcome of the litigation, and whether the class representatives have interests antagonistic to the unnamed class members. *Id.* (*citing Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir. 1971)).  In addition, the district court should inquire into the zeal and competence of the class representatives' counsel and into the class representatives' willingness to take an active role in the litigation and to protect the interests of absentees. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir. 2001).

65.     Under Fed. R. Civ. P. 23(g), a district court must appoint class counsel at the time the class is certified, unless otherwise provided by statute.  The class counsel must fairly and adequately represent the interests of the class, and the court must review the counsel's work in investigating claims, experience in handling class action litigation, knowledge of the applicable law, and the resources counsel will commit to representing the class. *See* Rule 23(g)(1)(B),(C).

66.     The class representatives have the same interest as class members in obtaining property damage relief from the Taishan Defendants.  They also all share the same interest in the enforcement of a class judgment and the collection of that judgment against the Taishan Defendants.  The class representatives have demonstrated their commitment to the litigation by subjecting their residences to screening inspections to establish product identification and the

fact of corrosion damage. Further, these class representatives have timely completed the court ordered Plaintiffs Fact Sheets.

67.     The proposed Class Counsel are experienced in class action practice, and are well-respected, and competent lawyers. This Court has already had the opportunity to work extensively with each of the proposed Class Counsel and their firms in proceedings related to the default judgment against Taishan and the evidentiary hearing and associated legal briefing relevant to this Court's Findings of Fact and Conclusions of Law as to the seven Intervenor Plaintiffs. Indeed, this Court has previously determined that proposed Class Counsel are adequate for purposes of serving as Class Counsel with respect to the settlements that have been approved by the Court. *See Chinese Drywall*, 2012 WL 92498 at *10-11. The Court has also appointed Class Counsel as lead counsel (Arnold Levin) and Plaintiffs' Liaison Counsel (Russ Herman) in the instant litigation. Thus, the Court finds that the proposed class representatives, (Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard), as well as the proposed Class Counsel (Russ Herman and Arnold Levin) are adequate.[8]

---

[8] Various courts consider *ascertainability* to be a requirement under Rule 23. Ascertainability pertains to the ability of the court based on record evidence to utilize objective criteria to determine who is a class member (and who is not). The Fifth Circuit has referred to ascertainability as an "implied prerequisite of Rule 23." *National Security Fire and Casualty Company*, 501 F.3d 443, 445 (5th Cir. 2007); *see also DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."), *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989); *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981); 5 James W. Moore, et al., MOORE'S FEDERAL PRACTICE § 23.21[1], at 23-47 (Matthew Bender 3d ed. 1997) ("It is axiomatic that in order for a class action to be certified, a class must exist."). Because this class action seeks certification of a class comprised of active litigants, all class members are presently before the Court. The identification of these class members is easily verifiable by reference to the PSC's Omnibus Class Action Complaints or the complaints in

29

## C.     Plaintiffs have Established All of the Requirements of Rule 23(b)(3)

68.     Rule 23(b)(3) requires that the common questions identified in Rule 23(a)(3) predominate

and that the class procedure is the superior method of litigating the claims.

### 1.     Predominance

69.     Predominance is established where common answers to common questions are likely to

"drive the resolution of the [instant] litigation."  *See Dukes*, 131 S.Ct. at 2551 ("what matters to

class certification is not the raising of common 'questions' – even in droves – but, rather the

capacity of a classwide proceedings to generate common answers apt to drive the resolution of

the litigation.") (citations omitted).  In *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133

S. Ct. 1184 (U.S. 2013), the Supreme Court explained that, "Rule 23(b)(3) ... does not require a

plaintiff seeking class certification to prove that each "elemen[t] of [her] claim [is] susceptible to

classwide proof."  *Id.* at 1196.   What the rule does require is that common questions

"predominate over any questions affecting only individual [class] members."  Fed. Rule Civ.

Proc. 23(b)(3) (emphasis added)."  *Amgen*, 133 S. Ct. at 1196.  A district court should consider

how the cases would proceed to trial, that is, whether any cases would require individual trials on

particular issues.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744-45 (5th Cir. 1996) (finding

---

intervention thereto.  *See Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.).

that certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims).

70.    In order to satisfy Rule 23(b)(3)'s requirement that common questions of law and fact predominate, "the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit." NEWBERG ON CLASS ACTIONS § *see also Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.")(citing 7A Wright, Miller, & Kane 518-19).

71.    Because the only claims at issue here are against default judgment defendants, and because the Court has already found sufficient facts to establish the causation issue associated with these types of claims, all that is required is an assessment of damages.  Liability is conceded by default.    Accordingly, the Court will establish class-wide damages pursuant to Rule 55(b)(2)(B).

72.    The Plaintiffs have demonstrated a methodology to calculate class-wide damages in compliance with *Monumental Life Insurance Co. v. National Life,* 365 F.3d 408, 419 (5th Cir. 2004) ("The policy variables are identifiable on a classwide basis and, when sorted, are capable of determining damages for individual policy owners; none of these variables is unique to particular plaintiffs.    The prevalence of variables common to the class makes damages computation 'virtually a mechanical task.'").

73.    As the Eleventh Circuit noted in the *Klay v. Humana*:

> Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class wide basis.  Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially

31

mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.

382 F.3d at 1259-60 (internal brackets, quotations and footnotes omitted).

74.     Damages were previously presented in *Germano* and *Hernandez* and sufficed to allow the Court to make per square foot damage calculations for all affected plaintiffs. *See* FOFCOL (awarding $86/square foot for Virginia); *see also* April 27, 2010 Findings of Fact and Conclusions of Law, Rec.Doc.# 2713 (awarding $81/square foot for Louisiana). Such aggregate proof is sufficient to meet Plaintiffs' obligations subject to appropriate cost adjustments. *See In re Terazosin Hydrochloride*, 220 F.R.D. 672, 699 (S.D. Fla. 2004) ("Assuming the jury renders an aggregate judgment, allocation will become an intra class matter accomplished pursuant to a court approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification."); *In re NASDAQ*, 169 F.R.D. at 525 ("Aggregate computation of class monetary relief is lawful and proper.").

75.     Given that the Court has already found that the costs of remediation can be calculated on a square footage basis and the Court has already determined what other property damages are recoverable, class-wide damages can be established in an efficient manner without the need for a trial.[9] The Court can likewise determine the cost of remediation, through the submission of affidavits, expert evidence and from data gathered by Moss & Associates (subject to appropriate cost adjustments), for remediation costs generally (*i.e.*, empirical evidence concerning the cost or remediation performed by Moss & Associates under the Knauf settlement program). For

---

[9] The claims process in the instant proceedings will be especially streamlined since the parties are already in possession of data needed to establish: (1) product identification for each claimant; and (2) the square footage of each property impacted by the Taishan Defendants' defective drywall.

purposes of calculating class-wide damages, data concerning class members currently before the

Court (*i.e.*, data from BrownGreer PLC concerning the square footage of class members' homes)

can be used to estimate the size of the class so that damages can be calculated on an aggregate

basis. Thus, Plaintiffs can establish a formulaic method to determine class-wide property

damages as required by the Rule 23(b)(3) predominance requirement. *Monumental,* 365 F.3d at

419. Indeed, damages are simply calculated by using a mathematical formula similar to what the

Court utilized in *Germano* and *Hernandez* (*i.e.*, price per square foot to remediate X number of

square feet in class members' homes = damages).

76.     Thus, for the reasons set forth above, all of the requirements of Rule 23(b)(3)

predominance are readily established.

### 2.     Superiority – Rule 23(b)(3)

77.     Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the

class action format is superior to other methods of adjudication: the class members' interest in

individually controlling their separate actions, the extent and nature of existing litigation by class

members concerning the same claims, the desirability of concentrating the litigation in the

particular forum, and the likely difficulties in class management. Fed. R. Civ. P. 23; *Mims v.*

*Stewart Title Guar. Co.*, 590 F.3d 298, 304 (5th Cir. 2009).[10]

---

[10] The Fifth Circuit in *Castano* advised that a district court's superiority analysis should include consideration of the negative impact upon a defendant of certification of a mass tort. *Castano,* 84 F.3d at 746. The court noted that class certification magnifies unmeritorious claims, increases plaintiffs' damage awards, and creates "insurmountable pressure" upon defendants to settle – all of which could be tantamount to "judicial blackmail." *Id.* As noted above, this Court has recognized that the types of claims represented herein are meritorious. FOFCOL at 17-59. In addition, Taishan's contemptuous refusal to appear at the judgment debtor proceedings, should serve to alleviate concern that this particular defendant is experiencing pressure of any kind to resolve these claims, due to so-called "judicial blackmail" or otherwise.

Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/26/18 Page 560 of 668
Case 2:09-cv-04073-EEF-JCW Document 1864-1 Filed 08/26/15 Page 34 of 36 of
759

78.     Class proceedings are a superior method to adjudicate the damage assessment remaining
in this case.   This case presents a factual and procedural status that makes certification
appropriate as a result of the entry of a default judgment on liability and the fact this Court has
already made extensive findings that are applicable to a cross-section of class members.   The
narrow scope of the factual determinations left to be made –the amount of damages for the class–
and the exhaustive record of the relevant factual evidence already reviewed by and ruled on by
this Court greatly enhances the manageability of this matter.   In addition, the Court has already
determined that these claims are meritorious.   FOFCOL at 17-59.   A class proceeding will
facilitate an expeditious and streamlined resolution for all impacted residents.   Given the extreme
costs involved in litigating this matter, class members (as a whole) have no ability to individually
prosecute these matters.   For all the reasons stated above, as well as the procedural advantages of
avoiding duplicate hearings on identical issues, class adjudication is the superior method to
resolve the remaining issues in this dispute.[11]

79.     Therefore, based upon the Findings of Fact and Conclusions of Law, the Court finds that
class certification is appropriate pursuant to Fed.R.Civ.P. 23(a)(1)-(4) and 23(b)(3) and
concludes as follows:

        A.     The certified class is defined as follows:

               All owners of real properties in the United States, who are named
               Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or
               *Wiltz* (*i.e.*, not an absent class member),  asserting  claims  for
               remediated damages arising from, or otherwise related to Chinese

---

[11] Moreover, in light of the JPML's Order transferring these cases and consolidating them before
this Court pursuant to 28 U.S.C. §1407, "[t]his factor should…be of little or no significance in
resolving  the  superiority  issue."   NEWBERG  ON  CLASS  ACTIONS,  §4:31.   The  JPML
previously considered, pursuant to 28 U.S.C. §1407, the desirability of centralizing the Chinese
Drywall litigation in this particular forum.

Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

B.  The above-defined class is comprised of active litigants (either in the original action or in complaints in intervention) who are participants in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum CorF Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.).[12]

C.  Plaintiffs, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard shall serve as class representatives.

D.  Russ Herman of Herman, Herman & Katz, LLC, and Arnold Levin of Levin, Fishbein, Sedran & Berman are appointed as Class Counsel.

E.  The notice appended hereto as Exhibit "A" is hereby approved, as modified, by the

---

[12] For administrative reasons the class definition is limited to the actions in *Amorin*, *Germano*, *Gross* and *Wiltz*. All class members are named plaintiffs in the *Amorin* actions.

35

Court. The opt out period shall be 30 days from the date of this Order.


New Orleans, Louisiana, this 26th day of September, 2014.

_____

U.S. District Judge

# Tab #11

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 564 of 668
Case 1:11-cv-22408-MGC Document 27 Entered on FLSD Docket 03/15/2019 Page 490 of
759

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      CASE NO. 11-CV-22408-MGC

 3

    MR. EDUARDO AMORIN, et al.
 4                                            Miami, Florida
                    Plaintiff(s),
 5                                            February 13, 2019

 6           vs.

    TAISHAN GYPSUM CO, LTD., f/k/a
 7  SHANDONG TAIHE DONGXIN CO., LTD.,
    et al.
 8

 9           Defendant(s).        Pages 1 - 26

10  ------------------------------------------------------------

11                         MOTION HEARING
               BEFORE THE HONORABLE MARCIA G. COOKE
12                UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

    FOR THE PLAINTIFF(S):  PATRICK S. MONTOYA, ESQ.
16                         NATALIE RICO, ESQ.
                           Colson Hicks Eidson
17                         255 Alhambra Circle
                           Coral Gables, Florida 33134
18                         (305) 476-7400
                           patrick@colson.com
19                         natalie@colson.com

20                         SANDRA L. DUGGAN, ESQ.
                           Levin Sedran & Berman
21                         510 Walnut Street
                           Philadelphia, Pennsylvania 19106
22                         (215) 592-1500
                           sduggan@lfsblaw.com
23                         alevin@lfsblaw.com

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 565 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 09/15/2015 Page 491 of
759

```
 1    APPEARANCES (CONT'D)

 2    FOR THE PLAINTIFF(S):    PETER ALBANIS, ESQ.
                               Morgan & Morgan
 3                             12800 University Drive
                               Suite 600
 4                             Fort Myers, Florida 33907
                               (239) 433-6880
 5

 6    FOR THE DEFENDANT(S):    BERNARD TAYLOR, ESQ.
      Taishan Gypsum           CHRISTY HULL EIKHOFF, ESQ.
 7                             Alston & Bird
                               1201 W. Peachtree Street
 8                             Atlanta, Georgia 30309
                               (404) 881-7000
 9                             bernard.taylor@alston.com
                               christy.eikhoff@alson.com
10

11                             ENJOLIQUE D. AYTCH, ESQ.
                               Akerman, LLP
12                             350 East Las Olas Boulevard
                               Fort Lauderdale, Florida 33301
13                             (954) 759-8970
                               enjoliuqe.aytch@akerman.com
14

15
      FOR THE DEFENDANT(S):    CRAIG P. KALIL, ESQ.
16    Beijing New Building     JOSHUA D. POYER, ESQ.
      Materials                Aballi Milne Kalil P.A.
17                             1 SE 3rd Avenue
                               Miami, Florida 33131
18                             (305) 373-6600
                               ckalil@aballi.com
19                             jpoyer@aballi.com

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 566 of 668
Case 1:11-cv-22408-MGC Document 27 Entered on FLSD Docket 09/15/2015 Page 492 of
759

```
1    APPEARANCES (CONT'D)

2

3    FOR THE DEFENDANT(S):    L. CHRISTOPHER VEJNOSKA, ESQ.
                              MARC SHAPIRO, ESQ.
4                             Orrick, Herrington & Sutcliff, LLP
                              405 Howard Street
5                             San Francisco, California 94105
                              (415) 773-5700
6                             jstengel@orrick.com
                              adavidson@orrick.com
7                             mshapiro@orrick.com

8

9    REPORTED BY:             Jill M. Felicetti, RPR, CRR, CSR
                              Official Court Reporter
10                            400 N. Miami Avenue, Suite 08S27
                              Miami, Florida 33128
11                            jill_felicetti@flsd.uscourts.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Case called to order of the court at 9:36 a.m.)

