**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS (except *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.)) | |

**SETTLEMENT CLASS COUNSEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING FINAL APPROVAL OF THE CLASS SETTLEMENT WITH TAISHAN AND CERTIFICATION OF THE SETTLEMENT CLASS**

## TABLE OF CONTENTS

### FINDINGS OF FACT

A.    History of the Chinese Drywall Proceedings .................................................1

B.    Remands.........................................................................................................10

C.    Substantial Litigation in the Remand Courts – *Amorin* cases.....................11

D.    Class Settlement Negotiations and Mediation ..............................................17

E.    Material Terms of the Settlement .................................................................19

    1.    The Settlement Class and Settlement Fund ....................................19

    2.    Releases..........................................................................................20

    3.    Allocation of the Settlement Fund .................................................23

    4.    The Master Spreadsheet for Known Class Members......................29

    5.    Claims by Absent Class Members ..................................................30

    6.    Distribution of the Settlement Fund...............................................31

    7.    Notice.............................................................................................31

    8.    Class Member Inquiries .................................................................37

    9.    Opt-Outs and Objections................................................................38

    10.   Class Representatives.....................................................................39

    11.   Settlement Class Counsel...............................................................41

    12.   Attorney's Fees and Incentive Awards ..........................................42

### CONCLUSIONS OF LAW

A.    Settlements of Complex Class Actions Are Favored.....................................43

B.    Standards for Approval of Class Settlements ...............................................44

i

C.    The Requirements of Rule 23 Have Been Met For Certification of the Settlement
      Class ...............................................................................................................45

      1.    Numerosity ...........................................................................................45

      2.    Commonality .........................................................................................46

      3.    Typicality  .............................................................................................47

      4.    Adequacy of Representation  ................................................................48

      5.    Common Questions of Law and Fact Predominate  ..........................49

      6.    The Class Settlement is Superior  .......................................................50

D.    The Proposed Settlement Is Fair, Reasonable and Adequate  .......................51

      1.    The Class Representatives and Class Counsel Have Adequately
            Represented the Class (Rule 23(e)(2)(A)) ........................................53

      2.    The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B))
            and There is No Existence of Fraud or Collusion Behind the
            Settlement (*Reed* Factor 1) ...............................................................54

      3.    The Relief Provided is Adequate, Taking into Account the Costs,
            Risks, and Delays of Trial and Appeals (Rule 23(e)(2)(C)(i)) ........................55

            a.    The Complexity, Expense, and Likely Duration of the
                  Litigation Weigh in Favor of Approval of the Settlement
                  (*Reed* Factor 2) .......................................................................56

            b.    The Stage of the Proceedings and the Amount of
                  Discovery Completed Support Approval of the Settlement
                  (*Reed* Factor 3) .......................................................................57

            c.    Plaintiffs' Probability of Success on the Merits
                  (*Reed* Factor 4) .......................................................................58

            d.    The Range of Possible Recovery (*Reed* Factor 5)  ...........................60

            e.    The Opinion of Class Counsel Supports Approval of
                  Settlement (*Reed* Factor 6) ....................................................61

      4.    The Relief Provided is Adequate, Taking into Account the Effectiveness
            of the Proposed Method of Distributing Relief to the Class
            (Rule 23(e)(2)(C)(ii)) .........................................................................61

5.  The Relief Provided is Adequate, Taking into Account the Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment (Rule 23(e)(2)(C)(iii)) ...................................................................................62

6.  The Relief Provided is Adequate, Taking into Account Any Agreement Required to be Identified Under Rule 23(e)(3) (Rule 23(e)(2)(C)(iv)) ..........63

7.  The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D)) ..............................................................................................63

E.  Notice to the Class Complied with this Court's Preliminary Approval Order and Due Process ..................................................................................................64

F.  The CAFA Notice Requirement Has Been Satisfied by Taishan ...............................64

G.  The Settlement Has Widespread Support and the Limited Objections That Were Submitted Are Without Merit ......................................................................................65

1.  Objections Regarding Amount of the Settlement or Individualized Allocation Amount ..................................................................68

2.  Objections Regarding the Allocation Model ...................................................71

3.  Objections Regarding Notice ..........................................................................75

4.  Objections by Non-Class Members .................................................................75

CONCLUSION ...........................................................................................................79

**FINDINGS OF FACT**

A.      **History of the Chinese Drywall Proceedings.**

1.      The *Chinese Drywall* Litigation arose out of thousands of individual and class action lawsuits filed in state and federal courts throughout the country on behalf of Plaintiffs seeking compensation for property damage and personal injuries allegedly caused by defective Chinese Drywall. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520, at *1-2 (E.D. La. Sept. 26, 2014) ("*Class FOFCOL*"). In the aftermath of the devastation caused by Hurricanes Katrina and Rita at the end of the summer of 2005, and in conjunction with a housing boom in other parts of the country, there was a critical shortage of drywall in the United States, which led to the importation of millions of square feet of drywall from China beginning in the fall of 2005 through 2008. *Id.* at *1.

2.      This Chinese-manufactured drywall was installed in thousands of properties, primarily in Florida and Louisiana, but also in Virginia, Alabama, Mississippi, Texas, Tennessee, Georgia, North Carolina, Illinois, Oklahoma, South Carolina, and California; and in time, many residents and owners began to notice unpleasant odors and corrosion to certain items made of metal. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*German*o), 706 F. Supp. 2d 655, 663, 671 (E.D. La. 2010) (Findings of Fact and Conclusions of Law). These problems were linked to the presence of sulfur gases contaminating the interior of these properties; and Plaintiffs filed claims for damages in various jurisdictions across the country alleging that Chinese Drywall emits sulfur gases that cause extensive damage to properties and, in some cases, physical ailments. *Id.* at 659, 664-66, 710.

3.      On June 15, 2009, the Judicial Panel for Multidistrict Litigation ("JPML") transferred all federal actions alleging damage from Chinese Drywall to the Eastern District of

1

Louisiana for coordinated discovery and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407. [Rec. Doc. 1]; *see also In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).

4.     Since the formation of the MDL, thousands of claimants have been named on one or more Omnibus Class Action Complaints ("Omni" actions) filed by the Plaintiffs' Steering Committee ("PSC") against more than 1,650 manufacturers, importers, suppliers, distributors, builders, installers, and insurers involved in the supply chain of Chinese Drywall installed in Plaintiffs' Affected Properties.[1]

5.     In 2010, Taishan Gypsum Company Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd.

---

[1] *See Payton v. Knauf Gips, KG*, No. 09-7628 (E.D. La.) (Omni I, I(A), I(B), I(C)); *Wiltz v. Beijing New Building Materials Public Limited Co.*, No. 10-361 (E.D. La.) (Omni II, II(A), II(B), II(C)); *Gross v. Knauf Gips, KG*, No. 09-6690 (E.D. La.) (original complaint, Omni III, III(A)); *Rogers v. Knauf Gips, KG*, No. 10-362 (E.D. La.) (Omni IV, IV(A), IV(B), IV(C)); *Amato v. Liberty Mutual Ins. Co.*, No. 10-932 (E.D. La.) (Omni V); *Hernandez v. AAA Ins.*, No. 10-3070 (E.D. La.) (Omni VI); *Abel v. Taishan Gypsum Co., Ltd.*, No. 11-080 (E.D. La.) (Omni VII); *Abreu v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-252 (E.D. La.) (Omni VIII); *Haya v. Taishan Gypsum Co., Ltd.*, No. 11-1077 (E.D. La.) (Omni IX); *Block v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-1363 (E.D. La.) (Omni X); *Benoit v. Lafarge S.A.*, No. 11-1893 (E.D. La.) (Omni XI); *Arndt v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-2349 (E.D. La.) (Omni XII); *Almeroth v. Taishan Gypsum Co., Ltd.*, No. 12-0498 (E.D. La.) (Omni XIII); *Cassidy v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 11-3023 (E.D. La.) (Omni XIV); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1672 (E.D. La.) (Omni XV); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1395 (E.D. La.) (Omni XVI); *Amorin v. Taishan Gypsum Co., Ltd.*, No. 11-1673 (Omni XVII); *Beane v. Gebrueder Knauf Verwaltungsgesellschaft, KG*, No. 13-609 (E.D. La.) (Omni XVIII); *Amorin v. State-Owned Assets Supervision and Admin. Comm'n of the State Council*, No. 14-1727 (E.D. La.) (Omni XIX); *Brooke v. State-Owned Assets Supervision and Admin. Comm'n of the State Council*, No. 15-4127 (E.D. La.) (Omni XX); *Macon v. Taishan Gypsum Co., Ltd.*, No. 17-1287 (N.D. Ala.) (Omni XXI); *Peoples v. Taishan Gypsum Co., Ltd.*, No. 17-2890 (N.D. Ga.) (Omni XXII); *Polk v. Taishan Gypsum Co., Ltd.*, No. 17-216H50 (S.D. Miss.) (Omni XXIII); *Bright v. Taishan Gypsum Co., Ltd.*, No. 17-0035 (E.D.N.C.) (Omni XXIV); *DeOliveira  v. Taishan Gypsum Co., Ltd.*, No. 17-2019 (D.S.C.) (Omni XXV); *Redden v. Taishan Gypsum Co., Ltd.*, No. 17-1146 (W.D. Tenn.) (Omni XXVI); *Mertlitz v. Taishan Gypsum Co., Ltd.*, No. 17-140 (E.D. Tex.) (Omni XXVII); *Bayne, v. Taishan Gypsum Co., Ltd.*, No. 17-1286 (N.D. Ala.) (Omni XXVIII); *Abner v. Taishan Gypsum Co., Ltd.*, No. 11-3094 (N.D. Calif.) (Omni XXIX); *Bentz v. Taishan Gypsum Co., Ltd.*, No. 17-2892 (N.D. Ga.) (Omni XXX); *Allen v. Taishan Gypsum Co., Ltd.*, No. 17-217LG (S.D. Miss.) (Omni XXXI); *Lochhead v. Taishan Gypsum Co.*, No. 17-294 (S.D. Tex.) (Omni XXXII); *Stutzman, et al. v. Taishan Gypsum Co., Ltd., et al.*, No. 17-1209 (S.D. Ill.) (Omni XXXIII); *Allman, et al. v. Taishan Gypsum Co., Ltd., et al.*, No. 17-00051 (E.D.N.C.) (Omni XXXIV); *Cole v. State-Owned Assets Supervision and Admin. Comm'n of the State Council, et al.*, No. 18-00562 (N.D. Okla.) (Omni XXXV).

and Taian Taishan Plasterboard Co. Ltd. (collectively "Taishan") filed motions to dismiss for lack of personal jurisdiction under Louisiana, Florida, and Virginia law. *See* Taishan's Motion to Vacate Default Judgment and Dismiss the Action [Rec. Doc. 5436]; Taishan's Motion to Vacate Order on Motion for Default Judgment and Motion to Dismiss the Action [Rec. Doc. 5583]. In order to protect the Plaintiffs' Claims where jurisdiction over Taishan was in question, the PSC filed identical *Amorin* Class Action Complaints in the MDL, the Southern District of Florida, and the Eastern District of Virginia. Each of the *Amorin* actions included all Plaintiffs named on any of the Omni actions against Taishan regardless of where the Plaintiff's property was located. These identical *Amorin* Complaints were transferred to the MDL by the JPML. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 6046189, at *2-3 (E.D. La. Nov. 19, 2018) (discussing background of identical *Amorin* complaints).

6.     The PSC pursued primarily two groups of drywall-manufacturer Defendants: (1) the Knauf entities, and (2) the Taishan entities.[2] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017). Knauf entered its appearance early in the Litigation, in July 2009, agreeing to a limited waiver of service in November 2009. *See id.* at *1. In contrast, the Taishan entities failed to appear in the Litigation and a default was entered against Taishan in 2009. *See Class FOFCOL*, 2014 WL 4809520, at *2.

7.     In February 2010, the Court presided over a trial of seven families' claims in

---

[2] The Knauf entities ("Knauf") are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd., manufactured and sold its Chinese Drywall in the United States.  The Taishan entities are Chinese companies that include Taishan, and its parents Beijing New Building Materials Public Limited Company ("BNBM"); Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"); China National Building Materials Co., Ltd. ("CNBM"); China National Building Materials Group Corporation ("CNBM Group"), and the State-Owned Assets Supervision and Admin. Comm'n of the State Council ("SASAC"). On March 10, 2016, the Court dismissed CNBM Group on the grounds of the Foreign Sovereign Immunity Act. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 168 F. Supp. 3d 918 (E.D. La. 2016).

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al*., Case No. 09-6687 (E.D. La.), after which the Court entered a monetary judgment in favor of Plaintiffs and against Taishan. *See Chinese Drywall*, 706 F. Supp. 2d 655.

8.      In March 2010, the Court presided over a trial of homeowners' claims in *Hernandez v. Knauf Gips KG*, Case No. 09-6050 (E.D. La.), after which the Court found in favor of Plaintiffs and against Knauf. *See Chinese Drywall*, 2017 WL 1421627, at *1.

9.      The Court's findings in *Germano* and *Hernandez* provided a foundation for Knauf and the PSC to enter into a comprehensive pilot remediation program for Knauf claimants on October 14, 2010 ("KPT Pilot Program"). *See id*. at *2. The KPT Pilot Program proved a catalyst toward a negotiated resolution with Knauf. As a result, on December 20, 2011, the Knauf entities and the PSC entered into a class settlement agreement providing comprehensive remediation and cash benefits to homeowners with Knauf drywall, which the Court certified as a class action and approved on February 7, 2013. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2013 WL 499474 (E.D. La. Feb. 7, 2013); *see also Chinese Drywall*, 2017 WL 1421627, at *2.

10.     In addition, the PSC reached class settlement agreements with hundreds of downstream Defendant homebuilders, suppliers, and installers (and most of their insurers), resulting in the resolution of "almost all of the Knauf Entities' chain-of-commerce litigation." *Chinese Drywall*, 2017 WL 1421627, at *2.

11.     Relatedly, the PSC negotiated, and the Court approved, four additional class settlements with "several downstream entities in the Taishan chain of commerce and their insurers" for the benefit of mostly Virginia claimants. *See* Order and Judgment [Rec. Doc. 16934] at 6.

12.     Plaintiffs also reached a class settlement with Taishan of Assigned Claims in MDL No. 2047 on Behalf of the Porter-Blaine/Venture Supply Class Regarding Claims Assigned to the

Class by the Porter-Blaine/Venture Participating Defendants and Participating Insurers Against Taishan Gypsum Company Ltd. and Taian Taishan Plasterboard Co., Ltd. *See* Order and Judgment [Rec. Doc. 21544].

13.     After entry of the *Germano* judgment, Taishan entered its appearance in the MDL to contest jurisdiction and vacate the default judgments. *See* Taishan's Motion to Vacate Default Judgment and Dismiss the Action [Rec. Doc. 5436]; Taishan's Motion to Vacate Order on Motion for Default Judgment and Motion to Dismiss the Action [Rec. Doc. 5583]. In the meantime, defaults were entered against CNBM, BNBM, and/or BNBM Group in various cases. *See Chinese Drywall*, 2017 WL 1421627, at *8. Two years later, after significant jurisdictional discovery, including depositions on several continents, a week of depositions personally overseen by the Court in Hong Kong, and extensive briefing, the Court issued its jurisdictional opinion. The Court declined to vacate the default judgments against Taishan and determined that Taishan was subject to the Court's jurisdiction under Louisiana, Florida, and Virginia law. *Chinese Drywall*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

14.     With the issue of jurisdiction resolved, Taishan discharged its counsel and announced that it would not appear for a judgment debtor examination as ordered by the Court. *Chinese Drywall*, 168 F. Supp. 3d at 932. The Court entered a civil and criminal contempt order and injunction enjoining Taishan and its affiliates and/or subsidiaries from conducting any business in the United States until or unless Taishan participated in this judicial process. Contempt Order [Rec. Doc. 17869].

15.     During Taishan's absence from the jurisdiction, *Amorin* Plaintiffs filed a Motion for Class Certification pursuant to Rule 23(b)(3). *Chinese Drywall*, 2017 WL 1421627, at *4. On September 26, 2014, the Court certified the *Amorin* class of homeowners with defective drywall

manufactured by any of the Taishan entities. *Class FOFCOL*, 2014 WL 4809520, at *16. The Court scheduled a hearing to determine class damages. *Chinese Drywall*, 2017 WL 1421627, at *5.

16.     On the day the class damages hearing was scheduled to begin on February 12, 2015, BNBM entered an appearance and requested a continuance [Rec. Doc. 18331]; *see also Chinese Drywall*, 2017 WL 1421627, at *5. Shortly thereafter, Taishan returned to the Litigation and paid the *Germano* judgment, plus fines *See* Notice of Appearance [Rec. Doc. 18352]; Notice of Payment of Contempt Penalty [Rec. Doc. 18448]. Around the same time, BNBM Group, CNBM, and additional CNBM entities appeared in the Litigation [Rec. Docs. 18397, 18411, 18427, 18428, 18431, 18444]; *see also Chinese Drywall*, 2017 WL 1421627, at *5.

17.     Beginning in September 2015, the PSC filed additional complaints ("*Brooke* actions") with new Plaintiffs, who were not part of the certified *Amorin* Class, asserting similar claims against Taishan and the BNBM and CNBM entities and including, among the Defendants, SASAC. *See Brooke, et al. v. State-Owned Assets Supervision & Admin. Comm'n of the State Council, et al.*, Civ. Action No. 15-4127 (E.D. La.); *Brooke, et al. v. State-Owned Assets Supervision & Admin. Comm'n of the State Council, et al.*, Civ. Action No. 15-6631 (S.D. Fla.) (Miami Case No. 15-24348); *Brooke, et al. v. State-Owned Assets Supervision & Admin. Comm'n of the State Council, et al.*, Civ. Action No. 15-6632 (E.D. Va.) (Norfolk Case No. 15-506). Much like the protective *Amorin* Complaints, identical *Brooke* Complaints containing all the same Plaintiffs were filed in Louisiana, Florida, and Virginia, which were then transferred to the MDL Court in Louisiana.

18.     Taishan, BNBM, BNBM Group, and CNBM entered their appearances in *Brooke*; however, unlike the *Amorin* cases, there are no defaults entered in the *Brooke* cases, no responsive

6

pleadings are filed in the *Brooke* cases, and the *Brooke* "class" has not been certified. *See* Declaration of Sandra L. Duggan ("Class Counsel Declaration"), attached as Exhibit 4 to Settlement Class Counsel's Mem. of Law[3] [Rec. Doc. 22392-7] at ¶¶ 8, 19. Further, BNBM moved to dismiss the *Brooke* Complaints, and this Court granted that motion, in part, by dismissing certain causes of action and ruling on BNBM's statute of limitations defense, that many claimants cannot rely on cross-jurisdictional tolling to save their Claims. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2019 WL 1057003 (E.D. La. Mar. 6, 2019). Other than dismissing certain claims raised by *Brooke* Plaintiffs and ruling on statute of limitations defenses, all other issues in the *Brooke* actions are yet to be litigated. Importantly, plaintiff-specific determinations regarding application of the respective statutes of limitations (and the applicability of the Court's March 6, 2019 order), and the applicability of any rulings from the *Amorin* actions to the *Brooke* actions has not been determined. *See* Class Counsel Declaration at ¶ 19.

