Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3      IN RE:  CHINESE-MANUFACTURED
       DRYWALL PRODUCTS LIABILITY
4      LITIGATION

5      This document relates to:

6      Elizabeth Bennett, et al.     CASE NO:  14-cv-2722

7      vs.

8      Gebr. Knauf Verwaltungsgesellschaft,
       KG, et al.

9

10                * * * * * * * * * * * * * *

11     DEPOSITION OF:   SANTIAGO GUZMAN

12     DATE TAKEN:      NOVEMBER 18, 2019

13     TIME:           10:42 a.m. - 12:39 p.m.

14     PLACE:          6303 BLUE LAGOON DRIVE, SUITE 380
                       NORTH MIAMI BEACH, FL  33126

15

       TAKEN BY:       THE DEFENDANT

16

       REPORTED BY:    MICHELLE J. BROWNE

17                     COURT REPORTER AND
                       NOTARY PUBLIC

18

       TRANSCRIBED BY: KRISTIN L. DWYER, RPR

19                     COURT REPORTER

20

21

22

23                                        EXHIBIT
                                             B
24

25

1      Q.   And you list here it was an owner/occupant

2    property, is that right?

3      A.   Yes.

4      Q.   If you go to page two, at the top, section

5    4, it asks about inspection information.  Do you

6    see that, sir?

7      A.   Where?  I'm sorry.  Okay.

8      Q.   And it provides that Allied Building

9    Inspection Services performed an inspection on

10   January -- excuse me, July 3rd of 2018, is that

11   right?

12     A.   Yes.

13     Q.   Okay.  And other than the Allied Building

14   Inspection, were there any other inspections of

15   the property?

16     A.   No.

17     Q.   Okay.  And when I ask about any other

18   inspections, I'm talking about prepurchase

19   inspections.  Were there any inspections?

20     A.   No, this property was purchased at

21   auction.

22          THE REPORTER:  I didn't hear you.

23          THE DEPONENT:  That property was purchased

24     at auction.

25          THE REPORTER:  At auction?

1       A.    Yes.

2       Q.    And what is the basis of that year, that

3    statement?

4       A.    I believe that's when it was constructed,

5    the townhouse.

6       Q.    Okay.  And how do you know it was

7    constructed in 2006?

8       A.    That's what it said on the -- when we

9    purchased the property, it was built on

10   that [sic].

11      Q.    On the ad for the auction?

12      A.    I don't really recall, but I know it was

13   constructed somewhere around there.

14      Q.    Okay.  And you knew that prior to the

15   foreclosure?

16      A.    No.

17      Q.    All right.  So when you acquired the

18   property, were you aware that it had Chinese

19   drywall?

20      A.    No.

21      Q.    When did you determine the property had

22   Chinese drywall?

23      A.    When we were able to get into the property

24   after we closed.

25      Q.    Okay.  And that was in January of 2018?

Page 28

1    A.   Correct.

2    Q.   And how did you know when you got into the

3    property in January 2018 that it had Chinese

4    drywall?

5    A.   It was rotten.

6    Q.   I'm sorry?

7    A.   It was rotten.

8    Q.   It was rotten?

9    A.   Yes.

10   Q.   What does that mean?

11   A.   It smelled like egg, like really bad.

12   Q.   Okay.  And what did that mean to you at

13   that time in January of 2018 when it smelled like

14   egg?

15   A.   Something was wrong.  When we inspected

16   the house and then we start seeing like the copper

17   all blacked [sic].  And opened some walls.  And

18   the walls had Knauf -- it was some kind of -- so

19   we took the -- tried to get the property back to

20   the courthouse.  And we were stuck with it.

21   Q.   You said you opened it up and you saw the

22   words Knauf, what did that mean to you?

23   A.   On the Chinese drywall.

24   Q.   Okay.  What is your -- prior to that time

25   in 2018, January, when you purchased this

1    property, did you know that there was such a thing

2    as defective Chinese drywall?

3        A.    Back in -- when it was the boom

4    construction, I heard about it.

5        Q.    Okay.

6        A.    But that was about it.

7        Q.    Okay.  And being in the construction

8    industry for how many years?

9        A.    7 -- what is it?  12 years?

10       Q.    Twelve years.  So both in relation to your

11   work in the construction industry and being in

12   south Florida, you were aware of such a thing as

13   Chinese drywall?

14           MR. DOYLE:  Object to the form of the

15       question.

16       A.    I don't have anything to do with the

17   Chinese drywall or drywall.

18       Q.    No, I'm not saying you did.  I'm just

19   saying you knew about the issue --

20       A.    I heard --

21           MR. DOYLE:  Object to the form of the

22       question.

