```
 1                UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3
     In Re: CHINESE-MANUFACTURED   |  MDL 2047
 4   DRYWALL PRODUCTS LIABILITY    |
     LITIGATION,                   |
 5                                 |  SECTION "L"
                                   |
 6   _____|
                                   |
     This document relates to:     |
 7                                 |  JUDGE ELDON FALLON
     Elizabeth Bennett, et al      |
 8   v. Gebr. Knauf                |
     Verwaltungsgesellschaft,      |  MAGISTRATE JOSEPH
 9   KG, et al                     |  WILKINSON, JR.
                                   |
10   Case No. 14-cv-2722           |
                                   |
11   _____|

12

13
                    DEPOSITION OF M. ELENA KENDALL
14

15

16
                     Thursday, August 1, 2019
17                     2:16 p.m. - 3:25 p.m.

18

19
                     Esquire Deposition Solutions
20             44 West Flagler Street, 14th Floor
                        Miami, Florida 33130
21

22      Taken before Laura Fish, Professional Shorthand

23   Reporter and Notary Public in and for the State of

24   Florida at Large, pursuant to Notice of Taking

25   Deposition filed in the above cause.
```



```
 1   Thereupon:
 2                       M. ELENA KENDALL
 3   was called as a witness and, having been first duly
 4   sworn, was examined and testified as follows:
 5                       DIRECT EXAMINATION
 6   BY MR. ROSENBLOOM:
 7        Q.   Ms. Kendall, we're here on the property for
 8   23205 Southwest 217 Avenue in Miami, Florida; is that
 9   correct?
10        A.   Yes.
11        Q.   Okay.  And who's the owner of this property?
12        A.   It's a trust.  The trust -- I think it's -- is
13   it A & B Real Estate Holdings?  It's the LLC that it --
14   this runs under.
15        Q.   Okay.  And A & B Real Estate Holdings is the
16   sole owner of the property?
17        A.   I think it's an LLC that's in a trust.
18        Q.   Okay.  So a trust is the owner?
19        A.   Of the LLC.
20        Q.   The membership interest of --
21        A.   Of the LLC.
22        Q.   Do you know the name of the trust?
23        A.   Yeah.  I think that one is called AMB.  It's
24   Kendall Family Trust II.  You know the numeral II, yeah.
25        Q.   And is this a trust that you established?
```



```
 1        A.   The law firm established it.  I don't know
 2   what you mean.
 3        Q.   Were you the person that was responsible for
 4   having the trust set up?
 5        A.   Yeah.  I'm the adult for that, yeah.
 6        Q.   Okay.  All right.  What's the highest level of
 7   education you've completed, ma'am?
 8        A.   M.D., dermatologist.
 9        Q.   Okay.
10        A.   Yeah.
11        Q.   And so you're currently a dermatologist?
12        A.   Yes.
13        Q.   What's the name of your practice?
14        A.   There's a couple.  The first one is
15   M. Elena Kendall, M.D., PA.  That's my practice, and
16   then I work for another practice.
17        Q.   And what's that one?
18        A.   Derm Bar Holdings, LLC.
19        Q.   And how long have you been a dermatologist?
20        A.   Thirty-seven years.  Going on thirty-seven,
21   yeah.
22        Q.   Do you have any construction expertise?
23        A.   No.
24        Q.   Any architecture experience or expertise?
25        A.   No.
```



```
 1        Q.    How about environmental hazards?
 2        A.    Well, some general knowledge.  I'm -- probably
 3   as it pertains to medical probably more.
 4        Q.    But not as it relates to construction real
 5   estate buildings?
 6        A.    No, I don't know anything.
 7        Q.    Do you know who is the manager of A & B Real
 8   Estate Holdings?
 9        A.    I think I'm one, and I'm not sure of the --
10   you know, it's complicated with the attorneys, you know,
11   the trustees.  There's a bunch of attorneys there.  So I
12   don't know, but I think I'm one of them.
13        Q.    Okay.  And so who's the trustee for the
14   Kendall Family Trust II?
15        A.    It's a law firm, but the main two attorneys --
16   the main attorney, I think, for this one is Robert
17   Stamen, and the law firm is Rosenberg da, da, da, da,
18   da, da, whatever.  And I don't know if Mr. Stamen's name
19   is on it.  They're in Dade County.  It's a, you know,
20   trust attorney firm.
21        Q.    Okay.  And are you affiliated with any other
22   real estate holding companies?
23        A.    Yes.
24        Q.    And what are those?
25        A.    There's different names.  I don't know all of
```



```
 1  them.
