UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  CHINESE-MANUFACTURED                    MDL 2047
DRYWALL PRODUCTS LIABILITY
LITIGATION                              SECTION "L"

_____
This document relates to:

                              JUDGE ELDON FALLON

Elizabeth Bennett, Et Al. versus
Gebr. Knauf
Verwaltungsgesellschaft, KG, Et Al.

                    MAGISTRATE JOSEPH WILKINSON, JR.


Case No. 14-cv-2722

_____




            DEPOSITION OF LISA LOFTON




  Taken at the instance of the Defendants at the
  offices of Brooks Court Reporting, 12 Lakeland
 Circle, Suite A, Jackson, Mississippi, on Monday,
    December 2, 2019, beginning at 11:05 a.m.


                REPORTED BY:
        SHANNA CUMBERLAND, CCR #1774


**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

EXHIBIT
B

1    by Katrina.

2         Q.    Okay.  So in 2005, when Hurricane Katrina

3    hits, the property that you described at Highway 90,

4    that property was destroyed?

5         A.    Correct.

6         Q.    Okay.  And where did they move at that

7    point?

8         A.    They stayed at -- at a shop that my father

9    had in Bay Saint Louis.

10        Q.    Okay.  And what did your father do?

11        A.    He did ornamental iron work.

12        Q.    Okay.  And what did Mrs. Baber do?

13        A.    She helped him with that, helped him with

14   his business.

15        Q.    All right.  And then, after they moved

16   into that shop, they eventually purchased property

17   at 121 Country Club Drive?

18        A.    Correct.

19        Q.    Okay.  And when they purchased the

20   property at Country Club Drive, do you know if it

21   was already renovated after Katrina?  Was it

22   undamaged?

23        A.    No.  It was gutted.

24        Q.    Okay.  So they bought that home gutted?

25        A.    Correct.

1    completed, your mother was still living?

2         A.   As far as I know, yes.

3         Q.   And you see on the last page, it was dated

4    November of '16?

5         A.   Yes.

6         Q.   All right.  If you go back to the first

7    page.

8         A.   Okay.

9         Q.   The Plaintiff Profile Form list, as the

10   insurer, Lexington Insurance.  Do you see that name?

11        A.   I see it.

12        Q.   Are you aware if whether Mrs. Baber or

13   yourself on behalf the estate, have you ever pursued

14   an insurance claim to collect insurance for Chinese

15   drywall?

16        A.   No, I'm not aware.

17        Q.   Okay.  Do you have any personal knowledge

18   of when your mother and father moved into the

19   property located at 121 Country Club Drive?

20        A.   Sometime in 2006, but I don't know a

21   specific date.

