This check represents payment for the amount due to you from the Chinese Drywall Settlement Program for your Global, Banner, InEx Repair and Relocation Expenses claim. If you are represented by an attorney, your attorney is not permitted to deduct any fees or costs from this check. By signing and depositing this check you agree to the terms of the release on the back of this check and contained in the Chinese Drywall Settlement Agreements. To review the Settlement Agreements and Allocation Agreements, please visit https://www3.browngreer.com/drywall.

**Chinese Drywall Settlement Program**
Chinese Drywall Settlement Administrator
P.O. Box 25401
Richmond, VA  23260

Esquire Bank
New York, NY

**62914**

**12/12/14**

**PAY:**  Four Thousand Three Hundred Twenty Nine Dollars And 99/100

**AMOUNT:** $4,329.99

**TO THE**
**ORDER OF:**  Andrew Williams
101347-6118
NO FEES OR COSTS TO BE DEDUCTED OR CHARGED BY ATTORNEY

*Lynn C. Greer*

**VOID AFTER  90 Days**

||; 62914||;  |: 026073066     |:     1012002638  ||;

**Chinese Drywall Settlement Program**
Chinese Drywall Settlement Administrator
P.O. Box 25401
Richmond, VA  23260

Podhurst Orseck, P.A.
25 W. Flagler St. Suite 800
Miami, FL 33130

EXHIBIT
C

This check represents payment for the amount due to you from the Chinese Drywall Settlement Program for your Global, Banner, InEx Repair and Relocation Expenses claim.  If you are represented by an attorney, your attorney is not permitted to deduct any fees or costs from this check.  By signing and depositing this check you agree to the terms of the release on the back of this check and contained in the Chinese Drywall Settlement Agreements.  To review the Settlement Agreements and Allocation Agreements, please visit https://www3.browngreer.com/drywall.

**Chinese Drywall Settlement Program**
Chinese Drywall Settlement Administrator
P.O. Box 25401
Richmond, VA  23260

Esquire Bank
New York, NY

**11548**

**12/12/14**

**PAY:**   Six Thousand Three Hundred Thirty Five Dollars And 01/100

**AMOUNT:** $6,335.01

**TO THE**
**ORDER OF:**  Andrew Williams
101347-6118
NO FEES OR COSTS TO BE DEDUCTED OR CHARGED BY ATTORNEY

*Lynn C. Greer*

**VOID AFTER  90 Days**

||; 11548||;  |: 026073066    |:    1012002604  ||;

**Chinese Drywall Settlement Program**
Chinese Drywall Settlement Administrator
P.O. Box 25401
Richmond, VA  23260

Podhurst Orseck, P.A.
25 W. Flagler St. Suite 800
Miami, FL 33130

# CHINESE DRYWALL SETTLEMENT PROGRAM
## MDL 2047

## GLOBAL, BANNER, INEX REPAIR AND RELOCATION EXPENSES CLAIM ELIGIBILITY NOTICE
### DATE OF NOTICE: 2/5/14
### DEADLINE TO APPEAL: 3/7/14

## I. CLAIMANT AND CLAIM INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| **Claimant Name** | Last<br>Williams | | First<br>Andrew | | Middle |
| **Representative Claimant Name** | Last | | First | | Middle |
| **Claimant ID** | 101347 | | **Claim ID** | | 6118 |
| **Law Firm** | Podhurst Orseck, P.A. | | **Affected Property ID** | | 2764 |
| **Affected Property Address** | Street<br>4531 SW Darwin Blvd | | | | Unit |
| | City<br>Port St Lucie | | State<br>FL | | Zip code<br>34953 |

## II. ELIGIBILITY DETERMINATION

This is an official Notice from the Settlement Administrator for the Chinese Drywall Settlement Program and relates to the claim identified in Section I. We reviewed your claim and determined that you are eligible for compensation for the Global, Banner, InEx Repair and Relocation Expenses Claim you submitted. The table below shows both the information you provided and the information that we confirmed.

Settlement Funds will be distributed on a pro-rata basis. To determine Compensation Amounts, we will divide the total square footage of all eligible claims by the total applicable Settlement Amounts to determine a per square foot Compensation Amount. For example, if the Settlement Amount is $10,000,000, and the total square footage of all eligible properties is 2,000,000 square feet, the amount available for each property is $5.00 per square foot ($10,000,000 divided by 2,000,000 square feet). We will then multiply the per square foot amount by the confirmed Under Air Square Footage listed in Row 1 to calculate your Compensation Amount. We cannot perform these calculations until all claims have been reviewed and we know the total square footage of all eligible properties. The square footage multiplier will be announced as soon as it is available.

| | CATEGORY | CLAIM FORM INFORMATION (WHAT YOU TOLD US) | CONFIRMED ELIGIBILITY INFORMATION (WHAT WE DETERMINED) |
|---|---|---|---|
| **1.** | **Under Air Square Footage** | 2817 | 2133 |
| **2.** | **Builder** | Diamond Court Construction Company | Diamond Court Construction Company |
| **3.** | **Supplier** | Banner | Banner |
| **4.** | **Installer** | Banner Homes of Florida, Inc. | Not Eligible |

## III. YOUR OPTIONS AFTER THIS NOTICE



If you agree with the information we confirmed, log in to the Chinese Drywall portal to accept our determinations.  If you disagree with our determination, you may file an Appeal.  The Appeal deadline is 30 days after the date of this Notice.  If you wish to file an Appeal, you must complete the Notice of Appeal by using the Chinese Drywall Settlement Program Online Portal at **https://www3.browngreer.com/drywall**.  If you do not have online access, you may submit the Notice of Appeal form attached to this Notice.  Follow the instructions on the Portal or on the form to submit the Notice of Appeal.

## IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

We are available to help you if you have questions or need assistance. If you have any questions about this Notice, the status of your claim(s), or just need help, contact us by phone at (866) 866-1729 or by email to **CDWQuestions@browngreer.com**.

## V. HOW TO RESPOND TO THIS NOTICE

| | |
|---|---|
| **By using our Online Portal** | Visit **https://www3.browngreer.com/drywall** to file an Appeal and upload documents. |
| **By Mail**<br>(Postmarked no later than your  submission deadline) | Chinese Drywall Settlement Administrator<br>P.O. Box 25401<br>Richmond, Virginia 23260 |
| **By Overnight, Certified or Registered Mail**<br>(Postmarked no later than your submission deadline) | BrownGreer, PLC<br>Chinese Drywall Settlement Administrator<br>250 Rocketts Way<br>Richmond, Virginia 23231 |
| **By Facsimile**<br>(Sent no later than 12:00 midnight local time on your submission deadline) | (804) 521-7299 |
| **By Email**<br>(Sent no later than 12:00 midnight local time on your submission deadline) | **CDWQuestions@browngreer.com** |

Claimant ID: 101347

Claim ID: 6118

# CHINESE DRYWALL SETTLEMENT PROGRAM

## MDL 2047

## NOTICE OF APPEAL

### I. CLAIMANT AND CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claimant Name** | Last<br>Williams | First<br>Andrew | Middle |
| **Representative Claimant Name** | Last | First | Middle |
| **Claimant ID** | 101347 | **Claim ID** | 6118 |
| **Claim Type** | Global, Banner, InEx Repair and Relocation Expenses | **Affected Property ID** | 2764 |
| **Affected Property Address** | Street<br>4531 SW Darwin Blvd | | Unit |
| | City<br>Port St Lucie | State<br>FL | Zip code<br>34953 |
| **Law Firm** | Podhurst Orseck, P.A. | | |

### II. BASIS OF APPEAL

Use the space below to provide information regarding the basis of your Appeal. If necessary, this information will be transmitted to the Special Master, along with all documents related to your claim. The Special Master will review your Appeal and will notify you once a determination has been made. You must attach all documents that support your Appeal if you have not already submitted them. You may attach additional sheets as necessary.



## III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

We are available to help you if you have questions or need assistance. If you have any questions about this Notice or the status of your claim(s) or need help, contact the Settlement Administrator's Office at (866) 866-1729 or send an email to **CDWQuestions@browngreer.com**.

## IV. HOW TO SUBMIT THIS NOTICE

| | |
|---|---|
| **By Online Portal**<br>(Submitted no later than 12:00 midnight local time on your submission deadline) | Visit **https://www3.browngreer.com/drywall** to upload required documents. |
| **By Mail**<br>(Postmarked no later than your submission deadline) | Chinese Drywall Settlement Administrator<br>P.O. Box 25401<br>Richmond, Virginia 23260 |
| **By Overnight, Certified or Registered Mail**<br>(Postmarked no later than your submission deadline) | BrownGreer, PLC<br>Chinese Drywall Settlement Administrator<br>250 Rocketts Way<br>Richmond, Virginia 23231 |
| **By Facsimile**<br>(Sent no later than 12:00 midnight local time on your submission deadline) | (804) 521-7299 |
| **By Email**<br>(Sent no later than 12:00 midnight local time on your submission deadline) | **CDWQuestions@browngreer.com** |

Claimant ID: 101347

Claim ID: 6118

















## PROPERTY RECORD CARD

Andrew Williams    Record: 1 of 1          <<Prev    Next >>    Spec.Assmnt    Taxes    Exemptions Permits Home Print

**Property Identification**

| | | | |
|---|---|---|---|
| Site Address: | 4565 SW Athena Dr | ParcelID: | 3420-665-1854-000-0 |
| Sec/Town/Range: | 33 :37S :40E | Account #: | 90205 |
| Map ID: | 44/33S | Use Type: | SF Res |
| Zoning: | RS-2 | City/Cnty: | Port St Lucie |



**Ownership and Mailing**

Owner:          Andrew Williams
Address:         3841 NW 6th Ct
                 Fort Lauderdale FL 33311

**Legal Description**

PORT ST LUCIE-SECTION 34- BLK 2397 LOT 3 (MAP 44/33S) (OR 2294-1408)

**Sales Information**

| Date | Price | Code | Deed | Book/Page |
|---|---|---|---|---|
| 7/5/2005 | 80000 | 00 | WD | 2294 / 1408 |
| 5/18/2005 | 0 | 01 | OA | 2256 / 1202 |
| 12/1/1986 | 5300 | 00 | CV | 0524 / 0383 |

**Assessment 2012**

| | |
|---|---|
| 2012 Final: | 7700 |
| Assessed: | 7700 |
| Ag.Credit: | 0 |
| Exempt: | |
| Taxable: | |
| Taxes: | 189.13 |

**Total Land and Building**

| | |
|---|---|
| Land Value: | 7700 Acres: 0.24 |
| Building Value: | 0 |
| Finished Area: | 2451 SqFt |

## BUILDING INFORMATION





07/25/2012

**Exterior Features**

| | | | | | |
|---|---|---|---|---|---|
| View: | - | RoofCover: | SD - Dim Shingle | RoofStruct: | HP - Hip |
| ExtType: | HB - HB | YearBlt: | 2006 | Frame: | - |
| Grade: | B - B | EffYrBlt: | 2006 | PrimeWall: | BS - CB Stucco |
| StoryHght: | 0010 - 1 Story | No.Units: | 1 | SecWall: | - |

**Interior Features**

| | | | | | |
|---|---|---|---|---|---|
| BedRooms: | 4 | Electric: | MX - MAXIMUM | PrmIntWall: | DW - Drywall |
| FullBath: | 3 | HeatType: | FHA - FrcdHotAir | AvgHt/Fl: | |
| 1/2Bath: | 0 | HeatFuel: | ELEC - Electric | Prm.Flors: | CU - Carpet |
| %A/C: | 100 | %Heated: | 100 | %Sprinkled: | 0 |

**Special Features and Yard Items**

| Type | Y/S | Qty. | Units | Qual. | Cond. | YrBlt. |
|---|---|---|---|---|---|---|
| DWC - Driv-Concret | Y | 1 | 720 | AV | AV | 2006 |

**Land Information**

| No. Use Type | | Type | Measure | Depth |
|---|---|---|---|---|
| 1 | 0100-SF Res | BI -Front Ft | 85 | 125 |

THIS INFORMATION IS BELIEVED TO BE CORRECT AT THIS TIME BUT IT IS SUBJECT TO CHANGE AND IS NOT WARRANTED.

## PROPERTY RECORD CARD

**Andrew Williams**   Record: 1 of 1          <<Prev    Next >>    Spec.Assmnt    Taxes    Exemptions Permits Home Print

**Property Identification**

| | | | |
|---|---|---|---|
| Site Address: | 4531 SW Darwin Blvd | ParcelID: | 3420-665-1643-000-8 |
| Sec/Town/Range: | 32 :37S :40E | Account #: | 90001 |
| Map ID: | 44/32S | Use Type: | SF Res |
| Zoning: | RS-2 | City/Cnty: | Port St Lucie |



**Ownership and Mailing**

Owner:     Andrew Williams
Address:     4531 SW Darwin Blvd
         Port St Lucie FL 34953-6046

**Legal Description**

PORT ST LUCIE-SECTION 34- BLK 2391 LOT 11 (MAP 44/32S) (OR 2294-1391)

**Sales Information**

| Date | Price | Code | Deed | Book/Page |
|---|---|---|---|---|
| 7/1/2005 | 84000 | 00 | WD | 2294 / 1391 |
| 7/20/1989 | 7000 | 05 | WD | 0646 / 2079 |
| 7/20/1989 | 5700 | 05 | WD | 0646 / 2078 |
| 1/27/1989 | 5700 | 05 | WD | 0622 / 0148 |
| 10/28/1988 | 4500 | 05 | WD | 0611 / 1013 |
| 10/1/1984 | 5000 | 00 | CV | 0448 / 1310 |

**Assessment 2012**

| | |
|---|---|
| 2012 Final: | 7200 |
| Assessed: | 7200 |
| Ag.Credit: | 0 |
| Exempt: | |
| Taxable: | |
| Taxes: | 176.87 |

**Total Land and Building**

| | |
|---|---|
| Land Value: | 7200 Acres: 0.23 |
| Building Value: | 0 |
| Finished Area: | 2374 SqFt |

## BUILDING INFORMATION





**Exterior Features**

| | | | | | |
|---|---|---|---|---|---|
| View: | - | RoofCover: | SD - Dim Shingle | RoofStruct: | HP - Hip |
| ExtType: | HB - HB | YearBlt: | 2006 | Frame: | - |
| Grade: | B - B | EffYrBlt: | 2006 | PrimeWall: | BS - CB Stucco |
| StoryHght: | 0010 - 1 Story | No.Units: | 1 | SecWall: | - |

**Interior Features**

| | | | | | |
|---|---|---|---|---|---|
| BedRooms: | 3 | Electric: | MX - MAXIMUM | PrmIntWall: | DW - Drywall |
| FullBath: | 2 | HeatType: | FHA - FrcdHotAir | AvgHt/Fl: | - |
| 1/2Bath: | 1 | HeatFuel: | ELEC - Electric | Prm.Flors: | CU - Carpet |
| %A/C: | 100 | %Heated: | 100 | %Sprinkled: | 0 |

**Special Features and Yard Items**

| Type | Y/S | Qty. | Units | Qual. | Cond. | YrBlt. |
|---|---|---|---|---|---|---|
| DWC = Driv-Concret | Y | 1 | 720 | AV | AV | 2006 |

**Land Information**

| No. | Use Type | Type | Measure | Depth |
|---|---|---|---|---|
| 1 | 0100-SF Res | BI -Front Ft | 80 | 125 |

THIS INFORMATION IS BELIEVED TO BE CORRECT AT THIS TIME BUT IT IS SUBJECT TO CHANGE AND IS NOT WARRANTED.

Case 1:09-md-02047-EEF-MBN Document 22447-4 Filed 01/06/20 Page 17 of 375

PREPARED BY:

Name: **Neermala Mukhtar**

Address: **HARBOR FEDERAL SAVINGS BANK**
**P.O. BOX 249**
**FORT PIERCE, FL 34954-0249**

Return to:
**FIRST AMERICAN TITLE**
**201 SW PORT ST. LUCIE BLVD., SUITE 205**
**PORT ST. LUCIE, FL 34984**

[Space Above This Line For Recording Data]

**5024374448**

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated **July 06, 2005** (together with all Riders to this document.

(B)  "Borrower" is **ANDREW WILLIAMS, A SINGLE ADULT**

Borrower is the mortgagor under this Security Instrument.

(C)  "Lender" is **HARBOR FEDERAL SAVINGS BANK**. Lender is a **Savings Bank** organized and existing under the laws of **the United States of America**. Lender's address is **P.O. BOX 249, FORT PIERCE, FL 34954-0249**

. Lender is the mortgagee under this Security Instrument.

(D)  "Note" means the promissory note signed by Borrower and dated **July 06, 2005**. The Note states that Borrower owes Lender **Two Hundred Sixty Two Thousand Two Hundred and no/100**

Dollars (U.S. $**262,200.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 01, 2036**.

(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010 1/01

ITEM 1616L1 (0011)                    *(Page 1 of 11 pages)*

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

(H) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Escrow Items"** means those items that are described in Section 3.

(L) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

<table>
<tr><td align="center">**County**<br>[Type of Recording Jurisdiction]</td><td align="center">of</td><td align="center">**ST LUCIE**<br>[Name of Recording Jurisdiction]</td><td>:</td></tr>
</table>



LOT 11, BLOCK 2391 OF PORT ST. LUCIE SECTION THIRTY FOUR, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 15, PAGE(S) 9, 9A TO 9W OF THE PUBLIC RECORDS OF ST. LUCIE COUNTY, FLORIDA.



<table>
<tr><td>which currently has the address of</td><td align="center">4531 SW DARWIN BLVD<br>[Street]</td></tr>
<tr><td align="center">PORT ST LUCIE<br>[City]</td><td align="center">, Florida</td><td align="center">34953<br>[Zip Code]</td><td>("Property Address"):</td></tr>
</table>

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1616L2 (0011)

*(Page 2 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L3 (0011)

*(Page 3 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may

require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1616L5 (0011)

*(Page 5 of 11 pages)*

**Form 3010 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)   Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.   **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1616L7 (0011)

*(Page 7 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

FLORIDA—Single Family—Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

ITEM 1815L9 (0011)

(Page 8 of 11 pages)

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1616L9 (0011)

*(Page 9 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

7-6-05

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ANDREW WILLIAMS          -Borrower
3841 NW 6TH CT
FORT LAUDERDALE, FL 33311

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Signed, sealed and delivered in the presence of:

_____
Debra A. Duke

_____
JEAN GRUBB

State of Florida
County of St Lucie

The foregoing instrument was acknowledged before me this 6th day of July 2005 by
Andrew Williams
who is personally known to me or who has produced dri lic
as identification.

DEBRA A. DUKE
Notary Public - State of Florida
My Commission Expires Apr 21, 2007
Commission # DD 204617
Bonded By National Notary Assn.

_____
Notary Public

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

ITEM 1816L11 (0011)                    (Page 11 of 11 pages)

# FIXED/ADJUSTABLE RATE RIDER
(One-Year Treasury Index—Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **6th** day of **July 2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **HARBOR FEDERAL SAVINGS BANK**

("Lender") of the same date and covering the property described in the Security Instrument and located at:
**4531 SW DARWIN BLVD
PORT ST LUCIE, FL 34953**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of **6.0000**%. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A)   Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **August 2010** , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B)   The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Three and One Quarter** percentage points ( **3.2500**%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER—ONE-YEAR TREASURY INDEX—Single Family—Fannie Mae Uniform Instrument**

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

ITEM 5745L1 (0011)                                     *(Page 1 of 3 pages)*

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.0000 %** or less than **4.0000 %**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest will never be greater than **11.0000 %**.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.   Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.   When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Fixed/Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
                              -Borrower                                  -Borrower
ANDREW WILLIAMS

7-6-05

_____ (Seal)    _____ (Seal)
                              -Borrower                                  -Borrower

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

ITEM 5745L3 (0011)                    (Page 3 of 3 pages)



Prepared by
Debra Duke, an employee of
First American Title Insurance Company
201 S.W. Port St. Lucie Blvd., Suite 205
Port St. Lucie, Florida 34984
(772) 878-9700

Return to: Grantee

File No.: 1081-879792

**WARRANTY DEED**

Made this _Jorc_ 15th _ of 2005_ by and between

**Raymond A. Anderson and Debra K. Anderson, husband and wife**

whose address is: **6081 Beaconwood Road, Lake Worth, FL 33467**
hereinafter called the "grantor", to

**Andrew Williams** an unmarried adult

whose post office address is: **3841 NW 6th Court, Ft. Lauderdale, FL 33311**
hereinafter called the "grantee":
(Which terms "Grantor" and "Grantee" shall include singular or plural, corporation or individual, and either sex, and shall include heirs, legal representatives, successors and/assigns of the same)

**Witnesseth,** that the grantor, for and in consideration of the sum of Ten Dollars, ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, releases, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee, all that certain land situate in **St. Lucie** County, **Florida,** to-wit:

Lot 11, Block 2391 of PORT ST. LUCIE SECTION THIRTY FOUR, according to the plat thereof as recorded in Plat Book 15, Page(s) 9, 9A to 9W of the Public Records of St. Lucie County, Florida.

Parcel Identification Number: **3420-665-1643-000/8**

**The land** is not the homestead of the Grantor under the laws and constitution of the State of Florida and neither the Grantor nor any person(s) for whose support the Grantor is responsible reside on or adjacent to the land.

**Subject to** all reservations, covenants, conditions, restrictions and easements of record and to all applicable zoning ordinances and/or restrictions imposed by governmental authorities, if any.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in any way appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances except taxes accruing subsequent to December 31st of 2004.

**In Witness Whereof,** the grantor has hereunto set their hand(s) and seal(s) the day and year first above written.

_____
Raymond A. Anderson

_____
Debra K. Anderson

Signed, sealed and delivered in the presence of these witnesses:

_____
Witness Signature

Print Name: _MARIA ALAMO_

State of _Florida_

County of _Palm Beach_

_____
Witness Signature

Print Name: _LAKSHMEE ALLI_

**The Foregoing Instrument was Acknowledged** before me on _July 1st 2005_, by **Raymond A. Anderson and Debra K. Anderson, husband and wife**  who is/are personally known to me or who has/have produced _Florida drivers licenses_ as identification.

_____
NOTARY PUBLIC

_Staci Morales-Fuchs_
Notary Print Name
My Commission Expires: _June 14, 2009_

| 3. SIGNATURE |
| --- |

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Registration Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Registration Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

By submitting this Registration Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my Registration Form.

| Signature: | _Andrew Williams_ | Date: | _____/_____/_____ (Month/Day/Year) |
| --- | --- | --- | --- |
| Printed Name: | First _Andrew_ | Last _Williams_ | M.I. |

4



# DIAMOND COURT
# HOMES INC.



Ron Brodsky
REALTOR®

**All Professional**

149 SW Port St. Lucie Blvd
Port St. Lucie, Florida 34984
**Business (772) 873-1121**
Fax (772) 873-0121
Toll Free (888) 879-2121
Cell (772) 360-5520
E-Mail Ron.Brodsky@century21.com
*Each Office Is Independently Owned And Operated*

## Model Center (772) 871-7700

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School





**DIAMOND COURT
HOMES, INC.**

## LUXURY PACKAGE
### Price List

| MODEL | TYPE | LIVING SQ FT | TOTAL SQ FT | PRICE |
|---|---|---|---|---|
| **CORAL BAY** | 3/2 | 1708 | 2389 | **$167,900** |
| **CORAL BAY – 4 BEDROOM VERSION** | 4/2 | 2001 | 2685 | **$182,900** |
| **DRUID HILLS – IN FIVE VERSIONS:** | | | | |
| #1 STANDARD | 3/2 | 1915 | 2575 | **$180,900** |
| #2 VERANDA ENTRY ON STANDARD VERSION | 3/2 | + 0 | + 56 | Add $6,000 |
| #3 STUDY | 3+/2 | + 198 | + 198 | Add $7,000 |
| #4 VERANDA ENTRY ON STUDY VERSION | 3+/2 | + 198 | + 282 | Add $14,500 |
| #5 4 BEDROOM /3 BATH | 4/3 | + 252 | + 252 | Add $14,900 |
| **MONARCH MANOR** | 3+/2 | 2133 | 2817 | **$187,500** |
| **COAST POINTE – IN SIX VERSIONS:** | | | | |
| #1 STANDARD - WITH OR WITHOUT ½ BATH ON LANAI VERSION | 3/2.5 | 2166 | 2826 | **$195,900** |
| #2 VERANDA ENTRY ON STANDARD VERSION | 3/2.5 | + 0 | + 48 | Add $6,000 |
| #3 STUDY | 3+/2.5 | + 189 | + 189 | Add $8,000 |
| #4 VERANDA ENTRY ON STUDY VERSION | 3+/2.5 | + 189 | + 274 | Add $14,500 |
| #5 4 BEDROOM /3 ½ BATH | 4/3.5 | + 241 | + 241 | Add $14,900 |
| #6 LARGE UTILITY & GARAGE | | + 32 | + 114 | Add $6,900 |
| **LAKESIDE TERRACE – IN FOUR VERSIONS:** | | | | |
| #1 STANDARD (ELEV. B - ADD $3,000) | 4-5/3 | 2306 | 2996 | **$199,900** |
| #2 BILLIARD / BEDROOM 4 | 4-5/3 | + 123 | + 123 | Add $8,000 |
| #3 BILLIARD / BR 4 WITH BAY WINDOW | 4-5/3 | + 144 | + 144 | Add $13,300 |
| #4 VERANDA ENTRY | 4-5/3 | + 0 | + 120 | Add $10,000 |
| **PALM ISLE - COMING SOON !** | 5/3 | 2339 | 3219 | **$201,900** |
| **GRAND HARBOR POINTE** (OPTIONAL 5 BEDROOM ADD $2,000) | 4-5/3 | 2864 | 3650 | **$244,900** |

Price list reflects Port St. Lucie Prices.  North Martin County Add $10,000.   Remote locations of St. Lucie County Add $3,000.  Prices will be determined for all coastal, rural and otherwise remote locations on an individual basis.  Diamond Court Construction Company reserves the right to accept or deny any area for construction.  See specifications for included features.   The above is subject to errors, omissions, or change of price without notice.  Diamond Court Construction Co. CBC#049065  See Builder for prices on additional upgrades and selections. Effective 06/15/05

**MODEL CENTER**
**(772) 871-7700**
**573 SW Nautical Ave., PSL, FL**
Off Bayshore Blvd., North of Bayshore Elementary School

**CONSTRUCTION OFFICE**
**(772) 337-3070**



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER   (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# CORAL BAY



FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



**CORAL BAY**

4 BEDROOM VERSION

| LIVING | 2001 |
| LANAI | 193 |
| GARAGE | 449 |
| ENTRY | 42 |

TOTAL AREA
2685 SQ FT

4 BEDROOM VERSION

BEDROOM 4
14' X 11'
(8'0" FLAT CEILING)

BEDROOM 3
10'4 X 11'8
(8'0" FLAT CEILING)

LANAI 27'4 x 8'8
(10'0" FLAT CEILING)

NOOK
13' X 9'8
(10'0" FLAT CEILING)

MASTER BDRM
13'4 X 17'
(VAULT TO 10'0" FLAT CEILING)

BEDROOM 3
10'4 X 11'4
(8'0" FLAT CEILING)

LANAI 25'8 x 8'8
(10'0" FLAT CEILING)

NOOK
8'8 X 9'8
(10'0" FLAT CEILING)

MASTER BDRM
13'4 X 17'
(11'0" FLAT CEILING)

FAMILY
17'7 X 18'4
(10'0" FLAT CEILING)

KITCHEN
12'9 X 15'6
(10'0" FLAT CEILING)

BEDROOM 2
11'4 X 11'4
(8'0" FLAT CEILING)

DINING
12'7 X 12'9
(10'0" FLAT CEILING)

MASTER BATH
13'4 X 11'4
(11'0" CEILING)

A/C PAD

A/C

WH

GARAGE
18'8 x 22'

**CORAL BAY**

| LIVING | 1708 |
| LANAI | 190 |
| GARAGE | 449 |
| ENTRY | 42 |

TOTAL AREA
2389 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER    (772) 871-7700

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# DRUID HILLS



STANDARD

VERANDA VERSION

STUDY VERSION

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

**4 BED 3 BATH VERSION**

BEDROOM 4
11'4 X 11'4

## DRUID HILLS

LIVING      1915  SQ. FT.
GARAGE     400  SQ. FT.
LANAI       177  SQ. FT.
ENTRY       40  SQ. FT.

**TOTAL  AREA**
2575 SQ FT

FAMILY ROOM
18'3 X 18'
VAULTED CEILING
(13'6)

BEDROOM 3
11'1 X 13'
FLAT CEILING
(8'0)

LANAI 19'8 X 9

NOOK
11' X 11'9

LIVING
14'4 X 17'
VAULTED CEILING
(13'6)

DW

BEDROOM 2
11'1 X 11'4
FLAT CEILING
(8'0)

DINING
12' X 12'

A/C

WH

MASTER BDRM
13' X 17'
VAULTED
CEILING
(9'4)

GARAGE
18'8 X 19'8

© 1999 Diamond Court Construction Company Inc.

**VERANDA
VERSION**

**STUDY
VERSION**

MASTER
BEDROOM
13' X 17'
Vaulted
Ceiling
(9'4)

FOYER

STUDY
13' X 11'
Tray Ceiling
(10'9" - 11'8')

VERANDA
16' X 6'
CEILING 12'1

1999
INC.

ENTRY

©  1999 Diamond Court Construction Company

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

**MODEL CENTER   (772) 871-7700**

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# MONARCH MANOR



FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



## MONARCH MANOR

| LIVING | 2133 |
|---|---|
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

### TOTAL AREA
#### 2817 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.



*Custom & Model Homes*

## MODEL CENTER     (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# COAST POINTE



STANDARD

STUDY VERSION

OPTIONAL WINDOW
DETAIL

VERANDA VERSION

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



**4 Bed / 3 Bath Version**

### COAST POINTE
STUDY / 4 BED -3 BATH/ VERANDA /
LARGE UTILITY & GARAGE / OMIT 1/2 BATH
VERSION

| | SQ. FT. |
|---|---|
| AREA | |
| LIVING | 2591 |
| GARAGE | 512 |
| ENTRY | 136 |
| LANAI | 204 |

**TOTAL  AREA**

**3444 sq ft**

Dining 12' x 12'

Standard Entry
8' x 6'

MASTER BATH
16' X 16'6

**Standard Entry**

**Veranda Version**

**Increase Lanai Remove 1/2 bath Version**

BEDROOM 4
11'4 x 11'

Family Room
18'3  x 18'

BEDROOM 3
12'5 x 13'4

LANAI
22'8 x 9'

Nook
11' x 11'9

Living
14'4 x 17'

Kitchen 14' X 10' 9'

MASTER BDRM
13'7 x 17'

Dining 12'
x 12'

BEDROOM 2
12'5 x 11'

UTILITY
9'5 x 9'1

MASTER BATH
16' x 16'6

FOYER
6'4 x 6'4

STUDY
13' x 11'

GARAGE
20' x 23'8

Veranda
18' X 6'

**Study Version**

**Veranda Version**

**Large Utility & Garage Version**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
Copyright 1999. All rights reserved. duplication prohibited



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER      (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

## LAKESIDE TERRACE



ELEVATION "A"

ELEVATION "B"

VERANDA ELEVATION

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

**BILLIARD ROOM VERSION**

**BILLIARD ROOM & BAY WINDOW VERSION**

**LAKESIDE TERRACE**

| LIVING | 2306 |
|---|---|
| GARAGE | 417 |
| LANAI | 230 |
| ENTRY | 43 |

**TOTAL AREA 2996 SQ FT**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

**MODEL CENTER        (772) 871-7700**
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# GRAND HARBOR POINTE



FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.

**GRAND HARBOR POINTE**

GRANDROOM STUDY 4BED VERSION

| AREA | SQ. FT. |
|---|---|
| LIVING | 2864 |
| GARAGE | 440 |
| LANAI | 200 |
| VERANDA | 146 |

**TOTAL AREA**
3650 SQ FT

Pool Pump
Pad
48"x84"

BEDROOM 4
11'-00 X 13'-30

2 S Egress

BEDROOM 3
11'-40 X 11'-00

OPTIONAL
5 BEDROOM
12' 6 X 13'3

FAMILYROOM
31' X 18'
Flat Ceiling
(12'-1")

LANAI
22' 4 X 9'
Vaulted / Flat Ceiling
(12'-1")

NOOK
11' X 11'9
Flat Ceiling
(12'-1")

KITCHEN
13'-70 X 13'-100

MASTER BDRM
13'-70 X 18'-10
Coffer Ceiling
(10'-1") 11'-1")

LIVING
14'4 x 22'6
Flat Ceiling
(12'-1")

BEDROOM 2
12'-60 X 12'-00
Flat Ceiling
(9'-1")

DINING
14' X 14'
Flat Ceiling
(12'-1")

LAUNDRY
8'-30 X 5'-30

A/C

A/C

A/C
PAD
480X
960

HW

STUDY
15'-00 X 11'-00
Flat Ceiling
(12'-1")

GARAGE
20'-00 X 19'-70

© 2004 Diamond Court Construction Company Inc.

LANAI
20' X 5'4

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# Standard Luxury Package
## *Features and Specifications*

*Visit our Showroom for a wide variety of selections and customizing options to personalize your home!*

## FEES, SURVEYS & CODE REQUIREMENTS:
♦ All Permits (building & health) and Impact Fees under one acre
♦ Water/sewer connection fees or well to 70' with 3/4 HP pump and septic for a standard 1/4 acre lot
♦ Survey (for a standard 1/4 acre lot)
♦ Compliance with state and local building codes

## EXTERIOR:
♦ *Exterior Structure:*
  * 2500 PSI fibermesh reinforced Concrete & Steel reinforced Monolithic slab with vapor barrier
  * Termite treatment with renewable bond
  * CBS/Concrete Block Structure with double concrete bond beam reinforced with #5 Steel Rebar each course
  * Engineered truss roof system -5/8"CDX plywood roof sheathing
  * 30 YR.. Architectural fungus-resistant asphalt Roof shingles
  * Aluminum vented soffits and Roof vents *
  * Solid Rough Sawn Spruce Fascia
  * Stucco finish Walls, Entry & Lanai ceilings
  * Upgraded Paint
  * Aluminum gutter and down spouts - as required
  * Trussed over Screened Lanai with concrete columns & beams
  * Tiled Entry and concrete stain on Lanai floor
  * Concrete-fibermesh reinforced driveway, walks, pads (1,000 sf)
♦ *Windows & Exterior Doors:*
  * Single hung white aluminum frame Windows, Sliding glass Doors and Screens where applicable, per plan
  * Insulated glass Front Entry Door with brass finish handle
  * Keyless Front Door/Deadbolt Entry System
  * Deadbolts on all Exterior Swing Doors
  * Hurricane Storm Panels
♦ *Landscaping:*
  * Bahia sod (for a standard 1/4 acre lot - 9000 sq.ft.)
  * $800 Landscape allowance including design service

## ELECTRICAL, PLUMBING, INSULATION, & HVAC:
♦ *Electrical:*
  * $1200 Lighting fixture allowance
  * 5 Ceiling fan outlets (single switched)
  * 3 TV and 3 Phone pre-wires
  * 200 Amp Electrical Service
  * Electric door chime and smoke detectors
  * GFI outlets in kitchen, baths, laundry, garage, 2 exterior
♦ *Plumbing:*
  * Seamless copper water lines
  * 2 Exterior hose faucets
  * 50 gallon energy efficient water heater *
♦ *Insulation:*
  * R-30 Insulation in Ceilings *
  * R-10.0 In-wall injected Foam Insulation *
♦ *HVAC:*
  * Return Air in all bedrooms & A/C vents in every room
  * High-efficiency 10-SEER/12-SEER Trane central air conditioning and heating system / per plan *

## INTERIOR:
♦ Architectural features such as plant shelves, arches, niches, columns, vaulted, tray or coffered ceilings, drop soffits with recessed lighting, crown molding, chair rail, per plan
♦ Wood Interior Stud Framing
♦ Choice of Travertine or Carrara Marble Window Sills
♦ Textured Ceilings and Walls
♦ Standard Trim package has 5 1/4" baseboards
♦ Upgraded Paint, semi-gloss in wet areas of Kitchen & Bath
♦ Rocker Switches
♦ Dual level Ventilated Closet Shelving in bedrooms for added storage
♦ *Interior Doors:*
  * Six-panel Passage Doors with Lever Door Hardware
  * Raised-panel Bi-fold Closet Doors
♦ *Floor Covering:*
  * 18x18 Ceramic Tile floors installed on Diagonal in Kitchen, Nook, Laundry, and straight in Baths and Foyer
  * Upgraded stain resistant Berber or Plush carpet

## BATHS:
♦ Cabinets with raised panel Wood Doors
♦ Cultured Marble Vanity tops with 1-1/2" Custom Edge
♦ Full width Mirrors with Beveled Strips
♦ Porcelain/steel tub, Ceramic Tile to ceiling with Decos in hallbath, per plan
♦ Ceramic Tile shower to ceiling with Decos & Listello Border, per plan
♦ Shower enclosure (above std.height in 2 colors)-MasterBath, per plan
♦ Soaker tub in Master Bath, per plan
♦ Elongated toilets (bidets - per plan)
♦ Mirrored medicine cabinets, per plan
♦ Single lever chrome faucets *(mfg.lifetime warranty)*
♦ Choice of upgraded bath Towel Bar accessory sets

## KITCHEN:
♦ Cabinets with raised panel Wood Doors
♦ Upgraded Stainless Steel or Granite Composite Sink - 4 colors
♦ Single lever Cathedral Faucet & spray - 3 finishes *(mfg.l.t. warr.)*
♦ Granite or Corian Level II colors Countertop & Backsplash
♦ Garbage disposal and copper icemaker line
♦ *Upgraded Appliance Package:* - 3 colors
  * Smooth top self-clean Range
  * Over The Range Microwave
  * Dishwasher with deluxe sound insulation & hush motor
  * 26 cf s/s Frig with ice/water in door
  * Elite Kingsize Capacity Washer & Dryer

## GARAGE:
♦ Stucco finish interior
♦ Attic access with pull-down stairs and light
♦ Steel overhead Garage Door
♦ Automatic Garage door opener with two remotes

## WARRANTIES:
♦ Builder's One Year Limited Warranty
♦ 10 Year Structural Warranty

 

Welcome To Diamond Court! Specializing in fine model and custom homes, Diamond Court offers a variety of beautiful and luxurious home plans and custom plan design service. Come see our Coast Pointe model - a Grand Award in the TCBA Parade of Homes!

Our Founder and President, Lance W. Collins, is a State Licensed Building Contractor and a Third Generation Contractor with over 20 years building experience in residential construction. Our reputation for quality construction, personalized service and incredible value are backed by our many satisfied homebuyers.

 

 

## UNIFORM RESIDENTIAL APPRAISAL REPORT

Summary Appraisal Report

**Property Description**

File No. 06190805

| SUBJECT | | | |
|---|---|---|---|
| Property Address 4565 SW Athena Drive | City Port St. Lucie | State FL | Zip Code 34953 |
| Legal Description Port St Lucie Section 34 Block 2397 Lot 3 | | County St. Lucie | |
| Assessor's Parcel No. 3420-665-1854-000-0 | Tax Year 2004 R.E. Taxes $ 600.19 Ln Special Assessments $ None | | |
| Borrower WILLIAMS, Andrew M. | Current Owner BRIGHT, Veronica(Est)-Clearance Occupant: [ ] Owner [ ] Tenant [X] Vacant | | |
| Property rights appraised [X] Fee Simple [ ] Leasehold Project Type [ ] PUD [ ] Condominium (HUD/VA only) HOA$N/A /Mo. | | | |
| Neighborhood or Project Name Port St Lucie Sec 34 | Map Reference 33-37S-40E | Census Tract 0021.04 | |
| Sale Price $ 292,900 Date of Sale 6-05 Insp | Description and $ amount of loan charges/concessions to be paid by seller N/A | | |
| Lender/Client BB&T Mortgage | Address 5600 Bee Ridge Road, Sarasota, FL 34233 | | |
| Appraiser Debra Ryan | Address 4025 SW Kactic Street, Port St. Lucie, FL 34953 | | |

| NEIGHBORHOOD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change | |
| Built up | [ ] Over 75% | [X] 25-75% | [ ] Under 25% | | PRICE $(000) | AGE (yrs) | One family 80 | [X] Not likely | [ ] Likely |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | [X] Owner | 200 Low NEW | | 2-4 family | [ ] In process | |
| Property value | [X] Increasing | [ ] Stable | [ ] Declining | [ ] Tenant | 400 High 40 | | Multi-family | To: | |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [ ] Vacant (0-5%) | Predominant | | Commercial | | |
| Marketing time | [X] Under 3 mos. | [ ] 3-6 mos. | [ ] Over 6 mos. | [ ] Vacant (over 5%) | 270 5 | | Vac. 20 | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: The subject is north of Becker Road, south of Paar Drive, east of Darwin Boulevard, and west of the Florida Turnpike.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): The subject is located in the city of Port St. Lucie. Neighborhood consists of single family detached homes with new construction taking place. Most amenities (school, shopping and other services) are within 1-2 miles. Market values appear increasing with a rapid growth rate.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Most current neighborhood sales report a marketing time of under 3 months. Supply and demand are in balance. Conventional financing is readily available at competitive rates with no unusual concessions. The subject is appraised above the predominant neighborhood price due to the new construction, however, it is not an overimprovement for the neighborhood.

| PUD | |
|---|---|
| Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owner's Association (HOA)? [ ] Yes [ ] No | |
| Approximate total number of units in the subject project N/A    Approximate total number of units for sale in the subject project | |
| Describe common elements and recreational facilities: | |

| SITE | | | | | | |
|---|---|---|---|---|---|---|
| Dimensions 85' x 125' SF+/- (Subject to Survey) Per Public Records | | | | Topography | Mostly Level | |
| Site area 10,625 .24 Acre | | Corner Lot [ ] Yes [X] No | | Size | Typical for the area | |
| Specific zoning classification and description RS-Single Family Residential | | | | Shape | Rectangular | |
| Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning | | | | Drainage | Appears Adequate | |
| Highest & best use as improved: [X] Present use [ ] Other use (explain) | | | | View | Residential | |
| Utilities | Public | Other | Off-site Improvements | Type | Public Private | Landscaping | Typical |
| Electricity | [X] | | Street | Asphalt | [X] | Driveway surface | Concrete |
| Gas | | None | Curb/gutter | None | | Apparent easements | Typical Utility |
| Water | | Well | Sidewalk | None | | FEMA Special Flood Hazard Area [ ] Yes [X] No | |
| Sanitary sewer | | Septic | Street lights | None | | FEMA Zone X   Map Date 8-19-1991 | |
| Storm sewer | | None | Alley | None | | FEMA Map No. 12111C 0405F | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): No apparent easements or encroachments noted. Lot is typical in utility for the area. Sewer and Septic Systems are typical for the area. Site improvements include a screened porch.

| DESCRIPTION OF IMPROVEMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | INSULATION |
| No. of Units | One | Foundation | Conc. Slab | Slab | Yes | Area Sq. Ft. N/A | Roof |
| No. of Stories | One | Exterior Walls | CBS | Crawl Space No | | % Finished N/A | Ceiling R-30 [X] |
| Type (Det./Att.) | Detached | Roof Surface | Asphalt | Basement No | | Ceiling N/A | Walls R-10 [X] |
| Design (Style) | Contemp | Gutters & Dwnspls. | None | Sump Pump No | | Walls N/A | Floor |
| Existing/Proposed | Proposed | Window Type | Alum SH | Dampness None noted | | Floor N/A | None |
| Age (Yrs.) | New | Storm/Screens | Yes-Yes | Settlement None noted | | Outside Entry N/A | Unknown |
| Effective Age (Yrs.) | New | Manufactured House | No | Infestation None noted | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | | Area | Area | 1 | 1 | | | 4 | 3 | Area | | 2,432 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:   7 Rooms;   4 Bedroom(s);   3.0 Bath(s);   2,432 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|
| Floors | CTile-Cpt-New | Refrigerator | P | None | | Fireplace(s) # | | None [ ] | |
| Walls | Drywall-New | Range/Oven | X | Stairs | | Patio | | Garage | 2 # of cars |
| Trim/Finish | Wood-New | Disposal | X | Drop Stair | X | Deck | | Attached | |
| Bath Floor | Tile-New | Dishwasher | X | Scuttle | | Porch Scr | X | Detached | |
| Bath Wainscot | Tile-New | Fan/Hood | X | Floor | | Fence | | Built-In | 2 Car |
| Doors | Glass Entry/New | Microwave | X | Heated | | Pool | | Carport | |
| Panel-New | Sliding-New | Washer/Dryer | P | Finished | X | Cov Entry | X | Driveway | Concrete |

Additional features (special energy efficient items, etc.): Vaulted Ceilings, Screened Porch, Tray Ceilings, Granite Countertops, Upgraded Appliances, Upgraded Cabinets.

Condition of the improvements, depreciation (physical, functional and external), repairs needed, quality of construction, remodeling/additions, etc.: The subject property is a proposed CBS home that has not been started. It is being appraised per builder's specs and floorplan. No functional or external inadequacies were noted.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: No apparent environmental hazards were noted, however, the appraiser is not an expert in this field. This is a summary appraisal report.

Freddie Mac Form 70  6-93                                    PAGE 1 OF 2                                    Fannie Mae Form 1004  6-93

DEBRA RYAN

Powered By appraisal.com

# UNIFORM RESIDENTIAL APPRAISAL REPORT
Summary Appraisal Report

**Property Description**

File No. 06190805

| SUBJECT | | | |
|---|---|---|---|
| Property Address 4565 SW Athena Drive | City Port St. Lucie | State FL | Zip Code 34953 |
| Legal Description Port St Lucie Section 34 Block 2397 Lot 3 | | County St. Lucie | |
| Assessor's Parcel No. 3420-665-1854-000-5 | Tax Year 2004 | R.E. Taxes $ 600.19 | Ln Special Assessments $ None |
| Borrower WILLIAMS, Andrew M. | Current Owner BRIGHT, Veronica(Est)-Clearance Occupant: | X Owner | Tenant X Vacant |
| Property rights appraised X Fee Simple | Leasehold Project Type PUD | Condominium (HUD/VA only) HOA$ N/A | /Mo. |
| Neighborhood or Project Name Port St Lucie Sec 34 | Map Reference 33-37S-40E | Census Tract 0021.04 | |
| Sale Price $ 292,900 Date of Sale 6-05 Insp | Description and $ amount of loan charges/concessions to be paid by seller N/A | | |
| Lender/Client BB&T Mortgage | Address 5600 Bee Ridge Road, Sarasota, FL 34233 | | |
| Appraiser Debra Ryan | Address 4025 SW Kadlic Street, Port St. Lucie, FL 34953 | | |

| NEIGHBORHOOD | | | | | |
|---|---|---|---|---|---|
| Location | Urban X Suburban Rural | Predominant occupancy | Single family housing | Present land use % | Land use change |
| Built up | Over 75% X 25-75% Under 25% | X Owner | PRICE $(000) AGE (yrs) | One family 80 | X Not likely Likely |
| Growth rate | X Rapid Stable Slow | Tenant | 200 Low NEW | 2-4 family | In process |
| Property value | X Increasing Stable Declining | Vacant (0-5%) | 400 High 40 | Multi-family | To: |
| Demand/supply | Shortage X In balance Over supply | X Vacant (over 5%) | Predominant | Commercial | |
| Marketing time | X Under 3 mos. 3-6 mos. Over 6 mos. | | 270 5 | Vac. 20 | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: The subject is north of Becker Road, south of Paar Drive, east of Darwin Boulevard, and west of the Florida Turnpike.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): The subject is located in the city of Port St Lucie. Neighborhood consists of single family detached homes with new construction taking place. Most amenities (school, shopping and other services) are within 1-2 miles. Market values appear increasing with a rapid growth rate.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Most current neighborhood sales report a marketing time of under 3 months. Supply and demand are in balance. Conventional financing is readily available at competitive rates with no unusual concessions. The subject is appraised above the predominant neighborhood price due to the new construction, however, it is not an overimprovement for the neighborhood.

| PUD | |
|---|---|
| Project Information for PUDs (if applicable) - - Is the developer/builder in control of the Home Owner's Association (HOA)? | Yes No |
| Approximate total number of units in the subject project N/A     Approximate total number of units for sale in the subject project | |
| Describe common elements and recreational facilities: | |

| SITE | | | | |
|---|---|---|---|---|
| Dimensions 85' x 125' SF+/- (Subject to Survey) Per Public Records | | Topography | Mostly Level | |
| Site area 10,625 .24 Acre | Corner Lot Yes X No | Size | Typical for the area | |
| Specific zoning classification and description RS-Single Family Residential | | Shape | Rectangular | |
| Zoning compliance X Legal Legal nonconforming (Grandfathered use) Illegal No zoning | | Drainage | Appears Adequate | |
| Highest & best use as improved: X Present use Other use (explain) | | View | Residential | |
| Utilities Public Other | Off-site improvements Type Public Private | Landscaping | Typical | |
| Electricity X | Street Asphalt X | Driveway surface | Concrete | |
| Gas None | Curb/gutter None | Apparent easements | Typical Utility | |
| Water Well | Sidewalk None | FEMA Special Flood Hazard Area | Yes X No | |
| Sanitary sewer Septic | Street lights None | FEMA Zone X | Map Date 8-19-1991 | |
| Storm sewer | Alley None | FEMA Map No. 12111C 0405F | | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): No apparent easements or encroachments noted. Lot is typical in utility for the area. Well and Septic Systems are typical for the area. Site improvements include a paved street.

| DESCRIPTION OF IMPROVEMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION | | | |
| No. of Units One | Foundation Conc. Slab | Slab Yes | Area Sq. Ft. N/A | Roof | | | |
| No. of Stories One | Exterior Walls CBS | Crawl Space No | % Finished N/A | Ceiling R-30 | X | | |
| Type (Det./Att.) Detached | Roof Surface Asphalt | Basement No | Ceiling N/A | Walls R-10 | X | | |
| Design (Style) Contemp | Gutters & Dwnspts. None | Sump Pump No | Walls N/A | Floor | | | |
| Existing/Proposed Proposed | Window Type Alum SH | Dampness None noted | Floor N/A | None | | | |
| Age (Yrs.) New | Storm/Screens Yes-Yes | Settlement None noted | Outside Entry N/A | Unknown | | | |
| Effective Age (Yrs.) New | Manufactured House No | Infestation None noted | | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | Area | Area | Area | 1 | 1 | 1 | | | 4 | Area | | 2,432 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:   7 Rooms;   4 Bedroom(s);   3.0 Bath(s);   2,432 Square Feet of Gross Living Area

| DESCRIPTION OF IMPROVEMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| INTERIOR Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | | AMENITIES | CAR STORAGE: | |
| Floors CTile-Cpt-New | Type FAU | Refrigerator P | None | | Fireplace(s) # | None | |
| Walls Drywall-New | Fuel Electric | Range/Oven X | Stairs | | Patio | Garage 2 # of cars | |
| Trim/Finish Wood-New | Condition New | Disposal X | Drop Stair X | | Deck | Attached | |
| Bath Floor Tile-New | COOLING | Dishwasher X | Scuttle | | Porch Scr X | Detached | |
| Bath Wainscot Tile-New | Central Yes | Fan/Hood X | Floor | | Fence | Built-In 2 Car | |
| Doors Glass Entry/New | Other | Microwave X | Heated | | Pool | Carport | |
| Panel-New | Sliding-New | Condition New | Washer/Dryer P | Finished X | Cov Entry | X | Driveway Concrete |

Additional features (special energy efficient items, etc.): Vaulted Ceilings, Screened Porch, Tray Ceilings, Granite Countertops, Upgraded Appliances, Upgraded Cabinets.

Condition of the improvements, depreciation (physical, functional and external), repairs needed, quality of construction, remodeling/additions, etc.: The subject property is a proposed CBS home that has not been started. it is being appraised per builder's specs and floorplan. No functional or external inadequacies were noted.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: No apparent environmental hazards were noted, however, the appraiser is not an expert in this field. This is a summary appraisal report.

Freddie Mac Form 70  6-93                    PAGE 1 OF 2                    Fannie Mae Form 1004  6-93

DEBRA RYAN

Powered By appraisal.com

Summary Appraisal Report

Valuation Section

File No. 06190805

## COST APPROACH

| | | |
|---|---|---|
| ESTIMATED SITE VALUE .................................... = $ | 80,000 | Comments on Cost Approach (such as, source of cost estimate, |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | site value, square foot calculation and for HUD, VA and FmHA, |
| Dwelling    2,432 Sq. Ft. @ $    80 = $    194,560 | | the estimated remaining economic life of the property): |
| _____ Sq. Ft. @ $ _____ = _____ | | SEE BUILDERS FLOORPLAN FOR CALCULATIONS. |
| Appliances _____ = _____ | 3,000 | ESTIMATED REMAINING LIFE IS 65 YEARS. |
| Garage/Carport    406 Sq. Ft. @ _____ 30 = _____ | 12,180 | |
| Total Estimated Cost New ............. = $    209,740 | | Land Sale: |
| Physical    Functional    External | | 342066512060003 .23 Acre 4-2005 $80,000 |
| Less | | |
| Depreciation | | |
| _____ | _____ = $ | 0 | |
| Depreciated Value of Improvements ................... = $ | 209,740 | |
| "As-is" Value of Site Improvements ................. = $ | 8,000 | |
| INDICATED VALUE BY COST APPROACH ........... = $ | 297,700 | |

## SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4565 SW Athena Drive | 3790 SW Sabatini Street | | 1331 SW Stony Avenue | | 4290 SW Yalta Street | |
| | Port St. Lucie | Port St. Lucie | | Port St. Lucie | | Port St. Lucie | |
| Proximity to Subject | | 2.64 miles NW | | 2.94 miles NW | | 1.69 miles NW | |
| Sales Price | $    292,900 | $    310,000 | | $    268,000 | | $    289,900 | |
| Price/Gross Liv. Area | $    120.44 | $    131.19 | | $    132.48 | | $    133.53 | |
| Data and/or | Inspection | MLS | | MLS | | MLS | |
| Verification Source | Public Records | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing | | Conventional | | Conventional | | Conventional | |
| Concessions | | Loan | | Loan | | Loan | |
| Date of Sale/Time | 6-05 Insp | 5-05 Closed | | 12-04 Closed | 6,000 | 4-05 Closed | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .24 Acre | .23 Acre | Est Eq. | .24 Acre | | .24 Acre | |
| View | Residential | Residential | | Residential | | Resid/Corner | -3,000 |
| Design and Appeal | Contemp | Contemp | | Contemp-Avg | 5,000 | Contemp | |
| Quality of Construction | CBS/Good | CBS/Good | | CBS/Good | | CBS/Good | |
| Age | New | New | | 2 Years | 2,000 | New | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 7    4    3 | 7    4    3 | | 7    4 | | 7    4 | |
| Gross Living Area | 2,432 Sq. Ft. | 2,363 Sq. Ft. | Est Eq. | 2,023 Sq. Ft. | 8,200 | 2,171 Sq. Ft. | 5,200 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Item | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | 2 Car Garage | |
| Porch, Patio, Deck, | Scr Porch | Porch | 2,000 | Scr Patio/Porch | -2,000 | Scr Patio | 1,000 |
| Fireplace(s), etc. | None | None | | None | | None | |
| Fence, Pool, etc. | No Pool | No Pool | | No Pool | | No Pool | |
| Features | Good Features | V.Good Features | -10,000 | Avg Features | 10,000 | Good Features | |
| Net Adj. (total) | | + X - $ | -8,000 | X + - $ | 29,200 | X + - $ | 3,200 |
| Adjusted Sales Price | | -2.58 % Net | | 10.90 % Net | | 1.10 % Net | |
| of Comparable | | 3.87 % Grs $ | 302,000 | 12.39 % Grs $ | 297,200 | 3.17 % Grs $ | 293,100 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): All sales are given equal weight for value determination. Sale 2 is a resale. Sales 1 & 3 are new construction. Adjustments utilized were extracted from paired sales analysis. Sale 2 is a sale six months old, and an adjustment was reflected.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price, and Data | Buying Lot for | 3-2004 $33,000 | 11-2003 $189,900 | 8-2004 $54,900 |
| Source, for prior sales | $80,000. No Prior Sale | 10-2003 $25,000 | 2-2003 $91,000 | 4-2004 $32,000 |
| within year of appraisal | Within 3 Years | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: The subject is new construction. The cost of the lot is $80,000 and is being bought separately. Construction cost of $212,900. Total Sale Price is $292,900.

| | | |
|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH ................................................. $ | 297,000 | |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A    /Mo. x Gross Rent Multiplier N/A    = $ N/A | | |

## RECONCILIATION

This appraisal is made    ☐ "as is"    ☐ subject to repairs, alterations, inspections or conditions listed below    ☒ subject to completion per plans and specifications.
Conditions of Appraisal:   Subject to completion per plans and specs provided. The S P was appraised for "Loan" purposes.
See attached Statement of Limiting Conditions and Appraiser's Certification.
Final Reconciliation:   Most emphasis was placed on the Sales Comparison Approach. The Cost Approach was given supportive consideration. The Income Approach was not considered as homes in this predominantly owner occupied market area are typically not purchased for investment purposes.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  06/93    ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF   June 20, 2005
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $    297,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | | |
|---|---|---|---|
| Signature   Debra Ryan | Signature | ☐ Did | ☐ Did Not |
| Name   Debra Ryan | Name | | Inspect Property |
| Date Report Signed   June 22, 2005 | Date Report Signed | | |
| State Certification #   RD4614    State   FL | State Certification # | | State |
| Or State License #    State | Or State License # | | State |

Freddie Mac Form 70  6-93                          PAGE 2 OF 2                          Fannie Mae Form 1004  6-93

Valuation Section

Summary Appraisal Report

File No.  06190805

Summary Appraisal Report

| COST APPROACH | | |
|---|---|---|
| ESTIMATED SITE VALUE . . . . . . . . . . . . . . . . . . = $ | 80,000 | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | |
| Dwelling    2,432 Sq. Ft. @ $    80 = $ | 194,560 | |
| _____ Sq. Ft. @ $ _____ = | | SEE BUILDERS FLOORPLAN FOR CALCULATIONS. |
| Appliances _____ = | 3,000 | ESTIMATED REMAINING LIFE IS 65 YEARS. |
| Garage/Carport    406 Sq. Ft. @    30 = | 12,180 | |
| Total Estimated Cost New . . . . . . . . . . = $ | 209,740 | Land Sale: |
| Physical   Functional   External | | 342066512060003 .23 Acre 4-2005 $80,000 |
| Less | | |
| Depreciation _____ = $ | 0 | |
| Depreciated Value of Improvements . . . . . . . . . = $ | 209,740 | |
| "As-is" Value of Site Improvements . . . . . . . . . = $ | 8,000 | |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . = $ | 297,700 | |

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address  4565 SW Athena Drive | | 3790 SW Sabatini Street | | 1331 SW Stony Avenue | | 4290 SW Yalta Street | |
| | Port St. Lucie | Port St. Lucie | | Port St. Lucie | | Port St. Lucie | |
| Proximity to Subject | | 2.64 miles NW | | 2.94 miles NW | | 1.69 miles NW | |
| Sales Price | $           292,900 | $           310,000 | | $           268,000 | | $           289,900 | |
| Price/Gross Liv. Area | $      120.44 | $     131.19 | | $      132.48 | | $      133.53 | |
| Data and/or | Inspection | MLS | | MLS | | MLS | |
| Verification Source | Public Records | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + ( ) $ Adjustment | DESCRIPTION | + ( ) $ Adjustment | DESCRIPTION | + ( ) $ Adjustment |
| Sales or Financing | | Conventional | | Conventional | | Conventional | |
| Concessions | | Loan | | Loan | | Loan | |
| Date of Sale/Time | 6-05 Insp | 5-05 Closed | | 12-04 Closed | 6,000 | 4-05 Closed | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .24 Acre | .23 Acre | Est Eq. | .24 Acre | | .24 Acre | |
| View | Residential | Residential | | Residential | | Resid/Corner | -3,000 |
| Design and Appeal | Contemp | Contemp | | Contemp-Avg | 5,000 | Contemp | |
| Quality of Construction | CBS/Good | CBS/Good | | CBS/Good | | CBS/Good | |
| Age | New | New | | 2 Years | 2,000 | New | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total  Bdrms  Baths | Total  Bdrms  Baths | | Total  Bdrms  Baths | | Total  Bdrms  Baths | |
| Room Count | 7      4      3 | 7      4      3 | | 7      4      3 | | 7      4      3 | |
| Gross Living Area | 2,432 Sq. Ft. | 2,363 Sq. Ft. | Est Eq. | 2,023 Sq. Ft. | 8,200 | 2,171 Sq. Ft. | 5,200 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Item | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | 2 Car Garage | |
| Porch, Patio, Deck, | Scr Porch | Porch | 2,000 | Scr Patio/Porch | -2,000 | Scr Patio | 1,000 |
| Fireplace(s), etc. | None | None | | None | | None | |
| Fence, Pool, etc. | No Pool | No Pool | | No Pool | | No Pool | |
| Features | Good Features | V.Good Features | -10,000 | Avg Features | 10,000 | Good Features | |
| Net Adj. (total) | | + X - $ | -8,000 | X + - $ | 29,200 | X + - $ | 3,200 |
| Adjusted Sales Price | | -2.58 % Net | | 10.90 % Net | | 1.10 % Net | |
| of Comparable | | 3.87 % Grs $ | 302,000 | 12.39 % Grs $ | 297,200 | 3.17 % Grs $ | 293,100 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):  All sales are given equal weight for value determination. Sale 2 is a resale. Sales 1 & 3 are new construction. Adjustments utilized were extracted from paired sales analysis. Sale 2 is a sale six months old, and an adjustment was reflected.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price, and Data | Buying Lot for | 3-2004 $33,000 | 11-2003 $189,900 | 8-2004 $54,900 |
| Source, for prior sales | $80,000. No Prior Sale | 10-2003  $25,000 | 2-2003 $31,000 | 4-2004 $32,000 |
| within year of appraisal | Within 3 Years | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:  The subject is new construction. The cost of the lot is $80,000 and is being bought separately. Construction cost of $212,900. Total Sale Price is $292,900.

| INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . | $            297,000 |
|---|---|

INDICATED VALUE BY INCOME APPROACH  (If Applicable) Estimated Market Rent $ N/A _____ /Mo. x Gross Rent Multiplier N/A ____ = $ N/A

This appraisal is made [ ] "as is" [ ] subject to repairs, alterations, inspections or conditions listed below [X] subject to completion per plans and specifications.

Conditions of Appraisal:  Subject to completion per plans and specs provided. The S P was appraised for "Loan" purposes.

See attached Statement of Limiting Conditions and Appraiser's Certification.

Final Reconciliation:  Most emphasis was placed on the Sales Comparison Approach. The Cost Approach was given supportive consideration. The Income Approach was not considered as homes in this predominantly owner occupied market area are typically not purchased for investment purposes.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  06/93 _____ ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF  June 20, 2005 _____
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $            297,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature _Debra Ryan_ | Signature _____ [ ] Did [ ] Did Not |
| Name  Debra Ryan | Name _____ Inspect Property |
| Date Report Signed    June 22, 2005 | Date Report Signed _____ |
| State Certification #    RD4614         State  FL | State Certification # _____ State _____ |
| Or State License # _____ State ___ | Or State License # _____ State _____ |

Statement of Limiting Conditions

Summary Appraisal Report
File #: 06190805

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undo stimulus. Implicit in this definition is the consumation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in the market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantee, express or implied, regarding the determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous waste, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantee or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

DEBRA RYAN

Summary Appraisal Report
File #:  06190805

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undo stimulus.  Implicit in this definition is the consumation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:  (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in the market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantee, express or implied, regarding the determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous waste, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

DEBRA RYAN

## SUBJECT PHOTOGRAPH ADDENDUM

Summary Appraisal Report
06190805

| | | | | | |
|---|---|---|---|---|---|
| Borrower | WILLIAMS, Andrew M. | | | | |
| Property Address | 4565 SW Athena Drive | | | | |
| City | Port St. Lucie | County | St. Lucie | State FL | Zip Code 34953 |
| Lender | BB&T Mortgage | | | | |



FRONT OF
SUBJECT PROPERTY

REAR OF
SUBJECT PROPERTY

STREET SCENE

DEBRA RYAN

**SUBJECT PHOTOGRAPH ADDENDUM**

Summary Appraisal Report

06190805

| | |
|---|---|
| Borrower | WILLIAMS, Andrew M. |
| Property Address | 4565 SW Athena Drive |
| City | Port St. Lucie |
| County | St. Lucie |
| State | FL |
| Zip Code | 34953 |
| Lender | BB&T Mortgage |



FRONT OF
SUBJECT PROPERTY

REAR OF
SUBJECT PROPERTY



STREET SCENE

DEBRA RYAN

| | Diamond Court Draw Schedule | | |
|---|---|---|---|
| \multicolumn Customer: Williams   (Job# 9805) | | | |
| 1 | Contract Total | 100% | $212,900 |
| 2 | | | |
| 3 | **Absolute Deposit** | 10% | $21,290 |
| 4 | Utility Draw | | $4,600 |
| 5 | Lot Prep Draw | | $8,500 |
| 6 | Lot Payoff | | |
| 7 | Closing Costs | | |
| 8 | Realtor Comm. | | |
| 9 | **Pool Draw Total** | | $0 |
| 10 | Pool Draw #1 Shell | | $0 |
| 11 | Pool Draw #2 Deck | | $0 |
| 12 | Pool Draw #3 Marcite | | $0 |
| 13 | Pool Draw #4 Screen | | $0 |
| 14 | **Total Const. Funds** | | $178,510 |
| 15 | Slab Poured | 16% | $28,562 |
| 16 | CBS/Lintels/Beam | 11% | $19,636 |
| 17 | Interior Framing | 3% | $5,355 |
| 18 | Roof, Sheathed, Dry-in | 9% | $16,066 |
| 19 | Plumbing Top-out | 2% | $3,570 |
| 20 | Rough Electric | 4% | $7,140 |
| 21 | A/C Ducts | 3% | $5,355 |
| 22 | Windows and Doors | 3% | $5,355 |
| 23 | Soffit & Fascia | 2% | $3,570 |
| 24 | Garage Door | 1% | $1,785 |
| 25 | Finish Roof | 2% | $3,570 |
| 26 | Exterior Finish | 5% | $8,926 |
| 27 | Wall Insulation | 2% | $3,570 |
| 28 | Drywall Rough | 3% | $5,355 |
| 29 | Drywall finish | 3% | $5,355 |
| 30 | Bath Tile | 2% | $3,570 |
| 31 | Interior Doors Trim | 2% | $3,570 |
| 32 | Cabinets & Vanities | 5% | $8,926 |
| 33 | Int & Ext. Paint Primed | 1% | $1,785 |
| 34 | Finish Painting | 2% | $3,570 |
| 35 | Finish Plumbing | 2% | $3,570 |
| 36 | Finish Electric | 2% | $3,570 |
| 37 | Finish Floor Covering | 4% | $7,140 |
| 38 | Driveway & Walkways | 1% | $1,785 |
| 39 | Appliance | 2% | $3,570 |
| 40 | Sod, Landscaping | 2% | $3,570 |
| 41 | Finish A/C, Condenser | 2% | $3,570 |
| 42 | Drainfield/Sewer Conn | 1% | $1,785 |
| 43 | Well/Water Conn | 2% | $3,570 |
| 44 | Clean-up | 1% | $1,785 |
| 45 | ELEVATION B | ADD | $3000 |
| 46 | | | |
| 47 | | | |
| 48 | | | |
| 49 | Customer Signature | | |
| 50 | | | |
| 51 | Builder Signature | | 6-6-05 |
| 52 | | | |
| 53 | | | |
| 54 | Bank Rep Signature | | |

\\JENNIFER\My Document\\DCCC\CONTRACT-S\Draw Schedule & Cost Breakdown Calc Form.wpd





BBT

FOR ERICH



# DIAMOND COURT CONSTRUCTION CO.

June 16, 2006

Dear Mr. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4531 SW Darwin Boulevard. Since your last courtesy letter we have completed:

- The slab has been poured. The slab is the concrete foundation that your home will be built on.

- The block mason has assembled the concrete block structure of your home.

- The interior framing has been installed. The framing is the base of making the walls throughout a house.

- The roof has been installed. The shingles will be applied soon.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*



# DIAMOND COURT CONSTRUCTION CO.

June 16, 2006

Dear Mr. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4565 SW Athena Drive. Since your last courtesy letter we have completed:

- The plumbing pipes have been installed, both underground and inside your home.

- The air conditioning company has installed the ducts.

- The soffit and fascia have been installed.

- The garage door has been installed.

- The shingles have been installed on your roof.

- Your home has been filled with insulation.

- The drywall has been hung.

  ***IMPORTANT:*** Before the upcoming electrical inspection, your home will need to have an electric account. You should now call FP&L to set up a new residential account for your home. The phone number is **1.800.226.3545**. Your account has not been set up until you receive an account number from FP&L. Please keep this number for your records.

- The interior doors and trim (i.e. crown molding, chair rails, etc.) have been installed.

- The house has been prepped for interior and exterior paint.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*



# DIAMOND COURT CONSTRUCTION CO.

September 28, 2006

Dear Ms. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4531 SW Darwin Boulevard. Since your last courtesy letter we have completed:

- The plumbing has been completed. This includes faucets, toilets, showers, tubs, sinks, etc.

- The electric has been finished. This includes lighting fixtures, fans, switches, etc.

- The floors have been installed. This includes carpeting, hardwood, and tile in all rooms except the bathrooms.

- The driveway and walkways around your home have been poured.

- The air conditioning unit is being installed.

- The sewer has been connected to your home.

- The water supply has been connected to your home.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*

# Hometown

No.1 Community Newspaper in America
afcp

Your Local News & Information Source • www.HometownNewsOL.com

Vol. 5, No. 4

SACK

abc WPBF NEWS 25

WEATHER FIRST

WEEKEND FAMILY PLANNER

FRIDAY
PARTLY CLOUDY
Storm Chance: 40%

High Tide: 12:10 AM
Low Tide: 6:18 AM

SATURDAY
PARTLY CLOUDY
Storm Chance: 40%
88 HIGH 76 LOW
High Tide: 12:48 AM
Low Tide: 7:42 AM

SUNDAY
PARTLY CLOUDY
Storm Chance: 40%
88 HIGH 73 LOW
High Tide: 1:27 AM
Low Tide: 7:47 AM

WPBF NEWS 25
Chief Weather Specialist
MIKE LYONS
WHERE YOU COME FIRST



## Local builder collecting big price hikes at closing time

**By Kim Cotton**
*Staff writer*

PORT ST. LUCIE — Ira and Susan Able signed a contract in March 2005 for their dream home. It is the home they planned to spend the rest of their lives in.

It is complete, but it sits empty. It waits for the Ables to move in, but they cannot until they pay their builder nearly $20,000 more than the original price in the contract.

"At the walkthrough, everything was great," Mr. Able said. "We signed the papers for the house, then the builder presented us with a document that said the price increased by $19,900."

The builder is Diamond Court Construction, of Port St. Lucie, is owned by Lance W. Collins.

Mr. Able said Mr. Collins told them the cost of building the home went up. Mr. Collins produced several documents stating the reason for the increase, the actual charge, and a second mortgage document to cover the increase.

In the Ables case, their increase was $30,900 for a house they contracted to

"He is demanding the money. I told him I know that prices have gone up, but he should have come to me earlier. And $19,900 is a bit outrageous."

**Ira Able**
**PSL home buyer**

⊳ See CLOSING, A10

## Churches share space, faith

**By Kim Cotton**
*Staff writer*

PORT ST. LUCIE — On the surface, the relationship seemed an unlikely one between a Protestant pastor and a Catholic priest.

But through necessity came friendship. The two men, and their parishes, helped each other out during times of need.

When St. Bernadette Catholic Church was getting started in 2001, it needed a place to worship.

"Dr. (Charles) Hamilton was gracious enough to allow us to use his church for weekday mass and Satur-





Jerry Flyn the Sackn testant o town to make sar Lucie Cou able at w

Ce
Annu

| A. Settlement Statement | B. Type of Loan |
|---|---|

# First American Title Insurance Company
## Settlement Statement

**B. Type of Loan**

1-5. Loan Type  Conv. Unins.

6.   File Number  1081-836992

7.   Loan Number

8.   Mortgage Insurance Case Number

**C.   Note:**  This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown, items marked *(POC)* were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

**D.**   Name of Borrower:  Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

**E.**   Name of Seller:  Clarence I. Bright
188-12  Turin Drive St. Albins, NY 11412

**F.**   Name of Lender:

**G.**   Property Location:  4565 SW Athena Dr., Port St. Lucie, FL 34953
Lot 3, Block 2397, PSL 34

**H.**   Settlement Agent: First American Title Insurance Company
Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

**I.**  Settlement Date: 07/05/2005

Place of Settlement Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

Print Date: 06/30/2005, 2:25 PM

Disbursement Date: 07/05/2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract Sales Price | 80,000.00 | 401. Contract Sales Price | 80,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 703.50 | 403. Total Deposits | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. Water & Sewer 07/05/05 to 11/01/05 @$228.37/yr | 74.45 | 409. Water & Sewer 07/05/05 to 11/01/05 @$228.37/yr | 74.45 |
| 110. Drainage 07/05/05 to 10/01/05 @$78.75/yr | 18.99 | 410. Drainage 07/05/05 to 10/01/05 @$78.75/yr | 18.99 |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. Gross Amount Due From Borrower** | **80,796.94** | **420. Gross Amount Due To Seller** | **80,093.44** |
| **200. Amounts Paid By Or In Behalf of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. *Deposit or earnest money | 1,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges (line 1400) | 590.00 |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes  01/01/05 to 07/05/05 @$600.19/yr | 304.21 | 511. County taxes  01/01/05 to 07/05/05 @$600.19/yr | 304.21 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | **1,304.21** | **520. Total Reduction Amount Due Seller** | **894.21** |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from Borrower (line 120) | 80,796.94 | 601. Gross amount due to Seller (line 420) | 80,093.44 |
| 302. Less amounts paid by/for Borrower (line 220) | 1,304.21 | 602. Less reductions in amounts due to Seller (line 520) | 894.21 |
| **303. Cash (X From) ( To) Borrower** | **79,492.73** | **603. Cash (X To) ( From) Seller** | **79,199.23** |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____        Date: _____

\* See Supplemental Page for details.

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission based on price $80,000.00 @ 0.0000% = $0.00 | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| Division of Commission (line 700) as follows | | |
| 201. | | |
| 702. | | |
| 703.  Commission paid at Settlement | | |
| 704. | | |
| **800.  Items Payable in Connection with Loan** | | |
| 801.  Loan Origination Fee | | |
| 802.  Loan Discount | | |
| 803.  Appraisal Fee | | |
| 804.  Credit Report | | |
| 805.  Lender's Inspection Fee | | |
| 806.  Mortgage Insurance Application Premium | | |
| 807.  Assumption Fee | | |
| 808. | | |
| 809. | | |
| 810. | | |
| 811. | | |
| 812. | | |
| 813. | | |
| 814. | | |
| Supplemental Summary | | |
| **900.  Items Required by Lender to be Paid in Advance** | | |
| 901.  Interest | | |
| 902. | | |
| 903.  Hazard Insurance Premium for | | |
| 904. | | |
| 905. | | |
| Supplemental Summary | | |
| **1000.  Reserves Deposited with Lender** | | |
| 1001.  Hazard Insurance | | |
| 1002.  Mortgage Insurance | | |
| 1003.  City Property Taxes | | |
| 1004.  County Property Taxes | | |
| 1005.  Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008.  Aggregate Accounting Adjustment | | |
| **1100.  Title Charges** | | |
| 1101.  Settlement or closing fee - First American Title Insurance Company | 75.00 | |
| 1102.  Abstract or title search - First American Title Insurance Company | 75.00 | |
| 1103.  Title examination - First American Title Insurance Company | 75.00 | |
| 1104.  Title Insurance Binder | | |
| 1105.  Document Fee | | |
| 1106.  Notary Fee | | |
| 1107.  Attorney Fee | | |
| (includes above item numbers: ) | | |
| 1108.  Title Insurance – See supplemental page for breakdown of individual fees and payees | 460.00 | |
| (includes above item numbers: ) | | |
| 1109.  Lender's coverage $0.00 | | |
| 1110.  Owner's coverage $80,000.00 Premium: $460.00 | | |
| 1111.  Shipping/Handling Admin Service Fee - First American Title Insurance Company | | 30.00 |
| 1112. | | |
| 1113. | | |
| 1114. | | |
| 1115. | | |
| 1116. | | |
| 1117. | | |
| **1200.  Government Recording and Transfer Charges** | | |
| 1201.  *Recording fees:  Deed $18.50 Mortgage $0.00 Release $0.00 | 18.50 | |
| 1202.  City/county tax/stamps: | | |
| 1203.  *State tax/stamps:  Deed $560.00 Mortgage $0.00 | | 560.00 |
| 1204. | | |
| 1205. | | |
| 1206. | | |
| **1300.  Additional Settlement Charges** | | |
| 1301.  Survey to | | |
| 1302.  Pest Inspection to | | |
| 1303.  2004 taxes to St. Lucie County Tax Collector | POC-S $907.31 | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1310. | | |
| 1311. | | |
| 1312. | | |
| 1313. | | |
| 1314. | | |
| Supplemental Summary | | |
| **1400.  Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 703.50 | 590.00 |

* See Supplemental Page for details.

Supplemental Page
HUD-1 Settlement Statement

| | Loan No. |
|---|---|
| | 1081-836992 |

# First American Title Insurance Company
## Settlement Statement

| Loan No. |
|---|
| |

| Settlement Date: |
|---|
| 07/05/2005 |

Borrower Name & Address:  Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

Seller Name & Address:  Clarence I. Bright
188-12  Turin Drive St. Albans, NY 11412

| Section L. Settlement Charges continued | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 1108.    Supplemental Summary | 460.00 | | |
| a) Owner's Title Policy - First American Title Insurance Company | | 460.00 | |
| 1201.    Supplemental Summary | 18.50 | | |
| a) Record Warranty Deed - Clerk of the Circuit Court | | 18.50 | |
| 1203.    Supplemental Summary | 560.00 | | |
| a) State Documentary Transfer Tax - Clerk of the Circuit Court | | | 560.00 |

| Section J.  Summary of Borrower's Transaction continue | | | |
|---|---|---|---|
| 100.  Gross Amount Due From Borrower | | Borrower Charges | Borrower Credits |
| 200.  Amounts Paid By Or In Behalf of Borrower | | | |
| 201.    Supplemental Summary | . 1,000.00 | | |
| a) Earnest Money Deposit | | | 1,000.00 |

| The following Section is restated from the Settlement Statement Page 1 | | | |
|---|---|---|---|
| 300.  Cash At Settlement From/To Borrower | | 600.  Cash At Settlement To/From Seller | |
| 301.  Gross amount due from Borrower (line 120) | 80,796.94 | 601.  Gross Amount due to Seller (line 420) | 80,093.44 |
| 302.  Less amounts paid by/for Borrower (line 220) | 1,304.21 | 601.  Less reductions in amounts due to Seller (line 520) | 894.21 |
| 303.  Cash (X From) ( To) Borrower | 79,492.73 | 603.  Cash (X To) ( From) Seller | 79,199.23 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S):                                         SELLER(S):


_____                _____
Andrew M. Williams                               Clarence I. Bright



# DIAMOND COURT CONSTRUCTION CO.

June 16, 2006

Dear Mr. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4565 SW Athena Drive. Since your last courtesy letter we have completed·

- The plumbing pipes have been installed, both underground and inside your home.

- The air conditioning company has installed the ducts.

- The soffit and fascia have been installed.

- The garage door has been installed.

- The shingles have been installed on your roof.

- Your home has been filled with insulation.

- The drywall has been hung.

    ***IMPORTANT:*** Before the upcoming electrical inspection, your home will need to have an electric account. You should now call FP&L to set up a new residential account for your home. The phone number is **1.800.226.3545**. Your account has not been set up until you receive an account number from FP&L. Please keep this number for your records.

- The interior doors and trim (i.e. crown molding, chair rails, etc.) have been installed.

- The house has been prepped for interior and exterior paint.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952   FAX (772) 335-1150



# DIAMOND COURT CONSTRUCTION CO.

June 16, 2006

Dear Mr. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4565 SW Athena Drive. Since your last courtesy letter we have completed·

- The plumbing pipes have been installed, both underground and inside your home.

- The air conditioning company has installed the ducts.

- The soffit and fascia have been installed.

- The garage door has been installed.

- The shingles have been installed on your roof.

- Your home has been filled with insulation.

- The drywall has been hung.

   ***IMPORTANT:*** Before the upcoming electrical inspection, your home will need to have an electric account. You should now call FP&L to set up a new residential account for your home. The phone number is **1.800.226.3545**. Your account has not been set up until you receive an account number from FP&L. Please keep this number for your records.

- The interior doors and trim (i.e. crown molding, chair rails, etc.) have been installed.

- The house has been prepped for interior and exterior paint.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*



# DIAMOND COURT CONSTRUCTION CO.

June 16, 2006

Dear Mr. Williams,

This is a courtesy letter is to inform you of the progress that has been made on your new home located at 4531 SW Darwin Boulevard. Since your last courtesy letter we have completed:

- The slab has been poured. The slab is the concrete foundation that your home will be built on.

- The block mason has assembled the concrete block structure of your home.

- The interior framing has been installed. The framing is the base of making the walls throughout a house.

- The roof has been installed. The shingles will be applied soon.

If you have any questions or concerns, please feel free to call our office Monday through Friday between 9:00am and 5:00pm. Thank you for your time.

Sincerely,

*Diamond Court Construction*

AUTO-OWNERS INSURANCE COMPANY
AUTO-OWNERS LIFE INSURANCE COMPANY
HOME-OWNERS INSURANCE COMPANY
OWNERS INSURANCE COMPANY
PROPERTY-OWNERS INSURANCE COMPANY
SOUTHERN-OWNERS INSURANCE COMPANY



**Auto-Owners Insurance**

Life  Home  Car  Business

*The "No Problem" People®*

*~ Serving Our Policyholders and Agents for More Than 90 Years ~*

May 7, 2010

**BRANCH CLAIM OFFICE**
710 S.E. Indian Street • P.O. Box 2880
Stuart, Florida 34995-2880
772-219-3465   FAX 772-219-9538
800-783-1269
WWW.AUTO-OWNERS.COM

Gonzalez Drywall, Inc.
966 Fort Street NW
Palm Bay, FL 32907

| | | |
|---|---|---|
| Our Insured | : | Diamond Court Construction |
| Our Claim Number | : | 93-527-10 |
| Date of Loss | : | not known - recently discovered |
| Claimant | : | Andrew Williams |
| Property Location | : | 4531 SE Darwin Blvd., Port St Lucie |

**and**

| | | |
|---|---|---|
| Our Insured | : | Diamond Court Construction |
| Our Claim Number | : | 93-516-10 |
| Date of Loss | : | not known - recently discovered |
| Claimant | : | Andrew Williams |
| Property Location | : | 4565 SW Athens Dr., Port St Lucie |

Dear Mr. Gonzalez:

We are the insurance carrier for Diamond Court Construction.  At this time we are
handling a claim initiated by Victor M. Diaz, Jr., Esq. on behalf of his client, Andrew
Williams arising out of alleged defective Chinese drywall installed in his home located
at 4531 SE Darwin Blvd. , and 4565 SW Athens Dr., Port St Lucie, Florida.

Our investigation into this matter reveals you were subcontracted by our insured to install
the drywall in question during construction of the home.  Contract was entered into on
May 2005.  Per your proposal, you were to furnish the material and labor to install this
drywall.

*"Highest in Customer Satisfaction with the Auto Insurance Claims Experience, Two Years in a Row"*

*- - J.D. Power and Associates*

It is our opinion that this matter should be properly handled by you or your insurance carrier.  Please report this claim to all general liability carriers, prior through the present that may provide coverage for this claim.  We would appreciate your communicating with attorney, Victore M. Diaz, Jr., to determine what disposition, if any, you may wish to make of his clients' claim.  Please provide us in writing your acceptance of this tender within 30 days.

Thank you in advance for your courtesies and cooperation in this matter.  Should you have any questions, please feel free to contact me.

Sincerely,

Suanne George
Senior Claims Specialist


Cc:  Lance Collins
Diamond Court Construction
2112 SE Bersell Rd.
Port St. Lucie, FL  34952


Cc:  Podhurst Orseck
Victor M. Diaz, Esq.
25 West Flagler St., Suite 800
Miami, FL  33130

*[handwritten note at top: illegible — "Mr. D____ — My note ____ As identified on page 2. ____ ____ ____ file!! When does statute run?"]*

## NAVARETTA & NAVARETTA
### ATTORNEYS AT LAW, P.A.

STEPHEN NAVARETTA
• BOARD CERTIFIED
  REAL ESTATE LAWYER
• COMMERCIAL LITIGATION
• ALSO ADMITTED IN
  NEW YORK AND WASHINGTON STATE

MARY JEAN NAVARETTA
• BOARD CERTIFIED LABOR
  AND EMPLOYMENT LAWYER
• ALSO ADMITTED IN
  DISTRICT OF COLUMBIA AND
  NEW YORK

1100 S.W. ST. LUCIE WEST BOULEVARD
SUITE 203
PORT ST. LUCIE, FLORIDA 34986
(772) 340-5121

FACSIMILE
(772) 878-3116

March 19, 2010

## VIA FACSIMILE AND FIRST CLASS MAIL

Victor M. Diaz, Jr.,
Attorney at Law
Podhurst Orseck
25 West Flagler Street, Suite 800
Miami, FL 33130

> **Re:**   ***Diamond Court Construction Company***
> ***Claim of Williams, Andrew***
> ***4565 S.W. Athena Drive, Port St. Lucie, FL - and-***
> ***4531 S.W. Darwin Blvd., Port St. Lucie, FL***

Dear Mr. Diaz:

Please be advised that we represent Diamond Court Construction Company. Our Client is in receipt of purported Notices of Claim Pursuant to Chapter 558 dated February 12, 2010 in reference to the captioned properties. Please direct any future correspondence to our attention. Our review of this matter indicates that your client is in material breach of its construction contract and related documents. Our Client has substantial contractual defenses to any claim. On the surface of the matter, it also seems that the economic loss will preclude any non-contractual remedies. Please find enclosed a copy of a Performance Guaranty, and portions of the contracts which present a substantial contractual defense to any claim asserted on behalf of Mr. Andrews and relegates Mr. Andrews to remedies against the subcontractors and material men as stated in Section 558.12(c), Chapter 558 does not create remedies nor abrogate any existing contractual agreements and waivers between the parties.

In any event, our client is unaware of any merits to the allegations contained in your purported Notices of Claim, and therefore must dispute the claim and will not remedy the alleged defect or compromise to settle the claim in any manner.

Victor M. Diaz, Jr.
Page 2
March 19, 2010

Your correspondence also demands compliance with Section 558.004(3), Florida Statues, which purports to demand disclosure of "all available discoverable evidence relating to the drywall." As you know, the section of Florida Statutes upon which you rely does not require the delivery of disclosure of "all available discoverable evidence relating to the drywall." Further, the design plans, specifications, as-built plans, and any documents detailing the design drawings or specifications, are of no relevance to a purported dry wall claim. The design of the building would have nothing to do whatsoever with a claim related to the installation of drywall. Accordingly, as the demanded material is not reasonably calculated to lead to any admissible or reasonable evidence, your demand is rejected.

Reserving our objections, on behalf of our Client, to your demand for "all discoverable materials", we advise you that the drywall in question was installed by Gonzalez Drywall, Inc., whose address is 966 Fort Street NW, Palm Bay, Florida 32907, using drywall supplied by Rosen Materials, pursuant to customary and standard terms and conditions by and between our Client and the drywall subcontractor. Our client is presently out of business and is not actively operating. It is reported to us that our client has no assets and is essentially unable to respond to the demand set forth in your correspondence.

Very truly yours,

Stephen Navaretta

SN/ar
Enclosure.

cc: Client

NAVARETTA & NAVARETTA

# ONE YEAR PERFORMANCE GUARANTY

Buyer: _Andrew Williams_

Property Address: _4531 SW Darwin Blvd._

Date: _10-18-06_

    Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof. Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective. This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

    Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

    Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

    This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

    Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

    Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty. No monetary settlement will be made in lieu of performance.

_____
Homebuyer Signature

_____
Homebuyer Signature

_____
Builders Rep.

GUARANTY2.wpd

exception only to other provisions provided herein. Should start of construction be delayed beyond this time by Buyer or Buyer Agents, or by reason of ruling or regulation of any governmental authority, or by reason of any other cause not the fault of Builder, then the above price may be increased to the published price for the month of actual start. Start of construction is defined as the date on which the slab is poured.

The Buyer shall not perform any work on subject property (under section I) related or unrelated to this Building Agreement, either directly or indirectly, except as covered by this Agreement, nor award any other contracts in connection with construction or other work on the Buyer's property.

♦ **VI. Delivery & Warranty:** Subject to the provisions of this Agreement, the Builder agrees to use its best effort to deliver the substantially completed residence specified herein on or about __180__ days from start of construction. Start of construction is defined as the date on which the slab is poured. However, the Builder cannot and will not be responsible for any damages or inconvenience caused to the Buyer for failure to complete the residence specified herein within the above number of days, regardless of the reason for such delay. Buyer agrees that Builder shall have the right to substitute material or items of comparable quality for such material or items which may be unobtainable by reason of strikes or discontinuance of production for any reason. Builder shall advise Buyer of such substitutions, giving advance notice where possible.

It is expressly understood and agreed that the Buyer shall in no event take possession of, or enter upon the Property prior to closing and should the buyer breach this provision: first the Buyer accepts house as is and forfeits all warranty and second the Buyer consents that the Builder shall have the right to dispossess them from the Property by summary proceedings if such action is deemed necessary by Builder.

The Performance Warranty in the form shown in this Agreement shall be issued to Buyer upon complete payment of all funds as provided for in this Agreement. I further understand that no other representation, either oral or written, or whether obtained in any advertisements, pamphlets, brochures or similar sales materials, shall create any additional express or implied warranties or guaranties beyond those contained in the "Performance Warranty". To the extent any such prior representations contradict the terms hereof, such representations shall be invalid and the terms of this document control.

BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY HABITABILITY OF SOIL OR SUBSURFACE CONDITIONS OF THE SUBJECT PROPERTY. BUYER EXPRESSLY ASSUMES THE RISK OF ANY AND ALL LOSS OR DAMAGE TO THE SUBJECT PROPERTY. DAMAGE CAUSED BY SOIL OR SUBSURFACE CONDITIONS, WHETHER OR NOT ANY SUCH ADVERSE CONDITIONS COULD HAVE BEEN DISCOVERED PRIOR TO THE CLOSING BY APPROPRIATE TESTING. OTHER THAN THE PERFORMANCE WARRANTY, THE BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY , ANY TYPE OF FITNESS AND MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

♦ **VII. Property Contingencies:** Items listed below which are applicable may be shown in the attached Addendum /Itemization of extra's or may be charged to the Buyer (upon) request by change order at a later date. It is hereby agreed that, when applicable, the following property related items are to be charged to the Buyer:

- ♦ All lot preparation (including but not limited to)
- ♦ Other impact fees not directly related to the material construction of the home.
- ♦ Soil tests & Engineering for other reasons than construction (diagnostic)
- ♦ Pilings
- ♦ Additional expenses for pumping concrete due to site conditions
- ♦ Underground electric & telephone service
- ♦ Additional electric service lines over fifty (50) feet for overhead power or Temp. Power pole
- ♦ Extended electrical service through attic or under slab (200amp @ $20 per ft.)
- ♦ Expense caused by rock or other adverse subsoil conditions
- ♦ Additional concrete drive & walkway over __1000__ square feet will be charged at $5.00 per sq. ft.
- ♦ Additional Bahia Sod over __9000__ sq. ft. will be charged at $0.20 per sq. ft.
- ♦ Additional public water and sewer lines over a distance of five (5) feet from house
- ♦ Septic tank over 900 gal.

Revised February 3, 2003

# ONE YEAR PERFORMANCE GUARANTY

Buyer: Andrew Williams

Property Address: 4505 SW Athena Drive

Date: 8-9-06

Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof. Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective. This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty. No monetary settlement will be made in lieu of performance.

_____
Homebuyer Signature

_____
Homebuyer Signature

_____
Builders Rep.

GUARANTY2.wpd

exception only to other provisions provided herein. Should start of construction be delayed beyond this time by Buyer or Buyer Agents, or by reason of ruling or regulation of any governmental authority, or by reason of any other cause not the fault of Builder, then the above price may be increased to the published price for the month of actual start. Start of construction is defined as the date on which the slab is poured.

The Buyer shall not perform any work on subject property (under section I) related or unrelated to this Building Agreement, either directly or indirectly, except as covered by this Agreement, nor award any other contracts in connection with construction or other work on the Buyer's property.

◆ **VI. Delivery & Warranty:** Subject to the provisions of this Agreement, the Builder agrees to use its best effort to deliver the substantially completed residence specified herein on or about __180__ days from start of construction. Start of construction is defined as the date on which the slab is poured. However, the Builder cannot and will not be responsible for any damages or inconvenience caused to the Buyer for failure to complete the residence specified herein within the above number of days, regardless of the reason for such delay. Buyer agrees that Builder shall have the right to substitute material or items of comparable quality for such material or items which may be unobtainable by reason of strikes or discontinuance of production for any reason. Builder shall advise Buyer of such substitutions, giving advance notice where possible.

It is expressly understood and agreed that the Buyer shall in no event take possession of, or enter upon the Property prior to closing and should the buyer breach this provision: first the Buyer accepts house as is and forfeits all warranty and second the Buyer consents that the Builder shall have the right to dispossess them from the Property by summary proceedings if such action is deemed necessary by Builder.

The Performance Warranty in the form shown in this Agreement shall be issued to Buyer upon complete payment of all funds as provided for in this Agreement. I further understand that no other representation, either oral or written, or whether contained in any advertisements, pamphlets, brochures or similar sales materials, shall create any additional express or implied warranties or guaranties beyond those contained in the "Performance Warranty". To the extent any such prior representations contradict the terms hereof, such representations shall be invalid and the terms of this document control.

BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY HABITABILITY OF SOIL OR SUBSURFACE CONDITIONS OF THE SUBJECT PROPERTY. BUYER EXPRESSLY ASSUMES THE RISK OF ANY AND ALL LOSS OR DAMAGE TO THE SUBJECT PROPERTY. DAMAGE CAUSED BY SOIL OR SUBSURFACE CONDITIONS, WHETHER OR NOT ANY SUCH ADVERSE CONDITIONS COULD HAVE BEEN DISCOVERED PRIOR TO THE CLOSING BY APPROPRIATE TESTING. OTHER THAN THE PERFORMANCE WARRANTY. THE BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY , ANY TYPE OF FITNESS AND MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

◆ **VII. Property Contingencies:** Items listed below which are applicable may be shown in the attached Addendum /Itemization of extra's or may be charged to the Buyer (upon) request by change order at a later date. It is hereby agreed that, when applicable, the following property related items are to be charged to the Buyer:

  ◆ All lot preparation (including but not limited to)
  ◆ Other impact fees not directly related to the material construction of the home.
  ◆ Soil tests & Engineering for other reasons than construction (diagnostic)
  ◆ Pilings
  ◆ Additional expenses for pumping concrete due to site conditions
  ◆ Underground electric & telephone service
  ◆ Additional electric service lines over fifty (50) feet for overhead power or Temp. Power pole
  ◆ Extended electrical service through attic or under slab  (200amp @ $20 per ft.)
  ◆ Expense caused by rock or other adverse subsoil conditions
  ◆ Additional concrete drive & walkway over __1000__ square feet will be charged at $5.00 per sq. ft.
  ◆ Additional Bahia Sod over __9000__ sq. ft.  will be charged at $0.20 per sq. ft.
  ◆ Additional public water and sewer lines over a distance of five (5) feet from house
  ◆ Septic tank over 900 gal.

Revised February 3, 2005

FATIC 524

Policy No.: **FA-35-1081-871239**

# Policy of Title Insurance



ISSUED BY

## *First American Title Insurance Company*

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1.  Title to the estate or interest described in Schedule A being vested other than as stated therein;

2.  Any defect in or lien or encumbrance on the title;

3.  Unmarketability of the title;

4.  Lack of a right of access to and from the land.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

*First American Title Insurance Company*

By: *Gary L. Kermott*                    President

Attest: *Mark R. Arnesen*                    Secretary



© 2000 The First American Corporation.
All Rights Reserved

**ALTA Owner's Policy (10-17-92)** *(With Florida Modifications)*

COMMERCIAL   RESIDENTIAL   NEW HOME SALE   RESALE   FORECLOSURE   OTHER

# SCHEDULE A

Issuing Office File No. **1081-871239**                    Policy No. **FA-35-1081-871239**

Date of Policy:   **07/06/2005**                    Amount of Insurance: **$ 212,900.00**
(or the date of recording of the instrument
executed at closing vesting title in the insured,
whichever is later)

1.        Name of Insured:

          **Andrew M. Williams**

2.        The estate or interest in the land which is covered by this policy is:

          **Fee Simple**

3.        Title to the estate or interest in the land is vested in:

          **Andrew M. Williams, an unmarried person**

4.        The land referred to in this policy is described as follows:

                    **See Schedule A attached hereto and made a part hereof**

                                                        First American Title Insurance Company

                              By:

                                                        as Vice President of First American Title Insurance Company

## Schedule A (Continued)

Issuing Office File No.:  **1081-871239**

Lot 3, Block 2397 of PORT ST. LUCIE SECTION THIRTY FOUR, according to the plat thereof as recorded in Plat Book 15, Page(s) 9, 9A to 9W of the Public Records of St. Lucie County, Florida.

## SCHEDULE B

Issuing Office File No. 1081-871239          Policy No.: **FA-35- 1081-871239**

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.      Any rights, interests, or claims of parties in possession of the land not shown by the public records.

2.      Any rights, interests, or claims affecting the land which a correct survey would disclose and which are not shown by the public records.

3.      Any lien for services, labor, or materials in connection with improvements, repairs or renovations provided before, on, or after Date of Policy, not shown by the public records.

4.      Any dispute as to the boundaries caused by a change in the location of any water body within or adjacent to the land prior to Date of Policy, and any adverse claim to all or part of the land that is, at Date of Policy, or was previously, under water.

5.      Taxes or special assessments not shown as liens in the public records or in the records of the local tax collecting authority, at Date of Policy.

6.      Any minerals or mineral rights leased, granted or retained by prior owners.

7.      Taxes and assessments for the year **2005**  and subsequent years.

**NOTE: Exception(s) numbered  1,3, & 5  above is/are hereby deleted.**

8.      Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of PORT ST. LUCIE SECTION THIRTY FOUR, as recorded in Plat Book 15, Page 9, 9A to 9W.

9.      Declaration of Covenants, Conditions, Restrictions and Easements, recorded in Book 179, Page 2692 and amended in Book 197, Page 1809 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

10.     Assignment Agreement assigning the right to use platted easements from General Development Corporation to Florida Power & Light Company recorded in Book 473, Page 1177.

11.     Assignment and Assumption Agreement with the City of Port St. Lucie recorded in Book 1141, Page 2395.

12.     Special Assessment by the City of Port St. Lucie for water and sewer system improvements, which is billed with the annual property taxes which are not yet due and payable.

13.     Any lien as provided for by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas systems supplying the lands described herein.

14.     Pending disbursement of the full proceeds of the loan secured by the insured mortgage, this policy only insures the amount actually disbursed, but, notwithstanding paragraph 8(d)(ii) of the Conditions and Stipulations, increases as proceeds are disbursed in good faith, up to the amount of insurance stated in Schedule A

15.     Liability under this policy is presently limited to the purchase price of the land - $212,900.00, but will increase to include the actual cost of improvements erected thereon, in good faith and fully paid for, not to exceed the face amount of the policy.

Issuing Office File No.: **1081-871239**

Note: All of the recording information contained herein refers to the Public Records of St. Lucie County, Florida , unless otherwise indicated. Any reference herein to a Book and Page is a reference to the Official Record Books of said county, unless indicated to the contrary.

## Notices - Where Sent

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 1 First American Way, Santa Ana, CA  92707.

## Service, Quality and Availability

First American Title Insurance Company cares about its customers and their ability to obtain information and service on a convenient, timely and accurate basis. A qualified staff of service representatives is dedicated to serving you. A toll-free number is available for your convenience in obtaining information about coverage and to provide assistance in resolving complaints at 1-800-929-7186. Office hours are from 8:30 a.m. through 5:30 p.m. Monday through Friday.

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that it is based on:
   (a) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# CONDITIONS AND STIPULATIONS

## 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule (A), and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY AN INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

## 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or affecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

## 5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the

Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

## 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

(i) To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

(ii) Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees, and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

## 7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) (This paragraph dealing with Coinsurance was removed from Florida policies.)

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. APPORTIONMENT.

If the land described in Schedule A consists of two or more parcels which are not used as a single site, and a loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time

of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

## 9. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter an shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

## 11. LIABILITY NONCUMULATIVE.

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

## 12. PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 13. SUBROGATION UPON PAYMENT OR SETTLEMENT.

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-Insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by

reason of this policy.

## 14. ARBITRATION.

Unless prohibited by applicable law, arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association may be demanded if agreed to by both the Company and the Insured. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the Insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitrations Rules.

A copy of the Rules may be obtained from the Company upon request.

## 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 16. SEVERABILITY.

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 17. NOTICES, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 1 First American Way, Santa Ana, California 92707.



FIRST AMERICAN

First American Title Insurance Company

# POLICY
# OF
# TITLE
# INSURANCE

 **Harbor Federal**

Downtown Fort Pierce
100 S 2nd Street
Fort Pierce, Florida 34950-4393
Telephone: (772) 461-2414

April 12, 2006

ANDREW WILLIAMS
3841 NW 6TH CT
FORT LAUDERDALE FL 333110000

RE: Loan Number 5024374448

Dear Borrower(s):

According to our records, there has been no disbursement activity since 01/12/2006.  The balance available for disbursement is $173,560.00.

Please contact the Construction Department at 772-467-3202 or via email at construction@harborfederal.com to relay the status of your loan.  Your immediate attention to this matter is of the utmost importance.

Sincerely,

Nicole Poirier
Construction Dept. Supervisor



**harborfederal.com**



Print Form

Plaintiff Profile Form - Residential Properties

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |

**For Internal Use Only**

File Number

Date Received

This Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation using one form per affected address.  In completing this Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge.  If you cannot recall all of the details requested, please provide as much information as you can and expressly indicate "unknown" in the space provided when not known.  You must supplement your responses if you learn they are incomplete or incorrect in any material respect. You may and should consult with your attorney if you have any questions regarding completion of this form.  If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The questions and requests for production contained within this Profile Form are non-objectionable and shall be answered without objection.  By answering this Profile Form, you are not waiving the attorney work product and/or attorney client privileges.  Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts and are subject to all protections afforded by law.

To the extent that the form does not provide enough space to complete your responses, you may attach as many sheets of paper as necessary.  All photographs produced in response to this form shall be in color and attached to or printed on 8 1/2" x 11" white paper.

### Section I. Property Information

| | |
|---|---|
| Name Property Owner | Andrew Williams |
| Address of Affected Property | 4531 S.W. Darwin Blvd. |
| | Port St. Lucie, FL 34953 |
| Is this Property:* ☑ Residential  ☐ Commercial  ☐ Governmental | |
| Name of Person Completing this Form | Andrew Williams |
| Is above your primary residence? | ● Yes   No ○ |
| Mailing Address (if different) | |
| Phone: | (954 ) 806   - 2256 |

\* If your response is commercial or governmental you should not fill out the remaining questions, you will receive a follow up form at a later date.

| | |
|---|---|
| Circle one: | ☑ Owner-Occupant  ☐ Owner Only  ☐ Renter-Occupant |
| Represented By: | Podhurst Orseck PA/Victor Diaz |
| Address: | 25 W. Flagler Street |
| | Suite 800 |
| | Miami, FL 33130 |
| Phone: | (305 ) 358   - 2800 |
| Case No. /Docket Info: | |

### Section II. Insurance Information

| | |
|---|---|
| Homeowner/ Renter Insurer: | Security First Insurance Co. |
| Policy #: | SFIH0074498-03-1870 |
| Agent: | M.E. Glennon & Associates, Inc./Luis Martinez |
| Address: | P.O. Box 881055 |
| | Port St. Lucie, FL 34988 |
| Phone: | (772 ) 879   - 1307 |

+ Attach Copy of  Insurance Declaration Page

### Section III. Claimant Information

| Name of Claimant | Dates Occupied Move-in | Dates Occupied Leave | Gender | Date of Birth | Are you claiming personal injuries?* Circle One | Identify Claimant Status as an Owner-Occupant, an Owner Only, or an Occupant or Renter Only |
|---|---|---|---|---|---|---|
| Andrew Williams | 10 /18/ 06 | / / | M / F | 3 /22/30 | ● Yes   No ○ | Owner-Occupant |
| Diana Williams | 10 /18/ 06 | / / | M / F | 9 /11/47 | ● Yes   No ○ | Occupant or Renter Only |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |

\* Personal injuries include claims for mental anguish and medical monitoring.

Page 1

Plaintiff Profile Form - Residential Properties

## Section IV. Inspection Information

1.0. Have you, or has anyone on your behalf, conducted an inspection into whether Chinese-manufactured drywall is present in your home?  ● Yes   No ○

1.1. If "Yes" to Question 1.0 Section IV. Who conducted the inspection?   Steve Litrides

1.2. When did the inspection take place?   `1  /14 /10`

2.0. Has a determination been made that Chinese-manufactured drywall is present in your home?   ● Yes   No ○

2.1. If "Yes" to Question 2.0. Section IV. Who made this determination?   Steve Litrides

2.2. When was this determination made?   `1  /14 /10`

## Section V. Drywall Information

| Drywall Manufacturer | Markings on Drywall | Location in Home |
|---|---|---|
| Knauf Tianjin | Knauf Tianjin China | Attic |
| | | |
| | | |
| | | |

## Section VI. Home Information

| Approx. Sq. Ft. of House: | 2817 | | | Yes | No |
|---|---|---|---|---|---|
| Estimated Sq. Ft. of Drywall | unknown | Occupied | | X | |
| Height of Interior Walls | 9 ft | Year-round | | X | |
| Number of Bedrooms: | 3 | Summer | | | |
| Number of Bathrooms: | 2 | Winter | | | |

### Plumbing System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| PVC/ CPVC/ Plastic Piping | | | X |
| Copper Piping | X | | |
| Copper Fixtures | X | | |
| Other Fixtures | X | | |
| Were repairs made to the plumbing system? | | No | |
| Dates: | | | |

### Electrical System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| Receptacles | X | | |
| Switches | X | | |
| Main Panel | X | | |
| 2nd Panel | X | | |
| Exposed Copper Wires | X | | |
| Were repairs made to the electrical system? | X | | |
| Dates: | AC - many times past 2 yrs. | | |

+ Attach Copy of Floor Plan on 8 1/2" X 11" paper

## Section VII. Construction/Renovation Information

Date Range for New Home Construction: (Month/Day/Year)

| Start Date: | `/  /05` | Completion Date | `10 /18 /06` |
|---|---|---|---|
| Move in Date: | `10 /18 /06` | Date Acquired Home | `7  /6 /05` |

Date Range for Renovations: (Month/Day/Year)

| Start Date: | `na /  /` | Completion Date | `/  /` |
|---|---|---|---|
| Move in Date: | `/  /` | | |

| Renovation(s) | Yes | No | N/A |
|---|---|---|---|
| First Floor: 1/2 Wall of drywall replaced | | | |
| First Floor: Full Wall of drywall replaced | | | |
| Second Floor: Any drywall replaced | | | |

## Section VIII. Homebuilder/ General Contractor/ Developer Information

Homebuilder/ General Contractor/ Developer's Name:

Diamond Court Construction Co.

Address:  2112 S.E. Bersell Road
Port St. Lucie, FL 34952

Phone: (      )      -

+ Attach Copy of Construction/Renovation Contract
+ Attach Copy of New Home Warranty Declaration

## Section IX. Drywall Installer

Drywall Installer's Name:   Unknown

Address: 

Phone: (      )      -

## Section X. Drywall Supplier

Drywall Supplier's Name:   Unknown

Address: 

Phone: (      )      -

Page 2

**ANDREW WILLIAMS**
3841 N.W. 6TH CT.
FORT LAUDERDALE, FL 33311-6344

**500**

63-4/630 FL
1310

DATE 5 - 7 - 05

PAY TO THE
ORDER OF First AmericanTitle                    $ 1,000.00

One Thousand +                    00/100    DOLLARS

**Bank of America**

Equity Maximizer

FOR LoT 4565 AThenA Dr.                    Andrew Williams

MP

⑆063000047⑆68 21 1047573099⑈0500

Plaintiff Profile Form - Residential Properties

**Section XI. Verification of Plaintiff Profile Form**

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information provided in this Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |
|---|---|---|---|
| *Andrew Williams* | 1-28-2010 | | |
| *Liana Williams* | 1-27-10 | | |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |



**Security First**

Post Office Box 45-9025, Sunrise, FL 33345-9025

For servicing questions, please contact your agent at the phone number listed below.
For claims reporting dial toll free: 866-354-4778 or visit www.sficins.com.

## SECURITY FIRST INSURANCE COMPANY
## HOMEOWNERS HO-3 POLICY DECLARATIONS

| Insured Name and Mailing Address: | Insured Location Covered by this Policy: | Policy Number | SFIH0074498-01-0000 |
|---|---|---|---|
| ANDREW WILLIAMS<br>4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953 | 4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953 | | |
| | | New Issue | |
| | | Policy Effective Date: | 04/25/2007 12:01 AM |
| | County: SAINT LUCIE | Policy Expiration Date: | 04/25/2008 12:01 AM |

COVERAGE IS PROVIDED WHERE A PREMIUM OR LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE

| Coverages | Limit of Liability | Annual Premium | Forms and Endorsements: | |
|---|---|---|---|---|
| **Section I** | | | SFIV HO 09 CDV 01 06 | SFIV HO 09 ED 06 06 |
| A. Dwelling | $205,000 | $447 | HO 00 03 04 91 | SFIV HO 09 FCE 01 06 |
| B. Other Structures | $41,000 | Included | SFIV HO 09 SP 05 06 | SFIV HO 09 HD 01 06 |
| C. Personal Property | $102,500 | Included | HO 04 21 10 94 | SFIV HO 09 OL1 05 06 |
| D. Loss of Use | $20,500 | Included | HO 04 96 04 91 | SFIV HO 09 SDE 01 06 |
| **Section II** | | | SFIV HO 08 04 90 01 06 | HO 04 48 04 91 |
| E. Personal Liability | $300,000 | $30 | SFIV HO 09 23 70 01 06 | |
| F. Medical Payments | $1,000 | Included | SFIV HO 09 CLP 01 06 | |
| | | | SFIV HO 09 ON 05 06 | |

| Endorsement Premium Total | $658 |
|---|---|
| (see Endorsement Details, p.2) | |

**Credits and Charges:**
Age of Dwelling Credit
All Other Perils Deductible Credit
Hurricane Deductible Credit
Coverage B Limit Surcharge
Windstorm Loss Mitigation Credit
Building Code Effectiveness Grading Credit
Senior or Retiree Credit

**Rating Information:**

| Construction: | Masonry |
|---|---|
| Year Built: | 2006 |
| Occupied By: | Owner |
| Usage Type: | Primary Residence |
| Territory: | 181 |
| BCEG Grade: | 02 |
| Burglar Alarm: | None |
| Fire Alarm: | None |
| Automatic Sprinklers: | None |
| Protection Class: | 03 |
| Opening Protection: | Hurricane |
| Roof Shape: | Hip |
| Exclude Wind Coverage: | No |

| Total Annual Policy Premium | $1,135 |
|---|---|
| MGA Fee | $25.00 |
| EMPA Fee | $2.00 |
| FL Insurance Guaranty Association Assessment | $0.00 |
| FL Hurricane Cat. Fund Emergency Assessment | $11.60 |
| Total Policy Charges | $1,173.60 |

**Deductible - Section I** In case of a loss, we only cover that part of the loss over the deductible stated:

$2,500 All Other Perils Deductible

**$4,100 (2% of Cov A) Hurricane Deductible**

The Hurricane portion of the Premium is:  $548.00     The Non-Hurricane portion of the Premium is:  $625.60

## Please see Page 3 of the Declarations Page for important notices
## that apply to this policy.

| Agency: 20269 Phone: (772) 879-1307 | Loss Payable/Mortgagee: | Loss Payable/Mortgagee |
|---|---|---|
| M.E. Glennon and Associates, Inc. | HARBOR FEDERAL SAVINGS BAN | None |
| P.O. Box 881055 | ITS SUCCESSORS AND/OR ASSIG | |
| Port St. Lucie, FL 34986 | PO BOX 249 | |
| | FORT PIERCE, FL 34954-0249 | |
| Agent: Luis Martinez | | |

| Authorized Countersignature: | *signature* | SFI DEC 001 05 06 |
|---|---|---|
| Agent Copy | Page 1 of 3 | Ren: 01, End: 0000 |

**EAST REGION**
Mail to:
2-10 HBW®
1728 Montreal Cir.
Tucker, GA 30084

# BUILDER APPLICATION
# FOR HOME ENROLLMENT
**FORM HBW 302 FL**
THIS DOCUMENT IS NOT YOUR NEW HOME WARRANTY



The undersigned Builder Member of the 2-10 HBW® New Home Warranty program makes application for enrollment of the home whose address is listed below. The Builder Member is responsible for completion of all enrollment requirements on the home. If all enrollment requirements are not completed on the new home, this Application will be denied and no coverage by the Builder's Warranty Insurer will be provided. The Builder must send or have his closing agent send the original of this Application for Home Enrollment and a check for full payment to 2-10 HBW®. If the Builder Member has satisfied all the enrollment requirements and 2-10 HBW® has received this Application and full payment within 15 days of the date of closing on the home, the Buyer will receive the Certificate of Warranty Coverage and Warranty Booklet within 30 days of closing from 2-10 HBW®. **IF THE BUYER HAS NOT RECEIVED THE CERTIFICATE OF WARRANTY COVERAGE AND WARRANTY BOOKLET FROM 2-10 HBW® WITHIN THIRTY (30) DAYS AFTER CLOSING, THEN THERE IS NO COVERAGE BY THE BUILDER'S WARRANTY INSURER, YOU SHOULD CONTACT YOUR BUILDER.**

**PLEASE PRINT OR TYPE:**

(1) Buyer(s): _Andrew Williams_
(Name(s) as recorded on deed)

Address of Home: _4531 SW Darwin Blvd._   _Pt St Lucie_   _FL_   _34953_
Street Address                                        City                       State        Zip Code

Lot / Block: _11 / 2391_                   Subdivision: _PSL Sec 34_

2. Builder Name: _Diamond Court Construction Co._   HBW Builder No: _8800-8905_

(3) Effective Date of Warranty: Date of Closing: _____   Date of earlier first occupancy if before closing: _____
**CONDOMINIUMS ONLY:** The Effective Date of Common Elements Coverage is the date the main structure housing individual units was completed. Effective date of Common Elements Coverage: _____

(4) COVERAGE: Both the Builder and Buyer(s) must check and initial which of the following coverage(s) apply to the unit being enrolled.
A. ☐ _____ 1-Year Workmanship / 2-Year Systems / 10-Year Structural Coverage
B. ☒ _____ 10-Year Structural Coverage Only
C. ☐ _____ 2-10 Plus Extended Warranty Plan Accepted
D. ☐ _____ 5-Year Extended Structural Warranty

5. ☒ Single Family Detached   ☐ Townhome   ☐ Manufactured   ☐ Modular   ☐ Condominium
If Condominium:   ☐ Low Rise   ☐ Mid Rise (3-5 Story)   ☐ High Rise (6 Story or Greater)
No common elements coverage will be provided unless all units in a building are enrolled.

(6) Type Financing:   FHA Check One:  A. ☐ FHA using Bldg. Permit; C.O./or equivalent and HUD-92544
                                      B. ☐ FHA using HUD-approved 2-10 warranty
                        ☐ VA   ☐ RHS   ☒ Conventional   ☐ Cash

7. A. Rate Formula for 1-Year Workmanship / 2-Year Systems / 10-Year Structural Coverage or Ten Year Structural Only Coverage:

| _230,900_ ÷ 1,000 = | _230.90_ | X | _95%_ | = | _209.80_ | X | _1.25_ | = | _262.3_ (A) |
|---|---|---|---|---|---|---|---|---|---|
| Final Sales Price | | | Rate | | Basic Warranty Fee | | If price does not include land | | Basic Warranty Fee |

B. Rate Formula for Optional 5-Year Extended Structural Warranty:

| ÷ 1,000 = | | X | | = | | X | | = | (B) |
|---|---|---|---|---|---|---|---|---|---|
| Final Sales Price | | | Rate | | 5-Year Extended Structural Premium | | If price does not include land | | 5-Year Extended Warranty Fee |

+ **$30.00** (C)  +  _____ (D)  +  _____ (E)  −  **$0.00** (F)  =  _262.32_
If (6B.) checked Add FHA / VA Fee  |  Final Sale Price X $1.00 per $1,000 for condo wood stairs & landings coverage  |  Any additional fee  |  Less the prepaid fee  |  A + B + C +D +E - F = Total Warranty Fee Due

**BUILDER'S AUTHORIZED SIGNATURE** _____   Date _10-18-06_

**BUYER'S ACKNOWLEDGEMENT AND CONSENT**
Your Builder is applying to enroll your home in the 2-10 HBW® New Home Warranty program. By signing below, you acknowledge that you have read a sample copy of the Warranty Booklet, and **CONSENT TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION** contained therein. You further understand that when the warranty is issued on your new home, it is an Express Limited Warranty and that all claims and liabilities are limited to and by the terms and conditions of the Express Limited Warranty as stated in the 2-10 HBW® Booklet. **IF YOU, THE BUYER(S), HAVE NOT RECEIVED A CERTIFICATE OF WARRANTY COVERAGE AND A WARRANTY BOOKLET FROM 2-10 HBW® WITHIN THIRTY (30) DAYS AFTER CLOSING, THEN THERE IS NO COVERAGE BY THE BUILDER'S WARRANTY INSURER, YOU SHOULD CONTACT YOUR BUILDER.**

Buyer(s) Signature _____   Date _____

Buyer(s) Signature _____   Date _____

Buyer(s) Phone # _____

**OFFICE USE ONLY**
Accounting: _____
Risk Mgmt: _____
Warranty No.: _____

HBW 302 FL 10/04

## ONE YEAR PERFORMANCE GUARANTY

Buyer: _Andrew Williams_

Property Address: _4531 SW Darwin Blvd._

Date: _10-18-06_

     Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof.  Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective.  This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

     Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

     Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

     This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

     Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

     Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty.  No monetary settlement will be made in lieu of performance.

Homebuyer  Signature                        Homebuyer  Signature

Builders Rep.

GUARANTY2.wpd

**Diamond Court Construction Company**    SELECTION SHEET & WORK ORDER SHEET- pg 1

Fax to: _____
Fax #: _____
From: _____
Re: _____ Pages: ____

Customer: ANDREW WILLIAMS  Job #: _____

Model: _____    Job Address: DARWIN

| | KITCHEN SELECTIONS | LAUNDRY | BAR |
|---|---|---|---|
| Cabinets - Style Name:<br>Color: | SENICA RIDGE MALE<br>AACH       TOFFEE | | |
| Cabinet Hardware: | DOORS HK123<br>DRAWS HP124 | | |
| 1. Countertop Color: | 1. JADE GREEN | 1. | 1. |
| 2. Is this . . . Laminate,<br>Corian and it's level # ,<br>or 1-1/4" Granite | 2. GRANITE | 2. Laminate | 2. |
| 3. Edge Style: -see red sel. book | 3. BEVEL TOP | 3. Straight | 3. |
| 1. Kitchen Sink:<br>Blancodiamond Silgranite in<br>WH, BI, BL, GR * or<br>Blancospex in SS -see red sel. book | 1. BLACK | 1. Fiberglass | 1. |
| 2. Drop In or Undermount | 2. UNDERMOUNT | 2. Drop-In | 2. |
| Moen Monticello 7730 Kitchen<br>Faucet - SS, WH, SA, CH * | STAINLESS | Chrome | |

**Attention !**
**Countertop Contractor:**
1. Kitchen sink supplied by Diamond Court - pick up at office  (see Brand & Model above)
2. Kitchen faucet supplied by Plumber - 3 holes / 4" on center  (see Brand & Model above)
3. Wood mount for Dishwasher needed for installation for Granite top order
4. Paintable wood corbels required for Granite bar tops
5. Backsplash: ☑ Customer wants backsplash SAME AS COUNTERTOP: Full backsplash at
   bar top & approximately 6" elsewhere to match bar top backsplash height
   ☐ Customer wants backsplash TILED: Tile company will install Full
   backsplash tiled at Range side.  Sales Coordinator to record selection on
   Main Flooring Selection Work Order Sheet (Upgrade)***
6. If 30" Kenmore 22-46359 style Slide in Range is selected below, confirm cut out dimensions

Appliances:    See attached Appliance Order Sheet to select Appliances

Check one for type of Range to be selected: ☑ Free Standing Range   ☐ Slide in Range

Check one for type of appliance to be selected: ☑ Electric   ☐ Gas: range & dryer

Kitchen Flooring & Tiled Backsplash:    See attached Main Flooring Selection Work Order Sheet

* WH - white, BI - bisque, BL - black, SA - sand, BO - bone, GR - gray, CH - chrome, SS - stainless    DCC/Delivery/ selection sheet 06-01-05

Homebuyer's Approval _Andrew Williams_    Date: 6-11-05

**Diamond Court Construction Company** - SELECTION SHEET & WORK ORDER SHEET - pg 2

| Fax to: _____ | |
|---|---|
| Fax #: _____ | |
| From: _____ | |
| Re: _____ Pages: ___ | Customer: ANDREW WILLIAMS  Job #: _____ |

Model: _____          Job Address: DARWIN

## BATH SELECTIONS

| | Master Bath | Bath 2 - Middle Bath between BR2 & 3 | Bath 3 - Rear Bath near BR 4 | Cabana (½) Bath on Lanai |
|---|---|---|---|---|
| Cabinets - Style Name: Color: | PEMBERTON OAK SP CIDER | SUNDALE MAPLE SQUARE PAPRICA | | |
| Cabinet Hardware: | HK107 DOORS HP106 DRAWS | HK128 | | |
| 1. Vanity - Cultured Marble Color: | 1. EBONY W/BLK | 1. HUNTER GREEN | 1. | 1. |
| 2. Vanity Cultured Marble bowl shape - see red selection book | 2. HILO SHELL WSD | 2. LAPAZ LZ | 2. | 2. |
| 3. Vanity 1-1/2" Cultured Marble edge - see red selection book | 3. DROP LIP OGEE | 3. DROP LIP OGEE | 3. | 3. |
| 4. Caulking Color: Black, White or Clear | 4. BLK | 4. CLEAR | 4. | 4. |

**Attention !**
**Cultured Marble Subcontractor:**    1. Faucets centers are 3 holes with 4" on center

| | Master Bath | Bath 2 - Middle Bath between BR2 & 3 | Bath 3 - Rear Bath near BR 4 | Cabana (½) Bath on Lanai |
|---|---|---|---|---|
| 1. Tub: WH - standard | 1. WH | 1. WH | 1. | 1. |
| 2. Toilet & (Pedestal Sink - if appl): WH-std | 2. WH | 2. W/H | 2. | 2. WH |
| 1. Shower Door  Clear or Obscure | 1. CLEAR | 1. | 1. | 1. |
| 2. Shower Door  Chrome or Gold tone | 2. CHROME | 2. | 2. | 2. |
| Bath Accessories/Hardware: (see Red Selection Book) | | | | |
| 1. Style Name: | 1. GILCREST COLL. | 1. YORKSHIRE COLL | 1. | 1. PRESTON COLL. |
| 2. Finish: | 2. OIL RUBBED BRONZ ORB | 2. SATIN NICH SN | 2. | 2. MPCW |
| 3. Item & Quantity: **FAX FLOOR PLAN WITH INSTALL LOCATIONS** | 3. Paper Holder = 1  24' Towel Bar = 2  Towel Ring = 1 | 3. Paper Holder = 1  24' Towel Bar = 1  Towel Ring = 1 | 3. Paper Holder = 1  24' Towel Bar = 1  Towel Ring = 1 | 3. Paper Holder = 1  Towel Ring = 1 |
| Bath Wall Tile | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |
| Bath Flooring | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |

* WH - white,  BI - bisque,  BL - black,  SA - sand,  BO - bone,  GR - gray,  CH - chrome,  SS - stainless          DCC/Delivery/ selection sheet 06-01-05

Homebuyer's Approval: _Andrew Williams_                          Date: 6-11-05

# Diamond Court Construction Company

**SELECTION SHEET & WORK ORDER SHEET** - pg 3

| | |
|---|---|
| Fax to: _____ | |
| Fax #: _____ | |
| From: _____ | |
| Re: _____ Pages: ___ | |

**Customer:** _ANDREW WILLIAMS_ **Job #:** _____

**Model:** _____ **Job Address:** _DARWIN_

## INTERIOR COLOR SELECTIONS

| Wall & Ceiling Texture<br>Textured like Model is Standard<br>Specify standard or upgrade below | Int. Paint Colors | Switch / Outlet Plates<br>House: White is Standard<br>Kitchen Backsplash: WH, BI, BL * | Window Sills<br>Specify Carrara or Travertine below | Carpet & Tile |
|---|---|---|---|---|
| Wall: _STD_<br>Ceiling: _STD_ | See attached<br>Paint Selection Sheet | House Wall plates: _WH_<br>Kitchen counter backsplash<br>plates: _BLK_ | Carrara or Travertine:<br>_TRAVERTINE_ | See attached<br>Main Flooring Sheet |

## EXTERIOR COLOR SELECTIONS

| Ext Paint/Stain Colors | 30 yr. Architectural Roof Shingles | Aluminum Soffit Color & Fascia Color |
|---|---|---|
| See attached<br>Paint Selection Sheet | Brand: _ELK_<br>Color: _FOREST GREEN_ | Alumn. Soffit Color ☒ Check for White (standard)<br>☐ Check for upgrade color: _____<br>Wood Fascia Color: See Painting Sheet for trim color |

## INTERIOR & EXTERIOR DOOR SELECTIONS

| Front Entry Door | Front Door Hardware | Ext/Int Door Hardware | Interior Doors |
|---|---|---|---|
| **Standard:** (see red Sel. Book)<br>☐ Six-panel steel &<br>  694 IM 5-lite sidelight if appl.<br>☐ 686 CL full light with matching<br>  694-CL sidelights if applicable<br>☐ 686-IM 15-lite like Model with<br>  694-IM 5-lite sidelight if appl.<br>☒ 686-QE light silkscreen<br>  694-QE sidelights if applicable<br>☐ **Upgrade:** (See red Sel. Book) | ☒ P.Brass handle: standard<br>☐ Ant. Nickel handle: upgrade<br>☐ Ant. Brass handle:  upgrade<br>Note:  Keyless entry in Polish<br>  Brass only at this time<br><br>☐ Other: _____ | ☒ Ext P. Brass finish Lido lever:  standard<br>☐ Ext _____ finish:  upgrade<br>☐ Ext _____ lever:  upgrade<br><br>☒ Int P. Brass finish Lido lever:  standard<br>☐ Int _____ finish:  upgrade<br>☐ Int _____ lever:  upgrade<br><br>☐ Other: _____ | ☒ Six-panel: standard<br><br><br><br><br><br>☐ Other: _____ |

## Lighting & Landscape Selections
### See attached information sheet for instructions

Colors that the Buyer selects may vary from display samples due to different manufacturing color dye lots, patterns, or veining. If selected materials are not available, the Buyer agrees to make new selections without delay or Diamond Court Construction Company reserves the right to substitute materials of a like pattern, quality and design. Any unauthorized work scheduled or performed by the Buyer shall be removed, with cost of such removal charged to the Buyer. Selections to be finalized and signed 21 days after bank closing. Any changes to selections, must be made prior to the building permit being issued. An Administrative service charge of $250.00 will be added to the price of any and every change. No changes allowed once building permit is issued.

IMPORTANT: Homebuyer, please review all information for accuracy of selection numbers and colors before signing.

Homebuyer's Approval: _Andrew Williams_ Date: _6-11-05_

DCC/Delivery/selection sheet 06-01-05

**Diamond Court Construction Company**   **SELECTION SHEET & WORK ORDER SHEET** - pg 4

Fax to: _____

Fax #: _____

From: _____

Re: _____ Pages: _____

Customer: _____   Job #: _____

Model: _____   Job Address: _____ *DARWIN* _____

| List Of All Upgrades And Changes | | |
|---|---|---|
| DESCRIPTION | LEVEL | PRICE |
| SENICA RIDGE MAPLE TOFFEE ARCH | I | 950 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Person coordinating selections:** _Andrew William_

DCC/Delivery/selection sheet  06-01-05

## PAINT SELECTION WORK ORDER

Date:                               From:     Diamond Court Construction Co.
To:                                 Sender:
Fax:                                Pages:

**Customer:** _A WILLIAMS_     **Job #:** _____

**Model:** _COAST POINTE_     **Job Address:** _DARWIN_

### Write in Sherwin Williams Color Name and Number below:

**A.**    **Interior Selections:** *(Choose 1 color for ceilings & walls & 1 color for trim)*
     1. Wall & Ceiling Color:     Masterhide Int. Flat: _POLAR WH SW 2423_
     2. Kitchen & Bath Color:     Masterhide Int. Semi-gloss: _POLAR SW 2423_
     3. Trim Color:     Masterhide Int. Semi-gloss: _PURE 7005_
     (doors, baseboard, casings, moldings)
     4. List any upgrades here: _____

**B.**    **Exterior Selections -** *(Choose up to 3 colors)* | See Elevation sheet for color locations |
     1. Stucco Sealer:     Loxon
     2. Body Color:     DuraCraft Ext. Flat: _SAGEY SW 6175_
     3. Trim Color #1:     DuraCraft Ext. Flat: _LIVEABLE GREEN SW 6176_
     4. Trim Color #2:     DuraCraft Ext. Flat: _PURE WHITE 7005_
     5. Exterior Front Door:     DuraCraft Ext Satin:   Same as Trim Color # _6176_
     6. All other Exterior Doors: DuraCraft Ext Satin:   Same as Trim Color # _6176_

   **Note:** The inside of Exterior Doors are to be painted with the Interior Trim Color

**C.**    **Lanai Floor Selection:**
     1. Floor Stain Color:     HC Brand Stain Color : _Dusted Clover HC121_
     *(Exterior silicone acrylic concrete sealer)*

**D.**    **Leave Touch up kit &/or remaining paint buckets in attic**

Homebuyer's Approval: _Andrew Williams_        Date: _6-11-05_

# MAIN FLOORING SELECTIONS
### INCLUDING KITCHEN TILED FULL BACKSPLASH
# DELIVERY / WORK ORDER SHEET

| Job #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: *COAST POINTE* | 2112 SE Bersell Rd., PSL, FL. 34952   (772) 337-3070   FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: *A WILLIAMS* |
| CONST. STAGE: | DELIVERY ADDRESS: *DARWIN* |

| Floor Tile | Brand, Tile Name, Number, Color & Size * | Level #<br>Standard, I, II, or III | Grout Color & # | Tile Dir<br>straight or diagonal |
|---|---|---|---|---|
| FULL TILED BACK SPLASH at range side | | upgrade | | ☐ STRT<br>☐ DIAG |
| FRONT ENTRY: strt is standard | *INDIAN SLATE SIOUX VARDE 12X13* | *STD* | *GRAY 16* | STRT |
| FOYER: strt is standard unless upgraded to diag in Liv/Din | *TEJA* *LAMESA 18X18 ELEMENTS* | | *BRICK 41* | ☒ STRT<br>DIAG |
| KITCHEN + pantry | | | | DIAG |
| NOOK + hallway off nook | | | | DIAG |
| LAUNDRY + hallway off laundry | | | | DIAG |
| REAR HALLWAY - next to rear bath | | | | ☐ STRT<br>☐ DIAG |
| | | | | |
| | | | | |
| | | | | |

| Carpet - more than one color is an upgrade | Brand / Color / Number | Level #<br>Standard, I, II, or III | MISC. |
|---|---|---|---|
| LIVING | *ZANZIBAR 872 FUDGE* | *STD* | |
| DINING | | | |
| FAMILY + hallway off family | | | |
| DEN/STUDY | | | |
| MASTER BEDRM + closets | | | |
| BEDROOM 2 | | | |
| BEDROOM 3 | | | |
| BEDROOM 4 | | | |

* Threshold in Travertine or Carrara Marble to separate room floor tiles that are different

Homebuyer's Approval: *Andrew H Williams*     Date: *6-11-05*

DCC//Delivery/Floor (Main) Tile Selection Sheet/06-01-05

Floor (Main) Tile Selection Sheet.wpd

# Bath - Wall & Floor Tile
# DELIVERY / WORK ORDER SHEET

| JOB #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: | 2112 SE Bersell Rd., PSL, FL. 34952   (772) 337-3070   FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: A WILLIAMS |
| CONST. STAGE: | DELIVERY ADDRESS: DARWIN |

| Bath Tile | Brand, Tile Name, Number, Color & Size | Level # Standard, I, II, or III | Tile Dir Straight or Diagonal | Grout Color & # | Tub/Shower Walls Ceramic Towel Bar & Soap dish White or Bone |
|---|---|---|---|---|---|
| **Master Bath** SHOWER WALL | CHURCHILL ELEMENTS 8X10 ALMOND | STD | STRT | EGGSHELL 58 | ☐ Check if you want towel bar & soap dish - color:_____ |
| 7 - SHOWER WALL DECOS | ALMOND + ALMOND 8X10 | | ---- | | ☐ Check for upgrade corner shelf - color:_____ |
| **Master Bath** BATH FLOOR | ALMOND 12X12 | | STRT | | ☐ Check if Listellos to be put on tub deck  - OR - |
| **Master Bath** SHOWER FLOOR | RAINFOREST GARDENIA 3X3 | | STRT | | ☐ Check if Listellos to be placed on shower wall |
| **Master Bath** TUB DECK | SAME AS FLOOR TILE ALMOND 12X12 | | STRT | | LISTELLO #: |
| **Bath 2 - middle bath by BR2 - BR3** SHOWER OR TUB WALL | PESCARA 8X10 VERDE P5705 | | STRT | GRAY 16 | ☑ Check if you want towel bar & soap dish - color: BONE |
| 5 - WALL DECOS | PECARA 8X10 VERDE P5706 | | ---- | | ☐ Check for upgrade corner shelf - color:_____ |
| **Bath 2 - middle bath by BR2 - BR3** BATH FLOOR | PESCARA 12X12 VERDE P3072 | | STRT | | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Bath 2 - middle bath by BR2 - BR3** SHOWER FLOOR | | | STRT | | |
| **Bath 3 - rear bath near BR 4** SHOWER OR TUB WALL | | | STRT | | ☐ Check if you want towel bar & soap dish - color:_____ |
| 5 - WALL DECOS | | | ---- | | ☐ Check for upgrade corner shelf - color:_____ |
| **Bath 3 - rear bath near BR 4** BATH FLOOR | | | STRT | | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Bath 3 - rear bath near BR 4** SHOWER FLOOR | | | STRT | | |
| **Cabana (½) Bath on Lanal** SHOWER OR TUB WALL | | | STRT | | ☐ Check if you want towel bar & soap dish - color:_____ |
| 5 - WALL DECOS | N/A | | ---- | | ☐ Check for upgrade corner shelf - color:_____ |
| **Cabana (½) Bath on Lanal** BATH FLOOR | CHURCHILL 12X12 BEIGE | | STRT | EGG SHELL 58 | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Cabana (½) Bath on Lanal** SHOWER FLOOR | N/A | | STRT | | |

**TILE SPECS:** (1) All transitions/sills to be recessed in tile (2) All corners to be caulked - to windows also (3) Window sills to be re-set, if needed (4) Listellos for front of tub deck selection to be placed at top front of deck and step, angle walls also (5) All floor to shower transitions to be done with 5 ½" sill, over hanging into shower & recessed

Homebuyer's Approval: _Andrew Williams_                     Date: _6-11-05_

Bath Tile Selection Sheet.wpd

**To:**   **Mike Cormier**
**Fax:**   **561-791-8082**
**From:**
**Date:**


**SEARS**
⌂ **Contract Sales**

If Customer chooses appliance allowance, use Appliance Select form

| Account No: | | | Quote #: | | Quote Date: | | 2/15/05 |
|---|---|---|---|---|---|---|---|
| | **Prepared For:** | | | | **Project Information:** | | |
| Company<br>DIAMOND COURT CONST | | | Name | ANDREW WILLIAM | | | |
| Address<br>2112 SE BERSELL RD | | | Address | DARWIN | | | |
| City<br>PORT ST LUCIE | State<br>FL | Zip<br>34952 | City | | | State | Zip |
| Contact<br>JENNIFER | Phone<br>772-337-3070 | Fax<br>772-335-1150 | Contact | Phone | | Fax | |

## Standard Appliance Selections
### Check one of the appliance packages & circle choice of colors below

☒ **Standard Selection**
in choice of white, bisque, black

☐ **Stainless Steel Upgrade**
with standard laundry selection

| Stock Number | Description | Color | Qty | | Stock Number | Description | Color | Qty |
|---|---|---|---|---|---|---|---|---|
| | 26CU SXS REFRIG | | | | | | | |
| 46-54522 | KN; 26 SXS ICE WATER FILTER | W/BI/BL | 1 | | 46-52673 | 26 Ice and water Dispenser, Filtration Energy Star SS | SS | 1 |
| CODE 46 | WATER LINE HOOK UP | | 1 | | | | | |
| | RADIANT RANGE | | | | 22-95023 | Americas Best with Kenmore Exclusive Logiclean, SS | SS | 1 |
| 22-96012 | KN; 30 RADIANT TOP RANGE | W/BI/BL | 1 | | 22-2244 | Range Cord 4 ft., 4 Wire | | 1 |
| 22-49624 | RANGE CORD | | 1 | | | | | |
| | DISHWASHER | | | | 22-14773 | 8 touchpads plus china gentle cycle deluxe insulation, 5 Level, 7 Cycles. | SS | 1 |
| 15162 | KN;6 CYCLE DEL START | W/BI/BL | 1 | | 22-16006 | 6 ft. Dishwasher Cord | | 1 |
| 22-16006 | DISHWASHER CORD | | 1 | | | | | |
| | MICRO | | | | 20-62643 | 1.6 CU FT MHC 1,000 WATTS SENSOR ON OFF TURNTABLE AUTO | SS | 1 |
| 22-60402 | KN; 1.7 1000 WATTS COMBO | W/BI/BL | 1 | | CODE 61 | MICROWAVE INSTALL | | 1 |
| CODE 61 | INSTALL MICRO | | 1 | | | | | |
| 26-24942 | KN; SUPER CAP PL ELIT | W/BI/BL | 1 | | 26-24942 | KN; SUPER CAP PL ELIT | W/BI/BL | 1 |
| 26-64942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 | | 26-64942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 |
| 26-49606 | DRY; LP DRYER EXHST | | 1 | | 26-49606 | DRY; LP DRYER EXHST | | 1 |
| 26-49388 | DRYER CORD | | 1 | | 26-49388 | DRYER CORD | | 1 |

**Check one:** ☒ Electric
☐ Gas: Dryer & Range

| | |
|---|---|
| Mdse. Before Tax | |
| Tax Total 6.50% | |
| Misc. (Inst) | |
| Delivery Total | |
| Del. Tax* | |
| Grand Total | |
| *If applicable, delivery must be taxed in certain areas | |

This offer is good for 30 days, unless otherwise noted. This is a quote and is subject to the terms and conditions on our Contract &
Security Agreement. Sears Contract Sales reserves the right to change or withdraw this offer at any time prior to acceptance by purchaser.
Prices Effective _____ Thru _____

Accepted By: _____     Date: _____

*Your Sears Contract Sales Account Manager*

Submitted By: _____  Phone _____
Fax: _____  E-mail: _____
*Customer Support Center (800) 359-2000 Press 1*

**SEARS**
⌂ **Contract Sales**
www.ContractSales.Sears.com

**Selection Coordinator:** If Customer chooses to select appliances other than our standard appliance selections (even if it's only one that is different from our standard) fill out Appliance Select form. Our standards in addition to any upgrades can be selected at this location.

Homebuyer's Approval: _Andrew William_     Date: _6-11-05_     Eff: 4/29/05



DIAMOND COURT
CONSTRUCTION CO.

# LIGHTING & LANDSCAPE
# INFORMATION SELECTION SHEET

## Lighting Allowance

### $1200 Luxury Package

Make an appointment with the following Lighting store below before or after interior framing has been completed on your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately.

Crystal Lighting
1984 SW Bayshore Blvd.
Port St. Lucie, FL 34984
(772) 340-1140

## Landscape Allowance

### $800 Luxury Package

Make an appointment with the following Landscaping Center below after Stucco has been completed on the exterior of your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately.

Arbor Landscape & Lighting
Jim Quackenbush
(772) 879-6264 office
(888) 879-6264 office
(772) 519-3212 cell

DCC/Delivery/Lighting & Landscape Selections/06-01-05

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952   FAX (772) 335-1150

# Plumbing Specifications for Diamond Court Construction Company

Job # _____     Customer  A WILLIAMS

Job Address  _____ DARWIN _____     Model COAST POINTE

## Standard Luxury Specs
### Refer to Customer's Selection Sheet for Color & Finish selections
### See Contract Addendum or Change Order(s) for upgrades &/or changes

| | **Master Bath** |
|---|---|
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Showerhead (L2352-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Jetta Tub (soaker) *as per plan* - white |
| 5 | Moen Monticello Roman Tub faucet (T951-C + 4997 or 4999 valve) |
| 6 | American Standard Bidet-white, with Moen Chateu Bidet faucet (5200-C) *as per plan* |
| | **Guest Baths** |
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Tub/Shower (L2353-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Porcelain/Steel Tub *as per plan - white* |
| 5 | Pedestal-white, with Moen Chateu single lever Lav faucet (L4621-C) at Cabana bath *as per plan* |
| | **Kitchen** |
| 1 | Kitchen sink supplied by Diamond Court |
| 2 | Moen Monticello w/cathedral spout kitchen faucet # 7730 - choice of finishes  SL,CH,WH,BI,SA, |
| 3 | 1/2 HP Food disposal |
| 4 | Icemaker supply line |
| 5 | Dishwasher connection of supply & discharge line |
| | **Laundry** |
| 1 | 50 Gallon electric HWH |
| 2 | Wash Machine Hanson box |
| 3 | 2 Hose bibbs |
| 4 | A/C Chase *as per plan* |
| 5 | Necessary Lead vent pipe flashings |
| 6 | Copper  (water distribution lines) |



**DIAMOND COURT CONSTRUCTION CO.**

## Color Selection Authorization Release Form

I / We ____ANDREW WILLIAMS____, customer of

Diamond Court Construction Co., authorize ____RON BRODSKY____,

who is my ☒ Sales Agent for Diamond Court

who is my ☐ _____ (Relation to Customer)

to select and complete color selections for my / our property at:

_____

Homebuyer's Approval: ___Andrew William___   Date: ___6-11-05___

Homebuyer's Approval: _____   Date: _____

**Selection Check Off List:** Job#/Customer: _Williams_

---

## Sales Coordinator:

[X] Call customer to set up appointment: Ask them if they have been in Model to pre-select. If they have not, Customers should be encouraged to browse Show Room to allow time to consider possible selections prior to appointment. Allotted time is 5 hours. Thereafter $30 / hour. Average time customers take for selections is 4-1/2 hours.

[X] Review contract prior to appointment: Building Agreement, Addendum, Specs, Change Orders, Elevation, Floor Plan

[X] Review selections with customer upon finalizing selections

[X] Customer listed on Building Agreement or Authorized Person as shown on Color Selection Authorization Release form to sign &/or initial and date EVERY page.

[X] Make copy of ENTIRE Selection Packet:    Copy for Customer
                                            Copy for Sales
                                            Originals to Construction Office

◆ **Important Note:** **Do not make changes on selection sheet once customer has signed & been given a copy. Record any changes on a separate piece of paper or blank selection sheet form with their signature & date - submit to office.**

---

## Construction Office:

[ ] Make one copy of each of the below forms found in the legal file for comparing any upgrades listed on them with any upgrades listed on the selection forms:

      Building Agreement, Addendum, Spec Sheet, Change Orders, Floor Plan, Elevation if applicable

[ ] Print 8 ½ x 11 architectural plan from Chief Architect to include with selection sheet forms

[ ] Review selection sheets for accuracy. (Write up customers List of Upgrades for making a Change Order)

[ ] Record on kitchen sink order list

[ ] Color selection finalized ✓ off on customer list

[ ] Make copies of color selections for Superintendent Field Books

[ ] Write up a Change Order if applicable - see Change Order procedure

◆ **Important Note:** **For changes: Record changes to original selection sheet with revised date. Make copy of revised selection sheet & stamp with Field Book Updated stamp & file change request that was submitted on a separate piece of paper or blank selection sheet form with their signature & date in the back of original selection sheet forms.**



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## Model Center (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# COAST POINTE



Wood Fascia on Lux Pkg Color!

STANDARD

SASEX SW 6175

WH 7005 Wood Fascia on Lux Pkg Color!

WH 7005

WH 7005

WH 7005

LIVEABLE GREEN SW 6176

OFFICE VERSION

LIVEABLE GREEN SW 6176

WH 7005

WH 7005

WH 7005

WH 7005

Homebuyer,s Approval: Andrew Williams          Date: 6-11-05

# DIAMOND COURT HOMES INC.



**MONARCH MANOR**

| | |
|---|---|
| LIVING | 2133 |
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

TOTAL AREA
2817 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



Security First Insurance
*Insuring Florida Homes*

Post Office Box 45-9025, Sunrise, FL 33345-9025

For claims reporting dial toll free: 877-581-4862
International callers dial        : 386-673-5308
Or visit www.SecurityFirstFlorida.com .
For servicing questions, please contact your agent
  at the phone number listed below.

## SECURITY FIRST INSURANCE COMPANY

## HOMEOWNERS HO-3 POLICY DECLARATIONS

| Insured Name and Mailing Address: | Insured Location Covered by this Policy: | | |
|---|---|---|---|
| ANDREW WILLIAMS<br>4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953-6046 | 4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953-6046 | **Policy Number:** | SFIH0074498-03-1870 |
| | | **Amended** | 10/29/2009 12:01 AM |
| | | **Policy Effective Date:** | 04/25/2009 12:01 AM |
| | **County:** SAINT LUCIE | **Policy Expiration Date:** | 04/25/2010 12:01 AM |

COVERAGE IS PROVIDED WHERE A PREMIUM OR LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE

| Coverages | Limit of Liability | Annual Premium | Forms and Endorsements: | |
|---|---|---|---|---|
| **Section I** | | | SFIV HO 09 COV 11 08 | SFIV HO 09 SDE 03 08 |
| A. Dwelling | $219,000 | $653 | HO 00 03 04 91 | SFIV HO 09 SLC 07 07 |
| B. Other Structures | $43,800 | Included | SFIV HO 09 SP 12 08 | HO 04 48 04 91 |
| C. Personal Property | $109,500 | Included | HO 04 21 10 94 | |
| D. Loss of Use | $21,900 | Included | HO 04 96 04 91 | |
| **Section II** | | | SFIV HO 09 04 90 01 06 | |
| E. Personal Liability | $300,000 | $30 | SFIV HO 09 CLP 01 06 | |
| F. Medical Payments | $1,000 | Included | SFIV HO 09 ED 12 08 | |
| | | | SFIV HO 09 ELE 03 08 | |
| | | | SFIV HO 09 FCE 01 06 | |
| | | | SFIV HO 09 HD 01 06 | |
| | | | SFIV HO 09 OL1 05 06 | |

| Endorsement Premium Total<br>(see Endorsement Details, p.2) | $437 | Rating Information: | |
|---|---|---|---|
| | | Construction: | Masonry |
| **Credits and Charges:** | | Year Built: | 2006 |
| Age of Dwelling Credit | | Occupied By: | Owner |
| All Other Perils Deductible Credit | | Usage Type: | Primary Residence |
| Hurricane Deductible Credit | | Territory: | 181 |
| Coverage B Limit Surcharge | | BCEG Grade: | 02 |
| Windstorm Loss Mitigation Credit | | Burglar Alarm: | None |
| Building Code Effectiveness Grading Credit | | Fire Alarm: | None |
| Senior or Retiree Credit | | Automatic Sprinklers: | None |
| Maximum Discount Adjustment | Surcharge | Protection Class: | 03 |
| | | Opening Protection: | Hurricane |
| | | Roof Shape: | Hip |
| | | Exclude Wind Coverage: | No |

| Total Annual Policy Premium | $1,120.00 | Deductible - Section I | In case of a loss, we only cover that part of the loss over the deductible stated: |
|---|---|---|---|
| Total Policy Fees (see Details, p.2) | $57.95 | $2,500 All Other Perils Deductible | |
| **Total Policy Charges** | **$1,177.95** | **$4,380 (2% of Cov A) Hurricane Deductible** | |

The Hurricane portion of the Premium is:   $609.00          The Non-Hurricane portion of the Premium is:   $568.95

## Please see Page 3 of the Declarations Page for important notices that apply to this policy.

| Agency: 20269 Phone: (772) 879-1307 | First Lienholder | Loss Payable/Mortgagee: |
|---|---|---|
| M.E. Glennon and Associates, Inc. | Loan #TBA | NONE |
| P.O. Box 881055 | Select Portfolio Svc, Inc ISAOA | |
| Port St. Lucie, FL 34988 | PO Box 7277 | |
| | Springfield, OH 45501-7277 | |
| Agent: Luis Martinez | | |

Authorized Countersignature:   *N. E. M*                     SFI DEC 001 07 07



**Premium Bearing Endorsement Details:**

|  | Limit of Liability | Premium |
|---|---|---|
| **SFIV HO 09 04 90 - Replacement Cost on Contents** |  | $243 |
| **SFIV HO 09 OL1 - Ordinance or Law Coverage** | 25% of Coverage A | $161 |
| **HO 04 48 - Other Structures on the Residence Premises** |  | $24 |
| Description of Structure:<br>Miscellaneous Other Structure 1 | $6,150 |  |
| **SFIV HO 09 FCE - Fungi (Mold) Coverage** |  | $0 |
| 1. Section I - Each Covered Loss | $10,000 |  |
| Section I - Policy Aggregate | $10,000 |  |
| 2. Section II | $50,000 |  |
| **SFIV HO 09 SLC - Optional Sinkhole Loss Coverage** |  | $9 |
|  | **Endorsement Premium Total:** | **$437** |

**Policy Fee Details:**

|  | Amount |
|---|---|
| Managing General Agency Fee | $25.00 |
| Emergency Management Preparedness and Assistance Trust Fund Fee | $2.00 |
| Florida Insurance Guaranty Association 2007 Regular Assessment Recoupment Fee | $3.47 |
| Florida Hurricane Catastrophe Fund Emergency Assessment | $11.45 |
| Citizens Property Insurance Corporation 2005 Emergency Assessment | $16.03 |
| **Policy Fee Total:** | **$57.95** |

Prepared by
Debra Duke, an employee of
First American Title Insurance Company
201 S.W. Port St. Lucie Blvd., Suite 205
Port St. Lucie, Florida 34984
(772) 878-8700

Return to: Grantee

File No.: 1081-836992

EDWIN M. FRY, Jr., CLERK OF THE CIRCUIT COURT
SAINT LUCIE COUNTY
FILE # 2661684 07/07/2005 at 10:30 AM
OR BOOK 2294 PAGE 1408 - 1409 Doc Type: DEED
RECORDING: $18.50
D DOC STAMP COLLECTION: $560.00

# WARRANTY DEED

Made this _JULY 5 TH_, of 20 _05_ by and between

**Clarence I. Bright**

whose address is: **188-12 Turin Drive, St. Albins, NY 11412**
hereinafter called the "grantor", to

**Andrew M. Williams, an unmarried man**

whose post office address is: **3841 NW 6th Court, Ft. Lauderdale, FL 33311**
hereinafter called the "grantee":
(Which terms "Grantor" and "Grantee" shall include singular or plural, corporation or individual, and either sex, and shall include heirs, legal
representatives, successors and assigns of the same)

**Witnesseth,** that the grantor, for and in consideration of the sum of Ten Dollars, ($10.00) and other
valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens,
remises, releases, conveys and confirms unto the grantee, all that certain land situate in **St.
Lucie** County, **Florida**, to-wit:
 Lot 3, Block 2397 of PORT ST. LUCIE SECTION THIRTY FOUR, according to the plat thereof as recorded
in Plat Book 15, Page(s) 9, 9A to 9W of the Public Records of St. Lucie County, Florida.

Parcel Identification Number: **3420-665-1854-000/0**

**The land** is not the homestead of the Grantor under the laws and constitution of the State of Florida and
neither the Grantor nor any person(s) for whose support the Grantor is responsible reside on or adjacent
to the land.

**Subject to** all reservations, covenants, conditions, restrictions and easements of record and to all
applicable zoning ordinances and/or restrictions imposed by governmental authorities, if any.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in any way
appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances except taxes accruing subsequent to December 31st of 2004.

**In Witness Whereof,** the grantor has hereunto set their hand(s) and seal(s) the day and year first above written.

_____
Clarence I. Bright

Signed, sealed and delivered in the presence of these witnesses:

_____
Witness Signature

Print Name: __Asheena Moore__

_____
Witness Signature

Print Name: __Jennifer M. Moore__

State of __New York__

County of __Queens__

**The Foregoing Instrument was Acknowledged** before me on __July 5, 2005__, by **Clarence I. Bright** who is/are personally known to me or who has/have produced __NY Driver's License__ as identification.

_____
NOTARY PUBLIC

_____
Notary Print Name
My Commission Expires: __October 15, 2006__

Jennifer M. Moore
Notary Public - State of New York
No. 01MO5067142
Qualified in Queens County
My Commission Expires October 15, 2006

Page 2 of 2
1081 - 838992

*First American*

**First American Title Insurance Company**
**Port St. Lucie**
**201 S.W. Port St. Lucie Blvd., Suite 205**
**Port St. Lucie, FL 34984**

Andrew M. Williams
3841 NW 6th Court

Ft. Lauderdale, FL 33311

July 07, 2005

RE:     File Name:          Bright / Williams
        Property Address:   4565 SW Athena Dr.,
                            Port St. Lucie, Florida 34953
        File No.:           1081-836992

Dear Mr./Ms. Williams

Please find enclosed the original recorded documents for the above captioned property. Your Owner's Policy was delivered to you at the time of your closing. Please keep these documents with your permanent records for this property.

We thank you for the opportunity to be of service to you in this transaction. If you have any questions or concerns or need anything further, please do not hesitate to contact this office.

Sincerely,

Closing Team
First American Title Insurance Company

Print Form

Plaintiff Profile Form - Residential Properties

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |

**For Internal Use Only**

File Number

Date Received

This Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation using one form per affected address.  In completing this Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge.  If you cannot recall all of the details requested, please provide as much information as you can and expressly indicate "unknown" in the space provided when not known.  You must supplement your responses if you learn they are incomplete or incorrect in any material respect. You may and should consult with your attorney if you have any questions regarding completion of this form.  If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The questions and requests for production contained within this Profile Form are non-objectionable and shall be answered without objection.  By answering this Profile Form, you are not waiving the attorney work product and/or attorney client privileges.  Similarly, by disclosing the identity of consultants, such consultants remain non-testifying experts and are subject to all protections afforded by law.

To the extent that the form does not provide enough space to complete your responses, you may attach as many sheets of paper as necessary.  All photographs produced in response to this form shall be in color and attached to or printed on 8 1/2" x 11" white paper.

| Section I. Property Information | |
|---|---|
| Name Property Owner | Andrew Williams |
| Address of Affected Property | 4565 S.W. Athena Drive |
| | Port St. Lucie, FL 34953 |
| Is this Property:* ☑ Residential ☐ Commercial ☐ Governmental | |
| Name of Person Completing this Form | Andrew Williams |
| Is above your primary residence? ○ Yes No ● | |
| Mailing Address (if different) | 4531 S.W. Darwin Blvd. |
| | Port St. Lucie, FL 34953 |
| Phone: | (954 ) 806  - 2256 |

* If your response is commercial or governmental you should not fill out the remaining questions, you will receive a follow up form at a later date.

| Circle one: | ☐ Owner-Occupant ☑ Owner Only ☐ Renter-Occupant |
|---|---|
| Represented By: | Podhurst Orseck PA/Victor Diaz |
| Address: | 25 W. Flagler Street |
| | Suite 800 |
| | Miami, FL 33130 |
| Phone: | (305 ) 358  - 2800 |
| Case No. /Docket Info: | |

| Section II. Insurance Information | |
|---|---|
| Homeowner/ Renter Insurer: | Universal Property & Casualty Insurance |
| Policy #: | 592-437-627 |
| Agent: | M.E. Glennon |
| Address: | 1726 S.W. Bayshore Blvd. |
| | Port St. Lucie, FL 34984 |
| Phone: | (772 ) 879  - 1307 |

+ Attach Copy of  Insurance Declaration Page

**Section III. Claimant Information**

| Name of Claimant | Dates Occupied | | Gender | Date of Birth | Are you claiming personal injuries?* Circle One | | Identify Claimant Status as an Owner-Occupant, an Owner Only, or an Occupant or Renter Only |
|---|---|---|---|---|---|---|---|
| | Move-In | Leave | | | | | |
| Tracey M. Nichols | 8 / / 06 | / / | M / ☒ | 2  25/ 67 | ● Yes | No ○ | Occupant or Renter Only |
| Mark A. Nichols | 8 / / 06 | / / | ☒ / F | 12 16/ 64 | ● Yes | No ○ | Occupant or Renter Only |
| Jordan J. Nichols | 8 / / 06 | / / | ☒ / F | 9  15/ 93 | ● Yes | No ○ | Occupant or Renter Only |
| Justin V. Nichols | 8 / / 06 | / / | ☒ / F | 12 8 / 94 | ● Yes | No ○ | Occupant or Renter Only |
| Jarred S. Nichols | 8 / / 06 | / / | ☒ / F | 11 7 / 95 | ● Yes | No ○ | Occupant or Renter Only |
| | / / | / / | M / F | / / | ○ Yes | No ○ | |
| | / / | / / | M / F | / / | ○ Yes | No ○ | |
| | / / | / / | M / F | / / | ○ Yes | No ○ | |
| | / / | / / | M / F | / / | ○ Yes | No ○ | |
| | / / | / / | M / F | / / | ○ Yes | No ○ | |

* Personal injuries include claims for mental anguish and medical monitoring.

Plaintiff Profile Form - Residential Properties

## Section IV. Inspection Information

1.0. Have you, or has anyone on your behalf, conducted an inspection into whether Chinese-manufactured drywall is present in your home?   ● Yes   No ○

  1.1. If "Yes" to Question 1.0 Section IV. Who conducted the inspection?   Steve Litrides

  1.2. When did the inspection take place?   1  /14 /10

2.0. Has a determination been made that Chinese-manufactured drywall is present in your home?   ● Yes   No ○

  2.1. If "Yes" to Question 2.0. Section IV. Who made this determination?   Steve Litrides

  2.2. When was this determination made?   1  /14 /10

## Section V. Drywall Information

| Drywall Manufacturer | Markings on Drywall | Location in Home |
|---|---|---|
| Unknown | No markings | Everywhere |
|  |  |  |
|  |  |  |
|  |  |  |

## Section VI. Home Information

| Approx. Sq. Ft. of House: | 2451 | | | Yes | No |
|---|---|---|---|---|---|
| Estimated Sq. Ft. of Drywall | unknown | Occupied | | x | |
| Height of Interior Walls | 10 ft | Year-round | | x | |
| Number of Bedrooms: | 4 | Summer | | | |
| Number of Bathrooms: | 3 | Winter | | | |

### Plumbing System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| PVC/ CPVC/ Plastic Piping | | | x |
| Copper Piping | x | | |
| Copper Fixtures | x | | |
| Other Fixtures | x | | |
| Were repairs made to the plumbing system? | | No | |
| Dates: | | | |

### Electrical System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| Receptacles | x | | |
| Switches | x | | |
| Main Panel | x | | |
| 2nd Panel | x | | |
| Exposed Copper Wires | x | | |
| Were repairs made to the electrical system? | | x | |
| Dates: | | | |

+ Attach Copy of Floor Plan on 8 1/2" X 11" paper

## Section VII. Construction/Renovation Information

Date Range for New Home Construction: (Month/Day/Year)

| Start Date: | /  /05 | Completion Date | 8  /22 /06 |
|---|---|---|---|
| Move in Date: | 10 /18 /06 | Date Acquired Home | 7  /6  /05 |

Date Range for Renovations: (Month/Day/Year)

| Start Date: | /  /  | Completion Date | /  /  |
|---|---|---|---|
| Move in Date: | /  /  | | |

| Renovation(s) | Yes | No | N/A |
|---|---|---|---|
| First Floor: 1/2 Wall of drywall replaced | | | |
| First Floor: Full Wall of drywall replaced | | | |
| Second Floor: Any drywall replaced | | | |

## Section VIII. Homebuilder/ General Contractor/ Developer Information

Homebuilder/ General Contractor/ Developer's Name:

Diamond Court Construction Co.

Address: 2112 S.E. Bersell Road
Port St. Lucie, FL 34952

Phone: (    )    -

+ Attach Copy of Construction/Renovation Contract
+ Attach Copy of New Home Warranty Declaration

## Section IX. Drywall Installer

Drywall Installer's Name:

Unknown

Address:

Phone: (    )    -

## Section X. Drywall Supplier

Drywall Supplier's Name:

Unknown

Address:

Phone: (    )    -

Page 2

Plaintiff Profile Form - Residential Properties

| Section XI. Verification of Plaintiff Profile Form |
| --- |

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information provided in this Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |
| --- | --- | --- | --- |
| | 1-27.10 | | |
| | 1/27/2010 | | |
| | 1/27/10. | | |

THIS DOCUMENT IS INTENDED TO BE A LEGALLY BINDING CONTRACT TO PURCHASE REAL ESTATE IN THE STATE OF FLORIDA. IF YOU DO NOT UNDERSTAND THIS CONTRACT, OR DO NOT UNDERSTAND HOW TO USE THIS CONTRACT OR YOU DO NOT BELIEVE THIS CONTRACT IS ADEQUATE TO PROTECT YOU, THEN DO NOT USE OR SIGN THIS CONTRACT OR YOU SHOULD SEEK THE ADVICE OF A FLORIDA LICENSED ATTORNEY PRIOR TO SIGNING.

### RESIDENTIAL
### CONTRACT FOR SALE AND PURCHASE

SELLER: _VERONICA B BRIGHT_____ ("Seller")

BUYER: _ANDREW WILLIAMS_____ ("Buyer")

Seller and Buyer agree by signing this Contract that Seller will sell to Buyer the real estate and personal property described in this Contract (collectively "Property") upon the terms and conditions set forth in this Contract.

1.    **Description of Property**: The legal description of the Property located in _SANTLUCIE_ County, Florida is as follows: _SECT 34 BLK 2397 LOT 3_

Street Address: _4565 SW ATHENA DR._____

Property Appraiser's Identification or Folio Number, if known: _3420 665 1854 000-0_

2.    **Personal Property Included**: All improvements and attached items, including fixtures, built-in furnishings, built-in appliances and equipment, light fixtures, ceiling fans, attached floor coverings and window coverings. In addition, the following items of personal property that are checked are specifically included:

Dishwasher _____    Microwave Oven _____    Range_____    Refrigerator _____
Washer _____    Dryer _____    Security/Alarm System _____
Pool Cleaning Equipment _____    Satellite Dish _____

Other items of personal property included: _____
_____

1

Other personal property specifically excluded: _____

_____

3.   **Purchase Price and Method of Payment:**  Purchase price is $ *80,000* U.S. funds, payable as follows:

A.   $ *1000.00*   Deposit paid to *FIRST AMERICAN TITLE* at the time Buyer signs this Contract to be held in escrow pursuant to the terms of Paragraph 37 Escrow.

B.   $ *TBD*   Additional Deposit due by *TBD*, and if not paid by that date, Seller may cancel this Contract and retain any deposits paid.

C.   $ *TBD*   Amount of mortgage financing .

D.   $ *TBD*   Other: _____

E.   $ *TBD*   Cash or cashier's check drawn on local funds on closing and delivery of deed (or such greater or lesser amount as may be necessary to complete payment purchase after credits, adjustments, and prorations).

F.   $ *80,000*   TOTAL PURCHASE PRICE

4.   **Closing:**  The purchase hereunder shall be closed at the office of the attorney or agent for Buyer or mortgage lender unless otherwise agreed to by the parties hereto in writing on the *12* day of *JULY*, 20*05*, or, if said date is not filled in, on or before thirty (30) days from the date of this Contract. Possession shall be delivered to the Buyer at closing. Seller and Buyer shall execute and deliver at closing the documents and affidavits reasonably required to close the sale and purchase of the Property under this Contract.

5.   **Time for Acceptance:**  If this Contract is not signed by the Seller and the Buyer and a signed copy delivered by the last party signing this agreement to the other by mail, facsimile or personally, so that same is received on or before 5:00 P.M. *MAY 14TH*, 20*05*, the aforesaid deposit shall be, at the option of the Buyer, returned to him and this Contract shall be canceled. The date of the Contract for the purposes of performance shall be regarded as the date when the last one of the Seller and Buyer has

2

signed this Contract. A facsimile copy of this entire Contract and any signatures hereon shall be considered as an original.

6. **Mortgage Approval**: If this Contract provides for Buyer to obtain a mortgage, then Buyer's performance under this Contract shall be conditioned upon Buyer being approved for a mortgage loan in the mortgage amount specified in this Contract at an annual interest rate not to exceed _TBD_ %. Buyer agrees to apply for a mortgage within five (5) days and to make a good faith effort to get approved. In the event Buyer does not get approved for the mortgage within twenty (20) days from the date of this Contract and notify Seller of same, then either party may terminate this Contract by delivery of written notice to the other party or his agent, the deposit shall be returned to Buyer, and this Contract shall terminate. Buyer within the time allowed for obtaining mortgage approval may waive this condition. If Buyer obtains mortgage approval before the Contract is terminated, then this mortgage approval condition is deemed satisfied.

7. **FHA or VA Mortgage**: If the Buyer is seeking an FHA or VA mortgage loan, then the Buyer shall not be obligated to complete the purchase of the Property or to incur any penalty by forfeiture of deposits or otherwise unless the Buyer has been given certain written statements by the Federal Housing Commissioner, Veteran's Administration or Direct Endorsement lender setting forth the appraised value of the property in accordance with the requirements of the Federal Housing Commissioner, the Veteran's Administration or the Direct Endorsement lender. The FHA or VA Addendum to Contract is attached to this Contract and made a part of this Contract.

8. **Conveyance and Title Exceptions**: Seller agrees to give Buyer title to the above described property by statutory form of Warranty Deed free and clear of all encumbrances, except those being paid or released at closing by Seller, subdivision restrictions, zoning ordinances or regulations and easements for public utilities provided that none of the foregoing materially interfere with the use of the Property for residential purposes. The Property shall be delivered to Buyer free and clear of all reverter clauses and reservations for drainage, phosphate, minerals, metals, petroleum, which provide for a right of entry, road right-of-way, whether in favor of an individual, entity or governmental unit. The personal property described under Paragraph 2 shall be transferred by Seller by Bill of Sale Absolute.

9. **Title Evidence and Title Insurance**: Check (1) or (2):
(1) ☐   Seller will provide an owner's title insurance commitment as title evidence through First American Title Insurance Company or other title company of Buyer's choice (Title Agent or attorney Title Agent's name: _DEBRA DUKE_ ; Telephone No. _878 8700_ ). Seller will pay for the owner's title insurance commitment and policy, search, examination and related charges. If requested by Buyer, Seller's title agent will provide a simultaneous mortgagee policy and lender required endorsements at promulgated premium rates and Buyer shall pay for same. The closing fee to be charged by the title insurance agent, shall be divided equally between Seller an Buyer. Search, examination and related charges and closing fee charges shall not exceed fees customarily charged for similar services in the locality where the Property is located.

3

(2)  ☒      Buyer will obtain an owner's title insurance commitment as title evidence through First American Title Insurance Company or other title company of Buyer's choice (Agent or attorney Agent's name: DEBRA DUKE_____; Telephone No. 878 8700_____). Buyer shall pay for title examination and related fees. Seller will pay the for title searches prior to closing, including tax search and lien search fees. The closing fee to be charged by the title insurance agent, shall be divided equally between Seller an Buyer. Search, examination and related charges and closing fee charges shall not exceed fees customarily charged for similar services in the locality where the Property is located.

10.     **Title Defects**: Buyer shall have a reasonable time, but not to exceed ten (10) days from the date of receiving the owner's title insurance commitment to examine same. If Buyer finds upon examination of the title insurance commitment that the title to the Property is not good and marketable in accordance with the applicable Title Standards adopted by the Florida Bar and in accordance with the law, then Buyer shall notify Seller of such defects in writing and thereafter the Seller agrees to use reasonable diligence to make the title good and marketable and shall have a reasonable time to do so but not to exceed thirty (30) days from the date of receipt of the notice. If Seller is unable to cure the defects within said time frame, Buyer shall have the option of extending the time in which said defects are to be cured and corrected by Seller or accepting the title as it then is, or of demanding a refund of the money deposited under this Contract and terminating this Contract. If this Contract is terminated by reason of unmarketability of title, upon the return of the deposit to Buyer and Seller shall be released of all further obligations under this Contract.

11.     **Prorations**. Real estate taxes, assessments, association fees and rents, if any, shall be prorated through the day prior to closing. If the current amount of real estate taxes is not known at the time of closing, taxes will be prorated based upon the previous year's taxes, taking into account the maximum allowable discount and exemptions currently applicable.

12.     **Special Assessment Liens**: Certified special assessment liens as of the date of the Contract shall be paid by Seller. Pending liens as of the date of the Contract shall be assumed by Buyer.

13.     **Closing Expenses**: Seller shall pay for the Florida Documentary Stamps on the Deed and any surtax payable on the Deed and the costs of recording any corrective instruments and satisfactions. Buyer shall pay for the recording of the Deed and any mortgage loan expenses. Each party shall pay their own attorneys' fee; otherwise, any other closing expenses shall be paid as provided in this Contract.

14.     **Survey**: Prior to closing, Buyer may have the Property surveyed at his sole expense. If the survey shows any encroachments on the Property or shows the improvements located on the Property in fact encroach upon an adjoining property, or into easements on the Property, same shall be treated as a title defect.

4

15.   **Seller's Affidavit:** Seller shall furnish to Buyer an affidavit stating that there have been no improvements or repairs to the Property for ninety (90) days immediately preceding the date of closing which remain unpaid and such other affidavits that may be required by the title insurance commitment.

5

16.   **Property Inspections**: Within ten (10) days of the date of this Contract, Buyer, at Buyer's expense, shall have the right to have the Property inspected by licensed inspectors to determine whether there are any defects or damage to the roof, structural components, plumbing systems, exterior irrigation systems, electrical systems, windows, septic system, pool and filter systems, major appliances, air conditioning and heating systems, docks and sea walls, if any (collectively referred to as "Inspected Items"); whether there are active, live termite infestation or wood destroying organisms; or whether there are any adverse environmental conditions existing. The written inspection reports which shall include estimated cost of repairs and treatments shall be delivered by Buyer to Seller within fifteen (15) days from the date of this Contract. In the event Seller disagrees with any part of Buyer's inspection reports, Seller may have his own reports performed by licensed inspectors. If Buyer and Seller cannot resolve the differences between the reports, the parties shall agree on a third inspector to re-inspect the disputed items and his report shall be binding. The cost of the third inspector shall be paid one-half (½) each by Seller and Buyer. Seller shall provide utility services necessary for the inspections. All parties and the real estate brokers have the right to be present at the time of all inspections and shall be given reasonable notice of the schedule of all inspections.

17.   **Disclosure of Unobservable Defects**: If Seller knows of hidden, concealed or not readily observable defects materially affecting the value of the Property, then Seller is under a duty to disclose such defects to Buyer. If Seller knows of such defects, they are set forth in writing under "Special Clauses" below or have been separately disclosed by Seller and acknowledged in writing by Buyer. The covenants in this paragraphs shall survive the closing.

18.   **Repairs**: Seller shall pay all costs of replacement or repair required to remedy functional defects in the Inspected Items revealed by the inspections and for the cost of treatment and repair of active termite or wood destroying organism infestation or damage. Seller is not obligated to repair or replace cosmetic or aesthetic defects such as cracked roof tiles, missing or torn screens, tears, worn spots and discoloration of floor coverings/wallpaper/window treatments, nail holes, scratches, dents, scrapes, chips and caulking in ceiling/wall/flooring/tile/fixtures/mirrors and minor cracks in floor tiles/window/driveways/sidewalks/pool decks/garage and patio floors and pitted marcite nor is Seller obligated to bring any item into compliance with existing building code regulations if such items complied with the building code regulations at the time it was constructed or installed unless it is necessary to do so to repair a functional defect in Inspected Items. If the cost of repair and treatment exceed $____NA____ (2% of the purchase price if this blank is not filled in), either Buyer or Seller may elect to pay the excess, failing which, either party may terminate this Contract by delivery of written notice to the other party and deposits paid shall be returned to Buyer and this Contract shall terminate.

19.   **Walk-Through Inspection**: There shall be a walk-through inspection on the day of closing or as otherwise agreed between the parties to determine whether any functional defects have occurred since the inspections. Seller warrants that all appliances and equipment included in this sale shall be in working order at closing.

6

20.    **Escrow for Repairs**: If repairs and treatments are not completed by Seller prior to closing, unless prohibited by the mortgage lender of Buyer, one hundred fifty percent (150%) of the estimated cost of completing the repairs and treatments shall be escrowed at closing from the Seller's proceeds and the repairs and treatments shall be completed by Seller using licensed contractors within ten (10) days of closing.

21.    **Maintenance and Removal of Belongings**: Prior to closing, Seller shall perform routine maintenance to the Property, including but not limited to, the lawn and shrubbery. Seller shall remove all furniture and personal items from the Property not included in this sale and leave the house in a clean condition before the time set for closing.

22.    **Environmental Condition**: Seller does not know of any prior or existing environmental condition or problem affecting the Property or any adjacent property that might result in the Seller or the Property being cited for a violation of any law or regulation. This representation shall survive the closing.

23.    **Service Contracts**: The assignment of service contracts is not included in the sale unless specifically provided under the Special Clauses. If any service contracts are assigned to Buyer, the cost thereof shall be prorated between Seller and Buyer and the transfer fee, if any, shall be paid by the Buyer.

24.    **Leases**: Unless otherwise stated under Special Clauses, there are no tenants or leases encumbering the Property.

25.    **Risk of Loss**: If the Property is damaged by fire or other casualty before the delivery of the deed and can be restored substantially to their current condition within a period of time not to exceed thirty (30) days after the date of such casualty, Seller shall restore the improvements located on the Property and the closing date shall be extended accordingly. If such restoration cannot be completed within said period of time, this Contract at the option of the Buyer shall be terminated and the deposit shall be returned to Buyer; but if Buyer elects to purchase he shall be entitled to the benefits of any insurance carried on the Property.

26.    **Default by Buyer**: If Buyer fails to perform any of the obligations of this Contract, all money paid pursuant to this Contract by Buyer as aforesaid shall be retained by or for the account of the Seller as consideration for the execution of this Contract and as agreed and liquidated damages and in full settlement of any claims for damages, specific performance and the release of liability of the parties hereto. In such event, the holder of the deposit shall pay the real estate broker his commission but no more than one-half (½) of the total deposit and pay the balance of the deposit to Seller.

27.    **Default by Seller**: If the Seller fails to perform any of the obligations of this Contract, all deposits paid by the Buyer, at the option of the Buyer, shall be returned to the Buyer on demand or the Buyer may institute a lawsuit for specific performance. In addition, Seller shall pay forthwith to the real estate brokers entitled to a commission the full professional service fee provided for under this Contract.

7

28.   **Attorneys' Fees and Costs**: In connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' fees, including in the event of appellate review, and in arbitration, bankruptcy or other administrative or judicial proceedings.

29.   **Broker's Commission**: Check (1) or (2):

(1)   ☒   The broker's commission, if any, shall be paid by Seller at the time of the disbursement of the proceeds at closing.   Seller acknowledges the employment of _RON BRODERY_ listing broker and _CENTURY 21 ALL Professionas_ selling broker and agrees to pay said broker(s) the total sum of $_____ or _4_____% of the purchase price as commission for finding the Buyer and in the event the sale is closed.   The parties each represent that there are no brokers involved in this transaction, other than set forth above, and each party hereby indemnifies the other against liability by reason of a breach of this representation.

(2)   ☐   There are no brokers involved in this transaction and each party hereby indemnifies the other against liability by reason of a breach of this representation.

30.   **Assignment of Contract**: This Contract is not assignable by Buyer.

31.   **No Recording of Contract**: This Contract may not be recorded in any public records.

32.   **Foreign Investment and Real Property Tax ACT (FIRPTA)**: The parties will comply with the provisions of FIRPTA and applicable regulations. This may require that 10% of the purchase price is withheld and paid to the Internal Revenue Service on sales by certain foreigners.

33.   **Radon Gas**: Radon is a naturally occurring radioactive gas that when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

34.   **Energy-Efficiency Rating**: "In accordance with the Florida Building Energy-Efficiency Rating Act (Chapter 553, Part XI, F.S.), the Buyer of real property with a building for occupancy located thereon is notified that the Buyer may have the building's energy-efficiency rating determined".  Buyer acknowledges receipt of the "Florida Building Energy-Efficiency Rating System" Disclosure.

35.   **Selection of Service Providers**: If there are any referrals by one of the real estate brokers involved in this transaction to service providers, Buyer and Seller acknowledge that they are free to

8

select any providers and not just those referred or recommended by a broker; and the brokers do not guaranty the performance or quality of work of any of the providers of services.

36.   **Notices**:  All notices shall be made to the parties and any real estate brokers involved by mail, personal delivery, facsimile or other electronic media.

37.   **Escrow Agent**:  The escrow agent ("Escrow Agent") shall receive, hold and disburse funds in accordance with all of the terms and conditions of this Contract.  Upon completion of the disbursement of the funds held in escrow, Escrow Agent shall be automatically released and discharged of its escrow obligations and all liability associated with this escrow.  Escrow Agent will have no liability in connection with this escrow unless the Escrow Agent is determined by a court to be grossly negligent in the performance of the duties required of the Escrow Agent.  In the event that one party gives written notice to Escrow Agent requesting disbursement of any of the funds in escrow, or claiming to dispute, default, or non-performance relating to this Contract, then Escrow Agent shall promptly give written notice to the remaining parties, return receipt requested.  The Escrow Agent's written notice shall include a statement that if there is no objection given to Escrow Agent within ten (10) days of the date of the notice, the funds will be released pursuant to the demand.  If contrary written instructions are received by Escrow Agent before the ten (10) day period has run, Escrow Agent shall not disburse the funds until receipt of the written instructions agreed to by all parties, or upon receipt of the appropriate court order.  Escrow Agent may deposit the funds in escrow with the Clerk of the Circuit Court having jurisdiction of any dispute over the funds in escrow of the Contract.

38.   **Addendums and Disclosures**:  The following addendums are incorporated herein and attached hereto.  Please check the ones that are applicable and complete and attach them to this Contract.

      ☐ Condominium Association Disclosure
      ☐ Homeowners' Association Disclosure
      ☐ "As is" Addendum
      ☐ Lead Based Paint Disclosure
      ☐ Coastal Construction Control Line
      ☐ Information Sheet
      ☐ FHA or VA Rider Specific Locality Disclosure or Requirements

39.   **Special Clauses**: _____

_____

_____

_____

_____

_____

_____

9

40.   **Entire Agreement**: This Contract is the entire agreement between Seller and Buyer. No prior or present agreements will bind the Seller or Buyer unless incorporated into this Contract. Modifications to this Contract will not be binding upon either party unless in writing and signed and delivered by the party to be bound. This Contract shall not be recorded in the Public Records.

**THIS DOCUMENT IS INTENDED TO BE A LEGALLY BINDING CONTRACT TO PURCHASE REAL ESTATE IN THE STATE OF FLORIDA.   IF YOU DO NOT UNDERSTAND THIS CONTRACT, OR DO NOT UNDERSTAND HOW TO USE THIS CONTRACT OR YOU DO NOT BELIEVE THIS CONTRACT IS ADEQUATE TO PROTECT YOU, THEN DO NOT USE OR SIGN THIS CONTRACT OR YOU SHOULD SEEK THE ADVICE OF A FLORIDA LICENSED ATTORNEY PRIOR TO SIGNING.**

BUYER: _Andrew Williams_　BUYER: _____
Printed Name: ANDREW WILLIAMS　Printed Name: _____
Social Security or Tax I.D. # _____　Social Security or Tax I.D. # _____
Address: 3841 NW 6 CT　Address: _____
FT. LAUDERDALE FL. 33311
Telephone # 954-583 7035　Telephone # _____
Fax # 1800 237-1491　Fax # _____

DEPOSIT RECEIVED in escrow ___1000, 00___, _____ to be held subject to this Contract; if check, subject to clearance.

Escrow Agent: FIRST AMERICAN TITLE   By: _____
Company Name                    Signature

SELLER _____
Printed Name: VERONICA B BRIGHT　Printed Name: _____
Social Security or Tax I.D. # _____　Social Security or Tax I.D. # _____
Address: 188-12 TURIN DR.　Address: _____
ST ALBINS, N.Y. 11412
Telephone # _____　Telephone # _____

10

## PROPERTY RECORD CARD

Veronica B Bright   Record: 1 of 1          <<Prev     Next >>     Spec.Assmnt     Taxes     Exemptions  Permits  Map

**Property Identification**

| | | | |
|---|---|---|---|
| Site Address: | 4565 SW ATHENA DR | ParcelID: | 3420-665-1854-000-0 |
| Sec/Town/Range: | 33 :37S :40E | Account #: | 90205 |
| Map ID: | 44/33S | Land Use: | Vac Res |
| Zoning: | RS-4 - PSL | City/Cnty: | PORT ST. LUCIE |

**Ownership and Mailing**

Owner:        Veronica B Bright
Address:      3309 Ave J
              Brooklyn NY 11210-4117

**Legal Description**

PORT ST LUCIE-SECTION 34- BLK 2397 LOT 3 (MAP 44/33S) (OR 524-383)

**Sales Information**

| Date | Price | Code | Deed | Book/Page |
|---|---|---|---|---|
| 12/1/1986 | 5300 | 00 | CV | 0524 / 0383 |

**Assessment Final Value**

| | |
|---|---|
| 2004 Val: | 23800 |
| Assessed: | 23800 |
| Ag.Credit: | 0 |
| Exempt: | 0 |
| Taxable: | 23800 |
| TotalTax: | 600.19 |

**Total Land and Building**

| | |
|---|---|
| Land Value: | 23800  Acres: 0.24 |
| Building Value: | 0 |
| Finished Area: | 0 SqFt |

*188-17 TURIN DR*
*ST. ALBANS N.Y.*
*No Sketch 11412*

*Available*

**BUILDING INFORMATION**

**Exterior Features**

| | | | | | |
|---|---|---|---|---|---|
| View: | - | RoofCover: | - | RoofStruct: | - |
| ExtType: | - | YearBlt: | | Frame: | - |
| Grade: | - | EffYrBlt: | | PrimeWall: | - |
| StoryHght: | - | No.Units: | | SecWall: | - |

**Interior Features**

| | | | | | |
|---|---|---|---|---|---|
| BedRooms: | | Electric: | - | PrmIntWall: | - |
| FullBath: | | HeatType: | - | AvgHt/Fl: | |
| 1/2Bath: | | HeatFuel: | - | Prm.Flors: | - |
| %A/C: | | %Heated: | | %Sprinkled: | |

**Special Features and Yard Items**

| Type | Y/S | Qty. | Units | Qual. | Cond. | YrBlt. |
|---|---|---|---|---|---|---|
| | | | | | | |

**Land Information**

| No. | Land Use | Type | Measure | Depth |
|---|---|---|---|---|
| 1 | 0000-Vac Res | Bl -Front Ft | 85 | 125 |

THIS INFORMATION IS BELIEVED TO BE CORRECT AT THIS TIME BUT IT IS SUBJECT TO CHANGE AND IS NOT WARRANTED
THIS INFORMATION IS BELIEVED TO BE CORRECT AT THIS TIME BUT IT IS SUBJECT TO CHANGE AND IS NOT WARRANTED

Case 2:09-md-02047-EEF-MBN   Document 22447-4   Filed 01/06/20   Page 127 of 375



**Display:**
- ☑ County
- ☑ Street Labels
- ☑ Parcels
- ☑ Lot Dimensions
- ☑ Lot Labels



# ◆ BUILDING AGREEMENT ◆

This Agreement made and entered into this _14_ day of _MAY_, 20_05_, by and between _ANDREW WILLIAMS_ as Buyer/s, whose mailing address is: _3841 NW 6 CT FORTLAUDERDALE FL_ Phone: Home _954 583 7035_ Work _1800 237-1491_ Beeper/ Mobile _____, and Diamond Court Construction Company as Builder.

◆   **I. Location:** The Builder will for the consideration hereinafter mentioned, finish and deliver a residence or structure on the following described land, the Legal Description of which is:
Lot: _3_ Block: _2397_ Section: _34_   O.R. Book _____ Pages_____
Address: _4565 SW ATHENA DR_   County _SAINT LUCIE_

◆   **II. Payments:** The Buyer will in consideration of the Agreement being performed by the Builder as specified, pay or cause to be paid to the Builder, the sum of $ _209,900.00_ (U.S. Dollars) in the following manner:

| | Approved Lenders Draw | | | Cash Buyers Draw | |
|---|---|---|---|---|---|
| 1 | Contract Total  (see Addendum) | 209,900 | 1 | Contract Total   (see Addendum) | |
| 2 | Initial partial Deposit | $5,000 | 2 | less Lot prep Draw | |
| 3 | less 10% Deposit | 29,900 | 3 | less City Utilities Draw | |
| 4 | less City Utilities Draw | 4,600 | 4 | Draws based on lines 1 minus 2 & 3 | |
| 5 | less Lot prep Draw | 8,500 | 5 | Initial partial Deposit | |
| 6 | less Closing Costs paid up to | 2,000. | 6 | Remainder of Deposit Due | |
| 7 | less Lot Purchase/ Payoff | | 7 | Deposit.................................10% | |
| 8 | less Pool Draw (line #7 Adden.) | | 8 | Slab Draw............................20% | |
| 9 | | | 9 | Tie beam Draw.....................20% | |
| 10 | | | 10 | Mechanical rough-in Draw....25% | |
| 11 | | | 11 | Cabinet & Trim Draw...........20% | |
| 12 | Const. funds (omit line 2) | 164,900.00 | 12 | Final Draw............................5% | |

All payments will be made solely to Diamond Court Construction Company.  Deposit due in 60 days. All Bank draw schedules of any type are subject to approval by Builder.  Under <u>no</u> circumstances will the final draw of any Loan schedule be more than 10%.

THE BUYER/OWNER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN INTEREST-BEARING ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER/OWNER.

Revised February 3, 2005

The failure to waive the escrow requirement will result in an extra charge to the Buyer. The Builder shall be entitled to all interest accrued on the account.

_____ (Initials) Buyer/Owner hereby WAIVES the request for escrow of any portion of the deposit monies received.

At such time as each payment becomes due, Builder shall notify Buyer or Buyers Agents of same in writing whereupon Buyer or Buyers Agents shall have seven (7) days from receipt of such notification within which to make such payment. If Buyer or Buyers Agents fails to make the payment within the time period stated, there will be a penalty charge of $500 every 30 days plus an interest charge of two and one-half percent (2-1/2) per month on the amount of the unpaid payment from the due date until the payment is received.

**A. Default:** In the event of a default by buyer the parties agree that the amount of damages incurred by builder is not readily ascertainable. Builder will be incurring out of pocket expenses, as well as expending time and effort in connection with the contract before any actual construction work is done. The parties further acknowledge that the amount of loss profits of the builder in connection with a default by buyer, are also not readily ascertainable. It is therefore agreed that in the event that buyer defaults in this agreement, the buyer shall pay to the builder as liquidated damages and not as a penalty, the following amounts at the following times: If the buyer defaults after preliminary plans are prepared, the buyer shall pay the builder as liquidated damages 10% of the purchase price; if buyer defaults after plans are prepared and the filing of the application for the engineering permit, the buyer shall pay builder liquidated damages in the amount of 12% of the purchase price; if the buyer defaults after plans are prepared, the application for the engineering permit and the application for the building permit, the buyer shall pay the builder as liquidated damages a total of 18% of the purchase price; if the buyer defaults after construction has begun, the buyer shall pay the builder actual damages incurred by the builder, which shall include all out of pocket expenses of the builder paid or to be paid, reasonable amounts for time, effort, and expertise of the builder, and prospective loss of profits by the builder for the construction.

It is agreed that the Builder will deliver a notice of completion (substantial completion) to the Buyer, and the Buyer shall, within seven (7) days after receipt of said notice, make final payment to the Builder. Possession of the premises shall be delivered to the Buyer when the residence has been fully constructed and all monies due the Builder have been paid. If the final payment is not paid to Builder within 7 days of receipt of notice of completion for any reason, Buyer agrees to pay an additional three dollars/ month/ sq.ft. daily prorated until Builder receives final payment. At this time an Affidavit of No Liens covering all materials and labor will be presented to the Buyer by the Builder. There will be no occupancy of home prior to final payment. Occupancy by Buyer shall constitute complete acceptance by Buyer and waiver of all claims against Builder with exceptions to warranty only. The Buyer further agrees to pay all Attorney's fees, Court fees & related fees necessary to enforce this Building Agreement.

♦   **III. Craftsmanship:** This residence will have craftsmanship equal to or better than that used in the model home located at   573 SW NAUTICAL BLVD.   PSL, FL   .

♦   **IV. Insurance, Bank & Related fees:** The Buyer will furnish Builder's Risk Insurance in the full amount of this Agreement during the construction period as required by all Banks/Lenders and list Builder as additionally insured. The Builders Risk Policy must meet the following criteria: $250/$500 deductible, theft, vandalism, fire, damage, liability, wind storm coverage. It is the Buyers responsibility to make the necessary reports, claims and coverages on their builders risk policy without exception . The Buyer is advised to furnish Owner's Flood Insurance where applicable and any other Insurance Buyer deems necessary. Buyer will pay any and all loan interest, bank inspection fees, draw fees, courier fees and any other fee related to the mortgage. Buyer will pay utility company bills for electricity and water used during construction. If Buyer

is represented by an Agent or verbal communication becomes excessive (20 min./week), a fee of $360 per hour will be charged for responses.  Buyer acknowledges and agrees that Builder is not an insurer of Buyer's property.  The Buyer shall release the Builder and its agents and employees from any and all liability for damages, theft, etc. sustained to the property or injury to the Buyer while on the Property, and further shall hold the Builder and its agents and employee harmless from any liability for damages sustained to the Property or injury to a third party brought on the Property.

♦     **V. Changes & Extras:**     Buyer is requested to mail or fax any changes or concerns, this saves time and confusion.  A formal change order will be mailed to Buyer with requested change. Should the Buyer at any time before or during the construction of said residence require any additions or changes to the plans, they shall have the right to make such changes when practical, and the cost of Change order will be paid immediately when the change order is signed.  No change orders will be implemented until payment for change is received. If a change order has been sent to you and you have decided against it, write declined on the change order and mail or fax it back to us.  There will be a minimum administrative service charge of $100.00 on all declined change orders. A Selection Approval Period, extending from the date of this Agreement to 21 days after the 10% deposit is paid (bank closing), is the time when the Selection sheets are to be completed and signed.  If changes are requested after the Selection Approval Period but before the Building permit is issued  an administrative service charge of $250.00 will be added to the price of any and every change. After the Building permit has been issued , changes will be priced to include rework on the job or rework of materials being prepared by a supplier to the job and will be charged at three times the normal rate.  If for any reason the colors have not been chosen prior to the Building permit issuance date, Buyer understands and acknowledges that the Builder will use the current Model selections of color and specifications to complete Buyer's house.  Let it be known that all extras, changes or related contracts will have a minimum mark up of 20%.  There will be no provisions for anything verbal.

        Should changes in plans or specifications effecting the structure or land be required by Authorities where said lot is located, such as the Developer, Architectural Review Board, Homeowner's Association or by federal, state, municipal or any other governmental authority having jurisdiction over construction practices on said lot and structure, such changes shall be made at the Buyer's expense, including but not limited to changes in impact amounts, material amounts or changes in building codes. In effect Builder will receive no less than but not limited to the total U.S. Currency stated under the section II of this Agreement incorporating any changes, extras, Customized Plan charges and any other applicable charges made during construction. However, the Builder shall be allowed the additional time necessary to complete said structure for each change order, whether at the request of the Buyer or in compliance with or due to governmental authority changes.

        Builder may offer as an option to the plans and specifications a security system to be installed by an independent security company not affiliated with Builder.  The installation of the system and continued subscription of the services provided by the Security Company shall be at the sole option of the Buyer. Builder does not warrant or guarantee the equipment installed by the Security Company and Buyer shall look only to the Security Company in the event of breakdown or failure of such equipment or disruption of services resulting therefrom.  Builder shall not install the equipment or maintain same or monitor same if external monitoring capabilities are included therewith. Builder shall not be responsible for any representations made by Security Company, written or oral.  The Builder does not make or imply any warranty or guaranty that the equipment or the services provided will prevent or lessen the effects of burglaries, fire or other occurrences which the system is designed to prevent or monitor.  Buyer acknowledges and agrees that the Builder shall not be liable for loss or damage to property or for personal injury or death whether directly or indirectly due to (i) any failure of the system, the equipment or the components thereof, or the failure of any of the services provided by the Security Company, or (ii) the negligence of the employees of the Security Company.

        The above price is guaranteed to the buyer for 60 days from the signing of this Agreement with

exception only to other provisions provided herein. Should start of construction be delayed beyond this time by Buyer or Buyer Agents, or by reason of ruling or regulation of any governmental authority, or by reason of any other cause not the fault of Builder, then the above price may be increased to the published price for the month of actual start. Start of construction is defined as the date on which the slab is poured.

The Buyer shall not perform any work on subject property (under section I) related or unrelated to this Building Agreement, either directly or indirectly, except as covered by this Agreement, nor award any other contracts in connection with construction or other work on the Buyer's property.

♦    **VI. Delivery & Warranty:**  Subject to the provisions of this Agreement, the Builder agrees to use its best effort to deliver the substantially completed residence specified herein on or about ___180___ days from start of construction. Start of construction is defined as the date on which the slab is poured. However, the Builder cannot and will not be responsible for any damages or inconvenience caused to the Buyer for failure to complete the residence specified herein within the above number of days, regardless of the reason for such delay. Buyer agrees that Builder shall have the right to substitute material or items of comparable quality for such material or items which may be unobtainable by reason of strikes or discontinuance of production for any reason. Builder shall advise Buyer of such substitutions, giving advance notice where possible.

It is expressly understood and agreed that the Buyer shall in no event take possession of, or enter upon the Property prior to closing and should the buyer breach this provision: first the Buyer accepts house as is and forfeits all warranty and second the Buyer consents that the Builder shall have the right to dispossess them from the Property by summary proceedings if such action is deemed necessary by Builder.

The Performance Warranty in the form shown in this Agreement shall be issued to Buyer upon complete payment of all funds as provided for in this Agreement.  I further understand that no other representation, either oral or written, or whether contained in any advertisements, pamphlets, brochures or similar sales materials, shall create any additional express or implied warranties or guaranties beyond those contained in the "Performance Warranty". To the extent any such prior representations contradict the terms hereof, such representations shall be invalid and the terms of this document control.

BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY HABITABILITY OF SOIL OR SUBSURFACE CONDITIONS OF THE SUBJECT PROPERTY. BUYER EXPRESSLY ASSUMES THE RISK OF ANY AND ALL LOSS OR DAMAGE TO THE SUBJECT PROPERTY. DAMAGE CAUSED BY SOIL OR SUBSURFACE CONDITIONS, WHETHER OR NOT ANY SUCH ADVERSE CONDITIONS COULD HAVE BEEN DISCOVERED PRIOR TO THE CLOSING BY APPROPRIATE TESTING. OTHER THAN THE PERFORMANCE WARRANTY. THE BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY , ANY TYPE OF FITNESS AND MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

♦    **VII. Property Contingencies:** Items listed below which are applicable may be shown in the attached Addendum /Itemization of extra's or may be charged to the Buyer (upon) request by change order at a later date. It is hereby agreed that, when applicable, the following property related items are to be charged to the Buyer:

   ♦ All lot preparation (including but not limited to)
   ♦ Other impact fees not directly related to the material construction of the home.
   ♦ Soil tests & Engineering for other reasons than construction (diagnostic)
   ♦ Pilings
   ♦ Additional expenses for pumping concrete due to site conditions
   ♦ Underground electric & telephone service
   ♦ Additional electric service lines over fifty (50) feet for overhead power or Temp. Power pole
   ♦ Extended electrical service through attic or under slab  (200amp @ $20 per ft.)
   ♦ Expense caused by rock or other adverse subsoil conditions
   ♦ Additional concrete drive & walkway over ___1000___ square feet will be charged at $5.00 per sq. ft.
   ♦ Additional Bahia Sod over ___9000___ sq. ft.  will be charged at $0.20 per sq. ft.
   ♦ Additional public water and sewer lines over a distance of five (5) feet from house
   ♦ Septic tank over 900 gal.

4 of 5            Revised February 3, 2005

◆ **VIII. Special Assessments:** Buyer acknowledges that the subject property is or may be located in a special assessment district and is now or will be subject to a special assessment lien for certain improvements in that district. Buyer agrees to take title subject to and be solely responsible for payment of any assessment established, whether or not said assessment is pending, certified, or confirmed prior to the date of closing, and the Buyer specifically releases the Seller of any requirement for payment on said special assessment.

◆ **IX. Absolute Domain:** The following exhibits which are attached hereto and more fully describe the residence covered by this Agreement: Floor Plan Sheet, Elevation Sheet, Included Features Sheet and Addendum /Itemization of extra's. Let it be known that Diamond Court Construction Company is the procurator of this Contract/ Building Agreement and that this Contract/ Building Agreement supersedes all past and future Contracts or Agreements no matter what is signed or executed in relation to this contract by any officer or representative of the Builder with exception only to extras, addendums, customized plan charges or new Building Agreements drafted, written, produced and executed by Diamond Court Construction Company.

◆ **X. Disclosures:** Florida law requires the following disclosure to be given to the Buyer of property in this State. Builder has made no independent inspection of the Property to determine the presence of conditions which may result in radon gas, or any other conditions; however, Builder is not aware of any such conditions. Certain building methods and materials have been proven to reduce the possibility of radon gas entering the building. Buyers hereby unconditionally, jointly and severally agrees to indemnify and save harmless Diamond Court Construction Company ((Owners, Agents & Assigns) Indemnities)) and its successors and assigns, from any claim, action, liability, loss, damage or suit, arising from or effected by the building of the Buyers house or structure for any and all reasons other than payment for materials & labor. I understand that "Diamond Court Homes, Inc." is a trademark only, and is being used by the Builder "Diamond Court Construction Co., Inc., and that Diamond Court Homes, Inc., has no legal involvement in or responsibility, obligation or liability for the construction of my home.

◆ **XI. Severability:** If any portion of this Agreement is held unenforceable, void, or voidable by any court, each of the remaining terms hereof shall nevertheless remain in full force and effect as a separate contract and Buyers agree to the terms stated herein to make all terms enforceable . This Agreement shall be deemed modified and amended to the extent necessary to render it valid and enforceable.

◆ **XII. Binding Effect:** This contract shall be binding on the parties hereto, their heirs, successors, and personal representatives. Buyer shall not be entitled to assign this contract without written consent of Diamond Court Construction Company.

IN WITNESS WHEREOF, the said parties to these presents have hereunto set their hands and seals the day and year above written.

_____
◆BUYER

_____          ◆ Lance W. Collins, **CBC**, President
◆BUYER                                Diamond Court Construction Company
                                      Contract Corporately validated by President
                                      Contract must bear a copy of Corporate Seal

                                                                Corporate Seal

Revised February 3, 2005



# DIAMOND COURT CONSTRUCTION CO

**Lot Information Required**

Address: 4565 SW. ATHENA DR.

Lot: 3   Block: 2397   Section/Unit: 34

Subdivision: _____   Assoc. Docs: _____

## Customizing Agreement

### Section I : Bids on Plans
A $250 Fee is required to be paid at the same time you submit your plans to us for bidding. Bids will reflect specifications similar to our home designs. Extra features can then be added to fit your personal needs and tastes.

### Section II : Conference Time
An appointment for plan review with the Builder and the time in Conference is charged at $120/Hr. (1Hr. min.). Appointments will be prepaid before Conference is scheduled.

### Section III : CAD Time
CAD time to change prints after first preliminary review is charged at $90/Hr.

### Section IV : Custom Plans
The cost of plans to be produced from conceptual design through preliminary plans to final prints depends entirely on you, your plan design & how much time is spent in conferences about the plan. A $250 deposit for the initial conference is required. Due to the intense amount of labor that is expended to produce plans & Bids, it has become necessary to require a $2000 deposit to start the prints. The cost to produce a Custom plan from a preliminary to a final is approximately $2.10/ SQ FT.

[ _Andrea William_ ]    [ _____ ]
Customer Signature             Customer Signature

[ ANDREW WILLIAM ]    [ _____ ]
Printed                        Printed

[ 3841 NW 6 Ct. ]    Date:[ _____ ]
[ FT LAUDERDALE FL 33311 ]   Phone:[ 954 583 7035 ]
Home Address

D I A M O N D   C O U R T   C O N S T R U C T I O N   C O M P A N Y   I N C .
PHONE (772) 337-3070  2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952  FAX (772) 335-1150

DESIGN.FEE

# NOTICE OF CONSUMER RIGHTS UNDER THE CONSTRUCTION INDUSTRIES RECOVERY FUND

You have certain rights under Florida law if you have suffered damages caused by a state-licensed contractor or a construction company with whom you have signed a contract. State law requires that you be provided with this notice of your rights regarding the Construction Industries Recovery Fund, including how and where you can file a claim against the Fund for reimbursement of any damages you have suffered.

You may be eligible for reimbursement if you have suffered monetary loss due to certain acts (described below) by the contractor, financially responsible officer or business organization licensed under Chapter 489, Part I, Florida Statutes. The Fund is available only in cases where the contract was signed and the violation occurred on or after July 1, 1993.

## Who Is Eligible?

In order to seek compensation from the Construction Industries Recovery Fund, you must have:

1. Entered into a written contract with a licensed contractor for work on residential real property;

2. Commenced legal action against the contractor, financially responsible officer or business organization; and

3. Suffered a financial loss due to the contractor:

   a) Knowingly violating applicable city, county or state building codes or laws;

   b) Committing mismanagement or misconduct in the practice of contracting that causes financial harm to a customer;

   c) Abandoning a construction project for more than 90 days; or

   d) Signing a false statement claiming that the work is bonded, that all payments to subcontractors have been made, or claiming to have provided certain worker's compensation and insurance protection.

Florida laws provide specific definitions for determining whether a contractor's actions may constitute one of these violations. See §489.129(1)(d),(h),(k),(l), Fla. Stat. In addition, you must notify the Construction Industry Licensing Board (CILB) of your claim by certified mail at the time you commence legal action.

Filing a complaint against a contractor is not the same as filing a claim against the Fund. Even if you file a complaint against a contractor with the Department of Business and Professional Regulation (DBPR), you still have to give the CILB notice of your claim and you will also be required to file a Construction Industries Recovery Fund Claim Form with the CILB.

To request a Construction Industries Recovery Fund Claim Form or to receive more information about the Fund, write to:

Construction Industry Licensing Board
7960 Arlington Expressway
Suite 300
Jacksonville, Florida 32211-7467
Phone (904) 359-6310

If you have questions and/or want to file a complaint with the DBPR against the contractor, the financially responsible officer and/or the business organization, please write to the Complaints Section, DBPR, 1940 North Monroe Street, Tallahassee, Florida 32399-0782.

## Conditions For Recovery

In order to recover from the Fund, you must be an individual - not a company. The Recovery Fund is a last resort. Before you can receive any money from the Fund, you must have obtained a final judgment from a Florida court or a restitution order from the CILB based on the types of violations of law already mentioned. Both the violation of law and the signing of the construction contract must have occurred on or after July 1, 1993. Before the Fund will pay you any money, you must show that you have made every effort to determine if there are any assets from which you can recover all or part of the money you are owed. If so, you must try to recover before you can collect from the Fund. You have to file a claim for recovery with the Fund within 2 years of the time the violation of law happens or within 2 years of the time you find out or should have found out about the violation of law. No claim can be made more than 4 years after the time the violation of law happened.

## Payments From The Fund

The Fund does not pay post-judgment interest, punitive damages, or attorney fees. The Fund only pays what you have not yet collected for actual or compensatory damages. The Fund pays the lesser of up to $25,000 per claim, $25,000 per transaction, or $50,000 per contractor.

> FOR MORE INFORMATION ABOUT THE FUND, SEE §§ 489.140 TO 489.143, FLA. STAT. AND RULES 61G4-21.001 TO 61G4-21.005, FLA. ADMIN. CODE

Received by:   Homeowner's Signature _Andrew Williams_   Date: _5-14-05_

**FOR YOUR PROTECTION THE BUILDER PROVIDES AND YOUR LENDER REQUIRES A RELEASE OF LIEN FOR EACH NOTICE TO OWNER PRIOR TO DISPERSING EACH DRAW.**

**ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT ATTORNEY. LEGISLATIVE MANDATED 2003 DISCLOSURE REQUIRED BY FLORIDA.**

Received by: _Andrew Williams_          Date: _5-14-05_
Homebuyer's Signature

C:\Documents and Settings\Owner\My Documents\DCCC\CONTRACT.S\LIEN LAW DISCLOSURE.wpd



## DIAMOND COURT CONSTRUCTION CO.

### Customer Correspondence Info Sheet

| 1 | Full Name | ANDREW WILLIAMS | |
|---|---|---|---|
| 2 | Full Name of Spouse | | |
| 3 | Home Address | 3841 NW 6TH Ct. | |
| | | FT LAUDERDALE | |
| 4 | Home Phone # | 954 583-7035 | |
| 5 | Cell Phone # | Husband: | Wife: |
| 6 | Business Phone # | Husband: | Wife: |
| 7 | Fax Phone # | 1800 237-1491 | |
| 8 | Place of Employment | | |
| | Spouse's Employer | | |
| 9 | Copy of Driver License | Must have date of birth on license | |
| 10 | Spouse's License | Must have date of birth on license | |

C:\Documents and Settings\Owner\My Documents\DCCC\CONTRACT.S\Customer Correspondence Info Sheet.wpd

Buyer's Signature: _Andrew William_    Date: _5-14-05_

Buyer's Signature: _____    Date: _____

Sales Associate Signature: _____    Date: _____

# UPGRADE CHECK LIST / PRICE LIST
## EFFECTIVE: APRIL 29, 2005
### FEATURES & PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE OR OBLIGATION

| | ENERGY SAVING FEATURE PRIORITY | PRICE |
|---|---|---|
| **BLUEPRINTS** | | |
| NON STRUCTURAL CHANGES [$500 INITIAL + $300 EACH ADDITIONAL AREA] | | $500 |
| STRUCTURAL CHANGES TO BE DETERMINED ON WRITTEN REQUEST. | | TBD |
| BIDDING PRINTS / CUSTOM PLANS SEE CUSTOMIZING AGREEMENT | | TBD |
| PER ITEM CHANGE - CHANGE ORDER FEE AFTER THE SELECTION APPROVAL PERIOD AND PRIOR TO THE BUILDING PERMIT BEING ISSUED | | $250 |
| **LOT PREPARATION** | | |
| STANDARD LOT PREP   (ALLOWANCE & MIN. COST)   80FT X 125FT, 1/4 ACRE | | $8,500 |
| CORNER LOT PREP   (ALLOWANCE & MIN. COST)   100FT - 120FT X 125FT, 1/3 ACRE | | $10,500 |
| ESTATE LOT PREP   (ALLOWANCE & MIN. COST)   120FT - 160FT X 125FT, 1/2 ACRE | | $14,000 |
| OVER 1 ACRE WILL BE ESTIMATED ON AN INDIVIDUAL BASIS DUE TO MANY LOCAL, STATE & FEDERAL REQUIREMENTS     [ SITE PLAN ]   [ JOB REPORTING ] | | |
| **DRIVEWAYS / WALKWAYS** | | |
| WIDEN DRIVEWAY TO 20FT  FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $1,250 |
| WIDEN DRIVEWAY TO 21FT 4IN FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $1,650 |
| 16FT CIRCULAR DRIVEWAY FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $4,900 |
| WIDEN WALK WAY FROM DRIVEWAY TO FRONT DOOR FROM 3FT TO 5FT | | $400 |
| WALK WAY FROM DRIVEWAY TO GARAGE ACCESS DOOR 3FT WIDE | | $500 |
| WALK WAY FROM CABANA OR REAR BATH TO POOL DECK 3FT WIDE | | $400 |
| **POOL PACKAGES** | | |
| POOL & SCREEN PACKAGE STANDARD 14FT X 28FT            [ALLOWANCE  $28,800] <br> SUPERVISION & COORDINATION            $1,100 <br> ELECTRIC POOL PREWIRE & HOOKUP     $650 <br> CITY WATER POOL FILL                      $350 | | $30,900 |
| POOL & SCREEN PACKAGE RAISED WHIRLPOOL + HEATER 14FT X 28FT <br> [ALLOWANCE            $39,500] <br> SUPERVISION & COORDINATION            $1,100 <br> ELECTRIC POOL PREWIRE & HOOKUP     $650 <br> CITY WATER POOL FILL                      $350 | | $41,600 |
| **SPRINKLERS** | | |
| IRRIGATION SYSTEM FOR 1/4 ACRE      STANDARD LOTS 80' X 125' | | $3,000 |
| IRRIGATION SYSTEM FOR 1/3 ACRE      CORNER LOTS 90' TO 110' X 125' | | $3,900 |
| IRRIGATION SYSTEM FOR 1/2 ACRE      ESTATE LOTS 120' TO 160' X 125' | | $4,800 |



| | Effective: 4/29/05 |
|---|---|
| **WELLS / SOD** | |
| WELL & PUMP FOR HOUSE SUPPLY 3/4 HP PUMP & 32 GAL. PRESSURE TANK $1800<br>ELECTRICAL REQUIRED                 $400 | $2,200 |
| WELL & PUMP FOR IRRIGATION    1 ½ HP PUMP & ELEC RELAY            $1800<br>ELECTRICAL REQUIRED                 $400 | $2,200 |
| ADDITIONAL 8000 SQ FT BAHIA SOD FOR CORNER LOT 120' X 125' | $2,000 |
| UPGRADE 9000 SQ FT OF BAHIA TO FLORITAM SOD FOR 1/4 ACRE 9000SQ FT | $2,000 |
| FLORITAM SOD FOR 1/3 ACRE 11000SQ FT | $2,750 |
| FLORITAM SOD FOR 1/2 ACRE 18000SQ FT | $5,150 |
| **ROOFING** | |
| UPGRADE FROM 30 YR TO 40 YR ARCHITECTURAL SHINGLES | $3,500 |
| METAL ROOF FOR COAST POINTE - STD,        AND MODELS UP TO  2826 SQ FT | $13,500 |
| METAL ROOF FOR COAST POINTE - OFC        AND MODELS UP TO  3015 SQ FT | $14,250 |
| METAL ROOF FOR COAST POINTE - 4BR/3BA  AND MODELS UP TO  3067 SQ FT | $15,000 |
| METAL ROOF FOR COAST POINTE - 4BR/3BA & OFC  AND MODELS UP TO 3256 SQ FT | $16,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 2826 SQ FT | $13,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 3015 SQ FT | $15,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 3256 SQ FT | $16,500 |
| **Windows / Exterior Doors** | |
| UPGRADE STANDARD CLEAR WINDOWS TO TINTED WINDOWS | **1** $1,200 |
| UPGRADE TINTED WINDOWS TO INSULATED WINDOWS | **1** $3,100 |
| UPGRADE INSULATED WINDOWS TO INSULATED (LOW-E) WINDOWS) | **1** $1,800 |
| UPGRADE FULL LITE DOORS TO INTERNAL BLINDS (TILT ONLY) | $350 |
| UPGRADE FULL LITE DOORS TO INTERNAL BLINDS (TILT & RAISE) | $400 |
| UPGRADE GLASS BLOCK IN COAST POINT MASTER BATH BAY WINDOWS | $2,250 |
| ADDITIONAL HANDLESET ON FRONT ENTRY DOUBLE DOORS | $350 |
| IMPACT RESISTANT GLASS WINDOWS & DOORS | TBD |
| OBSCURE WINDOW | $150 |
| **Painting** | |
| FLOOR STAIN AT LANAI | $450 |
| ONE ADDITIONAL INTERIOR COLOR (WALL COLOR DIFFERENT THAN CEILING COLOR)<br>(IN CP STUDY/4BR - ENTIRE HOUSE) | |
| | |
| | |
| | |

| ELECTRICAL | EFFECTIVE: 4/29/0 |
|---|---|
| UNDERGROUND ELECTRIC SERVICE   STANDARD LOT | $1,20 |
| INTERIOR WALL OUTLET | $9 |
| EXTERIOR (G.F.I.) WEATHER-PROOF OUTLET | $14 |
| LIGHT SWITCH | $9 |
| DIMMER FOR LIGHT | $12 |
| RECESS CAN LIGHTING (HI-HATS) | $11 |
| CEILING FAN OUTLET (SINGLE SWITCHED)   **1** | $18 |
| HANG NORMAL LIGHT FIXTURE | $5 |
| HANG LARGE LIGHT FIXTURE OR FAN INSTALL | $7 |
| PHONE PRE-WIRE | $7 |
| TV / CABLE PRE-WIRE | $7 |
| FLOOR OUTLET | $425 |
| ELECTRIC SERVICE FOR FUTURE SECURITY LIGHTS (SINGLE SWITCHED) | $180 |
| POOL PRE-WIRE (STD, 1-PUMP, 1-HEATER 1-TIME CLOCK) | $650 |
| UPGRADE TO BISQUE OR BLACK WALL/SWITCH PLATES FOR ENTIRE HOUSE | $550 |
| **PLUMBING / BATHS** | |
| UPGRADE MASTER BATH WHIRLPOOL TUB          PLUMBER $1,500  NOTE FOR ELECTRIC GFIC SERVICE      ELECTRIC $ 350 | $1,850 |
| UPGRADE MASTER TUB COLORS - (BONE OR ALMOND) | $250 |
| UPGRADE MASTER TUB COLORS - (RED, BLUE, BLACK, ETC PREMIUM COLORS) | $700 |
| UPGRADE TOILETS OR HALL TUB TO BONE | $150 |
| BIDET | $750 |
| HANDICAPPED TOILET (TO ADD TOILET) | $800 |
| HANDICAPPED TOILET (IN PLACE OF STANDARD TOILET) | $500 |
| BI-PASS TUB ENCLOSURE | $600 |
| ADDITIONAL SHOWER HEAD | $750 |
| CERAMIC CORNER SHELF IN WHITE OR BONE APPROX. 7" BACK TO FRONT | $50 |
| BUILT-IN SHOWER BENCH (IN ALL MODELS) | $300 |
| SPORT SHOWER IN MASTER BATH OF COAST POINTE | $8,000 |
| UPGRADE FROM STD. LUXURY PKG. VANITY TOPS TO GRANITE VANITY TOPS W/CHINA SINK | $2,800 |
| UPGRADE FROM 50 GALLON TO 66 GALLON WATER HEATER   **2** | $275 |
| UPGRADE FROM 50 GALLON TO 80 GALLON WATER HEATER   **3** | $350 |
| LAUNDRY TUB - FREESTANDING | $650 |
| LAUNDRY TUB - BUILT IN (PRICE DEPENDS UPON SIZE) | TBD |
| HOSE BIBB | $150 |

| INSULATION & AIRCONDITIONER | | EFFECTIVE: 4/29/05 |
|---|---|---|
| VENT MICROWAVE EXHAUST TO OUTSIDE | | $300 |
| PRIVACY INSULATION AT FAMILY ROOM AND BEDROOM WALLS | | $450 |
| ADD R-19 INSULATION TO 2 CAR GARAGE | ••1•• | $450 |
| ADD R-30 INSULATION TO 2 CAR GARAGE | ••1•• | $550 |
| ADD R-19 TO REAR LANAI | ••1•• | $450 |
| ADD R-30 TO REAR LANAI | ••1•• | $550 |
| UPGRADE ATTIC INSULATION FROM R-19 TO R-30 | ••1•• | $2,100 |
| UPGRADE ATTIC INSULATION FROM R-30 TO R-38 | ••1•• | $1,600 |
| UPGRADE WALL INSULATION FROM R-5 TO R-10 | ••1•• | $1,500 |
| UPGRADE WALL INSULATION FROM R-10 TO R-15 | ••1•• | $1,800 |
| UPGRADE TRANE AIRCONDITIONER FROM    12 SEER TO 14 SEER | ••1•• | $2,400 |
| UPGRADE TRANE AIRCONDITIONER FROM    12 SEER TO 16 SEER | ••1•• | $3,900 |
| 2 - ZONE AIRCONDITIONER SYSTEM          2 TON 12 SEER | | $4,400 |

| INTERIOR | |
|---|---|
| **Door Hardware:** UPGRADE INTERIOR & EXTERIOR HARDWARE: & FINISH | $200 |
| **Rounded Corners in Coast Pointe**        **$10./Linel Ft** | |
| **Trim:** UPGRADE COLONIAL MILLWORK TO BABY HOWE MILLWORK | $2,200 |
| **Sills:** UPGRADE TRAVERTINE MARBLE TO CULTURED MARBLE WINDOW SILLS | $1,150 |
| **Carpet:** FOR EACH DIFFERENT COLOR | $50 |
| **Full Granite (std. level) backsplash at Rangeside** | $1,200 |
| **Wall tile backsplash at Rangeside** - (PRICE NOT AVAILABLE YET) | |
| **Add Closets at Study/Foyer** IN LAKESIDE TERRACE/CP/GHP | $750 |
| **Add French Double Doors at Foyer** IN LAKESIDE TERRACE/MM | $900 |

| CABINETRY | |
|---|---|
| CABINET PRICING ON SEPARATE CABINET PRICE LIST | |
| **Cabinet Storage/Organizing Accessories:** BASE CABINET ROLL OUT SHELF | $250 |
| LAZY SUZAN (ALUMINUM) | $280 |

| KITCHEN COUNTERTOPS | Add $800 more to Mon.Manor | |
|---|---|---|
| UPGRADE CORIAN LEVEL I TO CORIAN LEVEL II | | $1,500 |
| UPGRADE CORIAN LEVEL II TO CORIAN LEVEL III | | $2,500 |
| UPGRADE CORIAN LEVEL II TO CORIAN LEVEL IV | | $4,000 |
| UPGRADE CORIAN LEVEL I TO GRANITE LEVEL I | | $4,300 |
| UPGRADE CORIAN LEVEL II TO GRANITE LEVEL I | | $3,800 |

| | | |
|---|---|---|
| **KITCHEN APPLIANCES** | | EFFECTIVE: 4/29/05 |
| UPGRADE KITCHEN APPLIANCES TO STAINLESS STEEL | | $1,200 |
| SLIDE IN RANGE WITH WALL TILE AT STOVE/BARTOP BACKSPLASH - (PRICE NOT AVAILABE YET) | | |
| **GARAGE** | | |
| INSULATE GARAGE DOOR | **1** | $400 |
| SIDE LOAD GARAGE | | $1,800 |
| GARAGE DOOR OPENER | | $450 |
| **GAS SERVICE** | | |
| GAS SERVICE FOR (RANGE, WATER HEATER, DRYER, OUTDOOR GRILL) INCLUDES 50 WATER HEATER, VENTING, UP TO 150' INT. PIPING & 40' UNDER GRD. & 120 GAL. TANK LEASED | **1** | $2,400 |
| GAS SERVICE FOR (RANGE, WATER HEATER, DRYER, OUTDOOR GRILL, POOL & SPA HEATER) INCLUDES 50 WATER HEATER, VENTING, UP TO 150' INT. PIPING & 40' UNDER GRD. & 250 GAL. TANK LEASED | | $2,900 |
| UPGRADE GAS WATER HEATER 50 GAL. TO 75 GAL. | **1** | $600 |
| **SPECIALTIES & MISC.** | | |
| ADD SQ. FT. TO LANAI ( $65 PER SQ. FT.) | | |
| FIREPLACE | | $4,200 |
| SECURITY SYSTEM BY BRINKS          PERIMETER SYSTEM | | $1,500 |
| CENTRAL VACUUM SYSTEM | | $1,500 |

DCC/CONTRACTS/UPGRADE LIST

| < CREDIT > LIST<br>EFFECTIVE APRIL 29, 2005 | CREDIT AMOUNT |
|---|---|
| **EXTERIOR** | |
| 1  Lanai Concrete Floor Stain | < $100 |
| 2  Lanai Screen | < $250 |
| **BATHS** | |
| 1  Bidet | < $200 > |
| 2  Luxury Bath Accessories for 2 Bath | < $150 > |
| 3  Luxury Bath Accessories for 2-1/2 Bath | < $185 > |
| 4  Luxury Bath Accessories for 3 Bath | < $205 > |
| | |
| | |
| | |
| **KITCHEN** | |
| 1  Kitchen Island | < $400 > |
| Appliances:   Credit for individual items only if customer is omitting | |
| 2  Washer | < $463 > |
| Dryer | < $382 > |
| 4  Dishwasher | < $245 > |
| 5  Refrigerator | < $915 > |
| 6  Range | < $496 > |
| 7  Microwave | < $286 > |
| 8  Standard Luxury Package Appliances:      W/D, DW, Frig, Range, Micro | <$2787> |

FEATURES & PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE OR OBLIGATION

DCC/CONTRACTS /CREDIT LIST                    EFFECTIVE: APRIL 29, 2005



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

**MODEL CENTER** (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

## LAKESIDE TERRACE



WH 7005

WH 7005 Wood Fascia on Lux pkg Court

ELEVATION "B"

WH 7005
THRESHOLD TAUPE 2023

THRESHOLD TAUPE 2023

CASTLE BEIGE 2025

WH 7005

THRESHOLD TAUPE 2023

WH 7005

Homebuyer's Approval: _Andrew William_     Date: 6-11-05

Case 2:09-cv-08441-EEF-MBN Document 22447-4 Filed 04/06/20 Page 145 of 375

**Diamond Court Construction Company** SELECTION SHEET & WORK ORDER SHEET- pg 1

| | |
|---|---|
| Fax to: _____ | |
| Fax #: _____ | |
| From: _____ | |
| Re: _____ Pages: _____ | |

Customer: _ANDREW WILLIAMS_   Job #: _____

Model: _LAKESIDE TERR. ELEVB / BRUINS_   Job Address: _ATHENA_

| KITCHEN SELECTIONS | | LAUNDRY | BAR |
|---|---|---|---|
| **Cabinets** - Style Name:<br>Color: | _PEMBERTON OAK SQ_<br>_FROST_ | | |
| **Cabinet Hardware:** | _HK123 DOORS_<br>_HP124 DRAWS_ | | |
| **1.** Countertop Color:<br><br>**2. Is this** . . . Laminate,<br>Corian and it's level # ,<br>or 1-1/4" Granite<br><br>**3.** Edge Style: -see red sel. book | 1. _BALTIC BROWN_<br><br>2. _GRANITE_<br><br>3. _1/2 Bull_ | 1.<br><br>2. Laminate<br><br>3. Straight | 1.<br><br>2.<br><br>3. |
| **1.** Kitchen Sink:<br>Blancodiamond Silgranite in<br>WH, BI, BL, GR *  or<br>Blancospex in SS -see red sel. book<br><br>**2.** Drop In or Undermount | 1. _BLACK_<br><br>2. _UNDERMOUNT_ | 1. Fiberglass<br><br>2. Drop-In | 1.<br><br>2. |
| Moen Monticello 7730 Kitchen<br>Faucet - SS, WH, SA, CH * | _STAINLESS STEEL_ | Chrome | |

| **Attention !**<br>**Countertop Contractor:** | 1. Kitchen sink supplied by Diamond Court - pick up at office  (see Brand & Model above)<br>2. Kitchen faucet supplied by Plumber - 3 holes / 4" on center  (see Brand & Model above)<br>3. Wood mount for Dishwasher needed for installation for Granite top order<br>4. Paintable wood corbels required for Granite bar tops<br>5. Backsplash: ☒ Customer wants backsplash SAME AS COUNTERTOP: Full backsplash at<br>bar top & approximately 6" elsewhere to match bar top backsplash height<br>☐ Customer wants backsplash TILED:  Tile company will install Full<br>backsplash tiled at Range side.  Sales Coordinator to record selection on<br>Main Flooring Selection Work Order Sheet (Upgrade)***<br>6. If 30" Kenmore 22-46359 style Slide in Range is selected below, confirm cut out dimensions |
|---|---|

| Appliances: | See attached Appliance Order Sheet to select Appliances |
|---|---|
| | Check one for type of Range to be selected:  ☒ **Free Standing Range**   ☐ **Slide in Range** |
| | Check one for type of appliance to be selected:  ☒ **Electric**   ☐ **Gas:  range & dryer** |

| Kitchen Flooring & Tiled Backsplash: | See attached Main Flooring Selection Work Order Sheet |
|---|---|

* WH - white,  BI - bisque,  BL - black,  SA - sand,  BO - bone,  GR - gray,  CH - chrome,  SS - stainless     DCC/Delivery/ selection sheet  06-01-05

Homebuyer's Approval: _Andrew Williams_     Date: _6 - 11 -05_

| Fax to: _____ | |
|---|---|
| Fax #: _____ | |
| From: _____ | |
| Re: _____ Pages: ___ | |

**Customer:** ANDREW WILLIAMS **Job #:** _____

**Model:** _____  **Job Address:** _____

| | BATH SELECTIONS | | | |
|---|---|---|---|---|
| | **Master Bath** | **Bath 2 - Middle Bath** between BR2 & 3 | **Bath 3 - Rear Bath** near BR 4 | **Cabana (½) Bath** on Lanai |
| Cabinets - Style Name: Color: | PEMBERTON OAK SQ CIDER | PEMBERTON SQ CIDER | SUNDALE MAPLE SQ PAPRICA | |
| Cabinet Hardware: | HP128 | HK109 | HP118 | |
| 1. Vanity - Cultured Marble Color: | 1. EBONY+WH | 1. BUILDERS BLUE W/WH | 1. GOLDSMITH | 1. |
| 2. Vanity Cultured Marble bowl shape - see red selection book | 2. USD HILO SHELL → | | 2. SAME | 2. |
| 3. Vanity 1-1/2" Cultured Marble edge - see red selection book | 3. DROP LIP OGEE | | 3. → SAME | 3. |
| 4. Caulking Color: Black, White or Clear | 4. CLEAR | 4. → | 4. → SAME | 4. |

| **Attention !** | |
|---|---|
| **Cultured Marble Subcontractor:** | 1. Faucets centers are 3 holes with 4" on center |

| | **Master Bath** | **Bath 2 - Middle Bath** between BR2 & 3 | **Bath 3 - Rear Bath** near BR 4 | **Cabana (½) Bath** on Lanai |
|---|---|---|---|---|
| 1. Tub: WH - standard | 1. WH | 1. WH | 1. WH | 1. |
| 2. Toilet & (Pedestal Sink - if appl): WH-std | 2. WH | 2. WH | 2. WH | 2. |
| 1. Shower Door Clear or Obscure | 1. OBSCURE | 1. | 1. | 1. |
| 2. Shower Door Chrome or Gold Tone | 2. CHROME | 2. | 2. | 2. |
| Bath Accessories/Hardware: (see Red Selection Book) | | | | |
| 1. Style Name: | 1. THE GILCREST COLLECTION ← | | | 1. |
| 2. Finish: | 2. BN | 2. BN | 2. BN | 2. |
| 3. Item & Quantity: **FAX FLOOR PLAN WITH INSTALL LOCATIONS** | 3. Paper Holder = 1 24' Towel Bar = 2 Towel Ring = 2 | 3. Paper Holder = 1 24' Towel Bar = 1 Towel Ring = 1 | 3. Paper Holder = 1 24' Towel Bar = 1 Towel Ring = 1 | 3. Paper Holder = 1 Towel Ring = 1 |
| Bath Wall Tile | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |
| Bath Flooring | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |

\* WH - white, BI - bisque, BL - black, SA - sand, BO - bone, GR - gray, CH - chrome, SS - stainless   DCC/Delivery/ selection sheet 06-01-05

Homebuyer's Approval: _Andrew Williams_   Date: 6-11-05

# Diamond Court Construction Company – SELECTION SHEET & WORK ORDER SHEET - pg 3

| Fax to: _____ | |
| Fax #: _____ | |
| From: _____ | |
| Re: _____ Pages: _____ | **Customer:** ANDREW WILLIAM   **Job #:** _____ |

**Model:** L/STERR BILLINIUS ELEVE B   **Job Address:** _____

## INTERIOR COLOR SELECTIONS

| Wall & Ceiling Texture Textured like Model is Standard Specify standard or upgrade below | Int. Paint Colors | Switch / Outlet Plates House: White is Standard Kitchen Backsplash: WH, BI, BL * | Window Sills Specify Carrara or Travertine below | Carpet & Tile |
|---|---|---|---|---|
| Wall: STD Ceiling: STD | See attached Paint Selection Sheet | House Wall plates: WH Kitchen counter backsplash plates: BLK | Carrara or Travertine: TRAVERTINE | See attached Main Flooring Sheet |

## EXTERIOR COLOR SELECTIONS

| Ext Paint/Stain Colors | 30 yr. Architectural Roof Shingles | Aluminum Soffit Color & Fascia Color |
|---|---|---|
| See attached Paint Selection Sheet | Brand: GAF Color: DRIFTWOOD BLEND | Alumn. Soffit Color: ☒ Check for White (standard) ☐ Check for upgrade color: Wood Fascia Color: See Painting Sheet for trim color |

## INTERIOR & EXTERIOR DOOR SELECTIONS

| Front Entry Door | Front Door Hardware | Ext/Int Door Hardware | Interior Doors |
|---|---|---|---|
| **Standard:** (see red Sel. Book) ☐ Six-panel steel & 694 IM 5-lite sidelight if appl. ☐ 686 CL full light with matching 694-CL sidelights if applicable ☐ 686-IM 15-lite like Model with 694-IM 5-lite sidelight if appl. ☒ 686-QE light silkscreen 694-QE sidelights if applicable ☐ Upgrade: (see red Sel. Book) | ☒ P.Brass handle: **standard** ☐ Ant. Nickel handle: upgrade ☐ Ant. Brass handle: upgrade Note: Keyless entry in Polish Brass only at this time ☐ Other: _____ | ☒ Ext P. Brass finish Lido lever: **standard** ☐ Ext _____ finish: upgrade ☐ Ext _____ lever: upgrade ☒ Int P. Brass finish Lido lever: **standard** ☐ Int _____ finish: upgrade ☐ Int _____ lever: upgrade ☐ Other: _____ | ☒ Six-panel: **standard** ☐ Other: _____ |

## Lighting & Landscape Selections
### See attached information sheet for instructions

Colors that the Buyer selects may vary from display samples due to different manufacturing color dye lots, patterns, or veining. If selected materials are not available, the Buyer agrees to make new selections without delay or Diamond Court Construction Company reserves the right to substitute materials of a like pattern, quality and design. Any unauthorized work scheduled or performed by the Buyer shall be removed, with cost of such removal charged to the Buyer. Selections to be finalized and signed 21 days after bank closing. Any changes to selections, must be made prior to the building permit being issued. An Administrative service charge of $250.00 will be added to the price of any and every change. No changes allowed once building permit is issued.

IMPORTANT: Homebuyer, please review all information for accuracy of selection numbers and colors before signing.

**Homebuyer's Approval:** X Andrew William   **Date:** 6-11-05

DCC/Delivery/selection sheet 06-01-05

**Diamond Court Construction Company - SELECTION SHEET & WORK ORDER SHEET - pg 4**

Fax to: _____

Fax #: _____

From: _____

Re: _____ Pages: _____

**Customer:** _____ **Job #:** _____

**Model:** _____ **Job Address:** _____

| List Of All Upgrades And Changes | | |
|---|---|---|
| DESCRIPTION | LEVEL | PRICE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Person coordinating selections:** *Andrew Killam* 6-11-05

DCC/Delivery/selection sheet 06-01-05

## PAINT SELECTION WORK ORDER

Date:                     From:    Diamond Court Construction Co.
To:                       Sender:
Fax:                      Pages:

**Customer:** _____ **Job #:** _____

**Model:** _____ **Job Address:** _____

### Write in Sherwin Williams Color Name and Number below:

A.   **Interior Selections:** *(Choose 1 color for ceilings & walls & 1 color for trim)*
     1. Wall & Ceiling Color:      Masterhide Int. Flat: *POLARWHITE SW 2423*
     2. Kitchen & Bath Color:     Masterhide Int. Semi-gloss: *POLAR WH SW 2423*
     3. Trim Color:              Masterhide Int. Semi-gloss: *PURE WH 7005*
        (doors, baseboard, casings, moldings)
     4. List any upgrades here:   _____

B.   **Exterior Selections -** *(Choose up to 3 colors)*    See Elevation sheet for color locations
     1. Stucco Sealer:           Loxon
     2. Body Color:             DuraCraft Ext. Flat: *CASTLE BEIGE SW 2025*
     3. Trim Color #1:          DuraCraft Ext. Flat: *WHITE 2193*
     4. Trim Color #2:          DuraCraft Ext. Flat: *THRESHOLD TAUPE SW 2023*
     5. Exterior Front Door:    DuraCraft Ext Satin:  Same as Trim Color # *SW 2023*
     6. All other Exterior Doors: DuraCraft Ext Satin:  Same as Trim Color # *SW 2023*

     **Note:** The inside of Exteror Doors are to be painted with the Interior Trim Color

C.   **Lanai Floor Selection:**
     1. Floor Stain Color:       HC Brand Stain Color : *HC149 SIBERIAN HASE*
                          *(Exterior silicone aerylic concrete sealer)*

D.   **Leave Touch up kit &/or remaining paint buckets in attic**

Homebuyer's Approval: *Andrew William*       Date: *6-11-05*

DCC/Delivery/paint.sel 06-01-05

# MAIN FLOORING SELECTIONS
### INCLUDING KITCHEN TILED FULL BACKSPLASH
# DELIVERY / WORK ORDER SHEET

| JOB #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: | 2112 SE Bersell Rd., PSL, FL. 34952  (772) 337-3070  FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: |
| CONST. STAGE: | DELIVERY ADDRESS: |

| **Floor Tile** | **Brand, Tile Name, Number, Color & Size \*** | **Level #** Standard, I, II, or III | **Grout Color & #** | **Tile Dir** straight or diagonal |
|---|---|---|---|---|
| FULL TILED BACK SPLASH at range side | | upgrade | | ☐ STRT ☐ DIAG |
| FRONT ENTRY: strt is standard | ARIZONA BEIGE 58 13X13 | STD | TAUPE 38 | STRT |
| FOYER: strt is standard unless upgraded to diag in Liv/Din | SANTA CRUZ II 18X18 P5721 BEIGE | STD | SANDLE WOOD 37 | ☒ STRT DIAG |
| KITCHEN + pantry | | | | DIAG |
| NOOK + hallway off nook | | | | DIAG |
| LAUNDRY + hallway off laundry | | | | DIAG |
| REAR HALLWAY · next to rear bath | | | | ☐ STRT ☒ DIAG |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Carpet - more than one color is an upgrade | **Brand / Color / Number** | **Level #** Standard, I, II, or III | **MISC.** |
|---|---|---|---|
| LIVING | WITHOUT LIMITS 662 JUNGLE BEIGE | STD | |
| DINING | | | |
| FAMILY + hallway off family | | | |
| DEN/STUDY | | | |
| MASTER BEDRM + closets | | | |
| BEDROOM 2 | | | |
| BEDROOM 3 | | | |
| BEDROOM 4 | | | |

\* Threshold in Travertine or Carrara Marble to separate room floor tiles that are different

Homebuyer's Approval: _Andrew Williams_  Date: _6-11-05_

DCC//Delivery/Floor (Main) Tile Selection Sheet/06-01-05

Floor (Main) Tile Selection Sheet.wpd

# BATH - WALL & FLOOR TILE
## DELIVERY / WORK ORDER SHEET

| JOB #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: | 2112 SE BERSELL RD., PSL, FL. 34952   (772) 337-3070   FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: |
| CONST. STAGE: | DELIVERY ADDRESS: |

| Bath Tile | Brand, Tile Name, Number, Color & Size | Level # Standard, I, II, or III | Tile Dir Straight or Diagonal | Grout Color & # | Tub/Shower Walls Ceramic Towel Bar & Soap dish White or Bone |
|---|---|---|---|---|---|
| **Master Bath** SHOWER WALL | CHURCHILL ELEMENT 8X10 ALMOND | STD | STRT | MARBLE | ☐ Check if you want towel bar & soap dish - color:_____ |
| 7 - SHOWER WALL DECOS | ALMOND WITH BEIGE CENTER | — | | 02 | ☐ Check for upgrade corner shelf - color:_____ |
| **Master Bath** BATH FLOOR | 12X12 BEIGE CHURCHILL | | STRT | SADDLE WOOD 27 | ☐ Check if Listellos to be put on tub deck - OR - |
| **Master Bath** SHOWER FLOOR | RAINFOREST 313 GARDINA RF84 | | STRT | SAME | ☐ Check if Listellos to be placed on shower wall |
| **Master Bath** TUB DECK | ~~SAME AS FLOOR TILE~~ 12X12 ALMOND | ↓ | STRT | MARBLE 02 | LISTELLO #: |
| **Bath 2 · middle bath by BR2 · BR3** SHOWER OR TUB WALL | PISCARA 8X10 BLUE P4797 | STD | STRT | SAPHIRE 27 | ☒ Check if you want towel bar & soap dish - color: WH |
| 5 - WALL DECOS | P4798 8X10 BLUE | STD | — | ↓ | ☐ Check for upgrade corner shelf - color:_____ |
| **Bath 2 · middle bath by BR2 · BR3** BATH FLOOR | 12X12 BLUE P3073 | STD | STRT | ↓ | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Bath 2 · middle bath by BR2 · BR3** SHOWER FLOOR | | | STRT | | |
| **Bath 3 · rear bath near BR 4** SHOWER OR TUB WALL | PASCARA WALL 8X10 BEIGE P7488 | STD | STRT | ANTIQUE 11 | ☒ Check if you want towel bar & soap dish - color: BONE |
| 5 - WALL DECOS | PASCARA P4789 8X10 | STD | — | | ☐ Check for upgrade corner shelf - color:_____ |
| **Bath 3 · rear bath near BR 4** BATH FLOOR | PASCARA 12X12 BEIGE P3070 | STD | STRT | ↓ | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Bath 3 · rear bath near BR 4** SHOWER FLOOR | | | STRT | | |
| **Cabana (½) Bath on Lanal** SHOWER OR TUB WALL | | | STRT | | ☐ Check if you want towel bar & soap dish - color:_____ |
| 5 - WALL DECOS | N/A | — | | | ☐ Check for upgrade corner shelf - color:_____ |
| **Cabana (½) Bath on Lanal** BATH FLOOR | | | STRT | | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| **Cabana (½) Bath on Lanal** SHOWER FLOOR | N/A | | STRT | | |

**TILE SPECS:** (1) All transitions/sills to be recessed in tile (2) All corners to be caulked - to windows also (3) Window sills to be re-set, if needed (4) Listellos for front of tub deck selection to be placed at top front of deck and step, angle walls also (5) All floor to shower transitions to be done with 5 ½" sill, over hanging into shower & recessed

Homebuyer's Approval: _Andrea Williams_      Date: 6-11-05

DCC/Delivery/Bath Tile Selection Sheet/06-01-05

Bath Tile Selection Sheet.wpd

**To:** Mike Cormier
**Fax:** 561-791-8082
**From:**
**Date:**


**SEARS**
△ Contract Sales

If Customer chooses appliance allowance, use Appliance Select form

| Account No: | | | Quote #: | | Quote Date: | 2/15/05 |
|---|---|---|---|---|---|---|
| **Prepared For:** | | | | **Project Information:** | | |

| Company | DIAMOND COURT CONST | | | Name | ANDREW WILLIAMS |
|---|---|---|---|---|---|
| Address | 2112 SE BERSELL RD | | | Address | ATHENA |
| City PORT ST LUCIE | State FL | Zip 34952 | | City PSL | State FL | Zip |
| Contact JENNIFER | Phone 772-337-3070 | Fax 772-335-1150 | | Contact | Phone | Fax |

## Standard Appliance Selections
### Check one of the appliance packages & circle choice of colors below

☐ **Standard Selection**
in choice of white, bisque, black

☐ **Stainless Steel Upgrade**
with standard laundry selection

| Stock Number | Description | Color | Qty | Stock Number | Description | Color | Qty |
|---|---|---|---|---|---|---|---|
| | 26CU SXS REFRIG | | | | | | |
| 46-54522 | KN; 26 SXS ICE WATER FILTER | W/BI/BL | 1 | 46-52673 | 26 Ice and water Dispenser, Filtration Energy Star SS | SS | 1 |
| CODE 46 | WATER LINE HOOK UP | | 1 | | | | |
| | RADIANT RANGE | | | 22-95023 | Americas Best with Kenmore Exclusive Logiclean, SS | SS | 1 |
| 22-96012 | KN; 30 RADIANT TOP RANGE | W/BI/BL | 1 | 22-2244 | Range Cord 4 ft., 4 Wire | | 1 |
| 22-49624 | RANGE CORD | | 1 | | | | |
| | DISHWASHER | | | 22-14773 | 8 touchpads plus china gentle cycle deluxe insulation, 5 Level, 7 Cycles. | SS | 1 |
| 15162 | KN;6 CYCLE DEL START | W/BI/BL | 1 | 22-16006 | 6 ft. Dishwasher Cord | | 1 |
| 22-16006 | DISHWASHER CORD | | 1 | | | | |
| | MICRO | | | 20-62643 | 1.6 CU FT MHC 1,000 WATTS SENSOR ON OFF TURNTABLE AUTO | SS | 1 |
| 22-80402 | KN; 1.7 1000 WATTS COMBO | W/BI/BL | 1 | CODE 61 | MICROWAVE INSTALL | | |
| CODE 61 | INSTALL MICRO | | 1 | | | | |
| 26-24942 | KN: SUPER CAP PL ELIT | W/BI/BL | 1 | 26-24942 | KN: SUPER CAP PL ELIT | W/BI/BL | 1 |
| 26-84942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 | 26-84942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 |
| 26-49606 | DRY; LP DRYER EXHST | | 1 | 26-49606 | DRY; LP DRYER EXHST | | 1 |
| 26-49388 | DRYER CORD | | 1 | 26-49388 | DRYER CORD | | 1 |

Check one: ☒ Electric
☐ Gas:  Dryer & Range

| | |
|---|---|
| Mdse. Before Tax | |
| Tax Total 6.50% | |
| Misc. (Inst) | |
| Delivery Total | |
| Del. Tax* | |
| Grand Total | |

*If applicable, delivery must be taxed in certain areas

This offer is good for 30 days, unless otherwise noted. This is a quote and is subject to the terms and conditions on our Contract & Security Agreement. Sears Contract Sales reserves the right to change or withdraw this offer at any time prior to acceptance by purchaser.

Pricess Effective _____ Thru _____

Accepted By: _____     Date: _____

**Your Sears Contract Sales Account Manager**

Submitted By: _____     Phone: _____
Fax: _____     E-mail: _____
Customer Support Center (800) 359-2000 Press 1

**SEARS**
△ Contract Sales
www.ContractSales.Sears.com

**Selection Coordinator:** If Customer chooses to select appliances other than our standard appliance selections (even if it's only one that is different from our standard) fill out Appliance Select form. Our standards in addition to any upgrades can be selected at this location.

Homebuyer's Approval: _Andrew Williams_     Date: 6-11-05     Eff: 4/29/05



## LIGHTING & LANDSCAPE
## INFORMATION SELECTION SHEET

### Lighting Allowance

#### $1200 Luxury Package

Make an appointment with the following Lighting store below before or after interior framing has been completed on your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately.

Crystal Lighting
1984 SW Bayshore Blvd.
Port St. Lucie, FL 34984
(772) 340-1140

### Landscape Allowance

#### $800 Luxury Package

Make an appointment with the following Landscaping Center below after Stucco has been completed on the exterior of your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately.

Arbor Landscape & Lighting
Jim Quackenbush
(772) 879-6264 office
(888) 879-6264 office
(772) 519-3212 cell

DCC/Delivery/Lighting & Landscape Selections/06-01-05

# Plumbing Specifications for Diamond Court Construction Company

Job # _____ Customer _A WILLIAMS_

Job Address _ATHENA_ Model _LK/SIDE/TEAM BILL_

## Standard Luxury Specs
### Refer to Customer's Selection Sheet for Color & Finish selections
### See Contract Addendum or Change Order(s) for upgrades &/or changes

### Master Bath

| | |
|---|---|
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Showerhead (L2352-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Jetta Tub (soaker) *as per plan* - white |
| 5 | Moen Monticello Roman Tub faucet (T951-C + 4997 or 4999 valve) |
| 6 | American Standard Bidet-white, with Moen Chateu Bidet faucet (5200-C) *as per plan* |

### Guest Baths

| | |
|---|---|
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Tub/Shower (L2353-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Porcelain/Steel Tub *as per plan* - *white* |
| 5 | Pedestal-white, with Moen Chateu single lever Lav faucet (L4621-C) at Cabana bath *as per plan* |

### Kitchen

| | |
|---|---|
| 1 | Kitchen sink supplied by Diamond Court |
| 2 | Moen Monticello w/cathedral spout kitchen faucet # 7730 - choice of finishes  SL,CH,WH,BI,SA, |
| 3 | 1/2 HP Food disposal |
| 4 | Icemaker supply line |
| 5 | Dishwasher connection of supply & discharge line |

### Laundry

| | |
|---|---|
| 1 | 50 Gallon electric HWH |
| 2 | Wash Machine Hanson box |
| 3 | 2 Hose bibbs |
| 4 | A/C Chase *as per plan* |
| 5 | Necessary Lead vent pipe flashings |
| 6 | Copper  (water distribution lines) |

DCC/Delivery/plumbing specs - 06/01/05



## DIAMOND COURT CONSTRUCTION CO.

### Color Selection Authorization Release Form

I / We ___ANDREW WILLIAMS_____, customer of

Diamond Court Construction Co., authorize ___Ron BRODSKY_____,

who is my ☒ Sales Agent for Diamond Court

who is my ☐ _____ (Relation to Customer)

to select and complete color selections for my / our property at:

_____ATHENA_____

Homebuyer's Approval: _~Andrea Williams~_____   Date: __6-11-05___

Homebuyer's Approval: _____   Date: _____

**Selection Check Off List:** Job#/Customer: _____

---

## Sales Coordinator:

[X] Call customer to set up appointment: Ask them if they have been in Model to pre-select. If they have not, Customers should be encouraged to browse Show Room to allow time to consider possible selections prior to appointment. Allotted time is 5 hours. Thereafter $30 / hour. Average time customers take for selections is 4-1/2 hours.

[X] Review contract prior to appointment: Building Agreement, Addendum, Specs, Change Orders, Elevation, Floor Plan

[X] Review selections with customer upon finalizing selections

[X] Customer listed on Building Agreement or Authorized Person as shown on Color Selection Authorization Release form to sign &/or initial and date UNDERLINE EVERY page.

[ ] Make copy of ENTIRE Selection Packet:     Copy for Customer
                                              Copy for Sales
                                              Originals to Construction Office

◆ **Important Note:** Do not make changes on selection sheet once customer has signed & been given a copy. Record any changes on a separate piece of paper or blank selection sheet form with their signature & date - submit to office.

---

## Construction Office:

[ ] Make one copy of each of the below forms found in the legal file for comparing any upgrades listed on them with any upgrades listed on the selection forms:

    Building Agreement, Addendum, Spec Sheet, Change Orders, Floor Plan, Elevation if applicable

[ ] Print 8 ½ x 11 architectural plan from Chief Architect to include with selection sheet forms

[ ] Review selection sheets for accuracy. (Write up customers List of Upgrades for making a Change Order)

[ ] Record on kitchen sink order list

[ ] Color selection finalized ✓ off on customer list

[ ] Make copies of color selections for Superintendent Field Books

[ ] Write up a Change Order if applicable - see Change Order procedure

◆ **Important Note:** For changes: Record changes to original selection sheet with revised date. Make copy of revised selection sheet & stamp with Field Book Updated stamp & file change request that was submitted on a separate piece of paper or blank selection sheet form with their signature & date in the back of original selection sheet forms.

# ONE YEAR PERFORMANCE GUARANTY

Buyer: _Andrew Williams_

Property Address: _45105 SW Athena Drive_

Date: _8-9-06_

     Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof. Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective. This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

     Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

     Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

     This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

     Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

     Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty. No monetary settlement will be made in lieu of performance.

Homebuyer Signature            Homebuyer Signature

Builders Rep.

GUARANTY2.wpd

**ADDITIONAL ATTACHMENT**

Summary Appraisal Rep
06190805

| | |
|---|---|
| Borrower | WILLIAMS, Andrew M. |
| Property Address | 4565 SW Athena Drive |
| City Port St. Lucie County St. Lucie State FL Zip Code 34953 |
| Lender BB&T Mortgage |



**DEBRA RYAN**

**Universal Property and Casualty Insurance**
c/o Universal Risk Advisors
**1110 W. COMMERCIAL BLVD.**
**SUITE 300**
**FORT LAUDERDALE FL 33309**
**TOLL FREE: 800-425-9113**

Tenant

**Declaration Effective**
09/27/2007


UNIVERSAL PROPERTY AND CASUALTY INSURANCE COMPANY

1110 W. Commercial Blvd.  Suite ☐ Fort Lauderdale, FL

| Claims: 1-800-218-3206 | | | Service: Contact your Agent Listed Below | |
|---|---|---|---|---|

| Policy Number | Policy Period | | 12:01 AM Standard Time | Agent Code |
|---|---|---|---|---|
| | FROM | TO | | |
| 592-437-627 | 09/27/2007 | 09/27/2008 | 12:01 AM Standard Time | AA70 |

| Named Insured and Address | Agent Name and Address |
|---|---|
| TRACEY NICHOLS<br>4565 SW ATHENA DR<br>PORT ST LUCIE  FL  34953<br><br>(954) 298-4135 | M E Glennon & Associates, Inc<br>1726 SW Bayshore Blvd<br>Pt St Lucie FL 34984<br>(772) 879-1307 |

**Premium Summary**

| Basic Coverages Premium | Attached Endorsements Premium | Assessments / Surcharges | MGA Fees/Policy Fees | Total Policy Premium (Including Assessments & Surcharges) |
|---|---|---|---|---|
| $79 | $71 | $15 | $31 | $196 |

**Location 001**

| Form | Construction | Year | Townhouse/ Rowhouse | Number of Families | Occupied | Protection Class | Territory | BCEG |
|---|---|---|---|---|---|---|---|---|
| HO4 | Masonry | 2007 | N | 1 | Y | 3 | 562 | 3 |

| County | Dwelling Replacement Cost | Home Updated | Protective Device Credits: Burglar | Fire | Sprinkler | Shutter | Wind / Hail Exclusion |
|---|---|---|---|---|---|---|---|
| Saint Lucie | N/A | Y | N | N | N | N | N |

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. If we elect to continue this insurance, we will renew this policy if you pay the required renewal premium for each successive policy period subject to our premiums, rules and forms then in effect. You must pay us prior to the end of the current policy period or else this policy will expire.

Insurance is provided only with respect to the following coverages for which a limit of liability is specified, subject to all the conditions of this policy.

| COVERAGES - SECTION I | LIMITS | PREMIUMS | COVERAGES - SECTION II | LIMITS | PREMIUMS |
|---|---|---|---|---|---|
| Coverage -A- Dwelling | | $79 | Coverage -E- Personal Liability | $ 300,000 | $18 |
| Coverage -B- Other Structures | | | Coverage -F- Medical Payments | $1,000 | |
| Coverage -C- Personal Property | $25,000 | | | | |
| Coverage -D- Loss of Use | $5,000 | | | | |

**NOTE: The portion of your premium for hurricane coverage is:**      **$49**

## Section 1 coverages subject to $1,000 non-hurricane deductible per loss.
## Section 1 coverages subject to $500 hurricane deductible per calendar year.

# This policy contains a separate deductible for hurricane which may result in high out of pocket expenses to you.

**If there are hurricane losses in a calendar year on more than one UPCIC policy, the hurricane deductible will be the highest amount stated in any one of the policies. If you have a hurricane loss and choose a lower deductible at policy renewal, the lower deductible will not take effect until January 1 of the following year.**

DESCRIBED LOCATION - The Described Location covered by this policy is at the above address unless otherwise stated:

4565 SW ATHENA DR , PORT SAINT LUCIE, FL  34953

**Flood coverage is not provided by Universal Property & Casualty Insurance Company and is not part of this policy.**

| | | *Bradley J. Meier* |
|---|---|---|
| Countersignature | Date | President |

## Addendum to Building Agreement

**Customer:** ANDREW WILLIAMS        **Date:** 5/14/05

**MODEL:** LAKESIDE TERR        **Versions:** BILLIARDS RM

**Elevation:** B        **# of Bedrooms:** 4        **# of Baths:** 3

| No. | Change | Description of Work | Charge |
|-----|--------|---------------------|--------|
| 1 | General | **Price of Model** | 304,400.00 |
| 2 | Bldg. County | County in which House is located    SAINT LUCIE | |
| 3 | Lot Prep | Lot Prep Allowance ($8,500 min. charge) | 8500 |
| 4 | Elec. Service | Electric Service type - Check One:<br>☑ **Overhead at garage/power pole side -N/C**    ☐ **Underground-$1200**<br>Garage side dictated by power pole location unless otherwise requested.  If Power Co.<br>does not have poles in yet, charges for underground may apply at a later date. | |
| 5 | Association | Association considerations | |
| 6 | Custom Print | Custom Prints | |
| 7 | Pool Pkg. | Pool Allowance        circle one      (YES)  (NO) | |
| | DCCC | Supervision & Coordination | |
| | Electric | Electric Pool prewire & Hookup    circle one      (YES)  (NO) | |
| 10 | City Water | City Water Pool Fill | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| | Total Due | | $0 342,900 |

**Signature:** Andrew Williams        **Date:** 5-14-05.

**Signature:** _____        **Date:** _____

RAADD.wpd

**PROPERTY RECORD CARD**

Andrew Williams   Record: 1 of 1        &lt;&lt;Prev    Next &gt;&gt;    Spec.Assmnt    Taxes    Exemptions  Permits Home Print



### Property Identification

| | | | |
|---|---|---|---|
| Site Address: | 4565 SW Athena Dr | ParcelID: | 3420-665-1854-000-0 |
| Sec/Town/Range: | 33 :37S :40E | Account #: | 90205 |
| Map ID: | 44/33S | Land Use: | SF Res |
| Zoning: | RS-2 | City/Cnty: | Port St Lucie |

### Ownership and Mailing

Owner: Andrew Williams
Address: 3841 NW 6th Ct
Fort Lauderdale FL 33311

**Legal Description**
PORT ST LUCIE-SECTION 34- BLK 2397 LOT 3 (MAP 44/33S) (OR 2294-1408)

### Sales Information

| Date | Price | Code | Deed | Book/Page |
|---|---|---|---|---|
| 7/5/2005 | 80000 | 00 | WD | 2294 / 1408 |
| 5/18/2005 | | 01 | OA | 2256 / 1202 |
| 12/1/1986 | 5300 | 00 | CV | 0524 / 0383 |

**Assessment 2009 Final**

| | |
|---|---|
| 2009 Final: | 150200 |
| Assessed: | 150200 |
| Ag.Credit: | 0 |
| Exempt: | |
| Taxable: | |
| Taxes: | 3431.37 |

**Total Land and Building**

| | |
|---|---|
| Land Value: | 14500  Acres: 0.24 |
| Building Value: | 135700 |
| Finished Area: | 2451 SqFt |

### BUILDING INFORMATION





### Exterior Features

| | | | | | |
|---|---|---|---|---|---|
| View: | - | RoofCover: | SD - Dim Shingle | RoofStruct: | HP - Hip |
| ExtType: | HB - HB | YearBlt: | 2006 | Frame: | - |
| Grade: | B - B | EffYrBlt: | 2006 | PrimeWall: | BS - CB Stucco |
| StoryHght: | 0010 - 1 Story | No.Units: | 1 | SecWall: | - |

### Interior Features

| | | | | | |
|---|---|---|---|---|---|
| BedRooms: | 4 | Electric: | MX - MAXIMUM | PrmIntWall: | DW - Drywall |
| FullBath: | 3 | HeatType: | FHA - FrcdHotAir | AvgHt/Fl: | - |
| 1/2Bath: | 0 | HeatFuel: | ELEC - Electric | Prm.Flors: | CU - Carpet |
| %A/C: | 100 | %Heated: | 100 | %Sprinkled: | 0 |

### Special Features and Yard Items

| Type | Y/S | Qty. | Units | Qual. | Cond. | YrBlt. |
|---|---|---|---|---|---|---|
| DWC – Driv-Concret | Y | 1 | 720 | AV | AV | 2006 |

### Land Information

| No. | Land Use | Type | Measure | Depth |
|---|---|---|---|---|
| 1 | 0100-SF Res | BI -Front Ft | 85 | 125 |

THIS INFORMATION IS BELIEVED TO BE CORRECT AT THIS TIME BUT IT IS SUBJECT TO CHANGE AND IS NOT WARRANTED.

*Andrew Williams' Investment Property*

# ♦ BUILDING AGREEMENT ♦

This Agreement made and entered into this _14_ day of _MAY_, 2005, by and between _ANDREW WILLIAMS_, as Buyer/s, whose mailing address is: _3841 NW 6 CT FORT LAUDERDALE FL_, Phone: Home _954 583 7035_ Work _1800 237-1481_ Beeper/ Mobile _____, and Diamond Court Construction Company as Builder.

♦ **I. Location:** The Builder will for the consideration hereinafter mentioned, finish and deliver a residence or structure on the following described land, the Legal Description of which is:
Lot: _3_ Block: _2397_ Section: _34_    O.R. Book _____ Pages _____
Address: _4565 SW ATHENA DR_    County _SAINT LUCIE_

♦ **II. Payments:** The Buyer will in consideration of the Agreement being performed by the Builder as specified, pay or cause to be paid to the Builder, the sum of $ _212,900.00_ (U.S. Dollars) in the following manner:

| | Approved Lenders Draw | _Amt_ | | Cash Buyers Draw | |
|---|---|---|---|---|---|
| 1 | Contract Total  (see Addendum) | 212,900 | 1 | Contract Total    (see Addendum) | |
| 2 | Initial partial Deposit | $5,000 | 2 | less Lot prep Draw | |
| 3 | less 10% Deposit | 29,900 | 3 | less City Utilities Draw | |
| 4 | less City Utilities Draw | 4,600 | 4 | Draws based on lines 1 minus 2 & 3 | |
| 5 | less Lot prep Draw | 8,500 | 5 | Initial partial Deposit | |
| 6 | less Closing Costs paid up to | 2,000. | 6 | Remainder of Deposit Due | |
| 7 | less Lot Purchase/ Payoff | | 7 | Deposit.................................10% | |
| 8 | less Pool Draw (line #7 Adden.) | | 8 | Slab Draw.............................20% | |
| 9 | | | 9 | Tie beam Draw......................20% | |
| 10 | | | 10 | Mechanical rough-in Draw....25% | |
| 11 | | _Amt_ | 11 | Cabinet & Trim Draw...........20% | |
| 12 | Const. funds (omit line 2) | 167,900.00 | 12 | Final Draw...........................5% | |

All payments will be made solely to Diamond Court Construction Company. Deposit due in 60 days. All Bank draw schedules of any type are subject to approval by Builder. Under **no** circumstances will the final draw of any Loan schedule be more than 10%.

THE BUYER/OWNER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN INTEREST-BEARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER/OWNER.

1 of 5            Revised February 3, 2005

Building Department of Port St. Lucie, FL

CERTIFICATE OF OCCUPANCY

PERMIT #: 0545466

THIS CERTIFICATE ISSUED PURSUANT TO THE REQUIREMENTS OF SECTION 150.10392
OF THE CITY CODE CERTIFYING THAT AT THE TIME OF ISSUANCE THIS STRUCTURE WAS
IN COMPLIANCE WITH THE VARIOUS ORDINANCES OF THE CITY OF PORT ST. LUCIE
REGULATING BUILDING CONSTRUCTION OR USE FOR THE FOLLOWING:

USE CLASSIFICATION: SINGLE FAMILY RESIDENCE

OWNER: WILLIAMS, ANDREW

TYPE: RS

ADDRESS: 4565 SW ATHENA DR

CONST TYPE: CBS

CONTRACTOR: DIAMOND COURT CONSTRUCTION CO

UNITS: 1

SEC/BLK/LOT: 34-2397-3

COMPLETED: 08/22/06

LOCALITY: Port St. Lucie, Florida

Fire Dist: St. Lucie County

BY: BUILDING DEPT.

* * * POST IN A CONSPICUOUS PLACE * * *

_____
BUILDING OFFICIAL

---

Building Department of Port St. Lucie, FL

CERTIFICATE OF OCCUPANCY

PERMIT #: 0545466

THIS CERTIFICATE ISSUED PURSUANT TO THE REQUIREMENTS OF SECTION 150.10392
OF THE CITY CODE CERTIFYING THAT AT THE TIME OF ISSUANCE THIS STRUCTURE WAS
IN COMPLIANCE WITH THE VARIOUS ORDINANCES OF THE CITY OF PORT ST. LUCIE
REGULATING BUILDING CONSTRUCTION OR USE FOR THE FOLLOWING:

USE CLASSIFICATION: SINGLE FAMILY RESIDENCE

OWNER: WILLIAMS, ANDREW

TYPE: RS

ADDRESS: 4565 SW ATHENA DR

CONST TYPE: CBS

CONTRACTOR: DIAMOND COURT CONSTRUCTION CO

UNITS: 1

SEC/BLK/LOT: 34-2397-3

COMPLETED: 08/22/06

LOCALITY: Port St. Lucie, Florida

Fire Dist: St. Lucie County

BY: BUILDING DEPT.

_____
BUILDING OFFICIAL

* * * POST IN A CONSPICUOUS PLACE * * *



**DIAMOND COURT CONSTRUCTION CO.**

# Notice of Completion

*Customer's Name:* Andrew Williams     *Date:* 8-9-06

*Address:* 4565 SW Athena Drive

This letter serves as a notice of substantial completion of your new home. A Final Inspection Checklist will be compiled on or after the Walk-Thru. We will notify you when your home is ready for occupancy once the final draw from your Lender is received and any other outstanding balances due are received. The items listed below in the left column are to be signed today. Homebuyer to keep a copy and originals to be returned to the construction office at Diamond Court. The items listed in the right column will be compiled and mailed to you in the Delivery Packet after delivery of your new home.

### *Presented with Notice of Completion*

- Documents signed today includes the following:
  - ‣ Notice of Completion
  - ‣ Final Inspection Checklist
  - ‣ Notice of Consumer Rights
  - ‣ Builder's One Year Performance Guarantee
  - ‣ Builder's Structural Warranty Application
  - ‣ Trade List (to set up Warranty Appointments and any follow-up work listed on Final Inspection Checklist)
  - ‣ Important Reminders
  - ‣ Irrevocable Authorization form
  - ‣ Invoice/Statement of any money due

### *Mailed after Delivery of New Home*

Delivery Packet includes the following:
- Additional copies of documents in left column
- Certificate of Occupancy
- Final Plot Plan Survey
- Certificate of Termite Treatments & Warranty
- Storm Shutter Completion Certificate (File this with your insurance company for a discount if applicable.)
- Release of Liens (for cash customers only, otherwise Lender receives Releases)
- Property Tax brochure
- Care and Maintenance Information for specific selected items

Thank you for building with Diamond Court. Please keep these documents in a safe place. We wish you many years of enjoyment in your new home, and again, thank you for your business.

Sincerely,

*Diamond Court*

| | |
|---|---|
| Andrew Williams | 8-9-06 |
| Homebuyer's Signature | Date |

| | |
|---|---|
| | |
| Homebuyer's Signature | Date |

DCC/Contracts/Notice of Completion Revised 8/2/06

# ONE YEAR PERFORMANCE GUARANTY

Buyer: _Andrew Williams_

Property Address: _4505 SW Athena Drive_

Date: _8-9-06_

     Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof. Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective. This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

     Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

     Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

     This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

     Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

     Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty. No monetary settlement will be made in lieu of performance.

_____
Homebuyer Signature

_____
Homebuyer Signature

_____
Builders Rep.

GUARANTY2.wpd



| A. Settlement Statement | | | B. Type of Loan | |
|---|---|---|---|---|
| | | | 1-5. Loan Type Conv. Ins. | |
| **First American Title Insurance Company** | | | 6. File Number 1081-871239 | |
| Settlement Statement | | | 7. Loan Number 6930308844 | |
| | | | 8. Mortgage Insurance Case Number | |

C. **Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D. Name of Borrower: Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

E. Name of Seller: Diamond Court Construction Company
2112 SE Bersell Road St. Lucie, FL 34952

F. Name of Lender: Branch Banking and Trust
301 College Street
Greenville, SC 29601

G. Property Location: 4565 SW Athena Drive, Port St. Lucie, FL 34953
Lot 3, Block 2397, PSL 34

H. Settlement Agent: First American Title Insurance Company
Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

Place of Settlement Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

I. Settlement Date: 07/06/2005

Print Date: 07/01/2005, 4:32 PM

Disbursement Date: 07/06/2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract Sales Price | 212,900.00 | 401. Contract Sales Price | 212,900.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 5,258.30 | 403. Total Deposits | |
| 104. Lot payoff | 79,492.73 | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. Gross Amount Due From Borrower** | 297,651.03 | **420. Gross Amount Due To Seller** | 212,900.00 |
| **200. Amounts Paid By Or In Behalf of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | 5,000.00 | 501. Excess deposit (see instructions) | 5,000.00 |
| 202. Principal amount of new loan(s) | 260,900.00 | 502. Settlement charges (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Utilities draw | 4,600.00 |
| 207. | | 507. Lot prep draw | 8,500.00 |
| 208. | | 508. Disbursed as Proceeds ($0.00) | |
| 209. | | 509. LIP - Branch Banking and Trust | 178,510.00 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 265,900.00 | **520. Total Reduction Amount Due Seller** | 196,610.00 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from Borrower (line 120) | 297,651.03 | 601. Gross amount due to Seller (line 420) | 212,900.00 |
| 302. Less amounts paid by/for Borrower (line 220) | 265,900.00 | 602. Less reductions in amounts due to Seller (line 520) | 196,610.00 |
| 303. Cash (X From) ( To) Borrower | 31,751.03 | 603. Cash (X To) ( From) Seller | 16,290.00 |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____ Date: _____

* See Supplemental Page for details.

**L. Settlement Charges**

| | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| **700. Total Sales/Broker's Commission based on price** | | |
| Division of Commission (line 700) as follows | | |
| 701. | | |
| 702. | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| **800. Items Payable in Connection with Loan** | | |
| 801. Loan Origination Fee | | |
| 802. Loan Discount | | |
| 803. Appraisal Fee - Debra Lee Ryan | 300.00 | |
| 804. Credit Report - FPMR | 15.00 | |
| 805. Lender's Inspection Fee - Branch Banking and Trust | 250.00 | |
| 806. Mortgage Insurance Application Premium | | |
| 807. Assumption Fee | | |
| 808. Tax Service Contract - Branch Banking and Trust | 85.00 | |
| 809. Flood Certification - Branch Banking and Trust | 8.00 | |
| 810. Underwriting Fee - Branch Banking and Trust | 175.00 | |
| 811. Processing fee - Branch Banking and Trust | 150.00 | |
| 812. Courier/e-mail/wire fee - Branch Banking and Trust | 30.00 | |
| 813. Const admn fee - Branch Banking and Trust | 375.00 | |
| 814. | | |
| Supplemental Summary | | |
| **900. Items Required by Lender to be Paid in Advance** | | |
| 901. Interest | | |
| 902. | | |
| 903. Hazard Insurance Premium for | | |
| 904. | | |
| 905. | | |
| Supplemental Summary | | |
| **1000. Reserves Deposited with Lender** | | |
| 1001. Hazard Insurance | | |
| 1002. Mortgage Insurance | | |
| 1003. City Property Taxes | | |
| 1004. County Property Taxes | | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee - First American Title Insurance Company | 250.00 | |
| 1102. Abstract or title search - First American Title Insurance Company | 75.00 | |
| 1103. Title examination - First American Title Insurance Company | 75.00 | |
| 1104. Title Insurance Binder | | |
| 1105. Document Fee | | |
| 1106. Notary Fee | | |
| 1107. Attorney Fee | | |
| (includes above item numbers: ) | | |
| 1108. Title Insurance – See supplemental page for breakdown of individual fees and payees | 1,483.50 | |
| (includes above item numbers: ) | | |
| 1109. *Lender's coverage $260,900.00 Premium: $1,183.50 | | |
| 1110. Owner's coverage $212,900.00 Premium: $300.00 | | |
| 1111. Download/process loan package - First American Title Insurance Company | 35.00 | |
| 1112. Shipping/Handling Admin Service Fee - First American Title Insurance Company | 105.00 | |
| 1113. Title/Wire Fee - First American Title Insurance Company | 10.00 | |
| 1114. FL/ALTA Form 9 - First American Title Insurance Company | 120.85 | |
| 1115. 8.1 Environmental Endorsement - First American Title Insurance Company | 25.00 | |
| 1116. ALTA 6 Variable Rate Endorsement - First American Title Insurance Company | 25.00 | |
| 1117. | | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. *Recording fees:  Deed $0.00 Mortgage $205.50 Release $0.00 | 205.50 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps: | | |
| 1204. Record notice of commencement | 25.50 | |
| 1205. State Tax Stamps on Mortgage | 913.15 | |
| 1206. Intangible Tax | 521.80 | |
| **1300. Additional Settlement Charges** | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. 2004 taxes to St. Lucie County Tax Collector          POC $907.31 | | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1310. | | |
| 1311. | | |
| 1312. | | |
| 1313. | | |
| 1314. | | |
| Supplemental Summary | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 5,258.30 | |

* See Supplemental Page for details.

Supplemental Page
HUD-1 Settlement Statement

| | |
|---|---|
| | File No.<br>1081-871239 |

## First American Title Insurance Company
### Settlement Statement

| | |
|---|---|
| Loan No.<br>6930308844 | |
| Settlement Date:<br>07/06/2005 | |

Borrower Name & Address: Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

Seller Name & Address: Diamond Court Construction Company
2112 SE Bersell Road Port St. Lucie, FL 34952

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1108. Supplemental Summary | 1,483.50 | | |
| a) Owner's Title Policy - First American Title Insurance Company | | 300.00 | |
| b) Lender's Title Policy - First American Title Insurance Company | | 1,183.50 | |
| 1201. Supplemental Summary | 205.50 | | |
| a) Record Mortgage - Clerk of the Circuit Court | | 205.50 | |

| The following Section is restated from the Settlement Statement Page 1 | | | | |
|---|---|---|---|---|
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | | |
| 301. Gross amount due from Borrower (line 120) | 297,651.03 | 601. Gross Amount due to Seller (line 420) | | 212,900.00 |
| 302. Less amounts paid by/for Borrower (line 220) | 265,900.00 | 602. Less reductions in amounts due to Seller (line 520) | | 196,610.00 |
| 303. Cash (X From) ( To) Borrower | 31,751.03 | 603. Cash (X To) ( From) Seller | | 16,290.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S):

_____
Andrew M. Williams

SELLER(S):

Diamond Court Construction Company, a
Florida Corporation

_____
By: Lance W. Collins, President

| A. Settlement Statement | B. Type of Loan | | |
|---|---|---|---|

**First American Title Insurance Company**
Settlement Statement

| B. Type of Loan | |
|---|---|
| 1-5. Loan Type Conv. Unins. | |
| 6. File Number 1081-836992 | |
| 7. Loan Number | |
| 8. Mortgage Insurance Case Number | |

C.   **Note:**   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside this closing; they are shown here for informational purposes and are not included in the totals.

D.   Name of Borrower: Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

E.   Name of Seller: Clarence I. Bright
188-12 Turin Drive St. Albins, NY 11412

F.   Name of Lender:

G.   Property Location: 4565 SW Athena Dr., Port St. Lucie, FL 34953
Lot 3, Block 2397, PSL 34

H.   Settlement Agent: First American Title Insurance Company
Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

I. Settlement Date: 07/05/2005

Place of Settlement Address: 201 S.W. Port St. Lucie Blvd., Suite 205, Port St. Lucie, FL 34984

Print Date: 06/30/2005, 2:25 PM

Disbursement Date: 07/05/2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract Sales Price | 80,000.00 | 401. Contract Sales Price | 80,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 703.50 | 403. Total Deposits | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. Water & Sewer 07/05/05 to 11/01/05 @$228.37/yr | 74.45 | 409. Water & Sewer 07/05/05 to 11/01/05 @$228.37/yr | 74.45 |
| 110. Drainage 07/05/05 to 10/01/05 @$78.75/yr | 18.99 | 410. Drainage 07/05/05 to 10/01/05 @$78.75/yr | 18.99 |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| **120. Gross Amount Due From Borrower** | **80,796.94** | **420. Gross Amount Due To Seller** | **80,093.44** |
| **200. Amounts Paid By Or In Behalf of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. *Deposit or earnest money | 1,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges (line 1400) | 590.00 |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes 01/01/05 to 07/05/05 @$600.19/yr | 304.21 | 511. County taxes 01/01/05 to 07/05/05 @$600.19/yr | 304.21 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | **1,304.21** | **520. Total Reduction Amount Due Seller** | **894.21** |
| **300. Cash At Settlement From/To Borrower** | | **800. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from Borrower (line 120) | 80,796.94 | 601. Gross amount due to Seller (line 420) | 80,093.44 |
| 302. Less amounts paid by/for Borrower (line 220) | 1,304.21 | 602. Less reductions in amounts due to Seller (line 520) | 894.21 |
| **303. Cash (X From) ( To) Borrower** | **79,492.73** | **603. Cash (X To) ( From) Seller** | **79,199.23** |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____   Date: _____

* See Supplemental Page for details.

**L. Settlement Charges**

| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price $80,000.00 @ 0.0000% = $0.00 | | | |
| Division of Commission (line 700) as follows | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee | | | |
| 804. Credit Report | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Premium | | | |
| 807. Assumption Fee | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| 812. | | | |
| 813. | | | |
| 814. | | | |
| Supplemental Summary | | | |
| **900. Items Required by Lender to be Paid in Advance** | | | |
| 901. Interest | | | |
| 902. | | | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | | |
| 905. | | | |
| Supplemental Summary | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee - First American Title Insurance Company | | 75.00 | |
| 1102. Abstract or title search - First American Title Insurance Company | | 75.00 | |
| 1103. Title examination - First American Title Insurance Company | | 75.00 | |
| 1104. Title Insurance Binder | | | |
| 1105. Document Fee | | | |
| 1106. Notary Fee | | | |
| 1107. Attorney Fee | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance – See supplemental page for breakdown of individual fees and payees | | 460.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage $0.00 | | | |
| 1110. Owner's coverage $80,000.00 Premium: $460.00 | | | |
| 1111. Shipping/Handling Admin Service Fee - First American Title Insurance Company | | | 30.00 |
| 1112. | | | |
| 1113. | | | |
| 1114. | | | |
| 1115. | | | |
| 1116. | | | |
| 1117. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. *Recording fees: Deed $18.50 Mortgage $0.00 Release $0.00 | | 18.50 | |
| 1202. City/county tax/stamps: | | | |
| 1203. *State tax/stamps: Deed $560.00 Mortgage $0.00 | | | 560.00 |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. 2004 taxes to St. Lucie County Tax Collector | POC-S $907.31 | | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| 1309. | | | |
| 1310. | | | |
| 1311. | | | |
| 1312. | | | |
| 1313. | | | |
| 1314. | | | |
| Supplemental Summary | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 703.50 | 590.00 |

* See Supplemental Page for details.

| | File No.<br>1081-836992 |
|---|---|
| Supplemental Page<br>HUD-1 Settlement Statement | |
| **First American Title Insurance Company**<br>**Settlement Statement** | Loan No. |
| | Settlement Date:<br>07/05/2005 |

Borrower Name & Address:  Andrew M. Williams
3841 NW 6th Court, Ft. Lauderdale, FL 33311

Seller Name & Address:  Clarence I. Bright
188-12  Turin Drive St. Albins, NY 11412

| Section L. Settlement Charges continued | | Paid From<br>Borrower's<br>Funds at<br>Settlement | Paid From<br>Seller's<br>Funds at<br>Settlement |
|---|---|---|---|
| 1108.    Supplemental Summary | 460.00 | | |
| a) Owner's Title Policy - First American Title Insurance Company | | 460.00 | |
| 1201.    Supplemental Summary | 18.50 | | |
| a) Record Warranty Deed - Clerk of the Circuit Court | | 18.50 | |
| 1203.    Supplemental Summary | 560.00 | | |
| e) State Documentary Transfer Tax - Clerk of the Circuit Court | | | 560.00 |

| Section J.  Summary of Borrower's Transaction continue | | Borrower Charges | Borrower Credits |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | | |
| 200. Amounts Paid By Or In Behalf of Borrower | | | |
| 201.    Supplemental Summary | 1,000.00 | | |
| a) Earnest Money Deposit | | | 1,000.00 |

| The following Section is restated from the Settlement Statement Page 1 | | | |
|---|---|---|---|
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 80,796.94 | 601. Gross Amount due to Seller (line 420) | 80,093.44 |
| 302. Less amounts paid by/for Borrower (line 220) | 1,304.21 | 601. Less reductions in amounts due to Seller (line 520) | 894.21 |
| 303. Cash (X From) ( To) Borrower | 79,492.73 | 603. Cash (X To) ( From) Seller | 79,199.23 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and distributions made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S):                                          SELLER(S):

Andrew M. Williams                        Clarence I. Bright

# CLARIFICATION OF TITLE VESTING

RE:    Closing Date:    07/05/2005
        Buyer(s):    Andrew M. Williams, an unmarried man
        Property Address:    4565 SW Athena Dr., Port St. Lucie, Florida 34953
        File No.:    1081-836992

In order to clarify the manner in which I/We will be taking title to the above captioned property, I/We the undersigned herein direct and authorize First American Title Insurance Company to prepare the closing documents with the name of the buyer reflected as follows:

Andrew M. Williams, an unmarried man

I/We hereby acknowledge that we fully understand the importance of the proper vesting of title to real property.

Further, I/We herein agree to indemnify and hold harmless First American Title Insurance Company from any loss or damage concerning the way title is vested on the Deed of Conveyance for this transaction other than its' compliance with instructions contained herein.

_____

Andrew M. Williams

**If you do not fully understand the importance of proper VESTING OF TITLE TO REAL PROPERTY, First American Title Insurance Company urges you to seek the advice of a Real Estate Attorney.**

# COMPLIANCE AND TAX PRORATION AGREEMENT

RE:   Closing Date:        07/05/2005
      Buyer(s):            Andrew M. Williams, an unmarried man
      Seller(s):           Clarence I. Bright
      Property Address:    4565 SW Athena Dr.,
                           Port St. Lucie, Florida 34953

We, the undersigned Sellers and/or Buyers/Borrowers herein acknowledge the following as conditions of the above referenced transaction:

1.    All contingencies set forth in the Contract for Sale have been complied with in full;

2.    All utility bills, including but not limited to water, sewer, gas, garbage and electric are the responsibility of the undersigned parties, not the closing agents. All matters regarding utility bills will be handled outside of closing;

3.    The undersigned parties will fully cooperate if adjustment for clerical errors on any or all closing documentation is necessary, and will sign such additional documents as are necessary to correct such errors.

4.    Calculations of payoff figures, or principal balance and escrow account balances and/or proration, were based on information, either obtained orally or in writing from your existing lender(s). The closing agent will not be held liable for miscalculations as a result of errors made by the lender(s). If there is/are discrepancies between the figures used in preparing the closing statements, and future information provided by the lender(s) resulting in a demand by the lender(s) for additional funds, owner will, upon request forward said funds forthwith;

5.    Consent is hereby given, pursuant to Rule 4-186.008(3) of the Florida Administrative Code, to the placement of the settlement funds for the transaction into an interest bearing account in the name of First American Title Insurance Company. The parties understand the interest earned or other benefits earned, if any, on such account will be the property of First American Title Insurance Company;

6.    The undersigned parties understand and agree that any shortage in payments made to any debt holder as a "courtesy" or "accommodation" payoff, that are not secured by the property, (i.e. credit cards, car loans, student loans, etc.) will be the sole responsibility of the borrower.

7.    xx  The proration of taxes reflected on the closing statement has been made on the basis of a gross tax figure in the amount of $600.19 in compliance with instructions contained in the Purchase and Sale Agreement for this transaction.
                    **OR**
      _____  No prorations have been made for current years taxes per Instructions received for closing and shall not be the liability of First American Title Insurance Company.

The undersigned Owners of the above referenced property herein acknowledge they _____**have**
_____**have not** filed for and received homestead exemption for property taxes for the current year.

| | SELLER INITIALS | BUYER INITIALS |
|---|---|---|
| **PLEASE NOTE!!  If the final tax bill for the current year has not been issued, the amount utilized for the purpose of this closing should be considered an estimate and subject to change in the current and subsequent years, based on the value and tax rates assessed to the property by the appropriate taxing authorities.** | | |

We understand that First American Title Insurance Company is relying on the statements contained herein to compute the applicable tax proration amounts between Sellers and Buyers and/or the appropriate tax amount for the Lender's escrow account.

The closing agent will not be liable for any discrepancies that may arise in these proration figures when the actual tax bills for the year of closing are available, or for any shortages in escrow accounts. Upon receipt of the current tax statement, the undersigned parties will make proration adjustments between themselves outside of the closing if the total proration difference exceeds $10.00.

_____

Andrew M. Williams


_____

Clarence I. Bright

# AGREEMENT

It is agreed and understood between the parties herein that the charges for the water and sewer assessments applicable to the subject property described as follows are in the amount of $228.37, ANNUALLY .

Lot 3, Block 2397 of PORT ST. LUCIE SECTION THIRTY FOUR, according to the plat thereof as recorded in Plat Book 15, Page(s) 9, 9A to 9W of the Public Records of St. Lucie County, Florida.

Each party understands that:

The special assessments for water & sewer are paid by the sellers.

The special assessments for water & sewer are paid by the buyers.

 XX   The parties agree that the principal amount of special assessments for water and sewer plus interest and any other applicable charges are assumed by the buyers and that the buyers assumes full responsibility for the balance due for the assessments and will continue to make the payments for the assessments or pay them in full in the future date.

The special assessment for water & sewer are not yet due and payable any future assessments will be paid by buyers.


_____          _____
Clarence I. Bright                        Andrew M. Williams

# ADJUSTABLE RATE NOTE

(1 Year Treasury Index - Rate Caps - Fixed Rate Conversion Option)
(Assumable during Life of Loan unless Converted - Convertible 1st through 5th Change Date)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALSO CONTAINS AN OPTION TO CONVERT MY ADJUSTABLE INTEREST RATE TO A FIXED RATE.**

|  |  |  |
|---|---|---|
| | Port Saint Lucie | Florida |
| [Date] | [City] | [State] |

4565 SW Athena Dr, Port Saint Lucie, FL  34953

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 260,900.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is   Branch Banking and Trust Company

I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          5.500   %. The interest rate I will pay may change in accordance with Sections 4 or 5 of this Note.

The interest rate required by this Section 2 and Sections 4 or 5 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on  See Addendum A
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  August 1, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  223 West Nash Street, Wilson, NC  27893

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ See Addendum A          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 or 5 of this Note.

---

DOC #:520751                    APPL #:7000546163              LOAN #:6930308844

MULTISTATE  CONVERTIBLE/ADJUSTABLE RATE NOTE - 1 Year Treasury (Assumable during Life of Loan) (Convertible 1st through 5th Change Date) - Single Family - Freddie Mac UNIFORM INSTRUMENT
Amended for Florida

B890N(FL) ((0404)      UM51 0404    **Form 5511 3/04**
   VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 5                         Initials:_____

4. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first day of August, 2008 , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Three Quarters percentage point(s) ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 7.500% or less than 3.500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than Two percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 10.500 %, (the "Maximum Rate").

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. **FIXED INTEREST RATE CONVERSION OPTION**

(A) Option to Convert to Fixed Rate

I have a Conversion Option which I can exercise unless I am in default or this Section 5(A) will not permit me to do so. The "Conversion Option" is my option to convert the interest rate I am required to pay by this Note from an adjustable rate with interest rate limits to the fixed rate calculated under Section 5(B) below.

The conversion can only take place on a date(s) specified by the Note Holder during the period beginning on the first Change Date and ending on the fifth Change Date. Each date on which my adjustable interest rate can convert to the new fixed rate is called the "Conversion Date."

If I want to exercise the Conversion Option, I must first meet certain conditions. Those conditions are that: (i) I must give the Note Holder notice that I want to do so; (ii) on the Conversion Date, I must not be in default under the Note or the Security Instrument; (iii) by a date specified by the Note Holder, I must pay the Note Holder a conversion fee of U.S. $ 250.00 ; and (iv) I must sign and give the Note Holder any documents the Note Holder requires to effect the conversion.

(B) Calculation of Fixed Rate

My new, fixed interest rate will be equal to the Federal Home Loan Mortgage Corporation's required net yield as of a date and time of day specified by the Note Holder for (i) if the original term of this Note is greater than 15 years, 30-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus Zero and Five Eighths percentage points ( .625 %), or (ii) if the original term of this Note is 15 years or less, 15-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus Zero and Five Eighths percentage points ( .625 %). If this required net yield cannot be determined because the applicable commitments are not available, the Note Holder will determine my interest rate by using comparable information. My new rate calculated under this Section 5(B) will not be greater than the Maximum Rate stated in Section 4(D) above.

Form 5511 3/04

**(C) New Payment Amount and Effective Date**

If I choose to exercise the Conversion Option, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe on the Conversion Date in full on the Maturity Date at my new fixed interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Beginning with my first monthly payment after the Conversion Date, I will pay the new amount as my monthly payment until the Maturity Date.

**6.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**7.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**8.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**9.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

DOC #:520753

B890N(FL)  (0404)

APPL #:7000546163

Page 3 of 5

LOAN #:6930308844  **Form 5511 3/04**

Initials: _____

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 11. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 12. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) UNTIL I EXERCISE MY CONVERSION OPTION UNDER THE CONDITIONS STATED IN SECTION 5 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Secion 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) IF I EXERCISE MY CONVERSION OPTION UNDER THE CONDITIONS STATED IN SECTION 5 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 12(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the trnasfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

DOC #:520754

B890N(FL)  (0404)

APPL #:7000546163

Page 4 of 5

LOAN #:6930308844  Form 5511 3/04
Initials: ____

13. **DOCUMENTARY TAX**

    The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)    _____ (Seal)
                              -Borrower                                     -Borrower
Andrew M Williams

_____ (Seal)    _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)    _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)    _____ (Seal)
                              -Borrower                                     -Borrower

*[Sign Original Only]*

07/01/05  10:50:59 AM

**Creditor: BRANCH BANKING AND TRUST COMPANY ("BB&T")**

Mortgage Loan Administration     INTERIM INTEREST $
P.O. Box 2305, Wilson, N.C. 27894

## Federal TRUTH-IN-LENDING DISCLOSURE STATEMENT

| DATE | LOAN NUMBER | DATE OF DISBURSEMENT __07/06/05__ |
|------|-------------|------------------------------------|
| 07/06/05 | 6930308844 | ☐ ADVANCE DISCLOSURE   ☒ DISCLOSURE AT CLOSING |

TYPE OF LOAN

See your Good Faith Estimate form for an itemization of your Amount Financed if your loan is subject to the Real Estate Settlement Procedures Act.

3 Year Conv C/P 2/5

BORROWER(S): Andrew M Williams

ADDRESS: 4565 SW Athena Dr, Port Saint Lucie, Florida   34953

| ANNUAL PERCENTAGE RATE  The cost of your credit as a yearly rate | FINANCE CHARGE  The dollar amount the credit will cost you | Amount Financed  The amount of credit provided to you or on your behalf | Total of Payments  The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 6.388 % | $ 327,437.62 | $ 259,827.00 | $ 587,264.62 |

You have a right to receive at this time an itemization of the Amount Financed.

☐ I want an itemization     ☐ I do not want an itemization

Your payment schedule will be:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE FIRST OF EACH MONTH BEGINNING: |
|---|---|---|
| INTEREST ON AMOUNT OF CREDIT OUTSTANDING WILL BE PAID MONTHLY. | | |
| 24 | $1,613.98 | September 1, 2006 |
| 74 | $1,713.08 | September 1, 2008 |
| 261 | $1,580.46 | November 1, 2014 |
| 1 | $1,575.24 | August 1, 2036 |
| | | |
| | | |

**Security:**  You are giving a security interest in:
  ☒ The goods or property being purchased.
  ☐ Other: _____

**Filing Fees:** $ 210.00

**Late Charge:** If a payment is received more than 15 days after the due date, you will be charged 5.000 % of the amount of the payment past due.

**Prepayment:** If you pay off early, you will not have to pay a penalty and you ☐ may, ☒ will not, be entitled to a refund of part of the prepaid finance charges.

**Insurance:**  Property - You may obtain property insurance from anyone you want that is acceptable to BB&T. If you get the insurance from BB&T you will pay $ _____ for a term of _____ .
  Credit and Disability - Credit life insurance and disability insurance are not required to obtain credit and will not be provided unless you sign below and agree to pay the additional cost.

| TYPE | PREMIUM | SIGNATURE |
|---|---|---|
| CREDIT LIFE  for the Stated Term of the Credit | | I want Credit Life Insurance _____  SIGNATURE _____  SIGNATURE |
| CREDIT DISABILITY  for the Stated Term of the Credit | | I want Credit Disability Insurance _____  SIGNATURE |

**Assumption:** Someone buying your home ☒ may, subject to conditions, be allowed to ☐ cannot assume the remainder of the mortgage on the original terms.

  ☐ If checked here, this obligation has a demand feature.

**Variable Rate:** ☒ If checked here, your loan contains a variable rate feature and is secured by your principal dwelling. Disclosures about the variable rate feature have been provided to you earlier.

  ☐

# ADDENDUM A

## INITIAL PERIOD (CONSTRUCTION-PHASE) ADDENDUM TO NOTE

DATED
EXECUTED BY   Andrew M Williams

AS MAKER(S)

IN FAVOR OF   Branch Banking and Trust Company

THIS ADDENDUM CONTAINS ADDITIONAL PROVISIONS REGARDING MY MONTHLY PAYMENT AND IS A PART OF MY NOTE OF EVEN DATE.

In addition to the provisions of my Note, my monthly payment will be as follows:

**Amount of Initial Monthly Payments During Construction Phase ("Initial Period")**

My initial monthly payments will be in the amount of all accrued interest outstanding. Interest during the construction phase will be computed and charged monthly following the date of first disbursement at the rate of interest set forth in Section 2 of the Note. Interest will accrue during the construction phase on all funds disbursed from the date of each disbursement. Subject to the foregoing, my initial monthly payments will begin on the first day of September, 2005     , and continue on the first day of each month thereafter until September 1st , 2006     (Initial Period). *At the end of the initial period, my new interest rate and my new monthly payment will be set forth, evidenced by a Modification Agreement. My new monthly payment shall be determined based upon the amount borrowed and the interest rate that is offered by the lender at the time of my interest rate lock of modification to permanent loan.*

I understand that the terms of this Addendum form a part of the terms of the Note pursuant to which I am obligated to repay the Note Holder.

Witness the Hand(s) and Seal(s) of the undersigned.

| | |
|---|---|
| _____(SEAL) | _____(SEAL) |
| Andrew M Williams    -Borrower | -Borrower |
| _____(SEAL) | _____(SEAL) |
| -Borrower | -Borrower |
| _____(SEAL) | _____(SEAL) |
| -Borrower | -Borrower |
| _____(SEAL) | _____(SEAL) |
| -Borrower | -Borrower |

# BB&T Mortgage

## DISCLOSURE STATEMENT ABOUT MERS

Mortgage Electronic Registration Systems, Inc. (MERS) is named on your security instrument as the mortgagee in a nominee capacity for Branch Banking and Trust Company (Lender). MERS is a company separate from your lender that operates an electronic tracking system for mortgage rights. MERS is not your lender; it is a company that provides an alternative means of registering the mortgage lien in the public records. MERS maintains a database of all the loans registered with it, including the name of the lender on each loan. Your lender has elected to name MERS as the mortgagee in a nominee capacity and record the mortgage in the public land records to protect its lien against your property.

**Naming MERS as the mortgagee and registering the mortgage on the MERS electronic tracking system does not affect your obligation to your lender, under the Promissory Note.**

DOC #:521201
ML212 (0207)

APPL #:7000546163

LOAN #:6930308844



## First American Title Insurance Company
201 S.W. Port St. Lucie Blvd., Suite 205
Port St. Lucie, Florida 34984
Ph. (772) 878-8700 / Fax.  (772) 340-3362

## PLEASE READ BEFORE SIGNING THIS DOCUMENT!!!!

## INSTRUCTIONS FOR EXECUTING
## MORTGAGE

This is the most important document in our package. It MUST be completed correctly or the closing **WILL BE DELAYED** .

Please call this office if you have any questions.

Please be sure to sign your names(s) where indicated **EXACTLY AS IT IS TYPED** .

There must be **two (2) separate disinterested witnesses** present when this document is signed. The Mortgage may be **INVALID** if it is not witnessed. (The Notary may act as one(1) of the witnesses.) The witnesses MUST print their names below their signatures. The witnesses may not be related to you.

This Mortgage must also be **signed in the PRESENCE OF A NOTARY PUBLIC.** The Notary may not be related to you. The Notary must complete the acknowledgement section of the Mortgage and also AFFIX HIS/HER OFFICIAL SEAL OF OFFICE. The Notary must print their name below their signature and the date of their commission expiration (if it is not contained in their official seal).

Return To:

This document was prepared by:

————————————[Space Above This Line For Recording Data]————————————

# MORTGAGE

MIN 100159969303088440

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated
together with all Riders to this document.
(B) "Borrower" is  Andrew M Williams

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is  Branch Banking and Trust Company

DOC #:522051                        APPL #:7000546163                        LOAN #:6930308844
FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3010 1/01

VMP®-6A(FL) (0005).01
Page 1 of 16        UM51 0005.10        Initials:_____

VMP MORTGAGE FORMS - (800)521-7291



Lender is a  Corporation
organized and existing under the laws of  North Carolina
Lender's address is  223 West Nash Street, Wilson, NC  27893

(E) "Note" means the promissory note signed by Borrower and dated   as of the date hereof
The Note states that Borrower owes Lender   Two Hundred Sixty Thousand Nine Hundred
and No/100                                                             Dollars
(U.S. $  260,900.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  August 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Constr/Perm Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the   County          [Type of Recording Jurisdiction]
of   Saint Lucie                                                    [Name of Recording Jurisdiction]:

Parcel ID Number:                                which currently has the address of
4565 SW Athena Dr                                                              [Street]
Port Saint Lucie                         [City], Florida   34953        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

DOC  #:522053              APPL #:7000546163                   LOAN #:6930308844
                                                     Initials:_____
-6A(FL) (0005).01               Page 3 of 16                    Form 3010  1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard

or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise

agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of

disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

DOC #:522059

APPL #:7000546163

Initials:_____

LOAN #:6930308844

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument

shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument,

DOC #:522062
APPL #:7000546163
LOAN #:6930308844
Initials:_____

VMP®  -6A(FL) (0005).01
Page 12 of 16
Form 3010  1/01

and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental

DOC  #:522063                  APPL #:7000546163                                     LOAN #:6930308844

                                                                    Initials:_____

VMP®-6A(FL) (0005).01           Page 13 of 16                                         Form 3010  1/01

Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                                                              -Borrower
                                            Andrew M Williams
                                            4565 SW Athena Dr
                                            Port Saint Lucie, FL  34953

                                                                   (Address)

_____          _____ (Seal)
                                                                              -Borrower

                                                                   (Address)

_____ (Seal)             _____ (Seal)
               -Borrower                                                      -Borrower

          (Address)                                                (Address)

_____ (Seal)             _____ (Seal)
               -Borrower                                                      -Borrower

          (Address)                                                (Address)

_____ (Seal)             _____ (Seal)
               -Borrower                                                      -Borrower

          (Address)                                                (Address)

DOC  #:522065
VMP  -6A(FL) (0005).01
®

APPL #:7000546163
Page 15 of 16

LOAN #:6930308844
Form 3010  1/01

**STATE OF FLORIDA,**                                                    County ss:                                    by

    The foregoing instrument was acknowledged before me this
Andrew M Williams

who is personally known to me or who has produced                                        as identification.

_____
Notary Public

DOC  #:522066

APPL #:7000546163                          Initials:_____                    LOAN #:6930308844

Page 16 of 16                                                    Form 3010  1/01

VMP®-6A(FL) (0005).01

Exhibit "A"

Lot 3, Block 2397 of PORT ST. LUCIE SECTION THIRTY FOUR, according to the plat thereof as recorded in Plat Book 15, Page(s) 9, 9A to 9W of the Public Records of St. Lucie County, Florida.

# ADJUSTABLE RATE RIDER
### (1 Year Treasury Index - Rate Caps - Fixed Rate Conversion Option)

THIS ADJUSTABLE RATE RIDER is made this                    day of                    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Branch Banking and Trust Company

(the "Lender") of the same date and covering the property described in the Security Instrument and located
at: 4565 SW Athena Dr, Port Saint Lucie, FL  34953

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY. THE NOTE ALSO CONTAINS THE OPTION TO CONVERT THE ADJUSTABLE RATE TO A FIXED RATE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          5.500 %. The Note provides for changes in the adjustable interest rate and the monthly payments as follows:

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The adjustable interest rate I will pay may change on the first day of August, 2008          , and on that day every 12th month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

DOC  #:520531                 APPL #:7000546163                    LOAN #:6930308844

MULTISTATE CONVERTIBLE ADJUSTABLE RATE RIDER - Single Family

BBT890R (0009)

Page 1 of 5   UM31 0008   Initials:_____
VMP MORTGAGE FORMS - (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Three Quarters                                                       percentage points
(               2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 3.500%.
7.500 % or less than
Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than Two                                                       percentage points
(               2.000%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                               10.500 %, which is called the "Maximum Rate."

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   FIXED INTEREST RATE OPTION**

The Note provides for the Borrower's option to convert from an adjustable interest rate with interest rate limits to a fixed interest rate, as follows:

DOC #:520532                     APPL #:7000546163                               LOAN #:6930308844
                                                                 Initials:_____

BBT890R (0009)                          Page 2 of 5

5.   **FIXED INTEREST RATE CONVERSION OPTION**
   **(A) Option to Convert to Fixed Rate**
   I have a Conversion Option which I can exercise unless I am in default or this Section 5(A) will not permit me to do so. The "Conversion Option" is my option to convert the interest rate I am required to pay by this Note from an adjustable rate with interest rate limits to the fixed rate calculated under Section 5(B) below.

   The conversion can only take place on a date(s) specified by the Note Holder during the period beginning on the first Change Date and ending on the fifth Change Date. Each date on which my adjustable interest rate can convert to the new fixed rate is called the "Conversion Date."

   If I want to exercise the Conversion Option, I must first meet certain conditions. Those conditions are that: (i) I must give the Note Holder notice that I want to do so; (ii) on the Conversion Date, I must not be in default under the Note or the Security Instrument; (iii) by a date specified by the Note Holder, I must pay the Note Holder a conversion fee of U.S. $   250.00                  ; and (iv) I must sign and give the Note Holder any documents the Note Holder requires to effect the conversion.

   **(B) Calculation of Fixed Rate**
   My new, fixed interest rate will be equal to the Federal Home Loan Mortgage Corporation's required net yield as of a date and time of day specified by the Note Holder for (i) if the original term of this Note is greater than 15 years, 30-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus Zero and Five Eighths        percentage points (   .625 %), or (ii) if the original term of this Note is 15 years or less, 15-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus Zero and Five Eighths        percentage points (   .625 %). If this required net yield cannot be determined because the applicable commitments are not available, the Note Holder will determine my interest rate by using comparable information. My new rate calculated under this Section 5(B) will not be greater than the Maximum Rate stated in Section 4(D) above.

   **(C) New Payment Amount and Effective Date**
   If I choose to exercise the Conversion Option, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe on the Conversion Date in full on the maturity date at my new fixed interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Beginning with my first monthly payment after the Conversion Date, I will pay the new amount as my monthly payment until the maturity date.

C.   **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
   1.   UNTIL BORROWER EXERCISES THE CONVERSION OPTION UNDER THE CONDITIONS STATED IN SECTION B OF THIS ADJUSTABLE RATE RIDER, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS AMENDED TO READ AS FOLLOWS:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. **IF BORROWER EXERCISES THE CONVERSION OPTION UNDER THE CONDITIONS STATED IN SECTION B OF THIS ADJUSTABLE RATE RIDER, THE AMENDMENT TO UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT CONTAINED IN SECTION C1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE IN EFFECT, AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

DOC #:520534                   APPL #:7000546163                              LOAN #:6930308844
                                                            Initials:_____

BBT890R (0009)                      Page 4 of 5

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
Andrew M Williams              -Borrower                                                   -Borrower


_____ (Seal)                    _____ (Seal)
                               -Borrower                                                   -Borrower


_____ (Seal)                    _____ (Seal)
                               -Borrower                                                   -Borrower


_____ (Seal)                    _____ (Seal)
                               -Borrower                                                   -Borrower

DOC  #:520535                 APPL #:7000546163            LOAN #:6930308844
BBT890R (0009)                     Page 5 of 5

# CONSTRUCTION LOAN RIDER TO MORTGAGE

This CONSTRUCTION LOAN RIDER made this the                              day of                              ,
is incorporated in and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's note (the "Note") to   Branch Banking and Trust Company
                              , a   North Carolina
banking corporation (the "Lender") of the same date covering the property described in the Security Instrument and located at:
4565 SW Athena Dr, Port Saint Lucie, Florida  34953
(Property Address)

Additional Provisions. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

The Security Instrument also secures future advances made by the Lender.

The Borrower has on the date hereof executed a Construction Loan Agreement, the terms of which are incorporated herein by reference as if set forth following. Any default in the terms, conditions, covenants or provisions of the Construction Loan Agreement executed by Borrower and Lender shall constitute a default under the terms of this Security Instrument. In the event of such default, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument and this Rider.

If any person, corporation or other entity including without limitation the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association but excluding Lender (or an Affiliate or Subsidiary of Lender as defined in 12 U.S.C.S. 1841) buys all or some of the Lender's rights under the Security Instrument and Note, (said assignee herein "Third Party") the terms, promises and agreements in this Rider will no longer have any force or effect, except for those terms above which are necessary to ensure the priority and effectiveness of the Lender's lien, which shall not be affected by any such sale. Without in any way limiting the foregoing, the Borrower shall not have an option under this Security Instrument to borrow additional funds secured hereby from the Lender or from the Third Party upon purchase of all or some of the Lender's right under the Security Instrument and Note by the Third Party. Notwithstanding the foregoing provisions, the ability of the Lender, its successors and assigns, to enforce the repayment of future advances made prior to the sale of the Security Instrument to the Federal Home Loan Mortgage Corporation or any other Third Party shall remain in full force and effect.

DOC #:511316

B113-1FL  (0008)

APPL #:7000546163

Page 1 of 2

LOAN #:6930308844

Initials:_____

By signing below, Borrower accepts and agrees to the terms and covenants contained in the Construction Loan Rider.

IN WITNESS WHEREOF, each Borrower has affixed his Hand and adopted as his seal the word "SEAL" appearing beside or near his signature the day and year first above written.

_____ (Seal)
Andrew M Williams                 -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

# CONSTRUCTION LOAN AGREEMENT

This Construction Loan Agreement ("Agreement") is made                                    and is by and between,
Andrew M Williams

("Owner"), whose address is 3841 NW 6th Ct, Fort Lauderdale, FL  33311

and Branch Banking and Trust Company
("Lender").

## PRELIMINARY STATEMENT

1. Owner has applied to Lender for a loan in the gross amount of $      260,900.00    (the "Loan") and Lender has agreed to make the Loan pursuant to a mortgage loan commitment to Owner (the "Commitment").

2. The Loan is to be evidenced by a note of even date herewith in the amount of the Loan (the "Note"), the repayment of which is to be secured by, among other things, a mortgage of even date herewith (the "Mortgage") encumbering certain real property (the "Property") owned by Owner, which property is located in    Saint Lucie            County, Florida, and is more particularly described as follows:

3. The Loan proceeds shall be used to construct certain improvements (the "Improvements") on the property to be completed no later than   12    months from the date hereof (the "Completion Date").

## ARTICLE I. REPRESENTATIONS AND WARRANTIES OF OWNER

Owner represents and warrants to Lender as follows:

a) EXISTENCE: Owner, if a corporation, is duly authorized, validly existing and in good standing under the laws of the state of its incorporation and the laws of the state in which the Property is located, and has all necessary corporate power to enter into these agreements. Owner, if a partnership, is validly existing and in good standing under the laws of the state of its formation and, if required, is qualified to do business in the state in which the Property is located, and the partners executing this Agreement and the Note and Mortgage have lawful authority to bind the partnership in accordance with the terms of this Agreement, the Note and Mortgage and any other documents being executed by the partnership for the benefit of the Lender.

b) NO DEFAULT. Owner is not in Default and has not breached in any material respect any agreement or instrument to which it is a party or by which it may be bound, and the execution and delivery of this Agreement, the Note and Mortgage, and the consummation of the other transactions contemplated herein do not conflict with or result in (i) a violation of any regulation, order, writ, judgment, injunction or decree of any court or governmental or municipal authority or (ii) the breach of or default under any agreement or instrument to which Owner is a party or by which it may be bound.

c) NON-COMMENCEMENT OF WORK. There has been no commencement of operations on the Property incident to the Improvements and no activities have occurred prior to the date hereof which could result in any construction lien or similar lien being filed against the Property which would be superior to the lien of the Mortgage. No notice of commencement has been filed in the public records of the county in which the Property is located.

d) COMPLIANCE WITH LAWS. Owner has obtained all necessary permits and governmental approvals, including FHA and VA approvals, if applicable, necessary to commence and complete construction of the Improvements.

e) UTILITIES AND ZONING. Sewer, water and all other necessary utilities are available to serve the Property and the Improvements in sufficient quantity for their intended use, and the current zoning classification of the Property and any covenants and restrictions affecting the Property permit the construction and intended use of the Improvements without the necessity of obtaining further approvals, authorizations, waivers, consents, exceptions or variances.

f) ABSENCE OF PROCEEDINGS AND ACTIONS. There are no action, suits or proceedings pending or, to the knowledge of the Owner, threatened against or affecting Owner or the Property, or any guarantors of the Loan.

g) FINANCIAL STATEMENTS. All financial statements of Owner and any guarantors of the Loan submitted to Lender are true and correct as of the date of this Agreement.

Page 1 of 9

h) TITLE TO PROPERTY. Owner has good and marketable title to the property and all of the collateral given as security to Lender free and clear of all mortgages, pledges, liens, security interests and other encumbrances, except for those exceptions appearing in the Commitment for Title Insurance accepted by Lender and will warrant and defend the same from all claims and demands of all persons.

i) OTHER LIENS. The Property shall continue to be free from any pledges, liens, encumbrances and security interests or other claims in favor of others, and Owner will warrant and defend the same from all claims and demands of all persons.

j) ASSESSMENT. The Property is separately assessed from all other property for real estate tax purposes.

k) MORATORIUMS. There presently exists no moratorium of any kind which would interfere with the construction, marketing, operation or sale of the Improvements.

l) CONTRACTS. The construction contract and the architect's contract are in full force and effect with no amendments other than those approved in writing by Lender, and no default exists hereunder by either party thereto.

## ARTICLE II. COVENANTS OR OWNER

a) DEVELOPMENT WORK CRITERIA. Development of the Property and construction of the Improvements shall be in accordance with the plans and specifications therefore which have heretofore been submitted by Owner to Lender and approved by Lender (the "Plans and Specifications") and in compliance with all restrictions, conditions, ordinances, codes, regulations and laws of governmental authorities, including, if applicable, FHA and VA, and agencies having control or jurisdiction over the Property and the Improvements. No deviation shall be made in the Plans and Specifications without the prior written consent of Lender, and to the extent applicable, no change shall be made in any contracts Owner has entered into with respect to construction of the improvements without the prior written consent of Lender.

b) COMMENCEMENT AND CONTINUITY OF WORK. Development of the Property shall commence within fifteen (15) days from the date of this Agreement and shall be carried on diligently and without interruption or delay until completed and the same shall be constructed in a good and workmanlike manner, and in accordance with the Plans and Specifications. Development of the Property shall be completed no later than the Completion Date.

c) OWNER'S EQUITY. Owner will place in a construction loan account with Lender funds in the amount of which Owner represents to be sufficient funds over and above the net amount available from the Loan to complete the Improvements in accordance with the Plans and Specifications.

d) USE OF PROCEEDS AND DEFICIENCY IN LOAN AMOUNT. Owner will use the proceeds of the Loan only for the payment of costs directly associated with the construction of the Improvements and shall not divert such funds for any other purpose. If it appears the construction costs of the improvements will exceed the net amount available from the Loan, and any prior deposit by Owner, Lender may, at its option, require Owner to deposit, and Owner shall deposit with Lender within ten (IO days) after receipt of any request from Lender, sufficient sums, which together with a net amount remaining available for disbursement, will be sufficient to pay all construction costs and related costs of completing the Improvements in accordance with the Plans and Specifications. The judgment and determination of Lender as to any such deficiency shall be final and conclusive.

e) ACCESS TO BOOKS AND RECORDS. Owner will permit Lender or its agents to have at all reasonable times, unrestricted access to its records, accounting books, contracts, subcontracts, bills and statements, including any supporting or related vouchers or other instruments, as they relate in any manner to the development and construction of the improvements, and Lender or its agents shall have the right to copy the same.

f) FINANCIAL STATEMENTS. Owner will furnish to Lender signed, annual unaudited statements of its financial condition, including a profit and loss statement, and a true and correct copy of Owner's federal income tax return, and will permit Lender through any means deemed appropriate by Lender to verify the correctness of such statements. The annual statements shall be delivered to Lender within thirty (30) days after the close of Owner's annual fiscal period. A copy of each income tax return filed by Owner shall be delivered to Lender within thirty (30) days after the original has been filed with the Internal Revenue Service. If the Note has been guaranteed by one or more guarantors, Owner will cause such guarantors to furnish Lender such updates of their financial statement and tax returns as Lender may from time to time reasonably request.

g) DELIVERY OF MATERIALS TO PROPERTY. Owner will cause all materials, supplies and goods to be incorporated as part of the Improvements to be delivered to the Property free and clear of all liens and encumbrances so that no other party shall have an interest therein, whether superior or inferior to the lien of the Mortgage.

ML201FL (0209)

Doc# 620142  APPL #:7000546163  LOAN #:6930308844

h) ACCESS TO PROPERTY. Owner will permit Lender and its agents at all reasonable times to have the right of entry and free access to the Property and the right to inspect the Property and all work done, labor performed and material furnished thereon or thereabout.

i) SERVICES TO BENEFIT LENDER. All inspections and other services rendered by or on behalf of Lender and whether or not paid for by Owner shall be rendered solely for the protection and benefit of Lender, and Owner shall not be entitled to claim any loss or damage against Lender or its agents or employees for failure to properly discharge their duties to Lender.

j) PROMOTION. Owner will permit Lender to publicize its involvement in the Property and construction of the Improvements and will, at Lender's request, name Lender as the construction Lender in all publicity and promotion which Owner or its agent publishes in connection therewith, and will permit Lender to place and keep its signs on the Property at all times during the construction of the Improvements.

k) JOINDER BY CONTRACTOR. If Owner is employing a licensed contractor with respect to construction of the Improvements, Owner will require such contractor to execute the Assent of Contractor which is made a part of this agreement.

l) FURTHER ASSURANCES. Owner will, at any time on Lender's request, make, do, execute and deliver to Lender and where appropriate shall cause to be recorded or filed at Owner's expense any and all further documents, acts, mortgages, and assurances as may be reasonably necessary to effectuate, complete and confirm the transactions sought to be consummated hereunder.

m) COMPLIANCE WITH COMMITMENT, NOTE AND MORTGAGE. Owner will comply with and abide by all the terms, conditions, covenants, agreements, representations and warranties contained in the Commitment, Note and Mortgage, each of which documents are incorporated herein by the reference thereto. In the event of a conflict between this Agreement and the Commitment, Note or Mortgage, the terms and conditions of this Agreement shall govern and control.

n) DISPUTES. Should any disputes arise between Owner and Lender with respect to the construction or meaning of the Plans and Specifications, the same shall, at the option of Lender, be decided by a competent architect, engineer or contractor to be selected by Lender, but paid for by Owner. The decision of such architect, engineer or contractor, as the case may be, shall be conclusive and binding upon the parties hereto.

o) INSPECTION FEES. The term of the Commitment require that Owner pay Lender inspection fees with respect to the disbursement of the Loan. Owner will pay such fees in the amounts, at the times and in the manner specified by the terms of the Commitment.

p) PROPERTY OF LENDER. All drawings, specifications and addenda submitted by Owner to Lender are and shall remain the property of Lender.

q) ITEMIZED BREAKDOWN. Owner, when requested by Lender, shall promptly furnish Lender with an itemized breakdown of the costs of the Improvements which are to be or have been made under the ten-ns of this Agreement.

r) IMPROVEMENTS. Owner certifies that the Improvements to the real property will comply with all zoning, land use and building laws, codes and ordinances and covenants and restrictions affecting the Property.

s) FOUNDATION SURVEY. Owner shall provide to Lender a foundation survey, certified to the satisfaction of Lender and otherwise satisfactory to Lender, when the foundation of the Improvements has been substantially completed.

t) FINAL SURVEY. Owner shall provide to Lender a finial survey showing the completed Improvements, certified to the satisfaction of Lender and otherwise satisfactory to Lender.

u) CERTIFICATE OF OCCUPANCY. On or before the completion date, Owner shall deliver to Lender a letter or certificate of occupancy and acceptance or its equivalent ("Certificate of Occupancy") issued by the public authorities having jurisdiction over the Property and Improvements confirming that construction of the Improvements has been completed in accordance with all applicable requirements and accepted by such public authorities.

v) INSURANCE. Owner shall at all times keep the Property insured against all hazards as Lender may reasonably require, including, but not limited to, insurance against loss or damage by fire, with extended coverage, public liability coverage, and flood insurance, if required, for all Improvements, all of which shall be issued by an insurance company satisfactory to Lender and in such amounts as Lender may require from time to time. Each policy shall be in a form satisfactory to Lender, shall be maintained in full force and effect, shall name Lender as an additional loss payee and shall provide for at least thirty (30) days notice to Lender prior to cancellation. Owner shall provide Lender satisfactory evidence of such insurance as requested by Lender.

ML201FL (0209)

Doc# 620143   APPL #:7000546163   LOAN #:6930308844

w)  INDEMNIFICATION. Owner shall and does hereby indemnify and save Lender harmless from any and all loss or damage of whatsoever kind and from any suits, claims, or demands, including Lender's reasonable fees and expenses, on account of any matter or things arising out of this Agreement or in connection herewith, or on account of any act or omission to act by the owner in connection with this Agreement. Such obligations shall survive completion of the Improvement and repayment of the Loan.

x)  PAYMENT OF TAXES AND CHARGES. Owner will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed upon the Property or any part thereof, and Owner will pay any and all fees, costs and expenses, of whatever kind and nature, which Lender may incur in filing notices, and the reasonable charges of attorneys whom Lender may engage in preparing and filing such documents, making title examinations and rendering opinion letters, as well as expenses incurred by Lender, including reasonable attorneys' fees, in protecting, maintaining, preserving, enforcing or foreclosing the security interest granted to Lender hereunder and under the Mortgage, whether through judicial proceedings or otherwise, or in defending or prosecuting any proceedings arising out of or relating to this transaction, promptly after Owner shall have been notified by Lender of the amount of such fees, costs or expenses.

y)  OTHER FINANCING. Owner shall not undertake additional financing secured by any lien or security interest on the Property, or any other real or personal property encumbered in favor of Lender to secure the Loan, without first obtaining Lender's written consent.

## ARTICLE III. DISBURSEMENT OF FUNDS

a)  DISBURSEMENT OF FUNDS. Loan funds and additional deposits by Owner under this Agreement shall be disbursed in accordance with this Agreement and the schedule of the disbursements attached hereto. Lender shall not be obligated to make any disbursements unless and until the following conditions are satisfied:

1.  There shall be no default under this Agreement, the Note or the Mortgage.

2.  Lender or its designated agent shall have received a request for disbursement in the manner approved by Lender. Such request shall be accompanied by:

   i.  In the case of the initial disbursement, the foundation survey and evidence of satisfactory insurance (unless permit draw only).

   ii.  Proof as to paid and unpaid construction bills for materialmen and subcontractors which show full payment (except for holdback) of such bills then due and payable except those covered under the current draw requests, as required by Lender in its discretion.

   iii.  Lien waivers for all work and materials as required by Lender or title insurance company for the issuance of endorsements, except that covered by current requests.

   iv.  Any inspection report or architectural certificates with respect to the stage of completion of the Improvements, and such other proof as Lender may reasonably require to establish that development or construction progress has been made in compliance with the Plans and Specifications.

   v.  The current status of accounts, contractors, subcontractors, materialmen and laborers furnishing labor, materials or services in the construction of the improvements.

   vi.  Advice from Lender or Lender's agent that the construction of the Improvements is consistent with the request for disbursement.

   vii.  In the case of the final disbursement the Lender shall also have received:

      1)  Issuance of Certificate of Occupancy by the appropriate legal governmental authority and, to the extent applicable, that final FHA and VA approval has been given.

      2)  Advice from the Lender or its agents to the effect that the Improvements have been completed.

      3)  Four (4) prints of a final survey showing the completed Improvements certified to the satisfaction of Lender and otherwise satisfactory to the Lender.

      4)  Final lien waivers and owner's and contractor's affidavit which may be required under Florida's Construction Lien Law.

b)  METHOD OF DISBURSEMENT. Lender may, at its option, disburse the proceeds of the Loan through the title insurance company, mortgage company, or other third party, to or for the account of the Owner, or directly to any contractor, subcontractor, materialman or laborer directly, but except as may be required by agreements with the title insurance company insuring the validity and priority of the Mortgage, such election shall not prevent Lender from making subsequent disbursements in a different manner and through a different party.

ML201FL (0209)

Doc# 620144  APPL #:7000546163  LOAN #:6930308844

c) REQUEST FOR DISBURSEMENTS. Requests for disbursements of the proceeds of the Loan shall be submitted to Lender by Owner in the manner approved by the Lender. Funds shall be deemed disbursed to Owner and shall bear interest at a rate set forth in the Note when disbursed by Lender.

d) DISBURSEMENT ACCOUNTS. Owner agrees to advise Lender in writing prior to the first disbursement of where the disbursements are to be made and the parties authorized to request disbursements. In any event, to the extent disbursements are made directly to Owner, such disbursements shall be placed into a separate account by Owner which amounts shall not be commingled with any other funds of the Owner.

e) DISBURSEMENT OBLIGATION OF LENDER. Nothing contained in this Agreement, the Note or the Mortgage shall impose upon Lender any obligation to see to the proper application of any disbursements made pursuant to the Loan. The sole obligation of the Lender shall be to disburse funds as set forth herein, provided there exists no default under this Agreement, the Note or the Mortgage.

f) RETAINAGE. Lender retains the right, at its discretion and without liability to Owner, to withhold ten percent (10%) of the Loan amount pending completion of construction, issuance of the Certificate of Occupancy, and satisfaction by Owner of all terms and conditions of this Agreement. The monies so withheld shall not be disbursed until work has been completed and final and completed releases, discharges, approvals and acceptance satisfactory to Lender shall have been delivered to Lender. Upon completion of construction, as approved by Lender, and the satisfaction of all other conditions precedent, the balance of the Loan allocated for the Improvements then due shall be paid by Lender, within a period not to exceed thirty (30) days.

g) DESIGNATION BY OWNER. Disbursements pursuant to this Agreement shall be made as authorized by Owner in the Construction Funds Disbursements Authorization executed by Owner, delivered to Lender and accepted by Lender or in accordance with such other written authorization as Lender may from time to time require. Lender shall have no responsibility or liability for any loss, damage or injury incurred or suffered by Owner as a result of Lender's delivery of disbursement checks to Owner's agent as specified in a written authorization from Owner. Final disbursement will be made payable to Owner and Owner's agent.

h) REPRESENTATIONS. Each request for disbursement submitted shall constitute a representation by Owner: that the work done and the materials applied to date are in accordance with the plans and specifications; that the work and materials for which payment is requested have been physically incorporated into the Improvements; that the value is as stated; that the work and materials conform with all applicable rules and regulations of the public authorities having jurisdiction of the Property and Improvements; and that payment for the work or materials described in such request has been made or will be made with the proceeds of the advance in connection with which the request is submitted. All advances shall be subject to the prior approval of Lender or its representatives inspecting the Property and Improvements, and Lender may refuse to make any advance unless and until Lender determines that Owner's foregoing representations are substantiated in every respect.

# ARTICLE IV. CONSTRUCTION LIEN LAW AND NOTICE OF COMMENCEMENT

a) PROPER PAYMENTS. The right of Owner to make proper payments under its construction contract will be limited by any notice to owner or claims of lien, which may be served by any person supplying labor, or materials to the project.

b) LENDER NOTIFICATION. If Owner desires Lender to consider any such notices or claims of lien in making disbursements under this Agreement, Owner shall furnish Lender a copy of the notices or claims of lien immediately upon receipt of same.

c) LENDER'S RIGHTS TO DISBURSE. In the event Lender has not received copies of any notice to owner or claims of lien at the time of any disbursement under the Loan, Lender may, but shall not be obligated to, disburse as directed by this Agreement without notice to Owner and without responsibility of liability to owner, or any contractor, subcontractor, laborers, or materialmen.

d) RELEASE OF LIEN. Owner further agrees to furnish releases or waivers of lien from all persons giving any notice to owner and from all others that may heretofore and hereafter file a claim of lien against the Property.

e) CONTRACTOR'S FINAL AFFIDAVIT. Owner or its licensed contractor shall furnish the Contractor's Final Affidavit as required by Florida's Construction Lien Law.

f) LENDER'S RIGHT TO MAKE PAYMENTS TO LIENORS. Notwithstanding anything contained in this Agreement to the contrary, Lender shall have the right to make payments directly to lienors as provided in Florida's Construction Lien Law.

ML201FL (0303)

Doc# 620145   APPL #:7000546163   LOAN #:6930308844

g) NOTICE OF COMMENCEMENT.  Owner shall not cause or allow recordation of any Notice of Commencement prior to recording the Mortgage of Lender.  In the event a Notice of Commencement should be recorded prior to the recording of the Mortgage, Lender shall have the right to cancel this Agreement and be reimbursed for its costs and expenses incurred to date.

h) POST COPY.   Owner shall post a certified copy of the recorded Notice of Commencement on the property in accordance with Florida's Construction Lien Law.

i) CONTESTED LIEN.  Lender shall have the right to contest any lien filed or to transfer to other security if Owner fails to do so in a timely manner.

j) TRANSFER OF LIEN.   Owner is required, at Lender's request, to satisfy any lien or transfer any lien to other security (cash deposit or transfer bond) within ten (10) days after any lien is recorded.

k) LIABILITY TO THIRD PERSONS.   This Agreement shall not be construed to make Lender liable to materialmen, contractors, craftsmen, laborers, or others for goods or services delivered by them in or upon said premises, or for debts or claims accruing to any such parties against Owner or Owner's licensed contractor.

l) COMPLIANCE WITH CONSTRUCTION LIEN LAW.  Owner and its licensed contractor will comply in all respects whatsoever with the Florida Construction Lien Law as the same may from time to time exist, and Lender shall not be obligated to disburse any funds to Owner if, in the opinion of Lender or its counsel, such disbursements would result in a violation of such law.

## ARTICLE V.  EVENTS OF DEFAULT

The happening of any one or more of the following events shall constitute a default under the Agreement, the Note and the Mortgage:

a) NONPAYMENT OF MONEY.   Owner's failure to pay when due any required payment of principal or interest due under the Note or any other sums due under the Mortgage or this Agreement.

b) BREACH OF CONDITION.   Owner's or Owner's licensed contractor's violation or breach of any term, condition, covenant, representation or warranty contained in this agreement, the Commitment, Note or Mortgage, or the existence of a material misrepresentation of a fact contained in the documents submitted in support of the Loan, and the continuance of such condition for a period of fifteen (15) days after Lender has given notice thereof to Owner.

c) TRANSFER OF PROPERTY.   The sale or transfer by Owner of any interest in the Property without the prior written consent of Lender or, if Owner is a corporation, partnership or other entity, the sale, assignment, pledge, transfer, hypothecation, or other disposition of any proprietary or beneficial interest in Owner without the prior written consent of Lender.

d) IMPAIRMENT OF THE PROPERTY.   The occurrence of any condition or situation which, in the sole determination of Lender, constitutes a danger to or impairment of the Property or repayment of the Loan and such condition or situation is not remedied within ten (10) days after written notice to Owner of such condition or situation.

## ARTICLE VI.  LENDER'S REMEDIES

Upon the occurrence of any event of default under this Agreement, the Note or the Mortgage, Lender shall have the absolute right to refuse to disburse any funds hereunder, and Lender shall have the absolute right at its option and election and in its sole discretion to:

a) POSSESSION.   Take immediate possession of the Property as well as all other security for the Loan as is necessary to fully complete the Improvements as required hereunder and to do anything in its sole judgment to fulfill the obligations of Owner hereunder.

b) ACCELERATION.   Accelerate the maturity of the Note and Mortgage and demand payment of the principal sums due hereunder with interest, advances, costs and attorney's fees, whether incurred at the trial or appellate level, and enforce collection of such payment by foreclosure of the Mortgage or other appropriate action in a court of competent jurisdiction.

ML201FL (020 9)

Doc# 620146   APPL #:7000546163   LOAN #:6930308844

c) EXERCISE.  Exercise any of the rights, privileges or remedies available to Lender under the Note or Mortgage, or as otherwise may be permitted by applicable law.

d) PAYMENT TO LENDER.  In the event Lender completes the Improvements, Owner expressly agrees to pay to Lender, upon demand, any and all costs and expenses incurred by Lender and not covered by the proceeds of the Loan in completing the Improvements, together with reasonable compensation to Lender for extra services rendered by it in completing the Improvements, and agrees that such amounts shall be secured by the lien of the Mortgage.   If such amounts shall not be paid immediately upon demand or arrangement satisfactory to Lender made for the payment thereof, Lender may declare all sums secured by the Mortgage to be immediately due and payable, and may proceed to foreclose the Mortgage.

e) REIMBURSEMENT OF LENDER.  Owner agrees to reimburse Lender for all costs and expenses incurred by Lender in connection with any controversy, claim, demand or suit filed in connection with or arising from this Agreement or the construction of the Improvements, all court costs and Lender's reasonable attorney's fees incurred in connection with any matter relating hereto.

f) DEFAULT AND NON-PERFORMANCE. Notwithstanding anything contained herein to the contrary, there shall be no obligation upon Lender to make any additional disbursements hereunder, if at the time of the request for such disbursements Owner is in default or has failed to perform any provision of this Agreement or any provision of the Note or the Mortgage.

The remedies and rights of Lender under this agreement, the Note and the Mortgage shall be cumulative and not mutually exclusive. Lender may resort to any one or more or all of the remedies but not to the exclusion of any other remedy. No party, whether contractor, materialman, subcontractor, or supplier, shall have any interest in the proceeds of the Loan withheld because of default, and shall have no right to garnish, require or compel payment thereof to be applied towards discharge or satisfaction of any claim or lien which such party may have for work performed or materials supplied for the development and construction of the Improvements.

# ARTICLE VII. MISCELLANEOUS

a) NOTICE. All notices provided for herein shall be sent by certified mail, return receipt requested, addressed to the appropriate party at the address designated for such party in the preamble to this Agreement, or such other address as the party who is to receive such notice may designate in writing. Notice shall be completed by depositing the same in a letter box or other means provided for the posting of mail addressed to the party with the proper amount of postage affixed thereto. Actual receipt of notice shall not be required to effect notice hereunder.

b) GOVERNING LAW. This Agreement, the Note and the Mortgage shall be governed and construed in accordance with the laws of the State of Florida.

c) MODIFICATION AND WAIVER. No provision of this Agreement, the Note or the Mortgage shall be amended, waived or modified except by an instrument in writing signed by the parties against whom such amendment, waiver or modification is sought to be enforced.

d) EXTENSION. At Lender's option and the request of Owner, Lender may extend the term of the construction period of the Note for an additional period of three (3) months. Owner shall pay Lender an additional fee of 0.50% of the outstanding principal balance and all construction interest during this extended period at a rate specified by Lender for such extension. At the option of Lender, additional extensions may be negotiated. No extension shall be valid and enforceable unless evidenced by a written instrument signed by Lender and Owner.

e) SEVERABILITY. The inapplicability or unenforceability of any provision of this Agreement, the Note or the Mortgage shall not limit or impair the operation or continued validity of any other provision of this Agreement, the Note or the Mortgage.

f) COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and such counterparts together shall constitute one and the same instrument.

g) ASSIGNABILITY. Owner shall not assign this Agreement or any part of any advance to be made hereunder or convey, encumber, mortgage, or lease, in whole or in part, any portion of the Property without the prior written consent of Lender. The rights of Lender under this agreement are assignable by Lender in whole or in part without the consent of Owner. This Agreement is binding upon the heirs, personal representatives, successors and permitted assigns of Owner and Lender.

h) WAIVER OF DEFAULTS. Waiver by Lender of any breach or default by Owner under any terms of the Note, the Mortgage or this Agreement shall not be deemed to constitute a waiver of any subsequent breach or default on the part of Owner. No waiver shall be effective against Lender unless the waiver is in writing and signed by Lender.

ML201FL (0209)

Doc# 620147   APPL #:7000546163   LOAN #:6930308844

i)  EXPENSES. Owner shall pay Lender the commitment fee, if any, and Lender's architect, engineer, inspector and counsel fees incurred in connection with the closing of the Loan, the administration of the Loan, and the completion of Improvements, and will pay all costs and expenses required to satisfy the conditions of this Agreement incidental to the Loan, including, without limitation, all taxes, insurance premiums, recording expenses, stamp taxes, all brokerage fees, appraisal fees, survey costs and title insurance costs.

j)  BENEFICIARIES. This Agreement is an agreement only by and between Owner and Lender and for their benefit and the benefit of their successors and assigns permitted by this Agreement. No other person or party, including any contractor that assents hereto, shall be a beneficiary hereof or have any rights hereunder, and no rights are conferred by this Agreement upon any other person or party, whether or not their name may be used or otherwise identified in this Agreement or in the Assent of Contractor below.

k)  HEADINGS. The headings preceding the text of the sections and subsections of this Agreement are used solely for convenience of reference and shall not affect the meaning, construction or effect of this Agreement.

l)  GENDER. The term Owner and Lender shall be deemed to include both the singular and plural where appropriate, and the use of any gender, whether masculine, feminine or neuter, shall include all genders, as and where appropriate.

## ARTICLE VIII. WAIVER OR JURY TRIAL

Lender and Owner hereby knowingly, voluntarily and intentionally waive the right they may have to trial by jury in respect to any litigation arising out of, under, or in connection with this Agreement or any of the loan documents or the financing contemplated hereby, or any course of conduct, course of dealing, statements (whether oral or written), or actions of any parties hereto. This provision is a material inducement for Lender entering into this Agreement.

IN WITNESS WHEREOF, Owner and Lender have executed this Agreement on the date set forth above

_____          _____ (SEAL)
Witness                                   Owner

_____          _____ (SEAL)
Witness                                   Owner


                                          Branch Banking and Trust Company
                                          _____

                                          Lender

                                          By:_____

ML201FL (0209)

Doc# 620148   APPL #:7000546163   LOAN #:6930308844

<u>Attention: Lender and Closing Agent</u> -- This form is to be delivered to the borrower with each disbursement of loan proceeds for home improvement or construction.

# WARNING!

YOUR LENDER IS MAKING A LOAN DISBURSEMENT DIRECTLY TO YOU AS THE BORROWER, OR JOINTLY TO YOU AND ANOTHER PARTY.  TO PROTECT YOURSELF FROM HAVING TO PAY TWICE FOR THE SAME LABOR, SERVICES, OR MATERIALS USED IN MAKING THE IMPROVEMENTS TO YOUR PROPERTY, BE SURE THAT YOU REQUIRE YOUR CONTRACTOR TO GIVE YOU LIEN RELEASES FROM EACH LIENOR WHO HAS SENT YOU A NOTICE TO OWNER EACH TIME YOU MAKE A PAYMENT TO YOUR CONTRACTOR.

ML474 (0403)

Doc #:547401   Appl #: 7000546163   Loan #: 6930308844

| Diamond Court  Draw Sch. / Cost Brk. Down | | | |
|---|---|---|---|
| Job#/Name | 9805 Williams | | |
| Model type | Lakeside Terrace / Billiard / Elev. B | | |
| Address | 4565 SW Athena Drive | | |
| Legal | Lot - 3 | Blk.- 2397 | Sec. - 34 |
| Parcel ID | 3420-665-1854-000-0 | | |
| Bank | Branch Banking and Trust Co. | | |
| Additional Lot Survey | Legal-          NO | | |
| Notes | | | |
| 1 | Contract Total | 100% | $212,900 |
| 2 | | | |
| 3 | **Absolute Deposit** | 10% | $21,290 |
| 4 | Utility Draw | | $4,600 |
| 5 | Lot Prep Draw | | $8,500 |
| 6 | Lot Payoff | | |
| 7 | Closing Costs | | |
| 8 | Realtor Comm. | | |
| 9 | **Pool Draw Total** | | $0 |
| 10 | Pool Draw #1 Shell | | $0 |
| 11 | Pool Draw #2 Deck | | $0 |
| 12 | Pool Draw #3 Marcite | | $0 |
| 13 | Pool Draw #4 Screen | | $0 |
| 14 | **Total Const. Funds** | | $178,510 |
| 15 | Slab Poured | 16% | $28,562 |
| 16 | CBS/Lintels/Beam | 11% | $19,636 |
| 17 | Interior Framing | 3% | $5,355 |
| 18 | Roof, Sheathed,Dry-in | 9% | $16,066 |
| 19 | Plumbing Top-out | 2% | $3,570 |
| 20 | Rough Electric | 4% | $7,140 |
| 21 | A/C Ducts | 3% | $5,355 |

| 22 | Windows and Doors | 3% | $5,355 |
|---|---|---|---|
| 23 | Soffit & Fascia | 2% | $3,570 |
| 24 | Garage Door | 1% | $1,785 |
| 25 | Finish Roof | 2% | $3,570 |
| 26 | Exterior Finish | 5% | $8,926 |
| 27 | Wall Insulation | 2% | $3,570 |
| 28 | Drywall Rough | 3% | $5,355 |
| 29 | Drywall finish | 3% | $5,355 |
| 30 | Bath Tile | 2% | $3,570 |
| 31 | Interior Doors Trim | 2% | $3,570 |
| 32 | Cabinets & Vanities | 5% | $8,926 |
| 33 | Int & Ext. Paint Primed | 1% | $1,785 |
| 34 | Finish Painting | 2% | $3,570 |
| 35 | Finish Plumbing | 2% | $3,570 |
| 36 | Finish Electric | 2% | $3,570 |
| 37 | Finish Floor Covering | 4% | $7,140 |
| 38 | Driveway & Walkways | 1% | $1,785 |
| 39 | Appliance | 2% | $3,570 |
| 40 | Sod, Landscaping | 2% | $3,570 |
| 41 | Finish A/C, Condenser | 2% | $3,570 |
| 42 | Drainfield/Sewer Conn | 1% | $1,785 |
| 43 | Well/Water Conn | 2% | $3,570 |
| 44 | Clean-up | 1% | $1,785 |
| 45 | | | |
| 46 | | | |
| 47 | Customer Signature  ^ | Date: | |
| 48 | | | |
| 49 | Builder Signature  ^ | Date: 6-14-05 | |
| 50 | | | |
| 51 | Bank Rep Signature  ^ | Date: | |

**ANDREW WILLIAMS**
3841 N.W. 6TH CT.
FORT LAUDERDALE, FL 33311-6344

502

DATE 5/14/2000

DD-4/630 FL
1310

PAY TO THE
ORDER OF Diamond court Construction Co. | $ 10,000

Ten Thousand DOLLARS

**Bank of America**

Equity Maximizer

deposit only
375 sw Ridgecrest
FOR 465 sw athena    Andrew Williams    MP

⑆063000047⑆68 21 1047573099⑈0502

# Building Agreement
# Package Checklist

[ ]   Plan Review with Buyer:
    [ ]   Plan Review Upgrade Check List
    [ ]   Standard Luxury Package Spec Sheet
    [ ]   Elevation: Cross out elevations that do not apply
    [ ]   Floor Plan:  Review Floor Plan for Upgrade Placement & Plan Notes

[ ]   Addendum

[ ]   Building Agreement – Buyer to initial all pages at page No. and Sign & Date page 5.
                (Important– Customer to initial Top of page 2 Section II, Escrow)

[ ]   Customizing Agreement (To be signed by every Buyer)

[ ]   Notices: Florida Recovery Fund Notice & Florida Lien Law Disclosure Notice

[ ]   Customer Correspondence Info Sheet

[ ]   Copy of Driver's License of each Buyer

[ ]   Field Inspection Report (Include property record card with lot information & area map)

---

[ ]   Make sure Buyer (only the person whose name is on the contract) has **signed &/or initialed**
**EVERY** page except for: Field Inspection Report
              & this checklist

[ ]   $5,000 check made payable to: **Diamond Court Construction Co.**

[ ]   Make 2 copies of **ALL** paperwork of this entire package except for: Field Insp.Report
   1)  Copy for Buyer                 & this checklist
   2)  Copy for Sales
   3)  Originals for Construction Office including: Field Insp. Report
                  & this checklist

**Important:**     **After a fully executed contract has been delivered to
the construction office, all changes to Addendums must
be made by Construction Office.  Tell the Customer to
contact Construction Office.  No Exceptions !!!**

---

Sales Associate: _Ronnie B_

DCC/contracts/Building Agreement Package Checklist

Revised   April 29, 2005

# Plan Review Upgrade Check List

[  ]  Garage:        [ ]  Garage side location: [ ] left  or  [ ] right        [ ] Extend Garage Depth

[  ]  Electrical:    [ ]  Underground Electric                    [ ]  Floor Outlet
                     [ ]  Additional TV/Cable pre-wire            [ ]  Outside Flood Light pre-wire
                     [ ]  Additional Phone pre-wire               [ ]  Landscape Lighting
                     [ ]  Additional Fan pre-wires/Ceiling Fan Outlets   [ ]  Holiday/Seasonal Lighting
                     [ ]  3 way switches, dimmers, controlled outlets    [ ]  Pool pre-wire
                     [ ]  Recessed can lighting                   [ ]  Pool complete wire (2pump2lite)

[  ]  Plumbing:      [ ]  Double Headed Shower                    [ ]  MBA Jetted Tub
                     [ ]  Hose Bibbs                              [ ]  Upgrade toilet/hall tub (light colors)
                     [ ]  Laundry Tub freestanding or built-in    [ ]  Upgrade MBA tub  (light colors)
                     [ ]  Hot Water Heater-66 or 80 gallon

[  ]  Interior:      [ ]  Ceramic Tile Floors in Family,          [ ]  Intercom System
                          Living, Dining, Study, etc.             [ ]  Central Vac System
                     [ ]  Door Hardware - style & finish          [ ]  Security System
                     [ ]  Add Closet in Study/Foyer               [ ]  Fireplace - wood
                     [ ]  Surround Sound                          [ ]  Double Closet for Druid Hills
                     [ ]  Floor Stain-Garage/Lanai/Entry/Veranda   [ ]  Double French Doors
                     [ ]  Granite Vanity Tops in Baths            [ ]  Wall tile at kitchen stove/bartop
                                                                       backsplash

[  ]  Exterior:      [ ]  Widen Driveway                          [ ] Windows-Tinted/Insulated/Glass Block
                     [ ]  Widen Walkways                          [ ]  Internal Blinds for a full-lite door:
                     [ ]  Bahia Sod for oversized lot                 [ ] Tilt only
                     [ ]  Floratam Sod for standard/oversized lot     [ ] Tilt and raise
                     [ ]  Irrigation System                       [ ]  Upgrade front door
                     [ ]  Well & Pump                             [ ]  Roofing-Metal/Flat Tile/S-Tile
                     [ ]  Pool & Screen Enclosure                 [ ]  Aluminum Gutters

[  ]  A/C &          [ ]  Privacy Insulation at FamRm/Bedroom walls   [ ] Trane A/C 14 or 16 Seer
      Insulation:    [ ]  Vent Microwave Exhaust to Outside

[  ]  Gas Service:   [ ]  Gas Service (where available) for range, water heater, dryer, outdoor grill,
                          pool, and spa heater locations.

[  ]  Cabinetry:     [ ]  Cabinet Upgrade        [ ]  Roll Out Shelf   [ ]  Lazy Susan

[  ]  Kitchen        [ ]  Stainless Steel upgrade   [ ]  Slide in range with wall tile at stove/bartop backsplash
      Appliances:

[  ]  Future Upgrades:  Add additional amount for extras to include in mortgage

## Standard Luxury Package
*Features and Specifications*

*Visit our Showroom for a wide variety of selections and customizing options to personalize your home!*

### FEES, SURVEYS & CODE REQUIREMENTS:
♦ All Permits (building & health) and Impact Fees under one acre
♦ Water/sewer connection fees or well to 70' with 3/4 HP pump and septic for a standard 1/4 acre lot
♦ Survey (for a standard 1/4 acre lot)
♦ Compliance with state and local building codes

### EXTERIOR:
♦ *Exterior Structure:*
 * 2500 PSI fibermesh reinforced Concrete & Steel reinforced Monolithic slab with vapor barrier
 * Termite treatment with renewable bond
 * CBS/Concrete Block Structure with double concrete bond beam reinforced with #5 Steel Rebar each course
 * Engineered truss roof system -5/8"CDX plywood roof sheathing
 * 30 YR.. Architectural fungus-resistant asphalt Roof shingles
 * Aluminum vented soffits and Roof vents *
 * Solid Rough Sawn Spruce Fascia
 * Stucco finish Walls, Entry & Lanai ceilings
 * Upgraded Paint
 * Aluminum gutter and down spouts - as required
 * Trussed over Screened Lanai with concrete columns & beams
 * Tiled Entry and concrete stain on Lanai floor
 * Concrete-fibermesh reinforced driveway, walks, pads (1,000 sf)
♦ *Windows & Exterior Doors:*
 * Single hung white aluminum frame Windows, Sliding glass Doors and Screens where applicable, per plan
 * Insulated glass Front Entry Door with brass finish handle
 * Keyless Front Door/Deadbolt Entry System
 * Deadbolts on all Exterior Swing Doors
 * Hurricane Storm Panels
♦ *Landscaping:*
 * Bahia sod (for a standard 1/4 acre lot - 9000 sq.ft.)
 * $800 Landscape allowance including design service

### ELECTRICAL, PLUMBING, INSULATION, & HVAC:
♦ *Electrical:*
 * $1200 Lighting fixture allowance
 * 5 Ceiling fan outlets (single switched)
 * 3 TV and 3 Phone pre-wires
 * 200 Amp Electrical Service
 * Electric door chime and smoke detectors
 * GFI outlets in kitchen, baths, laundry, garage, 2 exterior
♦ *Plumbing:*
 * Seamless copper water lines
 * 2 Exterior hose faucets
 * 50 gallon energy efficient water heater *
♦ *Insulation:*
 * R-30 Insulation in Ceilings *
 * R-10.0 In-wall injected Foam Insulation *
♦ *HVAC:*
 * Return Air in all bedrooms & A/C vents in every room
 * High-efficiency 10-SEER/12-SEER Trane central air conditioning and heating system / per plan *

### INTERIOR:
♦ Architectural features such as plant shelves, arches, niches, columns, vaulted, tray or coffered ceilings, drop soffits with recessed lighting, crown molding, chair rail, per plan
♦ Wood Interior Stud Framing
♦ Choice of Travertine or Carrara Marble Window Sills
♦ Textured Ceilings and Walls
♦ Standard Trim package has 5 1/4" baseboards
♦ Upgraded Paint, semi-gloss in wet areas of Kitchen & Bath
♦ Rocker Switches
♦ Dual level Ventilated Closet Shelving in bedrooms for added storage
♦ *Interior Doors:*
 * Six-panel Passage Doors with Lever Door Hardware
 * Raised-panel Bi-fold Closet Doors
♦ *Floor Covering:*
 * 18x18 Ceramic Tile floors installed on Diagonal in Kitchen, Nook, Laundry, and straight in Baths and Foyer
 * Upgraded stain resistant Berber or Plush carpet

### BATHS:
♦ Cabinets with raised panel Wood Doors
♦ Cultured Marble Vanity tops with 1-1/2" Custom Edge
♦ Full width Mirrors with Beveled Strips
♦ Porcelain/steel tub, Ceramic Tile to ceiling with Decos in hallbath, per plan
♦ Ceramic Tile shower to ceiling with Decos & Listello Border, per plan
♦ Shower enclosure (above std.height in 2 colors)-MasterBath, per plan
♦ Soaker tub in Master Bath, per plan
♦ Elongated toilets (bidets - per plan)
♦ Mirrored medicine cabinets, per plan
♦ Single lever chrome faucets *(mfg.lifetime warranty)*
♦ Choice of upgraded bath Towel Bar accessory sets

### KITCHEN:
♦ Cabinets with raised panel Wood Doors
♦ Upgraded Stainless Steel or Granite Composite Sink - 4 colors
♦ Single lever Cathedral Faucet & spray - 3 finishes *(mfg.l.t. warr.)*
♦ Granite or Corian Level II colors Countertop & Backsplash
♦ Garbage disposal and copper Icemaker line
♦ *Upgraded Appliance Package:* - 3 colors
 * Smooth top self-clean Range
 * Over The Range Microwave
 * Dishwasher with deluxe sound insulation & hush motor
 * 26 cf s/s Frig with ice/water in door
 * Elite Kingsize Capacity Washer & Dryer

### GARAGE:
♦ Stucco finish interior
♦ Attic access with pull-down stairs and light
♦ Steel overhead Garage Door
♦ Automatic Garage door opener with two remotes

### WARRANTIES:
♦ Builder's One Year Limited Warranty
♦ 10 Year Structural Warranty



Diamond Court Construction Co. CBC#049065   *  Energy Saving Features   Features & specifications subject to change without notice   Eff. 04/18/05

## Addendum to Building Agreement

| Job # _____ | Customer : _ANDREW WILLIAMS_ | Date: _5/14/05_ |

**MODEL:** _LAKESIDE TERR_    **Versions:** _BILLIARDS RM_

**Elevation:** _B_    **# of Bedrooms:** _4_    **# of Baths:** _3_

| No. | Change | Description of Work | Charge |
|---|---|---|---|
| 1 | General | **Price of Model** | 201,400.00 |
| 2 | Bldg. County | County in which House is located   _SAINT LUCIE_ | |
| 3 | Lot Prep | Lot Prep Allowance ($8,500 min. charge) | 8500 |
| 4 | Elec. Service | Electric Service type - Check One:<br>☑ **Overhead at garage/power pole side -N/C**   ☐ **Underground-$1200**<br>Garage side dictated by power pole location unless otherwise requested.  If Power Co.<br>does not have poles in yet, charges for underground may apply at a later date. | |
| 5 | Association | Association considerations | |
| 6 | Custom Print | Custom Prints | |
| 7 | Pool Pkg. | Pool Allowance        circle one     (YES) (NO) | |
| 8 | DCCC | Supervision & Coordination | |
| 9 | Electric | Electric Pool prewire & Hookup   circle one    (YES) (NO) | |
| 10 | City Water | City Water Pool Fill | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | Total Due | | $0 209,900 |

gnature: _Andrew William_    Date: _5-14-05_

gnature: _____    Date: _____

XTRAADD.wpd

# ◆ BUILDING AGREEMENT ◆

This Agreement made and entered into this _14_ day of _MAY_, 200_5_, by and between _ANDREW WILLIAMS_, as Buyer/s, whose mailing address is: _3841 NW 6 CT FORT LAUDERDALE FL_
Phone: Home _954 583 7035_ Work _1800 237-1491_ Beeper/ Mobile _____, and Diamond Court Construction Company  as Builder.

◆   **I. Location:**  The Builder will for the consideration hereinafter mentioned, finish and deliver a residence or structure on the following described land, the Legal Description of which is:
Lot:_3_ Block:_2397_ Section:_34_   O.R. Book _____ Pages_____
Address: _4565 SW ATHENA DR_   County _SAINT LUCIE_

◆   **II. Payments:**  The Buyer will in consideration of the Agreement being performed by the Builder as specified, pay or cause to be paid to the Builder, the sum of $ _209,900.00_ (U.S. Dollars) in the following manner:

| | Approved Lenders Draw | | | Cash Buyers Draw | |
|---|---|---|---|---|---|
| 1 | Contract Total  *(see Addendum)* | 209,900 | 1 | Contract Total     *(see Addendum)* | |
| 2 | Initial partial Deposit | $5,000 | 2 | less Lot prep Draw | |
| 3 | less 10% Deposit | 29,900 | 3 | less City Utilities Draw | |
| 4 | less City Utilities Draw | 4600 | 4 | Draws based on lines 1 minus 2 & 3 | |
| 5 | less Lot prep Draw | 8500 | 5 | Initial partial Deposit | |
| 6 | less Closing Costs paid up to | 2000 | 6 | Remainder of Deposit Due | |
| 7 | less Lot Purchase/ Payoff | | 7 | Deposit...................................10% | |
| 8 | less Pool Draw (line #7 Adden.) | | 8 | Slab Draw.............................20% | |
| 9 | | | 9 | Tie beam Draw.....................20% | |
| 10 | | | 10 | Mechanical rough-in Draw....25% | |
| 11 | | | 11 | Cabinet & Trim Draw...........20% | |
| 12 | Const. funds (omit line 2) | 164,900.00 | 12 | Final Draw.............................5% | |

All payments will be made solely to Diamond Court Construction Company.  Deposit due in 60 days. All Bank draw schedules of any type are subject to approval by Builder.  Under <u>no</u> circumstances will the final draw of any Loan schedule be more than 10%.

THE BUYER/OWNER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN INTEREST-BEARING ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER/OWNER.

1 of 5          Revised February 3, 2005

The failure to waive the escrow requirement will result in an extra charge to the Buyer. The Builder shall be entitled to all interest accrued on the account.

_____ (Initials) Buyer/Owner hereby WAIVES the request for escrow of any portion of the deposit monies received.

At such time as each payment becomes due, Builder shall notify Buyer or Buyers Agents of same in writing whereupon Buyer or Buyers Agents shall have seven (7) days from receipt of such notification within which to make such payment. If Buyer or Buyers Agents fails to make the payment within the time period stated, there will be a penalty charge of $500 every 30 days plus an interest charge of two and one-half percent (2-1/2) per month on the amount of the unpaid payment from the due date until the payment is received.

**A. Default:** In the event of a default by buyer the parties agree that the amount of damages incurred by builder is not readily ascertainable. Builder will be incurring out of pocket expenses, as well as expending time and effort in connection with the contract before any actual construction work is done. The parties further acknowledge that the amount of loss profits of the builder in connection with a default by buyer, are also not readily ascertainable. It is therefore agreed that in the event that buyer defaults in this agreement, the buyer shall pay to the builder as liquidated damages and not as a penalty, the following amounts at the following times: If the buyer defaults after preliminary plans are prepared, the buyer shall pay the builder as liquidated damages 10% of the purchase price; if buyer defaults after plans are prepared and the filing of the application for the engineering permit, the buyer shall pay builder liquidated damages in the amount of 12% of the purchase price; if the buyer defaults after plans are prepared, the application for the engineering permit and the application for the building permit, the buyer shall pay the builder as liquidated damages a total of 18% of the purchase price; if the buyer defaults after construction has begun, the buyer shall pay the builder actual damages incurred by the builder, which shall include all out of pocket expenses of the builder paid or to be paid, reasonable amounts for time, effort, and expertise of the builder, and prospective loss of profits by the builder for the construction.

It is agreed that the Builder will deliver a notice of completion (substantial completion) to the Buyer, and the Buyer shall, within seven (7) days after receipt of said notice, make final payment to the Builder. Possession of the premises shall be delivered to the Buyer when the residence has been fully constructed and all monies due the Builder have been paid. If the final payment is not paid to Builder within 7 days of receipt of notice of completion for any reason, Buyer agrees to pay an additional three dollars/ month/ sq.ft. daily prorated until Builder receives final payment. At this time an Affidavit of No Liens covering all materials and labor will be presented to the Buyer by the Builder. There will be no occupancy of home prior to final payment. Occupancy by Buyer shall constitute complete acceptance by Buyer and waiver of all claims against Builder with exceptions to warranty only. The Buyer further agrees to pay all Attorney's fees, Court fees & related fees necessary to enforce this Building Agreement.

◆ **III. Craftsmanship:** This residence will have craftsmanship equal to or better than that used in the model home located at _573 SW NAUTICAL BLVD. PSL, FL_.

◆ **IV. Insurance, Bank & Related fees:** The Buyer will furnish Builder's Risk Insurance in the full amount of this Agreement during the construction period as required by all Banks/Lenders and list Builder as additionally insured. The Builders Risk Policy must meet the following criteria: $250/$500 deductible, theft, vandalism, fire, damage, liability, wind storm coverage. It is the Buyers responsibility to make the necessary reports, claims and coverages on their builders risk policy without exception . The Buyer is advised to furnish Owner's Flood Insurance where applicable and any other Insurance Buyer deems necessary. Buyer will pay any and all loan interest, bank inspection fees, draw fees, courier fees and any other fee related to the mortgage. Buyer will pay utility company bills for electricity and water used during construction. If Buyer

Revised February 3, 2005

is represented by an Agent or verbal communication becomes excessive (20 min./week), a fee of $360 per hour will be charged for responses. Buyer acknowledges and agrees that Builder is not an insurer of Buyer's property. The Buyer shall release the Builder and its agents and employees from any and all liability for damages, theft, etc. sustained to the property or injury to the Buyer while on the Property, and further shall hold the Builder and its agents and employee harmless from any liability for damages sustained to the Property or injury to a third party brought on the Property.

♦    **V. Changes & Extras:**   Buyer is requested to mail or fax any changes or concerns, this saves time and confusion. A formal change order will be mailed to Buyer with requested change. Should the Buyer at any time before or during the construction of said residence require any additions or changes to the plans, they shall have the right to make such changes when practical, and the cost of Change order will be paid immediately when the change order is signed. No change orders will be implemented until payment for change is received. If a change order has been sent to you and you have decided against it, write declined on the change order and mail or fax it back to us. There will be a minimum administrative service charge of $100.00 on all declined change orders. A Selection Approval Period, extending from the date of this Agreement to 21 days after the 10% deposit is paid (bank closing), is the time when the Selection sheets are to be completed and signed. If changes are requested after the Selection Approval Period but before the Building permit is issued an administrative service charge of $250.00 will be added to the price of any and every change. After the Building permit has been issued , changes will be priced to include rework on the job or rework of materials being prepared by a supplier to the job and will be charged at three times the normal rate. If for any reason the colors have not been chosen prior to the Building permit issuance date, Buyer understands and acknowledges that the Builder will use the current Model selections of color and specifications to complete Buyer's house. Let it be known that all extras, changes or related contracts will have a minimum mark up of 20%. There will be no provisions for anything verbal.

Should changes in plans or specifications effecting the structure or land be required by Authorities where said lot is located, such as the Developer, Architectural Review Board, Homeowner's Association or by federal, state, municipal or any other governmental authority having jurisdiction over construction practices on said lot and structure, such changes shall be made at the Buyer's expense, including but not limited to changes in impact amounts, material amounts or changes in building codes. In effect Builder will receive no less than but not limited to the total U.S. Currency stated under the section II of this Agreement incorporating any changes, extras, Customized Plan charges and any other applicable charges made during construction. However, the Builder shall be allowed the additional time necessary to complete said structure for each change order, whether at the request of the Buyer or in compliance with or due to governmental authority changes.

Builder may offer as an option to the plans and specifications a security system to be installed by an independent security company not affiliated with Builder. The installation of the system and continued subscription of the services provided by the Security Company shall be at the sole option of the Buyer. Builder does not warrant or guarantee the equipment installed by the Security Company and Buyer shall look only to the Security Company in the event of breakdown or failure of such equipment or disruption of services resulting therefrom. Builder shall not install the equipment or maintain same or monitor same if external monitoring capabilities are included therewith. Builder shall not be responsible for any representations made by Security Company, written or oral. The Builder does not make or imply any warranty or guaranty that the equipment or the services provided will prevent or lessen the effects of burglaries, fire or other occurrences which the system is designed to prevent or monitor. Buyer acknowledges and agrees that the Builder shall not be liable for loss or damage to property or for personal injury or death whether directly or indirectly due to (i) any failure of the system, the equipment or the components thereof, or the failure of any of the services provided by the Security Company, or (ii) the negligence of the employees of the Security Company.

The above price is guaranteed to the buyer for 60 days from the signing of this Agreement with

Revised February 3, 2005

exception only to other provisions provided herein. Should start of construction be delayed beyond this time by Buyer or Buyer Agents, or by reason of ruling or regulation of any governmental authority, or by reason of any other cause not the fault of Builder, then the above price may be increased to the published price for the month of actual start. Start of construction is defined as the date on which the slab is poured.

The Buyer shall not perform any work on subject property (under section I) related or unrelated to this Building Agreement, either directly or indirectly, except as covered by this Agreement, nor award any other contracts in connection with construction or other work on the Buyer's property.

♦ **VI. Delivery & Warranty:** Subject to the provisions of this Agreement, the Builder agrees to use its best effort to deliver the substantially completed residence specified herein on or about ___180___ days from start of construction. Start of construction is defined as the date on which the slab is poured. However, the Builder cannot and will not be responsible for any damages or inconvenience caused to the Buyer for failure to complete the residence specified herein within the above number of days, regardless of the reason for such delay. Buyer agrees that Builder shall have the right to substitute material or items of comparable quality for such material or items which may be unobtainable by reason of strikes or discontinuance of production for any reason. Builder shall advise Buyer of such substitutions, giving advance notice where possible.

It is expressly understood and agreed that the Buyer shall in no event take possession of, or enter upon the Property prior to closing and should the buyer breach this provision: first the Buyer accepts house as is and forfeits all warranty and second the Buyer consents that the Builder shall have the right to dispossess them from the Property by summary proceedings if such action is deemed necessary by Builder.

The Performance Warranty in the form shown in this Agreement shall be issued to Buyer upon complete payment of all funds as provided for in this Agreement. I further understand that no other representation, either oral or written, or whether contained in any advertisements, pamphlets, brochures or similar sales materials, shall create any additional express or implied warranties or guaranties beyond those contained in the "Performance Warranty". To the extent any such prior representations contradict the terms hereof, such representations shall be invalid and the terms of this document control.

BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY HABITABILITY OF SOIL OR SUBSURFACE CONDITIONS OF THE SUBJECT PROPERTY. BUYER EXPRESSLY ASSUMES THE RISK OF ANY AND ALL LOSS OR DAMAGE TO THE SUBJECT PROPERTY. DAMAGE CAUSED BY SOIL OR SUBSURFACE CONDITIONS, WHETHER OR NOT ANY SUCH ADVERSE CONDITIONS COULD HAVE BEEN DISCOVERED PRIOR TO THE CLOSING BY APPROPRIATE TESTING. OTHER THAN THE PERFORMANCE WARRANTY. THE BUILDER DOES NOT EXPRESSLY WARRANT OR GUARANTY , ANY TYPE OF FITNESS AND MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

♦ **VII. Property Contingencies:** Items listed below which are applicable may be shown in the attached Addendum /Itemization of extra's or may be charged to the Buyer (upon) request by change order at a later date. It is hereby agreed that, when applicable, the following property related items are to be charged to the Buyer:

♦ All lot preparation (including but not limited to)
♦ Other impact fees not directly related to the material construction of the home.
♦ Soil tests & Engineering for other reasons than construction (diagnostic)
♦ Pilings
♦ Additional expenses for pumping concrete due to site conditions
♦ Underground electric & telephone service
♦ Additional electric service lines over fifty (50) feet for overhead power or Temp. Power pole
♦ Extended electrical service through attic or under slab  (200amp @ $20 per ft.)
♦ Expense caused by rock or other adverse subsoil conditions
♦ Additional concrete drive & walkway over ___1000___ square feet will be charged at $5.00 per sq. ft.
♦ Additional Bahia Sod over ___9000___ sq. ft.  will be charged at $0.20 per sq. ft.
♦ Additional public water and sewer lines over a distance of five (5) feet from house
♦ Septic tank over 900 gal.

Revised February 3, 2005

♦   **VIII. Special Assessments:**  Buyer acknowledges that the subject property is or may be located in a special assessment district and is now or will be subject to a special assessment lien for certain improvements in that district.  Buyer agrees to take title subject to and be solely responsible for payment of any assessment established, whether or not said assessment is pending, certified, or confirmed prior to the date of closing, and the Buyer specifically releases the Seller of any requirement for payment on said special assessment.

♦   **IX. Absolute Domain:**  The following exhibits which are attached hereto and more fully describe the residence covered by this Agreement:  Floor Plan Sheet, Elevation Sheet, Included Features Sheet and Addendum /Itemization of extra's.  Let it be known that Diamond Court Construction Company is the procurator of this Contract/ Building Agreement and that this Contract/ Building Agreement supersedes all past and future Contracts or Agreements no matter what is signed or executed in relation to this contract by any officer or representative of the Builder with exception only to extras, addendums, customized plan charges or new Building Agreements drafted, written, produced and executed by Diamond Court Construction Company.

♦   **X. Disclosures:**  Florida law requires the following disclosure to be given to the Buyer of property in this State.  Builder has made no independent inspection of the Property to determine the presence of conditions which may result in radon gas, or any other conditions; however, Builder is not aware of any such conditions.  Certain building methods and materials have been proven to reduce the possibility of radon gas entering the building.  Buyers hereby unconditionally, jointly and severally agrees to indemnify and save harmless Diamond Court Construction Company ((Owners, Agents & Assigns) Indemnities)) and its successors and assigns, from any claim, action, liability, loss, damage or suit, arising from or effected by the building of the Buyers house or structure for any and all reasons other than payment for materials & labor. I understand that "Diamond Court Homes, Inc." is a trademark only, and is being used by the Builder "Diamond Court Construction Co., Inc., and that Diamond Court Homes, Inc., has no legal involvement in or responsibility, obligation or liability for the construction of my home.

♦   **XI. Severability:**  If any portion of this Agreement is held unenforceable, void, or voidable by any court, each of the remaining terms hereof shall nevertheless remain in full force and effect as a separate contract and Buyers agree to the terms stated herein to make all terms enforceable .  This Agreement shall be deemed modified and amended to the extent necessary to render it valid and enforceable.

♦   **XII. Binding Effect:** This contract shall be binding on the parties hereto, their heirs, successors, and personal representatives. Buyer shall not be entitled to assign this contract without written consent of Diamond Court Construction Company.

IN WITNESS WHEREOF, the said parties to these presents have hereunto set their hands and seals the day and year above written.

_Andrew Hallia_
_____
♦BUYER

_____
♦BUYER

_____
♦ Lance W. Collins, **CBC**, President
Diamond Court Construction Company
Contract Corporately validated by President
Contract must bear a copy of Corporate Seal

Corporate Seal

5 of 5                    Revised February 3, 2005



# DIAMOND COURT CONSTRUCTION CO

**Lot Information Required**

Address: 4565 SW, ATHENA DR.

Lot: 3   Block: 2377   Section/Unit: 34

Subdivision: _____   Assoc. Docs: _____

## Customizing Agreement

### Section I : Bids on Plans

A $250 Fee is required to be paid at the same time you submit your plans to us for bidding. Bids will reflect specifications similar to our home designs. Extra features can then be added to fit your personal needs and tastes.

### Section II : Conference Time

An appointment for plan review with the Builder and the time in Conference is charged at $120/Hr. (1Hr. min.). Appointments will be prepaid before Conference is scheduled.

### Section III : CAD Time

CAD time to change prints after first preliminary review is charged at $90/Hr.

### Section IV : Custom Plans

The cost of plans to be produced from conceptual design through preliminary plans to final prints depends entirely on you, your plan design & how much time is spent in conferences about the plan. A $250 deposit for the initial conference is required. Due to the intense amount of labor that is expended to produce plans & Bids, it has become necessary to require a $2000 deposit to start the prints. The cost to produce a Custom plan from a preliminary to a final is approximately $2.10/ SQ FT.

[ *Andrea Williams* ]          [ _____ ]
Customer Signature              Customer Signature

[ ANDREW WILLIAM ]          [ _____ ]
Printed                          Printed

[ 3841 NW 6 Ct. ]          Date:[ _____ ]
[ FT LAUDERDALE FL 33311 ]  Phone:[ 954 583 7035 ]
Home Address

DIAMOND COURT CONSTRUCTION COMPANY INC.
PHONE (772) 337-3070  2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952  FAX (772) 335-1150

DESIGN.FEE

# NOTICE OF CONSUMER RIGHTS UNDER THE CONSTRUCTION INDUSTRIES RECOVERY FUND

You have certain rights under Florida law if you have suffered damages caused by a state-licensed contractor or a construction company with whom you have signed a contract. State law requires that you be provided with this notice of your rights regarding the Construction Industries Recovery Fund, including how and where you can file a claim against the Fund for reimbursement of any damages you have suffered.

You may be eligible for reimbursement if you have suffered monetary loss due to certain acts (described below) by the contractor, financially responsible officer or business organization licensed under Chapter 489, Part I, Florida Statutes. The Fund is available only in cases where the contract was signed and the violation occurred on or after July 1, 1993.

## Who Is Eligible?

In order to seek compensation from the Construction Industries Recovery Fund, you must have:

1. Entered into a written contract with a licensed contractor for work on residential real property;

2. Commenced legal action against the contractor, financially responsible officer or business organization; and

3. Suffered a financial loss due to the contractor:

   a) Knowingly violating applicable city, county or state building codes or laws;

   b) Committing mismanagement or misconduct in the practice of contracting that causes financial harm to a customer;

   c) Abandoning a construction project for more than 90 days; or

   d) Signing a false statement claiming that the work is bonded, that all payments to subcontractors have been made, or claiming to have provided certain worker's compensation and insurance protection.

Florida laws provide specific definitions for determining whether a contractor's actions may constitute one of these violations. See §489.129(1)(d),(h),(k),(I), Fla. Stat. In addition, you must notify the Construction Industry Licensing Board (CILB) of your claim by certified mail at the time you commence legal action.

Filing a complaint against a contractor is not the same as filing a claim against the Fund. Even if you file a complaint against a contractor with the Department of Business and Professional Regulation (DBPR), you still have to give the CILB notice of your claim and you will also be required to file a Construction Industries Recovery Fund Claim Form with the CILB.

To request a Construction Industries Recovery Fund Claim Form or to receive more information about the Fund, write to:

Construction Industry Licensing Board
7960 Arlington Expressway
Suite 300
Jacksonville, Florida 32211-7467
Phone (904) 359-6310

If you have questions and/or want to file a complaint with the DBPR against the contractor, the financially responsible officer and/or the business organization, please write to the Complaints Section, DBPR, 1940 North Monroe Street, Tallahassee, Florida 32399-0782.

## Conditions For Recovery

In order to recover from the Fund, you must be an individual - not a company. The Recovery Fund is a last resort. Before you can receive any money from the Fund, you must have obtained a final judgment from a Florida court or a restitution order from the CILB based on the types of violations of law already mentioned. Both the violation of law and the signing of the construction contract must have occurred on or after July 1, 1993. Before the Fund will pay you any money, you must show that you have made every effort to determine if there are any assets from which you can recover all or part of the money you are owed. If so, you must try to recover before you can collect from the Fund. You have to file a claim for recovery with the Fund within 2 years of the time the violation of law happens or within 2 years of the time you find out or should have found out about the violation of law. No claim can be made more than 4 years after the time the violation of law happened.

## Payments From The Fund

The Fund does not pay post-judgment interest, punitive damages, or attorney fees. The Fund only pays what you have not yet collected for actual or compensatory damages. The Fund pays the lesser of up to $25,000 per claim, $25,000 per transaction, or $50,000 per contractor.

> FOR MORE INFORMATION ABOUT THE FUND, SEE § § 489.140 TO 489.143, FLA. STAT. AND RULES 61G4-21.001 TO 61G4-21.005, FLA. ADMIN. CODE

Received by: Homeowner's Signature *Andrew Williams*          Date: 5-14-05

# FOR YOUR PROTECTION THE BUILDER PROVIDES AND YOUR LENDER REQUIRES A RELEASE OF LIEN FOR EACH NOTICE TO OWNER PRIOR TO DISPERSING EACH DRAW.

ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN.  IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY.  THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY.  FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT ATTORNEY. LEGISLATIVE MANDATED 2003 DISCLOSURE  REQUIRED BY FLORIDA.

Received by: _Andrew Williams_           Date: _5-14-05_
          Homebuyer's Signature

C:\Documents and Settings\Owner\My Documents\DCCC\CONTRACT.S\LIEN LAW DISCLOSURE.wpd



# DIAMOND COURT CONSTRUCTION CO.

## Customer Correspondence Info Sheet

| 1 | Full Name | ANDREW WILLIAMS | |
|---|-----------|-----------------|---|
| 2 | Full Name of Spouse | | |
| 3 | Home Address | 3841 NW 6TH Ct. | |
| | | FT LAUDERDALE | |
| 4 | Home Phone # | 954 583 - 7035 | |
| 5 | Cell Phone # | Husband: | Wife: |
| 6 | Business Phone # | Husband: | Wife: |
| 7 | Fax Phone # | 1800 237·1491 | |
| 8 | Place of Employment | | |
| | Spouse's Employer | | |
| 9 | Copy of Driver License | Must have date of birth on license | |
| 10 | Spouse's License | Must have date of birth on license | |

C:\Documents and Settings\Owner\My Documents\DCCC\CONTRACT.S\Customer Correspondence Info Sheet.wpd

Buyer's Signature: _Andrew Williams_    Date: _5-14-05_

Buyer's Signature: _____    Date: _____

Sales Associate Signature: _____    Date: _____

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952   FAX (772) 335-1150

# UPGRADE CHECK LIST / PRICE LIST
## EFFECTIVE: APRIL 29, 2005
### FEATURES & PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE OR OBLIGATION

| | ENERGY SAVING FEATURE PRIORITY | PRICE |
|---|---|---|
| **BLUEPRINTS** | | |
| NON STRUCTURAL CHANGES [$500 INITIAL + $300 EACH ADDITIONAL AREA] | | $500 |
| STRUCTURAL CHANGES TO BE DETERMINED ON WRITTEN REQUEST. | | TBD |
| BIDDING PRINTS / CUSTOM PLANS SEE CUSTOMIZING AGREEMENT | | TBD |
| PER ITEM CHANGE - CHANGE ORDER FEE AFTER THE SELECTION APPROVAL PERIOD AND PRIOR TO THE BUILDING PERMIT BEING ISSUED | | $250 |
| **LOT PREPARATION** | | |
| STANDARD LOT PREP   (ALLOWANCE & MIN. COST)   80FT X 125FT, 1/4 ACRE | | $8,500 |
| CORNER LOT PREP   (ALLOWANCE & MIN. COST)   100FT - 120FT X 125FT, 1/3 ACRE | | $10,500 |
| ESTATE LOT PREP   (ALLOWANCE & MIN. COST)   120FT - 160FT X 125FT, 1/2 ACRE | | $14,000 |
| OVER 1 ACRE WILL BE ESTIMATED ON AN INDIVIDUAL BASIS DUE TO MANY LOCAL, STATE & FEDERAL REQUIREMENTS   [SITE PLAN]   [JOB REPORTING] | | |
| **DRIVEWAYS / WALKWAYS** | | |
| WIDEN DRIVEWAY TO 20FT FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $1,250 |
| WIDEN DRIVEWAY TO 21FT 4IN FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $1,650 |
| 16FT CIRCULAR DRIVEWAY FROM 16FT WITH STANDARD 25' HOUSE FRONT SET BACK | | $4,900 |
| WIDEN WALK WAY FROM DRIVEWAY TO FRONT DOOR FROM 3FT TO 5FT | | $400 |
| WALK WAY FROM DRIVEWAY TO GARAGE ACCESS DOOR 3FT WIDE | | $500 |
| WALK WAY FROM CABANA OR REAR BATH TO POOL DECK 3FT WIDE | | $400 |
| **POOL PACKAGES** | | |
| POOL & SCREEN PACKAGE STANDARD 14FT X 28FT   [ALLOWANCE $28,800]<br>SUPERVISION & COORDINATION   $1,100<br>ELECTRIC POOL PREWIRE & HOOKUP   $650<br>CITY WATER POOL FILL   $350 | | $30,900 |
| POOL & SCREEN PACKAGE RAISED WHIRLPOOL + HEATER 14FT X 28FT   [ALLOWANCE   $39,500]<br>SUPERVISION & COORDINATION   $1,100<br>ELECTRIC POOL PREWIRE & HOOKUP   $650<br>CITY WATER POOL FILL   $350 | | $41,600 |
| **SPRINKLERS** | | |
| IRRIGATION SYSTEM FOR 1/4 ACRE   STANDARD LOTS 80' X 125' | | $3,000 |
| IRRIGATION SYSTEM FOR 1/3 ACRE   CORNER LOTS 90' TO 110' X 125' | | $3,900 |
| IRRIGATION SYSTEM FOR 1/2 ACRE   ESTATE LOTS 120' TO 160' X 125' | | $4,800 |



| WELLS / SOD | | | EFFECTIVE: 4/29/05 | |
|---|---|---|---|---|
| WELL & PUMP FOR HOUSE SUPPLY 3/4 HP PUMP & 32 GAL. PRESSURE TANK $1800  ELECTRICAL REQUIRED $400 | | | | $2,200 |
| WELL & PUMP FOR IRRIGATION   1 ½ HP PUMP & ELEC RELAY $1800  ELECTRICAL REQUIRED $400 | | | | $2,200 |
| ADDITIONAL 8000 SQ FT BAHIA SOD FOR CORNER LOT 120' X 125' | | | | $2,000 |
| UPGRADE 9000 SQ FT OF BAHIA TO FLORITAM SOD FOR 1/4 ACRE 9000SQ FT | | | | $2,000 |
| FLORITAM SOD FOR 1/3 ACRE 11000SQ FT | | | | $2,750 |
| FLORITAM SOD FOR 1/2 ACRE 18000SQ FT | | | | $5,150 |
| **ROOFING** | | | | |
| UPGRADE FROM 30 YR TO 40 YR ARCHITECTURAL SHINGLES | | | | $3,500 |
| METAL ROOF FOR COAST POINTE - STD,      AND MODELS UP TO 2826 SQ FT | | | | $13,500 |
| METAL ROOF FOR COAST POINTE - OFC      AND MODELS UP TO 3015 SQ FT | | | | $14,250 |
| METAL ROOF FOR COAST POINTE - 4BR/3BA   AND MODELS UP TO 3067 SQ FT | | | | $15,000 |
| METAL ROOF FOR COAST POINTE - 4BR/3BA & OFC   AND MODELS UP TO 3256 SQ FT | | | | $16,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 2826 SQ FT | | | | $13,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 3015 SQ FT | | | | $15,500 |
| UPGRADE FROM 30 YR TO FLAT OR S-TILE ROOF MODELS UP TO 3256 SQ FT | | | | $16,500 |
| **Windows / Exterior Doors** | | | | |
| UPGRADE STANDARD CLEAR WINDOWS TO TINTED WINDOWS | | ••1•• | | $1,200 |
| UPGRADE TINTED WINDOWS TO INSULATED WINDOWS | | ••1•• | | $3,100 |
| UPGRADE INSULATED WINDOWS TO INSULATED (LOW-E) WINDOWS) | | ••1•• | | $1,800 |
| UPGRADE FULL LITE DOORS TO INTERNAL BLINDS (TILT ONLY) | | | | $350 |
| UPGRADE FULL LITE DOORS TO INTERNAL BLINDS (TILT & RAISE) | | | | $400 |
| UPGRADE GLASS BLOCK IN COAST POINT MASTER BATH BAY WINDOWS | | | | $2,250 |
| ADDITIONAL HANDLESET ON FRONT ENTRY DOUBLE DOORS | | | | $350 |
| IMPACT RESISTANT GLASS WINDOWS & DOORS | | | | TBD |
| OBSCURE WINDOW | | | | $150 |
| **Painting** | | | | |
| FLOOR STAIN AT LANAI | | | | $450 |
| ONE ADDITIONAL INTERIOR COLOR (WALL COLOR DIFFERENT THAN CEILING COLOR (IN CP STUDY/4BR - ENTIRE HOUSE) | | | | |
| | | | | |
| | | | | |
| | | | | |

| ELECTRICAL | | EFFECTIVE: 4/29/0 |
|---|---|---|
| UNDERGROUND ELECTRIC SERVICE   STANDARD LOT | | $1,20 |
| INTERIOR WALL OUTLET | | $9 |
| EXTERIOR (G.F.I.) WEATHER-PROOF OUTLET | | $14 |
| LIGHT SWITCH | | $9 |
| DIMMER FOR LIGHT | | $12 |
| RECESS CAN LIGHTING (HI-HATS) | | $11 |
| CEILING FAN OUTLET (SINGLE SWITCHED) | **1** | $18 |
| HANG NORMAL LIGHT FIXTURE | | $5 |
| HANG LARGE LIGHT FIXTURE OR FAN INSTALL | | $7 |
| PHONE PRE-WIRE | | $7 |
| TV / CABLE PRE-WIRE | | $7 |
| FLOOR OUTLET | | $425 |
| ELECTRIC SERVICE FOR FUTURE SECURITY LIGHTS (SINGLE SWITCHED) | | $180 |
| POOL PRE-WIRE (STD, 1-PUMP, 1-HEATER 1-TIME CLOCK) | | $650 |
| UPGRADE TO BISQUE OR BLACK WALL/SWITCH PLATES FOR ENTIRE HOUSE | | $550 |

| PLUMBING / BATHS | | |
|---|---|---|
| UPGRADE MASTER BATH WHIRLPOOL TUB          PLUMBER $1,500    NOTE FOR ELECTRIC GFIC SERVICE          ELECTRIC $ 350 | | $1,850 |
| UPGRADE MASTER TUB COLORS - (BONE OR ALMOND) | | $250 |
| UPGRADE MASTER TUB COLORS - (RED, BLUE, BLACK, ETC PREMIUM COLORS) | | $700 |
| UPGRADE TOILETS OR HALL TUB TO BONE | | $150 |
| BIDET | | $750 |
| HANDICAPPED TOILET  (TO ADD TOILET) | | $800 |
| HANDICAPPED TOILET  (IN PLACE OF STANDARD TOILET) | | $500 |
| BI-PASS TUB ENCLOSURE | | $600 |
| ADDITIONAL SHOWER HEAD | | $750 |
| CERAMIC CORNER SHELF IN WHITE OR BONE APPROX. 7" BACK TO FRONT | | $50 |
| BUILT-IN SHOWER BENCH  (IN ALL MODELS) | | $300 |
| SPORT SHOWER IN MASTER BATH OF COAST POINTE | | $8,000 |
| UPGRADE FROM STD. LUXURY PKG. VANITY TOPS TO GRANITE VANITY TOPS W/CHINA SINK | | $2,800 |
| UPGRADE FROM 50 GALLON  TO 66 GALLON WATER HEATER | **2** | $275 |
| UPGRADE FROM 50 GALLON  TO 80 GALLON WATER HEATER | **3** | $350 |
| LAUNDRY TUB - FREESTANDING | | $650 |
| LAUNDRY TUB - BUILT IN (PRICE DEPENDS UPON SIZE) | | TBD |
| HOSE BIBB | | $150 |

| INSULATION & AIRCONDITIONER | | EFFECTIVE: 4/29/0 |
|---|---|---|
| Vent Microwave Exhaust to Outside | | $30 |
| Privacy Insulation at Family room and Bedroom walls | | $45 |
| Add R-19 Insulation to 2 Car Garage | ••1•• | $45( |
| Add R-30 Insulation to 2 Car Garage | ••1•• | $55( |
| Add R-19 to Rear Lanai | ••1•• | $45( |
| Add R-30 to Rear Lanai | ••1•• | $55( |
| Upgrade Attic Insulation from R-19 to R-30 | ••1•• | $2,10( |
| Upgrade Attic Insulation from R-30 to R-38 | ••1•• | $1,60( |
| Upgrade Wall Insulation from R-5 to R-10 | ••1•• | $1,50( |
| Upgrade Wall Insulation from R-10 to R-15 | ••1•• | $1,80( |
| Upgrade Trane AirConditioner from    12 SEER to 14 SEER | ••1•• | $2,40( |
| Upgrade Trane AirConditioner from    12 SEER to 16 SEER | ••1•• | $3,90( |
| 2 - Zone AirConditioner System    2 TON 12 SEER | | $4,40( |
| **INTERIOR** | | |
| **Door Hardware:** Upgrade Interior & Exterior Hardware: & Finish | | $200 |
| **Rounded Corners in Coast Pointe    $10./Line Ft** | | |
| **Trim:** Upgrade Colonial Millwork to Baby Howe Millwork | | $2,200 |
| **Sills:** Upgrade Travertine Marble to Cultured Marble Window Sills | | $1,150 |
| **Carpet:** for each different color | | $50 |
| **Full Granite (std. level) backsplash at Rangeside** | | $1,200 |
| **Wall tile backsplash at Rangeside** - (price not available yet) | | |
| **Add Closets at Study/Foyer** in Lakeside Terrace/CP/GHP | | $750 |
| **Add French Double Doors at Foyer** in Lakeside Terrace/MM | | $900 |
| **CABINETRY** | | |
| Cabinet pricing on separate Cabinet Price List | | |
| **Cabinet Storage/Organizing Accessories:**   Base cabinet Roll Out Shelf | | $250 |
| Lazy Suzan (aluminum) | | $280 |
| **KITCHEN COUNTERTOPS**    **Add $800 more to Mon.Manor** | | |
| Upgrade Corian Level I to Corian Level II | | $1,500 |
| Upgrade Corian Level II to Corian level III | | $2,500 |
| Upgrade Corian Level II to Corian Level IV | | $4,000 |
| Upgrade Corian Level I to Granite Level I | | $4,300 |
| Upgrade Corian Level II to Granite Level I | | $3,800 |

| KITCHEN APPLIANCES | | EFFECTIVE: 4/29/0 |
|---|---|---|
| UPGRADE KITCHEN APPLIANCES TO STAINLESS STEEL | | $1,20 |
| SLIDE IN RANGE WITH WALL TILE AT STOVE/BARTOP BACKSPLASH - (PRICE NOT AVAILABE YET) | | |
| **GARAGE** | | |
| INSULATE GARAGE DOOR | **1** | $400 |
| SIDE LOAD GARAGE | | $1,800 |
| GARAGE DOOR OPENER | | $450 |
| **GAS SERVICE** | | |
| GAS SERVICE FOR (RANGE, WATER HEATER, DRYER, OUTDOOR GRILL) INCLUDES 50 WATER HEATER, VENTING, UP TO 150' INT. PIPING & 40' UNDER GRD. & 120 GAL. TANK LEASED | **1** | $2,400 |
| GAS SERVICE FOR (RANGE, WATER HEATER, DRYER, OUTDOOR GRILL, POOL & SPA HEATER) INCLUDES 50 WATER HEATER, VENTING, UP TO 150' INT. PIPING & 40' UNDER GRD. & 250 GAL. TANK LEASED | | $2,900 |
| UPGRADE GAS WATER HEATER 50 GAL. TO 75 GAL. | **1** | $600 |
| **SPECIALTIES & MISC.** | | |
| ADD SQ. FT. TO LANAI ( $65 PER SQ. FT.) | | |
| FIREPLACE | | $4,200 |
| SECURITY SYSTEM BY BRINKS          PERIMETER SYSTEM | | $1,500 |
| CENTRAL VACUUM SYSTEM | | $1,500 |

DCC/CONTRACTS/UPGRADE LIST

# < CREDIT > LIST
## EFFECTIVE APRIL 29, 2005

| | | | CREDIT AMOUNT |
|---|---|---|---|
| | **EXTERIOR** | | |
| 1 | LANAI CONCRETE FLOOR STAIN | | < $100 |
| 2 | LANAI SCREEN | | < $250 |
| | **BATHS** | | |
| 1 | BIDET | | < $200 |
| 2 | LUXURY BATH ACCESSORIES FOR 2 BATH | | < $150 |
| 3 | LUXURY BATH ACCESSORIES FOR 2-1/2 BATH | | < $185 |
| 4 | LUXURY BATH ACCESSORIES FOR 3 BATH | | < $205 |
| | | | |
| | | | |
| | **KITCHEN** | | |
| 1 | KITCHEN ISLAND | | < $400 > |
| | APPLIANCES: CREDIT FOR INDIVIDUAL ITEMS ONLY IF CUSTOMER IS OMITTING | | |
| 2 | WASHER | | < $463 > |
| | DRYER | | < $382 > |
| 4 | DISHWASHER | | < $245 > |
| 5 | REFRIGERATOR | | < $915 > |
| 6 | RANGE | | < $496 > |
| 7 | MICROWAVE | | < $286 > |
| 8 | STANDARD LUXURY PACKAGE APPLIANCES: W/D, DW, FRIG, RANGE, MICRO | | <$2787> |

FEATURES & PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE OR OBLIGATION

DCC/CONTRACTS /CREDIT LIST

EFFECTIVE: APRIL 29, 2005

# *Final Inspection Checklist*

Date 10-18-06   Customer Andrew Williams   Address 4531 SW Darwin Blvd.

This form serves as notice that your home is substantially completed, in satisfactory condition, and meets the quality standards established by our model home. This final inspection is your opportunity to review your home to confirm this fact. Final payment must be received prior to taking occupancy with no exceptions.

Please inspect the items such as the ones listed below for cosmetic damage in your home. This is the time to request service for these items before they are excluded from your Limited Warranty coverage. Cosmetic damages (scratches, scuffs, marks, chips, cracks, dents, tears, gouges, burns, stains, or tarnished areas) or missing items are readily identified at this time. Many items are vulnerable to damage during the process of move-in or through normal living activities. Consequently, they are not covered by our Limited Warranty. Future repairs of cosmetic damages such as those listed above are considered normal homeowner maintenance.

1. Countertops and cabinets
2. Floor coverings
3. Doors (interior and exterior) and screens
4. Light fixtures and ceiling fans
5. Plumbing fixtures

6. Appliances and utilities (i.e., water heater, air conditioning, etc.)
7. Glass components (i.e., mirrors, windows, tub and shower enclosures)
8. Site grading and drainage

[ ] We have inspected the home and found it to our satisfaction.
[✓] We have inspected the home and found the following items in need of attention:

① missing Int. transom glass ② Fridge crisper drawer damaged ③ Mstr Pocket Hardware missing
④ Cabinet touch-ups ⑤ A/c - cabana bath not cooling, wires exposed @ condensor ⑥ grout touch-ups
⑦ Drywall touch-ups ⑧ Paint touch-ups ⑨ 1 cracked Flourescent lens (4') in garage
Hang Study fan once owner obtains downrod

All items in need of attention are noted on this page and no verbal representations whatsoever have been made. Please allow approximately 10 - 30 days to complete the items listed above. In the event of a back-ordered item or other delay, we will inform you immediately. We authorize release of the final bank draw payment to Diamond Court Construction Co.

Homebuyer's Signature Andrew Williams   Date 10-18-06

Homebuyer's Signature _____   Date _____

*Diamond Court Construction Co.*

DCC/Final Inspection List/04-28-04

# IMPORTANT REMINDERS:

**Customer's Name:** Andrew Williams

**Address:** 4531 SW Darwin Blvd.    **Date:** 10-18-06

**I.   TRANSFER OF UTILITY SERVICE:** Upon your Notice of Completion, the utility service is scheduled to cease in our name; therefore, it is important that you call your local utility company to set up an account in your name; otherwise, you may experience an interruption of service.

| | | |
|---|---|---|
| Port St. Lucie Utilities | (772) 871-5330 | Mon - Fri / 8 a.m. - 5 p.m. |
| Martin County Utilities | (772) 221-1434 | Mon - Fri / 7:30 a.m. - 4 p.m. |
| Ft. Pierce Utilities | (772) 466-1600 | Mon - Fri / 8 a.m. - 5 p.m. |

**II.   HOMEOWNERS INSURANCE:** Your Lending Institution usually makes sure that you have Homeowner's Insurance prior to moving in your new home; however, if your bank does not contact you regarding this matter, please be advised that once the Certificate of Occupancy is issued you are no longer protected by Builder's Risk Insurance and must have a Homeowner's Policy in place prior to that time to avoid a lapse in coverage of your new home. You will be given a Hurricane Protection Certificate for you to submit to your Insurance Carrier that may qualify you for rate deduction.

_____          _____
*Customer's Signature*                              *Date*

_____          _____
*Customer's Signature*                              *Date*



# DIAMOND COURT CONSTRUCTION CO.

## Irrevocable Authorization to Release Final Payments

We, _Andrew Williams_ , the Buyers hereby and forthwith

Irrevocably Authorize the release of Final payments and any payments due to Diamond

Court Construction Company.  Upon  receipt of funds in full Diamond Court

Construction Company will produce a Final release of lien and / or a Satisfaction of Lien

as per statutory rights and guidelines.

_Andrew Williams_
Buyer                                         Buyer

Date: _____

_Lance W. Collins_
Lance W. Collins, CBC
President
Diamond Court Construction Company

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA  34952   FAX (772) 335-1150

# Release

Be it known, for good consideration, and in further consideration of the release herein entered into, that: Andrew Williams

do(es) hereby completely, release, discharge, acquit and forgive from all claims, contracts, actions, suits, demands, agreements, liabilities, and proceedings of every nature and description both at law and in equity that the undersigned has or may have against Diamond Court Construction Co. arising form the beginning of time to the date of these presence and continuing to endure, including all.

This release shall be binding upon the undersigned and inure to the benefit of  Diamond Court Construction Co.  its officers, stock holders, employees and subcontractors (on site construction subs).

Signed this ___18___ day of ___OCTOBER___, 200_6_
In the presence of:

Signature  WITNESS                          CANCE VL. COLLINS
                                            Printed

Andrew Williams                            Andrew Williams
Signature                                   Printed

Witness                                     Brian Cornell
                                            Printed

Witness                                     Tracey Nichols
                                            Printed

Witness                                     Printed

Witness                                     Printed

DIAMOND COURT
CONSTRUCTION CO.

# Notice of Completion

Customer's Name: _Andrew Williams_     Date: _10-18-06_

Address: _4531 SW Darwin Boulevard_

This letter serves as a notice of substantial completion of your new home. A Final Inspection Checklist will be compiled on or after the Walk-Thru. We will notify you when your home is ready for occupancy once the final draw from your Lender is received and any other outstanding balances due are received. The items listed below in the left column are to be signed today. Homebuyer to keep a copy and originals to be returned to the construction office at Diamond Court. The items listed in the right column will be compiled and mailed to you in the Delivery Packet after delivery of your new home.

### _Presented with Notice of Completion_

- Documents signed today includes the following:
  - ► Notice of Completion
  - ► Final Inspection Checklist
  - ► Notice of Consumer Rights
  - ► Builder's One Year Performance Guarantee
  - ► Builder's Structural Warranty Application
  - ► Trade List (to set up Warranty Appointments and any follow-up work listed on Final Inspection Checklist)
  - ► Important Reminders
  - ► Irrevocable Authorization form
  - ► Invoice/Statement of any money due

### _Mailed after Delivery of New Home_

Delivery Packet includes the following:
- Additional copies of documents in left column
- Certificate of Occupancy
- Final Plot Plan Survey
- Certificate of Termite Treatments & Warranty
- Storm Shutter Completion Certificate (File this with your insurance company for a discount if applicable.)
- Release of Liens (for cash customers only, otherwise Lender receives Releases)
- Property Tax brochure
- Care and Maintenance Information for specific selected items

Thank you for building with Diamond Court. Please keep these documents in a safe place. We wish you many years of enjoyment in your new home, and again, thank you for your business.

Sincerely,

Diamond Court

_Andrew W. W._     _10-18-06_
Homebuyer's Signature       Date

_____     _____
Homebuyer's Signature       Date

DCC/Contracts/Notice of Completion Revised 8/2/06



# DIAMOND COURT
# HOMES INC.



*Custom & Model Homes*

## Model Center (772) 871-7700

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School







Welcome To Diamond Court!

Specializing in fine model and custom homes, Diamond Court offers a variety of beautiful and luxurious home plans and custom plan design service. Come see our Coast Pointe model - the 2003 Grand Award in the TCBA Parade of Homes!

Our Founder and President, Lance W. Collins, is a State Licensed Building Contractor and a Third Generation Contractor with over 20 years building experience in residential construction. Our reputation for quality construction, personalized service and incredible value are backed by our many satisfied homebuyers.

We look forward to building your Dream Home, where you can enjoy the Comforts and Memories of Home!

*Diamond Court*

# DIAMOND COURT HOMES INC.



SITTING AREA

18' X 10'
LANAI
Flat Ceiling 8'-0"

NOOK
9'5 X 12'8

BEDROOM2
11'1 X 14'5
Flat Ceiling 8'-0"

MASTER BDRM
13'3 X 19'3
TRAY CEILING 8'- 9"

FAMILY ROOM 17'7 X 23'
Vaulted Ceiling 13'-8"

BEDROOM 3
11'1 X 12'1
Flat Ceiling 8'-0"

Ceiling 9' Flat

A/C

STUDY / LIVING
13'7 X 11'
TRAY CEILING 8'- 9"

DINING
11'9 X 13'4
Vaulted Ceiling 12'-8"

GARAGE
20' X 20'
Flat Ceiling 8'-0"

METER PANEL

WH

RELOCATABLE
A/C PAD

© 1999 Diamond Court Construction Company Inc.

< < <60'-0" < < <

**MONARCH MANOR**

| | |
|---|---|
| LIVING | 2133 |
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

TOTAL AREA
2817 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# Affordable Package
## *Features and Specifications*

*Visit our Showroom for a wide variety of selections and customizing options to personalize your home!*

### FEES, SURVEYS & CODE REQUIREMENTS:
♦ All Permits (building & health) and Impact Fees under one acre
♦ Water/sewer connection fees or well to 70' with 3/4 HP pump and septic for a standard 1/4 acre lot
♦ Survey (for a standard 1/4 acre lot)
♦ Compliance with state and local building codes

### EXTERIOR:
♦ *Exterior Structure:*
  * 2500 PSI fibermesh reinforced Concrete & Steel reinforced Monolithic slab with vapor barrier
  * Termite treatment with renewable bond
  * CBS/Concrete Block Structure with double concrete bond beam reinforced with #5 Steel Rebar each course
  * Engineered truss roof system with 1/2"CDX plywood roof sheathing
  * 30 YR.. Architectural fungus-resistant asphalt Roof shingles
  * Aluminum vented soffits and Roof vents *
  * Aluminum Fascia
  * Stucco finish Walls, Entry & Lanai ceilings
  * Upgraded Paint
  * Aluminum gutter and down spouts - as required
  * Trussed over porch with concrete columns & beams
  * Concrete-fibermesh reinforced driveway, walks, pads (1,000 sf)
♦ *Windows & Exterior Doors:*
  * Single hung white aluminum frame Windows, Sliding glass Doors and Screens where applicable, per plan
  * Six panel Insulated Steel Front Entry Door with brass finish lever
  * Keyless Front Door/Deadbolt Entry System
  * Deadbolts on all Exterior Swing Doors
  * Hurricane Storm Panels
♦ *Landscaping:*
  * Bahia sod (for a standard 1/4 acre lot - 9000 sq.ft.)
  * $300 Landscape allowance

### ELECTRICAL, PLUMBING, INSULATION, & HVAC:
♦ *Electrical:*
  * $800 Lighting fixture allowance
  * 5 Ceiling fan outlets (single switched)
  * 2 TV and 2 Phone pre-wires
  * 200 Amp Electrical Service
  * Electric door chime and smoke detectors
  * GFI outlets in kitchen, baths, laundry, garage, 2 exterior
♦ *Plumbing:*
  * Seamless copper water lines
  * 2 Exterior hose faucets
  * 50 gallon energy efficient water heater *
♦ *Insulation:*
  * R-19 batts in vaulted ceilings *
  * R-5 Celotex 3/4" Foam Board walls *
♦ *HVAC:*
  * Return Air in all bedrooms & A/C vents in every room
  * High-efficiency 10-SEER/12-SEER Trane central air conditioning and heating system / per plan *

### INTERIOR:
♦ Architectural features such as plant shelves, arches, niches, columns, vaulted, tray or coffered ceilings, drop soffits with recessed lighting, per plan
♦ Wood Interior Stud Framing
♦ Choice of Travertine or Carrara Marble Window Sills
♦ Textured Ceilings and Walls
♦ Standard Trim package has 3 1/4" base
♦ Upgraded Paint, semi-gloss in wet areas of Kitchen & Bath
♦ Rocker Switches
♦ Ventilated Closet Shelving (single shelves in bedrooms)
♦ *Interior Doors:*
  * Six-panel Passage Doors with Lever Door Hardware
  * Raised-panel Bi-fold Closet Doors
♦ *Floor Covering:*
  * 18x18 Ceramic Tile floors installed on Diagonal in Kitchen, Nook, Laundry, and straight in Baths and Foyer
  * Upgraded stain resistant Berber or Plush carpet

### BATHS:
♦ Cabinets with raised panel Wood Doors
♦ Cultured Marble Vanity tops
♦ Full width Mirrors
♦ Porcelain/steel tub, Ceramic Tile to ceiling with Decos in hallbath, per plan
♦ Ceramic Tile shower to ceiling with Decos & Listello Border, per plan
♦ Shower enclosure (chrome frame)(std. height)-Master Bath, per plan
♦ Soaker tub in Master Bath, per plan
♦ Elongated toilets (bidets - per plan)
♦ Mirrored medicine cabinets, per plan
♦ Single lever chrome faucets *(mfg.lifetime warranty)*
♦ Choice of standard bath accessory sets

### KITCHEN:
♦ Cabinets with raised panel Wood Doors
♦ Upgraded Stainless Steel or Granite Composite Sink - 4 colors
♦ Single lever Cathedral Faucet & spray - 3 finishes *(mfg.l.t. warr.)*
♦ Laminate countertop/backsplash
♦ Garbage disposal and copper icemaker line
♦ *Upgraded Appliance Package:* - 3 colors
  * Smooth top self-clean Range
  * Over The Range Microwave
  * Dishwasher with deluxe sound insulation & hush motor
  * 26 cf s/s Frig with ice/water in door

### GARAGE:
♦ Attic access with pull-down stairs and light
♦ Steel overhead Garage Door
♦ Garage Door Opener Pre-Wire

### WARRANTIES:
♦ Builder's One Year Limited Warranty
♦ 10 Year Structural Warranty

---

Diamond Court Construction Co. CBC#049065      *  Energy Saving Features      Features & specifications subject to change without notice      Eff. 03/01/04

# Luxury Package
### *Features and Specifications*

## Affordable Package + Upgraded Items Below = Luxury Package

**EXTERIOR**
* 5/8"CDX plywood Roof Sheathing
* Solid Rough Sawn Spruce Fascia
* Screened Lanai
* Tiled Entry and concrete stain on Lanai floor
* Insulated glass Front Entry Door with brass finish handle
* $800 Landscape allowance including design service

**ELECTRICAL**
* $1200 Lighting Fixture allowance
* 3 TV and 3 Phone pre-wires

**INSULATION**
* R-30 Insulation in Ceilings
* R-10.0 In-wall injected Foam Insulation

**INTERIOR**
* Architectural features: crown molding, chair rail, per plan
* 5-1/4" Baseboards
* Dual level Ventilated Closet Shelving in bedrooms for added storage

**BATHS**
* Cultured Marble Vanity tops with a 1-1/2" Custom Edge
* Full width Mirrors with Beveled Strips
* Shower enclosure (above standard height & choice of frame) in Master Bath, per plan
* Choice of upgraded Bath Towel Bar accessory sets

**KITCHEN**
* Granite - Level I  or  Corian - Level II   Countertop & Backsplash
* Elite Kingsize Capacity Washer & Dryer

**GARAGE**
* Stucco finish interior
* Automatic Garage door opener with two remotes



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER      (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# CORAL BAY



ELEVATION "A"



ELEVATION "B"

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



**4 BEDROOM VERSION**

## CORAL BAY
4 BEDROOM VERSION

| | |
|---|---|
| LIVING | 2001 |
| LANAI | 193 |
| GARAGE | 449 |
| ENTRY | 42 |

TOTAL AREA
2685 SQ FT

BEDROOM 4
14' X 11'
(8'0" FLAT CEILING)

BEDROOM 3
10'4 X 11'8
(8'0" FLAT CEILING)

LANAI 27'4 x 8'8
(10'0" FLAT CEILING)

NOOK
13' X 9'8
(10'0" FLAT CEILING)

MASTER BDRM
13'4 X 17'
(VAULT TO 10'0" FLAT CEILING)

BEDROOM 3
10'4 x 11'4
(8'0" FLAT CEILING)

LANAI 25'8 x 8'8
(10'0" FLAT CEILING)

NOOK
8'8 X 9'8
(10'0" FLAT CEILING)

MASTER BDRM
13'4 X 17'
(10' FLAT CEILING)

FAMILY
17'7 X 18'4
(10'0" FLAT CEILING)

KITCHEN
12'9 X 15'6
(10'0" FLAT CEILING)

BEDROOM 2
11'4 X 11'4
(8'0" FLAT CEILING)

DINING
12'7 X 12'9
(10'0" FLAT CEILING)

MASTER BATH
13'4 X 11'4
(10' CEILING)

A/C PAD

A/C

GARAGE
18'8 x 22'

## CORAL BAY

| | |
|---|---|
| LIVING | 1708 |
| LANAI | 190 |
| GARAGE | 449 |
| ENTRY | 42 |

TOTAL AREA
2389 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

**MODEL CENTER     (772) 871-7700**
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

## DRUID HILLS



STANDARD

VERANDA VERSION

STUDY VERSION

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER     (772) 871-7700

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# Seville Place



**Elevation "A"**



**ELEVATION "B"**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



LANAI 16' X 10'

BEDROOM 3
11' X 11'
FLAT
CEILING
10'-0"

FAMILY
17' X 19'7
VAULTED
CEILING
18'-0"

NOOK
11' X 9'
VAULTED
CEILING
11'-0"

MASTER BDRM
13'4 X 16'
TRAY CEILING
10'-0 TO 9'-00

MASTER
BATH
11'9 X 8'1

NICHE

BEDROOM 2
11' X 13'4
FLAT
CEILING
10'-0"

STUDY /
BEDROOM 4
11' X 12'5
VAULTED
CEILING
10'-0

DINING
11'4 X 12'4

A/C

WH

GARAGE 18'8' X 20'

© 1999 DIAMOND COURT CONSTRUCTION CO.

**SEVILLE PLACE**

| | |
|---|---|
| LIVING | 1956 |
| GARAGE | 420 |
| LANAI | 160 |
| ENTRY | 45 |

**TOTAL AREA**
**2581 SQ FT**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

**MODEL CENTER    (772) 871-7700**

573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# Monarch Manor



FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



## MONARCH MANOR

| | |
|---|---|
| LIVING | 2133 |
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

TOTAL  AREA
2817 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.



*Custom & Model Homes*

## MODEL CENTER   (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# COAST POINTE



**Standard**



**STUDY VERSION**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.

**4 BED 3 BATH VERSION**

FOYER
6'4 X 6'4

STUDY
13' X 11'
Flat Ceiling
(12'-1")

POWDER BATH WITH
STUDY VERSION

BEDROOM 4
11'4 X 11'4

## COAST POINTE

| LIVING | 2166 |
|--------|------|
| GARAGE | 450 |
| LANAI | 162 |
| ENTRY | 48 |

TOTAL   AREA
2826 SQ FT

FAMILY ROOM
18'3 X 18'
Flat Ceiling
(12'-1")

BEDROOM 3
12'5 X 13'4
Vaulted Ceiling
(12'-1")

LANAI
18' X 9'
Vaulted / Flat
Ceiling
(12'-1")

NOOK
11' X 11'9
Flat Ceiling
(12'-1")

KITCHEN 14' X 10'9

MASTER BDRM
15'7 X 17'
Coffer Ceiling
(8'-1'/8'-4")

LIVING
14'4 X 20'8
Flat Ceiling
(12'-9")

BEDROOM 2
12'5 X 11'
Flat Ceiling
(8'-0")

DINING
12' X 12'
Flat Ceiling
(12'-1")

A/C

WH

MASTER BATH
16' X 16'6
Vaulted Ceiling (10'-0")

GARAGE
20' X 19'8

2000 Diamond Court Construction Company Inc.

<<< 58'8' <<<

**STUDY VERSION**

**VERANDA VERSION**

FOYER
6'7 X 6'4

DELETE FRENCH ENTRY
JAL HEADER
4FT X1 WINDOW.2 ABOVE

STUDY
13'0 X 11'0
Flat Ceiling
(12'-1")

MASTER BATH
16'0 X 16'6
VAULTED CEILING (10'-0")

VERANDA
16' X 6'
CEILING 12'-1

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED



# DIAMOND COURT HOMES INC.

*Custom & Model Homes*

## MODEL CENTER     (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# LAKESIDE TERRACE



Elevation "A"

Elevation "B"

Veranda Elevation

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE. BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# DIAMOND COURT HOMES INC.



**BILLIARD ROOM OPTION**

BILLIARD / BEDROOM 4
18' X 13'
(Tray Ceiling 8' to 9')

LANAI
20'8 X 12'4
(Flat Ceiling 8'-0")

BEDROOM 4
11' X 12'
(Flat Ceiling 8'-0")

LANAI
20'0 X 12'4
(Flat Ceiling 8'-0")

MASTER BDRM
13'1 X 17'
(Tray Ceiling 8' to 9')

NOOK
11' X 10'4
(Vaulted Ceiling 14'-4")

BEDROOM 3
11'4 X 13'10
(Flat Ceiling 8'-0")

FAMILY
17'6 X 19'
(Vaulted Ceiling 14'-4")

NICHE

Optional Bedroom
& Coat Closets    OPTIONAL DOUBLE DOORS

STUDY
11' X 13'4
Optional 11' x 11' Bedroom
(Vaulted Ceiling 14'-4")

DINING
11' X 13'4
(Vaulted Ceiling 14'-4")

GARAGE
18'8 X 19'8

BEDROOM 2
11'4 X 13'8
(Flat Ceiling 8'-0")

© 1999 Diamond Court Construction Co

**VERANDA VERSION**

VERANDA
27'4 X 6'8

## LAKESIDE TERRACE

| | |
|---|---|
| LIVING | 2306 |
| GARAGE | 417 |
| LANAI | 230 |
| ENTRY | 43 |

**TOTAL AREA
2996 SQ FT**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# Affordable Package
## *Features and Specifications*

*Visit our Showroom for a wide variety of selections and customizing options to personalize your home!*

## FEES, SURVEYS & CODE REQUIREMENTS:
♦ All Permits (building & health) and Impact Fees under one acre
♦ Water/sewer connection fees or well to 70' with 3/4 HP pump and septic for a standard 1/4 acre lot
♦ Survey (for a standard 1/4 acre lot)
♦ Compliance with state and local building codes

## EXTERIOR:
♦ *Exterior Structure:*
  * 2500 PSI fibermesh reinforced Concrete & Steel reinforced Monolithic slab with vapor barrier
  * Termite treatment with renewable bond
  * CBS/Concrete Block Structure with double concrete bond beam reinforced with #5 Steel Rebar each course
  * Engineered truss roof system with 1/2"CDX plywood roof sheathing
  * 30 YR.. Architectural fungus-resistant asphalt Roof shingles
  * Aluminum vented soffits and Roof vents *
  * Aluminum Fascia
  * Stucco finish Walls, Entry & Lanai ceilings
  * Upgraded Paint
  * Aluminum gutter and down spouts - as required
  * Trussed over porch with concrete columns & beams
  * Concrete-fibermesh reinforced driveway, walks, pads (1,000 sf)
♦ *Windows & Exterior Doors:*
  * Single hung white aluminum frame Windows, Sliding glass Doors and Screens where applicable, per plan
  * Six panel Insulated Steel Front Entry Door with brass finish lever
  * Keyless Front Door/Deadbolt Entry System
  * Deadbolts on all Exterior Swing Doors
  * Hurricane Storm Panels
♦ *Landscaping:*
  * Bahia sod (for a standard 1/4 acre lot - 9000 sq.ft.)
  * $300 Landscape allowance

## ELECTRICAL, PLUMBING, INSULATION, & HVAC:
♦ *Electrical:*
  * $800 Lighting fixture allowance
  * 5 Ceiling fan outlets (single switched)
  * 2 TV and 2 Phone pre-wires
  * 200 Amp Electrical Service
  * Electric door chime and smoke detectors
  * GFI outlets in kitchen, baths, laundry, garage, 2 exterior
♦ *Plumbing:*
  * Seamless copper water lines
  * 2 Exterior hose faucets
  * 50 gallon energy efficient water heater *
♦ *Insulation:*
  * R-19 batts in vaulted ceilings *
  * R-5 Celotex 3/4" Foam Board walls *
♦ *HVAC:*
  * Return Air in all bedrooms & A/C vents in every room
  * High-efficiency 10-SEER/12-SEER Trane central air conditioning and heating system / per plan *

## INTERIOR:
♦ Architectural features such as plant shelves, arches, niches, columns, vaulted, tray or coffered ceilings, drop soffits with recessed lighting, per plan
♦ Wood Interior Stud Framing
♦ Choice of Travertine or Carrara Marble Window Sills
♦ Textured Ceilings and Walls
♦ Standard Trim package has 3 1/4" base
♦ Upgraded Paint, semi-gloss in wet areas of Kitchen & Bath
♦ Rocker Switches
♦ Ventilated Closet Shelving (single shelves in bedrooms)
♦ *Interior Doors:*
  * Six-panel Passage Doors with Lever Door Hardware
  * Raised-panel Bi-fold Closet Doors
♦ *Floor Covering:*
  * 18x18 Ceramic Tile floors installed on Diagonal in Kitchen, Nook, Laundry, and straight in Baths and Foyer
  * Upgraded stain resistant Berber or Plush carpet

## BATHS:
♦ Cabinets with raised panel Wood Doors
♦ Cultured Marble Vanity tops
♦ Full width Mirrors
♦ Porcelain/steel tub, Ceramic Tile to ceiling with Decos in hallbath, per plan
♦ Ceramic Tile shower to ceiling with Decos & Listello Border, per plan
♦ Shower enclosure (chrome frame)(std. height)-Master Bath, per plan
♦ Soaker tub in Master Bath, per plan
♦ Elongated toilets (bidets - per plan)
♦ Mirrored medicine cabinets, per plan
♦ Single lever chrome faucets *(mfg.lifetime warranty)*
♦ Choice of standard bath accessory sets

## KITCHEN:
♦ Cabinets with raised panel Wood Doors
♦ Upgraded Stainless Steel or Granite Composite Sink - 4 colors
♦ Single lever Cathedral Faucet & spray - 3 finishes *(mfg.l.t. warr.)*
♦ Laminate countertop/backsplash
♦ Garbage disposal and copper icemaker line
♦ *Upgraded Appliance Package:* - 3 colors
  * Smooth top self-clean Range
  * Over The Range Microwave
  * Dishwasher with deluxe sound insulation & hush motor
  * 26 cf s/s Frig with ice/water in door

## GARAGE:
♦ Attic access with pull-down stairs and light
♦ Steel overhead Garage Door
♦ Garage Door Opener Pre-Wire

## WARRANTIES:
♦ Builder's One Year Limited Warranty
♦ 10 Year Structural Warranty

## Luxury Package
### *Features and Specifications*

**Affordable Package + Upgraded Items Below = Luxury Package**

**EXTERIOR**
* 5/8"CDX plywood Roof Sheathing
* Solid Rough Sawn Spruce Fascia
* Screened Lanai
* Tiled Entry and concrete stain on Lanai floor
* Insulated glass Front Entry Door with brass finish handle
* $800 Landscape allowance including design service

**ELECTRICAL**
* $1200 Lighting Fixture allowance
* 3 TV and 3 Phone pre-wires

**INSULATION**
* R-30 Insulation in Ceilings
* R-10.0 In-wall injected Foam Insulation

**INTERIOR**
* Architectural features: crown molding, chair rail, per plan
* 5-1/4" Baseboards
* Dual level Ventilated Closet Shelving in bedrooms for added storage

**BATHS**
* Cultured Marble Vanity tops with a 1-1/2" Custom Edge
* Full width Mirrors with Beveled Strips
* Shower enclosure (above standard height & choice of frame) in Master Bath, per plan
* Choice of upgraded Bath Towel Bar accessory sets

**KITCHEN**
* Granite - Level I or Corian - Level II Countertop & Backsplash
* Elite Kingsize Capacity Washer & Dryer

**GARAGE**
* Stucco finish interior
* Automatic Garage door opener with two remotes

# **Approved Lenders**

Customers must deal with one of the Lenders listed below. These Lenders have many types of loans and very competitive rates.  We are confident they will effectively supply you with the loan you need. When you call one of these mortgage loan officers, tell them your building with Diamond Court Construction Co.  Unfortunately, we can not spend hours and hours filling out application packets to as many Lenders that are available in the area.

## Harbor Federal

| | | | |
|---|---|---|---|
| Gabriel Delgado | - | St. Lucie West | 772-344-2265 |
| | | | 772-370-3018 |

## Fidelity Federal

| | | | |
|---|---|---|---|
| John Farwell | - | Port St. Lucie | 772-871-5616 or |
| | | | 772-486-1689 |
| Wendy Lounds | - | Port St. Lucie | 772-785-8158 |
| | | | 772-812-0113 cell |

# **Approved Title Insurance Agency**

**First American Title**          201 SW Port St. Lucie Blvd.  772-878-8700
Debbie Duke         -         Port St. Lucie, FL          772-340-3362 fax

# **Builder's Risk Insurance Agency**

**Harbor Insurance Agency** (an affiliate of Harbor Federal Bank)
     772-335-3445  in Port St. Lucie     or     772-461-6070  in Ft. Pierce

Diamond Court Construction Co.

DCC/lenders/02-04-05



**DIAMOND COURT
HOMES, INC.**

## LUXURY PACKAGE
### *Price List*

| MODEL | | TYPE | LIVING SQ FT | TOTAL SQ FT | PRICE |
|---|---|---|---|---|---|
| **CORAL BAY** | *(ELEV. B · ADD $1,500)* | 3/2 | 1708 | 2389 | $ 165,900 |
| **CORAL BAY - 4 BEDROOM VERSION** | | 4/2 | 2001 | 2685 | $ 181,900 |
| **DRUID HILLS** -- IN FIVE VERSIONS: | | | | | |
| # 1 | STANDARD | 3/2 | 1915 | 2575 | $ 175,900 |
| # 2 | VERANDA ENTRY ON STD. VERSION | 3/2 | 1915 | 2631 | $ 180,900 |
| # 3 | STUDY | 3+/2 | 2113 | 2773 | $ 181,900 |
| # 4 | VERANDA ENTRY ON STUDY VERSION | 3+/2 | 2113 | 2857 | $ 187,900 |
| # 5 | 4 BEDROOM /3 BATH | 4/3 | 2167 | 2827 | $ 189,900 |
| **SEVILLE PLACE** | | 4/2 | 1956 | 2581 | $ 171,900 |
| **MONARCH MANOR** | | 3+/2 | 2133 | 2817 | $ 184,900 |
| **COAST POINTE** -- IN SIX VERSIONS: | | | | | |
| # 1 | STANDARD | 3/2.5 | 2166 | 2826 | $ 191,900 |
| # 2 | VERANDA ENTRY ON STD. VERSION | 3/2.5 | 2166 | 2874 | $ 194,400 |
| # 3 | STUDY | 3+/2.5 | 2345 | 3015 | $ 198,900 |
| # 4 | POWDER BATH ON STUDY VERSION | 3+/3 | 2345 | 3015 | $ 200,900 |
| # 5 | VERANDA ENTRY ON STUDY VERSION | 3+/2.5 | 2345 | 3100 | $ 203,500 |
| # 6 | 4 BEDROOM /3 ½ BATH | 4/3.5 | 2415 | 3067 | $ 203,900 |
| **LAKESIDE TERRACE** -- IN THREE VERSIONS: | | | | | |
| # 1 | STANDARD *(ELEV. B · ADD $2,500)* | 4-5/3 | 2306 | 2996 | $ 194,900 |
| # 2 | BILLIARD / GAME ROOM | 4-5/3 | 2421 | 3119 | $ 198,900 |
| # 3 | VERANDA ENTRY | 4-5/3 | 2306 | 3150 | $ 199,900 |

Price list reflects Port St. Lucie Prices.  North Martin County Add $10,000.  Remote locations of St. Lucie County Add $3,000.  Prices will be determined for all coastal, rural and otherwise remote locations on an individual basis.  Diamond Court Construction Company reserves the right to accept or deny any area for construction.  See specifications for included features.    The above is subject to errors, omissions, or change of price without notice.   Diamond Court Construction Co. CBC#049065   See Builder for prices on additional upgrades and selections. Effective 07/21/04

| **MODEL CENTER** (772) 871-7700 | **573 SW Nautical Ave., PSL, FL** Off Bayshore Blvd., North of Bayshore Elementary School | **CONSTRUCTION OFFICE** (772) 337-3070 |
|---|---|---|

# DIAMOND COURT HOMES INC.



**MONARCH MANOR**

| | |
|---|---|
| LIVING | 2133 |
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

**TOTAL AREA**
**2817 SQ FT**

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

# HARBOR FEDERAL SAVINGS BANK
## SCHEDULE "A"

BORROWER: **ANDREW WILLIAMS**  LOAN #: **5024374448**

The following is a breakdown of cost in order to arrive at the construction funds. For a breakdown of percentages for items completed, see back page.

### BUILDER LOAN

| | |
|---|---|
| Loan Amount | $_____ |
| Plus Appraisal Fee Credit | $_____ |
| Less Holdback (if applicable) | $_____ |
| Less Closing Cost | $_____ |
| Less Lot Purchase/Payoff | $_____ |
| Less Swimming Pool/Screen | $_____ |
| +/- Other | $_____ |
| +/- Other | $_____ |
| **Total Construction Funds** | $_____ |

### OWNER-BUILDER

| | |
|---|---|
| Cost to Build | $_____ |
| Less Swimming Pool/Screen | $_____ |
| Less Other | $_____ |
| **Total Cost to Build** | $_____ |
| First Draw Will Be Reduced By (Credit for Prepaids) | $_____ |

### CUSTOM CONSTRUCTION

| | |
|---|---|
| Construction Contract | $207,400.00 |
| Less Lot: Site Prep | $ 8,500.00 |
| Less Swimming Pool/Screen | $_____ |
| +/- Other:      Utilities | $ 4,600.00 |
| +/- Other: Upfront Deposit | $ 20,740.00 |
| **Total Construction Funds** | $173,560.00 |
| First Draw Will Be Reduced By (Total Deposits Given to Bldr) | $_____.00 |

### SWIMMING POOL – (3 inspections)

Contract/Allowance    $_____

50% when shell is in
30% when deck is poured
20% when pool is complete

### SCREENING – (1 inspection)

Contract/Allowance    $_____

100% paid upon completion

OTHER:_____

Total $_____

OTHER:_____

Total $_____

OTHER:_____

Total $_____

_____
Borrower

_____
Contractor

_____
Borrower

97800
06/17/05

# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index—Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

**July 06, 2005**                  **PORT ST LUCIE**                     **Florida**
[Date]                                [City]                                 [State]

**4531 SW DARWIN BLVD**
**PORT ST LUCIE, FL 34953**

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **262,200.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **HARBOR FEDERAL SAVINGS BANK**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.0000**%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **September 01, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 01, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 1300, FORT PIERCE, FL 34954**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **1,572.03**. This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE FIXED/ADJUSTABLE RATE NOTE—ONE-YEAR TREASURY INDEX—Single Family—**Fannie Mae Uniform Instrument**

Form 3522 1/01
GreatDocs™
To Order Call: 1-800-968-5775

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)   Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of     **August 2010**
, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B)   The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding     **Three and One Quarter**
percentage points (     **3.2500**%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than     **8.0000**% or less than     **4.0000**%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than     **11.0000**%.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already

collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)   Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.0000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Form 3522 1/01

GreatDocs™
To Order Call: 1-800-968-5775
**5024374448**

(A)   Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)   When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

Borrower has executed and acknowledges receipt of pages 1 through 5 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
**ANDREW WILLIAMS**                  -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                     -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                     -Borrower                                              -Borrower


*[Sign Original Only]*

**Form 3522 1/01**
GreatDocs™
To Order Call: 1-800-968-5775
**5024374448**

# TRUTH-IN-LENDING DISCLOSURE FOR REAL ESTATE MORTGAGE LOAN (VARIABLE RATE OPTION)

| NAME(S) / ADDRESS(ES) OF BORROWER(S) ("Borrower, you or your") | NAME / ADDRESS OF LENDER (CREDITOR) ("Lender, us or our") |
|---|---|
| ANDREW WILLIAMS<br>3841 NW 6TH CT<br>FORT LAUDERDALE, FL 33311 | HARBOR FEDERAL SAVINGS BANK<br>P.O. BOX 249<br>FORT PIERCE, FL 34954-0249 |

PROPERTY ADDRESS    4531 SW DARWIN BLVD, PORT ST LUCIE, FL 34953

| LOAN NUMBER | TRANSACTION DATE | | |
|---|---|---|---|
| 5024374448 | 07/06/2005 | ☐ Preliminary | ☒ Final |

Words, numbers or phrases preceded by a ☐ are applicable only if the ☐ is marked.

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| E    6.9150 % | $    364,195.87 E | $    262,200.00 | $    626,395.87 E |

| | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|
| | | Interest on the amount of credit outstanding during the construction period will be paid monthly, followed by | |
| YOUR<br><br>PAYMENT<br><br>SCHEDULE<br><br>WILL BE: | 48 | $1,716.24 | Monthly beginning 09/01/2006 |
| | 60 | $1,833.12 | Monthly beginning 09/01/2010 |
| | 251 | $1,688.91 | Monthly beginning 09/01/2015 |
| | 1 | $1,686.42 | Due on 08/01/2036 |

☒ This transaction is subject to a variable rate feature.  Variable rate disclosures have been provided at an earlier time.

**PAYABLE ON DEMAND:**   ☐ This obligation is payable on demand.          ☐ The disclosures are based on an assumed maturity of one year.

Filing / Recording Fee $ 1,577.60

You may obtain property insurance from anyone acceptable to the lender.

**SECURITY:**   You are giving a security interest in the real property and any of the following items which are checked:

☐ Goods being purchased.          ☐ Funds on deposit with the lender.

☐ Other (Specify)          ☐ Collateral securing other loans with us may also secure this loan.

**LATE CHARGE:**

If you are more than    **Fifteen**    days late in making any payment, in addition to your payment, you will pay a late charge of:

**5.0000** % of the payment in default.

**PREPAYMENT:**

If you pay off early, you    ☐ may    ☒ will not    have to pay a penalty.

☐ may    ☒ will not    be entitled to a refund of part of the finance charge.

**ASSUMPTION:**   If this loan is to purchase and is secured by your principal dwelling, and if checked here,   ☐ someone buying your
dwelling cannot assume the remainder of this purchase money mortgage loan on the original terms.
If this loan is to purchase and is secured by your principal dwelling, and if checked here,   ☒ someone buying your
dwelling may, subject to conditions, be allowed to assume the remainder of this purchase money mortgage loan.

| See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and Creditor's policy regarding assumption of the obligation. | "e" means<br>an estimate. |
|---|---|

☒ Please refer to the "Good Faith Estimate" for a breakdown of fees, charges and amount financed.          ☐ Please refer to the Itemization of Amount Financed Statement.

**SIGNATURES:**

By signing you acknowledge receipt of a completed copy of this disclosure.  You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures reflected on this form relate.

X _____          X _____
ANDREW WILLIAMS                     DATE                              DATE

X _____          X _____
                    DATE                              DATE

© GREATLAND 1995   ITEM 57628L0 (C1824L) (0001)          GREATLAND ■ To Order Call: 1-800-530-9393 ☐Fax 616-791-1131

PREPARED BY:

Name: **Neermala Mukhtar**

Address: **HARBOR FEDERAL SAVINGS BANK
P.O. BOX 249
FORT PIERCE, FL 34954-0249**

Return to:
**FIRST AMERICAN TITLE
201 SW PORT ST. LUCIE BLVD., SUITE 205
PORT ST. LUCIE, FL  34984**

———————————————————————— [Space Above This Line For Recording Data] ————————————————————————

5024374448

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **July 06, 2005**                               , together with all Riders to this document.

(B) **"Borrower"** is **ANDREW WILLIAMS, A SINGLE ADULT**

Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is **HARBOR FEDERAL SAVINGS BANK**
Lender is a **Savings Bank**                                                                    organized and existing under
the laws of **the United States of America**                                        . Lender's address is
**P.O. BOX 249, FORT PIERCE, FL  34954-0249**

. Lender is the mortgagee under this Security Instrument.
(D) **"Note"** means the promissory note signed by Borrower and dated **July 06, 2005**                     . The Note
states that Borrower owes Lender **Two Hundred Sixty Two Thousand Two Hundred and no/100**
                              Dollars (U.S. $ **262,200.00**           ) plus interest. Borrower has promised
to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 01, 2036**               .
(E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(F) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L1 (0011)                                            *(Page 1 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

**(H)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Escrow Items"** means those items that are described in Section 3.

**(L)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

**County**                                          of                    **ST LUCIE**                          :
[Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]

**LOT 11, BLOCK 2391 OF PORT ST. LUCIE SECTION THIRTY FOUR, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 15, PAGE(S) 9, 9A TO 9W OF THE PUBLIC RECORDS OF ST. LUCIE COUNTY, FLORIDA.**

which currently has the address of                    **4531 SW DARWIN  BLVD**
                                                                            [Street]

**PORT ST LUCIE**                    , Florida           **34953**                    ("Property Address"):
[City]                                                                    [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

FLORIDA—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L2 (0011)                    *(Page 2 of 11 pages)*

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for

FLORIDA—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L3 (0011)

*(Page 3 of 11 pages)*

**Form 3010 1/01**

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 516-791-1131

Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may

require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may

**FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

**Form 3010 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

ITEM 1615L5 (0011)

*(Page 5 of 11 pages)*

disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L6 (0011)

*(Page 6 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b)  **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1616L7 (0011)

*(Page 7 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18.  Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L9 (0011)

*(Page 9 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L10 (0011)

(Page 10 of 11 pages)

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower
**ANDREW WILLIAMS**
**3841 NW 6TH CT**
**FORT LAUDERDALE, FL 33311**

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

Signed, sealed and delivered in the presence of:

_____          _____

State of Florida
County of St Lacie

The foregoing instrument was acknowledged before me this 6th day of July 2005 by

Andrew Williams

who is personally known to me or who has produced driv lic

as identification.

_____
                              Notary Public

FLORIDA—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3010 1/01
                                                                                    GREATLAND ■
ITEM 1615L11 (0011)                            *(Page 11 of 11 pages)*    To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index—Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **6th** day of **July 2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **HARBOR FEDERAL SAVINGS BANK**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**4531 SW DARWIN BLVD
PORT ST LUCIE, FL 34953**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of **6.0000** %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **August 2010**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Three and One Quarter** percentage points ( **3.2500** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER—ONE-YEAR TREASURY INDEX—Single Family—
Fannie Mae Uniform Instrument

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

ITEM 5745L1 (0011)

*(Page 1 of 3 pages)*

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

    **(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.0000** % or less than **4.0000** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest will never be greater than **11.0000** %.

    **(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

    **(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

    1.   Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    2.   When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment

sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Fixed/Adjustable Rate Rider.

_____ (Seal)      _____ (Seal)
ANDREW WILLIAMS   -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                  -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                  -Borrower                                      -Borrower

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

ITEM 5745L3 (0011)          *(Page 3 of 3 pages)*

## INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENT     Date: **July 06, 2005**

| BORROWER(S) NAME AND ADDRESS | LENDER / SERVICER NAME AND ADDRESS |
|---|---|
| **ANDREW WILLIAMS**<br>**3841 NW 6TH CT**<br>**FORT LAUDERDALE, FL 33311** | **HARBOR FEDERAL SAVINGS BANK**<br>**P.O. BOX 249**<br>**FORT PIERCE, FL 34954**<br><br>TOLL FREE NO. **(800) 226-4375** |
| LOAN NO.<br>**5024374448** | MORTGAGE INSURANCE / CASE NUMBER |

[ ] Your  [ ] monthly  [ ] biweekly   mortgage payment for the coming year will be $         of which
$         will be for $         will go into your escrow account, and $
will be for discretionary items (such as life insurance, disability insurance) that you chose to be included with your monthly payment.

[X] Your first  [X] monthly  [ ] biweekly   mortgage payment for the coming year will be **$1,962.82**   of which
**$1,572.03**   will be for **principal and interest  $390.79**   will go into your escrow account, and $
will be for discretionary items (such as life insurance, disability insurance) that you chose to be included with your monthly payment.
The terms of your loan may result in changes to the principal and interest payments during the year.

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made from your account.

| MONTH/<br>PAYMENT NO. | PAYMENTS TO<br>ESCROW ACCT. | PAYMENTS FROM<br>ESCROW ACCT. | DESCRIPTION | ESCROW ACCT.<br>BALANCE |
|---|---|---|---|---|
| Starting balance: | | | | $      1,611.82 |
| 11/01/2005 | | 872.02 | County Taxes | 739.80 |
| 09/01/2006 | 390.79 | 144.21 | PMI | 986.38 |
| 10/01/2006 | 390.79 | 144.21 | PMI | 1,232.96 |
| 11/01/2006 | 390.79 | 144.21 | PMI | 1,479.54 |
| 11/01/2006 | | 872.02 | County Taxes | 607.52 |
| 12/01/2006 | 390.79 | 144.21 | PMI | 854.10 |
| 01/01/2007 | 390.79 | 144.21 | PMI | 1,100.68 |
| 02/01/2007 | 390.79 | 144.21 | PMI | 1,347.26 |
| 03/01/2007 | 390.79 | 144.21 | PMI | 1,593.84 |
| 04/01/2007 | 390.79 | 144.21 | PMI | 1,840.42 |
| 05/01/2007 | 390.79 | 144.21 | PMI | 2,087.00 |
| 06/01/2007 | 390.79 | 144.21 | PMI | 2,333.58 |
| 07/01/2007 | 390.79 | 144.21 | PMI | 2,580.16 |
| 07/01/2007 | | 2,087.00 | Hazard INSURANCE | 493.16 |
| 08/01/2007 | 390.79 | 144.21 | PMI | 739.74 |

*(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year.)*

Cushion selected by servicer: $ **493.16**

**(Signatures are optional.)** By signing below, borrower acknowledges receipt of this Initial Escrow Account Disclosure Statement.

Borrower **ANDREW WILLIAMS**     Date         Borrower         Date

Borrower         Date         Borrower         Date

© 2000 Harland Financial Solutions, Inc.<br>ITEM 9551L0 (0405)

GreatDocs™
To Order Call: 1-800-968-5775
**5024374448**

# HARBOR FEDERAL SAVINGS BANK

## Construction Loan Agreement

BORROWER:   **ANDREW WILLIAMS**
LOAN NO.:   **5024374448**
LOAN AMOUNT: $ **$262,200.00**
DATE OF NOTE AND MORTGAGE: **July 06, 2005**

**IT IS AGREED** by Borrower and Lender, as follows:

1.   **Borrower's Request for Loan.**   Borrower has applied for a Loan for purpose of constructing certain Improvements to the Land and Lender has agreed to make the Loan pursuant to a mortgage loan commitment to Borrower and pursuant to the terms, conditions, and limitations herein set forth and as set forth in the Note, Mortgage, and other Loan documents.

2.   **Borrower's Selection of Contractor.**   Borrower has selected the Contractor to perform the construction upon the Land and Lender is and shall be in no way liable or responsible for any acts or omissions of the Contractor selected by Borrower nor for the quality of construction, labor performed, or materials furnished or used in the construction of the Improvements upon the Land, nor for construction supervision nor for any nonfeasance nor malfeasance by the Contractor or anyone working under or through the Contractor. It is the responsibility of the Borrower to satisfy himself or herself as to the qualifications of the Contractor and the subcontractors to be selected by Contractor and no oral representations nor prior business dealings between Contractor and Lender or any of Lender's other customers nor any presence by any of Lender's representatives at any model homes or open houses of Contractor shall be deemed to be a representation or endorsement by Lender of any particular skill, quality or reputation of Contractor. Likewise, Lender shall have no liability for determining the sufficiency of the construction budget for the completion of construction in accordance with the plans and specifications for the contract price agreed upon between Borrower and Contractor. Any appraisal, study, analysis or other investigation by Lender as to the sufficiency of the construction budget is for the benefit and protection of Lender exclusively and not the Borrower.

3.   **Loan-in-Process Account.**   The face amount of the Note less Loan costs and costs required to render Lender's mortgage a paramount lien on a merchantable fee simple title, will be credited as a deposit with Lender in Borrower's LP Account. Such deposit of Net LP Account Funds conclusively shall be deemed a full and complete consideration for the Note and Mortgage given Lender. Borrower approves the credit of the construction funds to Borrower's LP Account and releases the Lender from any loss resulting from the handling of such funds in the ordinary course of business and such funds need not be physically separated by Lender but may be commingled with other monies held by Lender pending their actual disbursement. Such funds shall be held for the benefit of Borrower but no interest shall be payable to Borrower on account of such funds. Correspondingly, no interest shall be charged by Lender or be payable by Borrower on account of such funds until they are disbursed.

4.   **Front-End Deposit.**   In order to assure the availability of all funds necessary to complete the contemplated construction, Borrower shall deposit to the LP Account the Front-End Deposit. All LP Account funds shall be paid out and used for the purposes set forth herein, and following final inspection and approval of construction by Lender, any positive LP Account balance remaining shall be paid over to Borrower or, at Lender's option, be disbursed by Lender to pay outstanding interest, late charges and advances or to reduce the principal amount of the Loan.

5.   **Assignment of LP Account.**   Subject to the provisions of this Agreement, Borrower irrevocably assigns to Lender, as security for the obligations secured by the Mortgage and the performance of this Agreement by Borrower, and for any other obligations of Borrower to Lender, all right, title and interest of Borrower in and to the LP Account and the monies placed, or to be placed, therein, specifically including future amounts that may be deposited to the LP Account from time to time by Borrower or Lender.

6.   **Death of Any Borrower.**   In the event of any Borrower's death, Lender may, at its option, continue to make advances under this Agreement to or for the benefit of any surviving Borrower (in the case of joint Borrowers or Tenants by the Entireties) or to or for the benefit of Borrower's Personal Representative. Any surviving Borrower or Personal Representative of any deceased Borrower shall timely supply evidence of the authority of such person to act on behalf of any deceased Borrower and in no event shall any of the obligations of any Borrower be waived or terminated as a consequence of death, including the obligation to timely perform all of Borrower's obligations hereunder and under the Note, Mortgage and other Loan documents. All sums so advanced by Lender shall be deemed advances under this Agreement, as if the same had been made to Borrower during the lifetime of Borrower. All such advances shall be deemed evidenced by the Note and secured by the Mortgage.

7.   **Evidence of Title.**   Borrower authorizes Lender to first disburse from the funds on deposit in the LP Account those Loan costs disclosed to Borrower by Lender, together with such additional costs as may be required to render the Mortgage a paramount lien upon the Land. Borrower shall furnish evidence of title showing the Mortgage to be a valid first lien upon a merchantable fee simple title to the Land owned by Borrower to the full and complete satisfaction of the attorneys or title insurer serving Lender.

8.   **Commencement of Construction.**   Borrower represents and warrants to Lender that there has been no commencement of construction on the Land other than site preparation which could result in any Construction Lien being filed against the Land and that no Notice of Commencement has been filed or recorded against the Land. Borrower is aware

of no action, suit or proceeding pending or threatened against the Land or against the Borrower which might become a lien upon the Land. When advised by its attorneys or title insurer, Lender will in turn notify Borrower that the Mortgage has been approved as a paramount lien upon the merchantable title to the Land owned by Borrower. Notification to Borrower shall consist of Lender's delivery or delivery by a designee of Lender, by mail or hand, to Borrower or his authorized agent, of a duly certified copy of the recorded Notice of Commencement required to be posted by Borrower or his authorized agent at the construction site upon the Land pursuant to Chapter 713, Florida Statutes. Such notification to Borrower or his authorized agent, by mail or hand delivery of the Notice of Commencement, and only such delivery, shall constitute final Loan approval and Lender's authority extended to Borrower to commence construction. Borrower's failure to receive notification by mail delivery within fifteen (15) days from the date of the Mortgage shall be reported to Lender. Non-receipt of a properly addressed notice deposited in the United States mail shall not relieve Borrower from the time limitation for commencement of construction imposed by Item 9 (c), infra.

9.  **Conduct of Construction.**

(a)  Upon receipt from Lender of the duly certified copy of the recorded Notice of Commencement, Borrower immediately upon posting such certified copy shall commence, and thereafter uninterruptedly continue, the construction of Improvements on the Land, in accordance with the plans and specifications approved by Lender. Any modifications of such plans and specifications or amendments thereto for "extras" shall first be submitted to Lender for its approval in writing. Lender approval of any "extras" may be conditioned upon an immediate further deposit to the LP Account by Borrower equal to the estimated additional cost of such "extras". The Improvements shall be completed by Borrower within the Construction Time Period, provided, however, that Lender may grant reasonable extensions for completion in the event of delay caused by fire, strike, or other casualty or causes not within the control of Borrower, or in the event of modifications or amendments to the plans and specifications approved by Lender requiring an increase of the Construction Time Period.

(b)  Any unexcused cessation of work for more than thirty (30) days will constitute a breach of this Agreement. In that event, Lender, notwithstanding any other remedies that might be available to it under the Note, the Mortgage or this Agreement, shall have full power and authority to take charge of and complete the construction and to make disbursements therefor from the LP Account; or Lender may give Borrower ten (10) days written notice to correct the breach, whether caused by Borrower or by the Contractor or by any agent of the Borrower or Contractor, and upon failure of Borrower to correct, or cause to be corrected, the breach specified in the notice within the ten (10) day period, Lender may credit all funds in Borrower's LP Account upon the debt and declare the remainder of such debt to be forthwith due and payable and proceed to foreclose the Mortgage for the balance due.

(c)  In the event it is determined that Lender's Mortgage does not constitute a paramount lien upon a merchantable fee simple title, and cannot be so made or constituted within a reasonable period not to exceed thirty (30) days after written notice to Borrower of title deficiency, or in the event a matter affecting title to the Land other than the Permitted Exceptions becomes of record and is objectionable to Lender, in its reasonable discretion, or in the further event construction does not substantially commence within thirty (30) days of Borrower's receipt of the duly certified copy of the recorded Notice of Commencement, or if the first disbursement of construction funds has not been made within sixty (60) days after Borrower's receipt of the duly certified copy of the Notice of Commencement, Lender may apply the balance of the LP Account, or so much thereof as may be necessary, to repayment of the Note. Any balance thereafter remaining due upon the Note shall be due and payable forthwith by Borrower and its payment secured by the Mortgage. Any balance remaining in the LP Account after full discharge of the Note shall be paid to Borrower and this Agreement shall be deemed to be fully performed by Lender.

(d)  In the event environmental hazards or conditions arise or are discovered during the course of construction, Lender shall be authorized by Borrower to discontinue disbursements of Gross LP Account Funds until such condition or conditions are remedied through testing or cure of condition. Borrower grants to Lender at all times during construction, a right of entry at reasonable times for purposes of conducting environmental testing at Borrower's expense. If it is determined an environmental hazard or condition exists which cannot be remedied or cured within a reasonable time, Lender shall have the remedies available as set forth in this Item 9, Subpart (c).

10.  **Advertising Signs.** If requested by Lender, Borrower shall place an advertising sign upon the Land, advertising that financing of construction has been provided by Lender. Lender shall approve all other advertising signs to be displayed upon the Land during the Construction Time Period.

11.  **Borrower's Disbursement Instructions.** Borrower hereby instructs Lender to disburse the gross LP Account funds to the Contractor in accordance with the Construction Draw Schedule upon the completion of the stages of construction described therein. No requisition from Borrower shall be necessary. Borrower reserves the right to notify Lender in writing to disburse other than to the Contractor and upon receipt of such Borrower's Disbursement Instructions, Lender shall disburse only pursuant to requisitions from Borrower. The Lender reserves the right to impose additional reasonable charges in connection with Borrower's Disbursement Instructions as may be contrary to the Disbursement Instructions herein made. If it should appear to Lender at any time that construction costs, including any additions thereto because of approved modifications or amendments to plans and specifications, will exceed the amount on deposit in the LP Account, Borrower shall, upon written demand of Lender, immediately deposit to the LP Account the sum calculated to cure the deficiencies in available construction funds. Borrower acknowledges that Lender shall rely on the Disbursement Instructions throughout the construction process, unless these instructions are otherwise modified in writing, and Borrower hereby waives any action

against Lender for payment of Construction Costs on work that Borrower may later consider to be substandard or unsatisfactory.

12.     **Statutory Improper Payments by Borrower.**  At all times during the construction of the Improvements, the total amount of the Loan proceeds disbursed pursuant to this Agreement shall be deemed secured by the lien of Lender's Mortgage, notwithstanding the fact that Borrower or any agent(s) of Borrower may have made improper payments as defined by the Florida Construction Lien Law.  Under no circumstances shall Lender be liable for any improper payments which may have been made by Borrower or Borrower's agent(s).

13.     **Interest Charges.**  Anything contained in this Agreement, and in the Note and Mortgage securing same given by Borrower to Lender to the contrary notwithstanding, interest shall be paid by Borrower to Lender only on Net LP Account Funds or portions thereof, disbursed as herein provided and only from the date of disbursements made as of the Closing and during the Interest Only Time Period.  Interest payments during the Interest Only Time Period shall be made monthly by Borrower upon receipt from lender of Interest Billing Notices.  The failure of Borrower to pay interest within twenty (20) days of the due date shall entitle Lender to deduct the same from the LP Account.

14.     **First Payment Due Date.**  Upon expiration of the Construction Time Period, and regardless of whether all LP Account Funds have been disbursed, the Borrower shall be required to begin payment of the regularly scheduled monthly payments provided for in the Note.  The first installment due date shall be the first payment due date contained in the Note from Borrower to Lender.

15.     **Progress Inspection.**  Lender shall have the right (but not the obligation) to disapprove defective work and materials and may withhold disbursements of LP Account Funds until such defects are cured.  Lender shall have the right of entry upon the Land for inspections at all times, which inspections are for the sole protection of the Lender and may not be relied upon by Borrower.  **THESE RIGHTS ARE SOLELY FOR THE PROTECTION AND BENEFIT OF LENDER AND, IN THE EXERCISE THEREOF, NO RESPONSIBILITY TO BORROWER OR OTHERS FOR ARCHITECTURAL OR CONSTRUCTION SUPERVISION IS ASSUMED BY LENDER.**  Regardless of whether any inspection reports are paid for by Borrower, Borrower will not look to Lender for the acts or omissions of Lender or its agents in performing inspections, as such inspections are solely for the benefit of Lender and to facilitate Lender's internal construction requirements, any of which may be waived by Lender at any time without notice to Borrower.  Without limiting the foregoing, Borrower understands and acknowledges that it should perform its own inspections of the Improvements to determine the sufficiency and progress of Contractor's work, or should retain others to do so on Borrower's behalf and Borrower covenants and agrees to indemnify the Lender and hold it harmless from any claim or contention that the Lender's inspections failed to reveal any construction defect, deficiency, or the failure of Contractor to have achieved the level of completion as set forth in the Construction Draw Schedule.  In no way shall this Agreement be construed to make Lender liable to Owner, Contractor, nor to any Lienor nor to others for goods or services delivered or rendered in or upon the Land, or for debts accruing to any other parties owed by Borrower or Contractor or their agents or assigns.

16.     **Construction Lien Law Compliance.**  This Agreement is subject to Chapter 713, Florida Statutes (the "Construction Lien Law"), and Borrower agrees that Lender shall not be required to make any disbursements (other than Loan costs) from the LP Account prior to obtaining satisfactory evidence that the Mortgage constitutes a paramount lien upon a merchantable fee simple title, specifically taking priority to any Notice of Commencement or Claim of Lien filed as to the Land.

    (a)     **Notice of Commencement.**  The Notice of Commencement to be recorded by Lender on behalf of Borrower shall comply with the provisions of Section 713.13(1)(d), Florida Statutes and shall identify the Borrower as owner, Contractor, and Lender in addition to all other matters required by law.  Borrower shall be responsible for accurately providing to Lender and/or the Settlement Agent preparing the Notice of Commencement, correct information to be included in the Notice of Commencement and shall indemnify Lender from liability in the event any such information shall be incorrect.  Fax numbers shall not be included in the Notice of Commencement and notice by facsimile pursuant to Section 713.18(3), Florida Statutes shall be prohibited, except that Lender may, in its sole discretion, elect to honor such notice.  In addition, the Notice of Commencement shall specify Lender to receive Notices to Owner pursuant to Section 713.13(1)(b), Florida Statutes.

    (b)     **Notice to Owner.**  Borrower shall examine each Notice to Owner received by Owner and if any Notice to Owner does not reflect that a copy has been served upon the Lender, Borrower shall deliver to Lender any such Notice to Owner within 24 hours of Borrower's receipt of same.  Notwithstanding the provisions of Florida Statute Section 713.18(1)(b), which provides that Notices to Owner are effective as of the date of mailing if mailed by certified mail under the conditions set forth in the statute, no claim shall be made against Lender for any Progress Payments made by Lender with respect to any Notice to Owner that has not been received by Lender at least two (2) business days preceding any construction disbursement.

    (c)     **Progress Payment Advances - Procedure.**  Lender shall make Advances on the Loan to the Contractor without requisition or other authorization by Borrower, provided, however, no more than the total certified Construction Costs approved by Lender shall be disbursed at any time under the Loan and provided further that the Lender retains the right to reallocate designated construction loan proceeds in Lender's sole reasonable judgment and to make disbursements from the loan contrary to the original loan budget. Borrower agrees that all Advances will be made by such means as Lender may from time to time designate; however, Lender shall not be required to see to the proper application of any such Advance and shall not incur any liability for any failure of such proper application. Furthermore, following an Event of Default and for as long as such Event of Default remains uncured (if cure thereof is accepted by Lender), Lender reserves the right to continue to disburse Advances directly to the Contractor and also to any sub-

contractors, laborers or material suppliers and no further direction or authorization from Borrower or Contractor shall be necessary following an Event of Default to permit disbursement directly to the subcontractors, laborers or material suppliers, and all disbursements so made shall satisfy pro tanto the obligations of Lender under this Agreement. Notwithstanding the foregoing, the Lender reserves the right to cease further Advances under the Loan, in which case Lender shall give notice to the Contractor and the Borrower of its decision within five (5) business days after making such final determination.

Unless otherwise specified in this Agreement, as a condition to Lender's obligation to make any Advance, Lender shall have received all of the following:

(i)     A Contractor's Progress Payment Affidavit from the Contractor stating whether all persons, firms, and corporations who have supplied labor and materials with respect to the Land or Improvements have been paid through a date not more than twenty (20) days prior to the date of disbursement, which Contractor's Progress Payment Affidavit shall have attached to it, recordable Waivers and Releases of Lien Upon Progress Payment in the form as prescribed by Section 713.20(4), <u>Florida Statutes</u>, from all such persons, firms, and corporations except as to those Lienors identified in the Contractor's Progress Payment Affidavit. If any unpaid Lienors are identified in the Contractor's Progress Payment Affidavit, Lender (a) shall have the right to withhold disbursement of all or a portion of the draw in an amount sufficient to pay the claims of the unpaid Lienors; or (b) upon compliance with the provisions of Section 713.06(3), <u>Florida Statutes</u>, the right to pay or cause to be paid the Lienors so identified; or (c) the right to require the transfer of any lien to security pursuant to Section 713.24, <u>Florida Statutes</u>; or (d) the right of interpleader pursuant to Section 713.27 , <u>Florida Statutes</u>; or (e) the right to cease further advances under the loan; or (f) the right to disburse to the Contractor or Borrower without regard to such Lienor so identified, or any of the foregoing or any combination of the foregoing in Lender's sole discretion. Inclusion by the Contractor on the Contractor's Progress Payment Affidavit of any Lienor who has not given Notice to Owner as required by Section 713.06, <u>Florida Statutes</u>, shall not entitle such Lienor to payment unless otherwise provided by law.

(ii)    Waivers, releases, or satisfactions of liens in form and substance reasonably satisfactory to Lender, and such other evidence as Lender may reasonably request showing that all outstanding claims for construction costs, including claims of the Contractor, subcontractors, laborers, and material suppliers, have been paid through a date which is not more than twenty (20) days preceding the Requested Advance, and that there are no liens outstanding. As a condition precedent to any Progress Payment, all Lienors shall be required to execute a Waiver and Release of Lien Upon Progress Payment as prescribed by Section 713.20(4), <u>Florida Statutes</u>, reciting a waiver of its right to claim a lien for labor, services or materials through a date which is not more than twenty (20) days preceding the date of the disbursement and the Borrower hereby irrevocably authorizes the Bank to rely on such a Waiver and Release of Lien Upon Progress Payment. In the event of a Claim of Lien arising hereunder by any Lienor who may assert a right to file a Claim of Lien for work provided during the period of time between the effective date of a Waiver and Release of Lien Upon Progress Payment and the date of disbursement of the Requested Advance, the Borrower agrees to hold the Lender harmless therefrom, the Borrower agreeing that a Waiver and Release of Lien Upon Progress Payment reciting a waiver of lien rights for labor, services or materials furnished not more than twenty (20) days preceding the date of disbursement shall be deemed to be substantially contemporaneous with the date of disbursement. Notwithstanding the foregoing, the Lender reserves the absolute right and discretion to waive any of the foregoing requirements and to disburse construction funds at any time; provided however, that Lender shall not disburse construction funds at any time that Borrower has given written notice to Lender to cease construction disbursements.

(iii)   Such other instruments, documents, and certificates as Lender may reasonably request.

(d)     **Final Advance - Procedure.**  Before the date of the Final Advance with respect to the Improvements described in the Construction Contract, and following the substantial completion of the Improvements, unless otherwise specified in this Agreement, Lender shall receive all of the following:

(i)     A Final Affidavit from the Contractor as prescribed by Section 713.06(3)(d)(1), <u>Florida Statutes</u>, stating whether all persons, firms, and corporations who have supplied labor and materials with respect to the Land or Improvements have been paid in full, which Contractor's Final Affidavit shall have attached to it, recordable Waivers and Releases of Lien Upon Final Payment in the form as prescribed by   Section 713.20(5), <u>Florida Statutes</u>, from all such persons, firms, and corporations except as to those Lienors identified in the Contractor's Final Affidavit. If any unpaid Lienors are identified in the Contractor's Final Affidavit, Lender (a) shall have the right to withhold disbursement of all or a portion of the final draw in an amount sufficient to pay the claims of the unpaid Lienors; or (b) upon compliance with the provisions of Section 713.06(3), <u>Florida Statutes</u>, the right to pay or cause to be paid the Lienors so identified; or (c) the right to require the transfer of any lien to security pursuant to Section 713.24, <u>Florida Statutes</u>; or (d) the right of interpleader pursuant to Section 713.27, <u>Florida Statutes</u>; or (e) the right to disburse to the Contractor or Borrower without regard to such Lienor so identified, or any of the foregoing or any combination of the foregoing in Lender's sole discretion. Inclusion by the Contractor on the Contractor's Final Affidavit of any Lienor who has not given Notice to

Owner as required by Section 713.06, Florida Statutes, shall not entitle such Lienor to payment unless otherwise provided by law.

(ii)   Waivers, releases, or satisfactions of liens in form and substance reasonably satisfactory to Lender, and such other evidence as Lender may reasonably request showing that all outstanding claims for construction costs, including claims of the Contractor, subcontractors, laborers, and material suppliers, have been paid in full.  As a condition precedent to the Final Payment, all Lienors shall be required to execute a Waiver and Release of Lien Upon Final Payment as prescribed by Section 713.20(5), Florida Statutes, reciting a final waiver of its right to claim a lien for labor, services or materials and the Borrower hereby irrevocably authorizes the Bank to rely on such a Waiver and Release of Lien Upon Final Payment.

(iii)   Two (2) final currently dated copies of the Survey, showing the location of all the Improvements evidencing that the same are in compliance with any restrictions of record or ordinances relating to the locations thereof; and final "as-built" Plans of the Improvements.

(iv)   The final and unconditional acceptances of the Improvements, or appropriate portions thereof, by the appropriate Governmental Authority to the extent that any such approval is a condition to the lawful use of the Improvements or a letter from the appropriate Governmental Authority to the effect that no such certificate or other approval is issued by it, accompanied by Borrower's certificate that no notices of any claimed violations of ordinances have been served on Borrower.

(v)   A current endorsement to the Title Insurance Policy (a) increasing the aggregate amount of the policy by an amount equal to the Advance then being requested; (b) confirming that the lien of the Mortgage remains a valid first lien on the Premises; and (c) reflecting that no matters adversely affecting title to the Land have been filed of record.

(vi)   Such other instruments, documents, and certificates as Lender may reasonably request.

(e)   **Conditions of Advances.**  Anything contained herein or in any other agreement between Borrower and Lender to the contrary notwithstanding, Lender shall not be obligated to make an Advance under this Agreement if, on the date such Advance is to be made, any of the following conditions exist:

(i)   Borrower shall be unwilling or unable to pay for that portion of Construction Costs then due and payable that will not be covered by the Advance.

(ii)   There is of record any mortgage, lien, charge, or other encumbrance on the Land other than the lien of the Mortgage and the Permitted Exceptions, or there is any mortgage, lien, charge, or other encumbrance not of record that, in the reasonable opinion of Lender, may constitute a cloud on the title to the Premises, render such title unmarketable, or otherwise invalidate or adversely affect the lien of the Mortgage.

(iii)   There is any litigation or proceedings pending or threatened that may affect the validity or priority of the lien of the Mortgage or that may materially affect Borrower's ability to perform its obligations under this Agreement or any other agreement relating to the Premises.

(iv)   The portion of the Improvements theretofore constructed shall have been destroyed or materially damaged by fire or other casualty and either (a) Lender shall not have received insurance proceeds sufficient in the judgment of Lender to effect the satisfactory restoration of the Improvements and to permit the completion thereof before the Completion Date; or (b) Borrower shall not have agreed to fund any deficit as estimated by Lender and in a manner satisfactory to Lender to effect the satisfactory restoration to the Improvements and to permit the completion thereof before the Completion Date.

(v)   Lender shall determine that there will not be available by the Completion Date (a) adequate road access to the Improvements; (b) adequate potable water supply meeting all governmental and fire underwriter requirements; (c) adequate sanitary sewer collection and disposal services meeting all governmental requirements; and (d) all other public utility services contemplated to be necessary or desirable for the Improvements.

(f)   **Payment and Performance Bond.**   Should Lender or Borrower require a Payment and Performance Bond from the Contractor pursuant to Section 713.23, Florida Statutes, a fully executed copy thereof shall be furnished to Lender and Lender shall be named a co-obligee thereon.

(g)   **Copies of Contracts Required.**  At the request of Lender, Borrower shall furnish Lender, at Borrower's expense, copies of any and all contracts and statements of account of any and all contractors, subcontractors, materialmen or laborers, and when directed by Lender, Borrower shall require the same from all contractors, subcontractors, materialmen and laborers and immediately supply them to Lender.

(h)   **Status Affidavits Required.**  When requested by lender, Borrower shall demand in writing of any Lienor a written statement under oath of such Lienor's account showing the nature of the labor or services performed or to be performed, the materials furnished or to be furnished, the amount paid on account to date, and the amount due or to become due thereon.

(i)     **Contractor Default.** If the Contractor defaults or construction is abandoned for any reason, Lender shall have all of the rights set forth in Paragraph 18 hereof and in addition, Lender may disburse Advances directly to sub-contractors, laborers, and material suppliers.   Before recommencing construction, Borrower shall promptly record of public records the documents prescribed by Section 713.07(4), Florida Statutes, and comply with the provisions thereof and take all other steps required by law to eliminate construction liens, or the threat thereof, upon the Land.  If the Contractor's default includes a failure to provide a Contractor's Progress Payment Affidavit or a Contractor's Final Affidavit, Lender may make disbursements directly to Borrower or, if so instructed by Borrower, Lender shall make disbursements pursuant to Borrower's Disbursement Instructions.  In no event shall Lender be liable for improper payments as a consequence of disbursing construction funds to Borrower or pursuant to Borrower's Disbursement Instructions upon or after the default of the Contractor.

(j)     **Bonding of Liens.** Lender is authorized to deposit funds with the appropriate Clerk of the Circuit Court under Section 713.24(1), Florida Statutes, for the purpose of transferring liens to security in the event Borrower fails to do so within ten (10) days of written demand therefore by Lender. Any such deposit made by Lender shall be charged to the LP Account of Borrower.

(k)     **Notice of Contest of Lien.**  Should claims of lien be filed against the Land, Lender is irrevocably constituted Borrower's attorney-in-fact for the sole purpose of recording a Notice of Contest of Lien under Section 713.22(2), Florida Statutes, provided Lender shall first have given Borrower ten (10) days written notice of its intention to do so.

(l)     **Lender Review of Compliance.**   Lender shall not be required to make any Progress Payment Advances nor Final Advances for at least two (2) business days after Borrower's and/or Contractor's compliance with the procedures set forth herein in order for Lender to compile, review and determine, in Lender's sole judgment, the sufficiency of such compliance.

(m)     **Statutory Disclosure.**     Lender hereby makes the following disclosure mandated by Florida Statute Section 713.3471:

## WARNING!

## YOUR LENDER IS MAKING A LOAN DISBURSEMENT DIRECTLY TO YOU AS THE BORROWER, OR JOINTLY TO YOU AND ANOTHER PARTY.  TO PROTECT YOURSELF FROM HAVING TO PAY TWICE FOR THE SAME LABOR, SERVICES, OR MATERIALS USED IN MAKING THE IMPROVEMENTS TO YOUR PROPERTY, BE SURE THAT YOU REQUIRE YOUR CONTRACTOR TO GIVE YOU LIEN RELEASES FROM EACH LIENOR WHO HAS SENT YOU A NOTICE TO OWNER EACH TIME YOU MAKE A PAYMENT TO YOUR CONTRACTOR.

17.     **Rights in Litigation.** Lender shall have the right to commence, appear in, or defend, any action or proceeding affecting, or purporting to affect, the rights, duties or liabilities of the parties hereunder, or the payment of any funds in the LP Account, and in connection therewith, to incur and/or pay all costs and expenses, including reasonable attorney's fees, all of which the Borrower, jointly and severally, agrees to pay to Lender on demand, and to the extent the LP Account Funds are sufficient, Lender may pay, but shall not be obligated to pay, the costs, expenses or attorney's fees out of the LP Account Funds. In all events, payment of such costs, expenses or attorney's fees shall be secured by the lien of Borrower's Mortgage.

18.     **Interpleader.** Should a dispute arise between Lender, Borrower, Contractor, any subcontractor, material suppliers, laborers or any other Lienor, or any of them, Lender reserves the right to interplead such parties pursuant to the provisions of Section 713.27, Florida Statutes.

19.     **Failure to Perform.**  Upon the failure of Borrower, Contractor or their agents, to diligently prosecute the construction of Improvements contemplated hereto, or to perform or comply with any of the provisions of this Agreement, or in the event they should prevent Lender from so performing, or if they should cause or permit conditions to arise so that performance would be rendered unduly difficult or hazardous for Lender, or in the event of the breach of any condition thereof or of the Note or Mortgage, Lender is authorized to withhold further disbursement of Gross LP Account Funds until all objections are removed. In the event of any breach for default as aforesaid, Lender may give Borrower ten (10) days written notice to correct such breach or default, whether same be by Borrower or by Contractor or their agents, and upon the failure of Borrower to correct, or cause to be corrected, the breach or default specified in such notice within such period, or within any other required period, Lender may either credit all funds in Borrower's LP Account upon the Mortgage debt and declare said Mortgage debt to be forthwith due and payable and proceed to foreclose the Mortgage for the then remaining balance due, or Lender may assume full charge of the construction of the Improvements as agent for Borrower and proceed to enter into contracts reasonably required by the completion of the contemplated Improvements; or Lender, in the event of Contractor's breach or default, may deduct any costs, expenses or other sums then due from the funds next due and payable to the Contractor; or Lender may have a receiver appointed at Borrower's expense to take immediate possession of the Land and to do anything in its sole judgment may be necessary to fulfill the obligations of Borrower hereunder. In the event Lender or a receiver completes the Improvements, Borrower expressly agrees to pay Lender, upon demand, all amounts that may have been disbursed in such completion in excess of the aggregate amount deposited into the LP Account and agrees that such excess sum shall be secured by the lien of the Mortgage. If the excess sum shall not be paid immediately upon demand,

or arrangements satisfactory to Lender made for the payment thereof, Lender may declare the sums secured by the Mortgage immediately due and payable and may proceed to foreclose the Mortgage, as well for the excess sum as for the principal sum named in the Note, secured by the Mortgage, and remaining unpaid. Nothing in this paragraph shall be construed to preclude Lender from exercising any other remedies available to it.

20.     **Insolvency.**  The evidenced insolvency of Borrower or Contractor shall be deemed a default hereunder and under the Mortgage given by Borrower to Lender. In the event of such evidenced insolvency, all remedies elsewhere provided to Lender hereunder or under its Mortgage given by Borrower shall then and there be available for exercise by Lender.

21.     **Casualty Loss Claims.**  In the event of fire or other casualty, Borrower shall join with Lender in the making of immediate applicant for insurance proceeds which proceeds shall be deposited into the LP Account upon their receipt and thereafter used to restore or repair the damages to the Improvements, provided such restoration or repair is economically feasible and the security of Lender's Mortgage is not impaired. If such restoration or repair is not economically feasible or if the security of the Mortgage would be impaired, the insurance proceeds shall be deposited into the LP Account and thereafter applied to the sums secured by the mortgage with the excess, if any, to be paid to Borrower. If the Land or construction thereof is abandoned by Borrower, or if Borrower fails to respond to Lender within ten (10) days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance proceeds, Lender is authorized to collect and apply the insurance proceeds at its option either to restoration or repair of the Improvements or to the sums secured by Borrower's Mortgage.

22.     **Default or Breach Extends to Note and Mortgage.**  Any default or breach of this Agreement shall likewise be deemed a default or breach under the Note and Mortgage given by Borrower to Lender. The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a wavier of any subsequent breach or breaches on the part of Borrower.

23.     **Address for Notices.**  Any notices to Borrower to be provided by Lender shall be mailed to Borrower by certified mail, return receipt requested, at the mailing address given on Borrower's Loan application, or at such other address as Borrower may designate by notice to Lender given by certified mail, return receipt requested, addressed to:

Harbor Federal Savings Bank
Post Office Box 249
Fort Pierce, Florida 34954-0249

24.     **Time of the Essence.**  Time is hereby expressly made of the essence of this Agreement.

25.     **Commitment Letter Tie-In.**  The terms and provision of any Loan commitment letter issued to Borrower by Lender prior to the date of this Agreement, not in conflict with this Agreement, are made a part hereof, and by this reference incorporated herein, as if fully set forth.

26.     **Mutuality and Interpretation.**  This Agreement, together with all attached exhibits or schedules, and the Note, Mortgage and Loan commitment letter, have been submitted to the scrutiny of both Borrower and Lender and shall be given fair and reasonable interpretation in accordance with the words thereof without consideration or weight being given to there having been drafted by either Borrower or Lender or the counsel of either.

27.     **Survival of Provisions.**  All covenants, agreements, representations and warranties made in this Agreement and the documents delivered in support of the Loan shall be deemed to have been material and relied on by the Lender and shall survive the execution and delivery to the Lender of the Note, the Mortgage and the disbursement and advance of funds pursuant to the Loan.

28.     **Indemnification.**  Without limiting any of the other provisions contained in the Agreement, the Note or the Mortgage, Borrower agrees to indemnify and hold Lender harmless against and with respect to any and all liability, deficiency, damage, cost or expense resulting from any misrepresentations, material omission, breach of warranty or representation, or the non-fulfillment of any covenant or agreement on the part of Borrower under or relating to this Agreement, the Note or the Mortgage, and any and all actions, suits, proceedings, demands, assessments, judgments, costs, legal and accounting fees or other expenses incident to the foregoing indemnification of the Borrower pursuant to this subsection, all of which are secured by the lien of the Mortgage. The indemnity contemplated herein shall not apply to loss or damage resulting from Lender's own willful misconduct or gross negligence.

29.     **Waiver of Jury Trial.**  Borrower and Lender hereby knowingly, voluntarily and intentionally waives any right either or both may have to a trial by jury in respect of any litigation based on this Agreement, or arising out of, under or in connection with this Agreement or any document or agreement contemplated to be executed in connection with this Agreement, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party, now or in the future, with respect hereto or arising out of this Agreement or future dealings between Borrower and Lender, or their successors or assigns. This provision is a material inducement to Borrower and Lender for the execution, delivery, and acceptance of this Agreement.

30.     **Definitions.**  Defined terms are as set forth in the Glossary attached to and made a part of this Agreement.

EXECUTED this _____ day of _____, _____.

Witnesses:

_____          _____
                                           **ANDREW WILLIAMS**
_____          Printed Name
Printed Name


_____          _____
                                           Printed Name
_____
Printed Name


EXECUTED this _____ day of _____, _____.

                                           HARBOR FEDERAL SAVINGS BANK

                                           By: _____
                                               **TAMMY ALLAN**

                                           Its: VICE PRESIDENT

## ASSENT BY CONTRACTOR

THE UNDERSIGNED hereby certifies that he/it is Contractor for the Borrower named herein above and that he/it is licensed with the Florida Construction Industry Licensing Board as a certified or registered General or Residential Contractor (Occupation and Class Code Numbers CG, RG, CB, RB, CR or RR) **OR** the undersigned is a business organization that engages in contracting and employs one or more registered or certified contractors licensed in accordance with Florida Statute 489.119 who is responsible for obtaining permits and supervising all of the business organization's contracting activities **OR** the undersigned is engaged in contracting as a business organization, including any partnership, corporation, business trust, or other legal entity and the business organization has applied for and has obtained a certificate of authority through a qualifying agent as provided in Florida Statute 489.119   In consideration of Lender's making the mortgage Loan referenced in the above Agreement, Contractor agrees to the terms and conditions of the Agreement, and further agrees that where the Agreement conflicts with the terms and provision of any construction contract existing with Borrower, that this Agreement shall control.  Any construction disbursements received by Contractor shall be utilized only to pay for costs which are authorized hereunder.  In the event of default by Borrower under this Construction Loan Agreement or otherwise, Contractor agrees that it shall upon Lender's request continue performance of the construction contract in accordance with the terms of this Construction Loan Agreement provided that the Contractor receives the compensation provided for in the construction contract for work performed for Lender after notice by Lender that it is exercising its rights hereunder. Contractor further represents that the Contract with Borrower, is valid, and in full force and effect, that no default exists thereunder.  The Contractor agrees to make no changes in or amendments to the construction contract, including, but not limited to, any addenda, modifications or change orders, without the consent of Lender.  In addition to the foregoing, Contractor agrees that it will not terminate the construction contract or cease to perform its work thereunder except for good reason, including but not limited to the failure to make any payments due to Contractor or other breach or default.  Contractor agrees to give written notice to Lender of such intention to terminate or cease performing its work at least seven (7) days prior thereto.


EXECUTED this _____ day of _____, _____.

WITNESSES:                                 **DIAMOND COURT CONSTRUCTION COMPANY**
                                           Printed Name of Contractor's Individual or Firm

_____          By:_____

_____          _____
Printed Name                               Printed Name

_____          Its:_____

_____
Printed Name

# CONSTRUCTION LOAN AGREEMENT - GLOSSARY

IT IS AGREED by Borrower with Lender that in this Agreement, the following words and phrases shall have the meanings stated:

**"Abandoned"** shall mean that there has been a substantial cessation of work upon the Land for a period of THIRTY (30) days.

**"Advances"** shall mean advances on the Loan to Borrower, in aggregate principal amounts as outlined on Schedule A for the purpose of paying Construction Costs incurred in connection with the construction of Improvements upon the Land.

**"Agreement"** shall mean this Construction Loan Agreement which includes an assignment of the LP Account.

**"Borrower"** shall mean the borrower, or any of the borrowers, identified herein.

**"Borrower's Disbursement Instructions"** shall mean the request of Borrower made to Lender for disbursing LP Account funds. Advances of construction funds, as provided by the Construction Draw Schedule, shall be made upon the requisition of the "Contractor", unless or until Borrower provides contrary instructions in writing to Lender.

**"Borrower's Total Cost"** shall mean the cost of construction, any amount that must be paid upon the Land, loan expenses, and any additional sums required to fulfill conditions of the loan commitment or this Agreement.

**"Closing"** shall mean the date upon which Borrower signs this Agreement and other loan documents or the date that the documents are otherwise effective.

**"Construction Draw Schedule"** shall mean the scheduled of periodic disbursements of LP Account funds to be made on an incremental draw basis based upon the percentage of work completed as outlined therein, which Construction Draw Schedule is attached to this Agreement or otherwise made a part hereof and incorporated herein by reference.

**"Construction Time Period"** shall mean the time allowed for the completion of the improvements and shall begin when Lender received a duly certified copy of the recorded Notice of Commencement, and shall run for the time allotted according to the Promissory Note.

**"Contractor"** shall mean the person or firm employed as general contractor by Borrower to complete the construction of improvements contemplated by this Agreement.

**"Front-End Deposit"** shall mean the sum of money, representing the difference between the face amount of the loan and the Borrower's Total Cost to close.

**"Gross LP Account Funds"** shall mean the face amount of the loan less loan costs and costs requirement to render Lender's mortgage a paramount lien on a merchantable fee simple title, as augmented from time to time by Borrower's Front-End Deposit and other deposits made by Borrower as required hereunder.

**"Improvements"** shall mean the improvements to be made to the Land, consisting of the construction in accordance with the approved plans and specifications, and all other improvements now existing or hereafter erected upon the Land.

**"Interest Only Time Period"** shall mean the time period from the closing date to and inclusive of the day the amortization period commences according to the Promissory Note.

**"Land"** shall mean the real property more particularly described in the Mortgage (together with any pre-existing improvements thereon).

**"Lender"** shall mean Harbor Federal Savings Bank, a U.S. corporation.

**"Lienor"** shall mean a person who has a lien or a prospective lien upon the Land as defined by Section 713.01(16), Florida Statutes.

**"Loan"** shall mean the Loan, evidenced by the Promissory Note, to be made by Lender in favor of Borrower.

**"Loan-in-Process Account"** or **"LP Account"** shall mean the Borrower's special non-interest bearing account in which the gross proceeds of the loan are placed, as augmented from time to time by Borrower's Front-End Deposit or other deposits made by Borrower as required hereunder.

**"Mortgage"** shall mean the mortgage given by Borrower in favor of Lender creating a paramount lien upon the Land.

**"Net LP Account Funds"** shall mean the face amount of the loan less loan costs and costs required to render Lender's mortgage a paramount lien on a merchantable fee simple title.

**"Permitted Exceptions"** shall mean those title matters such as liens, charges, encumbrances, security interests and adverse claims identified in the Title Insurance Commitment and/or Policy to be issued in favor of Lender which are acceptable to Lender and Lender's counsel.

**DRAW SCHEDULE**

Construction funds will be disbursed based on percentage of completion. Harbor Federal's inspector will determine the percentage of completion using the percentages below, giving credit only for items inspected and accepted.

| ITEMS COMPLETED | PERCENTAGE |
|---|---|
| Site Preparation and Permitting | 7% |
| First Rough Plumbing | 3% |
| Slab Poured | 6% |
| Exterior Studs – Sheeting/C.B. Lintel | 10% |
| Interior Studs – Walls and Partitions | 2% |
| Roof Framing, Sheathed and Dried In | 9% |
| Second Rough Plumbing (tub set) | 2% |
| Rough Electric | 4% |
| Duct Work | 2% |
| Exterior Window and Door Frames | 1% |
| Windows Installed | 2% |
| Soffit & Facia | 1% |
| Outside Doors (includes overhead garage) | 1% |
| Finish Roof | 2% |
| Exterior Finish | 5% |
| Wall Insulation | 1% |
| Rough Drywall/Plaster | 3% |
| Finish Drywall/Plaster | 3% |
| Bath Tile | 2% |
| Interior Doors and Trim | 4% |
| Cabinets/Vanities and Interior Detail | 5% |
| Interior & Exterior Prime Coat of Paint | 1% |
| Finish Painting | 2% |
| Finish Plumbing Fixtures & Trim | 2% |
| Finish Electric Fixtures & Trim | 2% |
| Finish Floor Covering | 4% |
| Exterior Concrete (driveway. Walks, stoop, patio) | 1% |
| Appliances Installed | 2% |
| Finish Grade, Grass, Landscaping | 2% |
| A/C Trim & Condenser and Heating | 4% |
| Septic Tank/Drainfield/Sewer Connection | 2% |
| Well & Public Water Connection | 2% |
| Clean-up | 1% |

**\*\*TO AVOID ADDITIONAL INSPECTION FEES, USE THE FOLLOWING DRAW SCHEDULE: \*\***

# PRIVATE MORTGAGE INSURANCE DISCLOSURE
## (Adjustable Rate Mortgages)

Date: **July 06, 2005**

| BORROWER(S) NAME AND PROPERTY ADDRESS | LENDER(S) NAME AND ADDRESS |
|---|---|
| **ANDREW WILLIAMS**<br>**4531 SW DARWIN  BLVD**<br>**PORT ST LUCIE, FL  34953** | **HARBOR FEDERAL SAVINGS BANK**<br>**P.O. BOX 249**<br>**FORT PIERCE, FL  34954-0249** |

| LOAN NO. | PMI CERTIFICATE NO. |
|---|---|
| **5024374448** | **0518653331** |

You are obtaining a mortgage loan that requires private mortgage insurance ("PMI"). PMI protects lenders and others against financial loss when borrowers default. Charges for the insurance are added to your loan payments.

Under certain circumstances, federal law gives you the right to cancel PMI or requires that PMI automatically terminate. This disclosure describes when cancellation and termination may occur. Please note that PMI is *not* the same as property/casualty insurance—such as homeowner's or flood insurance—which protect you against damage to the property. Cancellation or termination of PMI does *not* affect any obligation you may have to maintain other types of insurance.

In this disclosure, "loan" means the mortgage loan you are obtaining; "you" means the original borrower (or his or her successors or assigns); and "property" means the property securing the mortgage loan.

**Borrower Requested Cancellation of PMI**

You have the right to request that PMI be canceled on or after the following dates:
(1) The date the principal balance of your loan is first *scheduled* to reach 80% of the original value of the property. (If your loan has a balloon feature with either an adjustable interest rate or a conditional right to refinance, this date will not be reached before your loan matures.)
(2) The date the principal balance *actually* reaches 80% of the original value of the property.

"Original value" means the lesser of the contract sales price of the property or the appraised value of the property at the time the loan was closed. If this loan refinances an existing loan secured by the property, "original value" means the appraised value relied on by the lender to approve this loan.

You will be notified when these dates are reached.

PMI will only be canceled if all the following conditions are satisfied:
(1) you submit a written request for cancellation;
(2) you have a good payment history;
(3) you are current on the payments required by your loan; and
(4) we receive, if requested and at your expense, evidence that the value of the property has not declined below its original value, and certification that there are no subordinate liens on the property.

For purposes of PMI cancellation, a good payment history means no payments 60 or more days past due within two years and no payments 30 or more days past due within one year of the later of (a) the cancellation date, or (b) the date you submit a request for cancellation.

**Automatic Termination of PMI**

If you are current on your loan payments, PMI will automatically terminate on the date the principal balance of your loan is first *scheduled* to reach 78% of the original value of the property. This date is called the "termination date." (If your loan has a balloon feature with an adjustable interest rate or a conditional right to refinance, this date will not be reached before your loan matures.) If you are *not* current on your loan payments as of the termination date, PMI will automatically terminate on the first day of the month immediately following the date you thereafter become current on your payments. On or about the termination date, you will be notified that the PMI has been terminated or will be terminated when you become current on your loan payments.

**Exceptions to Cancellation and Automatic Termination**

The cancellation and automatic termination requirements described above do not apply to certain loans that may present a higher risk of default. Your loan, however, does not fall into this category. Accordingly, the cancellation and automatic termination provisions described above apply to your loan.

By signing below, I/we hereby acknowledge receipt of this Private Mortgage Insurance Disclosure.

| | | | |
|---|---|---|---|
| Borrower **ANDREW WILLIAMS** | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

© 1999, 2001 America's Community Bankers®, Mortgage Bankers Association of America
ITEM 9499L0 (0107)

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131
5024374448

# HARBOR FEDERAL SAVINGS BANK
## PROPERTY INSURANCE REQUIREMENTS

Loan Number:  5024374448  Loan Amount:  $262,200.00

Borrower(s):  ANDREW WILLIAMS

Property Address:  4531 SW DARWIN BLVD, PORT ST LUCIE, FL 34953

Legal Description:  LOT 11, BLOCK 2391 OF PORT ST. LUCIE SECTION THIRTY FOUR, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 15, PAGE(S) 9, 9A TO 9W OF THE PUBLIC RECORDS OF ST. LUCIE COUNTY, FLORIDA.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### GENERAL INSURANCE INFORMATION

The Insurance Laws of this State provide that the Lender **May Not** require the borrower to purchase Insurance through any particular Insurance Agent or Company.  The Lender does have the right, however to designate reasonable financial requirements as to Company and adequacy of coverage.

The policy must contain the Perils of Fire, Windstorm, Extended Coverage, Vandalism and Malicious Mischief.  The minimum policy period is one year.  The company must have a rating in accordance with the latest edition of **Best's Key Rating Guide of B: Class III** or better.  All policies must be signed by agents registered in the State of Florida.  The policy must provide the standard mortgagee clause protecting Lender's insurance interest (except where losses are to be paid to Insurance Trustee.)

**If Lender does not require Flood Insurance, the borrower should still evaluate his need for this coverage.** In the event that the flood designation of the property changes in the future, Harbor Federal may require the borrower to purchase a flood insurance policy at that time.

The Mortgagee Clause must read:  Harbor Federal Savings Bank
It's Successors and/or it's Assigns
P.O. Box 249
Fort Pierce, FL 34954-0249

**Individual Insurance Policy Requirements:**

**Hazard/Windstorm Insurance - prior to scheduling closing,** borrower or insurance agent **must** provide Evidence of Hazard/Windstorm Insurance and a Paid In Full Receipt to Harbor Federal's Loan Closing Department. The minimum acceptable coverage is **$ 201,100.00** and must be prepaid one year in advance.

**Flood Insurance** – if the subject property has been identified by the Federal Emergency Management Agency (FEMA) as a special flood hazard area, **prior to scheduling closing,** borrower or insurance agent **must** provide Evidence of Flood Insurance and a Paid In Full Receipt to Harbor Federal's Loan Closing Department.  The minimum acceptable coverage is **$__** and must be prepaid one year in advance.  **If this is a Construction Loan,** you will not be able to obtain Flood Insurance until the foundation is poured.  Prior to disbursement of the 2nd Draw, you must provide Evidence of Flood Insurance and a paid receipt.

**Master Insurance Policy Requirements:**

**Master Hazard/Windstorm Insurance** – if coverage is provided through the **Home Owner's Association Master Policy,** it will not be necessary to obtain additional coverage.  A unit owner's certificate evidencing coverage under the Associations Master Policy is required.

**Master Flood Insurance -** if coverage is provided through the **Home Owner's Association Master Policy,** it will not be necessary to obtain additional coverage.  A unit owner's certificate evidencing coverage under the Associations Master Policy is required.

THE UNDERSIGNED HAS READ THE FOREGOING DISCLOSURE, AND HEREBY ACKNOWLEDGES THAT THEY UNDERSTAND AND AGREE TO THE TERMS THEREOF.

_____  DATE _____
ANDREW WILLIAMS

_____  DATE _____

## PLEASE SIGN AND RETURN

## SECOND AMENDED SETTLEMENT ALLOCATION PLAN FOR
## SETTLEMENT INVOLVING BUILDERS, INSTALLERS,
## <u>SUPPLIERS AND PARTICIPATING INSURERS</u>

The Settlement Funds shall be distributed pursuant to the following allocation protocol:

**1.      Eligibility.**  To be eligible for an allocation of Settlement Funds, a Class Member must own, have owned, reside in, or have resided in, or in the case of a defendant Class Member must have repaired, an Affected Property containing defective Chinese Drywall ("CDW"), and the Affected Property's builder, installer, and/or supplier must have participated in this Settlement by contributing to the Settlement Funds.

**2.      Gross Settlement Amount.**  The Settlement Funds available for allocation and distribution shall be $73,354,000, or $82,784,000 less credits as provided in Section 4.2.1 of the Settlement ("Gross Settlement Amount").

**3.      Participating Defendant Funds.**  The Gross Settlement Amount was created from settlement contributions from various Participating Defendants, which include participating builders, installers, and suppliers, along with their respective Participating Insurers.  Settlement contributions from participating builders and any of their Participating Insurers shall be referred to as the "Participating Builders Fund."  Settlement contributions from participating installers and any of their Participating Insurers shall be referred to as the "Participating Installers Fund." Settlement contributions from participating suppliers and any of their Participating Insurers shall be referred to as the "Participating Suppliers Fund."  The Participating Builders Fund, the Participating Installers Fund, and the Participating Suppliers Fund shall be collectively referred to as the "Participating Defendant Funds."

> **3.1      Distributions to Participating Defendant Funds.**  The Participating Defendant Funds are expected to be funded roughly as follows:  (a) Participating Builders Fund – 40% of the Gross Settlement Amount; (b) Participating Suppliers Fund – 40% of the Gross Settlement Amount; and (c) Participating Installers Fund – 20% of the Gross Settlement Amount.

**4.      Set Aside for Attorneys' Fees and Costs.**  The Parties recognize that the final determination of entitlement to attorneys' fees and costs, and the amount of any such award, shall be made by Judge Eldon E. Fallon.  Pending a determination of the entitlement to and  amount of any awards of attorneys' fees and costs, the Parties agree to set aside a portion of the Gross Settlement Amount from each of the Participating Defendant Funds to satisfy any such awards. Thirty-two percent (32%) of the Gross Settlement Amount shall initially be set aside from each of the Participating Defendant Funds for an award of attorneys' fees ("Attorneys' Fees Set Aside").  An additional fund in the amount of $5,000,000 shall be created (by setting aside this amount from the Gross Settlement Amount) for the reimbursement of reasonable expenses, including the cost of notice advanced from the Settlement Funds, the cost of the mediator and the cost of administering the allocation of Settlement Funds ("Cost Set Aside").  Collectively, these two set asides shall be referred to as the "Attorneys' Fees and Cost Set Aside."  The remaining

funds of the Gross Settlement Amount, shall be referred to as the "Funds Available for Distribution."

For all Affected Properties, the maximum allowable award of attorneys' fees from the Attorneys' Fees Set Aside shall be thirty-two percent (32%), with no more than 15% of the Gross Settlement Amount allocated to common benefit fees. All Parties reserve their rights to object to or oppose any motions or petitions seeking an award of attorneys' fees, common benefit fees, and/or costs for any Affected Property.[1]

Following the submission of all claims forms, and motions or petitions seeking an award of fees and/or costs, along with any objections thereto, the Court will determine the appropriate amount of attorneys' fees and/or common benefit fees awarded for each Affected Property from the Attorneys' Fees Set Aside. At that time, the Court will also establish a procedure for the return of any "Applicable Overages", *i.e.*, the difference between the thirty-two percent set aside and the amount of attorneys' fees and/or common benefit fees awarded for each Affected Property. These procedures shall ensure that any Class Members subject to lower attorneys' fees and/or common benefit fees will get a larger distribution than Class Members subject to higher fees, so that each Class Member will receive the precise net distribution to which that Class Member is entitled after deducting the applicable award of attorneys' fees, common benefit fees, and costs attributable to each Affected Property for that Class Member.

**5.    Repair and Relocation Payments.**  Ninety-five percent (95%) of the Funds Available for Distribution in each of the Participating Defendant Funds shall be set aside to compensate or reimburse Class Members for "Repair and Relocation Damages"[2] ("Repair and Relocation

---

[1]    There remains a dispute as to what amount in fees and costs should be paid for Affected Homes that were repaired by a defendant who actively pursued this Litigation and/or whose homeowner did not actively pursue Litigation. The Parties agree to submit this dispute for resolution by Judge Fallon as soon as possible if and when this settlement receives final approval.

[2]    The term "Repair and Relocation Damages" shall mean costs and expenses associated with the following: (i) the removal of the CDW from the Affected Property and repairing or replacing affected building materials and fixtures in the Affected Property (the "repair work"); (ii) the relocation of the property owners' belongings (*i.e.*, moving expenses and storage-related expenses) during the repair work; and (iii) if necessary, obtaining comparable alternative living arrangements for the homeowners during the repair work. Notwithstanding the foregoing, sellers of Affected Properties who sold un-remediated Affected Properties at a diminished value after disclosure of the existence of CDW to the buyer and retained, in writing, the exclusive right to assert all claims associated therewith against the builder, installer or supplier of the Affected Property, shall be entitled to make a claim for their damages under the distribution terms of this "Repair and Relocation Payment" section. All other sellers of Affected Properties who sold Affected Properties at a diminished value, including but not limited to sellers of Affected Properties that were later remediated by a repairing builder, shall be entitled to make a claim for their damages exclusively from the "Other Loss Set Aside," as defined below, and, in that

Payments"). Class Members shall be entitled to recover their Repair and Relocation Payments from only those Participating Defendant Funds to which their respective builder, installer, and/or supplier contributed. If a Class Member's builder, installer, and/or supplier does not participate in this Settlement, that Class Member shall not be entitled to a recovery of a Repair and Relocation Payment from the corresponding Participating Defendant Fund to which the applicable Non-Participating Defendant failed to contribute. In such a case, the Class Member does not release and maintains all claims against that Non-Participating Defendant. Repair and Relocation Payments shall only be recoverable once per Affected Property, and shall be paid to the person or entity that retains the right to recover for such claims against the Participating Defendant(s) for CDW claims. This shall include sellers of Affected Properties who sold un-remediated Affected Properties at a diminished value after disclosure of the existence of CDW to the buyer and retained, in writing, the exclusive right, as opposed to the buyer, to pursue the builder, installer or supplier for the CDW claims.

6.     **Bodily Injury and Other Loss Set Aside.** Five percent (5%) of the Funds Available for Distribution in each of the Participating Defendant Funds shall be set aside in one separate fund to compensate or reimburse Class Members for alleged bodily injury ("Bodily Injury Set Aside") and "Other Losses"[3] ("Other Loss Set Aside"). The amount of the Bodily Injury Set Aside shall not exceed two and one-half percent (2.5%) of the Funds Available for Distribution from each of the Participating Defendant Funds and the amount of the Other Loss Set Aside shall not exceed two and one-half percent (2.5%) of the Funds Available for Distribution from each of the Participating Defendant Funds. Class Members shall be eligible to recover from the Bodily Injury Set Aside and Other Loss Set Aside if one or more of their respective builders, installers, and/or suppliers contributed to the Settlement Funds.

7.     **Affected Property Allocation and Recovery From Each Participating Fund.**

   a.     **Claim Form Information.** In order to allocate the Repair and Relocation Payments from each Participating Defendant Fund between the Class Members, the Special Master or Claims Administrator shall first compile claims information from the Class Members, by a date certain, to determine: (i) the total number of Affected Properties that are entitled to an allocation from the particular Participating Fund (*i.e.*, for each affected home, the Special Master or Claims Administrator must determine whether the respective builder, installer or supplier participated in this Settlement by contributing to the applicable Participating Defendant Fund); and (ii) the total combined square footage under air of all such Affected Properties for each Participating Defendant Fund ("Total Square Footage")

---

situation, the builder that repaired the Affected Property shall be the exclusive right to make a claim for "Repair and Relocation Damages" under this section.

[3]     The term "Other Losses" shall mean any alleged damages claimed by any Class Member that is not for Repair and Relocation Damages or Bodily Injury.

b. **Determine Square Footage Allocation.** The Special Master or Claims Administrator shall then divide the total amount of the Repair and Relocation Payments for each Participating Defendant Fund by the Total Square Footage for that fund to determine the amount per square foot to allocate to each Affected Property for each Participating Defendant Fund. This shall be the "Square Footage Allocation" for each Participating Defendant Fund.

c. **Determine Claimants' Individual Distributions.** After the Square Footage Allocation for each Participating Defendant Fund has been determined, the Special Master or Claims Administrator shall determine the allocated amount for each qualifying Affected Property by multiplying the number of square feet in the Affected Property by the Square Footage Allocation to determine the "Net Payment for Affected Property" for the Repair and Relocation Damages Payment for that Affected Property.

This Net Payment for Affected Property shall be distributed to the owner or former owner of each Affected Property unless: (i) the Affected Property has been repaired by a defendant; (ii) the owner is both a Knauf Class Member (as that term is defined in Paragraph 1.1.2 of the Knauf Class Settlement) and a present or former KPT Property Owner (as that term is defined in Paragraph 1.28 of the Knauf Class Settlement) obligated to assign this distribution pursuant to Paragraph 4.8.3.1 of the Knauf Class Settlement; or (iii) or the owner is both a Knauf Class Member (as that term is defined in Paragraph 1.1.2 of the Knauf Class Settlement) and a Lower-Case KPT Property Owner (as that term is described in Paragraph 4.9, *et seq.*, of the Knauf Class Settlement) who has received an inspection report from GFA International substantially in the form attached as Exhibit J under Section 4.9.2 of the Knauf Class Settlement and who is obligated to assign 50% of this distribution pursuant to Paragraph 4.9.2.1 of the Knauf Class Settlement; or (iv) the owner is both a Knauf Class Member (as that term is defined in Paragraph 1.1.2 of the Knauf Class Settlement) and a present or former Mixed Property Owner (as that term is defined in Paragraph 1.35 of the Knauf Class Settlement) obligated to assign some portion of this distribution pursuant to Paragraph 4.8.3.1 of the Knauf Class Settlement. In the event (i) applies, the Net Payment for each Affected Property shall be transferred to the remediating defendant who will not be obligated to assign any of that amount to the Remediation Fund created by the Knauf Class Settlement. In the event (ii) applies, 50% of the Net Payment for each Affected Property shall be transferred to the Remediation Fund created by the Knauf Class Settlement and 50% of the Net Payment for each Affected Property shall be transferred to the Other Loss Fund created by the Knauf Class Settlement (or if the Knauf Class Settlement is not finally approved, the Net Payment for each Affected Property shall be transferred to the Escrow Fund established by the Pilot Program for those assignments that were made through participation in the Pilot Program). In the event (iii) applies, 50% of the Net Payment for each Affected Property involving Lower-Case KPT shall be transferred to the Remediation Fund created by the Knauf Class Settlement (or if the Knauf Class Settlement is not finally approved, to the Escrow Fund established by the Pilot Program for those assignments that were made through participation in the Pilot Program). In the event (iv) applies, 50% of the Net Payment for each Affected Property multiplied by the KPT Drywall Percentage (as defined in Paragraph 1.26 of the Knauf Class Settlement) shall be transferred to the Remediation Fund created by the Knauf Class Settlement, 50% of the Net Payment for each Affected Property multiplied by the

KPT Drywall Percentage (as defined in Paragraph 1.26 of the Knauf Class Settlement) shall be transferred to the Other Loss Fund created by the Knauf Class Settlement and the remainder shall be transferred to the owner of that Affected Property. Under no circumstances shall any Class Member (property owner or its assignee or any other Class Member) receive any distribution under this Settlement for Repair and Relocation Related Expenses beyond their reasonable, actual out-of-pocket (or estimated, in the case of unrepaired properties) Repair and Relocation Related Expenses.

In addition to any other requirements under this Settlement, in order to recover from the Participating Defendant Funds, the Class Members must submit documentation or other sources of proof to the Special Master or Claims Administrator: (a) that the Affected Property contains CDW; (b) of the square footage under air of the Affected Property; and (c) that the home was built by a participating builder, the drywall was installed by a participating installer and/or the drywall was supplied by a participating supplier. The Special Master or Claims Administrator will determine the sufficiency of any such documentation or other sources of proof based on a preponderance of the evidence. The Special Master or Claims Administrator may also communicate with and/or rely on information provided by the PSC, the claimant and/or participating builders, installers or suppliers, or other third parties, to determine the validity of a claim or the right of a Class Member to recover from one or more of the Participating Defendant Funds. Any Class Member who is also a Participating Class Member in the Knauf Class Settlement must comply with the qualifying procedures in Paragraph 4.4 of the Knauf Class Settlement. Any decision by the Special Master or Claims Administrator accepting or rejecting a claim, or any part thereof, may be appealed directly to Judge Fallon and his decision shall be final and not subject to appeal. Because defendant Class Members did not contribute funds for Affected Properties they own or repaired, such defendant Class Members are not entitled to recover from their respective Participating Defendant Fund (*i.e.* a remediating builder cannot recover from the Participating Builders Fund, etc.) with respect to any such Affected Property, except to the extent that another Participating Defendant contributed to that same Participating Defendant Fund for that Affected Property.

**8.     Allocation and Recovery of Bodily Injury Set Aside.**  In order to recover for bodily injury from the Bodily Injury Set Aside, all qualifying Class Members (*i.e.*, those Class Members whose builder, installer, and/or supplier(s) contributed to the Settlement Funds) are required to comply with a claims process similar to the process set forth in Paragraph 4.7 of the Knauf Class Settlement, whether or not that Class Member has claims arising out of KPT Drywall.

All Class Members with Affected Properties containing KPT Chinese Drywall (as that term is defined in Paragraph 1.25 of the Knauf Class Settlement) must, prior to seeking a distribution from the Bodily Injury Set Aside, first seek to recover such benefits from the Knauf Other Loss Fund described in Paragraph 4.6 of the Knauf Class Settlement, the Banner Class Settlement and/or the Interior Exterior Class Settlement, if applicable.

If a Class Member with an Affected Property has a claim for bodily injury that is rejected by the Special Master overseeing the Knauf Class Settlement's Other Loss Fund Claims Procedures, or through the Banner Class Settlement or Interior Exterior Class Settlement, that Class Member shall be precluded from recovering from this Bodily Injury Set Aside. If, on the other hand, a Class Member with an Affected Property is able to recover some but not all of his/her alleged

bodily injury damages from the Knauf Other Loss Fund, or through the Banner Class Settlement or Interior Exterior Class Settlement, that Class Member shall then be entitled to an allocation from this Bodily Injury Set Aside.

The Special Master or Claims Administrator shall determine the amount of approved bodily injury claims according to the standards set forth in Paragraph 4.7 of the Knauf Class Settlement. If the amount of approved claims for bodily injury is less than the Bodily Injury Set Aside, the Special Master or Claims Administrator shall award each Class Member with an approved claim the full amount of their approved bodily injury claim. If, on the other hand, the total amount of approved claims for bodily injury exceeds the total amount of the Bodily Injury Set Aside, the Special Master or Claims Administrator shall decrease the amount of each Class Members' approved claim for bodily injury on a pro-rata basis, and award each Class Member with an approved claim their pro-rata share. Under no circumstances shall any Class Member receive a distribution for bodily injury beyond their actual damages.

9. **Allocation and Recovery of Other Loss Set Aside.** To recover Other Losses, including claims addressing Multiple Unit Properties, as described in Paragraphs 4.3.6.1 and 4.7.1 of the Knauf Settlement, from the Other Loss Set Aside all qualifying Class Members (*i.e.*, those Class Members whose builder, installer, and/or supplier(s) contributed to the Settlement Funds) are required to comply with a claims process similar to the process set forth in Paragraph 4.7 of the Knauf Class Settlement, whether or not that Class Member has claims arising out of KPT Drywall.

All qualifying Class Members who participate in the Knauf Settlement and receive the Lump Sum Payment defined in Paragraph 4.3.1.1. of the Knauf Settlement shall be precluded from receiving any distribution for Other Losses from the Other Loss Set Aside. This Other Loss Set Aside is available to Class Members who do not receive compensation for Other Losses under the Pilot Program, the Knauf Class Settlement, Banner Class Settlement, or Interior Exterior Class Settlement, and who did not already release their claims for Other Losses.

The Special Master or Claims Administrator shall determine the amount of approved Other Losses according to the standards set forth in Paragraph 4.7 of the Knauf Class Settlement. If the amount of approved claims for Other Losses is less than the Other Loss Set Aside, the Special Master or Claims Administrator shall award each Class Member with an approved claim the full amount of their approved Other Losses claim. If, on the other hand, the total amount of approved claims for Other Losses exceeds the total amount of the Other Loss Set Aside, the Special Master or Claims Administrator shall decrease the amount of each Class Members' approved claim for Other a pro-rata basis, and award each Class Member with an approved claim their pro-rata share. Under no circumstances shall any Class Member receive a distribution for Other Losses beyond their actual damages.

10. **Distribution of Unused Bodily Injury or Other Loss Set Aside.** Any funds from the Bodily Injury Set Aside or Other Loss Set Aside that are not used to compensate a Class Member for bodily injury or Other Losses shall be transferred to each of the Participating Defendant Funds in their percentage allocation under Section 3.1 and distributed to all qualifying owners of Affected Properties or their assignees in the same manner as provided for in section 7 above.

**11.     Cap on Distribution to Knauf.**  To the extent under this allocation plan Knauf is allocated a recovery exceeding 35% of the Gross Settlement Amount less the amount actually awarded by the Court for attorneys' fees and costs (the "Total Distribution"), Knauf's recovery shall be capped at 35% of the  Total Distribution.  Any amount under this allocation plan allocated to Knauf in excess of 35% of the Total Distribution shall be instead re-allocated to all Class Members who are entitled to a recovery of Repair and Relocation Payments on a per square foot pro-rata basis.

{817140.3}



Podhurst Orseck, P.A.
25 W. Flagler St., Ste. 800
Miami, FL 33130

Andrew Williams.
4531 SW Darwin Blvd
Port St. Lucie, FL 34953
1/14/10



Williams, Andrew
4531 SW Darwin Blvd.
Port St. Lucie, FL 34953

Podhurst Orseck, P.A.
25 W. Flagler St., Ste. 800
Miami, FL 33130



Podhurst Orseck, P.A.
25 W. Flagler St., Ste. 800
Miami, FL 33130

Williams, Andrew
4531 SW Darwin Blvd.
Port St. Lucie, FL 34953

CDWINDO4-001437

Print Form

Plaintiff Profile Form - Residential Properties

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |

**For Internal Use Only**

File Number

Date Received

This Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation using one form per affected address. In completing this Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can and expressly indicate "unknown" in the space provided when not known. You must supplement your responses if you learn they are incomplete or incorrect in any material respect. You may and should consult with your attorney if you have any questions regarding completion of this form. If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The questions and requests for production contained within this Profile Form are non-objectionable and shall be answered without objection. By answering this Profile Form, you are not waiving the attorney work product and/or attorney client privileges. Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts and are subject to all protections afforded by law.

To the extent that the form does not provide enough space to complete your responses, you may attach as many sheets of paper as necessary. All photographs produced in response to this form shall be in color and attached to or printed on 8 1/2" x 11" white paper.

**Section I. Property Information**

| | |
|---|---|
| Name Property Owner | Andrew Williams |
| Address of Affected Property | 4531 S.W. Darwin Blvd. |
| | Port St. Lucie, FL 34953 |
| Is this Property:* ☒ Residential ☐ Commercial ☐ Governmental |
| Name of Person Completing this Form | Andrew Williams |
| Is above your primary residence? | ◉ Yes   No ○ |
| Mailing Address (if different) | |
| Phone: | (954) 806 - 2256 |

* If your response is commercial or governmental you should not fill out the remaining questions, you will receive a follow up form at a later date.

| | |
|---|---|
| Circle one: | ☒ Owner-Occupant ☐ Owner Only ☐ Renter-Occupant |
| Represented By: | Podhurst Orseck PA/Victor Diaz |
| Address: | 25 W. Flagler Street |
| | Suite 800 |
| | Miami, FL 33130 |
| Phone: | (305) 358 - 2800 |
| Case No. /Docket Info: | 10-362 |

**Section II. Insurance Information**

| | |
|---|---|
| Homeowner Renter Insurer: | Security First Insurance Co. |
| Policy #: | SFIH0074498-03-1870 |
| Agent: | M.E. Glennon & Associates, Inc./Luis Martinez |
| Address: | P.O. Box 881055 |
| | Port St. Lucie, FL 34988 |
| Phone: | (772) 879 - 1307 |

+ Attach Copy of Insurance Declaration Page

**Section III. Claimant Information**

| Name of Claimant | Dates Occupied Move-in | Dates Occupied Leave | Gender | Date of Birth | Are you claiming personal injuries?* Circle One | Identify Claimant Status as an Owner-Occupant, an Owner Only, or an Occupant or Renter Only |
|---|---|---|---|---|---|---|
| Andrew Williams | 10 /18/ 06 | / / | ☒ M / F | 3 /22/ 30 | ◉ Yes   No ○ | Owner-Occupant |
| Diana Williams | 10 /18/ 06 | / / | M / ☒ F | 9 /11/ 47 | ◉ Yes   No ○ | Occupant or Renter Only |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |
| | / / | / / | M / F | / / | ○ Yes   No ○ | |

* Personal injuries include claims for mental anguish and medical monitoring.

WilliamsA4531-00001

Plaintiff Profile Form - Residential Properties

### Section IV. Inspection Information

1.0. Have you, or has anyone on your behalf, conducted an inspection into whether Chinese-manufactured drywall is present in your home? **●Yes  No ○**

    1.1. If "Yes" to Question 1.0 Section IV. Who conducted the inspection? **Steve Litrides**

    1.2. When did the inspection take place? **1 /14 /10**

2.0. Has a determination been made that Chinese-manufactured drywall is present in your home? **● Yes  No ○**

    2.1. If "Yes" to Question 2.0. Section IV. Who made this determination? **Steve Litrides**

    2.2. When was this determination made? **1 /14 /10**

### Section V. Drywall Information

| Drywall Manufacturer | Markings on Drywall | Location in Home |
|---|---|---|
| Knauf Tianjin | Knauf Tianjin China | Attic |
| | | |
| | | |

### Section VI. Home Information

| | | | Yes | No |
|---|---|---|---|---|
| Approx. Sq. Ft. of House: | 2817 | | | |
| Estimated Sq. Ft. of Drywall | unknown | Occupied | x | |
| Height of Interior Walls | 9 ft | Year-round | x | |
| Number of Bedrooms: | 3 | Summer | | |
| Number of Bathrooms: | 2 | Winter | | |

#### Plumbing System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| PVC/ CPVC/ Plastic Piping | | | x |
| Copper Piping | x | | |
| Copper Fixtures | x | | |
| Other Fixtures | x | | |
| Were repairs made to the plumbing system? | | No | |
| Dates: | | | |

#### Electrical System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| Receptacles | x | | |
| Switches | x | | |
| Main Panel | x | | |
| 2nd Panel | x | | |
| Exposed Copper Wires | x | | |
| Were repairs made to the electrical system? | x | | |
| Dates: | AC - many times past 2 yrs. | | |
| + Attach Copy of Floor Plan on 8 1/2" X 11" paper | | | |

### Section VII. Construction/Renovation Information

Date Range for New Home Construction: (Month/Day/Year)

| | | | |
|---|---|---|---|
| Start Date: | / /05 | Completion Date | 10 /18 /06 |
| Move in Date: | 10 /18 /06 | Date Acquired Home | 7 /6 /05 |

Date Range for Renovations: (Month/Day/Year)

| | | | |
|---|---|---|---|
| Start Date: | na / / | Completion Date | / / |
| Move in Date: | / / | | |

| Renovation(s) | Yes | No | N/A |
|---|---|---|---|
| First Floor: 1/2 Wall of drywall replaced | | | |
| First Floor: Full Wall of drywall replaced | | | |
| Second Floor: Any drywall replaced | | | |

### Section VIII. Homebuilder/ General Contractor/ Developer Information

Homebuilder/ General Contractor/ Developer's Name:

    Diamond Court Construction Co.

Address:   2112 S.E. Bersell Road

    Port St. Lucie, FL 34952

Phone:   (   )  -

+ Attach Copy of Construction/Renovation Contract

+ Attach Copy of New Home Warranty Declaration

### Section IX. Drywall Installer

Drywall Installer's Name:

    Unknown

Address:

Phone:   (   )  -

### Section X. Drywall Supplier

Drywall Supplier's Name:

    Unknown

Address:

Phone:   (   )  -

WilliamsA4531-
00002

Jan 28 10 11:36a        Jordan Nichols              17728739066                    p.3

Plaintiff Profile Form - Residential Properties

**Section XI. Verification of Plaintiff Profile Form**

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information provided in this Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |
|---|---|---|---|
| | 1-23-2010 | | |
| | 1-27-10 | | |
| | | | |

Page 3

WilliamsA4531-00003

05/20/2007  11:19    7727858986              M.E.:GLENNON&ASSOC1              PAGE  01/01



**Security First**

Post Office Box 45-9025, Sunrise, FL 33345-9025

For servicing questions, please contact your agent
at the phone number listed below.
For claims reporting dial toll free: 866-354-4778 or
visit www.sficins.com.

## SECURITY FIRST INSURANCE COMPANY
## HOMEOWNERS HO-3 POLICY DECLARATIONS

| Insured Name and Mailing Address: | Insured Location Covered by this Policy: | Policy Number | SFIH0074498-01-0000 |
|---|---|---|---|
| ANDREW WILLIAMS | 4531 SW DARWN BLVD | | |
| 4531 SW DARWN BLVD | PORT SAINT LUCIE, FL 34953 | **New Issue** | |
| PORT SAINT LUCIE, FL 34933 | | **Policy Effective Date:** | 04/25/2007 12:01 AM |
| | | **Policy Expiration Date:** | 04/25/2008 12:01 AM |
| | County: SAINT LUCIE | | |

COVERAGE IS PROVIDED WHERE A PREMIUM OR LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE

| Coverages | Limit of Liability | Annual Premium | Forms and Endorsements: | |
|---|---|---|---|---|
| **Section I** | | | SFIV HO 09 COV 01 06 | SFIV HO 09 ED 06 06 |
| A. Dwelling | $205,000 | $447 | HO 00 03 04 91 | SFIV HO 09 FCE 01 06 |
| B. Other Structures | $41,000 | Included | SFIV HO 09 SP 05 06 | SFIV HO 09 HD 01 06 |
| C. Personal Property | $102,500 | Included | HO 04 21 10 94 | SFIV HO 09 OL1 05 06 |
| D. Loss of Use | $20,500 | Included | HO 04 96 04 91 | SFIV HO 09 SDE 01 06 |
| **Section II** | | | SFIV HO 09 04 50 01 06 | HO 04 48 04 91 |
| E. Personal Liability | $300,000 | $30 | SFIV HO 09 23 70 01 06 | |
| F. Medical Payments | $1,000 | Included | SFIV HO 09 CLP 01 06 | |
| | | | SFIV HO 09 ON 05 06 | |

| Endorsement Premium Total | $658 | Rating Information: | |
|---|---|---|---|
| (see Endorsement Details, p.2) | | Construction: | Masonry |
| **Credits and Charges:** | | Year Built: | 2006 |
| Age of Dwelling Credit | | Occupied By: | Owner |
| All Other Perils Deductible Credit | | Usage Type: | Primary Residence |
| Hurricane Deductible Credit | | Territory: | 181 |
| Coverage B Limit Surcharge | | BCEG Grade: | 02 |
| Windstorm Loss Mitigation Credit | | Burglar Alarm: | None |
| Building Code Effectiveness Grading Credit | | Fire Alarm: | None |
| Senior or Retiree Credit | | Automatic Sprinklers: | None |
| | | Protection Class: | 03 |
| | | Opening Protection: | Hurricane |
| | | Roof Shape: | Hip |
| | | Exclude Wind Coverage: | No |

| Total Annual Policy Premium | $1,135 | Deductible - Section I   In case of a loss, we only cover that part of the loss over the deductible stated: |
|---|---|---|
| MGA Fee | $25.00 | $2,500 All Other Perils Deductible |
| EMPA Fee | $2.00 | **$4,100 (2% of Cov A) Hurricane Deductible** |
| FL Insurance Guaranty Association Assessment | $0.00 | |
| FL Hurricane Cat. Fund Emergency Assessment | $11.60 | |
| **Total Policy Charges** | **$1,173.60** | |

The Hurricane portion of the Premium is:    $548.00          The Non-Hurricane portion of the Premium is:   $625.60

## Please see Page 3 of the Declarations Page for important notices
## that apply to this policy.

| Agency:  20269 Phone: (772) 879-1307 | Loss Payable/Mortgagee: | Loss Payable/Mortgagee |
|---|---|---|
| M.E. Glennon and Associates, Inc. | HARBOR FEDERAL SAVINGS BAN | None |
| P.O. Box 881055 | ITS SUCCESSORS AND/OR ASSIG | |
| Port St. Lucie, FL 34988 | PO BOX 249 | |
| | FORT PIERCE, FL 34954-0249 | |
| Agent: Luis Martinez | | |

Authorized Countersignature:    _Bruce M. Smiley_

SFI DEC 001 05 06

Agent Copy                                      Page 1 of 3                          Ren: 01, End: 0000

WilliamsA4531-
00004

**EAST REGION**
Mail to:
2-10 HBW®
1728 Montreal Cir.
Tucker, GA 30084

# BUILDER APPLICATION
# FOR HOME ENROLLMENT
FORM HBW 302 FL
THIS DOCUMENT IS NOT YOUR NEW HOME WARRANTY


2-10
Home Buyers Warranty®
America's Choice

The undersigned Builder Member of the 2-10 HBW® New Home Warranty program makes application for enrollment of the home whose address is listed below. The Builder Member is responsible for completion of all enrollment requirements on the home. If all enrollment requirements are not completed on the new home, this Application will be denied and no coverage by the Builder's Warranty Insurer will be provided. The Builder must send or have his closing agent send the original of this Application for Home Enrollment and a check for full payment to 2-10 HBW®. If the Builder Member has satisfied all the enrollment requirements and 2-10 HBW® has received this Application and full payment within 15 days of the date of closing on the home, the Buyer will receive the Certificate of Warranty Coverage and Warranty Booklet within 30 days of closing from 2-10 HBW®. **IF THE BUYER HAS NOT RECEIVED THE CERTIFICATE OF WARRANTY COVERAGE AND WARRANTY BOOKLET FROM 2-10 HBW® WITHIN THIRTY (30) DAYS AFTER CLOSING, THEN THERE IS NO COVERAGE BY THE BUILDER'S WARRANTY INSURER, YOU SHOULD CONTACT YOUR BUILDER.**

**PLEASE PRINT OR TYPE:**

① Buyer(s): _Andrew Williams_
(Name(s) as recorded on deed)

Address of Home: _4531 SW Darwin Blvd._ Pt St. Lucie _FL_ _34953_
Street Address          City          State   Zip Code

Lot / Block: _11 / 2391_          Subdivision: _PSL Sec 34_

2. Builder Name: _Diamond Court Construction Co._          HBW Builder No: _8800-8905_

③ Effective Date of Warranty:  Date of Closing: _____ Date of earlier first occupancy if before closing: _____
**CONDOMINIUMS ONLY:** The Effective Date of Common Elements Coverage is the date the main structure housing individual units was completed. Effective date of Common Elements Coverage: _____

④ COVERAGE: Both the Builder and Buyer(s) must check and initial which of the following coverage(s) apply to the unit being enrolled.
A. ☐ _____ 1-Year Workmanship / 2-Year Systems / 10-Year Structural Coverage
B. ☒ _____ 10-Year Structural Coverage Only
C. ☐ _____ 2-10 Plus Extended Warranty Plan Accepted
D. ☐ _____ 5-Year Extended Structural Warranty

5. ☒ Single Family Detached    ☐ Townhome    ☐ Manufactured    ☐ Modular    ☐ Condominium
If Condominium:    ☐ Low Rise    ☐ Mid Rise (3-5 Story)    ☐ High Rise (6 Story or Greater)
No common elements coverage will be provided unless all units in a building are enrolled.

⑥ Type Financing:    FHA Check One:  A. ☐ FHA using Bldg. Permit; C.O./or equivalent and HUD-92544
                                     B. ☐ FHA using HUD-approved 2-10 warranty
        ☐ VA    ☐ RHS    ☒ Conventional    ☐ Cash

⑦ A. Rate Formula for 1-Year Workmanship / 2-Year Systems / 10-Year Structural Coverage or Ten Year Structural Only Coverage:

| $230,900$ | ÷ 1,000 = | $230.90$ | X | $95$ % | = | $209.80$ | X | $1.25$ | = | $262.31$ | (A) |
| Final Sales Price | | | | Rate | | Basic Warranty Fee | | If price does not include land | | Basic Warranty Fee | |

B. Rate Formula for Optional 5-Year Extended Structural Warranty:

| _____ | ÷ 1,000 = | _____ | X | _____ | = | _____ | X | _____ | = | _____ | (B) |
| Final Sales Price | | | | Rate | | 5-Year Extended Structural Premium | | If price does not include land | | 5-Year Extended Warranty Fee | |

+ **$30.00** (C) + _____ (D) + _____ (E) - **$0.00** (F) = _262.31_
If (6B.) checked      Final Sale Price X $1.00 per    Any additional    Less the      A + B + C + D + E - F =
Add FHA / VA Fee      $1,000 for condo-wood         fee           prepaid fee    Total Warranty Fee Due
                     stairs & landings coverage

✕ **BUILDER'S AUTHORIZED SIGNATURE** _____          Date _10-18-06_

BUYER'S ACKNOWLEDGEMENT AND CONSENT
Your Builder is applying to enroll your home in the 2-10 HBW® New Home Warranty program. By signing below, you acknowledge that you have read a sample copy of the Warranty Booklet, and CONSENT TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION contained therein. You further understand that when the warranty is issued on your new home; it is an Express Limited Warranty and that all claims and liabilities are limited to and by the terms and conditions of the Express Limited Warranty as stated in the 2-10 HBW® Booklet. IF YOU, THE BUYER(S), HAVE NOT RECEIVED A CERTIFICATE OF WARRANTY COVERAGE AND A WARRANTY BOOKLET FROM 2-10 HBW® WITHIN THIRTY (30) DAYS AFTER CLOSING, THEN THERE IS NO COVERAGE BY THE BUILDER'S WARRANTY INSURER, YOU SHOULD CONTACT YOUR BUILDER.

✕ Buyer(s) Signature _____ Date _____

✕ Buyer(s) Signature _____ Date _____

✕ Buyer(s) Phone # _____

| OFFICE USE ONLY |
| Accounting: _____ |
| Risk Mgmt: _____ |
| Warranty No. _____ |

HBW 302 FL 10/04

WilliamsA4531-
00005

## ONE YEAR PERFORMANCE GUARANTY

Buyer: _Andrew Williams_

Property Address: _4531 SW Darwin Blvd._

Date: _10-18-06_

    Builder certifies that the above home is guaranteed thru subcontractors and suppliers against defects in the original material and workmanship for one year from the date hereof.  Builder will at its option repair or replace, at no charge to the Buyer, any component of this home which shall be found either structurally or functionally defective.  This guaranty does not cover carpet, lawns, landscaping, natural stone, cracked tiles due to settling or items which can be corrected by the homeowner as normal maintenance.

    Further, the basic structural components of the above home are covered under the Home Buyers Warranty VI for a period of ten years from the date hereof.

    Minor expansion, contraction and settling cracks normal to construction, damage and consequential damage due to undisclosed subsoil conditions are not considered to be structural defects under the terms of this guaranty.

    This guaranty remains with the home and is not transferable to future owners and is in exclusion of, and in lieu of, all other guarantees, expressed or implied, written or oral, save and except all manufacturers' guarantees or warranties which shall be in force according to their own terms.

    Builder, Diamond Court Construction Company, is required to provide all customer service necessary thru its subcontractors and suppliers under the terms of this Performance Guaranty.

    Diamond Court Construction Company reserves the right to determine whether the work requested is included under this Performance Guaranty.  No monetary settlement will be made in lieu of performance.

Homebuyer  Signature          Homebuyer  Signature

Builders  Rep.

GUARANTY2.wpd

WilliamsA4531-
00006

**Diamond Court Construction Company** - | SELECTION SHEET & WORK ORDER SHEET- pg 1 |

Fax to: _____
Fax #: _____
From: _____
Re: _____ Pages: ___

**Customer:** *ANDREW WILLIAMS* **Job #:** _____

**Model:** _____  **Job Address:** *DARWIN* _____

| | KITCHEN SELECTIONS | LAUNDRY | BAR |
|---|---|---|---|
| Cabinets - Style Name:<br>Color: | *SENICA RIDGE MAPLE*<br>*AACH      TOFFEE* | | |
| Cabinet Hardware: | *DOORS HK123*<br>*DRAWS HP124* | | |
| **1.** Countertop Color: | **1.** *JADE GREEN* | **1.** | **1.** |
| **2. IS THIS** . . . Laminate,<br>Corian and it's level # ,<br>or 1-1/4" Granite | **2.** *GRANITE* | **2.** Laminate | **2.** |
| **3.** Edge Style: -see red sel. book | **3.** *BEVEL TOP* | **3.** Straight | **3.** |
| **1.** Kitchen Sink:<br>Blancodiamond Silgranite in<br>WH, BI, BL, GR *  or<br>Blancospex in SS -see red sel. book | **1.** *BLACK* | **1.** Fiberglass | **1.** |
| **2.** Drop In or Undermount | **2.** *UNDERMOUNT* | **2.** Drop-In | **2.** |
| Moen Monticello 7730 Kitchen<br>Faucet - SS, WH, SA, CH * | *STAINLESS* | Chrome | |

| **Attention !**<br>**Countertop Contractor:** | 1. Kitchen sink supplied by Diamond Court - pick up at office (see Brand & Model above)<br>2. Kitchen faucet supplied by Plumber - 3 holes / 4" on center (see Brand & Model above)<br>3. Wood mount for Dishwasher needed for installation for Granite top order<br>4. Paintable wood corbels required for Granite bar tops<br>5. Backsplash: ☑ Customer wants backsplash SAME AS COUNTERTOP: Full backsplash at<br>bar top & approximately 6" elsewhere to match bar top backsplash height<br>☐ Customer wants backsplash TILED: Tile company will install Full<br>backsplash tiled at Range side. Sales Coordinator to record selection on<br>Main Flooring Selection Work Order Sheet (Upgrade)***<br>6. If 30" Kenmore 22-46359 style Slide in Range is selected below, confirm cut out dimensions |

Appliances:      See attached Appliance Order Sheet to select Appliances

Check one for type of Range to be selected:   ☑ Free Standing Range    ☐ Slide in Range

Check one for type of appliance to be selected:   ☑ Electric    ☐ Gas: range & dryer

Kitchen Flooring & Tiled Backsplash:      See attached Main Flooring Selection Work Order Sheet

* WH - white, BI - bisque, BL - black, SA - sand, BO - bone, GR - gray, CH - chrome, SS - stainless              DCC/Delivery/ selection sheet 06-01-05

Homebuyer's Approval *Andrew Williams*                                      **Date:** *6-11-05*

WilliamsA4531-
00007

**Diamond Court Construction Company** - | SELECTION SHEET & WORK ORDER SHEET - pg 2 |

Fax to: _____
Fax #: _____
From: _____
Re: _____ Pages: ____

**Customer:** ANDREW WILLIAMS **Job #:** _____

**Model:** _____  **Job Address:** _____ DARWIN

## BATH SELECTIONS

| | Master Bath | Bath 2 - Middle Bath between BR2 & 3 | Bath 3 - Rear Bath near BR 4 | Cabana (½) Bath on Lanai |
|---|---|---|---|---|
| Cabinets -    Style Name: Color: | PEMBERTON OAK SQ CIDER | SUNDALE MAPLE SQUARE PAPRICA | | |
| Cabinet Hardware: | HK107 DOORS HP106 DRAWS | HK128 | | |
| 1. Vanity · Cultured Marble Color: | 1. EBONY W/BLK | 1. HUNTER GREEN | 1. | 1. |
| 2. Vanity Cultured Marble bowl shape - see red selection book | 2. HILO'S SHELL WSD | 2. LAPAZ LC | 2. | 2. |
| 3. Vanity 1-1/2" Cultured Marble edge - see red selection book | 3. DROP LIP OGEE | 3. DROP LIP OGEE | 3. | 3. |
| 4. Caulking Color: Black, White or Clear | 4. BLK | 4. CLEAR | 4. | 4. |

**Attention !**
**Cultured Marble Subcontractor:**    1.  Faucets centers are 3 holes with 4" on center

| | Master Bath | Bath 2 - Middle Bath between BR2 & 3 | Bath 3 - Rear Bath near BR 4 | Cabana (½) Bath on Lanai |
|---|---|---|---|---|
| 1. Tub: WH - standard | 1. WH | 1. WH | 1. | 1. |
| 2. Toilet & (Pedestal Sink - if appl): WH-std | 2. WH | 2. WH | 2. | 2. WH |
| 1. Shower Door   Clear or Obscure | 1. CLEAR | 1. | 1. | 1. |
| 2. Shower Door   Chrome or Gold tone | 2. CHROME | 2. | 2. | 2. |
| Bath Accessories/Hardware: (see Red Selection Book) | | | | |
| 1. Style Name: | 1. GILCREST COLL. | 1. YORKSHIRE COLL | 1. | 1. PRESTON COLL |
| 2. Finish: | 2. OIL RUBBED BRONZ ORB | 2. SATIN NICH SN | 2. | 2. MPW |
| 3. Item & Quantity: **FAX FLOOR PLAN WITH INSTALL LOCATIONS** | 3. Paper Holder  = 1  24' Towel Bar = 2  Towel Ring  = 2 | 3. Paper Holder  = 1  24' Towel Bar = 2  Towel Ring  = 1 | 3. Paper Holder  = 1  24' Towel Bar = 1  Towel Ring  = 1 | 3. Paper Holder  = 1   Towel Ring  = 1 |
| Bath Wall Tile | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |
| Bath Flooring | see attached Bath - Wall & Floor Tile Work Order Sheet | | | |

* WH - white,  BI - bisque,  BL - black,  SA - sand,  BO - bone,  GR - gray,  CH - chrome,  SS - stainless        DCC/Delivery/ selection sheet 06-01-05

Homebuyer's Approval: _Andrew Williams_ _____        Date: 6-11-05

WilliamsA4531-
00008

**Diamond Court Construction Company**  -  | **SELECTION SHEET & WORK ORDER SHEET** - pg 3 |

Fax to: _____
Fax #: _____
From: _____
Re: _____ Pages: ___

**Customer:** _ANDREW WILLIAMS_  **Job #:** _____
_DARWIN_

**Model:** _____  **Job Address:** _____

## INTERIOR  COLOR  SELECTIONS

| Wall & Ceiling Texture<br>Textured like Model is Standard<br>Specify standard or upgrade below | Int. Paint Colors | Switch / Outlet Plates<br>House: White is Standard<br>Kitchen Backsplash: WH, BI, BL * | Window Sills<br>Specify Carrara or Travertine below | Carpet & Tile |
|---|---|---|---|---|
| Wall: _STD_<br>Ceiling: _STD_ | See attached<br>Paint Selection Sheet | House Wall plates: _WH_<br>Kitchen counter backsplash plates: _BLK_ | Carrara or Travertine:<br>_TRAVERTINE_ | See attached<br>Main Flooring Sheet |

## EXTERIOR  COLOR  SELECTIONS

| Ext Paint/Stain Colors | 30 yr. Architectural Roof Shingles | Aluminum Soffit Color & Fascia Color |
|---|---|---|
| See attached<br>Paint Selection Sheet | Brand: _ELK_<br>Color: _FOREST GREEN_ | Alumn. Soffit Color: ☒ Check for White (standard)<br>☐ Check for upgrade color:<br>Wood Fascia Color:  See Painting Sheet for trim color |

## INTERIOR  &  EXTERIOR  DOOR  SELECTIONS

| Front Entry Door | Front Door Hardware | Ext/Int Door Hardware | Interior Doors |
|---|---|---|---|
| **Standard:** (see red Sel. Book)<br>☐ Six-panel steel &<br> 694 IM 5-lite sidelight if appl.<br>☐ 686 CL full light with matching<br> 694-CL sidelights if applicable<br>☐ 686-IM 15-lite like Model with<br> 694-IM 5-lite sidelight if appl.<br>☒ 686-QE light silkscreen<br> 694-QE sidelights if applicable<br>☐ **Upgrade:** (See red Sel. Book) | ☒ P.Brass handle: standard<br>☐ Ant. Nickel handle: upgrade<br>☐ Ant. Brass handle:  upgrade<br><br>**Note:**  Keyless entry in Polish<br> Brass only at this time<br><br>☐ Other: _____ | ☒ Ext P. Brass finish Lido lever:  standard<br>☐ Ext _____ finish:  upgrade<br>☐ Ext _____ lever:  upgrade<br><br>☒ Int P. Brass finish Lido lever:  standard<br>☐ Int _____ finish:  upgrade<br>☐ Int _____ lever:  upgrade<br><br>☐ Other: _____ | ☒ Six-panel: standard<br><br><br><br><br>☐ Other: _____<br>_____<br>_____ |

## Lighting & Landscape Selections
See attached information sheet for instructions

Colors that the Buyer selects may vary from display samples due to different manufacturing color dye lots, patterns, or veining.  If selected materials are not available, the Buyer agrees to make new selections without delay or Diamond Court Construction Company reserves the right to substitute materials of a like pattern, quality and design.  Any unauthorized work scheduled or performed by the Buyer shall be removed, with cost of such removal charged to the Buyer.  Selections to be finalized and signed 21 days after bank closing. Any changes to selections, must be made prior to the building permit being issued.  An Administrative service charge of $250.00 will be added to the price of any and every change.  No changes allowed once building permit is issued.

IMPORTANT: Homebuyer, please review all information for accuracy of selection numbers and colors before signing.

Homebuyer's Approval: _Andrew Williams_  Date: _C - / / -05_

DCC/Delivery/selection sheet 06-01-05

WilliamsA4531-00009

**Diamond Court Construction Company** - | SELECTION SHEET & WORK ORDER SHEET - pg 4 |

Fax to: _____
Fax #: _____
From: _____
Re: _____ Pages: _____

**Customer:** _____ **Job #:** _____

**Model:** _____ **Job Address:** _DARWIN_

| List Of All Upgrades And Changes | | |
|---|---|---|
| DESCRIPTION | LEVEL | PRICE |
| SENICA RIDGE MAPLE TOFFEE | | |
| ARC H | I | 950 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Person coordinating selections:** _Andrew Williams_

WilliamsA4531-00010

DCC/Delivery/selection sheet  06-01-05

## PAINT SELECTION WORK ORDER

Date:                                  From:    Diamond Court Construction Co.
To:                                    Sender:
Fax:                                   Pages:

**Customer:** A WILLIAMS   **Job #:**

**Model:** COAST POINTE   **Job Address:** DARWIN

### Write in Sherwin Williams Color Name and Number below:

A.  **Interior Selections:**  *(Choose 1 color for ceilings & walls & 1 color for trim)*
1.  Wall & Ceiling Color:      Masterhide Int. Flat: POLAR WH SW 2423
2.  Kitchen & Bath Color:      Masterhide Int. Semi-gloss: POLAR SW 2423
3.  Trim Color:                Masterhide Int. Semi-gloss: PURE 7005
    (doors, baseboard, casings, moldings)
4.  List any upgrades here:    _____

B.  **Exterior Selections -** *(Choose up to 3 colors)*  | See Elevation sheet for color locations |
1.  Stucco Sealer:            Loxon
2.  Body Color:               DuraCraft Ext. Flat: SAGEY SW 6175
3.  Trim Color #1:            DuraCraft Ext. Flat: LIVEABLE GREEN SW6176
4.  Trim Color #2:            DuraCraft Ext. Flat: PURE WHITE 7005
5.  Exterior Front Door:      DuraCraft Ext Satin:   Same as Trim Color # 6176
6.  All other Exterior Doors: DuraCraft Ext Satin:   Same as Trim Color # 6176

**Note:** The inside of Exterior Doors are to be painted with the Interior Trim Color

C.  **Lanai Floor Selection:**
1.  Floor Stain Color:        HC Brand Stain Color : Dusted Clover HC121
    *(Exterior silicone acrylic concrete sealer)*

D.  **Leave Touch up kit &/or remaining paint buckets in attic**

Homebuyer's Approval: Andrew Williams   Date: 6-11-05

DCC/Delivery/paint.sel 06-01-05

WilliamsA4531-
00011

# MAIN FLOORING SELECTIONS
### INCLUDING KITCHEN TILED FULL BACKSPLASH
# DELIVERY / WORK ORDER SHEET

| JOB #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: *COAST POINTE* | 2112 SE Bersell Rd., PSL, FL. 34952   (772) 337-3070   FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: *A WILLIAMS* |
| CONST. STAGE: | DELIVERY ADDRESS: *DARWIN* |

| Floor Tile | Brand, Tile Name, Number, Color & Size * | Level # Standard, I, II, or III | Grout Color & # | Tile Dir straight or diagonal |
|---|---|---|---|---|
| FULL TILED BACK SPLASH at range side | | upgrade | | ☐ STRT ☐ DIAG |
| FRONT ENTRY: strt is standard | *INDIAN SLATE SIOUX VARDE 12X13* | *STD* | *GRAY 16* | STRT |
| FOYER: strt is standard unless upgraded to diag in Liv/Din | *TEJA LAMESA 18X18 ELEMENTS* | | *BRICK 41* | ☒ STRT DIAG |
| KITCHEN + pantry | | | | DIAG |
| NOOK + hallway off nook | | | | DIAG |
| LAUNDRY + hallway off laundry | | | | DIAG |
| REAR HALLWAY - next to rear bath | | | | ☐ STRT ☐ DIAG |
| | | | | |
| | | | | |
| | | | | |

| Carpet - more than one color is an upgrade | Brand / Color / Number | Level # Standard, I, II, or III | MISC. |
|---|---|---|---|
| LIVING | *ZANZIBAR 872 FUDGE* | *STD* | |
| DINING | | | |
| FAMILY + hallway off family | | | |
| DEN/STUDY | | | |
| MASTER BEDRM + closets | | | |
| BEDROOM 2 | | | |
| BEDROOM 3 | | | |
| BEDROOM 4 | | | |

\* Threshold in Travertine or Carrara Marble to separate room floor tiles that are different

Homebuyer's Approval: *Andrew A Williams*     Date: *6-11-05*

DCC/Delivery/Floor (Main) Tile Selection Sheet/06-01-05

Floor (Main) Tile Selection Sheet.wpd

WilliamsA4531-00012

## Bath - Wall & Floor Tile
# DELIVERY / WORK ORDER SHEET

| JOB #: | DIAMOND COURT CONSTRUCTION COMPANY |
|---|---|
| MODEL: | 2112 SE Bersell Rd., PSL, FL. 34952   (772) 337-3070   FAX 335-1150 |
| DELIVERY DATE: | CUSTOMER'S NAME: *A WILLIAMS* |
| CONST. STAGE: | DELIVERY ADDRESS: *DARWIN* |

| Bath Tile | Brand, Tile Name, Number, Color & Size | Level # Standard, I, II, or III | Tile Dir Straight or Diagonal | Grout Color & # | Tub/Shower Walls Ceramic Towel Bar & Soap dish White or Bone |
|---|---|---|---|---|---|
| Master Bath SHOWER WALL | *CHURCHIL ELEMENTS 8X10 ALMOND* | *STD* | STRT | *EGG-SHELL 5-8* | ☐ Check if you want towel bar & soap dish - color:_____ |
| 7 - SHOWER WALL DECOS | *8X10 ALMOND + ALMOND* | | — | | ☐ Check for upgrade corner shelf - color:_____ |
| Master Bath BATH FLOOR | *ALMOND 12X12* | | STRT | | ☐ Check if Listellos to be put on tub deck - OR - |
| Master Bath SHOWER FLOOR | *RAINFOREST GARDENIA 3X3* | ✓ | STRT | ✓ | ☐ Check if Listellos to be placed on shower wall |
| Master Bath TUB DECK | SAME AS FLOOR TILE *ALMOND 12X12* | | STRT | ✓ | LISTELLO #: |
| Bath 2 - middle bath by BR2 - BR3 SHOWER OR TUB WALL | *PESCARA 8X10 VERDE P5705* | | STRT | *GRAY 16* | ☑ Check if you want towel bar & soap dish - color: *BONE* |
| 5 - WALL DECOS | *PESCARA 8X10 VERDE P5706* | | — | | ☐ Check for upgrade corner shelf - color:_____ |
| Bath 2 - middle bath by BR2 - BR3 BATH FLOOR | *PESCARA 12X12 VERDE P3072* | | STRT | ✓ | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| Bath 2 - middle bath by BR2 - BR3 SHOWER FLOOR | | | STRT | | |
| Bath 3 - rear bath near BR 4 SHOWER OR TUB WALL | | | STRT | | ☐ Check if you want towel bar & soap dish - color:_____ |
| 5 - WALL DECOS | | | — | | ☐ Check for upgrade corner shelf - color:_____ |
| Bath 3 - rear bath near BR 4 BATH FLOOR | | | STRT | | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| Bath 3 - rear bath near BR 4 SHOWER FLOOR | | | STRT | | |
| Cabana (½) Bath on Lanal SHOWER OR TUB WALL | | | STRT | | ☐ Check if you want towel bar & soap dish - color:_____ |
| 5 - WALL DECOS | N/A | | — | | ☐ Check for upgrade corner shelf - color:_____ |
| Cabana (½) Bath on Lanal BATH FLOOR | *CHURCHILL 12X12 BEIGE* | | STRT | *EGG SHELL 5 8* | ☐ CHECK FOR UPGRADE - ADD LISTELLOS - #: |
| Cabana (½) Bath on Lanal SHOWER FLOOR | N/A | | STRT | | |

**TILE SPECS:** (1) All transitions/sills to be recessed in tile (2) All corners to be caulked - to windows also (3) Window sills to be re-set, if needed (4) Listellos for front of tub deck selection to be placed at top front of deck and step, angle walls also (5) All floor to shower transitions to be done with 5 ½" sill, over hanging into shower & recessed

Homebuyer's Approval: *Andrew Williams*                     Date: *6-11-05*

Bath Tile Selection Sheet.wpd

**To:** Mike Cormier
**Fax:** 561-791-8082
**From:**
**Date:**

**SEARS**
△ Contract Sales

If Customer chooses appliance allowance, use Appliance Select form

| Account No: | | Quote #: | | Quote Date: | 2/15/06 |
|---|---|---|---|---|---|

| Prepared For: | | | Project Information: | | |
|---|---|---|---|---|---|
| Company
DIAMOND COURT CONST | | | Name
ANDREW WILLIAM | | |
| Address
2112 SE BERSELL RD | | | Address
DARWIN | | |
| City
PORT ST LUCIE | State
FL | Zip
34952 | City | State | Zip |
| Contact
JENNIFER | Phone
772-337-3070 | Fax
772-335-1150 | Contact | Phone | Fax |

## Standard Appliance Selections
### Check one of the appliance packages & circle choice of colors below

☒ Standard Selection
in choice of white, bisque, (black)

☐ Stainless Steel Upgrade
with standard laundry selection

| Stock Number | Description | Color | Qty | | Stock Number | Description | Color | Qty |
|---|---|---|---|---|---|---|---|---|
| | 26CU SXS REFRIG | | | | | | | |
| 46-54622 | KN; 26 SXS ICE WATER FILTER | W/BI/BL | 1 | | 46-52673 | 26 Ice and water Dispenser, Filtration Energy Star SS | SS | 1 |
| CODE 46 | WATER LINE HOOK UP | | 1 | | | | | |
| | RADIANT RANGE | | | | 22-95023 | Americas Best with Kenmore Exclusive Logiclean SS | SS | 1 |
| 22-96012 | KN; 30 RADIANT TOP RANGE | W/BI/BL | 1 | | 22-2244 | Range Cord 4 ft., 4 Wire | | 1 |
| 22-49624 | RANGE CORD | | 1 | | | | | |
| | DISHWASHER | | | | | | | |
| 15162 | KN;6 CYCLE DEL START | W/BI/BL | 1 | | 22-14773 | 8 touchpads plus china gentle cycle deluxe insulation. 5 Level. 7 Cycles. | SS | 1 |
| 22-16006 | DISHWASHER CORD | | 1 | | 22-16006 | 6 ft. Dishwasher Cord | | 1 |
| | MICRO | | | | | | | |
| 22-60402 | KN; 1.7 1000 WATTS COMBO | W/BI/BL | 1 | | 20-62643 | 1.6 CU FT MHC 1,000 WATTS SENSOR ON OFF TURNTABLE AUTO | SS | 1 |
| CODE 61 | INSTALL MICRO | | 1 | | CODE 61 | MICROWAVE INSTALL | | 1 |
| 26-24942 | KN; SUPER CAP PL ELIT | W/BI/BL | 1 | | 26-24942 | KN; SUPER CAP PL ELIT | W/BI/BL | 1 |
| 26-64942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 | | 26-64942 | KN;SUPER CAP PL DRYER | W/BI/BL | 1 |
| 26-49606 | DRY; LP DRYER EXHST | | 1 | | 26-49606 | DRY; LP DRYER EXHST | | 1 |
| 26-49388 | DRYER CORD | | 1 | | 26-49388 | DRYER CORD | | 1 |

Check one: ☒ Electric
☐ Gas:  Dryer & Range

| Mdse. Before Tax | |
|---|---|
| Tax Total 6.50% | |
| Misc. (Inst) | |
| Delivery Total | |
| Del. Tax* | |
| Grand Total | |

*If applicable, delivery must be taxed in certain areas

This offer is good for 30 days, unless otherwise noted. This is a quote and is subject to the terms and conditions on our Contract &
Security Agreement. Sears Contract Sales reserves the right to change or withdraw this offer at any time prior to acceptance by purchaser.

Prices Effective _____ Thru _____

Accepted By: _____        Date: _____

*Your Sears Contract Sales Account Manager*

Submitted By: _____        Phone _____
Fax: _____        E-mail: _____

*Customer Support Center (800) 359-2000 Press 1*

**SEARS**
△ Contract Sales
www.ContractSales.Sears.com

**Selection Coordinator:** If Customer chooses to select appliances other than our standard appliance selections (even if it's only one
that is different from our standard) fill out Appliance Select form. Our standards in addition to any upgrades can be selected at this location.

Homebuyer's Approval: *Andrew William*        Date: 6-11-05        Eff: 4/29/05

Williams-A4531-00014



DIAMOND COURT
CONSTRUCTION CO.

## LIGHTING & LANDSCAPE
## INFORMATION SELECTION SHEET

| | |
|---|---|
| **Lighting Allowance** | **Landscape Allowance** |
| **$1200 Luxury Package** | **$800 Luxury Package** |
| Make an appointment with the following Lighting store below before or after interior framing has been completed on your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately. | Make an appointment with the following Landscaping Center below after Stucco has been completed on the exterior of your home. Out of town customers who can not return during construction to make this selection will need to make an appointment immediately. |
| Crystal Lighting<br>1984 SW Bayshore Blvd.<br>Port St. Lucie, FL 34984<br>(772) 340-1140 | Arbor Landscape & Lighting<br>Jim Quackenbush<br>(772) 879-6264 office<br>(888) 879-6264 office<br>(772) 519-3212 cell |

DCC/Delivery/Lighting & Landscape Selections/06-01-05

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952   FAX (772) 335-1150

WilliamsA4531-00015

# Plumbing  Specifications  for  Diamond Court Construction Company

Job #  _____        Customer  A  WILLIAMS

Job Address  _____ DARWIN _____  Model  COAST  POINTE

## Standard Luxury Specs
### Refer to Customer's Selection Sheet for Color & Finish selections
See Contract Addendum or Change Order(s) for upgrades &/or changes

| | **Master Bath** |
|---|---|
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Showerhead (L2352-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Jetta Tub (soaker) *as per plan* - white |
| 5 | Moen Monticello Roman Tub faucet (T951-C + 4997 or 4999 valve) |
| 6 | American Standard Bidet-white, with Moen Chateu Bidet faucet (5200-C) *as per plan* |
| | **Guest Baths** |
| 1 | Moen Chateu single lever Lav faucet (L4621-C) |
| 2 | Moen Chateu single lever Posi-Temp Tub/Shower (L2353-C) |
| 3 | American Standard elongated W/C 1.5gpf toilet - white |
| 4 | Porcelain/Steel Tub *as per plan* - white |
| 5 | Pedestal-white, with Moen Chateu single lever Lav faucet (L4621-C) at Cabana bath *as per plan* |
| | **Kitchen** |
| 1 | Kitchen sink supplied by Diamond Court |
| 2 | Moen Monticello w/cathedral spout kitchen faucet # 7730 - choice of finishes  SL,CH,WH,BI,SA, |
| 3 | 1/2 HP Food disposal |
| 4 | Icemaker supply line |
| 5 | Dishwasher connection of supply & discharge line |
| | **Laundry** |
| 1 | 50 Gallon electric HWH |
| 2 | Wash Machine Hanson box |
| 3 | 2 Hose bibbs |
| 4 | A/C Chase *as per plan* |
| 5 | Necessary Lead vent pipe flashings |
| 6 | Copper  (water distribution lines) |

DCC/Delivery/plumbing specs - 06/01/05

Plumbing Specs



## DIAMOND COURT CONSTRUCTION CO.

## Color Selection Authorization Release Form

I / We ___ANDREW WILLIAMS___ , customer of

Diamond Court Construction Co., authorize ___RON BRODSKY___ ,

who is my ☒ Sales Agent for Diamond Court

who is my ☐ _____ (Relation to Customer)

to select and complete color selections for my / our property at:

_____

Homebuyer's Approval: ___Andrew Williams___  Date: ___6-11-05___

Homebuyer's Approval: _____  Date: _____

DIAMOND COURT CONSTRUCTION COMPANY
OFFICE (772) 337-3070   2112 SE BERSELL ROAD, PORT ST. LUCIE, FLORIDA 34952   FAX (772) 335-1150
DCC/color selection authorization release form/6-01-05

WilliamsA4531-00017

## Selection Check Off List: Job#/Customer: _A Williams_

---

### Sales Coordinator:

 Call customer to set up appointment: Ask them if they have been in Model to pre-select. If they have not, Customers should be encouraged to browse Show Room to allow time to consider possible selections prior to appointment. Allotted time is 5 hours. Thereafter $30 / hour. Average time customers take for selections is 4-1/2 hours.

 Review contract prior to appointment: Building Agreement, Addendum, Specs, Change Orders, Elevation, Floor Plan

Review selections with customer upon finalizing selections

 Customer listed on Building Agreement or Authorized Person as shown on Color Selection Authorization Release form to sign &/or initial and date _EVERY_ page.

 Make copy of _ENTIRE_ Selection Packet:   Copy for Customer
Copy for Sales
Originals to Construction Office

◆ **Important Note:** **Do not make changes on selection sheet once customer has signed & been given a copy. Record any changes on a separate piece of paper or blank selection sheet form with their signature & date - submit to office.**

---

### Construction Office:

[ ] Make one copy of each of the below forms found in the legal file for comparing any upgrades listed on them with any upgrades listed on the selection forms:

    Building Agreement, Addendum, Spec Sheet, Change Orders, Floor Plan, Elevation if applicable

[ ] Print 8 ½ x 11 architectural plan from Chief Architect to include with selection sheet forms

[ ] Review selection sheets for accuracy. (Write up customers List of Upgrades for making a Change Order)

[ ] Record on kitchen sink order list

[ ] Color selection finalized ✓ off on customer list

[ ] Make copies of color selections for Superintendent Field Books

[ ] Write up a Change Order if applicable - see Change Order procedure

◆ **Important Note:** **For changes: Record changes to original selection sheet with revised date. Make copy of revised selection sheet & stamp with Field Book Updated stamp & file change request that was submitted on a separate piece of paper or blank selection sheet form with their signature & date in the back of original selection sheet forms.**



# DIAMOND COURT
# HOMES INC.

*Custom & Model Homes*

## Model Center (772) 871-7700
573 SW Nautical Ave., PSL, FL - Off Bayshore Blvd., North of Bayshore Elementary School

# COAST POINTE



Wood Fascia
on Lux Pkg
Color!

STANDARD

SAGE
SW 6175

WH
7005
Wood Fascia
on Lux Pkg
Colors!

WH
7005

WH
7005

WH
7005

LIVEABLE
GREEN
SW 6176

OFFICE VERSION

LIVEABLE
GREEN
SW 6176

WH
7005

WH
7005

WH 7005

Homebuyer,s Approval: _Andrew William_          Date: _6-11-05_

WilliamsA4531-
00019



# DIAMOND COURT HOMES INC.

**MONARCH MANOR**

| | |
|---|---|
| LIVING | 2133 |
| GARAGE | 444 |
| LANAI | 176 |
| ENTRY | 64 |

TOTAL AREA
2817 SQ FT

FLOOR PLANS, DIMENSIONS AND ELEVATIONS ARE APPROXIMATE. FEATURES AND SPECIFICATIONS SUBJECT TO CHANGE WITHOUT NOTICE.
BUILT BY DIAMOND COURT CONSTRUCTION COMPANY, INC. STATE CERTIFIED CBC 049065 INSURED
COPYRIGHT 1999. ALL RIGHTS RESERVED. DUPLICATION PROHIBITED

WilliamsA4531-
00020



**Security First Insurance**
Insuring Florida homes

Post Office Box 45-9025, Sunrise, FL 33345-9025

For claims reporting dial toll free: 877-581-4862
International callers dial         : 386-673-5308
Or visit www.SecurityFirstFlorida.com .
For servicing questions, please contact your agent
    at the phone number listed below.

## SECURITY FIRST INSURANCE COMPANY
## HOMEOWNERS HO-3 POLICY DECLARATIONS

| Insured Name and Mailing Address: | Insured Location Covered by this Policy: | |
|---|---|---|
| ANDREW WILLIAMS<br>4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953-6046 | 4531 SW DARWIN BLVD<br>PORT SAINT LUCIE, FL 34953-6046 | **Policy Number:** SFIH0074498-03-1870 |
| | | **Amended** 10/29/2009 12:01 AM |
| | **County:** SAINT LUCIE | **Policy Effective Date:** 04/25/2009 12:01 AM<br>**Policy Expiration Date:** 04/25/2010 12:01 AM |

COVERAGE IS PROVIDED WHERE A PREMIUM OR LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE

| Coverages | Limit of Liability | Annual Premium | Forms and Endorsements: | |
|---|---|---|---|---|
| **Section I** | | | SFIV HO 09 COV 11 08 | SFIV HO 09 SDE 03 08 |
| A. Dwelling | $219,000 | $653 | HO 00 03 04 91 | SFIV HO 09 SLC 07 07 |
| B. Other Structures | $43,800 | Included | SFIV HO 09 SP 12 08 | HO 04 48 04 91 |
| C. Personal Property | $109,500 | Included | HO 04 21 10 94 | |
| D. Loss of Use | $21,900 | Included | HO 04 96 04 91 | |
| | | | SFIV HO 09 04 90 01 06 | |
| **Section II** | | | SFIV HO 09 CLP 01 06 | |
| E. Personal Liability | $300,000 | $30 | SFIV HO 09 ED 12 08 | |
| F. Medical Payments | $1,000 | Included | SFIV HO 09 ELE 03 08 | |
| | | | SFIV HO 09 FCE 01 06 | |
| | | | SFIV HO 09 HD 01 06 | |
| | | | SFIV HO 09 OL L 05 06 | |

| Endorsement Premium Total (see Endorsement Details, p.2) | $437 | Rating Information: | |
|---|---|---|---|
| **Credits and Charges:** | | Construction: | Masonry |
| Age of Dwelling Credit | | Year Built: | 2006 |
| All Other Perils Deductible Credit | | Occupied By: | Owner |
| Hurricane Deductible Credit | | Usage Type: | Primary Residence |
| Coverage B Limit Surcharge | | Territory: | 181 |
| Windstorm Loss Mitigation Credit | | BCEG Grade: | 02 |
| Building Code Effectiveness Grading Credit | | Burglar Alarm: | None |
| Senior or Retiree Credit | | Fire Alarm: | None |
| Maximum Discount Adjustment | Surcharge | Automatic Sprinklers: | None |
| | | Protection Class: | 03 |
| | | Opening Protection: | Hurricane |
| | | Roof Shape: | Hip |
| | | Exclude Wind Coverage: | No |

| Total Annual Policy Premium | $1,120.00 | Deductible - Section I | In case of a loss, we only cover that part of the loss over the deductible stated: |
|---|---|---|---|
| Total Policy Fees (see Details, p.2) | $57.95 | $2,500 All Other Perils Deductible | |
| **Total Policy Charges** | **$1,177.95** | **$4,380 (2% of Cov A) Hurricane Deductible** | |

The Hurricane portion of the Premium is:   $609.00           The Non-Hurricane portion of the Premium is:   $568.95

## Please see Page 3 of the Declarations Page for important notices that apply to this policy.

| Agency: 20269 Phone: (772) 879-1307 | First Lienholder | Loss Payable/Mortgagee: |
|---|---|---|
| M.E. Glennon and Associates, Inc. | Loan #TBA | NONE |
| P.O. Box 881055 | Select Portfolio Svc, Inc ISAOA | |
| Port St. Lucie, FL 34988 | PO Box 7277 | |
| | Springfield, OH 45501-7277 | |
| Agent: Luis Martinez | | |

Authorized Countersignature: _M. E. N._                          SFI DEC 001 07 07

WilliamsA4531-00021

## SETTLEMENT AGREEMENT IN MDL NO. 2047
## REGARDING CLAIMS INVOLVING
## BUILDERS, INSTALLERS, SUPPLIERS
## <u>AND PARTICIPATING INSURERS</u>[1]

This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee on behalf of the Class Members, as defined below, in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (EDLA), including the various consolidated Omnibus Complaints and individual actions, and those Builders, Installers and Suppliers identified in Exhibit 1 (included within the definition of "Participating Defendants" as hereinafter defined), together with the Participating Defendants' Participating Insurers identified in Exhibit 2, as of the latest date of a Party's signature below.

**WHEREAS**, certain Participating Defendants and some of their Participating Insurers have been named as defendants in MDL No. 2047, in state or federal court litigation, and/or are otherwise alleged to be liable for the damages and/or injuries related to Chinese Drywall that was installed in various properties throughout the United States; and

**WHEREAS**, the Participating Defendants and Participating Insurers deny the allegations against them and dispute liability, causation and damages with respect to any and all claims relating to Chinese Drywall; and

**WHEREAS**, certain Participating Defendants have sought insurance coverage from the Participating Insurers with respect to the Litigation and/or other claims relating to Chinese Drywall, and certain Participating Insurers have reserved rights and/or denied insurance coverage; and

**WHEREAS,** without conceding the correctness of any other Party's legal position, claims and/or defenses, the Parties wish to avoid the effort, expense and risk of continued litigation,

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and intending to be legally bound, the Parties agree as follows:

1.      **<u>Definitions</u>**

    1.1.      **Parties.**      "Parties" shall mean the Class, Participating Defendants, and Participating Insurers:

        1.1.1.      **Class.**  "Class," also referred to as "Settlement Class" or "Class Members," shall include all persons or entities, along with their heirs, representatives, attorneys, executors, administrators, executives, subsequent purchasers, residents, guests, tenants, lenders, successors

---

[1]      This Settlement is referred to in the Knauf Defendants' Settlement Agreement as the "Prospective Insurance Agreement."

and assigns, with claims, known or unknown, arising from or related to actual or alleged Chinese Drywall purchased, imported, supplied, distributed, marketed, installed, used, sold or in any way alleged to be within the legal responsibility of any Participating Defendant. A Participating Defendant shall also be a Class Member to the extent the Participating Defendant has remediated or participated in the settlement of claims related to the Chinese Drywall in one or more Affected Properties or repurchased an Affected Property. Participating Insurers are not Class Members. Class Members do not include persons or entities with claims involving an Affected Property in the Commonwealth of Virginia.

1.1.2. **Participating Defendants; Participating Defendant**. "Participating Defendants" shall mean those persons or entities identified in Exhibit 1. "Participating Defendant" shall mean any one of the Participating Defendants. Knauf shall not be considered a Participating Defendant.

1.1.2.1. **Participating Defendant Released Parties; Participating Defendant Released Party**. "Participating Defendant Released Parties" shall mean all Participating Defendants and their respective past, present, and future officers, directors, board members, members, agents, attorneys, consultants, claim administrators, managers, employees, partners, parent corporations, sister corporations, subsidiaries, Affiliates, related entities, divisions, heirs, associates, stockholders, shareholders, retail dealers, distributors, insurers, reinsurers, and all of their predecessors, successors, assigns, legatees, legal representatives, and any other stakeholders of each of the foregoing. "Participating Defendant Released Party" shall mean any one of the Participating Defendant Released Parties.

1.1.3. **Participating Insurers; Participating Insurer.** "Participating Insurers" shall mean (a) all insurers identified in Exhibit 2 to the extent of any insurance policy issued or alleged (i) to have been issued to any non-insurer Participating Defendant and/or under which any non-insurer asserts an entitlement to rights or benefits, or (ii) to include any Participating Defendant as an additional insured. An insurer listed on Exhibit 2 as a Participating Insurer may also be a Non-Participating Defendant to the extent of a Reserved Claim against that insurer in Exhibit 3, an assignment against that insurer in Exhibit 4, or to the extent that insurer issued a policy of insurance to a Non-Participating Defendant. "Participating Insurer" shall mean any one of the Participating Insurers.

2

          1.1.3.1.    **Participating Insurer Released Parties; Participating Insurer Released Party**. "Participating Insurer Released Parties" shall mean all Participating Insurers, and their respective past, present, and future officers, directors, board members, members, agents, attorneys, consultants, claim administrators, managers, employees, partners, parent corporations, sister corporations, subsidiaries, Affiliates, related entities, divisions, heirs, associates, stockholders, shareholders, retail dealers, distributors, insurers, reinsurers, and all of their predecessors, successors, assigns, legatees, legal representatives, and any other stakeholders of each of the foregoing. "Participating Insurer Released Party" shall mean any one of the Participating Insurer Released Parties.

1.2.    **Affected Property**. "Affected Property" shall mean any real or personal property, residential or commercial, actually or allegedly containing or exposed to Chinese Drywall allegedly purchased from, imported, supplied, distributed, marketed, installed, used, sold and/or delivered by or in any way alleged to be within the legal responsibility of any Participating Defendant.

1.3.    **Affiliate.** "Affiliate" shall mean: (1) any entity or person that directly or indirectly owns, controls, or holds with the power to vote, any outstanding voting securities or interests of a Participating Defendant; (2) an entity any of whose outstanding voting securities or interests are or were directly or indirectly owned, controlled, or held with power to vote, by a Participating Defendant, or by an entity or person that directly or indirectly owns or owned, controls or controlled, or holds or held with the power to vote, any outstanding voting securities or interests of a Participating Defendant; (3) an entity or person whose business is or was operated under a lease, management or operating agreement by a Participating Defendant, or person or entity substantially all of whose property is or was operated or managed under an operating or management agreement with a Participating Defendant; or (4) an entity that operates or operated, manages or managed the business or substantially all of the property of a Participating Defendant under a lease, management or operating agreement, subject to the limitation that an individual person holding common shares of publicly issued and traded stock of a Participating Defendant or Participating Insurer, either directly or through an investment fund, shall not be deemed an Affiliate hereunder.

1.4.    **CDW-Related Actions**. "CDW-Related Actions" shall mean any and all state court, federal court, international tribunal, arbitration claims or other claims, including any claim under Section 558 of the Florida Statutes or any similar statute in any other state, against any Participating Defendant or Participating Insurer arising out of or relating to Chinese Drywall.

1.5.    **Chinese Drywall**. "Chinese Drywall" shall mean any and all drywall products actually or allegedly purchased from, imported, supplied, distributed, marketed,

installed, used, sold and/or delivered prior to the Effective Date of this Settlement by or in any way alleged to be within the legal responsibility of any Participating Defendant, which drywall product was allegedly manufactured, in whole or in part, in China, or that include components manufactured, in whole or in part, in China, including, but not limited to, drywall manufactured by Knauf Plasterboard (Tianjin) Co., Ltd.; Knauf Plasterboard (Wuhu), Co., Ltd.; Guangdong Knauf New Building Materials Products Co., Ltd.; Knauf Gips KG; Gebrueder Knauf Verwaltungsgesellschaft, KG; Knauf International GmbH; Knauf Insulation GmbH; Knauf UK GmbH; Knauf AMF GmbH & Co. KG; Knauf do Brasil Ltd.; PT Knauf Gypsum Indonesia; Beijing New Building Materials Public Ltd. Co.; CNBM; Taishan Gypsum Co., Ltd. f/k/a/ Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard Co., Ltd.; Pingyi Zhongxin Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.; Crescent City Gypsum, Inc.; The China Corporation, Ltd.; Run & Fly (Jinan) New Building Material Co., Ltd; Baier Building Materials Co. Ltd. "Chinese Drywall" shall also include any and all drywall products at issue in the Litigation whose origin or manufacturer is not ascertainable.

1.6. **Counsel**. "Counsel" shall mean:

    1.6.1. Plaintiffs' Class Counsel shall mean Russ Herman of Herman Herman & Katz LLP, 820 O'Keefe Avenue, New Orleans, LA 70113 and Arnold Levin of Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106.

    1.6.2. As to the PSC, those counsel as defined in Section 1.15.

    1.6.3. As to Participating Defendants, those counsel of record for each entity identified in Exhibit 1.

    1.6.4. As to Participating Insurers, those counsel of record for each entity identified in Exhibit 2.

1.7. **Court.** "Court" shall mean The Honorable Eldon E. Fallon who presides over *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, in the United States District Court for the Eastern District of Louisiana.

1.8. **Escrow Account.** "Escrow Account" shall mean an account to be approved by the Court that is a Qualified Settlement Fund pursuant to Section 1.468B-1 *et seq.* of the Treasury Regulation promulgated under Section 468B of the Internal Revenue Code of 1981, as amended.

1.9. **Execution Date.** "Execution Date" shall mean the latest date on which any of the Parties signs this Settlement Agreement, as shown by their signature blocks below.

1.10. **Knauf.** "Knauf" shall mean Knauf Plasterboard (Tianjin) Co., Ltd.; Knauf Plasterboard (Wuhu), Co., Ltd.; Guangdong Knauf New Building Materials

Products Co., Ltd.; Knauf Gips KG; Gebrueder Knauf Verwaltungsgesellschaft KG; Knauf International GmbH; Knauf Insulation GmbH; Knauf UK GmbH; Knauf AMF GmbH & Co. KG; Knauf do Brasil Ltd.; and PT Knauf Gypsum Indonesia.

    1.10.1.    **Knauf Released Parties**. "Knauf Released Parties" shall mean Knauf, and their respective past, present, and future officers, directors, board members, members, agents, attorneys, consultants, claim administrators, managers, employees, partners, parent corporations, sister corporations, subsidiaries, Affiliates, related entities, divisions, heirs, associates, stockholders, shareholders, retail dealers, distributors, insurers, reinsurers, and all of their predecessors, successors, assigns, legatees, legal representatives, and any other stakeholders of each of the foregoing.

1.11.  **Knauf Class Settlement.** "Knauf Class Settlement" shall mean the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047.

1.12.  **Litigation.** "Litigation" shall mean all Class Action Omnibus Complaints ("Omni Complaints") and all other complaints filed in or consolidated with MDL No. 2047 and all CDW-Related Actions, as defined in Section 1.4.

1.13.  **Non-Participating Defendant**. "Non-Participating Defendant" shall mean any person or entity that is not a Participating Defendant (whether or not that person or entity is named as a defendant, cross-defendant, third-party defendant or fourth-party defendant in the Litigation or any CDW-Related Actions) and, to the extent of applicable insurance coverage allegedly provided, that person's or entity's insurers. Non-Participating Defendant shall also include Beijing New Building Materials Public Ltd. Co.; CNBM; Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard Co., Ltd.; Pingyi Zhongxin Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.; Crescent City Gypsum, Inc., The China Corporation, Ltd.; Run & Fly (Jinan) New Building Material Co., Ltd.; Baier Building Materials Co., Ltd., and any other manufacturers of Chinese Drywall; as well as any person or entity listed on Exhibit 1 or Exhibit 2 that subsequently withdraws from and cancels its obligations under this Settlement pursuant to Sections 6.4, 8.3.2, 8.4.1 or 13.2 below. Non-Participating Defendant, however, shall not include Knauf.

1.14.  **Order and Judgment.** The "Order and Judgment" shall mean the final order and judgment entered by the Court following the Fairness Hearing, that:

    1.14.1.    Certifies the Settlement Class pursuant to Fed. R. Civ. P. 23(b)(3);

    1.14.2.    Finds that the Settlement is fair, reasonable, and adequate; finds that the Settlement was entered into in good faith and without collusion; finds the Settlement represents a negotiated agreement; and approves the Settlement;

1.14.3.    Issues the Orders identified in Section 10;

1.14.4.    Finds that the indemnity, defense and judgment reduction provisions in Sections 4.3 and 5.2.6 are valid, binding, and enforceable; and therefore, bars the assertion by any Class Member of any contribution, indemnification, subrogation, or other claims related to or arising out of Chinese Drywall against the Participating Defendants or Participating Insurers, excluding only any Reserved Claims;

1.14.5.    Enters the findings of fact and conclusions of law proposed in Section 17.4; and

1.14.6.    Finds that pursuant to Fed. R. Civ. P. 54(b), there is no just reason for delay of entry of final judgment with respect to the foregoing.

1.15.    **Plaintiffs' Steering Committee; PSC.**    "Plaintiffs' Steering Committee" or "PSC" shall mean the group of plaintiffs' counsel appointed by the Court to manage and administer the affairs of all plaintiffs in MDL No. 2047 and to assist the Court in administering its docket.    The PSC, as currently constituted, is described by Pretrial Order No. 8B (Rec. Doc. No. 13084) in MDL No. 2047.

1.16.    **Preliminary Approval Order.**    "Preliminary Approval Order" shall mean an order of the Court preliminarily certifying the Class and approving this Settlement.

1.17.    **Related Claims**.    "Related Claims" shall mean any unlitigated claims, known or unknown, against any Participating Defendant or Participating Insurer related to or arising out of Chinese Drywall.    "Related Claims" shall not include Reserved Claims.

1.18.    **Released Claim; Released Claims**.    "Released Claim" or "Released Claims" shall be as defined in Section 5.1, and shall include all releases described in Sections 5.1-5.5.    "Released Claims" shall not include Reserved Claims.

1.19.    **Released Party; Released Parties**.    Except as provided in Section 5.6, "Released Party" or "Released Parties" shall mean each Participating Defendant Released Party and each Participating Insurer Released Party.    "Released Party" or "Released Parties" shall also include the Knauf Released Parties, but only to the extent provided in Sections 5.3.1 and 5.4.1.

1.20.    **Reserved Claims.**    "Reserved Claims" shall mean those claims reserved in Section 5.6.

1.21.    **Settlement; Agreement**.    "Settlement" or "Agreement" shall mean this Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers and Participating Insurers.

1.22. **Settlement Class Counsel**.  "Settlement Class Counsel" shall mean MDL No. 2047 Plaintiffs' Liaison Counsel, Russ Herman and MDL No. 2047 Lead Counsel, Arnold Levin.

1.23. **Settling Party; Settling Parties**.  "Settling Parties" shall mean all Class Members who do not opt-out of this Settlement and all Participating Defendants and Participating Insurers who do not withdraw from this Settlement, except to the extent of Reserved Claims in Section 5.6.  "Settling Party" shall mean any one of the Settling Parties.  To the extent a Participating Defendant is also a Class Member as described in Section 1.1.1 above, that Participating Defendant may be a Settling Party in its capacity as a Participating Defendant but not be a Settling Party in its capacity as a Class Member by choosing to opt-out one or more of its claims in accordance with the procedure set forth in Section 8 below.

1.24. **Fairness Hearing**.  "Fairness Hearing" shall mean the hearing before the Court described in Section 10 of this Settlement.

## 2.  <u>Effective Date</u>

2.1. The "Effective Date" of this Settlement shall be the date when the Settlement is Final irrespective of the Execution Date or the date of the Preliminary Approval Order.  "Final" means the later of:

2.1.1. The date after the time to appeal the Order and Judgment has expired with no appeal having been taken; or

2.1.2. If an appeal is sought from the Order and Judgment, the day after the Order and Judgment is either affirmed, or any and all appeals, or motions for reargument or reconsideration are dismissed or denied, and the judgment is no longer subject to further appellate review.

2.2. An appeal from any order approving the payment of fees and costs which seeks to reduce amounts to be paid to Petitioning Attorneys, as defined in Section 16.6, shall not affect the finality of the  Settlement.

## 3.  <u>Settlement of All Claims Against Participating Defendants and Participating Insurers</u>

3.1. Except as to any Class Member who opts out of the Class in accordance with Section 8, and except as to any Reserved Claims described in Section 5.6, the Parties agree to settle and resolve all claims asserted by and amongst each other as set forth in Sections 5.1 – 5.5, and this Settlement will settle and resolve with finality the Litigation, the Released Claims, and the Related Claims involving the Class Members, the Participating Defendants and Participating Insurers and any other claims that have been brought, could have been brought or could be brought now or at any time in the future in the Litigation or in any other proceeding of any kind against any Participating Defendant and/or Participating Insurer relating to or arising out of Chinese Drywall, whether based in law, equity or otherwise.

7

**4.** **Payments by Participating Defendants and Participating Insurers and Application of Proceeds**

4.1.    In consideration of the settlement of all Class Members' claims arising out of or related to Chinese Drywall in the Litigation and/or CDW-Related Actions and/or Related Claims against Participating Defendants and Participating Insurers, the Participating Defendants and Participating Insurers will pay the collective sum of EIGHTY TWO MILLION SEVEN HUNDRED EIGHTY-FOUR THOUSAND DOLLARS ($82,784,000.00) (the "Settlement Funds"), subject to the credits in Section 4.2. The credits in Section 4.2 shall not be included in the Settlement Funds subject to allocation under Section 16.1. No Participating Defendant and none of his, her or its Participating Insurers is liable to pay settlement funds committed by or on behalf of any other Participating Defendant and his, her or its Participating Insurers. Each Participating Defendant and his, her or its Participating Insurers, are obligated only to pay their individual settlement amounts, as committed in response to the MDL No. 2047 Mediator's confidential settlement proposal, and which amounts are to be paid as follows:

4.1.1.    Each Participating Defendant and/or its Participating Insurers shall deposit 5% of the total sum to be paid by such Participating Defendant and/or its Participating Insurers into the trust account for Insurance Liaison Counsel, Judy Y. Barrasso, payable to Barrasso Usdin Kupperman Freeman & Sarver, L.L.C., IOLTA Account and sent c/o H. Minor Pipes, III, 909 Poydras Street, 24th Floor, New Orleans, Louisiana 70112. This amount is to be paid within seven (7) days following the entry of the Preliminary Approval Order by the Court. These funds are to be used for the purposes of (a) paying Mediator's costs, and (b) paying the cost of class notice. To the extent any of the funds are spent on those purposes, there shall be no refund of this sum, or any portion thereof, to any Participating Defendant or Participating Insurer who withdraws from this Settlement pursuant to Sections 8.3.2 or 8.4.1. However, if any Participating Defendant or Participating Insurer properly withdraws from this settlement when a portion of these funds has not been spent on these stated purposes, it shall be entitled to a refund of the portion of its payment in the same percentage as that left unspent on the date of withdrawal. Any of these funds remaining after payment of the Mediator's costs and class notice, and not refunded to withdrawing Participating Defendants, shall be deposited in the Escrow Account for use in the allocations provided in Section 16.

4.1.2.    Each Participating Defendant and/or its Participating Insurers shall deposit into the Escrow Account the remaining 95% of the total sum to be paid by such Participating Defendant and/or its Participating Insurers within fifteen (15) days of the Effective Date of this Settlement. These funds will be allocated in accordance with Section 16 of this Settlement Agreement.

4.2.    The following amounts shall be applied towards satisfying the Settlement Funds in Section 4.1, but shall not be applied towards satisfying the recovery of attorneys' fees and reimbursement of costs available under Section 16.6 (because these funds will be the subject of a separate recovery from the Knauf Defendants (if used by those entities to satisfy a builders' claim, *e.g.,* CastleRock) or by a Class Member that opts-out of this settlement and pursues its claim against a Participating Defendant or Non-Participating Defendant):

 4.2.1.    Separate Settlements.  Because the following entities have either reached, or have been in negotiations for, separate full or partial settlements regarding claims involving Chinese Drywall, after the negotiations that led to this Settlement, thereby removing those claims from this Settlement, the following amounts will be credited against the Settlement Funds due in Section 4.1:

  4.2.1.1.    CastleRock Communities LP – $1,284,000.

  4.2.1.2.    Coastal Construction Group of South Florida, Inc. – $3,936,000.

  4.2.1.3.    Devon International Industries, Inc. – $756,000.

  4.2.1.4.    Gulf Coast Shelter, Inc. and Shelter Products, Inc. – $720,000.

  4.2.1.5.    RCR Holdings II, LLC – $2,376,000.

  4.2.1.6.    Shoma Homes Splendido, Inc. – $358,000.

 4.2.2.    For each of the Separate Settlements listed in Section 4.2.1., the PSC, class counsel, common benefit attorneys and privately retained attorneys for all Class Members shall be entitled to recover an award of attorneys fees equivalent to the common benefit percentage set by the Court in accordance with Section 16.6.

 4.2.3.    Opt-outs and Withdrawals.  To the extent of any opt-outs or withdrawals pursuant to Sections 8.1, 8.3 or 8.4, the payment of Settlement Funds by an individual Participating Defendant for the Affected Properties associated with any opt-outs shall be reduced pro-rata relative to the number of units comprising the Mediator's confidential settlement proposal for the number of opt-outs to the applicable Participating Defendant, or for the Participating Defendant's share if a withdrawal, and these amounts will be credited against the Settlement Funds due in Section 4.1.

4.3.    In consideration of the payments and other consideration made by Participating Defendants and Participating Insurers, Class Members agree, in addition to other conditions set forth in this Settlement Agreement, to apply the settlement

proceeds they receive, except for funds allocated to resolve claims for bodily injury pursuant to Section 16, to assist in the remediation of their Affected Property allegedly damaged by Chinese Drywall, or, in instances where a lender holds a mortgage or deed of trust on the Affected Property, the Class Member may defer remediation by securing the release of all of the lender's claims regarding the Chinese Drywall and recording a notice in the land records office of the appropriate governmental agency of the presence of Chinese Drywall in the Class Member's property. This provision does not apply to the extent the Class Member is a Participating Defendant who has remediated the Affected Property. Any Class Member that fails to comply with the obligations set forth in this paragraph shall indemnify, (including attorney fees and costs, both at trial court and appellate court levels), defend and hold harmless each Participating Defendant and Participating Insurer for any claim brought by any person or entity, including, without limitation, that Class Member's lender or any subsequent purchaser of that Affected Property, against the Participating Defendant or Participating Insurer relating to the existence of Chinese Drywall in the Affected Property.

**5.**     **Releases**

5.1.    **"Released Claim"** or **"Released Claims"** shall mean, except as listed below, and except for Reserved Claims in Section 5.6, any and all claims of any kind and nature whatsoever of a Class Member, Participating Defendant, Participating Insurer or Knauf (a) arising out of, or in any manner related to, Chinese Drywall, the Litigation, CDW-Related Actions or Related Claims, and/or (b) for any and all losses, damages and/or injuries arising from, or in any manner related to, all and/or any of the claims described in (a) above, including but not limited to, any and all claims that a Class Member, Participating Defendant, Participating Insurer, or Knauf, or anyone claiming by or through any of these individuals or entities, has, may have, or may have had, regardless of whether such claim is known or unknown, filed or unfiled, asserted or as yet unasserted, or existing or contingent, whether asserted by petition, complaint, cross-claim, third party complaint, fourth-party complaint, arbitral demand, written demand, or otherwise (or any judgment or order entered on such claims), based upon or alleging any act, conduct, status or obligation of any person or entity (including any Participating Defendant or Participating Insurer) and/or any source of liability whatsoever, and regardless of the legal theory or theories of damages involved and/or (c) for any and all claims for insurance coverage (including claims for additional insured coverage), indemnity, duty to defend, common law and statutory bad faith claims, and/or extra-contractual liability or any other insurer misconduct of any kind related to any or all of the claims described in (a) above, which claims arise under state, or other law (including common law) and any and all past, present, and/or future claims arising out of, or related to indemnity obligations, duty to defend, claims handling, claims adjustment, breach of contract, breach of duty or duties, negligent investigation, breach of warranty, failure to warn, breach of implied warranty, breach of good faith and fair dealing, bad faith, statutory bad faith, negligent or intentional interference with contractual relationships, deceptive

trade practices, unfair trade practices, unfair settlement practices, or conduct in violation of any insurance code, and/or any other alleged misconduct, omission, or wrongdoing of any kind, of whatever nature or source, known or unknown, related to any or all of the claims described in (a) above. Notwithstanding the above, the only persons or entities released are those defined as Participating Defendant Released Parties and/or Participating Insurer Released Parties. This Settlement does not provide complete compensation to redress all Class Members' damages and therefore Class Members' claims are reserved against any person or entity that is not a Participating Defendant Released Party or a Participating Insurer Released Party. The term "Released Claim" or "Released Claims" includes, but is not limited to, the following:

5.1.1.   For personal injury, bodily injury (including death), damage to real or personal property, remediation and/or clean-up of property, diminution of property value, stigma, groundwater contamination, loss of use, loss of enjoyment, economic loss, fear, fear of illness or disease, fear of developing illness or disease, fright, mental or emotional distress, pain and suffering, loss of earnings, impairment of earning capacity, loss of consortium, loss of support, loss of love and affection, equity and medical monitoring, bystander liability, wrongful death, survival actions, breach of contract, all statutory claims, punitive or exemplary damages, attorneys' fees, attorneys' costs or expenses, moving expenses, or additional rental or mortgage payments;

5.1.2.   For nuisance, trespass, inconvenience, loss of use or enjoyment, negligence, negligence *per se*, tort, public or private nuisance, custody of a thing containing a vice or defect, strict liability, liability for ultra hazardous activities or conduct, absolute liability, wanton and reckless misconduct, malicious misconduct, servitude or obligation of vicinage, abuse of right, or any other liability legally asserted or assertable under any federal, state, or local statute, directive or regulation, redhibition, violation of any state or federal home warranty act, products liability act, unfair trade practices or consumer protection law, negligent discharge of a pollutant or corrosive substance, unjust enrichment, breach of express or implied warranty, breach of implied warranty of fitness and merchantability, breach of implied warranty of habitability, negligent misrepresentation, building code violations;

5.1.3.   For damages or alleged damages resulting in whole, or in part, from exposure of the Class or Class Members or property of the Class Members to hazardous or allegedly hazardous, toxic, dangerous or harmful substances;

5.1.4.   For all personal injury and related statutory violations;

11

5.1.5.    For bad faith damages, whether statutory or at common law, extra-contractual damages based upon any alleged insurer misconduct of any kind or nature and punitive damages;

5.1.6.    For any and all claims under any state, federal, tribal or local law, rule or regulation, including but not limited to any environmental law, rule or regulation;

5.1.7.    For derivative or vicarious liability arising out of the conduct or fault of others for which the Participating Defendants and/or Participating Insurers may be responsible;

5.1.8.    For any right legally assertable by the Class or any Class Member now or in the future, whether the claim is personal to each individual, is derivative of a claim now or in the future, or as assignee, successor, survivor, beneficiary, subrogee, or representative of a Class Member;

5.1.9.    For a past, present, future, known, unknown, foreseen, unforeseen, contingent, nascent, mature claim or a claim arising at law, in equity or otherwise, including but not limited to, claims for survival and wrongful death;

5.1.10.   For any claim, right, or action arising out of, based on, or relating to any body of law whatsoever;

5.1.11.   For all injuries or damages of any type, nature, or character arising from, attributable to, or in any way resulting from the Chinese Drywall;

5.1.12.   For any conduct of any of the Participating Defendants and/or Participating Insurers with respect to Chinese Drywall, CDW-Related Actions, Related Claims or the Litigation; however, this provision shall not prevent or impede the enforcement of claims or entitlements to benefits under this Settlement;

5.1.13.   For any claim, known or unknown, for contribution, subrogation, or indemnity, contractual or otherwise, arising out of, attributable to, or in any way related to Chinese Drywall;

5.1.14.   For any further claims and/or liabilities arising out of, or otherwise relating to, the purchase, import, sale, supply, storage, handling, installation, marketing, distribution, and/or use of Chinese Drywall, including, but not limited to, punitive damages, fines, interest, attorneys' fees, and costs of any nature.

5.2. **Class Release**

5.2.1.    Except as provided in Section 5.6, as of the Effective Date of the Settlement, each Class Member and any person or entity claiming by, through, and/or on behalf of a Class Member, hereby fully, finally, and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits and forever discharges any and all Released Claims against the (a) Participating Defendant Released Parties and (b) Participating Insurer Released Parties. The release of the Participating Insurer Released Parties is only to the extent of a Participating Insurer's obligations relating to any policies alleged to provide insurance coverage to any Participating Defendant, whether as a named or additional insured.

5.2.2.    Without limiting the foregoing, with respect to any Affected Property involving WCI Communities, Inc., and its affiliates, the Class Release set forth in Section 5.2.1 of this Settlement shall extend to and include the following: WCI Communities, Inc., New WCI, the WCI Chinese Drywall Property Damage and Personal Injury Settlement Trust (the "WCI Chinese Drywall Trust"), Robert C. Pate, as Trustee for the WCI Chinese Drywall Trust, and their respective past, present and future owners, partners, shareholders, officers, directors, board members, members, managers, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers and all predecessors and successors, assigns or legal representatives.

5.2.3.    Without limiting the foregoing, with respect to any Affected Property involving North Pacific Group, Inc., and its affiliates, the Class Release set forth in Section 5.2.1 of this Settlement shall extend to and include the following: North Pacific Group, Inc., Northern Pacific Lumber Co., the NPG Chinese Drywall Property Damage and Personal Injury Settlement Trust (the "NPG Chinese Drywall Trust"), Robert C. Pate as Trustee of the NPG Chinese Drywall Trust, and their respective past, present and future owners, partners, shareholders, officers, directors, board members, members, managers, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers and all predecessors and successors, assigns or legal representatives.

5.2.4.    As of the Effective Date of the Settlement, all Class Members, and anyone claiming by, through and/or on behalf of any of them, will be forever barred and enjoined from asserting any and/or all Released Claims, but not Reserved Claims, against the (a) Participating Defendant Released Parties and/or the (b) Participating Insurer Released Parties only to the extent of any policy issued or allegedly issued by a Participating Insurer alleged to provide insurance to a Participating Defendant, whether as a named or additional insured.

13

5.2.5.   Each Class Member represents and warrants that it has not assigned and will not assign any claims relating to Chinese Drywall it may possess against any Participating Defendant or Participating Insurer to any person or entity, except as set forth below and in Exhibit 4. This representation and warranty shall not, however, apply to a Class Member who has had their Affected Property remediated by a Participating Defendant and assigned some or all of their claims in connection with this remediation.

5.2.6.   As of the Effective Date of the Settlement, each Class Member receiving an allocated settlement payment under Section 16 shall: (i) **DEFEND, INDEMNIFY (INCLUDING ATTORNEY FEES) AND HOLD HARMLESS** each of the Participating Defendant Released Parties and Participating Insurer Released Parties from and against (a) any and all Chinese Drywall-related claims involving that Affected Property brought or otherwise asserted by, on behalf of, through, or deriving from other owners or occupiers of the Affected Property or from such Class Member's lenders, heirs, executors, representatives, attorneys or former attorneys, successors, employers, insurers, employers' insurers, health insurers, health care providers, assignees, subrogees, predecessors in interest, successors in interest, beneficiaries or survivors; and (b) any claims for contribution, common law indemnity, contractual indemnity, and/or subrogation, whether arising under tort, contract or otherwise, brought or otherwise asserted against the Participating Defendants and/or Participating Insurers as a result of such Class Member's or a surety's continued pursuit of Chinese Drywall-related claims related to that particular Affected Property; and (ii) reduce or satisfy any judgment involving that Affected Property against the Participating Defendants and/or Participating Insurers under applicable federal or state law, whether it be *pro rata*, *pro tanto*, and/or by set off, to reduce or extinguish (a) any and all Chinese Drywall-related claims, other than Reserved Claims, involving that Affected Property brought or otherwise asserted by, on behalf of, through, or deriving from other owners or occupiers of the Affected Property or from such Class Member's lenders, heirs, executors, representatives, attorneys or former attorneys, successors, employers, insurers, employers' insurers, health insurers, health care providers, assignees, subrogees, predecessors in interest, successors in interest, beneficiaries or survivors; and (b) any claims for contribution, common law indemnity, contractual indemnity, and/or subrogation, whether arising under tort, contract or otherwise, brought or otherwise asserted against the Participating Defendants and/or Participating Insurers as a result of such Class Member's or a surety's continued pursuit of Chinese Drywall-related claims related to that particular Affected Property. To the extent the Class Member is also a Participating Defendant with respect to a particular Affected Property, the total amount of the defense and indemnity obligation that will be

14

due under this provision is limited to the amount the Class Member actually receives pursuant to Section 16 for this Affected Property.

**5.3.  Participating Defendants' Releases**

5.3.1.    Except as provided in Section 5.6, as of the Effective Date of the Settlement, each Participating Defendant and any person or entity claiming by, through, and/or on behalf of a Participating Defendant hereby fully, finally and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits, and forever discharges any and all Released Claims against all Class Members, all Participating Defendant Released Parties and all Participating Insurer Released Parties.  Notwithstanding anything else in this Agreement or the Knauf Agreement to the contrary, (i) the WCI Chinese Drywall Trust expressly retains its New WCI Preferred B Stock, and all rights associated therewith; (ii) neither the Knauf Defendants nor any other person or entity (other than the WCI Chinese Drywall Trust) shall have any right, title, or interest in and to the New WCI Preferred B Stock; and (iii) no Class Member shall be deemed to have assigned his/her right to the proceeds of the New WCI Preferred B Stock or his/her claim against the WCI Chinese Drywall Trust or the NPG Chinese Drywall Trust.

5.3.2.    Except as provided in Section 5.6, as of the Effective Date of the Settlement, each Participating Defendant and any person or entity claiming by, through or on behalf of a Participating Defendant hereby fully, finally and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits and forever discharges any and all claims against the Knauf Released Parties to recover on claims arising out of or related to any Affected Properties, and the payments for those Affected Properties under this Settlement by such Participating Defendant.  The Participating Defendants' release of the Knauf Released Parties is contingent upon Knauf providing a reciprocal release to the Participating Defendant Released Parties as provided in Section 5.5.  Knauf's release will not release any claim Knauf may have to participate in this Settlement as the assignee of a Class Member.  The Participating Defendants' obligations under this Agreement, including their release of the Knauf Released Parties, are contingent on the entry of a mutually satisfactory allocation plan pursuant to Section 16.1.

5.3.3.    To the extent a Participating Defendant has remediated, settled or repurchased an Affected Property, and has the right to recover from other Participating Defendants for the costs associated with this remediation, settlement or repurchase that Participating Defendant may participate in this Settlement as a Class Member for that Affected Property, or opt-out those claims as provided in this Settlement.

However, in the event that a Participating Defendant opts-out as a Class Member for any Affected Property, that Participating Defendant shall be permitted to pursue claims against other Participating Defendants in an attempt to recover the costs associated with this remediation, but shall be precluded from pursuing any claims against the Participating Defendants and/or Participating Insurers for defense costs and/or insurance coverage as an additional insured on any other Participating Defendants' insurance policies.

5.3.4. Each Participating Defendant represents and warrants that it has not assigned and will not assign any claims relating to Chinese Drywall it may possess against any Participating Insurer to any person or entity, except by prior court order, or as set forth below and in Exhibit 4, assigning certain claims to the PSC.

5.3.4.1. PSC Assignments. The Participating Defendants and Participating Insurers listed on Exhibit 4 assign to the PSC any and all claims for insurance coverage (excluding reinsurance claims), claim handling, defense, indemnity, contribution, or bad faith claims handling, whether statutory or common law and related to Chinese Drywall against the non-participating entities listed in Exhibit 4 for all claims related to any policies which may provide coverage to the Participating Defendant listed. The PSC will be entitled to separately petition for an award of attorney fees and reimbursement of reasonable costs from any additional recoveries obtained through these assignments. However, any such award shall not be paid to the Participating Defendant and/or Participating Insurer that provided the Assignment.

5.4. **Participating Insurers' Releases**

5.4.1. Except as provided in Section 5.6, as of the Effective Date of the Settlement, each Participating Insurer and any person or entity claiming by, through, and/or on behalf of a Participating Insurer hereby fully, finally and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits, and forever discharges any and all Released Claims against all Class Members, all Participating Defendant Released Parties and all other Participating Insurer Released Parties.

5.4.2. Except as provided in Section 5.6, as of the Effective Date of the Settlement, each Participating Insurer and any person or entity claiming by, through or on behalf of a Participating Insurer hereby fully, finally and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits, and forever discharges

16

any and all claims whatsoever against the Knauf Released Parties, to recover on claims arising out of or related to any Affected Properties, and the payments for those Affected Properties under this Settlement by such Participating Insurer. The Participating Insurers' release of the Knauf Released Parties is contingent upon Knauf providing a reciprocal release to the Participating Insurer Released Parties as provided in Section 5.5. Knauf's release will not release any claim Knauf may have to participate in this Settlement as the assignee of a Class Member. The Participating Insurers' obligations under this Agreement, including their release of the Knauf Released Parties, are contingent on the entry of a mutually satisfactory allocation plan under Section 16.1.

5.4.3.  Each Participating Insurer represents and warrants that it has not assigned and will not assign any claims relating to Chinese Drywall it may possess against any Participating Defendant or Participating Insurer to any person or entity, except to the extent of a written settlement agreement regarding a remediated Affected Property that was executed before the Effective Date of this Settlement and except as set forth in Sections 5.3.4.1 and 5.6 and in Exhibit 4.

5.5.  **Knauf Release**

5.5.1.  Except as provided in Section 5.6, as of the Effective Date of the Settlement, Knauf and/or any person or entity who or which derives any right or claim for, by and/or through Knauf, shall execute an agreement that fully, finally and forever releases, remises, waives, surrenders, foregoes, gives up, abandons, cancels, acquits and forever discharges any and all claims whatsoever against all Participating Defendant Released Parties and all Participating Insurer Released Parties to recover on claims arising out of or related to any Affected Properties, and the payments for those Affected Properties under the Knauf Class Settlement by Knauf, including but not limited to those for subrogation, implied or express indemnification, contribution, the inability to seek damages from any third parties for monies paid to settle and/or resolve claims, common law and statutory bad faith and/or any other alleged misconduct, omissions, or wrongdoing of any kind, of whatever nature or source, known or unknown, that Knauf ever had, now has, could have had, may have in the future, or that it may acquire, against any Participating Defendant and/or Participating Insurer. However, this release is not intended to release any claim Knauf may have to participate in this settlement as the assignee of a Class Member.

5.6.  **Reserved Claims**. Notwithstanding anything in this Agreement to the contrary, the following claims are reserved:

5.6.1.   This Settlement does not release any claims or defenses whatsoever that any Class Member, Participating Defendant, or Participating Insurer may have against any Non-Participating Defendant, or with respect to any insurance policy or policies issued to a Non-Participating Defendant, even if issued by a Participating Insurer, arising out of, in any manner related to, or connected in any way with Chinese Drywall. The Parties will not interfere with any Class Member's, Participating Defendant's, or Participating Insurer's rights or efforts to assert claims and obtain recoveries against any Non-Participating Defendant arising out of, in any manner related to, or connected in any way with Chinese Drywall or those claims assigned in Exhibit 4.

5.6.2.   This Settlement does not release any claims or defenses whatsoever that any Class Member who opts-out from this Settlement may have, except as provided in Section 5.3.3. The Parties expressly reserve all claims or defenses against Class Members who opt-out from this Settlement. Further, in the event a Class Member opts out from this Settlement, all Parties reserve all claims, defenses and coverage positions against that Class Member, against each other, and against any person or entity alleged to have any liability related to the Chinese Drywall in the Affected Property of that opt-out Class Member (including, without limitation, builders, developers, installers, suppliers, distributors, importers, exporters, manufacturers, Knauf, etc.), and that person's or entity's insurers (including, without limitation, under any policy under which a Participating Defendant claims to be an additional insured), whether or not that person or entity might also be a Participating Defendant or Participating Insurer, but only to the extent the claims arise out of the Affected Property opted-out by that Class Member. Notwithstanding, anything in this Settlement, or in Exhibit 3, it is the intent of this Settlement that the Parties retain all rights and coverage positions as to opts outs that the Parties possessed prior to the Effective Date of this Settlement, and the Parties reserve all claims, defenses and coverage positions relating to any opt-outs.

To the extent an opt-out Class Member is also a Participating Defendant for a remediated, settled or repurchased Affected Property that Participating Defendant shall be precluded from pursuing any claims against the other Participating Defendants and/or Participating Insurers for defense costs and/or insurance coverage as an additional insured on any Participating Defendants' insurance policy. This remediating Participating Defendant, however, reserves all other claims and defenses, relating to that opted-out Affected Property, from and against any person or entity alleged to have liability related to the Chinese Drywall in that Affected Property (including, without limitation, installers, suppliers, distributors, importers, exporters,

manufacturers, and Knauf), along with that person's or entity's insurers, whether or not that person or entity might also be a Participating Defendant or Participating Insurer. The defense, indemnity and hold harmless provisions of Section 5.2.6 shall not apply to any claims reserved as a result of an opt-out.

5.6.3. This Settlement does not release any claims whatsoever that any Participating Defendant or Participating Insurer may have against another Participating Defendant or Participating Insurer to the extent that those claims are reserved in Exhibit 3 of this Settlement or assigned in Exhibit 4 of this Settlement. In addition, this Settlement does not release or waive any defenses or coverage positions whatsoever that any insurer, whether a Participating Insurer or not, has to those claims reserved in Exhibit 3 and/or assigned in Exhibit 4.

5.6.4. Except for the release of the Knauf Released Parties as provided in Sections 5.3.1 and 5.4.1, the Parties do not release any claims against persons or entities who are manufacturers of Chinese Drywall, including, but not limited to Beijing New Building Materials Public Ltd. Co.; CNBM; Taishan Gypsum Co., Ltd. f/k/a/ Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard Co., Ltd.; Pingyi Zhongxin Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.; Crescent City Gypsum, Inc.; The China Corporation, Ltd.; Run & Fly (Jinan) New Building Material Co., Ltd.; Baier Building Materials Co., Ltd., and any other manufacturer of Chinese Drywall. To the extent this Agreement is terminated under Section 13, or a mutually satisfactory allocation plan is not approved pursuant to Section 16.1, all claims against Knauf are also reserved.

5.6.5. This Settlement does not release any rights, claims or causes of action any Participating Insurer may have arising out of the payment of claims or settlements made to or on behalf of insureds which are not identified as a Participating Defendant on Exhibit 1. Specifically, nothing in this Settlement shall in any way affect the rights identified in or release any claims preserved in Sections 3.2 and 3.5.2 of the "Amended Stipulation and Agreement of Settlement" among Banner, its insurers and class members, dated August 8, 2011.

5.6.6. This settlement does not release any rights, claims or causes of action for reinsurance recovery that any Participating Insurer may have, including, but not limited to those against any other Participating Insurer acting in its capacity as a reinsurer or retrocessionaire for any claims paid, settled or released herein.

5.6.7. This Settlement does not release any rights, claims or causes of action whatsoever that a Class Member may have against any performance

and payment surety bond, including the surety bond in *Hobbie, et al. v. RCR Holdings, II, LLC, et al.,* No. 10-1113 (E.D. La.).

5.6.8.    The releases set forth in Sections 5.3.2 and 5.4.2 are not intended to release, nor shall they operate to release:  (a) any obligations of Knauf under the Knauf Class Settlement; (b) any obligations of Knauf under any existing or later executed settlement agreements between Knauf and any Participating Defendant, including, without limitation, any agreements with any Participating Defendant that has remediated or paid to remediate any portion of one or more Affected Properties; (c) any unresolved claims between Knauf and any Participating Defendant that has remediated or paid to remediate one or more Affected Properties, including, without limitation, any claims a Participating Defendant may have against Knauf by virtue of any settlement with a property owner or any assignment of claims from a property owner related to the remediation of any Affected Property; (d) any responsibility of Knauf to Participating Defendants arising out of or related to claims of persons or entities who do not fall within the definition of a "Class Member" as that term is defined in either Section 1.1.1 of this Agreement or Section 1.1.2 of the Knauf Class Settlement; and (e) claims, defenses and coverage positions of a Participating Defendant arising out of or related to an Affected Property connected in any way with a person or entity who opts out of this Settlement as reserved in Section 5.6.2.

5.6.9.    The release contemplated by Section 5.5.1 is not intended to release, nor shall it operate to release:  (a) any obligation of any Participating Defendant or Participating Insurer under any existing or later executed settlement agreements between Knauf and any Participating Defendant or Participating Insurer; (b)  any unresolved claims between any Participating Defendant or Participating Insurer and Knauf related to Affected Properties as to which Knauf is not receiving a release under Section 5.6.8(c); (c) any responsibility of any Participating Defendant or Participating Insurer to Knauf arising out of or related to claims of persons or entities who do not also fall within the definition of a "Class Member" as that term is defined in either Section 1.1.1 of this Agreement or 1.1.2 of the Knauf Class Settlement; and (d) claims and defenses of Knauf arising out of or related to an Affected Property connected in any way with a person or entity who opts out of this Settlement as reserved in Section 5.6.2.

5.6.10.    Each Participating Insurer reserves the right to collect a deductible, if due (and not otherwise expressly waived or resolved in writing by the Participating Insurer), or to enforce a fronting policy.    Each Participating Defendant reserves the right to assert defenses or coverage positions to a Participating Insurer's attempt to collect a deductible allegedly due or to enforce a fronting policy.

5.6.11. The Parties expressly reserve all claims or defenses against a Participating Defendant or a Participating Insurer who withdraws from this Settlement. Further, in the event a Participating Defendant or a Participating Insurer withdraws from this Settlement, all other Participating Defendants and Participating Insurers reserve all claims, defenses and coverage positions against that withdrawing Participating Defendant or Participating Insurer, and if a Participating Defendant, that withdrawing Participating Defendant's insurers, whether a Participating Insurer or not. Notwithstanding, anything in this Settlement, or in Exhibit 3, it is the intent of this Settlement that the Parties retain all rights and coverage positions as to withdrawals that the Parties possessed prior to the Effective Date of this Settlement, and the Parties reserve all claims, defenses and coverage positions relating to any withdrawals.

## 6. Certification of Federal Rule of Civil Procedure 23(b)(3) Settlement Class and Related Motions

6.1. This Settlement shall be subject to approval of the Court.

6.2. Within ten (10) days of the Execution Date of this Settlement, the PSC will move for an order:

6.2.1. Preliminarily certifying the Class and approving the Settlement (the "Preliminary Approval Order");

6.2.2. Staying all claims in the Litigation and CDW-Related Actions as to all Participating Defendants and their Participating Insurers, except for Reserved Claims; and

6.2.3. Declaring that, in entering into the Settlement, the Parties are acting in good faith and in compromise of disputed claims, and therefore, that the Settlement and the Preliminary Approval Order cannot be used as evidence in any other claim, lawsuit or other proceeding relating to allegations of harm, including bodily injury or property damage, alleged to be associated with defective drywall manufactured in China (in whole or in part), whether offered as evidence of liability, of insurance coverage, or of good or bad faith in the treatment of any party or non-party to the Settlement or in any fashion whatsoever.

6.3. The PSC shall file a separate motion, which the Participating Defendants and Participating Insurers shall join, seeking the following Orders, which are to remain in force until the issuance of the Order and Judgment:

6.3.1. Approval of an Order to stay all future payments under insurance policies issued by Participating Insurers to Participating Defendants, other than payments to counsel engaged by Participating Insurers to defend Participating Defendants, payments of costs related to

21

defending the Participating Defendants, payments in satisfaction of the settling Participating Defendants' obligations under prior settlements or pending settlements, or claims related to opt-outs or Reserved Claims under this Settlement, or claims not related to Chinese Drywall and payments made pursuant to Section 4.1.1;

6.3.2. Approval of an Order or Orders to stay all claims as to all Participating Defendants and Participating Insurers in the Litigation and all CDW-Related Actions, except for Reserved Claims; and

6.3.3. Approval of an Order or Orders staying and enjoining all claims and cases involving Chinese Drywall, except for Reserved Claims, in which any person or entity claims to be an insured, additional insured, by definition, endorsement or otherwise, third-party beneficiary, or named insured under any insurance policy issued to any Participating Defendant.

6.4. Any one of the Participating Defendants or Participating Insurers shall have the right to withdraw from the Settlement if the Court does not issue any of the requested orders, if the Class is not certified, or as provided in Section 8.3.2.

6.5. The Parties will stipulate to the Court in the request for entry of the Preliminary Approval Order that (i) the Class is being certified for settlement purposes only pursuant to the Settlement, (ii) the Participating Defendants and Participating Insurers reserve the right to object to certification in the event this Settlement is terminated for any reason, including termination pursuant to Section 13, and (iii) this Settlement shall have no precedential effect with regard to certification of a litigation class that may arise if this matter is not fully and completely resolved through this Settlement, or otherwise.

## 7. Notice to Class Members

### 7.1. Type of Notice Required

7.1.1. Within thirty (30) days after entry of the Preliminary Approval Order preliminarily certifying the Settlement Class as defined in Section 1.1.1, Settlement Class Counsel will commence the Class Settlement Notice Period by disseminating, or, for purchased media, initiating efforts to disseminate, the Class Settlement Notice ("Notice") by:

7.1.1.1. First-class mail, postage prepaid, to the last known address of all Class Members who are identifiable through the Plaintiff Profile Forms and their counsel;

7.1.1.2. First-class mail, postage prepaid, to the last known address of all Class Members with claims in all CDW-Related Actions and their counsel, involving those Class Members

ascertainable from available records, such as the notices required by Fla. Stat. § 558 *et. seq.*;

7.1.1.3.  Publication in local newspapers in markets to be identified at least 5 days before the hearing on any motion for preliminary approval of this Settlement;

7.1.1.4.  Publication in periodicals to be identified at least 5 days before the hearing on any motion for preliminary approval of this Settlement*;*

7.1.1.5.  Publication in community newspapers throughout those markets to be identified at least 5 days before the hearing on any motion for preliminary approval of this Settlement with substantial African American and Hispanic populations;

7.1.1.6.  Providing a press release to include national press release distribution, Twitter post to reporters, video distribution of TV spot, selected image distribution, and distribution to select microlists including Construction & Building, Banking, and Real Estate;

7.1.1.7.  Publication on 30 second television spots for two to three weeks in each of the markets identified in Section 7.1.1.3;

7.1.1.8.  Publication in on-line media including 24/7 Media Network, Quadrant One, Yahoo and Facebook;

7.1.1.9.  Providing a copy of the Notice and requesting that it be posted at the United States District Court, Eastern District of Louisiana;

7.1.1.10.   Providing a copy of the Notice and requesting that it be posted at each courthouse in which the CDW-Related Actions are pending;

7.1.1.11.  Providing a copy of the Notice and requesting that it be posted on the Court's Chinese Drywall MDL website, the CPSC website, and the following state departments of health websites: Florida Department of Health;

7.1.1.12.   Providing a copy of the Notice and requesting that it be posted at such other public places as may be ordered by the Court or by request of the Parties; and

7.1.1.13.  As the Court may direct, in accordance with the requirements of Federal Rule of Civil Procedure 23(c)(2).

23

8. **Opt-Outs and Withdrawals**

8.1. **Opt-Out Period**

8.1.1. Following the Class Notice, Class Members (including Participating Defendants in their capacity as Class Members) will have sixty (60) days (or such different period as the Court may direct) to opt-out of the Settlement in accordance with Section 8.2. Class Members with claims involving more than one Affected Property may opt-out on a property-by-property basis. A Participating Defendant who opts out in its capacity as a Class Member on any Affected Property may still participate in this Settlement in its capacity as a Participating Defendant, subject to its right to withdraw from or cancel its obligations under this Settlement pursuant to Sections 8.3.2 or 13.2 below. At the end of the sixty (60) day period (and provided the Settlement is finally approved by the Court), all Class Members (including Participating Defendants in their capacity as Class Members but not in their capacity as Participating Defendants) who have not opted out of the Class will be deemed to be bound by the Settlement, and the relief provided by the Settlement will be their sole and exclusive remedy for their claims arising out of, in any manner related to, or in any way connected with Chinese Drywall, except to the extent of Reserved Claims.

8.2. **Opt-Out Process**

8.2.1. Any Class Member wishing to opt-out of the Settlement must notify Plaintiffs' Lead Counsel, Arnold Levin, Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106, and Russ Herman of Herman Herman & Katz LLP, 820 O'Keefe Avenue, New Orleans, LA 70113, in writing, postmarked no later than sixty (60) days following the Class Notice. To be effective, the opt-out notice must set forth the full name and current address of the Class Member seeking to opt-out, the address of the property allegedly damaged by Chinese Drywall and/or the address of the property from which the Class Member alleges injurious exposure to Chinese Drywall, and to the best of the Class Member's knowledge, the identities of every purchaser, supplier, marketer, installer, builder, developer and its/their insurers, and any other Participating Defendant and Participating Insurer against which the Class Member intends to pursue his, or her, or its claims. The opt-out notice must be signed by the Class Member, and contain a sentence stating: "The undersigned hereby opts out from the Builder, Installer, Supplier and Participating Insurer Settlement Class in the Chinese Drywall Action."

8.2.2. For each property identified on an opt-out notice, the Class Member shall use its best efforts to confirm and further identify every builder,

developer, purchaser, supplier, distributor, marketer, installer, and its/their insurers and any other Participating Defendant and Participating Insurer pertaining to such property.

8.2.3.   Arnold Levin and Russ Herman shall provide a copy of any opt-outs to all Liaison Counsel and file a copy with the Court no later than twenty-four (24) hours after receipt of the opt-out through LexisNexis File & Serve.

8.2.4.   This Settlement is an integral part of the Knauf Class Settlement. A Class Member who participates in the Knauf Class Settlement also must, if eligible, participate in this Settlement. The Notice shall advise Class Members that if eligible to participate in the Knauf Class Settlement, they can receive no benefits under the Knauf Class Settlement if they opt out of this Settlement. Any opt out from this Settlement by a Class Member otherwise eligible to participate in the Knauf Class Settlement will be invalid if the Class Member did not timely opt out of the Knauf Class Settlement.

8.3.   **Rights With Respect to Opt-outs**

8.3.1.   Consistent with the Court's oversight of the process and its inherent jurisdiction, the Parties recognize that the Court may use its good offices to attempt to resolve any opt-out.

8.3.2.   The Parties agree and acknowledge that any opt-out by a Class Member may materially alter the benefit of each Party's respective bargain, so each Participating Defendant or Participating Insurer shall have the right to withdraw from the Settlement in his, her or its sole discretion if the opt-out relates to an Affected Property of that Participating Defendant. This right to withdraw from the Settlement must be exercised by written notice to the Court and filing with Lexis/Nexis File & Serve no earlier than ten (10) days after notification of such opt-outs, if any, and no later than seven (7) days before the Fairness Hearing to consider this Settlement. If the withdrawal of a Participating Defendant or Participating Insurer results in any other Participating Defendant or Participating Insurer choosing to withdraw, the other Participating Defendant or Participating Insurer shall have two (2) business days from the service of such withdrawal to itself withdraw from this Settlement by filing written notice with the Court and filing with Lexis/Nexis File & Serve. A Participating Defendant who is a Class Member for a remediated or repurchased Affected Property may continue as a Class Member for those Affected Properties even if it withdraws as a Participating Defendant from this Settlement.

8.3.3.    Any party exercising its right to opt-out shall have a right to rescind its opt-out and participate in the Settlement by notifying Plaintiffs' Lead Counsel, Arnold Levin, Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106 and Russ Herman of Herman Herman & Katz LLP, 820 O'Keefe Avenue, New Orleans, LA 70113, in writing, postmarked no later than twenty-one (21) days before the Final Fairness Hearing.  To be effective, the rescission of the opt-out notice must set forth the full name and current address of the Class Member seeking to rescind the opt-out, be signed by the Class Member, provide the address of the property allegedly damaged by Chinese Drywall and/or the address of the property from which the Class Member alleges injurious exposure to Chinese Drywall, and contain a sentence stating: "The undersigned hereby rescinds its opt-out from the Builder, Installer, Supplier and Participating Insurer Settlement Class in the Chinese Drywall Action."

8.3.4.    Arnold Levin and Russ Herman shall provide a copy of any rescission of opt-outs to all Liaison Counsel and file a copy with the Court no later than twenty-four (24) hours after receipt of the rescission of opt-out through LexisNexis File & Serve.

**8.4.    Rights With Respect to Surety Bonds**

8.4.1.    Any Participating Defendant or Participating Insurer may withdraw from the Settlement in the event any Class Member is still pursuing a claim against any performance and/or payment surety bond, including the performance or surety bond at issue in *Hobbie, et al. v. RCR Holdings, II, LLC, et al.*, No. 10-1113 (E.D. La. ) and that Participating Defendant, or its Participating Insurer, is or can be the subject of a claim or indemnity obligation brought by either:  (1) the issuer of that surety or performance bond, or (2) any other party as a result of being sued by the issuer of the surety or performance bond to recover amounts that are or may be paid under that performance or surety bond.

## 9.    Objections

9.1.    Any Class Member who objects to certification of the Class and/or to approval of this Settlement, any terms hereof, or the approval process must make that objection by the following procedure:

9.1.1.    The objection must be in writing;

9.1.2.    The objection must set forth all objections and the reasons therefor, and a statement whether the Class Member intends to appear at the Fairness Hearing either with or without the objector's counsel.  The objection must identify any witnesses intended to be called, the subject

area of the witnesses' testimony, and all documents to be used or offered into evidence at the Fairness Hearing;

9.1.3.    The objection must be signed by the Class Member and his, her or its counsel; an objection signed by counsel alone shall not be sufficient;

9.1.4.    The objection must contain the caption of the Litigation and include the name, mailing address, e-mail address, if any (an e-mail address is not required), and telephone number of the objecting Class Member; and

9.1.5.    The objection shall be mailed to Plaintiffs' Lead Counsel, Arnold Levin, Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106 and Russ Herman of Herman Herman & Katz LLP, 820 O'Keefe Avenue, New Orleans, LA 70113, in writing, postmarked no later than sixty (60) days following the Class Notice.

9.1.6.    Arnold Levin and Russ Herman shall provide a copy of all objections to other liaison counsel and file any objections with the Court no later than seventy (70) days after commencement of the Class Settlement Notice Period. The objection must be filed in MDL No. 2047 and served through LexisNexis File & Serve.

9.2.    Failure to comply timely and fully with these procedures shall result in the invalidity and dismissal of any objection. Class Members who fail to file and serve timely written objections in accordance with Section 9.1 shall be deemed to have waived any objections, shall not be heard at the Fairness Hearing, and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement.

9.3.    The PSC, Participating Defendants and Participating Insurers shall file any response to the objections with the Court no later than five (5) days before the date of the Fairness Hearing.

## 10.    <u>Fairness Hearing</u>

10.1.    After close of the Class Settlement Notice Period, the PSC shall move for final approval of the Settlement and final certification of the Class.

10.1.1.    As part of that motion, the Parties shall:

10.1.1.1.    Move the Court to enter the Order and Judgment described in 1.14;

10.1.1.2.    Move the Court to enjoin and forever bar any and all Class Members, including, but not limited to, those who have not properly opted out of the Class, from maintaining, continuing, prosecuting, and/or commencing the Litigation,

CDW-Related Actions, Related Claims, or any action, pending or future, against the Settling Parties (but excluding any Reserved Claims) that arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall; and

10.1.1.3. Jointly submit to the Court, or the appropriate forum, a proposed order dismissing with prejudice all claims and actions against the Participating Defendants and Participating Insurers in the Eastern District of Louisiana and all other CDW-Related Actions in state court, federal court, international tribunal, or in any arbitral forum, with each party to bear his, her or its own costs.

10.1.2. Any Participating Defendant and any Participating Insurer shall have the right to withdraw from the proposed Settlement if the Court does not issue all of the requested orders and/or injunctions.

10.2. At the Fairness Hearing the Court shall be requested to, *inter alia*, (i) consider any properly filed objections to the Settlement, (ii) determine whether the Settlement is fair, reasonable, and adequate, was entered into in good faith and without collusion, and should be approved, (iii) provide findings in connection therewith, and (iv) enter a proposed Order and Judgment.

## 11. <u>Dismissals</u>

11.1. Within thirty (30) days of the Effective Date, the PSC and/or counsel for each Class Member shall file motions to dismiss with prejudice, with each party to bear his, her or its own costs, the Litigation, all CDW-Related Actions by Class Members which are pending in any court, except for Reserved Claims, but only to the extent that they assert claims against the Participating Defendants and their insurers or against Participating Insurers, and the PSC shall use its best efforts to assist the Participating Defendants and their insurers and the Participating Insurers in obtaining the dismissal with prejudice of any other CDW-Related Actions maintained by any Class Member, with each party to bear his, her or its own costs, but only to the extent that they assert claims against the Participating Defendants and their insurers and/or Participating Insurers, whether in state court, federal court or any arbitral forum.

## 12. <u>Bar Order</u>

12.1. As part of the Order and Judgment, the Court shall issue a bar order and permanent injunction against any and all pending or future claims or lawsuits, other than Reserved Claims or assigned claims on Exhibit 4, by any and all Class Members who do not opt-out against the Participating Defendants and Participating Insurers in connection with claims arising out of, or otherwise related to, Chinese Drywall purchased, imported, supplied, distributed, marketed,

installed, used, sold, and/or delivered, or alleged in any way to be within the responsibility of any Participating Defendant.

12.2. The bar order and permanent injunction shall:

12.2.1. Except for any Reserved Claims or assigned claims on Exhibit 4, enjoin and forever bar any and all Class Members or any entity or person claiming through a Class Member who does not opt-out from commencing and/or maintaining any action, and/or asserting any claim, suit, counterclaim or cross-claim, legal or otherwise, against the Participating Defendants and Participating Insurers arising out of, or otherwise relating to Chinese Drywall.

12.2.2. Except for any Reserved Claims or opt-outs, bar the assertion by any entity or person against the Participating Defendants and/or Participating Insurers of any contribution, indemnification, subrogation, or other claims concerning (i) Chinese Drywall, the Litigation, CDW-Related Action, Released Claims or Related Claims, or (ii) this Settlement.

12.3. This provision is not intended to prevent or impede the enforcement of claims or entitlements to benefits under this Settlement.

## 13. <u>Termination of this Settlement</u>

13.1. This Settlement shall be terminated and cancelled upon any of the following events:

13.1.1. The Court declines to enter the Preliminary Approval Order or the bar order described in Section 12;

13.1.2. The Fairness Hearing is not held by the Court;

13.1.3. The Order and Judgment is not entered by the Court, or is reversed by a higher court, or is entered in a form inconsistent with the terms of this Settlement; or

13.1.4. The Court declines to dismiss the Participating Defendants and Participating Insurers with prejudice.

13.2. Any Participating Defendant and/or any Participating Insurer may, at their sole and exclusive discretion and option, withdraw from and cancel their obligations under this Settlement, except for their obligations under Section 4.1.1, upon any of the following events:

13.2.1. The Class Settlement Notice does not comply with the Order of the Court;

13.2.2.   Any Participating Defendant or Participating Insurer exercises his, her or its rights pursuant to Section 8.3.2;

13.2.3.   Any Participating Defendant and/or Participating Insurer and/or the PSC may, at their sole and exclusive discretion and option, withdraw from and cancel their obligations under this Settlement, except for their obligations under Section 4.1.1, upon any of the following events:

13.2.3.1.   The Parties fail to reach a plan for allocation of the Settlement Funds that is satisfactory to that Participating Defendant and/or Participating Insurer and/or the PSC; or

13.2.3.2.   Knauf terminates the Knauf Class Settlement because the condition set forth in Section 2.1 of the Knauf Class Settlement has not been satisfied or the Knauf Class Settlement is terminated for any other reason specified in that agreement.

13.2.4.   The PSC, on behalf of the Class, materially breaches the Settlement and such breach materially frustrates the purposes of this Settlement;

13.2.5.   The Litigation and CDW-Related Actions against the Participating Defendants and Participating Insurers are not dismissed with prejudice;

13.2.6.   The bar order and permanent injunction barring and preventing each and every Class Member, or any entity or person claiming through a Class Member, including, but not limited to, those who have not properly opted out of the Class, from maintaining, continuing, prosecuting and/or commencing any subsequent claims or causes of action in law or equity that arise from or are related to, directly or indirectly, Chinese Drywall, the Litigation, the CDW-Related Actions, and/or any Released Claims or Related Claims is not entered by the Court in the Order and Judgment. However, such injunction shall not prevent any of the Participating Defendants or Participating Insurers from asserting their Reserved Claims, or from monitoring or participating in the Litigation, at their discretion, so as to protect their rights before the Settlement is Final;

13.2.7.   The Court does not enter the Order described in paragraph 6.2.3 above; or

13.2.8.   This Settlement is changed in any material respect, except by written consent of the Parties.

## 14.  **Severability**

14.1.   If any Participating Defendant or Participating Insurer chooses to withdraw from the Settlement in accordance with Sections 8.3.2 and 13.2, all remaining provisions of this Settlement shall remain in full force and effect, except Section 4.1.1, will be amended to exclude the withdrawing Participating Defendant's and Participating Insurer's settlement contribution *nunc pro tunc*.

## 15.   Court to Retain Jurisdiction to Implement and Enforce Settlement Agreement

15.1.   Notwithstanding any other provision of this Settlement, the Court shall retain continuing jurisdiction over the Litigation, the Class, the Class Members, and the Settlement for the purposes of administering, supervising, construing and enforcing same, and also continuing and exclusive jurisdiction over the Settlement Funds and the distribution of same to Class Members. This Section shall not be construed as a finding, admission, or consent that the Court or any other court in the State of Louisiana has general or specific personal jurisdiction over any Participating Defendant or Participating Insurer, nor as a finding, admission, or consent that the law of the State of Louisiana shall apply to any aspect of the Litigation or this Settlement.

## 16.   Allocation of Payments

16.1.   This Agreement is contingent on an allocation plan that is mutually acceptable to the PSC, Participating Defendants, Participating Insurers and Knauf. The Court shall establish a procedure for allocation of the Settlement Funds among the various interests who have claimed entitlement to the same. An Allocation Committee, which will include representatives appointed by the Court from the PSC, the Participating Defendants, the Participating Insurers and Knauf, will be appointed to make recommendations to the Court as to: (i) a fair and equitable plan of allocation of the Settlement Funds; and (ii) the evidence that Class Members will need to provide as part of their Proof of Claim to submit a valid claim, including proof of reactive Chinese Drywall. The allocation will apportion funds (including any funds to resolve claims for bodily injury and personal property damages), without regard to fees or costs, by each Affected Property. The Settlement Funds will be segregated into a builder fund, an installer fund, and a supplier fund. A Class Member's entitlement to funds from each of these three segregated funds will depend on whether that Class Member's builder, installer, or supplier is a Participating Defendant. A Participating Defendant that is a builder shall not receive any funds out of the builder fund, except to the extent such builder is a Class Member who either owns or remediated a particular Affected Property for which another builder has contributed to the builder fund as a Participating Defendant. The funds that will ultimately be distributed to Class Members out of each of these segregated funds may not necessarily correlate to the actual contribution to this Settlement made by such Class Members' builder, installer or supplier. The PSC will recommend that the Court appoint a Special Master to assist the Court in the allocation process. The Court shall entertain interventions for the purpose of determining the allocation and shall establish procedures by order setting forth the manner in which this allocation shall

31

proceed. The allocation by the Special Master may be appealed solely to Judge Fallon, whose decision shall be final.

16.2. The Parties agree to comply with the provisions of Section 111 of the Medicare, Medicaid & SCHIP Extension Act of 2007 as codified in 42 U.S.C. Sec. 1395y(b)(8) ("MMSEA") and/or any state equivalents and/or other delegated authority (collectively "Medicare").

16.2.1. This Settlement is based upon a good faith determination of the Parties to resolve a disputed claim in which certain Class Members have alleged bodily injury. The Participating Defendants and Participating Insurers deny that there is any evidence of bodily injury arising from or related to Chinese Drywall. Requests for compensation related to bodily injury will be considered by the Special Master, who will have the authority to allocate Settlement Funds towards such injury claims. Any funds so allocated by the Special Master as part of the procedure set forth in Section 16.1 above will be paid directly to the Class Member, unless he or she is a Medicare Beneficiary as defined by MMSEA and/or Medicare, in which case, such funds shall be paid into an escrow account maintained by Settlement Class Counsel pending resolution of that Class Member's Medicare Claim. Written documentation from Medicare establishing resolution of any Medicare claim shall be provided to Participating Defendants and Participating Insurers prior to the distribution of any settlement proceeds from the escrow account to the Class Member.

16.2.2. In instances where a Class Member requests compensation related to bodily injury, that Class Member and Settlement Class Counsel shall provide within ten (10) days of each such request notice of that request and the following information to those individuals identified in Section 17.8 *infra*: (a) the Class Member's identity (including his or her name, date of birth, social security number, and gender) and (b) the Participating Defendant(s) that allegedly caused that Class Member's bodily injury. Settlement Class Counsel shall ensure compliance with these provisions.

16.2.3. Each Class Member who receives in excess of the MMSEA and/or Medicare reporting dollar threshold in effect at the time the Settlement is Final from the Settlement Funds ("Excess Recipient") acknowledges his/her duty to cooperate with Settlement Class Counsel, Participating Defendants and Participating Insurers in order to permit Responsible Reporting Entity(ies), as defined by MMSEA, to fulfill their reporting obligations to comply with MMSEA and/or Medicare. Within ten (10) days of the date on which the Excess Recipient receives an allocation of any Settlement Funds for personal injury or bodily injury claims, each Excess Recipient and his/her attorney agrees to provide the Responsible Reporting Entity(ies) with any and all information

necessary for the Responsible Reporting Entity(ies) to comply with MMSEA and/or Medicare, including his or her legal name, date of birth, social security number, and gender, so as to allow the Responsible Reporting Entity(ies), or their agents, to determine whether the Excess Recipient is a Medicare Beneficiary, as defined by MMSEA and/or Medicare (a "Triggering Claimant").

16.2.4.    Each Triggering Claimant and his/her attorney shall provide any additional information requested by the Responsible Reporting Entity(ies) to comply with MMSEA and/or Medicare, including without limitation the identity of his/her attorney, his/her address, his/her ICD9 code (if applicable), and information related to the injuries allegedly arising from Chinese Drywall.  Such information may be reported to the Centers for Medicare & Medicaid Services (CMS), as well as certain agent(s) necessary to facilitate reporting to CMS, pursuant to the Responsible Reporting Entity's duty to comply with MMSEA and/or Medicare.

16.2.5.    Each Triggering Claimant represents and warrants that all bills, costs or liens resulting from or arising out of alleged injuries, claims or lawsuits related to Chinese Drywall are his/her responsibility to pay, including, without limitation, all Medicare conditional payments, subrogation claims, liens, or other rights to payment, relating to medical treatment or lost wages that have been or may be asserted by any health care provider, insurer, governmental entity, employer or other person or entity ("Medical Claims").  Further, each Triggering Claimant will indemnify, defend and hold each Participating Defendant and Participating Insurer harmless from any and all damages, claims and rights to payment, including any attorneys' fees or fines, brought by any person, entity or governmental agency arising out of or relating to Medical Claims.

16.2.6.    The procedures set forth in this Section 16.2 are intended to ensure compliance with 42 U.S.C. § 1395y (and/or any state equivalents and/or other delegated authority).  The Parties resolved this matter in compliance with both state and federal law.

16.2.7.    Any Class Member alleging a bodily injury claim has been apprised of his/her right to seek assistance from legal counsel of his/her choosing or directly from the Social Security Administration or other governmental agencies regarding the impact this Settlement Agreement may have on that Class Member's current or future entitlement to Social Security or other governmental benefits.

16.2.8.    Any Class Member alleging a bodily injury claim understands that the receipt of settlement funds may affect that Class Member's rights to other governmental benefits, insurance benefits, disability benefits, or

pension benefits. Despite this possibility, any such Class Member desires to enter into this Settlement to settle his/her injury claim as set forth in this Settlement.

16.2.9.   Any Class Member alleging a bodily injury claim understands that should CMS (Medicare) find that a Medicare Set-Aside Allocation should have been established and that Medicare's interests were not adequately protected, CMS (Medicare) may require the Class Member to expend up to the entire settlement amount allocated to that Class Member on Medicare covered expenses related to the injury before Medicare will provide coverage for the injury. Any Class Member alleging a bodily injury claim voluntarily accepts this risk and waives any and all claims of any nature and/or damages against the Participating Defendants and Participating Insurers should Medicare take such action, including, but not limited to a Private Cause of Action against the Participating Defendants and Participating Insurers under the Medicare Secondary Payer Act (MSP) pursuant to 42 USC §1395y(b)(3)(A).

16.3.   Any disputes as to the allocation of payments among Class Members (including Participating Defendants in their capacity as Class Members) pursuant to the allocation procedure referenced in Section 16.1 will not defeat this Settlement and shall not involve the Participating Defendants (in their capacity as Participating Defendants) or Participating Insurers except as provided for in Section 16.2.

16.4.   All costs of administering the allocation of Settlement Funds and the cost of notice to Class Members will be paid out of the Settlement Funds.

16.5.   Notwithstanding any other provision of this Settlement or of any other document, the Participating Defendants and Participating Insurers shall not be liable for, and shall have no responsibility whatsoever for any payment of, any fees, costs, and expenses incurred by the PSC, Settlement Class Counsel, plaintiffs' counsel or privately retained counsel for Class Members, or common benefit counsel, whether at the trial, appellate or administrative levels, Mediator's fees and costs, court costs, Notice Costs, the fees and costs of any person or entity retained by the Mediator, and/or all other costs and fees associated with this Litigation, CDW-Related Actions, Released Claims and/or Related claims, the approval and/or implementation of this Settlement, the administration of claims, and/or the disposition of the Settlement Funds, except to the extent of any Reserved Claims or Assigned Claims. Notwithstanding the provisions of this Settlement or of any other document, the Participating Defendants and Participating Insurers shall have no obligation to pay any amount beyond the obligations set forth in Section 4.1 of this Settlement, except to the extent of any Reserved Claims or Assigned Claims.

16.6.   After the Effective Date, the PSC, Class Counsel, common benefit attorneys, and privately retained attorneys for all Class Members (the "Petitioning Attorneys") shall be entitled to petition the Court for attorneys' fees totaling in the aggregate

34

up to 32% of the Settlement Funds, with no more than 15% of the Settlement Funds to be allocated to common benefit fees, and reimbursement of reasonable expenses, excluding the cost of notice. Participating Defendants and Participating Insurers reserve their right to object to or oppose any such petition, in whole or in part, including, without limitation, on grounds that Petitioning Attorneys' fees on certain Affected Properties already remediated or agreed to be remediated by certain Participating Defendants shall be limited to the common benefit percentage set by the Court, if any at all. The determination of any attorneys' fee or court cost issue, including the allocation between and amongst the Petitioning Attorneys, shall be determined by the Court and all Parties agree such determination is not appealable and hereby waive all appeals of any such determination.

16.7.    If a Class Member opts out of this Settlement pursuant to Section 8.2.1, then the PSC has the right to petition the Court for attorneys fees and reimbursement of reasonable costs in the event that Class Member subsequently obtains a separate recovery to the extent of the predetermined individual settlement amounts of Section 4.1 attributable to that Class Member, and the Class Member has the right to oppose such a petition.

## 17.    Miscellaneous

17.1.    The Parties and their attorneys and agents shall not attempt to use the payments made pursuant to this Settlement or the terms hereof to argue in any other proceeding or context that there is insurance coverage for Chinese Drywall claims.

17.2.    The Participating Defendants, Participating Insurers and Knauf do not admit or concede any liability or damages whatsoever relating to Chinese Drywall.

17.3.    The Participating Insurers do not admit or concede any liability or insurance coverage obligation for any claims relating to Chinese Drywall.

17.4.    As part of the Order and Judgment, the Court will be requested to enter findings of fact and conclusions of law stating that:

17.4.1.    Other than as it relates to Reserved Claims or Assigned Claims, or to enforce any term of the Settlement, or as to insurance matters concerning depletion or exhaustion of one or more policies of insurance, or prior compensation for a claimed loss or set-off, no person or entity may use or refer to any aspect of this Settlement in any litigation in which any Participating Defendant or Participating Insurer is a party.

17.4.2.    The Settlement shall not constitute a waiver of any coverage defense or position taken by any Participating Defendant and/or its insurers, whether a Participating Insurer or not, related to Chinese Drywall and no insurer, whether a Participating Insurer or not, shall be estopped

35

from raising any coverage issue or defense by reason of the Settlement. In addition, any payment by a Participating Insurer as set forth in Section 4, shall not be considered a confession of judgment or trigger any obligation to pay attorney's fees under Florida Stat. 627.428 or any other fee shifting statute in any state.

17.4.3. Except for any Reserved Claims, the Parties agree that by entering this Settlement, each Participating Insurer has acted in good faith and fairly, reasonably, and honestly towards its insured Participating Defendant, and any actual and/or potential Class Members and with due regard for the Participating Insurer's Participating Defendant, and any potential Class Members' interests regarding Chinese Drywall.

17.4.4. Except for any Reserved Claims, the Parties agree that the actions and positions of the Participating Insurers, being in good faith, upon the Settlement becoming Final, precludes any Participating Defendant and any actual and/or potential Class Member from asserting, maintaining or assigning any statutory and/or common law bad faith claim against any Participating Insurer.

17.4.5. The Settlement shall not constitute a waiver or release by any Participating Defendant or Participating Insurer of any claims or defenses related to any actual or alleged obligations under a policy of insurance that such Participating Defendant or Participating Insurer may have against any person or entity, including another Participating Insurer, in any manner related to or connected in any way with the Chinese Drywall claims of Class Members who opt-out of this Settlement.

17.5. If the last day of any period mentioned in this Settlement falls on a weekend or legal holiday, the period shall include the next business day.

17.6. All persons shall be on notice of their continuing duty to monitor the Court's docket for the most current filings and information. The Court, in its discretion, may alter, postpone or amend any of these deadlines scheduled by the Court in connection with the certification of the class and approval of this Settlement without additional formal notice. Orders of any such changes are expected to be presented on the Court's website: **http://www.laed.uscourts.gov/Drywall/Drywall.htm**.

17.7. Any Class Member (or his or her attorney) who submits false or intentionally misleading information, through any form of deception, dishonesty or fraud, shall be subject to appropriate sanctions (including monetary sanctions and costs).

17.8. Unless otherwise specified, any written notices and other communications under this Settlement shall be in writing and shall be sent to:

For Settlement Class Counsel:
Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA   19106
alevin@lfsblaw.com
flonger@lfsblaw.com

Russ Herman
Leonard A. Davis
Herman Herman & Katz LLP
820 O'Keefe Avenue, Suite 100
New Orleans, LA   70113
rherman@hhkc.com
ldavis@hhkc.com

For Builders' Liaison Counsel:
Dorothy Wimberly
Stone Pigman Walther Wittmann LLC
546 Carondelet Street
New Orleans, LA  70130
mailto:dwimberly@stonepigman.com

For Installers' Liaison Counsel
Robert V. Fitzsimmons
Rumberger, Kirk &    Caldwell
Brickell Bayview Centre, Suite 3000
80 Southwest 8th Street
Miami, FL  33130
rfitzsimmons@rumberger.com

For Insurers' Liaison Counsel
H. Minor Pipes, III
Barrasso Usdin Kupperman Freeman & Sarver, LLC
909 Poydras Street, 24th Floor
New Orleans, LA  70112
mpipes@barrassousdin.com

Routine communications may be by email.  Communications asserting a breach of this Settlement shall be by hand delivery or overnight courier (*e.g.* Express Mail, Overnight UPS or Federal Express).

17.9.    All prior settlements entered into by any of the Parties shall be recognized and nothing in this Settlement shall in any way affect prior settlements.

37

17.10. This Settlement is the product of arms' length negotiations between the PSC, the Participating Defendants and Participating Insurers. Neither the PSC, Participating Defendants nor Participating Insurers shall be deemed to be the drafter of this Settlement or any provision thereof. No presumption shall be deemed to exist in favor of or against either the PSC, Participating Defendants or Participating Insurers as a result of the preparation or negotiation of this Settlement.

17.11. This Settlement, including its exhibits, constitutes the entire agreement between the Parties. The Parties have not received or relied upon any agreements or promises other than as contained in writing in this Settlement, including its exhibits.

17.12. Except with respect to Reserved Claims identified on Exhibit 3, this Settlement may not be modified or amended unless such modification or amendment is in writing executed by all Parties. Reserved Claims may be modified or amended in a writing executed by all parties identified in the reservation.

17.13. This Settlement may be executed in multiple counterparts, all of which taken together shall constitute one and the same Settlement.

## 18. Federal Rule of Evidence 408

18.1. The Parties specifically acknowledge, agree and admit that this Settlement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations and correspondence, shall be considered a compromise within the meaning of Federal Rules of Evidence Rule 408, and any equivalent rule of evidence or procedure of any state, and shall not (i) constitute, be construed, be offered, or received into evidence as an admission of the validity of any claim or defense, or the truth of any fact alleged or other allegation in the Litigation, the CDW-Related Actions, or in any other pending or subsequently filed action, or of any wrongdoing, fault, violation of law, or liability of any kind on the part of any Party, except as permitted in Section 18.3(vi) of this Settlement or (ii) be used to establish a waiver of any defense or right, or to establish or contest jurisdiction or venue.

18.2. The Parties also agree that this Settlement, any orders, pleadings or other documents entered in furtherance of this Settlement, and any acts in the performance of this Settlement are not intended to be, nor shall they in fact be, admissible, discoverable, or relevant in any case or other proceeding against the Participating Defendants or Participating Insurers to establish grounds for certification of any class involving any Class Member, against the Participating Defendants or Participating Insurers to prove either the acceptance by any Party hereto of any particular theory of coverage, or as evidence of any obligation that any Party hereto has or may have to anyone.

38

18.3. The provisions of this Settlement, and any orders, pleadings or other documents entered in furtherance of this Settlement, may be offered or received in evidence solely (i) to enforce the terms and provisions hereof or thereof, (ii) as may be specifically authorized by a court of competent jurisdiction after contradictory hearing upon application of a Party hereto, (iii) in order to establish payment, proof of depletion or exhaustion of an insurance policy, prior payment for a claimed loss, set-off or an affirmative defense of exception in a subsequent case, including *res judicata*, (iv) in connection with any motion to enjoin or stay any of the CDW-Related Actions, (v) to obtain Court approval of the Settlement, or (vi) to comply with Participating Insurers' reporting requirements pursuant to Section 111 of the MMSEA.

**IN WITNESS HEREOF**, the Parties have executed this Settlement Agreement by their duly authorized representatives on the dates stated below.

[Signatures]

# CHINESE DRYWALL SETTLEMENT PROGRAM
# REMEDIATION CLAIM FORM
# KNAUF SETTLEMENT ONLY

Any Residential Owner or Commercial Owner seeking Remediation under the Knauf Settlement Agreement for a property that currently contains KPT Chinese Drywall must complete and submit this Remediation Claim Form to the Claims Administrator for the Chinese Drywall Settlement Program on or before September 30, 2013.  Remediation refers to the process of having all KPT Chinese Drywall removed from your property and replaced with new drywall.  KPT Chinese Drywall is drywall manufactured by Knauf Plasterboard (Tianjin) Co., Ltd or any of its subsidiaries ("Knauf").  Claimants seeking Remediation under the Settlement Program may choose among one of three Remediation Options:  (1) Program Contractor Remediation; (2) Self Remediation; or (3) Cash Out Option.  A detailed description of each Option may be found in the Definitions section of the Appendix to this Claim

You may be eligible for Remediation if:  (1) you registered your claim by the Registration deadline; (2) your property contains drywall manufactured by Knauf; (3) you currently own the property; and (4) the property has not been remediated.

When completing this Remediation Claim Form, refer to the Instructions and Definitions in the Appendix.  These Instructions and Definitions contain step-by-step instructions for completing this Claim Form, guidance on how to submit it, and helpful definitions for words that appear in this Claim Form or in the Settlement Agreement.

If you have access to a computer with an internet connection and previously registered your claim with the Claims Administrator, submit your Remediation Claim Form online.  Online submission will be easier to complete than a hard-copy Claim Form because the online version will guide you through the specific questions you need to answer based on the answers you enter as you go along.  Go to https://www3.browngreer.com/drywall to submit your Remediation Claim Form online.

If you are unable to complete the Remediation Claim Form online, you may submit this form by email by sending it to CDWQuestions@browngreer.com, or by Registered U.S. Mail to:

**Chinese Drywall Settlement Administrator**
**P.O. Box 25401**
**Richmond, Virginia 23260**

## A. CLAIM INFORMATION

| 1. **Claimant Name:** | Last Name/Business Name<br>Williams | | First<br>Andrew | M.I. |
|---|---|---|---|---|
| | Co-Owner Last Name/Business Name | | Co-Owner First | M.I. |
| | DBA or Fictitious Name (if applicable) | | | |

| 2. **Individual Claimant's Social Security Number (SSN)** | | 3. **Business Claimant's Employer Identification Number (EIN)** | |
|---|---|---|---|
| 4. **Are you pursuing this claim on behalf of a minor, deceased, or incompetent claimant?** | ☐ Yes<br><br>☒ No | | |

# CHINESE DRYWALL SETTLEMENT PROGRAM
# REMEDIATION CLAIM FORM
# KNAUF SETTLEMENT ONLY

| | |
|---|---|
| **5. Provide your name and SSN if you are pursuing this claim on behalf of a minor, deceased, or incompetent claimant.** | Name: ⌐⌐<br><br>SSN: |

| | |
|---|---|
| **6. Attorney Information:** | ☐ Check here if you are not represented by an attorney and skip to Question 6.  If you are represented by an attorney, complete this section.<br><br>Firm Name<br>Podhurst Orseck, P.A.<br><br>Attorney Last Name / Attorney First Name<br><br>Street<br><br>City / State / Zip<br><br>Email<br>JDonner@podhurst.com / Phone Number<br>( ) - |

| | |
|---|---|
| **7. Affected Property Address:** | Street<br>4531 SW Darwin Blvd<br><br>City<br>Port St Lucie / State<br>FL / Zip<br>34953 / County/Parish<br>St. Lucie |

| | |
|---|---|
| **8. Settlement Agreement under which you are submitting this claim (check all that apply):** | ☒ Knauf.<br>☒ Banner.<br>☐ InEx.<br>☐ Global.<br> Participating Supplier Name:  Banner<br> Participating Builder Name:  Diamond Court Construction Company<br> Participating Installer Name:  Banner Homes of Florida, Inc.<br><br>☐ L&W.<br>☐ Unknown.<br><br> Additional Comments (attached additional pages if necessary): |

Williams, Andrew

101347

2

## CHINESE DRYWALL SETTLEMENT PROGRAM
## REMEDIATION CLAIM FORM
## KNAUF SETTLEMENT ONLY

| | | |
|---|---|---|
| **9. Lawsuit:** | Jurisdiction: <u>E.D. La.</u><br>Case/Docket Number: <u>10-362</u><br>Date Filed: <u>12/ 09/ 2009</u><br>    (Month/Day/Year) | |
| **10. Drywall Manufacturer:** | ☒ Knauf<br>  ☒ I am a member of the Knauf Settlement Class<br>  ☐ I have Knauf Drywall but I am not a member of the Knauf Settlement Class<br>  ☐ Mixed (Knauf and other)<br>  ☐ Non-Knauf<br>  Unknown | |
| **11. Select the option that best describes your relationship to the Affected Property:** | ☒ Residential Owner<br>☐ Commercial/Rental Property Owner<br>☐ Tenant<br>☐ Previous Commercial/Rental Property Owner<br>☐ Previous Residential Owner<br>☐ Repairing Builder/Installer/Assignee<br>☐ Non-Tenant Occupant (e.g. family member)<br>☐ Condominium Association<br>☐ Mortgagee (Bank)<br>Other:_____ | |
| **12. Select the option that best describes how you used the Affected Property:** | ☒ Primary Residence<br>☐ Rental/Commercial Property<br>☐ Secondary Residence<br>☐ Vacant<br>☐ Other_____ | |
| **13. Was the Affected Property remediated through the Pilot Program?** | ☐ Yes<br>☒ No | |
| **14. Have you filed an already Remediated Claim for this Affected Property with Knauf?** | ☐ Yes<br>☒ No | |
| **15. Date You Acquired the Affected Property:** | <u>07/ 06/ 2005</u><br>(Month/Day/Year) | |

Williams, Andrew

101347

3

# CHINESE DRYWALL SETTLEMENT PROGRAM
# REMEDIATION CLAIM FORM
# KNAUF SETTLEMENT ONLY

| | | |
|---|---|---|
| **16.** | **Select Your Anticipated Remediation Option:** | ☒ Program Contractor Remediation<br>☐ Self-Remediation<br>☐ Cash-Out |
| **17.** | **Comments and additional information about your claim:** | |

## B. REQUIRED DOCUMENTS

Claimants seeking Remediation for Chinese Drywall must submit all documents listed below.  Your claim cannot be considered for compensation until you provide all required documentation. You may attach pages with any additional comments regarding your claim.

1. Documents demonstrating proof of ownership of the Affected Property, such as a deed; and

2. Photographs or Inspection Reports demonstrating evidence of KPT Chinese Drywall in the Affected Property.

## C. SIGNATURE

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my Claim Form.

| **Signature of Claimant/Attorney:** | Andrew Williams | **Date:** | 09/ 26/ 2013<br>(Month/Day/Year) |
|---|---|---|---|
| **Printed Name:** | First | Last | M.I. |

Williams, Andrew

101347

# CHINESE DRYWALL SETTLEMENT PROGRAM
## GLOBAL, BANNER, INEX REPAIR AND RELOCATION EXPENSES CLAIM FORM

Any Claimant seeking Repair and Relocation Expenses under the Global, Banner, or InEx Settlement Agreements must complete and submit this Global, Banner, InEx Repair and Relocation Expenses Claim Form to the Claims Administrator for the Chinese Drywall Settlement Program on or before September 30, 2013.

When completing this Claim Form, refer to the Instructions and Definitions in the Appendix. These Instructions and Definitions contain step-by-step instructions for completing this Claim Form, guidance on how to submit it, and helpful definitions for words that appear in this Claim Form or in the Settlement Agreement.

If you have access to a computer with an internet connection and previously registered your claim with the Claims Administrator, submit your Global, Banner, InEx Repair and Relocation Expenses Claim Form online. Online submission will be easier to complete than a hard-copy Claim Form because the online version will guide you through the specific questions you need to answer based on the answers you enter as you go along. Go to https://www3.browngreer.com/drywall to submit your Global, Banner, InEx Repair and Relocation Expenses Claim Form online.

If you are not able to complete the Global, Banner, InEx Repair and Relocation Expenses Claim Form online, you may submit this form by email by sending it to CDWQuestions@browngreer.com, or by Registered U.S. Mail to:

**Chinese Drywall Settlement Administrator**
**P.O. Box 25401**
**Richmond, Virginia 23260**

## A. CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **1. Claimant Name:** | Last Name/Business Name<br>Williams | First<br>Andrew | M.I. |
| | DBA or Fictitious Name (if applicable) | | |

| | | | |
|---|---|---|---|
| **2. Individual Claimant 's Social Security Number (SSN):** | &#124;_____&#124; | **3. Business Claimant's Employee Identification Number (EIN)** | &#124;__&#124;__&#124;__&#124; - &#124;__&#124;__&#124; - &#124;__&#124;__&#124;__&#124;__&#124; |

| | |
|---|---|
| **4. Are you pursuing this claim on behalf of a minor, deceased, or incompetent claimant?** | ☐ Yes<br><br>☒ No |

| | |
|---|---|
| **5. Provide your name and SSN if you are pursuing this claim on behalf of a minor, deceased, or incompetent claimant.** | Name:_____<br><br>SSN: &#124;__&#124;__&#124;__&#124; - &#124;__&#124;__&#124; - &#124;__&#124;__&#124;__&#124;__&#124; |

| | |
|---|---|
| | ☐ Check here if you are not represented by an attorney and skip to Question 5.<br>If you are represented by an attorney, complete this section. |
| | Firm Name<br>Podhurst Orseck, P.A. |
| **6. Attorney Information:** | Attorney Last Name        Attorney First Name |
| | Street |

Online Portal Submission

| | | |
|---|---|---|
| | Email<br>JDonner@podhurst.com | Phone Number<br>(\_\|\_\|\_) \|\_\|\_\|\_\| - \|\_\|\_\|\_\|\_\| |

| | | | | | |
|---|---|---|---|---|---|
| **7. Affected**<br>**Property**<br>**Address:** | Street<br>4531 SW Darwin Blvd | | | | |
| | City<br>Port St Lucie | State<br>FL | Zip<br>34953 | County/Parish<br>St. Lucie | |

**8. Settlement Agreement under which you are submitting this claim (check all that apply):**

- ☒ Knauf
- ☒ Banner
- ☐ InEx
- ☒ Global
    - Participating Supplier Name: Banner
    - Participating Builder Name: Diamond Court Construction Company
    - Participating Installer Name: Banner Homes of Florida, Inc.
- ☐ L&W
- ☐ Unknown

Additional Comments (attached additional pages if necessary):

**9. Lawsuit:**

Jurisdiction: E.D. La.

Case/Docket Number: 10-362

Date Filed: <u>12/9/09</u>
(Month/Day/Year)

**10. Drywall Manufacturer:**

- ☒ Knauf
    - ☒ I am a member of the Knauf Settlement Class
    - ☐ I have Knauf Drywall but I am not a member of the Knauf Settlement Class
- ☐ Mixed (Knauf and other)
- ☐ Non-Knauf
- ☐ Unknown

**11. Select the option that best describes your relationship to the Affected Property:**

- ☒ Residential Owner
- ☐ Tenant
- ☐ Previous Commercial or Rental Property Owner
- ☐ Previous Residential Owner
- ☐ Commercial or Rental Property Owner
- ☐ Repairing Builder/Installer/Assignee
- ☐ Non-Tenant Occupant (e.g. family member)
- ☐ Condominium Association
- ☐ Mortgagee(Bank)
- ☐ Other

**12. Provide the Under Air Square Footage for the Affected Property:**

2817

**13. Comments and additional information about your claim:**

## B. Required Documents

Claimants seeking compensation for Repair and Relocation Damages caused by Chinese Drywall under the Banner, InEx or Global Settlements must submit all documents listed below. Your claim cannot be considered for compensation until you provide all required documentation.

**1.** Proof of Ownership or Assignment of Claim, such as

(a) a Deed or other document demonstrating the ownership of the Affected Property; OR

(b) an Assignment of Claim from the Owner of the Affected Property;

**2.** Documents demonstrating the presence of Chinese Drywall in the Affected Property;

**3.** Floor Plan or other document showing the Under Air Square Footage of the Affected Property;

**4.** Evidence of Settlement Eligibility, such as

(a) a Document demonstrating that Chinese Drywall in the Affected Property was supplied by participating supplier; OR

(b) a Document demonstrating that a participating builder built the Affected Property; OR

(c) a Document demonstrating that Chinese Drywall in the Affected Property was installed by participating installer.

**5.** Any other document that you believe supports your claim.

## C. SIGNATURE

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my Claim Form.

| Signature of Claimant/Attorney | Andrew Williams | **Date** | 09/26/13 (Month/Day/Year) | |
|---|---|---|---|---|
| **Printed Name** | First | Last | | M.I. |