**In the Matter Of:**

BENNETT vs GEBR

14-cv-2722

---

# JAMES BLEVINS

*June 18, 2019*

---

EXHIBIT
D



800.211.DEPO (3376)
EsquireSolutions.com

 1   documents relating to any pre-purchase inspection of the

 2   property that is the subject of this litigation,

 3   including but not limited to property inspection and

 4   Chinese-drywall inspections."

 5          To be clear, the property that's the subject

 6   of this litigation -- I know you testified that you live

 7   in Salem, South Carolina; but the property that we're

 8   here about today is 2636 Southeast 19th Place, in Cape

 9   Coral.  Is that correct?

10       A.   Yes.

11       Q.   And before you bought the property, were there

12   any inspections of the property that you know about?

13       A.   I didn't buy the property.  I had it built.

14       Q.   All right.  So were there any inspections of

15   the property before you had it built?

16       A.   I bought the lot; no inspections.

17       Q.   Thank you.  So there wouldn't be any

18   pre-purchase inspections that would be responsive to

19   No. 1.  Correct?

20       A.   No.

21       Q.   No, that's not correct; or no, there wouldn't

22   be any responsive?

23       A.   You said "Is that correct?"  Yes.

24       Q.   So it is correct, no pre-purchase inspection

25   reports?



1      A.   Correct.

2      Q.   Thank you.

3           No. 2 says, "Your entire loan file for the

4   property that is the subject of this litigation,

5   including but not limited to all documents and

6   correspondence with or concerning the State of Florida."

7           Did you take a loan out on this property?

8      A.   Yes.

9      Q.   Have you provided the loan documents for that

10  property -- is there still a loan outstanding on the

11  property?

12     A.   Yes.

13     Q.   Have you provided the documents concerning

14  that loan to your attorney?

15     A.   I provided a document that was requested just

16  recently concerning the takeover of the property.

17     Q.   What do you mean by "the takeover"?

18     A.   All mortgage documents and the certificate of

19  livability or whatever it's called, when it was built.

20     Q.   I see.

21          MR. DODSON:  I don't believe I have that, so

22     I'd ask that that be produced.

23          MR. DOYLE:  What number is that related to?

24     I'm sorry.

25          MR. DODSON:  This is with respect to No. 2,



 1          seemingly.

 2     BY MR. DODSON:

 3          Q.   When you say "takeover," are you talking about

 4     when you took the property over?

 5          A.   I took over use of the home, the house, after

 6     it was built.

 7          Q.   Okay.  Now, if I'm understanding correctly,

 8     that's like a certificate saying that the house is

 9     constructed and it's ready to be moved into, occupied?

10          A.   Yes, occupation.

11          Q.   So separately from that, do you have loan

12     documents evidencing the loan that you have to finance

13     the property?

14          A.   I'm sure I can get them, yes.

15               MR. DODSON:  So I'd ask that those be

16          produced, the mortgage documents, whatever it is,

17          the loan documents.

18               MR. DOYLE:  (Moves head up and down.)

19     BY MR. DODSON:

20          Q.   I know there's -- No. 3, "Please produce all

21     documents relating to the purchase of the property that

22     is the subject of this litigation, including but not

23     limited to closing statements, advertisements, and

24     disclosures."

25               That, I think, would probably encompass the



 1  certificate of livability that you're referencing,

 2  so ...

 3          MR. DODSON:  And I have not seen that, so I'd

 4      ask that that be produced.

 5  BY MR. DODSON:

 6      Q.   Are there any other closing statements,

 7  advertisements, disclosures that you have from the time

 8  that you purchased the property?

 9      A.   No.

10      Q.   Other than the certificate of livability?

11      A.   Not that I'm aware of.

12      Q.   No. 4, "Please produce any other post-purchase

13  inspections performed on the property that's the subject

14  of this litigation, including but not limited to

15  Chinese-drywall inspections, and including but not

16  limited to all inspection reports generated by the

17  inspections identified in your response to Section 4 of

18  the plaintiff profile form."

19          So on this one, if we flip to Exhibit 1,

20  under -- behind Tab 3, the second page of Exhibit 1 --

21  you're one page too far.

22      A.   Oh.

23      Q.   All right.  Up at the top there it says under

24  Section 4 that "Chinese Drywall Screening, LLC,

25  performed an inspection on August 5, 2017."  Do you see



1          A.    No.

2          Q.    Do you have any videos of any inspections or

3     any taking videos of the Chinese -- of drywall or of the

4     items in the home?

