IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: ) | |
| CHINESE-MANUFACTURED ) | |
| DRYWALL PRODUCTS LIABILITY ) | |
| LITIGATION, ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| ) | |
| VS. ) | CASE NO.14-cv-2722 |
| ) | |
| ) | |
| Elizabeth Bennett, et al ) | |
| vs. Gebr. Knauf ) | DEPOSITION OF: |
| Verwaltungsgesellschaft, ) | JOHN JUDGE |
| KG, et al, ) | |
| ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

JOHN JUDGE,

may be taken before LaKeysha T. Satterfield, Commissioner and Notary Public, State at Large, at the offices of Bain & Associates, 505 20th Street North, Suite 1250, Birmingham, Alabama  35203, on the 5th day of December, 2019, commencing at approximately 2:00 p.m.

EXHIBIT 4

**Worldwide Court Reporters, Inc.**
**(800) 745-1101**

```
 1   Q.          Listed repaired?
 2   A.          Yes.
 3   Q.          And you and your wife Rebecca divorced in 2015?
 4   A.          It was finalized in 2015, sir.
 5   Q.          And how did the divorce interact with the
 6   ownership of the house?
 7   A.          Can you ask me that again?
 8   Q.          Yeah.  I'm just curious.  So did the divorce
 9   become final before the short sale?
10   A.          The divorce was final before the short sale.
11   That's right.
12   Q.          After the divorce but before short sale -- let
13   me go back.  Was your wife ever a co-owner of this house
14   with you?
15   A.          No, sir.  She -- she was on the -- she was on
16   the mortgage but as part of the ownership of it, but it was
17   relinquished at the divorce.
18   Q.          Okay.  So you became the sole owner of the
19   house --
20   A.          That is correct.
21   Q.          -- at the time of divorce?
22   A.          Yes, sir.
23   Q.          And you were the sole owner at the time that
24   the house was sold to the bank?
25   A.          Yes, sir.
```

```
 1   Q.            And the date of that mortgage was February
 2   22nd, 2008.  We know that's the date you took possession of
 3   the home?
 4   A.            Yes.
 5   Q.            Basically moved in, right?
 6   A.            Yes.
 7   Q.            And at the time of foreclosure or short sale --
 8   by the way, it's dated October 14th, 2016.  Do you see that?
 9   A.            I do, sir.
10   Q.            It noted that the outstanding amount of the
11   debt and the loan was 147,936.00?
12   A.            That's what it says, sir.
13   Q.            Does that comport with your recollection?
14   A.            That's what's listed, sir.  I don't recall.
15   Q.            You have no reason to believe that information
16   is inaccurate; is that right?
17   A.            No, sir.  I wouldn't believe it would be.
18   Q.            Probably came from Wells Fargo, right?
19   A.            I would believe so.
20   Q.            Yeah.  And then the short sale price is listed
21   as $82,000, correct?
22   A.            That's what's listed, sir.  Yes, sir.
23   Q.            And so the difference between the amount that
24   the home sold for short sale and the short sale amount, that
25   amount of debt was forgiven, correct?
```

```
 1   Question 7 on that page, If you sold or transferred
 2   ownership of the property, what was the name of the
 3   purchaser, and it says short sale Mark Houchens, correct?
 4   A.         That's what it says, sir.
 5   Q.         We saw the Warranty Deed earlier established
 6   that, correct, sir?
 7   A.         Yes, sir.
 8   Q.         When the short sale was done from you to
 9   Mr. Mark Houchens, we saw the warranty deed and the
10   associated closing statement, correct?
11   A.         Yes, sir.
12   Q.         Were there any separate documents that were
13   exchanged between you and Mr. Houchens regarding who had the
14   Chinese drywall claim to pursue?  Did you retain rights or
15   is there a document that you were going to include
16   Mr. Houchens where you retain rights to sue for Chinese
17   drywall or did you assign the rights to Mr. Houchens?
18   A.         I do not recall.
19   Q.         Do you know if Mr. Houchens is the individual
20   who repaired the home?
21   A.         I do not know.
22   Q.         So you just know from your friend who is a
23   Realtor that it was done.  You don't know if Mr. Houchens or
24   someone bought the property from him?
25   A.         I do not know.
```

```
 1   Q.          Don't have basements in --
 2   A.          No, we don't.  No, sir, we don't.
 3   Q.          Yeah, I come from Louisiana.  We don't have
 4   them there either.  Too much water.
 5   A.          I understand.
 6   Q.          Let me check one more thing.  We're close to
 7   being done here, sir.  I take it you didn't know this
 8   individual, Mark Houchens, who bought the house at the short
 9   sale?
10   A.          No, sir.
11   Q.          Any other inspection report that you're aware
12   of other than the one by Drywall Science you've looked at?
13   A.          No, sir.
14   Q.          Did you bring personal property that was in the
15   the home in Lehigh Acres, Florida to the home in Coral
16   Gables?
17   A.          No.  Calhoun?
18   Q.          Yeah.  But didn't you move --
19   A.          Oh, Cape Coral?
20   Q.          Cape Coral.  I'm sorry.
21   A.          No, sir.  Other than maybe like a, you know,
22   couch or things like that.
23   Q.          When you were living in the home in Lehigh
24   Acres, I mean, you told me that you had no indication that
25   Chinese drywall was in it, right?
```

```
 1   You can answer.
 2   A.          I lived in the home.
 3   Q.          (By Mr. Miller)  And you lived in the home
 4   without knowledge or awareness of Chinese drywall, correct?
 5   A.          Yes, sir.
 6   Q.          And then you moved out of the home when to Cape
 7   Coral?
 8   A.          I want to say it was approximately April.
 9   Q.          Of '16?
10   A.          2015.
11   Q.          2015.
12   A.          Yes, sir.
13   Q.          So you had made previous arrangements to move
14   out of the home prior to putting it up for sale?
15   A.          No, sir.
16   Q.          Explain that timeline for me.
17   A.          Absolutely.
18   Q.          Yeah.
19   A.          My current wife and I, she had a home.  I had
20   that home and decided to sell the home in Lehigh and stay in
21   Cape Coral at her home.
22   Q.          And so you moved to Cape Coral in April of
23   2015?
24   A.          Approximately April, May, somewhere in there.
25   Q.          And that's concurrent with the time that you
```

```
 1  put the Lehigh Acres home up for sale, correct?
 2  A.          Yes, sir.
 3  Q.          And the home is up for sale and you get a
 4  contract in July, correct?
 5  A.          No, sir.  I don't recall when the exact month
 6  was.  It was sometime in that neighborhood.
 7  Q.          Yeah.  Because you know the Drywall Science
 8  report was in July, right?
 9  A.          The Drywall Science report was in July, yes,
10  sir.
11  Q.          And so you had a contract shortly before that,
12  right?
13  A.          Yes, sir.
14  Q.          And then you lived in Cape Coral from April of
15  2015 until when you moved to Calhoun, Georgia?
16  A.          She actually sold the house sometime, I
17  believe, in 2016.
18  Q.          And that's when y'all moved out?
19  A.          She did, yes.  I stayed with my sister.
20  Q.          Oh, you stayed with your sister in Florida for
21  a while?
22  A.          Yes, sir.
23  Q.          And then you followed her when?
24  A.          2017.  Beginning.
25  Q.          And your sister was living where in Florida?
```