# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | MDL NO. 2047 |
| THIS DOCUMENT RELATES TO: ALL CASES (Except *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.)) | SECTION "L" (5) |

## ORDER AND REASONS

Pending before the Court is Settlement Class Counsel's Motion for Entry of an Order and Judgment (1) Granting Final Approval of the Class Settlement with Taishan and (2) Certifying the Settlement Class. R. Doc. 22397. Defendants have filed a supplemental memorandum in support thereof. R. Doc. 22393. Settlement Class Counsel has also filed a Motion for an Award of Attorney Fees and Costs. R. Doc. 22380. Because the award of attorney fees is relevant to the fairness, reasonableness, and adequacy of the Settlement, the Court will address both issues in this Order and Reasons. The Court heard oral argument from counsel at a Final Fairness Hearing on December 11, 2019, and, having considered the arguments of counsel and the objectors, as well as the parties' submissions, now rules as follows.

## Table of Contents

I.   BACKGROUND ................................................................... 3

II.  PROCEDURAL HISTORY ................................................ 4

   A.   *The Knauf Defendants* .......................................... 4

B.   *The Chinese Defendants*                                                      *5*

C.   *The Taishan Settlement Agreement*                                           *12*

## III. MOTION FOR FINAL APPROVAL                                              16

A.   *Objections to the Motion*                                                    *17*

B.   *Law & Discussion*                                                            *26*
   1.   Class Action Settlement Prior to Class Certification                26
   2.   Rule 23 Criteria                                                     28
      a.   Numerosity                                                       28
      b.   Commonality                                                      29
      c.   Typicality                                                       29
      d.   Adequacy of Representation                                       30
      e.   Predominance of Common Questions of Law & Fact                   31
   3.   Fairness, Reasonableness, and Adequacy                               32
      a.   Adequacy of Representation                                       34
      b.   Arm's Length Negotiation                                         35
      c.   Adequacy of Relief                                               36
         i.   The Complexity, Expense, and Likely Duration of the Litigation   37
         ii.   The Stage of the Proceedings                                   38
         iii.  Plaintiffs' Probability of Success on the Merits               39
         iv.   Range of Possible Recovery                                     40
         v.   Opinion of Class Counsel, Class Representatives, and Absent Class Members   42
      d.   Equitable Treatment of Class Members                             43
      e.   The Objections                                                   44
         i.   The Size of the Settlement and Adequacy of the Funds           46
         ii.   Disparate Treatment of *Amorin* and *Brooke* Plaintiffs        47
         iii.  Effect of Product Identification                               48
         iv.   Inclusion of Attorney Fees                                     49
         v.   Notice                                                         50
      f.   The Settlement Agreement is Fair, Reasonable, and Adequate        52

## IV. MOTION FOR ATTORNEYS' FEES AND COSTS                                    52

A.   *Law and Analysis*                                                            *52*
   1.   Methodology for Determining Common Benefit Fees                      55
      a.   Lodestar Method                                                  55
      b.   Percentage Method                                                56
      c.   Blended Method                                                   57
         i.   Valuation of Benefit Obtained and Determination of a Benchmark Percentage   58
         ii.   Johnson *Factors*                                             61
            a.   The time and labor required                               61
            b.   The novelty and difficulty of the questions               62
            c.   The skill required to properly perform the necessary legal services   62

        d.   The preclusion of other employment by the attorneys due to
             acceptance of this case                                 63
        e.   The customary fee                    63
        f.   Whether the fee is fixed or contingent        63
        g.   Time limitations imposed by circumstance      63
        h.   The amount involved and the result achieved    64
        i.   Experience, reputation and ability of common benefit counsel   65
        j.   The "undesirability" of the case       65
        k.   The nature and length of the professional relationship with the client 65
        l.   Fee awards in similar cases        65
      iii.  Lodestar Analysis          66
  2.   Costs              68
  3.   Incentive Awards        69

**V.   CONCLUSION**           **70**

## I.     BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gas, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).

In an attempt to recoup their damages, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a

multidistrict litigation in accordance with 28 U.S.C § 1407. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were transferred and consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.

## II.    PROCEDURAL HISTORY

### A.  The Knauf Defendants

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009 and discovery quickly ensued. Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46—which represented a remediation cost of $81.13 per square foot based on the footprint square footage of the house.

Subsequently, the Knauf Entities agreed to institute a pilot remediation program utilizing the remediation protocol formulated by the Court from the evidence in *Hernandez*. The pilot

program included about fifty homes.  At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. Under the terms of the Knauf Settlement, homeowners had the choice of a sum certain or having the house totally remediated in addition to receiving reasonable costs and attorney fees. Furthermore, after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation.  The total amount of the Knauf Settlement is estimated at $1.1 billion.

Although the Court occasionally has to deal with settlement administration and enforcement issues, the Knauf portion of this litigation is now resolved.

### B.  The Chinese Defendants

The litigation against the Chinese entities has taken a different course.  The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities").  Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL:  (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on the Plaintiffs' claimed damages. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 10, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs in the amount of $2,609,129.99. R. Doc. 2380, 3013. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. Taishan challenged this Court's jurisdiction over the Defendants. As a result, because this was the first instance where Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether the Court indeed has jurisdiction over Taishan.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents, as well as depositions of

Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track and conducted hearings and issued rulings to resolve numerous discovery-related disputes.

The first Taishan depositions were held in Hong Kong on April 4-8, 2011. Thirteen attorneys traveled to Hong Kong and deposed several Taishan witnesses. However, upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. The Court, after reviewing the transcripts from the depositions, concluded that the depositions were ineffective because of disagreement among interpreters, counsel and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general, ensuing chaos.

In view of the foregoing, the Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong. Due to the problems experienced during the first depositions, the Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions, and the Court decided to travel to Hong Kong to preside over the depositions. Counsel for the interested parties and the Court traveled to Hong Kong for these depositions. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems that plagued the first round of depositions were absent. Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TPP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG and TPP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to pay the *Germano* judgment or voluntarily participate in this litigation.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that

Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participated in this judicial process; and that if Taishan violated the injunction, it would be obligated to pay a further penalty of 25-percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid the judgment and both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States.

Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants. The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order. Because the Court found that its Order and Reasons involved a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons could materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California*. Based on *Bristol–Myers Squibb*, Defendants contested this Court's findings of

personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued that the *Bristol–Myers Squibb* opinion impacts questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers Squibb* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding that *Bristol–Myers Squibb* does not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM Company, BNBM Group, and BNBM PLC's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certify interlocutory appeal of its April 2017 jurisdiction opinion arising from the Chinese Defendants' agency relationship. The Court, nevertheless, denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers Squibb*'s impact (or lack thereof) on the Court's personal jurisdiction analysis. The Court noted that the Supreme Court's opinion in *Bristol–Myers Squibb* did not address class actions and therefore was inapplicable to this MDL. Additionally, two separate panels on the Fifth Circuit had already reaffirmed the Court's original personal jurisdiction analysis in 2014. Any further litigation on the issue of personal jurisdiction for the Chinese Defendants would cause needless delay and waste judicial resources. BNBM and CNBM petitioned the Fifth Circuit for permission to appeal this Court's jurisdictional order, and the jurisdictional appeal is currently pending.

In 2018, the Court suggested to the Judicial Panel on Multidistrict Litigation that the Florida and Virginia *Amorin* actions be remanded to the transferor courts. R. Docs. 21242, 21695.

In 2019, the Court issued a suggestion of remand with respect to the Florida and Virginia *Brooke* actions as well. R. Doc. 22138, 22139.

A significant development in the Taishan aspect of this litigation occurred in the spring of 2019. On May 22 and 23, 2019, the parties underwent mediation with the goal of resolving the entirety of the *Amorin*[1] and *Brooke*[2] matters pending in the Eastern District of Louisiana, the Southern District of Florida, and the Eastern District of Virginia. On May 23, 2019, the parties agreed to a Term Sheet, and negotiations continued in person and by telephone for three months. All matters in the *Amorin* and *Brooke* actions were accordingly stayed by the remand courts and this Court, pending the execution of a Settlement Agreement between the parties. The stay was extended several times and preliminary approval of the Settlement Agreement was granted by the Court on August 29, 2019. R. Doc. 22314.

### C. The Taishan Settlement Agreement

The proposed Taishan Settlement Agreement is the result of over a decade of litigation and a complex negotiation process. Specifically, it obligates Taishan to pay $248,000,000 to fully resolve all claims of the *Amorin* class, the plaintiffs named in the *Brooke* complaints, and any other property owners with Chinese drywall attributable to Taishan ("Absent Class Members"). The settlement funds are "intended to provide compensation for all property and remediation damages as well as Other Losses." R. Doc. 22305-2 at 21. The Settlement specifically excludes 498 Florida *Amorin* Plaintiffs who received a separate settlement from Taishan (the "Parker Waichman

---

[1] On September 26, 2014, the Court certified the *Amorin* class, comprised of homeowners with defective drywall allegedly manufactured by any of the Taishan entities.

[2] The *Brooke* action involves the plaintiffs who filed suit after the *Amorin* class had been certified. The Court has not ruled on the applicability of *Amorin* rulings to the *Brooke* complaints. The operative *Brooke* complaints are *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-4127 (E.D. La.); *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-6631 (S.D. Fla.) (Miami Case No. 15-24348); *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-6632 (E.D. Va.) (Norfolk Case No. 15-506).

Settlement"), the plaintiffs involved in the *Mitchell* action,[3] and plaintiffs whose claims were previously voluntarily dismissed or dismissed for failure to complete a Supplemental Plaintiff Profile Form. R. Doc. 22305-2 at 5. If the Settlement is approved, Class Members who have not opted out will be deemed to have fully released any and all claims, as defined by the Settlement Agreement, against Taishan and the Additional Released Parties,[4] and will be barred from bringing or continuing suit on a released claim against these entities. R. Doc. 22305-2 at 19-20.

The amount a plaintiff stands to receive under the Settlement Agreement is determined by a Court-appointed Allocation Neutral. R. Doc. 22305-2 at 20-21. Mr. J. Cal Mayo, Jr., the Allocation Neutral, has developed an allocation model to determine the proper allocation and distribution of settlement funds among all the affected properties and eligible class members. R. Doc. 22304. This model attempts to "strike a balance between property-specific allocation, on the one hand, and efficient and effective allocation, on the other hand." R. Doc. 22304-1 at 2. To that end, the allocation model considers a number of "objective allocation criteria," including square footage of the Affected Property, whether the claimant was an *Amorin* plaintiff, a *Brooke* plaintiff, or an Absent Class Member, product identification, and the prior receipt of settlement funds. R. Doc. 22304-1. The allocation model does not consider the national average construction cost based on zip codes, ownership status, remediation status, or the value of other losses. R. Doc. 22304-1. The Settlement provides for a single allocation for each Affected Property, such that settlement awards may need to be divided among eligible class members with competing claims to the same

---

[3] On July 8, 2019, the Court denied Mitchell's motion seeking certification of a homebuilder class. R. Doc. 22287. On August 22, 2019, the Court suggested that the *Mitchell* matter be remanded to state court in Florida. The Court noted that remand was appropriate because the purpose behind consolidating these related actions in this Court had been served. The Court had addressed numerous discovery disputes, dispositive motions, and other pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding. No further pretrial motions raising common questions were pending in these cases, and remand to the transferor court appeared to be in the interest of judicial efficiency and fairness to the parties.

[4] The released parties are Taishan, BNBM, BNBM Group, CNBM, CNBM Group, and the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC"). R. Doc. 22392-3 at 20.

property. The allocation model does not consider, nor does the Settlement provide compensation for personal injury claims, but such claims shall nevertheless be released pursuant to the Agreement. R. Doc. 22397-1 at 23.

