1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  CHINESE-MANUFACTURED   *        09-MD-2047
             DRYWALL PRODUCTS        *
5            LIABILITY LITIGATION    *        Section L
                                     *
6    Relates to:  All Cases          *        December 11, 2019
                                     *
7    * * * * * * * * * * * * * * * * *

8

9                 TRANSCRIPT OF PROCEEDINGS BEFORE
                  THE HONORABLE ELDON E. FALLON
10                 UNITED STATES DISTRICT JUDGE

11

     Appearances:
12

13   For the Plaintiffs:          Levin Sedran & Berman, LLP
                                   BY:  ARNOLD LEVIN, ESQ.
14                                      SANDRA L. DUGGAN, ESQ.
                                   510 Walnut Street, Suite 500
15                                 Philadelphia, Pennsylvania 19106

16
     For the Plaintiffs:          Herman Herman & Katz, LLC
17                                 BY:  STEPHEN J. HERMAN, ESQ.
                                   820 O'Keefe Avenue
18                                 New Orleans, Louisiana 70113

19
     For the Plaintiffs:          Law Offices of Richard J. Serpe
20                                 BY:  RICHARD J. SERPE, ESQ.
                                   580 East Main Street, Suite 310
21                                 Norfolk, Virginia 23510

22
     For the Plaintiffs:          Colson Hicks Eidson
23                                 BY:  PATRICK S. MONTOYA, ESQ.
                                   255 Alhambra Circle, Penthouse
24                                 Coral Gables, Florida 33134

25

Appearances:

For the Taishan, CNBM,           Phelps Dunbar, LLP
and BNBM Defendants:             BY:  HARRY ROSENBERG, ESQ.
                                 365 Canal Street, Suite 2000
                                 New Orleans, Louisiana 70130


For the Taishan, CNBM,           Alston & Bird, LLP
and BNBM Defendants:             BY:  CHRISTINA HULL EIKHOFF, ESQ.
                                 1201 West Peachtree Street
                                 Suite 4900
                                 Atlanta, Georgia 30309

For Certain Plaintiffs:          Faircloth Melton Sobel & Bash, LLC
                                 BY:  JIMMY R. FAIRCLOTH JR., ESQ.
                                 105 Yorktown Drive
                                 Alexandria, Louisiana 71303


For Certain Plaintifs:           Doyle Law Firm, PC
                                 BY:  JAMES V. DOYLE JR., ESQ.
                                 2100 Southbridge Parkway
                                 Suite 650
                                 Birmingham, Alabama 35209


For Settlement Class             Gainsburgh Benjamin David Meunier
Counsel:                           & Warshauer, LLC
                                 BY:  GERALD E. MEUNIER, ESQ.
                                 1100 Poydras Street, Suite 2800
                                 New Orleans, Louisiana 70163


Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, HB-275
                                 New Orleans, Louisiana 70130
                                 (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## INDEX

|                                                    | Page |
|----------------------------------------------------|------|
| Presentation by Sandra L. Duggan, Esq.             | 10   |
| Presentation by Christina Hull Eikhoff, Esq.       | 32   |
| Testimony of James Cal Mayo Jr.                    | 36   |
| Testimony of Jake Woody                            | 57   |
| Testimony by Shannon Wheatman                      | 66   |
| Objections                                         | 88   |
| Presentation by Gerald E. Meunier, Esq.            | 136  |

**MORNING SESSION**

**(December 11, 2019)**

**THE COURT:** Good morning, ladies and gentlemen.  Be seated, please.

Let's call the case.

**THE DEPUTY CLERK:** MDL 2047, *In Re: Chinese-Manufactured Drywall Products Liability Litigation.*

**THE COURT:** Liaison counsel make their appearance for the record, please.

**MS. DUGGAN:** Good morning, Your Honor.  Sandra Duggan for the plaintiffs.

**THE COURT:** Okay.

**MR. LEVIN:** Your Honor, on the phone is Arnold Levin also for the plaintiffs.  Good morning, sir.

**THE COURT:** Good morning, Arnold.

**MR. ROSENBERG:** Good morning, Judge Fallon.

Good morning Arnie.

Your Honor, Harry Rosenberg, liaison counsel for Taishan, CNBM, and BNBM.

**THE COURT:** Okay.  Fine.  I know we have several people in the audience as well as on the phone.  Please, when you address the Court, address us from the podium so that we can all hear you.

Let me make some comments in advance.  By way of background, I think it's important to recognize that between

2004 and 2006, the housing boom in Florida and the building efforts necessitated by hurricanes Rita and Katrina lead to a shortage of building materials, particularly in the form of drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in and around the Gulf area and the East Coast.

Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gas, corrosion and blackening of metal, wiring surfaces and various objects, and breaking down of appliances and electrical devices in their homes.  As a result, these homeowners began filing suits both in state court as well as in federal court throughout the country.

Because of the commonality of the facts of the various cases, the litigation was designated as a multidistrict litigation pursuant to a transfer order from the United States Judicial Panel on Multidistrict Litigation.  On June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in this Court.

There were a number of cases in state courts that were not transferred and I, as the transferee judge, contacted those judges and have worked with each of them.  I appreciate all the help that they have given to me over this period of time.

Pursuant to the transfer order, the cases, as I

09:03

1   say, were assigned to this Court.  The Chinese drywall cases

2   were largely manufactured by two groups of defendants.  One

3   group was known as the Knauf entities.  They were a

4   German-based company with Chinese affiliates that manufactured

5   a substantial amount of the drywall at issue.  The other

6   entities were known as the Taishan entities.  This included

7   Taishan as well as several other affiliated companies.  The

8   litigation focused on these entities and their downstream

9   associates and has proceeded in actually two different tracks.

10              The Knauf entities accepted service of process

11  and they stipulated to the Court's jurisdiction.  The discovery

12  then proceeded immediately, and following discovery several

13  cases were set for trial and tried.  Based upon those cases,

14  the Court was able to put some square footage amounts based on

15  the evidence of those particular cases, and eventually that

16  group of cases was settled by Knauf.

17              The Court then proceeded with the Taishan cases.

18  The Taishan cases presented other issues.  They presented

19  service issues.  They presented jurisdictional issues.  They

20  eventually presented some solvency issues, and they also

21  presented some collectability issues.

22              The Court issued a number of opinions in those

23  cases.  Each of the opinions were generally appealed, and the

24  Fifth Circuit Court of Appeals has decided most of the cases.

25  They still have one that's pending before them.

09:06

1       As I say, the case was originally sent to this
2   case in 2009, and we are now in the closing months of 2019, so
3   I'm familiar with the case.  I've seen many of the opinions of
4   courts, both my court as well as other state courts.  The case
5   now has reached a point where I remanded a number of those
6   Taishan cases.  I felt my job had been completed.  I finished
7   discovery of the cases.  I wrote a number of opinions on it.  I
8   had about a thousand motions throughout the period.  It was
9   time for me to begin sending those cases back.

10      I sent a number to Virginia and a larger number
11  to Florida.  Those judges then proceeded because they got it in
12  a package, they were ready to try the cases, and they put them
13  up for trial.  In the process the parties began discussing the
14  potential settlement of the case.  They have arrived at a
15  proposed settlement.  Today I have before me class counsel's
16  motion for entry of an order of judgment granting final
17  approval of the class settlement with Taishan and also
18  certifying the settlement class.  The motion is joined by the
19  defendants.

20      The matter before me at this time is the final
21  settlement approval.  Under Rule 23 of the Federal Rules of
22  Civil Procedure as well as the applicable jurisprudence
23  interpreting that particular rule, the review of the proposed
24  settlement is actually set in two stages.  The first stage is
25  known as the preliminary fairness evaluation.  This comes most

1    of the time -- and it did in this Court -- before the notice of

2    the settlement goes out.

3              During the initial evaluation, the Court makes a

4    preliminary determination that the proposed class satisfies the

5    criteria set out in Rule 23(a) and at least one of the

6    subsections of Rule 23(b).  I took that motion, I heard the

7    parties, and I granted the preliminary evaluation.  I held that

8    the preliminary determination satisfied the rule, and that was

9    done August 29, 2019.

10             After that is done, a notice goes out.  It's

11   important that the notice notifies all of the members of the

12   class that the Court has made a preliminary evaluation of the

13   case and found that the settlement was fair and reasonable

14   based on all of the circumstances that are involved in this

15   particular case.  I then advised the parties to send out the

16   notice.

17             The notice was sent out in various forms to

18   alert all of the individuals of this situation and their rights

19   to opt out of the settlement if they felt it was not

20   appropriate or to file objections if they wished to proceed

21   with the settlement but had some objection as to the various

22   terms of the settlement.

23             That then goes to Step 2, and we are now at the

24   Step 2 part of the process.  At this phase the Court conducts a

25   more thorough and a rigorous analysis of roughly the same

1   factors in order to determine the appropriateness of granting a
2   final approval.
3           Now, the final fairness hearing is actually not
4   a trial.  The Fifth Circuit, of course, has told us that the
5   Court does not need to open question to debate on every
6   settlement aspect, and it may limit the proceedings to whatever
7   is necessary to aid in reaching an informed, just, and reasoned
8   decision, but I proceeded to meet with the objectors.
9           I received several objections, and I wanted to
10  meet with them to discuss with them the logistics of this
11  matter.  I proceeded to alert them to the fact that what I had
12  intended to do, subject to their suggestions, was to hear from
13  the class counsel first, to hear their presentation.  I asked
14  the objectors to please listen closely to it, and then I would
15  like to hear from Taishan as to their view of this proposed
16  settlement.
17          At that point we will take a break, and then
18  following that we will hear from Mr. Cal Mayo telling about how
19  he proposed the allocation.  He is a neutral in this matter and
20  devised a method.  I would like him to explain his methodology
21  and the reasons for it.  Then we will hear from Shannon
22  Wheatman, who will tell us about the notice, the aspects of the
23  notice, what it consisted of and where it was sent.  Then we
24  will hear from Mr. Jake Woody from BrownGreer, the claims
25  administrator, discussing with us what his portion of the

09:13   1   settlement involves.

2           We will take a break for lunch, and then

3   following lunch I would like to hear from the objectors.  I met

4   with the objectors this morning, and they will favor us with

5   their views of it.  I won't have any cross-examination of the

6   objectors.  I'm interested in what their views are and what

7   their positions are.  I appreciate their being here today, and

8   I want to assure them that I'm listening and will be very

9   attentive to their comments.

10          Then following the objectors, if there's any

11  information that the plaintiff committee has that can help

12  explain the matter further, I'll invite that part of the

13  matter.

14          As I understand it, that was agreeable to all

15  parties, and we will proceed accordingly.  Let me hear first

16  from the plaintiffs.

17          **MS. DUGGAN:**  Good morning.  It is a privilege and a

18  great honor to present to the Court our motion for class

19  certification and final approval of the settlement with

20  Taishan Gypsum.

21          These Chinese drywall proceedings have been

22  pending since 2009.  We have been litigating plaintiffs' claims

23  for more than 10 years.  During these proceedings almost 4,000

24  current and former owners of affected properties in 13 states

25  have brought claims for damages allegedly caused by Chinese

09:14  1    drywall that was installed in their homes.

2                    The top six states, as you can see on the map,

3    are Florida, Louisiana, Alabama, Virginia, Mississippi, and

4    Georgia.  Claims were also filed in North Carolina, Tennessee,

5    Texas, California, South Carolina, Oklahoma, and Illinois.  In

6    total, 3,948 known class members have brought claims against

7    Taishan and the additional released parties.

8                    As part of the settlement approval process,

9    class members were afforded 90 days to review the class notice,

10   the settlement agreement, all of the materials in support of

11   the settlement, the master spreadsheet, and the allocation

12   model.  These documents were posted on the Court's docket and

13   also on the settlement website.  For the known class members on

14   the master spreadsheet, they were given an opportunity to

15   review the estimate letter that they received from BrownGreer.

16                   We will be presenting testimony today from

17   Mr. Cal Mayo.  He is the Court-appointed allocation neutral who

18   developed the allocation model.  Mr. Mayo previously served as

19   a special master in this case with regard to product ID issues.

20                   We will also be hearing from Mr. Jake Woody, the

21   Court-appointed claims administrator, BrownGreer.  BrownGreer

22   served as the claims administrator in this litigation for the

23   five interrelated Knauf class settlements.

24                   Then we will be hearing from Dr. Shannon

25   Wheatman from Kinsella Media, who is a notice expert, and she

09:16

1 will testify to the reach and the sufficiency of the class

2 notice program.

3      All class members were given three months during

4 the notice period to consider all aspects of the class

5 settlement.  Significantly, over 97 percent of the class

6 supports this settlement.  Approximately one-half of one

7 percent objected to the settlement, and only two percent of the

8 class chose to opt out.

9      This settlement is an excellent result for the

10 class.  It provides meaningful recovery to plaintiffs now as

11 opposed to some hypothetical recovery years down the road.

12 Taishan Gypsum will pay $248 million in cash for the benefit of

13 all eligible *Amorin* plaintiffs who are property owners named in

14 the certified *Amorin* class.  It will also benefit all eligible

15 *Brooke* plaintiffs who are property owners named on a *Brooke*

16 complaint.  It will benefit all eligible absent class members

17 who are property owners with Chinese drywall alleged to be

18 manufactured by Taishan or BNBM.  The payments of the

19 settlement are as follows:

20      Taishan Gypsum has already made the initial

21 payment of $24.8 million, and that money is in the Court

22 registry.  Class counsel have invoiced Taishan for the second

23 payment of $74.4 million.  That payment is due on December 27,

24 and the money will be deposited into the Court registry.  The

25 final payment of $148.8 million will be made no later than

09:18  1   60 days after final approval.

2                If this Court grants our motion for final

3   approval of the settlement promptly, eligible class members

4   could receive their allocation amount determination as early as

5   March of 2020.  Eligible class members will get their

6   allocation amount determination directly from BrownGreer.

7   These victims of Chinese drywall have been waiting for relief

8   for over a decade, and this settlement will provide much needed

9   payments to eligible class members in relatively short order.

10               A significant aspect of the settlement is that

11  the claims administration process is simple and efficient.  For

12  known *Amorin* and *Brooke* class members who are listed on the

13  revised master spreadsheet that's been filed on the docket,

14  they do not have to do anything.  They do not have to fill out

15  the claim form.

16               The revised master spreadsheet lists all known

17  class members with sufficient indicia of product ID.  If a

18  known class member on the spreadsheet is determined by

19  BrownGreer to be eligible for an allocation amount of more than

20  zero, after the allocation model is applied to that class

21  member's objective criteria on the spreadsheet, the class

22  member will get paid once the allocation model is applied to

23  all claims.

24               Now, for the absent class members and class

25  members not listed on the master spreadsheet, they must

09:20

1    complete a simple, short claim form that's already been

2    approved by the Court.   The proposed order and judgment sets a

3    deadline of 30 days.   This claim form will be available on the

4    BrownGreer portal once final approval is granted.   The

5    settlement website will direct the class members to the link on

6    the portal.   The claim form can be completed online or by

7    paper, and absent class members will need to provide

8    identifying information and proof of objective criteria such as

9    ownership of the affected property, under-air square footage,

10   product ID, prior payments for Chinese drywall claims,

11   assignments to third parties, etc.   The information is similar

12   to what was required in the supplemental plaintiff profile

13   form.

14            We submit that this settlement is an excellent

15   result, especially considering there are significant costs,

16   risks, and delays of continuing to litigate these claims.   No

17   matter what the result is, there is a cost of litigation.

18   Trials of 3,948 cases would be very expensive even if the cases

19   were tried in flights.   Experts are costly.   Having to prove

20   product defect is expensive.   In the *Brooke* case, we were at

21   the initial stages of litigation.   International discovery is

22   expensive.   Extensive motion practice is costly.

23            The evidence for this is that class counsel and

24   the PSC collectively have expended over $4.6 million in shared

25   expenses and over $1.1 million in held costs to prosecute these

cases.  In addition, individually retained counsel have paid
for the inspections of plaintiffs' properties and the expenses
to produce evidence of plaintiffs' damages.

In addition to these costs, there are risks of
litigation.  The outcome of any case is uncertain.  This
settlement will allow class members to avoid the risks that
they would have faced in this case.  There would have been
risks with regard to product ID, to dismissal of *Brooke*
actions, to liability, damages, appeals, and collectability.

If we look at product ID, in this case BNBM only
admitted to manufacturing BNBM Dragon board, and Taishan
admitted to manufacturing DUN, Venture Supply, Taian Taishan,
and Taihe Edge Tape.  Those were the product categories that
were admitted by the defense, but there were more categories of
drywall in this case that were alleged to be attributed to the
defendants.

So, for example, Taishan admitted to
manufacturing some but not all of certain markings, and those
were: Crescent City Gypsum, "MADE IN CHINA MEET[S] OR
EXCEED[S]," and various drywall dimensions, including 4 feet by
12 feet by 1/2 inch.

There were other categories of drywall involved
in this case where the defendants categorically denied
manufacturing those products, and those were: C&K, Chinese
Manufacturer #2 (purple stamp), IMT Gypsum, ProWall, White Edge

09:23

1    Tape, and blank boards.

2              We tried as hard as we could, Your Honor, and we

3    fought to attribute all of the product categories in this

4    litigation to Taishan and BNBM.  However, the special master in

5    Florida issued a report and recommendation on product ID that

6    essentially dismissed more than half of the 1,700 Florida

7    *Amorin* claims.  We filed an objection and appeal to Judge

8    Cooke, but there was a risk that if Judge Cooke upheld that

9    ruling, those plaintiffs would have recovered nothing.

10   Further, there was a significant risk that the unfavorable

11   product ID rulings in Florida would apply to *Amorin* plaintiffs

12   in other jurisdictions and to all *Brooke* plaintiffs.

13             In addition to the risk associated with product

14   ID, there was a risk of dismissal of *Brooke* actions as

15   untimely.  After extensive briefing on BNBM's motion to dismiss

16   on statute of limitations grounds, this Court ruled that many

17   claimants cannot rely on cross-jurisdictional tolling to save

18   their claims; therefore, many *Brooke* plaintiffs would face

19   individual determinations regarding the application of the

20   respective statute of limitations to their claims.  Further,

21   some states have applicable statutes of repose, and that would

22   bar some of the *Brooke* plaintiffs' claims.

23             Another risk in this case concerned liability.

24   Liability was established only for the *Amorin* plaintiffs

25   through defaults.  There are no defaults in the *Brooke* action;

09:25

1    therefore, all *Brooke* plaintiffs would need to establish the

2    defendants' Chinese drywall products are defective.

3              Another risk concerned damages.  With regard to

4    remediation damages, despite the Court's approval of the

5    remediation damages formula for current *Amorin* plaintiffs,

6    which was adopted by Judge Cooke in Florida and Judge Davis in

7    Virginia, the defendants were permitted an opportunity to

8    assert contests to plaintiffs' remediation damages.  In fact,

9    defendants asserted 17 different contests to plaintiffs'

10   remediation damages in Florida.  The special master sustained

11   some of those contests, she denied others, and she deferred

12   ruling on some of them because there were issues pending before

13   this Court with regard to former owners and also before

14   Judge Cooke.

15             With regard to plaintiffs' other losses,

16   recovery of those losses was not guaranteed.  Some former

17   owners risked not being able to recover the value of the

18   remediation damages formula.  Stigma damages were uncertain or

19   unavailable.  Losses to personal property would be challenging

20   due to lack of receipts and challenges from the defendants.

21   Claims for damage to credit scores would be problematic for

22   causation issues.  Recovery of losses for short sales,

23   bankruptcies, foreclosures would also be uncertain due to

24   causation.

25             Then there's the issue of appeals.  The

09:27

1   complexity of this case and its long and tortured history have

2   resulted in many favorable decisions to the plaintiffs.

3   However, the defendants would appeal the defaults against BNBM,

4   BNBM Group, and CNBM.  Absent the defaults, the defendants

5   would appeal any rulings on the defectiveness of BNBM products.

6   They would appeal the class certification in *Amorin*, the

7   aggregate remediation damages calculations, the rights of

8   former owners to collect remediation damages.

9           They would appeal defendants' responsibility for

10  other losses.  They would appeal the product ID rulings, the

11  sufficiency of indicia of product ID, the impact of partial

12  remediation on plaintiffs' damages.  They would appeal the

13  standing of condominium associations or nonprofit organizations

14  like Habitat for Humanity to bring actions against defendants.

15          The jurisdiction order over BNBM, BNBM Group,

16  and CNBM is currently on appeal in the Fifth Circuit.  That

17  appeal will be argued the week of February 3, 2020, and that

18  matter has not been stayed.

19          Finally, there is the risk of collectability.

20  Collecting on a judgment against foreign companies presents

21  risks.  The international treaties do not protect the

22  claimants.

23          In addition to the costs and the risks, there's

24  the issue of delay.  There is no question the continued

25  litigation would cause delay.  The trials of 3,948 cases would

09:28

1    take years to complete even if they are tried in flights.

2    Appeals of those cases would take another year at least to

3    resolve.  Then it would be time-consuming to collect on any

4    judgments.

5              We submit to Your Honor that this settlement is

6    fair, reasonable, and adequate and merits the Court's approval.

7    There is a strong judicial policy favoring pretrial settlement

8    of claims in complex class action lawsuits.  Looking at this

9    settlement on its terms and then through the prism of the

10   policy favoring pretrial settlement of claims in complex class

11   actions, this settlement should receive final approval.

12             It's important to understand that we are not

13   operating in a vacuum.  We have had 10 years of litigation.

14   There has been a lot of discovery of individual claims.  There

15   were 10,000 plaintiffs in the litigation, including all the

16   plaintiffs who also had Knauf product.  There have been 1,650

17   defendants that were part of the lawsuit.  We have currently

18   over 22,400 docket entries in the MDL.  We had bellwether

19   trials in *Germano* and *Hernandez* in 2010.

20             In addition to that, we established jurisdiction

21   over Taishan, but it took four years, and there were four

22   appeals to the Fifth Circuit.  We established jurisdiction over

23   BNBM and CNBM.  That took two years, and there's an appeal

24   that's pending.  We have had hundreds of depositions and

25   extensive written discovery and hundreds of motions hearings

09:30   1   and minute entries.

2           Then on remand, starting in 2018 there were

3   1,700 *Amorin* plaintiffs' claims remanded to Judge Cooke in the

4   Southern District of Florida.  There were 850 *Brooke*

5   plaintiffs' claims remanded to Judge Williams in the Southern

6   District of Florida.  In Virginia, 175 *Amorin* plaintiffs'

7   claims were remanded to Judge Davis in the Eastern District of

8   Virginia.  And 30 *Brooke* plaintiffs' claims were remanded to

9   Judge Smith in the Eastern District of Virginia.

10          In Louisiana, the *Amorin* and *Brooke* actions

11  remain in the MDL, but there are 10 other jurisdictions where

12  the parties fully expected this Court to suggest that the

13  *Amorin* and *Brooke* cases be remanded.  We had already provided

14  the Court with lists of those claims by state.

