UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * <br> * <br> * CIVIL ACTION <br> * <br> * MDL NO. 2047 <br> * <br> * SECTION L (2) |
| THIS DOCUMENT RELATES TO: <br> *Guilfort Dieuvil* No. 13-609 | * <br> * <br> * |

## ORDER & REASONS

Before the Court is Plaintiff Guilfort Dieuvil's objection to the Special Master's Order and Decree, which concluded that Mr. Dieuvil was not entitled to Knauf settlement funds because he failed to comply with the terms of the Knauf Settlement Agreement and PTO 1(B). R. Doc. 21104. Knauf opposes the objection. The Court heard oral argument on August 29, 2019 and ordered the parties to discuss an amicable resolution to the dispute. On October 3, 2019, the parties were ordered to submit recommendations regarding the amount allegedly owed to Mr. Dieuvil. Having considered the parties' submissions, the Court now rules as follows.

I. **BACKGROUND**

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts. Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the

1

breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners began filing suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation (the "JPML") on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group. Relevant to this Order are the Knauf Defendants.[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States.

The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation as well as litigation in state courts. The Knauf Entities did not contest jurisdiction and first

---

[1] The Chinese Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

entered their appearance in the MDL litigation on July 2, 2009. *See* R. Doc. 18. On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service. *See* R. Doc. 401. After a period of intense discovery, the Court set various bellwether trials. From March 15–19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* R. Doc. 2713. For purposes of the trial, Knauf stipulated that KPT Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor." *Id*. The Court, based on the evidence presented, found the KPT Drywall was a defective product and issued a detailed Findings of Fact and Conclusions of Law in favor of Plaintiff Hernendez ("*Hernandez* FOF /COL"), *see id.*, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* R. Doc. 3012.

On October 14, 2010, Knauf agreed to participate in a pilot program to remediate a number of homes using the remediation protocol formulated by the Court in *Hernandez*. The Knauf pilot remediation program has, at present, remediated over 2,800 homes containing KPT Chinese drywall using essentially the same protocol. At the Court's urging, after a number of homes had been remediated, the parties began working together to monetize this program and make it available to a broader class of plaintiffs. Thereafter, the PSC and Knauf entered into settlement discussions, and on December 20, 2011, some two years after the formation of this MDL, the PSC reached a global remediation settlement with Knauf, which is designed to resolve all Knauf-related Chinese drywall claims. R. Doc. 16407-3. This agreement (the "Knauf Class Settlement Agreement") applied to all claimants who filed suit against Knauf on or before December 9, 2011.

On August 12, 2013, Plaintiffs' and Defendants' Liaison counsel entered into a second settlement agreement addressing claims filed after December 9, 2011 (the "New Claims Settlement

Agreement"). R. Doc.16978-1. Under the New Claims Settlement Agreement, Claimants who gave notice prior to October 25, 2013 and qualified under the terms of the New Claims Agreement were eligible to seek benefits under the Knauf Class Settlement Agreement, subject to the requirements set forth in both agreements. R. Doc. 16978-1.

Under the terms of the settlements, the claimants with KPT Chinese drywall (drywall manufactured by Knauf's Chinese subsidiary) were offered several options. Under Option 1, the claimants were offered the opportunity to receive a complete, environmentally certified remediation of their properties. Under Option 2, claimants could recover for the cost of self-remediation. Finally, under Option 3, claimants were offered a cash payment instead of remediation as well as the opportunity to receive monetary benefits from the Knauf downstream chain of commerce entities to compensate them for other specifically designated losses. The total amount of the Knauf Settlement is approximately $1.1 billion.

Pursuant to the Settlement Agreement's terms, owners who had self-remediated Affected Properties could seek benefits to resolve their Remediation Claims as provided in the Already Remediated Properties Protocol. R. Doc. 12061-6 at § 4.3.7. Pursuant to the protocol, owners of Already Remediated Homes (ARHs) were required to submit the following documentation concerning remediation of the property: (1) photographs and/or video images of all drywall removed from the property during remediation (for owners with claims pending in MDL 2047, the submission shall be in the form required by MDL Pretrial Order 1B); (2) any evidence of KPT Chinese Drywall and Non-KPT Chinese Drywall, if any, in the property prior to remediation; (3) proof of corrosion or other evidence that the KPT Chinese Drywall was reactive; (4) interior photographs of the property immediately prior to the commencement, and following completion of the remediation, including photographs and/or video images of the flooring and major

