# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS (except *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Civil Action No. 09-4115 (E.D. La.)) | |

**JOINT AFFIDAVIT OF DAWN M. BARRIOS AND EMMA KINGSDORF SCHWAB IN SUPPORT OF BARRIOS KINGSDORF & CASTEIX, L.L.P.'S APPLICATION FOR AN ALLOCATION OF COMMON BENEFIT FEES AND REIMBURSEMENT OF HELD COSTS**

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned authority, duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, personally came and appeared

**Dawn M. Barrios and Emma Kingsdorf Schwab**

who, after being first duly sworn, under penalty of perjury, did depose and declare that the following are true and correct and based on personal knowledge:

1.  Dawn M. Barrios ("Barrios") is a partner and Emma Kingsdorf Schwab ("Schwab") is an associate in the law firm of Barrios Kingsdorf & Casteix, L.L.P. ("BKC"), located at 701 Poydras Street, Suite 3650, New Orleans, LA 70139.

2.  The Court appointed Barrios as a member of the Chinese Drywall MDL 2047 Plaintiffs' Steering Committee ("PSC"). BKC has done extensive and quality common benefit work in this MDL since Barrios' initial appointment by the Court in July 2009.  The PSC membership provided

BKC with the opportunity to work in virtually every aspect of the MDL from 2009-2020. And, due to the quality of the firm's legal ability and work product, assignments were freely and routinely assigned by Lead and Liaison Counsel.

**BKC's Common Benefit Hours and Expenses**

3.   BKC has complied with Pre-Trial Order No. 9 and 9A and the Court's January 16, 2020 Order [Rec. Doc. No. 22481] in all material aspects and has submitted true and correct time and expense submissions pursuant to the Court's Pre-Trial Orders. Barrios and Schwab jointly submit this Affidavit on behalf of BKC as they were the primary attorneys who did the common benefit work for which BKC seeks compensation.

4.   The Court may rely on the information submitted by BKC to Philip Garrett, the Court appointed Certified Public Accountant, which is contained in his Case Cost Management System in this litigation.[1]

5.   BKC made a substantial common benefit contribution to the decade long, ground breaking outcome of this MDL. All BKC attorneys doing common benefit work have steadfastly and unselfishly contributed quality work product to the MDL since its inception, and particularly on the Taishan segment. Schwab continues to work in 2020 for the claimants in the settlement under the direction of Sandra Duggan ("Duggan"), and will persist with the same level of intensity BKC always displays in any MDL until its conclusion.

---

[1] *See* notes 2 and 3, *infra*, describing BKC's compilation and submission of time.

6.  BKC submitted common benefit hours of 9,652.85[2] from January 1, 2014 until December 31, 2019.[3]  Since Taishan came back into the litigation, almost no work day passed that BKC did not contribute to the common benefit.  BKC worked over 280 weekend days and there were over 500 days where a BKC attorney worked at least 7 hours on this case.

7.  As a PSC member, BKC paid $754,718.00 in assessments to the litigation of which $700,000.00 has been reimbursed,[4] leaving an outstanding balance of $54,718.00.  BKC has also incurred $22,850.55[5] in unreimbursed common benefit held expenses since January 2015.

**Introduction to BKC's Common Benefit Work**

8.  Leadership regularly called upon Barrios and Schwab to do a variety of tasks which will be explained in more detail below, but examples include:

---

[2] When Barrios and Schwab were preparing this affidavit, they learned that July 2017, October 2017 and December 2017 time was inadvertently not submitted and January 2018 time was submitted late. At Barrios' request, the July 2017, October 2017 and December 2017 times were resubmitted on January 22, 2020. Barrios signed an affidavit attesting to the fact that the time was kept contemporaneously and the circumstances surrounding the late submissions. Barrios submitted the affidavit with exhibits to the Court *via* email on January 22, 2020. The total for these submissions is 249.50 hours (July 2017: 176.65, October 2017: 30.35, December 2017: 12, January 2018: 30.5). BKC seeks inclusion of these 249.50 hours, should the Court and Fee Committee accept this time. Thus, these 249.50 hours are already included in the 9,652.85 hours for which BKC seeks compensation.  The affidavit and exhibits are attached hereto as Exhibit "A." Moreover, throughout the course of this litigation, BKC has resubmitted time entries in accordance with PTO 9. It was BKC's understanding that resubmitted time would automatically overwrite the previous entries, if timely submitted, such that the previous entries would be withdrawn. BKC has since learned that this was not always the case and there are 111 duplicate entries totaling 148.5 hours. These 148.5 duplicative hours are not included in the 9,652.85 hours for which BKC seeks compensation. Should the Court or the Fee Committee wish to examine the list of these entries, BKC will provide them.

[3] Barrios was appointed by the Court to serve on the Knauf Fee Committee. BKC appreciates the Court's directive to remove "L190" (Fee Committee) hours from the firm's total hours submitted. BKC submitted 682.60 hours under the "L190" task code. In addition, there are 83 entries that were coded something other than "L190" but are related to the Fee Committee. The total for these 83 entries is 162.15 hours. BKC's 844.75 Knauf Fee Committee hours, which includes the miscoded entries, are not included in the 9,652.85 hours for which BKC seeks compensation.

[4] BKC, as well as other members of the PSC, each donated $7,142.86 of this reimbursement to the American Association of Justice as a non-reimbursable expense.

