**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON MAG. JUDGE WILKINSON |
| ALL CASES | |

## COMMON BENEFIT FEE APPLICATION OF GERALD E. MEUNIER ON BEHALF OF GAINSBURGH BENJAMIN

**MAY IT PLEASE THE COURT:**

On a consistent basis from the outset of this MDL, Gainsburgh Benjamin has provided valuable legal services inuring to the benefit of all plaintiffs with claims against Taishan and its parent entities.  The firm respectfully submits that its services, taken as a whole, substantially contributed to the class settlement recovery from these defendants.  This Application seeks the Court's allocation of a common benefit fee to the firm which is commensurate with these efforts.

As a Gainsburgh, Benjamin partner, as well as a member of the PSC during the entirety of these proceedings, I respectfully represent that I am in a position to both verify and support the following description of the nature and extent of Gainsburgh Benjamin's common benefit services in the case against the Taishan defendants.  I further certify that the firm has complied with the Court's orders governing the submission of time and expenses to Phil Garrett as the Court-appointed CPA, and that Mr. Garrett's records related to the firm are reliable.

## CONTRIBUTION TO THE ESTABLISHMENT OF JURISDICTION OVER THE SETTLING DEFENDANTS

Under the *Johnson* factors and the applicable jurisprudence, the extent to which a common benefit lawyer's activity meaningfully and substantially contributed to the outcome of

1

plaintiffs' recovery, has been entitled to predominant weight and consideration.  It therefore seems appropriate to begin with the firm's contributions to establishing *in personam* jurisdiction over the settling defendants, failing which no recovery by plaintiffs, in settlement or trial, would have been possible.

The Court's 100-page Order and Reasons of 4/21/17 (R.D. 20739) was the culmination of a roughly eight-year period during which Taishan and its parent entities vigorously challenged this Court's exercise of personal jurisdiction over them.  The Court's decision that such jurisdiction could be exercised over CNBM, BNBM and BNBM Group, was predicated on the imputable forum contacts and "single business enterprise" relationships between these parent entities and Taishan.  Both this Court and the Fifth Circuit (on two occasions) previously had ruled that Taishan was subject to personal jurisdiction in these proceedings.

The Gainsburgh Benjamin firm, principally through the undersigned, made substantial contributions to these essential outcomes.  I had been one of a small group of plaintiffs' counsel charged with securing sworn testimony from Taishan officials during the initial "jurisdictional discovery phase" of the MDL.  Accompanied by Your Honor as the presiding Judge to assure a meaningful record of this testimony, other counsel and I spent a week in Hong Kong deposing a number of Taishan witnesses.  This evidence became an essential predicate for the Court's jurisdictional analysis as to Taishan.  Thereafter, beginning in the summer of 2015, I was a principal participant in the PSC's formulation of the legal basis for building on this analysis to support the exercise of personal jurisdiction over the defendant parent entities of Taishan (who vigorously asserted jurisdictional defenses).  This entailed my review and analysis of voluminous discovery materials reflecting the "alter ego" relationships between and among Taishan and its parent entities, as well as active involvement in the preparation of *intra*-PSC memoranda and

pleadings addressed to defendants' jurisdictional challenge.  I took part in a number of telephone as well as in-person meetings with members of the PSC Law Subcommittee to formulate approaches for plaintiffs' establishment of *in personam* jurisdiction over the parent entities through the alter-ego/single business enterprise doctrines.

In the latter part of 2015, I also consulted with an expert on Chinese business activities and culture, Rosemary Coates, in order to facilitate the PSC's understanding of inter-business relationships between and among Taishan and parent entities operating as "State-Owned Enterprises."  The unique political and cultural aspects of vertical entity-to-entity overlap and control in the organization of these companies, greatly facilitated our analysis of the legal issues presented.

