**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL ACTIONS** | |

## ORDER & REASONS

Pending before the Court are requests by Mary Escudie and Michael Guerrier to be instated as Class Members in the Taishan Settlement. Considering the applicable law and the parties' arguments, the Court now rules as follows.

## I.       BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gas, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).

In an attempt to recoup their damages, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation in accordance with 28 U.S.C § 1407. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were transferred and consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.

## II.     PROCEDURAL HISTORY

### A.  The Knauf Defendants

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009 and discovery quickly ensued. Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, and entered a Judgment in the amount of $164,049.64, including

remediation damages in the amount of $136,940.46—which represented a remediation cost of $81.13 per square foot based on the footprint square footage of the house.

Subsequently, the Knauf Entities agreed to institute a pilot remediation program utilizing the remediation protocol formulated by the Court from the evidence in *Hernandez*. The pilot program included about fifty homes. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. Under the terms of the Knauf Settlement, homeowners had the choice of a sum certain or having the house totally remediated in addition to receiving reasonable costs and attorney fees. Furthermore, after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is estimated at $1.1 billion.

Although the Court occasionally has to deal with settlement administration and enforcement issues, the Knauf portion of this litigation is now resolved.

### B. The Chinese Defendants

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on the Plaintiffs' claimed damages. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 10, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs in the amount of $2,609,129.99. R. Doc. 2380, 3013. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. Taishan challenged this Court's jurisdiction over the Defendants. As a result, because this was the first instance where Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether the Court indeed has jurisdiction over Taishan.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial

discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track and conducted hearings and issued rulings to resolve numerous discovery-related disputes.

The first Taishan depositions were held in Hong Kong on April 4-8, 2011. Thirteen attorneys traveled to Hong Kong and deposed several Taishan witnesses. However, upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. The Court, after reviewing the transcripts from the depositions, concluded that the depositions were ineffective because of disagreement among interpreters, counsel and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general, ensuing chaos.

In view of the foregoing, the Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong. Due to the problems experienced during the first depositions, the Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions, and the Court decided to travel to Hong Kong to preside over the depositions. Counsel for the interested parties and the Court traveled to Hong Kong for these depositions. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems that plagued the first round of depositions were absent.

Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TPP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG and TPP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to pay the *Germano* judgment or voluntarily participate in this litigation.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participated in this judicial process; and that if Taishan violated the injunction, it would be obligated to pay a further penalty of 25-percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid the judgment and both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28

U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants. The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order. Because the Court found that its Order and Reasons involved a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons could materially advance the ultimate termination of this MDL, on August 4,

2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California*. Based on *Bristol–Myers Squibb*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued that the *Bristol–Myers Squibb* opinion impacts questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers Squibb* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding that *Bristol–Myers Squibb* does not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM Company, BNBM Group, and BNBM PLC's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certify interlocutory appeal of its April 2017 jurisdiction opinion arising from the Chinese Defendants' agency relationship. The Court, nevertheless, denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers Squibb*'s impact (or lack thereof) on the Court's personal jurisdiction analysis. The Court noted that the Supreme Court's opinion in *Bristol–Myers Squibb* did not address class actions and therefore was inapplicable to this MDL. Additionally, two separate panels on the Fifth Circuit had already reaffirmed the Court's original personal jurisdiction analysis in 2014. Any further litigation on the issue of personal jurisdiction for the Chinese Defendants would cause needless delay and waste

judicial resources. BNBM and CNBM petitioned the Fifth Circuit for permission to appeal this Court's jurisdictional order, and the jurisdictional appeal is currently pending.

In 2018, the Court suggested to the Judicial Panel on Multidistrict Litigation that the Florida and Virginia *Amorin* actions be remanded to the transferor courts. R. Docs. 21242, 21695. In 2019, the Court issued a suggestion of remand with respect to the Florida and Virginia *Brooke* actions as well. R. Doc. 22138, 22139.

