# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: *Elizabeth Bennett, et al. v. Knauf Gips, KG, et al.* 2:14-cv-02722-EEF-JCW | JUDGE ELDON FALLON MAG. JUDGE WILKINSON |

## PLAINTIFF FACT SHEET

Name of Plaintiff: Jacques Brousseau

Affected Property Address: 437 Delgado Drive, Baton Rouge, LA 70808

## I.  Purchase, Sale and/or Transfer of Ownership of Property

1.  On what date did you purchase the Property?

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Bennett Supplemental Plaintiff Profile Form ("SPPF").  Plaintiff directs the defendants to Section II of the SPPF. Without waiving said objection, Plaintiff adopts the SPPF response again here and intends to provide the exact same date as provided in the verified SPPF as follows: Plaintiff purchased the property:

(Month/Day/Year)        07 / 27 / 2012

2.  When you took ownership of the Property, what was the name of the seller?

Jude Waylon Brand and Belinda B. Brand

1

3.  Name and address of the realtor?

Christie Fawley, 508 Delgado Drive, Baton Rouge, LA  70808

4.  Name and address of the closing agent?

J. Donald Morgan, Red Stick Title Company, Inc., 2111 Quail Run Drive, Baton Rouge, LA 70808

5.  What was the price of the home when you purchased it?  $ 370,000.00

6.  Was it an "as-is" sale?

**Response**: Plaintiff objects to the use of "as-is" in this question as vague, ambiguous, uncertain, and unintelligible; consequently, Plaintiff cannot determine the exact nature of the information being sought.  This term is not defined and is not commonly understood with one accepted meaning; multiple inpretations are possible.  Without waiving said objection, plaintiff responds as follows:

☑ Yes    ☐ No    ☐ I'm not sure.

7.  If you sold or transferred ownership of the Property, what was the name of the purchaser?

N/A

8.  If you sold or transferred ownership of the Property, what was the name and address of the realtor?

N/A

9.  If you sold or transferred ownership of the Property, what was the name and address of closing agent?

N/A

10.  If you sold or transferred ownership of the Property, what was the price paid for home?
$ N/A

## II.  Appraisal of the Home

11.  Date of each appraisal:

a.  04 / 03 /20 18

b.  07 / 11 /20 12

c. 09 / 26 / 2016

2

**PFS REQUEST FOR DOCUMENT PRODUCTION #1**: Please produce copies of any and all appraisals performed on the house both prior and subsequent to the occurrence of any of the events allenged in the petition.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 1."

## III.  Discovery of Drywall

12.  Date that the property was constructed and/or renovated that installed the allegedly defective Chinese Drywall.

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Bennett Supplemental Plaintiff Profile Form ("SPPF").  Plaintiff directs the defendants to  Section II of the SPPF. Without waiving said objection, Plaintiff adopts the SPPF response again here and intends to provide the exact same date as provided in the verified SPPF as follows: The property construction and/or renovation that installed the allegedly defective drywall occurred on or about the following date (to the best of my knowledge):

> (Month/Day/Year)          ____/____/20_06___

**PFS REQUEST FOR DOCUMENT PRODUCTION #2**: Please produce all documents, reports, photographs, videotapes, samples and any other materials which evidence and/or identify that there is defective Chinese Drywall in the Property.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 2."

## IV.  Manufacturer/Seller of Drywall

13.  Who sold or distributed the drywall in the house?

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Plaintiff Profile Form ("PPF"). Plaintiff directs the defendants to  Section X of the PPF.  Without waiving said objection, Plaintiff adopts the PPF response again here and intends to provide the exact same information as provided in the verified PPF as follows:   The drywall Supplier's name (to the best of my knowledge) is:

I don't know.

**PFS REQUEST FOR DOCUMENT PRODUCTION #3**: Please produce all documents, reports, photographs, videotapes, samples and any other materials which evidence and/or identify the manufacturer of drywall installed in the house. The submission must be in the form of PTO 1(B).

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 3."

## V.  Damages

14.  Identify any harm, financial or otherwise, that you contend was caused by defective Chinese Drywall installed in the Property.

**Response**:  Plaintiff directs the defendants to review the complaint filed with the court in this case for a full listing of the claims being asserted and the damages being sought.  The defective Knauf Chinese Drywall emitted gasses that cause damage to Plaintiff's home and the personal property contained therein.  It also significantly diminished the use and enjoyment of the home; therefore, Plaintiff seeks the following:  all compensatory, statutory, and/or punitive damages; all pre-judgment and post-judgment interest as allowed by law; any appropriate injunctive relief; an award of attorney's fees as allowed by law; an award of taxable costs; and, any and all such further relief as a jury or judge presiding over my trial deems just and proper.  Other damages include, but are not limited to:

Loss of use/enjoyment; impacted livelihood; health issues; immense stress and depression

at times; inconvenience our family's lives and mobility.

15.  If you contend that you entered personal bankruptcy as a result of damage to your property from defective Chinese Drywall, please describe the facts and circumstances that relate to your claim.

N/A

16.  If you contend that you entered short sale and/or foreclosure as a result of damage to your property from defective Chinese Drywall, please describe the facts and circumstances that relate to your claim.

N/A

4

**PFS REQUEST FOR DOCUMENT PRODUCTION #4**: If you claim loss of income, please produce any copies of any and all documentation upon which you intend to rely upon to prove this claim.

>   **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 4."

17.  If you claim diminution of the property as a result of Chinese Drywall, state with particularity each fact which supports your claim.

See appraisals - value significantly reduced due to Chinese Drywall.

_____

_____

_____

18.  Identify the appliances, fixtures and/or other electronics, if any, that you claim were damaged by Chinese Drywall in the property.

>   **Response**: An list of damaged items is attached as "Exhibit 14."

19.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Address of each location you stayed thereafter.

>   a. 417 Delgado Drive, Baton Rouge, LA 70808
>
>   b. _____
>
>   c. _____

20.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Time periods in which you resided at each property.

>   a.  12 / 01 /20 16  to   07 / 01 /20 17
>
>   b. ____/_____/20_____  to   ____/_____/20_____
>
>   c. ____/_____/20_____  to   ____/_____/20_____

21.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Moving costs and/or alternative living expenses you claim to have incurred as a result of the alleged presence of Chinese Drywall.

>   a. $ N/A
>
>   b. $_____
>
>   c. $_____

5

**PFS REQUEST FOR DOCUMENT PRODUCTION #5**:  If you vacated the property because of the alleged presence of Chinese Drywall, please provide any documentation to support your claims.

> **Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 5."

22.  Are you claiming damages for personal injury?  ☐ Yes (explain below) ☑ No

_____

_____

23.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  Date you allege that you first sustained personal injuries as a result of your exposure to allegedly defective Chinese Drywall.

> **Response**:   ☑ N/A

24.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  What specific injuries have you suffered?

> **Response**:   ☑ N/A

25.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  Name and address of any doctor, physician, surgeon, chiropractor, or osteopath who examined and/or treated your alleged injuries.

> **Response**:   ☑ N/A

## VI.  Potential Witnesses/Evidence

26.  Has any written or recorded statement been taken from any witness or person who has knowledge of relevant facts, including the nature, character, and extent of the injuries referred to in the petition, and for each statement identified?

> ☐ Yes  ☐ No  ☑ I don't know

27.  If the answer to 26 is "yes," please state:  The name, address, and telephone number of the person from whom the statement was taken.

N/A_____

_____

28.  If the answer to 26 is "yes," please state:  The name, address, and telephone number of the person who took the statement.

N/A

29.  If the answer to 26 is "yes," please state:  The name address, and telephone number of the party having custody of such statement.

N/A

30.  If the answer to 26 is "yes," please state:  The date the statement was taken.

N/A

## VII.  Already Remediated Properties

31. If you already remediated the Property, who conducted the remediation?

    **Response:**    [✓] N/A

32. When did the remediation commencement date occur?

    **Response:**    [✓] N/A

33. When did the remediation end date occur?

    **Response:**    [✓] N/A

34. What was the scope of the remediation and the scope of the work carried out?

    **Response:**    [✓] N/A

35. What costs or expenses, if any, did you incur related to the remediation of the Property?

    **Response:**    [✓] N/A

36. Were any samples from the remediation retained?

   **Response**:   ☑ N/A

37. If the response to 36 is "yes," were the samples compliant with PTO 1(B)?

   **Response**:   ☑ N/A

38. Were any photographs taken of the allegedly defective Chinese Drywall?

   **Response**:   ☑ N/A

39. If the response to 38 is "yes," were the photographs compliant with PTO 1(B)?

   **Response**:   ☑ N/A

**PFS REQUEST FOR DOCUMENT PRODUCTION #6**:  Please produce the following documentation concerning the remediation of the Property:  Any evidence of KPT Chinese Drywall and Non-KPT Chinese Drywall, if any, in the Property prior to remediation.

   **Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 6."

**PFS REQUEST FOR DOCUMENT PRODUCTION #7**:  Please produce the following documentation concerning the remediation of the Property:  Interior photographs of the Affected Property immediately prior to the commencement of, and following completion of, the remediation, including photographs and/or video images of the flooring and major components such as cabinets, moldings, doors, intercom systems, and fixtures for every room and bathroom and, to the extent possible, security systems, appliances and audio such as surround sound.

** The photographs do not need to be pictures taken specifically for the litigation. For example, family photographs or photographs taken for purposes of refinancing a mortgage are acceptable in the absence of other photographs.

   **Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 7."

**PFS REQUEST FOR DOCUMENT PRODUCTION #8**:  Please produce the following documentation concerning the remediation of the Property:  The remediation contract and an itemization from the contractor who performed the remediation work of the materials used during the remediation, including, but not limited to, manufacturer, model number, and quantity.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 8."

**PFS REQUEST FOR DOCUMENT PRODUCTION #9**:   Please produce the following documentation concerning the remediation of the Property:  An itemized invoice from the contractor who performed the remediation work ("Itemized Invoice") showing the scope of work carried out.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 9."

**PFS REQUEST FOR DOCUMENT PRODUCTION #10**:   Please produce the following documentation concerning the remediation of the Property:  Proof of payment of the Itemized Invoice and any other expenses, such as cancelled checks, credit card statements, etc.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 10."

**PFS REQUEST FOR DOCUMENT PRODUCTION #11**:   Please produce the following documentation concerning the remediation of the Property:  A floor plan of the Affected Property with dimensions.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 11."

**PFS REQUEST FOR DOCUMENT PRODUCTION #12**:   Please produce the following documentation concerning the remediation of the Property:  An Environmental Certificate.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 12."

**PFS REQUEST FOR DOCUMENT PRODUCTION #13**:   Please produce the following documentation concerning the remediation of the Property:  An Owner Disclosure Affidavit in the form attached as Exhibit 1, which includes a certification that the materials provided comprise all of the available documentation regarding the following:  The drywall that was in the Affected Property prior to the commencement of the remediation; and, the scope, extent, and cost of the remediation.

**Response**:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 13."

## VERIFICATION

I hereby verify that the responses to the Plaintiff Fact Sheet are correct to the best of my knowledge.


_____        _____
Signature of Plaintiff                  Date   1/22/19


_____
Printed Name   Jacques Brousseau

# Exhibit 1

## Uniform Residential Appraisal Report

File # 3193-C

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | | | |
|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | City Baton Rouge | | State LA | Zip Code 70808 |
| Borrower N/A | | Owner of Public Record Jacques Brousseau | | County East Baton Rouge | |
| Legal Description | Ward 1-3 #4102, Lot: 17, Square: 1, Subdiv: UNIVERSITY HILLS. | | | | |
| Assessor's Parcel # 008-7601-1 | | Tax Year 2017 | | R.E. Taxes $ 3,183 | |
| Neighborhood Name UNIVERSITY HILLS | | Map Reference 12940 | | Census Tract 0048.00 | |

**SUBJECT**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Occupant | ☒ Owner | Tenant | Vacant | Special Assessments $ | | PUD | HOA $ | per year  per month |
| Property Rights Appraised | ☒ Fee Simple | Leasehold | Other (describe) | | | | | |
| Assignment Type | Purchase Transaction | Refinance Transaction | ☒ Other (describe) | Other; Legal | | | | |
| Lender/Client | | Address | | | | | | |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  Yes  ☒ No

Report data source(s) used, offering price(s), and date(s). GBRMLS

**CONTRACT**

I  did  did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

| | | | | | | |
|---|---|---|---|---|---|---|
| Contract Price $ | Date of Contract | Is the property seller the owner of public record? | Yes | No | Data Source(s) | |

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  Yes  ☒ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Urban | ☒ Suburban  Rural | Property Values | Increasing | ☒ Stable  Declining | PRICE | AGE | One-Unit | 80 % |
| Built-Up | Over 75% | ☒ 25-75%  Under 25% | Demand/Supply | Shortage | ☒ In Balance  Over Supply | $ (000) | (yrs) | 2-4 Unit | 3 % |
| Growth | Rapid | ☒ Stable  Slow | Marketing Time | Under 3 mths | ☒ 3-6 mths  Over 6 mths | 220 Low | 15 | Multi-Family | 2 % |
| Neighborhood Boundaries | | Subject is bounded North by Milford Wampold Memorial Park, South by | | | | 630 High | 75 | Commercial | 10 % |
| Highway 42, East by Lee Drive and West by Highway 30. | | | | | | 400 Pred. | 50 | Other | 5 % |

Neighborhood Description   Homes in this area are in C2-C3 Condition. There is an average supply of shopping in the area.

Market Conditions (including support for the above conclusions)   See Market Conditions Report.

**SITE**

| | | | | |
|---|---|---|---|---|
| Dimensions 123x60 | Area 7,380 sf | Shape Rectangle. | View N;Res | |
| Specific Zoning Classification A1 | | Zoning Description Low Density Residential | | |
| Zoning Compliance ☒ Legal | Legal Nonconforming (Grandfathered Use) | No Zoning | Illegal (describe) | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes  No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FEMA Special Flood Hazard Area | Yes | ☒ No | FEMA Flood Zone X500 | FEMA Map # 22033C0245E | | FEMA Map Date 5/2/2008 | |

Are the utilities and off-site improvements typical for the market area?  ☒ Yes  No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  Yes  ☒ No  If Yes, describe

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units | One  One with Accessory Unit | ☒ Concrete Slab  Crawl Space | | Foundation Walls | Concrete;Avg | Floors | Wood;Gd |
| # of Stories | 2 | Full Basement  Partial Basement | | Exterior Walls | Brick;Wd;Gd | Walls | Drywall;Poor |
| Type | ☒ Det.  Att.  S-Det./End Unit | Basement Area | sq.ft. | Roof Surface | Comp Shingle;Gd | Trim/Finish | Elab Wd;Gd |
| ☒ Existing  Proposed  Under Const. | | Basement Finish | % | Gutters & Downspouts | Alum;Gd | Bath Floor | C.Tile;Good |
| Design (Style) | Nola | Outside Entry/Exit  Sump Pump | | Window Type | Vinyl;Gd | Bath Wainscot | C.Tile;Gd |
| Year Built | 1950 | Evidence of  Infestation | | Storm Sash/Insulated | None, Yes;Gd | Car Storage | None |
| Effective Age (Yrs) | 14 | Dampness  Settlement | | Screens | Yes;Gd | ☒ Driveway  # of Cars 3 |
| Attic | None | Heating ☒ FWA  HWBB  Radiant | | Amenities | Woodstove(s) # 0 | Driveway Surface Conc |
| ☒ Drop Stair  Stairs | | Other | Fuel elec | Fireplace(s) # 0 | Fence Wood | Garage  # of Cars 0 |
| Floor  Scuttle | | Cooling ☒ Central Air Conditioning | | Patio/Deck Rear | Porch Front | Carport  # of Cars 0 |
| Finished  Heated | | Individual  Other | | Pool None | Other None | Att.  Det.  Built-in |

| | | | | | | |
|---|---|---|---|---|---|---|
| Appliances | Refrigerator ☒ Range/Oven | ☒ Dishwasher | ☒ Disposal | ☒ Microwave | Washer/Dryer | Other (describe) |

Finished area above grade contains:  8 Rooms  4 Bedrooms  2.1 Bath(s)  2,439 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).  Front Porch;Balcony Porch;Open Courtyard Patio; Updated Kitchen; Updated baths; Detached

## Uniform Residential Appraisal Report

File # 3193-C

| | | | |
|---|---|---|---|
| There are 08 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 297,000 to $ 599,993 . | | | |
| There are 27 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 220,000 to $ 630,000 . | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 437 Delgado Dr Baton Rouge, LA 70808 | 1200 Ross Ave Baton Rouge, LA 70808 | 4348 Oxford Ave Baton Rouge, LA 70808 | 1528 Stuart Ave Baton Rouge, LA 70808 |
| Proximity to Subject | | 0.73 miles NE | 0.25 miles W | 1.06 miles NE |
| Sale Price | $ | $ 425,000 | $ 425,000 | $ 427,500 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 200.19 sq.ft. | $ 214.43 sq.ft. | $ 215.91 sq.ft. |
| Data Source(s) | | MLS: 2017006841; DOM:31 | MLS: 2017011471; DOM: 20 | MLS: 2017017258; DOM: 4 |
| Verification Source(s) | | Public Records | Public Records | Public Records |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | | Armslgth;Cash 0 | | Armslgth;Cash 0 | | Armslgth;Conv 0 | |
| Date of Sale/Time | | c06/17;s07/17 | 0 | c09/17;s09/17 | 0 | c08/17;s09/17 | 0 |
| Location | N;Res | N;Res | | N;Res | | N;Res | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7,380 sf | 13536 sf | 0 | 10500 sf | 0 | 11250 sf | 0 |
| View | N;Res | N;Res | | N;Res | | N;Res | |
| Design (Style) | Nola | DT1;Acad | 0 | DT1;Cottage | +20,000 | DT1; Cottage | 0 |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 69 | 35 | 0 | 76 | 0 | 62 | 0 |
| Condition | C2 | C2 | | C2 | | C2 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8 4 2.1 | 12 3 2.1 | +3,500 | 10 3 2.1 | +3,500 | 7 3 2 | +4,500 |
| Gross Living Area | 2,439 sq.ft. | 2,123 sq.ft. | +47,400 | 1,982 sq.ft. | +68,600 | 1,980 sq.ft. | +68,900 |
| Basement & Finished Rooms Below Grade | | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Standard Pkg | Standard Pkg | | Standard Pkg | | Standard Pkg | |
| Garage/Carport | 2dw | 3cp6dw | -3,500 | 1cp2dw | -1,500 | 2dga4dw | -5,000 |
| Porch/Patio/Deck | 2prch;2patio | Front;Rear | | Front | | None | |
| Fence | wood | Full | 0 | Wood | 0 | None | 0 |
| Fireplace | None | 1FP | -2,500 | 1FP | -2,500 | None | |
| Pool | None | None | | None | | None | |
| Net Adjustment (Total) | | X + - $ | 44,900 | X + - $ | 88,100 | X + - $ | 68,400 |
| Adjusted Sale Price of Comparables | | Net Adj. 10.6 % Gross Adj. 13.4 % $ | 469,900 | Net Adj. 20.7 % Gross Adj. 22.6 % $ | 513,100 | Net Adj. 16.0 % Gross Adj. 18.3 % $ | 495,900 |

I [X] did  did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research  did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Public Records
My research  did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   GBRMLS/Public Records
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | GBRMLS/Public Records | GBRMLS/Public Records | GBRMLS/Public Records | GBRMLS/Public Records |
| Effective Date of Data Source(s) | 04/03/2018 | 04/03/2018 | 04/03/2018 | 04/03/2018 |

Analysis of prior sale or transfer history of the subject property and comparable sales   The subject property has not transferred within the previous 3 years, the comparable sales have not sold within 12 months prior to last noted transaction

Summary of Sales Comparison Approach   GLA factored at $150/sf. Condition, quality, and effective ages all adjusted using MLS images and local market data. Site size adjusted using local market data after reviewing similar lot sizes. All sales have settled within the previous 12 months , all sales are within subject market area. Bed/bath counts were adjusted according to local market reaction. After reviewing sales within the local area the appraiser concluded to adjust at the rate of $150/sf based on supporting data. Effective age was adjusted on all sales.
*Concessions of 2% to 6% are common within this market and ARE NOT considered a factor.

SALES COMPARISON APPROACH

## Uniform Residential Appraisal Report

**File #** 3193-C

ADDITIONAL COMMENTS

**Home was pending on MLS with a purchase agreement sale for $490,000 in 10/10/2016 (GBRMLS: 2016009794). During the inspection process it was made known to both seller and buyer that "Chinese Drywall" was used for the interior walls. Upon this finding the purchase agreement fell apart and the buying party withdrew their offer. The value listed on page one is as if the home did not suffer from this issue. The typical cost to cure an issue of this magnitude for this home ranges in the $75/sf range. The list of curing is as follows.

1) Remove all drywall (even ceiling drywall) / haul away
2) Replacement of electrical distribution components,including receptacles, switches and circuit breakers (Federal Government FHA statement)
3) All cabinets must be removed, along with trim work, interior doors, etc.
4) Home rewired with new electrical.
5) Drywall installed, finished, textured, primed.
6) Home Painted
7) Trim/interior doors replaced and painted
8) Cabinets/counter-tops replaced.
Current Home Price "As-IS" with no curing: $325,000

The Intended User of this appraisal report is the Owner/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for establishing market value, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form and definition of Market Value. No additional Intended Users are identified by the appraiser. This appraiser has not performed any appraisal valuation services) to include appraising, reviewing, BPO's, inspecting or updating) on the subject 36 months of the effective date of the current assignment.

It is beyond the scope of work for the appraiser to supply additional data provided by an AVM.  AVM's are not a credible source of sales information.  Most municipalities in Louisiana do not disclose what type of property was transferred, commercial, residential, vacant land or other types of real estate.

Answering AVM data falls under the guidelines of appraisal review and thus would fall under Uniform Standards of the Professional Appraisal Practice Standard 3-1 with careful instruction to the appraiser in Advisory Opinion 18.  Any information in regards to an AVM should be referred to a review appraiser and fall under his or her scope of work and fee schedule.


Utilities were on and functioning at the time of inspection.

The subject property is located 08 miles from my office. This assignment requires geographic competency as part of the scope of work. I have spent sufficient time in the subjects market and understand the nuances of the local market and the supply and demand factors relating to the specific property type and the location involved. Such understanding will not be imparted solely from a consideration of specific data such as demographics, costs, sales, and rentals. The necessary understanding of local market conditions provides the bridge between a sale and a comparable sale or a rental and a comparable rental.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

COST APPROACH

| | | | | | |
|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | | OPINION OF SITE VALUE | | =$ | 115,000 |
| Source of cost data | | DWELLING | Sq.Ft. @ $ | =$ | |
| Quality rating from cost service | Effective date of cost data | | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | =$ | |
| | | Garage/Carport | Sq.Ft. @ $ | =$ | |
| | | Total Estimate of Cost-New | | =$ | |
| | | Less Physical Functional External | | | |
| | | Depreciation | | =$( ) | |
| | | Depreciated Cost of Improvements | | =$ | |
| | | "As-is" Value of Site Improvements | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only) | Years | INDICATED VALUE BY COST APPROACH | | =$ | |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

INCOME

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____   Indicated Value by Income Approach _____
Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes   ☐ No   Unit type(s)   ☐ Detached   ☐ Attached

## Uniform Residential Appraisal Report

File # 3193-C

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK:   The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE:   The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER:   The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE:   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:   The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the

## Uniform Residential Appraisal Report

**File #** 3193-C

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of

## Uniform Residential Appraisal Report

File # 3193-C

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| John P Wren | |
| Signature | Signature |
| Name   John Paul Wren | Name |
| Company Name    Wren's Appraisal Service | Company Name |
| Company Address    19704 S. Harrells Ferry Rd | Company Address |
| Baton Rouge, LA 70816 | |
| Telephone Number   (225)278-9892 | Telephone Number |
| Email Address   johnwren.appraiser@gmail.com | Email Address |
| Date of Signature and Report   04/04/2018 | Date of Signature |
| Effective Date of Appraisal   04/03/2018 | State Certification # |
| State Certification #    3044 | or State License # |
| or State License # | State |
| or Other (describe)                 State # | Expiration Date of Certification or License |
| State   LA | |
| Expiration Date of Certification or License    12/31/2018 | SUBJECT PROPERTY |
| | Did not inspect subject property |

# Uniform Residential Appraisal Report

File # 3193-C

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 437 Delgado Dr | 13 Rue Toulouse | | | | | |
| | Baton Rouge, LA 70808 | Baton Rouge, LA 70808 | | | | | |
| Proximity to Subject | | 0.32 miles NW | | | | | |
| Sale Price | $ | | $ 610,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 244.10 sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS: 2017012015; DOM: 2 | | | | | |
| Verification Source(s) | | Public Records | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Armslgth;Cash | | | | | |
| Concessions | | 0 | | | | | |
| Date of Sale/Time | | c08/17;s10/17 | 0 | | | | |
| Location | N;Res | N;Res | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 7,380 sf | 3120 sf | 0 | | | | |
| View | N;Res | N;Res | | | | | |
| Design (Style) | Nola | DT2;French | 0 | | | | |
| Quality of Construction | Q3 | Q2 | -55,000 | | | | |
| Actual Age | 69 | 35 | 0 | | | | |
| Condition | C2 | C2 | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8   4   2.1 | 12   4   3.1 | -2,500 | | | | |
| Gross Living Area | 2,439 sq.ft. | 2,499 sq.ft. | -9,000 | sq.ft. | | sq.ft. | |
| Basement & Finished | | 0sf | | | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | Central | Central | | | | | |
| Energy Efficient Items | Standard Pkg | Standard Pkg | | | | | |
| Garage/Carport | 2dw | 2aga2dw | -5,000 | | | | |
| Porch/Patio/Deck | 2prch;2patio | Rear | | | | | |
| Fence | wood | Brick | 0 | | | | |
| Fireplace | None | 1FP | -2,500 | | | | |
| Pool | None | None | | | | | |
| Net Adjustment (Total) | | + ☒ - $ | -74,000 | + - $ | | + - $ | |
| Adjusted Sale Price | | Net Adj. 12.1 % | | Net Adj. 0.0 % | | Net Adj. 0.0 % | |
| of Comparables | | Gross Adj. 12.1 % $ | 536,000 | Gross Adj. 0.0 % $ | 0 | Gross Adj. 0.0 % $ | 0 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | GBRMLS/Public Records | GBRMLS/Public Records | | |
| Effective Date of Data Source(s) | 04/03/2018 | 04/03/2018 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

## Comparable Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Comparable 1

| | |
|---|---|
| 1200 Ross Ave | |
| Prox. to Subject | 0.73 miles NE |
| Sale Price | 425,000 |
| Gross Living Area | 2,123 |
| Total Rooms | 12 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res |
| View | N;Res |
| Site | 13536 sf |
| Quality | Q3 |
| Age | 35 |



### Comparable 2

| | |
|---|---|
| 4348 Oxford Ave | |
| Prox. to Subject | 0.25 miles W |
| Sale Price | 425,000 |
| Gross Living Area | 1,982 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res |
| View | N;Res |
| Site | 10500 sf |
| Quality | Q3 |
| Age | 76 |



### Comparable 3

| | |
|---|---|
| 1528 Stuart Ave | |
| Prox. to Subject | 1.06 miles NE |
| Sale Price | 427,500 |
| Gross Living Area | 1,980 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | N;Res |

## Comparable Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Comparable 4

13 Rue Toulouse

| | |
|---|---|
| Prox. to Subject | 0.32 miles NW |
| Sale Price | 610,000 |
| Gross Living Area | 2,499 |
| Total Rooms | 12 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res |
| View | N;Res |
| Site | 3120 sf |
| Quality | Q2 |
| Age | 35 |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |

## Additional Listings

File # 3193-C

| FEATURE | SUBJECT | | | LISTING # 1 | | LISTING # 2 | | | LISTING # 3 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Address 437 Delgado Dr | | | 5960 Menlo Dr | | | 921 Carriage Way | | | | |
| Baton Rouge, LA 70808 | | | Baton Rouge, LA 70808 | | | Baton Rouge, LA 70808 | | | | |
| Proximity to Subject | | | 1.23 miles SE | | | 0.35 miles E | | | | |
| List Price | $ | | | $ 399,000 | | $ 399,500 | | | $ | |
| List Price/Gross Liv. Area | $ sq.ft. | | $ 198.31 sq.ft. | | | $ 171.68 sq.ft. | | | $ sq.ft. | |
| Last Price Revision Date | | | | | | | | | | |
| Data Source(s) | | | MLS: 2018004159 | | | MLS: 2018000298 | | | | |
| Verification Source(s) | | | Public Records | | | Public Records | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | | DESCRIPTION | +(-) $ Adjust. | | DESCRIPTION | +(-) $ Adjust. | | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | | Active | | | Active | | | | |
| Concessions | | | n/a | | | n/a | | | | |
| Days on Market | | | 19 | | | 44 | | | | |
| Location | N;Res | | N;Res | | | N;Res | | | | |
| Leasehold/Fee Simple | Fee Simple | | Fee Simple | | | Fee Simple | | | | |
| Site | 7,380 sf | | 19596 sf | 0 | | 14000 sf | 0 | | | |
| View | N;Res | | N;Res | | | N;Res | | | | |
| Design (Style) | Nola | | DT1;Trad | | | DT2;Acad | | | | |
| Quality of Construction | Q3 | | Q3 | | | Q4 | +30,000 | | | |
| Actual Age | 69 | | 62 | | | 2327 | | | | |
| Condition | C2 | | C2 | | | C3 | +15,500 | | | |
| Above Grade | Total Bdrms. Baths | | Total Bdrms. Baths | | | Total Bdrms. Baths | | | Total Bdrms. Baths | |
| Room Count | 8   4   2.1 | | 10   4   2 | 0 | | 11   4   3.1 | -2,500 | | | |
| Gross Living Area | 2,439 sq.ft. | | 2,012 sq.ft. | +64,100 | | 2,327 sq.ft. | +16,800 | | sq.ft. | |
| Basement & Finished | | | 0sf | | | 0sf | | | | |
| Rooms Below Grade | | | | | | | | | | |
| Functional Utility | Average | | Average | | | Average | | | | |
| Heating/Cooling | Central | | Central | | | Central | | | | |
| Energy Efficient Items | Standard Pkg | | Standard Pkg | | | Standard Pkg | | | | |
| Garage/Carport | 2dw | | 2cp2dw | -2,500 | | 4dw | | | | |
| Porch/Patio/Deck | 2prch;2patio | | Front;Rear | | | Front;Side | | | | |
| Fence | Wood | | Full | | | None | | | | |
| Fireplace | None | | None | | | None | | | | |
| Pool | None | | None | | | None | | | | |
| Net Adjustment (Total) | | | ✕ +   ☐ - | $ 61,600 | | ✕ +   ☐ - | $ 59,800 | | ☐ +   ☐ - | $ |
| Adjusted List Price | | | Net 15.4 % | | | Net 15.0 % | | | Net % | |
| of Comparables | | | Gross 16.7 % | $ 460,600 | | Gross 16.2 % | $ 459,300 | | Gross % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | | LISTING # 1 | | LISTING # 2 | | LISTING # 3 |
|---|---|---|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | | | | |
| Price of Prior Sale/Transfer | | | | | | | |
| Data Source(s) | GBRMLS/Public Records | | GBRMLS/Public Records | | GBRMLS/Public Records | | |
| Effective Date of Data Source(s) | 04/03/2018 | | 04/03/2018 | | 04/03/2018 | | |

