```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3    *****************************************************************

 4    IN RE: CHINESE-MANUFACTURED        CIVIL NO. 09-MD-2047

 5    DRYWALL PRODUCTS                   SECTION "L"

 6    LIABILITY LITIGATION               WEDNESDAY, JANUARY 22, 2020

 7

 8    This relates to:
      Elizabeth Bennett, et al v. Gebrueder Knauf
 9    Verwaltungsgesellschaft, KG, et al, No. 14-2722

10    *****************************************************************

11                    TRANSCRIPT OF MOTION HEARINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
12                   UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15

16    FOR THE PLAINTIFFS:             DOYLE LAW FIRM
                                      BY: JAMES V. DOYLE, JR., ESQ.
17                                    2100 Southbridge Parkway
                                      Suite 650
18                                    Birmingham, Alabama   35209

19

20    FOR THE KNAUF DEFENDANTS:       FISHMAN HAYGOOD, LLP
                                      BY: KERRY J. MILLER, ESQ.
21                                        DANIEL J. DYSART, ESQ.
                                          KAKI JOHNSON, ESQ.
22                                        MICHAEL DODSON, ESQ.
                                          REBEKKA C. VEITH, ESQ.
23                                        WILLIAM MIZELL, ESQ.
                                      201 St. Charles Avenue
24                                    Suite 4600
                                      New Orleans, Louisiana  70170
25


                             OFFICIAL TRANSCRIPT
```

Official Court Reporter:           Alexis A. Vice, CCR, RPR, CRR
                                   500 Poydras Street, HB-275
                                   New Orleans, LA  70130
                                   (504) 589-7777
                                   *Alexis_Vice@laed.uscourts.gov*

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
PRODUCED BY COMPUTER.

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                 WEDNESDAY, JANUARY 22, 2020
 3                    (MOTION HEARINGS)
 4
 5           DEPUTY CLERK: MDL No. 2047, In Re:
 6   Chinese-Manufactured Drywall Products Liability Litigation,
 7   regarding Civil Action 14-2722.
 8           THE COURT: Counsel, make your appearance for the
 9   record, please.
10           MR. DOYLE: Jimmy Doyle on behalf of plaintiffs, Your
11   Honor.
12           MR. MILLER: Good morning, Your Honor, Kerry Miller on
13   behalf of Knauf.
14           THE COURT: Okay, we've got a couple of motions here
15   today.  The easiest ones to deal with are, first, the
16   suggestion of remand, then the motion to deny class
17   certification.  Then there's an issue of a new affidavit.  I
18   can take that up.  And then we'll go with the other motions.
19           With the other motions, it's easier, I think, if we
20   kind of group those together rather than argue one at a time.
21   The big issues in the case seem to be statute of limitations,
22   the evidence of damages, the failure to comply with pretrial
23   orders.  Those are kind of the ones that I see, statute of
24   limitations, assumption of the risk, diminution in value or
25   loss of use, that is those issues, failure to comply with
```

OFFICIAL TRANSCRIPT

1   pretrial order.  And then we can argue those substantive

2   issues, and then you can tell me which cases fall in that,

3   whether or not they're distinguished, things of that nature.

4           MR. MILLER: Judge, if it's acceptable to the Court, I

5   submitted a proposed agenda to Anais yesterday.  I copied

6   Mr. Doyle on it.  And it basically tries to do that, to group

7   them by way of category that we thought we would do.  I have my

8   team here, who I'll introduce in a second, but basically, do

9   like you suggested.

10          Once we get into the substantive motions, just sort

11  of make, you know, sort of broad substantive points that apply

12  across the board, and then we sort of have a slide show, sort

13  of one slide each where we go over the particular facts or the

14  particular issues for that case.  And then so we can argue them

15  two or three or four at a time, kind of like we set forth in

16  the email and Mr. Doyle.

17          THE COURT: Jimmy, are you okay with that?

18          MR. DOYLE: I'm okay with that.  Sure, Your Honor.

19          THE COURT: Let's do it that way, then.

20          Let's look at the suggestion of remand at this time.

21  I understand that from the plaintiff's standpoint, the

22  plaintiff says, "Judge, you've had this for nine years,

23  ten years.  It's time to get you off the case.  Send us back;

24  so we can deal with the issues of trial.  That you've been

25  discovering the case for nine years, there's nothing left.

OFFICIAL TRANSCRIPT

1    It's time to go back."

2          The defendant takes the position that these

3    individuals have not been a part of the matter.  They came kind

4    of late in the game.  And that while discovery has been

5    somewhat specific, there's still some discovery to do.  And

6    more importantly, there's some motions that have been generated

7    from that discovery that this Court ought to handle, such as,

8    summary judgment and things of that nature.

9          I'll hear from the parties.

10         MR. MILLER: Yeah, Your Honor, this is actually, I

11   think, Mr. Doyle's motion.  But for us, I want to introduce my

12   team.  Kaki Johnson is going to argue the opposition to

13   suggested remand.  Your Honor, she clerked for Judge Lemelle.

14   You may recognize her from the building, from the Law Review at

15   Loyola.

16         Sitting next to her, Mike Dodson is going to argue

17   some of the summary judgment motions or one for sure.  He

18   clerked in the Middle District of Alabama for Senior

19   Judge Albritton.  And even though he went to the University of

20   Alabama, we still love him.

21         Rebekka Veith, who is sitting next to him, clerked

22   for Judge Drell over in Alexandria.  She was on the Law Review

23   at Tulane and went to Ben Franklin.

24         And Will Mizell is the newest addition to my team.

25   He's a proud Rummel Raider and a graduate of Tulane and Loyola

OFFICIAL TRANSCRIPT

1  Law School.

2          THE COURT: Jimmy, it's your motion.  Why don't you

3  tell me how you see it?

4          MR. DOYLE: Judge, good morning.  This *Bennett* action

5  hasn't been around since the beginning of the Chinese drywall

6  litigation.  This came, you know, about after the initial

7  settlement --

8          THE COURT: Right, yeah.

9          MR. DOYLE: -- that was approved in 2013.  So

10  defendants have always taken the position they're not part of

11  that group settlement.  I'm calling that a group settlement for

12  a specific reason because it was not a true class settlement.

13  I think they've argued that recently in some of their responses

14  to a couple of these summary judgment motions.

15          But the reason that we filed this motion is because

16  we're now done with case-specific discovery, and there has not

17  been any consolidated, coordinated discovery in this case.  All

18  the consolidated, coordinated discovery was done prior to 2013.

19  In fact, the Court has, you know, instructed us to use all of

20  that discovery that was made available to us through the trial

21  package in, I believe it was, one of the latest MDL pretrial

22  orders.  I'm not sure about the exact number, maybe 32.

23          THE COURT: Uh-huh.

24          MR. DOYLE: And that's going to be discussed later on

25  with regard to one of the attachments that they've objected to

OFFICIAL TRANSCRIPT

1  that were attached in support of the opposition to summary

2  judgment.

3          But under 28 U.S.C. 1407, it says that, "each action

4  so transferred shall be remanded by the panel at or before the

5  conclusion of such pretrial proceedings to the district from

6  which it was transferred unless it shall have been previously

7  terminated."  And there have been a number of cases, I've cited

8  them in my brief, that say when it's case-specific discovery

9  and there's nothing else going on, it's due to go back to the

10 transferor court.

11         THE COURT: How about the motions that are filed,

12 should the court, transferor court handle that, or you think it

13 should send that to the other courts?

14         MR. DOYLE: Well, I think that was addressed by the

15 J.P.M.L. in 1978.  If you look specifically at the *Orthopedic*

16 *Bone Screws Products Liability* case, it says that,

17 "case-specific motions for disposition by the various

18 transferor courts."  It's appropriate in the transferor court,

19 not the transferee court.  That's only one.

20         There's a couple of other cases.  I believe I cited

21 the *In Re Air Crash Disaster at Tenerife, Canary Islands*.  It

22 says that the courts applying these principles have remanded

23 cases when discovery on common issues is complete and the

24 remaining discovery and pretrial proceedings involve issues

25 that are unique to the individual cases or claims.  I think

OFFICIAL TRANSCRIPT

1  it's pretty clear from those cases.  They have not been

2  overruled.  They're still valid controlling law.

3          Any case-specific motions, and everything that we're

4  going to do today after this motion is case specific.  And it's

5  directly on -- these cases are directly on point.  They should

6  be decided by the transferor court.

7          THE COURT: Okay, I got it.

8          But let me hear your response.  Basically, he's

9  taking the position that all of the discovery is finished and

10 that the motions that are -- potential motions are really

11 case-specific motions and that these should be handled by the

12 transferor court.  How do you see it?

13         MS. JOHNSON: Good morning, Your Honor.  We would

14 respectfully disagree with that position.  We believe that

15 maintaining this action in this court is consistent with the

16 purpose of MDL consolidation.  Specifically, one of the

17 purposes of MDL consolidation is for the MDL judge to manage a

18 number of related cases and prepare them all for trial such

19 that they are trial ready when they are transferred back to

20 their home court.

21         At present, there are over 120 consolidated claims in

22 *Bennett* are not trial ready.  They have not completed pretrial

23 proceedings as set forth in the case management order.  The

24 motions pending today highlight that there are pretrial issues

25 to resolve, and defendants anticipate filing additional motions

OFFICIAL TRANSCRIPT

1  related to pretrial issues.

2            THE COURT: Like what?  What are they?  What are the

3  motions?

4            MS. JOHNSON: Different discovery motions.  One will

5  reflect the failure to comply with discovery deadlines,

6  notices, and court orders.  Others are based on prescription

7  issues with the individual claimants.  Some will be based on

8  Florida law and some issues arising under Florida law.  Others

9  are going to be based on Louisiana law and other issues with

10 prescription under Louisiana law.

11            Accordingly, we think that while there may be

12 individual, unique circumstances of individual claimants, there

13 are different categories of issues that can be lumped together

14 and are more appropriately decided by one court as opposed to

15 many courts.

16            THE COURT: He says that those actions, those motions

17 are really case specific and that those cases, those motions

18 ought to be decided by the transferee judge who is going to

19 deal with that particular case.  How do you see it?

20            MS. JOHNSON: I think he's right that there are

21 individual issues in each case, but I still believe that they

22 can be categorized as much broader issues that can more quickly

23 and efficiently decide the individual cases.  As opposed to

24 having 120 different decisions, you could have maybe 10 to 15

25 decisions.  And I think for that reason it's still appropriate

OFFICIAL TRANSCRIPT

1   to maintain the MDL consolidation.

2              THE COURT: Any discovery issues that are still

3   outstanding as you see it?

4              MS. JOHNSON: Just the ones that we will address with

5   the Rule 37 motion to dismiss.

6              Co-counsel reminds me that we're also conducting

7   expert discovery through March.

8              Additionally, we believe that three prerequisites for

9   MDL consolidation are still applicable here.  One is the

10  existence of a common question of fact.  Many of the claims

11  present similar discovery based issues that are more

12  appropriately handled through consolidation.  Two, transfer is

13  convenient for parties and witnesses.  We have one schedule,

14  one set of rules.  It's easier for everyone to comply.  And

15  remaining in this court will promote the just and efficient

16  conduct of the action.

17             If remand does occur, there will be over 120

18  claimants with 130 property cases.  They'll be reset,

19  completely negating all of the progress we've made here.

20             Second, there's no reason to deviate from the case

21  management order.  The current CMO which is Document No. 22359

22  extends deadlines through the first quarter of this year.

23  Plaintiffs have provided no justification for now abandoning

24  that CMO that we agreed upon.

25             Additionally, plaintiffs' argument for remand must

OFFICIAL TRANSCRIPT

1  fail because it hinges on class certification.  Specifically,

2  plaintiffs' argument for remand relies on the assumption that

3  the Northern District of Alabama is the district court with

4  proper jurisdiction and venue for the *Bennett* action based on

5  plaintiffs' unsupported conclusion that the class will be

6  certified.  The *Bennett* action is unlikely to be certified as a

7  class because plaintiffs cannot satisfy predominance.

8         Specifically, plaintiffs' motion makes clear that

9  there are fact-intensive questions pertaining to individual

10 plaintiffs.  Specifically, plaintiffs' motion points out that

11 there are hundreds of discrete responses to plaintiffs

12 corresponding to 130 affected properties.

13        As will be discussed with our motion to deny class

14 certification, defendants agree that the *Bennett* class cannot

15 be certified because common questions do not predominate over

16 any question affecting only individual class members.  Absent

17 certification, venue is then improper in the Northern District

18 of Alabama for the majority of claimants.  Therefore, remand at

19 this time would result in transfer to an improper court or a

20 multitude of different courts.

21        And finally, we just want to point out that this

22 Court can decide these issues.  This Court has discretion to

23 rule on substantive motions and pretrial motions regarding

24 discovery, including, those pending before it today.

25 Specifically, MDL courts frequently make substantive rulings on

OFFICIAL TRANSCRIPT

1   consolidated legal claims.  And that's all I have.

2          THE COURT: Okay, all right, thank you very much.

3          Any response?

4          MR. DOYLE: Yeah, just a quick response, Your Honor.

5          THE COURT: Yeah.

6          MR. DOYLE: Opposing counsel suggested that the CMO is

7   something that we agreed to.  We never agreed to this.  They

8   never participated in the Rule 26 conference.  If you recall,

9   this was a CMO that they provided to the Court after refusing

10  to participate.  So it's not anything we agreed to.

11         But it is in place, and we're at the end of

12  case-specific discovery.  We've deposed experts.  We now have

13  these very specific motions about individual cases.  There's

14  nothing more case specific than a motion for summary judgment

15  on an individual claim.  And I think the J.P.M.L. case law is

16  pretty clear.  Those are the issues that should be decided by

17  the court that's going to ultimately try these cases, and it's

18  not this Court.

19         *Lexecon*, which I've also cited in there, stands

20  specifically for the principle that a transferee court, meaning

21  an MDL court, cannot transfer to itself.  It has to go back to

22  where it came from which is the Northern District of Alabama.

23  And that's according to the cases from 1977 and '78 that I've

24  got in my brief.

25         It's pretty clear.  Those are the issues, all those

OFFICIAL TRANSCRIPT

1   issues that are case specific that would impact trial of these

2   individual claims must be decided by the individual transferor

3   court.

4           THE COURT: Okay, I got it.

5           MR. DOYLE: Thank you, Your Honor.

6           THE COURT: In this particular matter, I'm not going

7   to rule on this motion, deny it or grant it, but I feel it's

8   premature at this time.  So I will deny it with the

9   understanding that you can refile it at another time.  From the

10  standpoint of the motion, I'm going to deny it as being

11  premature reserving to the party an opportunity to refile it at

12  another time.

13          The next motion we have is the motion by the

14  defendant to deny the class certification in this particular

15  matter.  So it's not a question of the plaintiff asking for

16  certification.  It's the defendant preempting that motion and

17  filing to deny the certification.

18          MR. MILLER: Thank you, Judge.  Kerry Miller on behalf

19  of Knauf.

20          As pointed out already, the *Bennett* case, which is

21  what we're here about today, was filed as a class action or a

22  putative class action in the Northern District of Alabama in

23  2014 and then transferred to Your Honor by virtue of the

24  J.P.M.L. consolidation procedures.

25          Post-transfer, there were various amendments to the

OFFICIAL TRANSCRIPT

1 complaint, but it always remained styled as a class action, and
2 there was always a section in the complaint based upon the
3 Rule 23 requirements.

4      For a while, the *Bennett* case was stayed pursuant to
5 Your Honor's stay order I think under Pretrial Order 15, but
6 that stay order was lifted.  As Your Honor knows, the local
7 rules of court apply in MDL, and we have a local rule which
8 requires for the timely moving, filing of a Rule 23 motion for
9 class certification.  That was not done here, and nor was an
10 extension ever requested.

