UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*************************************************************

IN RE:  CHINESE-MANUFACTURED   *   Docket No. 09-MDL-2047
DRYWALL PRODUCTS LIABILITY     *
LITIGATION                     *
                               *   February 19, 2020
                               *
                               *
Relates to Case No. 14-2722    *   Section "L"
                               *

*************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE**
**MOTIONS FOR SUMMARY JUDGMENT**
**BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE.**

*************************************************************

**APPEARANCES:**

**For the Plaintiffs:**          Jimmy Doyle


**For the Defendants:**          Kerry Miller
                                 Daniel Dysart
                                 Rebekka Veith
                                 William Mizell
                                 Katherine Johnson


**REPORTED BY:**      Mary Thompson, RMR, FCRR
                      500 Poydras Street, Room B275
                      New Orleans, Louisiana  70130
                      (504)589-7783

**OFFICIAL TRANSCRIPT**

# P R O C E E D I N G S

THE CASE MANAGER:  MDL No. 2047, *Chinese-Manufactured Drywall Products Liability Litigation*.

09:59:50   THE COURT:  Counsel, make your appearances for the record, please.

MR. DYSART:  Danny Dysart on behalf of the Knauf defendants.

THE COURT:  Come on up, Jim.

10:00:09   Make the appearances for the record.

MR. DOYLE:  Good morning.  Jimmy Doyle on behalf of the plaintiffs.

THE COURT:  Jimmy, did you receive the suggested thing from Kerry?

10:00:35   MR. DOYLE:  I did.  Yes, Your Honor.

THE COURT:  Are you okay with that?

MR. DOYLE:  I'm okay with it.  I think there was a change.  I think there was an e-mail yesterday regarding some changes.

10:00:42   THE COURT:  Yeah.  All right.

And are we dealing with all of the Louisiana cases?  Not all of them have the subsequent purchase of --

MR. DYSART:  That's correct, Judge, not all of them do.

We have them grouped, Judge, and we'll kind of take

10:01:11   them in groups.  But we have roughly the Louisiana cases first.

**OFFICIAL TRANSCRIPT**

1   There is an Alabama and then the Mississippi.

2           THE COURT:  Right.

3           MR. DYSART:  With the Court's indulgence, I would ask

4   to take out of turn what I'm doing, a group that I'm covering,

*10:01:21*   5   because I have a conflict later this morning.

6           THE COURT:  Okay.

7           MR. DYSART:  I'd like to take Powell and Baber out of

8   turn, and I'll note those when I get to them.

9           THE COURT:  All right.

*10:01:39*   10           MS. JOHNSON:  Good morning, Your Honor.  Kaki Johnson

11   on behalf of the Knauf defendants.

12           THE COURT:  Morning.

13           MS. JOHNSON:  This first part will be about plaintiff

14   Mardechria McDonald Charles.  We're respectfully asking this

*10:01:54*   15   Court grant our summary judgment and dismiss her claims.

16           As discussed more fully in defendant's briefs, which

17   I'll try to not bore you on, plaintiff has not and cannot prove

18   that the Knauf defendants' Chinese drywall is or was on her

19   property for two reasons.

*10:02:09*   20           First, plaintiff has failed to come forward with

21   evidence of KPT on the property.

22           THE COURT:  Which one is that?  That's the first one?

23   Mardechria McDonald.

24           MS. JOHNSON:  Yes.  Charles.

*10:02:22*   25           THE COURT:  All right.

**OFFICIAL TRANSCRIPT**

1          MS. JOHNSON:  First, plaintiff has failed to come

2    forward with evidence of KPT on the property.  The only evidence

3    plaintiff has produced of KPT is one low-resolution photo that

4    appears to show KPT lettering.

*10:02:34*

5          Plaintiff herself had never seen the photo, however,

6    prior to her deposition on June 26, 2019.  Rather, she stated

7    that someone else took the photo and submitted it to her

8    attorney, who, in turn, produced it to the Knauf defendants.

9          THE COURT:  That's the one that the house was burned

*10:02:52*

10    and it was knocked down?

11          MS. JOHNSON:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MS. JOHNSON:  Plaintiff was also not present when the

14    photo was taken.  She's lived in Michigan since 2001.

*10:03:04*

15          Consequently, because plaintiff was not on the property

16    when the photo was taken, and because she had never seen the

17    photo previously, she could not affirmatively state that the

18    photo was actually taken at the subject property.

19          Additionally, the photo doesn't have any identifying

*10:03:18*

20    marks to suggest that it came from the property, nor has

21    plaintiff produced any other information that might allow the

22    photo to be properly authenticated or identified.

23          Therefore, plaintiff's only evidence of KPT cannot

24    properly be introduced as evidence, and as a result, plaintiff

*10:03:33*

25    today has not produced any reputable evidence of KPT on the

**OFFICIAL TRANSCRIPT**

1    property or, for that matter, any Chinese drywall.

2         And second, plaintiff has no future possibility for

3    obtaining evidence that KPT was or is on the property or to what

4    extent it was on the property, because the structure on the

10:03:52    5    property that allegedly contained Chinese drywall no longer

6    exists.

7         As highlighted by the Fire Marshal's report, which is

8    here on the PowerPoint, there was a fire on the property on

9    July 10, 2016, that caused damage to the structure of the

10:04:06    10    property.  As a result of that fire, plaintiff's husband was

11    arrested for arson, and ultimately a declaratory judgment action

12    was filed in this district.  Nonetheless, the cause of the fire

13    isn't relevant for purposes of this motion.

14         As you can see, after the property was destroyed by the

10:04:26    15    fire, a lot of the property actually remained intact, so relevant

16    for this motion is only her subsequent destruction of evidence.

17         As you can see, a lot of the walls were still intact

18    after the fire actually occurred.  However, plaintiff testified

19    that after the fire, the structure on the property was demolished

10:04:53    20    while she was still the owner, but no evidence preservation was

21    performed.  Therefore, plaintiff failed to comply with this

22    Court's pretrial orders.

23         Despite having filed this lawsuit nearly two years

24    prior, plaintiff likewise did not have any inspection conducted

10:05:07    25    or seek to obtain additional evidence of KPT prior to demolishing

**OFFICIAL TRANSCRIPT**

1  the structure.

2        Subsequently, plaintiff sold the property.  Therefore,

3  there's no possibility of plaintiff or the defendants to obtain

4  evidence regarding the presence of KPT on the property as the

5  allegedly contaminated structure no longer exists and plaintiff

6  no longer owns the property.

7        Plaintiff has failed in her opposition to come forward

8  with any evidence or testimony that would create a genuine issue

9  of material fact as to plaintiff's ability to prove her property

10  was contaminated with KPT or to what extent it was contaminated

11  with KPT.

12        For those reasons, we respectfully ask that you dismiss

13  plaintiff's claims in this matter.

14        THE COURT:  Okay.  Jimmy, why don't we do one at a time

15  so that I can keep up with you-all.

16        What's your position on this?  I understand the facts

17  of the case.

18        MR. DOYLE:  Sure.  Your Honor, it looks like they are

19  staying away from the unclean hands argument they've made.  We

20  briefed it.  I think that it's pretty straight forward, our

21  position on it.

22        The authentication issue I think is kind of moot.  I

23  think the Court has already said anything that was submitted is

24  properly authenticated.  Now, the admissibility at trial is a

25  different issue, but this was a -- the picture of the marking

**OFFICIAL TRANSCRIPT**

1   that was found by a relative that helped initiate this claim,

2   it's a picture that can properly be authenticated and admitted at

3   trial.

4       So the fact that this particular person can't

5   authenticate a picture that was taken inside the house that

6   established the defective KPT board was there doesn't mean that

7   ultimately it's not admissible at trial.  We believe it is.

8       There's also an assumption-of-risk argument that was

9   pled by the defendants.  It looks like we're not going to address

10  that either.

11      But as far as the proof of Chinese drywall in the house

12  goes, I think the plaintiff has established that.

13      And with regard to the sale and the demolition of the

14  house, ultimately after the house burned and the insurance

15  company got involved, there was a settlement.  And there was no

16  finding of any wrongdoing by this plaintiff or her husband.  And

17  I think, you know -- when we get to trial, I think there's going

18  to be a 403 evaluation of whether or not the probative value

19  outweighs the prejudicial effect.  We think it's going to cut

20  against the defendants in this case.  Any mention that they were

21  investigated for arson I think is completely unrelated and

22  immaterial and highly prejudicial to the plaintiff.

23      Ultimately what happened was the insurance company

24  settled the remaining principal on the loan, paid off the house,

25  didn't provide any compensation for equity.  And then the terms

**OFFICIAL TRANSCRIPT**

1   were that the insurance company would demolish the property and

2   the property would be sold, and everything would be settled out.

3   That's how it was done.

4           There was -- and then the plaintiff's position -- you

5   know, this plaintiff's position was there is -- or there was

6   Chinese drywall in the home, and she had established that.  And I

7   think the picture will prove that.  And the fact that she didn't

8   see it personally is immaterial.

9           She was in Michigan; family living in the house in

10  Louisiana.  One of the family members took the picture of the

11  KPT.  It was there.

12          And I guess ultimately the issue of demolition of the

13  remainder of the house is, again, another spoliation-type

14  situation that the Court will need to evaluate before trial.

15          THE COURT:  Okay.

16          MR. DOYLE:  Thank you, Your Honor.

17          THE COURT:  Any response on that?

18          MS. JOHNSON:  Yes.  I would just quickly note that

19  regardless of the authentication of the photo, there's still no

20  possibility of determining to what extent the property was

21  contaminated, if at all, with KPT.

22          And also as to additional damages, this wasn't fully

23  addressed, but her personal property she testified that she

24  removed it from the property about a month prior to the fire.

25          THE COURT:  Okay.  Why don't you give me the second

**OFFICIAL TRANSCRIPT**

1   case, Ronald and Catherine Martinez.

2           MR. DYSART:  Judge, if the Court's willing, I would

3   take the next four in a group.

