```
              IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA


   In Re:                      )
   CHINESE-MANUFACTURED        )
   DRYWALL PRODUCTS LIABILITY  )
   LITIGATION,                 )
                               )
   PLAINTIFFS,                 )
                               )
                               )
   VS.                         )   CASE NO. 14-cv-2722
                               )
   This document relates to:   )
                               )
   Elizabeth Bennett, et al    )   DEPOSITION OF:
   vs. Gebr. Knauf             )   LYNN RUSSELL
   Verwaltungsgesellschaft,    )
   KG, et al,                  )
                               )
                               )
   DEFENDANTS.                 )
                               )
```

                S T I P U L A T I O N S
            IT IS STIPULATED AND AGREED, by and between
the parties through their respective counsel, that the
deposition of:
                     LYNN RUSSELL,
may be taken before LaKeysha T. Satterfield, Commissioner and
Notary Public, State at Large, at the offices of Bain &
Associates, 505 20th Street North, Suite 1250, Birmingham,
Alabama  35203, on the 5th day of December, 2019, commencing
at approximately 12:27 p.m.

```
 1                        APPEARANCES
 2

 3   FOR THE PLAINTIFFS:
 4        Jimmy Doyle
          Attorney at Law
 5        Doyle Law Firm, PC
          2100 Southridge Parkway, Suite 650
 6        Birmingham, Alabama 35209
 7

 8   FOR THE DEFENDANTS:
 9        Kerry Miller
          Attorney at Law
10        Fishman Haygood
          201 St. Charles Avenue, Suite 4600
11        New Orleans, Louisiana  70170
12

13
                        EXAMINATION INDEX
14
                                              Page
15      Examination by Mr. Miller              3
16

17                      EXHIBIT INDEX
18             (Exhibits were not introduced.)
19

20

21

22

23

24

25
```

```
 1                    I, LaKeysha T. Satterfield, a Court Reporter
 2    of Birmingham, Alabama, and a Notary Public for the State
 3    of Alabama at Large, acting as Commissioner, certify there
 4    came before me on the 5th day of December, 2019, at the
 5    offices of Bain & Associates, 505 20th Street North, Suite
 6    1250, Birmingham, Alabama  35203, commencing at
 7    approximately 12:27 p.m., LYNN RUSSELL, witness in the
 8    above cause, for oral examination, whereupon the following
 9    proceedings were had:
10                           LYNN RUSSELL
11     Having been duly sworn, was examined and testified as
12     follows:
13                           EXAMINATION
14    BY MR. MILLER:
```

15   **Q.           Good afternoon, Mrs. Russell.  Please state your**
16   **name for the record.**

17   A.           Lynn C. Russell.

18   **Q.           Mrs. Russell, for the last hour and a half or so**
19   **I've been asking your husband Carl Russell questions about the**
20   **home at 5427 Creekside Lane and the claim being made in the**
21   **Chinese drywall lawsuit about that.  Were you able to listen**
22   **to my questions and to his answers, Mrs. Russell?**

23   A.           Yes, sir.

24   **Q.           And so what I'm going to ask you to do is, is**
25   **there any answer that your husband gave to any questions that**

1   I asked him that you would like to elaborate on or modify or

2   change in any way because I'd like to give you that

3   opportunity.  I saw at some instance you had a couple of

4   things that you were thinking of in response to my questions

5   and so --

6   A.           I know.  And I may have to have you go to some

7   of those questions because I'm mainly remembering the later.

8   Q.           Okay.  Well, let me just ask the way I did.  Is

9   there anything that comes to mind right now that you would

10  like to amend or change or add onto or provide some

11  elaboration?

12  A.           There were several things that I'd like to help

13  him with, and honestly -- could you go over some of those?

14  Q.           Yeah.  I think one of the things might have

15  dealt with air conditioning repairs.

16  A.           Yes.  Coils.  The coils were replaced once or

17  twice.

18  Q.           Do you recall when the coils were replaced?

19  A.           No, sir, I don't.

20  Q.           Or by whom they were replaced?

21  A.           I do not because I'm not sure if we still had

22  Mainline at that time.

23  Q.           Let me ask it the other way, ma'am.  You agreed

24  with your husband's testimony?

25  A.           Yes, sir.

1  Q.            Would you like to adopt his testimony as your

2  testimony?

3  A.            For the most part.  It's more or less maybe

4  throwing in a little something like the coils, you know, with

5  the air conditioning.

