UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
IN RE:  CHINESE-MANUFACTURED     : MDL NO. 2047
DRYWALL PRODUCTS LIABILITY       :
LITIGATION                       : Section:  L
                                 :
Elizabeth Bennett, et al.,       :
V.                               : 2:14-cv-02722-EEF-JCW
Knauff Gips, KG, et al.          :
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
FRANK GRANDE
NOVEMBER 26, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF FRANK GRANDE, produced as a witness at the instance of the Knauf Defendants, and duly sworn, was taken in the above-styled and numbered cause on November 26, 2019, from 10:11 a.m. to 11:32 a.m., before PHYLLIS WALTZ, RMR, CRR, CRC, Texas CSR, TCRR, Louisiana CCR, in and for the State of Texas, recorded by machine shorthand, at the offices of Worldwide Court Reporters, Inc., 3000 Weslayan, Suite 235, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; signature having not been reserved.

EXHIBIT
D

```
         1       Q.   If at any time you need a break, I'm happy to
         2  accommodate you.  Just let me know.  The only thing I
         3  ask is that if there is a question pending when you ask
         4  for a break, that you answer it first, okay?
10:12    5       A.   Uh-huh.
         6       Q.   Is that a "yes"?
         7       A.   I was sipping on it.  Yes.
         8       Q.   All right, no problem.  And then, finally, if
         9  there is any questions that you don't understand or need
10:12   10  me to repeat, just ask me to do so.
        11       A.   Okay.
        12       Q.   I'll do my best to rephrase or speak louder,
        13  as the case may be, all right?
        14       A.   Okay, yes.
10:13   15       Q.   We are here today about a property located at
        16  7 Nevin Court; is that correct?
        17       A.   Yes.
        18       Q.   Am I saying that right, Nevin?
        19       A.   Nevin.
10:13   20       Q.   7 Nevin.  Are you familiar with a company
        21  named CJ Properties?
        22       A.   Yes.
        23       Q.   And what is CJ Properties?
        24       A.   CJ Properties is a d/b/a that I have with my
10:13   25  wife.
```

```
 1        Q.   All right.  So is there any kind of
 2   operating -- is it -- is there any kind of corporate
 3   structure to it?  Is it an L.L.C. or --
 4        A.   Not an L.L.C.  Strictly d/b/a.
 5        Q.   d/b/a, all right.  And what is the business of
 6   CJ Properties?
 7        A.   It's kind of an investment business,
 8   whereas -- first of all, CJ -- the name CJ refers to my
 9   son and my daughter.  That's CJ, Chris and Jen.  And
10   what we do is we buy houses, we lease them, sometimes
11   flip them, and that sort of thing.
12        Q.   So other than investing in houses to either
13   lease or flip, does it have any other business, CJ
14   Properties?
15        A.   No.
16        Q.   And the income from CJ Properties, does that
17   go solely to you and your wife?
18        A.   It's distributed.
19        Q.   How is it distributed?
20        A.   I bring my children into it and I pay them for
21   their work and I pay them if there is a profit margin.
22        Q.   What kind of work does Chris and Jen do for CJ
23   Properties?
24        A.   They buy homes, primarily.
25        Q.   So when you say "they buy homes," do you mean
```

```
 1              I think it's accurate.
 2         Q.   Okay.  Well --
 3              MR. DOYLE:  Let's take a break real quick.
 4         Q.   (BY MR. DODSON)  That's okay.  There is one
 5   thing we talked about right before we started today.
 6   Did you acquire the property in October of 2010, or is
 7   that an error and you actually acquired it in 2016?
 8         A.   I did not acquire it in 2010.  I believe it
 9   was 2016.  That is an error.
10         Q.   All right, great.  So, and if we look at the
11   substitute trustee's deed attached as an exhibit to
12   this.  If you'd flip over past the seventh page with the
13   signatures and then past the document labeled exhibit.
14         A.   Right there?
15         Q.   Yes, right there.  And do you see where it
16   says date of sale of property, January 5th, 2016?  Up in
17   the -- there is a heading that says Substitute Trustee's
18   Deed, Deed of Trust date October 8, 2010.
19         A.   Yes.
20         Q.   And date of sale of property January 5th,
21   2016.
