UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED     : MDL NO. 2047
DRYWALL PRODUCTS LIABILITY       :
LITIGATION                       : Section:  L
                                 :
Elizabeth Bennett, et al.,       :
V.                               : 2:14-cv-02722-EEF-JCW
Knauff Gips, KG, et al.          :


*****************************************
ORAL DEPOSITION OF
TOSHONIA JACKSON ARMSTRONG
NOVEMBER 26, 2019
*****************************************


ORAL DEPOSITION OF TOSHONIA JACKSON ARMSTRONG,
produced as a witness at the instance of the Knauf
Defendants, and duly sworn, was taken in the
above-styled and numbered cause on November 26, 2019,
from 12:09 p.m. to 2:04 p.m., before PHYLLIS WALTZ, RMR,
CRR, CRC, Texas CSR, TCRR, Louisiana CCR, in and for the
State of Texas, recorded by machine shorthand, at the
offices of Worldwide Court Reporters, Inc., 3000
Weslayan, Suite 235, Houston, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto; signature
having not been reserved.

EXHIBIT
D

```
 1              TOSHONIA JACKSON ARMSTRONG,
 2   having been first duly sworn, testified as follows:
 3               E X A M I N A T I O N
 4   BY MR. DODSON:
 5        Q.    State your name for the record, please.
 6        A.    Toshonia Jackson Armstrong.
 7        Q.    Ms. Armstrong, we're here today on a case in
 8   which both you and a gentleman named Martin Armstrong
 9   are claimants.  What is your relationship to Martin
10   Armstrong?
11        A.    My husband.
12        Q.    And is he here today?
13        A.    He is not.
14        Q.    Why?
15        A.    He has medical issues that is keeping him from
16   being here.
17        Q.    Are they ongoing, or is this just something
18   that's happened recently?
19        A.    They're ongoing.
20        Q.    And is there an expectation that he'll be able
21   to appear for a deposition at some point in the future?
22        A.    Probably not, based upon health condition.
23        Q.    What is the health condition, specifically?
24        A.    He's got neuropathic issues that are actually
25   causing him to have short-term memory issues.
```

12:09  5
12:09 10
12:09 15
12:09 20
12:10 25

1      MR. DOYLE:  I think they're in the portal.

2      MR. DODSON:  They're in the portal?

3      MR. DOYLE:  Yeah.  But if not, send me an

4  e-mail.

12:22  5      MR. DODSON:  I'll ask Ashley to look that

6  one.

7      Q.   (BY MR. DODSON)  Now, you said the initial

8  class-action.  What -- what are you referring to with

9  that?

12:23 10      A.   I'll have to -- jeez.  It would have been

11  the -- I can't think of -- I can't think of the name

12  of -- of what it was called.

13      Q.   Were you part of a previous class-action?

14      A.   Yes.

12:23 15      Q.   Okay.  When was that suit filed?

16      A.   That was 20 -- I can't even give you the date.

17  I just know that we had to go into a portal, we had to

18  submit information, pictures, and pretty much the -- the

19  same thing, as far as creating a profile, but I can't

12:23 20  think of the -- the actual date or the year, at this

21  moment.

22      Q.   Okay.  So other than the photographs that you

23  submitted with respect to that other class-action, do

24  you have any other photographs that -- or videos or

12:23 25  anything, any other documentation to support property

1    damage claims?

2         A.    Not at this time.

3         Q.    And that previous class-action, do you know

4    who that was against?

12:24  5         A.    It would have been against -- just drawing a

6    blank.  I'm drawing a blank.

7         Q.    Was it against Knauf?

8         A.    It wasn't against Knauf.  It was against

9    the -- I be- -- I'm not going to even speculate on it.

12:24  10    I was going to say the builders, because the builders,

11    of course, they were the ones that came out and

12    explained to us that we have -- there is a possibility

13    that we may have Chinese drywall.  And at that point we

14    set up an appointment with them to have someone come out

12:24  15    and do an inspection through the builder.  And then

16    whatever findings they had, that was reported back to

17    the builder.  And at that point the builder said there

18    is a class-action suit you guys may want to get involved

19    in that, if you want your home repaired.  So, and I

12:24  20    believe there's documentation that I would have given

21    Mr. Doyle based on that.

22         Q.    And did you actually receive a report from

23    when they came out and looked at the property?

