IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re:  CHINESE-MANUFACTURED         MDL 2047
DRYWALL PRODUCTS LIABILITY           SECTION "L"
LITIGATION                           JUDGE ELDON FALLON
                                     MAGISTRATE JOSEPH
                                     WILKINSON, JR.

This document relates to:
Elizabeth Bennett, et al.,
v. Gebr. Knauf
Verwaltungsgesellschaft,
KG, et al.

Case No. 14-CV-2722


        The testimony of DANIEL TRIPLETT, taken at
the office of Bain & Associates, 9 Dauphin Street,
Mobile, Alabama, on the 9th day of December 2019,
commencing at approximately 1:00 p.m.

```
 1   Q        Did you discuss this deposition with anyone
 2   prior to our meeting?
 3   A        No.
 4   Q        Did you prepare for this deposition at all?
 5   A        Yes.
 6   Q        How did you prepare for this deposition?
 7   A        I looked over some of my records while we
 8   were preparing over the last however long we've been
 9   involved in this.
10   Q        And you say your records.  Are these the
11   documents that you previously submitted in support of
12   your claims?
13   A        Yes.
14   Q        Are you relatively familiar with those
15   documents?
16   A        Yes.
17   Q        We're still going to go through them anyway.
18   I have them right here for you.
19            Actually, just before we start going through
20   these one by one, if you could just explain to me
21   the -- I guess the structure of the trust and your
22   relationship to it, that would be very helpful.
23   A        The trust is a simple land trust.  The
24   property in question is the only asset in the trust.
25   Since 2000, when we became full-time real estate
```

```
 1    investors, we put all of our individual properties in
 2    land trusts.  James B. Wright, Jr., trustee, has been
 3    my attorney since about 2000.  He's been the trustee
 4    in all of our trusts.
 5         Since we found out about the drywall and the
 6    lawsuit started, I have relieved him of his
 7    obligation as trustee and assumed that obligation
 8    myself, and I am the beneficiary of the trust.
 9    Q         Okay.  And you are also the successor
10    trustee originally?
11    A         Yes.
12    Q         But you're now the primary trustee?
13    A         Yes.
14    Q         And Mr. Wright, he is your attorney and also
15    serves as the trustee in other land trusts?
16    A         Yes.
17    Q         But not in this one anymore?
18    A         Correct.
19    Q         Okay.  Taking a look at this first document,
20    this is Tab 1, which we will be marking as Exhibit 1,
21    and this is the plaintiff profile form.
22              (Defendant's Exhibit 1
23              was marked for identification.)
24    Q         Go ahead and take a moment and flip all the
25    way through it and through the attachment.  When you
```

```
 1   get to the 2, stop and let me know.  Take as much
 2   time to review it as you need.
 3              (Pause)
 4   Q       Do you recognize these documents?
 5   A       Yes.
 6   Q       Who prepared these documents?
 7   A       I did.  I mean, can I --
 8   Q       Yes.
 9   A       I mean, I was asked to fill out forms and I
10   filled them out, and I'm assuming that applies as I
11   prepared them.
12   Q       Okay.  Yes.
13           And did Mr. Wright also help you fill out
14   these forms?
15   A       No.  But as the trustee at the time, he was
16   a party to it and signed it for me.
17   Q       Okay.  So he signed, but you did prepare
18   them.
19           And that's his signature on page 7?
20   A       Yes.
21   Q       And the document is dated August 31st, 2018,
22   the signature on page 3?
23   A       Yes.
24   Q       And to the best of your knowledge, is the
25   information contained within this document accurate?
```

```
 1   A         There are some issues that aren't correct.
 2   Q         Well, go ahead.  You can tell me.
 3   A         The address for the trust, P.O. Box 1021, is
 4   no longer correct.
 5   Q         Okay.  At the time this was filled out in
 6   2018 was that correct?
 7   A         It would have been, yes.
 8   Q         And have you provided any documentation that
 9   lists the correct address?
10   A         Not that I'm aware of.
11   Q         Then what's the correct address?
12   A         P.O. Box 594.
13   Q         And the rest is the same?
14   A         Yes.
15   Q         And was there anything else that you wanted
16   to note?
17   A         No.
18   Q         I had a quick question.  Looking at this
19   insurance declaration page that you attached, it said
20   the named insured is Dantam Investments, LLC?
21   A         Correct.
22   Q         Can you tell me your relationship to that
23   company?
24   A         That is my management company hired by the
25   trust.
