```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3    In Re:  CHINESE-MANUFACTURED        | MDL 2047
      DRYWALL PRODUCTS LIABILITY          |
 4    LITIGATION                          |
                                          | SECTION "L"
      _____|
 5    This document relates to:           |
                                          |
 6    Elizabeth Bennett, et al v. Gebr.   | JUDGE ELDON FALLON
      Knauf Verwaltungsgesellschaft,      |
 7    KG, et al.                          |
                                          | MAGISTRATE JOSEPH
 8    Case No.14-cv-2722                  | WILKINSON, JR.
      _____|
 9

10
              DEPOSITION OF EDWARD JAMES LAREMORE
11         Taken By Counsel for the Knauf Defendants
                         (Pages 1 - 98)
12

13              Tuesday, June 18, 2019
                9:17 a.m. - 12:15 p.m.
14

15          Esquire Deposition Solutions
               Bank of America Plaza
16           101 East Kennedy Boulevard
                    Suite 3350
17               Tampa, Florida

18

19

20

21

22
      Stenographically Reported By:
23    Jennifer Figueroa, RPR, CLR, FPR
      Notary Public, State of Florida at Large
24    Esquire Deposition Solutions - Tampa Office
      Phone - 813.221.2535, 800.838.2814
25    Esquire Job No. J4211560
```



```
 1        Q.   Other than what you've seen in this binder in
 2   front of you, is there any other documentation
 3   supporting your damages -- or your property-damage
 4   claim?
 5        A.   No.
 6        Q.   No. 7, "Please produce any and all copies of
 7   statements or reports prepared in connection with any
 8   interview conducted by you or on your behalf concerning
 9   the circumstances of the claims asserted in the
10   petition."
11             Have you gotten any statements from any
12   witnesses or anything like that?
13             MR. DOYLE:  And before you respond to this,
14        just, I want to make clear that any discussions
15        that you might have had with your attorney are
16        protected.  And I'm going to instruct you not to
17        answer to the extent that it would require you to
18        disclose those conversations.
19             MR. DODSON:  Totally fair.
20   BY MR. DODSON:
21        Q.   Statements not made by you to your attorney
22   or -- so, yeah, statements not made by you to your
23   attorney -- any other statements that you're aware of by
24   witnesses?
25        A.   Let me mention one thing.  When I think of
```



```
 1  zipline manager, working at a camp, and --
 2             THE COURT REPORTER:  I'm sorry, a what camp?
 3             THE WITNESS:  At a Christian camp.
 4             THE COURT REPORTER:  At a camp.  Thank you.
 5             THE WITNESS:  Yeah.  At a Christian camp; and
 6  the camp pastor now.
 7  BY MR. DODSON:
 8       Q.   Have you ever lived in LaBelle, Florida?
 9       A.   I have not.
10       Q.   The property that's the subject of this
11  litigation, 7018 Pilgrim Court, that was an investment
12  property.  Correct?
13       A.   Yes.
14       Q.   If we look at Exhibit 1, the plaintiff profile
15  form, the first page down at the bottom says -- are you
16  there?  Okay -- says, "Edward Laremore, move-in 1/3/07."
17  And at the far right it says "Owner-occupant."  Do you
18  see that?
19       A.   Yes.
20       Q.   Have you ever occupied the Pilgrim Court
21  property?
22       A.   No.
23       Q.   Is the property on Pilgrim Court in a
24  subdivision?
25       A.   It is.  It was -- it's standing by itself out
```



```
 1  conversations.  I think he did know.
 2       Q.   Would that have been -- you're saying that
 3  you're sure he knew about Chinese drywall and you keep
 4  referencing the quitclaim, would these have been
 5  discussions before the time that you met with him in
 6  San Francisco three or four months ago?
 7       A.   Yes.
 8       Q.   Are there specific conversations that you can
 9  recall with Mr. Cochran about Chinese drywall or the
10  litigation?
11       A.   I really don't know.
12       Q.   Do you know when you first spoke with
13  Mr. Cochran regarding Chinese drywall or this
14  litigation?
15       A.   No.  It's vague.
16       Q.   "Vague," but do you have a ballpark of when
17  you first did?
18       A.   No.
19       Q.   Other than the Pilgrim Court property have you
20  invested in any other real estate?
21       A.   Yes.
22       Q.   What are those investments?
23       A.   I have three homes in Seaford, Delaware; and I
24  have a duplex in Dallas; and I am in the middle of
25  getting a duplex in Akron, Ohio.  I'm trying to get the
```



```
 1  give a cash offer on the house, but he said he smelled a
 2  rotten-egg smell.
