# Exhibit F



# RECALL HANDBOOK

A Guide for Manufacturers, Importers, Distributors and
Retailers on Reporting Under Sections 15 and 37 of the
Consumer Product Safety Act and Section 102 of the
Child Safety Protection Act and Preparing for, Initiating,
and Implementing Product Safety Recalls
Including CPSC Fast Track Product Recall Program
and use of Social Media

U.S. Consumer Product Safety Commission
Office of Compliance & Field Operations
4330 East West Highway, Room 613
Bethesda, Maryland 20814
Telephone: (301) 504-7520
Fax: (301) 504-0359

E-mail address: Section15@cpsc.gov

www.cpsc.gov

www.saferproducts.gov

March 2012

Foreword

The U.S. Consumer Product Safety Commission (CPSC) Office of Compliance and Field Operations staff prepared this Recall Handbook to help your company understand your obligations and responsibilities under the Consumer Product Safety Act. It applies to you if you manufacture, import, distribute, or retail consumer products. The latest revision of this Handbook incorporates changes to the statute as a result of the Consumer Product Safety Improvement Act.

No company likes to recall one of its products, but when a safety problem makes a product recall necessary to prevent injuries and save lives, it benefits everyone to move quickly and effectively.

Our staff is constantly striving to improve both the timeliness of recalls and the effectiveness of the recall programs negotiated with companies. Our Fast Track Product Recall Program and use of Social Media to reach consumers in the event of a recall is helping both of these efforts. The Fast Track Product Recall Program is designed for companies willing and able to move quickly with a voluntary recall of their product. The program, described in detail in Section IV, eliminates some of the procedural steps in the traditional recall process, including a staff preliminary determination that the product contains a defect that presents a substantial product hazard.

Many companies have used the Fast Track Product Recall program since CPSC introduced it in August 1995 and have found it to be a useful way to expedite product safety recalls.

 We welcome your comments on the Fast Track Product Recall Program or any other information in this handbook.


Office of Compliance and Field Operations

301-504-7520

Section15@cpsc.gov

**RECALL HANDBOOK**

<u>Background</u>

I.  <u>Reporting Requirements</u>

 A.  <u>Section 15 Reports</u>

  1.  What and Where to Report
  2.  When to Report
  3.  Confidentiality of Reports

 B.  <u>Section 37 Reports</u>

  1.  What to Report
  2.  When and Where to Report
  3.  Confidentiality of Reports

 C.  <u>Section 102</u>

  1.  What to Report
  2.  When and Where to Report
  3.  Confidentiality of Reports

II.  <u>Identifying a Defect</u>

III.  <u>CPSC Evaluation of Section 15 Reports</u>

 • Class A Hazards
 • Class B Hazards
 • Class C Hazards

IV.  <u>Fast Track Product Recall Program</u>

V.  <u>Putting Together a Corrective Action Plan</u>

 A.  Preparing for a Product Recall
 B.  Elements of a Recall

VI.  <u>Communicating Recall Information</u>

 A.  News Releases
 B.  Video News Releases
 C.  Posters
 D.  Social media

3

E.  Other Forms of Notice
F.  Toll-Free Numbers

VII. <u>Monitoring Product Recalls</u>

VIII. <u>Developing a Company Policy and Plan to Identify Defective Products and to
      Undertake a Product Recall</u>

A.  Designating a Recall Coordinator
B.  Role of the Recall Coordinator

IX. <u>Records Maintenance</u>

A.  Records of complaints, warranty returns, insurance claims, lawsuits
B.  Production Records
C.  Distribution Records
D.  Quality Control Records
E.  Product Registration Cards

X. <u>Conclusion</u>

# RECALL HANDBOOK[1]

## Background

The U.S. Consumer Product Safety Commission (CPSC) is an independent regulatory agency responsible for protecting the public from unreasonable risks of injury and death associated with consumer products. Established by Congress in the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051-2089, the CPSC has jurisdiction over approximately 15,000 different types of products used in and around the home, in schools, in recreation, and otherwise ("consumer products").[2]

This handbook is for companies that manufacture, import, distribute, retail, or otherwise sell consumer products. It has three purposes: (1) to familiarize companies with their reporting requirements under sections 15(b) and 37 of the CPSA, 15 U.S.C. § 2064(b) and § 2084, and Section 102 of the Child Safety Protection Act, Pub. L. 103-267, 108 Stat. 722, 6/16/94; (2) to help companies learn how to recognize potentially hazardous consumer products at an early stage; and (3) to assist firms that discover they have manufactured, distributed or retailed such products to develop and implement "corrective action plans" that address the hazards. The term "corrective action plan" (CAP) generally includes any type of remedial action taken by a firm. A CAP could, for example, provide for the return of a product to the manufacturer or retailer for a cash refund or a replacement product; for the repair of a product; and/or for public notice of the hazard. A CAP may include multiple measures that are necessary to protect consumers. The Commission staff refers to corrective actions as "recalls" because the public and media more readily recognize and respond to that description.[3]

This handbook is not an all-inclusive reference source of information describing how to recall products. The goal of a corrective action plan should be to retrieve as many hazardous products from the distribution chain and from consumers as is possible in the most efficient, cost-effective manner. Reaching this goal often requires creative planning. Companies developing specific corrective action plans to address unsafe or potentially unsafe products typically work closely with the Commission staff to take advantage of the staff's expertise in designing and carrying out such plans. This results in greater protection for consumers against injury or death.

[1]This handbook does not replace the Commission's statutes or interpretative regulations set out in 16 C.F.R. Parts 1115, 1116, and 1117. If there is any discrepancy, the statutes and regulations supersede this handbook. This material is available on the CPSC web site at: http://www.cpsc.gov .

[2]The Commission does not have jurisdiction over foods, drugs, cosmetics, medical devices, firearms and ammunition, boats, motor vehicles, aircraft, or tobacco. Specific questions about the Commission's jurisdiction over particular products should be directed to the Office of the General Counsel.

