**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL | * | |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | **CIVIL ACTION** |
| | * | |
| | * | **MDL NO. 2047** |
| | * | |
| | * | **SECTION L (5)** |
| THIS DOCUMENT RELATES TO: | * | |
| *Elizabeth Bennett, et al. v. Gebr. Knauf* | * | |
| *Verwaltungsgesellschaft, KG, et al.*, No. 14-2722 | * | |

**ORDER & REASONS**

Pending before the Court is Defendant Knauf Gips KG's Motion for Summary Judgment, R. Doc. 22678.  Plaintiffs oppose the motion, R. Doc. 22797, and Defendants have filed a reply, R. Doc. 22773.  Having considered the applicable law and the parties' arguments, the Court now rules as follows.

**I.      BACKGROUND**

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of foul-smelling gas, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).  Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. As a result, many homebuilders also filed suit seeking to recoup their damages. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court. Since that date, numerous cases have been consolidated, involving thousands of individual claims; over 20,000 documents have been entered into the record, millions of documents have been exchanged in discovery, depositions have been taken in the United States and in China, and over thirty Pretrial Orders have been issued; the Court has appointed steering committees and liaison counsel for plaintiffs, homebuilders, insurers, installers, and manufacturers, and it has presided over monthly status conferences, hearings, and several bellwether trials.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.

## A. The Knauf Defendants

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46—which represented a remediation cost of $81.13 per square foot based on the footprint square footage of the house.

Subsequently, the Knauf Entities agreed to institute a pilot remediation program utilizing the remediation protocol formulated by the Court from the evidence in *Hernandez*. The Knauf pilot remediation program is now completed and has remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Thereafter, additional claims were filed against Knauf and others.

3

### B.  The Bennett Matter

The instant matter is a purported class action filed on November 13, 2014 by Elizabeth Bennett in the Northern District of Alabama. [1] Ms. Bennet raised claims on her own behalf and on the behalf of a nationwide class of similarly situated homeowners who allegedly suffered damages due to the presence of defective Chinese drywall in their homes. The Plaintiffs raised claims against the Knauf Entities for negligence, negligence per se, strict liability, breach of express and/or implied warranty, redhibition, violations of the Louisiana Products Liability Act, private nuisance, negligent discharge of a corrosive substance, unjust enrichment, violations of consumer protection laws, and equitable and injunctive relief and medical monitoring with respect to the manufacture of allegedly defective Chinese drywall. In January 2015, the Judicial Panel on Multidistrict Litigation transferred the case to the Eastern District of Louisiana and consolidated it with the *In re Chinese Manufactured Drywall Liability Litigation*, MLD 09-2047, currently pending before this Court.

On October 31, 2019, the Court granted leave for Plaintiffs to add several new Plaintiffs to the action. R. Doc. 22357. The case now involves 130 affected properties. On that date, the Court also extended many of the Case Management Order's deadlines. R. Doc. 22357. With discovery well underway, the Knauf Defendants have begun to file dispositive motions targeting the claims of several individual plaintiffs.

---

[1] On January 22, 2020, the Court granted Defendant's Motion to Deny Class Certification, finding that the predominance requirement of Rule 23(b)(3) was not satisfied. R. Docs. 22524, 22528. Specifically, the Court noted that the variety in the individual claims, which included personal injury and property damage claims, theories of liability, applicable state laws and defenses, and different damage calculations precluded the finding of predominance necessary to warrant class certification.

4

## II.     PENDING MOTION

Defendant Knauf GIPS KG ("GIPS") seeks summary judgment of all claims against it in the Fifth Amended Complaint. R. Doc. 22678-1 at 1. Defendants explain that the Fifth Amended Complaint alleges the Knauf entities are collectively the "manufacturers of drywall located in plaintiffs' homes," and that GIPS specifically "supervised, operated, trained and otherwise exercised control of KPT's operations." R. Doc. 22678-1 at 5. GIPS argues that summary judgment is warranted because the Court has previously determined that GIPS was "not involved in the manufacture, marketing, sale, or distribution of KPT Chinese drywall nor are they responsible" for it. *Id*. GIPS contends it never manufactured the drywall at issue nor did it excerpt control over KPT. Id. at 8. Further, GIPS avers no other Defendant acted as its agent. Id. GIPS argues the Knauf entities are all legally distinct, and that "only KPT drywall produced the defective Chinese drywall at issue." *Id*.

