# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

MDL NO. 2047

SECTION: L

THIS DOCUMENT RELATES TO:

JUDGE ELDON FALLON

MAG. JUDGE MICHAEL NORTH

*Selene Acosta, et al. v. Knauf Gips, KG,*
*et al.,* **2:21-cv-02033-EEF-MB**

## AMENDED COMPLAINT

Plaintiffs allege that defective Chinese-manufactured drywall products have been found

in their homes.  Based on the markings found on the defective products, Plaintiffs bring this

action against Knauf entities[1] (collectively hereinafter "Knauf" or "Knauf Entities" or

"Defendants), who are believed to be the manufacturers or agents of the manufacturers of the

defective drywall found in Plaintiffs' homes.  Pursuant to Fed.R.Civ.P.20, Plaintiffs have

permissively joined as parties in this action against these Defendants because their claims arise

from a common series of actions or occurrences.  Each Defendant in this action is liable for

damages incurred by Plaintiffs due to their role in the design, manufacture, importing,

distributing, delivery, supply, marketing inspecting, installing, or sale of the defective drywall at

issue in the litigation.

---

[1] Knauf entities consists of Gebrueder Knauf Verwaltungsgesellschaft, KG ("GKV"); Knauf
International GmbH ("Knauf International"); Knauf Insulation GmbH ("Knauf Insulation");
Knauf AMF GmbH & Co. KG ("Knauf AMF"); Guangdong Knauf New Building Material
Products Co., Ltd. ("Guangdong Knauf"); Knauf GIPS KG ("Knauf GIPS"); Knauf UK GmbH
("Knauf UK") Knauf Plasterboard Tianjin Co., Ltd. ("Knauf Tianjin").

## JURISDICTION, PARTIES, AND VENUE

1.      This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(a)(2) as the amount in controversy for each Plaintiff exceeds $75,000.00, exclusive of interest and costs.  Plaintiffs are owners of real property in Florida and all Defendants are foreign business entities; thus, complete diversity exists.

2.      This Court has supplemental jurisdiction over this matter under 28 U.S.C. §1367 as all Defendants are subject to the Florida Long-Arm Statute, Fla. Stat. §48.193, for the tortious conduct described herein.

3.      Venue in this district satisfies the requirements of 28 U.S.C. § 1391(b) and (c) because all Plaintiffs reside in United States, most currently reside in the State of Florida within this jurisdiction and a substantial amount of the events and occurrences giving rise to the claim occurred in this district, or a substantial part of the property that is the subject of this action is situated in this district, while all Defendants are foreign business entities with no principle place of business or corporate headquarters located within Florida.

## PLAINTIFFS

4.      Plaintiff, Selene Y. Acosta, is a citizen of Florida and owns real property located at 11617 Hammocks Glade Drive, Riverview, FL 33569.  Plaintiff brings claims against Defendants as set forth in the following paragraphs of this Complaint.

5.      Plaintiffs, Amarilys Diaz and Martin Garcia, are citizens of Florida and own real property located at 928 SE 5th Court, Cape Coral, FL 33990.  Plaintiffs are bringing claims against Defendants as set forth in the following paragraphs of this Complaint.

2

6.     Plaintiffs, Dennis P. Gardner and Sandra K. Gardner, are citizens of Minnesota and own real property located at 3720 River Point Drive, Ft. Myers, FL 33905.  Plaintiffs are bringing claims against Defendants as set forth in the following paragraphs of this Complaint.

7.     Plaintiffs, Karl Juergen Harttmann and Karl Juergen Harttmann on behalf of Hartmann Trust, own real property located at 1811 SW 13th Lane, Cape Coral, FL 33991. Plaintiffs are bringing claims against Defendants as set forth in the following paragraphs of this Complaint.

8.     Plaintiff, Walter Montgomery, is a citizen of Florida and owns real property located at 1204 Bayou Pass Drive, Ruskin, FL 33570.  Plaintiff is bringing claims against Defendants as set forth in the following paragraphs of this Complaint.

9.     Plaintiff, Joe Hansen on behalf of SAV Holdings, LLC, is a citizen of New Jersey. Joe Hansen is a member of the limited liability company.  SAV Holdings, LLC owns real property located at 2001 Pergola Bend Drive, Tampa, FL 33647.  Plaintiff is bringing claims against Defendants as set forth in the following paragraphs of this Complaint.

