# EXHIBIT K

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**John Carter on 12/11/2020**

```
         IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
_____
IN RE:  CHINESE-MANUFACTURED      :
DRYWALL, PRODUCTS LIABILITY       :
LITIGATION                        :
EDUARDO AND CARMEN AMORIN,        :
ET AL, INDIVIDUALLY AND ON        :
BEHALF OF OTHERS SIMILARLY        :
SITUATED,                         :
               Plaintiffs,        :
                                  :
VS                                :
                                  :
TAISHAN GYPSUM CO., LTD. F/K/A    :
SHANDONG TAIHE DONGXIN CO.,       :
LTD.; TAIAN TAISHAN PLASTERBOARD:
CO, LTD, ET AL,                   :
               Defendants.        :
NO. 2:11-CV-01395-EEF-JCW
_____
WITNESS:   JOHN CARTER (ZOOM)
PAGES:     1 through 89
PLACE:     Huseby Zoom
           Atlanta, Georgia
DATE:      Friday, December 11, 2020
TIME:      1:30 p.m.
Court Reporter:  CELESTE PERLA, CSR, MERIT
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                      Pages 2..5

**Page 2**

```
1          APPEARANCES OF COUNSEL:
2   On behalf of the Plaintiffs:
3       JAMES DOYLE, ESQUIRE
        Doyle Law Firm, P.C.
4       2100 Southbridge Parkway
        Suite 650
5       Birmingham, Alabama 35202
        jimmy@doylefirm.com
6
    On behalf of Taishan Gypsum:
7
        CHRISTINA EIKHOFF, ESQUIRE
8       AND
        MATTHEW LAWSON, ESQUIRE
9       Alston & Bird
        1201 W. Peachtree Street NW
10      Suite 4200
        Atlanta, Georgia 30309
11      christy.eikhoff@alston.com
12  On behalf of Beijing New Building Materials
    Public Limited Company, Beijing New Building
13  Materials Group Corporation, and China National
    Building Materials Company, Limited:
14
        DANIEL GUERRA, ESQUIRE
15      Orrick, Harrington & Sutcliffe
        The Orrick Building
16      405 Howard Street
        San Francisco , California 94105-2669
17      dguerra@orrick.com
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              C O N T E N T S
2   WITNESSES:                              PAGE
3   JOHN CARTER
4       Examination by Ms. Eikhoff           5
5       Examination by Mr. Guerra          None
6       Examination by Mr. Doyle           None
7
                    ***
8
9                  EXHIBITS
10  EXHIBITS:                     MARKED RECEIVED
11  Deft Ex 1    Building Permit
                 Application          26
12
    Deft Ex 2    United States
13               District Court       27
14  Deft Ex 3    Building Application  31
15  Deft Ex 5    Document             38
16  Deft Ex 6    Photograph           46
17  Deft Ex 7    Photograph           48
18  Deft Ex 8    Photograph           48
19  Deft Ex 9    Plaintiff Profile
                 Form                 54
20
    Deft Ex 10   Supplemental Plaintiff
21               Profile Form         71
22  Deft Ex 11   Verification Form    71
23
24
25
```

**Page 4**

```
1              -----------
2          MS. EIKHOFF:  Will you please
3   swear the witness.
4              -----------
5          JOHN CARTER,
6   Having been first duly sworn, is
7   examined and testifies as follows:
8              -----------
9          DIRECT EXAMINATION
10             -----------
11  BY MS. EIKHOFF:
12  Q.    Hi, Mr. Carter, I am not sure whether to say
13  good morning or good afternoon or good night to
14  you.
15  A.    I am not sure what it is either.
16  Q.    I appreciate you being here with us today
17  via Zoom.
18        Could you please state your full
19  name for the record?
20  A.    John Anderson Carter.
21  Q.    And have you ever been deposed before, Mr.
22  Carter?
23  A.    I don't think so.
24  Q.    Okay.
25  A.    Not that I remember.
```

**Page 5**

```
1   Q.    Well, you just raised your right hand and
2   sworn to tell the truth.  You understand that
3   you're under oath just like you would be if you
4   were sitting in a witness stand in a court of
5   law?
6   A.    Yes.
7   Q.    And the court reporter here is recording my
8   questions and your answers, and you understand
9   that?
10  A.    Yes.
11  Q.    Okay.  I know we are on Zoom and we are a
12  half a world away.  It would be important to
13  speak audibly and loudly in your responses.  And
14  avoid just head nods, head shakes, or other forms
15  of communication that are nonverbal.
16  A.    I am in a hotel room, so I am trying to be
17  considerate at 3 o'clock in the morning with my
18  neighbor, so if I am not speaking loud enough,
19  please let me know but I am trying to balance
20  that.
21  Q.    I appreciate that.
22        MS. EIKHOFF:  Madam court
23        reporter, please indicate if you can
24        not capture the record.  Thank you.
25  BY MS. EIKHOFF:
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                    Pages 6..9

Page 6

1   Q.    And now I heard you say that you have given
2   a deposition before.  From time to time, your
3   attorney Mr. Doyle may state objections on the
4   record.  If he does, just wait for him to make
5   his statement and then you can answer the
6   question.
7   A.    Okay.
8   Q.    Do you understand that?
9   A.    Yes.
10  Q.    Okay.  And if you don't understand my
11  question, if it's not clear or if it's confusing,
12  please let me know.  I am not here to try to
13  confuse you or to trick you, and so if you don't
14  understand what I am asking you, please let me
15  know and I will restate the question until ably
16  answer it; is that fair?
17  A.    Yes.
18  Q.    Okay.  Good.
19        Now, I know that you have been
20  flying, I know it's the middle of the night where
21  you are.  Do you feel competent that you are in a
22  condition where you can understand my questions
23  and give truthful answers today, sir?
24  A.    Yes.
25  Q.    And are you under any -- taking any

Page 7

1   medications that you think may inhibit your
2   ability to understand my questions or give
3   truthful answers?
4   A.    No.
5   Q.    Okay.  Did you meet with your lawyer to
6   prepare for today's deposition, either virtually
7   or in person?
8   A.    No.  No.
9   Q.    And have you met with anyone else in
10  preparation for this deposition?
11  A.    No.
12  Q.    Okay.  Have you done anything yourself to
13  prepare for the deposition?
14  A.    Other than -- no, other than look back at
15  some of the property details because it's been so
16  long.  Just little things like the plans in the
17  house and that kind of stuff, that is it.
18  Q.    So you just mentioned that you maybe took a
19  look at the plans for the house, did I hear you
20  right?
21  A.    Yeah.  So I would remember -- trying to
22  remember what the square footages were, when it
23  was built.  It's been so long.
24  Q.    Okay.  Well, besides the house plans, were
25  there any other documents that you reviewed in

Page 8

1   preparation for today's deposition?
2   A.    No.
3   Q.    And, Mr. Carter, where do you live?
4   A.    I live in Auburn, Alabama.  Do you need the
5   full address?
6   Q.    Yeah.  Why don't you give me that address,
7   please, sir.
8   A.    1590 Crescent Boulevard, Auburn, Alabama.
9   Q.    And how long have you lived there, at that
10  address?
11  A.    Since 2004.
12  Q.    Okay.
13  A.    Since 2004.
14  Q.    Okay.  And had you lived in Auburn before
15  2004, just at a different address?
16  A.    Not -- not recently.  I was born there, went
17  to high school there, went to college there and
18  then moved back in 2004 after I retired from the
19  Military or just retiring from the Military.
20  Q.    So prior to moving to Auburn in 2004, you
21  were actively serving in the Military?
22  A.    Yes.
23  Q.    Okay.  And where was the last place you were
24  stationed before going back to Auburn?
25  A.    I was stationed at Maxwell Airforce Base but

Page 9

1   commuted from Auburn for that.  Prior to that, I
2   was in Wichita, Kansas, at McConnell Airforce
3   Base.
4   Q.    What is your current occupation?
5   A.    I am an airline pilot for FedEx.
6   Q.    And how long have you been working for
7   FedEx?
8   A.    For I am in my fifth year.  Four and a half
9   years.
10  Q.    Before you went to FedEx, were you a
11  commercial pilot elsewhere?
12  A.    For just under a year at Express Jet.
13  Q.    Okay.  When did you get your pilot's
14  license?
15  A.    I first started applying for the Airforce in
16  '88.
17  Q.    Okay.  So in the time from retiring from
18  active service in the Military to the time you
19  started working at Express Jet, did you have any
20  other occupations in that period of time?
21  A.    I owned a residential construction company
22  and a flooring company when I transitioned from
23  the military.
24  Q.    Okay.  And what was the name of that company
25  or those companies?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                          Pages 10..13

Page 10

1   A.    Patriot Homes and Auburn Flooring & Stone.
2   Q.    So I just want to make sure that I have got
3   the sequence right, because I know we have been
4   jumping around a little bit, but you retired from
5   active Military service in 2004?
6   A.    2007 is when I actually retired.
7   Q.    Oh, I am sorry.  I see.  You moved to Auburn
8   in 2004, but you retired in 2007 and you stopped
9   commuting?
10  A.    Yeah.
11  Q.    Got it.  Okay.  And then from the active
12  Military service, then you were working as owner
13  of the Patriot Homes and Auburn Flooring & Stone
14  companies; is that right?
15  A.    That is correct.
16  Q.    And then from there you started working at
17  Express Jet around six years ago maybe, six or
18  seven years ago?
19  A.    Yes.
20  Q.    Okay.  And then started working for FedEx;
21  is that right?
22  A.    Yes.  That is correct.
23  Q.    Okay.  Did you go to college?
24  A.    Yes.
25  Q.    Where did you go?

Page 11

1   A.    Went to Auburn for my undergraduate.  Embry
2   Riddle for my Master's Degree in Auburn for my
3   Ph.D.
4   Q.    What degree were your Master's and Ph.Ds in?
5   What field of study?
6   A.    Undergrad and Master's Degrees are both
7   aviation management.  And my Ph.D. work is in
8   adult education.
9   Q.    Okay.  Now, I know you said you have not
10  been deposed before.  Have you ever been involved
11  in a lawsuit before as a plaintiff other than
12  this one?
13  A.    No.
14  Q.    You haven't sued anyone except for the
15  current case we are in?
16  A.    Correct.
17  Q.    Okay.  And have you ever been involved in a
18  lawsuit as a defendant?  Have you been sued
19  before?
20  A.    Yes.
21  Q.    Okay.
22  A.    As Patriot Homes.  I was building houses and
23  that is actually how I found out that there was,
24  potential --
25        MS. EIKHOFF:  And, madam court

Page 12

1   reporter, could you please read the
2   last question back for the witness?
3         (Whereupon, the last question
4   was read back.)
5         THE WITNESS:  That is how I
6   found out that there was potential
7   Chinese Drywall in the house that I had
8   built for my mother which is this
9   house.
10  BY MS. EIKHOFF:
11  Q.    Okay.  So I am sorry, sir.  I didn't mean to
12  cut you off.  I thought you were done.
13  A.    That is really it.  That is how I found out.
14  Q.    So if I am understanding you right, you're
15  saying that the entity Patriot Homes that you
16  owned was sued related to Chinese Drywall?
17  A.    Yes.
18  Q.    Okay.  And had you or any of your companies
19  ever been sued for anything else before that
20  time?
21  A.    No.
22  Q.    Okay.  And since being a defendant in the
23  Chinese Drywall lawsuits, have you been sued in
24  any other cases, you or your companies?
25  A.    No.

Page 13

1   Q.    Okay.  Let's -- I have some questions for
2   you about Patriot Homes.
3         You mentioned that you own that
4   company, are you the sole member of that company
5   or are there other others?
6   A.    Sole owner.
7   Q.    Okay.  So single member LLC; is that
8   correct?
9   A.    Yes.
10  Q.    And do you remember when you formed Patriot
11  Homes as a company?
12  A.    I think it was around 2005.
13  Q.    Okay.  Is it still in existence?
14  A.    No.
15  Q.    When was it -- was it dissolved?
16  A.    When the housing market began to go down and
17  when the lawsuit came for the Chinese Drywall
18  against me, I decided I did not want to play
19  anymore.
20  Q.    About what year was that, that you were on
21  the receiving end of the lawsuit?
22  A.    I believe it was end of 2010, beginning of
23  2011 I think.
24  Q.    Okay.  And what was the business purpose of
25  Patriot Homes?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                    Pages 14..17

Page 14

1   A.    Residential construction company.
2   Q.    Were you a general contractor for
3   residential construction?
4   A.    Yes.
5   Q.    And could you estimate in the five to six
6   years that Patriot Homes was an active company,
7   how many residential homes you developed through
8   the company?
9   A.    I think it was only around 14.
10  Q.    And then you also mentioned that you had
11  another company, Auburn Flooring & Stone; is that
12  correct, sir?
13  A.    Yes.
14  Q.    Were you also the sole member of that
15  company?
16  A.    It started out as a partnership and I ended
17  up taking full control of it.  So by the time --
18  by the time it was all done, I was sole
19  ownership.
20  Q.    Were its dates of creation and disillusion
21  approximately the same as Patriot Homes?
22  A.    It started a little bit before Patriot Homes
23  did.  Maybe a year, maybe, but closed a little
24  after Patriot Homes.
25  Q.    So maybe sometime around 2011?

Page 15

1   A.    I totally would be guessing, but I think so.
2   Q.    Okay.  And after you closed up shop on the
3   residential construction and the flooring, was
4   when you pursued commercial flying as your prime
5   occupation; is that right?
6   A.    No.  I went back to school to work on the
7   Ph.D.  The plan was to teach at Auburn and the
8   opportunity came back to go back into flying and
9   I chose that path.
10  Q.    I see.  So you were a full-time student for
11  some period of time?
12  A.    Yes.
13  Q.    Okay.  Now, when Patriot Homes was named as
14  a defendant in Chinese Drywall litigation, who
15  represented Patriot Homes in that case?
16  A.    The lawyer provided to me through my
17  insurance, Alabama Home Builders Association.
18  Q.    Okay.  And what was the name of the carrier,
19  the insurance carrier?
20  A.    It was Alabama Home Realtor's Association,
21  but beyond that, I honestly don't remember.
22  Q.    Okay.  And they provided a lawyer for you
23  for defense?
24  A.    Yes.
25  Q.    Okay.  Did Patriot Homes ever need to pay

Page 16

1   out-of-pocket to resolve any of those claims or
2   pay damages in any of those claims?
3   A.    No.
4   Q.    So it was -- the defense and the settlement
5   to some extent -- I am sorry.  It looks like you
6   wanted to add something.
7   A.    Actually, they did settle.  I believe the
8   settlement was for $10,000.00.  It was a part of
9   -- and a part of that was the agreement that I
10  was not found negligent or at fault for anything.
11  Q.    Okay.  And so no part of that settlement
12  payment or the defense cost came out of the
13  pocket of the company; is that correct?
14  A.    That is correct.
15  Q.    Okay.  Now, it's my understanding that we
16  are here to talk today about your claim related
17  to the property at 703 Waverly Place in Opelika,
18  Alabama; is that correct, sir?
19  A.    That is correct.
20  Q.    Do you currently own that property?
21  A.    I do.
22  Q.    And are you the only owner of that property?
23  A.    I believe my wife is also on the title for
24  the house.
25  Q.    And what is her name?

Page 17

1   A.    Jill, J-I-L-L.
2   Q.    And you and Jill are still married?
3   A.    Yes.
4   Q.    Okay.  Has the property, and unless I say
5   otherwise, when I am talking about the property
6   or the home, I am going to be referring to 703
7   Waverly Place.  There may be some other questions
8   about some other properties, but, if so, I will
9   make it clear I am talking about something else.
10  All right?
11  A.    Okay.
12  Q.    Okay.  Has the property ever been held in
13  anyone else's name besides you and your wife
14  Jill?
15  A.    It may have been under Patriot Homes for a
16  short period until we bought it from our company,
17  so... I am not really -- hadn't been with anyone
18  else but me.
19  Q.    Okay.
20  A.    Since the completion of the construction.
21  Q.    I am sorry.  I spoke over you.
22          MS. EIKHOFF:  Did you get
23          that, madam court reporter?
24          COURT REPORTER:  Yes.
25  BY MS. EIKHOFF:

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                   Pages 18..21

Page 18

1  Q.  Do you recall who you bought the property
2  from?
3  A.  R -- think it's R&S Properties, it's Rusty
4  and Sallie Deen.  That is who I bought the lot
5  from.
6  Q.  What was the last name of Rusty and Sallie?
7  A.  Deen, D-E-E-N.
8  Q.  Okay.  And at the time you bought the
9  property, was it developed or undeveloped?
10  A.  It was a new development, so nothing had
11  been built on it yet but the lots had been
12  developed by the time I bought it.
13  Q.  By the time you bought it, were there
14  structures on the property?
15  A.  Not on the lot that I bought, no.
16  Q.  Okay.  Do you recall what you paid for the
17  property?
18  A.  I don't.  I don't.  Now, when you say what I
19  paid, do you mean me or Patriot Homes, because
20  that does -- I realize that does make a
21  difference.
22  Q.  Well, are you not sure whether you bought it
23  or Patriot Homes bought it?
24  A.  Patriot Homes bought it for the construction
25  loan and it was in the ownership of Patriot Homes

Page 19

1  until construction was complete, and it was after
2  construction was complete that the company sold
3  it to me.
4  Q.  Okay.  So do you recall how much Patriot
5  Homes purchased the lot for?
6  A.  I don't.  I don't.
7  Q.  And do you know how Patriot Homes financed
8  that purchase?
9  A.  Through a construction loan at a local bank.
10  Q.  And then at some point you said you and your
11  wife bought it from Patriot Homes; is that right?
12  A.  Yes.
13  Q.  And did you finance that purchase or did you
14  pay for it in cash?
15  A.  Financed it.
16  Q.  Okay.  Was that with a mortgage?
17  A.  Yes.
18  Q.  And who was that mortgage through?
19  A.  I don't -- I don't remember.  We are still
20  paying it, so I could get that for you easily.
21  Q.  Okay.  That was actually going to be another
22  one of my questions, is whether you were still
23  paying it.  Do you know how much is left on the
24  mortgage, the balance?
25  A.  I am guessing around 80 -- around 80,000

Page 20

1  probably.
2  Q.  Okay.  Who is the lender for that mortgage?
3  A.  I don't remember.
4  Q.  Okay.  Did you ever live in the property?
5  A.  No.  I built the house and bought the house
6  specifically for my mother.
7  Q.  Okay.  What is your mother's name?
8  A.  Ann Carter.
9  Q.  Is your mother still alive?
10  A.  No.
11  Q.  When did she pass away?
12  A.  In April of this year.
13  Q.  I am sorry to hear that and that is
14  especially a hard time of this year for someone
15  to have lost someone, so my condolences.
16  A.  Thank you.
17  Q.  And so upon completion of the construction
18  of the property and a certificate of occupancy,
19  your mother, Ann Carter, was she the sole
20  occupant of it?
21  A.  Yes.
22  Q.  So no one else lived with her at any time?
23  A.  No.
24  Q.  And at some point did she vacate the
25  property?

Page 21

1  A.  Yes.  When we had found out the possibility
2  of the drywall being an issue, she had been
3  having health issues.  And when we had found out
4  what the symptoms associated with that drywall
5  and that's what basically led us to get her out
6  of the house as soon as possible, so we moved her
7  out as soon as we found out that that is what the
8  problem was.  That there was an issue with the
9  drywall and it had been affecting her health.
10  Q.  When did she leave the property?
11  A.  Almost immediately after we found out.  So
12  it would have been 2011 I believe.
13  Q.  Okay.  All right.  I am going to go ahead
14  and show you a couple of papers related to the
15  property purchase.  And they are going to be --
16  it's going to be put on the screen in just a
17  moment here.
18       The first one -- I will wait until
19  we see it.  Can you see that, Mr. Carter?
20  A.  Yes.
21  Q.  I will represent to you that this is a
22  warranty deed from Lee County for the property.
23  A.  Okay.
24  Q.  Do you recall seeing this document before?
25  A.  I remember doing warranty deeds for

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 22..25

Page 22

1  properties, but that was one of the steps in the
2  process for building a house.
3  Q.    Okay.
4           MS. EIKHOFF:  Matt, could you
5        scroll down to the very bottom so we
6        can see the date and zoom in?
7  BY MS. EIKHOFF:
8  Q.    So just above the signatures of Marvin Deen
9  and Sallie Deen, do you see the date December
10  22nd, 2006?
11  A.    Yes.
12  Q.    And do you know if that date would be the
13  date that the property was purchased or -- and by
14  that I mean the lot, the land unimproved, or
15  would that be the date that it was purchased by
16  you after construction?
17  A.    That would be before construction.
18  Q.    Okay.
19           MS. EIKHOFF:  And can you
20        scroll back up, Matt?
21  BY MS. EIKHOFF:
22  Q.    This warranty deed, if you look at the first
23  paragraph there, appears to show that the
24  transaction was from R&S Properties to John A.
25  Carter and Jill M. Carter.

Page 23

1  A.    Okay.
2  Q.    Does that seem accurate to you in light of
3  your prior testimony, that you, Patriot Homes
4  purchased the lot?
5  A.    I think so.  I am really not sure, to be
6  honest with you, why it would be different.  But
7  it's still showing as Lot 18 Waverly Park
8  Subdivision is the description of it and the
9  construction was complete.  Normally that would
10  show as the actual physical address, the 703
11  Waverly Place.  So I believe that that indicates
12  that that was sold to us prior to -- I guess the
13  lot, prior to construction.
14  Q.    Is it possible that you and your wife bought
15  this lot and not Patriot Homes, LLC, before the
16  construction commenced?
17  A.    No.
18  Q.    Okay.  So your clear recollection is that
19  Patriot Homes purchased the lot before
20  construction?
21  A.    Yes.
22  Q.    Okay.
23           MS. EIKHOFF:  And, Matt, could
24        you scroll down to the very bottom
25        again and zoom in?  And actually, Matt,

Page 24

1        if you could zoom into the notary seal.
2  BY MS. EIKHOFF:
3  Q.    Mr. Carter, I just want to -- I noticed
4  something on this document that I wanted to ask
5  you about.  It says December 22nd, 2006 above the
6  signatures, but if you can see the notary's
7  notarization date is 2005, December 22nd.  Do you
8  -- do you believe that the right date is 2005 or
9  2006?
10  A.    I do not know.  I can't -- I don't remember
11  it's been so far back.
12  Q.    Okay.
13  A.    There does appear to be inconsistencies in
14  the dates.
15  Q.    Now, are Marvin and Sallie Deen the
16  proprietors of R&S Properties as you recall?
17  A.    I believe so, yes.
18  Q.    Is maybe Marvin a/k/a Rusty?
19  A.    Yes.
20  Q.    Okay.  Did you have any relationship with
21  Mr. and Mrs. Deen before you purchased this lot?
22  A.    We were -- we had been acquainted for many
23  years before, but no ongoing relationship.  Just
24  small town, I knew who they were and they knew
25  who I was.

