# EXHIBIT A

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

| For Internal Use Only |
|---|
| File No. _____ |
| **Date Received:** |
| _____ |

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re:  Chinese Manufactured Drywall
Products Liability Litigation

This Document Relates to:

MDL NO. 2047
SECTION:  L
JUDGE FALLON
MAG. JUDGE WILKINSON

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1672 (S.D. Fl.);
*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1395 (E.D. La.); and
*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1673 (E.D. Va.).

This Supplemental Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation against the manufacturer of Chinese Drywall, other than the Knauf Defendants, using one form per Property. In completing this Supplemental Profile Form, you are under oath and must provide all information within your knowledge, custody and control that is true and correct to the best of your knowledge.  If you have already submitted a Plaintiff Profile Form, this Supplemental Plaintiff Profile Form will be in addition to and supplement the prior Profile Form submitted.  You have an affirmative obligation to search for all documents, electronically stored information, and tangible things responsive to this questionnaire.  You may and should consult with your attorney if you have any questions regarding completion of this form. If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The responses contained within this Supplemental Plaintiff Profile Form are made without waiving any rights or objections as to relevance or privilege and are made without any abrogation of legal defenses, including those of the Collateral Source Doctrine.

The questions and requests for production contained within this Supplemental Profile Form are non-objectionable and shall be answered without objection. By answering this Supplemental Profile Form, you are not waiving the attorney work product and/or attorney client privileges. Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts if provided for by applicable law, and are subject to all protections afforded by law.  Failure to fully complete this Supplemental Profile Form and provide the appropriate documents may result in a motion filed against you pursuant to Rule 37 of the Federal Rules of Civil Procedure, which could include a request for dismissal of the action in whole or in part.

All photographs produced in response to this form shall be in color.

### Section I. Claimant and Property Information

Name of Claimant:

| Gene | R | Gibbs | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |
| Darla | D | Gibbs | |
| Co-Claimant First Name (if applicable) | M.I. | Last Name | Suffix |
| | | | |
| Business/Entity Name (if applicable) | | | |

1

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Address of Property in this Lawsuit ("Property"):

701 Waverly Place
Address 1                                                    Address 2

Opelika                              AL          36801
City                                 State       Zip Code

Is the Property residential or commercial?  Residential

Name of Person
Completing this Form:   Darla            D     Gibbs
                        First Name       M.I.  Last Name                    Suffix

Mailing Address (if different):

Address 1                                                    Address 2

City                                 State       Zip Code

Phone Number of Person Completing This Form: ( 334 ) 750 - 9689

***Section II. Purchase, Sale and/or Transfer of Ownership of a Property and Assignments of Claims***

When did you acquire the Property? Month/Day/Year: 6 / 1 / 2007

When was Chinese drywall installed in the Property (to the best of your knowledge)?

Month/Day/Year: 3 / 1 / 2007

When you acquired the Property, were you aware that it contained Chinese drywall?  ☐ Yes  ☑ No

If you were not aware, at the time you acquired the Property, that the Property contained Chinese drywall, when did you first become aware that the Property contained Chinese drywall?

Month/Year: 11 / 2011

If you believe Chinese drywall was installed after you acquired the Property, when and how did you first become aware that the Property contained Chinese drywall?

We were contacted by the builder, Patriot Homes, LLC, in approximately October 2011, to make us aware that the home might have been built using defective Chinese-manufactured drywall.

If you acquired the Property knowing that the Property contained Chinese drywall, have you expressly acquired an assignment or other personal right of action that allows you to pursue a claim for damages?  ☐ Yes  ☐ No

If Yes, attach a copy of the document assigning any right or claim to you.

If Yes, did you acquire the assignment with the purchase of the Property or at some later time?

Have you sold or transferred ownership of the Property since you acquired it?  ☐ Yes  ☑ No

If No, go to Section III.

If Yes, on what date did you sell or transfer ownership of the Property?

Month/Day/Year: _____ / _____ / _____

2

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

If you have sold or transferred ownership of the Property, did you at the time of sale assign to anyone any right of action for damages relating to the Property?   ☐ Yes   ☐ No

If you have sold or transferred ownership of the Property, did you expressly retain a personal right of action to allow you to pursue damages?   ☐ Yes   ☐ No

If you answered Yes to either of the two prior questions, attach a copy of any documents relating to your sale or transfer of ownership of the Property and to the assignment of a right of action for damages.

### Section III.  Product Identification and Evidence Retention

Did you provide evidence of Chinese drywall in the Property to the Plaintiffs' Steering Committee to be placed in the PSC FileCloud Database?   ☑ Yes   ☐ No

If Yes, do you have any additional evidence of Chinese drywall in the Property that you have not provided to the Plaintiffs' Steering Committee?   ☐ Yes   ☑ No

If No, go to Section IV.  If Yes, **attach** all additional evidence of Chinese drywall in the Property that you have not already provided to the Plaintiffs' Steering Committee.

### Section IV. Bankruptcy, Foreclosure or Short Sale

Do you contend that you entered personal bankruptcy as a result of damage to your Property from defective Chinese Drywall?   ☐ Yes   ☑ No

If Yes, answer the following questions:

If you entered personal bankruptcy, identify the case number and docket information of the filing.

Court filed in: _____

Date of filing: _____/_____/_____
                Month    Day      Year

Docket No.: _____

Present Status: _____

Attach your bankruptcy petition and documents filed therewith, including (1) the schedule of assets and liabilities; (2) the schedule of income and expenditures; (3) the statement of financial affairs; (4) the schedule of executory contracts and unexpired leases; (5) the list of creditors and amount and nature of claims; (6) the source, amount, and frequency of the debtor's income; (7) the list of all the debtor's property; and (8) the detailed list of the debtor's monthly living expenses.

Do you contend that a foreclosure or short sale occurred as a result of damage to your Property from defective Chinese Drywall?   ☐ Yes   ☐ No

If Yes, answer the following questions:

If the Property was the subject of a foreclosure or short sale, identify the following:

Foreclosure or Short Sale?                _____

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Lender's name: _____

Loan Number: _____

Original Loan/Mortgage Amount: $_____

Date of Original Loan/Mortgage: _____/_____/_____
                                 Month   Day    Year

At the Date of Foreclosure or Short Sale, the amount owed on the Loan/Mortgage: $_____

Date of Foreclosure or Short Sale: _____/_____/_____
                                 Month   Day    Year

Short Sale Price (if applicable): $_____

Attach all loan/mortgage documentation and documentation pertaining to the acquisition of the property.

Attach all documents relating to any foreclosure or short sale, including but not limited to any financial statements provided to the lender, a seller's hardship letter, tax returns, W-2 forms, payroll stubs, and bank statements provided to the lender, and comparative market analyses of comparable sales provided to the lender.

### Section V. Already Remediated Property

Has the Property been partially or completely remediated? No _____

If completely or partially remediated, answer the following questions.  If No, go to Section VI.

Please identify the dates during which the remediation took place:

_____

Please identify who performed the work to remediate the property (for example: self, name of contractor, name of remediation service): _____

If the Property has been partially remediated, identify the rooms of the Property that were remediated, the current condition and status of the remediation and the amount of work remaining to be remediated:

Attach any documents supporting any work that you or others performed for remediation of the Property.

If the Property has been partially or completely remediated, what was the total cost to date for the remediation of the Property?

$_____

Attach all invoices and documents to support the total cost of remediation to date.

4

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Attach all invoices, purchase receipts and documents supporting the total cost or value of any appliances, fixtures or other electronics that you claim were damaged by Chinese drywall.

Attach all invoices, purchase receipts and documents supporting the total cost or value of any other movables (property or possessions, not including land or buildings) that you claim were damaged by Chinese drywall.

If the Property has been completely remediated, what was the date the remediation was completed? Month/Year: _____/_____

Have you preserved at least two samples (of ten inches by ten inches (10" x 10") in size if possible) of every different drywall brand or marking removed from the Property? ☐ Yes ☐ No

If you have preserved samples, where are the samples located?

_____

Have you preserved at least one sample of each type of drywall endtape, if any, that was found during inspection, repair or removal of drywall in or from the Property? ☐ Yes ☐ No

If you have preserved samples, where are the samples located?

_____

Have you photographed the backside of each Chinese-manufactured drywall board removed from the Property immediately after it was removed, and have you documented on a floor plan or other similar diagram the location of each full or partial Chinese-manufactured drywall board and its photograph?
☐ Yes ☐ No

If you have photographed and documented each Chinese-manufactured board, please attach the photograph(s) and floor plan.

Have you photographed the HVAC coil, at least one (1) plumbing component and three (3) electrical components that you allege were damaged by Chinese drywall? ☐ Yes ☐ No

If you have photographed these materials, please attach the photographs.

Have you photographed any other building materials, components, or other personal property for which you intend to seek recovery? ☐ Yes ☐ No

If you have photographed these materials, please attach the photographs.

**Section VI. Prior Payments**

Have you received any payments, including but not limited to settlement payments, payments from homebuilders, and insurance payments, related to damages you claim to have suffered caused by defective Chinese drywall in the Property or related to any other harm caused by defective Chinese drywall? ☑ Yes ☐ No

If Yes, identify the source(s) and state the amount of payment(s) you received?

Source: CDW Settlement Program

Amount of payments received: $ 4,998.93

5

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Source: GBI Holdback Payment

Amount of payments received: $ 313.02

Source: _____

Amount of payments received: $ _____

If you received payments from the Knauf settlement, state the percentage of the Chinese Drywall that was identified as "KPT Chinese Drywall" as described in section 1.27 of the Knauf Settlement Agreement: _____%

Attach documents reflecting the total amount you received from the source(s).

### Section VII. Other Damages

If you incurred alternative living expenses as a result of Chinese Drywall, identify the total moving cost and/or alternative living expense you incurred.

$_____

Attach all receipts and documents supporting the total moving cost and/or alternative living expense you incurred.

If you experienced any loss of use and/or loss of enjoyment of the Property as a result of Chinese Drywall, identify the total amount of such loss.

$ 337,500.00

Attach all documentation to support the total amount claimed for the loss.

If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

$_____

Attach all documentation to support the total amount claimed for diminution of value, including documents showing that the Property's previous value.

### Section VIII. "Under Air" Square Footage

Has the under air square footage of the Property changed at any time since installation of the Chinese drywall?  ☐ Yes  ☑ No

If the square footage has changed, please identify the date(s) and change(s) to under air square footage, and attach all documentation that relates to each change:

Date: _____

Change: _____

Date: _____

Change: _____

Supplemental Plaintiff Profile Form – Residential and Commercial Properties

Date: _____

Change: _____

**Section IX. Verification of Supplemental Plaintiff Profile Form**

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that I am the claimant identified in this Supplemental Plaintiff Profile Form and that all information provided in this Supplemental Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

I further declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information previously provided by me in my original Plaintiff Profile Form continues to be true and correct and has been updated to the best of my knowledge.

_____          12/22/2020
Claimant's signature                                    Date signed

Name:        Gene R. Gibbs

Address:     701 Waverly Place
             Address 1                      Address 2
             Opelika              AL        36801
             City                 State     Zip Code

Phone No.: ( 334 )  750 - 9689

Email:       grgusmc@myops.net


_____          12/22/2020
Claimant's signature                                    Date signed

Name:        Darla D. Gibbs

Address:     701 Waverly Place
             Address 1                      Address 2
             Opelika              AL        36801
             City                 State     Zip Code

Phone No.: ( 334 )  750 - 9689

Email:       grgusmc@myops.net

7

# EXHIBIT B

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

| For Internal Use Only |
| --- |
| File No. _____ |
| |
| **Date Received:** |
| _____ |

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re:  Chinese Manufactured Drywall
Products Liability Litigation

This Document Relates to:

MDL NO. 2047
SECTION:  L
JUDGE FALLON
MAG. JUDGE WILKINSON

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1672 (S.D. Fl.);
*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1395 (E.D. La.); and
*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1673 (E.D. Va.).

This Supplemental Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation against the manufacturer of Chinese Drywall, other than the Knauf Defendants, using one form per Property. In completing this Supplemental Profile Form, you are under oath and must provide all information within your knowledge, custody and control that is true and correct to the best of your knowledge.  If you have already submitted a Plaintiff Profile Form, this Supplemental Plaintiff Profile Form will be in addition to and supplement the prior Profile Form submitted.  You have an affirmative obligation to search for all documents, electronically stored information, and tangible things responsive to this questionnaire.  You may and should consult with your attorney if you have any questions regarding completion of this form. If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The responses contained within this Supplemental Plaintiff Profile Form are made without waiving any rights or objections as to relevance or privilege and are made without any abrogation of legal defenses, including those of the Collateral Source Doctrine.

The questions and requests for production contained within this Supplemental Profile Form are non-objectionable and shall be answered without objection. By answering this Supplemental Profile Form, you are not waiving the attorney work product and/or attorney client privileges. Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts if provided for by applicable law, and are subject to all protections afforded by law.  Failure to fully complete this Supplemental Profile Form and provide the appropriate documents may result in a motion filed against you pursuant to Rule 37 of the Federal Rules of Civil Procedure, which could include a request for dismissal of the action in whole or in part.

All photographs produced in response to this form shall be in color.

### Section I. Claimant and Property Information

Name of Claimant: John                          A      Carter
                  First Name                   M.I.   Last Name                        Suffix

                  Co-Claimant First Name (if applicable)   M.I.   Last Name                        Suffix

                  Business/Entity Name (if applicable)

1

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Address of Property in this Lawsuit ("Property"):

703 Waverly Place
Address 1

| Opelika | AL | 36801 |
|---|---|---|
| City | State | Zip Code |
| | | Address 2 |

Is the Property residential or commercial?  Residential

Name of Person
Completing this Form:

| John | A | Carter | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

Mailing Address (if different):

1590 Crescent Boulevard
Address 1

| Auburn | AL | 36830 |
|---|---|---|
| City | State | Zip Code |
| | | Address 2 |

Phone Number of Person Completing This Form: ( 334 ) 319 - 6473

*Section II. Purchase, Sale and/or Transfer of Ownership of a Property and Assignments of Claims*

When did you acquire the Property? Month/Day/Year:  12 / 22 / 2006

When was Chinese drywall installed in the Property (to the best of your knowledge)?
Month/Day/Year: _____/_____/ 2007

When you acquired the Property, were you aware that it contained Chinese drywall? ☐ Yes ☑ No

If you were not aware, at the time you acquired the Property, that the Property contained Chinese drywall, when did you first become aware that the Property contained Chinese drywall?
Month/Year: 11 / 2011

If you believe Chinese drywall was installed after you acquired the Property, when and how did you first become aware that the Property contained Chinese drywall?

Defective Chinese-manufactured drywall was found by Doyle Law Firm, PC and the markings were confirmed by me personally after an inspection of the attic area over the living space of the home. +

If you acquired the Property knowing that the Property contained Chinese drywall, have you expressly acquired an assignment or other personal right of action that allows you to pursue a claim for damages? ☐ Yes ☐ No

If Yes, attach a copy of the document assigning any right or claim to you.

If Yes, did you acquire the assignment with the purchase of the Property or at some later time?

_____

Have you sold or transferred ownership of the Property since you acquired it? ☐ Yes ☑ No

If No, go to Section III.

If Yes, on what date did you sell or transfer ownership of the Property?

Month/Day/Year: _____/_____/_____

2

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

If you have sold or transferred ownership of the Property, did you at the time of sale assign to anyone any right of action for damages relating to the Property? ☐ Yes ☐ No

If you have sold or transferred ownership of the Property, did you expressly retain a personal right of action to allow you to pursue damages? ☐ Yes ☐ No

If you answered Yes to either of the two prior questions, attach a copy of any documents relating to your sale or transfer of ownership of the Property and to the assignment of a right of action for damages.

### Section III.  Product Identification and Evidence Retention

Did you provide evidence of Chinese drywall in the Property to the Plaintiffs' Steering Committee to be placed in the PSC FileCloud Database? ☑ Yes ☐ No

If Yes, do you have any additional evidence of Chinese drywall in the Property that you have not provided to the Plaintiffs' Steering Committee? ☐ Yes ☑ No

If No, go to Section IV.  If Yes, **attach** all additional evidence of Chinese drywall in the Property that you have not already provided to the Plaintiffs' Steering Committee.

### Section IV. Bankruptcy, Foreclosure or Short Sale

Do you contend that you entered personal bankruptcy as a result of damage to your Property from defective Chinese Drywall? ☐ Yes ☑ No

If Yes, answer the following questions:

If you entered personal bankruptcy, identify the case number and docket information of the filing.

Court filed in: _____

Date of filing: _____/_____/_____
                     Month     Day     Year

Docket No.: _____

Present Status: _____

Attach your bankruptcy petition and documents filed therewith, including (1) the schedule of assets and liabilities; (2) the schedule of income and expenditures; (3) the statement of financial affairs; (4) the schedule of executory contracts and unexpired leases; (5) the list of creditors and amount and nature of claims; (6) the source, amount, and frequency of the debtor's income; (7) the list of all the debtor's property; and (8) the detailed list of the debtor's monthly living expenses.

Do you contend that a foreclosure or short sale occurred as a result of damage to your Property from defective Chinese Drywall? ☐ Yes ☑ No

If Yes, answer the following questions:

If the Property was the subject of a foreclosure or short sale, identify the following:

Foreclosure or Short Sale? _____

3

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Lender's name: _____

Loan Number: _____

Original Loan/Mortgage Amount: $_____

Date of Original Loan/Mortgage: _____/_____/_____
                                  Month    Day       Year

At the Date of Foreclosure or Short Sale,
the amount owed on the Loan/Mortgage: $_____

Date of Foreclosure or Short Sale: _____/_____/_____
                                    Month    Day       Year

Short Sale Price (if applicable): $_____

Attach all loan/mortgage documentation and documentation pertaining to the acquisition of the property.

Attach all documents relating to any foreclosure or short sale, including but not limited to any financial statements provided to the lender, a seller's hardship letter, tax returns, W-2 forms, payroll stubs, and bank statements provided to the lender, and comparative market analyses of comparable sales provided to the lender.

### *Section V. Already Remediated Property*

Has the Property been partially or completely remediated?   No_____

If completely or partially remediated, answer the following questions.  If No, go to Section VI.

Please identify the dates during which the remediation took place:

_____

Please identify who performed the work to remediate the property (for example: self, name of contractor, name of remediation service): _____

If the Property has been partially remediated, identify the rooms of the Property that were remediated, the current condition and status of the remediation and the amount of work remaining to be remediated:

Attach any documents supporting any work that you or others performed for remediation of the Property.

If the Property has been partially or completely remediated, what was the total cost to date for the remediation of the Property?

$_____

Attach all invoices and documents to support the total cost of remediation to date.

4

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Attach all invoices, purchase receipts and documents supporting the total cost or value of any appliances, fixtures or other electronics that you claim were damaged by Chinese drywall.

Attach all invoices, purchase receipts and documents supporting the total cost or value of any other movables (property or possessions, not including land or buildings) that you claim were damaged by Chinese drywall.

If the Property has been completely remediated, what was the date the remediation was completed?

Month/Year: _____ / _____

Have you preserved at least two samples (of ten inches by ten inches (10" x 10") in size if possible) of every different drywall brand or marking removed from the Property?  ☐ Yes  ☐ No

If you have preserved samples, where are the samples located?

_____

Have you preserved at least one sample of each type of drywall endtape, if any, that was found during inspection, repair or removal of drywall in or from the Property?  ☐ Yes  ☐ No

If you have preserved samples, where are the samples located?

_____

Have you photographed the backside of each Chinese-manufactured drywall board removed from the Property immediately after it was removed, and have you documented on a floor plan or other similar diagram the location of each full or partial Chinese-manufactured drywall board and its photograph?
☐ Yes  ☐ No

If you have photographed and documented each Chinese-manufactured board, please attach the photograph(s) and floor plan.

Have you photographed the HVAC coil, at least one (1) plumbing component and three (3) electrical components that you allege were damaged by Chinese drywall?  ☐ Yes  ☐ No

If you have photographed these materials, please attach the photographs.

Have you photographed any other building materials, components, or other personal property for which you intend to seek recovery?  ☐ Yes  ☐ No

If you have photographed these materials, please attach the photographs.

**Section VI.  Prior Payments**

Have you received any payments, including but not limited to settlement payments, payments from homebuilders, and insurance payments, related to damages you claim to have suffered caused by defective Chinese drywall in the Property or related to any other harm caused by defective Chinese drywall?  ☑ Yes  ☐ No

If Yes, identify the source(s) and state the amount of payment(s) you received?

Source:  CDW Settlement Program

Amount of payments received:  $ 4,830.44

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Source: ___GBI Holdback Payment___

Amount of payments received: $ _291.91_____

Source: _____

Amount of payments received: $ _____

If you received payments from the Knauf settlement, state the percentage of the Chinese Drywall that was identified as "KPT Chinese Drywall" as described in section 1.27 of the Knauf Settlement Agreement: _____%

Attach documents reflecting the total amount you received from the source(s).

### Section VII. Other Damages

If you incurred alternative living expenses as a result of Chinese Drywall, identify the total moving cost and/or alternative living expense you incurred.

$_____

Attach all receipts and documents supporting the total moving cost and/or alternative living expense you incurred.

If you experienced any loss of use and/or loss of enjoyment of the Property as a result of Chinese Drywall, identify the total amount of such loss.

$ _337,500.00_____

Attach all documentation to support the total amount claimed for the loss.

If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

$_____

Attach all documentation to support the total amount claimed for diminution of value, including documents showing that the Property's previous value.

### Section VIII. "Under Air" Square Footage

Has the under air square footage of the Property changed at any time since installation of the Chinese drywall? ☐ Yes ☑ No

If the square footage has changed, please identify the date(s) and change(s) to under air square footage, and attach all documentation that relates to each change:

Date: _____

Change: _____

Date: _____

Change: _____

6

Supplemental Plaintiff Profile Form – Residential and Commercial Properties (Non-Knauf)

Date: _____

Change: _____

### Section IX. Verification of Supplemental Plaintiff Profile Form

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that I am the claimant identified in this Supplemental Plaintiff Profile Form and that all information provided in this Supplemental Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

I further declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information previously provided by me in my original Plaintiff Profile Form continues to be true and correct and has been updated to the best of my knowledge.

_____         12/16/20
Claimant's signature                                 Date signed

Name:        John A. Carter

Address:     1590 Crescent Blvd.
             Address 1                    Address 2
             Auburn                 AL       36830
             City                   State    Zip Code

Phone No.: ( 334  )  319  –  5180

Email:       andycarter64@gmail.com

7

# EXHIBIT C

# BUILDING PERMIT APPLICATION

The City of Opelika
Alabama

**IMPORTANT – Complete ALL items.  Mark blanks where applicable.**

FILE NUMBER: _06-2321_

## Part 1.    LOCATION OF BUILDING

Number and Street _701 WAVERLY PLACE_

Other Locations _WAVERLY PARK_   Subdivision _____ Lot _17_ Zone _____
Is the proposed development in an identified floodway? ☐ Yes ☐ No   If yes, has a no-rise certification been obtained and attached? ☐ Yes ☐ No

## PART II.    TYPE AND COST OF BUILDING - All applicants are required to complete Parts A-D

### A.  TYPE OF IMPROVEMENT
- ☑ New Building
- ☐ Addition (If residential, enter number of new housing units added, if any in part D)
- ☐ Alteration (See Addition above)
- ☐ Repair, replacement
- ☐ Wrecking (If multifamily residential, enter number of units in building in Part D)
- ☐ Moving (relocation)
- ☐ Foundation only

### B.  OWNERSHIP
- ☑ Private (Individual, corporation, nonprofit institutions, etc.)
- ☐ Public (Federal, State or local government)

### C.  COST
Cost of Improvement: . . . . . . . . . . . . . . . . . . . . $ _____
*To be installed but not included in the above cost.*

a. Electrical . . . . . . . . . . . . . . . . . . . . _____

b. Plumbing . . . . . . . . . . . . . . . . . . . . _____

c. Heating, air conditioning . . . . . . . . _____

d. Other (elevator, etc.) . . . . . . . . . . _____

**TOTAL COST OF IMPROVEMENT:** . . . . . . . . . . $ _119,846_

### D.  PROPOSED USE – For "Wrecking" most recent use

**Residential**
- ☑ One family
- ☐ Two or more family – Enter number of units................._____
- ☐ Transient hotel, motel or dormitory – Enter number of units..........................._____
- ☐ Garage
- ☐ Carport
- ☐ Other  Specify_____

**Nonresidential**
- ☐ Amusement, recreational
- ☐ Church, other religious
- ☐ Industrial
- ☑ Parking garage
- ☐ Service station, repair garage
- ☐ Hospital institution
- ☐ Office, bank, professional
- ☐ Public utility
- ☐ School, library, other educational
- ☐ Stores, mercantile
- ☑ Tanks, towers
- ☐ Other – Specify:_____

**Job Description —** Describe in detail proposed use of buildings; e.g., food processing plant, machine shop, laundry, building at hospital, elementary school, secondary school, college, parochial school, parking garage for department store, rental office building, office building at industrial plant.  If use of existing building is being changed, enter proposed use.

_NEW RESIDENTIAL_
_SINGLE FAMILY_

## PART III.    SELECTED CHARACTERISTICS OF BUILDING
For new buildings and additions, complete Parts E-K; for wrecking, complete only Part I; for all others, skip to IV.

### E.  PRINCIPAL TYPE OF FRAME
- ☐ Masonry (wall bearing)
- ☑ Wood frame
- ☐ Structural steel
- ☐ Reinforced concrete
- ☐ Other – Specify

### F.  SEWER ASSESSMENT FEE
☑ _1_ Number of equivalent average connections

☑ _1250_ Fee Paid

☑ Receipt attached from Public Works Department

### G.  TYPE OF SEWAGE DISPOSAL
- ☑ City Sewer
- ☐ Individual (septic tank, r.tc.)

### H.  TYPE OF WATER SUPPLY
- ☑ Public
- ☐ Individual (well, cistern)

*  CONTRACTOR MUST REMOVE ALL CONSTRUCTION DEBRIS FROM THE CONSTRUCTIONSITE BEFORE THE C.O. WILL BE ISSUED

*  CONTRACTOR MUST HAVE A PORTA-TOILET ON SITE BEFORE TEMPORARY CONSTRUCTION POWER IS RELEASED.

### I.  DIMENSIONS
Number of Stories: . . . . . . . . . _1_

Total square feet of floor area, all floors, based on exterior dimensions: . . . . . . . _1,973 S.F._ (HEATED)

Total land area, sq. ft.: . . . . . . . _17,538 F._

### J.  # OF OFF-STREET PARKING SPACES
Enclosed: . . . . . . . . . . . . . . . _2_

Outdoors: . . . . . . . . . . . . . . . ___

### K.  RESIDENTIAL BUILD-INGS (ONLY)
# of Bedrooms:. . . . . . . . . . . _3_

Full: . . . . . _2_

# of Bathrooms   Partial:. . . . . . ___

## PART IV.    IDENTIFICATION – To be completed by all applicants

| | Name | Mailing Address –Number, Street, City and State | Zip Code | Area Code - Phone Number |
|---|---|---|---|---|
| Owner | _PATRIOT HOMES, LLC_ | _701 WAVERLY PL. OPELIKA, AL_ | _36801_ | _(319-6520)_ |
| Contractor | _PATRIOT HOMES, LLC_ | _480 N. DEAN RD., # H-6 AUBURN, AL_ | _36830_ | _(319-5478) JOHN CARTER_ |
| Architect | | | | |

**The Owner of this building and the undersigned agree to conform to all applicable laws and Code of Ordinances of the City of Opelika, Alabama.**

Printed Name of Applicant: _____

Signature of Applicant: _[signature]_

Approved by: _Jeff Kugal / 4/00_

Reviewed by: _Shane Kyles / 4/00_

Curb Cut Fee: _30.00_

Permit Fee: _800.00_

Tax: _299.62_

Total Fee: _1,129.62_

Plan Review Fee: _____

Date Permit Issued: _12/21/06_

Permit Number: _06-2321_

Cash/Check # _1213_

Application Date: _12/19/06_

License Date: _14218_

State License: _HB-11249_

Form 0655_Building Permit Application.doc

2/24/06

# EXHIBIT D

# Opelika
### Alabama

**BUILDING PERMIT APPLICATION**

IMPORTANT – Complete ALL items. Mark blanks where applicable.

FILE NUMBER: _OC-2322_

**Part 1.   LOCATION OF BUILDING**

Number and Street _703 WAVERLY PLACE_

Other Locations _WAVERLY PARK_   Subdivision _____   Lot _18_   Zone _____

Is the proposed development in an identified floodway? ☐ Yes  ☐ No   If yes, has a no-rise certification been obtained and attached? ☐ Yes  ☐ No

**PART II.   TYPE AND COST OF BUILDING** - All applicants are required to complete Parts A-D

**A. TYPE OF IMPROVEMENT**

- ☑ New Building
- ☐ Addition (If residential, enter number of new housing units added, if any in part D)
- ☐ Alteration (See Addition above)
- ☐ Repair, replacement
- ☐ Wrecking (If multifamily residential, enter number of units in building in Part D)
- ☐ Moving (relocation)
- ☐ Foundation only

**B. OWNERSHIP**

- ☑ Private (Individual, corporation, nonprofit institutions, etc.)
- ☐ Public (Federal, State or local government)

**D. PROPOSED USE** – For "Wrecking" most recent use

Residential

- ☑ One family
- ☐ Two or more family – Enter number of units..............
- ☐ Transient hotel, motel or dormitory – Enter number of units............................
- ☐ Garage
- ☐ Carport
- ☐ Other  Specify_____

Nonresidential

- ☑ Amusement, recreational
- ☐ Church, other religious
- ☐ Industrial
- ☐ Parking garage
- ☐ Service station, repair garage
- ☐ Hospital institution
- ☐ Office, bank, professional
- ☐ Public utility
- ☐ School, library, other educational
- ☐ Stores, mercantile
- ☐ Tanks, towers
- ☐ Other – Specify:_____

**C. COST**

Cost of Improvement: . . . . . . . . . . . . . . . . . . . . . .   *(Omit Cents)*   $_____

*To be installed but not included in the above cost.*

a. Electrical . . . . . . . . . . . . . . . . . . . . . . .

b. Plumbing . . . . . . . . . . . . . . . . . . . . .

c. Heating, air conditioning . . . . . . . .

d. Other (elevator, etc.) . . . . . . . . . .

TOTAL COST OF IMPROVEMENT: . . . . . . . . . . .   $ _111,339_

**Job Description** – Describe in detail proposed use of buildings; e.g., food processing plant, machine shop, laundry, building at hospital, elementary school, secondary school, college, parochial school, parking garage for department store, rental office building, office building at industrial plant. If use of existing building is being changed, enter proposed use.

_NEW RESIDENTIAL_
_SINGLE FAMILY_

**PART III.   SELECTED CHARACTERISTICS OF BUILDING**   For new buildings and additions, complete Parts E-K; for wrecking, complete only Part I; for all others, skip to IV.

**E. PRINCIPAL TYPE OF FRAME**

- ☐ Masonry (wall bearing)
- ☑ Wood frame
- ☐ Structural steel
- ☐ Reinforced concrete
- ☐ Other – Specify _____

**F. SEWER ASSESSMENT FEE**

☑ _1_ Number of equivalent average connections

☑ _1,252_ Fee Paid

☑ Receipt attached from Public Works Department

**G. TYPE OF SEWAGE DISPOSAL**

- ☑ City Sewer
- ☐ Individual (septic tank, etc.)

**H. TYPE OF WATER SUPPLY**

- ☑ Public
- ☐ Individual (well, cistern)

\* CONTRACTOR MUST REMOVE ALL CONSTRUCTION DEBRIS FROM THE CONSTRUCTION SITE BEFORE THE C.O. WILL BE ISSUED

\* CONTRACTOR MUST HAVE A PORTA-TOILET ON SITE BEFORE TEMPORARY CONSTRUCTION POWER IS RELEASED.

**I. DIMENSIONS**

Number of Stories: . . . . . . . . .   _1_

Total square feet of floor area, all floors, based on exterior dimensions: . . . . .   _(HEATED)_  _1,148 S.F._

Total land area, sq. ft.: . . . . . .   _1,4578.F._

**J. # OF OFF-STREET PARKING SPACES**

Enclosed: . . . . . . . . . . . . . . .   _1/2_

Outdoors: . . . . . . . . . . . . . . .

**K. RESIDENTIAL BUILD-INGS (ONLY)**

# of Bedrooms:. . . . . . . . . . . .   _2_

# of Bathrooms    Full:. . . . . .   _2_

Partial:. . . . .

**PART IV.   IDENTIFICATION** – To be completed by all applicants

| | Name | Mailing Address –Number, Street, City and State | Zip Code | Area Code - Phone Number |
|---|---|---|---|---|
| Owner | PATRIOT HOMES, LLC | 703 WAVERLY PL OPELIKA, AL | 36801 | 319-6520 |
| Contractor | PATRIOT HOMES, LLC | 480 N. DEAN RD., #H-6 AUBURN, AL | 36830 | 319-5478 |
| Architect | | | | |

The Owner of this building and the undersigned agree to conform to all applicable laws and Code of Ordinances of the City of Opelika, Alabama.



**SITE PLAN REVIEW**

City of Opelika

Opelika Planning Department

700 Fox Trail, Opelika, Al 36801

(334) 705-5156, Fax (334) 705-5159

---

PART I.    SITE INFORMATION

JOB NAME: _New House_          OWNER: _Patriot Homes, LLC_

LOCATION: _Lot 18 Waverly Park_   ADDRESS: _703 Waverly Place_

PHONE: _____

ARCHITECT/CONTRACTOR: _Patriot Homes, LLC_

ADDRESS: _480 N. Dean Rd. #H-6_  PHONE: _319-5478_
_Auburn, AL 36830_

TYPE OF WORK:___SIGN; ___COMMERCIAL BUILDING; _____OTHER

---

**PART II. SITE REVIEWED FOR:**

_R-3_ ZONING DISTRICT          _No_ Located in HISTORIC DISTRICT?

**SIGN REQUIREMENTS**                **PARKING REQUIREMENTS**

| Type | Proposed | Allowed |
|------|----------|---------|
| Elevated | _____ | _____ s.f. |
| Wall | _____ | _____ s.f. |
| Ground | _____ | _____ s.f. |
| Other | _____ | _____ s.f. |

_____ Parking Required

_____ Parking Proposed

_____

_____

_____ TOTAL SQUARE FEET OF SIGNAGE

**LIGHTING REQUIREMENTS**

_____

**MAXIMUM BUILDING AREA (%)**               **SETBACKS**

| | Proposed | Required |
|---|----------|----------|
| Front: | 28 | 25 |
| ~~Side:~~ Front | 25 | 25 |
| Side: | 20 | 10 |
| Rear: | 25 | 10 |

_____ Proposed

_____ Required

---

PART III.    APPROVAL:

_____ Approved as Submitted_____ Approved Subject to Conditions_____ Not Approved

Comments/Notes: _____

_____

PLANNING DEPARTMENT          DATE  _12-19-06_

DEVELOPER REPRESENTATIVE     DATE  _12-19-06_

# SITE PLAN FOR:
# PATRIOT HOMES, LLC
## LOT 18
## WAVERLY PARK PARCEL D

*703 Waverly Place*



| CURVE | ARC | RADIUS | DELTA | Ch BEARING | Ch LENGTH |
|-------|-----|--------|-------|-----------|-----------|
| C1 | 60.78' | 280.00' | 12°26'12" | N37°29'41"E | 60.66' |

NOTE:
ALL STAKING DIMENSIONS ARE SHOWN TO FACE OF EXTERIOR
WALL. FOR FRAMING ADD 4" TO DIMENSIONS.

LEGEND
N = NORTH
E = EAST
W = WEST
S = SOUTH
B.L. = BUILDING LINE
CONC. = CONCRETE

| Drawn By: RWP | | 595 Dekalb Street | Seal |
|---|---|---|---|
| Scale: 1"=30' |  | Suite "D" Auburn, Alabama 36830 Phone (334) 821-0105 |  |
| File Name: R06-26B LOT 17.dwg | | | |
| Date: DECEMBER 18, 2006 | | | |



30   15   0       30       60

SCALE IN FEET



*The City Of*
Opelika
*Alabama*

## Sewer Assessment Fee Calculation

### Customer Information

Name:   Patriot Homes

Address:   480 N Dean Rd #H7,  Auburn, AL  36830

Phone:   (334)319-6473

### Development Information

Address of new Development:   Lot 18  703 Waverly Pl

                              Opelika, AL  36801

Use:   Single Family Home

### Calculation:

| | | |
|---|---|---|
| # of Equivalent Average Connections | 1 | |
| Fee | X   **$1,250.00** | |
| Fraction Computation | | (As Determined by Table for various developments) |
| Less Calculation (Percentage, etc) | | (As Determined by Table for various developments) |
| Plus 25% (if outside Corporate Limits) | | |
| Total | $1,250.00 | |

Payment Received  (Circle one)        Cash        (Check)              (Check No. 1201  )

ESG Representative Signature

Customer Signature

Date  12/19/06

Date  12/19/06

ESG

9

# EXHIBIT E

STATE OF ALABAMA )                     FILED SIMULTANEOUSLY WITH
COUNTY OF LEE   )                      MORTGAGE OF EVEN DATE

## WARRANTY DEED

**KNOW ALL MEN BY THESE PRESENTS**: That in consideration of **TEN DOLLARS AND OTHER GOOD AND VALUABLE CONSIDERATIONS ($10.00),** to the undersigned **R & S Properties, LLC, an Alabama limited liability company**, (hereinafter referred to as the "Grantor") in hand paid by **John A. Carter and Jill M. Carter, husband and wife,** (hereinafter referred to as the "Grantees") the receipt of which is hereby acknowledged, the said Grantor does by these presents grant, bargain, sell and convey unto the said Grantee, the following described real estate, situated in **LEE** County, Alabama, to-wit;

> **"Lot # 18, WAVERLY PARK SUBDIVISION, Parcel D on, according to and as shown by that certain map or plat thereof of record in Plat Book 26, at Page 162, and recorded on June 15, 2005, and ratified by instrument recorded in Deed Book 2277, at Page 230, on June 27, 2005, in the Office of the Judge of Probate of Lee County, Alabama."**

> **"Subject to all rights of way, easements and restrictions which exist as a matter of record or exist de facto."**

**TO HAVE AND TO HOLD,** to the said **Grantees**, their heirs and assigns in fee simple forever.

And the said Grantor**,** does for itself, its successors and assigns, covenant with the said Grantees, their heirs and assigns, that it is lawfully seized in fee simple of said premises, that it is free from all encumbrances unless otherwise noted above, that it has a good right to sell and convey the same as aforesaid, and that it will, and its successors and assigns shall, warrant and defend the same to the Grantees**,** their heirs and assigns forever, against the lawful claims of all persons.

**IN WITNESS WHEREOF,** the said **R & S Properties, LLC**, by Marvin E. Deen and Sallie H. Deen, who are authorized to execute this conveyance, have hereto set their signatures and seals on behalf of the Grantor, this the 22nd day of December, 2006.

<div style="margin-left:3em">

**R & S Properties, LLC,**
**An Alabama limited liability company**

_(signature)_
Marvin E. Deen          Member / Manager

_(signature)_
Sallie H. Deen          Member / Manager

</div>

STATE OF ALABAMA )
COUNTY OF LEE     )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that **Marvin E. Deen**, whose name is signed to the foregoing conveyance as authorized agent of **R & S Properties, LLC**, and who is known to me, acknowledged before me on this day that, being informed of the contents of said conveyance, he, as Member and Manager, executed the same voluntarily and with full authority as the act of said company, on the day the same bears date.

Given under my hand and official seal, this 22nd day of December, 2006.

2307 75
Recorded in the Above
DEEDS  Book & Page
01-02-2007 03:55:06 PM

# EXHIBIT F

File No. 0518207

CUSTOMER COPY



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
701 Waverly Place
Lot 17, Waverly Park Subdivision, Parcel D, Plat Book 26, Page 162
Opelika, AL  36801-3378

**FOR:**
Auburn Bank
215 South 6th Street
Opelika, AL  36801

**AS OF:**
May 18, 2007

**BY:**
Haskel J. Patterson (334) 745 - 0311
Patterson Services, Inc.
d/b/a/ H & L Appraisal Service
1204 Fitzpatrick Avenue
Opelika, Alabama 36801

| Borrower/Client | Gibbs, Gene Ralph & Darla Dee | | | | File No. | 0518207 |
|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Place | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801-3378 |
| Lender | Auburn Bank | | | | | |

## TABLE OF CONTENTS

Cover Page .................................................................................................................................. 1
URAR ....................................................................................................................................... 2
Additional Comparables 4-6 ........................................................................................................... 8
Building Sketch (Page - 1) ............................................................................................................ 9
Building Sketch (Page - 2) ............................................................................................................ 10
Subject Photos ........................................................................................................................... 11
Comparable Photos 1-3 ................................................................................................................. 12
Comparable Photos 4-6 ................................................................................................................. 13
Comparable Sales Map ................................................................................................................. 14
Supplemental Addendum w/sig block ............................................................................................... 15
Invoice .................................................................................................................................... 16

Patterson Services, Inc. (334)745-0311

File No. 0518207

**Summary Appraisal Report**

# Uniform Residential Appraisal Report

File # 0518207

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 701 Waverly Place | City Opelika   State AL   Zip Code 36801-3378 |
| Borrower Gibbs, Gene Ralph & Darla Dee | Owner of Public Record Patriot Homes Inc.   County Lee |
| Legal Description Lot 17, Waverly Park Subdivision, Parcel D, Plat Book 26, Page 162 | |
| Assessor's Parcel # 43-09-01-11-2-000-028.000 | Tax Year 2007   R.E. Taxes $ 243.00 |
| Neighborhood Name Waverly Park Subdivision, Parcel D | Map Reference 43-09-01-11-2-000   Census Tract 0411.00 |
| Occupant ☐ Owner ☐ Tenant ☒ Vacant | Special Assessments $ None   ☐ PUD   HOA $ 45   ☐ per year ☒ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | |
| Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe) | |
| Lender/Client Auburn Bank | Address 215 South 6th Street, Opelika, AL 36801 |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?   ☒ Yes   ☐ No
Report data source(s) used, offering price(s), and date(s).   The subject is currently listed for sale with Sallie Dean of John Rice, L. L. C. thru the Lee County Multiple Listing Service for $158,748 and has been on the market for 107 days.
☐ I did  ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.   The subject is currently under contract for sale for a consideration of $167,807.50 Transaction appears to be arms length with nothing atypical noted. No seller paid concessions were noted and the closing date is set for 7/6/2007.
Contract Price $ 167,807.5   Date of Contract 7/6/2007   ☒ Is the property seller the owner of public record? ☒ Yes   ☐ No   Data Source(s) Public Records
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?   ☐ Yes   ☒ No
If Yes, report the total dollar amount and describe the items to be paid.   N/A   Buyer has requested numerous upgrades thus the difference in the list and contract price.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 55 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | 350+ High | 75+ | 2-4 Unit | 1 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 50's Low | New | Multi-Family | 1 % |
| Neighborhood Boundaries   Veterans Parkway to the north and west, Norfolk Southern Railway to | | | | | 170's Pred. | 30 | Commercial | 2 % |
| the south and Terracewood Drive to the east. | | | | | | | Other | 41 % |

Neighborhood Description   The subject is located 3 miles west of downtown Opelika in Waverly Park Subdivision. This is a new addition that will contain small detached single family dwellings of good quality. The first phase of this subdivision is composed of attached and detached condos. There is a PUD office development under construction on a 100+ acre tract to the south of the subdivision.
Market Conditions (including support for the above conclusions)   The Opelika real estate market is an active market that has experienced good increases in property values and moderate to good growth in the past few years. This trend should continue if interest rates remain low. Supply and demand appear to be in balance and the local MLS currently reports a normal marketing time of 3- 6 months.

| | | | |
|---|---|---|---|
| Dimensions 51.2 X 120.9 X 81.8 X 139.3 | Area .20 Acres | Shape Rectangular | View Average Residential |
| Specific Zoning Classification R - 3 | Zoning Description Low Density Residential District | | |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | | | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?   ☒ Yes   ☐ No   If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | City of Opelika | Water | ☒ | City of Opelika | Street Asphalt Pavement | ☒ | |
| Gas | ☒ | Alagasco | Sanitary Sewer | ☒ | City of Opelika | Alley None (Typical) | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone C   FEMA Map # 010145 0018 B   FEMA Map Date 9/16/1981
Are the utilities and off-site improvements typical for the market area?   ☒ Yes   ☐ No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?   ☐ Yes   ☒ No If Yes, describe
There were no noted adverse easements, encroachments, visible environmental conditions, illegal or legal nonconforming zoning uses apparent during the inspection of the subject property. No current survey was provided to the appraiser for review.

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls | ConcreteSlab/New | Floors | HdWd/C.Tile/New |
| # of Stories | One | ☐ Full Basement ☐ Partial Basement | | Exterior Walls | VinylSiding/BV/New | Walls | Drywall/New |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area N/A sq.ft. | | Roof Surface | AsphaltShngl/New | Trim/Finish | Wood/Good |
| ☐ Existing ☐ Proposed ☒ Under Const. | | Basement Finish N/A % | | Gutters & Downspouts | None | Bath Floor | Ceramic Tile/New |
| Design (Style) | 1-Story/Good | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | Alum Frame/New | Bath Wainscot | Molded Unit/New |
| Year Built | New | Evidence of ☐ Infestation | | Storm Sash/Insulated | Insulated/New | Car Storage | None |
| Effective Age (Yrs) 0 | | ☐ Dampness ☐ Settlement | | Screens | Screens/New | ☐ Driveway # of Cars |
| Attic ☒ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | Woodstove(s) # | Driveway Surface Concrete Pvmt |
| ☒ Drop Stair ☐ Stairs | | ☐ Other | Fuel Electricity | | ☐ Fireplace(s) # ☒ Fence | ☒ Garage # of Cars 2 |
| ☐ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☐ Patio/Deck ☒ Porch Screen | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other | ☐ Att. ☐ Det. ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☒ Other (describe) Microwave/Fan Hood Combo
Finished area **above** grade contains:   5 Rooms   3 Bedrooms   2 Bath(s)   1,231 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.).   Subject has front stoop, 136 sf rear screen porch, box ceiling in master bedroom, granite counter tops and separate shower in master bath.
Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).   Subject property is currently under construction and the inspection notes and specifications reflect that the home will be of good quality construction. A probable time of completion is 1 month. This appraisal is made based on the inspection notes and specifications provided by the builder and contract addendum and is subject to a final inspection to ascertain completion of same. Physical depreciation is limited due to dwelling being new construction. A short wall in the master bedroom is concave and should be reframed and finished.
Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?   ☐ Yes   ☒ No If Yes, describe
The subject property is currently under construction and is approximately 90% finished therefore no physical deficiencies exist at the time of this appraisal. The floor plan of the dwelling appears to be functional in design and layout and the home should be built in a workmanlike manner subject to all local building codes.
Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?   ☒ Yes   ☐ No If No, describe
The subject dwelling is very similar to most of the dwellings in this homogeneous neighborhood.

Freddie Mac Form 70 March 2005                    Page 1 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

# Uniform Residential Appraisal Report
File # 0518207

| There are | 4 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 159,000 to $ 177,000 . |
| There are | 5 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 151,900 to $ 174,900 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 701 Waverly Place Opelika, AL 36801-3378 | 807 Waverly Place Opelika, AL 36801 | | 713 Waverly Place Opelika, AL 36801 | | 601 Waverly Place Opelika, AL 36801 | |
| Proximity to Subject | | 0.07 miles | | 0.06 miles | | 0.04 miles | |
| Sale Price | $ 167,807.5 | | $ 172,800 | | $ 159,000 | | $ 168,000 |
| Sale Price/Gross Liv. Area | $ 136.32 sq.ft. | $ 128.00 sq.ft. | | $ 122.03 sq.ft. | | $ 123.26 sq.ft. | |
| Data Source(s) | | MLS/Listing Agent | | Inspection/Sales Contract | | MLS/Listing Agent | |
| Verification Source(s) | | MLS/Selling Agent | | Public Records | | MLS/Selling Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conventional | | Conventional | | Conventional | |
| Concessions | | Seller Paid | -2,000 | NoConcession | | NoConcession | |
| Date of Sale/Time | | 4/2007 | | 2/2007 | | 1/2007 | |
| Location | Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .20 Acres | .31 Acres | | .24 Acres | | .18 Acres | |
| View | Average | Average | | Average | | Average | |
| Design (Style) | 1-Story/Good | 1-Story/Good | | 1-Story/Good | | 1-Story/Good | |
| Quality of Construction | VnylSg/BVAvg | BrickVnr/Good | | Vinyl/Dryvit/Gd | | Hardiplank/Gd | |
| Actual Age | New | New | | New | | New | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 5  3  2 | 5  3  2 | | 5  2  2 | | 4  2  2 | |
| Gross Living Area | 1,231 sq.ft. | 1,350 sq.ft. | -4,500 | 1,303 sq.ft. | -2,700 | 1,363 sq.ft. | -5,000 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | | None | | None | | None | |
| Functional Utility | Adequate | Adequate | | Adequate | | Adequate | |
| Heating/Cooling | Htpump/Cent | Htpump/Cent | | Htpump/Cent | | Htpump/Cent | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | 2-Garage | 2-Garage | | 2-Garage | | 2-Garage | |
| Porch/Patio/Deck | Stp/ScrnPorch | Stoop/Deck | +1,500 | Stoop/Deck | +1,500 | Stoop/Patio | +2,500 |
| Fireplace | None | None | | None | | None | |
| Additional Amenities | None | None | | None | | None | |
| Additional Amenities | None | None | | None | | None | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 5,000 | ☐ + ☒ - | $ 1,200 | ☐ + ☒ - | $ 2,500 |
| Adjusted Sale Price of Comparables | | Net Adj. 2.9% Gross Adj. 4.6% | $ 167,800 | Net Adj. 0.8% Gross Adj. 3.4% | $ 157,800 | Net Adj. 1.5% Gross Adj. 4.5% | $ 165,500 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain   For the subject a review of The Lee County Multiple Listing Service, Lee County Public Records and FSBO (for sale by owner) data retained by the appraiser was made. For the comparable sales only a review of MLS and FSBO data was made. Any findings or conclusions are reported below.

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Lee County Multiple Listing Service, Lee County Public Records and FSBO data derived from the appraiser's files.
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   Lee County Multiple Listing Service and FSBO data derived from the appraiser's files.
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/22/2006 | None Noted | None Noted | None Noted |
| Price of Prior Sale/Transfer | Unknown | N/A | N/A | N/A |
| Data Source(s) | MLS/Public Records | MLS/Appraiser's Files | MLS/Appraiser's Files | MLS/Appraiser's Files |
| Effective Date of Data Source(s) | 5/2007 | 5/2007 | 5/2007 | 5/2007 |

Analysis of prior sale or transfer history of the subject property and comparable sales   The subject site was sold on 12/6/2006 for a unknown amount. No sales or transfers were noted in the last year for any of the comparable sales used.

Summary of Sales Comparison Approach   The comparable sales utilized are the most similar and recent sales available at the time of appraisal. This subdivision is composed of both 2 and 3 bedroom units with the 2 bedroom units being the majority. Sale 1 was the only comparable 3 bedroom unit located. All sales are considered similar in terms of location, quality of construction, condition, utility and market appeal. All sales are given consideration after adjustments.

Indicated Value by Sales Comparison Approach $ 168,000
Indicated Value by: Sales Comparison Approach $ 168,000   Cost Approach (if developed) $ 166,061   Income Approach (if developed) $ N/A
The final value estimate indicated below is a reconciliation of the cost and market approaches to value. The income approach was not utilized because it is not felt to be an applicable indicator of value for property of this type.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  This appraisal is made from inspection notes and specs supplied by the builder/contract and is subject to a final inspection to ascertain completion of same.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 168,000 , as of May 18, 2007 , which is the date of inspection and the effective date of this appraisal.

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

## Uniform Residential Appraisal Report
File # 0518207

"This assignment was made subject to the regulations of the State of Alabama Real Estate Appraisers Board. The undersigned State Certified Appraiser has met the requirements of the board that allows this report to be regarded as a 'Certified Appraisal'". This appraisal was developed as a "complete appraisal" in accordance with Standards Rule 1 of the USPAP. This appraisal is being reported as a "summary appraisal report" in accordance with Standards Rule 2-2(b) of the USPAP.

*ADDITIONAL COMMENTS*

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   The site value was estimated by a comparison of similar land or lot sales that have occurred within the subject market but not necessarily within the subject neighborhood. Sources for these land sales include the Lee County MLS, real estate agents, other appraisers, local lenders and public records.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 32,000 |
|---|---|---|---|---|
| Source of cost data   Marshall & Swift and Local Contractors | DWELLING   1,231   Sq.Ft. @ $ | 80.50 | =$ | 99,096 |
| Quality rating from cost service   Good      Effective date of cost data  3/2007 | None  Sq.Ft. @ $ | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Stoop,Screen Porch | | =$ | 8,500 |
| Cost estimates were derived from the Marshall & Swift Residential | Garage/Carport   367  Sq.Ft. @ $ | 43.50 | =$ | 15,965 |
| Cost Handbook and were compared to the local market.  Physical | Total Estimate of Cost-New | | =$ | 123,561 |
| depreciation was estimated using the Marshall & Swift Residential | Less   Physical   Functional   External | | | |
| Cost Handbook depreciation tables. | Depreciation | | =$( | ) |
| | Depreciated Cost of Improvements | | =$ | 123,561 |
| | "As-is" Value of Site Improvements | | =$ | 10,500 |
| Estimated Remaining Economic Life (HUD and VA only)          65  Years | INDICATED VALUE BY COST APPROACH | | =$ | 166,061 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

*INCOME*

| Estimated Monthly Market Rent $   N/A | X Gross Rent Multiplier   N/A   = $   N/A   Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)   The income approach was not utilized because it is not felt to be an applicable indicator of value for property of this type.

### PROJECT INFORMATION FOR PUDs (if applicable)

*PUD INFORMATION*

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project   N/A

| Total number of phases   N/A | Total number of units   N/A | Total number of units sold   N/A |
|---|---|---|
| Total number of units rented   N/A | Total number of units for sale   N/A | Data source(s)  N/A |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.  N/A

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source   N/A

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.   N/A

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.  N/A

Describe common elements and recreational facilities.   N/A

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

# Uniform Residential Appraisal Report

File # 0518207

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:**  The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:**  The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:**  The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:**  The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

## Uniform Residential Appraisal Report   File # 0518207

**APPRAISER'S CERTIFICATION:**  The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005                Page 5 of 6                Fannie Mae Form 1004 March 2005

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

## Uniform Residential Appraisal Report

File # 0518207

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER   Haskel J. Patterson (334) 745 - 0311 | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Haskel J. Patterson (334) 745 - 0311 | Name |
| Company Name  Patterson Services, Inc. | Company Name |
| Company Address  1204 Fitzpatrick Avenue | Company Address |
| Opelika, AL 36801 | |
| Telephone Number  (334) 745 - C311 | Telephone Number |
| Email Address  handlappraisal@charter.net | Email Address |
| Date of Signature and Report  May 22, 2007 | Date of Signature |
| Effective Date of Appraisal  May 18, 2007 | State Certification # |
| State Certification #  R00610 | or State License # |
| or State License # | State |
| or Other (describe)  State # | Expiration Date of Certification or License |
| State  AL | |
| Expiration Date of Certification or License  9/30/2007 | **SUBJECT PROPERTY** |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 701 Waverly Place | Date of Inspection |
| Opelika, AL 36801-3378 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $  168,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name  Kathy Crawford | **COMPARABLE SALES** |
| Company Name  Auburn Bank | |
| Company Address  215 South 6th Street, Opelika, AL 36801 | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address  kcrawford@auburnbank.com | Date of Inspection |

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 0518207

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 701 Waverly Place | 707 Waverly Place | | | | | |
| | Opelika, AL 36801-3378 | Opelika, AL 36801 | | | | | |
| Proximity to Subject | | 0.04 miles | | | | | |
| Sale Price | $ 167,807.5 | $ 177,000 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $ 136.32 sq.ft. | $ 121.07 sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS/Listing Agent | | | | | |
| Verification Source(s) | | MLS/Selling Agent | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conventional | | | | | |
| Concessions | | NoConcession | | | | | |
| Date of Sale/Time | | 11/2006 | | | | | |
| Location | Average | Average | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | .20 Acres | .29 Acres | | | | | |
| View | Average | Average | | | | | |
| Design (Style) | 1-Story/Good | 1-Story/Good | | | | | |
| Quality of Construction | VnylSg/BVAvg | Hardiplank/Gd | | | | | |
| Actual Age | New | New | | | | | |
| Condition | Good | Good | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 5   3   2 | 5   2   2 | | | | | |
| Gross Living Area | 1,231 sq.ft. | 1,462 sq.ft. | -8,800 | sq.ft. | | sq.ft. | |
| Basement & Finished | None | None | | | | | |
| Rooms Below Grade | None | None | | | | | |
| Functional Utility | Adequate | Adequate | | | | | |
| Heating/Cooling | Htpump/Cent | Htpump/Cent | | | | | |
| Energy Efficient Items | Standard | Standard | | | | | |
| Garage/Carport | 2-Garage | 2-Garage | | | | | |
| Porch/Patio/Deck | Stp/ScrnPorch | Stoop/Deck | +1,500 | | | | |
| Fireplace | None | None | | | | | |
| Additional Amenities | None | None | | | | | |
| Additional Amenities | None | None | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | 7,300 | ☐ + ☐ - $ | | ☐ + ☐ - $ | |
| Adjusted Sale Price | | Net 4.1 % | | Net % | | Net % | |
| of Comparables | | Gross 5.8 % $ | 169,700 | Gross % $ | | Gross % $ | |
| Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3). | | | | | | | |
| ITEM | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
| Date of Prior Sale/Transfer | 12/22/2006 | None Noted | | | | | |
| Price of Prior Sale/Transfer | Unknown | N/A | | | | | |
| Data Source(s) | MLS/Public Records | MLS/Appraiser's Files | | | | | |
| Effective Date of Data Source(s) | 5/2007 | 5/2007 | | | | | |
| Analysis of prior sale or transfer history of the subject property and comparable sales | | | | | | | |

Analysis/Comments

Freddie Mac Form 70 March 2005

Fannie Mae Form 1004 March 2005

File No. 0518207

## Building Sketch (Page - 1)

| | |
|---|---|
| Borrower/Client | Gibbs, Gene Ralph & Darla Dee |
| Property Address 701 Waverly Place | |
| City Opelika | County Lee State AL Zip Code 36801-3378 |
| Lender Auburn Bank | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1230.51 | 1230.51 |
| P/P | Screen Porch | 136.25 | 136.25 |
| GAR | 2-Garage | 366.97 | 366.97 |
| | | | |
| | TOTAL LIVABLE (rounded) | | 1231 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| | 1.2 x 13.7 | 16.44 |
| | 13.1 x 44.4 | 581.64 |
| | 0.3 x 2.9 | 0.87 |
| | 8.0 x 26.7 | 213.60 |
| | 18.3 x 20.1 | 367.83 |
| | 2.1 x 5.8 | 12.18 |
| 0.5 x | 2.9 x 2.1 | 3.05 |
| 0.5 x | 2.1 x 2.1 | 2.21 |
| | 3.0 x 10.9 | 32.70 |
| 9 Calculations Total (rounded) | | 1231 |

Form SKT.BldSkI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0518207

## Building Sketch (Page - 2)

| | |
|---|---|
| Borrower/Client | Gibbs, Gene Ralph & Darla Dee |
| Property Address | 701 Waverly Place |
| City  Opelika    County  Lee    State  AL    Zip Code  36801-3378 | |
| Lender  Auburn Bank | |

| First Floor | | | | GLA1 |
|---|---|---|---|---|
| | 1.2 | x | 13.7 | = | 16.44 |
| | 13.1 | x | 44.4 | = | 581.64 |
| | 0.3 | x | 2.9 | = | 0.87 |
| | 8.0 | x | 26.7 | = | 213.60 |
| | 18.3 | x | 20.1 | = | 367.83 |
| | 2.1 | x | 5.8 | = | 12.18 |
| 0.5 | x | 2.9 | x | 2.1 | = | 3.05 |
| 0.5 | x | 2.1 | x | 2.1 | = | 2.21 |
| | 3.0 | x | 10.9 | = | 32.70 |

Area total (rounded)   =   1231

| 2-Garage | | | | GAR |
|---|---|---|---|---|
| 1.2 | x | 19.3 | = | 23.16 |
| 11.8 | x | 18.7 | = | 220.66 |
| 0.3 | x | 7.9 | = | 2.37 |
| 6.6 | x | 18.3 | = | 120.78 |

Area total (rounded)   =   367

| Screen Porch | | | | P/P |
|---|---|---|---|---|
| 10.9 | x | 12.5 | = | 136.25 |

Area total (rounded)   =   136

File No. 0518207

## Subject Photo Page

| Borrower/Client | Gibbs, Gene Ralph & Darla Dee | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Place | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code 36801-3378 |
| Lender | Auburn Bank | | | | | |



**Subject Front**
701 Waverly Place
Sales Price    167,807.5
GLA           1,231
Total Rooms    5
Total Bedrms   3
Total Bathrms  2
Location    Average
View        Average
Site        .20 Acres
Quality     VnylSg/BVAvg
Age         New



**Subject Rear**



**Subject Street**

File No. 0518207

**Comparable Photo Page**

| | |
|---|---|
| Borrower/Client | Gibbs, Gene Ralph & Darla Dee |
| Property Address | 701 Waverly Place |
| City Opelika | County Lee | State AL | Zip Code 36801-3378 |
| Lender | Auburn Bank |



**Comparable 1**
807 Waverly Place
Proximity      0.07 miles
Sale Price     172,800
GLA            1,350
Total Rooms    5
Total Bedrms   3
Total Bathrms  2
Location       Average
View           Average
Site           .31 Acres
Quality        BrickVnr/Good
Age            New



**Comparable 2**
713 Waverly Place
Proximity      0.06 miles
Sale Price     159,000
GLA            1,303
Total Rooms    5
Total Bedrms   2
Total Bathrms  2
Location       Average
View           Average
Site           .24 Acres
Quality        Vinyl/Dryvit/Gd
Age            New



**Comparable 3**
601 Waverly Place
Proximity      0.04 miles
Sale Price     168,000
GLA            1,363
Total Rooms    4
Total Bedrms   2
Total Bathrms  2
Location       Average
View           Average
Site           .18 Acres
Quality        Hardiplank/Gd
Age            New

File No. 0518207

## Comparable Photo Page

| Borrower/Client | Gibbs, Gene Ralph & Darla Dee | | | | |
|---|---|---|---|---|---|
| Property Address | 701 Waverly Place | | | | |
| City Opelika | | County Lee | State AL | | Zip Code 36801-3378 |
| Lender Auburn Bank | | | | | |



**Comparable 4**

707 Waverly Place

| Proximity | 0.04 miles |
|---|---|
| Sale Price | 177,000 |
| GLA | 1,462 |
| Total Rooms | 5 |
| Total Bedrms | 2 |
| Total Bathrms | 2 |
| Location | Average |
| View | Average |
| Site | .29 Acres |
| Quality | Hardiplank/Gd |
| Age | New |

**Comparable 5**

Proximity
Sale Price
GLA
Total Rooms
Total Bedrms
Total Bathrms
Location
View
Site
Quality
Age

**Comparable 6**

Proximity
Sale Price
GLA
Total Rooms
Total Bedrms
Total Bathrms
Location
View
Site
Quality
Age

File No. 0518207

## Comparable Sales Map

| Borrower/Client | Gibbs, Gene Ralph & Darla Dee | | | | |
|---|---|---|---|---|---|
| Property Address | 701 Waverly Place | | | | |
| City Opelika | | County Lee | | State AL | Zip Code 36801-3378 |
| Lender Auburn Bank | | | | | |



File No. 0518207

## Supplemental Addendum

File No. 0518207

| Borrower/Client | Gibbs, Gene Ralph & Darla Dee | | | | |
|---|---|---|---|---|---|
| Property Address | 701 Waverly Place | | | | |
| City Opelika | County Lee | | State AL | Zip Code 36801-3378 | |
| Lender Auburn Bank | | | | | |

The author of this report personally inspected the subject property and any obvious defects such as visible rotten wood, settlement cracks or any deferred maintenance were noted in the report. The appraiser is not a "qualified" home inspector and does not warrant that all of the mechanical systems, appliances and structural systems are free from defects or infestations. If this type of inspection is desired then a qualified inspector such as a licensed contractor, licensed home inspector or pest expert should be employed to determine any of these deficiencies exist. A inspection from a licensed pest expert is recommended on all structures of any kind. The appraiser has not inspected for the presence of fungus which includes mold, mildew, mycotoxins, spore scents or byproducts produced or released by fungi.

The square footage of the subject property was calculated using the American National Standard for Single Family Residential Buildings ANSI Z765-2003 which was approved on April 8, 1996 by the following organizations: American Association of Certified Appraisers, The American Institute of Architects, The Appraisal Foundation, Bureau of the Census, Employee Relocation Council, Fannie Mae, Freddie Mac, National Association of Home Builders, National Association of REALTORS, U.S. Department of Energy, U.S. Department of Housing and Urban Development, U.S. Department of Veterans Affairs and numerous other building and home ownership groups. If this appraisal was made based on plans from the proposed house, then the finished square footage calculations for this house were made based on plan dimensions only and may vary from the finished square footage of the house as built.

Type of Appraisal and Type of Report

The scope of the assignment includes an attempt to employ all three recognized approaches to value which are the cost, income and market approaches.

The cost approach includes research into the local market for land or site values. This research included interviews with other real estate appraisers as well as other real estate brokers and agents and review of current multiple listing data and public records. Unless otherwise noted, the inspection notes are the basis for the type of construction of the subject property. The cost estimates were taken from the Marshall & Swift Residential Cost Handbook which is a national publication that is indexed to the local Auburn/Opelika market. Other cost estimates were taken from current construction estimates by local contractors for similar type dwellings. Depreciation estimates were taken from the Marshall & Swift Residential Cost Handbook Depreciation Tables.

When utilized, the income approach involves interviews with local property managers, real estate brokers and sales agents, property owners and other real estate appraisers. Estimated market rents and vacancy rates are arrived at and sales of various similar investment properties are analyzed to derive a gross rent multiplier (GRM). The estimated market rent is then multiplied by the GRM to arrive at an income approach value estimate.

The sales approach involves research in the subject market through interviews with local real estate brokers, agents and other real estate appraisers and reviewing current multiple listing data and public records for sales of similar type properties. All of the comparables used are closed sales to the best of the appraiser's knowledge. Verification of these sales has been with any of, or combination of, the above mentioned sources. The sales used are as similar as possible and there may be differences in design and style but all are considered to have the same utility. All of the sales utilized are then compared to the subject and adjusted for any differences. The adjustments are based on current market data and the value of the adjustments are the appraiser's opinion from the perspective of a typical buyer. Finally, all of the applied approaches are then reconciled into a final value estimate.

Intended Use of Appraisal

This appraisal has been requested by the named client to serve as a basis for loan underwriting purposes in connection with a mortgage loan to be made against the subject property. This appraisal may therefore be relied upon by Auburn Bank to serve this function. This appraisal may not be used by any other individual or party for any reason without the appraiser's consent. This appraisal was undertaken without departure in accordance with the Uniform Standards of Professional Appraisal Practice as enacted by the appraisal foundation and as amended by the Comptroller of the Currency.

| Signature | | Signature | |
|---|---|---|---|
| Name Haskel J. Patterson (334) 745 - 0311 | | Name | |
| Date Signed May 22, 2007 | | Date Signed | |
| State Certification # R00610 | State AL | State Certification # | State |
| Or State License # | State | Or State License # | State |

Patterson Services, Inc. (334)745-0311
Form TADD2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# EXHIBIT G

Wilson Appraisals (334) 741-9290

# INVOICE

**FROM:**

Molly McLeod Wilson
Wilson Appraisals, LLC
P.O. Box 2976
Auburn, AL 36831

Telephone Number:  (334) 444-6603          Fax Number:

| INVOICE NUMBER | |
|---|---|
| 210412783 | |
| **DATES** | |
| Invoice Date: | 04/09/2021 |
| Due Date: | 04/19/2021 |

**TO:**

Individual - Jimmy Doyle

,

E-Mail:  jimmy@doylefirm.com
Telephone Number:                     Fax Number:
Alternate Number:

| REFERENCE | |
|---|---|
| Internal Order #: | 210412783 |
| Lender Case #: | |
| Client File #: | |
| FHA/VA Case #: | |
| Main File # on form: | 210412783 |
| Other File # on form: | |
| Federal Tax ID: | 20-0964456 |
| Employer ID: | |

## DESCRIPTION

| | | | |
|---|---|---|---|
| **Lender:** | Individual - Jimmy Doyle | **Client:** | Individual - Jimmy Doyle |
| **Purchaser/Borrower:** | N/A | | |
| **Property Address:** | 701 Waverly Pl | | |
| **City:** | Opelika | | |
| **County:** | Lee | **State:** AL | **Zip:** 36801 |
| **Legal Description:** | Lot 17 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E | | |

| FEES | AMOUNT |
|---|---|
| 1004 Full Appraisal | 500.00 |
| **SUBTOTAL** | 500.00 |

| PAYMENTS | AMOUNT |
|---|---|
| Check #: 1829   Date: 04/09/2021   Description: Total check $1000 | 500.00 |
| Check #:   Date:   Description: | |
| Check #:   Date:   Description: | |
| **SUBTOTAL** | 500.00 |
| **TOTAL DUE** | $ 0 |

Serial# 4CA6CFC7
esign.alamode.com/verify

**Property Description**

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No.   210412783

## SUBJECT

| | | | |
|---|---|---|---|
| Property Address | 701 Waverly Pl | City Opelika | State AL   Zip Code 36801 |

Legal Description   Lot 17 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E      County Lee

Assessor's Parcel No.   43-09-01-11-2-000-028.000      Tax Year 2020      R.E. Taxes $ 0      Special Assessments $ 0

Borrower  N/A      Current Owner Gibbs Gene R & Darla D      Occupant: ☒ Owner   ☐ Tenant   ☐ Vacant

Property rights appraised   ☒ Fee Simple   ☐ Leasehold      Project Type ☒ PUD   ☐ Condominium (HUD/VA only)      HOA $ 60      /Mo.

Neighborhood or Project Name   Waverly Park Subdivision      Map Reference 12220      Census Tract 0411.00

Sale Price $   N/A      Date of Sale N/A      Description and $ amount of loan charges/concessions to be paid by seller   N/A

Lender/Client   Individual - Jimmy Doyle      Address

Appraiser   Molly McLeod Wilson      Address P.O. Box 2976, Auburn, AL 36831

## NEIGHBORHOOD

| Location | Urban | ☒ Suburban | ☐ Rural | **Predominant occupancy** | **Single family housing** | | **Present land use %** | | **Land use change** | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PRICE $(000) | AGE (yrs) | | | | |
| Built up | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | | | | One family | 80 | ☒ Not likely | ☐ Likely |
| Growth rate | ☐ Rapid | ☒ Stable | ☐ Slow | ☒ Owner | 110 Low | 10 | 2-4 family | 15 | ☐ In process | |
| Property values | ☐ Increasing | ☒ Stable | ☐ Declining | ☐ Tenant | 200 High | 25 | Multi-family | | To: | |
| Demand/supply | ☐ Shortage | ☒ In balance | ☐ Over supply | ☐ Vacant (0-5%) | Predominant | | Commercial | | | |
| Marketing time | ☐ Under 3 mos. | ☒ 3-6 mos. | ☐ Over 6 mos. | ☐ Vac.(over 5%) | 175 | 15 | Vacant | 5 | | |

Note:   Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:      The subject is bounded to the North and West by Veterans Parkway, East by Oak Bowery Road, and South by Birmingham Highway.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
The subject is located in Waverly Park Subdivision and within the Opelika City Limits. No adverse conditions were noted in the neighborhood, and appeal to the market is good. The subject is located close to value supporting amenities such as schools, entertainment, shopping, places of worship, and employment. Approximately 5% of land in the development is vacant.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):
There are currently few properties in immediate area offered for sale.  Marketing trends appear to be increasing and appeal to this area is good.  Supply and demand appears to be in balance with no substantial number of properties listed on the open market.

## PUD

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?      ☐ Yes   ☒ No

Approximate total number of units in the subject project ____      Approximate total number of units for sale in the subject project ____

Describe common elements and recreational facilities:

## SITE

| | | | | |
|---|---|---|---|---|
| Dimensions   51.2' x 120.9' x 81.8' x 139.3' | | | Topography | Relatively Level |
| Site area   10,010 sf | | Corner Lot ☒ Yes   ☐ No | Size | 10010 sf |
| Specific zoning classification and description   R-3 Low Density Residential | | | Shape | Irregular |
| Zoning compliance   ☒ Legal   ☐ Legal nonconforming (Grandfathered use)   ☐ Illegal   ☐ No zoning | | | Drainage | Appears Adequate |
| Highest & best use as improved: ☒ Present use   ☐ Other use (explain) | | | View | Residential |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | Asphalt | ☒ | ☐ | Landscaping | Typical |
| Gas | ☒ | | Curb/gutter | Concrete | ☒ | ☐ | Driveway Surface | Concrete |
| Water | ☒ | | Sidewalk | None | | | Apparent easements | None Apparent |
| Sanitary sewer | ☒ | | Street lights | Mercury Vapor | ☒ | ☐ | FEMA Special Flood Hazard Area   ☐ Yes ☒ No | |
| Storm sewer | ☒ | | Alley | None | | | FEMA Zone   X      Map Date  11/2/2011 | |
| | | | | | | | FEMA Map No.   01081C0068G | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.):      There was no noted adverse easements or encroachments observed on the day of inspection. The subject appears to have adequate grading and drainage.

## DESCRIPTION OF IMPROVEMENTS

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | Concrete | Slab | Yes | Area Sq. Ft. | 0 | Roof | Unk | ☐ |
| No. of Stories | 1 | Exterior Walls | Brick/Vinyl | Crawl Space | None | % Finished | N/A | Ceiling | Unk | ☐ |
| Type (Det./Att.) | Detached | Roof Surface | Shingle | Basement | None | Ceiling | N/A | Walls | Unk | ☐ |
| Design (Style) | Traditional | Gutters & Dwnspts. | Aluminum | Sump Pump | None Seen | Walls | N/A | Floor | Unk | ☐ |
| Existing/Proposed | Existing | Window Type | Vinyl Clad | Dampness | None Noted | Floor | N/A | None | Unk | ☐ |
| Age (Yrs.) | 14 | Storm/Screens | Yes | Settlement | None Noted | Outside Entry | N/A | Unknown | Yes | ☒ |
| Effective Age (Yrs.) | 10 | Manufactured House | No | Infestation | None Noted | | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 0 |
| Level 1 | X | 1 | X | 1 | | | | 3 | 2 | X | | 1,272 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:      5 Rooms;      3 Bedroom(s);      2 Bath(s);      1,272 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Cer/Wood/Good | Type | Fwa | Refrigerator | | None | | Fireplace(s) # | 0 | None | ☐ |
| Walls | Dry Wall/Good | Fuel | Electric | Range/Oven | ☒ | Stairs | | Patio | None | Garage | # of cars |
| Trim/Finish | Wood/Good | Condition | Good | Disposal | | Drop Stair | ☒ | Deck | Open | Attached | 2 |
| Bath Floor | Ceramic/Good | COOLING | | Dishwasher | ☒ | Scuttle | | Porch | Screened | Detached | |
| Bath Wainscot | Cer/Fiber/Good | Central | Yes | Fan/Hood | ☒ | Floor | | Fence | None | Built-In | |
| Doors | Wood/good | Other | None | Microwave | | Heated | | Pool | None | Carport | |
| | | Condition | Good | Washer/Dryer | | Finished | | | | Driveway | 2 |

Additional features (special energy efficient items, etc.):      Ceiling fans, Low E windows, Insulation

## COMMENTS

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:      C3;No updates in the prior 15 years;The floor plan is considered functional and well accepted by the buying public.  No external obsolescence was observed on the day of inspection.  On the day of inspection the utilities were on and appeared to be functioning properly.  On the day of inspection, the subject was considered to be in good condition.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.:      No adverse conditions were noted on the day of inspection

| Valuation Section | UNIFORM RESIDENTIAL APPRAISAL REPORT | File No. 210412783 |
|---|---|---|

### COST APPROACH

| | |
|---|---|
| ESTIMATED SITE VALUE | = $ |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | |
| Dwelling 1,272 Sq. Ft. @ $ | = $ |
| 0 Sq. Ft. @ $ | = $ |
| | = $ |
| Garage/Carport 372 Sq. Ft. @ $ | = $ |
| Total Estimated Cost New | = $ |
| Less Physical Functional External | |
| Depreciation | = $ |
| Depreciated Value of Improvements | = $ |
| "As-is" Value of Site Improvements | = $ |
| INDICATED VALUE BY COST APPROACH | = $ |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):   The Cost Approach to Value was considered and rejected as an applicable approach to value as calculating physical depreciation could create misleading results.

### SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 701 Waverly Pl<br>Opelika, AL 36801 | 706 Waverly Pl<br>Opelika, AL 36801 | | 611 Waverly Pl<br>Opelika, AL 36801 | | 705 Waverly Pl<br>Opelika, AL 36801 | |
| Proximity to Subject | | 0.04 miles W | | 0.04 miles SE | | 0.03 miles NW | |
| Sales Price | $ N/A | $ 198,000 | | $ 188,000 | | $ 165,000 | |
| Price/Gross Living Area | $ | $ 144.53 | | $ 134.67 | | $ 141.63 | |
| Data and/or | LCAR/Tax Rec | LCAR #147389;DOM 14 | | LCAR #146290;DOM 0 | | LCAR #147386;DOM 1 | |
| Verification Source | Inspection | Tax Records/External Observ | | Tax Records/External Observ | | Tax Records/External Observ | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Sales or Financing | | Arms Length | | ArmLth | | ArmLth | |
| Concessions | | Conv;3000 | | Conv;600 | | Conv;3000 | |
| Date of Sale/Time | | s09/20;c08/20 | | s08/20;c08/20 | | s09/20;c08/20 | |
| Location | N;Res | N;Res | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10,010 sf | 8,689 sf | | 7814 sf | 0 | 9583 sf | 0 |
| View | N;Res | N;Res | | N;Res; | | N;Res; | |
| Design and Appeal | DT1;Trad | DT2;Trad | 0 | DT1;Trad | | DT1;Trad | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Age | 14 | 16 | 0 | 14 | | 13 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 5   3   2 | 5   3   2.1 | -2,500 | 5   3   2.0 | | 4   2   2.0 | +4,280 |
| Gross Living Area | 1,272 Sq. Ft. | 1,370 Sq. Ft. | -3,920 | 1,396 Sq. Ft. | -4,960 | 1,165 Sq. Ft. | +4,280 |
| Basement & Finished | 0 | 0 | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Good | Good | | Good | | Average/2bdrm | +10,000 |
| Heating/Cooling | Fwa / Cac | Fwa / Cac | | Fwa / Cac | | Fwa / Cac | |
| Energy Efficient Items | CFan/Win/Insul | CFan/Win/Insul | | CFan/Win/Insul | | CFan/Win/Insul | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 1ga2dw | +4,000 |
| Porch, Patio, Deck, | Stoop/ScrPch/Dk | Stoop/Patio | 0 | Stoop/Deck | 0 | Stp/ScrnPatio | 0 |
| Fireplace(s), etc. | No Fireplace | No Fireplace | | No Fireplace | | No Fireplace | |
| Fence, Pool, etc. | None | Rear Fence | | None | | None | |
| Net Adj. (total) | | ☐ + ☒ − $ | -6,420 | ☐ + ☒ − $ | -4,960 | ☒ + ☐ − $ | 18,280 |
| Adjusted Sales Price | | Net 3.2 % | | Net 2.6 % | | Net 11.1 % | |
| of Comparable | | Gross 3.2 % $ 191,580 | | Gross 2.6 % $ 183,040 | | Gross 11.1 % $ 183,280 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):   See attached addenda.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | The subject has not sold within the past 3 years | Comparable 1 has not sold within the past year other than reported above. | Comparable 2 has not sold within the past year other than reported above. | Comparable 3 has not sold within the past year other than reported above. |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:
The subject is not currently offered for sale.

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 185,000 |
| INDICATED VALUE BY INCOME APPROACH (if Applicable)   Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier | = $ |

This appraisal is made ☒ "as is"   ☐ subject to the repairs, alterations, inspections or conditions listed below   ☐ subject to completion per plans & specifications.

Conditions of Appraisal:   This report considers the subject in its present state and condition.

Final Reconciliation:   See attached addenda.

### RECONCILIATION

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA Form 1004B (Revised 06/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 04/11/2021 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 185,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature   ☐ Did   ☐ Did Not |
| Name  Molly McLeod Wilson | Name   Inspect Property |
| Date Report Signed  04/19/2021 | Date Report Signed |
| State Certification #  R00956   State AL | State Certification #   State |
| Or State License # | Or State License #   State |

Form UA2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 4CA6CFC7
esign.alamode.com/verify

## Supplemental Addendum

File No. 210412783

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |

**ZONING:**  Low Density Residential District. These districts are intended to provide areas for development not exceeding four (4) dwelling units per acre. It is desirable that development in these districts be compatible with the character, scale, and density of the existing neighborhood.

**HIGHEST AND BEST USE:**  The subject is a legally permissible use based on its current zoning.  Also, the lot size, shape, and land to building ratio allow the present structure and indicate a good utilization of the improvements.  Based on current market conditions, the existing structure as a single family residence is its financially feasible and maximally productive use. The highest and best use, as if vacant, would be to construct a single family residence.

**Intended Use/User:**
The intended user of this appraisal report is Jimmy Doyle and Christy Eikhoff and their assigns.  The intended use is to evaluate the property that is the subject of this report to obtain market value.  This report is subject to the stated scope of work, purpose of the appraisal, reporting requirements of this report form and the definition of anticipated sales price.  No additional intended users are identified by the appraiser.  This report contains sufficient information to enable the client to understand the report.  Any other party receiving a copy of this report for any reason is not an intended user, nor does it result in an appraiser - client relationship.  Additional users not named or identified are not intended users.

**Scope of Assignment:**
The scope of this assignment is specific to the needs of Jimmy Doyle, Christy Eikhoff and assigns, the client.  If you are not identified as the client, you are a third party and should recognize that the appraisal was not developed, nor the report communicated, in a manner consistent with the needs or users of parties other than the identified client.  This appraisal report contains abbreviations, acronyms, and terminology that may not be readily or properly understood by third parties.  Third parties are stongly cautioned against relying on the appraisal report for any purpose.  It should not be used in any manner for insurance purposes.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties.  Some of the standardized responses requirement by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business.  Examples specifically include condition and quality ratings as well as other data regarding comparable sales and listings.  Not every element of the comparable properties was viewable from the roadway and data for the comparable sales was generally obtained from the multiple listing services and tax records.  Consequently, this information should be considered as an estimate unless otherwise noted by the appraiser. In the sales analysis the affect may be observed by a lack of adjustments for quality or condition.

**SCOPE OF WORK:**
The subject of this assignment is for a current value opinion, fee simple estate, for a single unit home.  The sales approach to value would be appropriate to utilize for this assignment as there are sufficient comps to use in the sales analysis.  The cost approach was considered but not utilized as estimating depreciation could lead to a misleading value.  The income approach was considered but not utilized as rental data is very limited and the use of limited data could provide misleading results, thus no confidence would be placed in that approach and not considered in the reconciliation.

A complete visual observation of the subject will be conducted but that does not include any part of the subject that was not readily observable, does not include observations of the attic or crawl space, complete activation or testing of all mechanical systems, an environmental assessment, mold assessment, radon assessment or roof inspection other than observations from the ground, unless indicated or required by the assignment.  Heat and cooling systems are considered to be in average conditionif the home temperature is comfortablefor the season unless observations indicate a less than average condition.  In the sales analysis the selected and used comparable sales were locationally, physically, and functionally the most similar to the subject.  When required by the client or lender conditions, observations of the attic and crawl space were made.

The gross living area (base area) as presented by the tax records may differ from the measurements provided in this report. The Alabama Real Estate Appraisers Board has adopted the standard for the calculation and reporting of above grade (GLA) and below grade square footage in single family residences as developed by the "American National Standard for Single Family Residential Buildings: Square Footage Method for Calculating", ANSI Z765, as approved by the American National Standards Institute, Inc.  The public records do not utilize the same methods and standards and are not under the same guidelines and should not be relied upon for gross living area or below grade area.

The scope of the appraisal defines the extent of the process of collecting, confirming and reporting data utilized in the report for any or all of the three approaches to value as applicable to the appraisal assignment and as it relates to the needs of the client.  The primary source of data for the report would be the multiple listing service that provides sales data for the community.  As the multiple listing service does not provide a reliable source of some data relating to sales, such as the gross living area and site size, public records are utilized for that information.  Publication of gross living area in the multiple listing service is never utilized unless there is an assiciated statement as to the source that would represent a factual representation such as from a prior appraisal.  Whenever possible, the actual gross living area is utilized by actual measurements or data from a prior appraisal or from a reliable source such as another certified appraiser or AGDA, which is a data source compiled by certified appraisers.  Data is obtained from multiple listing information, buyers and/or sellers, attorneys, brokers or sales agents, closing statements, public records such as deeds or tax records and third parties to the transaction with knowledge of the sale.

Verfication of the sale is obtained from parties to the transaction to insure its accuracy and gain insight into the motivation behind each transaction.  The purpose of verification is to make sure that the sale occurred under conditions that meet the definition of value used in this report.  In some instances parties to the transaction are unable or refuse to make themselves available for verification of the sale.  In those instances the verification on file in the Office of the Probate Judge is utilized or the sale is compared with other sales and, if found similar, the sale is utilized.  Verfication also includes information about the comparable sale such as location, site size, basement areas, gross living area, age, and car storage.

The purpose of this report is for an opinion of market value of the fee simple interest.  The fee simple estate is absolute ownership unencumbered by any other interest or estate, subject onnly to the limitations imposed by governmental prowers of taxation, eminent domain, police power and escheat.  This is the most desired form of ownership of land.  There were no encroachments or other adverse conditions noted.

Serial# 4CA6CFC7
esign.alamode.com/verify

**Supplemental Addendum**                                    File No. 210412783

| Borrower | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | |

**INSPECTION:**  The use of the term inspection, when utilized in this report, is not the same level of inspection that is required for a "professional home inspection".  The appraiser does not fully inspect the electrical system, plumbing systems, mechanical system, foundation, floor structure or subfloor.  The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic valuation of the subject property.  Although the report may cite a general rating of the adequacy and or condition (based on observation only) it should be clearly understood that these statements are a general guide for comparison purposes and are not a detailed report on the physical and/or operational condition of these items.  The appraiser is not an expert in these matters and any opinion stated is advisory based only upon observation.  This report is not a home inspection.  While others may choose to rely on the report, they should not rely on it to disclose condition or defects in the subject property.  Such knowledge goes beyond the scope of this appraisal and as such, comments on observed conditions given in this report should not be taken as a guarantee that a problem does not exist.  If the client needs a more detailed inspection of the subject property, a home inspection by a professional home inspector is recommended.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

This assignment was made subject to the regulations of the Alabama Real Estate Appraisers Board.  The undersigned state licensed real estate appraiser has met the requirements of the board that allow this report to be regarded as a certified appraisal.

The global outbreak of a "novel coronavirus" known as COVID-19 was officially declared a pandemic by the World Health Organization (WHO).  The reader is cautioned, and reminded that the conclusions presented in this appraisal report apply only as of the effective date(s) indicated.  The appraiser makes no representation as to the effect on the subject property of any unforeseen event, subsequent to the effective date of the appraisal.

**• URAR: Sales Comparison Analysis - Summary of Sales Comparison Approach**
All sales are located in the same general marketing environment as the subject and are similar in style, design, and overall functional utility.  Sales 1-3 are considered to be the best and most reliable indicators of value as of the effective date of this report.  All sales, after each required adjustment was made, reasonably support the final estimate of value. Adjustments were made for gla, room count and amenities, and these adjustments were extracted from the market by a matched pairs analysis. Data to calculate adjustments for other differences was not sufficient to create credible adjustments.  Though some differences were not adjusted, these differences were considered in the reconciliation of the final estimate of value.  The subject and comparables would appeal to the same buyer.  All comparables reasonably support the estimate of value.

The Sales Comparison was utilitized in this report.  Primary emphasis was given the Sales Comparison Approach as it best relates the actions of buyers and sellers under present economic conditions.  The subject is located in an area of primarily owner occupied residences and the Income Approach could not be developed due to lack of data.  The Cost Approach to value was considered and rejected as an applicable approach as calculating physical depreciation could create misleading results. The undersigned state licensed appraiser has met the requirements of the board that allow this report to be regarded as a certified appraisal.

Serial# 4CA6CFC7
esign.alamode.com/verify

File No.   210412783

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
## (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Serial# 4CA6CFC7
esign.alamode.com/verify

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.



Serial# 4CA6CFC7
esign.alamode.com/verify

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| | | |
| | | |
| | | |
| | | |
| | | |

Form UADDEFINE1A - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 4CA6CFC7
esign.alamode.com/verify

## Building Sketch

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



TOTAL Sketch by a la mode, inc.

### Area Calculations Summary

| Living Area | | Calculation Details |
|---|---|---|
| First Floor | 1272.41 Sq ft | 0.5 × 2.95 × 2.06 = 3.04 |
| | | 0.5 × 2.06 × 2.95 = 3.04 |
| | | 6 × 2.06 = 12.39 |
| | | 16.1 × 10.8 = 173.88 |
| | | 13.7 × 8 = 109.6 |
| | | 26.8 × 21.3 = 570.84 |
| | | 20.6 × 19.4 = 399.6 |
| | | 0.5 × 20.6 × 0 = 0.01 |
| **Total Living Area (Rounded):** | **1272 Sq ft** | |
| **Non-living Area** | | |
| 2 Car Attached | 372.47 Sq ft | 19.2 × 19.4 = 372.46 |
| | | 0.5 × 19.2 × 0 = 0.01 |
| Porch | 60.8 Sq ft | 8 × 7.6 = 60.8 |
| Screened Porch | 137.16 Sq ft | 10.8 × 12.7 = 137.16 |
| Open Deck | 466.51 Sq ft | 0.5 × 6.65 × 3.32 = 11.04 |
| | | 0.5 × 2.95 × 2.06 = 3.04 |
| | | 22.28 × 2.95 = 65.71 |
| | | 22.28 × 6 = 133.69 |
| | | 0.5 × 2.06 × 2.95 = 3.04 |
| | | 22.28 × 2.95 = 65.71 |
| | | 13.55 × 13.6 = 184.26 |

Serial# 4CA6CFC7
esign.alamode.com/verify

## Location Map

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



Serial# 4CA6CFC7
esign.alamode.com/verify

## Location Map

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | N/A | | | | | |
| Property Address | 701 Waverly Pl | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | |



Serial# 4CA6CFC7
esign.alamode.com/verify

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



### Subject Front

701 Waverly Pl

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 1,272 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | N;Res |
| View | N;Res |
| Site | 10,010 sf |
| Quality | Q4 |
| Age | 14 |



### Subject Rear



### Subject Street

Serial# 4CA6CFC7
esign.alamode.com/verify

## Interior Photos

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 701 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



**Bathroom**



**Bedroom**



**Living Room**



**Kitchen**



**Dining Area**

Serial# 4CA6CFC7
esign.alamode.com/verify

## Comparable Photo Page

| | |
|---|---|
| Borrower | N/A |
| Property Address | 701 Waverly Pl |
| City | Opelika |
| Lender/Client | Individual - Jimmy Doyle |

County  Lee    State  AL    Zip Code  36801



### Comparable 1

706 Waverly Pl
| | |
|---|---|
| Prox. to Subject | 0.04 miles W |
| Sale Price | 198,000 |
| Gross Living Area | 1,370 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res |
| View | N;Res |
| Site | 8,689 sf |
| Quality | Q4 |
| Age | 16 |



### Comparable 2

611 Waverly Pl
| | |
|---|---|
| Prox. to Subject | 0.04 miles SE |
| Sale Price | 188,000 |
| Gross Living Area | 1,396 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7814 sf |
| Quality | Q4 |
| Age | 14 |



### Comparable 3

705 Waverly Pl
| | |
|---|---|
| Prox. to Subject | 0.03 miles NW |
| Sale Price | 165,000 |
| Gross Living Area | 1,165 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 9583 sf |
| Quality | Q4 |
| Age | 13 |

Serial# 4CA6CFC7
esign.alamode.com/verify

**Plat**



Serial# 4CA6CFC7
esign.alamode.com/verify

**Tax Card**

## Lee County Alabama
## 2021 - Realtor GIS
### Web19 - f16.2-d16.3 - LeeGov - 04-02-2021
## Parcel Details

**FavLink**   **PRCMap**   **NewSrch**   **Back**   **Print**

### Parcel

| | |
|---|---|
| Delta Pin: | 61614 |
| Parcel No: | 43 09 01 11 2 000 028.000 |
| Prop Addr: | 701 WAVERLY PLACE |
| Deeded Acres: 0.00 | Calc't: 0.23 |
| Deed Info: | B 2315 | P 0000564 | D 06-01-2007 |
| Plat Info: | B | P | D -- |
| Neighborhood: | OP R WP |
| Tax District: | 01-Opelika |

### Owner

| | |
|---|---|
| Name: | GIBBS GENE R & DARLA D |
| Address: | 701 WAVERLY PLACE |
| City, State, ZIP: | OPELIKA, AL  36801 |

### Values

| | |
|---|---|
| Land Total: | $35,000.00 |
| Building Total: | $143,640.00 |
| Appraised Value: | $178,640.00 |
| Yrly Tax: | $0 for 2020 |

### Sales History

| SDate | SPrice | Type | Ratio | DBook | DPage |
|---|---|---|---|---|---|
| 06-01-2007 | $164,000 | 111 | Y | 2315 | 0000564 |
| 12-22-2006 | $1,000 | 913 | N | 2307 | 0000074 |
| 01-22-2004 | $0 | 0 | N | 2249 | 0000963 |

### Building   **Bldg-Sketch**

| Bldg No | Use Type | Yr Built | Base Area | Upper Area | Story |
|---|---|---|---|---|---|
| 1 | 111 | 2007 | 1237 | 0 | 1 |

### Tax History

| Tax Year | Date Paid | Amount Paid |
|---|---|---|
| 2020 | // | $0.00 |
| 2019 | // | $0.00 |
| 2018 | // | $0.00 |
| 2017 | // | $0.00 |

**Basic** | **Parcel** | **Land** | **Bldg** | **Imp** | **Sale**

Serial# 4CA6CFC7
esign.alamode.com/verify

Wilson Appraisals (334) 741-9290

| | |
|---|---|
| File No. | 210412783 |

## AGREEMENT FOR APPRAISAL SERVICES

1. PARTIES  Individual - Jimmy Doyle                                    Client

hereby agrees to employ  Molly McLeod Wilson                           Appraiser

2. PROPERTY located in  Lee          County, State of  AL          legally described as:
Lot 17 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E

ADDRESS  701 Waverly Pl                                 hereinafter called Property.

3. APPRAISAL REPORT. Appraiser agrees to prepare, in writing, an Appraisal Report, in conformity with any professional organizations to which Appraiser may belong, with an opinion of value. The purpose of this appraisal is:

☐ Purchase  ☐ Sale  ☐ Estate Tax  ☐ Lessee  ☐ Insurance  ☐ Ad valorem Tax  ☐ Mortgage Financing  ☐ Condemnation

☒ General Information  ☐ Other

4. INTEREST to be appraised shall be  ☒ Fee Simple  ☐ Leasehold  ☐ Leased Fee  ☐ Other

5. COMPLETION of the appraisal shall be by  04/19/2021          subject to unforeseen circumstances or
conditions beyond the control of the Appraiser. The number of copies to be prepared is  1 via email

6. PAYMENTS FOR SERVICES:
☒ AGREED FEE. Client agrees to pay Appraiser a cash fee of  $   500.00
☐ HOURLY-PER DIEM. Client agrees to pay Appraiser a cash fee of  $          per  ☐ hour  ☐ day for time expanded on
Client's behalf, to an estimated maximum of  $
☐ EXPENSES. Appraiser shall be additionally paid usual and necessary expenses for the following

☐ LITIGATION. In the event Appraiser is called upon, voluntarily or otherwise, to testify in court or deposition regarding the Appraisal Report herein, Client agrees to pay an additional sum of  $          for each
plus Appraiser's usual and customary expenses.
☒ CANCELLATION. If this agreement is canceled at any time prior to the delivery of the Appraisal Report, Client agrees to pay a fee of
$75 after inspection but prior to research and work on the report.

☐ RETAINER fee in the amount of  $          is payable          to apply toward the total fee herein.

All sums due hereunder shall be paid on delivery of the Appraisal Report to Client, and are payable in the County of Appraiser's principal residence. The Appraiser's fee is in no way based on the opinion of value of the appraised Property, and all sums hereunder are due and payable regardless of the amount of the opinion of value. In the event it is necessary to employ an attorney to collect any sums due herein, Client agrees to pay reasonable attorney's fees and court costs expended by Appraiser.

7. AUTHORITY. Appraiser and his subcontractors are hereby authorized to make on-site inspections of subject property at all reasonable times to obtain supporting property data, including but not limited to: Building plans, plats, deeds, legal descriptions, abstracts, income and expense data, leases, options. Further to interview Client's attorneys, accountants, managers, agents, present and prospective tenants. To be furnished copies of relevant information, to copy same and use as documentation for the Appraisal Report. To obtain such information that in the Appraiser's judgment may be relevant to the appraisal. CLIENT'S AUTHORITY to execute this agreement is hereby warranted, and that client is either owner of the subject property or has authority of the owner to enter into this agreement.

8. CONDITIONS. The Appraisal Report shall be subject to Appraiser's conditions and limitations standard form or as shown on attachment hereto. The Appraisal Report will be prepared for the sole and exclusive use of the Client, and shall not be reproduced, printed or distributed in any manner without written consent of Appraiser, as it consists of "trade secrets and commercial and financial information" which is privileged and confidential and exempted from disclosure under 5USC(b)(4).

9. WARRANTIES AND INDEMNITY. Appraiser does not make any warranties or guarantees of any kind regarding the condition of the property, sufficiency of title, areas and boundaries, mechanical and structural conditions of the improvements and with the agreement that the Appraisal Report represents Appraiser's opinion of value only, without any warranty that the property will sell for the appraised value. Client agrees to indemnify Appraiser, his employees and independent contractors from all claims, suits and charges of any nature that may arise out of this agreement.

10. ADDITIONAL AGREEMENTS:

🔒 esign.alamode.com/verify    Serial:4CA6CFC7

Executed in duplicate originals on this day,

Individual - Jimmy Doyle          Molly McLeod Wilson
Client                            Appraiser
                                  P.O. Box 2976, Auburn, AL 36831
Address                           Address

                                  (334) 444-6603
Telephone                         Telephone

Form AS2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial#4CA6CFC7
esign.alamode.com/verify

# EXHIBIT H

Wilson Appraisals (334) 741-9290

# INVOICE

| FROM: |
|---|
| Molly McLeod Wilson |
| Wilson Appraisals, LLC |
| P.O. Box 2976 |
| Auburn, AL 36831 |
| |
| Telephone Number:  (334) 444-6603          Fax Number: |

| INVOICE NUMBER |
|---|
| 210412784 |

| DATES | |
|---|---|
| Invoice Date: | 04/09/2021 |
| Due Date: | 04/19/2021 |

| TO: |
|---|
| |
| Individual - Jimmy Doyle |
| |
| , |
| |
| E-Mail:  jimmy@doylefirm.com |
| Telephone Number:          Fax Number: |
| Alternate Number: |

| REFERENCE | |
|---|---|
| Internal Order #: | 210412784 |
| Lender Case #: | |
| Client File #: | |
| FHA/VA Case #: | |
| Main File # on form: | 210412784 |
| Other File # on form: | |
| Federal Tax ID: | 20-0964456 |
| Employer ID: | |

## DESCRIPTION

| | | | |
|---|---|---|---|
| Lender: | Individual - Jimmy Doyle | Client: | Individual - Jimmy Doyle |
| Purchaser/Borrower: | N/A | | |
| Property Address: | 703 Waverly Pl | | |
| City: | Opelika | | |
| County: | Lee | State:  AL | Zip:  36801 |
| Legal Description: | Lot 18 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E | | |

| FEES | AMOUNT |
|---|---|
| 1004 Full Appraisal | 500.00 |
| | |
| SUBTOTAL | 500.00 |

| PAYMENTS | AMOUNT |
|---|---|
| Check #:  1829    Date:  04/09/2021    Description:  Total check $1000 | 500.00 |
| Check #:          Date:          Description: | |
| Check #:          Date:          Description: | |
| SUBTOTAL | 500.00 |
| TOTAL DUE  $ | 0.00 |

Serial# 12D17869
esign.alamode.com/verify

Wilson Appraisals (334) 741-9290

# UNIFORM RESIDENTIAL APPRAISAL REPORT

**Property Description**  File No. 210412784

## SUBJECT

| Property Address | 703 Waverly Pl | City Opelika | State AL | Zip Code 36801 |
|---|---|---|---|---|

Legal Description  Lot 18 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E  County Lee

Assessor's Parcel No.  43-09-01-11-2-000-029.000  Tax Year 2020  R.E. Taxes $ 444  Special Assessments $ 0

Borrower  N/A  Current Owner Carter John A & Jill M  Occupant: ☐ Owner ☐ Tenant ☒ Vacant

Property rights appraised  ☒ Fee Simple  ☐ Leasehold  Project Type  ☒ PUD  ☐ Condominium (HUD/VA only)  HOA $ 60  /Mo.

Neighborhood or Project Name  Waverly Park Subdivision  Map Reference 12220  Census Tract 0411.00

Sale Price $  N/A  Date of Sale N/A  Description and $ amount of loan charges/concessions to be paid by seller  N/A

Lender/Client  Individual - Jimmy Doyle  Address

Appraiser  Molly McLeod Wilson  Address P.O. Box 2976, Auburn, AL 36831

## NEIGHBORHOOD

| Location | ☐ Urban ☒ Suburban ☐ Rural | **Predominant occupancy** | **Single family housing** | **Present land use %** | **Land use change** |
|---|---|---|---|---|---|

| | | | PRICE $(000) | AGE (yrs) | | |
|---|---|---|---|---|---|---|
| Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | ☒ Owner | Low 110 | Low 10 | One family 80 | ☒ Not likely ☐ Likely |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☐ Tenant | High 200 | High 25 | 2-4 family 15 | ☐ In process |
| Property values | ☐ Increasing ☒ Stable ☐ Declining | ☒ Vacant (0-5%) | Predominant | | Multi-family | To: |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☐ Vac.(over 5%) | 175 | 15 | Commercial | |
| Marketing time | ☒ Under 3 mos. ☐ 3-6 mos. ☐ Over 6 mos. | | | | Vacant 5 | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:  The subject is bounded to the North and West by Veterans Parkway, East by Oak Bowery Road, and South by Birmingham Highway.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
The subject is located in Waverly Park Subdivision and within the Opelika City Limits. No adverse conditions were noted in the neighborhood, and appeal to the market is good. The subject is located close to value supporting amenities such as schools, entertainment, shopping, places of worship, and employment.  Approximately 5% of land in the development is vacant.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):
There are currently few properties in immediate area offered for sale.  Marketing trends appear to be increasing and appeal to this area is good.  Supply and demand appears to be in balance with no substantial number of properties listed on the open market.

## PUD

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?  ☐ Yes ☒ No

Approximate total number of units in the subject project  Approximate total number of units for sale in the subject project

Describe common elements and recreational facilities:

## SITE

| Dimensions | 60.7' x 129.6' x 73.4' x 120.9' | Topography | Relatively Level |
|---|---|---|---|
| Site area | 8,101 sf  Corner Lot ☐ Yes ☒ No | Size | 8101 sf |
| Specific zoning classification and description | R-3 Low Density Residential | Shape | Irregular |
| Zoning compliance | ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | Drainage | Appears Adequate |
| Highest & best use as improved: | ☒ Present use ☐ Other use (explain) | View | Residential |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | | |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | Asphalt | ☒ | ☐ | Landscaping | Typical | |
| Gas | ☒ | | Curb/gutter | Concrete | ☒ | ☐ | Driveway Surface | Concrete | |
| Water | ☒ | | Sidewalk | None | ☐ | ☐ | Apparent easements | None Apparent | |
| Sanitary sewer | ☒ | | Street lights | Mercury Vapor | ☒ | ☐ | FEMA Special Flood Hazard Area | ☐ Yes ☒ No | |
| Storm sewer | ☒ | | Alley | None | ☐ | ☐ | FEMA Zone X | Map Date 11/02/2011 | |
| | | | | | | | FEMA Map No. | 01081C0068G | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.):  There was no noted adverse easements or encroachments observed on the day of inspection. The subject appears to have adequate grading and drainage.

## DESCRIPTION OF IMPROVEMENTS

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | Concrete | Slab | None | Area Sq. Ft. | 0 | Roof | Unk | ☐ |
| No. of Stories | 1 | Exterior Walls | Brick/Vinyl | Crawl Space | Yes | % Finished | N/A | Ceiling | Unk | ☐ |
| Type (Det./Att.) | Detached | Roof Surface | Shingle | Basement | None | Ceiling | N/A | Walls | Unk | ☐ |
| Design (Style) | Traditional | Gutters & Dwnspts. | Aluminum | Sump Pump | None Seen | Walls | N/A | Floor | Unk | ☐ |
| Existing/Proposed | Existing | Window Type | Vinyl Clad | Dampness | None Noted | Floor | N/A | None | Unk | ☐ |
| Age (Yrs.) | 14 | Storm/Screens | Yes | Settlement | None Noted | Outside Entry | N/A | Unknown | Yes | ☒ |
| Effective Age (Yrs.) | 14 | Manufactured House | No | Infestation | None Noted | | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 0 |
| Level 1 | X | 1 | X | 1 | | | | 2 | 2 | X | | 1,181 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:  4 Rooms;  2 Bedroom(s);  2 Bath(s);  1,181 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Cer/Wood/BelowAvg | Type | Fwa | Refrigerator | ☐ | None | ☒ | Fireplace(s) # 0 | ☐ | None | ☐ |
| Walls | Dry Wall/BelowAvg | Fuel | Electric | Range/Oven | ☒ | Stairs | ☐ | Patio None | ☐ | Garage | # of cars |
| Trim/Finish | Wood/BelowAvg | Condition | Good | Disposal | ☐ | Drop Stair | ☒ | Deck Screened | ☒ | Attached | 1 |
| Bath Floor | Ceramic/BelowAvg | COOLING | | Dishwasher | ☒ | Scuttle | ☐ | Porch Stoop | ☒ | Detached | ☐ |
| Bath Wainscot | Cer/Fiber/BelowAvg | Central | Yes | Fan/Hood | ☒ | Floor | ☐ | Fence None | ☐ | Built-In | ☐ |
| Doors | Wood/BelowAvg | Other | None | Microwave | ☐ | Heated | ☐ | Pool None | ☐ | Carport | ☐ |
| | | Condition | Good | Washer/Dryer | ☐ | Finished | ☐ | | | Driveway | 2 |

Additional features (special energy efficient items, etc.):  Ceiling fans, Low E windows, Insulation

## COMMENTS

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:  C4;No updates in the prior 15 years;The floor plan is considered functional and well accepted by the buying public.  No external obsolescence was observed on the day of inspection.  On the day of inspection the utilities were not on and could not be checked for funcationality. On the day of inspection, the subject was considered to be in overall below average condition.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.:  No adverse conditions were noted on the day of inspection

*Molly McLeod Wilson*

Form UA2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 12D17869
esign.alamode.com/verify

**Valuation Section**

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 210412784

## COST APPROACH

| | |
|---|---|
| ESTIMATED SITE VALUE .......................................... = $ | Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):   The Cost Approach to Value was considered and rejected as an applicable approach to value as calculating physical depreciation could create misleading results. |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | |
| Dwelling     1,181 Sq. Ft. @ $ _____ = $ _____ | |
| 0 Sq. Ft. @ $ _____ = $ _____ | |
| _____ = $ _____ | |
| Garage/Carport   271   Sq. Ft. @ $ _____ = $ _____ | |
| Total Estimated Cost New _____ = $ _____ | |
| Less        Physical      Functional      External | |
| Depreciation _____ = $ _____ | |
| Depreciated Value of Improvements _____ = $ _____ | |
| "As-is" Value of Site Improvements _____ = $ _____ | |
| INDICATED VALUE BY COST APPROACH _____ = $ | |

## SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 703 Waverly Pl<br>Opelika, AL 36801 | 706 Waverly Pl<br>Opelika, AL 36801 | 611 Waverly Pl<br>Opelika, AL 36801 | 705 Waverly Pl<br>Opelika, AL 36801 |
| Proximity to Subject | | 0.04 miles SW | 0.06 miles SE | 0.01 miles NW |
| Sales Price | $        N/A | $        198,000 | $        188,000 | $        165,000 |
| Price/Gross Living Area | $ | $ 144.53 | $ 134.67 | $ 141.63 |
| Data and/or<br>Verification Source | LCAR/Tax Rec<br>Inspection | LCAR #147389;DOM 14<br>Tax Records/External Observ | LCAR #146290;DOM 0<br>Tax Records/External Observ | LCAR #147341;DOM 1<br>Tax Records/External Observ |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION +(−)$ Adjust. | DESCRIPTION +(−)$ Adjust. | DESCRIPTION +(−)$ Adjust. |
| Sales or Financing<br>Concessions | | Arms Length<br>Conv;3000 | ArmLth<br>Conv;600 | ArmLth<br>Conv;3000 |
| Date of Sale/Time | | s09/20;c08/20 | s08/20;c08/20 | s09/20;c08/20 |
| Location | N;Res | N;Res; | N;Res; | N;Res; |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Site | 8,101 sf | 8,689 sf | 7814 sf                  0 | 9583 sf                  0 |
| View | N;Res | N;Res; | N;Res; | N;Res; |
| Design and Appeal | DT1;Trad | DT2;Trad          0 | DT1;Trad | DT1;Trad |
| Quality of Construction | Q4 | Q4 | Q4 | Q4 |
| Age | 14 | 16            0 | 14 | 13            0 |
| Condition | C4 | C3        -10,000 | C3        -10,000 | C3        -10,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | Total Bdrms Baths | Total Bdrms Baths |
| Room Count | 4     2     2 | 5     3     2.1    -2,500 | 5     3     2.0 | 4     2     2.0 |
| Gross Living Area | 1,181 Sq. Ft. | 1,370 Sq. Ft.    -7,560 | 1,396 Sq. Ft.    -8,600 | 1,165 Sq. Ft. |
| Basement & Finished<br>Rooms Below Grade | 0 | 0 | 0sf | 0sf |
| Functional Utility | Average/2bdrom | Good        -10,000 | Good        -10,000 | Average/2bdrm |
| Heating/Cooling | Fwa / Cac | Fwa / Cac | Fwa / Cac | Fwa / Cac |
| Energy Efficient Items | CFan/Win/Insul | CFan/Win/Insul | CFan/Win/Insul | CFan/Win/Insul |
| Garage/Carport | 2ga2dw | 2ga2dw        -4,000 | 2ga2dw        -4,000 | 1ga2dw |
| Porch, Patio, Deck,<br>Fireplace(s), etc. | Stoop/ScrPch/Dk<br>No Fireplace | Stoop/Patio           0<br>No Fireplace | Stoop/Deck           0<br>No Fireplace | Stp/ScrnPatio           0<br>No Fireplace |
| Fence, Pool, etc. | None | Rear Fence | None | None |
| Net Adj. (total) | | ☐ + ☒ − $      -34,060 | ☐ + ☒ − $      -32,600 | ☐ + ☒ − $      -10,000 |
| Adjusted Sales Price<br>of Comparable | | Net 17.2 %<br>Gross 17.2 % $ 163,940 | Net 17.3 %<br>Gross 17.3 % $ 155,400 | Net 6.1 %<br>Gross 6.1 % $ 155,000 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): _____ See attached addenda. _____

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data<br>Source, for prior sales<br>within year of appraisal | The subject has<br>not sold within<br>the past 3 years | Comparable 1 has not sold<br>within the past year other than<br>reported above. | Comparable 2 has not sold<br>within the past year other than<br>reported above. | Comparable 3 has not sold<br>within the past year other than<br>reported above. |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:
The subject is not currently offered for sale.

| | | |
|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | $ | 160,000 |
| INDICATED VALUE BY INCOME APPROACH (if Applicable)   Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier | = $ | |

## RECONCILIATION

This appraisal is made ☒ "as is"  ☐ subject to the repairs, alterations, inspections or conditions listed below  ☐ subject to completion per plans & specifications.

Conditions of Appraisal:   This report considers the subject in its present state and condition.

Final Reconciliation:   See attached addenda.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA form 1004B (Revised ___06/93___).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF ___04/11/2021___ (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE    $ ___160,000___

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | ☐ Did  ☐ Did Not |
| Name  Molly McLeod Wilson | Name | Inspect Property |
| Date Report Signed   04/20/2021 | Date Report Signed | |
| State Certification #   R00956     State AL | State Certification # | State |
| Or State License # | Or State License # | State |

Form UA2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 12D17869
esign.alamode.com/verify

## UNIFORM RESIDENTIAL APPRAISAL REPORT
## MARKET DATA ANALYSIS

These recent sales of properties are most similar and proximate to subject and have been considered in the market analysis.  The description includes a dollar adjustment, reflecting market reaction to those items of significant variation between the subject and comparable properties.  If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (-) adjustment is made, thus reducing the indicated value of the subject.  If a significant item in the comparable is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the indicated value of the subject.

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 703 Waverly Pl | 2303 Ellenwood Dr | | | | | |
| | Opelika, AL 36801 | Opelika, AL 36801 | | | | | |
| Proximity to Subject | | 2.49 miles NE | | | | | |
| Sales Price | $ N/A | $ 183,000 | | $ | | $ | |
| Price/Gross Living Area | $ ⌂ | $ 103.98 ⌂ | | $ ⌂ | | $ ⌂ | |
| Data and/or | LCAR/Tax Rec | LCAR #148447;DOM 22 | | | | | |
| Verification Sources | Inspection | Tax Records/External Observ | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Sales or Financing | | Arms Length | | | | | |
| Concessions | | Conv;5000 | | | | | |
| Date of Sale/Time | | s01/21;c12/20 | | | | | |
| Location | N;Res | N;Res | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 8,101 sf | 16192 sf | 0 | | | | |
| View | N;Res | N;Res | | | | | |
| Design and Appeal | DT1;Trad | DT1;Trad | | | | | |
| Quality of Construction | Q4 | Q4 | | | | | |
| Age | 14 | 29 | 0 | | | | |
| Condition | C4 | C4 | | | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 4  2  2 | 5  3  2 | 0 | | | | |
| Gross Living Area | 1,181 Sq. Ft. | 1,760 Sq. Ft. | -23,160 | Sq. Ft. | | Sq. Ft. | |
| Basement & Finished | 0 | 0 | | | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average/2bdrom | Good | -10,000 | | | | |
| Heating/Cooling | Fwa / Cac | Fwa / Cac | | | | | |
| Energy Efficient Items | CFan/Win/Insul | CFan/Win/Insul | | | | | |
| Garage/Carport | 2ga2dw | 1ga2dw | | | | | |
| Porch, Patio, Deck, | Stoop/ScrPch/Dk | Stoop/Patio | 0 | | | | |
| Fireplace(s), etc. | No Fireplace | No Fireplace | | | | | |
| Fence, Pool, etc. | None | None | | | | | |
| Net Adj. (total) | | ☐ + ☒ − $ | -33,160 | ☐ + ☐ − $ | | ☐ + ☐ − $ | |
| Adjusted Sales Price | | Net  18.1 % | | Net  % | | Net  % | |
| of Comparable | | Gross 18.1 % $ | 149,840 | Gross  % $ | | Gross  % $ | |
| Date, Price and Data | The subject has | Comparable 4 has not sold | | | | | |
| Source for prior sales | not sold within | within the past year other than | | | | | |
| within year of appraisal | the past 3 years | reported above. | | | | | |

Comments:

Market Data Analysis 6-93

Serial# 12D17869
esign.alamode.com/verify

## Supplemental Addendum

File No. 210412784

| Borrower | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | |

**ZONING:** Low Density Residential District. These districts are intended to provide areas for development not exceeding four (4) dwelling units per acre. It is desirable that development in these districts be compatible with the character, scale, and density of the existing neighborhood.

**HIGHEST AND BEST USE:** The subject is a legally permissible use based on its current zoning.  Also, the lot size, shape, and land to building ratio allow the present structure and indicate a good utilization of the improvements.  Based on current market conditions, the existing structure as a single family residence is its financially feasible and maximally productive use. The highest and best use, as if vacant, would be to construct a single family residence.

**Intended Use/User:**
The intended user of this appraisal report is Jimmy Doyle and Christy Eikhoff and their assigns.  The intended use is to evaluate the property that is the subject of this report to obtain market value.  This report is subject to the stated scope of work, purpose of the appraisal, reporting requirements of this report form and the definition of anticipated sales price.  No additional intended users are identified by the appraiser.  This report contains sufficient information to enable the client to understand the report.  Any other party receiving a copy of this report for any reason is not an intended user, nor does it result in an appraiser - client relationship.  Additional users not named or identified are not intended users.

**Scope of Assignment:**
The scope of this assignment is specific to the needs of Jimmy Doyle, Christy Eikhoff and assigns, the client.  If you are not identified as the client, you are a third party and should recognize that the appraisal was not developed, nor the report communicated, in a manner consistent with the needs or users of parties other than the identified client.  This appraisal report contains abbreviations, acronyms, and terminology that may not be readily or properly understood by third parties.  Third parties are stongly cautioned against relying on the appraisal report for any purpose.  It should not be used in any manner for insurance purposes.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties.  Some of the standardized responses requirement by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business.  Examples specifically include condition and quality ratings as well as other data regarding comparable sales and listings.  Not every element of the comparable properties was viewable from the roadway and data for the comparable sales was generally obtained from the multiple listing services and tax records.  Consequently, this information should be considered as an estimate unless otherwise noted by the appraiser. In the sales analysis the affect may be observed by a lack of adjustments for quality or condition.

**SCOPE OF WORK:**
The subject of this assignment is for a current value opinion, fee simple estate, for a single unit home.  The sales approach to value would be appropriate to utilize for this assignment as there are sufficient comps to use in the sales analysis.  The cost approach was considered but not utilized as estimating depreciation could lead to a misleading value.  The income approach was considered but not utilized as rental data is very limited and the use of limited data could provide misleading results, thus no confidence would be placed in that approach and not considered in the reconciliation.

A complete visual observation of the subject will be conducted but that does not include any part of the subject that was not readily observable, does not include observations of the attic or crawl space, complete activation or testing of all mechanical systems, an environmental assessment, mold assessment, radon assessment or roof inspection other than observations from the ground, unless indicated or required by the assignment.  Heat and cooling systems are considered to be in average conditionif the home temperature is comfortablefor the season unless observations indicate a less than average condition.  In the sales analysis the selected and used comparable sales were locationally, physically, and functionally the most similar to the subject.  When required by the client or lender conditions, observations of the attic and crawl space were made.

The gross living area (base area) as presented by the tax records may differ from the measurements provided in this report. The Alabama Real Estate Appraisers Board has adopted the standard for the calculation and reporting of above grade (GLA) and below grade square footage in single family residences as developed by the "American National Standard for Single Family Residential Buildings: Square Footage Method for Calculating", ANSI Z765, as approved by the American National Standards Institute, Inc.  The public records do not utilize the same methods and standards and are not under the same guidelines and should not be relied upon for gross living area or below grade area.

The scope of the appraisal defines the extent of the process of collecting, confirming and reporting data utilized in the report for any or all of the three approaches to value as applicable to the appraisal assignment and as it relates to the needs of the client.  The primary source of data for the report would be the multiple listing service that provides sales data for the community.  As the multiple listing service does not provide a reliable source of some data relating to sales, such as the gross living area and site size, public records are utilized for that information.  Publication of gross living area in the multiple listing service is never utilized unless there is an assiciated statement as to the source that would represent a factual representation such as from a prior appraisal.  Whenever possible, the actual gross living area is utilized by actual measurements or data from a prior appraisal or from a reliable source such as another certified appraiser or AGDA, which is a data source compiled by certified appraisers.  Data is obtained from multiple listing information, buyers and/or sellers, attorneys, brokers or sales agents, closing statements, public records such as deeds or tax records and third parties to the transaction with knowledge of the sale.

Verfication of the sale is obtained from parties to the transaction to insure its accuracy and gain insight into the motivation behind each transaction.  The purpose of verification is to make sure that the sale occurred under conditions that meet the definition of value used in this report.  In some instances parties to the transaction are unable or refuse to make themselves available for verification of the sale.  In those instances the verification on file in the Office of the Probate Judge is utilized or the sale is compared with other sales and, if found similar, the sale is utilized.  Verfication also includes information about the comparable sale such as location, site size, basement areas, gross living area, age, and car storage.

The purpose of this report is for an opinion of market value of the fee simple interest.  The fee simple estate is absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by governmental prowers of taxation, eminent domain, police power and escheat.  This is the most desired form of ownership of land.  There were no encroachments or other adverse conditions noted.

Serial# 12D17869
esign.alamode.com/verify

## Supplemental Addendum

File No. 210412784

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |

**INSPECTION:**  The use of the term inspection, when utilized in this report, is not the same level of inspection that is required for a "professional home inspection".  The appraiser does not fully inspect the electrical system, plumbing systems, mechanical system, foundation, floor structure or subfloor.  The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic valuation of the subject property.  Although the report may cite a general rating of the adequacy and or condition (based on observation only) it should be clearly understood that these statements are a general guide for comparison purposes and are not a detailed report on the physical and/or operational condition of these items.  The appraiser is not an expert in these matters and any opinion stated is advisory based only upon observation.  This report is not a home inspection.  While others may choose to rely on the report, they should not rely on it to disclose condition or defects in the subject property.  Such knowledge goes beyond the scope of this appraisal and as such, comments on observed conditions given in this report should not be taken as a guarantee that a problem does not exist.  If the client needs a more detailed inspection of the subject property, a home inspection by a professional home inspector is recommended.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

This assignment was made subject to the regulations of the Alabama Real Estate Appraisers Board.  The undersigned state licensed real estate appraiser has met the requirements of the board that allow this report to be regarded as a certified appraisal.

The global outbreak of a "novel coronavirus" known as COVID-19 was officially declared a pandemic by the World Health Organization (WHO).  The reader is cautioned, and reminded that the conclusions presented in this appraisal report apply only as of the effective date(s) indicated.  The appraiser makes no representation as to the effect on the subject property of any unforeseen event, subsequent to the effective date of the appraisal.

**• URAR: Sales Comparison Analysis - Summary of Sales Comparison Approach**
All sales are located in the same general marketing environment as the subject and are similar in style, design, and overall functional utility.  Sales 1-4 are considered to be the best and most reliable indicators of value as of the effective date of this report.  All sales, after each required adjustment was made, reasonably support the final estimate of value. Adjustments were made for gla, room count and amenities, and these adjustments were extracted from the market by a matched pairs analysis. Data to calculate adjustments for other differences was not sufficient to create credible adjustments.  Though some differences were not adjusted, these differences were considered in the reconciliation of the final estimate of value.  The subject and comparables would appeal to the same buyer.  All comparables reasonably support the estimate of value.

The Sales Comparison was utilitized in this report.  Primary emphasis was given the Sales Comparison Approach as it best relates the actions of buyers and sellers under present economic conditions.  The subject is located in an area of primarily owner occupied residences and the Income Approach could not be developed due to lack of data.  The Cost Approach to value was considered and rejected as an applicable approach as calculating physical depreciation could create misleading results.  The undersigned state licensed appraiser has met the requirements of the board that allow this report to be regarded as a certified appraisal.

Serial# 12D17869
esign.alamode.com/verify

File No.   210412784

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

**C1**

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

**C2**

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

**C3**

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

**C4**

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

**C5**

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

**C6**

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

**Q1**

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

**Q2**

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Serial# 12D17869
esign.alamode.com/verify

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
### (Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.



Serial# 12D17869
esign.alamode.com/verify

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Form UADDEFINE1A - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 12D17869
esign.alamode.com/verify

**Building Sketch**

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



| Area Calculations Summary | | |
|---|---|---|
| **Living Area** | | **Calculation Details** |
| First Floor | 1181.46 Sq ft | 34.8 × 26.6 = 925.68 |
| | | 11.4 × 14.1 = 160.74 |
| | | 6.6 × 14.4 =  95.04 |
| **Total Living Area (Rounded):** | **1181 Sq ft** | |
| **Non-living Area** | | |
| 1 Car Attached | 270.72 Sq ft | 19.2 × 14.1 = 270.72 |
| Stoop | 31.68 Sq ft | 4.8 × 6.6 =  31.68 |
| Screened Porch | 139.16 Sq ft | 14.2 × 9.8 = 139.16 |

Serial# 12D17869
esign.alamode.com/verify

## Location Map

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



Serial# 12D17869
esign.alamode.com/verify

# Location Map

| Borrower | N/A | | | | | | |
|----------|-----|--|--|--|--|--|--|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



Serial# 12D17869
esign.alamode.com/verify

## Subject Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



**Subject Front**

703 Waverly Pl
Sales Price            N/A
Gross Living Area      1,181
Total Rooms            4
Total Bedrooms         2
Total Bathrooms        2
Location               N;Res
View                   N;Res
Site                   8,101 sf
Quality                Q4
Age                    14



**Subject Rear**



**Subject Street**



Serial# 12D17869
esign.alamode.com/verify

## Interior Photos

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



**Bathroom**



**Bedroom**



**Bedroom**



**Bathroom**



**Kitchen**



**Deferred Maintenance**

Serial# 12D17869
esign.alamode.com/verify

## Interior Photos

| | |
|---|---|
| Borrower | N/A |
| Property Address | 703 Waverly Pl |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle |



**Deferred Maintenance**



**Dining Area**



**Living Room**

Serial# 12D17869
esign.alamode.com/verify

## Comparable Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



### Comparable 1

706 Waverly Pl

| | |
|---|---|
| Prox. to Subject | 0.04 miles SW |
| Sale Price | 198,000 |
| Gross Living Area | 1,370 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res |
| View | N;Res |
| Site | 8,689 sf |
| Quality | Q4 |
| Age | 16 |



### Comparable 2

611 Waverly Pl

| | |
|---|---|
| Prox. to Subject | 0.06 miles SE |
| Sale Price | 188,000 |
| Gross Living Area | 1,396 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7814 sf |
| Quality | Q4 |
| Age | 14 |



### Comparable 3

705 Waverly Pl

| | |
|---|---|
| Prox. to Subject | 0.01 miles NW |
| Sale Price | 165,000 |
| Gross Living Area | 1,165 |
| Total Rooms | 4 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 9583 sf |
| Quality | Q4 |
| Age | 13 |

Serial# 12D17869
esign.alamode.com/verify

## Comparable Photo Page

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 703 Waverly Pl | | | | | | |
| City | Opelika | County | Lee | State | AL | Zip Code | 36801 |
| Lender/Client | Individual - Jimmy Doyle | | | | | | |



### Comparable 4

| | |
|---|---|
| 2303 Ellenwood Dr | |
| Prox. to Subject | 2.49 miles NE |
| Sale Price | 183,000 |
| Gross Living Area | 1,760 |
| Total Rooms | 5 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | N;Res |
| View | N;Res |
| Site | 16192 sf |
| Quality | Q4 |
| Age | 29 |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

Serial# 12D17869
esign.alamode.com/verify

**Plat**



Serial# 12D17869
esign.alamode.com/verify

**Tax Card**

## Lee County Alabama
## 2021 - Realtor GIS
Web19 - f16.2-d16.3 - LeeGov - 04-02-2021
## Parcel Details

**FavLink**   **PRCMap**   **NewSrch**   **Back**   **Print**

### Parcel

| | |
|---|---|
| Delta Pin: | 61615 |
| Parcel No: | 43 09 01 11 2 000 029.000 |
| Prop Addr: | 703 WAVERLY PLACE |
| Deeded Acres: 0.00 | Calc't: 0.19 |

| Deed Info: | B 2307 | P 0000075 | D 12-22-2006 |
|---|---|---|---|
| Plat Info: | B | P | D -- |

| | |
|---|---|
| Neighborhood: | OP R WP |
| Tax District: | 01-Opelika |

### Owner

| | |
|---|---|
| Name: | CARTER JOHN A & JILL M |
| Address: | 1590 CRESCENT BLVD |
| City, State, ZIP: | AUBURN, AL  36830 |

### Values

| | |
|---|---|
| Land Total: | $35,000.00 |
| Building Total: | $6,780.00 |
| Appraised Value: | $41,780.00 |
| Yrly Tax: | $443.88 for 2020 |

### Sales History

| SDate | SPrice | Type | Ratio | DBook | DPage |
|---|---|---|---|---|---|
| 12-22-2006 | $1,000 | 913 | N | 2307 | 0000075 |
| 01-22-2004 | $0 | 0 | N | 2249 | 0000963 |

### Building   **Bldg-Sketch**

| Bldg No | Use Type | Yr Built | Base Area | Upper Area | Story |
|---|---|---|---|---|---|
| 1 | 111 | 2007 | 1183 | 0 | 1 |

### Tax History

| Tax Year | Date Paid | Amount Paid |
|---|---|---|
| 2020 | 11/27/2020 | $443.88 |
| 2019 | 11/16/2019 | $441.72 |
| 2018 | 11/17/2018 | $439.56 |
| 2017 | 11/22/2017 | $425.52 |

**Basic** | **Parcel** | **Land** | **Bldg** | **Imp** | **Sale**

Serial# 12D17869
esign.alamode.com/verify

Wilson Appraisals (334) 741-9290

| | File No. | 210412784 |
|---|---|---|

## AGREEMENT FOR APPRAISAL SERVICES

1. PARTIES   Individual - Jimmy Doyle                                                    Client

hereby agrees to employ   Molly McLeod Wilson                                     Appraiser

2. PROPERTY located in   Lee                          County, State of   AL                        legally described as:
Lot 18 Waverly Park Parcel D Plat 26-162 Sec 11 T19N R27E

ADDRESS   703 Waverly Pl                                                          hereinafter called Property.

3. APPRAISAL REPORT. Appraiser agrees to prepare, in writing, an Appraisal Report, in conformity with any professional organizations to which Appraiser may belong, with an opinion of value. The purpose of this appraisal is:

☐ Purchase    ☐ Sale    ☐ Estate Tax    ☐ Lessee    ☐ Insurance    ☐ Ad valorem Tax    ☐ Mortgage Financing    ☐ Condemnation

☒ General Information    ☐ Other

4. INTEREST to be appraised shall be    ☒ Fee Simple    ☐ Leasehold    ☐ Leased Fee    ☐ Other

5. COMPLETION of the appraisal shall be by    04/19/2021                    subject to unforeseen circumstances or
conditions beyond the control of the Appraiser. The number of copies to be prepared is    1 via email

6. PAYMENTS FOR SERVICES:
☒ AGREED FEE. Client agrees to pay Appraiser a cash fee of $    500.00
☐ HOURLY-PER DIEM. Client agrees to pay Appraiser a cash fee of $ _____    per    ☐ hour    ☐ day for time expanded on
Client's behalf, to an estimated maximum of $ _____
☐ EXPENSES. Appraiser shall be additionally paid usual and necessary expenses for the following

☐ LITIGATION. In the event Appraiser is called upon, voluntarily or otherwise, to testify in court or deposition regarding the Appraisal Report herein, Client agrees to pay an additional sum of $ _____ for each
plus Appraiser's usual and customary expenses.
☒ CANCELLATION. If this agreement is canceled at any time prior to the delivery of the Appraisal Report, Client agrees to pay a fee of $75 after inspection but prior to research and work on the report.

☐ RETAINER fee in the amount of $ _____ is payable _____ to apply toward the total fee herein.

All sums due hereunder shall be paid on delivery of the Appraisal Report to Client, and are payable in the County of Appraiser's principal residence. The Appraiser's fee is in no way based on the opinion of value of the appraised Property, and all sums hereunder are due and payable regardless of the amount of the opinion of value. In the event it is necessary to employ an attorney to collect any sums due herein, Client agrees to pay reasonable attorney's fees and court costs expended by Appraiser.

7. AUTHORITY. Appraiser and his subcontractors are hereby authorized to make on-site inspections of subject property at all reasonable times to obtain supporting property data, including but not limited to: Building plans, plats, deeds, legal descriptions, abstracts, income and expense data, leases, options. Further to interview Client's attorneys, accountants, managers, agents, present and prospective tenants. To be furnished copies of relevant information, to copy same and use as documentation for the Appraisal Report. To obtain such information that in the Appraiser's judgment may be relevant to the appraisal. CLIENT'S AUTHORITY to execute this agreement is hereby warranted, and that client is either owner of the subject property or has authority of the owner to enter into this agreement.

8. CONDITIONS. The Appraisal Report shall be subject to Appraiser's conditions and limitations standard form or as shown on attachment hereto. The Appraisal Report will be prepared for the sole and exclusive use of the Client, and shall not be reproduced, printed or distributed in any manner without written consent of Appraiser, as it consists of "trade secrets and commercial and financial information" which is privileged and confidential and exempted from disclosure under 5USC(b)(4).

9. WARRANTIES AND INDEMNITY. Appraiser does not make any warranties or guarantees of any kind regarding the condition of the property, sufficiency of title, areas and boundaries, mechanical and structural conditions of the improvements and with the agreement that the Appraisal Report represents Appraiser's opinion of value only, without any warranty that the property will sell for the appraised value. Client agrees to indemnify Appraiser, his employees and independent contractors from all claims, suits and charges of any nature that may arise out of this agreement.

10. ADDITIONAL AGREEMENTS:

🔒 esign.alamode.com/verify     Serial:12D17869

*Molly McLeod Wilson*

Executed in duplicate originals on this day, _____

Individual - Jimmy Doyle                              Molly McLeod Wilson
Client                                                Appraiser
                                                      P.O. Box 2976, Auburn, AL 36831
Address                                               Address
                                                      (334) 444-6603
Telephone                                             Telephone

*Molly McLeod Wilson*
Serial#:12D17869
esign.alamode.com/verify

Form AS2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# EXHIBIT I

OMB NO. 2502-0265

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |

6. FILE NUMBER:
R-07-0312

7. LOAN NUMBER:
0062544853

8. MORTGAGE INS CASE NUMBER:

C. NOTE:    *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown.
Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0   3/98    (R-07-0312.PFD/R-07-0312/9)

| D.  NAME AND ADDRESS OF BORROWER: | E.  NAME AND ADDRESS OF SELLER: | F.  NAME AND ADDRESS OF LENDER: |
|---|---|---|
| John A. Carter and<br>Jill M. Carter, husband and wife<br>703 Waverly Place<br>Opelika, Alabama 36801 | | Colonial Bank, N.A.<br>2301 Lucien Way, Ste. 395<br>Maitland, Florida 32751 |

| G.  PROPERTY LOCATION:<br>703 Waverly Place<br>Opelika, AL 36801 | H.  SETTLEMENT AGENT:        20-4718537<br>Ingrum, Rice & Parr, LLC<br><br>PLACE OF SETTLEMENT<br>410 Second Avenue<br>Opelika, AL  36801 | I.  SETTLEMENT DATE:<br><br>December 12, 2007 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100.  GROSS AMOUNT DUE FROM BORROWER:** | | **400.  GROSS AMOUNT DUE TO SELLER:** | |
| 101.  Contract Sales Price | | 401.  Contract Sales Price | |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to Borrower (Line 1400) | 2,186.98 | 403. | |
| 104.  Payoff first mortgage to Colonial Bank, N.A. | 99,747.40 | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106.  City/Town Taxes          to | | 406.  City/Town Taxes          to | |
| 107.  County Taxes             to | | 407.  County Taxes             to | |
| 108.  Assessments              to | | 408.  Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| *120.  GROSS AMOUNT DUE FROM BORROWER* | 101,934.38 | *420.  GROSS AMOUNT DUE TO SELLER* | |
| **200.  AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500.  REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201.  Deposit or earnest money | | 501.  Excess Deposit (See Instructions) | |
| 202.  Principal Amount of New Loan(s) | 98,960.00 | 502.  Settlement Charges to Seller (Line 1400) | |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first Mortgage | |
| 205. | | 505.  Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210.  City/Town Taxes          to | | 510.  City/Town Taxes          to | |
| 211.  County Taxes             to | | 511.  County Taxes             to | |
| 212.  Assessments              to | | 512.  Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| *220.  TOTAL PAID BY/FOR BORROWER* | 98,960.00 | *520.  TOTAL REDUCTION AMOUNT DUE SELLER* | |
| **300.  CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600.  CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301.  Gross Amount Due From Borrower (Line 120) | 101,934.38 | 601.  Gross Amount Due To Seller (Line 420) | |
| 302.  Less Amount Paid By/For Borrower (Line 220) | ( 98,960.00) | 602.  Less Reductions Due Seller (Line 520) | ( ) |
| *303.  CASH ( X FROM ) (  TO ) BORROWER* | 2,974.38 | *603.  CASH (  TO ) (  FROM ) SELLER* | 0.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower _____          Seller _____

John A. Carter

Jill M. Carter

OMB NO. 2502-0265

| A. | | | B. | OF LOAN: |
| --- | --- | --- | --- | --- |
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | 1. ☐ FHA 2. ☐ FmHA 3. ☒ CONV. UNINS. 4. ☐ VA 5. ☐ CONV. INS. | | | |
| **SETTLEMENT STATEMENT** | 6. FILE NUMBER: R-06-0145 | | 7. LOAN NUMBER: DOT0006248619 | |
| | 8. MORTGAGE INS CASE NUMBER: | | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

10  3/86  (CARTER)/(FORM-05-0145/12)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
| --- | --- | --- |
| John A. Carter and Jill M. Carter, husband and wife 1590 Crescent Blvd Auburn, AL 36830 | R & S Properties, LLC 475 N. Dean Road Auburn, AL 36830 | Colonial Bank Mortgage 1962 West Main Street Dothan, Alabama 36303 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: 20-4716537 | I. SETTLEMENT DATE: |
| --- | --- | --- |
| 703 Waverly Place Opelika, AL 36801 | Ingrum, Rice & Parr, LLC PLACE OF SETTLEMENT 410 Second Avenue Opelika, AL 36801 | December 22, 2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
| --- | --- | --- | --- |
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 23,000.00 | 401. Contract Sales Price | 23,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 3,582.10 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes             to | | 407. County Taxes             to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 26,582.10 | **420. GROSS AMOUNT DUE TO SELLER** | 23,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 98,960.00 | 502. Settlement Charges to Seller (Line 1400) | 83.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. LIP Balance $ 72,488.40 | | 504. Payoff of first Mortgage to Compass Bank | 20,000.00 |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. Construction Draw | | 507. Payment of 2006 property taxes to Lee Co Rev Comm | 243.00 |
| 208. Cost to Construct $93,427.00 | 26,526.85 | 508. Cost to Construct $93,427.00 | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes  10/01/06  to  12/22/06 | 55.25 | 511. County Taxes  10/01/06  to  12/22/06 | 55.25 |
| 212. Assessments              to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 26,582.10 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 20,381.25 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 26,582.10 | 601. Gross Amount Due To Seller (Line 420) | 23,000.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 26,582.10 ) | 602. Less Reductions Due Seller (Line 520) | ( 20,381.25 ) |
| **303. CASH ( FROM ) ( TO ) BORROWER** | 0.00 | **603. CASH ( X TO ) ( FROM ) SELLER** | 2,618.75 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower _____  
John A. Carter

_____  
Jill M. Carter

Seller  R & S Properties, LLC

_____  
Marvin E. Deen, Managing Member

_____  
Sallie H. Deen, Managing Member

SEE PROFILE

# EXHIBIT J

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF LOUISIANA
2

3    IN RE: CHINESE                § MDL NO. 2047
     MANUFACTURED DRYWALL          § SECTION: L
4    PRODUCTS LIABILITY            §
     LITIGATION                    § JUDGE FALLON
5                                  § MAG. JUDGE WILKINSON
     ~~~~~~~~~~~~~~~~~~~~~~~~
6
                            DEPOSITION OF
7                            DARLA GIBBS
                        CONDUCTED REMOTELY
8

9                        10:44 a.m. EST
            Wednesday, the 9th day of December 2020
10

11

12

13        Blanche J. Dugas, CRR, RPR, CCR No. B-2290

14

15

16

17

18

19

20

21

22

23

24

25

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**
Pages 2..5

**Page 2**
```
 1         APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE
 2   On Behalf of the Plaintiffs:
       JAMES V. DOYLE, JR., Esquire
 3     Doyle Law Firm, PC
       Suite 1800
 4     3340 Peachtree Road, NE
       Atlanta, Georgia  30326
 5     (678) 799-7676
       (844) 638-5812 (facsimile)
 6     jimmy@doylefirm.com
 7   On Behalf of the Defendants Taishan Gypsum Co. and
     Tai'an Taishan Plasterboard Co.:
 8     MATTHEW D. LAWSON, Esquire
       CHRISTINA H. EIKHOFF, Esquire
 9     Alston & Bird, LLP
       One Atlantic Center
10     1201 West Peachtree Street, NW
       Atlanta, Georgia  30309-3424
11     (404) 881-7000
       (404) 881-7777 (facsimile)
12     matt.lawson@alston.com
       christy.eikhoff@alston.com
13
     On Behalf of the BNBM and CNBM Entities:
14     ANDREW K. DAVIDSON, Esquire
       Orrick, Herrington & Sutcliffe, LLP
15     The Orrick Building
       405 Howard Street
16     San Francisco, California  94105-2669
       (415) 773-5472
17     adavidson@orrick.com
18
19
20
21
22
23
24
25
```

**Page 3**
```
 1              INDEX OF EXAMINATION
 2   EXAMINATION                          PAGE
 3   EXAMINATION                             4
     BY MR. LAWSON
 4
 5                   -  -  -
 6              INDEX TO EXHIBITS
 7   EXHIBIT    DESCRIPTION              PAGE
 8    1    Warranty deed with right of    22
          survivorship
 9
      2    Building permit application    32
10
      3    Document titled               45
11         "Replacements for
           electric/electronic items"
12
      4    Plaintiff profile form,       51
13         Bates-stamped Gibbs,
           Gene-0001  through 0003
14
      5    Photograph                    57
15
      6    Photograph                    59
16
      7    Supplemental plaintiff        78
17         profile form
18
           (Original Exhibits 1 through 7 have
19      been attached to the original transcript.)
20
21
22
23
24
25
```

**Page 4**
```
 1            Deposition of Darla Gibbs
                  December 9, 2020
 2
 3       MR. LAWSON:  My name is Matt Lawson.
 4   I am appearing on behalf of Taishan Gypsum
 5   Co., Limited, and Tai'an Taishan
 6   Plasterboard Co., Limited.  Also appearing
 7   on behalf of Taishan and TTP is Ms. Christy
 8   Eikhoff, who is on the call as well.
 9       MR. DOYLE:  Jimmy Doyle on behalf of
10   the plaintiffs.
11       MR. DAVIDSON:  And Andrew Davidson on
12   behalf of the CNBM and BNBM entities.
13       (Counsel for all parties stipulate
14   that the Court Reporter is authorized to
15   swear the witness remotely.)
16              DARLA GIBBS,
17   having been first duly sworn, was examined and
18   testified as follows:
19   EXAMINATION
20   BY MR. LAWSON:
21       Q.  Mrs. Gibbs, thank you again for bearing with
22   us this morning as we got everything set up and for
23   being here on this Zoom deposition.  We appreciate
24   your time.
25           Could you please state your name, your full
```

**Page 5**
```
 1   name for the record.
 2       A.  Darla D. Gibbs.
 3       Q.  Now, as we're going through this, let me
 4   know if you're having any trouble hearing me or if you
 5   need me to repeat a question at any time.
 6           Have you ever been deposed before like this?
 7       A.  We have been to court one time before many
 8   years ago.
 9       Q.  Okay.  And were you asked questions by an
10   attorney during that court appearance?
11       A.  Yes, sir, we were.
12       Q.  Okay.  Was that like a trial or some kind of
13   hearing?
14       A.  It was a custody hearing for our
15   grandchildren.
16       Q.  Understood.
17           So here, this is -- this deposition is going
18   to be your deposition, and that means that I'm going
19   to be asking you questions.  I completely understand
20   if Mr. Gibbs has information that he wants to share or
21   that he knows during this, but at first, I'm just
22   going to be asking you questions, and then he'll have
23   an opportunity to be able to say his piece or to be
24   able to change or add to anything that you say.
25       A.  Yes, sir.
```

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                    Pages 6..9

Page 6

1   Q.   Great.  Now, do you understand that you
2   are -- that you've been sworn in to tell the truth
3   here today during this deposition?
4   A.   Yes, I do.
5   Q.   And it's kind of like as if you were sitting
6   in a courtroom with the judge, that you're under oath
7   to tell the truth.  Do you understand that?
8   A.   Yes, sir.
9   Q.   Is there anything that would prevent you
10  from testifying truthfully here today?
11  A.   No, sir.
12  Q.   And you understand that the court reporter
13  is recording my questions and your answers throughout
14  this deposition; correct?
15  A.   Yes, sir.
16  Q.   Now, because the court reporter is going to
17  be taking down a written record of everything that we
18  say, it is important that any answers that you give
19  are audible and in words.  That means that when you
20  answer a question, instead of nodding, you want to say
21  yes or no, and you want to try to avoid saying things
22  like uh-huh (affirmative) or anything that is maybe
23  unclear when written as to what you meant.
24       So as best you can, you want to be able to
25  say yes or no to answer questions and make sure that

Page 7

1   all of your answers are audible as opposed to bodily.
2   Does that make sense?
3   A.   Yes, sir.
4   Q.   Great.  Thank you.
5       And again, if anything is unclear at any
6   point, just ask me to rephrase the question.  I'm sure
7   I will have some bad questions along the way.  Feel
8   free to tell me, I don't understand that.  Ask again.
9       Now, you may hear objections from your
10  attorney, Mr. Doyle, throughout the proceedings, or
11  someone else may interject.  I only ask that when you
12  hear that, you can allow them to be able to say their
13  objection or to be able to speak, and then I'll direct
14  you to answer the question unless otherwise you were
15  directed not to; all right?
16  A.   Yes, sir.
17  Q.   And if you need a break at any point, please
18  let me know.  You know, obviously we're all -- we're
19  all in the comforts of either our offices or homes
20  right now, so we may need breaks at different points.
21  Just please let me know if at any point you need to
22  stop; all right?
23  A.   Yes, sir.
24  Q.   I'd only ask that if we're in the middle of
25  a question that you answer it and then we can take a

Page 8

1   break from there.
2   A.   Yes, sir.
3   Q.   Are you taking any medication that would
4   impair your ability to be able to understand my
5   questions or to answer truthfully today?
6   A.   No, sir.
7   Q.   And did you meet with your lawyer prior to
8   this deposition to prepare for it?
9   A.   Yes, sir.
10  Q.   And when did that happen?
11  A.   We did that on a telephone call yesterday.
12  Q.   For about how long did you speak?
13  A.   I would say it was probably about an hour.
14  I would have to look at my phone to see how long it
15  took.
16  Q.   Okay.  And who was present on that phone
17  call?
18  A.   Mr. Doyle and myself, and I had it on
19  speaker for my husband so that he could hear it;
20  however, he is very hard of hearing, so I'm not sure
21  how much of it he understood.
22  Q.   Okay.  And did you speak with anyone other
23  than your lawyer to be able to prepare for this
24  deposition today?
25  A.   No, sir.

Page 9

1   Q.   Did you do anything else to prepare for your
2   deposition today beyond speaking to Mr. Doyle?
3   A.   I went back through some of our records last
4   night, trying to find all of the things that were
5   pertinent to this house over the last 13 years.
6   Q.   And what kind of documents did you look at
7   when you did that?
8   A.   Well, I guess I'm kind of one of those
9   people that likes to keep records of everything that
10  we do.  And month by month, I keep a record of what we
11  have charged on our charge cards and purchased along
12  the way.  And so I have been going back through and I
13  have all of them, 13 years' worth of these documents,
14  and just scanning down through and trying to find the
15  things that were things that we purchased or had to
16  replace in this house.
17  Q.   And have you produced those documents and
18  records to your attorney, Mr. Doyle?
19  A.   No, sir, because they are -- I did send him
20  kind of a synopsis of those things through the years.
21  I had to send him a new one this morning to correct
22  something I found that I had incorrect on it.  But I
23  don't know that it is a full documentation of
24  everything yet.
25  Q.   Do you know when you first created that

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**                                    Pages 10..13

Page 10

1  summary that you're talking about of the different
2  items that you've purchased?
3      A.  I'm sorry, I didn't hear the first part.
4      Q.  Yeah.  Do you know when you first created
5  that summary of items that you're talking about?  Do
6  you know when that was?
7      A.  Well, we started several years ago on some
8  of the items, and all -- but then I had -- I would say
9  that up until probably -- oh, my goodness, you know,
10 I'm not really sure when I started with that.  I was
11 doing some of it last night.
12     Q.  Do you know when you first sent that summary
13 or synopsis, as you called it, to Mr. Doyle?
14     A.  Yes.  I sent him one last night; however,
15 this morning, I went over it again and I saw some
16 mistakes and I went back and corrected them and sent
17 him a new copy this morning.
18         MR. LAWSON:  Jimmy, to the extent that
19     you have that document, that updated one,
20     and haven't sent it to us, at least I have
21     not seen it, if you could send it over --
22         MR. DOYLE:  Yeah.
23         MR. LAWSON:  -- so we could review it,
24     I'd like to do that as soon as we can.
25         MR. DOYLE:  Sure.

Page 11

1          MR. LAWSON:  Okay.  And if there are
2      paper records or electronic records that
3      can be printed related to -- that connect
4      to the items listed in that synopsis, we'd
5      like those produced as well if those are
6      being included in any request for damages
7      in this action.
8          MR. DOYLE:  Yes.
9      Q.  (By Mr. Lawson)  We'll go back to that in a
10 little bit.  Once we're able to look at it, we might
11 ask some questions about that synopsis, Mrs. Gibbs.
12 I'd like to ask if there was anything else you
13 reviewed other than records of items that you've
14 purchased and that synopsis that you talked about?
15 Were there any other records that you looked at to
16 prepare for this deposition?
17     A.  No, sir.
18     Q.  Okay.  Now, when you were speaking with
19 Mr. Doyle, did you review any documents while you were
20 on the call with him?
21     A.  Yes, sir.  We reviewed the documents that he
22 had sent to us.
23     Q.  And do you have those documents with you
24 today?
25     A.  Yes, sir.

Page 12

1      Q.  Great.
2          Have you ever been involved in a lawsuit
3  before this one outside of the custody situation with
4  your grandchildren that you were talking about
5  earlier?
6      A.  No, sir.
7      Q.  All right.  Have you ever participated in a
8  class action before?
9      A.  No, sir.
10     Q.  Now, have you -- at this time, are you
11 employed or do you work anywhere?
12     A.  No, sir.  I'm retired.
13     Q.  When you say you're retired, what was your
14 job before you retired?
15     A.  When I was very young, I was in the United
16 States Marine Corps.  That is how my husband and I
17 met.  We were both in the Marines, Cherry Point, North
18 Carolina.
19     Q.  And when were you in the Marines?
20     A.  Oh, long before you were born.  1959 and
21 1960.
22     Q.  And did you work after that time, after you
23 were out of the Marines?
24     A.  Yes, sir.  I had various jobs along the way
25 as a secretary, and we had -- when we moved down to

Page 13

1  this area, we had our own business of electronics
2  repair and communications and repair business.
3      Q.  From about when to when did you have that
4  electronics repair business?
5      A.  19 -- I have -- I'm guessing because it's
6  been too long, but I would say about from '84 to '99,
7  about that length of time that we had our own business
8  here.
9      Q.  And where was that business located?  Was it
10 near where you live now?
11     A.  It was here in Opelika, Alabama.
12     Q.  After 1999, were you employed anywhere?
13     A.  I worked small time part-time jobs along the
14 way.
15     Q.  And when did you retire officially?
16     A.  Oh, my.  Let me see.  Seventeen years ago.
17 When I was 62.
18     Q.  So in this case, the property at issue, the
19 address that I have for you-all is 701 Waverly Place,
20 Opelika, Alabama; is that right?
21     A.  Yes, sir.
22     Q.  And is that where you're sitting today?
23     A.  Yes, sir.
24     Q.  How long have you lived there?
25     A.  We have lived here since 2007.

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                                              Pages 14..17

Page 14

1    Q.   Have you lived anywhere else during that
2    time, since 2007?
3    A.   No, sir.  We can't afford to live anywhere
4    else.
5    Q.   And prior to moving to that address in 2007,
6    where did you live?
7    A.   We lived at -- I have to remember what the
8    number is -- 1907 High Point Drive, Opelika, Alabama.
9    Q.   About how far away is that from where you
10   live now?
11   A.   About three miles.
12   Q.   What was the reason that you decided to move
13   from that home to your current home?
14   A.   My husband didn't like cutting a one-acre
15   yard and he said the house was too big, so we
16   downsized and we moved in where there was an HOA to
17   take care of the yard.
18   Q.   How long had you lived in that previous home
19   before moving?
20   A.   I think we were there for somewhere between
21   10 and 12 years.
22   Q.   And in your current home, at 701 Waverly
23   Place, do you own that home?
24   A.   Yes, sir.
25   Q.   Has anyone lived in that home other than you

Page 15

1    since 2007?
2    A.   No, sir.
3    Q.   Now, what made you decide to buy the home at
4    701 Waverly Place that you live in today?
5    A.   We were looking at downsizing to a smaller
6    place since there was just the two of us, and we had
7    watched this particular area as it was being built and
8    it was very attractive to us because of the size and
9    the location.
10   Q.   Was it a large neighborhood where you live?
11   A.   Not really.  There's only 40 houses in our
12   HOA.
13   Q.   And when you moved into the home, did you
14   know if anyone had lived in it prior to you?
15   A.   No, sir.  It was being built before we moved
16   in.  We saw it as it was being built.  It was mostly
17   finished but not all the way.
18   Q.   So when you purchased the home, it was in
19   the process of being built; is that right?
20   A.   Yes, sir, in the process of being built.
21   Q.   Were you involved at all in picking out the
22   design of the house or how -- how it was built?
23   A.   No, sir.
24   Q.   You built -- you purchased the home -- how
25   much before the home was completed did you purchase

Page 16

1    the home?  How long before it was completed?
2    A.   The -- the interior -- the wallboard was up.
3    The windows were in.  The doors were in.  There was no
4    flooring.  They had not put in the kitchen cabinets or
5    anything yet when we purchased it.
6    Q.   And you saw the inside of the house at that
7    time when you purchased it; is that right?
8    A.   Yes, sir.
9    Q.   And when you said that the wallboard was up,
10   you were able to see the wallboard up in the house at
11   the time that you came in?
12   A.   It was all -- yes.  It was all -- the
13   wallboard was all in the house at that point.
14   Q.   Now, obviously one of the major issues here
15   relates to the drywall, the wallboard inside of your
16   house.  Did you ever see that the drywall or wallboard
17   inside of the house had markings on it that said "Made
18   in China"?
19   A.   No, sir, because that -- what we saw was
20   just a plain wallboard.  There was nothing showing on
21   it.
22   Q.   Do you remember who you bought the house
23   from?
24   A.   Yes, sir.  We bought it from Patriot Homes.
25   Q.   And did you have any relationship with

Page 17

1    Patriot Homes or know who Patriot Homes was before you
2    purchased the home from them?
3    A.   No, sir.
4    Q.   I am going to pull up a document here.  This
5    is the -- I'll represent to you that this is the
6    warranty deed for your purchase of the home that was
7    produced in this action.  Let me pull that up on the
8    screen for you.
9         All right.  Can you see that?
10   A.   Yes, sir.
11   Q.   Now, do you recognize this document or have
12   you seen it before, to your knowledge?
13   A.   Yes, sir.
14   Q.   And to your knowledge, what is this
15   document?
16   A.   It's one of the many papers you get when you
17   buy a house.
18   Q.   I recently bought a house, and, yes, there
19   are many, many pages that you get when you do that.
20        So at the top of this document, do you see
21   where it says, "Warranty deed with right of
22   survivorship"?
23   A.   Yes, sir.
24   Q.   And above that, there's a timestamp.  Do you
25   see that?

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                        Pages 18..21

Page 18

1    A.   Yes, sir.
2    Q.   And it appears that the timestamp says
3  June 1, 2007.
4    A.   Yes, sir.
5    Q.   Do you see that?
6         Does that sound about right for the time
7  that you purchased your home?
8    A.   Yes, sir.
9    Q.   Looking down at the first paragraph that I'm
10 showing you here, it appears to say that the home --
11 the grantor for this warranty deed is Patriot Homes,
12 LLC, an Alabama limited liability company.  Did I read
13 that correctly?
14   A.   Yes, sir.
15   Q.   And is that the company that you bought the
16 home from?
17   A.   Yes, sir.
18   Q.   Now, it says below that that the grantees
19 for this warranty deed are Gene R. Gibbs and Darla D.
20 Gibbs.  That is you and your husband; correct?
21   A.   Yes, sir.
22   Q.   Now, I want to go down a little bit on this
23 document, and if we look here on the second page,
24 there's a signature from a notary public.  Do you see
25 that?

Page 19

1    A.   Yes, sir.
2    Q.   And here, it states that they -- on the
3  second line, it says they "Hereby certify that John A.
4  Carter, whose name as a member of Patriot Homes, LLC,
5  an Alabama limited liability company, is signed to the
6  foregoing conveyance."  Do you see that?
7    A.   Yes, sir.
8    Q.   Do you know who John A. Carter is?
9    A.   We didn't -- we met him on the date that
10 this was signed, I do believe, but -- when we signed
11 the papers, but, yes, we know who he is now.
12   Q.   Who is he?
13   A.   Well, he was one of the originators -- the
14 builders with -- with Patriot Homes.  He was not
15 physically involved in building the home as such, but
16 he did do some of the work on the home also with the
17 flooring also.
18   Q.   So it's your understanding that Mr. Carter,
19 at least at this time, was either an employee or owner
20 of Patriot Homes; is that right?
21   A.   He -- I assume.  I'm not sure, but I know
22 that he was a member or part of the Patriot Homes.
23   Q.   Okay.  And you said that he was involved in
24 working on the flooring in the house; is that right?
25   A.   Yes, sir.

Page 20

1    Q.   How did you know that?
2    A.   Because it was at his place.  He had a
3  flooring company also that is where we went to pick
4  out the flooring for in the house.
5    Q.   Okay.  And did you meet him when you picked
6  out the flooring for the house?
7    A.   I did not.  My husband did.
8    Q.   And did you talk to Mr. Carter before the
9  day that you purchased the home?
10   A.   I did not.
11   Q.   Did you pick out the flooring before you
12 purchased the home or was that after?
13   A.   I did not.  My husband picked it out.  I was
14 in Idaho visiting my family at the time, and he came
15 back to -- to Alabama and he picked out the flooring
16 and the paint colors and the granite, all of those
17 things, through Mr. Carter and his company.
18   Q.   I'm sorry, my question was -- wasn't clear
19 there.  Did that happen before or after you purchased
20 the home?
21   A.   That happened before.
22   Q.   Did Mr. Carter ever make any representations
23 to you or guarantees about the quality of the products
24 that were going to be used in building -- that were
25 used in building your home?

Page 21

1    A.   No, sir.
2    Q.   Did he ever tell you that the home was built
3  with Chinese drywall?
4    A.   No, sir.
5    Q.   Did Mr. Carter ever tell you that -- that
6  the home was built with Chinese drywall after you
7  purchased it at any time?
8    A.   Yes, sir.
9    Q.   When did that happen?
10   A.   I have to go back and look, but I think it
11 had to have been sometime in the middle of 2011 was
12 when we -- we were informed that our home had Chinese
13 wallboard in it is what -- and he stated also there
14 were two other homes that he was involved in building
15 that had it also.
16   Q.   What do you remember about that conversation
17 that you had with Mr. Carter about there being Chinese
18 drywall in your home?
19   A.   The conversation was that his -- his mother
20 lived in the house next door to us, and she was having
21 some health problems and he had moved her out of his
22 home -- out of this home into her -- his home while
23 his mother recovered from some surgery.
24        He stated he was talking to a friend of his
25 who was an attorney that also knew his mother.  And

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**                                    Pages 22..25

Page 22

1  when he was in -- the friend was informed of his
2  mother's -- Mr. Carter's mother's health issues, he
3  asked Mr. Carter if he had had the home that he had
4  built for her inspected for Chinese wallboard.  Mr.
5  Carter did not know anything about that, but was
6  informed that he needed to have it checked because of
7  the health issues of his mother.
8        He let us know that he had had it checked
9  and that it did indeed have Chinese wallboard in it,
10  and he went back to his records and stated that he
11  confirmed we had it in our house also and that he
12  highly recommended we have it inspected.
13        MR. LAWSON:  Court reporter, before I
14     take down this exhibit, I just wanted to
15     mark it as Exhibit 1 on your side.  If that
16     can be marked as Exhibit 1, this warranty
17     deed that we're discussing.  I believe it's
18     also premarked as Exhibit 1 in the
19     documents that we sent to you.
20        (Exhibit 1 was marked for
21     identification.)
22     Q.  (By Mr. Lawson)  I wanted to ask you, Mrs.
23  Gibbs, a little bit more about that conversation with
24  Mr. Carter.  After you had that conversation, did you
25  have your home checked to see if it had Chinese

Page 23

1  drywall in it?
2     A.  Yes, sir.
3     Q.  And who did you go to to have it checked?
4     A.  We called the attorney that Mr. Carter was
5  using, which is Jimmy Doyle, and asked what we needed
6  to do.
7     Q.  And when you had that conversation with
8  Mr. Carter, who was present at that time?
9     A.  My husband and I.
10     Q.  Between the time that Mr. Carter was
11  involved in building your house and when you had that
12  conversation in 2011, I believe you said, had you
13  talked to Mr. Carter at all in between, in those
14  intervening four years?
15     A.  We would see him occasionally when he
16  visited his mother next door, but no major
17  conversations.  It was never concerning anything about
18  our home as such.
19     Q.  Before we get to that time period in 2011, I
20  wanted to ask you about the time that you purchased
21  your home.  We talked about that you purchased it
22  around June of 2007; is that right?
23     A.  Yes.
24     Q.  And did you move in soon after that?
25     A.  Yes, sir.

Page 24

1     Q.  What was your experience like moving into
2  your new home?
3     A.  Well, we were excited and all -- one of the
4  things that we noticed, we noticed that there was a
5  funny smell, but we thought that was just a new home
6  smell, but other than that, everything seemed to be
7  very -- very good.
8     Q.  Did you notice that -- did you visit the
9  home before you purchased it?
10     A.  Yes, sir.
11     Q.  And did you notice that smell before you
12  purchased the home?
13     A.  Whenever we came over, I didn't notice it
14  because the house was open while they were working on
15  it.  It was warm outside and so they had the windows
16  open, doors open and what have you.
17     Q.  So when the windows and doors are open in
18  the home, can you not smell the smell that you're
19  talking about?
20     A.  It's -- it's much less you smell it.
21     Q.  From the point that you bought the home in
22  2007 throughout the last 13 years, has the smell
23  changed in any way?
24     A.  It's still there, but we open and shut our
25  doors and windows frequently.  So I don't know that

Page 25

1  it's any worse than it was, but I'm not sure that it's
2  any less either.
3     Q.  What does it smell like you to?
4     A.  Similar to rotten eggs.
5     Q.  And is the smell different -- I'm sorry, go
6  ahead.
7     A.  A mild rotten eggs smell.
8     Q.  And is the smell different in any parts of
9  the house than others?
10     A.  No, sir, I don't think so.
11     Q.  Have others told you that they can smell the
12  smell inside of your house as well?
13     A.  Oh, yes, sir.  When we first moved in, our
14  children and our grandchildren came over and they --
15  they said, What is that funny smell?
16     Q.  Did you have any theories or ideas of what
17  could be causing that smell other than it being a new
18  house smell that you mentioned earlier?
19     A.  No, sir.
20        MR. DOYLE:  Objection to form.  You
21     can answer.  You can answer.
22        THE WITNESS:  Thank you.
23        No, sir.  We had no idea what was
24     causing it.
25     Q.  (By Mr. Lawson)  When did you first hear

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                    Pages 26..29

Page 26

1   about Chinese drywall?
2       A.   In 2011 when Mr. Carter informed us.
3       Q.   Now, did Mr. Carter tell you when you had
4   that conversation with him in 2011 that he had -- that
5   he knew that the home had been built with drywall made
6   in China at the time that the house was built?
7       A.   No, sir.  He informed us that his mother's
8   house had Chinese wallboard in it and that we should
9   have ours inspected, and that's when we contacted
10  Mr. Doyle.
11      Q.   I think you said that he went back to his
12  records when he was told about his -- that he needed
13  to check for his home -- his mother's home having
14  Chinese drywall.  Do you know if he told you anything
15  about that -- his own personal records about what
16  drywall was purchased to build those homes?
17      A.   He told -- that, I may need to clarify.  He
18  had let us know that there might be the chance and we
19  needed to have it checked.  And it was after that
20  conversation and after Mr. Doyle came, I do believe,
21  that Mr. Carter informed us that he went back to his
22  records and stated that our house had it, his mother's
23  house next door had it, and the house next to that one
24  had some in it, and he could verify that with his
25  records.

Page 27

1       Q.   Do you know what the address is for the
2   third home that you just mentioned, the -- you said
3   there's your home, there's the home that Mr. Carter's
4   mother lived in and then the third one.  Can you tell
5   me the address for that one?
6       A.   Yes, sir.  It was 705 Waverly Place, and Mr.
7   Carter's mother's number was 703 Waverly Place.
8       Q.   So given the funny smell that you talked
9   about, are there -- were there any other things that
10  were unusual or -- in the home after you moved into
11  it?
12      A.   Yes, sir.  Within the first year that we
13  were in the home, our air conditioning quit.  And we
14  had the people come out and check it, and we had a bad
15  A-coil, but it was under warranty so they replaced it.
16  I believe -- and I would -- I'm not sure on my dates,
17  but I know that within another year or so, the A-coil
18  went out again.  So we had it replaced and -- under
19  warranty.  And I do believe there was a third one that
20  it finally went, and that may have been in 2011.
21          And we assumed, which we probably shouldn't
22  have, but we assumed that it was we had a bad heating
23  and air conditioning unit altogether.  And so at that
24  time, we purchased a new heating and air conditioning
25  system for the whole house.  It was after we had put

Page 28

1   in that new system that Mr. Carter informed us about
2   the possibility of the Chinese wallboard.
3       Q.   After installing that new system in the
4   house, did you have any further issues with your air
5   conditioning or -- in the home?
6       A.   Yes, sir.  Let me look at my paperwork here
7   because I can tell you.  We had that replaced in 2011
8   and then we ended up having a problem with the A-coil
9   again.  And so we had the company come out and it --
10  they looked at it and confirmed that the copper was
11  black again just like the other one had been that they
12  had replaced.
13          And so -- let's see.  That was done in --
14  the new system had been put in -- I gotta look at
15  this.  Then we had to have a new coil put in it in
16  2014 and they put in an aluminum one.
17      Q.   What document are you looking at right now?
18      A.   This was when we ended up having -- this is
19  just one of the things that I had checked off
20  everything that we had replaced on the house.  A
21  summary.
22      Q.   So this is -- you were talking about a
23  synopsis or a summary that you created for all of the
24  items that you replaced, that's what you're looking at
25  right now?

Page 29

1       A.   Yes, sir.
2       Q.   And do you also have the records showing
3   those purchases for the new air conditioning system
4   and the repairs for it?
5       A.   I do believe I do have that.  I believe I
6   sent those -- yes.
7       Q.   We would just ask that you hold on to all of
8   that and make sure to get it over to your attorney
9   just so that we can take a look at it as well; all
10  right?
11      A.   Yes, sir.  Yes, sir.
12          MR. DOYLE:  Matt, real quick.  Just so
13      you know, in your e-mail inbox, I sent it
14      to Christy and Mr. Davidson also, you
15      should have a copy of the spreadsheet
16      synopsis that's been referenced a couple of
17      times.  I forwarded that to you.
18          MR. LAWSON:  Okay.  Thank you.
19          THE WITNESS:  May I make a correction
20      on that particular one because I have
21      mis -- I have put down that heating and air
22      conditioning in 2013.  It -- the paperwork
23      that I have, it was put in in 2011, not in
24      2013.
25      Q.   (By Mr. Lawson)  Okay.  Thank you.

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                              Pages 30..33

Page 30

```
1           So you talked about your initial
2   conversation with Mr. Carter -- excuse me -- your
3   conversation with Mr. Carter in 2011.  Do you remember
4   about when that conversation happened where he told
5   you that there may be Chinese drywall in your home?
6        A.  Well, let's see.  We put that heating
7   unit -- new air conditioning unit in in July, I
8   believe, and it was sometime in September or October
9   of that year that he informed us of the possibility of
10  Chinese wallboard.
11       Q.   Did Mr. Carter or Patriot Homes ever offer
12  to assist you in repairing your home or replacing the
13  drywall in it?
14       A.  No, sir.
15       Q.  Did you ever ask them to be able to do that?
16       A.  No, sir, I did not -- we did not.
17       Q.  Have you ever asked for a quote or looked
18  into the cost of repairing or replacing the drywall in
19  your home?
20       A.  I do believe we did something like that
21  right after we got that information concerning the --
22  I remember seeing something on it.  I would have to go
23  back to my records again.
24           MR. DOYLE:  Mrs. Gibbs, let me just
25       clarify something.  Answer the -- you don't
```

Page 31

```
1   have to pull out all of your records and
2   refer to any papers that are not in the
3   record that he hasn't presented you with.
4   So at this point, set your papers aside.
5   Let him ask you questions -- his questions,
6   you answer it to the best of your knowledge
7   and recollection, and we'll proceed that
8   way.
9           THE WITNESS:  Okay.  Thank you.
10          MR. DOYLE:  If they want to make a
11  specific request for any additional
12  records, they can do so.  But we're going
13  to provide them with your damages documents
14  in the coming days, in addition to the
15  summary that we've already provided them.
16  But the deposition needs to be on
17  the -- his questions and the documents he
18  presents to you as exhibits; okay?
19          THE WITNESS:  Okay.  Thank you.
20          MR. LAWSON:  And I would just like to
21  put on the record that we have made a
22  specific request for those documents that
23  we were not aware of until this deposition
24  started.  We do now have this summary, but
25  it appears that Mrs. Gibbs has additional
```

Page 32

```
1   records and we would ask for all of those
2   to be able to be produced, including the
3   ones that she's looking at right now.
4           And we would obviously request to hold
5   this deposition open until our opportunity
6   to be able to review all of those documents
7   and potentially ask additional questions
8   related to them if they're going to be
9   included in the damages requested by Mr.
10  and Mrs. Gibbs.
11          MR. DOYLE:  Sure.  We're going to have
12  to get it done by the 31st of this month.
13  So we won't delay.  We'll put it in your
14  hand as quickly as I can.
15          MR. LAWSON:  Okay.
16       Q.  (By Mr. Lawson) Ms. Gibbs, I want to show
17  you another document here.  I'm going to pull it up.
18  Just one moment.
19          Mrs. Gibbs, what I'm showing you has been
20  premarked as Exhibit 2.  I'll represent to you that
21  this is a building permit application for the City of
22  Opelika that appears to have your address, 701 Waverly
23  Place.  Do you see that?
24           (Exhibit 2 was marked for
25        identification.)
```

Page 33

```
1           THE WITNESS:  Yes, sir.
2        Q.  (By Mr. Lawson)  And do you recognize this
3   document or do you believe you've seen it before?
4        A.  Yes, sir.
5        Q.  To the best of your knowledge, what is this
6   document?
7        A.  Another one of those pieces of paper we got
8   when we bought the house.
9        Q.  Taking a look at this document, is that your
10  address at the top where it's written next to location
11  of building?
12       A.  Yes, sir.
13       Q.  And as we look down below on this document,
14  I'll show you, there is a Part IV here, IV, that
15  states identification, to be completed by all
16  applicants.  Do you see that?
17       A.  Yes, sir.
18       Q.  And it states that the -- under owner,
19  Patriot Homes, LLC.  Do you see that?
20       A.  Yes, sir.
21       Q.  And the address next to that is 701 Waverly
22  Place, Opelika, Alabama.  Did I read that correctly?
23       A.  Yes, sir.
24       Q.  And that is your address; correct?
25       A.  Yes, sir.
```

Page 34

1    Q.   All right.  Going down, there's some
2  signatures that you see in the bottom left-hand
3  corner; correct?
4    A.   Yes, sir.
5    Q.   And if you look on a couple of columns to
6  the right, it says, "Date permit issued."  Do you see
7  that?
8    A.   Yes, sir.
9    Q.   And that date is December 21st, 2006; is
10  that correct?
11    A.   Yes, sir.
12    Q.   So to the best of your knowledge, does this
13  appear to be a permit application for the building of
14  your home at 701 Waverly Place by Patriot Homes?
15    A.   Yes, sir.
16    Q.   Looking to the Part IV, the identification
17  section that we just talked about, in the rightmost
18  column, you see a couple of phone numbers there; is
19  that right?
20    A.   Yes, sir.
21    Q.   Then there's a name below it, and that name
22  appears to be John Carter; is that correct?
23    A.   Yes, sir.
24    Q.   And again, it's your understanding that John
25  Carter was part of Patriot Homes, LLC, who built your

Page 35

1  home?
2    A.   Yes, sir.
3    Q.   I'd like to take a look a little bit above
4  that.  You can see in the middle of the page here,
5  there is a -- excuse me -- let's first look above Part
6  III.  It says, "Total cost of improvement."  Do you
7  see that?
8    A.   Yes, sir.
9    Q.   And then there's a dollar figure there as
10  $119,846.  Did I read that correctly?
11    A.   Yes, sir.
12    Q.   Have you ever heard that before, that the
13  total cost of building your home was around $119,846?
14    A.   No.  Like I said, this was a part of the
15  records.  We never really looked at that particular
16  figure.
17    Q.   Okay.  And have you ever been told what the
18  cost or estimate of the cost would be of repairing
19  your home from the Chinese drywall issue that you've
20  described?
21    A.   Just a rough, but nothing specific.
22    Q.   What was that rough figure, if you remember
23  it?
24    A.   Somewhere around $90,000.
25    Q.   And when did you receive that rough

Page 36

1  estimate?
2    A.   That was -- you know, I don't remember.
3  That was right after.  It had to be right after we
4  knew about this Chinese wallboard, somewhere at that
5  point.
6    Q.   Do you remember who gave you that estimate?
7    A.   It was an acquaintance of ours who was in
8  the business of building -- doing buildings mostly --
9  he wasn't a full-time builder.
10    Q.   And has anyone else given you an estimate
11  other than that person, that acquaintance that you
12  just described of what it would cost to repair your
13  home?
14    A.   No, sir.
15    Q.   Is there any reason why you haven't gotten
16  an estimate of what it would cost to be able to repair
17  it other than the one that we just talked about?
18    A.   We didn't know when we would even be able to
19  afford to repair it, so we didn't see any reason to
20  get an estimate.
21    Q.   We talked a little bit about the homes at
22  703 Waverly Place and 705 Waverly Place potentially
23  having issues with Chinese drywall; correct?
24    A.   Yes, sir.
25    Q.   To your knowledge, have either of those

Page 37

1  homes been repaired or have the Chinese drywall
2  removed from them?
3    A.   703 has set -- sat empty since Mr. Carter's
4  mother moved out of that house back in 2011.  705 was
5  just redone just in the last six months or so.
6    Q.   And do you know if 705 Waverly Place has
7  changed ownership since -- since 2011 when you learned
8  from Mr. Carter that it may have some Chinese drywall
9  in it?
10    A.   Yes, sir.  It has.
11    Q.   Okay.  When did it change ownership?
12    A.   Within -- I would say it's been within the
13  last three months, three or four months.
14    Q.   And the owner prior to three months ago, do
15  you know who that was?
16    A.   I only knew the name, and he was up in
17  Birmingham.  I think the name -- last name was Harris.
18    Q.   Did you ever meet the person who lived in
19  that house?
20    A.   I've never -- we never met Mr. Harris.  The
21  house has been rented for several years, so we've only
22  known who was renting it prior to the young lady that
23  just purchased it.
24    Q.   Is it your understanding that the home was
25  being rented from 2007 when you moved into your home

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020
Pages 38..41

**Page 38**

1  until recently when it was sold in the last three
2  months?
3      A.  I'm not sure whether it was rented in 2007.
4  I only became acquainted with the fact that someone
5  was renting it when I became treasurer of our HOA and
6  was keeping track of the payments.  And the person
7  that was renting it did move out of the house because
8  she was having some health problems, and then the
9  house sat empty -- has sat empty for one to two years
10  before it was renovated.
11      Q.  And do you have any idea of how much it cost
12  to be able to renovate the home at 705 Waverly Place?
13      A.  No, sir.  I have no idea.
14      Q.  Do you know who did the renovation of the
15  home?
16      A.  No, sir.  There was never any name on the
17  vehicles there.
18      Q.  Do you know if the renovation occurred after
19  the new owner purchased it or before?
20      A.  Before.
21      Q.  And do you know how much the house at 705
22  Waverly Place sold for when it sold in the last three
23  months?
24      A.  I'm not aware of that figure.
25      Q.  I just took it down, but I had one more

**Page 39**

1  question about the document that we were just looking
2  at, the building permit application.  So I'm going to
3  put it back up onto your screen.  On the right-hand
4  side of this document, you can see that there is a --
5  a section called I, dimensions.  Do you see that?
6      A.  Yes, but the pictures of -- the others are
7  right over the --
8      Q.  I know.  It's possible for you to be able to
9  move that.  I don't know if I can move it for you.
10  But I'm trying -- I want to be able to try to show you
11  what's behind where the pictures are.  If you go to
12  that window that's showing all of our faces, you might
13  be able to drag it over to the other side to be able
14  to move it away.
15      A.  I just diminished it.
16      Q.  Great.  Okay.  So when you see that section
17  that says -- Section I, dimensions; correct?
18      A.  Yes.
19      Q.  It says that it's one story in your home;
20  correct?
21      A.  Yes, sir.
22      Q.  And then it asks the total square feet of
23  floor area, all floors based on exterior dimensions.
24  Do you see that?
25      A.  Yes, sir.

**Page 40**

1      Q.  And then next to that, it says 1,197 square
2  feet -- or SF, excuse me -- it says SF.  Do you see
3  that?
4      A.  Yes, sir.
5      Q.  Okay.  All right.  And also in parentheses,
6  it says, "Heated."  Do you see that?
7      A.  Yes, sir.
8      Q.  Now, does that sound about right for the
9  square footage of the home that you live in?
10      A.  It's a little bit lower than what we had
11  been told from when we were purchasing the house.
12      Q.  And who told you the square footage of the
13  home when you purchased it?
14      A.  Oh, the real estate agent.
15      Q.  And do you know where the real estate agent
16  got that figure from?
17      A.  I have no idea.
18      Q.  Do you remember what's the figure that the
19  real estate agent told you the home was?
20      A.  Oh, yes.  1,250 square feet.
21      Q.  Okay.  And is it your understanding that
22  this building -- the building permit application
23  was -- from looking at it, that it was filled out by
24  Patriot Homes, LLC or someone who worked for them?
25      A.  I would have -- I don't have any idea who

**Page 41**

1  did that.
2      Q.  Okay.  When we looked at it below, the -- it
3  was -- the identification of who was applying for this
4  permit was Patriot Homes, LLC; correct?
5      A.  Yes, sir.
6      Q.  And from what you can see on this document,
7  it appears that when they were asked the total square
8  feet of the floor area, all floors, based on exterior
9  dimensions, they said 1,197 square feet; is that what
10  it appears to say?
11      A.  Yes, sir.
12      Q.  Do you have any reason to doubt that that is
13  accurate?
14      A.  Well, I've never measured our house to find
15  out whether it was accurate or not.
16      Q.  Have you ever had someone come to measure
17  the square footage --
18      A.  No, sir.
19      Q.  -- if you haven't done it?
20      A.  No, sir.
21          MR. LAWSON:  All right.  We have been
22      going for, I think, about an hour now.  So
23      I think it's probably -- and you've been
24      waiting for even longer, sitting in front
25      of that computer for all of us to get

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                           Pages 42..45

Page 42

1   started.  So it's probably an appropriate
2   time to be able to take a break.  So I
3   don't know if -- what sounds good to you,
4   five minutes, ten minutes?  What would be
5   good?
6           THE WITNESS:  Five will do fine.
7           MR. LAWSON:  All right.  Five minutes.
8   Let's reconvene in about five minutes and
9   we can continue from there.
10          THE WITNESS:  Thank you.
11          (A recess was taken.)
12      Q.  (By Mr. Lawson)  Welcome back, Mrs. Gibbs.
13  I wanted to -- in just a moment here, I wanted to take
14  a look at that synopsis that you put together and sent
15  over to Mr. Doyle.  I'm going to pull up a PDF copy of
16  it.  I know you have it as well.  But I just wanted to
17  kind of talk a little bit about that since we're just
18  kind of getting eyes on it for the first time here.
19  If you can give me one moment, I'm just going to pull
20  up a copy of it.
21          All right.  Can you see the synopsis there?
22      A.  Oh, yes.
23      Q.  And is this the same one that you're looking
24  at as well, does it appear to be?
25      A.  Yes, sir.  This is the one I've got some

Page 43

1   corrections to make on, but that's beside the point.
2       Q.  All right.  I wanted to -- just because we
3   haven't seen all of the documents that are underlying
4   these totals that are on here, I just kind of wanted
5   to ask you about this document generally; all right?
6       A.  Yes, sir.
7       Q.  Do you believe that you have receipts or
8   backup documentation for all of the expenses that are
9   listed on this document?
10      A.  No, sir.  I would have to go back and
11  request the ones from my form.  I do have some of
12  them, but I do not have all of them.
13      Q.  Okay.  And how were you able to come up with
14  these numbers if you don't have the receipts or
15  invoices for them?
16      A.  Okay.  I have spreadsheets that I put
17  together for each month's billings, especially our
18  credit cards, and I kept those so that I could check
19  them against our credit card bill when it came in to
20  make sure they were accurate.
21      Q.  And --
22      A.  And I --
23      Q.  Excuse me.  Go ahead.
24      A.  Go ahead.
25      Q.  I wanted you to finish.  Did you finish your

Page 44

1   answer?
2       A.  Yes, sir.
3       Q.  Great.  Looking at this document that I have
4   up on the screen, is this the original version that
5   you sent to Mr. Doyle or the corrected version that
6   you sent?
7       A.  Let me look and see.
8       Q.  The total on this --
9       A.  That's -- that's the corrected one.  I had
10  the wrong figures in one area.  That's all that
11  happened.
12      Q.  Understood.  So these figures come from a
13  spreadsheet that you have put together over some time;
14  is that right?
15      A.  Yes, sir.
16      Q.  And when you created that original
17  spreadsheet, you had the documentation to be able to
18  put these figures into the spreadsheet; is that right?
19      A.  Yes, sir.
20      Q.  But over time, you no longer have some of
21  that documentation; is that right?
22      A.  No, sir.  I just have the spreadsheet.
23      Q.  You did have the receipts at one point when
24  you input the data into the spreadsheet, but now some
25  of it you do not have; is that right?

Page 45

1       A.  Yes, sir.
2       Q.  And what corrections do you still need to
3   make to this summary that we have?
4       A.  If you look at 2013, I put down there -- you
5   see where it says the new heat and air conditioning on
6   the 13th of July?
7       Q.  Yes.
8       A.  That should be in 2011, not in 2013.  I was
9   doing this late last night --
10      Q.  I understand.
11      A.  -- and I didn't realize that I had put it in
12  2013 instead of 2011.
13          MR. LAWSON:  Madam Court Reporter,
14      before I forget, we've marked this exhibit
15      as Exhibit 3.  That's obviously going out
16      of the order that we had before, but since
17      this is the third exhibit, we'll mark it as
18      that, and I'll send you a PDF copy of it as
19      well for your records.
20          (Exhibit 3 was marked for
21      identification.)
22      Q.  (By Mr. Lawson)  So at the top of this
23  document, it states it's a replacement for
24  electric/electronic items?
25      A.  Yes, sir.

**Page 46**

1    Q.   So is that accurate, that this is only a
2  summary for any electric or electronic items that
3  you've replaced in the home?
4    A.   Yes, sir.
5    Q.   Are there any other items that you've
6  replaced in the home that are not included on this
7  list?
8    A.   I don't recall.  I -- this was very quickly
9  done last night, so I would have to go back and more
10  carefully go through my records.
11    Q.   Okay.  I would ask that if there are
12  additional items that you are claiming were damaged
13  related to your claims in this action, that you
14  produce those to your attorney.
15        MR. LAWSON:  And I'm just going to
16      reiterate on the record that we are
17      requesting all of the documentation,
18      receipts, invoices and supporting documents
19      related to this list and any other damages
20      that are being requested in this action.
21      And we will be asking to hold open this
22      deposition until we have the opportunity to
23      be able to review those documents, and we
24      can reconvene this deposition at a later
25      date.

**Page 47**

1        And, Mr. Doyle, I know you referred
2      earlier to the idea of us being tapped at
3      December 31st.  We are receiving this
4      documentation for the very first time now.
5      It should have been produced a long time
6      ago based on the age of the documentation
7      involved.  So we will reserve the right to
8      hold open the deposition beyond that
9      December 31st date since that contemplated
10      the idea that we had already received all
11      of your damages discovery that you were
12      required to produce in this action.
13        MR. DOYLE:  I'll go ahead and put on
14      the record that we're going to oppose
15      leaving this open beyond the 31st.  We're
16      going to produce any additional supporting
17      documentation referenced in this exhibit
18      quickly to you, and we don't see any reason
19      to go beyond December 31st for you to ask
20      follow-up questions regarding supporting
21      documents that are already reflected in
22      this exhibit.
23        And if there are any other damages
24      that need to be clarified in the remainder
25      of your deposition, we're going to produce

**Page 48**

1  everything that we need to to clarify what
2  damages we're going to seek when we have
3  our default damages hearing before the
4  magistrate in New Orleans.
5        So you'll get those as quickly as we
6  can if there needs to be any clarification.
7  But we anticipate having that to you in
8  days and having plenty of time to get this
9  done by December 31st.
10        MR. LAWSON:  I would also add onto the
11      record that to the extent that there was
12      just a reference to additional areas of
13      damages that have not been clarified or
14      articulated for these claimants, that needs
15      to be done immediately.  It should already
16      have been done, and if there is additional
17      documentation or additional claims for
18      damages that we are not aware of at this
19      point, that is a further reason that we
20      will need to hold this deposition open
21      beyond the 31st so we can understand what
22      claims are -- excuse me -- what damages are
23      being requested in this action.
24        MR. DOYLE:  Sure.  I'm sorry for
25      interrupting.  You still got an opportunity

**Page 49**

1      to continue this deposition.  What I was
2      referencing a second ago was there still
3      remains time for you to ask all the
4      questions that you need to ask today.  And
5      if there is any other documentation that
6      appears relevant that's necessary to
7      clarify any position that the Gibbs may
8      have in the questions in this continuing
9      deposition, we will produce anything in
10      addition to what we've already produced or
11      to help support any testimony that comes in
12      this deposition later today.
13        So carry on, and we'll -- we'll
14      address anything that we need to.
15    Q.   (By Mr. Lawson)  Mrs. Gibbs, sorry for that
16  interruption of lawyers talking.  Let's get back to my
17  questions for you.
18        Looking at this document, is it your
19  representation that all of these items that are listed
20  in the middle column -- or excuse me -- that are
21  listed in this document are items that needed to be
22  replaced because they did not work anymore; is that
23  right?
24    A.   These are items that failed after we moved
25  into this house that we were told or we have been

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020
Pages 50..53

**Page 50**

1  trying to put together because of the fact that these
2  all had the copper in them that could be damaged by
3  the Chinese wallboard.
4      Q.   And who told you that they have copper in
5  them that could be damaged by the Chinese wallboard?
6      A.   Well, I can tell you that our attorney came
7  down here.  He pulled the plug off from our electrical
8  outlet down here and showed us that the copper wire in
9  it that was black and that that is what is from the
10 sulfuric acid gas that is in the wallboard.
11     Q.   Have you ever had the wallboard in your home
12 tested?
13     A.   No, sir.
14     Q.   Have samples of the wallboard ever been
15 taken off the walls in your home?
16     A.   No, sir.
17     Q.   Has anyone ever asked you to do that before?
18     A.   No, sir.
19     Q.   Have you ever had someone give you the
20 professional opinion that there is sulfur gas that is
21 emitting from drywall in your home?
22     A.   I don't know what you're meaning, but --
23     Q.   You said a little bit earlier that there
24 was -- that -- you referred to sulfur gas.  Do you
25 remember that?

**Page 51**

1      A.   Yes, sir.
2      Q.   Where did you hear about the idea of sulfur
3  gas emitting in your home?
4      A.   Well, that came from the fact that we have
5  the people next door, Mr. Carter's home, the smell in
6  it, and he had his confirmed, then he was down and
7  confirmed that we have Chinese wallboard in it.
8      Q.   I want to pull up another document here.
9           I'm showing you what will be marked as
10 Exhibit 4.  Do you recognize this document?
11     A.   Yes, sir.
12          (Exhibit 4 was marked for
13     identification.)
14     Q.   (By Mr. Lawson)  To your knowledge, what is
15 it?
16     A.   It's the same paper that I have in front of
17 me that was that -- that was sent by our attorney to
18 us from the United States District Court, Eastern
19 District of Louisiana.
20     Q.   I'll represent to you that this is a
21 plaintiff profile form from the multidistrict
22 litigation in the Eastern District of Louisiana
23 related to the Chinese drywall before Judge Fallon.
24 And if you look down to the Section I of this
25 document, do you see your name and address listed

**Page 52**

1  there?
2      A.   Yes, sir.
3      Q.   And if we go to the third page of this
4  document, do those appear to be your signature and
5  Mr. Gibbs' signature?
6      A.   Yes, sir.
7      Q.   It looks like you-all signed this document
8  in November of 2011, on November 17th; is that right?
9      A.   Yes, sir.
10     Q.   Now, do you remember filling this document
11 out yourself?
12     A.   Yes, sir.
13     Q.   And when you filled out this document, your
14 signature was verification that all of the information
15 in it was true, to the best of your knowledge; is that
16 right?
17     A.   Yes, sir.
18     Q.   Looking at this document, I'd like to
19 specifically turn to the Section 3, claimant
20 information that you see here.  Do you see that?
21     A.   Yes, sir.
22     Q.   And specifically it lists a move-in date for
23 the home -- the home being occupied of June 16th,
24 2007.  Do you see that?
25     A.   Yes, sir.

**Page 53**

1      Q.   Does that sound about right for when you
2  moved into your home?
3      A.   It was within those -- a few days of that,
4  yes.
5      Q.   If you go over to the second to last column
6  here, there is a question that asked, "Are you
7  claiming personal injuries?"
8           Do you see that?
9      A.   Yes, sir.
10     Q.   Now, at the time that you filled out this
11 form, you said yes, you and Mr. Gibbs both circled yes
12 for that.  Do you see that?
13     A.   Yes, sir.
14     Q.   Now, is it your understanding that today,
15 you are no longer pursuing personal injury claims in
16 this action?
17     A.   I'm sorry?
18     Q.   Are you still pursuing personal injury
19 claims in this action, to your knowledge?
20     A.   I would have to ask my attorney if I -- if
21 that question is right -- is answered the way I
22 would have to answer it.  I'm not sure how you want me
23 to -- what you're wanting.
24     Q.   Now, I will represent to you it is our
25 understanding that you are not pursuing them any

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**
Pages 54..57

Page 54

1  longer. We just wanted to be able to clarify that, if
2  that is true. I guess that can be a question for
3  Mr. Doyle if you're not sure.
4         MR. LAWSON: Mr. Doyle, is it -- I
5     think she's asking for clarification from
6     you.
7         MR. DOYLE: There are no personal
8     injury claims being pursued any longer in
9     the litigation.
10     Q. (By Mr. Lawson) I'd like to turn now to the
11  second page of this document, specifically it's called
12  Section IV, inspection information. Do you see that,
13  Mrs. Gibbs?
14     A. Yes, sir.
15     Q. Looking at the -- that section, it asks in
16  the first question, "Have you or has anyone on your
17  behalf conducted an inspection into whether
18  Chinese-manufactured drywall is present in your home?"
19        Did I read that correctly?
20     A. Yes, sir.
21     Q. Then if you looked to the right of that
22  question, you've circled yes; correct?
23     A. Yes, sir.
24     Q. And then when you were asked who conducted
25  the inspection, below that, you stated Doyle Law Firm,

Page 55

1  PC. Do you see that?
2     A. Yes, sir.
3     Q. So someone from the Doyle Law Firm inspected
4  your property to confirm -- to conduct an inspection
5  into whether there was Chinese drywall present in your
6  house; is that right?
7     A. Yes, sir.
8     Q. And who was that that conducted that
9  inspection from the Doyle Law Firm?
10     A. Mr. Doyle.
11     Q. Did Mr. Doyle have anyone else with him when
12  he conducted that information?
13     A. I am not certain. I don't remember on that
14  particular situation.
15     Q. And when we say Mr. Doyle, are you referring
16  to Jimmy Doyle who is on this call -- excuse me -- on
17  this deposition with us right now?
18     A. Yes, sir.
19     Q. Now, do you know if anyone else other than
20  Mr. Doyle has ever inspected your home for Chinese
21  drywall?
22     A. Well, I don't remember how -- who else went
23  up in our attic that day.
24     Q. And when Mr. Doyle came to your home, he
25  went into the attic; is that right?

Page 56

1     A. Yes, sir.
2     Q. And do you know what Mr. Doyle did in the
3  attic when he was there?
4     A. My husband and he went up in the attic.
5  They pulled back the insulation, and very distinctly,
6  on the back of the wallboard is the name of the
7  company that made the Chinese wallboard.
8     Q. And have you seen the -- that wallboard
9  before?
10     A. There was no reason for us to see it.
11     Q. And, I'm sorry, I'll clarify my question.
12        Since that day of that inspection, have you
13  seen that drywall board?
14     A. That is up in the attic myself?
15     Q. Yes.
16     A. Yes, sir. I have.
17     Q. You went up to the attic and saw it?
18     A. Yes, sir.
19     Q. Do you recall what it says on it?
20     A. Just Taishan right on it.
21     Q. Now, do you have an idea of -- other than in
22  the attic where the drywall board that says -- did you
23  say that it says Taishan on it, excuse me?
24     A. Yes.
25     Q. Okay. So you saw the words "Taishan" on it?

Page 57

1     A. Yes, sir.
2     Q. All right. And that drywall is in your
3  attic; is that correct?
4     A. Yes, sir.
5     Q. Have you seen drywall board that you believe
6  was made in China anywhere else in your home?
7     A. I haven't taken any of the wallboard off to
8  look at the back of it.
9     Q. Has anyone done that?
10     A. No, sir.
11     Q. I'm now going to show you some photographs.
12  Let me pull those up for you.
13        All right. I'm going to show you here
14  photographs that were produced by your attorney in
15  this action that we are going to mark, I believe, as
16  Exhibit 5.
17        MR. DOYLE: Collectively or you're
18     going to do them individually?
19        MR. LAWSON: I'm going to do them
20     individually. This one first, and then
21     I'll move on to the next one. This one
22     will be marked as Exhibit 5.
23        (Exhibit 5 was marked for
24     identification.)
25     Q. (By Mr. Lawson) Do you recognize this, the

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                    Pages 58..61

Page 58

1  image of this photograph?
2      A.   Yes, sir.
3      Q.   And what does -- does this look like the
4  drywall that is in your attic?
5      A.   Yes, sir.
6      Q.   Now, what does that drywall board say on the
7  photograph that you see?
8      A.   "Made in China."
9      Q.   All right.  And that is your address that's
10 on that Post-it note that's shown in the photograph;
11 is that correct?
12     A.   Yes, sir.
13     Q.   Do you know who took these photos?
14     A.   Mr. Doyle.
15     Q.   Okay.  And do you believe that happened
16 around November 2017 when this inspection that's
17 listed on the plaintiff profile form occurred?
18     A.   Whatever day he was here, yes, sir.
19     Q.   Has he come any other time to the home to
20 inspect your attic?
21     A.   No, sir.
22     Q.   All right.  I'm going to show you a second
23 photograph.  All right.  Here, I'm showing you a
24 document that we're going to mark as Exhibit 6.  Do
25 you see a photograph -- a new photograph in front of

Page 59

1  you on your screen?
2      A.   Yes, sir.
3          (Exhibit 6 was marked for
4      identification.)
5      Q.   (By Mr. Lawson)  Okay.  Do you recognize
6  this marking that you see?
7      A.   Yes, sir.
8      Q.   What can you see, as far as what this
9  marking says on it?
10     A.   This says "Or exceeds ASTM, CI," whatever.
11     Q.   And do you see at the beginning of the
12 marking where there's the letters ET?
13     A.   Yes, sir, I do with the post.
14     Q.   A moment ago, you said that the drywall said
15 Taishan on it; is that correct?
16     A.   Yes, sir.
17     Q.   And that was based on your recollection of
18 seeing it in person; is that right?
19     A.   Yes, sir.
20     Q.   Now, have you seen the name Taishan anywhere
21 on any of the photographs that we've looked at in
22 Exhibits 5 and 6?
23     A.   No, sir.
24     Q.   Okay.  Do you believe that there is a
25 different marking inside of your home that says

Page 60

1  Taishan on it that has not been shown in these two
2  photographs?
3      A.   Yes, sir.
4      Q.   Okay.  Do you have any photographs of the
5  drywall in your home beyond the two that I have just
6  shown you?
7      A.   No, sir.
8      Q.   All right.  Have you had -- do you believe
9  that the drywall that says Taishan on it is still
10 within your home at this time?
11     A.   No wallboard has been removed from our home
12 since 2007.
13     Q.   Do you agree that in the photos that I've
14 shown you in Exhibits 5 and 6, the name Taishan does
15 not appear; is that right?
16     A.   Correct.
17     Q.   I want to go back to what we marked as
18 Exhibit 4 that was the plaintiff profile form.  Now,
19 under that same section, IV, inspection information,
20 there's a second question below the one that we looked
21 at before about who conducted the inspection, and it
22 asks, "Has a determination been made that
23 Chinese-manufactured drywall was present at your
24 home?"
25         Do you see that?

Page 61

1      A.   Yes, sir.
2      Q.   And you answered yes; correct?
3      A.   Yes, sir.
4      Q.   And it, again, asked who made that
5  determination, and you said the Doyle Law Firm again;
6  correct?
7      A.   Yes, sir.
8      Q.   So is it your understanding that Mr. Doyle
9  made the determination that there was
10 Chinese-manufactured drywall in your home during that
11 inspection that occurred in November of 2011?
12     A.   Yes, sir.
13     Q.   And I apologize if I've asked this already,
14 but no one else other than Mr. Doyle, to your
15 knowledge, has inspected your home at any point?
16     A.   No one other than my husband and myself.
17     Q.   And Mr. Doyle; correct?
18     A.   And Mr. Doyle.  Yes, sir.
19     Q.   And no one else has made a determination
20 that Chinese drywall is in your home other than
21 Mr. Doyle; is that correct?
22     A.   No, sir.
23     Q.   Now, going down to Section V, drywall
24 information, it asked you the drywall manufacturer.
25 There, you state Taishan Gypsum Company.  Do you see

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020
Pages 62..65

Page 62

1  that?
2      A.   Yes, sir.
3      Q.   How did you decide that that was the name of
4  the drywall manufacturer for the drywall in your home?
5      A.   If you pull back enough of the insulation
6  off from the wallboard, you will find the name on it.
7      Q.   And you have seen that personally; correct?
8      A.   Yes, sir.
9      Q.   And when you look at the next column, it
10  asks the markings on the drywall.  You see that?
11      A.   Yes, sir.
12      Q.   And here it says, "Made in China, meets or
13  exceeds ASTM"; is that correct?
14      A.   Yes, sir.
15      Q.   And that is the only mark that you listed on
16  this form; correct?
17      A.   Yes, sir.
18      Q.   You did not list a marking that says
19  "Taishan Gypsum" on it; correct?
20      A.   Didn't know that I needed to add any more to
21  it.
22      Q.   Well, it asked you the markings on the
23  drywall and you said, "Made in China.  Meet or exceeds
24  ASTM"; right?
25      A.   Yes, sir.

Page 63

1      Q.   And you stated in the next column that the
2  location in the home of the drywall is ceiling and
3  walls; correct?
4      A.   Yes, sir.
5      Q.   How were you able to determine that the
6  drywall is in the walls of your home?
7      A.   Taking the electrical plug off from our wall
8  and finding the blackened ground wire is a part of why
9  it was into the walls also.
10      Q.   You haven't seen the markings on the drywall
11  in the walls; correct?
12      A.   No.
13           MR. DOYLE:  Matt, let's take a quick
14      break.  Three minutes.
15           MR. LAWSON:  Okay.
16           (A recess was taken.)
17      Q.   (By Mr. Lawson)  Okay.  Welcome back, Mrs.
18  Gibbs.  A moment ago, you had a discussion with your
19  attorney.  I just wanted to ask if you wanted to
20  clarify anything about the statements you made about
21  the drywall that you have seen inside your home?
22      A.   Yes, sir.  I -- I misspoke when I said I saw
23  the name Taishan on it.  I did not see that name on
24  it.  It was probably -- I had it in my mind when you
25  said that, and that's not what I saw.  I'm sorry.

Page 64

1      Q.   Is the drywall that you recall seeing in
2  your home, does it have the markings that look similar
3  to the ones I showed you in the two photographs in
4  Exhibit 5 and 6?
5      A.   Yes, it has those definitely.  It's been
6  many years since I was up there to look at that
7  specific thing, but I did see it at that time.
8      Q.   I want to take you back to the plaintiff
9  profile form that we have been looking at previously.
10  I'm going to pull that up again and share it onto your
11  screen.  Now, earlier, we had a little bit of a
12  discussion about the square footage of your home.  I
13  just wanted to ask you, in Section VI here for home
14  information, it states that the approximate square
15  footage of your house is 1,600 square feet.  Do you
16  see that?
17      A.   Yes, sir.
18      Q.   Do you know why that number is so much
19  different than the ones that we talked about today?
20      A.   That was including the two-car garage.
21      Q.   Also, I wanted to ask you about a section
22  that is Section X that's in the bottom right-hand
23  corner of this document.  It says, "Drywall supplier."
24  Do you see that?
25      A.   Yes, sir.

Page 65

1      Q.   And it states that the drywall supplier's
2  name is RL Stockett & Associates, LLC.  Do you see
3  that?
4      A.   Yes, sir.
5      Q.   And they're listed as having an address of
6  500 Easy Street, Carefree, Arizona 85377.  Did I read
7  that correctly?
8      A.   Yes, sir.
9      Q.   Do you know who that company is?
10      A.   Yes, sir.
11      Q.   Where did you get that information that the
12  drywall supplier for the drywall in your home is RL
13  Stockett & Associates?
14      A.   I have no idea where it came from.
15      Q.   Have you ever heard that name before?
16      A.   No, sir.
17      Q.   Has anyone ever told you that your drywall
18  was supplied from Arizona?
19      A.   No, sir.
20      Q.   Going up to Section VIII, it asks you the
21  homebuilder/general contractor/developer information.
22  Do you see that?
23      A.   Yes.
24      Q.   And here, for the name of the homebuilder,
25  you put Patriot Contracting, LLC; is that right?

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                   Pages 66..69

Page 66

1    A.   Yes, sir.
2    Q.   Is that the same as Patriot Homes that we
3    discussed earlier?
4    A.   Yes, sir.
5    Q.   Was anyone other than Patriot Homes or
6    Patriot Contracting involved in building your house,
7    to your knowledge?
8    A.   Not that I know of.
9    Q.   Do you know if Patriot Homes is the one who
10   installed the drywall in your home?
11   A.   I do not know.
12   Q.   Now, under the plumbing system and
13   electrical system questions that you see on the
14   left-hand column of this document under Section -- I
15   believe it's Section VI, home information.  Do you see
16   that?
17   A.   Yes, sir.
18   Q.   It asks you for a variety of different items
19   where there's been blackening or corrosion in your
20   home for those items.  Do you see that?
21   A.   Yes, sir.
22   Q.   And you have said for the plumbing system
23   section that there was blackening or corrosion to PVC,
24   CPVC or plastic piping, you said yes; copper piping,
25   you said yes; copper fixture, you said yes; and other

Page 67

1    fixers, you said yes.  Do you see that?
2    A.   Yes, sir.
3    Q.   Do you know if you have all those different
4    types of plumbing fixtures in your home?
5    A.   No, sir.
6    Q.   Okay.  Do you know if there's any corrosion
7    to the plumbing systems in your home today?
8    A.   We have had an -- had it in one area, yes.
9    Q.   What area is that?
10   A.   The connection of the -- to the toilet.  The
11   copper to the -- the waterline on the toilet.
12   Q.   Did you have any problems with that toilet
13   as a result of that corrosion?
14   A.   Yes, sir.
15   Q.   What was that?
16   A.   A water leak.
17   Q.   Around what time did that happen?
18   A.   I don't recall.  I would have to go back to
19   see if I could find that.
20   Q.   Do you think it was some years ago?
21   A.   I'm not sure when it was.
22   Q.   Did you have it replaced?
23   A.   Yes, sir.
24   Q.   So the connection between the waterline and
25   the toilet was replaced with a new one.

Page 68

1    A.   Yes, sir.
2    Q.   Has it malfunctioned since it was replaced?
3    A.   No, sir.
4    Q.   Has there been corrosion since it was
5    replaced?
6    A.   I haven't looked at it.
7    Q.   Going down to the electrical system
8    questions that we have here, it asks you if there's
9    been blackening or corrosion for the receptacles,
10   switches, main panel, second panel and exposed copper
11   wires.  Do you see that?
12   A.   Yes, sir.
13   Q.   And you've said yes to all of those except
14   for second panel, which is marked as not applicable.
15   Do you see that?
16   A.   Yes, sir.
17   Q.   Do you know if there's been blackening or
18   corrosion on all of the items that you said yes to on
19   this list?
20   A.   I have -- I'm not sure exactly what they
21   involve because we don't -- I haven't gone into the --
22   to check on everything recently.
23   Q.   I believe earlier you mentioned that there
24   was blackening or corrosion in one of the receptacles
25   in the walls; is that right?

Page 69

1    A.   Yes, sir.
2    Q.   And have you seen that personally?
3    A.   Yes, sir.
4    Q.   Have you ever had any issues with the
5    outlets in your home working?
6    A.   So far, no.
7    Q.   Have you had any issue with the lights in
8    your home turning on or off?
9    A.   No, sir.
10   Q.   Okay.  To your knowledge, have you had any
11   issues with your electrical system or problems with
12   your electrical system that you attribute to Chinese
13   drywall?
14   A.   Not that I can think of right now.
15   Q.   Okay.  I wanted to ask you about your home
16   since 2007.  Have you renovated or made any
17   improvements to the home since you moved into it in
18   2007 as far as structural changes?
19   A.   No, sir.
20   Q.   So the square footage of the home has not
21   changed since it was built, as far as -- to your
22   knowledge?
23   A.   No, sir.
24   Q.   When you purchased the home, did you
25   purchase it with cash or through a mortgage?

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020
Pages 70..73

Page 70

1    A.   Mortgage.
2    Q.   Do you -- are you still paying that mortgage
3  today?
4    A.   No, sir.
5         I don't know how to answer that one.
6    Q.   Okay.  So what was the term of the mortgage,
7  if you recall, when you purchased it in 2007?  Do you
8  know if it was ten years, 30 years, 15?
9    A.   Fifteen.  Fifteen.
10   Q.   And you don't -- do you know if you are
11 making mortgage payments today?
12   A.   We -- we put it on a reverse mortgage.
13   Q.   And when did you do that?
14   A.   Before we got -- before we knew about the
15 Chinese wallboard.
16   Q.   Was that before 2011?
17   A.   Yes, sir.
18   Q.   Does anyone else have a lien on your
19 property or any ownership interest in your property
20 other than you?
21   A.   No, sir.
22   Q.   Have you ever assigned your claim in this
23 action related to Chinese drywall to anyone else?
24   A.   No, sir.
25   Q.   Has anyone ever assigned a Chinese drywall

Page 71

1  claim to you, to your knowledge?
2    A.   No, sir.
3    Q.   We had some discussion about the odor in
4  your home that you noticed shortly after you moved in
5  that you thought was a new house smell.  Do you
6  remember that?
7    A.   Yes, sir.
8    Q.   Now, does the odor change at all different
9  times of the year, seasons?
10   A.   I don't know if I can even tell whether it's
11 changing.
12   Q.   And do you have -- other than the odor and
13 the items that you've had to replace in the home, can
14 you think of any other issues that you've had living
15 in your home that you believe have been caused by the
16 Chinese drywall?
17   A.   There have been some physical problems for
18 us that -- before we moved into this house, I would
19 only have a sinus problem in the springtime and in the
20 fall.  But since living in this house, I have a
21 constant problem with my sinuses, and my doctor --
22 they've only tried -- they're treating it and have had
23 me on antihistamines to try and keep that down.
24        We've had more headaches than normal than we
25 used to have before we moved in here.  My husband and

Page 72

1  our great-granddaughter have both had nosebleeds.  Our
2  granddaughter -- our granddaughter here has a cough
3  that she cannot get rid of.  My husband has skin
4  rashes that he can't seem to get over, and these are
5  all things that have been symptoms of things that we
6  did not know could possibly be related to Chinese
7  wallboard gases.
8    Q.   You mentioned some family members there that
9  I'm guessing have been in your house; is that right?
10   A.   We have -- now we have a granddaughter and a
11 great-granddaughter that both live with us.
12   Q.   Okay.  And what are their names?
13   A.   My -- our granddaughter's name is Danielle
14 Green.
15   Q.   And your great-granddaughter?
16   A.   Is Lydia Torbert Green.
17   Q.   How do you spell Torbert?  Is that
18 T-O-R-B-E-R-T?
19   A.   Yes, sir.
20   Q.   And how long have they lived with you?
21   A.   Our great-granddaughter -- I have to go back
22 and look.  She has been living with us over five
23 years.  I think closer to seven.
24   Q.   And what about your great-granddaughter?
25   A.   That's our great-granddaughter.

Page 73

1    Q.   Excuse me.  So five to seven years for your
2  great-granddaughter.
3    A.   Right.  And our granddaughter, I think, has
4  been here for three.  I don't -- I'm not sure exactly
5  how long, but somewhere around that.
6    Q.   Okay.  And you said that your granddaughter
7  has experienced a cough?
8    A.   Yes, sir.
9    Q.   And was it your great-granddaughter or your
10 granddaughter who was experiencing nosebleeds?
11   A.   Great-granddaughter and my husband.
12   Q.   Now, have you or any of the family members
13 that you mentioned gone to a doctor related to these
14 issues that we've described?
15   A.   Yes, sir.
16   Q.   And who has gone to a doctor for these
17 issues?
18   A.   Well, my husband, my granddaughter, my great
19 granddaughter and me.
20   Q.   Have you had a doctor tell you that these
21 issues -- any of these issues are related to the
22 Chinese drywall in your home?
23   A.   Well, no, they have never mentioned that to
24 us in any way, shape or form, no.
25   Q.   How old is your granddaughter?

**Page 74**

1   A.   Our granddaughter is 40.
2   Q.   And how old is your great-granddaughter?
3   A.   Sixteen.
4   Q.   And they have lived -- they live in the
5   house with you as their primary residence right now?
6   A.   Yes, sir.
7   Q.   Anyone else other than them have lived in
8   the home with you since 2007?
9   A.   Yes, sir.  Our other two great
10  grandchildren.
11  Q.   And when did they live with you?
12  A.   Since -- let's see.  Okay.  2016 till 2018
13  for one of them.  2016 to 2019 for the other.
14  Q.   What are their names?
15  A.   The first one is Audrey Alice Gibbs.
16  Q.   And the second?
17  A.   Helen Carter Torbert.
18  Q.   Beyond those three great grandchildren and
19  your granddaughter, has anyone else lived in the home
20  with you since you moved in in 2007?
21  A.   No, sir.
22  Q.   How has the presence of Chinese drywall in
23  your home affected your life living in the home at 701
24  Waverly Place?
25  A.   That's a hard question to answer when you --

**Page 75**

1   when you try to think of what you're looking at.  I
2   think one of the things is that so many have not
3   wanted to come and be in our home too much, and
4   they've been pretty polite, other than our family
5   members who tell us there's a smell.
6       We -- my husband also has COPD.  So knowing
7   that we may have this problem in our home, we try to
8   keep it open as much as possible except when we
9   absolutely have to have heating or air condition just
10  to try and air the place out.
11  Q.   You mentioned your husband has COPD and you
12  mentioned your sinus issues.  Have either of you been
13  diagnosed with any other conditions or currently have
14  any other conditions other than sinus issues and COPD?
15  A.   My husband's got a rash on several places on
16  his body that they -- the doctor has been trying to
17  figure out for at least two years.  I had a severe
18  rash at one time, and I still have times when my skin
19  is very, very itchy.  And it seems to be worse just
20  after we have to close the house up and start heating
21  or air conditioning the house seems to be the time
22  when it gets the worse.
23  Q.   Anything other than that?
24  A.   Not that I can think of at the moment.
25  Q.   Are you taking any other medications related

**Page 76**

1   to any conditions?
2   A.   Oh, yes, sir.  Yes, sir.
3   Q.   And what are those -- or excuse me -- what
4   are those conditions that the medications are
5   treating?
6   A.   High blood pressure.  I take medication for
7   prediabetes.  Trying to think of anything else.  We
8   take some over-the-counter medications also.
9   Q.   Are there any things that you do not do in
10  your home because of the issues that you have with
11  Chinese drywall that you can think of?
12  A.   Well, I don't move pictures around on the
13  walls because I don't want to leave holes in the
14  walls.  I can't think of anything that we, you know --
15  we have to live here.  We can't afford to live
16  anywhere else.
17  Q.   Have you ever considered selling your home?
18  A.   No, sir.
19  Q.   Why is that?
20  A.   Because we know we cannot get what we would
21  need out of it to move.
22  Q.   Has anyone told you how much you could sell
23  your home for if you sold it as it exists today?
24  A.   No, sir.
25  Q.   Did you enjoy living in your home before you

**Page 77**

1   knew that it had Chinese drywall in it?
2   A.   Yes, except for the frustrations of things
3   breaking, the air conditioning going out and things
4   like that, which it should not have done in a new
5   home.
6   Q.   And once you learned that it had Chinese
7   drywall, were there -- did you have any -- did you
8   still enjoy your home the same or did it change once
9   you learned that you have Chinese drywall in it?
10  A.   Well, we knew that we needed to open the
11  doors and windows more than we had been doing at that
12  point and making sure we tried to air it out as much
13  as possible.
14  Q.   Did you have a difference in your enjoyment
15  of the home after you started to open the doors and
16  windows more often?
17  A.   Yes.  We've had complaints that it's too
18  hot, we needed to turn on the air conditioning or it's
19  too cold, we need to turn on the heat.  And so I hold
20  off on it as long as absolutely possible.
21  Q.   I want to show you another document and I'm
22  going to pull it up right now.  So one moment.  Bear
23  with me.  All right.  I'm going to mark this as, I
24  believe, Exhibit 7.  Do you recognize this document
25  that I'm showing you?

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                    Pages 78..81

Page 78

```
1           (Exhibit 7 was marked for
2      identification.)
3           THE WITNESS:  Yes, sir.
4      Q.   (By Mr. Lawson)  And do you have a copy of
5  it before you easily?
6      A.   I do believe we do.
7      Q.   I'll represent to you this is a supplemental
8  plaintiff profile form for the United States District
9  litigation before Judge Fallon in the Eastern District
10 of Louisiana, and that is a form that was filled out
11 for your claim.
12          I'd like to turn your attention to the
13 second page of the document.  If you could take a look
14 under Section I, claimant and property information, do
15 you see your name and your husband's name there?
16     A.   Yes, sir.
17     Q.   And it asks the address of the property in
18 this lawsuit, and it lists your address, 701 Waverly
19 Place; correct?
20     A.   The ZIP code is incorrect.
21     Q.   Okay.  So the ZIP code that's listed here is
22 36804.  What is the correct ZIP code?
23     A.   36801.
24     Q.   And below that, it asked the name of the
25 person completing this form, and it lists your name;
```

Page 79

```
1  is that right?
2      A.   Yes, sir.
3      Q.   Do you remember filling out this form?
4      A.   Yes, sir.
5      Q.   Going to the last page of this document, and
6  I believe this might have been given to you
7  separately, but I'll show you.  I have them all merged
8  together.  There's a signature page.  I don't know --
9  do you have that?
10     A.   Yes, sir.
11     Q.   And do you see it before you here, the
12 signature page that I have up on the screen?
13     A.   Yes, sir.
14     Q.   And that's your signature and your husband's
15 signature on this page; correct?
16     A.   Yes, sir.
17     Q.   Your signature was your verification that
18 you were telling the truth, to the best of your
19 knowledge, in this document; correct?
20     A.   Yes, sir.
21     Q.   And you believe that you did that when you
22 filled this out?
23     A.   Yes, sir.
24     Q.   All right.  I'd like to go now to the, I
25 believe, third page of this document.  If you can
```

Page 80

```
1  click over there.  I'm sorry.  Let's go to the bottom
2  of the second page.  Now, here, there's a section,
3  Section II, purchase, sale and/or transfer of
4  ownership of a property and assignment of claims.  Do
5  you see that?
6      A.   Yes, sir.
7      Q.   And here, under the second question, it
8  asks, "When was Chinese drywall installed in the
9  property, to the best of your knowledge?"
10          Do you see that?
11     A.   Yes, sir.
12     Q.   And that is listed by you as March 1st,
13 2007.  Do you see that?
14     A.   Yes, sir.
15     Q.   Do you know where that date came from?
16     A.   I -- I have no -- well, yes, I do.  That was
17 before we bought the house, and I -- I assumed that it
18 was going to be about -- it would have been in about
19 that time.  That's --
20     Q.   So you've --
21     A.   That was to the best of my knowledge and it
22 was about that time.
23     Q.   Understood.  And then above that, it asked
24 when you acquired the property, and that was June 1st,
25 2007; correct?
```

Page 81

```
1      A.   Yes, sir.
2      Q.   So it's your understanding that the drywall
3  was installed in your home before you acquired the
4  property; is that right.
5      A.   Yes, sir, before we ever saw the property.
6      Q.   All right.
7      A.   Uh-huh (affirmative).
8      Q.   And you were asked when you acquired the
9  property, were you aware that it contained Chinese
10 drywall and you marked no; correct?
11     A.   No, sir.  We did not.
12     Q.   So you had no idea that there was Chinese
13 drywall when you purchased that property; correct?
14     A.   No, sir.
15     Q.   And you were asked if you were not aware at
16 the time you acquired the property that the property
17 contained Chinese drywall, when did you first become
18 aware that it contained Chinese drywall, and here on
19 this form you say November 2011; correct?
20     A.   Yes, sir.
21     Q.   And based on what we saw previously on the
22 plaintiff profile form, the first one that we looked
23 at, that that was around the time that Mr. Doyle came
24 over to your home to inspect it; correct?
25     A.   Yes, sir.
```

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                                    Pages 82..85

Page 82

1    Q.   Now, I'd like to turn your attention over to
2  the third page of this document, it's Section III, it
3  says, "Product identification and evidence retention."
4  Do you see that?
5    A.   Yes, sir.
6    Q.   Essentially, this is asking you if you've
7  produced any kind of evidence that you have of Chinese
8  drywall in your home, like photographs.  Do you
9  remember filling this out?
10    A.   Yes, sir.
11    Q.   And you've indicated here that you provided
12  that evidence; correct?
13    A.   Yes, sir.
14    Q.   And that we looked at those two photographs
15  earlier that were Exhibits 5 and 6, I believe.
16    A.   Yes, sir.
17    Q.   Is that right?
18        And it's -- you were asked if you have
19  additional evidence of Chinese drywall in the property
20  that you have not provided, and you said no; is that
21  right?
22    A.   Yes, sir.
23    Q.   Do you have any additional evidence of
24  Chinese drywall in your home, any additional
25  photographs that you have not provided to your

Page 83

1  attorney since you filled out this form?
2    A.   No, sir.
3    Q.   You state on this form that you are not
4  seeking personal bankruptcy as a result of the damages
5  to your property.  Is that still correct?
6    A.   That is correct.
7    Q.   And going on to Page 4, you state in
8  Section IV, you were asked if the property has been
9  partially or completely remediated, and you have
10  indicated no.  Is that still correct?
11    A.   That is correct.
12    Q.   Going on to Page 5 of this document in
13  Section VI, prior payments, you were asked if you had
14  received any payments including, but not limited to
15  settlement payments from homebuilders and insurance
16  payments related to damages you claim to have suffered
17  caused by defective Chinese drywall in the property or
18  related to any other harm caused by defective Chinese
19  drywall.  Do you see that?
20    A.   Yes, sir.
21    Q.   And you said yes, you have received prior
22  payments of that nature; correct?
23    A.   Yes, sir.
24    Q.   Now, have you ever received insurance
25  payments related to your claims of Chinese drywall in

Page 84

1  your home?
2    A.   Not from our insurance.  Not from anyone
3  else's that I know of.
4    Q.   Okay.  So have you ever made a claim with
5  your homeowners' insurance related to the Chinese
6  drywall?
7    A.   No.
8    Q.   Have you ever looked into making a claim for
9  homeowners' insurance on your Chinese drywall?
10    A.   No, sir.
11    Q.   And here, there are two different payments
12  that are listed on this form.  The first one is a
13  Chinese drywall settlement program as the source, and
14  the amount received listed was $4,998.93.  Do you see
15  that?
16    A.   Yes, sir.
17    Q.   And does that look accurate for an amount
18  that you received from the Chinese drywall settlement
19  program?
20    A.   To the best of my knowledge.
21    Q.   Do you remember receiving payments from the
22  Chinese drywall settlement program at any time?
23    A.   Vaguely.  I don't remember when.
24    Q.   And then there's an additional payment
25  that's listed as GBI holdback payment that's $313.02.

Page 85

1  Do you see that?
2    A.   Yes, sir.
3    Q.   Do you have any recollection of receiving
4  that money?
5    A.   Not to my knowledge right now.  I don't
6  remember it.
7    Q.   Can you think of any other payments that
8  you've received related to Chinese drywall other than
9  the ones that are listed here?
10    A.   Not to my knowledge right now.  I would have
11  to check on all of that stuff.
12    Q.   Okay.  Let's go on to the bottom of the
13  fifth page.  It's entitled, "Section VII, other
14  damages."  Do you see that?
15    A.   Yes, sir.
16    Q.   And it asks if you've incurred alternative
17  living expenses as a result of Chinese drywall and to
18  identify the total moving costs and/or alternative
19  living expenses you incurred.  You left that blank; is
20  that right?
21    A.   Yes, sir.
22    Q.   And is that because you are not pursuing
23  damages for alternative living expenses in this case?
24    A.   We can't afford to move somewhere else, so I
25  don't have any option on having an alternative living

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                                  Pages 86..89

**Page 86**

1  situation.
2      Q.   You haven't lived anywhere else other than
3  your home since you moved in in 2007; correct?
4      A.   No, sir.
5      Q.   Going down a little bit further, it asks you
6  on Page 6 here at the top if you experienced any loss
7  of use and/or loss of enjoyment of the property as a
8  result of Chinese drywall, and it asked to identify
9  the total amount of such loss.  Do you see that?
10     A.   Yes, sir.
11     Q.   And you've listed $275,000.  Do you see
12 that?
13     A.   Yes, sir.
14     Q.   Do you know where that figure came from?
15     A.   No, sir.
16     Q.   Do you remember -- did you write that figure
17 in, to the best of your knowledge?
18     A.   I must have.
19     Q.   And to your knowledge, did you work with
20 your attorney to be able to fill out this form?
21     A.   I don't recall.
22     Q.   Do you know if you are seeking any amount
23 different than that for loss of use and enjoyment in
24 this -- of your home in this action?
25     A.   Would you repeat that question?

**Page 87**

1      Q.   Yeah.  Do you know if you are -- having
2  looked at that number and not -- do you know if you're
3  seeking a different amount for that number for loss of
4  use and enjoyment today?
5      A.   At this moment, I'm not sure.
6      Q.   And it asks you to attach all documentation
7  to support the total amount claimed for the loss.  Do
8  you see that?
9      A.   Yes, sir.
10     Q.   Do you know if you have provided any
11 documentation or attached any to this submission of
12 this form related to that loss of use -- and/or loss
13 of enjoyment of your property that you're asking for
14 monetary damages for?
15     A.   No, sir.
16     Q.   Are you aware of any documentation today
17 that would support that claim?
18     A.   Not to my knowledge.
19     Q.   You're also asked on this form if you
20 claimed a diminution in value of the property as a
21 result of Chinese drywall and to identify the --
22 identify the total amount of such diminution of value
23 being claimed.  Do you see that?
24     A.   Yes, sir.
25     Q.   And you've left that blank on this form.  Do

**Page 88**

1  you see that?
2      A.   Yes, sir.
3      Q.   Does that reflect that you're not seeking
4  damages for diminution of value of your property in
5  this action?
6      A.   I would have to look up the word "diminution
7  of value" to know what we were talking about.
8      Q.   I think that it's -- I'll represent to you
9  that it's referring to loss of value of your property.
10 Do you know if you're seeking any damages for loss of
11 value of your property?
12     A.   Not at this time.
13     Q.   And do you know if you have any
14 documentation that would support loss of value of your
15 property?
16     A.   No, sir.
17     Q.   Have you had your home appraised at any
18 point?
19     A.   Not since we purchased it.
20     Q.   Do you remember what the home appraised for
21 when you purchased it?
22     A.   I do not remember the exact figure, no.
23     Q.   Do you remember how much you paid for your
24 home when you purchased it?
25     A.   I would have to go back and look at my

**Page 89**

1  records again.
2      Q.   Do you remember how much money you put down
3  on the home for a down payment when you purchased it?
4      A.   Thirteen years is a long time --
5      Q.   It is.
6      A.   -- to remember those things.
7           I -- I would have to go back and look at it
8  to see and make sure.
9      Q.   Looking at down -- I'll ask you and you can
10 tell me to the best of your knowledge.  Do you know
11 other than these other damages that we just listed and
12 for the repair to your home, are there any other
13 damages that -- oh, excuse me -- and the personal
14 property that you have mentioned and that's summarized
15 here, are there any other damages that you can think
16 of that you're pursuing in this action other than
17 those?
18     A.   Over the time that we have been
19 knowledgeable of this Chinese wallboard, we have come
20 to the knowledge that there are certain things in our
21 home that would have to be replaced even though they
22 don't seem like they are -- have been damaged by this.
23 Like our sofa and chairs, our bed and what have you,
24 that would need to be replaced because they could not
25 be cleaned properly.  And those things, I haven't --

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**
Pages 90..93

Page 90

1  we haven't come up with any figure on what that would
2  entail unless we have someone come in and tell us what
3  all has to be replaced in the process.
4      Q.   Do you know any items that you've been told
5  will need to be replaced in your home?
6      A.   We have heard that -- and don't ask me where
7  I heard it because I'm not sure -- but that, yes, the
8  sofas -- anything that was not leather-type of
9  furniture and all would absorb that sulfuric acid gas.
10     Q.   So fabric items, is that what you're saying
11  would need to be replaced?
12     A.   Things that cannot be washed and dried, yes,
13  or dry cleaned.
14     Q.   The clothes could be washed or dry cleaned;
15  correct?
16     A.   Yes, sir.
17     Q.   And furniture, you -- would you agree that
18  furniture can be cleaned?
19     A.   I can't say that I can answer that yes or no
20  on that, no, not at this time.
21     Q.   Looking further down this document, there's
22  a Section VIII that's titled, "Under air square
23  footage," and you have indicated that the square
24  footage of your home has not changed since the
25  installation of Chinese drywall; is that correct?

Page 91

1      A.   Yes, sir.
2      Q.   Okay.
3           MR. LAWSON:  I think we've hit another
4      good point for a break.  I understand, you
5      know, we're probably around lunchtime for
6      you-all.  I don't know if anyone here wants
7      to be able to take a break for lunch.  I
8      don't think we have a lot left.  So I can
9      leave it up to everybody to decide whether
10      we want to keep pushing to try to finish or
11      if we want to take a break for people to be
12      able to eat.
13           We can go off the record.
14           (A recess was taken.)
15      Q.   (By Mr. Lawson)  Welcome back, Mrs. Gibbs.
16  I just have a few more questions that I wanted to ask
17  you.
18           MR. DOYLE:  Excuse me, Matt.  Do we
19      still have the court reporter?
20           COURT REPORTER:  Yes.  I'm here.
21      Q.   (By Mr. Lawson)  Okay, Mrs. Gibbs.  I just
22  wanted to ask you a few more questions.  Going back to
23  talk a little bit about Mr. John Carter, who we talked
24  about before.  You mentioned earlier that Mr. Carter
25  was involved with the putting in the flooring in the

Page 92

1  house; is that right?
2           MR. GIBBS:  Correct.
3           THE WITNESS:  He's asking me.
4           Yes.
5      Q.   (By Mr. Lawson)  And was he -- I think you
6  mentioned that he wasn't involved in other aspects of
7  the house.  Can you tell me more about that.
8      A.   His partner, I do believe, was what -- I
9  can't remember his name -- was, I think, the one that
10  was really the prime -- prime contractor -- doing the
11  contracting work on the house itself.
12     Q.   And do you know if Mr. Carter was local to
13  the area?
14     A.   Yes, sir.
15     Q.   And so he lived in Auburn or Opelika or
16  somewhere around there?
17     A.   Yes, sir.
18           MR. GIBBS:  He lives in Auburn.
19     Q.   (By Mr. Lawson)  Okay.  He lives in Auburn.
20  And did you have any conversations with him in the
21  time that -- between 2007 and 2011 that you were
22  living in the house and his mother was living next
23  door?
24     A.   The only time we had conversations was to
25  say hello and how were you -- are you when he visited

Page 93

1  his mother next door.
2      Q.   When you had conversations about the final
3  details of the house, like the color of the paint and
4  things like that, were those conversations with Mr.
5  Carter or his partner?
6           MR. GIBBS:  Mr. Carter.
7           THE WITNESS:  Mr. Carter.
8           MR. LAWSON:  I think we're at a point
9      where it's good to turn over to Mr. Gibbs
10      because I think he knows the answers.
11           THE WITNESS:  Yes.  I was not present
12      when the colors and all were chosen.  My
13      husband did those by himself.
14           MR. LAWSON:  Mrs. Gibbs, you have
15      given us a lot of information, and I
16      appreciate everything, you taking the time
17      to be able to do this today.  I have no
18      further questions for you at this time, but
19      however, as I mentioned earlier, we look
20      forward to getting the documentation that
21      you have related to the items in the home
22      that you say that have been replaced as a
23      result of Chinese drywall issues, and we
24      will likely be speaking with you again
25      about those at a later date.

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Darla Gibbs on 12/09/2020**                                    **Pages 94..97**

---

**Page 94**

1   THE WITNESS:  Thank you.

2   (Deposition concluded at 1:03 p.m.)

---

**Page 96**

1                    DISCLOSURE

2

3        Pursuant to Article 10.B of the Rules
     and Regulations of the Board of Court
     Reporting of the Judicial Council of

4   Georgia which states:  "Each court reporter
     shall tender a disclosure form at the time

5   of the taking of the deposition stating the
     arrangements made for the reporting

6   services of the certified court reporter,
     by the certified court reporter, the court

7   reporter's employer or the referral source
     for the deposition, with any party to the

8   litigation, counsel to the parties, or
     other entity.  Such form shall be attached

9   to the deposition transcript," I make the
     following disclosure:

10

11       I am a Georgia Certified Court
     Reporter.  I am here as a representative of

12  Huseby Global Litigation.  Huseby Global
     Litigation was contacted to provide court

13  reporting services for the deposition.
     Huseby Global Litigation will not be taking

14  this deposition under any contract that is
     prohibited by O.C.G.A. 9-11-28(c).

15       Huseby Global Litigation has no
     contract/agreement to provide reporting

16  services with any party to the case, any
     counsel in the case, or any reporter or

17  reporting agency from whom a referral might
     have been made to cover this deposition.

18

19       Huseby Global Litigation will charge
     its usual and customary rates to all

20  parties in the case, and a financial
     discount will not be given to any party to

21  this litigation.

22
                               Blanche J. Dugas
23                             CCR No. B-2290

24

25

---

**Page 95**

1                    CAPTION

2

3        The Deposition of DARLA GIBBS, taken in the

4   matter, on the date, and at the time and place set out

5   on the title page hereof.

6        It was requested that the deposition be

7   taken by the reporter and that same be reduced to

8   typewritten form.

9        It was agreed by and between counsel and

10  the parties that the Deponent will waive reading and

11  signing of the transcript of said deposition.

---

**Page 97**

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4        I hereby certify that the foregoing

5   transcript was reported, as stated in the

6   caption, and the questions and answers

7   thereto were reduced to typewriting under

8   my direction; that the foregoing pages

9   represent a true, complete, and correct

10  transcript of the evidence given upon said

11  hearing, and I further certify that I am

12  not of kin or counsel to the parties in the

13  case; am not in the employ of counsel for

14  any of said parties; nor am I in any way

15  interested in the result of said case.

16

17

18

19

20       BLANCHE J. DUGAS, CCR-B-2290

---

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                    Index: $119,846..6

Exhibits

GibbsD-1   3:8
  22:15,16,
  18,20

GibbsD-2   3:9
  32:20,24

GibbsD-3
  3:10
  45:15,20

GibbsD-4
  3:12
  51:10,12
  60:18

GibbsD-5
  3:14
  57:16,22,
  23  64:4

GibbsD-6
  3:15  58:24
  59:3

GibbsD-7
  3:16  77:24
  78:1

$

$119,846
  35:10,13

$275,000
  86:11

$313.02
  84:25

$4,998.93

84:14

$90,000
  35:24

1

1   18:3
  22:15,16,
  18,20

1,197   40:1
  41:9

1,250   40:20

1,600   64:15

10   14:21

12   14:21

13   9:5,13
  24:22

13th   45:6

15   70:8

16th   52:23

17th   52:8

19   13:5

1907   14:8

1959   12:20

1960   12:21

1999   13:12

1:03   94:2

1st   80:12,
  24

2

2   32:20,24

2006   34:9

2007   13:25
  14:2,5
  15:1  18:3
  23:22
  24:22
  37:25  38:3
  52:24
  60:12
  69:16,18
  70:7  74:8,
  20  80:13,
  25  86:3
  92:21

2011   21:11
  23:12,19
  26:2,4
  27:20  28:7
  29:23  30:3
  37:4,7
  45:8,12
  52:8  61:11
  70:16
  81:19
  92:21

2013   29:22,
  24  45:4,8,
  12

2014   28:16

2016   74:12,
  13

2017   58:16

2018   74:12

2019   74:13

2020   4:1

21st   34:9

3

3   45:15,20
  52:19

30   70:8

31st   32:12
  47:3,9,15,
  19  48:9,21

36801   78:23

36804   78:22

4

4   51:10,12
  60:18  83:7

40   15:11
  74:1

5

5   57:16,22,
  23  59:22
  60:14  64:4
  82:15
  83:12

500   65:6

6

6   58:24

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Darla Gibbs on 12/09/2020                    Index: 62..antihistamines

59:3,22
60:14 64:4
82:15 86:6

**62**  13:17

―――――――――
            **7**
―――――――――

**7**  77:24
78:1

**701**  13:19
14:22 15:4
32:22
33:21
34:14
74:23
78:18

**703**  27:7
36:22 37:3

**705**  27:6
36:22
37:4,6
38:12,21

―――――――――
            **8**
―――――――――

**84**  13:6

**85377**  65:6

―――――――――
            **9**
―――――――――

**9**  4:1

**99**  13:6

―――――――――
            **A**
―――――――――

**A-COIL**

27:15,17
28:8

**ability**  8:4

**absolutely**
75:9 77:20

**absorb**  90:9

**accurate**
41:13,15
43:20 46:1
84:17

**acid**  50:10
90:9

**acquaintance**
36:7,11

**acquainted**
38:4

**acquired**
80:24
81:3,8,16

**action**  11:7
12:8 17:7
46:13,20
47:12
48:23
53:16,19
57:15
70:23
86:24 88:5
89:16

**add**  5:24
48:10
62:20

**addition**
31:14

49:10

**additional**
31:11,25
32:7 46:12
47:16
48:12,16,
17 82:19,
23,24
84:24

**address**
13:19 14:5
27:1,5
32:22
33:10,21,
24 49:14
51:25 58:9
65:5
78:17,18

**affected**
74:23

**affirmative**
6:22 81:7

**afford**  14:3
36:19
76:15
85:24

**age**  47:6

**agent**  40:14,
15,19

**agree**  60:13
90:17

**ahead**  25:6
43:23,24
47:13

**air**  27:13,
23,24 28:4
29:3,21
30:7 45:5
75:9,10,21
77:3,12,18
90:22

**Alabama**
13:11,20
14:8 18:12
19:5 20:15
33:22

**Alice**  74:15

**alternative**
85:16,18,
23,25

**altogether**
27:23

**aluminum**
28:16

**amount**
84:14,17
86:9,22
87:3,7,22

**and/or**  80:3
85:18 86:7
87:12

**Andrew**  4:11

**answers**
6:13,18
7:1 93:10

**anticipate**
48:7

**antihistamines**

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                    Index: anymore..beginning

71:23

**anymore**
49:22

**apologize**
61:13

**appearance**
5:10

**appearing**
4:4,6

**appears**
18:2,10
31:25
32:22
34:22
41:7,10
49:6

**applicable**
68:14

**applicants**
33:16

**application**
32:21
34:13 39:2
40:22

**applying**
41:3

**appraised**
88:17,20

**approximate**
64:14

**area** 13:1
15:7 39:23
41:8 44:10
67:8,9

92:13

**areas** 48:12

**Arizona**
65:6,18

**articulated**
48:14

**asks** 39:22
54:15
60:22
62:10
65:20
66:18 68:8
78:17 80:8
85:16 86:5
87:6

**aspects** 92:6

**assigned**
70:22,25

**assignment**
80:4

**assist** 30:12

**Associates**
65:2,13

**assume** 19:21

**assumed**
27:21,22
80:17

**ASTM** 59:10
62:13,24

**attach** 87:6

**attached**
87:11

**attention**
78:12 82:1

**attic** 55:23,
25 56:3,4,
14,17,22
57:3 58:4,
20

**attorney**
5:10 7:10
9:18 21:25
23:4 29:8
46:14 50:6
51:17
53:20
57:14
63:19 83:1
86:20

**attractive**
15:8

**attribute**
69:12

**Auburn**
92:15,18,
19

**audible** 6:19
7:1

**Audrey** 74:15

**authorized**
4:14

**avoid** 6:21

**aware** 31:23
38:24
48:18
81:9,15,18

87:16

_____

**B**
_____

**back** 9:3,12
10:16 11:9
20:15
21:10
22:10
26:11,21
30:23 37:4
39:3 42:12
43:10 46:9
49:16
56:5,6
57:8 60:17
62:5 63:17
64:8 67:18
72:21
88:25 89:7
91:15,22

**backup** 43:8

**bad** 7:7
27:14,22

**bankruptcy**
83:4

**based** 39:23
41:8 47:6
59:17
81:21

**Bear** 77:22

**bearing** 4:21

**bed** 89:23

**beginning**
59:11

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                    Index: behalf..change

behalf  4:4,
  7,9,12
  54:17

big  14:15

bill  43:19

billings
  43:17

Birmingham
  37:17

bit  11:10
  18:22
  22:23 35:3
  36:21
  40:10
  42:17
  50:23
  64:11 86:5
  91:23

black  28:11
  50:9

blackened
  63:8

blackening
  66:19,23
  68:9,17,24

blank  85:19
  87:25

blood  76:6

BNBM  4:12

board  56:13,
  22 57:5
  58:6

bodily  7:1

body  75:16

born  12:20

bottom  34:2
  64:22 80:1
  85:12

bought
  16:22,24
  17:18
  18:15
  24:21 33:8
  80:17

break  7:17
  8:1 42:2
  63:14
  91:4,7,11

breaking
  77:3

breaks  7:20

build  26:16

builder  36:9

builders
  19:14

building
  19:15
  20:24,25
  21:14
  23:11
  32:21
  33:11
  34:13
  35:13 36:8
  39:2 40:22
  66:6

buildings

36:8

built  15:7,
  15,16,19,
  20,22,24
  21:2,6
  22:4 26:5,
  6 34:25
  69:21

business
  13:1,2,4,
  7,9 36:8

buy  15:3
  17:17

——————————
——————————
        C

cabinets
  16:4

call  4:8
  8:11,17
  11:20
  55:16

called  10:13
  23:4 39:5
  54:11

card  43:19

cards  9:11
  43:18

care  14:17

Carefree
  65:6

carefully
  46:10

Carolina

12:18

carry  49:13

Carter  19:4,
  8,18 20:8,
  17,22
  21:5,17
  22:3,5,24
  23:4,8,10,
  13 26:2,3,
  21 28:1
  30:2,3,11
  34:22,25
  37:8 74:17
  91:23,24
  92:12
  93:5,6,7

Carter's
  22:2 27:3,
  7 37:3
  51:5

case  13:18
  85:23

cash  69:25

caused  71:15
  83:17,18

causing
  25:17,24

ceiling  63:2

certify  19:3

chairs  89:23

chance  26:18

change  5:24
  37:11 71:8
  77:8

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                    Index: changed..complaints

changed
  24:23  37:7
  69:21
  90:24

changing
  71:11

charge   9:11

charged   9:11

check   26:13
  27:14
  43:18
  68:22
  85:11

checked
  22:6,8,25
  23:3  26:19
  28:19

Cherry   12:17

children
  25:14

China   16:18
  26:6  57:6
  58:8
  62:12,23

Chinese
  21:3,6,12,
  17  22:4,9,
  25  26:1,8,
  14  28:2
  30:5,10
  35:19
  36:4,23
  37:1,8
  50:3,5
  51:7,23

55:5,20
56:7  61:20
69:12
70:15,23,
25  71:16
72:6  73:22
74:22
76:11
77:1,6,9
80:8  81:9,
12,17,18
82:7,19,24
83:17,18,
25  84:5,9,
13,18,22
85:8,17
86:8  87:21
89:19
90:25
93:23

Chinese-
manufactured
  54:18
  60:23
  61:10

chosen   93:12

Christy   4:7
  29:14

CI   59:10

circled
  53:11
  54:22

City   32:21

claim   70:22
  71:1  78:11
  83:16

84:4,8
87:17

claimant
  52:19
  78:14

claimants
  48:14

claimed
  87:7,20,23

claiming
  46:12  53:7

claims   46:13
  48:17,22
  53:15,19
  54:8  80:4
  83:25

clarification
  48:6  54:5

clarified
  47:24
  48:13

clarify
  26:17
  30:25  48:1
  49:7  54:1
  56:11
  63:20

class   12:8

cleaned
  89:25
  90:13,14,
  18

clear   20:18

click   80:1

close   75:20

closer   72:23

clothes
  90:14

CNBM   4:12

code   78:20,
  21,22

coil   28:15

cold   77:19

Collectively
  57:17

color   93:3

colors   20:16
  93:12

column   34:18
  49:20  53:5
  62:9  63:1
  66:14

columns   34:5

comforts
  7:19

communications
  13:2

company
  18:12,15
  19:5  20:3,
  17  28:9
  56:7  61:25
  65:9

complaints
  77:17

completed
  15:25 16:1
  33:15

completely
  5:19 83:9

completing
  78:25

computer
  41:25

concluded
  94:2

condition
  75:9

conditioning
  27:13,23,
  24 28:5
  29:3,22
  30:7 45:5
  75:21
  77:3,18

conditions
  75:13,14
  76:1,4

conduct   55:4

conducted
  54:17,24
  55:8,12
  60:21

confirm   55:4

confirmed
  22:11
  28:10
  51:6,7

connect   11:3

connection
  67:10,24

considered
  76:17

constant
  71:21

contacted
  26:9

contained
  81:9,17,18

contemplated
  47:9

continue
  42:9 49:1

continuing
  49:8

contracting
  65:25 66:6
  92:11

contractor
  92:10

contractor/
developer
  65:21

conversation
  21:16,19
  22:23,24
  23:7,12
  26:4,20
  30:2,3,4

conversations
  23:17

92:20,24
93:2,4

conveyance
  19:6

COPD   75:6,
  11,14

copper   28:10
  50:2,4,8
  66:24,25
  67:11
  68:10

copy   10:17
  29:15
  42:15,20
  45:18 78:4

corner   34:3
  64:23

Corps   12:16

correct   6:14
  9:21 18:20
  33:24
  34:3,10,22
  36:23
  39:17,20
  41:4 54:22
  57:3 58:11
  59:15
  60:16
  61:2,6,17,
  21 62:7,
  13,16,19
  63:3,11
  78:19,22
  79:15,19
  80:25

81:10,13,
  19,24
  82:12
  83:5,10,
  11,22 86:3
  90:15,25
  92:2

corrected
  10:16
  44:5,9

correction
  29:19

corrections
  43:1 45:2

correctly
  18:13
  33:22
  35:10
  54:19 65:7

corrosion
  66:19,23
  67:6,13
  68:4,9,18,
  24

cost   30:18
  35:6,13,18
  36:12,16
  38:11

costs   85:18

cough   72:2
  73:7

counsel   4:13

couple   29:16
  34:5,18

court  4:14
 5:7,10
 6:12,16
 22:13
 45:13
 51:18
 91:19,20

courtroom
 6:6

CPVC  66:24

created  9:25
 10:4 28:23
 44:16

credit
 43:18,19

current
 14:13,22

custody  5:14
 12:3

cutting
 14:14

───────────
       D
───────────

damaged
 46:12
 50:2,5
 89:22

damages  11:6
 31:13 32:9
 46:19
 47:11,23
 48:2,3,13,
 18,22
 83:4,16

85:14,23
87:14
88:4,10
89:11,13,
15

Danielle
 72:13

Darla  4:1,16
 5:2 18:19

data  44:24

date  19:9
 34:6,9
 46:25 47:9
 52:22
 80:15
 93:25

dates  27:16

Davidson
 4:11 29:14

day  20:9
 55:23
 56:12
 58:18

days  31:14
 48:8 53:3

December  4:1
 34:9 47:3,
 9,19 48:9

decide  15:3
 62:3 91:9

decided
 14:12

deed  17:6,
 21 18:11,

19 22:17

default  48:3

defective
 83:17,18

delay  32:13

deposed  5:6

deposition
 4:1,23
 5:17,18
 6:3,14
 8:8,24 9:2
 11:16
 31:16,23
 32:5
 46:22,24
 47:8,25
 48:20
 49:1,9,12
 55:17 94:2

design  15:22

details  93:3

determination
 60:22
 61:5,9,19

determine
 63:5

diagnosed
 75:13

difference
 77:14

dimensions
 39:5,17,23
 41:9

diminished
 39:15

diminution
 87:20,22
 88:4,6

direct  7:13

directed
 7:15

discovery
 47:11

discussed
 66:3

discussing
 22:17

discussion
 63:18
 64:12 71:3

distinctly
 56:5

District
 51:18,19,
 22 78:8,9

doctor  71:21
 73:13,16,
 20 75:16

document
 10:19
 17:4,11,
 15,20
 18:23
 28:17
 32:17
 33:3,6,9,
 13 39:1,4

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020      Index: documentation..electric

41:6 43:5,
9 44:3
45:23
49:18,21
51:8,10,25
52:4,7,10,
13,18
54:11
58:24
64:23
66:14
77:21,24
78:13
79:5,19,25
82:2 83:12
90:21

documentation
9:23 43:8
44:17,21
46:17
47:4,6,17
48:17 49:5
87:6,11,16
88:14
93:20

documents
9:6,13,17
11:19,21,
23 22:19
31:13,17,
22 32:6
43:3
46:18,23
47:21

dollar   35:9

door   21:20
23:16

26:23 51:5
92:23 93:1

doors   16:3
24:16,17,
25 77:11,
15

doubt   41:12

downsized
14:16

downsizing
15:5

Doyle   4:9
7:10 8:18
9:2,18
10:13,22,
25 11:8,19
23:5 25:20
26:10,20
29:12
30:24
31:10
32:11
42:15 44:5
47:1,13
48:24
54:3,4,7,
25 55:3,9,
10,11,15,
16,20,24
56:2 57:17
58:14
61:5,8,14,
17,18,21
63:13
81:23
91:18

drag   39:13

dried   90:12

Drive   14:8

dry   90:13,
14

drywall
16:15,16
21:3,6,18
23:1 26:1,
5,14,16
30:5,13,18
35:19
36:23
37:1,8
50:21
51:23
54:18
55:5,21
56:13,22
57:2,5
58:4,6
59:14
60:5,9,23
61:10,20,
23,24
62:4,10,23
63:2,6,10,
21 64:1,23
65:1,12,17
66:10
69:13
70:23,25
71:16
73:22
74:22
76:11
77:1,7,9

80:8 81:2,
10,13,17,
18 82:8,
19,24
83:17,19,
25 84:6,9,
13,18,22
85:8,17
86:8 87:21
90:25
93:23

duly   4:17

_____

**E**

e-mail   29:13

earlier   12:5
25:18 47:2
50:23
64:11 66:3
68:23
82:15
91:24
93:19

easily   78:5

Eastern
51:18,22
78:9

Easy   65:6

eat   91:12

eggs   25:4,7

Eikhoff   4:8

electric
46:2

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020        Index: electric/electronic..filled

electric/
electronic
  45:24

electrical
  50:7 63:7
  66:13 68:7
  69:11,12

electronic
  11:2 46:2

electronics
  13:1,4

else's  84:3

emitting
  50:21 51:3

employed
  12:11
  13:12

employee
  19:19

empty  37:3
  38:9

ended  28:8,
  18

enjoy  76:25
  77:8

enjoyment
  77:14
  86:7,23
  87:4,13

entail  90:2

entities
  4:12

entitled

85:13

Essentially
  82:6

estate
  40:14,15,
  19

estimate
  35:18
  36:1,6,10,
  16,20

evidence
  82:3,7,12,
  19,23

exact  88:22

EXAMINATION
  4:19

examined
  4:17

exceeds
  59:10
  62:13,23

excited  24:3

excuse  30:2
  35:5 40:2
  43:23
  48:22
  49:20
  55:16
  56:23 73:1
  76:3 89:13
  91:18

exhibit
  22:14,15,
  16,18,20

32:20,24
  45:14,15,
  17,20
  47:17,22
  51:10,12
  57:16,22,
  23 58:24
  59:3 60:18
  64:4 77:24
  78:1

exhibits
  31:18
  59:22
  60:14
  82:15

exists  76:23

expenses
  43:8
  85:17,19,
  23

experience
  24:1

experienced
  73:7 86:6

experiencing
  73:10

exposed
  68:10

extent  10:18
  48:11

exterior
  39:23 41:8

eyes  42:18

F

fabric  90:10

faces  39:12

fact  38:4
  50:1 51:4

failed  49:24

fall  71:20

Fallon  51:23
  78:9

family  20:14
  72:8 73:12
  75:4

Feel  7:7

feet  39:22
  40:2,20
  41:8,9
  64:15

Fifteen  70:9

figure  35:9,
  16,22
  38:24
  40:16,18
  75:17
  86:14,16
  88:22 90:1

figures
  44:10,12,
  18

fill  86:20

filled  40:23
  52:13
  53:10

78:10
79:22 83:1

**filling**
52:10 79:3
82:9

**final** 93:2

**finally**
27:20

**find** 9:4,14
41:14 62:6
67:19

**finding** 63:8

**fine** 42:6

**finish** 43:25
91:10

**finished**
15:17

**Firm** 54:25
55:3,9
61:5

**fixers** 67:1

**fixture**
66:25

**fixtures**
67:4

**floor** 39:23
41:8

**flooring**
16:4
19:17,24
20:3,4,6,
11,15
91:25

**floors** 39:23
41:8

**follow-up**
47:20

**footage**
40:9,12
41:17
64:12,15
69:20
90:23,24

**foregoing**
19:6

**forget** 45:14

**form** 25:20
43:11
51:21
53:11
58:17
60:18
62:16 64:9
73:24
78:8,10,25
79:3
81:19,22
83:1,3
84:12
86:20
87:12,19,
25

**forward**
93:20

**forwarded**
29:17

**found** 9:22

**free** 7:8

**frequently**
24:25

**friend** 21:24
22:1

**front** 41:24
51:16
58:25

**frustrations**
77:2

**full** 4:25
9:23

**full-time**
36:9

**funny** 24:5
25:15 27:8

**furniture**
90:9,17,18

———————————

**G**

———————————

**garage** 64:20

**gas** 50:10,
20,24 51:3
90:9

**gases** 72:7

**gave** 36:6

**GBI** 84:25

**Gene** 18:19

**generally**
43:5

**Gibbs** 4:1,
16,21 5:2,
20 11:11

18:19,20
22:23
30:24
31:25
32:10,16,
19 42:12
49:7,15
53:11
54:13
63:18
74:15
91:15,21
92:2,18
93:6,9,14

**Gibbs'** 52:5

**give** 6:18
42:19
50:19

**good** 24:7
42:3,5
91:4 93:9

**goodness**
10:9

**gotta** 28:14

**grandchildren**
5:15 12:4
25:14
74:10,18

**granddaughter**
72:2,10
73:3,6,10,
18,19,25
74:1,19

**granddaughter'**
**s** 72:13

granite
  20:16

grantees
  18:18

grantor
  18:11

great   6:1
  7:4 12:1
  39:16 44:3
  73:18
  74:9,18

great-
granddaughter
  72:1,11,
  15,21,24,
  25 73:2,9,
  11 74:2

Green   72:14,
  16

ground   63:8

guarantees
  20:23

guess   9:8
  54:2

guessing
  13:5 72:9

Gypsum   4:4
  61:25
  62:19

─────────────
         H
─────────────

hand   32:14

happen   8:10

20:19 21:9
  67:17

happened
  20:21 30:4
  44:11
  58:15

hard   8:20
  74:25

harm   83:18

Harris
  37:17,20

he'll   5:22

headaches
  71:24

health   21:21
  22:2,7
  38:8

hear   7:9,12
  8:19 10:3
  25:25 51:2

heard   35:12
  65:15
  90:6,7

hearing   5:4,
  13,14 8:20
  48:3

heat   45:5
  77:19

Heated   40:6

heating
  27:22,24
  29:21 30:6
  75:9,20

Helen   74:17

High   14:8
  76:6

highly   22:12

hit   91:3

HOA   14:16
  15:12 38:5

hold   29:7
  32:4 46:21
  47:8 48:20
  77:19

holdback
  84:25

holes   76:13

home   14:13,
  18,22,23,
  25 15:3,
  13,18,24,
  25 16:1
  17:2,6
  18:7,10,16
  19:15,16
  20:9,12,
  20,25
  21:2,6,12,
  18,22
  22:3,25
  23:18,21
  24:2,5,9,
  12,18,21
  26:5,13
  27:2,3,10,
  13 28:5
  30:5,12,19
  34:14

35:1,13,19
  36:13
  37:24,25
  38:12,15
  39:19
  40:9,13,19
  46:3,6
  50:11,15,
  21 51:3,5
  52:23 53:2
  54:18
  55:20,24
  57:6 58:19
  59:25
  60:5,10,
  11,24
  61:10,15,
  20 62:4
  63:2,6,21
  64:2,12,13
  65:12
  66:10,15,
  20 67:4,7
  69:5,8,15,
  17,20,24
  71:4,13,15
  73:22
  74:8,19,23
  75:3,7
  76:10,17,
  23,25
  77:5,8,15
  81:3,24
  82:8,24
  84:1 86:3,
  24 88:17,
  20,24
  89:3,12,21

Case 2:09-md-02047-EEF-MBN   Document 23301-3   Filed 03/24/22   Page 122 of 237

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020        Index: homebuilder..injuries

90:5,24
93:21

homebuilder
  65:24

homebuilder/
general
  65:21

homebuilders
  83:15

homeowners'
  84:5,9

homes   7:19
  16:24 17:1
  18:11
  19:4,14,
  20,22
  21:14
  26:16
  30:11
  33:19
  34:14,25
  36:21 37:1
  40:24 41:4
  66:2,5,9

hot   77:18

hour   8:13
  41:22

house   9:5,16
  14:15
  15:22
  16:6,10,
  13,16,17,
  22 17:17,
  18 19:24
  20:4,6

21:20
22:11
23:11
24:14
25:9,12,18
26:6,8,22,
23 27:25
28:4,20
33:8 37:4,
19,21
38:7,9,21
40:11
41:14
49:25 55:6
64:15 66:6
71:5,18,20
72:9 74:5
75:20,21
80:17
92:1,7,11,
22 93:3

houses   15:11

husband   8:19
  12:16
  14:14
  18:20
  20:7,13
  23:9 56:4
  61:16
  71:25 72:3
  73:11,18
  75:6,11
  93:13

husband's
  75:15
  78:15
  79:14

─────────
    I
─────────

Idaho   20:14

idea   25:23
  38:11,13
  40:17,25
  47:2,10
  51:2 56:21
  65:14
  81:12

ideas   25:16

identification
  22:21
  32:25
  33:15
  34:16 41:3
  45:21
  51:13
  57:24 59:4
  78:2 82:3

identify
  85:18 86:8
  87:21,22

II   80:3

III   35:6
  82:2

image   58:1

immediately
  48:15

impair   8:4

important
  6:18

improvement
  35:6

improvements
  69:17

inbox   29:13

included
  11:6 32:9
  46:6

including
  32:2 64:20
  83:14

incorrect
  9:22 78:20

incurred
  85:16,19

individually
  57:18,20

information
  5:20 30:21
  52:14,20
  54:12
  55:12
  60:19
  61:24
  64:14
  65:11,21
  66:15
  78:14
  93:15

informed
  21:12
  22:1,6
  26:2,7,21
  28:1 30:9

initial   30:1

injuries

53:7

**injury**
 53:15,18
 54:8

**input**  44:24

**inside**  16:6,
 15,17
 25:12
 59:25
 63:21

**inspect**
 58:20
 81:24

**inspected**
 22:4,12
 26:9 55:3,
 20 61:15

**inspection**
 54:12,17,
 25 55:4,9
 56:12
 58:16
 60:19,21
 61:11

**installation**
 90:25

**installed**
 66:10 80:8
 81:3

**installing**
 28:3

**insulation**
 56:5 62:5

**insurance**

83:15,24
 84:2,5,9

**interest**
 70:19

**interior**
 16:2

**interject**
 7:11

**interrupting**
 48:25

**interruption**
 49:16

**intervening**
 23:14

**invoices**
 43:15
 46:18

**involve**
 68:21

**involved**
 12:2 15:21
 19:15,23
 21:14
 23:11 47:7
 66:6 91:25
 92:6

**issue**  13:18
 35:19 69:7

**issued**  34:6

**issues**  16:14
 22:2,7
 28:4 36:23
 69:4,11
 71:14

73:14,17,
 21 75:12,
 14 76:10
 93:23

**itchy**  75:19

**items**  10:2,
 5,8 11:4,
 13 28:24
 45:24
 46:2,5,12
 49:19,21,
 24 66:18,
 20 68:18
 71:13
 90:4,10
 93:21

**IV**  33:14
 34:16
 54:12
 60:19 83:8

___

**J**

**Jimmy**  4:9
 10:18 23:5
 55:16

**job**  12:14

**jobs**  12:24
 13:13

**John**  19:3,8
 34:22,24
 91:23

**judge**  6:6
 51:23 78:9

**July**  30:7

45:6

**June**  18:3
 23:22
 52:23
 80:24

___

**K**

**keeping**  38:6

**kind**  5:12
 6:5 9:6,8,
 20 42:17,
 18 43:4
 82:7

**kitchen**  16:4

**knew**  21:25
 26:5 36:4
 37:16
 70:14
 77:1,10

**knowing**  75:6

**knowledge**
 17:12,14
 31:6 33:5
 34:12
 36:25
 51:14
 52:15
 53:19
 61:15 66:7
 69:10,22
 71:1 79:19
 80:9,21
 84:20
 85:5,10
 86:17,19

87:18
89:10,20

knowledgeable
89:19

———————
L
———————

lady  37:22

large  15:10

late  45:9

Law  54:25
55:3,9
61:5

Lawson  4:3,
20 10:18,
23 11:1,9
22:13,22
25:25
29:18,25
31:20
32:15,16
33:2 41:21
42:7,12
45:13,22
46:15
48:10
49:15
51:14
54:4,10
57:19,25
59:5
63:15,17
78:4 91:3,
15,21
92:5,19
93:8,14

lawsuit  12:2
78:18

lawyer  8:7,
23

lawyers
49:16

leak  67:16

learned  37:7
77:6,9

leather-type
90:8

leave  76:13
91:9

leaving
47:15

left  85:19
87:25 91:8

left-hand
34:2 66:14

length  13:7

letters
59:12

liability
18:12 19:5

lien  70:18

life  74:23

lights  69:7

likes  9:9

limited  4:5,
6 18:12
19:5 83:14

list  46:7,
19 62:18
68:19

listed  11:4
43:9
49:19,21
51:25
58:17
62:15 65:5
78:21
80:12
84:12,14,
25 85:9
86:11
89:11

lists  52:22
78:18,25

litigation
51:22 54:9
78:9

live  13:10
14:3,6,10
15:4,10
40:9 72:11
74:4,11
76:15

lived  13:24,
25 14:1,7,
18,25
15:14
21:20 27:4
37:18
72:20
74:4,7,19
86:2 92:15

lives  92:18,

19

living
71:14,20
72:22
74:23
76:25
85:17,19,
23,25
92:22

LLC  18:12
19:4 33:19
34:25
40:24 41:4
65:2,25

local  92:12

located  13:9

location
15:9 33:10
63:2

long  8:12,
14 12:20
13:6,24
14:18 16:1
47:5 72:20
73:5 77:20
89:4

longer  41:24
44:20
53:15
54:1,8

looked  11:15
28:10
30:17
35:15 41:2
54:21

59:21
60:20 68:6
81:22
82:14 84:8
87:2

**loss** 86:6,
7,9,23
87:3,7,12
88:9,10,14

**lot** 91:8
93:15

**Louisiana**
51:19,22
78:10

**lower** 40:10

**lunch** 91:7

**lunchtime**
91:5

**Lydia** 72:16

──────────

**M**

──────────

**Madam** 45:13

**made** 15:3
16:17 26:5
31:21 56:7
57:6 58:8
60:22
61:4,9,19
62:12,23
63:20
69:16 84:4

**magistrate**
48:4

**main** 68:10

**major** 16:14
23:16

**make** 6:25
7:2 20:22
29:8,19
31:10
43:1,20
45:3 89:8

**making** 70:11
77:12 84:8

**malfunctioned**
68:2

**manufacturer**
61:24 62:4

**March** 80:12

**Marine** 12:16

**Marines**
12:17,19,
23

**mark** 22:15
45:17
57:15
58:24
62:15
77:23

**marked**
22:16,20
32:24
45:14,20
51:9,12
57:22,23
59:3 60:17
68:14 78:1

81:10

**marking**
59:6,9,12,
25 62:18

**markings**
16:17
62:10,22
63:10 64:2

**Matt** 4:3
29:12
63:13
91:18

**meaning**
50:22

**means** 5:18
6:19

**meant** 6:23

**measure**
41:16

**measured**
41:14

**medication**
8:3 76:6

**medications**
75:25
76:4,8

**meet** 8:7
20:5 37:18
62:23

**meets** 62:12

**member** 19:4,
22

**members** 72:8

73:12 75:5

**mentioned**
25:18 27:2
68:23 72:8
73:13,23
75:11,12
89:14
91:24 92:6
93:19

**merged** 79:7

**met** 12:17
19:9 37:20

**middle** 7:24
21:11 35:4
49:20

**mild** 25:7

**miles** 14:11

**mind** 63:24

**minutes**
42:4,7,8
63:14

**mis** 29:21

**misspoke**
63:22

**mistakes**
10:16

**moment** 32:18
42:13,19
59:14
63:18
75:24
77:22 87:5

**monetary**

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                            Index: money..order

87:14

money  85:4
89:2

month  9:10
32:12

month's
43:17

months  37:5,
13,14
38:2,23

morning  4:22
9:21
10:15,17

mortgage
69:25
70:1,2,6,
11,12

mother
21:19,23,
25 22:7
23:16 27:4
37:4 92:22
93:1

mother's
22:2 26:7,
13,22 27:7

move  14:12
23:24 38:7
39:9,14
57:21
76:12,21
85:24

move-in
52:22

moved  12:25
14:16
15:13,15
21:21
25:13
27:10
37:4,25
49:24 53:2
69:17
71:4,18,25
74:20 86:3

moving  14:5,
19 24:1
85:18

multidistrict
51:21

───────────

**N**

───────────

names  72:12
74:14

nature  83:22

needed  22:6
23:5
26:12,19
49:21
62:20
77:10,18

neighborhood
15:10

night  9:4
10:11,14
45:9 46:9

nodding  6:20

normal  71:24

North  12:17

nosebleeds
72:1 73:10

notary  18:24

note  58:10

notice  24:8,
11,13

noticed  24:4
71:4

November
52:8 58:16
61:11
81:19

number  14:8
27:7 64:18
87:2,3

numbers
34:18
43:14

───────────

**O**

───────────

oath  6:6

objection
7:13 25:20

objections
7:9

occasionally
23:15

occupied
52:23

occurred
38:18

58:17
61:11

October  30:8

odor  71:3,
8,12

offer  30:11

offices  7:19

officially
13:15

one-acre
14:14

Opelika
13:11,20
14:8 32:22
33:22
92:15

open  24:14,
16,17,24
32:5 46:21
47:8,15
48:20 75:8
77:10,15

opinion
50:20

opportunity
5:23 32:5
46:22
48:25

oppose  47:14

opposed  7:1

option  85:25

order  45:16

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                    Index: original..place

original
  44:4,16

originators
  19:13

Orleans   48:4

outlet   50:8

outlets   69:5

over-the-
counter   76:8

owner   19:19
  33:18
  37:14
  38:19

ownership
  37:7,11
  70:19 80:4

―――――――――――
         P
―――――――――――

p.m.   94:2

pages   17:19

paid   88:23

paint   20:16
  93:3

panel   68:10,
  14

paper   11:2
  33:7 51:16

papers   17:16
  19:11
  31:2,4

paperwork
  28:6 29:22

paragraph
  18:9

parentheses
  40:5

part   10:3
  19:22
  33:14
  34:16,25
  35:5,14
  63:8

part-time
  13:13

partially
  83:9

participated
  12:7

parties   4:13

partner   92:8
  93:5

parts   25:8

Patriot
  16:24 17:1
  18:11
  19:4,14,
  20,22
  30:11
  33:19
  34:14,25
  40:24 41:4
  65:25
  66:2,5,6,9

paying   70:2

payment
  84:24,25

89:3

payments
  38:6 70:11
  83:13,14,
  15,16,22,
  25 84:11,
  21 85:7

PC   55:1

PDF   42:15
  45:18

people   9:9
  27:14 51:5
  91:11

period   23:19

permit   32:21
  34:6,13
  39:2 40:22
  41:4

person   36:11
  37:18 38:6
  59:18
  78:25

personal
  26:15
  53:7,15,18
  54:7 83:4
  89:13

personally
  62:7 69:2

pertinent
  9:5

phone   8:14,
  16 34:18

photograph
  58:1,7,10,
  23,25

photographs
  57:11,14
  59:21
  60:2,4
  64:3 82:8,
  14,25

photos   58:13
  60:13

physical
  71:17

physically
  19:15

pick   20:3,
  11

picked   20:5,
  13,15

picking
  15:21

pictures
  39:6,11
  76:12

piece   5:23

pieces   33:7

piping   66:24

place   13:19
  14:23
  15:4,6
  20:2 27:6,
  7 32:23
  33:22
  34:14

36:22 37:6
38:12,22
74:24
75:10
78:19

places   75:15

plain   16:20

plaintiff
51:21
58:17
60:18 64:8
78:8 81:22

plaintiffs
4:10

Plasterboard
4:6

plastic
66:24

plenty   48:8

plug   50:7
63:7

plumbing
66:12,22
67:4,7

point   7:6,
17,21
12:17 14:8
16:13
24:21 31:4
36:5 43:1
44:23
48:19
61:15
77:12

88:18 91:4
93:8

points   7:20

polite   75:4

position
49:7

possibility
28:2 30:9

possibly
72:6

post   59:13

Post-it
58:10

potentially
32:7 36:22

prediabetes
76:7

premarked
22:18
32:20

prepare   8:8,
23 9:1
11:16

presence
74:22

present   8:16
23:8 54:18
55:5 60:23
93:11

presented
31:3

presents
31:18

pressure
76:6

pretty   75:4

prevent   6:9

previous
14:18

previously
64:9 81:21

primary   74:5

prime   92:10

printed   11:3

prior   8:7
14:5 15:14
37:14,22
83:13,21

problem   28:8
71:19,21
75:7

problems
21:21 38:8
67:12
69:11
71:17

proceed   31:7

proceedings
7:10

process
15:19,20
90:3

produce
46:14
47:12,16,
25 49:9

produced
9:17 11:5
17:7 32:2
47:5 49:10
57:14 82:7

Product   82:3

products
20:23

professional
50:20

profile
51:21
58:17
60:18 64:9
78:8 81:22

program
84:13,19,
22

properly
89:25

property
13:18 55:4
70:19
78:14,17
80:4,9,24
81:4,5,9,
13,16
82:19
83:5,8,17
86:7
87:13,20
88:4,9,11,
15 89:14

provide
31:13

Case 2:09-md-02047-EEF-MBN   Document 23301-3   Filed 03/24/22   Page 129 of 237

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020        Index: provided..receptacles

provided
 31:15
 82:11,20,
 25  87:10

public  18:24

pull  17:4,7
 31:1 32:17
 42:15,19
 51:8 57:12
 62:5 64:10
 77:22

pulled  50:7
 56:5

purchase
 15:25 17:6
 69:25 80:3

purchased
 9:11,15
 10:2 11:14
 15:18,24
 16:5,7
 17:2 18:7
 20:9,12,19
 21:7
 23:20,21
 24:9,12
 26:16
 27:24
 37:23
 38:19
 40:13
 69:24 70:7
 81:13
 88:19,21,
 24  89:3

purchases

 29:3

purchasing
 40:11

pursued  54:8

pursuing
 53:15,18,
 25  85:22
 89:16

pushing
 91:10

put  16:4
 27:25
 28:14,15,
 16  29:21,
 23  30:6
 31:21
 32:13 39:3
 42:14
 43:16
 44:13,18
 45:4,11
 47:13 50:1
 65:25
 70:12 89:2

putting
 91:25

PVC  66:23

─────────────

Q
─────────────

quality
 20:23

question  5:5
 6:20 7:6,
 14,25

20:18 39:1
53:6,21
54:2,16,22
56:11
60:20
74:25 80:7
86:25

questions
 5:9,19,22
 6:13,25
 7:7 8:5
 11:11
 31:5,17
 32:7 47:20
 49:4,8,17
 66:13 68:8
 91:16,22
 93:18

quick  29:12
 63:13

quickly
 32:14 46:8
 47:18 48:5

quit  27:13

quote  30:17

─────────────

R
─────────────

rash  75:15,
 18

rashes  72:4

read  18:12
 33:22
 35:10
 54:19 65:6

real  29:12
 40:14,15,
 19

realize
 45:11

reason  14:12
 36:15,19
 41:12
 47:18
 48:19
 56:10

recall  46:8
 56:19 64:1
 67:18 70:7
 86:21

receipts
 43:7,14
 44:23
 46:18

receive
 35:25

received
 47:10
 83:14,21,
 24  84:14,
 18  85:8

receiving
 47:3 84:21
 85:3

recently
 17:18 38:1
 68:22

receptacles
 68:9,24

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020                          Index: recess..replaced

recess   42:11
  63:16
  91:14

recognize
  17:11 33:2
  51:10
  57:25 59:5
  77:24

recollection
  31:7 59:17
  85:3

recommended
  22:12

reconvene
  42:8 46:24

record   5:1
  6:17 9:10
  31:3,21
  46:16
  47:14
  48:11
  91:13

recording
  6:13

records   9:3,
  9,18 11:2,
  13,15
  22:10
  26:12,15,
  22,25 29:2
  30:23
  31:1,12
  32:1 35:15
  45:19
  46:10 89:1

recovered
  21:23

redone   37:5

refer   31:2

reference
  48:12

referenced
  29:16
  47:17

referencing
  49:2

referred
  47:1 50:24

referring
  55:15 88:9

reflect   88:3

reflected
  47:21

reiterate
  46:16

related   11:3
  32:8
  46:13,19
  51:23
  70:23 72:6
  73:13,21
  75:25
  83:16,18,
  25 84:5
  85:8 87:12
  93:21

relates
  16:15

relationship
  16:25

relevant
  49:6

remainder
  47:24

remains   49:3

remediated
  83:9

remember
  14:7 16:22
  21:16
  30:3,22
  35:22
  36:2,6
  40:18
  50:25
  52:10
  55:13,22
  71:6 79:3
  82:9
  84:21,23
  85:6 86:16
  88:20,22,
  23 89:2,6
  92:9

remotely
  4:15

removed   37:2
  60:11

renovate
  38:12

renovated
  38:10
  69:16

renovation
  38:14,18

rented
  37:21,25
  38:3

renting
  37:22
  38:5,7

repair   13:2,
  4 36:12,
  16,19
  89:12

repaired
  37:1

repairing
  30:12,18
  35:18

repairs   29:4

repeat   5:5
  86:25

rephrase   7:6

replace   9:16
  71:13

replaced
  27:15,18
  28:7,12,
  20,24
  46:3,6
  49:22
  67:22,25
  68:2,5
  89:21,24
  90:3,5,11
  93:22

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Darla Gibbs on 12/09/2020        Index: replacement..showing

replacement
  45:23

replacing
  30:12,18

reporter
  4:14 6:12,
  16 22:13
  45:13
  91:19,20

represent
  17:5 32:20
  51:20
  53:24 78:7
  88:8

representation
  49:19

representations  20:22

request  11:6
  31:11,22
  32:4 43:11

requested
  32:9 46:20
  48:23

requesting
  46:17

required
  47:12

reserve  47:7

residence
  74:5

result  67:13
  83:4 85:17
  86:8 87:21

93:23

retention
  82:3

retire  13:15

retired
  12:12,13,
  14

reverse
  70:12

review  10:23
  11:19 32:6
  46:23

reviewed
  11:13,21

rid  72:3

right-hand
  39:3 64:22

rightmost
  34:17

RL  65:2,12

rotten  25:4,
  7

rough  35:21,
  22,25

―――――――

S

―――――――

sale  80:3

samples
  50:14

sat  37:3
  38:9

scanning
  9:14

screen  17:8
  39:3 44:4
  59:1 64:11
  79:12

seasons  71:9

secretary
  12:25

section
  34:17
  39:5,16,17
  51:24
  52:19
  54:12,15
  60:19
  61:23
  64:13,21,
  22 65:20
  66:14,15,
  23 78:14
  80:2,3
  82:2 83:8,
  13 85:13
  90:22

seek  48:2

seeking  83:4
  86:22 87:3
  88:3,10

sell  76:22

selling
  76:17

send  9:19,
  21 10:21
  45:18

sense  7:2

separately
  79:7

September
  30:8

set  4:22
  31:4 37:3

settlement
  83:15
  84:13,18,
  22

Seventeen
  13:16

severe  75:17

SF  40:2

shape  73:24

share  5:20
  64:10

shortly  71:4

show  32:16
  33:14
  39:10
  57:11,13
  58:22
  77:21 79:7

showed  50:8
  64:3

showing
  16:20
  18:10 29:2
  32:19
  39:12 51:9
  58:23

77:25

**shown** 58:10
  60:1,6,14

**shut** 24:24

**side** 22:15
  39:4,13

**signature**
  18:24
  52:4,5,14
  79:8,12,
  14,15,17

**signatures**
  34:2

**signed** 19:5,
  10 52:7

**similar** 25:4
  64:2

**sinus** 71:19
  75:12,14

**sinuses**
  71:21

**sir** 5:11,25
  6:8,11,15
  7:3,16,23
  8:2,6,9,25
  9:19
  11:17,21,
  25 12:6,9,
  12,24
  13:21,23
  14:3,24
  15:2,15,
  20,23
  16:8,19,24

17:3,10,
13,23
18:1,4,8,
14,17,21
19:1,7,25
21:1,4,8
23:2,25
24:10
25:10,13,
19,23 26:7
27:6,12
28:6 29:1,
11 30:14,
16 33:1,4,
12,17,20,
23,25
34:4,8,11,
15,20,23
35:2,8,11
36:14,24
37:10
38:13,16
39:21,25
40:4,7
41:5,11,
18,20
42:25
43:6,10
44:2,15,
19,22
45:1,25
46:4
50:13,16,
18 51:1,11
52:2,6,9,
12,17,21,
25 53:9,13
54:14,20,

23 55:2,7,
18 56:1,
16,18
57:1,4,10
58:2,5,12,
18,21
59:2,7,13,
16,19,23
60:3,7
61:1,3,7,
12,18,22
62:2,8,11,
14,17,25
63:4,22
64:17,25
65:4,8,10,
16,19
66:1,4,17,
21 67:2,5,
14,23
68:1,3,12,
16 69:1,3,
9,19,23
70:4,17,
21,24
71:2,7
72:19
73:8,15
74:6,9,21
76:2,18,24
78:3,16
79:2,4,10,
13,16,20,
23 80:6,
11,14
81:1,5,11,
14,20,25
82:5,10,

13,16,22
83:2,6,20,
23 84:10,
16 85:2,
15,21
86:4,10,
13,15
87:9,15,24
88:2,16
90:16 91:1
92:14,17

**sitting** 6:5
  13:22
  41:24

**situation**
  12:3 55:14
  86:1

**Sixteen** 74:3

**size** 15:8

**skin** 72:3
  75:18

**small** 13:13

**smaller** 15:5

**smell** 24:5,
  6,11,18,
  20,22
  25:3,5,7,
  8,11,12,
  15,17,18
  27:8 51:5
  71:5 75:5

**sofa** 89:23

**sofas** 90:8

**sold** 38:1,

22 76:23

sound   18:6
  40:8 53:1

sounds   42:3

source   84:13

speak   7:13
  8:12,22

speaker   8:19

speaking   9:2
  11:18
  93:24

specific
  31:11,22
  35:21 64:7

specifically
  52:19,22
  54:11

spell   72:17

spreadsheet
  29:15
  44:13,17,
  18,22,24

spreadsheets
  43:16

springtime
  71:19

square   39:22
  40:1,9,12,
  20 41:7,9,
  17 64:12,
  14,15
  69:20
  90:22,23

start   75:20

started
  10:7,10
  31:24 42:1
  77:15

state   4:25
  61:25
  83:3,7

stated
  21:13,24
  22:10
  26:22
  54:25 63:1

statements
  63:20

states   12:16
  19:2
  33:15,18
  45:23
  51:18
  64:14 65:1
  78:8

stipulate
  4:13

Stockett
  65:2,13

stop   7:22

story   39:19

Street   65:6

structural
  69:18

stuff   85:11

submission

87:11

suffered
  83:16

sulfur
  50:20,24
  51:2

sulfuric
  50:10 90:9

summarized
  89:14

summary
  10:1,5,12
  28:21,23
  31:15,24
  45:3 46:2

supplemental
  78:7

supplied
  65:18

supplier
  64:23
  65:12

supplier's
  65:1

support
  49:11
  87:7,17
  88:14

supporting
  46:18
  47:16,20

surgery
  21:23

survivorship
  17:22

swear   4:15

switches
  68:10

sworn   4:17
  6:2

symptoms
  72:5

synopsis
  9:20 10:13
  11:4,11,14
  28:23
  29:16
  42:14,21

system   27:25
  28:1,3,14
  29:3
  66:12,13,
  22 68:7
  69:11,12

systems   67:7

─────────
        T
─────────

T-O-R-B-E-R-T
  72:18

Tai'an   4:5

Taishan   4:4,
  5,7 56:20,
  23,25
  59:15,20
  60:1,9,14
  61:25
  62:19

taking   6:17
 8:3 33:9
 63:7 75:25
 93:16

talk   20:8
 42:17
 91:23

talked   11:14
 23:13,21
 27:8 30:1
 34:17
 36:17,21
 64:19
 91:23

talking
 10:1,5
 12:4 21:24
 24:19
 28:22
 49:16 88:7

tapped   47:2

telephone
 8:11

telling
 79:18

ten   42:4
 70:8

term   70:6

tested   50:12

testified
 4:18

testifying
 6:10

testimony
 49:11

theories
 25:16

thing   64:7

things   6:21
 9:4,15,20
 20:17 24:4
 27:9 28:19
 72:5 75:2
 76:9 77:2,
 3 89:6,20,
 25 90:12
 93:4

Thirteen
 89:4

thought   24:5
 71:5

till   74:12

time   4:24
 5:5,7
 12:10,22
 13:7,13
 14:2 16:7,
 11 18:6
 19:19
 20:14 21:7
 23:8,10,
 19,20 26:6
 27:24
 42:2,18
 44:13,20
 47:4,5
 48:8 49:3
 53:10

58:19
 60:10 64:7
 67:17
 75:18,21
 80:19,22
 81:16,23
 84:22
 88:12
 89:4,18
 90:20
 92:21,24
 93:16,18

times   29:17
 71:9 75:18

timestamp
 17:24 18:2

titled   90:22

today   6:3,10
 8:5,24 9:2
 11:24
 13:22 15:4
 49:4,12
 53:14
 64:19 67:7
 70:3,11
 76:23
 87:4,16
 93:17

toilet
 67:10,11,
 12,25

told   25:11
 26:12,14,
 17 30:4
 35:17
 40:11,12,

19 49:25
 50:4 65:17
 76:22 90:4

top   17:20
 33:10
 45:22 86:6

Torbert
 72:16,17
 74:17

total   35:6,
 13 39:22
 41:7 44:8
 85:18 86:9
 87:7,22

totals   43:4

track   38:6

transfer
 80:3

treasurer
 38:5

treating
 71:22 76:5

trial   5:12

trouble   5:4

true   52:15
 54:2

truth   6:2,7
 79:18

truthfully
 6:10 8:5

TTP   4:7

turn   52:19
 54:10

77:18,19
78:12 82:1
93:9

turning   69:8

two-car
64:20

types   67:4

**U**

uh-huh   6:22
81:7

unclear   6:23
7:5

underlying
43:3

understand
5:19 6:1,
7,12 7:8
8:4 45:10
48:21 91:4

understanding
19:18
34:24
37:24
40:21
53:14,25
61:8 81:2

understood
5:16 8:21
44:12
80:23

unit   27:23
30:7

United   12:15
51:18 78:8

unusual
27:10

updated
10:19

**V**

Vaguely
84:23

variety
66:18

vehicles
38:17

verification
52:14
79:17

verify   26:24

version
44:4,5

VI   64:13
66:15
83:13

VII   85:13

VIII   65:20
90:22

visit   24:8

visited
23:16
92:25

visiting
20:14

**W**

waiting
41:24

wall   63:7

wallboard
16:2,9,10,
13,15,16,
20 21:13
22:4,9
26:8 28:2
30:10 36:4
50:3,5,10,
11,14 51:7
56:6,7,8
57:7 60:11
62:6 70:15
72:7 89:19

walls   50:15
63:3,6,9,
11 68:25
76:13,14

wanted
22:14,22
23:20
42:13,16
43:2,4,25
54:1 63:19
64:13,21
69:15 75:3
91:16,22

wanting
53:23

warm   24:15

warranty

17:6,21
18:11,19
22:16
27:15,19

washed
90:12,14

watched   15:7

water   67:16

waterline
67:11,24

Waverly
13:19
14:22 15:4
27:6,7
32:22
33:21
34:14
36:22 37:6
38:12,22
74:24
78:18

window   39:12

windows   16:3
24:15,17,
25 77:11,
16

wire   50:8
63:8

wires   68:11

word   88:6

words   6:19
56:25

work   12:11,
22 19:16

49:22
86:19
92:11

**worked** 13:13
40:24

**working**
19:24
24:14 69:5

**worse** 25:1
75:22

**worth** 9:13

**write** 86:16

**written**
6:17,23
33:10

**wrong** 44:10

---

**Y**

---

**yard** 14:15,
17

**year** 27:12,
17 30:9
71:9

**years** 5:8
9:5,20
10:7 13:16
14:21
23:14
24:22
37:21 38:9
64:6 67:20
70:8 72:23
73:1 75:17
89:4

**years'** 9:13

**yesterday**
8:11

**you-all**
13:19 52:7
91:6

**young** 12:15
37:22

---

**Z**

---

**ZIP** 78:20,
21,22

**Zoom** 4:23

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Gene Gibbs on 12/09/2020**

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF LOUISIANA
2

3    IN RE: CHINESE              § MDL NO. 2047
     MANUFACTURED DRYWALL        § SECTION: L
4    PRODUCTS LIABILITY          §
     LITIGATION                  § JUDGE FALLON
5                                § MAG. JUDGE WILKINSON
     ~~~~~~~~~~~~~~~~~~~~~~~~
6
                        DEPOSITION OF
7                         GENE GIBBS
                     CONDUCTED REMOTELY
8

9                      1:05 p.m. EST
            Wednesday, the 9th day of December 2020
10

11

12

13       Blanche J. Dugas, CRR, RPR, CCR No. B-2290

14

15

16

17

18

19

20

21

22

23

24

25
```

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
**Gene Gibbs on 12/09/2020**                                    Pages 2..5

---

**Page 2**

1          APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE
2    On Behalf of the Plaintiffs:
3          JAMES V. DOYLE, JR., Esquire
           Doyle Law Firm, PC
           Suite 1800
4          3340 Peachtree Road, NE
           Atlanta, Georgia  30326
5          (678) 799-7676
           (844) 638-5812 (facsimile)
6          jimmy@doylefirm.com
7    On Behalf of the Defendants Taishan Gypsum Co. and
     Tai'an Taishan Plasterboard Co.:
8          MATTHEW D. LAWSON, Esquire
           CHRISTINA H. EIKHOFF, Esquire
9          Alston & Bird, LLP
           One Atlantic Center
10         1201 West Peachtree Street, NW
           Atlanta, Georgia  30309-3424
11         (404) 881-7000
           (404) 881-7777 (facsimile)
12         matt.lawson@alston.com
           christy.eikhoff@alston.com
13
     On Behalf of the BNBM and CNBM Entities:
14         ANDREW K. DAVIDSON, Esquire
           Orrick, Herrington & Sutcliffe, LLP
15         The Orrick Building
           405 Howard Street
16         San Francisco, California  94105-2669
           (415) 773-5472
17         adavidson@orrick.com
18
19
20
21
22
23
24
25

---

**Page 3**

1                    INDEX OF EXAMINATION
2    EXAMINATION                              PAGE
3    EXAMINATION                                4
     BY MR. LAWSON
4
5                       - - -
6                  INDEX TO EXHIBITS
7                (No exhibits marked.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1                      Deposition of Gene Gibbs
                         December 9, 2020
2
3          MR. LAWSON:  Mr. Gibbs, thank you for
4    taking the time to be able to be on this
5    deposition today.  I appreciate your time.
6          (Counsel for all parties stipulate
7    that the Court Reporter is authorized to
8    swear the witness remotely.)
9                   GENE GIBBS,
10   having been first duly sworn, was examined and
11   testified as follows:
12   EXAMINATION
13   BY MR. LAWSON:
14       Q.  Thank you, Mr. Gibbs.  I wanted to ask you
15   first, you've been sitting in on the entire deposition
16   next to your wife; correct?
17       A.  Yes.
18       Q.  And you've heard her testimony and my
19   questions so far today; correct?
20       A.  That is correct.
21       Q.  Do you have anything that you have been
22   wanting to add in addition to what your wife testified
23   to earlier or to correct that she said along the way?
24       A.  No.  Whatever she told you, I agree with
25   because we live in this household together.

---

**Page 5**

1        Q.  That's a good answer from a husband.
2            I wanted to ask you a little bit about the
3    inspection that occurred in November of 2011 with
4    Mr. Doyle.  Do you remember that?
5        A.  Yes, I do.
6        Q.  And were you present at the house on that
7    day when Mr. Doyle came over to look at the drywall in
8    your attic?
9        A.  I was.
10       Q.  Can you tell me what happened that day.
11       A.  Mr. Doyle went up in the attic, pulled back
12   some insulation and looked at the drywall -- the
13   markings on the drywall and said, Yes, you have
14   Chinese drywall in your house.
15       Q.  Did you do anything else with Mr. Doyle
16   while he visited that day, without divulging any kind
17   of legal advice that he gave to you?
18       A.  I don't -- don't think there was anything
19   else.
20       Q.  And did Mr. Doyle come over to your house to
21   inspect it at any other point?
22       A.  Only that one time.
23       Q.  Has anyone else come over to inspect your
24   house other than Mr. Doyle?
25       A.  No.

---

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Gene Gibbs on 12/09/2020
Pages 6..9

Page 6

1    Q.  I wanted to ask you about John Carter.  When
2  is the first time that you remember speaking with John
3  Carter?
4    A.  Well, I went down to his place of business
5  to discuss the colors and the flooring and all of
6  that, and I talked with him and his office about which
7  type of flooring and everything and the granite and
8  the color of the walls and all of that.
9    Q.  And did you have any other discussions with
10  him before you purchased the house other than that
11  one?
12    A.  Not really, no.
13    Q.  Do you know how long before you purchased
14  the home that discussion happened at his office?
15    A.  Say that again.
16    Q.  How soon before you purchased the home did
17  that discussion happen at his office?
18    A.  I don't know.  A week or month.  I don't
19  really know.
20    Q.  And when you moved into the home, was
21  everything completed, as far as the building and
22  finishing of the home?
23    A.  Yes.  We had a home inspection at that time.
24    Q.  Did the home inspection tell you anything
25  about there being Chinese drywall in the home?

Page 7

1    A.  No.
2    Q.  Did the home inspection mention the smell in
3  the home to you?
4    A.  No, because as a new home -- and we've had
5  new home homes before and they all have an odor to
6  them, and so we didn't expect anything to be unusual
7  in that.
8    Q.  And do you remember having any conversations
9  with John Carter after you moved into the home before
10  in 2011 when he told you about the potential Chinese
11  drywall issue in your house?
12    A.  No.  He told us that we had Chinese drywall
13  and that was pretty much the end of the conversation.
14    Q.  Do you know if Patriot Homes or Mr. Carter
15  were involved with building any other homes in your
16  neighborhood other than the three that we talked about
17  at 701, 703 and 705 Waverly Place?
18    A.  Not that I'm aware of, no.
19    Q.  You never heard that he built any other
20  homes in your neighborhood?
21    A.  No.
22    Q.  Have you ever heard that any other homes in
23  your neighborhood has Chinese drywall issues?
24    A.  None of them do.
25    Q.  Have you ever heard of any other homes in

Page 8

1  your area outside of your neighborhood that have had
2  Chinese drywall issues?
3    A.  No.
4    MR. LAWSON:  All right, Mr. Gibbs.  I
5  don't believe I have any further questions
6  for you at this time.  Like I -- we said
7  with Mrs. Gibbs, we're going to look at the
8  materials that you-all have related to
9  repairs or replacements in your home, and
10  we will likely have some follow-up
11  questions for that.
12    But I appreciate your time today and I
13  will open it up to our co-defendants or to
14  Mr. Doyle to be able to ask you any further
15  questions.
16    MR. DAVIDSON:  No questions here.
17  Thanks, Matt.
18    MR. DOYLE:  All right.  So we're done
19  today.
20    MR. LAWSON:  I think we're done for
21  today.  We're obviously holding things open
22  until we get a look at those additional
23  materials and we look forward to seeing
24  them.  Thank you-all so much for your time
25  today and your patience when we were having

Page 9

1  those technical difficulties at the
2  beginning of the day.  And I hope that
3  everyone has a great day from here that
4  doesn't involve sitting in front of a Zoom
5  screen for the rest of the day.
6    (Deposition concluded at 1:12 p.m.)

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Gene Gibbs on 12/09/2020                                    Pages 10..13

---

**Page 10**

1                    DISCLOSURE
2
3        Pursuant to Article 10.B of the Rules
    and Regulations of the Board of Court
    Reporting of the Judicial Council of
4   Georgia which states:  "Each court reporter
    shall tender a disclosure form at the time
5   of the taking of the deposition stating the
    arrangements made for the reporting
6   services of the certified court reporter,
    by the certified court reporter, the court
7   reporter's employer or the referral source
    for the deposition, with any party to the
8   litigation, counsel to the parties, or
    other entity.  Such form shall be attached
9   to the deposition transcript," I make the
    following disclosure:
10
    I am a Georgia Certified Court
11  Reporter.  I am here as a representative of
    Huseby Global Litigation.  Huseby Global
12  Litigation was contacted to provide court
    reporting services for the deposition.
13  Huseby Global Litigation will not be taking
    this deposition under any contract that is
14  prohibited by O.C.G.A. 9-11-28(c).
15  Huseby Global Litigation has no
    contract/agreement to provide reporting
16  services with any party to the case, any
    counsel in the case, or any reporter or
17  reporting agency from whom a referral might
    have been made to cover this deposition.
18
    Huseby Global Litigation will charge
19  its usual and customary rates to all
    parties in the case, and a financial
20  discount will not be given to any party to
    this litigation.
21
22
                        Blanche J. Dugas
23                      CCR No. B-2290
24
25

---

**Page 11**

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4        I hereby certify that the foregoing

5   transcript was reported, as stated in the

6   caption, and the questions and answers

7   thereto were reduced to typewriting under

8   my direction; that the foregoing pages

9   represent a true, complete, and correct

10  transcript of the evidence given upon said

11  hearing, and I further certify that I am

12  not of kin or counsel to the parties in the

13  case; am not in the employ of counsel for

14  any of said parties; nor am I in any way

15  interested in the result of said case.

16

17

18

19

20       BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

---

**Page 12**

1                       CAPTION
2
3        The Deposition of GENE GIBBS, taken in the

4   matter, on the date, and at the time and place set out

5   on the title page hereof.

6        It was requested that the deposition be

7   taken by the reporter and that same be reduced to

8   typewritten form.

9        It was agreed by and between counsel and

10  the parties that the Deponent will read and sign the

11  transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 13**

1                      CERTIFICATE

2   STATE OF GEORGIA

3   COUNTY OF FULTON

4        Before me, this day, personally appeared,

5   GENE GIBBS, who, being duly sworn, states that the

6   foregoing transcript of his deposition, taken in the

7   matter, on the date, and at the time and place set out

8   on the title page hereof, constitutes a true and

9   accurate transcript of said deposition.

10

11  _____

12  GENE GIBBS

13

14       SUBSCRIBED and SWORN to before me this

15  _____day of_____, 20___ in the

16  jurisdiction aforesaid.

17

18  _____    _____

19  My Commission Expires      Notary Public

20

21  *If no changes need to be made on the following two

22  pages, place a check here _____, and return only this

23  signed page.*

24

25

---

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Gene Gibbs on 12/09/2020                                Pages 14..16

Page 14

```
1              DEPOSITION ERRATA SHEET
2
3    Our Assignment No.  323629
4    Case Caption:  IN RE: Chinese Manufactured drywall
5              Products Liability Litigation
6
7    Witness: GENE GIBBS - 12/09/2020
8         DECLARATION UNDER PENALTY OF PERJURY
9    I declare under penalty of perjury that I have read
10   the entire transcript of my deposition taken in the
11   captioned matter or the same has been read to me, and
12   The same is true and accurate, save and except for
13   changes and/or corrections, if any, as indicated by me
14   on the DEPOSITION ERRATA SHEET hereof, with the
15   understanding that I offer these changes as if still
16   under oath.
17
18   Signed on the _____ day of
19   _____, 20___.
20
21   _____
22   GENE GIBBS
23
24
25
```

Page 16

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25   GENE GIBBS
```

Page 15

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25   GENE GIBBS
```

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION
Gene Gibbs on 12/09/2020                Index: 1:12..happened

**1**

1:12   9:6

**2**

2011   5:3
   7:10
2020   4:1

**7**

701   7:17
703   7:17
705   7:17

**9**

9   4:1

**A**

add   4:22
addition
   4:22
additional
   8:22
advice   5:17
agree   4:24
area   8:1
attic   5:8,11
authorized
   4:7
aware   7:18

**B**

back   5:11
beginning
   9:2
bit   5:2
building
   6:21 7:15
built   7:19
business   6:4

**C**

Carter   6:1,3
   7:9,14
Chinese   5:14
   6:25 7:10,
   12,23 8:2
co-defendants
   8:13
color   6:8
colors   6:5
completed
   6:21
concluded
   9:6
conversation
   7:13
conversations
   7:8
correct
   4:16,19,
   20,23

counsel   4:6
Court   4:7

**D**

DAVIDSON
   8:16
day   5:7,10,
   16 9:2,3,5
December   4:1
deposition
   4:1,5,15
   9:6
difficulties
   9:1
discuss   6:5
discussion
   6:14,17
discussions
   6:9
divulging
   5:16
Doyle   5:4,7,
   11,15,20,
   24 8:14,18
drywall   5:7,
   12,13,14
   6:25 7:11,
   12,23 8:2
duly   4:10

**E**

earlier   4:23

end   7:13
entire   4:15
EXAMINATION
   4:12
examined
   4:10
expect   7:6

**F**

finishing
   6:22
flooring
   6:5,7
follow-up
   8:10
forward   8:23
front   9:4

**G**

gave   5:17
Gene   4:1,9
Gibbs   4:1,3,
   9,14 8:4,7
good   5:1
granite   6:7
great   9:3

**H**

happen   6:17
happened

**IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION**
Gene Gibbs on 12/09/2020                                    Index: heard..taking

5:10  6:14

**heard**  4:18
  7:19,22,25

**holding**  8:21

**home**  6:14,
  16,20,22,
  23,24,25
  7:2,3,4,5,
  9  8:9

**homes**  7:5,
  14,15,20,
  22,25

**hope**  9:2

**house**  5:6,
  14,20,24
  6:10  7:11

**household**
  4:25

**husband**  5:1

**I**

**inspect**
  5:21,23

**inspection**
  5:3  6:23,
  24  7:2

**insulation**
  5:12

**involve**  9:4

**involved**
  7:15

**issue**  7:11

**issues**  7:23
  8:2

**J**

**John**  6:1,2
  7:9

**K**

**kind**  5:16

**L**

**LAWSON**  4:3,
  13  8:4,20

**legal**  5:17

**live**  4:25

**long**  6:13

**looked**  5:12

**M**

**markings**
  5:13

**materials**
  8:8,23

**Matt**  8:17

**mention**  7:2

**month**  6:18

**moved**  6:20
  7:9

**N**

**neighborhood**
  7:16,20,23
  8:1

**November**  5:3

**O**

**occurred**  5:3

**odor**  7:5

**office**  6:6,
  14,17

**open**  8:13,
  21

**P**

**p.m.**  9:6

**parties**  4:6

**patience**
  8:25

**Patriot**  7:14

**place**  6:4
  7:17

**point**  5:21

**potential**
  7:10

**present**  5:6

**pretty**  7:13

**pulled**  5:11

**purchased**
  6:10,13,16

**Q**

**questions**
  4:19  8:5,
  11,15,16

**R**

**related**  8:8

**remember**  5:4
  6:2  7:8

**remotely**  4:8

**repairs**  8:9

**replacements**
  8:9

**Reporter**  4:7

**rest**  9:5

**S**

**screen**  9:5

**sitting**  4:15
  9:4

**smell**  7:2

**speaking**  6:2

**stipulate**
  4:6

**swear**  4:8

**sworn**  4:10

**T**

**taking**  4:4

talked  6:6
  7:16

technical
  9:1

testified
  4:11,22

testimony
  4:18

things  8:21

time  4:4,5
  5:22 6:2,
  23 8:6,12,
  24

today  4:5,19
  8:12,19,
  21,25

told  4:24
  7:10,12

type  6:7

—————————
        U
—————————

unusual  7:6

—————————
        V
—————————

visited  5:16

—————————
        W
—————————

walls  6:8

wanted  4:14
  5:2 6:1

wanting  4:22

Waverly  7:17

week  6:18

wife  4:16,
  22

—————————
        Y
—————————

you-all  8:8,
  24

—————————
        Z
—————————

Zoom  9:4

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**Darla Gibbs- Vol. 2 on 01/26/2021**

```
 1            IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
 2
       IN RE:                    )
 3     CHINESE-MANUFACTURED      )
       DRYWALL, PRODUCTS         )
 4     LIABILITY LITIGATION      )
       EDUARDO AND CARMEN        )
 5     AMORIN, ET AL.,           )  No.
       INDIVIDUALLY AND ON       )  2:11-cv-01395-EEF-JCW
 6     BEHALF OF OTHERS          )
       SIMILARLY SITUATED,       )
 7                               )
            Plaintiffs,          )
 8                               )
       vs.                       )
 9                               )
       TAISHAN GYPSUM CO.,       )
10     LTD. F/K/A SHANDONG       )
       TAIHE DONGXIN CO.,        )
11     LTD.; TAIAN TAISHAN       )
       PLASTERBOARD CO, LTD,     )
12     ET AL,                    )
                                 )
13          Defendants.          )

14

15                     - - -

16

          Continuation of the Videoconference
17
                    Deposition of
18
                    DARLA GIBBS
19
              (Taken by Defendants)
20
                  Atlanta, Georgia
21
                 January 26, 2021
22
                     Volume 2
23
     Reported by:  Lynne C. Fulwood
24
                 Certified Court Reporter
25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**Darla Gibbs- Vol. 2 on 01/26/2021**          Pages 99..102

**Page 99**

```
1   STATE OF GEORGIA
2   COUNTY OF COBB
3   CONTINUATION OF THE VIDEOCONFERENCE DEPOSITION OF
4   DARLA GIBBS
5
6           Pursuant to Article 8.B of the RULES AND
7   REGULATIONS OF THE BOARD OF COURT REPORTING OF THE
8   JUDICIAL COUNCIL OF GEORGIA, I make the following
9   disclosure:
10          I am a Georgia Certified Court Reporter.
11  I am here as a representative of Huseby Global
12  Litigation.
13          Huseby Global Litigation was contacted by
14  the offices of ALSTON & BIRD, LLP, to provide court
15  reporting services for this deposition.  Huseby
16  Global Litigation will not be taking this deposition
17  by O.C.G.A. 15-14-37 (a) and (b).
18
19
20
21
22
23
24
25
```

**Page 101**

```
1            - - -
2          Continuation of the Videoconference
3   Deposition of DARLA GIBBS, taken by the
4   Defendants, at 1201 West Peachtree Street,
5   N.W., Suite 4200, Atlanta, Georgia 30309,
6   on the 26th day of January 2021, at 2:30
7   p.m., before Lynne C. Fulwood, Certified
8   Court Reporter.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 100**

```
1   ON BEHALF OF THE PLAINTIFFS:
2        JAMES DOYLE - videoconference
         Attorney at Law
3        Doyle Law Firm, PC
         2100 Southbridge Parkway
4        Suite 650
         Birmingham, Alabama 35202
5        205-533-9500
         Jimmy@doylefirm.com
6
    ON BEHALF OF THE DEFENDANT TAISHAN GYPSUM:
7
         MATTHEW LAWSON - videoconference
8        CHRISTINA EIKHOFF - audio
         Attorneys at Law
9        Alston & Bird
         1201 West Peachtree Street, N.W.
10       Suite 4200
         Atlanta, Georgia 30309
11       Matt.lawson@alston.com
         Christy.eikhoff@alston.com
12
    ON BEHALF OF THE DEFENDANTS BEIJING NEW BUILDING
13  MATERIALS PUBLIC LIMITED COMPANY, BEIJING NEW
    BUILDING MATERIALS GROUP CORPORATION, AND CHINA
14  NATIONAL BUILDING MATERIALS COMPANY, LIMITED:
15       ANDREW DAVIDSON - videoconference
         Attorney at Law
16       Orrick, Harrington & Sutcliffe
         The Orrick Building
17       405 Howard Street
         San Francisco, California 94105-2669
18       415-773-5700
         Adavidson@orrick.com
19
    ALSO PRESENT:
20
         Mr. Gibbs
21
22
23
24
25
```

**Page 102**

```
1            INDEX TO EXHIBITS
2   Exhibit 8    Amended Supplemental Plaintiff
                 Profile Form                 105
3
4
5        INDEX TO PREVIOUSLY MARKED EXHIBITS
6   Exhibit 3    Spreadsheet                  107
7
8
             INDEX TO EXAMINATION
9
    Examination by Mr. Lawson                 103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Pages 103..106

Page 103

```
 1              P R O C E E D I N G S,
 2                     - - -
 3          (Whereupon, counsel for all parties
 4      stipulates that the Court Reporter is
 5      authorized to swear the witness remotely.)
 6                 DARLA GIBBS,
 7      having first been duly sworn, was deposed and
 8      examined as follows:
 9                 EXAMINATION
10  BY MR. LAWSON:
11      Q    Welcome back, Mrs. Gibbs.  I appreciate
12  you all being back here today for the continuation of
13  your deposition that we started back in December.  So
14  obviously very similar setup to last time around.  We
15  are on a Zoom call again and pretty much the same
16  rules as previously with the deposition, meaning, you
17  know, we're going to do our best to speak clearly and
18  verbally to make sure that the transcription can
19  catch everything that we're saying between each
20  other.
21          While I anticipate that this will not
22  take very long, if you need a break at any point, let
23  me know.  And also if you hear your attorney, Mr.
24  Doyle, objecting at any point, please make sure to
25  pause and let him complete his objection.  And then
```

Page 104

```
 1  at that point, unless he's instructed you not to
 2  answer, I'll ask you to answer the question, or if at
 3  any point you need it I could repeat my question so
 4  you could hear it again.
 5          Does that all sound okay?
 6      A    Yes, sir.
 7      Q    All right.  And to be clear again, I'm
 8  going to be just talking to Mrs. Gibbs here at the
 9  beginning and then if we have any followup with Mr.
10  Gibbs, we'll do that separately.  All right?
11      A    Thank you.
12      Q    Okay.  So just wanted to be able to
13  follow up quickly and make sure that there -- is
14  there any reason why you would not be able to testify
15  truthfully here today during the continuation of this
16  deposition?
17      A    I certainly hope not.
18      Q    All right.  Since the last time that we
19  spoke, have you collected any new documents that you
20  have produced to your attorney, Mr. Doyle?
21      A    I sent him whatever I had probably two
22  weeks after the last time that we were on because I
23  was taking care of my husband.  And it took me a
24  while to get back to where I could collect anything,
25  but I don't think there was anything that I added to
```

Page 105

```
 1  it that wasn't already there before.
 2      Q    Okay.  And we'll get into the details of
 3  what you have produced and go through that.
 4          Have you met or spoken with Mr. Doyle to
 5  be able to prepare for this deposition today, this
 6  continuation?
 7      A    Just what we have had since then, yes.
 8      Q    And have you spoken with anyone else to
 9  prepare for this deposition other than Mr. Doyle?
10      A    No, sir.
11      Q    All right.  So to begin with, I want to
12  go back to what was previously marked at the
13  beginning of last month's deposition or near the
14  beginning of it as Exhibit 3.  I'm going to pull that
15  up for you here and share it on the screen like we
16  did previously during last month's deposition, if
17  that's all right.  And bear with me for one moment.
18  All right.
19          (Whereupon, Exhibit No. 3 was previously
20      marked for identification by the court
21      reporter.)
22  BY MR. LAWSON:
23      Q    You should now be seeing the document
24  that was previously marked as Exhibit 3 during
25  December's deposition on your screen.  Do you see
```

Page 106

```
 1  that there?
 2      A    Yes, sir.
 3      Q    All right.  And do you recognize this
 4  document?
 5      A    Yes, sir.
 6      Q    And what is this?
 7      A    That's a spreadsheet that I created of
 8  all the things that Mr. Doyle had asked me about
 9  several years ago and then whatever was added onto
10  it.
11      Q    All right.  Now, we received this chart
12  that you had created on the morning of the deposition
13  that we had back in December.  And we asked you to be
14  able to collect any invoices or receipts that you had
15  showing proof of these different purchases that are
16  listed here.  Do you recall that?
17      A    Yes, sir.
18      Q    And here on this chart you had listed
19  this as replacements for electronic/electronic items
20  at the top of the chart.  Do you see that?
21      A    Yes, sir.
22      Q    Okay.  And then you listed various items
23  and the years that you purchased them; is that right?
24      A    Yes, sir.
25      Q    All right.  So it's my understanding that
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Pages 107..110

Page 107

1  you have undertaken to try to find any receipts or
2  invoices that you have showing payments for the items
3  that are on this list?
4      A    Yes, sir.
5          (Whereupon, Exhibit No. 8 was marked for
6      identification by the court reporter.)
7  BY MR. LAWSON:
8      Q    Okay.  I'm now going to show you a new
9  document that is going to be marked as Exhibit 8.
10 Let me pull that up for you.  Okay.  We'll mark this
11 document as Exhibit 8.  I represent to you that this
12 is an Amended Supplemental Plaintiff Profile Form
13 that you and your attorney Mr. Doyle submitted to us
14 near the end of December, around December 22nd.  Do
15 you recognize this document from looking at it?
16     A    Yes.
17     Q    All right.  I'm going to take you down to
18 what I believe is your signature, which is found on
19 the seventh page of this document.  Do you see your
20 signature there?
21     A    Yes, sir.
22     Q    And it appears that you signed this
23 document on December 22nd, 2020; is that right?
24     A    Yes, sir.
25     Q    All right.  Now, we're going to go

Page 108

1  through a few different parts of this amended form,
2  but I wanted to begin by going down to page nine of
3  the document.
4      A    Yes, sir.
5      Q    And this is titled itemization of damages
6  or repair to home.  And in parentheses it says
7  appliances, fixtures, electrical system, AC system
8  and other.  Do you see that?
9      A    Yes, sir.
10     Q    All right.  So what did you list on this
11 document that we're looking at on page nine?
12     A    I listed the heating and air-conditioning
13 system.
14     Q    All right.  So we previously looked at
15 Exhibit 3, which was a list of different items that
16 you have replaced in your home that you claim were
17 damaged by defective Chinese drywall, correct?
18     A    Yes, sir.
19     Q    And would you agree that the items that
20 you've listed here across the supplemental plaintiff
21 profile form that we're looking at as Exhibit 8
22 replaced the chart that you had submitted previously
23 as Exhibit 3?
24     A    I'm not sure how I want to answer that.
25     Q    Okay.  Are there -- are the items that

Page 109

1  you have listed on this amended supplemental
2  plaintiff profile form that we're going to be looking
3  at today all of the personal property items that
4  you're seeking damages for that you believe were
5  damaged by defective Chinese drywall?
6      A    Yes, sir.
7      Q    And so if there were items listed on
8  the -- on Exhibit 3 that we looked at earlier, the
9  previous chart, that are not listed on this Exhibit
10 8, you are no longer seeking damages for those in
11 this action; is that right?
12     A    No, sir, that's not the -- that was not
13 the reason for leaving them off of this one.  The
14 reason for leaving them off of this one was I
15 couldn't get the receipts because they were over --
16 some were eight years old or better.  And so
17 therefore I did not have the receipts for those
18 things even though they had been damaged.
19     Q    Okay.  But you're seeking damages for the
20 items that you do have receipts for; is that right?
21     A    I was trying to be as honest as I could
22 by only asking for the ones that we had receipts.
23     Q    I appreciate that.  So that's a yes to my
24 question, that you're seeking damages for the items
25 that are listed that you have receipts for; is that

Page 110

1  right?
2      A    Yes.
3      Q    And you are not seeking damages for items
4  that you do not have receipts for; is that right?
5      A    Unfortunately, yes.
6      Q    All right.  So on this page on page nine
7  there is the HVAC unit listed under line item one.
8  And it says repair and replacement of multiple coils,
9  and the value that you put on there is $8,697.  Do
10 you see that?
11     A    Yes, sir.
12     Q    All right.  Now, I wanted to take a look
13 at the receipts that you have and invoices that
14 you've attached to this document.  And specifically
15 I'm going to be going to page I believe 18 -- excuse
16 me.  Yes, this is page 18 of this Exhibit 8.  And I'm
17 going to zoom out a little bit so you can see a
18 little bit more of page 18.  By looking at page 18
19 can you tell me what this is?
20     A    Well, that's for the washer and dryer.
21     Q    All right.  So this is not related to the
22 HVAC unit; is that right?
23     A    Right, no.
24     Q    Let's go then to page 20 and this lists
25 an invoice from Energy Savers of Georgia.  Do you see

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Pages 111..114

Page 111

1   that?
2        A    Yes, sir.
3        Q    All right.  And specifically can you tell
4   me what this invoice is for?
5        A    That is the HVAC that was replaced.
6        Q    All right.  And this -- the date on this
7   invoice for the HVAC that you're saying was replaced
8   is July 13th, 2011.  Do you see that?
9        A    Yes, sir.
10       Q    And is this the current HVAC unit that
11  you have at your house?
12       A    Yes, sir.
13       Q    And does the HVAC unit work today?
14       A    Yes, sir.
15       Q    Have you had to do any repairs to this
16  unit since it was replaced?
17       A    Yes, sir.
18       Q    All right.  And why did you have to
19  replace it?
20       A    We had to replace the A coil because it
21  had copper in it and it quit and they replaced that.
22  They replaced it with one that is aluminum instead of
23  copper.
24       Q    Now, it says that you installed a Carrier
25  heat pump system.  Do you see that?

Page 112

1        A    Yes, sir.
2        Q    What kind of unit did you have previously
3   in your home before July of 2011?
4        A    I don't remember what brand it was.
5        Q    And was that unit original to the house
6   when you purchased it, the one that you replaced?
7        A    Yes, sir.
8        Q    Now I'd like to turn your attention to
9   the next page, which is page 21 of this form.  And
10  I'm going to zoom out a little bit more to be able to
11  see the full document.  Now, what is this invoice?
12       A    It's extremely difficult to read.
13       Q    Let me zoom in for you so you can see it
14  a little bit closer and then we can scroll down if
15  needed.  Can you see that?
16       A    Yes.  This is when I believe -- let's
17  see, that's two years -- this is when they had to
18  replace the A coil on it.  Again, it was -- it was
19  second A coil.
20       Q    Okay.  So this is an invoice dated August
21  13th, 2013, correct?
22       A    Yes, sir.
23       Q    And under the description of the service
24  performed it states:  Completed cooling service,
25  checked refrigerant, checked and tightened electrical

Page 113

1   components and connections, checked amp draw on
2   compressor, blew out drain line and flushed, cleaned
3   condenser coil and cleaned debris from outdoor unit,
4   checked blower assembly, checked air flow, checked
5   thermostat operation, checked and verified system
6   operation.
7             Did I read that correctly?
8        A    Yes, sir.
9        Q    Now, they don't say that they replaced
10  the coil here, do they?
11       A    No, I don't know.  I'd have had to look
12  down and think what was the amount that was on this.
13       Q    Let's go to the bottom of the page.
14       A    (Inaudible) show me.
15       Q    Yes.  Now, looking at the bottom of the
16  page, it says a total.  I'm zooming in here for you.
17       A    Okay.  All right.  Now I understand.
18  That's when they first came out to check it out.  And
19  I do believe that -- oh, I'm not sure.  I'm not sure.
20       Q    Okay.  So they didn't charge you for
21  this, correct?
22       A    Here is the -- they came out every --
23  twice a year to check our system out automatically
24  when it was heating air-conditioning systems.  And
25  I'm not sure on that.  That may have been just one of

Page 114

1   those that they did an automatic check.
2        Q    And you'd agree on this invoice they
3   didn't charge you for any of these services, correct?
4        A    They did not charge us for that.
5        Q    And that was part of some kind of
6   maintenance plan, is that right, that they'd come out
7   twice a year?
8        A    Yes, sir.  We have them come out even
9   today.
10       Q    All right.  Now, let's go down to the
11  next page, which is page 22.  This appears to also be
12  an Energy Savers of Georgia invoice and it's dated
13  June 21st, 2014.  I'm going to scroll down a little
14  bit for you so you can see a description of the work.
15  And maybe you can tell us what exactly this was for.
16       A    Okay.  This is when they replaced the A
17  coil.  This is when they -- the second A coil.
18       Q    So in 2014 they needed to replace the
19  coil in your AC -- HVAC unit again or they needed to
20  replace it; is that right?
21       A    Yes, sir.  And if you notice it's a
22  tin-plated evaporator coil replacement, not the --
23  and that was when they came out with this and we
24  never had a problem with it again.
25       Q    Okay.  So when they installed the unit in

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Pages 115..118

Page 115

1  2011, did they use a copper coil when they installed
2  it?
3       A   Yes, sir.
4       Q   All right.  But then when they did this
5  replacement in 2014, they installed a tin coil?
6       A   Yes, sir.  And we had to wait a little
7  bit longer to get that.  And it was extremely hot
8  when they did that.
9       Q   Right, because this was June 2014; is
10 that right?
11      A   Oh, yeah.
12      Q   All right.  Looking down, the total that
13 is listed on this particular invoice is $2,555.06.
14 Do you see that?
15      A   Yes, sir.
16      Q   And that concludes the invoices related
17 to the air-conditioning unit that you've attached,
18 correct?
19      A   Yes.
20      Q   Now, going back to what we were looking
21 at previously on page nine, you listed the total
22 value across the HVAC unit repairs and replacements
23 as $8,697; is that right?
24      A   Yes, sir.
25      Q   And we looked at two different items just

Page 116

1  now that totaled a little bit less than that total
2  amount.  They totaled $8,370.  My question to you is:
3  Do you know where the remaining $327 comes into play
4  that would be totaled to $8,697 on this chart here?
5       A   Not right off my -- not off the top of my
6  head right now, no.
7       Q   Okay.  And do you think you have any
8  other receipts or invoices related to the HVAC unit
9  that -- any replacement or repairs related to that?
10      A   I would have to go back to the file.
11      Q   But when you did look before -- after our
12 previous deposition, the only ones that you found
13 were the ones that we've looked at so far today?
14      A   I guess.
15      Q   Can you think of any other invoices other
16 than the ones that we've looked at that you found?
17      A   We've had -- we've had the -- we've had
18 the annual repairs on it every year, but that would
19 not -- I would not have included that in that price.
20 I can guarantee you that because I felt like that was
21 something that we would have done for any system.  I
22 don't know what the difference is.  Maybe I made a
23 miscalculation when I was adding them up.  I don't
24 know.
25      Q   All right.  Let's go on to page 11 of

Page 117

1  this document, which is another chart that you've
2  included.  This one is titled Itemization of Damaged
3  Personal Property.  Do you see that there?
4       A   Yes, sir.
5       Q   All right.  And then you have two
6  different items here.  The first one under line item
7  one is washer/dryer replacement.  And that's listed
8  at the value of $2,826.  Do you see that?
9       A   Yes, sir.
10      Q   All right.  And then the second item is
11 computer replacement, and it's listed as $1,496.  Do
12 you see that?
13      A   Yes, sir.
14      Q   All right.  And between the HVAC unit,
15 the washer/dryer replacement and the computer
16 replacement, you've listed three different items that
17 you're seeking -- personal property items that you're
18 seeking damages for in this action; is that right?
19      A   Yes, sir.
20      Q   All right.  I wanted to first ask you
21 about this washer and dryer replacement.  Can you
22 tell me about what happened with the original washer
23 and dryer that you had in your house?
24      A   The washer quit.  I am trying to
25 remember.  I know it was December, I do believe, when

Page 118

1  it went out.  And it -- and the very next day I
2  was -- I had taken the clothes out of the washer.  It
3  was still sopping wet, rung them out the best I
4  could, put them in the dryer to get them dried and it
5  quit.  Both of those within 24 hours, the washer and
6  the dryer.  They were both Bosche units.  And they
7  both quit and we had to go buy new ones.
8       Q   Now, when did you purchase that washer
9  and dryer, the Bosche units that you're describing?
10      A   I really can't remember.  We moved them
11 into this house from our former residence.  And I
12 would have to look at the dates.  I'm not sure when
13 we bought them.  And we've lived in this house for --
14 it will be 14 years in June or July.
15      Q   About how old do you think the washer and
16 dryer units were when they stopped working?
17      A   They were less than five years.
18      Q   And -- go ahead, sorry.
19      A   As I remember I was thinking that they
20 were fairly new considering that they went out.
21      Q   And when you replaced them, what kinds of
22 washer and dryer units did you purchase to replace
23 them with?
24      A   The ones from Sears, the Kenmore washer
25 and dryer.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                                              Pages 119..122

Page 119

1    Q    Now, before you replaced them, did you
2  have anyone come out to be able to look at the washer
3  and dryer unit to see if they could repair them?
4    A    No, sir.
5    Q    And why is that?
6    A    Because I wanted -- I felt like I wanted
7  to get something that was not going to be breaking
8  down again.
9    Q    Why did you think that the washer and
10  dryer units had broken at the time that they broke?
11    A    You know, I don't remember.  I'd have to
12  look at the dates for when we bought those.
13    Q    You said that you wanted units that would
14  work and that wouldn't break down again.  Why would
15  you think that new units would not break again?
16    A    Well, for the same reason I think we all
17  want the newer improved items.  When we purchased new
18  ones and I think -- you know, I don't remember, but
19  maybe I did have somebody tell us about them, but --
20  or maybe I looked up on the Internet.  I don't know.
21    But it was the idea that they were at the
22  age that they were at, five to eight years old or
23  whatever, is something in there that said -- they
24  said, you know, that they were getting at that point
25  where they might be getting near the end of their

Page 120

1  life.  And so rather than putting money into old
2  ones, we bought the new ones.
3    Q    When you replaced those washer and dryer
4  units, did you think that the drywall in your house
5  had caused them to stop working?
6    A    I don't know if that was before or after
7  we found out about the drywall.  I really don't.
8    Q    Has anyone told you that the drywall in
9  your house is what caused those units to fail?
10    A    I never discussed it with anyone
11  concerning the washer and dryer.
12    Q    Today do you think that the drywall was
13  the reason that the washer and dryer units stopped
14  working?
15    A    Well, I really think that there was
16  probably more reason for it, because I wasn't using
17  the washer and dryer any differently than I had been
18  before.  And for them to pop and go out, both of them
19  within 24 hours, that's the reason I put them in
20  this.
21    Q    Do you have any sense of how long you had
22  lived in your house before those washer and dryer
23  units broke?
24    A    I have to look at the date on the Sears
25  receipt, when did I buy them.

Page 121

1    Q    All right.  Let's take a look at those
2  receipts.  And first here I'm going to be going onto
3  page 13.  And on this page -- and I'll zoom out a
4  little bit for you so you can see this.  It looks
5  like it's an Auburn Bank statement and --
6    A    Yes, sir.
7    Q    -- specifically -- yeah, there's an item
8  here listed for February 25th, 2014 for $400 from
9  Sears Outlet.  Do you see that?
10    A    Yeah.
11    Q    What is this?
12    A    That's a payment towards their washer and
13  dryer.
14    Q    Okay.  And do you think you made these
15  payments around the time that the old washer and
16  dryer unit in your house had broken?
17    A    I think the washer and dryer must have
18  gone out in December of 2013.
19    Q    Okay.
20    A    Because it was right at Christmas time
21  when they went out.  And trying to get new ones
22  delivered during the holiday was a challenge.
23    Q    So looking at this, these were payments
24  that you made on the washer and dryer unit to Sears
25  to be able to purchase the replacement units; is that

Page 122

1  right?
2    A    Yes, sir.
3    Q    So we have a $400 payment on February
4  25th, 2014 that's listed on page 13.  I'm going to be
5  taking you down to page 14.  This is another Auburn
6  bank statement.  And here there appears to be another
7  $400 amount listed for purchase at Sears outlet on
8  January 28th, 2014.  Do you see that?
9    A    Yes, sir.  I think I know one of the
10  things we did was we got -- I think we bought these
11  on 12 months interest free.  And that's the way we
12  try to buy things is anything that we have to buy
13  like this, we buy in that way.  And so therefore I
14  was making these payments so that over -- by the end
15  of the year I could pay it off before the interest
16  would be incurred.
17    Q    All right.  Going down to page 15, we
18  have another Auburn Bank statement.  And scrolling
19  down it looks like there's a March 25th, 2014, $400
20  payment as well.  Is that what that's showing here?
21    A    Yes, sir.
22    Q    And then finally going down to page 16,
23  there is an Auburn Bank statement from -- showing a
24  purchase or payment to Sears outlet on May 19th, 2014
25  for $765.22.  Do you see that?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                     Pages 123..126

Page 123

1     A     Yes, sir.
2     Q     And so this was also a payment for the
3  washer and dryer units that you purchased from Sears?
4     A     Yes, sir.
5     Q     All right.  So now going down -- we're
6  going to come back to page 17 here, but I want to
7  direct your attention to page 18, which we looked at
8  previously.  You said that this was different from
9  the HVAC invoices, but this was related to the washer
10  and dryer unit on page 18; is that right?
11     A     Yes, sir.
12     Q     What is this -- this statement on page 18
13  that we're looking at?  What is it?
14     A     That had to be for one of the items.  And
15  I don't know what happened to the second invoice that
16  showed the second one added on.
17     Q     Okay.  So here this --
18     A     I think you'll see if you look, I had a
19  register tape that I had put the two of them
20  together.  At some point I had all of that
21  information and I put it together on a tape that
22  showed the total of the two items when we bought
23  them.
24     Q     Okay.  Let's go look at that.  That's on
25  page 19 of this document.

Page 124

1     A     Yeah, yeah.  This is where I did it.
2     Q     And can you tell me what this is again?
3     A     Okay.  This was -- this was the washer --
4  I don't remember all of the numbers.  I don't know
5  what their model numbers were, but I added it up,
6  whatever it was, 15 and 12 -- whatever that was.
7  Those two figures was what it ended up being for a
8  washer and dryer.
9     Q     Okay.  So there -- it appears that here
10  on page 19 you have -- someone's written in
11  handwriting here on this page total cost.  Do you
12  know if you wrote that?
13     A     That is my writing.
14     Q     All right.  And then there appears to be
15  a few different typewritten items listed there.
16  There's one for $1,530.98 and then there's one for
17  $1,295.23.  And then it lists an added amount between
18  those two of $2,826.21.  Do you see that?
19     A     Yes.
20     Q     All right.  And what does that represent
21  to you?
22     A     The washer and dryer.
23     Q     So that was the total cost of them; is
24  that right?
25     A     That's what I came up with I guess.

Page 125

1  That's what it was, yes.
2     Q     So far we saw those Auburn Bank
3  statements showing payments of $400, $400, $400
4  again, so three $400 payments.  And then a $765.22
5  payment.  Do you recall that?
6     A     Yes, sir.
7     Q     All right.  And that adds up to
8  $1,965.22.  So do you know if you have any other
9  statements showing payments for the $861 that would
10  be remaining from the total that we just looked at
11  there, that $2,826.21?
12     A     When I was going through it, I was going
13  through it so fast trying to find everything.  I'm
14  assuming that I had just missed two of those bank
15  statements that showed on there.
16     Q     Do you think that you would have the
17  statements showing additional payments for the rest
18  of the total that you've listed?
19     A     Perhaps I do.
20     Q     We would just ask to the extent that you
21  do have them that you produce them to Mr. Doyle so he
22  can produce them to us.  Okay?
23     A     Yes, sir.
24     Q     All right.  Now, so I think at this point
25  we have looked at all of the different invoices and

Page 126

1  receipts that you've attached to the supplemental
2  plaintiff profile form.  I'm just doubling back.
3     Other than what we just talked about,
4  that maybe you might have the receipts for the
5  additional payments for the washer and dryer, do you
6  think that you have any other invoices or receipts
7  related to items that were damaged in your
8  possession?
9     A     Well, I do have one that I -- that I
10  realized after we had sent it off that we had to
11  replace the garage door opener.  And that was -- that
12  was beginning of December I think of this last year,
13  just before we did this deposition, that I had
14  forgotten that we had to replace it because it got to
15  where you could not -- it would not work with the
16  remotes and it would not work with the switch on the
17  wall, whatever.  And we had had to replace that --
18  that garage door opener so we could get in and out of
19  the garage.
20     Q     And was that garage door opener original
21  to the house when you bought the house?
22     A     No, sir.
23     Q     When was that, the one that just broke at
24  the end of this last year, when did you originally
25  buy it and install it in the house?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Pages 127..130

Page 127

1    A    I can't even remember when that was.  I
2  would have to go back and see if I can find the
3  records on that.  But I do know I got the receipt for
4  this last one because we just paid it off and all.
5    Q    And so previously on Exhibit 3 you had
6  listed a new door opener in 2020 as being $309.61?
7    A    Yes, that's the one.  Yes, that's the one
8  we just replaced.
9    Q    Okay.  And you think you have the receipt
10  for that; is that right?
11    A    Yes, I know I've got the receipt for that
12  one.
13    Q    All right.  And we would just ask that
14  you produce that to Mr. Doyle if that is an item that
15  you're seeking damages for in this lawsuit.  All
16  right?
17    A    Yes.
18    Q    And has anyone told you that that garage
19  door opener broke because of Chinese drywall?
20    A    No.
21    Q    And do you believe that Chinese drywall
22  caused the garage door opener to break?
23    A    Yes.
24    Q    Why do you believe that?
25    A    Well, because once I replaced the thing,

Page 128

1  it has worked perfectly ever since.  And it's -- I'm
2  not sure how the gentleman, you know, in wiring,
3  rewiring and what have you, but -- but it had been
4  giving us problems for quite some time, but we just
5  kept working with the remotes or with the opener on
6  the door and on the wall.  And I finally decided we
7  just needed to get a different one because it was
8  not -- it got to the point where I couldn't get it
9  open unless I went over and popped the cord and did
10  it by hand.
11    Q    And had you had any kind of issues like
12  that with the previous garage door opener that you
13  had in the house that was original to the house?
14    A    Yes, sir, and that's why we had replaced
15  it, but I don't remember when that was or what have
16  you.
17    Q    Okay.  All right.  I want to go back to
18  this supplemental plaintiff profile form.  And
19  specifically I want to go to page six of the
20  supplemental plaintiff profile form that I'm showing
21  you.  And specifically I want to talk about this
22  section titled Other Damages.
23    A    Yes, sir.
24    Q    Do you see that on your screen?
25    A    Yes, sir.

Page 129

1    Q    And here it asks if you experienced any
2  loss of use and/or loss of enjoyment of the property
3  as a result of Chinese drywall, identify the total
4  amount of such loss.  Do you see that?
5    A    Yes, sir.
6    Q    And previously you listed I believe an
7  amount of $250,000 to your -- and now you are listing
8  an amount of $337,000 -- excuse me $337,500.  Do you
9  see that?
10    A    Yes, sir.
11    Q    All right.  I'm going to take you now to
12  page eight, where you've attached a paragraph here
13  titled Loss of Use/Loss of Enjoyment.  Do you see
14  that?
15    A    Yes, sir.
16    Q    Now, can you explain to me why you have
17  increased the amount that you are seeking for loss of
18  use or loss of enjoyment of your home?
19    A    Because it's been going on for years.
20  This -- the frustrations of not knowing what's going
21  to break next, what else are we going to have to
22  replace electronic-wise, wire-wise, whatever in this
23  house, has been going on for the last 13 and a half
24  years since we moved into this house.
25          And it's true we have -- we have

Page 130

1  purchased several houses over the last 60 years.  We
2  have purchased at least -- I'm trying to remember,
3  one, two, three, I think this is the fourth new house
4  that we have purchased.  And we have -- we have -- we
5  had smells in it that was like the new smell of a
6  house and what have you.  And we just kind of -- it
7  finally went away.
8          This one has always had a strange smell
9  in this house, totally different, never anything like
10  we've had before.  We have -- in fact, right now I
11  have our windows -- I have a door open with the
12  window open because I want to air out this house as
13  much as possible to try and make it smell halfway
14  decent.  We burn candles.  I have the -- I forgot
15  what they're called, diffusers, something to try and
16  make this place smell better.
17          And I told Mr. Doyle after our last
18  deposition about something that I've never
19  experienced with any other house, and that is this
20  sticky dust.  It's the strangest dust that comes in
21  this house.  It's not like most dust, you can just
22  dust it up and it goes away and what have you.  In
23  this one it sticks to things.  Never have had that in
24  any house we've ever lived in in 60 years.
25          And I'm not saying that I'm the best of

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**Darla Gibbs- Vol. 2 on 01/26/2021**                    **Pages 131..134**

Page 131

1   housekeepers, but there is a difference of the dust
2   in this house.  It's just my husband has problems
3   with his skin itching.  I have had it.  In fact, I've
4   got several spots on my -- they itch constantly.  And
5   we never had that wherever we had lived before.
6           Our granddaughter and great granddaughter
7   that lived with us, and myself, now I think about it,
8   my husband too, we are all on antihistamines
9   constantly because we're constantly having problems
10  with our sinuses and coughing and what have you that
11  we didn't have in other houses.
12          And I'm not saying that I don't have
13  allergies.  I know I've had allergies for years.  But
14  this is all year long.  It's not just in the spring
15  and in the fall like it used to be for me.  I've had
16  it that way.  And it just doesn't get any better in
17  that respect.
18      Q    Have you had the dust that you discussed
19  earlier, have you had that dust forming in your house
20  just for a certain number of years?  Can you remember
21  when it started?
22      A    You know, that is one of the things when
23  I got to thinking back on it.  I -- this house has
24  always had kind of a funny dust, and I don't know
25  what the difference is.  I probably thought it was a

Page 132

1   part of the environment where we were living.  And
2   yet we're only three miles from where we lived before
3   and only ten miles from where we lived before that,
4   all in this same area.  But this house just has a
5   different kind of a dust.
6       Q    And do you know when that dust started?
7       A    About from the beginning we always seemed
8   to have a problem with more dust than anything else
9   in this house.
10      Q    And you believe that dust is caused by
11  defective Chinese drywall?
12      A    I -- in some way I think it is.  I'm not
13  sure how, but I think it does have something to do
14  with it.
15      Q    Has anyone told you that it's caused by
16  Chinese drywall?
17      A    No.  That's just -- I'm just speaking
18  from experience of living in different houses,
19  different places across the country, three different
20  places here in the Opelika area and never had this
21  kind of dust.  And we lived out in the country, but
22  we lived off of a dirt road.  And the dust from that
23  did not stick like this dust.
24          MR. LAWSON:  We can go off the record.
25          (Whereupon, a brief recess was taken.)

Page 133

1   BY MR. LAWSON:
2       Q    Welcome back, Mrs. Gibbs.  So today you
3   come [sic] to our attention that there may be
4   additional documents that you have in your possession
5   related to personal property or home repair items
6   that were not included in the amended supplemental
7   plaintiff profile form.  We did think that we were
8   going to be getting everything today.  That was the
9   reason that we rescheduled the continuation of this
10  deposition.
11          So we're going to be putting on the
12  record that the close of discovery is February 5th.
13  That is the end of all discovery in this matter.  We
14  are asking that we receive any further documentation
15  related to your damage claims in this action by
16  February 5th date and that will -- as that is the
17  close of discovery in this matter.  We will not
18  have -- we're -- so we're going to be asking that
19  those all be received by that date if there are any
20  additional ones at this time.
21          If there are not, then we will assume
22  that there is no further damages being requested
23  beyond the ones that have already been put into the
24  record that we've had across these two depositions,
25  multiple plaintiff profile forms and the additional

Page 134

1   documents that have been submitted.
2           And with that I do not have any further
3   questions at this time.  I would hand things over to
4   Mr. Davidson if he has any further questions.
5           MR. DAVIDSON:  No questions here.
6   Thank you.
7           MR. LAWSON:  Mr. Doyle, do you have
8   any questions?
9           MR. DOYLE:  I don't have any
10  questions, no.
11          MR. LAWSON:  And then we do not have
12  any questions for Mr. Gibbs, and I hand it
13  over to Mr. Davidson if he has any
14  questions.
15          MR. DAVIDSON:  No questions.  Thank
16  you.
17          MR. LAWSON:  Jimmy, anything further?
18          MR. DOYLE:  No, sir.  I think we're
19  done today.
20          MR. LAWSON:  Thank you very much, Mr.
21  and Mrs. Gibbs, for your time.  We
22  appreciate you coming in for the
23  continuation of this deposition, and we
24  hope that you have a great day.  Thanks so
25  much.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**Darla Gibbs- Vol. 2 on 01/26/2021**                              **Pages 135..136**

Page 135

1                    - - -
2   (Deposition concluded at 3:15 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1                C E R T I F I C A T E
2   STATE OF GEORGIA:
3   COUNTY OF COBB:
4
5        I hereby certify that the foregoing
6   transcript was taken down as stated in the
7   caption and the questions and answers thereto
8   were reduced to typewriting under my direction,
9   that the foregoing pages 98 through 136 represent
10  a true, complete and correct transcript of the
11  evidence given upon said hearing, and I further
12  certify that I'm not of kin or counsel to the
13  parties in the case; am not in the regular employ
14  of counsel of any of said parties; nor am I in
15  anywise interested in the result of said case.
16       This 30th day of January 2021.
17
18              *Lynne C. Fulwood*
19
20              LYNNE C. FULWOOD,
                Certified Court Reporter
21              State of Georgia
                License No. B-1075
22
23
24
25

Case 2:09-md-02047-EEF-MBN   Document 23301-3   Filed 03/24/22   Page 156 of 237

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021          Index: $1,295.23..added

Exhibits

GibbsD-3
  102:6
  105:14,19,
  24 108:15,
  23 109:8
  127:5

GibbsD 8
  102:2
  107:5,9,11
  108:21
  109:9,10
  110:16

$

$1,295.23
  124:17

$1,496
  117:11

$1,530.98
  124:16

$1,965.22
  125:8

$2,555.06
  115:13

$2,826   117:8

$2,826.21
  124:18
  125:11

$250,000
  129:7

$309.61

127:6

$327   116:3

$337,000
  129:8

$337,500
  129:8

$400   121:8
  122:3,7,19
  125:3,4

$765.22
  122:25
  125:4

$8,370   116:2

$8,697   110:9
  115:23
  116:4

$861   125:9

1

11   116:25

12   122:11
  124:6

13   121:3
  122:4
  129:23

13th   111:8
  112:21

14   118:14
  122:5

15   122:17
  124:6

16   122:22

17   123:6

18   110:15,
  16,18
  123:7,10,
  12

19   123:25
  124:10

19th   122:24

2

20   110:24

2011   111:8
  112:3
  115:1

2013   112:21
  121:18

2014
  114:13,18
  115:5,9
  121:8
  122:4,8,
  19,24

2020   107:23
  127:6

21   112:9

21st   114:13

22   114:11

22nd
  107:14,23

24   118:5
  120:19

25th   121:8

122:4,19

28th   122:8

3

3   105:14,
  19,24
  108:15,23
  109:8
  127:5

3:15   135:2

5

5th   133:12,
  16

6

60   130:1,24

8

8   107:5,9,
  11 108:21
  109:10
  110:16

A

AC   108:7
  114:19

action
  109:11
  117:18
  133:15

added   104:25

106:9
123:16
124:5,17

adding
116:23

additional
125:17
126:5
133:4,20,
25

adds  125:7

age  119:22

agree  108:19
114:2

ahead  118:18

air  113:4
130:12

air-
conditioning
108:12
113:24
115:17

allergies
131:13

aluminum
111:22

amended
107:12
108:1
109:1
133:6

amount
113:12
116:2

122:7
124:17
129:4,7,8,
17

amp  113:1

and/or  129:2

annual
116:18

anticipate
103:21

antihistamines
131:8

appears
107:22
114:11
122:6
124:9,14

appliances
108:7

area  132:4,
20

asks  129:1

assembly
113:4

assume
133:21

assuming
125:14

attached
110:14
115:17
126:1
129:12

attention
112:8
123:7
133:3

attorney
103:23
104:20
107:13

Auburn  121:5
122:5,18,
23 125:2

August
112:20

authorized
103:5

automatic
114:1

automatically
113:23

_____

B
_____

back
103:11,12,
13 104:24
105:12
106:13
115:20
116:10
123:6
126:2
127:2
128:17
131:23
133:2

bank  121:5
122:6,18,
23 125:2,
14

bear  105:17

begin  105:11
108:2

beginning
104:9
105:13,14
126:12
132:7

bit  110:17,
18 112:10,
14 114:14
115:7
116:1
121:4

blew  113:2

blower  113:4

Bosche
118:6,9

bottom
113:13,15

bought
118:13
119:12
120:2
122:10
123:22
126:21

brand  112:4

break  103:22
119:14,15

Case 2:09-md-02047-EEF-MBN   Document 23301-3   Filed 03/24/22   Page 158 of 237

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
Darla Gibbs- Vol. 2 on 01/26/2021        Index: breaking..created

127:22
129:21

**breaking**
  119:7

**broke**  119:10
  120:23
  126:23
  127:19

**broken**
  119:10
  121:16

**burn**  130:14

**buy**  118:7
  120:25
  122:12,13
  126:25

_____

C
_____

**call**  103:15

**called**
  130:15

**candles**
  130:14

**care**  104:23

**Carrier**
  111:24

**catch**  103:19

**caused**
  120:5,9
  127:22
  132:10,15

**challenge**
  121:22

**charge**
  113:20
  114:3,4

**chart**
  106:11,18,
  20 108:22
  109:9
  116:4
  117:1

**check**
  113:18,23
  114:1

**checked**
  112:25
  113:1,4,5

**Chinese**
  108:17
  109:5
  127:19,21
  129:3
  132:11,16

**Christmas**
  121:20

**claim**  108:16

**claims**
  133:15

**cleaned**
  113:2,3

**clear**  104:7

**close**
  133:12,17

**closer**
  112:14

**clothes**
  118:2

**coil**  111:20
  112:18,19
  113:3,10
  114:17,19,
  22 115:1,5

**coils**  110:8

**collect**
  104:24
  106:14

**collected**
  104:19

**complete**
  103:25

**Completed**
  112:24

**components**
  113:1

**compressor**
  113:2

**computer**
  117:11,15

**concluded**
  135:2

**concludes**
  115:16

**condenser**
  113:3

**connections**
  113:1

**constantly**
  131:4,9

**continuation**
  103:12
  104:15
  105:6
  133:9
  134:23

**cooling**
  112:24

**copper**
  111:21,23
  115:1

**cord**  128:9

**correct**
  108:17
  112:21
  113:21
  114:3
  115:18

**correctly**
  113:7

**cost**
  124:11,23

**coughing**
  131:10

**counsel**
  103:3

**country**
  132:19,21

**court**  103:4
  105:20
  107:6

**created**
  106:7,12

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
Darla Gibbs- Vol. 2 on 01/26/2021                    Index: current..dryer

current
  111:10

_____

D
_____

damage
  133:15

damaged
  108:17
  109:5,18
  117:2
  126:7

damages
  108:5
  109:4,10,
  19,24
  110:3
  117:18
  127:15
  128:22
  133:22

DARLA  103:6

date  111:6
  120:24
  133:16,19

dated  112:20
  114:12

dates  118:12
  119:12

Davidson
  134:4,5,
  13,15

day  118:1
  134:24

debris  113:3

December
  103:13
  106:13
  107:14,23
  117:25
  121:18
  126:12

December's
  105:25

decent
  130:14

decided
  128:6

defective
  108:17
  109:5
  132:11

delivered
  121:22

deposed
  103:7

deposition
  103:13,16
  104:16
  105:5,9,
  13,16,25
  106:12
  116:12
  126:13
  130:18
  133:10
  134:23
  135:2

depositions
  133:24

describing
  118:9

description
  112:23
  114:14

details
  105:2

difference
  116:22
  131:1,25

differently
  120:17

difficult
  112:12

diffusers
  130:15

direct  123:7

dirt  132:22

discovery
  133:12,13,
  17

discussed
  120:10
  131:18

document
  105:23
  106:4
  107:9,11,
  15,19,23
  108:3,11
  110:14
  112:11
  117:1
  123:25

documentation
  133:14

documents
  104:19
  133:4
  134:1

door
  126:11,18,
  20  127:6,
  19,22
  128:6,12
  130:11

doubling
  126:2

Doyle  103:24
  104:20
  105:4,9
  106:8
  107:13
  125:21
  127:14
  130:17
  134:7,9,18

drain  113:2

draw  113:1

dried  118:4

dryer  110:20
  117:21,23
  118:4,6,9,
  16,22,25
  119:3,10
  120:3,11,
  13,17,22
  121:13,16,
  17,24

123:3,10
124:8,22
126:5

**drywall**
108:17
109:5
120:4,7,8,
12 127:19,
21 129:3
132:11,16

**duly** 103:7

**dust**
130:20,21,
22 131:1,
18,19,24
132:5,6,8,
10,21,22,
23

_____

**E**

**earlier**
109:8
131:19

**electrical**
108:7
112:25

**electronic-
wise** 129:22

**electronic/
electronic**
106:19

**end** 107:14
119:25
122:14
126:24

133:13

**ended** 124:7

**Energy**
110:25
114:12

**enjoyment**
129:2,13,
18

**environment**
132:1

**evaporator**
114:22

**EXAMINATION**
103:9

**examined**
103:8

**excuse**
110:15
129:8

**Exhibit**
105:14,19,
24 107:5,
9,11
108:15,21,
23 109:8,9
110:16
127:5

**experience**
132:18

**experienced**
129:1
130:19

**explain**
129:16

**extent**
125:20

**extremely**
112:12
115:7

_____

**F**

**fact** 130:10
131:3

**fail** 120:9

**fairly**
118:20

**fall** 131:15

**fast** 125:13

**February**
121:8
122:3
133:12,16

**felt** 116:20
119:6

**figures**
124:7

**file** 116:10

**finally**
122:22
128:6
130:7

**find** 107:1
125:13
127:2

**fixtures**
108:7

**flow** 113:4

**flushed**
113:2

**follow**
104:13

**followup**
104:9

**forgot**
130:14

**forgotten**
126:14

**form** 107:12
108:1,21
109:2
112:9
126:2
128:18,20
133:7

**forming**
131:19

**forms** 133:25

**found** 107:18
116:12,16
120:7

**fourth** 130:3

**free** 122:11

**frustrations**
129:20

**full** 112:11

**funny** 131:24

---
**G**
---

garage
  126:11,18,
  19,20
  127:18,22
  128:12

gentleman
  128:2

Georgia
  110:25
  114:12

Gibbs   103:6,
  11  104:8,
  10  133:2
  134:12,21

giving   128:4

granddaughter
  131:6

great   131:6
  134:24

guarantee
  116:20

guess   116:14
  124:25

---
**H**
---

half   129:23

halfway
  130:13

hand   128:10
  134:3,12

handwriting
  124:11

happened
  117:22
  123:15

head   116:6

hear   103:23
  104:4

heat   111:25

heating
  108:12
  113:24

holiday
  121:22

home   108:6,
  16  112:3
  129:18
  133:5

honest
  109:21

hope   104:17
  134:24

hot   115:7

hours   118:5
  120:19

house   111:11
  112:5
  117:23
  118:11,13
  120:4,9,22
  121:16
  126:21,25
  128:13
  129:23,24

130:3,6,9,
  12,19,21,
  24  131:2,
  19,23
  132:4,9

housekeepers
  131:1

houses   130:1
  131:11
  132:18

husband
  104:23
  131:2,8

HVAC   110:7,
  22  111:5,
  7,10,13
  114:19
  115:22
  116:8
  117:14
  123:9

---
**I**
---

idea   119:21

identification
  105:20
  107:6

identify
  129:3

improved
  119:17

Inaudible
  113:14

included

116:19
  117:2
  133:6

increased
  129:17

incurred
  122:16

information
  123:21

install
  126:25

installed
  111:24
  114:25
  115:1,5

instructed
  104:1

interest
  122:11,15

Internet
  119:20

invoice
  110:25
  111:4,7
  112:11,20
  114:2,12
  115:13
  123:15

invoices
  106:14
  107:2
  110:13
  115:16
  116:8,15

123:9
125:25
126:6

**issues**
128:11

**itch**  131:4

**itching**
131:3

**item**  110:7
117:6,10
121:7
127:14

**itemization**
108:5
117:2

**items**
106:19,22
107:2
108:15,19,
25  109:3,
7,20,24
110:3
115:25
117:6,16,
17  119:17
123:14,22
124:15
126:7
133:5

___

**J**

**January**
122:8

**Jimmy**  134:17

**July**  111:8
112:3
118:14

**June**  114:13
115:9
118:14

___

**K**

**Kenmore**
118:24

**kind**  112:2
114:5
128:11
130:6
131:24
132:5,21

**kinds**  118:21

**knowing**
129:20

___

**L**

**LAWSON**
103:10
105:22
107:7
132:24
133:1
134:7,11,
17,20

**lawsuit**
127:15

**leaving**
109:13,14

**life**  120:1

**list**  107:3
108:10,15

**listed**
106:16,18,
22  108:12,
20  109:1,
7,9,25
110:7
115:13,21
117:7,11,
16  121:8
122:4,7
124:15
125:18
127:6
129:6

**listing**
129:7

**lists**  110:24
124:17

**lived**  118:13
120:22
130:24
131:5,7
132:2,3,
21,22

**living**
132:1,18

**long**  103:22
120:21
131:14

**longer**
109:10
115:7

**looked**
108:14
109:8
115:25
116:13,16
119:20
123:7
125:10,25

**loss**  129:2,
4,13,17,18

___

**M**

**made**  116:22
121:14,24

**maintenance**
114:6

**make**
103:18,24
104:13
130:13,16

**making**
122:14

**March**  122:19

**mark**  107:10

**marked**
105:12,20,
24  107:5,9

**matter**
133:13,17

**meaning**
103:16

**met**  105:4

**miles**  132:2,

Case 2:09-md-02047-EEF-MBN   Document 23301-3   Filed 03/24/22   Page 163 of 237

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
Darla Gibbs- Vol. 2 on 01/26/2021 Index: miscalculation..previously

3
124:4,5

miscalculation
116:23

missed
125:14

model   124:5

moment
105:17

money   120:1

month's
105:13,16

months
122:11

morning
106:12

moved   118:10
129:24

multiple
110:8
133:25

—————————
            N
—————————

needed
112:15
114:18,19
128:7

newer   119:17

notice
114:21

number
131:20

numbers

—————————
            O
—————————

objecting
103:24

objection
103:25

Opelika
132:20

open   128:9
130:11,12

opener
126:11,18,
20 127:6,
19,22
128:5,12

operation
113:5,6

original
112:5
117:22
126:20
128:13

originally
126:24

outdoor
113:3

outlet   121:9
122:7,24

—————————
            P
—————————

p.m.   135:2

paid   127:4

paragraph
129:12

parentheses
108:6

part   114:5
132:1

parties
103:3

parts   108:1

pause   103:25

pay   122:15

payment
121:12
122:3,20,
24 123:2
125:5

payments
107:2
121:15,23
122:14
125:3,4,9,
17 126:5

perfectly
128:1

performed
112:24

personal
109:3
117:3,17
133:5

place   130:16

places

132:19,20

plaintiff
107:12
108:20
109:2
126:2
128:18,20
133:7,25

plan   114:6

play   116:3

point
103:22,24
104:1,3
119:24
123:20
125:24
128:8

pop   120:18

popped   128:9

possession
126:8
133:4

prepare
105:5,9

pretty
103:15

previous
109:9
116:12
128:12

previously
103:16
105:12,16,
19,24

108:14,22
112:2
115:21
123:8
127:5
129:6

price   116:19

problem
114:24
132:8

problems
128:4
131:2,9

produce
125:21,22
127:14

produced
104:20
105:3

profile
107:12
108:21
109:2
126:2
128:18,20
133:7,25

proof   106:15

property
109:3
117:3,17
129:2
133:5

pull   105:14
107:10

pump   111:25

purchase
118:8,22
121:25
122:7,24

purchased
106:23
112:6
119:17
123:3
130:1,2,4

purchases
106:15

put   110:9
118:4
120:19
123:19,21
133:23

putting
120:1
133:11

Q

question
104:2,3
109:24
116:2

questions
134:3,4,5,
8,10,12,
14,15

quickly
104:13

quit   111:21

117:24
118:5,7

R

read   112:12
113:7

realized
126:10

reason
104:14
109:13,14
119:16
120:13,16,
19 133:9

recall
106:16
125:5

receipt
120:25
127:3,9,11

receipts
106:14
107:1
109:15,17,
20,22,25
110:4,13
116:8
121:2
126:1,4,6

receive
133:14

received
106:11
133:19

recess
132:25

recognize
106:3
107:15

record
132:24
133:12,24

records
127:3

refrigerant
112:25

register
123:19

related
110:21
115:16
116:8,9
123:9
126:7
133:5,15

remaining
116:3
125:10

remember
112:4
117:25
118:10,19
119:11,18
124:4
127:1
128:15
130:2
131:20

remotely

103:5

remotes
 126:16
 128:5

repair  108:6
 110:8
 119:3
 133:5

repairs
 111:15
 115:22
 116:9,18

repeat  104:3

replace
 111:19,20
 112:18
 114:18,20
 118:22
 126:11,14,
 17 129:22

replaced
 108:16,22
 111:5,7,
 16,21,22
 112:6
 113:9
 114:16
 118:21
 119:1
 120:3
 127:8,25
 128:14

replacement
 110:8
 114:22

115:5
116:9
117:7,11,
15,16,21
121:25

replacements
 106:19
 115:22

reporter
 103:4
 105:21
 107:6

represent
 107:11
 124:20

requested
 133:22

rescheduled
 133:9

residence
 118:11

respect
 131:17

rest  125:17

result  129:3

rewiring
 128:3

road  132:22

rules  103:16

rung  118:3

————————
       S
————————

Savers
 110:25
 114:12

screen
 105:15,25
 128:24

scroll
 112:14
 114:13

scrolling
 122:18

Sears  118:24
 120:24
 121:9,24
 122:7,24
 123:3

section
 128:22

seeking
 109:4,10,
 19,24
 110:3
 117:17,18
 127:15
 129:17

sense  120:21

separately
 104:10

service
 112:23,24

services
 114:3

setup  103:14

seventh
 107:19

share  105:15

show  107:8
 113:14

showed
 123:16,22
 125:15

showing
 106:15
 107:2
 122:20,23
 125:3,9,17
 128:20

sic  133:3

signature
 107:18,20

signed
 107:22

similar
 103:14

sinuses
 131:10

sir  104:6
 105:10
 106:2,5,
 17,21,24
 107:4,21,
 24 108:4,
 9,18
 109:6,12
 110:11
 111:2,9,

12,14,17
112:1,7,22
113:8
114:8,21
115:3,6,
15,24
117:4,9,
13,19
119:4
121:6
122:2,9,21
123:1,4,11
125:6,23
126:22
128:14,23,
25 129:5,
10,15
134:18

skin  131:3

smell  130:5,
8,13,16

smells  130:5

someone's
124:10

sopping
118:3

sound  104:5

speak  103:17

speaking
132:17

specifically
110:14
111:3
121:7
128:19,21

spoke  104:19

spoken
105:4,8

spots  131:4

spreadsheet
106:7

spring
131:14

started
103:13
131:21
132:6

statement
121:5
122:6,18,
23 123:12

statements
125:3,9,
15,17

states
112:24

stick  132:23

sticks
130:23

sticky
130:20

stipulates
103:4

stop  120:5

stopped
118:16
120:13

strange
130:8

strangest
130:20

submitted
107:13
108:22
134:1

supplemental
107:12
108:20
109:1
126:1
128:18,20
133:6

swear  103:5

switch
126:16

sworn  103:7

system
108:7,13
111:25
113:5,23
116:21

systems
113:24

_____

T

_____

taking
104:23
122:5

talk  128:21

talked  126:3

talking
104:8

tape
123:19,21

ten  132:3

testify
104:14

thermostat
113:5

thing  127:25

things  106:8
109:18
122:10,12
130:23
131:22
134:3

thinking
118:19
131:23

thought
131:25

tightened
112:25

time  103:14
104:18,22
119:10
121:15,20
128:4
133:20
134:3,21

tin  115:5

tin-plated
114:22

titled   108:5
  117:2
  128:22
  129:13

today   103:12
  104:15
  105:5
  109:3
  111:13
  114:9
  116:13
  120:12
  133:2,8
  134:19

told   120:8
  127:18
  130:17
  132:15

top   106:20
  116:5

total   113:16
  115:12,21
  116:1
  123:22
  124:11,23
  125:10,18
  129:3

totaled
  116:1,2,4

totally
  130:9

transcription
  103:18

true   129:25

truthfully

  104:15

turn   112:8

typewritten
  124:15

———————————
           U
———————————

understand
  113:17

understanding
  106:25

undertaken
  107:1

unit   110:7,
  22 111:10,
  13,16
  112:2,5
  113:3
  114:19,25
  115:17,22
  116:8
  117:14
  119:3
  121:16,24
  123:10

units   118:6,
  9,16,22
  119:10,13,
  15 120:4,
  9,13,23
  121:25
  123:3

Use/loss
  129:13

———————————
           V
———————————

verbally
  103:18

verified
  113:5

———————————
           W
———————————

wait   115:6

wall   126:17
  128:6

wanted
  104:12
  108:2
  110:12
  117:20
  119:6,13

washer
  110:20
  117:21,22,
  24 118:2,
  5,8,15,22,
  24 119:2,9
  120:3,11,
  13,17,22
  121:12,15,
  17,24
  123:3,9
  124:3,8,22
  126:5

washer/dryer
  117:7,15

weeks   104:22

wet   118:3

window
  130:12

windows
  130:11

wire-wise
  129:22

wiring   128:2

work   111:13
  114:14
  119:14
  126:15,16

worked   128:1

working
  118:16
  120:5,14
  128:5

writing
  124:13

written
  124:10

wrote   124:12

———————————
           Y
———————————

year   113:23
  114:7
  116:18
  122:15
  126:12,24
  131:14

years   106:9,
  23 109:16
  112:17
  118:14,17
  119:22

129:19,24
130:1,24
131:13,20

———————————

**Z**

———————————

**zoom**  103:15
110:17
112:10,13
121:3

**zooming**
113:16

# EXHIBIT K

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**John Carter on 12/11/2020**

```
            IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
_____
IN RE:  CHINESE-MANUFACTURED     :
DRYWALL, PRODUCTS LIABILITY      :
LITIGATION                       :
EDUARDO AND CARMEN AMORIN,       :
ET AL, INDIVIDUALLY AND ON       :
BEHALF OF OTHERS SIMILARLY       :
SITUATED,                        :
              Plaintiffs,        :
                                 :
VS                               :
                                 :
TAISHAN GYPSUM CO., LTD. F/K/A   :
SHANDONG TAIHE DONGXIN CO.,      :
LTD.; TAIAN TAISHAN PLASTERBOARD :
CO, LTD, ET AL,                  :
              Defendants.        :
NO. 2:11-CV-01395-EEF-JCW
_____
WITNESS:  JOHN CARTER (ZOOM)
PAGES:    1 through 89
PLACE:    Huseby Zoom
          Atlanta, Georgia
DATE:     Friday, December 11, 2020
TIME:     1:30 p.m.
Court Reporter:  CELESTE PERLA, CSR, MERIT
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                Pages 2..5

Page 2
```
1        APPEARANCES OF COUNSEL:
2   On behalf of the Plaintiffs:
3      JAMES DOYLE, ESQUIRE
        Doyle Law Firm, P.C.
4      2100 Southbridge Parkway
        Suite 650
5      Birmingham, Alabama 35202
        jimmy@doylefirm.com
6
    On behalf of Taishan Gypsum:
7
       CHRISTINA EIKHOFF, ESQUIRE
8      AND
       MATTHEW LAWSON, ESQUIRE
9      Alston & Bird
       1201 W. Peachtree Street NW
10     Suite 4200
       Atlanta, Georgia 30309
11     christy.eikhoff@alston.com
12  On behalf of Beijing New Building Materials
    Public Limited Company, Beijing New Building
13  Materials Group Corporation, and China National
    Building Materials Company, Limited:
14
       DANIEL GUERRA, ESQUIRE
15     Orrick, Harrington & Sutcliffe
       The Orrick Building
16     405 Howard Street
       San Francisco , California 94105-2669
17     dguerra@orrick.com
18
19
20
21
22
23
24
25
```

Page 3
```
1            C O N T E N T S
2   WITNESSES:                          PAGE
3   JOHN CARTER
4      Examination by Ms. Eikhoff       5
5      Examination by Mr. Guerra        None
6      Examination by Mr. Doyle         None
7
                   ***
8
9              EXHIBITS
10  EXHIBITS:                    MARKED RECEIVED
11  Deft Ex 1    Building Permit
                 Application         26
12
    Deft Ex 2    United States
13               District Court      27
14  Deft Ex 3    Building Application 31
15  Deft Ex 5    Document            38
16  Deft Ex 6    Photograph          46
17  Deft Ex 7    Photograph          48
18  Deft Ex 8    Photograph          48
19  Deft Ex 9    Plaintiff Profile
                 Form                54
20
    Deft Ex 10   Supplemental Plaintiff
21               Profile Form        71
22  Deft Ex 11   Verification Form   71
23
24
25
```

Page 4
```
1              -----------
2         MS. EIKHOFF:  Will you please
3   swear the witness.
4              -----------
5              JOHN CARTER,
6   Having been first duly sworn, is
7   examined and testifies as follows:
8              -----------
9           DIRECT EXAMINATION
10             -----------
11  BY MS. EIKHOFF:
12  Q.   Hi, Mr. Carter, I am not sure whether to say
13  good morning or good afternoon or good night to
14  you.
15  A.   I am not sure what it is either.
16  Q.   I appreciate you being here with us today
17  via Zoom.
18       Could you please state your full
19  name for the record?
20  A.   John Anderson Carter.
21  Q.   And have you ever been deposed before, Mr.
22  Carter?
23  A.   I don't think so.
24  Q.   Okay.
25  A.   Not that I remember.
```

Page 5
```
1   Q.   Well, you just raised your right hand and
2   sworn to tell the truth.  You understand that
3   you're under oath just like you would be if you
4   were sitting in a witness stand in a court of
5   law?
6   A.   Yes.
7   Q.   And the court reporter here is recording my
8   questions and your answers, and you understand
9   that?
10  A.   Yes.
11  Q.   Okay.  I know we are on Zoom and we are a
12  half a world away.  It would be important to
13  speak audibly and loudly in your responses.  And
14  avoid just head nods, head shakes, or other forms
15  of communication that are nonverbal.
16  A.   I am in a hotel room, so I am trying to be
17  considerate at 3 o'clock in the morning with my
18  neighbor, so if I am not speaking loud enough,
19  please let me know but I am trying to balance
20  that.
21  Q.   I appreciate that.
22       MS. EIKHOFF:  Madam court
23       reporter, please indicate if you can
24       not capture the record.  Thank you.
25  BY MS. EIKHOFF:
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 6..9

Page 6

1   Q.    And now I heard you say that you have given
2   a deposition before.  From time to time, your
3   attorney Mr. Doyle may state objections on the
4   record.  If he does, just wait for him to make
5   his statement and then you can answer the
6   question.
7   A.    Okay.
8   Q.    Do you understand that?
9   A.    Yes.
10  Q.    Okay.  And if you don't understand my
11  question, if it's not clear or if it's confusing,
12  please let me know.  I am not here to try to
13  confuse you or to trick you, and so if you don't
14  understand what I am asking you, please let me
15  know and I will restate the question until ably
16  answer it; is that fair?
17  A.    Yes.
18  Q.    Okay.  Good.
19          Now, I know that you have been
20  flying, I know it's the middle of the night where
21  you are.  Do you feel competent that you are in a
22  condition where you can understand my questions
23  and give truthful answers today, sir?
24  A.    Yes.
25  Q.    And are you under any -- taking any

Page 7

1   medications that you think may inhibit your
2   ability to understand my questions or give
3   truthful answers?
4   A.    No.
5   Q.    Okay.  Did you meet with your lawyer to
6   prepare for today's deposition, either virtually
7   or in person?
8   A.    No.  No.
9   Q.    And have you met with anyone else in
10  preparation for this deposition?
11  A.    No.
12  Q.    Okay.  Have you done anything yourself to
13  prepare for the deposition?
14  A.    Other than -- no, other than look back at
15  some of the property details because it's been so
16  long.  Just little things like the plans in the
17  house and that kind of stuff, that is it.
18  Q.    So you just mentioned that you maybe took a
19  look at the plans for the house, did I hear you
20  right?
21  A.    Yeah.  So I would remember -- trying to
22  remember what the square footages were, when it
23  was built.  It's been so long.
24  Q.    Okay.  Well, besides the house plans, were
25  there any other documents that you reviewed in

Page 8

1   preparation for today's deposition?
2   A.    No.
3   Q.    And, Mr. Carter, where do you live?
4   A.    I live in Auburn, Alabama.  Do you need the
5   full address?
6   Q.    Yeah.  Why don't you give me that address,
7   please, sir.
8   A.    1590 Crescent Boulevard, Auburn, Alabama.
9   Q.    And how long have you lived there, at that
10  address?
11  A.    Since 2004.
12  Q.    Okay.
13  A.    Since 2004.
14  Q.    Okay.  And had you lived in Auburn before
15  2004, just at a different address?
16  A.    Not -- not recently.  I was born there, went
17  to high school there, went to college there and
18  then moved back in 2004 after I retired from the
19  Military or just retiring from the Military.
20  Q.    So prior to moving to Auburn in 2004, you
21  were actively serving in the Military?
22  A.    Yes.
23  Q.    Okay.  And where was the last place you were
24  stationed before going back to Auburn?
25  A.    I was stationed at Maxwell Airforce Base but

Page 9

1   commuted from Auburn for that.  Prior to that, I
2   was in Wichita, Kansas, at McConnell Airforce
3   Base.
4   Q.    What is your current occupation?
5   A.    I am an airline pilot for FedEx.
6   Q.    And how long have you been working for
7   FedEx?
8   A.    For I am in my fifth year.  Four and a half
9   years.
10  Q.    Before you went to FedEx, were you a
11  commercial pilot elsewhere?
12  A.    For just under a year at Express Jet.
13  Q.    Okay.  When did you get your pilot's
14  license?
15  A.    I first started applying for the Airforce in
16  '88.
17  Q.    Okay.  So in the time from retiring from
18  active service in the Military to the time you
19  started working at Express Jet, did you have any
20  other occupations in that period of time?
21  A.    I owned a residential construction company
22  and a flooring company when I transitioned from
23  the military.
24  Q.    Okay.  And what was the name of that company
25  or those companies?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 10..13

Page 10

1  A.    Patriot Homes and Auburn Flooring & Stone.
2  Q.    So I just want to make sure that I have got
3  the sequence right, because I know we have been
4  jumping around a little bit, but you retired from
5  active Military service in 2004?
6  A.    2007 is when I actually retired.
7  Q.    Oh, I am sorry.  I see.  You moved to Auburn
8  in 2004, but you retired in 2007 and you stopped
9  commuting?
10  A.    Yeah.
11  Q.    Got it.  Okay.  And then from the active
12  Military service, then you were working as owner
13  of the Patriot Homes and Auburn Flooring & Stone
14  companies; is that right?
15  A.    That is correct.
16  Q.    And then from there you started working at
17  Express Jet around six years ago maybe, six or
18  seven years ago?
19  A.    Yes.
20  Q.    Okay.  And then started working for FedEx;
21  is that right?
22  A.    Yes.  That is correct.
23  Q.    Okay.  Did you go to college?
24  A.    Yes.
25  Q.    Where did you go?

Page 11

1  A.    Went to Auburn for my undergraduate.  Embry
2  Riddle for my Master's Degree in Auburn for my
3  Ph.D.
4  Q.    What degree were your Master's and Ph.Ds in?
5  What field of study?
6  A.    Undergrad and Master's Degrees are both
7  aviation management.  And my Ph.D. work is in
8  adult education.
9  Q.    Okay.  Now, I know you said you have not
10  been deposed before.  Have you ever been involved
11  in a lawsuit before as a plaintiff other than
12  this one?
13  A.    No.
14  Q.    You haven't sued anyone except for the
15  current case we are in?
16  A.    Correct.
17  Q.    Okay.  And have you ever been involved in a
18  lawsuit as a defendant?  Have you been sued
19  before?
20  A.    Yes.
21  Q.    Okay.
22  A.    As Patriot Homes.  I was building houses and
23  that is actually how I found out that there was,
24  potential --
25          MS. EIKHOFF:  And, madam court

Page 12

1  reporter, could you please read the
2  last question back for the witness?
3          (Whereupon, the last question
4  was read back.)
5          THE WITNESS:  That is how I
6  found out that there was potential for
7  Chinese Drywall in the house that I had
8  built for my mother which is this
9  house.
10  BY MS. EIKHOFF:
11  Q.    Okay.  So I am sorry, sir.  I didn't mean to
12  cut you off.  I thought you were done.
13  A.    That is really it.  That is how I found out.
14  Q.    So if I am understanding you right, you're
15  saying that the entity Patriot Homes that you
16  owned was sued related to Chinese Drywall?
17  A.    Yes.
18  Q.    Okay.  And had you or any of your companies
19  ever been sued for anything else before that
20  time?
21  A.    No.
22  Q.    Okay.  And since being a defendant in the
23  Chinese Drywall lawsuits, have you been sued in
24  any other cases, you or your companies?
25  A.    No.

Page 13

1  Q.    Okay.  Let's -- I have some questions for
2  you about Patriot Homes.
3          You mentioned that you own that
4  company, are you the sole member of that company
5  or are there other others?
6  A.    Sole owner.
7  Q.    Okay.  So single member LLC; is that
8  correct?
9  A.    Yes.
10  Q.    And do you remember when you formed Patriot
11  Homes as a company?
12  A.    I think it was around 2005.
13  Q.    Okay.  Is it still in existence?
14  A.    No.
15  Q.    When was it -- was it dissolved?
16  A.    When the housing market began to go down and
17  when the lawsuit came for the Chinese Drywall
18  against me, I decided I did not want to play
19  anymore.
20  Q.    About what year was that, that you were on
21  the receiving end of the lawsuit?
22  A.    I believe it was end of 2010, beginning of
23  2011 I think.
24  Q.    Okay.  And what was the business purpose of
25  Patriot Homes?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                  Pages 14..17

Page 14

1  A.    Residential construction company.
2  Q.    Were you a general contractor for
3  residential construction?
4  A.    Yes.
5  Q.    And could you estimate in the five to six
6  years that Patriot Homes was an active company,
7  how many residential homes you developed through
8  the company?
9  A.    I think it was only around 14.
10 Q.    And then you also mentioned that you had
11 another company, Auburn Flooring & Stone; is that
12 correct, sir?
13 A.    Yes.
14 Q.    Were you also the sole member of that
15 company?
16 A.    It started out as a partnership and I ended
17 up taking full control of it.  So by the time --
18 by the time it was all done, I was sole
19 ownership.
20 Q.    Were its dates of creation and disillusion
21 approximately the same as Patriot Homes?
22 A.    It started a little bit before Patriot Homes
23 did.  Maybe a year, maybe, but closed a little
24 after Patriot Homes.
25 Q.    So maybe sometime around 2011?

Page 15

1  A.    I totally would be guessing, but I think so.
2  Q.    Okay.  And after you closed up shop on the
3  residential construction and the flooring, was
4  when you pursued commercial flying as your prime
5  occupation; is that right?
6  A.    No.  I went back to school to work on the
7  Ph.D.  The plan was to teach at Auburn and the
8  opportunity came back to go back into flying and
9  I chose that path.
10 Q.    I see.  So you were a full-time student for
11 some period of time?
12 A.    Yes.
13 Q.    Okay.  Now, when Patriot Homes was named as
14 a defendant in Chinese Drywall litigation, who
15 represented Patriot Homes in that case?
16 A.    The lawyer provided to me through my
17 insurance, Alabama Home Builders Association.
18 Q.    Okay.  And what was the name of the carrier,
19 the insurance carrier?
20 A.    It was Alabama Home Realtor's Association,
21 but beyond that, I honestly don't remember.
22 Q.    Okay.  And they provided a lawyer for you
23 for defense?
24 A.    Yes.
25 Q.    Okay.  Did Patriot Homes ever need to pay

Page 16

1  out-of-pocket to resolve any of those claims or
2  pay damages in any of those claims?
3  A.    No.
4  Q.    So it was -- the defense and the settlement
5  to some extent -- I am sorry.  It looks like you
6  wanted to add something.
7  A.    Actually, they did settle.  I believe the
8  settlement was for $10,000.00.  It was a part of
9  -- and a part of that was the agreement that I
10 was not found negligent or at fault for anything.
11 Q.    Okay.  And so no part of that settlement
12 payment or the defense cost came out of the
13 pocket of the company; is that correct?
14 A.    That is correct.
15 Q.    Okay.  Now, it's my understanding that we
16 are here to talk today about your claim related
17 to the property at 703 Waverly Place in Opelika,
18 Alabama; is that correct, sir?
19 A.    That is correct.
20 Q.    Do you currently own that property?
21 A.    I do.
22 Q.    And are you the only owner of that property?
23 A.    I believe my wife is also on the title for
24 the house.
25 Q.    And what is her name?

Page 17

1  A.    Jill, J-I-L-L.
2  Q.    And you and Jill are still married?
3  A.    Yes.
4  Q.    Okay.  Has the property, and unless I say
5  otherwise, when I am talking about the property
6  or the home, I am going to be referring to 703
7  Waverly Place.  There may be some other questions
8  about some other properties, but, if so, I will
9  make it clear I am talking about something else.
10 All right?
11 A.    Okay.
12 Q.    Okay.  Has the property ever been held in
13 anyone else's name besides you and your wife
14 Jill?
15 A.    It may have been under Patriot Homes for a
16 short period until we bought it from our company,
17 so...  I am not really -- hadn't been with anyone
18 else but me.
19 Q.    Okay.
20 A.    Since the completion of the construction.
21 Q.    I am sorry.  I spoke over you.
22         MS. EIKHOFF:  Did you get
23         that, madam court reporter?
24         COURT REPORTER:  Yes.
25 BY MS. EIKHOFF:

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                Pages 18..21

**Page 18**

1  Q.   Do you recall who you bought the property
2  from?
3  A.   R -- think it's R&S Properties, it's Rusty
4  and Sallie Deen.  That is who I bought the lot
5  from.
6  Q.   What was the last name of Rusty and Sallie?
7  A.   Deen, D-E-E-N.
8  Q.   Okay.  And at the time you bought the
9  property, was it developed or undeveloped?
10  A.   It was a new development, so nothing had
11  been built on it yet but the lots had been
12  developed by the time I bought it.
13  Q.   By the time you bought it, were there
14  structures on the property?
15  A.   Not on the lot that I bought, no.
16  Q.   Okay.  Do you recall what you paid for the
17  property?
18  A.   I don't.  I don't.  Now, when you say what I
19  paid, do you mean me or Patriot Homes, because
20  that does -- I realize that does make a
21  difference.
22  Q.   Well, are you not sure whether you bought it
23  or Patriot Homes bought it?
24  A.   Patriot Homes bought it for the construction
25  loan and it was in the ownership of Patriot Homes

**Page 19**

1  until construction was complete, and it was after
2  construction was complete that the company sold
3  it to me.
4  Q.   Okay.  So do you recall how much Patriot
5  Homes purchased the lot for?
6  A.   I don't.  I don't.
7  Q.   And do you know how Patriot Homes financed
8  that purchase?
9  A.   Through a construction loan at a local bank.
10  Q.   And then at some point you said you and your
11  wife bought it from Patriot Homes; is that right?
12  A.   Yes.
13  Q.   And did you finance that purchase or did you
14  pay for it in cash?
15  A.   Financed it.
16  Q.   Okay.  Was that with a mortgage?
17  A.   Yes.
18  Q.   And who was that mortgage through?
19  A.   I don't -- I don't remember.  We are still
20  paying it, so I could get that for you easily.
21  Q.   Okay.  That was actually going to be another
22  one of my questions, is whether you were still
23  paying it.  Do you know how much is left on the
24  mortgage, the balance?
25  A.   I am guessing around 80 -- around 80,000

**Page 20**

1  probably.
2  Q.   Okay.  Who is the lender for that mortgage?
3  A.   I don't remember.
4  Q.   Okay.  Did you ever live in the property?
5  A.   No.  I built the house and bought the house
6  specifically for my mother.
7  Q.   Okay.  What is your mother's name?
8  A.   Ann Carter.
9  Q.   Is your mother still alive?
10  A.   No.
11  Q.   When did she pass away?
12  A.   In April of this year.
13  Q.   I am sorry to hear that and that is
14  especially a hard time of this year for someone
15  to have lost someone, so my condolences.
16  A.   Thank you.
17  Q.   And so upon completion of the construction
18  of the property and a certificate of occupancy,
19  your mother, Ann Carter, was she the sole
20  occupant of it?
21  A.   Yes.
22  Q.   So no one else lived with her at any time?
23  A.   No.
24  Q.   And at some point did she vacate the
25  property?

**Page 21**

1  A.   Yes.  When we had found out the possibility
2  of the drywall being an issue, she had been
3  having health issues.  And when we had found out
4  what the symptoms associated with that drywall
5  and that's what basically led us to get her out
6  of the house as soon as possible, so we moved her
7  out as soon as we found out that that is what the
8  problem was.  That there was an issue with the
9  drywall and it had been affecting her health.
10  Q.   When did she leave the property?
11  A.   Almost immediately after we found out.  So
12  it would have been 2011 I believe.
13  Q.   Okay.  All right.  I am going to go ahead
14  and show you a couple of papers related to the
15  property purchase.  And they are going to be --
16  it's going to be put on the screen in just a
17  moment here.
18       The first one -- I will wait until
19  we see it.  Can you see that, Mr. Carter?
20  A.   Yes.
21  Q.   I will represent to you that this is a
22  warranty deed from Lee County for the property.
23  A.   Okay.
24  Q.   Do you recall seeing this document before?
25  A.   I remember doing warranty deeds for

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                      Pages 22..25

Page 22

1  properties, but that was one of the steps in the
2  process for building a house.
3  Q.    Okay.
4              MS. EIKHOFF:  Matt, could you
5         scroll down to the very bottom so we
6         can see the date and zoom in?
7  BY MS. EIKHOFF:
8  Q.    So just above the signatures of Marvin Deen
9  and Sallie Deen, do you see the date December
10 22nd, 2006?
11 A.    Yes.
12 Q.    And do you know if that date would be the
13 date that the property was purchased or -- and by
14 that I mean the lot, the land unimproved, or
15 would that be the date that it was purchased by
16 you after construction?
17 A.    That would be before construction.
18 Q.    Okay.
19             MS. EIKHOFF:  And can you
20        scroll back up, Matt?
21 BY MS. EIKHOFF:
22 Q.    This warranty deed, if you look at the first
23 paragraph there, appears to show that the
24 transaction was from R&S Properties to John A.
25 Carter and Jill M. Carter.

Page 23

1  A.    Okay.
2  Q.    Does that seem accurate to you in light of
3  your prior testimony, that you, Patriot Homes
4  purchased the lot?
5  A.    I think so.  I am really not sure, to be
6  honest with you, why it would be different.  But
7  it's still showing as Lot 18 Waverly Park
8  Subdivision is the description of it and the
9  construction was complete.  Normally that would
10 show as the actual physical address, the 703
11 Waverly Place.  So I believe that that indicates
12 that that was sold to us prior to -- I guess the
13 lot, prior to construction.
14 Q.    Is it possible that you and your wife bought
15 this lot and not Patriot Homes, LLC, before the
16 construction commenced?
17 A.    No.
18 Q.    Okay.  So your clear recollection is that
19 Patriot Homes purchased the lot before
20 construction?
21 A.    Yes.
22 Q.    Okay.
23             MS. EIKHOFF:  And, Matt, could
24        you scroll down to the very bottom
25        again and zoom in?  And actually, Matt,

Page 24

1  if you could zoom into the notary seal.
2  BY MS. EIKHOFF:
3  Q.    Mr. Carter, I just want to -- I noticed
4  something on this document that I wanted to ask
5  you about.  It says December 22nd, 2006 above the
6  signatures, but if you can see the notary's
7  notarization date is 2005, December 22nd.  Do you
8  -- do you believe that the right date is 2005 or
9  2006?
10 A.    I do not know.  I can't -- I don't remember
11 it's been so far back.
12 Q.    Okay.
13 A.    There does appear to be inconsistencies in
14 the dates.
15 Q.    Now, are Marvin and Sallie Deen the
16 proprietors of R&S Properties as you recall?
17 A.    I believe so, yes.
18 Q.    Is maybe Marvin a/k/a Rusty?
19 A.    Yes.
20 Q.    Okay.  Did you have any relationship with
21 Mr. and Mrs. Deen before you purchased this lot?
22 A.    We were -- we had been acquainted for many
23 years before, but no ongoing relationship.  Just
24 small town, I knew who they were and they knew
25 who I was.

Page 25

1  Q.    Okay.  So you, Patriot Homes or your
2  flooring company had not been in any prior
3  business arrangements with their company?
4  A.    No.  Other than buying lots in that
5  neighborhood from them.
6  Q.    How many lots did you buy in the
7  neighborhood from them?
8  A.    I believe it was six.
9  Q.    And did you buy those six lots at
10 approximately the same time?
11 A.    They were staggered.  We bought three at a
12 time if I remember right.
13 Q.    And when you say staggered, about how far
14 apart were those projects, the first set of three
15 and the second set of three, time wise?
16 A.    I don't remember.  I think maybe four or
17 five months, but I am really not sure.
18 Q.    Was this property part of the first set of
19 three or the second set of three?
20 A.    I don't -- I don't recall which ones were
21 first.
22 Q.    Okay.  So you don't recall whether the home
23 that you were building for your mom was part of
24 the first group or the second group?
25 A.    I don't.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 26..29

Page 26

1   Q.    Okay.  And do you know about how many homes
2   were in this subdivision in total?
3   A.    It was a small subdivision on a single
4   street.  So relative to others, it wasn't very
5   big but I don't know exactly how many there were.
6   Q.    There were other homes in the subdivision
7   besides the six that you developed?
8   A.    Yes.  Yes.
9   Q.    And do you know if the other lots were
10  developed by multiple other builders or one other
11  builder?
12  A.    I don't know.
13  Q.    Okay.  I am going to -- we are going to put
14  up another document.
15        MS. EIKHOFF:  And, madam court
16        reporter, can we please mark that as
17        Exhibit 1?
18        ----------
19        (Whereupon, Deft Ex 1,
20        Building Permit Application, was marked
21        for the record at this time.)
22        ----------
23        MS. EIKHOFF:  And then next to
24        that and what we are about to show will
25        be Exhibit 2.

Page 27

1         ----------
2         (Whereupon, Deft Ex 2, United
3         States District Court, was marked for
4         the record at this time.)
5         ----------
6         MS. EIKHOFF:  Matt, could you
7         scroll down so the witness can have an
8         opportunity to observe the document?
9         Okay.  Maybe slow down.  You are flying
10        through.
11  BY MS. EIKHOFF:
12  Q.    This is the first page, that is the second
13  page, and that is the third page.  Do you
14  recognize that document, Mr. Carter?
15  A.    Which one?
16  Q.    It's a three page document.  Okay.  Tell me
17  what you recognize and what you think is
18  different.
19  A.    Looks like a building permit application,
20  the first one.
21  Q.    Do you recognize that document?
22  A.    Yeah.  That is the site plan review.  I
23  am not sure who the review -- I guess
24  that is the City of Opelika as well.  Yeah.  And
25  then that is the site plan.

Page 28

1   Q.    Okay.  Let's to go the first page, the
2   building permit application.
3   A.    Okay.
4   Q.    Did you fill out this document, sir?
5   A.    It does not look like my writing.  No.
6   Q.    Do you see at the bottom and we can zoom in
7   on it, that it identifies the owner and
8   contractor as Patriot Homes, LLC.  Do you see
9   that?
10  A.    Yes.  Yep.
11  Q.    And there is the address of 703 Waverly
12  Place is provided and then there is also a
13  separate address of 480 North Dean Road, Auburn
14  provided.  Is the 480 North Dean Road the
15  business address for Patriot Homes at the time?
16  A.    Yes, and for Auburn Floor.
17  Q.    Do you know who would have completed this
18  building permit application?
19  A.    Probably my wife.
20  Q.    Okay.  Do you recognize that handwriting as
21  your wife's handwriting?
22  A.    It does look like hers.  Yes.
23  Q.    Okay.  I think you have indicated that this
24  one page group is a separate document from the
25  second page which is the site plan review; is

Page 29

1   that right, sir?
2   A.    I think so.  They are different functions.
3   One is -- the survey document may have been part
4   of what was submitted to the City of Opelika for
5   overall approval.
6   Q.    Let's look at the bottom of the second page
7   of the site plan review.
8   A.    Okay.
9   Q.    Are either of those your signatures?
10  A.    No.  The bottom is my wife's.
11  Q.    Okay.  And that appears to be dated December
12  19th, 2006; is that right?
13  A.    It appears so.
14  Q.    Okay.  At what stage of the construction
15  process would this site plan review be completed?
16  A.    Prior to construction because you have to
17  have those permits before you can begin.
18  Q.    Okay.  And this date is December 19th, 2006.
19  The warranty deed that we looked at previously as
20  Exhibit 1 showed the transfer of the property on
21  December 22, 2006 or 2005, but the date of the
22  transfer suggested 2006.
23        So does it seem accurate that this
24  site plan review would be submitted around the
25  same time that the unimproved lot was being

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020
Pages 30..33

Page 30

1    transferred?
2    A.    Yes.
3    Q.    Okay.  On the first page of this exhibit,
4    the building permit application, there is an
5    itemization of costs, not an itemization, just an
6    identification of total costs.
7    A.    Okay.
8    Q.    We will zoom in on it.  It's right in the
9    middle of the page.  I know it's hard to read.
10   Can you read that number, Mr. Carter?
11   A.    I think it's -- I think it's $111,339.00.
12   Q.    And what does that figure represent on this
13   document?
14   A.    I believe that is the cost of the
15   construction on the property.
16   Q.    And at this point it would be the
17   anticipated construction cost because the
18   construction hadn't started; is that right?
19   A.    Yes.
20   Q.    Can you recall what the actual cost of the
21   project ended up being?
22   A.    No, I do not.
23   Q.    Do you have any idea whether it was more
24   than this $111,000.00 estimate or less?
25              MR. DOYLE:  Object to the form

Page 31

1              of the question.  You can answer.
2              MS. EIKHOFF:  I will rephrase
3              that.  It was a very poorly worded
4              question.
5    BY MS. EIKHOFF:
6    Q.    Do you know whether the actual cost ended up
7    being more than $111,000.00 or less than 111,000?
8    A.    I don't remember.
9    Q.    Okay.  We are going to put another document
10   that we will have marked as Exhibit 3.
11              ----------
12              (Whereupon, Deft Ex 3,
13              Building Application, was marked for
14              the record at this time.)
15              ----------
16              MS. EIKHOFF:  Matt, I am
17              looking for the building application.
18              Okay.  Matt, if you can slowly scroll
19              through that document to give our
20              witness an opportunity to see what it
21              looks like.
22   BY MS. EIKHOFF:
23   Q.    Mr. Carter, do you recognize that document?
24   A.    Yes.
25   Q.    What is it?

Page 32

1    A.    This is the same document that we looked at
2    before as far as it being a building permit
3    application.
4    Q.    Okay.  And it appears that at the top of the
5    page it says it's for 701 Waverly Place; is that
6    right?
7    A.    That is correct.
8    Q.    That is a different property than 703 that
9    we have been talking about today; is that right?
10   A.    That is right.
11   Q.    Okay.  And so what was -- what was the plan
12   for 701 Waverly Place?
13   A.    I don't remember.  They were two bedroom
14   houses and three bedrooms houses and I at the
15   time it was based on the price of that one, I am
16   guessing that that is the three bedroom.  I am
17   totally guessing.
18   Q.    Yeah.  And I realize that my question was
19   ambiguous and I think I led you astray because I
20   was actually not as interested in the house plan
21   as much as the business plan with respect to
22   Patriot Homes.  What was the intention of Patriot
23   Homes for this particular property?
24   A.    It was a spec house.
25   Q.    And a spec house would be a home that you

Page 33

1    would develop and then attempt to sell?
2    A.    Yes.
3    Q.    Okay.  At the time this building permit
4    application was submitted, there was no buyer; is
5    that correct?
6    A.    Correct.
7              MS. EIKHOFF:  And if you zoom
8              in to the date and signatures at the
9              bottom, please.
10   BY MS. EIKHOFF:
11   Q.    Are any of those your signatures?
12   A.    No.  Top one is my wife's.
13   Q.    Okay.  And that is also dated December 19th,
14   2006; is that correct?
15   A.    Yes.
16   Q.    And I believe you testified earlier that
17   there were three homes that -- or three lots that
18   you bought at the same time to develop.  The one
19   we have looked at is the 703, we have also just
20   looked at 701.  Do you recall what the third one
21   was that you were developing in this timeframe?
22   A.    The three were not right next to each other.
23   I don't remember what the house number was, but I
24   think it was 701, 3 and 5.  The Harrises were on
25   one side and the Gibbs were on the other side of

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 34..37

Page 34

1  my mother's house.
2  Q.    So the Gibbs you are referring to were the
3  purchasers of 701 Waverly Place; is that right?
4  A.    I don't remember which was which.
5  Q.    Okay.  They were purchasers of one of the
6  three properties, not the one that your mother
7  was going to live in?
8  A.    Right.
9  Q.    And then the other purchasers were the
10 Harrises?
11 A.    Yes.
12 Q.    Do you remember the names of the Harrises?
13 A.    Reggie, Reginald.
14 Q.    Reginald Harris?
15 A.    Yes.
16 Q.    Okay.  And were those three homes in fact
17 built at the same time on the same general
18 construction schedule?
19 A.    Roughly.  They -- they were staggered a
20 little bit, but I think they were about the same
21 time.  Yes.
22 Q.    Okay.  And were those other properties
23 purchased by Patriot Homes under the construction
24 loan?
25 A.    Each had its own construction loan.  Yes.

Page 35

1  Q.    Okay.  And then ultimately sold to the
2  purchasers that became the homeowners?
3  A.    Yes.
4          MS. EIKHOFF:  Matt, why don't
5          we pull up the warranty deed you had on
6          the screen a moment ago.
7  BY MS. EIKHOFF:
8  Q.    We will try to scroll through this to give
9  you a chance to see it.  I know it's jumping
10 around.
11 A.    Can't read that quick.
12 Q.    I think it's technically hard to scroll.
13 I will represent to you, Mr.
14 Carter, that this is a warranty deed on file for
15 701 Waverly Place.
16 A.    Okay.
17 Q.    Lee County.
18          MS. EIKHOFF:  And if we go
19          back to the first page -- if we could
20          go back to the first page.  There we
21          go.  And zoom into the top half of the
22          document.  There we go.
23 BY MS. EIKHOFF:
24 Q.    If you look in the upper right hand corner,
25 can you tell what date is on that time stamp?

Page 36

1  A.    Looks like June 1st, 2007.
2  Q.    Okay.  And we just looked at the building
3  permit application for this property which was in
4  late December 2006?
5  A.    Okay.
6  Q.    Does that sound right to you, that the spec
7  home, that the land was purchased in late
8  December and that the Gibbs purchased the
9  property in mid 2007, about six months later?
10 A.    That sounds about right.
11 Q.    Okay.  And do you know what state of
12 construction the Gibb's property was in at the
13 time of their purchase?  Was it ready for
14 occupancy, was it still being built?  Do you
15 recall?
16 A.    I think it was in the latter stages, but I
17 don't remember exactly.
18 Q.    Okay.  Do you know if the drywall in their
19 home had already been installed at the time they
20 bought it?
21 A.    I don't know.
22 Q.    Okay.  Now, let's --
23          MS. EIKHOFF:  Matt, hold up
24          the declaration of the square footage
25          document.

Page 37

1  BY MS. EIKHOFF:
2  Q.    Mr. Carter, we want to make sure that the
3  record in this case on the square footage is
4  correct, and so I am going to show you one of the
5  documents that has been produced in your case
6  that relates to square footage.
7          MS. EIKHOFF:  If you can
8          scroll down just a little more to show
9          the names and the signature.  There we
10         go.
11 BY MS. EIKHOFF:
12 Q.    Mr. Carter, have you ever seen this document
13 before?
14 A.    Not that I recall.
15 Q.    I will represent to you it's a declaration
16 that your attorney Mr. Doyle submitted in this
17 case, attesting that the square footage of the
18 property at 703 Waverly Place is 1,183 square
19 foot.  Do you have any reason to dispute that
20 number?
21 A.    No.
22 Q.    Okay.  And since the home was -- since the
23 initial construction and the home was completed,
24 have there been any expansions of the home or
25 other renovations that would have changed the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                          Pages 38..41

Page 38

1  square footage?
2  A.    No.
3  Q.    Okay.  We have been going for about 45
4  minutes.  Do you want to take a break before we
5  switch topics or do you want to keep going?
6  A.    I am good.  Let's keep going.
7  Q.    Okay.  So we can take --
8              MS. EIKHOFF:  We will mark
9         that as Exhibit 5.  Okay.
10              ----------
11         (Whereupon, Deft Ex 5,
12         Document, was marked for the record at
13         this time.)
14              ----------
15  BY MS. EIKHOFF:
16  Q.    All right.  I know that we were jumping back
17  and forth between 703 Waverly Place and 701
18  Waverly Place and the Gibb's place and the
19  Harris' Place.  I just want to ask you now about
20  your property at 703.
21  A.    Okay.
22  Q.    Okay?  Who installed the drywall at the
23  property?
24  A.    It was -- I don't know the name of the
25  company.  It would have been a drywall

Page 39

1  subcontractor and not necessarily the same one
2  for the different houses that I built.
3  Q.    Okay.  So a drywall subcontractor, but you
4  don't remember the name?
5  A.    Right.
6  Q.    Okay.  And did that subcontractor procure
7  the drywall or had you procured the drywall
8  separately for them to install?
9  A.    I procured it.
10  Q.    Okay.
11  A.    Drywall was in shortage at the time.
12  Q.    When you say I procured it, you through your
13  company Patriot Homes?
14  A.    Yeah, Patriot Homes did.
15  Q.    And where did it come from?
16  A.    Because there were three houses that were
17  being built roughly at that time, it may have
18  been more, I don't remember, there were multiple
19  sources from locally, like BMW or maybe Home
20  Depot or somewhere, probably not there.  There
21  were multiple -- multiple sources.  It wasn't
22  just one.
23  Q.    I see.  So do you not recall where you
24  bought the drywall that went into the property?
25  A.    There wasn't one specific place.  It was

Page 40

1  probably a mix of the BMW.  I think we bought
2  some from RL Stockett and I don't -- I don't
3  remember if we had to go outside our normal
4  because of the drywall shortage.  I don't
5  remember if we had to go outside of our normal
6  suppliers or not, but BMW was our normal
7  supplier, but I know they had more shortages, so
8  we had some from them, some from others in order
9  to cover multiple houses that were being done and
10  they were probably mixed between those houses.
11  Q.    Okay.  And so you referred to BMW.  Is that
12  a building supply company?
13  A.    Yes.
14  Q.    And where is that in Alabama or elsewhere?
15  A.    In Auburn.
16  Q.    Okay.
17  A.    Auburn and Blanca.  Those two cities run
18  together, so they are almost one city.
19  Q.    Right.  So BMW was the typical place for
20  Patriot Homes to source its drywall prior to the
21  time of the construction of these particular
22  property -- of this particular property; is that
23  right?
24  A.    I believe so.  That would -- prices would
25  change, so I would shop different places to see

Page 41

1  where I can get the best prices from.
2  Q.    Okay.
3  A.    Typically it would BMW that had the best
4  price.
5  Q.    Okay.  And so you have mentioned a couple of
6  times that there was a drywall shortage at that
7  time.  That is something that you recall?
8  A.    Yes.
9  Q.    And so what do you recall about your efforts
10  to procure drywall for this property and the
11  other two properties that you were -- that were
12  all at the same time?
13  A.    Just the costs were going up because of
14  Katrina.  And if I remember right, most of the
15  drywall was available in the southeast to go down
16  to build the Gulf Coast after the hurricane.
17  Q.    And so do you recall ultimately how you were
18  able to procure enough drywall to meet the needs
19  of the construction projects?
20  A.    By going to the different suppliers that I
21  mentioned before.
22  Q.    Okay.  So it would have been some
23  combination of BMW, maybe Home Depot, and maybe
24  RL Stockett?
25  A.    Yes.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                          Pages 42..45

Page 42

1   Q.    Home Depot, I think everyone is familiar
2   with.  RL Stockett, what is that -- where was
3   that business and what does it do?
4   A.    They are building suppliers is all I really
5   know.  They had some when I was trying to get
6   some, so bought from them.
7   Q.    Do they have a location in Auburn, Opelika?
8   A.    No.
9   Q.    So would they ship materials if you ordered
10  from them?
11  A.    They brought it.  They delivered it.
12  Q.    Okay.
13  A.    And my understanding was that throughout the
14  south they were trying, you know, to take
15  advantage of that shortage and do some business.
16  Q.    I see.  I see.  So when you purchased the
17  drywall for your property and the other two that
18  were being developed in the shortage, did you
19  know that the drywall that you were able to get,
20  at least some of it was from China?
21  A.    No.
22  Q.    Did you ever have any conversations with any
23  of these suppliers about them needing to source
24  drywall from China because of the shortage?
25  A.    No.

Page 43

1   Q.    Okay.  So your testimony is that when you
2   purchased the drywall for these properties, you
3   did not know it was Made In China; is that
4   correct?
5   A.    That is correct.
6   Q.    Do you recall how much you paid for the
7   drywall?
8   A.    No idea.
9   Q.    Okay.
10  A.    I rarely remember where I got it from.  It's
11  been so long ago.
12  Q.    Right.  And to the extent that you bought
13  drywall and other construction materials, would
14  those have been financed through the construction
15  loan for that property?
16  A.    Yes.
17  Q.    Okay.  You mentioned that you in preparation
18  for the deposition, went back and looked at some
19  of the building plan materials.  Did the
20  materials that you reviewed include records of
21  supply purchases?
22  A.    I wasn't looking for that.  They may be
23  there, but I don't remember if they are or not.
24  Q.    Do you recall seeing --
25  A.    And the reason we had those plans because it

Page 44

1   was my mother's house, so I kept those because we
2   were more aware of them I guess.
3   Q.    And when you say plans, you're talking about
4   actual drawings?
5   A.    Yes.
6   Q.    But did Patriot Homes keep records of the
7   materials that it purchased?
8   A.    Sure.
9   Q.    And do those records still exist?
10  A.    I think so, but 14 years later I don't know
11  what is there to be honest.  I don't know how
12  extensive they are of what we kept.
13  Q.    Where would you look if you were looking for
14  records from this time period for Patriot Homes?
15  A.    They are stored at my house and/or on
16  computers from when the records were kept and the
17  accounting was done on the computer.
18  Q.    Have you ever looked for those supply
19  records for --
20  A.    No reason, no.
21  Q.    Do you recall that when Patriot Homes was
22  sued and for Chinese Drywall and you were
23  represented by counsel through the insurance
24  company, do you recall ever going back through
25  the company records to see if there were records

Page 45

1   about the purchase of the Chinese Drywall?
2   A.    We pretty much had to give records of
3   everything about the house when it was built.
4   Did an all encompassing suit basically saying we
5   had done everything right.  We produced
6   everything for them.
7   Q.    Okay.  And I don't believe you mentioned the
8   name of the lawyer who represented the company?
9   A.    Because I don't remember who it was.
10  Q.    You don't remember the firm name?
11  A.    I don't.  Only thing I remember was that it
12  was provided through the Alabama Home Builders
13  Association as a part of my insurance fees.
14  Q.    And at some point you made copies of the
15  purchase records for the properties and provided
16  them to your counsel?
17  A.    Probably, yes.
18  Q.    Have you ever provided those same records to
19  your current counsel, Mr. Doyle?
20  A.    I don't think so, but... I don't know.
21  Q.    You don't know if they exist or not as we
22  sit here today?
23  A.    That is correct.  I am sure there is some
24  level of records, but I don't know the depth and
25  scope of what records are still around.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                      Pages 46..49

Page 46

1    Q.    And if you were to look for those records,
2    would you look at your home or is there some
3    other location off site where they might be
4    stored?
5    A.    No.  It would only be in my home.
6    Q.    Okay.  As the owner of the property that was
7    the contractor on this construction project, how
8    often were you personally on site for the build?
9    A.    I've done multiple houses that we were
10   doing, so daily probably.
11   Q.    Okay.  And as the contractor, were you
12   monitoring the progress of the construction and
13   making sure that the subcontractors were
14   fulfilling their obligations?
15   A.    Yes.
16   Q.    Did you witness the installation of the
17   drywall in the property?
18   A.    I probably did, but there was nothing that
19   stood out that would make me remember it over any
20   others.
21   Q.    Okay.  Let's mark as an exhibit the first
22   drywall photo that we have.
23            MS. EIKHOFF:  And I think this
24        should be Exhibit 6.
25            ----------

Page 47

1            (Whereupon, Deft Ex 6,
2        Photograph, was marked for the record
3        at this time.)
4            ----------
5    BY MS. EIKHOFF:
6    Q.    Mr. Carter, do you recognize that
7    photograph?
8    A.    Not specifically, no.
9    Q.    Do you know who took that photograph?
10   A.    If I took it, I don't remember.
11   Q.    Do you recognize the handwriting on the Post
12   It note?
13   A.    I don't.
14   Q.    I will represent to you that you have
15   submitted this photograph as proof of the product
16   ID of the drywall in your property.  Do you have
17   any reason to dispute that this is a photograph
18   of drywall that was taken in the property that
19   you own?
20   A.    No.
21   Q.    Do you know -- I know that there is a beam
22   that is blocking the letters after C-H.  Do you
23   know what the drywall says on it?
24   A.    I would bet that says Made In China.
25            MS. EIKHOFF:  Matt, why don't

Page 48

1    we go ahead and also show -- mark as a
2    new Exhibit 7, the next photograph that
3    we have for this property.
4            ----------
5            (Whereupon, Deft Ex 7,
6        Photograph, was marked for the record
7        at this time.)
8            ----------
9    BY MS. EIKHOFF:
10   Q.    Have you seen this document before, Mr.
11   Carter?
12   A.    No, not that I remember.
13   Q.    Do you have any reason to doubt that it is a
14   photograph of drywall at your property?
15   A.    I have no reason to doubt it.
16   Q.    Okay.
17            MS. EIKHOFF:  And then we will
18        mark as Exhibit 8 the third drywall
19        photo.
20            ----------
21            (Whereupon, Deft Ex 8,
22        Photograph, was marked for the record
23        at this time.)
24            ----------
25   BY MS. EIKHOFF:

Page 49

1    Q.    Do you recall seeing when the drywall
2    arrived on site and was being installed on the
3    property?  Do you recall seeing markings that
4    said Made In China on any of the drywall?
5    A.    No, I don't remember seeing it.
6    Q.    And the markings on the side of the drywall,
7    before it's installed would be visible to the
8    naked eye, would you agree?
9    A.    I believe they would be on the back side of
10   it, but I don't remember.
11            MR. DOYLE:  Objection to the
12        form.  Bad question.
13   BY MS. EIKHOFF:
14   Q.    Let me ask you a broader question about the
15   markings because I believe you testified earlier
16   that because of the drywall shortage, you may
17   have had mixed sources of drywall, that you
18   procured drywall from different suppliers.  Do
19   you remember any of the markings from any of the
20   drywall that was installed on the property?
21   A.    No.  It would not be normal procedure for me
22   to inspect all of the supplies that were
23   delivered to the property for the construction.
24   Q.    Okay.  In those photographs that we just
25   showed you, do you have any knowledge of where in

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                        Pages 50..53

Page 50

1  the home those photographs were taken?
2  A.    I am guessing that it would be in the attic
3  which is accessible from the garage area.  You
4  can go through there to get into see the back
5  side of some of the sheet rock that was up.
6  Q.    And you say you're guessing.  What is the
7  basis of that guess?
8  A.    A little bit -- I can't remember because
9  it's been however long since, nine years since we
10 did this, so -- but I don't believe from the
11 living space inside of the house, I don't believe
12 there was a point anywhere inside the house where
13 you could actually see the back side of any of
14 the walls to be able to read that.
15 Q.    Okay.
16 A.    And I think I remember going up to the attic
17 to check to see if it did say the Chinese Drywall
18 on there.  I think that would be the only place
19 it could be seen from.
20 Q.    Do you remember personally going to inspect
21 to see if you could see markings on drywall?
22 A.    Yeah, after we found out that that was a
23 possibility.  We were trying to figure out what
24 was wrong with my mother's health.
25 Q.    Do you recall how you learned about Chinese

Page 51

1  Drywall as a possible problem?
2  A.    From the lawsuit when I was served to the
3  other house.
4  Q.    I see.  Do you remember who sued you?
5  A.    I can picture them, but I don't remember
6  their names.  No.
7  Q.    Was it the Harrises --
8  A.    No.  No.  I went to --
9  Q.    The Gibbs?
10 A.    No.  I went to the Harrises and the Gibbs
11 and told them about the problem as soon as I knew
12 about it.
13 Q.    I see.  So the plaintiff that sued Patriot
14 Homes was one of the other three properties that
15 you developed in this neighborhood?
16 A.    It was in a different neighborhood on the
17 other side of town.
18 Q.    I see.  Was that development being done at
19 the same time?  Was that around the same time
20 that you were building these homes on Waverly
21 Place?
22 A.    Around the same time, yes.
23 Q.    Okay.  Do you remember the street name of
24 the other property where you had been sued?
25 A.    The neighborhood is The Preserves

Page 52

1  subdivision, but I don't remember the name of the
2  street.
3  Q.    Okay.  So you don't remember the names of
4  the people or the street that they were on?
5  A.    I don't.
6  Q.    Okay.  And so you received the notice of the
7  lawsuit and your testimony is that that is the
8  first that you had heard anywhere, that there may
9  be a problem with Chinese Drywall?
10 A.    Yes.
11 Q.    Okay.  And then what did you do to learn
12 more about that issue?
13 A.    I started reading anything I could find on
14 it and of course the information that I got from
15 the lawsuit where I was being sued gave me clues
16 of what to look for.  So I started -- we had
17 already had to replace the air conditioner coils
18 two or three times in the house, which at first
19 we thought that it was just an issue with the air
20 conditioner installer, but it was -- that was one
21 of several strange things that were happening,
22 such as the computer card going out on the
23 microwave which was new.  Just strange issues
24 like that.  And at the same time we were seeing
25 -- I noticed an odor in the house but did not

Page 53

1  recognize it as being something, something bad,
2  but my mother's health was going down hill.  She
3  was having trouble breathing, eyes burning and
4  started having some cognitive issues, and so kind
5  of looking for clues as to what might be causing
6  that, we were looking more into of course the
7  Chinese Drywall, because I know those houses were
8  built roughly the same time with mixing supplies
9  among the houses.  So then one of the things I
10 was told to look for, is pull off the socket
11 plates and look behind there at the copper wires
12 and make sure the copper is not discolored, so...
13 Q.    Okay.  We have been going over an hour now.
14 I know you can power through, but I think
15 everyone else might need a bit of a break.  Let's
16 take a five minute break.  You might want some
17 coffee and this is a good breaking point for us
18 to stop before we dive into some other documents.
19       (Whereupon, a discussion was
20       held off the record.)
21       (Whereupon, proceedings were
22       reconvened with all counsel and the
23       witness present.)
24       MS. EIKHOFF:  Okay.  Matt,
25       could you please pull up the plaintiff

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                      Pages 54..57

Page 54

1    profile form and we will mark that as
2    Exhibit 9.
3                   ----------
4              (Whereupon, Deft Ex 9,
5         Plaintiff Profile Form, was marked for
6         the record at this time.)
7                   ----------
8    BY MS. EIKHOFF:
9    Q.    Mr. Carter, we just put on the screen a
10   three page document.  I think you are seeing the
11   second page right now and then I believe there is
12   a third page.  Why don't we start at the third
13   page that we are on right now.
14              Do you recognize that signature?
15   A.    Yes.  That is mine.
16   Q.    That is your signature?  And going back to
17   the first page, we will zoom in a little bit and
18   scroll down a little bit.
19              Do you recognize this document, Mr.
20   Carter?
21   A.    Yes.  Vaguely.  I remember filling out a lot
22   of documents, but it's got my signature so I
23   guess I did.
24   Q.    Is it your understanding that this is a form
25   that you completed as a plaintiff in the Chinese

Page 55

1    Drywall lawsuit?
2    A.    Yes.
3    Q.    And at the time that you signed this
4    document, I don't see if we look at the signature
5    page, I don't see a date on it.  Do you remember
6    when you signed this document?
7    A.    No.
8    Q.    But your signature on it was to certify and
9    verify that the contents were true and correct;
10   is that your understanding?
11   A.    Yes.  That is a guess.
12   Q.    Well, we can look at the signature line
13   again.  It says, I declare under penalty of
14   perjury under the laws of the United States of
15   America and pursuant to 28 U.S.C. Code, that all
16   information in this Plaintiff Profile Form is
17   true and correct to the best of my knowledge, and
18   that I have supplied all of the documents
19   requested in this declaration to the extent that
20   such documents are in my possession, custody or
21   control.  Did I read that right?
22   A.    Looks good to me.
23   Q.    And so do you understand that your signature
24   on this form was verification of the contents?
25   A.    Yes.

Page 56

1    Q.    Okay.  So I want to just go to the first
2    page and ask you about a couple of things on the
3    document.
4              If we go to the next section.
5    There.  In the section for Claimant information,
6    it indicates a move in date of July 1st, 2006.
7    First of all, let me back up.  It shows the name
8    John A. Carter, that is you; is that correct?
9    A.    Correct.
10   Q.    And then Ann Carter is your mom?
11   A.    Correct.
12   Q.    And it identifies you both as occupants, you
13   as owner occupant, her as occupant.  I believe
14   you testified earlier that you never occupied the
15   property; is that right?
16   A.    That is correct.
17   Q.    Okay.  So it's -- to the extent that you're
18   identified on this form as an occupant, that
19   would be inaccurate?
20   A.    That I was the owner, yes, but my mother was
21   the occupant.
22   Q.    Understood.  And it shows a move in date,
23   setting aside that you never moved in but just
24   focusing on your mother Ms. Carter, July 1, 2006,
25   is that date right?

Page 57

1    A.    I don't remember.  I really don't remember.
2    Q.    We were looking at the -- and we can pull it
3    up if you need us to, but we were looking at the
4    Building Permit Application if you recall.  The
5    date of the Building Permit Application and the
6    original transfer of the lot was December of
7    2006?
8    A.    Right.
9    Q.    Does that refresh your mind at all, as to
10   whether your mom would have moved in in July of
11   2006 or do you think maybe this date is
12   incorrect?
13   A.    It might be incorrect.  And, to the best of
14   my knowledge, when I was filling out with the
15   dates when we thought that it was, it could have
16   been off or it might be a typo.  I don't know.
17   Q.    Okay.
18   A.    We can go look back and see.
19   Q.    What would you look back at to see?
20   A.    The records from Patriot Homes we are going
21   to have when it was started and when it was
22   built, and it would not have sat for any length
23   of time before the construction was built because
24   it was built for her to move into.
25   Q.    Right.  And if you recall the document we

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 58..61

**Page 58**

1  looked at which was the warranty deed for the
2  Gibbs who were neighbors, was in June of 2007.
3  Do you recall if your mother would have moved in
4  around the time that the Gibbs purchased the
5  home?
6  A.    It probably was the same time, but I would
7  have to look back and see.
8  Q.    Is it possible that your mom moved in in
9  July of 2007?
10  A.    That's possible.
11  Q.    But as we sit here today, you don't recall?
12  A.    I don't.
13  Q.    As we sit here today, do you have a
14  recollection of what would be more likely, 2006
15  or 2007?
16  A.    I don't.
17  Q.    Okay.  Now, if we go to the second page of
18  the document.  I just want to clear this up.
19              On the lower left hand side of your
20  screen, it says Section VI home information with
21  a square footage of 1,600 feet?
22  A.    Uh-huh.
23  Q.    Can you see that right at the top of -- the
24  top right, top left hand side of the screen?
25  A.    Yes.

**Page 59**

1  Q.    Now, before we were looking at a
2  verification that showed the square footage at
3  1,183.  Do you have any reason -- and I believe
4  that you testified before that you didn't have
5  any reason to dispute your attorney's
6  verification of the square footage; is that
7  correct?
8  A.    That is correct.
9  Q.    Okay.  So to the extent that this says 1,600
10  square feet, do you insist on that number or are
11  you accepting of the attorney verification that
12  we looked at before?
13  A.    One refers to the air-conditioning square
14  footage and I believe 1,600 refers to the overall
15  square footage which would include the garage.
16  Q.    Okay.  I appreciate that correction.  Thank
17  you.
18              Now, in the bottom right hand --
19  not your screen.  If you could scroll down to the
20  bottom of this page, there in the right hand side
21  of this stage, do you see where it says Section X
22  drywall supplier?
23  A.    Uh-huh.
24  Q.    And that identifies as the drywall
25  supplier's name RL Stockett & Associates, LLC.

**Page 60**

1  Do you see that?
2  A.    Yes.
3  Q.    And you testified a moment ago, that
4  Stockett was one of the potential suppliers of
5  drywall for this property; is that right?
6  A.    Yes.
7  Q.    Do you have reason to believe that the sole
8  drywall supplier for this property was Stockett
9  or --
10  A.    No.  It would not have been the sole
11  supplier.
12  Q.    It would not have been the sole supplier?
13  A.    Because there were multiple suppliers for
14  the multiple houses.
15  Q.    Do you know why Stockett is the only one
16  that was identified on this form?
17  A.    My guess is because it asked for one drywall
18  supplier and had room for one, so I put that one
19  in.
20  Q.    Okay.  If we go to the top of this same
21  page, we can see a Section IV in section
22  information.  Do you see that, Mr. Carter?
23  A.    Yes.
24  Q.    In this section there is an indication that
25  the property had been inspected for Chinese

**Page 61**

1  Drywall by the Doyle Law Firm, PC, on the date
2  November 12th, 2011; is that correct?
3  A.    Yes.
4  Q.    Were you there for that inspection?
5  A.    I believe I was.
6  Q.    Who at the Doyle Law Firm, PC, actually
7  performed the inspection?
8  A.    I think it was Jimmy.
9  Q.    Jimmy Doyle, your counsel who is here today?
10  A.    Yes.
11  Q.    And was there anyone else besides Mr. Doyle?
12  A.    I don't think so.  I think it was just him.
13  I think it was him.  I am honestly not sure if it
14  was actually him.  There is one representative
15  from the law firm that showed up.
16  Q.    I see.  Did anyone else besides the law firm
17  representative show up?
18  A.    No.
19  Q.    Do you know if the home has ever been
20  inspected by someone who is not an attorney or
21  works at a law firm, but someone who has a
22  background in the construction or building
23  industry?
24  A.    I don't remember.  I don't recall.
25  Q.    Do you recall any other inspections of the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020
Pages 62..65

Page 62

1  home for Chinese Drywall besides the time that
2  someone from the Doyle Firm came?
3  A.    No, not that I recall.  May have or may not
4  have.
5  Q.    Okay.  At the time your home was inspected
6  by Mr. Doyle, was he your attorney in this case?
7  A.    I think so.  It was right about that time,
8  so I don't remember if I retained him as my
9  attorney at that point or if it was after, but
10  that was the intent, was that he come and take a
11  look at it and try to verify it.
12  Q.    Okay.  Do you know if any drywall has been
13  removed from the home?
14  A.    The home has not been touched since we got
15  my mother out of it.
16  Q.    You're not aware of any samples of the
17  drywall, core samples or other pieces of the
18  drywall that may have been taken?
19  A.    I don't remember one way or the other.
20  Q.    Do you know if there has been any testing of
21  the drywall in the home?
22  A.    I don't remember either way.
23  Q.    Do you think that maybe that happened?
24  A.    May have, I would think, but I don't
25  remember.  I don't remember when who or -- I just

Page 63

1  don't remember.
2  Q.    Okay.  Well, I want to just make sure that
3  we get clarity on this point.
4          The only inspection that you know
5  of was the one identified here on this form by
6  the law firm; is that right?
7  A.    The only one that I can recall right now,
8  yes.
9  Q.    Okay.
10  A.    I am not saying that there wasn't another
11  one, I just don't remember.
12  Q.    Okay.  And when you -- when you were saying
13  maybe there was testing, then do you mean maybe
14  the representative of the law firm did some
15  testing while they were there inspecting the
16  home?
17  A.    Maybe.
18  Q.    Okay.  Do you know if the air in the home
19  has ever been tested?
20  A.    As far as an actual like -- an air quality
21  test, I don't think so.  I don't know.  I don't
22  remember.  And it's quite obvious when I walk
23  into -- like I mentioned earlier, there was a
24  noticeable smell that over time has gotten much
25  worse and to the point where I can't -- I can't

Page 64

1  walk into the house.  My eyes begin to burn
2  immediately, I have trouble breathing and have to
3  leave.
4  Q.    What do you recall from the visit from the
5  law firm representative for the inspection?  What
6  do you recall them doing?
7  A.    I remember -- I believe I remember looking
8  at the copper wire and I think I remember looking
9  at the back side of the labeling of the drywall,
10  but that is certainly not all inclusive.  I don't
11  know everything that was done.  I don't remember.
12  Q.    Okay.  Was your mother in the home at the
13  time of the inspection?
14  A.    Yes.
15  Q.    Okay.  So as of November --
16  A.    I think so -- I don't -- I don't think we
17  had moved her out yet, because we had not
18  verified what the problem was.  I think she was
19  still there.
20  Q.    That was actually -- I was going to ask
21  that.  As of November 12th, 2011, you believe she
22  was still in the home?
23  A.    I can't -- I can't be sure.
24  Q.    Okay.  In the second section on your screen
25  that says Section V drywall information.  Under

Page 65

1  the heading drywall manufacturer, it says Taishan
2  Gypsum Company.  Do you see that?
3  A.    I do.
4  Q.    How did you identify Taishan Gypsum Company
5  as the manufacturer of the drywall in the home?
6  A.    I believe the back side of the drywall had
7  the markings on there.  They indicated that and
8  also it said the next line over was Made In
9  China.
10  Q.    You believe the next line -- it says
11  markings on drywall, Made In China meets or
12  exceeds ASTM?
13  A.    Yes.
14  Q.    But do you know how those markings were
15  associated with Taishan Gypsum?
16  A.    Oh, I believe -- I believe the Taishan
17  Gypsum Company was also on there when we were
18  looking at the back side of the drywall.
19  Q.    Okay.  I will represent to you --
20  A.    It may have been the Chinese marking on
21  there, but I don't remember.  This is not my
22  expertise to identify it.
23  Q.    Okay.  The photographs that we looked at
24  earlier that said Made In China, meets or exceeds
25  ASTM just as reported in this form, I will just

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                      Pages 66..69

Page 66

1   represent to you those are the only photographs
2   of examples of the product in the property that
3   we have.
4   A.    Okay.
5   Q.    It also says that the drywall is in the
6   ceilings and the walls.
7   A.    Yes.
8   Q.    In your experience as a builder, is the same
9   type of drywall used on walls as used in
10  ceilings?
11  A.    Yes, it can be.
12  Q.    And do you recall on this property if the
13  same drywall was used for the ceilings and walls?
14  A.    Yes.  I don't remember using a different
15  drywall on the ceilings for any of the house.
16  Q.    Okay.  And I believe you testified earlier,
17  though, that the drywall in the home would have
18  been for multiple different sources; is that
19  correct?
20  A.    Yes.
21  Q.    So do you know if all of the drywall that is
22  in the house was Made In China Drywall?
23  A.    I do not know.
24  Q.    Okay.  And it sounds like the only drywall
25  markings that you have inspected were in the

Page 67

1   attic area of the house; is that correct?
2   A.    Yes.
3   Q.    Is it possible that at least some of the
4   drywall in other areas of the home that haven't
5   been inspected could not be Made In China
6   Drywall?
7   A.    It's possible.
8   Q.    But you've mentioned that there is an odor
9   in the home; is that correct?
10  A.    Yes.
11  Q.    Did you notice that when the house was
12  reaching completion of construction?
13  A.    No, not at all.
14  Q.    Okay.  When do you recall first noticing the
15  odor?
16  A.    It would have been after my mother had been
17  there for a while, but I don't remember
18  specifically now.
19  Q.    Okay.  So I think you said earlier you think
20  it's gotten worse over time; is that right?
21  A.    Yes.
22  Q.    Because when you go into the house now it's
23  very irritating to you?
24  A.    Yes.
25  Q.    But I am taking it from what you are saying,

Page 68

1   that that was not the case upon initial
2   construction?  You didn't have the same reaction
3   when the home was new and your mother was moving
4   in; is that accurate?
5   A.    That is accurate.
6   Q.    Okay.  And so do you recall it just getting
7   gradually worse over time?
8   A.    Yep.
9   Q.    Okay.  At the time that you were considering
10  moving your mother out of the home, do you recall
11  it having a noticeable odor at that time?
12  A.    Yes.
13  Q.    Okay.  And how long was that after she had
14  moved in?
15  A.    I don't remember.
16  Q.    Was it months or years?
17  A.    From the time that we noticed to the time
18  that we moved her out, is that what you are
19  asking?
20  Q.    I am sorry.  From the time that she moved in
21  to the time that she moved out.
22  A.    From the time she moved in and the time she
23  moved out was years.
24  Q.    Years.  About how many years?
25  A.    Three or four years.  Five years, something

Page 69

1   like that.
2   Q.    Okay.  Do you recall the odor being worse in
3   certain areas of the home than others?
4   A.    No.
5   Q.    Do you remember the odors being worse at a
6   certain time of day, or a certain time of year,
7   or under certain conditions?
8   A.    They seemed to be worse with heat.  When it
9   was hot outside, the odor seemed to be worse
10  then.
11  Q.    Okay.  Now, you have also mentioned that you
12  recall observing some discoloration of wiring in
13  the home; is that correct, Mr. Carter?
14  A.    Yes.
15  Q.    What do you recall seeing?
16  A.    Pulling off the cover plates on electrical
17  outlets and switches and checking the wire back
18  there appeared black.
19  Q.    And you personally observed that?
20  A.    Yes.
21  Q.    Any other blackening or discoloration that
22  you personally observed?
23  A.    The air-conditioner coils that I mentioned
24  earlier, they were black as well.
25  Q.    Okay.  What about copper piping?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                            Pages 70..73

Page 70

1   A.    I don't know that we had any copper piping
2   in there, but I don't remember honestly.
3   Q.    Okay.  Any other copper fixtures?
4   A.    I don't remember in particular like a light
5   fixture or something like that, because I knew
6   that copper was the potential issue, so I went to
7   where there was copper which was the potential
8   wire.  So that is where I went.
9   Q.    Okay.  You've described the home as still
10  there and still intact but vacant; is that right?
11  A.    Yes.
12  Q.    With the same original wiring and fixtures?
13  A.    Yes.
14  Q.    Okay.  And piping?
15  A.    All still there.
16  Q.    Okay.  Are there still appliances in the
17  home?
18  A.    Yes.
19  Q.    Did you take anything out of the home?
20  A.    A few of her personal --
21  Q.    Besides your mother's personal belongings?
22  A.    As far as any type of fixtures, cabinets,
23  anything like that, no, nothing was brought out.
24  Q.    Okay.
25  A.    It's all still there.

Page 71

1   Q.    All right.  I am going to show you a
2   document that we are going to mark as Exhibit 10
3   which is your Supplemental Plaintiff Profile
4   Form.
5   A.    Okay.
6              ----------
7              (Whereupon, Deft Ex 10,
8        Supplemental Plaintiff Profile Form,
9        was marked for the record at this
10       time.)
11             ----------
12  BY MS. EIKHOFF:
13  Q.    This document is seven pages long.
14            MS. EIKHOFF:  And, Matt, can
15       you go ahead and also put up and we
16       will mark it as Exhibit 11, the
17       verification form?
18             ----------
19            (Whereupon, Deft Ex 11,
20       Verification Form, was marked for the
21       record at this time.)
22             ----------
23  BY MS. EIKHOFF:
24  Q.    Okay.  Mr. Carter, I am going to represent
25  to you that this document was produced to us

Page 72

1   through your attorney as a court form.  Is this
2   your signature on the document?
3   A.    Looks like it.  Yeah.
4   Q.    Okay.  With a date March 8, 2018?
5   A.    Yes.
6   Q.    Do you remember filling out this document?
7   A.    I don't know.  Not specifically, no.
8   Q.    Okay.  Well, you will see that this is a
9   verification form for the document that we marked
10  as Exhibit 10, and I am going to go back to
11  Exhibit 10 and just ask you about a few of the
12  items of information on that form.  So let's stop
13  there.
14            It's asking for Claimant and
15  property information and the names of you and
16  your wife are there.  The address of the
17  property, the lawsuit is 703 Waverly Place.  And
18  then name of person completing this form is
19  listed as John A. Carter at 1590 Crescent
20  Boulevard, and that is you, right?
21  A.    Yeah.
22  Q.    And, I am sorry, I didn't hear your answer.
23  A.    Right.
24  Q.    Okay.  And in the next section, it says, the
25  question is, when did you acquire the property,

Page 73

1   and you said December 22nd, 2006.  And that's
2   consistent with the warranty deed that we looked
3   at earlier in the deposition.
4            The next question is, when was
5   Chinese Drywall installed in the property, to the
6   best of your knowledge.  It says September 1st,
7   2006.
8            Wasn't the drywall installed on the
9   property after you purchased the lot?
10  A.    Well, it may be that this confusion again
11  over whether it was purchased by me as Patriot
12  Homes or me as the individual buying the house
13  from Patriot Homes.
14  Q.    Okay.
15  A.    So I don't know.
16  Q.    Do you have any independent memory of when
17  the drywall was installed?
18  A.    I don't.
19  Q.    Okay.
20  A.    I don't.
21  Q.    Do you know -- do you know why you put
22  September 1st, 2006 on the form?
23  A.    I don't, unless that is the timeframe for
24  when the house was being built and the drywall
25  was installed then and then we purchased the

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Pages 74..77

Page 74

1  completed product in December.
2  Q.    Do you think that the records of Patriot
3  Homes that you have in your house would be
4  informative as to when the drywall was installed?
5  A.    We can certainly look, yes.
6  Q.    Okay.  The next question is, when did you
7  first become aware that the property contained
8  Chinese Drywall.  And the answer is November
9  2011.  November 2011 was the date that -- the
10  same month that the Doyle Law Firm inspection was
11  identified on the last document.  Is that right,
12  as to when you discovered that Chinese Drywall
13  was on the property, November of 2011?
14  A.    That sounds -- that sounds right.
15  Q.    Okay.  Let's to go Section V.  So the first
16  question in Section V is, has the property been
17  partially or completed remediated.  And your
18  answer was no; is that correct?
19  A.    That is correct.
20  Q.    Have you ever looked into how much it would
21  cost to remediate the property, replace the
22  drywall?
23  A.    Years ago I remember looking into it, early
24  on in this process, and I seem to remember an
25  estimate of 90 something thousand to remediate

Page 75

1  it.  But my understanding is the house would have
2  to be gutted, the remaining studs and what is
3  inside be treated and everything be rebuilt back
4  out.
5  Q.    Do you remember who you talked to about
6  potentially remediating it?
7  A.    Hank Moreman.
8  Q.    What was the last name of Hank?
9  A.    Moreman, M-O-R-E-M-A-N.  A local contractor
10  there in Auburn.
11  Q.    At this point, were you out of the home
12  building business?
13  A.    Yes.
14  Q.    And was Hank someone else -- someone that
15  you had worked with when you were developing
16  Patriot Homes?
17  A.    No.
18  Q.    Did you ever consider just contracting it
19  out yourself?
20  A.    No, it's cost prohibitive.  I already have a
21  loan on it for -- paying the mortgage for the
22  completed product the first time.  So to turn
23  around and do it again, we couldn't afford to do
24  that.  No.
25  Q.    Okay.  And, to the best of your

Page 76

1  recollection, the only information that you had
2  gotten about the cost to remediate was
3  approximately $90,000.00 from Mr. Moreman?
4  A.    Well, I heard from previous cases from Judge
5  Fallon, that there was a number of site per
6  square foot formulation and it may have been
7  where I got the number from.
8  Q.    Okay.  So you are not sure that the 90,000
9  came from Mr. Moreman, it may have come from
10  court records?
11  A.    I know that Mr. Moreman did these -- a
12  program called Xactimate which is a building
13  estimating tool.
14  Q.    Yeah.
15  A.    And the only reason he came up with that
16  figure 93 to 90 something thousand, but also I
17  remember there was a number from the court
18  records as well.
19  Q.    I see.  And do you remember if that number
20  was higher or lower than 90,000?
21  A.    I don't remember.
22  Q.    Okay.
23  A.    And that was also -- that would have been
24  seven years ago.
25  Q.    Sure.  Have you ever attempted to sell the

Page 77

1  property?
2  A.    No.  Can't sell it -- can't use it.
3  Q.    Right.  So you have not attempted to rent
4  it?
5  A.    No.
6  Q.    But you're still paying the mortgage on it?
7  A.    Yes.
8  Q.    Have you considered allowing it to go into
9  foreclosure?
10  A.    No, because I don't want my credit to be
11  destroyed because of that.
12  Q.    Okay.
13  A.    And there is always my hope that this would
14  be a much shorter process than what it's been and
15  we would be made whole I guess.
16  Q.    Do you know if any of the six homes that you
17  developed in this neighborhood were remediated
18  for Chinese Drywall?
19  A.    I don't -- I don't have any knowledge of
20  what has been done for any of them.  No.
21  Q.    Okay.  Do you ever go back to the property
22  for any reason?
23  A.    Occasionally I have driven by there, but I
24  have not gone and done much of anything there.
25  Q.    Okay.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                              Pages 78..81

Page 78

1   A.    I haven't been -- I really haven't been in
2   it but maybe once.
3   Q.    Okay.  When was the last time you were
4   actually inside the property?
5   A.    At least two years ago.
6   Q.    Okay.  And do you remember why you were
7   there?
8   A.    I believe I went by looking for some of my
9   mother's things --
10  Q.    Okay.
11  A.    -- that she had asked about.
12  Q.    Now, have you received money as a plaintiff
13  in the Chinese Drywall litigation at any point?
14  A.    There were -- there were a couple of various
15  model checks that I believe were sent as a part
16  of all this that we received seeing for some
17  portion of the group, but not much of anything.
18  Q.    You don't remember how much?
19  A.    No.
20  Q.    Look at Section VI.  Do you see the prior
21  payment section on your screen?
22  A.    Uh-huh.
23  Q.    Do you recognize those figures as amounts
24  that you've previously received?
25  A.    No.  Yeah, it looks like it could be it.

Page 79

1   Yeah.
2   Q.    Okay.  The next section of this form is
3   asking you to report other damages that you are
4   claiming in the lawsuit.  The first part says and
5   is asking about alternative living expenses and
6   there is no dollar amount listed there.
7           You are not seeking alternative
8   living expenses or damages in this lawsuit?
9   A.    I was not living in the house, so I didn't
10  feel it would be right for me to request
11  alternate living expenses for myself.
12  Q.    The next section is asking about loss of use
13  and/or loss of enjoyment of the property, and
14  there is a figure of $275,000.00.  Do you see
15  that?
16  A.    Yes.
17  Q.    And is that your request for compensation
18  for loss of use and enjoyment of the property?
19  A.    That was based on numbers from a previous
20  settlement from Judge Fallon with I believe
21  $25,000.00 a year is what they had said.  So that
22  was based on per year over the course of the
23  years and years have continued to go by, so...
24  So I would say it's not limited to that.
25  Q.    So you understand that there is a method of

Page 80

1   calculating alternative living expenses at 25,000
2   a year?
3   A.    That is not alternative living expenses, it
4   looks like --
5   Q.    I am sorry, I misspoke.  I will strike that
6   and I am going to rephrase my question so the
7   record is clear.  And thank you for correcting
8   me.
9   A.    Uh-huh.
10  Q.    So it's your understanding that there is a
11  method of computing damages for loss of use and
12  enjoyment of the property at 25,000 per year; is
13  that correct?
14  A.    Yes.  That is what I understood.
15  Q.    And that is how you arrived at the
16  $275,000.00 number that you put in this form?
17  A.    I believe so, yes.
18  Q.    Okay.  The next section is the diminution of
19  value and asks to identify an amount and you have
20  no amount listed; is that correct?
21  A.    That is correct.  But the reason is not
22  because it's not going to cost something to fix
23  it, but because at this point it can't be
24  determined because the house has to be completely
25  gutted.  So I figured using a price per square

Page 81

1   footage for remediation might be inappropriate
2   there, but as of right now the house has -- well,
3   it has a zero value because it can't be used at
4   all and has to have a lot of things done to it
5   before it can be used to any degree.
6   Q.    So the damages that you are referring to is
7   the remediation damages, how much it will cost to
8   remediate the home to get it back to a good,
9   livable condition without any drywall defects,
10  correct?
11  A.    Right.  I assume that is what that line
12  means.
13  Q.    Okay.  Diminution of value is actually
14  slightly different and, you know, not to give you
15  a law school lecture here, but the diminution in
16  value would be seeking for the lost property
17  value.  In addition to getting the house --
18  getting compensated so that the house can be
19  fixed, are you also seeking damages for the loss
20  of property value?
21  A.    Yes.
22  Q.    Okay.
23  A.    Yes.
24  Q.    And do you know why you didn't put anything
25  down in the form for that?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                           Pages 82..85

Page 82

1   A.    Apparently I misunderstood.
2   Q.    Okay. Are you also seeking damages for any
3   property in the home besides the actual structure
4   itself? So, for example, you have mentioned the
5   air-conditioning broke.
6   A.    Yes.
7   Q.    Are you seeking compensation for any costs
8   associated with that?
9   A.    Yes. And as well as the appliances inside,
10  televisions, any appliance that had copper
11  wiring, it's gone. And then furniture, that kind
12  of stuff which is now saturated with the sulfur
13  smell and sulfuric acid, gases.
14  Q.    Have you provided records of those damages
15  to your attorney?
16  A.    I don't -- I don't remember. I don't
17  remember either way, honestly. I don't remember
18  if I --
19  Q.    Do you recall ever sitting down and
20  collecting documents that would reflect the cost
21  of the items that you're seeking compensation for
22  in the lawsuit?
23  A.    I remember -- I remember discussing it and
24  trying to go through and figure out how much
25  different things would cost to replace, but I

Page 83

1   don't remember if that was just for us in
2   anticipation of this day coming or if it was
3   something that I did returning it to the lawyer.
4   I don't remember.
5   Q.    Do you believe you have records that would
6   support those damages?
7   A.    Even if I don't, I can walk in the house
8   right now which sits exactly the same as the day
9   she left. So that could be recreated quickly.
10  Q.    Do you have repair records or purchase
11  records for the property that you're seeking
12  damages for?
13  A.    Well, the only thing we replaced was when
14  she was still living there and had to replace the
15  air-conditioning coils and the microwave.
16  Everything else, nothing was replaced. It's
17  still sitting there from when she left.
18  Q.    I guess what I am getting at is not whether
19  the items still exist, but whether you have
20  records from when you purchased them.
21  A.    The original purchase records?
22  Q.    How much they cost. Yeah.
23  A.    I don't. I don't think most people keep the
24  purchase records for a refrigerator, but I will
25  happily look.

Page 84

1   Q.    Would that be -- do you think that would be
2   in the building file?
3   A.    No, that is not part of the building. That
4   is my mother's personal files.
5   Q.    Okay. Where would you look?
6   A.    I will have to look through some of her old
7   records which are now at my house since she
8   passed away.
9   Q.    They are at your house too?
10  A.    Yeah.
11  Q.    I think we are just about done, but I am
12  going to take a quick break.
13        MS. EIKHOFF: And, Matt, you
14        can take the document off the screen.
15        I am going to take a quick
16        break and look over my notes and my
17        documents and see if I missed anything.
18        So don't get your hopes up that you are
19        absolutely done, but there is a chance.
20        I am saying there is a chance you might
21        be done. So take a five minute break.
22        Okay.
23        THE WITNESS: Okay.
24        (Whereupon, a discussion was
25        held off the record.)

Page 85

1         (Whereupon, proceedings were
2   reconvened with all counsel and the
3   witness present.)
4   BY MS. EIKHOFF:
5   Q.    Okay. I have got just a couple of questions
6   for you and then I have a couple of questions for
7   you off the record. So we are back on the
8   record.
9         It sounds like, Mr. Carter, you may
10  have more documents that are related to this
11  claim that we haven't seen; is that right?
12  A.    Maybe.
13        MS. EIKHOFF: Okay. I am
14        going to ask, Mr. Doyle, that we hold
15        this open and we are going to see if he
16        has records that are -- we can identify
17        them for you in a letter that we talked
18        about that we would like to see if they
19        exist. So we will hold it open until
20        we receive those documents or otherwise
21        get a response. Okay, Mr. Doyle?
22        MR. DOYLE: I thought you were
23        addressing Mr. Carter. I am perfectly
24        okay with that. I have no opposition.
25        MS. EIKHOFF: Good.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                                                 Pages 86..89

Page 86

1  BY MS. EIKHOFF:
2  Q.    And I think you testified before that you
3  did not recall the purchase price of the
4  property?
5  A.    No, I don't recall.
6  Q.    Okay.
7  A.    If you are talking about the initial lot
8  buy?
9  Q.    That is right.
10 A.    Yeah, I don't.
11 Q.    Okay.  And are you the only person who is
12 seeking damages on this property?
13 A.    If your question is whether or not my mother
14 is, she passed away in April.
15 Q.    Okay.  And not your wife?
16 A.    No.  Nothing separate.
17 Q.    Okay.
18              MS. EIKHOFF:  Mr. Guerra, do
19        you have any questions for the witness?
20              MR. GUERRA:  No.  No questions
21        from me.
22              MS. EIKHOFF:  Okay.  Mr.
23        Doyle, do you have any questions for
24        the witness?
25              MR. DOYLE:  No, ma'am.

Page 87

1              MS. EIKHOFF:  We can go off
2        the record.
3              COURT REPORTER:  Mr. Guerra,
4        would you be taking taking a copy?
5              MR. GUERRA:  Yes.
6              COURT REPORTER:  And Mr.
7        Doyle?
8              MR. DOYLE:  Yes, I will take a
9        copy.
10             COURT REPORTER:  Ms. Eikhoff,
11       your usual I am assuming?
12             MS. EIKHOFF:  Yes.  We are
13       good.
14             (Adjourned at 4:00 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 88

1
2              C E R T I F I C A T I O N
3
4        I HEREBY CERTIFY that the
5        proceedings and evidence are contained
6        fully and accurately in the
7        stenographic notes taken by me upon the
8        foregoing matter on Friday, December
9        11, 2020, and that this is a correct
10       transcript of same.
11
12
13
14
15
16
17       Celeste Perla, RPR, CSR, Merit
         Reporter and Notary Public
         Registered ID #19508
18       CCR 6331-2589-3832-7040
19
20       (The foregoing certification of
         this transcript does not apply to any
21       reproduction of the same by any means, unless
         under the direct control and/or supervision of
22       the certifying reporter.)
23
24
25

Page 89

1              DISCLOSURE
2  IN THE UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF LOUISIANA
3  DEPONENT: JOHN CARTER
4
5              Pursuant to Article 10.B of the
   Rules and Regulations of the Board of Court
6  Reporting of the Judicial Council of Georgia, I
   make the following disclosure:
7
              I am a Certified Court Reporter.  I
8  am here as an independent contractor to Huseby
   Litigation.
9
              Huseby Litigation was contacted by
10 counsel to provide court reporting services for
   this deposition.  I am not disqualified for a
11 relationship of interest under the provisions of
   O.C.G.A. 9-11-28(c).  Huseby Litigation will not
12 be taking this deposition under any contract that
   is prohibited by the O.C.G.A. 15-14-37(a) and
13 (b).
              Huseby Litigation has no
14 contract/agreement to provide court reporting
   services with any party to the case, any counsel
15 in the case or any reporter or reporting agency
   from whom a referral might have been made to
16 cover this deposition.  Huseby Litigation has
   charged its usual and customary rates to all
17 parties in the case.
18             This date of Friday, December 11,
   2020.
19
20
21
   Celeste Perla
22 Certified Court Reporter
   Certificate #19508
23 CCR 6331-2589-3832-7040
24
25

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                    Index: $10,000.00..703

| | | | |
|---|---|---|---|
| | **$25,000.00** | | 12 |
| **Exhibits** | 79:21 | **2** | **28**  55:15 |
| | | | |
| **CarterJ 1** | **$275,000.00** | **2**  26:25 | |
| 3:11  26:17 | 79:14 | 27:2 | **3** |
| 29:20 | 80:16 | **2004**  8:11, | |
| **CarterJ 2** | **$90,000.00** | 13,15,18, | **3**  5:17 |
| 3:12  26:25 | 76:3 | 20  10:5,8 | 31:10,12 |
| **CarterJ 3** | | **2005**  13:12 | 33:24 |
| 3:14  31:10 | **1** | 24:7,8 | **4** |
| **CarterJ 5** | | 29:21 | |
| 3:15  38:9 | **1**  26:17,19 | **2006**  22:10 | **45**  38:3 |
| **CarterJ 6** | 29:20 | 24:5,9 | **480**  28:13, |
| 3:14,16 | 56:24 | 29:12,18, | 14 |
| 46:24 | **1,183**  37:18 | 21,22 | **4:00**  87:14 |
| **CarterJ 7** | 59:3 | 33:14  36:4 | |
| 3:17  48:2 | **1,600**  58:21 | 56:6,24 | **5** |
| **CarterJ 8** | 59:9,14 | 57:7,11 | |
| 3:18  48:18 | **10**  71:2,7 | 58:14 | **5**  33:24 |
| **CarterJ 9** | 72:10,11 | 73:1,7,22 | 38:9,11 |
| 3:19  54:2 | **11**  71:16,19 | **2007**  10:6,8 | **6** |
| **CarterJ 10** | **111,000**  31:7 | 36:1,9 | |
| 3:20  71:2 | **12th**  61:2 | 58:2,9,15 | **6**  46:24 |
| 72:10,11 | 64:21 | **2010**  13:22 | 47:1 |
| **CarterJ 11** | **14**  14:9 | **2011**  13:23 | **7** |
| 3:22  71:16 | 44:10 | 14:25 | |
| | **1590**  8:8 | 21:12  61:2 | **7**  48:2,5 |
| **$** | 72:19 | 64:21 | **701**  32:5,12 |
| | **18**  23:7 | 74:9,13 | 33:20,24 |
| **$10,000.00** | **19th**  29:12, | **2018**  72:4 | 34:3  35:15 |
| 16:8 | 18  33:13 | **22**  29:21 | 38:17 |
| **$111,000.00** | **1st**  36:1 | **22nd**  22:10 | **703**  16:17 |
| 30:24  31:7 | 56:6  73:6, | 24:5,7 | 17:6  23:10 |
| **$111,339.00** | 22 | 73:1 | 28:11  32:8 |
| 30:11 | | **25,000**  80:1, | 33:19 |

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                                    Index: 8..appears

37:18
38:17,20
72:17

---

**8**

---

8  48:18,21
72:4

80  19:25

80,000  19:25

88  9:16

---

**9**

---

9  54:2,4

90  74:25
76:16

90,000  76:8,
20

93  76:16

---

**A**

---

a/k/a  24:18

ability  7:2

ably  6:15

absolutely
84:19

accepting
59:11

accessible
50:3

accounting
44:17

accurate
23:2 29:23
68:4,5

acid  82:13

acquainted
24:22

acquire
72:25

active  9:18
10:5,11
14:6

actively
8:21

actual  23:10
30:20 31:6
44:4 63:20
82:3

add  16:6

addition
81:17

address  8:5,
6,10,15
23:10
28:11,13,
15 72:16

addressing
85:23

adjourned
87:14

adult  11:8

advantage
42:15

affecting

21:9

afford  75:23

afternoon
4:13

agree  49:8

agreement
16:9

ahead  21:13
48:1 71:15

air  52:17,
19 63:18,
20

air-
conditioner
69:23

air-
conditioning
59:13 82:5
83:15

Airforce
8:25 9:2,
15

airline  9:5

Alabama  8:4,
8 15:17,20
16:18
40:14
45:12

alive  20:9

allowing
77:8

alternate
79:11

alternative
79:5,7
80:1,3

ambiguous
32:19

America
55:15

amount  79:6
80:19,20

amounts
78:23

and/or  44:15
79:13

Anderson
4:20

Ann  20:8,19
56:10

answers  5:8
6:23 7:3

anticipated
30:17

anticipation
83:2

anymore
13:19

Apparently
82:1

appeared
69:18

appears
22:23
29:11,13
32:4

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**

appliance
  82:10

appliances
  70:16 82:9

application
  26:20
  27:19
  28:2,18
  30:4
  31:13,17
  32:3 33:4
  36:3 57:4,
  5

applying
  9:15

approval
  29:5

approximately
  14:21
  25:10 76:3

April 20:12
  86:14

area 50:3
  67:1

areas 67:4
  69:3

arrangements
  25:3

arrived 49:2
  80:15

asks 80:19

Associates
  59:25

Association
  15:17,20
  45:13

assume 81:11

assuming
  87:11

ASTM 65:12,
  25

astray 32:19

attempt 33:1

attempted
  76:25 77:3

attesting
  37:17

attic 50:2,
  16 67:1

attorney 6:3
  37:16
  59:11
  61:20
  62:6,9
  72:1 82:15

attorney's
  59:5

Auburn 8:4,
  8,14,20,24
  9:1 10:1,
  7,13 11:1,
  2 14:11
  15:7
  28:13,16
  40:15,17
  42:7 75:10

audibly 5:13

aviation
  11:7

avoid 5:14

aware 44:2
  62:16 74:7

---

**B**

---

back 7:14
  8:18,24
  12:2,4
  15:6,8
  22:20
  24:11
  35:19,20
  38:16
  43:18
  44:24 49:9
  50:4,13
  54:16 56:7
  57:18,19
  58:7 64:9
  65:6,18
  69:17
  72:10 75:3
  77:21 81:8
  85:7

background
  61:22

bad 49:12
  53:1

balance 5:19
  19:24

bank 19:9

Base 8:25
  9:3

based 32:15
  79:19,22

basically
  21:5 45:4

basis 50:7

beam 47:21

bedroom
  32:13,16

bedrooms
  32:14

began 13:16

begin 29:17
  64:1

beginning
  13:22

belongings
  70:21

bet 47:24

big 26:5

bit 10:4
  14:22
  34:20 50:8
  53:15
  54:17,18

black 69:18,
  24

blackening
  69:21

Blanca 40:17

blocking

47:22

**BMW** 39:19
40:1,6,11,
19 41:3,23

**born** 8:16

**bottom** 22:5
23:24 28:6
29:6,10
33:9
59:18,20

**bought** 17:16
18:1,4,8,
12,13,15,
22,23,24
19:11 20:5
23:14
25:11
33:18
36:20
39:24 40:1
42:6 43:12

**Boulevard**
8:8 72:20

**break** 38:4
53:15,16
84:12,16,
21

**breaking**
53:17

**breathing**
53:3 64:2

**broader**
49:14

**broke** 82:5

**brought**
42:11
70:23

**build** 41:16
46:8

**builder**
26:11 66:8

**builders**
15:17
26:10
45:12

**building**
11:22 22:2
25:23
26:20
27:19
28:2,18
30:4
31:13,17
32:2 33:3
36:2 40:12
42:4 43:19
51:20
57:4,5
61:22
75:12
76:12
84:2,3

**built** 7:23
12:8 18:11
20:5 34:17
36:14
39:2,17
45:3 53:8
57:22,23,
24 73:24

**burn** 64:1

**burning** 53:3

**business**
13:24 25:3
28:15
32:21
42:3,15
75:12

**buy** 25:6,9
86:8

**buyer** 33:4

**buying** 25:4
73:12

---

**C**

---

**C-H** 47:22

**cabinets**
70:22

**calculating**
80:1

**called** 76:12

**capture** 5:24

**card** 52:22

**carrier**
15:18,19

**Carter** 4:5,
12,20,22
8:3 20:8,
19 21:19
22:25 24:3
27:14
30:10
31:23

35:14
37:2,12
47:6 48:11
54:9,20
56:8,10,24
60:22
69:13
71:24
72:19
85:9,23

**case** 11:15
15:15
37:3,5,17
62:6 68:1

**cases** 12:24
76:4

**cash** 19:14

**causing** 53:5

**ceilings**
66:6,10,
13,15

**certificate**
20:18

**certify** 55:8

**chance** 35:9
84:19,20

**change** 40:25

**changed**
37:25

**check** 50:17

**checking**
69:17

**checks** 78:15

China  42:20,
  24 43:3
  47:24 49:4
  65:9,11,24
  66:22 67:5

Chinese
  12:7,16,23
  13:17
  15:14
  44:22 45:1
  50:17,25
  52:9 53:7
  54:25
  60:25 62:1
  65:20 73:5
  74:8,12
  77:18
  78:13

chose  15:9

cities  40:17

city  27:24
  29:4 40:18

claim  16:16
  85:11

Claimant
  56:5 72:14

claiming
  79:4

claims  16:1,
  2

clarity  63:3

clear  6:11
  17:9 23:18
  58:18 80:7

closed  14:23
  15:2

clues  52:15
  53:5

Coast  41:16

Code  55:15

coffee  53:17

cognitive
  53:4

coils  52:17
  69:23
  83:15

collecting
  82:20

college  8:17
  10:23

combination
  41:23

commenced
  23:16

commercial
  9:11 15:4

communication
  5:15

commuted  9:1

commuting
  10:9

companies
  9:25 10:14
  12:18,24

company
  9:21,22,24

13:4,11
14:1,6,8,
  11,15
16:13
17:16 19:2
25:2,3
38:25
39:13
40:12
44:24,25
45:8 65:2,
  4,17

compensated
  81:18

compensation
  79:17
  82:7,21

competent
  6:21

complete
  19:1,2
  23:9

completed
  28:17
  29:15
  37:23
  54:25
  74:1,17
  75:22

completely
  80:24

completing
  72:18

completion
  17:20

20:17
67:12

computer
  44:17
  52:22

computers
  44:16

computing
  80:11

condition
  6:22 81:9

conditioner
  52:17,20

conditions
  69:7

condolences
  20:15

confuse  6:13

confusing
  6:11

confusion
  73:10

considerate
  5:17

considered
  77:8

consistent
  73:2

construction
  9:21 14:1,
  3 15:3
  17:20
  18:24

19:1,2,9
20:17
22:16,17
23:9,13,
16,20
29:14,16
30:15,17,
18 34:18,
23,25
36:12
37:23
40:21
41:19
43:13,14
46:7,12
49:23
57:23
61:22
67:12 68:2

**contained**
74:7

**contents**
55:9,24

**continued**
79:23

**contracting**
75:18

**contractor**
14:2 28:8
46:7,11
75:9

**control**
14:17
55:21

**conversations**
42:22

**copies** 45:14

**copper**
53:11,12
64:8 69:25
70:1,3,6,7
82:10

**copy** 87:4,9

**core** 62:17

**corner** 35:24

**correct**
10:15,22
11:16 13:8
14:12
16:13,14,
18,19 32:7
33:5,6,14
37:4 43:4,
5 45:23
55:9,17
56:8,9,11,
16 59:7,8
61:2 66:19
67:1,9
69:13
74:18,19
80:13,20,
21 81:10

**correcting**
80:7

**correction**
59:16

**cost** 16:12
30:14,17,
20 31:6
74:21

75:20 76:2
80:22 81:7
82:20,25
83:22

**costs** 30:5,6
41:13 82:7

**counsel**
44:23
45:16,19
53:22 61:9
85:2

**County** 21:22
35:17

**couple** 21:14
41:5 56:2
78:14
85:5,6

**court** 5:4,7,
22 11:25
17:23,24
26:15 27:3
72:1
76:10,17
87:3,6,10

**cover** 40:9
69:16

**creation**
14:20

**credit** 77:10

**Crescent** 8:8
72:19

**current** 9:4
11:15
45:19

**custody**
55:20

**cut** 12:12

---

**D**

---

**D-E-E-N** 18:7

**daily** 46:10

**damages** 16:2
79:3,8
80:11
81:6,7,19
82:2,14
83:6,12
86:12

**date** 22:6,
9,12,13,15
24:7,8
29:18,21
33:8 35:25
55:5 56:6,
22,25
57:5,11
61:1 72:4
74:9

**dated** 29:11
33:13

**dates** 14:20
24:14
57:15

**day** 69:6
83:2,8

**Dean** 28:13,
14

**December**

22:9 24:5,
7 29:11,
18,21
33:13
36:4,8
57:6 73:1
74:1

decided
13:18

declaration
36:24
37:15
55:19

declare
55:13

deed 21:22
22:22
29:19
35:5,14
58:1 73:2

deeds 21:25

Deen 18:4,7
22:8,9
24:15,21

defects 81:9

defendant
11:18
12:22
15:14

defense
15:23
16:4,12

Deft 26:19
27:2 31:12

38:11 47:1
48:5,21
54:4 71:7,
19

degree 11:2,
4 81:5

Degrees 11:6

delivered
42:11
49:23

deposed 4:21
11:10

deposition
6:2 7:6,
10,13 8:1
43:18 73:3

Depot 39:20
41:23 42:1

depth 45:24

description
23:8

destroyed
77:11

details 7:15

determined
80:24

develop
33:1,18

developed
14:7 18:9,
12 26:7,10
42:18
51:15

77:17

developing
33:21
75:15

development
18:10
51:18

difference
18:21

diminution
80:18
81:13,15

DIRECT 4:9

discoloration
69:12,21

discolored
53:12

discovered
74:12

discussing
82:23

discussion
53:19
84:24

disillusion
14:20

dispute
37:19
47:17 59:5

dissolved
13:15

District
27:3

dive 53:18

document
21:24 24:4
26:14
27:8,14,
16,21
28:4,24
29:3 30:13
31:9,19,23
32:1 35:22
36:25
37:12
38:12
48:10
54:10,19
55:4,6
56:3 57:25
58:18
71:2,13,25
72:2,6,9
74:11
84:14

documents
7:25 37:5
53:18
54:22
55:18,20
82:20
84:17
85:10,20

dollar 79:6

doubt 48:13,
15

Doyle 6:3
30:25
37:16

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter on 12/11/2020          Index: drawings..expenses

45:19
49:11
61:1,6,9,
11 62:2,6
74:10
85:14,21,
22 86:23,
25 87:7,8

drawings
44:4

driven   77:23

drywall
12:7,16,23
13:17
15:14
21:2,4,9
36:18
38:22,25
39:3,7,11,
24 40:4,20
41:6,10,
15,18
42:17,19,
24 43:2,7,
13 44:22
45:1
46:17,22
47:16,18,
23 48:14,
18 49:1,4,
6,16,17,
18,20
50:17,21
51:1 52:9
53:7 55:1
59:22,24
60:5,8,17

61:1 62:1,
12,17,18,
21 64:9,25
65:1,5,6,
11,18
66:5,9,13,
15,17,21,
22,24
67:4,6
73:5,8,17,
24 74:4,8,
12,22
77:18
78:13 81:9

duly   4:6

_____

E

_____

earlier
33:16
49:15
56:14
63:23
65:24
66:16
67:19
69:24 73:3

early   74:23

easily   19:20

education
11:8

efforts   41:9

Eikhoff   4:2,
11 5:22,25
11:25
12:10

17:22,25
22:4,7,19,
21 23:23
24:2
26:15,23
27:6,11
31:2,5,16,
22 33:7,10
35:4,7,18,
23 36:23
37:1,7,11
38:8,15
46:23
47:5,25
48:9,17,25
49:13
53:24 54:8
71:12,14,
23 84:13
85:4,13,25
86:1,18,22
87:1,10,12

electrical
69:16

else's   17:13

Embry   11:1

encompassing
45:4

end   13:21,
22

ended   14:16
30:21 31:6

enjoyment
79:13,18
80:12

entity   12:15

estimate
14:5 30:24
74:25

estimating
76:13

EXAMINATION
4:9

examined   4:7

examples
66:2

exceeds
65:12,24

exhibit
26:17,25
29:20 30:3
31:10 38:9
46:21,24
48:2,18
54:2 71:2,
16 72:10,
11

exist   44:9
45:21
83:19
85:19

existence
13:13

expansions
37:24

expenses
79:5,8,11
80:1,3

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020          Index: experience..Gibbs

experience
  66:8

expertise
  65:22

Express
  9:12,19
  10:17

extensive
  44:12

extent   16:5
  43:12
  55:19
  56:17  59:9

eye   49:8

eyes   53:3
  64:1

———————

F

fact   34:16

fair   6:16

Fallon   76:5
  79:20

familiar
  42:1

fault   16:10

Fedex   9:5,7,
  10  10:20

feel   6:21
  79:10

fees   45:13

feet   58:21
  59:10

field   11:5

figure   30:12
  50:23
  76:16
  79:14
  82:24

figured
  80:25

figures
  78:23

file   35:14
  84:2

files   84:4

fill   28:4

filling
  54:21
  57:14  72:6

finance
  19:13

financed
  19:7,15
  43:14

find   52:13

firm   45:10
  61:1,6,15,
  16,21  62:2
  63:6,14
  64:5  74:10

fix   80:22

fixed   81:19

fixture   70:5

fixtures
  70:3,12,22

Floor   28:16

flooring
  9:22  10:1,
  13  14:11
  15:3  25:2

flying   6:20
  15:4,8
  27:9

focusing
  56:24

foot   37:19
  76:6

footage
  36:24
  37:3,6,17
  38:1  58:21
  59:2,6,14,
  15  81:1

footages
  7:22

foreclosure
  77:9

form   30:25
  49:12
  54:1,5,24
  55:16,24
  56:18
  60:16  63:5
  65:25
  71:4,8,17,
  20  72:1,9,
  12,18
  73:22  79:2
  80:16
  81:25

formed   13:10

forms   5:14

formulation
  76:6

found   11:23
  12:6,13
  16:10
  21:1,3,7,
  11  50:22

fulfilling
  46:14

full   4:18
  8:5  14:17

full-time
  15:10

functions
  29:2

furniture
  82:11

———————

G

garage   50:3
  59:15

gases   82:13

gave   52:15

general   14:2
  34:17

Gibb's   36:12
  38:18

Gibbs   33:25
  34:2  36:8
  51:9,10

58:2,4

give  6:23
7:2 8:6
31:19 35:8
45:2 81:14

good  4:13
6:18 38:6
53:17
55:22 81:8
85:25
87:13

gradually
68:7

group  25:24
28:24
78:17

Guerra
86:18,20
87:3,5

guess  23:12
27:23 44:2
50:7 54:23
55:11
60:17
77:15
83:18

guessing
15:1 19:25
32:16,17
50:2,6

Gulf  41:16

gutted  75:2
80:25

Gypsum  65:2,

4,15,17

—————————
          H
—————————

half  5:12
9:8 35:21

hand  5:1
35:24
58:19,24
59:18,20

handwriting
28:20,21
47:11

Hank  75:7,
8,14

happened
62:23

happening
52:21

happily
83:25

hard  20:14
30:9 35:12

Harris  34:14

Harris'
38:19

Harrises
33:24
34:10,12
51:7,10

head  5:14

heading  65:1

health  21:3,

9 50:24
53:2

hear  7:19
20:13
72:22

heard  6:1
52:8 76:4

heat  69:8

held  17:12
53:20
84:25

high  8:17

higher  76:20

hill  53:2

hold  36:23
85:14,19

home  15:17,
20 17:6
25:22
32:25
36:7,19
37:22,23,
24 39:19
41:23 42:1
45:12
46:2,5
50:1 58:5,
20 61:19
62:1,5,13,
14,21
63:16,18
64:12,22
65:5 66:17
67:4,9
68:3,10

69:3,13
70:9,17,19
75:11 81:8
82:3

homeowners
35:2

homes  10:1,
13 11:22
12:15
13:2,11,25
14:6,7,21
22,24
15:13,15,
25 17:15
18:19,23,
24,25
19:5,7,11
23:3,15,19
25:1 26:1,
6 28:8,15
32:22,23
33:17
34:16,23
39:13,14
40:20
44:6,14,21
51:14,20
57:20
73:12,13
74:3 75:16
77:16

honest  23:6
44:11

honestly
15:21
61:13 70:2
82:17

hope  77:13

hopes  84:18

hot  69:9

hotel  5:16

hour  53:13

house  7:17,
  19,24
  12:7,9
  16:24 20:5
  21:6 22:2
  32:20,24,
  25 33:23
  34:1 44:1,
  15 45:3
  50:11,12
  51:3
  52:18,25
  64:1
  66:15,22
  67:1,11,22
  73:12,24
  74:3 75:1
  79:9 80:24
  81:2,17,18
  83:7 84:7,
  9

houses  11:22
  32:14
  39:2,16
  40:9,10
  46:9 53:7,
  9 60:14

housing
  13:16

hurricane

41:16

─────────

**I**
─────────

ID  47:16

idea  30:23
  43:8

identification
  30:6

identified
  56:18
  60:16 63:5
  74:11

identifies
  28:7 56:12
  59:24

identify
  65:4,22
  80:19
  85:16

immediately
  21:11 64:2

important
  5:12

inaccurate
  56:19

inappropriate
  81:1

include
  43:20
  59:15

inclusive
  64:10

inconsistencies  24:13

incorrect
  57:12,13

independent
  73:16

indication
  60:24

individual
  73:12

industry
  61:23

information
  52:14
  55:16 56:5
  58:20
  60:22
  64:25
  72:12,15
  76:1

informative
  74:4

inhibit  7:1

initial
  37:23 68:1
  86:7

inside
  50:11,12
  75:3 78:4
  82:9

insist  59:10

inspect
  49:22
  50:20

inspected
  60:25
  61:20 62:5
  66:25 67:5

inspecting
  63:15

inspection
  61:4,7
  63:4 64:5,
  13 74:10

inspections
  61:25

install  39:8

installation
  46:16

installed
  36:19
  38:22
  49:2,7,20
  73:5,8,17,
  25 74:4

installer
  52:20

insurance
  15:17,19
  44:23
  45:13

intact  70:10

intent  62:10

intention
  32:22

interested
  32:20

involved
  11:10,17

irritating
  67:23

issue   21:2,8
  52:12,19
  70:6

issues   21:3
  52:23 53:4

itemization
  30:5

items   72:12
  82:21
  83:19

IV   60:21

J

J-I-L-L   17:1

Jet   9:12,19
  10:17

Jill   17:1,
  2,14 22:25

Jimmy   61:8,9

John   4:5,20
  22:24 56:8
  72:19

Judge   76:4
  79:20

July   56:6,
  24 57:10
  58:9

jumping   10:4

35:9 38:16

June   36:1
  58:2

K

Kansas   9:2

Katrina
  41:14

kind   7:17
  53:4 82:11

knew   24:24
  51:11 70:5

knowledge
  49:25
  55:17
  57:14 73:6
  77:19

L

labeling
  64:9

land   22:14
  36:7

late   36:4,7

law   5:5
  61:1,6,15,
  16,21
  63:6,14
  64:5 74:10
  81:15

laws   55:14

lawsuit
  11:11,18

13:17,21
  51:2 52:7,
  15 55:1
  72:17
  79:4,8
  82:22

lawsuits
  12:23

lawyer   7:5
  15:16,22
  45:8 83:3

learn   52:11

learned
  50:25

leave   21:10
  64:3

lecture
  81:15

led   21:5
  32:19

Lee   21:22
  35:17

left   19:23
  58:19,24
  83:9,17

lender   20:2

length   57:22

letter   85:17

letters
  47:22

level   45:24

license   9:14

light   23:2
  70:4

limited
  79:24

listed   72:19
  79:6 80:20

litigation
  15:14
  78:13

livable   81:9

live   8:3,4
  20:4 34:7

lived   8:9,14
  20:22

living   50:11
  79:5,8,9,
  11 80:1,3
  83:14

LLC   13:7
  23:15 28:8
  59:25

loan   18:25
  19:9
  34:24,25
  43:15
  75:21

local   19:9
  75:9

locally
  39:19

location
  42:7 46:3

long   7:16,

23 8:9 9:6
43:11 50:9
68:13
71:13

looked 29:19
32:1
33:19,20
36:2 43:18
44:18 58:1
59:12
65:23 73:2
74:20

loss 79:12,
13,18
80:11
81:19

lost 20:15
81:16

lot 18:4,15
19:5 22:14
23:4,7,13,
15,19
24:21
29:25
54:21 57:6
73:9 81:4
86:7

lots 18:11
25:4,6,9
26:9 33:17

loud 5:18

loudly 5:13

lower 58:19
76:20

---

**M**

---

M-O-R-E-M-A-N
75:9

madam 5:22
11:25
17:23
26:15

made 43:3
45:14
47:24 49:4
65:8,11,24
66:22 67:5
77:15

make 6:4
10:2 17:9
18:20 37:2
46:19
53:12 63:2

making 46:13

management
11:7

manufacturer
65:1,5

March 72:4

mark 26:16
38:8 46:21
48:1,18
54:1 71:2,
16

marked 26:20
27:3
31:10,13
38:12 47:2

---

48:6,22
54:5 71:9,
20 72:9

market 13:16

marking
65:20

markings
49:3,6,15,
19 50:21
65:7,11,14
66:25

married 17:2

Marvin 22:8
24:15,18

Master's
11:2,4,6

materials
42:9
43:13,19,
20 44:7

Matt 22:4,
20 23:23,
25 27:6
31:16,18
35:4 36:23
47:25
53:24
71:14
84:13

Maxwell 8:25

Mcconnell
9:2

means 81:12

---

medications
7:1

meet 7:5
41:18

meets 65:11,
24

member 13:4,
7 14:14

memory 73:16

mentioned
7:18 13:3
14:10
41:5,21
43:17 45:7
63:23 67:8
69:11,23
82:4

met 7:9

method 79:25
80:11

microwave
52:23
83:15

mid 36:9

middle 6:20
30:9

military
8:19,21
9:18,23
10:5,12

mind 57:9

mine 54:15

minute 53:16

84:21

minutes   38:4

missed   84:17

misspoke
  80:5

misunderstood
  82:1

mix   40:1

mixed   40:10
  49:17

mixing   53:8

model   78:15

mom   25:23
  56:10
  57:10 58:8

moment   21:17
  35:6 60:3

money   78:12

monitoring
  46:12

month   74:10

months   25:17
  36:9 68:16

Moreman
  75:7,9
  76:3,9,11

morning   4:13
  5:17

mortgage
  19:16,18,
  24 20:2
  75:21 77:6

mother   12:8
  20:6,9,19
  34:6
  56:20,24
  58:3 62:15
  64:12
  67:16
  68:3,10
  86:13

mother's
  20:7 34:1
  44:1 50:24
  53:2 70:21
  78:9 84:4

move   56:6,
  22 57:24

moved   8:18
  10:7 21:6
  56:23
  57:10
  58:3,8
  64:17
  68:14,18,
  20,21,22,
  23

moving   8:20
  68:3,10

multiple
  26:10
  39:18,21
  40:9 46:9
  60:13,14
  66:18

N

naked   49:8

named   15:13

names   34:12
  37:9 51:6
  52:3 72:15

necessarily
  39:1

needing
  42:23

negligent
  16:10

neighbor
  5:18

neighborhood
  25:5,7
  51:15,16,
  25 77:17

neighbors
  58:2

night   4:13
  6:20

nods   5:14

nonverbal
  5:15

normal   40:3,
  5,6 49:21

North   28:13,
  14

notarization
  24:7

notary   24:1

notary's
  24:6

note   47:12

notes   84:16

notice   52:6
  67:11

noticeable
  63:24
  68:11

noticed   24:3
  52:25
  68:17

noticing
  67:14

November
  61:2
  64:15,21
  74:8,9,13

number   30:10
  33:23
  37:20
  59:10
  76:5,7,17,
  19 80:16

numbers
  79:19

O

oath   5:3

Object   30:25

Objection
  49:11

objections
  6:3

obligations
  46:14

observe   27:8

observed
  69:19,22

observing
  69:12

obvious
  63:22

Occasionally
  77:23

occupancy
  20:18
  36:14

occupant
  20:20
  56:13,18,
  21

occupants
  56:12

occupation
  9:4 15:5

occupations
  9:20

occupied
  56:14

odor   52:25
  67:8,15
  68:11
  69:2,9

odors   69:5

ongoing
  24:23

Opelika
  16:17
  27:24 29:4
  42:7

open   85:15,
  19

opportunity
  15:8 27:8
  31:20

opposition
  85:24

order   40:8

ordered   42:9

original
  57:6 70:12
  83:21

out-of-pocket
  16:1

outlets
  69:17

owned   9:21
  12:16

owner   10:12
  13:6 16:22
  28:7 46:6
  56:13,20

ownership
  14:19
  18:25

————————
      P
————————

p.m.   87:14

pages   71:13

paid   18:16,
  19 43:6

papers   21:14

paragraph
  22:23

Park   23:7

part   16:8,
  9,11
  25:18,23
  29:3 45:13
  78:15 79:4
  84:3

partially
  74:17

partnership
  14:16

pass   20:11

passed   84:8
  86:14

path   15:9

Patriot
  10:1,13
  11:22
  12:15
  13:2,10,25
  14:6,21,
  22,24
  15:13,15,
  25 17:15

18:19,23,
  24,25
  19:4,7,11
  23:3,15,19
  25:1 28:8,
  15 32:22
  34:23
  39:13,14
  40:20
  44:6,14,21
  51:13
  57:20
  73:11,13
  74:2 75:16

pay   15:25
  16:2 19:14

paying
  19:20,23
  75:21 77:6

payment
  16:12
  78:21

PC   61:1,6

penalty
  55:13

people   52:4
  83:23

perfectly
  85:23

performed
  61:7

period   9:20
  15:11
  17:16
  44:14

perjury
55:14

permit   26:20
27:19
28:2,18
30:4 32:2
33:3 36:3
57:4,5

permits
29:17

person   7:7
72:18
86:11

personal
70:20,21
84:4

personally
46:8 50:20
69:19,22

Ph.d.   11:3,7
15:7

Ph.ds   11:4

photo   46:22
48:19

photograph
47:2,7,9,
15,17
48:2,6,14,
22

photographs
49:24 50:1
65:23 66:1

physical
23:10

picture   51:5

pieces   62:17

pilot   9:5,11

pilot's   9:13

piping   69:25
70:1,14

place   8:23
16:17 17:7
23:11
28:12
32:5,12
34:3 35:15
37:18
38:17,18,
19 39:25
40:19
50:18
51:21
72:17

places   40:25

plaintiff
11:11
51:13
53:25
54:5,25
55:16
71:3,8
78:12

plan   15:7
27:22,25
28:25
29:7,15,24
32:11,20,
21 43:19

plans   7:16,

19,24
43:25 44:3

plates   53:11
69:16

play   13:18

pocket   16:13

point   19:10
20:24
30:16
45:14
50:12
53:17 62:9
63:3,25
75:11
78:13
80:23

poorly   31:3

portion
78:17

possession
55:20

possibility
21:1 50:23

Post   47:11

potential
11:24 12:6
60:4 70:6,
7

potentially
75:6

power   53:14

preparation
7:10 8:1

43:17

prepare   7:6,
13

present
53:23 85:3

Preserves
51:25

pretty   45:2

previous
76:4 79:19

previously
29:19
78:24

price   32:15
41:4 80:25
86:3

prices   40:24
41:1

prime   15:4

prior   8:20
9:1 23:3,
12,13 25:2
29:16
40:20
78:20

problem   21:8
51:1,11
52:9 64:18

procedure
49:21

proceedings
53:21 85:1

process   22:2

29:15
74:24
77:14

procure   39:6
  41:10,18

procured
  39:7,9,12
  49:18

produced
  37:5 45:5
  71:25

product
  47:15 66:2
  74:1 75:22

profile
  54:1,5
  55:16
  71:3,8

program
  76:12

progress
  46:12

prohibitive
  75:20

project
  30:21 46:7

projects
  25:14
  41:19

proof   47:15

properties
  17:8 18:3
  22:1,24
  24:16

34:6,22
41:11 43:2
45:15
51:14

property
  7:15
  16:17,20,
  22 17:4,5,
  12 18:1,9,
  14,17
  20:4,18,25
  21:10,15,
  22 22:13
  25:18
  29:20
  30:15
  32:8,23
  36:3,9,12
  37:18
  38:20,23
  39:24
  40:22
  41:10
  42:17
  43:15
  46:6,17
  47:16,18
  48:3,14
  49:3,20,23
  51:24
  56:15
  60:5,8,25
  66:2,12
  72:15,17,
  25 73:5,9
  74:7,13,
  16,21
  77:1,21

78:4
79:13,18
80:12
81:16,20
82:3 83:11
86:4,12

proprietors
  24:16

provided
  15:16,22
  28:12,14
  45:12,15,
  18 82:14

pull   35:5
  53:10,25
  57:2

Pulling
  69:16

purchase
  19:8,13
  21:15
  36:13
  45:1,15
  83:10,21,
  24 86:3

purchased
  19:5
  22:13,15
  23:4,19
  24:21
  34:23
  36:7,8
  42:16 43:2
  44:7 58:4
  73:9,11,25
  83:20

purchasers
  34:3,5,9
  35:2

purchases
  43:21

purpose
  13:24

pursuant
  55:15

pursued   15:4

put   21:16
  26:13 31:9
  54:9 60:18
  71:15
  73:21
  80:16
  81:24

——————

Q

quality
  63:20

question
  6:6,11,15
  12:2,3
  31:1,4
  32:18
  49:12,14
  72:25 73:4
  74:6,16
  80:6 86:13

questions
  5:8 6:22
  7:2 13:1
  17:7 19:22
  85:5,6

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter on 12/11/2020                    Index: quick..relates

86:19,20,
23

**quick**  35:11
84:12,15

**quickly**  83:9

———————
R
———————

**R&s**  18:3
22:24
24:16

**raised**  5:1

**rarely**  43:10

**reaching**
67:12

**reaction**
68:2

**read**  12:1,4
30:9,10
35:11
50:14
55:21

**reading**
52:13

**ready**  36:13

**realize**
18:20
32:18

**Realtor's**
15:20

**reason**  37:19
43:25
44:20
47:17

48:13,15
59:3,5
60:7 76:15
77:22
80:21

**rebuilt**  75:3

**recall**  18:1,
16 19:4
21:24
24:16
25:20,22
30:20
33:20
36:15
37:14
39:23
41:7,9,17
43:6,24
44:21,24
49:1,3
50:25
57:4,25
58:3,11
61:24,25
62:3 63:7
64:4,6
66:12
67:14
68:6,10
69:2,12,15
82:19
86:3,5

**receive**
85:20

**received**
52:6
78:12,16,

24

**receiving**
13:21

**recently**
8:16

**recognize**
27:14,17,
21 28:20
31:23
47:6,11
53:1
54:14,19
78:23

**recollection**
23:18
58:14 76:1

**reconvened**
53:22 85:2

**record**  4:19
5:24 6:4
26:21 27:4
31:14 37:3
38:12 47:2
48:6,22
53:20 54:6
71:9,21
80:7 84:25
85:7,8
87:2

**recording**
5:7

**records**
43:20
44:6,9,14,
16,19,25

45:2,15,
18,24,25
46:1 57:20
74:2
76:10,18
82:14
83:5,10,
11,20,21,
24 84:7
85:16

**recreated**
83:9

**referred**
40:11

**referring**
17:6 34:2
81:6

**refers**
59:13,14

**reflect**
82:20

**refresh**  57:9

**refrigerator**
83:24

**Reggie**  34:13

**Reginald**
34:13,14

**related**
12:16
16:16
21:14
85:10

**relates**  37:6

EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.
John Carter on 12/11/2020        Index: relationship..roughly

relationship
  24:20,23

relative
  26:4

remaining
  75:2

remediate
  74:21,25
  76:2 81:8

remediated
  74:17
  77:17

remediating
  75:6

remediation
  81:1,7

remember
  4:25 7:21,
  22 13:10
  15:21
  19:19 20:3
  21:25
  24:10
  25:12,16
  31:8 32:13
  33:23
  34:4,12
  36:17
  39:4,18
  40:3,5
  41:14
  43:10,23
  45:9,10,11
  46:19
  47:10

48:12
49:5,10,19
50:8,16,20
51:4,5,23
52:1,3
54:21 55:5
57:1 61:24
62:8,19,
22,25
63:1,11,22
64:7,8,11
65:21
66:14
67:17
68:15 69:5
70:2,4
72:6
74:23,24
75:5
76:17,19,
21 78:6,18
82:16,17,
23 83:1,4

removed
  62:13

renovations
  37:25

rent   77:3

repair  83:10

rephrase
  31:2 80:6

replace
  52:17
  74:21
  82:25
  83:14

replaced
  83:13,16

report   79:3

reported
  65:25

reporter
  5:7,23
  12:1
  17:23,24
  26:16
  87:3,6,10

represent
  21:21
  30:12
  35:13
  37:15
  47:14
  65:19 66:1
  71:24

representative
  61:14,17
  63:14 64:5

represented
  15:15
  44:23 45:8

request
  79:10,17

requested
  55:19

residential
  9:21 14:1,
  3,7 15:3

resolve   16:1

respect

32:21

response
  85:21

responses
  5:13

restate   6:15

retained
  62:8

retired   8:18
  10:4,6,8

retiring
  8:19 9:17

returning
  83:3

review
  27:22,23
  28:25
  29:7,15,24

reviewed
  7:25 43:20

Riddle   11:2

RL   40:2
  41:24 42:2
  59:25

Road   28:13,
  14

rock   50:5

room   5:16
  60:18

roughly
  34:19
  39:17 53:8

run 40:17

Rusty 18:3,6
  24:18

———————————
          S
———————————

Sallie 18:4,
  6 22:9
  24:15

samples
  62:16,17

sat 57:22

saturated
  82:12

schedule
  34:18

school 8:17
  15:6 81:15

scope 45:25

screen 21:16
  35:6 54:9
  58:20,24
  59:19
  64:24
  78:21
  84:14

scroll 22:5,
  20 23:24
  27:7 31:18
  35:8,12
  37:8 54:18
  59:19

seal 24:1

section

56:4,5
58:20
59:21
60:21,24
64:24,25
72:24
74:15,16
78:20,21
79:2,12
80:18

seeking 79:7
  81:16,19
  82:2,7,21
  83:11
  86:12

sell 33:1
  76:25 77:2

separate
  28:13,24
  86:16

separately
  39:8

September
  73:6,22

sequence
  10:3

served 51:2

service 9:18
  10:5,12

serving 8:21

set 25:14,
  15,18,19

setting
  56:23

settle 16:7

settlement
  16:4,8,11
  79:20

shakes 5:14

sheet 50:5

ship 42:9

shop 15:2
  40:25

short 17:16

shortage
  39:11 40:4
  41:6
  42:15,18,
  24 49:16

shortages
  40:7

shorter
  77:14

show 21:14
  22:23
  23:10
  26:24
  37:4,8
  48:1 61:17
  71:1

showed 29:20
  49:25 59:2
  61:15

showing 23:7

shows 56:7,
  22

side 33:25

49:6,9
50:5,13
51:17
58:19,24
59:20 64:9
65:6,18

signature
  37:9
  54:14,16,
  22 55:4,8,
  12,23 72:2

signatures
  22:8 24:6
  29:9 33:8,
  11

signed 55:3,
  6

single 13:7
  26:3

sir 6:23
  8:7 12:11
  14:12
  16:18 28:4
  29:1

sit 45:22
  58:11,13

site 27:22,
  25 28:25
  29:7,15,24
  46:3,8
  49:2 76:5

sits 83:8

sitting 5:4
  82:19
  83:17

slightly
 81:14

slow  27:9

slowly  31:18

small  24:24
 26:3

smell  63:24
 82:13

socket  53:10

sold  19:2
 23:12 35:1

sole  13:4,6
 14:14,18
 20:19
 60:7,10,12

sound  36:6

sounds  36:10
 66:24
 74:14 85:9

source  40:20
 42:23

sources
 39:19,21
 49:17
 66:18

south  42:14

southeast
 41:15

space  50:11

speak  5:13

speaking
 5:18

spec  32:24,
 25 36:6

specific
 39:25

specifically
 20:6 47:8
 67:18 72:7

spoke  17:21

square  7:22
 36:24
 37:3,6,17,
 18 38:1
 58:21
 59:2,6,10,
 13,15 76:6
 80:25

stage  29:14
 59:21

stages  36:16

staggered
 25:11,13
 34:19

stamp  35:25

stand  5:4

start  54:12

started
 9:15,19
 10:16,20
 14:16,22
 30:18
 52:13,16
 53:4 57:21

state  4:18
 6:3 36:11

statement
 6:5

States  27:3
 55:14

stationed
 8:24,25

steps  22:1

Stockett
 40:2 41:24
 42:2 59:25
 60:4,8,15

Stone  10:1,
 13 14:11

stood  46:19

stop  53:18
 72:12

stopped  10:8

stored  44:15
 46:4

strange
 52:21,23

street  26:4
 51:23
 52:2,4

strike  80:5

structure
 82:3

structures
 18:14

student
 15:10

studs  75:2

study  11:5

stuff  7:17
 82:12

subcontractor
 39:1,3,6

subcontractors
 46:13

subdivision
 23:8 26:2,
 3,6 52:1

submitted
 29:4,24
 33:4 37:16
 47:15

sued  11:14,
 18 12:16,
 19,23
 44:22
 51:4,13,24
 52:15

suggested
 29:22

suit  45:4

sulfur  82:12

sulfuric
 82:13

Supplemental
 71:3,8

supplied
 55:18

supplier
 40:7 59:22
 60:8,11,

12,18

**supplier's**
59:25

**suppliers**
40:6 41:20
42:4,23
49:18
60:4,13

**supplies**
49:22 53:8

**supply** 40:12
43:21
44:18

**support** 83:6

**survey** 29:3

**swear** 4:3

**switch** 38:5

**switches**
69:17

**sworn** 4:6
5:2

**symptoms**
21:4

---

**T**

---

**Taishan**
65:1,4,15,
16

**taking** 6:25
14:17
67:25 87:4

**talk** 16:16

**talked** 75:5
85:17

**talking**
17:5,9
32:9 44:3
86:7

**teach** 15:7

**technically**
35:12

**televisions**
82:10

**test** 63:21

**tested** 63:19

**testified**
33:16
49:15
56:14 59:4
60:3 66:16
86:2

**testifies**
4:7

**testimony**
23:3 43:1
52:7

**testing**
62:20
63:13,15

**thing** 45:11
83:13

**things** 7:16
52:21 53:9
56:2 78:9
81:4 82:25

**thought**
12:12
52:19
57:15
85:22

**thousand**
74:25
76:16

**time** 6:2
9:17,18,20
12:20
14:17,18
15:11
18:8,12,13
20:14,22
25:10,12,
15 26:21
27:4 28:15
29:25
31:14
32:15
33:3,18
34:17,21
35:25
36:13,19
38:13
39:11,17
40:21
41:7,12
44:14 47:3
48:7,23
51:19,22
52:24 53:8
54:6 55:3
57:23
58:4,6
62:1,5,7

63:24
64:13
67:20
68:7,9,11,
17,20,21,
22 69:6
71:10,21
75:22 78:3

**timeframe**
33:21
73:23

**times** 41:6
52:18

**title** 16:23

**today** 4:16
6:23 16:16
32:9 45:22
58:11,13
61:9

**today's** 7:6
8:1

**told** 51:11
53:10

**tool** 76:13

**top** 32:4
33:12
35:21
58:23,24
60:20

**topics** 38:5

**total** 26:2
30:6

**totally** 15:1
32:17

touched
    62:14

town   24:24
    51:17

transaction
    22:24

transfer
    29:20,22
    57:6

transferred
    30:1

transitioned
    9:22

treated   75:3

trick   6:13

trouble   53:3
    64:2

true   55:9,
    17

truth   5:2

truthful
    6:23  7:3

turn   75:22

type   66:9
    70:22

typical
    40:19

Typically
    41:3

typo   57:16

**U**

U.S.C.   55:15

Uh-huh   58:22
    59:23
    78:22  80:9

ultimately
    35:1  41:17

Undergrad
    11:6

undergraduate
    11:1

understand
    5:2,8  6:8,
    10,14,22
    7:2  55:23
    79:25

understanding
    12:14
    16:15
    42:13
    54:24
    55:10  75:1
    80:10

understood
    56:22
    80:14

undeveloped
    18:9

unimproved
    22:14
    29:25

United   27:2
    55:14

upper   35:24

usual   87:11

**V**

vacant   70:10

vacate   20:24

Vaguely
    54:21

verification
    55:24
    59:2,6,11
    71:17,20
    72:9

verified
    64:18

verify   55:9
    62:11

VI   58:20
    78:20

virtually
    7:6

visible   49:7

visit   64:4

**W**

wait   6:4
    21:18

walk   63:22
    64:1  83:7

walls   50:14
    66:6,9,13

wanted   16:6
    24:4

warranty
    21:22,25
    22:22
    29:19
    35:5,14
    58:1  73:2

Waverly
    16:17  17:7
    23:7,11
    28:11
    32:5,12
    34:3  35:15
    37:18
    38:17,18
    51:20
    72:17

Wichita   9:2

wife   16:23
    17:13
    19:11
    23:14
    28:19
    72:16
    86:15

wife's   28:21
    29:10
    33:12

wire   64:8
    69:17  70:8

wires   53:11

wiring   69:12
    70:12
    82:11

**wise** 25:15

**worded** 31:3

**work** 11:7
  15:6

**worked** 75:15

**working** 9:6,
  19 10:12,
  16,20

**works** 61:21

**world** 5:12

**worse** 63:25
  67:20 68:7
  69:2,5,8,9

**writing** 28:5

**wrong** 50:24

---
**X**
---

**Xactimate**
  76:12

---
**Y**
---

**year** 9:8,12
  13:20
  14:23
  20:12,14
  69:6
  79:21,22
  80:2,12

**years** 9:9
  10:17,18
  14:6 24:23
  44:10 50:9
  68:16,23,

  24,25
  74:23
  76:24 78:5
  79:23

---
**Z**
---

**zoom** 4:17
  5:11 22:6
  23:25 24:1
  28:6 30:8
  33:7 35:21
  54:17

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021

```
 1              IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
        IN RE:                      )
 3      CHINESE-MANUFACTURED        )
        DRYWALL, PRODUCTS           )
 4      LIABILITY LITIGATION        )
        EDUARDO AND CARMEN          )
 5      AMORIN, ET AL.,             )   No.
        INDIVIDUALLY AND ON         )   2:11-cv-01395-EEF-JCW
 6      BEHALF OF OTHERS            )
        SIMILARLY SITUATED,         )
 7                                  )
             Plaintiffs,            )
 8                                  )
        vs.                         )
 9                                  )
        TAISHAN GYPSUM CO.,         )
10      LTD. F/K/A SHANDONG         )
        TAIHE DONGXIN CO.,          )
11      LTD.; TAIAN TAISHAN         )
        PLASTERBOARD CO, LTD,       )
12      ET AL,                      )
                                    )
13           Defendants.           )

14

15                          - - -

16

17           Continuation of the Videoconference

18                Deposition of JOHN CARTER

19                 (Taken by Defendants)

20                    Atlanta, Georgia

21                   January 26, 2021

22                        Volume 2

23   Reported by:   Lynne C. Fulwood

24                 Certified Court Reporter

25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
**John Carter- Vol. 2 on 01/26/2021**      **Pages 91..94**

**Page 91**

```
1    STATE OF GEORGIA
2    COUNTY OF COBB
3    CONTINUATION OF THE VIDEOCONFERENCE DEPOSITION OF
4    JOHN CARTER
5
6              Pursuant to Article 8.B of the RULES AND
7    REGULATIONS OF THE BOARD OF COURT REPORTING OF THE
8    JUDICIAL COUNCIL OF GEORGIA, I make the following
9    disclosure:
10             I am a Georgia Certified Court Reporter.
11   I am here as a representative of Huseby Global
12   Litigation.
13             Huseby Global Litigation was contacted by
14   the offices of ALSTON & BIRD, to provide court
15   reporting services for this deposition.  Huseby
16   Global Litigation will not be taking this deposition
17   by O.C.G.A. 15-14-37 (a) and (b).
18
19
20
21
22
23
24
25
```

**Page 93**

```
1              - - -
2              Continuation of the Videoconference
3    Deposition of JOHN CARTER, taken by the
4    Defendants, at 1201 West Peachtree Street,
5    N.W., Suite 4200, Atlanta, Georgia 30309,
6    on the 26th day of January 2021, at 4:00
7    p.m., before Lynne C. Fulwood, Certified
8    Court Reporter.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 92**

```
1    ON BEHALF OF THE PLAINTIFFS:
2         JAMES DOYLE - videoconference
          Attorney at Law
3         Doyle Law Firm, PC
          2100 Southbridge Parkway
4         Suite 650
          Birmingham, Alabama 35202
5         205-533-9500
          Jimmy@doylefirm.com
6
     ON BEHALF OF THE DEFENDANT TAISHAN GYPSUM:
7
          CHRISTINA EIKHOFF - videoconference
8         MATTHEW LAWSON - audio
          Attorneys at Law
9         Alston & Bird
          1201 West Peachtree Street, N.W.
10        Suite 4200
          Atlanta, Georgia 30309
11        Matt.lawson@alston.com
          Christy.eikhoff@alston.com
12
     ON BEHALF OF THE DEFENDANTS BEIJING NEW BUILDING
13   MATERIALS PUBLIC LIMITED COMPANY, BEIJING NEW
     BUILDING MATERIALS GROUP CORPORATION, AND CHINA
14   NATIONAL BUILDING MATERIALS COMPANY, LIMITED:
15        DANIEL GUERRA - videoconference
          Attorney at Law
16        Orrick, Harrington & Sutcliffe
          The Orrick Building
17        405 Howard Street
          San Francisco, California 94105-2669
18        415-773-5700
          Dguerra@orrick.com
19
20
21
22
23
24
25
```

**Page 94**

```
1         INDEX TO PREVIOUSLY MARKED EXHIBITS
2    Exhibit 10     Amended Supplemental Plaintiff
                    Profile Form              99
3
4
              INDEX TO EXHIBITS
5
     Exhibit 12     Amended Supplemental Plaintiff
6                   Profile Form              99
7
8         INDEX TO EXAMINATION
9    Examination by Ms. Eikhoff               95
10   Examination by Mr. Guerra                121
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Pages 95..98

Page 95

1                    P R O C E E D I N G S,
2                        - - -
3            (Whereupon, counsel for all parties
4        stipulates that the Court Reporter is
5        authorized to swear the witness remotely.)
6                    JOHN CARTER,
7    having first been duly sworn, was deposed and
8    examined as follows:
9                    EXAMINATION
10   BY MS. EIKHOFF:
11        Q    This is a continuation of the deposition
12   of Mr. John Carter, which commenced on December 11th,
13   2020.  Mr. Carter, you remember me?  I took your
14   deposition last time.  I'm Christy Eikhoff and I
15   represent Taishan Gypsum, who is a defendant in a
16   claim that you've made against them.
17        MS. EIKHOFF:  Do you want to make
18   appearances for the record of other
19   counsel?
20        MR. DOYLE:  Jimmy Doyle on behalf of
21   the plaintiff.
22        MR. LAWSON:  Matt Lawson on behalf of
23   Taishan Gypsum and Taian Taishan
24   Plasterboard.
25        MR. GUERRA:  Dan Guerra on behalf of

Page 96

1        Beijing New Building Materials, Public
2        Limited Company, Beijing New Building
3        Materials Group Corporation and China
4        National Building Materials Company,
5        Limited.
6    BY MS. EIKHOFF:
7         Q    Okay.  Let's go ahead and get started.
8    Mr. Carter, the last time that we met, you -- we had
9    some discussion about you maybe looking back for some
10   additional documentation and files from the building
11   of the house.  Do you remember talking about that?
12        A    Yes.
13        Q    And have you in fact gone back and looked
14   for building files since we last spoke?
15        A    Yes.  And the files are no longer
16   available, nowhere to be found.
17        Q    Okay.
18        A    I was able to forward along in terms of
19   there was a lease agreement with my mother that
20   clarified the dates for when the house was finished
21   and moved into.
22        Q    Okay.  Do you recall anything else that
23   you found besides the lease agreement?
24        A    No, that was it.
25        Q    And so specifically I asked you last time

Page 97

1    about whether you had any receipts, invoices,
2    documentation related to the purchase of the Chinese
3    drywall or I should just say the purchase of the
4    drywall that was used in this property.  And I take
5    it that you did not find any purchasing records of
6    that?
7         A    No.
8         Q    Okay.  Another thing that we talked about
9    last time was that at one point you did have a lot of
10   records related to the building of the house
11   particularly with your involvement with Patriot
12   Homes, which was your home building business.  And
13   those records have been turned over to an attorney
14   that had defended Patriot Homes in litigation several
15   years ago.  Do you remember that?
16        A    I don't remember that I turned the
17   paperwork over to that attorney.  Honestly I don't
18   remember if I did or did not.
19        Q    Okay.  Well, when we talked about it
20   before, you thought that you turned everything over
21   to that attorney, but you couldn't remember the name
22   of the attorney.  I was wondering if as we sit here
23   today anything has brought the name of that attorney
24   to your mind?
25        A    No, but it -- it was the assigned

Page 98

1    attorney through the Alabama Homebuilders Association
2    insurance if that helps you find who it was.
3         Q    Okay.  But that's all you remember?  You
4    don't remember the firm name or the attorney name?
5         A    I don't.  It's been a while.
6         Q    All right.  So I would like to mark as an
7    exhibit the supplemental -- the amended supplemental
8    plaintiff profile form that we have received since
9    your last deposition.  And do you have that document
10   with you, Mr. Carter?
11        A    I do.
12        Q    Okay.  We can put it up on the screen if
13   needed.  I will see if we can get on the same page
14   without putting it on the screen because we may be
15   able to just refer to page numbers, and you and I
16   will be on the same page, if you will.
17        A    Okay.
18        Q    So this amended supplemental plaintiff
19   profile form, or sometimes I may refer to it as an
20   SPPF, it shows a signature date of December 16th,
21   2020.
22        A    Okay.
23        Q    Is that what you have?
24        A    On the front, the signature date?
25        Q    It's on page seven.

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                              Pages 99..102

Page 99

1    A    Yes.
2    Q    Is that your signature?
3    A    It is.
4    Q    And did you sign that on the 16th?
5    A    I did.
6    Q    And our last deposition was December
7  11th, so within about a week of the last deposition
8  is when you did that?
9    A    Yes.
10   Q    And you -- we had previously wrote at a
11 prior version of an SPPF that you had executed on
12 March 8th, 2018, which was made Exhibit 10 to your
13 deposition.  Do you remember in your last deposition
14 when I was asking you questions about that SPPF?
15   A    That's the one you were putting on the
16 screen at the time?
17   Q    Yes.
18   A    Yes.
19        (Whereupon, Exhibit Nos. 10 and 12 were
20        previously marked for identification by the
21        court reporter.)
22 BY MS. EIKHOFF:
23   Q    Okay.  So what I want to do today is just
24 ask you about differences between that SPPF that was
25 Exhibit 10 and this newer SPPF which is Exhibit 12.

Page 100

1  Okay?
2    A    Okay.
3    Q    So the first change that I notice is on
4  page two, and that is the response to the question
5  right about in the middle of the page, when was
6  Chinese drywall installed in the property to the best
7  of your knowledge.  The prior SPPF said that -- had a
8  date there, September 1st, 2006, and Exhibit 12 shows
9  2007.  Did you make that change?
10   A    I did.
11   Q    And why?
12   A    Looking back at the settlement statement
13 for when the property itself, the empty lot was
14 bought was December.  And the lease agreement for my
15 mother started as May 1st of 2007.  And it was
16 obviously one of the last things done to the house is
17 finishing the drywall.  So I estimated that it was
18 February or March when that was installed for her
19 move-in in May.
20   Q    Okay.  I did not see another change until
21 page six.  And I want you to just flip through it and
22 tell me if you think you changed anything between --
23 anything else between page two and page six?
24   A    No, not that I see.
25   Q    Okay.  The next change I saw was on page

Page 101

1  six right at the middle of the page.  There was a
2  question about if you experienced any loss of use
3  and/or loss of enjoyment of the property as a result
4  of Chinese drywall, identify the total amount of such
5  loss.  And the previous SPPF in Exhibit 10 said
6  $275,000.  This version says $337,500.  Is that
7  correct?
8    A    Yes.
9    Q    And why did you make that change?
10   A    I believe that reflects the increase
11 in -- the substantial increase of the cost of fixing
12 the home due to material and labor costs being much
13 higher now than the first estimate that was put
14 together, probably the biggest part of it.
15        And then the -- I believe it also may or
16 may not include the numbers for the replacement costs
17 of those things that are in the house.
18   Q    So I just want to orient you to what line
19 we are on the form because this is for loss of use
20 and enjoyment.  And there are other lines where you
21 would itemize the cost of remediation or the cost of
22 repair or replacement of personal items.
23   A    Okay.  Okay.
24   Q    So do you know why your quantification of
25 loss of use and enjoyment went from $275,000 to

Page 102

1  $337,500?
2    A    If we could go offline for a second, I'll
3  talk to my attorney.  We were talking about what
4  numbers to put in there based on the things that we
5  added up, so I can give you a more specific answer
6  after talking to him.
7    Q    I cannot actually have you talk to your
8  attorney before you answer my question.  So if the
9  answer is I don't know, then --
10   A    I don't remember exactly.
11   Q    Okay.  One thing that did not change
12 between Exhibit 10 and Exhibit 12 is the next line,
13 which is a blank line, the question about diminution
14 of value.  It was blank on the last one and it's
15 blank here.  And can you just confirm that you have
16 not articulated an amount to recover for diminution
17 in value?
18   A    I have not because I don't know how to
19 calculate that because I haven't done anything to
20 remediate the house.  I've not tried to sell it, so I
21 don't know how to -- how to calculate that in.
22   Q    Okay.  And then if you move ahead and the
23 pages stop with being numbered.  But if you flip
24 through Exhibit F, then we will encounter section
25 seven, loss of use and enjoyment.  Do you see that

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 103..106

Page 103

1  paragraph?
2          MR. DOYLE:  You may want to put it up
3  on the screen.
4          MS. EIKHOFF:  It's after Exhibit F as
5  in Frank.  And Jimmy, I lost Matt, so I
6  don't know how to put him back on the
7  screen.
8          THE WITNESS:  I think I'm missing that
9  page that identifies the title page for
10  Exhibit F.  So which page is it after that,
11  the actual --
12  BY MS. EIKHOFF:
13     Q    It looks like this.  I'm going to hold it
14  up to the screen.
15     A    Section seven, loss of use and enjoyment.
16          MR. DOYLE:  Hang on a second.  Let me
17  see if I can pull it up and I may be able
18  to share it.
19          MR. LAWSON:  I'm back connected and I
20  can share it if we need that page.
21          MR. DOYLE:  Please do, Matt.
22          MS. EIKHOFF:  Yeah, if you could pull
23  it up.  I'm looking for section seven, loss
24  of use and enjoyment.
25          MR. LAWSON:  No problem.

Page 104

1          MS. EIKHOFF:  And my copy comes right
2  after Exhibit F.
3          MR. LAWSON:  I have it here on page
4  14.  Let me share it on the screen.
5  BY MS. EIKHOFF:
6     Q    Okay.  Do you see that, Mr. Carter?
7     A    Oh, okay.  Yes.
8     Q    Did you -- are those your words?
9     A    Yes.
10     Q    Okay.
11     A    I've got the handwritten portion in front
12  of me.
13     Q    This -- and this paragraph was not
14  included in the previous version of your SPPF,
15  correct?
16     A    Right.
17     Q    And I see here that you say at the
18  bottom, really the last sentence:  Although not
19  comprehensive, I've calculated personal property
20  damage to be approximately $8,714 and home repair
21  damage to be approximately $5,337 -- sorry, $5,337
22  since I purchased the affected property.
23     A    Yes.
24     Q    Okay.  And are those amounts itemized in
25  the subsequent pages?

Page 105

1     A    Yes.
2     Q    I see a couple of charts.
3     A    Yes, they are.
4     Q    Okay.  So I want to look at the next one
5  that I come across, which is the one that starts with
6  Frigidaire refrigerator.  And Matt has it up on the
7  screen.  Do you see that?
8     A    I do.
9     Q    Okay.  Are these amounts listed for
10  Frigidaire refrigerator, Frigidaire microwave,
11  Frigidaire stove, are those amounts of what you paid
12  for items that were actually in the house and may
13  still be in the house?
14     A    No, they are items that we looked up on
15  the Internet for replacement with like model
16  appliances for the house.
17     Q    Are those three appliances, refrigerator,
18  microwave and stove, were they Frigidaire brand?
19     A    Yes.
20     Q    And you had said that you were going --
21  in our last deposition that you were going to look
22  and see if there were any purchase records for those
23  appliances.  And I take it that there are none that
24  you could find?
25     A    No.

Page 106

1     Q    So what you did then is to look up how
2  much it would cost to buy those items now?
3     A    Yes.
4     Q    And those are the prices that you put in?
5     A    Yes.
6     Q    And I think I see some Internet
7  printouts, so you went to -- you looked at Lowe's?
8     A    Yes.  I don't know exactly where each one
9  of them came from.  Yeah, Lowe's was one of them.
10     Q    Where did the original appliances that
11  are in the house, where were they actually purchased?
12     A    There's not a lot of options.  We're in a
13  small town, so it would have been Lowe's or Home
14  Depot or there's a place called Rex Appliances in
15  town.  So it would have been one of those three, but
16  I can't tell you exactly which one.
17     Q    Did you personally buy the appliances for
18  that house or did someone else do that?
19     A    Someone at Patriot Homes did.
20     Q    Did -- I think you said -- did your wife
21  work with you at Patriot Homes?
22     A    Yes.
23     Q    Would either you or your wife have
24  actually made the selections and made the purchases
25  on behalf of Patriot Homes?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021          Pages 107..110

Page 107

1      A    We would have made all the selections,
2  yes.
3      Q    Okay.  The next item is -- it says
4  replacement of three air-conditioner coils, $880 in
5  parentheses.  Do you see that?
6      A    Yes.
7      Q    Now, I do see in this packet of documents
8  that have been produced that there is almost like an
9  invoice from Andy -- I'm sorry, from Oasis Heating
10  and Air, LLC?
11      A    Yes.
12          MS. EIKHOFF:  Matt, put that on the
13      screen.  All right.
14  BY MS. EIKHOFF:
15      Q    In the upper right-hand corner of the
16  screen it says billed 17 August '11.
17      A    Okay.
18      Q    Do you know what date that is?
19      A    What date that is?
20      Q    Yeah.
21      A    August.  I'm not sure what you're asking.
22      Q    What date and year is that, because I'm
23  just asking for you to clarify because it could be
24  read two ways?
25      A    17 August 2011.

Page 108

1      Q    Okay.  That's when you believe that that
2  evaporator coil was replaced?
3      A    Yes, that was one of them.
4      Q    And that would have been approximately
5  five years after the house was finished being built;
6  is that right?
7      A    Okay.
8      Q    I'm asking?
9      A    Sounds right.
10      Q    Would it have been in 2017?
11      A    No, she had moved out long -- long before
12  that.
13      Q    So it would have been August 17th, 2011,
14  which is about five years after your mother had moved
15  into the house?
16      A    Yes.
17      Q    And where did you find this document?
18      A    It was in the file that I had for her
19  rental agreement.
20      Q    And I take it there were no other heating
21  and air invoices or receipts?
22      A    No, there were not.
23      Q    Okay.
24      A    The other two times that we had to
25  replace it were after much discussion with Oasis.

Page 109

1  And then on the third time, as you can see on there,
2  it talks about the warranty for the installation.
3  And after the third time of coming in to replace it,
4  he said you're going to have to pay for all these
5  because he could tell I guess that something was
6  going on or something was wrong, and he didn't want
7  to foot the bill.
8      Q    So this was -- you believe this was the
9  first time he came out?
10      A    I don't remember which time that was.
11      Q    Okay.  Let's try and see how much you can
12  remember.
13      A    It was the first or the second because
14  the third time he didn't offer any kind of an
15  invoice.  He just said you're going to have to pay
16  for these.  Actually may have been the third, I don't
17  know.
18      Q    This says replaced evaporator coil, 90
19  day labor warranty from installation, one year
20  warranty from date of installation.  Now, this
21  reflects that $880 was charged, right?
22      A    Yes.
23      Q    So if you needed to replace the coil
24  within a year of August 17th, 2011, then would you
25  have been paid for it -- sorry, would you have paid

Page 110

1  for it?
2      A    No, I did not, did not pay for it.
3      Q    So did he come -- so he came out within a
4  year.  Is that your memory of it being under
5  warranty?
6      A    Well, that was the year.  Did he come out
7  within a year of the first time it was replaced, yes.
8      Q    Yes.  And so that would have been under
9  warranty so he would not have charged you for that;
10  is that correct?
11      A    That is correct.  He did not charge me
12  the second time.
13      Q    Okay.  And so then did he replace it --
14  did he have to come out and replace it again?
15      A    Yes, he replaced it a third time, at
16  which point he demanded that I pay for all three.
17      Q    So he replaced it three times?
18      A    Yes.
19      Q    Even though at least one of those times
20  was under warranty, he charged you retroactively for
21  the previous times under warranty?
22      A    Yes.  Yes.
23      Q    And was it $880 each time?
24      A    Yes.
25      Q    But you don't have the receipts for that?

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 111..114

Page 111

1      A    No.
2      Q    Your recollection of three times for a
3  total of $2640, that's just based on your memory?
4      A    Yes, because I ended up going back to him
5  and paying him for all of those.  I could have
6  claimed warranty and said no, this is still under
7  warranty.  But I felt that the right thing to do was
8  to pay him for what he was owed since there was some
9  kind of a problem that we weren't seeing.  I didn't
10  feel it was right for him to eat it.
11      Q    Now, this was five years after the house
12  was inhabited by your mother.  So was -- I guess
13  there was no problem with the coils for the first
14  five years?
15      A    Well, there were -- there were problems
16  that were showing up, but that's -- but that's
17  when -- roughly around that five-year point, whether
18  that was the first one or whatever, that was when the
19  coils were replaced the first time.
20      Q    And then after five years of not
21  replacing the coils, then they had to be replaced two
22  more times in quick succession within a year or so?
23      A    Yes.
24      Q    And do you know if those coils still
25  work?  Are they still being used at all?

Page 112

1      A    The house has been sitting since my
2  mother moved out, so nothing's being used.  It's all
3  just sitting there.
4      Q    What year did she move out again?
5      A    I don't remember.  It's been quite a
6  while back.  I don't remember exactly when.
7      Q    Let's look real quick and figure out
8  where we are on the timeline.
9          (Whereupon, a discussion ensued off the
10        record.)
11  BY MS. EIKHOFF:
12      Q    It looks like the last time when I asked
13  you how much time there was between her moving in and
14  moving out, you said three or four years, five years,
15  something like that?
16      A    Yeah.
17      Q    Do you have any sharper recollection
18  today than you did then?
19      A    No, I don't.  It's still been quite a
20  long time ago.  Well, we know when she moved in.  It
21  was around April or so of 2007.  So it was probably
22  around 2012, maybe 2011 that she moved out.
23      Q    Right, because you would not have been
24  replacing the coils on air-conditioning if she
25  weren't living there; is that correct?

Page 113

1      A    Correct.
2      Q    And if this was the first time that had
3  happened, then she may have been there another year
4  or so?
5      A    Yes, but I think it happened pretty quick
6  in succession like you had mentioned before.  And as
7  soon as we figured out what was happening, then we
8  got her out of the house.
9      Q    Okay.  I want to turn to the next page.
10  It's actually going back a little bit.  It's the page
11  after the first chart we were looking at with the
12  refrigerator and microwave on it.
13      A    Okay.
14      Q    And that is the itemization of damaged
15  personal property.
16      A    Uh-huh.
17      Q    Matt is going to put it on the screen.
18  It starts with a queen size mattress set.
19      A    Okay.
20      Q    You have listed here a queen size
21  mattress set, a full size mattress set, a Bassett
22  sofa, a Bassett love seat, a Bassett chair and a Dell
23  desktop computer; is that correct?
24      A    That's correct.
25      Q    And why did you list those particular

Page 114

1  items on this sheet?
2      A    Those were personal items of hers that we
3  could not pull out of the house and still use because
4  as they got saturated with the fumes, they were not
5  usable anymore.  You can't wash the mattress or wash
6  the sofa and love seat and get that out of it.  So
7  those are actually all still there in the house.
8          The desktop computer was listed because
9  of the copper wiring and it made it unusable anymore.
10      Q    Okay.  Now, the prices that you -- the
11  values that you have put next to each of these items
12  were fairly recently pulled from Lowe's; is that
13  correct?
14      A    Yes.
15      Q    Lowes.com?
16      A    Lowe's or -- well, it's listed on
17  whatever page we pulled these things from, so yeah.
18      Q    And the printouts that I see that follow
19  in your production are printouts of searches that you
20  did in or around December --
21      A    Yes.
22      Q    -- for certain items; is that right?
23      A    That's correct.
24      Q    You don't have receipts from the actual
25  mattresses and sofas and chairs and computer that

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Pages 115..118

Page 115

1  were in your -- the property; is that correct?
2      A    That's correct.
3      Q    Okay.  And did you know -- like for
4  example, for the queen size mattress set it looks
5  like this is a Serta iComfort 14 inch queen hybrid
6  mattress.  Do you know if that's the kind of mattress
7  she had or were you just approximating?
8      A    It was not the kind of mattress that she
9  had, but you can't get anything other than that in a
10 hybrid today.  So that was what was included.  Not
11 trying to run up the price, just something that was
12 midlevel that's similar to what she would have had.
13     Q    Okay.  And have you or your wife or
14 Patriot Homes made the purchases for these items that
15 were in your -- in the property that your mother
16 lived in?
17     A    Yes, those were purchased by my mother,
18 who has since passed away.
19     Q    Okay.  So she had purchased -- and let me
20 ask you this.  Were they purchased new to go into the
21 home or were they moved from wherever she was living
22 before she moved into the home?
23     A    Both.  Some of both.
24     Q    Okay.  Do you know if the mattress -- the
25 queen mattress was new?

Page 116

1      A    I think the mattress was not new.  The
2  sofa and love seat and chair were and the computer
3  was.
4      Q    Was new?
5      A    Uh-huh.
6      Q    But the full size mattress and the queen
7  size mattress were from her prior home?
8      A    Yeah, I believe they were.
9      Q    And just to be clear, whenever they were
10 bought, the mattresses, the sofas, the love seats,
11 the chairs and the computer were all purchased by
12 your mother?
13     A    Yes.
14     Q    Are all of those items still in the
15 property?
16     A    They are.
17     Q    Including the computer?
18     A    Yes.
19     Q    Then you've mentioned that you found a
20 lease and -- when you were looking through the files
21 after the first session of this deposition and I
22 believe we have a copy of that.  It is a lease
23 between Andy Carter and Ann Carter?
24     A    Yes.
25     Q    Are you Andy Carter?

Page 117

1      A    I am.
2      Q    I thought you were John Carter?
3      A    John Anderson Carter.
4      Q    Got it.  And the lease that we have a
5  copy of looks like it was signed by your mother Ann
6  on May 1st, 2007, and by -- is that by you on May
7  1st, 2007?
8      A    Yes.
9      Q    And it looks like it's just a one-year
10 lease.  Did you renew that lease with her each year?
11     A    No.  I was taking care of my mother at
12 that point, so there was no need to unless we at some
13 point needed to show the cash flow for bank credit
14 purposes.  We were doing something else, so there was
15 no need to.
16     Q    Okay.  And it looks like there's a
17 payment here, check's payable to Andy Carter.  It
18 calls for a $600 a month rent check.  Did she
19 continue to make those payments to you as long as she
20 lived in the house?
21     A    She did.  That was -- that was
22 essentially what -- that's what she could afford.  It
23 didn't cover costs by any stretch, but that's what we
24 had worked out, again, mainly so that the -- we're
25 covering the cost for the (inaudible).

Page 118

1      Q    Right.  Sure.  And my question is -- and
2  I just want to make sure that I've got a clear answer
3  on it, is that she did pay you $600 a month for the
4  full amount of time that she lived there?
5      A    For the four years, yeah.  Five, whatever
6  it is, yeah, she did.
7      Q    Okay.  And did that $600 amount rent ever
8  change?
9      A    No.
10     Q    Okay.  The next document in this new
11 packet that I have is a HUD settlement statement.
12 And there's -- actually looks like there's two.  So
13 I'm going to start with the first one that has a
14 settlement date of December 12, 2007.  Do you have
15 that document, Mr. Carter?
16     A    I do.
17     Q    What was this transaction?  What
18 transaction is this document reflecting?
19     A    I believe that is the purchase of the lot
20 before any improvement to build the house on.
21     Q    Well, it's talking about a payoff of the
22 first mortgage to Colonial Bank of $99,000?
23     A    I'm looking at the wrong one.  I'm sorry.
24     Q    Okay.  Look at the one right next to that
25 which has a settlement date of December 12th, 2007 on

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Pages 119..122

Page 119

1  the right-hand side.
2      A    Okay.  Got it.  Yes.
3      Q    What transaction is this document
4  reflecting?
5      A    That was the sale of the property from
6  Patriot Homes to my wife and I.
7      Q    And what was the amount of that sale?
8      A    Looks like it was the 101,934, is that...
9      Q    That money went to pay off the mortgage
10 at Colonial Bank?
11     A    Probably went to pay off the mortgage for
12 the lot.  The Colonial -- well, yeah, that was
13 Colonial as well.  So that went to pay off the
14 construction loan.
15     Q    The construction loan.  You got the
16 construction loan at Colonial Bank; is that right?
17     A    Yes.
18     Q    Okay.
19     A    So that would have been for the
20 construction loan which would have included -- I
21 guess would have included the lot and all
22 construction costs.  So we sold it for ourselves at
23 cost.
24     Q    I see.  And so the cost of the property
25 improved when you paid back your construction loan,

Page 120

1  the cost to build it, and for the land was
2  $101,934.38?  Does that sound right?
3      A    Yes.
4      Q    And then the other HUD settlement
5  statement that was produced has a date of December
6  22nd, 2006, and shows a contract sales price of
7  $23,000.  I think that's what you were looking at
8  before; is that right?
9      A    Yes, that's the purchase of the lot.
10     Q    Okay.  So the lot cost $23,000 and then
11 to build the house on it and to buy the improved
12 property was about $102,000; is that right?
13     A    I believe so.
14     Q    Okay.  And then the last document that
15 you -- at least it's the last page of the set that I
16 got, it looks like it's a floor plan of the property.
17 Do you see that?
18     A    I don't have it in front of me.  Yes,
19 that looks like a floor plan.
20     Q    Is that something you recently found or
21 do you think that was already in there?
22     A    I honestly don't know.  I think it was
23 already in there, but...
24     Q    Okay.  You don't recall recently finding
25 that floor plan when you were looking through the

Page 121

1  documents to supplement your production?
2      A    No, not that I remember.
3      Q    Okay.  Let me ask you one final question,
4  which is:  Are there any other documents related to
5  your damages that you have that you have not
6  provided --
7      A    Not that I'm aware of.
8      Q    -- to your attorney?
9      A    Not that I'm aware of.
10         MS. EIKHOFF:  Okay.  Why don't we take
11 a quick break?  I think we're done, but let
12 me just check my notes and make sure.
13 Okay?  Off the record.
14         (Whereupon, a brief recess was taken.)
15         MS. EIKHOFF:  Okay.  We're back.  I
16 have no further questions.  Dan, do you
17 have any questions?  Mr. Guerra?
18         MR. GUERRA:  I do have one question,
19 Mr. Carter.
20             EXAMINATION
21 BY MR. GUERRA:
22     Q    Thank you for joining us.  To your
23 knowledge was your mom ever a plaintiff in this
24 lawsuit?
25     A    No, she was not.

Page 122

1      MR. GUERRA:  I have no further
2  questions.
3      THE COURT REPORTER:  Mr. Guerra, do
4  you need a copy?
5      MR. GUERRA:  Yes, E-tran.  We need a
6  copy of both depositions.
7      MR. DOYLE:  We'll waive signature and
8  E-tran is fine for both.
9              - - -
10 (Deposition concluded at 4:45 p.m.)

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                    Page 123

Page 123

```
 1            C E R T I F I C A T E
 2   STATE OF GEORGIA:
 3   COUNTY OF COBB:
 4
 5       I hereby certify that the foregoing
 6   transcript was taken down as stated in the
 7   caption and the questions and answers thereto
 8   were reduced to typewriting under my direction,
 9   that the foregoing pages 90 through 122 represent
10   a true, complete and correct transcript of the
11   evidence given upon said hearing, and I further
12   certify that I'm not of kin or counsel to the
13   parties in the case; am not in the regular employ
14   of counsel of any of said parties; nor am I in
15   anywise interested in the result of said case.
16       This 30th day of January 2021.
17
18              Lynne C. Fulwood
19
20              LYNNE C. FULWOOD,
                Certified Court Reporter
21              State of Georgia
                License No. B-1075
22
23
24
25
```

**Exhibits**

**CarterJ 10**
94:2
99:12,25
101:5
102:12

**CarterJ 12**
94:5 99:25
100:8
102:12

**$**

**$101,934.38**
120:2

**$102,000**
120:12

**$23,000**
120:7,10

**$2640**  111:3

**$275,000**
101:6,25

**$337,500**
101:6
102:1

**$5,337**
104:21

**$600**  117:18
118:3,7

**$8,714**
104:20

**$880**  107:4
109:21

110:23

**$99,000**
118:22

**1**

**10**  99:12,
19,25
101:5
102:12

**101,934**
119:8

**11**  107:16

**11th**  95:12
99:7

**12**  99:19,25
100:8
102:12
118:14

**12th**  118:25

**14**  104:4
115:5

**16th**  98:20
99:4

**17**  107:16,
25

**17th**  108:13
109:24

**1st**  100:8,
15 117:6,7

**2**

**2006**  100:8

120:6

**2007**  100:9,
15 112:21
117:6,7
118:14,25

**2011**  107:25
108:13
109:24
112:22

**2012**  112:22

**2017**  108:10

**2018**  99:12

**2020**  95:13
98:21

**22nd**  120:6

**4**

**4:45**  122:10

**8**

**8th**  99:12

**9**

**90**  109:18

**A**

**actual**
103:11
114:24

**added**  102:5

**additional**

96:10

**affected**
104:22

**afford**
117:22

**agreement**
96:19,23
100:14
108:19

**ahead**  96:7
102:22

**air**  107:10
108:21

**air-
conditioner**
107:4

**air-
conditioning**
112:24

**Alabama**  98:1

**amended**
98:7,18

**amount**  101:4
102:16
118:4,7
119:7

**amounts**
104:24
105:9,11

**and/or**  101:3

**Anderson**
117:3

**Andy**  107:9

116:23,25
117:17

**Ann**   116:23
117:5

**anymore**
114:5,9

**appearances**
95:18

**appliances**
105:16,17,
23  106:10,
14,17

**approximately**
104:20,21
108:4

**approximating**
115:7

**April**   112:21

**articulated**
102:16

**assigned**
97:25

**Association**
98:1

**attorney**
97:13,17,
21,22,23
98:1,4
102:3,8
121:8

**August**
107:16,21,
25  108:13
109:24

**authorized**
95:5

**aware**   121:7,
9

---
**B**
---

**back**   96:9,
13  100:12
103:6,19
111:4
112:6
113:10
119:25
121:15

**bank**   117:13
118:22
119:10,16

**based**   102:4
111:3

**Bassett**
113:21,22

**behalf**
95:20,22,
25  106:25

**Beijing**
96:1,2

**biggest**
101:14

**bill**   109:7

**billed**
107:16

**bit**   113:10

**blank**

102:13,14,
15

**bottom**
104:18

**bought**
100:14
116:10

**brand**   105:18

**break**   121:11

**brought**
97:23

**build**   118:20
120:1,11

**building**
96:1,2,4,
10,14
97:10,12

**built**   108:5

**business**
97:12

**buy**   106:2,
17  120:11

---
**C**
---

**calculate**
102:19,21

**calculated**
104:19

**called**
106:14

**calls**   117:18

**care**   117:11

**Carter**   95:6,
12,13  96:8
98:10
104:6
116:23,25
117:2,3,17
118:15
121:19

**cash**   117:13

**chair**   113:22
116:2

**chairs**
114:25
116:11

**change**
100:3,9,
20,25
101:9
102:11
118:8

**changed**
100:22

**charge**
110:11

**charged**
109:21
110:9,20

**chart**   113:11

**charts**   105:2

**check**   117:18
121:12

**check's**
117:17

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Index: China..Depot

China   96:3

Chinese   97:2
  100:6
  101:4

Christy
  95:14

claim   95:16

claimed
  111:6

clarified
  96:20

clarify
  107:23

clear   116:9
  118:2

coil   108:2
  109:18,23

coils   107:4
  111:13,19,
  21,24
  112:24

Colonial
  118:22
  119:10,12,
  13,16

commenced
  95:12

Company
  96:2,4

comprehensive
  104:19

computer
  113:23

114:8,25
116:2,11,
17

concluded
  122:10

confirm
  102:15

connected
  103:19

construction
  119:14,15,
  16,20,22,
  25

continuation
  95:11

continue
  117:19

contract
  120:6

copper   114:9

copy   104:1
  116:22
  117:5
  122:4,6

corner
  107:15

Corporation
  96:3

correct
  101:7
  104:15
  110:10,11
  112:25
  113:1,23,

24 114:13,
23 115:1,2

cost
  101:11,21
  106:2
  117:25
  119:23,24
  120:1,10

costs
  101:12,16
  117:23
  119:22

counsel
  95:3,19

couple   105:2

court   95:4
  99:21
  122:3

cover   117:23

covering
  117:25

credit
  117:13

————————

———— D ————

damage
  104:20,21

damaged
  113:14

damages
  121:5

Dan   95:25
  121:16

date   98:20,
  24 100:8
  107:18,19,
  22 109:20
  118:14,25
  120:5

dates   96:20

day   109:19

December
  95:12
  98:20 99:6
  100:14
  114:20
  118:14,25
  120:5

defendant
  95:15

defended
  97:14

Dell   113:22

demanded
  110:16

deposed   95:7

deposition
  95:11,14
  98:9 99:6,
  7,13
  105:21
  116:21
  122:10

depositions
  122:6

Depot   106:14

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021          Index: desktop..Frigidaire

desktop
  113:23
  114:8

differences
  99:24

diminution
  102:13,16

discussion
  96:9
  108:25
  112:9

document
  98:9
  108:17
  118:10,15,
  18 119:3
  120:14

documentation
  96:10 97:2

documents
  107:7
  121:1,4

Doyle  95:20
  103:2,16,
  21 122:7

drywall
  97:3,4
  100:6,17
  101:4

due  101:12

duly  95:7

——————
       E
——————
E-TRAN

122:5,8

eat  111:10

Eikhoff
  95:10,14,
  17 96:6
  99:22
  103:4,12,
  22 104:1,5
  107:12,14
  112:11
  121:10,15

empty  100:13

encounter
  102:24

ended  111:4

enjoyment
  101:3,20,
  25 102:25
  103:15,24

ensued  112:9

essentially
  117:22

estimate
  101:13

estimated
  100:17

evaporator
  108:2
  109:18

EXAMINATION
  95:9
  121:20

examined

95:8

executed
  99:11

exhibit  98:7
  99:12,19,
  25 100:8
  101:5
  102:12,24
  103:4,10
  104:2

experienced
  101:2

——————
       F
——————
fact  96:13

fairly
  114:12

February
  100:18

feel  111:10

felt  111:7

figure  112:7

figured
  113:7

file  108:18

files  96:10,
  14,15
  116:20

final  121:3

find  97:5
  98:2
  105:24

108:17

finding
  120:24

fine  122:8

finished
  96:20
  108:5

finishing
  100:17

firm  98:4

five-year
  111:17

fixing
  101:11

flip  100:21
  102:23

floor
  120:16,19,
  25

flow  117:13

follow
  114:18

foot  109:7

form  98:8,
  19 101:19

forward
  96:18

found  96:16,
  23 116:19
  120:20

Frank  103:5

Frigidaire

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                                Index: front..items

105:6,10,
11,18

**front**   98:24
104:11
120:18

**full**   113:21
116:6
118:4

**fumes**   114:4

———————————
          **G**
———————————

**give**   102:5

**Group**   96:3

**Guerra**   95:25
121:17,18,
21  122:1,
3,5

**guess**   109:5
111:12
119:21

**Gypsum**
95:15,23

———————————
          **H**
———————————

**handwritten**
104:11

**Hang**   103:16

**happened**
113:3,5

**happening**
113:7

**heating**

107:9
108:20

**helps**   98:2

**higher**
101:13

**hold**   103:13

**home**   97:12
101:12
104:20
106:13
115:21,22
116:7

**Homebuilders**
98:1

**Homes**   97:12,
14  106:19,
21,25
115:14
119:6

**honestly**
97:17
120:22

**house**   96:11,
20  97:10
100:16
101:17
102:20
105:12,13,
16  106:11,
18  108:5,
15  111:11
112:1
113:8
114:3,7
117:20

118:20
120:11

**HUD**   118:11
120:4

**hybrid**
115:5,10

———————————
          **I**
———————————

**icomfort**
115:5

**identification**
99:20

**identifies**
103:9

**identify**
101:4

**improved**
119:25
120:11

**improvement**
118:20

**inaudible**
117:25

**inch**   115:5

**include**
101:16

**included**
104:14
115:10
119:20,21

**Including**
116:17

**increase**
101:10,11

**inhabited**
111:12

**installation**
109:2,19,
20

**installed**
100:6,18

**insurance**
98:2

**Internet**
105:15
106:6

**invoice**
107:9
109:15

**invoices**
97:1
108:21

**involvement**
97:11

**item**   107:3

**itemization**
113:14

**itemize**
101:21

**itemized**
104:24

**items**   101:22
105:12,14
106:2
114:1,2,

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Index: Jimmy..money

11,22
115:14
116:14

**J**

Jimmy  95:20
103:5

John  95:6,
12  117:2,3

joining
121:22

**K**

kind  109:14
111:9
115:6,8

knowledge
100:7
121:23

**L**

labor  101:12
109:19

land  120:1

Lawson  95:22
103:19,25
104:3

lawsuit
121:24

lease  96:19,
23  100:14
116:20,22
117:4,10

Limited
96:2,5

lines  101:20

list  113:25

listed  105:9
113:20
114:8,16

litigation
97:14

lived  115:16
117:20
118:4

living
112:25
115:21

LLC  107:10

loan
119:14,15,
16,20,25

long  108:11
112:20
117:19

longer  96:15

looked  96:13
105:14
106:7

loss  101:2,
3,5,19,25
102:25
103:15,23

lost  103:5

lot  97:9
100:13

106:12
118:19
119:12,21
120:9,10

love  113:22
114:6
116:2,10

Lowe's
106:7,9,13
114:12,16

Lowes.com
114:15

**M**

made  95:16
99:12
106:24
107:1
114:9
115:14

make  95:17
100:9
101:9
117:19
118:2
121:12

March  99:12
100:18

mark  98:6

marked  99:20

material
101:12

Materials
96:1,3,4

Matt  95:22
103:5,21
105:6
107:12
113:17

mattress
113:18,21
114:5
115:4,6,8,
24,25
116:1,6,7

mattresses
114:25
116:10

memory  110:4
111:3

mentioned
113:6
116:19

met  96:8

microwave
105:10,18
113:12

middle  100:5
101:1

midlevel
115:12

mind  97:24

missing
103:8

model  105:15

mom  121:23

money  119:9

month   117:18
   118:3

mortgage
   118:22
   119:9,11

mother   96:19
   100:15
   108:14
   111:12
   112:2
   115:15,17
   116:12
   117:5,11

move   102:22
   112:4

move-in
   100:19

moved   96:21
   108:11,14
   112:2,20,
   22 115:21,
   22

moving
   112:13,14

_____

      N

National
   96:4

needed   98:13
   109:23
   117:13

newer   99:25

Nos   99:19

notes   121:12

nothing's
   112:2

notice   100:3

numbered
   102:23

numbers
   98:15
   101:16
   102:4

_____

      O

Oasis   107:9
   108:25

offer   109:14

offline
   102:2

one-year
   117:9

options
   106:12

orient
   101:18

original
   106:10

owed   111:8

_____

      P

p.m.   122:10

packet   107:7
   118:11

pages   102:23
   104:25

paid   105:11
   109:25
   119:25

paperwork
   97:17

paragraph
   103:1
   104:13

parentheses
   107:5

part   101:14

parties   95:3

passed
   115:18

Patriot
   97:11,14
   106:19,21,
   25 115:14
   119:6

pay   109:4,
   15 110:2,
   16 111:8
   118:3
   119:9,11,
   13

payable
   117:17

paying   111:5

payment
   117:17

payments

117:19

payoff
   118:21

personal
   101:22
   104:19
   113:15
   114:2

personally
   106:17

place   106:14

plaintiff
   95:21
   98:8,18
   121:23

plan
   120:16,19,
   25

Plasterboard
   95:24

point   97:9
   110:16
   111:17
   117:12,13

portion
   104:11

pretty   113:5

previous
   101:5
   104:14
   110:21

previously
   99:10,20

price  115:11
  120:6

prices  106:4
  114:10

printouts
  106:7
  114:18,19

prior  99:11
  100:7
  116:7

problem
  103:25
  111:9,13

problems
  111:15

produced
  107:8
  120:5

production
  114:19
  121:1

profile
  98:8,19

property
  97:4
  100:6,13
  101:3
  104:19,22
  113:15
  115:1,15
  116:15
  119:5,24
  120:12,16

provided

121:6

Public  96:1

pull
  103:17,22
  114:3

pulled
  114:12,17

purchase
  97:2,3
  105:22
  118:19
  120:9

purchased
  104:22
  106:11
  115:17,19,
  20  116:11

purchases
  106:24
  115:14

purchasing
  97:5

purposes
  117:14

put  98:12
  101:13
  102:4
  103:2,6
  106:4
  107:12
  113:17
  114:11

putting
  98:14

99:15

_____

Q

quantification
  101:24

queen
  113:18,20
  115:4,5,25
  116:6

question
  100:4
  101:2
  102:8,13
  118:1
  121:3,18

questions
  99:14
  121:16,17
  122:2

quick  111:22
  112:7
  113:5
  121:11

_____

R

read  107:24

real  112:7

recall  96:22
  120:24

receipts
  97:1
  108:21
  110:25
  114:24

received
  98:8

recently
  114:12
  120:20,24

recess
  121:14

recollection
  111:2
  112:17

record  95:18
  112:10
  121:13

records
  97:5,10,13
  105:22

recover
  102:16

refer  98:15,
  19

reflecting
  118:18
  119:4

reflects
  101:10
  109:21

refrigerator
  105:6,10,
  17  113:12

related
  97:2,10
  121:4

remediate
  102:20

remediation
  101:21

remember
  95:13
  96:11
  97:15,16,
  18,21
  98:3,4
  99:13
  102:10
  109:10,12
  112:5,6
  121:2

remotely
  95:5

renew  117:10

rent  117:18
  118:7

rental
  108:19

repair
  101:22
  104:20

replace
  108:25
  109:3,23
  110:13,14

replaced
  108:2
  109:18
  110:7,15,
  17  111:19,
  21

replacement
  101:16,22

105:15
107:4

replacing
  111:21
  112:24

reporter
  95:4  99:21
  122:3

represent
  95:15

response
  100:4

result  101:3

retroactively
  110:20

Rex  106:14

right-hand
  107:15
  119:1

roughly
  111:17

run  115:11

———————

S

———————

sale  119:5,
  7

sales  120:6

saturated
  114:4

screen
  98:12,14
  99:16

103:3,7,14
104:4
105:7
107:13,16
113:17

searches
  114:19

seat  113:22
  114:6
  116:2

seats  116:10

section
  102:24
  103:15,23

selections
  106:24
  107:1

sell  102:20

sentence
  104:18

September
  100:8

Serta  115:5

session
  116:21

set  113:18,
  21  115:4
  120:15

settlement
  100:12
  118:11,14,
  25  120:4

share

103:18,20
104:4

sharper
  112:17

sheet  114:1

show  117:13

showing
  111:16

shows  98:20
  100:8
  120:6

side  119:1

sign  99:4

signature
  98:20,24
  99:2  122:7

signed  117:5

similar
  115:12

sit  97:22

sitting
  112:1,3

size
  113:18,20,
  21  115:4
  116:6,7

small  106:13

sofa  113:22
  114:6
  116:2

sofas  114:25
  116:10

**sold** 119:22

**sound** 120:2

**Sounds** 108:9

**specific** 102:5

**specifically** 96:25

**spoke** 96:14

**SPPF** 98:20 99:11,14, 24,25 100:7 101:5 104:14

**start** 118:13

**started** 96:7 100:15

**starts** 105:5 113:18

**statement** 100:12 118:11 120:5

**stipulates** 95:4

**stop** 102:23

**stove** 105:11,18

**stretch** 117:23

**subsequent** 104:25

**substantial** 101:11

**succession** 111:22 113:6

**supplement** 121:1

**supplemental** 98:7,18

**swear** 95:5

**sworn** 95:7

**T**

**Taian** 95:23

**Taishan** 95:15,23

**taking** 117:11

**talk** 102:3, 7

**talked** 97:8, 19

**talking** 96:11 102:3,6 118:21

**talks** 109:2

**terms** 96:18

**thing** 97:8 102:11 111:7

**things**

**100:16 101:17 102:4 114:17**

**thought** 97:20 117:2

**time** 95:14 96:8,25 97:9 99:16 109:1,3,9, 10,14 110:7,12, 15,23 111:19 112:12,13, 20 113:2 118:4

**timeline** 112:8

**times** 108:24 110:17,19, 21 111:2, 22

**title** 103:9

**today** 97:23 99:23 112:18 115:10

**total** 101:4 111:3

**town** 106:13,15

**transaction** 118:17,18

**119:3**

**turn** 113:9

**turned** 97:13,16, 20

**U**

**Uh-huh** 113:16 116:5

**unusable** 114:9

**upper** 107:15

**usable** 114:5

**V**

**values** 114:11

**version** 99:11 101:6 104:14

**W**

**waive** 122:7

**warranty** 109:2,19, 20 110:5, 9,20,21 111:6,7

**wash** 114:5

**ways** 107:24

**EDUARDO AND CARMEN AMORIN, ET AL. vs TAISHAN GYPSUM CO., LTD., ET AL.**
John Carter- Vol. 2 on 01/26/2021                    Index: week..years

**week**  99:7

**wife**
  106:20,23
  115:13
  119:6

**wiring**  114:9

**wondering**
  97:22

**words**  104:8

**work**  106:21
  111:25

**worked**
  117:24

**wrong**  109:6
  118:23

**wrote**  99:10

───────────
       **Y**
───────────

**year**  107:22
  109:19,24
  110:4,6,7
  111:22
  112:4
  113:3
  117:10

**years**  97:15
  108:5,14
  111:11,14,
  20 112:14
  118:5