1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  CHINESE MANUFACTURED      *
             DRYWALL PRODUCTS           *
6            LIABILITY LITIGATION       *
                                        *   Docket No.: 09-MD-2047
7    This Document Relates To:          *   Section "L"(5)
                                        *   March 23, 2022
8    Amorin, et al. v. Taishan Gypsum   *   New Orleans, Louisiana
     Co., Ltd., et al.,                 *
9    Case No. 11-CV-1395                *
     * * * * * * * * * * * * * * * * *

10

          TRANSCRIPT OF HEARING PROCEEDINGS
11   HELD BEFORE THE HONORABLE MICHAEL B. NORTH
             UNITED STATES MAGISTRATE JUDGE

12

13

     APPEARANCES:

14

15   For the Plaintiffs:        Doyle Law Firm, PC
                                 BY:  JAMES V. DOYLE, JR., ESQ.
16                               2100 Southbridge Parkway
                                 Suite 650
17                               Birmingham, Alabama 35209

18

19   For Taishan Gypsum Co.,
     Ltd., and Tai'an Taishan
20   Plasterboard Co., Ltd.:    Alston & Bird, LLP
                                 BY:  CHRISTINA H. EIKHOFF, ESQ.
21                               BY:  MATTHEW D. LAWSON, ESQ.
                                 One Atlantic Center
22                               1201 West Peachtree Street
                                 Suite 4900
23                               Atlanta, Georgia 30309

24

25

OFFICIAL TRANSCRIPT

```
1    APPEARANCES:
2
     For Taishan, CNBM,          Phelps Dunbar, LLC
3    and BNBM Defendants:        BY:  HARRY ROSENBERG, ESQ.
                                 365 Canal Street
4                                Suite 200
                                 New Orleans, Louisiana  70130
5
6
     Official Court Reporter:    Jodi Simcox, RMR, FCRR
7                                500 Poydras Street
                                 Room B-406
8                                New Orleans, Louisiana 70130
                                 (504) 589-7780
9
10
11
12   Proceedings recorded by mechanical stenography, transcript
13   produced by computer.
14
15
16
17
18
19
20
21
22
23
24
25
```

OFFICIAL TRANSCRIPT

1                              <u>I N D E X</u>

2                                                              <u>Page</u>

3

JOHN ANDREW CARTER
4        Direct Examination By Mr. Doyle:            22
         Proffer By Mr. Doyle:                       46
5        Cross-Examination By Ms. Eikhoff:           55
         Proffer By Ms. Eikhoff:                     61
6
DARLA GIBBS
7        Direct Examination By Mr. Doyle:            71
         Proffer By Mr. Doyle:                       85
8        Cross-Examination By Mr. Lawson:            94

9    SHAWN MACOMBER
         Direct Examination By Mr. Doyle:           104
10       Cross-Examination By Ms. Eikhoff:          111

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL TRANSCRIPT

1                           **PROCEEDINGS**

2                         **(March 23, 2022)**

3                             **\*\*\*\*\*\*\***

4

5        (COURT CALLED TO ORDER)

6        **THE COURT:**  Good morning, everyone.  You all can have

7 a seat.

8        **THE DEPUTY CLERK:**  Case No. 09-MD-2047, *In Re:*

9 *Chinese-Manufactured Drywall Products Liability Litigation.*

10            Counsel, would you make your appearances for the

11 record, please.

12        **MR. DOYLE:**  Jimmy Doyle on behalf of the plaintiffs.

13        **MR. ROSENBERG:**  Good morning, Judge North.  Harry

14 Rosenberg as defendant's liaison counsel.

15        **MS. EIKHOFF:**  Christy Eikhoff and Matt Lawson on

16 behalf of defendants Taishan.

17        **THE COURT:**  All right.  Good morning.

18           Mr. Doyle --

19        **MR. DOYLE:**  Yes, Your Honor.

20        **THE COURT:**  -- in the short time that I've been

21 involved in this case -- I had to go back and look -- since

22 June 3rd of 2020, in my recollection, you've either missed

23 conferences or hearings all together or you've been late for

24 every one of them.  You were late last week for a telephone

25 call.  Today you've kept your clients here and on Zoom,

1    opposing counsel, and me and my staff waiting for a half an

2    hour to start a 10:00 conference.  I don't know what makes you

3    think that that pattern of conduct is acceptable, at least in

4    this court.  Explain yourself, please.  Why are you a half an

5    hour late to this conference?

6         **MR. DOYLE:**  Traffic, Your Honor.  I had to stay --

7    because of the weather, I stayed in Mississippi.  Coming

8    across, there's work on the bridge coming in to Louisiana.

9         **THE COURT:**  Does your telephone work?

10        **MR. DOYLE:**  It does.

11        **THE COURT:**  Why didn't you call my chambers and tell

12   them to tell me that you were running late and why?

13        **MR. DOYLE:**  I apologize, Your Honor.  I knew the

14   clients were going to be here.  I asked them to let the

15   courtroom deputy know while I made my way in.

16        **THE COURT:**  All right.  For your sake, I'm starting

17   to think -- you better hope this is the last conference that we

18   have to have together because if not, you better be early and

19   not -- if you're late again for another session with this

20   Court, there's going to be serious consequences.  Do you

21   understand?

22        **MR. DOYLE:**  Yes, Your Honor.  I understand.

23        **THE COURT:**  All right.

24            Let me ask -- I want to handle a few preliminary

25   issues.  I'm going to ask defense counsel, can we have -- I

OFFICIAL TRANSCRIPT

1    know that you all did not -- you all did not object to the

2    exhibits related to the plaintiffs' ownership of their

3    respective homes.  Can we forego presentation of that -- I

4    mean, I'm going to have those entered into the record as

5    un-objected to.  Can we have a stipulation that the Gibbs and

6    the Carters own their respective homes?

7            **MS. EIKHOFF:**  Your Honor, yes.

8            **THE COURT:**  Okay.  Let me ask this question, and I

9    don't know the answer:  Do the parties agree -- do counsel for

10    the parties agree that the cost to remediate these respective

11    homes would, in fact, exceed the diminution of fair market

12    value of these two homes?

13            **MR. DOYLE:**  It would, Your Honor.

14            **THE COURT:**  Do you all agree with that?

15            I'm asking that question because I'm -- I want

16    to understand to what extent we need to have evidence and

17    testimony to bring these cases within the Alabama case law that

18    everybody's been citing, that I've cited, when it comes to the

19    question of diminution of value as the proper measure of

20    damages even when the cost to remediate the damages exceeds the

21    market value.

22            And I know I'm probably asking you all this

23    blind.  If you want to consult for a second.  I'm just trying

24    to determine the extent to which we need to go down this road

25    in an evidentiary hearing or whether we're going to have

1   agreement on it.

2           **MS. EIKHOFF:**  Sure, Your Honor.  And I think that --

3   that part of what I'm grappling with, with respect to your

4   question, is that I think your question was framed as do the

5   cost of repair or remediation exceed the diminution in property

6   value.  We don't have any evidence of what the diminution in

7   property value is.  That is -- there's nothing but speculation

8   on that.  There's nothing in the record that is to be submitted

9   or that can be submitted at this point that would establish

10  what the diminution in property value is.

11          So what we have is only the remediation

12  estimates, which have --

13          **THE COURT:**  Are substantial.

14          **MS. EIKHOFF:**  Which are substantial, and also have

15  evidentiary defects.

16          **THE COURT:**  Sure.

17          **MS. EIKHOFF:**  But even setting those aside, Your

18  Honor, Alabama law measures the diminution in property value by

19  a fair -- on a fair market value standard, you know, the cost

20  before minus the cost after.  We have nothing to reflect that

21  in the record, and so it's impossible for me, and I think for

22  this Court, to do a comparison when the central -- the

23  centrally required evidence is lacking on the central and

24  required measure of damages.

25          **THE COURT:**  You do understand that I have ruled

OFFICIAL TRANSCRIPT

1    previously that the -- I'll call it Court ordered, I don't know
2    if it was an order, but that the Court ordered or suggested
3    appraisal of the plaintiffs' property that took place last year
4    that I was going to accept that into evidence?
5             MS. EIKHOFF:  That's right.
6             THE COURT:  Okay.  I know that you all had suggested
7    on numerous occasions that -- that there was evidence available
8    to prove what the diminution of value -- or at least estimate
9    what the diminution of value of the plaintiffs' homes is.
10            MS. EIKHOFF:  Your Honor --
11            THE COURT:  Are you suggesting you just don't know
12   what that evidence is as you sit here today?
13            MS. EIKHOFF:  What I'm saying, Your Honor, is that to
14   establish diminution in value, which is the fair market value
15   objective standard under Alabama law, that was doable, but it
16   was not done by the plaintiffs, who bear the burden of proof in
17   this case.
18                 And Your Honor gave the plaintiff an opportunity
19   after the close of discovery to get an appraisal that would
20   take into account the presence of Chinese drywall, and that
21   appraisal could have been measured against other metrics of
22   original pre-damage property value.  Had there been an
23   appraisal that took into account the presence of Chinese
24   drywall, that delta would have been -- would have satisfied
25   Alabama's standard for diminution in value.

1          THE COURT:  I agree with you.

2          MS. EIKHOFF:  But that wasn't done.

3          THE COURT:  But that's not the only -- that's not the

4    only path toward a determination of those numbers.  It would

5    have been a pretty clear path, I agree with you.  We've had

6    that discussion.

7          MS. EIKHOFF:  Right.

8          THE COURT:  But we don't have that.

9          MS. EIKHOFF:  We don't have that.

10          THE COURT:  There are other methods -- there are

11    other forms of proof where we can get there -- or at least to

12    assist me to get there.

13          MS. EIKHOFF:  Sure.  And, Your Honor, we have seen

14    the Alabama cases that do -- as the Court has held and has

15    recognized that do allow the admissibility of repair damages

16    for consideration in the determination of diminution of

17    property value, but there are no Alabama cases that we have

18    seen anywhere that would use that figure as a proxy for

19    diminution.

20          THE COURT:  I'm not suggesting that I'm looking to

21    use it as a proxy.  I mean, we have individual plaintiffs who

22    are prepared to testify about what their homes cost, what they

23    paid for them, to the extent that they were aware of an

24    appraised value at some point, through whatever means -- and I

25    don't know what the testimony will be, and I guess you don't

1   either.  And I do have an appraisal, for whatever it's worth,

2   that was done last year.  And there may or may not be fact

3   testimony about repairs that have been done and what actual

4   repair costs are, and I'll address that in a minute.

5              But I don't want to go too far afield.  It

6   sounds to me -- I think you've got a legitimate -- a legitimate

7   hesitancy to want to respond to my question and enter into a

8   stipulation along the lines of what I suggested.  So we'll

9   just -- we'll see where the evidence takes us and we'll go from

10  there.  Okay?

11             **MS. EIKHOFF:**  Thank you.

12             **THE COURT:**  All right.  Before we get started, and, I

13  mean, Mr. Doyle, at some point I guess before we get started --

14  maybe I'll ask the parties to address what is the impact of

15  this so-called motion to clarify damages that you filed.  But

16  before I even get to that, I just want to kind of talk about

17  the chronology of the case since I've been involved and what I

18  expect to happen today.

19             Almost a year ago, I issued an order finding

20  that Mr. Macomber's Xactimate reports were untimely.  Where is

21  Mr. Macomber?  Is he here?

22             **MR. DOYLE:**  He's not here today, Your Honor.  He's

23  working on -- when this got moved by a week, he's working on

24  another project in another state.  We couldn't get him here.

25  We have him by Zoom for this hearing.  If the Court doesn't

1    want to indulge us and allow that, maybe we can continue his

2    portion of it, come back in the near future for him to testify

3    live if that's what the Court's desire is.  But Mr. Macomber is

4    not going to present an Xactimate because you've excluded the

5    Xactimate.

6             **THE COURT:**  Oh, that's -- we can agree on that.  We

7    can certainly agree on that.

8             **MR. DOYLE:**  Yeah.  But we're going to talk about his

9    methodology for calculating --

10            **THE COURT:**  All right.  Once again, that's -- that's

11   a development that should have been shared with the Court

12   before everybody showed up here today, by you.  I mean, I made

13   it clear last week that this was an in-person hearing.

14            **MR. DOYLE:**  Yes, sir.

15            **THE COURT:**  The moment you found out he couldn't

16   attend an in-person hearing, you should have told somebody, and

17   that somebody should have been me or my chambers.

18            **MR. DOYLE:**  Yes, Your Honor.

19            **THE COURT:**  All right.  Notwithstanding that

20   Mr. Macomber is somewhere out there, apparently, I'm told on

21   the phone now or by Zoom, I did, as you mentioned, and I

22   mentioned, I did issue an order finding that his estimates in

23   the Xactimate were untimely.  That ruling was based on

24   timeliness.  That ruling was not appealed or objected to.  At a

25   hearing the day before I issued that ruling -- and that

1  transcript is in the record.  I don't have the record document
2  number, but it was March 31st, 2021 -- Mr. Doyle insisted
3  throughout the hearing that Mr. Macomber could provide some
4  form of fact testimony regarding repair costs of the
5  plaintiffs' homes.
6          Obviously, I was focused on the untimeliness
7  argument and the other issues that were raised there, but to
8  some extent, and as I will get to, I have to credit at this
9  stage Mr. Doyle's suggestion that Mr. Macomber can provide some
10  form of relevant fact testimony in the case.
11          In advance of this hearing, on November 4th of
12  last year, I issued another order that stated very clearly that
13  expert testimony on estimated repair costs would not be
14  entertained, and I invited counsel, particularly counsel for
15  the plaintiffs, to object to that ruling, which Mr. Doyle did
16  on November 12th, 2021.
17          In that objection, plaintiffs' counsel engaged
18  in a number of arguments regarding my prior finding that
19  diminution of value of the property was the sole measure for
20  recovery of property damage under Alabama law, but did not
21  argue, object, or appeal to my finding that Mr. Macomber's
22  Xactimates or related materials were untimely or that as an
23  expert he was untimely disclosed.
24          After my review of the plaintiffs' objections
25  and Taishan's response, I issued an order scheduling this

OFFICIAL TRANSCRIPT

1   hearing and ruling on those objections on February 4th, 2022.

2                   That ruling, which was entitled "Order," stated

3   that:  "An evidentiary hearing to determine the value of the

4   diminution of plaintiffs' homes is now ordered to take place on

5   Tuesday, March 15th, 2022, at 10:00 a.m. in the undersigned's

6   courtroom.  At that hearing, the Court will not entertain

7   evidence of estimated repair costs of the property at the

8   evidentiary hearing."  Bad sentence -- bad English, but that's

9   what I wrote.

10                   "Any expert on estimated repair costs shall be

11  excluded.  The Court will accept only evidence pertaining to

12  any diminution of value of the property.  The Court will

13  consider the appraisals already submitted, but said appraisals

14  must be submitted to the Court as exhibits at the evidentiary

15  hearing.  The Court will also accept the testimony of the

16  plaintiffs themselves."  That order was also un-objected to or

17  un-appealed under Rule 72.

18                   On March 4th, 2022, despite my earlier rulings

19  regarding the exclusion of expert testimony and estimated

20  remediation costs, Mr. Doyle listed Shawn Macomber as a witness

21  without, as he has noted here today, listing his Xactimates or

22  estimates as exhibits.  I assume that is because Mr. Doyle

23  continues to believe that Mr. Macomber has relevant fact

24  testimony to provide in support of the plaintiffs' claims,

25  which is why I issued the following order last week on

1    March 17th, noting that because Alabama law is clear that
2    evidence of repair costs can be relevant to a determination of
3    the diminution of value of the plaintiffs' property, that I
4    declined to strike Mr. Macomber from the list because I really
5    don't know, as I sat there that day, or as I sit here today,
6    whether he can or will provide relevant fact testimony.  But,
7    obviously, we'll find out when it comes time for him to
8    testify.

9              Plaintiffs have also listed a document that has
10   long been in the record since May 2nd of 2019, which is
11   entitled "The Remediation Calculation."  That was objected to
12   by the defendants.  But, again, frankly, I do not know the
13   providence of that document.  I don't know the extent to which
14   Mr. Macomber was involved in its creation.  I doubt that he
15   was, but I don't know.  Again, there were 22,000 plus documents
16   in this record when I got assigned to this case and I haven't
17   read them all.

18             So you all are going to have to shed some light
19   on that document.  And, Mr. Doyle, you'll have to explain to me
20   why it's relevant and why it's something I need to consider.

21             **MR. DOYLE:**  Sure.

22             **THE COURT:**  I made these decisions known in an order
23   that was issued on March 17th, 2022, in which I noted the prior
24   exclusion of Mr. Macomber and his Xactimate, but I also
25   recognized what I believe to be controlling precedent in

1    Alabama that we've already discussed this morning with defense

2    counsel, that evidence of repair costs is admissible to show

3    diminution of value even if the diminution remains the sole

4    measure of damages.

5                    I wanted to make clear because I know Mr. Doyle

6    filed a motion to clarify damages, which is unrelated to a lot

7    of what I just said.  But I wanted to make clear to counsel for

8    the parties this morning as we proceed exactly what I expect

9    this proceeding to encompass.  Okay?  I don't know what

10   relevant testimony Mr. Macomber has to offer within those

11   parameters if he is not offering testimony as an expert in

12   remediation or estimating, but I'm willing to hear.  There's no

13   jury here.  It's just me.

14                   And if there is an argument over whether any

15   testimony, but particularly Mr. Macomber's testimony, is --

16   should or should not be permitted or admissible for various

17   reasons, I am likely to take that testimony as a proffer and

18   deal with it down the road because, God knows, it's taken us

19   long enough to get here, and I don't want to have to do this

20   more than once.

21                   Okay.  All right.  Before we begin, Mr. Doyle,

22   do you have any comments or questions?

23            MR. DOYLE:  I do.  Your Honor, we've got that motion

24   to clarify now pending.  It's the same argument I've made

25   several times, including in November when the Court invited a

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | briefing on Alabama law.  So we're going to file our formal |
| 2 | objection under the record here for disallowing anything beyond |
| 3 | diminution in value.  Alabama law is clear, where there is an |
| 4 | item inside the home that doesn't provide any structural |
| 5 | integrity, it remains a product under Alabama law. |
| 6 |      **THE COURT:**  You don't have to -- you know, you've |
| 7 | made those arguments enough times.  I'm well familiar. |
| 8 |      **MR. DOYLE:**  Right.  Right.  So because our position |
| 9 | is that it's a product, diminution in value isn't the sole |
| 10 | measure of damages here.  It's all incidental and consequential |
| 11 | damages.  So the repair costs, although relevant, are just a |
| 12 | portion of it.  By limiting the damages to diminution in value, |
| 13 | the Court is excluding loss of use and enjoyment, which all of |
| 14 | the plaintiffs here today have suffered for -- since 2006 or |
| 15 | 2007, whenever they purchased and moved into the homes. |
| 16 |      It's a substantial amount of the damages, Your |
| 17 | Honor, and under Alabama law, they're entitled to recover or |
| 18 | seek recovery for it if the evidence is there. |
| 19 |      In addition, all the other incidental and |
| 20 | consequential damages would be available under Alabama law. |
| 21 |      **THE COURT:**  I understand all those things. |
| 22 |      **MR. DOYLE:**  I just want to make sure that on the |
| 23 | record we had voiced that objection. |
| 24 |      **THE COURT:**  Multiple times. |
| 25 |      **MR. DOYLE:**  Good. |

1          **THE COURT:**  By the way, that motion's been referred
2    to me.
3          **MR. DOYLE:**  I learned that on the way down last
4    night.  So I guess we'll address that in a separate proceeding.
5          **THE COURT:**  At some point, I guess we will.  I don't
6    know exactly how that's going to look.  The defendants have to
7    have the opportunity to file a response.  I'm pretty sure I
8    know what it's going to say since we've all been down this road
9    multiple times.
10         **MR. DOYLE:**  Sure.
11         **THE COURT:**  I do have this question, while we're on
12   the subject, and I don't want to go down a rabbit hole because
13   I'm not going to change my mind today, the cases -- the Alabama
14   cases that I've read that you all have all cited and that we
15   have discussed talk about the measure of damages for damage to
16   property.
17              I'm trying to understand, I guess, the head of
18   the pin that you are dancing on when you are arguing that this
19   Chinese drywall is a product and not part of the property.
20   Because to me the natural -- that argument, if you're right,
21   naturally flows to the conclusion that you're only seeking
22   damages for damages to the product, which is the drywall, not
23   the house, which is the property.
24              I see your argument as saying the damages to the
25   property were caused by a product, and I don't -- I'm unaware

OFFICIAL TRANSCRIPT

1    of any Alabama rulings, and I've looked for them, that say that

2    somehow the supreme -- the various cases that are out there on

3    damages to real property, that that is somehow limited or

4    qualified if those damages are caused by a product versus

5    ordinary negligence or something else.

6           **MR. DOYLE:**  The Alabama Extended Manufacturer

7    Liability Doctrine is directly on point, Your Honor.  That's

8    why we cited it.  It becomes a strict liability case, and all

9    the claims related to the product are available for the Court

10   to evaluate and for the plaintiffs to recover damages.

