# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: ALL CASES | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW
## RELATED TO THE JUNE 9, 2015 DAMAGES HEARING

## I.     PROCEDURAL HISTORY

The following procedural history has been recited in several of the Court's previous opinions, but in order to place the current issues in context it is restated here. From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014).  Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.  Accordingly, these

homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below:

### A. Knauf Entities

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service. *See* (R. Doc. 401). On March 15-19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). For purposes of the trial, KPT stipulated that its Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor." *Id*. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law ("*Hernandez* FOFCOL"), *see id.*, and entered a Judgment in the amount of

$164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc. 3012).

Thereafter, on October 14, 2010, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court in *Hernandez*. The Knauf pilot remediation program is ongoing and has, at present, remediated over 2,200 homes containing KPT Chinese drywall using the same protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* (R. Doc. 12061-5). In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. These additional class action settlement agreements involve the following defendants and in most cases, their insurers: Interior Exterior Building Supply, LP ("Interior Exterior"); the Banner Entities; L&W Supply Corp. and USG Corp.; and a group of numerous homebuilders, installers, suppliers. *See* (R. Docs. 10033-3, 12258-3, 13375-2, 14404-2). The Court first granted preliminary approval to all of the foregoing settlement agreements, and after the fairness hearing, certified and granted approval for the class settlements. Although the Court occasionally must deal with common benefit fees, settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

###### B. Chinese Defendants

In contrast to the straightforwardness with which the MDL litigation proceeded against the Knauf Defendants, the litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM Defendants ("CNBM"), comprised of the China National Building Materials Group Corporation, China National Building Materials Company Limited, China National Building Materials & Equipment Import & Export Corporation, and CNBM Forest Products (Canada) Ltd; and the BNBM Defendants ("BNMB"), comprised of Beijing New Building Materials Public Limited Company, and Beijing New Building Material (Group) Co. Ltd. As discussed below, the course of the litigation involving the Taishan Entities and other Chinese-based defendants has not followed the same trajectory or enjoyed the same measure of resolution as that involving the Knauf Entities.

As an alleged manufacturer of Chinese drywall which has been installed in plaintiffs' properties, Taishan is a named defendant in numerous cases in both the MDL litigation and litigation filed in state courts. The Court's initial inquiry regarding Taishan involved four cases in the MDL in which Taishan was served, entered an appearance, and in two of these cases, subjected to default judgment proceedings. These four cases are: *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; *Gross v. Knauf Gips KG*, Case No. 09-6690; and *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361. The Court will briefly discuss each of these cases as they pertain to Taishan before detailing the overall course of the MDL litigation involving the claims against Taishan.

4

*Germano* has served as the main vehicle for the MDL litigation involving Taishan, particularly TG. *Germano* was filed originally in the U.S. District Court for the Eastern District of Virginia as a putative class action against TG by the owners of homes located in Virginia which allegedly contain TG-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2) (Case No. 09-6678). On August 3, 2009, TG was validly served. *See* (R. Doc. 1-7) (Case No. 09-6687). Thereafter, on October 13, 2009, *Germano* was transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009. (R. Doc. 1) (Case No. 09-6678). Subsequent to transfer, Plaintiffs filed a Second Amended Complaint ("SAC"), which was granted, expanding the class to a nationwide class. *See* (R. Doc. 470) (Case No. 09-md-2047). The Court then permitted the intervention of 14 individual plaintiffs (the "Intervening-Plaintiffs"). (R. Doc. 641).

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida who used drywall manufactured by TG for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall and/or other property damaged by the drywall, and/or incurred liability for property damages. *See* (R. Doc. 1-1) (Case No. 09-4115). On May 8, 2009, service was executed on TG. *See* (R. Doc. 52) (Case No. 09-md-2047). Shortly thereafter, *Mitchell* was transferred to the Eastern District of Louisiana and consolidated with the MDL litigation. *See* (R. Doc. 1) (Case No. 09-4115).

*Gross* and *Wiltz* were both filed in the Eastern District of Louisiana and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall. *See* (R. Doc. 1) (Case No. 09-6690); (R. Docs. 1, 1-1)

(Case No. 10-361).  Taishan was served or entered an appearance in both cases.  *See* (R. Docs. 2140, 2141, 2553); (R. Docs. 7408, 7409).  *Gross* involves claims against "indeterminate defendants" who have allegedly concealed their identity and are allegedly responsible for the Chinese drywall in plaintiff class members' properties.  *See* (R. Doc. 1) (Case No. 09-6690).  *Wiltz*, on the other hand, is a more typical class action filed on behalf of property owners against Taishan as a result of the damage caused by the presence of Taishan's drywall in their properties.  *See* (R. Docs. 1, 1-1) (Case No. 10-361).

The first issues in the MDL litigation involving Taishan arose when TG failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that TG had been properly served in each case.  *See* (R. Doc. 52); (R. Doc. 1-7) (Case No. 09-6687).  After affording TG more than a reasonable amount of time to answer or enter an appearance, the Court entered a preliminary default against TG in both cases (R. Docs. 277, 487) and moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Intervening-Plaintiffs' claimed damages.  *See* (R. Doc. 502, 1223, 1258, 2380).  At this hearing, the Intervening-Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases.  Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law.  *See* (R. Doc. 2380, hereinafter "*Germano* FOFCOL").  The *Germano* FOFCOL noted that the average cost per square foot to repair the *Germano* properties was $86 and that the average cost was based on "the average of independent quotes from two local reputable Virginia contractors." *Id*. at 57. Further, the *Germano* FOFCOL found that the "homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes." *Id*. at 62.  On May 11, 2010, the Court issued a Final Default Judgment against TG in *Germano*, in favor of the Intervening-Plaintiffs, in

the amount of $2,609,129.99. (R. Doc. 3031). On the last day to timely do so, June 10, 2010,

TG filed a Notice of Appeal of the Default Judgment in *Germano*. (R. Doc. 3670). On this same

day, TG also entered its appearance in *Germano* and *Mitchell*. *See* (R. Doc. 3668).

After TG entered its appearance in the MDL, it quickly sought to have the Final Default

Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal

jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because of

the pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See*

(R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its

appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the

preliminary default and default judgments. *See* (R. Doc. 5649). In response, this Court issued an

order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See*

(R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal

jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial

discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to

other cases in which Taishan been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010, *see, e.g.*, (R.

Docs. 5839, 5840), and continued over the year-and-a-half leading up to the filing of Taishan's

motions. Discovery has included the production of both written and electronic documents, as

well as depositions of Taishan's corporate representatives, with each type of discovery

proceeding in a parallel fashion. This discovery has often been contentious, requiring close

supervision by the Court. The Court has presided over regularly-scheduled status conferences to

keep the parties on track, and conducted hearings and issued rulings to resolve numerous

discovery-related disputes. *See, e.g.*, (R. Docs. 7136, 7511).

In April 2012, TG and TTP re-filed various motions: a motion to dismiss for lack of personal jurisdiction, a motion to vacate the entry of default and to dismiss the action in *Mitchell*, a motion to dismiss the complaint in *Gross*, and a motion to dismiss the complaint in *Wiltz*. Responses in opposition were filed by the PSC, Interior Exterior, the Banner Entities, and Certain Florida Homebuilders, (R. Docs. 14202, 14204, 14209, 14216, 14356, 14372, 14390, 14392, 14391-4), with other parties joining in these motions, including the State of Louisiana (collectively the "Respondents"). Prior to the hearing, evidentiary objections were raised by Taishan, which the Respondents addressed. On June 29, 2012, over three years since the creation of MDL 2047, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to vacate, denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that TTP was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for

writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

This Court set a judgment debtor examination for July 17, 2014 and ordered Taishan to appear. Instead of appearing, however, Taishan fired its Hogan Lovells attorneys and indicated that it was again "withdrawing" from the litigation. The Court held Taishan in contempt of court. (R. Doc. 17869). Pursuant to this contempt order, Taishan was ordered to pay $15,000 in attorneys' fees to Plaintiffs' counsel and $40,000 as a penalty for contempt. The contempt order also enjoined Taishan and its affiliates and subsidiaries from conducting business in the United States until or unless it participated in the judicial process. In addition, the contempt order provided that if Taishan or its affiliates or alter egos did business in violation of the contempt order, they would forfeit 25% of the earnings. The Court did not immediately permit Taishan's terminated attorneys to withdraw from the litigation, in order to ensure that Taishan was on notice of the progress of the proceedings, Taishan's contempt and "withdrawal" notwithstanding.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to [Taishan] drywall. *See* (R. Doc. 18028 at 34-35, hereinafter "Class Certification FOFCOL"). The Court so ruled following a motion from the PSC. (R. Doc. 18086). The motion was unopposed by any party.

The Court set a class damages hearing for February 12, 2015. At that hearing, BNBM entered an appearance for the first time in this litigation and asked for a continuance to prepare for a class damages hearing. (R. Doc. 18331). The Court granted the request for a continuance.

Taishan subsequently entered an appearance with its new counsel, Alston & Bird, LLP. (R. Doc. 18352). CNBM also entered an appearance for the first time in this litigation. On March 17, 2015, the Court ordered Taishan to purge itself of contempt and again continued the damages hearing to April 28, 2015. (R. Doc. 18831). Thereafter, the Court granted yet another request for a continuance and set the class damages hearing for June 9, 2015.

The hearing on damages proceeded on June 9, 2015. The PSC presented two witnesses. First, the PSC called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer serves as Settlement Administrator for the Knauf Settlement and Claims Administrator for the Global, Banner, and InEx Settlements (collectively referred to as the "GBI settlements"). The PSC then called George J. Inglis, a Professional Engineer and Senior Project Consultant with Berman & Wright Architecture, Engineering and Planning, as its designated expert to testify about remediation damage estimates. Defendants called David Pogorolich as their first damages rebuttal expert. Pogorolich is a Director at Navigant Consulting and a licensed Certified General Contractor in the State of Florida. Defendants called Dr. M. Laurentis Marais as their second expert. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc. The Court earlier held that Dr. Marais was an expert in statistical science and sampling but was not qualified to testify about building damage or remediation estimation methodology.

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the hearing, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a

finding of fact, the Court adopts it as such. Notwithstanding the foregoing, the Court would like

to make clear at the outset that the instant Findings of Fact and Conclusions of Laws relate to the

property damages caused by Chinese Drywall. The June 9, 2015, Hearing was held for the sole

purpose of hearing testimony regarding the property damages aspect of this MDL litigation.

Accordingly, the findings and conclusions herein do not address issues of alter ego, jurisdiction

or contempt.

## II.     BACKGROUND – GYPSUM & DRYWALL

Drywall is a widely used construction material that is also known as gypsum board,

wallboard, plasterboard, and sheetrock. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall*

*Litigation: Subrogation Whitepaper* (2009)). A drywall panel is composed of a layer of

hardened gypsum plaster sandwiched between two layers of paper liner. *Id*. Gypsum is a

hydrated calcium sulfate, composed of two molecules of water (H2O) and one of calcium sulfate

(CaSO4). *Id.* The gypsum used to make drywall can be created both naturally and synthetically.

*Id*. Naturally occurring gypsum is a deposit largely the result of the evaporation of water in

ancient inland seas which contains large amounts of dissolved gypsum. P2.0051-001 (*Treatment*

*and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 5). Synthetic

gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials

and unreacted sorbents found in the source material can vary among power plants and among

mines from which it originates. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall Litigation:*

*Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of

industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is

produced as a byproduct of coal combustion power plants. *Id*.; P2.0240.0014 (ASTM

International report). To make drywall from gypsum, first gypsum is crushed or ground up and

heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of

its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 6); P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 9-10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P2.0240-0026 (ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall. P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimensions, February 1992 at 6). Since the 1950's, drywall has become a primary source material for

buildings in the United States. As mentioned above, due to a shortage of U.S.-manufactured drywall, Chinese-manufactured drywall was brought into the United States.

## III.  GENERAL FINDINGS ON CHINESE DRYWALL

### A.  Chinese Drywall is Defective

**1.**  As established by the U.S. Consumer Product Safety Commission ("CPSC"), the Florida Dept. of Health, other scientific entities, and this Court in the *Germano* FOFCOL, the defective nature of this Chinese drywall is undisputed.

**2.**  The Chinese drywall in question has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. It releases three main gases: (i) hydrogen sulfide ($H_2S$), (ii) carbonyl sulfide (COS), and (iii) carbon disulfide ($CS_2$). *Germano* FOFCOL at 12. The Plaintiffs' experts detected sulfur gas emissions by conducting laboratory tests on samples of this Chinese drywall. The CPSC, Florida Dept. of Health and other investigatory agencies and firms also reported that Chinese drywall emits sulfur gases. *Id.* at 12-13.

**3.**  The sulfur gases released by Chinese drywall are irritating to the human body during exposure. Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things. *Id*. at 13.

**4.**  The sulfur gases released by this Chinese drywall cause offending odors in homes, making them hard if not impossible to live in, and are corrosive to metals, particularly copper and silver, which are uniquely vulnerable to corrosion from sulfur gases. *Id.* The sulfur gases emitted from Chinese drywall create an environment classified among the most severe industrial corrosive environments in the Battelle Classification scheme and the standards established by the International Standards Association. *Id*. at 19-20.

5.  Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the *Germano* Plaintiffs, further confirmed the wide-spread impact of the corrosive environment, which included corrosion of copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes, causing premature failure of electrical and mechanical devices.  *Id.* at 14, 23.

### B. Property Damage Arising From Chinese Drywall Requires Total Remediation

6.  The Court adopts and incorporates herein the *Germano* FOFCOL, which accurately explains the scope of remediation required for class plaintiffs' properties.  *Germano* FOFCOL at 29-31; *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010).

7.  After considered analysis of the impracticality and risks of the selective remediation approach, the Court found in *Germano* and re-affirms herein that remediating a Chinese drywall property requires complete remediation and cleaning; thus, the Court again rejects any remediation approach that favors selective remediation such as the one originally proposed by the Knauf experts in *Germano*. *Id.* The remediation protocol fashioned in *Germano* is evidence based and has been confirmed via its application in the actual remediation of several thousand homes.

8.  The scientific and practical constructability evidence presented before this Court, which relies on long-term observation, sampling and testing of properties with Chinese drywall, scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of the national builders), and electric and building codes, demonstrates that proper remediation of the danger posed by Chinese drywall must include the removal of *all* drywall, all electrical wiring, the entire HVAC system, and many other items such

as appliances, carpet, cabinetry, trim work and flooring.  *Germano* FOFCOL at 27-55;

*Hernandez* FOFCOL at 20-34; Transcript at pp. 106:8-110:3.

**9.**   This scope of remediation is necessary even in homes with "mixed" drywall, where

Chinese and non-reactive drywall may be found, because the sulfur gases disburse and circulate

creating a generally corrosive environment and, moreover, there is no reliable or practicable

method for selective identification and removal of Chinese drywall in mixed homes.  *Germano*

FOFCOL at 27-40.  Large Florida homebuilders with extensive experience in Chinese drywall

remediation have determined that removal of all drywall in affected homes is efficient and cost-

effective, and that attempted selective identification and removal of CDW is neither efficient nor

cost-effective.  *Id.* at 31.

**10.** It is both economical and practical to remove all the wiring while the drywall is removed,

rather than removing only some of the wiring at the time of remediation and then risk later

having to tear down the drywall again in the event that additional wiring exposed to the sulfur

gases is harmed or fails.  Additionally, the low-voltage wiring supporting life and safety devices

such as fire alarms and smoke detectors should be removed and replaced because of the low cost

of replacement when compared with the high risk of injury or death if these devices are not

functioning properly.  *Id.* at 39.

**11.** Copper pipes and HVAC units must be replaced.  It is more cost-effective and less time

consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall

properties as opposed to attempting to "clean" the corrosion off copper components and HVAC

ductwork.  *Id.* at 39-46.

**12.** The evidence shows that carpeting must be replaced because attempting to remove and

store the carpet during the remediation is not cost-effective.  Similarly, hardwood or vinyl

flooring must be replaced because dust generated during the remediation process will intrude into the cracks and crevices of the flooring. However, tile flooring may be properly protected during the remediation process, and if this can be done, the Court finds that it does not need to be removed and replaced. *Id.* at 49-50.

**13.** Similarly, it is more cost-effective to replace cabinets, countertops, trim, crown molding, baseboards, bathroom fixtures, and insulation than attempt exacting removal, storage and subsequent re-installation. *Id.* at 51-53.

**14.** In order to eliminate the tremendous amount of dust produced from removal of the drywall, and to eliminate the offensive odor of the Chinese drywall, properties need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be used to remove the fine drywall dust and other particles. Additionally, properties should be wet-wiped or power washed to eradicate any remaining particles. *Id.* at 53.

**15.** Following the deconstructing phase of the remediation process, the properties will need to be inspected by an independent and qualified engineering company. This is important for insurance, resale potential, and peace of mind for the present occupants. The independent and qualified engineering company should provide a letter or report indicating that the remediation has been correctly performed. *Id.* at 53-54.

**16.** The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders Beazer Homes and Lennar Homes. National builders Beazer and Lennar have also independently assessed the need for complete remediation through scientific evidence, practical cost considerations, and hands-on experience with the problem. Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, the evidence does not support the

feasibility of such an option. The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the property owner. *Id.* at 54.

