**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br><br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br><br>*Elizabeth Bennett, et al. v. Knauf Gips, KG, et al.*<br>**2:14-cv-02722-EEF-JCW** | JUDGE ELDON FALLON<br><br>MAG. JUDGE WILKINSON |

### PLAINTIFF FACT SHEET

Name of Plaintiff:  Jawad Gharib & Fatme Gharib

Affected Property Address:  8807 South Claiborne Avenue, New Orleans, LA 70118

Apt. A, Apt. B, Apt. C, and commercial space.

## I.  Purchase, Sale and/or Transfer of Ownership of Property

1.  On what date did you purchase the Property?

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Bennett Supplemental Plaintiff Profile Form ("SPPF").  Plaintiff directs the defendants to Section II of the SPPF. Without waiving said objection, Plaintiff adopts the SPPF response again here and intends to provide the exact same date as provided in the verified SPPF as follows: Plaintiff purchased the property:

(Month/Day/Year)      10 / 31 / 2002

2.  When you took ownership of the Property, what was the name of the seller?

Eduardo Guevara


EXHIBIT
8

1

EXHIBIT
7

3.  Name and address of the realtor?

Wayne Finley

4.  Name and address of the closing agent?

First Louisiana Title Corporation, 4515 Shores Drive, Suite 102, Metairie, LA 70006

5.  What was the price of the home when you purchased it?  $ 112,000.00

6.  Was it an "as-is" sale?

**Response**:  Plaintiff objects to the use of "as-is" in this question as vague, ambiguous, uncertain, and unintelligible; consequently, Plaintiff cannot determine the exact nature of the information being sought.  This term is not defined and is not commonly understood with one accepted meaning; multiple inpretations are possible.  Without waiving said objection, plaintiff responds as follows:

[✓] Yes   [ ] No   [ ] I'm not sure.

7.  If you sold or transferred ownership of the Property, what was the name of the purchaser?

N/A

8.  If you sold or transferred ownership of the Property, what was the name and address of the realtor?

N/A

9.  If you sold or transferred ownership of the Property, what was the name and address of closing agent?

N/A

10.  If you sold or transferred ownership of the Property, what was the price paid for home?
            $ N/A

## II.  Appraisal of the Home

11.  Date of each appraisal:

            a. _____/_____/20_____
            b. _____/_____/20_____

2

**PFS REQUEST FOR DOCUMENT PRODUCTION #1**: Please produce copies of any and all appraisals performed on the house both prior and subsequent to the occurrence of any of the events allenged in the petition.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 1."

## III.  Discovery of Drywall

12.  Date that the property was constructed and/or renovated that installed the allegedly defective Chinese Drywall.

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Bennett Supplemental Plaintiff Profile Form ("SPPF").  Plaintiff directs the defendants to  Section II of the SPPF. Without waiving said objection, Plaintiff adopts the SPPF response again here and intends to provide the exact same date as provided in the verified SPPF as follows: The property construction and/or renovation that installed the allegedly defective drywall occurred on or about the following date (to the best of my knowledge):

> (Month/Day/Year)            _____/_____/20_06___

**PFS REQUEST FOR DOCUMENT PRODUCTION #2**: Please produce all documents, reports, photographs, videotapes, samples and any other materials which evidence and/or identify that there is defective Chinese Drywall in the Property.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 2."

## IV.  Manufacturer/Seller of Drywall

13.  Who sold or distributed the drywall in the house?

**Response**:  Plaintiff objects to this question as duplicative.  In addition, Plaintiff objects to this question on the ground that it seeks information in the possession of, known to, or otherwise equally available to the defendants.  Plaintiff has previously provided this information to defendants in the Plaintiff Profile Form ("PPF"). Plaintiff directs the defendants to  Section X of the PPF.  Without waiving said objection, Plaintiff adopts the PPF response again here and intends to provide the exact same information as provided in the verified PPF as follows:   The drywall Supplier's name (to the best of my knowledge) is:

Interior Exterior Building Supply

**PFS REQUEST FOR DOCUMENT PRODUCTION #3:** Please produce all documents, reports, photographs, videotapes, samples and any other materials which evidence and/or identify the manufacturer of drywall installed in the house. The submission must be in the form of PTO 1(B).

> **Response:** All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 3."

## V.  Damages

14.  Identify any harm, financial or otherwise, that you contend was caused by defective Chinese Drywall installed in the Property.

**Response:**  Plaintiff directs the defendants to review the complaint filed with the court in this case for a full listing of the claims being asserted and the damages being sought.  The defective Knauf Chinese Drywall emitted gasses that cause damage to Plaintiff's home and the personal property contained therein.  It also significantly diminished the use and enjoyment of the home; therefore, Plaintiff seeks the following:  all compensatory, statutory, and/or punitive damages; all pre-judgment and post-judgment interest as allowed by law; any appropriate injunctive relief; an award of attorney's fees as allowed by law; an award of taxable costs; and, any and all such further relief as a jury or judge presiding over my trial deems just and proper.  Other damages include, but are not limited to:

Significant financial burden due to the corrosion caused by the defective Chinese drywall

gasses.


15.  If you contend that you entered personal bankruptcy as a result of damage to your property from defective Chinese Drywall, please describe the facts and circumstances that relate to your claim.

N/A


16.  If you contend that you entered short sale and/or foreclosure as a result of damage to your property from defective Chinese Drywall, please describe the facts and circumstances that relate to your claim.

N/A

**PFS REQUEST FOR DOCUMENT PRODUCTION #4**: If you claim loss of income, please produce any copies of any and all documentation upon which you intend to rely upon to prove this claim.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 4."

17.  If you claim diminution of the property as a result of Chinese Drywall, state with particularity each fact which supports your claim.

N/A _____

_____

_____

_____

18.  Identify the appliances, fixtures and/or other electronics, if any, that you claim were damaged by Chinese Drywall in the property.

> **Response**: An list of damaged items is attached as "Exhibit 14."

19.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Address of each location you stayed thereafter.

a. N/A _____

b. _____

c. _____

20.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Time periods in which you resided at each property.

a. _____/_____/20_____  to  _____/_____/20_____

b. _____/_____/20_____  to  _____/_____/20_____

c. _____/_____/20_____  to  _____/_____/20_____

21.  If you vacated the property because of the alleged presence of Chinese Drywall, please provide:  Moving costs and/or alternative living expenses you claim to have incurred as a result of the alleged presence of Chinese Drywall.

a. $ N/A _____

b. $_____

c. $_____

5

**PFS REQUEST FOR DOCUMENT PRODUCTION #5:**   If you vacated the property because of the alleged presence of Chinese Drywall, please provide any documentation to support your claims.

> **Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 5."

22.  Are you claiming damages for personal injury? ☐ Yes (explain below) ☑ No

_____

_____

23.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  Date you allege that you first sustained personal injuries as a result of your exposure to allegedly defective Chinese Drywall.

> **Response**:   ☑ N/A

24.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  What specific injuries have you suffered?

> **Response**:   ☑ N/A

25.  If you suffered personal injuries as a result of the alleged presence of Chinese Drywall:  Name and address of any doctor, physician, surgeon, chiropractor, or osteopath who examined and/or treated your alleged injuries.

> **Response**:   ☑ N/A

## VI.  Potential Witnesses/Evidence

26.  Has any written or recorded statement been taken from any witness or person who has knowledge of relevant facts, including the nature, character, and extent of the injuries referred to in the petition, and for each statement identified?

> ☐ Yes   ☑ No   ☐ I don't know

27.  If the answer to 26 is "yes," please state:  The name, address, and telephone number of the person from whom the statement was taken.

N/A_____

_____

28. If the answer to 26 is "yes," please state: The name, address, and telephone number of the person who took the statement.

N/A

29. If the answer to 26 is "yes," please state: The name address, and telephone number of the party having custody of such statement.

N/A

30. If the answer to 26 is "yes," please state: The date the statement was taken.

N/A

## VII.  Already Remediated Properties

31. If you already remediated the Property, who conducted the remediation?

    **Response:** [✓] N/A

32. When did the remediation commencement date occur?

    **Response:** [✓] N/A

33. When did the remediation end date occur?

    **Response:** [✓] N/A

34. What was the scope of the remediation and the scope of the work carried out?

    **Response:** [✓] N/A

35. What costs or expenses, if any, did you incur related to the remediation of the Property?

    **Response:** [✓] N/A

36. Were any samples from the remediation retained?

Response:   [✓] N/A

37. If the response to 36 is "yes," were the samples compliant with PTO 1(B)?

Response:   [✓] N/A

38. Were any photographs taken of the allegedly defective Chinese Drywall?

Response:   [✓] N/A

39. If the response to 38 is "yes," were the photographs compliant with PTO 1(B)?

Response:   [✓] N/A

**PFS REQUEST FOR DOCUMENT PRODUCTION #6:**  Please produce the following documentation concerning the remediation of the Property:  Any evidence of KPT Chinese Drywall and Non-KPT Chinese Drywall, if any, in the Property prior to remediation.

Response:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 6."

**PFS REQUEST FOR DOCUMENT PRODUCTION #7:**  Please produce the following documentation concerning the remediation of the Property:  Interior photographs of the Affected Property immediately prior to the commencement of, and following completion of, the remediation, including photographs and/or video images of the flooring and major components such as cabinets, moldings, doors, intercom systems, and fixtures for every room and bathroom and, to the extent possible, security systems, appliances and audio such as surround sound.

** The photographs do not need to be pictures taken specifically for the litigation. For example, family photographs or photographs taken for purposes of refinancing a mortgage are acceptable in the absence of other photographs.

Response:  All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 7."

**PFS REQUEST FOR DOCUMENT PRODUCTION #8:**  Please produce the following documentation concerning the remediation of the Property:  The remediation contract and an itemization from the contractor who performed the remediation work of the materials used during the remediation, including, but not limited to, manufacturer, model number, and quantity.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 8."

**PFS REQUEST FOR DOCUMENT PRODUCTION #9**:  Please produce the following documentation concerning the remediation of the Property:  An itemized invoice from the contractor who performed the remediation work ("Itemized Invoice") showing the scope of work carried out.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 9."

**PFS REQUEST FOR DOCUMENT PRODUCTION #10**:  Please produce the following documentation concerning the remediation of the Property:  Proof of payment of the Itemized Invoice and any other expenses, such as cancelled checks, credit card statements, etc.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 10."

**PFS REQUEST FOR DOCUMENT PRODUCTION #11**:  Please produce the following documentation concerning the remediation of the Property:  A floor plan of the Affected Property with dimensions.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 11."

**PFS REQUEST FOR DOCUMENT PRODUCTION #12**:  Please produce the following documentation concerning the remediation of the Property:  An Environmental Certificate.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 12."

**PFS REQUEST FOR DOCUMENT PRODUCTION #13**:  Please produce the following documentation concerning the remediation of the Property:  An Owner Disclosure Affidavit in the form attached as Exhibit 1, which includes a certification that the materials provided comprise all of the available documentation regarding the following:  The drywall that was in the Affected Property prior to the commencement of the remediation; and, the scope, extent, and cost of the remediation.

**Response**: All documents in Plaintiff's possession responsive to this request are attached as "Exhibit 13."

9

**VERIFICATION**

I hereby verify that the responses to the Plaintiff Fact Sheet are correct to the best of my knowledge.

_Jawad Gha_
_Fatme Gharib_
_____
Signature of Plaintiff

1/19/2019
_____
Date

Jawad Gharib and Fatme Gharib
_____
Printed Name

# Exhibit 1

# Orleans Parish
## Assessor's Office

| **Return to Main Search Page** | **Orleans Home** |
|---|---|

## Owner and Parcel Information

| | | | |
|---|---|---|---|
| **Owner Name** | GHARIB JAWAD K | **Today's Date** | July 4, 2018 |
| **Mailing Address** | 4 BERESFORD DR. METAIRIE, LA 70001 | **Municipal District** | 7 |
| **Location Address** | 8807 S CLAIBORNE AV | **Tax Bill Number** | 716307009 |
| **Property Class** | Commercial | **Special Tax District** | |
| **Subdivision Name** | | **Land Area (sq ft)** | 10800 |
| **Zoning District** | Show Viewer (41027245) | **Building Area (sq ft)** | 5552 |
| **Square** | 337 | **Revised Bldg Area (sqft)** | |
| **Book** | 32 | **Lot / Folio** | H-I / 041 |
| **Line** | 009 | **Parcel Map** | Show Parcel Map |
| **Legal Description** | 1. SQ 337 LOTS H-1 2. S CLAIBORNE & EAGLE 3. 90 X 120 | **Assessment Area** | HOLLYGROVE COM 71 Show Assessment Area Map |

## Value Information

Estimate Taxes   Tax Information

Special Assessment Treatment

| Year | Land Value | Building Value | Total Value | Assessed Land Value | Assessed Building Value | Total Assessed Value | Homestead Exemption Value | Taxable Assessment | Age Freeze | Disability Freeze | Assmnt Change | Tax Contract |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | $ 108,000 | $ 317,400 | $ 425,400 | $ 10,800 | $ 39,680 | $ 50,480 | $ 0 | $ 50,480 | | | BOR-18 | |
| 2017 | $ 108,000 | $ 317,400 | $ 425,400 | $ 10,800 | $ 39,680 | $ 50,480 | $ 0 | $ 50,480 | | | | |
| 2016 | $ 108,000 | $ 317,400 | $ 425,400 | $ 10,800 | $ 39,680 | $ 50,480 | $ 0 | $ 50,480 | | | | |

Certified Values

## Change Order Information

| Year | Date Approved | Reason | Assessed Land Value | Assessed Building Value | Total Assessed Value | Homestead Exemption Value | Taxable Assessment |
|---|---|---|---|---|---|---|---|
| 2016 | 02/22/2016 | Other – Reason: MARKET VALUE INDICATES CHANGE. PROPERTY REMAINS DAMAGED PER OUR | $ 7,000 | $ 21,900 | $ 28,900 | $ 0 | $ 28,900 |

## Sale/Transfer Information

| Sale/Transfer Date | Price | Grantor | Grantee | Notarial Archive Number | Instrument Number |
|---|---|---|---|---|---|
| 11-12-2002 | $ 112,000 | | GHARIB JAWAD K | 02-56962 | 000247544 |
| 06-19-1984 | $ 0 | | | 051925 | 000000000 |

| **Building Sketch 1** | **Building Photos Enlarge/Show All** |
|---|---|
| |  |



| | | Building Sketch 1 |
|---|---|---|
| | | Building Sketch Not Available |

**Building Photos  Enlarge/Show All**



| **Return to Main Search Page** | **Orleans Home** |
|---|---|

The Orleans Parish Assessor's Office makes every effort to produce the most accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use or interpretation. Website Updated: July 4, 2018

