UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| In Re:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL 2047 SECTION "L" |
|---|---|
| This document relates to: Case No. 20-cv-3264 | JUDGE ELDON FALLON MAGISTRATE NORTH |

MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
TO EXCLUDE THE EXPERT TESTIMONY AND REMEDIATION COST
<u>ESTIMATES OF DEFENSE CONSULTANT, PHILLIP A. ADAMS</u>

**MAY IT PLEASE THE COURT:**

The issue of the proper scope of remediation in a Chinese drywall property has been litigated many times in this Court—not once, not twice, but on at least three occasions in MDL-2047. In every such instance, Knauf or Taishan has presented some variation of its selective remediation approach, and the Court has rejected that approach <u>every</u> <u>single</u> <u>time</u>, calling instead for full and complete remediation of the *whole home* (*i.e.*, "stripped to the studs (with all wiring, plumbing, fixtures, cabinets, HVAC systems and insulation removed),"[1]).  In the latest of its *Finding of Fact & Conclusions of Law…* (Rec. Doc. 20741), the Court set forth its most pronounced and far-reaching holding yet, finding that "there is a ***well-established*** and ***defined scope of work necessary to fully remediate a Chinese drywall property***." (Rec. Doc. 20741, p. 24) citing *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34 (emphasis added).  The Court's

---

[1] Rec. Doc. 20741, p. 24.

scope of remediation is "based on long-term observation of properties with Chinese drywall (including sampling and testing), scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of national builders, and electric and building codes)." (*Id*. at 24). On the other hand, the Court has criticized what it refers to as "alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall", which the Court concluded, "will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the property owner."

Defendants have offered Phillip A. Adams of Moss and Associates, LLC, to act as their expert for purposes of the proper scope and costs of remediation in this case. Despite the Court's very clear guidance, defense counsel has instructed Mr. Adams to ignore the Court's scope of remediation and rely instead on the Consumer Product Safety Commission ("CPSC") Guidelines in formulating his scope of remediation, which he agreed to do. Mr. Adams' remediation protocol is just another version of the same song – he admits that he intends to offer a scope that is "something less than the full remediation of the property,"[2] which is a selective remediation approach and includes many of the same "alternative remedies" that the Court has admonished on multiple occasions. Based on the Court's clear and consistent holdings, Mr. Adams' opinions, as contained in his Xactimate estimates, are not reliable pursuant to the doctrines set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 703 of the Federal Rules of Evidence.

## BACKGROUND

### A. This Court's Prior Rulings Have Repeatedly Established that Complete Remediation is Required

---

[2] Ex. 1, Adams' Deposition, p. 92.

According to Defendants herein, "[s]ince June 2009, numerous cases have been consolidated, involving thousands of individual claims. Over 20,000 documents have been filed into the record, millions of documents have been exchanged in discovery, depositions have been taken in the United States and in China, *over thirty Pretrial Orders have been issued*, and the MDL Court has presided over *discovery, hearings, and bellwether trials*." (Rec. Doc. 23350, p. 4) (emphasis added). That Chinese drywall is defective and emits certain reduced sulfur gases was admitted by Knauf early on, ahead of the *Hernandez* trial held on March 15, 2010, possibly even earlier, so with that issue settled, the primary issue being litigated over the next decade or so was scope and extent of remediation. Over the course of 8 years, the Court issued 3 very detailed rulings defining the proper scope of remediation for a Chinese drywall property, including *Findings of Fact & Conclusions of Law* ("FOFCOL") for (1) *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, case no. 09-6687; (2) *Hernandez v. Knauf Gips KG*, Case No. 09-6050; and then (3) a *Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing*, which the Court applied to "ALL CASES". (Rec. Doc. 20741, p. 1). The first two FOFCOL call for complete remediation, but seem to have more narrow application, as the science was still developing. Nevertheless, at the time of the third FOFCOL, issued on April 21, 2017, the Court was confidently able to apply its scope of remediation to all properties containing Chinese drywall. (Rec. Doc. 20741, pp. 14-17).

Beginning almost 13 years ago, on or about February 19, 2010, this Court held a default proceeding in the MDL that applied to the *Germano* cases.[3] While these cases were filed against Taishan, Knauf Plasterboard Tianjin Co. Ltd. was permitted to intervene. As the Court described, "[v]igorous discovery was conducted by the Intervenors. Depositions were taken and expert

---

[3] *Germano, et al. v. Taishan Gypsum Co. Ltd.*, et al., case no. 09-6687

reports were exchanged. A *Daubert* hearing was held on January 29, 2010. Subsequently, the

Intervenors filed numerous motions *in limine*. *On the eve of the evidentiary hearing*, both Knauf

and The Mitchell Co. voluntarily withdrew from the proceeding, leaving only the Plaintiff-

intervenors to put on evidence."  (Rec. Doc. 2380, p. 5) (emphasis added).

