# In The Matter Of:

*Chinese-Manufactured*
*Drywall Products Liability Litigation*

---

*Phillip Allen Adams*
*February 13, 2020*

---

*Associated Reporters, Inc.*
*201 St. Charles Ave.*
*Suite 2415*
*New Orleans, La.*
*www.aridepos.com*

Original File Adams_Philip 02-13-2020.txt
Min-U-Script® with Word Index

Exh. 1

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
 6
 7  * * * * * * * * * * * * * * * *
 8  IN RE:  CHINESE-MANUFACTURED  *  MDL NO. 2047
    DRYWALL PRODUCTS LIABILITY
 9  LITIGATION                   *  SECTION:  L
    * * * * * * * * * * * * * * *
10  THIS DOCUMENT RELATES TO:     *
                                     JUDGE FALLON
11  Elizabeth Bennett, et al. v.  *
    Knauf Verwaltungsgesellschaft,   MAG. JUDGE
12  KG, et al.                   *  WILKINSON
    2:14-cv-02722-EEF-JCW
13  * * * * * * * * * * * * * * *
14
15
16
17
18
19
20            Deposition of PHILIP ALLEN ADAMS,
21  taken on Thursday, February 13, 2020, in the
22  offices of FISHMAN HAYGOOD, LLP, Attorneys at
23  Law, 201 St. Charles Avenue, Suite 4600, New
24  Orleans, Louisiana 70170.
25
```

Page 2

```
 1  APPEARANCES:
 2
 3      Representing the Plaintiffs:
 4
 5          Mr. James V. Doyle, Jr.
            DOYLE LAW FIRM, PC
 6          Attorneys at Law
            2100 Southbridge Parkway, Suite 650
 7          Birmingham, Alabama  35209
 8
 9      Representing the Defendants:
10          Ms. Kaki Johnson
            FISHMAN HAYGOOD, LLP
11          Attorneys at Law
            201 St. Charles Avenue, Suite 4600
12          New Orleans, Louisiana  70170
13
14
15      Also Present:  James V. Doyle, Sr., Esquire
16
17
18          Reported by:  Cindi Cameron, CCR
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2                                              Page
 3  Caption                                       1
 4
 5  Appearances                                   2
 6
 7  Agreement of Counsel                          5
 8
 9  Examination
10      JAMES V. DOYLE, JR., ESQUIRE              6
11      KAKI JOHNSON, ESQUIRE                   152
12
13  Re-examination
14      JAMES V. DOYLE, JR., ESQUIRE            159
15      KAKI JOHNSON, ESQUIRE                   169
16
17  Witness' Certificate                        170
18  Reporter's Certificate                      171
19
20                  * * * * *
21
22
23
24
25
```

Page 4

```
 1            E X H I B I T   I N D E X
 2
 3  Exhibits:
 4
 5      Number 1                                 31
 6          Notice of Deposition
 7
 8      Number 2                                 31
 9          Curriculum Vitae
10
11      Number 3                                 47
12          Phase 1 Letters
13
14      Number 4                                124
15          9/8/19 Brousseau Xactimate
16
17
18
19
20
21
22
23
24
25
```

Page 5

1          S T I P U L A T I O N

2

3          It is stipulated and agreed by
4   and between counsel for the parties hereto
5   that the deposition of the aforementioned
6   witness is hereby being taken under the
7   Federal Rules of Civil Procedure, for all
8   purposes, in accordance with law;
9          That the formalities of reading
10  and signing are specifically not waived;
11         That the formalities of sealing,
12  certification, and filing are specifically
13  waived;
14         That all objections, save those
15  as to the form of the question and the
16  responsiveness of the answer, are hereby
17  reserved until such time as this deposition,
18  or any part thereof, may be used or sought to
19  be used in evidence.
20         * * * * *
21         CINDI CAMERON, Certified Court
22  Reporter, in and for the Parish of Orleans,
23  State of Louisiana, officiated in
24  administering the oath to the witness.
25

Page 6

1          PHILIP ALLEN ADAMS, 2101 North
2   Andrews Avenue, Fort Lauderdale, Florida
3   33311, after having been first duly sworn,
4   testified on his oath as follows:
5   EXAMINATION BY MR. DOYLE:
6     Q.  Mr. Adams, my name is Jimmy Doyle.  We
7   introduced ourselves in person just before the
8   start of this deposition, although we've
9   spoken on the phone many times in the past.
10  I'm going to be taking your deposition today
11  on behalf of the plaintiffs in this Bennett
12  case.  You're familiar with the Bennett case?
13    A.  Yes.
14    Q.  My understanding is you've been
15  retained as an expert in the Bennett case; is
16  that right?
17    A.  That's correct.
18    Q.  Okay.  Have you given a deposition
19  before?
20    A.  Yes.
21    Q.  How many times?
22    A.  In the last how many years?
23    Q.  Sir?
24    A.  In the last how many years?
25    Q.  Ten years.

Page 7

1     A.  Five.
2     Q.  Okay.  When was the last one that
3   you've given?
4     A.  Probably three years ago.
5     Q.  Okay.  Since you've been through this
6   a few times, I really only have a couple of
7   things that I like to mention at the beginning
8   of a deposition just to make sure that things
9   go smoothly.
10         We've got a court reporter here taking
11  down your testimony just like always.  I try
12  to give you an opportunity to answer questions
13  completely.  I would simply ask that you give
14  me the opportunity to finish my question
15  before you start responding.  That will just
16  keep the record clean so that, when we read
17  this down the road, we'll be able to
18  understand what I asked and what you responded
19  to.  Does that make sense?
20    A.  Makes sense.
21    Q.  Fantastic.  How many times in the last
22  ten years have you given a deposition did you
23  say?
24    A.  Five.
25    Q.  Were all of those related to Chinese

Page 8

1   Drywall?
2     A.  No.
3     Q.  How many were related to Chinese
4   Drywall?
5     A.  Probably two.
6     Q.  Were you retained as an expert in
7   those cases?
8     A.  No.
9     Q.  How many times have you been retained
10  as an expert in Chinese Drywall litigation?
11    A.  This time.
12    Q.  Have you ever been retained as an
13  expert in the past?
14    A.  No.
15    Q.  That answers the second question.
16         Have you ever been denied by a court,
17  rejected by a court as an expert in any
18  capacity?
19    A.  No.
20    Q.  Fantastic.  The other thing that I
21  want to mention on the front end, you're free
22  to take a break at any time.  Just answer my
23  questions.  If we get to a point where you
24  need to take a bathroom break, get a cup of
25  coffee, just let me know.  I'm happy to do it.

Page 9

1        I'm not going to try to rush through
2   this, but I'm not going to slow it down
3   either.  I just want to gather the information
4   that we need in order to be able to understand
5   what your testimony is going to be when we get
6   to trial.  That make sense?
7     A.   Yes.
8     Q.   Are you on any medication today that
9   might prevent you from giving truthful
10  testimony?
11    A.   No.
12    Q.   Do you suffer from any medical
13  conditions that might prevent you from giving
14  truthful testimony to me today?
15    A.   No.
16    Q.   Have you ever testified, not as an
17  expert, but have you testified during any
18  trials in the Chinese Drywall litigation,
19  whether it's in federal court or in state
20  court maybe in Florida?
21    A.   Yes.
22    Q.   How many times?
23    A.   Four.
24    Q.   What capacity?
25    A.   Testified in federal court for several

Page 10

1   of the cases that were in the settlement
2   agreement.
3     Q.   The Peyton case you're talking about?
4     A.   No, did not do the Peyton case.
5     Q.   What cases?  Do you recall the style
6   of those cases, the name of the cases?
7     A.   One was an ARH that I know of.
8     Q.   What state was the ARH in?
9     A.   Everything was in federal court here
10  with Judge Fallon.
11    Q.   Do you recall where the properties
12  were located?
13    A.   One was in Florida.  The other I
14  believe were in Louisiana.
15    Q.   Okay.  So one Florida, three
16  Louisiana?
17    A.   One in Alabama also.
18    Q.   Okay.  So one Florida, one Alabama,
19  two Louisiana properties?
20    A.   Sure.
21    Q.   And tell me what it was that you were
22  asked to testify about.
23    A.   On the Florida case, it was an ARH.
24  It was regarding cost, remediation cost.
25    Q.   And generally speaking, what was the

Page 11

1   substance of that?  Were you asked to evaluate
2   the incurred cost, the documented cost that
3   the plaintiff had presented for reimbursement?
4     A.   Yes.
5     Q.   Is that something you've done outside
6   of this case routinely for the Knauf
7   defendants?
8     A.   Yes.
9     Q.   How many times do you think that
10  you've evaluated an ARH submission for
11  evaluation of reimbursable costs?
12    A.   With the settlement agreement, I've
13  done over 300.
14    Q.   So you've done over 300, where you
15  were applying the settlement agreement terms
16  to evaluate whether the costs were
17  appropriate.
18    A.   Yes.
19    Q.   All right.  Mr. Adams, I have received
20  the expert disclosures made by opposing
21  counsel that have the documents that you and
22  your company created.  I've got a copy of your
23  CV, I've got a copy of your Phase 1 letters,
24  I've got all the Xactimates that have been
25  completed.

Page 12

1        I don't have a standalone expert
2   report.  Was one generated in this case?
3     A.   No, not by me.
4     Q.   Was one created by anybody else?
5     A.   I don't know.
6     Q.   Tell me what the subjects were that
7   you were retained as an expert to provide
8   opinions about.
9     A.   The subjects?
10    Q.   Yes.  What subjects were you to
11  address as an expert on behalf of the Knauf
12  defendants?
13    A.   We were given a list of properties to
14  inspect --
15    Q.   Okay.
16    A.   -- which we provided the ANSI sketch,
17  the inspection report, and provided an
18  Xactimate for every one of them.
19    Q.   So I'm trying to understand the role
20  that you're going to play in this.  So you
21  were asked by the Knauf defendants to inspect
22  each home for the presence of Chinese Drywall.
23    A.   Yes.
24    Q.   You were asked to measure the square
25  footage of the home, right?

Page 13

1  A. Yes.
2  Q. And you were also asked to create a
3  cost estimate in some fashion; is that right?
4  A. Yes.
5  Q. Is there anything else that you were
6  asked to do?
7  A. No.
8  Q. Are you going to have any opinions
9  outside of those documents that were created?
10  A. No.
11  Q. So the limits of your testimony will
12  be the documents that have been provided to us
13  through counsel that relate to inspections,
14  measurement of square footage, and cost
15  projections via Xactimate.
16  A. Yes.
17  Q. Are you going to provide any testimony
18  evaluating our expert's opinions in any way?
19  A. No.
20  Q. After reviewing the Phase 1 letters --
21  they're labeled as Phase 1 letters. What
22  exactly does Phase 1 mean?
23  A. Phase 1 was the inspection report, the
24  physical inspection of the home.
25  Q. Got you. And Phase 2 would be what?

Page 14

1  Is there a Phase 2?
2  A. The inspection protocol actually does
3  Phase 1, and if Phase 1 is positive, then you
4  do Phase 2.
5  Q. Okay. Which inspection protocol are
6  you talking about?
7  A. The settlement agreement protocol.
8  Q. Were you provided that or instructed
9  by the Knauf lawyers to utilize that
10  inspection protocol from the earlier
11  settlement agreement?
12  A. Yes.
13  MS. JOHNSON:
14  Objection, compound.
15  BY MR. DOYLE:
16  Q. Were you provided with the settlement
17  agreement by Knauf's counsel to use as a
18  reference in this case?
19  A. Yes.
20  Q. Did you use the protocol that was
21  agreed by the parties in the settlement
22  agreement and apply it to this case?
23  MS. JOHNSON:
24  Objection, calls for an opinion.
25  MR. DOYLE:

Page 15

1  He's an expert.
2  BY MR. DOYLE:
3  Q. I'm asking did you use it and apply it
4  to this case. Did you apply the protocol that
5  was attached as an exhibit from the 2011
6  settlement agreement to this case?
7  MS. JOHNSON:
8  Objection, compound.
9  BY MR. DOYLE:
10  Q. You can answer.
11  A. Yes.
12  Q. Did you use any standard outside of
13  what was contained in the 2011 settlement
14  agreement for inspections of homes?
15  A. For the inspection, no.
16  Q. Did you use any standard or protocol
17  outside of the 2011 settlement agreement for
18  measuring the square footage of the homes?
19  A. Measuring, no.
20  Q. Did you use anything outside the
21  settlement agreement from 2011 to generate the
22  Xactimate cost estimates?
23  A. Yes.
24  Q. What?
25  A. CPSC guidelines.

Page 16

1  Q. Tell me what the CPSC guidelines, what
2  they are generally.
3  A. It is the March 15th, 2013, version of
4  the CPSC. It's guidelines for Chinese
5  drywall.
6  Q. March 15th, what year?
7  A. March 15th, 2013.
8  Q. Okay.
9  A. And it's a CPSC and the HUD
10  guidelines.
11  Q. Why did you choose to use the CPSC
12  guidelines and the HUD guidelines?
13  A. That was the discussion between
14  counsel and myself.
15  Q. When did that discussion take place,
16  approximately?
17  A. Year ago.
18  Q. Okay. So early 2019 sometime?
19  A. Yes.
20  Q. Before you started the inspections?
21  A. Yes.
22  Q. Were you ever provided any documents
23  that were court filings or orders issued by
24  Judge Fallon for use as guidelines in this
25  case?

Page 17

1    A.   No.
2    Q.   There's a document labeled 20741,
3    which is called The Finding of Fact and
4    Conclusion of Law that was issued by Judge
5    Fallon in this case.
6         Was that ever a consideration before
7    you began this process of evaluating homes?
8    A.   No.
9    Q.   There are just a couple of properties
10   that we refer to as mixed properties.  Are you
11   familiar with that term, mixed properties?
12   A.   Yes.
13   Q.   And what I mean by that is there are
14   two different brands of defective Chinese
15   Drywall in them.
16        Do you recall inspecting a handful of
17   those homes in this case?
18   A.   Yes.
19   Q.   Are you going to provide any opinions
20   on the percentage of off-gassing or the degree
21   of off-gassing by one particular brand of
22   defective Chinese drywall versus another?
23   A.   No.
24   Q.   Are you going to provide any opinion
25   about which Chinese drywall brand is worse

Page 18

1    than the other?
2    A.   No.
3    Q.   Do you have any opinion whether KPT is
4    -- and what I mean by KPT is Knauf
5    Plasterboard Tianjin.
6         Do you have any opinion whether it is
7    more defective or less defective than other
8    product?
9    A.   No.
10   Q.   Any opinion that it produces more
11   corrosion on components in a home than some
12   other brand?
13   A.   No.
14   Q.   Are you going to provide any opinion
15   that might suggest that Knauf Plasterboard
16   Tianjin drywall is not defective?
17   A.   No.
18   Q.   These may seem like silly questions,
19   but let me ask them anyway.
20        Are you being retained because you're
21   an expert in home inspections for
22   identification of Chinese drywall?
23   A.   Yes.
24   Q.   Okay.  Are you being retained by
25   defense counsel because you are an expert in

Page 19

1    the measurement of residential properties to
2    determine the under air square footage?
3    A.   Yes.
4    Q.   This one may not be as obvious, and I
5    understand we may need to follow up with some
6    follow-up questions on this.
7         Are you being retained because you're
8    an expert in Xactimate cost projections?
9    A.   Yes.
10   Q.   How many Xactimate cost projections
11   have you done over the years?  And when I say
12   you, I'm talking about your company, Moss &
13   Associates.
14   A.   Over 3,000.
15   Q.   And those in the Chinese drywall?
16   A.   Yes.
17   Q.   Entirely?
18   A.   Yes.
19   Q.   Did you begin using Xactimate around
20   the time that Chinese drywall created work for
21   your company?
22      MS. JOHNSON:
23          Objection, vague.
24   BY MR. DOYLE:
25   Q.   You can answer.  Any time she objects,

Page 20

1    you can still answer.
2    A.   Yes.
3    Q.   When do you estimate that you first
4    used, your company, Moss & Associates, first
5    used Xactimate?
6    A.   The date is on my training CV.  I
7    believe it was 2010.
8    Q.   Okay.  And on your CV, I think there's
9    a reference to a course for Xactimate.
10   A.   Correct.
11   Q.   Is that when you became familiar with
12   it?
13   A.   Yes.
14   Q.   At that time, you began utilizing it
15   in the Chinese drywall litigation?
16   A.   Yes.
17   Q.   How many Xactimate cost projections
18   have you personally created beginning to end?
19   A.   Probably around 200.
20   Q.   So generally speaking, you've got
21   staff that will help you create these,
22   correct?
23   A.   Yes.
24   Q.   In this case, how many of the
25   Xactimates that were created for the

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 21

1    properties owned by the Bennett plaintiffs did
2    you personally create?
3        A.  I didn't create any of them.  I
4    reviewed all of them.
5        Q.   That was my follow-up question.  Did
6    you review each and every one of them for
7    completeness?
8        A.   Yes.
9        Q.   Did you review each and every one for
10   accuracy?
11       A.   Yes.
12       Q.   Did you identify any omissions in
13   those Xactimate reports?
14       A.   I did, and they were revised.
15       Q.   Before they were submitted to us?
16       A.   Yes.
17       Q.   Since the time that they were created
18   and transmitted to us, have you recognized any
19   omissions that you may need to address?
20       A.   No.
21       Q.  I think you answered this earlier, but
22   you don't intend to offer any testimony
23   rebutting our expert who has projected costs
24   in this case, right?
25       A.   No.

Page 22

1        Q.   Are you familiar with the RSMeans
2    method of estimating repair costs?
3        A.   I am.
4        Q.   Have you used it in the past?
5        A.   No.
6        Q.   Have you ever evaluated it in the
7    past?
8        A.   No.
9        Q.   Have you done any comparison using
10   Xactimate versus RSMeans to evaluate whether
11   one is more accurate than the other?
12       A.   I've compared them versus cost, yes.
13       Q.   When?
14       A.   Last week.
15       Q.   Which RSMeans projections versus which
16   costs?  Explain that to me.
17       A.   I compared the RSMean report that was
18   done by Sean Macomber, his cost versus our
19   Xactimate cost.
20       Q.   Are you going to provide any testimony
21   regarding the comparison?
22       A.   I can.
23       Q.   Have you been asked to by the
24   defendants?
25       A.   Yes.

Page 23

1        Q.   Is this one of the areas that you
2    intend to offer testimony at trial?
3        A.   Yes.
4        Q.   Okay.  That was getting back to what I
5    was asking earlier, whether you're going to
6    make any comparisons.
7            Did you generate any type of documents
8    when you made that comparison?
9        A.   No.
10       Q.   Did you intend to create any documents
11   regarding the comparison that you made?
12       A.   Not at this time.
13       Q.   Have you been asked by the defense
14   counsel or the defendants to create any type
15   of document that might show a comparison
16   between RSMeans projected cost versus
17   Xactimate?
18       A.   No.
19       Q.   You answered this, but I forgot what
20   you said, so I'm going to have to ask it
21   again, and I apologize.
22           Are you going to offer any testimony
23   about whether the RSMeans method of projecting
24   costs in this case is in any way deficient?
25       A.   Yes.

Page 24

1        Q.   What testimony do you plan to offer?
2        A.   The cost comparison between the
3    RSMeans and Xactimate, I mean, RSMeans does
4    not take into account any of the specific
5    finishes, the size of the home.  All it's
6    based on is square foot.
7        Q.   Is it your opinion that it over
8    projects the cost or under projects the cost?
9        A.   Over projects.
10       Q.   Did you do the comparison for each and
11   every one of the pre-remediation properties
12   that you evaluated?
13       A.   No.
14       Q.   How many did you do a comparison of?
15       A.   I know what the Xactimate was for the
16   '98 inspections that we did, and they were all
17   way below the RSMeans.
18       Q.   Do you have any explanation for why
19   there's a deviation between the two values?
20       A.   I've never used RSMeans, but I know
21   the Xactimate was used for the settlement
22   agreement for the homes that we did, and it
23   was very accurate, and it's property-specific.
24       Q.   Let's talk about that for just a
25   second.  The settlement agreement provided for

Page 25

1    the use of Xactimate. I recall that being an
2    exhibit. But I also had a number of clients
3    that settled through that 2011 KPT agreement,
4    and utilized Option 1, which was having your
5    company oversee the remediation using prime
6    subcontractors.
7            And we found that there were a number
8    of instances where Xactimate omitted items
9    that later had to be captured through a change
10   order. Do you recall that being the case
11   during that settlement process?
12   A.  It did occur.
13   Q.  How often did it occur?
14   A.  It was a fairly good size number.
15   Q.  Any estimate regarding the percentage
16   of remediations that occurred during that
17   settlement process that required a change
18   order to be submitted?
19   A.  I don't know what percentage it would
20   be.
21   Q.  More than 50 percent?
22   A.  I don't think so.
23   Q.  Would it be more than 33 percent of
24   the homes, more than a third?
25   A.  Twenty-five to 30 percent.

Page 26

1    Q.  What were the common items that
2    required a change order to be submitted?
3    A.  Some of the items we wouldn't find
4    until we opened up a wall versus -- insulation
5    would be one item. We would not know what the
6    insulation value was until we opened up the
7    wall.
8    Q.  Anything else?
9    A.  I can't think of --
10   Q.  What about appliances?
11   A.  Appliances on the settlement
12   agreement, most of them we scoped to be
13   replaced, except for 3,500 square feet and
14   over.
15   Q.  Under 3,500 square feet, they were
16   scheduled to be replaced?
17   A.  Refrigerators, stoves, microwaves, not
18   dishwashers.
19   Q.  What about washers and dryers?
20   A.  No.
21   Q.  Ice makers?
22   A.  Ice makers would fit under
23   refrigeration, so yes.
24   Q.  Wine chillers?
25   A.  Yes.

Page 27

1    Q.  They were all due to be replaced if
2    the home was under 3,500 without an
3    inspection?
4    A.  Yes.
5    Q.  Describe for me what process you went
6    through for those properties that were greater
7    than 3,500 square feet under air.
8    A.  They were inspected for functioning at
9    time of move out, and they were inspected for
10   functioning at time of move back in.
11   Q.  So the one criteria that was applied
12   is whether or not it actually functioned at
13   that moment?
14   A.  That's correct.
15   Q.  What about if it showed signs of
16   corrosion on the item, was it still removed
17   and replaced? I'm sorry. Was it detached and
18   reset?
19   A.  Cooking, there was no signs of it.
20   Some refrigeration, yes.
21   Q.  Is there any other criteria that was
22   applied that would have created the need for a
23   change order for any other item in the house?
24   A.  There was a few houses where, when we
25   took the drywall down on one side of a

Page 28

1    bathroom, we could see on the other side that
2    it was not cementitious type board, or the
3    board should have been behind the tile. So it
4    was not originally scoped to replace tile, and
5    we ended up having to do it if it had KPT
6    behind it.
7    Q.  What about damage to floors? Is that
8    also an item that would require a change order
9    periodically?
10   A.  Occasionally, yes.
11   Q.  What about building code requirements?
12   MS. JOHNSON:
13        Object to the form.
14   BY MR. DOYLE:
15   Q.  Were those ever items that
16   precipitated the need for a change order?
17   A.  Some yes, some no.
18   Q.  Tell me about the building code
19   compliance that would require a change order
20   to be submitted during the 2011 settlement.
21   A.  Typically it was breakers. After
22   2006, 2007, when these were constructed,
23   arc-fault breakers were required, so we put
24   those instead, standard breaker.
25   Q.  Okay. You're a licensed contractor in

Page 29

1  Florida; is that correct?
2  A.  Correct.
3  Q.  How long have you had that license?
4  A.  Since 1980.
5  Q.  Do you have to do periodic continuing
6  education to retain that license?
7  A.  Every two years.
8  Q.  During that time, have you taken any
9  courses that would address or that have
10 addressed changes to the building codes in
11 Florida?
12 A.  Yes.
13 Q.  Is it your understanding that some of
14 the building codes now require upgrades if the
15 value of a project in a home exceeds
16 50 percent?
17 A.  Yes.
18 Q.  How many counties have a building code
19 that requires that type of evaluation?
20 A.  I don't know.
21 Q.  Is it more than one?
22 A.  I don't know.
23 Q.  In this case, do you know if any of
24 the properties are going to be impacted by
25 that 50 percent rule?

Page 30

1  A.  I don't know.
2  Q.  In the Xactimate cost projections,
3  have you made any type of line item cost
4  projection for compliance with building codes?
5  A.  No.
6  Q.  Plaintiffs have also retained an
7  expert that is going to talk about the effect
8  of the Chinese drywall gases generally on a
9  home.
10     Do you have any opinions that you
11 intend to offer regarding the effect of the
12 Chinese drywall gases on the mechanical
13 systems or the property items contained within
14 the four walls of the home?
15 A.  No.
16 Q.  All right.  Let's look at the binder.
17 Go to Tab 1.  This is a deposition notice for
18 Philip A. Adams.  Is that you?
19 A.  Yes.
20 Q.  Did you receive this before today,
21 notifying you that we're going to have a
22 deposition here today?
23 A.  I did.
24    MR. DOYLE:
25        I'd like to mark that as

Page 31

1  Exhibit 1 to the deposition.  It's behind
2  Tab 1 in the folder.
3        (Whereupon, the document was
4     introduced for identification as Exhibit No.
5     1.)
6  BY MR. DOYLE:
7  Q.  Look at Tab 2, please.  This appears
8  to be a CV.  Is this your CV?
9  A.  Yes.
10 Q.  When was this last updated?
11 A.  Two months ago.
12 Q.  Two months ago.
13        (Whereupon, the document was
14     introduced for identification as Exhibit No.
15     2.)
16 BY MR. DOYLE:
17 Q.  And it indicates that you are working
18 for Moss & Associates, correct?
19 A.  Yes.
20 Q.  Are you in the -- is your office in
21 the main office or the satellite office for
22 Moss & Associates?
23 A.  Currently, the satellite office.
24 Q.  How many employees does Moss &
25 Associates have?

Page 32

1  A.  Six hundred plus.
2  Q.  These are full-time employees I'm
3  talking about.
4  A.  Full-time.
5  Q.  Describe for me what Moss &
6  Associates' business entails generally?
7  A.  We are a construction management
8  company.  We do commercial, we do multi-family
9  residential, we do educational, we do medical
10 facilities, we do entertainment facilities.
11 Q.  What percentage of the work is
12 residential property related?
13 A.  Currently, over 50 percent.
14 Q.  Has that changed over time?
15 A.  It's mainly been residential, more
16 than 50 percent all along.
17 Q.  At what point did Moss & Associates
18 begin to do commercial work?
19 A.  Moss was formed in 2004.
20 Q.  Who formed it in 2004?
21 A.  Bob Moss.
22 Q.  Is Bob Moss still with us?
23 A.  Bob Moss is still with us.
24 Q.  Is he still working day to day?
25 A.  Longer than anybody else.

Page 33

1  Q.  Who else formed it with Bob?  Anybody?
2  A.  His two sons and his wife.
3  Q.  Is Moss & Associates an L.L.C.?  I
4  just don't recall.  What business entity?
5  A.  I think it's an L.L.C.
6  Q.  How many members in the L.L.C.?
7  A.  I don't know.
8  Q.  Are you a member of the L.L.C.?
9  A.  No.
10  Q.  Appears that your education took you
11  to Kansas State University for undergraduate
12  studies in the '70s; is that right?
13  A.  That's correct.
14  Q.  What did you study while you were
15  there?
16  A.  Pre-vet.
17  Q.  Did you ever become a vet?
18  A.  I did not.
19  Q.  When did you realize that you didn't
20  want to be a vet?
21  A.  First year.
22  Q.  And so what degree did you receive
23  from Kansas State University?
24  A.  I did not.
25  Q.  Okay.  You transferred to Broward

Page 34

1  College; is that right?
2  A.  Yes.
3  Q.  Where's Broward College located?
4  A.  Fort Lauderdale.
5  Q.  Why the move to Fort Lauderdale?
6  A.  That's where I live; that's my home.
7  Q.  Did you grow up in Fort Lauderdale?
8  A.  I did.
9  Q.  You've been in Fort Lauderdale your
10  whole life?
11  A.  Since I was five.
12  Q.  It appears, after you finished at
13  Broward College, you studied at Florida
14  Atlantic University; is that right?
15  A.  Yes.
16  Q.  In business administration studies?
17  A.  Yes.
18  Q.  Were you studying to get an MBA?  Is
19  that what this is?
20  A.  No.  I was scheduling to get a BS.
21  Q.  Just in business, general business?
22  A.  Yes.
23  Q.  Did any of these three schools provide
24  any education in construction?
25  A.  No.

Page 35

1  Q.  When did you begin your career in
2  construction?
3  A.  1978.
4  Q.  Why?  Why did you move to construction
5  in 1978 after education at Florida Atlantic
6  University?
7  A.  I needed a job and it was well-paying.
8  Q.  I understand that.  What was the
9  attraction to construction out of school?  Was
10  there any attraction to it, or was that the
11  job that was available at the time?
12  A.  That was the job that was available.
13  Q.  So this took you on a path, starting
14  in the late 1970s, in the construction field,
15  and you've been there ever since?
16  A.  Yes.
17  Q.  All right.  It shows that you've got a
18  license issued by the State of Florida for
19  general contracting.  It appears that it was
20  -- is that right?
21  A.  Yes.
22  Q.  And it appears that it was issued
23  first in 1980; is that right?
24  A.  Correct.
25  Q.  Has there ever been a lapse in your

Page 36

1  contractor's license since 1980?
2  A.  No.
3  Q.  State of Florida has a licensure
4  board; is that right?
5  A.  Yes.
6  Q.  And there is a disciplinary component
7  to it is my understanding; is that right?
8  A.  Yes.
9  Q.  If anybody has a complaint against a
10  contractor, they can lodge a complaint with
11  that disciplinary board; is that right?
12  A.  Yes.
13  Q.  Have you ever had any complaints filed
14  against you personally?
15  A.  No.
16  Q.  What about Moss & Associates?
17  Generally speaking, have they had any
18  complaints lodged against them that you're
19  aware of?
20  A.  Yes.
21  Q.  What types of complaints, generally
22  speaking?
23  A.  The only ones I know about relate to
24  the Chinese drywall, where I appeared before
25  the licensing board in Alabama.

Page 37

1  Q.  For what purpose?
2  A.  Had two complaints.
3  Q.  Tell me about those complaints.  Tell
4  me about the first one.
5  A.  I don't remember exactly what they
6  were about.  It was just the two homeowners
7  were not happy with the remediation, and we
8  won both of those.  They were both dismissed.
9  Q.  Sure.  The first one in Alabama, they
10  filed a complaint because they were unhappy
11  with what aspect of the remediation?
12  A.  Quality.
13  Q.  And they attributed that to Moss &
14  Associates?
15  A.  Yes.
16  Q.  Generally speaking, what percentage of
17  remediations in the Chinese drywall
18  remediation program following the 2011
19  settlement did Moss & Associates employees
20  actually conduct themselves?
21  A.  The work --
22  Q.  The work to be done.
23  A.  We did minor work.
24  Q.  Right.  My understanding was that
25  virtually all the work was done by

Page 38

1  subcontractors.  You provided an oversight of
2  the work being done; is that right?
3  A.  That's correct.  We would do punch
4  out, we would do completion.
5  Q.  You're right.  But prior to the
6  punch-out phase, it was generally the prime
7  subcontractors and their subcontractors that
8  did most of the work, right?
9  A.  Yes.
10  Q.  And is that what you presented to the
11  board that that was essentially the defense in
12  those cases?
13  A.  No.  I actually presented that we
14  actually did the remediation properly.  They
15  had their pictures; I had my pictures.
16  Q.  And your defense was the work that was
17  done by Moss & Associate employees in those
18  cases?
19  A.  No.  That was anybody that was under
20  our -- we pulled the permits.
21  Q.  Okay.
22  A.  There might have been other
23  contractors, but we had the prime permit.
24  Q.  But this first Alabama complaint was
25  entirely about quality.

Page 39

1  A.  Yes.
2  Q.  Tell me about the second one.
3  A.  Same thing.
4  Q.  Was it also in Alabama?
5  A.  Yes.
6  Q.  So the second one was also about
7  quality --
8  A.  Yes.
9  Q.  -- of the workmanship.
10  Do you recall where these properties
11  were located, either Complaint Number 1 or
12  Complaint Number 2?
13  A.  I don't remember.  I went to appear in
14  Birmingham for both.
15  Q.  Is that where the licensure board is?
16  A.  Yes.
17  Q.  How often did you personally travel to
18  oversee the work that was being done through
19  the remediation program in Alabama?
20  A.  I traveled weekly, not specifically to
21  Alabama.
22  Q.  But did your role in this remediation
23  program take you to all the states where the
24  remediations were taking place?
25  A.  The five states.

Page 40

1  Q.  Tell me those five states.
2  A.  Florida, Louisiana, Mississippi,
3  Alabama, and Texas.
4  Q.  You told me about the outcome of
5  Complaint Number 1, that it was dismissed,
6  that you were successful defending that with
7  the licensure board.  Is that the same for
8  Complaint Number 2?
9  A.  Yes.
10  Q.  Have there been any other complaints
11  lodged in any other states against you or Moss
12  & Associates regarding Chinese drywall?
13  A.  No.
14  Q.  I should have asked this on the front
15  end.  Mr. Adams, have you ever been convicted
16  of a crime?
17  A.  No.
18  Q.  Have you ever been charged with any
19  crime that involved dishonesty?
20  A.  No.
21  Q.  Have you ever been reprimanded by any
22  school for any incident that involved
23  dishonesty?
24  A.  No.
25  Q.  Have you ever been reprimanded by any

Page 41

1  other organization after school that involved
2  dishonesty in any way?
3    A.  No.
4    Q.  Next item on the CV that I see is
5  basic adjusting.  Does that apply to Chinese
6  drywall in any way?
7    A.  Yes.
8    Q.  How?
9    A.  This is part of the Xactimate
10  training.
11    Q.  Describe for me what basic adjusting
12  is, then.
13    A.  It's an insurance method of doing the
14  Xactimate for remediations for issues that
15  happen for insurance claims.
16    Q.  Okay.  So tell me how it applies to
17  Chinese drywall.
18    A.  It was just part of the basic
19  Xactimate training.
20    Q.  And what you mean by that is how to
21  set up the Xactimate so it does the cost
22  estimating in a Chinese drywall case?
