```
                                                              1
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4

 5

 6

 7   * * * * * * * * * * * * * * *

 8   IN RE: CHINESE-MANUFACTURED   *  MDL NO. 2047
     DRYWALL PRODUCTS LIABILITY
 9   LITIGATION                    *  SECTION:  L
     * * * * * * * * * * * * * * *
10   THIS DOCUMENT RELATES TO:     *
                                      JUDGE FALLON
11   Elizabeth Bennett, et al. v.  *
     Knauf Verwaltungsgesellschaft,   MAG. JUDGE
12   KG, et al.                    *  WILKINSON
     2:14-cv-02722-EEF-JCW
13   * * * * * * * * * * * * * * *

14

15

16

17

18

19

20           Deposition of PHILIP ALLEN ADAMS,

21   taken on Thursday, February 13, 2020, in the

22   offices of FISHMAN HAYGOOD, LLP, Attorneys at

23   Law, 201 St. Charles Avenue, Suite 4600, New

24   Orleans, Louisiana 70170.

25
```

EXHIBIT 8

1   substance of that?  Were you asked to evaluate
2   the incurred cost, the documented cost that
3   the plaintiff had presented for reimbursement?
4       A.   Yes.
5       Q.   Is that something you've done outside
6   of this case routinely for the Knauf
7   defendants?
8       A.   Yes.
9       Q.   How many times do you think that
10  you've evaluated an ARH submission for
11  evaluation of reimbursable costs?
12      A.   With the settlement agreement, I've
13  done over 300.
14      Q.   So you've done over 300, where you
15  were applying the settlement agreement terms
16  to evaluate whether the costs were
17  appropriate.
18      A.   Yes.
19      Q.   All right.  Mr. Adams, I have received
20  the expert disclosures made by opposing
21  counsel that have the documents that you and
22  your company created.  I've got a copy of your
23  CV, I've got a copy of your Phase 1 letters,
24  I've got all the Xactimates that have been
25  completed.

```
 1                He's an expert.
 2   BY MR. DOYLE:
 3       Q.   I'm asking did you use it and apply it
 4   to this case.  Did you apply the protocol that
 5   was attached as an exhibit from the 2011
 6   settlement agreement to this case?
 7       MS. JOHNSON:
 8                Objection, compound.
 9   BY MR. DOYLE:
10       Q.   You can answer.
11       A.   Yes.
12       Q.   Did you use any standard outside of
13   what was contained in the 2011 settlement
14   agreement for inspections of homes?
15       A.   For the inspection, no.
16       Q.   Did you use any standard or protocol
17   outside of the 2011 settlement agreement for
18   measuring the square footage of the homes?
19       A.   Measuring, no.
20       Q.   Did you use anything outside the
21   settlement agreement from 2011 to generate the
22   Xactimate cost estimates?
23       A.   Yes.
24       Q.   What?
25       A.   CPSC guidelines.
```

```
                                                                19
 1    the measurement of residential properties to
 2    determine the under air square footage?
 3        A.   Yes.
 4        Q.   This one may not be as obvious, and I
 5    understand we may need to follow up with some
 6    follow-up questions on this.
 7             Are you being retained because you're
 8    an expert in Xactimate cost projections?
 9        A.   Yes.
10        Q.   How many Xactimate cost projections
11    have you done over the years?  And when I say
12    you, I'm talking about your company, Moss &
13    Associates.
14        A.   Over 3,000.
15        Q.   And those in the Chinese drywall?
16        A.   Yes.
17        Q.   Entirely?
18        A.   Yes.
19        Q.   Did you begin using Xactimate around
20    the time that Chinese drywall created work for
21    your company?
22    MS. JOHNSON:
23             Objection, vague.
24    BY MR. DOYLE:
25        Q.   You can answer.  Any time she objects,
```

1    A.    Six hundred plus.
2    Q.    These are full-time employees I'm
3  talking about.
4    A.    Full-time.
5    Q.    Describe for me what Moss &
6  Associates' business entails generally?
7    A.    We are a construction management
8  company.  We do commercial, we do multi-family
9  residential, we do educational, we do medical
10 facilities, we do entertainment facilities.
11   Q.    What percentage of the work is
12 residential property related?
13   A.    Currently, over 50 percent.
14   Q.    Has that changed over time?
15   A.    It's mainly been residential, more
16 than 50 percent all along.
17   Q.    At what point did Moss & Associates
18 begin to do commercial work?
19   A.    Moss was formed in 2004.
20   Q.    Who formed it in 2004?
21   A.    Bob Moss.
22   Q.    Is Bob Moss still with us?
23   A.    Bob Moss is still with us.
24   Q.    Is he still working day to day?
25   A.    Longer than anybody else.

