UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:   CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL 2047<br><br>SECTION "L" |
| This document relates to:<br><br>Case No. 20-cv-3264 | JUDGE ELDON FALLON<br><br>MAGISTRATE NORTH |

**MEMORANDUM IN SUPPORT OF OPPOSITION TO
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT FILED BY
PLAINTIFFS, JAWAD & FATME GHARIB**

**MAY IT PLEASE THE COURT:**

The following is the Plaintiffs', the Gharibs', Opposition to the Defendants, Knauf Gips, KG and Knauf Plasterboard Tianjin, Co., Ltd. (collectively "Knauf" or "Defendants") Motion for Partial Summary Judgment (Doc. 23360).

Defendants seek summary judgment that is directly contrary to the Court's clear and consistent rulings in MDL-2047.  This time is no different than others - Knauf is trying to run a play out of the same, selective remediation playbook that this Court has shut down at least three times over the past decade or so.  Specifically, Knauf's line of thinking goes something like this: "*we believe* the contaminated areas of the Gharibs' properties are limited to the first floor of the Gharibs' home and second floor of the Gharibs' commercial property, so that means the scope of remediation must also be limited to those areas only."  A litany of problems arises in the field when this arm of reasoning is applied by actual field experts, as this Court has pointed out in its three rulings entitled *Findings of Fact & Conclusions of Law* ("FOFCOL") for *Germano, et al. v.*

*Taishan Gypsum Co. Ltd., et al*., case no. 09-6687 and *Hernandez v. Knauf Gips KG*, Case No. 09-6050, and *Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing*, which the Court applied to "ALL CASES". (Rec. Doc. 20741, p. 1).

Knauf's theory is even more dubious in the instant case for three reasons: (1) severe corrosion has manifested in the attics of the Gharibs' home (*i.e.*, top level of the home) and their commercial property, including in lines and copper piping, as documented by the *defense* expert, Philip Adams; (2) those lines and copper piping traverse through contaminated areas of the Gharibs' properties and then into areas where Chinese drywall is not believed to be present; and finally, (3) the Gharibs' home has an open floor plan in which the first floor is open to the second floor.

These are the inconvenient truths that Knauf must face. Trying to force the logical flaw that, no *defective drywall* in one area is the same as no *damage* in that same area, might work in other courts, but not in this one, where the Court has witnessed the science develop for the past 13 years or so and designed the authoritative scope of remediation for the entire judicial system.

Defendants also fail to establish that there is no contested issues of law or fact with respect to the Gharibs' redhibition claims. At all pertinent times, the law was not clear and, if anything, suggested that the applicable time period was a liberative prescription period, rather than a peremption period.

Accordingly, Defendants' motion for partial summary judgment should be denied in its entirety and the Gharibs should be permitted to pursue their claims for damage to their whole properties and both of their redhibition claims.

# BACKGROUND

The Gharibs own two properties in the New Orleans metro area, both of which have been found by experts (on both sides) to contain Chinese drywall manufactured and/or distributed by Knauf.[1] These properties include: (1) the Gharibs' home located at 4 Beresford Drive, Metairie, Louisiana (the "Gharib Home"), and (2) their commercial property located at 8807 South Claiborne Avenue, New Orleans, Louisiana 70118 (the "Gharib Commercial Property").

### a. The Gharibs' Home located at 4 Beresford Drive, Metairie, Louisiana

Back in 2003, Mr. Gharib and his wife, Fatme, purchased the property located at 4 Beresford Drive, Metairie, Louisiana, as a vacant lot in the Metairie Club Estates neighborhood, adjacent to Metairie Country Club. Mr. Gharib served as the contractor for the building of the home on that property. In August of 2005, only some two months shy of completing construction, Hurricane Katrina made landfall and pushed well over four feet of water inside the new home. (Ex. 1, Affidavit of Jawad Gharib, para. 2)

Despite the loss, the Gharibs remained committed to the project and cleaned and remediated the resulting damage. They intended for this property to be their primary residence and family home for the foreseeable future, so they spared no expense and customized the home with the best materials, appliances and technology on the market. (Ex. 1, Affidavit of Jawad Gharib, para. 3)

