UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: **CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL 2047**<br><br>**SECTION "L"** |
| **This document relates to:**<br><br>Case No. 20-cv-3264 | **JUDGE ELDON FALLON**<br><br>**MAGISTRATE NORTH** |

**STATEMENT OF MATERIAL FACTS THAT PRESENT A GENUINE ISSUE – OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT FILED BY PLAINTIFFS, JAWAD & FATME GHARIB**

**MAY IT PLEASE THE COURT:**

Plaintiffs, Jawad and Fatme Gharib (the "Gharibs"), submit the following statement of the material facts which present a genuine issue, in accordance with Local Rule 56.2, as follows:

1. The following is a well-established fact that applies to the Gharibs' case against Defendants:

   "Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the *Germano* Plaintiffs, further confirmed the ***wide-spread impact of the corrosive environment***, which included corrosion of copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes, causing premature failure of electrical and mechanical devices." *Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing* ("2017 FOFCOL"), which the Court applied to "ALL CASES". (Rec. Doc. 20741, p. 1, 14)

2. The following is a well-established fact that applies to the Gharibs' case against Defendants:

> "After considered analysis of the impracticality and risks of the selective remediation approach, the Court found in Germano and re-affirms herein that remediating a Chinese drywall property requires ***complete remediation and cleaning; thus, the Court again rejects any remediation approach that favors selective remediation such as the one originally proposed by the Knauf*** experts in Germano. Id. The remediation protocol fashioned in Germano is evidence based and has been confirmed via its application in the actual remediation of several thousand homes." (2017 FOFCOL, Rec. Doc. 20741, pp. 14-15)

3. The following is a well-established fact that applies to the Gharibs' case against

    Defendants:

    "The scientific and practical constructability evidence presented before this Court, which relies on long-term observation, sampling and testing of properties with Chinese drywall, scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of the national builders), and electric and building codes, demonstrates that ***proper remediation of the danger posed by Chinese drywall must include the removal of all drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring***. Germano FOFCOL at 27-55; Hernandez FOFCOL at 20-34; Transcript at pp. 106:8-110:3; (2017 FOFCOL, Rec. Doc. 20741, pp. 14-15)

4. The following is a well-established fact that applies to the Gharibs' case against

    Defendants:

    "***This scope of remediation is necessary <u>even in homes with "mixed" drywall</u>, where Chinese and non-reactive drywall may be found, because the sulfur gases disburse and circulate creating a generally corrosive environment*** and, moreover, there is no reliable or practicable method for selective identification and removal of Chinese drywall in mixed homes. Germano FOFCOL at 27-40. Large Florida homebuilders with extensive experience in Chinese drywall remediation have determined that removal of all drywall in affected homes is efficient and cost-effective, and that attempted selective identification and removal of CDW is neither efficient nor cost-effective.." (2017 FOFCOL, Rec. Doc. 20741, p. 15)

5. The Gharibs' have consistently claimed damages and submitted evidence thereof with respect to the second floor of their home and first floor of their commercial property. With respect to their commercial property, Mr. Gharib testified, during his deposition, as follows:

> Q. So it's not in your commercial property [referring to first floor of Claiborne property]?
> A. ***Not in my commercial property, no, but it's in the residential part of the property of the building. But that Sheetrock damaged -- the damage of it is everywhere. There's -- there's a difference between what damage does it do and where is it and how much of is in there? It's in the middle part of the building.*** See these windows right here? These are the apartments. This is where the Chinese Sheetrock all over right here. ***My commercial property is below here. The attic is here. This Chinese Sheetrock, gases go up and down everywhere. This is where it causes the damage.*** <u>***There's a difference between where it's at and the damage that it caused. It caused damage everywhere in the property.***</u> ***I was answering in here where was that and these -- I think in these documents I've answered where the Chinese Sheetrock was. It was in the apartments.***
> Q. Okay. Couple things --
> A. ***When they asked me in '18 what damage it did, and I listed all the damage that I had in the whole building.*** (Indicating.).[1]
> \* \* \*
> Q. ….Did you not intend to list the commercial space because the commercial space is not affected by the presence of Chinese drywall in the commercial space?
> A. The commercial space is affected. It is affected by the Chinese Sheetrock. It does not have Chinese Sheetrock, but the gases travel up and down the walls in this property because you can see that this is the same property, we're not moving next door. It is the same walls, the same space everywhere.  The attic, for example, that attic, even though that it does not – the walls of it does not have Chinese Sheetrock, but the bottom, which is the ceiling of the apartment downstairs is Chinese Sheetrock, ***and that gases travel everywhere in this -- in this whole building***.[2]

---

[1] Ex. 2, Mr. Gharib's Deposition, p. 119-120 (emphasis added).
[2] Id. at 123-124.

