# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:   **CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL 2047** |
| | **SECTION "L"** |
| **This document relates to:** | **JUDGE ELDON FALLON** |
| **Case No. 20-cv-3264** | **MAGISTRATE NORTH** |

## KNAUF DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY AND REMEDIATION ESTIMATE OF PHILLIP A. ADAMS

**MAY IT PLEASE THE COURT:**

Defendants, Knauf Gips KG and Knauf New Building System (Tianjin) Co. Ltd. ("KPT") (the "Knauf Defendants"), submit the following Memorandum in Opposition to Plaintiffs Jawad and Fatme Gharib's Motion *in Limine* to Exclude the Expert Testimony and Remediation Cost Estimates of Defense Consultant, Phillip A. Adams (Doc. 23363). In their Motion, Plaintiffs ask the Court to exclude Phil Adams' testimony because his conclusion as to the extent of Plaintiffs' damages and the required scope of remediation differs, in part, from the conclusions as to damages and necessary remediation reached by this Court following the *Hernandez* and *Germano* trials— early *bench*, *bellwether* trials in the MDL, which were the product of significant stipulations and default judgments and to which neither Plaintiffs here nor at least one of the Knauf Defendants were parties. As further explained herein, Plaintiffs' reliance on the *Hernandez* and *Germano*

1

decisions is misplaced. Phil Adams is eminently qualified to present rebuttal expert testimony as to the appropriate calculation of Plaintiffs' damages.

This is a trial by jury wherein Plaintiffs bear the burden of proof as to individual causation, liability, and damages. The jury, as the ultimate fact finder, will determine whether Plaintiffs have satisfied their burden of proof. Here, there remains is at least some genuine dispute as to causation, liability, and damages for the jury to determine, as confirmed by Plaintiffs' own experts. Therefore, the Knauf Defendants are afforded the right and opportunity to provide rebuttal opinions from an expert on the measure of damages using Court-accepted methodology: Xactimate.

Phil Adams, who was disclosed and may be called to testify as a defense expert in rebuttal to Plaintiffs' experts on the issue of damages, provided expert opinions using Xactimate for Plaintiffs' properties and for the other currently pending *Bennett* Action properties. Mr. Adams is uniquely qualified to provide expert opinions on the issue of remediation damages. Notably, Mr. Adams' opinions are based on his training and experience in being involved in the remediation of over 3,000 properties involved with Chinese drywall.  Mr. Adams was the lead contractor for the Court-approved remediation program in the Knauf Class Settlement Agreement, and his Xactimate calculations for areas of damage are a result of the same program, which is a reliable and acceptable principle.  The fact that Plaintiffs disagree with the conclusion of Mr. Adams' opinions as a rebuttal expert to Plaintiffs' experts is not a basis for exclusion under *Daubert*, but rather is grounds for cross-examination in this adversarial proceeding where several facts and claims remain disputed. For these reasons, and as more fully set forth below, the Motion *in Limine* should be denied.

## RELEVANT FACTUAL BACKGROUND

The Gharibs' suit is one of few remaining cases in MDL No. 2047, which was formed in 2009 to consolidate what were ultimately hundreds of lawsuits involving thousands of plaintiffs

who alleged damages associated with Chinese-manufactured drywall. *See In re Chinese Manufactured Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 830 (E.D. La. 2012). Since that consolidation, the Knauf Defendants have participated in extensive discovery, including thousands of depositions and the exchange of millions of documents, and a largescale settlement program (the "Knauf Class Settlement Agreement") that resulted in mediation of over 2,000 homes. The deadline to file claims to the Knauf Class Settlement Agreement was October 25, 2013.

In November 2014, over a year after the October 25, 2013 deadline to participate in the Knauf Class Settlement Agreement and several years after the creation of this MDL, after the Knauf pilot program and after the Knauf supply chain of interlocking class settlements, Elizabeth Bennett and several other individual property owners filed suit against the Knauf Defendants in the Northern District of Alabama (the "*Bennett* Action"). The claims were transferred and consolidated in MDL 2047. Additional claimants, like Plaintiffs in this action, were later added to the *Bennett* Action in MDL 2047. Following substantial pre-trial litigation in the MDL Court, on November 23, 2020, this Court severed Plaintiffs' claims, alongside those of nine other plaintiffs, from the larger *Bennett* Action so that they could file separate amended complaints and proceed independently in their final preparations for trial. (*See* MDL Doc. 22980).

In Plaintiffs' operative Amended Complaint, Plaintiffs assert claims against the Knauf Defendants for redhibition and under the Louisiana Products Liability Act ("LPLA"), alleging damages to two of their properties caused by drywall manufactured by the Knauf Defendants (hereinafter "KPT Drywall"). (*See* Case 2:20-cv-3264, Doc. 1; *See also* Doc. 21334 at ¶¶ 86-108; Doc. 22925 (limiting Louisiana plaintiffs' claims to redhibition and LPLA claims)). The two allegedly damaged properties include Plaintiffs' two-story residence bearing municipal address 4 Beresford Drive, Metairie, Louisiana 70118 (hereinafter the "Beresford Property"), and a three-

story mixed commercial and residential building bearing municipal address 8807 South Claiborne Avenue, New Orleans, Louisiana (hereinafter the "Claiborne Property").

Plaintiffs their Motion ask the Court to exclude the Knauf Defendants' expert, Phil Adams, because his rebuttal opinion differs from this Court's findings of fact in prior bench, bellwether trials in the *Hernandez* and *Germano* cases and because he concludes that, based on his inspection and the available evidence, only a partial remediation of the Gharibs' properties is necessary. But the *Hernandez* and *Germano* opinions were the product of wide-ranging stipulations and default judgments and thus cannot be dispositive of the issue of the Gharibs' damages. Moreover, Phil Adams' rebuttal opinion is appropriately tailored to the available evidence and the opinions of Plaintiffs' own experts, who made no findings as to the existence or cause of damages in certain areas of the Plaintiffs' properties yet agree that such an individualized inspection of the property and causation analysis is necessary to impose liability upon the Knauf Defendants.

### A.      The *Hernandez* and *Germano* Actions

#### 1.      *MDL Rulings Relating to the Taishan Defendants*

The Chinese Drywall MDL primarily concerns drywall manufactured by two groups of defendants: (1) the Knauf Defendants, the named Defendants in the matter currently before the Court, and (2) several Chinese-based manufacturers, including Taishan Gypsum Co. Ltd. ("TG") and Taian Taishan Plasterboard Co., Ltd., which are often referred to as the "Taishan Defendants."[1] Because Plaintiffs' Motion directs the Court to a few of the MDL Court's rulings pertaining to the Taishan Defendants—namely the Findings of Fact and Conclusions of Law ("FOFCOL") in *Germano, et. al v. Taishan Gypsum Co. Ltd., et al.*, case no. 09-6687 ("*Germano* Default FOFCOL") and a later FOFCOL "Related to the June 9, 2015 Damages Hearing" in the same

---

[1] The Taishan Defendants are not in any way affiliated with the Knauf Defendants; rather the Taishan Defendants and the Knauf Defendants are competing manufacturers.

matter and issued on April 21, 2017 (hereinafter the "*Germano* Damages FOFCOL"), a brief background of each of the referenced findings is provided.

        a.        *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E.D. La.)

