# Bennett v. Knauf 5th Amended Complaint

# Expert Report
# on Property Impacts and Corrosion

Prepared for:

Doyle Law Firm, PC

CDS Report Number: FL01-0517

December 31, 2019

Prepared by: _Howard Ehrsam_

Howard Ehrsam, P.E., CGC, LEED AP
President, Chinese Drywall Screening, LLC
Florida Professional Engineer No. 73975



Digitally signed
by Howard
Ehrsam
Date: 2019.12.31
12:15:57 -05'00'



**CHINESE DRYWALL | SCREENING** LLC

Inspections and documentation from leading experts

EXHIBIT
2





# Table of Contents

I. Overview · · · · · · · · · · · · · · · · · · · · · · · · · · · · · Page 3

II. Qualifications · · · · · · · · · · · · · · · · · · · · · · · · · Page 3

III. Retention of Services · · · · · · · · · · · · · · · · · · · Page 5

IV. Executive Summary · · · · · · · · · · · · · · · · · · · · · Page 5

V. Summary of KPT defects and off-gassing · · · · · · Page 5

VI. Materials and Impacts · · · · · · · · · · · · · · · · · · · Page 8

    Shell Components · · · · · · · · · · · · · · · · · · · · · · Page 8

    Fixtures, Furnishings and Equipment (FFE) · · · · · Page 8

    Personal Property · · · · · · · · · · · · · · · · · · · · · · Page 9

    Secondary Impacts · · · · · · · · · · · · · · · · · · · · · Page 9

VII. Summary and Conclusion · · · · · · · · · · · · · · · · Page 9

VIII. Exhibits and References · · · · · · · · · · · · · · · · · Page 10



Inspections and documentation from leading experts

# Bennett v. Knauf 5th Amended Complaint

MDL 2047 RE:  Chinese Manufactured Drywall Products Liability Litigation
Civil Action No.: 14-cv-2722-EEF-JCW
Expert Report on Property Impacts and Corrosion

## I.  Overview

The above referenced complaint represents real estate property owners against Knauf-Tianjin (KPT), a manufacturer of corrosive Chinese drywall.  The property owners were not part of the original KPT complaint or settlement.  The primary complaint is that the drywall off-gasses corrosive sulfide gases that damage various components of and within the affected property.  Howard Ehrsam, P.E. of Chinese Drywall Screening, LLC (CDS) was retained as an expert due his appropriate qualifications, knowledge and extensive experience surrounding Chinese drywall (CDW).

## II. Qualifications

I, Howard Ehrsam P.E., obtained my bachelor's degree from the University of Florida in Civil Engineering in 1995.  I have worked in the fields of general contracting, land development, consulting and civil engineering design.

Degrees, Licenses and Certifications include, but not limited to:

- Bachelors of Science Civil Engineering, University of Florida
- Professional Engineer (P.E. Lic# 73975)
- Certified General Contractor (CGC 1509717)
- LEED AP (US Green Building Council)

I began my diverse career in 1995 at the Whiting-Turner Contracting Company in Orlando, FL working in a variety of roles on construction projects ranging from warehouse, office to complex theme parks.  A highlight of that time was coordinating the mechanical, electrical, plumbing, fire protection and kitchen equipment trades for Seuss Landing at Universal's Islands of Adventure.  In 2003, I moved to Port St Lucie to start a new career in land development.  From 2003 to 2009 during the building boom, I managed design consultants and contractors for various development projects for Core Communities, LLC (Tradition Development), a master planned community developer and subsidiary of Levitt Corp.



Inspections and documentation from leading experts

In 2007, Chinese drywall was discovered in a condominium property that I owned.  While serving as the Association president in 2008, several residents began complaining about odors and failing air conditioning systems.  In late December 2008, the news broke about Chinese drywall around the same time it was suspected to be throughout my condominium community.  My background combined with the current events at the time created a perfect storm and I quickly founded Chinese Drywall Screening, LLC on January 19, 2009.

Concurrent to starting CDS in early 2009, I continued the role as president of a Condo Association assessing 135 units in tandem with the builder and determining 80 of the units contained corrosive Chinese drywall.  I quickly became a leading resource and advocate for property owners, contractors, attorney's and real estate agents.

