UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:   CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL 09-2047<br><br>SECTION "L" |
| This document relates to:<br><br>Case No. 20-cv-3264 | JUDGE ELDON FALLON<br><br>MAGISTRATE NORTH |

**REPLY MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE*
TO EXCLUDE THE EXPERT TESTIMONY AND REMEDIATION COST
ESTIMATES OF DEFENSE CONSULTANT, PHILLIP A. ADAMS**

**MAY IT PLEASE THE COURT:**

Incredibly, Defendants, Knauf Gips KG and Knauf New Building System (Tianjin) Co. Ltd. (collectively referenced as "Defendants" or "Knauf"), submitted a memorandum in opposition to the Gharibs' Motion *in Limine* that spans 30 pages, but somehow never reaches a discussion of the science behind its expert's methodology. As the Gharibs' motion is specifically directed to Mr. Adams' methodology and whether it lacks scientific support, Knauf's unwillingness to discuss those issues is fatal. The Gharibs enumerated a dozen or so ways in which Mr. Adams' scope of remediation deviated from the Court's, and Knauf did not dispute a single one of them. Nor did Knauf provide any meaningful discussion as to why the Court-endorsed protocol should not be followed in this case. For example, the Gharibs' pointed out that Mr. Adams did not call for the replacement of copper piping, wiring, appliances, plumbing fixtures, insulation, and many other items, despite the Court's consistent guidance that called for replacement of these items. Rather than explaining why each such component did not require replacement, Knauf instead addressed a myriad of issues not challenged in the Gharibs' motion. To be clear, the Xactimate vs. R.S.

Means damage calculation; the underlying facts and data of Mr. Adams' reports (the Gharibs' motion is directed to his methodology, not his facts and data); Mr. Adams' qualifications; the findings of the Gharibs' experts; and even whether the Court's previous rulings are the law of the case—are not the subject of the Gharibs' motion. These are classic red herrings and strawman arguments designed to steer the Court's attention from the questions raised in the Gharibs' motion, such as Mr. Adams' blatant disregard for the Court's guidance.

Furthermore, Knauf struggles greatly to distance itself from the previous rulings of this Court, claiming that they do not apply to the instant case. But, this motion is not directed to that the issue of whether those rulings apply – the Gharibs' filed a separate motion about the application of certain findings within the Court's April 21, 2017 ruling. Rather, the Gharibs are using the findings by this Court in MDL-2047 regarding the science behind complete remediation as opposed to lack of science supporting Mr. Adams' selective remediation methodology. The Court has described its scope of remediation and the methods therein as a "***well-established* and *defined scope of work necessary to fully remediate a Chinese drywall property***." (Rec. Doc. 20741, p. 24) citing *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34 (emphasis added). The Court is in a unique position where it has first-hand knowledge of the years of evidence, observation and trials and errors that went into its scope of remediation. (See: April 21, 2017 FOFCOL, Rec Doc. 20741, finding its scope of work "relies on long-term observation, sampling and testing of properties with Chinese drywall, scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of the national builders), and electric and building codes, demonstrates that proper remediation of the danger posed by Chinese drywall must include the removal of all drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring."

(FOFCOL issued April 21, 2017, Rec. Doc. 20741, p. 14-15). Courts relish and seek out precedent and guidance as sound as the findings here.

The Court's scope of remediation findings are not property-specific or brand-specific. Knauf has admitted that there is no difference between its drywall and Taishan's. Knauf attempts to distinguish the Court's previous findings on the sole basis that the Gharibs' properties contain defective drywall only in certain areas (i.e. the first floor of the Gharibs' home and second floor of their commercial property). But, this does not explain why remediation of damaged items outside of those areas (as documented by Mr. Adams) is not necessary.