2              THE DEPUTY CLERK:  Motion hearing, Mr. Eduardo Amorin

3    v. Taishan Gypsum Company, civil matter.

4              THE COURT:  For the record, appearing on behalf of the

5    plaintiffs.

6              MR. MONTOYA:  Patrick Montoya, Sandra Duggan, Pete

7    Albanis, and Natalie Rico.

8              THE COURT:  Appearing on behalf of the defendants.

9              MR. TAYLOR:  For the record, Bernard Taylor, Christy

10   Eikhoff, and Ms. Enjolique Aytch.

11             MR. KALIL:  Craig Kalil and Joshua Poyer, of Aballi

12   Milne & Kalil, and Christopher Vejnoska and Marc Shapiro of

13   Orrick, Herrington & Sutcliffe, appearing on behalf of

14   BNBM PLC.

15             THE COURT:  What we have this morning is sort of

16   competing motions.  The plaintiffs say for this other set of

17   complaints, which is Docket Entry Number 49, that I should stay

18   the actions; the defendants are saying that all the non-Florida

19   claims should be dismissed.

20             So Mr. Montoya, will you be arguing on behalf of the

21   plaintiffs today?

22             MR. MONTOYA:  Yes, your Honor.

23             THE COURT:  You may proceed.  Mr. Montoya, can you

24   explain to me -- I think I understand -- how this separate set

25   of complaints came to be, and then why is it important to keep

1            It would be an odd jurisprudence, your Honor, to say a

2    non-resident plaintiff who is thrown out of the state on

3    jurisdictional grounds can then come to another court in

4    another state where they don't reside and find jurisdiction

5    there.

6            We think, your Honor, there is no basis, then, for

7    staying these claims, and they should be dismissed, at a

8    minimum, without prejudice.

9            THE COURT:  Thank you, counsel.  Counsel, anyone else?

10   Co-counsel?

11           Mr. Montoya, a brief response?

12           MR. MONTOYA:  Briefly.

13           I want to correct one statement by BNBM's counsel.

14           THE COURT:  What about that last one, that somehow I

15   would have to, sort of, jump another jurisdictional hurdle to

16   have a plaintiff who is jurisdictionally qualified in another

17   jurisdiction end up here?  Wouldn't that plaintiff had already

18   gotten relief in either Judge Fallon or Judge Davis?

19           MR. MONTOYA:  I am happy you raise that because they

20   keep -- what I heard was jurisdiction is done in this case, but

21   what we have seen is after the Fifth Circuit ruled twice and

22   issued a ruling in 2014, the defendants raise Bristol-Myers

23   Squibb in 2017, and then --

24           THE COURT:  Well, I admit the defendants have been

25   extremely litigious on the issue of jurisdiction, but, in their

1    defense, Bristol-Myers Squibb didn't exist until then.

2          MR. MONTOYA:  That's why you stayed the cases, because

3    you stayed them as a protective measure for the plaintiffs to,

4    frankly, have to go through the Hague Convention, spend six

5    figures for each complaint to get it translated and service, in

6    about nine months to a year, and then the Chinese, they just,

7    frankly, reject it.

8          I have been through the service issue.  It goes and it

9    sits in their Embassy, or wherever it sits, for months and

10   months and months, and eventually they reject it, and then we

11   are years down the road.

12         But to go further to your point.  BNBM does have a

13   pending appeal right now on jurisdiction before the Fifth

14   Circuit.  So Judge Fallon's words and the words that your Honor

15   used, it's prudent.  It will be prudent to stay these cases.

16   There is no drain on judicial resources for these non-Florida

17   cases to be here.  There's certainly a drain on plaintiffs'

18   resources if they should be dismissed and have to be refiled

19   due to the time and the money that could be expended.

20         So they keep telling us the jurisdiction is done, but

21   in every instance they have a chance to raise it.  They are

22   able lawyers that are defending their clients, they will do so.

23   We are asking your Honor to simply protect the plaintiffs'

24   rights that do not harm the court.  They have proved no

25   prejudice, and there is no additional judicial labor that has

1    to be done here, and it's potentially great prejudice to the

2    plaintiffs.

3           THE COURT:  Thank you.  I am going to take both of

4    these matters, the plaintiffs' motion to stay and the

5    defendants' motion to dismiss, under advertisement.  I want to

6    take a moment to make sure I understand all of the issues, and

7    I thought by allowing counsel a chance to argue it would, sort

8    of, flesh out some issues for me, which it has.  So order to

9    enter on this matter.

10          Thank you very much, counsel.

11             (Proceedings adjourned at 10:07 a.m.)

12

13                    C E R T I F I C A T E

14

15      I hereby certify that the foregoing is an accurate

16   transcription of the proceedings in the above-entitled matter.

17

18

19   February 21, 2019        /s/ Jill M. Felicetti
                              Jill M. Felicetti, RPR, CRR, CSR
20                            Official Court Reporter
                              400 N. Miami Avenue, Suite 08S27
21                            Miami, Florida 33128
                              jill_felicetti@flsd.uscourts.gov
22

23

24

25

# Tab #12

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 572 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 08/15/2011 Page 498 of
759

# INVESTIGATION OF IMPORTED DRYWALL
## *STATUS UPDATE, SEPTEMBER 2009*

### I. <u>Overview</u>

This update describes new developments in the ongoing investigation of imported drywall and supplements the previous reports provided to the Committee:

- http://www.cpsc.gov/info/drywall/drywallstatus07092009.pdf
- http://www.cpsc.gov/info/drywall/drywallstatus08112009.pdf

Since the August report, the Consumer Product Safety Commission ("CPSC") has received an additional 382 incident reports related to drywall, raising the total number of incident reports to 1192. We also had reports from one new state, South Carolina, making a total of 24 states and the District of Columbia where problem drywall has been reported. The majority of the reports continue to be from Florida, Louisiana, and Virginia.

The focus of the federal drywall team has remained on pursuing the scientific bases of this problem, through the several studies described in previous reports, and tracing the chain of commerce of the drywall. Highlights this past month:

- conducted investigative visit to China including meetings with government officials,
- completed principal field work for 50 home indoor air sampling program,
- coordinated a rapid state and federal response to allegations of radioactive phosphogypsum in Chinese drywall,
- followed-up with more than 500 consumers to update the data submitted in their initial incident reports and
- completed 75 "in-depth investigations" with another 20 in progress.

### II. <u>Federal and State Coordination</u>

Regular coordination and information sharing continues among the federal drywall team and our state partners. Immigration and Customs Enforcement (ICE) has joined the federal partnership with CPSC, EPA, CDC, and HUD as a regular participant in information sharing.

CPSC coordinated testing and reporting results for radioactive phosphogypsum contamination in drywall with the Florida Department of Health and the EPA National Air and Radiation Environmental Laboratory.

The CPSC updated the *Drywall Information Center* website to include a new report form that allows consumers to directly input detailed information about imported drywall in their homes. For those consumers who do not have access to the Internet, the CPSC also takes consumer calls regarding drywall on its Hotline and handled 158 such calls during the month of August.

### III. __International Efforts__

CPSC staff visited China and met with Chinese government officials as well as management from several sites that we believe to be of interest. The team inspected gypsum mines and drywall manufacturing plants in China with Chinese government officials. During the trip, the team collected samples of raw materials and finished products from both mine/manufacturing establishments and retailers and met with the China Building Materials Academy, a state-owned research and development institute.

### IV. __Progress in the Investigation__

A.    Investigation into Scope of Affected Homes and Chain of Commerce

CPSC continues to analyze the information received from consumers, builders, importers, manufacturers and suppliers of drywall to determine how much imported drywall is affected and where that drywall has been installed. To date, CPSC staff has confirmed that during 2006, 6,997,456 sheets of Chinese drywall were imported into the U.S. and 28,778 sheets were imported into Guam, Saipan, and American Samoa. The staff is continuing to verify more shipments through our partnerships with CBP and ICE, as well as by investigating importers and distributors.

B.    Technical Investigation

Engineering, health and safety analyses continue as planned and discussed in earlier reports. CPSC engineering staff has visited ten homes in Florida, Louisiana and Virginia to harvest samples of electrical, plumbing and safety systems. To date, we have gathered 110 electrical receptacles, 31 switches, 5 circuit breakers, 26 smoke alarms, and 18 samples of copper piping, among other such components. Eighty pieces of drywall have been collected from affected homes. We continue to have no confirmed fire incidents involving Chinese drywall, but are investigating all reports on this subject.

EPA is conducting elemental analyses of 15 drywall samples. EPA expects to complete its analyses of drywall samples in the next two weeks. An interagency technical committee has been established which will review all test results and interpretations for the drywall investigation to ensure sound science is employed. We anticipate that the technical committee will complete its review and report its findings to the CPSC in October.

In July, CPSC staff became aware of allegations of the use of radioactive phosphogypsum in some imported drywall. Radioactive materials are outside of the CPSC's authorities under the Federal Hazardous Substances Act, and as such are also outside of our expertise. CPSC staff immediately arranged for testing in the radiation labs of our partner agencies in the State of Florida and with the EPA, and we provided samples to these laboratories for analysis. The data from these tests were reviewed by the interagency technical committee. The results along with the technical review showing that no radiological hazard was found were released on our *Drywall Information Center*.

The chamber studies at Lawrence Berkeley National Laboratory to isolate drywall emissions, as described in the July report, have begun and remain in progress.  Additional samples collected in China will be added to the study and additional time will be needed for that work.  For the in-home indoor air sampling study, the contractor, Environmental Health and Engineering, has already conducted air sampling in all 50 homes, but additional long-term sampling has been added to the tests to improve detection capabilities, and those longer-term tests will be completed later this month.  The evaluation of the results is expected to be complete by October.  The results of both of these studies will be evaluated by the technical committee prior to public release.

\* \* \*

# Tab #13

# Study of the Possible Effect of Problem Drywall Presence on Foreclosures
## Report to Congress
## July 17, 2012

### Summary Overview

This report is HUD's response to section 1494 of the Dodd-Frank Act, which required the Secretary of Housing and Urban Development, in consultation with the Secretary of the Treasury, to conduct a study of the effect on residential mortgage loan foreclosures of: (1) the presence in residential structures subject to such mortgage loans of drywall that was imported from China during the period beginning with 2004 and ending at the end of 2007; and (2) the availability of property insurance for residential structures in which such drywall is present. The report begins by providing context and background information regarding drywall imported from China, its presence in the U.S. homebuilding market, and the recent problems associated with it.  It then calculates the extent of possible impacts associated with problem drywall by estimating of the number of residences built with drywall imported from China, the geographic distribution of these units, and the fraction of units affected.  Following this assessment of scope and scale, the report examines how the presence of problem drywall might catalyze a foreclosure.  This section includes discussion of the indirect consequences of problem drywall, the primary causes of foreclosure in the U.S. housing market, and whether property insurance mitigates the problems caused by some of the Chinese drywall.  The report concludes with recommendations and a summary of key findings.

**Key Findings**. While a significant issue for those with problem drywall in their homes, problem drywall was not a significant contributor to the foreclosure crisis in the United States.  Problem drywall imported from China was most likely used in the construction of approximately 11,000 new homes.  While preliminary estimates indicated the imported drywall could have been used to construct an estimated 25,000 to 31,000 homes, further analysis revealed that not all drywall from China was problematic, reducing the figure to approximately 11,000 homes affected.  This

1

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 577 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 08/15/2015 Page 803 of
759

is HUD's best estimate, as it incorporates non-public data compiled by the U.S. Consumer Product Safety Commission as part of their study on the drywall problem. Given that there were approximately 1.2 million foreclosure completions (REOs) during 2007 and 2008, as well as others in process at other times, drywall could have been responsible for less than 1 percent of foreclosures since the foreclosure crisis began. Even in places where the problems were concentrated, such as Florida, the fraction of foreclosures potentially caused by problems associated with drywall is quite low. Finally, although the presence of problem drywall is not a significant factor in the nation's foreclosure crisis, it is enough of a detriment to potentially trigger foreclosure among the Americans who own these homes.

## Background and Origins of the Issue

Drywall, also known as gypsum board, wallboard, and sheetrock, is manufactured from gypsum ($CaSO_4 \cdot 2H_2O$), a soft, semi-water-soluble, crystalline mineral that can either be mined or synthetically produced. This common interior construction material is made by mixing gypsum with water to form a plaster that gets pressed into boards between sheets of paper. Manufacturers produce drywall of various sizes to accommodate different construction needs, with a ½-inch thickness employed most typically in residential buildings. Market demand for drywall surged in 2006, fueled by both a nationwide boom in residential construction and the need for extensive post-hurricane reconstruction along the Gulf Coast.[1] While drywall produced in the United States, Mexico, and Canada had typically met market demand, the supply pressures in 2006 caused users to import a relatively large amount from China and increase imports from still other countries. As shown in Figure 1 and Table 1, 2006 was the only year that a substantial amount – 218,100 metric tons – of drywall was imported from China. This surge occurred in part because, at that point, Chinese drywall was not considered to be fundamentally different from drywall produced elsewhere. As a consequence, a large number

---

[1] Notable events were Hurricane Charley in 2004 and Hurricanes Katrina, Rita and Wilma in 2005.