19.     BNBM, BNBM Group, and the CNBM entities filed jurisdictional challenges in *Amorin* once they entered the Litigation in 2015. *See* BNBM and CNBM entities' Motions to Dismiss [Rec. Docs. 19527, 19646, 19663, 19664]; *see also* BNBM Group's Motion to Dismiss the Complaints Pursuant to Rule 12(b)(2) and 12(b)(5) [Rec. Doc. 18841].

20.     In addition, Defendants sought to decertify the *Amorin* class. *See* CNBM's Motion to Decertify the Class [Rec. Doc. 20627]; Taishan's joinder in CNBM's Motion to Decertify the Class [Rec. Doc. 20632]; Defendants' Motion to Certify an Immediate Appeal from the Court's Order Denying their Motions to Decertify the Class (§1292(b) Motion #2) [Rec. Doc. 20780];

---

[3] On December 6, 2019, Settlement Class Counsel submitted their Memorandum of Law in Support of their Motion for Entry of An Order and Judgment (1) Granting Final Approval of the Class Settlement with Taishan and (2) Certifying the Settlement Class [Rec. Doc. 22392-3] ("Settlement Class Counsel's Mem. of Law").

Taishan's Motion to Amend the Order Denying Class Decertification and the Class Damages Order and to Certify for Interlocutory Appeal Under Section 1292(b) [Rec. Doc. 20778].

21.     On June 9, 2015, the Court oversaw the class damages hearing. *See Chinese Drywall*, 2017 WL 1421627, at *5. Following extensive pretrial briefing, which included *Daubert* motions, the Parties presented remediation damages evidence at the class damages hearing, and after that hearing prepared extensive proposed findings of fact and conclusions of law. *See* PSC's Proposed Findings of Fact & Conclusions of Law [Rec. Doc. 19197].

22.     On April 21, 2017, the Court entered an order on class damages adopting a formula for calculating remediation damages (the "Remediation Damages Formula") based on universally accepted RS Means data, analogous to that used by national builders. *Chinese Drywall*, 2017 WL 1421627, at *14. The Court concluded that Plaintiffs' remediation damages should be "calculated by multiplying the under air square footage of the affected properties…by [the national unit square foot price for remediation] *as adjusted* by the RS Means location factor." *Id*. at *24.

23.     Also, on April 21, 2017, the Court denied Defendants' motion to decertify the *Amorin* class. *See* [Rec. Doc. 20740]; *see also Chinese Drywall*, 2017 WL 1421627, at *8.

24.     With respect to the ongoing efforts of CNBM and BNBM to contest jurisdiction over them, the Court entered an Order and Reasons on April 21, 2017, holding that the Claims against certain Defendants, including CNBMIT Co. Ltd., CNBM USA Corp., and United Suntech Craft, must be dismissed for lack of jurisdiction and that, for jurisdictional purposes (i) CNBM, BNBM Group, BNBM, and Taishan operate as a single business enterprise under Louisiana law, (ii) Taishan and BNBM are agents under Virginia and Florida law, (iii) there is jurisdiction over BNBM under Florida law for its manufacture and sales of BNBM Dragon Board in Florida, and (iv) the Court does not have jurisdiction over BNBM Group or the CNBM entities under Florida

law or Virginia law. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595 (E.D. La. Apr. 21, 2017), *mot. to certify appeal granted*, 2018 WL 4863625 (E.D. La. Mar. 6, 2018). Following these rulings, BNBM, BNBM Group and CNBM filed motions pursuant to 28 U.S.C. § 1292(b), seeking immediate appellate review. *See* Rec. Doc. 20779; Defendants' Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b), Fifth Circuit Docket 17-90027, filed by CNBM, BNBM Group, and BNBM [Rec. Doc. 20898-2] (permission denied by the Fifth Circuit on September 1, 2017).

25.     On August 4, 2017, the Court certified its Jurisdiction Order for immediate appeal but, thereafter, Taishan, BNBM, BNBM Group, and CNBM filed supplemental motions to dismiss based on *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017) ("*BMS*"). *See* Order & Reasons (8/4/2017) [Rec. Doc. 20890], vacated while *BMS* briefing occurred [Rec. Doc. 20927]; *see also* Motion to Dismiss for Lack of Jurisdiction and Class Certification following *BMS* [Rec. Doc. 20882]. Defendants' 1292(b) motions on class damages and decertification were denied by Order & Reasons (8/22/2017) [Rec. Doc. 20910].

26.     In order to protect the Plaintiffs facing potential dismissal challenges, at varying times based on the information provided by counsel representing individual Plaintiffs, the PSC filed protective *Amorin* and *Brooke* actions in each of the States where Affected Properties were located. *See* fn. 1, *supra* (citing Omni XVI-Omni XXXV). Extensive briefing again occurred on the issue of the Court's jurisdiction over Defendants, and on November 30, 2017, this Court issued an opinion on personal jurisdiction that rejected the challenges under *BMS*. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 5971622 (E.D. La. Nov. 30, 2017).

27.     Thereafter, the BNBM and CNBM entities revisited their request for interlocutory review. *See* Renewed Motion to Certify an Immediate Appeal from the Court's Jurisdictional

Orders as to ED 20739 and DE 21088 (12/13/2017) [Rec. Doc. 21095]; Notice by Defendant of Joinder to CNBM and BNBM Entities' Motion to Certify Immediate Appeal of November 30, 2017 Order [Rec. Doc. 21096]. That request was granted in part by the Court, certifying the issues arising from the original Jurisdiction Order but denying certification with respect to issues raised by *BMS*. Order & Reasons (3/6/2018) [Rec. Doc. 21231]. BNBM, BNBM Group, and CNBM petitioned the Fifth Circuit for permission to appeal the Jurisdiction Order, which prompted additional briefing. *See* Defendants' Petition, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-90013 (5th Cir. Mar. 15, 2018), Doc. No. 00514397054; Plaintiffs' Response, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-90013 (5th Cir. Mar. 28, 2018), Doc. No. 0051440659. Defendants' petition was granted; the jurisdictional appeal in the Fifth Circuit is fully briefed and oral argument has been scheduled for the week of February 3, 2020. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-30742 (5th Cir.).

28.     In 2018, the Court rejected BNBM's and CNBM's efforts to vacate the *Amorin* defaults that had been entered against them. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, at *8 (E.D. La. Jan. 2, 2018).

     **B.**    <u>**Remands.**</u>

29.     In 2018, this Court suggested that the Florida and Virginia *Amorin* actions be remanded. *See* Suggestion of Remand, Opinion and Order (3/12/2018) [Rec. Doc. 21242 (Florida)]; Suggestion of Remand, Opinion and Order (8/20/2018) [Rec. Doc. 21695 (Virginia)]. The *Amorin* cases were remanded by Order of the JPML to Florida on June 6, 2018, and to Virginia on October 10, 2018. *See* JPML Rec. Doc. 524 (Florida); JPML Rec. Doc. 547 (Virginia). As a result, the Florida *Amorin* action was remanded to Judge Cooke in the Southern District of Florida (Civil Action No. 11-22408), and the Virginia *Amorin* action was remanded to Judge Davis in the

Eastern District of Virginia (Norfolk Civil Action No. 11-377).

30.     In 2019, this Court suggested that the Florida and Virginia *Brooke* actions be remanded. *See* Suggestion of Remand, Opinion and Order (3/11/2019) [Rec. Doc. 22138 (Florida)]; Suggestion of Remand, Opinion and Order (3/11/2019) [Rec. Doc. 22139 (Virginia)]. On March 29, 2019, the Florida and Virginia *Brooke* actions were remanded by Order of the JPML. *See* Remand Order [Rec. Doc. 22198]; JPML Rec. Doc. 556. As a result, the Florida *Brooke* action was remanded to Judge Williams in the Southern District of Florida (Civil Action No. 15-24348), and the Virginia *Brooke* action was remanded to Judge Smith in the Eastern District of Virginia (Norfolk Civil Action No. 15-506).

31.     The Louisiana *Amorin* and *Brooke* actions remained in the MDL (not remanded), and even though the Florida and Virginia *Amorin* and *Brooke* actions were remanded, because the PSC filed identical *Amorin* and *Brooke* Complaints in Louisiana, Florida, and Virginia all *Amorin* and *Brooke* Plaintiffs' Claims remained in the Louisiana. *See Chinese Drywall*, 2018 WL 6046189, at *5-6 (staying, instead of dismissing, Florida and Virginia-based claims in the Louisiana *Amorin* Complaint).

## C.     <u>Substantial Litigation in the Remand Courts – *Amorin* cases.</u>

32.     Upon remand of the Florida *Amorin* cases, on November 16, 2018, Judge Cooke entered an ambitious two-track scheduling order designed to move the cases to resolution – one track for remediation damages and one track for other losses. *See* Florida Trial Plan, *Amorin v. Taishan*, Civil Action No. 11-cv-22408 (Nov. 16, 2018) (FLSD ECF No. 112) [Rec. Doc. 21933-1]. For the next six months, the Parties worked diligently to execute the remand court's trial plan. On behalf of approximately 1,700 Florida *Amorin* Plaintiffs, Settlement Class Counsel responded to Defendants' discovery requests and contests regarding remediation damages, generally, and

proof of Product ID, ownership status of Affected Properties, under air square footage, remediation status, prior payments for Chinese Drywall Claims, and assignments of claims to third parties, specifically. *See* Class Counsel Declaration at ¶ 11.

33.     In addition, Settlement Class Counsel and other common benefit counsel, including PSC members and attorneys working under their direction, took the deposition of Taishan's 30(b)(6) witness on the topic of product identification. *See* Amended Notice of Deposition (FLSD ECF No. 160) [Rec. Doc. 22363-36].

34.     Settlement Class Counsel also sought to depose a BNBM 30(b)(6) witness on Product identification issues. *See* Notice of Deposition (FLSD ECF No. 167) [Rec. Doc. 22363-37].  However, even though BNBM's 30(b)(6) witness had been granted approval to enter the United States, it was unlikely the witness would formally receive his visa in time to sit for a live deposition due to State Department issues. As a result, the Parties agreed to written 30(b)(6) discovery of BNBM in lieu of live testimony. Class Counsel Declaration at ¶ 12.

35.     Plaintiffs alleged that the following categories of Chinese Drywall were attributable to Taishan and/or BNBM:

> (A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K) Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. *See* Rec. Doc. 22152-3.

*See, e.g.*, CDW PID Position Chart [Rec. Doc. 22152-13].

36.     Defendants asserted 17 different categories of contests to the Florida *Amorin* Plaintiffs' Claims for remediation damages. Specifically: (a) Claimant is not an *Amorin* named Plaintiff; (b) Claimant assigned the *Amorin* claim to other person or entity; (c) Claimant purchased

with knowledge of Chinese drywall in the Affected Property; (d) Claimant does not currently own the Affected Property; (e) Claimant failed to submit a Supplemental Plaintiff Profile Form ("SPPF"); (f) Claimant never owned the Affected Property; (g) Claimant did not sign the current SPPF submission; (h) Claimant failed to fill out all relevant fields in the SPPF; (i) Incorrect reported Under Air Square Footage; (j) Chinese drywall in Affected Property was not manufactured by Taishan; (k) Insufficient proof to identify manufacturer of Chinese drywall; (l) Affected Property was completely remediated; (m) Affected Property was partially remediated; (n) Remediation of Affected Property was funded by other person or entity; (o) Claimant's reported diminution in value is less than the amount requested under the remediation-damages formula; (p) Remediation-damages formula calculation proffered by Plaintiffs does not conform to the formula adopted by the Court; and (q) Claimant did not preserve evidence during remediation as required under MDL Pre-Trial Order 1. *See, e.g.*, Special Master's First Report and Recommendation Regarding Defendants' Contests and Set-Offs (5/6/2019) (FLSD ECF No. 266) [Rec. Doc. 22363-68] ("SM First R&R Re: Contests").

37.     Following discovery, the Parties presented multiple briefs and several days of oral argument separately on both the Product ID and remediation damages to Special Master Tiffani Lee who had been appointed by Judge Cooke in Florida.

38.     The Special Master issued a Report and Recommendation Regarding Product ID Categories Attributable to Taishan Defendants ("Product ID R&R"), rejecting Plaintiffs' arguments for attribution to Taishan for the following categories of Chinese Drywall products: "MADE IN CHINA MEETS OR EXCEEDS" (Category "I"), nearly all "various Drywall dimensions" with the exception of one marking that Taishan admitted to and the other where Plaintiffs had direct evidence that it was a Taishan marking (Category "J"), Prowall (Category

13

"G"), IMT Gypsum (Category "F"), C&K (Category "B"), and White Edge Tape and "blank boards" (Category "L"). *See* Special Master's Product ID R&R (4/8/2019) (FLSD ECF No. 233), attached as Exhibit 5 to Settlement Class Counsel's Mem. of Law. Plaintiffs filed Objections to the Product ID R&R before Judge Cooke. *See* Plaintiffs' Objections to and Appeal from Product ID R&R (FLSD ECF No. 253), attached as Exhibit 6 to Settlement Class Counsel's Mem. of Law; Plaintiffs' Reply in Further Support of Their Objections (FLSD ECF No. 297), attached as Exhibit 8 to Settlement Class Counsel's Mem. of Law. Taishan filed an Opposition to Plaintiffs' Objections (FLSD ECF No. 277), attached as Exhibit 7 to Settlement Class Counsel's Mem. of Law.

39.     In addition, the Special Master issued two Reports and Recommendations Regarding Defendants' Contests and Set-Offs. *See* SM First R&R Re: Contests (FLSD ECF No. 266), attached as Exhibit 9 to Settlement Class Counsel's Mem. of Law; Special Master's Second Report and Recommendation Regarding Defendants' Contests and Set-Offs (5/13/2019) (FLSD ECF No. 268), attached as Exhibit 10 to Settlement Class Counsel's Mem. of Law ("SM Second R&R Re: Contests"). The Special Master sustained the following Contests asserted by Defendants: (g) only SPPFs and amended SPPFs with signed verifications are admissible; (n) Plaintiffs whose Affected Property was remediated by another person or entity at no cost to the Plaintiffs have no remediation damages to recover; and (o) Plaintiffs whose diminution in value is less than the amount requested under the remediation damages formula are entitled to only the diminution in value and not remediation formula damages in accordance with Florida law. *See* SM First R&R Re: Contests at 15; SM Second R&R Re: Contests at 8. The Special Master denied the following Contests asserted by Defendants: (a) certain Plaintiffs are not *Amorin* Class Members; (c) Plaintiffs who were aware of the Chinese Drywall prior to purchasing the Affected Property are not entitled

to remediation or any other kind of damages; (e) condominium associations do not have standing as Class Members; (h) Plaintiffs who did not fill out all relevant fields in the SPPF should be off-tracked; (i) Plaintiffs who have more than one proof of under-air square footage should be off-tracked; (k) Plaintiffs who lack sufficient Product ID should be excluded from the remediation damages formula process; (l) and (m) Plaintiffs whose Affected Properties were partially or completely remediated should be off-tracked; (p) Plaintiffs eligible for the Remediation Damages Formula are only entitled to the 2015 RS Means national price per square foot; and (q) Plaintiffs who did not preserve evidence in compliance with Pre-Trial Order 1 should be off-tracked and resolved through individual adjudication. *See* SM First R&R Re: Contests at 15; SM Second R&R Re: Contests at 8.

40.     The Special Master also overruled the following Contests as they sought input on matters pending before Judge Cooke or this Court: (d) former owners are not entitled to the Remediation Damages Formula; (f) certain Plaintiffs did not submit a SPPF; and (j) Plaintiffs without proof of Product ID attributable to Taishan cannot recover against Taishan. *See* SM First R&R Re: Contests at 10-11.

41.     In Florida, the Parties also engaged in discovery regarding Other Losses of 20 *Amorin* Priority Plaintiffs set for trial in July 2019. *See, e.g.*, Florida Trial Plan Order (FLSD ECF No. 112) [Rec. Doc. 21933-1]; Declaration of Sandra L. Duggan in Support of Settlement Class Counsel's Motion for an Award of Attorneys' Fees and Cost Reimbursements for Common Benefit Counsel and Individually Retained Attorneys ("Duggan Declaration") [Rec. Doc. 22363-4] at ¶ 45. During a two-month period, the Priority Plaintiffs produced relevant documents requested by Defendants on the subjects of alternative living expenses, short sales, foreclosures, bankruptcies, bodily injury claims, loss of use and enjoyment, punitive damages, lost equity, personal property

damages and other losses. In addition, the Priority Plaintiffs prepared lists of fact witnesses and submitted themselves (and other owners of the Affected Properties) for deposition and home inspections if requested. *See, e.g.*, Duggan Declaration at ¶¶ 46 (h)-(j). Following fact discovery, Settlement Class Counsel and other common benefit counsel working under their direction engaged in expert discovery and motions practice in preparation of the trials scheduled for Other Loss claims. *See, e.g.*, *id.* at ¶¶ 46 (b)-(d).  Tens of thousands of pages of expert reliance material were exchanged, including copious scientific testing data and complex housing market valuations. Depositions of both Plaintiff and Defendant experts were vigorously pursued, generating thousands of pages of expert transcripts. *See, e.g.*, *id.* These depositions formed the basis of motion practice, which was fully briefed and pending at the time the proposed Settlement was reached. *See, e.g.*, *id.*; *see also* Oppositions to Defendants' motions to exclude numerous experts [Rec. Docs. 22363-27, 22363-29, 22363-34, and 22363-35].

42.     Further, on April 29, 2019, Defendants filed an omnibus motion for summary judgment, which posited multiple theories as to why the Florida Priority Plaintiffs should not be entitled to any recovery (or, to the extent they can recover, why their damages should be minimized). (FLSD ECF No. 245). Plaintiffs responded to this motion. (FLSD ECF No. 284) [Rec. Doc. 22363-66].

43.     Similar to the Florida remand court, on October 12, 2018, this Court entered an Order requiring the Parties to select 40 Louisiana *Amorin* Plaintiffs ("Select Plaintiffs") to form a discovery pool. [Rec. Doc. 21847].  Thereafter, this Court entered an Order setting the Louisiana *Amorin* Select Plaintiffs' claims for trial. *See* Order & Reasons re Trial Plan [Rec. Doc. 22251].