23       Q.    You can answer.

24           MR. DOYLE:  You can answer.  I'm sorry.

25       We talked about that -- I'm going to object

Page 30

```
 1      from time to time, because I don't like the
 2      question --
 3            THE DEPONENT:  No, it's like when they had
 4      the construction on the news, it was everywhere
 5      that there was Chinese drywall in the new
 6      constructions.  That's it.  Other than that...
 7  BY MR. DYSART:
 8      Q.   And that was around 2006, 2007?
 9      A.   Something like that; 5, 6, 7, I don't
10  know.
11      Q.   Okay.  In any of the properties that you
12  lived at, were there any neighbors or friends of
13  yours that had problems with Chinese drywall?
14      A.   No, not that I know.
15      Q.   All right.  In any of the jobs that you've
16  worked on --
17      A.   No.
18      Q.   -- did any of them have problems with
19  Chinese drywall?
20      A.   No.
21      Q.   Where you live, is there a homeowners
22  association?
23      A.   Where I live now?
24      Q.   Just anywhere in the last ten years.
25      A.   Where I live now, there is.
```

1    profile form, was July 6 of 2018 that you

2    completed it.  Stated that you moved in on

3    January 8 of '18.  So you did not move in the

4    property in January of '18?

5        A.   That's when we purchased the property.

6    There was a mistake there somehow.

7        Q.   Okay.  So you never did move into the

8    property --

9        A.   No.

10       Q.   -- in January of '18.  You waited until

11   January of '19 after you completed the remediation

12   when you moved in?

13       A.   Yes, it took -- we did the inspection.

14   And then we started making all the work, CD,

15   plans, and all that.  And everything was completed

16   by January 2019 and we were able to live in the

17   house.

18       Q.   Okay.  And again, you said you purchased

19   this property at auction following foreclosure?

20       A.   Yes.

21       Q.   Okay.  So did you acquire any assignments

22   or rights from the previous owners of the

23   property?

24       A.   In auction, you don't know anything about

25   the property.

Page 41

```
 1        Q.   And you hired an attorney for that
 2   process.  Who was your attorney?
 3        A.   No, it was the representative.  It was the
 4   company who purchased the property.
 5        Q.   And what were their names?
 6        A.   I don't recall.  It's on the paper.
 7   Valdemar and the others.
 8        Q.   Burdman & Bloom?
 9        A.   Yeah.
10        Q.   You said that -- did you have to file a
11   lawsuit for it?
12        A.   No, we didn't file a lawsuit.  I don't --
13   to be honest, I don't recall the whole thing.  I
14   just -- when we purchased the property and we
15   found out, tried to get it back.  And it was like
16   it was an auction and there was nothing to do
17   about it then.  We were stuck with the property.
18        Q.   In connection with that sale, did you have
19   any kind of disclosures for the property?
20        A.   No.
21        Q.   Okay.  How did you identify this
22   particular property?
23        A.   What do you mean?
24        Q.   Well, you purchased it at auction, right?
25        A.   Yeah.
```

Page 43

1    right?

2        A.   No.

3        Q.   Skyline Glass is --

4        A.    Is just a company that I put the

5    properties under that.

6        Q.    When you purchased this property, you knew

7    it was a foreclosure?

8        A.    Yes.

9        Q.    And you knew that you would be buying it

10   sight unseen?

11            MR. DOYLE:  Object to the form of the

12       question.

13       Q.    You knew that you would be buying the

14   property without having viewed it?

15            MR. DOYLE:  Object to the form of the

16       question.

17       A.    We just purchased the property to -- on a

18   lower value to fix it and have it as a market

19   number [sic].

20       Q.    Okay.  So when you buy a foreclosed

21   property, you understand that you're taking a

22   calculated risk on what that property may be on

23   the inside?

24            MR. DOYLE:  Object to the form of the

25       question.

Page 44

1    A.   Yes.  We know that we have to fix, most

2    likely, the cabinets in the kitchen and maybe

3    floors and maybe bathrooms.  Calculating no more

4    than 20,000 to 30,000 on that.

5    Q.   And then because you haven't seen the

6    inside of the property, there's a possibility that

7    it contains other defects?

8        MR. DOYLE:  Object to the form of the

9    question.

10   A.   Not as Chinese drywall.

11   Q.   Okay.  And why is that?

12   A.   Because it should be dis- -- what is it?

13       MR. DOYLE:  Disclosure.

14   A.   Disclosure.

15       MR. DOYLE:  Sorry.

16   A.   It's very important, very delicate, very

17   damaging to people.

18   Q.   Okay.

19   A.   No matter if it's a foreclosure or

20   whatever it is.

21   Q.   Well, did you receive disclosures for this

22   property?