 2      Q.   Okay.
 3      A.   But one of the ones that has a bunch of
 4  holdings is B as in boy, VK, LLC.  I know there's a
 5  bunch of others, but I don't remember all the initials
 6  or whatever.
 7      Q.   Among all of these entities, how many homes
 8  would you say you own?
 9      A.   Residential?  I don't know the exact number.
10  Do you want an approximate?  Because I don't know.
11      Q.   Yeah.
12      A.   I don't know.  Maybe --
13      Q.   Ten?  Thirty?  A hundred?
14      A.   Maybe 80, 90.  I don't know.  It's around
15  there.  I don't know.
16      Q.   And what about commercial property?
17      A.   I don't know.  Let me think.  Mr. Stamen could
18  give you exact numbers.  I don't know.  I don't know.
19  Maybe 10, 15.  They're slower.  The buildings -- you
20  know, there's not as many as the houses, yeah.
21      Q.   And your commercial properties, generally are
22  they strip malls or, like, skyscrapers?
23      A.   No.  They're small, you know, office buildings
24  and here mostly in southeast Florida.  Some on the west
25  coast of Florida.  You know, like Naples, that area.
```



```
 1   there.  So, you know...
 2        Q.   The next set of other damages is loss of use
 3   and/or loss of enjoyment, and the figure for that claim
 4   is $150,000.  Do you see that?
 5        A.   Yes.
 6        Q.   How did you arrive at that figure?
 7        A.   I don't know.  I guess the amount of time we
 8   had the property.  I'm not sure exactly.  I was
 9   probably -- you know, the number of years, I don't know.
10   A rental or loss of -- you know, income, but I don't
11   know exactly.  I don't remember how -- maybe I was told
12   by the trust or this gentleman how to arrive at that,
13   but that's probably -- you know, it would make sense
14   because I'm not a, you know, contractor.  I don't know
15   how you fill these things out.  We just put what --
16   according to loss of maybe income of rental or something
17   like that or -- I don't know.
18        Q.   Okay.
19        A.   Yeah, I don't know really.
20        Q.   Can you identify any loss of use of the
21   property?
22        A.   Meaning -- what do you -- I don't know how to
23   answer that question.  I don't know what you're --
24        Q.   Sure.  Have you lost use of the property?
25        A.   Yes.  And -- because these properties get
```



```
 1   rented and, you know, fixed, and there's expenses to fix
 2   them and rent them and all that.  So I think so, yeah.
 3        Q.   Okay.  Is the property currently rented?
 4        A.   I think you asked that before.  I don't think
 5   so.  I think it might be, or they moved out.  I don't
 6   know the answer to that.  So...
 7        Q.   And if it's not rented currently, do you know
 8   the last time someone occupied the home?
 9        A.   Not exactly, but I can ask.  And, you know,
10   the -- and then check for you.  Let me put that as a
11   question, because I can send you these things.
12             MR. DOYLE:  Send them to me --
13             THE WITNESS:  Yeah.  The last time -- because
14        he's asking if I have -- this other property is
15        Chinese drywall.  And I -- you know, last time
16        rented okay.  And then why did I write rental --
17        oh, you want to see an example of what
18        Mr. Stratton -- how he does those --
19   BY MR. ROSENBLOOM:
20        Q.   Typically, I'm interested in learning about
21   this property.  If your loss of use and loss of
22   enjoyment claim includes a loss of rental.
23        A.   Uh-huh.  Yeah.
24        Q.   If that's the basis for this claim.
25        A.   Oh, okay.  Let me write that down.  Loss of
```



```
 1   rental.  Yeah, I don't know.  I'm just, like -- yeah --
 2   okay.
 3        Q.   I've just got to try and figure out how you
 4   got to where you are.
 5        A.   Yeah.  Okay.  I need to ask a -- loss of
 6   rental.  So you need an answer, how we came to that.
 7   Okay.  So I -- like, in medicine you don't allege.  You
 8   do accurate.  You either have cancer or you don't.  So I
 9   don't want to answer what -- I'm -- like, I'm in a
10   foreign country right now.  So --
11        Q.   No, I understand.
12        A.   So I can send that and give you an accurate
13   answer once I can ask.
14        Q.   Okay.
15        A.   Yeah.
16        Q.   Just to close the loop on this one, as I
17   understood, your testimony is basically you were advised
18   by someone else that the loss of use or loss of
19   enjoyment claim was valued at $150,000?