22        Q.   Okay.  And are -- do you see, on Page 1 of

23   the Plaintiff Profile Form, your mother had

24   indicated that they moved on the date of July 11th

25   of '06?  Do you see that?

```
 1        A.    I see it.

 2        Q.    Okay.  And does that roughly coincide with

 3   your knowledge?

 4        A.    If that's what she put, then I'm assuming

 5   that's -- yes, that's when they moved in.

 6        Q.    Okay.  Now, the move-out date is not -- is

 7   not listed.  Did your mother remain in the property

 8   until her death?

 9        A.    No.

10        Q.    Okay.  The property was -- well, let me

11   back up.

12              Your father, when he passed away in 2015,

13   at that time, they were still residing on the

14   property?

15        A.    No.

16        Q.    Okay.  When did they vacate the property?

17        A.    Sometime in 2013, I believe.

18        Q.    Okay.  And why did they vacate the

19   property in 2013?

20        A.    They had bought a house and some property

21   somewhere else.

22        Q.    Okay.  And where is that property located?

23        A.    It was located in -- do you need the exact

24   address?

25        Q.    If you know.
```

```
 1        A.    113 -- I'm doing this off the top of my
 2   head, so it could be wrong.  11371 Hidden Valley
 3   Road, Pass Christian.
 4        Q.    Okay.  And when did they purchase that
 5   property?
 6        A.    I guess at the beginning of 2013 sometime,
 7   maybe.
 8        Q.    Okay.  And following the purchase of the
 9   Hidden Valley property, they moved into it,
10   essentially, immediately?
11        A.    I'm not sure what you mean by
12   "immediately."  I don't know when they -- how long
13   it was before, between when they purchased it and
14   when they moved in.
15        Q.    But it was in 2013?
16        A.    Yes, uh-huh (affirmative response).
17        Q.    Okay.  And when they moved into the Hidden
18   Valley property in 2013, what became of 121 Country
19   Club Drive?
20        A.    They rented it out.
21        Q.    Okay.  All right.  And do you have any
22   knowledge about who or when the individuals rented
23   the property at 121 Country Club Drive?
24        A.    No, not any specific knowledge.
25        Q.    As the executor of the estate of
```

```
 1          A.    Okay.

 2          Q.    Do you recognize that document?

 3          A.    Yes.

 4          Q.    Okay.  And what is this document?

 5          A.    It looks to be a Warrant Deed for the

 6    property on 121 Country Club Drive.

 7          Q.    Okay.  And did you provide this Warranty

 8    Deed in connection with this case?

 9          A.    I did.

10          Q.    Okay.  So this -- this was actually

11    provided by you and not by your mother?

12          A.    Well, I -- I'm not sure if she provided

13    it, too, or not, but I remember seeing it in...

14          Q.    Okay.  So this would have been in the

15    files and materials you received as the executrix,

16    that you provided in this matter?

17          A.    It wasn't really a file, but yeah.

18          Q.    Okay.  And do you see where the prior

19    owners are conveying the property at 121 Country

20    Club to Mr. Baber?

21          A.    Yes.

22          Q.    Okay.  Are there any other Warranty Deeds

23    in connection with the Country Club property that

24    you're aware of?

25          A.    Not that I remember aware of.
```

```
 1        Q.   Are you aware of any other documents that
 2   would provide ownership to your mother, Catherine
 3   Baber?
 4        A.   No.
 5        Q.   Okay.  Now, you're here today as the
 6   executrix for the estate of her property at 121
 7   Country Club Drive, true?
 8        A.   Uh-huh (affirmative response), yes.
 9        Q.   And that is based on claims alleging
10   Chinese drywall for that property, true?
11        A.   True.
12        Q.   So we know that they purchased the
13   property in 2006, right?
14        A.   Correct.
15        Q.   Okay.  And then, they moved out in 2013?
16        A.   Correct.  Sometime in 2013, yes.
17        Q.   All right.  And when they moved out, they
18   moved to the Hidden Valley until both Mr. Baber's
19   passing in 2015 and Mrs. Baber's passing in 2018,
20   true?
21        A.   True.
22        Q.   All right.  Do you have any information
23   about when -- I mean how much the property was
24   purchased for?
25        A.   This property?  I think -- I think there
```

```
 1    was something somewhere that had it on there.  I'm
 2    not sure what it was.
 3              (Exhibit 4 marked for identification.)
 4         Q.   (By Mr. Dysart)  This is Deposition
 5    Exhibit 4, the Plaintiff Fact Sheet.  Do you
 6    recognize that document, ma'am?
 7         A.   I do.
 8         Q.   Okay.  And did you complete this document
 9    in connection with this case?
10         A.   Yes.
11         Q.   Okay.  And how much did you put for the