5          A.    No.  Does the Kraus inspection have a picture

6     of the label?  Is it that one or both of them?

7          Q.    Well, I haven't seen the other one.

8               THE WITNESS:  Because I know you have that,

9          whether it's the Kraus or the other one.

10              MR. DOYLE:  (Moves head up and down.)

11    BY MR. DODSON:

12         Q.    So other than what's before you today and the

13    Chinese Drywall Screening report, is there any other

14    documentation that you're aware of that supports your

15    property-damage claims?

16         A.    No.

17         Q.    No. 7, "Please produce any and all copies of

18    statements or reports prepared in connection with any

19    interview conducted by you or on your behalf concerning

20    the circumstances of the claims asserted in the

21    petition."

22              Setting aside anything you might have said to

23    your lawyer, did you take any statements from witnesses

24    or did you prepare any reports or any interviews?

25         A.    No.



1  proof -- or proof of corrosion or other evidence that

2  the KPT Chinese drywall was reactive."

3          There are photographs; there's information

4  contained in this inspection report from Kraus that

5  purports to show that there is reactive Chinese drywall.

6          And I understand that there's a separate

7  report from Chinese Drywall Screening that may contain

8  similar information.

9          Setting aside those two reports, do you have

10  any other evidence to show corrosion or anything else to

11  show that the drywall was reactive and caused damage?

12      A.   No.

13      Q.   No. 10, "Please produce any and all

14  documentation evidencing or supporting your claims for

15  damages in this matter, including but not limited to all

16  receipts, invoices, photos, reports, and accountings."

17          So I've seen several receipts in this

18  submission that you have in front of you today, and

19  we've already talked about photographs.

20          Do you have any other information, other than

21  what's before you right here today and the photographs

22  that you believe are in the Chinese Drywall Screening

23  report -- any other information and documents that you

24  have to support your claims for damages?

25      A.   No, but I haven't looked at all of this.  But



 1  if it's everything I've submitted is in here, then

 2  that's all I have.

 3      Q.   What I'd like for you to do based on that

 4  response is to flip through --

 5      A.   Is look through it?

 6      Q.   -- the documents, take your time; and if

 7  there's something that you see that's missing -- I want

 8  to be careful here, because I'm not asking for

 9  privileged documents; but if there's a document that you

10  recall having submitted that you don't see in here,

11  perhaps you either tell me or maybe your lawyer -- or

12  you confer with your lawyer about it, but just see if

13  you can jog your memory.

14      A.   That's not going to be easy to do.  For

15  example, this page right here, I wouldn't know if it was

16  in here or not, if it wasn't there.

17      Q.   That's right.  What I'm asking, though, is if

18  you flip through that, if there's anything that you

19  recall specifically having submitted that you don't see

20  in here.

21      A.   Other than the Chinese Drywall Screening?

22      Q.   Yes.  Take as much time as you need.

23      A.   It appears it's all there.

24      Q.   It appears to all be there?  With the

25  exception of the Chinese Drywall Screening report?



JAMES BLEVINS                                          June 18, 2019
BENNETT vs GEBR                                                   24

1        A.    Right.

2        Q.    No. 11, it says, "Please produce any and all

3   communications between you and Interior Exterior

4   Building Supply and/or received from Interior Exterior

5   Building Supply."

6              Have you ever communicated with that company?

7        A.    No.

8        Q.    So there are no responsive documents to

9   No. 11?

10       A.    No.

11       Q.    No. 12 -- I'm going to skip 12.  I'm going to

12   skip 13.  So we can set that aside.

13             You mentioned that you live at 10 Boatswain

14   Way --

15       A.    Yes.

16       Q.    -- in Salem, South Carolina?

17             How long have you lived at that address?

18       A.    December 4, 2018.

19       Q.    When did you purchase that property?

20       A.    December 4, 2018 -- 2017, I'm sorry.

21       Q.    And where did you live before you lived at the

22   Boatswain Way address?

23       A.    In between living at the home we're talking

24   about?

25       Q.    (Moves head up and down.)



1        A.    I was in an RV.

2        Q.    And before you lived in the RV, where were you

3    living?

4        A.    At 2636 Southeast 19th Place.

5        Q.    When did you make the decision to move to

6    South Carolina?

7        A.    I don't remember.

8        Q.    Was it before December of 2017?

9        A.    Yes.

10        Q.    Was it --

11        A.    Because that's when I bought it.

12        Q.    Right.  Had you been looking at properties in

13    South Carolina for a while before you bought the house

14    on Boatswain Way?