Following preliminary approval, Class Members were able to access the allocation model on the Settlement website and on the Court's docket. A Master Spreadsheet of Known Class Member Claims was also posted and filed, providing class members who had submitted sufficient proof of covered Chinese drywall with the ability to review the objective criteria used to calculate the value of their claim. Class Members had the opportunity to dispute the information on the Master Spreadsheet by October 3, 2019. One hundred and nine challenges were made, and a Revised Master Spreadsheet was filed with the Court on October 31, 2019. R. Doc. 22355-1. It was also posted on the Settlement Website, and a Challenge Determination Notice was sent to each affected Class Member. Under the terms of the Settlement, the review, determination, and approval of the allocation model by the Court shall be final and binding.

The parties undertook a significant effort to notify all Class Members, including Absent Class Members, of the proposed Settlement Agreement. A website (ChineseDrywallSettlement.com) was published to provide Class Members with up to date information about the settlement and the litigation. A notice of the proposed settlement was posted in every courthouse in which a Chinese drywall related case was pending. Working with Kinsella Media, the parties implemented a Media Notice Program to publish notice of the Settlement in print and online/mobile ads in relevant markets. Critically, each known Class Member was notified of the Settlement by mail and provided with a gross estimate of their award under the Settlement as calculated by the allocation model.

The Taishan Settlement Agreement binds all Class Members save those who formally opt-out from its terms. The Settlement involved a ninety-day period during which plaintiffs could opt-out by personally signing and mailing a request to do so to Settlement Class Counsel. Parties who choose not to opt-out but nevertheless were displeased with the Settlement could submit a formal objection within the same ninety-day period. The opt-out and objection period closed on November 27, 2019. The objections were collected by Settlement Class Counsel and submitted to the Court for consideration at the Final Fairness Hearing on December 11, 2019. Settlement Class Counsel received ninety-two opt-out requests, although not all were compliant with the Settlement Agreement's opt-out procedure. Of the compliant requests, seventy-eight were from known Class Members, [5] and twelve were from Absent Class Members. Settlement Class Counsel received twenty-two objections.

The Taishan Settlement Agreement is a historic achievement. It is, however, critically different from the Settlement Agreement reached in the Knauf aspect of this litigation. While the Knauf Settlement Agreement obligated Knauf to pay a designated amount to cover reasonable costs and attorney fees for both contract counsel and common benefit counsel in addition to completely remediating the affected properties,[6] the Taishan Settlement Agreement provides $248,000,000 to resolve all claims *and* pay all attorney fees and costs. Taishan is not involved in the allocation of funds. Therefore, while the Knauf aspect of the litigation required the Court to fairly allocate designated funds among common benefit counsel and individually retained attorneys, the Court has a much more difficult task here. First, the Court must determine what percentage of the total settlement fund is appropriately allocated to attorney fees and costs. Second,

---

[5] This represents about 2% of known Class Members.

[6] The total for both attorney fees and costs in the Knauf aspect of this litigation was $233,078,270.33, which included $197,803,738.17 for attorney fees and $35,274,532.16 for costs. *In re Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 09-2047, 2018 WL 2095729, at *2 (E.D. La. May 7, 2018).

the Court must determine how to allocate that amount between common benefit counsel and individually retained attorneys. Third, the Court must individually allocate a specific portion of those fees to each attorney entitled to such an award. Furthermore, this is a time sensitive inquiry because the allocation of attorney fees and costs necessarily reduces the amount of settlement funds available for distribution to the individual plaintiffs in this matter. Settlement Class Counsel has requested an award of attorney fees for both contract counsel and common benefit counsel totaling 30% of the settlement funds, and a 3% award for expenses. The Court first addresses final approval in Section III of this opinion and turns to the issue of attorney fees in Section IV.

### III.    MOTION FOR FINAL APPROVAL

Settlement Class Counsel seeks certification of the Settlement Class and final approval of the class settlements with Taishan Gypsum Company Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. and Taian Taishan Plasterboard Co. Ltd. R. Doc. 22397. In support of its motion, Settlement Class Counsel argues that the settlement is fair, reasonable, and adequate in light of the specific requirements of Rule 23(e) and the Fifth Circuit's *Reed* factors. Further, Settlement Class Counsel stresses that notice to the class complied with due process and that the overwhelming majority of class members support the settlement. At the Final Fairness Hearing, Class Counsel stressed that the Settlement will provide significant benefits to almost 4,000 plaintiffs and that the Settlement is an historic and substantial achievement in light of the procedural posture of the litigation, factual issues, the challenges of service, jurisdiction, and appeals, and the significant uncertainty of collecting on a potential judgment if the case went to trial.

### A. *Objections to the Motion*

Class counsel received and filed into the record twenty-seven objections to the settlement. Twenty-two objections were made by Class Members. The Court summarizes the objections below and addresses the arguments in its analysis.

1. Alisa Roundtree

Alisa Roundtree objected to the Settlement on November 7, 2019. Ms. Roundtree's primary concerns involve the disparate treatment of *Amorin* and *Brooke* plaintiffs and the reduction of claims involving disputed product identification. She contends that an eighty percent reduction of the *Brooke* plaintiffs' claims is unfair because "it is not [the plaintiffs'] fault that the discovery and litigation necessary to move the Brooke Complaint case to resolution was stayed or halted for several years." R. Doc. 22389-1 at 4.

2. Penny Alexander

Penny Alexander objected to the Settlement on November 20, 2019. Ms. Alexander's primary concern involves the amount of her estimated award, which she does not believe sufficiently compensates her and her family for the loss they have endured. R. Doc. 22389-2.

3. Lori Staton

Lori Staton objected to the Settlement on November 22, 2019. Her property contained both Knauf and Taishan drywall. Ms. Staton's primary concern involves the amount of her estimated award, which she does not believe sufficiently compensates her for the loss she has endured. Ms. Staton explains that she has previously received settlement funds for Alternative Living Expenses and Other Losses from the Knauf Global Settlement. Her Other Losses award originally entailed $10,000. She objected to this award and the Special Master in the Global Settlement ruled that her Other Losses actually totaled $170,000. However, Ms. Staton contends she only received

$73,161.79 "[d]ue to the limitation of funds in the settlement." R. Doc. 22389-3 at 1. Accordingly, Ms. Staton believes she is still owed the outstanding balance of that claim, and accordingly wishes to receive $96,838.21, instead of her lower estimated amount in the Taishan settlement. R. Doc. 22389-3.

4. Charles Caulkins

Charles Caulkins objected to the Settlement on November 27, 2019. Mr. Caulkins' primary concern involves the disparate treatment of *Amorin* and *Brooke* plaintiffs. Mr. Caulkins recognizes that there are legal and factual challenges involving the statute of limitations that may impact *Brooke* claims, but believes "they are not such a certainty to justify wiping out 80% of his claim." R. Doc. 22389-4.

5. Dailyn Martinez

Dailyn Martinez objected to the Settlement on November 27, 2019. Ms. Martinez and her husband also addressed the Court at the Final Fairness Hearing. Ms. Martinez's primary concern involves the amount of her estimated award, which she does not believe sufficiently compensates her and her family for the losses they have endured. R. Doc. 22389-5.

6. Gary and Ina Helmick

Gary and Ina Helmick objected to the Settlement on November 10, 2019. The Helmicks' primary concern involves the method of allocating settlement funds. In particular, the Helmicks' argue the allocation model should consider actual losses or expenses incurred, rather than the solely the "objective criteria" considered by the Allocation Neutral. R. Doc. 22389-6. The Helmicks' further disagree with the disparate treatment of the *Amorin* and *Brooke* plaintiffs because "the losses experience by all individuals who have lived in Chinese drywall homes, while all very individual, have been EQUALLY devastating." R. Doc. 22389-6.

7.    Dominesha Clay

Dominesha Clay objected to the Settlement on October 14, 2019. Ms. Clay's primary concern involves the amount of her estimated award, which she does not believe sufficiently compensates her and her family for the loss they have endured. R. Doc. 22389-7.

8.    Kenneth Randall and Alicia Doherty

Kenneth Randall and Alicia Doherty object to the settlement for three reasons. First, they disagree with the 25% discount of their claim based on product identification. The believe that Taishan admitted to manufacturing the drywall used in their home, which contained the words "meet or exceeds." According to Mr. Randall and Ms. Doherty, the Special Master's report regarding product identification categories attributable to Taishan indicates that Taishan only denies liability as to drywall with the marking "*meets* or exceeds." Second, Mr. Randall and Ms. Doherty object to the deduction of previous funds received from other drywall settlements. They explain that they received $16,169.22 for loss of household items from a previous settlement. They argue that this sum should not be deducted from their instant recovery because these funds were not used for remediation, which is the purpose of the Taishan Settlement. Third, Mr. Randall and Ms. Doherty object to the allocation of attorney fees from the settlement award. R. Doc. 22389-8.

9.    Stephen and Bonita Hemming

Stephen and Bonita Hemming object to the Settlement on the grounds that it is unfair to treat *Amorin* and *Brooke* plaintiffs differently merely because *Brooke* plaintiffs were not aware of the presence of Chinese drywall in their homes until after the litigation began. R. Doc. 22389-9.

10.    Russell Moody

Russell Moody objected to the Settlement on November 26, 2019. Mr. Moody raises ten objections. First, he argues that the Settlement should not be given final approval until Class

Counsel's concerns regarding the Parker Waichman Settlement are addressed. He believes the Parker Waichman Settlement, which applies to the 498 Florida plaintiffs who are excluded from the Taishan Settlement, "appears to . . . blatantly violate the legal and Constitutional rights" of the plaintiffs. R. Doc. 22389-10 at 5. Second, he argues that the Court, his individual attorney, and Class Counsel have failed to keep the plaintiffs informed and engaged during this litigation. Specifically, he contends his attorney failed to provide him with honest answers to his questions regarding the Settlement. Third, he argues that a motion pending before Judge Cooke, Plaintiff's Motion and Memorandum of Law to Adopt Plan for Resolution of the Florida Amorin Plaintiffs' Claims for Remediation and Other Damages, contained false and fraudulent statements. The Court, however, is unable to decipher exactly what statements Mr. Moody believes to be false and fraudulent. Fourth, he argues the Settlement should be denied because the Allocation Neutral considered inadmissible evidence when developing the allocation model. In particular, he objects to the Allocation Neutral's reliance on the Florida Special Master's Report because the report has not yet been adjudicated or adopted by Judge Cooke. Fifth, he believes the allocation model is directly in conflict with the Settlement's terms. In particular, he believes the decision to discount claims based on product identification clearly contradicts the PSC's previous position that all the drywall at issue was in fact manufactured by Taishan. Accordingly, he believes product identification should not be considered in the allocation model. He also objects to the fact that the Settlement does not provide plaintiffs with the right to appeal the application of the allocation model. Sixth, he argues that treating product identification as anything other than mere proof of defective drywall is a violation of the Settlement's terms. Seventh, he argues that the Settlement fails to provide sufficient funds for its intended purpose, which is to "provide compensation for **all** [emphasis added] property and remediation damages as well as other losses." R. Doc. 22389-10 at

11. Eighth, he doubts that the Settlement's Notice program complied with the Settlement's own terms. Ninth, he objects to the fact that plaintiffs with drywall not attributable to Taishan as per the Florida Special Master's Report stand to recover for what he calls a "participation trophy." He does not believe these plaintiffs are entitled to receive a settlement award since the report indicated that Taishan did not manufacture the drywall affecting their homes. Tenth, he argues that certain Plaintiffs' attorneys made public statements concerning the likelihood of success on the merits that are "at odds with the Global Settlement Agreement." R. Doc. 22389-10 at 11.

11.     Frederick Yorsch

Frederick Yorsch objected to the Settlement on November 27, 2019.  R. Doc. 22389-11. On December 17, 2019, Mr. Yorsch withdrew his objection to the Settlement. Accordingly, the Court will not consider it.

12.     Van Foster for Good Ole Boyz, LLC

Van Foster objected to the Settlement on November 27, 2019, on behalf of Good Ole Boyz, LLC. His only objection involves a notation on the master spreadsheet, which indicates that another class member has asserted a claim for the same Affected Property. Mr. Foster believes he is entitled to the entirety of the settlement proceeds and does not know whether the competing claim has submitted any documentation to the claims administrator. R. Doc. 22389-12. Because Van Foster's objection does not involve the fairness, reasonableness, or adequacy of the Settlement Agreement, the Court will not address it here. Mr. Foster is instructed to raise this argument with the Claims Administrator.