15          So, in sum, all of the real and expected costs,

16  risks, and delays were taken into consideration by class

17  counsel in negotiating this settlement.  These negotiations

18  were by experienced class counsel.

19          Arnold Levin was appointed as lead counsel in

20  this litigation at the very beginning.  I've worked with

21  Mr. Levin and others for over 10 years.  Mr. Herman is liaison

22  counsel, Mr. Serpe lead Virginia counsel, and Mr. Montoya lead

23  Florida counsel.  The CVs of all class counsel are filed in the

24  record at Rec. Doc. 22305-9.

25          We also received input from plaintiffs' counsel

09:32
1    with intimate knowledge of plaintiffs' claims.  Pete Albanis,
2    who is a PSC member from Morgan & Morgan, Emma Schwab from
3    Barrios Kingsdorf & Casteix, Allison Grant, and Holly Werkema
4    from Baron & Budd were present at the negotiations.
5    Collectively, those firms represent over 1,000 Chinese drywall
6    clients with claims against Taishan and/or BNBM.  As I said,
7    class counsel have worked on this case for over 10 years.  We
8    are well aware of the strengths and the weaknesses of
9    plaintiffs' claims.
10                    This settlement was the result of several weeks
11   of arm's-length negotiations.  That is set forth in the class
12   counsel declaration that's filed on the record at Rec. Doc.
13   22397-5.  The parties exchanged demands and counteroffers that
14   were based on detailed statistics regarding the perceived
15   values of all *Amorin* and *Brooke* cases on the master
16   spreadsheet.  We were not operating in a vacuum.  We have spent
17   10 years litigating these cases in the MDL.
18                    Trials of Louisiana select cases were scheduled
19   to begin this fall.  We spent almost one year litigating the
20   1,700 Florida *Amorin* cases that were before Judge Cooke under
21   an incredibly aggressive time schedule.  The trials of the
22   priority plaintiffs' other losses in Florida were scheduled to
23   begin in July of 2019.
24                    We spent about six months litigating the
25   Virginia *Amorin* cases before Judge Davis, and a trial plan was

09:33

1    entered in Virginia.  The court made clear there would be no

2    extensions of time.  The *Brooke* cases that were remanded to

3    Florida and Virginia were beginning to be litigated, and we

4    were facing remands to 10 other jurisdictions.  At all times

5    the parties negotiated at arm's-length.  There are no side

6    agreements.

7              We also engaged in mediation that was

8    court-ordered from Judge Cooke.  We had an experienced

9    mediator, John S. Freud.  The mediation took place in Austin,

10   Texas, on May 22 and May 23, 2019.  We were guided by the

11   mediator.  We had intense, hard-fought negotiations, and each

12   side acquiesced to compromises.

13             On May 23, 2019, the parties signed a term sheet

14   that set forth the structure of the class settlement, the

15   composition of the class, the payment terms, and the specific

16   drywall products that would be covered by the settlement.  As

17   the Court is well aware, when the settlement is the product of

18   arm's-length negotiations by experienced counsel, there's a

19   presumption of its fairness.

20             This Court appointed an independent neutral,

21   Mr. Cal Mayo, to develop an allocation model to fairly and

22   adequately allocate the settlement funds among eligible class

23   members.  Mr. Mayo previously served as a Court-appointed

24   special master in this case with regard to product ID issues.

25             The allocation model has been published on the

09:35

1    Court docket at Rec. Doc. 22304-1.  The Court approved this

2    model in the preliminary approval order.  Mr. Mayo is here

3    today, and he is prepared to testify regarding the details of

4    the allocation model that he developed.  He conferred jointly

5    and separately with settlement class counsel and counsel for

6    Taishan and the additional released parties.  He reviewed Court

7    orders and legal authorities that were relevant, documents that

8    were filed in the record, and other information.  His

9    declaration is filed at Rec. Doc. 22397-14.

10           The allocation model fairly and equitably

11    allocates settlement funds among eligible class members.  The

12    neutral's methodology is sound and well supported.  The

13    allocation model will be applied to the objective criteria for

14    each class member set forth on the revised master spreadsheet

15    or in a claim form.

16           The objective criteria are: under-air square

17    footage; whether the class member is an *Amorin* plaintiff, a

18    *Brooke* plaintiff, or an absent class member; product ID, which

19    means the type of covered Chinese drywall in the affected

20    property; whether an assignment was made to a third party;

21    prior payments received for Chinese drywall claims; whether

22    there is a competing claim for the same affected property.

23           The allocation neutral determined that ownership

24    status and remediation status will not be factors in

25    calculating allocation amounts.  Mr. Mayo will explain how he

09:37  1    arrived at these determinations when he testifies.

2              Briefly, the allocation model uses a methodology

3    that assigns relative values to the objective criteria.  In

4    other words, those are discounts that will be applied.  So when

5    you think about class member status, *Amorin* plaintiffs will

6    receive no discount, but *Brooke* plaintiffs will receive an

7    80 percent discount, and new claims will receive a 95 percent

8    discount.  Mr. Mayo will explain how he arrived at these

9    figures.

10             With regard to product ID, where Taishan or BNBM

11   admitted manufacturing the products in the category, there will

12   be no discount.  Where the defendants admit some but not all of

13   the products in the category, there will be a 25 percent

14   discount.  Where they deny the products in the category,

15   there's an 80 percent discount.

16             With regard to prior payments, these are

17   accounted for in calculating the allocation amounts.  Many

18   class members in this case received prior settlement payments,

19   and some of those payments were substantial.  So obviously if a

20   class member was already fully compensated, it would be a

21   windfall for them to receive an additional allocation from this

22   settlement.

23             If two plaintiffs live side by side and they

24   have the same square footage home and the same product ID, but

25   one received perhaps half of the value of their damages from

09:38

1   the Banner, Global, or InEx settlement and the other next-door
2   neighbor did not receive anything yet, it would not be fair to
3   give them the same allocation amount in this case from this
4   settlement.  So Mr. Mayo has adopted a formula that would take
5   into consideration their hypothetical damages under the
6   remediation formula damages and take into consideration the
7   amount of prior payments they received.  The mechanism was
8   fully tested by the allocation neutral and BrownGreer, and
9   there's been no challenge to the methodology of fairly reducing
10  allocation amounts for prior payments.
11              As I said before, according to Mr. Mayo, the
12  ownership status is not a factor so that current and former
13  owners, under this settlement, will be treated the same.  With
14  regard to remediation status, if there was complete remediation
15  or partial remediation or no remediation, that's not going to
16  be relevant.  The settlement agreement provides that only one
17  allocation payment per affected property will be made, and it
18  will compensate for all damages that the plaintiff sustained.
19              So we submit that these decisions were
20  reasonable and well supported and that the allocation model is
21  fair, reasonable, and adequate.
22              I want to talk a little bit about the master
23  spreadsheet.  The master spreadsheet has objective criteria for
24  known class members with sufficient proof of product ID.  It
25  states what the under-air square footage is, the product ID,

09:40

1    the prior payments, the assignments, and the status.

2              Under the settlement, class members were

3    permitted 35 days once the settlement was preliminarily

4    approved to make a challenge or a dispute with regard to the

5    objective criteria that was set forth in their spreadsheet.

6    Those disputes were submitted to the claims administrator,

7    BrownGreer.

8              Now, the class notice program was robust,

9    wide-ranging, and had a broad reach.  The Court-appointed

10   administrator, BrownGreer, disseminated the long form notice

11   that was approved by the Court.  It went to all known class

12   members and their counsel of record.

13             BrownGreer provided the known class members on

14   the master spreadsheet with a gross estimate of their potential

15   recovery under the settlement before deducting attorneys' fees

16   and costs that were approved by the Court.  BrownGreer applied

17   the allocation model to the objective criteria for each

18   property to arrive at an estimate.  Jake Woody from BrownGreer

19   will testify regarding the steps that BrownGreer took to mail

20   the notice and to prepare the estimates.

21             The claims administrator received 109 challenges

22   by known class members to the objective criteria.  Again,

23   Mr. Woody will testify about the steps that BrownGreer took to

24   evaluate those challenges to the objective criteria.  Then

25   BrownGreer published a revised master spreadsheet on the docket

09:41

1  on October 31, 2019, and that's at Rec. Doc. 22355-1.

2  BrownGreer also sent out notices of the results of these

3  challenges to those class members.

4  In addition, to reach the absent class members

5  in this case, Kinsella Media developed and implemented a media

6  notice program that was approved by the Court.  It included ads

7  in newspapers, magazines, ads on Facebook, YouTube.

8  Dr. Shannon Wheatman of Kinsella is prepared to testify about

9  Kinsella's efforts to develop and implement that notice plan,

10  and the plan included media in all states with at least one

11  affected property.

12  The media program heavily targeted the top six

13  states that we looked at earlier: Florida, Louisiana, Alabama,

14  Virginia, Mississippi, and Georgia.  Those top six states

15  account for more than 90 percent of the known Chinese drywall

16  claims.

17  In addition to the media program for the absent

18  class members, settlement class counsel established a call

19  center.  The call center had a toll free member where class

20  members or potential class members could inquire about the

21  settlement.  During the notice period, we fielded more than 270

22  callers from 24 states.

23  In addition to the call center, settlement class

24  counsel established a website, a settlement website,

25  ChineseDrywallSettlement.com.  We monitored the activity on

09:43

1    this website.   There have been in excess of 121,000 page views.

2    More than 86,000 individual logins occurred from new users.

3    Significantly, we had users from all 50 states plus the

4    District of Columbia.   The top five states were from Florida,

5    Georgia, Virginia, Texas, and California.

6                    In addition to the website, settlement class

7    counsel issued a press release.   This press release reached

8    5,400 traditional media outlets and 4,000 national websites.

9    We highlighted in the press release the number for the call

10   center and also the settlement website.

11                   Finally, the notice was posted on the court

12   dockets.   It was posted on this MDL's website, the MDL docket.

13   Notice was sent out by Your Honor to all of the district courts

14   in the United States providing the long form notice that was

15   approved by the Court in the preliminary approval order.   The

16   notice was posted on the Florida dockets, the Virginia docket,

17   and also the Fifth Circuit docket.   The results of the notice

18   outreach speak for themselves.   We submit that we have

19   satisfied due process.

20                   Now, considering the wide-reaching and

21   successful class notice program, it is significant that only

22   2 percent of the class submitted a valid opt-out request and

23   only 22 class members objected.   We received word, Your Honor,

24   this morning that one of those objectors is withdrawing his

25   objection.   Mr. Frederick Yorsch, who is represented by Andrew

09:44

1    Lemmon, wants to withdraw his objection, and Mr. Lemmon will

2    file something on the docket to that effect.

3                The affected class members had 90 days to

4    carefully consider this settlement, and all known class members

5    were given a gross estimate of their potential recovery under

6    the settlement, so the overwhelming support speaks volumes.

7    All class representatives support the settlement.

8                I just want to mention briefly with regard to

9    the opt-outs, we have provided Your Honor with information on

10   the states where they are located.  There's 14 in Alabama, 54

11   in Florida, 7 in Georgia, 10 in Louisiana, and 5 in

12   Mississippi.

13               Now, with regard to the objections -- as I said,

14   it's only 21 now and not 22 -- they lack merit.  As set forth

15   in our brief, no objector made any challenges that would

16   justify undoing this settlement, especially considering that

17   97 percent of the class wants the settlement to go through

18   promptly.

19               None of the objections raise any serious

20   question as to the integrity, loyalty, or adequacy of the PSC

21   or class counsel.  No objection raises a due process concern.

22   No one has challenged the certification process, and no one has

23   articulated any credible objection to class notice.

24               There has been no credible allegation of any

25   collusion and no suggestion whatsoever that continued

litigation against Taishan and the additional released parties, all foreign Chinese companies, would be preferable to the settlement before the Court, which is supported by the vast majority of all class members.

In fact, Your Honor, just yesterday an *Amorin* class member who supports the settlement and is represented by Jimmy Doyle left us a message through the call center, and the message was: "We need our money.  We are broke.  Please help." The plaintiffs have waited too long.  They want the settlement to go through.  Even the objectors want that result.

It is well settled that "Particularly in class action suits, there is an overriding public interest in favor of settlement."  And as Your Honor said in *Murphy Oil*, "There is a strong judicial policy favoring the resolution of disputes through settlement."

We have satisfied Rule 23.  We submit that the Court should grant the motion.  We have satisfied Rule 23(a), 23(b)(3), and 23(e).

Previously the Court certified, in 2014, the *Amorin* class.  The requirements of Rule 23(a) are easily met here.  We have 3,948 class members.  The questions as to the defectiveness of Chinese drywall and damages are common to all plaintiffs.  All plaintiffs' claims arise from the same event or pattern or practice and are based on the same legal theory.

With regard to adequacy of representation, as I

09:47

1    said, all class representatives support this settlement.  There

2    are six class representatives.  Three of them are *Amorin*

3    plaintiffs.  Three of them are *Brooke* plaintiffs.  They are

4    from Louisiana, Florida, and Virginia.  They have no interests

5    that are antagonistic to the class, and they have a high degree

6    of knowledge and understanding of the litigation.  Michelle

7    Germano was one of the very first plaintiffs in this case.  She

8    is the named class representative in the *Germano* action.

9              As I said and it's clearly in the record,

10    settlement class counsel are highly qualified in class actions,

11    and we were well informed of the strengths and the weaknesses

12    of the plaintiffs' claims.

13             Since 2014 alone, common benefit counsel have

14    spent over 100,000 hours in legal time pursuing Taishan.  As

15    the Fifth Circuit said in *Reed*, "The linchpin of an adequate

16    settlement is adequacy of representation."

17             We have also met the 23(b)(3) factors,

18    predominance and superiority.  I think there's no question

19    about that, as well as all of the *Reed* factors.

20             Your Honor, we would like to hand up to the

21    Court our proposed findings of fact and conclusions of law.

22    They were filed on Friday.  They are in the record at Rec. Doc.

23    22394.

24             Just in closing, Your Honor, I would like to

25    thank the Court, on behalf of class counsel, for its judicial

09:49

1   oversight and guidance to the parties and its patience

2   throughout this process.

3           I would also like to thank all of the

4   plaintiffs' counsel on our team who helped to achieve this

5   settlement.

6           I would like to thank my formidable opponents on

7   the defense side, especially Taishan's counsel, Christy

8   Eikhoff, whose professionalism and courtesies throughout helped

9   us get to this point.

10          Lastly, I would like to thank the defendant for

11  funding this settlement.  Thank you.

12      **THE COURT:**  Thank you.

13          Let's hear from Taishan at this point, and then

14  we will take a break.

15      **MS. EIKHOFF:**  Good morning, Your Honor.  I am Christy

16  Hull Eikhoff here representing Taishan.

17          The additional released parties in the

18  settlement are represented by Chris Vejnoska, Jim Stengel, and

19  others.  In my remarks this morning, I'm speaking on behalf of

20  Taishan and the additional released parties.

21          This is a historic occasion.  To the best of our

22  knowledge, this is the first time that a Chinese company has

23  settled litigation with U.S. consumers in an American court.

24  Under the settlement Taishan will pay thousands of homeowners

25  almost a quarter of a billion dollars.  This settlement was

09:50

1  certainly forged after years of litigation and months of

2  negotiation with able adversaries that zealously represented

3  their clients' interests.  It's worth noting that this historic

4  settlement has been achieved in the context of ever changing

5  geopolitical dynamics.  We are very pleased to have reached

6  this point.

7           Now, class counsel ably covered the Rule 23

8  factors that this Court must consider and the *Reed* factors of

9  the Fifth Circuit in considering the fairness of this

10  settlement, and so I only want to reiterate a few of the

11  factors that have been covered.

12          First, one of this Court's considerations must

13  be the prospects of continued litigation, what would happen if

14  the cases continued down the litigation path instead of

15  settlement.  We can confidently say that but for this

16  settlement, that path would have been long, complex, expensive,

17  and uncertain.

18          It is true that a tiny fraction of the claims

19  were scheduled for trial in Florida starting in July 2019, but

20  only 59 of the 2,541 *Amorin* claims were in line for trial at

21  the time that we negotiated the settlement.  Even if we had

22  tried those small number of cases as originally scheduled, the

23  unprecedented procedural history and structure for all of these

24  cases ensured that there would be multiple appellate issues

25  that would have either extinguished recovery for these

09:52

1    plaintiffs or certainly in all cases would have delayed it.

2              As an example of how appeals create risk of

3    delay, as the Court knows, there is currently on appeal in the

4    Fifth Circuit one of this Court's decisions regarding whether

5    this Court has jurisdiction over Taishan's parent companies.

6    That appeal was filed in the summer of 2017 and will not have

7    oral argument until February of 2020, and then there's no

8    telling how long the court will take to issue its decision

9    after that.  So no claim in this case was on the cusp of

10   recovery; in fact, very far from it.

11             Another factor for this Court to consider is the

12   stage of litigation when the settlement was negotiated and the

13   status of the proceedings and discovery that had been done.

14   There have been years of motions practice and discovery in this

15   case for a decade.  Taishan has participated in discovery in

16   these cases going back to 2010.  In the past year, more than

17   100 homeowners and their family members sat for depositions and

18   gave testimony in the case for the priority claims that were

19   advancing towards trial, and we learned a lot from that

20   discovery.

21             One takeaway from that discovery, from the

22   depositions of the homeowners and their related parties, is

23   that there is no doubt that many people experienced real

24   hardship.  We heard stories of suffering and loss, and the

25   human impact of this whole situation is real.

09:54

1          Another takeaway is that, from a legal
2     perspective, everyone had a unique story, and they had
3     different economic impacts that could require thousands of
4     individual court proceedings.  As Ms. Duggan said, that could
5     easily take years, and those cases were just the *Amorin* cases
6     that were already in a class that had been certified by this
7     Court.  There were also more than a thousand *Brooke* claimants
8     who had not filed a claim until 2015 or later, and those *Brooke*
9     claims were procedurally years behind the *Amorin* claimants.  No
10    answer had yet been filed in the *Brooke* case, no class
11    certification, no discovery, no trial plan.
12          Finally, the settlement amount is fair,
13    reasonable, and adequate.  The overall amount is $248 million.
14    As I said before, that's nearly a quarter of a billion dollars.
15    That is money coming from China into the U.S. economy, into the
16    registry of the Court, and then distributed to U.S. consumers,
17    putting money in their pockets to spend according to their
18    individual means.
19          Now, in terms of how that money is being divided
20    among the claimants, neither we nor class counsel were in a
21    position to determine how that money should be divided up.  So
22    we proposed and the Court approved that a knowledgeable and
23    purely neutral professional, Mr. Cal Mayo, would independently
24    develop an allocation model to fairly distribute the funds.  We
25    will be hearing from him shortly.

09:56

1    In closing, we appreciate the Court's time and

2  attention to the materials we have submitted and throughout the

3  course of today's hearing.  I also want to thank the parties in

4  this case who have participated for years and thank our able

5  adversaries, especially Ms. Duggan.  Thank you.

6       **THE COURT:**  Thank you very much.  Let's take a

7  10-minute break at this time, and we will come back and hear

8  from others.  Court will stand in recess.

9       **THE DEPUTY CLERK:**  All rise.

10      (Recess.)

11      **THE COURT:**  Be seated, please.

12          Let's hear from the parties.

13      **MR. HERMAN:**  Good morning.  Steve Herman for the

14  settlement class.  We would like to call Cal Mayo, who served

15  as the allocution neutral.

16      **THE COURT:**  Mr. Mayo, if you would come forward,

17  please.

18              **JAMES CAL MAYO JR.,**

19  having been duly sworn, testified as follows:

20      **THE DEPUTY CLERK:**  Please have a seat.  State your

21  name for the record, sir.

22      **THE WITNESS:**  My name is Cal Mayo.  My full name is

23  James Cal Mayo Jr.

24      **THE COURT:**  The purpose of Mr. Mayo's testimony or

25  description is, in a matter of this sort, the parties can agree

10:10

1  upon a particular amount or a limitation of settlement, but the

2  decision then has to be made as to who gets what in that

3  settlement and how it is apportioned.

4          It's important to have an experienced individual

5  who has no interest in either side to look at this objectively

6  and try to define and devise some methodology that is

7  appropriate with regard to the facts of this particular case so

8  that people are treated in the same manner if they fall into

9  certain slots.  I have had experience with Mr. Mayo.  I know

10  his abilities and his knowledge, and I felt confident in

11  appointing him as the neutral in this case to come up with that

12  plan to assist us.

13          Today I wanted him to have an opportunity to

14  explain what he did and how he did it so that our objectors

15  could at least understand the process; not necessarily agree,

16  but at least understand the process.

17          We will do that either through question and

18  answer or, Mr. Mayo, you can follow up on anything that you

19  need to follow up on.

20          Counsel.

21      **THE WITNESS:**  Thank you, Your Honor.

22                          **EXAMINATION**

23  **BY MR. HERMAN:**

24  **Q.**  Can you please tell us a little bit about your

25  professional background.

10:12

1    **A.**   Certainly.  Can the people in the back of the room hear

2    me?

3              I'm an attorney.  I practice law in Oxford,

4    Mississippi.  I've been practicing law for about 30 years.  I

5    obtained my undergraduate degree from the University of

6    Mississippi in accounting and my law degree at the University

7    of Virginia.

8              My practice has primarily involved litigation work,

9    representing plaintiffs and defendants in various types of

10   cases, most typically in commercial disputes of some type.  I

11   call myself a general surgeon when it comes to litigation.  I

12   do a little bit of everything.  Oxford is a relatively small

13   town.  My practice is both statewide and across the region.

14             I was appointed special master in this case.  We will

15   get into this, I'm sure, in a minute, but I've also been

16   appointed as a special master in the Northern District of

17   Alabama in a complex commercial case there.  So this is also

18   part of what I do in my practice.

19   **Q.**   Thank you.

20             **MR. HERMAN:**  Your Honor, I will just note for the

21   record that Mr. Mayo's CV is already in the record at Rec. Doc.

22   22305-7.

23   **BY MR. HERMAN:**

24   **Q.**   How did you first get involved in Chinese drywall

25   litigation?

10:13

1  **A.**  My first involvement was back in 2016.  I was appointed as

2  a co-special master to work with John Perry, who at the time

3  was working with the parties to try to resolve the claims.

4  Mr. Perry had been involved for several months before I got

5  involved, asked me to come in specifically to work on product

6  ID issues.  The parties at that time were in the process of

7  deciding what we ultimately referred to as buckets, which

8  buckets the different types of drywall product would go into

9  based on their markings.

10       I worked with the parties beginning in the late

11  spring of 2016 for several months both in trying to determine

12  the origin of the various types of drywall product and which of

13  the ID buckets they would go into as well as trying to resolve

14  the claims.  That went on for several months until about this

15  time three years ago the settlement negotiations fell apart,

16  and my role ended at that point.

17  **Q.**  Could you tell us a little bit more about how you

18  approached or how you saw your role in the process at that

19  time.