components such as cabinets, moldings, doors, intercom systems, and fixtures for every room and bathroom, and, to the extent possible, security systems, appliances and audio such as surround sound; (5) the remediation contract and an itemization from the contractor who performed the remediation work of the materials used during the remediation, including but not limited to manufacturer, model number, and quantity; (6) an itemized invoice [or ledger] from the contractor who performed the remediation work; (7) proof of payment, such as cancelled checks, credit card statements, etc; (8) a floor plan of the property with dimensions; (9) an environmental certificate; and (10) an Owner Disclosure Affidavit, which includes a certification that the materials provided comprise all of the available documentation regarding the claim. *Id.* at § III.

On October 9, 2009, the Court issued PTO 1(B) (R. Doc. 337). PTO 1(B), which established the Court's requirements "with respect to the preservation of physical evidence from properties that may be repaired by the parties during the course of this litigation." *Id*. at 1. PTO 1(B) states, "[f]rom this date forward, all persons or entities who have or who intend to pursue a claim relating to allegedly defective Chinese-manufactured drywall . . . shall preserve . . . physical evidence at their own expense." *Id*. at 2. Parties were and are required to preserve physical evidence by following a few basic procedures, including but not limited to the following:

> The parties shall photograph the backside of each Chinese drywall board immediately after it is removed on-site, and, document on a floor plan, building diagram, or other similar form of documentation, the location of each full or partial Chinese drywall board removed from the property and its photograph. Photographs of the wall sections should be taken so that any markings on the backside of the drywall sections are most clearly visible in the photographs.

*Id*. at 3. The party responsible for failing to preserve evidence may be subject to dismissal of the claim or defense of spoliation. *Id*. at 7.

II.  **THE INSTANT DISPUTE**

In the mid-2000s, Mr. Dieuvil purchased a property located in Boyton Beach, Florida. R.

Doc. 21104 ¶ 3. In 2010, the home's builder, GL Holmes, conducted an inspection of the property that revealed the presence of defective Chinese-manufactured drywall. R. Doc. 21104 ¶ 4. Mr. Dieuvil represents that he shortly thereafter entered into an agreement with GL Homes to remediate the property. R. Doc. 21104 ¶ 5. Mr. Dieuvil alleges that during the remediation, GL Homes demanded that he pay $25,000 "as contribution for remediation," and that when he refused to pay, GL Homes ceased all work on the property." R. Doc. 21104 ¶ 5-6.

Mr. Dieuvil asserts he joined the Chinese drywall litigation in 2013 and promptly submitted a Plaintiff Profile Form to the Knauf Defendants pursuant to the Knauf Settlement Agreement. Knauf initially denied the claim; however, in 2015, the parties entered into an agreement whereby Mr. Dieuvil would recover to the extent that he could present evidence preserved in accordance with PTO 1(B), which set forth the protocol for the preservation of evidence in the MDL. After an inspection of Mr. Dieuvil's property in 2015, Knauf again denied his claim, and the issue was submitted to Special Master Dan Balhoff for consideration. On November 22, 2017, the Special Master issued his report, finding in favor of Knauf and against Mr. Dieuvil. R. Doc. 21104-1 at 8-10. In his report, the Special Master reasoned that denial of Mr. Dieuvil's claim was appropriate because he did not present evidence in compliance with PTO 1(B). R. Doc. 21104-1 at 3. The Special Master further reasoned that such a failure to preserve evidence pursuant to the PTO would prejudice Knauf's ability to present a defense, since only Mr. Dieuvil had access to the evidence before its disposal. *Id.* In response, Mr. Dieuvil, acting *pro se*, filed his objection to the Special Master's report on December 21, 2017. R. Doc. 21104.

In his objection, Mr. Dieuvil alleges the Special Master's report is unclear as to what evidence was non-compliant with PTO 1(B). R. Doc 21104 at 5 ¶ 11, 18. In particular, he explains that during the renovation and remediation conducted by GL Homes in 2010, the company

6

recorded, photographed, and preserved samples of the defective drywall sections, evidence Mr. Dieuvil contends is in compliance with this Court's procedures. R. Doc. 21104 ¶ 15-16.