[5] This figure does not include costs that were rejected. A held cost report generated from Phillip Garrett's Case Cost Management System is attached hereto as Exhibit "B."

3

- creating the universal repository for all property claimed to have Taishan drywall, the Master Spreadsheet, which was the only site for all information about each property with a Taishan claim,

- identifying the various markings which have come to be known as "buckets" and amassing evidence to tie these markings to Taishan,

- vetting all claims for critical criteria from product identification to under air square footage to ownership status to whether assignments for remediation and/or at the time of sale were made to a third party, to whether there was any partial or complete remediation,

- vetting all claims for inclusion on Omni XX, the *Brooke* complaint, and all subsequent *Brooke* interventions,

- revising and confirming the information on the principal exhibit in connection with the June 9, 2015 class damages hearing (Ex.10/79),

- coordinating all state court cases with the MDL and particularly working with Richard Serpe on Virginia discovery and trials,

- working with Lead and Liaison counsel to create Supplemental Plaintiff Profile Forms ("SPPFs") and work with BrownGreer to perfect the submission process,

- obtaining from counsel the information needed on the SPPFs for each of their clients and directing counsel how to obtain the information if missing,

- opposing dismissal of individual claims sought by Taishan for failure to complete SPPFs, and communicating with each counsel to defeat the dismissal,

- preparing discovery requests to defendants regarding product identification and creating the outline for the 30(b)(6) deposition of Taishan,

- advising counsel of defendants' contests and claims for setoffs on all 1,700 Florida *Amorin* plaintiffs and assisting with the defenses particular to each property,

- preparing the global response to defendants' contests and setoffs, which impacted all Florida *Amorin* plaintiffs,

- vetting more than 100 and selecting 20 Priority Plaintiffs for trials in Florida and 20 Select Class Claimants in Louisiana,

- working with Priority Plaintiff and Select Class Claimant's individual counsel to meet all Court imposed deadlines and collect all evidence necessary to support the plaintiffs' claims,

- preparing the trial plaintiffs and attending their depositions, and

- assisting with writing and editing, and oftentimes preparing the first drafts, of briefs filed in Florida, Louisiana and Virginia post remand as well as submissions to the Special Master appointed in Florida.

9.   Since the inception of the MDL, and at the request of Lead Counsel, BKC has sent "mass" emails to all individual counsel in the MDL thereby making BKC the "voice of the MDL."  Since these mass emails contain BKC's contact information, *pro se* plaintiffs and plaintiffs' counsel in state and federal courts contacted, and continue to contact, our office virtually daily with questions. Attached as Exhibit "C" is list of *pro se* plaintiffs and firms BKC regularly communicated with about this MDL.

10. BKC labored side-by-side with Russ Herman ("Herman"), Lenny Davis ("Davis"), Arnold Levin ("Levin"), Sandra Duggan ("Duggan"), Richard Serpe ("Serpe") and Patrick Montoya ("Montoya"), and other  PSC members, at virtually every level of activity of the MDL, from being on trial teams in the MDL (*Germano*, *Hernandez*, and North River), Virginia and Florida, to the less glamorous claimant management work.  No task was too unimportant or too small for BKC; BKC accepted everything assigned to advance the MDL. BKC never felt too superior to undertake the most trivial of tasks as long as the MDL benefited from it. And, BKC always produced an excellent work product.

**Dedication to the Chinese Drywall MDL**

11. BKC is a very small firm and has only 5 attorneys. BKC submitted a total of 7,774.5 *attorney* hours, excluding fee committee hours, which makes up more than 80% of the hours submitted by BKC.[6] As illustrated in the number of hours worked, four of the 5 attorneys at BKC devoted substantial and quality time, legal talent, experience, and resources to this MDL.

---

[6] Barrios (senior partner) spent 1,449.6 hours or 18.65% of all BKC *attorney* time for common benefit; Bruce S. Kingsdorf ("Kingsdorf") (senior partner) spent 270.90 hours or 3.48% of all BKC *attorney* time for common benefit; Zachary L. Wool ("Wool") (partner) spent 450.25 hours or 5.79% of all BKC *attorney* time for common benefit; and Schwab (senior associate) spent 5,603.75 hours or 72.08% of all BKC *attorney* time for common benefit.

12. Schwab gave up working in the *Xarelto* MDL in order to become the primary BKC attorney assisting Lead and Liaison Counsel in this MDL.

**Groundwork Laid for the Taishan Aspect of this Litigation**

13. Given the reluctance and partial absence of Taishan for much of the MDL, it is without question that the years of litigating and settling with Knauf became the roadmap for litigating and settling with Taishan. BKC's common benefit work was extensive in January 2014 and thereafter.[7]

14. As the Court appointed Federal-State Liaison Counsel, Barrios monthly collected, analyzed and prepared a chart detailing all state court activity. Barrios prepared and presented the state court report to the Court during the monthly status conferences until the end of 2015 when the state court cases were complete. BKC has attended virtually every status conference and often attended the Chambers conferences which immediately preceded the status conferences.