I devoted significant time in helping to finalize the PSC briefing on the jurisdictional challenges made by the BNBM and CNBM entities.  The ultimate success of these efforts on plaintiffs' behalf, predicated on the initial efforts to support a finding of jurisdiction over Taishan, is reflected in the Court's April 2017 decision.  Without all defendants having been made subject to the Court's jurisdiction, and its orders and judgments in these proceedings, it is highly unlikely this class settlement recovery would have been possible.

## PARTICIPATION IN TRIALS, HEARINGS, AND ARGUMENTS BEFORE THE COURT

After having served as a principal member of the trial team in all of the MDL bellwether trials (starting with the *Germano* trial against Taishan as defendant), I was asked to be a co-lead trial counsel with Chris Seeger in the Taishan class damages trial of June 9, 2015.  Mr. Seeger was ably assisted by Scott George of his firm, just as I received invaluable assistance from Rich Lewis of the Hausfeld firm.  Denise Martin of our firm served as the trial team's primary legal assistant during the trial.

As part of pretrial preparation, I traveled to Atlanta for the depositions of the Taishan trial experts, and was assigned to depose Taishan's expert in statics, Mr. Laurentius Marais.  I cross-examined this expert at trial and questioned plaintiffs' witnesses on the questions of remediation and the square footage formula to be utilized in calculating class-wide remediation damages.  I also participated in the preparation of the proposed Findings of Fact and Conclusions of Law following this trial and drafted and edited the PSC's post-trial briefing on the core issue of how to calculate class-wide remediation damages.  These class damages efforts were intense for all members of the trial team, but they made important contributions to the PSC's, and hopefully, the Court's understanding of the need to resolve the remaining issues of product i.d., remediation cost, and property ownership, before any global or class settlement could be negotiated.

When settlement discussions stalled after the class damages trial, the parties and the Court turned their attention to the remand of individual cases for trial.  Certain of the "Select Plaintiffs" whose cases were scheduled to be tried on remand to the Eastern District of Louisiana were cases in which I became actively involved.  I met with these plaintiffs, prepared them for their depositions, and identified the most effective way to present the evidence of their damages. My associate Rachel Naquin also rendered invaluable service toward assuring these cases were "trial ready."  I believe that the thorough preparation of these cases helped motivate the defendants in their progress toward a class settlement agreement, by allowing them to see that the alternative of trials would entail facing well-prepared plaintiffs and plaintiffs' counsel.

As early as 2017, it became clear to the PSC that the various delay tactics and strategies of the defendants were affecting both the census and status of owners in the plaintiff class.  It thus became critical to maintain the quality of a potential recovery outcome by establishing both the factual and legal bases for "former owner" plaintiffs to be made whole.  These class

members, increasing in number with the passage of time, were being called upon by defendants to prove loss only through reductions in sale prices which they could link to unremediated Chinese drywall in the home.  If defendants had prevailed in their position, both the potential value of class claims and the prospects of a meaningful class settlement, would have been greatly diminished.

I was asked to assume the primary responsibility for advocating the rights of these former owners, specifically under Louisiana law as an initial matter (in the hopes of having the Court's analysis then being referenced by judges in the other remand jurisdictions of Florida and Virginia).  My associate Rachel Naquin and I conducted substantial and careful research on the legal aspects of "former owner" property damage recovery.  I consulted at times with counsel in the remanded Virginia and Florida cases to discern how the laws in those States might compare or be harmonized on this issue.  These efforts culminated in exhaustive briefing efforts throughout March and early April 2019, as the support for a formal motion presented to the Court in April of 2019.  I then made the oral argument on plaintiffs' behalf at the hearing on this motion, and argued that Louisiana "former owners" should not be required to have their property damages calculated on anything other than the square footage-based remediation formula which the Court had approved when they were "current owner" plaintiffs in the proceedings.