A significant development in the Taishan aspect of this litigation occurred in the spring of 2019. On May 22 and 23, 2019, the parties underwent mediation with the goal of resolving the entirety of the *Amorin*[1] and *Brooke*[2] matters pending in the Eastern District of Louisiana, the Southern District of Florida, and the Eastern District of Virginia. On May 23, 2019, the parties agreed to a Term Sheet, and negotiations continued in person and by telephone for three months. All matters in the *Amorin* and *Brooke* actions were accordingly stayed by the remand courts and this Court, pending the execution of a Settlement Agreement between the parties. The stay was extended several times and preliminary approval of the Settlement Agreement was granted by the Court on August 29, 2019. R. Doc. 22314.

### C. The Taishan Settlement Agreement

The proposed Taishan Settlement Agreement is the result of over a decade of litigation and a complex negotiation process. Specifically, it obligates Taishan to pay $248,000,000 to fully resolve all claims of the *Amorin* class, the plaintiffs named in the *Brooke* complaints, and any other

---

[1] On September 26, 2014, the Court certified the *Amorin* class, comprised of homeowners with defective drywall allegedly manufactured by any of the Taishan entities.

[2] The *Brooke* action involves the plaintiffs who filed suit after the *Amorin* class had been certified. The Court has not ruled on the applicability of *Amorin* rulings to the *Brooke* complaints. The operative *Brooke* complaints are *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-4127 (E.D. La.); *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-6631 (S.D. Fla.) (Miami Case No. 15-24348); *Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, et al.*, Civ. Action No. 15-6632 (E.D. Va.) (Norfolk Case No. 15-506).

property owners with Chinese drywall attributable to Taishan ("Absent Class Members"). The settlement funds are "intended to provide compensation for all property and remediation damages as well as Other Losses." R. Doc. 22305-2 at 21. The Settlement specifically excludes 498 Florida *Amorin* Plaintiffs who received a separate settlement from Taishan (the "Parker Waichman Settlement"), the plaintiffs involved in the *Mitchell* action,[3] and plaintiffs whose claims were previously voluntarily dismissed or dismissed for failure to complete a Supplemental Plaintiff Profile Form. R. Doc. 22305-2 at 5. If the Settlement is approved, Class Members who have not opted out will be deemed to have fully released any and all claims, as defined by the Settlement Agreement, against Taishan and the Additional Released Parties,[4] and will be barred from bringing or continuing suit on a released claim against these entities. R. Doc. 22305-2 at 19-20.

The amount a plaintiff stands to receive under the Settlement Agreement is determined by a Court-appointed Allocation Neutral. R. Doc. 22305-2 at 20-21. Mr. J. Cal Mayo, Jr., the Allocation Neutral, has developed an allocation model to determine the proper allocation and distribution of settlement funds among all the affected properties and eligible class members. R. Doc. 22304. This model attempts to "strike a balance between property-specific allocation, on the one hand, and efficient and effective allocation, on the other hand." R. Doc. 22304-1 at 2. To that end, the allocation model considers a number of "objective allocation criteria," including square footage of the Affected Property, whether the claimant was an *Amorin* plaintiff, a *Brooke* plaintiff, or an Absent Class Member, product identification, and the prior receipt of settlement funds. R.

---

[3] On July 8, 2019, the Court denied Mitchell's motion seeking certification of a homebuilder class. R. Doc. 22287. On August 22, 2019, the Court suggested that the *Mitchell* matter be remanded to state court in Florida. The Court noted that remand was appropriate because the purpose behind consolidating these related actions in this Court had been served. The Court had addressed numerous discovery disputes, dispositive motions, and other pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding. No further pretrial motions raising common questions were pending in these cases, and remand to the transferor court appeared to be in the interest of judicial efficiency and fairness to the parties.

[4] The released parties are Taishan, BNBM, BNBM Group, CNBM, CNBM Group, and the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC"). R. Doc. 22392-3 at 20.

Doc. 22304-1. The allocation model does not consider the national average construction cost based on zip codes, ownership status, remediation status, or the value of other losses. R. Doc. 22304-1. The Settlement provides for a single allocation for each Affected Property, such that settlement awards may need to be divided among eligible class members with competing claims to the same property. The allocation model does not consider, nor does the Settlement provide compensation for personal injury claims, but such claims shall nevertheless be released pursuant to the Agreement. R. Doc. 22397-1 at 23.