Comments:

## Listing Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Listing 1

| | |
|---|---|
| 5960 Menlo Dr | |
| Proximity to Subject | 1.23 miles SE |
| List Price | 399,000 |
| Days on Market | 19 |
| Gross Living Area | 2,012 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2 |
| Age/Year Built | 62 |

### Listing 2

| | |
|---|---|
| 921 Carriage Way | |
| Proximity to Subject | 0.35 miles E |
| List Price | 399,500 |
| Days on Market | 44 |
| Gross Living Area | 2,327 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Age/Year Built | 2327 |

### Listing 3

| | |
|---|---|
| Proximity to Subject | |
| List Price | |
| Days on Market | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Age/Year Built | |

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Subject Front

437 Delgado Dr
Sales Price
Gross Living Area     2,439
Total Rooms            8
Total Bedrooms         4
Total Bathrooms        2.1
Location               N;Res
View                   N;Res
Site                   7,380 sf
Quality                Q3
Age                    69



### Subject Rear



### Subject Side

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



**Subject Side**

437 Delgado Dr
Sales Price
Gross Living Area        2,439
Total Rooms             8
Total Bedrooms          4
Total Bathrooms         2.1
Location                N;Res
View                    N;Res
Site                    7,380 sf
Quality                 Q3
Age                     69





**Subject Address**



**Subject Living**
(Updated)
thick granite
New appliances/fixtures

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Kitchen (updated)

| | |
|---|---|
| 437 Delgado Dr | |
| Sales Price | |
| Gross Living Area | 2,439 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.1 |
| Location | N;Res |
| View | N;Res |
| Site | 7,380 sf |
| Quality | Q3 |
| Age | 69 |



### Kitchen (updated)



### Kitchen (updated)

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### Subject Dining

437 Delgado Dr
Sales Price
Gross Living Area    2,439
Total Rooms    8
Total Bedrooms    4
Total Bathrooms    2.1
Location    N;Res
View    N;Res
Site    7,380 sf
Quality    Q3
Age    69



### Subject Living

Updated/Hardwood



### Subject Street

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



### M Bedroom

437 Delgado Dr
Sales Price
Gross Living Area    2,439
Total Rooms          8
Total Bedrooms       4
Total Bathrooms      2.1
Location             N;Res
View                 N;Res
Site                 7,380 sf
Quality              Q3
Age                  69



### M Bath (updated)



### M Bath

## Interior Photos

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



**Half Bath**



**Bedroom 2**



**Bedroom 2**



**Stairs**





## Interior Photos

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | | |



**Bedroom 4**



**Bath 2**

## Sketch  2439GLA 1.5 Story



Second Floor

Comments

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1702.4 | 1702.4 |
| GLA2 | Second Floor | 736.6 | 736.6 |
| P/P | Front Porch | 75.2 | |
| | Courtyard Patio | 342.9 | |
| | Rear Open Patio | 186.0 | |
| | Balcony Porch | 131.9 | 735.9 |

| LIVING AREA BREAKDOWN | | | |
|---|---|---|---|
| | Breakdown | | Subtotals |
| First Floor | | | |
| | 39.3 | x  25.1 | 988.0 |
| | 17.3 | x  22.6 | 391.2 |
| | 13.9 | x  23.2 | 323.2 |
| Second Floor | | | |
| | 29.3 | x  25.1 | 736.6 |

| Net LIVABLE Area | (rounded) | 2439 |
|---|---|---|

| 4 Items | (rounded) | 2439 |
|---|---|---|

## Market Conditions Addendum to the Appraisal Report

File No. 3193-C

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 437 Delgado Dr | City Baton Rouge | State LA | ZIP Code 70808 |
|---|---|---|---|---|

Borrower   N/A

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

**MARKET RESEARCH & ANALYSIS**

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 16 | 8 | 3 | Increasing | Stable | ✕ Declining |
| Absorption Rate (Total Sales/Months) | 2.67 | 2.67 | 1.00 | Increasing | Stable | ✕ Declining |
| Total # of Comparable Active Listings | 7 | 6 | 8 | Declining | ✕ Stable | Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 2.6 | 2.2 | 8.0 | Declining | Stable | ✕ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | $364,750 | $340,000 | $398,700 | ✕ Increasing | Stable | Declining |
| Median Comparable Sales Days on Market | 10 | 16 | 50 | Declining | Stable | ✕ Increasing |
| Median Comparable List Price | $386,950 | $389,900 | $389,900 | Increasing | ✕ Stable | Declining |
| Median Comparable Listings Days on Market | 30 | 127 | 62 | ✕ Declining | Stable | Increasing |
| Median Sale Price as % of List Price | 96.73% | 100.00% | 93.81% | Increasing | ✕ Stable | ✕ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | Yes   ✕ No | | | Declining | ✕ Stable | Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).   Concessions of 2% to 6% are common within this market and ARE NOT  considered a factor.

Are foreclosure sales (REO sales) a factor in the market?   Yes   ✕ No   If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.   The Greater Baton Rouge Multiple Listing Service provided the statistics for the above analysis.
The MLS system does not provide information for the blank boxes/ DEED FAX

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
All sales/listings (past 12 months) give or take 400sf GLA Within the subject market area.

**CONDO/CO-OP PROJECTS**

| If the subject is a unit in a condominium or cooperative project , complete the following: | | | Project Name: | | | |
|---|---|---|---|---|---|---|
| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Total # of Comparable Sales (Settled) | | | | Increasing | Stable | Declining |
| Absorption Rate (Total Sales/Months) | | | | Increasing | Stable | Declining |
| Total # of Active Comparable Listings | | | | Declining | Stable | Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | Declining | Stable | Increasing |

Are foreclosure sales (REO sales) a factor in the project?   Yes   No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

## Location Map

| Borrower | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender/Client | Reverse Mortgage Solutions (RMS) - Charlotte | | | | | |



3044
CRA







**SUMMARY APPRAISAL REPORT**

OF THE REAL PROPERTY LOCATED AT

437 Delgado Dr
Baton Rouge, La  70808


for

Assurance Financial Group. LLC.
4884 Bluebonnet Blvd
Baton Rouge, La. 70809



as of

07/11/2012


by

Danny Heroman
5802 Antioch Boulevard
Baton Rouge, LA 70817




Danny Heroman

# Uniform Residential Appraisal Report

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**S U B J E C T**

| | | | |
|---|---|---|---|
| Property Address 437 Delgado Dr | City Baton Rouge | State La | Zip Code 70808 |

Borrower Jacques Brousseau  Owner of Public Record Jude & Belinda Brand  County East Baton Rouge

Legal Description Lot # 17 University Hills

Assessor's Parcel # 008-7601-1  Tax Year 2011  R.E. Taxes $ 2,395

Neighborhood Name University Hills  Map Reference 640F  Census Tract 48.00

Occupant [X] Owner [ ] Tenant [X] Vacant  Special Assessments $ 0  [X] PUD  HOA $ 45  [X] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [X] Purchase Transaction [ ] Refinance Transaction [ ] Other (describe)

Lender/Client Assurance Financial Group. LLC.  Address 4884 Bluebonnet Blvd, Baton Rouge, La. 70809

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of the appraisal? [X] Yes [ ] No

Report data source(s) used, offering price(s), and date(s). DOM 4;Subject listed since 7/3/2012 for $369900

**C O N T R A C T**

I [X] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. Arms length sale;

Contract Price $ 370,000  Date of Contract 07/07/2012  Is the property seller the owner of public record? [X] Yes [ ] No  Data Source(s) Assessor Office

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [X] No

If Yes, report the total dollar amount and describe the items to be paid: $0;;

**N E I G H B O R H O O D**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Percent Land Use % | |
|---|---|---|---|---|---|---|---|
| Location | Urban [ ] Suburban [X] Rural [ ] | Property Values | Increasing [ ] Stable [X] Declining [ ] | PRICE | AGE | One-Unit | 95 % |
| Built-Up | Over 75% [X] 25-75% [ ] Under25% [ ] | Demand/Supply | Shortage [ ] InBalance [X] OverSupply [ ] | $(000) | (yrs) | 2-4 Unit | % |
| Growth | Rapid [ ] Stable [X] Slow [ ] | Marketing Time | Under 3 mths [X] 3-6 mths [ ] Over 6 mths [ ] | 175 Low | | Multi-Family | % |
| | | | | 750 High | 80 | Commercial | % |
| | | | | 320 Pred. | 55 | Other | 5 % |

Neighborhood Boundaries Bounded on the North by Perkins Rd ., On the South by Highland Rd ., On the East by Lee Dr. *** See Additional Comments ***

Neighborhood Description The subject property is located in an older established neighborhood. Homes are varied as to size, age, condition and type of construction. The subject neighborhood has good access to shopping, schools, transportation and recreational facilities. *** See Additional Comments ***

Market Conditions (including support for the above conclusions) According to the records of the Baton Rouge MLS there have been approximately 14 Sales in the general area of the subject in the past year. The longest time a property was on the market was 199 days and the shortest time was 1 day. A marketing time of 3 to 6 months appears reasonable.

**S I T E**

| | | | | |
|---|---|---|---|---|
| Dimensions 60Fx123LSx60Rx123RS | Area 7380 sf | Shape Rectangular | View N;Res; | |

Specific Zoning Classification A-1 Residential  Zoning Description Low Density Residential

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe

*** See Additional Comments ***

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements--Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street 2-Lane Asphalt | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley None | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No  FEMA Flood Zone X500  FEMA Map No. 22033C0245E  FEMA Map Date 05/02/2008

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No. If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe

There were no adverse easements or encroachments noted that would affect the marketability of the subject. A title abstract or survey is recommended for this purpose.

**I M P R O V E M E N T S**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [X] Concrete Slab [ ] Crawl Space | | Foundation Walls Poured Con./Gd | | Floors | Ceramic/Wd-Gd |
| # of Stories 2 | | [ ] Full Basement [ ] Partial Basement | | Exterior Walls Brick/Wd/Gd | | Walls | Drywall/Panal/Gd |
| Type [X] Det. [ ] Att. [ ] S-Det/End Unit | | Basement Area 0 sq. ft. | | Roof Surface Archet. Shingles/Gd | | Trim/Finish | Wood/Gd |
| [X] Existing [ ] Proposed [ ] Under Const | | Basement Finish 0 % | | Gutters & Downspouts Vinyl/Gd | | Bath Floor | Ceramic/Gd |
| Design (Style) Acadian | | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type Aluminum Ins/Gd | | Bath Wainscot | Ceramic/Gd |
| Year Built 2006 | | Evidence of [ ] Infestation | | Storm Sash/Insulated N/A | | Car Storage | None |
| Effective Age (Yrs) 6 | | [ ] Dampness [ ] Settlement | | Screens Yes/Gd | | [X] Driveway # of Cars 3 |
| Attic | None | Heating [X] FWA [ ] HWBB [ ] Radiant | | Amenities | WoodStove(s)# 0 | Driveway Surface Concrete | |
| [X] Drop Stair [ ] Stairs | | [ ] Other Fuel Gas | | Fireplace(s) # 0 | Fence None | [ ] Garage # of Cars 0 |
| [X] Floor [ ] Scuttle | | Cooling [X] Central Air Conditioning | | Patio/Deck Patio | [X] Porch Balcony | [ ] Carport # of Cars 0 |
| [ ] Finished [ ] Heated | | [ ] Individual [ ] Other | | Pool None | [X] Other Ct Yd | Att. [ ] Det. [ ] Built-In |
| Appliances [P] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave | | | | [ ] Washer/Dryer [ ] Other (describe) | | | |

Finished area **above** grade contains: 7 Rooms  4 Bedrooms  2.5 Bath(s)  2,482 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) Insulated windows, ceiling fans, double insulation , metal support beams.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C2;Kitchen-remodeled-six to ten years ago;Bathrooms-remodeled-six to ten years ago;Subject property was rebuilt from the slab up in 2006 , due to tree damage from hurricane katrina. Subject changed floor plan in about 90 % of the home, and it was rebuilt from the slab up.Subject is only 6 years old.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe

| There are | 6 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 250,000 | to $ | 429,900 | . |
| There are | 10 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 278,000 | to $ | 550,000 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 437 Delgado Dr<br>Baton Rouge, La 70808 | 3400 Hyacinth Ave<br>Baton Rouge, LA 70808 | | 328 Delgado Dr<br>Baton Rouge, LA 70808 | | 290 Lsu Ave<br>Baton Rouge, LA 70808 | |
| Proximity to Subject | | 0.93 miles NE | | 0.07 miles S | | 0.18 miles N | |
| Sale Price | $ 370,000 | $ 374,625 | | $ 315,000 | | $ 531,250 | |
| Sale Price/Gross Liv. Area | $ 149.07 sq. ft. | $ 173.12 sq. ft. | | $ 162.45 sq. ft. | | $ 181.31 sq. ft. | |
| Data Source(s) | | MLS#1205853;DOM 5 | | MLS#1109212;DOM 32 | | MLS#1202542;DOM 13 | |
| Verification Source(s) | | Deed Fax/Pers Insp. | | Deed Fax/Pers Insp. | | Deed Fax/Pers Insp. | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | FHA;0 | | Cash;0 | |
| Date of Sale/Time | | s06/12;c05/12 | | s08/11;c08/11 | | s04/12;c03/12 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7380 sf | 8900 sf | -6,500 | 7500 sf | 0 | 10500 sf | -35,000 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | Acadian | Traditional | 0 | Acadian | | Traditional | 0 |
| Quality of Construction | Q2 | Q2 | | Q2 | | Q2 | |
| Actual Age | 6 | 17 | 0 | ~55 | 0 | 57 | 0 |
| Condition | C2 | C2 | | C3 | +24,661 | C2 | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 7 | 4 | 2.5 | 7 | 3 | 2.0 | +1,500 | 7 | 3 | 2.0 | +1,500 | 9 | 4 | 3.0 | -650 |
| Gross Living Area | 2,482 sq. ft. | 2,164 sq. ft. | +18,444 | 1,939 sq. ft. | +31,494 | 2,930 sq. ft. | -25,984 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | 0rr0br0.0ba0o | 0rr0br0.0ba0o | | 0rr0br0.0ba0o | | 0rr0br0.0ba0o | |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | CA/CH | CA/CH | | CA/CH | | CA/CH | |
| Energy Efficient Items | InsWind/CFans | InsWind/CFans | | InsWind/CFans | | InsWind/CFans | |
| Garage/Carport | No CovPking | Double Garage | -3,000 | Double Garage | -3,000 | Double Garage | -3,000 |
| Porch/Patio/Deck | Balcony/Ctyard | Front/CovPatio | -450 | Front/Open | 0 | Front/Cov/CtYd | +2,000 |
| Fireplace | None | 2-F/P | -2,400 | 1-F/P | -1,250 | 1-F/P | -1,250 |
| Fence/Pool | None/None | None/None | | Wood/none | -1,000 | None/None | |
| Net Adjustment (Total) | | X + - | $ 7,594 | X + - | $ 52,405 | + X - | $ -63,884 |
| Adjusted Sale Price | | Net Adj. 2.03 % | | Net Adj. 16.64 % | | Net Adj. 12.03 % | |
| of Comparables | | Gross Adj. 8.62 % $ 382,219 | | Gross Adj. 19.97 % $ 367,405 | | Gross Adj. 12.78 % $ 467,366 | |

I X did did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research did X did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MLS/Deed Fax

My research did X did not reveal any prior sales or transfers of the comparable sales for the prior year to the date of sale of the comparable sale.
Data Source(s) MLS/Deed Fax

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Deed Fax/MLS | Deed Fax/MLS | Deed Fax/MLS | Deed Fax/MLS |
| Effective Date of Data Source(s) | 07/11/2012 | 07/11/2012 | 07/11/2012 | 07/11/2012 |

Analysis of prior sale or transfer history of the subject property and comparable sales There have been no recorded transfers of the subject property in the last 36 months prior to the effective date of this report. There were no recorded sales in the past 12 months for the comparable sales

Summary of Sales Comparison Approach The search for property sales was made subject to alike criteria. The subject neighborhood was researched before going out of the immediate neighborhood. The sales nearest the subject were chosen. Location similarity was also a factor. It was necessary to search for comparables farther from the subject than desired due to the lack of alike sales in the immediate neighborhood. Living area was adjusted at $58 per foot rounded to the nearest $100. Site adjustments are based on the difference in values of the subject versus comparables sites. The site values are influenced by the presence orabsence of curbs, sidewalks, gutters as well as size, frontage, shape, topography, public versus private utilities and easements. *** See Additional Comments ***

Indicated Value by Sales Comparison Approach $ 375,000

| Indicated Value by: Sales Comparison Approach $ 375,000 | Cost Approach (if developed) $ 368,497 | Income Approach (if developed) $ 0 |

THE MARKET DATA APPROACH WAS CONSIDERED THE BEST INDICATION OF MARKET VALUE AND WAS SUPPORTED BY THE COST APPROACH. DUE TO THE LACK OF RELIABLE RENTAL INFORMATION THE GRM WAS NOT USED OR NEEDED FOR THIS RPORT. *** See Additional Comments ***

This appraisal is made X "as is", subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: *** See Additional Comments ***

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 375,000 , as of 07/11/2012 , which is the date of inspection and the effective date of this appraisal.

## ADDITIONAL COMMENTS

THE INTENDED USER OF THIS APPRAISAL REPORT IS ASSURANCE FINANCIAL GROUP    THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR A MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE STATED SCOPEOF WORK, PURPOSE OF THE APPRAISAL, REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT FOR, AND DEFINITION OF MARKET VALUE. NO ADDITIONAL INTENDED USERES ARE IDENTIFIED BY THE APPRAISER.

THIS APPRAISAL/INSPECTION IS NOT A HOME INSPECTION, STRUCTURAL INSPECTION, OR PEST NSPECTION. BY PREPARING THIS REPORT, THE APPRAISER IS NOT ACTING AS A HOME INSPECTOR, STRUCTURL ENGINEER, OR PEST INSPECTOR.  IN PERFORMING THE LIMITED INSPECTION OF THIS PROPERTY, AREAS THAT WERE READILY ACCESSIBLE WERE VISUALY OBSERVED AND THE REVIEW IS SUPERFICIAL ONLY.  THIS INSPECTION IS NOT TECHNICALLY EXAUSTIVE AD DOES NOT OFFER WARRANTIES OR GUARANTEES OF ANY KIND.  IT IS ADVISED TO HAVE THE STRUCTURE INSPECTED BY AN  INSPECTOR THAT OFFERS SUCH WARRANTED OR GUARANTEED INSPECTION IF THERE IS ANY CONCERN REGARDING ADVERSE OR NEGATIVE CONDITIONS.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

PRIOR VACANT LAND SALES IN NEIGHBORHOOD AND ALIKE SUBDIVISIONS IN AREA.

| ESTIMATED | X | REPRODUCTION OR | | REPLACEMENT COST NEW | OPINION OF SITE VALUE =$ | 110,000 |
|---|---|---|---|---|---|---|
| Source of cost data  M&S COST HND BK | | | | | Dwelling  2,482 Sq. Ft. @ $  112.52 =$ | 279,275 |
| Quality rating from cost service GD | | | | | Sq. Ft. @ $ =$ | 0 |
| Effective date of cost data  CURRENT | | | | | PCHS/PATIOS | 5,500 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | | Garage/Carport Sq. Ft. @ $ =$ | |
| AT THE REQUEST OF THE CLLIENT(NOT REQUIRED BY FNMA) DEVELOPMENT OF THE COST APPROACH HAS BEEN ATTEMPTED BY THE APPRAISER AS AN ANALYSIS TO SUPPORT THEIR OPINION OF THE PROPERTY'S MARKET VALUE. *** See Additional Comments *** | | | | | Total Estimate of Cost-New =$ | 284,775 |
| | | | | | Less  Physical Functional External | |
| | | | | | Depreciation  28,478 =$ ( | 28,478 ) |
| | | | | | Depreciated Cost of Improvements =$ | 256,297 |
| | | | | | 'As-is' Value of Site Improvements =$ | 2,200 |
| | | | | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only)  54  Years | | | | | Indicated Value By Cost Approach =$ | 368,497 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? [ ] Yes [X] No   Unit type(s) [X] Detached [ ] Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data Source(s) |

Was the project created by the conversion of existing building(s) into a PUD? [ ] Yes [ ] No   If Yes, date of conversion

Does the project contain any multi-dwelling units? [ ] Yes [ ] No   Data Source(s)

Are the units, common elements, and recreation facilities complete? [ ] Yes [ ] No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? [ ] Yes [ ] No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

**ADDITIONAL COMMENTS**

| Borrower or Owner | Jacques Brousseau | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Lender or Client | Assurance Financial Group, LLC. | | | | | |

## NEIGHBORHOOD BOUNDARIES
, and on the West by Louisiana St Univ.

## NEIGHBORHOOD DESCRIPTION
Very desireable location just east of Louisiana State Univrstiy. Most homes are 50-75 years old , and because of the location many have been remodled or totally gutted and rebuilt. MSA#0760 State #022

## MARKET CONDITIONS
The information in the 1004 MC addendum relates to properties that are comparable to the subject versus the subject's neighborhood which encompasses much broader market activity involved larger single family residences and smaller ones which is common in the area.

Typical sales concessions vary from 1% to 3% ; adjustments will be made on grid for any concessions exceeding 3%.

## HIGHEST AND BEST USE
The Subject as improved is a legally permissible use based on its current zoning/and or yard requirements. Also, the lot size, shape, physical condition and land - to - building ratio allow the present structure and inicate a good utilization of the improvements, Based on curent market conditions, the present use and structure as a single family residence is its finacially feasible and maximally productive use.

## ADVERSE SITE CONDITIONS AND/OR EXTERNAL FACTORS
There were no adverse easements or encroachments noted that would affect the marketability of the subject. A title abstract or survey is recommended for this purpose.

## SALES COMPARISON APPROACH
Comparable #3 was located on a high lot on small hill which gave it a very partial view of the lake, from the rear and the lot is more desirable in the small area on LSU Avenue just next to the subject subdivision. Comparables #1 and #3 were in completely remodled condtion with approx. the same effective age as the subject. Comparable #2 was updated to C3 condition but not down to the electrical and plumbing as was comparalbe #1 and #3.

Site adjustments are based on the difference in values of the subject versus comparables sites. The site values are influenced by the presence orabsence of curbs, sidewalks, gutters as well as size, frontage, shape, topography, public versus private utilities and easements.

The search for property sales was made subject to alike criteria. The subject neighborhood was researched before going out of the immediate neighborhood. The sales nearest the subject were chosen. Location similarity was also a factor. It was necessary to search for comparables farther from the subject than desired due to the lack of alike sales in the immediate neighborhood.

## RECONCILIATION
ALL COMPARBLES WERE USED IN DETERMING FINAL MARKET VALUE

## CONDITIONS OF APPRAISAL
This appraisal conforms to FIRREA Apraisal Standards.

## ADDITIONAL COMMENTS

Danny Heroman

**ADDITIONAL COMMENTS**
Page 2

| Borrower or Owner | Jacques Brousseau | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Lender or Client | Assurance Financial Group. LLC. | | | | | |

THE INTENDED USER OF THIS APPRAISAL REPORT IS ASSURANCE FINANCIAL GROUP     THE
INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL
FOR A MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE STATED SCOPEOF WORK,
PURPOSE OF THE APPRASIAL, REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT FOR,
AND DEFINITION OF MARKET VALUE. NO ADDITIONAL INTENDED USERES ARE IDENTIFIED BY
THE APPRAISER.

THIS APPRAISAL/INSPECTION IS NOT A HOME INSPECTION, STRUCTURAL INSPECTION, OR
PEST NSPECTION. BY PREPARING THIS REPORT, THE APPRAISER IS NOT ACTING AS A HOME
INSPECTOR, STRUCTURL ENGINEER, OR PEST INSPECTOR.  IN PERFORMING THE LIMITED
INSPECTION OF THIS PROPERTY, AREAS THAT WERE READILY ACCESSIBLE WERE VISUALY
OBSERVED AND THE REVIEW IS SUPERFICIAL ONLY.  THIS INSPECTION IS NOT TECHNICALLY
EXAUSTIVE AD DOES NOT OFFER WARRANTIES OR GUARANTEES OF ANY KIND.  IT IS
ADVISED TO HAVE THE STRUCTURE INSPECTED BY AN  INSPECTOR THAT OFFERS SUCH
WARRANTED OR GUARANTEED INSPECTION IF THERE IS ANY CONCERN REGARDING
ADVERSE OR NEGATIVE CONDITIONS.

ALL UTILITIES APPEAR TO BE IN PROPER WORKING ORDER.

**SUPPORT OF OPINION OF SITE VALUE**
PRIOR VACANT LAND SALES IN NEIGHBORHOOD AND ALIKE SUBDIVISIONS IN AREA

**COMMENTS ON COST APPROACH**
BECAUSE THERE IS INSUFFCIENT MARKET EVIDENCE TO CREDIBLY SUPPORT SITE
VALUE/DERIVATION OF TOTAL APPRECIATION, THE COST APPROACH IS  GIVEN SOME
CONSIDERATION IN THE APPRAISER'S FINAL ANALYSIS IN THE APPRAISAL SHOULD NOT BE
RELIED UPON FOR THE PURPOSE OF DETERMINING THE AMOUNT OF OR TYPE OF INSURANCE
COVERAGE TO BE PLACED ON THE SUBJECT PROPERTY.  THE APPRAISER RECOMMENDS THAT
AN INSURANCE PROFESSIONAL BE CONSULTED. FURTHER, THE COST APROACH MAY NOT BE
A RELIABLE INDICATION OF REPLACEMENT OR REPRODUCTION COST FOR ANY DATE OTHER
THAN THE EFFECTIVE DATE OF THIS APPRAISAL DUE TO CHANGING  COSTS OF LABOR AND
MATERIALS AND DUE TO CHANGING BUILDING CODES AND GOVERNMENTAL REGUALTIONS
ANE REQUIREMENTS.

**STATUS OF COMPLETION OF PUD COMM. ELEMENTS, REC. FACIL.**
Fannie Mae defines a planned unit development(PUD) as a project or subdivision that consists of common
property and improvements that are owned and maintained by and owner's association for the benefit and use of
the individual units within the project. For a project to qualify as a PUD, the owners' association must require
AUTOMATIC, NON -SEVERABLE  membership for each individual unit owner and provide for
MANDATORY ASSESSMENTS.  DUES ARE MANDATORY

Zoning should not be the basis for classifying a project as a PUD.  Thus, PUD is a Fannie Mae term to describe
properties that are not condominiums but are located in projects that have MANDATORY DUES AND
COMMON ELEMENTS.  They can be attached or detached homes or part of a small or a large project.  This
definitionis not the same as that used by some zoning authorities for which a PUD is a master-planned project
with a variety of land uses all plattted at one time

**EXTRA ADDITIONAL COMMENTS**

**ADDITIONAL COMMENTS**
Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower or Owner | Jacques Brousseau | | | | | | |
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Lender or Client | Assurance Financial Group, LLC. | | | | | | |

Exposure Time:  The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

I have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.

## F.I.R.R.E.A. ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City Baton Rouge | County East Baton Rouge | | State La | | Zip Code 70808 | |
| Lender or Client | Assurance Financial Group, LLC. | | | | | |

### Purpose of the Appraisal

The purpose of this appraisal is to estimate the Market Value as defined in the Certification and Statement of limiting Conditions of the fee simple interest in the above described property as of the date in the Reconcillation section of this appraisal.

### Scope of Work

In the preparation of this report, the appraiser identified the subject property and made a physical inspection including measuring the improvements and taking photographs to adequately characterize the nature of the property. The subject neighborhood and surrounding areas were also inspected to determine the neighborhood characteristilcs. This information was then analyzed in order to determine the various environmental, social, governmental and economic factors that influence Market Value. Sales of vacant land and improved properties were collected and verified. Those considered most relevant were further analyzed and compared to the subject aand are included in this appraisal report. an exterior examination was made and a photograph taken of each comparable sale cited.