11      Your Honor, so as we are moving toward the completion
12 of this *Bennett* action, filing motions, filing summary judgment
13 motions, and asking the Court to make these matters trial
14 ready, we filed a motion to deny class certification so that
15 when these cases are remanded, just like you did in the Taishan
16 cases recently, there are vehicles, proper vehicles of
17 jurisdiction and venue to remand the cases back to.

18      Your Honor, a couple additional points.  This motion
19 was originally set for January 8th.  Mr. Doyle sought a
20 continuance due to a personal conflict on January 6th to
21 which I consented, and the Court granted his motion as
22 unopposed.  However, at that time, Your Honor, no opposition
23 had been filed to our motion.  It was only after our motion got
24 continued until January 22nd was there even an opposition
25 filed.  Continuing a hearing does not revive your right to file

OFFICIAL TRANSCRIPT

1   an opposition.  That must be filed eight days before the
2   submission date.  It wasn't done that way in this case.

3          So there are two sort of procedural reasons why we
4   think our motion ought to be granted.  No. 1 is the
5   noncompliance with the local rule, and No. 2 is a failure to
6   file a timely opposition.

7          But substantively, Your Honor, what we have, what
8   we're dealing with here -- and it's really set forth through
9   the substantive motions we'll get to in a minute -- are a bunch
10  of case-specific issues, or as Kaki pointed out, a category or
11  a grouping of case-specific issues.  And we tried to itemize
12  them here, Your Honor.

13         There's statute of limitations issues, evidentiary
14  issues, and deficiencies type claim issues.  There's a home
15  remediation claim.  Is the home something of what we've talked
16  about for years now, an ARH, already remediated, where the
17  homeowner seeks damage reimbursement, or did the homeowner lose
18  their home in a short sale or foreclosure and seeks damages for
19  lost equity?  We have all those different variants within the
20  120 claimants in *Bennett*.

21         We also have issues, probably more so in *Bennett* than
22  we had early on, this is much like sort of the Brooke complaint
23  that we dealt with in Taishan, Your Honor, where many of these
24  claimants bought their homes in 2015 and 2016.  They might be
25  the second or third or fourth owner of the home since Chinese

OFFICIAL TRANSCRIPT

1   drywall was installed back in 2006.  So you have all of the

2   issues that deal with assignments and releases and knowledge

3   and inspections and all the things that you've dealt with for

4   ten years now as the MDL judge on this.

5           Also, the manner of purchase, some of those homes

6   were bought at auction.  Some of them were bought at

7   foreclosures.  Some of them were bought for cash without any

8   inspection, sight unseen.  So you have all these kind of issues

9   which pertain to our defenses.  As Your Honor knows, you must

10  not only have common issues of fact and law on the plaintiffs'

11  side, you also have to have common issues of law and fact on

12  the defense side.  We don't have those.

13          And then finally, Your Honor, you have the

14  application of different state law.  We have Texas, Louisiana,

15  Mississippi, Alabama, and Florida that will be implicated in

16  the *Bennett* cases.

17          Your Honor, earlier last year in June or July of

18  2019, you were presented with the *Mitchell* class certification

19  here, and you conducted a hearing.  And you put ultimate

20  finding on the predominance requirement was that there were

21  state specific complaints, specific claims, and that prevented

22  class certification in that case.  And I cited that at Record

23  Doc 22287, page 19.  It's at the end of your ruling.  It's

24  exactly the same issue here, Your Honor, substantive side.

25          THE COURT: How do you see the preemptive aspect of

OFFICIAL TRANSCRIPT

1    it?  Usually, I deal with this from the class certification

2    motion of the plaintiff, and the defendant makes the argument

3    that you've made.  But it's in defense of the matter as opposed

4    to being the movant.

5          MR. MILLER: Sure.  And Your Honor, we actually cited

6    a whole paragraph of cases of that in our brief.  And what the

7    law is, of the Fifth Circuit and generally, is a court can rule

8    on class certification sua sponte, and also the defendant can

9    initiate class certification.  Your Honor, and a lot of these

10   cases come out after sort of our common history in *Castano* and

11   those things that happened in the circuit after that.

12         I think I might have been the first person in your

13   court and Judge Berrigan's court right after *Castano* to file a

14   Rule 12(b)(3) motion on class certification where after *Castano*

15   came out and it set forth some very specific requirements in

16   the Fifth Circuit, you could look at the pleading and say,

17   "Look, all I'm seeking is personal injuries here.  It's not

18   certifiable."  So I know I have taken this initiative before in

19   your court and in Judge Berrigan's court, and I'm sure maybe

20   some other courts.  I know I took it in Middle District with

21   Judge Parker, maybe others.

22         But the law is absolutely clear that the court sua

23   sponte or the defendant, through an appropriate motion, can

24   initiate a court's decision on class certification.  It doesn't

25   need to be a plaintiffs' motion on Rule 23.


                    OFFICIAL TRANSCRIPT

```
1              THE COURT: Jimmy, let me hear from you.
2              MR. DOYLE: Your Honor, our position laid out in our
3    response, we think this should be decided by the transferor
4    court.  This is a case-specific issue.  This is another one.
5    This is what I was talking about earlier.  This is very case
6    specific.  It's how the judge in the transferor court would
7    handle the case going forward at trial.  It directly impacts
8    that.  We think that this is a motion that should be tried
9    there.  That's essentially what our response was.
10             THE COURT: Okay.  In this particular matter, there
11   were some common issues.  The common issues, however, are
12   product identification and liability.  That's no longer an
13   issue in this particular case.  There's product identification.
14   There's no question of that.  There's a question of liability.
15   It seems like liability is stipulated or will be stipulated.
16             The questions before me now really involve statute of
17   limitations, assumption of risk, remediation, whether it's an
18   already remediated home, whether it's a short sale, whether the
19   party knew or could have known or should have known of the
20   existence of drywall, the different state laws involved.
21             There's so many specific issues in this particular
22   case that I'm not even sure that it gets past the 23(a).  But
23   if it does squeak past that because that commonalty requirement
24   is not as bold or not as strict as the 23(b) one with
25   predominance, I think it's not going to survive predominance.
```

OFFICIAL TRANSCRIPT

1    I don't think that the common issues predominate in this

2    particular case.  In fact, it seems to me the specific issues

3    predominate in the case.

4            There's some seminal issue as to whether or not the

5    motion can be brought by the defendants.  Clearly, it was met

6    head-on in the Ninth Circuit in that *Vinole* case as the first

7    we really saw specific comment on it.  The Seventh Circuit

8    followed.  The Fifth Circuit, you can extrapolate from some of

9    the comments that the circuit has made they haven't really

10   decided it front-on, but the cases that they have mentioned it

11   and also affirmed in the lower courts seem to me there's really

12   no question that the Fifth Circuit will also follow the Ninth

13   and the Seventh.

14           I'm going to grant the motion to deny class

15   certification in this particular case.  I've been with it now

16   over ten years.  I know the case reasonably well.  I think that

17   the specific issues in this particular matter really

18   predominate.  I don't even feel it would get past 23(a)

19   commonalty; but if it does squeak past that, it's going to come

20   up short with 23(b), the predominance.  So I don't see this as

21   a class action.  I'm going to exercise my opportunity to rule

22   on that.  I'll do it in writing so that the parties have an

23   opportunity to appeal if an appeal is necessary.

24           Okay, let's go to the specifics, then, of the

25   motions.  But beforehand, before that, I received on Friday an

OFFICIAL TRANSCRIPT

1  amended pleading by the plaintiffs, an affidavit with

2  Mr. Pierre.  Mr. Pierre, in his deposition, indicated that he

3  knew in 2015 that the house had drywall in it.  There was some

4  inspection at that time.  He had some difficulty with the

5  wiring, and that brought it to his attention.  And also, he had

6  a neighbor, one or more neighbors, who indicated that they had

7  Chinese drywall.  That's what he said in his deposition.

8         In the affidavit that was tendered to the Court a day

9  or so ago, he took the position that he didn't understand the

10  questions that were being asked and that he never knew that

11  there was Chinese drywall, had no reason to know that there was

12  Chinese drywall.  There's a motion to strike that affidavit.

13         Any comment on that?

14         MS. VEITH: Yes, there is comment, Your Honor, Rebekka

15  Veith.

16         So Mr. Pierre actually said in his deposition that he

17  knew as far back as 2010 that he had Chinese drywall in his

18  home.  And what he said was that the repairmen told him in 2010

19  that his fuses needed to be replaced because of the drywall.

20  More importantly, he said that he knew in 2011 that if you live

21  in a home with Chinese drywall, it can make you sick.  So as of

22  2011, he was aware that if you live in a home with Chinese

23  drywall you potentially have a claim for harm caused by that

24  drywall.

25         Then in his deposition, he explained not just that

OFFICIAL TRANSCRIPT

1   his neighbors were remediating their homes for Chinese drywall

2   in 2011, but also that when his neighbors were remediating

3   their homes, he got someone to check his home.  And it was at

4   that point that he discovered that he had Chinese drywall.

5          His affidavit which was filed on January 15th -- so

6   that was too late to file an opposition for this hearing, and

7   it was also after he had filed one opposition, and we had filed

8   a reply -- attaching an affidavit where for the first time on

9   January 15th, when we presented his deposition testimony to

10  him on November 25th, 2019, that he was confused in his

11  deposition.  And that although he did know that his neighbors

12  were remediating their homes for Chinese drywall, he was told

13  at the time that some Chinese drywall isn't harmful.

14         Now Mr. Pierre was questioned at length in his

15  deposition about when he discovered Chinese drywall, what he

16  knew about Chinese drywall, and what he knew about his

17  neighbors who were remediating their homes.  He talked about

18  his homeowners association which he's now saying his homeowners

19  association told him that not all Chinese drywall is harmful.

20  He never mentioned that once in his deposition.  So this is

21  just a classic sham affidavit.

22         I mean I think ultimately it's untimely.  Federal

23  Rule of Civil Procedure 6 does not allow you to file an

24  untimely opposition if you don't seek leave and if you don't

25  have an excuse for your neglect, and there's not even any

OFFICIAL TRANSCRIPT

1  excuse provided in this amended opposition, nor was there a
2  motion for leave filed.

3          But even if Mr. Pierre gets over that hurdle, he is
4  trying to use an affidavit to create a fact issue after he was
5  questioned at length in a deposition.  That is a classic
6  example of the type of sham affidavit that's not appropriate to
7  be considered on a motion for summary judgment.  So we filed a
8  motion to strike for those reasons, and we think that the
9  affidavit should be stricken.

10          THE COURT: Okay, Jimmy.

11          MR. DOYLE: Your Honor, the first thing I want to
12  point out is there was an order by this Court last week issued
13  on the 15th that gave a deadline for filing any oppositions
14  until Friday, January 17th at 5:00 p.m.  This amended
15  opposition to the motion for summary judgment was timely filed.

16          There were a couple of mistakes in the motion for
17  summary judgment, clearly some cut-and-paste errors when we
18  were putting it together.  But the substance of the motion is
19  essentially the same.  The only thing we did was we added an
20  affidavit that clarifies exactly what this gentleman
21  experienced, and I'm going to run through that real quick for
22  you.  It also attached an email that we've pulled from the
23  trial package discovery that we're going to use at trial that
24  shows the knowledge by Knauf as far back as 2006 regarding the
25  problem that they've caused that they did not bother to warn

OFFICIAL TRANSCRIPT

1  anybody about.

2          And I think central to the defense of Mr. Pierre's

3  claims and the opposition to Mr. Pierre's motion for summary

4  judgment is the interplay in Florida of the law that we laid

5  out.  And I want to quickly talk about how the pieces fit

6  together and are going to be applicable in all of these motions

7  for summary judgment and our responses.

8          In Florida, there is a post-sale duty to warn by the

9  defendants.  If they've got a defective product, they know it's

10  defective, they've got a duty to warn everybody either through

11  a product recall or specific warnings to those that they can

12  identify are being affected by their defective product.  We've

13  cited in every single one of these responses Knauf has not, at

14  any point since this very day, from today backwards to 2006,

15  they have never once issued a warning to anybody that they can

16  identify as being affected by their defective product.

17          And they know who their distributors are.  They could

18  have easily gotten a hold of the distributors' invoices or data

19  and issued warnings to those specific property owners letting

20  them know, "Hey, you might have our defective product.  Now we

21  did sell some that's not defective," and the Court is well

22  aware of that.  It's on the Court's website that there is some

23  Knauf board that is not defective.

24          And so we've also presented this issue of if you

25  don't warn these particular plaintiffs and you stay silent,

OFFICIAL TRANSCRIPT

1  there's specific case law in Florida that we've cited that says

2  you're equitably estopped from arguing that.  "Because I didn't

3  give you that warning and you should have been on notice

4  because of some other source," that's inappropriate.

5       If the defendants did not provide that warning or

6  that notice, they can't rely on the defendants -- or excuse me,

7  the plaintiffs' inability to produce certain documents that

8  would substantively support some of their damages claims.

9       THE COURT: At this stage, though -- and I hear you,

10  and I'll give you an opportunity to respond to that aspect.

11  But at this stage, I'm really just focused on the affidavit and

12  why was the affidavit filed a couple of days ago, why wasn't it

13  filed earlier, why wasn't it, and so forth.

14       MR. DOYLE: Well, because it became clear -- well, the

15  Court, first of all, gave us the opportunity to file any

16  substantive paperwork or additional opposition to the motions

17  for summary judgment; so we took advantage of that.

18       THE COURT: I wasn't aware of that, but I'll let them

19  argue.

20       MR. DOYLE: Your Honor, I'm reading specifically from

21  your order.  It's Document 22479 that says, "Plaintiffs file

22  any opposition motions that remain set for January 22nd by

23  Friday, January 17th, 2020, 5:00 p.m."  So we took advantage

24  of that ability to supplement because that's really all we did.

25  We clarified some of the issues, supplemented what Mr. Pierre

1  experienced; so the Court would have a clear understanding of
2  how there was some confusion and what he experienced --
3           THE COURT: Okay.
4           MR. DOYLE: -- leading up to his discovery of Chinese
5  drywall in 2015 or '16, whenever it occurred.
6           THE COURT: Okay.  Any response?
7           MS. VEITH: Just very briefly.  I believe as we
8  understood this Court's order, there were some motions that
9  were set for hearing today that no timely opposition had been
10  filed to.  So when Mr. Doyle sought a continuance of all the
11  motions, we responded and said there are some that we'd really
12  like to still be heard on this date, and we wouldn't oppose if
13  Mr. Doyle would file an opposition to those motions by
14  January 17th, 2020.  And so it was our understanding that it
15  was those motions to which Mr. Doyle was filing oppositions.

16           But I think that there's something that Mr. Doyle is
17  missing regardless, even if he had the chance to supplement.
18  We filed this motion for summary judgment on November 25th,
19  2019.  He filed his original opposition on January 8th, 2020.
20  He has not yet provided any reason why Mr. Pierre could not
21  have provided this declaration with that opposition.  But even
22  if he did provide that declaration with that opposition, it is
23  still an inappropriate sham affidavit that attempts to create a
24  genuine issue of fact where there is none.  So the affidavit
25  should be stricken for numerous reasons.

                    OFFICIAL TRANSCRIPT

1          THE COURT: Okay, I understand the issue.  It seems to

2     me that the deposition testimony is very clear.  I do think

3     that the question of whether or not you can file an affidavit

4     comes up, and it's come up in a couple of cases.  One is the

5     *Perma Research* case, and most recently is the *Doe* case where

6     the circuit says that you can't create a finding of fact simply

7     by filing an affidavit that purportedly draws back all of the

8     things that you said.  It's not like a 501 clawback

9     provision, that this is intentionally or unintentionally -- I

10    would assume it's unintentionally sham to try to pull back

11    something that the client said at the time.

12         I also think that if it's filed, it needed to be

13    filed at an earlier time.  And also, it would be appropriate to

14    have a motion from the Court allowing that.

15         With regard to that extension that the Court issued,

16    that had nothing to do with this particular case.  I wasn't

17    looking at this particular case.  It was because of the

18    plaintiffs asking for a continuance of other motions that that

19    was entered.  So I'm sorry plaintiff attorney misunderstood

20    that, but that's the way it was.  I'm going to grant the motion

21    to exclude the affidavit.