4           THE COURT:  That's fine.

5           MR. DYSART:  And that would be the Martinez plaintiffs,

6   Natal, Ms. Macksey, and Nathan Junius.  And I've sort of grouped

7   these in terms of the arguments with respect to each one, Judge,

8   to try to -- for your convenience, the Court's convenience.

9           I've cited here in the slide the record docs with

10  respect to Martinez, Natal, and Macksey.  For each one of those

11  we have made arguments with respect to prescription in that they

12  are all prescribed on the face of the petition and through actual

13  notice.

14          The Court has already previously addressed the

15  inapplicability of a post-sale duty to warn or equitable estoppel

16  as well as the *American Pipe* equitable tolling that does not

17  apply in this case.

18          With respect to Mr. and Mrs. Martinez, I think the

19  evidence is undisputed that they had purchased the property.  The

20  property flooded during Hurricane Katrina in Lakeview.  They

21  remediate that property and install -- or allegedly install what

22  is deemed defective Chinese drywall in 2006.

23          Between 2006 and 2014, at points they are living in the

24  property and at other points they are renting the property out.

25  And there are certain symptoms with respect to Chinese drywall.

**OFFICIAL TRANSCRIPT**

1        It's undisputed that Mr. Martinez is informed in

2  February of 2014 that he likely has Chinese drywall by an air

3  conditioning technician.  He goes in his attic and he sees and he

4  finds it.  He does the inspection himself.

10:10:51

5        We cited in our brief, and also in this PowerPoint, the

6  Supplemental Plaintiff Profile Form, which is at Record Doc

7  22372-2 at Page 15, as well as the Plaintiff Profile Form at the

8  same record doc at Page 2.

9        Mr. Martinez testified as to this tenant and the

10:11:19

10 serviceman that informed him that he had Chinese drywall in his

11 attic.

12       Now, again, that's in February of 2014.  He's put on

13 affirmative notice that he has Chinese drywall.  He sees it for

14 himself.  He puts that in his Plaintiff Profile Form, in the

10:11:33

15 sworn profile forms that he attaches as to when he learned that

16 there was Chinese drywall on the property.  However, he does not

17 file any claims in this action until January 30, 2016.

18       Therefore, under the case law we cited with respect to

19 all of his claims and the one-year prescriptive period, Mr. and

10:11:49

20 Mrs. Martinez's claims are prescribed.

21       A similar case is Mr. and Mrs. Natal.  They had

22 performed a partial remediation after there was limited flooding

23 in their property after Hurricane Katrina.  They then performed a

24 subsequent partial remediation of the alleged Chinese drywall.

10:12:13

25       However, in October of 2015, Mr. and Mrs. Natal are

**OFFICIAL TRANSCRIPT**

1  trying to sell the property.  They're informed by a buyer through

2  an inspector that the house contains Chinese drywall.  That's

3  before this October 27, 2015, inspection.

4      Mr. Natal doesn't believe them.  He hires his own

10:12:32  5  inspector, Driskill, to come out and inspect the property.

6  Driskill Environmental comes out and inspects the property on

7  October 27, 2015, and informs Mr. Natal that he has alleged KPT

8  defective Chinese drywall.  However, Mr. and Mrs. Natal did not

9  file any claims in this case until September 10, 2018.

10:12:51  10      So on the face and through actual notice, Mr. and Mrs.

11  Natal's claims are prescribed.

12      Mr. Natal even testified, in terms of his deposition

13  that we've attached to our motion for summary judgment:  Is it

14  true that it was Driskill on October 27, 2015?

10:13:08  15      He actually corrects me and says:  No.  Actually I was

16  informed before that.  The prior home inspector told me.  I then

17  had Driskill come out and inform me that there was Chinese

18  drywall on the property.

19      Finally with respect to Ms. Macksey, Ms. Macksey

10:13:24  20  purchased the property in 2012.  There's other arguments made

21  with respect to her, but she's put on notice of Chinese drywall

22  either through constructive notice or through actual notice

23  sometime between the date she purchased it and November of 2013.

24      When she first goes to view the property, she

10:13:42  25  identifies certain problems with it.  Smells.  She's aware of

**OFFICIAL TRANSCRIPT**

1  Chinese drywall both from the news and the fact that the renters
2  in that property at that particular time were in that house
3  because their property was being remediated of Chinese drywall.
4  So it's known to her at the time.

10:13:57
5       The contaminated drywall indications on the disclosures
6  also are incomplete, and indicate the possibility of contaminated
7  drywall.

8       Ms. Macksey also testified that she received a letter
9  sometime in November of 2013 with respect to the supplier INEX
10:14:14
10 and whether she may have defective Chinese drywall on the
11 property.  However, she's unable to say when she got it exactly.

12      So again, based on the face of the petition in the
13 complaint, because Ms. Macksey's claims weren't filed until
14 November 13 of 2014, her claims have prescribed and there's no
10:14:31
15 way that she can overcome her burden that those claims are
16 otherwise barred.

17      She identified that in her Supplemental Plaintiff
18 Profile Form when she put November of 2013.  Again, as I stated,
19 she was made aware of the existence of defective Chinese drywall
10:14:47
20 in the pre-purchase disclosures.  She received an INEX notice
21 from her attorney indicating Chinese drywall.  Again, she
22 couldn't say exactly when in November 2013 that was.

23      Now, in terms of Natal and Macksey, they both had
24 Subsequent Purchase Doctrine issues, Judge.  We cited case law
10:15:16
25 from *Eagle Pipe & Supply*.

**OFFICIAL TRANSCRIPT**

1        This really -- the issue in this is really down to

2   whether they received an express assignment of the personal right

3   to sue for tort damages that existed on the property prior to the

4   time they purchased it.

10:15:29
5        And while plaintiffs' counsel cites the act of sale, we

6   have attached, in our motion for summary judgment and also put

7   here, the clear language that the assignment that is given, like

8   in any active of sale in Louisiana, is the assignment of a

9   warranty of title.  You go up the chain in terms of a warranty of

10:15:49
10  title.

11       So both for Macksey and Natal, they are not expressly

12  assigned that right.

13       The Fifth Circuit case law on that, and the other case

14  law we cited, is clear that you cannot implicitly convey that

10:16:01
15  right.  It has to be an expressed assignment.

16       THE COURT:  Does Natal have that, too?

17       MR. DYSART:  Natal and Macksey both have the same,

18  Judge.

19       And Natal is at Record Doc 22373-2 at Page 28.

10:16:21
20       Macksey, the act of sale and the relevant language is

21  at 22371-2 at Page 27.

22       Again, no dispute that the doctrine actually applies.

23  There's just a distinction in terms of plaintiffs' argument that

24  they believe, based on the act of sale language, that they were

10:16:41
25  assigned all rights including the right to sue for the personal

**OFFICIAL TRANSCRIPT**

1   right like *Eagle Pipe* says.  However, again, because it can't be

2   implicitly conveyed and because the express assignment is only

3   with respect to warranty of title, the Subsequent Purchaser

4   Doctrine should bar those claims.

10:16:57   5         Macksey alone has also this issue in terms of

6   redhibition and warranty of fitness.  She signed, both in the act

7   of sale and in the addendum to the act of sale, a waiver of the

8   warranty and redhibition rights and as-is clause.  The relevant

9   Civil Code articles are cited therein.

10:17:22   10        When asked at her deposition, Ms. Macksey said -- what

11   was her understanding of that?  That she was essentially waiving

12   those rights.  It was waiver of warranty, and that she did it

13   both voluntarily and knowingly.

14        Finally, although the Court has addressed this issue in

10:17:39   15   terms of Florida law, Ms. Macksey also has an issue in terms of

16   her pre-purchase knowledge in terms of drywall.  We have cited

17   those cases in our brief.

18        We've also included in that argument the property

19   disclosures, which are located at Record Doc 22371-2 between

10:17:56   20   Pages 30 and 34.

21        And there, as we've put here, you can see there's a

22   notation that there's contaminated drywall, and it looks like

23   there is a check and a scratch off.  And then also a check for

24   "not known" and a scratch off.

10:18:08   25        I asked Ms. Macksey about that in her deposition, and

**OFFICIAL TRANSCRIPT**

1    she said although she signed them and received them, she didn't

2    really even look at it.

3          So again, because of the notice and the facts that she

4    had prior to the time she purchased the property, the disclosures

5    that she received, and the fact that she did not undergo or take

6    any type of inspection with respect to Chinese drywall, those

7    claims should be barred as well.

8          Finally, Judge, I know that Your Honor has already made

9    a ruling with respect to compliance with Pretrial Order 1-B and

10   1-I in terms of preservation and presentment of evidence.  I just

11   want to reiterate that we have asserted those arguments with

12   respect to Martinez, Natal, Macksey, and Junius.

13         And again, it's not only a pretrial preservation issue,

14   but in the context of the settlement agreement when Your Honor

15   was dealing with this issue, while it was not dealing with it on

16   a preservation issue, it was can a homeowner prove simply based

17   on a board or two boards whether they have KPT and to what extent

18   they have KPT.  So simply from a burden of evidence standpoint,

19   we would still submit that Martinez, Natal, Macksey, and Junius

20   have all failed.

21         Junius has only provided evidence of one alleged KPT

22   board.

23         Martinez, one alleged KPT board.

24         Natal, three.

25         Macksey, while we have not made any argument with

**OFFICIAL TRANSCRIPT**

1   respect to her in terms of her preservation of KPT boards under

2   PTO 1-B, she has not provided any personal property evidence

3   similar to the other plaintiffs.

4           Finally, similar to what we've argued in other cases,

10:19:51   5   Judge, Junius, Martinez, Natal, and Macksey have failed to

6   provide adequate evidence to overcome their burden -- to meet

7   their burden at trial in terms of their claims for damages.  We

8   cited that in our brief.  And I won't go through them

9   individually, but we've cited with respect to each of those

10:20:06   10   claims the failure.

11           The two that I'll point out in particular, though, are

12   with respect to Mr. Junius.  There were certain things that were

13   clear in his deposition and his submissions that were upgrades

14   with respect to his property when he remediated it.  Those items

10:20:21   15   that were upgrades should not be compensible.