6  Q.            Any other -- so I understand, and you're

7  certainly entitled to adopt your husband's testimony for the

8  most part.  Any other details you'd like to add based on his

9  answers to the extent that you can recall?

10 A.            I don't know how important or how it has to do

11 with anything, but there's one thing that I recall when we

12 were selling the house.  Our Realtor -- I don't know where we

13 were at that time.  It might have been in Georgia.  I don't

14 know.  Said that when she went into our home, because someone

15 was wanting to view it, she opened our side door because there

16 was an odor, and that was interesting.  She was trying to air

17 it before the people came to look at it.

18 Q.            Your husband during his testimony, and I don't

19 know if this was one of the times when you were maybe wanting

20 to add some information, and he was mentioning that he would

21 walk down a hallway perhaps and smell a burnt match type odor.

22 And he said, well, maybe he'll talk to you about it, maybe he

23 didn't.  Is that an instance you'll like to elaborate on?  I

24 just don't recall exactly, but it looked like you were wanting

25 to talk.  I thought maybe that was another instance.

1   A.              It may have been something else around that.  I

2   guess I was agreeing because he, at one point, asked do you

3   smell anything right here --

4   **Q.              Uh-huh.**

5   A.              -- and I could.  But we've been living with it,

6   so I mean, we don't even notice it but other people do.

7   **Q.              Had anybody else noted to you a strange smell in**

8   **the home beside the Realtor?**

9   A.              Family.

10  **Q.              Uh-huh.  And when would that have been?  Do you**

11  **recall?**

12  A.              That would have been our children.  That could

13  have been at any point.

14  **Q.              You don't recall specifically when?**

15  A.              No, sir.

16  **Q.              Early on, more recently or --**

17  A.              In recent years.

18  **Q.              Anything else that you can think of, ma'am, that**

19  **you'd like to elaborate questions that I asked your husband**

20  **about the home, acquiring the home, knowledge of Chinese**

21  **drywall, the inspections, anything of that sort?**

22  A.              No.  I just recall him after he viewed that

23  letter being upstairs in the attic and looking for anything.

24  **Q.              You mean the letter from the contractor Gilbert**

25  **Anderson?**

```
 1   A.            I'm assuming that was it.  He was up there quite
 2   a while looking and trying to find some indication of the
 3   Chinese drywall.
 4   Q.            Do you have any ability to better pinpoint when
 5   that letter may have came in which caused your husband to go
 6   in the attic and look around for evidence of Chinese drywall?
 7   A.            It would be a guess.  Four or five years ago.
 8   Q.            Do you recall independent of the things that
 9   your husband talked about obtaining any information at all
10   about Chinese drywall from whatever source?
11   A.            Like after finding out?
12   Q.            No.  Prior to finding out.
13   A.            Oh, no.
14   Q.            People in the neighborhood, newspaper articles,
15   anything like that?
16   A.            No.  I do recall and when he was talking about
17   homes being --
18   Q.            Right.  That was it.  Yeah.
19   A.            The very first home as you entered the
20   neighborhood on the right was being gutted.
21   Q.            And how did you know that?
22   A.            We did find out -- well, we could see Pod -- a
23   Pod.
24   Q.            Uh-huh.
25   A.            And work going on.
```

1   Q.          Uh-huh.

2   A.              And I did see -- and I know he doesn't remember.

3   I did see several Pods.  I'm -- I'm surprised at the number,

4   but there were several homes later and a couple of years later

5   probably had Pods.

6   Q.          And so you would see Pods outside of the home,

7   and how did you know that those homes were being repaired

8   because of Chinese drywall?

9   A.              I didn't.

10  Q.          You just saw the Pods?

11  A.              Yes, sir.

12  Q.          And what did that mean to you at the time?

13  A.              It did mean Chinese drywall, I guess.

14  Q.          It did mean Chinese drywall at the time?

15  A.              Right.  I mean, it just --

16  Q.          And when you see -- you said the home right when

17  you come into the neighborhood -- go back and look at the map

18  I showed your husband so you can identify which one that would

19  be.  So just to give you a point of reference I guess.

20  A.              Yes.

21  Q.          So they don't exactly match up well, but this is

22  the Google Earth imagery with the different streets, and

23  that's your home.