22         A.   Yes.
23         Q.   Did you acquire -- did CJ Properties acquire
24   the property in January 5th, 2016?
25         A.   I would have to say yes, that's the deed.
```

```
 1        Q.   All right.  So the response to the question
 2   "When did you acquire the Property?" on Page 2 of
 3   Exhibit 2, it should say January 5th, 2016; is that
 4   correct?
 5        A.   Yes.
 6        Q.   All right.  This does bring up the importance
 7   of please -- I want -- I'd like for you to review that
 8   document carefully and let me know if there's anything
 9   you'd like to change in addition to that question about
10   when did you acquire the property.
11        A.   I believe it's all correct.
12        Q.   Did you flip through all the different pages?
13        A.   Oh, the entire...
14        Q.   Yes.
15             (Discussion off the record.)
16        A.   It seems to be correct.
17        Q.   (BY MR. DODSON)  All right.  If we could
18   please turn to Exhibit 3 behind Tab 5.
19             Same questions.  Have you seen this document
20   before?
21        A.   I'm going to assume I have, yeah.
22        Q.   All right.  Did you provide the information
23   for this document?
24        A.   I did.
25        Q.   All right.  If you would, please -- well,
```

```
 1            Q.   All right.  So, No. 1, "Please produce all
 2       documents relating to any pre-purchase inspection of the
 3       property that is the subject of this litigation,
 4       including but not limited to property inspections and
 5       Chinese-drywall inspections."  Before CJ Properties
 6       bought the house on Nevin Court, was there any
 7       inspection done on the property?
 8            A.   No, we purchased it at a foreclosure.
 9            Q.   So as to No. 1, there would be no responsive
10       documents; is that correct?
11            A.   No, that is correct.
12            Q.   No. 2, "Please produce all documents related
13       to any purchase, sale, and/or transfer of the property
14       that is the subject of this litigation, including but
15       not limited to closing statements, advertisements,
16       agreements to purchase, and disclosures."  We have a
17       substitute Deed of Trust, I think is what it's actually
18       called, but other than that, I have no documents from
19       the actual sale, I believe.  Are there any other
20       documents from the sale of the Nevin Court property to
21       CJ Properties other than the substitute trustee's deed?
22            A.   No.
23            Q.   No. 3, "Please produce all inspection reports
24       generated by the inspection identified in your response
25       to Section IV of the Plaintiff Profile Form."  The
```

Timestamps: 10:36 (line 5), 10:36 (line 10), 10:37 (line 15), 10:37 (line 20), 10:37 (line 25)

```
 1   2017 --
 2       A.  Yes, yes, there was a report generated.  Not
 3   that I request.  I got called --
 4           MR. DOYLE:  I think you're getting
 5   confused.  Listen to his question.  I don't want this to
 6   get sidetracked.
 7           Would you repeat the question.
 8       Q.  (BY MR. DODSON)  Chris did an inspection on
 9   October 24, 2017, correct?
10       A.  Correct.
11       Q.  Was there any report generated as a result of
12   that October 24th, 2017 --
13       A.  No.
14       Q.  -- inspection?
15       A.  No.
16       Q.  No. 4, "Please produce any documents related
17   in any way to any post-purchase inspections performed on
18   the property that is the subject of this litigation,
19   including, but not limited to Chinese drywall
20   inspections and appraisals."  So after CJ Properties
21   bought the property in January of 2017, did it have any
22   inspection done of the property?
23       A.  Not by me, no.
24       Q.  By -- who has done one?
25       A.  What we found out, there was an inspection
```

```
 1    done not to my knowledge, but there was one done
 2    regarding Chinese drywall.
 3        Q.   All right.  So is this the one that the prior
 4    owners had performed?
 5        A.   I assume it was the prior owners, yes.
 6        Q.   All right.  The question is, though, were
 7    there any -- after you bought the property, after CJ
 8    Properties bought the property, were there any
 9    post-purchase inspections performed on the property?