24         A.    We didn't get the report from them.

12:25  25         Q.    And so what is the documentation you're

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | A.    He does not.                                        |
|       | 2  | **Q.    Has he ever attended the meetings?**              |
|       | 3  | A.    He has not.                                         |
|       | 4  | **Q.    Does the HOA send out notices or newsletters?**   |
| 12:45 | 5  | A.    Yes.                                                |
|       | 6  | **Q.    How often do they send out notices?**             |
|       | 7  | A.    They send those out quarterly, the newsletter.      |
|       | 8  | **Q.    How do they send them out?**                      |
|       | 9  | A.    Via mail, or you can actually go onto the           |
| 12:45 | 10 | portal and pull down whatever it is that they're          |
|       | 11 | actually going to send you via mail.                      |
|       | 12 | **Q.    And do you read those notices and newsletters?**  |
|       | 13 | A.    I do.                                                |
|       | 14 | **Q.    Did any of those notices or newsletters at any**  |
| 12:45 | 15 | **time mention Chinese drywall?**                         |
|       | 16 | A.    No.                                                 |
|       | 17 | **Q.    Have you at any time listed the Sandstone**       |
|       | 18 | **Creek property house for sale?**                        |
|       | 19 | A.    No.                                                 |
| 12:45 | 20 | **Q.    So not necessarily just with respect to your**   |
|       | 21 | **property, the Sandstone Creek property, when did you**  |
|       | 22 | **first hear about Chinese drywall?**                     |
|       | 23 | A.    When we received a letter from the builder          |
|       | 24 | stating that they would need to come out and set up an    |
| 12:45 | 25 | appointment with us to have another company come in with  |

1      them to test our home to see if we had Chinese drywall.

2          Q.   And do you recall when you got that letter?

3          A.   Oh, gosh, I can guess around the time.

4      Probably about 20 -- the end of 2013, beginning of 2014.

12:46  5          Q.   All right.  We mentioned briefly on Exhibit 1,

6      the Plaintiff Profile Form, it says that Martin

7      Armstrong performed an inspection on January 10th, 2014.

8      Do you remember that?

9          A.   Correct, I do.

12:46  10         Q.   What prompted Mr. Armstrong to do that

11     inspection?

12         A.   That was prompted once we filled out paperwork

13     related to the plaintiff form, because it asked if we

14     knew of or had pictures that would show that we had K --

12:46  15     KPT in our home.  And so he went through the attics and

16     everything, trying to find out if we had it, because at

17     that point we had never seen -- we had never seen any, I

18     guess what they call the stamp.  We had never seen

19     stamps on anything.  So he went up and started going

12:47  20     through the home, trying to see if he could find it in

21     places that we were told that it might -- that it might

22     be there.

23         Q.   Did you go with Mr. Armstrong during the

24     inspection?

12:47  25         A.   I did not.

1    last few pages of this document behind exhibit -- Tab 5.

2        A.    Okay.

3        Q.    You see Miscellaneous Expenses attachment, and

4    then there is two pages -- two pages that have an

01:04  5    itemization.  You see about 65 different line items for

6    a total of $434,247.88.  Then two pages after that there

7    is just a page with, it says NT, NT, NT, 165.9335.  Do

8    you see that?

9        A.    I do.

01:05 10        Q.    It's like the last page.

11        A.    Uh-huh.

12        Q.    What is that, the 165.9335?

13        A.    I have no idea, due to the fact that I'm not

14    the one that created the spreadsheet.  The spreadsheet

01:05 15    was created by my husband with the information I gave to

16    him.

17        Q.    When you say the information you gave to

18    him --

19        A.    Which would be the itemized description of

01:05 20    everything that's listed.

21        Q.    And where did you get the information that you

22    gave to him?

23        A.    From all of the TVs that we had set aside, I

24    pulled the information off of the TVs to give to him.

01:05 25    Off of the deep freezer.  Off of the phones that we had

1   and collected in a drawer that we can no longer use.

2   Off the coffee maker.  So anything that's here is what I

3   would have gone through each room in the home and just

4   read off to him as he typed the information into a

01:06   5   spreadsheet.

6        **Q.   Is this, then -- as to the items in here, is**

7   **this, essentially, an inventory of everything in your**

8   **house?**

9        A.   It is.  It's an inventory of everything that

01:06   10   would have either been damaged or replaced.

11        **Q.   And as to these amounts, where did the**

12   **information for those amounts come from?**

13        A.   Those amounts came from what we knew that we

14   paid within the store.  That's either if we still had a

01:06   15   receipt or if we looked on actual copies from his bank

16   account or my bank account, depending on who would have

17   paid for these.

18        **Q.   Do you know whether any of that documentation**

19   **has been provided?**

01:06   20        A.   Ooh.  Some, I believe, may have.  I'm not

21   sure.  But I think within this I think we had, like, for

22   the HVAC stuff.  For, like, the Blackberries and the

23   curtains, I don't believe we do.  Because these are

24   things that would have been purchased when we initially

01:06   25   were in the home.  So having a record of that, I'd have

```
 1   me just interject real quick.

 2                 THE WITNESS:  Go ahead.

 3                 MR. DOYLE:  Do you want her to identify by

 4   number?  They are numbered.

 5                 MR. DODSON:  Sure, that would be okay.

 6                 MR. DOYLE:  Or, rather, the description?

 7                 THE WITNESS:  So could I go --

 8       Q.   (BY MR. DODSON)  So I have No. 2, 3, 4, and 5.

 9       A.   Would it be easier if I went 2 through 19 and

10   then --

11       Q.   Sure.  So 2 through 19?

12       A.   Correct.

13            And then we're looking at 20 through 27.

14       Q.   Were not working?

15       A.   Were not working.

16       Q.   So 2 through 27?

17       A.   Correct.

18       Q.   Okay.

19       A.   On this, as far as the moving and the rent and

20   deposit, that's not -- that's, like, things for

21   remediation, which we haven't -- we haven't done any of

22   that, but when we put this together, that's what we were

23   looking at.

24       Q.   Okay.

25       A.   So those would be obsolete.
```