```

```
 1    Q       How many members of the LLC are there?
 2    A       Currently one.
 3    Q       Just you?
 4    A       Yes.
 5    Q       Have there been more at any time?
 6    A       Originally it was myself and my wife up
 7    until January of 2016.
 8    Q       Okay.  On to Tab 2, which we'll be marking
 9    as Exhibit 2.
10            (Defendant's Exhibit 2
11            was marked for identification.)
12    Q       This is the supplemental plaintiff profile
13    form.
14            The same thing, I ask that you go ahead and
15    flip through and go beyond the yellow pages all the
16    way until you hit the 3 and that's when you can stop.
17    Let me know when you've had an opportunity to do so.
18            (Pause)
19    Q       Perfect.  Do you recognize these documents?
20    A       Yes.
21    Q       And did you prepare these documents?
22    A       Yes.
23    Q       And on page 7, I believe that's Mr. Wright's
24    signature as well; is that correct?
25    A       Yes.
```

```
 1   Q       But you actually supplied the information
 2   within the document?
 3   A       Yes.
 4   Q       And it's dated August 31st, 2018; is that
 5   correct?
 6   A       Yes.
 7   Q       And on what date did you actually become the
 8   primary trustee for the trust?
 9   A       I don't know for sure.
10   Q       But it was after filling out these
11   documents?
12   A       Yes.
13   Q       So sometime in 2019?
14   A       Yes.
15   Q       And to the best of your knowledge, is the
16   information contained within these documents
17   accurate?
18   A       Yes.
19   Q       Okay.  And on to Tab 3, which we'll be
20   marking as Exhibit 3.
21           (Defendant's Exhibit 3
22           was marked for identification.)
23   Q       This is the plaintiff fact sheet.  This is
24   also the longest one, so I apologize in advance.
25           The same thing, if you could take time to
```

```
 1   review it and let me know when you've gotten all the
 2   way through it.
 3              (Pause)
 4   Q          Perfect.  All right.  Do you recognize these
 5   documents?
 6   A          Yes.
 7   Q          Did you prepare these documents?
 8   A          Yes.
 9   Q          And Mr. Wright signed them; is that correct?
10   A          Yes.
11   Q          Okay.  And I believe, looking at the
12   verification page, he signed it on February 6th,
13   2019; is that correct?
14   A          Yes.
15   Q          To the best of your knowledge, is the
16   information contained within these documents
17   accurate?
18   A          Yes.
19   Q          What's the address of the property that you
20   allege is contaminated?
21   A          1329 Gum Street, Ocean Springs, Mississippi
22   39564.
23   Q          When did you purchase this property?
24   A          2007.
25   Q          How much did you purchase the property for?
```

```
 1    A      I'm not certain.
 2    Q      From whom did you purchase the property?
 3    A      The sellers' last name was Gospodinovich.
 4    Q      In the plaintiff fact sheet, which is
 5    Exhibit 3, I believe you said the purchase price was
 6    $68,808?  It's at the beginning of that, on page 2.
 7    A      Okay.
 8    Q      And were you looking at something that had
 9    the purchase price written on it when you filled this
10    out?
11    A      I'm sure I was, yes.
12    Q      Does that sound like the correct purchase
13    price?
14    A      Yes.
15    Q      Okay.  If you could turn to Exhibit 2, Tab
16    2, and then go to this blue tab that I have marked
17    for you, it should be the warranty deed.
18    A      Yes.
19    Q      Do you recognize this document?
20    A      Yes.
21    Q      And is this a copy of the warranty deed
22    through which you purchased the property at issue?
23    A      Yes.
24    Q      And I say you just generally, but I mean the
25    trust.
```

```
 1   A       Agreed, yes.
 2   Q       Okay.  And it was purchased on June 1st,
 3   2007; is that correct?
 4   A       Yes.
 5   Q       You said that the purchase price was
 6   $68,808?
 7   A       Yes.
 8   Q       And purchased from Bryan Keith Gospodinovich
 9   and Karen Gospodinovich?
10   A       Yes.
11   Q       How did you say that?  You were really good.
12   A       Gospodinovich.
13   Q       Okay.  Did you have a prior relationship
14   with them?
15   A       No.
16   Q       Just good at pronouncing words.  Got it.
17           Do you know when they purchased the
18   property?
19   A       No.
20   Q       And other than this warranty deed, were
21   there any other agreements made prior to execution of
22   the sale?
23   A       Yes.
24   Q       What were those?
25   A       An option-to-purchase contract.
```

```
 1   Q         Okay.  And is that kind of a transaction
 2   that you encounter frequently in your business?