 3          And I was familiar enough with Chinese
 4  drywall -- and that's what prompted them, as well, about
 5  the rotten-egg smell, so they wanted it tested.
 6          And I thought "Certainly."  And so we did the
 7  test as a result of that.
 8      Q.  Before you were trying to sell the house in
 9  2017 -- July 2017 -- there was a tenant in the home.  Is
10  that right?
11      A.  Yes.
12      Q.  And was it the same tenant or had you had
13  multiple tenants over the years?
14      A.  We had multiple tenants, because I think we
15  rented it for 10 or 11 years.
16      Q.  Did any of those tenants ever mention a
17  rotten-egg smell?
18      A.  No.
19      Q.  You mentioned earlier that you visited the
20  property in two thousand -- or eight to ten years ago,
21  and that was the only time you went?
22      A.  Yeah.
23      Q.  Did you notice a rotten-egg smell when you
24  went that time?
25      A.  No.
```



```
 1  believe the closing date was the 31st of -- the 30th of
 2  May, somewhere in there, and his financing fell through
 3  on his part.  In fact, we have the sales agreement to
 4  Mr. Lennox -- Lennox Lex -- Lex, I believe was his name.
 5  So with that, it fell apart; so I had the rental move
 6  out because we were closing on the property.
 7            Well, it fell apart two days before the
 8  closing.  And then I had the full-cash offer right after
 9  that, it was the next day; and that's when there was a
10  rotten-egg smell.  So we had moved the renter out just
11  preparing for the closing.
12       Q.   Have you tried marketing the property as a
13  rental property since the second sale fell through?
14       A.   No.
15       Q.   All right.  Let's talk about these two
16  full-price offers.  I believe you just mentioned a
17  moment ago that there was a sales agreement with the
18  first potential buyer.  Is that right?
19       A.   Yes, with --
20       Q.   Lennox?
21       A.   -- Mr. Lennox.
22       Q.   I don't believe I've seen that sales
23  agreement.
24            MR. DODSON:  I'm going to ask that it be
25       produced.  I'm not sure, I mean, since it's --
```



```
 1        Q.   So when you first bought the property in 2005
 2   your expectation was that you would buy it and flip it.
 3   Why did -- what changed, that you waited for 12 years
 4   before you started looking for offers?
 5        A.   The real -- the crash of 2007-2008.  I mean,
 6   as soon as we were in the property, everything just --
 7   just nose-dived; it's part of the reason.  So as it --
 8   because it just dropped so much in value.
 9        Q.   Do you know how much the property dropped in
10   value during the crash in 2007-2008?
11        A.   Well, I would do comps in the area; and some
12   of them were going for anywhere as low as 50- to
13   $75,000.  So I had a $189,000 mortgage, so it would have
14   been a huge loss.
15             Many people just gave the properties back to
16   the banks.  My wife and I discussed that.  We didn't
17   think that was right.  We said, "Hey," we said, "we said
18   we'd pay for it, let's pay for it"; so we kept the
19   property.
20        Q.   So when you decided to list the property in
21   2017, what prompted that decision?  Why 2017
22   specifically?
23        A.   Well, my wife wanted to sell the property all
24   along.  She was -- didn't like the fact I bought it.  I
25   knew if we were to sell, we were going to take a huge
```



```
 1  loss and we'd be paying back for years and years.  And I
 2  said, "It's worth 100 bucks a square foot.  That's how
 3  much it cost to build it."  So I'm thinking, all right,
 4  it's 150-.
 5           And so my wife said, "So it reaches 150-,
 6  we'll sell?"
 7           I said "Yes."
 8           So we waited and waited.  And I go, "Guess
 9  what, Nix?  It is now worth 150-."
10           And she goes "Let's sell it."
11           And we did, and we had two offers; but then,
12  this happened.
13       Q.  What indication did you have that the house
14  was worth 150,000 in 2017?
15       A.  Just comps, you know, looking in the real
16  estate listings.
17       Q.  So before you listed the house in 2017, you
18  didn't have comps to support that the house was worth
19  150,000?
20       A.  Not until then.  I mean, I was doing comps and
21  it was much lower than that up until -- you know, I
22  would check periodically, you know.
23       Q.  I don't think I've asked this exact question.
24  Other than the decision to list the house in 2017, had
25  the house been listed at any other time after you bought
```