[3]This handbook uses the term "recall" to describe any repair, replacement, refund, or notice/warning program.

---

I. Reporting Requirements.

## A. Section 15 Reports

Section 15(b) of the Consumer Product Safety Act establishes reporting requirements for manufacturers, importers, distributors and retailers of consumer products, or other product or substances distributed in commerce over which the Commission has jurisdiction. Each must notify the Commission immediately if it obtains information which reasonably supports the conclusion that a product distributed in commerce (1) fails to comply with an applicable consumer product safety rule or with a voluntary consumer product safety standard upon which the Commission has relied under section 9, (2) fails to comply with any other rule, regulation, standard or ban under the CPSA or any other Act enforced by the Commission, including the Flammable Fabrics Act, 15 U.S.C. §1193-1204; the Federal Hazardous Substances Act, 15 U.S.C. § 1261-1278; the Children's Gasoline Burn Prevention Act, 110 Public Law 278 (July 17, 2008), the Virginia Graeme Baker Pool and Spa Safety Act, 110 Public Law 140 (with amendments), the Poison Prevention Packaging Act, 15 U.S.C. § 1471-1476, and the Refrigerator Safety Act; 15 U.S.C. § 1211-1214; (3) contains a defect which could create a substantial product hazard, or (4) creates an unreasonable risk of serious injury or death. The Commission has issued an interpretive regulation, 16 C.F.R. Part 1115 that further explains a reporting company's obligations.

In enacting section 15(b), Congress intended to encourage the widespread reporting of timely, accurate and complete information that is necessary to protect public health and safety. In addition to assisting the Commission to discover substantial product hazards, reporting would identify risks of injury that the Commission could address through voluntary or mandatory standards, or information and education.

Although CPSC uses sources other than company reports to identify potentially hazardous products, reporting by companies under section 15 can provide the most timely and effective source of information about such products. This is

because firms often learn of potential product safety problems at an early stage. For this reason, companies involved in the manufacture, importation, distribution, or sale of consumer products should develop a system for maintaining and reviewing information about their products that might suggest that their product has a defect or poses an unreasonable risk of serious injury or death. Such information includes, but is not limited to, consumer complaints, warranty returns, insurance claims or payments, product liability lawsuits, reports of production problems, product testing, or other critical analyses of products.

**Reporting a product to the Commission under section 15 does not automatically mean that the Commission will conclude that the product creates a substantial product hazard or that corrective action is necessary**. The CPSC staff will evaluate the report and works with the reporting firm to determine if corrective action is appropriate. Many of the reports received require no corrective action because the staff concludes that the reported product defect does not create a substantial product hazard.

---

[4]As of January 2012, there were two such standards—the voluntary standards for chain saws and for unvented gas space heaters, See, Appendix to Part 1115, Voluntary Standards on Which the Commission Relied Under Section 9 of the Consumer Product Safety Act .

---

## 1. What and Where to Report

A company should file its report with the Office of Compliance and Field Operations. The report should be filed electronically through the CPSC website (SaferProducts.gov).  Alternatively, a firm can file its request by mail or telephone (301-504-7520).  A company should assign the responsibility of reporting to someone with knowledge of the product and of the reporting requirements of section 15. That individual should have the authority to report to CPSC or to quickly raise the reporting issue to someone who does.

Reporting firms should be prepared to provide the information described below. However, no company should delay a report because some of this information is not yet available. The following information should be transmitted:

- identification and description of the product;
- name and address of the manufacturer and/or importer of the product if known. If not known, then the names and addresses of all known distributors and retailers of the product;
- nature and extent of the possible defect, the failure to comply, or the risk;
- nature and extent of injury or risk of injury associated with the product;
- name and address of the person informing the Commission;
- if reasonably available, the other information specified in Section 1115.13(d) of the Commission's regulations; and
- a timetable for providing information not immediately available;

Retailers and distributors may satisfy their reporting obligations in the manner described above. Alternatively, a retailer or distributor may send a letter to the manufacturer or importer of a product describing the noncompliance with an applicable regulation, defect, or risk of injury or death associated with the product and forward a copy of that letter to the Office of Compliance and Field Operations.  A distributor or retailer may also satisfy their reporting obligations by forwarding to the Office of Compliance and Field Operations reportable information received from another firm.  Section 15(b) requires that a manufacturer, retailer, or distributor must immediately inform the CPSC of a failure to comply, a defect, or such a risk unless it has actual knowledge that the Commission has been adequately informed of such failure to comply, defect or risk.

## 2. When to Report

Section 15 requires firms to report "immediately." This means that a firm should notify the Commission within 24 hours of obtaining information described in section A.1 ("What and Where to Report") above. Guidelines for determining whether a product defect exists, whether a product creates an unreasonable risk of serious injury or death, and whether a report is necessary or appropriate are provided in 16 C.F.R. § 1115.12. Section II of this handbook does the same.

A company **must** report to the Commission within 24 hours of obtaining reportable information. The Commission encourages companies to report **potential** substantial product hazards even while their own investigations are continuing. However, if a company is uncertain whether information is reportable, the firm may spend a reasonable time investigating the matter. That investigation should not exceed 10 working days unless the firm can demonstrate that a longer time is reasonable in the circumstances. Absent such circumstances, the Commission will presume that, at the end of 10 working days, the firm has received and considered all information that would have been available to it had a reasonable, expeditious, and diligent investigation been undertaken.

The Commission considers a company to have obtained knowledge of product-safety-related information when that information is received by an employee or official of the firm who may reasonably be expected to be capable of appreciating the significance of that information. Once that occurs, under ordinary circumstances, five working days is the maximum reasonable time for that information to reach the chief executive officer or the official assigned responsibility for complying with the reporting requirements.