Plaintiffs oppose the motion. R. Doc. 22797. Plaintiffs argue that GIPS is a proper defendant in this action because it functions as KPT's alter ego. Id. at 6. Plaintiffs also argue that GIPS has "never been dismissed as a defendant" in any of the lawsuits in this MDL. Id. at 7. In particular, Plaintiffs note the 2011 global agreement was, upon information and belief, funded by GIPS, not KPT. Id. at 8. Plaintiff further argue that contrary to GIPS' assertions, its role in the distribution and sale of KPT drywall in the United States is well documented. Moreover, Plaintiffs allege that GIPS has "extensive overlap with its related entities overseas" sufficient to support an "alter ego" theory of liability. Id. In particular, Plaintiffs cite to purported evidence of of (1) contact with U.S. Markets; (2) business operations in the United States; (3) oversight of other entities by GIPS; (3) "overlap among the wallboard plant managers and the Knauf Gips, KG corporate officers present for the Plant Manager Conference in 2005"; overlap between GIPS employees and

employees at the Knauf Tainjin plant; (6) financial oversight of KPT and other Knauf entities by GIPS; (7) shipment of materials to the United States; (8) sharing of services between GIPS and KPT; (9) travel to the United States by GIPS officers. R. Doc. 22797.

In reply, Defendant re-aver that GIPS never manufactured, marketed, sold, or distributed KPT Chinese drywall, and stress that Plaintiffs never rebutted that fact. R. Doc. 22833 at 1. Defendant argues that Plaintiffs failed to raise the alter ego theory of liability in the operative complaint and cannot be allowed to raise this issue for the first time now. Even if Plaintiffs could pursue this argument, GIPS argues the allegations "fail as a matter of law to establish alter ego/Single-Business-Enterprise" liability. *Id.* at 2.

### III.   LAW & ANALYSIS

#### A. Legal Standard – Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. When the moving party has met its Rule 56(c) burden, "[t]he non-movant cannot

6

avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little*, 37 F.3d at 1075). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

### B. Alter Ego/Single Business Enterprise Theory

Although this MDL involves five different states' laws, the Court begins with a review of Louisiana law. "A bedrock principle of corporate law is that 'a parent corporation . . . is not liable' for actions taken by its subsidiaries." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Nevertheless, there are certain situations in which a court may disregard corporate formalities and "pierce the corporate veil" in order to extend liability to individual shareholders and/or affiliated entities. *Sentry Supply Inc. v. NLMK N. Am. Plate LLC*, No. 2:16-CV-01393, 2019 WL 1388793, at *3 (W.D. La. Mar. 27, 2019). The proponent of veil piercing bears the burden of demonstrating that it is appropriate, and because Louisiana law disfavors the practice, that burden is usually a heavy one. *Veterans Bros. No. 126, L.L.C. v. 7-Eleven, Inc.*, No. 16-2034, 2017 WL 345858, at *5 (E.D. La. Jan. 24, 2017) ("If fraud is not alleged, the proponent of piercing the veil bears a heavy burden of proof.").

Although Plaintiffs use the terms "alter ego" and "single business enterprise" interchangeably, the terms actually refer to similar but distinct legal doctrines that, if satisfied,

justify piercing the corporate veil. Alter ego liability typically arises when a plaintiff seeks to hold individual shareholders liable for the acts or debts or a corporation, and exists where "the shareholders disregard[] the corporate entity to such an extent that it cease[] to become distinguishable from them." *Aker Sols., Inc. v. Shamrock Energy Sols.*, LLC, No. CV 16-2560, 2016 WL 4529828, at *3 (E.D. La. Aug. 30, 2016) (quoting *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1167 (La. 1991)). In this case, Plaintiffs do not seek to impose liability on any GIPS shareholders for the actions of KPT; accordingly, the Court will not further consider whether the alter ego doctrine supports piercing the corporate veil.