10.     Plaintiffs, Erik V. Stewart and Kristina L. Stewart, are citizens of Florida and own real property located at 2635 Creekfront Drive, Green Cove Springs, FL 32043.  Plaintiffs bring claims against Defendants as set forth in the following paragraphs of this Complaint.

## DEFENDANTS

11.     All Defendants are foreign entities organized in foreign countries, with principal places of business also located in foreign countries.

12.     Defendant Knauf GIPS, KG ("Knauf GIPS") is a German corporation doing business in several states including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia. Knauf GIPS maintains its

3

company headquarters at Am Bahnhof 7, 97346 Iphofen, Germany.  Knauf GIPS is a leading

manufacturer of building materials and systems sold worldwide.  Knauf GIPS together with Knauf

Plasterboard Tianjin Co., Ltd, provides building materials and systems to customers in over 50

countries, including the United States.  Upon information and belief, at all times material hereto,

Knauf GIPS supervised, operated, trained and otherwise exercised control and/or had the right to

control the operations of Knauf Tianjin and its agents, apparent agents, and employees.  This

conduct by Knauf GIPS has resulted in harm and damages to Plaintiffs.

13.     Defendant Knauf Plasterboard Tianjin Co., Ltd. ("Knauf Tianjin" or "KPT") is a

foreign corporation doing business in several states, including but not limited to Alabama,

Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.

Knauf Tianjin is involved in the manufacturing and sale of gypsum drywall.  KPT is the actual

agent and/or apparent agent of Knauf GIPS and Knauf International.  KPT manufactured, sold,

distributed, marketed and placed within the stream of commerce gypsum drywall with the

expectation that the drywall would be purchased by thousands of consumers throughout the

United States. KPT is a subsidiary of Knauf International and maintains its company

headquarters at: East of Jingjin Highway (North of Yinheqiao), Beichen District Tianjin, 300400

China.  KPT manufactured the defective drywall at issue and systematically distributed and sold

its drywall to numerous purchasers in the United States with the assistance of other Knauf

Entities.  This conduct by KPT has resulted in harm and damages to Plaintiffs.

14.     Defendant Knauf International GmbH ("Knauf International") is a foreign

corporation doing business in several states including but not limited to Alabama, Florida,

Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Knauf

International is the parent company of Defendants Knauf Tianjin.  Knauf International maintains

its company headquarters at Am Bahnhof 7, 97346 Iphofen, Germany.  Knauf International is believed to be a holding company for GKV and other Knauf Entities.  Knauf International is closely related to Knauf GIPS.  Knauf International acted as an agent for Knauf GIPS and KPT by lending assistance and participating in the promotion, distribution, marketing, and sale of the drywall at issue in this litigation to U.S. suppliers.  Accordingly, Knauf International was responsible for the drywall at issue in the case being imported, distributed, delivered, supplied, inspected, marketed and/or sold.  This conduct by Knauf International has resulted in harm and damages to Plaintiffs.

15.     Defendant Gebrueder Knauf Verwaltungsgesellschaft KG ("GKV") is a foreign company doing business in several states including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  GKV maintains its company headquarters at Am Bahnhof 7, 97346 Iphofen, Germany.  GKV is owned by members of the Knauf family including Alfons Frederick Knauf, Karl Rudolf Thies, Alfons Jean Knauf, Christine Brigitte Knauf, Karl Heinrich Knauf, Angelika Werhan, Beatrix Knauf, Carlo Knauf, Christiane Knauf, Alexander Heinrich Knauf, Isabel Corinna Knauf, Mathias Knauf, Karl Konstantin Knauf, Phillippe Knauf, Rupert Knauf, Dr. Albrecht Knauf, Beteiligungs GmbH, Lothar Knauf, Nikolaus Knauf, and Baldwin Knauf.  GKV is the parent company of Knauf International.  GKV acted as an agent for Knauf GIPS and Knauf Tianjin by lending assistance and participating in the promotion, distribution, marketing, and sale of the drywall at issue in this litigation to American suppliers.  Accordingly, GKV was responsible for the drywall at issue in the case being imported, distributed, delivered, supplied, inspected, marketed and/or sold.  This conduct by GKV has resulted in harm and damages to Plaintiffs.