Page 25

1  Q.    Okay.  So you, Patriot Homes or your
2  flooring company had not been in any prior
3  business arrangements with their company?
4  A.    No.  Other than buying lots in that
5  neighborhood from them.
6  Q.    How many lots did you buy in the
7  neighborhood from them?
8  A.    I believe it was six.
9  Q.    And did you buy those six lots at
10  approximately the same time?
11  A.    They were staggered.  We bought three at a
12  time if I remember right.
13  Q.    And when you say staggered, about how far
14  apart were those projects, the first set of three
15  and the second set of three, time wise?
16  A.    I don't remember.  I think maybe four or
17  five months, but I am really not sure.
18  Q.    Was this property part of the first set of
19  three or the second set of three?
20  A.    I don't -- I don't recall which ones were
21  first.
22  Q.    Okay.  So you don't recall whether the home
23  that you were building for your mom was part of
24  the first group or the second group?
25  A.    I don't.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                          Pages 26..29

Page 26

1  Q.    Okay.  And do you know about how many homes
2  were in this subdivision in total?
3  A.    It was a small subdivision on a single
4  street.  So relative to others, it wasn't very
5  big but I don't know exactly how many there were.
6  Q.    There were other homes in the subdivision
7  besides the six that you developed?
8  A.    Yes.  Yes.
9  Q.    And do you know if the other lots were
10 developed by multiple other builders or one other
11 builder?
12 A.    I don't know.
13 Q.    Okay.  I am going to -- we are going to put
14 up another document.
15        MS. EIKHOFF:  And, madam court
16        reporter, can we please mark that as
17        Exhibit 1?
18            ----------
19        (Whereupon, Deft Ex 1,
20        Building Permit Application, was marked
21        for the record at this time.)
22            ----------
23        MS. EIKHOFF:  And then next to
24        that and what we are about to show will
25        be Exhibit 2.

Page 27

1            ----------
2        (Whereupon, Deft Ex 2, United
3        States District Court, was marked for
4        the record at this time.)
5            ----------
6        MS. EIKHOFF:  Matt, could you
7        scroll down so the witness can have an
8        opportunity to observe the document?
9        Okay.  Maybe slow down.  You are flying
10       through.
11 BY MS. EIKHOFF:
12 Q.    This is the first page, that is the second
13 page, and that is the third page.  Do you
14 recognize that document, Mr. Carter?
15 A.    Which one?
16 Q.    It's a three page document.  Okay.  Tell me
17 what you recognize and what you think is
18 different.
19 A.    Looks like a building permit application,
20 the first one.
21 Q.    Do you recognize that document?
22 A.    Yeah.  That is the site plan review.  I
23 am not sure who the review -- I guess
24 that is the City of Opelika as well.  Yeah.  And
25 then that is the site plan.

Page 28

1  Q.    Okay.  Let's to go the first page, the
2  building permit application.
3  A.    Okay.
4  Q.    Did you fill out this document, sir?
5  A.    It does not look like my writing.  No.
6  Q.    Do you see at the bottom and we can zoom in
7  on it, that it identifies the owner and
8  contractor as Patriot Homes, LLC.  Do you see
9  that?
10 A.    Yes.  Yep.
11 Q.    And there is the address of 703 Waverly
12 Place is provided and then there is also a
13 separate address of 480 North Dean Road, Auburn
14 provided.  Is the 480 North Dean Road the
15 business address for Patriot Homes at the time?
16 A.    Yes, and for Auburn Floor.
17 Q.    Do you know who would have completed this
18 building permit application?
19 A.    Probably my wife.
20 Q.    Okay.  Do you recognize that handwriting as
21 your wife's handwriting?
22 A.    It does look like hers.  Yes.
23 Q.    Okay.  I think you have indicated that this
24 one page group is a separate document from the
25 second page which is the site plan review; is

Page 29

1  that right, sir?
2  A.    I think so.  They are different functions.
3  One is -- the survey document may have been part
4  of what was submitted to the City of Opelika for
5  overall approval.
6  Q.    Let's look at the bottom of the second page
7  of the site plan review.
8  A.    Okay.
9  Q.    Are either of those your signatures?
10 A.    No.  The bottom is my wife's.
11 Q.    Okay.  And that appears to be dated December
12 19th, 2006; is that right?
13 A.    It appears so.
14 Q.    Okay.  At what stage of the construction
15 process would this site plan review be completed?
16 A.    Prior to construction because you have to
17 have those permits before you can begin.
18 Q.    Okay.  And this date is December 19th, 2006.
19 The warranty deed that we looked at previously as
20 Exhibit 1 showed the transfer of the property on
21 December 22, 2006 or 2005, but the date of the
22 transfer suggested 2006.
23        So does it seem accurate that this
24 site plan review would be submitted around the
25 same time that the unimproved lot was being

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020
Pages 30..33

Page 30

1  transferred?
2  A.   Yes.
3  Q.   Okay.  On the first page of this exhibit,
4  the building permit application, there is an
5  itemization of costs, not an itemization, just an
6  identification of total costs.
7  A.   Okay.
8  Q.   We will zoom in on it.  It's right in the
9  middle of the page.  I know it's hard to read.
10 Can you read that number, Mr. Carter?
11 A.   I think it's -- I think it's $111,339.00.
12 Q.   And what does that figure represent on this
13 document?
14 A.   I believe that is the cost of the
15 construction on the property.
16 Q.   And at this point it would be the
17 anticipated construction cost because the
18 construction hadn't started; is that right?
19 A.   Yes.
20 Q.   Can you recall what the actual cost of the
21 project ended up being?
22 A.   No, I do not.
23 Q.   Do you have any idea whether it was more
24 than this $111,000.00 estimate or less?
25                 MR. DOYLE:  Object to the form

Page 31

1                 of the question.  You can answer.
2                 MS. EIKHOFF:  I will rephrase
3                 that.  It was a very poorly worded
4                 question.
5  BY MS. EIKHOFF:
6  Q.   Do you know whether the actual cost ended up
7  being more than $111,000.00 or less than 111,000?
8  A.   I don't remember.
9  Q.   Okay.  We are going to put another document
10 that we will have marked as Exhibit 3.
11                 ----------
12                 (Whereupon, Deft Ex 3,
13                 Building Application, was marked for
14                 the record at this time.)
15                 ----------
16                 MS. EIKHOFF:  Matt, I am
17                 looking for the building application.
18                 Okay.  Matt, if you can slowly scroll
19                 through that document to give our
20                 witness an opportunity to see what it
21                 looks like.
22 BY MS. EIKHOFF:
23 Q.   Mr. Carter, do you recognize that document?
24 A.   Yes.
25 Q.   What is it?

Page 32

1  A.   This is the same document that we looked at
2  before as far as it being a building permit
3  application.
4  Q.   Okay.  And it appears that at the top of the
5  page it says it's for 701 Waverly Place; is that
6  right?
7  A.   That is correct.
8  Q.   That is a different property than 703 that
9  we have been talking about today; is that right?
10 A.   That is right.
11 Q.   Okay.  And so what was -- what was the plan
12 for 701 Waverly Place?
13 A.   I don't remember.  They were two bedroom
14 houses and three bedrooms houses and I at the
15 time it was based on the price of that one, I am
16 guessing that that is the three bedroom.  I am
17 totally guessing.
18 Q.   Yeah.  And I realize that my question was
19 ambiguous and I think I led you astray because I
20 was actually not as interested in the house plan
21 as much as the business plan with respect to
22 Patriot Homes.  What was the intention of Patriot
23 Homes for this particular property?
24 A.   It was a spec house.
25 Q.   And a spec house would be a home that you

Page 33

1  would develop and then attempt to sell?
2  A.   Yes.
3  Q.   Okay.  At the time this building permit
4  application was submitted, there was no buyer; is
5  that correct?
6  A.   Correct.
7                 MS. EIKHOFF:  And if you zoom
8                 in to the date and signatures at the
9                 bottom, please.
10 BY MS. EIKHOFF:
11 Q.   Are any of those your signatures?
12 A.   No.  Top one is my wife's.
13 Q.   Okay.  And that is also dated December 19th,
14 2006; is that correct?
15 A.   Yes.
16 Q.   And I believe you testified earlier that
17 there were three homes that -- or three lots that
18 you bought at the same time to develop.  The one
19 we have looked at is the 703, we have also just
20 looked at 701.  Do you recall what the third one
21 was that you were developing in this timeframe?
22 A.   The three were not right next to each other.
23 I don't remember what the house number was, but I
24 think it was 701, 3 and 5.  The Harrises were on
25 one side and the Gibbs were on the other side of

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                      Pages 34..37

Page 34

1  my mother's house.
2  Q.    So the Gibbs you are referring to were the
3  purchasers of 701 Waverly Place; is that right?
4  A.    I don't remember which was which.
5  Q.    Okay.  They were purchasers of one of the
6  three properties, not the one that your mother
7  was going to live in?
8  A.    Right.
9  Q.    And then the other purchasers were the
10 Harrises?
11 A.    Yes.
12 Q.    Do you remember the names of the Harrises?
13 A.    Reggie, Reginald.
14 Q.    Reginald Harris?
15 A.    Yes.
16 Q.    Okay.  And were those three homes in fact
17 built at the same time on the same general
18 construction schedule?
19 A.    Roughly.  They -- they were staggered a
20 little bit, but I think they were about the same
21 time.  Yes.
22 Q.    Okay.  And were those other properties
23 purchased by Patriot Homes under the construction
24 loan?
25 A.    Each had its own construction loan.  Yes.

Page 35

1  Q.    Okay.  And then ultimately sold to the
2  purchasers that became the homeowners?
3  A.    Yes.
4          MS. EIKHOFF:  Matt, why don't
5          we pull up the warranty deed you had on
6          the screen a moment ago.
7  BY MS. EIKHOFF:
8  Q.    We will try to scroll through this to give
9  you a chance to see it.  I know it's jumping
10 around.
11 A.    Can't read that quick.
12 Q.    I think it's technically hard to scroll.
13 I will represent to you, Mr.
14 Carter, that this is a warranty deed on file for
15 701 Waverly Place.
16 A.    Okay.
17 Q.    Lee County.
18         MS. EIKHOFF:  And if we go
19         back to the first page -- if we could
20         go back to the first page.  There we
21         go.  And zoom into the top half of the
22         document.  There we go.
23 BY MS. EIKHOFF:
24 Q.    If you look in the upper right hand corner,
25 can you tell what date is on that time stamp?

Page 36

1  A.    Looks like June 1st, 2007.
2  Q.    Okay.  And we just looked at the building
3  permit application for this property which was in
4  late December 2006?
5  A.    Okay.
6  Q.    Does that sound right to you, that the spec
7  home, that the land was purchased in late
8  December and that the Gibbs purchased the
9  property in mid 2007, about six months later?
10 A.    That sounds about right.
11 Q.    Okay.  And do you know what state of
12 construction the Gibb's property was in at the
13 time of their purchase?  Was it ready for
14 occupancy, was it still being built?  Do you
15 recall?
16 A.    I think it was in the latter stages, but I
17 don't remember exactly.
18 Q.    Okay.  Do you know if the drywall in their
19 home had already been installed at the time they
20 bought it?
21 A.    I don't know.
22 Q.    Okay.  Now, let's --
23         MS. EIKHOFF:  Matt, hold up
24         the declaration of the square footage
25         document.

Page 37

1  BY MS. EIKHOFF:
2  Q.    Mr. Carter, we want to make sure that the
3  record in this case on the square footage is
4  correct, and so I am going to show you one of the
5  documents that has been produced in your case
6  that relates to square footage.
7          MS. EIKHOFF:  If you can
8          scroll down just a little more to show
9          the names and the signature.  There we
10         go.
11 BY MS. EIKHOFF:
12 Q.    Mr. Carter, have you ever seen this document
13 before?
14 A.    Not that I recall.
15 Q.    I will represent to you it's a declaration
16 that your attorney Mr. Doyle submitted in this
17 case, attesting that the square footage of the
18 property at 703 Waverly Place is 1,183 square
19 foot.  Do you have any reason to dispute that
20 number?
21 A.    No.
22 Q.    Okay.  And since the home was -- since the
23 initial construction and the home was completed,
24 have there been any expansions of the home or
25 other renovations that would have changed the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020
Pages 38..41

Page 38

```
1   square footage?
2   A.    No.
3   Q.    Okay.  We have been going for about 45
4   minutes.  Do you want to take a break before we
5   switch topics or do you want to keep going?
6   A.    I am good.  Let's keep going.
7   Q.    Okay.  So we can take --
8         MS. EIKHOFF:  We will mark
9         that as Exhibit 5.  Okay.
10              ----------
11        (Whereupon, Deft Ex 5,
12        Document, was marked for the record at
13        this time.)
14              ----------
15  BY MS. EIKHOFF:
16  Q.    All right.  I know that we were jumping back
17  and forth between 703 Waverly Place and 701
18  Waverly Place and the Gibb's place and the
19  Harris' Place.  I just want to ask you now about
20  your property at 703.
21  A.    Okay.
22  Q.    Okay?  Who installed the drywall at the
23  property?
24  A.    It was -- I don't know the name of the
25  company.  It would have been a drywall
```

Page 39

```
1   subcontractor and not necessarily the same one
2   for the different houses that I built.
3   Q.    Okay.  So a drywall subcontractor, but you
4   don't remember the name?
5   A.    Right.
6   Q.    Okay.  And did that subcontractor procure
7   the drywall or had you procured the drywall
8   separately for them to install?
9   A.    I procured it.
10  Q.    Okay.
11  A.    Drywall was in shortage at the time.
12  Q.    When you say I procured it, you through your
13  company Patriot Homes?
14  A.    Yeah, Patriot Homes did.
15  Q.    And where did it come from?
16  A.    Because there were three houses that were
17  being built roughly at that time, it may have
18  been more, I don't remember, there were multiple
19  sources from locally, like BMW or maybe Home
20  Depot or somewhere, probably not there.  There
21  were multiple -- multiple sources.  It wasn't
22  just one.
23  Q.    I see.  So do you not recall where you
24  bought the drywall that went into the property?
25  A.    There wasn't one specific place.  It was
```

Page 40

```
1   probably a mix of the BMW.  I think we bought
2   some from RL Stockett and I don't -- I don't
3   remember if we had to go outside our normal
4   because of the drywall shortage.  I don't
5   remember if we had to go outside our normal
6   suppliers or not, but BMW was our normal
7   supplier, but I know they had more shortages, so
8   we had some from them, some from others in order
9   to cover multiple houses that were being done and
10  they were probably mixed between those houses.
11  Q.    Okay.  And so you referred to BMW.  Is that
12  a building supply company?
13  A.    Yes.
14  Q.    And where is that in Alabama or elsewhere?
15  A.    In Auburn.
16  Q.    Okay.
17  A.    Auburn and Blanca.  Those two cities run
18  together, so they are almost one city.
19  Q.    Right.  So BMW was the typical place for
20  Patriot Homes to source its drywall prior to the
21  time of the construction of these particular
22  property -- of this particular property; is that
23  right?
24  A.    I believe so.  That would -- prices would
25  change, so I would shop different places to see
```