11          **THE COURT:**  I've never -- you've not cited any case

12   to me that indicates that the *Poffenbarger* and *Birmingham Coke*

13   and the federal cases that have construed those decisions are

14   limited when the damage to real property is caused by a product

15   versus some other cause of damage.

16          **MR. DOYLE:**  We cited *Keck* in that -- in that brief,

17   Your Honor, if you look at that and then the cases that flow

18   from that.  And it's all briefed.  And, like I said, we can

19   have that discussion here today.  I wasn't prepared to make

20   that full argument --

21          **THE COURT:**  No.  And I'm just asking that question

22   because it's an anomaly, I think, in the argument that has

23   occurred to me.  I mean, there are other issues with the

24   argument that --

25          **MR. DOYLE:**  But you also look at the -- Your Honor,

OFFICIAL TRANSCRIPT

1    real quickly, if you look at the cases, though, the

2    *Poffenbarger* and the others, it's un- -- a lot of them are

3    undeveloped property where you've got flooding, where you've

4    got particulate matter being deposited.  There -- in those

5    cases, that's the distinction here.  We've got undeveloped

6    property or damage to property outside the structure of a home.

7                   In *Keck*, where there -- it was a Dryvit case, an

8    EIFS case, that's where the Alabama courts made the distinction

9    and found that where there is -- and that's where -- and we

10   cited it and I quoted it, the block quoting that, you know,

11   where it doesn't affect the structural integrity of that home,

12   it's on the property, it's not the law of property, it's not

13   the property or fixtures law, it's product liability.

14                  That's why all the incidental and consequential

15   damages that flow from the defective product and the nuisance

16   created by that product are recoverable by the plaintiffs.  In

17   a nutshell, that's how the Alabama courts have come down since

18   the 1970s.

19        **THE COURT:**  All right.  I know the defendants had a

20   response to your citation to the *Keck* case.  And since I asked

21   plaintiffs' counsel about this, I'm going to ask you all to

22   briefly address it, and then we're going to hear some

23   testimony.

24        **MS. EIKHOFF:**  Sure, Your Honor.  The *Keck* case

25   couldn't be more directly controlling of this case to reject

1    the plaintiffs' argument.  The *Keck* case stands for exactly the
2    opposite of what plaintiff is saying it stands for.
3              The product -- the alleged product at issue in
4    *Keck* was literally walls.  We are dealing with literal walls.
5    And there is nothing in the Alabama Supreme Court's holding in
6    *Keck* that has to do with load bearing capacity or with
7    structural integrity.  The central test under *Keck* of whether a
8    construction material is a product versus part of the property
9    is whether it is an item that one would reasonably expect to
10   repair or replace during the useful life of the realty.
11             And walls are not only the example that the
12   court gave, but they are, in fact, the substance at issue in
13   that case where the Alabama Supreme Court rejected the
14   application of AEMLD.
15             **THE COURT:**  All right.
16             **MR. DOYLE:**  Your Honor, real quickly --
17             **THE COURT:**  Those are arguments you all have already
18   made.  That's enough.
19             **MR. DOYLE:**  May I make one comment, Your Honor?
20             **THE COURT:**  Quickly.
21             **MR. DOYLE:**  This is the distinction, and I'm not
22   going to go further than this.  Dryvit is an exterior product,
23   and that's where the distinctions are.  I've laid this out for
24   the Court.
25             **THE COURT:**  There's enough paper on this issue

OFFICIAL TRANSCRIPT

1   already, you know.

2           **MR. DOYLE:**  Okay.

3           **THE COURT:**  You all have kept me busy and will

4   continue to keep me busy.

5           **MR. DOYLE:**  Okay.

6           **THE COURT:**  But I've already made my decision in

7   terms of what's going to be presented and acceptable at this

8   evidentiary hearing.

9               How do you -- how do you want to proceed in

10  terms of your oral proof?

11          **MR. DOYLE:**  Excuse me?  Pardon me?

12          **THE COURT:**  How do you want to proceed in your case?

13          **MR. DOYLE:**  We're going to call Mr. Carter first

14  since he's here --

15          **THE COURT:**  Okay.  Yep.

16          **MR. DOYLE:**  -- and then we'll proceed with

17  Mrs. Gibbs, and then Mr. Macomber at the end.

18          **THE COURT:**  Okay.  You can call your first witness.

19          **MR. DOYLE:**  All right.  I call Mr. Carter, Mr. Andy

20  Carter, as first witness for plaintiffs.

21          (WHEREUPON, **JOHN ANDREW CARTER**, having been duly

22  sworn, testified as follows**:)**

23          **THE COURT:**  All right.  If you pull that microphone

24  close to you, if you don't mind, so everybody can hear you.

25  Thank you.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1          **DIRECT EXAMINATION**

2    **BY MR. DOYLE:**

3    **Q.**   Mr. Carter, good morning.  I'm Jimmy Doyle.  I'm going to

4    ask you a few questions about the history of the property, the

5    damages that the property has sustained over the years, and

6    with -- if you can, in particular, provide Judge North with

7    the -- any dates and amounts, if they're relevant in this,

8    because that's what the Court is here to consider.

9          This is a default judgment damages hearing.  So we're

10   trying to determine what the correct damages are that you can

11   recover for the defective drywall in the home.

12   **A.**   Okay.

13   **Q.**   And we had -- earlier in the proceeding, I think there was

14   a stipulation, you are the owner of the house; correct?

15   **A.**   Correct.

16   **Q.**   Okay.  How long have you owned it?

17   **A.**   Since it was built.  I had a construction company that

18   actually built the house.

19   **Q.**   Okay.  Do you know approximately when the house was

20   completed?

21   **A.**   It would have been May, June, July of '07.

22   **Q.**   Okay.  Since there's a stipulation, we're not going to

23   offer the --

24          **THE COURT:**  You can offer it into evidence just so

25   it's in the record, but...

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1          **MR. DOYLE:**  Okay.  Your Honor, may I approach real

2    quick?

3          **THE COURT:**  Sure.

4          **MR. DOYLE:**  I'm going to offer, Mr. Carter, what

5    we've identified as Exhibit 4.  We've produced it.  We've got a

6    paper copy for the defendants if they need it.

7          **MS. EIKHOFF:**  Is that coming in as Exhibit 1?

8          **MR. DOYLE:**  It will come in as Exhibit 1, yes.

9          **THE COURT:**  It will.

10         **MR. DOYLE:**  These will be out of order.

11         **THE COURT:**  Is that the warranty deed for Mr. -- for

12   the Carters' home?

13         **THE WITNESS:**  Yes, sir.

14         **THE COURT:**  Okay.  Mr. Carter, is that your warranty

15   deed for your home?

16         **THE WITNESS:**  Yes, sir.

17         **THE COURT:**  All right.  Do you own your home?

18         **THE WITNESS:**  Yes, sir.

19         **THE COURT:**  Okay.  Very good.  That document will be

20   entered as Plaintiff's Exhibit No. 1.

21   **BY MR. DOYLE:**

22   **Q.**   Mr. Carter, one question about that.  What's the date on

23   there that it was filed into the probate court in Lee County?

24   **A.**   January the 2nd of 2007.  I see that there is a typo at

25   the bottom there where Brandon Rice signed it.  It was a

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

 1  preprinted 2005 and it was not changed.  It should say 2006,
 2  the 22nd day of December of 2006.
 3  **Q.**   Okay.  All right.  That's all we need for that.
 4        The next --
 5        **THE COURT:**  Could you hand me that document?
 6        **THE WITNESS:**  Yes, sir.
 7        **THE COURT:**  Thank you.
 8             Go ahead, Mr. Doyle.
 9  **BY MR. DOYLE:**
10  **Q.**   The next issue, really it's a minor issue -- well, let's
11  start here.  After you finished the home and a certificate of
12  occupancy was issued, you took possession of the home as a
13  residential property, how was it used?
14  **A.**   That home was built specifically for my mother.  She moved
15  into the house at that point.  So we finished the construction
16  of it as the contractor, and then, essentially, I sold it to
17  myself in order to maintain the ownership.  She couldn't afford
18  to buy it, so she was -- she moved into it.
19             And in order to satisfy the requirement of the banks
20  for credit, et cetera, we did a lease agreement for her
21  signing -- or for her paying a certain amount, which we worked
22  out to be the same amount as what she had been paying at her
23  previous place.  It didn't -- it wasn't enough to cover the
24  mortgage or the expenses, but it was enough to satisfy the bank
25  and, therefore, keep us personally in position to be able to

JOHN ANDREW CARTER - DIRECT

1    buy it.

2    **Q.**   So you're -- so I can understand this.  So your mother was

3    paying a portion of what the mortgage amount -- monthly

4    mortgage note payment would have been?

5    **A.**   Right.  She paid -- she paid what she could; we covered

6    the rest.

7    **Q.**   Okay.  How long did your mother live in the home?

8    **A.**   Until -- about five years.  And during that time frame,

9    her -- her health began to go downhill and we couldn't

10   understand why.  We had several issues that occurred in terms

11   of replacing coils in the air-conditioning system, and computer

12   cards going out on appliances, those kinds of things, which we

13   later found out were indicative of the drywall issue.

14            And we didn't know what the problem was until as the

15   builder, I was sued by another home that we had the drywall in,

16   which then pointed us to what the problem was.  We immediately

17   got her out of the house.  By that time, it had gotten to where

18   there were noticeable fumes when you walked in.  It was an

19   irritant to the eyes, to your skin.  And now knowing what the

20   issue was with my mother, we immediately got her out of there

21   and moved her to another place closer to the rest of our

22   family.

23   **Q.**   How was the property used after she moved out?

24   **A.**   It has sat.  Since then, nothing has been done to it.  We

25   couldn't afford to go in and remediate the problem that we had,

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1  and I couldn't in good conscience put someone else in there as

2  a renter or sell it.  Of course, it's going to come up, the

3  problem, when you try to sell it.  So we've been unable to do

4  anything with it.  It has sat there since she moved out in

5  2011.

6  **Q.**   Okay.  So when you learned that there was a problem in the

7  home, what problem are you talking about in particular?

8  **A.**   The fumes and the issues associated with the Chinese

9  drywall and sulphur being in it.

10 **Q.**   Okay.  Is that when you sought counsel to get involved in

11 the litigation?

12 **A.**   It is.

13 **Q.**   Okay.

14 **A.**   It is.

15 **Q.**   After you retained my firm to represent you in the

16 litigation, did you complete any documents for the MDL court,

17 in particular a plaintiff profile form?

18 **A.**   Yes, we --

19 **Q.**   Okay.

20          **MR. DOYLE:**  Your Honor, may I approach?

21          **THE COURT:**  Yes.

22          **MR. DOYLE:**  This will be Exhibit No. 2, Carter

23 plaintiff profile form.

24 **BY MR. DOYLE:**

25 **Q.**   Mr. Carter, do you recognize that document?

JOHN ANDREW CARTER - DIRECT

1  **A.**   I do.

2  **Q.**   What is it?

3  **A.**   It's a form that was filled out, specifically that I was

4  requested to fill out and present back to you to the court.

5  **Q.**   Is it labeled at the top?

6  **A.**   It is.  United States District Court, Eastern District of

7  Louisiana, Chinese-Manufactured Drywall Products Liability

8  Litigation.

9  **Q.**   And is it labeled as a plaintiff profile form?

10  **A.**   It is.

11  **Q.**   Okay.  Is it your name that's on the form?

12  **A.**   It is.

13         **MS. EIKHOFF:**  Excuse me.  Jimmy, can we get a copy of

14  that?

15         **MR. DOYLE:**  Yeah.  Yeah.  Yeah.

16         **MS. EIKHOFF:**  Thank you.

17  BY MR. DOYLE:

18  **Q.**   Ask you a few questions about the form itself.  On the

19  third page, there is a signature on that form.  Do you see

20  that?

21  **A.**   Yes.

22  **Q.**   Is that your signature?

23  **A.**   It is.

24  **Q.**   Okay.  We don't have a date there, but do you have any

25  idea when you might have executed it?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1    A.    I really do not.

2    Q.    Okay.  Let's go to page 2.  At the very top, there's some

3    information about when an inspection was done, when drywall was

4    identified in the property, and who did it.  Do you see that?

5    A.    I do.

6    Q.    It's up in block 4 -- section 4 of the plaintiff profile

7    form.

8    A.    Yes.

9    Q.    Okay.  That is -- what does it say there as the date for

10   question 1.1?

11   A.    November 12th, 2011.

12   Q.    And that question was:  "Who conduct-" -- "When did the

13   inspection take place?"  So it looks like November 12th, 2011,

14   is we the inspection took place?

15   A.    Yes.

16   Q.    Okay.  And Chinese drywall was identified on that day?

17   A.    Yes.

18   Q.    Do you recall what the markings were that were found?

19   A.    The markings, including Chinese markings, I believe, as

20   well as the "Made in China, Meets or Exceeds ASTM."

21   Q.    Okay.  In the block right below it, at section 5, that's

22   what was found?

23   A.    Yes.

24   Q.    Okay.  We're going to revisit that in a minute.  The next

25   section down, section 6, listed as "Home Information."  It

JOHN ANDREW CARTER - DIRECT

1    listed an approximate square footage of the home as 1600 square
2    feet.  Does that sound accurate to you?
3    **A.**   It does.
4    **Q.**   Does that include the garage as well?
5    **A.**   It does.
6    **Q.**   Okay.  So that's the gross square footage, not the under
7    air?
8    **A.**   Yes.
9    **Q.**   Do you understand -- do you have any understanding what
10   the under air square footage is?
11   **A.**   About just under 1200.  I think it's 1183 or something
12   like that.
13   **Q.**   Okay.  Okay.  And then there's other information about
14   the -- what was found in there, the corrosion throughout the
15   house.  Take a look at sections below -- like at section 6, the
16   plumbing system and the electrical system.  Do you see those
17   items that are marked "yes"?
18   **A.**   Yes.
19   **Q.**   And tell us if, in fact, you found blackening corrosion in
20   the home in those areas in the plumbing and on the electrical?
21   **A.**   Yes.  The blackening of all the copper in those specific
22   locations was found.
23   **Q.**   Okay.  Let's look over -- the last thing I want to talk to
24   you about is section 7.  That has to do with the construction
25   and renovation information on the property.

JOHN ANDREW CARTER - DIRECT

1   **A.**   Okay.

2   **Q.**   It lists a move-in date of July 1st, 2006.  Does that

3   sound accurate to you?

4   **A.**   It does.  No, that would have been 2007, I believe.

5   **Q.**   Okay.  So it's inaccurate on this by a year?

6   **A.**   Yes.

7   **Q.**   Okay.  I just wanted to make sure it's clear for the

8   record that the move-in date happened because you closed on the

9   home at the end of 2006, and it was -- the warranty deed

10  indicates that it was stamped in, in the probate court of Lee

11  County, Alabama, in early '07.  So is it your testimony here

12  today that you believe the move-in date would actually be

13  July 1st, 2006, for your mother?

14  **A.**   I believe that's correct.

15  **Q.**   Okay.  Now, let's go back and revisit the date at the top,

16  that November 12th, 2011.

17          **THE COURT:**  Let me stop you for a second.

18          **THE WITNESS:**  Yes, sir.

19          **THE COURT:**  When is the move-in date for your mother?

20          **THE WITNESS:**  It would have been -- it would have

21  been July 1st of 2007 as opposed to 2006.

22          **THE COURT:**  2007.  Okay.  You just --

23          **THE WITNESS:**  And that's based on the typo that we

24  saw on the other form.

25          **THE COURT:**  That's what I just wrote, but the last

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1  question you asked said 2006.

2          MR. DOYLE:  Oh, I apologize, Your Honor.  2007.

3          THE COURT:  That's why I wanted to make sure.

4          MR. DOYLE:  I was trying to clear that up.

5          THE COURT:  So you believe that somewhere near

6  July 1st of 2007 is when your mother moved in?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Okay.  Very good.

9  BY MR. DOYLE:

10  Q.    Now, the drywall -- the Taishan drywall was identified in

11  the property on November 12th of 2011.  How does that date

12  affect when your -- your mother's residency in the property?

13  Did she continue to live there through that date?

14  A.    No.

15  Q.    Okay.  When approximately did she move out?

16  A.    It would have been immediately after we found that out.

17  Q.    Okay.  So short- --

18  A.    It would have been just a very short time, days.

19  Q.    Yeah.  It sounds to me like you don't know the exact date

20  she moved out, but was it shortly after the November 12th,

21  2011?

22  A.    Yes.

23  Q.    Okay.  Was it days; was it weeks; was it months, to your

24  recollection?

25  A.    It was days.  She would have immediately -- we lived close

JOHN ANDREW CARTER - DIRECT

1  enough by, we would have moved her, and we did move her, into
2  our house until other arrangements could be made.
3          **MR. DOYLE:**  Your Honor, we offer that into evidence.
4          **THE COURT:**  All right.  There's been no objection to
5  that exhibit, so that will be Plaintiff's Exhibit 2.
6                  Could you hand me a copy of that?
7                  Mr. Doyle, if you've got a copy for the Court of
8  your other exhibits when you hand them up.  I don't have
9  anything to look at while you're asking the witness questions.
10         **MR. DOYLE:**  I apologize, Your Honor.  How about if I
11 make it available on the monitor?  Because I only brought three
12 copies.
13         **THE COURT:**  There you go, Jennifer.
14         **MR. DOYLE:**  Okay.  Next we're going move to, if I
15 could find it, what we've identified as Exhibit 2, and what
16 we've offered to the Court for evaluation prior to the hearing,
17 and it's going to be an abbreviated version of Exhibit 2.  We
18 didn't print out all of the pictures.  Only the one that we
19 believe is relevant.  Your Honor, may I approach?
20         **THE COURT:**  Yes.
21 BY MR. DOYLE:
22 **Q.**  All right.  Mr. Carter, what I've provided to you is an
23 exhibit that you may or may not have seen the written portion
24 of it before now, but it's a document produced by the Taishan
25 defendants regarding the product ID and attribution, and in it

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1  they've made certain admissions, certain denials regarding

2  which products they made.

3          I want to direct your attention to the very last page

4  of the picture, which is identified in the record as

5  document 17 -- or picture No. 17.  Do you see that?

6  **A.**   I do.

7  **Q.**   Do you recognize those markings and that type font?

8  **A.**   I do.

9  **Q.**   Tell me how you recognize it?

10 **A.**   That was on the drywall that was put into my mother's

11 house.

12 **Q.**   Is it the same -- so you identified the same markings as

13 that being which was found in your -- in your home that your

14 mother lived in --

15 **A.**   Yes.

16 **Q.**   -- in Opelika?

17         Tell us the street address again.  Is it 703 --

18 **A.**   703 Waverly Place.

19 **Q.**   Okay.  Just making sure.

20 **A.**   Yes.

21         **MR. DOYLE:**  All right.  Your Honor, I would offer

22 that into evidence as Plaintiff's Exhibit 3.

23         **THE COURT:**  All right.  There's been no objection to

24 that exhibit.  That will be Plaintiff's Exhibit 3.  Thank you,

25 Mr. Doyle.

JOHN ANDREW CARTER - DIRECT

1               Just so the record's clear, and in light of the
2    fact that there's a default judgment in this case, I take it --
3    and I should have asked this question earlier -- there's no
4    dispute that Taishan's product was the Chinese drywall in the
5    home of both the Carter and Gibbs plaintiffs; is that correct?
6               **MS. EIKHOFF:**  Correct.  We do not dispute that, Your
7    Honor.
8               **MR. DOYLE:**  All right.  Your Honor, I can skip over
9    that then since there is no dispute regarding it.
10   **BY MR. DOYLE:**
11   **Q.**   All right.  The next document that I would offer is a
12   document that was in the record after the first phase of the
13   default judgment process that was conducted by Judge Fallon,
14   and in response to it, there was a calculation made by the
15   expert that was accepted by the Court.
16              **MR. DOYLE:**  Your Honor, may I approach?
17              **THE COURT:**  Yes.
18              **MR. DOYLE:**  And I will move back to this exhibit,
19   Your Honor.
20   **BY MR. DOYLE:**
21   **Q.**   All right.  Mr. Carter, this was submitted on your behalf
22   after the phase one -- after the conclusion of the phase one
23   portion of the default judgment hearing that Judge Fallon
24   conducted years ago where he adopted a methodology for
25   calculating the remediation costs in the properties that were

JOHN ANDREW CARTER - DIRECT

1    the subject of the case that were in default at that time.

2    Yours is part of the *Amorin* case.  The *Amorin* case was in

3    default -- is in default, and there has been a default judgment

4    entered.

5              Judge Fallon at that time accepted Ronald Wright as

6    an expert.  And following the hearing, there have been a couple

7    of different submissions.  This is the second of those

8    submissions that's in the court record as Document 22235-1, and

9    it lays out both the methodology that was adopted and does a

10   calculation here on page 6 of 142.  And do you see that page?

11   **A.**   Yes.

12   **Q.**   It's got the cost index and location factor adjustment.

13   This is what Judge Fallon had -- it was the last calculation

14   that Judge Fallon had accepted on the issue of cost of

15   remediation.  And in it there was a cost index.  There's a

16   couple of items here.  But, generally speaking, the formula was

17   the national cost average times the location factor times the

18   under air square footage.  You provided testimony about the

19   under air square footage, so the Court has that in its

20   possession.