**17.** Thus, in sum, the appropriate scope of remediation includes: removal and disposal of all damaged and affected building components in the properties, replacement of all drywall, replacement of entire HVAC assembly, replacement of entire electrical system (including receptacles and switches), replacement of all copper and silver plumbing and electrical switches, replacement of all items that are likely to be damaged during demolition (i.e., cabinets, trim and baseboards), replacement of items that are ultimately more efficient to replace than restore, such as carpet and flooring, a complete cleaning of the premises, and confirmation from an independent and qualified engineering company to confirm the quality and completeness of the cleanup and provide the necessary assurances for insurance, resale potential and peace of mind for the affected property owners. As mentioned, the scope of remediation is supported by the testimony of the experts and confirmed by the remediation of over 2,200 homes carried out in the Knauf Settlement Program.

## IV. LIABILITY FOR EXPOSURE IN CLASS PLAINTIFFS' PROPERTY

**18.** The *Germano* FOFCOL resolved a multitude of factual and legal issues including the scope of remediation and the right to recover remediation damages. The Class Certification FOFCOL essentially adopted the *Germano* ruling regarding liability and causation. The Court adopts and incorporates herein the *Germano* and Class Certification Tools and emphasizes its prior holding that Taishan and its affiliates are liable to the Class Plaintiffs.

17

**19.** The Court already has found the Taishan Defendants in default.  The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). Additionally, the Taishan affiliates have also been held in default with respect to the proceedings in *Wiltz*, *Gross*, and *Amorin*.  On February 1, 2011, BNBM, BNBM Group, CNBM, and CNBM Group were held in default in the *Gross* proceedings.  (R. Doc. 7302).  These same entities were again held in default in *Gross* on August 7, 2012 (*i.e.*, as to the omnibus interventions complaint that was filed in *Gross*). (R. Doc. 15687).  On February 24, 2011, BNBM was held in default in the *Wiltz* proceedings. (R. Doc. 7735). On July 1, 2014, Taishan, TTP, and CNBM were held in default with respect to the *Amorin* case originally filed in this Court (Case No. 2:11-cv-1395) (R. Doc. 17814). Pursuant to this same Order, Taishan and TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11-cv-1672).  *Id.* Also on July 1, 2014, Taishan, TTP, BNBM, CNBM, and CNBM Group were held in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11-cv-1673) (R. Doc. 17815).  (R. Docs. 7735, 17814, 17815).  Moreover, the Court already determined that the Defendants' liability was conceded by their default.  Class Certification FOFCOL at 31.

**20.** Given that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default, there is no contributory negligence, and this Court already entered a liability judgment, the only issue currently pending before the Court is the amount of damages which should be awarded to the Plaintiffs in order to accomplish the necessary remediation.

## V.    EVIDENCE AT THE JUNE 9, 2015 DAMAGES HEARING

**21.** As discussed *supra*, in September of 2014, the Court conducted a certification and liability phase of this MDL, finding the Defendants liable and certifying a class of real property

owners asserting claims for remediated damages arising from or related to the Chinese drywall manufactured, sold, distributed, supplied, marketed, inspected, imported, or delivered by the Defendants and their affiliates. On June 9, 2015, this Court held an evidentiary hearing to deal with the second phase of the Chinese drywall litigation: damages. The purpose of the hearing was, simply, to determine how much the Defendants and their affiliates owe the class to remediate their homes due to the damages caused by toxic, corrosive Chinese drywall. The Plaintiffs called two witnesses—Jacob Woody and George Inglis—to present their formulaic class-wide damages approach. In response, the Defendants called two witnesses—David Pogorolich and Dr. M. Laurentis Marais—to demonstrate that the Plaintiffs' formulaic approach fails to provide a reasonable estimate of remediation costs.

**22.** First, Plaintiffs called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer has served, and continues to serve, as a settlement administrator for various settlements that have been entered into in these consolidated proceedings, including the Knauf remediation class settlement and the Global, Banner, and INEX ("GBI") Class Settlements. Tr. at 26:1-17. In connection with the settlements, BrownGreer has amassed a database containing square footage and other information regarding properties that have been the subject of claims in this litigation, including many of the properties that the PSC sought to include in the class. Tr. at 39:12-22.

**23.** BrownGreer utilizes a quality assurance protocol in the work it does as a claims administrator. 18:21-22. The QA protocol includes processes to review both the eligibility of claims as well as the allocation of payment to eligible clams. 19:1-9. In the course of its claims administration activity, BrownGreer allows audits by any party on request, and would have

19

allowed Taishan to request such an audit had it chosen to be, and remain, an active litigant in the MDL as claims were being submitted and verified. Tr. at 19:10-20.

24. Mr. Woody testified that, at all pertinent times, BrownGreer has endeavored to provide the best available claims information to all parties, has remained mindful of its Court-appointed position in this case, and has taken no interest in which party prevails in the class damages hearing. Tr. at 102:08-17.

25. In October 2014, at the request of the PSC, Mr. Woody oversaw a project to provide information regarding square footage of class properties as well as, to a lesser extent, to provide information regarding product identification. Tr. 39-41; 47-50.

26. BrownGreer used three sources of information to verify the square footage of class members' properties: (1) BrownGreer's prior GBI review process; (2) public sources such as tax appraisals, property ownership records and official government websites; and, if those two sources were unavailable, (3) square foot data from the Court-approved Plaintiff Profile Forms (PTO 11, R. Doc. 168-1). Tr. 44-47. The form specifies that it is to be completed under oath and signed under penalty of perjury, requires identification of the manufacturer of the Chinese drywall found on the property, and requests the amount of square footage for the property. It further allows for claimants to supplement information on an ongoing basis, permitting attachments such as photographs, inspection reports, etc. Tr. at 22:7-23:23. According to Mr. Woody, BrownGreer would not have relied solely on the square footage data from the Plaintiff Profile Forms in connection with the Knauf or GBI settlements. Tr. at 44:25-47:11; 71:24-72:9.

27. With regards to product identification, BrownGreer utilized both a Court-approved photograph catalog (PTO 10, R. Doc. 171) and a Court-approved "Drywall Indicia Guide" (PTO

27, R. Doc. 17060) in order to identify the types of drywall and the manufacturers of drywall associated with the properties on the class list. Tr. at 23:23-25:4; 34:15-19; 47:12-49:19.

**28.** Relying on photographic evidence and inspection reports, Mr. Woody was able to verify that 1,285 properties on the original class list of approximately 3,700 class members had Taishan drywall. As to the remaining 2,449 properties on the original class list, the only proof that Taishan or Chinese drywall was used in the claimants' properties was the claimants' statements on the Plaintiff Profile Forms. Tr. 55:23-56:10; 100:14-101:1. Mr. Woody did not undertake, and has not yet been asked to undertake, a review of attachments to the Plaintiff Profile Forms. Tr. 49:24-51:16. If and when BrownGreer determined that a property contained 100% Knauf drywall, not Taishan drywall, those properties were removed from the class list. Tr. 76-79.

**29.** Mr. Woody acknowledged that information on Plaintiff Profile Forms was not always reliable and, absent verifiable supporting evidence, such as photographs or inspection reports, he did not regard a statement on a profile form as sufficient evidence of product identification. Tr. 75.

**30.** In any allocation process to follow the Court's aggregation or assessment of class-wide remediation damages, Mr. Woody confirmed that BrownGreer would be able to use its existing systems and protocols to verify Plaintiff Profile Form statements identifying the presence and amount of Taishan drywall for a given property. Tr. 51:23-52:3. None of the changes to the list of properties for this first phase of damages proofs—the calculation of class-wide remediation damages—changed the class definition, but rather only refined it, by decreasing the number of properties, the list of properties that is the subject of remediation damages proof during this initial phase. Tr. 64:11-65:2.

31. At Defendants' request following their re-appearance in the litigation, Mr. Woody provided Knauf remediation data which, initially, included both remediation and move-in/move-out payments. Tr. 29:19-30:4. Following a second request from Defendants, Mr. Woody modified the Knauf remediation payment data to include only remediation data and not move-in/move-out payments. The Knauf Settlement remediation payments recorded by BrownGreer and provided to Defendants exclude the following cost items:

> Any delay payments made due to problems with Knauf remediation;
> (1) Still-open remediation properties (a total of 655 as of the time the information was provided by BrownGreer);
> (2) Insurance premiums for subcontractor or drywall disposal activities;
> (3) Both pre- and post-remediation inspection (including Xactimite and bid proposals) costs;
> (4) Certified Industrial Hygienist/Environmental charges for inspection and testing (clearance) remediation of a property, which is required in every case if remediation by Knauf;
> (5) "Economies of scale" associated with the Knauf use of Moss as a single, general contractor for the remediation settlement; and
> (6) Remediation administration/oversight fees and costs for Moss' services as general contractor. Tr. at 59:4-61:23; 62:17-19.

Thus, the average cost of $65.16 per square foot for the Knauf remediation under this calculation method does not reflect remediation-related costs for general contractor oversight, certified industrial hygienist (CIH) charges, inspection costs, or insurance premiums. Tr. at 98:4-11.

32. Second, Plaintiffs called George J. Inglis. Mr. Inglis is a Professional Engineer and Senior Project Consultant with Berman and Wright Architecture, Engineering, and Planning ("Berman & Wright"). He has 40 years of experience in project and construction management, building diagnostics, building forensics and remediation of building defect damages. 103:25-104:6.

**33.** After joining Berman & Wright's predecessor (Buric) in 2010, Mr. Inglis performed forensic engineering services to identify construction deficiencies and compliance with building codes, design documents, and manufacturers' specifications. He determined cause and effect relationships that resulted in damage to residential, multifamily, industrial, and commercial buildings, including damages such as water intrusion, mold, structural repairs, roofing repairs and replacement, and costs to remediate homes constructed with reactive Chinese drywall. Additionally, he has identified possible sources of defects that lead to water intrusion and/or mold problems and has worked with buildings in post-Hurricane Katrina and post-Hurricane Wilma settings to determine specific causes of damages and related cost estimations. 103:25-106:16.

**34.** Mr. Inglis' professional engineering engagements also include multi-state building defect cases, including the assessment and remediation of damages caused by synthetic stucco on buildings across several states. 105:17-106:7.

**35.** Mr. Inglis and his firm have widespread general experience estimating cost of repair damages and utilizing RS Means, which is a generally accepted method of calculating building costs. Specifically, they have been assessing construction estimates for remediating Chinese drywall properties since 2009. 106:8-107:5. In fact, they were instrumental in determining the appropriate scope and costs of remediating the Chinese drywall properties in *Germano*. 107:17-110:3. They continued their work on a variety of Chinese drywall properties across several states into 2015, establishing the scope of remediation for these properties and estimating the costs of remediation. 112:6-19; 157:8-18.

**36.** Mr. Inglis determined the remediation damages for each of the properties with verified under air square footage based on the following factors:

23

- A uniform and well-defined scope of work necessary to eliminate the harm and remediate the damage that is caused by Chinese drywall to the interior of each property;
- An established cost on a per-square-foot basis converted to present value;
- A measure of the under air space to remediated;
- Consideration of local factors related to building labor and materials

**37.** As this Court earlier determined and Mr. Inglis confirms, there is a well-established and defined scope of work necessary to fully remediate a Chinese drywall property. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Tr. at 157:8-158:5; 159:21-160:1. This well-established evidence-based and field-tested scope of work for remediating a Chinese drywall property requires that the interior of the home be stripped to the studs (with all wiring, plumbing, fixtures, cabinets, HVAC systems and insulation removed), cleaned by wet-wipe and HEPA vacuum, and examined and tested by an independent entity before the property is brought back to its originally intended condition. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34. This scope of work was established based on long-term observation of properties with Chinese drywall (including sampling and testing), scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of national builders, and electric and building codes). *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Tr. at 106:8-110:3. The scope of work is the same regardless of the type of building or the location of the property. The only difference is the square footage of the contaminated area of the building.

**38.** Mr. Inglis' determination regarding remediation damages for each property begins with a benchmark figure of $86 per square foot to remediate a property. This $86 figure was developed in 2010 using data from the *Germano* properties. In 2010 in the *Germano* litigation, Berman & Wright established that the cost of remediating the seven *Germano* homes was $86 per square foot. This figure was based on two competitive bids for the appropriate scope of work i.e., total

remediation, with a pricing cross-check developed through R.S. Means, which has been recognized by this Court to be a standard textbook and reference tool for building construction estimation. *Germano* FOFCOL at 57-86; 110:14-23. 111:7-24. Over the following years of experience with many Chinese drywall properties in several states, Mr. Inglis and his firm Berman & Wright have found that $86 per square foot is a reliable measure of the costs on a square foot basis for a full scope remediation of Chinese drywall properties, when adjusted for location and time. 111:23-112:3, 113:23-114:19, 116:21-117:3, 163:22-:24, 165:22-166:1, 166:16-117:17.

**39.** Using the widely-recognized R.S. Means, Mr. Inglis adjusted the $86 per square foot cost to reflect the then-current-day building materials and labor costs. 119:8-11. Thereafter, he generated a national square foot unit price by adjusting for the local building labor and material costs for Norfolk, Virginia where all of the *Germano* properties were located. *Id.* In making both of these adjustments, Mr. Inglis used data from R.S. Means to adjust for local material and labor costs listed by zip code. *Id.*

**40.** Initially, Mr. Inglis computed his estimations incorrectly because of a local cost factor error in the online R.S. Means tool he used. However, Mr. Inglis discovered this error and corrected it prior to the hearing. 120:14-123:10.

**41.** Defendants raised concerns that Mr. Inglis did not consider whether each property was in an urban, suburban or rural setting. However, the Court is satisfied that the use of R.S. Means data, a standard cost reference used by professionals in the field, keyed to the zip code of each property sufficiently and reliably accounts for location factors in the individual and aggregate damages estimate. 159:19-24, 170:20-171:2.

**42.** Finally, Mr. Inglis added 6% of the remediation costs to the national square foot unit price to pay for the pre- and post-remediation inspection, sampling, testing and certification of the homes. 110:21-23.

**43.** The final, national square foot unit price with CIH costs included is $105.91. However, this is reduced by the local building costs factors in nearly every state in which class properties exist. (R. Doc. 19197 at 37).

**44.** This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

**45.** Mr. Inglis' estimate applies to each of the Taishan properties, regardless of whether they have been remediated by the Taishan Property Owners in the past or are yet to be remediated. Each Taishan Property Owner is entitled to a sum that would pay for a proper, full remediation.

**46.** Following the testimony by the Plaintiffs' experts, Defendants called two experts. The Defendants' experts do not have building damage and cost of repair experience comparable to that of Mr. Inglis. First, Defendants called David Pogorolich as their first damages rebuttal expert at the hearing. Mr. Pogorilich is a Director in the Construction Practice at Navigant Consulting. He was qualified and accepted by the Court as an expert in the field of construction cost estimating and project management for construction sites.

**47.** However, Mr. Pogorolich's experience with Chinese drywall is limited to only five homes in Florida for which he assisted an insurance adjustor. He has no experience with establishing or implementing the remediation protocol for Chinese drywall homes, which were already being remediated when he was retained. 207:4-19; 210:11-213:24. While Mr.

Pogorolich agrees with the Plaintiffs that the drywall must come out of the home, he supports a remediation approach where each home is inspected and a project specific location estimate is developed for each home. 189:8-20. According to Mr. Pogorolich, "the only way to prepare a reasonable estimate for a particular house is to visit the house, look at the layout, look at the qualitative and quantitative issues, [and] look at the fit and finish." 189:14-18. However, this approach is impractical and ill-advised given the number of homes needing remediation and the more than six-year wait already endured by the homeowners. To deal with tragedy on a case-by-case or home-by-home basis where liability has already been established would result in decades of delay and would vary with the passing of time.

**48.** Additionally, the task of stripping a property to the studs and rebuilding does not present the same variability in costs as does an entirely new construction (*i.e.*, building a new house). 161:125-162:9. With Chinese drywall remediation, the bulk of the costs is in nearly uniform demolition of the drywall and replacement of standard building materials – differences in finish from home to home add little variability to the total damages estimate. *Id.*

**49.** Thus, the hypothetical problem posed by Mr. Pogorolich at the damages hearing when he compared two equally sized properties with very different lay-outs is not a problem; it is a routine aspect of damage estimation. Such variations, to the extent they exist in some outlier homes, present minimal cost variation in the final total remediation damages estimate. Defendants' Exhibit 34; 195:22-196:19. Most of the Taishan properties are typical single family homes—like the *Germano* homes—where variations in trim and standard appliances will ultimately make no significant difference in the cost of repair. 125:3-22. Furthermore, the potential risk of any minimal cost variation is greatly outweighed by the fact that the alternative—individually inspecting each home to determine a project specific estimate—is both

27

inefficient and unjust given the number of Plaintiffs who are still awaiting resolution of their claims where liability has already been established.

**50.** Second, Defendants called Dr. M. Laurentius Marais as their second damages rebuttal expert at the hearing. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc., specializing in applied mathematical and statistical analysis, including statistical extrapolations based on sampling and calculation of damages.