© 2009 by the Orleans Parish Assessor's Office | Website design by qpublic.net

APPRAISAL OF

**8807 South Claiborne Avenue
(Mixed Use - Commercial/Residential Property)
New Orleans, Louisiana**

**BAS File No. 15-78**

**The Findings of This Appraisal
Are Presented in an
Appraisal Report Format**

**FOR**

**Home Bank
3798 Veterans Memorial Boulevard
Metairie, Louisiana 70002**

**BY**

**William M. Baldwin, Jr., MAI
Louisiana State Certified General Real Estate Appraiser (No. G0601)
Baldwin Appraisal Services, LLC
1100 Poydras Street, Suite 2900
New Orleans, Louisiana  70163
(504) 264-5233**

# TABLE OF CONTENTS

Letter of Transmittal                                                          1
Assumptions and Limiting Conditions                                            4
Summary of Salient Facts and Conclusions                                       9
Appraisal Type/Purpose and Value, Etc. Definitions                            11
Intended Use/Users of the Appraisal                                           11
Effective Date of the Appraisal                                               12
Property Rights Appraised                                                     12
Scope of the Assignment and Discussion of the Appraisal                       13


**APPRAISAL INTRODUCTION AND SUBJECT PROPERTY DATA**

Legal Description                                                             20
Site Data                                                                     21
Improvement Data                                                              25
Subject Photographs                                                           29
Neighborhood Data                                                             36
Tax and Assessment Data                                                       37
Sale/Marketing History                                                        38


**HIGHEST AND BEST USE ANALYSIS**

Highest and Best Use Analysis                                                 40


**VALUATION SECTION**

Income Capitalization Approach to Value                                       43
Sales Comparison Approach to Value                                           56
Correlation and Final Market Value Estimate                                   69
Marketing Period Analysis                                                     70


**ADDENDA**

Qualifications of the Appraiser
Zoning Excerpts
Letter of Engagement

# Baldwin Appraisal Services, LLC

1100 Poydras Street • Suite 2900 • New Orleans, Louisiana 70163
Greater New Orleans Area
Phone No. (504) 264-5233 • Fax No. (504) 264-5925

William M. Baldwin, Jr., MAI                                  Louisiana Certified General
E-Mail: wbaldwin@appraisal.no.com                                Real Estate Appraiser

December 28, 2015
BAS File No. 15-78

Home Bank
3798 Veterans Boulevard
Metairie, Louisiana 70002

Attention: Mr. Jose Aldaya

                    Re:    Appraisal of
                           8807 South Claiborne Avenue
                           (Mixed Use Commercial/Residential Property)
                           New Orleans, Louisiana

Ladies and Gentlemen:

In accordance with your request, I have examined the above-referenced property
which is more fully described herein, and analyzed matters pertinent to the
estimation of its current market value, presuming a typical exposure time. This
appraisal is performed in accordance with your letter of authorization received on
December 8, 2015 a copy of which is contained in the **Addenda** of this report.
Enclosed is my Appraisal Report, including exhibits and addenda, which contains
data and analysis supportive of the conclusions presented.

Briefly, the subject property constitutes a 10,800 square foot site which forms the
northwest corner of the intersection of S. Claiborne Avenue and Eagle Street and is
currently improved with a two-story structure containing 5,710 square feet of gross
building area. This gross building area excludes the unfinished attic area which is
accessed from a rear stairwell and has been partially framed, wired and plumbed to
facilitate the future creation of an additional residential unit. The primary
improvement is partitioned into two ground floor commercial units and three
second floor two bedroom apartments. Subject's largest commercial unit is owner
occupied and the three residential apartments are rented on a month to month
basis.

Home Bank
BAS File No. 15-78
December 28, 2015
Page Two

"**Market Value**", as used herein, is defined as, "The most probable price a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1) Buyer and seller are typically motivated;

2) Both parties are well informed or well advised, and acting in what they consider their own best interests;

3) A reasonable time is allowed for exposure in the open market;

4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale".[1]

"**Exposure Time**", as used herein, is defined as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market".[2]

The market value concluded herein is based upon an exposure time estimate of six to twelve months; this projection is for the particular property addressed in this appraisal in the economic environment evidenced as of the date of appraisal, and presumes due diligence in the sale effort, with an offering price which is substantially compatible with the value estimated herein.  This estimate is based upon my general knowledge of the market in which subject competes, specific information gathered through the comparable data verification process, and interviews with market participants/agents.

Subject was last inspected on December 15, 2015 and the value concluded herein is effective as of said date.  Further, all comparables utilized in this report were inspected by the appraiser on or near the valuation date of the last inspection.

---

[1]   United States Treasury Department, Comptroller of the Currency 12 CFR part 34.42(f).

[2]   Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2014-2015 Edition, page U-79.

**Baldwin Appraisal Services, LLC**

Home Bank
BAS File No. 15-78
December 28, 2015
Page Three

This *Appraisal Report* is intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein.

No responsibility has been assumed for matters legal in nature, nor has the title been examined by this appraiser. This appraisal presumes subject property to be free from encumbrances, except as specifically noted herein, and under responsible ownership. My appraisal has been made in conformity with and is subject to the requirements of the Code of Professional Ethics and Uniform Standards of Professional Appraisal Practice of the Appraisal Institute and the State of Louisiana, the latter's guidelines being articulated in their appraiser certification law. Further, this appraisal complies with current FIRREA and Home Bank requirements, as I interpret same.

Based upon data and analysis presented herein, it is my opinion that the as is market value of the unencumbered interest in subject property, except as specifically noted herein, as of December 15, 2015, is estimated to be:

**Six Hundred Fifty Thousand and No/100 ($650,000.00) Dollars**
**(Presumes An Exposure Time of 6 to 12 Months)**

This is to certify that I have no interest, present or contemplated, in the subject property. My opinion of value is subject to the *Certifications, Assumptions, and Limiting Conditions* stated in the body of this report; please pay particular attention to any *Special/Extraordinary Certifications, Assumptions and Limiting Conditions* cited herein.

Respectfully submitted,

William M. Baldwin, Jr., MAI
Louisiana State Certified General
Real Estate Appraiser (No. G0601)

Enclosures

## CERTIFICATIONS, ASSUMPTIONS, AND LIMITING CONDITIONS

### I.  Certifications

The undersigned does hereby certify that to the best of his knowledge and belief, and except as otherwise noted in this appraisal report:

**A.**    The statements of fact contained in this report are true and correct; however, no responsibility is assumed for the accuracy of such information as survey, title information, measurements, and other information such as comparable and other data furnished by others.

**B.**    The reported analyses, opinions and conclusions are limited only by the reported assumptions, limiting conditions and the stated market value premise (imposed by the terms of the assignment), and are my personal, unbiased professional analyses, opinions and conclusions.

**C.**    The appraiser has the training, knowledge, and experience to complete the appraisal assignment competently and/or has taken all steps necessary (as disclosed herein where appropriate) to complete the assignment competently.

**D.**    This appraisal is not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

**E.**    Both the appraiser and this company do not have any present or prospective interest in the property that is the subject of this report, and he/they do not have any personal interest or bias with respect to the parties involved.

**F.**    My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

**G.**    This is to certify that during the inspection and research of the property that is the subject of this appraisal, the appraiser observed/discovered no evidence of potential environmental hazards, excepting those specifically detailed in the **Letter of Transmittal** and other appropriate portions of this report. However, this is not to imply that the appraiser has conducted any environmental audit inasmuch as he is not qualified to accomplish same. Even though t   he appraiser observed no obvious conditions, other than those specifically identified, which may or may not indicate the presence of hazardous materials, those wishing to assure themselves that none exist should retain an expert in this field.

15-78

- 4 -

## CERTIFICATIONS, ASSUMPTIONS, AND LIMITING CONDITIONS
### (Continued)

### I.  Certifications (Continued)

**H.**    During customary inspection and research of subject property, the appraiser observed/discovered no evidence to suggest the property to be affected by current wetlands regulations, unless specifically detailed in the **Letter of Transmittal**, and other appropriate portions of this report.  This is not to imply that the appraiser has made a wetlands determination as same can only be accomplished by the U.S. Army Corps of Engineers at the request of the property owner.

**I.**    The reported analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

**J.**    The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

**K.**    No one, other than those specifically cited herein, provided significant real property appraisal/consulting assistance to the person signing this certification (see *Professional Assistance* under *Part IV* of the **Certifications**, **Assumptions**, and **Limiting Conditions**).

**L.**    William M. Baldwin, Jr. has made a personal inspection of the property that is the subject of this report.

**M.**    William M. Baldwin, Jr. is currently a Louisiana State Certified General Real Estate Appraiser (No. G0601).  As of the date of this report, he has completed the continuing education program of the Appraisal Institute.

**N.**    William M. Baldwin, Jr. has not provided any real estate services, as an appraiser or in any other capacity, regarding the subject property within the last three years.

## CERTIFICATIONS, ASSUMPTIONS, AND LIMITING CONDITIONS
### (Continued)

## II.  Assumptions and Limiting Conditions

A.   It is assumed that the utilization of the land and improvements is within the boundaries of property lines of the property described and there is no encroachment or trespass unless noted within the report.

B.   The undersigned appraiser assumes that title to the property is free and clear, unencumbered, and there are no leases, easements, liens or other encumbrances on the property other than those listed in this report; however, no responsibility is assumed by the appraiser for any aspect of the title.

C.   No consideration is given any mineral rights or other subterranean interest (i.e., water, gravel, salt, etc.), unless specifically identified in the letter of transmittal and other appropriate portions of this appraisal report.

D.   No responsibility is herein assumed for any matters which are legal or political, social or economic changed conditions which could have an effect on real estate values which changes take place after the date of this valuation.

E.   In this appraisal assignment, the existence of potentially hazardous materials used in the construction or maintenance of the improvements, such as the presence of urea formaldehyde foam insulation or lead paint, or the existence of toxic wastes in the land, which hazardous materials may or may not be present on the property, has not been considered, except as specifically noted in the letter of transmittal and appropriate portions of this report (see *Certifications* under *Part I* of the **Certifications**, **Assumptions**, and **Limiting Conditions**).

F.   This appraisal assumes subject to be unaffected by current wetlands regulations unless specifically detailed in the **Letter of Transmittal**, and other appropriate portions of this report (see *Certifications* under *Part I* of the **Certifications**, **Assumptions**, and **Limiting Conditions**).

G.   The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further that all applicable zoning, building and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority -- local, state, federal and/or private entity/ organization -- have been or can be obtained for the use(s) considered in the value estimate.

15-78

**CERTIFICATIONS, ASSUMPTIONS, AND LIMITING CONDITIONS**
**(Continued)**

**II.  Assumptions and Limiting Conditions (Continued)**

**H.**     The Americans with Disabilities Act (ADA) became effective January 26, 1992.  I have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA; I am not professionally qualified to accomplish this task.  Further, no formal study, as accomplished, by qualified experts, has been provided to the appraiser nor is one known to exist.  It is possible that a compliance survey of the property together with a detailed analysis of the requirements of ADA, could reveal that the property is not in compliance with one or more of the requirements of the act.  If so, this fact could have a negative effect upon the value of the property.  Since I have no direct evidence relating to this issue, I did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

**I.**     During inspection and research of subject property, the appraiser observed/ discovered no evidence of structural defects, termite damage, etc., except as specifically detailed in this report.  However, the appraiser is not a trained or certified home/building inspector and this report should not be relied upon to disclose any such conditions present in the subject property.  Further, by preparing this report, the appraiser is not acting as a building inspector, structural engineer, or pest inspector.  In performing the limited inspection of this property, areas that were readily accessible were visually observed and the review is superficial only.  This inspection is not technically exhaustive and does not offer warranties or guarantees of any kind.  No responsibility is assumed for any non-apparent or hidden defects; those who wish to assure themselves that such problems do not exist should retain appropriate experts/professionals.

**III.  Restriction Upon Disclosure and Use**

Disclosure of the contents of this appraisal report is governed by the By-Laws and Regulations of the Appraisal Institute.

This appraisal report is prepared for the sole and exclusive use of the appraiser's client, as specifically cited herein.  No third parties are authorized to rely upon this report without the express written consent of the appraiser.

Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which he is connected, or any reference to the Appraisal Institute or to the MAI or SRA designation) shall be disseminated to the public through advertising media, public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the undersigned.

15-78                                                                                          - 7 -

## CERTIFICATIONS, ASSUMPTIONS, AND LIMITING CONDITIONS
### (Continued)

**IV.  Professional Assistance**

The names of those who provided substantial assistance to the appraiser are listed below.

_____          _____

**V.  Special/Extraordinary Certifications, Assumptions and Limiting Conditions**

The signer of this report has no financial obligations (indebtedness or pledges) to the client, nor are any contemplated, which would affect my ability to objectively complete this appraisal assignment

_____          _____
William M. Baldwin, Jr., MAI
Louisiana State Certified General
Real Estate Appraiser (No. G0601)

15-78                                                                                        - 8 -

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

**CLIENT:**                                  Home Bank

**PROPERTY OWNER/**
    **BORROWER:**                    Jawad K. Gharib/Laundromat Zone, Inc.

**PROPERTY ADDRESS:**           8807 South Claiborne Avenue, New
                                              Orleans, Louisiana

**KIND OF PROPERTY:**            Subject property constitutes a 10,800 square
                                              foot, commercially zoned site that is
                                              primarily improved/developed with a 5,710
                                              square foot, two story structure that is
                                              partitioned into a two first floor commercial
                                              units and three second floor apartments.

**PROPERTY "FACTS"**

    **Land Area:**                    10,800 square feet
    **Zoning:**                       C-1; General Commercial District
    **Gross Building Area**:          5,710 square feet

**HIGHEST AND BEST USE:**        *Site "As Vacant"* - Development with a
                                              retail/commercial project

                                              *Property "As Improved"* - Continued use of
                                              the property in support of the operation of a
                                              two first floor commercial units and three
                                              second floor residential apartments.

**APPROACHES TO VALUE:**              **VALUE INDICATIONS**

    **Cost Approach:**                         N/A
    **Income Capitalization Approach:**        $540,000
    **Sales Comparison Approach:**             $685,000

**DATE OF VALUE ESTIMATE:**      December 15, 2015

**DATE REPORT COMPLETED:**       December 28, 2015

15-78                                                                        - 9 -

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS
### (Continued)

**ESTIMATED MARKET VALUE: $650,000**

**INTEREST APPRAISED:**      Unencumbered/Fee Simple

**ESTIMATED MARKETING
  PERIOD:**       Within 6 to 12 Months

**NEIGHBORHOOD TREND/
  LIFESTAGE:**      Stable/Modest Growth

**APPRAISER:**      William M. Baldwin, Jr., MAI
                Louisiana State Certified General
                Real Estate Appraiser (No. G0601)

15-78

## APPRAISAL TYPE/PURPOSE AND VALUE, ETC. DEFINITIONS

The purpose of this appraisal is to estimate the market value for the subject property, presuming a reasonable/typical exposure time. Further, my value opinion is presented in an Appraisal Report, as defined by the Uniform Standards of Professional Appraisal Practice.