On April 8, 2010, the Court issued a very in-depth, 108 page ruling (hereinafter referred to

as "*Germano* FOFCOL").  First, the Court set forth the general scientific findings on Chinese

drywall, which "distinguish it from typical, benign drywall," providing, in pertinent part:

> "1. Chinese drywall has a significantly higher average concentration of
> strontium and significantly more detectable levels of elemental sulfur…
>
> 2. Chinese drywall releases reduced sulfur gases…The fact that Chinese
> drywall emits sulfur gases has also been reported by the U.S. Consumer
> Products Safety Commission, the Florida Department of Health, and other
> investigatory agencies and firms…
>
> *          *          *
>
> 4. The sulfur gases released by Chinese drywall cause offending odors in
> homes, making them hard if not impossible to live in…
>
> 5. The sulfur gases released by Chinese drywall are corrosive to metals,
> particularly copper and silver…The reaction of sulfur gases with metals can
> be said to be "consuming" the useful, pure metals by replacing those metals
> with sulfides...
>
> 6. The corrosion on metals caused by the sulfur gases emitted by Chinese
> drywall causes premature failure of electrical & mechanical
> devices…Laboratory analysis of these copper and silver components from
> the Virginia homes identified the corrosion as the cause of an HVAC coil
> failure and severe corrosion deposits at the operative connections in the
> appliances and in consumer electronics….
>
> 7. The corrosion on metals caused by the sulfur gases emitted by Chinese
> drywall poses a fire risk."  (Rec. 2380, pp. 12-16)

As the Court will recall, there is no difference between the Taishan drywall and Knauf

drywall—it all contains the same destructive properties: "Knauf Plasterboard Tianjin (hereinafter

"Knauf" or "KPT") and Plaintiffs Steering Committee (hereinafter "PSC") experts agree that ***all***

*of the problematic Chinese drywall products share similar chemical and physical properties*." (*Id.* at 17) (emphasis added).

The *Germano* FOFCOL also considered the severity of the corrosive environment created in the Chinese drywall properties involved in that matter.  "According to the Battelle Classification scheme, the recognized standard for measuring corrosivity of environments, there are four Classifications ranging from benign to severe industrial. (*Id*. at 19). The Classifications are characterized as I (**benign**), II (**mild**), III (**moderately severe**), and IV (**severe industrial**)." (*Germano* FOFCOL, Rec. Doc. 2380, p. 19*)*.  This Court concluded that, "The Plaintiff intervenors' homes demonstrate levels of corrosion found in the ***most severe industrial corrosive environment*.**" (*Id*.). One of the *Germano* properties only contained 8 KPT boards, so it does not take much KPT drywall to create the "most severe industrial corrosive environment." (See: *Id*. at 62) ("The use of drywall in the homes, based upon sales and delivery records, spans a spectrum from a small delivery of 8 boards to homes built with over 200 4'x12' sheets of drywall.").

As for the scope of remediation, the *Germano* FOFCOL noted that "[t]here seems to be little or no dispute.." that "…all Chinese drywall must be removed," but "there is dispute, however, over the scope of remediation where the home contains both Chinese drywall and non-Chinese drywall…*The overwhelming evidence reveals that in such mixed structures it is necessary to remove <u>all the drywall</u>, both Chinese and other, for the following reasons*." (*Id.* at 28) (emphasis added).   The Court also ordered that a proper scope of remediation required complete removal and replacement of all components of Chinese drywall properties, encompassing virtually every finish, fixture, appliance, electronic system, piping and wiring, etc., such that the home is essentially stripped down to the studs, with very few exceptions – *i.e.* "removal of <u>*all drywall*</u> *in a mixed home is efficient and cost effective*"; "<u>*[a]ll electrical wires* </u> in the Plaintiff-intervenor homes

need to be replaced"; "*[a]ll copper pipes* in the Plaintiff-intervenor homes need to be replaced"; "*HVAC units* in the Plaintiff-intervenor homes need to be replaced"; and *"[m]ost of the appliances and electronics* located in the representative homes need to be replaced due to corrosion on metallic contact surfaces and on other metallic components."  (Rec. Doc. 2380, pp. 27-46) (emphasis added). While the Court was not prepared at that time to conclude that *all* appliances and electronics must be replaced, it did, however, note that, "…the corrosion has damaged the copper wiring in the appliances and electronics," "[r]efrigerators are particularly susceptible to damage from the sulfur gasses due to the cool copper lines and compressor which circulate refrigerant,"[4] and "electronic systems in the Plaintiff intervenors' homes are likely to fail before their normal and expected periods of use end…[e]xamples of damaged or failed electronic systems include televisions, computers, and any other item with a circuit board"[5].  So, the vast majority of appliances and electronics would appear to fall within those items susceptible to corrosion and damage.  Similarly, the *Germano* FOFCOL found that most flooring types were susceptible to damage and should be replaced, holding that carpet and hardwood or vinyl flooring must be replaced and tile flooring may need to be replaced. (*Id.* at 50).

The Court also found that most items which must be removed with drywall may need to be replaced.  For example, "[t]he cabinets in the houses must be removed to gain access to the drywall…The testimony reveals that it would not be cost-effective to attempt to gently remove the cabinets and store them in a climate-controlled storage unit…It is more cost-effective to replace the cabinets than attempt removal and storage."  (*Id.* at 51).