23    A.  Yes.
24    Q.  We're going to get into this in more
25  detail later.  There are multiple ways to set

Page 42

1  up Xactimate is my understanding.
2    A.  Yes.
3    Q.  You can set it up for hurricane damage
4  or fire damage or some other damage; is that
5  right?
6    A.  Yes.
7    Q.  Is there a specific function inside
8  Xactimate that allows you to select Chinese
9  drywall?
10    A.  No.
11    Q.  What type of selection would you have
12  to make in Xactimate to set it up to project a
13  cost in the Chinese drywall litigation?
14    A.  Remediation or remodel.
15    Q.  Is that a subcategory of any area?
16    A.  No.
17    Q.  We're going to get to that later.  I
18  don't want to do that now.
19        The next item on your CV is adjuster
20  principles and ethics through Xactimate.  What
21  did that registration or course entail?
22    A.  It basically just told us or
23  instructed us how to prepare an Xactimate, how
24  to do a sketch, how to do the line items.
25    Q.  What were the ethics through Xactimate

Page 43

1  related to?
2    A.  That's just what they called it.
3    Q.  Did they describe for you unethical
4  methods of using Xactimate?
5    A.  No, no.
6    Q.  I'm just curious.
7    A.  It was a four-day course.
8    Q.  Okay.  And this just walked you
9  through how to create an Xactimate cost
10  estimate?
11    A.  Everybody had their own laptop.  She
12  did it up on the screen; we did it on our
13  laptop.
14    Q.  Just tell me what was involved, if you
15  would, that you recall.
16    A.  As I say, it was a four-day course.  A
17  lot of the four days did not pertain to
18  Chinese drywall and what we would be using,
19  because it would be for replacing a roof,
20  replacing windows, replacing the outside of a
21  house.
22        So we used probably two days of that
23  course, and basically she told us how to
24  create the sketch.  That's the hardest part,
25  creating the sketch.  Then you apply your

Page 44

1  finishes which is in the property.  You find
2  that in the categories, copy and paste it into
3  the estimate, and keep on going.
4    Q.  Got you.  So this was, of course, just
5  walking through from beginning to end how to
6  create an Xactimate, how to ensure that it's
7  complete to the best of your ability, right?
8    A.  Correct.
9    Q.  You got a certification for green mold
10  remediation; is that right?
11    A.  Yes.
12    Q.  Received that in 2009?
13    A.  Yes.
14    Q.  Does that apply to Chinese drywall in
15  any way?
16    A.  No.
17    Q.  Are you licensed as a general
18  contractor in any other states besides
19  Florida?
20    A.  No.
21    Q.  Page 2 of your CV, there's a note that
22  Sea Ranch Properties was your employer from
23  1978 to 2006.  What is Sea Ranch Properties,
24  Inc., in the business of doing?
25    A.  They were a builder/developer.

Page 45

1  Q.  Are they no longer in existence?
2  A.  No.
3  Q.  Did they go out of existence in 2006?
4  A.  The owner retired.
5  Q.  In 2006?
6  A.  Yes.
7  Q.  Is that what precipitated your move to
8  Moss & Associates?
9  A.  Yes.
10  Q.  We talked about the setup for
11  Xactimate in this case.  And I believe your
12  testimony was that you utilized the protocol
13  that was adopted in the 2011 KPT settlement to
14  help guide you when you were creating
15  Xactimates for these properties; is that
16  right?
17  A.  For which properties?
18  Q.  The plaintiff properties in Bennett.
19  A.  I used Xactimate with the CPSC
20  guidelines for the protocol.
21  Q.  How did the CPSC guidelines differ
22  from the protocol that was adopted in 2011?
23  A.  CPSC guidelines do not require the
24  replacement of appliances.  They do not
25  require the replacement of electrical wire.

Page 46

1  It's the replacement only of receptacles,
2  switches, and breakers.  Replacement of smoke
3  detectors and carbon monoxide detectors, which
4  is the same protocol.  CPSC also for
5  replacement of fusible type sprinkler heads,
6  which we didn't have any of in these.
7  Q.  And remind me again:  Why did you
8  shift to the CPSC guidelines, rather than the
9  2011 protocol guidelines?
10  A.  CPSC guidelines were a common sense
11  practical approach, and that's what was
12  discussed and that's what I used.
13  Q.  Is that what the Knauf counsel
14  instructed to you use?
15  A.  We discussed it and that's what --
16  Q.  And you agreed to use that?
17  A.  Yes.
18  Q.  What about the lessons that were
19  learned through the remediation program
20  following the 2011 settlement?  Were any of
21  those common change order items incorporated
22  into the Xactimate's cost projections that you
23  created in this case?
24  A.  You mentioned flooring replacement.
25  We still have in our Xactimate protection of

Page 47

1  flooring.  Insulation is included in the
2  Xactimate.  I can't think of anything else.
3  Q.  Let's turn to Exhibit Number 3 and try
4  to run through these as quickly as we can.
5      (Whereupon, the documents were
6  introduced for identification as Exhibit No.
7  3.)
8  BY MR. DOYLE:
9  Q.  This is the biggest exhibit today.
10  A.  Is it in any particular order?
11  Q.  It's the order that they were
12  presented in the disclosure, A through Z.
13  A.  Okay.
14  Q.  Before we start this, if you would,
15  just tell me your approach to inspecting the
16  Bennett plaintiff homes in this litigation,
17  from the time you pull up to the house, to the
18  time you leave the house, in general terms.
19  A.  We met with the homeowner.  Depending
20  on the temperature, the time of day, what we
21  would inspect first.  We'd try to do the
22  attics first in the morning before it gets to
23  be too hot.  That's part of the Phase 1
24  anyway.
25      We would go in the attic, pull away

Page 48

1  the insulation, try to get a visual on the
2  ceiling boards.  If the attic contained the
3  air-conditioning unit or the hot water heater,
4  we would inspect that at the same time.
5      We would come back down.  We would
6  inspect the plumbing in the bathrooms, the
7  kitchen.  Check electrical fixtures for
8  pitting and tarnishing.  Check mirrors.  And
9  then we would start with checking one
10  receptacle in each room.
11  Q.  Did you have any idea how many cuts
12  you were going to make to the walls before you
13  arrived at each home?
14  A.  We did.
15  Q.  What type of guidelines were you
16  following?  Or what process were you following
17  that would require a certain amount of cuts?
18  A.  What was provided to us by the square
19  footage.  If it was a thousand square feet or
20  less, we knew we were going to do four,
21  minimum four.
22  Q.  Okay.  Tell me about the different
23  size homes, how that would impact the number
24  of cuts you made.
25  A.  A thousand and under, four cuts.  Two

Page 49

1 thousand and under, I believe it was six or
2 eight. I'm not sure which one it was. And
3 over 2,000, 10. That doesn't mean we did ten
4 cuts. Of if we could get a back to back, that
5 counts as two. The attic counts as one.
6 Q. Got you. How did you decide where you
7 were going to make those cuts?
8 A. We were looking for KPT. We know
9 where KPT falls in a four-by-twelve board. We
10 know it's two-foot-four off of each end. So
11 we would come off -- typically, in a 10-by-12
12 bedroom, we knew it's full sheets. We would
13 come up two foot from the floor. That would
14 be the center of our cut. We'd do six inches
15 below, six inches above that. We would cut a
16 three-sided door and open it up.
17 Q. Did you or your staff utilize any
18 tools to help you identify which boards to
19 make cuts in?
20 A. Which boards?
21 Q. Yes.
22 A. No.
23 Q. Did you use an XRF device?
24 A. No.
25 Q. So it was -- I don't want to say

Page 50

1 random, but you went into each room and just
2 decided we're going to make a cut in bedroom
3 one, go to the corner, make the cut and --
4 A. I wouldn't say a corner. We wouldn't
5 do a corner.
6 Q. Near a corner, the area you just
7 described.
8 A. It would be near a receptacle, though.
9 We got a visual. We would pull out the cover
10 plate, look at the ground wires and the wires
11 on the receptacle. And if it was black, then
12 that's where we would make the cut.
13 Q. Got it.
14 A. But, again, we tried to pick back to
15 back so we could get two rooms at the same
16 time.
17 Q. So you're talking about interior
18 walls.
19 A. Interior walls. Rarely did we do
20 exterior.
21 Q. Tell me those instances where you had
22 to do exterior wall cuts. Why were you doing
23 exterior wall cuts?
24 A. Because there was no other available
25 wall. It was either a shower, a toilet wall,

Page 51

1 a vanity. If you were in a bathroom and it
2 was --
3 Q. Is it, generally speaking, the smaller
4 houses where you were limited?
5 A. Yes.
6 Q. How many different Moss employees did
7 you utilize during this process to assist you?
8 A. One.
9 Q. And who was that?
10 A. He was not a Moss employee.
11 Q. What's his name?
12 A. Carmen Salvatore.
13 Q. And who does Carmen Salvatore work
14 for?
15 A. The WCCI.
16 Q. Why was Carmen Salvatore selected to
17 assist you in this endeavor?
18 A. WCCI performed the Xactimate
19 inspections on the settlement agreement case.
20 Q. So you got a history with them going
21 back a number of years, to 2011, 2012.
22 A. Yes.
23 Q. You were consistently with Carmen
24 during that time?
25 A. Yes.

Page 52

1 Q. Is Carmen familiar with the standards
2 for measuring homes?
3 A. Yes.
4 Q. Is he familiar with, I guess, the
5 protocol, for lack of a better term, utilized
6 to identify Chinese drywall during
7 inspections?
8 A. Yes.
9 Q. When I say protocol, I'm talking about
10 the number of cuts, location of cuts, that
11 sort of thing.
12 A. Yes.
13 Q. Is Carmen the one that created the
14 Xactimates in this Bennett case that you
15 reviewed for accuracy and completeness?
16 A. He did some of them. His other
17 employees did some. He reviewed them all, and
18 then I reviewed them all.
19 Q. Okay.
20 A. Carmen did all of the inspection
21 reports, though.
22 Q. Meaning all of the Phase 1 letters?
23 A. Yes.
24 Q. And you reviewed those for accuracy,
25 right?

Page 53

1  A.  Yes.
2  Q.  Is Carmen going to be called as an
3  expert as well in any capacity?
4  A.  No.
5  Q.  Tell me about the methodology you
6  employed to calculate the under air square
7  footage for each one of those homes.
8  A.  We used a software called RapidSketch,
9  which we use the ANSI guidelines.
10  Q.  RapidSketch employs ANSI guidelines?
11  A.  No.  We used the ANSI guidelines, but
12  RapidSketch is just a quick way of creating a
13  sketch.  It's mainly used for property
14  appraisers.  It's much faster than doing the
15  Xactimate sketch.
16  Q.  So help me understand.  You used the
17  RapidSketch for what purpose?  To generate a
18  -- RapidSketch was --
19  A.  ANSI air conditioned square footage,
20  conditioned space.
21  Q.  Walk me through the process to utilize
22  RapidSketch to arrive at your under air square
23  footage.  How did this happen?
24  A.  RapidSketch is used from the outside,
25  outside wall to outside wall, basically.  And

Page 54

1  then you take away the garage area.  It shows
2  the garage area on the RapidSketch, but it's
3  not included in your air-conditioned space.
4  Q.  So you used RapidSketch just to
5  generate the footprint of the house?
6  A.  Yes.
7  Q.  And then on your ANSI sketch, you just
8  note the garage or storage areas, and subtract
9  it from the overall gross square footage?
10  A.  RapidSketch does that.
11  Q.  Okay.  And RapidSketch is what was
12  used to generate the ANSI sketch that was
13  attached as an exhibit --
14  A.  Yes.
15  Q.  -- in your reports, right?  Okay.
16     Tell me your understanding of what the
17  ANSI method of measuring square footage
18  entails.
19  A.  It's outside.  It's the actual
20  footprint, the outside footprint.  It excludes
21  several -- not include like back porches
22  that are not conditioned space.  Does not
23  include chimneys that jut out from a space.
24  It does not include basements that are not
25  conditioned.  Does not include attics.

Page 55

1  Q.  Let me ask you about the finished
2  basements.  You mentioned that the ANSI
3  standard requires exclusion of those; isn't
4  that right?
5  A.  If it's unconditioned.
6  Q.  Unconditioned.  Tell me what you mean
7  by that.
8  A.  ANSI -- if it's not air conditioned,
9  if it's not habitable.
10  Q.  If it is air conditioned, would it be
11  considered living space for the purpose of
12  measuring under air square footage?
13  A.  Yes.
14  Q.  What about garages that have air
15  conditioning in them?  Would those be
16  considered living spaces as well?
17  A.  If it has a garage door still, no.  An
18  enclosed garage, yes.  If they convert a
19  garage into a space without a garage door,
20  yes.
21  Q.  I asked you that because there are a
22  couple of plaintiffs in this case that have
23  air conditioning to their garages.  The air
24  circulates from the garages throughout the
25  house.  It's part of the system.  It's not a

Page 56

1  standalone system.  Would that be included in
2  the measurement, the ANSI measurement?
3  A.  If it was habitable space, yes.
4  Q.  If it's not habitable -- if the
5  primary purpose is storage of vehicles, it
6  would not be included.
7  A.  Correct.
8  Q.  All right.  Let's look at the first
9  letter that was created, and I want you to
10  help me understand what's captured in each one
11  of these letters.  It's obviously a letter to
12  Mr. Miller of the Fishman Haygood firm
13  regarding a property that you inspected.
14  A.  Date on the letter is the date of the
15  inspection.
16  Q.  Thank you.  There's a percentage in
17  the Overall Findings section, second
18  paragraph, or third paragraph, of the letter,
19  paragraph of the letter, there is a calculated
20  KPT percentage for the home.  And in this
21  instance, for the home on 3310 Northeast 3rd
22  Drive, Homestead, Florida, you calculated the
23  KPT percentage for the home to be 90 percent;
24  is that right?
25  A.  Yes.

Page 57

1   Q.  What does that percentage indicate?
2   A.  We looked at eight boards.  Seven of
3   the boards were KPT.  Take the seven, divide
4   it by eight, and then you round up.
5   Q.  So the percentage that's declared in
6   each one of these letters is not the
7   percentage of the Chinese drywall boards that
8   were found.  It's just the percentage of the
9   boards that were evaluated in each home; is
10  that right?
11  A.  Yes.
12  Q.  So tell me the purpose of projecting
13  the percentage of KPT boards in each home.
14  A.  Repeat the question.
15  Q.  Tell me what purpose it serves to
16  identify or calculate the percentage of KPT
17  boards in each one of these homes.
18  A.  I don't know what the -- that's what I
19  was asked to do.
20  Q.  Thank you.  So counsel for the
21  defendants has asked you to calculate the
22  percentage of KPT in each home.
23      MS. JOHNSON:
24          Objection, form.
25      THE WITNESS:

Page 58

1           This was the same way it was done
2   in the settlement agreement also, the original
3   inspections.
4   BY MR. DOYLE:
5   Q.  In the original settlement, wasn't the
6   percentage of KPT only important if there were
7   multiple brands of Chinese drywall in each
8   home?
9   A.  Yes.
10      MS. JOHNSON:
11          Objection, speculative.
12  BY MR. DOYLE:
13  Q.  The percentage of KPT in the
14  definition section of the 2011 agreement, I
15  believe, indicates that the percentage of
16  defective drywall was utilized for
17  qualification in the settlement; is that
18  right?
19  A.  I don't know.
20  Q.  Was the 2011 settlement agreement
21  utilized as a reference by you when creating
22  these documents?
23  A.  The percentages, no.
24  Q.  Was the 2011 settlement agreement a
25  guiding document for you when creating these

Page 59

1   Phase 1 letters in any way?
2   A.  No.
3   Q.  The top of Page 2 of each letter,
4   we've got a file number, followed by a house
5   address.  And then below that is the ANSI
6   footage for each home.
7           Did you compare these numbers to
8   ensure that they match up with the ANSI sketch
9   numbers in each case?
10  A.  Yes.
11  Q.  Is it your belief that each one of
12  these ANSI floor area numbers is accurate?
13  A.  Yes.
14  Q.  Did you find that any of them were not
15  accurate?
16  A.  Not that were submitted in the final
17  version.
18  Q.  There were a number of letters that
19  were revised at some point.  Are you aware of
20  that?
21  A.  Yes.
22  Q.  What was the purpose for revising each
23  one of those letters?
24  A.  It was format.  Basically it was for
25  the unknown boards.

Page 60

1   Q.  Tell me what was going on with the
2   unknown board issue.
3       MS. JOHNSON:
4           Objection, speculative.
5   BY MR. DOYLE:
6   Q.  Mr. Adams, you made a change to the
7   letters, correct?
8   A.  Some of them, yes.
9   Q.  They were revised because they had
10  some issue, some inaccuracy relating to
11  certain drywall that was noted in them,
12  correct?
13  A.  Yes.
14  Q.  What was the issue with the items in
15  the letter that were incorrect?
16  A.  I don't remember exactly what the
17  revisions were.  It was part in the first
18  page, part in the second page.  They just --
19  they wanted some of them revised, so we used
20  that new format to revise them.  Some of them
21  didn't have to be revised because the
22  inspection hadn't been done.
23  Q.  What formatting issue had to be
24  revised?
25  A.  Part of it was the summary part.  The

Page 61

1 summary on the first page had to match the
2 summary on the third page. That was one item.
3 Q. Any others?
4 A. No. It was standardizing mainly. So
5 the overall finding, the summary, the
6 environmental conditions are basically the
7 same on all of the inspection reports.
8 Q. Okay. Let's run through these, then.
9 A. Okay.
10 Q. This first letter involving the
11 Aguirre property in Homestead, you found an
12 ANSI square footage 1,843 square feet; is that
13 right?
14 A. Yes.
15 Q. And it appears that you found seven
16 KPT boards and one unknown board.
17 A. Correct.
18 Q. Is your testimony that the unknown
19 board is a brand of defective Chinese
20 manufactured sheetrock?
21 A. No.
22 Q. Generally speaking -- and we're going
23 to run through each one of these -- are any of
24 the unknown or unmarked boards defective
25 Chinese sheetrock in your opinion?

Page 62

1    MS. JOHNSON:
2        Objection to the form.
3    THE WITNESS:
4        I don't know.
5 BY MR. DOYLE:
6 Q. Were there any instances where you
7 found unmarked sheetrock that you believed to
8 be defective Chinese sheetrock in any of the
9 homes that you inspected?
10 A. I don't know.
11 Q. Are you going to offer any opinion on
12 whether the unmarked or unknown boards are
13 defective Chinese manufactured sheetrock?
14 A. No.
15 Q. Okay. Last question before we roll
16 through these: Did you find any homes owned
17 by any of the plaintiffs in the Bennett case
18 that did not have KPT drywall in the living
19 space of their homes?
20 A. No.
21 Q. Let's go to the second letter. And
22 this involves the Ambrose Lane property in
23 Kimberly, Alabama. The second page of the
24 letter, it appears that you measured the ANSI
25 square footage to be 2,881 square feet; is

Page 63

1 that right?
2 A. Yes. Which one are you doing?
3 Q. The second one. It's the Amuso
4 property.
5 A. Yes.
6 Q. You found it to be 2,881 square feet
7 under air, right?
8 A. Yes.
9 Q. And you found five KPT boards and five
10 other boards, correct?
11 A. Yes.
12 Q. Are any of those boards that are not
13 KPT defective Chinese sheetrock?
14 A. No.
15 Q. Let's go to the third letter, second
16 page. This is the Armstrong property in
17 Bradenton, Florida. Looks like the ANSI
18 square footage is 1,732 feet.
19 A. Yes.
20 Q. And you found eight KPT boards in the
21 living space of the home, correct?
22 A. Yes.
23 Q. The letter describes where those
24 boards were found; is that right?
25 A. First page, yes.

Page 64

1 Q. Next letter. This is the Armstrong
2 property in Hammond, Louisiana. ANSI square
3 footage was measured to be, 3,292 square feet;
4 is that right?
5 A. Yes.
6 Q. Do you believe that to be accurate?
7 A. Yes.
8 Q. You found three KPT boards in the
9 property; is that right?
10 A. Yes.
11 Q. Those were in the living space of the
12 property?
13 A. Yes.
14 Q. And it doesn't appear that there were
15 any other defective Chinese manufactured
16 sheetrock boards located anywhere in the house
17 in addition to the KPT; is that right?
18 A. Yes.
19 Q. Next letter is the Armstrong property
20 in Texas. This is 418 Sandstone Creek Lane in
21 Dickinson, Texas. It appears the ANSI square
22 footage was measured to be 2,795 square feet;
23 is that right?
24 A. Yes.
25 Q. And it looks like you found five KPT

Page 65

1 boards in the living space of the home,
2 correct?
3 A. Yes.
4 Q. And it does not appear that there are
5 any other Chinese manufactured products
6 manufactured by anybody other KPT in the home;
7 is that right?
8 A. Yes.
9 Q. Next letter is related to the Arnold
10 property in Denham Springs, Louisiana. Do you
11 see it?
12 A. Yes.
13 Q. It appears that the ANSI measured
14 under air square footage was 2,031 square
15 feet; is that correct?
16 A. Yes.
17 Q. And you found seven KPT boards in the
18 living space of that home.
19 A. Yes.
20 Q. Next letter is the Baldwin property in
21 Friendswood, Texas. The ANSI square footage
22 was measured to be 4,089 square feet under
23 air, correct?
24 A. Yes.
25 Q. And looks like seven KPT boards were

Page 66

1 identified in the living space of the home.
2 Is that your understanding?
3 A. Yes.
4 Q. Next document is the Ball property in
5 North Port, Florida. See it?
6 A. Yes.
7 Q. The under air square footage was
8 measured to be 2,511 square feet, correct?
9 A. Yes.
10 Q. And three KPT boards were found in the
11 home.
12 A. Yes.
13 Q. One Taishan board in the home; is that
14 right?
15 A. Yes.
16 Q. Is it your testimony that any of these
17 11 others that are marked as unknown boards
18 are either KPT or Taishan products?
19 A. Don't know.
20 Q. What about this one Panel Rey board,
21 do you have any opinion about whether that
22 board is defective in any way?
23 A. No.
24 Q. Next letter relates to the Beverly
25 Hills Drive property in Prairieville,

Page 67

1 Louisiana. This one is owned by the Bank of
2 Louisiana. It appears the ANSI square footage
3 was 4,210 under air; is that right?
4 A. Yes.
5 Q. I see that there were seven KPT boards
6 identified in the living space of the home.
7 A. Yes.
8 Q. Is it your testimony that any of the
9 other board, besides KPT in this Bank of
10 Louisiana, either the one USG board or the
11 seven unknown boards are defective?
12 A. No.
13 Q. Next property is the Bennett property
14 in Alabama. The under air square footage was
15 measured to be 2,221; is that right?
16 A. Yes.
17 Q. And it appears that one KPT board and
18 six other boards were found in the home; is
19 that correct?
20 A. Yes.
21 Q. Was the one KPT board found in the
22 living space of the Bennett home?
23 A. Yes.
24 Q. The next property is the Binns
25 property in Port St. Lucie. And the ANSI

Page 68

1 square footage was measured to be 2,106; is
2 that, right?
3 A. Yes.
4 Q. You found nine KPT boards in the
5 living space of that home; is that correct?
6 A. Yes.
7 Q. Just to make sure that we're talking
8 about the same thing, when I mention KPT
9 boards, I'm talking about the board that has
10 the all capital letters stamped on the back
11 that, generally speaking, has been found by
12 both experts on plaintiffs' side and defense
13 side, and recognized by the court to be
14 defective. Is that what we're talking about
15 here?
16 A. Yes.
17 Q. If there was an upper case and lower
18 case KPT board in the home, how would you have
19 described it in one of these letters?
20 A. Lower case kpt.
21 Q. Do you recall if any of them were
22 found in any of these properties?
23 A. No.
24 Q. What about boards from other Knauf
25 manufacturing sites? Did you find any of

Page 69

1   those in these properties?
2   A.   Yes.
3   Q.   Which ones do you recall finding?
4   A.   Wuhu, Wong, Dong, Wan, whatever it is.
5   We found another German board.
6   Q.   What about Indonesia?
7   A.   Yes.
8   Q.   Are any of those --
9   A.   -- plastic board natural?
10  Q.   Yes, sir.
11  A.   Yes.
12  Q.   Any of those boards, beside the KPT
13  board that we're talking about, is it your
14  opinion that any of those are defective?
15  A.   No.
16  Q.   Do any of them off gas to the best of
17  your knowledge?
18  A.   I don't know.
19  Q.   Do any of them cause corrosion, to the
20  best of my knowledge?
21  A.   No.
22  Q.   So the defective boards that we're
23  talking about in litigation that you've been
24  asked to provide opinions about in these
25  documents is strictly related to the KPT with

Page 70

1   the all capital letter stamp on the back.
2   A.   And Taishan.
3   Q.   And Taishan.  But just for the purpose
4   of identifying them.
5   A.   Yes.
6   Q.   Next document is Blevins in Cape
7   Coral, Florida.  Looks like the ANSI square
8   footage was measured to be 2,112 square feet;
9   is that right?
10  A.   I must be off.
11  Q.   Did I skip one?  We finished Binns.
12  The next one should be --
13  A.   I have Bogard.
14  Q.   For some reason, you don't have --
15  you're missing a letter.
16  A.   I got Blevins.  That's the one you're
17  on?
18  Q.   Yes, Blevins.  You have it?
19  A.   Yes.
20  Q.   Okay.  Blevins was measured to be
21  2,112 square feet; is that right?
22  A.   Yes.
23  Q.   And four KPT boards in the living
24  space of the home, correct?
25  A.   Yes.

Page 71

1   Q.   And seven other boards that haven't
2   been identified as defective, correct?
3   A.   Yes.
4   Q.   Next property is on Linda Drive.  It
5   is the Bogard property in Mississippi.  It
6   appears the ANSI square footage measurement is
7   2,996, and there were eight KPT boards found
8   in the living space of the home; is that
9   right?
10  A.   Yes.
11  Q.   Next document is the Bonney residence
12  in Slidell, Louisiana.  Are you on that one?
13  A.   Yes.
14  Q.   The ANSI square footage number is
15  2,667, and it appears there were three KPT
16  boards found in the living space of the home.
17  Is that what this document reflects?
18  A.   Yes.  Can I have one minute with my
19  counsel outside?
20  Q.   Absolutely.
21       (Off the record.)
22    MS. JOHNSON:
23       Let's go ahead back on the
24  record.  Mr. Adams would like to say something
25  for the record about the report that he's on.

Page 72

1    THE WITNESS:
2       You mentioned revisions to the
3   reports.
4   BY MR. DOYLE:
5   Q.   Did you receive two copies?
6   A.   Did you receive two copies?
7   Q.   I received two letters.  This is a
8   revised letter.
9   A.   These appear to be the original.
10  Q.   The letters that I printed, that we
11  printed were supposed to be the revised
12  letters.
13  A.   As we've been going through the first
14  ten, this Bonney brought it to light.  Where
15  it says "other" at the top, I believe my
16  revised -- are you still on Bonney?
17  Q.   I got Bonney, yes.  Where would the
18  revised notation be --
19  A.   We talked about I revised the
20  percentages.  Number one, I did not include it
21  in my original ones, the unidentified board in
22  the percentages.  But also, when it had
23  "other," I eliminated other in the revised
24  reports.
25       And down here, where it says USG and

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 73

1    National Gypsum, those would have been brought
2    up to the top and I would have had a
3    percentage for each one of those, which it's
4    not.  This -- I am confident that these are
5    the old original inspection reports.
6        MR. DOYLE:
7            Let's go off the record for a
8    second.
9            (Off the record.)
10       MS. JOHNSON:
11           Mr. Adams would just like to note
12   that he's not comfortable answering questions
13   about the outdated versions.
14       MR. DOYLE:
15           Let Mr. Adams say that.  Are you
16   here to represent Mr. Adams?
17       MS. JOHNSON:
18           That's correct.
19       MR. DOYLE:
20           Let's put this on the record.
21   Counsel, we just had a discussion off the
22   record that you're here to represent
23   Mr. Adams.
24       MS. JOHNSON:
25           Not to represent him personally.

Page 74

1    He's just an expert for --
2        MR. DOYLE:
3            He's an expert, that's right.
4    You're not here to represent his interests in
5    this litigation, are you?
6        MS. JOHNSON:
7            No.
8        MR. DOYLE:
9            Do you appear to represent him as
10   an individual in any way?
11       MS. JOHNSON:
12           No, James.
13       MR. DOYLE:
14           All right.  Then the discussion
15   that we're having, you're --
16       MS. JOHNSON:
17           So you're harassing Mr. Adams and
18   I'm going to prevent you from harassing him.
19       MR. DOYLE:
20           Mr. Adams, do you feel harassed
21   by my discussion with you, trying to
22   understand how these letters were incorrectly
23   or inaccurately labeled?
24       THE WITNESS:
25           I don't feel harassed.  I don't

Page 75

1    feel comfortable answering or referring to
2    these inspection reports on the record any
3    more.  I mean, they're not the revised copy.
4    This one proved it.  This one, when I got to
5    this page, I felt uncomfortable for the
6    previous ten.  But when we got to this one and
7    I looked at the bottom, I knew that they
8    hadn't been brought up to the top, which is
9    what I --
10       MR. DOYLE:
11           Let's put this on the record,
12   then.  We received an expert disclosure on
13   January 2nd, I believe, from the defense
14   counsel.  It's supposed to be done on
15   December 30th, the 31st.  But we received the
16   disclosure after the beginning of the year.
17   And in that disclosure are a number of items.
18   There's no expert report, but there are items
19   like a CV, a final Xactimate, an ANSI sketch,
20   and then letters that have been labeled as
21   Phase 1 by Mr. Adams.
22           Defense counsel today now has
23   asserted that some of those that are labeled
24   the same are in fact revised copies of a
25   letter.  But there was no indication in the

Page 76

1    disclosure that they were revised in any way.
2            So we had a discussion off the
3    record with Mr. Adams, trying to understand
4    how we could identify the letters that were
5    revised versus the ones that were the
6    originals.  And that's where the supposed
7    harassment is now coming from, being alleged
8    by Kaki Johnson, the defense counsel, who now
9    has taken the position that she's representing
10   Mr. Adams at this deposition.
11       MS. JOHNSON:
12           Objection.  I corrected my
13   statement.
14       MR. DOYLE:
15           We're opposed to it, and we
16   object to any effort to represent him in any
17   way in this.  He's an expert.
18   BY MR. DOYLE:
19   Q.  Okay.  Mr. Adams, let's talk about the
20   discussions that you had with defense counsel
21   when we took a break a little while ago.  Who
22   did you meet with?
23   A.  Met with Kaki and Danny Dysart.
24   Q.  And what instructions did they give
25   you during that meeting?

Page 77

1   A.  They didn't give me any instructions.
2   Q.  What was discussed specifically during
3   that meeting?
4   A.  I told them that I did not think that
5   what I was reviewing was revised inspection
6   reports.
7   Q.  And what was his response?
8   A.  Said both of them were sent to you.
9   Q.  Who's the party responsible for
10  labeling those letters?
11  A.  I don't know.
12  Q.  But you did in fact produce those
13  letters and provide them to Knauf's lawyers at
14  Fishman Haygood, correct?
15  A.  Yes, I did.
16  Q.  And they, in turn, produced them as
17  part of the expert disclosure that you made in
18  this case, right?
19  A.  Yes.
20  MS. JOHNSON:
21      Objection.
22  MR. DOYLE:
23      What's the basis of that
24  objection?  You produced the documents.
25  MS. JOHNSON:

Page 78

1       He doesn't know what we submitted
2   to you, outside of his expert testimony.
3   BY MR. DOYLE:
4   Q.  I understand that.  So you provided
5   them to Fishman Haygood, and you don't know
6   what happened after you produced them.
7   A.  That's correct.
8   Q.  But you produced two letters in each
9   of these cases.
10  A.  Yes.
11  Q.  And the inaccuracy in those letters is
12  related to identifying the non KPT drywall in
13  each home; is that right?
14  A.  I wouldn't call it an inaccuracy.  It
15  clarifies and details any changes, the --
16  brings the percentages up from the drywall
17  observed and replaces the other verbiage.
18  Q.  Tell me what you mean.
19  A.  In this report, it shows --
20  Q.  Referring to Bonney?
21  A.  Bonney.  Shows three KPT, eight other.
22  If you go down to the drywall observed, says
23  KPT, USG, and National Gypsum.  I went back up
24  and brought the number of boards for USG and
25  National Gypsum, so I would have a percentage

Page 79

1   over on the left-hand side for each one.
2   Q.  I got you.
3   A.  So everything up at the top, every
4   board in the house would have a percentage.
5   Q.  How does that impact your opinions in
6   any way in this case?
7   A.  With domestic board, it just
8   clarifies.  It clarifies the domestic board up
9   at the top.
10  Q.  Are you intending to offer any
11  testimony in your expert capacity in this case
12  regarding the domestic boards in each one of
13  these homes?
14  A.  No.
15  Q.  Does it make any material difference
16  that the boards are declared to be
17  specifically from one brand or another if
18  they're not defective in any way?
19  A.  No.  I just felt more comfortable with
20  the revised percentages being in the
21  identification in the inspection summary.
22  Q.  Okay.
23  A.  And it also -- and it refers to, when
24  I told you about the summary page from one to
25  three, that changed also.

Page 80

1   Q.  That's fine.  I'm going to use these
2   documents as this exhibit, but we'll stipulate
3   that you might have made some changes in a
4   revised copy.  No need to replace any of these
5   because it doesn't make any material
6   difference to your opinions.
7       But we're going to focus, from this
8   point forward, on the number of KPT boards in
9   each property that were found by you and your
10  employee.  And then the follow-up question --
11  and it doesn't make any material difference.
12      But you've described eight other
13  boards, for instance, in Bonney.  This isn't
14  Bates stamped, so I don't know -- we can't
15  refer to it on the record exactly.  But in the
16  case of Bonney, we've got three KPT boards,
17  eight other boards, correct, in this letter
18  that you created?
19  A.  Yes.
20  Q.  And those eight other boards don't
21  reflect any type of defective
22  Chinese-manufactured drywall; is that right?
23  A.  Correct.
24  Q.  Otherwise, it would have been labeled
25  as either Taishan or some other brand,

Page 81

1 correct?