35

1  Q.   When did you begin your career in
2  construction?
3  A.   1978.
4  Q.   Why?  Why did you move to construction
5  in 1978 after education at Florida Atlantic
6  University?
7  A.   I needed a job and it was well-paying.
8  Q.   I understand that.  What was the
9  attraction to construction out of school?  Was
10 there any attraction to it, or was that the
11 job that was available at the time?
12 A.   That was the job that was available.
13 Q.   So this took you on a path, starting
14 in the late 1970s, in the construction field,
15 and you've been there ever since?
16 A.   Yes.
17 Q.   All right.  It shows that you've got a
18 license issued by the State of Florida for
19 general contracting.  It appears that it was
20 -- is that right?
21 A.   Yes.
22 Q.   And it appears that it was issued
23 first in 1980; is that right?
24 A.   Correct.
25 Q.   Has there ever been a lapse in your

36

1  contractor's license since 1980?
2      A.   No.
3      Q.   State of Florida has a licensure
4  board; is that right?
5      A.   Yes.
6      Q.   And there is a disciplinary component
7  to it is my understanding; is that right?
8      A.   Yes.
9      Q.   If anybody has a complaint against a
10 contractor, they can lodge a complaint with
11 that disciplinary board; is that right?
12     A.   Yes.
13     Q.   Have you ever had any complaints filed
14 against you personally?
15     A.   No.
16     Q.   What about Moss & Associates?
17 Generally speaking, have they had any
18 complaints lodged against them that you're
19 aware of?
20     A.   Yes.
21     Q.   What types of complaints, generally
22 speaking?
23     A.   The only ones I know about relate to
24 the Chinese drywall, where I appeared before
25 the licensing board in Alabama.

45

1  Q.  Are they no longer in existence?
2  A.  No.
3  Q.  Did they go out of existence in 2006?
4  A.  The owner retired.
5  Q.  In 2006?
6  A.  Yes.
7  Q.  Is that what precipitated your move to
8  Moss & Associates?
9  A.  Yes.
10  Q.  We talked about the setup for
11  Xactimate in this case. And I believe your
12  testimony was that you utilized the protocol
13  that was adopted in the 2011 KPT settlement to
14  help guide you when you were creating
15  Xactimates for these properties; is that
16  right?
17  A.  For which properties?
18  Q.  The plaintiff properties in Bennett.
19  A.  I used Xactimate with the CPSC
20  guidelines for the protocol.
21  Q.  How did the CPSC guidelines differ
22  from the protocol that was adopted in 2011?
23  A.  CPSC guidelines do not require the
24  replacement of appliances. They do not
25  require the replacement of electrical wire.

47

1  flooring.  Insulation is included in the
2  Xactimate.  I can't think of anything else.
3     Q.   Let's turn to Exhibit Number 3 and try
4  to run through these as quickly as we can.
5          (Whereupon, the documents were
6  introduced for identification as Exhibit No.
7  3.)
8  BY MR. DOYLE:
9     Q.   This is the biggest exhibit today.
10    A.   Is it in any particular order?
11    Q.   It's the order that they were
12 presented in the disclosure, A through Z.
13    A.   Okay.
14    Q.   Before we start this, if you would,
15 just tell me your approach to inspecting the
16 Bennett plaintiff homes in this litigation,
17 from the time you pull up to the house, to the
18 time you leave the house, in general terms.
19    A.   We met with the homeowner.  Depending
20 on the temperature, the time of day, what we
21 would inspect first.  We'd try to do the
22 attics first in the morning before it gets to
23 be too hot.  That's part of the Phase 1
24 anyway.
25          We would go in the attic, pull away