Sometime around mid-2007, Mr. Gharib substantially completed re-construction on their home, but continued refining it to their liking, with custom lighting, automation and "smart home" technology. This is truly a "smart house" in every sense, with all lighting, electrical outlets, air conditioning, audio/video, and alarm systems automated through an automation system called Control4. Even the electrical fixtures, chandeliers and recessed light fixtures are special-order

---

[1] See: Ex. 5 to Defs' Motion, Macomber report; Ex. 6 to Defs' Motion, Adams' Report

3

high-end fixtures. The foyer and great room chandeliers are both hooked up to Aladdin lifts and a motorized lift system safely lowers the chandelier for easy cleaning and bulb changing with the press of a button or turn of a key. (Ex. 1, Affidavit of Jawad Gharib, para. 4)

As the building contractor, Mr. Gharib has first-hand knowledge of the design of the Gharibs' Home. The structure consists of two stories with an attic in the top level. The design is an open floor plan in which the first floor is open to the second floor and air circulates freely throughout the first and second floors.[2] The plumbing and water lines are virtually all copper throughout. Mr. Gharib summarizes the flow of water throughout his home as follows: cold water first enters the Gharibs' Home in copper piping that runs throughout the contaminated area of the first floor; then traverses up through the second floor, feeding cold water to bathrooms and other appliances along the way; and finally, that copper piping enters the attic and feeds into the hot water heater. Water is heated in 3 water heater units, and then traverses back down into the second floor and even back into parts of the first floor, feeding the hot water where needed. Mr. Gharib has had to replace 2 of those 3 units in the attic.[3] Further, the air-handler unit (AHU) in the attic supplies air-conditioned air to the second-floor bedrooms and bathrooms. Mr. Gharib confirms the defense expert's finding that the lineset connecting to this AHU is black with corrosion. (Ex. 1, Affidavit of Jawad Gharib, para. 5, referencing photo with caption in Adams' Phase 1 Inspection letter, p. 15).

Mr. Gharib recently took photos of the copper piping and lines that feed into the second floor of his home. They are heavily corroded and black in coloration, rather than the copper color they originally exhibited. (See: Ex. 1, Affidavit of Jawad Gharib, photos attached as Ex. __

---

[2] See photos attached to Adams' Xactimate for the Gharibs' Home, Ex. 2 to Plaintiffs' Motion in Limine, p. 26, 90 (Rec. Doc. 23363-4).
[3] Ex. 2, Mr. Gharib's Deposition, p. 152.

thereto.). Mr. Gharib also took photos of certain electrical and plumbing fixtures on the second floor of his home. The bare copper wires are all dark in coloration and not the copper color they once exhibited. The plumbing fixtures, including a water faucet and shut-off valves in second-floor bathrooms, show pitting and corrosion that is similar to the defense expert's findings on the first floor. (See: Ex. 1, Affidavit of Jawad Gharib, photos attached as Ex. __)

      b. **The Gharibs' Commercial Property located at 8807 South Claiborne Avenue, New Orleans, Louisiana**

The Gharibs also own the property located at 8807 South Claiborne Avenue, New Orleans, Louisiana. This property was purchased, in 2002, with an existing building zoned for mixed commercial and residential use and contains approximately 7,100 of total square footage. This building consists of three stories, which include the following: (1) the ground floor is a commercial space that is partitioned into two units, one housing Mr. Gharib's Laundromat business and the other, a Metro PCS; (2) the second story consists of 3 apartment units; and (3) an additional living quarters on the third with an unfinished attic. (Ex. 1, Affidavit of Jawad Gharib, para. 6)

As the contractor for the remodeling project he performed in the Laundromat space about 2 years ago, Mr. Gharib has first-hand knowledge of the design of the building and the electrical wiring, water/copper piping and HVAC system. Copper water lines extend from the second floor (i.e. contaminated area) and down into the first floor, along with HVAC ductwork and electrical wiring. (*See*: Ex. 1, Gharib Affidavit with video attached as ***Exhibit C***). Some of these are black and corroded, particularly, the copper piping and the electrical wiring. *Id.* Other lines are new from my remodeling and have not yet corroded, but all of those systems are interconnected and traverse between the first and second floor and attic. *Id.* The commercial space on the first floor utilizes a number of industrial washers and dryers and other equipment that have failed

prematurely and had to be replaced, as detailed further in my deposition and Question 18. Itemization (Personal Property Damage).