6. Mr. Gharib also testified that, in response to Plaintiff Fact Sheet, Question #18 entitled "Itemization (Personal Property Damage)", he included numerous items of damage throughout the first-floor commercial space of the Gharibs' Commercial Property, providing:

> Q. Okay. So you were just explaining to me though when you filled out the Plaintiff Profile Form, when you filled out the Supplemental Plaintiff Profile Form, you were listing the specific units in the property that you believed had Chinese drywall; correct?
> A. Yes.
> Q. Okay. ***When you filled out the Plaintiff Fact Sheet and you did that exhibit that we just went through, Exhibit 14 to the Plaintiff Fact Sheet, which is Exhibit 8 you were listing all of the items in your property that you believe are damaged because of the Chinese drywall that is somewhere in the property; right?***
> ***A. Yes***.[3]
>
> \*   \*   \*
>
> Q. Okay. Couple things --
> A. ***When they asked me in '18 what damage it did, and I listed all the damage that I had in the whole building***. (Indicating.).[4]

7. With respect to the Gharibs' home, Mr. Macomber issued a report that includes a damage calculation for the entire home and does not deduct any square footage for the second floor. He also concluded: "Remediation damages have been calculated for each property at issue in this case. Healthy Home Solutions verified the under air square footage of each home, gathered the R.S. Means National Square Foot Unit Price, each applicable R.S. Means Location Factor and calculated the projected remediation damages for each property. The table containing all projected remediation damages is attached as Exhibit B." ***(Ex. 5 to Defendants' motion, Rec. Doc. 23360-6, p. 6; table on p. 14)***

8. Mr. Macomber's table includes R.S. Means damage calculations for the Gharibs' home and commercial property that are based on the entire square footage of those properties,

---

[3] Id. at 122.
[4] Ex. 2 to Memo in Support, Mr. Gharib's Deposition, p. 120 (emphasis added).

neither of which deduct the second floor of the home or the first floor of the commercial property. (Id. at p. 14).

9. Mr. Macomber agrees with the Court's definition of "complete remediation": "It is my opinion that complete remediation was defined by Judge Fallon in his order labeled as "Finding of Fact & Conclusions of Law Related To the June 9, 2015 Damages Hearing" and I adopt that definition in its entirety. I have attached a copy of Judge Fallon's order as an exhibit to this report as Exhibit G." (Id. at p. 6)

10. Mr. David Herring was retained by Mr. Gharib to provide the damage estimates that Mr. Macomber's report called for (at least with respect to the Gharibs' home). His reports found remediation was needed throughout the Gharibs' home, including the second floor, and throughout the Gharibs' commercial property, including the first floor. (Ex. 9 to Motion to Add Expert Disclosures (filed under seal)).

11. The Court's February 6, 2023 Order and Reasons (Rec. Doc. 23358) denied the addition of Mr. Herring as an expert and his Xactimate reports. As a result, the Gharibs' suffered severe prejudice from the Court's February 6, 2023 Order and Reasons (Rec. Doc. 23358), as it has left them without damages estimates in what is a damages trial. (See: Motion to Reconsider, Rec. Doc. ___). The Court's reconsideration of its February 6, 2023 Order and Reasons (Rec. Doc. 23358), is warranted, based on new evidence; manifest errors of law and fact; and to prevent manifest injustice; and supported under Rules 54(b) and 59(e), Federal Rules of Civil Procedure.

12. Between the testimonies of Mr. Howard Ehrsam and Mr. Gharib, the Gharibs can demonstrate that all areas of their home and commercial property are damaged by KPT drywall. Mr. Ehrsam will provide testimony regarding the "correlation between off-

gassing of KPT drywall and corrosion," which "has been established by several government and private organizations. It has also been accepted through prior trials and/or summary judgments of MDL 2047." (Ex. 4, Ehrsam report, p. 5). He has performed extensive testing of KPT drywall's impact on common household components, like those in the Gharibs' home and commercial property. (See e.g.: testing and chemical analysis of the corrosion or "black deposits" on copper, p. 6 of report, Ex. 4). He will testify about the resulting impacts and may also testify as to whether KPT drywall causes impacts like those in the photos of Mr. Adams, Mr. Macomber and Mr. Gharib.

13. As the building contractor and an active participant in the design of his home, Mr. Gharib has first-hand knowledge of the design. His home has an open floor plan in which the first floor is open to the second floor and air circulates freely throughout the first and second floors (see: **Ex. 2 to Plaintiffs' Motion in Limine,** photos attached to Phillip Adams' Xactimate for Gharibs' Home, p. 26, 90 (Rec. Doc. 23363-4). (Ex. 1, Affidavit of Jawad Gharib, para. 5).