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09–6687 (E.D. La.), was one of four cases initially levied against the Taishan Defendants and served as the "main vehicle" for the MDL litigation involving the Taishan Defendants.[2] After one of the Taishan Defendants, TG, failed to make an appearance in *Germano* and one of the other matters, the Court entered a preliminary default against TG.[3] In furtherance of the preliminary default in *Germano*, the Court held an evidentiary hearing, without a jury, to address the scope and cost of remediation. The Court allowed several plaintiffs to intervene and present evidence at that hearing and subsequently entered a FOFCOL[4] and a Final Default Judgment against TG.[5] Relevant here, and as heavily emphasized in Plaintiffs' Motion, the Court found in the *Germano* Default FOFCOL that the *evidence at the default hearing* showed that, "*at least with regard to the representative cases,*" which were "representative of a cross-section of contaminated homes," selective remediation of the damaged areas was not feasible in "homes in which there is a *substantial mixture*" of non-Chinese and Chinese-manufactured drywall.[6]

       Following the entry of default, TG made its first appearance in the *Germano* case, appealed the default judgment, and filed several motions to dismiss for lack of personal jurisdiction.[7] After years of extensive litigation, the Final Default Judgment against TG was affirmed on appeal and

---

[2] *See Germano* Damages FOFCOL, Doc. 20741, at 5.
[3] *See id.,* at 7.
[4] *See* "Germano Default FOFCOL," Doc. 2380.
[5] *See* "*Germano* Damages FOFCOL," Doc. 20741, at 5.
[6] *See* Doc. 2380, at 56 (emphasis added).
[7] *See id.* at 7–10.

the Court found that it had personal jurisdiction over TG.[8] The Taishan Defendants again "withdrew" from the litigation, and the Court issued a contempt ruling against them.[9]

In the Taishan Defendants' absence, the plaintiffs in *Germano* filed an Omnibus Motion for Class Certification.[10] On September 26, 2014, the MDL Court issued a FOFCOL in which it granted the unopposed Motion and certified a class consisting of the property owners listed as plaintiffs "on the complaints in *Amorin, Germano, Gross, and/or Wiltz* (*i.e.,* not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants."[11] Notably, the Court found that certification was particularly appropriate in light of "the narrow scope of the factual determinations left to be made" as a result of the "default judgment on liability" that had already been issued against TG.[12] Following certification of the class but prior to the class damages hearing, the Taishan Defendants again appeared in the matter with new counsel.[13]

> b.   *The Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing—Pertaining to the Taishan Defendants*

On June 9, 2015, the MDL Court finally held the class damages hearing to determine the damages the Taishan Defendants owed to the *Germano* class described above.[1415] Again, neither of the Knauf Defendants were parties to the *Germano* action, the June 9, 2015 damages hearing, or the subsequent FOFCOL.[16] Following the hearing, the Court issued Findings of Fact &

---

[8] *See id*.
[9] *See id*. at 10.
[10] *See id.*
[11] *See* Doc. 180828, at 34–35 ("*Germano* Class Certification FOFCOL"); *see also Germano* Damages FOFCOL, Doc. 20741, at 10).
[12] *See id.*, at 16.
[13] *See* Doc. 20741, at 11.
[14] *See id.* at 11.
[15] *See* Doc. 20741, at 19.
[16]  *See generally id*.

Conclusions of Law Related to the June 9, 2015 Damages Hearing ("the *Germano* Damages FOFCOL").[17] Because the *Germano* Default FOFCOL and class certification findings "resolved a multitude of factual and legal issues," including liability, causation, and the right to recover damages,[18] the only issue before the MDL Court at the June 9, 2015 hearing, and subsequently decided by the Court in the *Germano* Damages FOFCOL, was "the amount of damages which should be awarded to the Class for property remediation."[19] In the *Germano* Damages FOFCOL, the Court ultimately adopted the class plaintiffs' damages formula on a class-wide basis, which required damages be "calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 as adjusted by the RS Means location factor."[20]

In reaching this conclusion, the Court spent several pages analyzing whether the formulaic approach could appropriately be applied on a class-wide basis. The Court explained, however, that the class before it was unique, in that it could be susceptible to a formulaic and universally applied damages calculation. The Court provided:

> 63. [ . . . ] In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence.

> 64. With regards to the Taishan drywall in this case, in contrast to these typical class actions, there is no issue of either liability or causation. . . . Here, Taishan has been held liable for defective Chinese drywall, and any properties containing Chinese drywall are defective, requiring the removal of the Chinese-drywall.[21]

---

[17] *See* Doc. 20741.
[18] *See id.* at 18.
[19] *See id.* at 31; *see also id.* at 33 ("While the default judgment conclusively establishes liability, it is not conclusive of the class damages for remediation costs which Plaintiffs seek. Liability and damages require separate and equally 'rigorous analysis.'").
[20] *See id.* at 50.
[21] See *id.*, at 32-33.

Thus, because of the limited issues remaining following Taishan's default, the Court concluded that the formulaic approach was "superior to the thousands of individual proceedings that would result if Defendants' proposal for property by property inspection and estimation were accepted."[22] The Court further acknowledged that "there is some variation, but conclude[d] that the time, expense, and inefficiency of inspecting every affected property would result in an inequitable solution, given the delay these property owners have already experienced in obtaining relief."[23]

In short, the Court's rulings in *Germano* cannot be excised from the circumstances surrounding Taishan's default. Liability, causation, and the scope of remediation were established in Taishan's absence, and Taishan was only present for the final determination of costs, which was specifically tailored to be easily and efficiently applied across a large class. Indeed, the Court has recently recognized in subsequent proceedings that "[w]hat sets Taishan apart from the other defendants is that it was defaulted by the District Judge …[and] the only issue to be decided [as to Taishan] is the quantum of damages. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-MD-2047, 2022 WL 17684805, at *1 (E.D. La. Nov. 28, 2022), report and recommendation adopted, No. 09-MD-2047, 2022 WL 17672496 (E.D. La. Dec. 14, 2022). And of course, the Knauf Defendants were not present or otherwise represented in any of the cited proceedings. The *Germano* rulings simply cannot be dispositive or influential upon the Knauf Defendants' expert's opinion, or the jury's conclusion, as to the extent of Plaintiffs' damages. Plaintiffs' arguments to the contrary should be disregarded.