Some of the highlights over the years include, but not limited to:
- Development of inspection protocols and training videos;
- Speaking engagements and expert panelist at conferences, seminars and regional meetings for various professional and government organizations;
- Featured on ABC Nightline, Palm Beach Post and many other news shows and publications;
- Provided education and training for the head of the Mongolian Building division;
- Interviewed and featured on Hong Kong TV;
- Committee member for ASTM to advance the standards for gypsum and drywall;
- Committee member and white paper co-author for AIHA on CDW assessment and remediation protocols;
- Developed accelerated drywall sample testing procedures;
- Developed a proprietary sulfur corrosion measurement and detection system (patent applied).

Over the last 11 years, myself and my team of inspectors have completed more than 3,000 assessments for corrosive and/or Chinese drywall in single family and multifamily residences, commercial and medical offices, warehouses and retail establishments.

In 2011, I reconnected back into the land development industry and joined Creech Engineers, Inc on a part time basis.  Creech was subsequently purchased by Bowman Consulting Group, ltd in 2013.  I currently split time between Bowman and CDS.  Although most of my time is spent as a Senior Project Manager and Engineer of Record for civil engineering projects, I stay active with CDS due to market demand for our specialty services and the continued discovery of new cases, improper remediations or fear of CDW due to blackening from other sources.



inspections and documentation from leading experts

### III. Retention of Services

CDS has been retained by Doyle Law Frim, PC to provide generic expert opinions on the following:

1. Whether defective Knauf drywall produces gasses and what gasses are emitted;
2. Whether defective Knauf drywall off gassing causes corrosion in the home and the extent of that corrosion;
3. Whether defective Knauf drywall causes damage to components in a home and which typical components (wiring, plumbing, a/c, etc.);
4. Whether defective Knauf drywall causes damage to personal property in the home and which items or contents are affected (computers, televisions, etc.); and,
5. Explain the difference between defective Knauf drywall and domestic-made drywall and the off-gassing that has been known to occur by each.

Opinions are based on overall experience inspecting properties with KPT drywall over the course of my experience from early 2009 to current along with the various experiments and testing explained herein.

CDS fee schedule is attached as an exhibit, refer to section VIII.

### IV. Executive Summary

The correlation between off-gassing of KPT drywall and corrosion has been established by several government and private organizations. It has also been accepted through prior trials and/or summary judgments of MDL 2047. CDS relies on the previous test reports by others as well as their own testing and observations. CDS has inspected over 500 properties with KPT type Chinese drywall over the past 11 years and the effects of the off-gassing and characteristics of the corrosion were relatively consistent across all of the properties. CDS is also utilizing their own proprietary drywall sample testing and Environmental Corrosion Testing techniques to further corroborate our opinions contained herein.

This report substantiates and explains the corrosive effects of KPT drywall on various interior components and systems within the property. It includes the various components that are affected and also includes the secondary impacts developed from the presence of corroded components within the property.

### V. Summary of KPT defects and off-gassing

According to the CPSC and other published reports, the gypsum in KPT drywall contains element sulfur that off-gasses a combination of hydrogen sulfide, carbon disulfide and carbonyl sulfide. Sulfur/sulfate reducing bacteria (SRB) has also been introduced as an



Inspections and documentation from leading experts

additive causation.  The source(s) of the off-gassing that are present in KPT drywall are not present in domestic drywall.   The chemical reaction between the sulfide gases released by KPT drywall and certain observable metals within the property create observable sulfide corrosion.  Specific testing and chemical analysis of the corrosion or "black deposits" on copper was defined to be copper sulfide by Unified Engineering File No. 4050.  The reaction and forming of the black deposits cause pitting on the surface of the metal.  Refer to the attached report in section VIII.

During the early years of CDW discovery, I performed my own experiments and testing utilizing samples of KPT drywall.   The most significant test is utilizing copper and silver test coupons to determine the corrosiveness of the samples tested.  Test coupons were created from 24 gauge sheets of copper cut into 1" diameter disks acquired from T.B Hagstoz & Sons located in Philadelphia, PA.  Silver coupons were created from the copper disks through a plating process using Silversmith Pure Silver Plate Agent manufactured by E-Z Way Restoration Products in Mount Vernon, WA.