Of particular importance, some of the properties involved in the Court's previous rulings were very similar to the Gharibs' properties – *i.e.* they, too, were believed to contain Chinese drywall only on certain floors of the claimants' home. Knauf fails to mention this in its cherry-picked summary of the *Germano* case. For instance, the Baldwins' home

> In another Intervenor family's home (Baldwin), the stacking records indicated 77 sheets ***were placed only on the first floor of the home***. ***The second floor air conditioning zone of the Baldwin home, which is fed by air wholly from this floor, has suffered copper sulfide corrosion from gases released by CDW.*** Trial Transcript at 2/22 Vol. II p.20 (6-15) (21-24) - p.21 (3)(Rutila Testimony). ***The second floor of the house also has light switches which have suffered silver sulfide corrosion from gases released by CDW***. P1.2049-0008 to -0011 (SGH analysis of Baldwin light switches showing silver sulfide corrosion) P3.0636-0001 (Schematic of second floor, with sample locations), Trial Transcript at 2/22 Vol. II p.20(6-15), p.22(3-15)(Rutila Testimony). (Germano FOFCOL, Rec. Doc. 2380, p. 29).

See also *Germano* FOFCOL, p. 85-89: the Court's findings as to the Orlandos' property, noting: "They essentially abandoned their second story as the majority of the Chinese Drywall is believed to be there."

This Court made no exceptions to its ruling requiring complete remediation (of all drywall and other components) for the Baldwin home or the Orlando home, despite the belief that those

3

homes contained Chinese drywall *only in a particular floor of the property*. The Court noted that certain drywall boards believed to domestic were actually Chinese drywall, prompting the Court to find: "The intervenor homes have suffered corrosive attack and, in order to make the plaintiff whole, any system that lacks the ability to definitely identify the offensive drywall is unacceptable and rejected by this Court. The regulatory and scientific record demonstrates that removing **all drywall from a mixed drywall home** is **the only method** that ensures this goal is obtained". (*Id.* at p. 31) So, Knauf's attempt to distinguish the Gharibs' properties on the basis of the location of the contaminated drywall is of no consequence.

In sum, the Gharibs have established the lack of science, economic and practical bases supporting Mr. Adams' methodology and Knauf never answers the looming questions raised in the Gharibs' motion—*i.e.*, what is Mr. Adams' basis for applying the CPSC methodology to the exclusion of the Court's remediation methodology? Is his basis founded in well-accepted science? What is Mr. Adams' basis for calling for remedies and techniques that this Court has rejected time after time? Knauf's opposition talks around these issues for 30 pages, providing no defense of their decision to use the Consumer Product Safety Commission ("CPSC") guidelines for Mr. Adams' scope of remediation. For example, they fail to identify their expert's scientific basis for recommending only cleaning copper wiring and piping that even their expert has deemed to exhibit classic signs of Chinese drywall corrosion; they fail to explain why the AHU linesets do not require replacement; they fail to explain why none of the appliances require replacement, only resetting; they fail to explain why no insulation must be removed; and the list goes on. Accordingly, the Gharibs' motion should be granted and Mr. Adams' testimony and his Xactimate reports excluded.

**I.        This Court's prior rulings in *Germano*, *Hernandez* and the April 21, 2017 *FOFCOL* provide precedent and guidance as to the scientific, economic and practical bases underlying the Court's scope of remediation methodology and the lack thereof supporting Mr. Adams' methodology.**

Defendants frame the Gharibs' motion *in limine* as seeking a wholesale application of the Court's previous rulings, as if they were stipulations of fact in the Gharibs' case, and argue against application of the law of the case doctrine.  However, the Gharibs do <u>not</u> argue for this kind of application; nor does their motion even mention the law of the case doctrine. Defendants have clearly set up a strawman argument in order to avoid the real issue that the Gharibs' raised.  Here, the Gharibs simply look to the Court's previous findings as precedent and guidance on the issue of the delineation between the science supporting two very different methodologies: (1) complete remediation, on one hand, which the Court has consistently found to be supported by scientific and practical evidence;[1] and (2) Mr. Adams' selective remediation methodology, on the other, which the Court has consistently found to be lacking in both such concerns.[2]