2

of builders turned to drywall from China to avoid delays in construction that would have arisen otherwise.

Some of the drywall imported from China during this period has since been discovered to be problematic due to its ability to corrode metal in homes. Some have complained of odors due to drywall emissions, sometimes comparing the odor to the smell of rotten eggs.[2] In addition to being malodorous, hydrogen sulfide gas emitted by problem drywall can also corrode a variety of metals, including copper and silver found in personal items in most homes such as silverware, jewelry, and various electronic appliances, devices, and fixtures. Although results from scientific testing conducted by the U.S. Consumer Product Safety Commission (CPSC) do not currently support a finding that corrosion of electronic building components constitutes a safety hazard to building occupants, CPSC continues to investigate this matter.[3] Some residents of homes containing problem drywall have complained of respiratory and other health-related problems associated with the problem drywall. The staff of the CPSC and the Centers for Disease Control and Prevention (CDC) agree that the levels of sulfur gases detected in the affected homes in the fifty-one home study conducted for CPSC (Environmental Health & Engineering, 2010) were at concentrations below the known irritant levels in the available scientific literature; however, it is possible that the additive or synergistic effects of these and other compounds in the subject homes could potentially cause irritant effects to consumers.[4]

While a few dozen or so cases of drywall having this emissions problem have been alleged to be linked with drywall produced in the United States, most of the problems are associated with

---

[2] The CPSC asked Lawrence Berkeley National Laboratories (LBNL) to analyze emissions from thirty drywall samples. That analysis found that "the top ten reactive sulfur emitting samples were of Chinese origin. Certain Chinese samples had emission rates of hydrogen sulfide one hundred times greater than non-Chinese samples." This and other work initiated by the CPSC supports "the preliminary conclusion that: certain Chinese drywall emits reactive hydrogen sulfide at rates much higher than other, non-Chinese drywall, and that hydrogen sulfide has a strong association to corrosion in homes with problem drywall." (U.S. CPSC, April 2, 2010)

[3] For this study, the terms sulfur and sulfide are assumed to include the various corrosive sulfur compounds that might be formed as a result of the emissions from the contaminated drywall.

[4] http://www.cpsc.gov/info/drywall/faqs.html

3

the presence of Chinese drywall.[5]  The CPSC had, as of October 15, 2010, received 3,650 reports concerning problem drywall across 38 states, the District of Columbia, Puerto Rico, and American Samoa (Table 2).  Figure 2 shows that, despite the wide geographic dispersion of complaints, the drywall problem is concentrated in a small number of southern states.  Two states, Florida and Louisiana, account for more than 75 percent of all complaints, and just five states (adding Mississippi, Alabama, and Virginia) account for more than 92 percent of all complaints.  This geographic distribution is due in large part to the distribution of Chinese drywall imports.  As shown in Table 3, 70 percent of all Chinese drywall imports flowed through Florida, and another 16 percent entered the United States through New Orleans, LA and Mobile, AL.

## Problem Drywall – Estimating the Possible Impact

In order to estimate the potential impact of the drywall problem on the foreclosure crisis, one must: (1) quantify the number of units constructed, either completely or partially, with drywall imported from China; (2) calculate the subset of those units likely to have a problem; and (3) determine the likelihood that such problems would lead to a property entering the foreclosure process, from which one can estimate the number of homes with a drywall problem likely to enter foreclosure.  This final estimate can then be compared to the overall number of foreclosures.  The following sections detail processes that produce estimates of each of these, after which they are combined to estimate the aggregate impact of the drywall problem on the foreclosure crisis.

### Estimated Number of Units Constructed with Drywall Imported from China

<u>Section Summary.</u> Using data drawn from multiple sources, the volume of drywall imported from China between 2004 and 2007 is estimated to have been enough to construct as many as 31,000 homes, but more likely was used to construct no more than 25,000 homes. Note that not all drywall imported from China is problematic, so the subset of units with problem drywall

---

[5] For example, the Lowe's settlement (Lamden, 2010) concerned domestic drywall cases.

4

(approximately 11,000 based on our primary estimate and covered in the next section) is less than the total number of units constructed with Chinese drywall.

<u>Analysis.</u> China's share of the drywall imported to the United States is quite small, with the amount being negligible in most years (Table 1).  The lone exception is 2006, when the share from China, in metric tons, represented 22 percent of the total drywall imported into the United States and 1.7 percent of all ½-inch drywall used in the U.S. in 2006.  In total, between 2004 and 2007, 230,850 metric tons of drywall was imported from China, representing 8 percent of all drywall imported and 0.5 percent of all ½-inch  drywall used in the U.S. over that time.[6]  Assuming that the drywall weighs 1.7 pounds per square foot[7] (USGS, 2000), this volume of Chinese drywall translates to approximately 299 million square feet of drywall available for use in the United States.

Recent national surveys of the quantity of drywall used for home construction can be used to estimate the average amount of drywall used in a typical new single-family detached home.  The results of two surveys conducted by the National Association of Home Builders suggest that about 3.7 square feet of drywall is used for every square foot of living space in the United States (table 4).  As about 85 percent of the drywall imported from China was used in southern states, it is most appropriate to apply this ratio to the average size of houses in the South to estimate the number of units that could have been constructed using drywall imported from China.  According to the United States Census Bureau, the median floor area of a new single-family home completed in the South in 2006 was 2,286 square feet.  This implies that the typical southern home would use 8,487 square feet of drywall.  Thus, the nearly 299 million square feet of drywall imported from 2004 to 2007 could have been used to construct almost

---

[6] The Department does not have data concerning different types of drywall imported from China.  The figures on drywall imported from China as a percentage of all ½ inch drywall sold in the United States are calculated under the analytically conservative (i.e., high) assumption that all Chinese drywall is ½ inch drywall.
[7] Using an industry standard of 1.7 pounds per square foot of ½-inch drywall; a metric ton equates to 1,300 square feet.

35,000 homes if one assumes that only ½-inch drywall imported from China was used in each home.

Finally, some drywall is trimmed and discarded during the construction process. By one recent estimate, about 12 percent of drywall is lost as waste (California Department of Resources Recycling and Recovery, 2007). Incorporating this into the previous estimates, approximately 31,000 entire homes could have been constructed from drywall imported from China.

It is arguable that the figure of 31,000 homes represents an upper bound estimate of the number of recently built homes containing drywall imported from China. One possible argument is that not all of the drywall imported from China may have been used in construction. As soon as the problem associated with some drywall became known, builders would have been reticent to buy drywall produced in China regardless of its quality. However, this argument does not apply to the vast majority of Chinese drywall because most of drywall was imported in 2006 and months elapsed before the problems were noticed by homeowners. From its study of the drywall supply chain, the CPSC estimates that 18 percent of all drywall imports from China were either damaged in transport to the United States or remained unused in warehouses.[8] Thus, only 82 percent of the drywall imported from China would have been used in the construction of homes, which reduces the ceiling of 31,000 potential homes affected to 25,000 (0.82 X 31,000). Two primary estimates of the number of houses built with drywall imported from China are presented throughout the analysis: (1) an "upper estimate" of 31,000 homes based entirely on publicly available data and (2) a "lower estimate" of 25,000 homes incorporating information received from the CPSC. The estimate of 25,000 (and 31,000) represents the potential number of homes built with drywall imported from China, whereas the number of homes with problem drywall will be smaller because not all Chinese drywall is problem drywall.

---

[8] CPSC staff communicated this result concerning damaged and stockpiled drywall in an email to HUD staff on March 28, 2011.

6

Another argument for viewing these as upper bound estimates is that drywall is used in a variety of product types not limited to residential uses, such as office, industrial, and retail properties.  If some of the drywall imported from China between 2004 and 2007 was used for purposes other than residential construction, then the estimate of 25,000 (or upper estimate of 31,000) homes would might overstate the extent to which drywall imported from China is present in homes in the U.S. and understate its presence in other structures.  However, estimates of the proportion of drywall produced for residential construction are based on the thickness of the board.  The overwhelming majority of residential construction uses ½-inch board, which is not used commonly in other types of construction.[9]  Although HUD does not have access to data on imports by type of drywall, some experts believe that a majority of the drywall imported from China was ½-inch for residential construction.  Consistent with this view, there have been few complaints of problem drywall in office or retail buildings.[10]  Thus, it is not likely that a significant amount of problem drywall was diverted to non-residential construction.

On the other hand, some estimates place the number of homes with problem drywall in them at almost 100,000.[11]  Given construction fundamentals reviewed above, this number seems implausible based on the amount of drywall imported from China into the U.S.  That noted, one possible justification of a larger estimate is that the construction of a home might involve drywall imported from China in conjunction with drywall from other sources.  If this were true, then the 25,000 (or 31,000) homes would be a lower bound estimate of the number of homes with drywall imported from China in them.[12]

---

[9] Commercial construction uses primarily 5/8" for additional soundproofing and to satisfy fire safety codes (International Code Council, 2009).

[10] This could potentially also be the result of larger office or retail room areas (and volumes) which significantly reduce the drywall to floor area ratio.

[11] However, according to the originator of the 100,000 estimate, the methodology was "unscientific" (Marsteller, 2009).

[12] An argument for a potentially larger number of affected homes stems from the requirements to repair homes damaged by disasters, where only some walls or ceilings must be replaced.  This would have applied more following Hurricane Charley in 2004 where there was minimal flooding than Hurricane Katrina in 2005 where homes that flooded typically had all drywall replaced.

7

Unfortunately, there has been no scientific survey to determine the typical pattern of how drywall imported from China has been used in home construction, whether used exclusively for a given home or in combination with other drywall sources.[13]  Because of the widespread use of specialty drywall subcontractors in residential construction, most homes receive all drywall at a single time from one supplier rather than from multiple suppliers.  Given the high cost of transporting drywall, contractors may not have the option of choosing among many different suppliers.  Using one shipment from the same supplier is also easier because drywall must be installed as quickly as possible to avoid damage.  It is also less burdensome to do business with one supplier than with many.  These arguments suggest a lower likelihood of mixing Chinese drywall and drywall manufactured in other countries; it is likely that Chinese drywall is concentrated in fewer homes.  Although the total number of homes with Chinese drywall is likely far less than 100,000, one must acknowledge that more homes may have drywall imported from China in them than the preliminary estimate of approximately 25,000 (or upper estimate of 31,000) homes built with drywall imported from China.

Thus, there remains considerable uncertainty regarding the number of homes that have drywall imported from China in them.  Lacking data to rationalize either a higher estimate if partial construction patterns prevailed or some lower estimate if some of the problem drywall was used for non-residential construction in any volume, the remainder of the analysis will use the lower and upper estimates of 25,000 and 31,000 homes containing drywall imported from China as a baseline.  In considering the ensuing analysis, readers should remain cognizant of the fact that this number is an estimate and the issues that could make the true presence either larger or smaller.[14]

---

[13] As a consequence, some have discounted the estimate of 100,000 as an "unscientific" estimate (Marstellar, 2009).

[14]  The reader should be assured by the fact that another careful estimate arrived at a roughly similar result: the U.S. Geological Survey estimated that 38,000 were built from drywall imported from China between 1999 and 2008 (U.S. Geological Survey, 2008).

## Estimated Subset of Units with Problem Chinese Drywall

Section summary. Not all homes that have Chinese drywall should be expected to have a drywall problem. Based on information from the CPSC,[15] a problem is associated with about 43 percent of the drywall imported from China. Therefore, HUD's primary estimate of the number of homes with problem drywall is 11,000.

Analysis. CPSC staff, who have been leading research of drywall imports since the onset of the first reports received of problem drywall, estimate that 43 percent of the drywall imported from China is problematic.[16] This estimate was the result of combining information from a variety of sources, some of which are non-public: import records by manufacturer, measurement by the Lawrence Berkeley National Laboratories of sulfur compound emission rates by manufacturer, consumer incident reports, and hundreds of other reports made to the CPSC from builders, suppliers, distributors, importers, and others, which the CPSC has collected in their two year investigation of problem drywall. Applying this ratio to the lower estimate of the stock of 25,000 homes built with drywall imported from China, the number of homes with problem drywall is estimated to be 11,000. Note that this estimate relies upon data that are not public.

An alternative estimate of the percentage of problem drywall could be derived from publicly available information. Laboratory tests conducted by the CPSC in the wake of claims of problems have definitively shown a difference in sulfur compound emissions between Chinese-manufactured drywall and North American-manufactured drywall only some of the time (CPSC, May 2010). In these tests, examiners compared nine Chinese drywall samples manufactured in 2005 and 2006 with 13 North American drywall samples manufactured in 2009 in terms of the level of sulfur compound emissions and the reactivity of these emissions. Seven of the nine Chinese drywall samples produced in 2005 and 2006 were found to emit more reactive sulfur

---

[15] CPSC staff communicated this information to HUD staff in an email dated March 28, 2011.
[16] The equivalence of the frequency of problems arising to the proportion of ½ inch drywall produced domestically (2004-2007) is coincidental. This result was communicated in an email to HUD staff in an email on March 28, 2011.

9

compounds than their North American counterparts, while two showed only minimal differences.[17]  A separate test of Chinese drywall samples from 2009 showed that the later Chinese drywall emitted less sulfur compounds than the 2005 and 2006 samples.[18]  Based on tests conducted on drywall used during the 2004 through 2007 period, one should not expect all of the drywall imported from China during 2004 through 2007 to have a problem.