The Parties engaged in fact discovery involving 39 Select Claimants.[4] These Plaintiffs (along with other owners of the subject Affected Properties) submitted themselves for depositions, home inspections, discovery exchanges (including providing lists of fact witnesses), and were preparing to engage in expert discovery. Class Counsel Declaration at ¶ 18.

44.     In advance of trial, this Court ruled that the former owners' diminished property values are presumptively the same as the cost required to remediate the homes. Order & Reasons (5/3/19) [Rec. Doc. 22237] at 12.

45.     In Virginia, Judge Davis entered an Order to resolve the Virginia *Amorin* claims. *See* Memorandum Order re Trial Plan, Civil Action No. 11-cv-00377 (VAED ECF No. 87) [Rec. Doc. 22253-1]. The Virginia Court adopted the remediation damages formula approved by this Court, *Chinese Drywall*, 2017 WL 1421627, for current owners who did not fully remediate their properties and permitted limited written discovery in order to verify ownership and square footage, as well as "setoffs" based on prior recoveries that claimants received from earlier settlements with different Defendants. For former owners, the Virginia Court adopted this Court's ruling that "the remediation damage formula is not only relevant to the determination of a former owner's 'diminution' damages, but creates a rebuttable presumption of the diminution in market value." [Rec. Doc. 22253-1]. Judge Davis ordered each Party to select 10 former owner Virginia *Amorin* Priority Plaintiffs to participate in fact and expert discovery relevant to diminution in value of the former-owners' Affected Properties and Other Losses. *Id.*

**D.     Class Settlement Negotiations and Mediation.**

46.     As part of the Florida *Amorin* Court proceedings, Judge Cooke ordered the Parties

---

[4] When it became impossible for one of the Select Plaintiffs (Daniel Gammage) to continue for medical reasons, the Parties agreed to reduce the discovery pool to proceed with only 39 Select Plaintiffs. [Rec. Doc. 22097].

to engage in mediation. *See* Class Counsel Declaration at ¶ 20 (citing FLSD ECF No. 113). The Parties jointly selected Mr. John Freud as the Mediator [FLSD ECF No. 237]. *See* Class Counsel Declaration at ¶ 21; *see also* C.V. of John S. Freud [Rec. Doc. 22305-8]. Thereafter, Plaintiffs timely filed a Notice of Mediation on the Florida docket. *See* [FLSD ECF No. 235]; Joint Report No. 110 of Plaintiffs' and Defendants' Liaison Counsel [Rec. Doc. 22224] at 35 (citing Notice of Mediation).

47.     Beginning in late spring 2019, the Parties engaged in arm's-length negotiations over several weeks to reach the Class Settlement preliminarily approved by this Court [Rec. Doc. 22314]. *See* Class Counsel Declaration at ¶ 21. Under the guidance of mediator John S. Freud, Settlement Class Counsel made a global demand of Taishan (to include *Amorin* Plaintiffs, *Brooke* Plaintiffs and absent Class Members), and the Parties exchanged detailed damages calculations and arguments in support of their respective positions, and made counter-offers and responded to the other side's positions. *Id.* In addition to Settlement Class Counsel, PSC member Pete Albanis of Morgan & Morgan, Plaintiffs' Counsel Emma Schwab of Barrios, Kingsdorf & Casteix, and Plaintiffs' Counsel Allison Grant and Holly Werkema of Baron & Budd participated in and contributed to the negotiations of the Settlement. *Id.* at ¶ 22.

48.     Following intense, hard-fought in-person negotiations that occurred over two days, where each side acquiesced to compromises, on May 23, 2019, the Parties agreed to a Settlement Term Sheet on behalf of the Settlement Class that set forth (i) the class definition, (ii) the cash payment amount, (iii) the terms of funding, (iv) the Parties' agreement to jointly recommend to the Court that an Allocation Neutral be appointed to determine, subject to Court approval, the allocation criteria for awards from the Settlement Fund among eligible Class Members based on objective factors including, but not limited to: Product ID; square footage; ownership status;

remediation status; and whether the claimant is an *Amorin* Class Member or a *Brooke* Plaintiff, and (v) the non-cash settlement terms. *Id.* at ¶ 23.

49.     Thereafter, over the next three months, the Parties met in person on multiple occasions and over the phone to negotiate the terms of the final Settlement Agreement. *Id.*

50.     At all times, the negotiations of the Parties proceeded at arm's length. *Id.* at ¶ 24. The Parties did not enter into any side-agreements, and the Settlement contains all terms agreed to by the Parties. *Id.* at ¶ 24.

51.     The Settlement Agreement with Taishan (the "Settlement Agreement") is filed on the public record [Rec. Doc. 22305-2]. Capitalized terms used in these Findings of Fact and Conclusions of Law have the same meaning as those defined in the Settlement Agreement.

### E.     Material Terms of the Settlement.

#### 1.     The Settlement Class and Settlement Fund.

52.     The Settlement Class includes:

(1) all Class Members in the *Amorin* Class certified by Judge Fallon in MDL No. 2047 in *In re Chinese-Manufactured Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014) ("*Amorin* Plaintiffs"); (2) all Plaintiffs who are named on one or more of the *Brooke* Complaints ("*Brooke* Plaintiffs"); and (3) all other property owners with Chinese Drywall alleged to be attributed to Taishan and/or the Additional Released Parties[5] ("absent Class Members"). *Amorin* Plaintiffs and *Brooke* Plaintiffs are collectively referred to as "known Class Members."

EXCLUDED from the Class are: (1) Plaintiffs listed on Exhibit 1 to the Settlement Agreement (Exhibit 1 includes 498 Plaintiffs who are included in a separate settlement agreement with Taishan); (2) the named Plaintiff and putative class members in *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.); and (3) Plaintiffs who asserted Claims against Taishan and/or the Additional Released Parties, but whose Claims were dismissed for

---

[5] The Additional Released Parties are: BNBM; BNBM Group; CNBM; CNBM Group, and SASAC.

failure to complete a Supplemental Plaintiff Profile Form or by motion for voluntary dismissal.

*See* Settlement Agreement [Rec. Doc. 22305-2] at § 1.1.1.

53.    Taishan agreed to pay $248,000,000 in cash to settle the Claims of Settlement Class Members. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 4.1. Taishan made an initial payment of $24,800,000, which is in the Court Registry. [Rec. Doc. 22330]. A portion of which is available to pay the costs of individually mailed Class Notices and other administrative expenses associated with the retention of the Allocation Neutral and the Claims Administrator. Settlement Agreement [Rec. Doc. 22305-2] at §§ 4.1.1 and 8.2.1. Under the Settlement Agreement, Taishan is obligated to make a second payment of $74,400,000 no later than 120 days following Preliminary Approval, *i.e.*, by December 27, 2019 (*see* Settlement Agreement [Rec. Doc. 22305-2] at § 4.1.2), and a final payment of $148,800,000 no later than 60 days after Final Approval of the Settlement (*see id.* at § 4.1.3).

## 2.    Releases.

54.    The purpose of the Settlement is to fairly and adequately resolve all Claims against Taishan and the Additional Released Parties for damages allegedly caused by Covered Chinese Drywall installed in Affected Properties owned by Plaintiff Class Members. *See id.* at § 3.1.

55.    "Covered Chinese Drywall" is defined as "All drywall products alleged to be attributable to Taishan and/or the Additional Released Parties, including, but not limited to those products identified in the Taishan Product ID Catalog." *See id.* at § 1.12. The types or "brands" of Chinese Drywall included in the Settlement ("Covered Chinese Drywall") are the following:

(A) BNBM and Dragon Brand; (B) C&K; (C) Chinese Manufacturer #2 (purple stamp); (D) Crescent City Gypsum; (E) DUN; (F) IMT Gypsum; (G) ProWall; (H) TAIAN TAISHAN and Taihe edge tape; (I) MADE IN CHINA MEET[S] OR EXCEED[S]; (J) various Drywall dimensions, including 4feet[x/*]12feet[x/*]1/2inch; (K)

Venture Supply; and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers or letters. *Id.* at § 1.12 & Exhibit 2 to the Settlement Agreement; *see also* Rec. Doc. 22152-3 and FLSD ECF No. 155-2.

The following products are excluded from the Settlement (*i.e.*, they are not Covered Chinese Drywall): Knauf, Knauf Tianjin, KPT, Bedrock, ProRoc, Panel Rey, IMG, USG, Shamrock Gold, Lafarge, Georgia Pacific, National Gypsum, and any drywall manufactured outside of the People's Republic of China. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 1.1.2 & Exhibit 2 to the Settlement Agreement.

56.     The released parties are Taishan, BNBM, BNBM Group, CNBM, CNBM Group, and SASAC. *See id.* at § 1.1.2. As of the Effective Date of the Settlement,[6] each Settlement Class Member (known and unknown) will be deemed to have fully released any and all Released Claims against Taishan and the Additional Released Parties. *See id.* at § 5.2.1.  Further, Class Members who have not opted out will be barred from bringing or continuing suit on any Released Claims against Taishan or the Additional Released Parties. *See id.* at § 5.2.2. Similarly, as of the Effective Date, Taishan will be deemed to have fully released any and all Released Claims against all Class Members who have not opted out of the Settlement. *See id.* at § 5.3.1.

57.     The term "Released Claims" encompasses "any and all Claims, including Other Losses, of a Class Member against Taishan or the Additional Released Parties pertaining to Chinese Drywall." *See id.* at § 5.1.

58.     The "Claims" subject to release in the Settlement generally are defined to include:

---

[6] The Effective Date of the Settlement is when the Settlement is Final, which is the date after the time to appeal the Order and Judgment has expired with no appeal having been taken; or if an appeal is sought, the day after the Order and Judgment is either affirmed, or any and all appeals, or motions for reargument or reconsideration are dismissed or denied, and the judgment is no longer subject to further appellate review. *See* Settlement Agreement [Rec. Doc. 22305-2], at § 2.1.

any and all claims of any kind and nature whatsoever of a Class Member (a) arising out of, or in any manner related to, Covered Chinese Drywall, the Litigation, or CDW-Related Actions, and/or (b) for any and all losses, damages and/or injuries arising from, or in any manner related to, all and/or any of the claims described in (a) above, including but not limited to, any and all claims that a Class Member or anyone claiming by or through any Class Member has, may have, or may have had, regardless of whether such claim is known or unknown, filed or unfiled, asserted or as yet unasserted, or existing or contingent, whether asserted by petition, complaint, cross-claim, third party complaint, fourth-party complaint, arbitral demand, written demand, or otherwise (or any judgment or order entered on such claims), based upon or alleging any act, conduct, status or obligation of any person or entity (including Taishan and/or any Released Party) and/or any source of liability whatsoever, and regardless of the legal theory or theories of damages involved. *See id.* at § 1.7.

59. The term "Claim" subject to release more specifically includes, but is not limited to, any claim:

For damage to real or immovable property and/or personal or movable property, remediation and/or clean-up of property, diminution of property value, stigma, contamination, alternative living expenses, loss of use, loss of enjoyment, economic loss, personal injury, bodily injury (including death), fear, fear of illness or disease, fear of developing illness or disease, fright, mental or emotional distress, pain and suffering, loss of earnings, impairment of earning capacity, loss of consortium, loss of support, loss of love and affection, equity and medical monitoring, bystander liability, wrongful death, survival actions, breach of contract, all statutory claims, punitive or exemplary damages, attorneys' fees, attorneys' costs or expenses, moving expenses, or additional rental or mortgage payments (*see id.* at § 1.7.1);

For nuisance, trespass, inconvenience, loss of use or enjoyment, negligence, negligence per se, tort, public or private nuisance, custody of a thing containing a vice or defect, strict liability, liability for ultrahazardous activities or conduct, absolute liability, wanton and reckless misconduct, malicious misconduct, servitude or obligation of vicinage, abuse of right, or any other liability legally asserted or assertable under any federal, state, or local statute, directive or regulation, redhibition, violation of any state or federal home warranty act, products liability act, unfair trade practices or consumer protection law, negligent discharge of a pollutant or

corrosive substance, unjust enrichment, breach of express or implied warranty, breach of implied warranty of fitness and merchantability, breach of implied warranty of habitability, negligent misrepresentation, building code violations (*see id.* at § 1.7.2);

For punitive damages, whether statutory or common law (*see id.* at § 1.7.3);

For derivative or vicarious liability arising out of the conduct or fault of others for which Taishan and/or any Released Party may be responsible (*see id.* at § 1.7.4);

For any right legally assertable by the Class or any Class Member now or in the future, whether the claim is personal to each individual, is derivative of a claim now or in the future, or as assignee, successor, survivor, beneficiary, subrogee, or representative of a Class Member (*see id.* at § 1.7.5);

For a past, present, future, known, unknown, foreseen, unforeseen, contingent, nascent, mature claim or a claim arising at law, in equity or otherwise, including but not limited to, claims for survival and wrongful death (*see id.* at § 1.7.6); and

For all injuries or damages of any type, nature, or character arising from, attributable to, or in any way resulting from Covered Chinese Drywall (*see id.* at § 1.7.7).

### 3.    Allocation of the Settlement Fund.

60.    The Parties, with approval by this Court, selected Mr. J. Cal Mayo, Jr. to serve as the Allocation Neutral responsible for developing a fair, reasonable, and adequate Allocation Model to allocate and distribute the Settlement Funds equitably among Eligible Class Members based on Objective Criteria. *See id.* at § 1.5; *see also* C.V. of Cal Mayo [Rec. Doc. 22305-7]. Previously, in 2016, Mr. Mayo served as a Special Master appointed by this Court to resolve Product ID disputes among the Parties [Rec. Docs. 20306 (*SEALED) and 22252] and therefore, he has familiarity with the legal and factual issues faced by the Parties in this Litigation.

61.    Under the terms of the Settlement Agreement, there is only one Allocation Amount per Affected Property, which is intended to provide compensation for remediation damages as well

23

as Other Losses. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 6.2. There is no payment of Settlement Funds to Class Members for Claims for personal injury or bodily injury, although those Claims will be released. *Id.* at § 6.3. Depending on the circumstances, an Allocation Amount may need to be divided among multiple Eligible Class Members asserting Claims with respect to the same Affected Property, and the court-appointed Claims Administrator BrownGreer has sole discretion to determine that division, unless the Allocation Model directs a specific division and distribution of the Allocation Amount applicable to the circumstances. *Id*. at § 6.2. In order to be considered eligible for an Allocation Amount, Class Members must provide sufficient proof of indicia of Covered Chinese Drywall in the subject Affected Property. *Id.* at § 1.13.

62.    On August 19, 2019, Mr. Mayo filed his Allocation Model and Allocation Neutral Report on the MDL docket. *See* Allocation Model and Allocation Neutral Report ("Allocation Model") [Rec. Doc. 22304-1]. On August 28, 2019, the Allocation Neutral filed a Supplement to his Allocation Model to address a unique situation involving an action pending in Alabama state court. *See* Supplement to Allocation Model and Allocation Neutral Report [Rec. Doc. 22310-1] *See also* Declaration of J. Cal Mayo, Jr. dated 12/2/2019, attached as Exhibit 11 to Settlement Class Counsel's Mem. of Law.

63.    In the process of developing the Allocation Model, Mr. Mayo conferred jointly and separately with Settlement Class Counsel and counsel for Taishan and the Additional Released Parties, and he also reviewed governing law, various court orders and other relevant documents filed of record. [Rec. Doc. 22304-1] at 1. After careful consideration, Mr. Mayo determined that the following factors will be used to calculate the Allocation Amounts for each Affected Property:

(i) Under Air Square Footage of the Affected Property;[7] (ii) whether the Settlement Class Member is an *Amorin* Plaintiff, a *Brooke* Plaintiff, or an absent Class Member; (iii) proof of Product ID (*i.e.*, which category of Covered Chinese Drywall was installed in the Affected Property); and (iv) whether any prior payments were received by the Class Member for Chinese Drywall claims related to the Affected Property. Allocation Model [Rec. Doc. 22304-1] at 2-4.

64.     Mr. Mayo concluded that the Ownership Status of Class Members (*i.e.*, whether they are current or former owners of Affected Property) would not be a factor in calculating Allocation Amounts. *Id.* at 4. In making this decision, the Allocation Neutral was "guided by the decisions of the courts in Louisiana, Virginia, and Florida, [and he] generally assumed the remediation cost and the diminution in value equate, such that any former owner received less consideration for the house at the time of ownership separation." *Id.* Mr. Mayo recognized that "[o]bviously, various factors could distinguish particular circumstances (*i.e.*, an arm's length sale versus a foreclosure with debt forgiveness). However, due to the expense of a claim-by-claim analysis, [Mr. Mayo decided to] treat former owners and current owners the same for purposes of the allocation model." *Id.*

65.     Mr. Mayo further determined that the Remediation Status of the Affected Property (*i.e.*, whether it was remediated in whole, in part, or not at all) is not a factor for consideration in the Allocation Model. *Id.* He explained that "[t]he need to conduct a claim-by-claim analysis for partial remediations and the resulting time and cost played a major role in [his] decision." *Id.* Likewise, "for efficiency and consistency purposes," the specific location of the Affected Property would not affect the value of the Allocation Amount, despite the fact that during the Litigation,

---

[7] Under Air Square Footage is "the area within the Affected Property that receives ventilation from the property's heating and air systems, not including garages, attics, or basements that are not part of this ventilation system." Settlement Agreement [Rec. Doc. 22305-2], at § 1.32.

"[t]he RS Means Location Factor provide[d] an adjustment to the national average construction cost based on zip code." *Id.*

66.     Regarding Other Losses, Mr. Mayo explained that "[i]mplicit in the allocation value for each Unit [*i.e.*, each Affected Property], is a sum paid to resolve claims for Other Losses." *Id.* at 5. However, [d]etermining the particular Other Losses for a Unit and its individual owners would require detailed and cost-prohibitive inquiry and examination. The allocation model is designed for overall fair treatment of the Class Members." *Id.*

67.     The Allocation Model developed by the Allocation Neutral uses a methodology that assigns relative values to the objective factors determined to be relevant in calculating Allocation Amounts. For example, whether a Class Member is an *Amorin* Plaintiff, a *Brooke* Plaintiff, or an absent Class Member, are among those factors. *Id.* at 2. *Brooke* Plaintiffs are ascribed a 20% value in comparison to *Amorin* Plaintiffs (*i.e.*, the *Brooke* claims are discounted by 80%) because "[f]or the *Amorin* plaintiffs, the MDL Court has entered a default judgment as to liability and has certified a class, which the courts in Florida and Virginia have acknowledged and adopted" while "[t]he *Brooke* litigation remains in the early stages" where "[t]he Defendants have not answered, no discovery has occurred, and no court has certified a class." *Id.* In addition, the *Brooke* litigants face various defenses such as statutes of limitations that are significant. *Id.* These considerations are valid and the discount for *Brooke* is appropriate when considering the various factual and legal challenges facing each category of Class Member.