23   A.   For this property?

24   Q.   The affected property.

25   A.   No.

Page 47

1        Q.   All right.  Now you've lived at the
2    property located at 3168 Southwest 153rd?
3        A.   Yes.
4        Q.   That's your primary residence?
5        A.   Yes.
6        Q.   And you've lived there for three years?
7        A.   Yes.
8        Q.   And that's prior to when you purchased
9    this property?
10       A.   That's prior, yes.
11       Q.   Okay.  And you still live there to this
12   day?
13       A.   Yeah.
14       Q.   Primary residence?
15       A.   Yes.
16       Q.   Okay.  What is the status of the affected
17   property at 10769 Northwest?
18       A.   It's rented.
19       Q.   It's rented.  And since when was it
20   rented?
21       A.   February 2019.
22       Q.   Okay.  So within 30 days of completion of
23   remediation?
24       A.   About.
25       Q.   Okay.  I'll take that document back from

Page 50

```
 1        Q.   Do you know if there were any other bids?
 2        A.   I don't do the bids, so I don't know how
 3     it works.
 4        Q.   Okay.  So tell me the process.  You give
 5     them a certain amount that you'll bid up to?
 6        A.   Yes.
 7        Q.   Okay.  And in this case how much were you
 8     going to bid up to?
 9        A.   255.
10        Q.   Okay.  And how did you identify 255 as the
11     amount you would bid up to?
12        A.   Based on -- they give you the address and
13     how much is the property worth on the market and
14     how much is it listed for as a foreclosure.  And
15     then you figure out like how much money you have
16     to invest on it, and if it's worth or not [sic].
17        Q.   And who gives you that?
18        A.   Valdemar and Herman.
19        Q.   All right.  And in this case, how much did
20     they tell you the property was worth?
21        A.   About 320.
22        Q.   Okay.  So when you bid up to 255, you were
23     bidding in the hopes that you would get the
24     property at a discount?
25        A.   Of course.
```

Page 54

1    purchasing a house for 250 and it was worth 397.

2    So it was worth it to buy it.  It's the same,

3    right now like I purchase that home at 383 and the

4    purchase value back then in 2007 was 575.

5        Q.    Okay.

6        A.    So it seems to be a good opportunity.

7        Q.    Okay.  And it's based on that opportunity

8    that you're willing to purchase properties for

9    251,000 without having viewed it?

10            MR. DOYLE:  Object to the form of the

11        question.

12        A.    If I'm buying it through a company and

13    everything is legal, yes.

14        Q.    All right.  Let's go to PFS request for

15    document production number two, page three of this

16    document.  It says all documents in plaintiff's

17    possession -- oh, I'm sorry.  Excuse me.

18            It says please produce all documents

19    reports, photographs, videotapes, samples, and any

20    other materials which evidence and/or identify

21    that there's defective Chinese drywall on the

22    property.  Do you see that, sir?

23        A.    Yes.

24        Q.    It says all documents in your possession

25    are attached to Exhibit 2.  All right.  If you

Page 59

1      A.    No.

2      Q.    -- that your girlfriend had to pay at

3    another property --

4      A.    It's the lost --

5      Q.    I'm sorry, sir.  She can't take down two

6    people at the same time, so just let me finish the

7    question.  My question is:  Is the $2,000 rent

8    that you say you paid since the purchase, does

9    that relate to money that you -- Skyline Glass,

10   LLC incurred in connection with paying rent

11   elsewhere or is it the lost rental income that

12   you're claiming with respect to this property?

13     A.    The lost -- the lost income to that.

14     Q.    Okay.  And my question is:  Was there ever

15   a lease in place for 2,000 a month in rent at

16   10769 Northwest?

17     A.    How --

18           MR. DOYLE:  Object to the form.

19     A.    -- if the property is not habitable?

20     Q.    I'm just asking the question.

21     A.    I'm just asking, too.

22     Q.    And my question is:  Was there ever a

23   lease?

24     A.    No, because the property wasn't habitable.

25     Q.    So when you signed the plaintiff profile

Page 60

1    form and you listed as owner/occupant, owner being

2    you, you were never intending to move into that

3    property?

4            MR. DOYLE:  Object to the form.

5        A.   Like I said, if I want to move, I move.

6    If not, I have it as an investment property.

7        Q.   Okay.  You've never lived in 10769

8    Northwest 81st, true?

9        A.   Correct.

10           MR. DOYLE:  Object to the form of the

11       question.

12       Q.   You're not making any claims with respect

13   to any personal bankruptcy, true?

14       A.   What is that?

15       Q.   Are you making -- you're not making any --

16   are you making any claims with respect to a

17   personal bankruptcy associated with Chinese

18   drywall?  Look at number 15 on the plaintiff fact

19   sheet.

20           MR. DOYLE:  Do you understand the

21       question?

22           THE DEPONENT:  No, not really.

23   BY MR. DYSART:

24       Q.   You haven't entered into personal

25   bankruptcy?