20        A.   Yes.
21        Q.   Okay.  All right.
22        A.   Uh-huh.
23        Q.   And you don't recall who that was?
24        A.   Well, most likely I will get an answer for you
25   because I would assume it's the people that examine that
```



1  house and found this -- the drywall issue, yeah.  So --
2  but there's several people that worked that.  So if I
3  tell you it's the guy who filled -- helped me fill out
4  the form where I put his name -- it could be him or
5  somebody else.  I don't know.  So I will get that answer
6  for you.
7       Q.   Sure.  And then the final category on this
8  page is the diminution in value of the property, that's
9  blank.  So I'm assuming here you don't have a claim for
10 diminution in value at this time?
11      A.   I guess not.  Maybe because we don't look --
12 we're not looking to sell these properties.  So maybe
13 the trust didn't -- you know, I don't know.
14           MR. ROSENBLOOM:  I'm going to mark as
15      Exhibit 4 a document titled "Certificate of Title."
16           (Thereupon, Exhibit 4 was marked for
17      identification.)
18 BY MR. ROSENBLOOM:
19      Q.   Have you seen that document before?
20      A.   Where is the -- oh, yeah.  These are the
21 things that come in the mail when the properties are
22 purchased, yes.
23      Q.   All right.
24      A.   Of value.  Yeah.  Uh-huh.
25      Q.   I'm no Florida lawyer.  So I can't say with



```
 1   certainty, but it looks like this house was bought out
 2   of a foreclosure action?
 3        A.   Probably.
 4        Q.   Okay.  Is that typical for A & B Real Estate
 5   Holdings?
 6        A.   Yeah.  All of the parcels -- most of the
 7   parcels purchased by the trust are either, yeah,
 8   distressed properties or trust sales or stuff like that.
 9        Q.   All right.  And it looks like at the top there
10   the house was purchased for $329,900.
11        A.   Where it does it say that?  Here?  Okay.
12   Yeah.  If that's -- then that's what they -- yeah,
13   that's probably correct.
14        Q.   Okay.  Do you know what, if any, due diligence
15   was done on the property prior to purchasing it?
16        A.   Well, if this is a foreclosure, usually you
17   don't -- from what I understand, you don't really get to
18   do it -- you know, you have to -- I think they go to a
19   courthouse or to a computer, and they put a price or
20   something.  And then they -- like, I don't know if they
21   get to see the house or, you know, walk through or any
22   of that because sometimes people are living there and
23   stuff.  So they -- it's kind of a risky thing.  So my
24   guess is, no, that they didn't go there if it's a
25   foreclosure, yeah.
```



1    Q.   So acquiring property out of a foreclosure, as
2  you said, is a risky thing?
3    A.   Yeah.  Because I don't think -- it's not like
4  a regular purchase that you go with a realtor.  You look
5  at the house, and you look at the bathrooms and decide
6  if you like the color or whatever.  It doesn't work like
7  that.  I think that they buy those through the court or
8  through other means, and they're competing with other
9  people for the same property.
10   Q.   Sure.  And --
11   A.   So I don't know.
12   Q.   And you kind of just look at the numbers and
13 maybe the size of the house or the location and the
14 house and --
15   A.   Yeah. They have a system.  Yeah.  They go in,
16 and they do a lot of research on the legal part of the
17 house.  You know, make sure there's -- you know,
18 whatever they can find out.  And then it's -- they put a
19 money amount, I think.  I think that's how I could put
20 the money amount, and then it's called a bid.  And then
21 the other people -- and then you see if they got it and,
22 you know...
23   Q.   And so is that Mr. Stamen that's doing all of
24 this?
25   A.   No.  There's people -- like, Mr. Luongo is one



```
 1   of them, you know, because he knows about finance and
 2   how to look for different, like, liens or things like
 3   that.  I've heard terms.  I don't know what they mean,
 4   crossclaims or, you know, things that you have to know
 5   before you actually bid on a -- on one of these parcels.
 6        Q.   Sure.
 7        A.   So he's one.  There's a couple of people that
 8   do that.
 9        Q.   So do you know who in sort of the
10   organization -- and I use that term very loosely.  I
11   know you have a lot of people coming in and out.
12        A.   Yeah.
13        Q.   Do you know who identified this property as a
14   property to pick up?
15        A.   To purchase?
16        Q.   Yes.
17        A.   I don't know.  I'm thinking that this one he
18   was involved because I put his name at the time, the Tom
19   Luongo.  So...
20        Q.   Okay.
21        A.   But he's not a realtor.  I mean, this is,
22   like, you know, we're -- you know, it's like you or this
23   young lady or whatever could go in a computer and decide
24   you're not trained at this.  He's not an attorney or a
25   real estate attorney or anything like that.  That's why
```



```
 1  I say it's kind of a risky thing.
 2      Q.   He saw this in the foreclosures, thought it
 3  might be a good investment for the --
 4      A.   For the trust, yeah.
 5      Q.   -- for the trust and went ahead?
 6      A.   Uh-huh.
 7      Q.   Does he have to come to you for approval to
 8  acquire the property?