12    price of the property at 121 Country Club Drive that
13    was purchased?
14         A.   70,000, is what it says.
15         Q.   Okay.  Where did you obtain that
16    information?
17         A.   Off some piece of paper, but I don't
18    remember what it was.  I think a settlement sheet,
19    maybe.
20         Q.   Okay.  Have you provided that document in
21    connection with this case?
22         A.   I believe so, but I'm not sure.
23         Q.   Okay.  Now, on the next page, you
24    indicated that the property was not purchased as-is.
25    Do you see that?
```

```
 1          A.   I looked over it.
 2          Q.   And how much did the property appraise
 3     for?
 4          A.   I don't remember off the top of my head.
 5               (Exhibit 5 marked for identification.)
 6          Q.   (By Mr. Dysart)  Okay.  I'll give you
 7     Deposition Exhibit 5.  I'm sorry.  I'll take that
 8     back from you.  Thank you.  We'll come back to it.
 9               Deposition Exhibit 5, is that the
10     appraisal that you have produced in connection with
11     this case for 121 Country Club?
12          A.   Yes.
13          Q.   Okay.  And the date is May of 2106?
14          A.   Correct.
15          Q.   Can you turn to Page 3 a minute.  Do you
16     see, at the bottom of the page of the appraisal
17     report, an estimated market value?
18          A.   Did you say Page 3?
19               MR. DOYLE:  The third page of -- is it the
20     labeled third page or the third page of --
21               MR. DYSART:  I'm sorry.  The third page of
22     the actual exhibit, the page you're on.
23               THE WITNESS:  Yes, uh-huh (affirmative
24     response).
25          Q.   (By Mr. Dysart)  Okay.  And what is the
```

```
 1    estimated market value?
 2         A.   192,000.
 3         Q.   Okay.  And were there any other appraisals
 4    done for the property located at 121 Country Club?
 5         A.   Not to my knowledge.
 6         Q.   Okay.  And the property was foreclosed
 7    in 2017, right?
 8         A.   I'm pretty sure -- as far as I know, it
 9    was 2017.
10         Q.   Okay.  Do you know what the property -- do
11    you know if the property was subsequently sold?
12         A.   I don't believe it was.
13         Q.   Okay.  Do you know if the property was
14    ever advertised for sale after the foreclosure?
15         A.   I just -- yes, I think -- I think I just
16    saw it recently, that it was for sale.
17         Q.   Okay.  I'll hand you back what has been
18    marked as Exhibit 4 to the deposition.  If you'll
19    turn to Page 4, ma'am, to that document.
20              Okay.  Do you have information as to when
21    it was determined Chinese drywall was located on the
22    property?
23         A.   I don't have a specific date.
24              Do you mean besides the inspection report,
25    the date of that?
```

```
 1        Q.    Correct.

 2        A.    No.

 3        Q.    Okay.  And that testimony is relying on

 4   the actual date of the inspection report?

 5        A.    What testimony?

 6        Q.    Does your testimony that the Chinese

 7   drywall was determined in the property in 2016 is

 8   based off your mother's statement in the Plaintiff

 9   Profile Form that occurred on October of 2016?

10        A.    Because that's when the inspection report

11   was.

12        Q.    Correct.

13        A.    Yes.

14        Q.    Okay.  So you didn't have any personal

15   knowledge as to when your mother may or may not have

16   have known about Chinese drywall on the property?

17        A.    I do not have any personal knowledge.

18        Q.    Okay.  And it would be the same question

19   for father.  Do you have any personal knowledge as

20   to when your father may or may not have known about

21   the Chinese drywall on the property?

22             MR. DOYLE:  Object to the form of the

23   question.

24             You can answer.

25        Q.    (By Mr. Dysart)  You can answer.
```

```
 1            A.   Say that, again.
 2            Q.   Yeah.
 3                 Do you have any personal knowledge as to
 4      when your father knew about Chinese drywall in the
 5      property?
 6            A.   I have no personal knowledge.
 7            Q.   When did you first become aware that the
 8      property at 121 Country Club Drive had Chinese
 9      drywall in it?
10            A.   I'm not sure of a specific date.
11            Q.   Okay.  Was it before your mother passed
12      away?
13            A.   Yes.
14            Q.   Okay.  Do you remember what year it was?
15            A.   Not -- she passed away in 2018.  It was
16      before then, obviously.
17            Q.   Okay.  Did you have any conversation with
18      your mother about it?
19            A.   About the Chinese drywall in the house?
20            Q.   Yes.
21            A.   Yes.
22            Q.   Okay.  And what -- what were those
23      conversations?
24            A.   What were they?
25            Q.   Uh-huh.
```