15        A.    No, not really.  It was after August.  We

16    started looking in like October of 2017.

17        Q.    And why did you choose South Carolina to move

18    to?

19        A.    My wife's cousin, we had visited him a few

20    times; and we liked the area, so ...

21        Q.    And he lives in Salem?

22        A.    Yes.

23        Q.    And your wife, is that Merla Blevins?

24        A.    Yes.

25        Q.    How long have you and Merla been married?



1   Q.   That same day?

2   A.   Well, no, not the same day.  And they're not

3   all consolidated.  She's got like six different bank

4   accounts and I've got two.

5   Q.   Do you and Merla share credit cards?

6   A.   Yes.

7   Q.   Does she have a separate credit card?

8   A.   Yes.

9   Q.   Is the home on Southeast 19th Place -- is that

10  home in a subdivision?

11  A.   No.

12  Q.   So there was never a homeowners association

13  or --

14  A.   No.

15  Q.   -- a property owners association?  No?

16  A.   No.

17  Q.   I just want to be clear on this.  You said

18  that you visited Merla's cousin in South Carolina and

19  you decided that you liked Salem because that's where he

20  or she lived.  Is that right?

21  A.   Yes.

22  Q.   And so when did you and Merla first have the

23  discussion of moving to Salem, South Carolina -- or

24  South Carolina generally?

25  A.   Prior to the discovery of the Chinese drywall,



 1  which is one of the reasons we were selling, we wanted

 2  to move.  But with the RV, we knew we had plenty of

 3  time.  So after the sale we were going to move into the

 4  RV and take our time to buy up there; but I don't know

 5  exactly the date.

 6       Q.   Thank you.  When did you first hear about

 7  Chinese drywall generally, just as a thing?

 8       A.   Jeez, I don't remember.

 9       Q.   Was it before the attempts to sell your home

10  in late 2017?

11       A.   I'm sure it was, but I didn't pay much

12  attention.

13       Q.   Do you recall any specifics about how you

14  first learned about Chinese drywall?

15       A.   Just aware of it.

16       Q.   Just aware of it?

17       A.   (Moves head up and down.)

18       Q.   All right.  Let's talk about these three

19  inspections: there's one by the buyer, there's a Kraus

20  inspection, and a Chinese Drywall inspection.

21            So my understanding is, did you put the

22  Southeast 19th Place home on the market to sell so you

23  could move to South Carolina?  Is that correct?

24       A.   Yes.

25       Q.   And you had an offer on that home.  Is that



 1  lawyer and what you read on the website, any other

 2  information concerning a settlement?

 3          A.   No.

 4          Q.   All right.  If we flip to Exhibit 2 on Page 6.

 5  All right.  In the middle there is Section 7, "Other

 6  damages."  Do you see that?

 7          A.   Yes.

 8          Q.   All right.  And there is three different

 9  blanks; all three are filled out.  I want to start with

10  the second one first.

11              So the question says, "If you experienced any

12  loss of use and/or loss of enjoyment of the property as

13  a result of Chinese drywall, identify the total amount

14  of such loss."

15              And it says "$275,000."  Do you see that?

16          A.   Yes.

17          Q.   How did you derive that amount for the loss of

18  use and/or loss of enjoyment of the property?

19          A.   I lived there 12 years.  I think this has

20  changed in recent -- this is an earlier -- for example,

21  the "Other damages, alternate living," the expenses is

22  higher now.

23          Q.   Right, we'll get to those.  But with respect

24  to --

25          A.   But this has changed to 24,000 times 12 years;



1   and I think this is 25,000 for 12 years; and I arrived

2   at that with discussing with my attorney about previous

3   settlements.

4        Q.   So your testimony is today, then, that the

5   amount of your loss of use, loss of enjoyment, is

6   $24,000 for 12 years.  Is that correct?

7        A.   Yes.

8        Q.   So less than the amount stated right here?

9        A.   Yes.

10       Q.   And other than discussing with your attorney,

11   do you have any other basis for claiming $275,000 in

12   loss of use, loss of enjoyment?

13       A.   Yes.  Oh, beside loss of use and loss of

14   enjoyment?  Is that what the question was?