13.     Theodore and Cynthia Tarver

Theodore and Cynthia Tarver objected to the Settlement on November 27, 2019. Their primary concern involves the settlement amount, which they contend is not large enough to

adequately compensate all the plaintiffs. In particular, they feel it is unfairly small in comparison to the Knauf Settlement. R. Doc. 22389-13.

14.     Chris Cummings

Chris Cummins objected to the Settlement on November 27, 2019. His primary concern involves the settlement amount, which he contends is not large enough to adequately compensate all the plaintiffs. Additionally, he objects to the disparate treatment of *Amorin* and *Brooke* plaintiffs. In particular, he believes it is unfair to reduce the value of the *Brooke* claims on the grounds that less work has been conducted in *Brooke*, while requiring *Brooke* and *Amorin* plaintiffs to equally share the burden of fees and costs. R. Doc. 22389-14.

15.     Robert Bishop

Robert Bishop objected to the Settlement on November 27, 2019. His primary concern involves the settlement amount, which he contends is not large enough to adequately compensate all the plaintiffs. Additionally, he objects to the disparate treatment of *Amorin* and *Brooke* plaintiffs. In particular, he believes it is unfair to reduce the value of the *Brooke* claims on the grounds that less work has been conducted in *Brooke*, while requiring *Brooke* and *Amorin* plaintiffs to equally share the burden of fees and costs. R. Doc. 22389-15.

16.     John Prestridge

John Prestridge objected to the Settlement on November 27, 2019. His primary concern involves the settlement amount, which he contends is not large enough to adequately compensate all the plaintiffs. He believes the settlement in unfair because it provides drastically less than he would have received under the Knauf Settlement. R. Doc. 22389-16.

17.     Matthew Harper

Matthew Harper objected to the Settlement on November 27, 2019. His primary concern involves the settlement amount, which he contends is not large enough to adequately compensate all the plaintiffs. He believes the settlement in unfair because it provides drastically less than he would have received under the Knauf Settlement. R. Doc. 22389-17.

18.     Kent and Lindsay Archer

Kent and Lindsay Archer objected to the Settlement on November 27, 2019. Their primary concern involves the settlement amount, which they contend is not large enough to adequately compensate all the plaintiffs. Additionally, they object to the disparate treatment of *Amorin* and *Brooke* plaintiffs. In particular, they believe it is unfair to reduce the value of the *Brooke* claims on the grounds that less work has been conducted in *Brooke*, while requiring *Brooke* and *Amorin* plaintiffs to equally share the burden of fees and costs. R. Doc. 22389-18.

19.     Timothy and Sebrina Hall

Timothy and Sebrina Hall objected to the Settlement on November 27, 2019. Their primary concern involves the settlement amount, which they contend is not large enough to adequately compensate all the plaintiffs. Additionally, they object to the disparate treatment of *Amorin* and *Brooke* plaintiffs. In particular, they believe it is unfair to reduce the value of the *Brooke* claims on the grounds that less work has been conducted in *Brooke*, while requiring *Brooke* and *Amorin* plaintiffs to equally share the burden of fees and costs. R. Doc. 22389-19.

20.     Robert Brasher

Robert Brasher objected to the Settlement on November 27, 2019. His primary concern involves the settlement amount, which he contends is not large enough to adequately compensate all the plaintiffs. Additionally, he objects to the disparate treatment of *Amorin* and *Brooke* plaintiffs. In particular, he believes it is unfair to reduce the value of the *Brooke* claims on the

grounds that less work has been conducted in *Brooke*, while requiring *Brooke* and *Amorin* plaintiffs to equally share the burden of fees and costs. R. Doc. 22389-20.

21.    Robert and Debbie Hayes

Robert and Debbie Hayes objected to the Settlement on November 27, 2019. Their primary concern involves the settlement amount, which they contend is not large enough to adequately compensate all plaintiffs. They argue that the Settlement should cover the full cost of remediation, as the Knauf Settlement did. R. Doc. 22389-21.

22.    James Zimmerman

James Zimmerman objected to the Settlement on November 20, 2019. His primary concern involves the settlement amount, which is not large enough to adequately compensate him for the necessary repairs to his property. R. Doc. 22389-22.

23.    Mary Escudie (non-class member)

Mary Escudie objects not to the Settlement itself, but to being excluded from it. Ms. Escudie explains that she was a Florida *Amorin* class member who rejected the Parker Waichman Settlement offer. Accordingly, she seeks to be reinstated a class member in the Taishan Settlement. R. Doc. 22389-23. Because Ms. Escudie's objection does not challenge the fairness, reasonableness, or adequacy of the Settlement Agreement, the Court will entertain her arguments in a separate, forthcoming order.

24.    Michael Guerriero (non-class member)

Michael Guerriero objected not to the Settlement itself, but to being excluded from it. He explains that he was originally a part of the individual settlement arranged by Parker Waichman. Although slightly unclear from his objection letter, it appears as though Mr. Guerriero failed to submit a Supplemental Plaintiff Profile Form in time to receive benefits from the Parker Waichman

settlement, and accordingly now requests the Court to allow him to participate in the Taishan Settlement. Mr. Guerriero explains that he failed to complete the SPPF in a timely manner because he suffered a stroke that required serious medical care and continues to suffer "depression, fear, and anxiety" as a result. He asks this Court to overlook what he believes amounts to "excusable neglect due to medical reasons beyond [his] control." R.Doc. 22389-24. Because Mr. Guerriero's objection does not challenge the fairness, reasonableness, or adequacy of the Settlement Agreement, the Court will entertain his arguments in a separate, forthcoming order.

25. Pamela Rigsby and Irene Page (non-class member)

Pamela Rigsby and Irene Page objected to the Settlement on October 9, 2019. Their primary concerns involve the disparate treatment of *Amorin* and *Brooke* plaintiffs and the disparity between the Knauf Settlement and the Taishan Settlement with respect to available funds. Ms. Rigsby and Ms. Page further indicate that they intend to opt-out of the settlement. The Court notes that Ms. Rigsby and Ms. Page have in fact opted-out, and therefore the Court will not consider their objection.

26. Patricia Gottlieb (non-class member)

Patricia Gottlieb objected to the Settlement on October 9, 2019. Her primary concerns involve the sufficiency of the settlement and the method of allocating funds under the allocation model. R. Doc. 22389-26. After filing an objection, Ms. Gottlieb opted-out of the Settlement. Accordingly, the Court will not consider her objection.

27. Jimmy Doyle (non-class member)

Jimmy Doyle is an attorney who represents six objectors and all but four of the opt-out plaintiffs in this matter. Mr. Doyle's primary concerns, ostensibly raised on behalf of his objecting clients, involve the disparate treatment of *Amorin* and *Brooke* plaintiffs because "[t]here are no

terms in the Agreement defining certain claims as either superior or inferior to others deserving of a different monetary allocation." R. Doc. 22389-27 at 3. He also objects to the Allocation Neutral's decision to ignore factors such as ownership status and remediation status. Additionally, he argues that the settlement is inadequate to compensate the class, especially in comparison to the "estimated damages incurred by members of the class as indicated by preliminary discovery or other objective measures." R. Doc. 22389-27 at 5.

### B. Law & Discussion

#### 1. Class Action Settlement Prior to Class Certification

While the *Amorin* class was certified by the Court, the *Brooke* class has not as yet been certified. Accordingly, it is necessary to consider the requirements for class certification for the proposed *Brooke* class and also evaluate the reasonableness, fairness, and adequacy of the proposed Settlement for the entire Settlement Class, which includes both the *Amorin* and *Brooke* classes, as well as absent Class Members.

"Before an initial class ruling, a proposed class settlement may be effectuated by stipulation of the parties agreeing to a temporary settlement class for purposes of settlement only." William B. Rubenstein, Alba Conte, and Herbert B. Newberg, 4 Newberg on Class Actions § 11:22 (4th ed. 2010). "[A]pproval of a classwide settlement invokes the requirements of Rule 23(e)." *Id.* Rule 23(e) provides that "[t]he claims . . . of a certified class may be settled . . . or compromised only with the court's approval." Fed. R. Civ. P. 23(e); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). "Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits." Manual for Complex Litigation § 21.612. However, "[c]ourts have held that approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval

of settlements reached only after class certification has been litigated through the adversary process." *Id.*

Rule 23 of the Federal Rules of Civil Procedure, governing class actions, sets forth certain requirements that must be satisfied in order for a proposed class to be certified. In particular, the "subsection (a) and (b) requirements insure that a proposed class has 'sufficient unity so that the absent class members can fairly be bound by decisions of the class representatives.'" *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2008 WL 5423488, at *3 (E.D. La. Dec. 29, 2008) (quoting *Amchem*, 521 U.S. 591). Under Rule 23(a),

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). As courts within this district have recognized,

> The first two requirements focus on the characteristics of the class; the second two focus instead on the desired characteristics of the class representatives. The rule is designed "to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and class counsel's ability to fairly and adequately protect class interests."

*In re FEMA Trailer*, 2008 WL 5423488, at *3 (quoting *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 419 (S.D. Tex. 1999)).

Additionally, class certification requires that at least one of the specific provisions of Rule 23(b) must be met. Relevant here, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "To succeed under Rule 23(b)(3), plaintiffs must

sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case." *In re FEMA Trailer*, 2008 WL 5423488, at *3 (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623-24 (5th Cir. 1999)).

## 2. Rule 23 Criteria

To determine whether a settlement class should be certified for the *Brooke* claimants and absent class members, the Court will review the applicable law on Rule 23 and evaluate each criterion.

### a. Numerosity

Rule 23(a)(1) provides that a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To demonstrate numerosity, Settlement Class Counsel must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). Rule 23 does not provide a clear formula for determining whether the numerosity requirement has been met; thus, courts evaluate numerosity based upon the facts, circumstances, and context of the case. 1 William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed. 2019). Indeed, "[t]here is enormous disparity among the decisions as to the threshold size of the class that will satisfy the Rule 23(a)(1) prerequisites." *Id.* Although the plaintiffs bear the burden of showing that joinder is impracticable, "a good-faith estimate should be sufficient when the number of class members is not readily ascertainable," and the numerosity requirement "ordinarily receives only summary treatment . . . and has often gone uncontested." *Id.*

Here, the class includes under 4,000 individual plaintiffs. Notably, over 2,800 of these plaintiffs have already been certified as a class in the *Amorin* matter. The Court concludes that the numerosity requirement is satisfied in this case.

### b. *Commonality*

The commonality requirement under Rule 23(a)(2) requires for maintenance of a class action that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not require that all questions of law or fact raised in the litigation be common. The commonality standard is more qualitative than quantitative." 1 William B. Rubenstein, *supra*, § 3:20; *see also In re FEMA Trailer*, 2008 WL 5423488, at *6. Indeed, "[t]he commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). The Rule 23(a)(2) commonality "requirement is easily met in most cases." *Id.*

Commonality is easily satisfied in the instant case, because the Judicial Panel on Multidistrict Litigation ordered the subject cases consolidated in this MDL based upon commonality of facts. Further, the various underlying claims all involve common questions about the defectiveness of the drywall and damages caused by the drywall. The Court finds that the commonality requirement is satisfied in this case.

### c. *Typicality*

Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The inherent logic of the typicality requirement is that a class representative will adequately pursue her own claims, and if those claims are 'typical' of those of the rest of the class,

then her pursuit of her own interest will necessarily benefit the class as well." 1 Rubenstein, *supra*, § 3:28.

Here, the typicality requirement is satisfied because each Class Member seeks to recover for the same type of property damage, caused by the same type of drywall, manufactured by the same entities. Additionally, the claims all involve similar questions involving property damage and the need for and scope of remediation. Accordingly, the Court finds that the typicality requirement is satisfied in this case.