20  **A.**  So my role has always been what I would consider to be a

21  neutral.  When I was involved back in 2016, I was not

22  advocating for a party.  I was at that point advocating for a

23  resolution and trying to assist, with the other special master,

24  in achieving that resolution using whatever information we had

25  available to us at the time to determine if there was a

10:15

1    difference in the value for the different types of product

2    based on their markings and how that would affect the

3    settlement values as we were negotiating or working with the

4    parties to negotiate resolution.

5    **Q.**   What types of evidence or documents or information were

6    you reviewing at that time?

7    **A.**   Well, we met several times and had a lot of information

8    provided by plaintiffs' counsel and by defense counsel.  You

9    know, photographs, we had numerous PowerPoints we looked at,

10   other documentary presentations that were made in trying to

11   determine the origins of this drywall and whether it had been

12   made by the defendants who are present today or whether it had

13   been made by others, so it was a wide variety of information

14   and documents that we looked at.

15   **Q.**   Then how did you more recently get pulled back into the

16   litigation?

17   **A.**   So actually the first contact I had was in late April of

18   this year from Judge Fallon's chambers.  Ultimately what I

19   determined -- after I was contacted and spoke with the judge, I

20   learned then that the cases had been remanded.  There were

21   going to be some Louisiana cases that remained.

22          Judge Fallon contacted me and asked me if I would

23   come in, and basically he would expand my assignment as a

24   special master to assist in determining the property damages.

25   That would include determining and confirming square footage as

10:16

1   well as making determinations about the remediation costs for

2   the Louisiana *Amorin* plaintiffs.  My recollection is there were

3   several hundred, maybe 800 or 900 of those, and I would come in

4   to assist in that process.

5         That order was not entered until May.  What happened

6   was, right about the time the order was entered, in the

7   presentation earlier we saw that there were settlement

8   negotiations going on on May 22 and 23 out in Austin that

9   resulted in a term sheet.  So my expanded role came to a quick

10   conclusion, and I thought at that point I would not be

11   involved.  However, the parties jointly asked if I would come

12   in and serve as the allocation neutral as part of the

13   settlement process.  In June I was here in this courtroom and

14   Judge Fallon approved me to serve as the allocation neutral.

15 **Q.**   What, specifically, as you understood it, were you asked

16 to do?

17 **A.**   So at kind of the 3,000-foot level, this settlement

18 involves a fixed amount of money.  Every claim is not going to

19 be paid on its own basis and its own merits, so to speak.

20 There's a fixed amount of money that's being allocated across

21 all the claimants that are part of this settlement, now close

22 to 4,000 different properties.

23         Somehow you have to decide who gets what amount of

24 money out of this fixed settlement amount.  My job was to

25 determine a methodology for getting to that result that's

10:18

1   equitable, that's efficient, and that's effective in allocating
2   the money out to the various property owners.
3          So, at the 3,000-foot level, that was my
4   responsibility, to come up with a methodology -- after visiting
5   with the parties, reviewing information in the Court file,
6   reviewing other documents provided to me and determine a method
7   for calculating those amounts of money.
8   Q.   Okay.  So you have answered this a little bit, but how did
9   you go about doing this?
10  A.   I met with the parties on several occasions.  Counsel
11  provided me with a list of documents they thought would be of
12  use in determining what the methodology would be.  That
13  included decisions by Judge Fallon, decisions by judges in
14  other states -- Virginia and Florida primarily, a special
15  master assigned in Florida -- to do basically a lot of what I
16  was going to be doing or had gone through part of the process
17  of what I would be going through.  There were opinions from
18  other courts.  There was product ID material.  All of that was
19  provided to me.  Those are all things I considered.
20  Q.   What are some of the objective criteria that you
21  considered in terms of whether they would be counted for and
22  how they would be counted for in your ultimate model?
23  A.   So on the spectrum of equitable and efficient and
24  effective, I guess the simplest way to do this would be to take
25  the 4,000 properties and, for sake of a discussion,

1  hypothetically $200 million and divide that evenly and

2  everybody gets a check for $50,000.  That would be efficient.

3  It would certainly be effective, I guess, but it wouldn't be

4  very equitable.

5         In the settlement agreement, there were a list of

6  objective criteria that counsel had identified as things for me

7  to consider.  It was not all inclusive.  As it turned out, I

8  think it covered everything that needed to be considered.

9         So, for example, while this is not a settlement based

10  on remediation necessarily -- or it's not a payment for

11  remediation, it is a settlement, a better way of saying it, it

12  appeared to me square footage is certainly something that needs

13  to be considered because different homes are different sizes.

14  That should be a factor to be considered.

15         Another factor that should be considered is whether

16  the parties were *Amorin* plaintiffs, *Brooke* plaintiffs, or

17  whether they were what I refer to as new claims, they had not

18  stepped forward to make a claim yet.  That was a factor I

19  thought that should be considered.

20         In the product buckets, there were 12 buckets

21  ultimately identified, different types of markings.  Taishan

22  had admitted some of the markings were its markings and those

23  were its products, there were some that they denied any of

24  those -- we saw this earlier, people have already seen -- and

25  then there were some of the middle, what Mr. Perry dubbed in

10:21

1  our settlement discussions the jump balls.  Maybe they are;
2  maybe they aren't.  That was another criteria factor that I
3  took into consideration.
4  **Q.**  Ultimately were you able to come up with an allocation
5  model that you proposed to the Court and to the parties?
6  **A.**  Yes.
7            **MR. HERMAN:**  Just for the record, Your Honor, that is
8  found in the record at Rec. Doc. 22304-1.
9            **THE COURT:**  Okay.
10 **BY MR. HERMAN:**
11 **Q.**  In addition, in preparing for this hearing today, am I
12 correct that you also provided the Court with a declaration
13 that kind of sets forth this process?
14 **A.**  Yes.
15           **MR. HERMAN:**  Your Honor, just for completeness of the
16 record, that declaration is found at Rec. Doc. 22392-16.
17 **BY MR. HERMAN:**
18 **Q.**  So if we go back to the things that you considered, let's
19 talk a little bit about these in more detail.  Can you explain
20 a little bit of your thinking in the differences between the
21 *Amorin* plaintiffs, the *Brooke* plaintiffs, and the new
22 plaintiffs.
23 **A.**  Yes.  So the way I approached the relative value of being
24 an *Amorin* plaintiff and a *Brooke* plaintiff and a new claim was
25 I thought of myself as a lawyer.  If you are going to hand me

10:22

1    an *Amorin* plaintiff and a *Brooke* plaintiff and a new claim and

2    everything else is the same -- the square footage is the same,

3    the product ID is the same -- which of those would I rather

4    take on as a lawyer?

5           Obviously, the relative progress of the different

6    claims is different.  Both procedurally and substantively, they

7    are in different postures.  It's easy to distinguish between

8    the value of the *Amorin* claims and the new claims because the

9    *Amorin* claims are way down the road towards resolution.  I will

10   talk about that a little bit more in a second.  It's easy to

11   distinguish those.  It's harder to distinguish the value of the

12   *Brooke* claims as related to the *Amorin* claims.

13          The conclusion I came to -- and I will explain how I

14   got there.  The conclusion I came to is I would much rather

15   have *Amorin* by a long shot over *Brooke* or the new claims, and

16   here's why.

17          In *Amorin* you have a default judgment that's been

18   entered by Judge Fallon, so that puts those plaintiffs in a

19   very strong position relative to the *Brooke* plaintiffs and

20   certainly to the new claims.  You have a class that's been

21   certified.  Discovery has been conducted.  My assignment, when

22   I came back in last spring, was to make damages determinations

23   for the *Amorin* plaintiffs in Louisiana.  So they're way down

24   the road.

25          Now, as was discussed earlier, there are still

10:23

1    issues -- collectability and things, appeals that were out

2    there -- but those were common to all the claims.  What

3    separated *Amorin*, what made the *Amorin* claims different was the

4    default, the class certification, the stage of the litigation.

5           You look at the *Brooke* plaintiffs, Judge Fallon has

6    already identified some serious statute of limitation problems,

7    statutes of repose problems that were discussed earlier.

8    There's just no comparison, in my view, between the relative

9    value.  The *Amorin* plaintiffs are far more valuable.  Those

10   were the factors I considered, and that's why I imposed a

11   fairly significant discount for the *Brooke* plaintiffs.

12          I think the new claims are, at best, on deck.  The

13   *Brooke* plaintiffs may be up to the plate, but the *Amorin*

14   plaintiffs are far down the road.

15   Q.   Can you talk about a little bit of the way that you looked

16   at the product ID and the way that you treated the different

17   buckets differently under your allocation model.

18   A.   Sure.  I talked about this a few minutes ago, but there

19   were some that are easy because they were admitted that they

20   were Taishan products or BNBM products.  Those went in one

21   bucket and I gave those, obviously, a factor of one.  They

22   should not be discounted at all.

23          I was guided on the remainder of this, at least for

24   some of the buckets, by the decisions made by the special

25   master down in Florida.  I didn't follow that a hundred

10:25

1   percent, but I was certainly guided by that.  That was

2   consistent with my recollection from back in 2016 as to what

3   the jump balls were and what the fully contested buckets were.

4           So for the ones that were jump balls, I gave those a

5   discount of 25 percent, which I thought was fair under the

6   circumstances based on the information that I had reviewed,

7   based on the decisions that were made by the special master in

8   Florida.

9           And then for the final group, I discounted those to

10  .2 or it was an 80 percent discount.  They get a 20 percent

11  participation because we don't know the answer to those.

12          Now, all of the products are covered under the

13  settlement agreement, so they are all part of the settlement.

14  There needs to be an allocation to cover all of these different

15  12 different buckets, but they don't need to be treated the

16  same.

17  **Q.**   Okay.  I would like to talk about some of the other

18  potential objective factors that you considered.  Former owners

19  versus current owners was something you were asked to consider.

20  Could you tell Court a little bit about your thinking on that.

21  **A.**   Sure.  Really the ownership comes up in two different

22  ways, but I think the way you are talking about is, as one of

23  the objective criteria in the methodology, should there be a

24  difference made between someone who owned their home at one

25  point, but in the last 11 years, 10 years has sold that home,

10:27

1  as compared to someone who still owns their home today.

2  **Q.**   Yes.

3  **A.**   I did not use that as a distinguishing factor for a couple

4  of reasons.  One is it's just another calculation the claims

5  administrator has to make.  It's another cost of going through

6  this process.

7         The other reason was that if I assumed that when a

8  person sold their house that there was a disclosure made or the

9  information was known about it having Chinese drywall in it,

10 the price a person received upon sale was diminished by some

11 amount.  For the sake of simplicity, I just assumed that was

12 whatever the cost of remediation would be, that it would be the

13 same; that if the person had the money to fix the house,

14 remediate it, that they would get a higher value for the home.

15 So that was kind of my thinking when I went through and

16 considered prior owners and current owners.

17 **Q.**   And then one of the other things that you were asked to

18 consider and you did, but it didn't show up in the model

19 necessarily, is the remediation status of the property at the

20 time of the settlement.  Could you just tell everyone your

21 thoughts about that.

22 **A.**   Sure.  So some of the homes have not been remediated at

23 all, some have been completely remediated, and some are in

24 between.  That became an efficiency issue for me, to try to go

25 in and look at every house and make a decision about what level

10:28

1    of remediation had occurred.  I thought it would be too costly.

2         The other part of that is this is not necessarily a

3    payment for remediation.  This is a settlement, and it's a

4    settlement of all claims.  It includes other losses.  It

5    includes everything.  I'm not just trying to compensate

6    homeowners for remediation.  I'm trying to allocate a fixed

7    amount of money across 4,000 homeowners in a way that's

8    equitable.  I didn't think it was appropriate to adjust for

9    remediation status for those two reasons.

10   Q.   You have mentioned several times that you're trying to

11   make this as equitable as possible, in your judgment.  What are

12   some of the equities that you were looking at in terms of the

13   prior payments and what type of offset there would be for that?

14   A.   So I think over half -- the number that I was given was

15   roughly 2,600 of these properties the property owners have

16   received a payment of some amount.  I'm sure that the payments

17   were made for different reasons for different homeowners.

18   Maybe they were remediation costs, maybe it was for other

19   losses of some type, alternative living expenses or loss of use

20   and enjoyment.  I don't know what they were.

21        I thought it was appropriate to take that into

22   consideration in some manner, as was discussed earlier, to

23   prevent a windfall.  Similarly situated houses right next to

24   each other, it just didn't seem fair in this process.  I

25   thought it was a fairly simple step at the very beginning of

10:30

1    the calculation to use that payment as a way to adjust the

2    square footage.

3            I had decided square footage would kind of be the

4    first item to use in the methodology, but you could easily

5    adjust that square footage, without taking too much time to do

6    it, just by using the settlement amount as a numerator --

7    whatever the prior payment was as a numerator and using the

8    2019 damages estimate as the denominator to come up with a

9    percentage and then reduce the square footage by that amount.

10   **Q.**   The slide that we had shown earlier kind of reflects that

11   calculation?

12   **A.**   That's correct.  As we will see when we get to the

13   methodology, that's the first step, to make that adjustment in

14   the square footage.

15   **Q.**   Now, one of the other things that you were asked to do was

16   to kind of do a breakdown or an allocation within a specific

17   property where you had a condo association versus a unit owner,

18   or maybe Habitat or Catholic Charities versus the particular

19   property owner.  Is that something that you undertook?

20   **A.**   Yes.  We had those situations.  We also had some

21   situations where some claims had been assigned so that the

22   remediation component of the claim had been separated from the

23   other losses component of the claim, and that needed to be

24   taken into consideration as part of this.

25           Basically, the estimate I came up with was

10:31

1   7.5 percent, and that was based on discussions with counsel,

2   some amounts that had been used in some other settlements.  If

3   you had, for example, $100,000 of value that we determined,

4   then $7,500 of that would be for other losses.  That comes into

5   play in a very small number of these settlements, but there are

6   some that that calculation had to be made in order to give some

7   compensation for other losses.

8   **Q.**   Thank you.  If you wouldn't mind, I think we have your

9   methodology broken down into the steps.

10       **MR. HERMAN:**   Just for the record again, this is

11   Rec. Doc. 22304-1.

12   **BY MR. HERMAN:**

13   **Q.**   If we could just take the Court and everyone through how

14   this works and how the methodology is applied to the master

15   spreadsheet.

16   **A.**   Yes, at the risk of putting the courtroom to sleep talking

17   about these calculations.

18       So the first step, as I mentioned a moment ago, is

19   for those properties that received a prior payment, the square

20   footage needs to be adjusted.  We just went through this

21   calculation.  You simply take the prior payment and divide it

22   by the 2019 remediation formula calculation to get a square

23   foot discount.  You then say one minus whatever that discount

24   is times the square footage to provide an adjusted square

25   footage for those -- I think it's 2,600 properties, give or

10:33

1  take.

2  **Q.**    Okay.  Let's go to Step 2.

3  **A.**    Okay.  So now we have to determine a unit value.  Okay.

4  There we go.

5           We need to come up over here with the unit value.  In

6  order to get there, you take either the square footage of the

7  home or if you have made an adjustment to the square footage,

8  you multiply that by the plaintiff group multiple we talked

9  about a moment ago, either *Amorin, Brooke*, or the new claims.

10  Then you multiply that times the product ID multiple to come up

11  with every individual -- you know, almost 4,000 different

12  properties, a unit value for that property.

13           The claims administrator would do this for all the

14  properties other than those that have been partially assigned

15  or there's been a settlement involving some condo claims.  So

16  we except those out of this calculation, but all the other

17  properties we determine a unit value for that property using

18  this methodology.

19  **Q.**    Let's go to Step 3.

20  **A.**    So this is what we do for those 14 claims, the eight in

21  Florida, the six -- I guess all 14 in Florida where we need to

22  determine just for those properties only a unit other loss

23  value because the remainder of that value has already been --

24  it's not part of this settlement.

25  **Q.**    Right.

10:35

1 **A.**  It's outside the settlement, but we need to determine this

2 amount.  So, again, you start the same way with the square

3 footage, plaintiff group multiple, the product ID multiple, and

4 then multiply that times the .075 or the 7 1/2 percent, which

5 gives you a unit other loss value for those 14 claims.

6 **Q.**  Okay.  And then Step 4?

7 **A.**  So Step 4 is we need to take all of these values we just

8 determined in Step 2 and Step 3 and aggregate those.  You take

9 every property, almost 4,000, less the 14 in Step 2.  You take

10 the 14 in Step 3.  You add all those values up, and you come up

11 with an aggregate unit value for all the claims, all the 4,000

12 claims.

13 **Q.**  Everybody in the class?

14 **A.**  It's the whole pot.

15 **Q.**  So Step 5.

16 **A.**  So now we need to go back and allocate out a unit value --

17 an allocation amount per unit; not a unit value but an

18 allocation amount.

19 **Q.**  Right.

20 **A.**  So you take the unit value for a specific unit that we

21 determined in Step 2.  You divide that by the total that we

22 came up with in Step 4, and you multiply that by the settlement

23 fund.  We don't know what that number is yet.  It will be

24 determined after the administrative costs and other things are

25 taken off the $248 million.  At some point that will settle

1    into a fixed number.

2    **Q.**    Right.

3    **A.**    You multiply it by that number, and that gives the unit

4    allocation amount for a particular unit.

5            You do the same thing for those 14 properties in

6    Step 3.  You multiply that particular unit other loss value to

7    determine -- by the settlement fund to get the unit other loss

8    allocation for those particular 14 units.

9    **Q.**    Step 6.

10   **A.**    So then we had some special cases, some condo owners and

11   associations in Florida, the nonprofit remediation claims in

12   Louisiana, and we needed to separate for them the unit other

13   loss allocation amount from the rest of it.  So we needed to

14   take the 7.5 percent out leaving the 92.5.

15           We did this because, for example, with the condo

16   owners and associations, there have been claims made for the

17   condo associations as a group and then there's also the other

18   losses that the condo owners would receive.  Now, there may be

19   particular bylaws and things that would change this.  That's

20   something the administrator can deal with on a case-by-case

21   basis.

22           Step 6 is designed to separate out that other loss

23   allocation from the bulk of the 92.5 percent for the condo

24   owners in Florida.  What we had in Louisiana was a situation

25   where there had been some remediations done by groups like

10:38

1    Habitat for Humanity.  They owned the remediation component.

2    The other loss component still belongs to the property owner.

3    We had to separate those.

4           The other thing I address here is there are some

5    situations where you have the owner of the remediation

6    component is part of one plaintiffs' class and the owner of the

7    other loss is part of a different plaintiffs' class.  The

8    methodology takes that into consideration, and that's something

9    the claims administrator can address when Mr. Woody does his

10   work.

11   **Q.**   That's what the asterisk at the bottom governs?

12   **A.**   Correct.

13   **Q.**   And then Step 7?

14   **A.**   So there were some situations where -- and this gets back

15   to where we started before, talking about taking ownership into

16   consideration.  This is the second part of that.

17          There are a few cases, as shown on the slide, where

18   there's a dispute as to who owns the claim.  The default is

19   that the former unit owner will receive the unit allocation

20   amount.  However, if there's been an assignment as part of the

21   sale of the property, that the owner could have sold the

22   entirety of the claim, could have sold the remediation claim,

23   could have sold the other losses claim -- we don't have that

24   information, but if there's been an assignment, then that's

25   something Mr. Woody can take into consideration.

10:39

1          Also, if there's some evidence of fraudulent

2   concealment, the methodology asks the claims administrator to

3   bring that to the Court's attention to address on a

4   case-by-case basis, but the default is that the prior owner

5   will get the unit allocation.

6          **MR. HERMAN:**  Thank you very much.

7          Unless the Court has any questions --

8          **THE COURT:**  That's fine.

9          So you make a distinction between the *Amorin* and

10  the *Brooke* plaintiffs and, in short, what's the reason?

11         **THE WITNESS:**  It's because of the relative status of

12  those case procedurally and substantively, Judge.

13  Procedurally, the default, I think, is a huge factor.

14  Substantively, there are a lot of defenses, statute of

15  limitations and other defenses that would need to be addressed

16  for the *Brooke* plaintiffs that does not have to be addressed

17  for the *Amorin* plaintiffs because of that default.

18         **THE COURT:**  Let's see how we did the notification and

19  the others.

20         Thank you very much.  I appreciate it.

21         **MR. HERMAN:**  Thank you.

22         **MR. MONTOYA:**  Patrick Montoya on behalf of settlement

23  counsel.  May Mr. Mayo be excused?

24         **THE COURT:**  Yes.  You are excused.  Thank you very

25  much.

10:40

1       **THE WITNESS:**  Thank you, Judge.

2       **MR. MONTOYA:**  Judge, if it pleases the Court, we

3   would like to call Mr. Woody next.  I know it's slightly out of

4   the Court's order.

5       **THE COURT:**  Okay.  Sure.

6       **MR. MONTOYA:**  Thank you.

7       **THE COURT:**  Tell us who Mr. Woody is.

8       **MR. MONTOYA:**  Your Honor, Mr. Woody is the

9   Court-appointed settlement administrator, appointed by

10  Your Honor on August 30, 2019.  That's Rec. Doc. 22314.

11                          **JAKE WOODY,**

12  having been duly sworn, testified as follows:

13      **THE COURT:**  In these matters, ladies and gentlemen,

14  because of the number of claims and the complexity of the

15  claims, when you are dealing with a situation of allocation and

16  distribution of these funds, you need someone who is qualified,

17  has the experience to deal with this mass of information and

18  mass of issues, and so I appointed Mr. Woody, who has worked on

19  several cases that I've been involved with.  I know his talents

20  and his experience.  I was confident in appointing someone of

21  his caliber to be able to make the proper distribution.  That's

22  his role in the case.

23      **MR. MONTOYA:**  Thank you, Judge.

24

25

10:42

1                          **EXAMINATION**

2   **BY MR. MONTOYA:**

3   **Q.**    Mr. Woody, please walk us through your professional

4   background briefly.

5   **A.**    I have a degree in history from George Mason University.

6   After graduating there, I went to work at BrownGreer as sort of

7   an entry level claims reviewer for a couple years.  Then I

8   attended law school at the University of Virginia and worked as

9   a litigation attorney for about four years.  I then returned to

10  BrownGreer in 2012, where I have worked ever since.

11  **Q.**    You've been at BrownGreer for how long?

12  **A.**    Seven years.

13  **Q.**    Are you a partner at BrownGreer?

14  **A.**    I am.

15  **Q.**    What does BrownGreer do?

16  **A.**    We are primarily a claims administration firm working on

17  large settlements.  Our experience in that field goes back to

18  the Dalkon Shield in the '80s and '90s.  Then we worked on the

19  *Fen-Phen* litigation for about a decade and, in fact, still do

20  some work on that.  We have worked on a number of large

21  settlements over the years, including the *Vioxx* settlement out

22  of this Court, the BP oil spill.  We handled most of the claims

23  in that settlement.  Now we work on other large settlements,

24  the NFL concussion settlement, including a number of large MDL

25  settlements throughout the country.