In its opposition to Mr. Dieuvil's objection, Knauf argues Mr. Dieuvil is responsible for the problems with his home's remediation. R. Doc. 21176 at 3. Knauf explains that although GL Homes was prepared to fully remediate the property, they refused to perform certain requested activities, such as replacing all metal studs in the property, because such work was outside the scope of remediation. Knauf alleges that the $25,000 requested by GL Homes, which Mr. Dieuvil refused to pay, was the amount necessary to complete this additional work. R. Doc. 21176 at 3. Knauf further explains that GL Homes was forced stop the remediation at Mr. Dieuvil's direction. R. Doc. 1176 at 3. Knauf notes that following Mr. Dieuvil's submission of a Plaintiff Profile Form, Benchmark conducted an inspection of the Property and identified no corrosion and no existence of Knauf drywall in the Property. Knauf also contends there were no drywall samples saved on site. Accordingly, Knauf denied the claim under the Knauf Class Settlement Agreement. *Id.* Claimant thereafter provided additional photographs of drywall samples, but Knauf determined his claim was nevertheless non-compensable under the Settlement for failure to comply with PTO 1(B). R. Doc. 21176 at 5.

On May 14, 2018, the Court ordered Plaintiffs' Liaison Counsel to review the objection, confer with all necessary parties, and make a recommendation regarding any further proceeding. R. Doc. 21335. Plaintiff's Liaison Counsel contacted Mr. Dieuvil in September 2018 and began an intensive review of the evidence submitted, including photographs of sample drywall, blueprints showing inspections, and documents regarding evidence retention. On February 8, 2019, Plaintiff's Liaison Counsel advised the Court that, after having completed a thorough investigation of Mr. Dieuvil's materials and documentation, he "strongly recommend[ed] that [the Court]

7

consider a Hearing . . . on Guilford Dieuvil's Request for an Appeal from Special Master Dan Balhoff['s] report."

The Court heard oral argument regarding this objection on August 29, 2019. Mr. Dieuvil brought into Court boxes of evidence and photographs of drywall samples with indications of where they came from. However, Knauf continued to argue that Mr. Dieuvil's objection should be denied because he had not strictly complied with the requirements of the Settlement Agreement and PTO 1(B)'s procedures regarding the preservation of physical evidence. The Court noted that as a *pro se* litigant, Mr. Dieuvil's lack of strict compliance should not preclude him from participating in the Settlement but would inevitably limit any potential recovery. The Court further ordered the parties to discuss an amicable resolution of this dispute. The parties have represented that compromise negotiations have been difficult. Accordingly, the Court held a status conference on October 3, 2019, in which the parties were ordered to submit memoranda addressing the amount of damages allegedly owed to Mr. Dieuvil. The Court has received these memoranda and now rules as follows.

**III. DISCUSSION**

For the purposes of determining how much, if anything, Mr. Dieuvil is owed, it is imperative to first characterize Mr. Dieuvil's claim under the Knauf Settlement Agreement. Accordingly, a brief overview of the Settlement's operative terms is necessary at this juncture.

The Settlement Agreement established a remediation fund from which to compensate affected property owners. R. Doc. 16407-3. Claimants could elect to receive benefits in several ways. Owners of un-remediated properties had three options. Under Option 1, the remediation fund would pay the Lead Contractor or an "Other Approved Contractor" to remediate the affected property in addition to other covered expenses and damages for any resulting delay. R. Doc. 16407-

3 at 17. Option 2 allowed owners of un-remediated properties to receive "an amount equal to the higher of the Final Cost Estimate prepared by the Lead Contractor or 65% of the Xactimate prepared by the Lead Contractor." R. Doc. 16407-3 at 19. This amount was paid directly to the property owner's chosen contractor. Option 3, styled the "cash-out option," allowed property owners to receive the amount they would have received under Option 2 (that is, the higher of the Final Cost Estimate or 65% of the Xactimate), with an discount of $7.50 per square foot. R. Doc. 16407-3 at 21.

In contrast, owners of already-remediated properties could recover "reasonable costs that the Owner incurred in remediating the Affected Property." R. Doc. 12061-6 at 5. According to the already remediated properties protocol, reasonable costs are calculated by Knauf with the assistance of, if necessary, the Special Master and the Court, and include the cost of remediation work "reasonably consistent with the Remediation Protocol." Reimbursable costs do not include any upgrades made to the property. Reimbursable costs are further limited to the percentage of KPT Drywall that was found in the home, such that a claimant is paid "an amount equal to the lump sum payment multiplied by the KPT Drywall Percentage." R. Doc. 12061-6 at 7.