15. Based upon Barrios' participation in 3 MDL trials (*Germano*, *Hernandez* and North River), and being Federal-State Liaison Counsel, Serpe asked Barrios to prepare the Virginia cases for trial in state court. Barrios worked very closely with Serpe on these plaintiffs' cases against Venture Supply and distributor defendants. Many cases were in the discovery phases and plaintiffs' individual cases had to be prepared for trial. Particularly in the *Davenport* case, Barrios devised the manner of determining, supporting, and proving economic losses, such as the additional cost of forbearance on a mortgage and the refinancing to do so; assisted Serpe in the selection of experts; traveled several times to Virginia to prepare plaintiffs for their depositions and present them at depositions; answered written discovery; prepared witness lists; and established the value of alternative living expenses, the manner to recoup repair and remediation damages, the determination of wage loss and the value of personal property loss. Pressing these

---

[7] The Court's January 16, 2020 Order instructs common benefit counsel to describe work beginning January 1, 2014 [Rec. Doc. 22481].

state court trials lead to the Virginia settlements with Venture Supply and others.

16. The Virginia settlements were months behind the Knauf settlement,[8] and Lead Counsel tasked Barrios with acting as liaison between the MDL settlements and the Virginia settlements to achieve consistency of results and coordination of Claims Administrators (BrownGreer for the MDL and Garrettson Resolution Group for Virginia). The Virginia Claims Administrator held weekly telephonic meetings to review issues and discuss the status of real property and other loss claims, establish the methodology of claim submission, claim review, distribution of awards, discuss policies and the various claim forms (comparing them to those of the MDL), determine the best method of communicating with the claimants, develop a deficiency process, establish a method of valuing damages for properties which were foreclosed and those with a short sale, and handle the myriad of claim administration issues. We tackled the issue of the effect of Statutes of Limitation on claims, ensured no one claimant made the same claim in both settlements, assisted with preparing determination notices, denial notices, and appeal notices similar to those in the MDL, made decisions on how to handle properties with Fannie Mae or Freddy Mac financing, made application to this Court to approve the settlement, and provided routine help with all issues related to closing out the settlement.

17. While working on the Virginia settlement, BKC also handled issues in the MDL settlements. Barrios, with Davis and Fred Longer, prepared guidelines for and policies of the MDL settlement administration, entitled Claims Administration Procedures ("CAPs") which were distributed to all counsel. The CAPs were shared with the Virginia Claims Administrator to

---

[8] Throughout 2014 and 2015, BKC assisted *pro se* claimants and individual counsel with Knauf settlement administration.

achieve as much coordination as possible.[9]

18. BKC played a major role in the following projects in the MDL beginning in 2014 before the litigation against Taishan began in earnest:

- Barrios spent many, many hours explaining the Knauf and Global/Banner/INEX (GBI) settlements to individual counsel, describing the elements of a successful claim, obtaining and reviewing indicia to determine with counsel if the plaintiff's indicia qualified for either MDL settlement, detailing how to determine under air square footage, explaining the Option 3 recordation requirement, recommending inspectors to obtain indicia of drywall, clarifying the deadlines and the repercussions of a late claim, informing counsel how to address a deficiency notice, and sending email blasts to all counsel with updates on the settlement and its administration.

- In order to "assist" *pro se* claimants, the Court appointed Robert Johnston as *pro se* curator to field questions of those plaintiffs who had no counsel and to steer them through the settlement process. BKC was the only firm which routinely worked with Johnston.[10]  BKC prepared draft memoranda for Johnston to distribute as he saw fit and set up a database for his office to capture information on all who contacted him. With guidance from BKC, Johnston obtained Knauf's permission to allow *pro se* plaintiffs to make a claim in the settlement despite the fact that the claims were outside the time limit to file claims.

- The defendants insisted on dismissals with prejudice from claimants in the Knauf and GBI settlements. Minor Pipes and Dorothy Wimberly were the point people for all defendants and Barrios and Davis handled the communication with the plaintiffs. Barrios individually contacted counsel for each plaintiff to explain the reason for a dismissal with prejudice, provided them a copy of the dismissal, and obtained written permission to file the dismissal. This work was a necessary chore of the MDL.

- Liaison Counsel specifically requested certain BKC attorneys (Kingsdorf and Wool) to assist with voluminous document review of Taishan, BNBM and CNBM productions. Kingsdorf and Wool had the tedious task of reviewing barely decipherable machine translations.  The many days they spent at Herman, Herman & Katz's offices paid off when Wool found a key document addressing the relationship between Taishan and its parent company that was one of the main exhibits to plaintiffs' alter ego and jurisdictional briefing. Other issues they dealt directly with Liaison Counsel on related to contempt and collection issues, such as whether Taishan was doing business in the United States and research on any Taishan domestic subsidiaries or trademarks. BKC also selected and organized documents for Liaison Counsel's depositions in the Taishan matter.

---

[9] This work was acknowledged in Judge Fallon's February 4, 2019 Order and Reasons Allocating Common Benefit Fees in the Knauf Aspect of this Litigation [Rec. Doc. 22089]. As indicated in BKC's monthly time submissions, this work continued through 2014.

[10] *See* note 9.

19. Trials and the Knauf, GBI and Virginia settlements formed a blueprint in which claims were valued, necessary information was determined and gathered, and indicia was studied. These findings, particularly the use of price per square footage, ultimately became the foundation of the Taishan litigation. However, the Court had to have the jurisdiction to bring Taishan, CNBM and BNBM into the MDL.  BKC devoted quality hours to challenge Taishan's jurisdictional motions. Lead Counsel asked Kingsdorf, one of BKC's senior partners, to issue Freedom of Information Act ("FOIA") requests to gather information in this effort.  In 2015, he issued 23 FOIA requests. Attached as Exhibit "D" is a list of FOIA requests sent to the various governmental entities. Unfortunately, these requests did not generate any document production.