The resulting decision by the Court did allow former owners to prove a diminution of value based on the square footage remediation costs of repair, and it proved to be a key leverage for the PSC members involved in efforts to negotiate a class settlement with the Taishan defendants.  I respectfully submit that my, and the firm's, work on the "former owner" issue was of significant value to the plaintiff class.  It in turn became an important contribution to the

outcome of a negotiated class settlement, particularly one in which "former owner" class members are not penalized by their status in the allocation of funds.

My last-in-time involvement in presentations to the Court was oral argument on behalf of the PSC and plaintiffs' counsel in seeking the Court's award of a percentage fee out of the class settlement recovery. This presentation, made at the Fairness Hearing on December 11, 2019, hopefully contributed to, or perhaps even facilitated, the analysis by which the Court ultimately determined both the total fee award and the total common benefit fee to be allocated in the approval of the class settlement.

## <u>INVOLVEMENT IN LEADERSHIP DECISIONS,<br>STRATEGY, AND TRIAL PLANS</u>

For significant periods of time over the course of this MDL, I was privileged to function as a *de facto* "of counsel" to the PSC leadership. On a number of occasions, Mr. Levin and I consulted on matters of overall strategy (including "end game" strategy) on plaintiffs' behalf. I believe my insight and advices on these occasions proved to be valuable.

Again based on my trial experience in the MDL, I was asked to take the lead role in formulating a trial plan for the Louisiana cases being remanded by the Court. I undertook an extensive analysis of Rule 55 (on default) and, specifically, the allowable approaches to the quantification of damages under Rule 55(b(2). I researched and analyzed the nature and scope of redhibition damages available under Louisiana law against Taishan as a manufacturer, and therefore a "bad faith" seller, under our Civil Code. I also made a PowerPoint presentation on the trial and required proof of damages in redhibition, to an assembled group of Louisiana trial attorneys in Mr. Herman's office.

I devoted substantial time and effort to the formulation of a Louisiana trial plan through, starting as early as the summer of 2016. The firm's staff and I remained dedicated to this work

through case review, legal analysis and strategic decision-making as to cases to be tried initially. As the Louisiana trial plan leader for plaintiffs, I also had meetings and extensive discussions with defendants in order to achieve some consensus on the plan.

This effort was prolonged, but in retrospect I submit it demonstrated to the settling defendants that the common benefit counsel remained committed to an "end game" for plaintiffs at all costs, and, specifically, to the securing of case-by-case monetized judgments in this matter. This no doubt helped to highlight the advantages of a class settlement. By the same token, these "Select Plaintiff" trial efforts also constituted part of a Louisiana "trial package" for all plaintiffs, as a potential benefit of great value which Defendants knew would become available had settlement not been achieved.

I should add that there was need for a specific trial plan with respect to Habitat for Humanities, a client of the Herman firm which had remediated numerous homes and had then received by assignment the property damage claims of these owners against the Taishan defendants. I was asked to help formulate this trial plan as well, and I met personally with Habitat representatives (and Herman firm staff) to discuss how to categorize and organize these claims for trial purposes. In the end, there was discussion both with defendants and with the Court about the prospect of having these Habitat claims assigned to a separate "trial track." Although such a separate track was not established prior to settlement, I believe defendants were placed at a potential disadvantage in having to contemplate the trial of a "stand alone" group of claims by this well-known, non-profit entity, proceeding on behalf of a number of disadvantaged homeowners.

## DISCOVERY ACTIVITY

In addition to the pretrial discovery activity already mentioned with regard to the class damages trial, I took an active role in the PSC discovery on the "contempt sanctions track" established by the Court. This followed the contempt and sanctions order entered when Taishan refused to obey the Court's order to appear for a Judgment Debtor Examination following the *Germano* trial. The contempt sanctions prohibited any "affiliates" of Taishan from doing business in the United States until and unless Taishan reappeared in the litigation; and if any affiliated companies found to have disobeyed this directive were subject to a monetary penalty under the Court's ruling. An extensive effort was undertaken by the PSC to identify all entities falling within the proper definition of an "affiliate" of Taishan, whether the affiliation ran in vertical or horizontal/collateral lines. With this accomplished, it then behooved the PSC to assign investigation and/or deposition duties to counsel for each affiliate.