Following preliminary approval, Class Members were able to access the allocation model on the Settlement website and on the Court's docket. A Master Spreadsheet of Known Class Member Claims was also posted and filed, providing class members who had submitted sufficient proof of covered Chinese drywall with the ability to review the objective criteria used to calculate the value of their claim. Class Members had the opportunity to dispute the information on the Master Spreadsheet by October 3, 2019. One hundred and nine challenges were made, and a Revised Master Spreadsheet was filed with the Court on October 31, 2019. R. Doc. 22355-1. It was also posted on the Settlement Website, and a Challenge Determination Notice was sent to each affected Class Member. Under the terms of the Settlement, the review, determination, and approval of the allocation model by the Court shall be final and binding.

The parties undertook a significant effort to notify all Class Members, including Absent Class Members, of the proposed Settlement Agreement. A website (ChineseDrywallSettlement.com) was published to provide Class Members with up to date information about the settlement and the litigation. A notice of the proposed settlement was posted in every courthouse in which a Chinese drywall related case was pending. Working with Kinsella Media, the parties implemented a Media Notice Program to publish notice of the Settlement in

print and online/mobile ads in relevant markets. Critically, each known Class Member was notified of the Settlement by mail and provided with a gross estimate of their award under the Settlement as calculated by the allocation model.

The Taishan Settlement Agreement binds all Class Members save those who formally opt-out from its terms. The Settlement involved a ninety-day period during which plaintiffs could opt-out by personally signing and mailing a request to do so to Settlement Class Counsel. Parties who choose not to opt-out but nevertheless were displeased with the Settlement could submit a formal objection within the same ninety-day period. The opt-out and objection period closed on November 27, 2019. The objections were collected by Settlement Class Counsel and submitted to the Court for consideration at the Final Fairness Hearing on December 11, 2019. Settlement Class Counsel received ninety-two opt-out requests, although not all were compliant with the Settlement Agreement's opt-out procedure. Of the compliant requests, seventy-eight were from known Class Members, [5] and twelve were from Absent Class Members. Settlement Class Counsel received twenty-two objections.

The Settlement was approved on January 10, 2020.

## III. THE OBJECTORS

### A. Mary Escudie

Mary Escudie objects not to the Settlement itself, but to being excluded from it. Ms. Escudie addressed the Court at the Final Fairness Hearing and sent the Court a follow-up letter clarifying her position. R. Doc. 22461. Ms. Escudie explains that she was a Florida *Amorin* class member who rejected the Parker Waichman Settlement offer. She explains that the Parker Waihman Settlement was a worse financial offer than the Taishan Settlement, based on the "rough

---

[5] This represents about 2% of known Class Members.

estimates" of the Allocation Model. R. Doc. 22461 at 2. She explains, "I am aware that the Global settlement is the better choice for my home." R. Doc. 22461 at 2. She also explains that she rejected the Parker Waichman Settlement because she "doubted the collectability [of the most favored nations clause] and understood that the Global settlement was much better for [her] particular case." R. Doc. 22461 at 3. She objects to being excluded from the Taishan Settlement Class without formally opting out, signing any opt-out documents, or "do[ing] anything to propel [her] exclusion." R. Doc. 22461 at 2. Ms. Escudie explains that she understood that rejecting the Parker Waichman Settlement would allow her to benefit from the Taishan Settlement. Ultimately, she seeks to be considered a Class Member in the Taishan Settlement or have "Parker Waichman honor the Allocation Model and settle on those figures in the side deal." R. Doc. 22461 at 3.

The Court cannot allow Ms. Escudie to participate in the Taishan Settlement. The Parker Waichman Settlement was negotiated on behalf of 498 Florida *Amorin* plaintiffs, including Ms. Escudie, before the Taishan Settlement was negotiated. Accordingly, the Taishan Settlement was specifically negotiated "on behalf of all *Amorin* Plaintiffs *except for* the 498 Plaintiffs who were offered the separate settlement by Taishan." R. Doc. 22483 at 3 (emphasis added). To reflect this consideration, the Taishan Settlement itself, as well as the notice circulated to affected parties, expressly excludes these 498 plaintiffs and lists them by name. Ms. Escudie was included on that list. R. Docs. 22305-2 at 52, 22316-1 at 5.