### Report of the prior year sales history for the subject property

Is the subject property currently listed?   [ ] Yes  [X] No   List Price: $ _____

Has the property sold during the prior year?   [ ] Yes  [X] No   If yes, describe below

Subject property is currently under contract for $370,000

### Marketing Time

What is your estimate of marketing time for the subject property? 3 to 6 Months   months   Describe below the basis (rationale) for your estimate?

The estimated marketing time for the subject property is based on recent and current market trends. An analysis of the multiple listing service statistics including both regional and neighborhood markets, an analysis of comparable sales inthe subjects immediate market area, financing availability in the area and known or publicized potential changes of employment trends are taken into consideration in reaching a conclusion.

### Non-real property transfers

Does the transaction involve the transfer of personal property, fixtures, or intangibles that are not real property?   [X] Yes   [ ] No

If yes, provide description and valuation below.

Transfers of property that may be considered personal properties customary in this market. This property includes window coverings, fixtures and appliaances including range tops, washers,dryers, satellite dishes, and above ground pools are occasionally transferred but are given no value.

### Additional Comments

Enviromental Disclaimer: The value estimated in this report is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions. The appraiser is not an expert in the identification of hazardous substances or detrimental environmental condition. The appraiser's routine inspections of and inquiries about the subject property did not develop any informatin that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property or its value. If a more comprehensive study of the property is deemed necessary it should be performed by a qualified environmental expert.

### Additional Certification

1. The acceptance of this appraisal assignment by the appraiser was not based on a requested minimum valuation, a specified valuation, or an approval of the loan.

2. The appraiser certifies that the compensation for this appraisal is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result of the occurence of a subsequent event.

3. This appraisal has been prepared to conform with the Uniform Standards of Professional Appraisal practice ("USPAP") adopted by the Appraisal Standards Board of the Appraisal foundation, except the Departure Provision, unless otherwise stated below.

4. The appraiser has disclosed within this appraisal report, or below, all steps taken that were necessary or appropriate to comply with the Competency provision of the USPAP.

5. As of the date of this appraisal, Daniel M. Heroman has completed the requirements of the continuing education program of the Louisiana State Certified Appraiser's Law. 6. Daniel M. Heroman is a Louisiana State Certified Residental Real Estate Appraiser. Certificate #R839 valid from January 1, 2012 through December 31, 2013.

Date: 07/11/2012   Appraiser(s): _D. Heroman_

Danny Heroman

Date: _____   Review Appraiser(s): _____

Form 953

Danny Heroman

**Market Conditions Addendum to the Appraisal Report** FPL05083 File No. 4946AFG

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 437 Delgado Dr | City | Baton Rouge | State | La | ZIP Code | 70808 |
| --- | --- | --- | --- | --- | --- | --- | --- |

Borrower   Jacques Brousseau

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current – 3 Months | | Overall Trend | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Total # of Comparable Sales (Settled) | 4 | 3 | 3 | Increasing | X Stable | | Declining |
| Absorption Rate (Total Sales/Months) | 0.67 | 1.00 | 1.00 | Increasing | X Stable | | Declining |
| Total # of Comparable Active Listings | 14 | 12 | 7 | Declining | X Stable | | Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 21.00 | 12.00 | 7.00 | Declining | X Stable | | Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7-12 Months | Prior 4-6 Months | Current – 3 Months | | Overall Trend | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Median Comparable Sale Price | 330,000 | 376,000 | 291,500 | Increasing | X Stable | | Declining |
| Median Comparable Sales Days on Market | 141 | 174 | 104.5 | Declining | X Stable | | Increasing |
| Median Comparable List Price | 272,000 | 307,000 | 274,900 | Increasing | X Stable | | Declining |
| Median Comparable Listings Days on Market | 232 | 230 | 92 | Declining | X Stable | | Increasing |
| Median Sale Price as % of List Price | 97.75 | 92.46 | 94.45 | Increasing | X Stable | | Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? | | Yes | X No | Declining | X Stable | | Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).  Seller contributions seem to be constant between 1 and 3%.  No adjustments are made on comparables under 3% which is typical for stable market. Any concessions over 3% will be adjusted negatively. These seller concessions do not appear to have any influence over market value.

Are foreclosure sales (REO sales) a factor in the market? | Yes | X No   If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.   Greater Baton RougeMLS/Deed Fax

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions. Median is a measure of central tendency, the value of the middle item in an uneven number of items arranged or arrayed according to size or the arithmetic average of the two central items in an uneven number of items similarly arranged; a positional average that is not affected by the size of extreme values. Half of the properties sold below the median price and half sold above the median price.The Median Sale Price as % of List Price is to be determined by analyzing the comparables that have sold and settled during the specific time frame, Not by using the data from the lines above this section on the form.The total # of comparables sales includes all listings sold over different time frames. In order to accurately determine the Overall Trend you must divide the # of sales by the number of months included in the time span. *** See Additional Comments ***

If the subject is a unit in a condominium or cooperative project, complete the following:   Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current – 3 Months | | Overall Trend | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Total # of Comparable Sales (Settled) | | | | Increasing | Stable | | Declining |
| Absorption Rate (Total Sales/Months) | | | | Increasing | Stable | | Declining |
| Total # of Active Comparable Listings | | | | Declining | Stable | | Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | Declining | Stable | | Increasing |

Are foreclosure sales (REO sales) a factor in the project? | Yes | No  If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| | |
| --- | --- |
| Signature | Signature |
| Appraiser Name Danny Heroman | Appraiser Name |
| Company Name   Danny Heroman | Company Name |
| Company Address 5802 Antioch Boulevard, Baton Rouge, LA 70817 | Company Address |
| State License/Certification #R839   State LA | State License/Certification #   State |
| Email Address golf.hero@cox.net | Email Address |

Freddie  Mac  Form  71  March  2009                Page 1 of 1                Fannie  Mae  Form  1004MC  March  2009

Danny Heroman

| Market Conditions (FNMA 1004MC) Comments | | | | | |
|---|---|---|---|---|---|
| Borrower or Owner    Jacques Brousseau | | | | | |
| Property Address    437 Delgado Dr | | | | | |
| City    Baton Rouge | County    East Baton Rouge | | State    La | | Zip Code    70808 |
| Lender or Client    Assurance Financial Group, LLC. | | | | | |

EXPLANATION AND SUPPORT

The prior 7-12 months spans 6 months, so you must divide this # by 6 to help determine the trends, The prior 4-6 months would be 3 months spand so divide by 3.  The total # of comparable active listings is found by analyzing historical data and finding the number of active listings on a single day.  There is no need to divide the # of actives by the number of months included in the time span.The information in the 1004 MC addendum relates to properties that are comparable to the subject versus the subject's neighborhood which encompasses a much broader market activity involved larger single family homes which is  more common in the subject's neighborhood.

Danny Heroman

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Danny Heroman

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Danny Heroman | Name |
| Company Name  Danny Heroman | Company Name |
| Company Address  5802 Antioch Boulevard | Company Address |
| Baton Rouge, LA 70817 | |
| Telephone Number  225-266-7603 or | Telephone Number |
| Email Address  golf.hero@cox.net | Email Address |
| Date of Signature and Report  07/11/2012 | Date of Signature |
| Effective Date of Appraisal  07/11/2012 | State Certification # |
| State Certification #  R839 | or State License # |
| or State License # | State |
| or Other                              State # | Expiration Date of Certification or License |
| State  LA | |
| Expiration Date of Certification or License  12/31/2013 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 437 Delgado Dr | Date of Inspection |
| Baton Rouge, La 70808 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED  VALUE  OF  SUBJECT  PROPERTY  $ 375,000 | Date of Inspection |
| LENDER/CLIENT | COMPARABLE SALES |
| Name  No AMC | |
| Company Name  Assurance Financial Group, LLC. | ☐ Did not inspect exterior of comparable sales from street |
| Company Address  4884 Bluebonnet Blvd | ☐ Did inspect exterior of comparable sales from street |
| Baton Rouge, La. 70809 | Date of Inspection |
| Email Address | |



**LOCATION MAP**

| Borrower or Owner | Jacques Brousseau | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Client | Assurance Financial Group, LLC. | | | | | | |

Subject: 437 Delgado Dr

Sale 1: 3400 Hyacinth Ave

Sale 2: 328 Delgado Dr

Sale 3: 290 Lsu Ave

**CAUTION:** The location of property arrows shown on this map are approximate only. Inaccuracies may exist on map such as missing, incorrectly drawn, or incorrectly addressed streets. Please report any such inaccuracy to MapPro, Inc. so that appropriate corrections can be made.

Copyright 1994-2012 MapPro Inc.

Danny Heroman



**FLOOD MAP**

| | |
|---|---|
| Borrower or Owner | Jacques Brousseau |
| Property Address | 437 Delgado Dr |
| City Baton Rouge | County East Baton Rouge State La Zip Code 70808 |
| Client | Assurance Financial Group, LLC. |

Flood Zone Information
FEMA Map No. 22033C0245E
FEMA Zone X500L
Effective Date 05/02/2008

100-Year
500-Year
Outside 500-Year

Subject: 437 Delgado Dr
Sale 1: 3400 Hyacinth Ave
Sale 2: 328 Delgado Dr
Sale 3: 290 Lsu Ave

0    0.2    0.4
Miles
Copyright 1994-2012 MapPro Inc.

**CAUTION:** The location of flood hazard areas shown on this map are approximate only. Flood hazard boundaries may change from time to time. A property in the general vicinity of a flood hazard area should be evaluated by a civil engineer or other appropriate specialist prior to purchase or investment.

Danny Heroman

## SKETCH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Client | Assurance Financial Group, LLC. | | | | | | |



**Second Floor**

| SUMMARY | | SQ FT AREA | PERIMETER | AREA CALCULATION DETAILS | | | | |
|---|---|---|---|---|---|---|---|---|
| Living Area | | | | First Floor | | | | |
| First Floor | | 1697 | 191 | 23.3 | X | 38.9 | = | 906.3 |
| Second Floor | | 785 | 117 | 16.0 | X | 25.0 | = | 400.0 |
| | Total | 2482 | 308 | 22.6 | X | 17.3 | = | 390.9 |
| | | | | | Total | | | 1697.2 |
| Porch | | | | Second Floor | | | | |
| Balcony | | 77 | 44 | 29.0 | X | 25.3 | = | 733.7 |
| | | | | 11.6 | X | 4.4 | = | 51.0 |
| | | | | | Total | | | 784.7 |

SKETCH/T 1-800-573-0872

Danny Heroman

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Client | Assurance Financial Group, LLC. | | | | | | |



**FRONT VIEW OF
SUBJECT PROPERTY**



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE OF
SUBJECT PROPERTY**

Danny Heroman

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Jacques Brousseau |
| Property Address | 437 Delgado Dr |
| City Baton Rouge | County East Baton Rouge   State La   Zip Code 70808 |
| Client | Assurance Financial Group. LLC. |



437 Delgado Dr

right side



437 Delgado Dr

Right Side



437 Delgado Dr

right rear

Danny Heroman

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Jacques Brousseau |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Client | Assurance Financial Group, LLC. |



437 Delgado Dr
Ct Yard



437 Delgado Dr
MASTER BEDROOM



437 Delgado Dr
MASTER BATH

Danny Heroman

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Client | Assurance Financial Group. LLC. | | | | | | |



437 Delgado Dr

MASTER BATH



437 Delgado Dr

CLOSET



437 Delgado Dr

BATH

Danny Heroman

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code 70808 |
| Client | Assurance Financial Group. LLC. | | | | | |



437 Delgado Dr

1/2 BATH



437 Delgado Dr

KITCHEN



437 Delgado Dr

DINING

Danny Heroman

RPC1207005083

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | | | | |
|---|---|---|---|---|---|---|---|
| **Property Address** | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | La | Zip Code | 70808 |
| Client | Assurance Financial Group. LLC. | | | | | | |



BEDROOM
437 Delgado Dr



BEDROOM
437 Delgado Dr



BEDROOM
437 Delgado Dr

Danny Heroman

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Jacques Brousseau | | | |
|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | |
| City Baton Rouge | County East Baton Rouge | State La | | Zip Code 70808 |
| Client | Assurance Financial Group, LLC. | | | |



437 Delgado Dr

KITCHEN

Danny Heroman

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Jacques Brousseau |
| Property Address | 437 Delgado Dr |
| City Baton Rouge | County East Baton Rouge State La Zip Code 70808 |
| Client | Assurance Financial Group. LLC. |



### COMPARABLE #1

3400 Hyacinth Ave
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $374,625 |
| Price/SF | 173.12 |
| Date | s06/12;c05/12 |
| Age | 17 |
| Room Count | 7-3-2.0 |
| Living Area | 2,164 |
| Value Indication | $382,219 |



### COMPARABLE #2

328 Delgado Dr
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $315,000 |
| Price/SF | 162.45 |
| Date | s08/11;c08/11 |
| Age | ~55 |
| Room Count | 7-3-2.0 |
| Living Area | 1,939 |
| Value Indication | $367,405 |



### COMPARABLE #3

290 Lsu Ave
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $531,250 |
| Price/SF | 181.31 |
| Date | s04/12;c03/12 |
| Age | 57 |
| Room Count | 9-4-3.0 |
| Living Area | 2,930 |
| Value Indication | $467,366 |

Danny Heroman

Inspection Date: **September 30, 2016**
Inspection No: 160941/310

# General Inspection

★ ★ ★

**Michael Armshaw** (Lic # 10252)
2132 Sassy Lane, Baton Rouge, LA 70808
Phone/Fax (225) **344-2525** ☎ Cellular (225) **933-1089**
Email: armshaw @ cox.net

## INSPECTION REPORT

For

# Kris Novak and Lauren Perry

**437 Delgado Ave.**
**Baton Rouge, Louisiana**

**1. PURPOSE OF INSPECTION:** The general purpose of this limited, visual inspection, evaluation and report is to provide the client with a better understanding of the property conditions, as observed at the time of the home inspection, and to identify, for the client's knowledge, the readily visible and accessible and apparent installed systems and components that do not function as intended, allowing for normal wear and tear, or which adversely affect the habitability of the dwelling, without regard to life expectancy. The seller is not obligated to repair the items on this report. A repair request document should be filled out based on the seller's disclosure, the home inspection report and your own observations. The repair request document then becomes a negotiable part of the purchase agreement. The summary of this report is divided into 3 main sections to help you with this process. Please keep in perspective that these sections are prioritized for that reason. A: Defects, Deficiencies and Inoperable Systems, B: Eventual Maintenance suggestions, and C: Incidental Observations.

**2. SCOPE OF INSPECTION:** The limited, visual inspections and reports for this building are intended for the exclusive use of the *"Client"* only, and will be performed in conformance with the minimal applicable *"Standards of Practice"* of the *"Louisiana State Board of Home Inspectors" (LSBHI)*, which is the *"State Law"* governing home inspections.  A copy of these LSBHI *"Standards of Practice"*, with the general limitations and exclusions, is included within the *"Client's"* report, and is also available at *www.lsbhi.com.* Contained within these *"Standards of Practice"* and the Inspection Agreement, are a listing of components which are excluded from the scope of the inspection.  It is *suggested* that the *"Clients"* review these exclusions, and make arrangements for additional inspections should components which are of concern be included within these exclusion lists.

**3. THE INSPECTION:**

This inspection was made on **September 30, 2016** and all utilities were turned on. Present for the inspection were **Michael Armshaw,** (*the Inspector*) **Kris Novak and Lauren Perry**, the clients, her father and **Donna Cutrer**, REMAX/Real Estate Group, (*the selling Realtor).* The home was occupied with restricted accessibility for the inspection, and the temperatures were approximately **80** degrees at the time of the inspection.

---

*Directional references used within this report are based on facing the front of the building*

---

**Michael Armshaw**
Licensed Home Inspector # 10252

**General Inspection, L.L.C.**

## 4. GENERAL INSPECTION OBSERVATIONS:

The inspection is of a multi-story, single-family residence on an asphalt suburban street, of wood frame construction on an at-grade concrete slab and foundation. There is no covered parking provided. This building is approximately 10 years old.

## 5. SITE INSPECTION:

An inspection of the **Landscaping, Lawns and Grounds** indicated that the vegetation was *generally* healthy and growing. The ground soil appears to slope away from the building. There are trees in close proximity to the building which currently do not appear to be adversely affecting or impacting the structure. No canals or streams are adjacent to the property, and there was not any evidence of high water or flooding apparent.

**Incidental Concrete** is the driveways, walkways, porches and A/C slabs.  Usually 3 ½" in thickness and without a sand bed or moisture barrier, the incidental concrete is much more susceptible to cracking than the building foundation.

"Shrinkage" cracks are normal and due to the drying (*curing*) process when the concrete was poured and are generally of little significance as they usually penetrate only the mortar surfaces.

"Stress" cracks usually are caused by the application of loads greater than the concrete can support.  "Stress" cracks normally occur during the first few months after the slab is poured, while strength in the slab is low, and will typically become dormant with time.

"Temperature" cracks are normal and are caused by the thermal expansions and contractions within the concrete slabs.

"Settlement" cracks are usually due to the subsidence or consolidation of the soils underlying the building, and will normally extend completely through, and from edge to edge of the slab.

Concrete cracks are classed as either dormant (*cracking activity has ceased*) or active (*cracking activity may be expected to continue*). It is very probable to discover some degree of cracking in every incidental concrete slab, however, this is a normal occurrence, and unless specifically noted, the observation of *"shrinkage"*, *"temperature"* or *"stress"* cracking will normally have only minor significance on the ability of the slab to support the normally applied loads.  Of primary importance with these cracks is to seal the surfaces against water intrusion, and the potential for further damage. The degree of cracking observed in the incidental concrete is considered to be *about* average.

The **Driveways** were observed to exceed the recommended minimum widths and were surfaced with concrete. **Walkways** were observed to be surfaced with aggregate. The **Front Porch** is constructed of stamped concrete, and the **Rear Patio** is constructed of concrete.

## 6. BUILDING FOUNDATION and STRUCTURAL INSPECTION:

The **Foundation** for this building is an at-grade concrete slab and foundation.  Portions of the perimeter of the foundation are concealed from inspection by adjacent pavements, ground soil levels and by vegetation. The siding is not the generally recommended 4 to 8 inches above the ground level, to reduce moisture and insect intrusion potential.(*The ground soil levels and vegetation should be maintained 4 to 8 inches below the bottom of siding or the top of the slab to help prevent insect, pest and moisture intrusions* Most lending institutions, architects and structural engineers use the general standard of settlement greater than 1" in 10' as an unacceptable degree of foundation settlement or point at which a foundation may need to be stabilized or foundation failure has occurred. There is no one correct way to build or to repair a house, so opinions may differ on the need to repair or manner in which to repair a foundation. Foundation failure therefore becomes somewhat of a subjective conclusion based on the structural deflection and the experience of the individual observing the structure.

Movement of foundations typically occurs as the result of a few primary causes in our general geographic area. Initial consolidation settlement occurs as a result of placing the weight of the building on the soil and the soil compressing under the weight. This typically occurs in the first few years with approximately 90 percent of the settlement occurring in the first 5 years, and the last 10 percent over the next 25 years.

***Directional references used within this report are based on facing the front of the building***

**Michael Armshaw**
Licensed Home Inspector # 10252

**General Inspection, L.L.C.**

Movement of a foundation also commonly occurs as a result of changing moisture content in the expansive clay soils found in this area. As the clay soil dries out, it shrinks resulting in some settlement of the foundation. As the clay in the soil regains moisture, it swells resulting in some uplift of the foundation. Shrink/Swell cycles typically occur due to seasonal changes and as the result of significant and extended changes in weather patterns. Since there have been several droughts as well as periods of wet weather over the last 15 years, it is not uncommon to find some movement of the foundation slab.

Some normal initial consolidation settlement was observed. The differential deflection noted in this house appeared to be minimal, from normal settlement and less than these standard criteria. The inspection of the *exposed and visible* exterior perimeter of the foundation slab did not reveal any evidence of *apparent* or *significant* cracking or failure. An inspection of the exposed exterior areas and the corresponding interior walls and ceilings did not reveal any *visible* evidence or damage that is normally associated with foundation failure. If further analysis is desired, it is suggested that a qualified foundation repair specialist or a structural engineer be consulted.

Some minor cracking has been observed in the exterior brick mortar. There was not any *visually apparent or significant* foundation slab cracking or *significant* interior evidence of damage observed in the vicinities of these cracks.

1.  Brick mortar hairline cracking, considered to be <u>normal</u>, has been observed at some of the windows.

> The <u>normal</u> settlement or the subsidence and consolidation process of the soils underlying the foundation slab may require up to 30 years to complete, with the majority of the consolidation generally occurring within the first few years. Depending upon the composition, the percentage of voids and the moisture content of the underlying soils, "settlement" may be "dormant", or still "active". Geo-technical (soil) investigations and analysis are required to accurately and completely make this determination, and are recommended should this be of a concern to the clients.
>
> Many masonry cracks are *usually* considered to be caused by <u>normal</u> temperature expansions and contractions and the differential soil settlements and the movements of the dissimilar building component materials. In commercial grade construction, expansion joints to control masonry cracking are normally placed at each side of windows and doors, and along the length of the wall at approximate 20-foot spacings, as these are locations where cracks are <u>expected</u> to occur. The absence of expansion joints in masonry construction *can* be a source of severe cracking. These types of joints are not normally found in residential construction, and the cracking as observed is considered to be a <u>normal occurrence</u>, and of little structural significance. *Of importance with all cracks, is to seal them against water intrusion.*

## 7. EXTERIOR INSPECTION:

This building is of wood frame construction with brick veneer and horizontal siding (Hardie plank) being the predominant **Exterior Siding** materials.

The **trim, facias and soffits** on this building are *typically* constructed of wood. These were visually inspected and found to be in *generally* serviceable condition. No determination could be made as to the condition of the concealed wooden components. The exterior walls and trim *appear* to be serviceably sealed *(the caulk is generally fair and non-pliable)* and the exterior paint quality appears to be *generally* good to fair, and serviceable. With the exception of those items which are specifically specified in the *Inspection Summaries*, the exterior items inspected were considered to in be *generally* serviceable condition.

There are wood Columns on this building. These columns appear to be generally plumb with little evidence of significant deterioration.

The wooden and insulated metal **Exterior Doors** are constructed with thresholds and weather-stripping. Wooden and Aluminum **Windows** have been used on this building. The inside of some of the wooden windows is not painted or sealed. The accessible exterior doors and windows were inspected and the doors were found to operate serviceably.

> *Directional references used within this report are based on facing the front of the building*

## 8. POTENTIAL MOISTURE INTRUSION:

Nearly all homes inspected have some minor exterior maintenance deficiencies.  Of primary importance when maintaining your home's exterior is to **keep the moisture out**.  Moisture which enters the building can cause wood deterioration and provides a damp environment which may attract wood destroying insects and organisms, and, with the proper conditions of moisture, warmth and food, unhealthy mold or mildew can grow on wood or cellulose.  Inadequate drainage away from the building, inadequate interior air infiltrations, and roof and wall flashings can trap moisture in the wall cavities, creating a mold or mildew growth environment.

To reduce the amount of *"moisture intrusion"* into the building, the exterior should be completely and properly sealed.  *It is recommended that if any of the deficiencies from the below list are found, that they be serviceably repaired or corrected, and that the clients have an independent inspection for wood destroying insects and organisms preformed.*

- the ground soil levels should be maintained 4 to 8 inches below the bottom of wood siding, the brick and the top of the foundation slab.
- prevent vegetation and planting beds from growing into, or over, bottom of wood siding, the brick and the top of the foundation slab.
- the weep holes at the bottom of the brick allow condensate *(water)* to drain from the air space, and should be free of debris.
- the gaps and openings around the doors and windows and at the different material joints and penetrations should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- door weather-stripping and thresholds should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- if gutters are installed, the gutters and downspouts should be kept clean and leak free to direct water away from the wood facias and soffits.
- the vertical joints in horizontal exterior siding should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- a good weather protective paint or varnish finish should be maintained on exterior wood.
- much of the decorative exterior wood trim is not treated wood, and should be completely painted and sealed and caulked, with the caulk being pliable without gaps or voids, if replacement of the trim becomes necessary, paint the backside and ends of the wood before installing.
- the roofing shingles should be pliable and without cracked, curled, loose or broken shingles.
- the gaps and openings around the roof penetrations and flashings, should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- drip edges at the roof edge will help direct water away from the wood facias and soffits.
- wood or debris should not be stacked against the building and there should be no wood in-contact with the foundation slab perimeter.
- proper ventilation is important in reducing moisture in the attic.
- have a *complete*, *professional* and *independent* **termite and wood destroying insect inspection** made on this house.

---

| *Directional references used within this report are based on facing the front of the building* |
| --- |

## 9. ROOF COVERING, FLASHINGS and GUTTER INSPECTION:

> Asphaltic or fiberglass shingled composition roof surfaces *typically* exist in one of three stages during their functional life
> 1. In the first, or earlier stage, the shingles are generally pliable and flat. Shingles in this stage are indicated as being in **"good"** condition, and this period will *normally* range from the initial installation to about 4 to 6 years.
> 2. When the shingles begin to become "brittle", or to "crack and split" or "curl" at the edges, they are considered to be in the second stage, and are rated as being in **"fair"** condition. This period may typically begin as early as 3 to 5 years and extend through 8 to 12 years. These shingles may be readily damaged by falling debris or limbs, and once "cracked or split", occasional leakage <u>can</u> occur in spot areas. The roofing nail heads may also begin to "pop" and become exposed through the shingles. Some maintenance may be required to seal the "cracks and splits" and the "popped" nail heads. The functional life of the roof surface *may* be extended by not walking on these brittle shingles.
> 3. In the final and last stage of the shingle's functional life, the shingles become <u>brittle</u>, <u>cracked</u>, <u>curled</u> and <u>cupped</u>. <u>Bead loss</u>, evident on the ground and in the gutters, is another indication that the shingles have reached this stage. Roofing surfaces which are in this final stage are indicated as being in **"poor"** condition, and *may* be easily damaged by wind and rain, and leakage *may* occur at any time, indicating that the replacement of the shingled roofing surface will be justified.

The **Roof** on this building is pitched and gabled with hips and the roof covering is Architecturally Styled fiberglass shingles. The manufacturer's suggested *normal* life expectancy of this type of roof covering may be from 35 to 40 years, when properly maintained. However, in Louisiana, with the hot sun and wind driven rains, a life expectancy from 20 to 25 years would be more realistic.

Our region of the country often experiences high intensity wind driven rains, which *can* penetrate a roof surface in any of these conditions. The necessary ridge, gable and turbine vents and the plumbing and gas vents and flashings are all susceptible to water intrusion during these weather conditions.
There are some shingles manufactured which have longer life expectations, and factors such as a southern exposure, shaded areas and windbreaks can create varying conditions of the shingles on the same roof. *The flashings around fireplaces, vent pipes and other roof penetrations can also deteriorate with time, and require periodic maintenance such as recaulking or sealing.*

The roof surface on this building has an *estimated* and *approximate* age of **10** years and the condition is considered to be **good, the shingles are generally flat and pliable,** and the general condition is commensurate with the age of the shingles.

**Attic ventilation** is provided by: soffit and gable vents. The **roof flashing** appears to be galvanized metal. The gutters are made of Aluminum. The gutters are clean and the joints appear to be sealed. It appears that the roof protrusions are generally properly flashed and the vents properly penetrate the roof and appear to be sufficiently sealed. The roof inspection was performed by accessing the roof surface.

## 10. ROOF STRUCTURE, ATTIC and INSULATION INSPECTION:

The inspection of the **Attic** provides information concerning the quality of construction and the structural integrity of the building as well as exposing potential fire or safety hazards and possible electrical and plumbing system deficiencies. The insulation in the attic is composed of Batt insulation approximately 6 to 8 inches thick. *(Recommendations for attic insulation in Louisiana are a value of **R-30**, which is approximately 8" to 9" of insulation.)* Insulation which has settled will have lost some of its insulating abilities. The heating and cooling ductwork in the attic is insulated and supported. It was also observed that there are not any apparent blocked air vents and plumbing vent pipe joints appeared to be tight and secure.

> *Directional references used within this report are based on facing the front of the building*

The *readily accessible* and *visible* wooden structural components of the roof and ceilings, being the ridge beams, the roofing rafters and sheathing, the supports and the ceiling joists were observed and the conditions and the material sizes and spacings *appeared* to be *generally* adequate to support the normal dead loads and the applied live loads and wind forces to which this structure may be *normally* subjected. "China" was observed printed on the top side of a sheet of sheetrock above the MBR. The attic stairs are not properly insulated.

## 11. GARAGE INSPECTION:

**There is no covered parking provided.**

## 12. PLUMBING SYSTEM INSPECTION:

The **Plumbing System** was inspected to determine the adequacy and the serviceable operation of the components and to detect any *visible and apparent* water leaks.  Water supply appears to be by the municipal or local supplier and sewage disposal appears to be a municipal sewage system.  The water closets *appeared* to fill within 60 to 90 seconds and to flush serviceably.  The lavatories, tubs and fixtures *appeared* to drain serviceably, and faucets have a serviceable water flow, both hot and cold and the lavatory pop-ups and the tub drains (*when installed*) *appeared* to be serviceable. There were not any significant *visible or apparent* Plumbing System deficiencies observed *(except as noted in the Inspection Summaries).*

Water supply and distribution materials observed to apparently be in use are; PEX (plastic).
Drain, waste and venting materials observed to apparently be in use are; PVC (plastic).

The tank type **Water Heater** a gas fired **Rheem** *(2005)* unit, having a 40-gallon water tank capacity. There is a temperature/pressure relief valve installed as required. There was a collection pan beneath the Water Heater. There was a draft diverter on the gas unit, and no airflow could be felt during operation.  Ventilation appears to be adequate. There is a flexible gas line to the heater and a gas shut off valve in close proximity.