22         Let's go to the motions now, folks.  We've got a

23    number of them, and I appreciate both of you-all trying to kind

24    of group these.  As I say, I will see groupings of statute of

25    limitations, assumption of risk, the question of diminution of

OFFICIAL TRANSCRIPT

1  value and/or loss of use, whether you can recover both or

2  whether if one is applicable, the other one is not applicable,

3  and the question of failure to comply with pretrial orders.

4          MS. JOHNSON: Yes, Your Honor.  We're going to start

5  with the failure to comply with pretrial orders.  Specifically

6  this is in regards to plaintiff Vashti Alethia Locke-Esberry,

7  and we're moving this Court to dismiss her claims under Rule 37

8  or alternatively for other sanctions as this Court deems

9  appropriate.  Particularly, Ms. Locke-Esberry has not displayed

10  the requisite intent to pursue her claims under Federal Rule of

11  Civil Procedure 37.

12          THE COURT: Is that the lady who is divorced?

13          MS. JOHNSON: I'm not clear on whether she was

14  divorced or not.

15          THE COURT: Okay, all right.

16          MS. JOHNSON: Under Federal Rule of Civil Procedure

17  37, the Court can sanction a party for failure to participate

18  in discovery under either Rule 37(b) where a court can sanction

19  a party for failure to comply with a court order or under

20  Rule 37(d) where a court can sanction a party for failure to

21  attend a deposition or respond to a request for an inspection.

22  Defendants maintain that this Court could sanction plaintiff

23  under either subpart of Rule 37.

24          Notably, there was a court order governing

25  depositions.  The Amended Case Management Order which is

OFFICIAL TRANSCRIPT

1  Document 22359 stated that plaintiff depositions must be taken

2  by no later than December 31st, 2019 and goes on to state

3  that the Court may make any appropriate order under Rule 37 for

4  failure to comply with this deadline.

5        Additionally, the defendants noticed the deposition

6  of Locke-Esberry under Rule 30 on two separate occasions.

7  First, on July 26th, 2019, a notice was served for an

8  August 5th, 2019 deposition in Tampa, Florida.  Defendants

9  traveled to Tampa, Florida, arranged for a deposition location

10 and a court reporter, but Locke-Esberry did not appear.

11       Second on September 5th, 2019, the defendants again

12 served a notice of deposition and noticed the deposition for

13 September 18th, 2019 in Bethesda, Maryland at the request of

14 plaintiff.  Again, counsel for defendants arranged a deposition

15 location and court reporter and traveled to Bethesda.

16       Locke-Esberry and her counsel appeared for the

17 deposition, but unfortunately, her deposition could not

18 proceed.  Specifically, Locke-Esberry was not familiar with any

19 of her own documents and could not review them because she

20 forgot her prescription glasses.  Thus, defendants have been

21 unable to sufficiently depose Locke-Esberry.

22       Counsel's other factual arguments in their opposition

23 are unfounded and unsupported by the deposition transcripts or

24 any other evidence.  Notably, Counsel argues that defendants

25 chose to end the deposition after plaintiff temporarily

OFFICIAL TRANSCRIPT

1  suspended the deposition to purchase reading glasses at a local

2  pharmacy store.  However, the record is clear that plaintiff

3  was present when counsel for defendants ended the deposition as

4  her attorney informed her that the deposition was, in fact,

5  over only ten minutes after it had begun.

6          Nothing in the transcript, which is on the PowerPoint

7  above, indicates that plaintiff visited a pharmacy for glasses,

8  and counsel for defendants have no knowledge of plaintiff

9  having done so.  Accordingly, Locke-Esberry failed to comply

10  with this Court's order and defendants two Rule 30 notices

11  thereby justifying sanctions under Rule 37(b) and (d).

12          Additionally, plaintiffs failed to allow defendants

13  to inspect her property.  Counsel for defendants confirmed an

14  inspection for June 19, 2019.  Defendant's inspector went to

15  the property that day and waited for four hours, but at no

16  point did anyone appear to allow entry onto the property.

17          Subsequently, counsel for defendants contacted

18  plaintiff's counsel on July 12th, 2019 to reschedule.

19  Plaintiff's counsel requested an inspection date of

20  July 24th, 2019 which defendants confirmed.  And then

21  plaintiff's counsel canceled the inspection on July 23rd,

22  2019.  Therefore, defendants have thus been unable to inspect

23  Ms. Locke-Esberry's property.  Based on her failure to allow an

24  inspection and to be sufficiently deposed, plaintiff has

25  displayed a pattern of unwillingness to cooperate in the

OFFICIAL TRANSCRIPT

1   discovery process and has not displayed the requisite intent to

2   pursue her claims.

3          Finally, plaintiff's other arguments in her

4   opposition on the merits are not at issue here.  Plaintiff

5   argues that defendants Rule 37 discovery motion is a motion for

6   summary judgment.  However, it is simply a motion based on the

7   lack of compliance with discovery.  Accordingly, plaintiff's

8   arguments on the merits which span the majority of their

9   opposition from pages 6 to 16 are irrelevant.  However,

10  defendants reserve their right to address the merits of

11  plaintiff's claims should they come before the Court at a later

12  time.

13         THE COURT: Is that the only one for failure to comply

14  with the orders?

15         MS. JOHNSON: For today, yes.

16         MR. MILLER: For today.  Everything else is Rule 56.

17         THE COURT: All right, okay.  I'm not going to rule on

18  these at this time, but I'll take your comments.  So let me

19  here from you.

20         MR. DYSART: Clarification, Judge, there are some PTO

21  issues, but those relate to ARH's.  So we grouped them at a

22  later time.  So we think those are going to be addressed more

23  substantively with the motions for summary judgment.

24         MR. DOYLE: Your Honor, I'm going to just address

25  Locke-Esberry real quickly.  We did the research on this, and

OFFICIAL TRANSCRIPT

1  the Rule 37 motion is improper because defendants didn't follow

2  the typical, common practice for getting a Rule 37 order

3  dismissing a case.  Typically, you seek relief from the Court

4  through a motion to compel, and then the Court gives the

5  plaintiff a deadline, they don't comply, then the repercussion

6  is the case gets dismissed.

7          That's not what happened here.  What we have is a

8  lady that lives in Maryland.  That's where her deposition took

9  place, in Maryland, and I'll get to the deposition in a minute.

10  She lives in Maryland.  Her property is in Florida.  She has

11  renters or she had renters in the house.  And the inspection --

12  and really, there were a couple of instances where we had

13  miscommunications with plaintiffs or they failed to, you know.

14  120 or plus inspections, there are going to be some hiccups.

15          In this case, there was a scheduled inspection of the

16  home that we coordinated with the defendants' expert on a

17  particular day.  It turns out that the renter had to stay at

18  work longer than expected, and there were two young children in

19  the home.  That's why they didn't get access to the home.  The

20  children were instructed not to open the door.  They waited

21  outside.  Our office was in communication with the homeowner in

22  Maryland.  She was having difficulty getting in touch with the

23  adult renter; so that day kind of fell apart.

24          We tried to schedule it one other time, again, in

25  July of 2019.  This is all taking place in June and July of

OFFICIAL TRANSCRIPT

1    2019.  We tried to do it again.  The renter again wouldn't

2    cooperate fully; so we had to cancel that.  When we realized

3    they were going to make a trip and it was going to be the same

4    scenario again, so we said, hey, we'll try to revisit this at a

5    later date.  It turns out that the lease ended on a particular

6    day, I think it was August or September.

7         And you know, on a couple of occasions, we discussed

8    this particular plaintiff during our status conference on the

9    phone.  And the plaintiffs mentioned to you -- excuse me.  The

10   defendants mentioned to you at that time, rather than finish

11   discovery, they're just probably going to file a motion to

12   dismiss this case.  Well, there wasn't any reason for the

13   plaintiff to have her case dismissed because of that issue

14   regarding the inspection at that time in particular.

15        She complied with the requirement to do all the

16   discovery documents which shows a willingness to participate in

17   this litigation.  She filed her case.  She did the Plaintiff

18   Profile Form.  She did the Supplemental Plaintiff Profile Form.

19   She did the Plaintiff Fact Sheet, and she tried to coordinate

20   the inspection of the home.  It just didn't work out.  But

21   there was never an effort by the defendants to seek an

22   inspection of the home after that June or July occasion, second

23   occasion when we couldn't get it coordinated; even though it

24   was raised as an issue a couple of times with defense counsel

25   on a couple of occasions.

OFFICIAL TRANSCRIPT

1          Now with regard to the deposition which the plaintiff

2   also appeared at in Maryland, she shows up, and she lives an

3   hour and a half, two hours away is my understanding.  She lives

4   a long way away from the site of the deposition.  She showed up

5   without her reading glasses.  Counsel that's presenting the

6   argument in this case was the counsel at that deposition that

7   was deposing our plaintiff.  It became clear that she couldn't

8   read the documents.

9          And so this was a timely deposition.  It started on

10  time.  She appeared on time, but she didn't have her reading

11  glasses.  So it had to be suspended while she went down the

12  street to purchase reading glasses at one of the local

13  pharmacies.  During that time, because of the tight schedule

14  that the defendants had laid out because there was a deposition

15  to follow, she decided -- opposing counsel decided she didn't

16  want to move forward because she didn't have time.  She had

17  other obligations afterwards in that area that didn't involve

18  this litigation.

19         Now it's their deposition, and it's their seven hours

20  under the rules that they can take this deposition on that

21  particular date.  It's not the plaintiff's place and it's not

22  our deposition to cancel or suspend or postpone.  Once it

23  starts, it's their deposition; and if they suspend it, that's

24  their choice.  If they decide to end it that day and not pick

25  it up at a later date, that's their choice.  Our position is

OFFICIAL TRANSCRIPT

 1  they've waived their ability to seek a second deposition now
 2  that discovery has ended.
 3          And filing this motion rather than seeking a motion
 4  to compel, which is the proper way to do things under the
 5  Federal Rules of Civil Procedure, our position is they've
 6  waived their ability to do either the inspection or the
 7  deposition.  But nothing in the record demonstrates that the
 8  plaintiff did not wish to participate in this litigation at
 9  all.  And her timely attendance and willingness to answer
10  questions is without question.
11          But I think there's an omission in the motion for
12  dismissal based on Rule 37 here that we believe, because of all
13  the attachments, is a motion for summary judgment and should be
14  treated as such with all inferences in a light most favorable
15  to the plaintiff, that we believe this particular motion should
16  be denied.
17          THE COURT: Okay, all right.  Is there any response?
18          MS. JOHNSON: Yes, Your Honor, just very quickly.  Not
19  to play he-said-she-said, counsel presenting his argument today
20  was not present in Bethesda, Maryland on the day that this
21  deposition was scheduled.  Accordingly, I can't verify that
22  what he says is factual at all, and in fact, is not what
23  happened.
24          I think the transcript speaks for itself here.  The
25  deposition started at 10:37 a.m.  Plaintiff was late.  And it

OFFICIAL TRANSCRIPT

1  ended at 10:47 a.m. only ten minutes after it had begun after
2  just a brief recess which you can see reflected here wherein
3  Ms. Locke-Esberry attempted to use the glasses of her counsel
4  at the time to read the documents and confirmed that she could
5  not, and we went on the record to then end the deposition.

6          THE COURT: Okay, all right.  As I say, I'm going to
7  take what you-all tell me, and again, look at this a little
8  more closely.

9          Let me just say just generally about the pretrial
10  orders.  In the MDL world, the concept of order and efficiency
11  is the whole purpose of the MDL.  You get these cases -- in
12  this particular case, I have had about 24,000 individual
13  claimants which is not necessarily unusual for a large MDL.
14  What was unusual in this particular case is that I had 1,000
15  defendants in this particular case.  I had 1400 lawyers in the
16  case.  So you're dealing with a large segment of the bar.
17  You're dealing with a large number of plaintiffs, a large
18  number of defendants.  And your job is to try to coordinate
19  this massive litigation.

20          You do that by establishing some game plan, some
21  roadmap.  You put it out in pretrial orders, and it's
22  necessary, in a case of this sort, that the pretrial orders be
23  followed because it's -- if there's no roadmap, people go all
24  over the place.  If there's no pretrial orders or the pretrial
25  orders are not enforced, the whole litigation becomes just a

OFFICIAL TRANSCRIPT

1    total chaos and dark night.  It can't be handled without these
2    roadmaps, pretrial orders, and the enforcement of it.

3            So I do take it seriously in other cases, but I take
4    it very seriously in the MDLs because without some pretrial
5    orders specifying rules so that everybody knows up front what
6    the rules are and the goal is, and if I don't enforce them,
7    then there's no sense of putting them in place.  So I do take
8    this as a serious matter.  And therefore, I'll think about it,
9    with what both of you-all have said to me; and I'll be ruling
10   on it shortly.

11           What's the other category that you-all were talking
12   about?

13           MR. MILLER: Yeah, the next category we go to, Your
14   Honor -- I'm assuming on the Wicler Pierre issue on the motion
15   to strike, you heard enough of the substance?

16           THE COURT: Yeah.

17           MR. MILLER: We'll pass that one.

18           So the next category we go to, Your Honor, pertains
19   to Rule 56 motions in which the property or the properties were
20   already released under the Knauf Class Action Settlement.  And
21   those would be two cases, Your Honor, the Clayton and Debra
22   Thomas case and the Kurt and Suzanne Tolliver case.  And so
23   we'll make argument on the specifics.

24           THE COURT: In this particular matter, there were two
25   groups basically of manufacturers.  One is the Knauf group, and

OFFICIAL TRANSCRIPT

1  the other is the Taishan group.  The Knauf group was able to be
2  worked out relatively quickly, and that was done after a
3  number -- a trial or so.  And the parties then monetized the
4  scope of the remediation that came out of those trials, and the
5  case was eventually settled.

6          After the settlement of that particular case,
7  subsequent claimants began filing suits, taking the position
8  that they too had a claim.  It wasn't part of the settlement.
9  The question that's posed in some of these cases is that some
10 of the people sold their homes and settled with Knauf; and now
11 the home is owned often by someone else, and that someone else
12 has filed a claim.  So we'll see what this is.

13          MR. DOYLE: Your Honor, I think I can short-circuit
14 this.  On the Thomases, we didn't file an opposition.  I think
15 this one is due to be -- summary judgment should be granted.

16          THE COURT: Yeah, it just seems to me that if a person
17 is -- if the other owner wishes to proceed, they could or may
18 or should proceed against the former owner as opposed to Knauf.

19          MR. DOYLE: Right.

20          THE COURT: Knauf is out of it.

21          MR. DOYLE: Your Honor, in this case, the case of the
22 Thomases, Defense Counsel provided us with evidence that the
23 previous owner had settled and received benefits from the
24 settlement on the day of the deposition.  So they didn't give
25 it to us ahead of time.  But we got it, and it confirms that

OFFICIAL TRANSCRIPT

1  the Thomases should have their claim dismissed.

2          MS. VEITH: Just so the record is abundantly clear,

3  it's actually that the former owners themselves were denied a

4  settlement.  So they didn't even get a settlement.

5          THE COURT: Okay.

6          MR. DYSART: Good morning.  I'm not sure I made an

7  appearance, Danny Dysart on behalf of the Knauf defendants.

8          Kurt and Suzanne Tolliver, it's the same issue.  The

9  prior owners filed a Knauf claim against the settlement.  They

10 filed GBI claims.  They obtained GBI benefits through

11 BrownGreer which we've attached to the summary judgment motion.

12 When they filed their Knauf claim, there's no evidence that we

13 were able to find of them obtaining benefits in terms of them

14 submitting the additional required information to get a claim.