16           And the same goes for any evidence of invoices or

17   payments made by the subsequent owner.  There was money that --

18   most of the invoices were to a gentleman by the name of Ben

19   Chaffee [phonetic] who is a former business partner of

10:20:40   20   Mr. Junius.  Those invoices were all to him.  There was no proof

21   of payment that was submitted Mr. Junius ever paid for that or

22   whether Mr. Chaffee ever paid for that.

23           And finally, with respect to Mr. Junius, the diminution

24   in value claim.  It's undisputed in this case that the appraisal

10:20:57   25   post-remediation exceeded the actual value of the property before

**OFFICIAL TRANSCRIPT**

1   it was alleged to be found with Chinese drywall.

2           And then finally we cited Natal in terms of that case

3   with respect to the remediation damages they submitted.  They've

4   only submitted proof really of $3,200.  Otherwise, there is no

10:21:18
5   other evidence of any remediation damages that we've received.

6           For those reasons, Judge, and for those multiple

7   reasons, we would ask that those claims be dismissed in full or

8   otherwise barred.

9           THE COURT:  Okay.  Thank you.

10:21:30
10          Jimmy, do you want to take this group.

11          Talk to me mainly about the subsequent purchase of the

12   property.  How do you see that?

13          MR. DOYLE:  The language in each one of the cash sales

14   I think explicitly lays out that they are either subrogated or

10:21:44
15   assigned all the claims, whatever they are.

16          If you looked at the section that Mr. Dysart had up on

17   the screen, I mean, it says right there they're subrogated all

18   claims.

19          THE COURT:  And you take that -- the position you take

10:21:58
20   is that is sufficient?

21          MR. DOYLE:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. DOYLE:  The same thing with every single one of the

24   cash sales.

10:22:04
25          The only one that has any issue that's different where

**OFFICIAL TRANSCRIPT**

1   they've alleged Subsequent Purchaser Doctrine is the Bank of

2   Louisiana, which we'll get to in a little while.

3          I want to first off address one of the last things

4   Mr. Dysart was talking about, and it was this dispute over

5   damages; whether or not they're entitled to be compensated,

6   whether or not the upgrades are appropriate.  All of that is an

7   issue for trial.  It's a damages issue.

8          And we obviously have a difference of opinion of what

9   the plaintiffs should recover, and that is genuine issue of

10  material fact.  For that reason alone, that argument fails.

11         With regard to the notice -- and I want to -- I guess

12  this is an appropriate place to discuss this aspect of every

13  single one of these cases.

14         The notice aspect, the warning that any of these

15  plaintiffs might have received, was not received from the KPT

16  defendants which is a requirement under every -- the law of every

17  state in the United States of America.

18         And I'm going to point out why.  It occurred to me --

19  and this is not in the brief so I'm going to tell you what

20  recently occurred to me.

21         I decided to look at it.  You know, each state -- as

22  we're looking at these challenges in Florida, in Alabama, in

23  Mississippi, and now Louisiana, each state has kind of a slightly

24  different view on products that have been sold.  In this case,

25  Louisiana has pretty extensive case law over the last 60 or

**OFFICIAL TRANSCRIPT**

1   70 years that lays out -- and we laid it out in our brief -- why

2   there is imputed knowledge to the defendants and why they have a

3   duty to warn end-users or consumers about the defective product.

4           But there's also another reason why there is a

10:23:52   5   post-sale duty to warn, and it's found in the United States Code,

6   Your Honor.  15 USC 2064 requires every manufacturer who

7   manufactures a defective product to report that product to the

8   Consumer Products Safety Commission.  And there is something that

9   they have devised called a Corrective Action Plan commonly

10:24:19   10   referred to as a recall.

11          What has to happen when there is a report -- and it's

12   an obligation.  This is not an option.  Under the U.S. Code, they

13   have to report that their product is defective and it was sold in

14   the United States whether it's ongoing or not.

10:24:33   15          They have to cease the immediate sale of that product

16   when they learn that it's defective.

17          They have to give notice to all entities that

18   transport, store, distribute, or otherwise handle the product,

19   and order them to cease their immediate distribution of that

10:24:51   20   product.  That wasn't done.

21          They have to notify all state and local public health

22   officials of the defective product.  That wasn't done.

23          They have to give public notice of the defect -- public

24   notice of the defect, Your Honor.  That certainly wasn't done.

10:25:06   25          We've been arguing that in every single one of these

**OFFICIAL TRANSCRIPT**

1  oppositions, that there had to be public notice by the defendants

2  about their defective product and how it's defective so that the

3  consumers, the homeowners, the end-users, the potential buyers --

4  everybody that might potentially be affected by this defective

5  product is on notice.  And the notice is clear and it's

6  understandable to each one.

7  　　　　Kind of the issue that we're dealing with here for a

8  lot of these plaintiffs is lack of accurate, specific knowledge

9  about the defective product that might be in their house.  We

10  argued in the Florida cases that if they had received -- some of

11  the plaintiffs, if they had received notice that they had the

12  defective product in their house, they would have participated

13  back in the 2011 settlement.  They would have been on notice.

14  They would have been able to come forward and participate there.

15  Because they didn't, they're now in the case that was filed in

16  2014 that's still pending in 2020.  That's six years of delay.

17  　　　　Some of them found -- you know, it's a four-year

18  statute of limitations in Florida.  Some of them found out well

19  before the 2013 filing day.  So we have that as well.

20  　　　　We're not done with the requirements under the

21  U.S. Code.  They have to mail notice to each person who is a

22  distributor or retailer.  I'm not sure if that was done or not.

23  　　　　And then the last one, they have to mail notice to

24  every person who received a delivery of the product.

25  　　　　We've been arguing that all along, that they have a

**OFFICIAL TRANSCRIPT**

10:25:23
10:25:40
10:25:55
10:26:11
10:26:31

1    duty to notify each and every homeowner that they can identify --

2    and they should easily be able to identify that.  They have these

3    distributors and they have these importers they've done business

4    with for years.

10:26:43    5    We know that in 2006, the one e-mail that we keep

6    attaching to all the oppositions, they knew.  They are discussing

7    the smelly board in Miami back in 2006.  That's just one.  We

8    haven't really pored over all of the trial package discovery that

9    was produced by the defendants earlier in this MDL, but what we

10:27:05    10    do know is that at least in mid-2006, they were aware of the

11    smelly board in Miami and contemplated the exposure to

12    litigation.  I think it's implied the litigation that may come

13    with regard to thousands of houses.

14    That's precisely what happened here.  We're looking at

10:27:24    15    somewhere -- I think the initial litigation involved 3200 or 3400

16    houses, and now we have another 130 here.  We're looking at 3500,

17    roughly, houses that are involved.  How many others are there

18    that might have received the drywall that should have been put on

19    notice that haven't found out to date, that aren't on notice,

10:27:43    20    that haven't ever gotten the proper warning that they deserve,

21    and they live in the house now, they try to sell it, and then

22    find out they have it through an inspection report?

23    Which is kind of what happened in a couple of these

24    cases, and I'll run through the ones at hand.

10:27:57    25    I'll start off with Junius.  Nathan Junius is a

**OFFICIAL TRANSCRIPT**

1  plaintiff who is an investor in properties in the New Orleans

2  area.  He bought this particular property that's at issue in

3  February 2006; never lived in it.  He found out in January of

4  2016 that the house had Chinese drywall in it.

*10:28:25*

5  He looks around for an attorney at that point and

6  doesn't realize the *Bennett* case is active.  He has no way of

7  participating.  He self-remediates.

8  He's aware that Chinese drywall at that -- has been an

9  issue in New Orleans, but he doesn't -- he files his claim in

*10:28:41*

10  this *Bennett* case on November 21, 2016.  That's well within the

11  one-year prescriptive period.

12  Defendants' claim that he failed to comply with PTO 1.

13  Well, he remediated between January and November of 2016 before

14  he was subject to the orders of this Court, but he has retained

*10:29:02*

15  samples.  He has pictures.  He has documentation.  It may not be

16  completely air tight, but he certainly did document the

17  remediation process.

18  He came in to his deposition; answered all questions I

19  think satisfactorily.  He let the defendants know what his

*10:29:20*

20  damages are.

21  With regard to the diminution in value, loss of use,

22  personal property claims, again those are damages that should be

23  addressed at trial.  I think we've laid out why, under Louisiana

24  law, each one of those is a claim that's appropriate for

*10:29:35*

25  resolution by a trier of fact.

**OFFICIAL TRANSCRIPT**

1      Toni Macksey, same sort of issue here, and it relates
2  back to the post-sale duty to warn that I just talked about under
3  the U.S. Code.

4      We have Ms. Macksey purchasing the home in October of
5  2012.  She's not -- I think her testimony is she's not aware it
6  has Chinese drywall.  She certainly doesn't assume any risk.
7  There's not any contemplation that it has Chinese drywall in it.
8  She doesn't find out until she gets an attorney advertisement
9  sometime in late 2014, and being -- receiving an advertisement is
10  not the same thing as providing you with constructive knowledge.

11      And I would submit that any advertisements that my firm
12  might have sent in the past has very limited disclosures that we
13  can make.  It simply says "you may have it," you know.  And the
14  Bar has to approve it.  It has to be pre-approved.  You keep
15  copies of it and out it goes.

16      My firm didn't send anything to Ms. Macksey, but she
17  did receive something that initiated her interest in Chinese
18  drywall.  So she looks into it, and ultimately has a Benchmark
19  inspection report in early 2014.

20      So she has that Benchmark inspection report; confirms
21  that she has the defective Chinese drywall in her house
22  manufactured by Knauf Plasterboard (Tianjin).  She files a claim
23  within that one-year prescriptive period, so I don't think
24  there's any issue with it.