24  A.              Uh-huh.  So this is the entrance.

25  Q.          Which street is that?

1   A.          What is this?

2   **Q.          It says --**

3   A.          I didn't bring my reading glasses.

4   **Q.          Brocks Gap Parkway and then Creekside Loop?**

5   A.          Yes.  And it was the very first home.  Is that a

6   home or is this --

7   **Q.          I think that's a home right there.**

8   A.          Okay.  Is it this one?

9   **Q.          It says print -- Party Art Studio.**

10  A.          Okay.  It would have been the very first home.

11  I don't what that Art Studio thing is.

12  **Q.          And if you'll look back on this map, it would**

13  **have been Brocks Gap Parkway and then there's Creekside Loop,**

14  **so it would have been this one or this one, right?**

15  A.          Right in about here.  Maybe right in the center.

16  **Q.          And so you noticed a Pod outside of that home?**

17  A.          More than a Pod, work going on.

18  **Q.          Work, Pod, dumpsters, things of that sort?**

19  A.          Yes, sir.

20  **Q.          And you knew that meant Chinese drywall?**

21  A.          We were told.

22  **Q.          And who told you that?**

23  A.          A neighbor.

24  **Q.          Was that McElhaney?**

25  A.          McElhaney and Hicks.

1  Q.              Hicks was another neighbor?

2  A.              Yes, sir.

3  Q.              What did Hicks tell you about Chinese drywall

4  repair activity in your neighborhood?

5  A.              Just that -- what my husband explained that --

6  because we were surprised some of them would be moving, you

7  know, or having problems so early.  Commented about the man

8  had been hospitalized --

9  Q.              Uh-huh.

10  A.              -- many times, and finally they felt that -- I

11  don't know what they had checked, but the point was that, yes,

12  it was Chinese drywall and they attributed it to his

13  illnesses.

14  Q.              When your husband --

15  A.              Oh --

16  Q.              I'm sorry.  Go ahead.

17  A.              Yeah, something about wiring and so forth.  This

18  is a continual thing so we're just used to it, bulbs going out

19  all the time.  We keep boxes of lightbulbs, and they would

20  either totally go out or right now we have two lights in the

21  living room.  One bulb in the ceiling, one in the standup lamp

22  that blinks on and off.  Like boom, boom, boom, boom, boom

23  just every now and then.  Suddenly that light goes off and it

24  comes back on, or standing lamp, you can press the button on

25  the floor and nothing happens.  You walk away, it comes on.

```
 1   Q.              And you've had that experience for how long?
 2   A.              Years.
 3   Q.              Years?
 4   A.              Years.
 5   Q.              Since shortly after moving into the house?
 6   A.              No.  No.  When I say years, probably it's a good
 7   seven or eight years, I would say.
 8   Q.              Anything else you can think of?
 9   A.              Nothing that I can recall.  I know there were
10   several times, you know, things popped into my head I know I
11   wanted to interjected it.  Right off the top of my head, I
12   can't think of anything.
13   Q.              Okay.  About any topic that we covered today,
14   anything else you'd like to add?
15   A.              Personally, the fact that we did have a lot
16   going on when we were hoping to move to Georgia, and that was
17   just a hard time and having sold the house.  Haven't got the
18   contract signed and finding out.  Just emotionally, it was
19   very hard.
20   Q.              Anything else?
21   A.              No.
22   Q.              Okay.
23                   MR. MILLER:  Okay.  I think we're done.  Thanks
24   for your time.
25                   THE WITNESS:  Thank you.
```

```
 1                    THE COURT REPORTER:  And just for the record,

 2       would anybody like a copy of this transcript?

 3                    MR. MILLER:  Yes.

 4                    MR. DOYLE:  Same as before, send us an invoice.

 5          (The deposition of LYNN RUSSELL was concluded at 12:40

 6       p.m.)

 7                              --oOo--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF ALABAMA        )

                              )

 4     JEFFERSON COUNTY        )

 5

 6               I hereby certify that the above and

 7     foregoing was taken down by me in stenotype, and the

 8     questions and answers thereto were reduced to computer

 9     print under my supervision, and that the foregoing

10     represents a true and correct transcript of the deposition

11     given by said witness upon said hearing.

12               I further certify that I am neither of

13     counsel nor of kin to the parties to the action, nor am I

14     in anywise interested in the result of said cause.

15

16     _____

       LaKeysha T. Satterfield, Commissioner

17     ACCR# TL2060 - Expires March 12, 2020

18

19

20

21

22

23

24

25
```