10        A.   No.
11        Q.   No. 5, "Please produce all documents
12    evidencing and/or supporting your property damage
13    claims, including, but not limited to, videotapes,
14    photographs, and documentation evidencing any covered
15    expenses, remediation expenses, or expected remediation
16    expenses."  On this particular case I have an
17    itemization attached to the Plaintiff Fact Sheet which
18    has five different items listed out for a total of
19    $15,500.  Other than that, I have photographs in the
20    report that we talked about, the one from before where
21    you purchased it.  Do you have any other documents or
22    photographs or videos demonstrating any damage claims,
23    any support for your expenses?
24        A.   No, I don't.  I don't have anything.
25        Q.   No. 6, "Please produce any and all copies of
```

```
 1   house and then chooses subs?
 2       A.   I guess my answer to that would be yes.
 3       Q.   And do you have background in construction?
 4       A.   Yes, I do.
 5       Q.   And what is your background in construction?
 6       A.   I was a union carpenter at one time.  I
 7   worked -- I had two jobs as -- working as a project
 8   manager and a superintendent for builders.
 9       Q.   At the time CJ Properties bought the Nevin
10   Court property in 2016, did you or your wife have any
11   intent on living in the property?
12       A.   No, sir.
13       Q.   Has -- have you or your wife ever intended on
14   living at the Nevin Court property?
15       A.   No, sir.
16       Q.   Did either your son or your daughter, Chris or
17   Jen, did they ever have any intent to live at the
18   property?
19       A.   No, sir.
20       Q.   With respect to the Nevin Court property
21   itself, that was bought as a investment property; is
22   that right?
23       A.   Correct.
24       Q.   Were you going to lease it?
25       A.   No.  I believe the initial thought and
```

```
         1   consideration was to buy it and flip it, sell it.
         2        Q.   And when we spoke earlier, you said that when
         3   you would enter into these kind of investments, you
         4   would, basically, make a business decision.  Did you
10:49    5   create any kind of financial projection for the Nevin
         6   Court property?
         7        A.   No.
         8        Q.   Did you have a pro forma for it?
         9        A.   But we have a -- what I utilize as a -- as a
10:49   10   general financial program that we have.  So when I buy a
        11   house, I have an idea what I want to pay for it, knowing
        12   the value after it's repaired and it can be sold on the
        13   open market.
        14        Q.   And how much did you pay for this Nevin Court
10:49   15   property?
        16        A.   I believe it was 156,000.
        17        Q.   And how much were you expecting to sell it
        18   for?
        19        A.   Yeah, 156,000.
10:49   20             I was expecting to sell it somewhere around
        21   225.
        22        Q.   Has the property been sold?
        23        A.   No, it has not.
        24        Q.   And were you expecting to do any kind of
10:50   25   renovation work on the property before you bought it?
```

```
 1  properties were?
 2       A.   By pulling up everything for sale in a
 3  neighborhood very close to it and determining what the
 4  homes go for per square foot.
 5       Q.   Page 2 of Exhibit 2, which is this one that is
 6  behind Tab 4.
 7       A.   Page 2?
 8       Q.   Yes.  It says, When was Chinese Drywall --
 9  it's in the middle of the page under "When did you
10  acquire the property."  It says, When was Chinese
11  Drywall installed in the property?"  And it says 2006.
12  Do you see that?
13       A.   Yes.
14       Q.   What information do you have that Chinese
15  drywall was installed in the property in 2006?
16       A.   Well, there -- I don't have knowledge of it,
17  but when the home was built and I believe that's the
18  year it was built, so I assume that's when the Chinese
19  drywall was put in.
20       Q.   If you'd please look at Page 6.
21            Page 6 under "Section VII. Other Damages,"
22  there is three blanks, two of which are filled in.  The
23  second blank follows a request that, "If you experienced
24  any loss of use and/or loss of enjoyment of the Property
25  as a result of Chinese Drywall, identify the total
```

(Timestamps: 11:14 at line 5; 11:15 at lines 10, 15, 20; 11:16 at line 25)