1      **Q.   And during that time, though, you lived at the**
2  **house; is that correct?**
3      A.   Correct, uh-huh.
4      **Q.   Lawn maintenance?**
01:15  5      A.   And, like I stated earlier, and I'll repeat, a
6  lot of this was based on -- like, you'll see, like I was
7  stating, like, loss of use, lawn maintenance, pet
8  boarding, the things I did not include, when you said
9  you could not use, those are the things that I'm stating
01:15 10  he put together as if we were to have the home
11  remediated.  So some of these things you can look at and
12  kind of see, okay, this is for remediation purposes,
13  like the utility transfers, things of that nature.  Of
14  course, we're not saying that's damage as of today.
01:15 15  That's if we had gone through a remediation process,
16  these are the things we were listing that would be a
17  part of that to consider.
18      **Q.   Okay.  It'd be helpful, then, can you just**
19  **tell me all the different items on here that you would**
01:16 20  **consider to be those if we were to undergo remediation,**
21  **then this would be what we would expect would be the**
22  **damages?**
23      A.   That's going to be hard, based on the fact
24  that we've got things that are currently not working or
01:16 25  that have been replaced.

1      Q.   The other is, essentially, if we were to

2  undergo remediation, then these expenses would be

3  incurred; and there is a value associated with those

4  that y'all have, through some kind of way, come up with

01:18   5  an estimate.

6      A.   Correct.

7      Q.   What I would like for you to do is identify on

8  these two pages the items that are in the second

9  category, the ones that are --

01:18  10      A.   Okay.

11      Q.   -- if we were going to do a remediation, this

12  is my expectation of what they would cost.

13              MR. DOYLE:  How do you want her to

14  identify it?

01:18  15              MR. DODSON:  The number is perfect.

16              MR. DOYLE:  Do you want her to mark on the

17  exhibit?

18              MR. DODSON:  No, I just want her to list

19  the numbers.  I'm going to mark it.

01:18  20      A.   Okay.  28, 29 --

21              MR. DOYLE:  Real quick.  I've got this

22  portal open.  This itemized list was created prior to

23  August 13th of 2013.  That might be useful to you when

24  you're having this discussion.  That's when this exact

01:18  25  list was uploaded.

1           MR. DODSON:  August of 2013?

2           MR. DOYLE:  August 1th of 2013 it was

3    uploaded to the portal, so --

4           MR. DODSON:  I see.  So it had to have

01:18  5    been created by then because --

6           MR. DOYLE:  There you go.

7           MR. DODSON:  Unless y'all hacked in the

8    data.

9           MR. DOYLE:  Use that going forward.

01:18  10       A.   Okay.  28, 29, 30, 32, 33, 34, 35, 36, 39, 41,

11   42, 56, 57, 60, 61.  Did I state 59?

12       Q.   (BY MR. DODSON)  You did not.

13       A.   Okay, 59.  61 was the last.  And that's it.

14       Q.   All right.

01:20  15           All right.  Now, that I know that this

16   inventory was uploaded in 2013, when did you first know

17   that your home had Chinese drywall?

18       A.   We knew when we got the letter that there was

19   a possibility that we had it.  Once we got that letter

01:20  20   from the builder, the builder had their third-party team

21   come out, same time frame; and all we got back from them

22   is that, yes, our home did.  We could at that point have

23   the home repaired, or we could go through the

24   class-action suit, because at that point it was

01:20  25   determined when the builder got their information or got

```
         1        A.    Gone.
         2        Q.    48 through 55?
         3        A.    No longer have.
         4        Q.    62 or 63?
01:44    5        A.    62 and 63 are going to be the new items.
         6        Q.    So you still have those?
         7        A.    Yes.
         8              MR. DODSON:  Can I look at those pictures
         9    right quick?  Well, actually, I think Ashley sent them
01:45   10    to me.
        11              MR. DOYLE:  You can do it on your phone?
        12              MR. DODSON:  Yeah.
        13              MR. DOYLE:  It's bigger on the screen over
        14    here.  They're the same.  She's just sending you the
01:45   15    ones from the website.  Come over here and you can...
        16              THE REPORTER:  Go off the record?
        17              MR. DODSON:  That's fine.
        18              (Recess from 1:45 p.m. to 2:00 p.m.)
        19        Q.    (BY MR. DODSON)  Okay.  This letter that I've
02:00   20    just given you as Exhibit 5 is a letter dated June 19,
        21    2012 to Toshonia Jackson and Martin Armstrong.  Is
        22    Toshonia Jackson you?
        23        A.    Yes.
        24        Q.    All right.  So you also go by Toshonia
02:00   25    Jackson?
```

```
  1          A.    Jackson Armstrong.

  2          Q.    Jackson Armstrong, okay.  That's your maiden

  3    name, potentially?

  4          A.    Yes.

02:00  5     Q.    All right.  And this is a letter from

  6    June 19th, 2012 from Richmond American Homes to you.  Do

  7    you recognize this letter?

  8          A.    I do.

  9          Q.    And it says in the first paragraph, As a

02:01 10    result -- it says -- let me just read the whole

 11    paragraph.  "I am your division president for Richmond

 12    American Homes.  As you know, our inspection of your

 13    home uncovered evidence indicating certain independent

 14    subcontractors installed defective Chinese-manufactured

02:01 15    drywall in your home.  As a result, in August 2011 we

 16    offered to repair your home and provided you with a home

 17    repair agreement."

 18                Do you see that?

 19          A.    I do.

02:01 20    Q.    And if you look to the second page, there is a

 21    document called "Home Repair Agreement."

 22          A.    Correct.

 23          Q.    Have you seen this document before?

 24          A.    I have.

02:01 25    Q.    All right.  And is this the home -- well, so
```