 3   A         Back then, yes.
 4   Q         Is there currently a mortgage or lien on the
 5   property?
 6   A         No.
 7   Q         Was it paid off?
 8   A         No.
 9   Q         Have you ever been in foreclosure?
10   A         That house went through foreclosure, yes.
11   Q         Was the loan ever refinanced prior to
12   foreclosure?
13   A         No.
14   Q         And when did the house go through
15   foreclosure?
16   A         January, to the best of my knowledge.
17   Q         Of 2019?
18   A         Yes.
19   Q         And if you don't mind, could you just walk
20   me through that process as well?
21   A         I had no knowledge of that process up until
22   about two months ago when I found out it had gone
23   through foreclosure.
24   Q         And is that something that Mr. Wright was
25   managing?
```

```
 1   A          No.  He would have been unaware as well.
 2   Q          Who would have been contacted about the
 3   house going through foreclosure?
 4   A          I would have thought I would have been, but
 5   I received no notice of foreclosure.
 6   Q          How did you find out that the house had gone
 7   through foreclosure?
 8   A          When I was contacted by the law firm for the
 9   inspection.  I went out to check to make sure I could
10   still get in it.  There were people living in the
11   property, which was a surprise to me.  And at that
12   point I found out that someone had bought it from
13   foreclosure and put them in it as tenants.  So that
14   was September, I think, early September.
15   Q          Okay.  The people living in the house now,
16   they're renting from whoever purchased the property?
17   A          They were, yeah.  They have since left.
18   Q          Is anyone living there now?
19   A          Not to my knowledge.
20   Q          Do you know why the property is vacant now?
21   A          It's got Chinese drywall in it.
22   Q          You might not know this, but do you know if
23   the new buyers knew of the Chinese drywall?
24   A          Apparently not.
25   Q          Do you know when they actually purchased the
```

```
 1   property?
 2   A       I'm not certain, but I know it was in
 3   January --
 4   Q       Okay.
 5   A       -- based on what I was told by the sheriff's
 6   department.
 7   Q       Okay.  And when you owned the property, was
 8   it insured?
 9   A       Yes.
10   Q       And was that with Accord Insurance?
11   A       I believe so, yes.  I go through an
12   insurance company in Biloxi that handles all my
13   insurance for me.
14   Q       So it sometimes changes?
15   A       Well, South Group is the company that I use,
16   and they buy my insurance through companies like
17   Accord.  If that's what I provided, then that's what
18   would be accurate, yes.
19   Q       But it's been continuously insured?
20   A       Oh, yes.
21   Q       Have you ever received payment from your
22   insurance company for the alleged contamination of
23   Chinese drywall?
24   A       No.
25   Q       Have you ever received payment from any
```

```
 1    other parties for the alleged contamination of
 2    Chinese drywall?
 3    A      No.
 4    Q      And when you purchased the property, what
 5    structures were constructed on the property?
 6    A      The subject house.  I believe that's it.
 7    I'm not sure if there's a shed on it or not, but the
 8    house.
 9    Q      And what's the square footage of the house?
10    A      Can I reference the documents or out of
11    memory?
12    Q      You can reference them.  That's fine.
13    A      I'm not sure where that would be, but I know
14    it was approximately 1300 square feet.
15    Q      How many beds and baths?
16    A      Two bedroom, two bath.
17    Q      And to the best of your knowledge, when was
18    the home constructed?
19    A      I believe around 2000.
20    Q      And to the best of your knowledge, when was
21    the Chinese drywall installed?
22    A      Sometime after Katrina in 2005.
23    Q      Do you know what damage the house took
24    during Katrina?
25    A      I do not.
```

```
 1   Q         Do you know if it was muck and gutted after
 2   Katrina?
 3   A         Based on memory, I don't remember.
 4   Q         Okay.  Do you know if it was renovated at
 5   all after Katrina?
 6   A         I don't remember.
 7   Q         After you purchased the property, was it
 8   renovated?
 9   A         Yes, but I can't remember to what extent.
10   Q         And these were just renovations to flip the
11   house?
12   A         Yes.
13             MS. JOHNSON:  Let's go ahead and take a
14   really quick break.
15             (Recess)
16   BY MS. JOHNSON:
17   Q         Have you ever lived on the property?
18   A         No.
19   Q         When you owned the property, did anyone else
20   live there?
21   A         Yes.
22   Q         Who lived there?
23   A         I had multiple tenants over the years.
24   Q         And how much did you rent the property out
25   for?