The Commission evaluates whether or when a firm should have reported. This evaluation will be based, in part, on what the company actually knew about the hazard posed by the product or **what a reasonable person, acting under the circumstances, should have known about the hazard while exercising due care including knowledge obtainable upon the exercise of due care to**

**ascertain the truth of representations.** Thus, a firm is deemed to know what it would have known had it exercised due care in analyzing reports of injury or consumer complaints, or in evaluating warranty returns, reports of experts, in-house engineering analyses, or any other information.

### 3. Confidentiality of Reports

The Commission often receives requests for information reported under section 15(b). Section 6(b)(5) of the CPSA, 15 U.S.C. § 2055(b)(5), prohibits the release of such information unless a remedial action plan has been accepted in writing; a complaint has been issued; the reporting firm consents to the release; or the Commission publishes a finding that public health and safety requires public disclosure with a lesser period of notice than 15 days. In addition, a firm claiming that information it has submitted is a trade secret or confidential commercial or financial information must mark the information as "confidential" in accordance with section 6(a)(3) of the CPSA, 15 U.S.C. § 2055(a)(3). That should be done when the information is submitted to the Commission. The firm will receive an additional opportunity to claim confidentiality when it receives subsequent notice from the Commission's Freedom of Information Office that the information may be disclosed to the public in response to a request. If section 6(b)(5) does not apply, the CPSC staff will not treat information as exempt from disclosure to the public under section 6(a) of the CPSA, 15 U.S.C. § 2055(a), and the Freedom of Information Act, absent a specific claim for confidential treatment.

### B. Section 37 Reports

Section 37 of the CPSA requires manufacturers of consumer products to report information about settled or adjudicated lawsuits.[5] Manufacturers must report if:

- a particular model of the product is the subject of at least three civil actions filed in federal or state court;

- each suit alleges the involvement of that particular model in death or grievous bodily injury—mutilation or disfigurement, dismemberment or amputation, the loss of important bodily functions or debilitating internal disorder, injuries likely to require extended hospitalization, severe burns, severe electric shock, or other injuries of similar severity;

- during one of the following two-year periods specified in the law, each of the three actions results in either a final settlement involving the manufacturer or in a court judgment in favor of the plaintiff:

  January 1, 2011 – December 31, 2012
  January 1, 2013 – December 31, 2014
  January 1, 2015 – December 31, 2016
  January 1, 2017 – December 31, 2018

and

- The manufacturer is involved in the defense of or has notice of each action prior to the entry of the final order and is involved in discharging any obligation owed to the plaintiff as a result of the settlement or judgment.

---

[5]The Commission has issued a rule interpreting the requirements of section 37 at 16 C.F.R. part 1116. The Commission recommends that manufacturers considering whether they have section 37 reporting obligations refer to that rule, particularly in determining whether products involved in different lawsuits are the same particular model.

---

## 1. What to Report

A report under section 37 must contain:

- The name and address of the manufacturer of the product.

- The model and model number or designation of the product.

- A statement as to whether the civil action alleged death or grievous bodily injury and in the case of the latter, the nature of the injury. For reporting purposes, the plaintiff's allegations as to the nature of the injury are sufficient to require a report, even if the manufacturer disagrees with the allegations.

- A statement as to whether the case resulted in a final settlement or a judgment in favor of the plaintiff. However, a manufacturer need not provide the amount of a settlement.

- In the case of a judgment in favor of the plaintiff, the name and case number of the case and the court in which it was filed.

A manufacturer may also provide additional information, if it chooses. Such information might include a statement as to whether the manufacturer intends to appeal an adverse judgment, a specific denial that the information it submits reasonably supports the conclusion that its product caused death or grievous bodily injury, and an explanation why the manufacturer has not previously reported the risk associated with the product under section 15.

## 2. When and Where to Report

A manufacturer must report within 30 days after a judgment or final settlement in the last of three lawsuits. The same is true of any additional lawsuits involving the

same model that are settled or adjudicated in favor of the plaintiff during the same two-year period.

Companies must file section 37 reports in writing to the Office of Compliance and Field Operations, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, Maryland 20814 with a copy to Section15@cpsc.gov.

### 3. Confidentiality of Reports

Under section 6(e) of the CPSA, the Commission and its employees may not publicly disclose c information reported under section 37 except that such information may be furnished to the reporting manufacturer or Congress, under certain circumstances. By law, reporting under section 37 is not an admission of the existence of an unreasonable risk of injury, a defect, a substantial product hazard, an imminent hazard, or any other liability under any statute or common law. Information voluntarily provided that is in addition to information required to be reported under Section 37, is governed by the confidentiality provisions governing Section 15 reports (see above section A.3).

### C. Section 102 Reports

Section 102 of the Child Safety Protection Act requires that companies report certain choking incidents to the Commission. Each manufacturer, distributor, retailer, and importer of a marble, a ball with a diameter of 1.75" or less ("small ball"), latex balloon or other small part, or a toy or game that contains such a marble, ball, balloon, or other small part must report information that reasonably supports the conclusion:

> 1) that a child (regardless of age) choked on such a marble, small ball, balloon, or small part; and

> 2) that, as a result of the incident, the child died, suffered serious injury, ceased breathing for any length of time, or was treated by a medical professional.

### 1. What to Report

The report should include the name and address of the child who choked and the person who notified the firm of the incident, a detailed identification of the product, a description of the incident and any resulting injuries or medical treatment, information about any changes made to the product involved or its labeling or warnings to address the risk of choking, and the details of any public notice or other corrective action planned. Firms should refer to 16 C.F.R. Part 1117 for more detailed information about this reporting requirement.

**2. When and Where to Report**

Section 102 reports must be filed within 24 hours of obtaining the information.

A company must file a section 102 report with the Office of Compliance and Field Operations by mail, telephone (301-504-7520), or fax (301-504-0359). Telephone reports must be followed with a written confirmation.