In contrast, the single business enterprise doctrine applies when a plaintiff seeks to impute liability on a separate but affiliated entity. If a group of affiliated entities acts as a single business, "a court may disregard the concept of corporate separateness and extend liability to each of the affiliated corporations for purposes of preventing fraud or achieving equity." *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 335 (5th Cir. 2007). The single business doctrine is an equitable one and may accordingly be applied only where adhering to corporate separateness would lead to an unjust result.

Whether the two affiliated entities operate as a "single business enterprise" depends on the following non-exclusive factors: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices, (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of

8

another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green v. Champion Ins. Co.*, 577 So.2d 249, 257–58 (La. Ct. App. 1991). No one factor is dispositive, and the Court must consider the totality of the circumstances. *Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana*, 690 F. Supp. 2d 435, 444 (E.D. La. 2010) (citing *Green*, 577 So. 2d at 251–53).

### C. Discussion

As an initial matter, Plaintiffs did not specifically raise single business enterprise liability in the operative complaint. Plaintiffs are not entitled to raise new claims for the first time in an opposition to a motion for summary judgment. *See U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012). Nevertheless, Plaintiffs' complaint does allege that GIPS "supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of" the other Knauf entities." R. Doc. 21334 ¶ 5. It also alleges that "Knauf GIPS directly controlled through its global family of businesses the importation of problematic/defective drywall at all times and provided oversight of internal investigations of sales of problematic/defective drywall," and that the Knauf entities collectively acted "without regard to corporate formalities." *Id.* ¶¶ 17, 21. Because Plaintiffs' currently-proffered single business enterprise theory of liability is clearly premised on the allegations of operational control and lack of corporate formalities alleged in the complaint, the Court will consider the argument.

In support of summary judgment, Defendants have cited affidavits and deposition testimony demonstrating that GIPS and Knauf Plasterboard (Tainjin) Co., Ltd. (the "KPT Plant") are distinct legal entities, with separate bank accounts and different employees. R. Doc. 22678 at

9

8; R. Doc. 22678-10 at 3; R. Doc. 22678-3 at 4. Specifically, the deponents and affiants represented that GIPS is not involved in quality control at the KPT Plant, R. Doc. 22678-2 at 9, and that drywall manufactured at the KPT plant is not subject to specific standards set by GIPS, *id.* at 3, nor is GIPS involved in training any staff at the KPT Plant, *id.* at 17. Additionally, there is evidence that the KPT Plant is one of three different plants in China that are each responsible for their own regional sales and, in some cases, conceivably compete with one another "[o]n the borders where they met." *Id.* at 6–7. In particular, Daniel Gabel, Senior Legal Counsel for Gebr. Knauf KG prepared a declaration addressing GIPS' corporate form. R. Doc. 22678-9 at 2. He explained that GIPS is a German limited commercial partnership with its principal place of business in Iphofen, Germany. GIPS's partners are Gebr. Knauf KG and Isogranulat GmbH. R. Doc. 22678-9 at 2. He explained that GIPS does not design, manufacture, or sell KPT drywall, does not conduct any business related to Chinese products, and does not own Knauf Plasterboard (Tainjin) Co., Ltd. *Id.* He further noted that GIPS "did not and does not control the chain of supply or exert operational control over Knauf Plasterboard (Tainjin) Co., Ltd." *Id.* at 3.

In an attempt to raise a genuine question of material fact regarding the relationship between KPT and GIPS, Plaintiffs cite, without any specificity, a 217-page document containing myriad documents with few distinguishing factors. Many documents contained in the exhibit are duplicative, illegible, or lacking context.[2] Others are completely irrelevant.[3] Plaintiffs' opposition

---

[2] For example, the same email chain discussing the presence of "smelly board" in the United States appears at least eight times in the exhibit. Further, the exhibit is largely comprised on emails with no clarification as to the identity of the individuals sending and receiving the communications.