16.     Defendant Knauf AMF GmbH & Co. KG ("Knauf AMF"), now operating as Knauf Ceiling Solutions GmbH & Co. KG, is a foreign corporation doing business in several states including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Knauf AMF maintains its company headquarters at Elsenthal 15, 94481 Grafenau, Germany.  Knauf AMF is involved in the insulation and building material industry.  Its business operations are closely associated with GKV, Knauf GIPS, Knauf International, and other Knauf Entities.  Knauf AMF has participated in the activities and sales of the Knauf Entities' drywall manufactured in China and sold in the United States. Knauf AMF provided assistance and participated in the promotion, distribution, marketing, and sale of the KPT drywall at issue in this litigation to American suppliers. Accordingly, Knauf AMF was responsible for the drywall at issue in the case being imported, distributed, delivered, supplied, inspected, marketed and/or sold.  This conduct by Knauf AMF has resulted in harm and damages to Plaintiffs.

17.     Defendant Knauf UK GmbH ("Knauf UK") is a foreign corporation doing business in several states including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Knauf UK maintains its company headquarters at Am Bahnhof 7, 97346 Iphofen, Germany. Knauf UK is owned by members of the Knauf family, with Alexander H. Knauf serving as Managing Director until approximately August 19, 2008.  Knauf UK operates in the insulation and building material industry.  Knauf UK is associated with GKV, Knauf GIPS and other Knauf Entities.  Knauf UK has participated in the activities and sales of the Knauf Entities' drywall manufactured in China and sold in the United States. Knauf UK provided assistance and participated in the promotion, distribution, marketing, and sale of the KPT drywall at issue in this litigation to American

6

suppliers.  Accordingly, Knauf UK was responsible for the drywall at issue in the case being imported, distributed, delivered, supplied, inspected, marketed and/or sold.  This conduct by Knauf UK has resulted in harm and damages to Plaintiffs.

18.     Defendant Knauf Insulation GmbH ("Knauf Insulation") is a foreign company that maintains its company headquarters at Am Bahnhof 7, 97346 Iphofen, Germany.  Knauf Insulation is owned by members of the Knauf family, with Thies Knauf serving as the Managing Director. Upon information and belief, Knauf Insulation is a subsidiary of GKV.  Knauf Insulation acted as an agent for Knauf GIPS, Knauf International, KPT, Knauf AMF, and GKV by lending assistance and participating in the promotion, distribution, marketing, and sale of the drywall at issue in this litigation to U.S. suppliers.  Accordingly, Knauf Insulation was responsible for the drywall at issue in the case being imported, distributed, delivered, supplied, inspected, marketed and/or sold.  This conduct by Knauf Insulation has resulted in harm and damages to Plaintiffs.

19.     Defendant Guangdong Knauf New Building Material Products Co., Ltd. ("Guangdong Knauf") is a foreign corporation doing business in several states, including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Guangdong Knauf maintains its company headquarters at 2 Xinsha Development Zone Machong Dongguan, 523147 China.  Guangdong Knauf is involved in the manufacturing and sale of gypsum drywall.  Guangdong Knauf is the actual agent and/or apparent agent of GKV, Knauf GIPS, KPT, and Knauf International.  Upon information and belief, Guangdong Knauf manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers throughout the United States.  Guangdong Knauf and/or the Knauf

7

Entities have continuously and systematically distributed and sold Chinese-manufactured drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States.  Guangdong Knauf and/or the Knauf Entities manufactured and sold, directly and indirectly, to certain suppliers in the United States.  Representatives of Guangdong Knauf have intentionally directed communications to distributors in the United States, employed American distributors as agents for the company, shipped product intending for it to be distributed in the United States and otherwise engaged in commerce and/or circumstances that the company reasonably expected that it could be hailed into the United States courts.  This conduct by Guangdong Knauf has resulted in harm and damages to Plaintiffs.

20.     Upon information and belief, Knauf GIPS, together with its affiliates and/or actual or apparent agents, including Knauf International, GKV, Knauf Insulation, Knauf UK, KPT, and Guangdong Knauf, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers within various states, including but not limited to Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Defendants manufactured and sold, directly and indirectly, to certain suppliers in the United States.  Agents or representatives of Knauf Tianjin intentionally directed communications to distributors in the United States, employed U.S. distributors as agents for the company, shipped product intending for it to be distributed in the U.S., and otherwise engaged in commerce and/or circumstances that the company reasonably should have expected that it could be hailed into the U.S. courts.