Page 41

```
1   where I can get the best prices from.
2   Q.    Okay.
3   A.    Typically it would BMW that had the best
4   price.
5   Q.    Okay.  And so you have mentioned a couple of
6   times that there was a drywall shortage at that
7   time.  That is something that you recall?
8   A.    Yes.
9   Q.    And so what do you recall about your efforts
10  to procure drywall for this property and the
11  other two properties that you were -- that were
12  all at the same time?
13  A.    Just the costs were going up because of
14  Katrina.  And if I remember right, most of the
15  drywall was available in the southeast to go down
16  to build the Gulf Coast after the hurricane.
17  Q.    And so do you recall ultimately how you were
18  able to procure enough drywall to meet the needs
19  of the construction projects?
20  A.    By going to the different suppliers that I
21  mentioned before.
22  Q.    Okay.  So it would have been some
23  combination of BMW, maybe Home Depot, and maybe
24  RL Stockett?
25  A.    Yes.
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                Pages 42..45

Page 42

1   Q.   Home Depot, I think everyone is familiar
2   with.  RL Stockett, what is that -- where was
3   that business and what does it do?
4   A.   They are building suppliers is all I really
5   know.  They had some when I was trying to get
6   some, so bought from them.
7   Q.   Do they have a location in Auburn, Opelika?
8   A.   No.
9   Q.   So would they ship materials if you ordered
10  from them?
11  A.   They brought it.  They delivered it.
12  Q.   Okay.
13  A.   And my understanding was that throughout the
14  south they were trying, you know, to take
15  advantage of that shortage and do some business.
16  Q.   I see.  I see.  So when you purchased the
17  drywall for your property and the other two that
18  were being developed in the shortage, did you
19  know that the drywall that you were able to get,
20  at least some of it was from China?
21  A.   No.
22  Q.   Did you ever have any conversations with any
23  of these suppliers about them needing to source
24  drywall from China because of the shortage?
25  A.   No.

Page 43

1   Q.   Okay.  So your testimony is that when you
2   purchased the drywall for these properties, you
3   did not know it was Made In China; is that
4   correct?
5   A.   That is correct.
6   Q.   Do you recall how much you paid for the
7   drywall?
8   A.   No idea.
9   Q.   Okay.
10  A.   I rarely remember where I got it from.  It's
11  been so long ago.
12  Q.   Right.  And to the extent that you bought
13  drywall and other construction materials, would
14  those have been financed through the construction
15  loan for that property?
16  A.   Yes.
17  Q.   Okay.  You mentioned that you in preparation
18  for the deposition, went back and looked at some
19  of the building plan materials.  Did the
20  materials that you reviewed include records of
21  supply purchases?
22  A.   I wasn't looking for that.  They may be
23  there, but I don't remember if they are or not.
24  Q.   Do you recall seeing --
25  A.   And the reason we had those plans because it

Page 44

1   was my mother's house, so I kept those because we
2   were more aware of them I guess.
3   Q.   And when you say plans, you're talking about
4   actual drawings?
5   A.   Yes.
6   Q.   But did Patriot Homes keep records of the
7   materials that it purchased?
8   A.   Sure.
9   Q.   And do those records still exist?
10  A.   I think so, but 14 years later I don't know
11  what is there to be honest.  I don't know how
12  extensive they are of what we kept.
13  Q.   Where would you look if you were looking for
14  records from this time period for Patriot Homes?
15  A.   They are stored at my house and/or on
16  computers from when the records were kept and the
17  accounting was done on the computer.
18  Q.   Have you ever looked for those supply
19  records for --
20  A.   No reason, no.
21  Q.   Do you recall that when Patriot Homes was
22  sued and for Chinese Drywall and you were
23  represented by counsel through the insurance
24  company, do you recall ever going back through
25  the company records to see if there were records

Page 45

1   about the purchase of the Chinese Drywall?
2   A.   We pretty much had to give records of
3   everything about the house when it was built.
4   Did an all encompassing suit basically saying we
5   had done everything right.  We produced
6   everything for them.
7   Q.   Okay.  And I don't believe you mentioned the
8   name of the lawyer who represented the company?
9   A.   Because I don't remember who it was.
10  Q.   You don't remember the firm name?
11  A.   I don't.  Only thing I remember was that it
12  was provided through the Alabama Home Builders
13  Association as a part of my insurance fees.
14  Q.   And at some point you made copies of the
15  purchase records for the properties and provided
16  them to your counsel?
17  A.   Probably, yes.
18  Q.   Have you ever provided those same records to
19  your current counsel, Mr. Doyle?
20  A.   I don't think so, but...  I don't know.
21  Q.   You don't know if they exist or not as we
22  sit here today?
23  A.   That is correct.  I am sure there is some
24  level of records, but I don't know the depth and
25  scope of what records are still around.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                Pages 46..49

**Page 46**

1   Q.    And if you were to look for those records,
2   would you look at your home or is there some
3   other location off site where they might be
4   stored?
5   A.    No.  It would only be in my home.
6   Q.    Okay.  As the owner of the property that was
7   the contractor on this construction project, how
8   often were you personally on site for the build?
9   A.    I've done multiple houses that we were
10  doing, so daily probably.
11  Q.    Okay.  And as the contractor, were you
12  monitoring the progress of the construction and
13  making sure that the subcontractors were
14  fulfilling their obligations?
15  A.    Yes.
16  Q.    Did you witness the installation of the
17  drywall in the property?
18  A.    I probably did, but there was nothing that
19  stood out that would make me remember it over any
20  others.
21  Q.    Okay.  Let's mark as an exhibit the first
22  drywall photo that we have.
23        MS. EIKHOFF:  And I think this
24        should be Exhibit 6.
25        ----------

**Page 47**

1               (Whereupon, Deft Ex 6,
2         Photograph, was marked for the record
3         at this time.)
4         ----------
5   BY MS. EIKHOFF:
6   Q.    Mr. Carter, do you recognize that
7   photograph?
8   A.    Not specifically, no.
9   Q.    Do you know who took that photograph?
10  A.    If I took it, I don't remember.
11  Q.    Do you recognize the handwriting on the Post
12  It note?
13  A.    I don't.
14  Q.    I will represent to you that you have
15  submitted this photograph as proof of the product
16  ID of the drywall in your property.  Do you have
17  any reason to dispute that this is a photograph
18  of drywall that was taken in the property that
19  you own?
20  A.    No.
21  Q.    Do you know -- I know that there is a beam
22  that is blocking the letters after C-H.  Do you
23  know what the drywall says on it?
24  A.    I would bet that says Made In China.
25        MS. EIKHOFF:  Matt, why don't

**Page 48**

1   we go ahead and also show -- mark as a
2   new Exhibit 7, the next photograph that
3   we have for this property.
4         ----------
5               (Whereupon, Deft Ex 7,
6         Photograph, was marked for the record
7         at this time.)
8         ----------
9   BY MS. EIKHOFF:
10  Q.    Have you seen this document before, Mr.
11  Carter?
12  A.    No, not that I remember.
13  Q.    Do you have any reason to doubt that it is a
14  photograph of drywall at your property?
15  A.    I have no reason to doubt it.
16  Q.    Okay.
17        MS. EIKHOFF:  And then we will
18        mark as Exhibit 8 the third drywall
19        photo.
20        ----------
21               (Whereupon, Deft Ex 8,
22        Photograph, was marked for the record
23        at this time.)
24        ----------
25  BY MS. EIKHOFF:

**Page 49**

1   Q.    Do you recall seeing when the drywall
2   arrived on site and was being installed on the
3   property?  Do you recall seeing markings that
4   said Made In China on any of the drywall?
5   A.    No, I don't remember seeing it.
6   Q.    And the markings on the side of the drywall,
7   before it's installed would be visible to the
8   naked eye, would you agree?
9   A.    I believe they would be on the back side of
10  it, but I don't remember.
11        MR. DOYLE:  Objection to the
12        form.  Bad question.
13  BY MS. EIKHOFF:
14  Q.    Let me ask you a broader question about the
15  markings because I believe you testified earlier
16  that because of the drywall shortage, you may
17  have had mixed sources of drywall, that you
18  procured drywall from different suppliers.  Do
19  you remember any of the markings from any of the
20  drywall that was installed on the property?
21  A.    No.  It would not be normal procedure for me
22  to inspect all of the supplies that were
23  delivered to the property for the construction.
24  Q.    Okay.  In those photographs that we just
25  showed you, do you have any knowledge of where in

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                        Pages 50..53

1  the home those photographs were taken?
2  A.    I am guessing that it would be in the attic
3  which is accessible from the garage area.  You
4  can go through there to get into see the back
5  side of some of the sheet rock that was up.
6  Q.    And you say you're guessing.  What is the
7  basis of that guess?
8  A.    A little bit -- I can't remember because
9  it's been however long since, nine years since we
10  did this, so -- but I don't believe from the
11  living space inside of the house, I don't believe
12  there was a point anywhere inside the house where
13  you could actually see the back side of any of
14  the walls to be able to read that.
15  Q.    Okay.
16  A.    And I think I remember going up to the attic
17  to check to see if it did say the Chinese Drywall
18  on there.  I think that would be the only place
19  it could be seen from.
20  Q.    Do you remember personally going to inspect
21  to see if you could see markings on drywall?
22  A.    Yeah, after we found out that that was a
23  possibility.  We were trying to figure out what
24  was wrong with my mother's health.
25  Q.    Do you recall how you learned about Chinese

1  Drywall as a possible problem?
2  A.    From the lawsuit when I was served to the
3  other house.
4  Q.    I see.  Do you remember who sued you?
5  A.    I can picture them, but I don't remember
6  their names.  No.
7  Q.    Was it the Harrises --
8  A.    No.  No.  I went to --
9  Q.    The Gibbs?
10  A.    No.  I went to the Harrises and the Gibbs
11  and told them about the problem as soon as I knew
12  about it.
13  Q.    I see.  So the plaintiff that sued Patriot
14  Homes was one of the other three properties that
15  you developed in this neighborhood?
16  A.    It was in a different neighborhood on the
17  other side of town.
18  Q.    I see.  Was that development being done at
19  the same time?  Was that around the same time
20  that you were building these homes on Waverly
21  Place?
22  A.    Around the same time, yes.
23  Q.    Okay.  Do you remember the street name of
24  the other property where you had been sued?
25  A.    The neighborhood is The Preserves

1  subdivision, but I don't remember the name of the
2  street.
3  Q.    Okay.  So you don't remember the names of
4  the people or the street that they were on?
5  A.    I don't.
6  Q.    Okay.  And so you received the notice of the
7  lawsuit and your testimony is that that is the
8  first that you had heard anywhere, that there may
9  be a problem with Chinese Drywall?
10  A.    Yes.
11  Q.    Okay.  And then what did you do to learn
12  more about that issue?
13  A.    I started reading anything I could find on
14  it and of course the information that I got from
15  the lawsuit where I was being sued gave me clues
16  of what to look for.  So I started -- we had
17  already had to replace the air conditioner coils
18  two or three times in the house, which at first
19  we thought that it was just an issue with the air
20  conditioner installer, but it was -- that was one
21  of several strange things that were happening,
22  such as the computer card going out on the
23  microwave which was new.  Just strange issues
24  like that.  And at the same time we were seeing
25  -- I noticed an odor in the house but did not

1  recognize it as being something, something bad,
2  but my mother's health was going down hill.  She
3  was having trouble breathing, eyes burning and
4  started having some cognitive issues, and so kind
5  of looking for clues as to what might be causing
6  that, we were looking more into of course the
7  Chinese Drywall, because I know those houses were
8  built roughly the same time with mixing supplies
9  among the houses.  So then one of the things I
10  was told to look for, is pull off the socket
11  plates and look behind there at the copper wires
12  and make sure the copper is not discolored, so...
13  Q.    Okay.  We have been going over an hour now.
14  I know you can power through, but I think
15  everyone else might need a bit of a break.  Let's
16  take a five minute break.  You might want some
17  coffee and this is a good breaking point for us
18  to stop before we dive into some other documents.
19          (Whereupon, a discussion was
20      held off the record.)
21          (Whereupon, proceedings were
22      reconvened with all counsel and the
23      witness present.)
24          MS. EIKHOFF:  Okay.  Matt,
25      could you please pull up the plaintiff

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 54..57

Page 54

1    profile form and we will mark that as
2    Exhibit 9.
3             ----------
4             (Whereupon, Deft Ex 9,
5    Plaintiff Profile Form, was marked for
6    the record at this time.)
7             ----------
8    BY MS. EIKHOFF:
9    Q.    Mr. Carter, we just put on the screen a
10   three page document.  I think you are seeing the
11   second page right now and then I believe there is
12   a third page.  Why don't we start at the third
13   page that we are on right now.
14             Do you recognize that signature?
15   A.    Yes.  That is mine.
16   Q.    That is your signature?  And going back to
17   the first page, we will zoom in a little bit and
18   scroll down a little bit.
19             Do you recognize this document, Mr.
20   Carter?
21   A.    Yes.  Vaguely.  I remember filling out a lot
22   of documents, but it's got my signature so I
23   guess I did.
24   Q.    Is it your understanding that this is a form
25   that you completed as a plaintiff in the Chinese

Page 55

1    Drywall lawsuit?
2    A.    Yes.
3    Q.    And at the time that you signed this
4    document, I don't see if we look at the signature
5    page, I don't see a date on it.  Do you remember
6    when you signed this document?
7    A.    No.
8    Q.    But your signature on it was to certify and
9    verify that the contents were true and correct;
10   is that your understanding?
11   A.    Yes.  That is a guess.
12   Q.    Well, we can look at the signature line
13   again.  It says, I declare under penalty of
14   perjury under the laws of the United States of
15   America and pursuant to 28 U.S.C. Code, that all
16   information in this Plaintiff Profile Form is
17   true and correct to the best of my knowledge, and
18   that I have supplied all of the documents
19   requested in this declaration to the extent that
20   such documents are in my possession, custody or
21   control.  Did I read that right?
22   A.    Looks good to me.
23   Q.    And so do you understand that your signature
24   on this form was verification of the contents?
25   A.    Yes.

Page 56

1    Q.    Okay.  So I want to just go to the first
2    page and ask you about a couple of things on the
3    document.
4             If we go to the next section.
5    There.  In the section for Claimant information,
6    it indicates a move in date of July 1st, 2006.
7    First of all, let me back up.  It shows the name
8    John A. Carter, that is you; is that correct?
9    A.    Correct.
10   Q.    And then Ann Carter is your mom?
11   A.    Correct.
12   Q.    And it identifies you both as occupants, you
13   as owner occupant, her as occupant.  I believe
14   you testified earlier that you never occupied the
15   property; is that right?
16   A.    That is correct.
17   Q.    Okay.  So it's -- to the extent that you're
18   identified on this form as an occupant, that
19   would be inaccurate.
20   A.    That I was the owner, yes, but my mother was
21   the occupant.
22   Q.    Understood.  And it shows a move in date,
23   setting aside that you never moved in but just
24   focusing on your mother Ms. Carter, July 1, 2006,
25   is that date right?

Page 57

1    A.    I don't remember.  I really don't remember.
2    Q.    We were looking at the -- and we can pull it
3    up if you need us to, but we were looking at the
4    Building Permit Application if you recall.  The
5    date of the Building Permit Application and the
6    original transfer of the lot was December of
7    2006?
8    A.    Right.
9    Q.    Does that refresh your mind at all, as to
10   whether your mom would have moved in in July of
11   2006 or do you think maybe this date is
12   incorrect?
13   A.    It might be incorrect.  And, to the best of
14   my knowledge, when I was filling out with the
15   dates when we thought that it was, it could have
16   been off or it might be a typo.  I don't know.
17   Q.    Okay.
18   A.    We can go look back and see.
19   Q.    What would you look back at to see?
20   A.    The records from Patriot Homes we are going
21   to have when it was started and when it was
22   built, and it would not have sat for any length
23   of time before the construction was built because
24   it was built for her to move into.
25   Q.    Right.  And if you recall the document we

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 58..61

1  looked at which was the warranty deed for the
2  Gibbs who were neighbors, was in June of 2007.
3  Do you recall if your mother would have moved in
4  around the time that the Gibbs purchased the
5  home?
6  A.   It probably was the same time, but I would
7  have to look back and see.
8  Q.   Is it possible that your mom moved in in
9  July of 2007?
10  A.   That's possible.
11  Q.   But as we sit here today, you don't recall?
12  A.   I don't.
13  Q.   As we sit here today, do you have a
14  recollection of what would be more likely, 2006
15  or 2007?
16  A.   I don't.
17  Q.   Okay.  Now, if we go to the second page of
18  the document.  I just want to clear this up.
19          On the lower left hand side of your
20  screen, it says Section VI home information with
21  a square footage of 1,600 feet?
22  A.   Uh-huh.
23  Q.   Can you see that right at the top of -- the
24  top right, top left hand side of the screen?
25  A.   Yes.

1  Q.   Now, before we were looking at a
2  verification that showed the square footage at
3  1,183.  Do you have any reason -- and I believe
4  that you testified before that you didn't have
5  any reason to dispute your attorney's
6  verification of the square footage; is that
7  correct?
8  A.   That is correct.
9  Q.   Okay.  So to the extent that this says 1,600
10  square feet, do you insist on that number or are
11  you accepting of the attorney verification that
12  we looked at before?
13  A.   One refers to the air-conditioning square
14  footage and I believe 1,600 refers to the overall
15  square footage which would include the garage.
16  Q.   Okay.  I appreciate that correction.  Thank
17  you.
18          Now, in the bottom right hand --
19  not your screen.  If you could scroll down to the
20  bottom of this page, there in the right hand side
21  of this stage, do you see where it says Section X
22  drywall supplier?
23  A.   Uh-huh.
24  Q.   And that identifies as the drywall
25  supplier's name RL Stockett & Associates, LLC.

1  Do you see that?
2  A.   Yes.
3  Q.   And you testified a moment ago, that
4  Stockett was one of the potential suppliers of
5  drywall for this property; is that right?
6  A.   Yes.
7  Q.   Do you have reason to believe that the sole
8  drywall supplier for this property was Stockett
9  or --
10  A.   No.  It would not have been the sole
11  supplier.
12  Q.   It would not have been the sole supplier?
13  A.   Because there were multiple suppliers for
14  the multiple houses.
15  Q.   Do you know why Stockett is the only one
16  that was identified on this form?
17  A.   My guess is because it asked for one drywall
18  supplier and had room for one, so I put that one
19  in.
20  Q.   Okay.  If we go to the top of this same
21  page, we can see a Section IV in section
22  information.  Do you see that, Mr. Carter?
23  A.   Yes.
24  Q.   In this section there is an indication that
25  the property had been inspected for Chinese

1  Drywall by the Doyle Law Firm, PC, on the date
2  November 12th, 2011; is that correct?
3  A.   Yes.
4  Q.   Were you there for that inspection?
5  A.   I believe I was.
6  Q.   Who at the Doyle Law Firm, PC, actually
7  performed the inspection?
8  A.   I think it was Jimmy.
9  Q.   Jimmy Doyle, your counsel who is here today?
10  A.   Yes.
11  Q.   And was there anyone else besides Mr. Doyle?
12  A.   I don't think so.  I think it was just him.
13  I think it was him.  I am honestly not sure if it
14  was actually him.  There is one representative
15  from the law firm that showed up.
16  Q.   I see.  Did anyone else besides the law firm
17  representative show up?
18  A.   No.
19  Q.   Do you know if the home has ever been
20  inspected by someone who is not an attorney or
21  works at a law firm, but someone who has a
22  background in the construction or building
23  industry?
24  A.   I don't remember.  I don't recall.
25  Q.   Do you recall any other inspections of the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                Pages 62..65

Page 62

1  home for Chinese Drywall besides the time that
2  someone from the Doyle Firm came?
3  A.    No, not that I recall.  May have or may not
4  have.
5  Q.    Okay.  At the time your home was inspected
6  by Mr. Doyle, was he your attorney in this case?
7  A.    I think so.  It was right about that time,
8  so I don't remember if I retained him as my
9  attorney at that point or if it was after, but
10 that was the intent, was that he come and take a
11 look at it and try to verify it.
12 Q.    Okay.  Do you know if any drywall has been
13 removed from the home?
14 A.    The home has not been touched since we got
15 my mother out of it.
16 Q.    You're not aware of any samples of the
17 drywall, core samples or other pieces of the
18 drywall that may have been taken?
19 A.    I don't remember one way or the other.
20 Q.    Do you know if there has been any testing of
21 the drywall in the home?
22 A.    I don't remember either way.
23 Q.    Do you think that maybe that happened?
24 A.    May have, I would think, but I don't
25 remember.  I don't remember when who or -- I just

Page 63

1  don't remember.
2  Q.    Okay.  Well, I want to just make sure that
3  we get clarity on this point.
4        The only inspection that you know
5  of was the one identified here on this form by
6  the law firm; is that right?
7  A.    The only one that I can recall right now,
8  yes.
9  Q.    Okay.
10 A.    I am not saying that there wasn't another
11 one, I just don't remember.
12 Q.    Okay.  And when you -- when you were saying
13 maybe there was testing, then do you mean maybe
14 the representative of the law firm did some
15 testing while they were there inspecting the
16 home?
17 A.    Maybe.
18 Q.    Okay.  Do you know if the air in the home
19 has ever been tested?
20 A.    As far as an actual like -- an air quality
21 test, I don't think so.  I don't know.  I don't
22 remember.  And it's quite obvious when I walk
23 into -- like I mentioned earlier, there was a
24 noticeable smell that over time has gotten much
25 worse and to the point where I can't -- I can't

Page 64

1  walk into the house.  My eyes begin to burn
2  immediately, I have trouble breathing and have to
3  leave.
4  Q.    What do you recall from the visit from the
5  law firm representative for the inspection?  What
6  do you recall them doing?
7  A.    I remember -- I believe I remember looking
8  at the copper wire and I think I remember looking
9  at the back side of the labeling of the drywall,
10 but that is certainly not all inclusive.  I don't
11 know everything that was done.  I don't remember.
12 Q.    Okay.  Was your mother in the home at the
13 time of the inspection?
14 A.    Yes.
15 Q.    Okay.  So as of November --
16 A.    I think so -- I don't -- I don't think we
17 had moved her out yet, because we had not
18 verified what the problem was.  I think she was
19 still there.
20 Q.    That was actually -- I was going to ask
21 that.  As of November 12th, 2011, you believe she
22 was still in the home?
23 A.    I can't -- I can't be sure.
24 Q.    Okay.  In the second section on your screen
25 that says Section V drywall information.  Under

Page 65

1  the heading drywall manufacturer, it says Taishan
2  Gypsum Company.  Do you see that?
3  A.    I do.
4  Q.    How did you identify Taishan Gypsum Company
5  as the manufacturer of the drywall in the home?
6  A.    I believe the back side of the drywall had
7  the markings on there.  They indicated that and
8  also it said the next line over was Made In
9  China.
10 Q.    You believe the next line -- it says
11 markings on drywall, Made In China meets or
12 exceeds ASTM?
13 A.    Yes.
14 Q.    But do you know how those markings were
15 associated with Taishan Gypsum?
16 A.    Oh, I believe -- I believe the Taishan
17 Gypsum Company was also on there when we were
18 looking at the back side of the drywall.
19 Q.    Okay.  I will represent to you --
20 A.    It may have been the Chinese marking on
21 there, but I don't remember.  This is not my
22 expertise to identify it.
23 Q.    Okay.  The photographs that we looked at
24 earlier that said Made In China, meets or exceeds
25 ASTM just as reported in this form, I will just

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 66..69

Page 66

1   represent to you those are the only photographs
2   of examples of the product in the property that
3   we have.
4   A.    Okay.
5   Q.    It also says that the drywall is in the
6   ceilings and the walls.
7   A.    Yes.
8   Q.    In your experience as a builder, is the same
9   type of drywall used on walls as used in
10  ceilings?
11  A.    Yes, it can be.
12  Q.    And do you recall on this property if the
13  same drywall was used for the ceilings and walls?
14  A.    Yes.  I don't remember using a different
15  drywall on the ceilings for any of the house.
16  Q.    Okay.  And I believe you testified earlier,
17  though, that the drywall in the home would have
18  been for multiple different sources; is that
19  correct?
20  A.    Yes.
21  Q.    So do you know if all of the drywall that is
22  in the house was Made In China Drywall?
23  A.    I do not know.
24  Q.    Okay.  And it sounds like the only drywall
25  markings that you have inspected were in the

Page 67

1   attic area of the house; is that correct?
2   A.    Yes.
3   Q.    Is it possible that at least some of the
4   drywall in other areas of the home that haven't
5   been inspected could not be Made In China
6   Drywall?
7   A.    It's possible.
8   Q.    But you've mentioned that there is an odor
9   in the home; is that correct?
10  A.    Yes.
11  Q.    Did you notice that when the house was
12  reaching completion of construction?
13  A.    No, not at all.
14  Q.    Okay.  When do you recall first noticing the
15  odor?
16  A.    It would have been after my mother had been
17  there for a while, but I don't remember
18  specifically now.
19  Q.    Okay.  So I think you said earlier you think
20  it's gotten worse over time; is that right?
21  A.    Yes.
22  Q.    Because when you go into the house now it's
23  very irritating to you?
24  A.    Yes.
25  Q.    But I am taking it from what you are saying,

Page 68

1   that that was not the case upon initial
2   construction?  You didn't have the same reaction
3   when the home was new and your mother was moving
4   in; is that accurate?
5   A.    That is accurate.
6   Q.    Okay.  And so do you recall it just getting
7   gradually worse over time?
8   A.    Yep.
9   Q.    Okay.  At the time that you were considering
10  moving your mother out of the home, do you recall
11  it having a noticeable odor at that time?
12  A.    Yes.
13  Q.    Okay.  And how long was that after she had
14  moved in?
15  A.    I don't remember.
16  Q.    Was it months or years?
17  A.    From the time that we noticed to the time
18  that we moved her out, is that what you are
19  asking?
20  Q.    I am sorry.  From the time that she moved in
21  to the time that she moved out.
22  A.    From the time she moved in and the time she
23  moved out was years.
24  Q.    Years.  About how many years?
25  A.    Three or four years.  Five years, something

Page 69

1   like that.
2   Q.    Okay.  Do you recall the odor being worse in
3   certain areas of the home than others?
4   A.    No.
5   Q.    Do you remember the odors being worse at a
6   certain time of day, or a certain time of year,
7   or under certain conditions?
8   A.    They seemed to be worse with heat.  When it
9   was hot outside, the odor seemed to be worse
10  then.
11  Q.    Okay.  Now, you have also mentioned that you
12  recall observing some discoloration of wiring in
13  the home; is that correct, Mr. Carter?
14  A.    Yes.
15  Q.    What do you recall seeing?
16  A.    Pulling off the cover plates on electrical
17  outlets and switches and checking the wire back
18  there appeared black.
19  Q.    And you personally observed that?
20  A.    Yes.
21  Q.    Any other blackening or discoloration that
22  you personally observed?
23  A.    The air-conditioner coils that I mentioned
24  earlier, they were black as well.
25  Q.    Okay.  What about copper piping?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 70..73

Page 70

1  A.    I don't know that we had any copper piping
2  in there, but I don't remember honestly.
3  Q.    Okay.  Any other copper fixtures?
4  A.    I don't remember in particular like a light
5  fixture or something like that, because I knew
6  that copper was the potential issue, so I went to
7  where there was copper which was the potential
8  wire.  So that is where I went.
9  Q.    Okay.  You've described the home as still
10 there and still intact but vacant; is that right?
11 A.    Yes.
12 Q.    With the same original wiring and fixtures?
13 A.    Yes.
14 Q.    Okay.  And piping?
15 A.    All still there.
16 Q.    Okay.  Are there still appliances in the
17 home?
18 A.    Yes.
19 Q.    Did you take anything out of the home?
20 A.    A few of her personal --
21 Q.    Besides your mother's personal belongings?
22 A.    As far as any type of fixtures, cabinets,
23 anything like that, no, nothing was brought out.
24 Q.    Okay.
25 A.    It's all still there.

Page 71

1  Q.    All right.  I am going to show you a
2  document that we are going to mark as Exhibit 10
3  which is your Supplemental Plaintiff Profile
4  Form.
5  A.    Okay.
6            ----------
7            (Whereupon, Deft Ex 10,
8       Supplemental Plaintiff Profile Form,
9       was marked for the record at this
10      time.)
11           ----------
12 BY MS. EIKHOFF:
13 Q.    This document is seven pages long.
14           MS. EIKHOFF:  And, Matt, can
15      you go ahead and also put up and we
16      will mark it as Exhibit 11, the
17      verification form?
18           ----------
19           (Whereupon, Deft Ex 11,
20      Verification Form, was marked for the
21      record at this time.)
22           ----------
23 BY MS. EIKHOFF:
24 Q.    Okay.  Mr. Carter, I am going to represent
25 to you that this document was produced to us

Page 72

1  through your attorney as a court form.  Is this
2  your signature on the document?
3  A.    Looks like it.  Yeah.
4  Q.    Okay.  With a date March 8, 2018?
5  A.    Yes.
6  Q.    Do you remember filling out this document?
7  A.    I don't know.  Not specifically, no.
8  Q.    Okay.  Well, you will see that this is a
9  verification form for the document that we marked
10 as Exhibit 10, and I am going to go back to
11 Exhibit 10 and just ask you about a few of the
12 items of information on that form.  So let's stop
13 there.
14           It's asking for Claimant and
15 property information and the names of you and
16 your wife are there.  The address of the
17 property, the lawsuit is 703 Waverly Place.  And
18 then name of person completing this form is
19 listed as John A. Carter at 1590 Crescent
20 Boulevard, and that is you, right?
21 A.    Yeah.
22 Q.    And, I am sorry, I didn't hear your answer.
23 A.    Right.
24 Q.    Okay.  And in the next section, it says, the
25 question is, when did you acquire the property,

Page 73

1  and you said December 22nd, 2006.  And that's
2  consistent with the warranty deed that we looked
3  at earlier in the deposition.
4           The next question is, when was
5  Chinese Drywall installed in the property, to the
6  best of your knowledge.  It says September 1st,
7  2006.
8           Wasn't the drywall installed on the
9  property after you purchased the lot?
10 A.    Well, it may be that this confusion again
11 over whether it was purchased by me as Patriot
12 Homes or me as the individual buying the house
13 from Patriot Homes.
14 Q.    Okay.
15 A.    So I don't know.
16 Q.    Do you have any independent memory of when
17 the drywall was installed?
18 A.    I don't.
19 Q.    Okay.
20 A.    I don't.
21 Q.    Do you know -- do you know why you put
22 September 1st, 2006 on the form?
23 A.    I don't, unless that is the timeframe for
24 when the house was being built and the drywall
25 was installed then and then we purchased the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 74..77

Page 74

1  completed product in December.
2  Q.    Do you think that the records of Patriot
3  Homes that you have in your house would be
4  informative as to when the drywall was installed?
5  A.    We can certainly look, yes.
6  Q.    Okay.  The next question is, when did you
7  first become aware that the property contained
8  Chinese Drywall.  And the answer is November
9  2011.  November 2011 was the date that -- the
10 same month that the Doyle Law Firm inspection was
11 identified on the last document.  Is that right,
12 as to when you discovered that Chinese Drywall
13 was on the property, November of 2011?
14 A.    That sounds -- that sounds right.
15 Q.    Okay.  Let's to go Section V.  So the first
16 question in Section V is, has the property been
17 partially or completed remediated.  And your
18 answer was no; is that correct?
19 A.    That is correct.
20 Q.    Have you ever looked into how much it would
21 cost to remediate the property, replace the
22 drywall?
23 A.    Years ago I remember looking into it, early
24 on in this process, and I seem to remember an
25 estimate of 90 something thousand to remediate

Page 75

1  it.  But my understanding is the house would have
2  to be gutted, the remaining studs and what is
3  inside be treated and everything be rebuilt back
4  out.
5  Q.    Do you remember who you talked to about
6  potentially remediating it?
7  A.    Hank Moreman.
8  Q.    What was the last name of Hank?
9  A.    Moreman, M-O-R-E-M-A-N.  A local contractor
10 there in Auburn.
11 Q.    At this point, were you out of the home
12 building business?
13 A.    Yes.
14 Q.    And was Hank someone else -- someone that
15 you had worked with when you were developing
16 Patriot Homes?
17 A.    No.
18 Q.    Did you ever consider just contracting it
19 out yourself?
20 A.    No, it's cost prohibitive.  I already have a
21 loan on it for -- paying the mortgage for the
22 completed product the first time.  So to turn
23 around and do it again, we couldn't afford to do
24 that.  No.
25 Q.    Okay.  And, to the best of your

Page 76

1  recollection, the only information that you had
2  gotten about the cost to remediate was
3  approximately $90,000.00 from Mr. Moreman?
4  A.    Well, I heard from previous cases from Judge
5  Fallon, that there was a number of site per
6  square foot formulation and it may have been
7  where I got the number from.
8  Q.    Okay.  So you are not sure that the 90,000
9  came from Mr. Moreman, it may have come from
10 court records?
11 A.    I know that Mr. Moreman did these -- a
12 program called Xactimate which is a building
13 estimating tool.
14 Q.    Yeah.
15 A.    And the only reason he came up with that
16 figure 93 to 90 something thousand, but also I
17 remember there was a number from the court
18 records as well.
19 Q.    I see.  And do you remember if that number
20 was higher or lower than 90,000?
21 A.    I don't remember.
22 Q.    Okay.
23 A.    And that was also -- that would have been
24 seven years ago.
25 Q.    Sure.  Have you ever attempted to sell the

Page 77

1  property?
2  A.    No.  Can't sell it -- can't use it.
3  Q.    Right.  So you have not attempted to rent
4  it?
5  A.    No.
6  Q.    But you're still paying the mortgage on it?
7  A.    Yes.
8  Q.    Have you considered allowing it to go into
9  foreclosure?
10 A.    No, because I don't want my credit to be
11 destroyed because of that.
12 Q.    Okay.
13 A.    And there is always my hope that this would
14 be a much shorter process than what it's been and
15 we would be made whole I guess.
16 Q.    Do you know if any of the six homes that you
17 developed in this neighborhood were remediated
18 for Chinese Drywall?
19 A.    I don't -- I don't have any knowledge of
20 what has been done for any of them.  No.
21 Q.    Okay.  Do you ever go back to the property
22 for any reason?
23 A.    Occasionally I have driven by there, but I
24 have not gone and done much of anything there.
25 Q.    Okay.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                    Pages 78..81

Page 78

1  A.    I haven't been -- I really haven't been in
2  it but maybe once.
3  Q.    Okay.  When was the last time you were
4  actually inside the property?
5  A.    At least two years ago.
6  Q.    Okay.  And do you remember why you were
7  there?
8  A.    I believe I went by looking for some of my
9  mother's things --
10  Q.    Okay.
11  A.    -- that she had asked about.
12  Q.    Now, have you received money as a plaintiff
13  in the Chinese Drywall litigation at any point?
14  A.    There were -- there were a couple of various
15  model checks that I believe were sent as a part
16  of all this that we received seeing for some
17  portion of the group, but not much of anything.
18  Q.    You don't remember how much?
19  A.    No.
20  Q.    Look at Section VI.  Do you see the prior
21  payment section on your screen?
22  A.    Uh-huh.
23  Q.    Do you recognize those figures as amounts
24  that you've previously received?
25  A.    No.  Yeah, it looks like it could be it.

Page 79

1  Yeah.
2  Q.    Okay.  The next section of this form is
3  asking you to report other damages that you are
4  claiming in the lawsuit.  The first part says and
5  is asking about alternative living expenses and
6  there is no dollar amount listed there.
7        You are not seeking alternative
8  living expenses or damages in this lawsuit?
9  A.    I was not living in the house, so I didn't
10  feel it would be right for me to request
11  alternate living expenses for myself.
12  Q.    The next section is asking about loss of use
13  and/or loss of enjoyment of the property, and
14  there is a figure of $275,000.00.  Do you see
15  that?
16  A.    Yes.
17  Q.    And is that your request for compensation
18  for loss of use and enjoyment of the property?
19  A.    That was based on numbers from a previous
20  settlement from Judge Fallon with I believe
21  $25,000.00 a year is what they had said.  So that
22  was based on per year over the course of the
23  years and years have continued to go by, so...
24  So I would say it's not limited to that.
25  Q.    So you understand that there is a method of

Page 80

1  calculating alternative living expenses at 25,000
2  a year?
3  A.    That is not alternative living expenses, it
4  looks like --
5  Q.    I am sorry, I misspoke.  I will strike that
6  and I am going to rephrase my question so the
7  record is clear.  And thank you for correcting
8  me.
9  A.    Uh-huh.
10  Q.    So it's your understanding that there is a
11  method of computing damages for loss of use and
12  enjoyment of the property at 25,000 per year; is
13  that correct?
14  A.    Yes.  That is what I understood.
15  Q.    And that is how you arrived at the
16  $275,000.00 number that you put in this form?
17  A.    I believe so, yes.
18  Q.    Okay.  The next section is the diminution of
19  value and asks to identify an amount and you have
20  no amount listed; is that correct?
21  A.    That is correct.  But the reason is not
22  because it's not going to cost something to fix
23  it, but because at this point it can't be
24  determined because the house has to be completely
25  gutted.  So I figured using a price per square

Page 81

1  footage for remediation might be inappropriate
2  there, but as of right now the house has -- well,
3  it has a zero value because it can't be used at
4  all and has to have a lot of things done to it
5  before it can be used to any degree.
6  Q.    So the damages that you are referring to is
7  the remediation damages, how much it will cost to
8  remediate the home to get it back to a good,
9  livable condition without any drywall defects,
10  correct?
11  A.    Right.  I assume that is what that line
12  means.
13  Q.    Okay.  Diminution of value is actually
14  slightly different and, you know, not to give you
15  a law school lecture here, but the diminution in
16  value would be seeking for the lost property
17  value.  In addition to getting the house --
18  getting compensated so that the house can be
19  fixed, are you also seeking damages for the loss
20  of property value?
21  A.    Yes.
22  Q.    Okay.
23  A.    Yes.
24  Q.    And do you know why you didn't put anything
25  down in the form for that?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                        Pages 82..85

Page 82

1   A.   Apparently I misunderstood.
2   Q.   Okay.  Are you also seeking damages for any
3   property in the home besides the actual structure
4   itself?  So, for example, you have mentioned the
5   air-conditioning broke.
6   A.   Yes.
7   Q.   Are you seeking compensation for any costs
8   associated with that?
9   A.   Yes.  And as well as the appliances inside,