21             This -- this figure here, this $117.94 was the last

22   of the adjustments before the pandemic and before the

23   settlement from which you opted out that the Court has in its

24   possession.

25             I'm going to direct your attention to the next page.

JOHN ANDREW CARTER - DIRECT

1          **MS. EIKHOFF:**  Your Honor, I --
2          **THE COURT:**  Hold on.  Hold on.
3          **MS. EIKHOFF:**  Sorry.
4          **THE COURT:**  Yeah.  Let's -- I haven't had a question
5     yet.
6          **MR. DOYLE:**  I'll give you the question here.
7          **THE COURT:**  All right.
8     BY MR. DOYLE:
9     **Q.**   On page 24 of 142, it's labeled -- and it's the first page
10    that has your property identified.  Do you see the line that
11    has your property identified?
12    **A.**   Yes.
13    **Q.**   And if you look at that line, there's a calculation that
14    was made by that expert.  What was the amount that was
15    calculated?
16    **A.**   It was the 117.94 times the square footage, 1183, giving a
17    total of 114,408 after the location factor was -- brought it
18    down.
19    **Q.**   Okay.  So within the Court's record, in 2019 at least,
20    there was a calculation that the cost of remediation was
21    $114,000 -- a little over $114,000.  Do you have an opinion as
22    to whether or not that amount is sufficient to remediate your
23    home?
24    **A.**   That is not sufficient in the -- the Auburn/Opelika area
25    is in a boom -- has been in a boom.  We're a university town,

JOHN ANDREW CARTER - DIRECT

1  and we don't see a drop in value.  As a matter of fact, it's

2  gone -- gone up quite a bit, at least -- I'd say at least

3  20 percent since that time frame.

4  **Q.**   Well, I'm not asking you about the rental value.  I'm

5  asking you about the cost of remediation.

6  **A.**   And I'm talking about the cost of remediation.  The

7  contractors are hard to be found, materials have gone up, and

8  anyone is charging a premium to come out and try to fix

9  anything.

10  **Q.**   Now, Mr. Macomber's Xactimate is not going to be

11  offered -- cannot be offered into the record.  It's been

12  excluded by this Court.  But did you have an estimate done by

13  Mr. Macomber or anybody that calculated an amount at any time

14  since this 2019 calculation that deviates in any way?

15  **A.**   Yes.  It better reflects what the current situation is,

16  which is about 145,000 to fix it.

17  **Q.**   So your testimony is now after -- after this 2019

18  calculation that was done and submitted to Judge Fallon, you've

19  had an estimate done by someone else that reflects a

20  remediation cost of $145,000?

21  **A.**   Yes, and that's a year old.  So I would suspect that it's

22  significantly higher now, probably ten percent higher.

23  **Q.**   Okay.  Why do you say that?

24  **A.**   Because the boom is continuing and there are fewer

25  contractors that are willing to go in, and they're going to

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1    charge a premium.

2    **Q.**    Okay.

3    **A.**    And materials have gone up.  Everything has gone up.

4    **Q.**    So it's your testimony that the cost of remediation is

5    even higher than the 145,000 --

6    **A.**    Yes.

7    **Q.**    -- figure?

8            Who provided you with that $145,000 figure?

9    **A.**    That was Mr. Roger -- or Mr. Macomber.

10   **Q.**    Okay.  Have you had anybody else since that time do an

11   estimate?

12   **A.**    Not since then.

13   **Q.**    Okay.

14           **MR. DOYLE:**  Now, Your Honor, the -- you mentioned

15   that you would like to have one hearing.  We would too, where

16   we can get the testimony on the record.  I think we've now

17   gotten the testimony regarding the cost of remediation, which I

18   believe is the appropriate measure of diminution in value, the

19   cost of fixing this -- oh, no.  Your Honor, there's one more --

20   one more item.

21           **THE COURT:**  What do you want to do with this

22   document?  You just want to ask him about it?

23           **MR. DOYLE:**  I want to offer that into the record as

24   Exhibit --

25           **THE COURT:**  You all have objected to this.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1   Defendant's objected on the list.

2               Let me hear -- let me hear your position on the

3   entry of this document as a piece of evidence in this hearing

4   given that it is already in the record of the case.

5           **MS. EIKHOFF:**  Your Honor, we object to it on multiple

6   grounds.  We object to it on foundation.  We object to it on

7   relevance.  And we reject to it -- we reject -- sorry.  We

8   object to it on foundation, on relevance, and as an untimely

9   submitted expert report.  And I'll go through each one those,

10  Your Honor, and explain the providence of this document.

11              I was certainly respectfully holding my tongue

12  while I listened to Mr. Doyle's representations as an attorney

13  as to what this document is.  And we think that there were

14  inaccuracies in that representation.

15              Your Honor, it is in the record insomuch as it

16  is filed on the docket.  It was filed on the docket by

17  plaintiffs in this case back in May of 2019.  It has never been

18  adjudicated.  It has never been reviewed by Judge Fallon, as

19  far as we know at least -- at least with respect for making any

20  decisions on it.

21          **THE COURT:**  It's Mr. Wright's table of estimates of

22  various values that is attached to his affidavit as an expert

23  for the plaintiffs that has been previously entered in the

24  record in some form or fashion.  I get what it is.

25          **MS. EIKHOFF:**  That is right.  Your Honor, it is true

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1    that Mr. Wright had submitted a previous expert report back in

2    2015 to the Court, and there was a hearing on that where

3    Mr. Wright testified.  And at that time, for that earlier

4    report, he was qualified as an expert by the Court.  And the

5    figures for aggregate class damages formula from that 2015

6    report were included in the Court's findings of fact and

7    conclusions of law.

8              Prior to the submission of this report, which,

9    other than being on the docket, has never seen the light of the

10   day in terms -- light of day in terms of the Court's attention,

11   we have not ever had any chance to depose Mr. Wright about this

12   report.  We haven't been able to go behind the numbers on this

13   report.  It's sitting on the docket.

14             And then it was rightfully abandoned on the

15   docket -- on the docket when the case settled and the class was

16   extinguished through that settlement.  Because these are

17   aggregate class damages, they are not relevant to the

18   determination of what it would actually cost for these specific

19   properties.

20             **THE COURT:**  Okay.  I get all that.

21             Let me ask Mr. Doyle, is it your -- are you

22   representing to the Court that Judge Fallon has ever adopted

23   any of these numbers or this methodology?

24             **MR. DOYLE:**  He's adopted that methodology for sure,

25   Your Honor.  Without a doubt.  Document 20741 lays out in

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1    detail that he accepts that methodology that's laid out on
2    page --
3              **THE COURT:**  This is just an expert report.
4              **MR. DOYLE:**  Right.  This is -- this is an updated
5    table after Judge Fallon had accepted him as an expert, had
6    invited the submission of the earlier calculations, this is an
7    update of that using the same methodology.
8              Just as you heard from Mr. Carter, year to year
9    the cost of construction changes.  This is just simply an
10   update by an expert that's been accepted.  It was invited by
11   the Court.  And it may not have been adjudicated, you know, on
12   the value of the national cost average, but it's using -- it's
13   from the same expert, using the same methodology that the Court
14   had accepted previously.
15             **THE COURT:**  All right.  Here's what I'm going to do
16   with this document because I think it suffers from another -- a
17   number of evidentiary maladies.  First of all, it is an expert
18   report.  It is the work product of an expert who wasn't
19   disclosed as participating in this proceeding.  And I'm not
20   sure that you established any foundation with Mr. Carter to
21   introduce it into evidence in terms of personal knowledge, any
22   sort of rational foundation.
23             Having said that, I'm obviously going to give
24   the parties an opportunity when this hearing is over to give me
25   some sort of post-hearing briefing as to what I ought to do

JOHN ANDREW CARTER - DIRECT

1   with the evidence that's adduced at this hearing and otherwise

2   in the case.  I will not foreclose plaintiffs' right and

3   privilege to argue why this document, or some other document in

4   the record, should be referred to by me in making my

5   recommendation.

6           If you want to make that argument to the Court

7   about a document that's already in the record, I'm not going to

8   tell you, you can't do that.  But I'm not going to let it come

9   into evidence through the testimony of Mr. Carter when it's not

10  his work product, he didn't have anything to do with creating

11  it, it's questionable whether he's even seen it before.

12          I understand and appreciate the testimony he

13  just provided about a number that's in this document.  I heard

14  what he said.  I heard what he said about other numbers.

15  That's all in the record, but this document is not going to be

16  in the record of this hearing as an exhibit.  Okay.

17          **MR. DOYLE:**  That's fine, Your Honor.

18          **THE COURT:**  All right.

19          **MR. DOYLE:**  And I think it's -- that's what the

20  purpose of eliciting the testimony was, is to raise the issue

21  of the cost of remediation because of the diminution in value

22  aspect of this.  If we're not going to have an Xactimate in, he

23  can certainly testify about the value of the property.

24          **THE COURT:**  I don't have a problem with his testimony

25  along those lines.  I specifically informed the parties that I

JOHN ANDREW CARTER - DIRECT

1  would be willing to listen to that testimony whether it's

2  Mr. Carter, Ms. Carter, Mr. and Mrs. Gibbs, whoever it is.

3          **MR. DOYLE:**  Yes, Your Honor.

4          **THE COURT:**  He's given that testimony.  I've heard

5  it.  And to the extent that you can convince me down the road

6  that I ought to be looking at other things in the docket that

7  aren't actually in evidence in this case, you can take your

8  best shot, and we'll go from there.

9          **MR. DOYLE:**  Sure.  Thank you, Your Honor.

10  BY MR. DOYLE:

11  **Q.**   All right.  Mr. Carter, I don't have a paper copy of this

12  in mine, but it's in the record.  The Court has received this.

13  The last item I'm going to ask you about, you can look on the

14  monitor and see it, and it's the appraisal.  And the only thing

15  that I want to ask you about is, are you aware that an

16  appraisal was done last year?

17  **A.**   Yes.

18  **Q.**   And let me see if I can reduce this so we can read it a

19  little better.  Okay.  At the top of this document on page 1,

20  it has listed as 703 Waverly Place, Opelika, Alabama 36801.  Is

21  that your property?

22  **A.**   It is.

23  **Q.**   Okay.  On the bottom of the second page, it says,

24  "Indicated value by sales comparison approach," and it provides

25  a value of $160,000.  Do you see that?

JOHN ANDREW CARTER - DIRECT

1   **A.**   I do.

2   **Q.**   Are you aware that this house was appraised for $160,000

3   in 2021?

4   **A.**   Yes.

5   **Q.**   Do you agree with that number?

6   **A.**   I do.

7   **Q.**   Okay.  Do you believe that's an accurate reflection of the

8   appraised -- or the value of the property in terms of 2022

9   dollars?

10  **A.**   No, it would be worth more now.  That's a little bit

11  dated.

12  **Q.**   Why do you say it would be worth more now?

13  **A.**   The way the value of properties have gone up in the

14  Auburn/Opelika area as much as 10 percent.

15  **Q.**   All right.  The last thing I want to ask you about, and

16  I'm going to make this --

17          **MR. DOYLE:**  Your Honor, you've limited the hearing to

18  diminution of value.  The only other thing that I'd like to get

19  in the record at this point is testimony about a couple of

20  other areas of damages that may be considered by the Court in

21  the future.  So I'd like to make a proffer through this witness

22  if the Court will indulge me.

23          **THE COURT:**  I'm going to allow him to make a

24  proffer -- a limited proffer.  Okay.

25          **MR. DOYLE:**  And there's only a couple of things that

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - DIRECT

1    I want to ask you about.

2            THE COURT:  Hold on.  Ms. Eikhoff wasn't listening.

3            MS. EIKHOFF:  No, I was making a note.  I'm sorry.

4            THE COURT:  He wants to ask Mr. Carter about some

5    additional areas of damage.

6            MS. EIKHOFF:  Yes.

7            THE COURT:  And he's asked to make a proffer, which

8    I'm going to let him do.

9            MS. EIKHOFF:  Okay, Your Honor.  Thank you.

10           THE COURT:  Understanding that this testimony insofar

11   as I made a ruling about the measure of damages will not be

12   evidence in chief, but I will accept it as a proffer.

13           MR. DOYLE:  Yes, Your Honor.

14           MS. EIKHOFF:  And, Your Honor, I think part of why I

15   was distracted was the -- is the appraisal going to be -- it's

16   going to be tendered into evidence?

17           MR. DOYLE:  Yeah.  I'm sorry.  Your Honor, we offer

18   the appraisal of Mr. Carter's property into evidence as the

19   next exhibit, Exhibit 5, I believe.

20           THE COURT:  As Exhibit 4.

21           THE DEPUTY CLERK:  4.

22           MR. DOYLE:  4.  Okay.  Exhibit 4.

23           THE COURT:  Yeah, your other 4 was not allowed into

24   evidence.

25           MR. DOYLE:  Okay.  So Exhibit 4, Your Honor.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1    **MS. EIKHOFF:** And, Your Honor, we -- we had that on
2 our exhibit list. It was not on the plaintiffs', but we are
3 happy to provide you with a copy of it.
4    **THE COURT:** Okay. Well, I have my own copy.
5    **MS. EIKHOFF:** Oh, you do. Okay.
6    **THE COURT:** Yeah. I take it that if it's on your
7 exhibit list, you don't have any objection to it coming in at
8 this point?
9    **MS. EIKHOFF:** Of course.
10    **THE COURT:** Okay. So that will be Plaintiff's
11 Exhibit 4, the appraisal. I think it was a 2021 appraisal of
12 the Carter home.
13                              **PROFFER**
14 BY MR. DOYLE:
15 **Q.** All right. So, Mr. Carter, we're done talking about the
16 cost of remediation as far as the testimony you can provide. A
17 couple of other areas I want to get on the record. This is --
18 what we're doing here is making a proffer, which is putting
19 this evidence into the record so it can be considered at a
20 later date if it's allowed to be considered.
21 **A.** Okay.
22 **Q.** The first thing I want to talk to you about is the rental
23 value of your property. And are you aware what amount per
24 month the 703 Waverly Place property would rent for if you put
25 it on the market if it did not have Chinese drywall?

JOHN ANDREW CARTER - PROFFER

1  **A.**   I recently seen by looking online that similar properties

2  are renting for $2,400, $2,500 a month.

3  **Q.**   Okay.  So your testimony is that the rental -- the

4  comparable rental homes in the Auburn/Opelika area are renting

5  for approximately $2,400 a month?

6  **A.**   Yes.

7  **Q.**   Okay.  All right.  The next area I also want to discuss,

8  there were some exhibits that we offered that were excluded

9  that go to personal property damage and home repair.  Do you

10 recall filling out some forms related to the supplemental

11 plaintiff profile form in this case?

12 **A.**   I do.

13 **Q.**   And do you remember discussing it at your deposition?

14 **A.**   Yes.

15 **Q.**   With opposing counsel, of course.

16       The first area I want to discuss with you is the

17 itemization of damages or repair to home, and you have a number

18 of items that are listed on that form on the first page.  And

19 I'm just going to list them off because I want to talk to you

20 really about the date that they failed and if they were

21 replaced so we can get that on the record.

22       The first item is a Frigidaire refrigerator; the

23 second is a Frigidaire microwave; the third is a Frigidaire

24 stove; the fourth is the replacement of AC coils.

25       **MS. EIKHOFF:**  Jimmy, what are you -- I'm sorry.  What

JOHN ANDREW CARTER - PROFFER

1   are you reading from?

2          MR. DOYLE:  This one.  I'm sorry.  Let me put it on

3   the record -- put it on the monitor.

4          THE COURT:  Is this a document that is part of or is

5   the supplemental personal property form?  Or the --

6          MR. DOYLE:  It was attached to it, yes, Your Honor.

7   But we were offering it -- just the exhibit to it.  It was

8   excluded.

9          THE COURT:  The plaintiff profile form.  I'm sorry.

10         MR. DOYLE:  Yeah, not the plaintiff profile form.

11  There was a supplemental plaintiff profile form.

12         THE COURT:  All right.  Well, let's provide it to

13  opposing counsel so that they know what you're talking about

14  when you're questioning the witness.

15         MR. DOYLE:  Yeah.  Give me one second.  Let me get it

16  up here on the monitor first.

17         MS. EIKHOFF:  Your Honor, this is a document that was

18  not listed on either our exhibit list or on the plaintiffs'

19  exhibit list.

20         THE COURT:  Is it on your exhibit list?

21         MR. DOYLE:  It was.

22         THE COURT:  What's it called on your exhibit list?

23         MR. DOYLE:  Exhibit 6.  Again, it was --

24         THE COURT:  Personal property and home repair

25  itemization.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1           **MR. DOYLE:**  There you go.  And it's labeled
2   "Supplemental Plaintiff Profile Form."  It's on the monitor
3   now, Your Honor.
4           **MS. EIKHOFF:**  Your Honor, that was subject of the
5   Court's exclusion ruling.
6           **THE COURT:**  Well, we're having a proffer.
7           **MS. EIKHOFF:**  Sorry.  Excuse me.
8           **THE COURT:**  Okay.
9           **MS. EIKHOFF:**  Sorry, Your Honor.
10          **THE COURT:**  The witness is here.
11          **MS. EIKHOFF:**  Yes.  Understood.  Sorry.
12          **THE COURT:**  We're going to let him ask -- answer
13  questions about this evidence.
14          **MR. DOYLE:**  All right.  We've got it on the monitor,
15  Your Honor.
16  **BY MR. DOYLE:**
17  **Q.**   Okay.  The question I have with regard to any of these
18  items -- well, first -- let's take the first three.  The
19  Frigidaire refrigerator, when did that fail?
20  **A.**   Shortly after she had moved out.  We did not move that out
21  with her because she was going to our house at first.  So it
22  stayed in the -- in the house and in the environment with the
23  fumes, and it's actually still there.
24  **Q.**   So you're -- so it's still there?  It has not been
25  replaced?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1   **A.**   No.

2   **Q.**   Okay.  And I believe the testimony was that she moved out

3   shortly after November of 2011.  So it's your testimony that

4   this failed sometime in 2012?

5   **A.**   In all likelihood, yes.

6   **Q.**   Okay.

7   **A.**   It is not working now.

8   **Q.**   Do you believe it happened at any other -- at any other --

9   at any other -- excuse me -- at any other time, at a later date

10  or earlier, or do you believe that it happened in 2012?

11  **A.**   In 2012.

12  **Q.**   Okay.  We're trying to get specific dates on the

13  records -- the record, so that's why I'm asking you this.

14         The same thing with the Frigidaire microwave.  Do you

15  have any recollection of when it failed?

16  **A.**   The microwave failed before she moved out.

17  **Q.**   So that happened in 2010, 2011?

18  **A.**   It would have been 2011, and it would have been probably

19  in October.

20  **Q.**   Okay.  And you have provided values of these items.  The

21  refrigerator that you testified failed in 2012 was valued at

22  $1,499; is that correct?

23  **A.**   Yes.

24  **Q.**   And how did you arrive at that amount?

25  **A.**   Online lookup of the same model.

JOHN ANDREW CARTER - PROFFER

1  **Q.**   Okay.  Let me see if we can find that.

2         Is this the document here that you've provided as

3  evidence to substantiate the value?

4  **A.**   Yes.  Yes.

5         **MR. DOYLE:**  All right.  This is on page 75 of the

6  plaintiffs' documents.  Your Honor, we'll offer this

7  collectively as a consolidated exhibit when we get through.

8  **BY MR. DOYLE:**

9  **Q.**   All right.  The next item I want to ask you about is

10 the -- okay.  So the microwave, you also provided a value of

11 $299.  Is it the same way that you arrived at that?

12 **A.**   Yes.

13 **Q.**   Was there an online document?

14 **A.**   Yes.

15 **Q.**   Okay.  And is it included in this exhibit?

16 **A.**   It is.

17        **THE COURT:**  If it's included in the exhibit, you

18 don't have to keep going back and forth.

19        **MR. DOYLE:**  Thank you, Your Honor.  Okay.  I'll just

20 have him -- I'll ask those questions.

21 **BY MR. DOYLE:**

22 **Q.**   The third item is the Frigidaire stove valued at $899; is

23 that correct?

24 **A.**   Yes.

25 **Q.**   How did you arrive at that value?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1  A.  The same way.

2  Q.  Did you provide a printout --

3  A.  I did.

4  Q.  -- for the online cost?

5  A.  Yes.

6  Q.  Okay.  The last item on this list is the replacement of

7  three air-conditioning coils and it looks like it's $880?

8  A.  Yes.

9  Q.  Does that indicate that each time that it was replaced, it

10  cost you $880?

11  A.  Yes.

12  Q.  And the grand total was $2,640; is that what it means --

13  is that what it says?

14  A.  Yes.

15  Q.  Okay.  Do you recall when those -- when the first coil

16  failed?  An approximate date.

17  A.  I don't recall exactly.  I'm thinking it would have been

18  in 2010 or so.

19  Q.  Okay.

20  A.  And then subsequently, another failure, and then a third

21  failure before we moved her out.

22  Q.  Do you have an approximate year that the second coil

23  failed?