**51.** This Court held earlier that Dr. Marais is not qualified to address the Court regarding building damage or remediation estimation methodology, but may only offer, to the extent relevant, testimony about raw statistics. (R. Doc. 19092 at 4) ("There is no basis for him to provide expert testimony regarding methods or scope of remediation or accuracy of square footage cost data.").

**52.** Dr. Marais is an expert in statistical science and statistical sampling. 231:14-20. Dr. Marias testified that Mr. Inglis' damages methodology is an extrapolation in that it attempts to determine, based on information obtained from a sample of properties, conclusions about the large group of properties that comprise the class. 234:4-23. According to Dr. Marais, Mr. Inglis' methodology does not comport with well-established principles for obtaining statistically and scientifically valid extrapolations from samples, and, therefore, cannot be relied upon to estimate class-wide damages or damages for individual class members. 233:4-238:1.

**53.** The Plaintiffs' expert, Mr. Inglis, however, testified that he did not rely on statistical sampling in reaching his opinions. 156:14-25. While he did calculate averages in forming his opinion, his opinion was grounded in his extensive professional experience evaluating the cost of repair for Chinese drywall buildings and extensive historical scope of work and cost of repair

data. 116-116; 156-157. Like any engineer, he made use of basic statistics but his estimates relied on professional experience, not statistical science. 156:17-158:11.

**54.** The statistical opinion of Dr. Marais does not alter this Court's conclusion regarding the adequacy of Plaintiffs' formulaic damages calculation. In forming his opinion, Dr. Marais neither relied on (nor was he qualified as an expert to opine on) the Court's Finding of Facts and Conclusions of Law in *Germano* and *Hernandez* regarding the scope of work or costs or repair to remediate Chinese drywall homes. 278:17-25; 280:6-10. Dr. Marais offered no statistical sampling alternative utilizing historical data of remediation activities.

**55.** Given the unique circumstances surrounding Chinese drywall and the absence of efficient and appropriate alternatives, a formulaic method used to calculate remediation damages is fair and reasonable. Mr. Inglis' estimation of remediation costs—rather than a series of individual inspections and individual mini-trial estimates—spares the Taishan Property Owners from the costs and further delay of individual inspections, which may cost thousands of dollars per person, take several months or years to complete and, most likely, will not lead to a more precise estimate than the ones provided by Mr. Inglis.[1]

**56.** That said, there will have to be a claims process, similar to that utilized in the Knauf settlement, to ensure that properties contained Taishan-manufactured Chinese drywall and to verify the under-air square footage. BrownGreer will be tasked with establishing and implementing this process. Such a process will ensure that damages are accurately allocated to each individual class member.

---

[1] Estimations, even when they are competitive bids performed by a builder personally inspecting the property, are still merely estimations. As the American Association of Profession Estimators notes in a leading treatise, variations even among several competitive bids can reach up to 30% with an average of a 17% difference. "If general contractors, bidding with the same documents, can't get closer than a 15-20% spread, it is unrealistic to guarantee an estimate to be within a specific, small percentage." Defendants' Exhibit 7 at p. 77.

## VI.    CONCLUSIONS OF LAW

### A.    Nature of the Proceedings Under Rule 55

**57.** This Court has (1) already found the Taishan Defendants in default pursuant to Fed. R. Civ. P. 55(a) and (2) already determined in its *Class Certification* FOFCOL that the Defendants' liability has been conceded by their default. *See Class Certification* FOFCOL at 31. As a result of Defendants' default, the defectiveness and the corrosive effect of Chinese drywall were resolved in favor of Class Members. Even the Defendants' experts agree that the drywall is defective and needs to be removed. Thus, the only issue before the Court is the amount of damages which should be awarded to the Class for property remediation.

**58.** Since Defendants are in default and this Court already entered a liability judgment, Rule 55(b)(2) governs the procedure for determining the amount of damages. Pursuant to Rule 55(b)(2), the Court may conduct hearings to determine the amount of damages. Although the Rule does not mandate such a hearing, this Court determined that a damages hearing was appropriate under the circumstances to determine a damages calculation. *James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993).

**59.** The June 9, 2015, Damages Hearing was the first hearing of what will be multiple hearings that the Court will hold in order to assess the full amount of damages owed to class members. On June 9, 2015, the Court considered only remediation damages for current owners. Other damages, such as alternative living expenses, bodily injury, foreclosure, and/or lost rent, may be considered at other proceedings in this Court or other Courts where appropriate. The Court divided the hearings into phases because it is the most fair and efficient way to assess damages in this complex litigation. As discussed further below, remediation damages in this unique Chinese Drywall MDL can be calculated on an aggregated formulaic basis and, thus, it is in the best interest of all parties to consider remediation damages together in the first stage of the

damages proceedings. This approach will also allow the prompt remediation of homes so they can be re-inhabited comfortably and safely.

**60.** It is well-established in this Circuit that this Court may divide hearings regarding damages into phases, particularly in complex cases where, as here, such a division would serve judicial efficiency by separating common issues from individual ones. *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir.) *cert. denied sub nom. BP Expl. & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754, 190 L. Ed. 2d 641 (2014) ("[P]redominance may be ensured in a mass accident case when a district court performs a sufficiently 'rigorous analysis' of the means by which common and individual issues will be divided and tried. In many circuits, this has been accomplished by means of multi-phase trials under Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination."); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir. 1992) *on reh'g*, 53 F.3d 663 (5th Cir. 1994) (affirming and "express[ing] [its] admiration" for the district court's trial plan, which included three damages phases and allowed the district court to adjudicate common class issues in the first phase and alter adjudicate individualized issues in later phases, despite due process challenge).

**61.** Further, this Court finds that the Class Notice and Supplemental Class Notice issued on September 26, 2014, and December 30, 2014, (*see* R. Doc. 18231-1 at 4) were sufficient under Rules 23(c)(2) and 23(d)(2) to inform class members about the nature of the litigation, the class claims, and their legal rights. *See* (R. Doc. 18998). Although Plaintiffs made certain changes to their damages model leading up to the June 9, 2015, hearing, these changes did not alter the sufficiency of the class notices. *Id.* at 4-5. The Class definition has remained the same and there

is no precedent to suggest that changes to a damages model require supplemental class notice. *Id.* at 5.

**62.** While the default judgment conclusively establishes liability, it is not conclusive of the class damages for remediation costs which Plaintiffs seek. Liability and damages require separate and equally "rigorous analysis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). The June 9, 2015, damages hearing provided the opportunity for the Court to engage in such rigorous analysis and determine that, given the uniqueness of the instant action, the Plaintiffs have presented a reasonable and reliable method of calculating remediation damages on a class-wide basis and have accommodated individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

### B. Chinese Drywall – A Unique Class Action

**63**. Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 396 (7th Cir. 2014) (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("Under Rule 23, district courts are permitted to 'devise imaginative solutions to problems created by the presence in a class action litigation of individual damage issues.'"). In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence.

**64**. With regards to the Taishan drywall in this case, in contrast to these typical class actions, there is no issue of either liability or causation. The fact that each Taishan property owner suffered the same harm to their property and the same type of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong.

Here, Taishan has been held liable for defective Chinese drywall, and any properties containing Chinese drywall are defective, requiring the removal of the Chinese drywall. As mentioned above, even the Defendants agree that the drywall is defective and must be removed and the property remediated. Thus, the only variation is the *extent* of the damages suffered based on the square footage of the involved property. *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("'Even wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.'") (quoting *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003)). This variation can be uniformly recognized by a square footage analysis established using a representative statistical sample. Indeed, recently, the Supreme Court held that, under certain circumstances, statistical evidence may be used to make class-wide determinations depending on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) (citing *Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011). A comparison of this class action to other more typical types of class actions is useful to demonstrate why a formulaic statistical method for calculating damages is appropriate in this case, even though it may not be appropriate under other circumstances.

### 1.     Asbestos

**65**. Asbestos class actions generally involve vast disparities among not only the degree of injury, but also the type of injury. In contrast to asbestos, the level of exposure to Chinese drywall in this case is immaterial because the class is not asserting personal injury claims, but rather property damage claims. No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it, which inevitably involves time and expense. As a result, Chinese drywall damages cannot be easily analogized to asbestos

33

damages.

66. In asbestos cases, plaintiffs share the common fact that they have all been exposed to asbestos at some point; however, the resultant health effects often vary dramatically and warrant individual adjudication to determine damages. Asbestos exposure does not guarantee illness, and even if sickness does occur, the degree of injury among plaintiffs varies according to the diversity of class members' characteristics, including their preexisting physical conditions, their health habits, the type and duration of the exposure, the severity and nature of the resulting diseases, the type of treatments received, etc. The variations among plaintiffs' injuries resulting from asbestos also preclude calculation of damages by formula because some individuals become more seriously ill than others. Additionally, the stakes for the defendants are relatively high in asbestos cases, rendering individual adjudication more appropriate than class action.[2]

67. In *Amchem Products, Inc. v. Windsor*, the Supreme Court considered certification of a class for settlement that included some individuals who had been exposed to asbestos and had become ill, and others that had been exposed but had yet to manifest any injuries. 521 U.S. 591 (1997). The Court held that the class failed to satisfy Rule 23's predominance and adequacy-of-

---

[2] Plaintiffs seeking compensation for property damage do not stand to recover nearly as much as plaintiffs would in actions for wrongful death, and accordingly have less incentive to litigate individually. *See Bevrotte v. Caesars Entm't Corp.*, No. 11-543, 2011 WL 4634174 at *5 (E.D. La. Oct. 4, 2011). Defendant BNBM's reliance on *McLaughlin v. Am. Tobacco Co.* for the proposition that a court should not estimate gross damages for the class and then adjust the total amount later on when processing individual claims is misplaced: whereas the plaintiffs bringing civil fraud claims against tobacco companies in *McLaughlin* proposed "an aggregate determination [that was] likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants," in this case, Plaintiffs' class damages proposal does not appear to compensate potential claimants who had not actually been affected by the presence of Chinese drywall. 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). The Second Circuit in *McLaughlin* was concerned that claimants who had perhaps never relied upon the defendants' misrepresentations about cigarettes or whose reliance was not the proximate cause of each individual's loss might still be allowed to recover despite not having a viable fraud claim, a circumstance distinguishable from the instant case where no proof of individual reliance on any representation is required. *Id.* at 231. Moreover, the *McLaughlin* plaintiffs had proposed disposing of the residue through a cy pres distribution rather than returning any overpayment to the defendants, which further increased the risk of overpayment in the aggregate. *Id.* at 232. However, the Second Circuit even acknowledged that "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Id.* at 231.

representation requirements because the class members' shared experience of asbestos exposure was outweighed by the variety of questions that pertained to the various subclasses and individual members. For example, some of the plaintiffs had been exposed but had experienced no symptoms at all and, even among those experiencing health problems, the degree of health issues were diverse.[3]  *Id.* at 626–28.

**68**.  Defendants cite to other asbestos cases such as *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) and *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the claim that Fifth Circuit law does not permit the assessment of tort damages derived from extrapolation formulas using averaged results from prior cases.  However, both asbestos-related cases are distinguishable from the present case, which only involves property damage.

**69**.  In *In re Fibreboard Corp.*, the Fifth Circuit reluctantly vacated a trial plan in mass tort litigation involving the claims of 3,031 plaintiffs asserting asbestos-related injuries. 893 F.2d 706 (5th Cir. 1990).  The phase of the trial plan at issue called for a jury to ascertain damages for the entire class on the basis of a trial of the specific claims of eleven class representatives, together with evidence the parties presented about the claims of thirty illustrative plaintiffs, and the testimony of experts about damages to the entire class. The Fifth Circuit blocked the proposed plan because it failed to require each claimant to prove both causation and damages, as required by Texas law, and because it asked the jury to ascertain damages for a group of

---

[3] The Supreme Court was also concerned that the notice might be insufficient to justify the preclusion of almost every class member from pursuing future litigation:  "Even if they appreciate the significance of [the] notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether" to participate in the class settlement.  *Id*. at 628.  Here, the *Amchem* Court's concern about sufficiency of notice to potential asbestos claimants is less relevant because the damages arising from Chinese drywall are not dependent on slowly-developing symptoms of illness that perhaps may be undiscoverable during a long latency period.  Another factor distinguishing the Chinese drywall class from *Amchem* is that the class representatives in the matter currently before this Court possess the same interest and had suffered the same injuries as the other class members.

claimants who suffered widely divergent injuries on the basis of a statistical profile. *Id.* at 710-711.

70. In *Cimino*, which involved the same asbestos cases from *Fibreboard*, the same plaintiffs proposed a new plan that contemplated trying 160 sample cases and then awarding the remaining 2,128 plaintiffs "an amount of actual damages equal to the average of the awards made in the sample cases." 151 F.3d at 319. The Court held that the damages plan "plainly contravenes *Fibreboard*'s holding" and "permit[ing] recoverable tort damages to be determined in a lump sum for the entire class" is simply contrary to *Fibreboard*. *Id.* at 319. As described *supra*, the focus in *Fibreboard* was not the number of sample cases; rather, it was the fact that "[i]n Texas, it is a fundamental principle of traditional products liability law that the plaintiffs must prove that the defendant supplied the product which caused the injury" and the fact that there were such great disparities among the class members. 893 F.2d at 710-711.

71. Specifically, the so-called "class" of plaintiffs in *In re Fibreboard* and *Cimino* consists of persons with different occupations, different exposure periods, who were claiming different diseases. *Id.* at 710. Additionally, the plaintiffs' admissions of fact in those cases show the following additional disparities among class members: (a) the class includes persons who do not have legal claims against one defendant; (b) one or more members of the class may be barred from prosecuting claims against one defendant by virtue of their prior employment with that defendant; (c) the severity and type of physical and mental injuries varies among class members; (d) the nature and type of damages varies among class members; (e) not all of the plaintiffs were injured by the acts or omissions, conduct, or fault of all of the defendants; (f) the dates of exposure to asbestos-containing products varies among class members; (g) the types of products to which class members were exposed varies among class members; and (h) the dates that class

members knew or should have known of their exposure to asbestos-containing products is not identical among class members. *Id.*

**72**.  The instant drywall action is highly distinguishable from *In re Fibreboard* because the Plaintiffs' characteristics in MDL 2047 cannot be described as particularly diverse and there is no issue relating to causation of injury.  All of the Plaintiffs in MDL 2047 have the same complaint; they own properties requiring remediation as a result of defective drywall.  There is no variation with regard to the severity and type of injury or the nature and type of the damages.  All Plaintiffs[4] are entitled to total remediation of their homes.  The duration of exposure or quantity of drywall installed does not change the nature of damages, and the solution to their problems (remediation) is identical in every instance.  Here, unlike most asbestos cases, including *In re Fibreboard*, (and unlike other similar circumstances, such as exposure to second-hand smoke), plaintiffs' property damages in the Chinese drywall class do not vary according to duration or intensity of exposure or resulting health effects that would require individual minitrials to ascertain the origins of the damages.[5]

---

[4] When this Court refers to the Plaintiffs, it is not referring to the Plaintiffs listed on the Class Spreadsheet presented at the June 9, 2015, hearing, which the Court is aware has been subsequently modified.  Rather, the Court is referring to those claimants who are able to adequately prove that the property they own contains Taishan/TTP drywall.

[5] Notably, both *Fibreboard* and *Cimino* rely on due process and Article III concerns relating to the fact that the assessment of tort damages is ultimately grounded in state tort law.  However, these concerns stemmed primarily and specifically from the fact that there was no trial determination regarding causation. *Cimino*, 151 F.3d at 319.  Under Texas law, the Seventh Amendment gives the right to a jury trial to make a causation determination.  In *Cimino*, there was no such trial determination made, and no jury determined, that exposure to [Defendant's] products was a cause of the asbestos disease of any of the 160 sample plaintiffs.  Since there was no causation determination regarding the sample plaintiffs, there could be no causation determination extrapolated to the remaining 2,128 plaintiffs.  For these remaining cases, there was also no trial and no jury determination that any individual plaintiff suffered an asbestos-related disease.  Predictably, the lack of causation determination renders any damages determination "likewise fatally defective." *Id.* at 319-320.  With regard to the instant MDL, which related to drywall, not asbestos, there has been a conclusive determination regarding causation.  Chinese drywall causes offending odors in homes and is corrosive to metals, requiring total property remediation.  The Article III and due process concerns present in the aforementioned cases are no present in MDL 2047.  Accordingly, this Court rejects Defendants' suggestion that it is ignoring its *Erie* obligation under Article III to "remain faithful" to the applicable law of each state in these diversity cases by accepting Plaintiffs' proposed formulaic damages plan.  *See Fibreboard*, 893 F.2d at 711.  Given that liability and the scope of remediation have been conclusively determined, awarding

## 2. Mass Accidents

**73**. The Advisory Committee commentary discussing the predominance requirement in FRCP 23(b)(3) specifically mentions mass accident victims as the type of class that would typically not meet the requirement, because the individual interests of each injured plaintiff would be too disparate and therefore better managed in individual adjudications. *See* Fed. R. Civ. P. 23 advisory committee's note to the 1966 amendments. However, as the Supreme Court noted in *Amchem*, "the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number." 521 U.S. 591, 625 (1997); *accord. Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that "it is theoretically possible to satisfy the predominance and superiority requirements of Rule 23(b)(3) in a mass tort or mass accident class action, a proposition this court has already accepted.").