"**Market Value**", as used herein, is defined as, "The most probable price a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1) Buyer and seller are typically motivated;

2) Both parties are well informed or well advised, and acting in what they consider their own best interests;

3) A reasonable time is allowed for exposure in the open market;

4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale".[3]

"**Exposure Time**", as used herein, is defined as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market".[4]

## INTENDED USE/USERS OF THE APPRAISAL

This appraisal is to provide a market value estimate to the client to assist in the collateral evaluation/loan underwriting process. This report is for the exclusive use of the Home Bank, its affiliates, designates and assignees, and no other party shall have any right to rely on this appraisal provided by Baldwin Appraisal Services, LLC without prior written consent.

---

[3] United States Treasury Department, Comptroller of the Currency 12 CFR part 34.42(f).

[4] Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2014-2015 Edition, page U-79.

## EFFECTIVE DATE OF THE APPRAISAL

Subject was last inspected on December 15, 2015 and the value concluded herein for the subject property is effective as of said date.

## PROPERTY RIGHTS APPRAISED

Excepting any specifically noted site servitudes/easements, if any, this appraisal addresses the unencumbered or fee simple interest/estate in the subject property. **"Fee Simple Estate"**, as used herein, is defined as "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat".[5]

---

[5]   The Dictionary of Real Estate Appraisal, Appraisal Institute, Fifth Edition, page 78.

15-78                                                                                                  - 12 -

## SCOPE OF THE ASSIGNMENT AND DISCUSSION OF THE
## APPRAISAL DEVELOPMENT/REPORTING PROCESS

It is my purpose herein to establish the market value of a mixed-use property located at the intersection of South Claiborne Avenue and Eagle Street in New Orleans, Louisiana. The site of 10,800 square feet is improved with a two story structure that is partitioned into two first floor commercial units and three second floor apartments. There is an unfinished attic space that is accessed via a rear stairwell and could be finished into additional building area (currently partially framed with some electrical/plumbing in place).

Two of the three classical approaches to value (**Income Capitalization** and **Sales Comparison**) were considered and are employed herein. Given the age of subject's improvements and the subjectivity involved in estimating all forms of depreciation, the **Cost Approach** will be excluded as it is not a primary value indicator in this instance. Detailed explanation of the application of these approaches to value is provided elsewhere in this report, but following please find a brief description of these appraisal methods.

The **Income Capitalization Approach to Value** involves the analysis of comparable rent and expense levels of similar properties from which a projection of subject's potential net income can be derived. An analysis of acceptable return on and of investment necessary to attract capital is simultaneously undertaken. Net Income estimates are processed via Direct Capitalization into an indication of current value.

The **Sales Comparison Approach to Value** involves an analysis of recent sales of similar competitive properties, comparing/analyzing all important characteristics relative to the subject. Such study tends to establish a range within which the value of the subject property will fall. Further, interpretation and analysis of the comparable data, including adjustment for all pertinent differences relative to the subject, leads the appraiser to an estimate of the probable price for which the subject property could be sold as of the date of the appraisal.

The final step in the valuation process involves the reconciliation of the value indications provided by the various approaches to value into a final value conclusion. The relative merits, weaknesses, significance, defensibility and applicability of each of the approaches to value utilized in the report are weighed, and a final estimate of market value for the subject property as of the date of the appraisal is concluded.

## SCOPE OF THE ASSIGNMENT AND DISCUSSION OF THE APPRAISAL DEVELOPMENT/REPORTING PROCESS
### (Continued)

In conducting this appraisal, the appraiser contacted various brokers, investors and Realtors familiar with the property type being appraised. Relevant market data (sales and current listings) was gathered from all available sources, including courthouse records, the assessor's office and real estate data services (Deedfax, etc.). The supply and demand characteristics in the market were also analyzed and related to the subject property. This information was ultimately correlated to establish appropriate value parameters for the subject property.

The scope of work (type and extent of research and analysis) employed in this appraisal is based on what is required to produce **creditable assignment results** in the context of the intended use. Creditable results are defined as being "worthy of belief"[6]; credible assignment results require support by relevant evidence and logic, to the degree necessary for the intended use. Further, the results must be compatible with expectations of the appraiser's peers in performing the same or a similar assignment. The appraiser's peers are defined as "other appraisers who have expertise and competency in a similar type of assignment"[7]. As per the client's request, the appraiser's findings are presented in an Appraisal Report, as defined in Standards Rule 2-2a of the Uniform Standards of Professional Appraisal Practice (USPAP) for an appraisal performed in accordance with Standards Rule 1 of USPAP.

---

[6]   Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2014-2015 Edition, page U-2.

[7]   Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2014-2015 Edition, page U-1.

**APPRAISAL INTRODUCTION AND SUBJECT PROPERTY DATA**









# REED ENGINEERING

## CIVIL ENGINEERS & LAND SURVEYORS

P.O. BOX 512, CHALMETTE, LA. 70044
(504) 277-8910

SQ. 337, SEVENTH DISTRICT
RE-SUBDIVISION of LOTS H,I, & J
into LOT H-1

Orleans Parish, La.

NELSON ST. (SIDE)

LOT   H-1

#8807

S. CLAIBORNE AVE.

I HEREBY CERTIFY THE ABOVE PLAN TO BE CORRECT IN ACCORDANCE WITH SURVEY MADE BY ME
AT THE REQUEST OF:

JAWAD GHARIB

DATE: 9/03/05

CIVIL ENGINEER LA. REG. 27076
LAND SURVEYOR LA. REG. 23168

15-78

## LEGAL DESCRIPTION

ONE CERTAIN LOT OF GROUND, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Seventh District of the City of New Orleans, in Square 337 thereof, bounded by South Claiborne Avenue, Eagle, Nelson and General Ogden Streets, designated as Lot H-1 on the plan of subdivision made by Thomas P. Reed, Land Surveyor, dated September 3, 2003, registered in CIN 273956, according to which, said lot forms the corner of South Claiborne Avenue and Eagle Street, and measures 90 feet front on South Claiborne Avenue, the same width in the rear, by a depth and front on Eagle Street of 120 feet, by a depth on the opposite sideline of 120 feet, between equal and parallel lines. Lot H-1 is composed of the whole of original Lots H, I and J.

The improvements thereon bear Municipal No. 8807 South Claiborne Avenue.

## SITE DATA

**General:**   The subject site constitutes a rectangular shaped lot which forms the northwest corner of the intersection of South Claiborne Avenue and Eagle Street. The site is currently improved with a mixed-use commercial/residential development.

For details not specifically discussed herein and complete orientation, please reference the *Maps/Plats* provided in the **Addenda**.

**Size (±):**   90' (S. Claiborne Ave.) x 120' (Eagle Street)

**Area:**   10,800 square feet

**Streets:**   South Claiborne Avenue is a six-lane, median divided, asphalt surfaced roadway over the extent of subject's frontage. This heavily traveled roadway constitutes one of the major thoroughfares through the City of New Orleans. Street amenities include concrete curbs/gutters, sidewalks, street lights and subsurface drainage. A comprehensive drainage project is presently underway along S. Claiborne Avenue in subject's area. As such access to subject has been severely restricted. This circumstance is temporary and the normal traffic patterns and accessibility to subject will return upon completion of the drainage project.

Eagle Street is a two-lane, concrete surfaced roadway which carries minimal traffic and primarily serves the immediate area. This street is generally in average condition and street amenities include concrete curbs/gutters, sidewalks, street lights and subsurface drainage.

**Utilities:**   All public utilities are available including telephone, electricity, natural gas, water and sanitary sewer.

**Site Servitudes/**
**Easements:**   Based upon examination of a survey of subject enclosed herein, there appear to be no apparent servitude/easements.

15-78                                                                                    - 21 -

## SITE DATA
### (Continued)

**Soil Conditions/
Topography:**

Typical of the area consisting of alluvial deposits. Subject site is level and at a base elevation two to three feet above street grade.

**Flood Zone:**

FEMA designated Flood Zone "A-3" - Area of Maximum Flood Hazards (FEMA Map #2252030160E, dated March 1, 1984); while flood zone designated, subject property and the immediate area have no known history of flood problems although street flooding is typical during heavy rainfall.

**Zoning:**

C-1; General Commercial District

This zoning classification allows for a variety of commercial/ retail, service, and office uses which generally serve a wide area and are oriented on major thoroughfares.

**Maximum Building Height -**          100′

**Base Yard Requirements (excluding atypical provisions).**

|  |  |
|---|---|
| **Front:** | None |
| **Side:** | None |
| **Rear:** | None |

**Parking Requirements** - Offstreet parking requirement is based upon use; for retail use one space per 300 square feet of floor area is required and for residential use one space per dwelling unit is required. Based upon applicable zoning ordinance guidelines, ±13 offstreet parking spaces are required for the subject property and ±17 spaces are currently provided.

**Zoning Compliance -** While not to be construed as a legal opinion, the subject site as currently developed, complies with applicable zoning ordinance guidelines.

**Comments:**

Subject site is an irregularly shaped parcel with a configuration that is not ideal but does have abundant street frontage.  No physical or political impairments are known which would adversely effect subject's development.

15-78

# **Zoning Map**





## IMPROVEMENT DATA

### General

Subject site is currently improved with a two-story structure which was constructed in 2007 and is partitioned into two first floor commercial units and three second floor residential apartments. The attic area which is presently unfinished is accessed via a rear stairwell and could be finished into additional building area. The property owner plans to finish this area into an additional +/- 1,000 square foot apartment in the future. In fact the apartment has been partially framed and some electrical wiring and plumbing has been installed. While this unfinished attic area is not included in the properties gross building area, same will be considered in the final valuation of subject.

The commercial units contain +/-800 square feet and +/-2,086 square feet. The property owner operates a Laundromat from the larger unit. The smaller unit is presently vacant and essentially constitutes a white box space with no floor finish, a larger open area and a single restroom. The Laundromat has a single restroom, a small office and a larger room equipped with 20 washers and 20 dryers. A 4' wide balcony extends across the front of the second floor apartments and is accessed via two exterior stairs. Each apartment contains +/-863 square feet and is partitioned into a living room/kitchen, two bedrooms and a bathroom.

Following is a brief outline description of the primary improvement's components/ features.

### Basic Construction

| | |
|---|---|
| **Foundation:** Concrete Slab | |
| **Structural Elements:** | Wood frame |
| **Sub-Floor** | |
| **(Upper levels):** | Wood deck over wood frame structural elements |
| **Exterior Walls:** | Concrete Block/Stucco |
| **Windows:** | Vinyl/aluminum frame |
| **Roof:** | Fiberglass shingle |
| **Exterior Doors:** | Solid core wood/metal and framed glass |
| **Other:** | The structure is fully insulated (foam/batt) and has corrugated gutters and down spouts |
| **Ceiling Height:** | 9' - 10' |

### Interior Finishes - Commercial Units

| | |
|---|---|
| **Floors:** | Concrete, ceramic tile |
| **Walls:** | Drywall |
| **Ceilings:** | Acoustical tile |
| **Trim:** | Softwoods |
| **Lighting:** | Fluorescent fixtures |
| **Doors:** | Hollow core |

15-78

## IMPROVEMENT DATA
### (Continued)

### Interior Finishes - Residential Units

| | |
|---|---|
| **Floors:** | Ceramic tile |
| **Walls:** | Drywall |
| **Ceilings:** | Drywall |
| **Trim:** | Wood |
| **Lighting:** | Incandescent and florescent fixtures |
| **Doors:** | Hollow core |

### Mechanical/Plumbing/Electrical/Etc. - Commercial Units

| | |
|---|---|
| **HVAC:** | Central |
| **Plumbing Fixtures:** | One restroom per unit |
| **Electrical:** | Adequate capacity and distribution |
| **Other:** | The largest commercial unit is utilized as a Laundromat and is presently equipped with 20 washers/20 dryers.  All equipment associated with the operation of a Laundromat from the premises is considered to be personal party and is not part of this valuation. |

### Mechanical/Plumbing/Electrical/Etc. - Residential Units

| | |
|---|---|
| **HVAC:** | Central |
| **Plumbing Fixtures:** | Average quality fixtures each unit has an individual water heater. |
| **Electrical:** | Adequate capacity and distribution |
| **Kitchen/Features Equipment:** | Range/oven, refrigerator/freezer, disposal, dishwasher, average quality cabinets and Formica countertops. |

### Project Amenities/Other Improvements

The majority of subject site not improved with building is concrete surfaced for offstreet parking (17 spaces) and access.   There is minimal landscaping.

15-78                                                                                          - 26 -

## IMPROVEMENT DATA
### (Continued)

### Comments

Subject's first floor commercial units  are generally in average overall condition
and remain functional for their current use. While one of subject units is presently
configured for use as a Laundromat (additional plumbing and electrical
distribution) and this use is reportedly successful, same could be easily
reconfigured for a variety of traditional retail uses.  The second floor apartments
are likewise in average overall condition.  No items of deferred maintenance were
noted beyond minor cosmetic repairs, touch up painting and general cleaning.  The
smaller commercial unit is in need of some of the wood baseboards and trim.
Further there is presently no floor covering in the main retail area of this unit but
same is going to be leased as a white box space with the tenant responsible for
installing a floor to their specifications.

Subject project improvements are reasonably designed and functional for their
intended use as a commercial/residential project.

Please reference the *Photographs/Building Plans* which follow for additional
project data.

15-78



## PHOTOGRAPHS OF THE SUBJECT PROPERTY



**Front View of Subject**



**Rear View of Subject.**

## PHOTOGRAPHS OF THE SUBJECT PROPERTY





**Interior Views of Commercial Units.**

### PHOTOGRAPHS OF THE SUBJECT PROPERTY
#### (Continued)





**Interior Views of Commercial Units.**

## PHOTOGRAPHS OF THE SUBJECT PROPERTY
### (Continued)





**Interior Views of Second Floor Apartment Units.**

15-78

- 32 -

## PHOTOGRAPHS OF THE SUBJECT PROPERTY
### (Continued)





**Interior Views of Second Floor Apartment Units.**

## PHOTOGRAPHS OF THE SUBJECT PROPERTY
### (Continued)



**Interior View of Unfinished Attic Space.**



**View of Eagle Street.**

## PHOTOGRAPHS OF THE SUBJECT PROPERTY
### (Continued)





**Views of South Claiborne Avenue.**

# NEIGHBORHOOD DATA

Subject property is located in an older/mature area of western Orleans Parish. More particularly, it is oriented on South Claiborne Avenue at its intersection with Eagle Street.   South Claiborne Avenue is the primary east/west traffic artery that primarily bisects the neighborhood.

Subject's neighborhood boundaries can generally be defined as Oak Street to the south, S. Carrollton Avenue to the east, the Earhart Expressway to the north and the Jefferson Parish line to the west.  Development in the area is primarily single and multi-family residential with commercial construction located, for the most part, along primary traffic arteries such as Carrollton Avenue, Oak Street and Earhart Boulevard.