The same is true of countertops: "[t]he countertops *must be* removed during the remediation to gain access to the drywall….The contractors providing estimates for the Virginia homes indicate

---

[4] Id. at 48.
[5] Id. at 48-49.

from experience that the countertops will chip or break during removal…*Beazer testified that the countertops in Florida homes being remediated broke during removal.* Because of these factors, the countertops should be replaced as part of the remediation."  (*Id.*)

As for "trim, crown molding and baseboards," the Court found that those items "must be removed to get to the defective drywall…In most instances it is less costly to replace these items than to take additional time to gently remove, store and put back the original materials. Id. This is the case with the representative homes." (Id. at 52)

The Court was very clear about the requirement that insulation be removed: "[t]he insulation *cannot* be adequately protected during the remediation process….***The insulation will be damaged during the removal of the drywall***…***It will also be contaminated with drywall dust produced during the removal of the drywall…***The drywall dust *cannot* be properly cleaned or removed from the insulation. (*Id.* at 52-53, citing "Photos of debris and dust in insulation fibers after CDW removal from a Beazer home" at P1-1803-0013, 0036 and 0012) [additional citations omitted].

The Court also ordered a number of steps to clean and air-out the affected properties following removal and replacement of the above components, including as follows:

> [i]n order to eliminate the tremendous amount of dust produced from removal of the drywall, and to eliminate the offensive odor of the Chinese drywall, Plaintiff-intervenors' home will need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be used to remove the fine drywall dust and other particles. Additionally, the homes should be wet-wiped or power washed to eradicate any remaining particles. Finally, the houses will need to air out for between fifteen (15) and thirty (30) days.

(*Id*. at 53).  In addition, the Court required that, "[f]ollowing the deconstructing phase of the remediation process, the houses will need to be inspected by an independent and qualified

engineering company…This is important for insurance, resale potential, and peace of mind for the present occupants." (*Id*.)

### B. Key Differences Between the Court's Remediation Protocol and the NAHB and CPSC Protocols

The Court then compared its remediation protocol to protocols issued by the National Association of Home Builders (NAHB) and the Consumer Product Safety Commission (CPSC), which both released their own remediation protocols following the *Germano* hearing. The Court found that, for the most part, the NAHB and CPSC's remediation protocols were consistent with the Court's, but the Court found several differences exist that are critically relevant here.

The Court began by describing the consistencies between its protocol and the NAHB's, noting that the NAHB protocol "recommends taking out all drywall in a home **unless the Chinese drywall is in a contained area**. Rebecca Mowbray, Chinese Drywall Guidance Offered by National Association of Home Builders, The Times-Picayune, March 18, 2010, http://www.nola.com/business/index.ssf/2010/03/chinese_drywall_guidance_offer.html." (Rec. Doc. 2380, p. 55) (emphasis added). The Times-Picayune article cited by the Court provides additional detail as to the phrase "unless the Chinese drywall is in a contained area", providing: "Marsh recommends taking out all the drywall in the house *unless it's in a contained area such as a* <u>*back bathroom or den*</u>*, and* <u>*corrosion hasn't showed up in air-conditioning coils*</u>." Mowbray, *supra* (emphasis added). These and other recommendations[6] were found to be consistent with the Court's findings. (Rec. Doc. 2380, p. 55).

Turning to the CPSC protocol, the Court noted that both protocols "call for the replacement of <u>all possible problem drywall</u>, <u>all fire safety alarm devices</u>, <u>all electrical components</u> and <u>wiring</u>,

---

[6] The Court also noted that NAHB recommends taking out all plumbing, low-voltage wiring, carpet, and then recommends the use of HEPA-filter vacuums to suck up dust, airing out homes over a period of time, and paying for temporary living expenses for displaced families. Id.

and <u>all gas service piping</u> and <u>fire suppression sprinkler systems</u>."  (Id. at 56) (emphasis added).

However, the Court noted, *"if a portion of drywall can be reasonably identified as non-problematic*

*drywall, the CPSC allows for leaving that drywall in place.*" *Id*.  The Court rejected this approach,

concluding as follows:

> [t]he evidence reviewed by this Court indicates that the better and more realistic approach dictates the removal of all drywall in those homes in which there is a substantial mixture. ***This is necessary in order to remove and replace wires, pipes, and insulation, and to adequately clean the home***. Furthermore, the evidence indicates that it is virtually impossible to detect with reasonable accuracy which is and which is not Chinese drywall.

(*Id*.). Following the issuance of the *Germano* FOFCOL, Knauf filed a *Motion in Limine to Restrict*

*the Evidentiary Hearing and the Court's Findings of Fact and Conclusions of Law to the Scope*

*and Extent of Appropriate Remediation for the Seven Homes at Issue* (Rec. Doc. 1109) in an

attempt to limit application of the Court's FOFCOL.  But, the Court denied Knauf's Motion

outright, finding that the motion raises a non-issue and describing the hearing as playing an

"important role." (Order and Reasons, filed 2/17/10, Rec. Doc. 1140, p. 4).

### C.  *Similarly, the Hernandez FOFCOL Ordered Complete Remediation*

On March 15-19, 2010, the Court presided over another bellwether trial in *Hernandez v. Knauf*

*Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall.