2 A. Yes.
3 Q. And so it would have been easily
4 identifiable, either in the original letter or
5 the revised letter, that there is a defective
6 Chinese-manufactured board found in that house
7 other than KPT, correct?
8 A. Yes.
9 Q. Fantastic. Let's keep going. So
10 we're done with Bonney.
11 Next one is Brady in Alabama. You
12 measured the under air square footage to be
13 5,867 feet, correct?
14 A. Yes.
15 Q. And you found three KPT boards in the
16 living space of the home.
17 A. Yes.
18 Q. Did you find any other non KPT
19 defective Chinese-manufactured board in the
20 Brady home during your inspection?
21 A. No. Can I say something?
22 Q. Sure.
23 A. This is the right one. The format on
24 this one is the way -- you see the difference,
25 the percentages and the number of boards

Page 82

1 brought from the bottom to the top?
2 Q. Mr. Adams, thank you, but that doesn't
3 make any material difference.
4 A. This one is the revised.
5 Q. Okay. And when we get to trial, your
6 counsel at Fishman Haygood can present
7 whatever letter they want to in support of
8 your expert testimony.
9 Next document is Brousseau from
10 Louisiana. It's a Baton Rouge property that
11 was measured to be 2,416 square feet under
12 air. And you found three KPT boards in the
13 living space of the property; is that right?
14 A. Yes.
15 Q. Did you find any other defective
16 drywall in that property?
17 A. No.
18 Q. Next document is related to Burgos in
19 Miami, Florida. 1,843 square feet under air
20 and six KPT boards found in the living space;
21 is that right?
22 A. Correct.
23 Q. The next document is Butcher. It's a
24 Winter Haven property in Florida, measured
25 under air square footage, according to your

Page 83

1 letter, is 1,834 square feet, and you found
2 two KPT boards in the living space of the
3 property; is that right?
4 A. Yes.
5 Q. Did you identify any other defective
6 Chinese manufactured sheetrock in the home
7 besides the KPT?
8 A. No.
9 Q. Next document is Calderone property,
10 located in Port St. Lucie, Florida. The ANSI
11 square footage under air is 2,053 square feet.
12 Looks like you found eight KPT boards in the
13 property; is that right?
14 A. Yes.
15 Q. Did you find any other defective
16 Chinese sheetrock manufactured by anyone other
17 than KPT?
18 A. No.
19 Q. Next document is Caranna in
20 Mississippi, C-A-R-A-N-N-A. Property is
21 located in Pass Christian, Mississippi. It
22 appears you've measured the under air square
23 footage to be 3,194, and you found one KPT
24 board in the home; is that right?
25 A. Yes.

Page 84

1 Q. Cason is the next document. 2,921
2 square feet under air; is that right?
3 A. Yes.
4 Q. And it appears you found four KPT
5 boards in the property.
6 A. Yes.
7 Q. Did you find any other defective
8 Chinese sheetrock in that property?
9 A. No.
10 Q. Cohen is the next Phase 1 letter that
11 you produced. It's a property in Tampa,
12 Florida. The ANSI under air square footage
13 number is 1,768; is that right?
14 A. Yes.
15 Q. Looks like you found five KPT boards
16 in the living space of the home.
17 A. Yes.
18 Q. Did you find any other defective
19 sheetrock in the home?
20 A. No.
21 Q. Next document is related to the
22 Cordiers, who have a home in New Orleans,
23 Louisiana. Appears that the square footage
24 measured by you is 2,563, and you found two
25 KPT boards in the living space of the home; is

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 85

1  that right?
2  A.  Correct.
3  Q.  Did you find any other non KPT
4  defective Chinese sheetrock in the property?
5  A.  No.
6  Q.  Next document is related to Dhume,
7  D-H-U-M-E.  It's a property located in New
8  Orleans, Louisiana.  The under air square
9  footage is 3,572 feet, and looks like you
10  found three KPT boards of the ten that you
11  inspected; is that right?
12  A.  Yes.
13  Q.  That was in the living space of the
14  home, if I'm not mistaken.  You agree?
15  A.  I have to look at Page 1.
16  Q.  Go ahead and look at Page 1 for Dhume.
17  A.  Yes, living space.
18  Q.  Next document is related to Dixon.
19  It's a Louisiana property in Slidell,
20  Louisiana.  Your letter indicates that the
21  measured square footage is 1,538, and there
22  are three KPT boards found in the property.
23  A.  Correct.
24  Q.  Were they found in the living space of
25  the property?

Page 86

1  A.  Yes.
2  Q.  Is it your opinion that USG produced
3  any defective sheetrock?
4  A.  I don't know.
5  Q.  Is it your opinion that GridMarX brand
6  sheetrock is defective in any way?
7  A.  Not that I know of.
8  Q.  Do you plan to offer any testimony
9  regarding either USG or GridMarX at trial?
10  A.  No.
11  Q.  There are six unknown boards in this
12  property.  Are any of those manufactured by
13  another Chinese manufacturer that you contend
14  produced defective Chinese sheetrock?
15  A.  No.
16  Q.  The next document is Ferrera in Cutler
17  Bay, Florida.  Your letter indicates that the
18  property is 1,390 square feet under air, and
19  you found seven KPT boards; is that right?
20  A.  Yes.
21  Q.  Were those boards found in the living
22  space of the home?
23  A.  I don't know.  This is an old
24  inspection report.
25  Q.  Let's take our time and let's take a

Page 87

1  look at this.  This is the Ferrera letter,
2  correct?
3  A.  Yes.
4  Q.  Your summary says that KPT was
5  identified throughout the home, is that right,
6  on Page 1?
7  A.  Yes.
8  Q.  Does that indicate that it's in the
9  living space?
10  A.  Not exclusively.  The overall findings
11  typically would show over the overall -- we
12  went back and looked at our pictures to find
13  out exactly where we found KPT, and it was
14  listed in the first page on the revised
15  inspection reports, so everything clarified.
16  Q.  If it was found in any place other
17  than living space in the home, how would it be
18  noted?
19  A.  Garage attic space, garage walls.
20  Q.  So your testimony is, in this original
21  letter that you created, that the summary that
22  states that KPT was identified throughout the
23  entire house doesn't indicate that it's in the
24  living space of the home.
25  A.  I don't know without looking at the

Page 88

1  pictures.  The pictures are not attached
2  either.
3  Q.  Okay.  Go on to the next one.  Ferry
4  is the next one in Waveland, Mississippi.
5  Looks like you measured the square footage to
6  be 3,209 square feet under air.
7  A.  Yes.
8  Q.  It looks like you found five KPT
9  boards in the property; is that right?
10  A.  Yes.
11  Q.  Is there going to be any testimony
12  that non KPT defective Chinese-manufactured
13  sheetrock was found in that property?
14  A.  No.
15  Q.  Next document is related to Fozard,
16  F-O-Z-A-R-D.  It's a property in Diamondhead,
17  Mississippi.  It appears that you measured the
18  ANSI square footage to be 1,947 square feet
19  under air; is that right?
20  A.  Yes.
21  Q.  And it looks like you found five KPT
22  boards in the property.
23  A.  Correct.
24  Q.  You also note that there's one board
25  that has Knauf blue-yellow end tape.  Explain

Page 89

1  to me how that differs from the KPT boards
2  that you found.
3     A.  Knauf product, other than KPT, has
4  blue and yellow end tape.  Doesn't mean it's
5  KPT.
6     Q.  Okay.  What effort was made to
7  determine whether this blue and yellow end
8  tape board was in fact either KPT or some
9  other Knauf brand?
10     A.  If we could have made a second cut, if
11  it was in a position to make a second cut and
12  find a label, we would.
13     Q.  Okay.  Is your testimony that this is
14  defective Chinese sheetrock?
15     A.  I don't know.
16     Q.  So in this instance with regard to
17  Fozard, this is still a Knauf product that
18  you've identified, right?
19     A.  Yes.
20     Q.  It's not a non Knauf-manufactured
21  product.  It still is under the Knauf
22  umbrella?
23     A.  I listed it as Knauf blue and yellow
24  end tape.
25     Q.  I'm just trying to make this clear on

Page 90

1  the record.  It's not some other non-Knauf
2  brand.  It's just undetermined whether it's in
3  fact defective like the KPT; is that right?
4     A.  Yes.
5     Q.  Okay.  Next document is related to --
6  it's labeled as Fussell, F-U-S-S-E-L-L.  It's
7  a Bay St. Louis, Mississippi, property.  It
8  appears that you measured the under air square
9  footage to be 2,332.
10     A.  Yes.
11     Q.  And you found five KPT boards in the
12  living space of the home; is that right?
13     A.  Yes.
14     Q.  Next document is related to Gaspard,
15  G-A-S-P-A-R-D, Port St. Lucie, Florida.  The
16  measured square footage is 2,334, and you
17  found one KPT board in the home; is that
18  right?
19     A.  Yes.
20     Q.  Do you know where that one was found?
21  It's another one of those letters where it's
22  not specific.
23     A.  It's not revised.
24     Q.  And you're not sure whether KPT
25  identified throughout the entire house

Page 91

1  indicates that this board was found there or
2  not?
3     A.  No.
4     Q.  Next document is Gauthreaux,
5  G-A-U-T-H-R-E-A-U-X, in Bay St. Louis,
6  Mississippi.  The under air square footage is
7  1,588 square feet under air is my
8  understanding.
9     A.  Yes.
10     Q.  And you found one KPT board in this
11  home --
12     A.  Yes.
13     Q.  -- of the nine that you inspected.
14     A.  Yes.
15     Q.  Down at the bottom, it looks like you
16  also found National Gypsum.  Is it your
17  opinion that any of the National Gypsum brands
18  are defective in any way?
19     A.  No.
20     Q.  It's a domestic product, isn't it?
21     A.  Yes.
22     Q.  Next document is one of the Gharib
23  properties, G-H-A-R-I-B.  This one happens to
24  be in Metairie, Louisiana.  And this one
25  you've labeled that the property has 2,439

Page 92

1  square feet under air, but this is the first
2  floor living area.  Explain for me why it's
3  labeled in this fashion.
4     A.  Mr. Gharib explained to Carmen during
5  the inspection that this home flooded during
6  Hurricane Katrina, and only the first floor
7  was remediated.  The second floor was way
8  before.
9     Q.  Are you going offer any testimony
10  about the scope of the required remediation in
11  each one of these properties?
12     A.  For the Xactimate for this one?
13     Q.  Yes.
14     A.  Yes.
15     Q.  Are you being asked by Fishman Haygood
16  to come to court on behalf of Knauf and offer
17  an Xactimate that does a cost projection for
18  something less than the full remediation of
19  the property?
20     MS. JOHNSON:
21        Objection, form.
22  BY MR. DOYLE:
23     Q.  You can answer.
24     A.  Yes.
25     Q.  Tell me what you've been asked to

Page 93

1  testify about in this fashion.
2  A.  The area that we know had potentially
3  Chinese drywall, which would have been the
4  first floor that was remediated only.  Second
5  floor was constructed way before 2006.
6  Q.  So are you going to be advocating on
7  behalf of Knauf to do selective remediation?
8  A.  When we know for sure, yes.
9  Q.  How do you know for sure that there is
10  no KPT board in the second floor of that
11  property?
12  A.  Homeowner told us they did absolutely
13  nothing after Hurricane Katrina when they
14  remediated the first floor.
15  Q.  Don't the forms that have been adopted
16  in this case require that there's a certain
17  occasion that all drywall is removed from the
18  property?
19  A.  All the defective drywall.
20  Q.  It's not limited to that, is it?
21  A.  If we can isolate or if we selectively
22  identify Chinese drywall, yes.  But I don't
23  feel comfortable selectively identifying
24  Chinese drywall where I know the entire house
25  was constructed or remediated at the same

Page 94

1  time.
2  Q.  Tell me what you're relying on that
3  will allow you to offer testimony that
4  selective remediation is appropriate in this
5  case.
6  A.  We have had several homes where the
7  people told us they put on an addition way
8  after the 2006, 2007, and 2008, 2009.  Area
9  they enclosed, a family room, they enclosed a
10  back patio.  They added a bedroom or areas
11  that they did not remediate.
12  Q.  Are you going to offer testimony that
13  certain areas of a home would not be affected
14  by the Chinese drywall gases if they were
15  constructed after the time that the KPT board
16  was installed?
17  A.  Yes.
18  Q.  What basis for that opinion do you
19  have?
20  A.  Just the CPSC guidelines.  The CPS
21  guidelines says if we can identify board, but
22  it's not a feasible or a reasonable way to do
23  it, to replace the board.
24  Q.  Do you know if the court -- when I say
25  the court, I'm talking about MDL 2047.  Do you

Page 95

1  have any understanding whether the court has
2  adopted the CPSC guidelines?
3  A.  I do not.
4  Q.  Do you have any understanding whether
5  the court has approved selective remediation
6  in any fashion?
7  MS. JOHNSON:
8      Objection.
9  THE WITNESS:
10      I don't know.
11  BY MR. DOYLE:
12  Q.  I'm asking about your understanding.
13  A.  I don't know.
14  Q.  Do you have any understanding that
15  there's any type of authoritative source that
16  the parties have agreed to utilize that would
17  deviate from the court's position on selective
18  remediation in this case?
19  A.  I don't know.
20  Q.  Do you have any understanding that the
21  CPSC guidelines supersede the court's position
22  on selective remediation in any fashion?
23  A.  The 2013 CPSC was after the 2011.
24  Q.  So is it your --
25  A.  -- afterward.

Page 96

1  Q.  So it's your testimony that a 2013
2  CPSC publication supersedes the court's orders
3  on the scope of remediation where property
4  contains defective drywall in the living
5  space.
6  A.  I don't know if it supersedes, but the
7  date for the CPSC is after the 2011.
8  Q.  So your opinion is going to be that
9  the latest publication controls.
10  A.  That was the guidelines we used.
11  Q.  You didn't answer my question.
12      Is it your testimony that the latest
13  published document regarding protocols for
14  Chinese drywall remediation controls in this
15  situation?
16  A.  I don't.
17  MS. JOHNSON:
18      Objection to form.
19  BY MR. DOYLE:
20  Q.  Have you been instructed by any
21  lawyers at Fishman Haygood to utilize a
22  document that is in direct conflict with a
23  court order in this case?
24  MS. JOHNSON:
25      Objection to form.

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 97

1    THE WITNESS:
2         We've discussed and we have
3    agreed to use the CPSC.
4    BY MR. DOYLE:
5    Q.   And your testimony earlier was you've
6    never considered any findings of fact and
7    conclusion of law issued by the court when
8    constructing your Xactimate cost estimates,
9    correct?
10   A.   Yes.
11   Q.   And you didn't consider the finding of
12   fact and conclusion of law issued by Judge
13   Fallon when evaluating homes for the presence
14   of defective Chinese sheetrock; is that right?
15   A.   Right.
16   Q.   Let's go back to this.  So the square
17   footage under air in the Gharib, Metairie,
18   Louisiana, property is only reflective of the
19   first floor living area, correct?
20   A.   Yes.
21   Q.   This 2,439 does not take into
22   consideration any other living space that may
23   be on the second floor; is that right?
24   A.   That's correct.
25   Q.   You found six KPT boards in the living

Page 98

1    space of that property.
2    A.   Yes.
3    Q.   Second document for Gharib,
4    G-H-A-R-I-B, is located on Claiborne, South
5    Claiborne Drive in New Orleans.  And it
6    appears that this is one of the apartments in
7    this building.
8    A.   Yes.
9    Q.   It appears that the under air square
10   footage was measured to be 900; is that right?
11   A.   Yes.
12   Q.   And you found two KPT boards in the
13   living space of that property.
14   A.   Yes.
15   Q.   Second document.  This one's labeled
16   as Apartment B.  I apologize.  The last one
17   was labeled as Apartment A.  This is Apartment
18   B for the South Claiborne Drive property.
19   It's 900 square feet under air, and you found
20   three KPT boards in the living space, correct?
21   A.   Yes.
22   Q.   The next one is Apartment C.  Same
23   South Claiborne property address.  This one
24   was measured to be 900 square feet under air.
25   You found two KPT boards in the living space

Page 99

1    of that apartment; is that right?
2    A.   Yes.
3    Q.   Let's move on.  The next one is
4    Ginart, G-I-N-A-R-T, in Meraux, Louisiana.
5    It's 2,416 square feet under air, and there
6    were four KPT boards found in the living
7    space, right?
8    A.   Yes.
9    Q.   Next property is Goldenberg.  It is a
10   Cooper City, Florida, property, measured to be
11   1,365 square feet, right?
12   A.   Yes.
13   Q.   And you found five KPT boards in the
14   living space of that property.
15   A.   Yes.
16   Q.   Did you find any drywall manufactured
17   by another Chinese manufacturer?
18   A.   No.
19   Q.   Next one is Grande, G-R-A-N-D-E, in
20   Conroe, Texas.  Measured to be 1,538 square
21   feet under air, and you found six KPT boards
22   in the living space, correct?
23   A.   Correct.
24   Q.   Did you find any other defective
25   Chinese sheetrock in that home?

Page 100

1    A.   No.
2    Q.   Next one is Green, G-R-E-E-N, in
3    Gautier, Mississippi.  The under air square
4    footage was measured to be 1,728 square feet,
5    and you found four KPT boards in that home; is
6    that right?
7    A.   Yes.
8    Q.   Were they found in the living space of
9    the home?
10   A.   Yes.
11   Q.   The next one is Gueydan,
12   G-U-E-Y-D-A-N.  It's a Hammond, Louisiana,
13   property.  Appears you measured the under air
14   square footage to be 3,019 square feet under
15   air; is that right?
16   A.   Yes.
17   Q.   Did you find five KPT boards in the
18   living space of the home?
19   A.   Yes.
20   Q.   Did you find any other Chinese
21   sheetrock manufactured by a different
22   manufacturer?
23   A.   No.
24   Q.   Next one is a property owned by 1329
25   Gum Street Land Trust, and it appears that --

Page 101

1   and this is in Ocean Springs, Mississippi.  It
2   appears that the under air square footage for
3   that structure is 1,058; am I right?
4   A.   Yes.
5   Q.   And you found five KPT boards in that
6   space?
7   A.   Yes.
8   Q.   The living space of the home, I mean;
9   is that right?
10   A.   Yes.
11   Q.   Next one relates to Hallmark, which is
12   an Alabama property in Odenville, Alabama.  My
13   understanding, based on this letter that
14   you've created, is that there are 2,231 square
15   feet under air, and you found four KPT boards
16   in the living space of that home.
17   A.   Yes.
18   Q.   And, again, we've already addressed
19   that GridMarX is a domestic product, correct?
20   A.   Yes.
21   Q.   It's not defective, to the best of
22   everybody's knowledge.
23        The next one is Helmick,
24   H-E-L-M-I-C-K.  It's a property owned by the
25   Helmicks in Dover, Florida.  It appears that

Page 102

1   you measured the under air square footage to
2   be 2,985 square feet under air; is that right?
3   A.   Yes.
4   Q.   And you found two KPT boards in that
5   home, in addition to five Taishan boards; am I
6   right?
7   A.   Yes.
8   Q.   Were all those found in the living
9   space of the home, both the Taishan and the
10   KPT?
11   A.   Yes.
12   Q.   Next document is related to Hoffman,
13   H-O-F-F-M-A-N.  It's in Cape Coral, Florida.
14   It appears you measured the ANSI square
15   footage to be 2,020.
16   A.   Yes.
17   Q.   And you found four KPT boards, in
18   addition to five Knauf Gypsum Indonesia
19   boards; am I right?
20   A.   Yes.
21   Q.   And I believe your testimony is that
22   the Indonesia boards produced by Knauf are not
23   defective.
24   A.   Correct.
25   Q.   Did find any other defective sheetrock

Page 103

1   in that home --
2   A.   No.
3   Q.   -- that was not created by KPT?
4   A.   No.
5   MS. JOHNSON:
6        Are we going to take a break for
7   lunch?  It's 12:30 now.  I assume you have a
8   good bit left.
9   MR. DOYLE:
10        We're going to run through all
11   these and I've got one other item.  We'll be
12   able to take a lunch break.  When do you want
13   to do it?
14   MS. JOHNSON:
15        How are you doing?
16   THE WITNESS:
17        I'm doing fine.
18   MR. DOYLE:
19        I'll tell you what.  We'll leave
20   it up to you.  We'll keep going on this until
21   you feel like you need to take a break, when I
22   finally wear you down, and we will go to
23   lunch.
24   THE WITNESS:
25        I'm doing good.  What's total

Page 104

1   time frame you think you have left, and that
2   will tell me if I need to take lunch or not.
3   MR. DOYLE:
4        Let's just go off the record.
5        (Off the record.)
6   BY MR. DOYLE:
7   Q.   We left off with Hoffman, I believe,
8   and I think we've already discussed it,
9   correct?
10   A.   Yes.
11   Q.   Let's move on to Hu, H-U.  It's a
12   Metairie property in Louisiana.  And my
13   understanding based on this document is it was
14   measured to be 1,621 square feet under air,
15   and six KPT boards were found in property; am
16   I right?
17   A.   Yes.
18   Q.   In this case, looks like all the
19   boards that were identified were KPT boards.
20   So that property appears to be close to a
21   hundred percent; am I right?
22   A.   Yes.
23   Q.   Next document is Humphries.  It's a
24   Bay St. Louis, Mississippi, property.  1,064
25   square feet under air, five KPT boards and two

Page 105

1  unknown boards were found in that property.
2  A.  Yes.
3  Q.  Those were in the living space of the
4  home; am I right?
5  A.  Yes.
6  Q.  Next one is Ijemere, I-J-E-M-E-R-E,
7  Birmingham, Alabama, property.  And looks like
8  you measured the under air square footage to
9  be 5,202 square feet.
10  A.  Yes.
11  Q.  And of the 15 boards that were
12  inspected, seven were KPT boards.
13  A.  Yes.
14  Q.  Those were found in the living space
15  of the home?
16  A.  Yes.
17  Q.  Next one is Issman, I-S-S-M-A-N, a
18  property in Madisonville, Louisiana.  Appears
19  you measured the under air square footage to
20  be 2,518 square feet, and found one KPT board
21  in the living space of the home; am I right?
22  A.  Yes.
23  Q.  Next property is Jarvis in Avon Park,
24  Florida, and the ANSI under air square footage
25  was measured to be 1,471; am I right?

Page 106

1  A.  Yes.
2  Q.  And you found six KPT boards in the
3  living space of the home.
4  A.  Yes.
5  Q.  Next one is Karpel, K-A-R-P-E-L.  It's
6  a Loxahatchee, Florida, property.  Looks like
7  you measured it to be 2,362 square feet under
8  air, and you found seven KPT boards in the
9  living space of the home; am I right?
10  A.  Yes.
11  Q.  And, again, you found one blue and
12  yellow end tape board, which is indeterminate
13  whether it's defective or not, correct?
14  A.  Correct.
15  Q.  And one Knauf Gypsum Indonesia board
16  that I believe you testified is not defective;
17  am I right?
18  A.  Yes.
19  Q.  Do you know if those seven KPT boards
20  in the Karpel property were found in the
21  living space?
22  A.  Yes.
23  Q.  Next property is a Kelley property,
24  K-E-L-L-E-Y, located in Pell City, Alabama.
25  It appears you measured that property to be

Page 107

1  1,533 square feet under air, and found two KPT
2  boards in the living space.
3  A.  Yes.
4  Q.  Next document is Kendall,
5  K-E-N-D-A-L-L, in Miami, Florida.  The area
6  under air is 3,419 square feet, and it looks
7  like YOU found seven KPT boards in the living
8  space of the home.
9  A.  Yes.
10  Q.  There's also a note here about three
11  Knauf Gypsum Indonesia boards, and, again,
12  that's not defective to the best of our
13  knowledge; is that right?
14  A.  Yes.
15  Q.  Next document relates to the
16  Lafontaine property in Bay St. Louis,
17  Mississippi.  Looks like the under air square
18  footage was measured to be 1,565 square feet;
19  am I right?
20  A.  Yes.
21  Q.  And there were eight KPT boards found
22  in the living space of that property.
23  A.  Yes.
24  Q.  Next one is Laremore in Labelle,
25  Florida.  1,535 square feet under air, and

Page 108

1  four KPT boards in the living space of the
2  home, correct?
3  A.  Yes.
4  Q.  Next property is Lee that's located in
5  Mobile, Alabama.  It appears you measured the
6  ANSI square footage to be 1,369 under air, and
7  found six KPT boards in the living space of
8  that property.
9  A.  Yes.
10  Q.  Next one is Lorquet, L-O-R-Q-U-E-T.
11  It's in Lake Alfred, Florida.  The ANSI square
12  footage under air is 3,481 square feet and
13  five KPT boards were found in the living space
14  of the home according to this letter.
15  A.  Yes.
16  Q.  Next one is M & M The Closers
17  property, located in Homestead, Florida.  And
18  you measured the ANSI under air square footage
19  to be 2,915.  It also appears that you found
20  two KPT boards in the living space of the
21  property of the 14 that were evaluated; am I
22  right?
23  A.  Yes.
24  Q.  Next property is Mansour,
25  M-A-N-S-O-U-R.  It's a Royal Palm Beach

Page 109

1 property that you measured to be 2,843 square
2 feet under air. And it appears that you found
3 five KPT boards in the living space of this
4 property; am I right?
5 A. Yes.
6 Q. Marques is the next one. It's a
7 Boynton Beach property. 1,690 square feet
8 under air, and one KPT board was found in the
9 living space; am I correct?
10 A. Yes.
11 Q. And it also appears that there was
12 another Knauf end tape board. Again,
13 indeterminate whether it's a defective brand
14 manufactured by Knauf or not, right?
15 A. Yes.
16 Q. Next one is Martinez in Florida. This
17 property is located at 14731 Southwest 34 Lane
18 in Miami, Florida. The ANSI under air square
19 footage is 2,853 square feet, and it looks
20 like you found four KPT boards in the living
21 space of that property; am I right?
22 A. Yes.
23 Q. Next one is Martinez, located at 23631
24 Southwest 112 Court in Miami, Florida. And
25 the letter you produced indicates that it has

Page 110

1 1,664 square feet under air, and five KPT
2 boards were found in the living space of that
3 property.
4 A. Yes.
5 Q. Next one is Martino. It's a
6 Mississippi property. Looks like the square
7 footage is 818 under air, and four KPT boards
8 were found in the living space.
9 A. Yes.
10 Q. The next letter is related to the
11 McCann property, M-C-C-A-N-N, in Covington,
12 Louisiana. Your letter indicates that
13 property was measured to be 2,569 square feet
14 under air, and you found three KPT boards in
15 the living space of that property.
16 A. Yes.
17 Q. Next document is related to the
18 McCullar, M-C-C-U-L-L-A-R, property in Pass
19 Christian, Mississippi. You measured the
20 under air square footage to be 826, and you
21 found four KPT boards of the six that were
22 evaluated in that property; am I correct?
23 A. Yes.
24 Q. The next letter relates to the Milam
25 property at 4625 Palmyra Street in New

Page 111

1 Orleans. And it appears that you measured
2 that portion of the home, of the structure, to
3 be 847 square feet under air, and you found
4 two KPT boards in the living space of that
5 property; am I right?
6 A. Yes.
7 Q. Next one is related to the 4627 Milam
8 property, located at 4627 Palmyra Street in
9 New Orleans, and that side of the structure
10 was measured to be 847 square feet, and you
11 found one KPT board in that living space,
12 correct?
13 A. Yes.
14 Q. Next one is Moore in North Port,
15 Florida. You measured it to be 2,089 square
16 feet under air, and you found that two KPT
17 boards were in the living space of that
18 property.
19 A. Yes.
20 Q. Nguyen is the next one, N-G-U-Y-E-N,
21 in Long Beach, Mississippi. You measured it
22 to be 1,379 square feet under air, and you
23 found two KPT boards in the living space of
24 that property; am I correct?
25 A. Yes.

Page 112

1 Q. Niemiec, N-I-E-M-I-E-C, property in
2 Lakeland, Florida, with an under air square
3 footage of 1,764 square feet under air. And
4 it looks like you found seven KPT boards in
5 the living space of that property.
6 A. Yes.
7 Q. Next one is Norris, N-O-R-R-I-S, and
8 it is in Madisonville, Louisiana. You
9 measured that property to be 2,519 square feet
10 under air, and you found KPT boards in four
11 locations in the living space of that home; am
12 I right?
13 A. Yes.
14 Q. Next one is Paredes, P-A-R-E-D-E-S.
15 It's a Pinecrest, Florida, property that you
16 measured to be 5,076 square feet under air.
17 Looks like you found seven KPT boards in the
18 living space of that home.
19 A. Yes.
20 Q. And no other defective Chinese
21 sheetrock from another manufacturer.
22 A. Correct.
23 Q. Next one is Pendelton in New Orleans,
24 Louisiana. It is measured to be 1,444 square
25 feet under air, and it looks like you found

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 113

1    six KPT boards in the living space of that
2    property.
3    A.   Yes.
4    Q.   Next one is Perez.  It is a Slidell,
5    Louisiana, property, measured to be 2,457
6    square feet under air, and it looks like you
7    found one KPT board of the nine you evaluated
8    in that property in the living space.
9    A.   Yes.
10   Q.   Next one is Pham, P-H-A-M, in Baton
11   Rouge, Louisiana.  And this one is measured to
12   be 2,961 square feet under air.  It looks like
13   you found one KPT board in the living space of
14   that property.
15   A.   Yes.
16   Q.   And Pierre is a Boynton Beach
17   property, measured to be 1,690 square feet
18   under air, and you found two KPT boards in the
19   living space of that property.
20   A.   Yes.
21   Q.   Next one is Pool.  It is a Spring
22   Hill, Florida, property, measured to be 2,595
23   square feet under air.  You found four KPT
24   boards in the living space of that property;
25   am I right?

Page 114

1    A.   I'm behind you, Jimmy.
2    Q.   I'm sorry.
3    A.   Yes.
4    Q.   That was Pool?
5    A.   Yes.
6    Q.   And you found four KPT in the living
7    space?
8    A.   Yes.
9    Q.   You measured to be 2,595?
10   A.   Yes.
11   Q.   Move on to Porcuincula.  This is a
12   Palm Bay, Florida, property, measured to be
13   1.538 square feet under air, and it looks like
14   you found nine KPT boards in the living space
15   of that property.
16   A.   Yes.
17   Q.   Next one is Powell, Pass Christian
18   property, measured to be 1,825 square feet
19   under air, correct?
20   A.   Yes.
21   Q.   You found three KPT boards in the
22   living space of that home?
23   A.   Yes.
24   Q.   And these other nine boards that you
25   evaluated were not found to be defective

Page 115

1    Chinese-manufactured sheetrock; am I correct?
2    A.   Correct.
3    Q.   Next one is Price in North Port,
4    Florida.  The ANSI square footage is 2,581
5    square feet under air, and it looks like you
6    found five KPT boards in that property.
7    A.   Yes.
8    Q.   In the living space of that property;
9    am I right?
10   A.   Wait.  The summary says walls of the
11   home and the garage ceiling.
12   Q.   So it's in both, the garage and the
13   living space?
14   A.   Yes.  I'm behind a little bit because
15   I'm looking at the summaries.
16   Q.   That's fine.  If you need me to slow
17   down, just let me know.  Just trying to walk
18   through each one of these.
19       The next one is R & S property,
20   located in Foley, Alabama.  Are you with me?
21   A.   Yes.
22   Q.   2,286 square feet under air, and there
23   was one KPT board found in the living space of
24   that property.
25   A.   Correct.

Page 116

1    Q.   Reynolds is the next letter.  It's a
2    Madison, Alabama, property, measured to be
3    3,200 square feet even.  And it looks like you
4    found five KPT boards in the living space of
5    that property; am I correct?
6    A.   Yes.  It was domestic in the attic.
7    Q.   Rigopoulos, R-I-G-O-P-O-U-L-O-S, it's
8    a Naples, Florida, property.  You measured it
9    to be 1,627 square feet under air, and it
10   looks like you found nine KPT boards in that
11   property; am I correct?
12   A.   Yes.
13   Q.   Were those in the living space of that
14   property?
15   A.   Yes.
16   Q.   Next one is Robbins, a property
17   located in Ormand Beach, Florida, 2,569 square
18   feet under air, and it looks like you found
19   three KPT boards in the living space of that
20   property.
21   A.   Yes.
22   Q.   This is the property you referenced
23   earlier where you found a Wuhu, W-U-H-U,
24   boards as well.
25   A.   Yes.

Page 117

1  Q.  Is it your testimony that those boards
2  are defective in any way?
3  A.  No.
4  Q.  Have they been tested?
5  A.  I'm sure they have.
6  Q.  Did you do any independent testing on
7  any of the brands of Chinese drywall in this
8  litigation?
9  A.  No.
10  Q.  Next property is, Roopchand,
11  R-O-O-P-C-H-A-N-D, located in Loxahatchee,
12  Florida.  The ANSI under air square footage is
13  2,334 square feet, and there's nine KPT boards
14  located in the living space.
15  A.  Yes.
16  Q.  Russell is the next letter.  It's a
17  Hoover, Alabama, property, 2,092 square feet
18  under air, and there are two KPT boards in the
19  living space, correct?
20  A.  Yes.
21  Q.  And you also have an indication,
22  again, there's one blue and yellow end tape
23  board that is indeterminate whether it's
24  defective or not.
25  A.  Yes.

Page 118

1  Q.  But the blue and yellow end tape you
2  have identified as a Knauf product.
3      Salabarria is the next one, a Miami,
4  Florida, property that was measured to be
5  1,490 square feet under air.  It looks like
6  you found three KPT boards in the living
7  space.
8  A.  Yes.
9  Q.  Next one is Scott.  It's a Madison,
10  Alabama, property, measured to be 2,309 square
11  feet under air, and there are four KPT boards
12  found in the living space of that property.
13  A.  Yes.
14  Q.  Stanfa is a Birmingham, Alabama,
15  property.  We don't have a measured under air
16  square footage on the one that I have.
17      Was there a revised version of the
18  Stanfa letter that may have cleared that up?
19  A.  Yes.  Should be.
20  Q.  I'm going to represent to you that you
21  produced an ANSI sketch for this Stanfa
22  property in Birmingham, Alabama, that was
23  measured to be 5,975 square feet under air.