48

1   the insulation, try to get a visual on the
2   ceiling boards.  If the attic contained the
3   air-conditioning unit or the hot water heater,
4   we would inspect that at the same time.
5          We would come back down.  We would
6   inspect the plumbing in the bathrooms, the
7   kitchen.  Check electrical fixtures for
8   pitting and tarnishing.  Check mirrors.  And
9   then we would start with checking one
10  receptacle in each room.
11       Q.   Did you have any idea how many cuts
12  you were going to make to the walls before you
13  arrived at each home?
14       A.   We did.
15       Q.   What type of guidelines were you
16  following?  Or what process were you following
17  that would require a certain amount of cuts?
18       A.   What was provided to us by the square
19  footage.  If it was a thousand square feet or
20  less, we knew we were going to do four,
21  minimum four.
22       Q.   Okay.  Tell me about the different
23  size homes, how that would impact the number
24  of cuts you made.
25       A.   A thousand and under, four cuts.  Two

1    A.    Yes.
2    Q.    Is Carmen going to be called as an
3    expert as well in any capacity?
4    A.    No.
5    Q.    Tell me about the methodology you
6    employed to calculate the under air square
7    footage for each one of those homes.
8    A.    We used a software called RapidSketch,
9    which we use the ANSI guidelines.
10   Q.    RapidSketch employs ANSI guidelines?
11   A.    No.  We used the ANSI guidelines, but
12   RapidSketch is just a quick way of creating a
13   sketch.  It's mainly used for property
14   appraisers.  It's much faster than doing the
15   Xactimate sketch.
16   Q.    So help me understand.  You used the
17   RapidSketch for what purpose?  To generate a
18   -- RapidSketch was --
19   A.    ANSI air conditioned square footage,
20   conditioned space.
21   Q.    Walk me through the process to utilize
22   RapidSketch to arrive at your under air square
23   footage.  How did this happen?
24   A.    RapidSketch is used from the outside,
25   outside wall to outside wall, basically.  And

55

1    Q.   Let me ask you about the finished
2  basements.  You mentioned that the ANSI
3  standard requires exclusion of those; isn't
4  that right?
5    A.   If it's unconditioned.
6    Q.   Unconditioned.  Tell me what you mean
7  by that.
8    A.   ANSI -- if it's not air conditioned,
9  if it's not habitable.
10   Q.   If it is air conditioned, would it be
11 considered living space for the purpose of
12 measuring under air square footage?
13   A.   Yes.
14   Q.   What about garages that have air
15 conditioning in them?  Would those be
16 considered living spaces as well?
17   A.   If it has a garage door still, no.  An
18 enclosed garage, yes.  If they convert a
19 garage into a space without a garage door,
20 yes.
21   Q.   I asked you that because there are a
22 couple of plaintiffs in this case that have
23 air conditioning to their garages.  The air
24 circulates from the garages throughout the
25 house.  It's part of the system.  It's not a

91

1  indicates that this board was found there or
2  not?
3      A.   No.
4      Q.   Next document is Gauthreaux,
5  G-A-U-T-H-R-E-A-U-X, in Bay St. Louis,
6  Mississippi.  The under air square footage is
7  1,588 square feet under air is my
8  understanding.
9      A.   Yes.
10     Q.   And you found one KPT board in this
11 home --
12     A.   Yes.
13     Q.   -- of the nine that you inspected.
14     A.   Yes.
15     Q.   Down at the bottom, it looks like you
16 also found National Gypsum.  Is it your
17 opinion that any of the National Gypsum brands
18 are defective in any way?
19     A.   No.
20     Q.   It's a domestic product, isn't it?
21     A.   Yes.
22     Q.   Next document is one of the Gharib
23 properties, G-H-A-R-I-B.  This one happens to
24 be in Metairie, Louisiana.  And this one
25 you've labeled that the property has 2,439

92

1   square feet under air, but this is the first
2   floor living area.  Explain for me why it's
3   labeled in this fashion.
4       A.   Mr. Gharib explained to Carmen during
5   the inspection that this home flooded during
6   Hurricane Katrina, and only the first floor
7   was remediated.  The second floor was way
8   before.
9       Q.   Are you going offer any testimony
10  about the scope of the required remediation in
11  each one of these properties?
12      A.   For the Xactimate for this one?
13      Q.   Yes.
14      A.   Yes.
15      Q.   Are you being asked by Fishman Haygood
16  to come to court on behalf of Knauf and offer
17  an Xactimate that does a cost projection for
18  something less than the full remediation of
19  the property?
20      MS. JOHNSON:
21              Objection, form.
22  BY MR. DOYLE:
23      Q.   You can answer.
24      A.   Yes.
25      Q.   Tell me what you've been asked to