### c. The Gharibs' Discovery of Chinese drywall in their properties.

Mr. Gharib explained in detail, during his deposition, how he first discovered that his properties contained Chinese drywall:

> Q. How did you discover Chinese drywall in this property at 8807 South Claiborne?
> A. So December 2015 I had -- well, when I constructed this building and it was in 2006, I've always thought about finishing up the attic to make an apartment over it and rent it out too. So what I did is I prepped for it. And I said I'm going to have all that Sheetrock that I need for this attic stored in the attic. And I had about over 100 sheets of 4x12 Sheetrock stored in that attic. And it just stayed there for -- till that day, the 2015 December. And I called the Sheetrock guy and I told him, look, I want to finish this apartment, I want to finish this space and make an apartment over it. And then he was looking, you know, checking the place. And then he looked at the Sheetrock. And he said, hey, Joe, you know you have Chinese Sheetrock? And I said no, where? And he said that -- that Sheetrock you have there is Chinese. Then it was stuff on top of it. You know, I've had -- I've used this space for storage and I had, you know, put stuff on top of that Sheetrock. So we moved it over and I looked and sure enough it was Chinese Sheetrock. And he said maybe you have it installed in here. And I said, no, man, don't tell me that. And he said, yeah, let's check. ***So we were in the attic and we looked at ceilings of the apartment and sure enough, it was Chinese Sheetrock.*** [4]

So, it was in December of 2015 that Mr. Gharib first discovered that he had Chinese drywall in one of his properties. After doing so, Mr. Gharib also considered whether *his home* contained defective drywall too, providing:

> Q. …When did you discover that there was what you believe to be Chinese drywall in this property?
> A. So when I told you about the --how we found out about the Chinese Sheetrock in my commercial building, then I went back and I started investigating, you know, what's this Chinese Sheetrock? What does it do? What's the symptoms of it. ***And then it just struck me. That's the same symptoms that I have in my house, maybe I have it in my house. Let me investigate it.*** [5]

---

[4] Ex. 2, Mr. Gharib's Deposition, pp. 30-32. (Emphasis added.)
[5] *Id.* at 141. (Emphasis added).

6

The Gharibs' promptly filed suit against Defendants herein on January 31, 2016, as part of the *Bennett* Plaintiffs' Second Amended Class Action Complaint. (See Docs. 20020, 20020-2).

### d. The Gharibs' have consistently claimed damage and produced evidence related to the second floor of their home and first floor of their commercial property.

Mr. Gharib has consistently claimed, that, while he believes defective drywall only exists in certain areas of their properties, that this drywall has caused damage to his whole home and commercial property. His deposition testimony, alone, constitutes evidence that precludes summary judgment as to the so called "other areas" of his home and commercial property. With respect to their commercial property, Mr. Gharib testified in response to Knauf's questions as follows:

> Q. So it's not in your commercial property [referring to first floor of Claiborne property]?
> A. ***Not in my commercial property, no, but it's in the residential part of the property of the building. But that Sheetrock damaged -- the damage of it is everywhere. There's -- there's a difference between what damage does it do and where is it and how much of is in there? It's in the middle part of the building.*** See these windows right here? These are the apartments. This is where the Chinese Sheetrock all over right here. ***My commercial property is below here. The attic is here. This Chinese Sheetrock, gases go up and down everywhere. This is where it causes the damage.*** <u>***There's a difference between where it's at and the damage that it caused. It caused damage everywhere in the property.***</u> ***I was answering in here where was that and these -- I think in these documents I've answered where the Chinese Sheetrock was. It was in the apartments.***
> Q. Okay. Couple things --
> A. ***When they asked me in '18 what damage it did, and I listed all the damage that I had in the whole building.*** (Indicating.).[6]

Instead of asking Mr. Gharib to expound further on the precise components or areas of damage in the first floor, Knauf's attorney tried to shut him up:

> Q. Okay. A few things, for the record, Mr. Gharib was just pointing to a photo in a printout from the Orleans Parish Assessor's website that's attached as an exhibit to Exhibit 2 of the deposition. The photo reflects that property that

---
[6] Ex. 2, Mr. Gharib's Deposition, p. 119-120 (emphasis added).