14. The Gharibs' home consists of two stories with an attic in the top level. The plumbing and water lines are virtually all copper throughout. The flow of water throughout the home can be summarized as follows: cold water first enters the Gharibs' Home in copper piping that runs throughout the contaminated area of the first floor; then traverses up through the second floor, feeding cold water to bathrooms and other appliances along the way; and finally, that copper piping enters the attic and feeds into the hot water heater. Water is heated in 3 water heater units, and then traverses back down into the second floor and even back into parts of the first floor, feeding the hot water where needed. Mr. Gharib has had

to replace 2 of those 3 units in the attic.[5] The air-handler unit (AHU) in the attic also supplies air-conditioned air to the second floor bedrooms and bathrooms. As the defense expert showed in his Phase 1 Inspection letter, the lineset connecting to this AHU is black with corrosion (see: Ex. 2 to Plaintiffs' Motion in Limine, Rec. Doc. 23363-3, p. 15). (Ex. 1, Affidavit of Jawad Gharib, para. 5)

15. Mr. Gharib recently took photos of the copper piping and lines located in his home's attic, which feed into the second floor of the home. They are heavily corroded and black in coloration, rather than the copper color they originally exhibited. He also took photos of certain electrical and plumbing fixtures on the second floor of my home. The bare copper wiring that connects to the outlets are all dark in coloration and not the copper color they once exhibited. The plumbing fixtures, including a water faucet and shut-off valves in second-floor bathrooms, show pitting and corrosion similar to the defense expert's findings on the first floor. (See: Ex. 1, Affidavit of Jawad Gharib, para. 6, with photos of attic as Ex. A and photos of 2nd Floor attached as Ex. B.)).

16. The Gharibs also own the property located at 8807 South Claiborne Avenue, New Orleans, Louisiana. This property was purchased, in 2002, with an existing building zoned for mixed commercial and residential use and contains approximately 7,100 of total square footage. This building consists of three stories, which include the following: (1) the ground floor is a commercial space that is partitioned into two units, one housing my Laundromat business and the other, a Metro PCS; (2) the second story consists of 3 apartment units; and (3) an additional living quarters in attic. (*See*: video attached as Exhibit C).

---

[5] Ex. 2 to Opposition to Defendants' Motion for Partial Summary Judgment, Mr. Gharib's Deposition, p. 152.

17. As the contractor for the remodeling project that Mr. Gharib did in the Laundromat space, he has first-hand knowledge of the design of the building and the water lines, copper piping and HVAC system. Copper water lines extend from the second floor (i.e. contaminated area) and down into the first floor, along with HVAC ductwork and electrical wiring. (*See*: video attached as **Exhibit C**). Some of these are black and corroded, particularly, the copper piping and the electrical wiring. *Id.* Other lines are new from the remodeling and have not yet corroded, but all of those systems are interconnected and traverse between the first and second floor and attic. *Id.* The commercial space on the first floor utilizes a number of industrial washers and dryers and other equipment that have failed prematurely and had to be replaced, as detailed further in my deposition and Question 18. Itemization (Personal Property Damage). (See: Ex. 1, Affidavit of Jawad Gharib, para. 6, with video attached as Ex. C).

18. Severe corrosion has manifested in the attics of the Gharibs' home (*i.e.*, top level of the home) and their commercial property, as documented by the *defense* expert, Philip Adams, including the copper piping and lines serving the hot water heater and air-handler unit ("AHU") in the attic, both of which have turned from an orange color to black and other dark variations (see photos in Ex. 2 to Plaintiffs' Motion in Limine (Rec. Doc. 23363-3, pp. 15-17, "Phase 1 Inspection" letter for Gharib home, pp. 15-17, captioned "Attic AHU Lineset *Black*" on page 15; 2 photos captioned "Attic Water Heater Copper *Dark*" on page 16; and 2 additional photos with that same caption on page 17);

19. Concerning Defendants' motion regarding the prescription of the Gharibs' redhibition claims, Defendants have the burden of proving when the sale of the drywall was

perfected, but have only document they produced is a Plaintiff Fact Sheet that provides, in pertinent part:

> "[w]hen was Chinese drywall installed in the Property (to the best of your knowledge)….Month/Day/Year: 1/ 7/ 2006".

(Exhibit 1, Beresford Property Supplemental Plaintiff Profile Form, at 2).

This does not establish when the sale was perfected. The question and response are not conclusive as to whether the sale was perfected on that date. For instance, it is very possible that drywall could have been delivered before finalizing the terms of the sale. It also does not impact the Gharibs' redhibition claim as to their commercial property, to which the Plaintiff Fact Sheet cited above has no relation whatsoever.

Respectfully submitted,

CRULL, CASTAING & LILLY

BY: */s/ Peter E. Castaing* .
Edward J. Castaing, Jr. #4022
Peter E. Castaing, #35019
Pan American Life Center
601 Poydras Street, Suite 2323
New Orleans, LA 70130
Telephone: (504) 581-7700
Facsimile: (504) 581-5523
pcastaing@cclhlaw.com

***Counsel for Jawad Gharib and Fatme Gharib***

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

/s/ *Peter E. Castaing*
Attorney