2.     *Hernandez v. Knauf Gips KG, et al.,* Case No. 09-6050 (E.D. La.)

The trial in *Hernandez v. Knauf Gips KG* was the first and only bellwether trial conducted in the MDL against any of the Knauf Defendants, and the only claims tried were those against

---

[22] See *id.*, at 48.
[23] See *id.*, at 47–47.

Defendant KPT.[24] The *Hernandez* plaintiffs voluntarily dismissed their claims against all other defendants (including Knauf Gips) prior to trial.[25] Contrary to Plaintiffs' assertion, Knauf Gips is not the manufacturer of KPT drywall and did not supply any KPT drywall to the United States.[26]

In preparation for the *Hernandez* bench trial, the *Hernandez* plaintiffs and KPT entered into two joint stipulations, which significantly narrowed the issues to be decided by the MDL Court at trial: a February 2010 Joint Stipulation and a March 2010 Joint Stipulation.[27] Notably, in the February 2010 Joint Stipulation, the parties stipulated to the following:

> (3) This stipulation shall only apply to the redhibition and fitness for ordinary use claims and associated defenses asserted by Plaintiffs in *Hernandez v. Knauf, et al.* (Case No. 09-6050). This stipulation shall not apply to any other claims or defenses which have been asserted or which may be asserted in the future by Plaintiffs, KPT, or any other party in any other matter. KPT expressly reserves, and does not waive, any of its defenses. KPT, nevertheless, stipulates in the *Hernandez* case, and only the *Hernandez* case, that it will not assert certain defenses, including comparative fault, contribution and/or reduction in KPT's legal responsibility to Plaintiffs as a result of any alleged conduct or fault of any other party, person or entity, in the *Hernandez* case, (and only in the *Hernandez* case). KPT expressly reserves and does not waive any other defenses in this or any other case. ***KPT and Plaintiffs do not intend that this stipulation, or any of its terms, <u>or any adjudication of any matter in this case</u>, be used for purposes of collateral estoppel or issue preclusion or as an evidentiary admission in any other case.*[28]**

Additionally, in the February 2010 Joint Stipulation, the parties also stipulated that, among other things, that: plaintiffs would only pursue claims in redhibition and fitness for ordinary use, plaintiffs' damages were not precluded under the LPLA, plaintiffs' claims had not prescribed,

---

[24] *See* Doc. 2713, at 4.

[25] *See id.*

[26] See Exhibit 1, Knauf Gips Profile Form.

[27] *See* Doc. 1438, February 2010 Joint Stipulation; Doc. 1728, March 2010 Joint Stipulation. Some undersigned counsel were counsel to Defendant KPT at the *Hernandez* trial and submit to the Court that the primary purpose of the *Hernandez* bellwether trial was to facilitate settlement discussions between the parties. The stipulations were intended to narrow the issues before the MDL Court in accordance with this purpose.

[28] *See* Doc. 1438, February 2010 Joint Stipulation, at 2–3 (emphasis added). The MDL Court also summarized several of the stipulations in its FOFCOL. *See* Doc. 2713 at 5–7.

plaintiffs bought certain KPT drywall, KPT manufactured and sold the drywall in the plaintiffs' house, and that the drywall in plaintiffs' home emits certain reduced sulfur gases and odor.[29]

In March of 2010, the *Hernandez* plaintiffs and KPT agreed to several more pre-trial stipulations. Most relevant here, the parties agreed that:

> 3.  ***With respect to the appropriate scope of remediation for the Hernandez home, the parties agree that (except with respect to the possibility of maintaining certain "green board" in the bathrooms), all drywall in the home, both Chinese-manufactured and domestic, will be removed and replaced, as well as all insulation, all flexible duckwork, all switches, all receptacles, all molding, and the countertops.*** Beyond these agreed-upon elements of the scope of remediation, the parties are in disagreement and will present opposing evidence and testimony at trial on the scope of remediation. Likewise, as to the cost of any and all remediation activity, the parties remain in disagreement and will present opposing evidence and testimony at trial.[30]

The parties further agreed that certain evidence regarding "XRF and/or wire corrosion visual inspections as a techniques or combination of techniques to identify and/or remove Chinese drywall" would not be introduced, although KPT reserved its right to propose such a technique in further proceedings.[31] Accordingly, unlike the matter currently at issue, there was no dispute in *Hernandez* as to whether the entire amount of drywall in the property needed to be removed and replaced.

In light of the parties' stipulations, the *Hernandez* bellwether trial, which was held before this Court from March 15, 2010 to March 19, 2010, effectively focused entirely on the issue of damages, but only to the extent that damages had not already been stipulated.[32] Accordingly, the

---

[29] *See id.*
[30] See Doc. 1728, March 2010 Joint Stipulation, at 2 (emphasis added).
[31] *See id.*, at 2.
[32] *See generally*, *Hernandez* FOFCOL, Doc. 2713, at 15 ("The parties agree that remediation is necessary. They also agree on various aspects of this remediation. But they disagree on the full scope of the remediation and the appropriate costs thereof. The only issue in this case, therefore, are the nature and scope of the remediation necessary to properly restore the Plaintiffs' home and the resulting damages if any.").

Court did not address several issues in *Hernandez* that are still outstanding with respect to the Gharibs' claims, including whether KPT was liable to the plaintiffs under their asserted legal theories, whether the KPT drywall was the cause of the damage, and whether KPT or Knauf Gips are liable for any alleged damages.[33] Rather, the MDL Court's FOFCOL focused on the only issue to which the parties could not reach an agreement: the "proper remediation for the electrical, plumbing, and HVAC systems, and other items which are involved in the removal of drywall or contain silver and copper components" and the cost of such remediation.[34] After weighing considerable evidence, expert testimony, and the damages available to plaintiffs under their asserted causes of action (redhibition and fitness for ordinary use), this Court rendered specific findings with respect to the appropriate scope of remediation and damages owed to plaintiffs.[35]

Following the *Hernandez* bellwether trial, on December 20, 2011, the Knauf Defendants entered into a global, class Settlement Agreement with the Plaintiffs' Steering Committee, which ultimately resulted in successful remediation of over 2,000 homes. The Gharibs did not timely file claims to the Knauf Class Settlement Agreement and years later have asserted these current claims.