The KPT samples were tested and compared to other manufacturers of drywall.  The test coupons quickly blackened during the test process which was accelerated with increased temperatures.  The corrosion was tested for chemical composition utilizing Thermo Niton X-ray Florescence Analyzer Model XL3t900S-HE. The most predominate chemical on the surface of the coupons was sulfur and concentrations varied depending on the duration and temperature control of the test.  For comparison and as an example, the sulfur might range from 300 to 500 ug/cm$^2$ for KPT and be non-detectable or below 20 ug/cm$^2$ for domestic samples.

We often come across non-corrosive Chinese drywall or unmarked/unknown drywall types while assessing properties.  We would utilize my testing methods to determine if the samples from the subject property were corrosive.  After testing many varieties and manufacturers of drywall, I established KPT drywall samples to be used as the comparison basis due to being on the more extreme end of corrosiveness when compared to other types.  A typical test consists of a sample of KPT, a sample of domestic and the unknown(s) from the subject property.  I would include KPT in each test to also validate the test.

During the time of my research and testing to develop my various methods and protocols, I would often test various blackened and/or corroded components of the property with the XRF and found sulfur was consistently present and corelated with the visual blackening and



Inspections and documentation from leading experts

presence of CDW.  This allowed us to associate the visible blackening and corrosion with copper and silver sulfide and associate it to the discovered CDW markings.

Copper sulfide also forms on brass that is an alloy typically consisting of about 67% copper. The black deposits and corrosion is formed on silver in the form of silver sulfide.

The visual characteristics of the blackening and corrosion associated with CDW has been verified and validated in many ways.  This allows us to make justifiable deductions across all properties with KPT that any observed blackening or corrosion is attributable to the CDW if the conditions are typical to what we would expect to see.

Based on our experience along with the magnitude of inspections, we see common complaints and issues with the property and/or components.  This experience allows for intuitive and deductive opinions without scientific testing or analysis.  These deductions include CDW effects on various aspects of the property that are not accessible or easily seen.  For example, the copper refrigerator components are always corroded in properties with KPT throughout the property.  It can be reasonably deducted that copper components of other appliances would be equally corroded.  There are several other deductions that can be reasonably made based on 3rd party reports along with personal experience, experiments and tests.  They include, but not limited to:

- If copper is affected, anything with copper components are affected.
- The higher the ratio of surface area to the mass of the metal, the higher the percentage of that material is affected.
- If some TV's are affected, all TV's are affected to some level and would at least have a shorten life expectancy.
- If circuit boards are affected, anything with a circuit board would be affected.
- If brass is affected, then any hardware, fixtures, trim, etc composed of brass would be affected.

It can be fairly simple to test the effects of CDW on various property components and personal electronics by performing XRF testing for the presence of sulfur or accelerated chamber testing with the item.  The item should be tested for surface corrosion using XRF, placed in a chamber with KPT drywall, baked at approximately 150º Fahrenheit for about 12 hours and retested with XRF to compare before and after sulfur levels on the various components.  These tests can be done upon request.



Inspections and documentation from leading experts

### VI. Materials and Impacts

Typical items, systems and/or components susceptible to CDW or KPT off-gassing include, but not limited to, the following:

A.  Shell Components

    i.  Power wiring – exposed copper wiring and uninsulated ground wires outside and inside the Romex through the entire length of the circuit.  CDS has verified that sulfide gases travel through the Romex sheathing to attack he ground wires inside the sheathing.  Evidence can be provided upon request.

    ii.  Low voltage wiring and devices including coaxial cable – all exposed copper wiring

    iii.  Low voltage controls and components – components susceptible to sulfide corrosion.

    iv.  Copper and brass plumbing rough-in and trim – exposed copper plumbing, rough-in and some trim.

    v.  Air conditioning systems – evaporator coils, refrigerant lines and exposed copper electrical components in the air handling unit.  Thermostats with copper components.

    vi.  Smoke detectors  – components susceptible to sulfide corrosion

    vii.  Fire protection systems – copper components to bulb type heads, fusible link type heads per CPSC

    viii.  Fire alarm systems – deductive reasoning for components susceptible to sulfide corrosion.