Regardless of whether the law of case doctrine applies, the Court has rendered these findings as to the science and practical considerations supporting replacement of most household components, in a way that is not case-specific, property-specific, nor party-specific.  For instance, in the April 21, 2017 FOFCOL, which was technically a Taishan proceeding, the Court recognized that its complete scope of remediation was utilized in the Knauf Settlement Program.  (See: Rec. Doc. 20741, p. 17, "As mentioned, *the scope of remediation is supported by the testimony of the*

---

[1] Rec. Doc. 20741, p. 24, "[a]s this Court earlier determined and Mr. Inglis confirms, *there is a well-established and defined scope of work necessary to fully remediate a Chinese drywall property*. Germano FOFCOL at 27-55; Hernandez FOFCOL at 20-34; Tr. at 157:8-158:5; 159:21-160:1. *This well-established evidence-based and field-tested scope of work for remediating a Chinese drywall property requires that the interior of the home be stripped to the studs (with all wiring, plumbing, fixtures, cabinets, HVAC systems and insulation removed), cleaned by wet-wipe and HEPA vacuum, and examined and tested by an independent entity before the property is brought back to its originally intended condition*. Germano FOFCOL at 27-55; Hernandez FOFCOL at 20-34.

[2] Rec. Doc. 20741, p. Rec. Doc. 20741, p. 17, "Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, the evidence does not support the feasibility of such an option. The *alternative remedies* to a complete remediation that have been tried or suggested, such as *selective identification and removal of Chinese drywall, "cleaning" corroded wires*, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, *will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability* to the property owner.") (emphasis added)

*experts and confirmed by the remediation of over 2,200 homes carried out in the Knauf Settlement Program*.") (emphasis added).  The Court also cited the Hernandez FOFCOL and Germano FOFCOL numerous times, together, throughout its April 21, 2017 FOFCOL. (See: Rec. Doc. 20741, p. 24, "[a]s this Court earlier determined and Mr. Inglis confirms, there is a well-established and defined scope of work necessary to fully remediate a Chinese drywall property. *Germano FOFCOL* at 27-55; *Hernandez FOFCOL* at 20-34; Tr. at 157:8-158:5; 159:21-160:1."). **Why would the Court be citing *Hernandez* in support of its scope of remediation in Taishan proceeding, if those proceedings are so different in terms of the stipulations, properties involved, and parties, etc., that they have no precedential relationship?** The answer, of course, is that this scope of remediation and the recommendations and techniques apply in every property with Chinese drywall, *regardless* of whether the manufacturer is Taishan or Knauf, regardless of what stipulations Knauf may or may not have entered prior to the proceeding, and even regardless of the type of buildings and locations of the properties involved. (Rec. Doc. 20741, p. 24) ("..the scope of work is the same regardless of the type of building or the location of the property").

    This Court also found that certain remediation methods were scientifically and practically based.  For instance, in the April 21, 2017 FOFCOL, the Court found that, "[c]opper pipes and HVAC units must be replaced. It is more cost-effective and less time consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall properties as opposed to attempting to "clean" the corrosion off copper components and HVAC ductwork. Id. at 39-46." (Rec. Doc. 20741, p. 15).  These findings do not change based on the property at issue.  And, Knauf has failed to show that they should change based on some unique condition in the Gharibs' properties. Again, the only property-specific evidence that Knauf has referenced in its Opposition is a statement by Mr. Adams showing he believes the KPT drywall is limited to the first floor of

the Gharibs' home and a statement by Mr. Macomber that the Gharibs' commercial property does not contain defective drywall on the first floor of that property. But, these statements do not explain why *remediation* should not be ordered in those areas. As discussed above, other properties in Germano have similar defective drywall locations and they were not excepted from the Court's order of complete remediation.