These tests clearly show a range of sulfur compound emissions among the drywall imported from China within the 2005-2006 cohort.  If one were to take the results of the test as a general pattern, then one would expect problems with Chinese drywall about seven-ninths, or 78 percent, of the time.  However, the small number of the sample means that the percentage is not particularly precise; see below for further discussion of the percentage. While a high percentage, the estimate of seven-ninths implies that it is possible that not all of homes containing drywall from China will have a problem.[19]  One could thus pro-rate the upper estimate of the number of homes built from Chinese drywall (31,000) using this percentage to estimate that 24,000 homes were constructed with problem drywall.  This figure of 24,000 represents the upper estimate of problem homes derived from publicly available data.  This validity of this estimate of seven-ninths is weakened, however, by the Department's lack of knowledge concerning the share of imports attributable to the manufacturers of problem drywall, which would result in a lower estimate.

The true percentage of problem drywall found in homes built from drywall imported from China is probably smaller than the unweighted, laboratory-measured 78 percent, and closer to the CPSC's estimate of 43 percent.  First, the samples collected for analysis were not necessarily

---

[17] Environmental Health & Engineering, 2010.

[18] Including the drywall samples from 2009 would lower the estimated proportion of problem drywall imported from China to 56 percent and the units affected would be 17,000.  However, doing so would be misleading because no drywall was imported from China in 2009.

[19] According to Environmental Health and Engineering (2010): "at this time there is insufficient evidence to support or refute the assertion that all Chinese-origin or imported drywall exhibits the health or corrosive characteristics reported in complaint homes."

designed to be representative of the housing stock built with drywall imported from China during 2004 to 2007. Instead, the drywall samples were collected by CPSC staff from different manufacturers, drywall suppliers, and storage warehouses. Second, the number of observations is small, and not necessarily representative of the proportion of different manufacturer's drywall among imports from China or their subsequent installation in houses. While a small sample size is sufficient to study the chemical properties of drywall, it is not alone sufficient for generalizing the incidence of problem drywall among Chinese imports to the housing produced with drywall imported from China. The incidence (i.e., percentage) of problem drywall may be very similar in the nine samples from China (2005-2006) and the estimated 24,000 homes built from problem drywall (2004-2007). However, the actual percentage is not likely to be identical, and is probably much lower. The calculation of the higher and lower (primary) estimates of homes with problem drywall is summarized in Table 6.

## Estimating Impact: Can a Drywall Problem Trigger Foreclosure?

An important first order question is whether a drywall problem could trigger a foreclosure. To answer this question, one must understand the drivers of default and foreclosure. Default and foreclosure typically arise[20] when: (1) homeowners have negative equity (the value of the home is less than the outstanding principal balance on the mortgage); and (2) homeowners experience a reduction in income and wealth due to the loss of a job or an event such as a medical emergency that makes making monthly mortgage payments difficult. This is often known as a "double trigger."

Regarding the first of these triggers, a simple interpretation of finance theory might lead one to predict default and foreclosure when a household immediately enters a negative equity situation, such that default occurs when the household's mortgage principal is $1 greater than the value of the house, regardless of whether the homeowner can afford to continue making the mortgage payment. This is known as strategic, or ruthless, default.[21] However, most argue

---

[20] U.S. Department of Housing and Urban Development, January 2010. .
[21] U.S. Department of Housing and Urban Development, January 2010.

11

that the level of negative equity must exceed some threshold before default and foreclosure become a possibility.[22] Strategic default is not common for several reasons.[23] Households always need shelter, and defaulting induces costs of search and disruption of established patterns of living. Families also often expect that housing values will rebound, and thus interpret a relatively small negative equity situation as temporary.

Foote et al (2008) examined data on homeowners in Massachusetts over a 20-year period and found that only 6.4 percent of homeowners with negative equity entered foreclosure. Bhutta et al. (2010) found that the median borrower does not strategically default, but rather defaults only after equity falls to negative 62 percent of their home's value, yielding a loan to value ratio of 162. Similarly, Guiso et al. (2009) found that no households would default if the equity shortfall was less than 10 percent of the value of their home. By contrast, 17 percent of the households surveyed report that they would default when the equity shortfall is 50 percent of the value of the home. On balance, economic theory and prevailing evidence suggest that negative equity alone (except in extreme cases) is unlikely to trigger foreclosure.

Rather, some income shock in addition to falling house prices is generally needed to cause default or foreclosure in most cases (Vandell, 1995; Elmer and Seelig, 1999). As one example that offers empirical support for this view, Bhutta et al (2010) found that 80 percent of the defaults in his sample of non-prime loans were generated by income shocks.[24]

In considering the drywall problem in this context, a problem drywall incident may satisfy the characteristics of a double-trigger event as it involves both a significant decline in house value and a potentially significant income shock. Regarding the decline in value, the standard appraisal paradigm for evaluating the economic damage inflicted upon environmentally

---

[22] Bhutta et al., May 2010
[23] U.S. Department of Housing and Urban Development, January 2010.
[24] Given the large declines in home prices during the current housing downturn, some have tried to estimate the frequency of strategic defaults. Guido et al (2009) estimate that 26 percent of defaults are strategic. A question of continuing interest is by just how much the home value needs to fall before a homeowner will consider ruthless default.

contaminated real estate is the difference between its problem-free value clean and its value when it has a problem: $V_c - V_d$ = damage (Mundy, 1992). This damage represents the decline in value, because a prospective buyer would only be willing to pay a price equal to the problem-free value less the damage, so as to be whole post-remediation.

For the drywall problem, there is general agreement among courts and regulators, and among others, that the only guaranteed mode of remediation is to replace all of the problem drywall in houses containing it (Lamden, 2010). Therefore, a straightforward means of computing the impact of the problem is to determine the "cost to cure" by implementing these renovations. In this case, the cost to cure the drywall problem is the cost to completely remove problem drywall and corroded fixtures and install new drywall as well as new fire safety alarms, some electrical components, and gas service piping. It would also include the cost of relocating the homeowner while the work is done, and any other incidentals.

Several media reports have cited $100,000 as an appropriate estimate of the cost to cure homes built using problem drywall (Allen, 2009; Clark, 2010; Martin, 2010). This amount is consistent with the $80.7 million set aside by the Lennar Corporation to assist the rebuilding of 900 homes at an average of $89,700 per home (Wotapka and Whelan, 2010). In addition, Lowe's has reached an out of court settlement that may provide $100,000 in cash to all households with problem drywall purchased from one of the company's retail outlets (Sapien and Kessler, 2010). Finally, the National Association of Home Builders (NAHB) has recently testified before Congress that it would probably cost between one-third of a home's value and up to $100,000 to repair (Mowbray, 2009). While these three independent pieces of evidence converge on a common cost to cure estimate of $100,000, it is useful to conduct more formal analysis to produce an estimate.

The median price of a new home in the first quarter of 2010 was $222,900 (U.S. Department of Housing and Urban Development, 2010). The price-proportional method – namely NAHB's estimate of one-third of a home's value – yields an average estimated cost of $72,600. Another consultant for the construction industry puts the cost at 50 to 55 percent of the cost of construction (NAHB, March 2010), and the average cost of construction per square foot in 2009

13

was $83.89 for the United States as a whole and $76.77 for the South (NAHB, June 2010).  This suggests a nationwide average cost to cure of $42 to $46 per square foot or $38 to $42 per square foot in the South, where construction costs are a bit lower.  Applying these estimates to an average size of 2,400 square feet yields an estimated cost of remediation that ranges from $101,000 to $111,000 nationwide and from $92,000 to $101,000 in the South.  Alternative estimates of the cost of cure are based on floor space and vary between $40 and $60 per square foot (Burdeau, 2010).  Using these estimates, the estimated cost of remediation for the same 2,400 square foot home ranges from $96,000 to $144,000.  The estimates based on square footage do not include the cost of relocating a household and are limited to the cost of repair.  Even using a slightly smaller figure of 2,286 square feet, the median floor area of a newly built home in the South in 2006 (Census, 2009), the estimated range of the cost to cure still comes out centered roughly on $100,000.

Dealing with the drywall problem can also constitute a negative and unexpected income shock.  The costs in this instance consist primarily of additional housing costs incurred as a result of relocating homeowners, but they may also include healthcare costs.  As an example, the American Community Survey indicated the median annual rent in 2009 was $10,100 in the United States and $11,400 in Florida.  [25]Estimates of the length of a drywall remediation are from four to six months (McQueen, April 9, 2010).  These supplemental housing costs are not an insignificant burden: the median income of owner occupants during 2009 was $63,300 nationally and $53,600 in Florida, so the cost of renting alternative living quarters for six months represents as much as 16 to 20 percent of pre-tax monthly income during the remediation (or a total ranging from $5,000 to $5,700).

Given the information on the costs of remediation, one can conclude that the incidence of problem drywall could trigger default.  The $100,000 remediation cost represents a 46.1 percent decline in value for the median house (which is valued at $217,000).  The scenario is

---

[25] Annual rent was assumed to equal twelve times the monthly rent.  Figures for monthly rent are available from the 2009 American Community Survey; the median monthly gross rent for the U.S. was $842 per month $952 and for Florida.

worse for the maximum cost estimate of $144,000, which would represent 66 percent of the average home's value. Assuming a loan to value (LTV) ratio of 80 percent for the median home, a remediation cost of $110,000 would be sufficient to surpass the critical default trigger LTV ratio of 162 percent found by Bhutta et al (2010). Even if the cost of remediation were lower, note that the cost of remediation would add to the decline in home value already caused by the downturn in the housing market during 2007.[26] If the incidence of problem drywall does not cause a default on its own, it could easily become one of many contributing causes.

Can the incidence of problem drywall cause a double-trigger event default? The impact will depend upon the financial resources of the household. For some, rent and relocation may be a relatively small expense. For lower-income households, however, the share of the household budget devoted to housing is much greater than for higher income households.[27] Lower-income households appear to handle the problem by tolerating the odor; ventilating when the HVAC system hasn't been corroded; or staying with friends or relatives until the home is remediated (Martin, 2010; McQueen, 2009). However, in cases where the noxious effects of the problem drywall are extreme, a household may not have much of a choice except to relocate. Even when they try to do so in a cost-minimizing fashion, these households incur housing costs beyond the cost of remediation, thereby increasing the probability of strategic default for households of all levels of income.

There are two fundamental points to be taken from this discussion:

- The reduction in home value as a result of problem drywall is significant enough to cause a default; and

- Not all homeowners should be expected to default.

---

[26] Home prices fell by 9.8 percent during 2007 in Florida as measured by the FHFA index.
[27] In 2009, 66 percent of renter households earning from $20,000 to $34,999 paid more than 30 percent of their earnings on housing, while for renter households earning $75,000 and greater, only 5 percent spent more than 30 percent of their income on housing (US Census, American Community Survey).

15

Table 5 illustrates the number of foreclosures as a result of problem drywall given different default rates for the upper and lower estimates of the total homes built from problem drywall. The maximum number of foreclosures directly caused by problem drywall would occur if all homes built with problem drywall were foreclosed upon. For the lower and primary estimate of problem homes, the maximum number of foreclosures would be 11,000 nationwide and 7,400 in Florida. For the upper estimate of problem homes, the maximum number of foreclosures would be 24,000 nationwide and 16,000 in Florida. As mentioned, it is unlikely that all homeowners will default and be foreclosed upon. An extremely high foreclosure rate of 50 percent leads to estimates of 5,500 - 12,000 and 3,700 - 8,200 foreclosures directly caused by problem drywall for the nation and Florida, respectively. Even a foreclosure rate of 10 percent is relatively high when compared to the foreclosure rate on other loans; the foreclosure inventory rate for all loans in the U.S. was 2.5 percent in the first quarter of 2008 and 4.6 percent in Florida (Mortgage Bankers Association, 2008). If the number of homes affected by problem drywall is greater than the estimate of 11,000 to 24,000, then the resulting foreclosures may also be greater than the estimates presented.

One variable that may influence the effect of problem drywall on foreclosure is the manner in which the problem drywall is distributed among homes (partial versus full construction). The effect of a substantial amount of problem drywall concentrated in a few homes can be expected to cause more defaults than a slight amount of such drywall dispersed over many homes. A household may be able to withstand an incremental loss to the value of its home, but not a more significant reduction in equity. However, it is also possible that the change in the probability of default from a change in the proportion of problem drywall decreases with the proportion of such drywall present. For example, if there are large lump-sum costs of remediation, then we can expect that a partial distribution of drywall over a greater number of homes will result in more foreclosures than a concentration of problem drywall in a few homes.

The foreclosures described above are assumed to have been caused by the problem drywall itself, i.e., a direct effect of the drywall on foreclosures. There is, however, the possibility of an

16

indirect effect such that even those homes that have non-problem drywall suffer a decline in value.

## Indirect Consequences

Economic theory suggests two interrelated mechanisms by which the presence of problem drywall, even if it is not problematic, may impact the value of homes containing it: (i) via a cost-to-cure effect, covered above; and (ii) via an "intangible" stigma effect. In addition to the cost of remediation, problem drywall may also impact the value of homes having – or suspected of having – it by way of a stigma effect. Mundy (1992) notes that "an environmental stigma results from perceptions of uncertainty and risk" associated with contamination that arises from a fear of negative financial, health, and/or other consequences. The stigma effect of environmental contamination is often much more complicated to estimate, and is perhaps more enduring than the cost-to-cure effect (McCluskey and Rausser, 2003).

The logic of stigma in the context of problem drywall is straightforward: even if the material has been removed – but especially if it has not – prospective buyers may have concerns about continued financial, health, or other risks associated with the property. Importantly, this risk is presently demonstrable via no more than a casual reading of recent newspaper articles, which are known to systematically influence real estate markets (Clark et al., 1997; Clark and Allison, 1999). What is more, that same sense of stigma may extend to properties containing such drywall, but that have not exhibited any offensive odor or any other symptoms. This is important because even though most reported negative incidents are in the Southeast where heat and humidity may act as a catalyst,[28] the drywall has been used elsewhere. Even if it takes a combination of intense heat and humidity to trigger the problems of some drywall, there may be patterns of geographic transference due to the material's high degree of visibility in the news and other media. If true, prospective buyers in a distant part of the country may be turned off even if they face little or no risk. Note, however, that research also illustrates that

---

[28] Environmental Health and Engineering (2010) found that the concentration of hydrogen sulfides in indoor air of CPSC's complaint homes is positively and significantly correlated with the dew point, which is a function of temperature and relative humidity.