68.     The claims of absent Class Members ("New Claims") are more heavily discounted, a value of 5% to the New Claims in comparison to *Amorin* Plaintiffs' claims, on the grounds that they "are worth significantly less than the *Amorin* plaintiffs' claims and less than the *Brooke* plaintiffs' claims." *Id.* These considerations are valid and the discount for New Claims is

appropriate when considering the various factual and legal challenges facing each category of Class Member.

69.     A similar range of discounts was applied to Product ID. The Allocation Model assigns certain discounts to the value of various categories of Covered Chinese Drywall Defendants denied manufacturing and/or which were determined by the Special Master in Florida not to be attributable to Taishan. This approach by the Allocation Neutral was well considered as the strength of the claims of Class Members with each of the various categories of Covered Chinese Drywall are notably different. *Id.* at 3; *see also* Product ID R&R at 5-7; Plaintiffs' Objections to and Appeal from Product ID R&R at 16-20.

70.     In order to equitably account for various prior payments received by a majority (but not all) Class Members for their Chinese Drywall claims, the Allocation Model applies fair discounts (Set-Offs) to the square footage of the Affected Property on the basis that "the [prior] settlement paid for a portion of the remediation, theoretically reducing the square footage for which additional remediation is necessary." *See* Allocation Model [Rec. Doc. 22304-1] at 4. To calculate the appropriate discount for prior payments, the Allocation Neutral instructs the Claims Administrator to divide the total amount of prior payments by the value of the 2019 Remediation Formula Damages Calculation for the Affected Property at issue (*i.e.*, the 2019 R.S. Means calculation for the Property), which will result in the percentage by which the Under Air Square Footage for the property should be adjusted. *Id.*[8]

---

[8] "For example, assuming a $20,000 prior payment, a home with 2000 square feet of space, and a $250,000 2019 Remediation Formula Calculation for the Unit, the discount is 20,000/250,000 or 8%. Thus, with a remaining square footage of 92% and a multiple of .92, the Adjusted Square Footage for the Unit, as used in the allocation calculation, is 1840 square feet." *Id.*

71.     The Allocation Model considers situations where multiple parties ("Competing Claimant(s)") have filed a claim with respect to the same Affected Property such as a condominium owner and condominium association, a non-profit organization and homeowner, or a former and current owner. *Id*. at 5. The Allocation Model establishes the general rules for division of competing claims and a Competing Claimant had until October 3, 2019 to submit documentation to the Claims Administrator to support his or her allocation. *Id.* at 4-5; *see* Settlement Agreement [Rec. Doc. 22305-2] at § 12.1.2. This was a fair, reasonable and equitable manner to make these determinations.

72.     Finally, the Allocation Model took into account "Split Claims," which are claims where the Class Member assigned his or her remediation claim to a third party that is not a Settlement Class Member (*e.g.*, a commercial builder that is excluded from the Settlement) ("Assigned Claim"), or the Class Member is a condominium owner or former owner and the condominium association is a Plaintiff that received a separate settlement offer from Taishan and is excluded from the Settlement Class (as set forth on Exhibit 1 to the Settlement Agreement). Allocation Model [Rec. Doc. 22304-1] at 6. Those Class Members are ascribed 7.5% of the Allocation Amount for the Affected Property at issue. *Id*.

73.     The application of any discounts to Under Air Square Footage of Affected Properties in the Settlement (for Product ID, prior payments, and/or Class Member Status), results in an "adjusted square footage" for the properties. After all of the Affected Properties are evaluated to determine whether any discounts should be applied, the aggregate adjusted square footage of all Affected Properties in the Settlement (taking into account the reductions for Assigned Claims and

Split Claims) will be divided into the total funds available for distribution to the Class[9] to determine the amount per square foot that will be awarded to each Eligible Class Member. Allocation Model [Rec. Doc. 22304-1] at 7.

74.    In the Court's Preliminary Approval Order, the Court found that the Allocation Neutral appropriately performed his assigned function. *See* Preliminary Approval Order [Rec. Doc. 22314] at ¶ 6. During the Class Notice/Opt-Out period, the Allocation Model was available for review by Settlement Class Members on the Settlement Website and on the Court's docket.

75.    The Court finds that the Allocation Model fairly, reasonably, and adequately allocates and distributes the Settlement Amount equitably among Eligible Class Members based on reasonable Objective Criteria.

76.    The Settlement provides that the review, determination and approval of the Allocation Model by the Court shall be final and binding on the Parties and the Class. There shall be no right of appeal of the approval of the Allocation Model to any other court, including the U.S. Court of Appeals for the Fifth Circuit, such right of appeal having been knowingly and intentionally waived by each Settlement Class Member. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 6.6.

**4.    The Master Spreadsheet for Known Class Members.**

77.    In accordance with the Settlement Agreement, on August 29, 2019, Settlement Class Counsel filed on the Court's docket and published on the Chinese Drywall Settlement Website (ChineseDrywallSettlement.com) the Master Spreadsheet of known Class Member

---

[9] The Settlement provides that the costs for Claims Administration, individual mailed notice, and the services of the Allocation Neutral may be deducted from the Settlement Fund, subject to court approval. In addition, if the Court grants Settlement Class Counsel's motion for incentive awards for the Settlement Class Representatives and their motion for an award of 30% in attorneys' fees and 3% in cost reimbursements [Rec. Doc. 22363], those amounts will be deducted from the Settlement prior to calculating Allocation Amounts for Class Members.

Claims with sufficient proof of indicia of Covered Chinese Drywall in the subject Affected Property. [Rec. Doc. 22312-1]. The Master Spreadsheet includes the following information for each Claim: (i) Under Air Square Footage, (ii) Product Identification, (iii) Ownership Status, (iv) Remediation Status, (v) Set-Offs, (vi) Assignments of rights to pursue Claims, and (vii) whether the claimant is an *Amorin* Plaintiff or a *Brooke* Plaintiff. *Id.* Settlement Class Members were afforded an opportunity to dispute the information on the Master Spreadsheet relating to his or her Claim by providing to the court-appointed Claims Administrator BrownGreer what he or she contends to be the correct information, as well as any supporting evidence or corroborating documentation by October 3, 2019. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 12.1.2; [Rec. Doc. 22316-1] at 6.

78.     BrownGreer received 109 challenges from Class Members disputing information on the Master Spreadsheet with regard to their Claims. *See* Declaration of Jacob Woody ("Woody Declaration"), attached as Exhibit 12 to Settlement Class Counsel's Mem. of Law at ¶ 10. BrownGreer evaluated these challenges, and, where appropriate, modified the information on the Master Spreadsheet for the challenges that were granted. *Id.*

79.     On October 31, 2019, BrownGreer published a Revised Master Spreadsheet on the MDL docket (Rec. Doc. 22355-1). Settlement Class Members who timely submitted a challenge under the Settlement received a Challenge Determination Notice. *See* Woody Declaration at ¶ 11.

### 5.     Claims by Absent Class Members.

80.     Upon final approval of the Settlement, absent Class Members and any other Class Members not listed on the Master Spreadsheet who seek an Allocation Amount must complete the Claim Form approved by the Court under oath and submit supporting proofs of Objective Allocation Criteria to the Claims Administrator (*see* Claim Form [Rec. Doc. 22305-6]; Preliminary

Approval Order [Rec. Doc. 22314] at ¶ 8) no later than the deadline set by the Court for making a claim for an Allocation Amount, which shall be within 30 days of Final Approval. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 12.1.4.

### 6.   Distribution of the Settlement Fund.

81.   Under the Settlement, the Claims Administrator shall distribute Allocation Amounts based on the application of the Allocation Model to the Objective Allocation Criteria in the Revised Master Spreadsheet (as revised based on challenges accepted by BrownGreer) for known Class Members, and to the supporting proofs of Objective Allocation Criteria timely submitted to the Claims Administrator by absent Class Members or any other Class Members not listed on the Master Spreadsheet. No additional evidence, documents or other information shall be considered by the Claims Administrator. *Id.* at § 12.1.5.

82.   Once the Allocation Amounts are calculated, BrownGreer will provide each Class Member seeking an award of Settlement funds "with an Allocation Amount determination made solely by the Claims Administrator, and a brief summary or explanation of how the Class Member's objective facts and circumstances were applied under the Allocation Model." *Id.* at § 12.2.1. The Settlement provides Class Members with an opportunity to appeal the determination of their Allocation Amount on the grounds that the Allocation Model was "misapplied to his or her Claim." *Id.* at § 12.2.2.

### 7.   Notice.

83.   The Class Notice Period commenced upon the entry of the Preliminary Approval Order. *Id.* at § 8.1.1. To satisfy Federal Rule of Civil Procedure 23 and Due Process, Settlement Class Counsel directed the Claims Administrator to disseminate the long-form notice approved by the Court (*see* Preliminary Approval Order [Rec. Doc. 22314] at ¶ 11; Long-Form Notice [Rec.

Doc. 22314-4]) by first-class mail, postage prepaid, to the last known address of all known Class Members and their counsel of record, if any. The Notice contained sufficient information for each Class Member to make an informed decision by clearly and concisely stating, in plain English, the nature of the action, class definition, claims and defenses, and that any Class Member could object and enter an appearance at the Fairness Hearing. The Notice also explained that a Class Member could object to the Settlement, and provided the manner for objecting and the deadline for doing so. Further, the Notice explained how a Class Member could request exclusion, the time and manner for requesting exclusion, and the binding nature of a judgment on Class Members who do not request exclusion.

84. In addition, BrownGreer was asked by the Court and the Parties to provide *Amorin* Plaintiffs and *Brooke* Plaintiffs identified on the Master Spreadsheet with gross estimates of their potential recovery under the Settlement (before deducting attorneys' fees and costs approved by the Court). BrownGreer applied the Allocation Model to the following information on the Master Spreadsheet for each Affected Property: (a) Under Air Square Footage; (b) Product ID; (c) prior payments received by the Class Member for Chinese Drywall claims made with respect to the subject Affected Property; (d) whether the Class Member assigned any of his or her rights to pursue claims with respect to the Affected Property; (e) whether the Class Member is an *Amorin* Plaintiff or a *Brooke* Plaintiff; and (f) whether multiple parties are asserting a claim regarding the Affected Property. *See* Woody Declaration at ¶ 3.

85. To arrive at a gross estimate for each Affected Property on the Master Spreadsheet, BrownGreer took into consideration the estimated costs of class notice and claims administration, and an estimated number and value of claims that may be made by absent Class Members. *Id.* at ¶

4. The Claims Administrator then prepared a letter ("Estimate Letter") for each Class Member on the Master Spreadsheet setting forth an estimated gross recovery under the Settlement. *Id.*

86.     In cases where multiple parties have filed a claim with respect to the same Affected Property, BrownGreer prepared Estimate Letters notifying each of the competing Class Members that they must submit to the Claims Administrator any documents they have to support their claim no later than 35 days from the date of the Preliminary Approval Order. *Id.* at ¶ 5. BrownGreer also provided the competing Claimants with the total gross estimated recovery for the Affected Property at issue. *Id.*

87.     On September 9, 2019, BrownGreer mailed to each known Class Member, *via* First Class Presort Mail, postage prepaid, a long-form notice, and for the *Amorin* Plaintiffs and *Brooke* Plaintiffs on the Master Spreadsheet, BrownGreer included an individualized Estimate Letter in the notice package. *Id.* at ¶ 6 & Exhibits "A" & "B" thereto. For the dissemination of mailed notice, the Claims Administrator used the mailing addresses for known Class Members identified on the BrownGreer Portal, the mailing addresses set forth in known Class Members' most recent Supplemental Plaintiff Profile Forms, the mailing addresses provided by individual counsel of record, and/or the mailing addresses identified by BrownGreer through the United States Postal Service National Change of Address Database. *Id.* at ¶ 6. In total, BrownGreer mailed 3,965 notices to the Class. *Id.*

88.     After BrownGreer mailed the long-form notices and Estimate Letters, 189 notices were returned, and following further investigation to obtain updated addresses from the United States Postal Service National Change of Address Database, 163 notices and, where applicable, the Estimate Letter were resent to Class Members. On several occasions, BrownGreer received updated address information from Class Members through the court-approved Settlement Website,

Call Center, and/or through their counsel, in which case the Claims Administrator resent the notice and, where applicable, the Estimate Letter. *Id.* at ¶ 8.

89.     In total, BrownGreer transmitted the long-form notice to more than 99% of the known Class Members and to all counsel of record for these Class Members. Despite a concerted effort to individually mail the long-form notice to all known Class Members, approximately 26 returned notices were undeliverable to Class Members in: Florida (17), Louisiana (5), and Mississippi (4) (*see* Woody Declaration at ¶ 8). Additionally, counsel of record, if any, for each of these Class Members received the long-form notice (*see* Woody Declaration at ¶ 8). Further, the Media Program developed and implemented by Kinsella Media, and approved by the Court, heavily targeted these states. *See* Declaration of Shannon R. Wheatman, Ph.D. on Implementation of Notices and Notice Plan ("Wheatman Declaration"), attached as Exhibit 13 to Settlement Class Counsel's Mem. of Law at ¶ 6 & Exhibit 1 thereto.  Still further, the long-form notice was published on the Court's website, the Court's docket, the dockets of each Court where CDW-Related Actions are pending, and the Settlement Website.

90.     BrownGreer sent the long-form notice and/or Estimate Letter *via* email to all counsel of record for Class Members (80 law firms received a copy of the long-form notice). *See* Woody Declaration at ¶ 7. Counsel with clients on the Master Spreadsheet also received a spreadsheet with their clients' names and gross estimate amounts *via* email with the long-form notice. *Id.*

91.     In accordance with the Preliminary Approval Order, Settlement Class Counsel provided a copy of the Notice to the MDL Court clerk and requested that it be posted at each courthouse and on all court dockets where the CDW-Related Actions are pending, including the MDL Court, the Florida Courts, the Virginia Courts, and all other Courts listed on Exhibit 6 to the

Settlement Agreement. *See* Class Counsel Declaration at ¶ 27. This Court facilitated the posting of Notice by writing a letter to all United States District Courts, the Fifth Circuit Court of Appeals, to State Judges where CDW-Related Actions are pending,[10] and by posting it on the Court's MDL Chinese Drywall website.

92.     To provide notice to absent Class Members, Taishan retained Kinsella Media LLC ("Kinsella Media") to develop and implement the Media Notice Program approved by the Court. *See generally* Wheatman Declaration. This plan included paid media in states containing at least one Affected Property of *Amorin* or *Brooke* Plaintiffs. *See* Wheatman Declaration. at ¶ 6. The media program heavily targeted the six states that each have over 1% of the Chinese Drywall Claims of *Amorin* and *Brooke* Plaintiffs – Florida, Louisiana, Alabama, Virginia, Mississippi, and Georgia ("Top 6 States"). *Id.* These six states combined account for over 90% of the known Chinese Drywall products at issue in this Settlement.

93.     Florida and Louisiana account for 75.8% of the known Chinese Drywall products in this Settlement and the four other states (Alabama, Virginia, Mississippi, and Georgia) account for an additional 14.7% of the known Chinese Drywall products in this Settlement. The breakdown of known Chinese Drywall products by state is: Florida (62.0%), Louisiana (13.8%), Alabama (6.6%), Virginia (5.2%), Mississippi (1.8%), Georgia (1.1%). *Id.* at ¶ 6.

94.     Accordingly, the media program included one newspaper to cover each media market in Florida and Louisiana, ads on two lifestyle websites in Florida and Louisiana, Hispanic newspapers for each media market in Florida,[11] and a national magazine and national digital media

---

[10] *See, e.g.*, Letter from this Court, filed on the *Amorin* docket in the U.S.D.C. for the Southern District of Florida (FLSD ECF No. 336), attached as Exhibit 14 to Settlement Class Counsel's Mem. of Law.

[11] Hispanic population represents 26.1% of Florida, which is higher than the national average of 18.3%. Source: www.census.gov.

that reached all states where Class Members have been affected by Chinese Drywall. Additionally, a heavier concentration of statewide digital media was targeted to the Top 6 States. *Id.* at ¶ 6.

95.     The short-form, summary notice ("Publication Notice") approved by the Court was published in English and/or Spanish in the following newspapers and magazines: People, News Press, Gainesville Sun, Florida Times Union, Miami Herald, Orlando Sentinel, Panama City News, Tallahassee Democrat, Tampa Bay Times, Palm Beach Post, Baton Rouge Advocate, Daily Advertiser, American Press, Monroe News Star, New Orleans Advocate, Shreveport Times, Nuevo Ecos, Hola Noticias, El Clarin, El Sentinel, Centro Tampa, El Semanario Acción. *Id.* at ¶¶ 16-18. Publication in each newspaper and magazine occurred bi-weekly, weekly, or one time depending on each publication's specific schedule for thirty (30) days. *Id.*

96.     The Media Notice Program also included a 30-day digital program comprised of programmatic advertising and social media with focused targeting based on keywords, geography, and topics. *Id.* at ¶ 19. Further, the media program included banner ads on digital media, including premium websites (*e.g.,* DIY Network), local news and newspapers sites, including Florida Weekly and Louisiana Life, contextual targeting, Facebook, and Google Display Network (which includes YouTube). *Id.*

97.     Settlement Class Counsel issued a press release about the Settlement, which was distributed on PR Newswire's US1 news circuit reaching 5,400 traditional media outlets (television, radio, newspapers, magazines) and relevant trade publications and 4,000 national websites. *Id.* at ¶ 20. The release highlighted the Call Center toll-free telephone number and the Settlement website address, so that Class Members could obtain complete information about their rights under the Settlement. Class Counsel Declaration at ¶ 33; Wheatman Declaration at ¶ 20.