 9      A.   They usually do and -- but a lot of these
10  properties are purchased at a very -- there's, like,
11  a -- you know, the trust won't allow -- like, let's say
12  a house.  You sell it to a couple for 100,000, and it's
13  valued, you know, at 100,000.  You're buying them for,
14  you know, 15,000.  So you expect things to have a
15  problem, but if they are buying them closer to -- you
16  know, so you expect that you might find that you have to
17  replace a roof and stuff like that.  So it's a risk
18  taken with that in mind.
19           So -- but you don't really know if you got
20  lucky and you're getting something really nice or
21  something bad, I guess, but they usually come to approve
22  the funds that are being -- you know, once they check
23  that it doesn't have legal issues of, you know, whatever
24  and to approve the funds being -- because these are
25  cash -- I think they give the money right away.  So they
```



```
 1   have to approve the funds.  You know, so that's how they
 2   do it.  Yeah.  That's the main --
 3        Q.   And would that approval have been done by you,
 4   or would that have been done by --
 5        A.   Yeah.  I would have approved -- unless I
 6   wasn't sure.  Then it would go to Mr. Stamen.  Say,
 7   look, you know, we're doing this, and he would decide.
 8   But a lot of these were purchased at the time that they
 9   were purchased for a very -- a lower than market price,
10   I guess.
11        Q.   Yeah.
12        A.   I -- you know, I don't know a whole lot about
13   this field but, you know -- and I'm just telling you the
14   way that they've kind of done it.  You know, so --
15        Q.   Whoever it was that identified this property
16   and said I think this is a good one worth rolling the
17   dice on, would they bring you some kind of packet on the
18   property or would they just briefly say, hey, I got this
19   property.  It's in this neighborhood.  I think it's
20   worth X, and we can get it for half of that in this --
21        A.   Yeah.  I usually get -- like, I recognize some
22   papers here.  Let me see.  You get a thing with some --
23   like, one of these things.  I recognize this because
24   they print these out all the time, and then there's a
25   bunch of other stuff, you know, like, kind of, like,
```



```
 1   that to allow you to see the valuation.  And there's
 2   something called Sunbiz or something where they check to
 3   see if -- who owned it and, you know, if there was --
 4   like, sometimes there's things that don't come out,
 5   like, zoning -- you know, things that can be very
 6   costly.  Unfortunately, this Chinese drywall is not one
 7   of them.  You wouldn't be sitting across from me, you
 8   know.  So...
 9        Q.   Right.
10        A.   But I think that's the general process that
11   you do.
12        Q.   And so then would you or you and
13   Mr. Stamen approved acquiring this house?
14        A.   Uh-huh.
15        Q.   Would you then take all that information you
16   were presented and kind of throw it in a folder for this
17   property and start the record collection, or is it less
18   formal than that?
19        A.   Well, maybe in some that are in there, and
20   maybe they're not.  And maybe they used it to evaluate.
21   And then I know that these things are -- this is like a
22   deed or -- this is an important document.  I know those
23   are in there.  I don't know, you know, and then, you
24   know, other stuff like that.  I don't know.  But what
25   you're saying -- you know, maybe it is in there for
```



1  that.  I don't know.
2      Q.   Okay.
3      A.   But we can look that up if you need other --
4  if you need that.  Like, if they assessed it, like, the
5  stuff that they used, do you need that provided to you?
6  Because I can have them look in the file.  I'm writing a
7  list of the things that you might need.  So...
8      Q.   Yeah.  I think we've got -- a lot of the stuff
9  we're kind of discussing should be in the discovery
10  request.
11      A.   Yeah.  I think they sent -- because I think
12  that -- you know, if they had -- somebody requests
13  something, they just copy what they have, and they send
14  it to whoever, you know.  So...
15      Q.   All right.
16          MR. ROSENBLOOM:  I'm going to mark as
17      Exhibit 5 a picture.
18          (Thereupon, Exhibit 5 was marked for
19  identification.)
20          THE WITNESS:  Uh-huh.
21  BY MR. ROSENBLOOM:
22      Q.   Have you seen that picture before?
23      A.   Probably if it's in the file, yeah.
24      Q.   Do you know what it's a picture of?
25      A.   I'm not sure.  I'm not sure.  I just know that