1    Valley was what?

2        A.   My dad wanted to -- my dad grew up on a

3    farm, so he wanted to move out with some land.  He

4    liked to plant plants and grow gardens.  That's why

5    they moved.

6        Q.   Okay.  Tell me a little bit about Hidden

7    Valley.  Is -- what -- how big is the house?

8        A.   I don't know how big the house was.

9        Q.   Did it include more square footage or

10   land --

11       A.   It had more land.  It had 30 acres.

12       Q.   So it was 30 acres.

13            And the property at 121 Country Club, was

14   that a house in a subdivision?

15       A.   It is, uh-huh (affirmative response).

16       Q.   Okay.  So the house at Hidden Valley, they

17   moved there because your father wanted to have more

18   land?

19       A.   Yes.

20       Q.   And that's -- that was the reason why they

21   moved?

22       A.   Uh-huh (affirmative response).

23       Q.   Okay.  On Page 5, ma'am, look at

24   Number 17.  In terms of the demolition of the value,

25   you have stated at the time of the foreclosure, the

```
 1   anyone else that you intend to use in connection
 2   with this claim?
 3        A.   No, I'm not aware.
 4        Q.   Okay.  Are you going to ask your sister,
 5   Darla, to testify in this case?
 6        A.   No.
 7        Q.   Are you going to ask your brother,
 8   Charles, to testify in this case?
 9        A.   No.
10        Q.   Okay.  Their testimony would be,
11   essentially, duplicative of yours?
12             MR. DOYLE:  Object to the form of the
13   question.
14             You can answer.
15             THE WITNESS:  I guess so.  I'm not sure.
16   I can't speak for somebody else.
17        Q.   (By Mr. Dysart)  Okay.  All right.  So in
18   this document, you list HVAC.  You put 8,000 and
19   scratch it to put 5400.
20             Can you tell me, what's the issue with the
21   HVAC?
22        A.   What do you mean what's the issue like
23   that?
24        Q.   Well, the property was foreclosed in 2017,
25   correct?
```

```
 1          A.    Whenever, yes.  I'm not sure about the
 2     date, but yes.
 3          Q.    Okay.  The estate no longer owns the
 4     property?
 5          A.    Correct.
 6          Q.    And the HVAC was included in that?
 7          A.    Yes.
 8          Q.    Okay.  And what information do you have
 9     that the HVAC was damaged?
10          A.    They -- as far as I can remember, they had
11     several issues with the air conditioner when they
12     were living there.  I don't know any specifics about
13     it, but...
14          Q.    Okay.  Have you provided any receipts or
15     invoices in connection with costs?
16          A.    I don't have any of that from -- from
17     their estate.
18          Q.    Do you have any documentation to support
19     the costs associated with HVAC damage in Item
20     Number 1?
21          A.    No.
22          Q.    Okay.  And as no longer being the owner of
23     the property at 121 Country Club Drive, you no
24     longer own the HVAC of the property?
25               MR. DOYLE:  Object to the form of the
```

```
 1    question.
 2             You can answer.
 3        Q.   (By Mr. Dysart)  You didn't take the HVAC
 4    out and install it somewhere else, correct?
 5        A.   Well, no.  You wouldn't want to.
 6        Q.   Correct.  Electrical wiring throughout the
 7    house, 8,000.  Do you see that?
 8        A.   I see it.
 9        Q.   Okay.  What is that regarding?
10        A.   Well, I think that's just from when you --
11    the remediation, all that has to be replaced.
12        Q.   Does that fall within the remediation
13    costs that you list later in this document or is
14    that something separate?
15        A.   Yes.  Well, it says right up underneath
16    that it's included.  Do you see that?
17        Q.   Price -- are you looking at Number 14 on
18    the spreadsheet?
19        A.   Yes, uh-huh (affirmative response).
20        Q.   And it says price for HVAC, electric
21    included in this dollar amount?
22        A.   Right.
23        Q.   Okay.  So that would be the first three
24    items of the spreadsheet at the top?
25        A.   Right.
```

```
 1        Q.    Okay.  In terms of the electrical wiring
 2   throughout the house, where does the 8,000 number
 3   come from?
 4        A.    I'm assuming from over the remediation
 5   report.  I'm not -- I don't remember specifically,
 6   but...
 7        Q.    Okay.  What remediation report?
 8        A.    I think there was a report that was going
 9   to say how much it was going to cost to repair the
10   house.
11        Q.    Okay.  Did you bring it with you here
12   today?
13        A.    No.
14        Q.    Okay.  Have you produced it in this case?
15        A.    I believe I have.
16        Q.    Okay.  All right.  I'll represent to you
17   that I do not have it.  It's not included in the
18   Plaintiff Fact Sheet --
19        A.    Okay.
20        Q.    -- or any of those documents we received
21   in connection with this case.
22              What was the date of the remediation
23   estimate?
24        A.    I don't have any idea off the top of my
25   head.
```

```
 1        Q.    Okay.  Was the electrical wiring replaced
 2   by either Mrs. Baber or yourself on behalf of the
 3   estate?
 4        A.    No.
 5        Q.    Did Mrs. Baber or yourself incur any costs
 6   in terms of replacing wiring throughout the house?
 7        A.    I didn't.  I don't know about her for
 8   sure, but I didn't.
 9        Q.    Okay.  Have you presented any information
10   that she incurred any electrical wiring costs
11   throughout the house?
12        A.    No, I can't.
13        Q.    Okay.  Plumbing throughout the house, the
14   next line item, 6200.  Do you see that, ma'am?
15        A.    I see it.
16        Q.    Where did the $6200 come from?
17        A.    From that same report, I'm assuming.
18        Q.    Okay.  And that's the report that we don't
19   have here today, true?
20        A.    Right.
21        Q.    All right.  And did Mrs. Baber or yourself
22   on behalf of the estate incur any costs, in terms of
23   replacing the plumbing throughout the house?
24        A.    I haven't paid anything; I'm not sure
25   about her.
```

1      Q.   Okay.  Do you have any information that
2   you can provide that any of the plumbing was
3   replaced?
4      A.   I do not.
5      Q.   So you don't know one way or the other if
6   your mother incurred -- do you know if your mother
7   incurred any costs in connection with the plumbing
8   throughout the house?
9      A.   I do not.
10     Q.   Okay.  The next line item is the
11  oven, $600?
12     A.   Yes.
13     Q.   Okay.  It says "Stopped working."  Do you
14  see that?
15     A.   I see it.
16     Q.   Okay.  When did the oven stop working?
17     A.   I can't give you a specific date for that.
18  It was several problems with it, but I'm not sure
19  about a date.
20     Q.   Okay.  Was it before your father passed
21  away?
22     A.   Yes.
23     Q.   Okay.  Was it before they moved into the
24  property at Hidden Valley?
25     A.   I believe so.