15       Q.   No, no, no.  Other than what you've discussed

16   with your lawyer about calculating the loss of use, loss

17   of your enjoyment, is there any other basis for claiming

18   $275,000 in loss of use, loss of enjoyment; just that

19   specific section?

20       A.   No, it's hard to put a number on that for

21   future health problems, or -- so no, nothing.

22       Q.   Let's -- you just commented on future health

23   problems.  Do you have health problems right now that

24   you consider attributable to Chinese drywall?

25       A.   I have health problems, but I don't know if



```
 1  they're contributable to Chinese drywall.

 2      Q.   Have you consulted a physician about the

 3  health problems?

 4      A.   I just had my bladder removed in March.

 5  Whether -- how are they going to know?

 6      Q.   Have you spoken with a physician about that,

 7  about whether your bladder issues were attributable to

 8  Chinese drywall?

 9      A.   No, but he wouldn't know.  That's my opinion.

10  I'm sorry.  No, I have not.

11      Q.   Have you spoken with a physician about --

12      A.   And I'm not sure it is either, so ...

13      Q.   Have you spoken with a physician about any

14  health conditions and whether those health conditions

15  are attributable to Chinese drywall?

16      A.   No.

17      Q.   Do you have any information that would support

18  that any health condition that you're currently

19  experiencing is attributable to Chinese drywall?

20      A.   No.

21      Q.   The second -- the third of these three

22  different distinct items of claims for "Other damages"

23  requests, "If you claim a diminution in value of the

24  property as a result of Chinese drywall, identify the

25  total amount of such diminution of value being claimed."
```



1              And the answer is "$283,866."

2              How did you derive that amount, that 283,866?

3         A.   Lee County Property Appraiser's market value

4    prior to discovery of Chinese drywall, and the reduced

5    value after they found out about it.  And that's here

6    somewhere.

7         Q.   Right.  If we could go to, I believe it's

8    attached as -- it's definitely attached to Exhibit 2.

9    There you go.

10             So after there's a lease agreement with the

11   storage unit, then there's a series of receipts and a

12   check.  And then we've got some tax information from the

13   Lee County Tax Collector.  Can you flip to that?

14             MR. DODSON:  For the record --

15        A.   I haven't found it yet.

16             MR. DODSON:  -- it looks to be the 16th page

17        of exhibits to Exhibit 2.

18        A.   Sixteenth page?

19   BY MR. DODSON:

20        Q.   If my counting is correct.  I'm not

21   guaranteeing that.

22        A.   After the receipts?

23        Q.   No, it's just of the total exhibits.  So after

24   the signature page of Exhibit 2, by my count -- I'm

25   doing it again -- it looks like there's 16 pages; and



 1 | the 16th page is the first page of this tax-collector
 2 | stuff.
 3 |         MR. DOYLE:  I think one page back.
 4 |         THE WITNESS:  Yep.
 5 |         MR. DOYLE:  Go back this way.  It's right
 6 |     after the check.
 7 | BY MR. DODSON:
 8 |     Q.   I miscounted.  It would be the 17th page.  I
 9 | knew I would do that.  I was hell-bent on a financing
10 | career.
11 |         All right.  So we're looking at the
12 | October 31, 2017, tax assessment.
13 |         And if we look at the next page, it says up at
14 | the top, "Market assessed value: 111,010."  Is that
15 | right?
16 |     A.   Yes.
17 |     Q.   All right.  And then if we flip over a few
18 | more pages, we have another tax assessment.  I'm not
19 | sure of the date that this was one provided, but at the
20 | top -- but it does -- let's see, something on
21 | here indicates it.
22 |     A.   2017.
23 |     Q.   This is 2017, so it's the same year; and it's
24 | for 394,876.  Right?
25 |     A.   Yes.



1      Q.   And that's for the same year as the one that
2  says 111-.  Is that right?
3      A.   The other one was corrected.
4      Q.   Did you contest the tax assessment that was
5  originally provided, the 394,876?
6      A.   Formally?
7      Q.   Yes.
8      A.   No.
9      Q.   How did you -- so did you contest it
10  informally?
11      A.   I called them, told them I had Chinese
12  drywall.
13           They said, "Send an inspection report."
14           I did; they reduced it.
15      Q.   Were there any letters exchanged between you
16  and them, other than this October 31, 2017, letter,
17  enclosing the changed assessment?
18      A.   No.
19      Q.   Other than the change of the assessment, do
20  you have any other information to support that your
21  house has devalued, or diminished in value, from
22  394,876, to 111- -- $111,010?
23      A.   No.
24      Q.   Other than the tax-assessor information, do
25  you have any evidence to support that your house has