### d. *Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This criterion, which aims to protect the rights of absent class members, requires courts to consider the adequacy of the proposed class representatives and the adequacy of class counsel. 1 Rubenstein, *supra*, § 3:54. "The central component of class representative adequacy is the absence of conflicts of interest between the proposed representatives and the class." *Id.* In contrast, "[a]dequacy of counsel asks whether the attorneys who seek to represent the class are competent to do the job." *Id.*; *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982) ("[T]he adequacy of representation requirement . . . also raises concerns about the competency of class counsel and conflicts of interest."). With regard to the former, a court must consider whether any proposed class representative has an interest "materially adverse to some of the class" and whether he or she "is properly qualified to assume the role of class representative." 1 Rubenstein, *supra*, § 3:54. As to the latter requirement, "courts consider the competence and experience of class counsel, attributes which will most often be presumed in the absence of proof to the contrary." 1 William B. Rubenstein, Alba Conte, and Herbert B. Newberg, Newberg on Class Actions § 3:24 (4th ed. 2010).

David Griffin, Lillian Eyrich, Michelle Geramo, Virginia Tiernan, Debra Williams, and Judd Mendelson act as Class Representatives. Each Class Representative owns property allegedly damaged by covered Chinese drywall and has a high degree of knowledge regarding the litigation. They do not possess any interests antagonistic to the Class as a whole. Further, Class Counsel has extensive experience with complex litigation in general and this litigation specifically, which has been active for more than ten years. The Court concludes that the Class Representatives and Class Counsel adequately represent the entire class.

### e. *Predominance of Common Questions of Law & Fact*

Rule 23(b)(3) provides that a class action is maintainable if all the prerequisites of subsection (a) are satisfied and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Factors for the Court to consider in its determination include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

There is "considerable overlap" between commonality and the predominance of common questions of law and fact. *See* 1 Rubenstein, *supra*, § 3:27. However, "the predominance test is 'far more demanding' than the commonality test." *In re FEMA Trailer*, 2008 WL 5423488, at * 12 (quoting *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)). "In order to

'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). "As the predominance test is meant to help courts identify cases in which aggregate treatment would be efficient, it focuses on the extent to which the issues in the cases are common as opposed to individual—the more common the issues, the more likely it is that the case will be processed efficiently in the aggregate; the less common the issues, the less likely efficient resolution will be furthered by aggregation." 2 William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2019).

This requirement is satisfied because the common questions of liability substantially outweigh any questions pertinent to individual Class Members alone. Further, the relevant evidence necessary to establish plaintiffs' claims is common to all Class Members who would seek to prove entitlement to damages based on Taishan's allegedly wrongful conduct. Lastly, as Class Counsel argues, the "resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication." R. Doc. 22397-1 at 52. The Court concludes that common questions of law and fact predominate in this case, and that a class action is a superior method of adjudication than consideration of several thousand individual claims. It is now appropriate to consider the fairness, reasonableness, and adequacy of the Settlement Agreement with respect to the claims of both the *Amorin* and *Brooke* claimants, as well as absent class members.

### 3. Fairness, Reasonableness, and Adequacy

Under Rule 23, "[r]eview of a proposed class action settlement generally involves two hearings," the first of which is a "preliminary fairness" evaluation made by the Court. Manual for Complex Litigation § 21.632 (4th ed. 2004). Indeed, within the Fifth Circuit it is routine to conduct a preliminary fairness evaluation prior to the issuance of notice. *See, e.g.*, *Cope v. Duggins*, 2001

WL 333102, at *1 (E.D. La. Apr. 4, 2001); *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993). During this evaluation, the Court must "make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." Manual for Complex Litigation § 21.632. Additionally, the Court "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing." *Id.* After having granted preliminary approval and allowed the notice process to move forward, the Court conducts a more thorough and rigorous analysis of the same factors in order to determine the appropriateness of granting final approval. *Id.* § 21.6; *see also In re OCA, Inc. Sec. & Derivative Litig.*, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008). "Counsel for the class and the other settling parties bear the burden of persuasion that the proposed settlement is fair, reasonable, and adequate." Manual for Complex Litigation § 21.631; *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006). The Court granted preliminary approval of the Taishan Settlement on August 29, 2019. R. Doc. 22314. Accordingly, the Court now considers whether final approval is warranted.

The Court is required to render a determination on the fairness, reasonableness, and adequacy of the Settlement Agreement. Courts may consider a large number of factors in order to determine whether these requirements are satisfied. Traditionally, courts in the Fifth Circuit have considered the following six factors, from *Reed v. General Motors Corp.*, in making this determination: (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings; (4) plaintiffs' probability of success; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and absent class members. 703 F.2d 170, 172 (5th Cir. 1983).

Additionally, in 2018, Rule 23 was amended to provide uniform guidance regarding this determination. Rule 23(e)(2) instructs courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee's notes to the 2018 amendments, however, clearly indicate that the changes to the rule are meant to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," rather than "displace any factor" sanctioned by the circuit courts. *Id.* Accordingly, the Court will consider the Rule 23 requirements as informed by the *Reed* factors.

### a. Adequacy of Representation

The adequacy requirement mandates an inquiry into "the zeal and competence of the representative[s'] counsel and . . . the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001).

Settlement Class Counsel have been intimately involved with the litigation for over a decade and strongly support this Settlement. Class Counsel suggests it has the experience and institutional knowledge to effectively resolve these claims "meaningfully and intelligently." R. Doc. 22397-1 at 56.

The Court finds that the Class Representatives and Settlement Class Counsel have diligently and zealously represented the plaintiffs. In the face of legal complexities, procedural

hurdles, and inherent uncertainty, Class Counsel has coordinated discovery efforts, conducted depositions both in this country and abroad, filed thousands of pleadings and other documents into the record, and represented the parties before this Court, the remand courts, and appellate courts, for over a decade. Class Counsel additionally succeeded in securing a Settlement Agreement with a formidable opponent that, at various points in this litigation, refused to so much as acknowledge this Court's jurisdiction. Further, the Class Representatives are capable of fairly and adequately protecting the interests of the Class because they have been involved in this litigation for years and raise claims that are factually and legally analogous to those of other Class Members.

### b. *Arm's Length Negotiation*

A strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also In re Oil Spill by Oil Rig Deepwater Horizon*, MDL 2179, 295 F.R.D. 112, 146 (E.D. La. 2013); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D. La. 2007); *In re Train Derailment Near Amite Louisiana*, MDL 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006). Fraud or collusion, either actual or perceived, may be suspected when the attorneys have made agreements amongst themselves regarding the allocation of attorney fees, especially when the common benefit fee is deducted directly from the settlement fund. Courts must be particularly diligent when evaluating a proposed settlement in which the fee award has been negotiated by class counsel because pecuniary self-interest has long been cited by courts and scholars as a threat to the performance of counsel's professional and fiduciary obligations to class members. *See, e.g.*, *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002); John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative*

*Litigation,* 100 Colum. L. Rev. 370, 385–93 (2002); David L. Shapiro, *Class Actions: The Class as Party and Client*, 73 Notre Dame L. Rev. 913, 958–60 & n. 132 (1998).

The presumption in favor of settlement is warranted here. First, the Settlement is the product of arms-length negotiations between sophisticated parties with the guidance of an experienced, professional mediator. The process involved a global demand on Taishan, followed by the exchange of detailed damage calculations, arguments, responses, offers, and counter offers. The mediation lasted several days, followed by a three-month negotiation period. The negotiation was conducted by highly skilled attorneys with extensive experience in complex litigation and specific knowledge of the facts and legal issues presented in this MDL. Counsel on both sides have zealously advocated for their clients for some ten years, as evidenced by the extensive discovery, motions practice, and significant resources expended in this case. The parties entered the negotiation with the experience and institutional knowledge necessary to successfully negotiate on behalf of their clients, and the settlement was accordingly achieved as a result of the adversarial process.

Second, the prospect of fraud or collusion is substantially lessened where, as here, the settlement agreement leaves the determination and allocation of attorney fees to the sole discretion of the trial court. Because the parties have not agreed to an amount of attorney fees and instead have merely petitioned the Court for an award they believe is appropriate, there is no threat of the issue tainting the fairness of the settlement negotiations. Accordingly, the Court finds that the proposed Settlement is the product of an arms-length negotiation untainted by fraud or collusion.

### c. *Adequacy of Relief*

Determining whether the proposed relief is adequate requires the Court to consider several of the *Reed* factors, namely, (1) the complexity, expense, and likely duration of the litigation, (2)

the stage of the proceedings, (3) plaintiffs' probability of success on the merits, (4) the range of possible recovery, and (5) the opinions of class counsel, class representatives, and absent class members. Here, these factors all indicate that the proposed relief is adequate. The Court discusses each factor in turn.

### i. The Complexity, Expense, and Likely Duration of the Litigation

This factor requires courts to compare the benefits and risks of the proposed settlement as well as the potential future relief in light of the uncertainties of the litigation. *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. at 147. This litigation has been procedurally complex, expensive, and extremely lengthy. The case has been active for over ten years, during which significant resources have been expended to serve Taishan, conduct discovery, undertake extensive motion practice, try bellwether trials, and file over 20,000 documents into the record. Each day the case continues is another day during which homeowners are unable to commit necessary financial resources to the remediation of their homes.

Additionally, the burden of this litigation cannot be understated. This settlement affects the claims of nearly 4,000 plaintiffs. Although the *Amorin* claims have been vigorously prosecuted, the *Brooke* claims remain in an early stage of litigation. Taking these 1,200 *Brooke* cases to trial would take years, require additional discovery and motion practice, and generate significant expenses. Further, if a favorable judgement were obtained, the prevailing party would likely encounter formidable hurdles in collecting on the judgment. In all cases, the determination of individual damages could take years to resolve, and would greatly increase the cost, fees, and time associated with this already-expansive litigation. Despite the PSC's diligent efforts, there is no certainty as to the outcome of these trials. Success on the merits is not guaranteed, and even if a judgment favorable to plaintiffs is rendered, Taishan would be certain to appeal it, as it has other

substantive directives from this Court. Because the settlement provides monetary relief for class members now, as opposed to potential relief in the future, the Court finds that this factor supports approval of the Settlement.

### ii.    The Stage of the Proceedings

The stage of the proceedings and the nature and extent of discovery can be significant factors in evaluating the fairness of a settlement. This factor requires courts to consider "whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. at 148 (quoting *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching: Grades 7–12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (quotations omitted)). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ." *Id.* (quoting *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620-21).

For the past ten years, the parties in this matter have conducted significant discovery, engaged reputable experts, litigated bellwether trials, and negotiated other settlements. In doing so, they have developed and honed a particularly thorough understanding of the facts of the case, its legal theories, and the strength and weaknesses of the parties' positions. Considering the work that has been done in this case and the expertise of counsel on all sides, the Court is convinced that the parties were fully informed of the factual and legal obstacles that could influence the decision to settle the matter before trial. Accordingly, this factor weighs in favor of approving the settlement.

### iii.  Plaintiffs' Probability of Success on the Merits

This factor requires the Court to compare the relief offered by the proposed Settlement with the likely recovery if the case were to proceed to trial. Absent fraud or collusion, the probability of success on the merits has been hailed as the most important *Reed* factor. *See Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). In evaluating the probability of success, "the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007).

The *Amorin* and *Brooke* complaints raise various claims aimed at holding Taishan responsible for property damage allegedly caused by defective Chinese drywall. Taishan has stipulated to manufacturing certain kinds of drywall, and there is no serious contention that the drywall itself was not defective.

This fact, however, must be weighed against the significant legal hurdles that could substantially impair the probability of success on the merits. The obstacles to achieving a favorable result and collecting on any potential judgment are significant. The Taishan Defendants have challenged this Court's rulings at every turn, and a challenge to this Court's jurisdiction over Defendants BNBM, BNBM Group, and CNBM is currently set for oral argument before the Fifth Circuit in February 2020.[7] Additionally, a large number of Florida *Amorin* claims risk being dismissed if Judge Cooke adopts the Florida Special Master's Report and Recommendation,[8] which found insufficient evidence to attribute certain types of drywall to Taishan. Although the PSC filed an opposition to the report, there is no guarantee that Judge Cooke will entertain the

---

[7] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, No. 18-30742 (5th Cir. Nov. 22, 2019), Doc. No. 00515211235.