10:43

1    **Q.**   How long has BrownGreer been involved in the Chinese
2    drywall litigation?
3    **A.**   We became involved in this litigation, I believe, in 2011
4    before there were any settlements, where we were tasked with
5    collecting plaintiff profile forms submitted by the plaintiffs
6    as part of discovery, kind of collecting that information and
7    aggregating it and reporting on what was in those forms.
8    **Q.**   In 2013 was BrownGreer appointed as the claims
9    administrator in the Knauf settlement?
10   **A.**   We were.  We handled the Knauf settlement, which involved
11   remediation of properties by contractors.  In fact, there was
12   something called the pilot program, which was sort of a test
13   run of the Knauf settlement.  We handled that.  Then we also
14   handled the Banner, INEX, and Global settlements, which were
15   not remediation settlements but were money damage settlements,
16   pro rata settlements involving many of the same people and
17   attorneys who are in the Knauf settlement.
18   **Q.**   How long have you been personally involved in Chinese
19   drywall litigation?
20   **A.**   I've personally been involved since the Knauf and Global,
21   Banner, INEX settlements were approved in, I think, early 2013.
22   I think March 2013.  I worked a little bit on it before then as
23   part of the pilot program.
24   **Q.**   I'm going to turn now to the work that you have been asked
25   to do in this case, which I have broken down in roughly four

10:44

1    areas.  The first would be the long form notice, the second

2    would be the sending of the gross allocation letters, the third

3    would be the competing claimants' letter, and the fourth would

4    be the master spreadsheet work that you did.

5    **A.**    Okay.

6    **Q.**    Does that work for you?

7    **A.**    Yes.

8    **Q.**    Great.  Let's talk about the long form notice first, which

9    is on the screen in front of you.  That's the Court-approved

10   long form notice, correct?

11   **A.**    Yes.

12   **Q.**    What were you tasked to do with the long form notice?

13   **A.**    Print it and mail it.

14   **Q.**    How did you do it?

15   **A.**    We retained a printer -- I think it's called SED Printing

16   Company outside of Philadelphia -- to print these for us and

17   mail them.

18   **Q.**    How did you know who to mail them to?

19   **A.**    We have addresses.  Over the years we have collected

20   addresses along with many other pieces of information for these

21   claimants, and we have received updates to those addresses over

22   the years.  We used those to instruct the printer on how to

23   mail these.

24   **Q.**    How many notices were sent out?

25   **A.**    3,965.

1    **Q.**    Were any of those notices returned to BrownGreer?

2    **A.**    Yes.  I think 189 were returned, some with forwarding

3    addresses that we remailed.  All in all, we remailed, I think,

4    162 of them.  29 -- or 27, excuse me, we could not find a new

5    address for those people, so we were unable to remail them.

6    **Q.**    As to those 20-odd notices that were sent out, was their

7    counsel notified of the notice?

8    **A.**    Yes.  In addition to mailing the notice directly to

9    claimants, we also notified all attorneys.  I think it's 80 law

10   firms.  We sent them a copy of the notice along with the

11   estimate letters for their clients.

12   **Q.**    Let's turn to the estimate letter, which is the next slide

13   in the presentation.  Can you tell us what the estimate letter

14   is.

15   **A.**    The estimate letter is a letter that went along with the

16   long form notice that was intended to convey an estimate to the

17   claimant of what they might receive in the settlement.

18   **Q.**    You heard Mr. Mayo testify a few minutes ago as to the

19   allocation formula, correct?

20   **A.**    Correct.

21   **Q.**    That number of the allocation was performed and a number

22   was inserted in the slot there to give the claimant a gross

23   estimate of what they may receive in the settlement.  Is that

24   fair?

25   **A.**    Correct.

10:47

1   **Q.**   Those were individualized for each claimant?

2   **A.**   Yes.

3   **Q.**   And individually addressed?

4   **A.**   Correct.

5   **Q.**   Were the gross estimate letters also included with the

6   notice letter?

7   **A.**   Yes.

8   **Q.**   So is it fair to say the bulk of the claimants, the

9   3,900-odd plaintiffs, received a notice letter along with a

10  gross allocation letter?

11  **A.**   Yes.

12  **Q.**   Okay.  The next letter that you were tasked with sending

13  out was what I'm calling the competing claims letter.  That

14  would be the next slide.  What's your understanding of what the

15  completing claimants' letter is?

16  **A.**   These letters were sent to owners where there appeared to

17  be multiple claims related to one property and instructed them

18  on what they needed to do to assert a claim for all of the

19  proceeds or some of it depending on their circumstances.

20  **Q.**   How did you know whether a claim had a competing claim or

21  not?

22  **A.**   Because we saw that there were two owners for the same

23  address.

24  **Q.**   We go to the master spreadsheet, which is the next slide

25  in the presentation.  You were provided with this master

10:48

1  spreadsheet by the litigants in this case, correct?

2  **A.**    Correct.

3  **Q.**    It contains addresses.  It's self-explanatory in terms of

4  what case folks were included in, their product ID, square

5  footage?

6  **A.**    Yes.

7  **Q.**    Were you able to tell from there what the competing claims

8  were as well?

9  **A.**    Yes.

10  **Q.**    What was your task in terms of the master spreadsheet?

11  **A.**    Our task was to make sure that it was accurate, that the

12  allocation model had been properly applied based on the

13  information in the spreadsheet, and then we used it to obtain

14  the addresses and competing claim information.

15  **Q.**    The master spreadsheet was posted on the Chinese drywall

16  settlement website?

17  **A.**    Yes.

18  **Q.**    What was your task in terms of challenges to the master

19  spreadsheet?  What do you understand the challenges to be?

20  **A.**    Yes.  After the master spreadsheet was posted and we sent

21  out all the letters, there was a method -- and it's in the

22  settlement agreement -- where people who believed that the

23  information was incorrect or otherwise should be changed could

24  submit to us a challenge, essentially a request for an update

25  to the information on the master spreadsheet.

10:49

1          We received 109 of those challenges.  We reviewed

2     them to determine if there was an objective basis to update the

3     information on the spreadsheet.  If there was, we updated the

4     spreadsheet.  Any updates to the spreadsheet for one claimant

5     affects everybody's amounts in a very small way because this is

6     a pro rata settlement.  We reviewed the challenges, determined

7     whether the spreadsheet should be updated based on those

8     challenges and, if so, we updated the spreadsheet and made sure

9     that it was accurate.

10    Q.   What were the bulk of the challenges that you received?

11    A.   They fell across a number of categories.  Some of them

12    were clerical issues, where somebody wanted their name updated.

13    The bulk of them were issues that would affect, obviously, the

14    settlement amount, which would be square footage, prior

15    payments, and competing claims.

16    Q.   You said you evaluated objective criteria.  How were you

17    able to do that?

18    A.   Along with the challenge, we asked the claimants to

19    provide some basis that would back up their assertions.  If we

20    reviewed it and thought this was correct and it was fair and

21    equitable to update the settlement based on the information

22    provided to us, we did so.

23    Q.   The revised master spreadsheet you published and it was

24    filed with the Court on October 31 of this year, that's the

25    next slide at Rec. Doc. 22355; is that right?

10:50

**A.**   Correct.  Correct.

**Q.**   That was the result of the challenges process that you

just described?

**A.**   Yes.

**Q.**   In terms of the future of the settlement, assuming

approval, what do you anticipate your role to be?

**A.**   We would accept new claims.  People who are not on the

master spreadsheet but feel that they have a right to

settlement proceeds can submit to us a claim form and

supporting documents.  We will review that, determine if they

should be included in the settlement based on the information

that they provide to us and documents, and then insert them

into the spreadsheet, essentially, making sure to apply the

correct discounts and updating the pro rata amounts.

**Q.**   Is BrownGreer ready, willing, and able to perform that

work?

**A.**   Yes.

        **MR. MONTOYA:**  Judge, I don't have anything further at

this point unless the Court might have questions.

        **THE COURT:**  Assume things work out.  When can these

people expect to receive some money?

        **THE WITNESS:**  We have the claim form ready and can

post that as soon as the settlement is approved, if it's

approved.  The bulk of the work in this settlement has been

done on the master spreadsheet.  It would take us a little bit

10:52

 1   of time to review the new claims, but I think that sometime in

 2   the second quarter of next year would be a very reasonable time

 3   period to expect payment.

 4            **THE COURT:**  Thank you very much.  I appreciate it.

 5            **MR. MONTOYA:**  Your Honor, for record purposes,

 6   Mr. Woody's affidavit, which explains his work in more detail,

 7   is at Rec. Doc. 22392.  I'll turn the podium over to Mr. Serpe.

 8            **THE COURT:**  Let's now discuss what notice was sent

 9   out and how it was done, things of that nature, so everybody

10   can understand what's happening.

11            **MR. SERPE:**  May it please the Court.  Richard Serpe

12   for the class.  We would like to call Dr. Shannon Wheatman to

13   describe that notice process.

14            **THE COURT:**  Dr. Wheatman, would you come forward,

15   please.

16                        **SHANNON WHEATMAN,**

17   having been duly sworn, testified as follows:

18            **THE DEPUTY CLERK:**  Please have a seat and state your

19   name for the record.

20            **THE WITNESS:**  My name is Shannon R. Wheatman.

21                          **EXAMINATION**

22   BY MR. SERPE:

23   **Q.**   Dr. Wheatman, by whom are you employed?

24   **A.**   I'm employed by Kinsella Media.

25   **Q.**   What does Kinsella Media do?

10:53

1  **A.**   Kinsella Media assists courts, attorneys, and the

2  government in class action litigation and other mass claims

3  processes.  That includes notice plan design, implementation,

4  and analysis.

5  **Q.**   Would you share with the Court your educational experience

6  that's relevant to notice.

7  **A.**   So I have a master's in legal studies from the University

8  of Nebraska-Lincoln and a Ph.D. in social psychology from the

9  University of Georgia, where my master's research was on

10  comprehension of jury instructions and my doctoral dissertation

11  was on laypersons' comprehension of class action notice.

12  **Q.**   Would you share your employment background that's relevant

13  to notice.

14  **A.**   I've been in the legal notice industry for over 15 years

15  as a notice expert.  I'd say for the last 12 years I've been

16  accepted as a notice expert.  Prior to that I worked at the

17  Federal Judicial Center, which is the research and educational

18  agency for the federal courts.  While I was there, I worked

19  with the civil rules advisory committee on a number of class

20  action projects, including the development of the model notices

21  to satisfy the plain language amendment to Rule 23.  That

22  research formed the basis of my doctoral dissertation.

23        **MR. SERPE:**  Your Honor, further educational

24  background and details are provided in a curriculum vitae for

25  Dr. Wheatman which can be found in the record at Rec. Doc.

10:54

1   22305-5.

2   **BY MR. SERPE:**

3   **Q.**   Dr. Wheatman, would you outline for the Court the number

4   of cases that you personally have been involved in that

5   involved notice.

6   **A.**   So I've been involved in over 600 class actions where I

7   either planned, designed, or implemented a notice program.

8   **Q.**   Have you been involved in a prior class action that

9   involved Chinese drywall?

10  **A.**   Yes.

11  **Q.**   Which one was that?

12  **A.**   My firm implemented a settlement notice program involving

13  the Banner Supply Company.

14  **Q.**   Have you and your firm been involved in other class

15  actions here in the Eastern District of Louisiana?

16  **A.**   Yes.  I've been involved as a notice expert in five

17  settlement notice programs.  Three of those notice programs

18  involved *Deepwater Horizon* or the BP oil spill settlement.  One

19  involved *Katrina Canal Breaches*.  Another one was the consumer

20  settlement in *Vioxx*.

21  **Q.**   Has your design of a notice program ever been rejected by

22  a court?

23  **A.**   No.

24  **Q.**   Have you been qualified to testify as an expert in other

25  class actions involving notice?

10:56

1  **A.**   Yes.  I've been qualified eight times in class action
2  notice.
3  **Q.**   In fact, in those actions did you testify and offer
4  opinions with respect to adequacy of notice?
5  **A.**   Yes, I did.
6  **Q.**   How many written expert declarations have you submitted on
7  notice programs?
8  **A.**   I've never counted, but it's definitely in the hundreds.
9          **MR. SERPE:**  Your Honor, we would tender Dr. Wheatman
10 as an expert on notice programs.  The declaration that was
11 specifically prepared for this case can be found in the record
12 at Rec. Doc. 22397-16.
13 **BY MR. SERPE:**
14 **Q.**   Dr. Wheatman, would you describe what your role was in
15 this case.
16 **A.**   So I worked with the counsel for the parties to design the
17 notice program, to determine the best method of dissemination
18 of notice, also worked with them to draft all notices, and
19 oversaw implementation of the notice program.
20 **Q.**   When were you first retained to provide those services?
21 **A.**   In June 2019.
22 **Q.**   In performing those services, what were your overriding
23 goals?
24 **A.**   The overall objective was to satisfy due process and
25 provide the best notice practicable under the circumstances.

10:57

1   We wanted to reach the greatest number of class members and
2   provide them with a notice that informed them of all the rights
3   and options in the case.  So in order to do that we wanted the
4   notice to be noticeable or attention-getting, and we wanted the
5   notice to be easy to understand.
6   **Q.**   Dr. Wheatman, I would like to ask you about individual
7   notices that were provided to class members.  What was the
8   principal method of providing notice to individual class
9   members?
10  **A.**   So as Mr. Woody just testified to, the individual or known
11  class members receive a long form notice and a cover letter
12  with their allocation estimate.
13           **MR. SERPE:**  Your Honor, that long form notice is in
14  the record at Rec. Doc. 22305-5, Exhibit 2.
15  **BY MR. SERPE:**
16  **Q.**   In terms of the design of the long form notice, what were
17  the goals or what factors were you looking to achieve on the
18  long form notice?
19  **A.**   So with the long form notice, it provides all the details
20  class members need, all the instructions for them to act on
21  their rights.  It also includes the background on the case so
22  that people have something that they can read and learn more
23  about the settlement.
24           The long form notice in this cases follows the plain
25  language model notices that I helped create with the Federal

10:58

1    Judicial Center.  It's in a reader-friendly format, so it's in
2    a question and answer format that's really easy for people to
3    digest the information.  All of the Rule 23 requirements were
4    covered in the notice.  We also prominently displayed the toll
5    free number and the website address so people could get
6    additional information.
7    Q.   What were the results of the mailing as you understood it
8    from your review of the record in this case?
9    A.   They were very successful.  As Mr. Woody testified, over
10   99 percent of the known class members were reached through
11   mailing, and they followed the effective protocols in address
12   updating any mail that had been returned.
13   Q.   Dr. Wheatman, I would like to turn from giving notice to
14   the individual known class members to unknown class members.
15   What steps did you take to reach unknown class members in this
16   class?
17   A.   Well, the first step was to determine geography.  As the
18   plaintiffs presented initially, we found in data that had been
19   provided to us that there were six states that had over
20   90 percent of the affected properties.  So this is information
21   that we are garnering from the plaintiffs, the *Brooke* and the
22   *Amorin* plaintiffs.  This allows us to determine where likely
23   unknown class members may reside.
24          So those six states were Florida, Louisiana, Alabama,
25   Virginia, Mississippi, and Georgia.  There were two states,

11:00

1    Florida and Louisiana, that had approximately 76 percent of the

2    affected properties.

3              Now, the second step was us to look at the

4    demographics of potential class members.  In this case we know

5    they are homeowners.  So we look at our media survey data and

6    we see that one of the most important demographics is that the

7    average age for homeowners is 35 years or older.  So that's an

8    important piece of information for us to consider in where do

9    we put the media.

10             The next step is we look at the media habits of

11   homeowners, and we find that on average they read 16 newspapers

12   per month, over eight magazines in that same time period, and

13   they spend 21 hours online each week.

14             So this information allows us to design a notice

15   program that will effectively reach them, and we did that

16   through a mix of media.  So we used newspapers, magazine, and

17   online advertising.

18   **Q.**   So through studying the demographics and the geographic

19   location, etc., what were your roles in terms of the nature of

20   the presentation that you were going to be delivering through

21   that publication?

22   **A.**   So for the publication notice, you know, again we want it

23   to be noticeable.  We want it to be attention-getting.  We want

24   to make sure that we are providing people all the information

25   they need to learn all about their rights and options.

11:01

**Q.** Do you believe that the notices that you prepared met that goal?

**A.** I do.

**Q.** Where did you publish the notice?

**A.** So we published in local newspapers in the top two states that I mentioned, Florida and Louisiana, that had approximately 76 percent of affected properties.  In Florida we were in nine English language newspapers and six Spanish language newspapers, and in Louisiana we were in six English language newspapers.

We chose the newspapers by looking at all of the media markets in those states, and we chose the newspaper that had the highest circulation amongst those media markets.  We also had a national consumer magazine, *People*, which is the highest performing weekly publication for homeowners.  We also published online advertisements, and we did that by targeting to the top six states that had, again, 90 percent of the affected properties and also nationally online as well.

**MR. SERPE:**  I would like to go through some of those individually, but before I do so I would like to hand the witness, Your Honor, an exhibit that we are going to supplement the record with, which I will identify as the tear sheets.

**THE COURT:**  Sure.

**MR. SERPE:**  Your Honor, may I provide one for you as well?

11:03

1          **THE COURT:**  Yes.

2    **BY MR. SERPE:**

3    **Q.**   Dr. Wheatman, can you identify what it is, the exhibit I

4    have just handed you.

5    **A.**   Yes.  So these are electronic tear sheets that we received

6    from the publications as proof of performance that the notices

7    actually did appear in the publications.

8    **Q.**   There is a collection of them here.  What is this a

9    collection of?  Is this a complete set of the tear sheets for

10   the notice program?

11   **A.**   I'm assuming if this is everything -- there should be 22

12   in here.

13   **Q.**   Yes, there are 22.

14   **A.**   Okay.  Yes, then it is a complete set.

15          **MR. SERPE:**  Your Honor, we are going to supplement

16   the record with the tear sheets for the actual copies of the

17   published notice.

18          **THE COURT:**  Okay.

19   **BY MR. SERPE:**

20   **Q.**   Dr. Wheatman, I'm going to put a couple of them up on the

21   screen to go through a couple of the attributes of them.

22          First is the *People* magazine.  Can you describe for

23   the Court what we are seeing here.

24   **A.**   Yes.  This is a vertical version of the summary notice for

25   publication.  As you will see, we have a very noticeable bold

11:04

1　font in the headline that's attention-getting that immediately

2　will allow people to know what this is about.

3　　　　　The information is provided again, like the long form

4　notice, in a question and answer format that we found, when we

5　did research at the Federal Judicial Center, is a really easy

6　way to present information.

7　　　　　All of the rights and options are explained here.

8　All of the Rule 23 requirements are included in this notice.

9　Again, we provide the toll free number and the website address

10　so that people can get additional information.

11　Q.　The significance of *People* magazine and homeowners, what's

12　the connection between *People* magazine and homeowners?

13　A.　As I mentioned, *People* magazine is the top performing

14　weekly publication with homeowners, so it is the best weekly

15　publication to reach them.

16　Q.　Dr. Wheatman, I have put a second slide up on the screen,

17　Exhibit 2 to your declaration.  Would you explain to the Court

18　what's important about this particular notice.

19　A.　So this is an example of a Spanish language translated

20　notice that was in a Hispanic newspaper in Florida.  We had

21　this translated by a professional company that does

22　translations in legal notice cases.

23　　　　　Again, it follows the format of the English notice.

24　These summary notices do follow the model of the plain language

25　notices as well.

11:06

1    **Q.**    I think we have an English version next.  Is this the

2    newspaper, the English version of what you just described?

3    **A.**    Yes, for the newspapers, correct.

4    **Q.**    You mentioned online, and I'm putting Exhibit 3 to your

5    declaration up, a banner ad.  Would you start by explaining

6    what a banner ad is.

7    **A.**    A banner ad appears on websites where we are doing

8    advertising online.  The banner ad, you want it to be simple.

9    You want it to be eye-catching, so you do want an image with

10   it.  When people click on this banner ad, they will be taken to

11   the case website.

12   **Q.**    How many times did a banner ad like this show up on the

13   internet while people were doing searches?

14   **A.**    So between banner advertisements and text ads that we did

15   on Facebook, the banner ads and text ads were delivered over

16   25 million times online.

17   **Q.**    In addition to the banner ads, did you provide

18   advertisements in online publications?

19   **A.**    Yes.  We were in *Florida Weekly* and *Louisiana Life*, so two

20   online publications that reached homeowners in Florida and

21   Louisiana.

22   **Q.**    Did you utilize social media outreach as well?

23   **A.**    Yes.  We had advertising on Facebook.  We did that

24   geographically targeted to the top six states that have the

25   90 percent of affected properties, and we also delivered ads

1    nationally on Facebook as well.

2    **Q.**    Dr. Wheatman, I want to switch from published notice to a

3    few other methods of notice that were undertaken here.  Were

4    press releases used?

5    **A.**    Yes.

6    **Q.**    Can you explain to the Court how press releases were used

7    to provide notice.

8    **A.**    So we wanted to issue a press release so that we could try

9    and garner some national news coverage.

10   **Q.**    Can you give examples to the Court of where that was

11   picked up, where the news press releases were picked up by news

12   outlets.

13   **A.**    I did have a report in my declaration that laid out every

14   media outlet that picked it up.  I can't think of any off the

15   top of my head.  It was picked up by 134 media outlets with a

16   potential audience of 58 million.

17   **Q.**    In addition to press releases, would you explain to the

18   Court your understanding of how websites were utilized to reach

19   absent class members.

20   **A.**    So the neutral case website was published in all of the

21   notices.  At the website, class members could receive

22   additional information.  They could review the settlement

23   agreement, look at frequently asked questions.  They could get

24   a long form notice.  They could look at the allocation model.

25   On the website itself, they could actually submit a question.

11:09

1    There was a form that they could fill out if they had a

2    question and submit that as well.

3    **Q.**   Did you review analytics as to how frequently that website

4    had been visited and reviewed?

5    **A.**   Yes.  I reviewed the Google Analytics, which tracks the

6    users who visit the website, and there were over 86,000

7    visits -- well, actually new users came to the website during

8    the notice period, and they viewed over 121,000 pages on that

9    website.

10    **Q.**   What does that usage indicate to you, as an expert in

11    class notice?

12    **A.**   To me it indicates that we have a highly engaged class as

13    well as people who may be going to the website just to

14    determine whether or not they are included, but they were

15    interested.  They weren't just going to the home page.  They

16    were looking at other pages to learn more about the settlement.

17    It also showed that the media program was effective because it

18    drove most of that traffic to the website.

19    **Q.**   You have mentioned a couple of times that the 800 number

20    was included on the FAQ and the notices, etc.  Were you able to

21    review reports with respect to the call volume and responses

22    received at the call center that was set up?

23    **A.**   Yes.  I reviewed that, and there were over 270 calls

24    received that were from 24 states.