**A. What Type of Claimant is Mr. Dieuvil?**

Because the Knauf Settlement treats differently-situated claimants in different fashions, the Court must first determine how to characterize Mr. Dieuvil's claim. Plaintiffs' Liaison Counsel takes the position that Mr. Dieuvil should be treated as an Un-remediated Property owner because, when he filed suit in 2013 and joined Mr. Doyle's agreement with Knauf in 2015, his home needed remediation to be habitable. R. Doc. 22338. Plaintiffs' Liaison Counsel argues that Mr. Dieuvil expected complete remediation from GL Homes, and the house is still in need of remediation today. R. Doc. 22338 at 2. In contrast, Knauf contends that because Mr. Dieuvil seeks a cash

payment, he must be treated as either an Already Remediated Property claimant or an Option 3 Cash-Out claimant, because these are the only two options that provide for a cash award. Knauf specifically believes Mr. Dieuvil should be treated like an Already Remediated Property claimant because his home has been partially remediated by GL Homes and would have been fully remediated if it were not for Mr. Dieuvil's dispute with the company. R. Doc. 22344 at 3.

The Court is inclined to treat Mr. Dieuvil as an Un-remediated Property owner because despite the initial progress made by GL Homes in 2010, Mr. Dieuvil's home remains largely un-remediated and uninhabitable. Because Mr. Dieuvil seeks a cash payment from the Settlement, his award must be calculated in accordance with Option 3, which is the only option available to a claimant seeking a lump sum cash payment.

**B. How much in Mr. Dieuvil owed?**

Treating Mr. Dieuvil as an Un-remediated Property claimant but without explaining which Settlement Agreement option it is applying, Plaintiffs' Liaison Counsel explains that J.E.S., Inc., an independent general contractor, estimates that completion of the remediation to Mr. Dieuvil's home will cost $612,625.83. R. Doc. 22338 at 3. This number includes $545,946.12 to complete the project and $66,679.71 for outstanding materials. R. Doc. 22338 at 3. Alternatively, "by way of compromise," PLC suggests the amount due to Mr. Dieuvil be calculated by using the average $65.16/square foot figure that Knauf spent remediating homes under the Settlement Agreement. R. Doc. 22338 at 3-4. Applying this figure to Mr. Dieuvil's home, which is indisputably 6,609 square feet, leads PLC to believe that Mr. Dieuvil is owed $430,642.44. Plaintiffs' Liaison Counsel additionally believes Mr. Dieuvil is entitled to $66,090 under Section 4.3.1.1.2 for other covered expenses and $9,913.50 for the delay under Section 4.3.1.2.2. In total, Plaintiffs' Liaison Counsel believes Mr. Dieuvil is owed $506,645.94. R. Doc. 22338 at 4.

In Knauf's estimation, Mr. Dieuvil's damages must be calculated as of the time he made a claim for compensation, and without considering the denial or delay of his claim, the effect of inflation on construction costs, or the fact that his property is now in disrepair. R. Doc. 22344 at 4. Knauf believes the cost to complete the remediation is $260,000.00.[2] After discounting the award by $7.50 per square foot, Knauf represents that Mr. Dieuvil stands to recover $210,432.50 under Option 3.[3] R. Doc. 22344 at 5.

Mr. Dieuvil has submitted his own affidavit in response to Knauf's submission. In it, he explains that an independent contractor submitted an Exactimate Report indicating that the total remediation cost required to make the property livable is $612,643.83. Mr. Dieuvil further explains that he seeks the following:

- Alternative Living Expenses $545,000.00
- Loss of Net Equity $675,055.00
- Loss of Furniture $174,590.00
- Property Taxes $106,821.00
- Property Insurance $58,799.00
- Remediation Cost $612,643.83

The Court is inclined to award Mr. Dieuvil an amount of damages calculated in accordance with Option 3's protocol and the specific operative terms of the Settlement Agreement. Option 3 allows eligible property owners to receive the higher of the Final Cost Estimate or 65% of the Xactimate, with a reduction of $7.50 per square foot. Mr. Dieuvil has presented the Court was an estimate provided by an independent general contractor, in the sum of $612,625.83. However, the Settlement makes clear that the Final Cost Estimate or Xactimate must be submitted by the Lead

---

[2] Knauf apparently bases this number on the affidavit of Heath C. Keith, Assistant General Counsel for Boynton Beach Associates XVI, LLLP, who declared that "[h]ad GL been allowed to complete the remediation . . . GL would have spent approximately $260,000 for the total demolition, reconstruction and move back process." R. Doc. 22344-2 ¶ 10.