**BKC's Significant Role to the Litigation Against Taishan**

20. After the Court certified the *Amorin* class in September 2014, and liability imposed on Taishan from the default judgment, the PSC had the responsibility to devise a methodology for determination of each class members' remediation damages, and to present the Court with the most efficient method possible- a formulaic approach. On June 9, 2015, the Court oversaw the class damages hearing[11] to address the issue of valuation of class wide remediation damages. The PSC analyzed each plaintiff's property to obtain the information our expert deemed critical—ownership status, square footage and zip code. BKC had the responsibility of gathering all evidence to support the expert's opinion and preparing the principal exhibit for the trial, Exhibit 10/79, a massive spreadsheet containing the objective information necessary for calculating damages for each class member. BKC worked with Richard Lewis ("Lewis") to prepare the expert report of George Inglis ("Inglis"). Inglis' report was the support and underlying data for Exhibit 10/79 and ultimately the Court's ruling. BKC was responsible for separating the Exhibit 10/79 Spreadsheet initially created

---

[11] On the day the class damages hearing was originally scheduled to begin, February 12, 2015, BNBM entered an appearance and the Court granted a continuance.

by BrownGreer by firm, distributing firm spreadsheets to counsel in over 50 firms, working with individual counsel on collecting missing square footage and attorney and client verifications for inclusion on Exhibit 10/79. Only current owners were on Exhibit 10/79 so ownership verification was imperative. BKC created a separate spreadsheet of former owners ("Reserved Properties") and undertook the same tasks with counsel outreach and collection of verifications as was done for Exhibit 10/79.

21. Lead Counsel next directed BKC to create a master list of every plaintiff named on any complaint in MDL 2047 against the Taishan defendants because the Reserved Properties list and Exhibit 10/79 did not include all claims. Lead Counsel needed a comprehensive list of properties and each's characteristics to move the case against Taishan forward. Schwab accomplished this by combining Exhibit 10/79 and the Reserved Properties list and cross-referencing these with the Omnibus complaints and complaints in intervention included in the certified *Amorin* class to ensure all plaintiffs with a claim against Taishan had been captured. This list has come to be known as the "Master Spreadsheet."

22. At Lead Counsel's request, BKC was tasked with vetting new plaintiffs to include on the Omni XX (*Brooke*) complaint.  This involved reviewing thousands of documents and having many discussions with individual counsel to request additional information such as proof of ownership, other forms of indicia, and verified proof of square footage. All told, BKC vetted and accepted over 800 new plaintiffs for the Omni XX complaint and worked with Lead Counsel's office to prepare and file it. Once the *Brooke* complaint was filed, all of the new plaintiffs' information was added to the ever-evolving Master Spreadsheet.

23. Endeavoring to include only properties with Taishan drywall <u>and</u> verified under air square footage on the Master Spreadsheet, Schwab reviewed all product identifications and square footage

information for each of the more than 4,100 claims.[12] This extensive vetting process required several of BKC's staff  to work under Schwab's direction to carefully examine the product identification indicia and under-air square footage documentation of each of properties. This major project (upon which the Taishan settlement was built) required attention to detail and vast organizational skills. Schwab worked with individual counsel for properties with insufficient indicia or under air square footage to assist counsel to obtain evidence to overcome any deficiency. If a plaintiff had insufficient proof of Taishan indicia or square footage, BKC moved the property to another tab on the Spreadsheet which captured such claimants.

24. Although the Court had created the Drywall Indicia Guide ("DIG") early in the litigation in December 2011, the PSC believed it did not identify all of the various board markings manufactured by Taishan or BNBM. As a result, BKC compiled all markings the PSC attributed to Taishan and created the Product Identification Catalog of photographs of 44 different markings. BKC's work in amassing, compiling and organizing the types of indicia was the exclusive reference throughout this litigation for claimant management and analysis.

25. At the direction of the Court, Barrios was asked to participate in mediation with Taishan in lieu of Lead and Liaison Counsel's attendance, along with Duggan and Davis. In an effort to settle this litigation, the Court entered a stay in August 2016. After countless meetings, the parties were finally able to agree on the 12 categories of Buckets (A-L), each bucket being one type of indicia, and for the most part, the parties agreed to which Bucket(s) each property belonged. BKC worked with Duggan and others to create a packet of proof for each Bucket evidencing the link between Taishan and the product. In many instances, the evidence to link a marking to Taishan or

---

[12] This number is greater than the number of claims on the Master Spreadsheet [Rec. Doc. 22355-1] as BKC's review and vetting efforts also included the 498 claims that are part of the Florida Individual Settlement ("FIS").

BNBM required reviewing depositions from distributors and suppliers, Manufacturer Profile Forms and a host of other evidence. BKC created many PowerPoint presentations used in our interactive settlement meetings with defense counsel.