My participation in this effort began as early as the summer of 2014, when I was able to determine that Taishan as well as certain CNBM parent entities still were using the "Alibaba" website to market and sell products in the United States, and that specifically this was being done during the period of prohibited U.S. business activity under the Court's order. After drafting a notice of the deposition of an Alibaba representative, I had discussions with both counsel and an official of Alibaba in Hong Kong (by way of a videoconference in which I participated along with Lenny Davis). The result of these discussions was an accord which made the deposition (entailing a costly trip to Hong Kong) unnecessary, i.e., Alibaba voluntarily withdrew from its website the posted "storefronts" of these Taishan entities.

Investigation also revealed that one of Taishan's affiliated entities was involved in federal litigation in the state of Oregon over a timber dispute with certain American companies. I

traveled to Portland and met with an attorney involved in this litigation, Dan Skerritt, with whom I collaborated in a continuing effort to have the PSC intervene in the Oregon proceedings.  The case was settled before this could occur, but the Chinese affiliate and its counsel were aware of my efforts (with Mr. Skerritt) on the PSC's behalf.

In the fall of 2015, we determined that another Taishan affiliate, CNBM Forest Products, had engaged in US business activities during the prohibited period; and I was assigned as the sole plaintiff questioner of a representative of this affiliate in a 30(b)(6) deposition.  With the assistance of my associate Rachel Sternlieb, a thorough compilation of relevant documents and material was prepared in advance, and a day-long questioning of the witness ensued.  In this testimony, we established that this affiliate actually was made aware of the Court's contempt/sanctions order, but on advice of its counsel elected to continue doing business in the United States anyway.  Again, through its counsel this affiliate of Taishan was made acutely aware of the PSC's determination to seek enforcement of the contempt sanction.

Although these multiple investigation and discovery activities did not lead to the actual, monetary enforcement of the penalties contemplated under the Court's contempt order, they sent a clear message to the Taishan organization of companies (including the parent entities) that plaintiffs' counsel were prepared to pursue the litigation vigorously, and to hold them accountable for compliance with the orders entered in an American court of law.  That the Taishan defendants ultimately elected not to simply ignore or walk away from these proceedings again, but to instead engage in a meaningful and enforceable settlement agreement, suggests that the continued pursuit of potential sanctions made a valuable contribution to outcome in this MDL.

Finally, in the area of discovery, I also took part in privilege log reviews, the identification of relevant discovery materials, and the general formulation of discovery strategy for pursing plaintiffs' claims not only against Taishan, but against the parent entities. In the course of this work, we discovered that the computer of a key Taishan witness, Peng Wenlong, somehow had been destroyed and its contents compromised. This necessitated our pursuit of a claim of potential spoliation against Taishan; and I participated in researching, analyzing and preparing a legal memorandum on this issue.

## CONTRIBUTIONS TO LEGAL BRIEFING

I was the primary author on numerous legal memoranda and briefs filed in this MDL on plaintiffs' behalf; but, in addition, I served as a continuing "editor" to review and finalize virtually all of the major briefs submitted by the PSC in the litigation, whether I was the initial drafter or not. A number of the written legal analyses for which I was primarily was responsible addressed: the recovery rights of "former owner" claims; the nature and parameters of Rule 55(b)(2) hearings on damages in default cases; and the scope as well as evidentiary criteria for the recovery of redhibition damages under Louisiana law.

I submit that these legal analyses and writing contributions were of substantial value to plaintiffs' cause, gave important credibility to that cause in defendants' view, and helped form the supportive framework for a class settlement recovery.