Further, Ms. Escudie was on notice of her exclusion from the Taishan Settlement. The Taishan Settlement was preliminarily approved on August 29, 2019, at which time Ms. Escudie should have learned about her exclusion from it through Court documents, her attorney, and/or the Class Settlement Notice mailed to her. Her offer to join to Parker Waichman Settlement, however,

14

was open until November 20, 2019. Accordingly, Ms. Escudie could have accepted the Parker Waichman Settlement after learning about her express exclusion from the Taishan Settlement.

Ms. Escudie argues that she rejected the Parker Waichman Settlement because she understood that the Taishan Settlement was a better financial option for her. However, the Parker Waichman Settlement contained a most favored nations ("MFN") clause allowing plaintiffs to recover additional funds if a later-negotiated Class Settlement exceeded the Parker Waichman Settlement by 110%. This provision was designed to preclude the very argument Ms. Escudie now makes. The Court recognizes that Ms. Escudie might have misunderstood the effect of the MFN clause or doubted its collectability but notes that she was represented by an attorney whose duty it was to answer these very kinds of questions.

Lastly, Ms. Escudie has not been prejudiced by her exclusion from the Taishan Settlement. The Parker Waichman Settlement was negotiated with the understanding that any party who opted-out from its terms would have the opportunity to continue litigating his or her case before Judge Cooke in the Southern District of Florida. Having rejected the offer negotiated for her by her attorney, Ms. Escudie is now free to do exactly that.

### B. Michael Guerriero

Michael Guerriero objects not to the Settlement itself, but to being excluded from it. He explains that he was originally a part of the individual settlement arranged by Parker Waichman. Although slightly unclear from his objection letter, it appears as though Mr. Guerriero failed to submit a Supplemental Plaintiff Profile Form in time to receive benefits from the Parker Waichman settlement, and accordingly now requests the Court to allow him to participate in the Taishan Settlement. Mr. Guerriero explains that he failed to complete the SPPF in a timely manner because on December 23, 2017, he suffered a stroke that required serious medical care and continues to

suffer "depression, fear, and anxiety" as a result. In particular, he expresses that the stroke caused him to suffer "very poor decision making and apathy towards some very relevant matters." He asks this Court to overlook what he believes amounts to "excusable neglect due to medical reasons beyond [his] control." R.Doc. 22389-24. He further explains that as an *Amorin* class member, his claims are known to Taishan and accordingly, allowing him to recover from the Settlement would not prejudice Defendants.

In opposition, Settlement Class Counsel explains that Mr. Guerriero's claim was remanded to the Southern District of Florida on October 11, 2018. R. Doc. 22502 at 1. Shortly thereafter, Defendants filed a motion to dismiss a group of claims for failure to file a Supplemental Plaintiff Profile Form by the Court's deadline of March 22, 2018. Common benefit counsel contacted Mr. Guerriero's attorney and, when asked about the status of Mr. Guerriero's claim, attorney Francisco Albites responded that he had been instructed by Mr. Guerriero to close case. Accordingly, Mr. Guerriero was included on a Motion to Voluntarily Dismiss Certain Claims with prejudice, which was granted on October 17, 2018.

The Court cannot allow Ms. Guerriero to participate in the Taishan Settlement. The Taishan Settlement expressly excludes plaintiffs whose claims were previously dismissed for failure to complete a Supplemental Plaintiff Profile Form ("SPPF") or by a Motion for Voluntary Dismissal. Mr. Guerriero's claim was dismissed at the direction of his individual counsel for failure to complete an SPPF. Accordingly, Mr. Guerriero is expressly excluded from the Settlement's terms. Even if the Court were inclined to overlook Mr. Guerriero's "excusable neglect," the proper procedure through which to seek his desired relief is a motion to vacate under Federal Rule of Civil Procedure 60, not the instant objection.

## IV.    CONCLUSION

Considering the foregoing,

**IT IS ORDERED** that Mary Escudie and Michael Guerriero's requests to participate in

the Taishan Settlement are **OVERRULED**.

New Orleans, Louisiana this 31st day of January, 2020.

Eldon E. Fallon
United States District Court Judge

CC:    Mary Escudie
       P.O. Box 7701,
       Wesley Chapel, FL 33545

       Michael Guerriero
       3565 Beaufort Court
       Naples, FL 34119