The second tank type **Water Heater** is a gas fired **Rheem** (*2005*) unit having a 40-gallon water tank capacity. There is a temperature/pressure relief valve installed as required. There was a collection pan beneath the Water Heater. There was a draft diverter on the gas unit, and no airflow could be felt during operation.  Ventilation appears to be adequate. There is a flexible gas line to the heater and a gas shut off valve in close proximity. The pilot lights appeared to be functional and the burners did not have any visible evidence of excessive corrosion, rust, flaking or cracks. The hot and cold water supply pipe material is PEX (plastic) and the water temperature produced at the faucets was sufficiently hot. The Water Heaters appeared to function serviceably, and there was not any *visible* evidence of current leakage.

## 13. ELECTRICAL SYSTEM INSPECTION:

The **Electrical System** inspection noted that the electrical service is overhead and that the electrical power is provided with a 3-wire 240-volt service. The main service panel is located on the exterior and has circuit breakers, with the main service being 200 amps. Copper wiring in the main panel is blackened and deteriorating. There is a sub-panel providing service to the interior lovated in the MBR closet. There are also exterior sub-panels providing service to the air conditioning equipment.

During the exterior electrical inspection, the following were inspected and found to be serviceable; *(except as noted in the Inspection Summaries)*
- a copper ground rod and a secure grounding connection.
- the service entrance galvanized conduit was inspected and observed to be generally serviceable.
- exterior receptacles have weather resistant covers and accessible receptacles inspected and tested, were *generally* properly "hot" and grounded with the correct polarity *(except as noted in the summary).*
- GFCI (Grounded Fault Circuit Interrupter) device protection is provided on the exterior.

> *Directional references used within this report are based on facing the front of the building*

Noted during the interior electrical inspection; the following representative number of accessible switches, receptacles and components were inspected and found to be serviceable; *(except as noted in the Inspection Summaries)*

- light circuits *randomly* tested, were *generally* operational.
- *accessible* receptacles inspected and *randomly* tested, were *generally* properly "hot" and grounded with the correct polarity. *(except as noted in the summary)*
- GFCI (Grounded Fault Circuit Interrupter) device protection is provided on the interior.

During the inspection of the electrical system, the inspector did not observe any significant *visible or apparent* Electrical System deficiencies *(except as noted in the summary)*. **GFCI** *(Grounded Fault Circuit Interrupter) device protection was available, but was not generally required by the building codes until approximately 1987. Any references to GFCI devices are informational only.*  Further information pertaining to the electrical system inspection may be found in the *Inspection Summaries*.

## 14. HEATING *(HVAC)* SYSTEM INSPECTION:

The **Heating and Cooling Systems**, commonly referred to as the "***HVAC***" system (*heating, ventilating and air conditioning*) is comprised of a central heat and air conditioning system. The inspection of the heating and cooling system is limited to a determination of *generally* serviceable operation, as of the date of the inspection. This inspection is not a determination of the remaining service life expected from the system components or of compliance to Governmental Building Codes or Regulations. Temperatures were approximately **80** degrees at the time of the inspection.

**SYSTEM #1: (downstairs)**
**Heating** is provided by a gas fired **"Rheem"** *(2005)* "forced air" horizontal furnace with an approximate input capacity of 100,000 BTU. The inspector observed that the fan and the thermostat *appear* to operate serviceably and that the ductwork is supported and insulated.  The gas piping is Black Iron and CSST. The electronic igniter and thermocouple appear to be serviceable. The unit was producing 126-degree warm air at the registers. The conditions observed are conditions that *typically* indicate a serviceably operating system.

**SYSTEM #2: (upstairs)**
**Heating** is provided by a gas fired **"Rheem"** *(2005)* "forced air" horizontal unit with an approximate input capacity of 50,000 BTU. The inspector observed that the fan and the thermostat *appear* to operate serviceably and that the ductwork is supported and insulated.  The gas piping is Black Iron and CSST. The electronic igniter and thermocouple appear to be serviceable. The unit was producing 118-degree warm air at the registers. The conditions observed are conditions that *typically* indicate a serviceably operating system.

## 15. AIR CONDITIONING *(HVAC)* SYSTEM INSPECTION:

**SYSTEM #1: (downstairs)**
**Cooling** is provided by an electrical split system **"Rheem"** *(2006)* air conditioner with an approximate capacity of 60,000 BTU, which is equivalent to 5 TONS. The exterior Compressor/Condenser unit was mounted on a flat stable surface with an electrical disconnect within reach.  It was *generally* level with serviceable valve caps and conduit. It was generally clean and operating smoothly and quietly. The copper on the evaporator coils is blackened and deteriorated. During the unit's operation, it was observed that the refrigerant level was *apparently* serviceable, the system was cooling 18 degrees. The AC system should be evaluated by a licensed Mechanical contractor. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.

---

> ***Directional references used within this report are based on facing the front of the building***

**SYSTEM #2: (upstairs)**

**Cooling** is provided by an electrical split system **"Rheem"** *(2005)* air conditioner with an approximate capacity of 36,000 BTU, which is equivalent to 3 TONS. The exterior Compressor/Condenser unit was mounted on a flat stable surface with an electrical disconnect within reach. It was *generally* and level with serviceable valve caps and conduit. It was generally clean and operating smoothly and quietly. The copper on the evaporator coils is blackened and deteriorated. During the unit's operation, it was observed that the refrigerant level was *apparently* serviceable, the system was cooling 17 degrees. The AC system should be evaluated by a licensed Mechanical contractor. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.

---

It is <u>**recommended**</u> that the **Heating and Cooling Systems** be professionally serviced and cleaned annually to provide more efficient operations and to help extend the service life of the components. The *"cloth duct tape"* often used in the attic to seal the duct, plenum and transition connections will deteriorate over time, and create inefficient air leakage into the system. Clean filters are necessary for efficient operation and should be changed at least monthly.

♦   The **Cooling System** components should be serviced and the components cleaned and checked for air and refrigerant leakage and the system properly charged with refrigerant and oil prior to the *cooling season*.

♦   Prior to the *heating season* the **Heating System** should be serviced and the components cleaned and checked for air leakage, with any rust removed from the heat exchanger *(gas fired systems)* and the burners, and the unit checked for defects in the heat exchanger.

---

## 16. INTERIOR INSPECTION:

The **Interior Rooms** inspected were the;

- living and dining areas
- kitchen
- 4 bedrooms
- 2 1/2 bathrooms
- foyers, hallways, storage and laundry rooms

Visually inspected in these rooms were the *"accessible and visible"* composition and condition of the ceilings and walls *(typically gypsum dry-wall)* and flooring together with the operation of a *representative (random)* number of the windows and doors. The presence of HVAC registers and a switched, overhead light was observed in each room and the location, grounding and polarity of a *representative (random)* number of *"accessible and visible"* electrical receptacles were evaluated, as was the operation of ceiling fans. In addition to the items listed above, in the kitchen and baths the cabinets, countertops and the water flow *(hot and cold water)* were inspected. The *"accessible and visible"* electrical receptacles within 6' of water services were inspected for **GFCI** devices and the plumbing was inspected for any *visible and apparent* water leakage evidence. In the bathrooms, the inspection included heaters, exhaust fans and ventilation, as well as the operation of installed plumbing fixtures.

In the kitchen, the operation and serviceability of the *built-in* appliances and equipment, being the;

- **Broan**        exhaust fan and light
- **Bosch**        dishwasher
- **G.E.**          microwave
- **G.E.**          cooktop
- **G.E.**          oven
- **G.E.**          refrigerator
- **U-Line**       mini refrigerator

---

*Directional references used within this report are based on facing the front of the building*

---

are evaluated for "*serviceable operation*" only as of the inspection date only.  The cooking devices were operated to determine that the burners functioned; "*dishwashers*" are operated to determine that water supply was present and that the dishwasher operated without leakage; "*disposals*" are inspected for operation and leakage only, no material is inserted into the disposal and the integrity or function of the internal components is not warranted.  Incidental and accessory items such as knobs, clocks, gaskets, timers, self-cleaners, lights and cooking temperatures are not inspected or warranted. Continued "*serviceable operation*" is not warranted.

With the exception of those items specifically listed in the *Inspection Summaries*, the items inspected were considered to be generally "*operating serviceably*" at the time of this inspection.

The **Stairways** in this building are surfaced with wood and the steps are *generally* uniformly spaced without *substantial* dimensional variances. The nose should be a maximum of 1", the tread width a minimum of 10" *(with the nose)*, and the riser height a maximum of 8 ¼".  This stairway *generally* meets these requirements. There is a handrail with the top of the handrail located between 30" to 36" above the treads.  The stairway is lighted with a 3-way switch at the top and the bottom.

---

*Directional references used within this report are based on facing the front of the building*

## 17. REPORT OF THE BUILDING'S GENERAL CONDITION:

**"China" was observed printed on the top side of a sheet of sheetrock above the MBR. Blackening of the copper wiring, plumbing pipes and AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.**

Based entirely upon the *readily accessible, visible and apparent* aspects of this inspection, this building is considered to have been originally constructed in a manner which *generally* conformed to the *minimum* construction material and skill standards ordinarily practiced by reputable contractors in this locality, for a building of this age and type.  Due to the copper deterioration found and the possibility of issues with the sheetrock, it is recommended that further evaluations are made.

Nearly all homes inspected have some minor exterior maintenance deficiencies. Of primary importance when maintaining your home's exterior is to keep the moisture out. The flashings around fireplaces, vent pipes and other roof penetrations can deteriorate with time, and require periodic maintenance such as recaulking, sealing or replacing. Any evidence of moisture intrusions should be addressed immediately before significant damage can occur.

Have a complete, professional and independent termite and wood destroying insect inspection made on this house. It is recommended that all homeowners, in this region where the soil does not freeze, maintain a wood destroying insect contract with a licensed exterminator.

No home, even a brand new home is flawless, and over time normal aging and normal wear and tear occur. The natural aging of a home develops much of the character we appreciate in homes while also requiring maintenance. Please keep into perspective the things that attracted you to this home and realize that the purpose of this report is to itemize the defects, deterioration and system failures, not to compliment the many attractive aspects of the home.

---

*Directional references used within this report are based on facing the front of the building*

---

# General Inspection

★ ★ ★

Inspection Date: **September 30, 2016**
Inspection No:   160941/310

**Michael Armshaw** (Lic # 10252)
2132 Sassy Lane, Baton Rouge, LA 70808
Phone/Fax (225) **344-2525** ☎ Cellular (225) **933-1089**
Email: armshaw @ cox.net

# INSPECTION REPORT SUMMARY

for

## Kris Novak and Lauren Perry

### 437 Delgado Ave.
### Baton Rouge, Louisiana

During the course of this home inspection the below listed components and items were determined, in the opinion of the Inspector, to be **un-serviceable** or **un-satisfactory**.  Should any *significant* deficiencies in the "components" or "mechanical systems" be reported, it is <u>recommended</u> that reputable and licensed contractors be engaged to provide repair proposals for properly operating "components" or "mechanical systems".

**A.  Deficiencies and Defects of Component Materials:**   There were not any *visually or readily apparent or significant* component deficiencies or material defects observed, except;

> **Exterior:**
> 1. ☐ Stepping stones behind out-building are not on a stable surface and provide a safety hazard. (photo #1)
>
> **Interior:**
> 1. ☐ "China" was observed printed on the top side of a sheet of sheetrock above the MBR. (photo #2)
> 2. ☐ The inside of some of the wooden windows is not painted or sealed. (photos #3 & #4)
> 3. ☐ Attic stairs are not properly insulated. (photo #5)

**B.  Inoperable Systems or Equipment**: Mechanical equipment and systems inspected were observed to be in *generally* serviceable operating condition, except;

> **Air Conditioning System:**
> 1. ☐ Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.  (photos #6, #7 & #8)
> 2. ☐ There are gaps in the insulation on the refrigerant lines in the attic providing condensation leak potential. (photo #9)
> 3. ☐ The duct to the Dining room is exposed in the upstairs left Bedroom.   (photo #10)

---

> *Directional references used within this report are based on facing the front of the building*

---

**Electrical System: (***from the operation of a <u>representative</u> number of <u>accessible</u> components***)**

1. ☐ Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor. (photos #11 & #12)
2. ☐ Electrical receptacles do not appear to be properly **G.F.C.I.** protected in the Master bathroom, half bathroom, on the Kitchen Island and on the exterior in some areas.
3. ☐ Electrical wires or splices are "**not**" contained in "*<u>covered junction boxes</u>*" in the attic. (photos #13 & #14)

**Plumbing System:**

1. ☐ Master bathroom: the tub mechanical stopper is not attached to the drain. (photo #15)
2. ☐ Upstairs Hallway bathroom:  the tub faucet is not sealed at the tub surround providing moisture intrusion potential. (photo #16)

**C. Items in need of "***Eventual***" Maintenance:**   There were no *visually apparent or significant* "eventual" maintenance requirements observed, except;

- The attic stairs are not properly insulated.
- Install G.F.C.I. protected receptacles within 6' of all water sources and on exterior.
- Electrical wires or splices are "**not**" contained in "*<u>covered junction boxes</u>*" in the attic.
- Dryer vents should be cleaned regularly for fire safety.
- HVAC air return filters should be changed every 60-90 days.
- Install doorstops as needed.
- Maintain weather stripping on all exterior doors.
- The exterior paint condition is good to fair, and serviceable.
- The exterior caulk is generally fair and non-pliable - *the exterior joints at <u>all</u> dissimilar materials should be caulked and sealed to prevent moisture intrusion.*
- Trim all vegetation that contacts the building.
- Trim all limbs that have potential to contact the roof surface.
- The ground soil levels and vegetation should be maintained below the bottom of siding, or the top of the slab to help prevent insect, pest and moisture intrusion.
- Clean all leaves and debris out of the gutters and off of the roof surface seasonally.
- Caulk and seal around all exterior windows and doors to help prevent moisture and air filtration every few years.
- It is recommended that carbon monoxide detectors and smoke detectors are kept operating in all homes.

**D. Incidental Observations:**

- The water system cut-off valve is located at the street side of the building.
- The electrical main service entrance is located at the left side of the building.
- The natural gas system cut-off valve is located at the right side of the building.

**E. Items observed and considered to be <u>NORMAL</u> in the aging process of this home**:

- evidence of **natural aging, wear and tear** was observed
- **brick and mortar hairline** cracking, considered to be <u>normal</u>, has been observed.
- the **foundation slab** was observed to have <u>normal</u> corner cracks.
- the **roof surface** was observed to have some <u>normal</u> unevenness.

---

*Directional references used within this report are based on facing the front of the building*

---

**Michael Armshaw**
Licensed Home Inspector # 10252

**General Inspection, L.L.C.**

**F. Components which were <u>NOT</u> inspected**: *(See limitations and exclusions)*

- sub-surface components; sprinklers, fountains, yard lighting, drainage systems, detached structures, decks or patios and telephone, internet, satellite, intercom, security, or audio/video systems, washing machines and clothes dryers were <u>**not**</u> inspected.
- in-accessible areas <u>**not**</u> inspected include; interior cavities of walls, areas obscured by stored or personal belongs *(i.e.: attics, closets and storage areas),* and areas with accessibility limitations such as the exterior edges of attics.
- this inspector is not qualified to detect the presence of Chinese Drywall. Accordingly, the issue of Chinese Drywall (and its potential problems) is beyond the scope of the inspection report.

❖   **END OF HOME INSPECTION REPORT**   ❖

Should additional assistance or information be required concerning this inspection or report, please, do not hesitate to contact me.

Sincerely,

**Michael Armshaw**
**Licensed Home Inspector #10252**

---

***Directional references used within this report are based on facing the front of the building***



**Photo #1:** Stepping stones behind out-building are not on a stable surface and provide a safety hazard.



**Photo #2:** "China" was observed printed on the top side of a sheet of sheetrock above the MBR



**Photo #3:** The inside of some of the wooden windows is not painted or sealed.



**Photo #4:** The inside of some of the wooden windows is not painted or sealed.

---

*Directional references used within this report are based on facing the front of the building*

---



**Photo #5:**  Attic stairs are not properly insulated.



**Photo #6:** Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.



**Photo #7:**  Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.



**Photo #8:** Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.

*Directional references used within this report are based on facing the front of the building*



**Photo #9:** There are gaps in the insulation on the refrigerant lines in the attic providing condensation leak potential.



**Photo #10:** The duct to the Dining room is exposed in the upstairs left Bedroom.



**Photo #11:** Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor.



**Photo #12:** Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor.

*Directional references used within this report are based on facing the front of the building*



**Photo #13:** Electrical wires or splices are "**not**" contained in *"covered junction boxes"* in the attic.



**Photo #14:** Electrical wires or splices are "**not**" contained in *"covered junction boxes"* in the attic.



**Photo #15:** Master bathroom: the tub mechanical stopper is not attached to the drain.



**Photo #16:** Upstairs Hallway bathroom: the tub faucet is not sealed at the tub surround providing moisture intrusion potential.

*Directional references used within this report are based on facing the front of the building*

# General Inspection

★ ★ ★

| | |
|---|---|
| Inspection Date: **September 30, 2016** | **Michael Armshaw** (Lic # 10252) |
| Inspection No: 160941/310 | 2132 Sassy Lane, Baton Rouge, LA 70808 |
| | Phone/Fax (225) **344-2525** ☎ Cellular (225) **933-1089** |
| | Email: armshaw @ cox.net |

**Indoor Air Quality (IAQ) services**, including those associated with mold/fungus, are not part of this inspection report and General Inspection LLC has performed no inspections or testing for the presence or absence of indoor air pollutants or Chinese drywall unless expressly and separately contracted for and separately reported. Inspecting and testing of IAQ is outside the scope of this inspection. This inspector is not qualified to detect the presence of Chinese Drywall. Accordingly, the issue of Chinese Drywall (and its potential problems) is beyond the scope of the inspection report.

Readily visible mildew/mold/fungus and conditions conducive to biogrowth may be noted in the report for informational purposes only. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing and remediation is warranted.

General Inspection LLC would be pleased, for additional fees, to help arrange for specific IAQ evaluations to determine the need for testing and remediation of specific indoor air pollutants.

Clients who desire additional Indoor Air Quality (IAQ) information can obtain it from the Federal Environmental Protection Agency (EPA) at:

EPA Indoor Air Quality Information Clearinghouse
P.O. Box 37133
Washington, DC 20013
www.epa.gov
1-800-438-4318

**"E.I.F.S." or "Synthetic Stucco" Inspection:**

The inspection of "*Synthetic Stucco*" or "*E.I.F.S.*" walls is a visual inspection of the exterior surface conditions only, the determination of the concealed interior wall conditions requires testing by a "*Moisture Intrusion*" inspector, and is beyond the scope of this inspection.

General Inspection LLC would be pleased, for additional fees, to arrange for specific Moisture Intrusion evaluations to determine the presence of moisture in concealed interior wall spaces.

*This report is for the exclusive use of the client for whom it was prepared. Neither the Licensed Home Inspector nor the Inspection Company shall have any liability whatsoever to any third party using or relying on its contents. Any third party using this report agrees thereby to defend, indemnify and hold the Licensed Home Inspector and the Inspection Company harmless from any claims of any person relying on the report."*

---

**Directional references used within this report are based on facing the front of the building**

---

## Louisiana State Board of Home Inspectors

### Standards of Practice and Code of Ethics

## STANDARDS OF PRACTICE

**301. Minimum Standards:** This Chapter sets forth the minimum Standards of Practice required of licensed home inspectors. AUTHORITY NOTE: Promulgated in accordance with RS. 37:1475. HISTORICAL NOTE: Promulgated by the Department of Economic Development, Board of Home Inspectors, L.R. 26:8, and (August 20, 2000).

**303. Definitions**

The definitions in Section 109 are incorporated into this Chapter by reference *(editing note: Section 109 definitions are included at rear of this section)*. The following definitions apply to this Chapter:

A. *Automatic safety controls* - devices designed and installed to protect systems and components from excessively high or low pressures and temperatures, excessive electrical current, loss of water, loss of ignition, fuel leaks, fire, freezing, or other unsafe conditions.

B. *Central air conditioning* - a system that uses ducts to distribute cooled or dehumidified air to more than one room or uses pipes to distribute chilled water to heat exchangers in more than one room, and that is not plugged into an electrical convenience outlet.

C. *Cross connection* - any physical connection or arrangement between potable water and any source of contamination.

D. *Dangerous or adverse situations* - situations that pose a threat of injury to the inspector, or those situations that require the use of special protective clothing or safety equipment.

E. *Describe* - report in writing a system or component by its type, or other observed characteristics, to distinguish it from other components used for the same project.

F. *Dismantle* - to take apart or remove any component, device or piece of equipment that is bolted, screwed, or fastened by other means and that would not be dismantled by a homeowner in the course of normal household maintenance.

G. *Enter* - to go into an area to observe all visible components.

H. *Functional drainage* - a drain is functional when it empties in a reasonable amount of time and does not overflow when another fixture is drained simultaneously.

I. *Functional flow* - a reasonable flow at the highest fixture in a dwelling when another fixture is operated simultaneously.

J. *Inspect* - to examine readily accessible systems and components of a building in accordance with the Standards of Practice, using normal operating controls and opening readily openable access panels.

K. *Installed* - attached or connected such that the installed item requires tools for removal.

L. *Normal operating controls* - homeowner operated devices such as a thermostat, wall switch, or safety switch.

M. *Observe* - the act of making a visual examination

N. *On-site water supply quality* - water quality based on the bacterial, chemical, mineral and solids contents of the water.

0. *On-site water supply quantity* - water quantity based on the rate of flow of water.

P. *Operate* - to cause systems or equipment to function.

Q. *Readily openable access panel* - a panel provided for homeowner inspection and maintenance that has removable or operable fasteners or latch devices in order to be lifted off, swing open, or otherwise removed by one person; and its edges and fasteners are not painted in place. This definition is limited to those panels within normal reach or from a four-foot stepladder, and that are not blocked by stored items, furniture, or building components.

R. *Representative numbers* - for multiple identical components such as windows and electrical outlets -one such component per room. For multiple identical exterior components - one such component on each side of the building.

S. *Roof drainage systems* - gutters, downspouts, leaders, splash blocks, scuppers and similar components used to carry water off a roof and away from a building.

T. *Shut down* - a piece of equipment or a system is shut down when it cannot be operated by the device or control that a homeowner should normally use to apart it. If its safety switch or circuit breaker is in the "off" position or its fuse is missing or blown, the inspector is not required to reestablish the circuit for the purpose of operating the equipment or system.

U. *Solid fuel heating device* - any wood, coal, or other similar organic fuel burning device, including but not limited to fireplaces whether masonry or factory built *(fireplace inserts and stoves, wood stoves (room heaters)*, central furnaces, and combinations of these devices.

V. *Structural component* - a component that supports non-variable forces or weights *(dead loads)* and variable forces or weights *(live loads)*.

W. *Technically exhaustive* - an inspection involving the extensive use of measurements, instruments, testing, calculations, and other means to develop scientific or engineering findings, conclusions, and recommendations.

X. *Under floor crawl space* - the area within the confines of the foundation and between the ground and the underside of the lowest floor structural component.

---

*Directional references used within this report are based on facing the front of the building*

---

**Definitions**

A.  *Applicant* - a person who seeks to be examined for licensure by the Board.
B.  *Board* - the Louisiana State Board of Home Inspectors.
B.  *Code* - the Louisiana Home Inspectors Licensing Administrative Code, promulgated at LAC 46: XL.
C.  *Component* - a readily accessible and observable aspect of a system, such as a floor or wall, but not individual pieces such as boards or nails or where many similar pieces make up a component.
E.  *Credit hour* - one continuing education course classroom horn, comprising at least 50 minutes of instruction.
F.  *Home inspection* - a written evaluation of two or more of the following components of a resale residential building

|   |   |   |   |
|---|---|---|---|
| 1. | Electrical system | 5. | Plumbing system |
| 2. | Exterior and interior components | 6. | Roof |
| 3. | Foundation | 7. | Structural and foundation system |
| 4. | Heating and cooling systems | 8. | Any other related residential housing system as defined in the standards of practice prescribed by the Board. |

G.  *Home inspector* - any person who, in accordance with the provisions of these Rules, holds himself out to the general public and engages in the business of performing home inspections on resale residential buildings for compensation and who examines any component of a building, through visual means and through normal user controls, without the use of mathematical sciences.
H.  *Inspection* - to examine readily accessible systems and components of a building in accordance with the Board's Standards of Practice, using normal operating controls and opening readily accessible panels.
I.  *Law* - the Louisiana Home Inspector Licensing Law, KS. 37:1471-1489.
J.  *License period* - one year, expiring on the last day of the month of issuance of the preceding year of the Law and these Rules.
K.  *Licensee* - any person who has been issued a license by the Board in accordance with the provisions of the Law and these Rules
L.  *LSBHI* - an acronym for Louisiana State Board of Home Inspectors.
M.  *Residential resale building* - a structure intended to be or that is used as a residence and consists of four or less living units, excluding commercial use space or units, and is not for sale for the first time.
N.  *Rules* - the body of regulations governing the Board's discharge of its duties and responsibilities and prescribing the privileges and obligations of persons desiring to engage in the home inspection business in Louisiana under the Louisiana State Home Inspectors Licensing Law. It may also be referred to as the Louisiana Home Inspectors Licensing Administrative Code.
0.  *System* - a combination of interactive or interdependent components assembled to carry out one or more functions.
P.  *Timely filing* - a letter or written communication bearing a United States Post Office Mark inscribed with the date a filing or report is due at the Board. Any report or materials for filing bearing the canceled Postal Mark received on the next business day following the due date a presumed timely filed. Any report or materials for filing received after that time may be deemed timely filed only if evidenced by a return receipt or proof of mailing bearing the due date.

**305, Purpose and Scope**

A.  Home inspections performed according to this Chapter shall provide the client with a better understanding of the property conditions, as observed at the time of the home inspection.
B.  Home inspectors shall:
1.  Provide the client with a written pre-inspection contract, whenever possible, which shall:
 a. State that the home inspection is to be done in accordance with the Standards of Practice of the Louisiana State Board of Home Inspectors.
 b. Describe what inspection services will be provided and their cost
 c. State that the inspection is limited to only those systems or components agreed upon by the client and the inspector
 d. contains copies of the Standards of Practice and Code of Ethics.
2.  Observe and inspect readily visible and accessible installed systems and components listed in this Chapter, and/or as contractually agreed upon;
3.  Submit a written report to the client which shall:
 a.  Describe those systems and components specified to be described in Sections 31 V through 329. and/or as contractually agreed upon;
 b.  State which systems and components designated for inspection in this Section have been inspected, and state any systems or components designated for inspection that were not inspected, and the reason for not inspecting;
 c.  State any systems or components so inspected that do not function as intended, allowing for normal wear and tear, or adversely affect the habitability of the dwelling; and
 d.  State the name, license number, and contain the signature of the person conducting the inspection.

C.  This Chapter does not limit home inspectors from:
1.  Reporting observations and coalitions or rendering opinions of items in addition to those required in Section B of this Rule; or
2.  Excluding systems and components from the inspection if requested by the client and so stated in the written contract.

> ***Directional references used within this report are based on facing the front of the building***

**307. General Limitations**
A.  Home inspections done in accordance with this Chapter are visual and are not technically exhaustive.
B.  This Chapter applies to residential resale buildings.

**308. General Exclusions**
A.  Home inspectors are **NOT REQUIRED** to report on:
1.  Life expectancy of any component or system;
1.  The causes of the need for a repair
2.  The methods, materials, and costs of corrections;
3.  The suitability of the property for any specialized use;
4.  Compliance or non-compliance with codes, ordinances, statutes, regulatory requirements, special utility, insurance or restrictions;
5.  The market value of the property or its marketability;
6.  The advisability or inadvisability of purchase of the property;
7.  Any component or system that was not inspected;
8.  The presence or absence of pests such as wood damaging organisms, rodents, or insects;
9.  Cosmetic items, underground items, or items not permanently installed.
10. Hidden or latent defects; or
11. Items not visible for inspection.

B.  Home inspectors are **NOT REQUIRED** to:
1.  Offer warranties or guarantees of any kind;
1.  Calculate the strength, adequacy, or efficiency of any system or component;
2.  Enter any area or perform any procedure that may damage the property or its components or be dangerous to the home inspector or other persons;
3.  Operate any system or component that is shut down or otherwise inoperable;
4.  Operate any system or component that does not respond to normal operating controls;
5.  Disturb insulation, move personal items, panels, furniture, equipment, plant life, soil, snow, ice, or debris that obstructs access or visibility;
6.  Determine the presence or absence of any suspected adverse environmental condition or hazardous substance, including but not limited to toxins such as asbestos, radon and lead, carcinogens, noise, contaminants in the building or in soil, water, and air;
7.  Determine the effectiveness of any system installed to control or remove suspected hazardous substances; predict fixture condition, including but not limited to failure of components;
8.  Project operating costs of components;
9.  Evaluate acoustical characteristics of any system or component; or
10. Inspect special equipment or accessories that are not listed as components to be inspected in this Chapter.

C.  Home inspectors **SHALL NOT**:
1.  Offer or perform any act or service contrary to law;
2.  Report on the market value of the property or its marketability;
3.  Report on the advisability or inadvisability of purchase of the property;
4.  Report on any component or system that was not inspected;
5.  Report on the presence or absence of pests such as wood damaging organisms, rodents or insects. However, the home inspector may advise the client of damages to the building and recommend further inspection by a licensed wood destroying insect inspector.
6.  At the time of the inspection or for a reasonable time thereafter, advertise or solicit to perform repair services or any other type of service on the home upon which he has performed a home inspection.