15         So whether the claim was denied like Thomas or

16 whether they just didn't comply to get the benefits through the

17 Knauf claim, they're still a class member to the Knauf Class

18 Settlement Agreement, and therefore, they're still subject to

19 the same class release with respect to that property and any

20 subsequent owners of that property.  Therefore, just like

21 Thomas, Tolliver is barred from a claim.

22         In addition to that, and I don't want to get ahead of

23 myself because there are other cases that have assumption of

24 risk, but Tolliver was on notice of this.  Prior to even

25 purchasing the property, they were given information in the

OFFICIAL TRANSCRIPT

1   appraisal report that the former property had Chinese drywall,

2   was involved in litigation, and that the owner had done some

3   type of remediation or some type of work pursuant to that

4   agreement.

5           They didn't do any inspection.  They didn't do

6   anything in terms of investigating as to whether the house

7   still did or did not have Chinese drywall.  And so for that

8   additional reason, the claim is also barred.

9           But first and foremost, there's no difference in this

10  claim between Tolliver and Thomas in terms of being barred by

11  the prior class settlement.

12          THE COURT: Jimmy, any comments on Tolliver?

13          MR. DOYLE: Yeah.  Your Honor, this one is different,

14  significantly different than the Thomases.  Thomas, there was

15  some evidence that they -- the prior owner had settled, filed

16  or had signed a release, received some benefits.  So that's why

17  that one, we agree that one probably needs to go away.

18          But with regard to Tolliver, you can see that one of

19  the exhibits that I filed in the opposition was a request to

20  Defense Counsel to produce a release.  Show me a release.  Show

21  me some evidence that the original owner received some

22  benefits, that shows not just that they filed a claim.  Because

23  the house ultimately was foreclosed at some point.

24          But if they filed a claim, that doesn't necessarily

25  bar any subsequent homeowner who doesn't have any knowledge

OFFICIAL TRANSCRIPT

1  about the filing by that particular individual who loses the
2  house to foreclosure, and it may change hands a couple of times
3  with no notice to anybody.  The way that these foreclosure
4  sales work is that they're sold as is.  There's no disclosure
5  by anybody at any time.  Banks, in particular, don't have any
6  disclosure requirements, and we've been addressing this for
7  years, you know, with plaintiffs to evaluate whether or not
8  they have a valid and viable claim.

9        And where there is no disclosure, in Florida in
10  particular, because it's a latent defect and there has been no
11  warning by the defendants, they're not required under Florida
12  law to search for a latent defect, and that's exactly what
13  we've got here.  They don't have any notice that there was a
14  previous owner who had filed a claim in some lawsuit that ended
15  up in MDL 2047 three states away.  There's just nothing in the
16  record that would or in any disclosure that would put them on
17  notice.

18        So because of the latency of the defect and under
19  Florida law, they're not required -- and we've provided the
20  case law that is directly on point.  They're not required to
21  search for the latent defect.  And with regard to the
22  Tollivers, I think there's an issue with both of them because
23  they were moving from Michigan to Florida.  The only time they
24  came to Florida to look for property was just before they
25  purchased this one.

OFFICIAL TRANSCRIPT

1          Again, there's no product recall.  There's no warning

2     out there that they could find.  And I think their declarations

3     speak directly to their lack of knowledge or conflicting

4     information they found on the Internet just prior to the sale.

5     Chinese drywall didn't mean anything to them.  And so without

6     the defendants taking the steps that they have a duty to take,

7     they can't now rely on some other source, and it can't be a

8     settlement in a lawsuit that puts some subsequent homeowner on

9     notice.  It can't be, you know, somebody that wrote an article

10    on the Internet about how Chinese drywall is affecting

11    homeowners in a particular community.

12          That doesn't alleviate their duty.  And they have

13    that specific duty to all homeowners, in this case potential

14    purchasers, because that's what the Tollivers were when they

15    first heard of Chinese drywall just prior to the closing.

16    Nobody bothered to disclose to them what it meant, how it would

17    impact the home, or anything of that nature.

18          So I think it's a genuine issue of material fact

19    whether or not their actions were reasonable in purchasing that

20    house, and I think that's what we've raised in our brief, and I

21    think it's applicable here.  The Tollivers are not precluded

22    because of the registration by a previous homeowner.

23          But again, like I said, and if you look at the email

24    to Kerry, to Mr. Miller, I asked him, "Hey, produce the

25    release.  Give me some evidence that they actually settled it."

1   And then we'll take a real close look at it and treat it

2   probably like other plaintiffs and agree that it shouldn't move

3   forward.  But if you can't produce that, then it's not

4   precluded in our opinion.

5           THE COURT: Okay.

6           MR. DYSART: First, Judge, in terms of the prior class

7   settlement, the Cowarts were denied class benefits from the

8   Knauf settlement program because you found on a Record Doc

9   20934 that when they purchase property as is and without

10  disclosures, they took a calculated risk in 2011 when they

11  purchased that property, and therefore, they were denied

12  settlement benefits under the terms of the Knauf Class

13  Settlement Agreement.  So there was no release with respect to

14  the Cowart settlement.

15          The only release that really applied is the class

16  release which is the same for Cowart as it was for Mr. Andrew

17  Williams, the prior owner for Kurt and Suzanne Tolliver.

18  Andrew Williams filed a remediation claim for Knauf, and

19  otherwise, did not receive benefits because he didn't submit

20  the required documentation to go through Option 1, Option 2,

21  Option 3, and the things that Your Honor has dealt with over

22  the past years.

23          Pursuant to Section 5.1.2.6 of the class settlement,

24  released claims include, "For any right legally assertible by

25  the class or any participating class member now or in the

OFFICIAL TRANSCRIPT

1   future, whether the claim is personal to each individual,

2   derivative of a claim now or in the future, or as assignee,

3   successor, survivor, legatee, beneficiary, subrogee, or

4   representative of a participating class member."

5           So the class settlement took that property.  When

6   that property was settled, it applied to Andrew Williams just

7   as it applied to the Tollivers and the same for Cowart as it

8   did for Debra Thomas.  There's no difference between them.

9           In terms of the other arguments that Counsel made in

10  terms of the assumption of risk and the notice and the

11  post-sale duty to warn, Mr. Miller is going to address those in

12  the larger concept of the statute of limitations.

13          But in terms of Tolliver, they were on notice.  They

14  had an appraisal done on the property.  They signed where the

15  prior remediation company had indicated that work was done

16  pursuant to Chinese drywall.  And those are at Record Doc Nos.

17  22447-2, page 26, 29, and 46.

18          And again, in terms of -- just stepping back, I

19  forgot to mention this, Judge, that we've attached all the

20  documents that we received from BrownGreer in terms of what is

21  on the portal for the prior owner.  That's at 22447-4 at 1 and

22  2 indicates the GBI payments received by the prior owner.  And

23  at page 369 of that document, it indicates the Knauf

24  remediation claim that was originally filed by the

25  administrator.

OFFICIAL TRANSCRIPT

1          MR. DOYLE: Your Honor, if I can, I got one other

2     point I want to make.

3          THE COURT: Sure.

4          MR. DOYLE: It was raised here, and I think it's

5     important to this issue, and again, in some of the other

6     claims.  But Counsel touched on the Tollivers, you know,

7     because of some other order with some other plaintiff, somehow

8     that is applicable here because of the assumption of the risk.

9     We provided the case law for Florida, and I want to just point

10    this out specifically about assumption of the risk.

11         And in Florida, this is how the Supreme Court there

12    has viewed assumption of the risk.  "For express assumption of

13    risk to be valid, whether it arises from a contract or from

14    voluntary participation in an activity, it must be clear that

15    the plaintiff understood that he or she was assuming the risk

16    of the particular conduct by the defendant which causes his

17    injuries."  If there's not any proper disclosure, any proper

18    warning, any product recall or anything of the like, they're

19    not on notice, and it's not available to the plaintiffs or the

20    potential purchasers at the time.  They just simply cannot

21    assume any risk.

22         And so under Florida law, at least, assumption of the

23    risk is just not appropriate, you know, not an appropriate

24    defense or grounds for a summary judgment unless there is

25    something in the documentation that shows they assumed a

OFFICIAL TRANSCRIPT

1   particular risk and appreciated it.

2           THE COURT: That's pretty standard in a lot of other

3   states.  We see that in the ball park cases where somebody

4   assumes the risk of getting hit by a ball, but they don't

5   assume the risk of getting hit by a bat.  And that's where the

6   concept really started coming out.  I understand that issue.

7           Okay.  Why don't we take a five-minute break here,

8   and we'll come back and deal with all the rest of them.

9           MR. MILLER: Okay, Judge, thanks.

10          DEPUTY CLERK: All rise.

11              (A short recess was taken.)

12          THE COURT: Be seated, please.

13          What's the next category that we'll be talking about?

14          MR. MILLER: Yeah, good morning, Your Honor.  Kerry

15  Miller again.

16          THE COURT: Statute of limitations?

17          MR. MILLER: Actually, no.  It's what we call no

18  evidence of causation or damages.

19          THE COURT: Got it.

20          MR. MILLER: And there are four that fall under this

21  category.  As Your Honor remarked earlier in the day, you know,

22  in this particular case, given where we're at from a trial

23  perspective, we'd probably be able to deal with product ID and

24  defects, liability pretty easily.

25          But as Your Honor knows, a trial is a spectrum, a

                        OFFICIAL TRANSCRIPT

1   full spectrum.  After you get past liability, you go to

2   causation, and after you go to causation, you go to damages.

3   And during discovery, you do discovery on everything:

4   Liability, causation, and damages.

5           Your Honor, and what we found out for these next four

6   claims is that when we took these individual's depositions,

7   they gave us no discovery, no information on causation and

8   damages.  So while they may be able to prove product defect,

9   while they may be able to prove product ID, that doesn't get

10  you anything.  You have to complete the spectrum and prove

11  causation and damages, and there's no evidence to support that

12  in these cases.

13          So the first one that falls under that category, Your

14  Honor, is the claim of John and Rebecca Judge, and the record

15  docs are set forth here and are on the agenda we sent to Anais.

16  They appear in the Fifth Amended Complaint filed by Mr. Doyle.

17          Just sort of factually, here's the way that they came

18  to be involved in the case.  In 2014 or 2015, Mr. and

19  Mrs. Judge go through a divorce.  In February or March of 2015,

20  the divorce decree is finalized.  Mr. Judge gets the home.

21  Mrs. Judge does not get any home.  She is now dispossessed of

22  her ownership interest in the home.  Mr. Judge then decides

23  later on in 2015 to move in with a girlfriend, and that's what

24  caused him to put his house on the market for sale.  He

25  discovers Chinese drywall in his home in July of 2015 in

OFFICIAL TRANSCRIPT

1  connection with listing his home for sale.

2          However, Your Honor, at that point in time, the wife,

3  five or six months before, had been the subject of a divorce

4  decree in which she had no ownership interest in the home.  At

5  the time the claim accrued, it accrued when the house was

6  listed in July, and she had no ownership interest.  She's got

7  no claim in it.  Despite that fact, Your Honor, she did appear

8  in a complaint.  We sent her a notice of deposition.  She never

9  appeared.

10          So we would ask that Rebecca Judge's claim be

11  dismissed for the reasons we just set forth.  She didn't appear

12  at her deposition, and at the time of accrual, she no longer

13  had an ownership interest in the house.

14          With respect to Mr. Judge, Your Honor, so he does get

15  the home in the divorce decree in early 2015, and he makes

16  three different claims for damage.  He's not a remediation guy.

17  He's not an ARH guy.  But what happened to him was he ended up

18  selling his house in a short sale.  And here are the

19  circumstances, Your Honor.  So he's got a claim for diminution

20  in value, No. 1.  He's got a claim for loss of use, No. 2.  And

21  he's got a claim for damage to personal property, No. 3.  Those

22  are his three claims, but he offered us no proof of causation

23  of damages as to any one of those.

24          He has no loss of use, Your Honor, because he had

25  already moved out of the house prior to realizing that the

OFFICIAL TRANSCRIPT

1  house had Chinese drywall.  So he was never deprived of use and
2  enjoyment while he lived in the house because while he lived in
3  the house he didn't know and he was not impacted by Chinese
4  drywall.  It was only after he moved out to move in with a
5  girlfriend that he realized by way of an inspection that the
6  home contained Chinese drywall.  So you don't have any loss of
7  use in that situation.

8         He then claims he suffered diminution in value by
9  virtue of the fact that the home was sold by way of short sale.
10 So when I took his deposition, I asked him sort of the basic
11 questions, trying to identify what that loss in value was, what
12 that diminution was.

13        So I say, "Sir, do you recall the amount of the short
14 sale?"

15        "No."

16        "Do you recall the amount of the mortgage that was
17 outstanding at the time of the short sale?"

18        "No."

19        With respect to a lost sale, I mean that's what he
20 claims the loss was, he was going to sell it in the summer of
21 2015.  There was an inspection.  He loses the sale.  Then he
22 had to do a short sale back to Wells Fargo.

23        I say, "Okay, with respect to the lost sale of the
24 home, with respect to the purchaser, what was the contract
25 amount of that prospective sale; do you recall?"

OFFICIAL TRANSCRIPT

1           "I do not recall."

2           So we don't have any of the information that sets

3    forth what the diminution value could possibly be.  On that

4    basis, Your Honor, now that we're at the close of discovery,

5    that's a factual issue.  That claim should be dismissed.

6           Lastly, Your Honor, on the issue of personal property

7    which is his last claim for damages, he confirmed he incurred

8    no personal property damage.  There was some information in the

9    fact sheet where he gave some itemizations of various personal

10   properties in his house, but I confirmed that these were

11   estimates that he himself had come up with.  He had no

12   receipts, and he incurred no actual damages themselves.  So

13   that's the story with Judge, Your Honor.

14          We'll go to Blevins next.

15          Oh, finally, Your Honor, when the house was sold by

16   way of short sale, Mr. Judge didn't reserve any claims.  He

17   sold all rights, title, and interest to the home.

18          MR. DOYLE: Your Honor, how are we going to do this?

19          THE COURT: Yeah, why don't you discuss with me the

20   Judge issues here.

21          MR. DOYLE: Yeah.  Your Honor, what they're --

22          THE COURT: Is there any issue on the wife?

23          MR. DOYLE: No, there's no issue on the wife.  She can

24   be dismissed.  I don't have any problem with that.

25          THE COURT: Yeah, yeah.

OFFICIAL TRANSCRIPT

1          MR. DOYLE: I think they're right.

2          THE COURT: Yeah.

3          MR. DOYLE: And there are a couple of others that are

4   outside of these proceedings that we probably need to group

5   together and dismiss one way or another.

6          THE COURT: Yeah.

7          MR. DOYLE: In these motions for summary judgment,

8   it's an interesting tactic that the defendants are taking, Your

9   Honor.  As you're well aware, they're going to stipulate to

10  liability in the case.  We can prove product ID in 100 percent

11  of these plaintiffs' cases; so that's not an issue.  We're now

12  trying to figure out what the damages are.

13          But in all of these motions for summary judgment,

14  even though we haven't resolved the issue of remediation

15  damages which is applicable in all of them with the exception

16  of, you know, Judge and a couple of others where they, you

17  know, were forced into a short sale because there was a threat

18  of foreclosure, and that's what happened with Judge.

19          He wanted to sell the home.  And during that, in the

20  course of that attempted sale, a buyer noticed, you know, the

21  signs of Chinese drywall; so they withdrew the offer.  And then

22  over the course of several months, the bank became involved and

23  said, "Listen, you need to get this thing sold," because he

24  couldn't pay for two houses.  So he needed to get the house

25  sold.  They said, "Listen, rather than do a deed in lieu of

OFFICIAL TRANSCRIPT

1  foreclosure, why don't we work on getting somebody to purchase
2  it through a short sale," which is what ultimately happened.
3  So there is a claim for that lost equity.

4        But there's also the issue of this diminution in
5  value that plays into a lot of the calculation of damages in
6  Florida because there's a restoration value and then there's a
7  diminution in value.  And the Florida law requires
8  consideration of both because there's a limitation on what can
9  be paid when you compare the diminution value and the
10 restoration value.  That's why diminution value is something
11 that we're going to need to address at trial and present as
12 part of the damages.