25      The Subsequent Purchaser Doctrine, I've already pointed

*10:29:58*

*10:30:19*

*10:30:41*

*10:31:03*

*10:31:19*

**OFFICIAL TRANSCRIPT**

1   out, Your Honor, we're going to stand on the language of the cash

2   sale.  We believe that it expressly assigns any and all --

3   expressly assigns and/or subrogates any and all claims that the

4   previous owner may have had.  The same is true for any Louisiana

10:31:40   5   homeowner that's a plaintiff in this case with the exception of

6   Bank of Louisiana.

7          Natal, this is one where it looks like they filed

8   outside of the prescriptive period.  Your Honor, we're going to

9   rely on the *American Pipe* protection and the lack of post-sale

10:32:03   10   warning, and, again, their inability to find counsel in Louisiana

11   that could take and file their case.  And I think the case law

12   will allow that prescriptive period to be extended beyond the

13   one-year period.

14          Same is true for Martinez.  The notice that -- Martinez

10:32:29   15   received no notice.  They may have found some markings in their

16   attic, but they are laymen.  There's nothing that would have

17   triggered either actual or constructive notice, because there is

18   no warning, there is no common understanding.  And that's really

19   what this gets to.

10:32:49   20          The post-sale duty to warn provides a common

21   understanding for everybody.  They understand what the defective

22   product looks like, how you can identify it, and what the

23   potential impact is on you and your home.  Without that, there's

24   no common understanding.  And what we think the defendants are

10:33:05   25   trying to do in this situation is take advantage of the lack of

**OFFICIAL TRANSCRIPT**

 1   knowledge, the intentional -- I don't want to say "intentional

 2   consumer," because that's not really it.  It's the failure to

 3   comply with the U.S. Code and let everybody know, either through

 4   a recall or a specific letter, that they might have this product,

10:33:22  5   here's how you identify it, here's what it might potentially do

 6   to you, and here's what we're going to do to take action.

 7           THE COURT:  Right.

 8           MR. DOYLE:  Anyway, I think I've covered everything,

 9   Your Honor.

10:33:32  10           THE COURT:  Okay.

11           Any response?

12           MR. DYSART:  Just a few points, Judge.

13           THE COURT:  Yeah.

14           MR. DYSART:  Going back to the language for the

10:33:39  15   Subsequent Purchaser Doctrine, it's in the middle paragraph of

16   this slide.  Again, it's cited in 22373 as an exhibit.

17           But it doesn't give them everything.  It gives them all

18   legal warranties, and with full substitution and subrogation, all

19   rights and action of warranty.

10:33:57  20           And the same concern with respect to Ms. Macksey.

21   Again, it's warranty of title claims that they have with respect

22   to any title issues.  They can go back against their vendor and

23   so on and so forth until they can clear their title.  There's

24   nothing in here with respect to anything in terms of a personal

10:34:12  25   right to sue.  And the Fifth Circuit and Louisiana courts are

**OFFICIAL TRANSCRIPT**

1  clear that there's a distinct difference between a real right and

2  a personal right.  And under *Eagle Pipe,* to have the personal

3  right to sue, it has to be expressly assigned, not implicitly

4  conveyed.

10:34:27

5           So again, based on the language and the arguments

6  submitted, we would argue that those are barred under that

7  doctrine.

8           THE COURT:  Okay.

9           MR. DYSART:  In terms of the 15 USC code argument that

10:34:39

10  Mr. Doyle had made, again, nowhere in his complaint is that claim

11  filed.  Nowhere in the pleadings has that been filed.

12          And in terms of whether the CPSC and certain

13  requirements with respect to CPSC, which has been heavily

14  involved in Chinese drywall since the beginning of this, that has

10:34:55

15  nothing to do whatsoever in terms of when a plaintiff has --

16  prescription begins to run against him in Louisiana.  And we

17  cited the case law in terms of that -- in terms of the one-year

18  prescriptive period for all of these various claims.

19          The other note is that plaintiffs' counsel continues to

10:35:15

20  bring up evidence in terms of samples that they have or other

21  things that -- that they are laymen and other terms.  None of

22  that evidence is in the record.  It is their burden to submit to

23  us all the evidence that they have in terms of what they have,

24  whether it be pictures of samples, whether it be the samples,

10:35:30

25  photographs of the KPT, photographs of the personal property --

**OFFICIAL TRANSCRIPT**

1   all those things.  They had to give that to us.  We need that --

2   we're supposed to receive it, and then we can identify whether it

3   meets the requirements and whether we can cross-examine them on

4   that at deposition.

5   10:35:45   In terms of both Macksey and Martinez in terms of the

6   notice that they received, both knew about KPT drywall.  It's not

7   that they were laymen or that you can just draw this common theme

8   across all of them.

9   You ask them in deposition:  Did you know about it?

10  10:36:00   Yes, I knew about it.

11  Did you know that it was defective?

12  Yes, I knew about it.

13  Did you see it?

14  Yes, I saw it.

15  10:36:04   That's why Ms. Macksey called Benchmark.  That's why

16  she had an inspection done.  We asked for the letter.  We asked

17  her to produce it.  It was never done.  So she can't prove when

18  and where she got that letter in November 2013.  And because it's

19  prescribed on the face, the claim should otherwise be prescribed.

20  10:36:21   Same thing with Mr. Martinez.  Mr. Martinez went to go

21  prove to his technician that he did not have defective Chinese

22  drywall.  He goes up and he sees that it is Chinese drywall.  At

23  that point he's put on notice of it.

24  For those reasons, we would say those claims are

25  10:36:34   prescribed, Judge.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  Let me take just a five-minute

2     break.  I'll be right back with you.

3          Court will stand in recess.

4                         (A recess was taken.)

10:36:41     5                    **AFTER THE RECESS**

6                         (Call to order of the court.)

7          THE COURT:  Okay, folks.  Be seated, please.

8          Let's go to the next ones, Bank of Louisiana, Bonnie

9     and Carl Cordier, and Jacques and Sarah Brousseau.

10:41:26    10          MR. DYSART:  Judge, I'm sorry.  At this point I would

11    ask, with the Court's indulgence, to beg your pardon and take out

12    of turn the last two, Powell and Baber.

13          THE COURT:  Okay.

14          MR. DYSART:  These are two Mississippi non-ARHs, Judge.

10:41:48    15          THE COURT:  And this is Powell and what's the other

16    one?

17          MR. DYSART:  It's the estate of Catherine Baber and

18    then it's also filed on behalf of the executrix, Lisa Lofton

19    [phonetic].

10:41:58    20          THE COURT:  Okay, I got it.

21          MR. DYSART:  Judge, this also involves statute of

22    limitations.

23          It's undisputed that the Mississippi claims have a

24    three-year statute of limitations that applies with respect to

10:42:11    25    property damages, and that the action accrues upon discovery of

**OFFICIAL TRANSCRIPT**

1    the injury, not upon discovery of the injury as cause.

2            Both Powell and Baber, on the face of the complaint,

3    they are -- statute of limitations bars those claims.

4            And also with respect to Ms. Powell, she had actual

5    notice of the defective Chinese drywall for more than three years

6    before filing any action.

7            And with respect to the estate of Ms. Baber, the

8    current plaintiff, there's no evidence that can dispute that the

9    claim has otherwise been barred by the statute of limitations.

10            Again, Your Honor has already dealt with the issue in

11    terms of post-sale duty to warn and equitable estoppel.  However,

12    we've also cited some case law specific to Mississippi in terms

13    that there is no post-sale duty to warn that applies with respect

14    to the equitable estoppel for the Powell and Baber statute of

15    limitations arguments.

16            And again, Your Honor has already dealt with the fact

17    that *American Pipe* and equitable tolling does not apply in this

18    case with respect to the *Bennett* class action.

19            But in terms of the specific facts for Ms. Powell, the

20    alleged defective drywall was installed sometime in 2006, again

21    after there was damage to the property with respect to Hurricanes

22    Katrina and Rita.  Again, she had problems associated with that

23    between 2006 and 2014 -- or at least that's what she alleges.

24            And in October of 2014, a buyer seeks to purchase the

25    property -- excuse me.  There's an inspection done, and

**OFFICIAL TRANSCRIPT**

1  Ms. Baber -- excuse me, Ms. Powell is informed at that time that

2  the house has defective Chinese drywall, and the sale is

3  canceled.  However, she decides, in her words, to just deal with

4  it later.

5          At the time she had already moved out of the property

6  for other reasons.  She had moved out because she was married --

7  or getting remarried to her new husband, and she was dealing with

8  the move and other things and just didn't deal with it at the

9  particular time.

10         We cited the deposition and attached it to the motion

11 for summary judgment.  And it was on Ms. Powell's own accord that

12 she came forward at the deposition and corrected the prior

13 Plaintiff Profile Form and Supplemental Plaintiff Profile Form.

14         What she did was she said, "Well, I didn't know it was

15 KPT until many years later.  However, in October of 2014, when

16 that sale was canceled, that's when the inspection was done.

17 That's when I was informed that the house had Chinese drywall."

18 In fact, she even went and looked in the electrical panel box.

19 The inspector said, "Look, you have the blackened wires here."

20         She did research at that time.  She found out what

21 defective Chinese drywall was, but she didn't do anything.

22 Again, in her own words, she cites that she would just deal with

23 it later.

24         For those reasons, Ms. Powell's claim should be barred

25 on the three-year statute of limitations.