1    conversation with my husband, and this was -- I found

2    out after the fact.  So he executed a conversation with

3    them.  And then that's when we received the notification

4    that -- saying the repeated refusal.

02:03  5         Q.   All right.  Do you know what your husband and

6    Richmond Homes discussed?

7         A.   The only thing that he brought to conversation

8    when I asked him about it when I got this was that the

9    offer that they were extending to us did not cover

02:03 10    anything that we had lost.  It was just for us to be

11    able to move out for the six to nine months, and that

12    was essentially the conversation that the two of us had

13    about the refusal.

14         Q.   Is it your understanding, then, that you

02:03 15    did -- that you or your husband or both of you did, in

16    fact, reject the offer to repair the home?

17         A.   My husband would have rejected the offer.

18         Q.   And your understanding is that he did?

19         A.   Yes.

02:04 20              MR. DODSON:  All right.  That is what I

21    wanted to ask about with this.

22              And I think, with that, subject to

23    receiving any additional documentation about which we

24    would need to ask you about --

02:04 25              THE WITNESS:  Okay.



*Claimant I D #*
*100767*
*Claim I D #*
*1166*

Building and Financing
the American Dream

June 19, 2012

**VIA FEDEX & CERTIFIED U.S. MAIL**
Toshonia Jackson and Martin Armstrong
418 Sandstone Creek Lane
Dickinson, TX 77539

*Re:     418 Sandstone Creek Lane (your "Home")*

Dear Mrs. Jackson and Mr. Armstrong:

I am your Division President for Richmond American Homes ("RAH"). As you know, our inspection of your Home uncovered evidence indicating certain independent subcontractors installed defective Chinese-manufactured drywall in your Home. As a result, in August 2011, we offered to repair your Home and provided you with a Home Repair Agreement (the "Agreement").

Based on your repeated refusal to accept our offer and execute the Agreement, RAH must rescind its previous offers and declare the proposed Agreement null and void. RAH is taking this action due to its participation in global settlement discussions, coordinated by the Office of the Court-Appointed Mediator for the *In re: Chinese Manufactured Drywall Products Liability Litigation,* MDL No. 2047, aimed at resolving all claims arising out of this defective Chinese-manufactured drywall.

To learn more about this proposed global settlement and how you can participate, please visit the MDL Court's website at http://www.laed.uscourts.gov/drywall/Drywall.htm. In the meantime, please do not hesitate to contact me if you have any questions or if you would like to discuss any of these issues further.

Sincerely,

Todd Demarets



M.D.C. Holdings, Inc.  4350 S. Monaco Street, Suite 500, Denver, Colorado, 80237, Phone: 303.773.1100
■ NYSE

Claimant ID #
100767
Claim ID#
1166

## HOME REPAIR AGREEMENT

This Home Repair Agreement (the "Agreement") is a legally binding contract by and between Richmond American Homes of Texas, LP together with its parent, affiliates, agents, employees, representatives, assigns, predecessors and successors (the "Homebuilder"), and _____, on behalf of himself/herself/themselves and his/her/their agents, representatives, assigns, predecessors and successors (the "Homeowner"), on the following terms and conditions and with the following warranties and covenants.  The Agreement is executed as of the date the Homeowner signs the Agreement.

In consideration of the terms and conditions set forth below, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1. Homeowner purchased a home, located at _____ (the "Home"), from and/or constructed by Homebuilder.  During the construction of the Home, Homebuilder entered into agreements for the installation of the drywall in the Home with certain independent drywall installation contractors, who obtained the drywall from one or more suppliers, distributors, importers, and manufacturers (collectively, the "Supply Chain Parties").  The Supply Chain Parties provided and/or installed Chinese-manufactured drywall that was in a defective condition (the "Defective Drywall") and which damaged other building materials in the Home (the "Affected Materials").