```

```
 1    them in a rental portfolio and rent them out over
 2    time until we sold them either as a rent-to-own sale
 3    or sold them outright on the market.
 4    Q       So you were actively trying to sell this
 5    property, though?
 6    A       In the beginning?
 7    Q       Throughout.
 8    A       Yes.
 9    Q       Okay.
10    A       Which is why we had the land contract.  It
11    was technically sold on a land contract when the
12    gentleman defaulted.
13    Q       Okay.  I'm not familiar with a land
14    contract.  That is a rent-to-own situation?
15    A       No.  It's more like a seller-financing type
16    arrangement.  However, he doesn't get the deed until
17    it's paid off.
18    Q       Got it.
19            And do you know when you entered into that
20    contract with him?
21    A       I'm not certain.
22    Q       After he defaulted, did you try to sell the
23    property?
24    A       Yes.
25    Q       When did you list the property for sale?
```

```
 1   the closet that remained after I opened up.
 2   Q         Okay.  And did you ever test this drywall?
 3   A         No.
 4   Q         Do you have any other photos of drywall?
 5   A         No.
 6   Q         Do you have any photos of blackening or
 7   corrosion of the electrical or plumbing system?
 8   A         No.
 9   Q         Did you do anything to remediate the
10   drywall?
11   A         No.
12   Q         And what relief are you seeking in this
13   case?
14   A         Damages that are appropriate with respect to
15   what my law firm determines based on how I've been
16   damaged.
17   Q         If you could turn to Exhibit 2, Tab 2, and
18   to page 6, you're claiming $300,000 in loss-of-use
19   and/or loss-of-enjoyment damages; is that correct?
20   A         Yes.
21   Q         And how did you calculate this value?
22   A         My law firm assisted with the calculation of
23   this value, and it is the amount that they
24   recommended.
25   Q         And how long has the property been vacant?
```

```
 1   A        Since, I think, March of 2018.
 2   Q        And that would be until January of 2019 when
 3   it was briefly occupied?
 4   A        Yes.
 5   Q        How long were you deprived of the property
 6   due to Chinese drywall?
 7   A        Since its discovery in -- was that June of
 8   2018?
 9   Q        And did you ever try to rent the property
10   out with the Chinese drywall?
11   A        No.
12   Q        Okay.  If you could now turn to the tab that
13   says PFS Exhibit 14, itemized list, this will be
14   Exhibit 5, though we've already seen it as part of
15   Exhibit 3.
16            (Defendant's Exhibit 5
17            was marked for identification.)
18   Q        This is the itemized personal property
19   damages form, and I believe you did in fact fill this
20   out?
21   A        Yes.
22   Q        We're going to go through each one, and
23   they're going to be kind of repetitive and boring
24   questions so bear with me.
25            Item 1 is four-burner stove.  Is this
```

```
 1  property when you owned it?
 2  A        Yes.
 3  Q        And is $495 an estimate of the price?
 4  A        Yes.
 5  Q        And what about the dryer?  Is it the same
 6  situation for that?
 7  A        Yes.
 8  Q        And Number 12, one window AC.  Did you ever
 9  have to replace the window AC?
10  A        No.
11  Q        Was that still on the property when you
12  owned it?
13  A        Yes.
14  Q        And was $375 an estimate?
15  A        Yes.
16  Q        And for all these purchases, do you have
17  receipts for the original purchases?
18  A        No.
19           MS. JOHNSON:  Okay.  Let's go ahead and take
20  a five-minute break, and I'll make sure I went
21  through everything and then we'll probably be done.
22           (Recess)
23  BY MS. JOHNSON:
24  Q        Is there anyone else that held an interest
25  in the property during the trust's ownership of the
```

```
 1  property?
 2  A        Yes, in the beginning.
 3  Q        Okay.
 4  A        My wife.
 5  Q        Just your wife?
 6  A        Uh-huh.
 7  Q        But that's it?
 8  A        Yes.
 9  Q        And does the trust have any ownership
10  interest in the property today?
11  A        No.
12  Q        Do you have any ownership interest in the
13  property today?
14  A        No.
15  Q        Okay.  To the extent other documents were
16  identified in the course of this deposition that were
17  not produced but are in the possession, custody and
18  control of the plaintiff, we reserve our right to
19  reopen the deposition and shift costs and to move to
20  strike or move in limine to preclude introducing
21  documents due to the failure to timely produce the
22  documents with the PPF, the SPPF, the PFS and/or at
23  the time of the deposition.
24           That's a wrap.
25           MR. DOYLE:  We again waive the reading of
```