**3. Confidentiality of Reports**

Section 102 reports receive the same confidentiality treatment as information submitted under section 15 of the CPSA.

**II. Identifying a Defect**

The Commission's reporting requirements provide information that assists the Commission in evaluating whether some form of remedial action is appropriate. However, in the absence of a regulation that addresses a specific risk of injury, the product in question must contain a defect that creates a substantial risk of injury to the public to warrant such remedial action. The Handbook next discusses the considerations that go into determining whether a product defect exists and, if so, whether the risk presented by that defect is substantial.

A defect could be the result of a manufacturing or production error; or it could result from the design of, or the materials used in, the product. A defect could also occur in a product's contents, construction, finish, packaging, warnings, and/or instructions. (See 16 C.F.R. § 1115.4)

Not all products that present a risk of injury are defective. A kitchen knife is one such example. The blade has to be sharp to allow the consumer to cut or slice food. The knife's sharpness is not a product defect, even though some consumers may cut themselves while using the knife.

In determining whether a risk of injury associated with a product could make the product defective, the Commission considers the following:

1. *What is the utility of the product? What is it supposed to do?*

2. *What is the nature of the risk of injury that the product presents?*

3. *Is the risk obvious to the consumer?*

4. *What is the need for the product?*

5. *What is the population exposed to the product and its risk of injury?*

6. *Are there adequate warnings and instructions that mitigate the risk?*

7. *What is the Commission's experience with the product?*

8. *Is the risk of injury the result of consumer misuse, and is that misuse foreseeable?*

9. *Finally, what other information sheds light on the product and patterns of consumer use?*

If the information available to a company does not reasonably support the conclusion that a defect exists, the firm need not report to the Commission under the defect reporting provision of section 15(b)(2) of the CPSA. However, since a product may be defective even when it is designed, manufactured, and marketed exactly as intended, a company in doubt as to whether a defect exists should still report if the potential defect could create a substantial product hazard. A firm that is in doubt as to whether a defect exists should only fail to report if the firm is certain that there is no substantial product hazard.  Additionally, a firm must report if it has information indicating the product creates an unreasonable risk of serious injury or death. See 15 U.S.C. §2064(b)(4) and 16 C.F.R. § 1115.6.

If the information obtained by a company supports a conclusion that a product has a defect, the company must then consider whether the defect could create a substantial product hazard. Generally, a product could create a substantial hazard when consumers are exposed to a significant number of units or if the possible injury is serious or is likely to occur. However, because a company ordinarily does not know the extent of public exposure or the likelihood or severity of potential injury when a product defect first comes to its attention, the company should report to the Commission even if it is in doubt as to whether a substantial product hazard exists.

Section 15(a)(2) lists criteria for determining when a product creates a substantial product hazard. Any one of the following factors could indicate the existence of a substantial product hazard:

- **Pattern of defect.** The defect may stem from the design, composition, content, construction, finish, or packaging of a product, or from warnings and/or instructions accompanying the product. The conditions under which the defect manifests itself must also be considered in determining whether the pattern creates a substantial product hazard.

- **Number of defective products distributed in commerce.** A single defective product could be the basis for a substantial product hazard determination if an injury is likely or could be serious. By contrast, defective products posing no risk of serious injury and having little chance of causing even minor injury ordinarily would not be considered to present a substantial product hazard. The number of products remaining with consumers is also a relevant consideration.

- **Severity of risk**. A risk is considered severe if the injury that might occur is serious, and/or if the injury is likely to occur.

- **Likelihood of injury.** The likelihood is determined by considering the number of injuries that have occurred, **or that could occur,** the intended or reasonably foreseeable use or misuse of the product, and the population group (such as children, the elderly, or the disabled) exposed to the product.

A substantial product hazard also exists when a failure to comply with an applicable consumer product safety rule,  creates a substantial risk of injury to the public.

## III. CPSC Evaluation of Section 15 Reports

When a company reports to the Commission, the staff of the Office of Compliance and Field Operations undertakes the same product hazard analysis as that requested of firms. First, the staff considers whether the product contains a defect. If the staff believes there is a defect, it then assesses the substantiality of the risk presented to the public, using the criteria listed in section 15 (that is, pattern of defect, number of defective products distributed in commerce, severity of the risk, likelihood of injury and other appropriate data). In determining preliminarily whether the product in question creates a substantial product hazard[6], the staff applies hazard priority standards to classify the severity of the problem.

The hazard priority system allows the Commission staff to rank defective products uniformly. For example, a Class A hazard rating is reserved for product defects that present a strong likelihood of death or grievous injury or illness to the consumer. Should the staff make a preliminary determination that a product creates a substantial product hazard; the hazard priority system also provides a guide for selecting the level and intensity of corrective action.

---

[6]The decision is preliminary because only the Commissioners, after a hearing, can make a formal determination that a product is defective and creates a substantial product hazard.

---

## Class A Hazard

Exists when a risk of death or grievous injury or illness is likely or very likely, or serious injury or illness is very likely.

Class A hazards warrant the highest level of attention. They call for a company to take immediate, comprehensive, and expansive corrective action measures to identify and notify consumers, retailers and distributors having the defective

product and to remedy the defect through repair or replacement of the product, refunds, or other measures.

**Class B Hazard**

> Exists when a risk of death or grievous injury or illness is not likely to occur, but is possible, or when serious injury or illness is likely, or moderate injury or illness is very likely.

**Class C Hazard**

> Exists when a risk of serious injury or illness is not likely, but is possible, or when moderate injury or illness is not necessarily likely, but is possible.

Regardless of whether a product defect is classified as a Class A, B, or C priority hazard, the common element is that each of these defects creates a substantial product hazard that requires corrective action to reduce that risk of injury.