[3] Plaintiffs appear to confuse the evidence necessary to establish single business enterprise theory for the purposes of personal jurisdiction and liability. Notably, many documents apparently pertain to GIPS' "contacts with US Market," GIPS' method of "conducting business in the U.S.," and GIPS' "direct shipments of building materials to the U.S. market." However, none of these facts are relevant to whether GIPS exerts operational control over the KPT Plant. Indeed, Defendant concedes that GIPS conducted business in the United States and had contacts there, as it was a manufacturer and distributer of *German* drywall in this country. R. Doc. 22833 at 5.

provides little discussion about these documents. This is a wholly inappropriate method of introducing summary judgment evidence, as it is not the Court's job to parse the evidence for support of Plaintiffs' position. Nevertheless, in the interest of justice and an attempt to make headway in this case, the Court will endeavor to decipher the material provided.

Plaintiffs' evidence suggests that there is a genuine question of material fact with respect to whether GIPS and the KPT Plant operate as a single business entity, at least under Louisiana law. Although the Court's investigation is frustrated by the fact that the documents are presented without context and with little indication of who the communications are being sent to and from, they collectively suggest that GIPS oversaw, and in some instances exerted significant influence over, the operation of the KPT Plant and other affiliated entities.[4]

As an initial matter, although the corporate structure of the entire Knauf Group has not been clearly established, it appears as though GIPS oversees the operation of the various Knauf entities, including the KPT Plant. For example, a PowerPoint presentation discussing GIPS' structure suggests that the company generates sales from distinct entities that manufacture and distribute various types of building materials, but that these entities share "marketing, administrative, finance, purchasing, production, [and] innovation" services. R. Doc. 22797-1 at 148. Additionally, there is evidence that the various Knauf entities were financially intertwined to the extent that loans are frequently distributed amongst the sister companies. *Id.* at 70. Further, an email from Martin Stuermer, who appears to oversee finances for the Knauf entities, discussed

---

[4] Specifically, much of Plaintiffs' evidence involves emails between officers and employees of the various Knauf entities. In large part, the identities of the communicants are unclear. However, it appears as though GIPS employees have email addresses ending in ".de". *See* R. Doc. 22797-1 at 50 (email from John Hirth, whose email address ends in ".de" and whose signature block indicates that he works for Knauf GIPS). The following analysis relies on this understanding.

bank records of the Chinese entities and indicated that "to finance further projects in Europe, we currently collect the money from our subsidiary companies all over the world." *Id*.

The close relationship between the various Knauf entities, including GIPS and the KPT Plant, is further indicated by emails between officers or employees of the various companies. Specifically, emails between KPT Plant employees and non-KPT Plant managers indicate that GIPS employees were kept abreast of developments at the plant. For example, an individual named Martin Halbach, who appears to be a GIPS employee responsible for overseeing the Chinese region, was copied on and often engaged in emails discussing routine topics such as the production schedule at the three Chinese plants, *id*. at 43, the status of repair and maintenance projects at the KPT plant, *id*. at 60, a production stoppage due to a gypsum shortage at the KPT Plant, *id*. at 21, and monthly production statistics for the Chinese plants, *id*. at 22. Although none of these emails alone indicates that GIPS and the KPT Plant operated as a single business, the constant contact between GIPS and KPT employees regarding developments and operations at the KPT Plant indicates a closer relationship than two independent businesses, at least when considered the light most favorable to Plaintiffs.