21.     In 1995, the Knauf Group introduced its advanced production techniques and technology into China through Knauf GIPS.  From 1997 through 2001, Knauf GIPS serviced the investments of Knauf International in China and established three plasterboards plants located in

Wuhu, Tinajin, and Dongguan.  The product quality of all Knauf International's plants in China, including KPT and Guangdong Knauf are strictly controlled according to the requirements of Knauf GIPS' headquarters in Germany.  Knauf GIPS's sales and technical support teams support Knauf International's businesses throughout the world, including Knauf Tianjin and Guangdong Knauf in China.  KPT and Guangdong Knauf and their employees are controlled by and the actual and/or apparent agents of GKV, Knauf GIPS, Knauf UK and/or Knauf International, as the Knauf Entities act without regard to corporate formalities.

22.     The Knauf Entities manufactured and sold, directly and indirectly, to certain suppliers in the United States.  The Knauf Entities directly controlled the sale activity through its global family of businesses, including the importation of defective drywall.  At all times, executives within Knauf GIPS, Knauf International, Knauf AMF, Knauf UK, Knauf Insulation, and GKV provided oversight of international sale of KPT drywall.  And, when defective drywall was identified in the United States, executives of multiple Knauf Entities conducted the subsequent investigation related to the KPT drywall exported to the United States.

## GENERAL ALLEGATIONS

23.   Defendants' drywall is predominately composed of gypsum.

24.   Within Defendants' defective drywall that was designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants as described herein, sulfur compounds exit the drywall.

25.   The sulfur compounds, including Hydrogen Sulfide, Carbonyl Sulfide, and Carbon Disulfide, exit Defendants' drywall and cause rapid sulfidation and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

26.     Although the drywall functions according to its intended purpose as a building component, it is unfit for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased their homes had the side effects been disclosed by Defendants.

27.     As a direct and proximate result of Defendants' actions and omissions, each Plaintiff's structures and personal property have been exposed to Defendants' defective drywall containing the latent defect and the harmful effects of the sulfur compounds that exit from Defendants' defective drywall.

28.     Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall, which was unfit for its intended purpose in that the drywall caused rapid sulfidation and damage to personal property in each Plaintiff's home, residence or structure.

29.     Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall at issue in this litigation.

30.     Defendants recklessly, wantonly and/or negligently implemented faulty procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the defective drywall at issue in this litigation.

31.     As a direct and proximate result of Defendants' defective drywall and the harmful effects of the sulfur compounds that exist as a latent defect which exit these products, Plaintiffs have suffered, and continue to suffer, economic harm.

32.     As a direct and proximate result of Defendants' defective drywall and the harmful effects of the sulfur compounds that exit these products, each Plaintiff has suffered, and

10

continues to suffer damages. These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages and loss of use and enjoyment of their home and property.

33.     After learning that their products being sold in the United States were defective, Defendants took no action required under federal law (see Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.*) to notify their importers, distributors, agents, or consumers of the harmful effects caused by their drywall.

34.      After learning that their products being sold in the United States were defective, Defendants took no action and initiate a corrective action plan.

35.     By failing to take action to notify potential victims or attempt to implement a corrective action plan for the damage their defective drywall products caused, Defendants directly violated the federal CPSA that specifically requires that when a manufacturer has reason to know its product does not meet safety standards, contains a defect, or creates and unreasonable risk of death or injury, it must inform the CPSC. (See 15 U.S.C. 2064(b)).

36.     After learning that their products being sold in the United States were defective, Defendants breached their post-sale duty to warn consumers in Florida, including Plaintiffs, as required by the laws of the State of Florida.

37.     Based on information and belief, Defendants executed confidential indemnification agreements with its distribution partners in the United States on or about

11

December 7, 2006, rather than comply with its post-sale duty to warn consumers as required by federal law and the laws of the State of Florida.

38.     Plaintiffs' damages include, but are not limited to, cost of inspection; cost and expenses necessary to fully remediate their homes of defective drywall, cost of alternative living arrangements, economic hardship resulting in lower credit ratings leading to higher interest rates on loans and credit cards, lost value or devaluation of their homes and property; and, loss of use and enjoyment of their home and property.