10  televisions, any appliance that had copper
11  wiring, it's gone.  And then furniture, that kind
12  of stuff which is now saturated with the sulfur
13  smell and sulfuric acid, gases.
14  Q.   Have you provided records of those damages
15  to your attorney?
16  A.   I don't -- I don't remember.  I don't
17  remember either way, honestly.  I don't remember
18  if I --
19  Q.   Do you recall ever sitting down and
20  collecting documents that would reflect the cost
21  of the items that you're seeking compensation for
22  in the lawsuit?
23  A.   I remember -- I remember discussing it and
24  trying to go through and figure out how much
25  different things would cost to replace, but I

Page 83

1   don't remember if that was just for us in
2   anticipation of this day coming or if it was
3   something that I did returning it to the lawyer.
4   I don't remember.
5   Q.   Do you believe you have records that would
6   support those damages?
7   A.   Even if I don't, I can walk in the house
8   right now which sits exactly the same as the day
9   she left.  So that could be recreated quickly.
10  Q.   Do you have repair records or purchase
11  records for the property that you're seeking
12  damages for?
13  A.   Well, the only thing we replaced was when
14  she was still living there and had to replace the
15  air-conditioning coils and the microwave.
16  Everything else, nothing was replaced.  It's
17  still sitting there from when she left.
18  Q.   I guess what I am getting at is not whether
19  the items still exist, but whether you have
20  records from when you purchased them.
21  A.   The original purchase records?
22  Q.   How much they cost.  Yeah.
23  A.   I don't.  I don't think most people keep the
24  purchase records for a refrigerator, but I will
25  happily look.

Page 84

1   Q.   Would that be -- do you think that would be
2   in the building file?
3   A.   No, that is not part of the building.  That
4   is my mother's personal files.
5   Q.   Okay.  Where would you look?
6   A.   I will have to look through some of her old
7   records which are now at my house since she
8   passed away.
9   Q.   They are at your house too?
10  A.   Yeah.
11  Q.   I think we are just about done, but I am
12  going to take a quick break.
13          MS. EIKHOFF:  And, Matt, you
14       can take the document off the screen.
15       I am going to take a quick
16       break and look over my notes and my
17       documents and see if I missed anything.
18       So don't get your hopes up that you are
19       absolutely done, but there is a chance.
20       I am saying there is a chance you might
21       be done.  So take a five minute break.
22       Okay.
23          THE WITNESS:  Okay.
24          (Whereupon, a discussion was
25       held off the record.)

Page 85

1          (Whereupon, proceedings were
2       reconvened with all counsel and the
3       witness present.)
4   BY MS. EIKHOFF:
5   Q.   Okay.  I have got just a couple of questions
6   for you and then I have a couple of questions for
7   you off the record.  So we are back on the
8   record.
9          It sounds like, Mr. Carter, you may
10  have more documents that are related to this
11  claim that we haven't seen; is that right?
12  A.   Maybe.
13          MS. EIKHOFF:  Okay.  I am
14       going to ask, Mr. Doyle, that we hold
15       this open and we are going to see if he
16       has records that are -- we can identify
17       them for you in a letter that we talked
18       about that we would like to see if they
19       exist.  So we will hold it open until
20       we receive those documents or otherwise
21       get a response.  Okay, Mr. Doyle?
22          MR. DOYLE:  I thought you were
23       addressing Mr. Carter.  I am perfectly
24       okay with that.  I have no opposition.
25          MS. EIKHOFF:  Good.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                    Pages 86..89

Page 86

1  BY MS. EIKHOFF:
2  Q.   And I think you testified before that you
3  did not recall the purchase price of the
4  property?
5  A.   No, I don't recall.
6  Q.   Okay.
7  A.   If you are talking about the initial lot
8  buy?
9  Q.   That is right.
10 A.   Yeah, I don't.
11 Q.   Okay.  And are you the only person who is
12 seeking damages on this property?
13 A.   If your question is whether or not my mother
14 is, she passed away in April.
15 Q.   Okay.  And not your wife?
16 A.   No.  Nothing separate.
17 Q.   Okay.
18            MS. EIKHOFF:  Mr. Guerra, do
19       you have any questions for the witness?
20            MR. GUERRA:  No.  No questions
21       from me.
22            MS. EIKHOFF:  Okay.  Mr.
23       Doyle, do you have any questions for
24       the witness?
25            MR. DOYLE:  No, ma'am.

Page 87

1            MS. EIKHOFF:  We can go off
2  the record.
3            COURT REPORTER:  Mr. Guerra,
4  would you be taking taking a copy?
5            MR. GUERRA:  Yes.
6            COURT REPORTER:  And Mr.
7  Doyle?
8            MR. DOYLE:  Yes, I will take a
9  copy.
10           COURT REPORTER:  Ms. Eikhoff,
11 your usual I am assuming?
12           MS. EIKHOFF:  Yes.  We are
13 good.
14       (Adjourned at 4:00 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 88

1            C E R T I F I C A T I O N
2
3            I HEREBY CERTIFY that the
4       proceedings and evidence are contained
5       fully and accurately in the
6       stenographic notes taken by me upon the
7       foregoing matter on Friday, December
8       11, 2020, and that this is a correct
9       transcript of same.
10
11
12
13
14
15
16
             Celeste Perla, RPR, CSR, Merit
17           Reporter and Notary Public
             Registered ID #19508
18           CCR 6331-2589-3832-7040
19
20           (The foregoing certification of
       this transcript does not apply to any
21     reproduction of the same by any means, unless
       under the direct control and/or supervision of
22     the certifying reporter.)
23
24
25

Page 89

1            DISCLOSURE
2  IN THE UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
3  DEPONENT: JOHN CARTER
4
5            Pursuant to Article 10.B of the
   Rules and Regulations of the Board of Court
6  Reporting of the Judicial Council of Georgia, I
   make the following disclosure:
7
             I am a Certified Court Reporter.  I
8  am here as an independent contractor to Huseby
   Litigation.
9
             Huseby Litigation was contacted by
10 counsel to provide court reporting services for
   this deposition.  I am not disqualified for a
11 relationship of interest under the provisions of
   O.C.G.A. 9-11-28(c).  Huseby Litigation will not
12 be taking this deposition under any contract that
   is prohibited by the O.C.G.A. 15-14-37(a) and
13 (b).
14           Huseby Litigation has no
   contract/agreement to provide court reporting
15 services with any party to the case, any counsel
   in the case or any reporter or reporting agency
16 from whom a referral might have been made to
   cover this deposition.  Huseby Litigation has
17 charged its usual and customary rates to all
   parties in the case.
18
             This date of Friday, December 11,
19 2020.
20
21
   Celeste Perla
22 Certified Court Reporter
   Certificate #19508
23 CCR 6331-2589-3832-7040
24
25

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                    Index: $10,000.00..703

| Exhibits | | | |
|---|---|---|---|

**CarterJ 1**
  3:11  26:17
  29:20

**CarterJ 2**
  3:12  26:25

**CarterJ 3**
  3:14  31:10

**CarterJ 5**
  3:15  38:9

**CarterJ 6**
  3:14,16
  46:24

**CarterJ 7**
  3:17  48:2

**CarterJ 8**
  3:18  48:18

**CarterJ 9**
  3:19  54:2

**CarterJ 10**
  3:20  71:2
  72:10,11

**CarterJ 11**
  3:22  71:16

---

**$**

**$10,000.00**
  16:8

**$111,000.00**
  30:24  31:7

**$111,339.00**
  30:11

**$25,000.00**
  79:21

**$275,000.00**
  79:14
  80:16

**$90,000.00**
  76:3

---

**1**

**1**  26:17,19
  29:20
  56:24

**1,183**  37:18
  59:3

**1,600**  58:21
  59:9,14

**10**  71:2,7
  72:10,11

**11**  71:16,19

**111,000**  31:7

**12th**  61:2
  64:21

**14**  14:9
  44:10

**1590**  8:8
  72:19

**18**  23:7

**19th**  29:12,
  18  33:13

**1st**  36:1
  56:6  73:6,
  22

---

**2**

**2**  26:25
  27:2

**2004**  8:11,
  13,15,18,
  20  10:5,8

**2005**  13:12
  24:7,8
  29:21

**2006**  22:10
  24:5,9
  29:12,18,
  21,22
  33:14  36:4
  56:6,24
  57:7,11
  58:14
  73:1,7,22

**2007**  10:6,8
  36:1,9
  58:2,9,15

**2010**  13:22

**2011**  13:23
  14:25
  21:12  61:2
  64:21
  74:9,13

**2018**  72:4

**22**  29:21

**22nd**  22:10
  24:5,7
  73:1

**25,000**  80:1,

---

**12**

**28**  55:15

---

**3**

**3**  5:17
  31:10,12
  33:24

---

**4**

**45**  38:3

**480**  28:13,
  14

**4:00**  87:14

---

**5**

**5**  33:24
  38:9,11

---

**6**

**6**  46:24
  47:1

---

**7**

**7**  48:2,5

**701**  32:5,12
  33:20,24
  34:3  35:15
  38:17

**703**  16:17
  17:6  23:10
  28:11  32:8
  33:19

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter on 12/11/2020                                    Index: 8..appears

37:18
38:17,20
72:17

**8**

8  48:18,21
72:4

80  19:25

80,000  19:25

88  9:16

**9**

9  54:2,4

90  74:25
76:16

90,000  76:8,
20

93  76:16

**A**

a/k/a  24:18

ability  7:2

ably  6:15

absolutely
84:19

accepting
59:11

accessible
50:3

accounting
44:17

accurate
23:2 29:23
68:4,5

acid  82:13

acquainted
24:22

acquire
72:25

active  9:18
10:5,11
14:6

actively
8:21

actual  23:10
30:20 31:6
44:4 63:20
82:3

add  16:6

addition
81:17

address  8:5,
6,10,15
23:10
28:11,13,
15 72:16

addressing
85:23

adjourned
87:14

adult  11:8

advantage
42:15

affecting

21:9

afford  75:23

afternoon
4:13

agree  49:8

agreement
16:9

ahead  21:13
48:1 71:15

air  52:17,
19 63:18,
20

air-
conditioner
69:23

air-
conditioning
59:13 82:5
83:15

Airforce
8:25 9:2,
15

airline  9:5

Alabama  8:4,
8 15:17,20
16:18
40:14
45:12

alive  20:9

allowing
77:8

alternate
79:11

alternative
79:5,7
80:1,3

ambiguous
32:19

America
55:15

amount  79:6
80:19,20

amounts
78:23

and/or  44:15
79:13

Anderson
4:20

Ann  20:8,19
56:10

answers  5:8
6:23 7:3

anticipated
30:17

anticipation
83:2

anymore
13:19

Apparently
82:1

appeared
69:18

appears
22:23
29:11,13
32:4

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020          Index: appliance..blocking

appliance
  82:10

appliances
  70:16 82:9

application
  26:20
  27:19
  28:2,18
  30:4
  31:13,17
  32:3 33:4
  36:3 57:4,
  5

applying
  9:15

approval
  29:5

approximately
  14:21
  25:10 76:3

April   20:12
  86:14

area   50:3
  67:1

areas   67:4
  69:3

arrangements
  25:3

arrived   49:2
  80:15

asks   80:19

Associates
  59:25

Association
  15:17,20
  45:13

assume   81:11

assuming
  87:11

ASTM   65:12,
  25

astray   32:19

attempt   33:1

attempted
  76:25 77:3

attesting
  37:17

attic   50:2,
  16 67:1

attorney   6:3
  37:16
  59:11
  61:20
  62:6,9
  72:1 82:15

attorney's
  59:5

Auburn   8:4,
  8,14,20,24
  9:1 10:1,
  7,13 11:1,
  2 14:11
  15:7
  28:13,16
  40:15,17
  42:7 75:10

audibly   5:13

aviation
  11:7

avoid   5:14

aware   44:2
  62:16 74:7

---

**B**

---

back   7:14
  8:18,24
  12:2,4
  15:6,8
  22:20
  24:11
  35:19,20
  38:16
  43:18
  44:24 49:9
  50:4,13
  54:16 56:7
  57:18,19
  58:7 64:9
  65:6,18
  69:17
  72:10 75:3
  77:21 81:8
  85:7

background
  61:22

bad   49:12
  53:1

balance   5:19
  19:24

bank   19:9

Base   8:25
  9:3

based   32:15
  79:19,22

basically
  21:5 45:4

basis   50:7

beam   47:21

bedroom
  32:13,16

bedrooms
  32:14

began   13:16

begin   29:17
  64:1

beginning
  13:22

belongings
  70:21

bet   47:24

big   26:5

bit   10:4
  14:22
  34:20 50:8
  53:15
  54:17,18

black   69:18,
  24

blackening
  69:21

Blanca   40:17

blocking

47:22

**BMW**  39:19
  40:1,6,11,
  19 41:3,23

**born**  8:16

**bottom**  22:5
  23:24 28:6
  29:6,10
  33:9
  59:18,20

**bought**  17:16
  18:1,4,8,
  12,13,15,
  22,23,24
  19:11 20:5
  23:14
  25:11
  33:18
  36:20
  39:24 40:1
  42:6 43:12

**Boulevard**
  8:8 72:20

**break**  38:4
  53:15,16
  84:12,16,
  21

**breaking**
  53:17

**breathing**
  53:3 64:2

**broader**
  49:14

**broke**  82:5

**brought**
  42:11
  70:23

**build**  41:16
  46:8

**builder**
  26:11 66:8

**builders**
  15:17
  26:10
  45:12

**building**
  11:22 22:2
  25:23
  26:20
  27:19
  28:2,18
  30:4
  31:13,17
  32:2 33:3
  36:2 40:12
  42:4 43:19
  51:20
  57:4,5
  61:22
  75:12
  76:12
  84:2,3

**built**  7:23
  12:8 18:11
  20:5 34:17
  36:14
  39:2,17
  45:3 53:8
  57:22,23,
  24 73:24

**burn**  64:1

**burning**  53:3

**business**
  13:24 25:3
  28:15
  32:21
  42:3,15
  75:12

**buy**  25:6,9
  86:8

**buyer**  33:4

**buying**  25:4
  73:12

___

**C**
___

**C-H**  47:22

**cabinets**
  70:22

**calculating**
  80:1

**called**  76:12

**capture**  5:24

**card**  52:22

**carrier**
  15:18,19

**Carter**  4:5,
  12,20,22
  8:3 20:8,
  19 21:19
  22:25 24:3
  27:14
  30:10
  31:23

35:14
37:2,12
47:6 48:11
54:9,20
56:8,10,24
60:22
69:13
71:24
72:19
85:9,23

**case**  11:15
  15:15
  37:3,5,17
  62:6 68:1

**cases**  12:24
  76:4

**cash**  19:14

**causing**  53:5

**ceilings**
  66:6,10,
  13,15

**certificate**
  20:18

**certify**  55:8

**chance**  35:9
  84:19,20

**change**  40:25

**changed**
  37:25

**check**  50:17

**checking**
  69:17

**checks**  78:15

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020          Index: China..construction

China   42:20,
   24 43:3
   47:24 49:4
   65:9,11,24
   66:22 67:5

Chinese
   12:7,16,23
   13:17
   15:14
   44:22 45:1
   50:17,25
   52:9 53:7
   54:25
   60:25 62:1
   65:20 73:5
   74:8,12
   77:18
   78:13

chose   15:9

cities   40:17

city   27:24
   29:4 40:18

claim   16:16
   85:11

Claimant
   56:5 72:14

claiming
   79:4

claims   16:1,
   2

clarity   63:3

clear   6:11
   17:9 23:18
   58:18 80:7

closed   14:23
   15:2

clues   52:15
   53:5

Coast   41:16

Code   55:15

coffee   53:17

cognitive
   53:4

coils   52:17
   69:23
   83:15

collecting
   82:20

college   8:17
   10:23

combination
   41:23

commenced
   23:16

commercial
   9:11 15:4

communication
   5:15

commuted   9:1

commuting
   10:9

companies
   9:25 10:14
   12:18,24

company
   9:21,22,24

13:4,11
14:1,6,8,
   11,15
16:13
17:16 19:2
25:2,3
38:25
39:13
40:12
44:24,25
45:8 65:2,
   4,17

compensated
   81:18

compensation
   79:17
   82:7,21

competent
   6:21

complete
   19:1,2
   23:9

completed
   28:17
   29:15
   37:23
   54:25
   74:1,17
   75:22

completely
   80:24

completing
   72:18

completion
   17:20

20:17
67:12

computer
   44:17
   52:22

computers
   44:16

computing
   80:11

condition
   6:22 81:9

conditioner
   52:17,20

conditions
   69:7

condolences
   20:15

confuse   6:13

confusing
   6:11

confusion
   73:10

considerate
   5:17

considered
   77:8

consistent
   73:2

construction
   9:21 14:1,
   3 15:3
   17:20
   18:24

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020      Index: contained..December

19:1,2,9
20:17
22:16,17
23:9,13,
16,20
29:14,16
30:15,17,
18  34:18,
23,25
36:12
37:23
40:21
41:19
43:13,14
46:7,12
49:23
57:23
61:22
67:12  68:2

contained
  74:7

contents
  55:9,24

continued
  79:23

contracting
  75:18

contractor
  14:2  28:8
  46:7,11
  75:9

control
  14:17
  55:21

conversations
  42:22

copies  45:14

copper
  53:11,12
  64:8  69:25
  70:1,3,6,7
  82:10

copy  87:4,9

core  62:17

corner  35:24

correct
  10:15,22
  11:16  13:8
  14:12
  16:13,14,
  18,19  32:7
  33:5,6,14
  37:4  43:4,
  5  45:23
  55:9,17
  56:8,9,11,
  16  59:7,8
  61:2  66:19
  67:1,9
  69:13
  74:18,19
  80:13,20,
  21  81:10

correcting
  80:7

correction
  59:16

cost  16:12
  30:14,17,
  20  31:6
  74:21

75:20  76:2
80:22  81:7
82:20,25
83:22

costs  30:5,6
  41:13  82:7

counsel
  44:23
  45:16,19
  53:22  61:9
  85:2

County  21:22
  35:17

couple  21:14
  41:5  56:2
  78:14
  85:5,6

court  5:4,7,
  22  11:25
  17:23,24
  26:15  27:3
  72:1
  76:10,17
  87:3,6,10

cover  40:9
  69:16

creation
  14:20

credit  77:10

Crescent  8:8
  72:19

current  9:4
  11:15
  45:19

custody
  55:20

cut  12:12

D

D-E-E-N  18:7

daily  46:10

damages  16:2
  79:3,8
  80:11
  81:6,7,19
  82:2,14
  83:6,12
  86:12

date  22:6,
  9,12,13,15
  24:7,8
  29:18,21
  33:8  35:25
  55:5  56:6,
  22,25
  57:5,11
  61:1  72:4
  74:9

dated  29:11
  33:13

dates  14:20
  24:14
  57:15

day  69:6
  83:2,8

Dean  28:13,
  14

December

22:9  24:5,
7  29:11,
18,21
33:13
36:4,8
57:6  73:1
74:1

**decided**
13:18

**declaration**
36:24
37:15
55:19

**declare**
55:13

**deed**  21:22
22:22
29:19
35:5,14
58:1  73:2

**deeds**  21:25

**Deen**  18:4,7
22:8,9
24:15,21

**defects**  81:9

**defendant**
11:18
12:22
15:14

**defense**
15:23
16:4,12

**Deft**  26:19
27:2  31:12

38:11  47:1
48:5,21
54:4  71:7,
19

**degree**  11:2,
4  81:5

**Degrees**  11:6

**delivered**
42:11
49:23

**deposed**  4:21
11:10

**deposition**
6:2  7:6,
10,13  8:1
43:18  73:3

**Depot**  39:20
41:23  42:1

**depth**  45:24

**description**
23:8

**destroyed**
77:11

**details**  7:15

**determined**
80:24

**develop**
33:1,18

**developed**
14:7  18:9,
12  26:7,10
42:18
51:15

77:17

**developing**
33:21
75:15

**development**
18:10
51:18

**difference**
18:21

**diminution**
80:18
81:13,15

**DIRECT**  4:9

**discoloration**
69:12,21

**discolored**
53:12

**discovered**
74:12

**discussing**
82:23

**discussion**
53:19
84:24

**disillusion**
14:20

**dispute**
37:19
47:17  59:5

**dissolved**
13:15

**District**
27:3

**dive**  53:18

**document**
21:24  24:4
26:14
27:8,14,
16,21
28:4,24
29:3  30:13
31:9,19,23
32:1  35:22
36:25
37:12
38:12
48:10
54:10,19
55:4,6
56:3  57:25
58:18
71:2,13,25
72:2,6,9
74:11
84:14

**documents**
7:25  37:5
53:18
54:22
55:18,20
82:20
84:17
85:10,20

**dollar**  79:6

**doubt**  48:13,
15

**Doyle**  6:3
30:25
37:16

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 32 of 69

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020          Index: drawings..expenses

45:19
49:11
61:1,6,9,
11 62:2,6
74:10
85:14,21,
22 86:23,
25 87:7,8

**drawings**
44:4

**driven** 77:23

**drywall**
12:7,16,23
13:17
15:14
21:2,4,9
36:18
38:22,25
39:3,7,11,
24 40:4,20
41:6,10,
15,18
42:17,19,
24 43:2,7,
13 44:22
45:1
46:17,22
47:16,18,
23 48:14,
18 49:1,4,
6,16,17,
18,20
50:17,21
51:1 52:9
53:7 55:1
59:22,24
60:5,8,17

61:1 62:1,
12,17,18,
21 64:9,25
65:1,5,6,
11,18
66:5,9,13,
15,17,21,
22,24
67:4,6
73:5,8,17,
24 74:4,8,
12,22
77:18
78:13 81:9

**duly** 4:6

---

**E**

---

**earlier**
33:16
49:15
56:14
63:23
65:24
66:16
67:19
69:24 73:3

**early** 74:23

**easily** 19:20

**education**
11:8

**efforts** 41:9

**Eikhoff** 4:2,
11 5:22,25
11:25
12:10

17:22,25
22:4,7,19,
21 23:23
24:2
26:15,23
27:6,11
31:2,5,16,
22 33:7,10
35:4,7,18,
23 36:23
37:1,7,11
38:8,15
46:23
47:5,25
48:9,17,25
49:13
53:24 54:8
71:12,14,
23 84:13
85:4,13,25
86:1,18,22
87:1,10,12

**electrical**
69:16

**else's** 17:13

**Embry** 11:1

**encompassing**
45:4

**end** 13:21,
22

**ended** 14:16
30:21 31:6

**enjoyment**
79:13,18
80:12

**entity** 12:15

**estimate**
14:5 30:24
74:25

**estimating**
76:13

**EXAMINATION**
4:9

**examined** 4:7

**examples**
66:2

**exceeds**
65:12,24

**exhibit**
26:17,25
29:20 30:3
31:10 38:9
46:21,24
48:2,18
54:2 71:2,
16 72:10,
11

**exist** 44:9
45:21
83:19
85:19

**existence**
13:13

**expansions**
37:24

**expenses**
79:5,8,11
80:1,3

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020        Index: experience..Gibbs

experience
  66:8

expertise
  65:22

Express
  9:12,19
  10:17

extensive
  44:12

extent  16:5
  43:12
  55:19
  56:17 59:9

eye  49:8

eyes  53:3
  64:1

———————

**F**

fact  34:16

fair  6:16

Fallon  76:5
  79:20

familiar
  42:1

fault  16:10

Fedex  9:5,7,
  10 10:20

feel  6:21
  79:10

fees  45:13

feet  58:21
  59:10

field  11:5

figure  30:12
  50:23
  76:16
  79:14
  82:24

figured
  80:25

figures
  78:23

file  35:14
  84:2

files  84:4

fill  28:4

filling
  54:21
  57:14 72:6

finance
  19:13

financed
  19:7,15
  43:14

find  52:13

firm  45:10
  61:1,6,15,
  16,21 62:2
  63:6,14
  64:5 74:10

fix  80:22

fixed  81:19

fixture  70:5

fixtures
  70:3,12,22

Floor  28:16

flooring
  9:22 10:1,
  13 14:11
  15:3 25:2

flying  6:20
  15:4,8
  27:9

focusing
  56:24

foot  37:19
  76:6

footage
  36:24
  37:3,6,17
  38:1 58:21
  59:2,6,14,
  15 81:1

footages
  7:22

foreclosure
  77:9

form  30:25
  49:12
  54:1,5,24
  55:16,24
  56:18
  60:16 63:5
  65:25
  71:4,8,17,
  20 72:1,9,
  12,18
  73:22 79:2
  80:16
  81:25

formed  13:10

forms  5:14

formulation
  76:6

found  11:23
  12:6,13
  16:10
  21:1,3,7,
  11 50:22

fulfilling
  46:14

full  4:18
  8:5 14:17

full-time
  15:10

functions
  29:2

furniture
  82:11

———————

**G**

garage  50:3
  59:15

gases  82:13

gave  52:15

general  14:2
  34:17

Gibb's  36:12
  38:18

Gibbs  33:25
  34:2 36:8
  51:9,10

58:2,4

**give**  6:23
7:2 8:6
31:19 35:8
45:2 81:14

**good**  4:13
6:18 38:6
53:17
55:22 81:8
85:25
87:13

**gradually**
68:7

**group**  25:24
28:24
78:17

**Guerra**
86:18,20
87:3,5

**guess**  23:12
27:23 44:2
50:7 54:23
55:11
60:17
77:15
83:18

**guessing**
15:1 19:25
32:16,17
50:2,6

**Gulf**  41:16

**gutted**  75:2
80:25

**Gypsum**  65:2,

4,15,17

---
**H**
---

**half**  5:12
9:8 35:21

**hand**  5:1
35:24
58:19,24
59:18,20

**handwriting**
28:20,21
47:11

**Hank**  75:7,
8,14

**happened**
62:23

**happening**
52:21

**happily**
83:25

**hard**  20:14
30:9 35:12

**Harris**  34:14

**Harris'**
38:19

**Harrises**
33:24
34:10,12
51:7,10

**head**  5:14

**heading**  65:1

**health**  21:3,

9 50:24
53:2

**hear**  7:19
20:13
72:22

**heard**  6:1
52:8 76:4

**heat**  69:8

**held**  17:12
53:20
84:25

**high**  8:17

**higher**  76:20

**hill**  53:2

**hold**  36:23
85:14,19

**home**  15:17,
20 17:6
25:22
32:25
36:7,19
37:22,23,
24 39:19
41:23 42:1
45:12
46:2,5
50:1 58:5,
20 61:19
62:1,5,13,
14,21
63:16,18
64:12,22
65:5 66:17
67:4,9
68:3,10

69:3,13
70:9,17,19
75:11 81:8
82:3

**homeowners**
35:2

**homes**  10:1,
13 11:22
12:15
13:2,11,25
14:6,7,21,
22,24
15:13,15,
25 17:15
18:19,23,
24,25
19:5,7,11
23:3,15,19
25:1 26:1,
6 28:8,15
32:22,23
33:17
34:16,23
39:13,14
40:20
44:6,14,21
51:14,20
57:20
73:12,13
74:3 75:16
77:16

**honest**  23:6
44:11

**honestly**
15:21
61:13 70:2
82:17

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter on 12/11/2020                              Index: hope..interested

hope  77:13

hopes  84:18

hot  69:9

hotel  5:16

hour  53:13

house  7:17,
  19,24
  12:7,9
  16:24 20:5
  21:6 22:2
  32:20,24,
  25 33:23
  34:1 44:1,
  15 45:3
  50:11,12
  51:3
  52:18,25
  64:1
  66:15,22
  67:1,11,22
  73:12,24
  74:3 75:1
  79:9 80:24
  81:2,17,18
  83:7 84:7,
  9

houses  11:22
  32:14
  39:2,16
  40:9,10
  46:9 53:7,
  9 60:14

housing
  13:16

hurricane

41:16

_____

I

ID  47:16

idea  30:23
  43:8

identification
  30:6

identified
  56:18
  60:16 63:5
  74:11

identifies
  28:7 56:12
  59:24

identify
  65:4,22
  80:19
  85:16

immediately
  21:11 64:2

important
  5:12

inaccurate
  56:19

inappropriate
  81:1

include
  43:20
  59:15

inclusive
  64:10

inconsistencie
s  24:13

incorrect
  57:12,13

independent
  73:16

indication
  60:24

individual
  73:12

industry
  61:23

information
  52:14
  55:16 56:5
  58:20
  60:22
  64:25
  72:12,15
  76:1

informative
  74:4

inhibit  7:1

initial
  37:23 68:1
  86:7

inside
  50:11,12
  75:3 78:4
  82:9

insist  59:10

inspect
  49:22
  50:20

inspected
  60:25
  61:20 62:5
  66:25 67:5

inspecting
  63:15

inspection
  61:4,7
  63:4 64:5,
  13 74:10

inspections
  61:25

install  39:8

installation
  46:16

installed
  36:19
  38:22
  49:2,7,20
  73:5,8,17,
  25 74:4

installer
  52:20

insurance
  15:17,19
  44:23
  45:13

intact  70:10

intent  62:10

intention
  32:22

interested
  32:20

involved
  11:10,17

irritating
  67:23

issue  21:2,8
  52:12,19
  70:6

issues  21:3
  52:23 53:4

itemization
  30:5

items  72:12
  82:21
  83:19

IV  60:21

**J**

J-I-L-L  17:1

Jet  9:12,19
  10:17

Jill  17:1,
  2,14 22:25

Jimmy  61:8,9

John  4:5,20
  22:24 56:8
  72:19

Judge  76:4
  79:20

July  56:6,
  24 57:10
  58:9

jumping  10:4

35:9 38:16

June  36:1
  58:2

**K**

Kansas  9:2

Katrina
  41:14

kind  7:17
  53:4 82:11

knew  24:24
  51:11 70:5

knowledge
  49:25
  55:17
  57:14 73:6
  77:19

**L**

labeling
  64:9

land  22:14
  36:7

late  36:4,7

law  5:5
  61:1,6,15,
  16,21
  63:6,14
  64:5 74:10
  81:15

laws  55:14

lawsuit
  11:11,18

13:17,21
  51:2 52:7,
  15 55:1
  72:17
  79:4,8
  82:22

lawsuits
  12:23

lawyer  7:5
  15:16,22
  45:8 83:3

learn  52:11

learned
  50:25

leave  21:10
  64:3

lecture
  81:15

led  21:5
  32:19

Lee  21:22
  35:17

left  19:23
  58:19,24
  83:9,17

lender  20:2

length  57:22

letter  85:17

letters
  47:22

level  45:24

license  9:14

light  23:2
  70:4

limited
  79:24

listed  72:19
  79:6 80:20

litigation
  15:14
  78:13

livable  81:9

live  8:3,4
  20:4 34:7

lived  8:9,14
  20:22

living  50:11
  79:5,8,9,
  11 80:1,3
  83:14

LLC  13:7
  23:15 28:8
  59:25

loan  18:25
  19:9
  34:24,25
  43:15
  75:21

local  19:9
  75:9

locally
  39:19

location
  42:7 46:3

long  7:16,

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 37 of 69

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                    Index: looked..minute

23 8:9 9:6
43:11 50:9
68:13
71:13

**looked**  29:19
32:1
33:19,20
36:2 43:18
44:18 58:1
59:12
65:23 73:2
74:20

**loss**  79:12,
13,18
80:11
81:19

**lost**  20:15
81:16

**lot**  18:4,15
19:5 22:14
23:4,7,13,
15,19
24:21
29:25
54:21 57:6
73:9 81:4
86:7

**lots**  18:11
25:4,6,9
26:9 33:17

**loud**  5:18

**loudly**  5:13

**lower**  58:19
76:20

————————

**M**

————————

**M-O-R-E-M-A-N**
75:9

**madam**  5:22
11:25
17:23
26:15

**made**  43:3
45:14
47:24 49:4
65:8,11,24
66:22 67:5
77:15

**make**  6:4
10:2 17:9
18:20 37:2
46:19
53:12 63:2

**making**  46:13

**management**
11:7

**manufacturer**
65:1,5

**March**  72:4

**mark**  26:16
38:8 46:21
48:1,18
54:1 71:2,
16

**marked**  26:20
27:3
31:10,13
38:12 47:2

48:6,22
54:5 71:9,
20 72:9

**market**  13:16

**marking**
65:20

**markings**
49:3,6,15,
19 50:21
65:7,11,14
66:25

**married**  17:2

**Marvin**  22:8
24:15,18

**Master's**
11:2,4,6

**materials**
42:9
43:13,19,
20 44:7

**Matt**  22:4,
20 23:23,
25 27:6
31:16,18
35:4 36:23
47:25
53:24
71:14
84:13

**Maxwell**  8:25

**Mcconnell**
9:2

**means**  81:12

**medications**
7:1

**meet**  7:5
41:18

**meets**  65:11,
24

**member**  13:4,
7 14:14

**memory**  73:16

**mentioned**
7:18 13:3
14:10
41:5,21
43:17 45:7
63:23 67:8
69:11,23
82:4

**met**  7:9

**method**  79:25
80:11

**microwave**
52:23
83:15

**mid**  36:9

**middle**  6:20
30:9

**military**
8:19,21
9:18,23
10:5,12

**mind**  57:9

**mine**  54:15

**minute**  53:16

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 38 of 69

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter on 12/11/2020          Index: minutes..Objection

84:21

minutes   38:4

missed   84:17

misspoke
  80:5

misunderstood
  82:1

mix   40:1

mixed   40:10
  49:17

mixing   53:8

model   78:15

mom   25:23
  56:10
  57:10 58:8

moment   21:17
  35:6 60:3

money   78:12

monitoring
  46:12

month   74:10

months   25:17
  36:9 68:16

Moreman
  75:7,9
  76:3,9,11

morning   4:13
  5:17

mortgage
  19:16,18,
  24 20:2
  75:21 77:6

mother   12:8
  20:6,9,19
  34:6
  56:20,24
  58:3 62:15
  64:12
  67:16
  68:3,10
  86:13

mother's
  20:7 34:1
  44:1 50:24
  53:2 70:21
  78:9 84:4

move   56:6,
  22 57:24

moved   8:18
  10:7 21:6
  56:23
  57:10
  58:3,8
  64:17
  68:14,18,
  20,21,22,
  23

moving   8:20
  68:3,10

multiple
  26:10
  39:18,21
  40:9 46:9
  60:13,14
  66:18

___ N ___

naked   49:8

named   15:13

names   34:12
  37:9 51:6
  52:3 72:15

necessarily
  39:1

needing
  42:23

negligent
  16:10

neighbor
  5:18

neighborhood
  25:5,7
  51:15,16,
  25 77:17

neighbors
  58:2

night   4:13
  6:20

nods   5:14

nonverbal
  5:15

normal   40:3,
  5,6 49:21

North   28:13,
  14

notarization
  24:7

notary   24:1

notary's
  24:6

note   47:12

notes   84:16

notice   52:6
  67:11

noticeable
  63:24
  68:11

noticed   24:3
  52:25
  68:17

noticing
  67:14

November
  61:2
  64:15,21
  74:8,9,13

number   30:10
  33:23
  37:20
  59:10
  76:5,7,17,
  19 80:16

numbers
  79:19

___ O ___

oath   5:3

Object   30:25

Objection
  49:11

objections
  6:3

obligations
  46:14

observe   27:8

observed
  69:19,22

observing
  69:12

obvious
  63:22

Occasionally
  77:23

occupancy
  20:18
  36:14

occupant
  20:20
  56:13,18,
  21

occupants
  56:12

occupation
  9:4 15:5

occupations
  9:20

occupied
  56:14

odor   52:25
  67:8,15
  68:11
  69:2,9

odors   69:5

ongoing
  24:23

Opelika
  16:17
  27:24 29:4
  42:7

open   85:15,
  19

opportunity
  15:8 27:8
  31:20

opposition
  85:24

order   40:8

ordered   42:9

original
  57:6 70:12
  83:21

out-of-pocket
  16:1

outlets
  69:17

owned   9:21
  12:16

owner   10:12
  13:6 16:22
  28:7 46:6
  56:13,20

ownership
  14:19
  18:25

———————————
       P
———————————

p.m.   87:14

pages   71:13

paid   18:16,
  19 43:6

papers   21:14

paragraph
  22:23

Park   23:7

part   16:8,
  9,11
  25:18,23
  29:3 45:13
  78:15 79:4
  84:3

partially
  74:17

partnership
  14:16

pass   20:11

passed   84:8
  86:14

path   15:9

Patriot
  10:1,13
  11:22
  12:15
  13:2,10,25
  14:6,21,
  22,24
  15:13,15,
  25 17:15

18:19,23,
  24,25

19:4,7,11
  23:3,15,19
  25:1 28:8,
  15 32:22
  34:23
  39:13,14
  40:20
  44:6,14,21
  51:13
  57:20
  73:11,13
  74:2 75:16

pay   15:25
  16:2 19:14

paying
  19:20,23
  75:21 77:6

payment
  16:12
  78:21

PC   61:1,6

penalty
  55:13

people   52:4
  83:23

perfectly
  85:23

performed
  61:7

period   9:20
  15:11
  17:16
  44:14

perjury
  55:14

permit  26:20
  27:19
  28:2,18
  30:4 32:2
  33:3 36:3
  57:4,5

permits
  29:17

person  7:7
  72:18
  86:11

personal
  70:20,21
  84:4

personally
  46:8 50:20
  69:19,22

Ph.d.  11:3,7
  15:7

Ph.ds  11:4

photo  46:22
  48:19

photograph
  47:2,7,9,
  15,17
  48:2,6,14,
  22

photographs
  49:24 50:1
  65:23 66:1

physical
  23:10

picture  51:5

pieces  62:17

pilot  9:5,11

pilot's  9:13

piping  69:25
  70:1,14

place  8:23
  16:17 17:7
  23:11
  28:12
  32:5,12
  34:3 35:15
  37:18
  38:17,18,
  19 39:25
  40:19
  50:18
  51:21
  72:17

places  40:25

plaintiff
  11:11
  51:13
  53:25
  54:5,25
  55:16
  71:3,8
  78:12

plan  15:7
  27:22,25
  28:25
  29:7,15,24
  32:11,20,
  21 43:19

plans  7:16,

19,24
  43:25 44:3

plates  53:11
  69:16

play  13:18

pocket  16:13

point  19:10
  20:24
  30:16
  45:14
  50:12
  53:17 62:9
  63:3,25
  75:11
  78:13
  80:23

poorly  31:3

portion
  78:17

possession
  55:20

possibility
  21:1 50:23

Post  47:11

potential
  11:24 12:6
  60:4 70:6,
  7

potentially
  75:6

power  53:14

preparation
  7:10 8:1

43:17

prepare  7:6,
  13

present
  53:23 85:3

Preserves
  51:25

pretty  45:2

previous
  76:4 79:19

previously
  29:19
  78:24

price  32:15
  41:4 80:25
  86:3

prices  40:24
  41:1

prime  15:4

prior  8:20
  9:1 23:3,
  12,13 25:2
  29:16
  40:20
  78:20

problem  21:8
  51:1,11
  52:9 64:18

procedure
  49:21

proceedings
  53:21 85:1

process  22:2

29:15
74:24
77:14

procure  39:6
  41:10,18

procured
  39:7,9,12
  49:18

produced
  37:5 45:5
  71:25

product
  47:15 66:2
  74:1 75:22

profile
  54:1,5
  55:16
  71:3,8

program
  76:12

progress
  46:12

prohibitive
  75:20

project
  30:21 46:7

projects
  25:14
  41:19

proof  47:15

properties
  17:8 18:3
  22:1,24
  24:16

34:6,22
41:11 43:2
45:15
51:14

property
  7:15
  16:17,20,
  22 17:4,5,
  12 18:1,9,
  14,17
  20:4,18,25
  21:10,15,
  22 22:13
  25:18
  29:20
  30:15
  32:8,23
  36:3,9,12
  37:18
  38:20,23
  39:24
  40:22
  41:10
  42:17
  43:15
  46:6,17
  47:16,18
  48:3,14
  49:3,20,23
  51:24
  56:15
  60:5,8,25
  66:2,12
  72:15,17,
  25 73:5,9
  74:7,13,
  16,21
  77:1,21

78:4
79:13,18
80:12
81:16,20
82:3 83:11
86:4,12

proprietors
  24:16

provided
  15:16,22
  28:12,14
  45:12,15,
  18 82:14

pull  35:5
  53:10,25
  57:2

Pulling
  69:16

purchase
  19:8,13
  21:15
  36:13
  45:1,15
  83:10,21,
  24 86:3

purchased
  19:5
  22:13,15
  23:4,19
  24:21
  34:23
  36:7,8
  42:16 43:2
  44:7 58:4
  73:9,11,25
  83:20

purchasers
  34:3,5,9
  35:2

purchases
  43:21

purpose
  13:24

pursuant
  55:15

pursued  15:4

put  21:16
  26:13 31:9
  54:9 60:18
  71:15
  73:21
  80:16
  81:24

---

Q

quality
  63:20

question
  6:6,11,15
  12:2,3
  31:1,4
  32:18
  49:12,14
  72:25 73:4
  74:6,16
  80:6 86:13

questions
  5:8 6:22
  7:2 13:1
  17:7 19:22
  85:5,6

86:19,20,
23

quick  35:11
84:12,15

quickly  83:9

_____

R

R&s  18:3
22:24
24:16

raised  5:1

rarely  43:10

reaching
67:12

reaction
68:2

read  12:1,4
30:9,10
35:11
50:14
55:21

reading
52:13

ready  36:13

realize
18:20
32:18

Realtor's
15:20

reason  37:19
43:25
44:20
47:17

48:13,15
59:3,5
60:7 76:15
77:22
80:21

rebuilt  75:3

recall  18:1,
16 19:4
21:24
24:16
25:20,22
30:20
33:20
36:15
37:14
39:23
41:7,9,17
43:6,24
44:21,24
49:1,3
50:25
57:4,25
58:3,11
61:24,25
62:3 63:7
64:4,6
66:12
67:14
68:6,10
69:2,12,15
82:19
86:3,5

receive
85:20

received
52:6
78:12,16,

24

receiving
13:21

recently
8:16

recognize
27:14,17,
21 28:20
31:23
47:6,11
53:1
54:14,19
78:23

recollection
23:18
58:14 76:1

reconvened
53:22 85:2

record  4:19
5:24 6:4
26:21 27:4
31:14 37:3
38:12 47:2
48:6,22
53:20 54:6
71:9,21
80:7 84:25
85:7,8
87:2

recording
5:7

records
43:20
44:6,9,14,
16,19,25

45:2,15,
18,24,25
46:1 57:20
74:2
76:10,18
82:14
83:5,10,
11,20,21,
24 84:7
85:16

recreated
83:9

referred
40:11

referring
17:6 34:2
81:6

refers
59:13,14

reflect
82:20

refresh  57:9

refrigerator
83:24

Reggie  34:13

Reginald
34:13,14

related
12:16
16:16
21:14
85:10

relates  37:6

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020          Index: relationship..roughly

relationship
  24:20,23

relative
  26:4

remaining
  75:2

remediate
  74:21,25
  76:2 81:8

remediated
  74:17
  77:17

remediating
  75:6

remediation
  81:1,7

remember
  4:25 7:21,
  22 13:10
  15:21
  19:19 20:3
  21:25
  24:10
  25:12,16
  31:8 32:13
  33:23
  34:4,12
  36:17
  39:4,18
  40:3,5
  41:14
  43:10,23
  45:9,10,11
  46:19
  47:10

48:12
49:5,10,19
50:8,16,20
51:4,5,23
52:1,3
54:21 55:5
57:1 61:24
62:8,19,
22,25
63:1,11,22
64:7,8,11
65:21
66:14
67:17
68:15 69:5
70:2,4
72:6
74:23,24
75:5
76:17,19,
21 78:6,18
82:16,17,
23 83:1,4

removed
  62:13

renovations
  37:25

rent   77:3

repair   83:10

rephrase
  31:2 80:6

replace
  52:17
  74:21
  82:25
  83:14

replaced
  83:13,16

report   79:3

reported
  65:25

reporter
  5:7,23
  12:1
  17:23,24
  26:16
  87:3,6,10

represent
  21:21
  30:12
  35:13
  37:15
  47:14
  65:19 66:1
  71:24

representative
  61:14,17
  63:14 64:5

represented
  15:15
  44:23 45:8

request
  79:10,17

requested
  55:19

residential
  9:21 14:1,
  3,7 15:3

resolve   16:1

respect

32:21

response
  85:21

responses
  5:13

restate   6:15

retained
  62:8

retired   8:18
  10:4,6,8

retiring
  8:19 9:17

returning
  83:3

review
  27:22,23
  28:25
  29:7,15,24

reviewed
  7:25 43:20

Riddle   11:2

RL   40:2
  41:24 42:2
  59:25

Road   28:13,
  14

rock   50:5

room   5:16
  60:18

roughly
  34:19
  39:17 53:8

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                          Index: run..sitting

run   40:17

Rusty   18:3,6
   24:18

————————
         S
————————

Sallie   18:4,
   6 22:9
   24:15

samples
   62:16,17

sat   57:22

saturated
   82:12

schedule
   34:18

school   8:17
   15:6 81:15

scope   45:25

screen   21:16
   35:6 54:9
   58:20,24
   59:19
   64:24
   78:21
   84:14

scroll   22:5,
   20 23:24
   27:7 31:18
   35:8,12
   37:8 54:18
   59:19

seal   24:1

section

56:4,5
58:20
59:21
60:21,24
64:24,25
72:24
74:15,16
78:20,21
79:2,12
80:18

seeking   79:7
   81:16,19
   82:2,7,21
   83:11
   86:12

sell   33:1
   76:25 77:2

separate
   28:13,24
   86:16

separately
   39:8

September
   73:6,22

sequence
   10:3

served   51:2

service   9:18
   10:5,12

serving   8:21

set   25:14,
   15,18,19

setting
   56:23

settle   16:7

settlement
   16:4,8,11
   79:20

shakes   5:14

sheet   50:5

ship   42:9

shop   15:2
   40:25

short   17:16

shortage
   39:11 40:4
   41:6
   42:15,18,
   24 49:16

shortages
   40:7

shorter
   77:14

show   21:14
   22:23
   23:10
   26:24
   37:4,8
   48:1 61:17
   71:1

showed   29:20
   49:25 59:2
   61:15

showing   23:7

shows   56:7,
   22

side   33:25

49:6,9
50:5,13
51:17
58:19,24
59:20 64:9
65:6,18

signature
   37:9
   54:14,16,
   22 55:4,8,
   12,23 72:2

signatures
   22:8 24:6
   29:9 33:8,
   11

signed   55:3,
   6

single   13:7
   26:3

sir   6:23
   8:7 12:11
   14:12
   16:18 28:4
   29:1

sit   45:22
   58:11,13

site   27:22,
   25 28:25
   29:7,15,24
   46:3,8
   49:2 76:5

sits   83:8

sitting   5:4
   82:19
   83:17

slightly
  81:14

slow  27:9

slowly  31:18

small  24:24
  26:3

smell  63:24
  82:13

socket  53:10

sold  19:2
  23:12 35:1

sole  13:4,6
  14:14,18
  20:19
  60:7,10,12

sound  36:6

sounds  36:10
  66:24
  74:14 85:9

source  40:20
  42:23

sources
  39:19,21
  49:17
  66:18

south  42:14

southeast
  41:15

space  50:11

speak  5:13

speaking
  5:18

spec  32:24,
  25 36:6

specific
  39:25

specifically
  20:6 47:8
  67:18 72:7

spoke  17:21

square  7:22
  36:24
  37:3,6,17,
  18 38:1
  58:21
  59:2,6,10,
  13,15 76:6
  80:25

stage  29:14
  59:21

stages  36:16

staggered
  25:11,13
  34:19

stamp  35:25

stand  5:4

start  54:12

started
  9:15,19
  10:16,20
  14:16,22
  30:18
  52:13,16
  53:4 57:21

state  4:18
  6:3 36:11

statement
  6:5

States  27:3
  55:14

stationed
  8:24,25

steps  22:1

Stockett
  40:2 41:24
  42:2 59:25
  60:4,8,15

Stone  10:1,
  13 14:11

stood  46:19

stop  53:18
  72:12

stopped  10:8

stored  44:15
  46:4

strange
  52:21,23

street  26:4
  51:23
  52:2,4

strike  80:5

structure
  82:3

structures
  18:14

student
  15:10

studs  75:2

study  11:5

stuff  7:17
  82:12

subcontractor
  39:1,3,6

subcontractors
  46:13

subdivision
  23:8 26:2,
  3,6 52:1

submitted
  29:4,24
  33:4 37:16
  47:15

sued  11:14,
  18 12:16,
  19,23
  44:22
  51:4,13,24
  52:15

suggested
  29:22

suit  45:4

sulfur  82:12

sulfuric
  82:13

Supplemental
  71:3,8

supplied
  55:18

supplier
  40:7 59:22
  60:8,11,

12,18

**supplier's**
59:25

**suppliers**
40:6 41:20
42:4,23
49:18
60:4,13

**supplies**
49:22 53:8

**supply**  40:12
43:21
44:18

**support**  83:6

**survey**  29:3

**swear**  4:3

**switch**  38:5

**switches**
69:17

**sworn**  4:6
5:2

**symptoms**
21:4

─────────────
**T**
─────────────

**Taishan**
65:1,4,15,
16

**taking**  6:25
14:17
67:25 87:4

**talk**  16:16

**talked**  75:5
85:17

**talking**
17:5,9
32:9 44:3
86:7

**teach**  15:7

**technically**
35:12

**televisions**
82:10

**test**  63:21

**tested**  63:19

**testified**
33:16
49:15
56:14 59:4
60:3 66:16
86:2

**testifies**
4:7

**testimony**
23:3 43:1
52:7

**testing**
62:20
63:13,15

**thing**  45:11
83:13

**things**  7:16
52:21 53:9
56:2 78:9
81:4 82:25

**thought**
12:12
52:19
57:15
85:22

**thousand**
74:25
76:16

**time**  6:2
9:17,18,20
12:20
14:17,18
15:11
18:8,12,13
20:14,22
25:10,12,
15 26:21
27:4 28:15
29:25
31:14
32:15
33:3,18
34:17,21
35:25
36:13,19
38:13
39:11,17
40:21
41:7,12
44:14 47:3
48:7,23
51:19,22
52:24 53:8
54:6 55:3
57:23
58:4,6
62:1,5,7

63:24
64:13
67:20
68:7,9,11,
17,20,21,
22 69:6
71:10,21
75:22 78:3

**timeframe**
33:21
73:23

**times**  41:6
52:18

**title**  16:23

**today**  4:16
6:23 16:16
32:9 45:22
58:11,13
61:9

**today's**  7:6
8:1

**told**  51:11
53:10

**tool**  76:13

**top**  32:4
33:12
35:21
58:23,24
60:20

**topics**  38:5

**total**  26:2
30:6

**totally**  15:1
32:17

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                    Index: touched..wiring

touched
    62:14

town   24:24
    51:17

transaction
    22:24

transfer
    29:20,22
    57:6

transferred
    30:1

transitioned
    9:22

treated   75:3

trick   6:13

trouble   53:3
    64:2

true   55:9,
    17

truth   5:2

truthful
    6:23 7:3

turn   75:22

type   66:9
    70:22

typical
    40:19

Typically
    41:3

typo   57:16

---
U
---

U.S.C.   55:15

Uh-huh   58:22
    59:23
    78:22 80:9

ultimately
    35:1 41:17

Undergrad
    11:6

undergraduate
    11:1

understand
    5:2,8 6:8,
    10,14,22
    7:2 55:23
    79:25

understanding
    12:14
    16:15
    42:13
    54:24
    55:10 75:1
    80:10

understood
    56:22
    80:14

undeveloped
    18:9

unimproved
    22:14
    29:25

United   27:2
    55:14

upper   35:24

usual   87:11

---
V
---

vacant   70:10

vacate   20:24

Vaguely
    54:21

verification
    55:24
    59:2,6,11
    71:17,20
    72:9

verified
    64:18

verify   55:9
    62:11

VI   58:20
    78:20

virtually
    7:6

visible   49:7

visit   64:4

---
W
---

wait   6:4
    21:18

walk   63:22
    64:1 83:7

walls   50:14
    66:6,9,13

wanted   16:6
    24:4

warranty
    21:22,25
    22:22
    29:19
    35:5,14
    58:1 73:2

Waverly
    16:17 17:7
    23:7,11
    28:11
    32:5,12
    34:3 35:15
    37:18
    38:17,18
    51:20
    72:17

Wichita   9:2

wife   16:23
    17:13
    19:11
    23:14
    28:19
    72:16
    86:15

wife's   28:21
    29:10
    33:12

wire   64:8
    69:17 70:8

wires   53:11

wiring   69:12
    70:12
    82:11

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Index: wise..zoom

**wise**  25:15

**worded**  31:3

**work**  11:7
  15:6

**worked**  75:15

**working**  9:6,
  19 10:12,
  16,20

**works**  61:21

**world**  5:12

**worse**  63:25
  67:20 68:7
  69:2,5,8,9

**writing**  28:5

**wrong**  50:24

────────────
           **X**
────────────

**Xactimate**
  76:12

────────────
           **Y**
────────────

**year**  9:8,12
  13:20
  14:23
  20:12,14
  69:6
  79:21,22
  80:2,12

**years**  9:9
  10:17,18
  14:6 24:23
  44:10 50:9
  68:16,23,

  24,25
  74:23
  76:24 78:5
  79:23

────────────
           **Z**
────────────

**zoom**  4:17
  5:11 22:6
  23:25 24:1
  28:6 30:8
  33:7 35:21
  54:17

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2
      IN RE:                      )
 3    CHINESE-MANUFACTURED        )
      DRYWALL, PRODUCTS           )
 4    LIABILITY LITIGATION        )
      EDUARDO AND CARMEN          )
 5    AMORIN, ET AL.,             )  No.
      INDIVIDUALLY AND ON         )  2:11-cv-01395-EEF-JCW
 6    BEHALF OF OTHERS            )
      SIMILARLY SITUATED,         )
 7                                )
            Plaintiffs,           )
 8                                )
      vs.                         )
 9                                )
      TAISHAN GYPSUM CO.,         )
10    LTD. F/K/A SHANDONG         )
      TAIHE DONGXIN CO.,          )
11    LTD.; TAIAN TAISHAN         )
      PLASTERBOARD CO, LTD,       )
12    ET AL,                      )
                                  )
13          Defendants.           )

14

15                      - - -

16

17          Continuation of the Videoconference

            Deposition of JOHN CARTER
18
                  (Taken by Defendants)
19
                    Atlanta, Georgia
20
                    January 26, 2021
21
                       Volume 2
22
      Reported by:   Lynne C. Fulwood
23
                     Certified Court Reporter
24

25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 91..94

**Page 91**