24  A.  Early 2011, I believe.

25  Q.  Okay.  What about the third?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1    **A.**   But I believe there's -- I believe there's a receipt in

2    there for that one, for the second one.

3    **Q.**   Okay.

4    **A.**   The third one was -- would have been later in 2011, closer

5    to the time that she moved.  Again, we couldn't figure out --

6    we didn't know why it was continuing to happen.

7    **Q.**   Okay.  All right.  The last item that I want to ask you

8    questions about is listed as the "Itemization of Damaged

9    Personal Property."  You've got six items on it.  I'll just run

10   through it real quick.

11           The queen-size mattress set you valued at $2,199.

12   The full-size mattress set you valued at $1,819.  The -- it

13   looks like the Bassett sofa you valued at $1,599.  The love

14   seat at $1,499.  The chair at $999.  And then, finally, the

15   Dell desktop computer you valued at $599.

16           Were all of those items damaged by Chinese drywall,

17   in your opinion?

18   **A.**   Yes.

19   **Q.**   And how did you arrive at the value of each of these?

20   **A.**   The same way, with online lookup of the product.

21   **Q.**   Okay.  And those items are in the document here that --

22   **A.**   They are.

23   **Q.**   -- that follows?

24           What happened to those items?

25   **A.**   They are still sitting in the house.

JOHN ANDREW CARTER - PROFFER

1  **Q.**   Okay.  All right.  The last item that I want to get some

2  proffer testimony about is any other expenses that you expect

3  to incur during the remediation of the property when it takes

4  place.  This would be incidental to the damage caused by what

5  we contend is a product under Alabama law.

6          So is -- have you looked into any other costs that

7  would be associated with the process of remediation, moving

8  items, insuring items?

9  **A.**   Yeah.  Just moving the stuff that's currently in there,

10 we'll have to move out and dispose of -- I guess dispose of

11 because it's not going to be usable prior to the house being

12 gutted.

13 **Q.**   I believe we have a quote here for storage.  It's

14 sideways.  Let me see if I can -- I don't know how to rotate

15 it.  But it looks like the quote here was for $131.04; is that

16 the storage quote?

17 **A.**   Yes, that's to move it all out.

18 **Q.**   Is that per month?

19 **A.**   I believe it is.

20         **MR. DOYLE:**  Okay.  Mr. Carter, I don't have any

21 further questions for you.  Thank you.

22         **THE COURT:**  Ms. Eikhoff, do you have some questions?

23         Oh.  Mr. Carter, Ms. Eikhoff's got some

24 questions for you.

25

JOHN ANDREW CARTER - CROSS

1                          CROSS-EXAMINATION

2     BY MS. EIKHOFF:

3     Q.    Hi, Mr. Carter.  We've met on Zoom?

4     A.    Yes.

5     Q.    All right.  Just a moment to get my notes together.

6             Why don't I start, Mr. Carter, with a document that

7     is not one of the documents that your attorney, Mr. Doyle,

8     showed you, but I want to hand it to you if I may.

9             MS. EIKHOFF:  May I approach, Your Honor?  May I

10    approach?

11            THE COURT:  Yes.

12              Is that the supplemental?  Okay.

13            MS. EIKHOFF:  It's the amended supplemental, yes.

14    BY MS. EIKHOFF:

15    Q.    Mr. Carter, do you recognize this document?  If you look

16    at the last page, you can see a date.  Is that your signature?

17    A.    It is.

18    Q.    And did you, in fact, sign that on December 16th, 2020?

19    A.    Apparently, yeah.  That's what it says.

20    Q.    And do you recall that this was -- that you signed this in

21    December 2020, after the first time I took your deposition?

22    A.    I don't recall exactly, but I guess so, yeah.  I don't

23    remember signing it, no, but it looks like I did.

24    Q.    And I took another deposition of you afterwards and asked

25    you some questions about this document.  Do you remember that?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - CROSS

1    **A.**    Okay.  Yes.

2    **Q.**    Okay.  And this -- is this the -- this December 2020

3    supplemental plaintiff profile form the most recent profile

4    form that you have completed?

5    **A.**    To my knowledge, yes.

6    **Q.**    Okay.  And so this is the most recent.  And you would

7    consider it to be, as far as you know, the most accurate of the

8    profile forms that you've completed?

9    **A.**    As far as I know, yes.

10   **Q.**    Okay.  Thank you.

11          Mr. Carter, you said that you built this home for

12   your mother to live in?

13   **A.**    Yes.

14   **Q.**    And I think you testified earlier that she moved in on

15   July 1st, 2007.  Do you remember producing a lease that started

16   on May 1st, 2007?

17   **A.**    I remember a lease, yes.

18   **Q.**    Okay.  Could it be -- could it be May or July?

19   **A.**    Yeah.  Yeah.  As I said, it was probably that May, June,

20   July time frame.

21   **Q.**    Somewhere in the summer of 2007?

22   **A.**    Yes.

23   **Q.**    Okay.  And then she moved out, you said, around five years

24   later, so maybe 2012?

25   **A.**    2011.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - CROSS

1   Q.   2011.  Okay.

2   A.   '11.

3   Q.   So she lived there from 2007 to 2011?

4   A.   Yes.

5   Q.   About four years?

6   A.   Yes.

7   Q.   Okay.  And after she moved out, you testified that nobody

8   else has ever lived there?

9   A.   That's correct.

10  Q.   And no one, in fact, ever lived there besides your mother;

11  is that correct?

12  A.   That's correct.

13  Q.   And when she moved out, you left personal property and

14  furniture in the home?

15  A.   We did.  Anything that was -- was basically saturated with

16  the fumes, we left it --

17  Q.   Anything --

18  A.   -- or it was not recoverable, such as the electronics.

19  Q.   Okay.  And since that time, since it's been abandoned,

20  have you been paying for central heating and air or HVAC?

21  A.   No.  We basically paid homeowners association dues, which

22  take care of the outside of the house.

23  Q.   Okay.  And, in fact, the home has just been untouched?

24  A.   Yes.  It's unlivable, so nothing's been done with it.

25  Q.   Okay.  And at no point since 2011, when mother moved out,

JOHN ANDREW CARTER - CROSS

1  have you attempted to rent the property; is that correct?
2  A.   That's correct.
3  Q.   And you have never attempted to put the house on the
4  market for sale?
5  A.   That's correct.
6  Q.   Even as is?
7  A.   That's correct.
8  Q.   And so for the last ten plus years, the home has just been
9  abandoned and deteriorating; would you agree?
10 A.   Yes.
11 Q.   Now, notwithstanding that condition, you saw that the home
12 did appraise for -- was it $160,000?
13 A.   Yes.
14 Q.   And that was in April of 2011?
15 A.   Yes.
16 Q.   And you said that you think the value has probably gone up
17 since then because of market conditions?
18 A.   Yes.
19          THE COURT:  I'm sorry you said 2011.
20          THE WITNESS:  '21.
21          MS. EIKHOFF:  I'm sorry.
22          THE COURT:  2021.
23          MS. EIKHOFF:  2021.  Sorry.
24 BY MS. EIKHOFF:
25 Q.   And is the appraisal for $160,000 the only appraisal that

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - CROSS

1    you know of that exists on the property?

2    **A.**    Yes.

3    **Q.**    You have never got an appraisal of it seeking to take into

4    account that there is Chinese drywall in the home?

5    **A.**    I've not.

6    **Q.**    Okay.  Now, you testified that you had gotten an estimate

7    from Mr. Macomber of a cost to remediate the home of $145,000?

8    **A.**    Yes.

9    **Q.**    And you have been in the home building industry; correct?

10   **A.**    Yes.

11   **Q.**    Have you undertaken on your own, besides what you saw from

12   Mr. Macomber, any assessment of costs of remediation?

13   **A.**    No.  The -- just the previous time when it was looked at.

14   I did have a -- I had a contractor well before any of that,

15   probably 2012, did an estimate at that time, again, using

16   Xactimate because that's what all of them are going to use to

17   make that estimate, and I believe it was $93 or $95,000, but I

18   don't have that documentation because we immediately walked

19   away saying we can't do that.

20   **Q.**    So you have a recollection of the $93 or $95,000 as a

21   previously quoted cost of remediation?

22   **A.**    2012.

23   **Q.**    From 2012.  Now, you mentioned that you believe that the

24   $145,000 estimate provided by Mr. Macomber is too low and

25   should be higher now; correct?

JOHN ANDREW CARTER - CROSS

1   **A.**   Yes.

2   **Q.**   And have you taken that quote and actually shopped around

3   for those services to be provided?

4   **A.**   Not at this time.  We've been hearing it for ten years, so

5   we haven't taken any further steps on any of it because it

6   continues to drag out, and I don't want to waste anyone's time.

7   **Q.**   And so your opinion that that number is too low and that

8   the cost would be higher now, is that just based on your

9   speculation of what construction and repair costs are in the

10  Opelika area these days?

11  **A.**   Yes, and based on the fact that my wife and I recently

12  looked at selling our house and downsizing to a smaller house,

13  and the cost of everything has gone up significantly.

14          And also in looking at having a house built for my

15  wife's parents, we've gone up over -- over $250 a square foot

16  now is what the going rate is for new construction.  And

17  existing construction has gone up significantly as well from,

18  say, 115 or so per foot to 250 plus.  So what we're seeing in

19  new construction also translates into essentially what's going

20  to be considered as new construction by somebody coming in to

21  replace everything that's in there.

22  **Q.**   Okay.  And you've not -- you've not looked at that --

23  taken a look at that specifically, but that's what you presume

24  based on these other experiences that you've had in the area

25  recently?

JOHN ANDREW CARTER - PROFFER

1    **A.**   And based on the fact that he's using Xactimate, which is
2    the standard that every contractor uses to determine the cost
3    of doing a job.
4    **Q.**   Okay.
5         **MS. EIKHOFF:**  Your Honor, I want to ask him questions
6    that relate to the proffer portion.
7              **THE COURT:**  Okay.  Sure.
8                              **PROFFER**
9    BY MS. EIKHOFF:
10   **Q.**   You testified that you believed the rental cost of a
11   comparable place is $2,400 a month?
12   **A.**   Yes.
13   **Q.**   Now, you have not actually marketed the property for rent?
14   **A.**   Not that one, no.
15   **Q.**   And you are not -- do you run any kind of home or
16   apartment rental business?
17   **A.**   I do not have rental properties anymore.  Well, not in
18   that state.  I do have a rental property in Georgia.
19   **Q.**   Okay.  And so the basis of the comparable that you
20   testified was your just online research?
21   **A.**   Yes, and my knowledge of the area where I live.
22   **Q.**   Okay.  But what specifically -- when you say your
23   knowledge of the area, your knowledge -- you're not -- do you
24   rent a home?
25   **A.**   I have a child in college who I rent a house for, and I

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1  have another child who I rented a house for until recently --
2  or paid their rent for them, I should say.
3  **Q.**   Okay.  You -- strike that.
4  **A.**   And that was from looking online from the Opelika/Auburn
5  area, the -- there were only probably three houses even
6  available, and of those, only one that's in a comparable
7  neighborhood, comparable age was at 2400.  Yeah, 2400.  And I
8  think another one was found that was 2200.
9  **Q.**   Okay.  But we don't have -- we don't know the size of
10  those houses, the conditions of those houses, the locations of
11  those houses.  That's --
12  **A.**   That was based on it being a comparable property, the same
13  size, same age.
14  **Q.**   Okay.  We were looking at a page of your supplemental
15  profile form that has a refrigerator, microwave, a stove, and
16  coils on it; is that correct?
17  **A.**   Yes.
18  **Q.**   And those figures, do those represent the amounts that you
19  paid for those items in your mother's house?
20  **A.**   No.  Those represent the amount that those could be bought
21  at the time of the form by going online and buying the same
22  product.
23  **Q.**   And based on going to like Lowe's or some other retailer
24  online?
25  **A.**   Yes.  Yes.

JOHN ANDREW CARTER - PROFFER

1    **Q.**   Okay.  And in terms of the actual items that were

2    purchased for the property, you don't have any -- any documents

3    or receipts of what those actually cost; is that right?  As we

4    sit here today.  I know it was a long time ago.

5    **A.**   No, probably not.

6    **Q.**   Okay.  And then, likewise, you have a list of furniture,

7    mattresses, sofa, love seat, chair, desktop computer.  You

8    don't have the original receipts for those.  But the figures

9    that are provided are what you have looked up online of what

10   they would cost today for something comparable?

11   **A.**   Yes.

12   **Q.**   Okay.

13   **A.**   And my mother did have to replace those when she moved

14   into a new place.  But I don't have the receipts for those, no.

15   **Q.**   And you don't know how much those costs?

16   **A.**   No.

17   **Q.**   And your mother bought those?

18   **A.**   Yes.

19   **Q.**   Okay.  Was all of the furniture your mother's furniture?

20   **A.**   Yes.

21   **Q.**   Okay.  The replacement of the three air-conditioner coils,

22   you said there were -- it was three times $880?

23   **A.**   Yes.

24   **Q.**   Do you have any record of those costs being expended?

25   **A.**   Yes.  There is a receipt, I believe, that's in the

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1    package, the second one, which was when they came back out
2    after the first one.
3    **Q.**   From Oasis Heating and Air?
4    **A.**   Yes.
5    **Q.**   And it says $880?
6    **A.**   I believe.  I don't have it in front of me.  I don't know.
7    **Q.**   Okay.
8    **A.**   Yes, $880.
9    **Q.**   So you have one invoice for $880.  And then are you just
10   by memory multiplying that times two?
11   **A.**   It was the same company that came out each time, so, yes.
12   They charged the same amount each time.
13   **Q.**   You recall that they charged --
14   **A.**   And after the third time, refused to come out again.
15   **Q.**   Okay.  Now, you testified that the items that have been
16   left for more than ten years in the abandoned property, that
17   you would dispose of them?
18   **A.**   Yes.
19   **Q.**   So there would be no need for you to pay to have them
20   stored?
21   **A.**   Unless there was some need for whatever that may want it
22   as damages -- or as proof, like an insurance company would say
23   they want it retained and they'd take care of it.
24            **THE COURT:**  Unless you had to save them, for
25   instance, for this lawsuit?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1        **THE WITNESS:**  Yes, sir.

2        **THE COURT:**  Okay.

3        **MS. EIKHOFF:**  No other questions, Your Honor.

4        **THE COURT:**  Any follow-up?

5        **MR. DOYLE:**  Your Honor, one last housekeeping.  I

6   forgot to offer the consolidated --

7        **THE COURT:**  That's what I was going -- I was going to

8   handle real quickly.  Do you want to offer that collection of

9   documents you questioned Mr. Carter on as your proffer No. 1?

10       **MR. DOYLE:**  Yes, Proffer No. 1.  Just the

11  consolidated group.

12       **THE COURT:**  Okay.  Right.  All right.  So that

13  exhibit will be entered as Plaintiff's Proffer No. 1.

14           Ms. Eikhoff, what about the supplemental

15  document that you questioned Mr. Carter on?

16       **MS. EIKHOFF:**  I'm sorry, Your Honor.  I meant to

17  tender that into evidence.

18       **THE COURT:**  Okay.

19       **MS. EIKHOFF:**  We would like to tender that into

20  evidence.  Your Honor, would you like for it to be

21  Defendant's 1?

22       **THE COURT:**  Yes.  This is plaintiff's supplemental

23  profile form that defendants questioned Mr. Carter on.

24           Mr. Doyle, any objection to that being in

25  evidence?

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1          **MR. DOYLE:**  No, Your Honor.

2          **THE COURT:**  Okay.  That will be Defendant's 1.

3                  Mr. Carter, I got just a couple of quick

4    questions for you.

5          **THE WITNESS:**  Yes, sir.

6          **THE COURT:**  Because one of the things I'm trying to

7    determine in the case is the difference in fair market value

8    between a house, you know, when -- say when you built it or

9    when your mom moved into it and what it is now.

10         **THE WITNESS:**  Yes, sir.

11         **THE COURT:**  Did you ever have an appraisal done of

12   the house prior to this 2021 appraisal that was done?

13         **THE WITNESS:**  When it was originally built and we did

14   the first purchase of it, I had to have an appraisal at that

15   time.

16         **THE COURT:**  All right.  Do you recall what that

17   number was?

18         **THE WITNESS:**  I don't remember exactly what it was,

19   but I know that we had built a house like that, that same one,

20   as part of the construction company, and I believe that one

21   sold for 147 or 152.  So it was right around that 150,000 mark.

22         **THE COURT:**  Do you recall what it cost to build the

23   house?

24         **THE WITNESS:**  I want to -- I'm guessing 110, but I

25   don't know for sure.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

1          **THE COURT:**  And I think you said that, I guess, your
2    company sold the house to you so that your mom could live in
3    it.  Do you recall what the purchase price of that sales price
4    was?
5          **THE WITNESS:**  Whatever the cost was.
6          **THE COURT:**  Okay.  If --
7          **THE WITNESS:**  The remaining amount of the loan, I
8    should say.
9          **THE COURT:**  If we wanted to look at the original
10   appraisal, where would we go to find it; do you know?  Did you
11   have some sort of mortgage on the house?
12         **THE WITNESS:**  I think we have it.  We may have that.
13   We may have that original appraisal.  Yes, sir, we did have a
14   mortgage.
15         **THE COURT:**  Okay.  All right.  And you know the
16   bank -- you know the bank where you had the mortgage?
17         **THE WITNESS:**  I'm not sure the bank still exists, but
18   I believe -- I think we have a copy of it.
19         **THE COURT:**  All right.  I would like a copy of
20   that -- I would like you all to try to find a copy of that
21   appraisal and get a copy of it to me and to defense counsel.
22         **MR. DOYLE:**  Sure.
23         **MS. EIKHOFF:**  Your Honor --
24         **THE COURT:**  There's been some confusion as to whether
25   there was -- and we have two plaintiffs, so I don't recall

JOHN ANDREW CARTER - PROFFER

1    which one is which.  There was some question as to whether
2    there was an appraisal and we looked for it.
3                    Have you -- have you tried to find that
4    appraisal as part of this process?
5                    **THE WITNESS:**  I don't remember.  I think we have.
6    There may also be in existence one where we refinanced the
7    house, but I'm not sure of the year of that.  We can try to
8    find that one as well.
9                    **THE COURT:**  All right.  Any prior appraisals that you
10   all have on the house, I would like for you all to try to find
11   and give to Mr. Doyle so he can get it to us.
12                   **MS. EIKHOFF:**  Your Honor, if I may.  It has been
13   represented to us by counsel that they have looked for all
14   appraisals for this particular -- for the Carter property and
15   none have ever been located.
16                   That said, they were able to locate a HUD 1
17   settlement statement that reflects the purchase of the property
18   at cost, is our understanding.
19                   **THE COURT:**  I think that's what Mr. Carter just said.
20                   **MS. EIKHOFF:**  And so we -- that does exist.  And we
21   don't have a copy of it with us today, but we have seen it, and
22   it was made a copy to depositions.
23                   **THE COURT:**  All right.  Well --
24                   **MR. DOYLE:**  And, Your Honor, I don't have a specific
25   recollection about that.  If we've got it, we'll produce it.

OFFICIAL TRANSCRIPT

JOHN ANDREW CARTER - PROFFER

```
 1          THE COURT:  Mr. Carter is here.  He tells me he
 2   thinks there's an appraisal, there might be two, and he thinks
 3   they may have it.  So I'm asking Mr. Carter to see if he can
 4   find that and get it to Mr. Doyle.  We'll take a look at it,
 5   and we'll take it from there.
 6          THE WITNESS:  We'll see if we can get the one from
 7   the bank who did the refi on it.
 8          THE COURT:  Okay.  Thank you very much.  I don't have
 9   any other questions for you.  Thank you, Mr. Carter.
10          THE WITNESS:  Thank you.
11          MR. DOYLE:  Thank you, Mr. Carter.
12          THE COURT:  All right.  We need to hear from
13   Ms. Gibbs.  How long do you think Ms. Gibbs -- Ms. Gibbs will
14   take about the same amount of time?
15          MR. DOYLE:  Maybe less.
16          THE COURT:  All right.  How about Mr. Macomber?
17          MR. DOYLE:  I really only have just a handful of
18   questions for Mr. Macomber.
19          THE COURT:  All right.  Why don't we take a -- why
20   don't we take a ten-minute break.  We will try to get through
21   this without having to take a longer break.  Let's see how long
22   Ms. Gibbs takes.  We'll take ten minutes.
23          (WHEREUPON, the Court took a recess.)
24          THE DEPUTY CLERK:  All rise.
25          MS. EIKHOFF:  Your Honor, we have identified a
```

OFFICIAL TRANSCRIPT

1    document that does reflect a transfer purchase price of the

2    Carter property.

3              THE COURT:  Okay.

4              MS. EIKHOFF:  And we've spoken with Mr. Doyle, and we

5    agree that it can be proffered -- sorry -- that it can be

6    tendered into evidence on stipulation.

7              THE COURT:  Okay.

8              MS. EIKHOFF:  And so that will be, I guess,

9    Defendant's Exhibit 2.

10             THE COURT:  Yes.  Can I just see a copy of it?  I can

11   look at the evidence.  That's fine.  Thank you.