**74**. Unlike asbestos cases where the exposure occurs over long periods of time, mass tort cases frequently arise following a single incident. Despite resulting from a single occurrence, most mass tort class actions are complicated, even if liability is established, because the issue of causation is inextricably intertwined with damages and remains to be litigated. For example, in *Robertson v. Monsanto Co.*, the Fifth Circuit found that class certification was inappropriate when the defendant was liable for an ammonia gas release at its plant, but the plaintiffs had highly individualized determinations regarding both causation and damages for mental distress, physical injuries, property damage, economic injuries, medical expenses, etc. 287 Fed. Appx. 354, 361-62 (5th Cir. 2008). In particular, the *Monsanto* plaintiffs were seeking damages for emotional distress and other intangible injuries, which are impossible to calculate using a

---

solely remediation damages to claimants whose homes require remediation due to the presence of Taishan drywall does not present a conflict with the *Erie* doctrine.

formula because they "implicate[] the subjective differences of each plaintiff's circumstances [and] cannot be calculated by objective standards." [6] *Id.* at 362 (quoting *Steering Comm.*, 461 F.3d at 602); *but see Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006) (finding presence of claims for personal injury and mental anguish damages did not undermine a finding of predominance when they did not form a significant portion of the plaintiffs' claims).

75. As with asbestos cases, damages resulting from mass accidents can be highly individualized because they involve such factors as "location, exposure, dose, susceptibility to illness, nature of symptoms, type and cost of medical treatment, and subsequent impact of illnesses on individuals." *Steering Comm.*, 461 F.3d at 602. The damages resulting from the oil spill at issue in *In re Deepwater Horizon*, for example, varied drastically depending on multiple "individual questions." 739 F.3d 790, 815 (5th Cir. 2014). In *Deepwater Horizon*, these questions presumably included disparities such as proximity to the oil spill, the type of claimant (whether a business or a property owner), and the amount of oil taken in, etc. *See also Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 553 (5th Cir. 2011) (remanding class certification to the district court for further consideration of whether the predominance requirement was met when plaintiffs exposed to petroleum coke dust from a nearby refinery "sought a variety of damages, including personal injury, fear, anguish, discomfort, inconvenience, pain and suffering, emotional distress, psychiatric and psychological damages, evacuation, economic damages, and property damages").

76. In contrast to mass tort plaintiffs complaining of personal injuries, the Chinese drywall plaintiffs' property damage claims vary only according to the cost of remediation based

---

[6] Another important distinguishing factor was that the *Monsanto* class consisted entirely of named plaintiffs, eliminating some of the usual benefits of class actions such as identification and notification of potential unnamed class members as well as issuance of a single binding judgment in order to foreclose indefinite, repetitive litigation. 287 Fed. Appx. at 363.

on the under-air square footage of the contaminated property and are therefore subject to formulaic calculation by objective standards.   In the instant case, the class experienced class-wide damages directly tied to liability: the need to replace the defective drywall.  This injury is common to every class member, with the only difference being how much drywall each class member had to replace and how much the contractor charged in order to perform the work.  This case is thus more analogous to *Turner v. Murphy Oil USA, Inc.*, in which a class action was brought against an oil company when plaintiffs suffered property damage as a result of an oil storage tank spill.  234 F.R.D. at 601.  This court found that the class negligence claims would not require extensive individualized proof that would preclude class treatment:

> Defendant has argued that Plaintiffs' claims for personal injury and mental anguish do not meet the predominance requirement because certain factual elements of their claims will require individualized inquiry—when the plaintiff first learned of the oil spill, what preventative measures were taken to avoid personal injury, and what pre-existing health and mental conditions existed for each plaintiff. While some individualized inquiry will be required, the Court does not believe that this inquiry will be extensive.

*Id*. at 607 n.6.  This court reasoned that "[t]he presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary."  *Id*. at 607.  Similarly, in this case, individualized trials are not necessary to determine either liability or the existence or nature of damages.  The defective drywall was found in the walls of each property, and there is no real variation as to the type of claimant since all of the Claimants are property owners.  The only variation among Claimants is the cost of remediation as determined by the under-square footage of the contaminated property.  For those few property owners who feel that their properties are unique and not similar other class members may opt out and have their properties individually inspected and then evaluated by a jury.

### 3. Antitrust

**77**. Antitrust class actions are also distinct from the instant action alleging property damage. Antitrust injuries are often speculative: but for the defendant's conduct, the market might have been more competitive, entry for new producers may have been easier, or prices hypothetically would have been lower. *See Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294, 297 (5th Cir. 2003) (recognizing that because "the nature of an antitrust claim means that 'some plaintiffs can only hypothesize about what the state of their affairs would have been absent the wrong,'" antitrust plaintiffs are not held "to the same burden of proof of damages as demanded of plaintiffs in other civil cases") (internal citation omitted) (quoting *H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978)). Antitrust injuries can be difficult to measure when they arise from multiple theories of liability or when the variegated nature of the plaintiffs affected makes an individualized damages determination more appropriate. In the instant matter, these types of problems observed with calculating damages resulting from antitrust injuries are not present: the injury is not speculative, and but for the production and installation of defective drywall, the plaintiffs would not have been required to remediate their properties.

**78**. For example, a divided Supreme Court in *Comcast Corp. v. Behrend* reversed a class certification in an action against a cable television company allegedly engaging in anticompetitive conduct because the plaintiffs could not demonstrate that "damages [were] capable of measurement on a classwide basis." 133 S. Ct. 1426, 1433 (2013). The plaintiffs in *Comcast* included some who "*may* have been overcharged because of petitioners' alleged elimination of satellite competition," others who "*may* have paid elevated prices because of petitioners' increased bargaining power vis-à-vis content providers ," and others who "*may* have paid rates produced by the combined effects of multiple forms of alleged antitrust harm." *Id*. at 1434 (emphasis added). Unlike the supra-competitive prices imposed upon consumers in

*Comcast*, which were potentially attributable to multiple other causes besides the defendant's specific anticompetitive conduct at issue, the property damages in this matter related to defective drywall are susceptible of estimation without raising similar questions of liability.[7] *Id.* at 1434.

**79**. Even when causation is clear, antitrust violations can cause drastically different levels of injury depending on the specific circumstances of various class members, such that determining injuries such as lost profits or lost labor productivity can be significantly more fact-intensive than the straightforward and uniform property damages at issue in this case. For example, in *Bell Atl. Corp. v. AT&T Corp.,* a class of businesses sued a telecommunications company under the Clayton Act, alleging that the defendant attempted to monopolize the "caller ID" market and, as a result, the service was unavailable to some users during the class period. 339 F.3d at 297. The plaintiffs' proposed formula used a nationwide average for labor costs and a national average for the amount of time that class members would have saved per telephone call had the caller ID service been available on long-distance calls during the class period. *Id.* at 304. However, the Fifth Circuit affirmed the district court's denial of class certification on the grounds that the individualized nature of the damages precluded certification when "[t]he record indicate[d] that rather than merely examining lost time and average labor costs, any adequate estimation of actual damages suffered would require consideration of the variegated nature of the businesses included in both the proposed classes, together with the range of uses, depending on the size and technological sophistication of any given business, to which caller ID could be applied." *Id.* Moreover, the plaintiffs in *Bell Atlantic* failed to demonstrate that the absence of

---

[7] In *In re Deepwater Horizon*, the Fifth Circuit observed that *Comcast's* holding that "a district court errs by premising its Rule 23(b)(3) decision on a formula for classwide measurement of damages whenever the damages measured by that formula are incompatible with the class action's theory of liability" is "simply inapplicable" in cases that do not involve numerous common issues of liability. 739 F.3d at 815. *Comcast* is distinguishable from this case because there is only one theory of liability: that the defendants manufactured and distributed defective drywall.

caller ID would have had any noticeable effect at all on some of the businesses in the proposed class.[8] *Id.* The circumstances in *Bell Atlantic* in which class members could have been compensated who had not even incurred *any* damages whatsoever are therefore distinguishable from the present case where the proposed class does not contain any individual who did not possess Chinese drywall.

### C. Aggregate Damages are Superior to an Individualized Alternative

#### 1. Plaintiffs Use an Appropriate Formula to Calculate Remediation Damages

80. $86 per square foot, which is evidence based, is a reliable benchmark estimate for the costs of remediation. The remediation costs take into account the uniform scope of the repair for each class member, the *limited* nature of repair (interiors only), and the use of well-established mid-points as the baseline for each damages estimate before considering individualized square footage and local building cost factors. Given these considerations, the degree of variability of square footage costs for remediation of these homes is typical of what is expected in the discipline of damages estimation, and is not significant when viewed in relation to the total costs of repair. Even the Defendants' suggestion—house by house inspection by a contractor—is not likely to lead to a more precise estimate, given the acknowledged variation of at least 17% in that method of estimation recognized by the estimation textbook authorities. Defendants Exhibit 7 at pg. 77. Considering this, pursuing the alternative is not only unreasonable and inefficient, it is also unjust in light of the continued suffering of the Plaintiffs.

---

[8] For example, some of the businesses potentially for inclusion in the proposed classes utilized telephone systems that were incompatible with the defendant's caller ID service, such that it would have been impossible for those businesses to have ever used the service even if the defendant had not engaged in the alleged conduct. *Id.* at 305-06.

**81**.  Plaintiffs' expert relied on multi-disciplinary corrosion science (as discussed at length in the Court's earlier FOFCOLs in *Germano* and *Hernandez*, particularly when defining the scope of work for remediation), in conjunction with bid-pricing, unit pricing, square footage pricing, and localized construction cost factors, to establish the damages formula.  While his formula stemmed from average calculations of the *Germano* properties, it was grounded in the relevant science and historical cost data.  Mr. Inglis used well-established estimation methods in arriving at the base $86 per square foot measure, and then used RS Means to adjust this sum to current building material and labor costs and then to reflect the local building and material costs for each Taishan property.  RS Means provides reliable data for such a calculation.  *Germano* FOFCOL at p. 58 ("RS Means is a well-recognized and accepted publication which compiles national data on a national basis for cost to repair and replace building components.").

### 2.  Fifth Circuit Law Does Not Bar Plaintiffs' Damages Proposal

**82**.  The Fifth Circuit has explained that a formula-based calculation of class damages is appropriate in circumstances where individual trials are not required, particularly when the damages portion of the suit can be severed from the liability inquiry:

> Even wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate, and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.  Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate.

*Bell Atlantic*, 339 F.3d at 306 (internal citation omitted).  *See also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (aggregating class damages by a formulaic calculation is acceptable in circumstances where individualized damage calculations are not required); *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 354-55 (5th Cir. 2005) (recognizing that damages which are "capable by means of objective standards" are permissible

so long as there exists a "suitable formula for calculation of damages"). This standard is met by Mr. Inglis' damages methodology, which is a formulaic calculation of class wide damages based on objective standards and verifiable data for each property.

> Nonetheless, the Fifth Circuit has also held:

> > [B]efore a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected. Typically, such a finding must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole.

*In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1020 (5th Cir. 1997). Defendants argue that the Court, bound by the holding in *Chevron*, must reject the Plaintiffs' request for an award of aggregate damages based on the Inglis method because his damages calculation stems from the $86 per square foot estimate from the seven *Germano* properties. In the abstract, this is a compelling argument. However, given the *sui generis* nature of this Chinese Drywall litigation, *Chevron*, like most of the cases cited by Defendants is distinguishable.

**83**. In *Chevron*, plaintiffs asserted tort claims for industrial pollution of a residential subdivision, claiming that hazardous substances that were improperly stored by defendants' in defendants' waste pits migrated into the environment causing personal injury and property damage. *Id.* at 1017. The trial plan invalidated by the Fifth Circuit "provided for a unitary trial on the issues of 'general liability or causation' on behalf of the remaining plaintiffs, as well as the individual causation and damage issues of the selected plaintiffs, and ordered the selection of a bellwether group of thirty (30) claimants, fifteen (15) to be chosen by the plaintiffs and fifteen (15) to be chosen by Chevron." *Id.* at 1017. The goal of the trial in *Chevron* "was to determine

its liability, or lack thereof, in a single trial and to establish bellwether verdicts to which the remaining claims could be matched for settlement purposes." *Id.*

84. In rejecting the plan, the Fifth Circuit was particularly concerned that the district court's trial plan was "devoid of safeguards designed to ensure that the claims against Chevron of the non-represented plaintiffs as they relate to liability or causation are determined in a proceeding that is reasonably calculated to reflect the results that would be obtained if those claims were actually tried." *Id.* at 1020. Instead, the court found the procedure created potential liability to 3,000 plaintiffs "by a procedure that is completely lacking in the minimal level of reliability necessary for the imposition of such liability." *Id.* The court focused its concern on the fact that a nonrepresentative bellwether sample group would be tasked with "answer[ing] troubling causation or liability issues" for the entire universe of plaintiffs and "the lack of fundamental fairness contained in a system that permits the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs." *Id.* at 1019, 1021.

85. In the instant case, claims will not be extinguished nor will liability be imposed on the basis of Mr. Inglis' methodology. Mr. Inglis' calculations are not an answer to causation or liability issues. Causation and liability have been conclusively established. Additionally, these concerns regarding the potential unrepresentativeness of plaintiffs are understandably alarming in a case like *Chevron* where there are so many variables. In *Chevron* (as in the asbestos-related cases), liability, causation, and damages may vary significantly according to the diversity of the class members' characteristics, including their preexisting physical conditions, their health habits, the type and duration of the exposure to the hazardous substance, the severity and nature of the resulting diseases, the type of treatments received, etc. In contrast to *Chevron*, duration of

exposure to Chinese drywall is immaterial. No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it. The use of data from the *Germano* homes does not present the same problems as the use of bellwethers in *Chevron* would have presented. The limited diversity among properties in the instant matter is not comparable to that of the personal injury and property damage claims in *Chevron*. Moreover, there is no dispute as to liability or causation in the present case. The Defendants are liable and the Chinese drywall caused the damage to the properties and it has to be removed.

### 3. Aggregate Damages are Favorable Given the Limited Variation Present in Chinese Drywall Litigation

**86**. District courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman*, 606 F.3d 391, 391 (7th Cir. 2014). Plaintiffs have devised a reasonable and reliable solution to calculate remediation damages on a class-wide basis and accommodate individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

**87**. Under the circumstances of this case and given the *sui generis* nature of Chinese Drywall, the Plaintiffs' proposal to calculate remediation damages is not "clearly inadequate," and a formulaic approach is superior to the thousands of individual proceedings that would result if Defendants' proposal for property by property inspection and estimation were accepted. The costly and wasteful individualized mini-trials that would result from Defendants' proposal would further burden the Taishan property owners and further delay the benefits they can hope to receive from this litigation. This Court has already ruled that damages may be calculated in a formulaic manner. *Class Certification* FOFCOL at 11-12 ("[T]he average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis.").

**88**. The Court does not deny that there is some variation, but concludes that the time,

expense, and inefficiency of inspecting every affected property would result in an inequitable

solution, given the delay these property owners have already experienced in obtaining relief. As

evidenced by Mr. Pogorolich's testimony, many properties will have varying remediation costs

based on factors such as ceiling height, number of partitions, and quality of interior finishes.

However, the variations among damages in this case are so relatively minor that the damages are

susceptible to being calculated by a formula.[9]

89. As discussed *supra*, the class remediation damages here do not present significant

individualized issues, in contrast to physical ailments and loss of business profits. Rather, the

only variance is in the amount required to pay for each remediation, which can be determined

using a formulaic methodology. Unlike asbestos and mass accident cases, the damage issues

presented in Chinese Drywall litigation are so distinct from questions of liability and causation

(questions which have already been answered in favor of the Plaintiffs), it is proper and just to

award aggregate damages. Mr. Inglis' formula, which calculates remediation damages based on

square footage for each of the Taishan properties with verified under air square footage, is

superior to the thousands of individual proceedings which would result if Defendants' proposal

for property by property inspection and estimation were accepted. Defendants' alternative

amounts to cruel and unusual treatment of innocent homeowners. To now require individuals

who have been displaced for more than six years to pursue individual claims and incur individual

---

[9] Defendants assert that Plaintiffs' formula for calculating damages is inadequate because it relies on "averages." (Rec. Doc. 18879 at 12). In support of their argument, they cite *Corley v. Orangefield Indep. Sch. Dist.*, in which the court reversed a class certification on the grounds that "the injur[ies] to the landowners varie[d] in substantial ways, depending on the value, character and location of the property." 152 F. App'x 350, 355 (5th Cir. 2005). However, *Corley* did not involve property damage, but rather involved unauthorized transmissions of voice, data and video communications across private land by telecommunications companies. The reason that the damages were so varied in *Corley* was because some parcels "might be situated in a geographic 'choke point' such that a telecom company would be forced go many miles out of its way if that parcel proved unavailable." *Id.* at 354. Defective drywall does not involve such drastic variations in damages.

costs in a case where liability and fault have been established is not only an imposition on the courts, but also and more importantly, a serious injustice to those who have been harmed by the Defendants' actions.