The neighborhood single and multi-family residential construction is older (40 to 100 years of age) and varies significantly in quality and condition.  The residential development located between South Carrollton Avenue and the Jefferson Parish line is ranges from upscale development near S. Carrollton Avenue to more modest single and two family dwellings.   There has been some new residential development and renovations of existing residential properties in the surrounding residential area.

Commercial development along South Carrollton Avenue and S. Claiborne Avenue is found in well defined pockets, the result of spot zoning.  The many commercial businesses which are attracted by the demographics of subject's immediate area have difficultly in moving into the neighborhood due to the limited amount of commercially zoned property and an even smaller amount of vacant developable land.  This circumstance has resulted in high land prices for those lands zoned for commercial use.

In summary, subject neighborhood will likely remain a mixed use area.  Subject's particular location on South Claiborne Avenue enhances its appeal.  It is anticipated that this area will continue to be generally stable with some modest growth continuing in the form of both new construction and renovation of existing improvements.

# TAX AND ASSESSMENT DATA

## Assessment Methodology

The method of assessment for the State of Louisiana as defined in the state's new constitution adopted in 1974 and effective as of 1978 is "market value times assessment ratio times millage rate".

Current assessments are based upon a statewide appraisal of all properties subject to ad valorem taxation performed and submitted by the individual parish assessors to the State Tax Commission for the Tax Year 2010.  The tax base is established based upon assessment ratios of 10% of "market value" on land and residential improvements and 15% of "market value" for all other improvements.

The existing state constitution calls for "reappraisal" of market value at a minimum every four years.  Next mandatory reassessment is due in 2016.  After statewide reappraisal in 2012, the last state mandated reassessment period, millage rates for all taxing districts were readjusted so that each taxing district could collect no more in tax revenues in 2012 than it did in 2011.  However, after 2012, each taxing district can adjust their millage rate annually to meet budgetary and bonding requirements provided proper, prior legal approval is voted by the residents of that taxing district.  This process is to be implemented with each mandatory reassessment.

## Current Subject Property Tax and Assessment Information

Orleans Parish taxes are due and payable in advance.  Thus, 2015 assessments and millage rates apply currently.  Current assessment data (2015) for the subject property is as follows:

**Assessment (Bill No. 716307009)**

| | |
|---|---|
| Land | $  7,000 |
| Improvements | $ 21,900 |
| Total | $ 28,900 |

| | |
|---|---|
| **2015 Millage Rate** | .14867 |

| | |
|---|---|
| **Tax** | **$4,296.56** |

According to the New Orleans Assessors office the subject property is tax exempt.  There are no known municipal liens (street, sewer, etc.) outstanding regarding subject property.   Employing the methodology described above, a value of $284,000 (Land - $70,000; Improvements - $140,000) is implied for subject by the current assessment.  Based on the value concluded herein, this assessment appears to be understated.

15-78

## <u>SALE/MARKETING HISTORY OF SUBJECT PROPERTY</u>

There have been no arms length sales of subject property within the last three years. Subject property is not presently being marketed for sale nor is it subject to any pending sale agreement.

15-78

## HIGHEST AND BEST USE ANALYSIS

## HIGHEST AND BEST USE ANALYSIS

Highest and best use is defined as "that use which at the time of appraisal is most likely to produce the greatest net return to the land and/or building over a given period of time".  This use must be logical, likely, reasonably probable, and proximate and not such as is merely possible.

There are essentially four criteria that the highest and best use must meet.  Such use must be:

|      |                           |
|------|---------------------------|
| 1.   | physically possible;      |
| 2.   | legally permissible;      |
| 3.   | financially feasible; and |
| 4.   | maximally productive.     |

These criteria are usually considered sequentially.  To illustrate the logic of such, it would make little difference if a particular use was financially feasible if it were not physically possible or legally permissible.

This discussion of highest and best use is segregated between that of the site "as vacant" and the property "as improved".

### Site "As Vacant"

The determination of the highest and best use of the site "as vacant" is made under the theoretical presumption that the land is vacant and available for development. Considering the site "as vacant", two possibilities exist: leave the site as it is or develop same.

From a physical standpoint, the subject has been previously described as being a rectangular shaped tract containing a total of 10,800 square feet.  The site's shape is not particularly prohibitive for most potential uses, and street access, soil conditions and utility availability are likewise suitable for most development alternatives.  In general terms there are no physical constraints to reasonable development.

Zoning applicable to the subject site (C-1; General Commercial District) permits a wide variety of commercial uses and subject site is generally suitable for such (adequately sized/ configured and served by appropriate infrastructure/services). Subject is located in a predominately residential area that flanks Claiborne Avenue between S. Carrollton Avenue and the Orleans/Jefferson Parish line.  In fact, subject constitutes one of the few commercially zoned properties in this area. Study of access routes, logistics, etc. clearly favor some form of convenience commercial development that primarily supports the surrounding residential development.   As such, subject's zoning is not considered overly restrictive.

15-78

## HIGHEST AND BEST USE ANALYSIS
### (Continued)

### Site "As Vacant" (Continued)

Financial feasibility and maximal productivity relate to implementation of a particular development scheme and its economic viability in comparison to alternative uses. While a site may be physically suitable for a particular utilization and legal restrictions allow same, it may be unsupportable economically or an alternate use may be more profitable. Even for a vacant site concerns regarding these elements of highest and best use must be considered. Commercial development, probably on a proprietary basis, is considered to be most likely and maximally productive in this instance. Further, given subject's size and physical features, development as a single economic unit.

Thus, subject site's highest and best use "as vacant" is for commercial development with either a single tenant or small multi tenant project that will serve the surrounding residential development as well as benefit from exposure to the high traffic volumes of South Claiborne Avenue. It is likely that any such development will be either entirely or partially owner occupied.

### Property "As Improved"

Subject improvements are presently configured as a mixed-use project containing two commercial units and three residential units. The project is readily accessible and has reasonable exposure and identity. The project was constructed in 2007 and has generally enjoyed a good occupancy history. Presently only subject's small commercial unit is vacant though same will reportedly be leased within the next 30 days. The larger commercial unit was constructed for use as a Laundromat which has been operated by the property owner. However, this unit could readily be converted to a more traditional retail use though it was reported that the existing Laundromat continues to be successful. The other unit is functional for a variety of retail users. Both commercial units benefit from the properties location on a well traveled artery and ample offstreet parking along the front entrances. The second floor apartments are reasonably sized and configured for the area and have had a good occupancy history.

It appears clear that the improvements contribute significantly to total property value beyond that of the site "as vacant". Theoretically, so long as improvements are judged it contribute even $1.00 to total property value above the value of the site "as vacant", they constitute the highest and best use of the property "as improved". Thus, continued utilization of subject as a mixed-use, residential/commercial project constitutes the highest and best use of the property "as improved".

15-78

- 41 -

**VALUATION SECTION**

## INDICATED MARKET VALUE OF SUBJECT BY THE
## INCOME CAPITALIZATION APPROACH TO VALUE

The Income Capitalization Approach is a method in which the earning potential of a property is processed into an indication of value. This approach is based on the principle of anticipation which "affirms that value is created by the anticipation of future benefits (value may be defined as the present worth of future benefits)." [8]

In application of this analysis we have utilized the Direct Capitalization Technique, employing a market derived overall rate to estimate the market value of the subject property by way of the Income Capitalization Approach. This valuation methodology includes estimation of the subject's gross potential income, deduction of an appropriate vacancy and credit loss allowance, operating expenses, and reasonable fees for management and reserves, to arrive at an indicated Net Operating Income (NOI). The resultant stabilized NOI is then capitalized at an appropriate, market derived, overall rate to reflect the indicated market value of the property.

Following, please appropriate summaries of data utilized herein, and value estimate by way of the Income Capitalization Approach.

---

[8]  Real Estate Appraisal Terminology, Revised Edition; Copyright 1981, Editor Byrle N. Boyce; Page 14.

15-78                                                                                          - 43 -

## SUMMARY OF COMPARABLE RENTAL DATA

| Comp. I.D. | Address | Area Leased (S.F.) | Monthly Rent | Unit Rent | Rental Basis | Use |
|---|---|---|---|---|---|---|
| R-1 | 7200 Washington Ave. | 1,920 | $1,600 | $10.00 S.F./Year | Mod. Gross | Retail |
| R-2 | 4747 Earhart Blvd. | 2,000 | $1,900 | $11.40/S.F./Year | Mod. Gross | Retail |
| R-3 | 2727 S. Broad Street | 919 - 1,340 | $1,531 - $1,950 | $17.01/S.F./Year - $20.73/S.F./Year | Mod. Gross | Retail |
| R-4 | 3609 Toledano St. | 2,198 | $1,800 | $9.83/S.F./Year | Mod. Gross | Retail |
| R-5 | 2236 Joliet St. | 937 - 2/1 | $750 | $0.80/S.F./Month | Mod. Gross | Apartment |
| R-6 | 2630 Eagle St. | 850 - 2/1 | $795 | $0.94/S.F./Month | Mod. Gross | Apartment |
| R-7 | 2611 Eagle St. | 1,000 - 2/1 | $995 | $1.00/S.F./Month | Mod. Gross | Apartment |
| R-8 | 8524-26 Apricot St. | 850 - 2/1 | $850 | $1.00/S.F./Month | Mod. Gross | Apartment |



## COMPARABLE RENTAL PHOTOGRAPHS



**Photograph of Comparable R-1.**



**Photograph of Comparable R-2.**

## COMPARABLE RENTAL PHOTOGRAPHS



**Photograph of Comparable R-3.**



**Photograph of Comparable R-4.**

## COMPARABLE RENTAL PHOTOGRAPHS



**Photograph of Comparable R-5.**



**Photograph of Comparable R-6.**

## COMPARABLE RENTAL PHOTOGRAPHS



**Photograph of Comparable R-7.**



**Photograph of Comparable R-8.**

## ECONOMIC/MARKET RENT ANALYSIS

The previously listed comparable rentals are all located in subject's broad market area and would effectively compete with subject.  The data previously listed relates well to subject and is deemed relevant in consideration of both its location and use.  Same is relied upon to test the reasonableness of the contract rents for the residential units which are all occupied as well as establish the economic rent for subject's commercial units (one of which is vacant and the other is owner occupied).  Each of the residential apartments are rented for $775 per month which equates to a unit rent of $0.90 per square foot per month ($775 divided by 863 square feet).

Comparables R-1 through R-4, which project rental rates ranging from $9.83 per square foot per year to $20.73 per square foot per year, are utilized herein to establish an economic rent for the commercial units.  All of the comparables are leased on a modified gross basis with the lessee being responsible for a unit utility and interior maintenance charges and the lessor responsible for all other property expenses including taxes, insurance and roof/structural maintenance. As previously noted the larger of subject units (2,086 square feet) is owner occupied (Laundromat) and the smaller unit (800 square feet) is vacant.   However, the property owner reported that this unit will likely be leased in January 2016 for $1,000 per month.  This equates to a unit rental rate of $15.00 per square foot per year.  The property owner indicated that he would just sign a one year lease as the Claiborne Avenue drainage project should be completed in 2016 at which time traffic patterns will return to normal and the rent for this unit will be able to be increased.  This lease will be established on a modified gross basis.

All of the comparables constitute first floor retail units which are oriented to primary traffic arteries and are generally similar to subject in location and overall appeal.  The primary difference in the rental rates is likely attributable to the size of the units as well as there overall condition.  Comparables R-1, R-2 and R-4 constitute larger units that are located within average quality multi-tenant retail projects.   Comparable R-3 constitutes a multi-unit project oriented near the intersection of Broad Street and Washington Avenue that has been recently renovated and features smaller units that are superior to subject in condition.    In consideration of the size, location and overall quality and condition of subject, a mid range rental rate of $15.00 per square foot is considered to be an appropriate economic/market rent for subject's commercial units.

Comparables R-5 through R-8, which project rental rates from $0.80 per square foot per month to $1.00 per square foot per month, constitute two and three bedroom apartments located in subject's market area.  All of the comparables are reasonably similar to subject in overall locational attributes, quality and condition. The current rents for subject units are well supported by these comparables and same is considered to be representative of an appropriate economic rent for these units.  Thus, an rent of $775 per month or $0.90 per square foot per month is projected for each residential unit.

On the following page please find a Stabilized, Pro-Forma Income Statement for subject project employing the current contract rents and economic/market rent.

## STABILIZED PRO-FORMA INCOME STATEMENT

Gross Potential Income

   Rental Income

| | |
|---|---:|
| Large Commercial Unit (2,086 SF x $15.00 per square foot) | $ 31,290 |
| Commercial Unit (800 SF x $15.00 per square foot) | $ 12,000 |
| Apartment A ($775/Month x 12 Months) | $ 9,300 |
| Apartment B ($775/Month x 12 Months) | $ 9,300 |
| Apartment C ($775/Month x 12 Months) | $ 9,300 |
| Total Potential Income | $ 71,190 |
| Less: Vacancy and Collection Loss Allowance (3%) | ($ 2,136) |
| Effective Gross Income (EGI) | $ 69,054 |

Less: Expenses

| | | |
|---|---:|---:|
| *Fixed* | | |
| Taxes | $ 9,000 | |
| Insurance | $ 4,000 | |
| *Variable* | | |
| Management (5% of EGI) | $ 3,453 | |
| Utilities | $ 3,000 | |
| Maintenance/Reserves/Misc. | $ 2,500 | |
| Total Expenses | | ($ 21,953) |

**Net Operating Income**                                                      **$ 47,101**

## EXPLANATION OF PRO-FORMA INCOME STATEMENTS ITEMS

### Gross Potential Income

Rental Income is based upon the terms and conditions of the leases presently encumbering subject.  Said leases were generally confirmed to be market oriented though analysis of the comparable rental data presented.

### Total Gross Potential Income

The sum total or rental income and recoverable expenses.

### Vacancy and Collection Loss Allowance

A 3% reduction is taken relative to this item.  This projection is considered reasonable in the context of subject property's particular circumstance (reasonable property location, high occupancy history and general market circumstances).

### Effective Gross Income (EGI)

Total Potential Income less Vacancy and Collection Loss Allowance.

### Expenses

Expense estimates are established based upon subject's actual experience, when available, and/or expenses reviewed regarding the operation of comparable projects.

*Fixed Expenses*

> **Taxes** - Based on the value concluded herein as well as current assessment practices and millage rates.

> **Insurance** - Based upon the reported cost of  insurance premium for subject as confirmed by comparable properties

15-78

## EXPLANATION OF PRO-FORMA INCOME STATEMENTS ITEMS
### (Continued)

*Variable Expenses*

**Management -** Based upon 5% of effective gross income and accounts for modest management efforts.

**Utilities -** The small commercial unit and each apartment are on a single water meter that is paid by the lessor.  Further there is a house meter that runs the exterior lights.