See (R. Doc. 2713). KPT stipulated that its Chinese drywall "emits certain reduced sulfur gases

and the drywall emits an odor." (*Id.* at 6). The Court found in favor of the Hernandez family,

issuing another detailed FOFCOL. Similar to the *Germano* FOFCOL, the *Hernandez* FOFCOL

requires a complete remediation approach as well.  The Court summarized the undisputed and

disputed portions of the scope of remediation, as follows:

> Based upon the stipulations entered into by the parties and the relevant evidence, ***there is no dispute that the following must be completely removed and replaced***: <u>all drywall</u>, <u>whether Chinese or domestic</u>, <u>all insulation</u>,

> flexible duct work, switches, receptacles, molding and countertops. However, *the parties are unable to reach an agreement as to the proper remediation* for the *electrical*, *plumbing*, and *HVAC systems*, and *other items which are involved in the removal of drywall or contain silver and copper components*. Thus the Court will now address these matters.[7]

Going further than it did in *Germano*, the Court in *Hernandez* was convinced that, "***the entire electrical system in the Hernandez home must be removed and replaced because the electrical wires are corroded and cannot practically be "cleaned" of corrosion***. Additionally, this corrosion violates applicable building codes, and, finally, complete removal and replacement of the electrical system is the most practical, economical, and efficient approach to remediation."  (Id.).

Similar to *Germano*, the Court found that, "the entire plumbing system should be removed and all copper and silver components replaced";[8] "the entire HVAC system," including "the entire air-handling unit must be removed and replaced";[9] "[t]he circuit boards in appliances and electrical devices which suffer from the corrosion cannot be practically cleaned of the corrosion… Accordingly, Plaintiffs' appliances and consumer electronics damaged by Chinese drywall must be disposed of and replaced";[10] "[a]s a practical matter, everything in front of the drywall in the Hernandez home, such as cabinets, trim, fixtures and bathroom porcelain, needs to be removed prior to removal of the drywall… likely they will be damaged and when one considers the relatively low cost of these items…Accordingly, these items must also be replaced.";[11] the Court finds that with the proper care, the wood floors can be sufficiently protected…the Court requires all carpet in the Plaintiffs' home to be removed and replaced…Tile floors can be sufficiently

---

[7] *Hernandez* FOFCOL, Rec. Doc. 2713, p. 20
[8] *Id.* at p. 30
[9] *Id*. ("The wires and circuit boards in the air-handling unit are subject to corrosion and premature failure…The insulation in the air-handling unit will also need to be replaced because of exposure to the off-gassing of reduced sulfur gases.")
[10] Id. at 32
[11] Id.

protected during remediation and thus do not require removal and replacement.";[12] "Certain Non-Electronic Personal Property Damaged by the Chinese Drywall Must be Replaced" (e.g. clothing, rugs and mattresses, non-electronic, metallic items, such as door knobs, strike plates, silver picture frame);[13] "after remediation, comprehensive cleaning of the home is necessary (i.e. "[c]omplete removal of the dust requires regular vacuuming, followed by vacuuming with a HEPA filter, and finally a pressure washing or wipe-down of all surfaces with a damp cloth" and airing out home for up to 30 days);[14] and "an independent, environmental consultant must certify the remediation is complete and successful".[15]

The Court also found that damage to personal property is recoverable and awarded the Hernandez family the costs of those items, less the benefit of their use.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. See (R. Doc. 12061-5). As the "Remediation Protocol" for the Knauf Settlement Agreement, Knauf agreed to a scope of remediation largely consistent with the *Hernandez* FOFCOL, such as requiring the removal and replacement of "all drywall in the home," with the exception of a few different kinds of drywall (none of which are relevant here); "all electrical wiring (including low-voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards"; "all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms"; and "all copper gas lines and fittings". (Exhibit F to Knauf Settlement Agreement (Rec. Doc. 12061-14)).

---

[12] Id. at 33
[13] Id.
[14] Id. at 34
[15] Id.

***D. The Court's Findings of Fact &Conclusions of Law Related to the June 9, 2015 Damages Hearing (Rec. Doc. 20741) is the Definitive Authority on the Issue of Scope of Remediation***

On April 21, 2017, the Court issued its *Findings of Fact &Conclusions of Law Related to the June 9, 2015 Damages Hearing* (Rec. Doc. 20741).  In the caption of this document, the Court made its applicability very clear: "THIS DOCUMENT RELATES TO: ALL CASES".  (*Id.* at p. 1).  In a section entitled "III. GENERAL FINDINGS ON CHINESE DRYWALL", the Court set forth general findings concerning the nature and scope of impact that Chinese drywall has on any property containing it. (Id. at 12-17).  Presumably, the science had progressed considerably since *Germano* and the Court had heard evidence from numerous experts regarding these issues, so the Court was able to refine and add additional content to its "general" findings.  In addition to its *Germano* findings regarding the nature and properties of Chinese drywall (*e.g.,* that "sulfur gases emitted from Chinese drywall create an environment classified among the most severe industrial corrosive environments…", the Court added that:

> 5. Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the Germano Plaintiffs, further confirmed the ***wide-spread impact** of the corrosive environment*, which included *corrosion of copper wiring*, *copper pipes* and *silver-based components in electronics*, including *HVAC circuitry* and *brazing on pipes*, causing premature failure of electrical and mechanical devices. Id. at 14, 23. (*Id*. at 14) (emphasis added).