24  Does that sound in the ball park to be
25  correct?  Do you have a recollection of the

Page 119

1  Stanfa property?
2  A.  I was there for the inspection, but I
3  do not.
4  Q.  Okay.  I'm not concerned about it.
5  Looks like in the Stanfa property, you found
6  two KPT boards in the living space of that
7  property.
8  A.  Yes.
9  Q.  Next one is Stockton in Spring Hill,
10  Florida.  You measured it to be 1,993 square
11  feet under air, and you found six KPT boards
12  in the living space.
13  A.  Yes.
14  Q.  Tabacchi is the next property,
15  T-A-B-A-C-C-H-I.  It's an Anthony, Florida,
16  property, measured to be 2,872 square feet
17  under air, and looks like you found nine KPT
18  boards in the living space of that property.
19  A.  My summary says walls throughout the
20  house and the garage ceiling.
21  Q.  So it's both.  You found KPT in both
22  garage and the living space.
23  A.  Yes.
24  Q.  Okay.
25  A.  Can I also say that this also had the

Page 120

1  Knauf Germany that I referred to earlier.
2  Q.  Sure.  Is there anything you want to
3  provide on the record about the German board?
4  A.  It's in the settlement agreement
5  booked as a nonreactive drywall.
6  Q.  Taylor is the next property in Port
7  St. Lucie, Florida.  You measured it to be
8  2,215 square feet under air.  And it looks
9  like you found eight KPT boards of the nine
10  you evaluated for that property.
11  A.  Yes.
12  Q.  Those eight boards were found in the
13  living space.
14  A.  Yes.
15  Q.  Timmons is the next property in Cape
16  Coral, Florida.  You measured it to be 2,413
17  square feet under air, and it looks like you
18  found five KPT boards in the living space.
19  A.  Yes.
20  Q.  Tolliver is a Port St. Lucie property
21  up next.  The ANSI square footage was measured
22  to be 2,393 square feet by you, and it looks
23  like you found four KPT boards in the living
24  space; am I right?
25  A.  Yes.

Page 121

1  Q.  Tran is the next letter that you
2  produced.  It's an Ocean Springs, Mississippi,
3  property, measured to be 1,451 square feet
4  under air.  And eight of the nine boards that
5  you found in the property that you evaluated
6  during this process were found to be KPT
7  boards in the living space; am I right?
8  A.  Yes.
9  Q.  Tyler, T-Y-L-E-R, is the next
10  property.  It's a Fellsmere, Florida,
11  property, F-E-L-L-S-M-E-R-E.  You measured it
12  to be 2,426 square feet, and you found six KPT
13  boards in the living space of that property.
14  A.  Yes.
15  Q.  Vandrie, V-A-N-D-R-I-E, is the next
16  property in Cape Coral, Florida.  You measured
17  it to be 2,257 square feet, and it looks like
18  in this one, you did not find any KPT boards
19  in the property; am I right?
20  A.  There was a KPT piece of board that
21  was on the attic access only.  There was no
22  KPT that was attached to studs.
23  Q.  Okay.  It looks like you made cuts to
24  evaluate 12 boards, but in that case, you were
25  not able to identify that KPT board was

Page 122

1  installed in any of the living space in that
2  property; am I right?
3  A.  Correct.  The new revised inspection
4  report will tell how many Taishan were found.
5  Q.  We're going to utilize this computer
6  since we don't have the document printed out,
7  if opposing counsel agrees that he can view
8  the document on the screen for the purpose of
9  his testimony.  We'll produce a paper copy and
10  insert it in this, if that's okay?
11  MS. JOHNSON:
12      Can we just print it now?  I'd
13  be more comfortable.
14  MR. DOYLE:
15      Yeah.  Let's go off the record.
16      (Off the record.)
17  BY MR. DOYLE:
18  Q.  Mr. Adams, we took a break because we
19  were discussing the Vandrie property, and it
20  looks like there was a revised letter that
21  I've now gotten printed, and we're going to
22  place into the record in the same Exhibit 3.
23      I have two letters, but they're
24  related to the same property.  Do you
25  understand?

Page 123

1  A.  Yes.
2  Q.  All right.  Let's take a look at the
3  second letter that appears to be a revised
4  version of the original letter.  And on the
5  second page, same square footage, 2,257 square
6  feet.  But in the section related to the
7  drywall that was identified, it appears that
8  you found four Taishan boards and one Knauf
9  board.  It's yellow and blue end tape, but you
10  didn't make any determination whether it's a
11  KPT board or some other board; am I right?
12  A.  Correct.  It's the attic access cover
13  that's a small piece of drywall.
14  Q.  Okay.
15  A.  All I could see was end tape.
16  Q.  You didn't find any KPT in any of the
17  walls in the living space; am I right?
18  A.  No.
19  Q.  Move on to the next one.  Veira is the
20  next one, V-E-I-R-A, 2,195 square feet under
21  air, and five KPT boards in the living space;
22  am I correct?
23  A.  Yes.
24  Q.  Zelenenki, Z-E-L-E-N-E-N-K-I.  It's a
25  Sebring, Florida, property.  You measured it

Page 124

1  to be 1,538 square feet under air, and it
2  appears you found six KPT boards in the living
3  space of that property; am I right?
4  A.  Yes.
5  Q.  Let's go to Exhibit 4, the last
6  exhibit in this binder in front of you.
7      (Whereupon, the document was
8  introduced for identification as Exhibit No.
9  4.)
10  BY MR. DOYLE:
11  Q.  And in it, I have one example,
12  Xactimate cost estimate that we're just going
13  to use so that I can understand how you
14  approached this process, okay?
15  A.  Okay.
16  Q.  I think we talked about some of this,
17  but I'm going to have to ask some questions a
18  second time just so I understand how you
19  arrived at the final cost estimate for, in
20  this case, the Brousseau house in Baton Rouge,
21  Louisiana.
22      But when I'm asking you questions,
23  unless I specifically say, tell me about
24  Brousseau, I'm just asking in general terms
25  how you approached creating an Xactimate bid

Page 125

1  scope, okay?
2  A.  Okay.
3  Q.  On the first page of this Brousseau
4  document, it looks like labor efficiency,
5  there's a notation that it's
6  restoration/service/remodel.  Tell me what
7  that indicates.
8  A.  This estimate has several categories
9  to choose from.  One is new construction, and
10  restoration/remodel fits the remediation
11  portion the best for Chinese drywall.
12  Q.  Is there anything else you have to do,
13  when you get into this restoration portion of
14  it?  Do you have to make any other adjustments
15  in the Xactimate program for it to be able to
16  project the cost that you need to generate a
17  cost estimate for a house that has Chinese
18  drywall that needs to be remediated?
19  A.  Location.
20  Q.  Okay.  What does the location do to
21  the program?
22  A.  Xactimate updates the pricing every
23  month by geographical location, so you plug in
24  a ZIP code, and it will give you pricing for
25  that specific area.

Page 126

1  Q.  Is it labor pricing in addition to --
2  A.  And material.
3  Q.  And material costs, okay.
4      Is there anything else that's affected
5  by that location factor?
6  A.  Sales tax.
7  Q.  And that is --
8  A.  -- automatically generated.
9  Q.  Good.  Let's turn to the second page,
10  General Requirements section.  Items one
11  through nine are items that you probably
12  include in each and every one of these
13  Xactimate cost estimates; am I right?
14  A.  Quantity changes.
15  Q.  Apart from quantity, but the items
16  themselves are probably the same.
17  A.  No.
18  Q.  Okay.  Tell me how they differ from
19  Xactimate to Xactimate?
20  A.  Number 9 would not be included in all
21  houses, only houses that have gas.
22  Q.  Okay.  Any others that might change?
23  A.  No.
24  Q.  Tell me about the duration estimate
25  for various sized homes.  How did you go about

Page 127

1  projecting that a remediation would take three
2  months as opposed to five or six months?
3  A.  Basically, depending on finishes,
4  anything from 3,000 to 3,500 square feet would
5  be three months.  For every thousand square
6  feet thereafter would be another month.
7  Q.  Three thousand to 3,500 would be three
8  months?
9  A.  Three months, yes.  That's typically
10  our historical when we did the remediation
11  program.
12  Q.  You're talking about the average time
13  that it took for those projects to finish
14  under the program?
15  A.  Yes.
16  Q.  In the beginning, the projects took a
17  little longer, didn't they?
18  A.  We had a three-month deadline.
19  Q.  Okay.  What percentage of the
20  remediations in the remediation program took
21  longer than three months, if they fit that
22  criteria that you projected it to be, three
23  months for 3,500-square-foot houses or less?
24  A.  There was a percentage at the
25  beginning part of the remediation program at

Page 128

1  the start-off.  After that, most of them made
2  the three months.
3  Q.  Okay.  Was it a change order that was
4  submitted if it needed to go longer than three
5  months?
6  A.  No.
7  Q.  How was that handled internally?
8  A.  Moss paid for it.
9  Q.  Why was Moss paying for that rather
10  than Knauf?
11  MS. JOHNSON:
12      Objection, form.
13  THE WITNESS:
14      If it was contractor delays, Moss
15  paid for it.
16  BY MR. DOYLE:
17  Q.  What if it wasn't contractor delays?
18  What if it was just out of everybody's control
19  for some reason?  Weather, for instance, was
20  Moss still obligated to pay it?
21  A.  There was a part in the settlement
22  agreement for weather delays.  We had
23  hurricanes, we had floods, we had --
24  Q.  Sure.
25  A.  We had delays from that.  We also had

Page 129

1  homeowner delays, which went longer than the
2  three months, but that was off the record.
3  That's off the time frame.
4    Q.   If the homeowner caused the delay --
5    A.   We had quite a few of those.
6    Q.   How was the additional time and the
7  payments that were necessary handled by Moss?
8    A.   We would send a notice to counsel for
9  that homeowner, tell him that as of today, we
10  have stopped our duration until the homeowner
11  fixes this item, this item, this item, if it
12  was something that was unrelated to Chinese
13  drywall, such as a roof leak, mold, window
14  leaks.
15         Could be a code issue, as you brought
16  up before, if they needed tie-down straps, had
17  nothing to do with Chinese drywall, they would
18  add the drywall straps.  If it was termites.
19    Q.   So under the terms of the original
20  agreement, any code compliance issues were
21  shifted to the homeowner to address rather
22  than Knauf; am I right?
23    A.   Yes, if they were not Chinese drywall
24  related.  Also, if the homeowner wanted to
25  make changes, which quite a few of them did.

Page 130

1  If they wanted to change their kitchen
2  cabinets, if they wanted to add granite, if
3  they wanted to do whatever else, time stopped
4  until they took care of that.
5    Q.   Okay.  In this case, are you going to
6  offer any testimony about who should shoulder
7  the burden of code compliance in those areas,
8  where the building code requires upgrades as a
9  result of Chinese drywall remediation?
10    A.   What type of upgrades?  What are you
11  talking, upgrades?
12    Q.   Code compliance is all I'm focused on
13  at this point.  Are you going to offer any
14  testimony in this case before a jury that the
15  homeowner should shoulder the burden of code
16  compliance, if the remediation triggers that
17  items need to be addressed, such as hurricane
18  straps, windows, fire safety systems, or
19  anything of that nature?
20    MS. JOHNSON:
21        Objection to form.
22  BY MR. DOYLE:
23    Q.   Do you understand my question?
24    A.   Yes.
25    Q.   Is that something you intend to

Page 131

1  testify about?
2    A.   If it's not Chinese drywall related,
3  it's not in the estimate.
4    Q.   Are you going to offer testimony that
5  -- again, this is the source of my question,
6  heart of my question.  Are you going to offer
7  testimony at trial that it's your opinion,
8  based on some rationale, that the homeowner
9  should be responsible for code compliance
10  rather than KPT or Knauf?
11    A.   No.  But let me just say what I talked
12  about before, the electrical.  If they need to
13  change to arc fault breakers, breaker change
14  is already in this estimate, which an old
15  house would have to go to arc fault breakers.
16    Q.   I understand.
17    A.   So that code change is included in
18  here because it's part of the electrical.
19    Q.   What about the hurricane straps?
20    A.   They are not included.
21    Q.   What about the windows that now have
22  to be shatterproof in South Florida, is that
23  included?
24    A.   No.
25    Q.   Is there any other item in here

Page 132

1  generally speaking in these Xactimates that
2  addresses requirements that Florida or any
3  other state is going to impose as a result of
4  code compliance?
5    A.   No.
6    MS. JOHNSON:
7        Objection, form.
8  BY MR. DOYLE:
9    Q.   Is it your understanding that any
10  other states have a similar 50 percent rule
11  that Florida has regarding code compliance?
12    A.   I know that Mississippi does.  If it's
13  all of Mississippi, I don't know.
14    Q.   Just South Mississippi?
15    A.   I know that during the remediation
16  program, we had homes that exceeded the 50
17  percent.  They were low end homes that they
18  said would have to be elevated.  This was a
19  flood plain; this was FEMA, and that was not
20  included.
21    Q.   So it was the homeowner's
22  responsibility to have the home elevated
23  during this process if the 50 percent rule
24  triggered code compliance.  And is it going to
25  be your testimony at trial that, in this case,

Page 133

1  the homeowners should also shoulder that
2  burden?
3     A.  Yes.
4     Q.  And what basis do you have that the
5  homeowners should be the ones that shoulder
6  the burden of code compliance?
7     A.  They don't meet FEMA regulations now
8  elevation-wise.
9     Q.  But you're going to be offering
10  testimony at trial that it's your belief, as
11  an expert you're going to offer this testimony
12  that the homeowner should have to pay for the
13  code compliance.
14     MS. JOHNSON:
15         Objection, asked and answered.
16     THE WITNESS:
17         Yes.
18  BY MR. DOYLE:
19     Q.  What basis do you have for offering
20  that opinion?
21     A.  Homes should meet the minimum flood
22  elevation regardless.
23     Q.  Have you ever published any document
24  on this subject?
25     A.  No.

Page 134

1     Q.  Have you ever been qualified as an
2  expert on this particular subject area?
3     A.  No.
4     Q.  What documents do you rely upon to
5  offer that testimony?
6     A.  My personal opinion.
7     Q.  Okay.  Let's go to the next section,
8  Exterior Insulation.  It's on the bottom of
9  Page 2 or the middle part of Page 2.  You've
10  got R & R batt insulation.  What does that
11  indicate?
12     A.  Remove and replace the batt insulation
13  on the walls, exterior.
14     Q.  In your experience, have those
15  insulation panels ever absorbed any gases by
16  the Chinese drywall?
17     A.  I don't know.  We scoped to replace
18  all insulation.
19     Q.  This is remove and replace, I'm sorry.
20  Forgive me.  This is remove and replace, not
21  detach and reset.
22     A.  Yes.
23     Q.  Let's go to Page 3.  First time we see
24  detach and reset, it's related to fixtures,
25  trim only.  At the bottom third of Page 3,

Page 135

1  it's line item 31.  Describe for me what's
2  going on there.
3     A.  This is a recessed high head can, so
4  the fixture would stay.  In order to replace
5  the drywall, you take the ring off, leave the
6  fixture, put the drywall back up.
7     Q.  If the fixture itself, when you start
8  to take it apart to do this detach and reset,
9  indicates that there's corrosion or there's
10  some damage in any fashion, how would your
11  cost projection capture the additional cost?
12     A.  It does not.
13     Q.  So detach and reset is essentially an
14  exclusion of that item from the cost estimate;
15  am I correct?
16     A.  Yes.
17     Q.  Detach and reset is also found in line
18  item 39, also line item 44 and 46 on Page 4.
19  Is that the same general theory that you're
20  going to detach and reset those things?
21     A.  No -- this pocket door.
22     Q.  Tell me about the pocket door.
23     A.  Pocket door is same as a pre-hung
24  door.  It's detached and reset.  I mean it
25  does not absorb.  It's not going to have

Page 136

1  corrosion.
2     Q.  What about the metal components to the
3  door?
4     A.  What metal components?
5     Q.  Hinges, the internal locking
6  mechanisms, could any of those possibly be
7  affected by Chinese drywall gases?
8     A.  They are not aluminum, they're not
9  copper.  They're typically galvanized or some
10  other produce for the rollers for the track.
11     Q.  Have you ever viewed bathroom fixtures
12  in a Chinese drywall home that were pitted
13  because of the Chinese drywall?
14     MS. JOHNSON:
15         Objection.
16  BY MR. DOYLE:
17     Q.  Have you?
18     A.  I have observed pitted fixtures in
19  bathrooms, yes.
20     Q.  Have you observed any chrome fixtures
21  that were pitted?
22     A.  Yes.
23     Q.  Does chrome typically react with
24  Chinese drywall?
25     A.  Chrome is a plating on top of either a

Page 137

1 brass or a copper, so yes, it does. Can.
2 Q. It can?
3 A. It can.
4 Q. It can. Have you seen any bronze
5 fixtures that were pitted as a result of the
6 Chinese drywall?
7 MS. JOHNSON:
8 Objection, compound.
9 THE WITNESS:
10 Not as many.
11 BY MR. DOYLE:
12 Q. Have you seen some?
13 A. But I don't know if it's from Chinese
14 drywall.
15 Q. Inside a bathroom where Chinese
16 drywall is in the home, have you seen any
17 pitted fixtures that you would not expect to
18 be pitted because of the metal type?
19 A. Bronze fixtures do pit because of
20 environmental conditions.
21 Q. Is it your opinion that bronze
22 fixtures would not pit because of Chinese
23 drywall gases?
24 A. I don't know.
25 Q. Are you going to offer any opinion

Page 138

1 about the different types of metals that react
2 with Chinese drywall?
3 A. No.
4 Q. Okay. Is it fair to say that detach
5 and reset of a pocket door could result in a
6 need for a change order type situation where
7 it turns out there is damage to the metal
8 components that weren't immediately identified
9 when you created this Xactimate?
10 MS. JOHNSON:
11 Object to form.
12 THE WITNESS:
13 I can tell you that from all of
14 the remediations we did, I never asked for a
15 change order for a pocket door.
16 BY MR. DOYLE:
17 Q. Okay. What about for the components
18 of the door itself?
19 A. No.
20 Q. What about the detach and reset switch
21 for the light fixture? Again, is this the
22 same situation where you don't expect there to
23 be any damage from the Chinese drywall in
24 either of those cases?
25 A. A switch should have been removed and

Page 139

1 replaced.
2 Q. Okay. With regard to the light
3 fixtures, was it your standard --
4 A. I can tell you the price -- it may be
5 the description only because the price is
6 remove and replace.
7 Q. Okay. Fair enough. I'm just trying
8 to get to the bottom of --
9 A. I understand.
10 Q. Let's look at line item 46, then.
11 We've already discussed the light fixture on
12 the previous page. Is this the same type of
13 situation that we discussed?
14 A. Yes.
15 Q. And your testimony is that there would
16 not be any change order provision included in
17 this cost estimate. This is a cost estimate
18 excluding these detach and reset items, right?
19 MS. JOHNSON:
20 Objection, mischaracterizes
21 earlier testimony.
22 THE WITNESS:
23 Yes.
24 BY MR. DOYLE:
25 Q. Let's just get to the heart of the

Page 140

1 matter. If you have detach and reset for
2 those items, apart from the labor cost for
3 detaching and resetting it, there is no
4 provision in this Xactimate cost projection
5 for recovery of that cost, if it's damaged at
6 the time it needs to be detached and reset; am
7 I right?
8 A. Right.
9 Q. So it would be an omission from the
10 cost projection; am I right?
11 A. Yes.
12 Q. At any point in the future, between
13 now and the time that we go to trial in these
14 cases, do you intend to revise any of these
15 final cost estimates that you've created?
16 A. No.
17 Q. Have you been asked to by defense
18 counsel to review any of the cost estimates
19 and potentially make any changes?
20 A. No.
21 Q. Have they asked you to evaluate the
22 court's orders and the items that the court
23 has stated need to be included in the
24 Xactimate or -- excuse me, need to be included
25 in a cost estimate for remediation that

Page 141

1    weren't included in yours?
2    A.   No.
3      MS. JOHNSON:
4         Objection, form.
5    BY MR. DOYLE:
6    Q.   Do you have any plans to review any
7    court documents on the issue of remediation to
8    revise your cost estimates before trial?
9    A.   No.  What page are you on?
10   Q.   We just grouped everything together
11   regarding detach and reset, so you've given me
12   the testimony that I needed.
13        Let's turn to Page 15 of this
14   Brousseau Xactimate.  Line item 268 deals with
15   cabinetry.
16   A.   Okay.
17   Q.   And you've got detach and reset for
18   the cabinetry.  Is it your testimony that
19   cabinets should be detached and reset?
20   A.   Yes.
21   Q.   Judge Fallon has issued an order
22   stating that cabinetry should be replaced,
23   removed and replaced, which directly conflicts
24   with your cost estimate.
25        Do you agree that your cost estimate

Page 142

1    needs to be revised?
2    A.   No.
3      MS. JOHNSON:
4         Objection, assumes facts not in
5    evidence.
6      THE WITNESS:
7         The 2011 remediation protocol, we
8    did not replace any cabinets.
9    BY MR. DOYLE:
10   Q.   Is it your testimony that the 2011
11   settlement agreement is binding in any way in
12   this case?
13   A.   No.
14     MS. JOHNSON:
15        Objection, form.
16   BY MR. DOYLE:
17   Q.   Have you been given any instructions
18   by either Fishman Haygood lawyers or Knauf to
19   leave cabinets out of your cost estimate for
20   any reason?
21   A.   No.
22   Q.   Have you had any discussions with the
23   Fishman Haygood lawyers or Knauf
24   representatives regarding whether cabinets
25   should be included in cost estimates?

Page 143

1    A.   We talked about it before we started
2    our inspections.
3    Q.   Who did you speak with?
4    A.   Kerry Miller and Danny Dysart.
5    Q.   And what instructions did they give
6    you regarding cabinets?
7    A.   They did not give me instructions.
8    Q.   So did you just take it upon yourself
9    to omit the cabinet replacement in these cost
10   estimates?
11     MS. JOHNSON:
12        Objection, form.
13     THE WITNESS:
14        We talked about it that that's
15   what's historically done in all of our
16   remediations.
17   BY MR. DOYLE:
18   Q.   During the remediation program --
19   A.   Yes.
20   Q.   -- following the 2011 settlement,
21   correct?
22   A.   Yes.
23   Q.   And, again, it's your testimony that
24   that settlement agreement is not binding in
25   this case, right?

Page 144

1      MS. JOHNSON:
2         Objection, form.
3      THE WITNESS:
4         Yes.
5    BY MR. DOYLE:
6    Q.   I think you've already answered that.
7         So why are you applying the protocol
8    and the standard that was adopted by agreement
9    in 2011 to this case?
10   A.   I'm not applying it.  I'm just saying
11   that that's what we went by in that one and it
12   worked.  We didn't have to replace cabinets or
13   bathroom vanities.
14   Q.   Will your testimony change if a court
15   order from Judge Fallon explicitly says that
16   cabinets have to be replaced as part of the
17   complete remediation of the home?
18     MS. JOHNSON:
19        Objection.
20     THE WITNESS:
21        I don't know.
22   BY MR. DOYLE:
23   Q.   You don't know.  If Judge Fallon has
24   issued an order that says the full remediation
25   of the home includes changing the cabinets,

Page 145

1  your testimony would not change?
2  A.  I don't know.  I mean, if somebody was
3  to instruct me that I have to do it, I guess I
4  would do it.
5  Q.  Okay.  Hypothetically, let's say a
6  federal judge overseeing this case says full
7  remediation of a home includes replacing
8  cabinets, among other things.  You don't have
9  it in your Xactimate cost projections.  Would
10  that change your testimony in any way?
11  MS. JOHNSON:
12        Objection, form.  That's an
13  argumentative question.
14  MR. DOYLE:
15        No, it's not.  It's a
16  hypothetical.  You can answer.
17  MS. JOHNSON:
18        Objection, incomplete
19  hypothetical, okay?  Keep going.
20  BY MR. DOYLE:
21  Q.  Okay.  Let's go back and let's make
22  sure that this is all tied up.
23        You'll agree with me that you have
24  left cabinetry out of each and every one of
25  these Xactimate final cost estimates for

Page 146

1  remediation of Bennett plaintiff homes,
2  correct?
3  A.  Yes.
4  Q.  And my hypothetical is, if you are
5  presented with an order from Judge Fallon that
6  says you are to include the cost of cabinetry
7  in the cost estimates for remediating homes
8  owned by Bennett plaintiffs in this Chinese
9  drywall case, would that change your testimony
10  in any way?
11  MS. JOHNSON:
12        Objection, form, incomplete
13  hypothetical.
14  THE WITNESS:
15        I would disagree with it.  I
16  would totally disagree with it.
17  BY MR. DOYLE:
18  Q.  So your testimony is that you're going
19  to get on the stand as an expert and inform
20  the court that you disagree with the court's
21  order?
22  A.  Sure.
23  Q.  Good.  What basis do you have for
24  disagreeing with the court's order?
25  MS. JOHNSON:

Page 147

1        Objection, asked and answered.
2  THE WITNESS:
3        -- remediated 2,800 home without
4  replacing cabinets.
5  BY MR. DOYLE:
6  Q.  The fact that you did it doesn't
7  necessarily mean that it didn't have to be
8  done; am I right?
9  A.  Did not have to be done.
10  Q.  Did you do any type of testing on any
11  of those cabinets?
12  A.  No.
13  Q.  Did anybody do any testing on the
14  cabinets?
15  A.  No.
16  Q.  You just assumed that it was okay to
17  put those back in the homes?
18  MS. JOHNSON:
19        Objection, form.
20  THE WITNESS:
21        There was no damage caused by
22  detach and reset.
23  BY MR. DOYLE:
24  Q.  How do you know there wasn't any
25  damage done to those cabinets?  They were

Page 148

1  contained in a house with Chinese drywall
2  gases circulating.
3  MS. JOHNSON:
4        Objection, compound.
5  THE WITNESS:
6        Same materials as the doors, same
7  materials as the wood furniture, same
8  materials as the wood flooring.
9  BY MR. DOYLE:
10  Q.  What type of evaluation process did
11  you or your representatives go through to
12  evaluate whether doors and/or cabinets are
13  made of this same material?
14  A.  We didn't do anything.
15  MS. JOHNSON:
16        How much more you got?
17  MR. DOYLE:
18        Not much.
19  MS. JOHNSON:
20        Less than five minutes?
21  MR. DOYLE:
22        Yes.
23         (Off the record.)
24  BY MR. DOYLE:
25  Q.  Mr. Adams, would you agree with me

Page 149

1 that the longer any mechanical systems are
2 exposed to Chinese drywall gases, the longer
3 the items will be subject to corrosion caused
4 by those gases?
5 A. I don't know.
6 Q. You're not going to offer any opinion
7 about the duration of mechanical items in the
8 home being affected by Chinese drywall gases?
9 A. No.
10 Q. Your testimony is limited just to
11 identification of the Chinese drywall,
12 measurement of the homes, and cost
13 projections.
14 A. Yes.
15 Q. Is there anything else outside of that
16 limitation that you're going to offer opinions
17 about?
18 A. No.
19 Q. We currently have no trial set at this
20 point, and there are going to be well over a
21 hundred properties that need to find
22 resolution probably through trials in this
23 case.
24     Would you agree with me that the
25 longer those items inside the home are exposed

Page 150

1 to the Chinese drywall gases, the stronger
2 likelihood there is that they will be corroded
3 and affected by the Chinese drywall gases?
4 MS. JOHNSON:
5     Objection, form.
6 THE WITNESS:
7     I don't know.
8 BY MR. DOYLE:
9 Q. You don't intend to offer any
10 testimony at all about how components in a
11 home are affected by gases?
12 A. No.
13 MS. JOHNSON:
14     Objection, asked and answered.
15 BY MR. DOYLE:
16 Q. Do you intend to amend any of your
17 Xactimate reports to reflect the requirements
18 by Judge Fallon's finding of fact and
19 conclusion of law, Document 20741?
20 MS. JOHNSON:
21     Objection, assumes facts not in
22 evidence.
23 THE WITNESS:
24     I don't know what that is, but,
25 no.

Page 151

1 BY MR. DOYLE:
2 Q. Do you have any intention of amending
3 any of your Xactimate reports for any reason?
4 A. No.
5 Q. So what you have in these reports
6 you're going to stand by when we get to trial?
7 A. Yes.
8 MR. DOYLE:
9     Let's take a break real quick. I
10 may be done.
11     (Off the record.)
12 MR. DOYLE:
13     I forgot to do a couple of
14 things, offer each one of these as exhibits.
15 Exhibit 1 to the deposition will be the
16 deposition notice behind Tab 1. Tab 2 is
17 Mr. Adams's résumé or CV. I'm going to offer
18 that as Exhibit 2 to the deposition.
19     Exhibit 3 behind Tab 3 are the
20 letters that Mr. Adams created. He's
21 identified them as Phase 1 letters. We've got
22 a compilation of them. Make those Exhibit 3
23 of the deposition. Exhibit 4 was the
24 Brousseau Xactimate cost estimate that we
25 discussed at the end. We'll offer it as

Page 152

1 Exhibit 4.
2     And I don't have any further
3 questions for Mr. Adams at this time. Thank
4 you.
5 EXAMINATION BY MS. JOHNSON:
6 Q. For the record, my name is Kaki
7 Johnson, and I represent the Knauf defendants
8 in this case. I am who have retained
9 Mr. Adams as an expert. I just have a few
10 questions based on items that we discussed
11 earlier.
12     First, you reviewed a series of
13 reports I believe that are marked as
14 Exhibit 3; is that correct?
15 A. Yes.
16 Q. Okay. And these are reports that you
17 drafted; is that correct?
18 A. Yes.
19 Q. And are they the most current version
20 of the reports that you created?
21 A. Some of them are, some of them aren't.
22 About 50-50.
23 Q. Okay. And did you individually
24 identify which ones were the older version and
25 which ones were the newer version in your

Page 153

1 testimony?
2    A.   I couldn't tell by looking at them.
3    Q.   Okay.  Could you, just for the record,
4 identify one that is in the older version and
5 how you know that, and one that's the newer
6 version and how you know that?  And just
7 providing the name of the claimant would be
8 sufficient.
9    A.   Trying to find good examples of each.
10   Q.   Take your time.
11   A.   Okay.  The old version, an example
12 would be 4020 Butcher in Winter Haven,
13 Florida.
14   Q.   What was the name of the claimant?
15   A.   Butcher, B-U-T-C-H-E-R.
16   Q.   Okay.
17   A.   And I can tell by the percentage,
18 which is the home inspection summary, it had
19 two KPT, and then it had eight other boards.
20      What I did on the new ones was brought
21 the other boards from the bottom, drywall
22 observed, up into those percentages.
23   Q.   Can you identify a newer or the most
24 recent version of one of your reports?
25   A.   Yes.  Fozard, F-O-Z-A-R-D, in

Page 154

1 Diamondhead, Mississippi.  This is one that
2 has all of the drywall observed on the bottom
3 up in the percentages themselves.  So each
4 board, the quantity is there and the
5 percentage.
6    Q.   And were there any other changes made
7 between the older versions of the reports and
8 the newer versions of the reports, other than
9 noting the percentages?
10   A.   The summary on Page 1 and Page 3
11 match, and then also the location in the
12 overall findings were noted on the revised
13 inspection sheet where each individual board
14 was located.
15   Q.   And as to all of the reports that you
16 reviewed today, were those the complete
17 reports that you generated for each claimant?
18   A.   The photo sections are missing, photo
19 pages, which would be three to four times the
20 number of pages.
21   Q.   Is there anything else that's missing?
22   A.   From the inspection reports?
23   Q.   Yes.
24   A.   No.
25   Q.   Were the ANSI sketches included?

Page 155

1    A.   ANSI sketches were not included.
2    Q.   And those were in the initial reports?
3    A.   They were part of the initial report.
4    Q.   Okay.  And did the missing portions of
5 the reports affect your testimony or your
6 ability to give testimony?
7    A.   The lack of pictures clearly
8 identifies the boards for the inspection
9 reports for location.
10   Q.   What about with the ANSI sketch?
11   A.   I compared all of the ANSI sketches to
12 the ANSI square footage on the report for
13 accuracy, but I would like to have the ANSI
14 sketch again to compare back and forth.
15   Q.   And the ANSI sketch would be the most
16 accurate reflection of the square footage?
17   A.   Yes.  That's auto-generated.
18   Q.   So there's no possibility for typos or
19 clerical errors on the ANSI sketch.
20   A.   Correct.
21   Q.   Does corrosion on the property always
22 indicate the presence of Chinese drywall?
23   A.   In my opinion, no.
24   Q.   Would you elaborate on that?
25   A.   My personal property, which was built

Page 156

1 in 1960, I have tarnished plumbing fixtures,
2 de-silvering of mirrors, dark copper pitted
3 hinges, pitted door knobs, but I live in close
4 proximity to the beach.
5    Q.   Where do you live?
6    A.   Fort Lauderdale, Florida.
7    Q.   And are you able to identify the cause
8 of an appliance failing?
9    A.   No.  I'm not an engineer.
10   Q.   And in the properties that you
11 inspected, what would you say the average age
12 of the appliances was?
13      MR. DOYLE:
14         Object to the form of the
15 question.  You can answer.
16      THE WITNESS:
17         I don't know.
18 BY MS. JOHNSON:
19   Q.   In terms of HVAC units, what was the
20 average age of the HVAC units in the
21 properties you inspected?
22      MR. DOYLE:
23         Object to the form of the
24 question.  You can answer.
25      THE WITNESS:

Page 157

1    Some were dated back to 2006.
2  BY MS. JOHNSON:
3    Q.  Do you know what percentage of
4  properties that was?
5    A.  No.  I believe in our Xactimate
6  reports, which the photos were not included in
7  the Xactimate, we did take pictures in many
8  cases of the label on the air-conditioning
9  unit.
10   Q.  So that would be in the more complete
11  version of the reports that you generated.
12   A.  There was typically a hundred-plus
13  pages on the Xactimate.
14   Q.  So that would be included?
15   A.  It would be included in the full
16  Xactimate, yes.
17   Q.  Okay.  Earlier we discussed the
18  procedure for locating KPT on a property, and
19  you mentioned that no specific tools were
20  used.  Could you just describe this procedure?