93

1  testify about in this fashion.
2      A.   The area that we know had potentially
3  Chinese drywall, which would have been the
4  first floor that was remediated only.  Second
5  floor was constructed way before 2006.
6      Q.   So are you going to be advocating on
7  behalf of Knauf to do selective remediation?
8      A.   When we know for sure, yes.
9      Q.   How do you know for sure that there is
10 no KPT board in the second floor of that
11 property?
12     A.   Homeowner told us they did absolutely
13 nothing after Hurricane Katrina when they
14 remediated the first floor.
15     Q.   Don't the forms that have been adopted
16 in this case require that there's a certain
17 occasion that all drywall is removed from the
18 property?
19     A.   All the defective drywall.
20     Q.   It's not limited to that, is it?
21     A.   If we can isolate or if we selectively
22 identify Chinese drywall, yes.  But I don't
23 feel comfortable selectively identifying
24 Chinese drywall where I know the entire house
25 was constructed or remediated at the same

94

1   time.
2       Q.   Tell me what you're relying on that
3   will allow you to offer testimony that
4   selective remediation is appropriate in this
5   case.
6       A.   We have had several homes where the
7   people told us they put on an addition way
8   after the 2006, 2007, and 2008, 2009.  Area
9   they enclosed, a family room, they enclosed a
10  back patio.  They added a bedroom or areas
11  that they did not remediate.
12      Q.   Are you going to offer testimony that
13  certain areas of a home would not be affected
14  by the Chinese drywall gases if they were
15  constructed after the time that the KPT board
16  was installed?
17      A.   Yes.
18      Q.   What basis for that opinion do you
19  have?
20      A.   Just the CPSC guidelines.  The CPS
21  guidelines says if we can identify board, but
22  it's not a feasible or a reasonable way to do
23  it, to replace the board.
24      Q.   Do you know if the court -- when I say
25  the court, I'm talking about MDL 2047.  Do you

1     THE WITNESS:
2            We've discussed and we have
3  agreed to use the CPSC.
4  BY MR. DOYLE:
5     Q.   And your testimony earlier was you've
6  never considered any findings of fact and
7  conclusion of law issued by the court when
8  constructing your Xactimate cost estimates,
9  correct?
10    A.   Yes.
11    Q.   And you didn't consider the finding of
12 fact and conclusion of law issued by Judge
13 Fallon when evaluating homes for the presence
14 of defective Chinese sheetrock; is that right?
15    A.   Right.
16    Q.   Let's go back to this.  So the square
17 footage under air in the Gharib, Metairie,
18 Louisiana, property is only reflective of the
19 first floor living area, correct?
20    A.   Yes.
21    Q.   This 2,439 does not take into
22 consideration any other living space that may
23 be on the second floor; is that right?
24    A.   That's correct.
25    Q.   You found six KPT boards in the living

```
                                                                  171
```

1           C E R T I F I C A T E

2

3

4            I, Cindi Cameron, Certified Court

5   Reporter, in and for the State of Louisiana,

6   as the officer before whom this testimony was

7   taken, do hereby certify that the

8   above-mentioned witness, after having been

9   first duly sworn by me upon authority of R.S.

10  37:2554, did testify as hereinbefore set

11  forth;

12

13           That the testimony was reported

14  by me in stenotype and transcribed under my

15  personal direction and supervision, and is a

16  true and correct transcript, to the best of my

17  ability and understanding;

18

19           That the transcript has been

20  prepared in compliance with transcript format

21  guidelines required by statute or by rules of

22  the board;

23

24           That I have acted in compliance

25  with the prohibition on contractual

172

1  relationships, as defined by Louisiana Code of
2  Civil Procedure Article 1434 and in rules and
3  advisory opinions of the board;
4
5          That I am not of counsel, not related
6  to counsel or the parties herein, nor am I
7  otherwise interested in the outcome of this
8  matter.
9
10         This certification is valid only for
11  a transcript accompanied by my original
12  signature and original required seal on this
13  page.
14
15
16
17
18
19
20
21         _____
           Cindi Cameron, CCR
22         Certified Court Reporter
           State of Louisiana
23         Certificate No. 91356
24
25