> we're discussing at 8807 South Claiborne. **You're not an expert witness are you, Mr. Gharib**?
> A. No, I'm not.
> Q. Okay. Just to clarify -- and I appreciate what you just told me -- and *I'm asking you a yes or no question, is there drywall -- is there Chinese drywall in the commercial space in this property*, to the best of your knowledge?
> A. No, there's not.[7]

However, Mr. Gharib refused to be silent and continued to point out that Knauf's counsel was conflating two separate issues: the area of the defective drywall and the extent of damage, noting:

> Q. ….Did you not intend to list the commercial space because the commercial space is not affected by the presence of Chinese drywall in the commercial space?
> A. The commercial space is affected. It is affected by the Chinese Sheetrock. It does not have Chinese Sheetrock, but the gases travel up and down the walls in this property because you can see that this is the same property, we're not moving next door. It is the same walls, the same space everywhere. The attic, for example, that attic, even though that it does not – the walls of it does not have Chinese Sheetrock, but the bottom, which is the ceiling of the apartment downstairs is Chinese Sheetrock, *and that gases travel everywhere in this -- in this whole building*.[8]

Mr. Gharib also pointed out that, in response to Plaintiff Fact Sheet, Question #18 entitled "Itemization (Personal Property Damage)", he included numerous items of damage throughout the first-floor commercial space of the Gharibs' Commercial Property, providing:

> Q. Okay. So you were just explaining to me though when you filled out the Plaintiff Profile Form, when you filled out the Supplemental Plaintiff Profile Form, you were listing the specific units in the property that you believed had Chinese drywall; correct?
> A. Yes.
> Q. Okay. *When you filled out the Plaintiff Fact Sheet and you did that exhibit that we just went through, Exhibit 14 to the Plaintiff Fact Sheet, which is Exhibit 8 you were listing all of the items in your property that you believe are damaged because of the Chinese drywall that is somewhere in the property; right?*
> *A. Yes*.[9]
>                                  *       *       *
> Q. Okay. Couple things --

---

[7] Ex. 2, Mr. Gharib's Deposition, pp. 120-121. (Emphasis added.)
[8] Id. at 123-124.
[9] Id. at 122.

8

> A. **_When they asked me in '18 what damage it did, and I listed all the damage that I had in the whole building_**. (Indicating.).[10]

Here, Mr. Gharib was explaining that his response to "Question #18. Itemization (Personal Property Damage" (see: Exhibit 7 to Defs' motion, pp. 124-25) included items located throughout the "whole building" and were not just limited to items on the second floor. Attached to the Gharibs' Itemization is also a receipt. So, there is evidence of damage in the first floor of the Gharibs' Commercial Property (*i.e.* Mr. Gharib's testimony and response to Question #18) and Knauf has had notice and evidence of damage to the first floor of the Gharibs' Commercial Property in its hands for a few years now.

Mr. Gharib also offered for Knauf to inspect the damaged components of the first floor of the Gharibs' Commercial Property. During his deposition, he invited Knauf's expert to inspect those items:

> Q. Okay. Just if there are. Did you ever take any photos of the corroded plumbing that you mentioned?
> A. No. But they're still there.
> Q. Okay. And any other photos of any other sort of blackening on any wires or anything at this property?
> A. No. But -- No. But they're there if somebody wants to look at it. Your expert wants to look at it.[11]

Rather than taking the opportunity to learn more about the damaged items in the first floor of the Gharibs' Commercial Property, Knauf's attorney abruptly changed the subject and began asking Mr. Gharib about his home. (Ex. 2, Mr. Gharib's Deposition, pp. 125-126). When she asked about the "symptoms" of damage in the Gharibs' Home, Mr. Gharib noted a classic sign of Chinese drywall damage in the *second* floor:

> Q. Can you remind me what these symptoms are?
> A. The black soot on the receptacles, the failing of my appliances, why did we have appliances that fail all the time? Why do we have -- why do we wake