**B.      The Experts**

*1.      The Gharibs' Experts*

Before Plaintiffs' claims were severed from the *Bennett* Action, the Court issued a Case Management Order setting forth deadlines for the disclosure of expert witnesses and opinions. Plaintiffs disclosed opinions from a general causation expert, Howard Ersham, and a damages expert, Shawn Macomber. In their Motion, Plaintiffs effectively argue for the application of the Court's remediation protocol formula previously utilized in class-wide applications and argue that

---

[33] S*ee generally, id*.; *see also id*., at 17 ("The evidence is conclusive that the corrosion in the Hernandez home was proximately caused by exposure to Chinese drywall manufactured and sold by Defendant." (citing expert testimony)).
[34] *See id.* at 10–24.
[35] *See generally*, Doc. 2713.

the Knauf Defendants' expert's failure to utilize this more generalized formula renders his opinion inadmissible. Critically, however, Plaintiffs' own causation expert, Mr. Ersham, agrees with the Knauf Defendants that an individualized inspection and causation analysis is requisite to an accurate finding of damages. Even more, neither of Plaintiffs' experts performed such an analysis.

Plaintiffs retained Mr. Ersham December 27, 2019 to provide a general opinion regarding the tendency for KPT drywall to produce gases, cause corrosion, and cause damage to components in a home generally.[36] In offering this opinion, Mr. Ersham agrees that both the existence and extent of corrosive effects of reactive drywall depend on a host of factors. For example, Mr. Ersham testified that the type of reactive drywall, the percentage or mix of reactive drywall and non-reactive drywall, the total amount of reactive drywall in the property, and other factors, like environmental conditions, all impact whether and to what extent reactive drywall causes corrosion or other damage to individual property.[37] Mr. Ersham also agrees that the only way to differentiate and determine whether there was damage from reactive drywall (or some other cause), and to what extent that damage was caused by uppercase KPT drywall, is to individually inspect and test the component parts and personal property located inside the individual properties.[38]

> Q.       And in terms of all these things, and corrosive Chinese drywall, because you have all those factors, how do you determine or rule out those factors?
>
> A.       We take everything in consideration.

---

[36]Exhibit 2, December 31, 2019 Expert Report of Howard Ersham at p. 5; Exhibit 3, Deposition of Howard Ersham at 7:20-8:5. 14:13 – 15:11; 36:25-37:3.

[37] See Exhibit 3, Deposition of Howard Ersham at 37:24-38:8; 70:5-17. (*See* Exhibit 3, Deposition of Howard Ersham 70:22 -71:17. ("Q. And what sources other than corrosive drywall can result in blackening of copper components? A. The most common is improperly treated well water; however, there are other things. It could be chemicals introduced by the homeowner. It could be dried traps, sewer gas, natural gas leaks, various chemicals that are stored in proximity to the affected items, natural subterranean gas emissions coming from the ground. Q. Could it also be -- other than coming from the ground, if you lived in a -- for lack of a better term -- lived in a swampy area where sulfur gas is common, could that also be a factor in terms of weather and the extent of the type of corrosion in a property? A. Theoretically, yes.").

[38] Exhibit 3, Deposition of Howard Ersham 76:7- 80:13.

> Q.      And I guess I'm trying to just ask the -- the simplest form of the answer is that you do an inspection; is that right?
>
> A.      Correct.[39]

Without conducting this type of inspection of the properties, their component parts, and the personal property within, Mr. Ersham cannot provide any reliable expert opinion as to whether any particular property suffered damage or impacts from reactive drywall, and to what extent that damage was caused by uppercase KPT drywall.

> Q.      Can you -- you cannot state with any degree of certainty that those secondary impacts that you've seen in the past also apply with respect to the individual plaintiffs in this case, true?
>
> A.      I guess.
>
> Q.      My point is that it can potentially apply, but you can't --
>
> A.      But I can't state with certainty, true.
>
> Q.      In fact, everything, in terms about your scientific opinions, you can't even say whether it's more likely than not, true?
>
> A.      True.[40]
>
> ***
>
> Q.      Okay. Again, my question is in terms of these items, or any item, you can't determine whether an item is impacted by corrosive Chinese drywall without having physically inspected that item or viewing it; is that accurate?
>
> A.      True.[41]

Plaintiffs' own expert thus agrees that the cause, extent, and basis for any damages associated with

Chinese drywall will be based on the individual facts of each plaintiffs' property and admits that,

---

[39] Exhibit 3, Deposition of Howard Ersham 71:18 - 72:1.
[40] Exhibit 3, Deposition of Howard Ersham at 102:5 - 16.
[41] Exhibit 3, Deposition of Howard Ersham at 111:10 - 15.

because he did not perform such an individualized inspection, his opinions cannot be extrapolated to prove causation as to Gharibs' claimed damages.

Moreover, Plaintiffs' damages expert Shawn Macomber did not provide any opinions as to the extent of defective drywall, did not inspect any personal property allegedly damaged, and did not inspect any component parts of the individual properties to determine the extent, if any, and the cause of any corrosion or damage.[42] Instead, Mr. Macomber simply attempted to determine whether any drywall manufactured by Defendant KPT was located in the property, calculated the square footage of the living area, and applied a multiplier based on RS Means to arrive at a remediation cost estimate.[43] Relevant here, with respect to Plaintiffs' residential property, the Beresford Property, it is undisputed that Plaintiffs only installed alleged Chinese-manufactured drywall in the first floor of their home following Hurricane Katrina,[44] and Macomber's report only identified KPT Drywall on the first floor of the home.[45] Mr. Macomber also excluded the first floor of the Claiborne Property from his RS Means Calculation because he found no evidence of KPT Drywall or related damages.[46]

Also relevant to the issue of expert testimony, on December 16, 2022, Plaintiffs filed a Motion to Add Expert Disclosures, wherein Plaintiffs sought to substitute Mr. Macomber's opinion for that of a new damages expert, David Herring.[47] Notably, Mr. Herring relied upon the Xactimate method—the same method utilized by Defendants' expert, Phil Adams—to reach his

---

[42] Exhibit 4, Expert Report of Shawn Macomber, Exhibit C (Inspection Letters).

[43] RS Means is a database that provides annual cost information to the construction industry to provide estimates and projections for construction costs by applying a multiplier to the square footage of the property. Exhibit 5, Expert Report of Shawn Macomber, Exhibit B (RS Means Estimates).

[44] *See* Doc. 23360-7, Excerpt from Phil Adams-Moss Report, at 1 (noting that because "only the ground floor was renovated/repaired [after Hurricane Katrina,] . . . [t]his Xactimate Estimate Report does not include any work for remediation of the 2nd floor of the home.").

[45] Exhibit 4, Excerpts from Exhibit C to Macomber Report, at 2 (identifying KPT Drywall in the Kitchen Wall);

[46] *See* Exhibit 6, Excerpts from Macomber Deposition (hereinafter "Macomber Depo."), at 110:5–25; 111:1-6).