B.  Fixtures, Furnishings and Equipment

    i.  Appliances – copper refrigerant and plumbing lines, components susceptible to sulfide corrosion affecting controls and some finishes.

    ii.  Small kitchen appliances – deductive reasoning for components susceptible to sulfide corrosion affecting controls and some finishes.

    iii.  Electrical fixtures rough-in and trim including ceiling fans – components susceptible to sulfide corrosion, common problems with can lights.  Pitting and corrosion on trim.

    iv.  Bathrooms furnishings and accessories - pitting and corrosion on some trim, delaminating of mirrors.

    v.  Kitchen accessories - pitting and corrosion on some trim.

    vi.  Furniture with brass or copper components – knobs, trim and other components susceptible to sulfide corrosion.

C.  Personal Property

    i.  TV's – display and functioning issues, some instances align with wall penetrations for wall mounted flat screens

    ii.  Audio equipment – deductive reasoning for components susceptible to sulfide corrosion.



Inspections and documentation from leading experts

    iii.  Intercom systems – components susceptible to sulfide corrosion affecting wiring, controls and some finishes.

    iv.  Computers – deductive reasoning for components susceptible to sulfide corrosion.

    v.  Telephones and cellular phones - deductive reasoning for components susceptible to sulfide corrosion.

    vi.  Tablets and personal electronics - deductive reasoning for components susceptible to sulfide corrosion.

    vii.  Security systems- deductive reasoning for components susceptible to sulfide corrosion.

    viii.  Home automation- deductive reasoning for components susceptible to sulfide corrosion.

    ix.  Musical instruments – blackened brass instruments

    x.  Jewelry – blackened silver jewelry

    xi.  Silverware and silver trinkets – blackened silver

    xii.  Control systems- deductive reasoning for components susceptible to sulfide corrosion.

D.  Secondary Impacts

Secondary impacts to property due to the visible corrosion observed in affected properties include, but not limited to:

    i.  Property value – homes either with or suspected to have CDW due to observed blackening or corrosion lose value equal to the cost to replace drywall;

    ii.  Salability – if any corrosion or blackening is observed, real estate agents typically will not list the property or buyers will be fearful of CDW and property won't be able to be sold;

    iii.  Home inspections for transactions – home inspectors find corrosion and will flag the property as having CDW regardless if it has been remediated;

    iv.  Mental anguish and stress and resulting health impacts – we have seen many cases with property owners complaining of stress and health issues upon seeing corrosive effects of CDW regardless if they actually have sensitivities to the sulfide gases.

VII. Summary and Conclusion

In summary, CDS has the qualifications and experience to opine as to the corrosive effects of KPT drywall and has provided substantial evidence illustrating the impacts to properties and various components within the properties. Not all impacts of sulfide corrosion can be readily seen. It can be reasonably deducted that all components susceptible to sulfide corrosion should be considered impacted. Impacts include aesthetic damage, functionality issues or shortened life expectancy. Therefore, all impacted items should be included in the remediation scope.



Inspections and documentation from leading experts

VIII.    Schedule of Exhibits

    A.  Photos of typical corroded components from properties with CDW

    B.  Unified Engineering Inc Report File No. 4050

    C.  CDS Schedule of Fees







# Photo Exhibit
## Typical Corroded Components





## Photo Exhibit
## Typical Corroded Components





## Photo Exhibit
## Typical Corroded Components





## Photo Exhibit
## Typical Corroded Components





# Photo Exhibit
## Typical Corroded Components





## Photo Exhibit
## Typical Corroded Components





# Photo Exhibit
## Typical Corroded Components





Photo Exhibit
Typical Corroded Components





Photo Exhibit
Typical Corroded Components



Exhibit B - Unified Report



**Unified Engineering Inc.**

3056 Weber Drive
Aurora, Illinois 60502

Phone: 630/851-4214
Fax: 630/851-5957

www.unified-eng.com

Writer's direct dial: 630/851-5363
e-mail: streit@unified-eng.com

**RECEIVED**

MAR 1 9 2009

BUREAU OF COMMUNITY
ENVIRONMENTAL HEALTH

March 17, 2009

Dr. David Krause
Florida Dept. of Health
Division of Environmental Health
4052 Bald Cypress Way, Bin A08
Tallahassee, FL  32399-1712

Re:   First Report on Florida Drywall Samples
      Unified Engineering File No. 4050

Dear Dr. Krause:

This report summarizes the analytical efforts to date on samples of drywall we received from your office on February 6, 2009. You requested analytical testing to determine differences between the drywall samples and to determine if any volatiles could be detected that originated from the drywall.