Furthermore, as discussed at length in the Gharibs' Opposition to Defendants' Motion for Partial Summary Judgment (Rec. Doc. 23375), both Mr. Gharib and Mr. Adams have documented damaged items well outside of the areas where Mr. Adams believes the defective drywall is located. The Gharibs have also referenced photos taken by Mr. Adams that show the Gharibs' home is an open floor plan design in which the air circulates freely between the first and second floors of the Gharibs' home. Mr. Gharib has also produced a video showing the copper piping and HVAC ducts traversing between the first and second floors of his commercial property. None of this evidence has been disputed by Defendants. Defendants also do not offer any evidence to show that the drywall at issue in the Gharibs' properties is not the kind that emits sulfur gases and creates "the wide-spread impact of the corrosive environment," as described by this Court in its April 21, 2017.[3] In other words, the Gharibs have cited to well-established precedent as to the science and practical needs for complete remediation, but Defendants have offered no evidence to distinguish this precedent. So, the result is that the Gharibs' have established that Mr. Adams' methodology is fundamentally unsound and not reliable.

II. **Mr. Phillip Adams' scope of remediation is not based on the Knauf Settlement Agreement, violates the inspection protocol for that program, and relies on CPSC guidelines, which have no place in litigation.**

---

[3] Rec. Doc. 20741, p. 14.

Defendants' claim that Mr. Adams' Xactimates are "a result of the same program" as the Knauf Settlement Agreement is patently false and was denied by him during his deposition. In an effort to rehabilitate Mr. Adams, Defendants attempt to expand his methodology and bring it closer to one that was previously accepted by this Court. During his deposition, Mr. Adams claimed that, for his *inspection* of the *Bennett* properties, he used the Inspection Protocol adopted in the Knauf Settlement Agreement. (Ex. 1, Adams' Depo, p. 14). He also used the Knauf Settlement Agreement for measuring the square footage of the *Bennett* homes. (Id. at 15). However, when it came to formulate his remediation protocol, he shifted to using the CPSC guidelines:

> Q. Did you use any standard outside of what was contained in the 2011 settlement agreement for inspections of homes?
> A. For the inspection, no.
> Q. Did you use any standard or protocol outside of the 2011 settlement agreement for measuring the square footage of the homes?
> A. Measuring, no.
> Q. Did you use anything outside the settlement agreement from 2011 to generate the Xactimate cost estimates?
> A. Yes.
> Q. What?
> A. **CPSC guidelines**. (*Id*. at p. 15).
>      *     *     *
> Q. We talked about the setup for Xactimate in this case. And I believe your testimony was that you utilized the protocol that was adopted in the 2011 KPT settlement to help guide you when you were creating Xactimates for these properties; is that right?
> A. For which properties?
> Q. The plaintiff properties in Bennett.
> A. *I used Xactimate with the CPSC guidelines <u>for the protocol</u>.*
> Q. How did the CPSC guidelines differ from the protocol that was adopted in 2011?
> **A. CPSC guidelines do not require the replacement of appliances. They do not require the replacement of electrical wire. It's the replacement only of receptacles, switches, and breakers. Replacement of smoke detectors and carbon monoxide detectors, which is the same protocol. CPSC also for replacement of fusible type sprinkler heads, which we didn't have any of in these.**
> Q. And remind me again: <u>**Why did you shift to the CPSC guidelines, rather than the 2011 protocol guidelines?**</u>

> ***A. CPSC guidelines were a common sense practical approach, and that's what was discussed and that's what I used.***
> Q. Is that what the Knauf counsel instructed to you use?
> A. We discussed it and that's what –
> Q. ***And you agreed to use that?***
> A. ***Yes.***      (Ex. 1, Adams' Deposition, pp. 45-46)(emphasis added).

Accordingly, Mr. Adams testified that he used the Inspection Protocol for his *inspection* of the *Bennett* properties, but then "shift[ed]" to the CPSC guidelines for his *remediation protocol*. However, an analysis of Mr. Adams' reports and deposition testimony shows that Mr. Adams' methodology deviated substantially from the Inspection Protocol, did not follow the Remediation Protocol adopted in the Knauf Settlement Agreement, and followed CPSC guidelines, most of which this Court has found to lack scientific, safety, practical and economic bases.