17

the degree, nature, and existence of stigma effects fluctuate through time and across geographic space (Carruthers and Clark, 2010).[29]

In sum, there is good reason to suspect that presence of Chinese drywall, whether problematic or not, may have an appreciable negative impact on the value of homes that contain it. If the drywall is problematic, there is a cost-to-cure effect, which corresponds to the cost – in terms of both money and inconvenience – of making the affected homeowner "whole" again. Beyond the cost-to-cure effect, there is a less tangible, yet still important stigma effect associated with the fact that homes that were once contaminated may continue to be perceived as such[30], and the stigma effect may spread as information about the risks associated with problem drywall spreads. At present, some uncertainty exists about what actually causes or triggers the problem, and this uncertainty may lead to losses in value in parts of the country where there is no known risk, i.e., hypothetically, a hot humid environment may trigger the problem, but homes located in cool, dry environments may be impacted by a transference of information or misinformation, as the case may be. If the stigma effect is substantial in the case of drywall imported from China, then the relevant baseline of homes affected would be the number of homes built with Chinese drywall (25,000 or 31,000) rather than the number of homes built with problem drywall (11,000 or 24,000). On the other hand, the stigma effect is likely to weaken over time as methods of identifying problem drywall are developed in order to reduce homebuyers' uncertainty.

### Housing Market and Problem Drywall

There are three primary and well understood causes of the foreclosure crisis, and problem drywall is not among them: (i) a slowdown in housing appreciation followed by depreciation in

---

[29] To understand why this is the case, consider the role of information in the housing market. In order for markets to operate efficiently, both buyers and sellers must be well-informed of the costs and benefits associated with their transaction. Hite (1998) finds that buyers in the housing market typically are not well-informed about deleterious environmental factors, such as contamination. When they are, they bid prices down accordingly. And this is in agreement with a large pool of empirical evidence finding that various forms of environmental contamination have adverse effects on housing and other real estate markets (see Freeman 2003).
[30] McCluskey and Rausser (2010) provide evidence that the rapid recovery of property values after cleanup from an environmental contamination is a likely market outcome.

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 594 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 08/15/2015 Page 820 of
759

many areas of the country; (ii) weak economic conditions in many parts of the nation, and (iii) growth in the volume of risky loans (U.S. Department of Housing and Urban Development, January 2010). Despite the severity and intractability of the drywall problem for affected households, it is not considered by expert analysts to have played any substantive part in precipitating the foreclosure crisis. Although Florida has experienced the majority of drywall cases, economic trends in Florida are such that a foreclosure crisis there was even more likely than in the average state: (i) the share of high-cost loans in 2006 was 37.0 percent compared to a 27.2 percent national average; (ii) the annual decline in home prices in 2008 was 20.1 percent in Florida as compared to 3.9 percent nationally; and (iii) the unemployment rate was 6.2 percent in Florida as compared to 5.3 percent nationally (U.S. Department of Housing and Urban Development, January 2010). In sum, the drywall problem did not cause the foreclosure crisis, not even in Florida where the drywall problem is at its worst.

An idea of the relative scale of the foreclosure crisis can be gained by comparing a hypothetical number of foreclosures caused by problem drywall with the actual foreclosures completed. Suppose, in a, worst-case analysis, that all of the foreclosures caused by problem drywall were completed during 2007 and 2008.[31] If 50 percent of all homes that could have been built with problem drywall imported from China between 2004 and 2007, approximately 5,500 homes, went into foreclosure[32] that number would account for only 0.4 percent of all completed foreclosures nationally during 2007 and 2008. In short, even if a large proportion of homes containing problem drywall went into foreclosure, the number would still appear small against the national backdrop. The proportion of foreclosures caused by drywall in Florida is higher at 4.4 percent of foreclosure completions[33] during 2007 and 2008. If half of the upper estimate of

---

[31] Many homes will take some time to reach foreclosure. First, the homeowner has to realize the difficulty of problem drywall and then many will attempt remediation before default. The process of foreclosure itself can take months or as long as two years to complete (Getter,

[32] As explained, not all of the Chinese drywall is problematic, and some of it may never even be detected, so it is not reasonable to suspect that all homes containing it would go into foreclosure.

[33] The foreclosure completion statistic reflects the number of properties that have been foreclosed upon. It is sometimes referred to as "REO" or real estate owned. It is different from total foreclosure in that total foreclosure

19

homes with problem drywall were foreclosed upon, then these foreclosures would represent an equivalently higher fraction of the total inventory of foreclosures: 1 percent of the inventory of foreclosures nationally and 9.4 percent of foreclosure completions in Florida.[34]

## Property Insurance Issues

Property insurance has not been an issue per se, but the lack of insurance as a remedy for the drywall problem has been. Whatever the exact origin of the sulfur emissions by some of the Chinese-manufactured drywall, the insurance industry has by-and-large treated it as a form of pollution, thereby compounding an already thorny problem. The so-called "pollution exclusion" clause in most property insurance policies exempts insurers from having to pay damages associated with environmental contamination. The pollution exclusion emerged in the wake of several large lawsuits seeking redress for industrial pollution in the 1970s. Today, it is common practice for comprehensive general liability insurance policies to eliminate coverage for nearly all types of pollution damage (Lamden, 2010). The property insurance industry followed the standard first set by the commercial insurance industry and added pollution exclusion clauses to home insurance policies.

Hydrogen sulfide and other sulfur compounds emitted from problem drywall are viewed as pollution by the insurance industry. Accordingly, insurers have consistently denied claims made by homeowners and homebuilders alike for damages associated with the problem drywall based on the pollution exclusion. Whether a homeowner is seeking compensation from their home insurance company or damages from a builder's insurance company, the pollution exclusion clause is a fundamental barrier to compensation because it is present in both home and commercial general liability policies (Mowbray, 2009; Dybdahl, 2009). The original purpose of the pollution exclusion is a matter of ongoing dispute but, until it is resolved, its role in compounding the problem presented by the drywall is clear: owners of homes containing

---

statistics includes defaults and auctions which do not always end in foreclosure if the lender or borrower find a way to cure. Thus, the completion is a more restrictive definition of foreclosure.
[34] Annual data on foreclosure completions were forwarded to HUD staff by Realty Trac on July 22, 2011.

affected drywall and the builders who used it are left exposed and have no obvious avenue of recourse.

As a consequence, homeowners have been forced to pursue their insurers and the insurers of builders, drywall suppliers, and others (Mowbray, 2009). Relief to homeowners from insurance companies has not been forthcoming: most insurance companies have yet to pay any claims (Martin, 2010) and some have responded by filing lawsuits of their own against builders (Casale, May 2010). Beyond the pollution exclusion, another justification that insurers have used is the "latent defect" exclusion. The view of many insurers is that the role of home insurance is not to insure against problem material that the homeowner – or their agent – has installed. Consider the kind of perverse incentives that could arise to cut all manner of corners when renovating a home if negative outcomes were dispelled by insurance. In other words, residential property insurance is not viewed as a warranty against problem material – whether installed intentionally or not – but, instead, it is viewed as insurance against sudden accidental events, or "acts of god." Here again, there is disagreement over the interpretation: some attest that, like the use of the pollution exclusion, the use of the latent defect exclusion in the case of drywall that emits sulfur compounds is questionable. A 2000 Louisiana State Supreme Court Case found that the pollution exclusion should not be applied to homeowners who unintentionally find themselves in polluted homes. A past president of the Louisiana Association of Justice has stated that latent defect denials could be challenged at least on the basis of the indirect damage caused to wiring and fixtures (Mowbray, 2009).

In the face of these alternative interpretations of what insurers are liable for, parties on both sides of the dispute have turned to the courts. One broad wrinkle in this process is that the outcome of litigation over insurance liability depends in a fundamental way upon the local interpretation of the law that often varies by state, and even by jurisdiction within a given state (Casale, May 2010).

Finally, a number of other questions for homeowners besides the role of the pollution exclusion (and other exclusions) remain. A crucial question concerns the timing and interpretation of when the drywall incident occurs. For example, Louisiana has a two-year time limit for

21

homeowners to file claims, so that if the clock starts running when the drywall is installed rather when the problem is first noticed, homeowners who have had problem drywall in their homes in 2006 will automatically have their claims denied. Another issue concerns the effect of sulfur compound emissions by drywall on the broader integrity of homes containing it. As an example, it is not clear how insurers would respond to an electrical fire caused by wiring that was first corroded by problem drywall. Moreover, even if suits against builders' insurance companies are successful, damages may be quite constrained because many small builders carry only about $1 million worth of coverage (Mowbray, 2009). It goes without saying that litigation is unpleasant to all involved, but perhaps especially unpleasant to homeowners and homebuilders who may feel randomly injured by such product.

## Recommendations

The problem drywall experience of the past 5 years has highlighted a number of issues that warrant new or continued attention from policy-makers and the construction industry. These issues point to potential actions that can be taken to ensure that another problem similar in form to this one never occurs.

- Recommendation 1: Consistent with the National Technology Transfer and Advancement Act and OMB Circular A-119, HUD should work with other government agencies and the industry to identify opportunities for national standards and testing protocols for construction materials that could be incorporated into the model building codes.

- Recommendation 3: Actively encourage Fannie Mae and Freddie Mac (the Government Sponsored Enterprises (GSEs)) to extend the period of loan forbearance under their policy to 12 months. While the Federal Housing Administration (FHA) and the GSEs have both pursued a policy of loan forbearance (U.S. Department of Housing and Urban Development, 2009; Fannie Mae, 2010), the GSE forbearance period is only six months as opposed to the FHA's twelve. The GSEs should be encouraged to match the FHA policy.

22

## Summary of Findings

This report addresses questions surrounding drywall imported from China, some of which has proven to have problems that unfolded during the 2004 to 2007 timeframe and the set of insurance issues that have since materialized. The specific objectives were to: (i) explain why certain drywall – namely, that imported from China (primarily) in 2006 – can be problematic; (ii) locate the drywall problem within the context of the foreclosure crisis that emerged in the middle part of the past decade and evaluate the potential extent of its contribution to it; (iii) develop an estimate of the economic value of the problem; (iv) identify the salient property insurance issues and describe how these issues may have contributed to the broader problem; and (v) suggest how the federal government may help to ameliorate the problem.

Overall, the analysis reveals that the maximum number of foreclosures caused by the direct effects of problem drywall is 11,000 (or a non-primary estimate of 24,000 using publically available information), exactly corresponding to the estimated number of homes with problem drywall. Only a small amount of drywall was imported from China – enough to build an estimated 25,000 (and as many as 31,000) homes, and not all of those will have problems – but the impact on individual homeowners may be very large. The drywall's contribution to the foreclosure crisis is small with respect to the size of the still-ongoing dislocation, but homeowners faced with the problem are severely impacted and may have an increased incentive to default on their mortgages. The study places primary emphasis on the lower end of the distribution (11,000 maximum foreclosures directly caused by problem drywall) because this estimate incorporates non-public information obtained from the CPSC. The range of estimates represents 0.4 to 1.0 percent of all foreclosures completed in 2007 and 2008., and smaller percentages when foreclosures over a broader period are considered.

However, it is reasonable to expect that only a fraction of the total number of homes with problem drywall will result in a completed foreclosure. If one-half of the homes assumed to be built with problem drywall went into foreclosure, then the foreclosures caused by problem drywall would amount to approximately 5,500 - 12,000 or 0.5 - 1.1 percent of the national inventory of foreclosures at the end of the first quarter of 2008.

23

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 599 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 08/15/2019 Page 825 of
759

# References

Allen, Greg, "Toxic Chinese Drywall Creates A Housing Disaster," National Public Radio, October 27, 2009, http://www.npr.org/templates/story/story.php?storyId=114182073, accessed: November 2, 2010.

Alonso, Parker Waichman Aug 3, 2009, "Chinese Drywall Found in Foreclosed Homes", www.yourlawyer.com, http://www.yourlawyer.com/articles/read/16832, accessed: November 12, 2010.

Ambrose, Brent W., and Charles A. Capone, 1998. "The Conditional Probability of Default," Real Estate Economics, 26 (3): 359-390.

Bajari, Patrick, Chenghuan Sean Chu, and Minjung Park, A Empirical Model of Subprime Mortgage Default from 200 to 2007, NBER Working Paper 14625, http://www.nber.org/papers/w14625, December 2008.

Bay, Carrie, "More Homeowners Underwater as Depression-Era Depreciation Nears," DSnews.com, 11/10/2010, accessed: November 12, 2010.

Bhutta, Neil, Jane Dokko and Hui Shan, "The Depth of Negative Equity and Mortgage Default Decisions," Federal Reserve Board of Governors, Washington, D.C., May 2010

Burdeau, Cain, "Chinese drywall maker, other firms to repair tainted homes in pilot program", Washington Post, October 14, 2010.

California Department of Resources Recycling and Recovery, "Construction and Demolition Recycling, Wallboard (Drywall) Recycling" http://www.calrecycle.ca.gov/condemo/wallboard/, accessed November 2, 2010, last updated: July 26, 2007.

Campbell, John Y., Stefano Giglio, and Parag Pathak. Forced Sales and House Prices. Forthcoming: American Economic Review, 2010.

Carruthers JI, Clark DE (2010) Valuing Environmental Quality: A Space-based Strategy. *Journal of Regional Science,* 50: 801 − 832.

Casale, Jeff, "Judge rejects policy exclusion in Chinese drywall case," Business Insurance, March 31, 2010, http://www.businessinsurance.com/article/20100331/NEWS/100339980, Accessed: November 5, 2010.

Casale, Jeff, "Pollution Exclusion in Focus in Chinese Drywall Litigation," Business Insurance, May 17, 2010, http://www.businessinsurance.com/article/20100516/ISSUE03/305169997, accessed: November 5, 2010.