### 8.    Class Member Inquiries.

98.    Settlement Class Counsel established a toll-free number for Class Members to call with questions about the Settlement ("Call Center") and set up a Chinese Drywall Settlement website (ChineseDrywallSettlement.com) that provides Class Members an opportunity to review relevant Settlement materials and send written requests or questions to Settlement Class Counsel. *See* Class Counsel Declaration at ¶ 28. The Settlement Agreement, Master Spreadsheet, Notice, and important deadlines are posted on the website. In addition, there are answers to Frequently Asked Questions ("FAQs") for both individual Class Members and Attorneys. *Id.*

99.    Settlement Class Counsel fulfilled their duty to answer inquiries from Settlement Class Members and potential members of the Settlement Class that were received primarily through the Call Center, by email *via* the Chinese Drywall Settlement website, and from direct inquiries made to the individual offices of Settlement Class Counsel. The wide reach of the Notice program was evidenced by the fact that Settlement Class Counsel responded to more than 270 inquiries made by Class Members and potential Class Members from approximately 24 different states. *Id.* at ¶ 29. To respond to those inquiries, Settlement Class Counsel researched the specifics of individual claims, confirmed information on the Master Spreadsheet, updated or corrected objective information, such as mailing addresses and name changes, facilitated communication with the Claims Administrator and/or individual counsel, and generally answered questions and listened to the concerns of the Class Member or potential Class Member. *Id.*

100.    When appropriate, Settlement Class Counsel immediately notified individual counsel of specific concerns or questions raised by Class Members or potential Class Members they represent. *Id*. Settlement Class Counsel provided individual counsel with a list client names,

to the best that they could be identified, who made inquiries to Settlement Class Counsel (*via* the Call Center and by other means). *Id.*

101.    Settlement Class Counsel monitored activity on the Chinese Drywall Settlement website. During the Class Notice Period, the website was accessed by over 86,000 users and had in excess of 121,000 page views. Importantly, the website was accessed by individuals from all 50 states plus the District of Columbia, with the top five (5) states being Florida, Georgia, Virginia, Texas, and California. Settlement Class Counsel responded to all inquiries sent by Class Members and others through the Settlement website. *Id.* at ¶ 30. *See also* Analytics of Settlement Website Data, attached as Exhibit 15 to Settlement Class Counsel's Mem. of Law.

### 9.    Opt-Outs and Objections.

102.    Class Members were afforded ninety (90) days following the commencement of the Class Notice Period (*i.e.*, until November 27, 2019) to opt out of the Settlement by submitting to Settlement Class Counsel an original request to opt-out signed by the Class Member. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 9.1.1; Preliminary Approval Order [Rec. Doc. 22314] at ¶ 16. A total of 92 opt-out requests were sent to Settlement Class Counsel, *See* Notice of Filing of Opt-Outs [Rec. Doc. 22388], but not all complied with § 9 of the Settlement Agreement.[12] The total number of compliant opt-out requests are as follows: 78 known Class Members (representing 2% of known Class Members) and 12 apparent absent Class Members. The remainder of the opt-out requests received by Class Counsel were deficient for various

---

[12] *See* [Rec. Docs. 22388-5, 22388-30, 22388-54, 22388-55 and 22388-88]. Opt-out requests that did not comply with § 9 of the Settlement Agreement are not included in the List of Opt-Outs attached as Exhibit 2 to Settlement Class Counsel's Mem. of Law.  For those opt-out requests, Class Counsel recognize that the opt-out request was valid as to the party who signed, but not the non-signing additional parties.

reasons. One opt-out request was untimely and otherwise not valid.[13] One opt-out request was submitted by a non-Class Member.[14] And several opt-out requests purported to name multiple claimants, but were signed by only one claimant. All but four of these requests are by Class Members represented by the same attorney, Jimmy Doyle. *See id.*

103.     Class Members who did not timely opt out will be bound by the Settlement if it is approved by the Court, and the relief provided by the Settlement Agreement will be their sole and exclusive remedy for the Claims alleged by the Class. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 9.1.1.

104.     In addition, Class Members were afforded the right to object to the Settlement Agreement as a whole, to object to any terms of the Settlement Agreement, or to object to the approval process. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 10.1; *see also* Preliminary Approval Order [Rec. Doc. 22314] at ¶ 17. Settlement Class Counsel received Objections from 22 Class Members.

### 10.     Class Representatives.

105.     David Griffin, Lillian Eyrich, Michelle Germano, Virginia Tiernan, Debra Williams, and Judd Mendelson were appointed to serve as named Class Representatives on behalf of the Settlement Class.  *See* Preliminary Approval Order [Rec. Doc. 22314] at ¶ 4.  Mr. Griffin is an *Amorin* Plaintiff, who served as a Priority Plaintiff in Florida. *See* Affidavit of David Griffin, attached as Exhibit 16 to Settlement Class Counsel's Mem. of Law at ¶ 6.  He is the former owner

---

[13] *See* [Rec. Doc. 22388-90]. The opt-out request was not postmarked within the 90-day period pursuant to §§ 9.1.1 and 9.2.1 and was submitted and signed by Mark Floman in his individual capacity for an Affected Property for which the known Class Member is an LLC (M and M the Closers, LLC).

[14] Jimmy Doyle represents Juana Martinez who submitted an opt-out request. Ms. Martinez's claims have been judicially dismissed. [Rec. Doc. 21888-1]; *see also* MDL Order Dismissing Ms. Martinez's Claims [Rec. Doc. 21894]. Ms. Martinez is not a Class Member.

the Affected Property at 9801 Cobblestone Creek Drive, Boynton Beach, FL, 33472.  *See id.* at ¶ 2.  Ms. Eyrich is an *Amorin* Plaintiff, who served as a Select Claimant in Louisiana.  *See* Affidavit of Lillian Eyrich, attached as Exhibit 17 to Settlement Class Counsel's Mem. of Law at ¶ 6.  She is a current owner of the Affected Property at 130 22nd Street, New Orleans, LA 70124.  *See id.* at ¶ 2.  Ms. Germano is an *Amorin* Plaintiff, who served as a named class representative in the *Germano* action.  *See* Affidavit of Michelle Germano, attached as Exhibit 18 to Settlement Class Counsel's Mem. of Law at ¶ 5. She is the former owner of an Affected Property at 8171 N. View Boulevard, Norfolk, VA 23518. *See id.* at ¶ 2. Ms. Tiernan is a *Brooke* Plaintiff, and current owner of an Affected Property at 4326 Garden Boulevard, Cape Coral, FL 33909.  *See* Affidavit of Virginia Tiernan, attached as Exhibit 19 to Settlement Class Counsel's Mem. of Law at ¶¶ 2 & 5. Ms. Williams is a *Brooke* Plaintiff, and current owner of an Affected Property at 8600 Scottsdale Drive, New Orleans, LA 70128. *See* Affidavit of Debra Williams, attached as Exhibit 20 to Settlement Class Counsel's Mem. of Law at ¶¶ 2 & 5. Mr. Mendelson is a *Brooke* Plaintiff, and current owner of an Affected Property at 1507 Burrowin Drive, Chesapeake, VA 23321. *See* Affidavit of Judd Mendelson, attached as Exhibit 21 to Settlement Class Counsel's Mem. of Law at ¶¶ 2 & 5.

106.    Each of the Class Representatives is a member of the Settlement Class. Each has alleged that their Property was damaged by Covered Chinese Drywall. *See* Affidavits of David Griffin, Lillian Eyrich, Michelle Germano, Virginia Tiernan, Debra Williams, and Judd Mendelson. The Class Representatives do not possess any interests antagonistic to the Class. They all have a high degree of knowledge and understanding of the Litigation.  *Id*.  They strongly support approval of the Settlement as fair, reasonable, and adequate, and they have urged the Court to grant the instant motion. *Id*.

107.     These Class Representatives are familiar with the Claims in this Litigation, they have closely followed the proceedings, they have reviewed the Settlement, and they strongly support its approval as fair, reasonable, and adequate. *See id*. The three *Amorin* Class Representatives, in particular, have been intimately involved in the litigation process for many years. Ms. Germano served as the named class representative in the *Germano* action filed in the Eastern District of Virginia in 2009 before the MDL was established. Mr. Griffin and Ms. Eyrich participated in individualized discovery, sat for their depositions, and prepared for and participated in pretrial proceedings in this Litigation following the remands.

### 11.     Settlement Class Counsel.

108.     The Court appointed Arnold Levin, Sandra L. Duggan, Stephen J. Herman, Patrick S. Montoya, and Richard J. Serpe as Settlement Class Counsel. *See* Preliminary Approval Order [Rec. Doc. 22314] at ¶ 5.   Settlement Class Counsel, individually and collectively, have vast experience in class actions and complex litigation generally, and are well-experienced in addressing the particular facts and circumstances of these decade-old Chinese Drywall proceedings. *See* Class Counsel Declaration; Declaration of Class Counsel Arnold Levin, attached as Exhibit 22 to Settlement Class Counsel's Mem. of Law; Declaration of Class Counsel Stephen J. Herman, attached as Exhibit 23 to Settlement Class Counsel's Mem. of Law; Declaration of Class Counsel Patrick S. Montoya, attached as Exhibit 24 to Settlement Class Counsel's Mem. of Law; Declaration of Class Counsel Richard J. Serpe attached as Exhibit 25 to Settlement Class Counsel's Mem. of Law; *see also* C.V.'s of Settlement Class Counsel [Rec. Doc. 22035-9]. Settlement Class Counsel are comprised of Plaintiffs' Lead and Liaison Counsel in the MDL, members of the PSC, and Interim Lead Counsel in the Florida and Virginia *Amorin* and *Brooke* remand actions. *Id*. They were lead counsel in the *Germano* and *Hernandez* bellwether trials that

took place early on in the case; they have aggressively prosecuted the cases on remand; they have served as Class Counsel in the Knauf and Virginia class settlements previously approved by this Court; and they have worked tirelessly on this case and funded it for over ten years. *Id*.

### 12.   Attorney's Fees and Incentive Awards.

109.   Settlement Class Counsel filed a Fee Petition that is set for hearing on December 11, 2019. *See* Fee Petition [Rec. Doc. 22363]. The motion seeks an award of attorneys' fees equal to 30% of the Settlement Fund for Common Benefit Counsel and Individually Retained Attorneys and expense reimbursements totaling 3% of the Settlement Fund.[15] The award of any attorney's fee or reimbursement of any cost, including the allocation between and amongst the Attorneys, shall be determined by the Court; and all Attorneys agree that such determination is not appealable and hereby waive all appeals of any such determination. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 16.1.

110.   The Parties recommend to the Court that Incentive Awards of $10,000 be made, subject to Court approval, to the Priority Plaintiff claimants in Florida (one incentive award per property) who are members of the Settlement Class, and to the Select Claimants in Louisiana (one incentive award per property) who are members of the Settlement Class. These awards will appropriately recognize their efforts in participating in additional individualized discovery, including subjecting themselves for a deposition.

---

[15] The Settlement Agreement provides that Petitioning Attorneys shall be entitled to petition the MDL Court for attorneys' fees totaling in the aggregate up to 32% of the Settlement Funds, and reimbursement of reasonable expenses, excluding the cost of notice. *See* Settlement Agreement [Rec. Doc. 22305-2] at § 16.1. Settlement Class Counsel have agreed to limit the *combined* fee and expense request to 33% of the Settlement Fund, comprised of 30% in fees and the remaining 3% toward expenses, as set forth above. *See* Fee Petition [Rec. Doc. 22363].

111.     The Parties further recommend Incentive Awards of $2,500 for the Settlement

Class Representatives (to the extent they are not Florida Priority Plaintiff claimants or Louisiana

Select Claimants) in recognition of their efforts in serving as named class representatives.

## CONCLUSIONS OF LAW

### A.     Settlements of Complex Class Actions Are Favored.

112.     In reviewing the Settlement, the Court is guided by the strong judicial policy

favoring pretrial settlement of claims in complex class action lawsuits. *See, e.g.*, *Maher v. Zapata*

*Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977);

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007); *Braud v. Transp. Serv.*

*Co. of Ill.*, 2010 WL 3283398, at *3 (E.D. La. Aug. 17, 2010). The policy favoring settlement

exists, in part, because of the complexity and size of class actions. *See Cotton*, 559 F.2d at 1331

("Particularly in class action suits, there is an overriding public interest in favor of settlement.");

*see also Murphy Oil*, 472 F. Supp. 2d at 843 ("The public interest favoring settlement is especially

apparent in the class action context where claims are complex and may involve a large number of

parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.").

This Settlement preference also exists, in part, because of the amount of time and resources

complex cases take to resolve, as illustrated by these proceedings, which now have been ongoing

for over ten years:

> Complex litigation – like the instant case – can occupy a court's docket for
> years on end, depleting the resources of the parties and the taxpayers while
> rendering meaningful relief increasingly evasive. Accordingly, the Federal
> Rules of Civil Procedure authorize district courts to facilitate settlements in
> all types of litigation, not just class actions. . . . Although class action
> settlements require court approval, such approval is committed to the sound
> discretion of the district court.

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493-94 (11th Cir. 1992) (citing Fed R. Civ. P. 16(a), 16(c), 23(e); *Bennett v. Behring*, 737 F.2d 982, 987 (11th Cir. 1984); *Cotton*, 559 F.2d at 1331)) (citations omitted).

### B.      Standards for Approval of Class Settlements.

113.     "[T]he proponents of the [class] settlement bear the burden of demonstrating that the settlement is fair, reasonable, and adequate." *Murphy Oil*, 472 F. Supp. 2d at 844. However, in the absence of contrary evidence, there is a presumption "in favor of the settlement's fairness." *Id.* at 843; *see also United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982); *Camp v. Progressive Grp.*, 2004 WL 2149079, at *7 (E.D. La. Sept. 23, 2004) ("The court may presume that a proposed settlement is fair and reasonable when it is the result of arm's length negotiations.") (citing Alba Conte & Herbert B. Newberg, 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002)).

114.     The Court has a responsibility to "critically examine[] the settlement's terms and implementation." *Murphy Oil*, 472 F. Supp. 2d at 843; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002); *Georgevich v. Strauss*, 96 F.R.D. 192, 196 (M.D. Pa. 1982) ("[T]he Court must vigorously act as guardian of the rights of absentee class members."), *vacated on other grounds*, 772 F.2d 1078 (3d Cir. 1985) ("Before a court approves a class action settlement, it must determine that the settlement is fair, adequate, and reasonable"), *cert. denied*, 475 U.S. 1028 (1986); 1 *Newberg on Class Actions* § 1:3 (4th ed.); *Manual for Complex Litig.* § 21.61 (4th ed. 2004). However, courts should exercise restraint in examining a proposed settlement and should not "make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (quotation marks omitted). In other words, in weighing the benefits obtained by settlement

44

against the hypothetical benefits that would accrue only upon a litigated recovery on the merits, courts are not expected to balance the scales. *See id*. The very object of a compromise is the certainty of resolution, and thus "to avoid the determination of sharply contested and dubious issues." *Young*, 447 F.2d at 433. The Court should not engage in a hypothetical trial on the merits when considering the propriety of a settlement. *See Cotton*, 559 F.2d at 1330; *see also Murphy Oil*, 472 F. Supp. 2d at 843 ("The Court may not resolve contested issues of fact or law, but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation.").

### C.   The Requirements of Rule 23 Have Been Met For Certification of the Settlement Class.

115.   Rule 23 of the Federal Rules of Civil Procedure govern class certification. Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As determined by *Amchem*, the issue of class management is not relevant for purposes of certifying the Class in the context of a settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

### 1.   Numerosity.

116.   To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). "Although the number of members

45

of any proposed class is not determinative of whether joinder is impracticable," the Fifth Circuit has generally set the threshold of 100 to 150 people as satisfying the numerosity requirement. *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

117.    Here, the class definition includes over 2,800 Plaintiffs in the *Amorin* Class that filed suit against Taishan, approximately 1,200 Plaintiffs named on one or more *Brooke* Complaints, and the Additional Released Parties alleging damages sustained as a result of Covered Chinese Drywall that was installed in Plaintiffs' properties. Under these circumstances, the numerosity factor specified in Rule 23(a)(1) is satisfied. *See, e.g.*, *Class FOFCOL*, 2014 WL 4809520 at *11.

### 2.    Commonality.

118.    The threshold for establishing commonality is not high since "for purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alteration in original) (internal quotation marks omitted). As per *Dukes*, to satisfy Rule 23's commonality requirement, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350. The Supreme Court explained that the key consideration in assessing commonality is not whether the class raises common claims, but whether a class action can "generate common *answers* apt to drive the resolution of the litigation." *Id*. "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014).

119.    The commonality requirement of Rule 23(a)(2) is satisfied here. First, the JPML ordered that the numerous *Chinese Drywall* actions be consolidated in the MDL based on "the

46

commonality of facts in the various cases." *See Chinese Drywall*, 626 F. Supp. 2d 1346. In addition, questions surrounding the defectiveness of the Chinese drywall at issue, the effects of Chinese drywall on members of the Settlement Class, and the damages caused thereby, are among the issues common to all Plaintiffs, satisfying this element of Rule 23(a). *See Califano v. Yamasaki*, 442 U.S. 682, 701 (1979) (Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and they "turn on questions of law applicable in the same manner to each member of the class."); *Class FOFCOL*, 2014 WL 4809520 at *11 ("The factual determination of class-wide property damages is common to the class members, and resolution of this common question will generate common answers apt to drive the resolution of the litigation.").

### 3.    **Typicality.**

120.    Rule 23(a)(3) requires that the class representatives' claims be typical of the claims of the putative class members. Fed. R. Civ. P. 23(a)(3). "Typicality measures whether a sufficient nexus exists between the claims of the named representative[s] and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003) (internal quotations omitted). A plaintiff's claim is typical of the class members' claims if they "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985). The measure of whether a plaintiff's claims are typical is whether the nature of the plaintiff's claims, judged from both a factual and a legal perspective, are such that in litigating his or her personal claims he or she reasonably can be expected to advance the interests of other members of the class. *See, e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156-57 (1982).

121.    Each of the Plaintiffs in the Settlement Class is seeking to recover, from Defendants, remediation damages and/or Other Losses allegedly caused by Covered Chinese

Drywall.  As this Court previously found in *Amorin*: "[t]he property damage claims of the class representatives are typical of, if not identical in nature to, those of the class members. The determination of these damages depends on the same factual predicate as to the manufacturer of the defective product, product identification, the mechanism of damage occurring in Class Members' homes, the need for remediation, the scope of remediation, the square footage costs of accomplishing the remediation, and alternative living expenses during remediation." *Class FOFCOL*, 2014 WL 4809520, at *12. As such, the typicality requirement of Rule 23(a)(3) is satisfied here.

### 4.   Adequacy of Representation.

122.   Rule 23(a)(4) requires that the named class representatives not possess interests which are antagonistic to the interests of the class. *See Amchem*, 521 U.S. at 625-26 ("[A class] [r]epresentative must be part of the class and possess the same interest and suffer the same injury as the class members.") (internal citation and quotations omitted). That section also mandates that class representatives possess "a sufficient level of knowledge and understanding" to take an active role in the litigation. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482 (5th Cir. 2001) (citing *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982)). Rule 23(a)(4) also requires that the named class representatives' counsel "must be qualified, experienced, and generally able to conduct the litigation." *Chinese Drywall*, 2013 WL 499474 at *8.

123.   Each of the Class Representatives is a member of the Settlement Class. Each has alleged that their Property was damaged by Covered Chinese Drywall. The Class Representatives do not possess any interests antagonistic to the Class. They all have a high degree of knowledge and understanding of the Litigation. They strongly support approval of the Settlement as fair, reasonable, and adequate, and they have urged the Court to grant the instant motion. Moreover,

48

only 2% of known Class Members have opted out, reflecting that the overwhelming majority of the Class approves of the Settlement, as the Class Representatives do.