1     Q.   All right.  Do you know what happened to
2  the oven?
3     A.   I don't.
4     Q.   Do you know what model number it was?
5     A.   No.
6     Q.   Do you know what the make was of it?
7     A.   No.
8     Q.   Okay.  Do you know why the oven stopped
9  working?
10         Did anyone tell you why the oven stopped
11  working?
12     A.   No.
13     Q.   Okay.  Were you ever told by anyone why
14  the oven was not working?
15     A.   Not that I remember, no.
16     Q.   The $600 number that you listed, what is
17  the basis of that number?
18     A.   Probably just a guess.
19     Q.   Okay.  Number 5, the microwave stopped
20  working.  Do you see that?
21     A.   I see it.
22     Q.   Okay.  When did the microwave stop
23  working?
24     A.   I don't remember a specific date.
25     Q.   Was it around the same time that the oven

```
 1    stopped working?
 2         A.    I don't remember.
 3         Q.    Was it before or after they moved to
 4    Hidden Valley?
 5         A.    I would assume it was before.
 6         Q.    Okay.  And how do you know the microwave
 7    stopped working before they moved to Hidden Valley?
 8         A.    I'm sure my mother must have mentioned it
 9    or something, but I don't know specifically when.
10         Q.    Okay.  Do you know where the microwave --
11    do you know what the make of the microwave was?
12         A.    No.
13         Q.    Do you know if the microwave was replaced?
14         A.    I'm not sure about that.
15         Q.    Okay.
16         A.    I would -- I would think so.  Usually
17    people use a microwave.
18         Q.    Do you have any information you can
19    provide as to why the microwave stopped working?
20         A.    No.
21         Q.    Okay.  And the $300 number that you've
22    included, what is the basis of that?
23         A.    Just a guess, an estimate.
24         Q.    The next line was the TV times two started
25    to malfunction.  Do you see that?
```

```
 1        A.    I see it.
 2        Q.    When did the TV malfunction?
 3        A.    Again, I'm not sure about a specific date.
 4        Q.    Okay.  Was it before they moved to Hidden
 5   Valley?
 6        A.    Well, it would have to be before they
 7   moved to Hidden Valley, because they wouldn't have
 8   had new TVs...
 9        Q.    Okay.  Was it either on -- from 2006
10   to 2013, was the 121 Country Club Drive, right?
11        A.    Yes.
12        Q.    Okay.  Was it closer to 2013 or closer
13   to 2006; do you know?
14        A.    I don't have any idea.
15        Q.    Okay.  Do you know how long they had the
16   TVs before they started malfunctioning?
17        A.    That, I'm not sure.  But it wasn't --
18   they -- I remember that they weren't old TVs.  It
19   was something that was -- nothing should have
20   happened to the TVs.
21        Q.    Other than the two TVs that started
22   malfunctioning, were those the same TVs in the house
23   from 2006 to when they started malfunctioning?
24        A.    I don't know.
25        Q.    All right.  Do you know what the models
```

```
 1    were of the TVs?
 2         A.   No, I don't.
 3         Q.   Okay.  Do you know why they started
 4    malfunctioning?
 5         A.   No, I don't.
 6         Q.   Do you have any information that anyone
 7    else's TVs started malfunctioning?
 8              I'm sorry.  You're shaking --
 9         A.   I'm sorry.  No, I don't have -- I don't
10    know.
11         Q.   All right.  The $1800 number that you
12    assigned to this value, is that just a guess, as
13    well?
14         A.   Yes.
15         Q.   Number 7, a dishwasher?
16         A.   Yes.
17         Q.   Malfunction and replace, 600?
18         A.   Yes.
19         Q.   What was the malfunction of the
20    dishwasher?
21         A.   I don't know the specifics.
22         Q.   Okay.  When did it malfunction?
23         A.   I don't know that date.
24         Q.   Okay.  And it was before they moved to
25    Hidden Valley in 2013?
```

```
 1          A.    Yes.
 2          Q.    Okay.  When they moved into the property
 3    in 2006, their appliances, did they take them from
 4    that prior residence and install them or did they
 5    buy new appliances?
 6          A.    The prior residence was blown away in
 7    Katrina.  There were no prior appliances.
 8          Q.    That's right.
 9                So everything that they would moved in,
10    in 2006, would have been brand new?
11          A.    Correct.
12          Q.    Okay.  And you said replace the
13    dishwasher.  When was it replaced?
14          A.    I don't have a specific date.
15          Q.    Do you have any information as to what
16    kind of dishwasher malfunctioned?
17          A.    No.
18          Q.    Do you have any information as to what
19    dishwasher was purchased to replace it?
20          A.    No.
21          Q.    Okay.  The $600 number is just a guess?
22          A.    Yes.
23          Q.    Okay.  The next line item is the garbage
24    disposal?
25          A.    Yes.
```

```
 1          Q.   $150?

 2          A.   Yes.

 3          Q.   Okay.  When did that stop working?

 4          A.   I don't have the specific date.

 5          Q.   And again, it would have been prior