 1  diminished in value at all?
 2      A.   Evidence?  No.
 3      Q.   The sale -- the attempt to sell the property
 4  in the middle of 2017, was the prospective buyer that
 5  ultimately fell through -- was that the first offer that
 6  you'd received on the property?
 7      A.   Yes.
 8      Q.   So you only had one offer and no others on the
 9  property?
10      A.   Correct.
11      Q.   Do you know whether there were competing
12  offers for the property, as in more than one offer and
13  you selected this prospective buyer?
14      A.   No.
15      Q.   No, you don't know; or no, there were not?
16      A.   No, I do not know that there were other ones.
17      Q.   All right.  Now we can talk about the moving
18  expenses.  If we go back to that Section 7 on Page 6 of
19  Exhibit 2 ...
20      A.   Page 6?
21      Q.   Yes, sir.  I'm going to give you fair warning;
22  we're going to compare and contrast, because you've
23  alluded to this already, but to be clear, we can put one
24  hand here and flip over to keep the page saved, and flip
25  over to Exhibit 3 -- to Page 5 of Exhibit 3;



 1  are there any other loans that you're claiming interest

 2  on in this response?

 3       A.   No, no.

 4       Q.   These -- all right.  Let's start with the

 5  mortgage.  Let me just start just with the credit-card

 6  balance.  Do you get a statement for that credit-card

 7  balance?

 8       A.   Yes.

 9       Q.   How often do you get a statement for that

10  credit-card balance?

11       A.   Monthly.

12       Q.   And does that credit-card balance show draws

13  on the credit card and shows interest accrued?

14       A.   Accrued for the month, yes.

15       Q.   And it shows amounts that were taken out on

16  the credit card?

17       A.   Yes, yes.

18       Q.   Have you provided those credit-card statements

19  to your lawyer?

20       A.   No.

21       Q.   I'd ask that you provide them to him, because

22  I think they're responsive to the claim for damages

23  since you're putting these amounts on your credit card

24  and you're saying that the interest on the credit-card

25  line is an amount that is caused by Chinese drywall.



```
1            MR. DODSON:  I think those are responsive, and
2       so we would ask that they be produced.
3  BY MR. DODSON:
4       Q.   With respect to the mortgage, I have a
5  mortgage in here -- I think the easier way to do this is
6  to go through each of these individual bills that are
7  attached.
8            So if we could go to Exhibit 5 of Exhibit 3.
9  And I'm going to flip through a bunch of these pages,
10 because we've already talked about them.  But I want to
11 start off with -- it's a document that has handwritten
12 on it, "Duke Energy: electric, Residence B."
13      A.   Yes.  I haven't found it, but ...
14      Q.   That's okay.  If you would please flip to it.
15           MR. DOYLE:  It's following the checks.  There
16      you go.
17           You don't have a question right now, do you?
18           MR. DODSON:  I do not.  You want to take a
19      break?
20           MR. DOYLE:  Take a quick break.  I need some
21      coffee.
22           MR. DODSON:  I might need a cookie or
23      something.
24           (Recess from 2:20 p.m. to 2:28 p.m.)
25           MR. DODSON:  Back on.
```



 1  not claiming any of those amounts; just the 339.49 per

 2  month on the Keowee Key Property Owners Association

 3  dues?

 4       A.    Never was my intention; but I made mistakes, I

 5  know.

 6       Q.    That's the end of Exhibit 5.  The reason I

 7  wanted to go through those is to be clear now, I don't

 8  have any information concerning your mortgage payment in

 9  Florida.  So do you have like a mortgage-interest

10  statement or payment information concerning your

11  mortgage in Florida?

12       A.    I got it all.

13             MR. DODSON:  We'd ask that that be produced.

14       A.    Like a one statement or a whole bunch of them

15  or --

16  BY MR. DODSON:

17       Q.    For any amounts that you're claiming.  If

18  you're claiming one --

19       A.    I'm not claiming any.

20       Q.    You're not claiming any amounts for

21  mortgage?