[8] *See* Special Master's Product ID R&R (FLSD ECF No. 233). At the time of Settlement, PSC's objections to the Special Master's Report were pending consideration by Judge Cooke.

objection and adopting the report would leave plaintiffs with non-attributable drywall without further recourse. Further, this Court has previously indicated that the applicable statutes of limitation pose a substantial bar to the *Brooke* claims.[9] Lastly, and perhaps most importantly, even if plaintiffs were to secure a judgment in their favor at trial, there is absolutely no guarantee of solvency and collectability. At the very least, a judgment would inevitably trigger an appeal, creating additional costs and delays. Even if a judgment were affirmed, there are significant questions regarding the enforcement of a judgment against a Chinese company that contests the jurisdiction of the American courts. Taishan has limited or no assets in this country. Thus, any enforcement would have to be pursued in China, a country that has no treaty with the United States governing enforcement of judgment. *See Enforcement of Judgments*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html (last visited Jan. 9, 2019). Accordingly, the Court considers the finality of the Settlement and the immediate cash benefit it provides to be superior to the possibility of achieving a larger judgment at a future trial without any mechanism to enforce it.

### iv.     Range of Possible Recovery

"[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Thus, after determining if any legal or factual obstacles exist, a district court must inquire whether the settlement's terms fall within a reasonable range of recovery,

---

[9] *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, 2019 WL 1057003 (E.D. La. Mar. 6, 2019).  In this order, the Court noted the potential viability of applicable statute of limitations defenses and explained that accordingly, the viability of *Brooke* claims would need to be addressed on case by case basis.

given the likelihood of the plaintiffs' success on the merits. When considering this factor, the Court must remain aware that

> [c]ompromise is the essence of settlement and the court should not make the proponents of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of which concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.

*Nelson v. Waring*, 602 F. Supp. 410, 413 (N.D. Miss. 1983) (quoting *Cotton v. Hilton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

Like all settlements, the Taishan Settlement Agreement is a compromise. It is not designed to provide complete and total relief to every single claimant. Without re-hashing the inherent risks and uncertainties associated with this litigation, the Court stresses that many plaintiffs risk recovering nothing if the case proceeds to trial, whether due to the Florida Special Master's determination regarding product identification, the effect of the statutes of limitation on *Brooke* claims, or the vagaries of collecting on any judgment. For these plaintiffs whose claims are in tenuous positions, the Settlement provides immediate monetary relief that is firmly in the range of possible recovery. The settlement award is also in the range of possible recovery even for the plaintiffs whose claims are not subject to dismissal for these reasons. As explained above, the inherent risks and uncertainties involving jurisdiction, appeals, and collectability render every claim subject to a possible recovery of zero dollars. Even though a larger recovery than the one offered by the Settlement is a possibility, the value of the settlement award represents a fair compromise when considering the risks associated with this litigation. Taking into consideration the legal and factual obstacles discussed above, the Court finds that the Taishan Settlement provides class members with a sum of money that falls within the reasonable range of recovery. It

will not make every plaintiff whole, but the Court urges litigants to remember that, as cited above, "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Id.*

### v. Opinion of Class Counsel, Class Representatives, and Absent Class Members

Class Counsel are intimately familiar with the case and the Settlement, and therefore the Court will give weight to class counsel's opinion regarding the fairness of settlement. *See Cotton*, 559 F.2d at 1330 ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties."). Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit. *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979). However, the Court's deference must not be so great that it blindly follows class counsel's recommendations. *Id.* Rather, the Court must give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement. *Id.* (citing *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978), and *Saylor v. Lindsley*, 456 F. 2d 896, 900–01 (2d Cir. 1972)).

Settlement Class Counsel has filed a 110-page brief in support of final approval of the Settlement. R. Doc. 22397-1. The Settlement is additionally supported by Defendants. R. Doc. 22393. As explained above, this Settlement was achieved through an arms-length negotiation between sophisticated and experienced counsel who developed a thorough understanding of the relative strengths and weakness of the case through extensive motion practice, discovery, and experience with complex litigation. Although the Court affords deference to their views, its consideration of this factor does not end there. All of the Class Representatives in this matter— David Griffin, Lillian Eyrich, Mary Michelle Germano, Virginia Tiernan, Debra Williams, and Judd Mendelson—have declined to opt-out or object to the Settlement. The Class Representatives have all filed affidavits in support of the Settlement, explaining that they "strongly support this

Settlement, believe it is fair, reasonable and adequate, and urge the Court to grant final approval to the Settlement and certify the Settlement Class." R. Doc. 22397-16, 22397-17, 22397-18, 22397-19, 22397-20, 22397-21.

Further, the attitude of Absent Class Members, expressed either directly or indirectly by their failure to object after notice and the high level of participation in the proposed settlement program, is an additional factor on which district courts generally place heavy emphasis. *See In re Microstrategy, Inc. Sec. Litig.*, 150 F. Supp. 2d 896 (E.D. Va. 2001) (stating that class reaction is perhaps the most significant factor in determining whether a settlement is adequate). The Taishan Settlement affects 3,948 known class members. Of those 3,948 plaintiffs, 22 objected to the settlement and 92 opted out.[10] Additionally, five non-class members filed objections to the Settlement, but two of these objectors in fact object to their status as non-class members and seek to join the Settlement Class and recover settlement funds. Thus, approximately 97% of proposed class members have accepted the Settlement, and the Court accordingly finds that this factor weighs in favor of final approval.

### d. Equitable Treatment of Class Members

This Rule 23 factor requires the Court to consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(d). This inquiry involves a determination of "whether the apportionment of relief among class members takes appropriate account of differences among their claims." Rule 23 (e)(2)(C), (D), Advisory Committee Notes to 2018 Amendments.

---

[10] The Court notes that only seventy-eight Class Members opted out of the Settlement, as did twelve absent class members. The remainder of opt-outs were procedurally deficient. The Court will address the procedurally deficient opt-outs in a separate, forthcoming order.

The Taishan Settlement is designed to distribute settlement funds among the thousands of plaintiffs on an equitable basis. To assist in this endeavor, the parties enlisted the help of an Allocation Neutral, who considered a variety of factors and ultimately developed an allocation model to guide the process. The allocation model assigns relative values to a handful of objective criteria that collectively determine each individual award. The Court finds that the allocation model is specifically designed to efficiently and effectively distribute funds on an equitable basis that considers relevant, objective factors. Accordingly, this factor weighs in favor of final approval.

### e.    *The Objections*

Any class member who does not opt out may object to the settlement under Rule 23(e)(4). The absence or small number of objections may provide a helpful indication that the settlement is fair, reasonable, and adequate. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981); *Pettway*, 576 F.2d at 1216–17 (stating that the higher the number of objectors, the heavier the burden of proving fairness, and ruling that it was an abuse of discretion to approve a settlement opposed by the named plaintiff and 70% of class members). *But see In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002) (stating that though class reaction is an indicator of class member support, courts must not place too much dependence on a small number of objections); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt–Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1532-34 (2004) (cautioning that reliance on low opt-out and objection numbers in any given case may be misplaced given that the authors found opt-out and objection rates to be "trivially small in the mass of cases"). However, a court may approve a class action settlement even if opposition exists. *See Ayers v. Thompson*, 358 F.3d 356, 368-73 (5th Cir. 2004) ("That several class members desire broader relief . . . does not prevent judicial approval of this settlement agreement, which

promises substantial relief to the class."). Nevertheless, courts must independently examine all objections to determine if they have merit and whether they raise questions regarding the fairness of settlement. *See In re Corrugated Container*, 643 F.2d at 217-18.

Courts have held that objections must be sufficiently clear and unambiguous for court consideration; otherwise the party will be deemed to have waived their objection. *Luevano v. Campbell*, 93 F.R.D. 68, 77 (D.D.C. 1981). Moreover, objectors must comply with procedural requirements stipulated in the settlement agreement, such as filing a written statement of objection with the court in advance of the hearing and giving notice of intent to appear at the fairness hearing. However, the court has discretion to permit objections at the fairness hearing even if the party wishing to voice an objection has not filed a written statement in advance. *See e.g., In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, MDL 991, 1994 WL 599525, at \*4-5 (E.D. La. Nov. 1, 1994); *In re Prudential–Bache Energy Income P'ships Sec. Litig.*, 815 F. Supp. 177, 179 (E.D. La. 1993). Objections ought to focus on the fairness, reasonableness, and adequacy of the agreement, rather than "renegotiate terms of the settlement based on individual preferences." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. at 152.

As explained above, the Court has received twenty-seven objections to the Settlement Agreement, twenty-two of which were filed by Class Members. Having detailed each above, the Court finds that the objections primarily involve the following issues: (1) the size of the settlement and adequacy of the funds, (2) the disparate treatment of *Amorin* and *Brooke* plaintiffs, (3) the effect of product identification on the award estimate, and (4) the inclusion of attorney fees. In addition, one objector challenges the sufficiency of the Notice Program. The Court will discuss each of these issues in turn.

### i. The Size of the Settlement and Adequacy of the Funds

Several Class Members object to the Settlement on the grounds that it simply does not provide enough money to make them whole again or to allow them to fully remediate their homes. Additionally, some Class Members object to the disparity between the Taishan Settlement and the Knauf Settlement, which provided for complete remediation of affected properties in addition to attorney fees.

The Court acknowledges that this Settlement is smaller than the Knauf Settlement and does not provide 100% of the funds necessary to completely remediate each Affected Property. However, the Court urges the parties to remember that settlements do not usually make claimants completely whole. This Settlement aims to resolve claims on an aggregate basis to provide the greatest total recovery for the greatest number of people and was negotiated in light of the complexities that exist in the Taishan aspect of the litigation that were absent from the Knauf matters. Many of these objections focus on the value of individual claims, but do not actually target the fairness or adequacy of the Settlement as a whole. While these may be reasons to opt out, they are not reasons to unravel the entire Settlement, which 97% of class members apparently support.

The court urges litigants to recognize that a settlement is, at its core, a compromise. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 941 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("Settlements are compromises, and the fact that some class members wish BP had paid more compensation is no reason to reject the Settlement."); *United States v. Par. of Orleans Criminal Sheriff*, No. CIV.A. 90-4930, 1997 WL 35215, at *4 (E.D. La. Jan. 27, 1997) ("Since this is a settlement, no one can be expected to receive 100% recovery . . . ."). What Class Members are missing in terms of dollars they make up for by guaranteed recovery and an end to a decade of litigation. The fact that Class Members wish Taishan

was willing to pay more to settle these claims does not warrant unraveling the entire Agreement. The objectors who are unhappy with the amount of their estimated allocation had the right to opt-out of the Settlement and pursue their claims against Taishan in court. In not opting out, these objectors apparently recognize the inherent difficulties and uncertainties associated with pursuing this option, and their actions suggest that final approval of the Settlement is warranted.

### ii. Disparate Treatment of *Amorin* and *Brooke* Plaintiffs

Several objectors raise concerns with the methodology used by the Allocation Neutral to determine the value of each claimant's recovery. The Court begins by noting that fairness is not synonymous with equality. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855–56 (1999) ("[A] settlement must seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves."). Indeed, "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims." *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d at 948. There is no elusive or magical way to distribute the funds among differently situated claimants in a manner that would make every single claimant completely satisfied with their recovery. The Allocation Neutral, who has no financial interest in this litigation, was appointed to determine the fairest, most equitable way of doing so. This methodology was designed to be efficient and cost effective, as is in the best interest of the class because it minimizes the expenses that will be deducted from the recovery.