25    **Q.**   Dr. Wheatman, based upon your review of all of these

11:11

1    materials and the metrics that we have just discussed and your

2    knowledge and training and experience, do you have an opinion

3    as to whether the goals that you set forth to achieve for

4    notice of this class were achieved and whether due process and

5    the best practical method of giving notice under the

6    circumstances was achieved in this case?

7    **A.**    Yes, I have written and spoken extensive on how to satisfy

8    due process in class action notice.  What it really takes is a

9    desire to actually inform, and in this case the counsel for the

10   parties had a desire to actually inform the class.

11             That was shown in the fact that we had notices that

12   were written in plain language that was very easy for people to

13   understand all of the rights and options in the case.  All of

14   the required information for Rule 23 were included in the

15   notice.  Information that's suggested in the *Manual for Complex*

16   *Litigation* was there as well.

17             The method of dissemination was very appropriate here

18   as far as sending the mailed notice to the known class members

19   and having a very robust media program to reach the absent

20   class members.  So in my opinion the notice program here fully

21   satisfies due process and provided the best notice practicable

22   under the circumstances of this case.

23             **MR. SERPE:**   Thank you.

24             Your Honor, does the Court have any questions

25   for Dr. Wheatman?

11:12

1       **THE COURT:**  No.  Thank you very much.  I appreciate
2  it.  Good seeing you again.
3       **MR. SERPE:**  May Dr. Wheatman be excused, Your Honor?
4       **THE COURT:**  Yes, you may be excused.  Thank you very
5  much.
6       **THE WITNESS:**  Thank you.
7       **THE COURT:**  Let me just summarize, at least what I
8  have been hearing, to explain particularly to the individuals
9  who are here in connection with their objections.
10            This case, as I mentioned at the outset, came to
11  me in 2009.  It looked like at the time that we would have
12  several thousand claimants.  It turned out that we had about
13  10,000 claimants.  In most of these large cases that I have
14  been involved in, there are one or two defendants and multiple
15  claimants.  In this case there were 10,000 claimants and 1,650
16  defendants.
17            Now, the defendants included both the
18  manufacturers of the drywall as well as the so-called
19  downstream individuals who bought it, who stored it, who
20  installed it, builders and so forth.  The manufacturers fell
21  into two groups: (1) the Knauf entities; and (2) the Taishan
22  entities.
23            As I mentioned at the outset, the Knauf entities
24  stipulated to jurisdiction and they accepted service of
25  process.  Jurisdiction was not an issue.  Service was not an

1    issue.  Solvency was not an issue.  This is an international

2    company well known in the building trades throughout the world.

3    Collectability was not a problem because they had institutions

4    or offices and so forth in the United States, products in the

5    United States.  Identification was not an issue because it was

6    clear that it was one type of drywall, and that was noticed and

7    that didn't pose any particular problems.  So I tried to focus

8    the attention of the parties on that particular defendant first

9    because it seemed that that would be the way to move the

10   litigation.

11           The discovery commenced immediately, and shortly

12   thereafter trials were set.  From the trials we were able to

13   design a methodology for determining remediation.  That was the

14   focus of that particular defendant, how much would it cost to

15   remediate a particular home.

16           I was able to, from evidence heard at the

17   trials, come up with a protocol, so to speak, that set a square

18   footage.  The parties then selected a number of cases to put

19   that protocol into action to see how it worked in practice.

20   You can come up with a theoretical protocol, but it needs to be

21   put into the real world to see whether that theory actually

22   works.

23           With the 50 or so cases, the protocol was put

24   into play.  We needed to tweak it a bit, but after that I was

25   satisfied that it was a workable protocol and a fair protocol

11:17   1   for determining remediation costs.

2           At that point the parties were able to then see
3   whether they could monetize the amount of the protocol, develop
4   square footage amounts, and see whether or not the matter could
5   be globally resolved.  They were able to do that, and the
6   thrust of the Knauf settlement focused on remediation and how
7   much it would cost to remediate a particular home.  That was
8   the thrust of that program and it resolved.

9           Then the case focused on Taishan.  The Taishan
10  entities, it was a bit different in that there were service
11  issues.  To serve Taishan through the Hague Convention, it
12  costs generally six figures to do so.  It was problematic.  It
13  was eventually done, but with great cost and great difficulty.

14          Then jurisdiction presented a significant
15  problem.  Discovery had to be devised for dealing with the
16  jurisdictional issues.  The first attempt to deal with it was
17  not successful because there were some translator issues and
18  some other matters.

19          I instructed the parties to set the discovery
20  again.  It had to be done in China.  This time I went over to
21  China to participate or to at least monitor the discovery
22  program.  Unusual.  I did it once.  I probably will not do that
23  again.  It was necessary, in my opinion, in that particular
24  case, so I did it.

25          Then the jurisdiction was at least something

11:19

1    that I could write an opinion on and I wrote an opinion.
2    Unfortunately, it took me a long time, but it consumed about a
3    hundred pages.  If I had a longer time, I would have gotten a
4    shorter opinion, but that was a longer one.
5                In any event, the appeal was taken.  The
6    Fifth Circuit had it for a while.  There were two groups of the
7    Fifth Circuit.  They sit in threes, as some of you may know.
8    It took two groups.  They both affirmed the Court's opinion,
9    and jurisdiction at least for Taishan was resolved.
10               The question of Taishan's parent companies posed
11   different problems and created different issues.  After a long
12   time of briefs and argument, I was able to write an opinion on
13   that, but that's been appealed, and the Fifth Circuit has not
14   ruled on that.  So jurisdiction, at least in Taishan entities
15   or parents or associates, is still pending.
16               Service is present.  Jurisdiction is present.
17   Solvency of Taishan can potentially create an issue.  They
18   don't have any facilities in the United States and there is at
19   least an issue, at certain amounts, that this might present a
20   significant problem.  Collectability is also an issue in that
21   particular matter because there's no assets in the
22   United States.  So any judgments, if there be any, against
23   Taishan and/or any of its affiliates have to be collected in
24   China.
25               The product ID presents an issue because there's

11:21

certain marks on the various drywall that's involved.  Some of
the marks Taishan admits to.  Some of the marks they are not
sure about.  Some of the marks they definitely say are not
theirs.  In any event, that's an issue that's prevalent in this
particular case.  It's no question that it's going to involve a
considerable amount of litigation in the future.

So the parties at some point felt that they had
enough information from the discovery aspect of the case, as
well as monitoring the Knauf aspect of the case, to analyze the
matter as a whole to see whether or not they could come up with
some method for resolving or at least presenting a plan of
resolution for the remaining cases.

This resolution program, however, was not
focused on remediation; it was focused on total amounts.  The
parties were not able to deal with remediation as they were
able to deal with it with Knauf, so they came to the conclusion
that a certain amount was potentially available.  They drilled
down on that, both sides, negotiated it, and the total amount
that they agreed upon was $248 million.  You have heard
expressions that this is the first time that a Chinese company
has agreed to settle a dispute of this sort.

In any event, the point that I need to make to
the objectors is that this is not a remediation program.  That
was what Knauf was.  This is a total amount program.  So the
Court, then, is confronted with a total amount of funds.  The

11:24

question is how to distribute that total amount of funds.  I
felt that what I needed to do was to get experts involved in
this particular process, experts who had no dog in the fight,
so to speak; they weren't associated with either side.

I recognized that the problems were the
allocation of the amount, the notice of the allocation, and the
distribution of the amount.  The Court was able to get together
what I consider experts in these three areas.  You heard an
expert talk about a program for allocating the amount.

Again, I reinforce that it's not related to
remediation.  My focus on allocation is give me some fair
method of allocating a fixed sum among individuals who have
claims to that particular sum.  They are different.  They are
different square footage.  They are in different cases.

There are different issues in the various cases.
There are issues of, as I say, service, jurisdiction, solvency,
collectability, and also some of the cases have issues of
identification.  Some of the cases have issues of whether or
not their time of filing has passed, because in the legal world
you have a certain time to file claims.  The question is
whether or not some of those cases, unfortunately, have been
filed too late.  The identification poses a significant issue
in some of the cases.

In any event, all of those matters have to be
taken into consideration by the individual expert who has

11:26

1    designed a program for allocating the funds.  I'm sure there

2    are other ways of allocating it, but I have to have an expert

3    to tell me a best way of doing it.  That's the best that they

4    could do.  That's the best that I can do.

5                    I'm dealing with a pie, so to speak, and I'm

6    trying to decide the slices of the pie.  It depends upon

7    various issues.  It can't be the same slice for everybody

8    because they are different square footage.  They fall into

9    different buckets, so to speak, so they have to come up with

10   some reasoned plan.

11                   Then I felt that I needed to make a special

12   effort to tell the claimants what this allocation was so that

13   they could make a decision as to whether or not they wanted to

14   stay in the program or whether they want to get out of the

15   program and file suit and proceed on their own.  They had a

16   right to do so.  Then if they did want to stay in the program,

17   I told them they had a right to object to it, to object to the

18   various aspects of it, and to bring that objection to me so

19   that I could analyze it and take that into consideration.

20                   I then have to figure out how to pay it, how to

21   distribute it.  A method of distributing this to several

22   thousand individuals is a daunting task, so I need an expert in

23   distribution.  I tried to get the person who I felt was able to

24   do that.

25                   Notwithstanding that, I do recognize that

11:28

1    individuals, we are dealing with their homes.  Next to your

2    spouse and your children, probably the home is the thing you

3    value most.  It's not only a place to live, but a place that

4    reflects you as an individual.  So everybody has a different

5    feeling for their home.  I recognize that.

6                 I invited objectors, anybody who objects, to put

7    it in writing for me and also an invitation to come to the

8    Court and tell me what they feel about the matter.  I'm

9    interested in hearing from them.  I talked to several of them

10   this morning to just go over the program and to let them know

11   that I am interested and I appreciate them being here.

12                 I'm interested in hearing from them.  That's

13   what we will do this afternoon, and we will start at 1:00.

14   Court will stand at recess until 1:00.  Thank you very much.

15           **THE DEPUTY CLERK:**  All rise.

16           (Lunch recess.)

17                              * * *

18

19

20

21

22

23

24

25

1     **AFTERNOON SESSION**

2     **(December 11, 2019)**

3          THE COURT:  Be seated, please.

4               We are at the point now that the matter has been

5     explained, and we are now hearing from the objectors.

6               One of the objectors, would you come forward.

7     I'll hear from you.  I think we have two or three.  Come on up.

8          MR. MOODY:  Good afternoon.

9          THE COURT:  Good afternoon, sir.

10         MR. MOODY:  Thank you for allowing me to address the

11    Court.

12         THE COURT:  Tell us your name.

13         MR. MOODY:  I'm Russell Moody.

14         THE COURT:  Okay, Mr. Moody.

15         MR. MOODY:  My wife, Beverly, and I live in

16    Cape Coral, Florida.

17         THE COURT:  Okay.

18         MR. MOODY:  I point out that Cape Coral, Florida, is

19    in southwest Florida, which was ground zero for this tragedy of

20    the toxic Chinese drywall.

21         THE COURT:  Hold on a minute.

22               Would you-all be more comfortable sitting in the

23    jury box?  Why don't you do that.  You can sit in the jury box

24    and then come up.

25               I'm sorry.  Go ahead.

01:03

1          **MR. MOODY:**  We heard a lot of perspective from this

2     side of that chair wall.  I sit on the other side in the real

3     world, where the victims live, and we have quite a bit

4     different perspective on how this unfolded and how it is

5     apparently going to end.

6               We retained our attorney a little less than a

7     decade ago.  From the first time we retained an attorney until

8     just shortly, we had been repeatedly told that we had Taishan-

9     manufactured drywall, and so it was a bit of a shock to see how

10    the case unfolded in the last 12, 18 months.

11         **THE COURT:**  Was your case transferred to Florida,

12    remanded to Florida?

13         **MR. MOODY:**  Yes, yes.  I didn't mention.  We are in

14    the *Amorin* class.

15         **THE COURT:**  Judge Cooke is handling that one?

16         **MR. MOODY:**  I was one of 1,734 plaintiffs, I believe,

17    that were transferred to that court.

18         **THE COURT:**  Okay.

19         **MR. MOODY:**  You had mentioned in your statements just

20    before we adjourned that it's not about the losses anymore;

21    it's just essentially about what we can get.  I understand

22    that, but it's not something that sits well with me.

23               The particular law firm that we retained prides

24    itself in never settling for less than a penny of what you have

25    lost.  They don't take cases to settle; they take cases to go

01:05   1    to trial.  You can understand our disappointment.

2                    I also want to, I think, dispel a myth.

3            THE COURT:  I don't mean to interrupt you, but didn't

4    you have a right to go to trial?  You understood that?  You

5    could opt out and proceed to trial.

6            MR. MOODY:  I don't believe that the way this

7    unfolded we ended up having that right.

8            THE COURT:  You do have the right always.

9            MR. MOODY:  There are rights that are attainable and

10   rights that aren't, so there's a difference there.  Maybe in

11   some of my comments that I make I might better clarify what I

12   mean, and then you can comment on it.

13                   This idea that you can opt out, that that's

14   actually a reasonable choice for anybody is, I believe, rather

15   absurd.  When the settlement was announced and we finally got

16   emails from our attorney, his recommendation was he strongly

17   recommended that we opt in.  And if we opt out, basically you

18   are on your own; you get nothing.  And if you want to go to

19   court, it's going to cost you hundreds of thousands of dollars.

20   That's not an option.

21                   I would like to comment a little bit -- I think

22   it was Attorney Duggan that addressed the Court initially.  I

23   don't believe she announced her name, but she made several

24   comments that I think are misleading.

25                   She said that 97 percent of the plaintiffs

01:06

1    overwhelmingly support this settlement and that only 2 percent
2    opted out.  I take great issue with that.  I do communicate
3    with a lot of the victims on a Facebook group.  There's a
4    couple of them.  I particularly go to Victims of Chinese
5    Drywall.  There's a couple hundred of people on that site.
6                I have friends and neighbors who have had this
7    drywall; some lucky enough to have Knauf drywall, others not so
8    lucky.  I don't know of anybody who supports this settlement.
9    They reluctantly accepted because they have been told that this
10   is their only choice if they want to see a dime out of Taishan.
11   So to say that people have an option to opt out, that they
12   support the settlement, I think is definitely misleading.
13               I was also concerned about a couple other
14   comments that Ms. Duggan made.  She mentioned that they tried
15   over a decade to attribute all the drywall to Taishan, which is
16   confusing to me because when we first retained our attorney, he
17   said that our drywall was manufactured by Taishan.  By the way,
18   we have ProWall drywall.  It turned up in the inspection that
19   the law firm contracted for.
20               Interestingly enough, a lot of the inspection
21   reports don't reveal all the types of drywall in the house, and
22   so a lot of the victims that may show up to have ProWall can
23   have other drywall in their house.  The only way to find that
24   is basically to be there when they built the house or to
25   basically remediate it.

01:08

1        A friend of mine luckily just recently had his
2   home remediated just before the deadline for updating the
3   spreadsheet.  He had been listed as having Taishan, you know,
4   in the 20 percent group.  When they remediated his home, they
5   found out they had multiple types of drywall in the home, which
6   is quite common, by the way, in homes constructed in southwest
7   Florida.
8            THE COURT:  Who is your attorney?
9            MR. MOODY:  My attorney was Mr. Albanis.
10        There's another aspect of this that bothers me,
11   and that is that -- and I'll get into some of my objections in
12   a minute, but this idea of the cost/benefit of continuing to
13   pursue the litigation versus accepting the settlement.  Clearly
14   there are costs and there are risks and there are time delays
15   associated with this, but the cost/benefit is clearly not the
16   same for those in the 100 percent category and those that are
17   discounted 20 percent, even some more than that.  So the
18   cost/benefit of proceeding isn't equal in this group, and I
19   think that's important to note.
20        Those are some of the comments I had based on
21   what I heard this morning.  I have some talking points here I
22   would like to discuss.  I'm sorry.  I'm not used to speaking in
23   front of a crowd like this.
24            THE COURT:  No, that's fine.  I understand.
25            MR. MOODY:  My only experience with the courts is

01:10    1    *Perry Mason* and more recently *All Rise*, so I'll do my best.

2              THE COURT:  You have written a document to me, which

3    I will make a part of the record.

4              MR. MOODY:  I was going to ask that because, based on

5    some of Ms. Duggan's comments, it wasn't clear to me that she

6    had read my objections.  She had indicated that there were no

7    objections in several different categories, and I believe mine

8    cover at least several of those.

9              THE COURT:  I will make that a part of the record.

10             MR. MOODY:  Thank you.  Thank you.  We all know that

11   justice delayed is justice denied.  For over a decade, toxic

12   Chinese drywall victims have been exposed to health risks,

13   particularly those who have opted to stay in their homes.  Some

14   elected to move.  Some were forced to move, and they had to go

15   into foreclosure and bankruptcies.  You know, it's been a

16   terrible situation.

17                   One of the sad things about this case is back in

18   2009 I could have had my home remediated for pretty much half

19   what it's going to cost me to remediate my home today.  The

20   cost of my remediation has almost doubled in a decade, which is

21   very unfortunate.

22                   I think it's also true that justice

23   short-circuited is also justice denied.  My ten objections --

24   and I won't talk to all of them.  I believe the defendants'

25   attorneys and you have a copy of that.  My ten objections

1    address those particular issues.

2                    I labeled them A through J, and my first

3    objection had to do with the Parker Waichman settlement.  Class

4    counsel presented a motion, I believe, to the Court -- and it's

5    in my document -- that's a compelling case of how inappropriate

6    that settlement was in terms of following Rule 23, which

7    unfortunately I haven't had a chance to read, and basically

8    denied the plaintiff in that settlement due process.  It's my

9    feeling that the Court shouldn't have sanctioned that, and any

10   of those 498 plaintiffs that were in that particular rogue

11   settlement should have had the option to stay within the same

12   Court-sanctioned litigation.

13                    My second objection has to do with a similar

14   situation, that all complaints that the class counsel included

15   in their motion objecting to the Parker Waichman settlement,

16   they basically were guilty of committing the same sins, you

17   might say, in their own proceedings, in this secretly

18   negotiated agreement.  My letter describes it a lot more

19   succinctly than I'm doing here.

20                    My next objection has to do with a motion made

21   to the Court -- it was Document 52 submitted in August of

22   2018 -- that basically said -- and I'm paraphrasing here --

23   that the plaintiffs seek to reduce the judicial labor and elect

24   to waive their rights to a jury trial and have a special master

25   decide on ownership, square footage, and product ID.

01:14

1          I understand that the plaintiffs' attorneys in a
2   class action suit have a lot of latitude in representing the
3   best interests of their clients, and they can't always
4   communicate and keep each client informed when you have 4,000
5   plaintiffs.  However, I don't think that they should have the
6   latitude to blatantly lie to the Cooke court.  I don't think
7   that any reasonable person would think that the plaintiffs were
8   particularly concerned about judicial labor.
9          The other thing I didn't like about that --
10          **THE COURT:**  Wait.  Let me just interrupt you.  Let's
11   not disparage any attorney because it's not right.  The person
12   is not here.  You don't know the situation.  Just tell me what
13   your objection is.  You talked about other cases.  It's really
14   your case that I'm concerned about.
15          **MR. MOODY:**  I understand.  With all due respect, my
16   objection, the things you don't want me to talk about are the
17   heart of my objection.  Many of the plaintiffs' attorneys are
18   here, by the way.  I believe class counsel is here.  The people
19   who signed that document, Document 52, I believe most, if not
20   all, are here.
21          At any rate, after the special master submitted
22   a report -- which was not a decision, it was just a
23   recommendation to the Cooke court, it was never approved -- the
24   plaintiffs' attorneys did file a motion objecting to that
25   report, including saying it was not following the law.  Neither

01:15

1    of those, I understand, were ruled on by Judge Cooke because it
2    was preempted by this settlement.
3                  As we heard this morning, the special master
4    report was one of the fundamental documents that the allocation
5    neutral used in deciding how to allocate funds.  It's based on
6    a document that the plaintiffs' attorneys themselves say didn't
7    follow the law and was never ruled on by Judge Cooke.  For that
8    reason I don't believe that the allocation neutral should have
9    considered that document.  It sort of bothers me that the
10   plaintiffs' attorneys included that in the documents that they
11   gave to the allocation neutral.
12             **THE COURT:**  Maybe you didn't understand it.  I wasn't
13   there, but what I understand Judge Cooke did, the issue is
14   identification, and so she appointed a special master to take
15   evidence and make a recommendation to her.
16             **MR. MOODY:**  That's correct.
17             **THE COURT:**  The special master took evidence and made
18   a recommendation.  She has that recommendation.  She hasn't
19   ruled on it yet.  She is waiting to rule on it.  Before she
20   ruled on it, she was told that the case has settled.
21             **MR. MOODY:**  Right, right.
22             **THE COURT:**  If the case doesn't settle, she is going
23   to rule on it.  If she accepts the special master's
24   recommendation -- whom she appointed -- many of those people
25   will not have a case.

01:17

1      **MR. MOODY:**  That may be true, but --

2      **THE COURT:**  That's why it was taken into

3  consideration by the neutral, because it's pending.

4      **MR. MOODY:**  Right.  Of course, if she ruled on that

5  recommendation from the special master, she would also have to

6  rule on the motion by class counsel.  When I use the term

7  "class counsel" or sometimes "Plaintiffs' Steering Committee"

8  or "lead counsel," I get confused as to who is in charge when,

9  but she would also have to rule on that motion.  The point

10  is --

11      **THE COURT:**  The point is if she rules in their favor,

12  meaning to accept the special master's recommendation, there

13  will be no case for all of those people.  They will have no

14  case, period.

15      **MR. MOODY:**  I understand, Your Honor.

16      **THE COURT:**  So that's why the special master took

17  that into consideration, because it is outstanding.

18      **MR. MOODY:**  I understand that.

19      **THE COURT:**  That's the reason.

20      **MR. MOODY:**  We could get into a lot of details about

21  that particular Document 52, but it gave the impression in that

22  document that the issue of product ID was simply does the

23  plaintiff have one of the covered drywalls.  They emphasize in

24  there that would be an administrative issue.  So there were

25  things in that motion, Document 52, that are troubling and

01:18   1    should be considered because it was a fundamental basis, we

2    understand from this morning, in terms of the allocation

3    neutral's decisions on product ID distribution.  That's all I'm

4    saying.

5              **THE COURT:**  Okay.

6              **MR. MOODY:**  Objections D, E, and F, basically the

7    allocation neutral violated the terms of the settlement

8    agreement.  He included inadmissible evidence, you know,

9    including the special master's report that shouldn't have been

10   included.  He considered the position of Taishan in his

11   allocation.  The settlement agreement specifically says that

12   neither the position of Taishan or the plaintiffs would be a

13   consideration in the settlement.  It also says in the

14   settlement agreement that Taishan would not be involved in the

15   allocation of funds.