[3] $260,000.00 – (6,609 x $7.50) = $210,432.50

Contractor, not an independently selected general contractor. Accordingly, the Court finds it fair and reasonable to determine the value of Mr. Dieuvil's claim using the average $65.16/square foot figure spent by Knauf remediating homes under the Settlement Agreement, R. Doc. 20741 ¶ 31, and reducing that figure by $7.50/square foot pursuant to Option 3's discount for cash payments. Considering that Mr. Dieuvil's property spans 6,609 square feet, he is entitled to $381,074.94, before any applicable deductions.[4]

Under Section 4.8 of the Settlement Agreement, eligible claimants were required to assign amounts received from other, prior settlements, such as those with Banner and INEX, to the Remediation Fund. R. Doc. 16407-3 at 47. Class Members who did not do so would have the same amount deducted from any benefit received from the Knauf Settlement. R. Doc. 16407-3 at 47. Accordingly, any amount Mr. Dieuvil is eligible to receive must be reduced by any amount he previously received from the Global, Banner, or INEX Settlements. Mr. Dieuvil has received $37,402.88 in other settlements. R. Doc. 22344-1 ¶ 13. Because he never deposited this sum into the Remediation Fund, any award in the instant matter must be reduced by that amount. R. Doc. 16407-3 at 14. Thus, Mr. Dieuvil is entitled to recover $343,672.06 from Knauf.[5]

Although Mr. Dieuvil believes he is entitled to additional damages for alternative living expenses, loss of net equity, loss of furniture, property taxes, property insurance, and remediation costs, the Court finds that the facts do not support his claim. Under the Settlement Agreement, these types of losses were reimbursed through a capped Other Loss Fund, funded by Knauf but administered solely by the Settlement Administrator. R. Doc. 16407-3 at 33. Parties were able to make claims with respect to these specific types of damages to the Settlement Administrator, who reviewed the claims and provided an allocation award. Mr. Dieuvil made an Other Loss claim

---

[4] ($65.16 - $7.50) x 6,609 = $381,074.94
[5] $381,074.94 - $37,402.88 = $343,672.06

under the "miscellaneous" category and was awarded $2,656.36, which he accepted. R. Doc. 22344-1 ¶ 8. This category covered claims for loss of furniture, property taxes, and property insurance. R. Doc. 22344-1 ¶ 7. Further, he made a Pre-Remediation Alternative Living Expenses claim which was denied and never appealed. R. Doc. 22344-1 ¶ 10. Lastly, Mr. Dieuvil never made a claim for loss of Net Equity to the Other Loss Fund, even though he was entitled to do so. R. Doc. 22344-1 ¶ 12. Mr. Dieuvil has presented no evidence or argument to the contrary. Accordingly, Mr. Dieuvil is ineligible to recover for these types of damages.

As for delay damages, Mr. Dieuvil believes he is entitled to an additional $1,040,917.50, and the PLC proposes that he recover $9,913.50. R. Doc. 22338 at 4. However, the Knauf Settlement only provides delay damages to Option 1 claimants.[6] R. Doc. 16407-3 at 15. As discussed above, Mr. Dieuvil is not an Option 1 claimant. As an Option 3 claimant, he has no claim for delay damages. R. Doc. 22344 at 6-7.

IV. **CONCLUSION**

Considering the foregoing,

**IT IS ORDERED** that Guilfort Dieuvil's Objection to the Special Master's Order and Decree, R. Doc. 21104, is **SUSTAINED IN PART** and **OVERRULED IN PART**. Mr. Dieuvil is entitled to recover $343,672.06 from Knauf.

New Orleans, Louisiana this 27th day of January, 2020.

*[signature: Eldon E. Fallon]*

Eldon E. Fallon
United States District Judge

---

[6] Section 4.3.3, governing the Option 3 Cash-Out option specifically provides, "The Remediation Fund will not pay a Delay Period Payment under Section 4.3.1.2. to a KPT Property Owner who selects this option." R. Doc. 16407-3 at 18.