26. Throughout 2016 and into 2017, BKC diligently assembled claim files on a FileCloud server for more than 4,100 properties and classified those properties by Product ID Bucket(s). Schwab ensured that each claim file included a Plaintiff Profile Form, indicia, and remediation documentation. One of the purposes of the FileCloud site and the Master Spreadsheet was to share the information with the defendants as they did not have access to claim files. Each property on the Master Spreadsheet was then classified by Bucket and photo number from the Product Identification Catalog. Schwab reviewed the inspection reports, delivery invoices, affidavits as well as the photographic indicia for each claim file for accuracy and completion. This lengthy vetting process, accumulation of evidence, and organization of the more than 4,100 properties was a daunting, detailed and extensive assignment to Schwab.

27. As the plaintiffs' efforts to settle with defendants in 2016 were unsuccessful, the MDL Court lifted the stay in November 2016. At that time, many new *Brooke* Complaints in Intervention were filed, and BKC again vetted the indicia, ownership information, and square footage verification for all claims. If a claim had all supporting documentation, it was included on an intervention and then added to the Master Spreadsheet. The Master Spreadsheet BKC kept was amended daily as information flowed to Schwab from nearly a hundred different firms.

28. After Judge Fallon rendered his April 20, 2017 Findings of Fact and Conclusions of Law from the Class Damages Hearing ("Class Damages Opinion") [Rec. Doc. 20741], BKC was charged with obtaining verified square footage for all *Amorin* and *Brooke* properties, approximately 4,100 claims. Individual counsel submitted proof to Schwab of under-air square

footage in the form of an inspection report, homeowner's insurance form, builder's floor plan, county or parish property tax assessor's report, or appraisal, along with a declaration signed by the attorney attesting to the verified under-air square footage. BKC vetted the proof and declarations, identified the under air square footage and type of proof submitted on the Master Spreadsheet, and stored supporting documentation in the appropriate individual claim file on the FileCloud site. If an attorney failed to submit sufficient document, or if the signed declaration contained information unsupported by the proof submitted, Schwab worked with individual counsel to resolve these issues. In many instances, Schwab and BKC paralegals conducted independent research on these properties and obtained information plaintiff's counsel could not or did not obtain. Schwab always reconciled the information on the Master Spreadsheet with the information on the FileCloud site, sometimes an hourly job.

29. The remediation damage methodology submitted in the class damages hearing in 2015 utilized the 2015 RS Means figures. Since the Court issued its Class Damages Opinion in 2017, BKC worked with Ronald Wright ("Wright"), plaintiffs' remediation damages expert who testified at the hearing in lieu of Inglis due to a personal issue, to update the RS Means national unit price from 2015 to 2017 figures.  Updating these figures was time consuming as the national unit price changes annually, as does the residential location factor. This process entailed updating all zip codes for every property in this litigation on a continual basis.

30. Taishan appealed Your Honor's April 21, 2017 Class Damages Opinion alleging it contained an injunction to trigger the narrow jurisdictional grant under 28 USC 1292(a)(1). At Lead Counsel's request, BKC drafted the motion to dismiss this appeal arguing that the Class Damages Opinion contains no injunction, is not a final order and thus the Fifth Circuit lacks jurisdiction. BKC also prepared the reply brief. Plaintiffs were successful and Taishan's appeal

was dismissed.

31. Between 2017 and 2018, BKC spent hundreds of hours populating and re-populating the Master Spreadsheet as new fields became necessary for litigation or settlement, such as identifying each plaintiff's Omnibus Complaint, the date of the earliest filed Omnibus Complaint for each plaintiff, the date of the most recent Plaintiff Profile Form, the current RS Means remediation formula damages, the most current ownership status, counsel information, prior payment information,[13] classifying any new indicia that was provided, whether there had been an assignment of rights, and remediation status. BKC vetted and verified all information and were in constant communication with individual counsel if the documentation was rejected or additional information was needed. Moreover, Schwab often discovered additional evidence such as ownership changes and under air square footage when individual counsel could not provide it for their clients. In these instances, BKC would send the proof to individual counsel to confirm with his or her client and request counsel to return a signed declaration verifying the correctness of the new information. BKC attempted to save every case in the MDL and would stop at nothing to ensure that a claim had all the required documentation and proof so plaintiffs unfortunate to have Chinese drywall were compensated.

32. BKC's efforts were critical to the individual discovery and claims analysis on every plaintiff in this MDL. As explained in detail above, BKC's active role in the vetting and collection of evidence, the creation and updating the Master Spreadsheet, and identification of the MDL's universe of claims played a major role in the day-to-day aspect of this litigation, as well as being pivotal in the claims analysis.  This work was superior in quality and importance and was never questioned.

---

[13] The ownership information (current or former) and prior payments from previous settlements in the MDL were supplied by BrownGreer.

33. In both 2017 and 2018, Liaison Counsel gave Schwab the assignment to review CNBM and BNBM documents to unseal and remove the confidentiality designations which involved reviewing the documents, drafting and editing briefs and participating in meet and confers with defendants. Plaintiffs were ultimately successful in de-designating and unsealing nearly all of the challenged documents.

34. When the Court entered PTO 11(A) on January 31, 2018, Schwab was Plaintiffs' Liaison Counsel's designee for handling all aspects of SPPFs. In that capacity, Schwab worked with defense counsel to obtain reasonable extensions to cure SPPFs on a case-by-case basis. BKC transferred information provided in the SPPFs to the Master Spreadsheet for each submitted SPPF so that all data was in a single, secure place and enabled Schwab to track the status of each SPPF to identify plaintiffs that had not submitted a SPPF or submitted an incomplete SPPF, and which had been granted an extension. SPPFs were amended daily, which required updating the Master Spreadsheet as well to keep it current as Duggan often and spontaneously asked Schwab for statistics of certain categories or states.