## COMMON BENEFIT SERVICES BY OTHER
## COUNSEL AND STAFF AT GAINSBURGH BENJAMIN

I'm fortunate to be in a law firm with a dedicated and experienced staff, particularly in mass tort and multi-litigation matters. The following are those who made meaningful contributions to the outcome of a class settlement recovery:

**Rachel Naquin**

My associate, Rachel M. Naquin, began her involvement in the Drywall litigation by thoroughly researching the recoverability of damages for former owners, and the measure of property damages in all eleven states where claims were pending.  She prepared a memorandum summarizing this research which was circulated to the members of the PSC. She researched the damages available to Louisiana plaintiffs for tort, breach of contract, and redhibition claims and a memorandum setting forth her findings which also was made available to PSC members. She also reviewed docket entries of pleadings that had been filed in the MDL to assist in the determination of which motions should be refiled in Florida after the Court remanded those cases.

Ms. Naquin worked with me to create a PowerPoint presentation which I used in an information session held for all attorneys representing Louisiana plaintiffs.  This presentation identified important legal issues to address, and the required proof for plaintiffs, following the Court's remand of Louisiana cases for merits trials.

Ms. Naquin also played an integral role in the PSC's designation of twenty "Select Claimants" to proceed to trial on remand in the E.D. La.; and she worked with Dawn Barrios and Emma Kingsdorf in researching and vetting the potential choices of such claimants.  This involved not only a careful review of claims-related documents submitted for specific plaintiffs, but also personally calling and/or meeting with plaintiffs to gauge their interest in moving forward to trial in their cases.  In some cases, Ms. Naquin met with plaintiffs at their homes. Several of the plaintiffs with whom she met, i.e., Lana Alonzo, Dawn and Ronald LaPierre, and Michael and Linda Zubrowski, eventually were nominated by the PSC to be Select Claimants.

Ms. Naquin also joined me at a meeting with representatives from Habitat for Humanity in order to discuss how to present 209 Habitat property cases at trial in the E.D. of La.

Two of the cases agreed upon by the parties as Select Claimants were Gainsburgh Benjamin clients:  Lana Alonzo was chosen by the PSC, and Brian and Barbara Lewis were chosen by Defendants. Ms. Naquin reviewed and analyzed the documents submitted for these claims and met with the clients to prepare them for their depositions. She assisted me in defending Ms. Alonzo's deposition, and on her own defended the depositions of Brian and Barbara Lewis.

Ms. Naquin ably assisted the PSC in briefs filed in the Louisiana, Florida and Virginia federal courts.  She specifically contributed to the brief submitted to Judge Cook in Florida to secure a ruling on the preclusive effect of this Court's prior decisions in the MDL, a critically important outcome for plaintiffs.  She researched the issue of specific damages recoverable in default for briefing in Virginia. She also prepared a memo on whether the *American Pipe* tolling doctrine is recognized in Mississippi and Texas, which was made part of a larger brief submitted to this Court.

Ms. Naquin prepared the PowerPoint presentations which assisted me in presenting the oral argument to this Court on Plaintiffs' motions regarding both the adoption of a trial plan for Louisiana *Amorin* cases, and the right of formers owners to recover remediation damages.

Throughout her involvement in the MDL, Ms. Naquin faithfully attended all monthly status conferences and hearings on motions.

**M. Palmer Lambert**

My partner Palmer Lambert assisted me in the preparation of exhibits and creation of presentation materials for the class damages trial held on June 9, 2015. He also worked directly

with Rich Lewis, Scott George, Elliot Robinson and Chris Seeger to prepare the plaintiffs' class damages trial.  Palmer edited and assisted in finalizing our opposition brief to the defendant's motion to strike exhibits for this trial, and he piloted the PowerPoint presentation during my trial cross-examination of defendant's expert Dr. Marais.

**Claire Berg**

Ms. Berg conducted valuable research and analysis to assist the PSC in connection with the Court's contempt sanctions order, in opposition and in response to Taishan's efforts to decertify the class, and to prepare a response to defendants' request for interlocutory appeals of adverse rulings by the Court.