**311. Structural Components**
A.  The home inspector shall inspect structural components including:

| | | | |
|---|---|---|---|
| 1. | Foundation | 4. | Columns or piers |
| 2. | Floors | 5. | Ceilings; and |
| 3. | Walls | 6. | Roofs |

B.  The home inspector shall describe the type of:

| | | | |
|---|---|---|---|
| 1. | Foundation | 4. | Columns or piers |
| 2. | Floor structure | 5. | Ceiling structure; and |
| 3. | Wall structure | 6. | Roof structure |

C.  The home inspector shall:
1.  Probe structural components only where deterioration is visible, except where probing would damage any surface;

---

***Directional references used within this report are based on facing the front of the building***

---

2.  Enter under floor crawl spaces, basements, and attic spaces, except when access is obstructed. When entry could damage the property, or when dangerous or adverse situations are suspected;

3.  Report the methods used to inspect under floor crawl spaces and attics; and

4.  Report signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components.

### 313. Exterior

A.  The home inspector shall inspect:

1.  Wall cladding and flashings and trim;
1.  Entryway doors and a representative number of windows;
2.  Garage door operators;
3.  Decks, balconies, stoops, steps, areaways, porches, and applicable railings;
4.  Eaves, soffits, and fascias; and
5.  Vegetation, grading, drainage, driveways, patios, walkways, and retaining walls with respect on the condition of the building.

B.  The home inspector shall:

1.  Describe wall cladding materials;
2.  Operate all entryway doors and a representative number of windows;
3.  Operate garage doors manually or by using permanently installed controls for any garage door operator; and
4.  Report whether or not any garage door operator will automatically reverse or stop and if so said safety feature.

C.  The home inspector is **NOT REQUIRED** to inspect:

1.  Storm windows, storm doom, screening, shutters, awnings, and similar seasonal accessories
2.  Fences;
3.  Presence of safety glazing in doors and windows;
4.  Garage door operator remote control transmitters;
5.  Geological conditions;
6.  Soil conditions;
7.  Recreational facilities *(including spas, saunas, steam baths, swimming pools, tennis courts, and other exercise, entertainment or athletic facilities)*;
8.  Detached buildings or structures;
9.  Presence or condition of buried fuel storage tanks.

### 315. Roofing

A.  The home inspector shall inspect:

1.  Roof coverings
2.  Rood drainage systems
3.  Flashings
4.  Skylights, chimneys, and roof penetrations; and
5.  Signs of leaks or abnormal condensation on building components

B   The home inspector shall:

1.  Describe the type of roof covering materials: and
2.  Report the methods used to observe the roofing.

C.  The home inspector is **NOT REQUIRED** to:

1.  Walk on the roofing; or
2.  Inspect attached accessories including but not limited to solar systems, antennae, and lightening arrestors.

### 317. Plumbing

A.  The home inspector shall inspect:

1.  Interior water supply and distribution systems, including piping materials, supports, insulation, fixtures and faucets; functional flow, leaks; and cross connections;
2.  Interior drain, waste and vent system, including: Imps, drain, waste, and vent piping; piping supports and pipe insulation; leaks, and functional drainage;
3.  Hot water systems including: water heating equipment; normal operating controls; automatic safety controls; and chimneys, flues and vents;
4.  Fuel storage and distribution systems including interior fuel storage equipment, supply piping, venting, and supports; leaks; and
5.  Sump pumps.

B.  The home inspector shall describe:

> ***Directional references used within this report are based on facing the front of the building***

      1.   Water supply and distribution piping materials;
      2.   Drain, waste and vent piping materials;
      3.   Water heating equipment; and
      4.   Location of main water supply shutoff device.

C.     The home inspector shall operate all plumbing and plumbing fixtures, including their faucets and all exterior faucets attached to the house, except where the flow end of the faucet is connected to an appliance or winterized equipment.

D.     The home inspector is **NOT REQUIRED** to:
      1.   State the effectiveness of anti-siphon devices;
      2.   Determine whether water supply and waste disposal systems are public or private;
      3.   Operate automatic safety controls;
      4.   Operate any valve except water closet flush valves, fixture faucets, and hose faucets;
      5.   Inspect:

| | | |
|---|---|---|
| a.   Water conditioning systems | e. | Foundation irrigation systems |
| b   Fire and lawn sprinkler systems | f. | Spas |
| c.   On-site water supply quantity and quality | g. | Swimming Pools |
| d.   On-site waste disposal systems | h. | Solar water heating equipment; or |

      6.   Inspect the system for proper sizing, design, or use of proper materials.

## 319. Electrical

A.     The home inspector shall inspect:
      1.   Service entrance conductors;
      2.   Service equipment, ground equipment, main over current device, and main and distribution panels:
      3.   Amperage and voltage ratings of the service;
      4.   Branch circuit conductors, their over current devices, and the compatibility of the ampacities and voltages;
      5.   The operation of a representative number of installed ceiling fans, lighting fixtures, switches and receptacles located inside the house, garage, and on the dwelling's exterior walls;
      6.   The polarity and grounding of all receptacles within six feet of interior plumbing fixtures, and all receptacles in the garage or carport, and on the exterior of inspected structures:
      7.   The operation of ground fault circuit interrupters; and
      8.   Smoke detectors.

B.     The home inspector shall describe:
      1.   Service amperage and voltage;
      2.   Service entry conductor materials;
      3.   Service type as being overhead or underground; and
      4.   Location of main and distribution panels.

C.     The home inspector shall report any observed aluminum branch circuit wiring.

D.     The home inspector shall report on the presence or absence of smoke detectors, and operate their test function, if accessible, except when detectors are part of a central system.

E.     The home inspector is **NOT REQUIRED** to:
      1.   Insert any tool, probe, or testing device inside the panels;
      2.   Test or operate any over current device except ground fault circuit interrupters;
      3.   Dismantle any electrical device or control other than to remove the dead front covers of the main and auxiliary distribution panels; or
      4.   Inspect:
         a.   Low voltage systems;
         b.   Security system devices, heat detectors, or carbon monoxide detectors;
         c.   Telephone, security, cable TV, intercoms, or other ancillary wiring that *is* not part of the primary electrical distribution system
         d.   Built-in vacuum equipment.

## 321. Heating

A.     The home inspector shall inspect permanently installed heating systems including:
      1.   Heating equipment;
      1.   Normal operating controls;
      2.   Automatic safety controls;
      3.   Chimneys, flues, and vents, where readily visible;
      4.   Solid fuel heating devices including fireplaces;

---

> ***Directional references used within this report are based on facing the front of the building***

---

    5.   Heat distribution systems including fans, pumps, ducts and piping, with associated supports, insulation, air filters, registers, radiators, fan coil units, convectors; and

    6.   The presence of an installed heat source in each room.

B.  The home inspector shall describe:

    1.   Energy source; and

    2.   Heating equipment and distribution type.

C.  The home inspector shall operate the systems using normal operating controls.

D.  The home inspector shall open readily openable access panels provided by the manufacturer or installer for routine homeowner maintenance.

E.  The home inspector is **NOT REQUIRED** to:

    1.   Operate heating systems when weather conditions or other circumstances may cause equipment damage;

    2.   Operate automatic safety controls,

    3.   Ignite or extinguish solid fuel fires; or

    4.   Inspect

        a.   The interior of flues;             d.   Electronic air filters;

        b.   Fireplace inserts flue connections.     the uniformity or adequacy of beat supply to the various rooms.

        c.   Humidifiers

### 323. Central Air Conditioning

A.  The home inspector shall inspect:

    1.   Central air conditioning systems including:

    2.   Cooling and air handling equipment;

    3.   Normal operating controls;

    4.   Fans, pumps, ducts, and piping with associated supports, dampers, insulation, air filters registers, fan coil units; and

    5.   The presence of an installed cooling source in each room.

B.  The home inspector shall describe:

    1.   Energy sources; and

    2.   Cooling equipment type.

C.  The home inspector shall operate the systems using normal operating controls.

D.  The home inspector shall open readily openable access panels provided by the manufacturer or installer for routine homeowner maintenance.

E.  The home inspector is **NOT REQUIRED** to:

    1.   Operate cooling systems when weather conditions or other circumstances may cause equipment damage;

    2.   Inspect non-central air conditioners or

2.  Inspect the uniformity or adequacy of cool-air supply to the various rooms.

### 325. Interiors

A.  The home inspector shall inspect:

    1.   Walls, ceiling, and floors;

    2.   Steps, stairways, balconies, and railings;

    3.   Countertops and a representative number of cabinets and drawers; and

    3.   A representative number of doors and windows.

B.  The home inspector shall:

    1.   Operate a representative number of windows and interior doors; and

    2.   Report signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components.

C.  The home inspector is **NOT REQUIRED** to inspect:

    1.   Paint, wallpaper, and other finish treatments on the interior walls, ceilings, and floors:

    1.   Carpeting; or

    3.   Draperies, blinds, or other window treatments.

### 327. Insulation and Ventilation

A.  The home inspector shall inspect:

    1.   Insulation and vapor retarders in unfinished spaces;

    2.   Ventilation of attics and foundation areas:

    3.   Kitchen, bathroom, and laundry venting system; and

    4.   The operation of any readily accessible attic ventilation fan, and, when temperature permits, the operation of any readily accessible thermostatic controls

B  The home inspector shall describe:

---

> *Directional references used within this report are based on facing the front of the building*

1.  Insulation in unfinished spaces, and
2.  Absence of insulation in unfinished space at conditioned surfaces.
C.  The home inspector is **NOT REQUIRED** to report on:
    1.  Concealed insulation and vapor retarders; or
1.  Venting equipment that is integral with household appliances.

### 329. Built-in Kitchen Appliances

A.  The home inspector shall inspect and operate the basic functions of the following kitchen appliances:
    1.  Permanently installed dishwasher through its normal cycle;
    2.  Range, cooktop, and permanently installed oven;
    3.  Trash compactor;
    4.  Garbage disposal;
    5.  Ventilation equipment or range hood; and
    6.  Permanently installed microwave oven.
B.  The home inspector is **NOT REQUIRED** to inspect
    1.  Clocks, timers, self-cleaning oven function, or thermostats for calibration or automatic operation;
    2.  Non built-in appliances such as clothes washers and dryers; or
    3.  Refrigeration units such as freezers, refrigerators and icemakers.
C.  The home inspector is **NOT REQUIRED** to operate:
    1.  Appliances in use
    2.  Any appliance that is shut down or otherwise inoperable.

## CODE OF ETHICS

### 501. Code of Ethics

A.  Licensees shall discharge their duties with fidelity to the public and to their clients, and with fairness and impartiality to all.
B.  Opinions expressed by licensees shall only be based on their education, experience and honest convictions.
C.  A licensee shall not disclose any information about the results of an inspection without the approval of the client for whom the inspection was performed, or the client's designated representative unless an unsafe condition is discovered.
D.  No licensee shall accept compensation or any other consideration from more than one interested party for the same service without consent of all interested parties.
H.  No licensee shall accept commissions or allowances from other parties dealing with the client in connection with the inspection report.
F.  No licensee shall offer commissions, fees or payment to other parties dealing with the client for the referral of the inspector to the client for an inspection.
G.  No licensee shall express, within the context of an inspection, an appraisal or opinion of the market value of the inspected property.
H.  Before the execution of a contract to perform a home inspection, a licensee shall disclose to the client any interest in a business that may affect the client.
I.  No licensee shall allow his or her interest in any business to affect the quality of results of the inspection work that the licensee may be called upon to perform.
J.  Licensees shall not engage in false or misleading advertising or otherwise misrepresent any matters to the public.
K.  Licensees shall bear a good reputation for honesty, trustworthiness and integrity.

## END OF SECTION

*Directional references used within this report are based on facing the front of the building*

# MyAMC, LLC Appraisal Certification Form

MyAMC, LLC (hereafter MyAMC) certifies, to the best of its knowledge, the following is accurate regarding the completion of the attached appraisal for the property address of
437 Delgado  Dr Baton Rouge LA 70808, MyAMC Order Number: 00599187000, Client Order Number: 640160980473.

Undue Influence Controls:
The appraiser was selected by MyAMC using criteria based on the appraiser's qualifications, proximity to the subject property, and other factors determined by MyAMC to ensure compliance with current appraiser independence regulations. The lender has had no influence in the selection of the appraiser.

MyAMC prohibits direct communication between the appraiser and the lender and requires the appraiser to report any such communication to appropriate regulatory authorities. All communication between the lender and the appraiser are believed to have been conducted through MyAMC, and MyAMC is not aware of any attempt by the lender to influence the value, opinion of market condition, or any other aspect of the appraisal.

Outside of a valid and complete executed purchase contract, no other information has been provided to the appraiser that might influence the value, opinion of market condition, or construction of the appraisal. Such prohibited data includes:
- The owners estimate of value
- A target value
- The purchase price (outside of a valid and complete executed purchase contract)
- The loan amount (outside of a valid and complete executed purchase contract)
- Comparable sales*
- The loan to value ratio (LTV) (outside of a valid and complete executed purchase contract)

*Comparable sales cannot be sent as part of the initial order. As part of value reconsideration process, or QA process, MyAMC  may provide reasonable comparables to the appraiser for further appraisal review to ensure that the best available comparables have been used.

With the exception of the bona fide quality assurance review, and requirement of minimum standards for factual information, MyAMC has made no attempt to influence the development of construction of the appraisal. Neither MyAMC, and to the best of its knowledge, nor the lender have conditioned payment for services, or promise of future engagements on the appraised value, opinion of market condition, or other opinions expressed in the appraisal.

Appraiser Qualifications and Watch/Exclusionary List Process:
MyAMC certifies the following:
- The appraiser's license/certification status was verified via ASC.gov
- The appraiser does not appear on the FNMA/FHLMA Exclusionary list






**APPRAISAL REPORT**

OF THE REAL PROPERTY LOCATED AT

437 Delgado Dr
Baton Rouge, LA  70808

for

Supreme Lending
14801 Quorum Dr, Suite 300
Dallas, TX
75254

as of

09/26/2016

by

Joseph E. Duggan
3367 White Shadows Dr
Baton Rouge, LA 70816

J. E. Duggan, LLC

J. E. Duggan, LLC
3367 White Shadows Dr
Baton Rouge, LA 70816
225-252-3619

September 27, 2016

Supreme Lending
14801 Quorum Dr, Suite 300
Dallas, TX
75254

| | |
|---|---|
| Property - | 437 Delgado Dr |
| | Baton Rouge, LA  70808 |
| Borrower - | Kristopher Novak & Lauren Perry |
| File No. - | 160917JD |
| Case No. - | |

Dear  :

In accordance with your request, I have prepared an appraisal of the real property located at 437 Delgado Dr, Baton Rouge, LA.

The purpose of the appraisal is to provide an opinion of the market value of the property described in the body of this report.

Enclosed, please find the report which describes certain data gathered during our investigation of the property.  The methods of approach and reasoning in the valuation of the various physical and economic factors of the subject property are contained in this report.

An inspection of the property and a study of pertinent factors, including valuation trends and an analysis of neighborhood data, led the appraiser to the conclusion that the market value, as of 09/26/2016 is :

$490,000

The opinion of value expressed in this report is contingent upon the Limiting Conditions attached to this report.

It has been a pleasure to assist you.  If I may be of further service to you in the future, please let me know.

Respectfully submitted,

J. E. Duggan, LLC

Joseph E. Duggan
LA Certification #1038

**Uniform Residential Appraisal Report**  File # 160917JD

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | |
|---|---|
| Property Address | 437 Delgado Dr | City | Baton Rouge | State | LA | Zip Code | 70808 |

Borrower Kristopher Novak & Lauren Perry   Owner of Public Record Jacques Brousseau   County East Baton Rouge

Legal Description   Lot: 17, Square 1, University Hills Subdivision

Assessor's Parcel # 008-7601-1   Tax Year 2015   R.E. Taxes $ 3,110

Neighborhood Name University Hills   Map Reference 640-F (BR Metro Key)   Census Tract 0048.00

Occupant  X Owner ☐ Tenant ☐ Vacant   Special Assessments $ 0   ☐ PUD   HOA $ 0   ☐ per year  ☐ per month

Property Rights Appraised  X Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type  X Purchase Transaction ☐ Refinance Transaction ☐ Other (describe)

Lender/Client Supreme Lending   Address 14801 Quorum Dr, Suite 300, Dallas, TX 75254

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of the appraisal?  X Yes ☐ No

Report data source(s) used, offering price(s), and date(s).  DOM 74;The subject is currently offered for sale in the GBR MLS #2016009794 for $499,500. The subject was originally listed for sale on 07/03/2016 for $509,500.

## CONTRACT

I  X did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  Arms length sale;The buyer and seller used a standard sales contract for the area. All the verbiage, terms and conditions were normal and acceptable for the area.

Contract Price $ 485,000   Date of Contract 09/15/2016   Is the property seller the owner of public record?  X Yes ☐ No   Data Source(s) Court Records

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  X Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid:  $0;;There were no disclosed sales concessions on the provided sales contract.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Percent Land Use % |
|---|---|---|---|
| Location ☐ Urban  X Suburban ☐ Rural | Property Values  X Increasing ☐ Stable ☐ Declining | PRICE $(000) / AGE (yrs) | One-Unit 98 % |
| Built-Up  X Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage  X InBalance ☐ OverSupply | Low 100 | 2-4 Unit % |
| Growth ☐ Rapid  X Stable ☐ Slow | Marketing Time ☐ Under 3 mths  X 3-6 mths ☐ Over 6 mths | High 2,500 / 130 | Multi-Family 0 % |
| | | Pred. 350 / 60 | Commercial 2 % |
| | | | Other % |

Neighborhood Boundaries   North of Burbank Road; South of Perkins Road; East of the LSU campus and West of Kenilworth Prkwy.

Neighborhood Description   *** See Additional Comments ***

Market Conditions (including support for the above conclusions)   *** See Additional Comments ***

## SITE

Dimensions 60Fx123LSx60Rx123RS   Area 7380 sf   Shape Rectangular   View N;Res;

Specific Zoning Classification A1   Zoning Description Single Family Residential

Zoning Compliance  X Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use?  X Yes ☐ No If No, describe

| Utilities Public Other (describe) | Public Other (describe) | Off-site Improvements--Type Public Private |
|---|---|---|
| Electricity X | Water X | Street 2 Ln Asphalt  X |
| Gas X | Sanitary Sewer X | Alley None |

FEMA Special Flood Hazard Area ☐ Yes  X No  FEMA Flood Zone X500L   FEMA Map # 22033C0245E   FEMA Map Date 05/02/2008

Are the utilities and off-site improvements typical for the market area?  X Yes ☐ No. If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes  X No If Yes, describe

## IMPROVEMENTS

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units  X One ☐ One with Accessory Unit | X Concrete Slab ☐ Crawl Space | Foundation Walls Concrete/Avg | Floors Wood/Gd |
| # of Stories 1.5 | ☐ Full Basement ☐ Partial Basement | Exterior Walls Brick,Wood/Gd | Walls Drywall/Gd |
| Type ☐ Det. ☐ Att. ☐ S-Det/End Unit | Basement Area 0 sq. ft. | Roof Surface Comp.Shingle/Gd | Trim/Finish Elab Wd/Gd |
| X Existing ☐ Proposed ☐ Under Const | Basement Finish 0 % | Gutters & Downspouts Alum/Gd | Bath Floor C.Tile/Gd |
| Design (Style) Cottage | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type Vinyl/Gd | Bath Wainscot C.Tile/Gd |
| Year Built ~1950 | Evidence of ☐ Infestation | Storm Sash/Insulated None,Yes/Gd | Car Storage None |
| Effective Age (Yrs) 2 | ☐ Dampness ☐ Settlement | Screens Yes/Gd | X Driveway # of Cars 4 |
| Attic ☐ None | Heating  X FWA ☐ HWBB ☐ Radiant | Amenities | Driveway Surface Concrete |
| X Drop Stair ☐ Stairs | ☐ Other Fuel Gas | ☐ Fireplace(s) # 0  X WoodStove(s) # 0 | ☐ Garage # of Cars 0 |
| ☐ Floor ☐ Scuttle | Cooling  X Central Air Conditioning | X Fence Wood | ☐ Carport # of Cars 0 |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | X Patio/Deck Fr,Rr  X Porch Fr,Blc | ☐ Att. ☐ Det. ☐ Built-in |
| | | ☐ Pool None  X Other Storage | |

Appliances ☐ Refrigerator  X Range/Oven  X Dishwasher ☐ Disposal  X Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area **above** grade contains:   8 Rooms   4 Bedrooms   2.1 Bath(s)   2,439 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.)   Front Porch; Balcony Porch; Open Courtyard Patio; Updated kitchen; Updated baths; Detached storage.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).   C2;Kitchen-updated-one to five years ago;Bathrooms-updated-one to five years ago;The improvements are found to be in attractive condition throughout the exterior & interior with no noted items of deferred maintenance. The subject has been well maintained & updated with attractive appeal & features having typical marketability and conformity to the immediate neighborhood.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes  X No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  X Yes ☐ No If No, describe

**ADDITIONAL COMMENTS**

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City  Baton Rouge | | County   East Baton Rouge | | State   LA | | Zip Code   70808 | |
| Lender or Client | Supreme Lending | | | | | | |

## SCOPE OF APPRAISAL

At the request of the client, the appraisal report has been prepared in compliance with the Uniform Appraisal Dataset(UAD) from Fannie Mae and Freddie Mac. The UAD requires the appraiser to use standardized responses that include specific formats, definitions, abbreviations and acronyms.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties. Some of the standardized responses required by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business. Examples include condition and quality ratings as well as comparable sales and listing data. Not every element of the subject property was viewable and comparable property data was generally obtained from third-party sources. Consequently, this information should be considered an "estimate" unless otherwise noted by the appraiser.

## NEIGHBORHOOD DESCRIPTION

The neighborhood consists of the residential area known as College Town & University Hills.   It is a high demand tree-lined area of older homes offering close proximity to the LSU lakes and campus.   Homes range from small "starter" to large custom and from new homes on resubdivided lots to older homes.   Most of the homes in the neighborhood have been updated/renovated while maintaining the old charm.   The neighborhood is a high demand one with increasing values and a "shortage" market condition.  There  are no adverse market or environmental factors adversely affecting home values.

## MARKET CONDITIONS

The current market condition is a "seller's market" due to current low mortgage interest rates, continued stable economy and the  continued desirability of the immediate development and neighborhood.  The subject's immediate market was not affected by a recent flooding disaster.  The surrounding marketing areas did experience significant flooding and damage. Quality homes that were not affected by the disaster are in short supply and high demand. Recovery for the market is anticipated to take 1-2yrs. There are no foreseen adverse conditions that may cause this current market condition to suddenly change.

## SALES COMPARISON APPROACH

Comps 1, 3 & 4 are over 1 mile from the subject. The use of comparables over 1 mile from the subject was necessary due to the low number of more similar sales with greater proximity to the subject.

The subject's parking was not bracketed due to a lack of similar quality homes in the market with no covered parking in the market. The lack of covered parking doesn't present a marketability issue for the subject.

The subject's market value is higher than the predominant market value. The subject is not a over-improvement in the market and no negative marketing is anticipated.

Matched paired analysis and historical market reaction trends were used to determine adjustments. A $5000 full bath, $2500 half bath and $100/sf adjustments were applied to the comparables.

My Comparable Search and Results:

My comparable search consisted of similar homes in the Baton Rouge MLS. The search area is North of Burbank Road;  South of Perkins Road; East of the LSU campus and West of Kenilworth Prkwy. The search

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Lender or Client | Supreme Lending | | | | | |

parameters were 4+yr old homes that are 1950sf - 2930sf living. The search produced 12 active listings and 40 sales. The final sales selected were more similarly aged homes in the subject's development having equal amenities and marketability.

## CONDITIONS OF APPRAISAL
This appraisal is made "as is" per page 1 comments and analysis.  The income approach to value is deemed N/A due to predominant owner/occupancy of the neighborhood.

## ADDITIONAL COMMENTS
- A full visual inspection of the entire attic perimeter was observed.
- All utilities were on and in working order at the time of the appraisal inspection.

***I have never performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report.***

Exposure Time: Exposure time is estimated to be 30-120 days based on historical days on market trends in the Baton Rouge MLS for similar homes in the subject's market.

The appraiser has prepared this appraisal in full compliance with the updated Interagency Appraisal & Evaluation Guidelines.

## EXTRA ADDITIONAL COMMENTS
The subject property has not been affected by any natural disaster, and there has been no effect on marketability or value as a result of the disaster.

## Uniform Residential Appraisal Report

File # 160917JD

| | | | |
|---|---|---|---|
| There are **12** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ **320,000** to $ **525,000** . | | | |
| There are **40** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ **300,000** to $ **559,000** . | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 437 Delgado Dr  Baton Rouge, LA 70808 | 6168 Chandler  Baton Rouge, LA 70808 | | 3850 Floyd  Baton Rouge, LA 70808 | | 2052 Myrtledale  Baton Rouge, LA 70808 | |
| Proximity to Subject | | 1.41 miles SE | | 0.69 miles NE | | 1.25 miles NE | |
| Sale Price | $ 485,000 | | $ 549,500 | | $ 525,000 | | $ 451,000 |
| Sale Price/Gross Liv. Area | $ 198.85 sq. ft. | $ 216.42 sq. ft. | | $ 207.84 sq. ft. | | $ 210.75 sq. ft. | |
| Data Source(s) | | GBR MLS #2015015036;DOM 110 | | GBR MLS #2016007095;DOM 13 | | GBR MLS #2016003198;DOM 4 | |
| Verification Source(s) | | PubRcd's,Realtor | | PubRcd's,Realtor | | PubRcd's,Realtor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | VA;0 | | Cash;0 | |
| Date of Sale/Time | | s04/16;c02/16 | | s08/16;c05/16 | | s04/16;c03/16 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7380 sf | 17860 sf | -10,480 | 18000 sf | -10,620 | 11250 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT1.5;Cottage | DT1;Ranch | 0 | DT1.5;Ranch | 0 | DT1;Cottage | 0 |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | ~66 | ~66 | | 45 | 0 | ~66 | |
| Condition | C2 | C2 | | C2 | | C2 | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | |
| Room Count | 8 / 4 / 2.1 | 8 / 4 / 3.0 | -2,500 | 8 / 4 / 2.0 | +2,500 | 7 / 3 / 2.0 | +2,500 |
| Gross Living Area | 2,439 sq. ft. | 2,539 sq. ft. | -10,000 | 2,526 sq. ft. | -8,700 | 2,140 sq. ft. | +29,900 |
| Basement & Finished  Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Conforms | Conforms | | Conforms | | Conforms | |
| Heating/Cooling | FWA / CAC | FWA / CAC | | FWA / CAC | | FWA / CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 4dw | 2cp4dw | -2,500 | 2ga2dw | -5,000 | 2gd2dw | -2,500 |
| Porch/Patio/Deck | 2Pch,2Pt | 2Pch,2Pt | | 1Pch,1Pt | | 1Pch,1Pt | +3,000 |
| Features: | 0Fp | 1Fp | -2,000 | 1Fp | -2,000 | 1Fp | |
| | | | | Pool | -15,000 | | |
| Net Adjustment (Total) | | + [ ] X - | $ -27,480 | + [ ] X - | $ -38,820 | X + [ ] - | $ 32,900 |
| Adjusted Sale Price  of Comparables | | Net Adj. 5.00 %  Gross Adj. 5.00 % | $ 522,020 | Net Adj. 7.39 %  Gross Adj. 8.35 % | $ 486,180 | Net Adj. 7.29 %  Gross Adj. 8.40 % | $ 483,900 |

I [ X ] did   did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [ X ] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s)   Baton Rouge MLS

My research [ ] did [ X ] did not reveal any prior sales or transfers of the comparable sales for the prior year to the date of sale of the comparable sale.

Data Source(s)   Baton Rouge MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | GBR MLS | GBR MLS | GBR MLS | GBR MLS |
| Effective Date of Data Source(s) | 09/26/2016 | 09/26/2016 | 09/26/2016 | 09/26/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales   There have been no sales, listings or transfers of the subject property within the past 3 years.  There have been no sales or transfers of the comparables sales 3 years from the current sales dates.

Summary of Sales Comparison Approach   The 4 sales presented & analyzed are the most recent & similar sales found in the immediate marketing area. Comps 5 & 6 are active/pending listings in the market. Comps 1, 2 & 3 are larger homes and Comp 3 is smaller. Comps 1 & 2 have larger lot sizes. Comp 1 has an inground pool. All of the comps have superior covered parking. Comps 1 & 2 have inferior bath counts and Comp 3 & 4 have superior bath counts. Comps 1 & 3 receive more consideration being more similarly aged homes with similar renovations, updates and equal effective ages with all having equal appeal and marketability.

Indicated Value by Sales Comparison Approach $ 490,000

Indicated Value by: Sales Comparison Approach $ 490,000   Cost Approach (if developed) $ 505,026   Income Approach (if developed) $ 0

Consideration is given to Cost, Sls. Comp. Analysis & current market activity (supply/demand) and trends.  However, S.C.A. receives most consideration as it is deemed most indicative of value for the subject & most reflective of the current market for this area.

This appraisal is made [ X ] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  *** See

Additional Comments ***

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 490,000 , as of 09/26/2016 , which is the date of inspection and the effective date of this appraisal.