13       Mr. Judge is not a home appraiser.  He doesn't have
14 any knowledge about how to value a home.  So you know, what
15 we're going to have to do when we get to trial to prove the
16 diminution in value, because we can figure out what the sale
17 price was and we know what he purchased it for, we're going to
18 show the diminution in value.  We'll show the restoration
19 costs, and somehow we can figure out damages in his case based
20 on those two figures.

21       And so that's the reason that we have an issue
22 regarding the restoration value which is the remediation value,
23 you know, and the Court's been on record about how to calculate
24 that.  And we've cited the -- I think it was the Taishan
25 opinion where the Court laid out exactly how to calculate based

OFFICIAL TRANSCRIPT

1  on RS Means and the location value, and we can use that as a
2  presumptive restoration value.

3          Now comparing that to the diminution in value also is
4  going to be part of what we're going to need to present to a
5  jury.  But those are genuine issues of material fact upon which
6  this Court has a basis to deny this summary judgment motion.
7  This is something that needs to go forward, have a jury decide,
8  a trier of fact.  So that's why --

9          THE COURT: The problem is, though, that during the
10 discovery process in a case of this sort the other side has a
11 right to say, well, what are you claiming, what's the basis of
12 your claim, what's the proof that you have a claim.  And that's
13 what's required under the pretrial orders.  That you can't all
14 of a sudden at trial come up with something that you didn't
15 give any evidence of, you didn't give any idea of.

16         The pretrial order is one of the -- is an example.
17 Even before the pretrial order, you're required to list the
18 witnesses.  Well, you can't come up with a witness that you
19 didn't list because both sides have an opportunity to know what
20 the other side's approach is going to be.

21         MR. DOYLE: That's right.

22         THE COURT: And that's the problem that we're dealing
23 with, Jimmy.  I'm not saying that at trial, but before trial,
24 you have some responsibility and obligation to present these
25 materials.  And I don't see any, or at least, that's what the

OFFICIAL TRANSCRIPT

1  defendants take the position of.

2        MR. DOYLE: Your Honor, what we've done in this

3  discovery process is respond to all questions in the form of

4  three discovery documents.  It wasn't the standard

5  interrogatories, request for production, request for

6  admissions.  None of that was done here.  There were three

7  discovery documents, and we responded fully to all three of

8  those documents and provided whatever the plaintiffs had in

9  their possession.

10        There's no hiding the ball here, Your Honor.  If they

11  had them in their possession, we produced it.  But there are --

12  we're not required at this point to answer questions that

13  aren't asked, and so we're not at the pretrial stage.  We

14  haven't gone to any motions in limine.  We haven't had to

15  declare the witness list.  That's when a lot of this is going

16  to be clear.

17        But in order to make it to trial, all this Court

18  needs to find is there is a genuine issue of material fact.

19  And in the responses to the discovery documents, plaintiffs

20  have asserted their position.  This is what the damages are.

21  This is what the basis of the damages is, and the defendants

22  are well aware of it.  They got clarification on the record

23  that they do or they don't have certain documents.  They are or

24  they're not making certain claims.  So it's clear what the

25  plaintiffs' position is.

OFFICIAL TRANSCRIPT

1        Now they may not like, you know, the supporting, the
2   documentation in support of certain claims, but that doesn't
3   mean all claims are to be dismissed.  If there's a single
4   genuine issue of material fact, summary judgment is due to be
5   denied.  In this case, we have genuine issues of material fact
6   that would allow this case to move forward to trial where we
7   can address all of these issues in limine.
8        THE COURT: I understand that's your position.
9        MR. MILLER: Your Honor, real quick.  You know my
10  mentor George Frilot.  He lamented the fact that in 1966 the
11  Federal Rules of Civil Procedure were amended to outlaw trial
12  by ambush.  George liked trial by ambush.  That's the way he
13  was trained.  That's the way he liked to function.
14       But the fact of the matter is, Your Honor, I mean
15  I've tried cases in this court, state court, other state's
16  courts.  These are pecuniary damage claims.  These are actual
17  damage claims.  We're not dealing with mental anguish and pain
18  and suffering, non-pecuniary damages, where Mr. Doyle would be
19  right.  You can't ask a plaintiff, "Quantify your pain and
20  suffering for me.  Is it worth $10,000 or $500,000?"  That is
21  for the jury.  But what we're talking about in these cases are
22  pecuniary damages.
23       And so, Your Honor, on the issue of Mr. Judge, the
24  reason why -- what's the input for the Elmo?
25       The reason why I went to his deposition and asked him

OFFICIAL TRANSCRIPT

1  the questions that I did is because this is the Profile Form in

2  the case.  On the issue of loss of use, I say, "If you

3  experienced loss of use or loss of enjoyment of the property,

4  what's the amount?"  The lawyer fills in $175,000.

5          Well, "Attach the documentation to support the total

6  amount of the claim."  Well, there was no documentation.

7          So I go to his deposition, and I said, "Tell me how

8  you got this number."

9          He says, "I don't know."

10         The next question, "If you claim diminution in value

11 as a result of Chinese drywall, identify the total amount of

12 such diminution of value being claimed."  Well, the lawyer

13 fills in $160,000.

14         I go to his deposition, and that was the transcript I

15 was showing you.  "How do you get there?  What was the sale

16 amount?  What was the mortgage amount?  What did you owe on the

17 home?"

18         He says, "I don't know.  I don't know.  I don't

19 know."

20         I still don't know.  These are hard damages, Your

21 Honor.  This is not pain and suffering.  This is something

22 that's supposed to be presented during discovery.  So we're

23 going to go to trial by ambush.  "I find a number.  Here it is,

24 jury."  That's not fair.  So that's what we're dealing with,

25 Your Honor.

OFFICIAL TRANSCRIPT

1          THE COURT: Yeah, in these cases too, with the MDL,
2     it's handled a little different than the regular case.  The
3     regular case, they use a discovery device that we all know
4     about, interrogatories.  The problem with interrogatories is
5     that they're questions asked by a lawyer, and they're questions
6     that are answered by a lawyer.  So two lawyers ask the
7     questions and answer the questions.

8          And the lawyer who asks the questions wants to know
9     everything from the time the world began, and the person who
10    answers the interrogatory doesn't want to give any information.
11    So this concept becomes just pregnant with motions.  So there
12    are motions that are filed, interrogatories, vagueness.
13    There's motions that are generated.  When you're dealing with
14    thousands and thousands of cases, this device is not helpful.

15         And so in place of interrogatories, this Court uses
16    profile or fact questions that each side delivers to the other.
17    And it is specific, and the questions are answered.  And if
18    they're not answered, the Court then rules the party into court
19    to show cause why that case should not be dismissed because
20    it's necessary for them to be answered.  And that is important
21    so that each side knows what the specific items are the other
22    side is claiming.

23         Here we are at this point, and I understand each
24    side's position.  Let's go to the other, the next case.

25         MR. DODSON: Good morning, Your Honor, Mike Dodson on

OFFICIAL TRANSCRIPT

1  behalf of the defendants.

2          This particular plaintiff James Blevins testified

3  that he moved up to South Carolina independently of Chinese

4  drywall.  He said that he and his new wife decided to go up

5  there because they really liked South Carolina.  Her cousin

6  lived up there, and so they just decided to move.

7          The evidentiary submission that he provided is all

8  about expenses to move up to South Carolina, the Kampgrounds of

9  America where he parked his RV, all the expenses he had with

10  the Keowee Key Property Owners Association, for eating dinner,

11  all the Duke Energy electric bills, everything for

12  South Carolina.  So Your Honor, just on the South Carolina

13  information alone, there's definite causation issues.

14          The damages associated with South Carolina were --

15  the alleged damages incurred in connection with South Carolina

16  were incurred totally independently of Chinese drywall.

17  There's no causation.

18          Then the question became what are you claiming with

19  respect to Florida.  I asked him about his mortgage, his

20  utility bills in Florida.  I even asked him what the expenses

21  were to keep the pool running.  And he said, "I'm not making

22  any claims for that old house.  Apparently, I will."

23          And then I asked him, "Do have your mortgage

24  statements?  Do you have your credit card statements, anything

25  like that?"

OFFICIAL TRANSCRIPT

 1          He said, "Yes, sir, I do, and I will provide those."
 2    None of that information has been provided.  Therefore, with
 3    respect to the Florida amounts, to the extent there was ever
 4    any claim for those amounts, there's been no evidence provided
 5    to support those claims.
 6          He also includes a diminution claim.  His sole
 7    support for diminution is that he called the property assessor
 8    or the tax assessor in the county where his property is.  And
 9    he said, "I've got Chinese drywall."  They lowered it to zero
10    dollars.  There's no competent evidence of actual diminution of
11    value of the property.
12          Then the other claim that he has is for loss of use.
13    The only evidence on the record that he provided us the
14    calculation of loss of use is the formula of $25,000 that his
15    attorney provided to him.  He amended it for some reason to
16    $24,000 per year at the deposition, but he just said it was a
17    formula.
18          Finally, the personal property items, he said that
19    with respect to the vast majority of them, they were based on
20    his experience as a, quote, jack of all trades.  But even as
21    plaintiffs assert in their brief, he's not got any expertise in
22    construction.  These were all just conjectural itemization
23    amounts that he provided at his deposition.
24          So as to all of his claimed damages amounts, Your
25    Honor, there's either no causation, or they're not supported by

1   competent summary judgment evidence.

2           THE COURT: The question of whether or not to dismiss

3   it on this at this level is an issue, may be an issue.  The

4   question of trial may be another, but he's at least given you

5   his estimate.  Whether you agree with it or disagree with it,

6   that's an issue.

7           The plaintiff takes the position that he's done the

8   best he can.  He's given you estimates, and you don't like the

9   estimates, but that's something that the jury is going to

10  decide.  That's his position.

11          MR. DOYLE: This is another instance, Your Honor,

12  where we have a genuine issue of material fact on the

13  remediation damages.  Plaintiffs have put forward what their

14  damages are and what we intend to seek at trial.  We disclosed

15  experts, given expert reports.  It's clear exactly what the

16  remediation damages are based on the Court's guidance on how to

17  calculate it.  Our expert has done exactly that.  They have not

18  stipulated to those damages.  That's our genuine issue.

19          Now these other issues, the non-pecuniary nature of

20  the loss of use and enjoyment is something for the trier of

21  fact.  I think it's clear under Florida law.  We've given a

22  couple of cases that are analogous.  It's a genuine issue of

23  material fact whether or not the jury believes that their loss

24  of use of the house or the money or having fear about, you

25  know, the way that their future is going to be impacted by the

OFFICIAL TRANSCRIPT

1   Chinese drywall are all issues that the trier of fact should --

2           THE COURT: What's your position on the South Carolina

3   expenses?

4           MR. DOYLE: Your Honor, after they find out that they

5   have Chinese drywall, alternative living expenses is a

6   component of damages.  They can't go back and live in their

7   house because they fear that the gases that they now know about

8   are going to impact their lives in any way.  That's something

9   for a jury to consider in their loss of use and enjoyment.

10  It's also alternative living expenses.  They're not required --

11  they didn't create this problem.  They're just having to deal

12  with it.

13          I think, you know, the way that courts have dealt

14  with this over the years is you've got to take the plaintiff as

15  they are.  You know, the plaintiff, maybe they wanted to spend

16  significant time in South Carolina.  Maybe they wanted to spend

17  time in Florida.  But it's the plaintiffs' prerogative where

18  they live.  If they're precluded or at least in their mind

19  they're fearful about the property's condition because of the

20  defective product that you've identified through the product ID

21  process, I don't think there's any dispute that the product is

22  there, you know, and we have issues on this material fact.

23          THE COURT: Okay, I understand.  Let's go to the next

24  one.

25          MR. DOYLE: Thank you, Your Honor.


                        OFFICIAL TRANSCRIPT

```
 1              THE COURT: The next category or subject?
 2              MR. MILLER: We got two more in this category, Judge.
 3              THE COURT: All right.
 4              MR. MILLER: I think Danny is doing them.
 5              MR. DYSART: Judge, I'm not going to rehash the same
 6    argument as co-counsel, but I'll address a couple of things to
 7    fill in.  With respect to Kendall and A&B Real Estate,
 8    Dr. Kendall is the trustee or the representative for the actual
 9    owner of the property A&B Real Estate which is a real estate
10    company that owns hundreds of properties in South Florida.
11    It's a trust.
12              First, in opposition, plaintiffs' counsel raises a
13    diminution in value claim.  In the Supplemental Plaintiff
14    Profile Form and Plaintiff Fact Sheet, the plaintiff indicated
15    they were not pursuing a diminution of value claim; so that
16    claim should be struck.
17              In addition, there's no evidence of causation of
18    damages presented for remediation damages, personal property,
19    and loss of use.  We've already discussed the remediation and
20    the loss of use.  But I will say that personal property is that
21    in almost all these cases, what we get in terms of their
22    personal property, we go to the deposition, we ask them the
23    questions of what happened, what broke.  It's the TV, okay.
24              "Did anybody look at it?"
25              "No."
```

1     "Did anybody tell you that it was Chinese drywall?"

2     "No."

3     "What did you do with the TV?"

4     "I threw it away."

5     "Do you have pictures of the TV?"

6     "No, I don't have pictures of the TV."

7     "Do you have a receipt for the TV?"

8     "No, I don't have a receipt for the TV."

9     "Do you have a receipt for the replacement?"

10    "No, I don't have a receipt for the replacement."

11        So in all of these cases, the pretrial order,

12   Pretrial Order 1(B) in particular, required that they retain

13   that evidence or photograph that evidence and provide it.  And

14   also, it's their burden to provide evidence of what those

15   damages are.  And so it's not just an issue for the trier of

16   fact.  If we can point to one absence in terms of their burden

17   of proof, then summary judgment is appropriate and should be

18   appropriate for personal property claims, not just from a

19   violation of the pretrial order standpoint, but from the

20   standpoint of being able to prove their substantive claim.

21        Finally, with respect to Kendall, there was this

22   issue of loss of rental income.  After the deposition, they

23   raised an issue in terms of their loss of rental income, and

24   they provided an Excel spreadsheet with nothing but numbers on

25   it.  We went back, and we retook the deposition based on that

OFFICIAL TRANSCRIPT

1   supplemental document.  And we asked the question of the
2   representative what this means.  She said, "I don't know.  I
3   don't know if that means that the rent was 2,000, 3,000,
4   4,000."  She couldn't provide any substantive evidence to
5   support the claim that they had any loss of rental or loss of
6   income.

7          In addition, those documents were required pursuant
8   to the Supplemental Plaintiff Profile and the Plaintiff Fact
9   Sheet, and that was the only document provided in support of
10  that claim.  So for those reasons alone, we think the claim
11  should be denied.

12         In addition, Judge, and just because we're talking
13  about no evidence of damage and causation, A&B Real Estate also
14  has an assumption of risk issue that we've already touched
15  upon.  But just to go over the facts with respect to this
16  claim, we briefed it in our summary judgment.  Again, it's a
17  real estate company that's held hundreds of properties.  They
18  never inspected it, conducted a Chinese drywall inspection.
19  They purchased it in 2013.  Plaintiff admitted in deposition
20  that she knew that purchasing property in South Florida as is
21  or through foreclosure was risky and that certain things would
22  have to be done because they didn't know what the status of the
23  property was, whether there was any defects whatsoever.

24         They expected that when purchasing the property at
25  foreclosure and less than market value that there would be

OFFICIAL TRANSCRIPT

1   problems with it.  And knowing these risks and knowing the

2   calculated risk that they were taking, that trust, A&B Real

3   Estate, still purchased that property voluntarily and knowingly

4   in 2013 as is through foreclosure.  And again, in terms of the

5   post-sale duty to warn, Mr. Miller is going to address that

6   with the statute of limitations argument.

7         The next one, Judge, is a similar case.  I can

8   address it now, or if Mr. Doyle would like to respond to A&B, I

9   can come back.