**OFFICIAL TRANSCRIPT**

10:44:00

10:44:15

10:44:33

10:44:51

10:45:05

1        In terms of Ms. Baber, first I'll take the statute of
2    limitations argument.
3            Again, she had notice of Chinese drywall problems on
4    her property based on the testimony of the now executrix of
5    personal property failing sometime between 2006 and early 2013.
6            Ms. Baber then files her action in November of 2016.
7    However, Ms. Baber then passes away.  Her husband, who is
8    actually the owner -- and we submitted arguments that I won't get
9    into, but in terms of failing to establish that Ms. Baber was
10   ever an owner of the property.
11           But in essence of the statute of limitations argument,
12   there is no evidence for them to dispute when or where Ms. Baber
13   actually had knowledge that the property had Chinese drywall.
14           So for that reason, we would submit that it's also
15   barred by the statute of limitations.
16           In terms of Ms. Baber, we cited case law in that.  In
17   2017 the property was lost in foreclosure.  We cited
18   Mississippi case law that after the foreclosure sale, the debtor,
19   Ms. Baber, if she had any interest at all, was divested of all
20   legal and equitable interest in that property.  And in fact, I do
21   not believe that plaintiffs' counsel ever addressed this argument
22   in the opposition that he filed at Record Doc 22573.
23           So for those reasons separately, we would request that
24   Ms. Baber -- the estate of Ms. Baber's claims be dismissed.
25           Again, I mentioned a moment ago there is this issue in

**OFFICIAL TRANSCRIPT**

1  terms of whether Ms. Baber actually had any interest in the

2  property.  The only evidence that we've received in terms of

3  ownership prior to when we filed our motion for summary judgment

4  was a warranty deed that was to her former husband, Mr. Charles

5  Baber, who also passed away.

10:47:07

6       In opposition for the first time, the estate attached

7  Mr. Baber's will.  But otherwise not only is it untimely, but the

8  will alone still doesn't establish that Ms. Baber actually had an

9  interest in the property.

10:47:23

10      Even if she did, again the property and the interest

11  was lost in foreclosure, and at that point she was divested of

12  all legal and equitable interest.

13      Again, I won't go through it again, Judge, but it's

14  plaintiff's burden to submit evidence of damages.  If they don't

10:47:39

15  submit the evidence of damages -- it's not, wait, we'll show you

16  at trial, it's you have to submit the evidence so we can view it

17  in discovery and question them on cross-examination.

18      Both for Baber and Powell, they failed to provide that

19  evidence, and for those reasons, those claims should also be

10:47:54

20  dismissed.

21      THE COURT:  Okay.  Jimmy, let me hear you on those two

22  claims.

23      MR. DOYLE:  I'll take Baber first, Your Honor.

24      THE COURT:  All right.

10:48:10

25      MR. DOYLE:  Opposing counsel is correct, we did produce

**OFFICIAL TRANSCRIPT**

1   the will of the husband when we received it, which was just prior

2   to filing the opposition.  Up to this point, that hadn't really

3   been an issue.  That's a different estate, but it is now in the

4   possession of the Court.

*10:48:30*

5   Charles Baber purchases the property -- I can't

6   remember the exact date.  I think it's 2006.  He passes away in

7   2015.  The will itself says explicitly, "All real and personal

8   property are given to my wife of 40 years, Catherine Baber."

9   She in turn tries to sell the property.  During the

*10:48:52*

10  sale process, which was sometime in 2015 or '16, that's when the

11  Chinese drywall was identified by a potential buyer saying you've

12  got it, and the inspection report that the potential buyer had

13  produced is attached, I believe, in the Plaintiff Fact Sheet.

14  But Ms. Baber -- during the pendency of this case,

*10:49:17*

15  Ms. Baber also passes away and so her estate needed to be

16  substituted.  We ultimately did substitute the estate.  That's

17  the reason that Ms. Lofton is in here now on behalf of the

18  estate.

19  And we've argued, in our opposition, that Mississippi

*10:49:34*

20  does have a discovery rule just like every other state.  It's a

21  three-year statute of limitations for these types of claims.  We

22  laid out the law.  We laid out the exceptions to the three-year

23  statute of limitations such as the discovery rule that's laid

24  out, I believe by statute, in Mississippi.

*10:49:53*

25  And so when Ms. Baber found out in 2016 -- and I think

**OFFICIAL TRANSCRIPT**

1  there isn't any dispute about the actual date of discovery, which

2  was the potential buyer, in 2016, producing a report.  The date

3  of discovery is October 17th of 2016.  The filing date was within

4  two months of that -- actually just over a month, November 21st

10:50:23   5  of 2016.  So this does meet the discovery rule exception and the

6  three-year statute of limitations.

7          THE COURT:  What about foreclosure?  They said you

8  don't have any interest in the property that was foreclosed in

9  2017.

10:50:40   10          MR. DOYLE:  Right, Your Honor.  And that was an

11  inadvertent omission, but we think it's covered in the argument

12  that we made with regard to consequential damages.

13          Mississippi, like any other state, allows for the

14  recovery of loss of use, lost rent -- and that's what this

10:50:57   15  property became.  I believe the testimony from the daughter was

16  that Mr. and Mrs. Baber lived in the property three or four years

17  and then it become a rental property.

18          Ultimately they tried to sell the property; couldn't

19  sell it.  So since 2016 the property couldn't be rented.  They

10:51:19   20  couldn't afford two mortgages, and as a direct consequence of the

21  Chinese drywall being found in the property, the house was

22  foreclosed.  They couldn't afford it.  And then the estate was in

23  the mix as well.

24          So this became a real issue that was a direct

10:51:33   25  consequential effect of having the Chinese drywall in the home

**OFFICIAL TRANSCRIPT**

1   itself, and that's why those damages are compensable.  And I

2   don't think that Mississippi law in any way prohibits that type

3   of claim from being made.

4           I think that we did -- I think it was mentioned in

5   there that diminution of value, loss of use, personal property,

6   and foreclosure are all consequential damages that can and will

7   be pursued at trial.  We don't see -- there's not any prohibition

8   on any of those.

9           I think there was also a duty to warn -- I'll skip

10  that, Your Honor.  I think that's sufficiently covered in the

11  brief.

12          THE COURT:  Okay.

13          MR. DOYLE:  The other claim is with regard to

14  Peggy Powell, and this one is a slightly different situation.

15  And it's not exactly as opposing counsel described it, so I want

16  to make sure the Court is clear on how this evolved.

17          Ms. Powell was trying to sell her house.  This was her

18  individual house.  She got married.  They already had a house

19  under construction.  She tried to sell this house for a period of

20  time; nobody was buying it.  Then a potential buyer comes along

21  and says, "Hey, it has the signs of Chinese drywall."

22          She didn't actually get a report, unlike what opposing

23  counsel is suggesting.  There is no report that was given to her.

24  The cancellation, which I believe is an exhibit to the

25  opposition, says "We're canceling this."  You know, "We don't

**OFFICIAL TRANSCRIPT**

1   want to buy it because it has signs that there might be Chinese

2   drywall in it," or something to that effect.

3        So what she does -- and I think there's a declaration

4   that's been attached to the opposition.  She explains what she

5   did.  She reached out to attorneys.  All of them said, We're not

6   doing Chinese drywall anymore.  We're certainly not doing Knauf

7   anymore.  She reaches out to home inspectors in the area, the

8   ones that she could identify.  None of them were doing it.  So

9   she actually took the steps to try to figure it out; couldn't get

10  it done at that time.

11       She makes it a rental house again for a period of time,

12  and then -- or makes it a rental house.  I believe it may have

13  been for the first time while she and her new husband were in a

14  separate home.

15       But ultimately the renter leaves.  She tries to sell it

16  again, and is confronted with this one more time.  She needs to

17  figure out whether or not it actually has it.  She reaches out to

18  my firm.  We give her some guidance.  She ultimately does figure

19  out that she has it.  She files a claim.

20       And so her date of discovery is when she actually found

21  the latent defect in her home.  It was July 25, 2018.  And she

22  files August 31st of 2018.  So that's within the three-year

23  statute of limitations.

24       And we believe that -- and we provided the case law in

25  the opposition, that the reasonableness of her actions under

**OFFICIAL TRANSCRIPT**

1  Mississippi law are an issue of material fact to be decided by a

2  jury.

3          With regard to all the other consequential damages, we

4  think that all those are appropriate.  We obviously have a

10:54:40  5  genuine difference with regard to the evaluation of those, but we

6  feel, just like we have in all these other ones -- we've argued

7  in all these other oppositions that all of the damages,

8  particularly those where we disagree, which is virtually all of

9  them, should be decided by a jury, Your Honor.

10:54:57  10          Thank you.

11          THE COURT:  Okay.

12          MR. DYSART:  Just briefly, Judge.  I want to touch on

13  the declaration.

14          We cited in our reply that it violates the sham

10:55:06  15  affidavit where you cannot manufacture a genuine issue of fact by

16  contradicting prior testimony.

17          And with respect to Ms. Powell, again, she cites in her

18  affidavit that she didn't even know if there was really an

19  inspection.  In her deposition transcript, which is Record

10:55:29  20  Doc 22412-3, she brings it up that there was an inspection; that

21  the buyer did an inspection.

22          We asked:  Did you actually go?  Did you seek to get an

23  inspection?

24          She said no.

10:55:41  25          That's at Page 10 of that Record Doc.

**OFFICIAL TRANSCRIPT**

1       At Page 12 of that record doc she indicated that she
2  couldn't recall all the research she did, but in the declaration
3  she then remembered.
4       At Pages 12 and 13 of 22412-3 -- this is at Page 34 and
5  Page 35 of the deposition.
6       You were aware that there is such a thing as reactive
7  Chinese drywall at that time in October of 2014, whatever the
8  date was?
9       And when I say reactive -- she says:  I'm not familiar
10 with that term.
11      I say:  When I say "reactive," we'll call it defective
12 Chinese drywall.
13      You were made aware through your research and through
14 the inspection that the buyers did that there is such a thing as
15 defective Chinese drywall?
16      Answer:  Yes.
17      Okay.  That in fact was inside your property?
18      Answer:  Yes.
19      Okay.  Did you ever take any other action from
20 October 2014 until when you filed this case to further inquire to
21 the Chinese drywall in your house?
22      Answer:  No.
23      So again, it contradicts.  The sham affidavit should
24 not be considered.  She was clearly on notice of the defective
25 Chinese drywall.  In her own words she decided to deal with it

**OFFICIAL TRANSCRIPT**

1   later.

2           And the fact that she even contacted attorneys, as she

3   alleges in her declaration, at that point she's on notice.  She

4   understands that she has an issue.  She understands that she has

5   this alleged injury.  She's trying to find it.  That doesn't stop

6   the statute of limitations from running in her case.  And it's

7   been over three years.