2. Homeowner made a demand against Homebuilder for property damage associated with the Defective Drywall and Affected Materials in the Home.  In full settlement of any and all claims, demands, losses, or damages for property damage resulting and/or associated directly or indirectly from the Defective Drywall and Affected Materials at the Home, including any claims related to the relocation of Homeowner during the repairs to the Home (the "Potential Claims"), Homebuilder agrees to do the following (the "Repair Work"):

- Provide Homeowner with, or reimburse Homeowner for, a temporary residence or other appropriate accommodations;
- Move Homeowner's furniture and belongings from the Home using a to Homeowner's temporary residence and/or a secure storage facility;
- Remove, dispose of, and replace all Defective Drywall in the Home;
- Remove, dispose of, and replace wall and ceiling insulation in the Home;
- Remove, dispose of, and replace affected HVAC systems and components in the Home;
- Repair or replace all affected electrical wiring, receptacles, switches, and electrical panels in the Home;
- Repair or replace all affected plumbing pipes, components, and fixtures in the Home;
- Finish and paint all new drywall in the Home;

Homebuilder: _____     Homeowner: _____
Initials                                      Initials

Claimant ID# 100767
claim ID# 1166

- Remove and replace all affected fixed appliances Homebuilder originally delivered with the Home;
- Repair or replace all materials, if any, damaged during the Repair Work in the Home, which may include flooring, wall coverings and tile, cabinets and countertops, sinks, toilets, bathtubs and shower enclosures, appliances, mirrors, lighting and plumbing fixtures, and wood trim and molding;
- HEPA vacuum the Home to remove all construction dust; and
- Move Homeowner's furniture and belongings back to the Home.

A supplemental description of finish selections and other special instructions, as agreed upon between the Homebuilder and Homeowner, is set forth on a separate "Specifications Sheet," which is incorporated herein.

3. In exchange for Homebuilder performing the Repair Work at the Home, Homeowner releases and forever discharges Homebuilder, together with its parent, affiliates, subsidiaries, divisions, including but not limited to M.D.C. Holdings, Inc., of and from all debts, demands, actions, causes of action, suits, damages, losses, fees, sums of money, controversies, agreements, promises, implied or express warranties, claims, and all liabilities whatsoever, past, present or future, vested or contingent, both at law and in equity, whether direct or indirect, foreseen or unforeseen, known or unknown, which Homeowner had, now has, or in the future may have for property damage associated directly or indirectly in any manner whatsoever with the Potential Claims. This Agreement shall not operate to release potential claims, if any, that Homeowner may have against Homebuilder or any of the Supply Chain Parties for personal injury.

4. Homebuilder intends to recover the expense arising from, among other things, the Repair Work from the Supply Chain Parties. In order to facilitate such recovery, Homeowner hereby assigns to Homebuilder all of Homeowner's present and future rights, title, interest, claims, demands, and all other "Assigned Rights", as defined herein, whether legal, equitable, or otherwise, against any individual or entity, including, but not limited to, the Supply Chain Parties, arising from or connected with, directly or indirectly, the Potential Claims for property damage. As used herein, the term "Assigned Rights" shall mean all debts, demands, actions, suits, sums of money, damages, liabilities, losses, causes of action or claims against any individual or entity, and rights to recovery, whether in equity, at law, or otherwise, direct or indirect, known or unknown, foreseen or unforeseen, existing or which may later accrue in Homeowner's favor, and arising out of or in any manner related directly or indirectly to the Potential Claims for property damage. Notwithstanding anything to the contrary contained herein, this Agreement shall not operate to assign any potential claims Homeowner may have against the Supply Chain Parties for damage resulting from the Defective Drywall to Homeowner's personal and household items, such as non-fixed appliances, electronics, and other personal property. Additionally, this Agreement shall not operate to assign potential claims, if any, that Homeowner may have against Homebuilder or any of the Supply Chain Parties for personal injury.

- 2 -

Homebuilder: _____    Homeowner: _____
Initials                                   Initials

*Claimant ID # 100767*

*Claim ID # 1166*

5.   Except as specifically provided to the contrary in paragraph 4 above, Homebuilder shall have the sole and exclusive right to bring any action or claim in connection with any property damage related to the Defective Drywall and Affected Materials.  Homeowner shall cooperate and use its best efforts to facilitate and assist Homebuilder in its recovery efforts, the reasonable costs of which shall be borne by Homebuilder.

6.   Each party agrees that the facts on which this Agreement is based may hereafter prove to be different from the facts now known by it or believed by it to be true, and that facts not now known may be later discovered, and each party agrees that all of the terms of this Agreement shall be in all respects effective and that no mistake as to such facts (whether mutual or unilateral), and no later discovery of facts not now known, will justify rescission of this Agreement or the Releases provided for herein. Furthermore, this Agreement and all papers relating to it are not, and shall not be construed as, an admission by any of the parties as to the validity of the Potential Claims, nor an admission by any of the parties of any liability or wrongdoing by any of them.

7.   Homeowner warrants that: (a) Homeowner has not settled or compromised, or released from liability any individual or entity, in whole or in part, with respect to any of the Potential Claims for property damage, and further warrants that it will not do so in the future without the prior written consent of Homebuilder; (b) all documents, records, examinations, investigations, and information relating directly or indirectly to the Potential Claims which are discovered in the future will be furnished to Homebuilder promptly upon their discovery; and (c) Homeowner has not done and will not do anything to prejudice Homebuilder's rights as its subrogee and assignee.