The priority given to a specific product defect provides a guideline for determining how best to communicate with owners and users of the defective product and to get them to respond appropriately. While some companies have exemplary track records in communicating with consumers independently, it is still to a company's advantage to work with the Commission staff, using both the company's and the Commission's skills and resources to conduct an effective product recall.

## IV. Fast Track Product Recall Program (No Preliminary Determination (PD) of Hazard)

A firm that files a section 15(b) report may wish to use of an alternative procedure that the Commission has established to expedite recalls.[7] The program is called the "Fast Track Product Recall Program" (no PD). If a firm reports a potential product defect and, within 20 working days of the filing of the report, implements with CPSC a consumer-level voluntary recall that is satisfactory to the staff, the staff will not make a preliminary determination that the product contains a defect which creates a substantial product hazard.

In cases where staff is unable to evaluate and approve implementation of the corrective action plan within 20 working days even though the firm has submitted all the necessary information in a timely manner, the firm may still use the Fast Track Product Recall program, and staff generally will not make a preliminary hazard determination despite the delay.

This program allows the staff and company to work together on a corrective action plan almost immediately, rather than spending the time and other resources necessary to investigate the reported defect further to determine whether it rises to the level of a substantial product hazard.

To participate in this program, companies must:

- provide all of the information required for a full report (16 C.F.R. § 1115.13(d));

- request to participate in the program; and

- submit a proposed corrective action plan with sufficient time for the Commission staff to analyze any proposed repair, replacement, or refund offer and to evaluate all notice material before the implementation (announcement) of the CAP which is to occur within 20 working days of the report.

---

[7]This program is described in more detail in the Federal Register of July 24, 1997, 62 Fed. Reg. 39,827-39,828. http://www.cpsc,gov/businfo/frnotices/fr97/frnopd.pdf.

---

## V. Putting Together a Corrective Action Plan

### A. Preparing For a Product Recall

It is rare that any two recall programs will ever be identical. Therefore, companies should be prepared to address issues that invariably arise. For instance:

- What is the defect that causes the product hazard?

- What caused the product defect to occur in the first place?

- Where are the unsafe products? How many are there?

- Did the product fail to comply with government safety regulations? How?

- Was the government or the appropriate regulatory body informed about the defect or lack of compliance?

- Has the company discontinued production and shipments of these products to distributors?

- Has the company notified retailers to stop selling the product and asked them to help identify consumers who own the product?

- Has the company started reviewing existing databases to identify potential product owners, *e.g.*, product registration and customer service records?

- Has a press release been prepared announcing the recall? What other forms of public notice are needed? Is the firm utilizing social media and

16

digital and mobile communication platforms to get its message out?  If so, how will it do so? If not, why not?

- Has a toll-free telephone service been set up that will be able to handle the number of calls expected after the recall is announced?

- Has the firm's website been modified to announce the recall and accept email requests to participate?

- What is the company's estimate of the cost of the product recall campaign?

- Is the company prepared to deploy manpower and/or fund an effort to provide replacement parts for defective products or to exchange them for new products that do not have the problem?

- Has a plan been developed to ship replacement parts or new units to distributors participating in the product recall, or otherwise repair units in their inventory?

- Has a plan been developed regarding the disposition of returned product? How will the product be reworked, broken down for reclamation of critical components, or destroyed? Are procedures in-place to ensure proper control and tracking of all defective materials returned in the recall?

- Is the company prepared to monitor the product recall and provide timely reports to the Commission on the progress of the recall?

- How is the company upgrading its quality control or risk analysis procedures to prevent a similar product recall in the future?

This list addresses administrative and operational functions of a company involved in a product recall. Even if a product recall is merely potential, a company should be prepared to respond to the questions listed above.

**B. Elements of a Recall**

A company that undertakes a recall should develop a comprehensive plan that reaches throughout the entire distribution chain to consumers who have the product. The company must design each communication to reach affected consumers, motivate people to respond to the recall and take the action requested by the company.

Once the staff and a company agree on a remedy to correct a product defect, the staff works with the company to put together an effective plan for public notification and implementation of the recall. The information that should be

included in a corrective action plan ("CAP") is set forth at 16 C.F.R. § 1115.20(a). A plan must include the company's agreement that the Commission will publicize the terms of the plan to inform the public of the nature of the alleged substantial product hazard and the actions being undertaken to correct that hazard.

The objectives of a recall are:

1. to locate all defective products as quickly as possible;

2. to remove defective products from the distribution chain and from the possession of consumers; and

3. to communicate accurate and understandable information in a timely manner to the public about the product defect, the hazard, and the corrective action. Companies should design all informational material to motivate retailers and media to get the word out and consumers to act on the recall.

In determining what forms of notice to use, the paramount consideration should be the level of hazard that the recalled product presents. Class A hazards warrant the highest level of company and Commission attention. Other considerations include where and how the product was marketed, its user population, the estimated useful life of the product, and how the product is most likely to be maintained and repaired.

A company conducting a recall must take particular care to coordinate the notice portion of the recall so that all participating parties, including traditional and on-line retailers, have sufficient advance notice so that they can carry out the actions agreed upon. Notice also needs to be balanced—the purpose of some elements, such as news releases, press conferences, and video news releases—is to get the media to publicize information about the recall widely. Other elements, such as advertisements and posters, ensure that the information is available to the public throughout the course of the recall and helps reaching consumers who did not hear the original announcement.

## VI. Communicating Recall Information

The Commission encourages companies to be creative in developing ways to reach owners of recalled products and motivate them to respond. The following are examples of types of notice that may be appropriate. This list is meant as a guide only, and is by no means all-inclusive. As new or innovative methods of notice and means of communication become available, such as social media, the staff encourages their use.