Further, the emails suggest that GIPS exerted significant influence over its subsidiaries' ability to export drywall to the United States. Numerous emails suggest that the various Knauf entities developed and implemented a coordinated strategy towards serving the U.S. market. For example, one email from Baldwin Knauf on behalf of GIPS indicated that a single individual had been appointed as the "coordinator for all supplies of plasterboards to the United States." *Id*. at 47. Mr. Knauf's email identifies the three U.S. companies the Knauf entities will supply, as well as the applicable price basis and payment terms. *Id*. He specifically instructs the various entities to

add costs for special packaging and/or transportation to their price quotes, to the extent these additions are requested. *Id.*

This coordinated strategy is reflected in other inter-entity communications, such as a letter from Barry Toppel, the individual appointed by GIPS to oversee the U.S. market to the managers of the various plants, discussing the Knauf Group's "prime strategy" and "controlled strategy for [its] approach to the [U.S.] market." *Id.* at 48. This letter also identifies specific price levels that "have been established and should be followed" in order to "establish some uniformity." *Id.* at 49. His letter, which concludes, "I hope this clarifies the current position," indicates that at least with respect to exports to the United States, the various Knauf entities apparently did not operate as distinct entities responsible for their own sales or distribution. *Id.* In sum, these documents reveal that GIPS was intimately involved in the supply of drywall from its various entities, including the KPT plant, to the United States, going so far as to dictate who the plants could sell to and on what terms.

The managerial relationship between GIPS and the KPT Plant is additionally indicated by the fact that as soon as a problem with Chinese drywall originating from the KPT Plant was identified, GIPS officers were informed of the issue and asked to solve it, rather than allowing the KPT Plant to address the problem on its own. R. Doc. 22797-1 at 9. Specifically, it appears as though the GIPS employee responsible for overseeing the Chinese region was notified of the problem immediately and asked whether "we [should] send the Knauf people to USA" to address the issue. *Id.* Furthermore, an email sent by a different manager responsible for the Chinese plants indicated that he did "not want Knauf dragged into a court case," indicating that responsibility for the defective drywall would not necessarily fall on KPT's shoulders alone. GIPS' involvement in

13

the developing defective drywall situation is telling of its control over and responsibility for the KPT Plant.

In sum, considering the evidence in the light most favorable to Plaintiffs, which is appropriate at this stage, the Court concludes that summary judgment is not appropriate on this issue at this time. In finding that a genuine question of fact exists concerning that organization of GIPS and its affiliated businesses and the amount of control GIPS had over the KPT Plant, the Court is cognizant that the purpose of the veil piercing doctrine is to prevent fraud or achieve equity. Considering the influence GIPS appears to have had over the KPT Plant's operation, it would be inappropriate to grant summary judgment and allow GIPS to avoid liability arising from damage caused by a product if it was intimately involved in the exportation of that product, especially when GIPS was immediately made aware of the problem and was significantly involved in its resolution from both a financial and logistical standpoint. Of course, imposing liability on GIPS is dependent on whether a trier of fact concludes GIPS and the KPT Plant are, in fact, a single business enterprise. *See Verhoeven v. Balboa Ins. Co.*, No. CIV.A. 06-4891 B(1), 2007 WL 4374222, at *11 (E.D. La. Dec. 13, 2007) ("Whether a group of entities is a single business enterprise is a question of fact.").

Moreover, the Court recognizes that this case involves Louisiana, Mississippi, Alabama, Texas, and Florida law that may differ on the availability and extent of the corporate veil piercing doctrine. *See, e.g., Taylor v. Tai-Ao Aluminum USA, Inc.*, No. 6:08-CV-77, 2009 WL 10677717, at *2 (E.D. Tex. Jan. 29, 2009) (recognizing that the Texas Supreme Court had abrogated the single business enterprise doctrine). Accordingly, whether and to what extent GIPS can be held liable under the single business enterprise theory depends on the nuances of each applicable state law and is a question best resolved by the courts upon remand. Although this Court has determined

14

that a question of material fact exists with respect to those cases that will proceed to trial in Louisiana, Defendants are free to re-urge this motion in the other states at the appropriate time after the matter is remanded.

## IV.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, R. Doc. 22678, is **DENIED**.

New Orleans, Louisiana this 21st day of August, 2020.

Eldon E. Fallon<br>
United States District Court