39.   As a direct and proximate result of Defendants' latent defect in its drywall and the harmful effects of the sulfur compounds that exit these products, each Plaintiff has a need for injunctive relief in the form of repair and remediation of their home, rescission of contracts, and the ordering of corrective notice to the Consumer Product Safety Commission, the federal agency charged with implementing a corrective action plan for defective consumer products sold in the United States of America.

## ESTOPPEL

40.   Defendants were and are under a continuous duty to disclose to Plaintiffs and other consumers in Florida the true character, quality, and nature of its gypsum drywall products. Instead, it actively concealed the true character, quality, and nature of its defective gypsum drywall products and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of its gypsum drywall products.

41.   Plaintiffs reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**DISCOVERY RULE**

42.   The causes of action alleged herein did not accrue until Plaintiffs discovered that the defective gypsum drywall products in their respective homes had the defective characteristics that were concealed by Defendants by overt acts and intentional omissions that breached their post-sale duty to warn Plaintiffs.

43.   Plaintiffs had no realistic ability to discover the presence of the defective drywall products or to otherwise learn of the fraudulent concealment and/or intentional misrepresentations by Defendants, until it was discovered and confirmed by an experienced Chinese-manufactured drywall inspector.

44.   At no time was the defective nature of Defendants' defective gypsum drywall product revealed to the public through either notice to the Consumer Product Safety Commission, the State of Florida, or directly to consumers.

**COUNT I**
**NEGLIGENCE**

45.   Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

46.   Defendants owed a duty to Plaintiffs to exercise reasonable care in designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall, including a duty to adequately warn of their failure to do the same.

47.   Defendants knew or should have known that their wrongful acts or omissions would result in harm and damages in the manner set forth herein.

48.     Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

49.     Defendants likewise breached their duties to Plaintiffs by failing to warn about the defective nature of the drywall.  Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the homes and belongings of Plaintiffs.

50.     Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of Plaintiffs with the drywall, upon learning it had been sold in an unreasonably dangerous condition.

51.     Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs.

52.     As a direct and proximate cause of Defendants' acts or omissions, Plaintiffs were harmed and have incurred damages as described herein.

## COUNT II
## NEGLIGENCE PER SE

53.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

54.     Defendants owed statutory duties to Plaintiffs to exercise reasonable care in designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

55.     Defendants breached their statutory duties to the Plaintiffs by failing to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, selling, and/or installing this drywall.

56.     Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other state and local building codes, to Plaintiffs by failing to warn about the defective nature of the drywall.  For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTM C 1396/C 1396M-069, and its predecessor(s).

57.     Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the homes of Plaintiffs.

58.     Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm and damages to Plaintiffs.

59.     As a direct and proximate cause of Defendants' acts or omissions, Plaintiffs were harmed and have incurred damages as described herein.

## COUNT III
## STRICT LIABILITY

60.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth fully herein.

61.     At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

62.     The drywall, including that installed in the homes of Plaintiffs was placed by Defendants into the stream of commerce.

63.     Defendants knew that the subject drywall would be used without inspection for defects by consumers.

64.     Defendants intended that the drywall reach the ultimate consumers, including Plaintiffs, and it indeed reached Plaintiffs when it was installed in their homes.

65.     When installed in Plaintiffs' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

66.     At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

67.     The subject drywall was not misused or altered by any third parties.

68.     The Defendants' drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

69.     The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing.

70.     The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gasses and/or other chemicals through off-gassing.

71.     The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

72.     The Defendants' defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use by Plaintiffs.

73.     The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct Plaintiffs of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

74.     Plaintiffs were neither aware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs, acting as reasonably prudent people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

75.     Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

76.     The benefit, if any, of Plaintiffs using Defendants' defective drywall was greatly outweighed by the risk of harm and danger.

77.     The defects in the drywall, as well as Defendants' failure to adequately warn Plaintiffs of the defects rendered the drywall unreasonably dangerous, was the direct and proximate cause of damages incurred by Plaintiffs.

## COUNT IV
## BREACH OF EXPRESS AND/OR IMPLIED WARRANTY

78.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

79.     Defendants and/or their agents were in privity with Plaintiffs and/or Plaintiffs were foreseeable third-party beneficiaries of any warranty.