```
1   STATE OF GEORGIA
2   COUNTY OF COBB
3   CONTINUATION OF THE VIDEOCONFERENCE DEPOSITION OF
4   JOHN CARTER
5
6             Pursuant to Article 8.B of the RULES AND
7   REGULATIONS OF THE BOARD OF COURT REPORTING OF THE
8   JUDICIAL COUNCIL OF GEORGIA, I make the following
9   disclosure:
10            I am a Georgia Certified Court Reporter.
11  I am here as a representative of Huseby Global
12  Litigation.
13            Huseby Global Litigation was contacted by
14  the offices of ALSTON & BIRD, to provide court
15  reporting services for this deposition.  Huseby
16  Global Litigation will not be taking this deposition
17  by O.C.G.A. 15-14-37 (a) and (b).
18
19
20
21
22
23
24
25
```

**Page 93**

```
1             - - -
2             Continuation of the Videoconference
3   Deposition of JOHN CARTER, taken by the
4   Defendants, at 1201 West Peachtree Street,
5   N.W., Suite 4200, Atlanta, Georgia 30309,
6   on the 26th day of January 2021, at 4:00
7   p.m., before Lynne C. Fulwood, Certified
8   Court Reporter.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 92**

```
1   ON BEHALF OF THE PLAINTIFFS:
2       JAMES DOYLE - videoconference
        Attorney at Law
3       Doyle Law Firm, PC
        2100 Southbridge Parkway
4       Suite 650
        Birmingham, Alabama 35202
5       205-533-9500
        Jimmy@doylefirm.com
6
    ON BEHALF OF THE DEFENDANT TAISHAN GYPSUM:
7
        CHRISTINA EIKHOFF - videoconference
8       MATTHEW LAWSON - audio
        Attorneys at Law
9       Alston & Bird
        1201 West Peachtree Street, N.W.
10      Suite 4200
        Atlanta, Georgia 30309
11      Matt.lawson@alston.com
        Christy.eikhoff@alston.com
12
    ON BEHALF OF THE DEFENDANTS BEIJING NEW BUILDING
13  MATERIALS PUBLIC LIMITED COMPANY, BEIJING NEW
    BUILDING MATERIALS GROUP CORPORATION, AND CHINA
14  NATIONAL BUILDING MATERIALS COMPANY, LIMITED:
15      DANIEL GUERRA - videoconference
        Attorney at Law
16      Orrick, Harrington & Sutcliffe
        The Orrick Building
17      405 Howard Street
        San Francisco, California 94105-2669
18      415-773-5700
        Dguerra@orrick.com
19
20
21
22
23
24
25
```