12             MS. EIKHOFF:  And, Your Honor, I'll represent to you,

13   this was produced to us by the plaintiff, and it is a HUD

14   settlement statement showing a transfer of the property with a

15   date of December 12th, 2007.  And on line 301, gross amount due

16   from the borrower, the amount is $101,934.38.

17             THE COURT:  Okay.  Thanks.

18                  All right.  Are we ready to proceed with

19   Ms. Gibbs?

20             MR. DOYLE:  Yeah, one second.  Just one short second,

21   Your Honor.

22                  Ready, Your Honor.

23             THE COURT:  All right.  Ms. Gibbs, can you hear us

24   okay?

25             THE WITNESS:  Yes, sir.

OFFICIAL TRANSCRIPT

DARLA GIBBS - DIRECT

1          **THE COURT:**  Okay.  Go ahead.

2          (WHEREUPON, **DARLA GIBBS,** having been duly sworn,

3    testified as follows**:)**

4                    **DIRECT EXAMINATION**

5    **BY MR. DOYLE:**

6    **Q.**   Mrs. Gibbs, good morning -- or good afternoon now.  This

7    is Jimmy Doyle.  Can you hear me?  Clearly?

8    **A.**   Yes, sir.

9    **Q.**   I can't hear you clearly.  And I don't know if anything

10   can be done about that.

11   **A.**   Yes, sir.

12   **Q.**   All right.  Can everyone else hear her?

13          **THE COURT:**  Yeah.  Can you see her?

14          **MR. DOYLE:**  I can see her perfectly.

15          **THE COURT:**  Okay.  It might help to watch her when

16   she's talking because it helps.  I can hear her better when I'm

17   looking at her on the Zoom.

18   **BY MR. DOYLE:**

19   **Q.**   Okay.  Ms. Gibbs, have you been paying attention?  Have

20   you been listening and monitoring the proceedings so far?

21   **A.**   Yes, sir, I have.

22   **Q.**   Okay.  I'm going to ask you some similar questions about

23   the same similar subjects.  Okay?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  We're here today to talk about your house in

DARLA GIBBS - DIRECT

1  Opelika.  Can you tell us the property address, please?
2  **A.**   701 Waverly Place, Opelika, Alabama 36801.
3  **Q.**   Okay.  Now, is that the house that has Chinese drywall in
4  it?
5  **A.**   Yes, sir.
6  **Q.**   Okay.  There's been a couple of stipulations, so we're
7  going to move past the -- a couple of items real quick.  I just
8  want to offer a couple of items into the record.
9          First, your warranty deed, which we've identified as
10 Exhibit 10.  Let me show you a copy of it real quick.
11 Actually, no, I'm not going to.
12         **MR. DOYLE:**  I think they're -- we're going to offer
13 this into evidence, Your Honor.  I don't think there was any
14 objection to it earlier.
15         **THE COURT:**  No, that will be -- that will be
16 Plaintiff's --
17         **THE WITNESS:**  I have a copy.
18 **BY MR. DOYLE:**
19 **Q.**   You have a copy of it; correct?
20 **A.**   Yes, sir, I do.
21         **THE COURT:**  All right.  Ms. Gibbs -- the Gibbs
22 warranty deed will come into evidence as Plaintiff's Exhibit 6.
23         **MR. DOYLE:**  6, I believe.
24         **THE COURT:**  6.
25

DARLA GIBBS - DIRECT

1   **BY MR. DOYLE:**
2   **Q.**   Okay.  Mrs. Gibbs, there is a date on the warranty deed
3   of -- it looks like it was stamped into the Lee County Probate
4   Court on June 1st of 2007.  Is that date familiar to you?
5   **A.**   Yes, sir.
6   **Q.**   Okay.  Does that sound about the time that you purchased
7   the house and closed on it?
8   **A.**   That is the date we did, yes, sir.
9   **Q.**   Okay.  And when did you move into the house after you
10  closed on it?
11  **A.**   It probably was within the first -- within a month after
12  that.
13  **Q.**   Okay.  So in mid-2007, you moved into the house?
14  **A.**   Yes, sir.
15  **Q.**   Have you lived there continuously since that time?
16  **A.**   Yes, sir, we have.
17  **Q.**   Has there been any time where you have not lived in that
18  home?
19  **A.**   No, sir.  We have had to stay in this house the whole
20  time.
21  **Q.**   Okay.  And the -- there's already been a stipulation that
22  the defendants manufactured the product that was found in your
23  home, so I'm not going to ask you any questions about it.
24         But let's talk about what you have experienced during
25  the time that you've lived in the home since mid-2007.  Tell us

DARLA GIBBS - DIRECT

1   how -- first of all, how you found out that the house had
2   Chinese drywall in it.
3   A.   Well, there might be -- I think one of the things is that
4   between the time we moved into the house in 2007 until 2011, we
5   had at least two, if not three, A coils go out on our
6   air-conditioning unit that had to be replaced.  Each of those
7   had been under warranty, so there was no cost to us for that.
8          However, in 2011, the warranty had gone out and we
9   had to have a new A coil put in that we had -- our opinion was
10  that we had a defective heating and air system, and so we had a
11  new one put in, in July of 2011.  An entire new system.
12         And then it was in October of -- I believe it was
13  October of 2011, that we were informed that there was the
14  possibility that we had this Chinese wallboard in our home.
15  And it was suggested that we have it inspected to confirm the
16  findings, which was done in November of 2011.
17  Q.   And so tell us about what's happened since you learned
18  that you have Chinese drywall, when it was confirmed.  How is
19  living in the house been affected by the presence of Chinese
20  drywall?
21  A.   Well, we have -- we couldn't afford to move somewhere else
22  and pay rent and still have a house payment at the same time
23  because we are retired.  And so we had to figure out how we
24  could live in the house at this point.  So we have tried to
25  keep the doors and windows open as much as possible to let in

DARLA GIBBS - DIRECT

1  fresh air and try and keep it ventilated as much as possible.
2  And when it's very hot or when it's very cold, that's not a
3  possibility.
4  **Q.**   Okay.  Now, after you --
5  **A.**   It is concerning --
6  **Q.**   I'm sorry?
7  **A.**   It is concerning because of health issues.  My husband
8  does have COPD, and as a result, we are very concerned about
9  how much he can breathe.
10 **Q.**   Yes, ma'am.
11           Now, after you learned that --
12           **MR. DOYLE:**  Your Honor, we've already offered into
13 evidence the exhibit we talked about that may or may not come
14 in later, the Wright form.  Is this going to be consolidated?
15           **THE COURT:**  Yes.
16           **MR. DOYLE:**  Okay.  So it's already in the record.
17 **BY MR. DOYLE:**
18 **Q.**   All right.  Mrs. Gibbs, the -- after retaining my firm to
19 represent you in this Chinese drywall litigation, do you recall
20 filling out a form called a plaintiff profile form?
21 **A.**   Yes, sir.
22 **Q.**   Okay.  I'm going to show you a document and you tell me if
23 you recognize it.  Can you see the document?
24 **A.**   Yes.  Yes, sir, I see that.  Yes, sir, I recognize that.
25 **Q.**   Okay.  You recognize it as your plaintiff profile form?

DARLA GIBBS - DIRECT

1    **A.**    Yes, sir.

2    **Q.**    Okay.  And it's got your name -- you and your husband's

3    name here where I'm pointing and moving the pointer.  Do you

4    see that?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  This is the first page of it.  And it's got your

7    names listed down here at the bottom.  There's a date that was

8    included in section 3 at the bottom.  The move-in date, it

9    looks like you indicated that you moved into the home

10   June 16th of 2007.  Does that sound right?  Is that consistent

11   with your recollection?

12   **A.**    Yes, sir.  It was about that time.  It was during the

13   month of June.

14   **Q.**    And then here on the second page at the top, there's a

15   date here, and the question -- section 4, and the question is:

16   When did the inspection take place for the Chinese-manufactured

17   drywall that was found in your home?  And there is a date of

18   November 17th, 2011.  Do you see that?

19   **A.**    Yes, sir.

20   **Q.**    Does that date sound correct --

21   **A.**    That was the date that --

22   **Q.**    -- to you?

23   **A.**    Yes, sir.

24   **Q.**    Okay.  A little further down, and there's already been a

25   stipulation regarding the product.  We don't need to talk about

OFFICIAL TRANSCRIPT

DARLA GIBBS - DIRECT

1  it.  Section 6 of the home information, it says that the --
2  you've indicated on this form that the approximate square
3  footage of the home is 1,600 square feet; is that right?
4  A.  Yes, sir.  It's a little bit smaller than that, I do
5  believe.
6  Q.  Okay.  Yours is a three bedroom, two bath house; correct?
7  A.  Yes, sir.
8  Q.  Okay.  And this number here is the gross square footage of
9  the home, approximately 1,600.  That includes your garage?
10  A.  That would include the garage, yes, sir.
11  Q.  Okay.  Just making sure.
12       And on the third page, there's a couple signatures
13  here.  I want to confirm that that's your signature here on the
14  second line down.  Is that yours?
15  A.  Yes, sir, and it is my husband's signature as well.
16  Q.  Yes, ma'am.  And there's date here of November 17th, 2011;
17  correct?
18  A.  Yes, sir.
19  Q.  Okay.  That's all I need to ask about there.
20       MR. DOYLE:  Your Honor, we offer this plaintiff
21  profile form for the Gibbs into evidence as the next exhibit.
22       THE COURT:  All right.  That will be entered as
23  Plaintiff's Exhibit 7.
24       Do we have -- do we have a copy of it?
25       MR. DOYLE:  I have copies, Your Honor.

DARLA GIBBS - DIRECT

1        **THE COURT:**  Can you bring it up here so we keep -- I
2     want to keep on top of these things.  6 and 7.
3     **BY MR. DOYLE:**
4     **Q.**   All right.  Mrs. Gibbs, I'm going to go back to a document
5     that was entered into the record.  And I asked Mr. Carter some
6     questions about it.  Bear with me a bit.
7             Okay.  Can you see this on the screen, this
8     declaration of Ronald Wright, P.E.?
9     **A.**   Yes, sir.
10    **Q.**   This is a document that was submitted into the Court's
11    record in the past.  This is the methodology that the Court
12    used to calculate -- to originally calculate the cost of
13    remediation of your home, I believe in 2017.  And then this
14    update here includes a table.  Okay.  And here on this page, it
15    has your property listed.  Do you see your name listed here on
16    line 347?
17    **A.**   Yes, sir.
18    **Q.**   Okay.  I'm going to try to zoom in a little bit to make
19    this easier for you.
20    **A.**   I can -- I can search it in mine.
21    **Q.**   Ma'am?
22    **A.**   Yes, sir.  There it is.
23    **Q.**   Okay.  Do you see it?  I'll put it right here in the
24    middle.  Do you see here where it says -- it has your name --
25    or your husband's name.  It has the property address.  And then

OFFICIAL TRANSCRIPT

DARLA GIBBS - DIRECT

1  it has an under air square footage.  Let me scroll up here so
2  we can see the column heading, "Verified Under Air Square
3  Footage," and it has a value of 1,237 square feet.  Do you see
4  that?
5  A.   Yes, sir.
6  Q.   Do you know if that number is correct?
7  A.   I would say that's probably pretty close to it, yes.
8  Q.   Okay.  And beside it, it has a couple of numbers that were
9  used to calculate this number here, the 2019 remediation
10 formula damages, and that's what I want to ask you about.  Do
11 you see here this grand total?  Can you tell us what that
12 number is?
13 A.   $119,630.
14 Q.   Okay.  Have you seen this document before?
15 A.   Yes, sir, I have.
16 Q.   Okay.  Have you reviewed it just to make sure it's
17 accurate?
18 A.   Yes, sir, I did.
19 Q.   To the best of your ability?
20 A.   As far as I know, yes.
21 Q.   Okay.  This number here, this 119,000 -- $119,630 that was
22 calculated in 2019 as the cost of remediation, do you believe
23 that it is sufficient to remediate your home now if you were
24 awarded those damages now?
25          MR. LAWSON:  Objection.  Lack of foundation.

DARLA GIBBS - DIRECT

1          **THE COURT:**  Yeah.  That question was asked of the

2     last plaintiff without objection.  I'm going to let her answer

3     it.

4          **THE WITNESS:**  No, sir, I do not.

5     **BY MR. DOYLE:**

6     **Q.**   Okay.  Why not?

7     **A.**   The costs have really risen dramatically in our area.  Our

8     house, when we purchased it, I believe was -- we had some extra

9     work, but I think it was $164,000 when we had it built in 2007.

10    A home down the street, which is very comparable in size to

11    ours, just this last year I think went for almost $252,000.

12    There is another home in our neighborhood that the young person

13    that wants to sell it is asking $225,000 for it, and it is

14    exactly the same floor plan as our house is.

15         So the costs have gone up so high that I don't think

16    that you can take this drywall out for $120,000 and rebuild it

17    because we can't get builders to come in and look at even doing

18    the simple things, let alone taking on a major job of this

19    size.

20    **Q.**   Have you had --

21    **A.**   The costs have gone up dramatically.

22    **Q.**   Yes, ma'am.

23         Have you had -- since this document was created in

24    2019, and submitted to the Court in 2019, have you had anyone

25    else calculate the cost of remediation and provide that quote

DARLA GIBBS - DIRECT

1    to you?

2    **A.**    Not -- not -- personally, I have not had that.  We have

3    not gone out and asked about that.  We are kind of ignorant on

4    all these procedures for doing this kind of thing.

5    **Q.**    Again, do you recall a gentleman named Mr. Macomber

6    visiting your house?

7    **A.**    Yes.  Mr. Macomber came in February of last year in 2021,

8    and did an appraisal at that point for our home -- an estimate

9    of how much it would cost to remediate it.

10   **Q.**    And was that cost different -- was that cost that he -- or

11   the quote that he gave you, was it different than this number,

12   this $119,630?

13   **A.**    Oh, yes, sir.  It was over 100 -- just a little bit over

14   $176,000.

15   **Q.**    $176,000 was the quote last year?  2021?

16   **A.**    Yes.  Yes.

17   **Q.**    Do you believe that number is sufficient to remediate your

18   home in 2022?

19   **A.**    Probably not because of the costs going up as much as they

20   did -- or they have been going up.  I think that we probably

21   would be a little bit over that even.

22   **Q.**    Okay.  Have you gotten quotes from any other contractors

23   other than Mr. Macomber since 2019?

24   **A.**    No, sir, because we couldn't afford to do it for the price

25   that he quoted us last year.

DARLA GIBBS - DIRECT

1   **Q.**   Yes, ma'am.

2          So are you waiting for this litigation to be over in

3   order to be able to fix your home?

4   **A.**   We have to.  Like I said, my husband and I are retired.

5   We don't the kind of funds that it needs.  And at our age,

6   there isn't anybody that's going to loan us the money to do it.

7   **Q.**   Yes, ma'am.

8          Okay.  The last item that I believe I want to get

9   onto the record -- okay.  Can you see the appraisal that was

10  done last year on your home?  Can you see this document that I

11  put on the screen?

12  **A.**   Yes, sir.

13  **Q.**   This is the Uniform Residential Appraisal Report that was

14  done.  This was done in -- I'll represent to you that this was

15  done in 2021.  And this was by --

16  **A.**   Right.

17  **Q.**   -- a lady in the Auburn/Opelika area that came and visited

18  your house.  I don't know if you interacted with her or not.  I

19  believe there was a stipulation that you could not.  But she

20  visited your home, at least on the outside, and did an

21  appraisal based on the comparable sales in the area.  So in

22  2021, she arrived at a value -- and I'm going to scroll down

23  here so you can see it -- at the bottom of page 2.  And I'm

24  going move my pointer around here.  Do you see this number?

25  **A.**   Yes, sir, $185,000.

DARLA GIBBS - DIRECT

1  **Q.**   Yes, ma'am.  So that is the indicated value by sales

2  comparison approach that Mrs. Molly McLeod Wilson calculated to

3  be the value of your home at that time in 2021.  So do you

4  agree that in 2022, that the value of your home, if did you not

5  have Chinese drywall in it, which she did not take into

6  consideration, do you believe that this $185,000 is a fair and

7  accurate appraisal value for your home?

8  **A.**   No, sir, because the exact same floor plan of my home down

9  the street, and they are -- they have it on the market -- or

10 they are putting it on the market for $225,000.

11 **Q.**   Yes, ma'am.

12 **A.**   And our homes in this -- in our neighborhood, we have

13 had -- I think the longest a house has been on the market has

14 been three days before it's been purchased.

15 **Q.**   I'm sorry.  Repeat that.

16 **A.**   In the last several years, where we've been living here

17 since 2007, there is not a single house in this neighborhood

18 that has been on the market longer than three days before it

19 was sold.

20 **Q.**   Oh, wow.

21 **A.**   And it has always gone for asking price or above.

22        **MR. DOYLE:**  Your Honor, I believe that concludes the

23 documents that were approved as exhibits for this witness.

24 Like Mr. Carter, I would like to make a proffer.

25        **THE COURT:**  Are you going to enter that document

DARLA GIBBS - DIRECT

1  into -- the appraisal into evidence?
2          **MR. DOYLE:**  Yes.  I offer the appraisal for the Gibbs
3  as plaintiffs' next exhibit.
4          **THE COURT:**  All right.  No objection, I take it?
5          **MR. LAWSON:**  No objection, Your Honor.
6          **THE COURT:**  All right.  That will be Plaintiff's
7  Exhibit 8.
8              Would you bring a copy up to the Court, please?
9          **MR. DOYLE:**  Again, I don't have a paper copy of the
10  appraisals.
11          **MR. LAWSON:**  I have a copy if you'd like, Your Honor.
12          **THE COURT:**  Okay.  We'll get a copy from the
13  defendant.  Thank you.
14          **MR. DOYLE:**  Do you have a copy of both the
15  appraisals?
16          **MR. LAWSON:**  Yes.
17          **MR. DOYLE:**  You do.  Thank you.
18              All right.  Your Honor, I would like to make a
19  proffer on some of the non-diminution of value related issues.
20          **THE COURT:**  All right.  The following testimony will
21  be offered as a proffer.
22          **MR. LAWSON:**  This is a copy of the Carter appraisal
23  from 2021.  I know Your Honor has it, but Mr. Doyle asked for
24  me to provide it.
25          **THE COURT:**  Thank you.

DARLA GIBBS - PROFFER

1          **MR. DOYLE:**  Thank you.

2          **THE DEPUTY CLERK:**  Thank you.

3                              **PROFFER**

4   BY MR. DOYLE:

5   **Q.**   All right.  Mrs. Gibbs, I want to talk to you about a

6   couple of issues that are not related to the actual cost of

7   fixing the house.  The first I want to talk to you about is

8   pretty straightforward and it's the rental value of your home.

9   Okay.  Have you looked into what a comparable home in the

10  Auburn/Opelika area would rent for if you had to go out and

11  rent the house today?

12  **A.**   I did last year at one point.  There were only two houses

13  in Opelika that were similar in size and what have you to be

14  rented, and at that time, I believe they were running about

15  $1,400 a month.  At this time, I don't know of any homes that

16  are in Opelika that are for rent.

17          We could go to the Auburn area where they are more

18  expensive and what have you, but that would take us outside of

19  our city limits, and we have a great granddaughter that lives

20  with us who is in high school.  And so if we had to move over

21  there, she would have to change schools, and that would not be

22  very conducive since she is a junior in high school.

23  **Q.**   Yes, ma'am.

24  **A.**   So I have no idea what's in Auburn.  The prices over there

25  I know are much higher than they are in Opelika, if you can

OFFICIAL TRANSCRIPT

DARLA GIBBS - PROFFER

1    find one in Opelika.

2    **Q.**   We have a listing here that is for a home on -- at 2682

3    Sophia Court in Auburn that recently was marketed.  Have you

4    seen this document before, Ms. Gibbs?

5    **A.**   Yes, sir, I saw that.

6    **Q.**   Okay.  And is this an accurate reflection of the rental

7    home in your area that's similar to your home?

8    **A.**   Yes, sir, it's $2,200.

9    **Q.**   Yeah.  It's a three bedroom, two bath house in the Auburn

10   area, which is a town very close, and it says that the rental

11   value is $2,200 a month.  Is this a listing that you're

12   familiar with?

13            **MR. LAWSON:**  Objection, Your Honor.  Lack of

14   foundation.

15            **THE WITNESS:**  Yes, sir, that's the kind of prices

16   there are in Auburn.

17   **BY MR. DOYLE:**

18   **Q.**   I'm sorry.  I didn't hear that response.

19            **THE COURT:**  We're still on -- hold on.

20            **THE WITNESS:**  Yes, sir.

21            **THE COURT:**  Yeah.  I mean, you got to stop asking

22   questions when there's an objection.

23                This is a proffer.

24            **MR. LAWSON:**  Yes, sir.

25            **THE COURT:**  So let's just -- let's just let him

OFFICIAL TRANSCRIPT

DARLA GIBBS - PROFFER

1   complete his proffer, and then you all can ask questions on

2   cross-examination.

3              Mr. Doyle.

4   BY MR. DOYLE:

5   Q.   Mrs. Gibbs, is this document here that was provided to us,

6   is this a document that reflects a comparable rental home in

7   your area for a home your size?