90. Each class member suffered the same kind of damage, and the only individualized determination required—the amount it will cost to remediate the properties—can be calculated using a formula to estimate the amount of each class member's damages. It is therefore unnecessary and unjust to hold individual mini-trials to determine remediation damages in this case. The damages calculation need not be exact. *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (ruling that damages estimates are appropriate even where "they cannot be measured . . . with exactness and precision . . .").

91. The fact that each Taishan property owner suffered the same harm and the same nature of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong. *See supra* Section VI (B). The class remediation damages here do not present significant individualized issues, like physical ailments and loss of business profits. *Id.* Rather, the only variance is in the amount required to pay for each remediation, which can be readily determined using the formulaic methodology presented by Mr. Inglis in accordance with the following protocol.

## VII. CONCLUSION

92. Plaintiffs have offered a reasonable and reliable measure (superior to any alternative) of the remediation damages for the Taishan Properties with verified under air living square footage. The Court adopts Mr. Inglis' damages *methodology* to quantify the aggregate damages.

93. To implement this remediation process:

**IT IS ORDERED** that the Plaintiffs Steering Committee, under the supervision of BrownGreer, submit an updated Class Plaintiffs' Spreadsheet endeavoring to include only

Taishan properties with verified under air living square footage. Any costs associated with Brown Greer's assistance in revising the Class Plaintiffs' Spreadsheet are to be borne by the Defendants.

**IT IS FURTHER ORDERED** that the revised Class Plaintiffs' Spreadsheet, on which the Court will rely to determine the aggregate total of these remediation damages, be submitted to the Court within two months of this Order. Taishan will then be permitted to review and contest or seek set-offs.

The damages awarded will be calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91[10] *as adjusted* by the RS Means location factor. Ultimately, all such claims will be based on verifications, not only of the under air living space square footage of the contaminated property, but also the presence of Taishan Drywall in those properties.

The relevant case law supports the appropriateness and reliability of the Inglis remediation damages methodology presented at the June 9, 2015 hearing. Therefore, the Court finds the Inglis remediation damages methodology to be a reliable, fair and reasonable estimate of aggregate remediation damages. The final determination of these damages shall be made pursuant to the subsequent set-offs and claims proceedings.

This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

---

[10] This figure is the national square foot unit price with certified industrial hygienist (CIH) costs included and was calculated by Mr. Inglis using R.S. Means to adjust the $86 per square foot cost to reflect current-day building materials and labor.

The alternative to estimating property damages on a class-wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages.  The Taishan Property Owners will still have an opportunity at later phases to seek damages for alternative living expenses and loss of use and enjoyment of their properties.

New Orleans, Louisiana this 21st day of April, 2017.

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED       MDL NO. 2047
DRYWALL PRODUCTS LIABILITY       SECTION: L
LITIGATION

_____

THIS DOCUMENT RELATES TO:       JUDGE ELDON FALLON
      MAG. JUDGE NORTH

*Eduardo and Carmen Amorin, et al. v. Taishan*
*Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin*
*Co., Ltd., et al.,* 2:11-cv-1395-EEF-MBN

_____

**PLAINTIFFS' PRE-HEARING POSITION ON ASSESSMENT OF DAMAGES**
**PURSUANT TO FRCP 55(b) FOR**
**PLAINTIFF JOHN ANDREW CARTER AND PLAINTIFFS GENE & DARLA GIBBS**

This Court instructed the parties to provide their respective positions on damages related

to the claims of Plaintiff John Andrew Carter and Plaintiffs Gene and Darla Gibbs in the above-

styled action prior to the hearing scheduled for March 31, 2021, at 9:00 am CST. Plaintiffs offer

their respective positions as follows:

**BACKGROUND**

The Plaintiffs in this proceeding, John Andrew Carter and Gene & Darla Gibbs, opted out

of the class action settlement that was certified by the district court on January 10, 2020. These

Plaintiffs both filed their claims in an "*Amorin*" civil action in 2012. The posture of the *Amorin*

actions prior to the class certification was the entry of default against the Taishan defendants.

The default entered by Judge Fallon in the Taishan "*Amorin*" group of cases applied to those

actions filed between 2009 and 2012. The reason for the default was due to Defendants' actions

in the pending litigation.  Defendants terminated their counsel and refused to participate in the active litigation for approximately eighteen months. The current counsel for the Taishan Defendants were engaged subsequent to the entry of default and have been representing their clients' interests since that time.

The class action settlement reached in 2019 and certified in January 2020 does not lift the entry of default by the district court against the Defendants. The entry of default is still applicable; thus, the assessment of damages through this Rule 55(b) hearing must now be undertaken to give Plaintiffs their long-awaited finality in this litigation.

This Court has chosen to undertake an evidentiary hearing on damages which will include both the submission of written evidence and live witness testimony.  This Court has the benefit of several orders previously issued by Judge Fallon following trials in MDL-2047 on individual damages, including two lengthy orders specifically applicable to the Taishan Defendants.  Plaintiffs overarching position with regard to this hearing and assessment of Plaintiffs' damages is that this Court should follow the previous Findings of Fact & Conclusions of Law, because they are directly on point.

## ARGUMENT

This court has been directed to provide recommendations to the district court regarding Plaintiffs' damages.  FRCP Rule 55(b)(2) grants this Court broad discretion in its process to ultimately assess all damages for individual claims following the entry of default.  At this point in the litigation, following an entry of default, this Court can accept the allegations in the complaint as true.  And, nothing in the record suggests that the allegations in the complaint are anything other than well plead.  "A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." *Wooten v. McDonald Transit*

*Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015); citing *Nishimatsu,*515 F.2d at 1206 (citing *Thomson v. Wooster,*114 U.S. 104, 113, 5 S.Ct. 788, 29 L.Ed. 105 (1885)). Put another way, "[t]he defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.*  Thus, this court is now asked to review the complaint, confirm product identification, consider the evidence and calculate the appropriate damages.

Plaintiffs will offer an inspection report by an experienced Chinese drywall inspector that will confirm the presence of Defendants' product in the living space of the two homes.   The identification of the markings and attribution to Defendants is not in dispute with regard to either home.  The Chinese drywall inspections performed by Shawn Macomber of Healthy Home Solutions, LLC confirms the presence of Defendants' product in the living space of each home. (See Exhibits 1 & 2). The markings on the drywall are clear and attribution has been acknowledged by Defendants multiple times during the pendency of this litigation.  Plaintiffs will offer Defendants' Product ID and Attribution document (Exhibit 3) that establishes Defendants as the manufacturer of the drywall at issue here.  With the drywall Product ID and attribution established, this Court can shift to the calculation of damages caused by the defective product in Plaintiff's homes.

The district court has ruled that the defective nature of Defendants' products is "undisputed."  See Doc. 20741 at 13.  And, because Plaintiffs have established the presence of Defendants' defective product in the living space of their homes, remediation and other damages are appropriate under the applicable law.  In this instance, both Plaintiff Carter's and Plaintiffs Gibbs' homes are situation in the State of Alabama; thus, the applicable law in this instance is the law of Alabama.  In *Casrell v. Altec Indistries*, the Alabama Supreme Court found as follows:

> Under the "extended manufacturer's liability doctrine," we opine that a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a *matter of law.* As Dean Wade suggests, we hold scienter is supplied as a matter of law, and there is no need to prove its existence as a matter of fact. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing a product on the market causing personal injury or property damage, when used to its intended purpose. As long as there is a causal relationship between the defendant's conduct and the defective product, he is held liable because he has created an unreasonable risk of harm.

*Casrell v. Altec Industries, Inc.*, 335 So. 2d 128, 132 (Ala. 1976)

Alabama law allows for the recovery of direct property damages and consequential damages that stem from the use of the defective product.  The categories of damages allowable under Alabama law that this court will be asked to consider are: 1) cost of remediation; 2) personal property damage; 3) recurring alternative living expenses; 4) non-recuring alternative living expenses; 5) pretrial repair costs; 6) post-trial repair costs; 7) lost rental income; 8) loss of use/ loss of enjoyment; 9) attorney's fees and expenses.   All categories have been directly addressed by the district court in past Chinese drywall verdicts.  For instance, in a Findings of Fact and Conclusions of Law ruling following the *Hernandez v. Knauf Gips KG* verdict in 2010 (Doc. 2713), Judge Fallon evaluated and assessed the appropriate damages for the plaintiffs in that Chinese drywall action.   In the conclusion of that ruling, six classes of damages were calculated.  Also, a finding was made that attorney's fees are appropriate under La. Civ. Code art. 2545 (Doc. 2713 at Pg. 47).

The district court also ruled on similar categories of damages in *Germano, et al. v. Taishan Gypsum Co., Ltd., et al*.   Following the *Germano* decision, a Findings of Fact & Conclusions of Law ruling was issued by Judge Fallon (Doc. 2380).   There, all categories of

damages, including loss of use/ loss of enjoyment were calculated and assessed against the Taishan Defendants. (See Doc. 2380 at Pgs. 106-108).

Judge Fallon also issued a Findings of Fact & Conclusions of Law order related to a 2015 class damages hearing (Doc. 20741).  There, on Page 13, Judge Fallon declared the court's position regarding several aspects of damages in a section entitled: "General Findings on Chinese Drywall."   There, Judge Fallon provided the parties with detailed rulings regarding the full extent of remediation required for a home containing defective drywall.  At Page 30, Judge Fallon again contemplated the additional damages beyond remediation, finding that other damages include, "alternative living expenses, bodily injury, foreclosure, and/or lost rent, may be considered at other proceedings in this Court or other Courts where appropriate."   So, the evidence to be offered by Plaintiffs will demonstrate to this court that damages are appropriate in each category as follows:

A.      **Plaintiff John Andrew Carter Damages**

1. **Remediation Damages** – Plaintiff Carter will offer the remediation estimate by Shawn Macomber of Healthy Home Solutions, LLC which reflects a remediation cost of $145,159.34. (See Exhibit 4).  This estimate captures the full remediation cost as described by Judge Fallon in Doc. 20741.

2. Personal Property Damage – Plaintiff will offer evidence and testimony in support of $8,714.00 in personal property damages directly attributable to the defective Chinese drywall in his home.

3.  Recurring Alternative Living Expenses - $0.00

4.   Non-recurring Alternative Living Expenses – Plaintiff will offer an exhibit documenting an insurance premium for $131.04 and moving expenses to and from the home

totaling $896.00.  Therefore, the total non-recurring alternative living expenses attributable to the remediation process for the home is an amount of $1,027.04.

5.   Pre-remediation repair costs – Plaintiff's exhibit for pre-remediation home repair costs demonstrates a total of $5,337.00 incurred to date.

6.   Post-remediation repair costs – see remediation damages in item #1.  No other repair costs have been identified.

7.   Lost Rental Income –  $1,200.00 per month since January 2012, following the discovery of defective drywall in the home.  Plaintiff have not been able to rent the home, sell the home or use the home since the date of discovery on November 12, 2011.  Plaintiff had been renting the home to his elderly mother, but she was moved from the property soon after the discovery of defective drywall.  The monthly rental amount claimed herein is consistent with other properties in the area, including another property of similar size owned by Plaintiff.  The total lost rental income as of the date of this evidentiary hearing is $133,000.00.

8.   Loss of Use / Loss of Enjoyment – Plaintiff cannot live in this home, cannot sell the home, and cannot rent the home due to the presence of defective Chinese drywall.  Plaintiff filed his claim in 2012 and since that time the monthly mortgage was paid, insurance paid, and upkeep on the home was performed routinely.  It has been a financial burden to pay these expenses without any use of the property.  Judge Fallon has previously ruled in multiple Findings of Fact & Conclusions of Law in post-trial Chinese drywall cases that $25,000 per year is  fair and appropriate amount for loss of use and enjoyment of a property containing defective Chinese drywall.  *See Hernandez, Germano, Gross & Wiltz FOFCOLs.*  Plaintiffs request the adoption of the same amount for the period of ownership by Plaintiff.  The total for this category of damages is $337,500 as of the date of this evidentiary hearing.

9.     Attorneys' Fees & Expenses – Alabama Code §12-19-272 controls the award of statutory attorney's fees in civil actions as sanctions available in a default judgment.  *See, e.g., Salser v. K.I.W.I., S.A.*, 591 So.2d 454 (Ala.1991).  Plaintiffs will request reasonable attorneys' fees of 33% of the compensatory damages total.  In addition, Plaintiffs request payment by Defendants for the expense of the remediation estimate in the amount of $2,394.14 as reflected on the invoice provided to this Court.

B.     **Plaintiffs Gene & Darla Gibbs Damages**

1.     **Remediation Damages** – Plaintiff Carter will offer the remediation estimate by Shawn Macomber of Healthy Home Solutions, LLC which reflects a remediation cost of $176,123.41. (See Exhibit 5).  This estimate captures the full remediation cost as described by Judge Fallon in Doc. 20741.

2.     **Personal Property Damage**s – Plaintiffs will offer evidence of personal property damage in the amount of $4,322.00.

3.     **Recurring Alternative Living Expenses** – $0.00.  Plaintiffs have continued to live in this home for the entire pendency of this case; therefore, no pre-remediation alternative living expenses are requested.

4.     **Non-recurring Alternative Living Expenses** – Plaintiffs have received a quote from a local mover in the amount of $11,437.65 to move their belongings and store them for the duration of the remediation of their home.  In addition, Plaintiffs have been searching for an appropriate rental home in their area that will accept their pets as well.  Although the exhibit provided by one rental income is for a smaller home that does not accept pets, it is at least representative of the cost of a rental home in their area. Because the rental company only will accept a 12-month lease, the amount for the rental home would amount to $12,000.00.

Therefore, Plaintiffs position is that the alternative living expenses they will incur as a result of the remediation process is a minimum of $23,437.65.

5.    Pre-remediation repair costs – Plaintiffs will offer $9,006.61 in documented home repair costs that they allege are related to the defective Chinese drywall in their home.

6.    Post-remediation repair costs - see remediation damages in item #1.  No other repair costs have been identified.

7.    Lost Rental Income – $0.00.  Plaintiffs live in this home and have not used it as a rental property at any time.

8.    Loss of Use / Loss of Enjoyment – Plaintiffs cannot move from this home and cannot sell the home due to the presence of defective Chinese drywall.  Plaintiffs filed this claim in 2012 and since that time the monthly mortgage was paid, insurance paid, and upkeep on the home was performed routinely.  Plaintiffs will offer testimony that the effects of the defective drywall, namely the off-gassing, have made living in this home difficult both in terms of the recurring repairs and the health effects experienced by Plaintiffs and their family.  Judge Fallon has previously ruled in multiple Findings of Fact & Conclusions of Law in post-trial Chinese drywall cases that $25,000 per year is  fair and appropriate amount for loss of use and enjoyment of a property containing defective Chinese drywall.  *See Hernandez, Germano, Gross & Wiltz FOFCOLs.*  Plaintiffs request the adoption of the same amount for the period of ownership.  The total for this category of damages is $337,500 as of the date of this evidentiary hearing.

9.    Attorneys' Fees & Expenses – Alabama Code §12-19-272 controls the award of statutory attorney's fees in civil actions as sanctions available in a default judgment.  *See, e.g., Salser v. K.I.W.I., S.A.*, 591 So.2d 454 (Ala.1991).  Plaintiffs will request reasonable attorneys' fees of 33% of the compensatory damages total.  In addition, Plaintiffs request payment by

Defendants for the expense of the remediation estimate in the amount of $2,394.14 as reflected on the invoice provided to this Court.

## <u>CONCLUSION</u>

In conclusion, it is Plaintiff John Andrew Carter's position that damages in the amount of $839,908.89, inclusive of all damages plus attorneys' fees is appropriate in his case.  Plaintiffs Gene & Darla Gibbs' position is that damages in the amount of $734,412.40, inclusive of all damages plus attorneys' fees is appropriate.  Plaintiffs request a recommendation with an itemization of each category of damages to the district court following the evidentiary hearing.

/s/ *James V. Doyle, Jr.*

James V. Doyle, Jr.
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500
Fax: 844-638-5812
jimmy@doylefirm.com

*Attorney for Plaintiffs*

DATED: March 19, 2021.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Position Statement has been served on

Counsel for the Defendants via email on this 19th day of March, 2021.


/s/ *James V. Doyle, Jr.*

James V. Doyle, Jr.
DOYLE LAW FIRM, PC

# EXHIBIT C

MINUTE ENTRY
NORTH, M.J.
MARCH 31, 2021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED    MDL DOCKET NO. 2047
DRYWALL PRODUCTS LIABILITY
LITIGATION           SECTION:  "L"(5)

THIS DOCUMENT RELATES TO:

EDUARDO AND CARMEN AMORIN, ET AL.
individually and on behalf of other similarly
situated v. TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO.,
LTD., ET AL., 2:11-cv-01395-EEF-JCW

   The Court held a status conference and hearing on Defendant's objections to certain

exhibits listed by Plaintiffs to be used at the upcoming evidentiary hearing.