**Maintenance/Reserves/Miscellaneous** - The commercial units will pay for all maintenance expenses for their units.  However, a prudent investor would likely budget a modest amount for maintenance and reserves to account for modest maintenance efforts on the apartment units as well as establish a  fund address short-lived improvement components which will require replacement on some scheduled basis (roof, unit turnover costs, etc.).

## Net Operating Income

EGI less all Expenses (Fixed and Variable).

## DIRECT CAPITALIZATION EMPLOYING A
## MARKET DERIVED OVERALL RATE

### Indicated Value of Subject Property Using Direct Capitalization

"Direct capitalization is a method used in the Income Capitalization Approach to convert a single year's income estimate into a value indication. This conversion is accomplished in one step, either by dividing the income estimate by an appropriate income rate or by multiplying it by an appropriate income factor".[9] Specific allocation of return on, and return of capital is not made in direct capitalization because this technique does not make direct forecasts of investor assumptions, holding period, the pattern of income or the long term changes in value of the original investment. However, if the income rate or factor is properly developed using truly comparable sales then, implicitly, all of the above considerations will be included in the rates developed. As a market derived Overall Capitalization Rate is employed herein, the following applies.

$$\text{Value} = \text{Net Operating Income} \div \text{Overall Capitalization Rate}$$

Depending upon the quantity and quality of the data available, the appraisers can estimate an overall capitalization rate using various techniques. Typically, these techniques include derivation from comparable sales, band of investment - mortgage and equity components, band of investment - land and building components, and the debt coverage formula. Abstraction for an overall value from the market is the method employed herein and the basis for same is established following.

### Direct Capitalization Using Overall Rates Developed From Comparable Sales

Overall Rates derived from comparable sales is the preferred method when comparable properties are available. Information relating to sale price, income, expenses, financing terms and market conditions at the time of sale are required. Most importantly, the appraiser must be careful to calculate the net operating income of each comparable sale in a method that is consistent with the way net operating income was estimated for the subject property. Any changes in market conditions and non-market financing must be carefully analyzed. Once these requirements are met the appraiser can estimate the overall rate by dividing each sale's net operating income by its sales price.

---

[9]   The Appraisal of Real Estate, Tenth Edition, Page 467.

## DIRECT CAPITALIZATION EMPLOYING A
## <u>MARKET DERIVED OVERALL RATE</u>
### (Continued)

Following is a table listing sale transactions from which overall rates could be abstracted from the market:

|  | Date | Address | Sale Price | Property Type | Overall Rate |
|---|---|---|---|---|---|
| O-1 | 05/12 | 1501 Religious Street<br>New Orleans, Louisiana | $ 950,000 | Retail | 10.58% |
| O-2 | 07/12 | 16 Airline Highway<br>Kenner, Louisiana | $ 620,000 | Retail | 10.70% |
| O-3 | 04/13 | 1200 Carondelet Street<br>New Orleans, Louisiana | $ 751,147 | Retail/Residential | 10.02% |
| O-4 | 07/14 | 621 & 641 River Highlands<br>Covington, Louisiana | $ 1,208,232 | Office | 9.68% |
| O-5 | 09/14 | 3631 Behrman Place<br>New Orleans, Louisiana | $ 3,167,737 | Office | 8.0% |
| O-6 | 12/14 | 850 Martin Behrman Ave<br>Metairie, Louisiana | $1,699,000 | Apartments | 8.69% |
| O-7 | 02/15 | 1011 Lake Ave<br>Metairie, Louisiana | $1,705,000 | Apartments | 8.78% |

Overall rates ranging from 8.0% to 10.70% are projected by these sales. These sales represent a variety of real estate types throughout the metropolitan New Orleans market. In this instance, primary emphasis is given to the most recent sales occurring since 2014 and a overall rate toward the lower end of the broad range or 8.75% is selected for subject. At a 8.75% overall rate and based upon subject's projected stabilized NOI of $47,101, a value indication of approximately $540,000 ($47,101 ÷ 8.75%, rounded) is indicated.

## INDICATED MARKET VALUE OF SUBJECT BY
## THE SALES COMPARISON APPROACH

The Sales Comparison Approach to Value is used to estimate the value of the subject property.  In application of this approach, the appraisers analyze sales of similar properties which have sold within a reasonable past period of time and compares them to the subject property.  The estimate of value for the subject property takes into consideration physical features and geographic, economic, and social factors.  Consideration is also given to trends and other important factors having a bearing on the value of the subject property as determined by the market.

On the following pages please find summaries of the Improved Comparable Sales considered to be the most useful in estimating the value of the subject property; furthermore, appropriate analysis is also provided.

15-78

## COMPARABLE IMPROVED SALE NO. I-1



| | |
|---|---|
| **ADDRESS:** | 1200 Carondelet Street, New Orleans, Louisiana |
| **DATE:** | April 10, 2013 |
| **RECORDATION:** | NA #2013-13848 , Orleans Parish, Louisiana |
| **VENDOR:** | Carondelet Investors Group, LLC |
| **VENDEE:** | 1200 Carondelet, LLC |
| **SALE PRICE:** | $765,000   **TERMS:** Cash; the vendor reportedly paid $13,853 of the vendee's closing costs.  Thus, the sale has a cash equivalent price of $751,147. |
| **LEGAL DESCRIPTION:** | Lots B and C, Square 213, First District, Orleans Parish, Louisiana |
| **LAND SIZE:** | 5,000 square feet |
| **BUILDING SIZE:** | 9,232 square feet |
| **ZONING:** | C-1A; General Commercial District |

15-78

## COMPARABLE IMPROVED SALE NO. I-1
### (Continued)

**IMPROVEMENT DATA/**
 **REMARKS:**                  This sale is improved with a two story mixed use
                               structure which is partitioned into three first floor
                               commercial units and four second floor apartments.
                               This structure is located at the corner of Carondelet
                               Street and Clio Street approximately one block from
                               St. Charles Avenue.  The improvements were
                               constructed in the early 1900's but were substantially
                               renovated in 2004 are were generally in average to
                               good condition at sale.  The commercial units range in
                               size from 650 square feet to 2,000 square feet.  The
                               two one bedroom apartments contain 600 square feet
                               while the two 2 bedroom apartments contain 1,150
                               square feet.  There is no offstreet parking provided
                               onsite.  At time of sale the property was 100%
                               occupied.

**UNIT VALUE:**                $81.36 per square foot of gross building area

**VERIFICATION:**             Courthouse Records and Paul Richard, Listing Agent

15-78                                                                      - 58 -

## COMPARABLE IMPROVED SALE NO. I-2



| | |
|---|---|
| **ADDRESS:** | 3336 S. Claiborne Avenue, New Orleans, Louisiana |
| **DATE:** | June 30, 2015 |
| **RECORDATION:** | NA #2015-28292, Orleans Parish, Louisiana |
| **VENDOR:** | Crunchtime Partners, LLC |
| **VENDEE:** | 3336 S Claiborne, LLC |
| **SALE PRICE:** | $465,000  **TERMS:**  Cash |
| **LEGAL DESCRIPTION:** | Lot 61-A, Square W, Belmont Place, Sixth Municipal District, Orleans Parish, Louisiana |
| **LAND AREA:** | 8,283 square feet |
| **BUILDING AREA:** | 3,402 square feet |
| **ZONING:** | C-1; General Commercial District |

15-78

## COMPARABLE IMPROVED SALE NO. I-2
### (Continued)

**IMPROVEMENT DATA/
COMMENTS:**         This property is improved with a single story,
masonry/metal clad commercial use structure that is
partitioned into a Laundromat and a restaurant.
Base construction of the primary improvement
includes a concrete slab foundation, steel frame,
masonry/metal panel exterior walls and a metal
roof.  Interior finishes include tile floors, sheetrock
walls, acoustical tile ceilings, florescent lighting
and central hvac.  Site improvements include a
paved parking lot at the front of the primary
improvement.

**UNIT VALUE:**         $136.68 per square foot of gross building area

**VERIFICATION:**         Courthouse Records and Vendor

## COMPARABLE IMPROVED SALE NO. I-3



| | |
|---|---|
| **ADDRESS:** | 4700 Freret Street, New Orleans, Louisiana |
| **DATE:** | October 29, 2014 |
| **RECORDATION:** | NA #2014-44271, Orleans Parish, Louisiana |
| **VENDOR:** | Go Mango, LLC |
| **VENDEE:** | Bentley Kazenmaier, LLC |
| **SALE PRICE:** | $1,300,000  **TERMS:**  Cash |
| **LEGAL DESCRIPTION:** | Lots A & B, Square 581, Sixth Municipal District, Orleans Parish, Louisiana |
| **LAND SIZE:** | 7,200 square feet |
| **BUILDING SIZE:** | 9,900 square feet |
| **ZONING:** | B-1A; Neighborhood Business District |

## COMPARABLE IMPROVED SALE NO. I-3
### (Continued)

**IMPROVEMENT DATA/
    REMARKS:**                    This property is improved with two adjacent two-
                                  story, wood frame/masonry structures, which have
                                  been connected and integrated in use. The primary
                                  improvement, which contains 9,900 square feet of
                                  gross building area, is partitioned into three first
                                  floor retail units oriented to Freret Street, four
                                  office units and two residential units. The primary
                                  improvement is oriented at the intersection of
                                  Freret Street and Valance Street and was in average
                                  to good overall condition at sale being recently
                                  renovated. No off-street parking is provided onsite.
                                  The vendee is an investor.

**UNIT VALUE:**                   $131.31 per square foot of gross building area

**VERIFICATION:**                 Courthouse Records and Troy Hagstette, listing
                                  agent.

15-78                                                                    - 62 -

## COMPARABLE IMPROVED SALE NO. I-4



| | |
|---|---|
| **ADDRESS:** | 3148 Calhoun Street, New Orleans, Louisiana |
| **DATE:** | April 29, 2015 |
| **RECORDATION:** | NA #2015-18191, Orleans Parish, Louisiana |
| **VENDOR:** | CharQueterie, LLC. |
| **VENDEE:** | Burrito Bandito, LLC. |
| **SALE PRICE:** | $625,000 **TERMS:** Cash |
| **LEGAL DESCRIPTION:** | Lot X, Square 137, Sixth Municipal District, Orleans Parish, Louisiana |
| **LAND AREA:** | 3,780 square feet |
| **BUILDING AREA:** | 5,085 square feet |
| **ZONING:** | B-1; Neighborhood Business District |

## COMPARABLE IMPROVED SALE NO. I-4
### (Continued)

**IMPROVEMENT DATA/
COMMENTS:**   This property is oriented at the corner of Calhoun Street and S. Tonti Street. Street and is principally developed with a 70 year old, two-story frame structure that is partitioned into a first floor commercial unit and three second floor apartments. The ground floor commercial unit containing 2,332 square feet which is currently vacant but has been partially renovated into a restaurant. The second floor is partitioned into two one bedroom apartments (containing 439 square feet and 545 square feet) and a two bedroom apartment (containing 1,376 square feet). In addition to the first floor commercial unit, there is a common use laundry facility located on the first floor. The commercial unit, which has +/- 8 foot ceilings, is presently vacant but has been partially renovated into a restaurant complete with a commercial grade hood and ventilation system. The commercial space features a large dining room area with a large service counter separating the dining area from the partially completed kitchen area. Most of the interior finishes in this unit are in place including flooring, wall covering and mechanical systems. However, the restrooms need to be finished as does the lighting. The largest of the second floor apartments is partitioned into a large living room/dining room area, kitchen, bathroom and two bedrooms. The other two apartments are partitioned into a living room, kitchen, bedroom and bathroom. Two of the second floor apartments have been renovated and are presently occupied. The third unit is vacant and partially renovated. This unit is in need of a kitchen as well as some painting and cosmetic repairs.

**UNIT VALUE:**   $122.91 per square foot of gross building area

**VERIFICATION:**   Courthouse Records and Vendee

15-78                                                                                        - 64 -



## ANALYSIS OF SALES AND PROPERTY VALUE CONCLUSION

### Recapitulation of Improved Sales Data

| Sale No. | Address | Sale Date | Sale Price | Gross Building Area (S.F.) | $/S.F. of GBA | Use |
|---|---|---|---|---|---|---|
| I-1 | 1200 Carondelet Street | 04/13 | $751,147(1) | 9,232 | $81.36 | Commercial/Residential |
| I-2 | 3336 S. Claiborne Ave. | 06/15 | $465,000 | 3,402 | $136.68 | Commercial/Retail |
| I-3 | 4700 Freret Street | 10/14 | $1,300,000 | 9,900 | $131.31 | Commercial/Residential |
| I-4 | 3148 Calhoun Street | 04/15 | $625,000 | 5,085 | $122.91 | Commercial/Residential |
| Subject | | | | 5,710 | | Commercial/Residential |

(1) Cash Equivalent Price

The prior summarized sales were selected from a larger group researched and same constitute the best available data from which to derive an appropriate market value for subject.

Following please find a general discussion of the comparable sales in comparison to subject, as well as a table which summarizes all adjustments applied to same and indicates unit value projections for subject. Where appropriate, adjustments made to the comparables are based upon reasonable estimates derived from comparative analysis of the sales; however, the appraiser recognizes that the limited sample of comparable sales inhibits the establishment of quantified adjustments for all variables present through paired data analysis. Nevertheless, broad indications for the magnitude of appropriate adjustments can be derived from such analysis of the comparable sales, and the appraiser recognizes and has attempted to identify those certain variables (i.e., location, size and condition/amenities) which necessitate adjustment, though definitive adjustment levels derived from paired data analysis was not readily achievable. Thus, while a certain degree of subjectivity is associated with the estimated adjustments, in light of the evidence available, these adjustments are considered reasonable.

Prior to consideration of any other adjustments, sales must first be adjusted for "special" conditions of sale (e.g., adjoining owner influence) and/or time/changed market conditions. No "special" conditions of sale were uncovered; furthermore, all of the sales except I-1 are reasonably current and no adjustments for changed time/market conditions are believed appropriate. Sale I-1 occurred in over two and half years ago and there has been general market improvement over that time. While there was insufficient data available to quantify the extent of any necessary adjustment for changed market conditions, same will be considered in the selection of a final value indication for subject.

## ANALYSIS OF SALES AND VALUE CONCLUSION
### (Continued)

Sale I-1 is located at the intersection of Carondelet Street and Clio Street in that area of New Orleans known as Central City. This area has been the focus of significant revitalization in recent years and same is considered to be similar in location despite its orientation on a secondary traffic artery. This sale is reasonably similar to subject in overall quality and condition. This sale is larger than subject in building area though no significant adjustment for same is considered appropriate in this instance. This sale lacks offstreet parking which is inferior to subject.