Over the years, the Court had clearly seen enough evidence to say that the off-gassing of Chinese drywall results in widespread damage throughout the home.  Based on this widespread impact, the Court was able to provide this remediation protocol in its "general" section, finding that:

> 7. After considered analysis of the impracticality and risks of the selective remediation approach, ***the Court found in Germano and re-affirms herein that remediating a Chinese drywall property requires complete remediation and cleaning; thus, the Court again rejects any remediation approach that favors selective remediation such as the one originally proposed by the Knauf experts in Germano.*** *Id*. The remediation protocol fashioned in

Germano is evidence based and has been confirmed via its application in the actual remediation of several thousand homes.

8. ***The scientific and practical constructability evidence presented before this Court, which relies on long-term observation, sampling and testing of properties with Chinese drywall, scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of the national builders), and electric and building codes, demonstrates that <u>proper remediation</u> of the <u>danger posed by Chinese drywall</u> <u>must</u> include the <u>removal</u> of <u>all drywall</u>, <u>all electrical wiring</u>, the <u>entire HVAC system</u>, and many other items such as <u>appliances</u>, <u>carpet</u>, <u>cabinetry</u>, <u>trim work</u> and <u>flooring</u>.*** Germano FOFCOL at 27-55; Hernandez FOFCOL at 20-34; Transcript at pp. 106:8-110:3. (Id. at pp. 14-15) (emphasis added).

The Court then explained the reason why this scope of remediation is required in all homes

containing Chinese drywall, even those containing a mix of defective and non-defective drywall:

9. This scope of remediation is necessary even in homes with "mixed" drywall, where Chinese and non-reactive drywall may be found, ***because the sulfur gases disburse and circulate creating a generally corrosive environment and, moreover, there is no reliable or practicable method for selective identification and removal of Chinese drywall in mixed homes***. Germano FOFCOL at 27-40. Large Florida homebuilders with extensive experience in Chinese drywall remediation have determined that removal of all drywall in affected homes is efficient and cost-effective, and that attempted selective identification and removal of CDW is neither efficient nor cost-effective. Id. at 31.

10. ***It is both economical and practical to remove all the wiring while the drywall is removed, rather than removing only some of the wiring at the time of remediation and then risk later having to tear down the drywall again in the event that additional wiring exposed to the sulfur gases is harmed or fails.*** Additionally, *the low-voltage wiring supporting life and safety devices such as fire alarms and smoke detectors should be removed and replaced* because of the low cost of replacement when compared with the high risk of injury or death if these devices are not functioning properly. Id. at 39.

11. ***Copper pipes and HVAC units must be replaced***. It is more cost-effective and less time consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall properties as opposed to attempting to "clean" the corrosion off copper components and HVAC ductwork. Id. at 39-46. (*Id*. at 17)

For the sake of brevity, the Court's subsequent findings up to #17 are not included here, but are incorporated by reference. (*Id*. at pp. 15-17).  The Court's finding #17 provides a helpful summary of the Court's scope of remediation.

The Court then set forth findings as to why selective remediation approaches are not acceptable:

> ***Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, the evidence does not support the feasibility of such an option.*** *The* ***alternative remedies*** *to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes,* ***will not make the plaintiff whole****,* ***will not be adequate from a*** *__scientific__ or __practical__ __standpoint__, and will not provide safety and marketability to the property owner. Id. at 54. (Id. at 16-17).*

Accordingly, the Court could not have been more clear: the proper scope of remediation is complete remediation; this is based in science and practicality; and selective remediation techniques are not.  Despite this, Knauf has (again) proposed a selective remediation approach, which totally disregards the Court's consistent and clear holdings, as discussed further below.

### E.  Mr. Adams Reports and Xactimate Estimates

The Gharibs own two properties that experts from both sides have confirmed contain Chinese drywall manufactured and/or distributed by Knauf, including their home located at 4 Beresford Drive, Metairie, Louisiana (the "Gharib Home") and their commercial property located at 8807 South Claiborne Avenue, New Orleans, Louisiana 70118 (the "Gharib Commercial Property").   The Gharib Home is a unique and custom home that took years to build and is not one of the "mass-produced" houses churned out following Hurricane Katrina.   Likewise, the Gharib Commercial Property also contains components that typical, residential structures do not have. That structure consists of three levels, including a commercial space on the first level; 3

apartments on the second level; and additional living quarters on the third.  Mr. Adams confirmed the existence of Chinese drywall in all three of the second floor apartments. (Ex. 3).  *In Mr. Adams' reports, he includes photos of Chinese drywall damage in the attics of both properties, confirming the widespread impact of the defective drywall; however, he omits any remediation anywhere else in those properties* (other than the second floor of the Gharibs' Commercial Property and the first floor of the Gharibs' home).

Mr. Adams and/or his colleague, Carmen Salvatore, inspected the properties involved in the *Bennett* class action.  For each property they inspected, Mr. Adams submitted a letter report that he refers to as a "Phase 1 Inspection Letter" (referenced herein as "Phase 1 Letter) and an Xactimate estimate.[16]

*Mr. Adams' Reports for the Gharibs' Home*. The Phase 1 Letter for the Gharibs' home stands in stark contrast to the Xactimate estimate.  Whereas the Phase 1 Letter finds the home has 90% KPT drywall and includes photos of widespread impacts and corrosion throughout the Gharibs' Home, the Xactimate estimate provides a scope of remediation limited solely to the first floor and, even assuming that scope is proper (which it is not), many of the items called for repeatedly in the Court's rulings are not included.