21   A.  We cut our holes in close proximity to
22  an outlet that was either showing signs of
23  darkening or some type of effect, other than
24  bright and shiny copper, and we cut in that
25  vicinity.

Page 158

1    Q.  And how did you know where on the wall
2  to cut?
3    A.  The label on a KPT board is in the
4  middle of the four foot, and it's two foot
5  from each end, so we would cut somewhere in
6  that location.
7    Q.  Okay.  And how large is the KPT
8  lettering on the board?
9    A.  A little over four inches, but it's
10  eight feet long.
11   Q.  Is it difficult to identify KPT in a
12  property?
13   A.  No.
14   Q.  Would you say that it's easy to
15  identify KPT in a property?
16   A.  Yes.
17   Q.  And that's because of the consistency
18  of the labeling and the size?
19   A.  Yes.
20   Q.  Does Chinese drywall contamination
21  require a replacement of all electrical?
22   A.  I don't know.
23   Q.  What about all plumbing?
24   A.  I don't know.
25   Q.  What about all flooring?

Page 159

1    A.  In my opinion, no.
2    Q.  What about all fixtures?
3    A.  In my opinion, no.
4    Q.  And in your opinion, what remediation
5  is required?
6    A.  Replacement of drywall in a home where
7  Chinese drywall is found, when you cannot
8  isolate which board, then it's all drywall in
9  the affected area.  Insulation gets replaced
10  because there's no way to save it.  You pull a
11  board down, the insulation falls down.
12  Carpeting is replaced just because there's no
13  way to protect it.
14   Q.  Is that it?
15   A.  That's it.
16   MS. JOHNSON:
17       We reserve the right to call back
18  any inadvertently produced earlier drafts of
19  reports by Mr. Adams.
20  EXAMINATION BY MR. DOYLE:
21   Q.  Mr. Adams, you've just given us a
22  couple of areas that seem to be at odds with
23  earlier testimony, so I want to get this
24  cleared up on the record.
25       I thought your testimony was you

Page 160

1  weren't going to offer any opinions regarding
2  corrosion in a property and how it's created
3  or affected by the duration of the Chinese
4  drywall gases in that property.  Are you now
5  saying that you're going to offer expert
6  testimony at trial?
7    MS. JOHNSON:
8       Objection, form.
9    THE WITNESS:
10      I don't believe that was the
11  question she asked me.
12  BY MR. DOYLE:
13   Q.  She asked you regarding whether
14  corrosion always indicates Chinese drywall in
15  a property.  Are you going to offer any
16  testimony in that capacity?
17   MS. JOHNSON:
18      Objection, mischaracterizes
19  earlier testimony.
20   THE WITNESS:
21      And I said no, because I said in
22  my house I have corrosion and I do not have
23  Chinese drywall.
24  BY MR. DOYLE:
25   Q.  Tell me the opinion that you're going

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 161

1   to offer at trial regarding corrosion in a
2   house being created by Chinese drywall.
3       A.  I'm not.
4       Q.  Okay.  You just also gave testimony
5   about the ease to which you can find KPT
6   markings in a house.  Are you suggesting that
7   it's easy enough to find KPT markings that a
8   layman should be able to do it?
9       MS. JOHNSON:
10          Objection, mischaracterizes
11  earlier testimony.  You can re-read it if you
12  want.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 162

1   BY MR. DOYLE:
2       Q.  Don't need to re-read it.
3           Didn't you say that it's easy to find
4   KPT markings?
5       A.  It is easy to find.
6       Q.  In your opinion based on your
7   experience, the number of houses that you've
8   inspected or been present while an employee or
9   an agent inspects homes, you found it to be
10  relatively easy to find the KPT markings,
11  right?
12      A.  Yes.
13      MS. JOHNSON:
14          Objection, asked and answered.
15      MR. DOYLE:
16          It's not asked and answered.
17      MS. JOHNSON:
18          Same question twice.
19      MR. DOYLE:
20          It's not.  You got to learn how
21  the rules work.  It's not asked and answered
22  if it's a different question.
23      MS. JOHNSON:
24          Just because you add more words
25  to your question doesn't mean it's not the

Page 163

1   same question.
2   BY MR. DOYLE:
3       Q.  Mr. Adams, let's get this clarified.
4   Are you suggesting that a layman should be
5   able to find Chinese drywall markings as easy
6   as you?
7       MS. JOHNSON:
8           Objection, mischaracterizes
9   earlier testimony.
10      THE WITNESS:
11          In some areas of the home --
12      MR. DOYLE:
13          There's no testimony
14  characterized there.  It's a question.
15      MS. JOHNSON:
16          You said you suggest.
17  BY MR. DOYLE:
18      Q.  Are you suggesting that?
19      A.  In some areas of the home, yes.
20      Q.  Which areas would a layman be able to
21  easily identify the Chinese drywall markings?
22      A.  Attic.
23      Q.  So you're suggesting that a layman
24  should be able to just climb in their attic
25  and be able to find Chinese drywall markings?

Page 164

1       A.  If they are on a knee wall, yes.
2   Those people in Alabama, Louisiana,
3   Mississippi, Texas have attic space.  We don't
4   in Florida.  Everything gets stored up there.
5   You can see it on the knee walls.
6       Q.  Is the building code different in
7   Florida as well, with respect to the board
8   that can be used in the ceiling; do you know?
9       A.  Ceiling, we cannot use half-inch
10  drywall in a garage.
11      Q.  What about in the ceiling?
12      A.  The ceiling, we can, depending if you
13  use furring strips.  If you use high hat
14  material, yes, you can.
15      Q.  Is that the same throughout the state?
16      A.  It is.  You can use high hat material
17  and use half-inch drywall with smaller
18  spacing; otherwise, you have to use
19  five-eighths drywall if you go straight to the
20  bottom of the trusses.
21      Q.  Okay.  Opposing counsel asked you a
22  couple of questions about your opinion
23  regarding which remediation protocol should be
24  adopted in this case.  Are you going to be
25  offering testimony at trial about which

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

Page 165

1  protocol is the proper protocol to be used?
2  A.  I don't remember her just asking me
3  that.
4  Q.  Sure, she did.  She asked if you were
5  going to -- she asked you specifically which
6  remediation protocol --
7  A.  I'm sorry, Jim.  I don't remember
8  that at all.
9  MS. JOHNSON:
10        We can re-read the transcript.
11  MR. DOYLE:
12        Let's re-read the transcript.
13  It's towards the end.
14        (Portions of testimony read.)
15  BY MR. DOYLE:
16  Q.  The last item that you discussed with
17  opposing counsel from Fishman Haygood was
18  whether or not certain aspects of the protocol
19  should be adopted in this case in your
20  opinion, whether flooring or electrical or
21  other items should be part of the remediation
22  protocol; is that right?
23  MS. JOHNSON:
24        Objection to the form.
25  THE WITNESS:

Page 166

1        Something similar to that, yes.
2  BY MR. DOYLE:
3  Q.  So that's the topic that was discussed
4  at the end, and you provided your opinion that
5  you think that some flooring doesn't need to
6  be replaced; am I right?
7  A.  Carpeting.
8  Q.  Carpeting.
9  A.  No, I'm sorry.  Carpeting does need to
10  be replaced.
11  Q.  Okay.  And you also provided an
12  opinion about some electrical components that
13  don't need to be replaced, some light fixtures
14  that don't need to be replaced.
15  A.  Yes.
16  Q.  Is there any other aspect of the
17  remediation protocol that you've adopted in
18  this case, or you've been told to adopt in
19  this case by Fishman Haygood lawyers that you
20  think should not be part of the protocol that
21  you utilized to create your Xactimate scopes
22  of work?
23  A.  No.
24  Q.  Describe for me if you would, just so
25  I have clarity on this, in general terms what

Page 167

1  you believe full remediation of the home
2  means.
3  A.  Replacement of all drywall,
4  replacement of all electrical devices, whether
5  it be switches, outlets, all breakers, all
6  fusible link sprinkler heads, which we didn't
7  have any.  Was no property that had that.  We
8  have to replace insulation.  I told you it's
9  just practical to do it.  It's practical to
10  replace carpeting.  Practical to replace
11  millwork, crown molding, baseboards, door
12  casings.  It's almost impossible to detach and
13  reset.  Detach and reset cabinets, bathroom
14  fixtures.  Mirrors that are adhered to the
15  wall, you have to replace them.
16  Q.  Anything else?
17  A.  Smoke detectors, carbon monoxide
18  detectors replaced.
19  Q.  Anything else?
20  A.  No.
21  Q.  Is there anything in the original
22  protocol that was attached to the settlement
23  agreement in 2011 that was adopted a couple
24  times thereafter in subsequent settlements?
25  Is there anything in that protocol utilized in

Page 168

1  those agreements that you disagree with?
2  MS. JOHNSON:
3        Objection.
4  THE WITNESS:
5        In the 2011 settlement agreement
6  protocol that I disagree with?
7  BY MR. DOYLE:
8  Q.  Yes.
9  MS. JOHNSON:
10        Do you have it to introduce as an
11  exhibit so he can look at it?
12  MR. DOYLE:
13        No.
14  BY MR. DOYLE:
15  Q.  Would you need a copy of it to respond
16  to this question?
17  A.  I know the differences with the
18  appliances.  I mean, the appliances are one.
19  I mean we go back to 2006.  An appliance that
20  was from 2006, the life expectancy 14 years
21  later, you know --
22  Q.  So your position is that appliances
23  shouldn't be part of the remediation protocol.
24  A.  Not in all cases, no.
25  Q.  Anything else?

Page 169

1    A.  No.
2     MR. DOYLE:
3          Very good.  Thank you, Mr. Adams.
4    I don't have any further questions.
5    EXAMINATION BY MS. JOHNSON:
6    Q.  I have just two clarifications.
7          Mr. Adams, when you were discussing
8    the ease of identifying KPT, we were
9    specifically talking about where to cut into
10   the wall, correct?
11   A.  Yes, you and I were -- that was
12   specific, yes.
13   Q.  So there was no reference to the attic
14   in that situation.
15   A.  No.
16   Q.  And also, in terms of a full
17   remediation and what items need to be
18   remediated, would that include items in --
19   earlier you referenced like an add-on?  Would
20   that include items in the add-on?
21   A.  No.
22    MS. JOHNSON:
23          That's all.
24          (End of deposition.)
25

Page 170

1
2
3
4          WITNESS' CERTIFICATE
5
6
7          I have read or have had the
8    foregoing testimony read to me and hereby
9    certify that it is a true and correct
10   transcript of my testimony, with the
11   exception of any attached corrections or
12   changes.
13
14
15
16
17
18
19
20
21          _____
22          Philip Allen Adams
23
24
25

Page 171

1          C E R T I F I C A T E
2
3
4          I, Cindi Cameron, Certified Court
5    Reporter, in and for the State of Louisiana,
6    as the officer before whom this testimony was
7    taken, do hereby certify that the
8    above-mentioned witness, after having been
9    first duly sworn by me upon authority of R.S.
10   37:2554, did testify as hereinbefore set
11   forth;
12
13          That the testimony was reported
14   by me in stenotype and transcribed under my
15   personal direction and supervision, and is a
16   true and correct transcript, to the best of my
17   ability and understanding;
18
19          That the transcript has been
20   prepared in compliance with transcript format
21   guidelines required by statute or by rules of
22   the board;
23
24          That I have acted in compliance
25   with the prohibition on contractual

Page 172

1    relationships, as defined by Louisiana Code of
2    Civil Procedure Article 1434 and in rules and
3    advisory opinions of the board;
4
5          That I am not of counsel, not related
6    to counsel or the parties herein, nor am I
7    otherwise interested in the outcome of this
8    matter.
9
10          This certification is valid only for
11   a transcript accompanied by my original
12   signature and original required seal on this
13   page.
14
15
16
17
18
19
20
21          _____
22          Cindi Cameron, CCR
          Certified Court Reporter
23          State of Louisiana
          Certificate No. 91356
24
25

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

## A

**ability (2)**
44:7;155:6
**able (11)**
7:17;9:4;103:12;
121:25;125:15;156:7;
161:8;163:5,20,24,25
**above (1)**
49:15
**Absolutely (2)**
71:20;93:12
**absorb (1)**
135:25
**absorbed (1)**
134:15
**access (2)**
121:21;123:12
**accordance (1)**
5:8
**according (2)**
82:25;108:14
**account (1)**
24:4
**accuracy (4)**
21:10;52:15,24;
155:13
**accurate (6)**
22:11;24:23;59:12,
15;64:6;155:16
**actual (1)**
54:19
**actually (5)**
14:2;27:12;37:20;
38:13,14
**ADAMS (28)**
6:1,6;11:19;30:18;
40:15;60:6;71:24;
73:11,15,16,23;74:17,
20;75:21;76:3,10,19;
82:2;122:18;148:25;
151:20;152:3,9;
159:19,21;163:3;
169:3,7
**Adams's (1)**
151:17
**add (3)**
129:18;130:2;162:24
**added (1)**
94:10
**addition (5)**
64:17;94:7;102:5,18;
126:1
**additional (2)**
129:6;135:11
**add-on (2)**
169:19,20
**address (6)**
12:11;21:19;29:9;
59:5;98:23;129:21
**addressed (3)**
29:10;101:18;130:17

**addresses (1)**
132:2
**adhered (1)**
167:14
**adjuster (1)**
42:19
**adjusting (2)**
41:5,11
**adjustments (1)**
125:14
**administering (1)**
5:24
**administration (1)**
34:16
**adopt (1)**
166:18
**adopted (9)**
45:13,22;93:15;95:2;
144:8;164:24;165:19;
166:17;167:23
**advocating (1)**
93:6
**affect (1)**
155:5
**affected (8)**
94:13;126:4;136:7;
149:8;150:3,11;159:9;
160:3
**aforementioned (1)**
5:5
**afterward (1)**
95:25
**again (12)**
23:21;46:7;50:14;
101:18;106:11;107:11;
109:12;117:22;131:5;
138:21;143:23;155:14
**against (4)**
36:9,14,18;40:11
**age (2)**
156:11,20
**agent (1)**
162:9
**ago (5)**
7:4;16:17;31:11,12;
76:21
**agree (5)**
85:14;141:25;
145:23;148:25;149:24
**agreed (5)**
5:3;14:21;46:16;
95:16;97:3
**agreement (28)**
10:2;11:12,15;14:7,
11,17,22;15:6,14,17,
21;24:22,25;25:3;
26:12;51:19;58:2,14,
20,24;120:4;128:22;
129:20;142:11;143:24;
144:8;167:23;168:5
**agreements (1)**
168:1
**agrees (1)**

122:7
**Aguirre (1)**
61:11
**ahead (2)**
71:23;85:16
**air (97)**
19:2;27:7;53:6,19,
22;55:8,10,12,14,23,
23;63:7;65:14,23;66:7;
67:3,14;81:12;82:12,
19,25;83:11,22;84:2,
12;85:8;86:18;88:6,19;
90:8;91:6,7;92:1;
97:17;98:9,19,24;99:5,
21;100:3,13,15;101:2,
15;102:1,2;104:14,25;
105:8,19,24;106:8;
107:1,6,17,25;108:6,
12,18;109:2,8,18;
110:1,7,14,20;111:3,
16,22;112:2,3,10,16,
25;113:6,12,18,23;
114:13,19;115:5,22;
116:9,18;117:12,18;
118:5,11,15,23;119:11,
17;120:8,17;121:4;
123:21;124:1
**air-conditioned (1)**
54:3
**air-conditioning (2)**
48:3;157:8
**Alabama (24)**
10:17,18;36:25;37:9;
38:24;39:4,19,21;40:3;
62:23;67:14;81:11;
101:12,12;105:7;
106:24;108:5;115:20;
116:2;117:17;118:10,
14,22;164:2
**Alfred (1)**
108:11
**alleged (1)**
76:7
**ALLEN (1)**
6:1
**allow (1)**
94:3
**allows (1)**
42:8
**almost (1)**
167:12
**along (1)**
32:16
**although (1)**
6:8
**aluminum (1)**
136:8
**always (3)**
7:11;155:21;160:14
**Ambrose (1)**
62:22
**amend (1)**
150:16

**amending (1)**
151:2
**among (1)**
145:8
**amount (1)**
48:17
**Amuso (1)**
63:3
**and/or (1)**
148:12
**Andrews (1)**
6:2
**ANSI (48)**
12:16;53:9,10,11,19;
54:7,12,17;55:2,8;
56:2;59:5,8,12;61:12;
62:24;63:17;64:2,21;
65:13,21;67:2,25;70:7;
71:6,14;75:19;83:10;
84:12;88:18;102:14;
105:24;108:6,11,18;
109:18;115:4;117:12;
118:21;120:21;154:25;
155:1,10,11,12,13,15,
19
**answered (9)**
21:21;23:19;133:15;
144:6;147:1;150:14;
162:14,16,21
**Anthony (1)**
119:15
**Apart (3)**
126:15;135:8;140:2
**Apartment (5)**
98:16,17,17,22;99:1
**apartments (1)**
98:6
**apologize (2)**
23:21;98:16
**appear (5)**
39:13;64:14;65:4;
72:9;74:9
**appeared (1)**
36:24
**appears (36)**
31:7;33:10;34:12;
35:19,22;61:15;62:24;
64:21;65:13;67:2,17;
71:6,15;83:22;84:4,23;
88:17;90:8;98:6,9;
100:13,25;101:2,25;
102:14;104:20;105:18;
106:25;108:5,19;
109:2,11;111:1;123:3,
7;124:2
**appliance (2)**
156:8;168:19
**appliances (7)**
26:10,11;45:24;
156:12;168:18,18,22
**applied (2)**
27:11,22
**applies (1)**

41:16
**apply (6)**
14:22;15:3,4;41:5;
43:25;44:14
**applying (3)**
11:15;144:7,10
**appraisers (1)**
53:14
**approach (2)**
46:11;47:15
**approached (2)**
124:14,25
**appropriate (2)**
11:17;94:4
**approved (1)**
95:5
**approximately (1)**
16:16
**arc (2)**
131:13,15
**arc-fault (1)**
28:23
**area (13)**
42:15;50:6;54:1,2;
59:12;92:2;93:2;94:8;
97:19;107:5;125:25;
134:2;159:9
**areas (9)**
23:1;54:8;94:10,13;
130:7;159:22;163:11,
19,20
**argumentative (1)**
145:13
**ARH (4)**
10:7,8,23;11:10
**Armstrong (3)**
63:16;64:1,19
**Arnold (1)**
65:9
**around (2)**
19:19;20:19
**arrive (1)**
53:22
**arrived (2)**
48:13;124:19
**aspect (2)**
37:11;166:16
**aspects (1)**
165:18
**asserted (1)**
75:23
**assist (2)**
51:7,17
**Associate (1)**
38:17
**Associates (12)**
19:13;20:4;31:18,22,
25;32:17;33:3;36:16;
37:14,19;40:12;45:8
**Associates' (1)**
32:6
**assume (1)**
103:7

Associated Reporters, Inc.

**assumed (1)**
147:16
**assumes (2)**
142:4;150:21
**Atlantic (2)**
34:14;35:5
**attached (5)**
15:5;54:13;88:1;
121:22;167:22
**attic (11)**
47:25;48:2;49:5;
87:19;116:6;121:21;
123:12;163:22,24;
164:3;169:13
**attics (2)**
47:22;54:25
**attraction (2)**
35:9,10
**attributed (1)**
37:13
**authoritative (1)**
95:15
**auto-generated (1)**
155:17
**automatically (1)**
126:8
**available (3)**
35:11,12;50:24
**Avenue (1)**
6:2
**average (3)**
127:12;156:11,20
**Avon (1)**
105:23
**aware (2)**
36:19;59:19
**away (2)**
47:25;54:1

**B**

**back (23)**
23:4;27:10;48:5;
49:4,4;50:14,15;51:21;
54:21;68:10;70:1;
71:23;78:23;87:12;
94:10;97:16;135:6;
145:21;147:17;155:14;
157:1;159:17;168:19
**Baldwin (1)**
65:20
**Ball (2)**
66:4;118:24
**Bank (2)**
67:1,9
**baseboards (1)**
167:11
**based (6)**
24:6;101:13;104:13;
131:8;152:10;162:6
**basements (2)**
54:24;55:2
**basic (3)**

41:5,11,18
**basically (6)**
42:22;43:23;53:25;
59:24;61:6;127:3
**basis (5)**
77:23;94:18;133:4,
19;146:23
**Bates (1)**
80:14
**bathroom (7)**
8:24;28:1;51:1;
136:11;137:15;144:13;
167:13
**bathrooms (2)**
48:6;136:19
**Baton (3)**
82:10;113:10;124:20
**batt (2)**
134:10,12
**Bay (6)**
86:17;90:7;91:5;
104:24;107:16;114:12
**Beach (6)**
108:25;109:7;
111:21;113:16;116:17;
156:4
**became (1)**
20:11
**become (1)**
33:17
**bedroom (3)**
49:12;50:2;94:10
**began (2)**
17:7;20:14
**begin (3)**
19:19;32:18;35:1
**beginning (6)**
7:7;20:18;44:5;
75:16;127:16,25
**behalf (4)**
6:11;12:11;92:16;
93:7
**behind (7)**
28:3,6;31:1;114:1;
115:14;151:16,19
**belief (2)**
59:11;133:10
**below (3)**
24:17;49:15;59:5
**Bennett (12)**
6:11,12,15;21:1;
45:18;47:16;52:14;
62:17;67:13,22;146:1,
8
**beside (1)**
69:12
**besides (3)**
44:18;67:9;83:7
**best (6)**
44:7;69:16,20;
101:21;107:12;125:11
**better (1)**
52:5

**Beverly (1)**
66:24
**bid (1)**
124:25
**biggest (1)**
47:9
**binder (2)**
30:16;124:6
**binding (2)**
142:11;143:24
**Binns (2)**
67:24;70:11
**Birmingham (4)**
39:14;105:7;118:14,
22
**bit (2)**
103:8;115:14
**black (1)**
50:11
**Blevins (4)**
70:6,16,18,20
**blue (7)**
89:4,7,23;106:11;
117:22;118:1;123:9
**blue-yellow (1)**
88:25
**board (63)**
28:2,3;36:4,11,25;
38:11;39:15;40:7;49:9;
60:2;61:16,19;66:13,
20,22;67:9,10,17,21;
68:9,18;69:5,9,13;
72:21;79:4,7,8;81:6,
19;83:24;88:24;89:8;
90:17;91:1,10;93:10;
94:15,21,23;105:20;
106:12,15;109:8,12;
111:11;113:7,13;
115:23;117:23;120:3;
121:20,25;123:9,11,11;
154:4,13;158:3,8;
159:8,11;164:7
**boards (143)**
48:2;49:18,20;57:2,
3,7,9,13,17;59:25;
61:16,24;62:12;63:9,
10,12,20,24;64:8,16;
65:1,17,25;66:10,17;
67:5,11,18;68:4,9,24;
69:12,22;70:23;71:1,7,
16;78:24;79:12,16;
80:8,13,16,17,20;
81:15,25;82:12,20;
83:2,12;84:5,15,25;
85:10,22;86:11,19,21;
88:9,22;89:1;90:11;
97:25;98:12,20,25;
99:6,13,21;100:5,17;
101:5,15;102:4,5,17,
19,22;104:15,19,19,25;
105:1,11,12;106:2,8,
19;107:2,7,11,21;
108:1,7,13,20;109:3,

20;110:2,7,14,21;
111:4,17,23;112:4,10,
17;113:1,18,24;114:14,
21,24;115:6;116:4,10,
19,24;117:1,13,18;
118:6,11;119:6,11,18;
120:9,12,18,23;121:4,
7,13,18,24;123:8,21;
124:2;153:19,21;155:8
**Bob (4)**
32:21,22,23;33:1
**Bogard (2)**
70:13;71:5
**Bonney (9)**
71:11;72:14,16,17;
78:20,21;80:13,16;
81:10
**booked (1)**
120:5
**both (9)**
37:8,8;39:14;68:12;
77:8;102:9;115:12;
119:21,21
**bottom (9)**
75:7;82:1;91:15;
134:8,25;139:8;
153:21;154:2;164:20
**Boynton (2)**
109:7;113:16
**Bradenton (1)**
63:17
**Brady (2)**
81:11,20
**brand (10)**
17:21,25;18:12;
61:19;79:17;80:25;
86:5;89:9;90:2;109:13
**brands (4)**
17:14;58:7;91:17;
117:7
**brass (1)**
137:1
**break (8)**
8:22,24;76:21;103:6,
12,21;122:18;151:9
**breaker (2)**
28:24;131:13
**breakers (6)**
28:21,23;46:2;
131:13,15;167:5
**bright (1)**
157:24
**brings (1)**
78:16
**bronze (3)**
137:4,19,21
**brought (7)**
72:14;73:1;75:8;
78:24;82:1;129:15;
153:20
**Brousseau (6)**
82:9;124:20,24;
125:3;141:14;151:24

**Broward (2)**
33:25;34:3,13
**BS (1)**
34:20
**builder/developer (1)**
44:25
**building (9)**
28:11,18;29:10,14,
18;30:4;98:7;130:8;
164:6
**built (1)**
155:25
**burden (4)**
130:7,15;133:2,6
**Burgos (1)**
82:18
**business (6)**
32:6;33:4;34:16,21,
21;44:24
**Butcher (3)**
82:23;153:12,15
**B-U-T-C-H-E-R (1)**
153:15

**C**

**cabinet (1)**
143:9
**cabinetry (5)**
141:15,18,22;
145:24;146:6
**cabinets (16)**
130:2;141:19;142:8,
19,24;143:6;144:12,16,
25;145:8;147:4,11,14,
25;148:12;167:13
**calculate (3)**
53:6;57:16,21
**calculated (2)**
56:19,22
**Calderone (1)**
83:9
**call (2)**
78:14;159:17
**called (4)**
17:3;43:2;53:2,8
**calls (1)**
14:24
**CAMERON (1)**
5:21
**can (38)**
15:10;19:25;20:1;
22:22;36:10;42:3;47:4;
71:18;81:21;82:6;
92:23;93:21;94:21;
119:25;122:7,12;
124:13;135:3;137:1,2,
3,4;138:13;139:4;
145:16;153:17,23;
156:15,24;161:5,11;
164:5,8,12,14,16;
165:10;168:11
**capacity (5)**

8:18;9:24;53:3;
79:11;160:16
**Cape (4)**
70:6;102:13;120:15;
121:16
**capital (2)**
68:10;70:1
**capture (1)**
135:11
**captured (2)**
25:9;56:10
**Caranna (1)**
83:19
**C-A-R-A-N-N-A (1)**
83:20
**carbon (2)**
46:3;167:17
**care (1)**
130:4
**career (1)**
35:1
**Carmen (9)**
51:12,13,16,23;52:1,
13,20;53:2;92:4
**Carpeting (5)**
159:12;166:7,8,9;
167:10
**case (56)**
6:12,12,15;10:3,4,
23;11:6;12:2;14:18,22;
15:4,6;16:25;17:5,17;
20:24;21:24;23:24;
25:10;29:23;41:22;
45:11;46:23;51:19;
52:14;55:22;59:9;
62:17;68:17,18,20;
77:18;79:6,11;80:16;
93:16;94:5;95:18;
96:23;104:18;121:24;
124:20;130:5,14;
132:25;142:12;143:25;
144:9;145:6;146:9;
149:23;152:8;164:24;
165:19;166:18,19
**cases (12)**
8:7;10:1,5,6,6;38:12,
18;78:9;138:24;
140:14;157:8;168:24
**casings (1)**
167:12
**Cason (1)**
84:1
**categories (2)**
44:2;125:8
**cause (2)**
69:19;156:7
**caused (3)**
129:4;147:21;149:3
**ceiling (7)**
48:2;115:11;119:20;
164:8,9,11,12
**cementitious (1)**
28:2

**center (1)**
49:14
**certain (5)**
48:17;60:11;93:16;
94:13;165:18
**certification (2)**
5:12;44:9
**Certified (1)**
5:21
**change (22)**
25:9,17;26:2;27:23;
28:8,16,19;46:21;60:6;
126:22;128:3;130:1;
131:13,13,17;138:6,15;
139:16;144:14;145:1,
10;146:9
**changed (2)**
32:14;79:25
**changes (7)**
29:10;78:15;80:3;
126:14;129:25;140:19;
154:6
**changing (1)**
144:25
**characterized (1)**
163:14
**charged (1)**
40:18
**Check (2)**
48:7,8
**checking (1)**
48:9
**chillers (1)**
26:24
**chimneys (1)**
54:23
**Chinese (88)**
7:25;8:3,10;9:18;
12:22;16:4;17:14,22,
25;18:22;19:15,20;
20:15;30:8,12;36:24;
37:17;40:12;41:5,17,
22;42:8,13;43:18;
44:14;52:6;57:7;58:7;
61:19,25;62:8,13;