---
[10] Ex. 2, Mr. Gharib's Deposition, p. 120 (emphasis added).
[11] Ex. 2, Mr. Gharib's Deposition, p. 50.

up with sinus headache all the time? I mean, what was going on? ***The smell that we had in the <u>second floor bathrooms</u> where we don't use them for a while, then come back and turn the water on, we get this bad smell of rotten eggs from this -- from us turning the water on.*** Then I say, you know, this is all related to the same -——[12]

Mr. Gharib also explained that many of his plumbing, mechanical and other systems in his home have failed or needed repair work. (See e.g.: Ex. 2, Mr. Gharib's deposition, p. 151, "[a]t one time I had a failing copper line that was leaking and we did not know why it was leaking."; Id. at 152, "I've changed two of my water heaters in that property already."; Id. at 174, "[y]ou know, the house has an electrical system, the electrical system is the copper wiring. It is the fixtures. These fixtures, they have copper wiring and they're all tarnished."). The corrosion in the Gharibs' Home has clearly manifested throughout with widespread impacts; these are not localized problems that can be selectively remediated, as Knauf suggests.[13]

    **e. The expert reports in this case provide additional evidence of damage in the second floor of the Gharibs' Home.**

Knauf's expert, Phillip Adams, observed and documented damages beyond the contaminated areas of the first floor of the Gharibs' Home and second floor of the Gharibs' Commercial Property. The Court should note that Defendants did not attach their expert's entire report to their motion; they omitted the letter reports, which are attached to the Gharibs' Motion in Limine, (see: Ex. 2 to Plaintiffs' Motion in Limine, Rec. Doc. 23363-3). Contained therein, defense expert, Phillip Adams, found that the Gharibs' Home "was determined to be a KPT property. No

---

[12] Id. at 141-142.

[13] "Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, ***the evidence does not support the feasibility of such an option***. ***The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the property owner.***" *Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing*, which the Court applied to "ALL CASES". (Rec. Doc. 20741, pp. 16-17) (emphasis added).

other CDW was observed in the home during the visual inspection. ***The calculated KPT percentage for the home is: 90%***." (Id. at p. 1) (emphasis added). Mr. Adams does not indicate in any of his reports pertaining to the Gharibs' Home whether he actually inspected the second floor of the Gharibs' Home, only stating: "The homeowner advised that this home was built in 2004-2005 prior to the Katrina Hurricane. The ground floor experienced water damage during Katrina. The ground floor was renovated/repaired at that time." (*Id.*). When asked during his deposition why his Xactimate report included only 2,439 square feet (of the total estimated 4,547 square feet of the home), Mr. Adams relied solely on the statement by Mr. Gharib that only his first floor was remediated:

> A. Mr. Gharib explained to Carmen during the inspection that this home flooded during Hurricane Katrina, and only the first floor was remediated. The second floor was way before.[14]

However, Mr. Adams testified, during his deposition, that he followed the Inspection Protocol used for the Knauf Settlement Agreement in 2011. (Ex. 3, Adams' Depo., p. 14-15. That Inspection Protocol requires full inspection of the properties. For example, the scope of visual inspection requires 4 steps for each such property, such as:

> A. Scope of Visual Inspection
> 1. Inspector will remove one electrical cover plate from an outlet in ***each room*** to inspect exposed wires for contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"). The exposed wires will be digitally photographed and the cover plate will be re-attached.

There is no limitation that allows the inspector to only inspect where he believes KPT drywall to exist or where the homeowner suggests it exists; this applies to every room, regardless of whether that room contains Chinese drywall. So, Mr. Adams' decision to confine his inspection to the first

---

[14] Ex. 2, Adams' Deposition, p. 92)

11

floor violates the protocol he claims to have used and lacks any scientific basis whatsoever, based on the Court's previous rulings. Knauf also cannot claim surprise or prejudice from the evidence of damage submitted herewith, because they had the opportunity to do the same, but their expert chose not to.