[47] *See generally*, Doc. 23349 (Motion to Add Expert Disclosures); Doc. 23358 (Order and Reasons)).

conclusion,[48] but he opined that there were additional damages to Plaintiffs' properties not previously raised by Plaintiffs' previous expert, including damages to the second floor of Beresford Property and the first-floor commercial spaces, stairwells, and third floor of the Claiborne Property.[49] On February 6, 2023, this Court denied Plaintiffs' Motion, finding the proposed untimely disclosure would "significantly prejudice Defendants in this matter and potentially in other pending Chinese Drywall cases."[50]

In the instant Motion, Plaintiffs essentially seek to sidestep this Court's denial of their motion to add expert testimony by implicitly asking that the Court to follow its FOFCOL in the *Hernandez* and *Germano* cases, in which the Court adopted those class plaintiffs' experts' opinions. Here, in this individual suit for damages, Plaintiffs bear the burden of proof at their jury trial to prove liability, causation, and damages. Plaintiffs should not be allowed to avoid this burden by asking the Court to usurp the jury and adopt findings from a wholly unrelated case.

### 2. The Knauf Defendants' Expert: Phil Adams

Phil Adams was disclosed as a rebuttal expert to the Plaintiffs on the issue of damages. As part of the Knauf Class Settlement Agreement, he was approved by this Court as the program contractor with Moss in remediating over 3,000 properties involving Chinese drywall and was consulted and provided expertise in examining partial and complete remediations of over 300 already-remediated properties.[51] Applying the same Xactimate principles he utilized in remediating and evaluating over 3,000 properties involving Chinese drywall, Mr. Adams rendered

---

[48] *See* Doc. 23349-11 (David Herring Report).
[49] *See generally,* Doc. 23349 (Motion to Add Expert Disclosures); Doc. 23349-11 (David Herring Report).
[50] *See* Doc. 23358, at 5.
[51] Exhibit 7, CV of Phil Adams.

opinions as to the cost of remediation based on the current protocol recommended by the CPSC for each of the *Bennett* plaintiffs, including the Gharibs.[52]

As further explained herein, Plaintiffs have failed to show that Mr. Adams' use of the Xactimate method is in any way unreliable, and their disagreement with Mr. Adams' conclusion that remediation consistent with CPSC guidelines is most appropriate in these circumstances presents a credibility determination for the trier of fact, which in this case is the jury.

## STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[53]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[54] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[55] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[56] The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[57] In *Daubert*, the

---

[52] *See* R. Docs. 23363-3, 23363-4, 23363-5, 23363-6, 23363-7; Exhibit 7, CV of Phil Adams.
[53] Fed. R. Evid. 702.
[54] 509 U.S. 579 (1993).
[55] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (citing Daubert, 509 U.S. at 592-93).
[56] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).
[57] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007); *see also Burleson v. Texas Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584-85 (5th Cir. 2003).

Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony. "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[58] The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[59]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[60]  "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[61] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[62]  The Court is not concerned with whether the opinion is correct but whether the preponderance of the evidence establishes that the opinion is reliable.[63] "It is the role of the adversarial system, not the court, to highlight weak evidence."[64]

"When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis ... on 'sufficient facts or data' is not intended to

---

[58] *Daubert*, 509 U.S. at 592-96.
[59] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[60] *See Primrose Operating Co. v. Nat'l Am. Ins. Co*., 382 F.3d 546, 562 (5th Cir. 2004).
[61] *Rosiere v. Wood Towing, L.L.C*., No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc*., No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[62] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[63] *See Johnson v. Arkema, Inc*., 685 F.3d 452, 459 (5th Cir. 2012).
[64] *Primrose*, 382 F.3d at 562.

authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[65]  "The district court should, initially, approach its inquiry with the proper deference to the jury's role as the arbiter of disputes between conflicting opinions."[66] The issues regarding these opinions relate to the weight of evidence and credibility. *Daubert* motions are inappropriate when they attack "the underlying facts upon which each opinion was based. That approach is not contemplated under a *Daubert* challenge."[67] To the contrary, "[t]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as basis for its exclusion."[68]

> Courts should not be lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." … Therefore, challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility.[69]

The validity of the conclusions reached by an expert is for the fact finder to determine after the *Daubert* analysis.[70] "[I]n a 'battle of the experts' a jury 'must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the truth of the matter.'"[71]

Further, the Supreme Court has emphasized that "the *Daubert* analysis is a 'flexible' one, and that 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his

---

[65] Pipitone, 288 F.3d at 249 (citing Fed. R. Evid. 702 advisory committee notes);

[66] *Viterbo*, 826 F.2d at 422.

[67] *In re Katrina Canal Breaches Consol. Litig.*, No. 10-866, 2012 WL 4328354, at *1 (E.D. La. Sept. 20, 2012).

[68] *Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, No. 03-189, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004) (citing *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392-93 (5th Cir. 2002)).

[69] *Gen. Elec. Capital*, 2004 WL 5495590, at *5 (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002); citing *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981)).

[70] *Pipitone*, 288 F.3d at 250.

[71] *Foradori v. Harris*, 523 F.3d 477, 516 (5th Cir. 2008).

testimony.'"[72] Overall, "[n]otwithstanding *Daubert . . .* 'the rejection of expert testimony is the exception and not the rule.'"[73] "A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[74] The district court must accord proper deference to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[75]

**LAW & ARGUMENT**

The Gharibs' case is now proceeding as a stand-alone case—not as part of a class or consolidated action—towards trial, and as such, Plaintiffs alone bear the burden of proving causation, liability, and damages. In their *Motion in Limine,* however, Plaintiffs ask this Court to adopt its damages findings from two early *bench, bellwether trials* in the MDL, the *Hernandez* and *Germano* trials—trials that were the product of default judgments and significant stipulations as to liability, causation, and damages, and in which either one or both of the Knauf Defendants were absent—and to order that those prior findings are dispositive of the correct determination of damages in Plaintiffs' wholly-separate *jury trial*. Indeed, Plaintiffs now ask that the Court exclude the Knauf Defendants' expert, Phil Adams, largely because his ultimate conclusions as to the extent of remediation required at Plaintiffs' properties do not align with this Court's *findings of fact* that were to be applied on a class-wide basis in *Hernandez* and *Germano*. In short, Plaintiffs do not challenge the reliability of Mr. Adams' methods, but merely disagree with his findings, and

---

[72] *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

[73] *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (quoting Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments).

[74] *Id.*

[75] *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987))) (emphasis added).

now ask the Court to subvert the role of the jury by imputing factual findings from a different trier of fact in a different case.