Samples
Four samples of drywall and a piece of copper tubing were received at Unified Engineering, Inc. The drywall was individually wrapped in aluminum foil. The copper tube section was in a zip-loc bag. They were described as follows:

1. Sample LOC1, Gridmarx, approximately 18cm x 31cm.
2. Sample LOC2, Unmarked, approximately 15cm x 25cm.
3. Sample LOC3, Knauf, approximately 15cm x 30cm (irregular shape).
4. Sample LOC4, Made in China, approximately 17cm x 34cm.
5. Sample LOC4 air conditioner copper tubing section with a black surface discoloration, approximately 1" long with no fins.

A transfer letter and chain of custody form are attached in Appendix I.

Procedures
**To determine the gypsum crystal structure** - Using a stainless steel blade, approximately 20mg of each sample was scraped from the gypsum portion of the drywall. Each sample was ground to slurry in a mortar with alcohol. The resulting slurry was dried on a glass slide. X-ray diffraction (XRD) patterns were obtained using a Philips wide-angle diffractometer with Cu radiation. The data was compared to a standard gypsum pattern (PDF 21-816).

1

**To determine the elemental composition of black deposits on copper tubing** - Black deposits on the outer surface of the LOC4 copper tube were removed using a tungsten needle under microscopic observation. The black material was mounted on a beryllium plate and analyzed to determine the elemental content using scanning electron microscopy with energy dispersive spectrometry detection (SEM/EDS).

**To analyze the physical structure and elemental composition of the drywall gypsum** - A Tracor Northern S3000N coupled with an Edax Phoenix EDS system (SEM/EDS) was used to analyze the gypsum component of each drywall sample. Using a stainless steel blade, a portion of each drywall sample was scraped to create a powder sample. The powder was pressed onto carbon tape. A SEM image was taken of each gypsum powder at 800X magnification. EDS spectra were obtained for the overall powder and then for crystalline inclusions that were observed using backscattered imaging techniques.

**To determine the organic content of the drywall gypsum** – A portion of gypsum from each drywall sample removed. The samples were photographed, placed in aluminum weigh pans and dried in a laboratory oven at 240°F for 20 hours while monitoring the weight until there was no further weight loss due to moisture or hydration.

The samples were crushed in a mortar. A portion of each was removed, weighed, ashed until glowing red, cooled and then reweighed. The results of the organic weight loss were tabulated.

**Volatile content of the gypsum after moisture exposure** -  In order to test for the presence of volatile compounds that may be released from the drywall after exposure to moisture, pieces of each drywall sample, approximately ¾" x 2 ¾" were removed from bulk drywall samples LOC3 (Knauf) and LOC1 (Gridmarx). The outside paper of each was peeled off and became samples LOC3-1 and LOC1-1 respectively. The cleaned gypsum (backing paper removed) became samples LOC3-2 and LOC1-2. All four of the samples were weighed and then exposed to 95% humidity in a sealed chamber. After 24 hours, the samples were reweighed and then sealed under nitrogen in septum vials for headspace analysis using gas chromatography. An Aligient gas chromatograph with an atomic emission detector (GC-AED) was used to identify and quantify the volatiles that had accumulated in the head space of the septum vial after ~24 hours as per ASTM method D6228.

**pH of volatiles with moisture exposure** – Pieces of each drywall sample, ~1/2" x 1 ¾", were removed and placed on top of an aluminum spacer in a vial. An empty control sample was also prepared. About 3ml of water was placed in the bottom of each vial. Moistened graduated pH paper was suspended above the water and away from contact with the drywall sample. The vials were sealed, warmed to 80°F and allowed to sit for 8 hours at room temperature. The pH paper was then examined and photographed.

<u>Results</u>
**X-ray diffraction (XRD)** - XRD results showed that all four samples had very similar patterns with respect to peak positions and intensities when compared to the standard gypsum pattern. There were two additional phases of note that showed minor variations. They were identified as quartz and anhydrite. Both were higher in the Gridmarx sample than in the other three. There were very weak peaks that were similar for all the samples but they could not be positively identified. The XRD report is attached as Appendix II.