First, Knauf admits that Mr. Adams failed to inspect the areas outside of where he believes KPT drywall exists in the Gharibs' home.[4] But, the Inspection Protocol on which Mr. Adams claims he relied requires <u>full inspection</u> of the properties. For example, the scope of visual inspection requires 4 steps for each such property, such as:

> A. Scope of Visual Inspection
> 1. Inspector will remove one electrical cover plate from an outlet in ***each room*** to inspect exposed wires for contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"). The exposed wires will be digitally photographed and the cover plate will be re-attached.
>                    *          *          *
> 3. Inspector will visually inspect for Contamination and digitally photograph (1) at least one plumbing fixture and (2) where present, at least one exposed copper piping in each room with plumbing fixtures and/or exposed piping.[5]

---

[4] See: *Memorandum in Support of Defendants' Motion for Partial Summary Judgment*, Rec. Doc. 23360-1, p. 6, "[a]ccordingly, because it was alleged that the KPT Drywall was installed after Hurricane Katrina, and only the first-floor drywall was replaced during that time, ***the Knauf Defendants' expert likewise only examined the first floor of the Beresford Property for KPT Drywall***" (emphasis added);
[5] Exhibit C to *Third Amended Settlement Agreement etc.* ("Knauf Settlement Agreement"), Rec. Doc. 12061-9, p. 2.

9

There is no exception in the Inspection Protocol that allows the inspector to only inspect where he believes KPT drywall to exist or where the homeowner suggests it exists; these 4 steps apply to "**each room**" (supra) of the property, regardless of whether that room is thought to contain KPT drywall. Mr. Adams also apparently limited his inspection of the Gharibs' commercial property to the second-floor apartments, as his reports and Xactimates are limited to those areas. (See: Ex. 3 to the Gharibs' Motion in Limine, Rec. Doc. 23363-5 *et seq*.). So, Mr. Adams' inspection methodology, which confines his inspections to areas where Chinese drywall is believed to be, disregards the Inspection Protocol, as well as the science this Court has cited in support of its finding that Chinese drywall creates "*wide-spread impact* of the corrosive environment".[6]

As the Gharibs' previously noted, however, Mr. Adams made certain key exceptions to his restrictive scope of inspection: he inspected the HVAC unit and other components in the attics of both of the Gharibs' properties. In doing so, Mr. Adams documented severe damage and corrosion to the air handler unit linesets, the copper water lines, and the hot water heater components (for the Gharibs' Claiborne property, photos in Ex. 3 to Gharibs' motion, "Phase 1 Inspection" letter, Rec. Doc. 23363-5, pp. 10-12; for the Gharibs' home, see Ex. 2 to Gharibs' motion, "Phase 1 Inspection" letter for Gharib home, Rec. Doc. 23363-3, pp. 15-17). As detailed in Mr. Gharibs' affidavit (attached as Ex. 1 to Memorandum in Opposition to Defs' Motion for Partial Summary Judgment, Rec. Doc. 23375-1), the corroded lines photographed in these attics extend throughout all areas of both properties, respectively, including the second floor the Gharibs' home and first floor of their commercial property. Based on the Inspection Protocol, these signs of "Contamination", along with those in the areas known to have defective drywall, would trigger a "Phase II Room-by Room inspection", which Mr. Adams also failed to conduct.

---

[6] Rec. Doc. 20741, p. 14.

Had Mr. Adams actually complied with the Inspection Protocol, he would have found "Contamination" (as defined above) throughout both of the Gharibs' properties, including the second floor of their home and first floor of their commercial property, as demonstrated in the Gharibs' *Memorandum in Support of Opposition To Defendants' Motion for Partial Summary Judgment,* and accompanying exhibits (Rec. Doc. 23375 *et seq*.).

Second, Knauf's half-hearted attempt to bolster Mr. Adams' scope of remediation methodology, by claiming (without support) that his Xactimates are the same as the Knauf Settlement Program, likewise fail. The Remediation Protocol adopted in the Knauf Settlement Agreement provides no scientific support for Mr. Adams' methodology, because he did not utilize any of the methods therein. Specifically, that protocol requires "[r]emoving and replacing all drywall in the home"…."Remove and replace all electrical wiring (including low voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards… Remove and replace all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms… Replace all copper gas lines and fittings" and more. (Rec. Doc. 12061-14, p. 2-3). Mr. Adams recommends replacement of very few of these items, as shown in Table 1., attached as Exhibit 5 to the Gharibs' motion.