Casale, Jeff, "Judge sends Chartis' Chinese suit to New Orleans," Business Insurance, September 23, 2010, http://www.businessinsurance.com/article/20100923/NEWS/100929959, accessed: November 6, 2010.

Clark DE, Allison T (1999) Spent Nuclear Fuel and Residential Property Values: The Influence of Proximity, Visual Cues and Public Information. *Papers in Regional Science,* 78: 403 − 421.

Clark DE, Michelbrink L, Allison T, Metz W (1997) Nuclear Power Plants and Residential Housing Prices: Evidence from Two California Plants. *Growth and Change*, 28: 496 − 519.

Clark, Lesley, "Feds advise replacing tainted drywall, electrical components," McClatchy Newspapers, April 2, 2010, http://www.mcclatchydc.com/2010/04/02/91559/feds-advise-replacing-tainted.html, accessed: November 2, 2010.

24

Dybdahl, David, "Chinese Drywall – Insurance Coverage Issues and Solutions," March 2009, http://www.armr.net/chinesedrywall10-09.pdf, accessed: November 7, 2010.

Elmer, Peter J. and Steven A. Seelig. 1999. "Insolvency, Trigger Events and Consumer Risk Posture in the Theory of Single Family Mortgage Default," Journal of Housing Research 10 (1): 1-25.

Environmental Health & Engineering, Inc. "Final Report on an Indoor Air Quality Assessment of Residences Containing Chinese Drywall," prepared for the U. S. Consumer Product Safety Commission, January 28, 2010.

Fannie Mae, "Fannie Mae Policy Will Provide Immediate Relief for Homeowners with Problem Drywall," June 17, 2010, http://www.fanniemae.com/newsreleases/2010/5066.jhtml, accessed: July 22, 2011.

Freddie Mac, "Freddie Mac Announces Forbearances for Borrowers with Single Family Homes Affected by Problem Drywall," June 18, 2010, http://www.freddiemac.com/news/archives/singlefamily/2010/20100618_drywall.html, Accessed: July 22, 2011.

Foote, Christopher L., Kristopher Gerardi, and Paul Willen, "Negative Equity and Foreclosure: Theory and Evidence," Journal of Urban Economics (64): 234-245, 2008.

Getter, Darryl E., "Understanding Mortgage Foreclosure: Recent Events, the Process, and Costs," November 5, 2007, Congressional Research Service, http://assets.opencrs.com/rpts/RL34232_20071105.pdf, Accessed: July 22, 2011Green, Richard K. Eric Rosenblatt, and Vincent Yao, "Sunk Costs and Mortgage Default," working paper, February 4, 2010, http://ssrn.com/abstract=1547812

Guiso, Luigi, Paolo Sapienza and Luigi Zingales, "Moral and Social Constraints to Strategic Default on Mortgages," July 2009, NBER Working Paper 15145, National Bureau of Economic Research.

Hagerty, James. R. , "Lennar Tots Up Chinese Drywall Damage," Wall Street Journal, July 13, 2009, http://online.wsj.com/article/SB124726920245725829.html, accessed: November 5, 2010.

Hartley, Daniel, "The Effect of Foreclosures on Nearby Housing Prices: Supply or Disamenity?," Working Paper 10-11, Federal Reserve bank of Cleveland, September 2010.

Immergluck, Daniel, and Smith, Geoff. 2006. "The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values," Housing Policy Debate 17 (1): 57-80.

Internal Revenue Service, "IRS Provides Relief for Homeowners with Corrosive Drywall," Sept. 30, 2010, http://www.irs.gov/newsroom/article/0,,id=228402,00.html, accessed November 1, 2010.

International Code Council, Inc., 2009 International Building Code, 2009.

Kiefer, Leonard C. and Hua Kiefer, "The Co-Movement of Mortgage Foreclosure Rate and House Price Depreciation: A Spatial Simultaneous Equation System," paper presented at the American Real Estate and Urban Economics Association, Washington DC, May 2010.

Kilgore, Austin, "GSEs Plan Chinese Drywall Mortgage Forbearances," Housing Wire, June 18th, 2010, http://www.housingwire.com/2010/06/18/gses-plan-chinese-drywall-mortgage-forbearances, accessed: November 12, 2010.

Lamden, Seth, Chinese Drywall: Big Damage Claims and Big Insurance Coverage Disputes Ahead, martindale.com Legal Library, October 25, 2010, http://www.martindale.com/products-liability-law/article_Howrey-LLP_1176920.htm, accessed: November 7, 2010.

Marseteller, Duane "Is scope of Chinese drywall problem exaggerated?", Brandenton Herald, November 27, 2009, http://www.bradenton.com/2009/11/27/1877882/is-scope-of-chinese-drywall-problem.html, accessed: November 3, 2010

Martin, Andrew, "Drywall Flaws: Owners Gain Limited Relief", The New York Times, September 17, 2010.

McCluskey, Jill J. and Gordon C. Rausser, "Stigmatized Asset Value: Is It Temporary or Long Term?" The Review of Economics and Statistics, May 2003, 85(2): 276-285.

McMillen D, Thrsnes P (2003) The Aroma of Tacoma: Time-Varying Average Derivatives and the Effect of a Superfund Site on House Prices, Journal of Business and Economic Statistics 21: 237-246.

McQueen, M.P., "The Prisoners of Drywall," Wall Street Journal, August 7, 2009, http://online.wsj.com/article/SB10001424052970203674704574332264031026476.html

McQueen, M.P, "Judge Awards $2.6 Million in Chinese Drywall Case," Wall Street Journal, April 9, 2010, http://online.wsj.com/article/SB10001424052702304198004575171853420327126.html

Mineral Information Institute (2001), "Look around…everything is made of something," http://www.mii.org/PosterDetSomething.htm, accessed: November 2, 2010.

Mortgage Bankers Association, National Delinquency Survey, First Quarter 2008, June 2008.

Mowbray, Rebecca, "Homeowners with Chinese drywall have been rebuffed by insurers, but hope may not be lost," The Times-Picayune, October 18, 2009, http://www.nola.com/business/index.ssf/2009/10/homeowners_with_chinese_drywal.html, accessed: November 5, 2010.

National Association of Home Builders (NAHB), Annual Builders' Practices Survey, for years 2006 and 2009, published in 2007 and 2010 respectively.

National Association of Home Builders (NAHB), Price per Square Foot by Location, June 2, 2010, http://www.nahb.org/reference_list.aspx?sectionID=130, Accessed: November 8, 2010.

National Association of Home Builders (NAHB), "Builders Rise to the Challenge of Corrosive Chinese Drywall," Nation's Building News, March 23, 2010, http://www.nbnnews.com/NBN/issues/2010-03-22/Front+Page/index.html, accessed: November 7, 2010.

Navigant Consulting, "Chinese Drywall Issue and Litigation," July 2009.

Pennington-Cross, Anthony and Giang Ho, The Termination of Subprime Hybrid and Fixed-Rate Mortgages, Real Estate Economics, 2010 38: 399-426.

Plyer, Allison, "News Release: Facts for Features Hurricane Katrina Impact," Greater New Orleans Community Data Center, April 15, 2010, http://www.gnocdc.org/Factsforfeatures/HurricaneKatrinaImpact/index.html, accessed: November 5, 2010.

Reuters, "Makers of Chinese drywall, insurer pay to fix U.S. homes," October 14, 2010, http://www.reuters.com/article/idUSTRE69D4MJ20101014.

Sapien, Joaquin and and Aaron Kessler, China Plays Tug-of-War With U.S. Inspectors Over Drywall, ProPublica, October 25, 2010, http://www.propublica.org/article/china-plays-tug-of-war-with-u.s.-inspectors-over-drywall, accessed: November, 12, 2010.

Sapien, Joaquin, and Aaron Kessler Kessler, Lowe's Amends Settlement to Get Drywall Victims More Money, ProPublica, October 28, 2010, http://www.propublica.org/article/lowes-amends-settlement-to-get-drywall-victims-more-money, accessed: November 8, 2010.

Schuetz, Jenny, Vicki Been and Ingrid Gould Ellen, "Neighborhood effects of concentrated mortgage foreclosures," Journal of Housing Economics, Volume 17, Issue 4, December 2008, Pages 306-319

U.S. Census Bureau, "Highlights of Annual 2006 Characteristics of New Housing" http://www.census.gov/const/www/highanncharac2006.html, accessed: November 2, 2010.U.S. Consumer Product Safety Commission (CPSC), Executive Summary of November 23, 2009 Release, November 23, 2009, http://www.cpsc.gov/info/drywall/nov2009execsum.pdf, accessed: November 3, 2010.

U.S. Consumer Product Safety Commission (CPSC), Executive Summary of April 2, 2010 Release, April 2, 2010, http://www.cpsc.gov/info/drywall/execsum0410.pdf.

U.S. Consumer Product Safety Commission, CPSC Identifies Manufacturers of Problem Drywall Made in China, Office of Information and Public Affairs, May 25, 2010, Release #10-243, http://www.cpsc.gov/cpscpub/prerel/prhtml10/10243.html

U.S. Department of Housing and Urban Development, HUD to Assist Homeowners Facing Problem Drywall, December 22, 2009, http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2009/HUDNo.09-237.http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2009/HUDNo.09-237.

U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Report to Congress on the Root Causes of the Foreclosure Crisis," January 2010.

U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "U.S. Housing Market Conditions," 1st Quarter 2010, May 2010.

U.S. Geological Survey, "Gypsum," Minerals Yearbook, 2001-2008, http://minerals.usgs.gov/minerals/pubs/commodity/gypsum/index.html#myb, accessed: November 4, 2010.

USG Corporation, Gypsum Construction Handbook: Centennial Edition, 2000.

USG Corp, Form 10-Q, Quarterly Report, July 29, 2010, accessed: http://biz.yahoo.com/e/100729/usg10-q.html.

Vandell, Kerry, "How Ruthless is Mortgage Default?: A Review and Synthesis of the Evidence," Journal of Housing Research, Vol. 6., No. 2, 1995, pp. 245-264.

Wotapka, Dawn and Robbie Whelan, "Florida Court Relieves Builders of Some Chinese Drywall Liability," Dow Jones Newswires, November 11, 2010.

**Figure 1.** Percentage of Prefabricated Drywall imported by Country



**Figure 2.** Reported Incidents of Problem Chinese Drywall and Ports of Entry



**Table 1. Metric Tons of Imported Drywall, 2004 - 2007**

|  | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|
|  | Metric Tons | % of Total | Metric Tons | % of Total | Metric Tons | % of Total | Metric Tons | % of Total |
| Canada | 382,697 | 62.0 | 389,628 | 52.7 | 416,345 | 41.9 | 211,989 | 48.4 |
| China | 10 | 0.00 | 369 | 0.05 | 218,100 | 22.0 | 12,371 | 2.8 |
| Mexico | 234,085 | 38.0 | 348,014 | 47.1 | 306,508 | 30.8 | 213,882 | 48.8 |
| Others | 83 | 0.01 | 1,136 | 0.2 | 52,876 | 5.3 | 244 | 0.06 |
| Total | 616,875 | | 739,147 | | 993,829 | | 438,486 | |

Source:  United States Trade Commission, dataweb.usitc.gov, (HTS Code 68091100)

30

**Table 2.** Number and Percentage of Reports by State – as of October 15, 2010

| | Number of Reports | Percent of All Reports |
|---|---|---|
| Florida | 2097 | 57.45% |
| Louisiana | 683 | 18.71% |
| Mississippi | 237 | 6.49% |
| Alabama | 203 | 5.56% |
| Virginia | 153 | 4.19% |
| Texas | 36 | 0.99% |
| California | 33 | 0.90% |
| Georgia | 33 | 0.90% |
| North Carolina | 27 | 0.74% |
| New York | 10 | 0.27% |
| Washington | 10 | 0.27% |
| Arizona | 9 | 0.25% |
| Tennessee | 9 | 0.25% |
| Indiana | 8 | 0.22% |
| Maryland | 8 | 0.22% |
| Kentucky | 7 | 0.19% |
| Illinois | 6 | 0.16% |
| Missouri | 6 | 0.16% |
| Nevada | 6 | 0.16% |
| Ohio | 6 | 0.16% |
| Pennsylvania | 6 | 0.16% |
| District of Columbia | 5 | 0.14% |
| Massachusetts | 5 | 0.14% |
| Michigan | 5 | 0.14% |
| New Jersey | 5 | 0.14% |
| Kansas | 4 | 0.11% |
| Oklahoma | 4 | 0.11% |
| South Carolina | 4 | 0.11% |
| Wisconsin | 4 | 0.11% |
| Arkansas | 2 | 0.05% |
| Connecticut | 2 | 0.05% |
| Delaware | 2 | 0.05% |
| Montana | 2 | 0.05% |
| West Virginia | 2 | 0.05% |
| Maine | 1 | 0.03% |
| New Mexico | 1 | 0.03% |
| Rhode Island | 1 | 0.03% |
| South Dakota | 1 | 0.03% |
| Vermont | 1 | 0.03% |
| Wyoming | 1 | 0.03% |
| American Samoa | 1 | 0.03% |
| Puerto Rico | 1 | 0.03% |
| Unknown | 3 | 0.08% |
| Total | 3650 | 100.00% |

Source: US Consumer Product Safety Commission

Case 1:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 607 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 08/15/2019 Page 833 of
759