124.     Settlement Class Counsel, individually and collectively, have vast experience in class actions and complex litigation generally, and are well-experienced in addressing the particular facts and circumstances of these decade-old *Chinese Drywall* proceedings specifically. Settlement Class Counsel are comprised of Plaintiffs' Lead and Liaison Counsel in the MDL, members of the PSC, and Interim Lead Counsel in the Florida and Virginia *Amorin* and *Brooke* remand actions. They were lead counsel in the successful bellwether trials that took place early on in the case; they have aggressively prosecuted the cases on remand; they have served as Class Counsel in the Knauf and Virginia class settlements previously approved by this Court; and they have worked tirelessly on this case as well as funded it for over ten years. Such zealous and continuing representation by highly qualified counsel has more than satisfied the requirement that the Settlement Class be adequately represented. *See Class FOFCOL*, 2014 WL 4809520, at *12.

125.     Thus, the Court finds that the proposed class representatives (David Griffin, Lillian Eyrich, Michelle Germano, Virginia Tiernan, Debra Williams, and Judd Mendelson), as well as the proposed Settlement Class Counsel (Arnold Levin, Sandra L. Duggan, Stephen J. Herman, Patrick S. Montoya, and Richard J. Serpe), are adequate.

### 5.     Common Questions of Law and Fact Predominate.

126.     "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Predominance is established where common answers to common questions are likely to 'drive the resolution of the [instant] litigation.'" *Class FOFCOL*, 2014 WL 4809520, at *14 (quoting *Dukes*, 131 S. Ct. at 2551 ("what matters to class certification is not the raising of common

'questions' – even in droves – but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (emphasis in original)).

127.    Plaintiffs satisfy the predominance requirement because liability questions common to all Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member. The salient evidence necessary to establish Plaintiffs' claims is common to both the Class Representatives and all members of the Class – they would all seek to prove entitlement to damages for Covered Chinese Drywall and that Taishan's conduct was wrongful. A class settlement ensures that Eligible Class Members receive payments for their Claims alleged to be caused by Covered Chinese Drywall. Furthermore, resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication. *See* Fed. R. Civ. P. 23(b)(3).

128.    In evaluating the proposed Settlement, any difficulties regarding management of this Class need not be considered. *Amchem*, 521 U.S. at 620; *see also* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.").

129.    The predominance requirement of Rule 23(b)(3) is satisfied here.

### 6.      The Class Settlement is Superior.

130.    The superiority requirement of Rule 23(b)(3) is satisfied here.  Resolving the claims of all class members in a single proceeding demonstrates the efficiency and benefits of the class procedure. These qualities are plainly superior to binary litigation. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 928-29 (E.D. La. 2012) ("*In re Deepwater Horizon*") ("The Class Structure enables the claims process established by the Settlement to be administered under Court supervision, provides the due process

protections of Rule 23 to the class member Claimants, and enables the Court to enforce the Settlement terms and administrative procedures for the benefit of class members, without necessitating new or individualized litigation."), *aff'd* 739 F.3d 790 (5th Cir. 2014), *rehearing en banc denied*, 756 F.3d 320 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 734 (2014). Further, the ability to administer the litigation in the context of the Settlement Class is vastly more desirable than confronting an uncertain future of costly litigation and the risks posed by efforts to enforce judgments against a foreign corporation.

### D.   The Proposed Settlement Is Fair, Reasonable and Adequate.

131.   Federal Rule of Civil Procedure 23(e)(2) requires that the court determine a proposed class settlement is fair, reasonable and adequate prior to granting approval of the settlement.

132.   The United States Court of Appeals for the Fifth Circuit has articulated six factors or "focal facets" that a court should consider when determining if a proposed settlement is fair, reasonable and adequate: (1) the existence of fraud or collusion behind the settlements; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the absent class members (the "*Reed* Factors"). *See Reed*, 703 F.2d at 172 (adopting six-factor test cited in prior Fifth Circuit decisions including *Parker*, 667 F.2d at 1209; *Corrugated Container*, 643 F.2d at 217; and *Pettway*, 576 F.2d at 1214).

133.   In 2018, Rule 23(e)(2) was amended to specify factors that a court should consider when determining if a proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Specifically, the amended Rule 23(e)(2) states that a court should consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

       (i)     the costs, risks, and delay of trial and appeal;

       (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

       (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

       (iv)    any agreement [made in connection with the proposal, which is] required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

134.    The Advisory Committee Notes to the 2018 Amendments to Rule 23(e) note that the new factors are not meant to replace the variety of factors that many courts have considered in assessing the fairness and adequacy of proposed class settlements instead making clear that: "[t]he goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *See Hays v. Eaton Grp. Attorneys, LLC*, 2019 WL 427331, at \*8-9 (Feb. 4, 2019) (analyzing new Rule 23(e)(2) considerations along with *Reed* factors); *see also ODonnell v. Harris Cty.*, 2019 WL 4224040, at \*8-9 (S.D. Tex. Sept. 5, 2019) (same).

135.    An analysis of all of these relevant factors, both those articulated in Rule 23(e)(2) and the *Reed* factors, overwhelmingly favors approval of the Settlement before the Court.

**1.     The Class Representatives and Class Counsel Have Adequately
Represented the Class (Rule 23(e)(2)(A)).**

136.     As discussed above, the Class Representatives and Settlement Class Counsel are highly qualified to adequately represent the interests of the Settlement Class. The Class Representatives are familiar with the Claims in this Litigation, they have closely followed the proceedings, they have reviewed the Settlement, and they strongly support its approval as fair, reasonable, and adequate.

137.     Again, as discussed above, Settlement Class Counsel aggressively pursued the Litigation on behalf of Plaintiffs for over ten years. Among other things, they obtained defaults against Taishan and other Defendants, they conducted several successful bellwether trials, they achieved nine class settlements with hundreds of other Defendants, they pursued written discovery of Defendants and third parties that generated millions of pages of documents, they took hundreds of depositions, they engaged numerous experts, they achieved class certification and a Class Damages Order in *Amorin*, and they aggressively litigated Claims in the remand courts on behalf of thousands of Plaintiffs. Plainly, Settlement Class Counsel not only possess the experience with which to conduct the Litigation and assess any potential global resolution, but having been so intimately involved with the Litigation for such a long time, they were fully apprised of all the relevant facts necessary to meaningfully and intelligently negotiate a class resolution of Plaintiffs' Claims. *See generally* Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(A) and (B) (court should consider, in part, "whether counsel negotiating on behalf of the class had an adequate information base"); *see also ODonnell*, 2019 WL 4224040, at *9 (record showed "the class has been ably and diligently represented, in a case filled with legal and factual complexities").

138.     This consideration weighs in favor of finding that the Settlement is fair, reasonable and adequate.

### 2. The Proposal Was Negotiated at Arm's Length (Rule 23(e)(2)(B)) and There is No Existence of Fraud or Collusion Behind the Settlement (*Reed* Factor 1).

139. The Settlement is the product of vigorous arm's-length negotiations between Settlement Class Counsel and Defendants. The Settlement was achieved through court-ordered mediation that was conducted by an experienced mediator. *See generally* Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(A) and (B) ("[T]he involvement of a neutral or court-affiliated mediator ... may bear on whether [negotiations] were conducted in a manner that would protect and further the class interests"). In late April 2019, the Parties began settlement discussions that involved arm's-length negotiations over several weeks to reach this Settlement. Under the guidance of Mr. Freud, Settlement Class Counsel made a global demand of Taishan, and the Parties exchanged detailed damages calculations and arguments in support of their respective positions, and made counter-offers and responded to the other side's positions. In addition to Settlement Class Counsel, other counsel with intimate knowledge of the litigation participated in and contributed to the negotiations of the Settlement. Following these intense, hard-fought, in-person mediation sessions, the Parties agreed to a Settlement Term Sheet on behalf of the Settlement Class. Thereafter, over the next three months, the Parties met in person and over the phone to negotiate the terms of the final Settlement Agreement. Throughout this process, both sides vigorously negotiated their respective positions on all material terms of the Settlement Agreement and the negotiations were non-collusive.[16] At all times, negotiations by the Parties occurred at arm's length.

140. The law recognizes "a presumption that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary." *Camp*, 2004 WL 2149079 at *7; *see also*

---

[16] Class Counsel Declaration at ¶ 24.

*Murphy Oil*, 472 F. Supp. 2d at 846 ("[A] presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair."). Certainly, there is no evidence of fraud or collusion in this matter. In fact, the lengthy record of this hard-fought and contentious litigation illustrates the "zealous advocacy that all sides deployed." *ODonnell*, 2019 WL 4224040, at *9.

141.    In addition, a determination of attorney's fees in this case has been left to the sound discretion of the Court which lessens the possibility of collusion among counsel. *See Murphy Oil*, 472 F. Supp. 2d at 845. As this Court previously explained, "[b]ecause the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining." *Id.* (citing Bruce L. Hay, *The Theory of Fee Regulation in Class Action Settlements*, 46 AM. U. L. REV. 1429, 1432 (1997) ("[P]roper regulation of the counsel's fee is both necessary, and within limits, sufficient to mediate the tension between the goals of facilitating settlement and protecting the class against collusion.")).

142.    For these reasons, this consideration weighs in favor of finding that the Settlement is fair, reasonable and adequate.

### 3.    The Relief Provided is Adequate, Taking into Account the Costs, Risks, and Delays of Trial and Appeals (Rule 23(e)(2)(C)(i)).

143.    A key concern in assessing the substantive terms of the Settlement "relate[s] to the cost and risk involved in pursuing a litigated outcome." Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(C) and (D). In making that assessment, "courts may need to forecast the likely range of classwide recoveries and the likelihood of obtaining such results." As other courts have explained:

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, it has been held <u>proper to take the bird in the hand instead of a prospective flock in the bush.</u>

*In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993) (quoting *Oppenlander v. Standard Oil Co*., 64 F.R.D. 597, 624 (D. Colo. 1974) (internal quotations omitted)) (emphasis added).

144.    Factors two through six of the *Reed* Factors address the considerations relating to the cost and risk involved in pursuing a litigated outcome.

### a.    The Complexity, Expense, and Likely Duration of the Litigation Weigh in Favor of Approval of the Settlement (*Reed* Factor 2).

145.    "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *See* 4 *Newberg on Class Actions* § 11.50 (4th ed.). "In assessing this factor, courts consider the uncertainties of litigation and compare the settlement to potential future relief." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 147 (E.D. La. 2013) ("*In re Deepwater Horizon*") (citing *Shell Oil Refinery*, 155 F.R.D. at 563).

146.    Timing and delay are significant here because there is no question about the complexity and expense of this Litigation. For more than ten years, the PSC has engaged in arduous efforts to establish jurisdiction over Taishan and the Additional Released Parties.[17] The PSC conducted extensive discovery of Defendants and third parties and concluded several successful bellwether trials in the MDL; they worked with experts on significantly complex scientific issues;

---

[17] Although jurisdiction over Taishan has been firmly established, the status of jurisdiction over BNBM, BNBM Group, and CNBM is uncertain since there is an appeal of this Court's Jurisdiction Order currently in the Fifth Circuit. That appeal has been fully briefed, and oral argument has been scheduled for the week of February 3, 2020. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 18-30742 (5th Cir. Nov. 22, 2019), Doc. No. 00515211235.

and they continued to fight for Plaintiffs in the remand courts. There can be no doubt that the PSC expended significant resources vigorously prosecuting the Claims of thousands of Plaintiffs against Taishan and the Additional Released Parties.

147.    The proposed Settlement provides much-needed cash payments now to Eligible Class Members and avoids the costs and risks of continued litigation, especially considering the substantial risks surrounding unresolved key issues such as Product ID and the validity of statutes of limitations defenses, where early rulings highlighted the potential for a significant percentage of the Class to end up with no recovery at all. Even for those who may recover, they likely would wait years for any recovery while Defendants exhaust their appeals.

148.    For these reasons, this factor weighs heavily in favor of granting final approval to the Settlement.

> ### b.    The Stage of the Proceedings and the Amount of Discovery Completed Support Approval of the Settlement (*Reed* Factor 3).

149.    "This factor 'asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions.'" *See In re Deepwater Horizon*, 295 F.R.D. at 148 (quoting *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006)). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed." *Id.* (quoting *Educ. Testing*, 447 F. Supp. 2d at 620-21); *see also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007).

150.     The *Chinese Drywall* Litigation as a whole has proceeded for more than ten years with substantial discovery, expert analysis, bellwether trials, and other settlements that have provided insight into the strengths and potential vulnerabilities that Plaintiffs face. Indeed, Class Counsel took hundreds of depositions of employees of Defendants and third parties; coordinated the submission of thousands of plaintiff profile forms detailing facts relevant to each Affected Property; developed experts on issues of corrosion, metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis to demonstrate the devastating effects of having Chinese Drywall installed in Plaintiffs' homes, the proper scope of remediation, proper inspection protocols, Chinese law, and damages for lost equity and the economic impact of Chinese Drywall on real estate.

151.     Considering that all of this information was in the hands of Settlement Class Counsel, it is clear that the "settlement was achieved in the full context of the adversarial process." *Murphy Oil*, 472 F. Supp. 2d at 846.  This factor supports final approval of the Settlement.

### c.     Plaintiffs' Probability of Success on the Merits (*Reed Factor 4*).

152.     In the absence of fraud or collusion behind the class settlement, "the probability of the plaintiffs' success on the merits has been held by the Fifth Circuit as the most important *Reed* factor." *Murphy Oil*, 472 F. Supp. 2d at 848 (citing *Parker*, 667 F.2d at 1209); *DeHoyos*, 240 F.R.D. at 287. In evaluating Plaintiffs' "likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos*, 240 F.R.D. at 287 (citing *Reed*, 703 F.2d at 172). "At the same time, a district court 'must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial.'" *See Slipchenko v. Brunel Energy, Inc.*, 2015 WL 338358, at *15 (S.D. Tex. Jan. 23, 2015) (quoting *Reed*, 703 F.2d at 172 (quotations

and alterations omitted)); *see also Murphy Oil*, 472 F. Supp. 2d at 848 (citing *Reed*, 703 F.2d at 172).

153.    The outcome of this *Chinese Drywall* Litigation is uncertain, the resolution of the bulk of Plaintiffs' claims *via* continued litigation are likely far in the future and the ability to collect on any resulting judgment is not guaranteed.  If Plaintiffs were able to secure judgments, it is likely that Defendants would file an appeal which would cause additional delays and expense.

154.    There are additional uncertainties.  For example, as noted previously, there is a pending appeal in the Fifth Circuit regarding jurisdiction over BNBM, BNBM Group, and CNBM which raises certain collectability issues.[18]  In addition, the Florida Special Master's Report and Recommendation on Product ID essentially "dismissed" more than half of the Florida *Amorin* claims. While there was an appeal of that determination, the outcome of that appeal was uncertain potentially leaving a large number of claimants with no recovery particularly if that ruling was followed by other courts. Also, this Court's statute of limitations ruling made the viability of some of the *Brooke* Plaintiffs' claims uncertain. As a result of these uncertainties, there are questions as to the enforceability of any award, the size of the award, and the parties to whom the award would apply.

155.    Furthermore, the potential duration of litigating Class Member claims to conclusion is a significant consideration. Even if members of the Class ultimately were to prevail on all issues at trial, the recovery, if collected, would be delayed for years from now, and greatly "diminished by the costs of litigation." *See In re Deepwater Horizon*, 295 F.R.D. at 149.

156.    Because of these considerations, this factor weighs in favor of approving the Settlement.

---

[18] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., No. 18-30742 (5th Cir.).

### d.  **The Range of Possible Recovery (*Reed* Factor 5).**

157.  "This factor requires the district court to 'establish the range of possible damages that could be recovered at trial and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors.'" *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1067 (S.D. Tex. 2012) (quoting *Maher*, 714 F.2d at 460) (internal quotation marks and citations omitted). "The court's consideration of this factor 'can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount.'" *ODonnell*, 2019 WL 4224040, at \*12 (quoting *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 656 (N.D. Tex. 2010)). The question is not whether the Plaintiffs have achieved the maximum result but whether the settlement "'fall[s] within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits.'" *Id.* (internal quotation marks omitted).

158.  The potential recovery in this Litigation ranges from nothing for many Plaintiffs, should, for instance, the Florida Special Master's Report and Recommendation on Product ID be upheld or should Defendants win on their statute of limitations defense against the *Brooke* Plaintiffs, to anywhere up to the maximum damages allowed under the Remediation Damages Formula, plus Other Losses, minus additional expenses incurred. The $248,000,000 cash settlement amount is an excellent result when considering the potential risks and certain delays of continued litigation and appeals.

159.  In addition, settling these Claims means that Eligible Class Members will finally receive much needed payments after more than a decade of litigation based on the square footage of their homes, Product ID, and the other factors identified by the Allocation Neutral.

160.    This factor weighs in favor of approving the Settlement.

**e.    The Opinion of Class Counsel Supports Approval of Settlement (_Reed_ Factor 6).**

161.    The Fifth Circuit has recognized that courts must largely rely on the judgment of competent counsel, terming such counsel the "linchpin" of an adequate settlement. _Reed_, 703 F.2d at 175. Thus, if experienced counsel determine that a settlement is in the best interests of the class, "the attorney's views must be accorded great weight." _Pettway_, 576 F.2d at 1216; 4 _Newberg on Class Actions_ § 11.47 (4th ed.) ("[T]he recommendation of counsel is entitled to great weight following arm's-length settlement negotiations").

162.    In this case, Settlement Class Counsel have a high level of competency and many years of experience litigating complex class action and multidistrict cases. These attorneys possess adequate information concerning the strengths and weaknesses of the case after extensive discovery, bellwether trials and significant briefing on relevant motions.  Having this strong base of information and experience, Settlement Class Counsel strongly support the Settlement.

163.    The fact that Settlement Class Counsel support the Settlement weighs in favor of its approval.

**4.    The Relief Provided is Adequate, Taking into Account the Effectiveness of the Proposed Method of Distributing Relief to the Class (Rule 23(e)(2)(C)(ii)).**

164.    The method for distributing relief to the Class was determined by the Court-appointed Allocation Neutral, Mr. Cal Mayo.  The Allocation Model uses a methodology that assigns relative values to the objective factors of square footage, Class Member status, Product ID, assignments, competing claims and prior payments received for Chinese Drywall Claims, in order to calculate Allocation Amounts. Once all of the Affected Properties are evaluated to determine whether any discounts should be applied to the Under Air Square Footage of the Property (for

Product ID, prior payments, assignments, competing claims or Class Member Status), the aggregate adjusted square footage of all Affected Properties in the Settlement will be divided into the total funds available for distribution to the Class to determine the amount per square foot that will be awarded.[19]

165.    The fact that the Allocation Neutral developed an Allocation Model that allocates and distributes the Settlement Amount equitably among Eligible Class Members based on Objective Criteria, supports approval of the Settlement. *See, e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d at 918-20.[20]

### 5.    The Relief Provided is Adequate, Taking into Account the Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment (Rule 23(e)(2)(C)(iii)).