 6     to 2013?

 7          A.   Yes.

 8          Q.   All right.  Do you know what type of

 9     garbage disposal stopped working?

10          A.   No, I don't.

11          Q.   Okay.  Do you know which one they replaced

12     it with?

13          A.   I don't.

14          Q.   All right.  And do you have any

15     documentation, in terms of costs, associated with

16     the replacement?

17          A.   No.

18          Q.   And so the $150 amount is just a guess?

19          A.   It is.

20          Q.   All right.  Number 9 is washer and dryer

21     combo.  Do you see that?

22          A.   I do.

23          Q.   And you had that they malfunctioned?

24          A.   Yes.

25          Q.   Same question.  Malfunctioned prior
```

```
1    to 2013?
2         A.   Yes.
3         Q.   Do you know what the malfunction was?
4         A.   I do not.
5         Q.   Do you know what the cause of the
6    malfunction was?
7         A.   I do not.
8         Q.   Do you -- and do you know what type of
9    washer and dryer it was?
10        A.   I don't know what brand it was, no.
11        Q.   Okay.  Do you know what brand they
12   replaced it with?
13        A.   I don't.
14        Q.   All right.  And the $1300 amount, do you
15   have any cost documentation to support that number?
16        A.   No.
17        Q.   Okay.  That's just your guess?
18        A.   That's a guess.
19        Q.   All right.  The next one is the
20   refrigerator?
21        A.   Yes.
22        Q.   When did it malfunction?
23        A.   I don't know.
24        Q.   Prior to 2013?
25        A.   Yes.
```

```
 1        Q.   Okay.  And do you know what kind of
 2   refrigerator it was?
 3        A.   I don't.
 4        Q.   Do you know what the cause of the
 5   malfunction was?
 6        A.   I don't.
 7        Q.   What was the malfunction?
 8        A.   I don't know.
 9        Q.   How do you know it was malfunctioning?
10        A.   They had to buy a new one; I remember them
11   saying that.  They didn't -- they didn't know why
12   all this stuff was happening.
13        Q.   All right.  And do you know what kind of
14   refrigerator they replaced it with?
15        A.   I don't.
16        Q.   Okay.  And do you have any cost
17   information that can be provided, in terms of the
18   costs of replacing the refrigerator?
19        A.   I do not.
20        Q.   So the 1500 number is just a guess?
21        A.   Yes.
22        Q.   All right.  In terms of appliances that
23   were malfunctioning prior to 2013, when were you
24   made aware that they were malfunctioning?
25        A.   I'm sure she -- I mean, she would mention
```

```
 1    it if she had to replace something or something was
 2    wrong.  They were getting a little bit -- just
 3    wondering what was going on.  The air conditioner
 4    unit was new when they moved in.  They shouldn't
 5    have had the problems they had with it.
 6             Just -- but I don't know any specifics
 7    about -- or I don't remember any specifics about
 8    what was wrong with each one of these things.
 9        Q.   Okay.  Do you know any specifics in terms
10    of the -- did this all occur close in time in
11    proximity?
12        A.   It was over the course of when they lived
13    there.
14        Q.   Okay.  It was in 2006.  You said it was
15    before 2013.  Was it a matter of months that they
16    moved into the property that this occurred?
17        A.   No.
18        Q.   Okay.
19        A.   I wouldn't think so.
20        Q.   Okay.  And was it closer in time to 2013
21    or 2006?
22        A.   I have no way of remembering that.
23        Q.   Okay.  The next item is the facet and
24    showerheads in the two bathrooms?
25        A.   Yes.
```

```
 1           Q.    Okay.  And you have a replacement of 300?

 2           A.    Uh-huh (affirmative response).

 3           Q.    Okay.  Were the facets and showerheads in

 4    the two bathrooms replaced?

 5           A.    I'm not sure if they were or not.

 6           Q.    Okay.  And so what is the basis for the

 7    damage to the facets and showerheads for $300?

 8           A.    Well, just to be replaced, I guess.

 9           Q.    Okay.  And that would have been replaced

10    during the scope of the remediation, to your

11    knowledge?

12           A.    As far as I know, yes.

13           Q.    Was the items actually replaced prior to

14    the foreclosure of the property?

15           A.    No, I don't think so.

16           Q.    Okay.  Did you or your -- did the estate

17    or your mother incur any costs in connection with

18    the facets or the showerheads in the bathrooms?

19           A.    That, I can't answer for sure.

20           Q.    Do you have any information that your

21    mother or the estate did incur any costs associated

22    with the showers -- facets or showerheads in the two

23    bathrooms?

24           A.    Say that, again.

25           Q.    Do you have any information that you can
```

```
 1   provide that the estate or your mother incurred any

 2   costs in with connection with facets and showerheads

 3   in the two bathrooms?

 4        A.   No.

 5        Q.   Okay.  The $300, is that a guess?