22             THE WITNESS:  Should I be?

23             MR. DOYLE:  (Moves head up and down.)

24       A.    That doesn't show up here.

25  BY MR. DODSON:



 1       Q.   If you're not claiming it, then that's one
 2   thing.
 3       A.   Well, wait a minute.  That didn't show up in
 4   all the questions, in all the ...
 5            MR. DOYLE:  To the deposition notice, I think
 6       it's -- arguably, it's in one of those.  You're
 7       right, it wasn't specifically requested in the
 8       previous discovery requests --
 9            THE WITNESS:  Right.
10            MR. DOYLE:  -- but I think it is responsive to
11       the request attached to the notice of deposition.
12            Anyway, let's talk about this after it's over.
13       And we'll produce it if we can get our hands on
14       it.
15   BY MR. DODSON:
16       Q.   All right.  Are you claiming the amounts for
17   electricity bills in Florida?
18            MR. DOYLE:  (Moves head up and down.)
19       A.   I don't know.
20   BY MR. DODSON:
21       Q.   Are you claiming amounts for water bills in
22   Florida?
23       A.   Yes.
24       Q.   Are you claiming -- are you claiming amounts
25   for taxes in Florida?



1        A.    Yes.

2        Q.    All right.  So I don't have any electric

3   bills, I don't have any water bills, and I don't have

4   any tax bills from Florida.  I do have a tax assessment

5   correction from October of 2017.

6              But to the extent you're making those claims,

7   that information should be produced.

8              You also include "Disruption of lifestyle" as

9   a claim.  Can you describe that for me, please,

10  "Disruption of lifestyle" -- what disruption of

11  lifestyle you've experienced?

12       A.    I had a home, I had a pool, I had to move

13  in -- I had to move, and I lost those things while I was

14  moved; so my lifestyle changed.  I had to rent out of a

15  mobile home park.

16       Q.    The last thing that you have mentioned on

17  Page 4 of Exhibit 3 is "Extra expenses" -- it's not the

18  last thing, but it's the next-to-last thing -- "Extra

19  expenses."  What extra expenses have you experienced?

20       A.    Was that for other -- other losses?

21       Q.    Well, you can look at it.

22       A.    Exhibit 3?

23       Q.    So behind Tab 5, Exhibit 3, on Page 4.

24       A.    Okay.

25       Q.    You have "Loss of use of home, pool, and



 1  Jacuzzi, interest on loans, extra expenses, disruption
 2  of lifestyle."  We've talked about everything except
 3  "extra expenses."  So now I'd like to know what the
 4  extra expenses are.
 5       A.   Well, the extra expenses are already included
 6  in what we're asking.
 7       Q.   So we've covered all of the extra expenses
 8  already in our discussion today?
 9       A.   No, but I don't think of anything off the top
10  of my head.  I'm sure I had other expenses I would
11  normally have not have accrued because of what happened
12  that I can't think of; but there has to be.
13       Q.   When you say "because of what happened," what
14  happened that you're referring to?
15       A.   I couldn't sell the house.  I had to get two
16  homes.  I had to move out and had to pay for a pool
17  service was one; whereas, if I was living there, I
18  didn't have to pay for pool service.
19            Same with lawn service; because I moved out, I
20  couldn't do the lawn.
21            That's all, off the top of my head, but ...
22       Q.   Right.  And I think we've covered those today.
23  I do want to -- so the pool maintenance, is the pool
24  full right now?
25       A.   Yes, it has to be.



1          Q.    Why does it have to be?

2          A.    Because you're not supposed to drain a pool;

3     it lifts up.

4          Q.    The pool does?

5          A.    (Moves head up and down.)

6          Q.    You have to say -- is that a "yes"?  Is that a

7     "yes"?

8                MR. DOYLE:  Give her a "yes" or "no."

9          A.    The pool does, yes.

10               MR. DOYLE:  Give her a "yes" or a "no" for the

11          transcript.

12               THE WITNESS:  I'm sorry.

13         A.    But I'm not claiming the pool service.  I'm

14    not claiming -- at this point -- anything at the old

15    house.  I will, apparently.

16               Other expenses, $600 to come down here.

17    BY MR. DODSON:

18         Q.    For this deposition?

19         A.    Yeah.

20         Q.    That's the second time I've heard that today.

21               And is that just for travel to Florida for the

22    deposition?

23         A.    Travel and two nights' hotel.

24               So there have been other expenses that I can't

25    think of right now.



 1        Q.   Did you ask to have the deposition in South

 2   Carolina?

 3        A.   Pardon?

 4        Q.   Did you ask to have the deposition in South

 5   Carolina?

 6        A.   No.  Didn't know I could.  Would you come up?

 7        Q.   I would travel to South Carolina.  Sounds like

 8   a nice place where --

 9        A.   I'm not claiming the 600, but ... it was my

10   expense.