With respect to the disparate treatment of *Amorin* and *Brooke* plaintiffs, the Court notes that this distinction may appear to be ambiguous line-drawing without good reason. However, as explained at the Final Fairness Hearing, the effect of a Class Member's claim status has a significant impact on the value of their claim and likelihood of success on the merits. As the

Allocation Neutral explained, the *Amorin* class has gone through a significant amount of litigation—a default judgment has been entered with respect to liability and a class has been certified. The Florida and Virginia remand courts have adopted this Court's rulings with respect to such matters. The last step of the *Amorin* litigation, albeit a very complex one, is to calculate the individual measure of damages suffered by each plaintiff. In stark contrast, the *Brooke* claims are in the nascent stages of litigation. Several complaints have been filed, but the Defendants have not answered, no discovery has occurred nor has a class been certified. Developing these claims in a manner that resembles the *Amorin* litigation would entail significant time and expense. Furthermore, many of these claims are jeopardized by applicable statute of limitations defenses potentially available to Defendants. Accordingly, the *Brooke* claims are inherently riskier and less valuable than the *Amorin* claims. The *Amorin* and *Brooke* groups have very different chances of success on the merits, and it is equitable to treat claimants with more fully developed cases as better situated than those facing more substantial obstacles to recovery. In so finding, the Court does not intend to suggest that the hardship suffered by *Amorin* and *Brooke* plaintiffs is not comparable. To the contrary, the Court recognizes that the hardship of living with Chinese drywall has been shared equally by all Affected Property owners. That fact, however, does not justify the equal distribution of funds among class members because fairness requires that claimants be treated in an equitable fashion that considers, among other things, the strength and status of their individual claims.

### iii.    Effect of Product Identification

The same logic applies to the discounts for product identification issues. The allocation model assigns certain discounts to claims arising from the installation of types of drywall the Florida Special Master determined were not attributable to Taishan. Taishan admits it

manufactured the following brand of drywall: (E) DUN, (H) TAIAN TAISHAN and Taihe Edge Tape, (K) Venture Supply. BNBM admits it manufactured (A) BNBM and Dragon Board. Accordingly, affected properties with these brands of drywall are not discounted. However, claims involving (D) Crescent City Gypsum, (I) MADE IN CHINA MEET[S] OR EXCEED[S], and (J) various drywall dimensions, including 4feet[x/*]12feet[x/*]1/2 inch, are discounted by 25% because Taishan admits it manufactured some, but not all of this drywall. An 80% discount is applied to drywall categories (B) C&K, (C) Chinese Manufacturer #2 (purple stamp), (F) IMT Gypsum, (G) Prowall, and (L) White Edge Tape, boards with no markings or boards with no markings other than numbers of letters, because, as the Florida Special Master found, there is insufficient evidence linking these boards to Taishan. With respect to product identification, the applicable discounts reflect the fact that if the class were to forego settlement and proceed to trial, the claimants with drywall falling into a discounted category would likely recover substantially less, or nothing at all, than a claimant with drywall clearly attributable to the Taishan Entities.

### iv.    Inclusion of Attorney Fees

The Court recognizes that the reduction of individual awards for an as-of-yet undetermined amount of attorney fees may seem, to some plaintiffs, like an unfair penalty. Nevertheless, the Court finds that a reduction of some amount for attorney fees is both absolutely necessary and well-deserved. Plaintiffs' attorneys typically work on a contingency arrangement, and the Court assumes that the majority, if not all, of the plaintiffs in this litigation were prepared to allocate approximately one-third of any recovery at trial to their attorney. Here, Settlement Class Counsel has requested an award of 30% for attorney fees, to include both contract counsel and common benefit counsel, and 3% for costs, which approximates a typical contingency arrangement. Further, an award of attorney fees is necessary in all settlements of this nature both to reward the attorneys

for their years of hard work and to encourage other attorneys to take on complex, challenging, and meaningful cases in the future. As noted above, both common benefit counsel and the individually retained attorneys have been actively litigating this case for over a decade to the benefit of individual clients and the entire class. This case has been exceedingly complex. It has been remarkably expensive. It has been taxing on the attorneys' time and financial resources. To simply deny them compensation from the settlement fund is inconceivable. The appropriate amount of attorney fees has not yet been established. The Court will deal with this issue in section IV of this opinion.

### v.    Notice

One objector alleges that due process has been violated because media outreach was insufficient. Although the Court notes that a generalized allegation is insufficient to stage an actual attack on a settlement, *DeHoyos*, 240 F.R.D. at 293, it will nevertheless address the argument.

Certification of a class settlement under Rule 23(b)(3) requires that the proposed class receive adequate notice of the settlement. Rule 23(c)(2)(b) requires that class members receive "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(b). This notice must include: (1) "the nature of the action," (2) "the definition of the class certified," (3) "the class claims, issues, or defenses," (4) "that a class member may enter an appearance through an attorney if the member so desires," (5) "that the court will exclude from the class any member who requests exclusion," (6) "the time and manner for requesting exclusion," and (6) "the binding effect of a class judgment on members." Fed. R. Civ. P. 23(c)(2)(b)(i)-(vii). Further, under Rule 23(e)(1), notice must be directed "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23's notice requirement implicates due process concerns, because "[n]otice of a mandatory class settlement . . . will deprive class members

of their claims" and "therefore requires that class members be given information reasonably necessary for them to make a decision whether to object to the settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010).

Here, the Court is satisfied that the Notice Program complied with Rule 23. During the Class Notice Period, the Claims Administrator mailed a long-form notice to all known Class Members. This notice was written in plain, understandable English, and advised class members of their rights and obligations under the Settlement. It explained the subject matter of the litigation, defined the class, advised Class Members of their right to representation and their right to object or opt-out, the procedure for doing so, and explained the binding effect of the Settlement on Class Members who chose not to opt-out. Each known Class Member was additionally provided with an estimate of their award and allowed to challenge that estimate. To notify Absent Class Members, the Court mailed notices to all courthouses in which Chinese drywall-related matters were pending. A website was published, and a call center established, to provide individuals with information about the litigation and the Settlement.

Class Counsel also worked with Kinsella Media to develop a Media Notice Program. Shannon Wheatman, a specialist in the design and implementation of class action notification programs, testified as a representative of Kinsella Media at the Final Fairness Hearing. As she explained, the Notice Program consisted of individual mailings to each known Class Member, paid media advertising in English and Spanish-language newspapers, lifestyle websites, national magazines, and digital media outlets. The digital media campaign resulted in twenty-five million gross impressions, and the settlement website has been viewed over 121,000 times. The notices and advertisements were written in plain English and designed to capture a reader's attention. Ms. Wheatman testified, and the Court agrees, that the Notice Program satisfies the best notice

practicable standard under Rule 23(c) and the requirements for class notification under Rule 23(e)(1).

### f. The Settlement Agreement is Fair, Reasonable, and Adequate

Considering the foregoing, none of the objections warrant denial of final approval. Accordingly, the Court concludes that the Taishan Settlement Agreement is fair, reasonable, and adequate. The Court concedes that this Settlement will not provide every plaintiff with sufficient funds to completely remediate their homes. However, considering the significant expenses, delays, risks of continued litigation, risks of collectability, and the overwhelming support of Class Counsel and Class Members, the Court finds that it is fair to monetarily compensate plaintiffs immediately rather than continuing this litigation for, at minimum, several more years. Class Counsel, Defense Counsel, and over 97% of Class Members appear to agree. Accordingly, the Court confirms its previous decision preliminarily approving the Settlement and certifying the Settlement Class.

## IV.    MOTION FOR ATTORNEYS' FEES AND COSTS

At this juncture, the Court turns to the issue of attorney fees and costs. Settlement Class Counsel seeks an award of attorney fees for common benefit counsel and contract counsel, and cost reimbursements for common benefit counsel. R. Doc. 22380. As mentioned, Settlement Class Counsel requests an award representing 30% of the aggregate amount of the Settlement for attorney fees and 3% for costs, totaling $74,400,000 in fees and approximately $7,074,830.15 in costs.

### A. Law and Analysis

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986) (quotation omitted). Likewise, the attorney for the prevailing litigant

must generally look to his or her own client for payment of attorneys' fees. Since the nineteenth century, however, the Supreme Court has recognized an equitable exception to this rule, known as the common fund or common benefit doctrine, that permits the creation of a common fund in order to pay reasonable attorney fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries. *See In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring).[11] This equitable common fund doctrine was originally, and perhaps still is, most commonly applied to awards of attorney fees in class actions. *See* e.g., 5 William B. Rubenstein, Newberg on Class Actions § 15:53 (5th ed. 2019) (discussing common fund doctrine in context of class actions).

But the common fund doctrine is not limited solely to class actions. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees and costs to litigant whose success benefitted unrelated parties by establishing their legal rights); *Alan Hirsh & Diane Sheeley*, Fed. Judicial Ctr., Awarding Attorneys' Fees and Managing Fee Litigation 51 (2nd ed. 2005) ("Although many common fund cases are class actions . . . the common fund doctrine is not limited to class actions."); Manual for Complex Litigation § 14.121. As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area. The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit. However, there is a difference. In class actions the beneficiary of the common benefit is the claimant; in

---

[11] Some authorities have commented on the "persistent and confusing identification of common-fund recovery as an 'exception' to the American rule on attorneys' fees," noting that in a common fund situation the funds are actually distributed "among those aligned with the plaintiff rather than extract[ed] ... from the defeated adversary." See Restatement (Third) of Restitution § 30 Reporter's Note a (Tentative Draft No. 3, 1994) (quoting Thomas D. Rowe, Jr*., The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 Duke L.J. 651, 662 (1982)). Regardless of specific taxonomy, the common-fund doctrine, as well as the Court's inherent power to assess fees to compensate appointed managing attorneys, constitute departures from the traditional rule that each litigant bears his or her own costs.

MDLs the beneficiary is the individually retained attorney (contract counsel). *See Eldon E. Fallon, Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 375 (2014).

MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs. *See e.g.*, *In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010) (relying on common fund doctrine as an alternate basis of inherent managerial authority and concluding that "[b]oth sources of authority provide the same result"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05–1708, 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008).

In addition to judicial precedent the Court also finds authority to assess common benefit attorney fees in its inherent managerial authority, particularly in light of the complex nature of this MDL. The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work. *See In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977). Further, the Fifth Circuit has explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent [the litigation] from monopolizing the services of the court to the exclusion of other litigants." *In re Air Crash Disaster*, 549 F.2d at 1012. This policy seeks to avoid the unjust enrichment of those who profit from a common fund at the expense of those whose labors produced the fund, and it serves to encourage attorneys to accept the considerable risks associated with prosecuting complex, multi-plaintiff matters for the benefit and protection of all plaintiffs' rights.

## 1. Methodology for Determining Common Benefit Fees

Attorney fees and costs, authorized by law or the agreement of the parties, must be reasonable. Fed. R. Civ. P. 23(h). "The decision of an award of attorney fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case." Manuel for Complex Litigation § 14.121 (4th ed. 2004).

Courts have employed various methods for determining the reasonableness of an award of common benefit fees. These methods include: (1) the lodestar method, which entails multiplying the reasonable number of hours expended on the litigation by an adjusted reasonable hourly rate; (2) the percentage method, in which the court compensates common benefit attorneys based on a percentage of the amount recovered; or (3) the blended method, a combination of both methods, in which the percentage is selected and cross checked for reasonableness by utilizing the lodestar method. *See Union Asset Mgmt. Holding A.G. v Dell Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010) (finding the blended method to be in line with Fifth Circuit precedent). It is appropriate to consider each of these methods in turn in an effort to determine a fair common benefit fee.

### a. Lodestar Method

Using the lodestar method to calculate reasonable common benefit fees begins with a determination of the reasonable number of hours spent on this part of the case. Once this is done, the appropriate hourly rate is established. This is then tested based on an analysis of 12 factors known as the *Johnson* factors—first formulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). These factors include (a) the time and labor required; (b) the novelty and difficulty of the questions; (c) the skill required to perform the legal service properly; (d) the preclusion of other employment by the attorneys due to acceptance of the case; (e) the customary

fee; (f) whether the fee is fixed or contingent; (g) time limitations imposed by the client or circumstances; (h) the amount involved and the results obtained; (i) the experience, reputation, and ability of the attorneys; (j) the "undesirability" of the case; (k) the nature and length of the professional relationship with the client; and (l) awards in similar cases. *Id.* at 717-19; *see also Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990).