16              So it was inappropriate for -- and, by the way,

17   it also says in there the definition of "product ID" is that it

18   relates to the covered drywall.  In other words, to meet the

19   product ID requirement, you have to have one of the covered

20   drywalls.  So the allocation neutral should never have -- and

21   in his report he specifically says that he is making the

22   20 percent allocation and the 75 percent allocation strictly

23   based on what Taishan says.  And that, based on the settlement

24   agreement itself, shouldn't have been a consideration in the

25   allocation.

01:20

1            The settlement agreement, when I see a lot of

2    things going on, the whole message seems to be this is a great

3    settlement; maybe not as great as everybody would like, but

4    it's a great settlement.  You read the media announcements --

5    by the way, which I saw very few of.  I would really question

6    whether they conducted the media outreach that they said.  This

7    settlement was going to compensate people for remediation for

8    their loss, that's what it says in the announcement.

9            It didn't say this is a settlement where we take

10   whatever Taishan decides to give us.  They didn't say that.

11   They said it's for compensating for remediation and other

12   losses.  Any reasonable person who would read that would expect

13   that they are going to get at least enough to remediate their

14   home.

15            By the way, because I am in the ProWall

16   20 percent group, I can hope, at best, to get about $9.55 per

17   square feet for my home.  To be able to remediate my home,

18   including the cost to move out and move back in, I need $65 a

19   square foot.  That's a substantial reduction in terms of

20   meeting my losses.

21            I get very animated and very frustrated when I

22   read things in the *CityBusiness* New Orleans and the Bloomberg

23   Law that the class counsel is extremely pleased with this

24   settlement.  They thank Taishan for reaching a fair settlement.

25   I'm sitting on the other side of the wall, along with these

01:22

1   other 3,900 people, saying, "What?  What?  Are these people in
2   a different reality?"
3            I'm sorry, I don't mean to get this animated,
4   but it's a frustration built over a decade of, I think, being
5   misrepresented, not being given the information I need at the
6   times that things were unfolding, and then to read these things
7   in the paper.
8            **THE COURT:**  Okay.
9            **MR. MOODY:**  I'm sorry.  I'm sorry.  I didn't mean to
10  get off the track.
11           I had three other objections I'm not going to
12  discuss.  One had to do with the media.  All I would say about
13  that is I'm on Google all the time.  I check the papers.  I'm
14  attuned to looking for things on victims of Chinese drywall.  I
15  found very, very little out there.  I haven't seen it on social
16  media.  *The News-Press*, which is the main newspaper we read, I
17  saw the announcement in there once, and so I'm not sure that
18  that -- but that's a pretty minor point.
19           I think -- and I think a lot of other plaintiffs
20  feel the same way -- the Court and the plaintiffs' attorneys
21  and the defendants' attorneys, clearly their best interest
22  is -- they are absolutely committed to this settlement.
23  There's no question that they are committed to this settlement,
24  and they want to ensure that nothing stands in the way of
25  getting it approved.

01:24

1          Here's what they know.  They know the plaintiffs
2    basically suffered the same basic losses, the 3,900 -- add, I
3    guess, the Parker Waichman, another 500.  They basically
4    suffered the same losses, basically, based on the cost for
5    remediation, which is clearly different --
6          **THE COURT:**  Mr. Moody, you can talk to me.  They have
7    nothing to do with anything.
8          **MR. MOODY:**  I'm sorry, Your Honor.  Like I said, I'm
9    not familiar with this.
10          **THE COURT:**  I ask that you hurry up because you have
11    other people waiting to speak.  You have written to me, so I
12    understand what your position is.  I want to respect you and
13    give you an opportunity to discuss matters, but --
14          **MR. MOODY:**  I appreciate that.
15          **THE COURT:**  -- let's move on.
16          **MR. MOODY:**  Let me make this point.  All of the
17    plaintiffs basically suffered the same, you know, adjusted for
18    square footage, of course.  The settlement falls way short of
19    covering the loss for all these plaintiffs even if the
20    attorneys basically got zero fee.
21          **THE COURT:**  Okay.
22          **MR. MOODY:**  Who is most likely to opt out?  Because
23    one of the things that the plaintiffs' attorneys and the
24    defendants' attorneys are concerned about is opt-outs.  They
25    want to make sure this deal goes through.  Well, the ones that

01:25

1   are going to most likely opt out are the ones that have the
2   best chance of winning a fair award if it goes to trial, and
3   who are those?  They are the ones that Taishan admits they
4   manufactured their drywall.  Who will the least opt out?  Those
5   with drywall Taishan denies manufacturing.  Now, keep in mind
6   that the plaintiffs' attorneys for a decade have told us that
7   Taishan manufactured that drywall.  Our attorney told us
8   unequivocally that that was the case, and that should be their
9   position today.

10                  So what can they do, anyway, to minimize the
11  opt-outs and to make those opt-outs less impactful to the
12  settlement?  Well, shift the funds from those who are the least
13  likely to opt out.  That's the people in the 20 percent because
14  Taishan denies they made the drywall.  Shift money from them to
15  those who have drywall that Taishan admits to.  That's why you
16  only have 2 percent opt-outs.  There's no basis for allocating
17  based on the product ID as the allocation neutral has decided.

18                  **THE COURT:**  Okay.  I got that point.

19                  **MR. MOODY:**  The problem for the plaintiffs' attorneys
20  and the defendants' attorneys is if they do it correctly, if
21  they just basically give the people the amount that's available
22  and equally compensate them for their losses, to the extent
23  that they can with $248 million, then there will be too many
24  opt-outs and the deal with fall through.  That's my story and
25  I'm sticking to it.

01:27

1        I have one other thing.  I am afraid the Court
2   is going to approve this settlement no matter what.
3        **THE COURT:**  Wait, wait, wait.  Just a moment, now.
4        **MR. MOODY:**  I believe there are lots of valid
5   objections.
6        **THE COURT:**  That's not accurate, Mr. Moody.  I'm
7   listening to you.  I want to hear you, but there's no
8   fait accompli here.
9        **MR. MOODY:**  Well, I'm only telling you what a lot of
10  the plaintiffs feel.  What can you do to make it a little
11  fairer?  Well, one thing you can do is -- it's clearly evident
12  that the plaintiffs' attorneys did not equally represent their
13  clients.  Some clients are getting basically -- I call it a
14  participation trophy award.  Taishan didn't admit to doing
15  their drywall; but, well, because they are a covered drywall,
16  they get 20 percent.  Clearly, the plaintiffs' attorneys failed
17  at least that -- and that's only 96.  That's, I believe, only
18  96 plaintiffs, by the way.  One of the things you could do to
19  sort of level the playing field here is at least waive their
20  attorney fees.
21        **THE COURT:**  Okay.
22        **MR. MOODY:**  I'm sorry I took so much time.
23        **THE COURT:**  That's okay.  Thank you very much.
24        Yes, ma'am.
25        **MS. ESCUDIÉ:**  Hi.  Thank you for having me today.  I

01:28   1   appreciate it.

2          THE COURT:  Would you give us your name first.

3          MS. ESCUDIÉ:  I'm Mary Escudié.

4          THE COURT:  Yes, ma'am.

5          MS. ESCUDIÉ:  I appreciate all the work that

6   everybody has done.  I know it's been a long haul.  I'm not

7   coming in here to argue and complain.  I'm just here to sort of

8   clarify my position.

9          THE COURT:  Sure.

10         MS. ESCUDIÉ:  I'm not objecting to the suit.  I'm

11   objecting to being excluded from the suit.

12              What happened to me is that I hired Parker

13   Waichman to help me many, many years ago.  I've been a part of

14   this.  I have proof that I was part of the 2014 settlement

15   which was, I believe, part of the requirement to be in the

16   suit.  Currently, when I look at ChineseDrywallSettlement.com,

17   I am able to be included according to their criteria.

18              I am on the exclusion list and that's my

19   concern.  I did not know I was on the exclusion list.  I was

20   not told I was on the exclusion list.

21         THE COURT:  Did you have a lawyer at that time?

22         MS. ESCUDIÉ:  I do.  I still have the same lawyer.  I

23   never signed anything to opt out.  Apparently the side deal

24   that Parker Waichman was involved in somehow got me kicked out

25   of the settlement.  I know nothing about how it happened.  I

01:29

1   have asked several people.  I have gotten several different

2   answers.  Mostly I don't know.

3            Obviously, that didn't sit well with me.  I've

4   been excluded, and I really don't have any clear answers as to

5   why.

6            **THE COURT:**  Yes, ma'am.  Where is your property?

7            **MS. ESCUDIÉ:**  It's in Wesley Chapel, Florida, which

8   is close to Tampa.

9            **THE COURT:**  Okay.

10           **MS. ESCUDIÉ:**  So basically I have lots of points that

11  I can go over as to why, but if you read everything -- and you

12  are a judge; you know -- that it says in a class action lawsuit

13  if you do nothing, you will remain in the class, and that is

14  exactly what I did.  I did nothing except follow every single

15  directive that I had had.  Anything that my attorney asked me

16  to do, I did, in terms of fill out every form on time,

17  submitting everything for many, many, many years, and then all

18  of a sudden out of the blue I find out I've been excluded, and

19  I don't think that's fair.

20           **THE COURT:**  I will look into it for sure.  Give me

21  your name again.

22           **MS. ESCUDIÉ:**  Mary Escudié, E-S-C-U-D-I-E.

23           Like I said, I believe it's because they did a

24  side deal, but I did not agree to it.  I did not sign on it.  I

25  believe that I am now able -- if that was the criteria, I now

01:31

1  am -- I should be in my opinion, but I'm not a lawyer -- able

2  to be reinstated, and that's what I'm asking for.  I'm asking

3  to be reinstated --

4          **THE COURT:**  Your attorney is Parker Waichman?

5          **MS. ESCUDIÉ:**  Correct.  I'm asking to be reinstated

6  as a known class member because I don't want to be reinstated

7  at the 5 percent when I have been here for a million years

8  doing what I'm supposed to do.  That's my basic -- I'll keep it

9  short here.

10          **THE COURT:**  Thank you very much.  I appreciate you

11  being here.  We'll see what we can do.

12          Jimmy.

13          **MR. FAIRCLOTH:**  Hello, Your Honor.  Jimmy Faircloth.

14          As the Court knows, I was retained by Parker

15  Waichman to handle some of the litigation in New Orleans and

16  then after the remand to negotiate what has become known as the

17  Taishan individual settlement.  That would be the 498 claims,

18  one of which included Ms. Escudié.  That particular settlement

19  was negotiated as an individual offer.  It was a formula.  All

20  the claimants had an opportunity to make a decision as to

21  whether they chose to participate in that.

22          In fairness to Mary, she is exactly right.  She

23  did kind of fall in a gap here, and I wanted to point that out

24  to the Court and validate what she is claiming in terms of she

25  made no direct action to overtly or directly get out of this

01:32

1    settlement.

2              What happened is there was an individual

3    settlement that was negotiated.  There was a stay issued by the

4    court in Florida at the request of class counsel for the

5    protection of the class.  During the existence of that stay is

6    when the mediation happened and the global settlement framework

7    was created.

8              I assume the assumption was that there was no

9    reason for folks to be in both groups, but it's not directly

10   apples and apples.  As the Court well knows, there's so many

11   factors it's very difficult to do that.  In any event, at that

12   time what happened is the definition of the global class

13   excluded the entire 498.

14             In fairness to Mary, she was originally notified

15   by Parker Waichman while the stay was in place -- the

16   notification was approved by the court in Florida, and she was

17   specifically told by Parker Waichman accurately, "This is an

18   offer.  You can elect to enter this offer and have a settlement

19   agreement or you can choose not to.  If you choose not to, by

20   default you would remain in the litigation as a member of the

21   *Amorin* class."  She was indeed told that.

22             Later, after the global settlement offer was

23   presented, she was told, "Now you're definitionally excluded

24   from the global settlement class."

25             When it was originally put together, she was

01:33

1    told, and then afterwards -- and I think that ultimately what

2    became difficult for her is it was -- we were able to quantify

3    what the recovery would be for the 498.  She was not really

4    able to quantify particularly what the quantification would be

5    if she stayed in the class.  I think her inability to do that

6    is what caused this particular gap.

7              The only point I really wanted to make in terms

8    of clarifying the record is there's a statement by class

9    counsel at page 77 of their proposed findings of fact which

10   states:  "This individual settlement offer was negotiated on

11   behalf of Ms. Escudié by her counsel, Parker Waichman, and

12   Jimmy Faircloth, who insisted that settlement class counsel did

13   not have authority to speak for her as their client during the

14   negotiations on the class settlement."  Your Honor, that is not

15   accurate and should not be accepted by the Court.

16             I will read now from a letter that I sent to

17   Mr. Montoya on August 29, 2019.  This was just before the

18   mediation.  This letter was sent.  The Court in -- and we filed

19   a motion to lift the stay.  The Court set the motion for

20   determination after the mediation, so it kind of left us in an

21   awkward position of who has authority to do what.

22             My letter to Mr. Montoya states:  "Dear

23   Mr. Montoya.  The order setting the hearing after the scheduled

24   mediation leaves unresolved questions concerning your

25   relationship with Parker Waichman's clients, especially those

01:35

1   who want to proceed with the Taishan settlement agreement.  The

2   circumstances dictate that I attend the mediation.  My hope is

3   to coordinate our positions as much as possible.  First, we

4   respectfully request that you refrain from making any

5   statements at the mediation regarding the rights of Parker

6   Waichman's clients without first obtaining our approval," and

7   then I went through and listed concerns that we had about the

8   case which may bear on the mediation.

9             I then attended the mediation.  I sat in a room

10  and did not participate at all, not in one conversation with

11  regard to construction of a global settlement.  Parker Waichman

12  was not involved in that process.  So it is inaccurate to

13  report to the Court that we told class counsel that they had no

14  authority to act or speak for her.  We simply said we didn't

15  want to jeopardize their offer that we had created.  I would

16  like the record to reflect that clarification.  I will be glad

17  to answer any other questions you have.

18            **THE COURT:**  No, I have it.  I understand it.  Let me

19  look into it.

20            **MR. FAIRCLOTH:**  Thank you, Judge.

21            **THE COURT:**  Anything, Patrick?  Do you have any

22  response?  Your name was mentioned.  I just want to give you

23  the opportunity --

24            **MR. MONTOYA:**  I think it's best to wait.

25            **THE COURT:**  Yes, ma'am.

01:36

1     MS. MARTINEZ:  Good afternoon.  My name is Dailyn

2  Martinez.  I'm Cuban.  I left my country in a raft.  I was

3  three days on the sea, and 10 months I spent in Guantanamo Bay.

4  I have worked very hard in this country for 25 years.  11 years

5  and three months ago, on September 16, 2008, I bought my house

6  located at 1624 Northwest 37th Avenue thinking that I had

7  reached the American dream without knowing that my nightmare

8  was going to start right there, my nightmare and my family's

9  nightmare.

10     When we learned that our house had Chinese

11  sheetrock, we learned many things.  We had to do many things.

12  We had to move.  We moved twice from the house.  We bought an

13  RV and we placed it in our yard.  We have slept in the lanai.

14  We have slept in the porch or the backyard.

15     For several years we have not been able to have

16  air conditioning.  All equipment has been broken inside the

17  house.  Twice the house has been on the verge of catching fire.

18  When that happened, my son was 11 years old.  He started to

19  suffer nosebleeds and irritation in his eyes, headaches.  I

20  started to have respiratory problems.  Currently I suffer from

21  fibromyalgia.  This is a disease caused from so much stress.

22  My husband started to experience respiratory problems, and he

23  has to sleep connected to a machine.

24     We have been in a nightmare for more than

25  10 years.  My family or myself have not been able to have a

01:39

1    normal life.  Last year, on December 14, 2018, I was cited to

2    do a deposition for six hours with my lawyers and lawyers of

3    the Chinese sheetrock.  They made questions to me in reference

4    to 10 years ago, which for me was a psychological torture.

5              We came to the conclusion that because of the

6    personal damages, they would have to give me an amount.  I have

7    my receipts for the alternative living expenses.  In my

8    documents I have another amount for the loss of use and of

9    enjoyment pursuant to the formula that he himself came up with,

10   that the same judge came up with.  Then I received a letter

11   that what they want to give me will not even be enough to

12   reconstruct my house, to rebuild my house.

13             I have an estimate to fix my house.  For

14   10 years my family and I have suffered.  I know that this has

15   not been easy for the judge.  I thank him for those years of

16   struggle and for being here, but I ask him, please, do justice

17   and to have them give us what belongs to us and not what they

18   want to give us.

19             Let me tell you that there's no money in the

20   world that would compensate what my family and I have suffered,

21   but if they give me what's been accorded or agreed, we are

22   happy.  Here I have all my proof, and I hope that you help me

23   the way that you have always done.

24             **THE COURT:**  Thank you for being here.

25             **MS. MARTINEZ:**  I have with me my husband and my son,

01:43    1    if you can hear them out.

2                     THE COURT:  Certainly.

3                     MR. LUIS DIAZ:  Good afternoon, Judge.  I am Luis

4    Diaz.  I am Dailyn's husband and father of Jeasiel.  I thank

5    you for giving me the opportunity to come here and express

6    myself in regards to my problem and my family's problem.

7                     We currently have Chinese sheetrock in our

8    house.  One knows the consequences of having Chinese sheetrock

9    only when you live there.  The gentleman and the lady were

10   saying that they want to end the case and, believe me, I am one

11   of the ones that wants the most to finish with this case.

12                    They said that they gave a reasonable amount of

13   money.  I don't think so.  They are giving me half the amount

14   of what I need to fix my house.  That's without taking into

15   consideration what my wife has mentioned, the illnesses, the

16   appliances in the home, and everything else that has gone to

17   waste or that has broken.

18                    My son started this nightmare when he was a

19   little boy.  He is a man now.  We are decent and hardworking

20   people, Your Honor.  We obey and we do all our

21   responsibilities, and we do everything that we are told to do,

22   but I believe that the offer that they have made to us -- I

23   think that's a lack of respect.  Sometimes I ask myself:  I can

24   fix half of my house, and then what do I do with the other

25   half?  Thank you, Your Honor.

01:46

1          **THE COURT:**  Thank you.  Thank you for being here.

2               Would you like to speak?

3          **MR. JEASIEL DIAZ:**  No, I'm good.  Thank you.

4          **THE COURT:**  Thank you very much.  Thanks to all of

5     you-all.  I appreciate it.

6               Anyone else?  Do you want to say something,

7     ma'am?

8          **MS. TORREGANO:**  Yes, Your Honor.

9               Your Honor, my name is Kathy Lee Torregano.  I'm

10    with the Berrigan Litchfield law firm.  I'm here on behalf of

11    one of our clients, Calvin and Lindsey Pizani and their

12    children.  They have a home at 2661 Rue Jesann in Marrero.

13    They have not written anything but have called the office and

14    would like to object to the settlement.  I appreciate the Court

15    giving me the opportunity to address it.

16               They are a member of the *Amorin* class.  Their

17    main concern is that one of the factors that was not considered

18    is that the property was never remediated.  As the couple from

19    Florida who just spoke to you indicated, they continue to live

20    in the property.  They have never left it.  One of their

21    daughters has developed brain cancer.  They do not know whether

22    or not it's related.

23               Their original estimate for the repair of the

24    property submitted to the Court was $188,000.  The amount of

25    the gross award is in the $67,000 range and which would then be

01:48   1   adjusted for the attorney fees and other costs.

2           They are part of the group of the Sierra Homes.

3   They have received a small stipend in connection with the

4   earlier settlements, which was deducted from this settlement

5   amount.  Their home is only 1,400 square feet, the under-air

6   square footage, and they feel a higher compensation to

7   compensate them for their remediation would be in order.  Thank

8   you, Your Honor.

9           **THE COURT:**  Thank you very much.

10          **MR. DOYLE:**  Good afternoon, Your Honor.  Jimmy Doyle

11   on behalf of plaintiffs.

12          **THE COURT:**  Who do you represent, people who have --

13          **MR. DOYLE:**  The people I represent, 360 --

14          **THE COURT:**  Yes, but have they opted in, opted out,

15   or what is it?

16          **MR. DOYLE:**  We have about 250 or so that are still in

17   the two complaints, about 90 or so that have opted out.  I

18   filed an objection officially with the record.

19          **THE COURT:**  With regard to the opt-outs, you can opt

20   out or you can be in the settlement and object to it, but you

21   can't be both of them.

22          **MR. DOYLE:**  Exactly, Your Honor.

23          **THE COURT:**  So with regard to the opt-outs, you are

24   not here.

25          **MR. DOYLE:**  I'm not here on behalf of the opt-outs.

01:49

1    They have made their choice.  They understood the risks.  We

2    have discussed that.  I'm just here to address just a couple of

3    issues, Your Honor.

4                    I filed an objection.  It's in the record.  I

5    believe that liaison counsel made you aware of it within the

6    past week or so.  There are just a couple of things that I

7    wanted to raise with the Court that is beyond what's in my

8    filing.

9                    I think I laid it out in decent detail,

10   Your Honor, but this is a 23(e) settlement, not a 23(a), (b),

11   with regard to the *Amorin* class, defining that class as the

12   settlement class -- although each and every homeowner that has

13   Chinese drywall manufactured by the Taishan defendants would

14   fit into that class -- but the settlement agreement clearly

15   expresses this is a 23(e) settlement, which is different,

16   because going through that that process --

17                   And if you read the terms of the settlement

18   agreement, there are covered individuals that have certain

19   product ID that become in the defined class.  So when that

20   occurs, the Court has an obligation to kind of evaluate the

21   three prongs.  I believe we have touched on that pretty well

22   today.

23                   The settlement has to be fair, reasonable, and

24   adequate.  In my opinion, Your Honor -- you may not have read

25   it yet, but I'm sure you will -- I think the settlement fails

01:51

1    in all three prongs, but what I'm going to focus on today more

2    than anything is the fairness aspect of it, the one prong being

3    the fairness aspect of it, because I think it's impacted by the

4    allocation plan that was discussed in great detail.

5              I sat here and listened to Mr. Mayo express why

6    he believes the allocation plan should be approved.  What I

7    heard from Mr. Mayo today was that a significant amount of

8    objectivity -- excuse me, subjectivity was used in crafting the

9    allocation plan.  As the Court knows, once you have defined the

10   class -- and here it was the product ID that was used to define

11   who was in.  Once you define that group, they have to be

12   treated equally.  If they are similarly situated plaintiffs,

13   they have to be treated fairly, equally, not subjectively.  An

14   objective standard needs to be used and applied in the

15   allocation plan.  So that's what stood out to me when listening

16   to Mr. Mayo's presentation today -- and I think it's going to

17   be part of the record -- is that he used a significant amount

18   of subjective factors to determine how to split the pie up, so

19   to speak.

20             We all know there's $248 million to go around.

21   Whether the case was in a better litigation posture in one

22   filed lawsuit versus the other is immaterial when we get to

23   this point in the process.  Once you define that these are

24   going to be the six lawsuits that are included in the

25   settlement and we define that those individuals that are in

01:53

1  those lawsuits that have a certain product ID are now part of

2  the universe of settling plaintiffs, they now have to be

3  treated equally, fairly, and there can't be disparate treatment

4  among the settling group.