35. In order to clean up the docket in 2018, Schwab worked with counsel for Taishan to identify inactive *Amorin* cases that had not been judicially dismissed, but for which no Taishan indicia had been submitted. To accomplish this, Schwab contacted individual counsel for these "inactive" plaintiffs to again request proof of Taishan indicia or obtain consent to include the claim on a Motion for Voluntary Dismissal. Hundreds of cases were dismissed after BKC obtained consent from individual counsel.[14]

---

[14] These claims were not listed on the Master Spreadsheet even before they were judicially dismissed as they were never marked as having verified product identification; instead, the claims were identified on an inactive/dismissed list on the Master Spreadsheet in order to track all claims in one place.

**BKC's Continued Commitment and Contributions Upon Remand**

36. When the Court remanded the *Amorin* Florida and Louisiana cases and trial plaintiffs for determination of damages needed to be selected, the Master Spreadsheet BKC prepared and exclusively controlled was the premier and exclusive source utilized for selecting plaintiffs with product identification Taishan confirmed or admitted it produced. The Master Spreadsheet also provided other useful information for the selection process because it identified the complete array of current and former owners, and those with non-remediation damages such as bankruptcy, loss of use and enjoyment, diminution of value, etc. All of this information was easily searchable and filtered through the Master Spreadsheet.

37. The initial deadline in Judge Cooke's vigorous trial plan required plaintiffs to file three lists with the Court: 1) plaintiffs with completed SPPFs who have not remediated, 2) plaintiffs with completed SPPFs who have remediated, and 3) plaintiffs who have not submitted a SPPF. BKC had the sole responsibility to ensure all plaintiffs completed verified SPPFs to avoid dismissal and reached out to each counsel with clients who had not submitted a SPPF. Moreover, at the direction of Lead Counsel, BKC created a checklist to identify all required steps for a complete remediation according to Your Honor's *Germano* opinion. BKC then circulated the checklist to Florida counsel with clients whose SPPFs indicated the property was completely remediated to confirm that all steps were satisfied.

38. Plaintiffs were permitted to conduct limited discovery on product identification in the Florida *Amorin* cases. BKC assisted with propounding written discovery on defendants and scheduling and taking the 30(b)(6) product identification depositions of Taishan [FLSD ECF No. 160] and preparing Requests for Admission to BNBM in lieu of a deposition [FLSD ECF No. 167]. BKC assisted with document review of supplemental productions leading up to Taishan's

30(b)(6) deposition, with the Product ID deposition of Taishan's corporate representative, Che Gang, and with the Product ID briefing. Importantly Schwab took an active role in preparing materials and presenting plaintiffs' position regarding each Product ID bucket before Florida's Special Master Tiffani Lee.

39. BKC was part of the trial teams in Florida and Louisiana and tasked with the search, selection, and preparation of trial plaintiffs. As part of the trial team in Florida, BKC assisted with vetting and selecting 20 Priority Plaintiffs for trial [FLSD ECF No. 73] and worked with Florida Interim Lead Counsel's office to identify all fact witnesses for these plaintiffs [*see* FLSD ECF Nos. 86, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150].   As a member of the Louisiana trial team, BKC met with over 50 claimants, in person and *via* telephone, to vet claims and ultimately chose 20 Select Claimants for trial [Rec. Docs. 21910 and 21934]. BKC worked with individual counsel and identified all fact witnesses for these plaintiffs, just as was done in Florida [Rec. Doc. 21941].

40. Barrios and Schwab also traveled to Birmingham, Alabama to assist with preparing a plaintiff (who had individual counsel) for her perpetuation deposition and collecting the evidence necessary for that plaintiff to make a successful claim. BKC provided needed assistance in preparing the plaintiff and defending the deposition.   Additionally, BKC assisted with the preparation of the plaintiffs and attended the depositions of the majority of the Louisiana *Amorin* Select Claimants and even for some Florida *Amorin* Priority Plaintiffs. Attached as Exhibit "E" is the list of depositions BKC did.

41. Defendants were permitted to conduct limited discovery on individual plaintiffs and raise objections related to product identification, ownership, and square footage in the Florida litigation. Despite these limited areas of discovery, defendants raised 17 (A-Q) different types of objections.

All 1,700 Florida *Amorin* plaintiffs received at least one objection, with five (5) being the average number of objections each claim received. Schwab transferred the objections and setoffs for each claim to the Master Spreadsheet.  Schwab then sent each firm an excerpt of their individual cases with the specific objections raised by defendants, as well as engaged in thorough back-and-forth discussions with individual counsel on their position for individualized issues. Schwab also had several dozen phone calls and hundreds of emails with defense counsel to resolve issues on both a global and individualized basis. Schwab worked with Duggan to prepare our Response to the Preliminary Objections, where we addressed each objection category and identified exemplars, utilizing the Master Spreadsheet, when we believed the objection either lacked merit or was inaccurate. The defendants raised a square footage objection to over 500 claims and, in many instances, disagreed with plaintiffs' square footage even if the square footage difference was negligible. Schwab worked with individual counsel and defendants to reduce and resolve these objections. Schwab's meet and confer efforts both with individual counsel and defendants resulted in hundreds of objections being withdrawn in defendants' Final Contests and Setoffs. Schwab worked with Duggan to prepare our Response to the Final Objections and took an active role in preparing the PowerPoint and making the presentation for plaintiffs at the contests and setoffs hearing before Special Master Tiffani Lee.