**Rachel Sternlieb**

Ms. Sternlieb, a former associate of the firm, did substantial and valuable work in this case from May of 2014 through January 2016.  Her legal research for the PSC extended to most of the important issues challenging plaintiffs' progress in the case, including jurisdiction, alter-ego/single business enterprise, the parameters of the default remedy, foreign sovereign immunity, enforcement of the Court's contempt/sanctions order, etc.  She participated in numerous conferences with leadership and with members of the PSC, and readily responded to numerous assignments for research and review.  She helped counsel prepare for important depositions, reviewed and summarized voluminous documents, and organized evidence in the case to such an extent that no eventual trial package of materials would have emerged without her being a significant contributor to the product.  I believe that the PSC leadership would agree that Rachel Sternlieb proved during her time with our firm to be one of the most helpful of all assistants to the PSC at the associate level.

**Denise Martin**

My Legal Assistant of 28 years, Denise Martin, has extensive experience and is highly skilled in mass tort litigation; and, as has been true in other matters, she effectively served at times as a legal assistant not just to me or the firm, but to the entire PSC.  She has logged and submitted important hours in every administrative aspect of PSC activity, ranging from the assembly of needed materials in preparation for depositions and trials, to the identification and forwarding of documents and pleadings in the record needed by plaintiffs' counsel for various purposes.  She served as the sole staff assistant present in Court for the class damages trial of June 9, 2015.  She has faithfully responded to numerous calls and inquiries by clients and by plaintiffs' counsel to report on the status of these proceedings as this case progressed over the years.

## TOTAL TIME AND EXPENSES SUBMITTED BY GAINSBURGH BENJAMIN

The following are the total and subtotals of common benefit hours submitted to Mr. Garrett by Gainsburgh Benjamin since January 1, 2014 in the case against the Taishan defendants:

| | |
|---|---|
| Gerald E. Meunier | 2,715.10 |
| Rachel Naquin | 268.40 |
| M. Palmer Lambert | 33.50 |
| Rachel Sternlieb | 1,698.10 |
| Denise Martin | 163.95 |
| **TOTAL HOURS** | **4,879.05** |

The following are the total and subtotals of common benefit expense incurred by Gainsburgh Benjamin in the case against the Taishan defendants:

| Held Expenses | $24,281.77[1] |
| Shared Expenses | $54,340.00[2] |
| "Select Plaintiff" Case Expenses | $3,276.01[3] |
| **TOTAL EXPENSES** | **$81,897.78** |

### **REQUEST FOR REVIEW**

I am prepared to meet with the Court's Fee Committee, and would request this opportunity if there are any questions or concerns regarding this Application.

Dated: January 31, 2020                    Respectfully submitted,

BY:   /s/ *Gerald E. Meunier*
      Gerald E. Meunier
      Bar No. 9471
      Gainsburgh, Benjamin, David,
      Meunier & Warshauer, LLC
      2800 Energy Centre
      1100 Poydras Street
      New Orleans, LA 70163-2800
      Phone: (504) 522-2304
      Fax: (504) 528-9973
      gmeunier@gainsben.com

---

[1] This amount conforms to Mr. Garrett's approved total from January 1, 2015 through December 31, 2019.

[2] This is the total amount of "cash call/special assessments" paid by the firm for the case against the Taishan defendants, as it appears in the attached list of approved assessments in Mr. Garrett's system.  *See* Exhibit I.

[3] These are the firm's case costs in the two "Select Plaintiff" cases of *Alonzo* and *Lewis*, discussed in the Fee Application at pp. 4,7 & 12.  The case ledgers are appended as Exhibits II(a) [Alonzo] and II(b) [Lewis].

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 31st day of January 2020.

*/s/ Gerald E. Meunier*
Gerald E. Meunier