J. E. Duggan, LLC

## ADDITIONAL COMPARABLES

| | | |
|---|---|---|
| Borrower | Kristopher Novak & Lauren Perry | |
| Property Address | 437 Delgado Dr | |
| City  Baton Rouge | County  East Baton Rouge   State  LA | Zip Code  70808 |
| Lender/Client | Supreme Lending | |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 437 Delgado Dr<br>Baton Rouge, LA 70808 | 1916 Glasgow<br>Baton Rouge, LA 70808 | | 536 LSU<br>Baton Rouge, LA 70808 | | 506 Stanford<br>Baton Rouge, LA 70808 | |
| Proximity to Subject | | 1.55 miles E | | 0.14 miles N | | 0.08 miles N | |
| Sale Price | $          485,000 | $          557,500 | | $          538,500 | | $          485,000 | |
| Sale Price/Gross Liv. Area | $ 198.85 sq. ft. | $ 222.02 sq. ft. | | $ 244.77 sq. ft. | | $ 190.20 sq. ft. | |
| Data Source(s) | | GBR MLS #2016009229;DOM 6 | | GBR MLS #2015016617;DOM 264 | | GBR MLS #2016013535;DOM 5 | |
| Verification Source(s) | | PubRcd's,Realtor | | PubRcd's,Realtor | | PubRcd's,Realtor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing<br>Concessions | | ArmLth<br>Cash;1500 | | Listing | | Listing | |
| Date of Sale/Time | | s07/16;c06/16 | | c09/16 | | c09/16 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7380 sf | 4920 sf | 0 | 10500 sf | 0 | 10125 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT1.5;Cottage | DT1.5;Cottage | | DT2;Cottage | 0 | DT1;Cottage | 0 |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | ~66 | 4 | -10,000 | 81 | 0 | ~55 | +10,000 |
| Condition | C2 | C2 | | C2 | | C3 | +10,000 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8    4    2.1 | 8    4    3.0 | -2,500 | 8    3    3.0 | -2,500 | 8    4    2.0 | +2,500 |
| Gross Living Area | 2,439 sq. ft. | 2,511 sq. ft. | -7,200 | 2,200 sq. ft. | +23,900 | 2,550 sq. ft. | -11,100 |
| Basement & Finished<br>Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Conforms | Conforms | | Conforms | | Conforms | |
| Heating/Cooling | FWA / CAC | FWA / CAC | | FWA / CAC | | FWA / CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 4dw | 2ga2dw | -5,000 | 3gd4dw | -5,000 | 2cp4dw | -2,500 |
| Porch/Patio/Deck | 2Pch,2Pt | 2Pch,1Pt | 0 | 1Pch,1Pt | 0 | 2Pch,2Pt | |
| Features: | 0Fp | 1Fp | -2,000 | 1Fp | -2,000 | 1Fp | -2,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ -26,700 | [X] + [ ] - | $ 14,400 | [X] + [ ] - | $ 6,900 |
| Adjusted Sale Price<br>of Comparables | | Net Adj. 4.79 %<br>Gross Adj. 4.79 % | $ 530,800 | Net Adj. 2.67 %<br>Gross Adj. 6.20 % | $ 552,900 | Net Adj. 1.42 %<br>Gross Adj. 7.86 % | $ 491,900 |

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | GBR MLS | GBR MLS | GBR MLS | GBR MLS |
| Effective Date of Data Source(s) | 09/26/2016 | 09/26/2016 | 09/26/2016 | 09/26/2016 |
| Comment on Sales Comparison | | | | |

J. E. Duggan, LLC

# Uniform Residential Appraisal Report

File # 160917JD

## ADDITIONAL COMMENTS

*** See Additional Comments ***

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Larger site values are common and typical in the market due to a lack of available vacant lots and the high desirability of the immediate market. A similar recent land sale sold for $205,000 and a dated sale of a larger lot sold for $179,900 in Sept. 2015.

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

| | | |
|---|---|---|
| OPINION OF SITE VALUE ....................................=$ | | 180,000 |
| Source of cost data  Local Builders | Dwelling  2,439 Sq. Ft. @ $  130.00  ....................=$ | 317,070 |
| Quality rating from cost service Good  Effective date of cost data 07/01/2016 | Storage  160 Sq. Ft. @ $  30.00  ....................=$ | 4,800 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Applnc's,Pch,Pt | 15,000 |
| The subject property suffers only a small degree of | Garage/Carport  Sq. Ft. @ $ | 0 |
| physical incurable depreciation due to its actual age, wear, | Total Estimate of Cost-New  ....................=$ | 336,870 |
| tear, and dating while suffering no functional or external | Less  Physical  Functional External | |
| obsolescence as it is typical of the immediate area homes. | Depreciation  16,844  =$ ( | 16,844 ) |
| | Depreciated Cost of Improvements  ....................=$ | 320,026 |
| | 'As-is' Value of Site Improvements ....................=$ | 5,000 |
| Estimated Remaining Economic Life (HUD and VA only)  88  Years | Indicated Value By Cost Approach ....................=$ | 505,026 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____ 0  Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

Total number of phases _____  Total number of units _____  Total number of units sold _____

Total number of units rented _____  Total number of units for sale _____  Data Source(s) _____

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

J. E. Duggan, LLC

# Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

J. E. Duggan, LLC

**Uniform  Residential  Appraisal  Report**      File #   160917JD

**APPRAISER'S  CERTIFICATION:**   The  Appraiser  certifies  and  agrees  that:

1. I  have,  at  a  minimum,  developed  and  reported  this  appraisal  in  accordance  with  the  scope  of  work  requirements  stated  in  this  appraisal  report.

2. I  performed  a  complete  visual  inspection  of  the  interior  and  exterior  areas  of  the  subject  property.  I  reported  the  condition  of  the  improvements  in  factual,  specific  terms.  I  identified  and  reported  the  physical  deficiencies  that  could  affect  the  livability,  soundness,  or  structural  integrity  of  the  property.

3. I  performed  this  appraisal  in  accordance  with  the  requirements  of  the  Uniform  Standards  of  Professional  Appraisal  Practice  that  were  adopted  and  promulgated  by  the  Appraisal  Standards  Board  of  The  Appraisal  Foundation  and  that  were  in  place  at  the  time  this  appraisal  report  was  prepared.

4. I  developed  my  opinion  of  the  market  value  of  the  real  property  that  is  the  subject  of  this  report  based  on  the  sales  comparison  approach  to  value.  I  have  adequate  comparable  market  data  to  develop  a  reliable  sales  comparison  approach  for  this  appraisal  assignment.  I  further  certify  that  I  considered  the  cost  and  income  approaches  to  value  but  did  not  develop  them,  unless  otherwise  indicated  in  this  report.

5. I  researched,  verified,  analyzed,  and  reported  on  any  current  agreement  for  sale  for  the  subject  property,  any  offering  for  sale  of  the  subject  property  in  the  twelve  months  prior  to  the  effective  date  of  this  appraisal,  and  the  prior  sales  of  the  subject  property  for  a  minimum  of  three  years  prior  to  the  effective  date  of  this  appraisal,  unless  otherwise  indicated  in  this  report.

6. I  researched,  verified,  analyzed,  and  reported  on  the  prior  sales  of  the  comparable  sales  for  a  minimum  of  one  year  prior  to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7. I  selected  and  used  comparable  sales  that  are  locationally,  physically,  and  functionally  the  most  similar  to  the  subject  property.

8. I  have  not  used  comparable  sales  that  were  the  result  of  combining  a  land  sale  with  the  contract  purchase  price  of  a  home  that  has  been  built  or  will  be  built  on  the  land.

9. I  have  reported  adjustments  to  the  comparable  sales  that  reflect  the  market's  reaction  to  the  differences  between  the  subject  property  and  the  comparable  sales.

10. I  verified,  from  a  disinterested  source,  all  information  in  this  report  that  was  provided  by  parties  who  have  a  financial  interest  in  the  sale  or  financing  of  the  subject  property.

11. I  have  knowledge  and  experience  in  appraising  this  type  of  property  in  this  market  area.

12. I  am  aware  of,  and  have  access  to,  the  necessary  and  appropriate  public  and  private  data  sources,  such  as  multiple  listing  services,  tax  assessment  records,  public  land  records  and  other  such  data  sources  for  the  area  in  which  the  property  is  located.

13. I  obtained  the  information,  estimates,  and  opinions  furnished  by  other  parties  and  expressed  in  this  appraisal  report  from  reliable  sources  that  I  believe  to  be  true  and  correct.

14. I  have  taken  into  consideration  the  factors  that  have  an  impact  on  value  with  respect  to  the  subject  neighborhood,  subject  property,  and  the  proximity  of  the  subject  property  to  adverse  influences  in  the  development  of  my  opinion  of  market  value.  I  have  noted  in  this  appraisal  report  any  adverse  conditions  (such  as,  but  not  limited  to,  needed  repairs,  deterioration,  the  presence  of  hazardous  wastes,  toxic  substances,  adverse  environmental  conditions,  etc.)  observed  during  the  inspection  of  the  subject  property  or  that  I  became  aware  of  during  the  research  involved  in  performing  this  appraisal.  I  have  considered  these  adverse  conditions  in  my  analysis  of  the  property  value,  and  have  reported  on  the  effect  of  the  conditions  on  the  value  and  marketability  of  the  subject  property.

15. I  have  not  knowingly  withheld  any  significant  information  from  this  appraisal  report  and,  to  the  best  of  my  knowledge,  all  statements  and  information  in  this  appraisal  report  are  true  and  correct.

16. I  stated  in  this  appraisal  report  my  own  personal,  unbiased,  and  professional  analysis,  opinions,  and  conclusions,  which  are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17. I  have  no  present  or  prospective  interest  in  the  property  that  is  the  subject  of  this  report,  and  I  have  no  present  or  prospective  personal  interest  or  bias  with  respect  to  the  participants  in  the  transaction.  I  did  not  base,  either  partially  or  completely,  my  analysis  and/or  opinion  of  market  value  in  this  appraisal  report  on  the  race,  color,  religion,  sex,  age,  marital  status,  handicap,  familial  status,  or  national  origin  of  either  the  prospective  owners  or  occupants  of  the  subject  property  or  of  the  present  owners  or  occupants  of  the  properties  in  the  vicinity  of  the  subject  property  or  on  any  other  basis  prohibited  by  law.

18. My  employment  and/or  compensation  for  performing  this  appraisal  or  any  future  or  anticipated  appraisals  was  not  conditioned  on  any  agreement  or  understanding,  written  or  otherwise,  that  I  would  report  (or  present  analysis  supporting)  a  predetermined  specific  value,  a  predetermined  minimum  value,  a  range  or  direction  in  value,  a  value  that  favors  the  cause  of  any  party,  or  the  attainment  of  a  specific  result  or  occurrence  of  a  specific  subsequent  event  (such  as  approval  of  a  pending  mortgage  loan  application).

19. I  personally  prepared  all  conclusions  and  opinions  about  the  real  estate  that  were  set  forth  in  this  appraisal  report.  If  I  relied  on  significant  real  property  appraisal  assistance  from  any  individual  or  individuals  in  the  performance  of  this  appraisal  or  the  preparation  of  this  appraisal  report,  I  have  named  such  individual(s)  and  disclosed  the  specific  tasks  performed  in  this  appraisal  report.  I  certify  that  any  individual  so  named  is  qualified  to  perform  the  tasks.  I  have  not  authorized  anyone  to  make  a  change  to  any  item  in  this  appraisal  report;  therefore,  any  change  made  to  this  appraisal  is  unauthorized  and  I  will  take  no  responsibility  for  it.

20. I  identified  the  lender/client  in  this  appraisal  report  who  is  the  individual,  organization,  or  agent  for  the  organization  that  ordered  and  will  receive  this  appraisal  report.

J. E. Duggan, LLC

## Uniform  Residential  Appraisal  Report
File #   160917JD

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY  APPRAISER'S  CERTIFICATION:**   The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name   Joseph E. Duggan | Name |
| Company Name   J. E. Duggan, LLC | Company Name |
| Company Address   3367 White Shadows Dr | Company Address |
| Baton Rouge, LA 70816 | |
| Telephone Number   225-252-3619 | Telephone Number |
| Email Address   jeduggan@cox.net | Email Address |
| Date of Signature and Report   09/27/2016 | Date of Signature |
| Effective Date of Appraisal   09/26/2016 | State Certification # |
| State Certification #   1038 | or State License # |
| or State License # | State |
| or Other                                State # | Expiration Date of Certification or License |
| State   LA | |
| Expiration Date of Certification or License   12/31/2017 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property from street |
| 437 Delgado Dr | Date of Inspection |
| Baton Rouge, LA 70808 | ☐ Did inspect exterior and interior of subject property |
| APPRAISED  VALUE  OF  SUBJECT  PROPERTY  $ 490,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name   myAmc.com | COMPARABLE SALES |
| Company Name   Supreme Lending | ☐ Did not inspect exterior of comparable sales from street |
| Company Address   14801 Quorum Dr, Suite 300 | ☐ Did inspect exterior of comparable sales from street |
| Dallas, TX  75254 | Date of Inspection |
| Email Address | |

J. E. Duggan, LLC

# Market Conditions Addendum to the Appraisal Report

File No. 160917JD

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| | |
|---|---|
| Property Address 437 Delgado Dr | City Baton Rouge   State LA   ZIP Code 70808 |
| Borrower Kristopher Novak & Lauren Perry | |

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

## MARKET RESEARCH & ANALYSIS

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 15 | 11 | 14 | Increasing | X Stable | Declining |
| Absorption Rate (Total Sales/Months) | 2.50 | 3.67 | 4.67 | Increasing | X Stable | Declining |
| Total # of Comparable Active Listings | 8 | 10 | 12 | Declining | X Stable | Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 3.20 | 2.73 | 2.57 | Declining | X Stable | Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | 365,000 | 380,000 | 392,000 | Increasing | X Stable | Declining |
| Median Comparable Sales Days on Market | 34 | 28 | 45 | Declining | X Stable | Increasing |
| Median Comparable List Price | 419,000 | 390,750 | 460,000 | Increasing | X Stable | Declining |
| Median Comparable Listings Days on Market | 126 | 73 | 63 | Declining | X Stable | Increasing |
| Median Sale Price as % of List Price | 97.85 | 97.33 | 97.10 | Increasing | X Stable | Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? | | X Yes | No | Increasing | X Stable | Declining |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). Trends vary from development to development. Seller concessions range from 0-5% for closing costs and pre-paids. Sales concessions are more prevelant in newer subdivisions where there is more competition.

Are foreclosure sales (REO sales) a factor in the market?   Yes   X No   If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.   Baton Rouge MLS

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions. The information was from the Baton Rouge MLS. A search of similar homes in the immediate marketing area consisting of 4+ homes that are 1950sf - 2930sf living with equal construction in the immediate and neighboring/competing developments.

## CONDO/CO-OP PROJECTS

If the subject is a unit in a condominium or cooperative project, complete the following:   Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | Increasing | Stable | Declining |
| Absorption Rate (Total Sales/Months) | | | | Increasing | Stable | Declining |
| Total # of Active Comparable Listings | | | | Declining | Stable | Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | Declining | Stable | Increasing |

Are foreclosure sales (REO sales) a factor in the project?   Yes   No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

## APPRAISER

| | |
|---|---|
| Signature | Signature |
| Appraiser Name Joseph E. Duggan | Appraiser Name |
| Company Name J. E. Duggan, LLC | Company Name |
| Company Address 3367 White Shadows Dr, Baton Rouge, LA 70816 | Company Address |
| State License/Certification # 1038   State LA | State License/Certification #   State |
| Email Address jeduggan@cox.net | Email Address |

J. E. Duggan, LLC

## PHOTOGRAPH ADDENDUM

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Client | Supreme Lending | | | | | |



**FRONT VIEW OF
SUBJECT PROPERTY**



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE OF
SUBJECT PROPERTY**

J. E. Duggan, LLC

File No. 160917JD

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| Client | Supreme Lending |
|---|---|



437 DELGADO DR
FAMILY ROOM



437 DELGADO DR
KITCHEN



437 DELGADO DR
DINING ROOM



437 DELGADO DR
MASTER BEDROOM



437 DELGADO DR
BEDROOM 2



437 DELGADO DR
BEDROOM 3

File No. 160917JD

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Client | Supreme Lending |



437 DELGADO DR
BEDROOM 4



437 DELGADO DR
SITTING ROOM



437 DELGADO DR
MASTER BATH



437 DELGADO DR
MASTER BATH B



437 DELGADO DR
BATH 2



437 DELGADO DR
BATH 2B

File No. 160917JD

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Client | Supreme Lending |



437 DELGADO DR
HALF BATH



437 DELGADO DR
ATTIC



437 DELGADO DR
REAR SIDE VIEW LEFT



437 DELGADO DR
REAR SIDE VIEW RIGHT



437 DELGADO DR
REAR VIEW 2



437 DELGADO DR
REAR VIEW 3

File No.   160917JD

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| Client | Supreme Lending |
|---|---|



437 DELGADO DR
FRONT VIEW 2



437 DELGADO DR
FRONT VIEW 3



437 DELGADO DR
STREET SCENE 2



437 DELGADO DR
BALCONY PORCH



437 DELGADO DR
STORAGE

J. E. Duggan, LLC

## PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |
| City Baton Rouge | County East Baton Rouge   State LA   Zip Code 70808 |
| Client | Supreme Lending |



### COMPARABLE #1

6168 Chandler
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $549,500 |
| Price/SF | 216.42 |
| Date | s04/16;c02/16 |
| Age | ~66 |
| Room Count | 8-4-3.0 |
| Living Area | 2,539 |
| **Value Indication** | **$522,020** |



### COMPARABLE #2

3850 Floyd
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $525,000 |
| Price/SF | 207.84 |
| Date | s08/16;c05/16 |
| Age | 45 |
| Room Count | 8-4-2.0 |
| Living Area | 2,526 |
| **Value Indication** | **$486,180** |



### COMPARABLE #3

2052 Myrtledale
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $451,000 |
| Price/SF | 210.75 |
| Date | s04/16;c03/16 |
| Age | ~66 |
| Room Count | 7-3-2.0 |
| Living Area | 2,140 |
| **Value Indication** | **$483,900** |

### PHOTOGRAPH ADDENDUM

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Client | Supreme Lending | | | | | | |



**COMPARABLE #4**

1916 Glasgow
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $557,500 |
| Price/SF | 222.02 |
| Date | s07/16;c06/16 |
| Age | 4 |
| Room Count | 8-4-3.0 |
| Living Area | 2,511 |
| **Value Indication** | $530,800 |



**COMPARABLE #5**

536 LSU
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $538,500 |
| Price/SF | 244.77 |
| Date | c09/16 |
| Age | 81 |
| Room Count | 8-3-3.0 |
| Living Area | 2,200 |
| **Value Indication** | $552,900 |



**COMPARABLE #6**

506 Stanford
Baton Rouge, LA 70808

| | |
|---|---|
| Price | $485,000 |
| Price/SF | 190.20 |
| Date | c09/16 |
| Age | ~55 |
| Room Count | 8-4-2.0 |
| Living Area | 2,550 |
| **Value Indication** | $491,900 |

## SKETCH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |
| City  Baton Rouge | County  East Baton Rouge   State  LA   Zip Code  70808 |
| Client | Supreme Lending |



Second Floor



Sketch by Apex Medina™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1702.4 | 1702.4 |
| GLA2 | Second Floor | 736.6 | 736.6 |
| P/P | Front Porch | 75.2 | |
| | Courtyard Patio | 342.9 | |
| | Rear Open Patio | 186.0 | |
| | Balcony POrch | 131.9 | 735.9 |
| | Net LIVABLE Area | (rounded) | 2439 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 39.3  x  25.1 | | 988.0 |
| 17.3  x  22.6 | | 391.2 |
| 13.9  x  23.2 | | 323.2 |
| Second Floor | | |
| 29.3  x  25.1 | | 736.6 |
| 4 Items | (rounded) | 2439 |

J. E. Duggan, LLC

**SITE PLAN**

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
| Client | Supreme Lending | | | | | | |



**FLOOD MAP**

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |
| City Baton Rouge | County East Baton Rouge   State LA   Zip Code 70808 |
| Client | Supreme Lending |

## Flood Zones

- Areas inundated by 500-year flooding
- Areas outside of the 100- and 500-year flood plains
- Areas inundated by 100-year flooding
- Areas inundated by 100-year flooding with velocity hazard
- Floodway areas
- Floodway areas with velocity hazard
- Areas of undetermined but possible flood hazards
- Areas not mapped on any published FIRM

## Flood Zone Determination

**Latitude:** 30.403660
**Longitude:** -91.166893
**Community Name:**
UNINCORPORATED AREA
**Community:** 220058
**SFHA (Flood Zone):** No
**Within 250 ft. of multiple flood zones:** No
**Zone:** X500L      **Map #:** 22033C0245E
**Panel:** 0245E      **Panel Date:** 05/02/2008
**FIPS Code:** 22033      **Census Tract:** 48

This Report is for the sole benefit of the Customer that ordered and paid for the Report and is based on the property information provided by that Customer. That Customer's use of this Report is subject to the terms agreed to by that Customer when accessing this product. No third party is authorized to use or rely on this Report for any purpose. THE SELLER OF THIS REPORT MAKES NO REPRESENTATIONS OR WARRANTIES TO ANY PARTY CONCERNING THE CONTENT, ACCURACY OR COMPLETENESS OF THIS REPORT, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. The seller of this Report shall not have any liability to any third party for any use or misuse of this Report.

J. E. Duggan, LLC

## Location Map

| | |
|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|
| Client | Supreme Lending | | | | | | |



**Comp 3**
2052 Myrtledale
Baton Rouge, LA 70808
1.25 miles NE
$451,000

**Comp 4**
1916 Glasgow
Baton Rouge, LA 70808
1.55 miles E
$557,500

**Comp 5**
536 LSU
Baton Rouge, LA 70808
0.14 miles N
$538,500

**Comp 6**
506 Stanford
Baton Rouge, LA 70808
0.08 miles N
$465,000

**Comp 2**
3850 Floyd
Baton Rouge, LA 70808
0.69 miles NE
$525,000

**Subject**
437 Delgado Dr
Baton Rouge, LA 70808

**Comp 1**
6168 Chandler
Baton Rouge, LA 70808
1.41 miles SE
$549,500

1 Miles

© 2016 Microsoft Corporation   © 2010 NAVTEQ   © AND

J. E. Duggan, LLC

**Aerial Map**

| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Client | Supreme Lending | | | | | |



Subject
437 Delgado Dr
Baton Rouge, LA 70808

500 Feet

© 2016 Microsoft Corporation   © 2010 NAVTEQ   © AND
Image courtesy of USGS   Earthstar Geographics SIO

J. E. Duggan, LLC

**General Map 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower or Owner | Kristopher Novak & Lauren Perry | | | | | |
| Property Address | 437 Delgado Dr | | | | | |
| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code 70808 |
| Client | Supreme Lending | | | | | |



Subject
437 Delgado Dr
Baton Rouge, LA 70808

1 Miles

© 2016 Microsoft Corporation   © 2010 NAVTEQ   © AND

J. E. Duggan, LLC

| Borrower | Kristopher Novak & Lauren Perry | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 437 Delgado Dr | | | | | |
| City   Baton Rouge | | County   East Baton Rouge | | State   LA | | Zip Code   70808 |
| Lender/Client   Supreme Lending | | | Address   14801 Quorum Dr, Suite 300, Dallas, TX  75254 | | | |

## Requirements - Condition and Quality Ratings Usage

Appraisers must utilize the following standardized conditions and quality ratings within the appraisal report.

### Condition Ratings and Definitions

**C1** - The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

**C2** - The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finished have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

**C3** - The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

**C4** - The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property*

**C5** - The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

**C6** - The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

### Quality Ratings and Definitions

**Q1** - Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified use. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are exceptionally high quality.

**Q2** - Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

**Q3** - Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

**Q4** - Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

**Q5** - Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

**Q6** - Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard non-conforming additions to the original structure.

### Definitions of Not Updated, Updated, and Remodeled

**Not  Updated** - Little or no updating or modernization. This description includes, but is not limited to, new homes.  Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

**Updated** - The area of the home has been modified to meet current market expectations.  These modifications are limited in terms of both scope and cost. An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations.  Updates do not include significant alterations to the existing structure.

**Remodeled** - Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion. A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls and/or the addition of square footage). This would include a complete gutting and rebuild.

### Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:  3.2 indicates three full baths and two half baths.

Data Standardization Text

| Abbreviation | Full Name | Appropriate Fields |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concession |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Administration | Sale or Financing Concessions |
| G | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid Rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PubTm | Public Transportation | Location |
| PwrLn | Power Lines | View |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| s | Settlement Date | Date of Sale/Time |
| sf | Square Feet | Area, Site, Basement |
| Short | Short Sale | Sale or Financing Concessions |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdraw Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |

J. E. Duggan, LLC

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

J. E. Duggan, LLC

## USPAP Compliance Addendum

File No.   160917JD

| | |
|---|---|
| Borrower/Client | Kristopher Novak & Lauren Perry |
| Property Address | 437 Delgado Dr |

| City | Baton Rouge | County | East Baton Rouge | State | LA | Zip Code | 70808 |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Lender/Client | Supreme Lending |

### APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

[X] **Appraisal Report**   This report was prepared in accordance with the requirements of the Appraisal Report option of USPAP Standards Rule 2-2(a).

[ ] **Restricted Appraisal Report**   This report was prepared in accordance with the requirements of the Restricted Appraisal Report option of USPAP Standards Rule 2-2(b). The intended user of this report is limited to the identified client. This is a Restricted Appraisal Report and the rationale for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood properly without the additional information in the appraiser's workfile.

### ADDITIONAL CERTIFICATIONS

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The report analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or specified) personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- This appraisal report was prepared in accordance with the requirements of Title XI of FIRREA and any implementing regulations.

### PRIOR SERVICES

[X] I have **NOT** performed services, as an appraiser or in any other capacity, regarding the property that is the subject of the report within the three-year period immediately preceding acceptance of this assignment.

[ ] I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

### PROPERTY INSPECTION

[ ] I have **NOT** made a personal inspection of the property that is the subject of this report.

[X] I **HAVE** made a personal inspection of the property that is the subject of this report.

### APPRAISAL ASSISTANCE

Unless otherwise noted, no one provided significant real property appraisal assistance to the person signing this certification. If anyone did provide significant assistance, they are hereby identified along with a summary of the extent of the assistance provided in the report.

### ADDITIONAL COMMENTS

Additional USPAP related issues requiring disclosure and/or any state mandated requirements:

### MARKETING TIME AND EXPOSURE TIME FOR THE SUBJECT PROPERTY

[X] A reasonable marketing time for the subject property is   90   day(s) utilizing market conditions pertinent to the appraisal assignment.

[X] A reasonable exposure time for the subject property is   30-120   day(s).

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|

| APPRAISER | | SUPERVISORY APPRAISER (ONLY IF REQUIRED) | |
|---|---|---|---|
| Signature | *Joseph Duggan* (signature) | Signature | |
| Name | Joseph E. Duggan | Name | |
| Date of Signature | 09/27/2016 | Date of Signature | |
| State Certification # | 1038 | State Certification # | |
| or State License # | | or State License # | |
| State | LA | State | |
| Expiration Date of Certification or License | 12/31/2017 | Expiration Date of Certification or License | |
| | | Supervisory Appraiser Inspection of Subject Property: | |
| Effective Date of Appraisal | 09/26/2016 | [ ] Did Not   [ ] Exterior-only from Street   [ ] Interior and Exterior | |

J. E. Duggan, LLC

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

DATE (MM/DD/YYYY) 12/22/2015

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | LYNN FEDERICO | | |
|---|---|---|---|---|
| RICE INSURANCE SERVICES COMPANY, LLC<br>4211 NORBOURNE BOULEVARD<br>LOUISVILLE, KY 40207 | PHONE (A/C, No, Ext): (502) 897-1876 EXT. 107 | | FAX (A/C, No): (502) 896-9518 | |
| | E-MAIL ADDRESS: lfederico@risceco.com | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : CONTINENTAL CASUALTY COMPANY | | | 20443 |
| INSURED | INSURER B : | | | |
| J E DUGGAN, LLC<br>9111 INTERLINE AVENUE, SUITE 2A<br>BATON ROUGE, LA  70809 | INSURER C : | | | |
| | INSURER D : | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | CLAIMS-MADE ☐ OCCUR | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | POLICY ☐ PRO-JECT ☐ LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | WC STATU-TORY LIMITS ☐ OTH-ER ☐ | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | REAL ESTATE ERRORS & OMISSIONS EXCESS LIABILITY | | | RXE287554138-16 | 01/01/2016 | 01/01/2017 | $1,000,000 PER OCCURRENCE<br>$1,000,000 AGGREGATE | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

ENDORSEMENT:  APPRAISALS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>*Lynn Federico* |

© 1988-2010 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2010/05)          The ACORD name and logo are registered marks of ACORD

J. E. Duggan, LLC

1038
CRA





# Exhibit 2

# Exhibit 3

General Inspection

★ ★ ★

Michael Armshaw (Lic # 10252)
2132 Sassy Lane, Baton Rouge, LA 70808
Phone/Fax (225) **344-2525** ☏ Cellular (225) **933-1089**
Email: armshaw @ cox.net

Inspection Date:   **September 30, 2016**
Inspection No:     160941/310

# INSPECTION REPORT

For

## Kris Novak and Lauren Perry

**437 Delgado Ave.**
**Baton Rouge, Louisiana**

**1. PURPOSE OF INSPECTION:**  The general purpose of this limited, visual inspection, evaluation and report is to provide the client with a better understanding of the property conditions, as observed at the time of the home inspection, and to identify, for the client's knowledge, the readily visible and accessible and apparent installed systems and components that do not function as intended, allowing for normal wear and tear, or which adversely affect the habitability of the dwelling, without regard to life expectancy. The seller is not obligated to repair the items on this report. A repair request document should be filled out based on the seller's disclosure, the home inspection report and your own observations. The repair request document then becomes a negotiable part of the purchase agreement. The summary of this report is divided into 3 main sections to help you with this process. Please keep in perspective that these sections are prioritized for that reason. A: Defects, Deficiencies and Inoperable Systems, B: Eventual Maintenance suggestions, and C: Incidental Observations.