10        THE COURT:  Is that Skyline?

11        MR. DYSART:  This is Carlos Salabarria.

12        MR. DOYLE:  I'll be real brief on this one, Your

13  Honor.  If we're going to address the riskiness, the as-is

14  sale, I think I've already touched on that; so we'll address

15  that briefly in a moment.

16        The plaintiffs in this case have presented their

17  claims for damages, the support for the damages.  You know,

18  this is another instance where they may not like what the

19  plaintiff has produced, but she has produced it.  The Excel

20  spreadsheet lays out and it's highlighted which ones matter,

21  which line matters and deposed at her deposition, I believe,

22  responded directly to that.  The line that's highlighted is the

23  one that matters, and it shows what the revenue is for renting

24  that property each month and where the gaps are when they

25  weren't able to rent it.

OFFICIAL TRANSCRIPT

1          And I believe her position is that it's due to the

2   Chinese drywall, the presence of Chinese drywall.  It is in the

3   properties.  There's no doubt about that.  There's that

4   remediation claim that is a genuine issue of material fact.  If

5   you look at what the proposed order is from the defendants,

6   what they're seeking as a result of their motion is a complete

7   dismissal of the claim.  We have at least two genuine issues of

8   material fact, but there are more than that, that just are not

9   being addressed here.

10          Because if you look in our brief, I'm just looking at

11  the Blevins brief, but we lay out precisely what the claims are

12  in the complaint.  The Court can go look at it in Section 1(b)

13  of the *Bennett* class action.  We lay out 11 of the claims that

14  are being made.  They're not all being addressed by the

15  defendants, and they weren't addressed during discovery.  They

16  never sought any evidence to support, you know, that the

17  plaintiffs are using to support their claim that the defendant,

18  Defendant Knauf, violated the Florida Deceptive and Unfair

19  Trade Practices Act.  You know, we got negligence claims.  We

20  got strict liability.  In Florida, it's going to be strict

21  liability.

22          So there's a whole variety of reasons why this, along

23  with the others, should be denied.  They're focusing on one

24  particular area of damages and then asking the Court, "Hey, we

25  don't like the support that the plaintiffs gave.  You should

OFFICIAL TRANSCRIPT

1  dismiss the whole thing."  It's preposterous.  It's absurd,

2  Your Honor.  These are the issues that defendants can make.  If

3  they want to limit something in some way, you do it in limine

4  prior to trial or you can make your argument to a jury.  It's

5  not a summary judgment because you don't have a receipt for a

6  TV.

7         When you've told the, you know, when the plaintiff

8  has told the defendants, "I lost a TV," say, for instance,

9  "back in 2011, 2012, 2013, before I knew I had Chinese drywall.

10  And because I was never warned about it, I took the action that

11  any normal person would take.  I threw it away.  I don't have

12  the receipt.  I don't have the credit card statements anymore.

13  It's gone.  But I did lose that TV over the course of the

14  ownership of this house."

15         And the plaintiffs are going to provide expert

16  testimony at trial in each of these cases regarding the effect

17  on the house and the belongings inside the house by the off

18  gassing produced by the Chinese drywall.  So again, I think

19  there's a genuine issue of material fact in each and every one

20  of these cases.

21         MR. DYSART: Briefly, Judge, I'll address the pretrial

22  orders in the context of the ARH's, but in terms of the other

23  claims, what we've been asking, we even asked them the question

24  in their deposition, "What are your claims?"  These are their

25  claims.  This is what they've told us.  This is why we have the

OFFICIAL TRANSCRIPT

1  Profile Forms and the Supplemental Profile Form and the

2  Plaintiff Fact Sheet.  That's why we took their deposition.

3        We said, "What are your claims?"  They tell us their

4  claims.

5        We say, "Okay, where is your proof of it?"

6        In terms of Kendall, they haven't provided it.  So

7  that's why we've addressed it in the context of that.

8        In terms of the deceptive trade practices, we'll get

9  into that.  But in terms of each state, we'll have separate

10 omnibus motions that will apply across the board with respect

11 to those claims where there's a preemptive period and those

12 damages are over with.

13       But in any event, in terms of Kendall, we asked the

14 question in terms of the lost rent, and she could not offer any

15 information concerning the items.  We're entitled to that

16 through discovery.

17       When we questioned regarding the amounts listed on

18 the table referenced by plaintiffs' counsel, "Would that

19 indicate, then, that there is 3100 in rent for that property in

20 2017?"

21       "Possibly.  But on top, it says rents and taxes.  I

22 don't know how they do this.  This is some Excel sheet, but

23 maybe it's rent minus taxes, plus taxes.  I don't know.  It

24 doesn't give the information on this."  So the only document

25 provided, their own representative of the plaintiff couldn't

OFFICIAL TRANSCRIPT

1    given any substantive information about it, and I'm quoting
2    from our Reply at Record Doc 22486-3, page 4.
3            So again, she hasn't provided any substantive
4    information to establish that there's any genuine issue of
5    material fact with respect to the loss of rental income.
6            THE COURT: Let's go to Salabarria.
7            MR. DYSART: Judge, same point here, in opposition,
8    plaintiff's counsel referenced that they had a diminution of
9    value claim.  Mr. Salabarria responded both in a Supplemental
10   Plaintiff Profile Form and the Plaintiff Fact Sheet attached as
11   exhibits to our motion for summary judgment that he did not
12   have a diminution of value claim.  He either left it blank or
13   answered that it was NA, not applicable.
14           And the same arguments are going to apply with
15   respect to Mr. Salabarria in terms of evidence and presentation
16   for damages in terms of remediation, personal property, and
17   loss of use as it does for Kendall, and we've submitted that in
18   our motion for summary judgment.
19           We've also briefed the assumption of risk with
20   respect to Mr. Salabarria and his 2015 as-is purchase without
21   an inspection, and we would submit that under the arguments in
22   our motion for summary judgment.
23           THE COURT: Okay.
24           MR. DOYLE: Your Honor, I'm going to be very brief
25   with this one.  Most of what I just presented in the previous

OFFICIAL TRANSCRIPT

1  claim or case also applies here.  The only thing I want to

2  address here is this diminution in value.  It seems to come up

3  over and over in their -- as the basis for their claims.  In

4  Florida, in particular, we're not making a separate diminution

5  in value claim.  For each and every one of these, it's the

6  restoration value.

7          But the reason the diminution value is important is

8  to compare the two because there's a limitation.  It works in

9  their benefit.  It may work in their benefit in some instances.

10  It's the only reason the diminution in value is even worth

11  looking at in these cases because we have a restoration value

12  that we can project very easily.  Diminution value is something

13  that Florida law requires.  You compare the two, and you

14  can't -- one of them sets the upper bar, the upper limits.

15  It's the only reason to do it.

16          But if they want to strike diminution in value from

17  all these claims and we'll just disregard it, fine by me.

18  We'll just go with the restoration value in each and every one

19  of these cases.  If they want to stipulate to that, we can move

20  a long way towards resolving these cases.

21          THE COURT: What you're saying is that if the

22  diminution in value is higher than restoration, then you don't

23  do restoration?

24          MR. DOYLE: Right, it's just the diminution is all

25  they can recover under Florida law.  That's the whole reason

OFFICIAL TRANSCRIPT

1  that that's important in this litigation at all.  Diminution is

2  kind of a moving target anyway.  The property may have been

3  worth $400,000, you know, back in 2007, and the market value

4  may have caused it to be somewhere around, you know, 420 total.

5          But if you've got a diminution value of some amount

6  that you calculate because of the Chinese drywall and then you

7  also look at the square footage and the location and you apply

8  the RS Means factors, you come up with a restoration value, the

9  remediation value.  Compare the two.  If the diminution is more

10  than the restoration value, the restoration value is what gets

11  paid.  If diminution is greater, that's the thing that gets

12  paid.

13          It's used under Florida law, and I think we've

14  provided it in a number of these briefs.  The diminution value

15  is only important with regard to that.  So if we wanted to

16  strike that from the proceeding, we'll stipulate we can remove

17  it, diminution in value from each and every one of these going

18  forward because it doesn't benefit the plaintiffs.  In some

19  cases, it may actually hurt them.

20          THE COURT: We'll go to the next case.

21          MR. DYSART: Judge, the next two cases are ARH claims

22  in Florida.  The first is Santiago Guzman.  He filed a claim on

23  behalf of his LLC, Skyline, LLC.  The first issue I want to

24  address is that in opposition for the first time ever we

25  received an Exhibit F which we think needs to be stricken from

OFFICIAL TRANSCRIPT

1   the record and disregarded.  That exhibit attaches a couple of

2   photographs of what appears to be or is alleged to be evidence

3   of product ID.

4           Through the process of the Plaintiff Fact Sheets and

5   Profile Forms, requests at depositions, request at deposition,

6   the 21-day order that Your Honor issued in terms of

7   post-deposition production, and even the end of discovery, we

8   never saw any evidence from Skyline or Santiago Guzman in terms

9   of PTO 1(B) evidence or any evidence of product ID.  We also

10  didn't receive any remediation cost evidence.  So as an ARH,

11  none of this evidence was provided.

12          Your Honor, as we went through these status

13  conferences -- and just to step back even further.  When we

14  first started in March of 2018 and we put together the trial

15  plan which was entered into later in the fall, we had the

16  process in early 2019 of these profile forms.  We came to the

17  Court in April of 2019 and argued, Judge, they haven't provided

18  the evidence.  It's not here.

19          At that point, we said, you know, Your Honor denied

20  our motions.  Said go take the depositions.  If they don't

21  produce it at the deposition, we'll shift costs.  If they don't

22  produce it after the deposition, file your motion for summary

23  judgment.  That's what we did here.  And now, within the last

24  week or two, Mr. Guzman has now submitted evidence which I'll

25  get to later is actually irrelevant under PTO 1(B), but still,

OFFICIAL TRANSCRIPT

1  it is untimely and should be stricken from the record and
2  disregarded.
3       Second, in terms of what he provided, the claim
4  should be dismissed for violations of Pretrial Order 1 in terms
5  of both product ID and remediation cost, but also in terms of
6  just summary judgment evidence in terms of not being able to
7  meet their burden of proof.  It's undisputed that Pretrial
8  Order 1, 1(B) and 1(I) all applies to Mr. Guzman's case.  He
9  remediated the property in, I believe, 2018.  When he purchased
10 it in '18, he remediated it shortly thereafter.  It's
11 undisputed that plaintiff's obligation under those pretrial
12 orders is to preserve and present the evidence that is needed
13 to establish product ID and if and how much KPT drywall was in
14 it.
15      As Your Honor referenced earlier, it is well-known
16 that there are various manufacturers of defective Chinese
17 drywall so that when the homeowner goes in and removes all the
18 drywall out, it's critical that they identify who the actual
19 manufacturer of the board and that they preserve evidence to
20 see if any other manufacturers are in there.  It's undisputed
21 in this case in opposition that they failed to comply with the
22 pretrial order.  The evidence that was provided, even untimely,
23 was only a few pictures of alleged KPT boards in the house.
24      And as Your Honor referenced in Record Docs 20930 and
25 20933, while those were in the context of the settlement, what

OFFICIAL TRANSCRIPT

1   Your Honor discussed was that if a homeowner doesn't or fails
2   to comply with these pretrial orders in terms of an ARH,
3   without that evidence, a homeowner cannot determine if or how
4   much the percentage of KPT drywall is in that property.  So
5   from a pretrial order standpoint and also from a summary
6   judgment standpoint, they can't meet their burden of proof in
7   terms of product ID of KPT.

8        Plaintiff's counsel in opposition characterized that
9   this is an issue of spoliation at trial.  While it is an issue
10  for spoliation at trial, should it get to that point, first and
11  foremost, it's an issue of compliance with this Court's
12  pretrial order that has been set in stone since October --
13  Pretrial Order 1(B) was set in October of 2009.  And there was
14  some issues, which I'll discuss in a moment, but that order
15  from that date forward has applied to all claims that come
16  before this Court or anyone who intends to file a Chinese
17  drywall claim.  So for those reasons alone, Skyline should be
18  dismissed.

19       We also discussed, and I'm not going to go through
20  them again, but Skyline has issued various claims for
21  remediation, diminution of value, loss of use or rent, personal
22  property.  We briefed those, and we've discussed those issues
23  with Your Honor in the context of other claims.  So we'll
24  submit those arguments in terms of no evidence of causation or
25  damages for those particular claims notwithstanding our

OFFICIAL TRANSCRIPT

1  arguments on PTO.

2          Additionally, we've also submitted an assumption of

3  risk argument in terms of the 2018 foreclosure purchase where

4  he purchased it at an auction as is, sight unseen.  Skyline is

5  in the residential/commercial construction business.  They were

6  aware of Chinese drywall in general, and they purchased that

7  property knowingly and voluntarily at foreclosure as is.  So

8  again, we've discussed sort of those issues in the context of

9  other claims.  So I won't go through the specific arguments.

10 And we submitted those in our record docs that we have here.

11         MR. DOYLE: Your Honor, I'm not sure, is there any

12 other particular area on this claim that you want me to

13 address?  A lot of it is, I think, redundant.

14         With regard to the spoliation, I want to talk about

15 the spoliation, that issue.  I briefed it, and I think the

16 Court can make its decision on it.  Product ID was established.

17 At the outset, the plaintiff provided the evidence that the KPT

18 board was in the house.  So there's no issue about it.

19         The documents that were recently produced were

20 recently obtained or acquired by the plaintiff.  So what we did

21 was under the Federal Rules of Civil Procedure, our obligation

22 to supplement was met.  We provided it.  But is it critical?

23 Are any of those documents in Exhibit F critical to the

24 survival of this case through this summary judgment motion?

25 No, it's not.  But it provides some clarity now on what the

OFFICIAL TRANSCRIPT

1  damages are that the plaintiff is claiming.

2          Specifically, with regard to the ARH, we now know

3  precisely what it is because the contractor has produced those

4  documents that the plaintiff couldn't locate prior to that

5  time.

6          But with regard to the spoliation, Your Honor, we

7  believe that, particularly in this case, because we've

8  established product ID, you know, it's clear what the claims

9  are.  There's the issue of the cost of remediating the property

10 that the plaintiff undertook out of his own pocket.  We believe

11 that those, that noncompliance, not strict compliance with PTO

12 1 should not prove to be dispositive in this case.  There is a

13 genuine issue of material fact regarding whether or not the KPT

14 which is certainly, was certainly found in the property,

15 whether or not it was the cause of plaintiff's requirement to

16 go and remediate this house and what the cost ultimately was.

17         With regard to spoliation, I think the law is pretty

18 clear there can be a limiting instruction at trial for the jury

19 on those damages.  Thank you, Your Honor.

20         THE COURT: Anything further on this?

21         MR. DYSART: Just briefly, Judge, before I move to the

22 next one.  In terms of product ID, there was zero product ID

23 before January 15th or whenever the opposition was filed.

24 There was no documents including the KPT.  There's no really

25 excusable reason why that evidence couldn't be presented over

OFFICIAL TRANSCRIPT

1  the course of the years, two years that we've been doing this.
2  And it is prejudicial, and it is an issue that it was their
3  obligation to provide.  So for those reasons, we would ask that
4  Guzman and Skyline, LLC, claim be granted summary judgment for
5  defendants for reasons we briefed.

6          Daniel and Shona Blonsky are somewhat similar.
7  They're an ARH claim as well.  They have a little particular
8  different facts or factual set in our opposition that was
9  presented.  In opposition, plaintiffs' counsel argues that
10 Pretrial Order 1 was not applicable to plaintiffs because at
11 the time they did the remediation in 2014, they had not filed a
12 claim, and they were not before Your Honor.

13         In reply, we've cited the relevant provisions of the
14 pretrial order, Judge, which is Pretrial Order 1(B) which was
15 enacted October 9th of 2009.  And in particular, just
16 paraphrasing, "In summary, from this day forward, all persons
17 or entities who have or who intend to pursue a claim relating
18 to allegedly defective Chinese-manufactured drywall shall
19 preserve the following physical evidence at their own expense."