8           And for those reasons, her claims are barred.

9           THE COURT:  Okay.  Let's go with --

10           MR. DOYLE:  Can I make two comments?

11           THE COURT:  Sure.

12           MR. DOYLE:  Mr. Dysart is clearly arguing constructive

13   knowledge of the defect.  That's insufficient to trigger a

14   statute of limitations.  We've provided the case law in that

15   respect.

16           And with regard to the notice that she received, the

17   actual notice, we -- I believe it's attached to the opposition.

18   The Court can read for itself what it says.

19           She never received that report, and so without actually

20   receiving the report, there's no actual knowledge that there's

21   Chinese drywall in there.  There's a suggestion that there is,

22   but that's not sufficient to trigger the statute.

23           And the reasonableness of her actions following that is

24   an issue of material fact for the jury to decide.

25           Thank you, Your Honor.

**OFFICIAL TRANSCRIPT**

1    MR. DYSART:  Just for the record, he keeps citing the

2   attachment to the declaration.  The declaration is at 22552-6.

3   Although it says that there is something attached, at least in

4   the record doc that we have, there is no attachment to that

10:58:23    5   declaration.

6    THE COURT:  All right.

7    MR. DOYLE:  Your Honor, may I move the Court, then, to

8   supplement?  The only thing that we would have added is that

9   page.  It looks like it may have been left off during filing.

10:58:32   10   We'd seek leave to add the one page as a notation.

11    THE COURT:  Let me go to the next ones.

12    MR. MILLER:  Judge, it's Kerry.

13    Just so the record is clear -- I know that we got a

14   little bit out of order.  We're going to submit -- or we would

10:58:44   15   ask to submit on the briefs, just move fast here, Brousseau,

16   Armstrong, Norris, and Van Tran.  Will can handle Bank of

17   Louisiana and Cordier.  I'll do Kelley.  And then Rebecca will do

18   Fozard.

19    So we have four left.

10:58:59   20    THE COURT:  Okay.

21    MR. DOYLE:  Which one is going to go first?

22    MR. MILLER:  He's doing Bank of Louisiana.

23    MR. MIZELL:  Good morning, Your Honor.  William Mizell

24   for the Knauf defendants.

10:59:11   25    If it please the Court, I'll go ahead and address the

**OFFICIAL TRANSCRIPT**

1    Bank of Louisiana claims.

2              THE COURT:  Yeah.

3              MR. MIZELL:  We respectfully submit to the Court that

4    the claims of Bank of Louisiana are very clearly prescribed.

5              Bank of Louisiana acquired the property in 2010 via

6    foreclosure, but it didn't file a claim against the Knauf

7    defendants until January 31, 2016.  However, the bank had actual

8    notice of Chinese drywall in the subject property more than a

9    year before it filed those claims, because the real estate agent

10   informed the bank that the property had Chinese drywall.

11             During a deposition with a representative for the bank,

12   he testified that the real estate agent said, quote, the neighbor

13   next door says the house has Chinese drywall, and the bank said,

14   We thought she was crazy.  And that was back in 2010 and so they

15   chose not to do anything.

16             If that wasn't enough, in 2013, the bank received an

17   inspection report that the property contained Chinese drywall.

18   Yet again, the claims were not filed until January 31, 2016,

19   three years later.

20             Moreover, to the extent the claims are not

21   prescribed -- if the Court finds that the claims are not

22   prescribed, which we submit they clearly are, the bank has

23   submitted a claim for allegedly damaged personal property, but it

24   provided absolutely no evidence of such.  Not even a listing of

25   the personal property, much less receipts or backup for the

**OFFICIAL TRANSCRIPT**

1  listing of allegedly damaged personal property.

2          And moreover, the Bank of Louisiana's claims are barred

3  under the Subsequent Purchaser Doctrine because the bank acquired

4  the property as-is without an express assignment of personal

11:00:50  5  rights.

6          I understand plaintiff's arguments.  They submit that

7  because the bank was a mortgage holder when the Chinese drywall

8  was allegedly installed in the property, that it has some type of

9  personal interest, some type of ownership interest in the

11:01:10  10  property; therefore, the Subsequent Purchaser Doctrine doesn't

11  apply.

12          But it hasn't been established that a mortgage holder

13  has an ownership interest in the property.  In fact, the bank

14  acquired the property after the installation of the Chinese

11:01:26  15  drywall via a sale.  So we submit that the Subsequent Purchaser

16  Doctrine would apply to bar those claims.

17          Next, Your Honor, I would like to move on to Bonnie and

18  Carl Cordier.

19          Similarly, we submit that Bonnie and Carl Cordier's

11:01:43  20  claims are prescribed.  Similar to the Bank of Louisiana, the

21  alleged defective drywall was installed in the Cordier's property

22  in 2006, but they didn't file claims until November 13, 2014.

23  However, they had actual notice that the property contained

24  Chinese drywall because they received an INEX settlement letter

11:02:06  25  between June 2012 and February 2013, which would have been the

**OFFICIAL TRANSCRIPT**

1  date that this Court issued an order approving final settlement.

2  So they would have received that letter before February 2013, yet

3  they didn't file claims until November 13, 2014.

4         And on top of -- you know, I'll just go ahead and

5  mention, Your Honor, on top of the notice they received from this

6  letter, they -- there was a strange smell that was noted in the

7  property, and the allegedly damaged personal property failed or

8  never worked since the Cordiers moved into the property in 2006.

9         So we submit that the Cordiers' claims are prescribed

10  just as Bank of Louisiana's claims are prescribed as well.

11         And as addressed by my colleague earlier and addressed

12  by yourself in your latest order in this matter, *American Pipe*'s

13  tolling does not save their claims.  It does not apply here.  And

14  *contra non valentum* does not apply either to the extent that the

15  claimants had actual notice that the property had Chinese

16  drywall.

17         And we will submit the Brousseaus' arguments on the

18  briefs, Your Honor.  I know they are listed.

19         THE COURT:  All right.  Thank you.

20         MR. MIZELL:  Thank you.

21         MR. DOYLE:  Your Honor, again this is an argument for

22  triggering the statute of limitations or prescriptive period in

23  Louisiana based on constructive knowledge.

24         Without receiving -- as I mentioned earlier, Louisiana

25  has this post-sale duty to warn.  Federal law also compels the

**OFFICIAL TRANSCRIPT**

1    defendants to provide notice.  And neither one of these
2    plaintiffs, either the Bank of Louisiana or the Cordiers, were on
3    actual notice that they had it.

4         And simply mentioning -- I think the record is clear,
5    as is the case law, that someone simply mentioning the term
6    "Chinese drywall" does not trigger your statute of limitations or
7    your prescriptive period from starting, from beginning to run.

8         A neighbor -- in the case of the Bank of Louisiana,
9    they lend money to have this home built in Prairieville, I
10   believe, or it's Gonzales, but the home is built.  The original
11   owner defaults on the loan.  They take it back through a judicial
12   sale.  We've attached the judicial sale document as an exhibit
13   here.

14        At no point was the latent defect known to the
15   plaintiff prior to the date of discovery.  It simply was not --
16   they were not on notice from KPT or from INEX or anyone else.  So
17   at no point did they know that the house had Chinese drywall or
18   even had a legitimate concern about Chinese drywall, as the
19   representative of the bank testified.

20        You know, he thought that it was crazy.  He didn't see
21   any signs of it.  He went himself and viewed the property.  He
22   didn't see any signs of the Chinese drywall.  But, again, he's a
23   layman, he's a banker.

24        THE COURT:  I thought they had it inspected.  They
25   didn't have it inspected?

11:04:03
11:04:26
11:04:49
11:05:12
11:05:24

**OFFICIAL TRANSCRIPT**

1       MR. DOYLE:  They ultimately did have it inspected in
2  March of 2015.  The Plaintiff Profile Form shows that the date of
3  discovery is March 21, 2015.  They filed their claim on
4  January 30, 2016.  So it's less than one year after the date of
5  actual discovery.

6           And, again, we've argued that even if you have a
7  situation where someone suggests, Hey, there might be Chinese
8  drywall in here, that doesn't put you on actual notice.  It
9  doesn't.  And that's not what the law requires.

10           So in this instance, once they finally discovered it,
11 that triggers their prescriptive period; they filed within the
12 appropriate time.  Their claims should proceed.

13           In our brief, Your Honor, we provided a case -- and I
14 can't remember the name of it off the top of my head.  But it had
15 to do with a piece of land that had a gas station on it in the
16 past.  The owner purchases it not knowing that it had the gas
17 tanks underground, and ultimately they received letters from a
18 Louisiana agency that said, Hey, there may be a problem here and
19 we want to come test it, is that okay?

20           They ultimately did test it, and during that time they
21 learned that it actually did have -- I think on one portion of
22 the land I think they had found out that it had some sort of
23 contaminate, and then didn't take action for more than a year.
24 That was prescribed.  They received letters, and the Court said
25 at that point -- the Louisiana state appellate courts have said

**OFFICIAL TRANSCRIPT**

1  that when they have notice like that, then they're compelled to
2  take action.
3          In the case of the Cordiers, Counsel's suggesting that
4  they received an INEX settlement notice.  I think that's contrary
5  to the testimony.  But in any event, even if they did receive the
6  letter in -- whenever it occurred, the Cordiers actually took
7  action in January of 2014.
8          If they received it in 2013 -- and we don't know the
9  specific date that they received any letter.  And I believe the
10 testimony, as I recall it, is that they did not receive that
11 letter.  The only thing that they received was a letter from an
12 attorney -- again, not my firm -- but a letter from an attorney
13 that said, You might have Chinese drywall.  That's what put them
14 into motion.  They ultimately had an inspection on their home in
15 January of 2014 with the initial filing of this case on
16 November 13th of 2014, within the one-year prescriptive period.
17 So the Cordiers have complied.
18         And just because they have -- again, we've laid this
19 out in every single brief.  Because there's a smell of some kind
20 in the house, that's not putting you on actual notice.  This is a
21 latent defect, and Louisiana -- we found this in our research.
22 Louisiana has found -- the State of Louisiana has found that
23 Chinese drywall, in particular, is a latent defect.
24         So if there's any question about whether or not the
25 case law regarding latent defects is applicable, Louisiana has

**OFFICIAL TRANSCRIPT**

1   cleared that up.  Chinese drywall is a latent defect.  Therefore,

2   when they -- so any of the protections that homeowners may have,

3   provided that they have not been put on actual notice or

4   sufficient notice, like the letter case that I just referenced --

5   and in this case there's no evidence that they did.  Unless that

6   is the case, there is no triggering of their prescriptive period,

7   and their claim is properly filed.