8.   Homeowner further warrants to Homebuilder that Homeowner is the fee simple owner of the Home. Homeowner acknowledges and agrees that Homebuilder is entering into this Agreement in reliance on the fact that Homeowner now owns and will continue to own the Home during the entire period in which Homebuilder will undertake the Repair Work.  In the event that Homeowner has any mortgages or other similar encumbrances on the Home (the "Mortgages"),  Homeowner hereby agrees during the Repair Period to: (i) immediately deliver to Homebuilder copies of any correspondence received from the holder of any Mortgages on the Home (a "Lender") in any way related to a default by Homeowner under any such Mortgages, and (ii) not transfer or sell the Home or enter into any agreement to transfer or sell the Home without first notifying the proposed transferee (a "Transferee") of the existence of this Agreement and notifying Homebuilder of the proposed transfer or sale.

Homeowner further authorizes Homebuilder to contact and communicate with any Transferee or with any Lender from which Homeowner receives any notice related to a default or potential default under any Mortgages so that Homebuilder may discuss this Agreement and address any issues pertaining to the Repair Work with such Transferee or Lender.   In the event that any Lender commences a foreclosure or other similar proceeding against Homeowner or the Home, or in the event that Homeowner enters into an agreement to transfer or sell the Home, Homebuilder shall have the right, in its sole

- 3 -

Homebuilder: _____     Homeowner: _____
Initials                                    Initials

*Claimant ID # 100767*

*Claim ID # 1166*

and absolute discretion, to delay the Repair Work until such time as the Homebuilder has reached agreement on scope of the Repair Work going forward with the Lender, any purchaser at a foreclosure sale of the Home or any other party that may obtain any interest in the Home by or through such Lender, or any Transferee or potential Transferee or buyer.

In addition, in the event that Homeowner is in default on the Mortgages or ceases to be the fee simple owner of the Home for any reason whatsoever during the term of this Agreement, Homebuilder's agreed upon obligation, if any, to provide Homeowner with alternative housing, or to reimburse Homeowner for rent paid by the Homeowner for alternate living arrangements, or for the loss of the use of the Home, or for the loss of any present rental income from the Home, shall immediately terminate and be of no further force and effect.

9.  Homeowner acknowledges and agrees that Homebuilder has the right in its sole discretion to schedule the Repair Work contemplated by this Agreement. Homeowner acknowledges further that Homebuilder shall not be required to commence the Repair Work and reimburse Homeowner for alternative living expenses, until such time as Homeowner has dismissed with prejudice all pending Potential Claims that have been released or assigned to Homebuilder in paragraph 4 above, if any, brought by Homeowner against Homebuilder, including those claims brought as part of *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047. Homeowner also acknowledges that Homebuilder shall not be required to commence the Repair Work and reimburse Homeowner for alternative living expenses, until such time as Homeowner has dismissed without prejudice all pending Potential Claims, if any, against Supply Chain Parties that have been assigned to Homebuilder in paragraph 4 above, including those Potential Claims brought as part of *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047. Homeowner agrees further that, to the extent Homeowner later reasserts Potential Claims against one or more of the Supply Chain Parties, Homeowner must clearly allege (in a complaint or in a exhibit or schedule thereto) that Homeowner is not pursuing the Potential Claims that have been released or assigned to Homebuilder in paragraph 4 above. In the event Homeowner reasserts claims against one or more of the Supply Chain Parties without clearly alleging that Homeowner is not pursuing the Potential Claims that have been assigned to Homebuilder in paragraph 4 above, Homebuilder may at its option and sole discretion suspend the Repair Work and withhold reimbursements to Homeowner for alternative living expenses.

Upon completion of the Repair Work, Homebuilder will provide Homeowner with written notice that Homebuilder's obligation to provide Homeowner with, or reimburse Homeowner for, temporary accommodations will terminate in ten (10) days (the "Completion Notice"). Within ten (10) days of Homeowner's receipt of the Completion Notice, Homebuilder will move Homeowner's furniture and belongings back to the Home (the "Move-In") in accordance with the Repair Work set forth paragraph 2 above.

- 4 -

Homebuilder: _____     Homeowner: _____
Initials                                     Initials

*Claimant ID* 100767

*Claim ID #* 1166

Prior to Move-In, a temporary or permanent certificate of completion or occupancy covering the Home shall be obtained by Homebuilder, if required by the proper governmental agency. Homebuilder is authorized to postpone the Move-In date at its sole discretion. Homebuilder must, however, give Homeowner no less than five (5) business days' written notice of the new date for Move-In. Any written notice hereunder shall be given by hand delivery, facsimile, electronic mail, or overnight mail. An affidavit of one of Homebuilder's representatives that such notice was given will be conclusive for purposes of proving that notice was given.

If Homeowner delays the Repair Work or Move-In for any reason without Homebuilder's prior written consent, which consent may not be unreasonably withheld, Homebuilder may hold Homeowner responsible for all costs and expenses Homebuilder incurs as a result of such delay, in addition to any other remedies which may be available to Homebuilder under any other agreement it may have with the Homeowner, or Texas law.

10.  This Agreement does not merge, affect, or supplant any terms, conditions, rights, or obligations set forth in the original agreement of sale executed in connection with the sale of your Home that are not expressly stated herein and that are not inconsistent with this Agreement. In the event that any provisions in this Agreement directly contradict any term in the agreement of sale, this Agreement shall govern.

11.  Homeowner shall have no right to share in any proceeds, associated costs, and attorneys' fees recovered by Homebuilder in connection with the Potential Claims that have been assigned to Homebuilder in paragraph 4 above.