- a joint news release from CPSC and the company;

- targeted distribution of the news release;

- a dedicated toll-free number and fax number for consumers to contact to respond to the recall notice;

- information on company external websites;

- a video news release to complement the written news release;

- a national news conference and/or television or radio announcements;

- use of a firm's social media presence to notify consumers of the recall, including Facebook, Google +, YouTube, Twitter, Flickr, Pinterest, company blogger networks, and blog announcements;

- direct notice to consumers known to have the product—identified through registration cards, sales records, catalog orders, retailer loyalty cards, or other means;

- notices to distributors, dealers, sales representatives, retailers (traditional brick and mortar and on-line), service personnel, installers, and other persons who may have handled or been involved with the product;

- purchase of mailing lists of populations likely to use the product;

- use of mobile scanners to obtain information on recalls from mobile devices;

- paid notices via television, or radio, Google, Facebook, and other online search engines;

- paid notices in national newspapers and/or magazines to reach targeted users of the product;

- paid notices through local or regional media;

- recall posters at stores;

- notices in product catalogs, newsletters, and other marketing materials;

- posters for display at locations where users are likely to visit, such as stores, medical clinics, pediatricians' offices, child care centers, repair shops, equipment rental locations, and others;

- notices to trade groups, utilities, and home/fire inspectors as applicable;

- notices to repair/parts shops;

- service bulletins;

- notices included with product replacement parts/accessories.

- notices to day care centers;

- notices to thrift stores and other secondhand retailers;

- incentives such as money, gifts, premiums, or coupons to encourage consumers to return the product;

The Communications staff must review and agree upon press releases and social media based communications that a company intends to use in a product recall before publication or dissemination. The Compliance staff must also review and agree upon all other notice to be disseminated. It is, therefore, imperative that companies give the staff advance drafts of all notices or other communications to media, customers, and consumers.

CPSC is first to issue the approved public communication messages and then recalling firm follows with issuance of its approved communication messages.

CPSC uses traditional and online media to communicate recalls to the public in plain language using information from agreed-upon joint press releases. Traditional media includes both print and broadcast outlets.  Online media includes social media, mobile platforms, and CPSC's external websites.  In media platforms that capture two-way communications, CPSC only manages the messages posted by CPSC.

Following are some specific suggestions for communicating recall information.

## A. News Releases

Unless a company can identify all purchasers of a product being recalled and notify them directly, the Commission typically issues a news release jointly with the firm. The Compliance staff develops the wording of the release with the recalling company in conjunction with the Commission's Office of Communication. The agreed-upon language for the news release provides the foundation for preparing other notice documents. The Commission discourages unilateral releases issued by companies because they create confusion among the media and public, particularly if CPSC is also issuing a release on the same subject.

The Office of Communications sends the news releases to national wire services, major metropolitan daily newspapers, television and radio networks, and

periodicals on the agency's news contact mailing list, and consumers who have signed up to receive direct notification of product recall news. News releases from the Commission receive wide media attention and generate a good response rate from consumers.

Each recall news release must use the word "recall" in the heading and should begin, "In cooperation with the U.S. Consumer Product Safety Commission (CPSC)...."

Recall news releases must include the following:

- the firm's legal and commonly known trade name and the city and state of its headquarters;
- whether the recalling firm is the manufacturer (or importer), distributor, or retailer of the product;
- if the firm is not the manufacturer, the manufacturer, including importers, of the product and the country of manufacture;
- if the product is manufactured outside the U.S., the identity of the foreign manufacturer or U.S. importer must include the city and c ountry of its headquarters;
- all significant retailers, by commonly known trade name, of the product. Significant is defined by 16 C.F.R. § 1115.27 and is in the sole discretion of Staff;
- number of product units covered by recall, including numbers manufactured, imported and/or distributed;
- a description of the product, including product name, the intended consumer population (i.e. infants, children or adults), product's colors and sizes, model numbers, date codes, sku's and tracking labels and their exact location on the product;
- hi-resolution electronic or digital color photographs that clearly show identifying features of the product;
- clear and concise description of the product's actual or potential hazards that give rise to the recall, including product defect and the type of hazard or risk (i.e. laceration, entrapment, burn…);
- for each make and m odel -- month and year manufacture of product began and ended, retail sales began and ended;
- approximate retail price or price range;
- concise summary of all incidents associated with circumstances giving rise to the recall, including number of incidents, property damage due t o incidents, injuries and deaths, including age of persons injured and killed;
- complete instructions for how to participate in the recall described in a manner that will motivate the consumer to take advantage of the remedy.

CPSC posts recall news releases on its external website.

**B. Video News Releases**

A video news release (VNR) is a taped version of the written news release that describes the recall in audio-visual terms. Distributed via satellite to television stations nationwide, it is an effective method to enhance a recall announcement. A VNR increases the chances that television news media will air information about a recall because it effectively provides news of the recall to television news producers in the form that they need.

Commission staff works with firms to produce VNRs announcing recalls. Like news releases, VNRs need to communicate basic information clearly and concisely. VNRs should incorporate the same information as the news release, as well as video images of the product. They often also include brief statements of company officials and/or the Chairman of the Commission. When writing a VNR script, remember that, if this information is to reach consumers, television networks or local stations must pick it up, which means that the script must be written for television producers. The VNR should be produced as a bites and cover package and not be a fully narrated video. At times the CPSC will produce and distribute its own VNR announcing the recall. Appropriate legal notifications and review will be provided to the recalling firm.

A brief guide describing how to produce a VNR is available from the Office of Compliance and Field Operations upon request.

**C. Posters**

Posters are an effective means of providing continuing notice of recalls to consumers at points of purchase or other locations that they visit. Guidelines for posters and counter cards:

- Keep them BRIEF and eye-catching; in general, a poster requires far fewer words than a news release.
- Describe the hazard and tell consumers what to do.
- Use color to make the poster stand out.
- Use a print font, size, and color that provides a strong contrast to the background color of the poster.
- Include the terms "safety" and "recall" in the heading.
- Use a good quality line drawing or photograph of the product with call outs identifying product information, such as model numbers and date codes.
- The firm's toll-free telephone number should be in large size type at the bottom of the poster.
- The poster should include "Post until [date at least 120 days from recall announcement]."
- Consider tear-off sheets with each poster with information on the recall for consumers to take home.