80.     At the times Defendants' drywall was installed, utilized, supplied, inspected, sold, in the Plaintiffs' homes, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in the Plaintiffs' homes for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

81.     Defendants placed their drywall products into the stream of commerce in a defective condition and these products were expected to, and did, reach users, handlers, and

persons coming into contact with said products without substantial change in the condition in which they were sold.

82.     The drywall was defective because it was not fit for the uses intended by Defendants; the installation of the drywall in Plaintiffs' homes was not suitable for use as a building material, because it contained the defects as set forth herein.

83.     The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in Plaintiffs' homes as a building material) due to the defects set forth herein.

84.     Defendants had reasonable and adequate notice of the Plaintiffs' claims for breach of warranty and failed to cure.

85.     As a direct and proximate cause of Defendants' breach of warranties, Plaintiffs have incurred harm and damages as described herein.

## COUNT V
## PRIVATE NUISANCE

86.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

87.     The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into Plaintiffs' homes which has unreasonably interfered, and continues to interfere, with the Plaintiffs' use and enjoyment of their properties and caused them harm and damage as discussed herein.

88.     Defendants' interference has impaired the rights of Plaintiffs' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

89.     Defendants' invasions were intentional and unreasonable, and/or unintentional, but otherwise negligent or reckless.

90.     The interference with Plaintiffs' use of their property was caused by Defendants and is substantial and is ongoing.

91.     Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

92.     As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs have incurred harm and damages and injuries as described herein.

## COUNT VI
## NEGLIGENT DISCHARGE OF A CORROSIVE SUBSTANCE

93.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

94.     Defendants had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

95.     Notwithstanding their actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, Defendants nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs.

96.     By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendants breached their duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs.

97.     Defendants likewise breached their duties to Plaintiffs by failing to warn about the corrosive and dangerous propensities of the drywall.

98.     Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs.

99.     Plaintiffs have incurred damages by virtue of exposure of their property to the defective drywall at issue in this litigation.   Given the defect in the Defendants' drywall, Defendants knew or should have known that their product would cause injury to Plaintiffs.

100.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs were harmed and have incurred damages as described herein.  The injuries sustained by Plaintiffs are within the foreseeable zone of risk created by Defendants.

**COUNT VII**
**UNJUST ENRICHMENT**

101.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

102.     Defendants received money as a result of Plaintiffs' purchase of Defendants' defective drywall, or purchase of homes containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs.

103.     Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs.

104.     Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

**COUNT VIII**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

105.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

106.     This is an action for relief under F.S. § 501.201, *et seq*. (Florida Deceptive and Unfair Trade Practices Act).

107.    The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but   not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of defective drywall constitute violation of the provisions of the Florida Deceptive and Unfair Trade Practices Act.

108.    Plaintiffs have suffered actual damages as a result of Defendants' violation of this Deceptive and Unfair Trade Practices Act and are entitled to relief.

109.    As a direct and proximate cause of Defendants' violation of the Deceptive and Unfair Trade Practices Act, Plaintiffs have incurred harm and damages as described herein.

## COUNT IX
## FRAUDULENT MISREPRESENTATION

110.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

111.     Beginning in 2006, Defendants intentionally and fraudulently misrepresented the fitness of their drywall product to its buyers and distributors through its marketing activities.

112.    In Particular, Defendants intentionally and fraudulently:

a.   Failed to adequately warn about the level of sulfur off-gassing;

b.   Failed to provide full and complete information about corrosive nature of the gasses its product emits;

c.   Provided marketing material that did not adequately disclose the risks that Defendants knew of;

d.   Provided importers, distributors, or consumers information about their product that did not adequately disclose the risks that Defendants knew of; and,

e.   Overstated the quality of their drywall product.

113.     The representations were made by the Defendants with the intent that importers, exporters, distributors and consumers, including Plaintiffs, rely upon them, in willful, wanton, and reckless disregard for the lack of truthfulness of the representations and with the intent to defraud and deceive Plaintiffs.

114.     Plaintiffs reasonably relied on the fraudulent misrepresentations directly or as third-party beneficiaries when purchasing their homes.

## COUNT X
## NEGLIGENT MISREPRESENTATION

115.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

116.     From the time Defendants first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiffs and the general public, including but not limited to the misrepresentation that Defendants' drywall was safe, fit, and effective for use in the homes of Plaintiffs.