**Page 94**

```
1        INDEX TO PREVIOUSLY MARKED EXHIBITS
2   Exhibit 10     Amended Supplemental Plaintiff
                   Profile Form              99
3
4
             INDEX TO EXHIBITS
5
    Exhibit 12     Amended Supplemental Plaintiff
6                  Profile Form              99
7
8            INDEX TO EXAMINATION
9   Examination by Ms. Eikhoff            95
10  Examination by Mr. Guerra             121
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                Pages 95..98

**Page 95**

1            P R O C E E D I N G S,
2                  - - -
3            (Whereupon, counsel for all parties
4       stipulates that the Court Reporter is
5       authorized to swear the witness remotely.)
6                  JOHN CARTER,
7       having first been duly sworn, was deposed and
8       examined as follows:
9                  EXAMINATION
10   BY MS. EIKHOFF:
11       Q    This is a continuation of the deposition
12   of Mr. John Carter, which commenced on December 11th,
13   2020.  Mr. Carter, you remember me?  I took your
14   deposition last time.  I'm Christy Eikhoff and I
15   represent Taishan Gypsum, who is a defendant in a
16   claim that you've made against them.
17       MS. EIKHOFF:  Do you want to make
18       appearances for the record of other
19       counsel?
20       MR. DOYLE:  Jimmy Doyle on behalf of
21       the plaintiff.
22       MR. LAWSON:  Matt Lawson on behalf of
23       Taishan Gypsum and Taian Taishan
24       Plasterboard.
25       MR. GUERRA:  Dan Guerra on behalf of

**Page 96**

1       Beijing New Building Materials, Public
2       Limited Company, Beijing New Building
3       Materials Group Corporation and China
4       National Building Materials Company,
5       Limited.
6   BY MS. EIKHOFF:
7       Q    Okay.  Let's go ahead and get started.
8   Mr. Carter, the last time that we met, you -- we had
9   some discussion about you maybe looking back for some
10   additional documentation and files from the building
11   of the house.  Do you remember talking about that?
12       A    Yes.
13       Q    And have you in fact gone back and looked
14   for building files since we last spoke?
15       A    Yes.  And the files are no longer
16   available, nowhere to be found.
17       Q    Okay.
18       A    I was able to forward along in terms of
19   there was a lease agreement with my mother that
20   clarified the dates for when the house was finished
21   and moved into.
22       Q    Okay.  Do you recall anything else that
23   you found besides the lease agreement?
24       A    No, that was it.
25       Q    And so specifically I asked you last time

**Page 97**

1   about whether you had any receipts, invoices,
2   documentation related to the purchase of the Chinese
3   drywall or I should just say the purchase of the
4   drywall that was used in this property.  And I take
5   it that you did not find any purchasing records of
6   that?
7       A    No.
8       Q    Okay.  Another thing that we talked about
9   last time was that at one point you did have a lot of
10   records related to the building of the house
11   particularly with your involvement with Patriot
12   Homes, which was your home building business.  And
13   those records have been turned over to an attorney
14   that had defended Patriot Homes in litigation several
15   years ago.  Do you remember that?
16       A    I don't remember that I turned the
17   paperwork over to that attorney.  Honestly I don't
18   remember if I did or did not.
19       Q    Okay.  Well, when we talked about it
20   before, you thought that you turned everything over
21   to that attorney, but you couldn't remember the name
22   of the attorney.  I was wondering if as we sit here
23   today anything has brought the name of that attorney
24   to your mind?
25       A    No, but it -- it was the assigned

**Page 98**

1   attorney through the Alabama Homebuilders Association
2   insurance if that helps you find who it was.
3       Q    Okay.  But that's all you remember?  You
4   don't remember the firm name or the attorney name?
5       A    I don't.  It's been a while.
6       Q    All right.  So I would like to mark as an
7   exhibit the supplemental -- the amended supplemental
8   plaintiff profile form that we have received since
9   your last deposition.  And do you have that document
10   with you, Mr. Carter?
11       A    I do.
12       Q    Okay.  We can put it up on the screen if
13   needed.  I will see if we can get on the same page
14   without putting it on the screen because we may be
15   able to just refer to page numbers, and you and I
16   will be on the same page, if you will.
17       A    Okay.
18       Q    So this amended supplemental plaintiff
19   profile form, or sometimes I may refer to it as an
20   SPPF, it shows a signature date of December 16th,
21   2020.
22       A    Okay.
23       Q    Is that what you have?
24       A    On the front, the signature date?
25       Q    It's on page seven.

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 52 of 69

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                          Pages 99..102

Page 99