8   A.   Yes, sir.

9   Q.   Okay.  Have you seen this document before today?

10             THE COURT:  She testified twice that she's seen the

11   document before.

12             MR. DOYLE:  Okay.  All right.

13                 Your Honor, we offer this into evidence as

14   Plaintiff's Exhibit --

15             THE COURT:  This is Proffer No. 2.

16             MR. DOYLE:  Yes.

17   BY MR. DOYLE:

18   Q.   All right.  Ms. Gibbs, let's shift gears and talk about

19   some of the items that were damaged by the Chinese drywall in

20   your home, and these are items that you discussed during your

21   deposition.  Do you recall taking your deposition?

22   A.   Yes, sir.

23   Q.   Okay.  I'm going to show you the next exhibit, and this

24   was an attachment that was created a while ago as an exhibit to

25   your supplemental plaintiff profile form.  Have you seen this

DARLA GIBBS - PROFFER

1   document before?

2   **A.**   Yes, sir.

3   **Q.**   Okay.  Did you create this document?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  The first item here on the itemization of damages

6   or repair to home, there's a couple of things that I want to

7   ask you about, namely, how you arrived at the price, and what

8   year they had to be replaced.  Those are important pieces of

9   information that the Court may be able to use in the future.

10  Okay.

11          The first item here says the HVAC unit repair and

12  replacement of the multiple coils, and you provided a value of

13  $8,697.  Do you see that?

14  **A.**   Yes, sir.

15  **Q.**   Tell me how you arrived at that value.

16  **A.**   The cost of the original heating and air-conditioning new

17  unit that we had put in, in July of 2011.  And then it was in

18  June of 2014, that we had to have a new A coil put into the

19  unit.  But it -- and that was outside the warranty time, so,

20  therefore, we had to pay for it.

21          So we had a new one that was recommended by the

22  heating and air company that was not made of copper, that it

23  should not be affected by this Chinese wallboard which is up in

24  our attic.  And so we had to have that -- we had that replaced

25  at that time.  So I believe that those are the two figures that

DARLA GIBBS - PROFFER

1  comes up to the figure of $8,697.

2  **Q.**  Okay.  And I believe there are some documents that are

3  attached, and we're going to offer these together.  Did you

4  provide these supporting documents to support the value that

5  you're claiming?

6  **A.**  Yes, sir, I did.

7        **MR. DOYLE:**  Okay.  And there are a couple of receipts

8  here, Your Honor.  We're going to offer those all at once when

9  we get done.

10  **BY MR. DOYLE:**

11  **Q.**  The second item on this list is your garage door opener,

12  and you have a value assigned to be $309.61.  Do you see that?

13  **A.**  Yes, sir.

14  **Q.**  Okay.  When did the garage --

15  **A.**  We had to have that replaced.  In November of 2020.

16  **Q.**  Okay.  2020 is when this one was replaced?

17  **A.**  Yes, sir.

18  **Q.**  Okay.  Now, with respect to the -- I want to make sure the

19  record's clear about this.  The HVAC unit, the repair and

20  replacement of the multiple coils, do you recall when the first

21  coil was replaced, the year?

22  **A.**  Actually, this unit was put in, in July of -- yeah, July

23  of 2011, the whole new unit.  There was, I believe, one A coil

24  put in under warranty between that time and June 2014.  When

25  that second coil, which was copper, failed, that's when we had

DARLA GIBBS - PROFFER

1    this new one put in, which costs considerably more than the
2    others, but it was made of a material, and we have not had to
3    have it replaced since.
4    **Q.**   So to be clear --
5    **A.**   So that's why I got the --
6    **Q.**   Okay.  To be clear, since 2014, there hasn't been any
7    other replacement of the air-conditioning coils?
8    **A.**   I have not had a replacement on the A coils since then.
9    But there have been at least, I want to say, three to four in
10   the original unit, and two in the second new unit.  But once we
11   had this tin A coil put in, in 2014, we have not had to replace
12   that A coil.
13   **Q.**   Okay.  I'm going to move on now to the next document.  It
14   has a couple of items listed on it I want to run through with
15   you real quick.  You have listed as itemization of damaged
16   personal property, two items on here, a washer and dryer
17   replacement with a value of $2,826, and a computer replacement
18   of $1,496.  Do you see that?
19   **A.**   Yes, sir.
20   **Q.**   And attached to this, you have canceled checks that
21   establish when and how much you paid to replace these items; is
22   that right?
23   **A.**   Yes, sir.
24   **Q.**   Okay.  So the dates and the amounts that are reflected in
25   this table would also be reflected on the canceled checks that

DARLA GIBBS - PROFFER

1 you provided; is that right?

2 **A.** Yes, sir.

3 **Q.** And you wrote those checks at the time that you paid for

4 the replacement of those items?

5 **A.** I did.

6 **Q.** Okay. All right. The next document that we want to talk

7 about here is this Lambert Transfer & Storage, Inc. estimate

8 and order for services. Do you see that?

9          **THE COURT:** Is this a different document?

10          **MR. DOYLE:** A different document. Yes, Your Honor.

11          **THE COURT:** All right. Do you want to move the other

12 document --

13          **MR. DOYLE:** I was just going to -- I was going to

14 consolidate them and offer them all at once.

15          **THE COURT:** I don't want to do it that way. This is

16 an entirely different type of damages.

17          **MR. DOYLE:** Okay. Then I'll offer the last group of

18 documents related to the replacement of the -- those items.

19          **THE COURT:** But the personal property documents that

20 you just examined the witness on are in a single document?

21          **MR. DOYLE:** They are a collective group. It's a

22 group of canceled checks. We didn't run through it, Your

23 Honor, but --

24          **THE COURT:** No. No. No. I'm talking about

25 everything that you just asked Ms. Gibbs about.

DARLA GIBBS - PROFFER

1              **MR. DOYLE:**  Yeah.

2              **THE COURT:**  The air-conditioning, the garage opener,

3      the canceled checks, are those all part of a single document?

4              **MR. DOYLE:**  They're two -- no, two separate

5      documents.

6              **THE COURT:**  All right.

7              **MR. DOYLE:**  Or two separate lists -- two separate

8      tables.  There's a table for the home repair.

9              **THE COURT:**  What document is it on your exhibit list?

10             **MR. DOYLE:**  These are documents 11 and 12.

11             **THE COURT:**  All right.  The home repair itemization

12     will be entered as Plaintiff's Proffer 3.  The personal

13     property itemization, which you just talked to her about, will

14     be Proffer 4.

15             **MR. DOYLE:**  Yes.  Thank you, Your Honor.

16     **BY MR. DOYLE:**

17     **Q.**   Ms. Gibbs, the next item that I began to ask you about,

18     we've labeled it as Exhibit 3.  It will be the next proffer

19     that we make to the Court.  And it has to do with the Lambert

20     Transfer & Storage, Inc. estimate.  Do you see that?

21     **A.**   Yes, sir.

22     **Q.**   What is this?

23     **A.**   Well, I was looking to see how much it would cost to have

24     our furniture packed up and stored while our house was being

25     repaired.

DARLA GIBBS - PROFFER

1  **Q.**   Okay.  And there's a quote here of $11,437.65.  What does
2  that reflect?
3  **A.**   That reflects --
4  **Q.**   Is that the total?
5  **A.**   Yes, sir.  That would be the total for them to come in and
6  pack up our items and then store them if we -- because we were
7  looking at the possibility of having to rent a travel trailer
8  or something of that nature in order to stay somewhere other
9  than in our house while it was being repaired.
10 **Q.**   Okay.
11          **MR. DOYLE:**  Your Honor, we'll offer that as the next
12 plaintiff's proffer exhibit.
13          **THE COURT:**  All right.  That will be Proffer 5.
14          **MR. DOYLE:**  Your Honor, I believe that concludes the
15 evidence we want to offer via proffer for Mrs. Gibbs.
16          **THE COURT:**  All right.  You're finished with your
17 questions of Mrs. Gibbs?
18          **MR. DOYLE:**  Yes, Your Honor.
19          **THE COURT:**  All right.  Mrs. Gibbs, counsel for the
20 defendants have a few questions for you.  Okay?
21          **THE WITNESS:**  Yes, sir.
22          **MR. LAWSON:**  May I proceed, Your Honor?
23          **THE COURT:**  Yes.
24
25

OFFICIAL TRANSCRIPT

DARLA GIBBS - CROSS

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MR. LAWSON:** |
| 3 | **Q.**    Good afternoon, Mrs. Gibbs.  Can you hear me okay? |
| 4 | **A.**    Yes, sir. |
| 5 | **Q.**    Wonderful.  It's good to speak with you again.  I know we |
| 6 | spoke a couple times in your depositions.  I just have a few |
| 7 | additional questions for you today.  First, I wanted to show |
| 8 | you -- start off by showing you a document, and I'm going to do |
| 9 | that like we have so far by pulling it up on your screen.  If |
| 10 | you can just give me one moment here. |
| 11 |         There we go. |
| 12 |         Mrs. Gibbs, I'll represent to you that this is a |
| 13 | supplemental plaintiff profile form that was submitted on your |
| 14 | behalf in the Chinese Drywall litigation before Judge Fallon. |
| 15 | Specifically, I want to turn your attention down to the last |
| 16 | page of this document.  It's page No. 7.  Do you see your |
| 17 | signature there along with your husband's signature? |
| 18 | **A.**    Yes, sir. |
| 19 | **Q.**    And that signature occurred on December 22nd, 2020; is |
| 20 | that correct? |
| 21 | **A.**    Yes, sir. |
| 22 | **Q.**    Mrs. Gibbs -- |
| 23 | **A.**    2022. |
| 24 | **Q.**    I'm sorry? |
| 25 | **A.**    It was December 22nd. |

DARLA GIBBS - CROSS

1  **Q.**   Correct.

2          Now, this document is the most recent and accurate

3  version of the supplemental profile form; is that correct?

4  **A.**   I think so, sir.

5  **Q.**   Do you remember filling out any other version of this form

6  since December of 2020?

7  **A.**   No, sir.

8          **MR. LAWSON:**  Your Honor, we would move for the

9  admission of this document as Defendant's Exhibit, I believe

10  now this would be 4.

11         **THE COURT:**  Any objection?

12         **MR. DOYLE:**  No, Your Honor.

13         **THE COURT:**  All right.  It will be entered.

14          Is it Defendant's 4?  Is that the right number?

15         **MR. LAWSON:**  Well, I think that we have 3 as the HUD

16  settlement form.  Or was that 2?

17         **THE COURT:**  That was 2.  I think this is 3.

18         **MR. LAWSON:**  Okay.  So we're on 3.  All right.

19          Would you like me to approach --

20         **THE COURT:**  I've got a copy of it.

21         **MR. LAWSON:**  Wonderful.

22          Mr. Doyle, would you like a copy of --

23         **MR. DOYLE:**  No, thank you.

24  BY MR. LAWSON:

25  **Q.**   Mrs. Gibbs, Mr. Doyle asked you a few questions about how

DARLA GIBBS - CROSS

1    long that you've lived in your home.  It's correct to say you
2    moved in around June of 2007; is that right?
3    A.    That is correct.
4    Q.    And that would mean that you've lived in your home for
5    around 15 years; correct?
6    A.    Yes, sir.
7    Q.    And like Mr. Doyle asked you, you've lived there
8    continuously for that 15 years; right?
9    A.    Yes, sir.
10   Q.    And you've also had family members live with you other
11   than your husband in the home during that time; is that right?
12   A.    Yes, sir.
13   Q.    You've had your granddaughter and great granddaughter live
14   with you during those 15 years for periods of years; is that
15   correct?
16   A.    Yes, sir.
17   Q.    And about how many years have your granddaughter and great
18   granddaughter lived with you in the home?
19   A.    Well, our granddaughter is no longer in our home, but our
20   great granddaughter has been in our home continually -- I have
21   to stop and think.  She's in the eleventh grade.  She's been
22   with us for eight years, I think, but at least eight years.
23   Q.    Another thing that Mr. Doyle asked you about was repair
24   estimates that you received for your property, and you
25   discussed the one with Mr. Macomber.  Do you recall that?

OFFICIAL TRANSCRIPT

DARLA GIBBS - CROSS

1   **A.**   Yes, sir.

2   **Q.**   Have you received any other repair estimates for your home

3   related to Chinese drywall repair, other than the one from

4   Mr. Macomber?

5   **A.**   No, sir.

6   **Q.**   Okay.  Now, we looked at an appraisal from 2021 a moment

7   ago with Mr. Doyle, but I wanted to show you a different

8   appraisal back from 2007.  Do you recall having an appraisal of

9   your home from 2007?

10  **A.**   Not really.

11  **Q.**   All right.  Well, let me take that up on the screen for

12  you, and I'm also going to share copies with everyone here in

13  the courtroom.  So if you can just bear with me for one moment.

14          **MR. LAWSON:**  Your Honor, let the record reflect that

15  I'm handing opposing counsel a copy of what will be now

16  Defendant's Exhibit 4 -- proposed Exhibit 4.  I have a copy

17  here as well for you.

18  **BY MR. LAWSON:**

19  **Q.**   Now, Mrs. Gibbs, taking a look at this document, do you

20  recognize the first page that we're looking at here?  The

21  document says, "Appraisal of Real Property," and it lists your

22  address, 701 Waverly Place.

23  **A.**   Yes, sir, now I recognize it.  I remember seeing this,

24  yes.

25  **Q.**   And if you look here on the first page, the date of this

DARLA GIBBS - CROSS

1    appraisal is listed as May 18th, 2007.  Do you see that that?

2    **A.**    Yes, sir.

3    **Q.**    And does that sound consistent with around the time that

4    you would have purchased the home?

5    **A.**    In fact, I think we looked at this home in April, so, yes.

6    **Q.**    All right.  Let me turn your attention now to what I

7    believe is the fourth page of this document.  If you go down to

8    the bottom of the fourth page, at the very bottom of it.  I'm

9    showing that here to you now on the screen.  And it says:

10   "Based on a complete visual inspection of the interior and

11   exterior areas of the subject property, defined scope of work,

12   statement of assumptions and limiting conditions, and

13   appraiser's" --

14           **THE COURT:**  Slow down.  Yeah, you got to slow down.

15           **MR. LAWSON:**  I'm sorry.  I'm sorry.

16   BY MR. LAWSON:

17   **Q.**    It says:  "Based on a complete visual inspection of the

18   interior and exterior areas of the subject property, defined

19   scope of work, statement of assumptions and limiting

20   conditions, and appraiser's certification, my (our) opinion of

21   the market value as defined of the real property that is

22   subject of this report is $168,000 as of May 18, 2007, which is

23   the date of inspection and the effective date of this

24   appraisal."

25           Did I read that correctly, Mrs. Gibbs?

DARLA GIBBS - CROSS

1   **A.**   Yes, sir.

2   **Q.**   And is that consistent with your memory that your home was

3   appraised for around $168,000 when you purchased it in 2007?

4   **A.**   I never paid any attention to that appraisal either when

5   we purchased the home.  So I would have to assume that that was

6   what it was appraised for.

7   **Q.**   And other than the 2021 appraisal that you looked at with

8   Mr. Doyle and this 2000 appraisal, are you aware of any other

9   appraisals that you've had done of your property?

10  **A.**   We have had no occasion to have it appraised over the

11  years.

12          **MR. LAWSON:**  Your Honor, we move for the admission of

13  this document as Defendant's Exhibit 4.

14          **MR. DOYLE:**  No objection.

15          **THE COURT:**  All right.  Any objection?

16          **MR. DOYLE:**  No objection, Your Honor.

17          **THE COURT:**  All right.  That will be entered as

18  Defendant's 4.

19  **BY MR. LAWSON:**

20  **Q.**   Mrs. Gibbs, is it correct to say that you have never tried

21  to sell your home before?

22  **A.**   No, sir.

23  **Q.**   Have you ever talked to a real estate agent about how much

24  you could sell your home for?

25  **A.**   No, sir.

DARLA GIBBS - CROSS

1    **Q.**   Now, when we looked at the 2021 appraisal with Mr. Doyle a

2    moment ago, you reflected on some other homes that have been

3    sold in the neighborhood where your home is; is that right?

4    **A.**   That is correct.

5    **Q.**   And you noted that they sell very quickly on the market;

6    is that right?

7    **A.**   In fact, many of them haven't even gone through a realtor

8    because there are people who have requested to be contacted if

9    anyone wants to sell their house.

10   **Q.**   And it was your testimony with Mr. Doyle a moment ago that

11   you believe that the $185,000 appraisal figure for your home

12   from 2021 should actually be higher now in 2022; is that right?

13   **A.**   Yes, sir.

14   **Q.**   All right.  I would like to ask you a few questions about

15   some of the documents that Mr. Doyle showed you at the end of

16   your testimony.

17          **MR. LAWSON:**  Your Honor, this is referring to the

18   proffer testimony that we looked at earlier.

19          **THE COURT:**  Okay.

20   **BY MR. LAWSON:**

21   **Q.**   First, there was some discussion about the rental value of

22   comparable homes in your area.  Do you remember talking about

23   that?

24   **A.**   Yes, sir.

25   **Q.**   When you looked at that before, your estimate of what a

OFFICIAL TRANSCRIPT

DARLA GIBBS - CROSS

1  rental home for a comparable home would cost was based on you
2  looking a year ago; is that right?
3  **A.**   Yes, sir.
4  **Q.**   And you have not looked since then into how much it would
5  cost to rent a comparable home?
6  **A.**   I have had no occasion to do so since then.
7  **Q.**   And you don't rent homes for a living or do that as a
8  profession; is that right?
9  **A.**   No, sir, my husband and I are both retired.  He's a
10  retired marine, and I'm just tired.
11  **Q.**   And you have never rented your own home; is that right?
12  **A.**   No, sir.
13  **Q.**   Next we looked at some itemization of home repairs that
14  you've done over the time that you've lived in the home.  Do
15  you remember that?
16  **A.**   Yes, sir.
17  **Q.**   Now, first you talked about how you had to replace the
18  HVAC unit with a different kind of system that cost more money
19  than the original system; is that right?
20  **A.**   I have no idea what the original system cost because it
21  was a part of the home when we purchased it.
22  **Q.**   But that new system is still part of your home today;
23  correct?
24  **A.**   Yes, sir.
25  **Q.**   And it still works?

DARLA GIBBS - CROSS

1   **A.**   Yes, sir.

2   **Q.**   And you think it's added value to your home since you

3   replaced the unit that did not work?

4   **A.**   Well, the unit is eleven years old now, so I do not know

5   how that -- whether that would be considered added value at

6   this point because of its age.

7   **Q.**   I'd also like to talk to you a little bit about the

8   damaged personal property chart that you showed -- that

9   Mr. Doyle showed you.  Do you remember that?

10  **A.**   Yes, sir.

11  **Q.**   Now, did anyone tell you that, for example, with the

12  washer and dryer unit, that it was Chinese drywall that caused

13  that item to stop working?

14  **A.**   No, sir.  At that point, we did not realize that -- that

15  it would -- could create that kind of a problem.  It was a

16  component within the unit that went, and it had copper in it,

17  so therefore that was the (audio transmission gap) found the

18  corrosion.

19  **Q.**   Now, is all the personal property that you had listed on

20  that chart now been replaced inside of your home?

21  **A.**   Yes, sir.

22  **Q.**   And are all of the replacement items still working inside

23  of the house?

24  **A.**   I still have the same washer and dryer at this point, yes,

25  sir.

OFFICIAL TRANSCRIPT

DARLA GIBBS - CROSS

1          **MR. LAWSON:**  Your Honor, I don't have any further
2    questions at this time for Mrs. Gibbs.
3          **THE COURT:**  Great.
4               Any follow-up for Ms. Gibbs, Mr. Doyle?
5          **MR. DOYLE:**  No, Your Honor.
6          **THE COURT:**  All right.  Ms. Gibbs, thank you for
7    standing by on Zoom and for your testimony.
8          **THE WITNESS:**  Thank you, sir.
9          **THE COURT:**  All right.
10         **MR. DOYLE:**  Your Honor, I think it might be time to
11   take a short break to get Mr. Macomber back.  He wasn't allowed
12   into the Zoom, so he hasn't been on this entire time.
13         **THE COURT:**  He's on right now --
14         **MR. DOYLE:**  Is he?
15         **THE COURT:**  -- as far as I can tell.
16         **MR. DOYLE:**  I don't see him.
17         **MR. MACOMBER:**  Jimmy, I'm --
18         **MR. DOYLE:**  Are you?
19         **MR. MACOMBER:**  I'm here, Jimmy.
20         **MR. DOYLE:**  Oh, Shawn, I don't see you on the --
21         **MR. MACOMBER:**  Yeah.  I've been here since the
22   beginning.  I just shut off the video.
23         **MR. DOYLE:**  Okay.  Great.
24         **THE COURT:**  Yeah.  Let's go ahead and keep going.
25         **MR. DOYLE:**  All right.  Super.

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - DIRECT

1          **THE COURT:**  We got to swear him in.

2          (WHEREUPON, **SHAWN MACOMBER**, having been duly sworn,

3    testified as follows**:)**

4                    **DIRECT EXAMINATION**

5    **BY MR. DOYLE:**

6    **Q.**   Mr. Macomber, I didn't see you on my screen during this.