      PARTICIPATING:  Jimmy Doyle    Cindy Eikhoff
              Harry Rosenberg

   The Court sustains Taishan's untimeliness objection to the Carter and Gibbs

"Property Screening Reports" (Exhibits 1 and 2) and to the associated Xactimate estimates

for the Carter and Gibbs homes (Exhibits 4 and 5).  These documents were created and

produced well after the discovery deadline of February 5, 2021 established by the District

Judge.  (Rec. doc. 22976).  Moreover, because they can only be admissible at the evidentiary

hearing to help establish diminution of value of the Plaintiffs' homes (the sole measure of

damages to real property under Alabama law), these documents arguably should have been

produced when Plaintiffs completed their Supplemental Plaintiff Profile Forms.  *See*

*Leftwich v. Brewster*, 306 So. 2d 26 (Ala. 2020), *Birmingham Coal Coke Co., Inc. v. Johnson*, 10

MJSTAR(00:45)

So. 3d 993, 998 (Ala. 2008), *Poffenbarger v. Merit Energy Co.*, 972 So.2d 792 (Ala. 2007).  As the Court explained at the hearing, it is loath to require Plaintiffs to attempt to prove diminution of value of their homes against a defaulted defendant with no evidence other than their testimony.  Accordingly, the Court directed that the parties make every attempt to agree on an appraiser to conduct an appraisal of the Carter and Gibbs homes to determine their respective fair market values today, with Chinese Drywall still in those homes.  Those appraisals should be conducted no later than April 20, 2021.  Immediately upon completion, the parties shall contact the Court for an update status conference, at which time the Court will schedule the evidentiary hearing to be held as expeditiously as possible.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED          *     Docket No. 2047
DRYWALL PRODUCTS LIABILITY           *
LITIGATION                           *
                                     *
                                     *
This Document Relates to:            *     March 31, 2021
                                     *
                                     *
                                     *
EDUARDO AND CARMEN AMORIN,           *
ET AL                                *
                                     *     Section L
                                     *

*************************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE STATUS CONFERENCE
BEFORE THE HONORABLE MICHAEL NORTH,
UNITED STATES MAGISTRATE JUDGE.**

*************************************************************************

**APPEARANCES**:

For the Plaintiffs:              Doyle Law Firm
                                 BY: JAMES V. DOYLE
                                 2100 Southbridge Pkway, Ste. 650
                                 Birmingham, AL  35209


For the Defendants:              Alston & Byrd
                                 BY: CHRISTINA HULL EIKHOFF
                                 1201 W. Peachtree St., Ste. 4900
                                 Atlanta, GA  30309-3424


**REPORTED BY**:       Mary V. Thompson, RMR, FCRR
                       500 Poydras Street, Room 275
                       New Orleans, Louisiana  70130
                       (504)589-7783

**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

1

2

3        THE COURT:  Good morning, everyone.

4        MR. DOYLE:  Morning, Judge.

5        MS. EIKHOFF:  Good morning.

6        MR. ROSENBERG:  Morning.

7        THE COURT:  Well, obviously y'all saw my minute entry.

8   We're not going to go forward today with an evidentiary hearing

9   because I don't think we're ready to do that.

10       The defendants asked for an evidentiary hearing, and I

11  granted one, and then I got objections to basically all the

12  evidence that the plaintiffs want to put in the record, so that's

13  what I've been trying to deal with leading up to today.  I have

14  some things I want to talk to y'all about on these objections,

15  recoverable damages and whatnot, and then we're going to figure

16  out where we go from here.

17       So I want to talk about the measure of damages for

18  damages to real property under Alabama law.

19       MR. DOYLE:  Which one first, Your Honor?

20       THE COURT:  Well, I'll tell you in a minute.

21       The cases that I've reviewed -- and most of them have

22  been cited by both parties.  My view of the law, based on my

23  review of those cases, is that the only measure of damages

24  available for damage to real property under Alabama law is

25  diminution of value, but that evidence regarding cost of repairs

*00:00:04* (line 5)
*00:00:18* (line 10)
*00:00:37* (line 15)
*00:00:57* (line 20)
*00:01:20* (line 25)

**OFFICIAL TRANSCRIPT**

1   or remediation can be admissible in some cases to establish

2   diminution of value.  That is my reading of the cases.

3          Do you-all agree or disagree with that?

4          I'll ask plaintiffs' counsel first.

*00:01:41*  5          MR. DOYLE:  Your Honor, I disagree.

6          The case that we cited yesterday that followed

7   *Poffenbarger*, the *Birmingham Coal* case, I believe specifically

8   addressed that, under Alabama law, you don't necessarily have to

9   make a -- you know, offer any opinion on diminution of value, but

*00:02:06*  10  you can't exceed the value of the property if there's property

11  damage.

12          Alabama follows -- the private nuisance law follows

13  trespass, a line of cases in trespass.  And when you have a

14  trespass and there's actual damage to the property, you can

*00:02:21*  15  recover it.  And it can be up to the value of the property.  So

16  diminution is something that the Court -- the Alabama Supreme

17  Court addressed in *Poffenbarger* where the damages claim exceeded

18  the value of the property.

19          Here we know what the value of the property is.  They

*00:02:36*  20  bought the property, had a home built, and then Chinese drywall

21  is in it.  We know actually what the value of the property is.

22  The cost of fixing it is -- you know, in each case can be

23  evaluated for that.  I mean, it's that simple.

24          So the diminution in value --

*00:02:54*  25          THE COURT:  At the end of the day, what I'm trying to

**OFFICIAL TRANSCRIPT**

1   determine is the diminution of value of the property.  That's the

2   measure of damages.

3           MR. DOYLE:  That's right.

4           THE COURT:  Well, that's what I said.

00:03:04

5           MR. DOYLE:  But it's the terminology that the

6   defendants are relying upon, the actual diminution of value.  You

7   know, there's a line in the supplemental plaintiff profile form

8   they're using as their basis for trying to exclude everything.

9           You know, did the -- are the plaintiffs claiming actual

00:03:21

10  diminution of value?  No, they just want the property fixed.

11  They don't care about the value of the property being diminished;

12  they want it fixed.  And that's what they thought they were going

13  to get.  So that's where we are.

14          THE COURT:  Under what claim do I order them to fix the

00:03:34

15  property?

16          MR. DOYLE:  Private nuisance.

17          If you look at private nuisance and you look at

18  *Birmingham Coal*, it says you don't have to make any particular

19  opinion.  You don't have to offer expert testimony.  You don't

00:03:48

20  have to do anything.  As long as the damages don't exceed the

21  value of the property, you can recover under the trespass line of

22  cases in Alabama.  You don't necessarily have to have an opinion

23  on diminution of value.  You don't have to use the term

24  "diminution of value."  You just have to use the evaluation, the

00:04:04

25  value of the property versus what, you know, needs to be done to

**OFFICIAL TRANSCRIPT**

 1  fix it.

 2         THE COURT:  I'm not sure I agree that that's what

 3  *Birmingham Coal* says.

 4         MR. DOYLE:  Well, in the end, also, Your Honor, the --

 5  they did not explicitly waive.  They just offered no opinion in

 6  their supplemental plaintiff profile form.  There was never any

 7  pleading.  There was never any motion to clarify.  Nothing filed

 8  with the Court that acknowledges that they dismissed that

 9  particular claim.

10         What they said in their deposition was we've got

11  Chinese drywall and we want to get it fixed.  We can't do

12  anything until we do that.

13         So if under Alabama law you want to call that

14  diminution of value, fine, but they're not qualified to make that

15  type of evaluation.  They're just simply homeowners.  So if there

16  needs to be expert testimony, Alabama law needs to say that, and

17  it doesn't.  What it says is you just do this evaluation.  What's

18  the value of the property versus what the damages are and the

19  cost to fix the damages to the property under the trespass line

20  of cases.  So if we want to call that diminution of value, fine.

21         THE COURT:  Well, that's what Alabama law calls it.

22  That's what it's called in the cases that I'm reading.

23         MR. DOYLE:  Right.  But we didn't -- just because the

24  plaintiffs put down that they had zero diminution of value, they

25  don't know what the diminution of value was.  And it doesn't

*00:04:24*

*00:04:41*

*00:04:55*

*00:05:13*

*00:05:29*

**OFFICIAL TRANSCRIPT**

1  necessarily say that's the remediation costs.

2       THE COURT:  Let's get to another problem that the

3  defendants raise, since we're on this subject.

4       MR. DOYLE:  Okay.

00:05:40
5       THE COURT:  The evidence that you-all want the Court to

6  consider to establish the -- what the cost of repair is to get to

7  a number that is less than the value of the house -- right?

8       MR. DOYLE:  Right.

9       THE COURT:  -- wasn't created until March of this year.

00:06:02
10  That's a problem.  That's an evidentiary problem.

11       And that's why it's important for me, and for all of

12  us, to understand really what is the answer to the first question

13  I asked.  Because there's an untimeliness objection on those

14  documents, on the Xactimate and the pictures that are attached to

00:06:24
15  it.  I understand that objection because the -- those materials

16  weren't created until a few weeks ago.

17       MR. DOYLE:  Right.

18       THE COURT:  The supplemental form asks about diminution

19  of value and requires all documentation to support a claim for

00:06:40
20  diminution of value to be produced, and that did not happen.  And

21  if in fact where we are ultimately headed is proving a diminution

22  of value claim by virtue of these Xactimates, they're untimely.

23       I think that's a problem.

24       MR. DOYLE:  Your Honor, may I respond?

00:07:01
25       THE COURT:  Yes.

**OFFICIAL TRANSCRIPT**

1     MR. DOYLE:  There was another -- there was another

2  methodology that Judge Fallon devised and adopted in

3  Document 20741, if I'm not mistaken, that says use the RSMeans

4  value times the location factor times the under air square

5  footage, and we're going to use that in evaluating the cost of

6  remediation across the board.  That was adopted.  That was

7  utilized throughout the course of the MDL proceedings.  The

8  latest value on it was $119.74 times the location factor times

9  the under air square footage.  That was in place, but that's 2019

10  numbers.

11     The only reason that this was created was so that we

12  could get a quantification of the true cost of remediation right

13  now in today's dollars.

14     So we've already got that.  The Court has adopted the

15  formula and it's been in place.  The only reason that we did

16  anything here was so that the Court could have true up-to-date

17  numbers.

18     Xactimate is a -- I don't know how familiar you are

19  with it.  It's a program --

20     THE COURT:  I know all about Xactimate.  You don't have

21  to worry about that.

22     MR. DOYLE:  Okay.

23     But that's the alternative.  You know, the Court can

24  look back at it.  Look at the document that established what the

25  remediation damages should be.  What should be included, what

**OFFICIAL TRANSCRIPT**

1   should be excluded, and how you go about calculating remediation

2   damages that Judge Fallon said everybody who has Chinese drywall

3   in their home should recover -- should be able to recover.  It's

4   the true cost of remediation.  It's in there.

00:08:37

5          This exercise here is just a way for the Court to

6   understand what the quantification of those damages are.

7          THE COURT:  All right.  I want to address defense

8   counsel on something.

9          So if I go down the line on all of these objections

00:08:54

10   that you-all have made, I've got a defaulted defendant who is

11   basically telling me they owe zero dollars to two people who have

12   undisputed damage due to Chinese drywall in their homes, and that

13   to me is not an equitable outcome.

14          Is that in fact what you-all are suggesting should

00:09:14

15   happen?

16          MS. EIKHOFF:  No, Your Honor, not at all.  And we did

17   not object to all of the exhibits that were produced by the

18   plaintiffs.  In fact, we submitted our own exhibit that included

19   the build cost of the property and the fair market value of the

00:09:29

20   property according to the tax assessment.  Right now those are

21   the only documents in the record, and they came in without the

22   objection of the plaintiffs as to the actual value of the

23   property.

24          The problem with the remediation damages -- setting

00:09:49

25   aside the untimeliness issue, which I can address separately, but

**OFFICIAL TRANSCRIPT**

1   the problem with leaving in these outside remediation estimates

2   that are higher than the build cost, higher than the fair market

3   value, is that, under Alabama law, that violates the principle of

4   exceeding the diminution in property value.

*00:10:13*

5          Just last year, in 2020, the Alabama Supreme Court in

6   the *Leftwich* case, which we cited in our papers, upheld the

7   exclusion of remediation damages where it was clear that it

8   exceeded any possible diminution in property value.  That's the

9   most recent Alabama Supreme Court case of all in the record, and

*00:10:35*

10  we think that's what the Court would follow here.

11         Your Honor, it does not mean that they necessarily walk

12  away with zero, but it does exclude evidence that would lead to

13  damages that would violate Alabama law.

14         THE COURT:  Let me ask you-all about what I call

*00:10:59*

15  non-pecuniary damages, loss of use and enjoyment.  Under what

16  theory -- under which of these claims is that category of damages

17  awarded?

18         MS. EIKHOFF:  Your Honor, were you directing that to

19  defense counsel or plaintiffs?

*00:11:24*

20         THE COURT:  Yeah, Mr. Doyle -- no, no, no, I want to

21  hear that from the plaintiffs.

22         MR. DOYLE:  Your Honor, it could be under -- I would

23  have to do the research under Alabama law.  I haven't necessarily

24  looked at it recently.

*00:11:37*

25         But we've got these other claims; negligence,

**OFFICIAL TRANSCRIPT**

1  negligence per se, strict liability, and then breach of a

2  warranty, along with the private and unjust enrichment.  I'll be

3  happy to brief it.

4          THE COURT:  Let me ask it a different way.  You

00:11:54  5  suggested in your -- in the paper that I got yesterday that even

6  under -- you know, even under the tort doctrines in Alabama, I

7  think -- I can't remember the terminology that extends --

8          MR. DOYLE:  Zone of danger.

9          THE COURT:  Yeah.  That if the plaintiffs are in the

00:12:16  10  zone of danger, that they're entitled to recover certain types of

11  those damages.  And you suggested that they -- because they have

12  noxious drywall in their homes, that they're in a zone of danger.

13          What evidence am I going to hear that that's actually

14  true, that they are in danger because they have remained in a

00:12:35  15  house for a decade with Chinese drywall?

16          Because I don't see any of that in this -- in your

17  submission.

18          MR. DOYLE:  Well, it may not be in the documents.

19          You're going to hear the testimony from each of the

00:12:47  20  plaintiffs that, you know, they have a house that has these gases

21  that are being emitted that are noxious.  It won't allow them to

22  sell the house, it won't allow them to live in the house, and it

23  won't let them rent the house.

24          The Carters, once they figured out -- Mr. and

00:13:02  25  Mrs. Carter, they had their elderly mother living in this house.

**OFFICIAL TRANSCRIPT**

1    They find out they've got Chinese drywall and pulled her out.

2    They're not able to -- they said in their deposition they just

3    don't feel right about renting the house to anybody else while

4    this house is emitting noxious gases.  So for ten years now

00:13:19    5    roughly -- I don't know what the exact duration is -- they

6    haven't been able to do anything with this house.  They're stuck

7    with a Chinese drywall house that's unsellable and you can't live

8    in it, you can't rent it.

9           Now, the Gibbs, on the other hand, they've had to live

00:13:33    10    in it.  They're elderly retired military, both, and they don't

11    have another option.  They have to live in the house.  And so the

12    testimony they're going to provide is, listen, they live in the

13    house.  All they can do is open the windows and doors and stay

14    outside of the house as much as possible.  That's not using and

00:13:49    15    enjoying their property.

16           So in either case we've got the inability to truly

17    fully use the house by either party.

18           MS. EIKHOFF:  Your Honor, if I may respond to that?

19           THE COURT:  Sure.

00:14:00    20           MS. EIKHOFF:  What I just heard from Mr. Doyle was that

21    they are not enjoying their property the way that they want to,

22    and I appreciate this.  I don't doubt that that is true.

23           However, Alabama law has a very high standard for

24    actually awarding mental anguish damages in this situation.  And

00:14:23    25    the *Birmingham Coal & Coke* case was a situation where it was

**OFFICIAL TRANSCRIPT**

1  undisputed that because of the vibration of the nearby blasting

2  and the noise of the nearby blasting, they were not enjoying

3  living in their house.  But the Alabama Supreme Court reversed an

4  award of mental anguish damages because there was no evidentiary

00:14:42  5  proof that they were actually in a zone of danger which is

6  defined by the Alabama courts as actual, proven danger.  You see

7  a lot of cases that are about fires, you know, that actually, you

8  know, puts someone in a zone of danger.

9         There is no evidence that there was actual physical

00:15:04  10  danger to these people who have been living in the house for ten

11  years or so.  And we asked them in their deposition if they had

12  any evidence that they had health problems that were attributable

13  to Chinese drywall, and they said they had no medical proof of

14  that.

00:15:24  15         So, Your Honor, we think that, under Alabama law, the

16  mental anguish damages are precluded in this situation.

17         THE COURT:  Let me circle back to what -- to something

18  we had discussed a moment ago on diminution of value.

19         Mr. Doyle suggested that Judge Fallon had laid out a

00:15:49  20  formula to calculate diminution of value in Record

21  Document 20741, which is not one of the prior orders that's been

22  abrogated in this case.  What's the defendants' view as to using

23  whatever -- and I -- you know, there are only 20-something

24  thousand documents in this record, so y'all will have to excuse

00:16:15  25  me if I have not looked at that one, but I would like to know

**OFFICIAL TRANSCRIPT**

1   what the defendants' view is as to using that formula or claim

2   work in this case to try and determine the diminution of value

3   without respect to the Xactimates and the other information

4   that's been provided?