Sale I-2 is located on S. Claiborne Avenue in a commercial area that is considered to be superior to subject in location. This sale is smaller than subject in size though no significant adjustment for same is considered appropriate in this instance. This sale lacks residential units. This sale is generally similar in overall quality and condition. This sale, like subject, is partially occupied by a Laundromat. This sale has ample offstreet parking that is similar to subject.

Sales I-3 is located within the Freret Street commercial corridor which is considered to be superior to subject in location. This sale is improved with a mixed use, multi tenant, commercial/residential project that has been recently renovated and is very similar to subject in quality and condition though it is larger than subject. This sale lacks offstreet parking which is inferior to subject.

Sale I-4 is located within a pocket of commercial development that flanks Calhoun Street just north of Claiborne Avenue and is marginally superior to subject in location. This sale is considered to be similar to subject in size though its overall quality and condition is inferior given the lower first floor ceiling height and a second floor apartment that needs renovation. This sale lacks offstreet parking which is inferior to subject.

The following table summarizes the adjustments applied regarding the sales analyzed herein:

| Sale I.D. | Unit Value At Sale ($/S.F.) | Time/ "Conditions" Adjustment | Time/ "Conditions" Adjusted Unit Value | Location | Size Quality Condition | Parking | Net | Subject Unit Value Indication |
|---|---|---|---|---|---|---|---|---|
| I-1 | $81.36 | Inferior | $81.36 | ----- | +5% | +5% | +10% | $89.50 |
| I-2 | $136.68 | ----- | $136.68 | -5% | -5% | ----- | -10% | $123.01 |
| I-3 | $131.31 | ----- | $131.31 | -10% | +5% | +5% | ----- | $131.31 |
| I-4 | $122.91 | ----- | $122.91 | -5% | +5% | +5% | +5% | $129.06 |

15-78

## ANALYSIS OF SALES AND VALUE CONCLUSION
### (Continued)

After adjustment, a range in unit values from $89.50 per square foot to $131.31 per square foot is indicated through analysis of the sales.  While primary emphasis is given no single sale consideration has been given to the fact that sale I-1 is somewhat dated and that subject has a partially framed unfinished attic area that is accessible by stairs and could readily be finished to create an additional apartment. Accordingly a unit value toward the upper end the range is considered most appropriate for subject.  Thus, a market value indication of $685,000 (5,710 square feet of gross building area x $120.00 per square foot, rounded) is indicated for subject property.

15-78

## CORRELATION AND FINAL MARKET VALUE ESTIMATE

The indications of market value from the two approaches utilized in this report are:

| | |
|---|---|
| **Income Capitalization Approach** | **$ 540,000** |
| **Sales Comparison Approach** | **$ 685,000** |

In analyzing the approaches to value used in this report, it is important to consider and weigh the inherent merits and weaknesses of each.

The **Income Capitalization Approach** is generally considered to be the most reliable method in which to estimate the value of income producing property.  This approach well quantifies the motivations of the investor class of purchaser, as classic investor criteria is applied.  In this instance there was a certain degree of subjectivity with the establishment of a economic rent for the unit presently configured as a Laundromat.  The comparable rental data available for comparison were for more traditional retail commercial spaces.  While the concluded rent is considered to be supported by the market data available, the lack of comparable rentals of units configured for use as Laundromats has resulted in a certain level of subjectivity.  Further, this approach to value does not account for the contributory value of the partially framed attic area that is readily accessible from a dedicated stairwell.

The **Sales Comparison Approach** generally gives a good indication of the basis on which properties like subject are transferred in the open market.  The data used was of good  quality and the value indicated is considered reasonable.

In the final analysis equal emphasis is given to the Sales Comparison Approach in the selecting of a final value indication for subject.  Accordingly, it is my opinion, that the market value of the unencumbered interest in subject property, as of December 15, 2015 is estimated to be:

**Six Hundred Fifty Thousand and No/100 ($650,000.00) Dollars**
**(Presumes An Exposure Time of 6 to 12 Months)**

## MARKETING PERIOD ANALYSIS

"**Marketing Time**", as used herein, is defined as "an estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value during the period immediately after the effective date (valuation date) of the appraisal".[10]

The prior listed market value conclusion is believed attainable within ±6 to 12 months.  This projection is based upon the experience of competitive properties and the opinions of local real estate brokers familiar with subject's market.  All of the latter questioned indicated that market conditions have been reasonable, and with aggressive marketing and pricing strategies sales are generally achievable within 6 to 12 months.

---

[10] Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2010-2011 Edition, page A-13.

# A D D E N D A

**Qualifications of the Appraiser**

**Zoning Excerpts**

**Letter of Engagement**



**QUALIFICATIONS OF THE APPRAISER**

## QUALIFICATIONS OF WILLIAM M. BALDWIN, JR., MAI

### Education

Bachelor of Arts, Economics, Tulane University
    New Orleans, Louisiana     1988

Appraisal Institute Sponsored Courses:
    Course IA - Basic Appraisal Principles, Methods, and Techniques     1989
    Course IB - Basic Valuation Procedures     1989
    Course IB-A - Capitalization Theory Techniques Part A     1990
    Course IB-B - Capitalization Theory Techniques Part B     1990
    Course 2-1 - Case Studies in Real Estate Valuation     1992
    Course SPP - Standards of Professional Practice Parts A & B     1992
    Course 540 - Report Writing and Valuation Analysis     1993
    Appraiser's Complete Review Seminar     1997
    Course 430 - Standards of Professional Practice Part C     1998

*International Right of Way Association:*
    Course 901 - Property Descriptions     1989

*Seminars:*

    Analyzing Operating Expenses     2005
    Small Hotel/Motel Valuation     2005
    Contract Law     2005
    Residential Appraisal Site Valuation and Cost Approach     2007
    Developing and Growing on Appraisal Practice     2007
    Appraising Historic Properties     2009
    Income Capitalization Approach     2009
    Construction Details and Trends     2009
    Residential Appraisal Review     2009
    Land and Site Valuation     2009
        Essential Elements of Disclosures and Disclaimers     2010
    Foundations in Sustainability:
        Greening the Real Estate and Appraisal Industry     2010
    National USPAP Update 2012-2013     2013
    Essential Elements of Disclosures and Disclaimers     2013
    The Evolution of Finance & the Mortgage Market     2013
    Environmental Issues for Appraisers     2014
    Appraisal Applications of Regression Analysis     2013
    Business Practices and Ethics     2014
    Market Analysis and Highest and Best Use     2014

### QUALIFICATIONS OF WILLIAM M. BALDWIN, JR., MAI
### (Continued)

#### Professional Associations/Affiliations

Appraisal Institute - MAI; Member No. 11410

Louisiana State Certified General Real Estate Appraiser (No. G0601)

#### Business Experience

Baldwin Appraisal Services, LLC (September 2012 - Present)

Partner in Truax, Robles & Baldwin Appraisers, LLC (March 2005 - August 2012)

Partner in Max J. Derbes Appraisers, L.L.C. (April 2002 - February 2005)

Commercial Appraiser, Max J. Derbes Appraisers and Real Estate Consultants, Inc. (June 1988 - March 2002)

Max J. Derbes, Inc. - Real Estate Researcher (1986 - 1987)

#### Approved Fee Appraiser For

| | |
|---|---|
| B B & T | Gulf Coast Bank |
| Bank Plus | Hancock/Whitney Bank |
| Capital One Bank | Home Bank |
| First Bank and Trust | Regions Bank |
| First National Bank USA | Business First Bank |
| Allstate Appraisal | Iberia Bank |

#### Court Testimony As Expert Witness

22nd Judicial District Court
Orleans Parish Civil District Court



State of Louisiana

Certified General Appraiser License

Having complied with the license requirements as set forth in in R.S. 1950 Title 37, Chapter 51, and Amendatory Acts, and the Real Estate Appraisers Board Rules and Regulations, a Certified General Appraiser License is hereby granted to

WILLIAM M BALDWIN, JR

In Testimony Whereof, This license has been issued by the Authority of the Louisiana Real Estate Appraisers Board.

Period Covered: 01    01    2015 Through 12    31    2016

Roland M. Hall
Chairman

Gayle A. Boudreaux
Secretary

License Number: G601

## ZONING EXCERPTS

# ARTICLE 15.
# COMMERCIAL CENTER & INSTITUTIONAL CAMPUS DISTRICTS

## PURPOSE OF THE COMMERCIAL CENTER AND INSTITUTIONAL CAMPUS DISTRICTS

Commercial Center and Institutional Campus Districts represent the major destination areas within the city. They contain districts that address areas of commercial concentration and institutional campuses, and range from areas that are more pedestrian in orientation to those designed to accommodate significant parking demand. The types of commercial uses permitted within the Commercial Center and Institutional Campus Districts are based on a number of factors, including their proximity to residential areas, their location along major streets and the intensity of uses allowed within the districts. In addition to commercial districts that allow a variety of retail, personal service, office, and restaurant uses, specialized districts for large-scale users are also destination centers, such as hospital and university campuses. Finally, in certain districts a mixed-use environment is permitted where higher density residential uses and vertical mixed-use is encouraged.





Commercial Center and Institutional Campus Districts contain regulations that create and maintain intensive mixed employment, shopping, and entertainment destination environments. Controls within the districts address proper scales of development based on the desired intensity of the district, including regulations on parking, landscape, and screening.



## CHARACTER OF THE COMMERCIAL CENTER AND INSTITUTIONAL CAMPUS DISTRICTS

The character of the Commercial Center and Institutional Campus Districts is defined by:

» Concentrations of retail, service, office, and entertainment uses both along major thoroughfares and at commercial nodes



» A variety of commercial district types – from pedestrian-oriented commercial corridors to larger shopping centers

» Large-scale campuses, such as hospitals and universities, that contain a variety of uses and activities on site

» Mixed-use development, including residences above ground floor commercial and higher density dwelling types

# ARTICLE 15.
# COMMERCIAL CENTER & INSTITUTIONAL CAMPUS DISTRICTS

| | |
|---|---|
| 15.1 | **PURPOSE STATEMENTS** |
| 15.2 | **USES** |
| 15.3 | **SITE DESIGN STANDARDS** |
| 15.4 | **COMMERCIAL CENTER AND INSTITUTIONAL CAMPUS DISTRICTS ILLUSTRATIVES AND SITE DIAGRAMS** |
| 15.5 | **INSTITUTIONAL MASTER PLAN FOR EC AND MC DISTRICTS** |
| 15.6 | **GENERAL STANDARDS OF APPLICABILITY** |

## 15.1   PURPOSE STATEMENTS

### A.   Purpose of the C-1 General Commercial District

The C-1 General Commercial District is intended to provide appropriate locations for a variety of commercial activities, generally serving a wide area and located particularly along commercial corridors with a mix of commercial, service, and residential activities. Areas of the C-1 District are oriented toward pedestrians but also accommodate larger commercial uses generally accessed by automobiles.

### B.   Purpose of the C-2 Auto-Oriented Commercial District

The C-2 Auto-Oriented Commercial District is intended for a wide variety of commercial activities, generally serving a wide area and located along major arterials. The C-2 District is intended for large-scale, auto-oriented commercial uses and strip commercial developments, which require significant parking. The C-2 District is also intended to accommodate marine-oriented commercial and recreational uses along major bodies of water.

### C.   Purpose of the C-3 Heavy Commercial District

The C-3 Heavy Commercial District is intended to provide for auto-oriented heavy commercial uses and large-scale shopping centers. Standards for the C-3 District are designed to maintain and enhance the appearance of these areas, and to provide adequate buffering between any residential and lower-intensity commercial properties adjacent to the district.

### D.   Purpose of the MU-1 Medium Intensity Mixed-Use District

The MU-1 Medium Intensity Mixed-Use District is intended to encourage walkable neighborhood centers and corridors, with a mix of residential and commercial uses. Buildings may contain vertical mixed-use as well as single purpose uses designed to provide transitions to adjacent lower density residential areas.

### E.   Purpose of the MU-2 High Intensity Mixed-Use District

The MU-2 High Intensity Mixed-Use District is intended encourage walkable neighborhood centers and corridors conducive to transit, with a mix of residential and supportive commercial and office uses. Buildings may contain vertical mixed-use as well as single purpose uses designed to be located both at neighborhood centers and along major arterial corridors.

City of New Orleans
Comprehensive Zoning Ordinance

15 - 1

Article 15
Commercial Center &
Institutional Campus Districts

**F.   Purpose of the EC Educational Campus District**

The EC Educational Campus District is intended for large university campus developments to facilitate an orderly and efficient regulation process for these types of uses. The district establishes a process that is flexible enough to accommodate evolving changes and expansions in campus plans, and creates the proper transitions between campus activities and adjacent neighborhoods. Within the district, development will proceed in accordance with an approved Institutional Master Plan that relates to the adjacent district, the surrounding neighborhoods, and needs of the universities.

**G.   Purpose of the MC Medical Campus District**

The MC Medical Campus District is intended for medical campuses and the accompanying medical-related support services, including offices, research facilities and commercial uses, to facilitate an orderly and efficient regulation process for these types of uses. The district establishes a process that is flexible enough to accommodate evolving changes and expansion in medical campus plans, and creates the proper transitions between hospital activities and adjacent neighborhoods. Within the district, development will proceed in accordance with an approved Institutional Master Plan that relates to the adjacent district, the surrounding neighborhoods, and needs of the hospital.

**H.   Purpose of the MS Medical Service District**

The MS Medical Service District is intended for local hospitals and medical service facilities of lower intensity than large medical campuses. The MS District is intended for hospitals, and hospital-related and support services that are generally integrated within and connected to adjacent areas of commercial and residential development.

**I.   Purpose of the LS Life Science Mixed-Use District**

The LS Life Science Mixed-Use District is intended to provide a district that is focused on life sciences research, including research, development, medical and limited manufacturing activity. In addition to life science research and development uses, the area is also intended to be more mixed-use in nature, by also allowing higher density residential and supportive commercial uses to serve those that live and work within the district.

**15.2   USES**

Only those uses of land listed under Table 15-1: Permitted and Conditional Uses as permitted uses or conditional uses are allowed within the Commercial Center and Institutional Campus Districts. A "P" indicates that a use is permitted within that zoning district. A "C" indicates that a use is a conditional use in that zoning district and  would require a conditional use approval as required in Section 4.3 (Conditional Use). For conditional uses in the EC and MC Districts, Institutional Master Plan approval, in accordance with Section 15.5 is also required. No letter (i.e., a blank space), or the absence of the use from the table, indicates that use is not permitted within that zoning district.