First, the Phase 1 Letter includes photos of severe damage to components located in the attic of home (*i.e* in the top story), but the Xactimate is limited to components located strictly on the first floor of the home. The letter notes that the "ground floor experienced water damage during Katrina. The ground floor was renovated/repaired at that time,"[17] but it provides no explanation as to why no remediation is called for in second story or attic of the Gharibs' home, despite that the

---

[16] Mr. Adams admits he did not actually create the Xactimate estimates, that they were created by an employee of a different company, named WCCI, but Adams claims that he "reviewed them all." (Ex. 1, Adams' Deposition, p. 52).
[17] Ex. 2, Phase 1 Letter, p. 1.

Phase 1 Letter notes severe damage to the attic components.  For instance, see photos in Exhibit 2, Phase 1 Letter, captioned "Attic AHU Lineset *Black*" on page 15; 2 photos captioned "Attic Water Heater Copper *Dark*" on page 16; and 2 additional photos with that same caption on page 17.  Turning to the Xactimate estimate (Ex. 2), ***none of those damaged attic items are recommended for replacement, nor are they even mentioned anywhere in the Xactimate, despite that the Phase 1 Letter shows classic signs of Chinese drywall damage to both the HVAC system and hot water heater***.[18]  Mr. Adams' Xactimate does not even recommend performing the "alternative remedies" that the Court rejected as "not...adequate from a scientific or practical standpoint." (Rec. Doc. 2074, p.17).  His silence on these severely damaged items is effectively a recommendation to leave the Gharibs' with a corroded air-handling unit and hot water heater that will eventually fail, which lacks any scientific basis whatsoever.

Mr. Adams admits that he only included the first floor within his recommended scope of remediation, since only the Gharibs' first floor was flooded during Hurricane Katrina:

> ***Q. Next document is one of the Gharib properties, G-H-A-R-I-B. This one happens to be in Metairie, Louisiana. And this one you've labeled that the property has 2,439 square feet under air, but this is the first floor living area. Explain for me why it's labeled in this fashion.***
> A. ***Mr. Gharib explained to Carmen during the inspection that this home flooded during Hurricane Katrina, and only the first floor was remediated. The second floor was way before.***
> Q. Are you going offer any testimony about the scope of the required remediation in each one of these properties?
> A. For the Xactimate for this one?
> Q. Yes.
> A. Yes.
> ***Q. Are you being asked by Fishman Haygood to come to court on behalf of Knauf and offer an Xactimate that does a cost projection for something less than the full remediation of the property?***
> ***MS. JOHNSON:***

---

[18]  The only mention of air-handling units is on these items are item #81 located on page 6 and item #317 on page 19.

> *Objection, form.*
> *BY MR. DOYLE:*
> *Q. You can answer.*
> *A. Yes.*[19]

Based on the above, it is clear that Mr. Adams intends to testify that complete remediation of the whole home is not necessary and that a selective remediation approach will be sufficient, despite the damage noted in other parts of the house (*i.e.* the attic) and despite the Court's ruling that a complete scope of remediation "is necessary **even in homes with 'mixed' drywall**, where Chinese and non-reactive drywall may be found, **because the sulfur gases disburse and circulate creating a generally corrosive environment**…" (Rec. Doc. 20741, p. 15) (emphasis added). Importantly, the first story of the Gharibs' home is open to and not separated from the second story, so the area where the Chinese drywall is believed to be (i.e. throughout the first floor) is not contained from the rest of the house. *See*: photos showing second story open to and shares same air with first story, Phase 1 Letter for Gharibs' Home, Ex. 2, p. 26, 90.

 <u>Second</u>, even assuming Mr. Adams' scope of remediation is correctly restricted to the first floor (which is wrong, according to multiple Court's orders), *his scope omits virtually every step ordered by Court with respect to the first floor of the Gharibs' home.* His omissions, however, are not the result of inadvertence or oversight; rather, they are intentional. During his deposition, Mr. Adams admitted he was instructed and agreed to use the CPSC guidelines for his remediation protocol:

> A. **I used Xactimate with the CPSC guidelines <u>for the protocol</u>.**
> Q. How did the CPSC guidelines differ from the protocol that was adopted in 2011?
> **A. CPSC guidelines do not require the replacement of appliances. They do not require the replacement of electrical wire. It's the replacement only of receptacles, switches, and breakers. Replacement of smoke detectors and carbon monoxide detectors, which is the same protocol. CPSC also for**

---

[19] Ex. 1, Adams' Deposition, p. 92.

> *replacement of fusible type sprinkler heads, which we didn't have any of in*
> *these.*
> Q. And remind me again: *Why did you shift to the CPSC guidelines, rather*
> *than the 2011 protocol guidelines?*
> *A. CPSC guidelines were a common sense practical approach, and that's*
> *what was discussed and that's what I used.*
> Q. Is that what the Knauf counsel instructed to you use?
> A. We discussed it and that's what –
> Q. *And you agreed to use that?*
> A. *Yes.*

(Ex. 1, Adams' Deposition, p. 45).  As such, Knauf and Mr. Adams felt the more "common sense practical approach" was to use the CPSC guidelines, instead of the Court's scope of remediation, despite the Court's findings that its own "scope of work was established based on *long-term observation of properties with Chinese drywall* (including sampling and testing), *scientific investigation of Chinese drywall and the science of corrosion*, *practical construction experience* (particularly the experience of national builders, and electric and building codes)." (Rec. Doc. 20741, p. 24).