63:13;64:15;65:5;83:6,
16;84:8;85:4;86:13,14;
89:14;93:3,22,24;
94:14;96:14;97:14;
99:17,25;100:20;
112:20;117:7;125:11,
17;129:12,17,23;
130:9;131:2;134:16;
136:7,12,13,24;137:6,
13,15,22;138:2,23;
146:8;148:1;149:2,8,
11;150:1,3;155:22;
158:20;159:7;160:3,
14,23;161:2;163:5,21,
25
**Chinese-manufactured (5)**
80:22;81:6,19;88:12;
115:1

**choose (2)**
16:11;125:9
**Christian (3)**
83:21;110:19;114:17
**chrome (3)**
136:20,23,25
**CINDI (1)**
5:21
**circulates (1)**
55:24
**circulating (1)**
148:2
**City (2)**
99:10;106:24
**Civil (1)**
5:7
**Claiborne (4)**
98:4,5,18,23
**claimant (3)**
153:7,14;154:17
**claims (1)**
41:15
**clarifications (1)**
169:6
**clarified (2)**
87:15;163:3
**clarifies (3)**
78:15;79:8,8
**clarity (1)**
166:25
**clean (1)**
7:16
**clear (1)**
89:25
**cleared (2)**
118:18;159:24
**clearly (1)**
155:7
**clerical (1)**
155:19
**clients (1)**
25:2
**climb (1)**
163:24
**close (3)**
104:20;156:3;157:21
**Closers (1)**
108:16
**code (18)**
28:11,18;29:18;
125:24;129:15,20;
130:7,8,12,15;131:9,
17;132:4,11,24;133:6,
13;164:6
**codes (3)**
29:10,14;30:4
**coffee (1)**
8:25
**Cohen (1)**
84:10
**College (3)**
34:1,3,13
**comfortable (5)**

73:12;75:1;79:19;
93:23;122:13
**coming (1)**
76:7
**commercial (2)**
32:8,18
**common (3)**
26:1;46:10,21
**company (6)**
11:22;19:12,21;20:4;
25:5;32:8
**compare (2)**
59:7;155:14
**compared (3)**
22:12,17;155:11
**comparison (8)**
22:9,21;23:8,11,15;
24:2,10,14
**comparisons (1)**
23:6
**compilation (1)**
151:22
**complaint (8)**
36:9,10;37:10;38:24;
39:11,12;40:5,8
**complaints (6)**
36:13,18,21;37:2,3;
40:10
**complete (4)**
44:7;144:17;154:16;
157:10
**completed (1)**
11:25
**completely (1)**
7:13
**completeness (2)**
21:7;52:15
**completion (1)**
38:4
**compliance (12)**
28:19;30:4;129:20;
130:7,12,16;131:9;
132:4,11,24;133:6,13
**component (1)**
36:6
**components (7)**
18:11;136:2,4;138:8,
17;150:10;166:12
**compound (4)**
14:14;15:8;137:8;
148:4
**computer (1)**
122:5
**concerned (1)**
119:4
**Conclusion (4)**
17:4;97:7,12;150:19
**conditioned (6)**
53:19,20;54:22,25;
55:8,10
**conditioning (2)**
55:15,23
**conditions (3)**

9:13;61:6;137:20
**conduct (1)**
37:20
**confident (1)**
73:4
**conflict (1)**
96:22
**conflicts (1)**
141:23
**Conroe (1)**
99:20
**consider (1)**
97:11
**consideration (2)**
17:6;97:22
**considered (3)**
55:11,16;97:6
**consistency (1)**
158:17
**consistently (1)**
51:23
**constructed (4)**
28:22;93:5,25;94:15
**constructing (1)**
97:8
**construction (7)**
32:7;34:24;35:2,4,9,
14;125:9
**contained (4)**
15:13;30:13;48:2;
148:1
**contains (1)**
96:4
**contamination (1)**
158:20
**contend (1)**
86:13
**continuing (1)**
29:5
**contracting (1)**
35:19
**contractor (5)**
28:25;36:10;44:18;
128:14,17
**contractors (1)**
38:23
**contractor's (1)**
36:1
**control (1)**
128:18
**controls (2)**
96:9,14
**convert (1)**
55:18
**convicted (1)**
40:15
**Cooking (1)**
27:19
**Cooper (1)**
99:10
**copies (2)**
72:6;75:24
**copper (4)**

136:9;137:1;156:2;
157:24
**copy (7)**
11:22,23;44:2;75:3;
80:4;122:9;168:15
**Coral (4)**
70:7;102:13;120:16;
121:16
**Cordiers (1)**
84:22
**corner (4)**
50:3,4,5,6
**corrected (1)**
76:12
**corroded (1)**
150:2
**corrosion (11)**
18:11;27:16;69:19;
135:9;136:1;149:3;
155:21;160:2,14,22;
161:1
**cost (54)**
10:24,24;11:2,2;
13:3,14;15:22;19:8,10;
20:17;22:12,18,19;
23:16;24:2,8,8;30:2,3;
41:21;42:13;43:9;
46:22;92:17;97:8;
124:12,19;125:16,17;
126:13;135:11,11,14;
139:17,17;140:2,4,5,
10,15,18,25;141:8,24,
25;142:19,25;143:9;
145:9,25;146:6,7;
149:12;151:24
**costs (7)**
11:11,16;21:23;22:2,
16;23:24;126:3
**counsel (21)**
5:4;11:21;13:13;
14:17;16:14;18:25;
23:14;46:13;57:20;
71:19;73:21;75:14,22;
76:8,20;82:6;122:7;
129:8;140:18;164:21;
165:17
**counties (1)**
29:18
**counts (2)**
49:5,5
**couple (7)**
7:6;17:9;55:22;
151:13;159:22;164:22;
167:23
**course (6)**
20:9;42:21;43:7,16,
23;44:4
**courses (1)**
29:9
**Court (22)**
5:21;7:10;8:16,17;
9:19,20,25;10:9;16:23;
68:13;92:16;94:24,25;

95:1,5;96:23;97:7;
109:24;140:22;141:7;
144:14;146:20
**court's (6)**
95:17,21;96:2;
140:22;146:20,24
**cover (2)**
50:9;123:12
**Covington (1)**
110:11
**CPS (1)**
94:20
**CPSC (18)**
15:25;16:1,4,9,11;
45:19,21,23;46:4,8,10;
94:20;95:2,21,23;96:2,
7;97:3
**create (10)**
13:2;20:21;21:2,3;
23:10,14;43:9,24;44:6;
166:21
**created (21)**
11:22;12:4;13:9;
19:20;20:18,25;21:17;
27:22;46:23;52:13;
56:9;80:18;87:21;
101:14;103:3;138:9;
140:15;151:20;152:20;
160:2;161:2
**creating (6)**
43:25;45:14;53:12;
58:21,25;124:25
**Creek (1)**
64:20
**crime (2)**
40:16,19
**criteria (3)**
27:11,21;127:22
**crown (1)**
167:11
**cup (1)**
8:24
**curious (1)**
43:6
**current (1)**
152:19
**Currently (3)**
31:23;32:13;149:19
**cut (12)**
49:14,15;50:2,3,12;
89:10,11;157:21,24;
158:2,5;169:9
**Cutler (1)**
86:16
**cuts (12)**
48:11,17,24,25;49:4,
7,19;50:22,23;52:10,
10;121:23
**CV (10)**
11:23;20:6,8;31:8,8;
41:4;42:19;44:21;
75:19;151:17

---

## D

**damage (9)**
28:7;42:3,4,4;
135:10;138:7,23;
147:21,25
**damaged (1)**
140:5
**Danny (2)**
76:23;143:4
**dark (1)**
156:2
**darkening (1)**
157:23
**date (4)**
20:6;56:14,14;96:7
**dated (1)**
157:1
**day (3)**
32:24,24;47:20
**days (2)**
43:17,22
**deadline (1)**
127:18
**deals (1)**
141:14
**December (1)**
75:15
**decide (1)**
49:6
**decided (1)**
50:2
**declared (2)**
57:5;79:16
**defective (50)**
17:14,22;18:7,7,16;
58:16;61:19,24;62:8,
13;63:13;64:15;66:22;
67:11;68:14;69:14,22;
71:2;79:18;80:21;81:5,
19;82:15;83:5,15;84:7,
18;85:4;86:3,6,14;
88:12;89:14;90:3;
91:18;93:19;96:4;
97:14;99:24;101:21;
102:23,25;106:13,16;
107:12;109:13;112:20;
114:25;117:2,24
**defendants (7)**
11:7;12:12,21;22:24;
23:14;57:21;152:7
**defending (1)**
40:6
**defense (10)**
18:25;23:13;38:11,
16;68:12;75:13,22;
76:8,20;140:17
**deficient (1)**
23:24
**definition (1)**
58:14
**degree (2)**

17:20;33:22
**delay (1)**
129:4
**delays (5)**
128:14,17,22,25;
129:1
**Denham (1)**
65:10
**denied (1)**
8:16
**Depending (3)**
47:19;127:3;164:12
**deposition (16)**
5:5,17;6:8,10,18;7:8,
22;30:17,22;31:1;
76:10;151:15,16,18,23;
169:24
**Describe (7)**
27:5;32:5;41:11;
43:3;135:1;157:20;
166:24
**described (3)**
50:7;68:19;80:12
**describes (1)**
63:23
**description (1)**
139:5
**de-silvering (1)**
156:2
**detach (15)**
134:21,24;135:8,13,
17,20;138:4,20;
139:18;140:1;141:11,
17;147:22;167:12,13
**detached (4)**
27:17;135:24;140:6;
141:19
**detaching (1)**
140:3
**detail (1)**
41:25
**details (1)**
78:15
**detectors (4)**
46:3,3;167:17,18
**determination (1)**
123:10
**determine (2)**
19:2;89:7
**deviate (1)**
95:17
**deviation (1)**
24:19
**device (1)**
49:23
**devices (1)**
167:4
**Dhume (2)**
85:6,16
**D-H-U-M-E (1)**
85:7
**Diamondhead (2)**
88:16;154:1

**Dickinson (1)**
64:21
**differ (2)**
45:21;126:18
**difference (5)**
79:15;80:6,11;81:24;
82:3
**differences (1)**
168:17
**different (7)**
17:14;48:22;51:6;
100:21;138:1;162:22;
164:6
**differs (1)**
89:1
**difficult (1)**
158:11
**direct (1)**
96:22
**directly (1)**
141:23
**disagree (5)**
146:15,16,20;168:1,
6
**disagreeing (1)**
146:24
**disciplinary (2)**
36:6,11
**disclosure (6)**
47:12;75:12,16,17;
76:1;77:17
**disclosures (1)**
11:20
**discussed (12)**
46:12,15;77:2;97:2;
104:8;139:11,13;
151:25;152:10;157:17;
165:16;166:3
**discussing (2)**
122:19;169:7
**discussion (6)**
16:13,15;73:21;
74:14,21;76:2
**discussions (2)**
76:20;142:22
**dishonesty (3)**
40:19,23;41:2
**dishwashers (1)**
26:18
**dismissed (2)**
37:8;40:5
**divide (1)**
57:3
**Dixon (1)**
85:18
**document (40)**
17:2;23:15;31:3,13;
58:25;66:4;70:6;71:11,
17;82:9,18,23;83:9,19;
84:1,21;85:6,18;86:16;
88:15;90:5,14;91:4,22;
96:13,22;98:3,15;
102:12;104:13,23;

107:4,15;110:17;
122:6,8;124:7;125:4;
133:23;150:19
**documented (1)**
11:2
**documents (13)**
11:21;13:9,12;16:22;
23:7,10;47:5;58:22;
69:25;77:24;80:2;
134:4;141:7
**domestic (6)**
79:7,8,12;91:20;
101:19;116:6
**done (20)**
11:5,13,14;19:11;
22:9,18;37:22,25;38:2,
17;39:18;58:1;60:22;
75:14;81:10;143:15;
147:8,9,25;151:10
**Dong (1)**
69:4
**door (13)**
49:16;55:17,19;
135:21,22,23,24;136:3;
138:5,15,18;156:3;
167:11
**doors (2)**
148:6,12
**Dover (1)**
101:25
**down (12)**
7:11,17;9:2;27:25;
48:5;72:25;78:22;
91:15;103:22;115:17;
159:11,11
**DOYLE (86)**
6:5,6;14:15,25;15:2,
9;19:24;28:14;30:24;
31:6,16;47:8;58:4,12;
60:5;62:5;72:4;73:6,
14,19;74:2,8,13,19;
75:10;76:14,18;77:22;
78:3;92:22;95:11;
96:19;97:4;103:9,18;
104:3,6;122:14,17;
124:10;128:16;130:22;
132:8;133:18;136:16;
137:11;138:16;139:24;
141:5;142:9,16;
143:17;144:5,22;
145:14,20;146:17;
147:5,23;148:9,17,21,
24;150:8,15;151:1,8,
12;156:13,22;159:20;
160:12,24;162:1,15,19;
163:2,12,17;165:11,15;
166:2;168:7,12,14;
169:2
**drafted (1)**
152:17
**drafts (1)**
159:18
**Drive (5)**

56:22;66:25;71:4;
98:5,18
**dryers (1)**
26:19
**Drywall (97)**
8:1,4,10;9:18;12:22;
16:5;17:15,22,25;
18:16,22;19:15,20;
20:15;27:25;30:8,12;
36:24;37:17;40:12;
41:6,17,22;42:9,13;
43:18;44:14;52:6;57:7;
58:7,16;60:11;62:18;
78:12,16,22;80:22;
82:16;93:3,17,19,22,
24;94:14;96:4,14;
99:16;117:7;120:5;
123:7,13;125:11,18;
129:13,17,18,23;130:9;
131:2;134:16;135:5,6;
136:7,12,13,24;137:6,
14,16,23;138:2,23;
146:9;148:1;149:2,8,
11;150:1,3;153:21;
154:2;155:22;158:20;
159:6,7,8;160:4,14,23;
161:2;163:5,21,25;
164:10,17,19;167:3
**due (1)**
27:1
**duly (1)**
6:3
**duration (4)**
126:24;129:10;
149:7;160:3
**during (17)**
9:17;25:11,16;28:20;
29:8;51:7,24;52:6;
76:25;77:2;81:20;92:4,
5;121:6;132:15,23;
143:18
**Dysart (2)**
76:23;143:4

**E**

**earlier (15)**
14:10;21:21;23:5;
97:5;116:23;120:1;
139:21;152:11;157:17;
159:18,23;160:19;
161:11;163:9;169:19
**early (1)**
16:18
**ease (2)**
161:5;169:8
**easily (2)**
81:3;163:21
**easy (6)**
158:14;161:7;162:3,
5,10;163:5
**education (4)**
29:6;33:10;34:24;

35:5
**educational (1)**
32:9
**effect (3)**
30:7,11;157:23
**efficiency (1)**
125:4
**effort (2)**
76:16;89:6
**eight (16)**
49:2;57:2,4;63:20;
71:7;78:21;80:12,17,
20;83:12;107:21;
120:9,12;121:4;
153:19;158:10
**either (14)**
9:3;39:11;50:25;
66:18;67:10;80:25;
81:4;86:9;88:2;89:8;
136:25;138:24;142:18;
157:22
**elaborate (1)**
155:24
**electrical (8)**
45:25;48:7;131:12,
18;158:21;165:20;
166:12;167:4
**elevated (2)**
132:18,22
**elevation (1)**
133:22
**elevation-wise (1)**
133:8
**eliminated (1)**
72:23
**else (14)**
12:4;13:5;26:8;
32:25;33:1;47:2;
125:12;126:4;130:3;
149:15;154:21;167:16,
19;168:25
**employed (1)**
53:6
**employee (3)**
51:10;80:10;162:8
**employees (6)**
31:24;32:2;37:19;
38:17;51:6;52:17
**employer (1)**
44:22
**employs (1)**
53:10
**enclosed (3)**
55:18;94:9,9
**end (21)**
8:21;20:18;40:15;
44:5;49:10;88:25;89:4,
7,24;106:12;109:12;
117:22;118:1;123:9,
15;132:17;151:25;
158:5;165:13;166:4;
169:24
**endeavor (1)**

35:5
**ended (1)**
28:5
**engineer (1)**
156:9
**enough (2)**
139:7;161:7
**ensure (2)**
44:6;59:8
**entail (1)**
42:21
**entails (2)**
32:6;54:18
**entertainment (1)**
32:10
**entire (3)**
87:23;90:25;93:24
**Entirely (2)**
19:17;38:25
**entity (1)**
33:4
**environmental (2)**
61:6;137:20
**errors (1)**
155:19
**essentially (2)**
38:11;135:13
**estimate (20)**
13:3;20:3;25:15;
43:10;44:3;124:12,19;
125:8,17;126:24;
131:3,14;135:14;
139:17,17;140:25;
141:24,25;142:19;
151:24
**estimates (10)**
15:22;97:8;126:13;
140:15,18;141:8;
142:25;143:10;145:25;
146:7
**estimating (2)**
22:2;41:22
**ethics (2)**
42:20,25
**evaluate (6)**
11:1,16;22:10;
121:24;140:21;148:12
**evaluated (10)**
11:10;22:6;24:12;
57:9;108:21;110:22;
113:7;114:25;120:10;
121:5
**evaluating (3)**
13:18;17:7;97:13
**evaluation (3)**
11:11;29:19;148:10
**even (1)**
116:3
**Everybody (1)**
43:11
**everybody's (2)**
101:22;128:18
**evidence (3)**

5:19;142:5;150:22
**exactly (5)**
13:22;37:5;60:16;
80:15;87:13
**EXAMINATION (4)**
6:5;152:5;159:20;
169:5
**example (2)**
124:11;153:11
**examples (1)**
153:9
**exceeded (1)**
132:16
**exceeds (1)**
29:15
**except (1)**
26:13
**excludes (1)**
54:20
**excluding (1)**
139:18
**exclusion (2)**
55:3;135:14
**exclusively (1)**
87:10
**excuse (1)**
140:24
**exhibit (22)**
15:5;25:2;31:1,4,14;
47:3,6,9;54:13;80:2;
122:22;124:5,6,8;
151:15,18,19,22,23;
152:1,14;168:11
**exhibits (1)**
151:14
**existence (2)**
45:1,3
**expect (2)**
137:17;138:22
**expectancy (1)**
168:20
**experience (2)**
134:14;162:7
**expert (31)**
6:15;8:6,10,13,17;
9:17;11:20;12:1,7,11;
15:1;18:21,25;19:8;
21:23;30:7;53:3;74:1,
3;75:12,18;76:17;
77:17;78:2;79:11;82:8;
133:11;134:2;146:19;
152:9;160:5
**experts (1)**
68:12
**expert's (1)**
13:18
**Explain (3)**
22:16;88:25;92:2
**explained (1)**
92:4
**explanation (1)**
24:18
**explicitly (1)**

Chinese-Manufactured
Drywall Products Liability Litigation

Phillip Allen Adams
February 13, 2020

144:15
**exposed (2)**
149:2,25
**exterior (5)**
50:20,22,23;134:8,
13

## F

**facilities (2)**
32:10,10
**Fact (9)**
17:3;75:24;77:12;
89:8;90:3;97:6,12;
147:6;150:18
**factor (1)**
126:5
**facts (2)**
142:4;150:21
**failing (1)**
156:8
**fair (2)**
138:4;139:7
**fairly (1)**
25:14
**Fallon (8)**
10:10;16:24;17:5;
97:13;141:21;144:15,
23;146:5
**Fallon's (1)**
150:18
**falls (2)**
49:9;159:11
**familiar (6)**
6:12;17:11;20:11;
22:1;52:1,4
**family (1)**
94:9
**Fantastic (3)**
7:21;8:20;81:9
**fashion (6)**
13:3;92:3;93:1;95:6,
22;135:10
**faster (1)**
53:14
**fault (2)**
131:13,15
**feasible (1)**
94:22
**Federal (5)**
5:7;9:19,25;10:9;
145:6
**feel (5)**
74:20,25;75:1;93:23;
103:21
**feet (89)**
26:13,15;27:7;48:19;
61:12;62:25;63:6,18;
64:3,22;65:15,22;66:8;
70:8,21;81:13;82:11,
19;83:1,11;84:2;85:9;
86:18;88:6,18;91:7;
92:1;98:19,24;99:5,11,

21;100:4,14;101:15;
102:2;104:14,25;
105:9,20;106:7;107:1,
6,18,25;108:12;109:2,
7,19;110:1,13;111:3,
10,16,22;112:3,9,16,
25;113:6,12,17,23;
114:13,18;115:5,22;
116:3,9,18;117:13,17;
118:5,11,23;119:11,16;
120:8,17,22;121:3,12,
17;123:6,20;124:1;
127:4,6;158:10
**Fellsmere (1)**
121:10
**F-E-L-L-S-M-E-R-E (1)**
121:11
**felt (2)**
75:5;79:19
**FEMA (2)**
132:19;133:7
**Ferrera (2)**
86:16;87:1
**Ferry (1)**
88:3
**few (5)**
7:6;27:24;129:5,25;
152:9
**field (1)**
35:14
**file (1)**
59:4
**filed (2)**
36:13;37:10
**filing (1)**
5:12
**filings (1)**
16:23
**final (5)**
59:16;75:19;124:19;
140:15;145:25
**finally (1)**
103:22
**find (29)**
26:3;44:1;59:14;
62:16;68:25;81:18;
82:15;83:15;84:7,18;
85:3;87:12;89:12;
99:16,24;100:17,20;
102:25;121:18;123:16;
149:21;153:9;161:5,7;
162:3,5,10;163:5,25
**Finding (5)**
17:3;61:5;69:3;
97:11;150:18
**Findings (4)**
56:17;87:10;97:6;
154:12
**fine (3)**
80:1;103:17;115:16
**finish (2)**
7:14;127:13
**finished (3)**

34:12;55:1;70:11
**finishes (3)**
24:5;44:1;127:3
**fire (2)**
42:4;130:18
**firm (1)**
56:12
**first (25)**
6:3;20:3,4;33:21;
35:23;37:4,9;38:24;
47:21,22;56:8;60:17;
61:1,10;63:25;72:13;
87:14;92:1,6;93:4,14;
97:19;125:3;134:23;
152:12
**Fishman (10)**
56:12;77:14;78:5;
82:6;92:15;96:21;
142:18,23;165:17;
166:19
**fit (2)**
26:22;127:21
**fits (1)**
125:10
**Five (27)**
7:1,24;34:11;39:25;
40:1;63:9,9;64:25;
84:15;88:8,21;90:11;
99:13;100:17;101:5;
102:5,18;104:25;
108:13;109:3;110:1;
115:6;116:4;120:18;
123:21;127:2;148:20
**five-eighths (1)**
164:19
**fixes (1)**
129:11
**fixture (5)**
135:4,6,7;138:21;
139:11
**fixtures (14)**
48:7;134:24;136:11,
18,20;137:5,17,19,22;
139:3;156:1;159:2;
166:13;167:14
**flood (2)**
132:19;133:21
**flooded (1)**
92:5
**floods (1)**
128:23
**floor (11)**
49:13;59:12;92:2,6,
7;93:4,5,10,14;97:19,
23
**flooring (6)**
46:24;47:1;148:8;
158:25;165:20;166:5
**floors (1)**
28:7
**Florida (60)**
6:2;9:20;10:13,15,
18,23;29:1,11;34:13;

35:5,18;36:3;40:2;
44:19;56:22;63:17;
66:5;70:7;82:19,24;
83:10;84:12;86:17;
90:15;99:10;101:25;
102:13;105:24;106:6;
107:5,25;108:11,17;
109:16,18,24;111:15;
112:2,15;113:22;
114:12;115:4;116:8,
17;117:12;118:4;
119:10,15;120:7,16;
121:10,16;123:25;
131:22;132:2,11;
153:13;156:6;164:4,7
**focus (1)**
80:7
**focused (1)**
130:12
**folder (1)**
31:2
**Foley (1)**
115:20
**follow (1)**
19:5
**followed (1)**
59:4
**following (5)**
37:18;46:20;48:16,
16;143:20
**follows (1)**
6:4
**follow-up (3)**
19:6;21:5;80:10
**foot (4)**
24:6;49:13;158:4,4
**footage (64)**
12:25;13:14;15:18;
19:2;48:19;53:7,19,23;
54:9,17;55:12;59:6;
61:12;62:25;63:18;
64:3,22;65:14,21;66:7;
67:2,14;68:1;70:8;
71:6,14;81:12;82:25;
83:11,23;84:12,23;
85:9,21;88:5,18;90:9,
16;91:6;97:17;98:10;
100:4,14;101:2;102:1,
15;105:8,19,24;
107:18;108:6,12,18;
109:19;110:7,20;
112:3;115:4;117:12;
118:16;120:21;123:5;
155:12,16
**footprint (3)**
54:5,20,20
**Forgive (1)**
134:20
**forgot (2)**
23:19;151:13
**form (23)**
5:15;28:13;57:24;
62:2;92:21;96:18,25;

128:12;130:21;132:7;
138:11;141:4;142:15;
143:12;144:2;145:12;
146:12;147:19;150:5;
156:14,23;160:8;
165:24
**formalities (2)**
5:9,11
**format (1)**
59:24;60:20;81:23
**formatting (1)**
60:23
**formed (2)**
32:19,20;33:1
**forms (1)**
93:15
**Fort (6)**
6:2;34:4,5,7,9;156:6
**forth (1)**
155:14
**forward (1)**
80:8
**found (125)**
25:7;57:8;61:11,15;
62:7;63:6,9,20,24;64:8,
25;65:17;66:10;67:18,
21;68:4,11,12;69:5;
71:7,16;80:9;81:6,15;
82:12,20;83:1,12,23;
84:4,15,24;85:10,22,
24;86:19,21;87:13,16;
88:8,13,21;89:2;90:11,
17,20;91:1,10,16;
97:25;98:12,19,25;
99:6,13,21;100:5,8;
101:5,15;102:4,8,17;
104:15;105:1,14,20;
106:2,8,11,20;107:1,7,
21;108:7,13,19;109:2,
8,20;110:2,8,14,21;
111:3,11,16,23;112:4,
10,17,25;113:7,13,18,
23;114:6,14,21,25;
115:6,23;116:4,10,18,
23;118:6,12;119:5,11,
17,21;120:9,12,18,23;
121:5,6,12;122:4;
123:8;124:2;135:17;
159:7;162:9
**Four (25)**
9:23;30:14;43:17;
48:20,21,25;70:23;
84:4;99:6;100:5;
101:15;102:17;108:1;
109:20;110:7,21;
112:10;113:23;114:6;
118:11;120:23;123:8;
154:19;158:4,9
**four-by-twelve (1)**
49:9
**four-day (2)**
43:7,16
**Fozard (3)**

88:15;89:17;153:25
**F-O-Z-A-R-D (2)**
88:16;153:25
**frame (2)**
104:1;129:3
**free (1)**
8:21
**Friendswood (1)**
65:21
**front (3)**
8:21;40:14;124:6
**full (7)**
49:12;92:18;144:24;
145:6;157:15;167:1;
169:16
**full-time (2)**
32:2,4
**function (1)**
42:7
**functioned (1)**
27:12
**functioning (2)**
27:8,10
**furniture (1)**
148:7
**furring (1)**
164:13
**further (2)**
152:2;169:4
**fusible (2)**
46:5;167:6
**Fussell (1)**
90:6
**F-U-S-S-E-L-L (1)**
90:6
**future (1)**
140:12

**G**

**galvanized (1)**
136:9
**garage (14)**
54:1,2,8;55:17,18,19,
19;87:19,19;115:11,
12;119:20,22;164:10
**garages (3)**
55:14,23,24
**gas (2)**
69:16;126:21
**gases (14)**
30:8,12;94:14;
134:15;136:7;137:23;
148:2;149:2,4,8;150:1,
3,11;160:4
**Gaspard (1)**
90:14
**G-A-S-P-A-R-D (1)**
90:15
**gather (1)**
9:3
**Gauthreaux (1)**
91:4

**G-A-U-T-H-R-E-A-U-X (1)**
91:5
**Gautier (1)**
100:3
**gave (1)**
161:4
**general (8)**
34:21;35:19;44:17;
47:18;124:24;126:10;
135:19;166:25
**generally (13)**
10:25;16:2;20:20;
30:8;32:6;36:17,21;
37:16;38:6;51:3;61:22;
68:11;132:1
**generate (6)**
15:21;23:7;53:17;
54:5,12;125:16
**generated (4)**
12:2;126:8;154:17;
157:11
**geographical (1)**
125:23
**German (2)**
69:5;120:3
**Germany (1)**
120:1
**gets (3)**
47:22;159:9;164:4
**Gharib (4)**
91:22;92:4;97:17;
98:3
**G-H-A-R-I-B (2)**
91:23;98:4
**Ginart (1)**
99:4
**G-I-N-A-R-T (1)**
99:4
**given (7)**
6:18;7:3,22;12:13;
141:11;142:17;159:21
**giving (2)**
9:9,13
**Goldenberg (1)**
99:9
**good (7)**
25:14;103:8,25;
126:9;146:23;153:9;
169:3
**Grande (1)**
99:19
**G-R-A-N-D-E (1)**
99:19
**granite (1)**
130:2
**greater (1)**
27:6
**green (2)**
44:9;100:2
**G-R-E-E-N (1)**
100:2
**GridMarX (3)**
86:5,9;101:19

**gross (1)**
54:9
**ground (1)**
50:10
**grouped (1)**
141:10
**grow (1)**
34:7
**guess (2)**
52:4;145:3
**Gueydan (1)**
100:11
**G-U-E-Y-D-A-N (1)**
100:12
**guide (1)**
45:14
**guidelines (22)**
15:25;16:1,4,10,12,
12,24;45:20,21,23;
46:8,9,10;48:15;53:9,
10,11;94:20,21;95:2,
21;96:10
**guiding (1)**
58:25
**Gum (1)**
100:25
**Gypsum (8)**
73:1;78:23,25;91:16,
17;102:18;106:15;
107:11

**H**

**habitable (3)**
55:9;56:3,4
**half-inch (2)**
164:9,17
**Hallmark (1)**
101:11
**Hammond (2)**
64:2;100:12
**handful (1)**
17:16
**handled (2)**
128:7;129:7
**happen (2)**
41:15;53:23
**happened (1)**
78:6
**happens (1)**
91:23
**happy (1)**
8:25;37:7
**harassed (2)**
74:20,25
**harassing (2)**
74:17,18
**harassment (1)**
76:7
**hardest (1)**
43:24
**hat (2)**
164:13,16

**Haven (2)**
82:24;153:12
**Haygood (10)**
56:12;77:14;78:5;
82:6;92:15;96:21;
142:18,23;165:17;
166:19
**head (1)**
135:3
**heads (2)**
46:5;167:6
**heart (2)**
131:6;139:25
**heater (1)**
48:3
**Helmick (1)**
101:23
**H-E-L-M-I-C-K (1)**
101:24
**Helmicks (1)**
101:25
**help (5)**
20:21;45:14;49:18;
53:16;56:10
**hereby (2)**
5:6,16
**hereto (1)**
5:4
**high (3)**
135:3;164:13,16
**Hill (2)**
113:22;119:9
**Hills (1)**
66:25
**Hinges (2)**
136:5;156:3
**historical (1)**
127:10
**historically (1)**
143:15
**history (1)**
51:20
**Hoffman (2)**
102:12;104:7
**H-O-F-F-M-A-N (1)**
102:13
**holes (1)**
157:21
**home (91)**
12:22,25;13:24;
18:11,21;24:5;27:2;
29:15;30:9,14;34:6;
48:13;56:20,21,23;
57:9,13,22;58:8;59:6;
63:21;65:1,6,18;66:1,
11,13;67:6,18,22;68:5,
18;70:24;71:8,16;
78:13;81:16,20;83:6,
24;84:16,19,22,25;
85:14;86:22;87:5,17,
24;90:12,17;91:11;
92:5;94:13;99:25;
100:5,9,18;101:8,16;

102:5,9;103:1;105:4,
15,21;106:3,9;107:8;
108:2,14;111:2;
112:11,18;114:22;
115:11;132:22;136:12;
137:16;144:17,25;
145:7;147:3;149:8,25;
150:11;153:18;159:6;
163:11,19;167:1
**homeowner (11)**
47:19;93:12;129:1,4,
9,10,21,24;130:15;
131:8;133:12
**homeowners (3)**
37:6;133:1,5
**homeowner's (1)**
132:21
**homes (26)**
15:14,18;17:7,17;
24:22;25:24;47:16;
48:23;52:2;53:7;57:17;
62:9,16,19;79:13;94:6;
97:13;126:25;132:16,
17;133:21;146:1,7;
147:17;149:12;162:9
**Homestead (3)**
56:22;61:11;108:17
**Hoover (1)**
117:17
**hot (2)**
47:23;48:3
**house (21)**
27:23;43:21;47:17,
18;54:5;55:25;59:4;
64:16;79:4;81:6;87:23;
90:25;93:24;119:20;
124:20;125:17;131:15;
148:1;160:22;161:2,6
**houses (6)**
27:24;51:4;126:21,
21;127:23;162:7
**Hu (1)**
104:11
**H-U (1)**
104:11
**HUD (2)**
16:9,12
**Humphries (1)**
104:23
**hundred (3)**
32:1;104:21;149:21
**hundred-plus (1)**
157:12
**hurricane (5)**
42:3;92:6;93:13;
130:17;131:19
**hurricanes (1)**
128:23
**HVAC (2)**
156:19,20
**hypothetical (4)**
145:16,19;146:4,13
**Hypothetically (1)**

145:5

# I

**Ice (2)**
26:21,22
**idea (1)**
48:11
**identifiable (1)**
81:4
**identification (7)**
18:22;31:4,14;47:6;
79:21;124:8;149:11
**identified (12)**
66:1;67:6;71:2;87:5,
22;89:18;90:25;
104:19;118:2;123:7;
138:8;151:21
**identifies (1)**
155:8
**identify (16)**
21:12;49:18;52:6;
57:16;76:4;83:5;93:22;
94:21;121:25;152:24;
153:4,23;156:7;
158:11,15;163:21
**identifying (4)**
70:4;78:12;93:23;
169:8
**Ijemere (1)**
105:6
**I-J-E-M-E-R-E (1)**
105:6
**immediately (1)**
138:8
**impact (2)**
48:23;79:5
**impacted (1)**
29:24
**important (1)**
58:6
**impose (1)**
132:3
**impossible (1)**
167:12
**inaccuracy (3)**
60:10;78:11,14
**inaccurately (1)**
74:23
**inadvertently (1)**
159:18
**Inc (1)**
44:24
**inches (3)**
49:14,15;158:9
**incident (1)**
40:22
**include (9)**
54:21,23,24,25;
72:20;126:12;146:6;
169:18,20
**included (19)**
47:1;54:3;56:1,6;

126:20;131:17,20,23;
132:20;139:16;140:23,
24;141:1;142:25;
154:25;155:1;157:6,
14,15
**includes (2)**
144:25;145:7
**incomplete (1)**
145:18;146:12
**incorporated (1)**
46:21
**incorrect (1)**
60:15
**incorrectly (1)**
74:22
**incurred (1)**
11:2
**independent (1)**
117:6
**indeterminate (3)**
106:12;109:13;
117:23
**indicate (5)**
57:1;87:8,23;134:11;
155:22
**indicates (10)**
31:17;58:15;85:20;
86:17;91:1;109:25;
110:12;125:7;135:9;
160:14
**indication (2)**
75:25;117:21
**individual (2)**
74:10;154:13
**individually (1)**
152:23
**Indonesia (5)**
69:6;102:18,22;
106:15;107:11
**inform (1)**
146:19
**information (1)**
9:3
**initial (2)**
155:2,3
**insert (1)**
122:10
**inside (3)**
42:7;137:15;149:25
**inspect (5)**
12:14,21;47:21;48:4,
6
**inspected (10)**
27:8,9;56:13;62:9;
85:11;91:13;105:12;
156:11,21;162:8
**inspecting (2)**
17:16;47:15
**inspection (26)**
12:17;13:23,24;14:2,