      **f.  Other circumstantial evidence suggests damage to the second floor of the Gharib's Home and first floor of the Gharibs' Commercial Property.**

The following facts are undisputed. When considered with the Court's consistent findings about the "wide-spread impact of the corrosive environment"[15] created by Chinese drywall, these facts render it likely that the entire Gharibs' Home and Gharibs' Commercial Property are damaged and must be remediated:

(1) severe corrosion has manifested in the attics of the Gharibs' home (*i.e.*, top level of the home) and their commercial property, as documented by the *defense* expert, Philip Adams, including the copper piping and lines serving the hot water heater and air-handler unit ("AHU") in the attic, both of which have turned from an orange color to black and other dark variations (see photos in ***Exhibit 1***, "Phase 1 Inspection" letter for Gharib hom, pp. 15-17, captioned "Attic AHU Lineset *Black*" on page 15; 2 photos captioned "Attic Water Heater Copper *Dark*" on page 16; and 2 additional photos with that same caption on page 17); (see also, e.g.,: photos in ***Exhibit 1***, "Phase 1 Inspection" letter for Gharib Commercial Property, Apt. A, pp. 10-11, with captions "Attic HVAC Lineset Black", "Attic Water Heater Copper Supply Black", etc.

---

[15] *Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing*, (Rec. Doc. 20741, p. 14) ("Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the Germano Plaintiffs, further confirmed the **wide-spread impact of the corrosive environment**, which included corrosion of copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes, causing premature failure of electrical and mechanical devices.")

(2) in the Gharibs' Home, those lines and copper piping in the attic traverse down into the second floor of the Gharibs' home; and in the Gharibs' Commercial Property, similar lines and copper piping traverse down through the second floor and enter into the first floor.

(3) the Gharibs' home has an open floor plan in which the first floor is open to the second floor (See photos attached to Adams' Xactimate for the Gharibs' Home, Ex. \_\_\_, p. 26, 90.

First, the severe corrosion documented by Knauf's expert in the attic of the Gharibs' home defeats Knauf's theory that the damage is confined to the contaminated areas of the Gharibs' home and commercial property (*i.e.*, the first floor of the Gharibs' Home and second floor of their commercial property). These facts are consistent with the Court's finding that:

> 5. Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the Germano Plaintiffs, ***further confirmed the wide-spread impact of the corrosive environment***, which included corrosion of copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes, causing premature failure of electrical and mechanical devices. Id. at 14, 23. (FOFCOL, Rec. 20741, p. \_\_)

Assuming that the contaminated area is limited to the first floor (which no one has confirmed), the damage in the home's attic (top of the home), above the second floor, suggests the second floor requires remediation. It would be impossible for the sulfur gases to reach the attic without traveling through the second floor. Even if somehow these gases managed to skip over the second floor (which is absurd), the Court has denied the theory that piping and lines can be partially replaced only where the signs of corrosion are located. CITE.

Second, that the first floor is open to the second floor means that they share the same air and the same sulfur gases that this Court has found create the "***most severe industrial corrosive***

13

*environment*"[16] in all the *Germano* homes, which were found to be "representative of a cross-section of contaminated homes." (Germano FOFCOL, Rec. Doc. 2380, p. 62). But, the Court has found that these sulfur gases from Chinese drywall result in "widespread impact" and create the Court's ruling that a complete scope of remediation "is necessary ***even in homes with 'mixed' drywall, where Chinese and non-reactive drywall may be found, because the <u>sulfur gases disburse and circulate</u> creating a generally corrosive environment***…" (Rec. Doc. 20741, p. 15) (emphasis added).

## LEGAL STANDARD

Summary judgment is only warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the ***moving party*** bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added). In making the determination, "all justifiable inferences are to be drawn in [the non movant's] favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The movant may argue that "there is an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), but "it is never enough simply to state that the non-moving party cannot meet its burden at trial," Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the non-moving party provides more than a mere "scintilla of evidence" demonstrating that "the jury could reasonably find for the plaintiff," it will defeat the motion. *Anderson*, 477 U.S. at 252. This can be done by pointing out where the record "contains supporting

---

[16] Germano FOFCOL, Rec. Doc. 2380, p.

evidence . . . which was 'overlooked or ignored' by the moving party." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing Celotex, 477 U.S. at 332 (Brennan, J., dissenting)).