The validity of the conclusions reached by an expert is for the fact finder to determine after the *Daubert* analysis.[76] Accordingly, in the *Daubert* analysis, "[a] judge must be cautious ***not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology***, or judge credibility, including the credibility of one expert over another. ***These tasks are solely reserved for the fact finder***."[77] Plaintiffs have the burden to prove all aspects of their case, and they can present evidence to the jury through their expert (who notably adopts this Court's *Germano* FOFCOL in his report) as to why they believe complete remediation is necessary and Mr. Adams' conclusion is purportedly incorrect. But a disagreement between experts merely presents a credibility determination for the jury.[78] Plaintiffs have not presented any legitimate challenge to Mr. Adams' testimony under *Daubert*. Their Motion should be denied.

**I.     This Court's findings in *Germano* and *Hernandez* are not dispositive of Plaintiffs' damages and do not serve as a basis upon which to exclude Phil Adams.**

In both this Motion and in Plaintiffs' contemporaneously filed Motion for Summary Judgment, Plaintiffs ask that the Court adopt its *Germano* Damages FOFCOL regarding the scope of remediation and apply them into this matter as the "law of the case." Plaintiffs also ask that the Court look to the *Hernandez* FOFCOL and the earlier *Germano* Default FOFCOL, presumably

---

[76] *Pipitone*, 288 F.3d at 250.

[77] *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) (*overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (emphasis added)); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765-766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."); *Tumbleweed Props., Inc. v. Colony Ins. Co.*, No. 07-9187, 2009 WL 1605152, at *2 (E.D. La. June 5, 2009) (denying motion to exclude the plaintiff's expert and noting "Defendant can cross-examine [the plaintiff's expert] vigorously"); *Corus U.K., Ltd. v. Forest Lines*, No. 04-cv-1553, 2005 WL 5974558, at *1 (E.D. La. Aug. 2, 2005) (Engelhardt, J.) (same)).

[78] *See Foradori v. Harris*, 523 F.3d 477, 516 (5th Cir. 2008) ("[I]n a 'battle of the experts' a jury 'must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the truth of the matter.'").

also as law of the case or otherwise controlling authority. Under the law-of-the-case doctrine, when "a court of competent jurisdiction decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *of the same case.*"[79] Although the law-of-the-case doctrine applies to MDL cases in some circumstances,[80] the doctrine still requires that *the cases be the same*.[81]

As more fully explained in the Knauf Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, which the Knauf Defendants incorporate herein as if copied *in extenso*, there are several reasons why the *Hernandez* and *Germano* FOFCOL simply cannot operate as law of case, the most fundamental of which being that *this is simply not the same case.* Indeed, neither the Gharibs nor one (*Hernandez*) or both (*Germano*) of the Knauf Defendants were parties to the *Hernandez* or *Germano* class actions, and the mere fact that Plaintiffs' claims in the *Bennett* Action were, years later, consolidated for *convenience* into this MDL does not give them the right to pick and choose favorable rulings from past cases or to receive the benefit of favorable testimony adduced from the *Germano* and *Hernandez* plaintiffs' experts. This case is proceeding independently to trial, and proceedings not held in the *Bennett* Action or this action are not dispositive of any issue currently before the Court. Indeed, this Court has already rejected "[f]or reasons that should be obvious, … the argument that the … aggregate class damages formula [*Germano* Damages FOFCOL] should be used to compute the individual damages" of two individual plaintiff properties in Taishan opt-out cases.[82] Specifically, the Court concluded that the

---

[79] *See Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1423 (5th Cir. 1995) (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988)) (emphasis added).
[80] *See In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009).
[81] *See Copeland*, 47 F.3d at 1423.
[82] *In re Chinese-Manufactured Drywall Prod. Liab. Litig*., No. 09-MD-2047, 2022 WL 17684805, at *6 (E.D. La. Nov. 28, 2022), report and recommendation adopted, No. 09-MD-2047, 2022 WL 17672496 (E.D. La. Dec. 14, 2022).

*Germano* Damages FOFCOL created in "a gigantic MDL to calculate damages for thousands and thousands of claims is highly unlikely to be probative" when evaluating individual properties.[83]

In addition to those reasons provided in the Knauf Defendants' Opposition to the Motion for Partial Summary Judgment, which reasons fully negate any potential applicability of the *Germano* or *Hernandez* rulings at trial in this matter, it is also important to note that the Court has never found the methods utilized by Mr. Adams *unreliable*. Rather, as evidenced from the excerpts cited in Plaintiffs' own Motion, the Court merely found a separate method "better and more realistic" *for class-wide application* and in light of the evidence concerning the "representative homes" and the expert testimony before it.[84] Accordingly, even if this Court's *Germano* FOFCOL was relevant to this *Daubert* motion, the admissibility of Mr. Adams' testimony would remain unaffected, and the issue would continue as one reserved for the jury.

The Gharibs are not part of a class action, and they have the burden of proving all aspects of their case at trial, including liability, causation, and damages. Unlike in *Hernandez* and *Germano*, there has been no stipulation entered in this case that would limit the issues that Plaintiffs are required to present to the jury to succeed in their case, and as evidenced from Plaintiffs' own experts' reports and testimony, both causation and damages remain in dispute.[85]

Plaintiffs cannot simply reap the benefits of stipulations made in KPT's cases with earlier class plaintiffs, or default judgment rendered against *different defendants*.[86] Just like this Court, as

---

[83] *Id*.

[84] *See* Doc. 23363-1, at 9.

[85] Again, the trial in *Hernandez v. Knauf Gips KG* was the first and only bellwether trial conducted in the MDL against any of the Knauf Defendants, and the only claims tried were those against Defendant KPT. *See* Doc. 2713, at 4.The *Hernandez* plaintiffs voluntarily dismissed their claims against all other defendants (including Knauf Gips) prior to trial. *See id.*  Contrary to Plaintiffs' assertion, Knauf Gips is not the manufacturer of KPT drywall and did not supply any KPT drywall to the United States. *See* Exhibit 1, Knauf Gips Profile Form.

[86] The Court has explicitly recognized that "[w]hat sets Taishan apart from the other defendants is that it was defaulted by the District Judge …[and] the only issue to be decided [as to Taishan] is the quantum of damages. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-MD-2047, 2022 WL 17684805, at *1 (E.D. La. Nov. 28, 2022), report and recommendation adopted, No. 09-MD-2047, 2022 WL 17672496 (E.D. La. Dec. 14, 2022).

the trier of fact, made discrete findings following the presentation of evidence in *Germano* and *Hernandez*, so too does the jury as the finder of fact in this case have the right to hear all of the evidence as to the alleged damages in Plaintiffs' homes, to determine whether that damage was caused by KPT Drywall, and to determine which expert's remediation approach is just under the circumstances. For these reasons and more fully provided in the Knauf Defendants' Opposition to the Motion for Summary Judgment, the Court should deny Plaintiffs' request to find the *Germano* and *Hernandez* FOFCOL dispositive of any outstanding issues in this matter.