2

**SEM/EDS of copper tubing** - Black deposits on the copper tube were mostly copper (Cu), sulfur (S), and oxygen (O) with smaller amounts of carbon (C), aluminum (Al) and phosphorus (P). Based on the elemental data and color, the material was determined to be a mixture of copper oxide and copper sulfide. Figures 1-4 were EDS spectra of four different deposits. They are attached to the report in Appendix III.

**SEM/EDS of drywall gypsum** – The SEM images for each drywall gypsum sample are attached in Appendix IV. Overall, the samples were similar. The "Made in China" sample LOC4 appeared to have the finest calcium sulfate crystals. The EDS overall spectra were similar but sample LOC4 did appear to have less oxygen relative to sulfur that would suggest different phases within the gypsum (figure 5-8 in Appendix IV).

Inclusions observed using backscattered electron imaging to highlight particles with a higher atomic number were analyzed. In all cases, the inclusions were present in trace amounts. The spectra are attached in Appendix V.

Sample LOC1 contained three types of inclusions. They were calcium oxide particles approximately 5-10μm in size that was associated with traces of mineral (Al, Si) as shown in figure 9. The second particle type was ~2μm size titanium oxide (Ti and O) shown in figure 10. One iron rich particle was found that was ~1μm in size (figure 11).

Sample LOC2 contained three types of inclusions in roughly equal proportions although all were trace. The first were strontium sulfide particles ~2μm in size (figure 12). The second were iron sulfide (pyrite) particles ~1 μm in size shown in figure 13. The third were calcium oxide particles (figure 14).

Sample LOC3 contained inclusions that were similar to sample LOC2. They were iron sulfide (Fe and S) shown in figure 15, strontium sulfide (Sr and S) shown in figure 16, and calcium oxide (Ca and O) with some magnesium as well (shown in figure 17).

Sample LOC4 contained strontium sulfide particles (figure 18), iron and magnesium rich inclusions (figure 19), and calcium oxide particles (figure 20). Different from the other samples, under microscopic examination, this sample was found to also contain yellow inclusion. Those inclusions were isolated using a tungsten needle and put on beryllium for analysis. One was calcium rich with some oxygen and sulfur (figure 21). Another was also calcium rich with oxygen, carbon, magnesium silicon and sulfur (figure 22).

**Ash test to determine the organic content –** The results of the moisture loss and organic content for each sample was tabulated in Appendix VI. The Knauf sample had the highest moisture content and the highest organic content. The Gridmarx sample contained trace organic material but the Chinese drywall samples all had over 5% organic material incorporated in the drywall.

**Sample preparation in a humidity chamber for headspace gas chromatography –** The four samples that were exposed to 95% humidity for 24 hours were documented as shown

3

in photographs included in Appendix VII. The samples gained the following weight due to moisture absorption before analysis by GC-AED.

> Sample LOC3-1 – outer paper from the drywall – initial weight was 0.5914 grams with a 10.8% weight gain.
> Sample LOC3-2 – gypsum from the drywall – initial weight was 10.3550 grams with a 0.94% weight gain.
> Sample LOC1-1 – outer paper from the drywall – initial weight was 0.7662 grams with a 10.5% weight gain.
> Sample LOC1-2 – gypsum from the drywall – initial weight was 8.8023 grams with a 1.1% weight gain.

**GC-AED Analysis of volatiles –** The GC-AED report is attached in Appendix VIII. The only volatile compounds detected were sulfur containing compounds. Hydrogen sulfide, carbonyl sulfide and carbon disulfide were all detected at trace levels. Both the paper and gypsum release volatiles. Both the Gridmarx and Knauf samples contained all three sulfur compounds.

The pH test results are included in Appendix IX. There was little, if any, change in the pH of this short duration test. There may have been a slight change toward lower pH (more acidic) in Unmarked sample LOC2.

Discussion and Conclusions
Given the limited samples to date, the following conclusions can be drawn based on the analysis performed to date as described above:

1. The gypsum sample manufactured in the United States (Gridmarx LOC1) contained no strontium rich inclusions detectable by SEM/EDS or XRD. The other three drywall samples that originated from China contained strontium sulfide inclusions at trace levels. According to the Merck Index, strontium sulfide has the odor of hydrogen sulfide ($H_2S$) in moist air.