Third, the Gharibs provided a detailed comparison of Mr. Adams' scope of remediation, the CPSC guidelines, and the Court's scope of remediation. (See: Table 1. attached as Ex. 5 to Gharibs' motion). Generally, Mr. Adams' scope is consistent with the CPSC guidelines, but the vast majority of those methods have been criticized by the Court for lacking scientific, practical, safety and economic bases. This is because the CPSC was not designed for litigation purposes; rather, it is "***to assist homeowners*** in making some of the challenging decisions they face

*remediating their homes.*" (Ex. 4 to the Gharibs' motion). It also is expressly limited to those components that might cause a health or safety: "[t]his Remediation Guidance summarizes what the staffs of the U.S. Consumer Product Safety Commission (CPSC) and the U.S. Department of Housing and Urban Development (HUD) believe is ***an effective approach to addressing potential health and safety issues*** to remediate houses affected by problem drywall, given the information now available." (Id. at p. 1). For instance, the CPSC guidelines do not include replacement of electrical wiring, water service plumbing, HVAC (heating, ventilation and air conditioning) evaporator coils, furnishings, and carpeting. According to the CPSC, "[s]taffs of the CPSC and HUD are aware that some remediation efforts have included"…"but ***their replacement is not included in this Guidance because of the absence of a direct connection to safety***."[7] So, even if there is science supporting Mr. Adams' CPSC-based methodology (which Knauf does not reference in its Opposition), Mr. Adams' reliance on that science is misplaced, because it is not the same science we use for litigation purposes, where the goal is to restore the claimant's property to its original condition, not just where a safety risk is posed. Thus, Mr. Adams' methodology is not reliable for purposes of litigation.

    Defendants also set up a strawman argument regarding the issue of Mr. Adams' use of Xactimates. The Gharibs' motion does not challenge his decision to use Xactimate estimates (the Gharibs believe they, too, are entitled to use the same such estimates, see the Gharibs' Motion to Add Expert Disclosures). While the Gharibs' do not agree with the pricing/costs that Mr. Adams' Xactimates generated, the Gharibs' motion is directed to the issue of Mr. Adams' methodology in terms of the areas, components and techniques he recommended for inclusion into his Xactimate

---

[7] Ex. 4 to Gharibs' motion, *Remediation Guidance for Homes with Corrosion from Problem Drywall as of March 15, 2013* by the U.S. Consumer Product Safety Commission and the U.S. Department of Housing and Urban Development, p. 3-4.

reports. The Gharibs view this issue as the scope of remediation, rather than the costs of remediation. The Gharibs' motion challenges the former, but not the latter.

Yet another red herring is Mr. Adams' qualifications. Knauf repeatedly touts their expert's experience in remediating the many properties involved in the Knauf Settlement Agreement, but this has absolutely no relevance in determining whether Mr. Adams' methodologies are supported by well accepted science or safety or practical concerns. The undisputed evidence that the Gharibs have offered shows numerous ways that Mr. Adams' scope of remediation deviates from the Court's and recommends methods that this Court has repeatedly and consistently criticized for lacking any scientific or practical basis.

## CONCLUSION

Based on the foregoing reasons, Mr. Adams' methodology lacks scientific, economic and practical foundation and therefore is unreliable. Thus, Mr. Adams' testimony and his Xactimate estimates should be excluded at trial.

Respectfully submitted,

CRULL, CASTAING & LILLY

BY: */s/ Peter E. Castaing* .
  Edward J. Castaing, Jr. #4022
  Peter E. Castaing, #35019
  Pan American Life Center
  601 Poydras Street, Suite 2323
  New Orleans, LA 70130
  Telephone: (504) 581-7700
  Facsimile: (504) 581-5523
  pcastaing@cclhlaw.com

***Counsel for Jawad Gharib and Fatme Gharib***

## CERTIFICATE OF SERVICE

 I hereby certify that on March 15, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all known counsel of record.

       /s/ *Peter E. Castaing*
        Attorney