**Table 3.** Imports of Drywall from China In Metric Tons, Square Feet, Estimated Homes Built, and Share of Total Port of Entry, 2004 - 2007

| Port of Entry | Metric Tons | Square Feet | Share of Subtotal | Upper Estimate of Number of Homes Built | Lower Estimate of Number of Homes Built |
|---|---|---|---|---|---|
| Miami, FL | 87,607 | 113,579,899 | 39.5% | 11,777 | 9,657 |
| Tampa, FL | 68,927 | 89,361,828 | 31.1% | 9,266 | 7,598 |
| New Orleans, LA | 24,161 | 31,324,026 | 10.9% | 3,248 | 2,663 |
| Mobile, AL | 11,418 | 14,803,101 | 5.2% | 1,535 | 1,259 |
| San Francisco, CA | 10,849 | 14,065,409 | 4.9% | 1,458 | 1,196 |
| Los Angeles, CA | 5,000 | 6,482,353 | 2.3% | 672 | 551 |
| New York, NY | 4,812 | 6,238,616 | 2.2% | 647 | 530 |
| Norfolk, VA | 4,420 | 5,730,400 | 2.0% | 594 | 487 |
| Philadelphia, PA | 3,971 | 5,148,285 | 1.8% | 534 | 438 |
| Houston-Galveston, TX | 418 | 541,925 | 0.19% | 56 | 46 |
| St. Louis, MO | 19 | 24,633 | 0.01% | 3 | 2 |
| Savannah, GA | 17 | 22,040 | 0.01% | 2 | 2 |
| Honolulu, HI | 3 | 3,889 | 0.0% | 0 | 0 |
| SUBTOTAL | 221,622 | 287,326,405 | 100% | 29,792 | 24,430 |
| All Other Ports | 9,229 | 11,965,127 | | 1,241 | 1,017 |
| All Ports | 230,851 | 299,291,532 | | 31,033 | 25,447 |

Source: United States Trade Commission, dataweb.usitc.gov, (HTSCode68091100)

## Table 4. Relationship between living area and drywall used in home construction.

| Year | Living area (square feet) | Drywall used (square feet) | Drywall/living area |
|---|---|---|---|
| 2006 | 2,420 | 8,985 | 3.713 |
| 2009 | 2,235 | 8,375 | 3.747 |
| Average | 2,327.5 | 8,680 | 3.729 |

Source: National Association of Home Builders (2007, 2010)

| Table 5. Number of Foreclosures* | | | | | | |
|---|---|---|---|---|---|---|
| | Homes Built with Chinese Drywall: | | Resulting Foreclosures Given a Foreclosure Rate of: | | | |
| | Primary (Lower) Estimate | | Primary (Lower) Estimate | | | |
| Area | Total | Problem Dry-Wall | 10% | 25% | 50% | 100% |
| Nationwide | 25,000 | 11,000 | 1,100 | 2,800 | 5,500 | 11,000 |
| Florida | 17,000 | 7,400 | 740 | 1,900 | 3,700 | 7,400 |
| | Upper Estimate | | Upper Estimate | | | |
| | Total | Problem Dry-Wall | 10% | 25% | 50% | 100% |
| Nationwide | 31,000 | 24,000 | 2,400 | 6,100 | 12,000 | 24,000 |
| Florida | 21,000 | 16,000 | 1,600 | 4,100 | 8,200 | 16,000 |

*Any minor discrepancies in this table between homes built and resulting foreclosures are due to the rounding of all figures to two significant digits.

| Table 6. Summary of Calculation of Number of Homes with Problem Drywall *Imported from China (2004 – 2007)* | | |
|---|---|---|
| Parameter | Primary (Lower) Estimate | Upper Estimate |
| (1) Metric tons of drywall | 230,851 | 230,851 |
| (2) Pounds of drywall (1) X 2204 | 508,796,000 | 508,796,000 |
| (3) Pounds of ½" drywall per square foot | 1.7 | 1.7 |
| (4) Square feet of drywall (2)/(3) | 299,000,000 | 299,000,000 |
| (5) Proportion of drywall unused | 18% | 0% |
| (6) Square feet of drywall used in construction (1-(5)) X (4) | 245,000,000 | 299,000,000 |
| (7) Square feet of drywall per square foot of floor area in 2006 (Table 4) | 3.713 | 3.713 |
| (8) Floor area (square feet) | 2,286 | 2,286 |
| (9) Square feet of drywall per home (7) X (8) | 8,488 | 8,488 |
| (10) Potential homes built from drywall (6)/(9) | 28,900 | 35,200 |
| (11) Percentage of waste | 12% | 12% |
| (12) Homes built net of waste (1 – (11)) X (10) | 25,400 | 31,000 |
| (13) Incidence of problem drywall | 43% | 78% |
| (14) Stock of problem homes (13) X (12) | 11,000 | 24,000 |

# Tab #14

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 610 of 668
Case 1:11-cv-22408-MGC Document 27 Entered on FLSD Docket 08/15/2011 Page 636 of
759

# INVESTIGATION OF IMPORTED DRYWALL
## *STATUS UPDATE, OCTOBER 2009*

### I.   Overview

This update describes new developments in the ongoing investigation of imported drywall and supplements the previous reports provided to the Committee.  Since the September report, the Consumer Product Safety Commission ("CPSC") has received an additional 309 incident reports related to drywall, including reports from Maryland, South Dakota and West Virginia, raising the total number of incident reports to 1501 from residents in 27 States, the District of Columbia, and Puerto Rico.  The majority of the reports (more than 93%) continue to be from Florida, Louisiana, and Virginia.

- Chairman Tenenbaum visited affected homes in Florida and Virginia and met with the families who reside in those homes.
- Chairman Tenenbaum and representatives of our partner agencies met with the Congressional Contaminated Drywall Caucus on September 23, 2009. Chairman Tenenbaum expressed her concerns about the families affected by drywall problems and committed to expediting our investigation.
- CPSC staff visited Lawrence Berkeley National Laboratory and reviewed the status of the on-going chamber studies.

### II.   Federal, State and International Coordination

We continue to have weekly coordination meetings with our agency partners and are working with the Council on Environmental Quality and the Domestic Policy Council.  The CPSC staff is continuing its dialogue with Chinese government officials and will include this issue in the 3rd Biennial United States - China Consumer Product Safety Summit in China October 21 - 26, 2009.

### III.   Progress in the Investigation

A.   Investigation into Scope of Affected Homes and Chain of Commerce

CPSC continues to analyze the information received from consumers, builders, importers, manufacturers and suppliers of drywall to determine how much imported drywall is affected and where that drywall has been installed.  CPSC staff continues to investigate all reports of electrical or fire incidents related to drywall, but no fire or electrical hazards related to drywall have been confirmed.

B.   Technical Investigation

Engineering, health and safety analyses continue as planned and discussed in earlier reports.  A timeline of the status of these studies is attached and was provided at the meeting referenced above with the Congressional Contaminated Drywall Caucus.  CPSC staff is committed to releasing our findings with all possible speed while maintaining scientific integrity.  Contract work is proceeding with Environmental Health and Engineering, Sandia National Laboratory, Lawrence Berkeley National Laboratory, and the National Institute of Standards and Technology.

# IMPORTED DRYWALL FACT SHEET

*September 2009*

## Background

In late December 2008, CPSC first received complaints from consumers related to the presence of drywall produced in China. The chief complaints were of noxious, "rotten egg" odors; corrosion of metal items inside the home, especially copper air conditioning coils; and short-term adverse health effects generally involving the upper respiratory tract. State and local authorities have also received similar reports. CPSC staff first contacted the Florida Department of Health about the drywall issue on Jan. 23, 2009. As of September 17, 2009, CPSC had received 1311 incident reports from residents in 26 states plus the District of Columbia. Reports have primarily originated from Florida, Louisiana, and Virginia. Consumers largely report that their homes were built in 2006 to 2007, when an unprecedented increase in new construction occurred in part due to the hurricanes of 2004 and 2005.



**Number (and Percentage) of Reports by State**

- Florida, 997, 76%
- Louisiana, 184, 14%
- Virginia, 41, 3.1%
- Alabama, 17, 1.3%
- Mississippi, 18, 1.4%
- Other States, 54, 4%

## Federal Coordination

CPSC is leading a federal drywall team to investigate the corrosion and health issues presented by the imported drywall. The federal team, which includes the Environmental Protection Agency (EPA), the Centers for Disease Control and Prevention (CDC)/Agency for Toxic Substances and Disease Registry (ATSDR), the U.S. Department of Housing and Urban Development (HUD), and U.S. Immigration and Customs Enforcement (ICE), coordinates regularly with state partners, including state departments of health and attorneys general. CPSC, EPA, CDC/ATSDR, HUD and ICE have weekly calls to discuss and share information about the investigation and to review technical data.

## International Efforts

Since the beginning of the investigation, it has been apparent that some answers to the cause of the drywall problem will have to come from sources in China through cooperation with the Chinese government. With that in mind, CPSC staff took steps early on to involve AQSIQ (CPSC's Chinese counterpart) in our investigation to the extent possible. In June 2009, two Chinese experts joined CPSC staff on inspections of homes in Florida and Louisiana, followed by technical discussions at CPSC headquarters and meetings with EPA and CDC. During the week of August 17, 2009, CPSC staff visited China and met with Chinese government officials as well as management from several sites that we believe to be of interest. The team inspected gypsum mines and drywall manufacturing plants in China with Chinese government officials. During the trip, the team collected samples of raw materials and finished products from both mine/manufacturing establishments and retailers and met with the China Building Materials Academy, a state-owned research and development institute. CPSC continues to engage with its Chinese counterpart to exchange information related to the investigation.

## Public Information

The combined federal agency team has focused on ensuring that the information disseminated to the public has been consistent, informative, and coordinated to ensure consistency and uniformity of messaging to the public and media. CPSC has developed a *Drywall Information Center*, linked to the agency homepage, which provides the latest information on technical developments and news about the investigation, including the number of consumer reports received and States involved. The information center has received more than 17,000 visits since its launch. Additionally, an e-mail distribution (listserv) has been established to disseminate noteworthy developments directly to interested parties. This e-mail list has 600+ members and updates have been sent approximately bi-weekly.

## Progress in the Investigation

The multi-pronged investigation has concurrent inquiries (1) to diagnose the health and corrosion issues encountered by home owners with imported drywall and (2) to trace the chain of commerce of the drywall from manufacture, through importation, to installation. This investigation includes field measurements in affected homes; chamber studies to isolate the emissions from the drywall; and laboratory studies on the elemental composition of the drywall. At this time, we expect that some preliminary results from these tests will be available by late October 2009, as further detailed on the next page. As the results come in, the CPSC will continue to work aggressively with its federal partners for scientific data that links specific emissions from the drywall to the reported corrosion and health issues.

This information has been prepared by CPSC staff, has not been reviewed or approved by, and may not necessarily reflect the views of the Commission.

# IMPORTED DRYWALL FACT SHEET

| **The investigation is proceeding simultaneously on two tracks:** | | Timeline | Results/ Evaluation |
|---|---|---|---|
| **Track 1**<br><br>*Technical evaluation of the relationship between drywall and health symptoms, electrical and fire safety issues.* | **Elemental and Chemical Testing**<br>*(CPSC & EPA's Environmental Response Team)*<br><br>Purpose: to characterize the components of uninstalled drywall, including imported drywall, domestic calcined drywall, and domestic synthetic drywall collected from warehouses, suppliers and manufacturers. The drywall samples will be analyzed for organic and inorganic compounds, metals, and other properties. | EPA to complete testing of 15 samples collected by CPSC by end of Sept. '09 | Analysis completed by end of Oct. '09 |
| | **Chamber Testing**<br>*(CPSC interagency agreement with Lawrence Berkeley National Laboratory)*<br><br>Purpose: to isolate the drywall's chemical emissions from those of other products (e.g., carpets, cleaners, paint, adhesives & beauty products). Investigations will provide data to model exposure and perform a preliminary health risk assessment.<br>**Phase I:** screen drywall samples in controlled chambers to identify the chemicals (particularly sulfur-containing but also major volatile organic compounds and other irritant gases) emitted from uninstalled drywall.<br>**Phase II:** focus on a limited number of higher emitting materials identified in the Phase I studies. The Phase II studies will characterize the factors that affect long-term emissions such as temperature, moisture, ventilation, and wall treatments. | Phase I will be completed by LBNL by mid Oct. '09. Phase II to follow. | Preliminary health risk assessment will be completed by CPSC staff by end of Oct. 2009. |
| | **In-Home Indoor Air Sampling**<br>*(CPSC contract with Environmental Health and Engineering)*<br><br>50 homes. The sampling consists of building characterization and indoor environmental measurements. This work will help provide input for future chamber studies and begin to inform on corrosivity on a range of affected and control homes in the most-affected states (Phase II and Engineering Analysis). | In-home testing completed by end of Sept. '09, laboratory analyses completed by mid Oct. '09 | Contractor report to CPSC by early Nov. '09. |
| | **Engineering Analyses: Electrical and Fire Safety**<br>*(CPSC interagency agreements with Sandia National Laboratory and the National Institute for Standards and Technology)*<br><br>Purpose: to determine possible risk of electrocution and fire hazards, via metallurgical analysis of components harvested from affected homes to characterize any damage, and by exposure of new components to elevated levels of gases identified in the drywall chamber studies to determine long-term exposure safety implications.<br>The components of interest include:<br>• Electrical - residential wiring, receptacles, switches, circuit breakers, panel boards, ground fault circuit interrupters (GFCIs), and arc fault circuit interrupters (AFCIs).<br>• Gas service - flexible connectors and copper piping.<br>• Fire safety - smoke alarms and fire sprinklers. | Majority of CPSC engineering sample collection is expected to be completed by late Sept. '09. Staff will continue to collect important samples as discovered. | Studies to commence after chamber study & air sampling (which provide necessary inputs) |
| **Track 2**<br><br>*Tracing the drywall chain of commerce.* | CPSC is pursuing a detailed investigation into where the imports of drywall originated and where they went. The inquiry involves well over 100 manufacturers, importers, drywall distributors and builders. The staff is also gathering detailed information from home owners about the composition of their homes and the health and corrosion effects experienced. | | |

This information has been prepared by CPSC staff, has not been reviewed or approved by, and may not necessarily reflect the views of the Commission.