166.    The Parties did not negotiate a particular fee amount.[21] The award of any attorney's fee or reimbursement of any cost, including the allocation between and amongst the Attorneys, shall be determined by the Court; and all Attorneys agree that such determination is not appealable and hereby waive all appeals of any such determination.[22]

---

[19] Allocation Model [Rec. Doc. 22304-1] at 7.

[20] This approach was again utilized and explicitly approved by the District Court in connection with the Halliburton/Transocean Class Settlement (*see* Order and Reasons, *In re Deepwater Horizon*, MDL No. 2179, ECF No. 22252, at 20-21 (E.D. La. Feb. 15, 2017)), and implicitly approved by the Fifth Circuit, when certain aspects of the neutral's Distribution Model were challenged (*see In re Deepwater Horizon*, 934 F.3d 434 (5th Cir. 2019)).

[21] The Settlement Agreement provides that Petitioning Attorneys shall be entitled to petition this Court for attorneys' fees totaling in the aggregate up to 32% of the Settlement Funds, and reimbursement of reasonable expenses, excluding the cost of notice. *See* Settlement Agreement [Rec. Doc. 22305-2], at § 16.1. Settlement Class Counsel have agreed to limit the *combined* fee and expense request to 33% of the Settlement Fund, comprised of 30% in fees and the remaining 3% toward expenses, as set forth above. Fee Petition [Rec. Doc. 22363].

[22] Settlement Agreement [Rec. Doc. 22305-2], at § 16.1.

167.     Because this Court will determine an appropriate fee award and the timing of any payment of fees, this factor weighs in favor of approving the Settlement.  *See Murphy Oil*, 472 F. Supp. 2d at 845.

**6.     The Relief Provided is Adequate, Taking into Account Any Agreement Required to be Identified Under Rule 23(e)(3) (Rule 23(e)(2)(C)(iv)).**

168.     Under Rule 23(e)(3), the parties to a proposed class settlement "must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3).  Because the only agreement entered into by the Parties here is the Settlement Agreement, the Parties did not enter into any side agreements, and the Settlement contains all terms agreed to by the Parties, this factor weighs in favor of approving the Settlement.

**7.     The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D)).**

169.     The question raised by this consideration is "whether the apportionment of relief among class members takes appropriate account of difference among their claims." Adv. Committee Notes, 2018 Amendments to Rule 23(e)(2)(C), (D). As discussed at length above, the methodology for allocating the Settlement Fund among all members of the Settlement Class was developed by an Allocation Neutral and takes into consideration the relative strengths and weaknesses of Plaintiffs' Claims using numerous objective factors.

170.     Taking the numerous relevant, objective considerations into account, the Allocation Model apportions the relief in an equitable fashion among differently situated members of the Settlement Class.  As a result, this consideration weighs in favor of approving the Settlement.

E.     **Notice to the Class Complied with this Court's Preliminary Approval**
       **Order and Due Process.**

171.     In conjunction with preliminary approval of the Settlement, the Court ordered that Notice be disseminated to the Class.  Notice was disseminated *via* first-class mail, postage prepaid to the last known address of all known Class Members and their counsel of record, if any. In addition, Settlement Class Counsel requested that a copy of the Notice be posted at each courthouse and on all court dockets where CDW-Related Actions are pending. The Notice was posted on this Court's MDL Chinese Drywall website and on the MDL docket, the Florida Court dockets, and the Virginia Court dockets, as well as the Fifth Circuit website. The Notice was also posted on the Settlement website established by Settlement Class Counsel (ChineseDrywallSettlement.com). Kinsella Media implemented the Publication and Media Notice Program as ordered by the Court.

172.     The Notices that have been disseminated and published comply with Due Process and support approval of the Settlement. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *see also In re Nissan Motor Corp. Antitrust Litig*., 552 F.2d 1088, 1097 (5th Cir. 1977).

F.     **The CAFA Notice Requirement Has Been Satisfied by Taishan.**

173.     The Class Action Fairness Act, 28 U.S.C § 1711 *et seq.* ("CAFA"), requires settling defendants to serve notice of a proposed settlement on the "appropriate" state and federal officials after a proposed class action settlement is filed with the court. 28 U.S.C. § 1715(b). Taishan, in conjunction with the Additional Released Parties, has satisfied this CAFA notice requirement. *See* Declaration of Christina Hull Eikhoff [Rec. Doc. 22387-1].

G. **The Settlement Has Widespread Support and the Limited Objections That Were Submitted Are Without Merit.**

174.    At the time the Settlement was reached, there were 3,948 known Class Members in this Litigation, which has been pending for more than ten years.  Consistent with the affidavits of Class Counsel and the Class Representatives, there is no question that an overwhelming majority of the Class supports the proposed Settlement.

175.    Only 22 Class Members (approximately 0.05% of the Class) submitted Objections. *See* Notice of Filing of Objections [Rec. Doc. 22389]. Five non-Class Members, including attorney Jimmy Doyle, also submitted objections "on behalf of all Plaintiffs affected by the terms contained in the proposed Taishan Class Settlement." *Id.*

176.    Relatively few "objections and opt-outs in comparison to the large size of the class indicate overwhelming support among the Class Members and weigh in favor of approval" of the settlement as fair, reasonable, and adequate. *See In re Lenovo Adware Litig*., 2019 WL 1791420, at *7 (N.D. Cal. Apr. 24, 2019); *Giroux v. Essex Prop. Tr., Inc*., 2019 WL 2106587, at *4-5 (N.D. Cal. May 14, 2019) ("The Court finds that the absence of objections and very small number of opt-outs indicate overwhelming support among the Class Members and weigh in favor of approval."); *In re Syngenta AG MIR 162 Corn Litig*., 357 F. Supp. 3d 1094, 1103 (D. Kan. 2018) ("The fact that the [650,000] class members have reacted so overwhelmingly in favor of the settlement [17 opt-outs and 9 objections] further supports a finding that the settlement is fair and reasonable and adequate."); *Educ. Testing*, 447 F. Supp. 2d at 626 ("Although the Court is careful not to infer too much from a lack of objectors, that the class is made up of a relatively sophisticated group whose claims arise out of a professional examination suggests that the lack of objections is an indicium of support and not of apathy."); *Murphy Oil*, 472 F. Supp. 2d at 853; *Corrugated Container*, 643 F.2d at 217-18; *DeHoyos*, 240 F.R.D. at 293 ("minimal level of opposition from absent class

members weighs in favor of approving the settlement"); *Cotton*, 559 F.2d at 1333 (approving settlement over objections of counsel purporting to represent almost 50% of class); *Klein*, 705 F. Supp. 2d at 661 ("approval can be given even if a significant portion of the class objects.").

177.    Even though there is heavy support for the Settlement, Rule 23(e) grants any Class Member who has not opted out of a class settlement the opportunity to object. The objection "must be sufficiently clear and unambiguous for court consideration, or otherwise the party will be deemed to have waived their objection." *Id. See also In re Educ. Testing Serv. Praxis Principles of Learning & Teaching Grades 7-12 Litig.*, 555 F. Supp. 2d 661, 671 (E.D. La. 2007), *aff'd sub nom, Kochensky v. Educ. Testing Servs. Inc.*, 278 Fed. Appx. 400 (5th Cir. 2008) (untimely objections filed after the expiration of the objection deadline not considered).

178.    Once Objections are lodged, it is the responsibility of the court, as a fiduciary to the class, to carefully examine all objections to a class settlement in conjunction with its assessment of the fairness and adequacy of the settlement. *See Pettway*, 576 F.2d at 1219; *Corrugated Container*, 643 F.2d at 217-18; *Murphy Oil*, 472 F. Supp. 2d at 853 ("courts must independently examine all objections to determine if they have merit and whether they raise questions regarding the fairness of [the] settlement."). However, all of the Objections must confront the legal headwind that "[o]nce the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable." *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 138-39 (W.D. Ky. 1992) (emphasis added); *DeHoyos*, 240 F.R.D. at 293.

179.    The Objections here focus principally on: (i) the particular individual recoveries allocated to certain Class Members based on Objective Criteria; and (ii) the fact there will be less than 100% recovery for all Claims. These factors are present in any class settlement, which by its

nature, seeks to compromise claims on an aggregate basis. As found above, the recoveries obtained for all Class Members are fair, reasonable and adequate, under the specific circumstances presented here. None of the Objections presents a reasonable justification for delaying or denying final approval of the Settlement, and there is no reason (legal or otherwise) to impede the prompt distribution of much-needed Settlement Funds to Eligible Class Members, who have waited more than a decade to receive just damages.

180.    These Objections do not raise the types of concerns that have undermined other class settlements. None of the Objections raises any serious question as to the integrity, loyalty, or adequacy of the PSC or Class Counsel. Nor do the Objections raise Due Process concerns. Likewise, there have been no challenges to the certification process, and no Objector has articulated any presumptive objection to Class Notice. In addition, there is no credible allegation – and no evidence – of any collusion or defect in the settlement process. Nor has there been any suggestion that continued litigation against Taishan and the Additional Released Parties would be preferable to the Settlement before the Court.

181.    Substantive objections are not preclusive of class settlements in instances, such as here, where the Settlement is otherwise fair, reasonable and adequate. *See Ayers v. Thompson*, 358 F.3d 356, 368-73 (5th Cir. 2004) ("That several class members desire broader relief . . . does not prevent judicial approval of this settlement agreement, which promises substantial relief to the class."); *In re Deepwater Horizon*, 295 F.R.D. at 152 ("Objections that seek to renegotiate terms of the settlement based on individual preferences are unhelpful and improper."); *Murphy Oil*, 472 F. Supp. 2d at 853. Once the settlement is determined to be fair, reasonable, and adequate, "the Court is not authorized to insist upon changes that, in its judgment, might lead to a superior settlement." *In re Deepwater Horizon*, 910 F. Supp. 2d at 944.

### 1. Objections Regarding Amount of the Settlement or Individualized Allocation Amount.

182.    Objections lodged based solely on the estimated Allocation Amounts provide no basis to challenge the Settlement.[23] None of the Objectors challenge the overall fairness or adequacy of the Settlement, which will provide $248 million in cash benefits to Class Members.[24] Instead, these opt-outs mostly set-forth their personal dissatisfaction with their specific estimated Allocation Amount or that they have to pay attorneys' fees out of the estimated Allocation Amount[25] – e.g., there are Objections that: the Allocation Amount may be inadequate to completely remediate some Objectors' Affected Properties,[26] or compensate for certain damages such as loss of use and enjoyment,[27] repair costs to an HVAC system,[28] or alternative living or

---

[23] See Objection of Dominesha Clay ("Clay Objection") [Rec. Doc. 22379-4]; Objection of Frederick Yorsch ("Yorsch Objection") [Rec. Doc. 22389-11], at page 2 of 13; Objection of Theodore and Cynthia Tarver ("Tarver Objection") [Rec. Doc. 22389-13], at pages 3-4 of 22; Objection of Robert Bishop ("Bishop Objection") [Rec. Doc. 22389-15], at pages 1-2; Objection of John Prestridge ("Prestridge Objection") [Rec. Doc. 22389-16], at pages 3-4 of 22; Objection of Matthew Harper ("Harper Objection") [Rec. Doc. 22389-17], at pages 3-4 of 21; Objection of Kent and Lindsey Archer ("Archer Objection") [Rec. Doc. 22389-18], at pages 3-5 of 22; Objection of Robert Brasher ("Brasher Objection") [Rec. Doc. 22389-20], at pages 3-5 of 22; Objection of Chris Cummins ("Cummins Objection") [Rec. Doc. 22389-14], at pages 3-4 of 22; Objection of Timothy and Sebrina Hall ("Hall Objection") [Rec. Doc. 22389-19], at pages 3-5 of 22; Objection of Robert and Debbie Hayes ("Hayes Objection") [Rec. Doc. 22389-21], at page 3 of 13; and Objection of James T. Zimmerman ("Zimmerman Objection") [Rec. Doc. 22389-22], at page 2 of 3.

[24] Subject to Court approval, certain fees and costs will be deducted from the Settlement Fund. Settlement Agreement [Rec. Doc. 22305-2], at Settlement Agreement [Rec. Doc. 22305-2], at §§ 4.1.1, 8.2.1, 16.1, 16.2.

[25] See Objection of Kenneth Randall and Alicia Doherty ("Doherty Objection") [Rec. Doc. 22379-1], at 2-3.

[26] See Objection of Alisa Roundtree ("Roundtree Objection") [Rec. Doc. 22389-1], at page 3 of 21; Objection of Russell Moody ("Moody Objection") [Rec. Doc. 22389-10], at page 20 of 185; Objection of Dailyn Martinez ("Martinez Objection") [Rec. Doc. 22389-5], at pages 3-4 of 15; Hayes Objection [Rec. Doc. 22389-21], at page 3 of 13; Zimmerman Objection [Rec. Doc. 22389-22], at page 2 of 3.

[27] See Roundtree Objection [Rec. Doc. 22389-1], at page 3 of 21.

[28] See Tarver Objection [Rec. Doc. 22389-13], at page 4 of 22; Harper Objection [Rec. Doc. 22389-17], at page 5 of 21; Archer Objection [Rec. Doc. 22389-18], at page 5 of 22; Brasher Objection [Rec. Doc. 22389-20], at page 5 of 22.

relocation costs;[29] one particular Plaintiffs' Allocation Amount is less than their award from the GBI settlement that was reduced pro-rata;[30] and the Settlement does not compensate for personal or bodily injuries.[31]  While such particularized complaints might motivate an individual to opt out, they do not provide a basis for undoing what is in the best interest of over  97% of the Class.  *See In re Deepwater Horizon*, 910 F. Supp. 2d at 938 ("For those few objectors unhappy with the Settlement, their remedy was simple: opt out.  The 'court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class.'").

183.    Here, the dissatisfactions expressed by these Objectors, while understandable, do not provide a basis for delaying or not approving the Settlement.  It is simply true that no settlement satisfies 100% of all concerned Plaintiffs.  *See Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (recognizing that no settlement can "satisfy every class members' desires" and affirming lower court's approval of consent decree, despite objections from "thirty-four percent of the known class members"); *DeHoyos*, 240 F.R.D. at 275 ("no settlement can attain perfection precluding objections."). While a class settlement of this complexity needs to meet the fair, reasonable and adequate standard for the class as a whole (which this Settlement does), it does not need to meet that standard for any one unique class member. Every settlement requires "compromise," not everyone's needs will be completely met – each side must give and take.  *See In re Deepwater Horizon*, 910 F. Supp. 2d at 941 ("Settlements are compromises, and the fact that

---

[29] *See* Objection of Penny Alexander ("Alexander Objection") [Rec. Doc. 22389-2], at page 3 of 17; Harper Objection [Rec. Doc. 22389-17], at page 4 of 21.

[30] *See* Objection of Lori Staton [Rec. Doc. 22389-3], at pages 2-3 of 17.

[31] Harper Objection [Rec. Doc. 22389-17], at page 5 of 21; Tarver [Rec. Doc. 22389-13], at page 4 of 22; Clay [Rec. Doc. 22379-4].

some class members wish BP had paid more compensation is no reason to reject the Settlement."); *see also Cotton*, 559 F.2d at 1330 ("compromise is the essence of a settlement"); *Corrugated Container*, 659 F.2d at 1325 ("A just result is often no more than an arbitrary point between competing notions of reasonableness."); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("[O]ur judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement.").

184.    Moreover, the fact that some Class Members will not be made whole is likewise an insufficient basis for defeating settlement approval. *See Educ. Testing*, 447 F. Supp. 2d at 626 (overruling objections containing "wildly optimistic suggestions of upper-end recoveries that, given the significant legal hurdles ahead, were at the bottom end of the probability scale."); *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (Class Counsel need only establish that "it is prudent to eliminate the risks of litigation to achieve specific certainty, though admittedly it might be considerably less (or more) than were the case fought to the bitter end."); *Cotton*, 559 F.2d at 1334 (upholding class settlement as "proper and constructive" and holding that "[n]either side received all which it desired.  Such is the nature of a compromise."); *Raines v. Florida*, 987 F. Supp. 1416, 1419 (N.D. Fla. 1997) ("That these claims are lost in the settlement is insufficient reason to find the settlement to be unfair. Settlement is a process of compromise."); *Murphy Oil*, 472 F. Supp. 2d at 873 & n.5 (approving settlement that released all personal injury claims, including past and future medical expenses); *In re Deepwater Horizon*, 295 F.R.D. at 158 ("It is well established that parties can settle claims without providing compensation for every alleged injury.") (citing *Maher*, 714 F.2d at 438 and *Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004)).

185.    Simply put, a small number of individualized Objections based on subjective lack

of 100% satisfaction is not a reason to deny fair, reasonable and adequate recovery to the more than 3,800 Class Members who have accepted the Settlement and are deserving of an Allocation Amount under the Settlement terms.

## 2. Objections Regarding the Allocation Model.

186.    Several Objections challenges the methodology developed by the Allocation Neutral and the Allocation Model. Some Objectors contend, for example, that the discounts for certain Product ID categories (a/k/a buckets) is unreasonable and/or unacceptable,[32] and/or the discount for *Brooke* Plaintiffs is too steep.[33] At least one Objector rejects the offset for payments received under prior Chinese Drywall settlements[34] while another Objector states his dissatisfaction over the division of his Allocation Amount with a Competing Claimant on the basis that he is entitled to 100% of the Affected Property's Allocation Amount.[35]

---

[32] *See* Roundtree Objection [Rec. Doc. 22389-1], at pages 4-5 of 21; Doherty Objection [Rec. Doc. 22379-1], at 1-2; Moody Objection [Rec. Doc. 22389-10], at pages 3-11 of 185. Mr. Moody objects on 10 different grounds. Although Class Counsel believe most of Mr. Moody's complaints emanate from his dispute with respect to the specific Product ID discount for his property (80% for ProWall), his objections are ambiguous, vague, and in some cases unintelligible, and thus waived. *See Murphy Oil*, 472 F. Supp. 2d at 853 (objection "must be sufficiently clear and unambiguous for court consideration, or otherwise the party will be deemed to have waived their objection.").