 6             Is there any basis for that number?

 7        A.   Just a guess of kind of how much facets

 8   and showerheads cost.

 9        Q.   Okay.  The treadmill, when did the

10   treadmill malfunction?

11        A.   I'm not sure of a specific date.

12        Q.   Okay.  And it was prior to 2013?

13        A.   Yes.

14        Q.   Okay.  How old was the treadmill

15   approximately when it malfunctioned?

16        A.   I'm not sure.  She bought it sometime when

17   she lived there, but I'm not sure of a specific

18   date.

19        Q.   Okay.  Do you have any documentation, in

20   terms of the treadmill that was replaced?

21        A.   No.

22        Q.   Okay.  Was the treadmill replaced?

23        A.   No.

24        Q.   Okay.  Do you have any documentation, in

25   terms of repairs that were attempted on the
```

```
 1    treadmill?
 2         A.   No.
 3         Q.   Okay.  The $1,000 to the treadmill, is
 4    that just a guess?
 5         A.   It is.
 6         Q.   Okay.  Ceiling fans and lights throughout
 7    the house, 600?
 8         A.   Uh-huh (affirmative response).
 9         Q.   Okay.  Were the ceiling fans with lights
10    times six throughout the house, were they ever
11    replaced?
12         A.   My brother replaced some, but I'm not sure
13    how many.  I don't know if he replaced all of them
14    or not.
15         Q.   Okay.  And when were they replaced?
16         A.   I don't know.  I don't know a specific
17    date.
18         Q.   Okay.  Was it prior to 2013?
19         A.   Yes.
20         Q.   Okay.  And your brother, has he provided
21    you with any documentation, in terms of the costs
22    associated with replacing the ceiling fans?
23         A.   No.
24         Q.   Okay.  And you don't know how many he
25    replaced?
```

```
 1        A.    I don't know how many specifically he
 2  replaced, no.
 3        Q.    Okay.  And the $600 number for the
 4  replacement, is that just a guess?
 5        A.    Just a guess, uh-huh (affirmative
 6  response).
 7        Q.    All right.  In terms of all the items that
 8  were replaced in this itemization, does the Estate
 9  of Catherine Barber have any of these items still?
10        A.    Do we have any of these, like the
11  refrigerator or dishwasher, no.
12        Q.    So at the time they were replaced, they
13  were all discarded?
14        A.    Well, obviously, I think the dishwasher
15  was probably at the house.
16              Do you mean the old one or the new one?
17        Q.    The old.
18        A.    No, huh-uh (negative response).
19        Q.    Prior to foreclosure, were any of the
20  items removed from the house?
21        A.    No.  Well, there might have been a -- when
22  you're saying were any of the items, do you mean the
23  old microwave or the new one that was --
24        Q.    Let's take it one at a time.
25        A.    Okay.
```

```
 1        Q.   At the time -- you say you don't know when
 2   they were replaced, but they were replaced prior
 3   to 2013?
 4        A.   Right.
 5        Q.   So those items were replaced by 2013,
 6   right?
 7        A.   As far as I know.
 8        Q.   Okay.  Those items that were replaced,
 9   does the Estate of Catherine Baber have or are you
10   aware where those items are?
11        A.   No.
12        Q.   The items they were replaced with, were
13   any of those items removed prior to the foreclosure
14   in 2017?
15        A.   No.
16        Q.   Okay.  Were any items removed from the
17   house prior to the foreclosure in 2017?
18        A.   There wasn't anything left in there.
19             I mean, you mean personal items or
20   anything?
21        Q.   Yes, anything.
22             Did -- are you aware of whether your
23   mother or yourself or anyone on behalf of the estate
24   removed any items prior to 2017?
25        A.   I'm not aware.
```

```
 1          Q.    All right.   The estimate for
 2     remediation, 102,000; do you see that?
 3          A.    Yes.
 4          Q.    Okay.   What is the basis of that number?
 5          A.    Off of that report, the report, the
 6     remediation report.
 7          Q.    Is that the same report we discussed
 8     earlier?
 9          A.    Yes.
10          Q.    That we don't have in front of us today,
11     right?
12          A.    Right.
13               MR. DYSART:   Would you like to take a
14     quick five-minute break and I'll go through my
15     notes.
16               (Off the record at 12:23 p.m.)
17               (On the record at 12:30 p.m.)
18          Q.    (By Mr. Dysart)   Exhibit 4, the Plaintiff
19     Fact Sheet that we were talking about.   There's a
20     verification on January 20th of 2019?
21          A.    Uh-huh (affirmative response).
22          Q.    Since that time, is there any other
23     information that you've become aware of in
24     connection with this case?
25          A.    Not that I'm aware of.
```

```
1         Q.   Have you received any other documentation
2    that you've provided or can provide in connection
3    with this case?
4         A.   Not that I'm aware of.
5         Q.   Okay.  Other than the remediation estimate
6    that we discussed that you think you may have