11             I want to get this over with.

12        Q.   Any other expenses other --

13        A.   I don't want to do --

14        Q.   -- than the expenses from having two homes,

15   pool maintenance, all that, the deposition you just

16   mentioned, anything else you can think of?

17        A.   No.

18        Q.   All right.  On the last page of Exhibit 3 --

19   very, very, very last page -- is an "Itemization,

20   property damage."  Do you see that?

21        A.   Yeah.  It didn't copy very well.

22        Q.   And there's a list of 1 through 6 -- six

23   items -- and it totals "3645."  Is that right?

24        A.   Yes.

25        Q.   Now, with respect to each of these, 1



1   through 6 -- we can go through them individually -- do

2   you have receipts for any of these items?

3        A.   They weren't repaired.

4        Q.   Okay.

5        A.   So no.

6        Q.   So all of these items are still in the home in

7   Cape Coral?

8        A.   Yes.

9        Q.   With respect to the air-conditioning, it says,

10  "Air conditioning, air handler and coils."  What

11  happened to the air-conditioning, air handler and

12  coils?

13       A.   All blackened.

14       Q.   And how do you value that -- is it

15  functioning?  Is the air-conditioning, air handler and

16  coils functioning?

17       A.   At this time, yes.

18       Q.   How do you value the damage to the

19  air-conditioning, air handler and coils at $2000?

20       A.   A verbal statement from air-conditioning -- a

21  heating and air-conditioning company for just the air

22  handler and the coils and installed; not the outside.  I

23  think it's a 16 -- I forget what they call it.

24       Q.   Do you know the name of the company you got

25  the estimate from?



1        A.   The verbal?

2        Q.   Yes.

3        A.   No.  Long time.

4        Q.   When did you get the estimate?

5        A.   I guess in the fall of 2017.

6        Q.   You keep saying "verbal."  Was there ever a

7   written estimate?

8        A.   No.

9        Q.   And what evidence do you have that the

10   air-conditioning, air handler and coils was damaged by

11   Chinese drywall?

12        A.   Coils are all blackened.

13        Q.   Other than the blackening, is there any basis

14   for saying that the air-conditioning, air handler and

15   coils were damaged --

16        A.   No.

17        Q.   -- by Chinese drywall?

18             Is that a "No"?

19        A.   Any other evidence?  The two inspectors said

20   so.

21        Q.   Other than the blackening and two inspectors,

22   any other evidence that the air handler and coils were

23   damaged by Chinese drywall?

24        A.   No.

25        Q.   "Electrical fixtures, outlets, switches,"



1  there's a value of $400.  Have any of the electrical

2  fixtures, outlets, switches been replaced or repaired?

3       A.   No.

4       Q.   Where did you get the value of $400 for

5  those?

6       A.   That's a low estimate, and I don't know the

7  remediation of the wiring -- the blackened wires --

8  whether they can just scrape them off or replace them

9  all; but this is based on just scraping them off, all

10  the outlets and stuff that are blackened, in my

11  estimate, which is low-ball.

12       Q.   So you provided the estimate?

13       A.   Yes.

14       Q.   How many outlets and switches are there that

15  you claim are damaged?

16       A.   I don't know.

17       Q.   Which outlets and switches -- can we put on

18  the map -- can you point out on a map where the

19  different outlets and switches are that you're claiming

20  were damaged?

21       A.   I didn't look at them all, nor did the

22  inspectors, so I don't know.  But if you find the three,

23  you're probably going to find 23.  I don't know.

24       Q.   What information do you have to support that

25  the electrical fixtures, outlets, and switches were



 1  damaged by Chinese drywall?

 2         A.    The inspections.

 3         Q.    Anything other than the inspections?

 4         A.    No.  Oh, eyesight; the pictures they took.

 5         Q.    Looking at pictures?

 6         A.    (Moves head up and down.)

 7         Q.    Other than the inspections and looking at the

 8  pictures, any other information?

 9         A.    No.

10         Q.    No. 3, "Overhead fans and light fixtures."

11  How many overhead fans and light fixtures are at

12  issue?

13         A.    Two fans and four light fixtures.

14         Q.    I should have asked this question: are the

15  electrical fixtures -- are the outlets and switches

16  still functioning?

17         A.    Yes.

18         Q.    With respect to the two fans and four light

19  fixtures, are those all functioning?