The lodestar method is not without flaws. Many courts and commentators have noted problems with the lodestar method including potential for manipulation, disincentive for an early settlement, reward for excessive and wasteful attorney effort, and confusion and lack of predictability in setting fees. *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Case*s, 18 Geo. J. Legal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)). In response to the difficulties with the lodestar method, some courts have used the percentage method for determining an appropriate common benefit fee.

### b. Percentage Method

The percentage method bases the common benefit fee on a fair percentage of the amount recovered. Some courts have concluded that the percentage method provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours. *See* Walker and Horwich, *supra* at 1456-57 (citing *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989)); *accord In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009).

The percentage method, however, cannot be arbitrary, devoid of all reality, or inconsistent with usual fees for the type of case involved. There is no one percentage that should apply to all

cases. The percentage should be informed by the facts and circumstances of the particular case. Data compiled in empirical studies of attorney fees in class actions reveal that the higher the settlement, the lower the percentage of the fee. Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements 1993–2008*, 7 J. Empirical Legal Studies 248 (2010). For example, in settlements between $190 million and $900 million, common benefit fees between 10 percent and 12 percent have been allowed. *See id.* at 265. Whereas for settlements between $1 million and $2 million, common benefit fees between 32-percent and 37-percent have been awarded. *See id.* Of course, the percentages allowed in past cases are only guideposts, and each case should be analyzed on its own basis with the objective of determining a reasonable fee in the case before the court.

### c. Blended Method

The blended method is usually used to ensure that the amount of the common benefit fee established by the percentage method is reasonable. Under the blended method, the fee arrived at by the percentage method is cross-checked by the lodestar method utilizing the *Johnson* factors. If the fee arrived at by the percentage method is within "the ballpark" of the fee that would result from the lodestar method, the reasonableness of the fee is more sustainable. The blended method has been used by many district courts, including this one. *See In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525 (N.D. Miss. 2003). All circuit courts, including the Fifth Circuit, have approved this use of the blended method. *See Union Asset Mgmt. Holding*, 669 F.3d at 644 ("To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors. We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar method

in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.").

The Court finds the blended percentage approach to be the best method for calculating reasonable attorney fees in this litigation. As such, the Court will (1) determine the value of the benefit claimants receive and assign an initial benchmark percentage, (2) determine whether the benchmark percentage should be adjusted in light of the *Johnson* factors, and (3) conduct a lodestar analysis to determine whether the fee is indeed reasonable. The Court notes, however, that "[t]he lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d at 652.

### i.   Valuation of Benefit Obtained and Determination of a Benchmark Percentage

The Taishan Settlement Agreement created a $248 million fund for the compensation of claimants whose damages were attributable to defective drywall manufactured by the Taishan entities. The Court finds no reason to omit any portion of that settlement fund from consideration with respect to the reasonable amount of attorney fees. Accordingly, $248 million is the appropriate amount for calculation of a reasonable percentage of attorney fees.

The Taishan Settlement Agreement provides that petitioning attorneys may seek an award of attorney fees "totaling in the aggregate up to 32% of the Settlement Funds," which "shall be paid from the Settlement Funds exclusively." R. Doc. 22305-2 at 38. Settlement Class Counsel now seeks an award of 30% and argues that this benchmark percentage is reasonable and consistent with Fifth Circuit precedent. However, the Court's goal in setting a benchmark percentage is not simply to rubber-stamp Settlement Class Counsel's proposed figured. Rather, the Court is required

to independently determine a reasonable percentage appropriate to the facts particular to the Settlement in this aspect of the case.

Determining a reasonable benchmark percentage is an inquiry that must be addressed on a case by case basis. An influential empirical study analyzing attorney fees in class action settlements is instructive to this endeavor. *See In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d at 652; *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1012-15 (E.D. Wis. 2010); *Murphy Oil*, 472 F. Supp. 2d at 862-64; *In re Educ. Testing Servs.*, 447 F. Supp. 2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *In re Cabletron Sys. Inc. Sec. Litig.*, 239 F.R.D. 30, 37 n. 12, 41 (D.N.H. 2006). Theodore Eisenberg and Geoffrey Miller's detailed study, titled *Attorney Fees in Class Action Settlements: An Empirical Study*, investigates the relationship between the amount recovered through a settlement and the award of attorney fees over a fifteen-year period. In particular, it explains that there exists "an overwhelming correlation between class recovery and attorney fees," and that the benchmark percentage should be determined by considering two specific *Johnson* factors: the customary fee and awards in similar cases. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 72 (2004).

Given that the parties have not negotiated a specific fee award, the Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude. The Court has already determined that for purposes of calculating reasonable attorney fees in this case, the class benefit is valued at $248,000,000. This recovery falls within the "greater than 90%" decile of client recovery in the study, which includes all recoveries greater than $190 million. The data suggests that the mean fee percentage in such cases in 12% with a standard deviation of 8.1%.

*Id.* Further, "fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee." *Id.* at 74. In other words, a fee falling between 4% (approximately one standard deviation below) and 20% (approximately one standard deviation above) is considered reasonable under this metric.

Awards in similar cases are also highly instructive to the Court for the purpose of determining a benchmark perspective. Perhaps most analogous here is the Knauf Settlement Agreement, reached in another aspect of this litigation. Despite the differences between the Knauf and Taishan Settlement described in detail above, the Knauf Settlement is instructive because it involved the same types of claims, many of the same attorneys, and the same diligent effort. Attorney fees in the Knauf matter constituted approximately 17.7% of the total settlement, which was divided among common benefit counsel and contract counsel. *See* R. Doc. 22168. Similarly, in *Murphy Oil*, this Court awarded 17% of a $195,000,000 settlement for attorney fees. 472 F. Supp. at 867. In that case, the Court stressed that property damage cases, such as the instant case, are entitled to a smaller award of attorney fees than cases involving personal injury claims. *Id.* at 866.

While the Manual for Complex Litigation states that a fee of 25% of a common fund "represents a typical benchmark," *see* Manual for Complex Litigation § 14.121, Eisenberg and Miller report that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Eisenberg & Miller, *supra*, at 28. In other words, the higher the recovery, the lower the percentage. Thus, after studying the relevant data and considering awards in similar cases, the Court will use an initial benchmark of 19% in this case to compensate both contract counsel and common benefit counsel. This sum is less than the Manual

for Complex Litigation's standard benchmark but within one standard deviation of the mean fee percentage in similar cases according to Eisenberg and Miller's study. The Court further notes that this fee, while on the high side of the standard deviation suggested in Eisenberg and Miller's study, is warranted in light of the complexities and challenges presented by the Taishan aspect of this litigation and also consistent with the fees in the Knauf Settlement and other comparable cases.

### ii. Johnson *Factors*

The Court now considers the *Johnson* factors, addressing them in conjunction with the circumstances of this case, to determine whether an adjustment to the benchmark of 19% is warranted.

### a. *The time and labor required*

Class counsel and their staff have logged over 109,000 hours of work in the Taishan aspect of this litigation between January 1, 2014 and August 31, 2019. These hours have been logged contemporaneously with performing the work and reported monthly in accordance with the protocol established by the Court in Pretrial Orders 9 and 9A. These reports have been systematically audited and approved by the Court-appointed CPA and reviewed monthly by the Court. A summary of these reports reflects the type of work performed and the total number of hours logged by common benefit counsel.

The work performed by common benefit counsel and contract counsel was time-consuming. Counsel had to negotiate trial plans and coordinate various schedules, travel nationally and internationally for depositions and hearings, and spend countless hours conducting discovery, drafting pleadings, and counseling clients. However, the Court believes the benchmark percentage adequately compensates the time and labor required in this particular case and declines to increase the benchmark percentage based on this factor, particularly in view of the fact that the fee comes

out of the litigants' recovery, a recovery that is considerably smaller than that of a comparable litigant in the Knauf Settlement.

### b. The novelty and difficulty of the questions

The corrosive environment shown to have resulted from the sulfur off-gassing of defective Chinese-manufactured drywall is an event unprecedented in the drywall industry. There was little or no evidence that this condition was known or could or should have been anticipated. Although manufacturers are "strictly liable" for manufacturing defective products, the Taishan Defendants raised a formidable challenge to the PSC's efforts to hold them accountable in this matter. Taishan is a foreign corporation with its principal offices in the China, and accordingly this case involved significant issues of service, jurisdiction, and limitations on any recovery. In sum, this case involves both challenging and novel issues of law, fact, and procedure. However, the Court believes the benchmark percentage adequately considers the novelty and difficulty of the questions presented by this particular case and declines to increase the benchmark percentage based on this factor.

### c. The skill required to properly perform the necessary legal services

The level of legal skills required to bring about the class settlements in this case was by no means ordinary. Common benefit counsel faced formidable adversaries with significant resources and had to make the case credible enough to convince a foreign manufacturer to resolve thousands of claims at a substantial economic cost. However, the Court concludes that the benchmark percentage adequately considers counsel's skill and declines to increase the benchmark percentage based on this factor.

### d. The preclusion of other employment by the attorneys due to acceptance of this case

As the time records and submissions in this case suggest, this litigation required attorneys to whole-heartedly devote themselves and their offices to the handling of this matter. The urgency of the situation was recognized, and the Court imposed a strict schedule. However, there is no evidence to suggest that counsel were precluded from other employment by having accepted responsibilities inherent in this case, and therefore an increase to the benchmark percentage is not warranted.

### e. The customary fee

"These factors primarily deal with the expectation of plaintiffs' attorneys at the outset of the case when measuring the risks involved and deciding whether to accept the case." *Murphy Oil*, 472 F. Supp. 2d at 866 (citing *Johnson*, 488 F.2d at 718). "In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results." *Id.* The Court considered this factor when determining the benchmark percentage. Further, the Court notes that the 19% benchmark percentage is reasonable in light of the awards granted in other similar cases, including approval of the Knauf Settlement. Accordingly, no adjustment of the benchmark is warranted.

### f. Whether the fee is fixed or contingent

All or virtually all plaintiffs' counsel undertook this case on a contingency basis. Especially considering the inherent risk and unpredictable nature of this litigation, the Court finds that counsel were subject to risks inherent in a contingent fee arrangement. Accordingly, this factor does not justify an adjustment to the benchmark fee.

### g. Time limitations imposed by circumstance

This case required the litigants and the attorneys to abide by a strict time schedule. The successful resolution of the Knauf aspect of the litigation in 2013 naturally informed and re-shaped

the ensuing litigation, allowing the attorneys to turn their attention to the more challenging Taishan aspect of the case. The Court continued to be intimately involved with every step of the case and held the parties to a high standard of efficient and effective work. The Court continued to hold monthly status conferences to discuss case developments and resolve any disputes that arose. Counsel responded diligently to the time schedule imposed by the Court, and their efforts played a major role in bringing this matter to a prompt and successful conclusion. However, the Court believes the benchmark percentage adequately reflects the time limitations imposed in this particular case and declines to increase the benchmark percentage based on this factor.

### h. The amount involved and the result achieved

This *Johnson* factor is entitled to considerable weight in evaluating the reasonableness of a common benefit fee award. In fact, the Supreme Court has observed, "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

The Court recognizes that this Settlement is an unprecedented success that directly benefits over three thousand individuals. However, the Court also recognizes that the settlement fund does not provide claimants with sufficient funds to completely remediate their homes. This is especially challenging considering that the Knauf Settlement provided substantially more funds for remediation and other losses. As explained above, the Court finds that the disparity between the Knauf and Taishan Settlements does not make this settlement unfair, inadequate, or unreasonable in light of the difficulties facing these claimants as opposed to claimants in the Knauf Settlement. However, the disparity does give this Court pause with respect to this *Johnson* factor. The Court weighs the limited funds provided by the Settlement against the formidable challenges associated with this litigation and finds that this *Johnson* factor is neutral.