5          In your role as the gatekeeper, Your Honor, you

6  are going to have to do a comparative analysis of the treatment

7  of the class members, both among each other and compared to

8  those that are handling their claims either before or after the

9  case, meaning the opt-outs, or those cases that have been tried

10  and/or settled in the past.

11          The Court can look to what the damages should be

12  and you can analyze whether it's reasonable and adequate by

13  going through your analysis, but the fairness aspect of it I

14  think is significantly deficient in this settlement.  I'm going

15  to give you just a couple of examples of how the breakdown in

16  the allocation plan is treating people with similar claims that

17  are similarly situated in a way that is not fair, Your Honor.

18          For instance, you take an *Amorin* property that

19  is owned by an individual who sells the property since it was

20  filed -- sold it, didn't remediate, all they did was turn

21  around and sell the property, got out -- they are going to get

22  the full allocation amount versus maybe their neighbor, who had

23  a property built around the same time if it's a development,

24  they may have found out a little bit later, filed in *Brooke*,

25  and they are going to get one-fifth of what the other

1    individual would receive.

2              So that 80 percent reduction -- and the basis of

3    it was clearly expressed by Mr. Mayo.  He thinks that it's a

4    better case in litigation, but that's not what we are doing

5    here.  We are settling the claims.  So when the claims are made

6    part of the universe of settlement claims, it has to be

7    objective standards, it can't be subjective standards -- at

8    least that's what the case law seems to indicate that I looked

9    at, and I have expressed that in my filing.

10             The settlement agreement simply defines -- and

11   just to reiterate this and put a bow on it, the proposed

12   settlement agreement defines covered Chinese drywall to be kind

13   of the threshold to get into the settlement.  You have to, A,

14   be in the case and, B, have the product ID, one of the product

15   IDs that was listed there.

16             There is no distinction in the settlement

17   agreement itself that DUN is worth more than Venture Supply

18   which is worth more than unmarked White Tape board only.  They

19   all have to be treated the same.  They are in the settlement

20   because of the terms.  They are in the settlement.  Now it's

21   time to figure out a way to allocate it fairly.

22             The bucket distinctions, again, that's kind of a

23   merit-based approach as well, which leads to the subjectivity,

24   which ultimately leads to an unfair allocation, one claim over

25   another.  Again, the disparate treatment in the class should

01:56

1    lead the Court to really closely scrutinize the Mayo allocation

2    plan.

3              THE COURT:  Okay.

4              MR. DOYLE:  Your Honor, I have laid out how we

5    believe the settlement is not reasonable, it's not adequate,

6    and I don't think that it's any surprise to the Court that this

7    doesn't achieve a recovery for any plaintiffs, bar none -- not

8    a single plaintiff is going to recover enough to remediate

9    their house fully, not a one, whether you are in *Amorin* or

10   whether you are in *Brooke*.

11             THE COURT:  All right.  Is that it?

12             MR. DOYLE:  That's essentially it, Your Honor.  You

13   have three options at this point, as you are well aware.  You

14   can either approve the settlement as it's written, as it's

15   proposed, you can disapprove it, or you can approve it on a

16   limited basis with instructions.

17             THE COURT:  Okay.

18             MR. DOYLE:  The plaintiffs that are in this case,

19   that are being treated unfairly, would ask that the Court look

20   at a better model for allocating the money that's available.

21   If $248 million is the right price to settle these claims, I'm

22   not going to dispute that.  The attorneys that worked hard to

23   get there have their rationale for arriving at that number.

24   The problem that I'm presenting to the Court with the

25   allocation model is that there's too much subjectivity in it.

01:57

1         There really needs to be a better way to do
2    this, kind of like in other lawsuits, the mass torts, where you
3    have a matrix and it's completely based on objective factors.
4    Here it could be ownership versus past ownership.  It could be
5    whether or not they remediated, whether or not it's a short
6    sale, whether or not it was lost in foreclosure.  All of those
7    things can go into the matrix as objective standards.  We would
8    simply ask that the Court consider that when it's evaluating
9    the settlement.  Thank you, Your Honor.
10             THE COURT:  Thank you very much.
11             Any other objectors?
12             Hearing none, do we have any response?
13             MR. HERMAN:  Good afternoon, Your Honor.  Steve
14   Herman for the plaintiff class.  If it's okay with Your Honor,
15   I think I'll address the objections, and then Ms. Duggan is
16   going to address Ms. Escudié, who is trying to get into the
17   class.
18             THE COURT:  Sure.
19             MR. HERMAN:  It's kind of an odd position to be in,
20   Your Honor, and candidly a little uncomfortable because we are
21   appointed to represent their interests as best we can.  As
22   Mr. Moody points out, the position that we have been taking for
23   the past 10 years or 11 years is that all of these class
24   members should be made whole.  Of course, in a perfect world,
25   we think that they should be.

01:59

1    In this adversarial process, the defendants come

2    to court and they firmly believe that they have facts and they

3    have law and they have evidence on their side -- and this goes

4    really to Mr. Moody's point.  We thought that we had the facts

5    and the evidence and the law on our side with respect to

6    ProWall.  They had their own facts and evidence and law.

7    Unfortunately, at least from our point of view and from

8    Mr. Moody's point of view, the special master in Florida agreed

9    with the defendants, and that has a certain implication on the

10   settlement value of the case.

11   In addition, because of the expense and the

12   delay, even if everyone were made whole 10 years from now, when

13   this litigation would finally come to an end perhaps, people

14   really aren't whole because of the time and the expense in

15   getting there.

16   So while we understand that after 10 years --

17   and, frankly, we share in some of their disappointment, that

18   some people may be disappointed -- it's our duty as class

19   counsel to look at the whole class, at all 4,000 people that we

20   were appointed to represent, and to try to do what we think is

21   best for the class as a whole.  We think we have done that.

22   Talking about the objections, not just the good

23   people that have appeared today -- and we appreciate you coming

24   here -- but the other 18 or 19 or so that were filed in the

25   record, it occurs to me that a lot of these objections, they

02:00

1   don't really appear to be objecting to the settlement itself.

2   They are just objecting to their own particular allocation.

3   They don't seem to be saying, "We want the Court to throw out

4   this settlement."  In fact, some of them have even said

5   expressly in their objections, for the avoidance of doubt, "We

6   want to participate in the settlement even if our objections

7   are overruled."

8           You might have people who have said or what they

9   may really be saying is that they don't think that the total

10  pie is enough, that the $248 million is enough.  I think, as

11  Your Honor has pointed out, if you don't think it's enough and

12  you want to try to get more and you want to keep litigating,

13  you have the choice to opt out.

14          If what they are really saying, or maybe one or

15  two of them are really saying, is that the $248 million isn't

16  enough so we should just scrap the whole thing and force

17  everyone to keep litigating, that really doesn't seem fair

18  because we have 3,849 people who want to participate in this

19  settlement, who want to get their money now and don't want to

20  keep litigating for the next 10 years.  I don't think it would

21  be fair to them to say you can't take this settlement because

22  we have 20 or 21 people that have objected to it.  Again, it's

23  really not even 21 because several of them have said, "We still

24  want to participate in the settlement even if our objections

25  are overruled."

02:02

1           So then you take the other potential objection,

2    and I think this really goes to the heart of it.  People are

3    objecting to the allocation model, so to speak.  This really

4    comes back to the old adage which is a good settlement is where

5    everyone walks away a little unhappy.  The reality is that when

6    you are dealing with a set amount, if you give more to the

7    *Brooke* folks, you are going to be taking from the *Amorin* folks.

8    If you give more to people that had ProWall, you are going to

9    be taking from people that were in other buckets where ID was

10   admitted.  If you give more to current owners, you are going to

11   be taking from former owners.

12          Just to Mr. Doyle's point very briefly -- I

13   think he has the law a little bit wrong, but the bottom line is

14   I think most people would say it's unfair and unreasonable to

15   just simply divide the fund up equally and give people who are

16   really in very different situations within the class, even

17   though they share a commonality, the same amount of money.

18          One thing that has been focused upon is the

19   difference between the *Brooke* cases and the *Amorin* cases.  The

20   *Brooke* claims, they face statute of limitations and

21   prescription problems.  They face the need and the expense and

22   the risk and the delay of having to prove liability.  They face

23   the advancement of the litigation generally.  We just know that

24   the *Amorin* cases are more advanced.

25          And then, finally, the big advantage of the

02:03

1   class certification of *Amorin* is that they had Your Honor's

2   aggregate class damage remediation formula, which I suspect, if

3   that were attempted to be applied to the *Brooke* plaintiffs,

4   would be disputed pretty vigorously by the defendants.

5               There's probably dozens of different ways to do

6   an allocation model, there's probably a dozen ways to look at

7   these factors, and none of them would be wrong or unreasonable.

8   This allocation model we have, it was developed by somebody who

9   is fair and impartial, who was a neutral, who didn't have a dog

10  in the fight, as Your Honor said, who is intimately familiar

11  with the issues, and there was a lot of careful consideration.

12  He may not be able to make everyone happy, but it is ultimately

13  very fair, reasonable, and adequate from a Rule 23(e) point of

14  view.

15              I'm happy to answer any of the Court's questions

16  and --

17          **THE COURT:**  What about the objective standard versus

18  subjective standard that counsel seems to feel is part of the

19  settlement?

20          **MR. HERMAN:**  Well, any time that you are giving

21  different weight to people who are not similarly situated

22  within a class settlement or any aggregate settlement, somebody

23  has to give different weight to those factors.  The two

24  critical things in this case, which makes it sufficient under

25  the law, one is that they are applying objective factors.  You

02:05

1    are either in *Brooke*, or you are in *Amorin*, or you are new.
2    You have a certain square footage.  You are in a certain
3    product ID bucket.  Those are all objective factors.
4              From a weighting standpoint, which is what the
5    allocation model is, the important thing -- from a class
6    certification standpoint or a settlement standpoint -- is that
7    that is done by somebody who is neutral, which provides the
8    structural safeguards to the people that are in the *Brooke*
9    bucket and the people in the *Amorin* bucket, as opposed to class
10   counsel trying to do that by themselves, which would raise
11   adequacy concerns.
12             We took ourselves out of the process.  We put in
13   a neutral who doesn't have a dog in the fight.  He was provided
14   with all the information, and he is the one that ultimately
15   made the call.  That is what the Supreme Court at least
16   suggested in *Amchem* and has been approved by the Fifth Circuit
17   in *Deepwater Horizon* and has been approved by other circuits in
18   other cases.
19             **THE COURT:**  Thank you.
20             **MR. HERMAN:**  Thank you.
21             **MS. DUGGAN:**  Your Honor, I would like to respond to
22   some statements Mr. Faircloth made on the record.  I think it's
23   important to put the situation involving Ms. Escudié in
24   context.
25             When Your Honor first remanded the Florida

02:06

1   *Amorin* plaintiffs' claims, we appeared before Judge Cooke.  On

2   July 13, 2018, there was a hearing before Judge Cooke.

3   Mr. Faircloth appeared at that hearing, and he made it clear to

4   the court -- it's on the transcript -- that Mr. Montoya had no

5   authority to speak for Parker Waichman's clients.

6                    Then nine months later Mr. Faircloth filed

7   before Your Honor a motion to lift PTO 32 because he had

8   reached a separate settlement with Taishan on behalf of 498

9   plaintiffs.  They also filed the same settlement before

10  Judge Cooke in Florida.  When we were in the process of heading

11  towards mediation on the class settlement, we filed in Florida

12  a notice of mediation.

13                   There's a typographical error in our brief at

14  page 91.  It says 2018, but it was April 18, 2019, this year,

15  Parker Waichman filed an objection to class counsel's notice of

16  mediation.  We attached that objection as Exhibit 27 to our

17  brief before Your Honor.

18                   Parker Waichman said that they object to the

19  mediation -- and I'm quoting -- "and any resulting mediation

20  implicating the rights of Parker Waichman's clients under the

21  settlement offer made by the Taishan entities."

22                   After we signed the term sheet, we went before

23  Judge Cooke.  We were all there on June 5, 2019, because we had

24  asked for a stay to be put in place while we negotiated the

25  class settlement agreement.  I just want to add also that

02:08

1   Mr. Faircloth attended the mediation in Austin, Texas.  He did

2   not participate in our negotiations, but he did sign in on

3   behalf of the 498 plaintiffs.

4            Judge Cooke was particularly concerned on

5   June 5, 2019, what would happen to any of the 498 plaintiffs

6   who did not accept the offer from Taishan.  Mr. Faircloth said

7   on the record he speaks for all of the 498 plaintiffs and that

8   if it did not go through, they would proceed as an individual

9   action.

10            As a matter of fact, Judge Cooke has scheduled a

11   status conference for January 8, 2020, to figure out if there

12   are any plaintiffs -- whether there be opt-outs from this

13   settlement or any of the 498 who did not accept -- that are

14   going to go forward.  They will have a trial date set.  Their

15   case will go forth as planned.

16            **MR. FAIRCLOTH:**  Your Honor, may I respond?

17            **MS. DUGGAN:**  I think Ms. Eikhoff wants --

18            **MR. FAIRCLOTH:**  She raised new allegations.

19            **THE COURT:**  I'll let him respond.  If you have

20   something to say, you can respond too.  Let's get this

21   finished.

22            **MR. FAIRCLOTH:**  Your Honor, I'm not going to litigate

23   the history of what happened in Florida.  Suffice it to say, I

24   did raise concerns at the initial hearing concerning the

25   authority of class counsel because there was no formal

02:09

1    aggregation of the proceeding. Judge Cooke responded that she

2    was going to appoint Mr. Patrick Montoya in the interim as

3    class counsel. I said, "Accepted, Your Honor. I understand,"

4    and that's the status. There was a formal order appointing him

5    as interim class counsel. I acknowledged that and have never

6    challenged that. That's number one.

7         Number two, with regard to the objection to

8    mediation, as she just read, our objection was to action which

9    would injure the rights of Parker Waichman clients under the

10   separate settlement agreement we had negotiated, which was an

11   offer. We did not want them injuring the opportunity of

12   Parker Waichman clients or of any of the 498 to separately

13   settle their cases. At no time have we ever, ever told them

14   they didn't have authority, in connection with that mediation,

15   to enter the global agreement. In fact, a number of times,

16   starting at that mediation, I said, "Guys, I have grave

17   concerns about trying to exclude members of the *Amorin* class

18   during the existence of a stay order simply because they have a

19   separate opportunity to settle their cases."

20        So I just wanted to point out for the record

21   Ms. Escudié didn't do anything to get out of this class action,

22   and Parker Waichman didn't remove her from the class action.

23        **THE COURT:** Well, maybe this is something that

24   Judge Cooke ought to focus on.

25        **MR. FAIRCLOTH:** I don't know how she could,

02:10   1    Your Honor, but we will ask her.

2              THE COURT:  Do you have anything to say, any more

3    response?

4              MR. MOODY:  Your Honor, I would like to --

5              THE COURT:  Not on this.  Just a moment.  I will let

6    you speak.

7              MR. MOODY:  Thank you, Your Honor.  I wanted to

8    respond to some of the --

9              THE COURT:  Okay.

10             MS. EIKHOFF:  Your Honor, I just wanted to provide

11   the Court with a little more context on the remarks that have

12   been made today and the submissions of Ms. Escudié.

13             Every *Amorin* class member was given the

14   opportunity to settle their claim on the same basic economic

15   terms.  There was a first set of settlement offers that were

16   made to individuals, that were negotiated by Mr. Faircloth on

17   behalf of Parker Waichman and a few other claims.  There were

18   498 plaintiffs that that deal was negotiated on behalf of for

19   those plaintiffs to receive offers that they could then choose

20   to accept or reject.

21             THE COURT:  Was Ms. Escudié involved in that?

22             MS. EIKHOFF:  Yes.  So she was then given notice --

23             THE COURT:  498?

24             MS. EIKHOFF:  Yes.  She was then given notice of that

25   opportunity.  Judge Cooke reviewed in chambers the notice that

02:12

1   she was given and approved the adequacy of the notice of that

2   opportunity.  That offer remained open to all 498 coterminously

3   with the notice period in the class settlement.  The attorneys

4   for that first group of 498 specifically anticipated that there

5   could be subsequent settlements, indeed a subsequent global

6   settlement.

7              So in anticipation of that, to protect those

8   clients, to protect the first wave of settling parties, they

9   negotiated and we agreed to a most-favored nation clause that

10  would protect them economically.  So if the terms of the

11  subsequent settlement were better economically, they could then

12  be made whole by an additional payment that would put them in

13  the same position as if they had participated in the subsequent

14  class settlement.

15             So out of the 498, 497 accepted that offer.  The

16  remainder of the claims have been settled through the

17  negotiated class settlement that we are here for today.  The

18  only party who declined that first offer is Ms. Escudié.  So

19  she is trying to get into the subsequent class settlement but

20  turned down the opportunity to be in the first wave of

21  settlement, which would have put her in the same economic

22  position by virtue of the most-favored nation clause.

23             **THE COURT:**  She takes the position that the first

24  group, she was in that group initially, before she was culled

25  out of the group.  When she read the general notice that said

02:14

 1    if you don't opt out you're in, if you don't do anything you're

 2    in, she says she thought she was in the big group.  The other

 3    group, the Parker Waichman group, she had to opt into that

 4    group.  She didn't do anything.  She thought she was in the

 5    first group.  That's her position.

 6           MS. EIKHOFF:  Her name was listed, identified in the

 7    class definition as an excluded party, and I think she alluded

 8    to that.  The 498 names were an exhibit to the class settlement

 9    materials to show that those people were not eligible to

10    participate, but at the same time she remained eligible to

11    participate in the first wave settlement that would have put

12    her in the same economic position.  So to try to argue to get

13    into the class settlement that she was excluded from, to try to

14    get into that settlement, economically she had the same

15    opportunity to be in the same position with the offer that was

16    completely open to her.

17           THE COURT:  You wanted to say something.  I'll

18    respect that.

19           MS. DUGGAN:  I just wanted to make the record clear,

20    Your Honor, that during the class notice period, Ms. Escudié

21    did contact class counsel, and we did make it clear that she

22    was not included in the class.

23           THE COURT:  Come forward and tell us.

24           MS. ESCUDIÉ:  Your Honor, so much of what has been

25    said is news to me today, which just shows the lack of

02:16

1  communication.

2           I have in my hand a letter from Parker Waichman

3  dated March 7, 2018, saying, "If you fail to submit a claimant

4  signature page on or prior to the deadline set forth," blah,

5  blah, blah, "of this letter, you will not be eligible to

6  participate in this settlement and your claim will proceed as

7  part of the *Amorin* class as explained above in writing."

8           I was told that that was the case and, no, it is

9  not an equitable settlement.  I have looked at the allocation

10  model.  When I found out that there was a

11  ChineseDrywallSettlement.com, which I found out on my own, I

12  looked at the allocation model, and it's not the same.

13           Now, this whole other issue that maybe you will

14  be able to come back and get the difference later, maybe I

15  will, but all of this other stuff I have heard about how it's

16  going to be hard to collect -- and even today I believe you

17  said, Judge, that that's one of the reasons why we want to

18  settle this, because we don't know what's going to happen in

19  the future.

20           So all I was trying to do was to stay in the

21  settlement that I signed up to be in in the first place, and

22  all this stuff that happened that I knew nothing about -- I

23  knew nothing about a mediation over here.  I knew there was a

24  stay.  I didn't understand who asked for it.  I'm not going to

25  get into personal things.  My father was dying.  I was worried

about him.  I was following direction.  So for me to hear, "Oh, it's the same," it's not the same at all.  It's not the same at all.

Yes, I did know about it way after the fact, and I have all the emails to prove it.  I sent Ms. Duggan an email, and she did respond quickly -- and I respected that, and she was professional -- but she basically said, "Ask your attorney," when I asked her questions because she couldn't help me because I wasn't in the class.  I guess that is the correct answer maybe, but it also stated earlier I was in the class and I was kicked out, and I didn't ask to be kicked out.  I don't want to be kicked out.

As far as I know, that's not legal.  It's not part of the written stuff.  I'm not an attorney, but I have a brain that works most of the time.  When I read this stuff, everything that I have read suggested I was taken out and it wasn't fair, period.

**THE COURT:**  I got it.

You want to say something, Mr. Moody?  Let's make it brief, and we will get out of here on time.

**MR. MOODY:**  Thank you again.  I appreciate it.

**THE COURT:**  Sure.

**MR. MOODY:**  I think it was Attorney Herman that spoke.  I'm not sure.

**THE COURT:**  Yes, it was.

1              **MR. MOODY:**   He said, "We thought we had the evidence,

2    and the special master disagreed."  Well, I would think that

3    they still think they have the evidence.  That was one of the

4    biggest problems I had with deciding whether to opt in or out

5    because my attorney, one of the class counsel, would share with

6    me the evidence they had developed throughout this decade that

7    drywall was manufactured by Taishan.

8              The other thing that I wanted to point out is

9    Mr. Herman mentioned that they took actions that they felt were

10   in the best interest of the class as a whole.  Now, clearly, by

11   making that statement, they are acknowledging that some in the

12   class, their best interests were not represented.  He has

13   clearly stated that, I believe, implicitly when he said the

14   20 percenters, those, they were the scapegoats.  They were the

15   ones that allowed the settlement to go forward with very few

16   opt-outs, and I think they should be given some consideration

17   in terms of at least the legal fees.

18             The last thing I wanted to mention was the issue

19   of objectivity in the allocation neutral report.  The biggest

20   concern I had about that allocation report is that it had no

21   basis to use Taishan's position that they made some, may have

22   made some, and didn't make other drywall.

23             That's a fact, actually, that they take that

24   position.  The problem is the settlement agreement itself says

25   that it's not allowed to use that as a basis for the

02:20

1    allocation, that Taishan cannot be involved in the allocation.

2    It says so.  They agree that they are not going to contest each

3    other's positions.  So there's no basis, none, that would allow

4    the special master to use the facts that Taishan agrees in some

5    cases and didn't agree that they made that drywall.  That's the

6    point I wanted to make.  Thank you, Your Honor.

7           THE COURT:  Thank you very much.

8                Okay folks.  I'll take all of this into

9    consideration and I will be writing my opinion shortly.

10               We have another issue on the attorneys' fees.

11   Let's bring that up.

12          MS. EIKHOFF:  Your Honor, I believe one of the

13   objectors may be trying to get your attention.

14          MS. MARTINEZ:  Thank you.  All I want, Your Honor, is

15   to ask you to please review my case because, from what I have

16   heard today, they want to end the case.  They want to end the

17   case, and we are the most interested in finishing the case.

18   But, really, if you look at my documents, with what they are

19   giving me, I cannot fix my house.  I cannot redo my house.

20          THE COURT:  Yes, ma'am.  Okay.  Thank you very much

21   again.  I appreciate it.

22          MR. MEUNIER:  Your Honor, might we have a brief

23   recess?