42. After this hearing, BKC again engaged with Wright to update the RS Means numbers from the 2017 numbers to the 2019 numbers, which were used to formulaically calculate remediation damages. This involved updating the location factor for each affected zip code and the National Unit Price to the 2019 figures, all of which was incorporated into the Master Spreadsheet. This information was then submitted to Special Master Lee as a Post-Hearing submission.

43. Throughout this litigation, BKC drafted dozens of motions and briefs, and has edited and assisted with countless others. The following are examples of *some* of the documents BKC drafted or worked with Lead Counsel on drafting:

- In the MDL, the Motion and Memorandum to Set Aside Judgments Pursuant to Fed. R. Civ. P. 60(b) [Rec. Doc. 20388], Notice of Submission of Updated Spreadsheet to Substitute Ex. 10/79 and Erratas thereto [Rec. Doc. Nos. 21339, 21343, and 21399], Motion and Memorandum to Stay the Florida Claims on the *Amorin* Complaint [Rec. Doc. 21639], Opposition to Defendants' Motion to Dismiss [Rec. Doc. 21758], Notice of Clarification Regarding the Composition of the *Amorin* Class [Rec. Doc. 21741], and the Omnibus Response to Defendants' Motions to Dismiss for Failure to Complete SPPFs [Rec. Doc. 21460].

- In Florida, the Motion to Stay the Non-Florida claims on the Florida *Amorin* complaint [FLSD ECF Nos. 49 & 63], the Opposition to Defendants' Motion to Dismiss the Non-Florida Claims [FLSD ECF No. 57], the Response to Defendants' Motion to Dismiss Claims for Failure to Complete SPPFs [FLSD ECF Nos. 82 & 175], and the Motions to Voluntarily Dismiss Certain Florida Claims [FLSD ECF Nos. 48 & 81]. Schwab also collaborated on preparing the briefs to the Special Master regarding product identification categories attributable to Taishan and BNBM. BKC assisted with objections to and an appeal from the Special Master's Report and Recommendation regarding product identification attributable to Taishan [FLSD ECF No. 253]. BKC worked on voluminous briefing in response to defendants' preliminary contests and again with drafting the opposition to defendants' final contests. BKC assisted with drafting Oppositions to Defendants' Motions for Summary Judgment directed to all of the Priority Plaintiffs [FLSD ECF Nos. 269, 270, 276, 278, 279, 281, 282, 283, 284, 288]. Moreover, when plaintiffs were preparing limited objections to the Special Master's Reports and Recommendations regarding defendants' contests and set-offs [FLSD ECF Nos. 266 & 268], motions *in limine*, and a response to defendants' expedited motion to establish a bench trial [FLSD ECF No. 299], the parties reached a global class settlement.[15]

- In Virginia, BKC assisted with preparing the Notice of Submission of Updated Spreadsheet [submitted to the Court *via* hand-delivery May 6, 2019] and drafted, edited and received approval from Duggan on the final drafts for the following: Motion to Stay the Non-Virginia Claims on the Virginia *Amorin* complaint, Motion to Dismiss Certain Non-Virginia Claims from Virginia Docket, and Motion to Voluntarily Dismiss Certain Virginia claims. Plaintiffs never filed these pleadings as the parties reached the global settlement agreement.

---

[15] In addition, Schwab assisted with the briefing regarding the 498 FIS and prepared and signed an affidavit attesting to the common benefit work she contributed to these cases on behalf of the PSC. It is Schwab's understanding that the work product relied on for purposes of negotiating the FIS (product identification, square footage, ownership status, and remediation status) was the information vetted and collated by BKC in the Master Spreadsheet.

44. A case of this magnitude with all if its unique issues involves all hands-on deck. When the Florida and Virginia *Amorin* cases were remanded and a trial plan issued for the Louisiana *Amorin* cases, Duggan led the smaller group of common benefit counsel who continued to work and created an assignment sheet to ensure that all assignments were accomplished and done timely. The last assignment sheet Duggan circulated on May 14, 2019, just prior to the mediation which resulted in the global settlement, identified 220 tasks. Out of those 220, Duggan assigned BKC to 77 tasks, more than 1/3 of all projects for the PSC to do. BKC handled all tasks assigned to BKC, as well as provided support on the tasks assigned to other firms.

**BKC's Assistance with Negotiating the Settlement and Resolution of the MDL**

45. BKC and Duggan compiled the analysis of the claims for the mediation which led to the settlement. The source of the underlying facts of this complicated analysis was the Master Spreadsheet created and exclusively controlled by Schwab. The analysis consisted of placing each of the more than 3,600 claims into various groupings: product identification buckets, states, status of claims, prior payments, remediation, square footage and ownership status, to name just a few. BKC's role in the claim analysis and calculations was integral to the global settlement as this information provided the plaintiffs' lead negotiator, Duggan, a clear understanding of the strengths and weaknesses of each case.