**2. SCOPE OF INSPECTION:**  The limited, visual inspections and reports for this building are intended for the exclusive use of the *"Client"* only, and will be performed in conformance with the minimal applicable *"Standards of Practice"* of the *"Louisiana State Board of Home Inspectors" (LSBHI)*, which is the *"State Law"* governing home inspections.  A copy of these LSBHI *"Standards of Practice"*, with the general limitations and exclusions, is included within the *"Client's"* report, and is also available at *www.lsbhi.com*. Contained within these *"Standards of Practice"* and the Inspection Agreement, are a listing of components which are excluded from the scope of the inspection.  It is *suggested* that the *"Clients"* review these exclusions, and make arrangements for additional inspections should components which are of concern be included within these exclusion lists.

**3. THE INSPECTION:**

This inspection was made on **September 30, 2016** and all utilities were turned on. Present for the inspection were **Michael Armshaw,** *(the Inspector)* **Kris Novak and Lauren Perry**, the clients, her father and **Donna Cutrer**, REMAX/Real Estate Group, *(the selling Realtor)*. The home was occupied with restricted accessibility for the inspection, and the temperatures were approximately **80** degrees at the time of the inspection.

---

*Directional references used within this report are based on facing the front of the building*

---

## 4. GENERAL INSPECTION OBSERVATIONS:

The inspection is of a multi-story, single-family residence on an asphalt suburban street, of wood frame construction on an at-grade concrete slab and foundation. There is no covered parking provided. This building is approximately 10 years old.

## 5. SITE INSPECTION:

An inspection of the **Landscaping, Lawns and Grounds** indicated that the vegetation was *generally* healthy and growing. The ground soil appears to slope away from the building. There are trees in close proximity to the building which currently do not appear to be adversely affecting or impacting the structure. No canals or streams are adjacent to the property, and there was not any evidence of high water or flooding apparent.

**Incidental Concrete** is the driveways, walkways, porches and A/C slabs.  Usually 3 ½" in thickness and without a sand bed or moisture barrier, the incidental concrete is much more susceptible to cracking than the building foundation.

"Shrinkage" cracks are normal and due to the drying (*curing*) process when the concrete was poured and are generally of little significance as they usually penetrate only the mortar surfaces.

"Stress" cracks usually are caused by the application of loads greater than the concrete can support.  "Stress" cracks normally occur during the first few months after the slab is poured, while strength in the slab is low, and will typically become dormant with time.

"Temperature" cracks are normal and are caused by the thermal expansions and contractions within the concrete slabs.

"Settlement" cracks are usually due to the subsidence or consolidation of the soils underlying the building, and will normally extend completely through, and from edge to edge of the slab.

Concrete cracks are classed as either dormant (*cracking activity has ceased*) or active (*cracking activity may be expected to continue*). It is very probable to discover some degree of cracking in every incidental concrete slab, however, this is a normal occurrence, and unless specifically noted, the observation of *"shrinkage"*, *"temperature"* "or *"stress"* cracking will normally have only minor significance on the ability of the slab to support the normally applied loads.  Of primary importance with these cracks is to seal the surfaces against water intrusion, and the potential for further damage. The degree of cracking observed in the incidental concrete is considered to be *about* average.

The **Driveways** were observed to exceed the recommended minimum widths and were surfaced with concrete. **Walkways** were observed to be surfaced with aggregate. The **Front Porch** is constructed of stamped concrete, and the **Rear Patio** is constructed of concrete.

## 6. BUILDING FOUNDATION and STRUCTURAL INSPECTION:

The **Foundation** for this building is an at-grade concrete slab and foundation.  Portions of the perimeter of the foundation are concealed from inspection by adjacent pavements, ground soil levels and by vegetation. The siding is not the generally recommended 4 to 8 inches above the ground level, to reduce moisture and insect intrusion potential.(*The ground soil levels and vegetation should be maintained 4 to 8 inches below the bottom of siding or the top of the slab to help prevent insect, pest and moisture intrusions* Most lending institutions, architects and structural engineers use the general standard of settlement greater than 1" in 10' as an unacceptable degree of foundation settlement or point at which a foundation may need to be stabilized or foundation failure has occurred. There is no one correct way to build or to repair a house, so opinions may differ on the need to repair or manner in which to repair a foundation. Foundation failure therefore becomes somewhat of a subjective conclusion based on the structural deflection and the experience of the individual observing the structure.

Movement of foundations typically occurs as the result of a few primary causes in our general geographic area. Initial consolidation settlement occurs as a result of placing the weight of the building on the soil and the soil compressing under the weight. This typically occurs in the first few years with approximately 90 percent of the settlement occurring in the first 5 years, and the last 10 percent over the next 25 years.

> ***Directional references used within this report are based on facing the front of the building***

Movement of a foundation also commonly occurs as a result of changing moisture content in the expansive clay soils found in this area. As the clay soil dries out, it shrinks resulting in some settlement of the foundation. As the clay in the soil regains moisture, it swells resulting in some uplift of the foundation. Shrink/Swell cycles typically occur due to seasonal changes and as the result of significant and extended changes in weather patterns. Since there have been several droughts as well as periods of wet weather over the last 15 years, it is not uncommon to find some movement of the foundation slab.

Some normal initial consolidation settlement was observed. The differential deflection noted in this house appeared to be minimal, from normal settlement and less than these standard criteria. The inspection of the *exposed and visible* exterior perimeter of the foundation slab did not reveal any evidence of *apparent* or *significant* cracking or failure. An inspection of the exposed exterior areas and the corresponding interior walls and ceilings did not reveal any *visible* evidence or damage that is normally associated with foundation failure. If further analysis is desired, it is suggested that a qualified foundation repair specialist or a structural engineer be consulted.

Some minor cracking has been observed in the exterior brick mortar. There was not any *visually apparent or significant* foundation slab cracking or *significant* interior evidence of damage observed in the vicinities of these cracks.

1. Brick mortar hairline cracking, considered to be <u>normal</u>, has been observed at some of the windows.

---

The <u>normal</u> settlement or the subsidence and consolidation process of the soils underlying the foundation slab may require up to 30 years to complete, with the majority of the consolidation generally occurring within the first few years. Depending upon the composition, the percentage of voids and the moisture content of the underlying soils, "settlement" may be "dormant", or still "active". Geo-technical (soil) investigations and analysis are required to accurately and completely make this determination, and are recommended should this be of a concern to the clients.

Many masonry cracks are *usually* considered to be caused by <u>normal</u> temperature expansions and contractions and the differential soil settlements and the movements of the dissimilar building component materials. In commercial grade construction, expansion joints to control masonry cracking are normally placed at each side of windows and doors, and along the length of the wall at approximate 20-foot spacings, as these are locations where cracks are <u>expected</u> to occur. The absence of expansion joints in masonry construction *can* be a source of severe cracking. These types of joints are not normally found in residential construction, and the cracking as observed is considered to be a <u>normal occurrence</u>, and of little structural significance. *Of importance with all cracks, is to seal them against water intrusion.*

---

## 7. EXTERIOR INSPECTION:

This building is of wood frame construction with brick veneer and horizontal siding (Hardie plank) being the predominant **Exterior Siding** materials.

The **trim, facias and soffits** on this building are *typically* constructed of wood. These were visually inspected and found to be in *generally* serviceable condition. No determination could be made as to the condition of the concealed wooden components. The exterior walls and trim *appear* to be serviceably sealed *(the caulk is generally fair and non-pliable)* and the exterior paint quality appears to be *generally* good to fair, and serviceable. With the exception of those items which are specifically specified in the *Inspection Summaries*, the exterior items inspected were considered to in be *generally* serviceable condition.

There are wood Columns on this building. These columns appear to be generally plumb with little evidence of significant deterioration.

The wooden and insulated metal **Exterior Doors** are constructed with thresholds and weather-stripping. Wooden and Aluminum **Windows** have been used on this building. The inside of some of the wooden windows is not painted or sealed. The accessible exterior doors and windows were inspected and the doors were found to operate serviceably.

---

*Directional references used within this report are based on facing the front of the building*

---

## 8.  POTENTIAL MOISTURE INTRUSION:

Nearly all homes inspected have some minor exterior maintenance deficiencies.  Of primary importance when maintaining your home's exterior is to **keep the moisture out**.  Moisture which enters the building can cause wood deterioration and provides a damp environment which may attract wood destroying insects and organisms, and, with the proper conditions of moisture, warmth and food, unhealthy mold or mildew can grow on wood or cellulose.  Inadequate drainage away from the building, inadequate interior air infiltrations, and roof and wall flashings can trap moisture in the wall cavities, creating a mold or mildew growth environment.

To reduce the amount of *"moisture intrusion"* into the building, the exterior should be completely and properly sealed.  *It is recommended that if any of the deficiencies from the below list are found, that they be serviceably repaired or corrected, and that the clients have an independent inspection for wood destroying insects and organisms preformed.*

- the ground soil levels should be maintained 4 to 8 inches below the bottom of wood siding, the brick and the top of the foundation slab.
- prevent vegetation and planting beds from growing into, or over, bottom of wood siding, the brick and the top of the foundation slab.
- the weep holes at the bottom of the brick allow condensate *(water)* to drain from the air space, and should be free of debris.
- the gaps and openings around the doors and windows and at the different material joints and penetrations should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- door weather-stripping and thresholds should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- if gutters are installed, the gutters and downspouts should be kept clean and leak free to direct water away from the wood facias and soffits.
- the vertical joints in horizontal exterior siding should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- a good weather protective paint or varnish finish should be maintained on exterior wood.
- much of the decorative exterior wood trim is not treated wood, and should be completely painted and sealed and caulked, with the caulk being pliable without gaps or voids, if replacement of the trim becomes necessary, paint the backside and ends of the wood before installing.
- the roofing shingles should be pliable and without cracked, curled, loose or broken shingles.
- the gaps and openings around the roof penetrations and flashings, should be completely sealed and caulked, with the caulk being pliable without gaps or voids.
- drip edges at the roof edge will help direct water away from the wood facias and soffits.
- wood or debris should not be stacked against the building and there should be no wood in-contact with the foundation slab perimeter.
- proper ventilation is important in reducing moisture in the attic.
- have a *complete*, *professional* and *independent* **termite and wood destroying insect inspection** made on this house.

---

> *Directional references used within this report are based on facing the front of the building*

## 9. ROOF COVERING, FLASHINGS and GUTTER INSPECTION:

Asphaltic or fiberglass shingled composition roof surfaces *typically* exist in one of three stages during their functional life

1.  In the first, or earlier stage, the shingles are generally pliable and flat.  Shingles in this stage are indicated as being in **"good"** condition, and this period will *normally* range from the initial installation to about 4 to 6 years.
2.  When the shingles begin to become "brittle", or to "crack and split" or "curl" at the edges, they are considered to be in the second stage, and are rated as being in **"fair"** condition.  This period may typically begin as early as 3 to 5 years and extend through 8 to 12 years.  These shingles may be readily damaged by falling debris or limbs, and once "cracked or split", occasional leakage <u>can</u> occur in spot areas.  The roofing nail heads may also begin to "pop" and become exposed through the shingles.  Some maintenance may be required to seal the "cracks and splits" and the "popped" nail heads.  The functional life of the roof surface *may* be extended by not walking on these brittle shingles.
3.  In the final and last stage of the shingle's functional life, the shingles become <u>brittle</u>, <u>cracked</u>, <u>curled</u> and <u>cupped</u>.  <u>Bead loss</u>, evident on the ground and in the gutters, is another indication that the shingles have reached this stage.  Roofing surfaces which are in this final stage are indicated as being in **"poor"** condition, and *may* be easily damaged by wind and rain, and leakage *may* occur at any time, indicating that the replacement of the shingled roofing surface will be justified.

The **Roof** on this building is pitched and gabled with hips and the roof covering is Architecturally Styled fiberglass shingles. The manufacturer's suggested *normal* life expectancy of this type of roof covering may be from 35 to 40 years, when properly maintained.  However, in Louisiana, with the hot sun and wind driven rains, a life expectancy from 20 to 25 years would be more realistic.

Our region of the country often experiences high intensity wind driven rains, which *can* penetrate a roof surface in any of these conditions. The necessary ridge, gable and turbine vents and the plumbing and gas vents and flashings are all susceptible to water intrusion during these weather conditions.
There are some shingles manufactured which have longer life expectations, and factors such as a southern exposure, shaded areas and windbreaks can create varying conditions of the shingles on the same roof.  *The flashings around fireplaces, vent pipes and other roof penetrations can also deteriorate with time, and* <u>*require periodic maintenance*</u> *such as recaulking or sealing.*

The roof surface on this building has an *estimated* and *approximate* age of **10** years and the condition is considered to be **good, the shingles are generally flat and pliable,** and the general condition is commensurate with the age of the shingles.

**Attic ventilation** is provided by: soffit and gable vents. The **roof flashing** appears to be galvanized metal. The gutters are made of Aluminum. The gutters are clean and the joints appear to be sealed. It appears that the roof protrusions are generally properly flashed and the vents properly penetrate the roof and appear to be sufficiently sealed.  The roof inspection was performed by accessing the roof surface.

## 10. ROOF STRUCTURE, ATTIC and INSULATION INSPECTION:

The inspection of the **Attic** provides information concerning the quality of construction and the structural integrity of the building as well as exposing potential fire or safety hazards and possible electrical and plumbing system deficiencies.  The insulation in the attic is composed of Batt insulation approximately 6 to 8 inches thick. *(Recommendations for attic insulation in Louisiana are a value of* **R-30**, *which is approximately 8" to 9" of insulation.)*  Insulation which has settled will have lost some of its insulating abilities. The heating and cooling ductwork in the attic is insulated and supported.  It was also observed that there are not any apparent blocked air vents and plumbing vent pipe joints appeared to be tight and secure.

---

*Directional references used within this report are based on facing the front of the building*

The *readily accessible* and *visible* wooden structural components of the roof and ceilings, being the ridge beams, the roofing rafters and sheathing, the supports and the ceiling joists were observed and the conditions and the material sizes and spacings *appeared* to be *generally* adequate to support the normal dead loads and the applied live loads and wind forces to which this structure may be *normally* subjected. "China" was observed printed on the top side of a sheet of sheetrock above the MBR. The attic stairs are not properly insulated.

## 11. GARAGE INSPECTION:

**There is no covered parking provided.**

## 12. PLUMBING SYSTEM INSPECTION:

The **Plumbing System** was inspected to determine the adequacy and the serviceable operation of the components and to detect any *visible and apparent* water leaks.  Water supply appears to be by the municipal or local supplier and sewage disposal appears to be a municipal sewage system.  The water closets *appeared* to fill within 60 to 90 seconds and to flush serviceably.  The lavatories, tubs and fixtures *appeared* to drain serviceably, and faucets have a serviceable water flow, both hot and cold and the lavatory pop-ups and the tub drains (*when installed*) *appeared* to be serviceable. There were not any significant *visible or apparent* Plumbing System deficiencies observed *(except as noted in the Inspection Summaries).*

Water supply and distribution materials observed to apparently be in use are; PEX (plastic).
Drain, waste and venting materials observed to apparently be in use are; PVC (plastic).

The tank type **Water Heater** a gas fired **Rheem** *(2005)* unit, having a 40-gallon water tank capacity. There is a temperature/pressure relief valve installed as required. There was a collection pan beneath the Water Heater. There was a draft diverter on the gas unit, and no airflow could be felt during operation.  Ventilation appears to be adequate. There is a flexible gas line to the heater and a gas shut off valve in close proximity.

The second tank type **Water Heater** is a gas fired **Rheem** (*2005*) unit having a 40-gallon water tank capacity. There is a temperature/pressure relief valve installed as required. There was a collection pan beneath the Water Heater. There was a draft diverter on the gas unit, and no airflow could be felt during operation.  Ventilation appears to be adequate. There is a flexible gas line to the heater and a gas shut off valve in close proximity. The pilot lights appeared to be functional and the burners did not have any visible evidence of excessive corrosion, rust, flaking or cracks. The hot and cold water supply pipe material is PEX (plastic) and the water temperature produced at the faucets was sufficiently hot. The Water Heaters appeared to function serviceably, and there was not any *visible* evidence of current leakage.

## 13. ELECTRICAL SYSTEM INSPECTION:

The **Electrical System** inspection noted that the electrical service is overhead and that the electrical power is provided with a 3-wire 240-volt service. The main service panel is located on the exterior and has circuit breakers, with the main service being 200 amps. Copper wiring in the main panel is blackened and deteriorating. There is a sub-panel providing service to the interior lovated in the MBR closet. There are also exterior sub-panels providing service to the air conditioning equipment.

During the exterior electrical inspection, the following were inspected and found to be serviceable; *(except as noted in the Inspection Summaries)*
- a copper ground rod and a secure grounding connection.
- the service entrance galvanized conduit was inspected and observed to be generally serviceable.
- exterior receptacles have weather resistant covers and accessible receptacles inspected and tested, were *generally* properly "hot" and grounded with the correct polarity *(except as noted in the summary).*
- GFCI (Grounded Fault Circuit Interrupter) device protection is provided on the exterior.

> ***Directional references used within this report are based on facing the front of the building***

Noted during the interior electrical inspection; the following representative number of accessible switches, receptacles and components were inspected and found to be serviceable; *(except as noted in the Inspection Summaries)*

- light circuits *randomly* tested, were *generally* operational.
- *accessible* receptacles inspected and *randomly* tested, were *generally* properly "hot" and grounded with the correct polarity. *(except as noted in the summary)*
- GFCI (Grounded Fault Circuit Interrupter) device protection is provided on the interior.

During the inspection of the electrical system, the inspector did not observe any significant *visible or apparent* Electrical System deficiencies *(except as noted in the summary).* **GFCI** *(Grounded Fault Circuit Interrupter) device protection was available, but was not generally required by the building codes until approximately 1987. Any references to GFCI devices are informational only.* Further information pertaining to the electrical system inspection may be found in the *Inspection Summaries*.

## 14. HEATING *(HVAC)* SYSTEM INSPECTION:

The **Heating and Cooling Systems**, commonly referred to as the "**HVAC**" system (*heating, ventilating and air conditioning*) is comprised of a central heat and air conditioning system. The inspection of the heating and cooling system is limited to a determination of *generally* serviceable operation, as of the date of the inspection. This inspection is not a determination of the remaining service life expected from the system components or of compliance to Governmental Building Codes or Regulations. Temperatures were approximately **80** degrees at the time of the inspection.

### SYSTEM #1: (downstairs)
**Heating** is provided by a gas fired **"Rheem"** *(2005)* "forced air" horizontal furnace with an approximate input capacity of 100,000 BTU. The inspector observed that the fan and the thermostat *appear* to operate serviceably and that the ductwork is supported and insulated. The gas piping is Black Iron and CSST. The electronic igniter and thermocouple appear to be serviceable. The unit was producing 126-degree warm air at the registers. The conditions observed are conditions that *typically* indicate a serviceably operating system.

### SYSTEM #2: (upstairs)
**Heating** is provided by a gas fired **"Rheem"** *(2005)* "forced air" horizontal unit with an approximate input capacity of 50,000 BTU. The inspector observed that the fan and the thermostat *appear* to operate serviceably and that the ductwork is supported and insulated. The gas piping is Black Iron and CSST. The electronic igniter and thermocouple appear to be serviceable. The unit was producing 118-degree warm air at the registers. The conditions observed are conditions that *typically* indicate a serviceably operating system.

## 15. AIR CONDITIONING *(HVAC)* SYSTEM INSPECTION:

### SYSTEM #1: (downstairs)
**Cooling** is provided by an electrical split system **"Rheem"** *(2006)* air conditioner with an approximate capacity of 60,000 BTU, which is equivalent to 5 TONS. The exterior Compressor/Condenser unit was mounted on a flat stable surface with an electrical disconnect within reach. It was *generally* level with serviceable valve caps and conduit. It was generally clean and operating smoothly and quietly. The copper on the evaporator coils is blackened and deteriorated. During the unit's operation, it was observed that the refrigerant level was *apparently* serviceable, the system was cooling 18 degrees. The AC system should be evaluated by a licensed Mechanical contractor. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.

> *Directional references used within this report are based on facing the front of the building*

**SYSTEM #2: (upstairs)**

**Cooling** is provided by an electrical split system **"Rheem"** *(2005)* air conditioner with an approximate capacity of 36,000 BTU, which is equivalent to 3 TONS. The exterior Compressor/Condenser unit was mounted on a flat stable surface with an electrical disconnect within reach.  It was *generally* and level with serviceable valve caps and conduit. It was generally clean and operating smoothly and quietly. The copper on the evaporator coils is blackened and deteriorated. During the unit's operation, it was observed that the refrigerant level was *apparently* serviceable, the system was cooling 17 degrees. The AC system should be evaluated by a licensed Mechanical contractor.  Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.

---

It is **recommended** that the **Heating and Cooling Systems** be professionally serviced and cleaned annually to provide more efficient operations and to help extend the service life of the components.  The *"cloth duct tape"* often used in the attic to seal the duct, plenum and transition connections will deteriorate over time, and create inefficient air leakage into the system. Clean filters are necessary for efficient operation and should be changed at least monthly.

♦    The **Cooling System** components should be serviced and the components cleaned and checked for air and refrigerant leakage and the system properly charged with refrigerant and oil prior to the *cooling season*.

♦    Prior to the *heating season* the **Heating System** should be serviced and the components cleaned and checked for air leakage, with any rust removed from the heat exchanger *(gas fired systems)* and the burners, and the unit checked for defects in the heat exchanger.

---

## 16. INTERIOR INSPECTION:

The **Interior Rooms** inspected were the;

- living and dining areas
- kitchen
- 4 bedrooms
- 2 1/2 bathrooms
- foyers, hallways, storage and laundry rooms

Visually inspected in these rooms were the *"accessible and visible"* composition and condition of the ceilings and walls *(typically gypsum dry-wall)* and flooring together with the operation of a *representative (random)* number of the windows and doors. The presence of HVAC registers and a switched, overhead light was observed in each room and the location, grounding and polarity of a *representative (random)* number of *"accessible and visible"* electrical receptacles were evaluated, as was the operation of ceiling fans.  In addition to the items listed above, in the kitchen and baths the cabinets, countertops and the water flow *(hot and cold water)* were inspected.  The *"accessible and visible"* electrical receptacles within 6' of water services were inspected for **GFCI** devices and the plumbing was inspected for any *visible and apparent* water leakage evidence.  In the bathrooms, the inspection included heaters, exhaust fans and ventilation, as well as the operation of installed plumbing fixtures.

In the kitchen, the operation and serviceability of the *built-in* appliances and equipment, being the;

- **Broan**          exhaust fan and light
- **Bosch**          dishwasher
- **G.E.**            microwave
- **G.E.**            cooktop
- **G.E.**            oven
- **G.E.**            refrigerator
- **U-Line**          mini refrigerator

---

***Directional references used within this report are based on facing the front of the building***

---

are evaluated for "*serviceable operation*" only as of the inspection date only.  The cooking devices were operated to determine that the burners functioned;  *"dishwashers"* are operated to determine that water supply was present and that the dishwasher operated without leakage;  *"disposals"* are inspected for operation and leakage only, no material is inserted into the disposal and the integrity or function of the internal components is not warranted.  Incidental and accessory items such as knobs, clocks, gaskets, timers, self-cleaners, lights and cooking temperatures are not inspected or warranted. Continued "*serviceable operation*" is not warranted.

With the exception of those items specifically listed in the *Inspection Summaries*, the items inspected were considered to be generally *"operating serviceably"* at the time of this inspection.

The **Stairways** in this building are surfaced with wood and the steps are *generally* uniformly spaced without *substantial* dimensional variances. The nose should be a maximum of 1", the tread width a minimum of 10" *(with the nose)*, and the riser height a maximum of 8 ¼".  This stairway *generally* meets these requirements. There is a handrail with the top of the handrail located between 30" to 36" above the treads.  The stairway is lighted with a 3-way switch at the top and the bottom.

---

*Directional references used within this report are based on facing the front of the building*

## 17. REPORT OF THE BUILDING'S GENERAL CONDITION:

**"China" was observed printed on the top side of a sheet of sheetrock above the MBR. Blackening of the copper wiring, plumbing pipes and AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted.**

Based entirely upon the *readily accessible, visible and apparent* aspects of this inspection, this building is considered to have been originally constructed in a manner which *generally* conformed to the *minimum* construction material and skill standards ordinarily practiced by reputable contractors in this locality, for a building of this age and type.  Due to the copper deterioration found and the possibility of issues with the sheetrock, it is recommended that further evaluations are made.

Nearly all homes inspected have some minor exterior maintenance deficiencies. Of primary importance when maintaining your home's exterior is to keep the moisture out. The flashings around fireplaces, vent pipes and other roof penetrations can deteriorate with time, and require periodic maintenance such as recaulking, sealing or replacing. Any evidence of moisture intrusions should be addressed immediately before significant damage can occur.

Have a complete, professional and independent termite and wood destroying insect inspection made on this house. It is recommended that all homeowners, in this region where the soil does not freeze, maintain a wood destroying insect contract with a licensed exterminator.

No home, even a brand new home is flawless, and over time normal aging and normal wear and tear occur. The natural aging of a home develops much of the character we appreciate in homes while also requiring maintenance. Please keep into perspective the things that attracted you to this home and realize that the purpose of this report is to itemize the defects, deterioration and system failures, not to compliment the many attractive aspects of the home.

---

*Directional references used within this report are based on facing the front of the building*

**General Inspection**

★ ★ ★

**Michael Armshaw** (Lic # 10252)
2132 Sassy Lane, Baton Rouge, LA 70808
Phone/Fax (225) **344-2525** ☎ Cellular (225) **933-1089**
Email: armshaw @ cox.net

Inspection Date:  **September 30, 2016**
Inspection No:    160941/310

# INSPECTION REPORT SUMMARY

for

## Kris Novak and Lauren Perry

### 437 Delgado Ave.
### Baton Rouge, Louisiana

During the course of this home inspection the below listed components and items were determined, in the opinion of the Inspector, to be **un-serviceable** or **un-satisfactory**.  Should any *significant* deficiencies in the "components" or "mechanical systems" be reported, it is <u>recommended</u> that reputable and licensed contractors be engaged to provide repair proposals for properly operating "components" or "mechanical systems".

**A.  Deficiencies and Defects of Component Materials:**   There were not any *visually or readily apparent or significant* component deficiencies or material defects observed, except;

    **Exterior:**
      1.  ☐ Stepping stones behind out-building are not on a stable surface and provide a safety hazard. (photo #1)

    **Interior:**
      1.  ☐ "China" was observed printed on the top side of a sheet of sheetrock above the MBR. (photo #2)
      2.  ☐ The inside of some of the wooden windows is not painted or sealed. (photos #3 & #4)
      3.  ☐ Attic stairs are not properly insulated. (photo #5)

**B.  Inoperable Systems or Equipment**: Mechanical equipment and systems inspected were observed to be in *generally* serviceable operating condition, except;

    **Air Conditioning System:**
      1.  ☐ Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.  (photos #6, #7 & #8)
      2.  ☐ There are gaps in the insulation on the refrigerant lines in the attic providing condensation leak potential. (photo #9)
      3.  ☐ The duct to the Dining room is exposed in the upstairs left Bedroom.   (photo #10)

---

> *Directional references used within this report are based on facing the front of the building*

---

**Electrical System: (***from the operation of a <u>representative</u> number of <u>accessible</u> components*)

1. ☐ Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor. (photos #11 & #12)
2. ☐ Electrical receptacles do not appear to be properly **G.F.C.I.** protected in the Master bathroom, half bathroom, on the Kitchen Island and on the exterior in some areas.
3. ☐ Electrical wires or splices are "**not**" contained in "*<u>covered junction boxes</u>*" in the attic. (photos #13 & #14)

**Plumbing System:**

1. ☐ Master bathroom: the tub mechanical stopper is not attached to the drain. (photo #15)
2. ☐ Upstairs Hallway bathroom: the tub faucet is not sealed at the tub surround providing moisture intrusion potential. (photo #16)

**C. Items in need of "*Eventual*" Maintenance:**   There were no *visually apparent or significant* "eventual" maintenance requirements observed, except;

- The attic stairs are not properly insulated.
- Install G.F.C.I. protected receptacles within 6' of all water sources and on exterior.
- Electrical wires or splices are "**not**" contained in "*<u>covered junction boxes</u>*" in the attic.
- Dryer vents should be cleaned regularly for fire safety.
- HVAC air return filters should be changed every 60-90 days.
- Install doorstops as needed.
- Maintain weather stripping on all exterior doors.
- The exterior paint condition is good to fair, and serviceable.
- The exterior caulk is generally fair and non-pliable - *the exterior joints at <u>all</u> dissimilar materials should be caulked and sealed to prevent moisture intrusion.*
- Trim all vegetation that contacts the building.
- Trim all limbs that have potential to contact the roof surface.
- The ground soil levels and vegetation should be maintained below the bottom of siding, or the top of the slab to help prevent insect, pest and moisture intrusion.
- Clean all leaves and debris out of the gutters and off of the roof surface seasonally.
- Caulk and seal around all exterior windows and doors to help prevent moisture and air filtration every few years.
- It is recommended that carbon monoxide detectors and smoke detectors are kept operating in all homes.

**D. Incidental Observations:**

- The water system cut-off valve is located at the street side of the building.
- The electrical main service entrance is located at the left side of the building.
- The natural gas system cut-off valve is located at the right side of the building.

**E. Items observed and considered to be <u>NORMAL</u> in the aging process of this home:**

- evidence of **natural aging, wear and tear** was observed
- **brick and mortar hairline** cracking, considered to be <u>normal</u>, has been observed.
- the **foundation slab** was observed to have <u>normal</u> corner cracks.
- the **roof surface** was observed to have some <u>normal</u> unevenness.