20 That includes the drywall evidence.  That includes the personal
21 property evidence.  So the pretrial order does apply with
22 respect to Blonsky.

23         They are here.  They remediated in 2014, five years
24 after that pretrial order was in place, and they didn't
25 preserve and present the evidence.  Plaintiffs' counsel also

OFFICIAL TRANSCRIPT

1  raises an issue with respect to two samples that they retained

2  in their garage and that we didn't go out and inspect them.

3  Again, it's their obligation to preserve and present that

4  evidence.  No photographs of it were presented in terms of

5  attaching it when it was requested in the Plaintiff Fact Sheet

6  and Supplemental Plaintiff Profile Form.

7          But in addition, because of the lack of evidence in

8  terms of what they presented, a few photographs, and the fact

9  that it's only two samples, does not get them over the bump of

10 compliance with Pretrial Order 1(B).  Again, pursuant to 20930

11 and 20933 Record Docs, they can't establish, therefore, how

12 much drywall was in the property.

13         In addition to that, Blonsky raises a separate issue

14 in terms of the deposition.  That's with respect to future

15 remediation damages.  This was a partial remediation that

16 Blonsky undertook and that Blonsky believes was not in

17 compliance with this Court's prior orders in *Hernandez*.  Again,

18 at this point in time, Blonsky has not provided any evidence

19 that Chinese drywall is still present in the property or that

20 there is any materials or effects of Chinese drywall in his

21 property.

22         In fact, after he did the partial remediation, he had

23 two separate companies come in.  We've attached those in terms

24 of our motion for summary judgment.  It's at Record Doc

25 22408-213 -- or 93, excuse me.  That's a certificate which was

OFFICIAL TRANSCRIPT

1  basically an environmental certificate that said there's no

2  evidence of Chinese drywall on the property.  So in terms of

3  their claim for any future remediation damages to the extent

4  they have that, even if they get over the pretrial hump,

5  there's no evidence of KPT in the property currently, and

6  there's no evidence of any damages currently being sustained

7  due to Chinese drywall on the property.

8           Other than that, the same issues with respect to

9  diminution in value, alternative living expenses and loss of

10 use, and a failure to provide evidence in support of those

11 claims is an issue with Blonsky on a claim by claim basis.

12          And also, in opposition, plaintiffs' counsel raises

13 an issue of personal property claims, but both Daniel and Shona

14 Blonsky, in their Supplemental Plaintiff Profile Forms and

15 Plaintiff Fact Sheets, did not provide any documents or

16 evidence of any personal property and didn't submit anything at

17 their deposition.  So for those reasons, we would ask for

18 summary judgment on Daniel and Shona Blonsky.

19          THE COURT: Okay.

20          MR. DOYLE: Again, you're hearing they're trying to

21 apply the summary judgment in its entirety because they don't

22 like certain portions of the damages being sought, Your Honor.

23 We think that's an improper use of the summary judgment

24 process, and we ask that this motion be denied on that reason

25 alone.

OFFICIAL TRANSCRIPT

1          These are where there is some presentation of some

2     potential damages, plaintiffs have testified to it, put it in

3     their verified discovery documents.  There is a genuine issue

4     there.

5          Now with regard to the Blonskys and the way that

6     their remediation took place, opposing counsel was correct.

7     This is a partial remediation.  This was not a complete

8     remediation, and this occurred after they discovered Chinese

9     drywall after the close of the initial Chinese drywall case,

10    the KPT settlement in 2013.  They found out about it, looked

11    for lawyers that were handling this particular type of case,

12    couldn't find any.  So they self-remediated a portion of the

13    house.  They didn't remediate the complete house, just a

14    portion of it.

15         They've retained samples.  We've provided pictures of

16    those samples that were taken out.  They've been attached to

17    multiple documents.  They were attached to the Plaintiff Fact

18    Sheet.  I believe they were also independently produced on the

19    BrownGreer portal.  But they have the pictures, the initial

20    pictures of those samples that were taken out of those couple

21    of rooms that were remediated.  They're available.  They

22    haven't gone anywhere.  They haven't changed, and you know,

23    they didn't bother to make any effort to go view those samples

24    if they think that that's important, Your Honor.

25         But we have a genuine issue of material fact

OFFICIAL TRANSCRIPT

1  regarding the proper remediation of the home.  And even though

2  the Blonskys, who weren't part of this litigation process in

3  2014, if you look at when they discovered it -- and there's no

4  question.  There hasn't been any tangible evidence raised that

5  they found out about Chinese drywall any other time than what

6  they said, in 2014 after the close of the initial settlement

7  and before their claim was filed here.

8          They took it upon themselves to remediate the

9  property to the best of their ability without regard to PTO 1

10  because they didn't know about it.  They're not in the case.

11  They're not in the litigation.  They just simply partially

12  self-remediated their home.  Luckily, they retained some

13  samples, you know, took some pictures of the process that, I

14  believe, have been produced.  But this is without a doubt a

15  partial remediation.

16          Now because they did that themselves without regard

17  to PTO 1(B) and they did not strictly comply with PTO 1(B),

18  that's -- we'll acknowledge that, Your Honor.  But is that

19  something that should be the basis for granting a motion for

20  summary judgment?  I don't think so, Your Honor.

21          They have kept the KPT sample.  They can prove that

22  it was in their house, and they've incurred damages remediating

23  the house themselves.  They should be allowed to present that

24  to a trier of fact.  So for that reason alone, along with all

25  the other reasons we've briefed, we believe that summary

OFFICIAL TRANSCRIPT

1    judgment is not appropriate for the Blonskys.

2                    THE COURT: Okay.  What's the next one?

3                    MR. MILLER: Your Honor, we're up to the last group,

4    and the last group pertains to statute of limitations.  There

5    are, I think, five or six under that group heading.

6                    THE COURT: Okay.

7                    MR. MILLER: You know, what I'm going to do is make

8    some remarks that I think apply across the board to all of

9    these, and then Will is going to cover them sort of case by

10   case by case.

11                   But on the issue of statute of limitations, what

12   we're going to ask Your Honor to do is just to apply the

13   discovery rule.  Mr. Doyle makes some arguments in his

14   opposition as to why the discovery rules should not be applied

15   as it would be in the ordinary course of dealings.  But we

16   think when you look at what those arguments are and you drill

17   down just a little bit, you can see that they don't apply in

18   the situation.  And with respect to whether or not the statute

19   of limitations has run on summary judgment, something the

20   courts do all the time, you apply the discovery rule in the

21   applicable state.

22                   THE COURT: And here, we're dealing with Florida?

23                   MR. MILLER: This here is Florida.  Next time, we'll

24   deal with Louisiana and Alabama.  But it looks like all the

25   states are applying a similar concept.

                        OFFICIAL TRANSCRIPT

1           THE COURT: Yeah.

2           MR. MILLER: The first argument, Your Honor, that

3   Mr. Doyle makes in his opposition is, well, there is some

4   tolling by way of American Pipe, and he seems to say that

5   everything is tolled up until February of 2013 which was the

6   date the final approval of the Knauf Class Action Settlement.

7           But Your Honor, American Pipe does not apply to these

8   unique circumstances.  We all learned about American Pipe from

9   1974.  It's predicated on a reliance interest.  I'm a putative

10  member of a class.  I'm not a named class member.  The class

11  action is pending for a while.  Class certification is then

12  denied.  It makes sense from a reliance standpoint that that

13  person's prescription or statute of limitations was tolled

14  while the class action was pending because inherently there was

15  a reliance interest.

16          The same thing with respect to a class action

17  settlement, if you are an opt-out during the time period that

18  the settlement was pending, you know, once you opt out of the

19  claim, the pendency of the settlement shouldn't be counted

20  against you for statute of limitation purposes.

21          This is not what we're dealing with here.  In fact,

22  we're dealing with the opposite, Your Honor.  As Your Honor

23  will recall, we've had a long history here with Chinese

24  drywall.  And the Knauf entities have entered into four

25  different settlements along a time continuum.  In 2010, we had

OFFICIAL TRANSCRIPT

1 the Pilot Program.  That evolved in 2011 into the Knauf Class

2 Action Settlement as Knauf entered its class action settlement

3 in 2007, and that was a class action settlement involving

4 everybody who had asserted a claim even in state or federal

5 court.  So it was a defined class so to speak.

6          What we did was we also negotiated at the same time,

7 when I say "we," I mean the Global group of us as you've

8 pointed out, the Knauf distribution settlement.  That would

9 include Banner.  That would include InEx, and that would

10 include the Global settlement as it was called.  That involved

11 builders and their insureds all around the southeast.  And so

12 what we did, Your Honor, as you'll recall, those settlements

13 basically happened in sequence, but in close sequence.  We were

14 all working together.

15          And it was the wisdom of all of us, the Court, PSC,

16 counsel for defendants, that it made the most sense to notice

17 and administer those settlements all at the same time.  So

18 BrownGreer did the administration.

19          We've talked a lot over the years about the two pot

20 theories.  There was a cash component.  There was a remediation

21 component.  You made claims to both.  Maybe you could make

22 recovery from both, or maybe you could make recovery from one

23 depending on how your claim was and what was presented.

24          I sat through the Taishan Fairness Hearing a couple

25 of weeks ago.  The same lady who testified about notice

OFFICIAL TRANSCRIPT

1  testified about notice in our case.  While it's true that
2  because Knauf was a settlement of known individuals, anyone who
3  asserted a claim in state or federal court, we sent direct
4  notice to them.  Our notice program was done in concert with
5  Banner, InEx, and Global.

6         And because those were true settlements of anybody or
7  everybody who might have a claim, a true putative class, Your
8  Honor approved a robust notice program, in Spanish and in
9  English, to the building trade, to the homeowners.  We had the
10 expert who is the best in the business really be targeted about
11 how to put people on notice who were involved in drywall and
12 construction and owning real estate.  We did it on the
13 Internet.  We did it in the newspaper.  Banner and InEx
14 actually had customer lists.  So they sent the actual notice to
15 the address where they delivered the drywall for 2005 and 2006
16 and 2007 to be over-encompassing.  It was really a very
17 comprehensive notice program.

18        So after the Knauf Class Action Settlement, we did
19 the *Beane* settlement which was the 2013 settlement.  The reason
20 why we did those was Knauf had an earlier cutoff date than
21 Banner and InEx and the others.  So to make all those come
22 together with BrownGreer, the registration date was
23 November 25th, 2013.  We did a separate *Beane* follow on
24 settlement.

25        And then finally, after that, Your Honor was getting

OFFICIAL TRANSCRIPT

1  some calls.  There were some people out there, for whatever

2  reason, had missed all the deadlines.  You appointed Bob

3  Johnston as a Pro Se Curator.  And so Mr. Johnston collected, I

4  think, about 100 individuals.  They didn't have all the

5  benefits of the Knauf Class Action Settlement, but they had a

6  subset of benefits.  And then that group of claims we settled

7  on November 24th, 2015.

8          So all these come after that.  So specifically, in

9  light of all that, there is no way that any of these

10  individuals had a reliance interest because they say the

11  opposite.  "I didn't know anything about those settlements.

12  Because if I did, I would have joined them."  So there's no

13  American Pipe tolling because there's no reliance interest.

14  And I think that this sort of policy reason beyond American

15  Pipe -- and I know Your Honor and lots of other jurists have

16  looked at it, struggled with it.

17          But I think Justice Ginsburg really hit the nail on

18  the head recently when she said what the policy was.  What she

19  said in the *Resh* decision is, and I quote, "that American Pipe

20  does not permit a plaintiff who waits out the statute of

21  limitations to piggyback on an earlier, timely filed class

22  action."  The Court explained that the American Pipe line of

23  cases focused on, and here's the quote again, "putative class

24  members who wish to sue individually after a class

25  certification denial."  So they're not penalized.

OFFICIAL TRANSCRIPT

1         This is not what we have here.  These people
2  specifically say, "I didn't know anything about those earlier
3  settlements."  So they shouldn't have the benefit of their
4  pendency.
5         Next we hear a lot about a post-sale duty to warn as
6  a means by which to escape the discovery rule or delay the
7  discovery rule.  I guess it's somewhat analogous to contra non
8  valentem type issues we deal with here in Louisiana.  But there
9  is no application of a post-sale duty to warn doctrine.  No. 1,
10  post-sale duty to warn is a specific product liability claim.
11  You know, it's recognized, for example, in our LPLA.
12         Your Honor, we looked at the Fifth Amended Complaint.
13  We looked at ever iteration of the complaint.  There is no
14  claim for post-sale duty to warn.  So what's happening here is
15  he's asserting a substantive claim by way of opposition.  It's
16  not in the complaint.  So the post-sale duty to warn claim
17  should be struck by virtue of the fact that it is not pled.
18         Second, because Your Honor has recognized in your
19  various rulings, the distribution that works with this drywall
20  from China on both the Knauf and Taishan side were very sort of
21  complex and hierarchal.  Neither Knauf nor Taishan dealt
22  directly with consumers or with builders or with building
23  supply stores or Home Depot, Lowes in America.  It went through
24  a long distribution chain.  Post-sale duty to warn deals with a
25  manufacturer or a seller of a product that knows who the

OFFICIAL TRANSCRIPT

1   impacted customers are.  We don't have that here, not on the
2   part of Knauf.

3           And then finally, Your Honor, with respect to
4   effectively whether or not there was a post-sale duty to warn,
5   did we, Knauf, should we be penalized by way of the application
6   of the discovery rule because we didn't do anything to notify
7   interested people about the prospect of Chinese drywall?  Well,
8   the opposite is the contrary.  Your Honor, we paid for the
9   notice program.  We paid for the robust notice program.  We
10  waited for the Banner and the builder and the InEx program to
11  come together to get maximum bang for the buck in doing a
12  notice program on all these different layers.

13          And that was done in 2012 after Your Honor conducted
14  a preliminary approval hearing and approved the form, method,
15  and means of the notice.  So for that reason too, there is no,
16  you know, post-sale duty to warn in any kind of an equitable
17  sort of way or facts that should apply.

18          So at the end of the day, what we're going to switch
19  to now is the basic precepts that should be applied under the
20  discovery rule in Florida for statute of limitations.

21          MR. MIZELL:  Good morning, Your Honor, Will Mizell for
22  the Knauf defendants.

23          So what I'd like to do is go through six claimants,
24  the last six that we're going to address today.  The first up
25  is Abigail Cohen.  And I'll note, Your Honor, that with each of

OFFICIAL TRANSCRIPT

1   those six claimants, we'd like to reiterate the lack of

2   evidence arguments that were made in reference to several other

3   claimants because those issues are common in these claimants as

4   well.  However, I'll go onto the statute of limitations issues;

5   so we can save some time here this morning.

6          Ms. Abigail Cohen purchased the property in 2006.

7   She didn't file a claim until January of 2016, ten years later.

8   Shortly after she purchased the home in 2006, she began to

9   experience successive appliance failures.  She testified that

10  she was aware of Chinese drywall from seeing it on the news and

11  that it had a sulfur smell.  She also testified that her

12  parents had smelled that sulfur smell in the home.  Beginning

13  in 2011, she started having issues with her HVAC and had to

14  make successive repairs to that equipment in the home.

15         She also testified that throughout living in the

16  home, she makes allegations regarding health effects related to

17  the Chinese drywall.  However, as I stated before, she took no

18  action to investigate the issues until 2015 and didn't file a

19  claim until 2016.  So for that reason, we would submit that

20  Ms. Cohen's claim should be denied because they're barred by

21  the statute of limitations.  If she had exercised reasonable

22  diligence, she would have discovered those issues before.  The

23  statute of limitations applies to bar those claims.

24         Next up is claimant Levi Taylor.  Again, I'd like to

25  reiterate that no evidence was submitted to support certain

OFFICIAL TRANSCRIPT

1  damages claims.  I'll move onto the statute of limitations
2  issues.