8         THE COURT:  Okay.  We have two more, the Hamilton and

9   the Fozard?

10        MR. MILLER:  Yes, Your Honor.

11        Your Honor, Hamilton, it's an Alabama case -- and it's

12   actually Kelley and Hamilton.  The son is Joshua Kelley.  The dad

13   is Earnest Hamilton.

14        Your Honor, I'm really at a loss for this.  I didn't

15   file a reply.  I didn't bother to file a reply.  I didn't want to

16   charge my client for it.  They're two independent reasons why

17   this claim should be dismissed, Your Honor.

18        Number one is *res judicata*.  Number two is statute of

19   limitations.

20        Your Honor, this property -- and I know you dealt with

21   this the last time, the Thomas home, and you also dealt with it

22   in the context of your ruling -- we're getting a follow-up

23   affidavit from BrownGreer.  The name escapes me -- Tolliver

24   [phonetic].  Those cases dealt with homes that were in the Knauf

25   settlement; a new owner comes along.

11:08:59

11:09:19

11:09:42

11:09:57

11:10:14

**OFFICIAL TRANSCRIPT**

1        Kelley is that on steroids, Your Honor.  Kelley was the

2  original owner.  He filed a claim in the Knauf and INEX

3  settlements.  There's his claim form, Your Honor.  Joshua Kelley.

4        Second -- and I'm going to point to Mr. Doyle's brief.

*11:10:36*  5  I mean, we sat here all morning.  We talked about actual notice.

6  He gets up and he says, Well, when someone knows about it, that's

7  really constructive notice.  Actual notice is when someone points

8  it out to you.

9        The same thing all over again.  Kelley signs -- checks

*11:10:56*  10  off a box that he is a member of the Knauf and INEX settlement

11  classes.

12        Dean, put the annotation on.

13        THE CASE MANAGER:  It's on.

14        MR. MILLER:  It wasn't.  I was just trying to point it

*11:11:13*  15  out.

16        THE CASE MANAGER:  It's frozen, Kerry.

17        MR. MILLER:  Unfreeze it and I'll keep moving.

18        But it's clear, Your Honor, that Kelley and this home

19  filed a claim on time in the Knauf class action settlement and in

*11:11:30*  20  the INEX class action settlement.

21        We subsequently obtained an affidavit from Jake Woody

22  of BrownGreer which confirmed, Your Honor, that in fact this

23  home, this property, was a timely settlement claim in the Knauf

24  and INEX class action settlements.

*11:11:56*  25        Now, in Mr. Doyle's opposition -- he writes it real

**OFFICIAL TRANSCRIPT**

1  fast.  There's no commas, there's no punctuation.  He says "INEX

2  Global."  It's Knauf.  The guy checked the box off.  Jake Woody

3  confirmed it by way of affidavit.  You have identity of parties;

4  all the elements of *res judicata* are met.

11:12:17
5          Your Honor, as you know, your approval order from back

6  in '13 has long since been final.  There's a final judgment.

7  They were class members.  It's barred on the basis of

8  *res judicata*.

9          Your Honor, independently it's also barred on the basis

11:12:30
10  of the expiration of the statute of limitations in Alabama.  The

11  settlement claim was made in 2013, Your Honor.

12          The claims under Alabama law sound in tort, which have

13  a two-year statute of limitations period in Alabama.  The Alabama

14  Unfair Trade Practices Act has a one-year statute of limitations.

11:12:50
15  And the warranty law of Alabama has a four-year statute of

16  limitations, but it runs from date of sale, not from date of

17  notice of a defect, sort of like our redhibition runs from date

18  of notice to the sale.  The sale was in 2012, so it's not an

19  issue.

11:13:07
20          They filed a claim in the Knauf class action

21  settlement.  It was timely.  It was on time.  That was in 2013.

22  Clearly that begins the running of the statute of limitations

23  when they filed a claim.  They're on actual notice.

24          I'm waiting for him to get up and say, They filed a

11:13:28
25  claim on constructive notice, because that's what he said before.

**OFFICIAL TRANSCRIPT**

1   That would be incredible.  I'm not a psychologist, I'm not a
2   psychiatrist, but I don't know how you could constructively
3   notice file a claim.  It is actual notice.
4          In addition, the co-owner, Earnest Hamilton, the dad of
5   Joshua Kelley, is a contractor.  On December 5, 2013, he submits
6   a construction repair invoice to fix the home.
7          I asked him in his deposition:  What's the purpose of
8   this construction repair invoice?
9          He goes:  To fix the Chinese drywall in the home.
10         That's three years before suit was filed.
11         So independently it is subject to *res judicata*.  It's
12   subject to expiration of the statute of limitations.  I didn't
13   file a reply.  I feel as if I'm screening a case here, Your
14   Honor.  If Your Honor rules in my favor, I'm going to seek a bill
15   of costs on this one.  There was just really no reason for me to
16   have to go deal with this; take depositions.  I mean, he filed a
17   claim in settlement.
18         THE COURT:  Thank you.
19         MR. DOYLE:  Your Honor, I'm going to clear up a couple
20   of things.  Joshua Kelley is not the original owner.  He
21   purchased the house in August of 2012 from the Department of
22   Veterans Affairs, if I'm not mistaken.
23         The Plaintiff Profile Form says he found out that he
24   had Chinese drywall made by Knauf May 29th of 2015.  They filed a
25   claim January 30th of 2016, less than one year after the date of

**OFFICIAL TRANSCRIPT**

1  discovery.

2        THE COURT:  But he says the claim was settled in the

3  Knauf Global.

4        MR. DOYLE:  Your Honor, this is something that they

*11:15:24*  5  could have easily provided to us.  If they're in possession of

6  that -- those initial disclosures, they should have provided that

7  to us following the Rule 26 conference that never took place,

8  that they refused to participate in.  This is at least the fourth

9  time now where at the end they say, Oh, we had this, you should

*11:15:41*  10  have known about it.

11        MR. MILLER:  Your Honor, that's wrong.  His client

12  attached his settlement claim form to his profile form.  That was

13  the only thing he attached that was worth a darn.

14        When I get into the profile form, then I call Jake

*11:15:55*  15  Woody, and I say, Jake, can you confirm this for me?

16        I mean, this is crazy that I've got to spend money

17  taking depositions and filing motions on a case like this.

18        MR. DOYLE:  You're suggesting my client attached his --

19        MR. MILLER:  Well, he must have committed perjury when

*11:16:08*  20  he wrote "2015," because that profile form attached the claim

21  information.

22        MR. DOYLE:  Well, we can talk about how he

23  constructively might have been on notice that there was Chinese

24  drywall and can participate, just like anybody.

*11:16:21*  25        If you talk with BrownGreer, you didn't actually have

**OFFICIAL TRANSCRIPT**

1  to produce evidence that you have a particular brand to

2  participate in that settlement.  And the only option for any

3  manufacturer was INEX.

4         MR. MILLER:  Your Honor --

11:16:36  5         MR. DOYLE:  Excuse me, was KPT.

6         MR. MILLER:  So what he just admitted is his client

7  either committed perjury in submitting the claim form to

8  BrownGreer, because the claim form was submitted subject to a

9  penalty of perjury, in which he said in 2013, I got a claim.  Or

11:16:51  10  he committed perjury in connection with his profile form when he

11  checked off "May of 2015."  It can't be both.

12         MR. DOYLE:  Your Honor, I don't think --

13         MR. MILLER:  What we know from the construction invoice

14  was it was 2013.

11:17:04  15         THE COURT:  Okay.

16         MR. DOYLE:  Your Honor, what we have is we've got

17  verified --

18         MR. MILLER:  Somebody committed perjury.  I'll go to

19  the U.S. Attorney's office.

11:17:11  20         THE COURT:  Wait, wait, wait.  Let's hear from the

21  defendant -- I mean the plaintiff.

22         MR. DOYLE:  Your Honor, what we've got here is we have

23  a plaintiff who may have learned that he has signs of Chinese

24  drywall, and participated -- or attempted to participate in the

11:17:25  25  2013 class case.  He submitted a form.

**OFFICIAL TRANSCRIPT**

1        This was never -- there was never a question about this
2   during the deposition or any effort to figure out why that box
3   was checked.  And what we're talking about here is checking one
4   box, whether he has a KPT claim.  They don't know.

5        They have already verified that they found out that
6   they have KPT in their house on May 29th.  That's what we're
7   relying on -- that's what my office is relying on.  We look at
8   the date of their discovery.  What is the date of discovery?
9   Tell me what your date of discovery is.  They say it's May 29,
10  2015.

11       THE COURT:  Okay.  I've got this one.  I understand.
12  I'll check and see what the situation is.

13       MR. DOYLE:  Okay, thanks.

14       THE COURT:  It is what it is.

15       Is that it?

16       MR. MILLER:  Fozard.

17       THE COURT:  Okay, Fozard.  Last one.

18       MS. VEITH:  Just one more.

19       So the Fozards -- this is an assumption of the risk
20  motion, and I read Your Honor's ruling from last Friday.  I know
21  what you said about assumption of the risk in Florida.

22       But the Fozards are in Mississippi where assumption of
23  the risk can be decided on summary judgment.  And we cited in our
24  briefs the *Green v Allendale Planting* case, which is from the
25  Mississippi Supreme Court, where the Supreme Court upheld a trial

**OFFICIAL TRANSCRIPT**

1    court's grant of summary judgment on assumption of the risk, and

2    that case really kind of provides a roadmap for this claim.