12.  This Agreement is in addition to, is intended to be supplementary to, and shall not be limited by the rights and remedies available to Homebuilder, including, but not limited to, equitable or legal subrogation and equitable assignment.

13.  The parties agree that this Agreement contains the entire agreement between the parties hereto and may not be modified except in a writing signed by both parties. The parties agree they shall not be bound by any terms, conditions, statements, warranties, or representations, oral or written, not contained herein.

14.  The Parties agree, for any and all construction defect claims, to follow the pre-suit requirements and procedures outlined in Chapter 27 of the Texas Property Code prior to initiating mediation and, if necessary, arbitration, as outlined below in paragraph 15.

15.  Homebuilder and Homeowner agree that any controversy or claim of matters in question arising out of or relating to (i) this Agreement, and any amendments thereto; (ii) the breach or termination of this Agreement; and/or (iii) the Defective Drywall, Affected Materials, and Repair Work, shall be submitted to mediation and, if not settled during mediation, shall thereafter be decided by neutral, binding arbitration and not by court action.

- 5 -

Homebuilder: _____     Homeowner: _____
Initials                                   Initials

*Claimant ID#  100767*
*Claim ID#  1166*

Homebuilder and Homeowner further agree that mediation shall be conducted before the American Arbitration Association ("AAA") in accordance with the AAA's Commercial or Construction Industry Mediation Rules, as appropriate. If the dispute is not fully resolved by mediation, the dispute shall be submitted to binding arbitration before the AAA in accordance with the AAA's Commercial or Construction Industry Arbitration Rules, as appropriate.

Homebuilder and Homeowner also agree that any mediation, arbitration or other action brought by Homeowner against Homebuilder shall be brought by independent action and that Homeowner shall neither serve as a class representative nor become a class member to pursue such action. The Parties will share equally all filing fees and administrative costs of the mediation and arbitration, however, any arbitral Award rendered may equitably reallocate those costs. The arbitration shall be governed by Texas law and the U.S. Arbitration Act, 9 U.S.C. §§ 1-16, for the exclusion of any provisions of state law that are inconsistent with application of the Federal Act. Judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If either Homebuilder or Homeowner fails to comply with all aspects of the Award within (30) days following issuance of the Award, the other party may seek enforcement of that Award and shall be entitled to recover reasonable attorneys fees and costs expended.

*NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY TEXAS LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL, BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE ARBITRATION OF DISPUTES PROVISION SET FORTH HEREIN.

Homebuilder: _____      Homeowner: _____
Initials                                      Initials

16. As a material consideration for the execution of this Agreement, Homeowner and Homebuilder covenant, represent and agree that the events leading to the negotiation of this Agreement, the substance of those negotiations and the terms and conditions of this Agreement (collectively, the "Confidential Information") shall be held strictly confidential and shall not be disclosed, directly or indirectly, to any third parties except for the parties' attorneys, consultants, insurers, or other parties involved or otherwise associated with the performance of the Repair Work, or otherwise as required by law or legal process. In the event Homebuilder or Homeowner receives a subpoena, court order or other process purporting to require disclosure of Confidential Information, the party receiving such process shall provide the other party to this Agreement notice of such

- 6 -

Homebuilder: _____      Homeowner: _____
Initials                                      Initials

*Claimant ID# 100767*

*1166 clm*
*ID#*

request at least ten (10) days prior to the date such disclosure is to be required (or within a reasonable time prior to the date of disclosure if ten days' notice is impossible) so that the other party may seek any appropriate protective order or other appropriate remedy. The parties to this Agreement agree that disclosure of Confidential Information by either party in violation of this provision would cause irreparable harm to the other party, and that the non-disclosing party will have all remedies available to it under this Agreement, at law or in equity, and shall also have the right to injunctive relief.

17. The provisions of this Agreement are separable. In the event that any paragraph of this Agreement shall be ordered or decreed to be unenforceable, it is the intent of Homeowner and Homebuilder that the remaining paragraphs shall nevertheless be given full force and effect.

18. Homeowner acknowledges that Homeowner has read and fully understood the provisions of this Agreement and has executed this Agreement freely and voluntarily. Therefore, the language of this Agreement shall not be construed presumptively against Homeowner or Homebuilder.

19. This Agreement shall be binding upon and inure to the benefit of Homeowner and Homebuilder and their respective predecessors, successors, assigns, subsidiary corporations, heirs, personal representatives, agents, or other representatives.

20. This Agreement shall be governed and construed in accordance with the laws of the State of Texas, without regard to its conflict of laws principles. Nothing in this Agreement is intended or shall be construed to give any other persons or entities any right, remedy or claim under or by reason of this Agreement.

21. The following disclosure is provided pursuant to Section 27.007 of the Texas Property Code:

This contract is subject to Chapter 27 of the Texas Property Code. The provisions of that chapter may affect your right to recover damages arising from the performance of this contract. If you have a complaint concerning a construction defect arising from the performance of this contract and that defect has not been corrected through normal warranty service, you must provide the notice required by Chapter 27 of the Texas Property Code to the contractor by certified mail, return receipt requested, not later than the 60th day before the date you file suit to recover damages in a court of law or initiate arbitration. The notice must refer to Chapter 27 of the Texas Property Code and must describe the construction defect. If requested by the contractor, you must provide the contractor an opportunity to inspect and cure the defect as provided by Section 27.004 of the Texas Property Code.