- Use a QR code or other mobile scanning code to let consumers act on the recall immediately.

The recalling company should contact the firms or individuals that the company wants to display the posters before the recall is announced. The company should explain the reason for the recall and the contribution to public safety that the posters provide. The company should also:

- Advise retailers or other firms to place the posters in several conspicuous locations in their stores or offices where customers will see them, *e.g.*, the area where the product was originally displayed for sale, store entrances, waiting rooms in pediatric clinics, service counters at repair shops.

- Provide sufficient numbers of posters for retailers or others to display them in more than one place in each store or location, and provide a contact for ordering additional posters.

CPSC recommends that posters be 8.5 x 11 inches. This size is the easiest to mail in bulk quantities. Larger sizes may be appropriate for repair and service shops. Also, many retailers, particularly large chains, have specific requirements for posters, including size and some product identification information. To avoid delays and having to reprint, a company producing a recall poster should take care to contact retailers in advance to see if they have any such requirements.

## D. Social Media

Firms should notify its customers using all available social media and mobile platforms including firm Facebook, Google+ pages,Twitter accounts, You Tube accounts, Pinterest , Flickr blogs and company blogging networks in an effort to get as broad a notice as possible.  Guidelines for such notifications:

- should be on the firm's website's first entry point, such as the home page;
- should include the words "recall" and "safety";
- contains all recall information available in the news release;
- permits persons to request remedy directly from website;
- Facebook, Twitter, Flickr, Pinterest or other social media notification must link to website location that includes recall information available in the news release.

## E.  Other Forms of Notice

Like news releases and posters, letters, advertisements, bulletins, newsletters, and other communications about a recall need to provide sufficient information and motivation for the reader or listener to identify the product and to take the action you are requesting. They should be written in language targeted to the intended audience.

- Letters or other communications should be specific and concise.

- The words "Important Safety Notice" or "Safety Recall" should appear at the top of each notice and cover letter and should also be on the lower left corner of any mailing envelope.

- Notices to retailers and distributors should explain the reason for the recall, including the hazard, and contain all the instructions needed to tell them how to handle their product inventory, as well as instructions for displaying posters or notices, providing information to consumers, and disposing of returned products.

- All letters and other notices to consumers should explain clearly the reason for the recall, including injury or potential injury information, and provide complete instructions.

## F. Toll-Free Numbers/URL/E-mail

A company conducting a recall should provide a toll-free (800/888/877/866) telephone number, website URL for consumers to respond to the recall announcement, and email address. Generally, this number and address should be dedicated only to the recall. Historically, the Commission staff has found that most company systems for handling consumer relations or for ordering products, repairs, or accessories are unable to respond effectively to callers about recall announcements, particularly during the first few weeks after the initial announcement.  Use of a URL address or e-mail address should be included for every recall.

When establishing a telephone system to handle a recall, be over-generous in estimating consumer response, especially during the first several days/weeks. It is easier to cut back than it is to add more capacity once a recall is announced, and consumers who are unable to get through may not keep trying.

Whether you use an automated system or live operators to answer the calls, prepare scripts and instructions for responding to questions. Operators or taped messages should begin by identifying the firm and product and explaining the reason for the recall. Most consumers who hear about a recall by radio, television, or word of mouth will not remember all the information they initially heard. Again, at its beginning, the message should reinforce the need for listeners to act, particularly if the message is lengthy. CPSC Compliance staff needs to review all scripts before the recall is announced. All automated systems should provide a number for consumers to contact the firm for special problems, *e.g.*, problems completing repairs or installing parts.

Recalling firms should ensure that their call center makes recall response a priority.

Firms should also provide a website and e-mail for consumers to register to participate in the recall.

## VII. Monitoring Recalled Products

Every recall conducted in coordination with the staff is monitored by both the recalling firm and the Commission. Recalling firms need to understand and prepare for the monitoring since the Consumer Product Safety Improvement Act (CPSIA) makes it unlawful for any person to sell, offer for sale, manufacture for sale, distribute in commerce, or import into the United States any consumer product or substance that is subject to a voluntary corrective action taken by the manufacturer, in consultation with the Commission (CPSA Section 19(a)(2)(B)-(C), 15 U.S.C. Section 2068(a)(B)-(C).

- The law applies to both voluntary recalls by a manufacturer and recalls ordered by the Commission.
- The definition of "manufacturer" includes an importer.
- Any person or firm distributing recalled products in commerce may be liable.
- It is your responsibility to monitor CPSC recalls and ensure that your business complies with the law.

CPSC monitoring of product recalls includes the following:

- Submission of monthly progress reports to the Office of Compliance and Field Operations using a required form so the staff can assess the effectiveness of the firms recall. Information requested includes number of products remedied, number of consumers notified of the recall, and any post recall announcement incidents and injuries.
- Recall verification inspections are conducted to monitor firm implementation of the corrective actions undertaken.
- Retail visits are conducted by CPSC field staff and state investigators to confirm receipt of recall notification and to assure recalled products are quarantined and no longer being sold.
- Requests to dispose or destroy recalled products should be submitted in writing to recalledproductdisposal@cpsc.gov so that CPSC investigator can either witness disposal or make arrangements for other verification of destruction.

Recalling firms need to take every step to assure recalled products are quarantined and segregated from other products throughout the distribution chain. Any third party hired to destroy or dispose of recalled products needs to be monitored by the recalling firm to assure they understand the importance of keeping recalled products separate from other returned products and that they take appropriate steps to assure proper disposal of recalled products. CPSC

staff will witness the safe disposal of recalled products or request written verification of such disposal.