117.     Defendants owed a duty to Plaintiffs to exercise reasonable care to ensure they did not misrepresent the safety or fitness for use, and failed to exercise that reasonable care and therefore breached their duty.

118.     The Defendants made misrepresentations without any reasonable grounds for believing them to be true, and were in fact, reckless.

119.     The Defendants had a duty to correct these material misstatements because they knew or should have known that they were inaccurate and that others would reasonably rely on them and suffer damages.

120.     These misrepresentations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written

materials directed to their customers including builders, distributors and importers, with the intention of inducing reliance, purchase, and use of their product.

121.    The representations by the Defendants were in fact false, in that their product is not safe, fit, and effective for use in the homes and structures owned by Plaintiffs because their drywall has a propensity to emit corrosive gasses.

122.    The representations by Defendants were made with the expectation and intention of inducing reliance upon them and increasing their sale of drywall products.

123.    Plaintiffs reasonably relied on the misrepresentations made by the Defendants to their detriment.

124.    In reliance of the misrepresentations by the Defendants, Plaintiffs were induced to purchase and use Defendants' drywall.

125.    If Plaintiffs had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Defendants' product.

126.    The reliance of Plaintiffs upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

127.    As a direct, proximate, and foreseeable result of Defendants' negligent misrepresentations, Plaintiff suffered injuries and damages as alleged herein.

## COUNT XI
### FRAUDULENT CONCEALMENT

128.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

129.    At all relevant times, Defendants knew that their drywall was defective, unreasonably unsafe, and that its risks were understated and its benefits were overstated.

130.    Defendants willfully, intentionally and fraudulently concealed their knowledge from Plaintiffs, Plaintiff's builders, distributors, importers, and the public, and instead knowingly provided false information.

131.    Defendants withheld information that they had a duty to disclose through advertising, marketing materials, sales personnel, publications, that their product was fit for its intended use.

132.    Defendants withheld information about the severity of the risks of using their product and their knowledge of the harmful effects.

133.    Defendants withheld information that their product failed to comply with the IBC, and other state and local building codes like other gypsum products available on the market.

134.    The above facts were material and would have been considered important to a reasonable person.

135.    Had the above facts been disclosed, they would have changed Plaintiffs' decision to purchase their affected property or Defendants' product.

136.    Defendants had a duty to disclose the information to Plaintiffs and other consumers.

137.    Defendants had sole access to material facts concerning, and unique and special knowledge and expertise regarding, the dangers and unreasonable risks associated with their gypsum products.

138.    Defendants knew or should have known and expected or should have expected and intended that Plaintiffs and others would rely on the inaccurate information they provided.

139.    As a foreseeable, direct, and proximate result of Defendants' actions and fraudulent concealment, Plaintiff suffered injury.

## COUNT XII
### FRAUD

140.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

141.    Defendants' intentional misrepresentations and concealments constitute fraud under state law and were made with the intent to defraud its distributors and all downstream purchasers, including consumers such as Plaintiffs.

142.    Specifically, Defendants intentionally and fraudulently did the following:

    a.  In 2006, Defendants received written and verbal complaints from U.S. customers about their defective drywall;

    b.  Specifically, Banner Supply Company passed complaints it received from builders and installers to Mike Norris, Defendant Knauf Tianjin's general manager;

    c.  Based on information and belief, Mr. Norris contacted the Knauf headquarters in Germany about the complaints received;

    d.  Executive level employees of Defendants, including Isabel Knauf who was serving as manager of Knauf's operations in Asia, discussed the complaints and chose to send at least one corporate representative to the United States to meet with one of their larger distributors in Florida, Banner Supply Company;

    e.  After confirming that their drywall product was indeed defective and being widely sold primarily in the Southeastern United States, Defendants chose to take no corrective action and instead continued to sell the product to its distributors without any

limitation or disclosure regarding the defective nature of their product;

f.   After confirming that their drywall product was defective and being sold in the United States, Defendants struck an indemnification agreement with Banner Supply Company, one of its distributors, in order to avoid litigation and to encourage continuing sales of the defective product without any limitation or disclosure regarding the defective nature of their product;

g.   Based on information and belief, the terms of the indemnification agreement between Defendants and Banner Supply required both parties to conceal the existence of the deal from government, media, and the public;