```
1     A    Yes.
2     Q    Is that your signature?
3     A    It is.
4     Q    And did you sign that on the 16th?
5     A    I did.
6     Q    And our last deposition was December
7  11th, so within about a week of the last deposition
8  is when you did that?
9     A    Yes.
10    Q    And you -- we had previously wrote at a
11 prior version of an SPPF that you had executed on
12 March 8th, 2018, which was made Exhibit 10 to your
13 deposition.  Do you remember in your last deposition
14 when I was asking you questions about that SPPF?
15    A    That's the one you were putting on the
16 screen at the time?
17    Q    Yes.
18    A    Yes.
19         (Whereupon, Exhibit Nos. 10 and 12 were
20         previously marked for identification by the
21         court reporter.)
22 BY MS. EIKHOFF:
23    Q    Okay.  So what I want to do today is just
24 ask you about differences between that SPPF that was
25 Exhibit 10 and this newer SPPF which is Exhibit 12.
```

Page 100

```
1  Okay?
2     A    Okay.
3     Q    So the first change that I notice is on
4  page two, and that is the response to the question
5  right about in the middle of the page, when was
6  Chinese drywall installed in the property to the best
7  of your knowledge.  The prior SPPF said that -- had a
8  date there, September 1st, 2006, and Exhibit 12 shows
9  2007.  Did you make that change?
10    A    I did.
11    Q    And why?
12    A    Looking back at the settlement statement
13 for when the property itself, the empty lot was
14 bought was December.  And the lease agreement for my
15 mother started as May 1st of 2007.  And it was
16 obviously one of the last things done to the house is
17 finishing the drywall.  So I estimated that it was
18 February or March when that was installed for her
19 move-in in May.
20    Q    Okay.  I did not see another change until
21 page six.  And I want you to just flip through it and
22 tell me if you think you changed anything between --
23 anything else between page two and page six?
24    A    No, not that I see.
25    Q    Okay.  The next change I saw was on page
```

Page 101

```
1  six right at the middle of the page.  There was a
2  question about if you experienced any loss of use
3  and/or loss of enjoyment of the property as a result
4  of Chinese drywall, identify the total amount of such
5  loss.  And the previous SPPF in Exhibit 10 said
6  $275,000.  This version says $337,500.  Is that
7  correct?
8     A    Yes.
9     Q    And why did you make that change?
10    A    I believe that reflects the increase
11 in -- the substantial increase of the cost of fixing
12 the home due to material and labor costs being much
13 higher now than the first estimate that was put
14 together, probably the biggest part of it.
15         And then the -- I believe it also may or
16 may not include the numbers for the replacement costs
17 of those things that are in the house.
18    Q    So I just want to orient you to what line
19 we are on the form because this is for loss of use
20 and enjoyment.  And there are other lines where you
21 would itemize the cost of remediation or the cost of
22 repair or replacement of personal items.
23    A    Okay.  Okay.
24    Q    So do you know why your quantification of
25 loss of use and enjoyment went from $275,000 to
```

Page 102

```
1  $337,500?
2     A    If we could go offline for a second, I'll
3  talk to my attorney.  We were talking about what
4  numbers to put in there based on the things that we
5  added up, so I can give you a more specific answer
6  after talking to him.
7     Q    I cannot actually have you talk to your
8  attorney before you answer my question.  So if the
9  answer is I don't know, then --
10    A    I don't remember exactly.
11    Q    Okay.  One thing that did not change
12 between Exhibit 10 and Exhibit 12 is the next line,
13 which is a blank line, the question about diminution
14 of value.  It was blank on the last one and it's
15 blank here.  And can you just confirm that you have
16 not articulated an amount to recover for diminution
17 in value?
18    A    I have not because I don't know how to
19 calculate that because I haven't done anything to
20 remediate the house.  I've not tried to sell it, so I
21 don't know how to -- how to calculate that in.
22    Q    Okay.  And then if you move ahead and the
23 pages stop with being numbered.  But if you flip
24 through Exhibit F, then we will encounter section
25 seven, loss of use and enjoyment.  Do you see that
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 103..106

Page 103

1  paragraph?
2          MR. DOYLE:  You may want to put it up
3  on the screen.
4          MS. EIKHOFF:  It's after Exhibit F as
5  in Frank.  And Jimmy, I lost Matt, so I
6  don't know how to put him back on the
7  screen.
8          THE WITNESS:  I think I'm missing that
9  page that identifies the title page for
10  Exhibit F.  So which page is it after that,
11  the actual --
12  BY MS. EIKHOFF:
13     Q    It looks like this.  I'm going to hold it
14  up to the screen.
15     A    Section seven, loss of use and enjoyment.
16          MR. DOYLE:  Hang on a second.  Let me
17  see if I can pull it up and I may be able
18  to share it.
19          MR. LAWSON:  I'm back connected and I
20  can share it if we need that page.
21          MR. DOYLE:  Please do, Matt.
22          MS. EIKHOFF:  Yeah, if you could pull
23  it up.  I'm looking for section seven, loss
24  of use and enjoyment.
25          MR. LAWSON:  No problem.

Page 104

1          MS. EIKHOFF:  And my copy comes right
2  after Exhibit F.
3          MR. LAWSON:  I have it here on page
4  14.  Let me share it on the screen.
5  BY MS. EIKHOFF:
6     Q    Okay.  Do you see that, Mr. Carter?
7     A    Oh, okay.  Yes.
8     Q    Did you -- are those your words?
9     A    Yes.
10     Q    Okay.
11     A    I've got the handwritten portion in front
12  of me.
13     Q    This -- and this paragraph was not
14  included in the previous version of your SPPF,
15  correct?
16     A    Right.
17     Q    And I see here that you say at the
18  bottom, really the last sentence:  Although not
19  comprehensive, I've calculated personal property
20  damage to be approximately $8,714 and home repair
21  damage to be approximately $5,337 -- sorry, $5,337
22  since I purchased the affected property.
23     A    Yes.
24     Q    Okay.  And are those amounts itemized in
25  the subsequent pages?

Page 105

1     A    Yes.
2     Q    I see a couple of charts.
3     A    Yes, they are.
4     Q    Okay.  So I want to look at the next one
5  that I come across, which is the one that starts with
6  Frigidaire refrigerator.  And Matt has it up on the
7  screen.  Do you see that?
8     A    I do.
9     Q    Okay.  Are these amounts listed for
10  Frigidaire refrigerator, Frigidaire microwave,
11  Frigidaire stove, are those amounts of what you paid
12  for items that were actually in the house and may
13  still be in the house?
14     A    No, they are items that we looked up on
15  the Internet for replacement with like model
16  appliances for the house.
17     Q    Are those three appliances, refrigerator,
18  microwave and stove, were they Frigidaire brand?
19     A    Yes.
20     Q    And you had said that you were going --
21  in our last deposition that you were going to look
22  and see if there were any purchase records for those
23  appliances.  And I take it that there are none that
24  you could find?
25     A    No.

Page 106

1     Q    So what you did then is to look up how
2  much it would cost to buy those items now?
3     A    Yes.
4     Q    And those are the prices that you put in?
5     A    Yes.
6     Q    And I think I see some Internet
7  printouts, so you went to -- you looked at Lowe's?
8     A    Yes.  I don't know exactly where each one
9  of them came from.  Yeah, Lowe's was one of them.
10     Q    Where did the original appliances that
11  are in the house, where were they actually purchased?
12     A    There's not a lot of options.  We're in a
13  small town, so it would have been Lowe's or Home
14  Depot or there's a place called Rex Appliances in
15  town.  So it would have been one of those three, but
16  I can't tell you exactly which one.
17     Q    Did you personally buy the appliances for
18  that house or did someone else do that?
19     A    Someone at Patriot Homes did.
20     Q    Did -- I think you said -- did your wife
21  work with you at Patriot Homes?
22     A    Yes.
23     Q    Would either you or your wife have
24  actually made the selections and made the purchases
25  on behalf of Patriot Homes?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Pages 107..110

Page 107

1      A     We would have made all the selections,
2   yes.
3      Q     Okay.  The next item is -- it says
4   replacement of three air-conditioner coils, $880 in
5   parentheses.  Do you see that?
6      A     Yes.
7      Q     Now, I do see in this packet of documents
8   that have been produced that there is almost like an
9   invoice from Andy -- I'm sorry, from Oasis Heating
10  and Air, LLC?
11     A     Yes.
12           MS. EIKHOFF:  Matt, put that on the
13     screen.  All right.
14  BY MS. EIKHOFF:
15     Q     In the upper right-hand corner of the
16  screen it says billed 17 August '11.
17     A     Okay.
18     Q     Do you know what date that is?
19     A     What date that is?
20     Q     Yeah.
21     A     August.  I'm not sure what you're asking.
22     Q     What date and year is that, because I'm
23  just asking for you to clarify because it could be
24  read two ways?
25     A     17 August 2011.

Page 108

1      Q     Okay.  That's when you believe that that
2   evaporator coil was replaced?
3      A     Yes, that was one of them.
4      Q     And that would have been approximately
5   five years after the house was finished being built;
6   is that right?
7      A     Okay.
8      Q     I'm asking?
9      A     Sounds right.
10     Q     Would it have been in 2017?
11     A     No, she had moved out long -- long before
12  that.
13     Q     So it would have been August 17th, 2011,
14  which is about five years after your mother had moved
15  into the house?
16     A     Yes.
17     Q     And where did you find this document?
18     A     It was in the file that I had for her
19  rental agreement.
20     Q     And I take it there were no other heating
21  and air invoices or receipts?
22     A     No, there were not.
23     Q     Okay.
24     A     The other two times that we had to
25  replace it were after much discussion with Oasis.

Page 109

1   And then on the third time, as you can see on there,
2   it talks about the warranty for the installation.
3   And after the third time of coming in to replace it,
4   he said you're going to have to pay for all these
5   because he could tell I guess that something was
6   going on or something was wrong, and he didn't want
7   to foot the bill.
8      Q     So this was -- you believe this was the
9   first time he came out?
10     A     I don't remember which time that was.
11     Q     Okay.  Let's try and see how much you can
12  remember.
13     A     It was the first or the second because
14  the third time he didn't offer any kind of an
15  invoice.  He just said you're going to have to pay
16  for these.  Actually may have been the third, I don't
17  know.
18     Q     This says replaced evaporator coil, 90
19  day labor warranty from installation, one year
20  warranty from date of installation.  Now, this
21  reflects that $880 was charged, right?
22     A     Yes.
23     Q     So if you needed to replace the coil
24  within a year of August 17th, 2011, then would you
25  have been paid for it -- sorry, would you have paid

Page 110

1   for it?
2      A     No, I did not, did not pay for it.
3      Q     So did he come -- so he came out within a
4   year.  Is that your memory of it being under
5   warranty?
6      A     Well, that was the year.  Did he come out
7   within a year of the first time it was replaced, yes.
8      Q     Yes.  And so that would have been under
9   warranty so he would not have charged you for that;
10  is that correct?
11     A     That is correct.  He did not charge me
12  the second time.
13     Q     Okay.  And so then did he replace it --
14  did he have to come out and replace it again?
15     A     Yes, he replaced it a third time, at
16  which point he demanded I pay for all three.
17     Q     So he replaced it three times?
18     A     Yes.
19     Q     Even though at least one of those times
20  was under warranty, he charged you retroactively for
21  the previous times under warranty?
22     A     Yes.  Yes.
23     Q     And was it $880 each time?
24     A     Yes.
25     Q     But you don't have the receipts for that?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 111..114

Page 111

1      A    No.
2      Q    Your recollection of three times for a
3  total of $2640, that's just based on your memory?
4      A    Yes, because I ended up going back to him
5  and paying him for all of those.  I could have
6  claimed warranty and said no, this is still under
7  warranty.  But I felt that the right thing to do was
8  to pay him for what he was owed since there was some
9  kind of a problem that we weren't seeing.  I didn't
10  feel it was right for him to eat it.
11      Q    Now, this was five years after the house
12  was inhabited by your mother.  So was -- I guess
13  there was no problem with the coils for the first
14  five years?
15      A    Well, there were -- there were problems
16  that were showing up, but that's -- but that's
17  when -- roughly around that five-year point, whether
18  that was the first one or whatever, that was when the
19  coils were replaced the first time.
20      Q    And then after five years of not
21  replacing the coils, then they had to be replaced two
22  more times in quick succession within a year or so?
23      A    Yes.
24      Q    And do you know if those coils still
25  work?  Are they still being used at all?

Page 112

1      A    The house has been sitting since my
2  mother moved out, so nothing's being used.  It's all
3  just sitting there.
4      Q    What year did she move out again?
5      A    I don't remember.  It's been quite a
6  while back.  I don't remember exactly when.
7      Q    Let's look real quick and figure out
8  where we are on the timeline.
9           (Whereupon, a discussion ensued off the
10           record.)
11  BY MS. EIKHOFF:
12      Q    It looks like the last time when I asked
13  you how much time there was between her moving in and
14  moving out, you said three or four years, five years,
15  something like that?
16      A    Yeah.
17      Q    Do you have any sharper recollection
18  today than you did then?
19      A    No, I don't.  It's still been quite a
20  long time ago.  Well, we know when she moved in.  It
21  was around April or so of 2007.  So it was probably
22  around 2012, maybe 2011 that she moved out.
23      Q    Right, because you would not have been
24  replacing the coils on air-conditioning if she
25  weren't living there; is that correct?

Page 113

1      A    Correct.
2      Q    And if this was the first time that had
3  happened, then she may have been there another year
4  or so?
5      A    Yes, but I think it happened pretty quick
6  in succession like you had mentioned before.  And as
7  soon as we figured out what was happening, then we
8  got her out of the house.
9      Q    Okay.  I want to turn to the next page.
10  It's actually going back a little bit.  It's the page
11  after the first chart we were looking at with the
12  refrigerator and microwave on it.
13      A    Okay.
14      Q    And that is the itemization of damaged
15  personal property.
16      A    Uh-huh.
17      Q    Matt is going to put it on the screen.
18  It starts with a queen size mattress set.
19      A    Okay.
20      Q    You have listed here a queen size
21  mattress set, a full size mattress set, a Bassett
22  sofa, a Bassett love seat, a Bassett chair and a Dell
23  desktop computer; is that correct?
24      A    That's correct.
25      Q    And why did you list those particular

Page 114

1  items on this sheet?
2      A    Those were personal items of hers that we
3  could not pull out of the house and still use because
4  as they got saturated with the fumes, they were not
5  usable anymore.  You can't wash the mattress or wash
6  the sofa and love seat and get that out of it.  So
7  those are actually all still there in the house.
8           The desktop computer was listed because
9  of the copper wiring and it made it unusable anymore.
10      Q    Okay.  Now, the prices that you -- the
11  values that you have put next to each of these items
12  were fairly recently pulled from Lowe's; is that
13  correct?
14      A    Yes.
15      Q    Lowes.com?
16      A    Lowe's or -- well, it's listed on
17  whatever page we pulled these things from, so yeah.
18      Q    And the printouts that I see that follow
19  in your production are printouts of searches that you
20  did in or around December --
21      A    Yes.
22      Q    -- for certain items; is that right?
23      A    That's correct.
24      Q    You don't have receipts from the actual
25  mattresses and sofas and chairs and computer that

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 115..118

Page 115

1  were in your -- the property; is that correct?
2      A    That's correct.
3      Q    Okay.  And did you know -- like for
4  example, for the queen size mattress set it looks
5  like this is a Serta iComfort 14 inch queen hybrid
6  mattress.  Do you know if that's the kind of mattress
7  she had or were you just approximating?
8      A    It was not the kind of mattress that she
9  had, but you can't get anything other than that in a
10  hybrid today.  So that was what was included.  Not
11  trying to run up the price, just something that was
12  midlevel that's similar to what she would have had.
13      Q    Okay.  And have you or your wife or
14  Patriot Homes made the purchases for these items that
15  were in your -- in the property that your mother
16  lived in?
17      A    Yes, those were purchased by my mother,
18  who has since passed away.
19      Q    Okay.  So she had purchased -- and let me
20  ask you this.  Were they purchased new to go into the
21  home or were they moved from wherever she was living
22  before she moved into the home?
23      A    Both.  Some of both.
24      Q    Okay.  Do you know if the mattress -- the
25  queen mattress was new?

Page 116

1      A    I think the mattress was not new.  The
2  sofa and love seat and chair were and the computer
3  was.
4      Q    Was new?
5      A    Uh-huh.
6      Q    But the full size mattress and the queen
7  size mattress were from her prior home?
8      A    Yeah, I believe they were.
9      Q    And just to be clear, whenever they were
10  bought, the mattresses, the sofas, the love seats,
11  the chairs and the computer were all purchased by
12  your mother?
13      A    Yes.
14      Q    Are all of those items still in the
15  property?
16      A    They are.
17      Q    Including the computer?
18      A    Yes.
19      Q    Then you've mentioned that you found a
20  lease and -- when you were looking through the files
21  after the first session of this deposition and I
22  believe we have a copy of that.  It is a lease
23  between Andy Carter and Ann Carter?
24      A    Yes.
25      Q    Are you Andy Carter?

Page 117

1      A    I am.
2      Q    I thought you were John Carter?
3      A    John Anderson Carter.
4      Q    Got it.  And the lease that we have a
5  copy of looks like it was signed by your mother Ann
6  on May 1st, 2007, and by -- is that by you on May
7  1st, 2007?
8      A    Yes.
9      Q    And it looks like it's just a one-year
10  lease.  Did you renew that lease with her each year?
11      A    No.  I was taking care of my mother at
12  that point, so there was no need to unless we at some
13  point needed to show the cash flow for bank credit
14  purposes.  We were doing something else, so there was
15  no need to.
16      Q    Okay.  And it looks like there's a
17  payment here, check's payable to Andy Carter.  It
18  calls for a $600 a month rent check.  Did she
19  continue to make those payments to you as long as she
20  lived in the house?
21      A    She did.  That was -- that was
22  essentially what -- that's what she could afford.  It
23  didn't cover costs by any stretch, but that's what we
24  had worked out, again, mainly so that the -- we're
25  covering the cost for the (inaudible).