7    Have you been monitoring the proceedings?

8    **A.**   Yes, sir.

9    **Q.**   Okay.  Did you hear the testimony --

10   **A.**   I've been on from the beginning.

11   **Q.**   Okay.  So you heard the testimony from both Mr. Carter and

12   Mrs. Gibbs?

13   **A.**   Yes, sir.

14   **Q.**   Okay.  Great.  I only have a few questions that I want to

15   ask you about -- a few items I want to ask you about.  And

16   we're not offering your Xactimates that you created, but I do

17   want to talk about what you did in preparation to create the

18   Xactimates and what methodology you used.

19          As part of the court proceedings, there was a

20   document that we looked at that was created and a table was

21   created that's attached to another expert that Judge Fallon

22   accepted as an expert in the first phase of these damages

23   hearings, a guy name Mr. Wright.  Are you familiar with that

24   document and that methodology?

25          **MS. EIKHOFF:**  Your Honor, I object to the question.

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - DIRECT

1                    THE WITNESS:  Yes, sir.

2                    THE COURT:  Hold on.  Hold on, Mr. Macomber.

3                        What's the objection?

4                    MS. EIKHOFF:  Your Honor, he is being offered as a

5     fact witness, and the question that is being asked is actually

6     sort of doubly expert -- he's asking an expert about another

7     expert's testimony -- or report.

8                    THE COURT:  All right.  Here's the problem,

9     Mr. Macomber did some sort of estimating work.  The results of

10    that work were communicated to the plaintiffs.  They've

11    testified that they received that information.  They testified

12    about their receipt of the information, their views about those

13    estimates.  You all cross-examined the plaintiffs on their

14    testimony about their receipt and review of whether it was

15    verbal or documentary of Mr. Macomber's expert -- estimates.

16                       I'm not going to go -- I'm not going to spend a

17    lot of time drilling down into what's in the Xactimates, but

18    the record is now clear that the plaintiffs themselves received

19    that information.  The plaintiffs are here to testify about

20    their views as to the value of their homes.

21                       I'm going to let Mr. Doyle ask Mr. Macomber some

22    questions about the information that he provided to the

23    plaintiffs in terms of his estimate for what it might cost to

24    repair their homes because they've testified they were in

25    receipt of that information, and you all have had an

SHAWN MACOMBER - DIRECT

1    opportunity to cross-examine them.

2              I don't know where he's going.  I'm listening

3    very closely.  But to the extent that the plaintiffs have

4    testified they received estimates from Mr. Macomber and they've

5    testified about them, I think it's appropriate to at least

6    learn how they were created.  Okay.  So I overrule the

7    objection for you now.

8              Go ahead, Mr. Doyle.

9    **BY MR. DOYLE:**

10   **Q.**   Mr. Macomber, really all I wanted to ask you about was the

11   underlying methodology that was used to calculate that original

12   remediation value that Mr. Wright offered to the Court.  And

13   are you familiar with that methodology?

14   **A.**   I'm familiar with that methodology.

15   **Q.**   Okay.  When you were asked to create or to calculate a

16   remediation cost for each of the plaintiffs, Carter and Gibbs,

17   is that the methodology that you used?

18   **A.**   No, sir.

19   **Q.**   How did you calculate the cost of remediation for these

20   plaintiffs?

21   **A.**   First, I visited both properties and photographed,

22   documented, measured, and accounted for basically every

23   component in the house that was going to need to be removed,

24   replaced, cleaned, addressed as part of the remediation scope.

25             I then entered into a software program called

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - DIRECT

1    Xactimate that utilizes a database that's -- it's typically
2    updated on a monthly basis, but it can be updated more
3    frequently during certain events.  And in this case, I -- I
4    utilized the -- I believe it was the March of 2021 database to
5    create a -- that it then went ahead and priced all of the items
6    that I identified and entered into the software.
7    **Q.**   Okay.  Let's --
8    **A.**   Then that -- then that totaled everything.
9    **Q.**   Let's take a step back.  You were asked to create these
10   estimates because you were -- you are a contractor -- or you
11   are licensed as a contractor; correct?
12   **A.**   Yes, sir.
13   **Q.**   Where are you licensed as a contractor?
14   **A.**   I'm licensed in the state of Louisiana.
15   **Q.**   Okay.  And during that time, when did you become familiar
16   with Chinese drywall?
17   **A.**   I've been working with Chinese drywall since about 2008,
18   2009.  Towards the end of 2008 is when I first became of it.
19   And I've worked as a contractor.  I've worked as a consultant.
20   I've also worked as a construction manager for another company
21   remediating properties in Louisiana, Alabama, Mississippi, and
22   Florida.
23   **Q.**   Do you have any -- excuse me -- any familiarity with the
24   protocol for remediating Chinese drywall properties that was
25   adopted by Judge Fallon in the Eastern District of Louisiana?

SHAWN MACOMBER - DIRECT

1  A.   Yes, sir.

2  Q.   And tell us what familiarity you have with that protocol.

3  What source did you utilize to identify the protocol that is

4  adopted?

5  A.   Sure.  So it's based on the -- the remediation protocol

6  that I used to create the estimates when I was in remediation

7  was based on a court document in MDL-2047.  I believe it was

8  *Germano -- Germano*.  I don't have it in front of me.  Maybe I

9  have it in front of me.  Let me see.

10       Yeah, it was *Germano*.  It explains the scope of

11  remediation and requirements for the plaintiffs' properties.

12 Q.   Okay.  So when you were calculating the cost of

13 remediation, is that document that you just referenced

14 something that you utilized to help figure out what had to be

15 done from beginning to end with regard to the cost of

16 remediation?

17 A.   That's correct.

18       THE COURT:  Is there a document number on that

19 document at the top?

20       THE WITNESS:  I only have some excerpts from it, but

21 I do have that number.  Document 20741.

22 BY MR. DOYLE:

23 Q.   And is it your testimony that within Document 20741

24 there's a protocol that's laid out for contractors to follow

25 for remediating homes?

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - DIRECT

1    **A.**   Yes, sir.

2    **Q.**   Is that something that you -- again, I just want to make

3    this clear, did you utilize that protocol in Document 20741

4    when you were calculating the cost of remediation for both the

5    Carter and Gibbs' homes?

6    **A.**   Yes, sir.  I used that as a guideline to identify which

7    particular components of the house would need to be removed and

8    replaced, cleaned, et cetera.

9    **Q.**   Did you deviate from that protocol in any way when you

10   were making the calculations?

11   **A.**   No, sir.

12   **Q.**   Do you recall what the total cost for remediation was for

13   the Carter property?  In 2021, when we asked you to do it.

14   **A.**   In 2021?  Yes, sir, I have that.  In 2021, for Carter was

15   $145,159.34.

16   **Q.**   All right.

17          **MS. EIKHOFF:**  Your Honor, again.  I object to this.

18   They testified --

19          **THE COURT:**  The testimony is in the record.

20   Mr. Carter -- Mr. Carter testified that he received this

21   information and there was no objection to it.

22          **MS. EIKHOFF:**  Thank you.

23   **BY MR. DOYLE:**

24   **Q.**   All right.  Mr. Macomber, what was the calculation for the

25   remediation cost of the Gibbs' property?

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - DIRECT

1   **A.**   That number I have as $176,123.41.

2   **Q.**   Okay.  Have you undertaken any effort since that time to

3   determine whether or not those costs are accurate today in

4   2022?

5   **A.**   Yes, sir.

6         **THE COURT:**  All right.  We're not going there.

7         **MR. DOYLE:**  Okay.

8   **BY MR. DOYLE:**

9   **Q.**   The only other issue I want to ask about, Mr. Macomber, is

10  since you are a contractor, tell us about the process in

11  general terms.  If you would, just describe what needs to be

12  done when you remediate a home that has Chinese drywall.

13        **THE COURT:**  I'm not going to listen to that testimony

14  either.

15        **MR. DOYLE:**  Okay.  Then, Mr. Macomber, I don't have

16  any further questions for you today.

17        **THE COURT:**  Do you have any questions for

18  Mr. Macomber?

19        **MS. EIKHOFF:**  I do, Your Honor.  And since I can't

20  really see him and he can't see me, can I stand at the lectern?

21        **THE COURT:**  Sure.

22        **MS. EIKHOFF:**  Thank you.

23        **THE WITNESS:**  Do you need me to zoom in more?

24        **THE COURT:**  No.  You're good right there.

25

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - CROSS

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MS. EIKHOFF:** |
| 3 | **Q.**   Can you see me now, Mr. Macomber? |
| 4 | **A.**   Yes, ma'am. |
| 5 | **Q.**   Okay.  Great.  Hi.  My name is Christy Eikhoff.  We've |
| 6 | never met before; is that correct? |
| 7 | **A.**   No -- no, ma'am. |
| 8 | **Q.**   I've never taken your deposition in this case? |
| 9 | **A.**   Not that I'm aware of, no. |
| 10 | **Q.**   And, in fact, this is your first testimony in this case |
| 11 | for these particular properties; is that right? |
| 12 | **A.**   Could you say it again? |
| 13 | **Q.**   This is your first testimony in this case for these |
| 14 | particular properties in Alabama; is that right? |
| 15 | **A.**   Yes.  Yes, ma'am. |
| 16 | **Q.**   You've worked with Mr. Doyle for a long time in the |
| 17 | Chinese drywall cases; is that correct? |
| 18 | **A.**   He's one of the attorneys I've worked with on this case |
| 19 | before, yes. |
| 20 | **Q.**   He's hired you as an expert witness before; right? |
| 21 | **A.**   Yes, ma'am. |
| 22 | **Q.**   And you have given -- you've prepared expert reports in |
| 23 | this Chinese drywall litigation?  That is correct? |
| 24 | **A.**   Yes, ma'am. |
| 25 | **Q.**   And you have, in fact, given other testimony hired by |

SHAWN MACOMBER - CROSS

1   Mr. Doyle for other of his clients; is that correct?

2   A.   Yes, ma'am.

3   Q.   Now, you did not build these two homes that are at issue

4   today, did you?

5   A.   I did not.

6   Q.   And you haven't been hired to actually remediate the

7   homes; is that correct?

8   A.   I have not.

9   Q.   And to the extent that you did an assessment of the costs

10  to remediate the homes, that was not so that you could do that

11  work yourself; is that correct?

12  A.   It was discussed at the time that I may do the work, yes.

13  Q.   It was discussed that you may do the work?

14  A.   Yes, ma'am.

15  Q.   Have you been hired to do that work?

16  A.   I have not.

17  Q.   Are you -- were you paid to provide that quote?

18  A.   Yes, ma'am.

19  Q.   Who paid you?

20  A.   I was paid by Mr. Doyle.

21  Q.   How much were you paid?

22  A.   I do not have that in front of me right now.

23  Q.   What was your hourly rate that you were paid?

24  A.   195.

25  Q.   And are you getting paid that same rate for your testimony

SHAWN MACOMBER - CROSS

1   today?

2   **A.**   The rate today is 295.

3   **Q.**   So $295 an hour for your testimony; $195 an hour for the

4   work that you did assessing the property?

5   **A.**   Yes, ma'am.

6   **Q.**   Okay.  And in your typical work as a contractor, when you

7   are bidding on jobs, do you charge an hourly rate to bid on a

8   job?

9   **A.**   Yes, ma'am.

10   **Q.**   You do?  And that's $195 an hour for bids?

11   **A.**   Yes, ma'am.

12   **Q.**   Okay.

13   **A.**   We credit it back if we -- if we're hired to do the job,

14   we credit back a portion of that money towards the job.

15   **Q.**   Okay.  Do you recall the date that you conducted your

16   inspection and prepared the bid for this property?

17            **THE COURT:**  There's two properties.

18   BY MS. EIKHOFF:

19   **Q.**   Sorry.  Let me rephrase -- let me strike that.  I'm going

20   to strike that and restate the question.

21            Do you recall the date on which you inspected the two

22   properties and prepared estimates for them?

23   **A.**   I visited the property on February 23rd, 2021, and I would

24   have begun the estimate the same day.

25   **Q.**   Okay.  So your first work on these properties was

SHAWN MACOMBER - CROSS

1   February 23rd, 2021?

2   **A.**   Yes, ma'am.

3   **Q.**   And that was arranged through Mr. Doyle?

4   **A.**   Yes, ma'am.

5            **MS. EIKHOFF:**  I have no other questions.  Thank you.

6            **THE COURT:**  Mr. Doyle, any questions?

7            **MR. DOYLE:**  I think it might be worthwhile, Your

8   Honor, to just take some proffer testimony on a couple of

9   issues.

10           **THE COURT:**  I'm not going to take proffer testimony

11  on this issue.

12           **MR. DOYLE:**  Okay.

13           **THE COURT:**  I excluded Mr. Macomber and his Xactimate

14  as being untimely --

15           **MR. DOYLE:**  Right.

16           **THE COURT:**  -- not on -- not necessarily on the

17  merits.  I don't need proffer testimony and going to revisit

18  that issue.  Untimeliness is untimeliness and that order has

19  not been appealed.  Okay?

20           **MR. DOYLE:**  Thank you, Your Honor.  No further

21  questions.

22           **THE COURT:**  Mr. Macomber, I do have a couple of

23  questions for you.  This is Judge North.

24                When you visited the Carter and Gibbs property

25  on either or both visits, did you meet and speak with the

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - CROSS

1   property owners?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Did you meet and speak with both the

4   Carters and Ms. Gibbs, or Mr. and Mrs. Gibbs?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Okay.  After you -- after you completed

7   your estimates for the two properties, did you ever speak with

8   them again?

9           THE WITNESS:  I believe so.  I know that I spoke with

10  Ms. Gibbs.

11          THE COURT:  All right.  Tell me about that

12  conversation.  What was the occasion of that conversation?

13          THE WITNESS:  Well, it would have been a phone call.

14  I didn't visit the property again.

15          THE COURT:  Did you --

16          THE WITNESS:  But I believe there was --

17          THE COURT:  Did you directly communicate the -- the

18  final number for your repair estimates to Ms. Gibbs?

19          THE WITNESS:  I'd have to check.  Typically, I e-mail

20  them to them, but I don't believe I would have communicated it

21  over the phone.

22          THE COURT:  Well, considering that you were hired by

23  Mr. Doyle in connection with litigation, do you have a

24  recollection of communicating directly with Ms. Gibbs your

25  final estimate to repair her home, or would you have done

OFFICIAL TRANSCRIPT

SHAWN MACOMBER - CROSS

1    that -- would you have communicated that to Mr. Doyle?
2              **THE WITNESS:**  I do not have a recollection of how --
3    how I communicated with them, if I communicated that number
4    directly to Mr. Doyle or to -- in some instances, I'll e-mail
5    the -- the homeowner directly, and in some instances, it will
6    be just to the attorney.
7              **THE COURT:**  All right.  How about with --
8              **THE WITNESS:**  I can check.
9              **THE COURT:**  How about with the Carters?
10             **THE WITNESS:**  It's the same thing.  I'd have to check
11   and see if it was e-mailed.  I do know that I spoke with them
12   again.  I believe I had -- I believe I talked with him about
13   making sure that the property was locked up when I left.  But
14   as far as communicating the actual price estimate, it would
15   have been done by e-mail.  And I can check my records to see if
16   I e-mailed directly Mr. Doyle or if I copied them on the e-mail
17   as well.
18             **THE COURT:**  All right.  I'm going to ask you to do
19   that.
20             Mr. Doyle, I'm going to ask you to follow-up
21   after the hearing to produce to the Court and to the defendants
22   any e-mail communications or how these numbers were
23   communicated to your clients by Mr. Macomber, whether it was
24   directly or through you.  Okay?
25             **MR. DOYLE:**  Yes, Your Honor.

1           THE COURT:  All right.  Mr. Macomber, thank you for
2      your time.
3           THE WITNESS:  Sure.  Thank you.
4           THE COURT:  All right.
5                Any more witnesses?
6           MR. DOYLE:  No, Your Honor.
7           THE COURT:  All right.  Do you all have any witnesses
8      to call for the defense?
9           MS. EIKHOFF:  We do not, Your Honor.
10          THE COURT:  Okay.  I'm inclined to take five or
11     ten minutes, give you all a minute -- a couple minutes to
12     gather your thoughts, give you five minutes or so to wrap up in
13     the form of argument, and then we will go from there.  Okay?
14          MR. DOYLE:  Yes, Your Honor.
15          THE COURT:  Let's see.  It's 1:20.  Let's come back
16     at 1:30.  Let's keep it to five minutes or so a side to
17     summarize, and then we will -- as I said, we'll take it from
18     there.  Okay?
19          MR. DOYLE:  Thank you.
20          MS. EIKHOFF:  Thank you.
21          THE COURT:  See you all back at 1:30.
22          (WHEREUPON, the Court took a recess.)
23          THE DEPUTY CLERK:  All rise.
24          THE COURT:  You all can have a seat.
25                All right.  Mr. Doyle, you can -- if you would

OFFICIAL TRANSCRIPT

```
 1   like to make any closing remarks.
 2                  Let me first say, as to Mr. Macomber's testimony
 3   and my ruling that I wasn't going to take a proffer of his
 4   testimony is not only based on the fact that I previously found
 5   that his work product and his designation as an expert was
 6   untimely, but I also don't think it was appropriate to make a
 7   proffer of any additional testimony as a part of a redirect --
 8           MR. DOYLE:  That's fine, Your Honor.
 9           THE COURT:  -- as opposed to during his direct
10   testimony.
11                  So what I'd like to hear about are your
12   thoughts -- or closing arguments as to this hearing and the
13   issues that are before the Court today, not the issues that are
14   before the Court in this motion that was filed before
15   Judge Fallon or any of the other motions or briefs that were
16   filed previously.
17           MR. DOYLE:  Your Honor, I want to make a few comments
18   that will dovetail into that.  I just want to make a quick
19   comment about it as we go forward, and it won't be -- I
20   won't -- I won't make an -- I'm not arguing that position.
21           THE COURT:  Okay.
22           MR. DOYLE:  It's been filed.
23                  Today we heard testimony from the plaintiffs in
24   this case who have been waiting almost 12 years, a little over
25   11 years to have their day in court, to have their testimony
```

OFFICIAL TRANSCRIPT

1  heard to move this forward.  I'm glad that we finally were able

2  to do it.

3  With respect to the diminution in value that the

4  Court is evaluating, and I think that Your Honor mentioned at

5  least an alternative methodology for evaluating the diminution

6  in value that would be appropriate for each of these

7  properties, that we have the true costs or the true appraised

8  value of the property that Mrs. Wilson provided to the Court

9  last year as kind of the top number that can't be exceeded with

10 respect to diminution in value.  There's testimony about it.

11 That's in --

12 **THE COURT:**  Who's Mrs. Wilson?

13 **MR. DOYLE:**  That's the appraiser.

14 **THE COURT:**  Oh, okay.  Okay.  I gotcha.

15 **MR. DOYLE:**  Yeah.  She provided us with what the

16 value of the property would have been if it didn't contain the

17 Chinese drywall, which is useful in this situation.

18 And because the District Court has undertaken an

19 enormous effort leading up to ultimately a settlement that

20 didn't involve the cost of remediation, counsel for all the

21 plaintiffs in that litigation did a tremendous amount of work

22 to provide the supporting document and gather the evidence that

23 was necessary to calculate the cost of remediation, and that's

24 what Mr. Wright's document indicates.  That's what the effort

25 was leading up to ultimately a settlement that didn't relate to

1    remediation.

2              And the Court was clear at the fairness hearing,

3    that it did not relate to the cost of remediation.  But here

4    because these plaintiffs have opted out, this -- and the

5    Court's taken into consideration the cost of remediation here,

6    we have at least a 2019 value that's obviously expired, and the

7    testimony is it's not appropriate.  And we now have the numbers

8    that Mr. Macomber calculated, and we know the methodology he

9    used, which is consistent with what Judge Fallon has laid out

10   in Document 20741 that I seem to bring up a lot in all of these

11   hearings because it applies to all cases.

12             And if Your Honor goes back and takes a look at

13   20741, not only does it lay out the foundation for the case,

14   but it does lay out in great detail what needs to be done for a

15   plaintiff to have their home properly and fully remediated,

16   according to Judge Fallon, and that comes after several

17   bellwether trials, the *Hernandez* case, the *Germano* case, and

18   others that are outside of the Eastern District of Louisiana,

19   but they all played into what the Eastern District of Louisiana

20   District Court and Judge Fallon in the consolidated proceedings

21   found to be persuasive throughout the process.