5   MS. EIKHOFF:  Your Honor, we did address this in our

6   pre-hearing brief that we submitted on the 19th because we

7   expected that the plaintiffs were going to rely on the formula to

8   establish damages.

9   The problem with that is that those were aggregate

10  class damages that were designed specifically to be applied to a

11  class of thousands.  And Judge Fallon, if you review his

12  decision, puts great weight on the difficulty of giving

13  individual remediation or other types of diminution estimates for

14  thousands of individual homeowners.

15  These two claims that are left opted out.  And by

16  opting out of the class settlement, they are no longer addressed

17  in a class.  The two do not make a class.  And therefore, when

18  they accepted the obligation of pursuing their claims as

19  individuals, they accepted the burden of proving their damages

20  individually.

21  That seems to be a development of proof that occurred

22  late to the plaintiff.  As we said, it was after the close of all

23  discovery.  It was -- actually, the Xactimates came in the day

24  that we had our status conference to discuss procedure, but -- so

25  it's too late.  But they could have and should have done

**OFFICIAL TRANSCRIPT**

1   something like that earlier if that's the route they wanted to

2   pursue.

3         THE COURT:  Well, that's --

4         MS. EIKHOFF:  And I'll just add one thing to what

*00:18:24*   5   Mr. Doyle said, that, well, he just wanted to get something up to

6   date.

7         Under Rule 26, an expert testimony -- an expert report

8   needs to be submitted 90 days before the hearing.  The case

9   management order said that this hearing needed to occur by

*00:18:42*   10   April 2nd, so 90 days before that would have been January 2nd.

11   That was before the close of discovery.

12         If we had gotten these reports on January 2nd, we would

13   have had plenty of time to depose the expert, to scrutinize the

14   report, and to potentially get a rebuttal expert if we needed to,

*00:19:02*   15   but it all came in so late.  We literally heard the name of this

16   guy for the first time seven hours after we had submitted our

17   pre-hearing.

18         THE COURT:  I agree with you.  I think the timing of

19   the creation and production of these documents is a serious

*00:19:18*   20   problem.  I agree with you.

21         But it also appears to me that the end result of those

22   activities and these Xactimates -- it would appear to me that the

23   numbers on those estimates would likely put this case -- or these

24   two cases right into that category of cases where the cost to

*00:19:45*   25   remediate exceeds the diminution of value of the property.

**OFFICIAL TRANSCRIPT**

1       So, I mean, we're going in circles as to how the
2  plaintiffs intend to prove diminution of value under Alabama law
3  in this case.
4       MR. DOYLE:  Your Honor, may I respond?
5       THE COURT:  Yes.
6       MR. DOYLE:  The document that I referenced -- the
7  characterization by opposing counsel I don't think is completely
8  accurate.  The fact that these folks opted out of the settlement
9  doesn't mean that all of the orders that have been generated by
10  Judge Fallon during the consolidated pretrial proceedings -- and
11  this is one of them --
12       THE COURT:  Okay.  Well, hold on.  Hold on.
13       MR. DOYLE:  -- would be applicable.
14       THE COURT:  Let me interrupt you.
15       A formula created by a district judge in a gigantic MDL
16  to calculate damages for thousands and thousands of claims is
17  highly unlikely to be probative when we are having an evidentiary
18  hearing that is specific to two claims where you've actually
19  given me -- albeit late-created, but you've given me actual
20  estimates.  There is no need to apply Judge Fallon's formula that
21  was intended to address these thousands of claims when we are
22  only talking about two homes.
23       The argument that wasn't made, but that is at the heart
24  of, I think, what the defendants are saying, is your clients
25  opted out of a settlement.  The formula in that settlement may or

00:20:05
00:20:23
00:20:34
00:21:03
00:21:25

**OFFICIAL TRANSCRIPT**

1  may not have been to their benefit, but they are essentially

2  saying, Well, we are opting out of this settlement, but we're

3  going to use the formula that was applied to the settlement, and

4  we just want to jump in and get our extra categories of damages

5  that everybody else in the case didn't get.

6        I don't think that's how it works, but that's what I

7  see has happened.

8        MR. DOYLE:  Your Honor, if I can address that.

9        The formula wasn't used for anybody.  There was a

10 settlement and the Court -- I was the only one that appeared to

11 discuss the application of the formula and the orders and

12 everything that went into us generating documents and data to

13 apply in a settlement.  All of it was abandoned.  None of it was

14 applied.

15       It's not that everybody else that settled got the

16 damages from that formula.  They got none of it.  They got

17 essentially 20 cents on the dollar.  So they didn't get the

18 formula.  They didn't get the damages that the formula would have

19 provided.  So nobody in that settlement -- not a single party --

20 got the full remediation cost.  They got something substantially

21 less, which was inadequate and it was inequitable, and the whole

22 reason that all of the opt-outs are now proceeding individually.

23       It doesn't mean that -- you know, had we used that

24 formula, they may have participated.  But that formula was

25 substantially more than they were offered in a settlement that

**OFFICIAL TRANSCRIPT**

1  the Court, and the lawyers that presented it to the Court, said
2  had nothing to do with the cost of remediation.  That's what they
3  said.  That's in the record.  They abandoned all of it, and it
4  came down to a lump-sum settlement that they were going to
5  distribute among 3,000 plaintiffs.

6      So it's not that they were walking away from that.
7  They were never offered that.  It's a formula that the judge
8  said, Hey, it's going to overshoot in some cases and it's going
9  to undershoot on others.

10     But they were willing to take that to be able to get
11 their home fixed and get their life back in order.  They weren't
12 offered that.

13     So, Judge, I just want you to take a look into that if
14 you would.

15         THE COURT:  Okay.

16         MR. DOYLE:  It's in there, and it says -- Judge Fallon
17 said, Hey, it's something that we can use that's useful.  And
18 there was a contractor that came in and provided testimony during
19 the damages hearing.  He said, This is useful.  Is it going to
20 overshoot some, yes, and undershoot others, yes, but it's a fair
21 estimation of remediation damages for everybody.

22         MS. EIKHOFF:  Your Honor, if I may just respond to
23 that.  I do have to correct the record.

24     It is not true that the settlement gave people 20 cents
25 on the dollar across the board.  The Court has -- Judge Fallon

*00:23:06*
*00:23:22*
*00:23:32*
*00:23:44*
*00:23:59*

**OFFICIAL TRANSCRIPT**

1    approved the settlement as fair, and approved it for all people.
2    And I can tell you it is no secret that these plaintiffs would
3    have gotten significantly more than 20 cents on the dollar had
4    they not opted out of the settlement.

00:24:22    5    THE COURT:  Well, that's going to depend on how many
6    dollars we're talking about, right?

7    I mean, if the plaintiffs want $800,000, then maybe it
8    is 20 cents on the dollar, but if they --

9    MS. EIKHOFF:  That is true.

00:24:33    10    THE COURT:  -- are looking at $300,000, it's a little
11    bit more.

12    MS. EIKHOFF:  That's true.

13    THE COURT:  That's all in the eye of the beholder.

14    MS. EIKHOFF:  Understood, Your Honor.

00:24:42    15    And to be clear, we're not saying that every order that
16    Judge Fallon has ever issued has been thrown out now that they
17    are opted out.  We're saying that a formula that was designed for
18    an aggregate class damages calculation does no longer apply when
19    you have two homeowners that can and should have gotten their own
00:25:04    20    remediation estimate within the discovery period and in
21    accordance with the rules.

22    THE COURT:  All right.  So here's the question I'm
23    going to put -- I'll put to you as defense counsel:  If my view
24    is that I think that it would be an inequitable result to prevent
00:25:27    25    the plaintiffs from proving diminution of value against your

**OFFICIAL TRANSCRIPT**

1  defaulted client, how do you suggest I go about -- or we go

2  about -- or plaintiffs go about proving the only measure of

3  damages that matters in my view, which is diminution of value of

4  their respective properties?  How do we do that?

*00:25:50*

5          MS. EIKHOFF:  Your Honor, I do think that there is a

6  way to do that.

7          We have evidence in the record of what the build costs

8  were for the house.  We have evidence of fair market value

9  according to the tax assessments.  In Alabama law -- and I'm sure

*00:26:06*

10  Mr. Doyle knows this because he's an Alabama lawyer -- a

11  homeowner can give testimony as to the value of their own

12  property.  Obviously the Court would need to take that into

13  account with the other objective measures, but those are -- those

14  are evidentiary testaments that the Court could use to determine

*00:26:28*

15  how much these properties have actually diminished in value and

16  come up with an award -- recommend an award within Alabama law

17  that would withstand Alabama legal scrutiny.

18          THE COURT:  Well, that's what I'm inclined to do.

19          And I don't know, Mr. Doyle, if you think that you have

*00:26:47*

20  marshaled the appropriate evidence, exhibit s, or whatnot to be

21  able to make that showing.  And I don't know what your view is as

22  to the numbers that the defendants gave me in their brief.

23          MR. DOYLE:  I would have to go back and review.  I

24  don't know off the top of my head, Your Honor.  I know it's

*00:27:08*

25  significantly less than what the cost of remediation is.  We now

**OFFICIAL TRANSCRIPT**

1    know what the cost of remediation is.

2             THE COURT:  Is it not more than the diminution of value

3    of the --

4             MR. DOYLE:  I don't believe so.  I don't believe so.

5    The fair market value --

6             THE COURT:  What was the fair market value of these two

7    homes when the sheetrock was installed?

8             MR. DOYLE:  I believe it was slightly more than -- if

9    my recollection is correct -- I don't remember the numbers

10   exactly, but my recollection is -- you know, these are

11   three-bedroom, two-bath houses in Opelika, Alabama.  They are not

12   half-million-dollar houses, but they're in the $200,000 range,

13   something like that.

14            MS. EIKHOFF:  Your Honor, we have --

15            THE COURT:  Hold on.

16            MS. EIKHOFF:  Oh, I'm sorry.  Excuse me.

17            MR. DOYLE:  Opposing counsel brought up an interesting

18   point.  They've got the tax records that show what the government

19   valuated the property value to be at certain times based on

20   whatever mechanisms they utilize, which isn't necessarily the

21   fair market value.

22            THE COURT:  It sure isn't in New Orleans.

23            MR. DOYLE:  Right.

24            THE COURT:  I don't know about Alabama, but...

25            MR. DOYLE:  That's right.

00:27:17
00:27:32
00:27:49
00:28:03
00:28:14

**OFFICIAL TRANSCRIPT**

1       So I don't know how to go about doing that.  If it
2  would require, you know, plaintiffs to get an appraisal done --
3  they haven't had one.  I think the parties had an appraisal done
4  when they purchased the properties, but I'm not sure that either
5  one of them have had one since then.
6       You know, that's something the defendants asked for
7  during the deposition.  It's not part of what the discovery
8  process is.  It's not what was required for production under
9  either of those two forms, but --
10          THE COURT:  Well --
11          MR. DOYLE:  It's not even available.
12          THE COURT:  -- here's the problem.  Here's the problem.
13  I'm very troubled by the fact that you-all are relying on a
14  couple of estimates that were just created.  And in my
15  experience, you know, when an Xactimate becomes a relevant piece
16  of evidence in a trial or an evidentiary hearing, the person
17  who's testifying about it is qualified as an expert of some sort
18  to do so.  I've got a serious problem with you-all relying solely
19  on these documents to prove diminution of value.
20       Now, maybe that was a gambit on your part.  I don't
21  know what the thinking was, but I do want to give your clients an
22  opportunity to prove the extent to which their properties have
23  diminished in value.  One way to do that is to have an appraisal
24  done of each property now.  And, you know, we'll look at the
25  appraisal now, we'll look at the appraisal then, we'll have them

00:28:28
00:28:39
00:28:54
00:29:18
00:29:43

**OFFICIAL TRANSCRIPT**

1  testify as to certain circumstances -- they've tried to sell it,

2  they can't.  They asked -- they asked $50,000 to sell the house

3  and never got an offer.  Whatever testimony that they have to

4  gloss that information will all be helpful and relevant.  And I

5  know you've got other elements of damages that have been listed

6  in the forms, and we add all of that up and that's where we are.

7       But in my view, given the problem that I have with

8  these estimates, and the sort of -- I mean, honestly, while I

9  think I understand Alabama law as to where -- when these

10 estimates would be appropriate and testimony would be

11 appropriate, notwithstanding that they're untimely in this case,

12 I'm not exactly sure how a Court is supposed to do the math to

13 determine how much -- to what extent a property is diminished in

14 value.

15      I can't see that the guidance says, Well, if it's worth

16 $200- and it's $150,000 to remediate, that's the value of the

17 diminution; those two things are equal.  If that was the case,

18 the cases would say that.  They don't say that.

19           MR. DOYLE:  Right.

20           THE COURT:  They say that the cost of remediation is

21 relevant to a determination of diminution of value.  They do not

22 say it's the same thing, so I'm not even sure how I'm supposed to

23 do that now.

24      And because, as I sit here today, my view is that I

25 don't have estimates that we can use in this hearing, my thought

00:30:05

00:30:27

00:30:44

00:30:59

00:31:19

**OFFICIAL TRANSCRIPT**

1  is that the parties agree on an appraiser and we get the two

2  properties appraised, present those to me along with the

3  testimony of the plaintiffs, and we have our hearing.

4      MR. DOYLE:  Okay.

00:31:36

5      MS. EIKHOFF:  Your Honor, I just might add that it is

6  also a matter of public record that the Gibbs' home was sold to

7  them for $164,000 when they bought it, and also Mr. Carter, he

8  built the home himself.

9      THE COURT:  Right.

00:31:56

10      MS. EIKHOFF:  So he bought a lot for about $30,000 or

11 $35,000, and then we have a build cost of about $110,000.  So we

12 do have some records of those --

13      THE COURT:  The cost for him to buy a lot and build a

14 house does not necessarily equate to what the fair market value

00:32:13

15 of the house is.  That's why he does those things.

16      MS. EIKHOFF:  Right.

17      THE COURT:  He's not necessarily building that house to

18 live in it.  He bought, what, six lots, I think -- or he bought a

19 number of lots and built -- I mean, he's expecting one day to

00:32:27

20 sell that house at a -- for more than what he put into it.

21      So I -- these are all relevant to my determination of

22 what I think the diminution of the value of the properties are.

23 Everything that you've just suggested is relevant.  I think the

24 appraisals before and now are relevant.  Now is the time that

00:32:48

25 counts because now is when I'm making the recommendation as to

**OFFICIAL TRANSCRIPT**

1   what the diminution is.

2          So let's get an appraisal of those two properties.

3   Present it to the Court along with all of the other evidence that

4   you-all have just discussed, and the testimony of the individual

5   plaintiffs, and we go from there.  That's how I think -- I think

6   that's the appropriate course to take.

7          MR. DOYLE:  Your Honor, can I just get a clarification

8   on the appraisal?

9          THE COURT:  Yeah.

10          MR. DOYLE:  Because we've had appraisals done -- or

11   offered to us -- provided to us by our clients, who opted out in

12   this case and others, where they had an appraisal done for the

13   fair market value without Chinese drywall and the fair market

14   value with Chinese drywall.  What are you looking for?

15          If we are going to exclude the Xactimate by

16   Mr. Macomber, then I need to know how the Court wants to --

17   because ultimately under Alabama law we have to figure out what

18   the top number is that this can't exceed.  That's fair market

19   value.  And then the remediation cost would be something less

20   than that.  That's what Alabama law will allow.  If it exceeds

21   it, then we have this whole *Poffenbarger* situation where it

22   exceeds the fair market value.

23          So I'm trying to get an understanding of what it is

24   you're looking for that will be useful to you when you're making

25   the recommendation.

00:33:07

00:33:20

00:33:38

00:33:56

00:34:10

**OFFICIAL TRANSCRIPT**

 1          THE COURT:  The cost of remediation I don't know how
 2     you prove.  You've given me untimely Xactimates.
 3          The appraisals -- you're telling me that your clients
 4     had their properties appraised at some point in the past before
 5     Chinese drywall was put into their homes; is that correct?
 6          MR. DOYLE:  That's right.
 7          THE COURT:  That's an appraisal -- you know, years ago,
 8     albeit.  That's an appraisal of the fair market value of the home
 9     without Chinese drywall.
10          MR. DOYLE:  Right.
11          THE COURT:  The only thing that matters is what is the
12     appraised value of the house now with Chinese drywall, because
13     that's the condition that they exist in.
14          MR. DOYLE:  Yes, sir.
15          THE COURT:  Okay.  We need an appraisal of those homes
16     as they exist today.
17          Now, how do we select an appraiser?  Do I make you-all
18     agree on someone?  Can we do that?
19          MR. DOYLE:  I don't know.
20          MS. EIKHOFF:  We're certainly willing to try.
21          THE COURT:  Why don't y'all agree on an appraiser.
22          MS. EIKHOFF:  I'm certainly willing to.
23          MR. DOYLE:  We'll try, Your Honor.
24          THE COURT:  Look, if the appraiser who did the previous
25     appraisals is still available, I don't know why you wouldn't

00:34:27
00:34:40
00:34:53
00:35:11
00:35:23

**OFFICIAL TRANSCRIPT**

1   agree to use that entity.