City of New Orleans
Comprehensive Zoning Ordinance

15 - 2

Article 15
Commercial Center &
Institutional Campus Districts

| USES¹ | DISTRICTS | | | | | | | | | USE STANDARDS |
|---|---|---|---|---|---|---|---|---|---|---|
| | C-1 | C-2 | C-3 | MU-1 | MU-2 | EC² | MC | MS | LS | |
| **RESIDENTIAL USE** | | | | | | | | | | |
| Bed and Breakfast – Accessory | | | | P | P | | | | | Section 20.3.I |
| Bed and Breakfast – Principal | | | | P | P | | | | | Section 20.3.I |
| Day Care Home, Adult or Child – Small | | | | P | P | | | | | Section 20.3.T |
| Day Care Home, Adult or Child – Large | | | | P | P | | | | | Section 20.3.T |
| Dormitory | | | | | | P | P | P | P | |
| Dwelling, Above the Ground Floor | C | C | C | P | P | | | | P | |
| Dwelling, Single-Family | | | | P | P | P | | | | |
| Dwelling, Two-Family | | | | P | P | P | | | | Section 20.3.Y |
| Dwelling, Townhouse | | | | P | P | | | | | Section 20.3.X |
| Dwelling, Multi-Family | | | | P | P | P | P | | P | |
| Dwelling, Existing Single-Family | | | | | | | | P | | |
| Dwelling, Established Two-Family | | | | | | | | P | | Section 20.3.W |
| Dwelling, Established Multi-Family | | | | | | | | P | | Section 20.3.W |
| Fraternity/Sorority | | | | | | P | | | | Section 20.3.DD |
| Group Home, Small | | | | P | P | | P | | | Section 20.3.GG |
| Group Home, Large | | | | P | P | | P | | P | Section 20.3.GG |
| Group Home, Congregate | | | | C | C | | P | | | Section 20.3.GG |
| Permanent Supportive Housing | | | | P | P | P | P | | P | Section 20.3.PP |
| Residential Care Facility | P | P | | P | P | | P | P | P | Section 20.3.YY |
| Short-Term Rental | | C | | P | P | | C | C | C | |
| Timeshare | | C | | C | | | C | C | C | |
| **COMMERCIAL USE** | | | | | | | | | | |
| Amusement Facility, Indoor | P | P | P | P | P | P | | | | Section 20.3.E |
| Amusement Facility, Outdoor | | C | P | P | P | P | | | | Section 20.3.E |
| Art Gallery | P | P | P | P | P | P | | | | |
| Arts Studio | P | P | P | P | P | P | | | | |
| Animal Hospital | P | P | P | P | P | | | | | |
| Auditorium | | | | P | P | C | C | P | P | |
| Bar | C | P | P | C | P | | | | P | Section 20.3.G |
| Broadcast Studio | | P | P | P | P | P | | | | |
| Bus Terminal | C | C | C | C | C | | | | | |
| Car Wash | C | C | P | C | C | | | | | Section 20.3.L |
| Catering Kitchen | P | P | P | P | P | P | P | P | P | |
| Check Cashing Establishment | P | P | P | P | P | | | | P | Section 20.3.O |
| Convention Center | | | | | C | | | | | |
| Day Care Center, Adult or Child - Small | P | P | P | P | P | P | P | P | P | Section 20.3.S |
| Day Care Center, Adult or Child - Large | P | P | P | P | P | P | P | P | P | Section 20.3.S |
| Day Care Center, Adult or Child - Commercial | P | P | P | P | P | P | P | P | P | Section 20.3.S |
| Drive-Through Facility | | P | P | C | C | | | | C | Section 20.3.V |
| Employment Services | | C | C | | | | | | P | Section 20.3.BB |
| Financial Institution | P | P | P | P | P | P | P | | P | |
| Funeral Home | P | P | P | P | P | | | | | |
| Greenhouse/Nursery | | P | C | P | | | | | | |
| Gas Station | C | P | P | C | C | | | | | Section 20.3.EE |
| Health Club | P | P | P | P | P | P | P | | | |
| Heavy Sales, Rental & Service | | | P | | C | | | | | |
| Hostel | P | P | P | P | P | P | P | | P | |
| Hotel/Motel | P | P | P | P | P | P | P | P | | |
| Kennel | | | C | C | C | | | | | Section 20.3.II |

| USES[1] | DISTRICTS | | | | | | | | | USE STANDARDS |
|---|---|---|---|---|---|---|---|---|---|---|
| | C-1 | C-2 | C-3 | MU-1 | MU-2 | EC[3] | MC | MS | LS | |
| Government Offices | P | P | P | P | P | P | P | P | P | |
| Hospital | | C | C | C | C | P | P | P | | |
| Place of Worship | P | P | P | P | P | P | P | | | |
| Public Works and Safety Facility | C | C | C | C | | | | | | |
| Social Club or Lodge | P | P | P | P | | P | P | P | P | Section 20.3.CCC |
| **OPEN SPACE USE** | | | | | | | | | | |
| Agriculture – No Livestock | | | | P | P | P | P | | | Section 20.3.C |
| Agriculture – With Livestock | | | | | C | C | C | C | | Section 20.3.C |
| Parks and Playgrounds | P | P | P | P | P | P | P | P | P | |
| Stormwater Management (Principal Use) | C | C | C | C | C | C | C | C | C | Section 23.12 |
| **OTHER** | | | | | | | | | | |
| Parking Lot (Principal Use) | C | C | C | C | C | P | P | P | P | Section 20.3.OO |
| Parking Structure (Principal Use) | C | C | C | C | C | P | P | P | P | Section 20.3.OO |
| Planned Development | C | C | C | C | C | | | | C | Article 5 |
| Public Transit Wait Station | C | C | C | C | C | C | C | C | C | Section 21.6.BB |
| Pumping Station | P | P | P | P | P | P | P | P | P | Section 20.3.UU |
| Utilities | P² | P² | P² | P² | P² | P | P | P² | P² | Section 20.3.GGG |
| Wireless Telecommunications Antenna & Facility | P⁴ | P⁴ | P⁴ | CP⁴ | C,P⁴ | P | P | P⁴ | P⁴ | Section 20.3.JJJ |
| Wireless Telecommunications Tower & Facility | P | P | P | C | C | P | P | C | C | Section 20.3.JJJ |

TABLE 15-1 FOOTNOTES

[1] The terms in this column ("Use") are defined in Article 26
[2] Electrical Utility Substations and Transmission Lines shall be subject to design review as per Article 4, Section 4.5.B.5 and Table 4-2.
[3] In addition to the permitted and conditional uses in the chart above, Colleges and Universities and uses normally associated therewith are permitted in the EC Districts when part of an approved Institutional Master Plan.
[4] Only wireless telecommunications antennas that comply with the stealth design standards of Section 20.3.JJJ are considered permitted uses.
[5] Only breweries that produce fewer than 12,500 barrels per year are considered permitted uses. In MU-1, breweries that produce more than 12,500 barrels per year are considered conditional uses.

## 15.3    SITE DESIGN STANDARDS

### A. Bulk and Yard Regulations

#### 1. General Regulations

Table 15-2: Bulk and Yard Regulations establishes bulk and yard regulations for the Commercial Center and Institutional Campus Districts.

#### 2. Front Yard Build-To Line Requirement

a. Within the C-1, C-2, C-3, and LS Districts of the Commercial Center and Institutional Campus Districts, the front yard build-to line is established by any one (1) of the following methods. A build-to line is an established setback line at which a structure is required to build. However, in no case may the front yard exceed twenty (20) feet.

  i. As of the effective date of this Ordinance, the current front yard of the existing structure may be set as the required front yard build-to line. When a structure is demolished, the demolition permit shall indicate the dimension of the front yard prior to demolition. The required front yard build-to line is that indicated on the demolition permit.

City of New Orleans
Comprehensive Zoning Ordinance
15 - 5
Article 15
Commercial Center &
Institutional Campus Districts

| USES[1] | DISTRICTS | | | | | | | | | USE STANDARDS |
|---|---|---|---|---|---|---|---|---|---|---|
| | C-1 | C-2 | C-3 | MU-1 | MU-2 | EC[3] | MC | MS | LS | |
| Government Offices | P | P | P | P | P | P | P | P | P | |
| Hospital | | C | C | C | C | P | P | P | P | |
| Place of Worship | P | P | P | P | P | P | P | P | | |
| Public Works and Safety Facility | C | C | C | C | C | C | | | P | |
| Social Club or Lodge | P | P | P | P | P | P | P | P | P | Section 20.3.CCC |
| **OPEN SPACE USE** | | | | | | | | | | |
| Agriculture – No Livestock | | | | P | P | P | P | | P | Section 20.3.C |
| Agriculture – With Livestock | | | | C | C | C | C | | | Section 20.3.C |
| Parks and Playgrounds | P | P | P | P | P | P | P | P | P | |
| Stormwater Management (Principal Use) | C | C | C | C | C | C | C | C | C | Section 23.12 |
| **OTHER** | | | | | | | | | | |
| Parking Lot (Principal Use) | C | C | C | C | C | P | P | P | P | Section 20.3.OO |
| Parking Structure (Principal Use) | C | C | C | C | C | P | P | P | P | Section 20.3.OO |
| Planned Development | C | C | C | C | C | | | | C | Article 5 |
| Public Transit Wait Station | C | C | C | C | C | C | C | C | C | Section 21.6.BB |
| Pumping Station | P | P | P | P | P | P | P | P | P | Section 20.3.UU |
| Utilities | P[2] | P[2] | P[2] | P[2] | P[2] | P | P | P[2] | P[2] | Section 20.3.GGG |
| Wireless Telecommunications Antenna & Facility | P[4] | P[4] | P[4] | CP[4] | C,P[4] | P | P | P[4] | P[4] | Section 20.3.JJJ |
| Wireless Telecommunications Tower & Facility | P | P | P | C | C | P | P | C | C | Section 20.3.JJJ |

Table caption (top of table): **TABLE 15-1: PERMITTED AND CONDITIONAL USES**

**TABLE 15-1 FOOTNOTES**

[1] The terms in this column ("Use") are defined in Article 26.
[2] Electrical Utility Substations and Transmission Lines shall be subject to design review as per Article 4, Section 4.5.B.5 and Table 4-2
[3] In addition to the permitted and conditional uses in the chart above, Colleges and Universities and uses normally associated therewith are permitted in the EC Districts when part of an approved Institutional Master Plan.
[4] Only wireless telecommunications antennas that comply with the stealth design standards of Section 20.3.JJJ are considered permitted uses.
[5] Only breweries that produce fewer than 12,500 barrels per year are considered permitted uses. In MU-1, breweries that produce more than 12,500 barrels per year are considered conditional uses

## 15.3   SITE DESIGN STANDARDS

### A.   Bulk and Yard Regulations

#### 1.   General Regulations

Table 15-2: Bulk and Yard Regulations establishes bulk and yard regulations for the Commercial Center and Institutional Campus Districts.

#### 2.   Front Yard Build-To Line Requirement

a.   Within the C-1, C-2, C-3, and LS Districts of the Commercial Center and Institutional Campus Districts, the front yard build-to line is established by any one (1) of the following methods. A build-to line is an established setback line at which a structure is required to build. However, in no case may the front yard exceed twenty (20) feet.

   i.   As of the effective date of this Ordinance, the current front yard of the existing structure may be set as the required front yard build-to line. When a structure is demolished, the demolition permit shall indicate the dimension of the front yard prior to demolition. The required front yard build-to line is that indicated on the demolition permit

City of New Orleans
Comprehensive Zoning Ordinance

15 - 5

Article 15
Commercial Center &
Institutional Campus Districts

ii.   The required front yard build-to line indicated on the most recent survey or Sanborn maps.

iii.   The average of the front yard of the adjacent lots on either side may be used to establish the required front yard build-to line. Averaging is based on the two (2) adjacent lots or, in the case of a corner lot, two (2) neighboring lots on the same blockface. In the case of a lot configuration where only one (1) lot is available for averaging, the front yard build-to line is that of the adjacent lot. (See Figure 15-1: Front Yard Averaging)

b.   The applicant is permitted a three (3) foot variation from a front yard build-to line established by any of the above methods.
c.   The required front yard build-to line is measured as the narrowest dimension from the front lot line to the principal structure. The measurement is taken from the building walls of the principal structure and does not include permitted encroachments or architectural features.

**FIGURE 15-1: FRONT YARD AVERAGING**



**EXAMPLES**

Lot 1: Middle lot – average of adjacent lots on both sides

Lot 2: Middle lot – average of adjacent lots on both sides

Lot 3: Corner lot – average of two most adjacent lots on same block

Lot 4: Lot with only one adjacent lot – same build-to line as adjacent lot

**TABLE 15-2: BULK & YARD REGULATIONS**

| BULK & YARD REGULATIONS¹ | C-1 | C-2 | C-3 | MU-1 | MU-2 | EC | MC | BS | LS |
|---|---|---|---|---|---|---|---|---|---|
| **BULK REGULATIONS** | | | | | | | | | |
| **A  MINIMUM LOT AREA** | 3,000sf | 5,000sf | 5,000sf | SF: 3,000sf/du 2F: 1,700sf/du MF: 1,000sf/du Townhouse 2,000sf/du Non-Residential None | SF: 3,000sf/du 2F: 1,700sf/du MF: 800sf/du Townhouse 1,890sf/du Non-Residential None | 2 acres | 2 acres | None | 5,000sf |
| **MAXIMUM BUILDING HEIGHT** | 40' & no more than 3 stories | 40' & no more than 3 stories | 130' & no more than 12 stories | SF & 2F: 35' Townhouse: 40' & no more than 3 stories MF & Non-Residential 90' & no more than 5 stories | SF & 2F: 35' Townhouse: 40' & no more than 3 stories MF & Non-Residential: 85' & no more than 7 stories | Limited to 2 times the most restrictive height of adjacent districts. height may be increased by 1' for each additional foot of setback from the required yard. additional height may be obtained through the conditional use process | Limited to 2 times the most restrictive height of adjacent districts. height may be increased by 1' for each additional foot of setback from the required yard | When adjacent to residential district Maximum height of adjacent residential district - may exceed this height by 20 ft when the structure is set back 3' from residential district line for each additional 5' in building height. When adjacent to non-residential district: 100' | 100', unless adjacent to a residential district then 50' but may exceed 50' if feet back 1' for each foot above 50' up to 100 |
| **MAXIMUM LOT COVERAGE** | | | | | | 70% | 70% | | |
| **MINIMUM YARD REQUIREMENTS** | | | | | | | | | |
| **B  FRONT YARD** | Section 15.3.A.2 | Section 15.3.A.2 | Section 15.3.A.2 | None | None | 10' | 10' | 20' | Section 15.3.A.2 |

City of New Orleans
Comprehensive Zoning Ordinance

15 – 7

Article 15
Commercial Center &
Institutional Campus Districts

**TABLE 15-2: BULK & YARD REGULATIONS**

| BULK & YARD REGULATIONS | C-1 | C-2 | C-3 | MU-1 | MU-2 | EC | MC | MS | LS |
|---|---|---|---|---|---|---|---|---|---|
| **C** INTERIOR SIDE YARD | None, unless abutting a residential district then 5' | 5' | 10' | SF & 2F 10% of lot width or 3' whichever is greater<br>Townhouse: 10'<br>MF & Non-Residential/Mixed-Use: None, unless abutting a residential district then 5' | SF & 2F 10% of lot width or 3' whichever is greater<br>Townhouse: 10'<br>MF & Non-Residential/Mixed-Use: None, unless abutting a residential district then 5' | 10', unless abutting residential district then 25' | 10', unless abutting residential district then 25' | 10' | None, unless abutting residential district then 10' |
| **D** CORNER SIDE YARD | None | 10' | 10' | None | None | 10' | 10' | 10' | None to a maximum of 20' |
| **E** REAR YARD | None, unless abutting a residential district then 20' | 25' | 25' | Residential: 20'<br>Non-Residential/Mixed-Use: None, unless abutting a residential district then 20' | Residential: 20'<br>Non-Residential/Mixed-Use: None, unless abutting a residential district then 20' | 20', unless abutting residential district then 35' | 20', unless abutting residential district then 35' | 10' | 10', unless abutting residential district then 20' |

**TABLE 15-2 FOOTNOTES**
¹ If a property abuts more than one zoning district, the more restrictive yard requirement applies

City of New Orleans
Comprehensive Zoning Ordinance

15 - 8

Article 15
Commercial Center &
Institutional Campus Districts

## LETTER OF ENGAGEMENT



## LETTER OF ENGAGEMENT

**DATE:** 12/8/2015
**TO:**    William M Baldwin, Jr MAI
          Baldwin Appraisal Services LLC

**PHONE:**
**EMAIL:** wbaldwin@appraisal.no.com

| | |
|---|---|
| BORROWER | Laundromat Zone Inc. |
| CONTACT | Jawad Gharib (504) 322-7442 |
| SUBJECT PROPERTY | 8807 S Claiborne Ave, New Orleans, LA 70118 |
| PROPERTY DESCRIPTION | Mixed Use property, Appraise As Is |

This letter will confirm the request that you provide an Appraisal Report, per industry standards, on the above referenced property including all applicable approaches to value.
Proposed construction and renovation appraisals should include an as is value and a prospective date and value for completion. Please submit an electronic copy unless instructed otherwise.