Further, in many cases, the Phase 1 Inspection Letter notes severe damage to first-story components, but those same components, in the Xactimate estimate, are either recommended to be "cleaned" or are not mentioned at all.  For instance, the Phase 1 Letter provides the following observations:

> **Environmental Conditions**
> *Moss and Associates detected a slight CDW type odor upon entering the home. <u>All of the examined outlet ground wires were observed to be either black or dull. The Bathroom fixtures were pitted. The HVAC Refrigerant linesets were black</u>*. The homeowner advised that this home was built in 2004-2005 prior to the Katrina Hurricane. The ground floor experienced water damage during Katrina. The ground floor was renovated/repaired at that time. (Ex. 2, Phase 1 Letter)

Despite Mr. Adams' admission that all "**[a]ll** *of the examined outlet ground wires were observed to be either black or dull*" (supra), he does not call for the replacement of any electrical wiring.  Like the corrosion found in the Hernandez home, the Gharibs' home contains the same

black and dull wires. See: *Hernandez* FOFCOL (Rec. Doc. 2713, p. 25) ("There are numerous examples of visual black copper sulfide corrosion film on the electrical wires in the Hernandez home."). The Court explained that, even when a wire is insulated, the corrosion permeates through the insulation and corrodes the wire. (Rec. Doc. 2713, p. 25, providing "…given the contrary evidence above, the Court finds that insulation does not protect wires from corrosion and there are risks of future failure and *danger to safety*.") (emphasis added). ***So, Mr. Adams' methods are not just minimal in scope, they are scientifically deficient and, frankly, dangerous to the Gharibs.***

In addition, the Phase 1 Letter includes a number of photos showing unmistakable signs of corrosion and damage caused by Chinese drywall– the same kinds discussed in the multiple Court decisions detailed above. See: Ex. 2, Phase 1 Letter with photo captioned, "Bathroom 1 Mirror Desilvered" p. 8; 2 photos captioned "Bathroom 1 Plumbing Fixture Pitted", p. 8; photo captioned "Bathroom 1 Toilet Supply Line Black and Pitted" p. 9; photo captioned "Media Room Outlet Ground Wire Black", p. 10; photo captioned "Kitchen Sink Copper Connections Black", p. 11; photo captioned "Kitchen Sink Supply Line Fixture Dark", p. 12; photo captioned "Cabana Bath Fixture Pitted", p. 14; photo captioned "Cabana Bath Mirror Desilvered", p. 14.

The attached Table 1. is offered to show a detailed comparison of Mr. Adams' remediation protocol for the Gharibs' Home and the Court's and the CPSC guidelines he claims to have used. See: Table 1 attached as Exhibit 5. The protocols listed as the Court's are taken directly from the Court's April 21, 2017 FOFCOL and from the *Germano* FOFCOL, which was adopted and incorporated in the April 21, 2017 FOFCOL (Rec. Doc. 20741, p. 14, finding #6). From Table 1., it is clear that Mr. Adams' protocol completely disregarded the Court's methodology and its reasoning therefor. He also disregards certain CPSC guidelines as well.

*Mr. Adams' Reports for the Gharibs' Commercial Properties*.  Similarly, Mr. Adams limits his scope of work to only one floor – the second floor apartments – and does not include any damage sustained in other floors of the property.  By way of example, the following summarizes the deficiencies that the Court has criticized in its prior rulings, as detailed above:

1. *Dining room:*  Mr. Adams calls for cleaning the copper wire and resetting light fixtures, despite the Court's ruling that: "11. *Copper pipes and HVAC units must be replaced*. It is more cost-effective and less time consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall properties as opposed to attempting to "clean" the corrosion off copper components and HVAC ductwork." (Rec. Doc. 20741, p. 15)
2. *Kitchen:* The defense report calls for "detaching and resetting" the following: all the cabinets, countertop backsplash, sink, sink faucet, garbage disposer, refrigerator, range, range hood and dishwasher. (Xactimate, pp. 3-5). There is no mention of replacing or cleaning of all the copper water lines.
3. *Pantry:*  Mr. Adams' report calls for detaching and resetting shelving, detaching and resetting light fixture.  See: Rec. Doc. 20741, finding #8, (see above) calls for replacement of these items.
4. *Hallway:*  Mr. Adams' Xactimate calls for cleaning copper wires and detaching and resetting light fixture. He also calls for replacing of all electrical system, copper wires and light fixtures.
5. *Bedroom 1, Closet 1, Bedroom 2 and Closet 2, and Bathroom, Linen and Living room:* Mr. Adams' Xactimate calls for cleaning copper wire, detaching, and resetting light fixtures.  There is no mention of HVAC system cleaning or replacement as the court order requires. And, there is no recommendation to replace plumbing water lines or fixtures.

Generally, Mr. Adams' followed the same methodology with respect to estimating in Apartments B and C.