5,10;15:15;27:3;52:20;
56:15;60:22;61:7;73:5;
75:2;77:5;79:21;81:20;

86:24;87:15;92:5;
119:2;122:3;153:18;
154:13,22;155:8
**inspections (9)**
13:13;15:14;16:20;
18:21;24:16;51:19;
52:7;58:3;143:2
**inspects (1)**
162:9
**installed (2)**
94:16;122:1
**instance (4)**
56:21;80:13;89:16;
128:19
**instances (3)**
25:8;50:21;62:6
**instead (1)**
28:24
**instruct (1)**
145:3
**instructed (4)**
14:8;42:23;46:14;
96:20
**instructions (5)**
76:24;77:1;142:17;
143:5,7
**insulation (12)**
26:4,6;47:1;48:1;
134:8,10,12,15,18;
159:9,11;167:8
**insurance (2)**
41:13,15
**intend (8)**
21:22;23:2,10;30:11;
130:25;140:14;150:9,
16
**intending (1)**
79:10
**intention (1)**
151:2
**interests (1)**
74:4
**interior (2)**
50:17,19
**internal (1)**
136:5
**internally (1)**
128:7
**into (11)**
24:4;41:24;44:2;
46:22;50:1;55:19;
97:21;122:22;125:13;
153:22;169:9
**introduce (1)**
168:10
**introduced (5)**
6:7;31:4,14;47:6;
124:8
**involved (4)**
40:19,22;41:1;43:14
**involves (1)**
62:22
**involving (1)**

61:10
**isolate (2)**
93:21;159:8
**Issman (2)**
105:17
**I-S-S-M-A-N (1)**
105:17
**issue (6)**
60:2,10,14,23;
129:15;141:7
**issued (8)**
16:23;17:4;35:18,22;
97:7,12;141:21;144:24
**issues (2)**
41:14;129:20
**item (20)**
26:5;27:16,23;28:8;
30:3;41:4;42:19;61:2;
103:11;129:11,11,11;
131:25;135:1,14,18,18;
139:10;141:14;165:16
**items (25)**
25:8;26:1,3;28:15;
30:13;42:24;46:21;
60:14;75:17,18;
126:10,11,15;130:17;
139:18;140:2,22;
149:3,7,25;152:10;
165:21;169:17,18,20

# J

**James (1)**
74:12
**January (1)**
75:13
**Jarvis (1)**
105:23
**Jim (1)**
165:7
**Jimmy (2)**
6:6;114:1
**job (3)**
35:7,11,12
**JOHNSON (71)**
14:13,23;15:7;19:22;
28:12;57:23;58:10;
60:3;62:1;71:22;73:10,
17,24;74:6,11,16;76:8,
11;77:20,25;92:20;
95:7;96:17,24;103:5,
14;122:11;128:11;
130:20;132:6;133:14;
136:14;137:7;138:10;
139:19;141:3;142:3,
14;143:11;144:1,18;
145:11,17;146:11,25;
147:18;148:3,15,19;
150:4,13,20;152:5,7;
156:18;157:2;159:16;
160:7,17;161:9;
162:13,17,23;163:7,15;
165:9,23;168:2,9;

169:5,22
**Judge (10)**
10:10;16:24;17:4;
97:12;141:21;144:15,
23;145:6;146:5;150:18
**jury (1)**
130:14
**jut (1)**
54:23

# K

**Kaki (3)**
76:8,23;152:6
**Kansas (2)**
33:11,23
**Karpel (2)**
106:5,20
**K-A-R-P-E-L (1)**
106:5
**Katrina (2)**
92:6;93:13
**keep (5)**
7:16;44:3;81:9;
103:20;145:19
**Kelley (1)**
106:23
**K-E-L-L-E-Y (1)**
106:24
**Kendall (1)**
107:4
**K-E-N-D-A-L-L (1)**
107:5
**Kerry (1)**
143:4
**Kimberly (1)**
62:23
**kitchen (2)**
48:7;130:1
**Knauf (31)**
11:6;12:11,21;14:9;
18:4,15;46:13;68:24;
88:25;89:3,9,17,21,23;
92:16;93:7;102:18,22;
106:15;107:11;109:12,
14;118:2;121:13;8;
128:10;129:22;131:10;
142:18,23;152:7
**Knauf-manufactured (1)**
89:20
**Knauf's (2)**
14:17;77:13
**knee (2)**
164:1,5
**knew (3)**
48:20;49:12;75:7
**knobs (1)**
156:3
**knowledge (4)**
69:17,20;101:22;
107:13
**KPT (170)**
18:3,4;25:3;28:5;

45:13;49:8,9;56:20,23;
57:3,13,16,22;58:6,13;
61:16;62:18;63:9,13,
20;64:8,17,25;65:6,17,
25;66:10,18;67:5,9,17,
21;68:4,8,18,20;69:12,
25;70:23;71:7,15;
78:12,21,23;80:8,16;
81:7,15,18;82:12,20;
83:2,7,12,17,23;84:4,
15,25;85:3,10,22;
86:19;87:4,13,22;88:8,
12,21;89:1,3,5,8;90:3,
11,17,24;91:10;93:10;
94:15;97:25;98:12,20,
25;99:6,13,21;100:5,
17;101:5,15;102:4,10,
17;103:3;104:15,19,
25;105:12,20;106:2,8,
19;107:1,7,21;108:1,7,
13,20;109:3,8,20;
110:1,7,14,21;111:4,
11,16,23;112:4,10,17;
113:1,7,13,18,23;
114:6,14,21;115:6,23;
116:4,10,19;117:13,18;
118:6,11;119:6,11,17,
21;120:9,18,23;121:6,
12,18,20,22,25;123:11,
16,21;124:2;131:10;
153:19;157:18;158:3,
7,11,15;161:5,7;162:4,
10;169:8

**L**

**label (3)**
    89:12;157:8;158:3
**labeled (11)**
    13:21;17:2;74:23;
    75:20,23;80:24;90:6;
    91:25;92:3;98:15,17
**labeling (2)**
    77:10;158:18
**Labelle (1)**
    107:24
**labor (3)**
    125:4;126:1;140:2
**lack (2)**
    52:5;155:7
**Lafontaine (1)**
    107:16
**Lake (1)**
    108:11
**Lakeland (1)**
    112:2
**Land (1)**
    100:25
**Lane (3)**
    62:22;64:20;109:17
**lapse (1)**
    35:25
**laptop (2)**

**43:11,13**
**Laremore (1)**
    107:24
**large (1)**
    158:7
**last (10)**
    6:22,24;7:2,21;
    22:14;31:10;62:15;
    98:16;124:5;165:16
**late (1)**
    35:14
**later (4)**
    25:9;41:25;42:17;
    168:21
**latest (2)**
    96:9,12
**Lauderdale (6)**
    6:2;34:4,5,7,9;156:6
**law (5)**
    5:8;17:4;97:7,12;
    150:19
**lawyers (6)**
    14:9;77:13;96:21;
    142:18,23;166:19
**layman (4)**
    161:8;163:4,20,23
**leak (1)**
    129:13
**leaks (1)**
    129:14
**learn (1)**
    162:20
**learned (1)**
    46:19
**leave (4)**
    47:18;103:19;135:5;
    142:19
**Lee (1)**
    108:4
**left (4)**
    103:8;104:1,7;
    145:24
**left-hand (1)**
    79:1
**less (5)**
    18:7;48:20;92:18;
    127:23;148:20
**lessons (1)**
    46:18
**letter (43)**
    56:9,11,14,19;59:3;
    60:15;61:10;62:21,24;
    63:15,23;64:1,19;65:9,
    20;66:24;70:1,15;72:8;
    75:25;80:17;81:4,5;
    82:7;83:1;84:10;85:20;
    86:17;87:1,21;101:13;
    108:14;109:25;110:10,
    12,24;116:1;117:16;
    118:18;121:1;122:20;
    123:3,4
**lettering (1)**
    158:8

**letters (26)**
    11:23;13:20,21;
    52:22;56:11;57:6;59:1,
    18,23;60:7;68:10,19;
    72:7,10,12;74:22;
    75:20;76:4;77:10,13;
    78:8,11;90:21;122:23;
    151:20,21
**license (4)**
    29:3,6;35:18;36:1
**licensed (2)**
    28:25;44:17
**licensing (1)**
    36:25
**licensure (3)**
    36:3;39:15;40:7
**life (2)**
    34:10;168:20
**light (5)**
    72:14;138:21;139:2,
    11;166:13
**likelihood (1)**
    150:2
**limitation (1)**
    149:16
**limited (3)**
    51:4;93:20;149:10
**limits (1)**
    13:11
**Linda (1)**
    71:4
**line (7)**
    30:3;42:24;135:1,17,
    18;139:10;141:14
**link (1)**
    167:6
**list (1)**
    12:13
**listed (2)**
    87:14;89:23
**litigation (8)**
    8:10;9:18;20:15;
    42:13;47:16;69:23;
    74:5;117:8
**little (4)**
    76:21;115:14;
    127:17;158:9
**live (3)**
    34:6;156:3,5
**living (101)**
    55:11,16;62:18;
    63:21;64:11;65:1,18;
    66:1;67:6,22;68:5;
    70:23;71:8,16;81:16;
    82:13,20;83:2;84:16,
    25;85:13,17,24;86:21;
    87:9,17,24;90:12;92:2;
    96:4;97:19,22,25;
    98:13,20,25;99:6,14,
    22;100:8,18;101:8,16;
    102:8;105:3,14,21;
    106:3,9,21;107:2,7,22;
    108:1,7,13,20;109:3,9,

**20;110:2,8,15;111:4,**
    11,17,23;112:5,11,18;
    113:1,8,13,19,24;
    114:6,14,22;115:8,13,
    23;116:4,13,19;117:14,
    19;118:6,12;119:6,12,
    18,22;120:13,18,23;
    121:7,13;122:1;
    123:17,21;124:2
**LLC (4)**
    33:3,5,6,8
**located (19)**
    10:12;34:3;39:11;
    64:16;83:10,21;85:7;
    98:4;106:24;108:4,17;
    109:17,23;111:8;
    115:20;116:17;117:11,
    14;154:14
**locating (1)**
    157:18
**location (8)**
    52:10;125:19,20,23;
    126:5;154:11;155:9;
    158:6
**locations (1)**
    112:11
**locking (1)**
    136:5
**lodge (1)**
    36:10
**lodged (2)**
    36:18;40:11
**long (3)**
    29:3;111:21;158:10
**Longer (9)**
    32:25;45:1;127:17,
    21;128:4;129:1;149:1,
    2,25
**look (10)**
    30:16;31:7;50:10;
    56:8;85:15,16;87:1;
    123:2;139:10;168:11
**looked (3)**
    57:2;75:7;87:12
**looking (4)**
    49:8;87:25;115:15;
    153:2
**Looks (38)**
    63:17;64:25;65:25;
    70:7;83:12;84:15;85:9;
    88:5,8,21;91:15;
    104:18;105:7;106:6;
    107:6,17;109:19;
    110:6;112:4,17,25;
    113:6,12;114:13;
    115:5;116:3,10,18;
    118:5;119:5,17;120:8,
    17,22;121:17,23;
    122:20;125:4
**Lorquet (1)**
    108:10
**L-O-R-Q-U-E-T (1)**
    108:10

**lot (1)**
    43:17
**Louis (4)**
    90:7;91:5;104:24;
    107:16
**Louisiana (29)**
    5:23;10:14,16,19;
    40:2;64:2;65:10;67:1,
    2,10;71:12;82:10;
    84:23;85:8,19,20;
    91:24;97:18;99:4;
    100:12;104:12;105:18;
    110:12;112:8,24;
    113:5,11;124:21;164:2
**low (1)**
    132:17
**lower (2)**
    68:17,20
**Loxahatchee (2)**
    106:6;117:11
**Lucie (5)**
    67:25;83:10;90:15;
    120:7,20
**lunch (2)**
    103:7,12,23;104:2

**M**

**Macomber (1)**
    22:18
**Madison (2)**
    116:2;118:9
**Madisonville (2)**
    105:18;112:8
**main (1)**
    31:21
**mainly (3)**
    32:15;53:13;61:4
**makers (2)**
    26:21,22
**Makes (1)**
    7:20
**management (1)**
    32:7
**Mansour (1)**
    108:24
**M-A-N-S-O-U-R (1)**
    108:25
**manufactured (11)**
    61:20;62:13;64:15;
    65:5,6;83:6,16;86:12;
    99:16;100:21;109:14
**manufacturer (4)**
    86:13;99:17;100:22;
    112:21
**manufacturing (1)**
    68:25
**many (21)**
    6:9,21,22,24;7:21;
    8:3,9,9;22;11:9;19:10;
    20:17,24,24;24:18;
    31:24;33:6;48:11;51:6;
    122:4;137:10;157:7

**March (3)**
  16:3,6,7
**mark (1)**
  30:25
**marked (2)**
  66:17;152:13
**markings (7)**
  161:6,7;162:4,10;
  163:5,21,25
**Marques (1)**
  109:6
**Martinez (2)**
  109:16,23
**Martino (1)**
  110:5
**match (3)**
  59:8;61:1;154:11
**material (7)**
  79:15;80:5,11;82:3;
  126:2,3;148:13;
  164:14,16
**materials (3)**
  148:6,7,8
**matter (1)**
  140:1
**may (9)**
  5:18;18:18;19:4,5;
  21:19;97:22;118:18;
  139:4;151:10
**maybe (1)**
  9:20
**MBA (1)**
  34:18
**McCann (1)**
  110:11
**M-C-C-A-N-N (1)**
  110:11
**McCullar (1)**
  110:18
**M-C-C-U-L-L-A-R (1)**
  110:18
**MDL (1)**
  94:25
**mean (17)**
  13:22;17:13;18:4;
  24:3;41:20;49:3;55:6;
  75:3;78:18;89:4;101:8;
  135:24;145:2;147:7;
  162:25;168:18,19
**Meaning (1)**
  52:22
**means (1)**
  167:2
**measure (1)**
  12:24
**measured (69)**
  62:24;64:3,22;65:13,
  22;66:8;67:15;68:1;
  70:8,20;81:12;82:11,
  24;83:22;84:24;85:21;
  88:5,17;90:8,16;98:10,
  24;99:10,20;100:4,13;
  102:1,14;104:14;

105:8,19,25;106:7,25;
  107:18;108:5,18;
  109:1;110:13,19;
  111:1,10,15,21;112:9,
  16,24;113:5,11,17,22;
  114:9,12,18;116:2,8;
  118:4,10,15,23;119:10,
  16;120:7,16,21;121:3,
  11,16;123:25
**measurement (6)**
  13:14;19:1;56:2,2;
  71:6;149:12
**measuring (5)**
  15:18,19;52:2;54:17;
  55:12
**mechanical (3)**
  30:12;149:1,7
**mechanisms (1)**
  136:6
**medical (2)**
  9:12;32:9
**medication (1)**
  9:8
**meet (3)**
  76:22;133:7,21
**meeting (2)**
  76:25;77:3
**member (1)**
  33:8
**members (1)**
  33:6
**mention (3)**
  7:7;8:21;68:8
**mentioned (4)**
  46:24;55:2;72:2;
  157:19
**Meraux (1)**
  99:4
**met (2)**
  47:19;76:23
**Metairie (3)**
  91:24;97:17;104:12
**metal (4)**
  136:2,4;137:18;
  138:7
**metals (1)**
  138:1
**method (4)**
  22:2;23:23;41:13;
  54:17
**methodology (1)**
  53:5
**methods (1)**
  43:4
**Miami (5)**
  82:19;107:5;109:18,
  24;118:3
**microwaves (1)**
  26:17
**middle (2)**
  134:9;158:4
**might (7)**
  9:9,13;18:15;23:15;

38:22;80:3;126:22
**Milam (2)**
  110:24;111:7
**Miller (2)**
  56:12;143:4
**millwork (1)**
  167:11
**minimum (2)**
  48:21;133:21
**minor (1)**
  37:23
**minute (1)**
  71:18
**minutes (1)**
  148:20
**mirrors (3)**
  48:8;156:2;167:14
**mischaracterizes (4)**
  139:20;160:18;
  161:10;163:8
**missing (4)**
  70:15;154:18,21;
  155:4
**Mississippi (21)**
  40:2;71:5;83:20,21;
  88:4,17;90:7;91:6;
  100:3;101:1;104:24;
  107:17;110:6,19;
  111:21;121:2;132:12,
  13,14;154:1;164:3
**mistaken (1)**
  85:14
**mixed (2)**
  17:10,11
**Mobile (1)**
  108:5
**mold (2)**
  44:9;129:13
**molding (1)**
  167:11
**moment (1)**
  27:13
**monoxide (2)**
  46:3;167:17
**month (2)**
  125:23;127:6
**months (12)**
  31:11,12;127:2,2,5,8,
  9,21,23;128:2,5;129:2
**Moore (1)**
  111:14
**more (15)**
  18:7,10;22:11;25:21,
  23,24;29:21;32:15;
  41:24;75:3;79:19;
  122:13;148:16;157:10;
  162:24
**morning (1)**
  47:22
**Moss (25)**
  19:12;20:4;31:18,22,
  24;32:5,17,19,21,22,
  23;33:3;36:16;37:13,

19;38:17;40:11;45:8;
  51:6,10;128:8,9,14,20;
  129:7
**most (6)**
  26:12;38:8;128:1;
  152:19;153:23;155:15
**move (9)**
  27:9,10;34:5;35:4;
  45:7;99:3;104:11;
  114:11;123:19
**much (3)**
  53:14;148:16,18
**multi-family (1)**
  32:8
**multiple (2)**
  41:25;58:7
**must (1)**
  70:10
**myself (1)**
  16:14

**N**

**name (6)**
  6:6;10:6;51:11;
  152:6;153:7,14
**Naples (1)**
  116:8
**National (5)**
  73:1;78:23,25;91:16,
  17
**natural (1)**
  69:9
**nature (1)**
  130:19
**Near (2)**
  50:6,8
**necessarily (1)**
  147:7
**necessary (1)**
  129:7
**need (24)**
  8:24;9:4;19:5;21:19;
  27:22;28:16;80:4;
  103:21;104:2;115:16;
  125:16;130:17;131:12;
  138:6;140:23,24;
  149:21;162:2;166:5,9,
  13,14;168:15;169:17
**needed (4)**
  35:7;128:4;129:16;
  141:12
**needs (3)**
  125:18;140:6;142:1
**new (10)**
  60:20;84:22;85:7;
  98:5;110:25;111:9;
  112:23;122:3;125:9;
  153:20
**newer (4)**
  152:25;153:5,23;
  154:8
**Next (92)**

19;38:17;40:11;45:8;
41:4;42:19;64:1,19;
  65:9,20;66:4,24;67:13,
  24;70:6,12;71:4,11;
  81:11;82:9,18,23;83:9,
  19;84:1,10,21;85:6,18;
  86:16;88:3,4,15;90:5,
  14;91:4,22;98:22;99:3,
  9,19;100:2,11,24;
  101:11,23;102:12;
  104:23;105:6,17,23;
  106:5,23;107:4,15,24;
  108:4,10,16,24;109:6,
  16,23;110:5,10,17,24;
  111:7,14,20;112:7,14,
  23;113:4,10,21;
  114:17;115:3,19;
  116:1,16;117:10,16;
  118:3,9;119:9,14;
  120:6,15,21;121:1,9,
  15;123:19,20;134:7
**Nguyen (1)**
  111:20
**N-G-U-Y-E-N (1)**
  111:20
**Niemiec (1)**
  112:1
**N-I-E-M-I-E-C (1)**
  112:1
**nine (11)**
  68:4;91:13;113:7;
  114:14,24;116:10;
  117:13;119:17;120:9;
  121:4;126:11
**non (5)**
  78:12;81:18;85:3;
  88:12;89:20
**non-Knauf (1)**
  90:1
**nonreactive (1)**
  120:5
**Norris (1)**
  112:7
**N-O-R-R-I-S (1)**
  112:7
**North (4)**
  6:1;66:5;111:14;
  115:3
**Northeast (1)**
  56:21
**notation (2)**
  72:18;125:5
**note (5)**
  44:21;54:8;73:11;
  88:24;107:10
**noted (3)**
  60:11;87:18;154:12
**notice (3)**
  30:17;129:8;151:16
**notifying (1)**
  30:21
**noting (1)**
  154:9
**number (23)**

25:2,7,14;39:11,12;
40:5,8;47:3;48:23;
51:21;52:10;59:4,18;
71:14;72:20;75:17;
78:24;80:8;81:25;
84:13;126:20;154:20;
162:7
**numbers (3)**
59:7,9,12

## O

**oath (2)**
5:24;6:4
**Object (5)**
28:13;76:16;138:11;
156:14,23
**Objection (44)**
14:14,24;15:8;19:23;
57:24;58:11;60:4;62:2;
76:12;77:21,24;92:21;
95:8;96:18,25;128:12;
130:21;132:7;133:15;
136:15;137:8;139:20;
141:4;142:4,15;
143:12;144:2,19;
145:12,18;146:12;
147:1,19;148:4;150:5,
14,21;160:8,18;
161:10;162:14;163:8;
165:24;168:3
**objections (1)**
5:14
**objects (1)**
19:25
**obligated (1)**
128:20
**observed (6)**
78:17,22;136:18,20;
153:22;154:2
**obvious (1)**
19:4
**obviously (1)**
56:11
**occasion (1)**
93:17
**Occasionally (1)**
28:10
**occur (2)**
25:12,13
**occurred (1)**
25:16
**Ocean (2)**
101:1;121:2
**odds (1)**
159:22
**Odenville (1)**
101:12
**off (19)**
49:10,11;69:16;
70:10;71:21;73:7,9,21;
76:2;104:4,5,7;122:15,
16;129:2,3;135:5;

148:23;151:11
**offer (29)**
21:22;23:2,22;24:1;
30:11;62:11;79:10;
86:8;92:9,16;94:3,12;
130:6,13;131:4,6;
133:11;134:5;137:25;
149:6,16;150:9;
151:14,17,25;160:1,5,
15;161:1
**offering (3)**
133:9,19;164:25
**off-gassing (2)**
17:20,21
**office (4)**
31:20,21,21,23
**officiated (1)**
5:23
**often (2)**
25:13;39:17
**old (4)**
73:5;86:23;131:14;
153:11
**older (3)**
152:24;153:4;154:7
**omission (1)**
140:9
**omissions (2)**
21:12,19
**omit (1)**
143:9
**omitted (1)**
25:8
**one (146)**
7:2;10:7,13,15,17,18,
18;12:2,4,18;17:21;
19:4;21:6,9;22:11;
23:1;24:11;26:5;27:11,
25;29:21;37:4,9;39:2,
6;48:9;49:2,5;50:3;
51:8;52:13;53:7;56:10;
57:6,17;59:11,23;61:2,
16,23;63:2,3;66:13,20;
67:1,10,17,21;68:19;
70:11,12,16;71:12,18;
72:20;73:3;75:4,4,6;
79:1,12,17,24;81:11,
23,24;82:4;83:23;88:3,
4,24;90:17,20,21;
91:10,22,23,24;92:11,
12;98:6,16,22,23;99:3,
19;100:2,11,24;101:11,
23;103:11;105:6,17,
20;106:5,11,15;
107:24;108:10,16;
109:6,8,16,23;110:5;
111:7,11,14,20;112:7,
14,23;113:4,7,10,11,
13,21;114:17;115:3,18,
19,23;116:16;117:22;
118:3,9,16;119:9;
121:18;123:8,19,20;
124:11;125:9;126:10,

12;144:11;145:24;
151:14;153:4,5,24;
154:1;168:18
**ones (8)**
36:23;69:3;72:21;
76:5;133:5;152:24,25;
153:20
**one's (1)**
98:15
**only (11)**
7:6;36:23;46:1;58:6;
92:6;93:4;97:18;
121:21;126:21;134:25;
139:5
**open (1)**
49:16
**opened (2)**
26:4,6
**opinion (32)**
14:24;17:24;18:3,6,
10,14;24:7;61:25;
62:11;66:21;69:14;
86:2,5;91:17;94:18;
96:8;131:7;133:20;
134:6;137:21,25;
149:6;155:23;159:1,3,
4;160:25;162:6;
164:22;165:20;166:4,
12
**opinions (10)**
12:8;13:8,18;17:19;
30:10;69:24;79:5;80:6;
149:16;160:1
**opportunity (2)**
7:12,14
**opposed (2)**
76:15;127:2
**opposing (4)**
11:20;122:7;164:21;
165:17
**Option (1)**
25:4
**order (23)**
9:4;25:10,18;26:2;
27:23;28:8,16,19;
46:21;47:10,11;96:23;
128:3;135:4;138:6,15;
139:16;141:21;144:15,
24;146:5,21,24
**orders (3)**
16:23;96:2;140:22
**organization (1)**
41:1
**original (10)**
58:2,5;72:9,21;73:5;
81:4;87:20;123:4;
129:19;167:21
**originally (1)**
28:4
**originals (1)**
76:6
**Orleans (7)**
5:22;84:22;85:8;

98:5;111:1,9;112:23
**Ormand (1)**
116:17
**others (3)**
61:3;66:17;126:22
**Otherwise (2)**
80:24;164:18
**ourselves (1)**
6:7
**out (12)**
27:9;35:9;38:4;45:3;
50:9;54:23;87:13;
122:6;128:18;138:7;
142:19;145:24
**outcome (1)**
40:4
**outdated (1)**
73:13
**outlet (1)**
157:22
**outlets (1)**
167:5
**outside (14)**
11:5;13:9;15:12,17,
20;43:20;53:24,25,25;
54:19,20;71:19;78:2;
149:15
**over (14)**
11:13,14;19:11,14;
24:7,9;26:14;32:13,14;
49:3;79:1;87:11;
149:20;158:9
**overall (6)**
54:9;56:17;61:5;
87:10,11;154:12
**oversee (2)**
25:5;39:18
**overseeing (1)**
145:6
**oversight (1)**
38:1
**own (1)**
43:11
**owned (6)**
21:1;62:16;67:1;
100:24;101:24;146:8
**owner (1)**
45:4

## P

**Page (28)**
44:21;59:3;60:18,18;
61:1,2;62:23;63:16,25;
75:5;79:24;85:15,16;
87:6,14;123:5;125:3;
126:9;134:9,9,23,25;
135:18;139:12;141:9,
13;154:10,10
**pages (3)**
154:19,20;157:13
**paid (2)**
128:8,15

**Palm (2)**
108:25;114:12
**Palmyra (2)**
110:25;111:8
**Panel (1)**
66:20
**panels (1)**
134:15
**paper (1)**
122:9
**paragraph (3)**
56:18,18,19
**Paredes (1)**
112:14
**P-A-R-E-D-E-S (1)**
112:14
**Parish (1)**
5:22
**Park (2)**
105:23;118:24
**part (20)**
5:18;41:9,18;43:24;
47:23;55:25;60:17,18,
25,25;77:17;127:25;
128:21;131:18;134:9;
144:16;155:3;165:21;
166:20;168:23
**particular (3)**
17:21;47:10;134:2
**parties (3)**
5:4;14:21;95:16
**party (1)**
77:9
**Pass (3)**
83:21;110:18;114:17
**past (4)**
6:9;8:13;22:4,7
**paste (1)**
44:2
**path (1)**
35:13
**patio (1)**
94:10
**pay (2)**
128:20;133:12
**paying (1)**
128:9
**payments (1)**
129:7
**Pell (1)**
106:24
**Pendleton (1)**
112:23
**people (2)**
94:7;164:2
**percent (12)**
25:21,23,25;29:16,
25;32:13,16;56:23;
104:21;132:10,17,23
**percentage (26)**
17:20;25:15,19;
32:11;37:16;56:16,20,
23;57:1,5,7,8,13,16,22;

58:6,13,15;73:3;78:25;
79:4;127:19,24;
153:17;154:5;157:3
**percentages (9)**
58:23;72:20,22;
78:16;79:20;81:25;
153:22;154:3,9
**Perez (1)**
113:4
**performed (1)**
51:18
**periodic (1)**
29:5
**periodically (1)**
28:9
**permit (1)**
38:23
**permits (1)**
38:20
**person (1)**
6:7
**personal (2)**
134:6;155:25
**personally (1)**
20:18;21:2;36:14;
39:17;73:25
**pertain (1)**
43:17
**Peyton (2)**
10:3,4
**Pham (1)**
113:10
**P-H-A-M (1)**
113:10
**Phase (17)**
11:23;13:20,21,22,
23,25;14:1,3,3,4;38:6;
47:23;52:22;59:1;
75:21;84:10;151:21
**PHILIP (2)**
6:1;30:18
**phone (1)**
6:9
**photo (2)**
154:18,18
**photos (1)**
157:6
**physical (1)**
13:24
**pick (1)**
50:14
**pictures (7)**
38:15,15;87:12;88:1,
1;155:7;157:7
**piece (2)**
121:20;123:13
**Pierre (1)**
113:16
**Pinecrest (1)**
112:15
**pit (2)**
137:19,22
**pitted (8)**

136:12,18,21;137:5,
17,18;156:2,3
**pitting (1)**
48:8
**place (4)**
16:15;39:24;87:16;
122:22
**plain (1)**
132:19
**plaintiff (4)**
11:3;45:18;47:16;
146:1
**plaintiffs (9)**
6:11;21:1;30:6;
55:22;62:17;146:8
**plaintiffs' (1)**
68:12
**plan (2)**
24:1;86:8
**plans (1)**
141:6
**Plasterboard (2)**
18:5,15
**plastic (1)**
69:9
**plate (1)**
50:10
**plating (1)**
136:25
**play (1)**
12:20
**please (1)**
31:7
**plug (1)**
125:23
**plumbing (3)**
48:6;156:1;158:23
**plus (1)**
32:1
**pocket (5)**
135:21,22,23;138:5,
15
**point (7)**
8:23;32:17;59:19;
80:8;130:13;140:12;
149:20
**Pool (2)**
113:21;114:4
**porches (1)**
54:21
**Porcuincula (1)**
114:11
**Port (8)**
66:5;67:25;83:10;
90:15;111:14;115:3;
120:6,20
**portion (3)**
111:2;125:11,13
**portions (2)**
155:4;165:14
**position (5)**
76:9;89:11;95:17,21;
168:22

**positive (1)**
14:3
**possibility (1)**
155:18
**possibly (1)**
136:6
**potentially (2)**
93:2;140:19
**Powell (1)**
114:17
**practical (4)**
46:11;167:9,9,10
**Prairieville (1)**
66:25
**precipitated (2)**
28:16;45:7
**pre-hung (1)**
135:23
**prepare (1)**
42:23
**pre-remediation (1)**
24:11
**presence (5)**
12:22;97:13;155:22
**present (2)**
82:6;162:8
**presented (5)**
11:3;38:10,13;47:12;
146:5
**prevent (3)**
9:9,13;74:18
**Pre-vet (1)**
33:16
**previous (2)**
75:6;139:12
**Price (3)**
115:3;139:4,5
**pricing (3)**
125:22,24;126:1
**primary (1)**
56:5
**prime (3)**
25:5;38:6,23
**principles (1)**
42:20
**print (1)**
122:12
**printed (4)**
72:10,11;122:6,21
**prior (1)**
38:5
**Probably (7)**
7:4;8:5;20:19;43:22;
126:11,16;149:22
**Procedure (3)**
5:7;157:18,20
**process (11)**
17:7;25:11,17;27:5;
48:16;51:7;53:21;
121:6;124:14;132:23;
148:10
**produce (3)**
77:12;122:9;136:10

**produced (12)**
77:16,24;78:6,8;
84:11;86:2,14;102:22;
109:25;118:21;121:2;
159:18
**produces (1)**
18:10
**product (7)**
18:8;89:3,17,21;
91:20;101:19;118:2
**products (2)**
65:5;66:18
**program (12)**
37:18;39:19,23;
46:19;125:15,21;
127:11,14,20,25;
132:16;143:18
**project (3)**
29:15;42:12;125:16
**projected (3)**
21:23;23:16;127:22
**projecting (3)**
23:23;57:12;127:1
**projection (5)**
30:4;92:17;135:11;
140:4,10
**projections (9)**
13:15;19:8,10;20:17;
22:15;30:2;46:22;
145:9;149:13
**projects (5)**
24:8,8,9;127:13,16
**proper (1)**
165:1
**properly (1)**
38:14
**properties (25)**
10:11,19;12:13;17:9,
10,11;19:1;21:1;24:11;
27:6;29:24;39:10;
44:22,23;45:15,17,18;
68:22;69:1;91:23;
92:11;149:21;156:10,
21;157:4
**property (166)**
30:13;32:12;44:1;
53:13;56:13;61:11;
62:22;63:4,16;64:2,9,
12,19;65:10,20;66:4,
25;67:13,13,24,25;
71:4,5;80:9;82:10,13,
16,24;83:3,9,13,20;
84:5,8,11;85:4,7,19,22,
25;86:12,18;88:9,13,
16,22;90:7;91:25;
92:19;93:11,18;96:3;
97:18;98:1,13,18,23;
99:9,10,14;100:13,24;
101:12,24;104:12,15,
20,24;105:1,7,18,23;
106:6,20,23,23,25;
107:16,22;108:4,8,17,
21,24;109:1,4,7,17,21;

110:3,6,11,13,15,18,22,
25;111:5,8,18,24;
112:1,5,9,15;113:2,5,8,
14,17,19,22,24;114:12,
15,18;115:6,8,19,24;
116:2,5,8,11,14,16,20,
22;117:10,17;118:4,10,
12,15,22;119:1,5,7,14,
16,18;120:6,10,15,20;
121:3,5,10,11,13,16,
19;122:2,19,24;
123:25;124:3;155:21,
25;157:18;158:12,15;
160:2,4,15;167:7
**property-specific (1)**
24:23
**protect (1)**
159:13
**protection (1)**
46:25
**protocol (28)**
14:2,5,7,10,20;15:4,
16;45:12,20,22;46:4,9;
52:5,9;142:7;144:7;
164:23;165:1,1,6,18,
22;166:17,20;167:22,
25;168:6,23
**protocols (1)**
96:13
**proved (1)**
75:4
**provide (10)**
12:7;13:17;17:19,24;
18:14;22:20;34:23;
69:24;77:13;120:3
**provided (12)**
12:16,17;13:12;14:8,
16;16:22;24:25;38:1;
48:18;78:4;166:4,11
**providing (1)**
153:7
**provision (2)**
139:16;140:4
**proximity (2)**
156:4;157:21
**publication (2)**
96:2,9
**published (2)**
96:13;133:23
**pull (4)**
47:17,25;50:9;
159:10
**pulled (1)**
38:20
**punch (1)**
38:3
**punch-out (1)**
38:6
**purpose (9)**
37:1;53:17;55:11;
56:5;57:12,15;59:22;
70:3;122:8
**purposes (1)**

5:8
**put (6)**
28:23;73:20;75:11;
94:7;135:6;147:17

## Q

**qualification (1)**
58:17
**qualified (1)**
134:1
**Quality (3)**
37:12;38:25;39:7
**Quantity (3)**
126:14,15;154:4
**quick (2)**
53:12;151:9
**quickly (1)**
47:4
**quite (2)**
129:5,25

## R

**Ranch (2)**
44:22,23
**random (1)**
50:1
**RapidSketch (11)**
53:8,10,12,17,18,22,
24;54:2,4,10,11
**Rarely (1)**
50:19
**rather (4)**
46:8;128:9;129:21;
131:10
**rationale (1)**
131:8
**react (2)**
136:23;138:1
**read (2)**
7:16;165:14
**reading (1)**
5:9
**real (1)**
151:9
**realize (1)**
33:19
**really (1)**
7:6
**reason (4)**
70:14;128:19;
142:20;151:3
**reasonable (1)**
94:22
**rebutting (1)**
21:23
**recall (10)**
10:5,11;17:16;25:1,
10;33:4;39:10;43:15;