## LAW & DISCUSSION

I. **The Gharibs' redhibition claim is timely and not prescribed by the 10-year prescription period.**

At the time the Gharibs' purchased the Knauf-drywall from the distributor, which is not known with any degree of certainty, the article governing the prescription period for a redhibition claim, La. C.C. art. 2534 provided, in pertinent part:

> "The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer."

1997 La. Sess. Law Serv. Act 266 (H.B. 974) (WEST). As the Court can see, there is absolutely no mention of a 10-year cap or peremptive period that applies from the time of sale. And, many courts refused to read a provision into the law that did not exist. For instance, in *Tiger Bend, L.L.C. v. Temple-Inland, Inc.*, 56 F. Supp. 2d 686, 690–91 (M.D. La. 1999), the Middle District Court of Louisiana astutely pointed out, regardless of whether comment (b) or Article 3499 is applied, the result is the same: a 10-year liberative prescription period, not a peremptive period, holding:

> Despite the analysis set forth heretofore, plaintiff's argument that comment (b) of article 2534 is incorrect still has merit. ***The Court notes that La.Civ.Code Art. 3499 is not a preemptive provision. Article 3499 is a prescriptive provision which is subject to suspension and interruption. Assuming plaintiff can prove an equitable tolling doctrine applies, such as contra non valentem, article 3499's ten year prescriptive period has not expired to bar plaintiff's suit.*** The scenario accepted by Louisiana courts to suspend prescription under contra non valentem is as follows:
>
> Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. [Citation omitted].

15

> ***The problem the Court sees with article 2534 comment (b) is that article 2534 essentially provides the same relief as contra non valentem.*** As mentioned above, La.Civ.Code Art. 2534 provides in pertinent part:
>
> B. The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was *discovered* by the buyer. [the court's emphasis, not ours].

Further, La. C.C. Art. 2439 defines sales and sets forth the required elements for the perfection of a sale as follows:

> Sale is a contract whereby a person transfers ownership of a thing to another for a price in money.
> The *thing*, the *price*, and the *consent of the parties* are requirements for the perfection of a sale. (emphasis added).

In the instant case, the Gharibs' PFS asks, "[w]hen was Chinese drywall installed in the Property (to the best of your knowledge)….Month/Day/Year: 1/ 7/ 2006". (Exhibit 1, Beresford Property Supplemental Plaintiff Profile Form, at 2). The question and response are not conclusive as to whether the sale was perfected on that date. For instance, it is very possible that drywall could have been delivered before finalizing the terms of the sale. This is post-Hurricane Katrina, and not everything was done as they were in regular conditions. Defendants have, thus, failed to show that each element of the sale of its defective drywall was met at the time noted in the Gharibs' PFS. Accordingly, there are both legal and factual issues that cannot be resolved on summary judgment.

    **II.**    **Defendants have failed to show that the Gharibs' have no claims for damage to the first story of their home or the second story of their commercial property.**

Defendants' motion fails on its face, as it is based on the logical flaw, that, because there is no defective drywall in those "other areas" of the Gharibs' properties, then there cannot be any damage in those areas. But, if we have learned anything from the Court's repeated rulings, it's that Chinese drywall (including KPT drywall) emits sulfur gases; those "sulfur gases disburse and

16

circulate creating a generally corrosive environment…" (Rec. Doc. 20741, p. 15) (emphasis added); and creates "wide-spread impact of the corrosive environment." These principles that governed the MDL are now the law of the case. And, Defendants completely ignore them.

Accordingly, Defendants' motion for partial summary judgment should be denied in its entirety.

Respectfully submitted,

CRULL, CASTAING & LILLY

BY: */s/ Peter E. Castaing* .
    Edward J. Castaing, Jr. #4022
    Peter E. Castaing, #35019
    Pan American Life Center
    601 Poydras Street, Suite 2323
    New Orleans, LA 70130
    Telephone: (504) 581-7700
    Facsimile: (504) 581-5523
    pcastaing@cclhlaw.com

    ***Counsel for Jawad Gharib and Fatme Gharib***

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

*/s/ Peter E. Castaing*
Attorney