**II.     Phil Adams' methods are reliable, and Plaintiffs' arguments to the contrary go only to the weight of his testimony, not the admissibility.**

Plaintiffs argue that Mr. Adams' testimony is not reliable because "(1) his testimony is not based on sufficient facts or data; (2) his testimony is not the product of reliable principles or methods; and (3) he has not applied the principles and methods reliably to the facts of this case."[87] Each argument will be addressed in turn.

**a)     Adams' opinions are based on sufficient facts or data.**

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis … on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.[88]

*Daubert* motions are thus inappropriate when they attack "the underlying facts upon which each opinion was based. That approach is not contemplated under a *Daubert* challenge."[89] To the contrary, "[t]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as basis for its exclusion."[90] Thus, "[a]s a general rule, the factual

---

[87] *See* Doc. 23363-1, at 24.
[88] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note)
[89] *In re Katrina Canal Breaches Consol. Litig.*, No. 10-866, 2012 WL 4328354, at *1 (E.D. La. Sept. 20, 2012).
[90] *Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, No. 03-189, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004) (citing *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392-93 (5th Cir. 2002)).

basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."

Plaintiffs argue that Mr. Adams' opinion is not based on sufficient facts or data because his "scope of remediation includes only the areas of the Gharibs' properties that he believes contain KPT Drywall." While it is true that Mr. Adams' report only opines as to the scope of remediation on the first floor of the Beresford Property and the second floor of the Claiborne Property, his decision to do so is not without a legitimate basis. With respect to the Beresford Property, Mr. Adams specifically explained in both his report and his deposition, that his report addresses only the first floor of the Beresford property because the homeowner advised at the time of the inspection that only the first floor was remediated following Hurricane Katrina.[91] Likewise, with respect to the Claiborne Property, Mr. Adams did not opine as to the scope of remediation required on the first floor because it was, and remains, undisputed that there is no evidence of KPT drywall or damage from KPT drywall on that floor. Indeed, Plaintiffs' own expert excluded the first floor of the Claiborne Property from his own analysis because of the undisputed lack of damage.[92]

In light of the foregoing evidence, Mr. Adams' *rebuttal* report speaks only to remediation on the first floor of the Beresford Property and the second floor of the Claiborne Property because those were, and remain, the only areas where Plaintiffs or their experts have presented competent evidence of KPT Drywall or related damages.[93] Plaintiffs have not presented any expert testimony identifying how KPT allegedly caused damages to their property on floors not containing KPT,

---

[91] *See* Phil Adams-Moss Report, at Doc. 23363-3, at 89; Doc. 23363-4, at 1 (noting that because "only the ground floor was renovated/repaired [after Hurricane Katrina,] . . . [t]his Xactimate Estimate Report does not include any work for remediation of thᵉ 2nd floor of the home."); Exhibit 8, Adams Depo., at 93:9-14 ("Q. How do you know for sure that there is no KPT board in the second floor of that property? A. Homeowner told us they did absolutely nothing after Hurricane Katrina when they remediated the first floor.").

[92] *See* Exhibit 6, Excerpts from Macomber Deposition (hereinafter "Macomber Depo."), at 110:5–25; 111:1-6).

[93] Plaintiffs also incorrectly contend that Mr. Adams found KPT Drywall in 90% of the home. As explained herein, Mr. Adams only inspected the first floor of the property, and accordingly estimated that 90% *boards he identified* contain KPT Drywall based on his finding that 6 out the 7 drywall boards he inspected on the first floor were KPT.[93]

and their one causation expert, Mr. Ehrsam, agrees that such testimony would have to be the product of an individualized analysis and inspection.[94] Mr. Adams' report is based upon all of the available facts, evidence, and testimony presented in *this* case, and his purposeful omission of certain floors from his recommended scope of remediation does not render his opinion unreliable.

Finally, it bears emphasizing that Mr. Adams has not opined as to the recommended scope of remediation or cause of damages on floors which he did not inspect. Thus, this is not a case where he reaches opinions on matters that he did not investigate such that it could theoretically create a question of reliability. Rather, to the extent Mr. Adams opines on the scope of Plaintiffs' damages, his opinions are competently based on a detailed inspection of the relevant area and a Xactimate report on the same. To the extent Plaintiffs would like to present evidence of damages to areas not addressed by Mr. Adams, it is their burden to do so. Again, Plaintiffs' argument to this point is an appropriate topic for cross-examination, not a *Daubert* motion.

**b)     Adams' opinions are based on reliable principles and methods.**

As an initial matter, although Plaintiffs do not dispute that Mr. Adams is qualified to render his opinions as an expert in this matter, Mr. Adams' qualifications are relevant to the issue of reliability.[95] Mr. Adams has been in the residential and commercial construction field for over 50 years, and since 2006 has been employed as a project manager by Moss and Associates, a leading national construction firm.[96] Mr. Adams has personally constructed, reconstructed, or remediated thousands of projects including single residential, multi-residential condominiums, collegiate

---

[94] Exhibit 3, Deposition of Howard Ersham 71:18 - 72:1; 102:5 – 16; 111:10 – 15.

[95] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2008) (explaining that "the *Daubert* analysis is a 'flexible' one, and that 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony'") (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

[96] *See* Exhibit 7, Adams CV; *see also* Exhibit 8, Adams Depo, at 32:5–10; 35:22–36:15 (explaining that he has held a contractor's license since 1980, that the license has never lapsed, and that he has never received a disciplinary board complaint).

25

facilities, hotels, and casinos.[97]   As part of the Knauf Class Settlement Agreement, he was approved by this Court as the program contractor with Moss in remediating, and providing Xactimate cost projections, in over 3,000 properties involving Chinese drywall and was consulted and provided expertise in examining partial and complete remediations of over 300 already-remediated properties.[98]

In reaching his opinions as to the Gharibs' property, Mr. Adams utilized the same methods he utilized in his remediation of the 3,000 properties in accordance with the 2011 settlement agreement.[99] As he explained in his deposition, with respect to each of the *Bennett* plaintiffs (like the Gharibs), Mr. Adams began by performing a visual inspection of property.[100] Mr. Adams then calculated the square footage for all air-conditioned (or habitable) areas of the property in accordance with American National Standards Institute ("ANSI") guidelines utilizing RapidSketch software.[101] Thereafter, Mr. Adams would produce an Xactimate report, which provides cost projections, for the areas he inspected. According to Mr. Adams, the Xactimate provides a more accurate estimate of remediation costs than does the RS Means method employed by Plaintiffs' expert, Mr. Macomber, because unlike RS Means, Xactimates take into account the specific details of the home, not just the square footage.