2. The Gridmarx sample contained only trace levels of organic materials while the Chinese drywall samples all contained over 5% organic material. FTIR would be required to confirm the identity of the organic material. There was a distinct sulfur odor from all three Chinese drywall samples when heated during the test while none was detected from the Gridmarx sample.

3. The Gridmarx sample contained higher levels (although small) of quartz and anhydride. Neither material would be expected to contribute to an odor.

4. GC-AED analysis confirmed that there were three volatile sulfur compounds that could potentially contribute to a detectable odor. Hydrogen sulfide, carbonyl sulfide and carbon disulfide were all detected at levels between 100 ppb to 1 ppm from drywall that had been exposed to moisture conditions that could be expected in a Florida environment that was not air conditioned. The Gridmarx sample was actually slightly higher than the Knauf Chinese sample. However, the samples were not sealed during transport to prevent vapor cross contamination and they were sent in the same package. In addition, in a residence, the Gridmarx and Chinese drywall samples are often present in the same wall cavity so that cross contamination could have occurred while the drywall was still in the residence. It is

4

recommended that this test be run with samples that had been better isolated when taken before transport to a lab (sealed in a metal can, glass jar or Tedlar bag). Plastic bags should not be used as they may absorb vapors.

5. Both the drywall outer paper and the gypsum core released sulfur compounds during the volatiles test. Therefore, the source of the sulfur has not yet been isolated. The following possibilities require further analytical efforts to come to a scientifically reliable conclusion:

> a. Treatment of the drywall (outer paper) with an insecticide/fungicide upon entry into the United States.
> b. Sulfur chemicals used in preparation of the paper coating.
> c. Contaminates in the drywall gypsum.
> d. Adhesive used to bond the paper to the drywall.
> e. Others.

6. The pH of volatiles emitted during a short duration test did not show an extreme pH change. It is recommended that this test be run for a longer period of time to allow for more vapor release and absorption of moisture by the drywall.

7. A copper metal tube taken from a condensation coil of an air conditioner was corroded. The black corrosion was a copper oxide/copper sulfide deposited that had formed on the outer tube surface that was exposed to moisture from condensate water. Vapors in the residential atmosphere that contained sulfur created a corrosive environment in the presence of moisture.

In summary, the odor that has been described by investigators and homeowners in Florida residences originated from the emission of volatile sulfur compounds. There is a distinct difference in drywall that was manufactured in the United States and those that were manufactured in China. The Chinese samples contained traces of strontium sulfide inclusions and more organic material that the Gridmarx sample (United States). However, it is not yet known if either contributed to the odor. The Chinese samples give off a sulfur odor when exposed to extreme heat and moisture. It is clear that exposure to moisture accelerates the release of volatiles from the drywall. Both the outer paper and the gypsum from the drywall had noticeable odors after moisture exposure and were found to release sulfur compounds.

I reserve the right to amend this report when new information becomes available.

Regards,

*Lori Streit*

Lori A. Streit, Ph.D.
Principal
Chemical and Environmental Science

Enc. 9 Appendices

5



Inspections and documentation from leading experts

# Exhibit C

## Schedule of Hourly Rates and Expenses

Principal – Expert/Testimony (standard): $350/hr
Principal - Expert/Testimony (premium): $500/hr
Field Inspector (standard):                     $100/hr
Field Inspector (premium):                      $175/hr
Administrative-skilled:                            $75/hr
X-ray Florescence (XRF)                        $300 + $100/hr
Vehicle travel:                                      $.58/mi
Reimbursables:                                    Actual Cost + 15%

Premium time is any time outside normal working hours of 8am to 5pm and based on Government schedules for holidays and operating times. Premium time may also apply to urgent deadlines that require re-arrangement of scheduled tasks. Fees will be billed based on actual time spent, with a minimum charge for any discrete task of one quarter of an hour. Minimum hours and fees per site visit shall be 4 hours for labor and $300 for XRF. Travel time shall be billed at 50% of the standard rate. Reimbursables include, but not limited to, printing/reprographics, lodging, tolls, food, airfare, rental car, airport parking, shuttle services and miscellaneous travel fees.

Valid through December 31, 2020