# Tab #15

CPSC Identifies Manufacturers of Problem Drywall Made in China                    Page 1 of 2

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 614 of 668
Case 1:11-cv-22408-MGC Document 27-1 Entered on FLSD Docket 09/15/2011 Page 840 of
759



# NEWS from CPSC

## U.S. Consumer Product Safety Commission

Office of Information and Public Affairs                          Washington, DC 20207



FOR IMMEDIATE RELEASE                    **CPSC Recall Hotline: (800) 638-2772**
May 25, 2010                             CPSC Media Contact: (301) 504-7908
Release #10-243

## CPSC Identifies Manufacturers of Problem Drywall Made in China

WASHINGTON, D.C. - The U.S. Consumer Product Safety Commission (CPSC) is releasing today the names of the drywall manufacturers whose drywall emitted high levels of hydrogen sulfide in testing conducted for the agency by Lawrence Berkeley National Laboratory (LBNL). There is a strong association between hydrogen sulfide and metal corrosion.

Of the samples tested, the top ten reactive sulfur-emitting drywall samples were all produced in China. Some of the Chinese drywall had emission rates of hydrogen sulfide 100 times greater than non-Chinese drywall samples.

"Homeowners who have problem drywall in their homes are suffering greatly", said CPSC Chairman Inez Tenenbaum. "I appeal to these Chinese drywall companies to carefully examine their responsibilities to U.S. families who have been harmed and do what is fair and just".

At the U.S.-China Strategic and Economic Dialogue meetings in Beijing May 24-25, U.S. officials pressed the Chinese government to facilitate a meeting between CPSC and the Chinese drywall companies whose products were used in U.S. homes, and which exhibit the emissions identified during the testing procedures. The Strategic and Economic Dialogue represents the highest-level bilateral forum to discuss a broad range of issues between the two nations.

The following list identifies the top 10 drywall samples tested that had the highest emissions of hydrogen sulfide, along with the identity of the manufacturer of the drywall and the year of manufacture, from highest to lowest.

- Knauf Plasterboard (Tianjin) Co. Ltd.: (year of manufacture 2005) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Shandong Taihe Dongxin Co.: (2005) China
- Knauf Plasterboard (Tianjin) Co. Ltd.: (2006) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Shandong Chenxiang GBM Co. Ltd. (C&K Gypsum Board): (2006) China
- Beijing New Building Materials (BNBM): (2009) China
- Taian Taishan Plasterboard Co. Ltd.: (2009) China
- Shandong Taihe Dongxin Co.: (2009) China

Other Chinese drywall samples had low or no detectable emissions of hydrogen sulfide as did the drywall samples tested that were manufactured domestically. They include: Knauf Plasterboard Tianjin: (2009) China; Tiger ***ShiGao JianCai***liangpianzhuang: (2006) China; USG Corporation: (2009) U.S.; Guangdong Knauf New Building Material Products Co. Ltd.: (2009) China; 3/8" drywall manufacturer uncertain (date uncertain): China; Knauf Plasterboard (Wuhu) Co. Ltd.: (2009) China; CertainTeed Corp.: (2009) U.S.; Georgia Pacific Corp.: (2009) U.S.; Dragon Brand, Beijing New Building Materials Co. Ltd.: (2006) China; CertainTeed Corp.: (2009) U.S.;

Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 615 of 668
Case 1:11-cv-22408-MGC Document 27-2 Entered on FLSD Docket 08/15/2019 Page 841 of
759

Pingyi Baier Building Materials Co. Ltd.: (2009) China; Sample purchased in China, manufacturer unknown: (2009) China; Panel Rey S.A.: (2009) Mexico; Lafarge North America: (2009) U.S.; National Gypsum Company: (2009) U.S.; National Gypsum Company: (2009) U.S.; Georgia Pacific Corp.: (2009) U.S.; Pabco Gypsum: (2009) U.S.; Temple-Inland Inc.: (2009) U.S.; and USG Corporation: (2009) U.S.

Last month, CPSC released the results of drywall emissions tests by LBNL. The studies showed a connection between certain Chinese drywall and corrosion in homes. In addition, the patterns of reactive sulfur compounds emitted from drywall samples show a clear distinction between certain Chinese drywall samples manufactured in 2005/2006 and other Chinese and non-Chinese drywall samples.

To date, CPSC has spent over $5 million to investigate the chemical nature and the chain of commerce of problem drywall. Earlier this year, CPSC and HUD issued an identification protocol to help consumers identify problem drywall in their homes. Last month, CPSC and HUD issued remediation guidance to assist impacted homeowners.

See the chart (pdf) listing drywall chamber test results.

---

The U.S. Consumer Product Safety Commission is charged with protecting the public from unreasonable risks of serious injury or death from thousands of types of consumer products under the agency's jurisdiction. The CPSC is committed to protecting consumers and families from products that pose a fire, electrical, chemical, or mechanical hazard. The CPSC's work to ensure the safety of consumer products - such as toys, cribs, power tools, cigarette lighters, and household chemicals - contributed significantly to the decline in the rate of deaths and injuries associated with consumer products over the past 30 years.

To report a dangerous product or a product-related injury, call CPSC's Hotline at (800) 638-2772 or CPSC's teletypewriter at (301) 595-7054. To join a CPSC e-mail subscription list, please go to https://www.cpsc.gov/cpsclist.aspx. Consumers can obtain recall and general safety information by logging on to CPSC's Web site at www.cpsc.gov.



# Tab #16

Case 2:09-md-02047-EEF-MBN Document 22382-10 Filed 12/06/19 Page 617 of 668
Case 1:11-cv-22408-MGC Document 299-2 Entered on FLSD Docket 08/13/2012 Page 3 of 45
759

# Appendix 2
# Taishan Product ID Catalog

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 618 of 668
Case 1:11-cv-22408-MGC Document 299-2 Entered on FLSD Docket 08/13/2012 Page 354 of 45
759

# PHOTO EXHIBIT FOR

# VASHAUN & ERIKA WILLIAMS



Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/18 Page 619 of 668
Case 1:11-cv-22408-MGC Document 259-2 Entered on FLSD Docket 08/13/2012 Page 345 45
759



# Drywall Markings
# Photo Exhibit



Interior Wall Drywall Stamp from Second Floor Bedroom Closet



Interior Wall Drywall Stamp from Second Floor Bedroom Closet

Tapered

3

edge 1020 oootkd

4

CLOSET
2ND
FLOOR

Drywall  4feetx12feetx1/2inch

5



Case 3:22-cv-06047-MCC-EFF MRN Document 99-2 entered 23292-19 Filed 12/05/18/18/19/2021 625 of 668 Page 61 of 45
759

Interior Wall Drywall Stamp from AC Room

9

Case 2:09-md-02047-EEF-JCW Document 21592 Entered on FLSD Docket 09/13/2019 Page 33 of 759



10



Interior Wall Drywall Stamp from Living Room

11



12



13

Case 2:09-md-02047-EEF-MBN Document 22380 Filed 12/06/19 Page 631 of 668






14



Paper Edge Tape from Kitchen

Interior Wall Drywall Stamp from Kitchen

15





16



Bernice Butler
2999 Silver Hill Drive
Douglasville, GA 30135

Daniel K. Bryson

MADE IN CHINA MEET OR EXCEEDS ASTM C1396 04 STANDARD



18



Grueninger, S-Indicia-0215



Grueninger, S-Indicia-0219

19



CravenD(38th St.)0014
20



21

Case 2:09-md-02047-EEF-MBN Document 22292-10 Filed 12/06/19 Page 639 of 668



22

23



BNBM DRAGON BRAND GYPSUM WALLBOARD
TYPE DBX-1
R19374

CLASSIFIED
UL®

5/8" OR 15.9mm THICK
GYPSUM BOARD
ISSUE NO. F-3851
FIRE RESISTANCE CLASSIFICATION
SEE UL FIRE RESISTANCE DIRECTORY

24

3 of 4 page










Case 2:09-md-02047-EEF-MBN Document 22380-10 Filed 12/06/19 Page 645 of 668

28







Bell, P-Indicia-0204

Case 2:09-md-02047-EEF-MBN Document 14354-2 Entered on FLSD Docket 03/13/2015 Page 759



Case 1:11-cv-22408-MGC Document 20592 Entered on FLSD Docket 02/13/2015 Page 33 of 759





32









Case 2:09-md-02047-EEF-MBN Document 22392-10 Filed 12/06/19 Page 652 of 668
Case 2:09-cv-02248-MBC Document 22592 Entered on FLSD Docket 08/13/2019 Page 36 of 759

# PHOTO EXHIBIT FOR

## VASHAUN & ERIKA WILLIAMS



Case 2:01-cv-22408-MSC Document 20592 entered on FLSD docket 02/18/2015 Page 379 of 759



36

759



37

Nell Boothe 483 Tranquill Drive, Winder GA
Northwest Port of Georgia Overhang "Taihe China"
11/17/09 1125 John Bubolski

VENTURE SUPPLY INC. MFG TAIHE CHINA

Nell Boothe
483 Tranquill Drive
Winder, GA 30680

Daniel K. Bryson

38

ENTURE SUPPLY INC. MFG TAIHE CHINA

39

Case 2:11-cv-22408-MGC Document 2597-2 Entered on FLSD Docket 08/13/2018 Page 33 of 759

VENTURE SUPPLY INC.MFG TAIHE CHINA

40



41

Case 2:09-md-02047-EEF-MBN   Document 22398-10   Filed 12/06/19   Page 659 of 668
Case 2:11-cv-22408-WGC   Document 2-5922   Entered on FLSD Docket 03/13/2019   Page 435 of 759

## Dun Gypsum Board in Attic



## Drywall in AC Closet



## Attic Drywall



42



Delayo, W-Indicia-0029

# Tab #17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL MDL NO. 2047
PRODUCTS LIABILITY LITIGATION

          SECTION:  L

          JUDGE FALLON
          MAG. JUDGE WILKINSON
………………………………………………………..
**THIS DOCUMENT RELATES TO ALL CASES**

### PRETRIAL ORDER #10

   In an effort to assure the success of the Threshold Inspection Program ("TIP") in achieving the objectives that have been previously stated by this Court of obtaining additional information to the fullest extent possible regarding the identification of manufacturers, suppliers, installers and/or contractors of the drywall in the property without being overly intrusive or destructive to the homeowners and their property, the Court believes that the inspectors who will undertake the TIP should be properly educated on the brands, markings and other available identifications for the Chinese manufactured drywall found in affected homes to date.  Toward that end, the Court orders that all parties provide either the Plaintiffs' Liaison Counsel or the Defendants' Liaison Counsel with a photographic catalog of markings, brands, endtapes and other identifying markers that they have found in the affected homes to date by no later than August 26, 2009 and that the Plaintiffs' Steering Committee and the Defendants' Steering Committee collect this data and submit to this Court and the inspection company chosen for the TIP a joint catalog of the data to assist in the training of the inspectors for the TIP by no later than August 28, 2009.

   Thus done and signed this 21ˢᵗ day of August, 2009, New Orleans, Louisiana.

         _____
         JUDGE ELDON E. FALLON

# Tab #18

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to All Cases | * | |
| | * | MAGISTRATE JUDGE WILKINSON |
| | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## JOINT MOTION FOR ENTRY OF
## PHOTOGRAPHIC CATALOG OF DRYWALL MARKINGS

**NOW COME** Plaintiffs' Liaison Counsel ("PLC") and Defendants' Liaison Counsel ("DLC"), who, in response to Pre-Trial Order no. 10, submit the following joint photographic catalog of markings, brands, endtapes, and other identifying markers that have been collected by various plaintiffs and defendants in the MDL and are attached hereto as Exhibit "A." Undersigned counsel further submit that Crawford & Co., the court-approved inspection company for the TIP, will be provided a color copy of the joint catalog of photographs, which will assist in the training of the inspectors for the TIP and in the product identification of drywall observed by Crawford & Co. personnel during the inspections.

- 1 -

Respectfully submitted,

| | |
|---|---|
| */s/ Russ M. Herman* | */s/ Kyle A. Spaulding* |
| Russ M. Herman (Bar No. 6819) | Kerry Miller (Bar No. 24562) |
| Leonard A. Davis (Bar No. 14190) | Kyle Spaulding (Bar No. 29000) |
| **Herman, Herman, Katz & Cotlar, LLP** | **Frilot L.L.C.** |
| 820 O'Keefe Avenue | 1100 Poydras Street |
| New Orleans, LA 70113 | Suite 3700 |
| PH: (504) 581-4892 | New Orleans, LA 70613-3600 |
| FAX: (504) 561-6024 | PH: (504) 599-8000 |
| | FAX: (504) 599-8100 |
| **Plaintiffs' Liaison Counsel** | |
| | **Defendants' Liaison Counsel** |

## CERTIFICATE

I hereby certify that the above and foregoing Joint Motion for Entry of Drywall Identification Markings has been served upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 2nd day of September, 2009.

> */s/ Kyle A. Spaulding*
> Kerry Miller (Bar No. 24562)
> Kyle Spaulding (Bar No. 29000)
> **Frilot L.L.C.**
> 1100 Poydras Street
> Suite 3700
> New Orleans, LA 70613-3600
> PH: (504) 599-8000
> FAX: (504) 599-8100
>
> **Defendants' Liaison Counsel**

- 2 -

# Tab #19

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: **CHINESE-MANUFACTURED** | * | **MDL Docket No. 2047** |
| **DRYWALL PRODUCTS** | * | |
| **LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to All Cases** | * | |
| | * | **MAGISTRATE JUDGE WILKINSON** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

Considering the foregoing Joint Motion for Entry of Photographic Catalog of Drywall Markings;

IT IS HEREBY ORDERED that said Joint Motion is granted and the photographic catalog of drywall markings be entered into the record. IT IS FURTHER ORDERED that the court-approved inspection company for the TIP, Crawford & Co., be provided with a color copy of said photographic catalog of drywall markings to assist in the training of inspectors and for the TIP product identification of drywall observed by Crawford & Co. personnel during the inspections.

New Orleans, Louisiana this ___3rd___ day of September, 2009.

HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT COURT JUDGE