[33] *See* Roundtree Objection [Rec. Doc. 22389-1], at page 4 of 21; Objection of Charles Caulkins ("Caulkins Objection") [Rec. Doc. 22389-4], at pages 3-4 of 15; Helmick Objection [Rec. Doc. 22379-2]; Hemming Objection [Rec. Doc. 22379-3]; Cummins Objection [Rec. Doc. 22389-14], at pages 4-5 of 22; Bishop Objection [Rec. Doc. 22389-15], at pages 4-5 of 22; Archer Objection [Rec. Doc. 22389-18], at pages 4-5 of 22; Hall Objection [Rec. Doc. 22389-19], at pages 4-5 of 22; Brasher Objection [Rec. Doc. 22389-20], at pages 4-5 of 22.

[34] *See* Doherty Objection [Rec. Doc. 22379-1] at page 2.

[35] *See* Objection of Van Foster for Good Ole Boyz, LLC ("Foster Objection") [Rec. Doc. 22389-12], at pages 3-4 of 18. Under the terms of the Settlement Agreement, there "will be only one Allocation Amount per Affected Property." Settlement Agreement [Rec. Doc. 22305-2], at § 6.2. Therefore, in cases where there are competing claims with respect to the same Affected Property, Class Members were required to "submit to the Claims Administrator documentation to support the allocation of the Allocation Amount for the property within 35 days of the Preliminary Approval Order," *id.* at § 12.1.2, and they were so advised in their Estimate Letter provided by BrownGreer, *see* Woody Declaration at ¶ 5 & Exhibit B thereto, attached as Exhibit 12 to Settlement Class Counsel's Mem. of Law. Mr. Foster failed to submit any documentation to the Claims Administrator, as required, to support his Allocation Amount, yet now

187.    First, Objections about the distribution of the Settlement Funds here are not a reason to deny or delay approval of this Settlement. There is no one right way to internally allocate and distribute the available settlement funds among Eligible Class Members. There are a host of potential distribution models, each of which could be reasonable, equitable, and fair.  It was in the common and collective interest of the Settlement Class as a whole for the Allocation Neutral to develop and utilize an Allocation Model that can be implemented and administered in an objective, fair, efficient, and relatively cost effective manner, and thereby maximize the total and collective distribution of Settlement funds for the benefit of the Class as a whole.

188.    Attempts to attack the Allocation Neutral and the Allocatin Model because of a Class Members status as an *Amorin* Plaintiff, a *Brooke* Plaintiff, or a New (absent) Class Member, or the strength of their Product ID evidence, and the associated values that were assigned are misguided. Class actions, and all legal mechanisms and procedures, depend upon line-drawing, deadlines, and other practical and/or legal limitations as to which all interested parties are on notice. The legal importance and necessity of reasonably drawn categories are illustrated in other recent class settlements, such as *Deepwater Horizon*[36] and *Murphy Oil*, 234 F.R.D. 597 (E.D. La. 2006). The necessity and efficacy of categorizing classes into discrete groups (without the designation of formal sub-classes) has also been acknowledged and approved. *See, e.g., Veal v. Crown Auto Dealerships, Inc.*, 2007 WL 2700969, at *1 (M.D. Fla. Sept. 13, 2007) (complex class divided into three groups based on circumstances of purchase transactions, without designation of subclasses).

---

contends he is entitled to the entirety of the settlement proceeds for his Affected Property. For this reason, Mr. Foster's Objection should be denied.

[36] *In re Deepwater Horizon*, *supra*, 910 F.Supp.2d 891 (E.D. La. 2012), *aff'd*, *Deepwater Horizon II*, 739 F.3d 790 (5th Cir. 2014), *rehearing en banc denied*, 756 F.3d 320 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 734 (2014).

189.    Here, the reasonableness of the line-drawing was informed by a lengthy and intensive litigation process which included defaults in *Amorin*, jurisdictional disputes, certification of the *Amorin* Class, ongoing verification and assessment of claims on the Master Spreadsheet, exhaustive Product ID proceedings before the Special Master in Florida, and the review of all relevant and available documents and materials by the Allocation Neutral (a knowing and disinterested Court-appointed individual). The Allocation Model is well-founded and well-supported.

190.    Unfortunately, virtually every class settlement is subject to an argument that some class members should have fared better vis-à-vis other class members. But the test is not whether the settlement is perfect in the estimation of each and every class member; rather, the test is whether the allocations are "reasonable." *See, e.g.*, *Lawnmower Engine Horsepower Mktg. & Sales Practices Litog.*, 733 F. Supp. 2d 997, 1011 (E.D. Wis. 2010); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 350 (E.D.N.Y. 2010); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 252 (D.N.J. 2000); *Newby v. Enron Corp.*, 2008 WL 4178151, at *5 (S.D. Tex. Sept. 8, 2008); *Thacker v. Chesapeake Appalachia, LLC*, 695 F. Supp. 2d 521, 533 (E.D. Ky. 2010).  It would be both "unfair" and "unreasonable" to compensate everyone within the Settlement Class exactly the same. And, it is both reasonable and fair that Class Members with more difficult or less valuable cases would generally be provided with less favorable relief. The Allocation Neutral took all objective criteria into consideration and made distinctions that are "rationally related to the relative strengths and merits of similarly situated claims." *Deepwater Horizon II*, 739 F.3d at 814.[37]

---

[37] Order and Reasons, *In re Deepwater Horizon*, MDL No. 2179, Rec. Doc. 22252, at 20-21 (E.D. La. Feb. 15, 2017) (…"the proposed New Class consists exclusively of individuals and businesses that have already suffered loss and have potential standing to claim punitive damages. The New Class settlement compensates class members for punitive damages through detailed, objective distribution criteria…. All class members are protected by a specific, detailed, and objective framework that was developed and promulgated publicly

191.     In addition, nothing binds any given Class Member to this Allocation Model.  In the few cases at or near the edges, if a Plaintiff felt that the settlement was inadequate, they were given the opportunity to opt out and continue to litigate to try to achieve a better result. *See, e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d at 938 (holding that for "objectors unhappy with the Settlement, their remedy was simple: opt out"); *Charron v. Pinnacle Group NY LLC*, 2012 WL 2053530, at *28 (S.D.N.Y. June 6, 2012) ("Class Members who wished to pursue [certain] claims and who preferred to go for every last dollar, had ample opportunity to opt out of the Class").

192.     Specific discounts are fair, equitable and reasonable. With respect to the discounts for certain categories of Product ID,[38] such discounts are a reasonable adjustment that aligned the Allocation Model with events that transpired in the Florida remand proceeding where numerous categories and sub-categories of Product ID were found not attributable to Defendants leaving more than half of the Florida *Amorin* Class with zero recovery. *See* Class Counsel Declaration at ¶ 13. With respect to the *Brooke* discount,[39] significant differences between the *Amorin* Plaintiffs' situations and the posture of the *Brooke* actions justify the differential treatment of those two groups. For example, among other things, the *Brooke* Complaints were not filed until September 2015 or later, there are no defaults in *Brooke*, there have not been any responsive pleadings filed, a class has not been certified, and the Court's ruling that many *Brooke* claimants will not be able

---

by the Claims Administrator. The differences within the framework are rationally related to the relative strengths and merits of similarly situated claims"), *aff'd*, *In re Deepwater Horizon*, 934 F.3d 434 (5th Cir. 2019) (affirming Distribution Model developed by Court-appointed Neutral under Halliburton/Transocean Class Settlements).

[38] *See* Roundtree Objection [Rec. Doc. 22389-1], at pages 4-5 of 21; Doherty Objection [Rec. Doc. 22379-1], at 1-2; Moody Objection [Rec. Doc. 22389-10].

[39] *See* Roundtree Objection [Rec. Doc. 22389-1], at page 4 of 21; Objection of Charles Caulkins ("Caulkins Objection") [Rec. Doc. 22389-4], at pages 3-4 of 15; Helmick Objection [Rec. Doc. 22379-2]; Hemming Objection [Rec. Doc. 22379-3]; Cummins Objection [Rec. Doc. 22389-14], at pages 4-5 of 22; Bishop Objection [Rec. Doc. 22389-15], at pages 4-5 of 22; Archer Objection [Rec. Doc. 22389-18], at pages 4-5 of 22; Hall Objection [Rec. Doc. 22389-19], at pages 4-5 of 22; Brasher Objection [Rec. Doc. 22389-20], at pages 4-5 of 22.

to rely on cross-jurisdictional tolling to save their Claims from the statute of limitations defenses. *See id*. at ¶¶ 8, 19. Under these circumstances, it cannot be said that the Allocation Neutral's methodology behind applying discounts to certain Class Members' Claims based upon Product ID or status as a *Brooke* Plaintiff was unwarranted or unreasonable.  On the contrary, the Allocation Model fairly, reasonably, and equitably distributes the Settlement Fund among Class Members according to the strength of their proof and their claims.

193.    For these reasons, Objections regarding the Allocation Model and/or Allocation Neutral's determinations are denied.

### 3.    Objections Regarding Notice.

194.    One Objector, on behalf of all absent Class Members, suggests without any support that there are "serious doubts" that media outreach was sufficient in this case although not specifically challenging the breadth of the Notice program or the substance of the Class Notice; and without providing any evidentiary support for his statement.[40]  This generalized Objection, without more, does not carry any weight. *See DeHoyos*, 240 F.R.D. at 293 ("General objections without factual or legal substantiation do not carry weight.").  However, even considering the substance, as previously found, the Notice program was implemented in accordance with the Preliminary Approval Order, and it satisfies Rule 23 and Due Process.[41]

195.    Therefore, the Objection regarding Notice should be denied.

### 4.    Objections by Non-Class Members.

196.    In the context of class settlements, non-settling parties generally have no standing to challenge the proposed settlement. *In re Deepwater Horizon*, 910 F. Supp. 2d at 941 (citing

---

[40] Moody Objection [Rec. Doc. 22389-10] at page 11 of 185 ("There are serious doubts that the Settlement Agreement's terms and conditions for media outreach, as defined on pages 24 and 25 have been met.").

[41] *See* Wheatman Declaration at ¶ 6; Preliminary Approval Order [Rec. Doc. 22314].

*Transamerican Refining Corp. v. Dravo Corp.*, 952 F.2d 898, 900 (5th Cir. 1992); *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir.1992); *In re Vioxx Prods. Liab. Litig.*, 388 Fed. Appx. 391, 395 (5th Cir. 2010)). Plaintiffs falling outside the settlement class are entirely unaffected by the Settlement, and thus lack standing to challenge it. *In re Deepwater Horizon*, 910 F. Supp. 2d at 941 (citing *Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, 580 (5th Cir.2007); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir.1989); 4 *Newberg on Class Actions* § 11:55 (4th ed.)); *see also* 4 *Newberg on Class Actions* § 13:22 (5th ed.).

197.    The Settlement Agreement expressly excludes from the Class: "(1) Plaintiffs listed on Exhibit 1 (Exhibit 1 includes 498 Plaintiffs who are included in a separate settlement agreement with Taishan); (2) the named Plaintiff and putative class members in *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.); and (3) Plaintiffs who asserted Claims against Taishan and/or the Additional Released Parties, but whose Claims were dismissed for failure to complete a [SPPF] or by motion for voluntary dismissal."[42]  Two Plaintiffs who were expressly excluded from the Class – Michael Guerriero and Mary Escudie – submitted purported objections.

198.    Michael Guerriero submitted a purported objection to being excluded from the Settlement for failing to timely submit an SPPF. *See* Guerriero Objection [Rec. Doc. 22389-24]. However, Mr. Guerriero's exclusion from the Class was not simply due to his failure to submit an SPPF, but also because his claim was judicially dismissed with prejudice at the direction of his individual counsel Parker Waichman. *See, e.g.,* Motion to Voluntarily Dismiss Certain Claims with prejudice (FLSD ECF No. 81) (email authorizing dismissal and motion to dismiss), attached,

---

[42] Preliminary Approval Order [Rec. Doc. 22314], at ¶ 3; Settlement Agreement [Rec. Doc. 22305-2], at § 1.1.1.

collectively, as Exhibit 26 to Settlement Class Counsel's Mem. of Law [Rec. Doc. 22392-31]; October 17, 2018 Order (FLSD ECF No. 96) [Rec. Doc. 21888-1]; MDL Order Dismissing Mr. Guerriero's Claims [Rec. Doc. 21894].  Mr. Guerriero's recourse, if any, was to file a motion to vacate his October 2018 dismissal under Federal Rule of Civil Procedure 60, not utilize the settlement process as a means of effectuating such an outcome.  Based upon the foregoing, Mr. Guerriero's exclusion from the Class Settlement does not render the Class Settlement unfair, unreasonable or inequitable and his Objection is denied.

199.    Mrs. Escudie objected because she was definitionally excluded from the Settlement Class because she is one of the 498 Florida *Amorin* Plaintiffs who were offered separate individual settlements from Taishan prior to the negotiation of the Class Settlement. *See* Escudie Objection [Rec. Doc. 22389-23]. Mrs. Escudie's individual offer remained open throughout virtually the entire Class Notice Period but because she declined to accept it, she believes she "should be reinstated as a Known Class Member." *Id*. at 2. This individual settlement offer was negotiated on behalf of Mrs. Escudie by her counsel Parker Waichman and Jimmy Faircloth who insisted that Settlement Class Counsel did not have the authority to speak for her, as their client, during the negotiations on the Class Settlement.  And, Mrs. Escudie was not prejudiced because the Settlement Agreement included a "[Most Favored Nations] clause that suggests that if the [Class] settlement exceeds the current offer by 110% we can go back and request more funds."[43]  For the foregoing reasons, nothing about Mrs. Escudie's exclusion from the Settlement Class renders the Class Settlement unfair, unreasonable or inequitable and her Objection is denied.

200.    Similarly, "class members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement; by opting out they escape the binding effect of

---

[43] Escudie Objection at [Rec. Doc. 22389-23], at page 3 of 17.

the class settlement." *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000) (internal quotations omitted); *see also Carter v. Forjas Taurus, S.A.*, 2016 WL 3982489, at *13 (S.D. Fla. July 22, 2016) ("it is well-established that 'class members may either object or opt out, but they cannot do both.'") (quoting 4 *Newberg on Class Actions* § 13:23 (5th ed.)).

201.    Pamela Rigsby and Irene Page (co-owners of an Affected Property) opted out of the Settlement during the Notice Period[44] but then submitted a purported objection "on behalf of those who do not opt out."[45] Similarly, Patricia Gottlieb submitted an Objection,[46] but then, after considering her options, timely elected to opt out of the Settlement.[47] Because these Plaintiffs do not have standing to object, their Objection should be denied.

202.    Finally, an Objection was filed by attorney Jimmy Doyle, the same attorney who represents all but four of the opt outs. However, Mr. Doyle does not have standing to object because he is not, and has never been, a Class Member. He is not a Plaintiff in the Litigation, and under the Settlement, he is not permitted to object on behalf of unspecified Class Members.  *See* Preliminary Approval Order [Rec. Doc. 22314], at ¶ 17; *see also* Settlement Agreement [Rec. Doc. 22305-2], at § 10.1.3.  Mr. Doyle's purported objection seeks to equalize the recoveries of all Plaintiffs regardless of their status as an *Amorin* Class Member, a *Brooke* Plaintiff, or an absent Class Member, because according to Mr. Doyle, "All Covered Chinese Drywall claims are similarly situated."[48] As discussed above, the Allocation Neutral's decision to discount certain

---

[44] *See* Notice of Filing of Opt-Outs [Rec. Doc. 22388-20].

[45] *See* Rigsby Objection [Rec. Doc. 22379-5].

[46] Ms. Gottlieb objected to the Settlement on the grounds that it did not provide remediation formula damages to all Class Members, and she contested the division of her Allocation Amount as to the condominium association.

[47] *See* Gottlieb Objection [Rec. Doc. 22389-26]; *see also* Notice of Filing of Opt-Outs [Rec. Doc. 22388-92].

[48] Doyle Objection [Rec. Doc. 22378], at 2.

claims was the reasonable approach based upon sound factors.  In addition, Mr. Doyle challenges

the adequacy of the Settlement Fund.  As discussed previously, that Objection is without merit.

Because of his lack of standing, Mr. Doyle's Objection is denied.  However, even if Mr. Doyle

had standing, his Objection would be denied based upon this Court's prior analysis.

203.   For all of the foregoing reasons, the Court finds that the Settlement is fair,

reasonable and adequate and none of the Objections impact on that analysis.  As a result, the

Objections are all denied.

## CONCLUSION

204.   Based upon the above findings of fact and conclusions of law, the Court will enter

a Rule 54(b) Order and Judgment: (1) granting final approval to the Settlement pursuant to Fed.

R. Civ. P. 23(e)(2); (2) certifying the Settlement Class pursuant to Fed. R. Civ. P. 23(a), (b)(3),

(e); (3) finding that Notice was issued in accordance with the Court's Preliminary Approval Order,

satisfying Fed. R. Civ. P. 23 and Due Process; (4) approving the Class Release and bar order in

the Settlement; (5) approving the Taishan Release in the Settlement; (6) overruling all Objections

filed in opposition to the Settlement; (6) granting incentive awards to the Priority Plaintiffs, the

Select Claimants, and the Settlement Class Representatives; and (7) dismissing all Claims of

Settlement Class Members in the Litigation and CDW-Related Actions who did not opt out.

Respectfully submitted,

Dated:  December 6, 2019             By: */s/ Stephen J. Herman*
                                    Russ M. Herman (Bar No. 6819)
                                    Leonard A. Davis (Bar No. 14190)
                                    Stephen J. Herman (Bar No. 23129)
                                    Charles King (Bar No.34621)
                                    Herman, Herman & Katz, LLC
                                    820 O'Keefe Avenue
                                    New Orleans, LA 70113
                                    Phone: (504) 581-4892
                                    Fax: (504) 561-6024

SHerman@hhklawfim.com
*Plaintiffs' Liaison Counsel MDL 2047 and*
*Settlement Class Counsel*

Arnold Levin
Fred S. Longer
Sandra L. Duggan
Keith J. Verrier
Nicholas J. Elia
Levin Sedran & Berman LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047 and*
*Settlement Class Counsel*

Patrick Shanan Montoya
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Phone: (305) 476-7400
Fax: (305) 476-7444
Patrick@colson.com
*Plaintiffs' Steering Committee MDL 2047 and*
*Settlement Class Counsel*

Richard J. Serpe, Esq.
LAW OFFICES OF RICHARD J. SERPE, PC
580 E. Main Street, Suite 310
Norfolk, Virginia 23510
Phone: (757) 233-0009
Fax: (757) 233-0455
Rserpe@serpefirm.com
*Plaintiffs' Steering Committee MDL 2047 and*
*Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Harry Rosenberg, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, which will serve a notice of the uploading in accordance with the procedures established in MDL 2047, on this 6th day of December, 2019.

*/s/ Stephen J. Herman*
Stephen J. Herman
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
SHerman@hhklawfim.com
*Plaintiffs' Liaison Counsel MDL 2047 and*
*Settlement Class Counsel*