7    produced in this case, is there any other documents
8    that you haven't gone over here today?
9         A.   Not that I'm aware of.
10        Q.   Okay.  Have you provided, in connection
11   with this case, the documents regarding your
12   appointment as executrix of the estate of
13   Mrs. Baber?
14        A.   I think I said earlier I'm pretty sure I
15   did, but I'm not -- I'm not -- I can't say a
16   hundred percent.
17        Q.   All right.  And have you produced the
18   documents regarding the estate of your father,
19   Charles Baber?
20        A.   Not that I'm aware of.  I don't think so.
21        Q.   Okay.  And have you completed a
22   Supplemental Plaintiff Profile Form in connection
23   with this case?
24        A.   I'm not sure what that is.
25        Q.   Okay.  Are you aware that in connection
```

```
 1    with this matter, that plaintiffs were obligated to
 2    complete a Supplemental Plaintiff Profile Form?
 3         A.    What does it look like?
 4         Q.    I don't have one in front of me.  I have
 5    the report and the registration form.
 6               Are you aware of whether you completed a
 7    Supplemental Plaintiff Profile Form?
 8         A.    Well, it sounds -- the name sounds
 9    familiar, but if you can't show it to me, I can't
10    say for sure.
11         Q.    And I'm just -- I'm just -- I don't have
12    one in --
13         A.    Well, I know.  I'm just saying.  I mean...
14         Q.    Okay.  Do you have any personal knowledge
15    in regards to when your mother first learned about
16    Chinese drywall on the property?
17         A.    I'm not -- I'm not sure when that was.
18         Q.    Okay.  Do you know -- do you know if
19    anyone else does?
20         A.    Not that I'm aware of.
21         Q.    Okay.  Do you have any information or
22    knowledge, other than the inspection report, in
23    terms of blackening of fixtures or electrical in the
24    property?
25         A.    What do you mean by "blackening"?
```

```
 1        Q.   Yeah.

 2        A.   No, I'm not aware.

 3        Q.   All right.  And of the estate of

 4   Mrs. Baber, do you receive any documents regarding

 5   the foreclosure?

 6        A.   No, I haven't.

 7        Q.   Okay.  Were you aware -- have you -- as

 8   the executrix of her estate, were you aware of any

 9   tax liens that Mrs. Baber was subject to?

10        A.   I'm not aware.

11        Q.   Okay.  When your father passed away

12   in 2015, did the ornamental iron continue operating?

13        A.   No.  It had not been operating before he

14   passed away.

15        Q.   Okay.  When -- when did it stop operating?

16        A.   I have no idea.

17        Q.   Okay.  You had indicated he was sick.  Did

18   it stop because of his illness?

19        A.   Yes.

20        Q.   Okay.  And was that prior to 2013, when

21   they moved to Hidden Valley?

22        A.   I don't think so.  It might have been

23   after that, but I can't say for sure.

24        Q.   Okay.  And what was your father's illness?

25        A.   He had lung cancer.
```

```
 1    mother by the property, in terms of why it was going
 2    into foreclosure?
 3          A.   Say that, again.
 4          Q.   Yeah.
 5               Do you know that your mom -- the property
 6    was going to go into foreclosure in 2017?
 7          A.   Did I know when it was going?
 8          Q.   Yes.  Did you know prior to the
 9    foreclosure?
10          A.   I don't think so, but I don't know
11    specifically when she told me.
12          Q.   Okay.  And did she indicate to you why
13    she -- why the property was going into foreclosure?
14    Why she wasn't going to keep it and sell it?
15          A.   Well, she was on a fixed income and she
16    wasn't going to be able to rent it or sell it.
17          Q.   Okay.  When you talked about the rental
18    before, that was based on your mother's statements,
19    right?
20               MR. DOYLE:  Object to the form of the
21    question.
22               You can answer.
23               THE WITNESS:  Say that, again.
24          Q.   (By Mr. Dysart)  You're not -- are you
25    aware -- strike that.
```

```
 1              Are you aware of any rental agreements
 2     that were canceled in connection with 121 Country
 3     Club Drive?
 4              MR. DOYLE:  Object to the form of the
 5     question.
 6              You can answer.
 7              THE WITNESS:  I'm not aware of any.
 8        Q.   (By Mr. Dysart)  Are you aware of whether
 9     your mother ever listed it for rent?
10        A.   I'm not aware.
11        Q.   Are you aware if your mother ever tried to
12     rent the property?
13        A.   I'm not sure what went on with that.
14        Q.   Okay.  So your statement that the property
15     was foreclosed on was just based on what your mother
16     had indicated to you?
17        A.   What statement on foreclosure?
18        Q.   That she wouldn't be able to keep up her
19     payments without renting the property.
20        A.   Yes.
21        Q.   Okay.  And do you have any other
22     information otherwise to support that?
23        A.   To support what?
24        Q.   That she was unable to rent the property?
25        A.   No.
```