20         A.    Yes.

21         Q.    And where did you get the value of the two

22  fans and four light fixtures totaling $418?

23         A.    My estimate.

24         Q.    And where are the two fans located?

25         A.    Two guest bedrooms.



```
 1        Q.   The next item is "Plumbing fixtures"?

 2        A.   Yes.

 3        Q.   And the value put on those is $300.  How did

 4   you derive the value of $300 for the plumbing

 5   fixtures?

 6        A.   My opinion, based on what needs to be done.

 7        Q.   And what plumbing fixtures are at issue?

 8        A.   Underneath the sink where you have the knobs

 9   to turn the water on and off -- not on top, but

10   inside -- those are all corroded; some you can turn off,

11   some you can't.

12        Q.   And which sink?  Is it more than one sink?

13        A.   Bathroom and kitchen.  The guest bathroom and

14   kitchen.

15        Q.   And you said they're corroded?

16        A.   Yes.

17        Q.   What information do you have that the

18   corrosion of the water valve under the guest-bathroom

19   sink is corroded because of Chinese drywall?

20        A.   None.

21        Q.   What information do you have to support that

22   the water valve under the kitchen sink is corroded

23   because of Chinese drywall?

24        A.   None.

25        Q.   And I'm calling it a "water valve."  Is
```



1   that what -- do we understand that's what we're talking

2   about is the thing that turns the water off under the

3   sink?

4        A.   Yes.  Little oval-shaped handle.

5        Q.   And we're talking about values that you've

6   attributed to these different items.  Do you have

7   experience with contracting, construction?

8        A.   Not contracting; construction.  With

9   jack-of-all-trades.  Some of these are low.  $400 for

10  the electrical fixtures; probably cost that to have an

11  electrician come out.

12       Q.   So I'm just trying to understand the basis for

13  these values, though.  Is this just from years of

14  experience of going to like Home Depot and seeing what

15  the prices were, or do you have specialized knowledge or

16  training of how much items cost to repair in homes?

17       A.   Not specialized.

18       Q.   It's just kind of an aggregate of information

19  that you've collected over the years?

20       A.   Yes.

21       Q.   No. 5 is a "Built-in microwave oven"; and the

22  value on that is "$300."  How did you derive the value

23  of $300?

24       A.   That, I looked up online for built-in, and ...

25       Q.   For what?  I'm sorry, I missed that.



1        Q.    Sears.

2              And you said the second one isn't working?

3        A.    Correct.

4        Q.    When did it stop working?

5        A.    Just about the time we were moving out,

6   August.

7        Q.    And it has not been replaced?

8        A.    Correct.

9        Q.    And when it's not working does the digital

10  clock turn on, or does it just not heat stuff up, or how

11  is it not working?

12       A.    It certainly doesn't heat things up.  I think

13  the clock does still work.

14       Q.    And you've looked it up.  So it went out in

15  August of 2017.  Is this information on the $300, is

16  that something you looked up at about that time, this

17  value?

18       A.    Yes.

19       Q.    And do you remember where you looked to find

20  that value?

21       A.    I want to say it's Panasonic, but it's not.  I

22  went to the model -- Kenmore; if it was Sears, it's

23  probably Kenmore.  I went to the model, whether it was

24  Sears or somewhere else, and looked at what it cost.

25       Q.    What information do you have to support that



1  the built-in microwave was damaged by Chinese drywall?

2      A.   I don't.

3      Q.   The bathroom mirrors, how many mirrors are

4  there?

5      A.   Two.

6      Q.   And where are those mirrors?

7      A.   Guest bedroom and master-bedroom mirrors.

8      Q.   Guest bathroom and master bathroom, or guest

9  bedroom and master bedroom?

10      A.   Guest bathroom and master bathroom.

11      Q.   What's wrong with the mirrors?

12      A.   The edges are turning, wearing out.

13      Q.   And there's a value with those of "$227."

14  What do you base the value of $227 on?

15      A.   My estimate.  I didn't look at them.

16      Q.   What information do you have that the mirrors

17  in the guest bathroom and master bathroom are damaged by

18  Chinese drywall?

19      A.   None, only from other people telling me that's

20  what happens.

21      Q.   Who are those other people?

22      A.   Everybody I talk to about Chinese drywall; the

23  inspectors.  The mirrors go, plumbing fixtures for sure,

24  electrical fixtures blackened.

25      Q.   Other than --