### i. Experience, reputation and ability of common benefit counsel

Although all counsel on the PSC or authorized by the PSC to do common benefit work are highly skilled and very capable professionals, the Court finds that this factor is adequately reflected in the benchmark percentage.

### j. The "undesirability" of the case

Significant economic risks were accepted by counsel in prosecuting a product liability case of this magnitude against foreign defendants. The fact that the major settling defendant was a Chinese manufacturer only added to the degree of risk given the renowned difficulty enforcing judgments in that country. Beyond these risks, the presence of these foreign manufacturers ensured that substantial litigation costs for travel would exist, and that difficulties with service of process, foreign discovery, translation services, sovereign immunity defenses and other jurisdictional defenses, would present themselves. Nevertheless, the Court finds that this factor is adequately reflected in the benchmark percentage.

### k. The nature and length of the professional relationship with the client

This factor was designed to consider those instances in which an attorney in private practice may vary his or her fee for similar work in the light of the professional relationship of the client with his or her office. Since few, if any longstanding client relations between common benefit counsel and class members preceded this MDL, this *Johnson* factor is a neutral as it relates to the reasonableness of the fee.

### l. Fee awards in similar cases

In MDL cases and also often in class action matters, the determination of a reasonable hourly fee is largely influenced by the relationship which the total fee bears to the total amount recovered. The Court specifically considered comparable awards of attorney fees, including an

award of attorney fees in another aspect of this case, when determining the benchmark percentage. Accordingly, the Court does not find that an upward adjustment is warranted.

### iii.     Lodestar Analysis

The final step of the blended method is to cross-check the benchmark percentage with an abbreviated loadstar analysis. *See In re Oil Spill by the Oil Rig Deepwater Horizon*, MDL 2179, 2016 WL 6215974, at *19 (E.D. La. Oct. 25, 2016) (citing *In re Vioxx*, 760 F. Supp. 2d at 659) ("[T]he loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination.").

An award of attorney fees of 19% of the Settlement Fund, or $47,120,000, is reasonable when analyzed in light of the *Johnson* factors and compared to hourly fees in similar cases. As mentioned above, common benefit counsel alone has logged over 109,236.22 hours of work in this litigation between January 1, 2014 and August 31, 2019. Notably, this number includes hours logged by non-lawyer professionals working at the direction of common benefit counsel but does not consider work performed by contract counsel. Accordingly, the Court must now address the division of the total fee between common benefit counsel and contract counsel to determine if the fee awarded to each group is indeed reasonable.

This Court concluded that the appropriate division of attorney fees in the Knauf portion of this case was 52% to common benefit counsel and 48% to contract counsel. It would be easy to make the same division for this portion of the case and to be done with the unpleasant task of dividing fees among attorneys. But such a division would not be fair since it would not account for the additional hours of discovery, travel (both domestic and foreign), motion practice, conferences, appeals, court appearances, and settlement negotiations that common benefit counsel expended in achieving resolution of the Taishan portion of this case. Taking all of this into

consideration, a fair division of fees is 40% to contract counsel and 60% to common benefit counsel. Such a split yields approximately $28,272,000 for common benefit counsel and $18,848,000 for contract counsel.

A common benefit fee of approximately $28,272,000 is reasonable. Taking into account the 109,236.22 hours reported by common benefit counsel, this award results in an hourly fee of approximately $258.82.[12] The Court acknowledges that this hourly fee is certainly less than the usual hourly rate for such experienced and competent counsel and is less than what common benefit counsel may have expected. However, the hours reported to the CPA included the work of non-lawyer legal professionals, which, while unquestionably necessary and important, does not generate the same hourly fee as the work of an attorney. Further, a common benefit fee of $28,272,000 is roughly 11.4% of the total settlement amount recovered. This percentage is consistent with the common benefit fee awarded in cases producing similar recoveries, as explained in Eisenberg and Miller's study, and greater than the percentage of the fee allocated to common benefit counsel in the Knauf aspect of this litigation. *See* R. Doc. 21168 at 20 (awarding 9.181% of the total settlement amount recovered to common benefit counsel).

This division leaves $18,848,000 for contract counsel. The Court recognizes that contract counsel generally performed significant works for their clients. But the nature of their services were mostly administrative, such as collecting evidence, filling out forms, keeping clients abreast of the developments on the case, and such other similar work. This work is necessary and important

---

[12] The number of hours reported does not reflect the considerable time spent on "other" administrative matters by the Fee Committee. The Court notes that including these additional hours in the lodestar analysis would reduce the already meager hourly fee. This reality is unfortunate, but the Court urges counsel to remember that the risk of a small recovery is inherent in any contingency arrangement, and that any sum allocated to attorney fees necessarily reduces the recovery available to the thousands of claimants who have patiently waited for over a decade to recover from Taishan. This unfortunate situation is somewhat ameliorated by the fact that many common benefit counsel also acted as contract counsel and accordingly will recover from both buckets, and that many common benefit counsel recovered attorney fees from the Knauf aspect of the MDL, which provided a substantially larger award of attorney fees.

in all cases, but it can be done—and usually is done—by non-lawyers working under the supervision and direction of attorneys. Accordingly, the work of contract counsel in this case is not entitled to the same consideration as the work performed by common benefit counsel.

Ultimately, the Court finds it reasonable to award $47,120,000 to compensate both common benefit counsel and individually retained attorneys in light of the circumstances in this case, namely that the case involves property damage claims and that the attorney fees come out of the overall recovery available to claimants, unlike in the Knauf Settlement. As previously mentioned, sixty percent of this award shall compensate common benefit counsel, and forty percent shall compensate contract counsel. The Court will determine the appropriate division of the common benefit fee among those counsel who performed common benefit work at a later date.

## 2. Costs

"Typically, class action counsel who create a common fund for the benefit of the class . . . are entitled to reimbursement of reasonable litigation expenses from that fund." *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, MDL 2328, 2015 WL 4528880, at *18 (E.D. La. July 27, 2015). The reimbursement of costs and expenses seeks not to reward attorneys for their work but restore the status quo. However, the requested expenses may not "cannibalize the entire . . . settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d at 196. Accordingly, the Court must review the estimated expenses for which reimbursement is sought and determine whether the total requested sum is fair to the settlement class.

Settlement Class Counsel seeks 3% for costs, which includes shared expenses, held costs, and a $500 stipend per Affected Property. According to detailed records kept by the Court-appointed CPA pursuant to PTO 9 and 9A, Settlement Class Counsel, the PSC, and common benefit counsel incurred $1,166,418.88 in held costs and $1,669,824.00 as cash assessments, for a

total of $2,836,242.88. R. Doc. 22380-4. These costs were generated between January 1, 2014 and August 31, 2019.

In view of the nature and circumstances of this case, the Court concludes that an award of $2,836,242.88 is appropriate to cover the costs and expenses of common benefit counsel. This award is in addition to the attorney fee award of 19% of $248,000,000, or $47,120,000, to cover the fees of both common benefit and contract counsel. Although this total award is less than the thirty percent sought by Class Counsel, plus three percent for costs, the Court finds that it strikes a fair balance between the diligent and commendable effort exerted by the attorneys and the limited funds available to compensate Class Members for their property damage.

### 3. Incentive Awards

Lastly, courts "commonly permit payments to class representatives above those received in settlement by class members generally." *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 367-68 (S.D. Miss. 2003); *see In re Catfish Antitrust Litig.*, MDL 928, 939 F. Supp. 493, 503-04 (N.D. Ms. 1996). Eisenberg and Miller have performed an empirical study of incentive payments to class representatives and have identified several justifications. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303 (2006). In particular, class representatives must be familiar with the case in order to be adequate representatives and are often deposed. In this case, certain plaintiffs participated in additional, individualized discovery and made themselves available for depositions. The Class Representatives also submitted affidavits demonstrating familiarity with the Settlement Agreement and expressing their approval of it. Accordingly, Settlement Class Counsel seeks an

award of $10,000 for each Priority Plaintiff in Florida[13] and each Select Claimant in Louisiana[14] to "recognize their efforts in participating in additional individualized discovery," and $2,500 for Settlement Class Representatives.[15] R. Doc. 22397-1 at 41.

The Court agrees that the Priority Plaintiffs, Select Claimants, and Class Representatives have been significantly involved in this matter to the benefit of the entire class and finds that an incentive award is justified. However, the Court recognizes that this Settlement provides a limited fund for recovery and that any additional award to one claimant necessarily reduces the available funds for all other claimants. Accordingly, in the interest of justice and fairness to all class members, the Court will award each Priority Plaintiff and Select Claimant an additional $5,000, and each Class Representative an additional $2,500.

## V. CONCLUSION

Considering the foregoing,

**IT IS ORDERED** that Settlement Class Counsel's Motion for Entry of an Order and Judgment (1) Granting Final Approval of the Class Settlement with Taishan and (2) Certifying the

---

[13] The Priority Plaintiffs in Florida are: Janet Avery; Lillian Chatmon; Andrew and Dawn Feldkamp; William and Vicki Foster; Candace Gody; David Griffin; John and Bertha Hernandez; Gul and Deborah Lalwani; Cassandra Marin; Dailyn Martinez; Jose and Adela Miranda; Tracy Nguyen; Jeovany and Monica Nunez; Kelly and Lori O'Brien; Kevin and Stacey Rosen; Michael Rosen; Larry and Rosalee Walls; and Marc and Jennifer Wites. R. Doc. 22305-2 at 39.

[14] The Select Claimants in Louisiana are: Lana Alonzo; Johnny and Rachelle Blue; Roger Callia; Mary Ann Catalanotto; Kasie and Patrick Couture; Brent Desselle; Lillian Eyrich; Nicola and Connie Fineschi; Jane Gonzales; Mary Haindel; Mathew and Jan Hughes; Betty Jurisich; Dawn Ross and Ronald V. LaPierre; Peter and Frankie Maggiore; Mark and Keri Pollock; Virginia Randazzo; Frankie Sims as Executrix of Estate of Juanita Davis (deceased); Martin and Doris Tatum; Melissa Young; Michael and Linda Zubrowsk; Cathy Allen; Charles and Mary Ann Back; Frances and Joseph Barisich; Colin Berthaut; Angeles Blalock; Boland Marine a/k/a 5943 Boeing Street, LLC; Holly Braselman; Jill Donaldson; Joseph and Tracy Fatta; Donald and Nadja Fisher; Dominesha James Clay; Sheral Lavergne; Annette Lawrence; Debbie Leon; Brian and Barbara Lewis; Jerry Phillips; Marcus and Dana Staub; Rosanne Wilfer; Zhou Zhang and Xue Ying Zhao. R. Doc. 22305-2 at 39.

[15] The Class Representatives are: Michelle Germano, Judd Mendelson, Debra Williams, and Virginia Tiernan. Class Representatives Lillian Eyrich and David Griffin are eligible to receive incentive awards as Select Claimants in Louisiana, and accordingly will not receive an additional award for serving as a Class Representative. R. Doc. 22305-2 at 39.

Settlement Class is **GRANTED** and that the Taishan Settlement Agreement is hereby **APPROVED**.

**IT IS FURTHER ORDERED** that Settlement Class Counsel's Motion for an Award of Attorneys' Fees and Cost Reimbursements for Common Benefit Counsel and Individually Retained Attorneys is **GRANTED IN PART**. Counsel are awarded 19% of the Settlement funds, or $47,120,000 for attorney fees, for both common benefit counsel and contract counsel. Common benefit counsel are entitled to 60% of this amount, or $28,272,000, and contract counsel are entitled to 40% of the this amount, or $18,848,000. Common benefit counsel are also awarded $2,836,242.88 for costs. The allocation of contract counsel's fees will be allocated in accordance with the standard set forth in PTO 28(f) and applied in the Knauf matter. R. Doc. 20282. The Court will address the allocation and distribution of common benefit fees among those attorneys who performed common benefit work at a later date.

New Orleans, Louisiana this 10th day of January 2020.

_____
Eldon E. Fallon
United States District Judge