24          THE COURT:  Yes.  Okay.  Let's take a 10-minute

25   recess at this time.  The Court will stand in recess for

02:22    1    10 minutes.

2               (Recess.)

3               **THE COURT:**  Be seated, please.

4                    We have another motion regarding attorneys'

5    fees.  It's particularly important in this particular case --

6    I've been mentioning the Knauf case.  In the Knauf case, the

7    attorneys' fees were set as part of the settlement; that is to

8    say, the Knauf defendant agreed to pay a certain amount of

9    attorneys' fees, and so my job as the MDL court was to start

10   with that and decide who gets a portion of those fees.

11                    In this particular case, the fees come out of

12   the recovery; they are not in addition to the recovery.  It's a

13   two-step proposition.  One, I have to decide the total amount

14   of the fees; and then, secondly, I have to decide who gets

15   what.  The size of the pie as well as the slice of the pie is

16   what I deal with at this juncture.

17                    I will hear from the parties.

18               **MR. MEUNIER:**  Thank you, Your Honor.  May it please

19   the Court.  Jerry Meunier for plaintiffs.

20                    In what I know has been a long day for

21   Your Honor and for your staff and for all counsel assembled, it

22   falls to me to address what I would like to say is the last but

23   hopefully not least of the category of matters to be addressed

24   in this hearing, which is fees and costs.

25                    Of course, these are always end of the day

02:34

1    matters in a litigation for plaintiffs because this is how the

2    fees and costs are owed by our clients and must be addressed on

3    our side of the V.  We represent individuals, for the most

4    part, who lack the wherewithal of, for example, corporate

5    clients to pay for legal services by the hour as the case

6    proceeds or much less to cover the costs of a case as it

7    proceeds.

8              Yet, Judge, this contingency compensation of

9    costs and payment of fees system can only be viewed as

10   essential because the clients we represent -- in this case

11   homeowners and property owners -- get to access the courts, get

12   to seek justice in our system only because their payment for

13   legal representation and reimbursement of case costs can be

14   made dependent on their recovery and is not due unless and

15   until there is a recovery that is secured through the work of

16   their attorneys.

17             **THE COURT:**  The poor man's key to the courthouse is

18   what you are saying.

19             **MR. MEUNIER:**  It is, Judge.  So at the end of not

20   only a long day but at the end of a long and challenging case,

21   I have the honor of speaking to you, Judge, on behalf of

22   colleagues who afford access to justice for folks who would not

23   have it otherwise, colleagues who are willing to work long and

24   hard hours for these clients with absolutely no guarantee of

25   payment, and colleagues who are accustomed to waiting until the

02:36

1    end of the case for compensation without any assurance of

2    outcome.  It's a crazy way to make a living, but having done it

3    for over 40 years, I guess I'm resigned to therapy.

4              In our motion we ask the Court to approve a

5    total fee amounting to 30 percent of the settlement fund, which

6    would be $74.4 million on a $248 million settlement.  As the

7    Court just mentioned, this is the total fee for all plaintiffs'

8    counsel, reserving for another day Your Honor's need to

9    allocate whatever portion of that should compensate class

10   counsel for common benefit work on the one hand and individual

11   plaintiffs' counsel on the other.

12             Before addressing what we know to be

13   Your Honor's concern and focus on the fact that this is a

14   property damage recovery and settlement, it represents dollars

15   needed by class members for property loss.  We heard from a

16   family today -- and you know our hearts, Judge.  You have lived

17   with plaintiffs yourself and lived with plaintiffs' counsel.

18   We take those stories seriously.  We heard from that family

19   about the need to fix their home.

20             There's a tension.  There is this inherent

21   tension between, on the one hand, this percentage fee which

22   allows plaintiffs to come into court and only allows them

23   access to the court through a percentage fee, and yet on the

24   other hand diminishes their ability to in many cases have

25   exactly what they need exactly, what they were looking for in a

02:38

1   property damage situation.

2           Before I get into that a bit further, though,

3   Judge, let me say just a few basic undisputed truths about the

4   30 percent fee request.  Number one, it is less than both the

5   customary one-third or even 35 or 40 percent contingency fee in

6   litigated plaintiff cases, and it is less than the maximum

7   amount of 32 percent specified in the class settlement

8   documents and class settlement notice because we do recognize

9   that this is a property damage case.

10          Second, Your Honor, it is less than a total fee

11  set-aside of 32 percent, which was approved by you as

12  appropriate in connection with the settlement of claims in the

13  Virginia court system resulting from an assignment of

14  Venture Supply's claims against Taishan.  That was the

15  so-called *Allen* settlement.

16          You did so in approving the set-aside of

17  32 percent as a fee in that settlement citing "all the *Johnson*

18  factors, in particular the results obtained."  That was in your

19  order of February 27, 2019.  It's Rec. Doc. 22122.

20          Third, this 30 percent fee request no doubt is

21  less than most of the retainer agreements which were negotiated

22  and entered into between class members and their individual

23  counsel when this case began, notwithstanding the fact that I

24  believe this case has always been one that has been seen as

25  predominantly seeking property damage recovery.

02:40

1          So I think it's fair to say that the plaintiffs'

2     bar in this litigation, in making this fee request of

3     30 percent, is endeavoring to recognize the property damage

4     feature of this class settlement.  Perhaps because we have done

5     so, Your Honor, it's interesting to note that no counsel, no

6     class member has stepped forward to file an objection or an

7     opposition to our fee request.  So our motion before you is

8     unopposed by any litigants in these proceedings.

9          **THE COURT:**  Well, Mr. Moody just said that he doesn't

10    think anybody ought to get anything.

11         **MR. MEUNIER:**  He did.  He also said that even if you

12    paid us no fee, there still wouldn't be enough.

13         So let me talk about this self-evident tension

14    between the deduction of even a reasonable, even a fair on its

15    face percentage fee on the one hand and the impact it has on

16    the net recovery of a client in a property damage situation.

17         The truth is, Judge, this tension really, when

18    looked at in strict made-whole terms in tort law, would exist

19    in any case where plaintiffs sought to recover property damage

20    and were responsible to pay legal fees unless, of course, the

21    statute shifted the fee burden to the defendants or unless we

22    were able to negotiate what we did in Knauf, which is the

23    defendants' payment of fees.  Absent those kinds of

24    developments with this type of settlement, there is simply no

25    way, even in a property damage case, to avoid the impact.

02:41

1          If you imagine these clients -- and I have never

2    had one accept my offer to be paid by the hour as opposed to a

3    percentage.  But even if a client were to have paid counsel by

4    the hour in this case, the end result would still be that the

5    recovery of property damages at the end has been offset,

6    impaired, diminished by the necessary transactional costs of

7    litigating in order to seek justice.

8          What I would like to emphasize, Judge, is not

9    this inevitable tension in the abstract in a property damage

10   case.  I would like to place it in context and look at it as a

11   tension that exists in a unique case here, which nonetheless is

12   a tension that I believe can be resolved in a way that allows

13   there both to be a fair and reasonable compensation for the

14   plaintiffs' counsel and a fair and reasonable outcome for the

15   clients that we represented.

16         I say that because this is not just any property

17   damage case.  It never has been.  This is a property damage

18   case, in fact, unlike any other in the experience of all the

19   parties, all the counsel, and I would submit, Your Honor,

20   unlike any other in the history of this or any other MDL.

21   Since the things that make this a unique property damage case

22   are the very things that I think or that we believe should

23   inform Your Honor's fee decision, let me summarize them in just

24   three words as they relate to plaintiffs' counsel and the

25   services rendered.  Three words: *work*, *risk*, *outcome*.

02:43

1      Now, it's true that in the characteristically
2  superb and scholarly brief written by my friend and fellow
3  counsel, Fred Longer, we have set forth for you the *Johnson*
4  factors analysis, the methodology, the jurisprudence, and all
5  the case law that would support this fee request.  I know
6  Your Honor has read that brief at least once.
7      I'm going to try to keep it simple by looking at
8  just these three words -- *work*, *risk*, and *outcome* -- because I
9  think what I'm saying is that if we focus just on those
10  concepts, you see the uniqueness of this property damage case
11  in a way that I do think justifies the 30 percent,
12  notwithstanding the tension it creates for the property damage
13  plaintiff.
14      Let's first talk about the work done by counsel.
15  You know, when it comes to the subject of the work by
16  plaintiffs' counsel in this case, we have a pretty unique
17  advantage in that Your Honor has overseen and managed these
18  proceedings in all phases in a truly hands-on fashion, and so
19  you know the work of plaintiffs' counsel in a way that is
20  up-front and personal.
21      You literally sat with counsel for the parties
22  in Hong Kong for extensive and critical deposition testimony
23  that ultimately completed the record for the personal
24  jurisdiction challenge made at the threshold by Taishan, a
25  challenge that took us not once but twice to the Fifth Circuit.

02:45

1    You presided over the *Germano* trial, which led
2  to the first monetized judgment against Taishan.  You not only
3  presided over the *Hernandez* trial, which helped establish the
4  nature, the scope, and the cost of Chinese drywall remediation,
5  you joined counsel on a walk-through inspection of a plaintiff
6  property on the North Shore when it had Chinese drywall in it.
7    You presided over a June 2015 class damages
8  hearing -- which was virtually a trial; it had competing expert
9  witness testimony -- which led to important challenges that we
10  needed to face and clarify regarding the inventory of cases,
11  but which also helped solidify the focus or the basis for
12  calculating damages on a square footage basis using RSMeans.
13    So others may be surprised to know that
14  thousands of plaintiffs were put on omni complaints filed
15  against over 1,600 defendants, served on foreign companies
16  through the Hague Convention at a cost of over $1.7 million,
17  that's no surprise to you.
18    Others may be surprised to know all that it took
19  to conduct discovery related to contempt sanctions, related to
20  nightmarish translation challenges involving thousands of
21  electronically stored documents in Chinese, deal at one point
22  with documents that were missing because a laptop computer had
23  disappeared for a key witness.  It's easy for forget some of
24  these details in the decade-long experience of this case, but
25  you have been there for it all, Judge.

02:47

1    So what I say is when you have addressed in your

2    hands-on fashion all of these ways, you have been able to

3    observe and witness and can verify the enormous and challenging

4    amount of work that it took on behalf of plaintiffs in this

5    anything but typical property damage litigation.

6    You know, this may be the only case in my career

7    where I'm making a point of the work done by counsel and it's

8    not only unopposed by any other litigant, but it is supported

9    in the record both by my colleagues on the defendants' side and

10    by this Court on the record.

11    I want to refer first to the defendants' joinder

12    in our motion for final approval of the settlement, which is

13    Rec. Doc. 22393 at pages 7 and 9.  It's a matter of record, but

14    here the defendants are making the valid point that this was a

15    well-negotiated, well-informed, well-educated settlement

16    because the parties had done so much.  So we have the

17    defendants acknowledging significant discovery, extensive

18    jurisdictional discovery, thousands of documents produced,

19    multiple rounds of written discovery, depositions of numerous

20    Taishan employees, including corporate reps, etc., etc.

21    Then if we go to the Court's language in PTO 32,

22    this was an order whereby you approved a set-aside of fees when

23    the cases were being remanded by the hundreds, and you rightly

24    wanted to protect the work product of common benefit counsel.

25    In PTO 32, which is Rec. Doc. 21328 at pages 1

02:48

1    and 2, you noted that the PSC and common benefit counsel have

2    made great and valuable contributions; to wit, organizing 99

3    monthly status conferences, taking over 170 depositions,

4    including two overseas trips to Hong Kong, reviewing over

5    500,000 pages of documents, prosecuting bellwether trials

6    involving seven properties, securing default judgments,

7    assembling the trial package, which includes colossal volumes

8    of discovery product and depositions, and achieving essential

9    jurisdictional victories.

10                Now, here you were just addressing the work of

11   common benefit counsel, but this fee request that's before you

12   today obviously is to compensate both common benefit counsel

13   and private counsel.

14                I might add, Judge, that this PTO was entered at

15   the time of remand, and post remand there was a significant

16   amount of additional work to be done as all of these cases had

17   to be worked up individually, and both common benefit and

18   individual counsel were active in that.

19                So I would say this.  The first thing I

20   mentioned, work, the work of plaintiffs' counsel in this case

21   has been steadfast, it has been complex, it has been thorough,

22   it has been skilled, and it has been challenging in the

23   extreme.  I would submit to the Court that it's work reflective

24   of the fact that this has been no ordinary or typical property

25   damage case.  I respectfully submit that the work is consistent

02:50  1    with the percentage fee requested.

2              I might add that, as the Court knows, when

3    percentage fees are addressed by the courts, there are

4    sometimes or more typically than not a lodestar crosscheck, and

5    courts ask the question:  What if, instead of a percentage of

6    recovery, we were compensating counsel on an hourly basis?

7              We have this in our brief, but it's worth

8    mentioning now.  By way of any such lodestar crosscheck of the

9    30 percent fee request of $74.4 million, we know this.  This is

10   at page 46 of our brief.  More than 109,000 hours have been

11   submitted by common benefit counsel alone as of August 31,

12   2019.  That was several months ago.  Those don't include the

13   hours of individual counsel.

14             As we say in our brief, if you just took those

15   hours and compensated them at the inception rates submitted to

16   your Court-appointed CPA, Mr. Garrett, we would have a total

17   fee of $75.3 million, not $74.4 million.

18             The second word after *work* is *risk*.  You know,

19   the burden of proof assures that risk is ever in the mind of a

20   plaintiffs' lawyer in litigation.  The resources assembled on

21   the side of corporate defendants are invariably greater.

22   Opposing counsel are invariably well situated to make every

23   appropriate dispositive issue a potential path to a zero

24   recovery and/or a zero fee, but I ask the Court to consider the

25   risk accepted by counsel in this case.

02:52

1          Ms. Duggan, in her opening presentation,

2    identified many of these risks for the record already, but I'll

3    just give two examples of the risk accepted and undertaken by

4    plaintiffs' counsel, one of which was embedded from day one in

5    this litigation, the other of which hasn't been mentioned yet.

6    It more or less took shape as the case progressed.

7          The risk that was present from day one is that

8    it was always known in this case from the inception that these

9    clients would be proceeding against not just foreign companies

10   and manufacturers, but companies with foreign sovereign

11   immunity links in the People's Republic of China.

12         I believe it's fair to say that from inception

13   these were, then, claims that posed a risk -- and I would

14   submit it's a unique risk in property damage litigation --

15   based on the fact that any judgment achieved, no matter what

16   the effort, no matter how long it took, no matter how costly it

17   was -- any judgment achieved might not prove to be easily

18   enforceable and would invariably lead to at least another

19   entire phase of enforcement, another entire phase of advocacy

20   and appeals and rulings on just getting the judgment enforced.

21         So the plaintiffs' counsel in this case, in this

22   property damage case, were willing to go to work for these

23   clients knowing that at the end of the day they were proceeding

24   not just against the foreign manufacturer, but against those

25   linked to a foreign sovereign without any treaty or commercial

02:54

1    arrangements in this country to address the enforcement of
2    judgments which might be entered against these defendants in a
3    court of law in this country.  From day one in this unique
4    case, I'm proud that plaintiffs' counsel accepted the risk that
5    all were conscious of, hopefully clients were made aware of.
6             The other risk that I'll mention that was
7    accepted by counsel is one that actually emerged as the case
8    proceeded.  Much has been already discussed in this record
9    about the delays, the deviations, the sidetracks, the fact that
10   it just took a long time for this case, against Taishan in
11   particular, to gain the kind of traction needed to get us here
12   today.
13            People went on with their lives.  Clients that
14   were current became former owners.  Clients would not return
15   calls.  Clients would say, "I've got a life to live."  It was
16   understandable.  I'm especially proud that the folks on this
17   side of the V persevered and stayed with it and told those
18   clients to not go home and to have faith, but there was
19   certainly a risk of an eroding inventory and client base simply
20   because in this unique situation, in this unique litigation
21   there was, if you will, a lot of wear and tear on the
22   representation of individual homeowners.
23            So I believe when we talk about risk we again,
24   like the factor of work, I believe, have to look at this as not
25   just any property damage case, but as a case that was truly

02:56

1   unique and extraordinary because of the truly unique and

2   extraordinary risks that were accepted by the plaintiffs'

3   counsel.

4            Finally, I want to talk about outcome.  You

5   know, of all the *Johnson* factors and all the Rule 23 criteria

6   informing the reasonableness of a requested fee, the

7   jurisprudence consistently suggests that the outcome achieved,

8   the result obtained, that's the most important thing.  I think

9   the one word that is most applicable to the outcome achieved

10  here is a word you heard from Ms. Eikhoff for the defendants.

11  That word is *historic*.

12           We completely agree with her.  This is a

13  historic outcome.  As far as we know, never before has a

14  Chinese company agreed to pay such an amount to U.S. consumers

15  suing in a U.S. court.  History was made in this case.  That's

16  a credit to the Court.  It's a credit to the distinguished

17  counsel for those defendants.  It is a credit to the plaintiff

18  lawyers who persevered and carried the proof and got this done

19  on their side.

20           It's not every property damage case in which

21  American consumers seek accountability from Chinese

22  manufacturers with state-owned enterprise parentage in the

23  People's Republic of China.  It's not every property damage

24  case in which an unprecedented multimillion dollar settlement

25  agreement is negotiated with such manufacturers on behalf of

02:58

1    those consumers.  It's not every property damage case in which

2    over 4,000 U.S. citizens get to receive property damage

3    compensation in a settlement like this.

4                    This is a legal battle longer than most, harder

5    than most, and more uncertain in outcome than most.  It will

6    now be successfully concluded by settlement.  But without the

7    considerable persistence, dedication, and skill of my plaintiff

8    counsel colleagues, Your Honor, this historic day never

9    happens.

10                   So, yes, there is the unavoidable tension in

11   seeking a percentage fee in a property damage case, but the

12   30 percent fee request that we make here is made in a unique

13   and historic property damage case, and it is consistent with

14   this Court's previous set-aside order in the *Allen* case and

15   it's not opposed.  In light of plaintiffs' counsel's work,

16   risk, and outcome, we believe that this is a fair and

17   reasonable request of the Court.

18                   Your Honor, I'll make one final point.  You

19   previously said this is not the Knauf settlement.  You know,

20   Knauf was, as you said, targeted to remediation.  This is not.

21   This is a compensation for people who have other losses, albeit

22   property damage related.  So while there will be stories of

23   folks who can't fix all of their house with what they receive

24   in the settlement, it's not quite the same as Knauf.  I think

25   it's fair to say that the net recovery for these folks, while

03:01

1    it can never make them whole, shouldn't necessarily be

2    characterized as a settlement which dollar for dollar has to be

3    dedicated to the fix of property.

4           When you look at the case -- the work, risk, and

5    outcome -- we have reduced our percentage fee request in light

6    of the property damage aspect of the litigation, and we think

7    it can be fair and reasonable for both our clients and counsel

8    for you to approve this fee.

9           Let me then finish by looking at our costs

10   request.  I'm going to ask Dean to put this on the ELMO.

11          This motion, Judge, is, as you know, inclusive

12   of both a request for a 30 percent fee and a 3 percent cost

13   deduction from the settlement.  This is in the brief, but I

14   wanted to quickly run through the numbers so the record is

15   clear about the request.

16          As of August 31, 2019, these were the totals for

17   shared and held costs.  This was the estimate of what we call

18   stipends, which is meant to be a $500 per property cost

19   reimbursement similar to what we tried to accomplish in the

20   Knauf settlement because we know that there are case costs

21   associated with identifying the Chinese drywall, conducting

22   inspections, etc.  This is, in effect, a case cost which is

23   included in the otherwise common benefit shared and held costs

24   request.

25          If you add those three subtotals, the total

1  amount of costs to date, or as of August 31, 2019, comes to

2  $7,074,830.15.  We know that there will be additional shared

3  and held costs to account for since August 31, 2019, because we

4  are three months later.  We don't know what those totals are.

5        The 3 percent holdback we request of 7.44 is

6  obviously several hundred thousand dollars more than the known

7  total.  What we are asking the Court to do by order is approve

8  a holdback and reserve of 3 percent on the assumption that

9  there will be added costs incurred or known about and submitted

10  by the time the settlement is finalized.  If we do not ever

11  reach the figure of $7,440,000, that can certainly be accounted

12  for in a way that benefits the class.

13        **THE COURT:**  What is the stipend?

14        **MR. MEUNIER:**  $500 per property is meant to address

15  what individual clients and their lawyers had to spend in order

16  to get the drywall identified and the property inspected,

17  reports issued.  So we are actually trying to benefit on the

18  net recovery side for the client something here that will

19  alleviate the need to have individual firms charge the client

20  that $500.  This is a $500 cost/benefit that's added to the

21  allocation that is otherwise given.  We did it in Knauf,

22  Your Honor.  There was a stipend payment.  That $1.3 million is

23  an estimate.  I believe it's set forth in Ms. Duggan's

24  declaration.  It can't be precise at this moment, but it's the

25  best estimate we have that that total for the stipend will come

03:06   1   to $1.3 million.

2           I'm reminded that that's meant to be a net

3   stipend on a property where there's previously been a stipend

4   paid in the Knauf settlement.  So we will take into account if

5   the property has previously received a stipend in Knauf.

6           Your Honor, I apologize for my voice today, but

7   the weather has affected me.  I have nothing else to offer to

8   you in terms of our fee request of 30 percent of the settlement

9   fund or 3 percent of the fund for costs.

10          We sat here and I promise you we have listened

11  to the clients who have come forward today, the individuals.

12  We empathized in every way with what they have been through.

13  They have also waited 10 years just as we have.  They have

14  great needs.  As I think Mr. Herman said, no settlement that we

15  ever know of is so perfect that both sides walk away happy.

16          I think we have done the best we can do.  I

17  think it's the best result we can achieve for these folks.  It

18  really is time for them to get some compensation for what they

19  have been through.  I hope that in that process we don't

20  overlook what would be fair for the attorneys who have worked,

21  who have taken risks, who have achieved history, and who have

22  patiently waited to get paid only if and when the clients

23  receive what they are entitled to.  Thank you, Judge.

24          **THE COURT:**  Any comments from anyone opposed or

25  whatever?

03:08

1          Okay, folks.  That ends it, then.  Thank you

2    very much.  I thank the objectors for making the trip down to

3    New Orleans.  I appreciate what they have said.  I'm obliged to

4    the attorneys for the presentation that they made in the case.

5    Thank you very much.  Court will stand in recess.

6          **THE DEPUTY CLERK:**  All rise.

7          (Proceedings adjourned.)

8                              *  *  *

9                        <u>**CERTIFICATE**</u>

10          I, Toni Doyle Tusa, CCR, FCRR, Official Court

11   Reporter for the United States District Court, Eastern District

12   of Louisiana, certify that the foregoing is a true and correct

13   transcript, to the best of my ability and understanding, from

14   the record of proceedings in the above-entitled matter.

15

16

17                         <u>*/s/ Toni Doyle Tusa*</u>
                            Toni Doyle Tusa, CCR, FCRR
18                          Official Court Reporter

19

20

21

22

23

24

25