46. After the parties agreed to the term sheet, BKC assisted Settlement Class Counsel with drafting and editing the Settlement Agreement, Motions and Memos in Support of Preliminary and Final Approval, the long form and short form notice, getting the Settlement Website (www.ChineseDrywallSettlement.com) up and running, preparing the FAQs for the Settlement Website, creating the claim form for absent Class Members, and working with the Claims Administrator in revising the Portal. Schwab attended numerous in person meetings in

Philadelphia and New Orleans as well as participated in dozens of telephone calls on the Settlement Agreement and accompanying motions, memorandums, and exhibits.

47. At the request of Settlement Class Counsel, BKC sent mass emails to *pro se* plaintiffs and all counsel identified on Exhibit "C" when the settlement was reached and periodically thereafter while the Settlement Agreement was being drafted to keep all informed of the status prior to filing for preliminary approval.  BKC collected and created a list of mailing addresses for all known Class Members, confirmed addresses with individual counsel, and provided this information to the Claims Administrator for direct mail notice. BKC also reached out to all counsel with clients on the Master Spreadsheet and obtained written confirmation that the information contained on the Master Spreadsheet was accurate and correct prior to filing it on the docket on August 29, 2019 [Rec. Doc. 22312-1].  If counsel identified any inaccuracies, Schwab vetted the submitted documentation and modified the information where appropriate.  BKC also responded to calls and email inquiries submitted *via* the settlement website.

48. Schwab tracked and summarized all opt-outs and objections for Duggan, and drafted the template for the class representative affidavits. Schwab prepared the PowerPoints with direction from Settlement Class Counsel for the Fairness Hearing, which informed the Court, as well as Class Members, of all relevant facts and the law plaintiffs proved over the decade of litigation to support Court approval.  BKC has devoted substantial time assisting with the claims process so that Class Members are paid as expeditiously as possible.

49. The statement: "BKC created the Master Spreadsheet" does not do this labor and time-consuming assignment justice.[16]  The various parts of this creation spanned years as BKC

---

[16] Indeed, the Master Spreadsheet filed on the docket is a small excerpt of the complete spreadsheet, which has a total of 129 columns of information for all *Amorin* and *Brooke* claimants.

communicated with all *pro se* plaintiffs and individual attorneys on a daily basis, and collected, reviewed and vetted tens of thousands of pieces of evidence for more than 4,100 plaintiffs. The Chinese Drywall Litigation has many complexities, not just due to the number of plaintiffs but also because of the number of jurisdictions, the multitude of complaints and interventions, and the different Chinese defendants and product markings. The litigation required patience, persistence, accuracy, intellect, and organization of all facts for more than 4,100 plaintiffs and Chinese defendants in one centralized location. The Master Spreadsheet was critical to the successful resolution of all claims.

50. In 2018 and through 2019 upon Your Honor's remand Orders, to accomplish all the common benefit work described above Schwab missed out on holidays, vacations, weddings and other events to meet the very tight deadlines in Florida, Louisiana, and Virginia. Schwab was available to Lead Counsel and Duggan 24 hours a day, 7 days a week. This included afterhours, weekends, and holidays. There were many weeks Schwab and Duggan worked virtually side-by-side for 14+ hour days, which often began before sunrise. Schwab also interfaced with defense counsel on a routine basis. Schwab's efforts and work product were often recognized by defense counsel, who were appreciative of and relied heavily on our claimant management efforts to create and constantly update the Master Spreadsheet, and often spoke of Schwab's ability to streamline issues and quickly answer questions. It is no secret that the parties reached an impasse in 2017 which stalled the MDL. The key to breaking the impasse was Schwab's work product which allowed Lead Counsel and Duggan to analyze the claims by state, complaint, product identification, and status of ownership and determine the strengths and weaknesses of each case. Schwab's contribution was critical to this litigation which is why she accompanied Duggan to the mediation that ultimately led to this settlement.

51. BKC has worked with Herman, Levin and Duggan for more than a decade to prosecute the claims of all plaintiffs in this MDL and all jurisdictions with claims of damage caused by defective Chinese drywall. BKC's commitment to this MDL and every jurisdiction has never wavered. In fact, Schwab continues to assist by responding to Class Members and potential absent class member inquiries submitted *via* the Settlement website even though this is time and expenses for which BKC will never be compensated. BKC continues to assist Duggan and Lead Counsel with other tasks such as communicating with individual counsel and *pro se* plaintiffs regarding the Settlement, and drafting and filing pleadings at Duggan's request, such as a supplemental response to a purported objection. BKC has passed on opportunities in other cases because of its commitment to this MDL.  BKC's efforts throughout this litigation have been performed under demanding deadlines and have produced excellent results. BKC worked tirelessly for the benefit of all plaintiffs. As a representative of the Plaintiffs' Steering Committee, BKC had a duty to protect every plaintiff's claim, which it did.  At all times, our efforts inured to the benefit of all plaintiffs, without exception, and the ultimate resolution of this case.

FURTHER, AFFIANT SAITH NOT.


Dawn M. Barrios


Emma Kingsdorf Schwab

SWORN AND SUBSCRIBED
BEFORE ME, THIS 31st DAY OF JANUARY, 2020.


NOTARY PUBLIC
MARIA H. ROMANO
Notary Public - Orleans Parish, LA
Notary ID No. 12380
Commissioned For Life

23