> ***Directional references used within this report are based on facing the front of the building***

**F. Components which were <u>NOT</u> inspected**: *(See limitations and exclusions)*

- sub-surface components; sprinklers, fountains, yard lighting, drainage systems, detached structures, decks or patios and telephone, internet, satellite, intercom, security, or audio/video systems, washing machines and clothes dryers were <u>not</u> inspected.
- in-accessible areas <u>not</u> inspected include; interior cavities of walls, areas obscured by stored or personal belongs *(i.e.: attics, closets and storage areas),* and areas with accessibility limitations such as the exterior edges of attics.
- this inspector is not qualified to detect the presence of Chinese Drywall. Accordingly, the issue of Chinese Drywall (and its potential problems) is beyond the scope of the inspection report.

❖   **END OF HOME INSPECTION REPORT**   ❖

Should additional assistance or information be required concerning this inspection or report, please, do not hesitate to contact me.

Sincerely,

**Michael Armshaw**
**Licensed Home Inspector #10252**

---

*Directional references used within this report are based on facing the front of the building*



**Photo #1:** Stepping stones behind out-building are not on a stable surface and provide a safety hazard.



**Photo #2:** "China" was observed printed on the top side of a sheet of sheetrock above the MBR



**Photo #3:** The inside of some of the wooden windows is not painted or sealed.



**Photo #4:** The inside of some of the wooden windows is not painted or sealed.

*Directional references used within this report are based on facing the front of the building*



**Photo #5:** Attic stairs are not properly insulated.



**Photo #6:** Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.



**Photo #7:** Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.



**Photo #8:** Blackening of the AC evaporator coil lines consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The AC systems should be evaluated by a licensed Mechanical contractor.

---

***Directional references used within this report are based on facing the front of the building***



**Photo #9:** There are gaps in the insulation on the refrigerant lines in the attic providing condensation leak potential.



**Photo #10:** The duct to the Dining room is exposed in the upstairs left Bedroom.



**Photo #11:** Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor.



**Photo #12:** Blackening of the copper wiring consistent with that known to have been caused by exposure to Hydrogen Sulfide and Sulfur Dioxide was observed. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing to see if remediation is warranted. The Electrical wiring should be evaluated by a licensed Electrical/Mechanical contractor.

*Directional references used within this report are based on facing the front of the building*



**Photo #13:** Electrical wires or splices are "**not**" contained in "*covered junction boxes*" in the attic.



**Photo #14:** Electrical wires or splices are "**not**" contained in "*covered junction boxes*" in the attic.



**Photo #15:** Master bathroom: the tub mechanical stopper is not attached to the drain.



**Photo #16:** Upstairs Hallway bathroom: the tub faucet is not sealed at the tub surround providing moisture intrusion potential.

---

*Directional references used within this report are based on facing the front of the building*

# General Inspection

★ ★ ★

Inspection Date: **September 30, 2016**
Inspection No:   160941/310

**Michael Armshaw** (Lic # 10252)
2132 Sassy Lane, Baton Rouge, LA 70808
Phone/Fax (225) **344-2525** ☏ Cellular (225) **933-1089**
Email: armshaw @ cox.net

**Indoor Air Quality (IAQ) services**, including those associated with mold/fungus, are not part of this inspection report and General Inspection LLC has performed no inspections or testing for the presence or absence of indoor air pollutants or Chinese drywall unless expressly and separately contracted for and separately reported. Inspecting and testing of IAQ is outside the scope of this inspection. This inspector is not qualified to detect the presence of Chinese Drywall. Accordingly, the issue of Chinese Drywall (and its potential problems) is beyond the scope of the inspection report.

Readily visible mildew/mold/fungus and conditions conducive to biogrowth may be noted in the report for informational purposes only. Clients who desire IAQ testing and/or remediation are advised to seek further evaluations by IAQ experts who can determine if further testing and remediation is warranted.

General Inspection LLC would be pleased, for additional fees, to help arrange for specific IAQ evaluations to determine the need for testing and remediation of specific indoor air pollutants.

Clients who desire additional Indoor Air Quality (IAQ) information can obtain it from the Federal Environmental Protection Agency (EPA) at:

EPA Indoor Air Quality Information Clearinghouse
P.O. Box 37133
Washington, DC 20013
www.epa.gov
1-800-438-4318

**"E.I.F.S." or "Synthetic Stucco" Inspection:**

The inspection of "*Synthetic Stucco*" or "*E.I.F.S.*" walls is a visual inspection of the exterior surface conditions only, the determination of the concealed interior wall conditions requires testing by a "*Moisture Intrusion*" inspector, and is beyond the scope of this inspection.

General Inspection LLC would be pleased, for additional fees, to arrange for specific Moisture Intrusion evaluations to determine the presence of moisture in concealed interior wall spaces.

*This report is for the exclusive use of the client for whom it was prepared. Neither the Licensed Home Inspector nor the Inspection Company shall have any liability whatsoever to any third party using or relying on its contents. Any third party using this report agrees thereby to defend, indemnify and hold the Licensed Home Inspector and the Inspection Company harmless from any claims of any person relying on the report."*

---

**Directional references used within this report are based on facing the front of the building**

---

## Louisiana State Board of Home Inspectors

## Standards of Practice and Code of Ethics

## STANDARDS OF PRACTICE

**301. Minimum Standards:** This Chapter sets forth the minimum Standards of Practice required of licensed home inspectors. AUTHORITY NOTE: Promulgated in accordance with RS. 37:1475. HISTORICAL NOTE: Promulgated by the Department of Economic Development, Board of Home Inspectors, L.R. 26:8, and (August 20, 2000).

**303. Definitions**

The definitions in Section 109 are incorporated into this Chapter by reference *(editing note: Section 109 definitions are included at rear of this section)*. The following definitions apply to this Chapter:

A.  *Automatic safety controls* - devices designed and installed to protect systems and components from excessively high or low pressures and temperatures, excessive electrical current, loss of water, loss of ignition, fuel leaks, fire, freezing, or other unsafe conditions.

B.  *Central air conditioning* - a system that uses ducts to distribute cooled or dehumidified air to more than one room or uses pipes to distribute chilled water to heat exchangers in more than one room, and that is not plugged into an electrical convenience outlet.

C.  *Cross connection* - any physical connection or arrangement between potable water and any source of contamination.

D.  *Dangerous or adverse situations* - situations that pose a threat of injury to the inspector, or those situations that require the use of special protective clothing or safety equipment.

E.  *Describe* - report in writing a system or component by its type, or other observed characteristics, to distinguish it from other components used for the same project.

F.  *Dismantle* - to take apart or remove any component, device or piece of equipment that is bolted, screwed, or fastened by other means and that would not be dismantled by a homeowner in the course of normal household maintenance.

G.  *Enter* - to go into an area to observe all visible components.

H.  *Functional drainage* - a drain is functional when it empties in a reasonable amount of time and does not overflow when another fixture is drained simultaneously.

I.  *Functional flow* - a reasonable flow at the highest fixture in a dwelling when another fixture is operated simultaneously.

J.  *Inspect* - to examine readily accessible systems and components of a building in accordance with the Standards of Practice, using normal operating controls and opening readily openable access panels.

K.  *Installed* - attached or connected such that the installed item requires tools for removal.

L.  *Normal operating controls* - homeowner operated devices such as a thermostat, wall switch, or safety switch.

M.  *Observe* - the act of making a visual examination.

N.  *On-site water supply quality* - water quality based on the bacterial, chemical, mineral and solids contents of the water.

0.  *On-site water supply quantity* - water quantity based on the rate of flow of water.

P.  *Operate* - to cause systems or equipment to function.

Q.  *Readily openable access panel* - a panel provided for homeowner inspection and maintenance that has removable or operable fasteners or latch devices in order to be lifted off, swing open, or otherwise removed by one person; and its edges and fasteners are not painted in place. This definition is limited to those panels within normal reach or from a four-foot stepladder, and that are not blocked by stored items, furniture, or building components.

R.  *Representative numbers* - for multiple identical components such as windows and electrical outlets -one such component per room. For multiple identical exterior components - one such component on each side of the building.

S.  *Roof drainage systems* - gutters, downspouts, leaders, splash blocks, scuppers and similar components used to carry water off a roof and away from a building.

T.  *Shut down* - a piece of equipment or a system is shut down when it cannot be operated by the device or control that a homeowner should normally use to apart it. If its safety switch or circuit breaker is in the "off" position or its fuse is missing or blown, the inspector is not required to reestablish the circuit for the purpose of operating the equipment or system.

U.  *Solid fuel heating device* - any wood, coal, or other similar organic fuel burning device, including but not limited to fireplaces whether masonry or factory built *(fireplace inserts and stoves, wood stoves (room heaters)*, central furnaces, and combinations of these devices.

V.  *Structural component* - a component that supports non-variable forces or weights *(dead loads)* and variable forces or weights *(live loads)*.

W.  *Technically exhaustive* - an inspection involving the extensive use of measurements, instruments, testing, calculations, and other means to develop scientific or engineering findings, conclusions, and recommendations.

X.  *Under floor crawl space* - the area within the confines of the foundation and between the ground and the underside of the lowest floor structural component.

---

*Directional references used within this report are based on facing the front of the building*

---

**Definitions**

A. *Applicant* - a person who seeks to be examined for licensure by the Board.

B. *Board* - the Louisiana State Board of Home Inspectors.

B. *Code* - the Louisiana Home Inspectors Licensing Administrative Code, promulgated at LAC 46: XL.

C. *Component* - a readily accessible and observable aspect of a system, such as a floor or wall, but not individual pieces such as boards or nails or where many similar pieces make up a component.

E. *Credit hour* - one continuing education course classroom horn, comprising at least 50 minutes of instruction.

F. *Home inspection* - a written evaluation of two or more of the following components of a resale residential building

| | | | |
|---|---|---|---|
| 1. | Electrical system | 5. | Plumbing system |
| 2. | Exterior and interior components | 6. | Roof |
| 3. | Foundation | 7. | Structural and foundation system |
| 4. | Heating and cooling systems | 8. | Any other related residential housing system as defined in the standards of practice prescribed by the Board. |

G. *Home inspector* - any person who, in accordance with the provisions of these Rules, holds himself out to the general public and engages in the business of performing home inspections on resale residential buildings for compensation and who examines any component of a building, through visual means and through normal user controls, without the use of mathematical sciences.

H. *Inspection* - to examine readily accessible systems and components of a building in accordance with the Board's Standards of Practice, using normal operating controls and opening readily accessible panels.

I. *Law* - the Louisiana Home Inspector Licensing Law, KS. 37:1471-1489.

J. *License period* - one year, expiring on the last day of the month of issuance of the preceding year of the Law and these Rules.

K. *Licensee* - any person who has been issued a license by the Board in accordance with the provisions of the Law and these Rules

L. *LSBHI* - an acronym for Louisiana State Board of Home Inspectors.

M. *Residential resale building* - a structure intended to be or that is used as a residence and consists of four or less living units, excluding commercial use space or units, and is not for sale for the first time.

N. *Rules* - the body of regulations governing the Board's discharge of its duties and responsibilities and prescribing the privileges and obligations of persons desiring to engage in the home inspection business in Louisiana under the Louisiana State Home Inspectors Licensing Law. It may also be referred to as the Louisiana Home Inspectors Licensing Administrative Code.

0. *System* - a combination of interactive or interdependent components assembled to carry out one or more functions.

P. *Timely filing* - a letter or written communication bearing a United States Post Office Mark inscribed with the date a filing or report is due at the Board. Any report or materials for filing bearing the canceled Postal Mark received on the next business day following the due date a presumed timely filed. Any report or materials for filing received after that time may be deemed timely filed only if evidenced by a return receipt or proof of mailing bearing the due date.

**305, Purpose and Scope**

A. Home inspections performed according to this Chapter shall provide the client with a better understanding of the property conditions, as observed at the time of the home inspection.

B. Home inspectors shall:

1. Provide the client with a written pre-inspection contract, whenever possible, which shall:

   a. State that the home inspection is to be done in accordance with the Standards of Practice of the Louisiana State Board of Home Inspectors.

   b. Describe what inspection services will be provided and their cost

   c. State that the inspection is limited to only those systems or components agreed upon by the client and the inspector

   d. contains copies of the Standards of Practice and Code of Ethics.

2. Observe and inspect readily visible and accessible installed systems and components listed in this Chapter, and/or as contractually agreed upon;

3. Submit a written report to the client which shall:

   a. Describe those systems and components specified to be described in Sections 31 V through 329. and/or as contractually agreed upon;

   b. State which systems and components designated for inspection in this Section have been inspected, and state any systems or components designated for inspection that were not inspected, and the reason for not inspecting;

   c. State any systems or components so inspected that do not function as intended, allowing for normal wear and tear, or adversely affect the habitability of the dwelling; and

   d. State the name, license number, and contain the signature of the person conducting the inspection.

C. This Chapter does not limit home inspectors from:

1. Reporting observations and coalitions or rendering opinions of items in addition to those required in Section B of this Rule; or

2. Excluding systems and components from the inspection if requested by the client and so stated in the written contract.

> ***Directional references used within this report are based on facing the front of the building***

**307. General Limitations**
A.   Home inspections done in accordance with this Chapter are visual and are not technically exhaustive.
B.   This Chapter applies to residential resale buildings.

**308. General Exclusions**
A.   Home inspectors are **NOT REQUIRED** to report on:
    1.   Life expectancy of any component or system;
    1.   The causes of the need for a repair
    2.   The methods, materials, and costs of corrections;
    3.   The suitability of the property for any specialized use;
    4.   Compliance or non-compliance with codes, ordinances, statutes, regulatory requirements, special utility, insurance or restrictions;
    5.   The market value of the property or its marketability;
    6.   The advisability or inadvisability of purchase of the property;
    7.   Any component or system that was not inspected;
    8.   The presence or absence of pests such as wood damaging organisms, rodents, or insects;
    9.   Cosmetic items, underground items, or items not permanently installed.
    10.  Hidden or latent defects; or
    11.  Items not visible for inspection.
B.   Home inspectors are **NOT REQUIRED** to:
    1.   Offer warranties or guarantees of any kind;
    1.   Calculate the strength, adequacy, or efficiency of any system or component;
    2.   Enter any area or perform any procedure that may damage the property or its components or be dangerous to the home inspector or other persons;
    3.   Operate any system or component that is shut down or otherwise inoperable;
    4.   Operate any system or component that does not respond to normal operating controls;
    5.   Disturb insulation, move personal items, panels, furniture, equipment, plant life, soil, snow, ice, or debris that obstructs access or visibility;
    6.   Determine the presence or absence of any suspected adverse environmental condition or hazardous substance, including but not limited to toxins such as asbestos, radon and lead, carcinogens, noise, contaminants in the building or in soil, water, and air;
    7.   Determine the effectiveness of any system installed to control or remove suspected hazardous substances; predict fixture condition, including but not limited to failure of components;
    8.   Project operating costs of components;
    9.   Evaluate acoustical characteristics of any system or component; or
    10.  Inspect special equipment or accessories that are not listed as components to be inspected in this Chapter.
C.   Home inspectors **SHALL NOT**:
    1.   Offer or perform any act or service contrary to law;
    2.   Report on the market value of the property or its marketability;
    3.   Report on the advisability or inadvisability of purchase of the property;
    4.   Report on any component or system that was not inspected;
    5.   Report on the presence or absence of pests such as wood damaging organisms, rodents or insects. However, the home inspector may advise the client of damages to the building and recommend further inspection by a licensed wood destroying insect inspector.
    6.   At the time of the inspection or for a reasonable time thereafter, advertise or solicit to perform repair services or any other type of service on the home upon which he has performed a home inspection.

**311. Structural Components**
A.   The home inspector shall inspect structural components including:

| | | | |
|---|---|---|---|
| 1. | Foundation | 4. | Columns or piers |
| 2. | Floors | 5. | Ceilings; and |
| 3. | Walls | 6. | Roofs |

B.   The home inspector shall describe the type of:

| | | | |
|---|---|---|---|
| 1. | Foundation | 4. | Columns or piers |
| 2. | Floor structure | 5. | Ceiling structure; and |
| 3. | Wall structure | 6. | Roof structure |

C.   The home inspector shall:
    1.   Probe structural components only where deterioration is visible, except where probing would damage any surface;

---

> ***Directional references used within this report are based on facing the front of the building***

---

2.   Enter under floor crawl spaces, basements, and attic spaces, except when access is obstructed. When entry could damage the property, or when dangerous or adverse situations are suspected;

3.   Report the methods used to inspect under floor crawl spaces and attics; and

4.   Report signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components.

**313.  Exterior**

A.   The home inspector shall inspect:

1.   Wall cladding and flashings and trim;

1.   Entryway doors and a representative number of windows;

2.   Garage door operators;

3.   Decks, balconies, stoops, steps, areaways, porches, and applicable railings;

4.   Eaves, soffits, and fascias; and

5.   Vegetation, grading, drainage, driveways, patios, walkways, and retaining walls with respect on the condition of the building.

B.   The home inspector shall:

1.   Describe wall cladding materials;

2.   Operate all entryway doors and a representative number of windows;

3.   Operate garage doors manually or by using permanently installed controls for any garage door operator; and

4.   Report whether or not any garage door operator will automatically reverse or stop and if so said safety feature.

C.   The home inspector is **NOT REQUIRED** to inspect:

1.   Storm windows, storm doom, screening, shutters, awnings, and similar seasonal accessories

2.   Fences;

3.   Presence of safety glazing in doors and windows;

4.   Garage door operator remote control transmitters;

5.   Geological conditions;

6.   Soil conditions;

7.   Recreational facilities *(including spas, saunas, steam baths, swimming pools, tennis courts, and other exercise, entertainment or athletic facilities)*;

8.   Detached buildings or structures;

9.   Presence or condition of buried fuel storage tanks.

**315.  Roofing**

A.   The home inspector shall inspect:

1.   Roof coverings

2.   Rood drainage systems

3.   Flashings

4.   Skylights, chimneys, and roof penetrations; and

5.   Signs of leaks or abnormal condensation on building components

B   The home inspector shall:

1.   Describe the type of roof covering materials: and

2.   Report the methods used to observe the roofing.

C.   The home inspector is **NOT REQUIRED** to:

1.   Walk on the roofing; or

2.   Inspect attached accessories including but not limited to solar systems, antennae, and lightening arrestors.

**317.  Plumbing**

A.   The home inspector shall inspect:

1.   Interior water supply and distribution systems, including piping materials, supports, insulation, fixtures and faucets: functional flow, leaks; and cross connections;

2.   Interior drain, waste and vent system, including: Imps, drain, waste, and vent piping; piping supports and pipe insulation; leaks, and functional drainage;

3.   Hot water systems including: water heating equipment; normal operating controls; automatic safety controls; and chimneys, flues and vents;

4.   Fuel storage and distribution systems including interior fuel storage equipment, supply piping, venting, and supports; leaks; and

5.   Sump pumps.

B.   The home inspector shall describe:

---

| ***Directional references used within this report are based on facing the front of the building*** |
|---|

1.   Water supply and distribution piping materials;
2.   Drain, waste and vent piping materials;
3.   Water heating equipment; and
4.   Location of main water supply shutoff device.

C.     The home inspector shall operate all plumbing and plumbing fixtures, including their faucets and all exterior faucets attached to the house, except where the flow end of the faucet is connected to an appliance or winterized equipment.

D.     The home inspector is **NOT REQUIRED** to:
1.   State the effectiveness of anti-siphon devices;
2.   Determine whether water supply and waste disposal systems are public or private;
3.   Operate automatic safety controls;
4.   Operate any valve except water closet flush valves, fixture faucets, and hose faucets;
5.   Inspect:

| | | | |
|---|---|---|---|
| a. | Water conditioning systems | e. | Foundation irrigation systems |
| b | Fire and lawn sprinkler systems | f. | Spas |
| c. | On-site water supply quantity and quality | g. | Swimming Pools |
| d. | On-site waste disposal systems | h. | Solar water heating equipment; or |

6.   Inspect the system for proper sizing, design, or use of proper materials.

### 319. Electrical

A.     The home inspector shall inspect:
1.   Service entrance conductors;
2.   Service equipment, ground equipment, main over current device, and main and distribution panels:
3.   Amperage and voltage ratings of the service;
4.   Branch circuit conductors, their over current devices, and the compatibility of the ampacities and voltages;
5.   The operation of a representative number of installed ceiling fans, lighting fixtures, switches and receptacles located inside the house, garage, and on the dwelling's exterior walls;
6.   The polarity and grounding of all receptacles within six feet of interior plumbing fixtures, and all receptacles in the garage or carport, and on the exterior of inspected structures:
7.   The operation of ground fault circuit interrupters; and
8.   Smoke detectors.

B.     The home inspector shall describe:
1.   Service amperage and voltage;
2.   Service entry conductor materials;
3.   Service type as being overhead or underground; and
4.   Location of main and distribution panels.

C.     The home inspector shall report any observed aluminum branch circuit wiring.

D.     The home inspector shall report on the presence or absence of smoke detectors, and operate their test function, if accessible, except when detectors are part of a central system.

E.     The home inspector is **NOT REQUIRED** to:
1.   Insert any tool, probe, or testing device inside the panels;
2.   Test or operate any over current device except ground fault circuit interrupters;
3.   Dismantle any electrical device or control other than to remove the dead front covers of the main and auxiliary distribution panels; or
4.   Inspect:
     a.   Low voltage systems;
     b.   Security system devices, heat detectors, or carbon monoxide detectors;
     c.   Telephone, security, cable TV, intercoms, or other ancillary wiring that *is* not part of the primary electrical distribution system
     d.   Built-in vacuum equipment.

### 321. Heating

A.     The home inspector shall inspect permanently installed heating systems including:
1.   Heating equipment;
1.   Normal operating controls;
2.   Automatic safety controls;
3.   Chimneys, flues, and vents, where readily visible;
4.   Solid fuel heating devices including fireplaces;

---

> ***Directional references used within this report are based on facing the front of the building***

---

5.  Heat distribution systems including fans, pumps, ducts and piping, with associated supports, insulation, air filters, registers, radiators, fan coil units, convectors; and
6.  The presence of an installed heat source in each room.

B.  The home inspector shall describe:
1.  Energy source; and
2.  Heating equipment and distribution type.

C.  The home inspector shall operate the systems using normal operating controls.

D.  The home inspector shall open readily openable access panels provided by the manufacturer or installer for routine homeowner maintenance.

E.  The home inspector is **NOT REQUIRED** to:
1.  Operate heating systems when weather conditions or other circumstances may cause equipment damage;
2.  Operate automatic safety controls,
3.  Ignite or extinguish solid fuel fires; or
4.  Inspect
     a.  The interior of flues;                              d.  Electronic air filters;
     b.  Fireplace inserts flue connections.          the uniformity or adequacy of beat supply to the various rooms.
     c.  Humidifiers

### 323.  Central Air Conditioning

A.  The home inspector shall inspect:
1.  Central air conditioning systems including:
2.  Cooling and air handling equipment;
3.  Normal operating controls;
4.  Fans, pumps, ducts, and piping with associated supports, dampers, insulation, air filters registers, fan coil units; and
5.  The presence of an installed cooling source in each room.

B.  The home inspector shall describe:
1.  Energy sources; and
2.  Cooling equipment type.

C.  The home inspector shall operate the systems using normal operating controls.

D.  The home inspector shall open readily openable access panels provided by the manufacturer or installer for routine homeowner maintenance.

E.  The home inspector is **NOT REQUIRED** to:
1.  Operate cooling systems when weather conditions or other circumstances may cause equipment damage;
2.  Inspect non-central air conditioners or

2.  Inspect the uniformity or adequacy of cool-air supply to the various rooms.

### 325.  Interiors

A.  The home inspector shall inspect:
1.  Walls, ceiling, and floors;
2.  Steps, stairways, balconies, and railings;
3.  Countertops and a representative number of cabinets and drawers; and
3.  A representative number of doors and windows.

B. The home inspector shall:
1.  Operate a representative number of windows and interior doors; and
2.  Report signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components.

C.  The home inspector is **NOT REQUIRED** to inspect:
1.  Paint, wallpaper, and other finish treatments on the interior walls, ceilings, and floors:
1.  Carpeting; or
3.  Draperies, blinds, or other window treatments.

### 327.  Insulation and Ventilation

A.  The home inspector shall inspect:

1.  Insulation and vapor retarders in unfinished spaces;
2.  Ventilation of attics and foundation areas:
3.  Kitchen, bathroom, and laundry venting system; and
4.  The operation of any readily accessible attic ventilation fan, and, when temperature permits, the operation of any readily accessible thermostatic controls

B   The home inspector shall describe:

> ***Directional references used within this report are based on facing the front of the building***

    1.   Insulation in unfinished spaces, and
    2.   Absence of insulation in unfinished space at conditioned surfaces.
C.   The home inspector is **NOT REQUIRED** to report on:
    1.   Concealed insulation and vapor retarders; or
1.   Venting equipment that is integral with household appliances.

### 329. Built-in Kitchen Appliances

A.   The home inspector shall inspect and operate the basic functions of the following kitchen appliances:
    1.   Permanently installed dishwasher through its normal cycle;
    2.   Range, cooktop, and permanently installed oven;
    3.   Trash compactor;
    4.   Garbage disposal;
    5.   Ventilation equipment or range hood; and
    6.   Permanently installed microwave oven.
B.   The home inspector is **NOT REQUIRED** to inspect
    1.   Clocks, timers, self-cleaning oven function, or thermostats for calibration or automatic operation;
    2.   Non built-in appliances such as clothes washers and dryers; or
    3.   Refrigeration units such as freezers, refrigerators and icemakers.
C.   The home inspector is **NOT REQUIRED** to operate:
    1.   Appliances in use
    2.   Any appliance that is shut down or otherwise inoperable.

## CODE OF ETHICS

### 501. Code of Ethics

A.   Licensees shall discharge their duties with fidelity to the public and to their clients, and with fairness and impartiality to all.
B.   Opinions expressed by licensees shall only be based on their education, experience and honest convictions.
C.   A licensee shall not disclose any information about the results of an inspection without the approval of the client for whom the inspection was performed, or the client's designated representative unless an unsafe condition is discovered.
D.   No licensee shall accept compensation or any other consideration from more than one interested party for the same service without consent of all interested parties.
H.   No licensee shall accept commissions or allowances from other parties dealing with the client in connection with the inspection report.
F.   No licensee shall offer commissions, fees or payment to other parties dealing with the client for the referral of the inspector to the client for an inspection.
G.   No licensee shall express, within the context of an inspection, an appraisal or opinion of the market value of the inspected property.
H.   Before the execution of a contract to perform a home inspection, a licensee shall disclose to the client any interest in a business that may affect the client.
I.   No licensee shall allow his or her interest in any business to affect the quality of results of the inspection work that the licensee may be called upon to perform.
J.   Licensees shall not engage in false or misleading advertising or otherwise misrepresent any matters to the public.
K.   Licensees shall bear a good reputation for honesty, trustworthiness and integrity.

## END OF SECTION

---

    *Directional references used within this report are based on facing the front of the building*

---

# Exhibit 4

# Exhibit 5

# Exhibit 6

# Exhibit 7

# Exhibit 8

# Exhibit 9

# Exhibit 10

# Exhibit 11

# Exhibit 12

# Exhibit 13

# Exhibit 14

# Plaintiff Fact Sheet

Plaintiff: *Jacques Brousseau*

Property Address: *437 Delgado Dr, Baton Rouge, LA  70808*

## Question #18 Itemization (Personal Property Damage)

| # | Description of Damaged Item | Value ($) |
|---|---|---|
| 1 | Broken/Replaced both A/C Coils (invoice/paid ) (8/23/2012) | $2,495 |
| 2 | Broken/Replaced Refrigerator (invoice/paid ) (10/23/2012) | $2,136 |
| 3 | Broken/Repaired Microwave Oven (invoice/paid ) (11/5/2012) | $300 |
| 4 | Broken/Replaced Dishwasher (invoice/paid ) (1/11/2013) | $1,153 |
| 5 | Broken/Replaced Range (invoice/paid ) (1/5/2015) | $1,698 |
| 6 | Broken/Replaced Mini-Fridge (invoice/paid ) (10/12/2015) | $1,777 |
| 7 | Broken/Repaired A/C Units (invoice/paid ) (6/2/2016) | $355 |
| 8 | Broken/Repaired Microwave Oven (invoice/paid ) (7/8/2016) | $300 |
| 9 | Broken/Repaired Microwave Oven (invoice/paid ) (8/10/2016) | $110 |
| 10 | Broken/Replace Microwave Oven (invoice/paid ) (8/12/2016) | $3,229 |
| 11 | Broken/Repaired A/C Units (invoice/paid ) (7/3/2017) | $255 |
| 12 | Broken/Repaired Refrigerator (invoice/paid ) (12/24/2017) | $453 |
| 13 | Broken/Repaired A/C Units (invoice/paid ) (2/9/2018) | $495 |
| 14 | Broken/Repaired Refrigerator (invoice/paid ) (9/24/2018) | $523 |
| 15 | Broken/Repaired A/C Units (invoice/paid ) (12/27/2018) | $95 |
| 16 | Broken/Replaced A/C Unit Coil System (invoice/paid ) (1/4/2019) | $2,954 |

| | | |
|---|---|---|
| 17 | Damaged/Replace Upstairs A/C Unit & Furnace (estimate) | $5,000 |
| 18 | Damaged/Replace Downstairs A/C Unit & Furnace (estimate) | $5,000 |
| 19 | Damaged /Replace Microwave Oven (estimate) | $3,300 |
| 20 | Damaged /Replace Mini-Fridge (estimate) | $1,900 |
| 21 | Damaged /Replace Range (estimate) | $1,800 |
| 22 | Damaged/Replace Dishwasher (estimate) | $1,300 |
| 23 | Damaged/Replace Washing Machine (estimate) | $1,300 |
| 24 | Damaged/Replace Dryer (estimate) | $1,300 |
| 25 | Damaged /Replace Refrigerator (estimate) | $2,300 |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |
| 33 | | |
| 34 | | |
| 35 | | |

Total:  $ 41,528