3        Mr. Taylor purchased and built the property in 2005,
4  slash, 2006 and moved into the property in January of 2007, but
5  he did not make a claim until March 2018.  He testified that
6  there was a horrible sulfur smell in the home and that he had
7  to repair and replace several personal items, appliances,
8  electronics, and also had HVAC issues throughout his ownership;
9  but he didn't take any steps to investigate the issues until
10 2017.
11       He testified that these issues were building in the
12 years since he moved in, and he noticed blackening corrosion on
13 fixtures within the first few years of his -- when he started
14 living there in 2007.  So like Ms. Cohen, we would submit that
15 Mr. Taylor's claims should be dismissed because they're barred
16 by the applicable statute of limitations.
17       Next are Isidro and Marfelia Calderon.  Again, lack
18 of evidence issues here, I'll reiterate those as well.  The
19 claims should be dismissed on that basis, and then I'll move
20 onto the statute of limitations issue with these claimants.
21       The property was purchased in 2005, and they
22 experienced smells that they associated with Chinese drywall
23 shortly after moving in.  However, they didn't file a claim
24 until 2016 in January, 11 years later.  They testified in their
25 testimony that within the first four to five years, appliances

OFFICIAL TRANSCRIPT

1    and personal property items began to rust and blacken and

2    failed, and they were replaced or discarded.  However, they

3    didn't do anything or exercise any diligence to investigate

4    these issues and failed to file a claim until 2016.

5            So similar with other claimants, we submit that the

6    Calderons' claims should be dismissed because the statute of

7    limitations operates to bar those claims.

8            Next is Ms. Anjali Van Drie.  Again, there's lack of

9    evidence issues here as well; so I'll reiterate those arguments

10   for this claim.

11           And moving onto the statute of limitations issues, we

12   submit that this claim, Ms. Van Drie's claim should be

13   dismissed for similar reasons.  She purchased the property in

14   August 2008 with her former husband, but she did not file a

15   claim until March 2018, ten years later.  Starting in 2009

16   which was shortly after she moved into the property, she began

17   to experience HVAC issues and failures, and shortly thereafter,

18   there was a noticeable smell, appliance failures, damage to

19   personal property items.  Yet Ms. Van Drie did not take any

20   steps to investigate these issues until 2015 following her

21   divorce and sole acquisition of the property.

22           So again, we submit that Ms. Van Drie's claim should

23   be dismissed because it's barred by the applicable statute of

24   limitations.

25           And moving onto Julio Martinez, again, evidentiary

OFFICIAL TRANSCRIPT

1    issues as well with this claimant.  I'll reiterate those

2    arguments that were presented before and move onto statute of

3    limitations issue.

4           This property was purchased in 2007, and at that

5    time, Mr. Martinez began experiencing smells of sulfuric acid,

6    was how he described it, and rotten eggs in the property, but a

7    claim was not filed until March 2018.  So like the other

8    claimants, within a year of purchasing and moving into the

9    property, Mr. Martinez alleges that he started to experience

10   appliance failures which continued throughout his ownership.

11   He also testified that he and his kids were constantly sick.

12   And at some point, he was made aware that all his neighbors

13   around him had Chinese drywall in their homes.

14          Yet, again, Mr. Martinez did not make a claim until

15   2018.  He didn't take any action to investigate these issues

16   until February 2017 when he cut out a section of drywall to

17   examine the markings on the back.  So we submit that

18   Mr. Martinez's claim should be dismissed because they're barred

19   by the applicable statute of limitations.

20          The last claimant, Elvis Ferrera, again, similar

21   issues, no evidence submitted.  Reiterate those arguments for

22   this claimant as well, but also, we'd submit the statute of

23   limitations applies to bar these claims on separate grounds.

24          Mr. Ferrera purchased the property in 2006, but he

25   did not file a claim until September 2018, almost 12 years.

OFFICIAL TRANSCRIPT

1  Mr. Ferrera is in the real estate business.  He purchases and
2  sells and rents properties in South Florida.  He always noticed
3  strange smells in this property, specific property; and
4  starting between 2009 and 2010, appliances started to fail in
5  succession in the property.  He stated -- he testified that the
6  smell he tolerated in the property lasted for 12 years since he
7  purchased the property.  So it's clear that he had noticed the
8  smell in the property shortly after he purchased it.

9         However, like the other claimants, Mr. Ferrera did
10 not take any action to investigate these issues until
11 August 2018.  Accordingly, we submit that Mr. Ferrera's claim
12 should be dismissed because they're barred by the applicable
13 statute of limitations.  That's all.

14         THE COURT: Okay, okay.

15         MR. MIZELL: Thank you.

16         MR. DOYLE: Your Honor, I believe that we have
17 sufficiently briefed these issues, and we're going to encourage
18 the Court to read our sections on latent defects, the discovery
19 rule.

20         THE COURT: Yeah, your concept is mainly that they may
21 have noticed smells, they may have noticed blackening; but they
22 didn't associate that with drywall, and they didn't know the
23 risk of drywall until they found it in their place.

24         MR. DOYLE: Right, Your Honor.  These are all laymen,
25 including, Elvis Ferrera.  Abigail Cohen, Levi Taylor, Isidro

OFFICIAL TRANSCRIPT

1   and Marfelia Calderon, Anjali Van Drie, Julio Martinez are all

2   outside of the construction or property ownership as a

3   business.  None of them have any expertise in Chinese drywall.

4           THE COURT: What about Ferrera?

5           MR. DOYLE: He accumulates properties to rent.  Never

6   had any experience with Chinese drywall.  This is the one and

7   only of his handful of homes that he owns.  This is a Cuban

8   immigrant, speaks primarily Spanish.  And at his deposition, he

9   made it clear he's never dealt with Chinese drywall before.

10  This is the one and only time.  He has no expertise.  Even

11  though he's in the business of acquiring, accumulating

12  distressed properties for maybe resale, rehab, whatever the

13  case may be, has no experience with Chinese drywall.

14          Post-sale duty to warn, Kerry touched on --

15  Mr. Miller touched on what he believes the law should be, but

16  it's not what the law is.  Post-sale duty to warn is laid out

17  pretty clearly in our briefs.  In Florida, the manufacturer who

18  can identify those that may be affected by their defective

19  product must take action; otherwise, they should be equitably

20  estopped from making any argument that they had a sufficient

21  warning to those people.

22          We have shown through the one document -- we didn't

23  really dig into the discovery documents that we have from the

24  trial package.  We'll do all that before it comes time for

25  trial.  But you know, this is common benefit work that the

OFFICIAL TRANSCRIPT

1  defendants are well aware of.  These are documents that were
2  produced during that course of that discovery.  They're useful
3  in this context in support of plaintiffs' summary judgment
4  oppositions.

5          And the one document that we attached, and this
6  probably is not the earliest, but we found one that said, hey,
7  this clearly shows the defendants were on notice as early as
8  2006 through that email among corporate officers in the Knauf
9  companies, they knew they had a problem in Miami.  There's
10 these smelly houses as it was described.  It may impact
11 thousands of houses in the United States.  Yet they didn't take
12 any action between 2006 and the settlement of a lawsuit which
13 is not the same thing as providing the consumers with
14 information about the defective product.  That's not the same
15 thing.

16          That's letting the world know, "Hey, we've settled
17 some claims."  It's not that, "You should look for A, B, and C;
18 or you should be on notice that it may be in your particular
19 property because we can identify that the drywall was delivered
20 by our distributors, our business partners, to your property,
21 and you may have it.  And this is what you should look for.
22 This is the action you should take."  Or they could recall the
23 product which is what's typically done with a defective
24 product, issue a recall.  Put everybody on notice.  Take the
25 appropriate steps to remediate the problem.  They didn't do any

OFFICIAL TRANSCRIPT

1  of that.

2         And it shows, the 2006 email shows that they knew

3  about the problem yet took no action for, what is that, six,

4  seven years.  And all it was at that point was just notifying

5  the world that we've settled claims in a lawsuit.  That's not

6  the same thing that's required under Florida law.  That's not

7  meeting their duty under Florida law.

8         The post-sale duty, although it's not a separate

9  standalone claim, it impacts all of the claims.  It impacts all

10 of the damages because it plays into this failure to warn and

11 the equitable estoppel issues that we've raised in our brief.

12 So I'm not going to rehash those now.

13        But that's the reason that it's useful to the Court

14 when evaluating these claims and the opposition by the

15 plaintiffs in each one of these individual damage components.

16 It's important that the Court understand none of these

17 plaintiffs had any notice.  Had they known that their house

18 contained product, you know, this defective product, they

19 probably would have been involved in the earlier settlement, or

20 they would have taken action to remediate the property

21 according to PTO 1(B).

22        None of them had any notice that it was in their

23 house.  So they didn't find out until after the whole process

24 was done, and now they're facing, you know, living with a house

25 that has Chinese drywall.  And this case was implemented, you

                      OFFICIAL TRANSCRIPT

 1 know, it was filed in November of 2014.  We're now in 2020, and

 2 we haven't resolved it.  So think about the stress, the anxiety

 3 that these people have gone through during the course of this.

 4 We're going on six years, heading towards six years.  We're

 5 over five years, heading towards six years in this case alone,

 6 not -- unresolved.

 7         And the defendants are claiming that, you know, they

 8 shouldn't be responsible when in each and every one of these

 9 cases we've provided product ID through an inspection report or

10 pictures or both.  There's no question about it.  And if there

11 wasn't, they would have filed dismissal motions long ago or

12 would have moved to compel the plaintiffs to or the Court to

13 issue a show cause order.  They didn't do that because they

14 have sufficient product ID in each and every one of these

15 cases.

16         I want to just point the Court to a section regarding

17 the warning issue that we've provided in our brief, and it

18 comes from a case from the Florida Supreme Court on the issue,

19 on this direct issue.  "It's longstanding Florida law that

20 provides that the sufficiency and reasonableness of a

21 manufacturer's warnings are fact questions appropriate for the

22 jury to decide unless such warnings are accurate, clear, and

23 unambiguous."  And that's the *Brito* case citing the *Felix*

24 *versus Hoffmann* case from the Florida Supreme Court in 1989.

25 It's very clear what their duty is under Florida law.


                         OFFICIAL TRANSCRIPT

1        If they want to make that argument, it is a question

2   for the trier of fact to evaluate whether or not any warning

3   was issued, whether or not it was sufficient, and whether it

4   was adequate to put all these plaintiffs on notice.  And if

5   not, then the jury can find in favor of the plaintiff.

6        With regard to the latent defect and the latency

7   aspect of this particular product, Your Honor, we've briefed it

8   in each and every one of these oppositions.  And I think it's

9   pretty clear, but I want to point out the latency aspect and

10  the duty on the part of the plaintiffs, Your Honor.  We've said

11  specifically, I'm just going to read from the brief these two

12  lines, "Florida courts have defined a latent defect broadly as

13  one in which it's, quote, 'not apparent by use of one's

14  ordinary senses from a casual observation of the premises,'"

15  unquote.  That's the *Hawkins* case.  Florida courts have also

16  found that there is no duty to discover latent defects, and I

17  quote, "latent defects which could not be discovered by a

18  reasonable and customary search."

19        That's what Florida law is regarding whether or not

20  the smell or some tarnished copper puts these laymen on notice

21  that they have not just defective drywall, but Chinese drywall

22  manufactured by the Knauf defendants.  The only way you can do

23  that is to have an inspection by somebody that knows what

24  they're doing and usually at a pretty reasonable -- a pretty

25  hefty cost, you know.  What we've found in Florida is it's

OFFICIAL TRANSCRIPT

1    somewhere between 500 and $2,000 to have a Chinese drywall
2    inspection done.
3          These plaintiffs don't have any duty to go and spend
4    that money because they smell something in their house which
5    could be any number of causes.  Sulfur, in Louisiana -- I'm
6    from Louisiana too, Your Honor.  We have sulfur smells all
7    over.  Florida is no different.  Where you've got marshland,
8    there's going to be sulfur smells.  The water may have high
9    sulfur contents.  So when you're taking a shower, there may be
10   that, you know, noticeable smell.  That doesn't put you on
11   notice that you have Chinese drywall.
12         And the Florida law says specifically you don't have
13   that obligation to go incur that cost and do that inspection.
14   So each one of these plaintiffs have defined exactly when they
15   found out they had Chinese drywall through some inspection.
16   Prior to that date, they didn't have an obligation to do
17   anything under Florida law.  Ultimately, they finally figured
18   out that they needed to do something to figure out whether
19   they've got Chinese drywall from a variety of sources.
20         But it is a fact that the sources were not Knauf or
21   any of the Knauf entities.  They didn't provide any notice.
22   They didn't provide any warning.  They didn't provide any
23   product recall.  Therefore, they can't rely on some other
24   source which is undefined and say that everybody was
25   sufficiently warned.  They just simply can't do it.

                    OFFICIAL TRANSCRIPT

1          So Your Honor, I think we've briefed it adequately.

2     We encourage you to evaluate our argument in the brief and deny

3     summary judgment.

4          THE COURT: Just some response on that.

5          MR. MILLER: Yeah, real quick, Your Honor.   Judge,

6     some of these arguments unpacked and revealed appropriately.

7     The case that Mr. Doyle cited to you deals with a failure to

8     warn or inadequacy to warn.  It's what Your Honor dealt with in

9     Propulsid.  It's what Your Honor dealt with in Vioxx.  It deals

10    with a warning that is on a consumer package or on a

11    pharmaceutical.  In your case, you deal with the FDA

12    regulations.  And yeah, those can be jury issues.  It's the

13    adequacy of the warning.

14         That's not applicable here, Your Honor.  We're not

15    dealing with a failure to warn claim or a warning that is

16    inadequate to put people on notice to the harms associated with

17    the use of their product.  So the case that he cited completely

18    doesn't apply.

19         Second, he made a presentation on latency.  Your

20    Honor, he doesn't make a latent defect claim.  In fact, the

21    claim is to the opposite.  He uses the word "noxious" seven or

22    eight times in the complaint.  The word that's not used in the

23    complaint is "latent."  He makes a patent defect claim, that

24    this drywall is so bad, the gassing issue is so bad that it

25    forces people from these homes, it causes these damages.  So

OFFICIAL TRANSCRIPT

1   again, latency, if that is an analogous argument to contra non

2   valentem is inconsistent with the face of what's on the

3   petition.

4          And then lastly, Your Honor, this whole notion of

5   duty to warn, what I do know about the law of duty to warn is

6   you got to plead it, and it's not pled.

7          Secondly, Your Honor, going back to my introductory

8   remarks, the notice program that was done by Knauf, by Banner,

9   by the builders in 2011 and 2012 is what populated the *Beane*

10  settlement in 2013.  It worked.  BrownGreer collected their

11  names.  They weren't part of the original group in 2011 and

12  2012.  We went through the Pilot Program and the Knauf Class

13  Action Settlement registration process.  We did the notice.

14  Banner had a November 2013 deadline.  BrownGreer got the names

15  of people who got the notice and who were filling out Banner

16  claims.  Then they became members of the Knauf *Beane*

17  settlement.

18         So we did the best that we possibly could do pursuant

19  to your own order to put people on notice of the prospect of

20  having Chinese drywall in Florida and throughout the Gulf

21  Coast.

22         THE COURT: All right, folks, we'll stop here.  I've

23  got a lot of notes that you-all have given me, and I'll do what

24  I can to get this out as quickly as I can.  Thank you very

25  much.

OFFICIAL TRANSCRIPT

1          The Court will be in recess.

2          DEPUTY CLERK: All rise.

3              (Whereupon this concludes the proceedings.)

4

5

6

7

8                          **CERTIFICATE**

9

10     I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

11   the United States District Court, Eastern District of

12   Louisiana, do hereby certify that the foregoing is a true and

13   correct transcript, to the best of my ability and

14   understanding, from the record of the proceedings in the

15   above-entitled and numbered matter.

16

17                          */s/Alexis A. Vice, RPR, CRR*
                            Alexis A. Vice, RPR, CRR
18                          Official Court Reporter

19

20

21

22

23

24

25

                          OFFICIAL TRANSCRIPT