3            So the Fozards are a couple who moved down to

4    Mississippi from Illinois.  For their whole careers they worked

5    in the insurance industry.  So I was looking at their Plaintiff

6    Profile Form, and I asked Ms. Fozard -- I said:  I see your

7    husband is the person who discovered the Chinese drywall.  Does

8    he have some sort of specialized knowledge about Chinese drywall?

9            She said:  Oh, well, only in that he has expertise from

10   being in the insurance industry.

11           So when I deposed Mr. Fozard, I asked him:  Well, what

12   did you know about Chinese drywall?

13           I wish PowerPoint was up here, because if it was, it

14   would show you that he said:  I was aware of Chinese drywall

15   being a problem down here.  I knew it was a problem and it was

16   driving people out of their homes.

17           So then I asked Mr. Fozard:  Well, did you have your

18   home inspected for Chinese drywall before you moved in?

19           They had their home inspected, but that inspection did

20   not check for Chinese drywall.

21           And he said:  Well, I didn't think that inspector could

22   check for Chinese drywall.

23           So I said:  Well, did you check and see if there were

24   inspectors who could check for Chinese drywall?

25           And he said no.

11:18:56
11:19:12
11:19:26
11:19:41
11:19:52

**OFFICIAL TRANSCRIPT**

1          So these are plaintiffs who have some specialized
2     understanding of the risks associated with Chinese drywall
3     because of the work that they did for decades.  They assumed the
4     risk when they did not have an inspection performed on their home
5     for Chinese drywall, that their home -- which they knew was
6     renovated after Hurricane Katrina.  That's another thing
7     Mr. Fozard told me.
8          I said:  Well, did you know that Chinese drywall was
9     often associated with homes that were renovated after
10    Hurricane Katrina?
11         He said yes.
12         I said:  Did you know that your home was renovated
13    after Hurricane Katrina?
14         He also said yes.
15         They assumed the risk that there might be Chinese
16    drywall in their house, and they chose not to have an inspection
17    of the house.
18         I expect there might be some argument about a post-sale
19    duty to warn here, but Mississippi's Products Liability Act says
20    that as to manufacturers of a defective product, there is no
21    liability if a plaintiff knowingly assumes the risk of the
22    dangerous design.  That's exactly what we have here.
23         The Mississippi Supreme Court in *Green* said that if a
24    party can choose a reasonably comfortable way of doing something,
25    but they go and choose the dangerous way, they have assumed the

11:20:09
11:20:19
11:20:26
11:20:39
11:20:59

**OFFICIAL TRANSCRIPT**

1   risk.  The Fozards had a reasonably comfortable way of assuring

2   their house didn't have Chinese drywall.  They knew it could have

3   it; they didn't get an inspection for it.  They assumed the risk

4   which they knew was likely that there might be Chinese drywall in

5   their home.

6          And just one brief point.  They are also claiming

7   damages for interest on money that they haven't borrowed yet.

8   Those kind of damages are far too speculative to ever be awarded.

9   They don't even know if they're going to borrow the money yet.

10          So I think their entire claim can be disposed on

11   assumption of the risk, which, again, in Mississippi, summary

12   judgment can be granted on those claims.  But if not, they

13   certainly shouldn't get damages that they don't even know if they

14   are going to incur yet.

15          THE COURT:  All right.

16          MR. DOYLE:  Your Honor, I'm just going to refer the

17   Court back to my argument previously on the damage issue.  Any

18   damages that the plaintiffs are seeking in this case can be

19   resolved by a trier of fact.  And we think that that's the

20   appropriate place to make that portion of the argument.

21          With regard to the statute of limitations and the

22   notice that the Fozards had in this case, we know that they

23   purchased the property in 2015, in March.  They had a home

24   inspection done at the time of purchase.  No, there wasn't a

25   Chinese drywall component to it, but there are limited Chinese

**OFFICIAL TRANSCRIPT**

1    drywall inspectors in the area.  And there's nothing that compels

2    them under any law, whether it's Mississippi or federal law, to

3    have a Chinese drywall inspection done before purchase.

4            Again, there is a duty to warn here that was

11:22:57    5    disregarded by the plaintiffs [sic].  It colors every single

6    aspect of every single one of these claims, and it colors this

7    particular case as well.

8            Just because the Fozards are in the insurance industry

9    does not -- that's not the same thing as being an expert on

11:23:15    10    Chinese drywall.  You may be aware that there is Chinese drywall

11    out there.  You may be aware that your particular insurance

12    company has assumed some risk or had to pay claims or maybe had

13    some claims filed.  That doesn't make you an expert on Chinese

14    drywall.

11:23:31    15            There are specific inspectors, and most home inspectors

16    are not checking for Chinese drywall because they don't

17    understand it.

18            The same thing here.  You can't expect an insurance

19    agent, who is aware that claims were made of Chinese drywall, to

11:23:46    20    be a Chinese drywall expert.  And so if he's not the expert, he

21    is by definition a layman.  Laymen are not expected to know a

22    home has a latent defect in it.  They're not compelled to search

23    for every potential latent defect.  And they certainly did not

24    assume any risk.

11:23:59    25            And Mississippi law is very clear on this.  To assume

**OFFICIAL TRANSCRIPT**

1    the risk, you have to know and contemplate it and agree to accept

2    that risk at the time of purchase.  That didn't happen here.

3             MS. VEITH:  Very briefly.

4             There is no evidence anywhere in the summary judgment

11:24:17
5    record that there weren't enough Chinese drywall inspectors in

6    Mississippi when the Fozards purchased their home.  In fact, what

7    the evidence shows is that Mr. Fozard doesn't know why he didn't

8    get an inspector for Chinese drywall.

9             And there is also no evidence -- there is no evidence

11:24:33
10   submitted at all to refute the deposition testimony that we

11   showed.  There is argument that they had heard the term "Chinese

12   drywall," but that's not what's in the deposition testimony.

13   There's argument that there is a general societal knowledge about

14   Chinese drywall.  That's not what we argued.

11:24:47
15            We said this specific person told us that he knew that

16   there were problems associated with homes that were renovated

17   after Hurricane Katrina; that these homes might have Chinese

18   drywall.  He knew that his home was one of those, and he chose

19   not to seek an inspection to determine if there was Chinese

11:25:02
20   drywall in it.

21            Thank you.

22            THE COURT:  All right.  I got it.  All right.  I'll

23   come out with my ruling very shortly.

24            MR. MILLER:  Your Honor, please.  Kerry Miller.  May it

11:25:09
25   please the Court:

**OFFICIAL TRANSCRIPT**

1        We filed last week a motion to extend the cut-off date

2   for the dispositive motions.  It's currently March 1st.  We

3   sought expedited consideration.  I saw Mr. Doyle filed an

4   opposition to it yesterday.  Ours is Rec Doc 22579, and the

5   motion to expedite is 22580.  I don't know if the Court wanted to

6   hear any more information on that.

7        What we would like to do, Your Honor, is now that we

8   have the benefit of your ruling on the first batch from last

9   Friday -- and we know that the Court put in a lot of hard work to

10  get that out as quickly as possible, so we're very appreciative

11  of that.  That certainly gave us some guidance on what issues we

12  might move forward on and what issues the Court sees that should

13  be reserved for trial or pretrial inserts or Rule 50 motions.  So

14  we thought that that ruling would be helpful.  Frankly, that's

15  why we just said for four of those, we'll submit them on the

16  briefs.

17        THE COURT:  How much time do you need?

18        MR. MILLER:  The motion sought 45 days.  The idea,

19  Your Honor, would be to go through -- basically, Your Honor, as

20  you know what happens -- look, we did the profile form thing, we

21  didn't really get information, so we took a bunch of depositions

22  last summer, about 60 for so.  The first batch that we filed were

23  based upon the depositions that we took in the summertime.

24        I was not able to go through 60 depositions and arrange

25  them in a way that I would have liked because we filed them

**OFFICIAL TRANSCRIPT**

1  before the end of the year.  We then didn't resume depositions --

2  as Your Honor will remember, Mr. Doyle had conflicts with the

3  Taishan settlement in the fall so then we didn't resume

4  depositions until November and December.  We took about 40 in

5  November and December.  Those are the ones we are going through

6  now.  So what I would like to do, Your Honor, is file two more

7  batches.  Maybe another Florida batch, kind of like we did

8  before.

9       In light of Your Honor's rulings of last Friday, we're

10  not going to repeat or re -- you know, if you have ones that

11  said, look, the evidence is scant but he gets across this hurdle;

12  deal with it at trial or in the pretrial proceedings, I mean,

13  we're not going to repeat that.

14       And I would like to file another Louisiana,

15  Mississippi, and Alabama version, so two more batches where I put

16  them together.  Maybe we can refine our arguments, curate them,

17  and do omnibus motions, sort of like the way we presented them

18  today, instead of filing single stand-alone motions.

19       So that's the idea behind that.  I don't think that

20  will delay proceedings, Your Honor.  I think that will help

21  better organize proceedings so that when you remand the cases --

22  and when you're hearing them, you're not looking at 20 or 30

23  different motions, maybe you're looking at three or four

24  different motions with a page or two per claimant based upon

25  whatever the issue is there.  But that's the idea.

**OFFICIAL TRANSCRIPT**

1    So I would like to have until April 15th, but I can do
2    it by March 31st too, if possible.
3        THE COURT:  Jimmy, I've given you enough time --
4    several times I've extended the time for you.  I think I'm going
5    to do the same, but I'll shorten it to the 30th -- the second
6    date.
7        MR. MILLER:  April 1st.  Okay.  That would be great.
8        THE COURT:  All right.  Thank you.  Court will stand in
9    recess.
10                            (Proceedings adjourned.)
11
12                        *  *  *  *
13                        CERTIFICATE
14
15       I hereby certify this 20th day of February, 2020, that
16   the foregoing is, to the best of my ability and understanding, a
17   true and correct transcript of the proceedings in the
18   above-entitled matter.
19
20                              /s/ Mary V. Thompson
21                            _____
                             Official Court Reporter
22
23
24
25

**OFFICIAL TRANSCRIPT**