Homebuilder: _____     Homeowner: _____
Initials                                        Initials

- 7 -

Homebuilder: _____     Homeowner: _____
Initials                                        Initials

*100767*
*1166 claim*
*ID#*

You have the right to consult with an attorney prior to executing the Agreement. Putative class action lawsuits related to Chinese-manufactured drywall have been filed in state and federal courts. Certain federal court actions are pending in Multidistrict Litigation ("MDL") No. 2047 before the United States District Court for the Eastern District of Louisiana. Information regarding the MDL is available at http://www.laed.uscourts.gov/.

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound, have executed and delivered this Agreement on the date below.

**HOMEOWNER**

By: _____

Print Name: _____

Title: _____

Date: _____

**HOMEBUILDER**

By: _____

Print Name: _____

Title: _____

Date: _____

**ADDITIONAL HOMEOWNER**
**(If Applicable)**

By: _____

Print Name: _____

Title: _____

Date: _____

- 8 -

**RICHMOND**
AMERICAN HOMES

# McKINLEY

*100767*
*1166*
*claim*
*10#*



**Exterior A**                              **Plan 42716**



**Exterior B**



**Exterior B with stone**



**Exterior C**

RICHMOND
AMERICAN HOMES

B-$1000
Stone-$2500
Brick Rear-1200

100767
1166 claim
ID #

# MCKINLEY
PLAN 42716

$1875

Optional Covered Patio

Nook

Family Room

Kitchen

Utility

Master Bedroom

775

Master Bath

Dining Room

Powder

Study

Living Room

Entry

Porch

Two-Car Garage

Main Level

Optional Bay Window

Optional 2' Garage Extension
Optional 4' Garage Extension
Optional 5' Garage Extension

Open To Below

Gameroom

Bedroom 4

Open To Below

Bath

Bedroom 3

Bedroom 2

Upper Level

Bath

Optional Bedroom 5

Optional Bedroom 5

1900

Up

Powder

Optional Master Bedroom Retreat

Optional Retreat

2200

Master Bath

Optional Master Bath

*Features:*
- 4 Bedrooms
- 2 1/2 Baths
- 2-Car Garage
- 2,716 sq. ft.

Plans and elevations are an artist's conception only and should not be relied upon as a representation of a completed house. The actual home as constructed may or may not contain the features and layouts depicted. Floorplans, elevations, features and related information, and information concerning the pricing and availability of our homes, are subject to change without notice. Drawings shown are not to scale.
©2005 Kipp Flores Architects LLC. No reproductions or other use of these plans may be made without the express written consent of Richmond American Homes.

Specification Sheet

Customer Name _____     Address _____

*100'16'1*
*1166 claim*
*10#*

Room Finishes

| Room Name | Wall color/finish | Ceiling color/finish | Floor type/color | Trim color |
|---|---|---|---|---|
| Living Room | | | | |
| Dining Room | | | | |
| Kitchen | | | | |
| Hallway | | | | |
| Stairs | | | | |
| Den | | | | |
| Family Room | | | | |
| Master bedroom | | | | |
| Master BR closet | | | | |
| Master bath | | | | |
| Bed 2 | | | | |
| Bed 3 | | | | |
| Bed 4 | | | | |
| Bath 2 | | | | |
| Bath 3 | | | | |
| | | | | |
| Moving and Living Expense for 3 months | Living SQ Ft  2716 | $8.50  23,086 | 1/2 paid at notice to move out | 1/2 paid at start of Remediation |
| | | | | |
| Additional Month Stipend if Construction Time Exceeds 90 Days | Living SQ Ft  2716 | $1.50  4,074 | Paid monthy as needed past original 90 day schedule | |

Appliance, fixture, & equipment schedule

100"16"1
1166
Claim
ID #

| Fixture/Appliance | Mfg | Model # | Quantity |
|---|---|---|---|
| Refrigerator | | | |
| Range | | | |
| Cooktop | | | |
| Oven | | | |
| Microwave | | | |
| Range Hood | | | |
| Dishwasher | | | |
| Freezer | | | |
| Washer | | | |
| Dryer | | | |
| Garbage disposal | | | |
| Ceiling Fan | | | |
| Chandelier | | | |
| Light fixture | | | |
| Light fixture | | | |
| Light fixture | | | |
| Hot water heater | | | |
| Cabinets | | | |
| Countertop | | | |
| Smoke Detectors | | | |
| Security alarms | | | |
| Intercoms | | | |
| Fire suppression sprinkler system | | | |
| Carbon monoxide alarm | | | |

*100 /6 /*
*1166 claim*
*10 #*

**HOMEOWNER**
By: _____

**HOMEBUILDER**
By: _____

Print Name: _____

Print
Name _____

Title: _____

Title:
_____

Date: _____

Date:
_____

**ADDITIONAL HOMEOWNER**
**(If Applicable)**
By: _____
Print Name: _____
Title: _____
Date: _____