When a firm determines that the corrective action plan has been implemented to the best of the firm's ability and as many products as possible have been removed from the marketplace, it may submit a final progress report requesting that Commission monitoring of the recall be ended.  A CPSC field investigator may conduct a close-out recall inspection of the firm upon the firm's request that the file be close. At that time the staff will review the number of notifications made to owners of the product and the number of products returned and/or corrected as well as whether there have been any post recall incidents/injuries or deaths involving the recalled product.  As a result of the review of this information, recalling firms should maintain appropriate records to show steps taken to reach owners of the product, the distribution chain, and others.  The Compliance staff will evaluate the effectiveness of the firm's corrective action plan.  The staff could seek broader corrective action if the plan does not prove effective.  When the staff closes its files on the corrective action plan, the firm should continue to implement the recall plan until as many products as possible have been removed from the marketplace.  The firm's toll free number should be maintained as well as notice of the recall on the firm's website so consumers can continue to reach the firm in the event they discover a recalled product.  Should the firm decide to change or discontinue its toll-free recall number, the firm must immediately notify the Office of Compliance and Field Operations and provide a new recall contact number for the firm.  If there are changes to the implementation of the corrective action plan, the firm should also immediately contact the staff.  The agreed upon press release announcing the recall is maintained on the Commission's website.  Any modifications to the firm's phone number or obligations under the corrective action plan would be posted on the existing press release by way of an update with the date the change was made.

## VIII. Developing a Company Policy and Plan to Identify Defective Products and To Undertake a Product Recall

Companies whose products come under the jurisdiction of the CPSC should consider developing an organizational policy and plan of action if a product recall or similar action becomes necessary, whether it involves the CPSC or another government agency. This policy and any related plans should focus on the early detection of product safety problems and prompt response.

## A. Designating A Recall Coordinator

Designating a company official or employee to serve as a "recall coordinator" is a significant step that a firm can take to meet its product safety and defect reporting responsibilities. Ideally, this coordinator has full authority to take the steps necessary (including reporting to the Commission) to initiate and

implement all recalls, with the approval and support of the firm's chief executive officer.

The recall coordinator should have the following qualifications and duties:

- Knowledge of the statutory authority and recall procedures of the U.S. Consumer Product Safety Commission;

- Ability and authority to function as the central coordinator within the company for receiving and processing all information regarding the safety of the firm's products. Such information includes, *e.g.*, quality control records, engineering analyses, test results, consumer complaints, warranty returns or claims, lawsuits, and insurance claims.

- Responsibility for keeping the company's chief executive officer informed about reporting requirements and all safety problems or potential problems that could lead to product recalls;

- Responsibility for making decisions about initiating product recalls;

- Authority to involve appropriate departments and offices of the firm in implementing a product recall;

- Responsibility for serving as the company's primary liaison person with CPSC.

## B. Role Of The Recall Coordinator

At the outset, the recall coordinator should fully review the company's product line to determine how each product will perform and fail under conditions of proper use and reasonably foreseeable misuse or abuse. Through research and analysis, product safety engineers can identify the safety features that could be incorporated into products that present safety risks to reduce their potential for future injury.

The company should institute a product identification system if one is not now in use. Model designations and date-of-manufacture codes should be used on all products, whether they carry the company's name or are privately labeled for other firms. If a product recall is necessary, this practice allows the company to identify easily all affected products without undertaking a costly recall of the entire production. Similarly, once a specific product has been recalled and corrected, a new model number or other means of identification used on new corrected products allows distributors, retailers, and consumers to distinguish products subject to recall from the new items. Until a production change can be made to incorporate a new model number or date code, some companies have

used sticker labels to differentiate products that have been checked and corrected from recalled products.

## IX. Records Maintenance

The goal of any product recall is to retrieve, repair, or replace those products already in consumers' hands as well as those in the distribution chain. Maintaining accurate records about the design, production, distribution, and marketing of each product for the duration of its expected life is essential for a company to conduct an effective, economical product recall. Generally, the following records are key both to identifying product defects and conducting recalls:

A. **Records of complaints, warranty returns, insurance claims, and lawsuits.** These types of information often highlight or provide early notice of safety problems that may become widespread in the future.

B. **Production records.** Accurate data should be kept on all production runs—the lot numbers and product codes associated with each run, the volume of units manufactured, component parts or substitutes use, and other pertinent information that will help the company identify defective products or components quickly.

C. **Distribution records.** Data should be maintained as to the location of each product by product line, production run, quantity shipped or sold, dates of delivery, and destinations.

D. **Quality control records.** Documenting the results of quality control testing and evaluation associated with each production run often helps companies identify possible flaws in the design or production of the product. It also aids the firm in charting and sometimes limiting the scope of a corrective action plan.

E. **Product registration cards.** Product registration cards for purchasers of products to fill out and return are an effective tool to identify owners of recalled products. The easier it is for consumers to fill out and return these cards, the greater the likelihood the cards will be returned to the manufacturer. For example, some firms provide pre-addressed, postage-paid registration cards that already have product identification information, *e.g.*, model number, style number, special features, printed on the card. Providing an incentive can also increase the return rate. Incentives can be coupons towards the purchase of other products sold by the firm, free accessory products, or entry in a periodic drawing for a product give away. The information from the cards then needs to be maintained in a readily retrievable database for use in the event a recall becomes necessary.

28

**X. Conclusion**

Consumers expect firms to stand behind the products they produce and sell. Millions of products have been recalled over the years. Consumers believe they enjoy a safer, better product as a result of a recall conducted responsibly by company. How well a company conducts a timely, reasonable recall of a product can have a strong influence on consumers' attitude about the firm. Successful product recalls in the past have rewarded companies with continuing consumer support and demand for the firms' products.

For additional information about product recalls and reporting, call (301) 504-7520, fax (301) 504-0359, or by email at section15@cpsc.gov or visit the Commission's website at www.cpsc.gov (click on the Business icon).