h.   After confirming that their drywall product was defective and being sold in the United States, Defendants chose to notify no other distributors or buyers that their drywall was indeed defective; instead, Defendants chose to conceal the defective nature of its product while continuing its marketing and sale of the remaining defective product, estimated to be 55 million pounds, that had been imported from its Tianjin plant in China;

i.   On information and belief each and every advertisement and marketing channel fraudulently omits information about the risks of defective Knauf-manufactured drywall and overstates the benefits;

j.   Defendants failed to disclose that their product was not as safe and effective as other gypsum products sold by other manufacturers;

k.   Defendants failed to disclose that the risk of harm associated with their gypsum products was greater than the risk of harm associated with other gypsum products sold by other manufacturers;

l.   Defendants failed to disclose that their drywall was not adequately tested;

m.   Defendants failed to disclose that testing had revealed unreasonably high risk of damage to homes and personal property;

n.   On information and belief, Defendants failed to disclose that Defendants intentionally withheld internal quality tests; and

o.   Defendants affirmatively asserted that their drywall was safe and fit for its intended use.

143.   Plaintiffs and other consumers were misled by Defendants' affirmative statements or material omissions that provided the fraudulently inaccurate information described above.

144.   Defendants had access to these facts, while Plaintiffs did not and were unaware of them and could not reasonably learn of them from an alternative source prior to purchase.

145.   The above facts were material to Plaintiffs' decision to either purchase the gypsum product from Defendants' distributors or to purchase the affected property, and they reasonably relied on Defendants' representations either directly or indirectly.

146.   As a direct, proximate, and foreseeable result of Defendants' fraud they caused Plaintiff injuries.

27

## **PUNITIVE DAMAGES ALLEGATIONS**

147.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

148.    The acts, conduct and omissions of Defendants, as alleged throughout the Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights and safety of Plaintiffs and other consumers and for the primary purpose of increasing Defendants' profits from the sale and distribution of its product. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

149.    Prior to the manufacturing, sale, and distribution of its product, Defendants knew that said drywall or sheetrock was in a defective condition as previously described herein and knew that those consumers or homeowners would experience and did experience damages due to the corrosive off-gassing.  Further, Defendants, through their officers, directors, managers, and agents, knew that the drywall or sheetrock presented a substantial and unreasonable risk of harm to Plaintiffs or other consumers and Defendants unreasonably subjected all consumers of said drywall or sheetrock to risk of injury or damages.

150.    Despite their knowledge, Defendants, acting through their officers, directors and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in their drywall and failed to warn the public, including Plaintiffs of the extreme risk of injury occasioned by said defects inherent in the defective drywall or sheetrock. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of drywall or sheetrock knowing these actions would expose persons to damages in order to advance Defendants' pecuniary interest and monetary profits.

151.    Defendants' conduct was so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs and other consumers, entitling Plaintiffs to exemplary damages.

## EQUITABLE AND INJUNCTIVE RELIEF

152.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

153.    Plaintiffs are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

154.    Plaintiffs will suffer irreparable harm if the Court does not render the injunctive relief as set forth herein, and if Defendants are not ordered to recall, rescind, and/or repair the homes and structures owned by Plaintiffs.

155.    Plaintiffs demand injunctive and equitable relief and further, that Defendants be ordered to: (1) remediate, repair and/or replace the drywall in the homes and structures upon proof by the Defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the general public that there is no defect in, or danger associated with the drywall; and, (3) institute, at their own cost, a public awareness campaign to alert the general public of the defect and dangers associated with their defective drywall.

156.    Until Defendants' defective drywall has been removed and Plaintiffs' homes are properly remediated, Defendants should provide continued environmental and air monitoring in the homes and structures.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

a.   Compensatory damages;

b.   Statutory damages;

c.   Punitive damages;

d.   Prejudgment interest as allowed by Florida law;

e.   Post-judgment interest as allowed by Florida law;

f.   Injunctive relief;

g.   An award of attorney's fees as allowed by law;

h.   An award of taxable costs; and

i.   Any and all such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

/s/ *James V. Doyle*

James V. Doyle (Fla. Bar No. 121505)
James V. Doyle, Jr.
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500
Fax: 844-638-5812
Jim.doyle@doylefirm.com
jimmy@doylefirm.com

*Attorneys for Plaintiffs*