Page 118

1      Q    Right.  Sure.  And my question is -- and
2  I just want to make sure that I've got a clear answer
3  on it, is that she did pay you $600 a month for the
4  full amount of time that she lived there?
5      A    For the four years, yeah.  Five, whatever
6  it is, yeah, she did.
7      Q    Okay.  And did that $600 amount rent ever
8  change?
9      A    No.
10      Q    Okay.  The next document in this new
11  packet that I have is a HUD settlement statement.
12  And there's -- actually looks like there's two.  So
13  I'm going to start with the first one that has a
14  settlement date of December 12, 2007.  Do you have
15  that document, Mr. Carter?
16      A    I do.
17      Q    What was this transaction?  What
18  transaction is this document reflecting?
19      A    I believe that is the purchase of the lot
20  before any improvement to build the house on.
21      Q    Well, it's talking about a payoff of the
22  first mortgage to Colonial Bank of $99,000?
23      A    I'm looking at the wrong one.  I'm sorry.
24      Q    Okay.  Look at the one right next to that
25  which has a settlement date of December 12th, 2007 on

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Pages 119..122

Page 119

1    the right-hand side.
2          A    Okay.  Got it.  Yes.
3          Q    What transaction is this document
4    reflecting?
5          A    That was the sale of the property from
6    Patriot Homes to my wife and I.
7          Q    And what was the amount of that sale?
8          A    Looks like it was the 101,934, is that...
9          Q    That money went to pay off the mortgage
10   at Colonial Bank?
11         A    Probably went to pay off the mortgage for
12   the lot.  The Colonial -- well, yeah, that was
13   Colonial as well.  So that went to pay off the
14   construction loan.
15         Q    The construction loan.  You got the
16   construction loan at Colonial Bank; is that right?
17         A    Yes.
18         Q    Okay.
19         A    So that would have been for the
20   construction loan which would have included -- I
21   guess would have included the lot and all
22   construction costs.  So we sold it for ourselves at
23   cost.
24         Q    I see.  And so the cost of the property
25   improved when you paid back your construction loan,

Page 120

1    the cost to build it, and for the land was
2    $101,934.38?  Does that sound right?
3          A    Yes.
4          Q    And then the other HUD settlement
5    statement that was produced has a date of December
6    22nd, 2006, and shows a contract sales price of
7    $23,000.  I think that's what you were looking at
8    before; is that right?
9          A    Yes, that's the purchase of the lot.
10         Q    Okay.  So the lot cost $23,000 and then
11   to build the house on it and to buy the improved
12   property was about $102,000; is that right?
13         A    I believe so.
14         Q    Okay.  And then the last document that
15   you -- at least it's the last page of the set that I
16   got, it looks like it's a floor plan of the property.
17   Do you see that?
18         A    I don't have it in front of me.  Yes,
19   that looks like a floor plan.
20         Q    Is that something you recently found or
21   do you think that was already in there?
22         A    I honestly don't know.  I think it was
23   already in there, but...
24         Q    Okay.  You don't recall recently finding
25   that floor plan when you were looking through the

Page 121

1    documents to supplement your production?
2          A    No, not that I remember.
3          Q    Okay.  Let me ask you one final question,
4    which is:  Are there any other documents related to
5    your damages that you have that you have not
6    provided --
7          A    Not that I'm aware of.
8          Q    -- to your attorney?
9          A    Not that I'm aware of.
10         MS. EIKHOFF:  Okay.  Why don't we take
11   a quick break?  I think we're done, but let
12   me just check my notes and make sure.
13   Okay?  Off the record.
14         (Whereupon, a brief recess was taken.)
15         MS. EIKHOFF:  Okay.  We're back.  I
16   have no further questions.  Dan, do you
17   have any questions?  Mr. Guerra?
18         MR. GUERRA:  I do have one question,
19   Mr. Carter.
20                  EXAMINATION
21   BY MR. GUERRA:
22         Q    Thank you for joining us.  To your
23   knowledge was your mom ever a plaintiff in this
24   lawsuit?
25         A    No, she was not.

Page 122

1          MR. GUERRA:  I have no further
2    questions.
3          THE COURT REPORTER:  Mr. Guerra, do
4    you need a copy?
5          MR. GUERRA:  Yes, E-tran.  We need a
6    copy of both depositions.
7          MR. DOYLE:  We'll waive signature and
8    E-tran is fine for both.
9                  - - -
10   (Deposition concluded at 4:45 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Page 123

Page 123

```
 1            C E R T I F I C A T E
 2    STATE OF GEORGIA:
 3    COUNTY OF COBB:
 4
 5        I hereby certify that the foregoing
 6    transcript was taken down as stated in the
 7    caption and the questions and answers thereto
 8    were reduced to typewriting under my direction,
 9    that the foregoing pages 90 through 122 represent
10    a true, complete and correct transcript of the
11    evidence given upon said hearing, and I further
12    certify that I'm not of kin or counsel to the
13    parties in the case; am not in the regular employ
14    of counsel of any of said parties; nor am I in
15    anywise interested in the result of said case.
16        This 30th day of January 2021.
17
18                 Lynne C. Fulwood
19
20                 LYNNE C. FULWOOD,
                   Certified Court Reporter
21                 State of Georgia
                   License No. B-1075
22
23
24
25
```

---

**Exhibits**

---

**CarterJ 10**
94:2
99:12,25
101:5
102:12

**CarterJ 12**
94:5 99:25
100:8
102:12

---

**$**

---

**$101,934.38**
120:2

**$102,000**
120:12

**$23,000**
120:7,10

**$2640**  111:3

**$275,000**
101:6,25

**$337,500**
101:6
102:1

**$5,337**
104:21

**$600**  117:18
118:3,7

**$8,714**
104:20

**$880**  107:4
109:21

110:23

**$99,000**
118:22

---

**1**

---

**10**  99:12,
19,25
101:5
102:12

**101,934**
119:8

**11**  107:16

**11th**  95:12
99:7

**12**  99:19,25
100:8
102:12
118:14

**12th**  118:25

**14**  104:4
115:5

**16th**  98:20
99:4

**17**  107:16,
25

**17th**  108:13
109:24

**1st**  100:8,
15 117:6,7

---

**2**

---

**2006**  100:8

120:6

**2007**  100:9,
15 112:21
117:6,7
118:14,25

**2011**  107:25
108:13
109:24
112:22

**2012**  112:22

**2017**  108:10

**2018**  99:12

**2020**  95:13
98:21

**22nd**  120:6

---

**4**

---

**4:45**  122:10

---

**8**

---

**8th**  99:12

---

**9**

---

**90**  109:18

---

**A**

---

**actual**
103:11
114:24

**added**  102:5

**additional**

96:10

**affected**
104:22

**afford**
117:22

**agreement**
96:19,23
100:14
108:19

**ahead**  96:7
102:22

**air**  107:10
108:21

**air-
conditioner**
107:4

**air-
conditioning**
112:24

**Alabama**  98:1

**amended**
98:7,18

**amount**  101:4
102:16
118:4,7
119:7

**amounts**
104:24
105:9,11

**and/or**  101:3

**Anderson**
117:3

**Andy**  107:9

116:23,25
117:17

**Ann**   116:23
117:5

**anymore**
114:5,9

**appearances**
95:18

**appliances**
105:16,17,
23 106:10,
14,17

**approximately**
104:20,21
108:4

**approximating**
115:7

**April**   112:21

**articulated**
102:16

**assigned**
97:25

**Association**
98:1

**attorney**
97:13,17,
21,22,23
98:1,4
102:3,8
121:8

**August**
107:16,21,
25 108:13
109:24

**authorized**
95:5

**aware**   121:7,
9

---
### B

**back**   96:9,
13 100:12
103:6,19
111:4
112:6
113:10
119:25
121:15

**bank**   117:13
118:22
119:10,16

**based**   102:4
111:3

**Bassett**
113:21,22

**behalf**
95:20,22,
25 106:25

**Beijing**
96:1,2

**biggest**
101:14

**bill**   109:7

**billed**
107:16

**bit**   113:10

**blank**

102:13,14,
15

**bottom**
104:18

**bought**
100:14
116:10

**brand**   105:18

**break**   121:11

**brought**
97:23

**build**   118:20
120:1,11

**building**
96:1,2,4,
10,14
97:10,12

**built**   108:5

**business**
97:12

**buy**   106:2,
17 120:11

---
### C

**calculate**
102:19,21

**calculated**
104:19

**called**
106:14

**calls**   117:18

**care**   117:11

**Carter**   95:6,
12,13 96:8
98:10
104:6
116:23,25
117:2,3,17
118:15
121:19

**cash**   117:13

**chair**   113:22
116:2

**chairs**
114:25
116:11

**change**
100:3,9,
20,25
101:9
102:11
118:8

**changed**
100:22

**charge**
110:11

**charged**
109:21
110:9,20

**chart**   113:11

**charts**   105:2

**check**   117:18
121:12

**check's**
117:17

China   96:3

Chinese   97:2
  100:6
  101:4

Christy
  95:14

claim   95:16

claimed
  111:6

clarified
  96:20

clarify
  107:23

clear   116:9
  118:2

coil   108:2
  109:18,23

coils   107:4
  111:13,19,
  21,24
  112:24

Colonial
  118:22
  119:10,12,
  13,16

commenced
  95:12

Company
  96:2,4

comprehensive
  104:19

computer
  113:23

114:8,25
116:2,11,
17

concluded
  122:10

confirm
  102:15

connected
  103:19

construction
  119:14,15,
  16,20,22,
  25

continuation
  95:11

continue
  117:19

contract
  120:6

copper   114:9

copy   104:1
  116:22
  117:5
  122:4,6

corner
  107:15

Corporation
  96:3

correct
  101:7
  104:15
  110:10,11
  112:25
  113:1,23,

24 114:13,
23 115:1,2

cost
  101:11,21
  106:2
  117:25
  119:23,24
  120:1,10

costs
  101:12,16
  117:23
  119:22

counsel
  95:3,19

couple   105:2

court   95:4
  99:21
  122:3

cover   117:23

covering
  117:25

credit
  117:13

———————————
———————————
          D
———————————

damage
  104:20,21

damaged
  113:14

damages
  121:5

Dan   95:25
  121:16

date   98:20,
  24 100:8
  107:18,19,
  22 109:20
  118:14,25
  120:5

dates   96:20

day   109:19

December
  95:12
  98:20 99:6
  100:14
  114:20
  118:14,25
  120:5

defendant
  95:15

defended
  97:14

Dell   113:22

demanded
  110:16

deposed   95:7

deposition
  95:11,14
  98:9 99:6,
  7,13
  105:21
  116:21
  122:10

depositions
  122:6

Depot   106:14

desktop
 113:23
 114:8

differences
 99:24

diminution
 102:13,16

discussion
 96:9
 108:25
 112:9

document
 98:9
 108:17
 118:10,15,
 18 119:3
 120:14

documentation
 96:10 97:2

documents
 107:7
 121:1,4

Doyle  95:20
 103:2,16,
 21 122:7

drywall
 97:3,4
 100:6,17
 101:4

due  101:12

duly  95:7

_____

E

_____

E-TRAN

122:5,8

eat  111:10

Eikhoff
 95:10,14,
 17 96:6
 99:22
 103:4,12,
 22 104:1,5
 107:12,14
 112:11
 121:10,15

empty  100:13

encounter
 102:24

ended  111:4

enjoyment
 101:3,20,
 25 102:25
 103:15,24

ensued  112:9

essentially
 117:22

estimate
 101:13

estimated
 100:17

evaporator
 108:2
 109:18

EXAMINATION
 95:9
 121:20

examined

95:8

executed
 99:11

exhibit  98:7
 99:12,19,
 25 100:8
 101:5
 102:12,24
 103:4,10
 104:2

experienced
 101:2

_____

F

_____

fact  96:13

fairly
 114:12

February
 100:18

feel  111:10

felt  111:7

figure  112:7

figured
 113:7

file  108:18

files  96:10,
 14,15
 116:20

final  121:3

find  97:5
 98:2
 105:24

108:17

finding
 120:24

fine  122:8

finished
 96:20
 108:5

finishing
 100:17

firm  98:4

five-year
 111:17

fixing
 101:11

flip  100:21
 102:23

floor
 120:16,19,
 25

flow  117:13

follow
 114:18

foot  109:7

form  98:8,
 19 101:19

forward
 96:18

found  96:16,
 23 116:19
 120:20

Frank  103:5

Frigidaire

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 63 of 69

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter- Vol. 2 on 01/26/2021                    Index: front..items

105:6,10,
11,18

**front**  98:24
104:11
120:18

**full**  113:21
116:6
118:4

**fumes**  114:4

---

### G

**give**  102:5

**Group**  96:3

**Guerra**  95:25
121:17,18,
21 122:1,
3,5

**guess**  109:5
111:12
119:21

**Gypsum**
95:15,23

---

### H

**handwritten**
104:11

**Hang**  103:16

**happened**
113:3,5

**happening**
113:7

**heating**

107:9
108:20

**helps**  98:2

**higher**
101:13

**hold**  103:13

**home**  97:12
101:12
104:20
106:13
115:21,22
116:7

**Homebuilders**
98:1

**Homes**  97:12,
14 106:19,
21,25
115:14
119:6

**honestly**
97:17
120:22

**house**  96:11,
20 97:10
100:16
101:17
102:20
105:12,13,
16 106:11,
18 108:5,
15 111:11
112:1
113:8
114:3,7
117:20

118:20
120:11

**HUD**  118:11
120:4

**hybrid**
115:5,10

---

### I

**icomfort**
115:5

**identification**
99:20

**identifies**
103:9

**identify**
101:4

**improved**
119:25
120:11

**improvement**
118:20

**inaudible**
117:25

**inch**  115:5

**include**
101:16

**included**
104:14
115:10
119:20,21

**Including**
116:17

**increase**
101:10,11

**inhabited**
111:12

**installation**
109:2,19,
20

**installed**
100:6,18

**insurance**
98:2

**Internet**
105:15
106:6

**invoice**
107:9
109:15

**invoices**
97:1
108:21

**involvement**
97:11

**item**  107:3

**itemization**
113:14

**itemize**
101:21

**itemized**
104:24

**items**  101:22
105:12,14
106:2
114:1,2,

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 64 of 69

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Index: Jimmy..money

11,22
115:14
116:14

---

### J

Jimmy  95:20
 103:5

John  95:6,
 12  117:2,3

joining
 121:22

---

### K

kind  109:14
 111:9
 115:6,8

knowledge
 100:7
 121:23

---

### L

labor  101:12
 109:19

land  120:1

Lawson  95:22
 103:19,25
 104:3

lawsuit
 121:24

lease  96:19,
 23  100:14
 116:20,22
 117:4,10

Limited
 96:2,5

lines  101:20

list  113:25

listed  105:9
 113:20
 114:8,16

litigation
 97:14

lived  115:16
 117:20
 118:4

living
 112:25
 115:21

LLC  107:10

loan
 119:14,15,
 16,20,25

long  108:11
 112:20
 117:19

longer  96:15

looked  96:13
 105:14
 106:7

loss  101:2,
 3,5,19,25
 102:25
 103:15,23

lost  103:5

lot  97:9
 100:13

106:12
118:19
119:12,21
120:9,10

love  113:22
 114:6
 116:2,10

Lowe's
 106:7,9,13
 114:12,16

Lowes.com
 114:15

---

### M

made  95:16
 99:12
 106:24
 107:1
 114:9
 115:14

make  95:17
 100:9
 101:9
 117:19
 118:2
 121:12

March  99:12
 100:18

mark  98:6

marked  99:20

material
 101:12

Materials
 96:1,3,4

Matt  95:22
 103:5,21
 105:6
 107:12
 113:17

mattress
 113:18,21
 114:5
 115:4,6,8,
 24,25
 116:1,6,7

mattresses
 114:25
 116:10

memory  110:4
 111:3

mentioned
 113:6
 116:19

met  96:8

microwave
 105:10,18
 113:12

middle  100:5
 101:1

midlevel
 115:12

mind  97:24

missing
 103:8

model  105:15

mom  121:23

money  119:9

month   117:18
   118:3

mortgage
   118:22
   119:9,11

mother   96:19
   100:15
   108:14
   111:12
   112:2
   115:15,17
   116:12
   117:5,11

move   102:22
   112:4

move-in
   100:19

moved   96:21
   108:11,14
   112:2,20,
   22  115:21,
   22

moving
   112:13,14

_____

N

National
   96:4

needed   98:13
   109:23
   117:13

newer   99:25

Nos   99:19

notes   121:12

nothing's
   112:2

notice   100:3

numbered
   102:23

numbers
   98:15
   101:16
   102:4

_____

O

Oasis   107:9
   108:25

offer   109:14

offline
   102:2

one-year
   117:9

options
   106:12

orient
   101:18

original
   106:10

owed   111:8

_____

P

p.m.   122:10

packet   107:7
   118:11

pages   102:23
   104:25

paid   105:11
   109:25
   119:25

paperwork
   97:17

paragraph
   103:1
   104:13

parentheses
   107:5

part   101:14

parties   95:3

passed
   115:18

Patriot
   97:11,14
   106:19,21,
   25  115:14
   119:6

pay   109:4,
   15  110:2,
   16  111:8
   118:3
   119:9,11,
   13

payable
   117:17

paying   111:5

payment
   117:17

payments

117:19

payoff
   118:21

personal
   101:22
   104:19
   113:15
   114:2

personally
   106:17

place   106:14

plaintiff
   95:21
   98:8,18
   121:23

plan
   120:16,19,
   25

Plasterboard
   95:24

point   97:9
   110:16
   111:17
   117:12,13

portion
   104:11

pretty   113:5

previous
   101:5
   104:14
   110:21

previously
   99:10,20

Case 2:09-md-02047-EEF-MBN   Document 23300-13   Filed 03/23/22   Page 66 of 69

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021              Index: price..remediate

price  115:11
  120:6

prices  106:4
  114:10

printouts
  106:7
  114:18,19

prior  99:11
  100:7
  116:7

problem
  103:25
  111:9,13

problems
  111:15

produced
  107:8
  120:5

production
  114:19
  121:1

profile
  98:8,19

property
  97:4
  100:6,13
  101:3
  104:19,22
  113:15
  115:1,15
  116:15
  119:5,24
  120:12,16

provided

121:6

Public  96:1

pull
  103:17,22
  114:3

pulled
  114:12,17

purchase
  97:2,3
  105:22
  118:19
  120:9

purchased
  104:22
  106:11
  115:17,19,
  20  116:11

purchases
  106:24
  115:14

purchasing
  97:5

purposes
  117:14

put  98:12
  101:13
  102:4
  103:2,6
  106:4
  107:12
  113:17
  114:11

putting
  98:14

99:15

_____

Q

_____

quantification
  101:24

queen
  113:18,20
  115:4,5,25
  116:6

question
  100:4
  101:2
  102:8,13
  118:1
  121:3,18

questions
  99:14
  121:16,17
  122:2

quick  111:22
  112:7
  113:5
  121:11

_____

R

_____

read  107:24

real  112:7

recall  96:22
  120:24

receipts
  97:1
  108:21
  110:25
  114:24

received
  98:8

recently
  114:12
  120:20,24

recess
  121:14

recollection
  111:2
  112:17

record  95:18
  112:10
  121:13

records
  97:5,10,13
  105:22

recover
  102:16

refer  98:15,
  19

reflecting
  118:18
  119:4

reflects
  101:10
  109:21

refrigerator
  105:6,10,
  17  113:12

related
  97:2,10
  121:4

remediate
  102:20

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021      Index: remediation..sofas

remediation
  101:21

remember
  95:13
  96:11
  97:15,16,
  18,21
  98:3,4
  99:13
  102:10
  109:10,12
  112:5,6
  121:2

remotely
  95:5

renew  117:10

rent  117:18
  118:7

rental
  108:19

repair
  101:22
  104:20

replace
  108:25
  109:3,23
  110:13,14

replaced
  108:2
  109:18
  110:7,15,
  17  111:19,
  21

replacement
  101:16,22

105:15
107:4

replacing
  111:21
  112:24

reporter
  95:4  99:21
  122:3

represent
  95:15

response
  100:4

result  101:3

retroactively
  110:20

Rex  106:14

right-hand
  107:15
  119:1

roughly
  111:17

run  115:11

─────────

S

─────────

sale  119:5,
  7

sales  120:6

saturated
  114:4

screen
  98:12,14
  99:16

103:3,7,14
104:4
105:7
107:13,16
113:17

searches
  114:19

seat  113:22
  114:6
  116:2

seats  116:10

section
  102:24
  103:15,23

selections
  106:24
  107:1

sell  102:20

sentence
  104:18

September
  100:8

Serta  115:5

session
  116:21

set  113:18,
  21  115:4
  120:15

settlement
  100:12
  118:11,14,
  25  120:4

share

103:18,20
104:4

sharper
  112:17

sheet  114:1

show  117:13

showing
  111:16

shows  98:20
  100:8
  120:6

side  119:1

sign  99:4

signature
  98:20,24
  99:2  122:7

signed  117:5

similar
  115:12

sit  97:22

sitting
  112:1,3

size
  113:18,20,
  21  115:4
  116:6,7

small  106:13

sofa  113:22
  114:6
  116:2

sofas  114:25
  116:10

sold   119:22

sound   120:2

Sounds   108:9

specific
  102:5

specifically
  96:25

spoke   96:14

SPPF   98:20
  99:11,14,
  24,25
  100:7
  101:5
  104:14

start   118:13

started   96:7
  100:15

starts   105:5
  113:18

statement
  100:12
  118:11
  120:5

stipulates
  95:4

stop   102:23

stove
  105:11,18

stretch
  117:23

subsequent
  104:25

substantial
  101:11

succession
  111:22
  113:6

supplement
  121:1

supplemental
  98:7,18

swear   95:5

sworn   95:7

          T

Taian   95:23

Taishan
  95:15,23

taking
  117:11

talk   102:3,
  7

talked   97:8,
  19

talking
  96:11
  102:3,6
  118:21

talks   109:2

terms   96:18

thing   97:8
  102:11
  111:7

things

100:16
101:17
102:4
114:17

thought
  97:20
  117:2

time   95:14
  96:8,25
  97:9 99:16
  109:1,3,9,
  10,14
  110:7,12,
  15,23
  111:19
  112:12,13,
  20 113:2
  118:4

timeline
  112:8

times   108:24
  110:17,19,
  21 111:2,
  22

title   103:9

today   97:23
  99:23
  112:18
  115:10

total   101:4
  111:3

town
  106:13,15

transaction
  118:17,18

119:3

turn   113:9

turned
  97:13,16,
  20

          U

Uh-huh
  113:16
  116:5

unusable
  114:9

upper   107:15

usable   114:5

          V

values
  114:11

version
  99:11
  101:6
  104:14

          W

waive   122:7

warranty
  109:2,19,
  20 110:5,
  9,20,21
  111:6,7

wash   114:5

ways   107:24

**week**  99:7

**wife**
  106:20,23
  115:13
  119:6

**wiring**  114:9

**wondering**
  97:22

**words**  104:8

**work**  106:21
  111:25

**worked**
  117:24

**wrong**  109:6
  118:23

**wrote**  99:10

─────────────
        **Y**
─────────────

**year**  107:22
  109:19,24
  110:4,6,7
  111:22
  112:4
  113:3
  117:10

**years**  97:15
  108:5,14
  111:11,14,
  20 112:14
  118:5