22             And he adopted the protocol and other aspects of

23   the remediation that are laid out in 20741.  So in the end, we

24   have what Mr. Macomber calculated based on what Judge Fallon

25   has adopted multiple times.  And the number in each case for

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | both Carter and Gibbs falls below the appraised value of the |
| 2 | property that Ms. Wilson provided to us. |
| 3 | In the case of Gibbs, the appraised value was |
| 4 | $180,000, if I'm not mistaken.  The cost of remediation that |
| 5 | Mr. Macomber provided was less than that.  The same thing with |
| 6 | regard to the Carters.  The appraised value of their property |
| 7 | without Chinese drywall exceeds the cost of the remediation. |
| 8 | So, therefore, the diminution in value based on those |
| 9 | calculations can be entered in their favor with respect to |
| 10 | that. |
| 11 | Now, beyond that, the Court has now the position |
| 12 | of the plaintiffs both through the filing that we offered in |
| 13 | November of 2021, and, again, attached to the motion to clarify |
| 14 | that we asked the District Court to take a look at, and it has |
| 15 | the rationale for us moving beyond what diminution in value |
| 16 | would provide and allow these plaintiffs to recover. |
| 17 | And they should be -- and it's our position |
| 18 | that, under Alabama law, they should be able to recover all |
| 19 | incidental and consequential damages.  And you're going to take |
| 20 | that issue up in the near future. |
| 21 | And we offered the Court the proffered testimony |
| 22 | and evidence that will allow this Court at that point, once |
| 23 | it's resolved, and if the Court does agree with the plaintiffs, |
| 24 | that it is a product under Alabama law, then the diminution in |
| 25 | value cap that we're talking about here, the Wilson appraisal, |

1  really is immaterial because the plaintiffs would be able to
2  recover the full cost of remediation and all incidental and
3  consequential damages that are laid out in the latest position
4  statement.
5          Now, the numbers that we provided in that latest
6  position statement deviate slightly from the testimony here
7  today, but not by much.
8          So in the end, if the Court is able to view
9  those documents and this evidence and get to that point where
10 they are able to recover under those theories under Alabama
11 law, then this becomes simply a math equation.
12         We'll have the cost of remediation, we'll have
13 the loss of use and enjoyment, personal property, the home
14 repair, the alternative living expenses, the prejudgment
15 interest, and then the attorney's fees and expenses, which is a
16 different issue that we have argued is available to the
17 plaintiffs under Alabama law because of this default, which
18 appears to allow them to seek recovery for that under Alabama
19 law, but we'll take that up at a later date.
20         But I think the Court now is in position to make
21 this evaluation.  Whichever way the Court decides, I think that
22 the Court is in position now to look to the motion to clarify,
23 decide that issue, and then enter the judgment in this case,
24 Your Honor.  And we look forward to that process.
25         Thank you, Your Honor.

OFFICIAL TRANSCRIPT

1          THE COURT:  Ms. Eikhoff.

2          MS. EIKHOFF:  Thank you, Your Honor.  We're going to

3   put something on the screen if that's okay with you.

4          THE COURT:  Sure.

5          MS. EIKHOFF:  So these proceedings are bound by

6   Alabama law, which is in and of itself a distinction from a lot

7   of the other proceedings that took place in this MDL before

8   that.

9               And Alabama law is very clear as to the measure

10  of damages for claims like this.  The Supreme Court of Alabama

11  has spoken to it in the *Poffenbarger* case and others, and that

12  is the diminution in property value, as this Court has ruled,

13  is the only measure of damages.

14              And from the pattern -- the Alabama pattern jury

15  instructions on diminution in value, we've distilled it to this

16  formula.  It is value -- what we call value B, because it's the

17  before value, minus value A, which is the after damage value,

18  equals value D, which is the diminution or the damages.  It's

19  that simple.  Before there was damage to the property, the

20  before value, minus the value after the damages, taking those

21  into account, and that delta is the damages and the diminution.

22              And in this case, Your Honor -- well, let me

23  back up before I go to the specifics of this case.  In terms of

24  Alabama law, each of those elements are objective measures.

25  It's fair market value.  It's not sentimental value or

OFFICIAL TRANSCRIPT

1    subjective value.  It is willing buyer, willing seller, fair
2    market value, what are they?
3               In this case, Your Honor, we have some inputs
4    now for value B.  What was the value before?  We have some
5    sense of what they paid for it.  We've gotten some appraisals.
6    And including the appraisal that we got just last summer is a
7    before value because it's not taking into account the Chinese
8    drywall.  We have nothing for value A.  That evidence is not in
9    the record.  It hasn't been developed.  It could have been, but
10   it wasn't.  And so without a reliable and competent after
11   value, the Alabama law calculation cannot be performed.
12              Now, it is true that Alabama courts have
13   considered as admissible repair costs in conjunction with this
14   evaluation.  We have seen that.  But we have never seen any
15   case in Alabama where the repair value substitutes for the fair
16   market diminution in value.  We have seen it compared against
17   the other and seen kind of how that shakes out.  And Alabama
18   law harshly applies that if the diminution is less than the
19   repair value, then the diminution always wins.  But that's
20   because diminution always wins, period.
21              Now, here when we speak of after value, not only
22   do we have nothing for it, but both of the plaintiffs today who
23   testified, testified in fact that in their opinion, the value
24   of their properties should be higher than the value Bs that
25   have been entered into the record.

OFFICIAL TRANSCRIPT

1                    So this, Your Honor, was doable, and it wasn't

2     done.  And as a result of that, the damages have not been

3     proven to satisfy Alabama law.  Now, that, we understand, is a

4     harsh result, but it is not unprecedented.  And as a matter of

5     fact, no opt-outs in this MDL with claims against Taishan have

6     recovered any damages.  All of them have been summarily

7     dismissed with no damages based on a failure of proof.

8              **THE COURT:**  Including plaintiffs who obtained default

9     judgments against Taishan?

10             **MS. EIKHOFF:**  These are the only two that have

11    obtained default judgments against Taishan.  But the burden of

12    proof exists in this damages hearing just as it does in the

13    cases without defaults.  Whether it's a default damages hearing

14    or it's, you know, a case in chief on the merits, there is a

15    burden of proof that must be satisfied.

16                    And so that -- that is -- that is where we are

17    left today at the end of this hearing, lots of value Bs,

18    nothing for value A, and the repair costs that have been

19    admitted and are defective in many ways, but they cannot be a

20    proxy or a substitute for diminution in value under Alabama

21    law.

22             **THE COURT:**  Now, I understand they can't be a proxy

23    or a substitute, but we've talked about the case law that says

24    that they're admissible or relevant as to a determination of

25    diminution of value.

OFFICIAL TRANSCRIPT

1        MS. EIKHOFF:  You're right, Your Honor, that is so.

2   But in every case in Alabama they are relevant against

3   competent proof of diminution in fair market value.  This is

4   the only case that I have seen where there is nothing for fair

5   market value.  Even if there are repair costs, there is --

6   there's no evidence whatsoever in this case of an actual

7   decrease in property value.

8        THE COURT:  Do I read this right, Mr. Doyle, that in

9   the *Amorin* cases, these are the only two opt-outs?

10        MR. DOYLE:  These are the only two in Alabama, Your

11   Honor.  There were a handful in Florida.  I don't think -- I

12   think that there have been orders issued in those that likely

13   will be challenged.

14        MS. EIKHOFF:  No, Your Honor.  They've been

15   dismissed.

16        THE COURT:  Okay.  I'm looking at case management

17   order --

18        MR. DOYLE:  They're not final yet.

19        THE COURT:  -- opt-out plaintiffs, Record

20   Document 22976, where Judge Fallon indicates that this matter

21   was among the cases subject to a class action settlement

22   approved by the Court in January of 2020.  A class settlement

23   resolved 1,069 of the claims in this case.  However, two

24   plaintiffs opted out of the class settlement and their claims

25   remain in this case.  This is the order that referred this

1    matter to me.  So the two plaintiffs, as I appreciate it, are

2    the Carters and the Gibbs.

3           **MR. DOYLE:**  Right.  And there were, I think, two in

4    Florida.  I represented one of them.

5           **THE COURT:**  Okay.

6           **MR. DOYLE:**  But that's it.

7           **THE COURT:**  This is why I make this observation and

8    ask this question, you have relied upon and want me to rely

9    upon work done in the class action by others, including experts

10   who are not before this Court, whose work product is apparently

11   reflected in Record Document 20741.

12           Of the 1,069 claims that were resolved by

13   settlement in this case, as I appreciate it, none of those

14   claims were resolved by the application of whatever formula is

15   in Record Document 20741 to the individual plaintiffs in those

16   cases.  In other words, no one in this class has received

17   recompense or damages based on those formulas.

18           **MR. DOYLE:**  That's correct, Your Honor.

19           **THE COURT:**  They have settled for some amount less

20   than that.

21           **MR. DOYLE:**  Substantially less.  Yes, Your Honor.

22           **THE COURT:**  All right.  And you and your clients --

23   you on behalf of your clients -- or your clients have opted out

24   of that class and come before the Court seeking to rely on that

25   formula to recover 100 percent of whatever damages would be

OFFICIAL TRANSCRIPT

1  calculated according to that formula and the various parameters

2  that their homes fall into in terms of size and whatnot.

3        **MR. DOYLE:**  They opted out of the settlement offer

4  and the agreement.  They didn't opt out of the proceedings

5  leading up to that settlement.

6        **THE COURT:**  Well, you can't opt out of that.

7        **MR. DOYLE:**  Right, and that's the point I'm making.

8  They may have been the only Alabama plaintiffs that opted out

9  of the settlement that was offered, but that's just a

10 settlement negotiation, a settlement amount and a settlement

11 offer.  It wasn't sufficient to fully compensate them or even

12 come close to making them whole.

13        They chose to move forward and raise those

14 issues in this court to proceed with their legal claims that

15 were asserted 11 years ago because the settlement was so

16 insufficient.  And by -- but I'm not going to go into the

17 fairness hearing or the standard that should have been followed

18 by the court in that settlement.  But they have -- for the

19 reasons --

20        **THE COURT:**  Well, that's been resolved, hasn't it?

21 Because a fairness hearing has been held.

22        **MR. DOYLE:**  A fairness hearing was held.

23        **THE COURT:**  Is it under appeal right now at the Fifth

24 Circuit?

25        **MR. DOYLE:**  I think -- I know there are appeals that

OFFICIAL TRANSCRIPT

1  don't involve us that others have had.  I have no idea whether

2  it's --

3          THE COURT:  It is a fait accompli in this case that

4  that class settlement has been approved.

5          MR. DOYLE:  The class -- yeah.  But the class

6  settlement by itself is irrelevant to this proceeding.

7  Everything that happened in this litigation involving the

8  District Court and the proceedings in it are still valid and

9  binding and they're the law of the case.

10          THE COURT:  There's been no instance anywhere in this

11  case where the formula that you're relying on has been applied

12  to a single plaintiff.

13          MR. DOYLE:  We never got that far, Your Honor.  It

14  was adopted back in 2015, I think the first time, and then --

15          THE COURT:  For what purpose was it adopted?

16          MR. DOYLE:  For projecting the cost of remediation

17  for each plaintiff.  So that the Court --

18          THE COURT:  For what purpose?

19          MR. DOYLE:  So that Judge Fallon could understand the

20  scope of the cost of remediation for all plaintiffs in all --

21  in all jurisdictions, all ZIP codes.

22          THE COURT:  And what was -- what do you think was the

23  ultimate purpose of that exercise?

24          MR. DOYLE:  I don't know.  It was requested by the

25  Court.  And after the fairness hearing, the first phase

OFFICIAL TRANSCRIPT

1   fairness hearing where he lays out, you know, "We've gone
2   through this now to determine what the cost of remediation
3   would be for these defendants that are in default.  This is
4   what we have calculated.  This is the methodology that I adopt.
5   And I've requested that a subsequent submission be provided to
6   the Court that has those numbers in it," and that's what was
7   done.  That's what I provided to you today.  And I've said all
8   along, that's the law of the case.  That's what Judge Fallon
9   has asked for.  That's what was provided.
10          THE COURT:  If that was the law of the case, then why
11  are we here?  Why did he send this to me for a hearing?
12          MR. DOYLE:  I think there was an instruction on why
13  he sent you this, to determine the credible evidence for those
14  categories that we've addressed today, even by proffer.
15          THE COURT:  I would have thought that if that was the
16  law of the case, Judge Fallon would have directed me to use the
17  calculations or the protocol set forth in that document.  He
18  would have called my attention to that document at some point.
19  He wouldn't have left it to you to do it.
20          MR. DOYLE:  Well, I'm representing these plaintiffs.
21  I don't know what his motivation would be to get involved once
22  he referred it to you.  Once we agreed to have this Court hear
23  the case, he referred it to you with instructions to provide
24  him with a recommendation regarding those classes of damages,
25  and it specifically has laid out what it is that he was

OFFICIAL TRANSCRIPT

1    expecting from this Court.

2              **THE COURT:**  That's not exactly what it says.  It says

3    what I should address.

4              **MR. DOYLE:**  Sure.

5              **THE COURT:**  And I've done that, all damages sought.

6    I've been addressing all damages sought for almost two years.

7    He didn't say award all damages sought.  He said address all

8    damages sought.

9              As I mentioned, I haven't been in this case as

10   long as you all have.  What is the defendant's view or

11   defendant's counsel's view as to the providence of this

12   framework, formula, whatever it is, in 20741?  I want to hear

13   your perspective as to what is the meaning of that framework or

14   method of calculation.

15             **MS. EIKHOFF:**  Your Honor, I'm happy to do that.  I've

16   lived through this since 2015, and was at, in June of 2015, the

17   hearing that led to this class damages formula.

18             This was an aggregate class damages formula

19   meant to administer and assess damages on a massive scale for

20   thousands of homeowners.  And if you read the judge's rulings

21   that entered that formula as class damages, it is specifically

22   because of the volume.  And specifically because, in the

23   Court's view, it would be impossible with 1,069 claimants to do

24   an individual assessment of remediation damages on individual

25   homes.  That -- it was adopted for that purpose.

OFFICIAL TRANSCRIPT

1          Once the case settled -- and, by the way, I just

2     thought this was interesting, the declaration of Ronald Wright,

3     the date on it is May 2nd, 2019.  We mediated -- the mediation

4     in the case that led to the settlement was the weekend before

5     Memorial Day 2019.  So within one month of this, the case was

6     settled.  And, of course, it took months to work that all out.

7          **THE COURT:**  Right.

8          **MS. EIKHOFF:**  So in the fairness hearing from the

9     bench, and in his ruling that was issued in early 2020,

10    Judge Fallon said, "Opt-outs have a heavy burden of proving

11    their damages individually.  There is no more class.  There are

12    two opt-outs in this case, and they are not a class."  And so

13    any aggregate class damages formula that was made to be applied

14    to thousands was abrogated by the class settlement.

15          And Alabama law -- the law of the state where

16    the property lies applies, and that is how the opt-outs have

17    been treated and should be treated going forward.  And

18    Judge Fallon warned opt-outs that, "If you're going to opt out,

19    you're going this alone, and you're going to have an individual

20    burden to prove your damages individually."

21          **THE COURT:**  All right.  I'm going to give you all a

22    couple of weeks to file a post-hearing brief.  Let's keep it

23    under 25 pages.  Let's keep it within the boundaries of the

24    hearing that's been had.  I don't need another brief on why my

25    rulings are wrong.  Okay?  Because I've already got to deal

1   with that now that Judge Fallon has sent your most recent

2   version to me.  And I'm going to get an opposition from them.

3   They've got to file two different things.  They've got to file

4   something to address that motion, plus the post-hearing brief.

5                So what I want is I want a typical post-hearing

6   brief to explain to me what you think the evidence is and how I

7   should apply it.

8                And, Mr. Doyle, I'm urging you to focus on my

9   prior rulings that the diminution of value to the plaintiffs'

10  homes is the measure of damages in this case.  And you've got

11  to point out to me where in this record is the evidence that I

12  need to use, how to use it, and what I should be coming up

13  with.  I've already stated that that is how this is -- this

14  operation is going to work until Judge Fallon or the Fifth

15  Circuit tells me I'm wrong.

16            **MR. DOYLE:**  Right.

17            **THE COURT:**  So I would stop devoting your energies to

18  trying to convince me that I'm wrong and focus on how to

19  maximize your clients' claims under the rubric that I have

20  stated is the proper rubric in this case.

21            **MR. DOYLE:**  Your Honor, I think it would be

22  beneficial from our point of view to have that issue resolved

23  and have an opinion -- a thorough opinion from the Court that

24  we can analyze and potentially take forward.  I'm happy to

25  provide a brief under the guise that diminution in value is the

OFFICIAL TRANSCRIPT

1    sole measure.

2              **THE COURT:**  It is not a guise.  It is the ruling of

3    this Court.

4              **MR. DOYLE:**  Right.

5              **THE COURT:**  And I'm pretty sure --

6              **MR. DOYLE:**  But we believe that --

7              **THE COURT:**  -- that one of the things that I'm going

8    to say in my report and recommendation, which it may not even

9    be, this is -- this is not an appeal of my prior order.  It's a

10   motion for clarification of somebody's order.  I don't know if

11   it's his order or my order.  But I don't know that I need to

12   issue a report and recommendation on that.  I can just issue a

13   ruling that you can appeal.

14             But I've issued rulings already in this case as

15   to what the -- what the proper measure of damages is.  They

16   haven't been appealed.  I'm a federal magistrate judge, and

17   when I make decisions on matters that are referred to me that

18   are non-dispositive of the case, Rule 72 sets out how you are

19   to object or appeal to those, and that hasn't happened.  To

20   this day it hasn't happened.  And that's one of the things I'm

21   going to be looking at.

22             So to suggest that maybe we should move forward

23   under the guise that these are the proper measure of damages is

24   a mistake.  Because until we go through this process and

25   somebody that sits higher than me says I'm wrong, which would

1  not be the first time, it's not a guise.  It's how we're

2  operating.  And that is exactly why I just told you that I urge

3  you to focus on that when you file your post-hearing brief on

4  behalf of your clients.

5           I'm not going to separate these two documents.

6  You've made the same argument in the most recent motion that

7  you've made to me multiple times.  I have only skimmed it and

8  perused it because it wasn't filed for me.  It was filed for

9  Judge Fallon.  I did look at it because I needed to determine

10  whether we should go forward with this hearing while it was

11  pending, and I determined that we should.  Now, it's been

12  referred to me.  I've got to look at it more closely.  I

13  generally don't do that until I get an opposition.  I'm going

14  to get an opposition.

15           I would ask you all to file whatever you're

16  going to file as expeditiously as you reasonably can --

17           MS. EIKHOFF:  Okay, Your Honor.

18           THE COURT:  -- to the defendants so that I can -- I

19  can work on that before I get your post-hearing briefs.

20           MS. EIKHOFF:  We will, Your Honor.

21           THE COURT:  I'm likely to address it all in one form

22  or fashion --

23           MR. DOYLE:  Thank you, Your Honor.

24           THE COURT:  -- whether it's two different -- it may

25  be two orders.  It may be an order and a report and

OFFICIAL TRANSCRIPT

1    recommendation, but I'm not going to piecemeal this.

2            MR. DOYLE:  Thank you, Your Honor.

3            THE COURT:  I'm going to deal with it all at once.  I

4    will package it in a way to make it as easy as possible for you

5    to appeal everything that you don't like about what I do.

6            MR. DOYLE:  Thank you, Your Honor.  That's ultimately

7    what I was after.

8            THE COURT:  Okay.  And I've got no problem with you

9    and your clients disagreeing with my rulings and my findings.

10   It happens all the time.  But I've got to do what I think is

11   right.  I know you all already disagree with the rulings that

12   I've made up until this point, which is why I'm highlighting

13   that I'm -- I'm -- I am trying to focus you on operating within

14   the parameters of those rulings for purposes of this hearing.

15           MR. DOYLE:  Thank you, Your Honor.  I will.

16           THE COURT:  Okay.  Any questions?

17           MS. EIKHOFF:  So, Your Honor, our 25 page

18   post-hearing brief is due in two weeks, Your Honor?

19           THE COURT:  I wrote it down, April 6th.

20           MS. EIKHOFF:  Okay.

21           THE COURT:  Two weeks from today.  I wrote it down,

22   but I didn't say it out loud.

23           MS. EIKHOFF:  And we will -- we will get our response

24   to the motion for clarification to you.  We should be able to

25   get that to you within a week.

OFFICIAL TRANSCRIPT

1          **THE COURT:**  Okay.  The submission date can remain

2    whatever the submission date is because I'm going to -- I'm

3    going to deal with it all sort of at the same time.

4          **MR. DOYLE:**  The submission date for the District

5    Court was April 13th.  I happen to just recall that.  That's

6    the next motion date.

7          **THE COURT:**  It will remain the same --

8          **MR. DOYLE:**  That's the next motion date.

9          **THE COURT:**  Yeah.  It will remain the 13th.  Although

10   I guess I'm asking you all if you can file your opposition

11   sooner than the due date on that date of submission, that would

12   be great.  And, again, I will try to -- I will try to handle

13   all this in as solid a unit as I can.

14         **MR. DOYLE:**  Thank you, Your Honor.

15         **MS. EIKHOFF:**  Thank you, Your Honor.

16         **THE COURT:**  Okay.  All right.  Thanks, everyone.

17         (WHEREUPON, the proceedings were concluded.)

18                            *******

19                          **CERTIFICATE**

20         I, Jodi Simcox, RMR, FCRR, Official Court Reporter
     for the United States District Court, Eastern District of

21   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and

22   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

23

24

                          *s/Jodi Simcox, RMR, FCRR*
25                         Jodi Simcox, RMR, FCRR
                          Official Court Reporter

                     OFFICIAL TRANSCRIPT