2          MS. EIKHOFF:  We're not aware of any prior appraisals

3   of these properties.  We did ask the plaintiffs if they had any

4   and we were told there were none.  We also didn't get any

00:35:37   5   produced to us, so I'm not sure what the prior appraisals are.

6   We will certainly consider -- if there was an appraiser that

7   we've never heard of, we'll certainly consider it.  I don't know

8   who this prior appraiser is.

9          THE COURT:  Okay.  So here's what we're going to do.

00:35:53   10   I'm going to issue a minute entry that lays this out with some

11   timelines to have this accomplished.  Then we can have our -- we

12   will have a brief status conference so you-all can let me know

13   when to expect the written appraisals.

14          I'm going to set a deadline for the appraisal to be

00:36:14   15   conducted.  And then as soon as that happens, I'm going to get

16   you-all on the phone so you-all can advise me when we can expect

17   the actual document to be produced.  And then we'll -- as I said,

18   we'll go from there.

19          Obviously the cost of the appraisal is going to be an

00:36:35   20   element of damages that I'm almost certain to include in any

21   recovery by the plaintiffs.

22          And I think -- I'll go back and look at my notes.  If

23   there are any other questions I want you-all to answer, I'll

24   include that in the minute entry.  Okay?

00:36:55   25          MR. DOYLE:  Yes.

**OFFICIAL TRANSCRIPT**

1    Your Honor, may I offer one other alternative?  We

2 don't have a problem -- throughout this effort at the end to

3 quantify what the cost of remediation is, we employed

4 Mr. Macomber to do these Xactimates.  We don't intend to offer

00:37:14   5 him as an expert.  All he is doing is plugging information into a

6 program.  He's not going to be offering any opinions.  He's going

7 to be offering what the result is of the process utilizing some

8 software.  That's it.  That's all he is going to do.

9    Why don't we just make him available for deposition?

00:37:31   10 That way they can scrutinize whether or not it's an accurate and

11 useful methodology or amount or product that he has produced.

12    THE COURT:  Well, let me hear from defense.

13    MS. EIKHOFF:  Yes, Your Honor.  If I may respond to the

14 idea that Mr. Macomber is not being offered as an expert but just

00:37:54   15 a fact witness, there are so many reasons why we think that that

16 is not an appropriate way to view him.

17    First of all, coming up with remediation plans and

18 construction cost estimates and highly skilled technical work --

19 using Xactimate is highly skilled technical work.  An average

00:38:13   20 person can't come up with a 465-line remediation cost estimate.

21 As Your Honor said, it needs to be explained to the jury and to

22 the Court.

23    And Mr. Doyle knows that Mr. Macomber is an expert

24 because he's used him as an expert in Chinese drywall cases for

00:38:32   25 the last several years.  And I'm holding in front of me -- we

**OFFICIAL TRANSCRIPT**

1  were able to just obtain this yesterday via a report that was

2  written by Mr. Macomber submitted on December 31, 2019, that's

3  entitled "Defective Knauf Drywall Expert Report For Plaintiffs

4  Represented By Doyle Law Firm" signed by Shawn Macomber, so he's

00:38:55   5  already testified as an expert.

6          THE COURT:  Ms. Eikhoff, let me interrupt you.

7          Look, I understand what you're saying about that

8  report.  That doesn't mean that everybody that testifies as an

9  expert necessarily is going to testify as an expert the next

00:39:13  10  time.

11         Having said that, this is expert testimony.  In my

12  view, it's expert testimony.  I have never been involved in a

13  case where someone testified about an Xactimate estimate where

14  that person was not first qualified as an expert to do so because

00:39:27  15  the information that is so-called plugged into the program is not

16  necessarily factual information.  Those are his decisions about

17  what needs to be done based on his expertise, and then he plugs

18  them into the program that is a cost-estimating program.

19         But what has to go -- it's not what the cost estimate

00:39:53  20  ultimately is that is spit out of the Xactimate that necessarily

21  matters, it's what goes into it.  He's the one determining what

22  goes into it, and that's not based on his status as a fact

23  witness.  Your clients couldn't have gone and done that

24  themselves because they don't have the expertise.

00:40:08  25         MR. DOYLE:  Your Honor, may I respond?

**OFFICIAL TRANSCRIPT**

1    THE COURT:  Yes.

2        MR. DOYLE:  In this case there wasn't any judgment

3    call.  And what we asked Mr. Macomber to do was simply follow

4    what Judge Fallon laid out precisely in 20741 starting at, I

00:40:22  5    think, No. 6 -- or No. 8.  I can't remember what it is.

6        But there is a -- after the damages hearings that

7    Ms. Eikhoff attended back in 2015, Judge Fallon issued this

8    damages order that has the formula in it as well.

9        But what he said was, this is what needs to be

00:40:40  10    remediated.  And if you go through and you look and what -- you

11    tick off each item that needs to be included.  You know, all

12    drywall removed, all plumbing replaced, all wiring replaced,

13    et cetera, et cetera, all the way down.  You take the house all

14    the way down to the studs.  There's not any real difference of

00:40:58  15    opinion about this.  Judge Fallon lays it out.

16        And what we asked him to do was apply that strictly

17    based on what Judge Fallon has instructed you to do.  Nothing

18    else.  And so that's why he's going to -- that's why we intended

19    to call him as a fact witness.  We don't want him to make any

00:41:12  20    judgment calls.  We want him to go to the house, count outlets,

21    look at the fixtures, identify what they are, and plug them in.

22    But there is not any judgment call --

23        THE COURT:  I cannot get past the fact that -- first of

24    all, I disagree that this guy can testify purely as a fact

00:41:29  25    witness.  And I -- I cannot get past the fact that these

**OFFICIAL TRANSCRIPT**

1  documents were created a couple of weeks ago.  And, I mean, the

2  objective here is to determine the diminution of value of the

3  property of the plaintiffs, and that's what these documents are

4  being used to accomplish.  And, I mean, they were produced too

*00:41:52*  5  late.  They were created and produced too late.

6        So we're going to take the alternate approach that I've

7  discussed, and we're going to have the homes appraised as they

8  are.  The appraisers are going to take into consideration

9  whatever it is that they normally take into consideration in

*00:42:10*  10  appraising a house to determine its fair market value, including

11  the fact that one of them has been unoccupied for a period of

12  time and that they both have Chinese drywall in them, and we're

13  going to see where that gets us.  And then we're going to proceed

14  from there.  Okay?

*00:42:27*  15        MR. DOYLE:  (Nods head.)

16        MS. EIKHOFF:  Yes, Your Honor.

17        THE COURT:  I'll issue a minute entry that sets

18  everything out in detail with a timeline.  And as we move

19  forward -- I would like to try to get -- I think Judge Fallon

*00:42:39*  20  wants to get this wrapped up as quickly as possible.  That's why

21  he gave us the date that he did.  But I'm going to tell him

22  what's going on and we're still going to get this done as quickly

23  as possible.

24        So I'll give you-all some deadlines.  I would like

*00:42:53*  25  you-all to start talking about selecting an appraiser so there

**OFFICIAL TRANSCRIPT**

```
 1   are no arguments over at least who does this work.
 2            MS. EIKHOFF:  Yes, Your Honor.
 3            And I just want to -- as kind of a housekeeping matter
 4   for the record, we do have some other objections.  We do not need
 5   to address them today, but, Your Honor, I just wanted to make
 6   sure that our other objections that weren't addressed today still
 7   stand as objections.
 8            THE COURT:  Yeah, I'll address them.  To the extent
 9   that I think you have any objections that survive this process,
10   we'll address them before the evidentiary hearing starts.
11            I mean, my -- I think that for the most part, the
12   relevance objections and the timeliness objection are what I was
13   looking at.  And I mean, if -- I think if we go this route, I
14   don't know what objections will still survive, but you can bring
15   those to my attention when we get closer to the hearing and I'll
16   deal with them.
17            MS. EIKHOFF:  Thank you.
18            MR. DOYLE:  Thank you.
19            THE COURT:  Thank you all.  I'll be talking to you-all
20   soon, I'm sure.
21            MS. EIKHOFF:  Thank you.
22            MR. DOYLE:  Thank you, Your Honor.  Have a good day.
23                              (Proceedings adjourned.)
24
25
```

**OFFICIAL TRANSCRIPT**

00:43:07
00:43:20
00:43:40
00:43:47

1                              * * * * *

2                            CERTIFICATE

3

4        I hereby certify this 6th day of April, 2021, that the

5   foregoing is, to the best of my ability and understanding, a true

6   and correct transcript of the proceedings in the above-entitled

7   matter.

8

9                                      /s/ Mary V. Thompson
                                _____
10                                    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

MDL NO. 2047
SECTION: L

_____

THIS DOCUMENT RELATES TO:

JUDGE ELDON FALLON
MAG. JUDGE NORTH

*Eduardo and Carmen Amorin, et al. v. Taishan*
*Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin*
*Co., Ltd., et al.,* 2:11-cv-1395-EEF-MBN

_____

## <u>PLAINTIFFS' POSITION REGARDING PROBATIVE VALUE OF 2021 APPRAISALS</u>

The Court has instructed the parties to present their positions regarding the probative

value of the 2021 appraisal conducted by Molly McLeod Wilson.  As instructed, Plaintiffs offer

the following memorandum.

As a preliminary matter, it must be noted again that Defendants are in default on all

claims contained in the Complaint.  The relevant counts (for non-Louisiana claims) contained in

the *Amorin* complaint are as follows:

| | |
|---|---|
| Count I: | Negligence |
| Count II: | Negligence Per Se |
| Count III: | Strict Liability |
| Count IV: | Breach of Express and/or Implied Warranties |
| Count VII: | Private Nuisance |
| Count VIII: | Unjust Enrichment |
| Count IX: | Violation of Alabama Deceptive Trade Practices Act |
| Count X: | Equitable and Injunctive Relief |

Plaintiffs previously provided this Court with a copy of the *Amorin v. Taishan* complaint. As the

court will note, all claims due to be considered when assessing damages through this Rule 55

proceeding.  Because Defendants are in default, all claims are relevant to this Court's assessment of damages through this Rule 55 Damages Hearing and ultimately in its recommendation to the district court.

The reason the entry of default is important is because private nuisance is one count under Alabama law that provides a mechanism for recovering abatement / remediation damages by Plaintiffs.  Plaintiffs may also recover other damages through other counts under Alabama law, but that is not the issue to be addressed at this time.  The Court wants the parties to address the usefulness or probative value of the 2021 appraisals of the current market value without considering the presence of Chinese drywall.

The 2021 appraisals generated by Mrs. Wilson simply define the current market value of a property. "*See* Jenelle Mims Marsh, *Alabama Law of Damages* § 33:1 (6th ed. 2012) ("'Market value' is defined as the price at which a willing seller would sell and a willing buyer would buy, neither being compelled to sell or to buy.")" *Bella Invs., Inc. v. Multi Family Servs., Inc.*, 148 So. 3d 716, 724 (Ala. Civ. App. 2013).  Plaintiffs have not previously provided an opinion regarding diminution, but Defendants have argued that the cost of abatement / remediation cannot exceed the diminution in value, based on the *Poffenbarger* case.  This issue has not been decided by Alabama court since the 2007 *Poffenbarger* opinion was published.  The Alabama Supreme Court has ruled in 2008 as follows:

> "The Court in *Poffenbarger* did not answer the question whether repair costs could be considered in cases where damage to real property occurred. Instead, it addressed only those situations in which the cost to repair the real property exceeds the diminution in the value of the property. Birmingham Coal does not point to any evidence indicating that the trial court awarded the plaintiffs property damages in excess of the diminution in value of the property or that the evidence of repair costs presented by the plaintiffs who did not express an opinion as to diminution did not present a reasonable inference of damage."

*Birmingham Coal Coke Co., Inc. v. Johnson*, 10 So. 3d 993, 998 (Ala. 2008).

The Wilson appraisals are probative because they define the current market value of each property – which is, again, arguably the limit of total recoverable amount for Plaintiffs' private nuisance claims if this court infers that diminution in value is the limit of recovery for private nuisance. Plaintiffs oppose this limitation on damages as it is not based on Alabama law.

The issue this court must now grapple with is how it can assess the remediation damages given its ruling excluding the testimony and reports by Shawn Macomber, the contractor employed by Plaintiffs who utilized the Xactimate computer program and applied Judge Fallon's ruling and specific guidance in Doc. 20741 to arrive at an estimated remediation cost for each property in 2021. It is particularly noteworthy that Judge Fallon has ruled that all plaintiffs who have Chinese drywall in their homes are entitled to recovery remediation damages. See Doc. 20741. The scope and limitations of each estimate by Mr. Macomber were defined by Judge Fallon's ruling this same document.

At the Rule 55 hearing, it is expected that Plaintiffs will testify that they expect their remediation costs to be consistent with the Macomber estimates, both of which are less than the 2021 appraised market value of the respective properties. Plaintiffs believe their testimony will be sufficient for the court to find in their favor under controlling law. Under Alabama law, mathematical certainty is not required regarding private nuisance damages. In the context of a jury trial, the Alabama Supreme Court has previously found that a jury cannot be left to speculate as to the amount of damages, but "'[t]his does not mean that a plaintiff must prove damages to a mathematical certainty or measure them by a money standard. Rather, *he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.* " C. Gamble, *Alabama Law of Damages* § 7–1 (2d ed. 1988).' *Industrial Chemical &*

*Fiberglass Corp. v. Chandler,* 547 So.2d 812, 820 (Ala.1988) (emphasis added)."  But, we are

not in the context of a jury trial – we are now engaged in a Rule 55 damages hearing after the

Defendants were found in default on all counts; thus, given the exclusion of the Macomber

estimates, this court can look now to other sources of remediation / abatement valuation,

particularly remediation costs calculated and submitted to the District Court in 2019.

First, the Court can look to the district court's Findings of Fact and Conclusions of Law

for the Court's position on utilization of RS Means construction data, where it found the source

to be "a generally accepted method of calculating building costs." Doc. 20741 at 23, ¶ 35.  The

court also found the utilization of RS Means data to be "instrumental in determining the scope

and costs of remediating the Chinese drywall properties in *Germano*." *Id*.  Thus, acceptance by

the district court of this methodology in this litigation is without dispute.

The 2019 national square footage price for remediation of a Chinese drywall home was

found to be $117.94. See Doc. 22235-1.  The District Court defined a formula for calculating

Chinese drywall remediation costs/damages utilizing the RS Means data.  The Court ruled that

remediation damages should be calculated based on the existing data regarding scope of work

and square footage of class members homes as follows: "'*i.e.*, price per square foot remediate X

number of square feet in class members' homes = damages.'" Doc. 20741 at 23, ¶ 44.  Lastly, the

Court noted that this calculation should be "reduced by the local building costs factors in nearly

every state in which class properties exist. (R. Doc. 19197 at 37)."

Second, the Court can look to previous documents submitted to the district court. The

2019 remediation costs for both properties were previously calculated and can be found in the

District Court's records at Document 22235-1.  The Gibbs remediation cost was calculated to be

$119,630.00.  See Doc. 22235-1 at Page 46.  The Carter remediation cost was calculated to be

$114,408.00. See Doc. 22235-1 at Page 24.  Obviously, these costs are undervalued when compared to the 2021 estimates by Mr. Macomber, but the Court can utilize both calculated values along with Plaintiffs' testimony when considering its recommendation to the district court.

Per the Court's request, all appraisals available are attached hereto as exhibits.  Plaintiffs Gibbs have provided a 2007 appraisal in addition to the 2021 appraisal created by Mrs. Wilson. Plaintiff Carter was not able to locate an earlier appraisal; thus, only the 2021 appraisal generated by Mrs. Wilson is attached.

At this point in the process, it appears that this Court has several options available: 1) issue a revised scheduling order granting Defendants additional time to retain a remediation cost expert, depose Mr. Macomber regarding his Xactimate estimates, allow Plaintiffs to depose Defendants' expert(s), and allow a revised witness list for the Rule 55 hearing that will allow Mr. Macomber to testify; 2) order Plaintiffs to engage a new appraiser with experience appraising property requiring remediation due to the presence of Chinese drywall to provide a current market valuation with full consideration of the Chinese drywall remediation costs involved; or, 3) proceed to a Rule 55 hearing and take judicial notice of the 2019 remediation cost calculations contained in Doc. 22235-1 in addition to Plaintiffs' testimony regarding 2021 remediation costs expected.

Plaintiffs take the position that option 1 is the best option for this Court to determine the true cost of remediation of Plaintiffs' homes.  Given Judge Fallon's rulings that Plaintiffs are entitled to recovery of the full cost of remediation in addition to other compensatory damages available under controlling law, this would be the optimal choice.

Respectfully submitted:

/s/ *James V. Doyle, Jr.*

James V. Doyle, Jr.
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500
Fax: 844-638-5812
jimmy@doylefirm.com

*Attorney for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Plaintiffs' Position Regarding Probative

Value of 2021 Appraisals for the Defendants via email on this 5th day of May, 2021.


/s/ *James V. Doyle, Jr.*

James V. Doyle, Jr.
DOYLE LAW FIRM, PC