**Payment of appraisal fee must only come from the bank**
**Payment from the borrower of the loan must not be accepted**
**Otherwise the appraisal report is not acceptable & valid**

**PLEASE ADDRESS REPORT & BILL TO** *José Aldaya-Home Bank Appraisal Department*

The appraisal should be complete **2 weeks** from the date of this letter.
Upon completion, please bill the bank **$1,400.00** at the address below for your fee.

Home Bank
3798 Veterans Memorial Blvd.
Metairie, LA 70002
Attn: Commercial.Appraisal@home24bank.com

*ALL QUESTIONS/CONTACTS MUST BE DIRECTED TO:
   Grady Thigpen (504) 455-4938 or grady.thigpen@home24bank.com
                              or
   Dee Bergeron (504)-457-2063 or diane.bergeron@home24bank.com



**Environmental Site Inspection Checklist**

Borrower: __Laundromat Zone Inc.__          Date of Inspection: __12/15/15__

Property Address: __8807 S Claiborne Ave, New Orleans, LA 70118__

Property Use (Actual/Proposed): __mixed use   Commercial /residential__

| ENVIRONMENTAL OBSERVATIONS | YES | POSS | NO | UNK |
|---|---|---|---|---|
| 1. Stressed or denuded vegetation/Unusual barren areas | ☐ | ☐ | ☒ | ☐ |
| 2. Discoloration/Oily Sheens, Foul/Unusual Odor | ☐ | ☐ | ☒ | ☐ |
| 3. Storage Drums | ☐ | ☐ | ☒ | ☐ |
| 4. Above/Below Ground Storage Tanks | ☐ | ☐ | ☒ | ☐ |
| 5. Evidence of Petroleum/Oil Products | ☐ | ☐ | ☒ | ☐ |
| 6. Evidence of PCBs (electrical transformers, capacitors) | ☐ | ☐ | ☒ | ☐ |
| 7. Existing Structures of Improvements (If yes, answer A,B,C) | ☒ | ☐ | ☐ | ☐ |
|    a.  Evidence of Chemical Spills/Leaks (Stains, Discoloration) | ☐ | ☐ | ☒ | ☐ |
|    b.  Evidence of Asbestos (sprayed on fireproofing, pipe wrap Friable ceiling tiles, acoustic plaster) | ☐ | ☐ | ☒ | ☐ |
|    c.  Source of Air Emission (smoke stacks, chimneys) | ☐ | ☐ | ☒ | ☐ |
| 8. Sources of radioactive emissions | ☐ | ☐ | ☒ | ☐ |
| 9. Ground water test wells | ☐ | ☐ | ☒ | ☐ |
| 10. Waste Water treatment facilities or liquid waste impoundments | ☐ | ☐ | ☒ | ☐ |
| 11. Equipment wash down area | ☐ | ☐ | ☒ | ☐ |
| 12. Solid waste storage areas | ☒ | ☐ | ☐ | ☐ |
| 13. Property is near a flood plain, wetland, or ecologically sensitive areas | ☐ | ☐ | ☑ | ☐ |
| 14. Could the activities of the site or adjacent properties pose potential environmental risk? | ☐ | ☐ | ☑ | ☐ |

*Other observations/Comments: _____

**In the case of existing improvements this appraisal/inspection is not a home/building inspection, structural inspection, or pest inspection. By preparing this report the appraiser is not acting as a home/building inspector, structural engineer or pest inspector. In performing the limited inspection of this property, areas that were readily accessible were visually observed and the review is superficial only. This inspection is not technically exhaustive and does offer warranties or guarantees of any kind. It is advised to have the structure inspected by an inspector that offers such warranted or guaranteed inspection if there is any concern regarding adverse of negative conditions.

Based on the on-site inspection, information provided to me by the property owner, and/or the evaluation of known environmental factors,

FURTHER ACTION IS RECOMMENDED (YES / NO)

_____   12/15/15

**Property Inspector Signature/Date**

***This checklist should not be considered a Phase One environmental audit. Performing such audits is beyond the scope of work for this appraisal and the appraiser is not qualified to complete such actions. The information cited in this checklist should be used by the client to determine is a Phase One is warranted.

# Exhibit 2



# Exhibit 3

# Exhibit 4

# Exhibit 5

# Exhibit 6

# Exhibit 7

# Exhibit 8

# Exhibit 9

# Exhibit 10

# Exhibit 11

# Exhibit 12

# Exhibit 13

# Exhibit 14

# Plaintiff Fact Sheet

Plaintiff:  Jawad Gharib and Fatme Gharib

Property Address: 8807 South Claiborne Ave., New Orleans LA. 70118.

## Question #18 Itemization (Personal Property Damage)

| # | Description of Damaged Item | Value ($) |
|---|---|---|
| 1 | 4 Four Ton A/C units each $5,200.00 (damaged and replaced) | $20,800.00 |
| 2 | 3 Two Ton A/C units each @3200.00 (damaged and replaced) | $9,600.00 |
| 3 | GE electric Stove (damaged and replaced) | $550.00 |
| 4 | Whirlpool Electric Stove (replaced) | $450.00 |
| 5 | 3 Dining Room Fans Fixtures (Apt. A, B and C) each $200.00 | $600.00 |
| 6 | 6 Bedroom Fans Fixtures (Apt. A, B and C) each $150.00 | $450.00 |
| 7 | 3 Living Room Chandeliers (Apt. A, B and C) each $260.00 | $780 |
| 8 | 3 Bosch Dishwashers (Apt. A, B and C) each $750.00 | $2250.00 |
| 9 | 3 Whirlpool Refrigerators (Apt. A, B and C) $850.00 | $2550.00 |
| 10 | 3 InSinkErator Disposals (Apt. A, B and C) 3/4HP each $210.00 | $630.00 |
| 11 | 3 Frigidare 30 in Electric Stoves (Apt. A, B and C) each $790.00 | $2370.00 |
| 12 | 4 Four Tons Trane A/C units $5200.00 each | 20,800.00 |
| 13 | 4 Two Tons Trane A/C units $3200.00 each | 12,800.00 |
| 14 | 11 W620 Wascomat 3PH washers each $1930.00 each | 21,230.00 |
| 15 | 5 W640 Wascomat 3PH washers each $3644.00 each | $18220.00 |
| 16 | 4 W655 Wascomat 3PH washers each $5348.00 each | $21,392.00 |

| 17 | 4 TD 50 Wascomat Dryers 1PH $2138.00 each | $8552.00 |
|----|---|---|
| 18 | 8 TD 30X30 Wascomat Dryers 1 PH $4114.00 each | $32912.00 |
| 19 | 1 Lochinvar Heater 100 Gallon<br>4 A.O Smith ECS40D 40 Gallon Water Heater | $5366.39 |
| 20 | Freight, Delivery, Set Up, Start Up | $7000.00 |
| 21 | Sales Tax State 4%+ Sales Tax Parish 5% (Washers + Dryers) | $10,179.59 |
| 22 | C-1500 2 CCI-Xchanger value Stations | $22,590.00 |
| 23 | 40 Card Readers $312.00 each | 12,480.00 |
| 24 | V-0600 VPS X-changers with voice prompting | $499.00 |
| 25 | Sales Tax State 4%+ Sales Tax Parish 5% ( X-Changer + Card readers) | $3,279.42 |
| 26 | 55-inch Samsung smart TV | $650.00 |
| 27 | 42 -inch Toshiba Commercial TV | $1200.00 |
| 28 | USI HR 24 Snack Vending Machine | $2500.00 |
| 29 | USI HR 32 Snack Vending Machine | $3,913.10 |
| 30 | Selectivend CB500 10 Selection Drink Vending Machine | $4898.00 |
| 31 | Coke 13 Selection Cold Drink Vending Machine | $4800.00 |
| 32 | Hikvision NVR 32 channel Surveillance System with 24 4Megapixel Camera installed with labor | $8750.00 |
| 33 | Control4 Automation. See attached work order | $15,864.22 |
| 34 | One Square 3 PH D 400Amp Main Panel. Three Siemen 200AMP Subpanel. Installation Of lighting and electrical system. | $28,250.00 |
| 35 | 12 column Vend-Rite Soap Vending Machine with card reader | $4200.00 |

Total: $313,355.72

# The Washing Machine, Inc.

1504 Pasadena Avenue
Metairie, LA 70001

Phone/Fax 504-834-8020

**Date:**
11/2/2006

**Invoice #**
11022006

**Bill To:**
Jawad Gharib
8733 S. Caliborne Ave.
New Orleans, LA 70118
Phone: 504-864-0057

**Ship To:**
South Claiborne Coin Laundry
8807 S. Claiborne Ave.
New Orleans, LA 70118

| Qty | Stock # | Description | Unit Price | Total |
|-----|---------|-------------|-----------|-------|
| 11 | W620CCR | Wascomat 20# washers, 208-240VAC/3ph, WH | $1,930.00 | **$21,230.00** |
| 5 | W640CCR | Wascomat 40# washers, 208-240VAC/3ph, WH | $3,644.00 | **$18,220.00** |
| 4 | W855CCR | Wascomat 55# washers, 208-240VAC/3ph, WH | $5,348.00 | **$21,392.00** |
| 4 | TD50CCR | Wascodry 50#, 120VAC/1ph, MP, WH | $2,138.00 | **$8,552.00** |
| 8 | TD30-30CCR | Wascodry 30# stack, NG, 120VAC/1ph, MP, WH | $4,114.00 | **$32,912.00** |
| 1 | TNR200-100 | Lochinvar heater/100gal/200,000 BTUs | $3,800.00 | **$3,800.00** |
| 20 | Bases | Steel bases: 11 @ 10" & 9 @ 6" | $277.00 | **$5,540.00** |
| 5 | 3060U | 30" x 60" Folding tables w/shelf | $575.00 | **$2,875.00** |
| 8 | R & B | Laundry carts | $110.00 | **$880.00** |
| 1 | | Freight, delivery, set-up, start-up | $7,000.00 | **$7,000.00** |

| | |
|---|---|
| Subtotal | $122,401.00 |
| Sales tax on purchase 9% | $11,016.09 |
| Forklift rental with 42' boom | $458.88 |
| **Total** | **$133,875.97** |
| Less down payment | ($21,000.00) |
| Total due when ready to ship | $112,875.97 |
| Less funds wired to Wascomat | ($100,000.00) |
| **Balance due** | **$12,875.97** |

Make all checks payable to The Washing Machine, Inc.
If you have any questions concerning this invoice, please contact:
Steve Clark, 504-834-8020, scsuds@cox.net

**Thank you for your business!**

# The Washing Machine, Inc.

1504 Pasadena Avenue
Metairie, LA 70001

Phone/Fax 504-834-8020

**Date:**
11/2/2006

**Invoice #**
11022006

**Bill To:**
Jawad Gharib
8733 S. Caliborne Ave.
New Orleans, LA 70118
Phone: 504-864-0057

**Ship To:**
South Claiborne Coin Laundry
8807 S. Claiborne Ave.
New Orleans, LA 70118

| Qty | Stock # | Description | Unit Price | Total |
|-----|---------|-------------|-----------|-------|
| 11 | W620CCR | Wascomat 20# washers, 208-240VAC/3ph, WH | $1,930.00 | **$21,230.00** |
| 5 | W640CCR | Wascomat 40# washers, 208-240VAC/3ph, WH | $3,644.00 | **$18,220.00** |
| 4 | W855CCR | Wascomat 55# washers, 208-240VAC/3ph, WH | $5,348.00 | **$21,392.00** |
| 4 | TD50CCR | Wascodry 50#, 120VAC/1ph, MP, WH | $2,138.00 | **$8,552.00** |
| 8 | TD30-30CCR | Wascodry 30# stack, NG, 120VAC/1ph, MP, WH | $4,114.00 | **$32,912.00** |
| 1 | TNR200-100 | Lochinvar heater/100gal/200,000 BTUs | $3,800.00 | **$3,800.00** |
| 20 | Bases | Steel bases: 11 @ 10" & 9 @ 6" | $277.00 | **$5,540.00** |
| 5 | 3060U | 30" x 60" Folding tables w/shelf | $575.00 | **$2,875.00** |
| 8 | R & B | Laundry carts | $110.00 | **$880.00** |
| 1 | | Freight, delivery, set-up, start-up | $7,000.00 | **$7,000.00** |

| | |
|---|---|
| Subtotal | $122,401.00 |
| Sales tax on purchase 9% | $11,016.09 |
| Forklift rental with 42' boom | $458.88 |
| **Total** | **$133,875.97** |
| Less down payment | ($21,000.00) |
| Total due when ready to ship | $112,875.97 |
| Less funds wired to Wascomat | ($100,000.00) |
| **Balance due** | **$12,875.97** |

Make all checks payable to The Washing Machine, Inc.
If you have any questions concerning this invoice, please contact:
Steve Clark, 504-834-8020, scsuds@cox.net

**Thank you for your business!**