## LAW & DISCUSSION

The standards are well established for the admission or exclusion of expert testimony pursuant to the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Rule 702 of the Federal Rules of Evidence, an expert qualified by "knowledge, skill, experience, training, or education" is allowed to give testimony where his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702;

*Daubert*, 509 U.S. at 589. In assessing the basis of an expert's proposed testimony, the Fifth Circuit has held that an "expert's testimony [should be] based mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002).

In order to be admissible, the testimony offered must rise above the level of "subjective belief" or "speculation," **which means that the reasoning or methodology underlying the testimony must be scientifically valid** (i.e., "reliable"). See *Sorensen*, 31 F.3d at 649; see also *Daubert*, 509 U.S. at 590. Rule 702 requires that expert opinion testimony be rendered by a qualified expert, based upon reliable data and methodology. *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 514 (E.D. La. 2002). The trial court has the responsibility of determining, under Rule 104(a), whether the expert's proposed testimony is reliable and helpful under Rule 702. *Daubert*, 509 U.S. at 589.

When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable. A party seeking to introduce expert testimony must show "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid. 702) (citation omitted).

Mr. Adams' testimony fails all three prongs of the test for reliability: (1) his testimony is not based on sufficient facts or data; (2) his testimony is not the product of reliable principles or methods; and (3) he has not applied the principles and methods reliably to the facts of this case. First, Mr. Adams' scope of remediation includes only the areas of the Gharibs' properties that he believes contain KPT drywall. He is silent as to whether he even inspected the other floors, for

example, the second floor of the Gharibs' Home or the first floor of the Gharibs' Commercial Property.   But, the Court has found that these sulfur gases from Chinese drywall result in "widespread impact" and create the "most severe industrial corrosive environment." Assuming Mr. Adams did not bother to inspect the other floors of the Gharibs' properties, as his reports and testimony suggest, his facts and data will be, in great measure, deficient and incomplete.  This is particularly true in the Gharibs' case, as Mr. Adams documented classic signs of Chinese drywall damage in other parts of their home and commercial properties (i.e. the attics in both properties). Mr. Adams cannot seriously believe that the damage to the pipes, linesets and wiring just skipped over the second floor.

Second, Mr. Adams' opinions are not based on reliable principles and methods. The Court should note there a major differences between its own remediation protocol and the CPSC's protocol, at least the March 15, 2013 version that Mr. Adams claims as his basis.  The purpose of that version is described as follows:

> The CPSC and HUD recognize that *many homeowners want to begin the process of repairing their homes*. This revised Guidance is designed to be a ***conservative, commonsense approach to assist homeowners*** *in making some of the challenging decisions they face remediating their homes*. Should additional scientific information become available that suggests *less extensive or less costly remediation methods would work*, the CPSC and HUD will consider the evidence, and we will update our guidance, as appropriate.[20]

So, the CPSC guidance is not geared towards litigation, where the Court must assess damages to restore a plaintiff's property to its original condition; rather, it is to assist homeowners who must determine the least costly way to get back in their homes.

The CPSC guidelines, as the Commission's name suggests, is also more concerned about safety risks than restoration and admits that its recommendations omit certain

---

[20] Ex. 4, *Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 15, 2013* by the U.S. Consumer Product Safety Commission and the U.S. Department of Housing and Urban Development, p. 4.

components provided they are not tied to safety. For instance, the CPSC guidelines <u>do not</u> include replacement of electrical wiring, water service plumbing, HVAC (heating, ventilation and air conditioning) evaporator coils, furnishings, and carpeting. According to the CPSC, "[s]taffs of the CPSC and HUD are aware that some remediation efforts have included"…"but ***their replacement is not included in this Guidance because of the absence of a direct connection to safety***."[21] Concerning electrical wiring, this Court found the opposite.  See: *Hernandez* FOFCOL, Rec. Doc. 2713, p. 25, providing "…given the contrary evidence above, the Court finds that insulation does not protect wires from corrosion and there are risks of future failure and *danger to safety*.") (emphasis added). Concerning all of these items, the failure to include them based on a perceived lack of safety risk is irrelevant for purposes of litigation, since the duty of tortfeasor is not to merely restore a property to a safe condition, but ***rather to restore the property to its original condition***.  Thus, the CPSC guidelines are unreliable for the purposes at issue here.

<u>Third</u>, Mr. Adams does not apply the principles and methods reliably to the facts of this case.  See: Table 1 above, which includes a number of items where he is not consistent with the CPSC guidelines, as well as some where he is not consistent with either the CPSC or the Court. Accordingly, Mr. Adams has not applied the CPSC or the Court's protocols reliably in this case.

## CONCLUSION

Based on the foregoing, Mr. Adams' opinions covering scope of remediation and his remediation protocol as well as his Xactimates should be excluded, as they are entirely unreliable

---

[21]

and not based in the scientific and practical bases that the Court has repeatedly pointed out in this litigation.

Respectfully submitted,

CRULL, CASTAING & LILLY

BY: */s/ Peter E. Castaing         .*
Peter E. Castaing, #35019
Edward J. Castaing, Jr. #4022
Pan American Life Center
601 Poydras Street, Suite 2323
New Orleans, LA 70130
Telephone: (504) 581-7700
Facsimile: (504) 581-5523
pcastaing@cclhlaw.com
ecastaing@cclhlaw.com

**Counsel for Jawad Gharib and Fatme Gharib**

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

/s/ *Peter E. Castaing*
Attorney