68:21;69:3
**receive (3)**
30:20;33:22;72:6

received (5)
11:19;44:12;72:7;
75:12,15
**recent (1)**
153:24
**receptacle (3)**
48:10;50:8,11
**receptacles (1)**
46:1
**recessed (1)**
135:3
**recognized (2)**
21:18;68:13
**recollection (1)**
118:25
**record (25)**
7:16;71:21,24,25;
73:7,9,20,22;75:2,11;
76:3;80:15;90:1;104:4,
5;120:3;122:15,16,22;
129:2;148:23;151:11;
152:6;153:3;159:24
**recovery (1)**
140:5
**refer (2)**
17:10;80:15
**reference (4)**
14:18;20:9;58:21;
169:13
**referenced (2)**
116:22;169:19
**referred (1)**
120:1
**referring (2)**
75:1;78:20
**refers (1)**
79:23
**reflect (2)**
80:21;150:17
**reflection (1)**
155:16
**reflective (1)**
97:18
**reflects (1)**
71:17
**refrigeration (2)**
26:23;27:20
**Refrigerators (1)**
26:17
**regard (2)**
89:16;139:2
**regarding (18)**
10:24;22:21;23:11;
25:15;30:11;40:12;
56:13;79:12;86:9;
96:13;132:11;141:11;
142:24;143:6;160:1,
13;161:1;164:23
**regardless (1)**
133:22
**registration (1)**
42:21
**regulations (1)**

133:7
**reimbursable (1)**
11:11
**reimbursement (1)**
11:3
**rejected (1)**
8:17
**relate (2)**
13:13;36:23
**related (23)**
7:25;8:3;32:12;43:1;
65:9;69:25;78:12;
82:18;84:21;85:6,18;
88:15;90:5,14;102:12;
110:10,17;111:7;
122:24;123:6;129:24;
131:2;134:24
**relates (4)**
66:24;101:11;
107:15;110:24
**relating (1)**
60:10
**relatively (1)**
162:10
**rely (1)**
134:4
**relying (1)**
94:2
**remediate (1)**
94:11
**remediated (7)**
92:7;93:4,14,25;
125:18;147:3;169:18
**remediating (1)**
146:7
**remediation (44)**
10:24;25:5;37:7,11,
18;38:14;39:19,22;
42:14;44:10;46:19;
92:10,18;93:7;94:4;
95:5,18,22;96:3,14;
125:10;127:1,10,20,25;
130:9,16;132:15;
140:25;141:7;142:7;
143:18;144:17,24;
145:7;146:1;159:4;
164:23;165:6,21;
166:17;167:1;168:23;
169:17
**remediations (7)**
25:16;37:17;39:24;
41:14;127:20;138:14;
143:16
**remember (5)**
37:5;39:13;60:16;
165:2,7
**remind (1)**
46:7
**remodel (1)**
42:14
**Remove (4)**
134:12,19,20;139:6
**removed (4)**

27:16;93:17;138:25;
141:23
**repair (1)**
22:2
**Repeat (1)**
57:14
**replace (15)**
28:4;80:4;94:23;
134:12,17,19,20;135:4;
139:6;142:8;144:12;
167:8,10,15
**replaced (15)**
26:13,16;27:1,17;
139:1;141:22,23;
144:16;159:9,12;
166:6,10,13,14;167:18
**replacement (11)**
45:24,25;46:1,2,5,
24;143:9;158:21;
159:6;167:3,4
**replaces (1)**
78:17
**replacing (5)**
43:19,20,20;145:7;
147:4
**report (11)**
12:2,17;13:23;22:17;
71:25;75:18;78:19;
86:24;122:4;155:3,12
**Reporter (2)**
5:22;7:10
**reports (28)**
21:13;52:21;54:15;
61:7;72:3,24;73:5;
75:2;77:6;87:15;
150:17;151:3,5;
152:13,16,20;153:24;
154:7,8,15,17,22;
155:2,5,9;157:6,11;
159:19
**represent (8)**
73:16,22,25;74:4,9;
76:16;118:20;152:7
**representatives (2)**
142:24;148:11
**representing (1)**
76:9
**reprimanded (2)**
40:21,25
**require (8)**
28:8,19;29:14;45:23,
25;48:17;93:16;158:21
**required (5)**
25:17;26:2;28:23;
92:10;159:5
**requirements (4)**
28:11;126:10;132:2;
150:17
**requires (3)**
29:19;55:3;130:8
**re-read (2)**
161:11;162:2;
165:10,12

reserve (1)
159:17
**reserved (1)**
5:17
**reset (19)**
27:18;134:21,24;
135:8,13,17,20,24;
138:5,20;139:18;
140:1,6;141:11,17,19;
147:22;167:13,13
**resetting (1)**
140:3
**residence (1)**
71:11
**residential (4)**
19:1;32:9,12,15
**resolution (1)**
149:22
**respect (1)**
164:7
**respond (1)**
168:15
**responded (1)**
7:18
**responding (1)**
7:15
**response (1)**
77:7
**responsibility (1)**
132:22
**responsible (2)**
77:9;131:9
**responsiveness (1)**
5:16
**restoration (1)**
125:13
**restoration/remodel (1)**
125:10
restoration/service/remodel (1)
125:6
**result (4)**
130:9;132:3;137:5;
138:5
**résumé (1)**
151:17
**retain (1)**
29:6
**retained (10)**
6:15;8:6,9,12;12:7;
18:20,24;19:7;30:6;
152:8
**retired (1)**
45:4
**review (4)**
21:6,9;140:18;141:6
**reviewed (7)**
21:4;52:15,17,18,24;
152:12;154:16
**reviewing (2)**
13:20;77:5
**revise (1)**
60:20;140:14;141:8
**revised (29)**

21:14;59:19;60:9,19,
21,24;72:8,11,16,18,
19,23;75:3,24;76:1,5;
77:5;79:20;80:4;81:5;
82:4;87:14;90:23;
118:17;122:3,20;
123:3;142:1;154:12
**revising (1)**
59:22
**revisions (2)**
60:17;72:2
**Rey (1)**
66:20
**Reynolds (1)**
116:1
**right (120)**
6:16;11:19;12:25;
13:3;21:24;30:16;
33:12;34:1,14;35:17,
20,23;36:4,7,11;37:24;
38:2,5,8;42:5;44:7,10;
45:16;52:25;54:15;
55:4;56:8,24;57:10;
58:18;61:13;63:1,7,24;
64:4,9,17,23;65:7;
66:14;67:3,15;68:2;
70:9,21;71:9;74:3,14;
77:18;78:13;80:22;
81:23;82:13,21;83:3,
13,24;84:2,13;85:1,11;
86:19;87:5;88:9,19;
89:18;90:3,12,18;
97:14,15,23;98:10;
99:1,7,11;100:6,15;
101:3,9;102:2,6,19;
104:16,21;105:4,21,25;
106:9,17;107:13,19;
108:22;109:4,14,21;
111:5;112:12;113:25;
115:9;120:24;121:7,
19;122:2;123:2,11,17;
124:3;126:13;129:22;
139:18;140:7,8,10;
143:25;147:8;159:17;
162:11;165:22;166:6
**Rigopoulos (1)**
116:7
**R-I-G-O-P-O-U-L-O-S (1)**
116:7
**ring (1)**
135:5
**road (1)**
7:17
**Robbins (1)**
116:16
**role (2)**
12:19;39:22
**roll (1)**
62:15
**rollers (1)**
136:10
**roof (2)**
43:19;129:13

**room (3)**
48:10;50:1;94:9
**rooms (1)**
50:15
**Roopchand (1)**
117:10
**R-O-O-P-C-H-A-N-D (1)**
117:11
**Rouge (3)**
82:10;113:11;124:20
**round (1)**
57:4
**routinely (1)**
11:6
**Royal (1)**
108:25
**RSMean (1)**
22:17
**RSMeans (9)**
22:1,10,15;23:16,23;
24:3,3,17,20
**rule (3)**
29:25;132:10,23
**Rules (2)**
5:7;162:21
**run (4)**
47:4;61:8,23;103:10
**rush (1)**
9:1
**Russell (1)**
117:16

**S**

**safety (1)**
130:18
**Salabarria (1)**
118:3
**Sales (1)**
126:6
**Salvatore (3)**
51:12,13,16
**Same (26)**
39:3;40:7;46:4;48:4;
50:15;58:1;61:7;68:8;
75:24;93:25;98:22;
122:22,24;123:5;
126:16;135:19,23;
138:22;139:12;148:6,
6,7,13;162:18;163:1;
164:15
**Sandstone (1)**
64:20
**satellite (2)**
31:21,23
**save (2)**
5:14;159:10
**saying (2)**
144:10;160:5
**scheduled (1)**
26:16
**scheduling (1)**
34:20

**school (3)**
35:9;40:22;41:1
**schools (1)**
34:23
**scope (3)**
92:10;96:3;125:1
**scoped (3)**
26:12;28:4;134:17
**scopes (1)**
166:21
**Scott (1)**
118:9
**screen (2)**
43:12;122:8
**Sea (2)**
44:22,23
**sealing (1)**
5:11
**Sean (1)**
22:18
**Sebring (1)**
123:25
**second (24)**
8:15;24:25;39:2,6;
56:17,18;60:18;62:21,
23;63:3,15;73:8;89:10,
11;92:7;93:4,10;97:23;
98:3,15;123:3,5;
124:18;126:9
**section (5)**
56:17;58:14;123:6;
126:10;134:7
**sections (1)**
154:18
**seem (2)**
18:18;159:22
**select (1)**
42:8
**selected (1)**
51:16
**selection (1)**
42:11
**selective (5)**
93:7;94:4;95:5,17,22
**selectively (2)**
93:21,23
**send (1)**
129:8
**sense (4)**
7:19,20;9:6;46:10
**sent (1)**
77:8
**series (1)**
152:12
**serves (1)**
57:15
**set (5)**
41:21,25;42:3,12;
149:19
**settled (1)**
25:3
**settlement (33)**
10:1;11:12,15;14:7,

11,16,21;15:6,13,17,
21;24:21,25;25:11,17;
26:11;28:20;37:19;
45:13;46:20;51:19;
58:2,5,17,20,24;120:4;
128:21;142:11;143:20,
24;167:22;168:5
**settlements (1)**
167:24
**setup (1)**
45:10
**Seven (15)**
57:2,3;61:15;65:17,
25;67:5,11;71:1;86:19;
105:12;106:8,19;
107:7;112:4,17
**several (4)**
9:25;54:21;94:6;
125:8
**shatterproof (1)**
131:22
**sheet (1)**
154:13
**sheetrock (23)**
61:20,25;62:7,8,13;
63:13;64:16;83:6,16;
84:8,19;85:4;86:3,6,
14;88:13;89:14;97:14;
99:25;100:21;102:25;
112:21;115:1
**sheets (1)**
49:12
**shift (1)**
46:8
**shifted (1)**
129:21
**shiny (1)**
157:24
**shoulder (4)**
130:6,15;133:1,5
**show (2)**
23:15;87:11
**showed (1)**
27:15
**shower (1)**
50:25
**showing (1)**
157:22
**shows (4)**
35:17;54:1;78:19,21
**side (6)**
27:25;28:1;68:12,13;
79:1;111:9
**signing (1)**
5:10
**signs (3)**
27:15,19;157:22
**silly (1)**
18:18
**similar (2)**
132:10;166:1
**simply (1)**
7:13

**sites (1)**
68:25
**situation (5)**
96:15;138:6,22;
139:13;169:14
**Six (18)**
32:1;49:1,14,15;
67:18;82:20;86:11;
97:25;99:21;104:15;
106:2;108:7;110:21;
113:1;119:11;121:12;
124:2;127:2
**size (4)**
24:5;25:14;48:23;
158:18
**sized (1)**
126:25
**sketch (15)**
12:16;42:24;43:24,
25;53:13,15;54:7,12;
59:8;75:19;118:21;
155:10,14,15,19
**sketches (3)**
154:25;155:1,11
**skip (1)**
70:11
**Slidell (3)**
71:12;85:19;113:4
**slow (2)**
9:2;115:16
**small (1)**
123:13
**smaller (2)**
51:3;164:17
**smoke (2)**
46:2;167:17
**smoothly (1)**
7:9
**software (1)**
53:8
**somebody (1)**
145:2
**sometime (1)**
16:18
**somewhere (1)**
158:5
**sons (1)**
33:2
**sorry (5)**
27:17;114:2;134:19;
165:7;166:9
**sort (1)**
52:11
**sought (1)**
5:18
**sound (1)**
118:24
**source (2)**
95:15;131:5
**South (5)**
98:4,18,23;131:22;
132:14
**Southwest (2)**

109:17,24
**space (107)**
53:20;54:3,22,23;
55:11,19;56:3;62:19;
63:21;64:11;65:1,18;
66:1;67:6,22;68:5;
70:24;71:8,16;81:16;
82:13,20;83:2;84:16,
25;85:13,17,24;86:22;
87:9,17,19,24;90:12;
96:5;97:22;98:1,13,20,
25;99:7,14,22;100:8,
18;101:6,8,16;102:9;
105:3,14,21;106:3,9,
21;107:2,8,22;108:1,7,
13,20;109:3,9,21;
110:2,8,15;111:4,11,
17,23;112:5,11,18;
113:1,8,13,19,24;
114:7,14,22;115:8,13,
23;116:4,13,19;117:14,
19;118:7,12;119:6,12,
18,22;120:13,18,24;
121:7,13;122:1;
123:17,21;124:3;164:3
**spaces (1)**
55:16
**spacing (1)**
164:18
**speak (1)**
143:3
**speaking (9)**
10:25;20:20;36:17,
22;37:16;51:3;61:22;
68:11;132:1
**specific (6)**
24:4;42:7;90:22;
125:25;157:19;169:12
**specifically (8)**
5:10,12;39:20;77:2;
79:17;124:23;165:5;
169:9
**speculative (2)**
58:11;60:4
**spoken (1)**
6:9
**Spring (2)**
113:21;119:9
**Springs (3)**
65:10;101:1;121:2
**sprinkler (2)**
46:5;167:6
**square (149)**
12:24;13:14;15:18;
19:2;24:6;26:13,15;
27:7;48:18,19;53:6,19,
22;54:9,17;55:12;
61:12,12;62:25,25;
63:6,18;64:2,3,21,22;
65:14,14,21,22;66:7,8;
67:2,14;68:1;70:7,8,
21;71:6,14;81:12;
82:11,19,25;83:1,11,

11,22;84:2,12,23;85:8,
21;86:18;88:5,6,18,18;
90:8,16;91:6,7;92:1;
97:16;98:9,19,24;99:5,
11,20;100:3,4,14,14;
101:2,14;102:1,2,14;
104:14,25;105:8,9,19,
20,24;106:7;107:1,6,
17,18,25;108:6,11,12,
18;109:1,7,18,19;
110:1,6,13,20;111:3,
10,15,22;112:2,3,9,16,
24;113:6,12,17,23;
114:13,18;115:4,5,22;
116:3,9,17;117:12,13,
17;118:5,10,16,23;
119:10,16;120:8,17,21,
22;121:3,12,17;123:5,
5,20;124:1;127:4,5;
155:12,16
**St (9)**
67:25;83:10;90:7,15;
91:5;104:24;107:16;
120:7,20
**staff (2)**
20:21;49:17
**stamp (1)**
70:1
**stamped (2)**
68:10;80:14
**stand (2)**
146:19;151:6
**standalone (2)**
12:1;56:1
**standard (6)**
15:12,16;28:24;55:3;
139:3;144:8
**standardizing (1)**
61:4
**standards (1)**
52:1
**Stanfa (5)**
118:14,18,21;119:1,
5
**start (5)**
6:8;7:15;47:14;48:9;
135:7
**started (2)**
16:20;143:1
**starting (1)**
35:13
**start-off (1)**
128:1
**State (9)**
5:23;9:19;10:8;
33:11,23;35:18;36:3;
132:3;164:15
**stated (1)**
140:23
**statement (1)**
76:13
**states (7)**
39:23,25;40:1,11;

44:18;87:22;132:10
**stating (1)**
141:22
**stay (1)**
135:4
**still (11)**
20:1;27:16;32:22,23,
24;46:25;55:17;72:16;
89:17,21;128:20
**stipulate (1)**
80:2
**stipulated (1)**
5:3
**Stockton (1)**
119:9
**stopped (2)**
129:10;130:3
**storage (2)**
54:8;56:5
**stored (1)**
164:4
**stoves (1)**
26:17
**straight (1)**
164:19
**straps (4)**
129:16,18;130:18;
131:19
**Street (3)**
100:25;110:25;111:8
**strictly (1)**
69:25
**strips (1)**
164:13
**stronger (1)**
150:1
**structure (3)**
101:3;111:2,9
**studied (1)**
34:13
**studies (2)**
33:12;34:16
**studs (1)**
121:22
**study (1)**
33:14
**studying (1)**
34:18
**style (1)**
10:5
**subcategory (1)**
42:15
**subcontractors (4)**
25:6;38:1,7,7
**subject (3)**
133:24;134:2;149:3
**subjects (3)**
12:6,9,10
**submission (1)**
11:10
**submitted (7)**
21:15;25:18;26:2;
28:20;59:16;78:1;

128:4
**subsequent (1)**
167:24
**substance (1)**
11:1
**subtract (1)**
54:8
**successful (1)**
40:6
**suffer (1)**
9:12
**sufficient (1)**
153:8
**suggest (2)**
18:15;163:16
**suggesting (4)**
161:6;163:4,18,23
**summaries (1)**
115:15
**summary (12)**
60:25;61:1,2,5;
79:21,24;87:4,21;
115:10;119:19;153:18;
154:10
**supersede (1)**
95:21
**supersedes (2)**
96:2,6
**support (1)**
82:7
**supposed (3)**
72:11;75:14;76:6
**sure (15)**
7:8;10:20;37:9;49:2;
68:7;81:22;90:24;93:8,
9;117:5;120:2;128:24;
145:22;146:22;165:4
**switch (2)**
138:20,25
**switches (2)**
46:2;167:5
**sworn (1)**
6:3
**system (2)**
55:25;56:1
**systems (3)**
30:13;130:18;149:1

## T

**Tab (6)**
30:17;31:2,7;151:16,
16,19
**Tabacchi (1)**
119:14
**T-A-B-A-C-C-H-I (1)**
119:15
**Taishan (9)**
66:13,18;70:2,3;
80:25;102:5,9;122:4;
123:8
**talk (3)**
24:24;30:7;76:19

**talked (2)**
45:10;72:19;124:16;
131:11;143:1,14
**talking (15)**
10:3;14:6;19:12;
32:3;50:17;52:9;68:7,
9,14;69:13,23;94:25;
127:12;130:11;169:9
**Tampa (1)**
84:11
**tape (10)**
88:25;89:4,8,24;
106:12;109:12;117:22;
118:1;123:9,15
**tarnished (1)**
156:1
**tarnishing (1)**
48:8
**tax (1)**
126:6
**Taylor (1)**
120:6
**temperature (1)**
47:20
**Ten (6)**
6:25;7:22;49:3;
72:14;75:6;85:10
**term (2)**
17:11;52:5
**termites (1)**
129:18
**terms (7)**
11:15;47:18;124:24;
129:19;156:19;166:25;
169:16
**tested (1)**
117:4
**testified (5)**
6:4;9:16,17,25;
106:16
**testify (3)**
10:22;93:1;131:1
**testimony (66)**
7:11;9:5,10,14;
13:11,17;21:22;22:20;
23:2,22;24:1;45:12;
61:18;66:16;67:8;78:2;
79:11;82:8;86:8;87:20;
88:11;89:13;92:9;94:3,
12;96:1,12;97:5;
102:21;117:1;122:9;
130:6,14;131:4,7;
132:25;133:10,11;
134:5;139:15,21;
141:12,18;142:10;
143:23;144:14;145:1,
10;146:9,18;149:10;
150:10;153:1;155:5,6;
159:23,25;160:6,16,19;
161:4,11;163:9,13;
164:25;165:14
**testing (3)**
117:6;147:10,13

**Texas (6)**
40:3;64:20,21;65:21;
99:20;164:3
**theory (1)**
135:19
**thereafter (2)**
127:6;167:24
**thereof (1)**
5:18
**third (5)**
25:24;56:18;61:2;
63:15;134:25
**though (2)**
50:8;52:21
**thought (1)**
159:25
**thousand (5)**
48:19,25;49:1;127:5,
7
**three (30)**
7:4;10:15;34:23;
64:8;66:10;71:15;
78:21;79:25;80:16;
81:15;82:12;85:10,22;
98:20;107:10;110:14;
114:21;116:19;118:6;
127:1,5,7,7,9,21,22;
128:2,4;129:2;154:19
**three-month (1)**
127:18
**three-sided (1)**
49:16
**throughout (6)**
55:24;87:5,22;90:25;
119:19;164:15
**Tianjin (2)**
18:5,16
**tied (1)**
145:22
**tie-down (1)**
129:16
**tile (2)**
28:3,4
**times (9)**
6:9,21;7:6,21;8:9;
9:22;11:9;154:19;
167:24
**Timmons (1)**
120:15
**today (9)**
6:10;9:8,14;30:20,
22;47:9;75:22;129:9;
154:16
**together (1)**
141:10
**toilet (1)**
50:25
**told (9)**
40:4;42:22;43:23;
77:4;79:24;93:12;94:7;
166:18;167:8
**Tolliver (1)**
120:20

**took (9)**
27:25;33:10;35:13;
76:21;122:18;127:13,
16,20;130:4
**tools (2)**
49:18;157:19
**top (8)**
59:3;72:15;73:2;
75:8;79:3,9;82:1;
136:25
**topic (1)**
166:3
**total (1)**
103:25
**totally (1)**
146:16
**towards (1)**
165:13
**track (1)**
136:10
**training (3)**
20:6;41:10,19
**Tran (1)**
121:1
**transcript (2)**
165:10,12
**transferred (1)**
33:25
**transmitted (1)**
21:18
**travel (1)**
39:17
**traveled (1)**
39:20
**trial (14)**
9:6;23:2;82:5;86:9;
131:7;132:25;133:10;
140:13;141:8;149:19;
151:6;160:6;161:1;
164:25
**trials (2)**
9:18;149:22
**tried (1)**
50:14
**triggered (1)**
132:24
**triggers (1)**
130:16
**trim (1)**
134:25
**trusses (1)**
164:20
**Trust (1)**
100:25
**truthful (2)**
9:9,14
**try (5)**
7:11;9:1;47:3,21;
48:1
**trying (7)**
12:19;74:21;76:3;
89:25;115:17;139:7;
153:9

**turn (4)**
47:3;77:16;126:9;
141:13
**turns (1)**
138:7
**Twenty-five (1)**
25:25
**twice (1)**
162:18
**two (36)**
8:5;10:19;17:14;
24:19;29:7;31:11,12;
33:2;37:2,6;43:22;
48:25;49:5,13;50:15;
72:6,7;78:8;83:2;
84:24;98:12,25;102:4;
104:25;107:1;108:20;
111:4,16,23;113:18;
117:18;119:6;122:23;
153:19;158:4;169:6
**two-foot-four (1)**
49:10
**Tyler (1)**
121:9
**T-Y-L-E-R (1)**
121:9
**type (17)**
23:7,14;28:2;29:19;
30:3;42:11;46:5;48:15;
80:21;95:15;130:10;
137:18;138:6;139:12;
147:10;148:10;157:23
**types (2)**
36:21;138:1
**Typically (7)**
28:21;49:11;87:11;
127:9;136:9,23;157:12
**typos (1)**
155:18

---

**U**

**umbrella (1)**
89:22
**uncomfortable (1)**
75:5
**unconditioned (2)**
55:5,6
**under (102)**
5:6;19:2;24:8;26:15,
22;27:2,7;38:19;48:25;
49:1;53:6,22;55:12;
63:7;65:14,22;66:7;
67:3,14;81:12;82:11,
19,25;83:11,22;84:2,
12;85:8;86:18;88:6,19;
89:21;90:8;91:6,7;
92:1;97:17;98:9,19,24;
99:5,21;100:3,13,14;
101:2,15;102:1,2;
104:14,25;105:8,19,24;
106:7;107:1,6,17,25;
108:6,12,18;109:2,8,

18;110:1,7,14,20;
111:3,16,22;112:2,3,
10,16,25;113:6,12,18,
23;114:13,19;115:5,
22;116:9,18;117:12,
18;118:5,11,15,23;
119:11,17;120:8,17;
121:4;123:20;124:1;
127:14;129:19
**undergraduate (1)**
33:11
**undetermined (1)**
90:2
**unethical (1)**
43:3
**unhappy (1)**
37:10
**unidentified (1)**
72:21
**unit (2)**
48:3;157:9
**units (2)**
156:19,20
**University (4)**
33:11,23;34:14;35:6
**unknown (10)**
59:25;60:2;61:16,18,
24;62:12;66:17;67:11;
86:11;105:1
**unless (1)**
124:23
**unmarked (3)**
61:24;62:7,12
**unrelated (1)**
129:12
**up (31)**
19:5;26:4,6;28:5;
34:7;41:21;42:1,3,12;
43:12;47:17;49:13,16;
57:4;59:8;73:2;75:8;
78:16,23;79:3,8;
103:20;118:18;120:21;
129:16;135:6;145:22;
153:22;154:3;159:24;
164:4
**updated (1)**
31:10
**updates (1)**
125:22
**upgrades (4)**
29:14;130:8,10,11
**upon (2)**
134:4;143:8
**upper (1)**
68:17
**use (22)**
14:17,20;15:3,12,16,
20;16:11,24;25:1;
46:14,16;49:3;50:9;
80:1;97:3;124:13;
164:9,13,13,16,17,18
**used (22)**
5:18,19;20:4,5;22:4;

18;110:1,7,14,20;
24:20,21;43:22;45:19;
46:12;53:8,11,13,16,
24;54:4,12;60:19;
96:10;157:20;164:8;
165:1
**USG (6)**
67:10;72:25;78:23,
24;86:2,9
**using (5)**
19:19;22:9;25:5;
43:4,18
**utilize (7)**
14:9;49:17;51:7;
53:21;95:16;96:21;
122:5
**utilized (7)**
25:4;45:12;52:5;
58:16,21;166:21;
167:25
**utilizing (1)**
20:14

---

**V**

**vague (1)**
19:23
**value (2)**
26:6;29:15
**values (1)**
24:19
**Vandrie (2)**
121:15;122:19
**V-A-N-D-R-I-E (1)**
121:15
**vanities (1)**
144:13
**vanity (1)**
51:1
**various (1)**
126:25
**vehicles (1)**
56:5
**Veira (1)**
123:19
**V-E-I-R-A (1)**
123:20
**verbiage (1)**
78:17
**version (12)**
16:3;59:17;118:17;
123:4;152:19,24,25;
153:4,6,11,24;157:11
**versions (3)**
73:13;154:7,8
**versus (8)**
17:22;22:10,12,15,
18;23:16;26:4;76:5
**vet (2)**
33:17,20
**via (1)**
13:15
**vicinity (1)**
157:25

**view (1)**
122:7
**viewed (1)**
136:11
**virtually (1)**
37:25
**visual (2)**
48:1;50:9

**W**

**Wait (1)**
115:10
**waived (2)**
5:10,13
**Walk (2)**
53:21;115:17
**walked (1)**
43:8
**walking (1)**
44:5
**wall (12)**
26:4,7;50:22,23,25,
25;53:25,25;158:1;
164:1;167:15;169:10
**walls (10)**
30:14;48:12;50:18,
19;87:19;115:10;
119:19;123:17;134:13;
164:5
**Wan (1)**
69:4
**washers (1)**
26:19
**water (1)**
48:3
**Waveland (1)**
88:4
**way (28)**
13:18;23:24;24:17;
41:2,6;44:15;53:12;
58:1;59:1;66:22;74:10;
76:1,17;79:6,18;81:24;
86:6;91:18;92:7;93:5;
94:7,22;117:2;142:11;
145:10;146:10;159:10,
13
**ways (1)**
41:25
**WCCI (2)**
51:15,18
**wear (1)**
103:22
**Weather (2)**
128:19,22
**week (1)**
22:14
**weekly (1)**
39:20
**well-paying (1)**
35:7
**weren't (3)**
138:8;141:1;160:1

**What's (6)**
51:11;56:10;77:23;
103:25;135:1;143:15
**Where's (1)**
34:3
**Whereupon (4)**
31:3,13;47:5;124:7
**whole (1)**
34:10
**Who's (1)**
77:9
**wife (1)**
33:2
**window (1)**
129:13
**windows (3)**
43:20;130:18;131:21
**Wine (1)**
26:24
**Winter (2)**
82:24;153:12
**wire (1)**
45:25
**wires (2)**
50:10,10
**within (1)**
30:13
**without (4)**
27:2;55:19;87:25;
147:3
**witness (32)**
5:6,24;57:25;62:3;
72:1;74:24;95:9;97:1;
103:16,24;128:13;
133:16;137:9;138:12;
139:22;142:6;143:13;
144:3,20;146:14;
147:2,20;148:5;150:6,
23;156:16,25;160:9,
20;163:10;165:25;
168:4
**won (1)**
37:8
**Wong (1)**
69:4
**wood (2)**
148:7,8
**words (1)**
162:24
**work (14)**
19:20;32:11,18;
37:21,22,23,25;38:2,8,
16;39:18;51:13;
162:21;166:22
**worked (1)**
144:12
**working (2)**
31:17;32:24
**workmanship (1)**
39:9
**worse (1)**
17:25
**Wuhu (2)**

69:4;116:23
**W-U-H-U (1)**
116:23

**X**

**Xactimate (63)**
12:18;13:15;15:22;
19:8,10,19;20:5,9,17;
21:13;22:10,19;23:17;
24:3,15,21;25:1,8;
30:2;41:9,14,19,21;
42:1,8,12,20,23,25;
43:4,9;44:6;45:11,19;
46:25;47:2;51:18;
53:15;75:19;92:12,17;
97:8;124:12,25;
125:15,22;126:13,19,
19;138:9;140:4,24;
141:14;145:9,25;
150:17;151:3,24;
157:5,7,13,16;166:21
**Xactimates (5)**
11:24;20:25;45:15;
52:14;132:1
**Xactimate's (1)**
46:22
**XRF (1)**
49:23

**Y**

**year (4)**
16:6,17;33:21;75:16
**years (9)**
6:22,24,25;7:4,22;
19:11;29:7;51:21;
168:20
**yellow (7)**
89:4,7,23;106:12;
117:22;118:1;123:9

**Z**

**Zelenenki (1)**
123:24
**Z-E-L-E-N-E-N-K-I (1)**
123:24
**ZIP (1)**
125:24

**1**

**1 (26)**
11:23;13:20,21,22,
23;14:3,3;25:4;30:17;
31:1,2,5;39:11;40:5;
47:23;52:22;59:1;
75:21;84:10;85:15,16;
87:6;151:15,16,21;
154:10
**1,058 (1)**
101:3

**1,064 (1)**
104:24
**1,365 (1)**
99:11
**1,369 (1)**
108:6
**1,379 (1)**
111:22
**1,390 (1)**
86:18
**1,444 (1)**
112:24
**1,451 (1)**
121:3
**1,471 (1)**
105:25
**1,490 (1)**
118:5
**1,533 (1)**
107:1
**1,535 (1)**
107:25
**1,538 (3)**
85:21;99:20;124:1
**1,565 (1)**
107:18
**1,588 (1)**
91:7
**1,621 (1)**
104:14
**1,627 (1)**
116:9
**1,664 (1)**
110:1
**1,690 (2)**
109:7;113:17
**1,728 (1)**
100:4
**1,732 (1)**
63:18
**1,764 (1)**
112:3
**1,768 (1)**
84:13
**1,825 (1)**
114:18
**1,834 (1)**
83:1
**1,843 (2)**
61:12;82:19
**1,947 (1)**
88:18
**1,993 (1)**
119:10
**1.538 (1)**
114:13
**10 (1)**
49:3
**10-by-12 (1)**
49:11
**11 (1)**
66:17
**112 (1)**

109:24
**12 (1)**
121:24
**12:30 (1)**
103:7
**1329 (1)**
100:24
**14 (2)**
108:21;168:20
**14731 (1)**
109:17
**15 (2)**
105:11;141:13
**15th (3)**
16:3,6,7
**1960 (1)**
156:1
**1970s (1)**
35:14
**1978 (3)**
35:3,5;44:23
**1980 (1)**
29:4;35:23;36:1

**2**

**2 (13)**
13:25;14:1,4;31:7,
15;39:12;40:8;44:21;
59:3;134:9,9;151:16,
18
**2,000 (1)**
49:3
**2,020 (1)**
102:15
**2,031 (1)**
65:14
**2,053 (1)**
83:11
**2,089 (1)**
111:15
**2,092 (1)**
117:17
**2,106 (1)**
68:1
**2,112 (2)**
70:8,21
**2,195 (1)**
123:20
**2,215 (1)**
120:8
**2,221 (1)**
67:15
**2,231 (1)**
101:14
**2,257 (2)**
121:17;123:5
**2,286 (1)**
115:22
**2,309 (1)**
118:10
**2,332 (1)**
90:9

**2,334 (2)**
90:16;117:13
**2,362 (1)**
106:7
**2,393 (1)**
120:22
**2,413 (1)**
120:16
**2,416 (2)**
82:11;99:5
**2,426 (1)**
121:12
**2,439 (2)**
91:25;97:21
**2,457 (1)**
113:5
**2,511 (1)**
66:8
**2,518 (1)**
105:20
**2,519 (1)**
112:9
**2,563 (1)**
84:24
**2,569 (2)**
110:13;116:17
**2,581 (1)**
115:4
**2,595 (2)**
113:22;114:9
**2,667 (1)**
71:15
**2,795 (1)**
64:22
**2,800 (1)**
147:3
**2,843 (1)**
109:1
**2,853 (1)**
109:19
**2,872 (1)**
119:16
**2,881 (2)**
62:25;63:6
**2,915 (1)**
108:19
**2,921 (1)**
84:1
**2,961 (1)**
113:12
**2,985 (1)**
102:2
**2,996 (1)**
71:7
**200 (1)**
20:19
**2004 (2)**
32:19,20
**2006 (9)**
28:22;44:23;45:3,5;
93:5;94:8;157:1;
168:19,20
**2007 (2)**

28:22;94:8
**2008 (1)**
94:8
**2009 (2)**
44:12;94:8
**2010 (1)**
20:7
**2011 (23)**
15:5,13,17,21;25:3;
28:20;37:18;45:13,22;
46:9,20;51:21;58:14,
20,24;95:23;96:7;
142:7,10;143:20;
144:9;167:23;168:5
**2012 (1)**
51:21
**2013 (4)**
16:3,7;95:23;96:1
**2019 (1)**
16:18
**2047 (1)**
94:25
**20741 (2)**
17:2;150:19
**2101 (1)**
6:1
**23631 (1)**
109:23
**268 (1)**
141:14
**2nd (1)**
75:13

---

## 3

**3 (10)**
47:3,7;122:22;
134:23,25;151:19,19,
22;152:14;154:10
**3,000 (2)**
19:14;127:4
**3,019 (1)**
100:14
**3,194 (1)**
83:23
**3,200 (1)**
116:3
**3,209 (1)**
88:6
**3,292 (1)**
64:3
**3,419 (1)**
107:6
**3,481 (1)**
108:12
**3,500 (6)**
26:13,15;27:2,7;
127:4,7
**3,500-square-foot (1)**
127:23
**3,572 (1)**
85:9
**30 (1)**

25:25
**300 (2)**
11:13,14
**30th (1)**
75:15
**31 (1)**
135:1
**31st (1)**
75:15
**33 (1)**
25:23
**3310 (1)**
56:21
**33311 (1)**
6:3
**34 (1)**
109:17
**39 (1)**
135:18
**3rd (1)**
56:21

---

## 4

**4 (5)**
124:5,9;135:18;
151:23;152:1
**4,089 (1)**
65:22
**4,210 (1)**
67:3
**4020 (1)**
153:12
**418 (1)**
64:20
**44 (1)**
135:18
**46 (2)**
135:18;139:10
**4625 (1)**
110:25
**4627 (2)**
111:7,8

---

## 5

**5,076 (1)**
112:16
**5,202 (1)**
105:9
**5,867 (1)**
81:13
**5,975 (1)**
118:23
**50 (8)**
25:21;29:16,25;
32:13,16;132:10,16,23
**50-50 (1)**
152:22

---

## 7

**70s (1)**

33:12

---

## 8

**818 (1)**
110:7
**826 (1)**
110:20
**847 (2)**
111:3,10

---

## 9

**9 (1)**
126:20
**90 (1)**
56:23
**900 (3)**
98:10,19,24
**98 (1)**
24:16