The only distinction between the method Mr. Adams used in remediating the over-3000 homes following the Knauf Class Settlement Agreement and the method he proposes for remediation of all former *Bennett* plaintiffs, is that he now utilizes the "Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 15, 2013" (or the CPSC protocol) in

---

[97] *See* Exhibit 7, Adams CV; Exhibit 8, Adams Depo., at 32:5-10.
[98] *See* Exhibit 8, Adams Depo., at 11:9-18;19:10–18.
[99] *See* Exhibit 8, Adams Depo., at 15:3-11.
[100] *See* Exhibit 8, Adams Depo., at 47:14-48:10.
[101] *See* Exhibit 8, Adams Depo., at 53:5-20; 55:1-13.

setting forth the specific property areas that require remediation.[102] The CPSC does not require the replacement of certain appliances and wiring that was required by the 2011 settlement, and provides a "common sense[,] practical approach" to the remediation of the individual homes of the *Bennett* Plaintiffs,[103] instead of the protocol adopted in the 2011 settlement agreement that was adopted specifically for class-wide application. Under CPSC guidelines, removal of drywall is required where identification of the boards is not feasible or reasonable.[104] However, where the allegedly defective drywall is indisputably isolated in a particular area, like in this case, CPSC guidelines provide (and Mr. Adams's past experiences have corroborated) that selective remediation is appropriate.[105] Accordingly, in properties like the Gharibs' where the drywall is indisputably isolated to particular areas, Mr. Adams concludes that a complete remediation of the entire building is unnecessary.[106]

As described above, Mr. Adams utilized the Xactimate method to determine the cost of remediation but utilized CPSC guidelines to reach his conclusion as to which items specifically required remediation. Plaintiffs, notably, do not provide any critique of the Xactimate method. Indeed, there can be no serious challenge to Mr. Adams' use of Xactimate, considering Plaintiffs recently tried, unsuccessfully, to add expert testimony which also relied upon the Xactimate method.[107] Plaintiffs' sole criticism of Mr. Adams' "methods," is to his conclusions based on CPSC guidelines. Specifically, Plaintiffs argue that the CPSC guidelines are not reliable because they: (1) were not utilized by the Court in *Hernandez* and *Germano* and (2) are "not geared towards litigation" but rather to "assist homeowners who must determine the least costly way to get back

---

[102] See CSPC Protocol, Doc. 23363-11.
[103] *See* Exhibit 8, Adams Depo., at 45:10-17.
[104] *See* Exhibit 8, Adams Depo., at 91:22 – 94:23; 97:16-23.
[105] *See id*.
[106] See *id*.
[107] *See* Doc. 23349-11 (David Herring Report).

in their homes."[108] The first argument has already been addressed herein and in the Knauf Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, and for those reasons already stated, this argument fails. Plaintiffs' second argument likewise fails to present a challenge to the reliability of the CPSC guidelines, but merely argues that the CPSC guidelines require less extensive remediation than what Plaintiffs and their experts are advocating be required in this individual case. This final point presents a debatable issue of fact and is illustrative of an opportunity for a battle of the experts. It is therefore an appropriate question for the jury. Plaintiffs have failed to show that Mr. Adams' use of the Xactimate method is in any way unreliable, and their disagreement with Mr. Adams' conclusions based on CPSC guidelines simply presents a credibility determination for the trier of fact. Plaintiffs' Motion should be denied.

c)      **Adams' application**

Lastly, Plaintiffs argue that Mr. Adams does "not apply the principles and methods reliably to the facts of this case." To support this argument, Plaintiffs attach a "Table 1" to their Motion, which purportedly presents a number of items about which Mr. Adams' testimony is not consistent with CPSC guidelines.[109] A review of the referenced Table, attached to Plaintiffs' Motion as Exhibit 5, however, reveals that Mr. Adams' conclusions are not inconsistent with the CPSC guidelines. For example, the CPSC guidelines require the "replacement of electrical distribution components (including receptacles, switches, and circuit breakers, but not necessarily wiring," and Mr. Adams' Remediation Protocol includes the "replacement of switches and outlets" in the areas identified to be allegedly affected by Chinese drywall.[110]  It is not clear what Plaintiffs are referring to when they make this allegation.

---

[108] See Doc. 23363-1, at 22-23.
[109] *See* Doc. 23363-1, at 23; Exhibit 5 to Plaintiffs' Motion in Limine; Doc. 23363-12.
[110] *Id*. at # 4.

Again, the methodology utilized by Mr. Adams was the Xactimate method, and the CPSC guidelines were used as an aid to Mr. Adams in forming his conclusion as to which specific items he calculated for remediation. Plaintiffs' complaints as to Mr. Adams' use of CPSC guidelines go the weight of his testimony, and do not present any reason to exclude him as an expert.

## CONCLUSION

Mr. Adams is eminently qualified to render his opinion as to Plaintiffs' damages, which is based upon reliable and court-proven methods. Plaintiffs have failed to provide any reason as to why Mr. Adams should be excluded. This Court should deny Plaintiffs' Motion *in Limine* to Exclude the Expert Testimony and Remediation Cost Estimates of Defense Consultant, Phillip A. Adams. The Knauf Defendants further request any and all relief the Court deems just.

Respectfully submitted,

**FISHMAN HAYGOOD, LLP**

/s/ *Daniel J. Dysart*

**KERRY J. MILLER (#24562), T.A.**
**PAUL C. THIBODEAUX (#29446)**
**DANIEL J. DYSART (#33812)**
**REBEKKA C. VEITH (#36062)**
**MICHAEL R. DODSON (#37450)**
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
Telephone:      504.556.5549
Facsimile:      504.949.8202
Email:          kmiller@fishmanhaygood.com
Email:          pthibodeaux@fishmanhaygood.com
Email:          ddysart@fishmanhaygood.com
Email:          rveith@fishmanhaygood.com
Email:          mdodson@fishmanhaygood.com

*Counsel for Defendants,*
*Knauf Gips KG and*
*Knauf New Building System (Tianjin) Co. Ltd.*
*(f/k/a Knauf Plasterboard (Tianjin) Co., Ltd.)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, individually to pro se claimants via U.S. Mail, and that the foregoing was filed with the Clerk of Court of the United States Court for the Eastern District of Louisiana, on this 7th day of March, 2023.

/s/ *Daniel J. Dysart*
**DANIEL J. DYSART**